# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **JEDIDIAH ISAAC MURPHY,** | § | |
| Petitioner | § | |
| | § | |
| **VS.** | § | **CIVIL NO.  3:10-CV-163-N** |
| | § | |
| **RICK THALER,** | § | |
| **DIRECTOR,** | § | |
| **TEXAS DEPARTMENT** | § | **DEATH PENALTY CASE** |
| **OF CRIMINAL JUSTICE,** | § | |
| **CORRECTIONAL** | § | |
| **INSTITUTIONS DIVISION,** | § | |
| Respondent | § | |

## BRIEF IN SUPPORT OF
## PETITION FOR A WRIT OF HABEAS CORPUS
## OF A PERSON IN STATE CUSTODY

**Richard Wetzel**                     **Randy Schaffer**
**State Bar No.  21236300**            **State Bar No. 17724500**

**1411 West Ave., Suite 100**          **The Schaffer Firm**
**Austin, Texas 78701**                **1301 McKinney, Suite 3100**
**(512) 469-7943**                     **Houston, Texas 77010**
**wetzel_law@1411west.com**            **(713) 951-9555**
                                       **(713) 951-9854 (facsimile)**
                                       **noguilt@swbell.net (e-mail)**

**Attorneys for Petitioner**
**JEDIDIAH ISAAC MURPHY**

## <u>SUBJECT INDEX</u>

<u>Page</u>

CUSTODY ........................................................................................ 1

CHRONOLOGY OF THE PROCEEDINGS ....................................... 1

ISSUES PRESENTED ...................................................................... 3

STATEMENT OF FACTS................................................................. 4

THE STATE HABEAS CORPUS PROCEEDING. ........................... 14

STANDARD OF FEDERAL HABEAS CORPUS REVIEW........................... 25

GROUND ONE ................................................................................ 28

        THE STATE SUPPRESSED EVIDENCE MATERIAL TO
        PUNISHMENT REGARDING SHERYL WILHELM'S
        UNCERTAINTY THAT PETITIONER WAS THE MAN
        WHO KIDNAPPED HER FROM A HOSPITAL PARKING
        LOT AND PRESENTED FALSE TESTIMONY THAT
        SHE WAS CERTAIN THAT HE WAS HER ASSAILANT.

    A.    The Standard Of Review ................................................ 28

    B.    The Suppressed Evidence And False Testimony ......................... 30

    C.    Materiality ................................................................... 34

GROUND TWO................................................................................ 36

    PETITIONER WAS DENIED THE EFFECTIVE
    ASSISTANCE OF COUNSEL AT THE PUNISHMENT
    STAGE.

    A.    The Standard Of Review ................................................ 36

    B.    Deficient Performance................................................... 38

**Page**

    1.   Counsel failed to present testimony regarding the distances between particular locations in Arlington, Wichita Falls, and Terrell in order to demonstrate that petitioner could not have kidnapped Sheryl Wilhelm in Arlington at 11:30 a.m., robbed Marjorie Ellis in Wichita Falls at 8:30 p.m., and clocked in at work in Terrell at 11:54 p.m ................................................... 38

    2.   Counsel failed to correct the false impression that the prosecution created on cross-examination of psychologist Mary Connell that the leading experts in the country on the interpretation of the MMPI-II and MCMI-III evaluated petitioner's test results and concluded that he could not be controlled, successfully treated, or rehabilitated .................................... 41

    3.   Counsel made an unsound strategic decision to call psychiatrist Jaye Crowder to testify and to elicit and open the door to extremely prejudicial testimony ............... 48

    4.   Counsel failed to object to Detective Matt Myers' opinion testimony that petitioner was lying about not remembering the location of the abduction ................... 52

    5.  Counsel failed to object to the prosecutor's argument that petitioner told the police that the shooting was an accident in an effort to be acquitted ................................ 53

C.    Prejudice ..................................................................... 54

GROUND THREE ........................................................... 58

PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-INNOCENCE STAGE.

A.    The Standard Of Review .............................................. 58

**Page**

    B.     Deficient Performance ..................................................... 58

            1.     Counsel failed to object to testimony regarding petitioner's post-arrest silence ............................................ 58

            2.     Counsel opened the door to police opinion testimony that petitioner was not telling the truth .............. 60

            3.     Counsel failed to object to the argument that the jury had to acquit petitioner of capital murder before it could consider the lesser included offenses .............................................................. 61

    C.     Prejudice ...................................................................... 63

GROUND FOUR ............................................................... 65

       THE STATE COURT DECISION THAT EXCUSING VENIREPERSON TREAT FOR CAUSE DID NOT VIOLATE THE FOURTEENTH AMENDMENT WAS CONTRARY TO OR INVOLVED AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT AND WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE *VOIR DIRE* RECORD.

GROUND FIVE ................................................................ 70

       THE STATE COURT DECISION THAT PETITIONER WAS NOT PROHIBITED FROM ASKING A PROPER QUESTION REGARDING VICTIM IMPACT AND CHARACTER EVIDENCE DURING THE *VOIR DIRE* EXAMINATION WAS CONTRARY TO OR INVOLVED AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT AND WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE *VOIR DIRE* RECORD.

**Page**

CONCLUSION ................................................................................   75

CERTIFICATE OF SERVICE ..........................................................   75

# INDEX OF AUTHORITIES

**Cases**          **Page**

Adams v. Texas, 448 U.S. 38 (1980) ................................................................ 68

Alcorta v. Texas, 355 U.S. 28 (1957) ............................................................ 29

Aldridge v. United States, 283 U.S. 308 (1931) ............................................. 72

Andrews v. State, 159 S.W.3d 98 (Tex. Crim. App. 2005) ............................ 54, 63

Barrios v. State, 283 S.W.3d 348 (Tex. Crim. App. 2009) ............................. 63

Brady v. Maryland, 373 U.S. 83 (1963) ......................................................... 28

Brown v. State,  974 S.W.2d 289 (Tex. App.—San Antonio 1998,
        pet. ref'd) ......................................................................... 60, 61, 63

Chambers v. Thompson, 903 S.W.2d 21 (Tex. Crim. App. 1995) ................. 71

Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388 (2011) ........................... 26

Davis v. State, 831 S.W.2d 426 (Tex. App.—Austin 1992, pet. ref'd) ........... 29

Doyle v. Ohio, 426 U.S. 610 (1976) ............................................................... 59

Ex parte Adams, 768 S.W.2d 281 (Tex. Crim. App. 1989) ............................ 28

Ex parte Drinkert, 821 S.W.2d 953 (Tex. Crim. App. 1991) ......................... 54, 63

Ex parte Duffy, 607 S.W.2d 507 (Tex. Crim. App. 1980) .............................. 40

Ex parte Guzmon, 730 S.W.2d 724 (Tex. Crim. App. 1987) ......................... 47

Ex parte Reynoso, 257 S.W.3d 715 (Tex. Crim. App. 2008) ......................... 17

Fernandez v. State, 830 S.W.2d 693 (Tex. App.—Houston [1st Dist.] 1992,
        no pet.) ....................................................................................... 51

**Page**

Garcia v. State, 712 S.W.2d 249 (Tex. App.—El Paso 1986, pet. ref'd) ........   52

Giglio v. United States, 405 U.S. 150 (1972) ...................................   29

Gray v. Mississippi, 481 U.S. 648 (1987)  ........................................   68

Ham v. South Carolina, 409 U.S. 524 (1973) ....................................   72

Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770 (2011) .............................   26

Henderson v. Cockrell, 333 F.3d 592 (5th Cir. 2003) ...................................   28

Hernandez v. State, 988 S.W.2d 770 (Tex. Crim. App. 1999)........................   37

Jackson v. State, 857 S.W.2d 678 (Tex. App.—Houston [14th Dist.] 1993,
           pet. ref'd)...................................................................   51

Jones v. State, 850 S.W.2d 223 (Tex. App.—Fort Worth 1993, pet. ref'd) ....   29

Kyles v. Whitley, 514 U.S. 419 (1995) ....................................... 30, 37, 58

Lyons v. McCotter, 770 F.2d 529 (5th Cir. 1985)...........................................   38

Martinez v, Ryan, ___ U.S. ___, 2012 WL 912950 (2012) ...................... 23, 24, 25

McMann v. Richardson, 397 U.S. 759 (1970)...................................................   36

Mickens v. Taylor, 535 U.S. 162 (2002) ........................................................   72

Miles v. State, 644 S.W.2d  23 (Tex. App.—El Paso 1982, no pet.)  .............   61

Miller-El v. Cockrell, 537 U.S. 322 (2003)........................................................   26

Mosley v. State, 983 S.W.2d 249 (Tex. Crim. App. 1998) .............................   73

Mu'Min v. Virginia, 500 U.S. 415 (1991) .......................................................   72

**Page**

Murphy v. State, 112 S.W.3d 592 (Tex. Crim. App. 2003), cert. denied,
541 U.S. 940 (2004)............................................. 1, 67, 68, 72, 73

Nance v. Ozmint, 626 S.E.2d 878 (S.C. 2006) ................................. 47-48

Ortiz v. Quarterman, 504 F.3d 492 (5th Cir. 2007) ......................... 68

Payne v. Tennessee, 501 U.S. 808 (1991) ........................................ 72

Perrero v. State, 990 S.W.2d 896 (Tex. App.—El Paso 1999, pet. ref'd)........ 47

Powell v. Alabama, 287 U.S. 45 (1932) ........................................... 36

Riascos v. State, 792 S.W.2d 754 (Tex. App.—Houston [14th Dist.] 1990,
pet.ref'd) .................................................................... 61

Russeau v. State, 171 S.W.3d 871 (Tex. Crim. App. 2005) ............................ 49

Sanchez v. State, 707 S.W.2d 575 (Tex. Crim. App. 1986) ............................ 59

Schutz v. State, 957 S.W.2d 52 (Tex. Crim. App. 1997) ................................ 52, 61

Soffar v. Johnson, 237 F.3d 411 (5th Cir. 2000) ................................. 40

St. Aubin v. Quarterman, 470 F.3d 1096 (5th Cir. 2006) ................................ 51

State v. Thomas, 768 S.W. 2d 335 (Tex. App—Houston [14th Dist.] 1989,
no pet.) ................................................................... 40

Strickland v. Washington, 466 U.S. 668 (1984).................................. 36, 37, 40, 58

Strickler v. Greene, 527 U.S. 262 (1999) ........................................ 28

Thompson v. State, 9 S.W.3d 808 (Tex. Crim. App. 1999) ............................ 23

United States v. Agurs, 427 U.S. 97 (1976) ..................................... 28

United States v. Bagley, 473 U.S. 667 (1985).................................... 29

**Page**

United States v. Hale, 422 U.S. 171 (1975)......................................................... 59-60

Wainwright v. Witt, 469 U.S. 412 (1985) .......................................... 68

White v. Thaler, 610 F.3d 890 (5th Cir. 2010) ....................................... 60

Williams v. Taylor, 529 U.S. 362 (2000) ........................................ 25, 26

Winn v. State, 871 S.W.2d 756 (Tex. App.—Corpus Christi 1993, no pet.) ....... 60

Witherspoon v. Illinois, 391 U.S. 510 (1968) ...................................67, 68

## Constitutional Provisions

U.S. CONST. amend. V .................................................................. 28

U.S. CONST. amend. VI ................................................................. 36

U.S. CONST. amend. XIV.............................................................28, 36

## Federal Statutory Provisions

28 U.S.C. § 2254 (a)(1) ................................................................ 26

28 U.S.C. § 2254 (d)(1) ................................................................ 25

## State Statutory Provisions

TEX. CODE CRIM. PROC. art. 11.071, § 4(a) (West 2010)....................................... 16

TEX. CODE CRIM. PROC. art. 11.071, § 4(b) (West 2010)....................................16, 18

TEX. CODE CRIM. PROC. art. 35.16, § (b)(3) (West 2010)....................................... 67

TEX. CODE CRIM. PROC. art. 37.071, § (e) (West 2010)........................................ 56

**Page**

TEX. PENAL CODE § 19.02(b)(3) (West 2010) ...................................................   53

TEX. PENAL CODE § 20.04(b) (West 2010) ........................................................   53

## Rules

TEX. R. APP. P. 21.4.............................................................................................   24

TEX. R. EVID.702..................................................................................................   61

## CUSTODY

Petitioner is illegally restrained of his liberty in the Texas Department of Criminal Justice, Correctional Institutions Division, pursuant to a judgment of the 194th District Court of Dallas County.

## CHRONOLOGY OF THE PROCEEDINGS

Petitioner pled not guilty to capital murder in cause number F-00-02424-NM in the 194th District Court of Dallas County before the Honorable Harold Entz. A jury convicted him and, based on its answers to the special issues, the court sentenced him to death on June 30, 2001. Dallas County Assistant Public Defenders Michael Byck, Jennifer Balido, and Jane Little represented him.

The Court of Criminal Appeals affirmed petitioner's conviction in a published opinion issued on June 25, 2003. The Supreme Court denied certiorari on March 22, 2004. Murphy v. State, 112 S.W.3d 592 (Tex. Crim. App. 2003), cert. denied, 541 U.S. 940 (2004). Adam Seidel represented him.

Petitioner filed a state habeas corpus application in the trial court in cause number W-00-02424-A on May 12, 2003. The trial court adopted the State's proposed findings of fact and conclusions of law and recommended that relief be denied on October 15, 2008. The Court of Criminal Appeals denied relief with written order on March 25, 2009; and, on June 17, 2009, it declined to act on petitioner's suggestion that it reconsider on its own initiative the denial of habeas

1

corpus relief.  Ex parte Murphy, No. WR-70,832-01 (Tex. Crim. App. 2009). Robert Abbott represented him in the trial court; Randy Schaffer and Richard Wetzel represented him in the Court of Criminal Appeals.

Petitioner filed a federal habeas corpus petition in the Northern District of Texas in cause number 3:10-CV-163-N on January 28, 2010.  He raised unexhausted claims of ineffective assistance of counsel at the guilt-innocence and punishment stages and a claim that the prosecution suppressed favorable impeachment evidence and presented false testimony.  He requested, *inter alia*, that the district court stay and abate the federal proceeding so he could return to state court to raise the unexhausted claims.  The respondent joined in that request. This Court stayed and abated the federal proceeding on June 8, 2010.

Petitioner filed a subsequent state habeas corpus application in the trial court in cause number W00-02424-M(B) raising the unexhausted claims on July 13, 2010.  On October 6, 2010, the Court of Criminal Appeals dismissed the ineffective assistance of counsel claims as an abuse of the writ without considering the merits but remanded the suppression of evidence/false testimony claim for an evidentiary hearing to determine whether the factual basis for the claim was ascertainable through the exercise of reasonable diligence on or before the date the initial application was filed.  Ex parte Murphy, No. WR-70,832-02 (Tex. Crim. App. 2010).  The Court of Criminal Appeals denied rehearing on the ineffective

assistance of counsel claims on November 17, 2010.

The trial court conducted an evidentiary hearing on the suppression of evidence/false testimony claim on February 21, 2011.  It found that the claim could have been discovered and raised at the time the initial application was filed and recommended that the claim be dismissed or denied.  The Court of Criminal Appeals dismissed the application as an abuse of the writ without considering the merits of the claim on March 21, 2012.  Ex parte Murphy, No. WR-70,832-02 (Tex. Crim. App. 2012).

Petitioner is refiling the federal petition within 45 days after the Court of Criminal Appeals ruled on the subsequent state application as required by this Court's order of June 8, 2010.

## **ISSUES PRESENTED**

1. Whether the State suppressed evidence material to punishment regarding Sheryl Wilhelm's uncertainty that petitioner was the man who kidnapped her from a hospital parking lot and presented false testimony that she was certain that he was her assailant.

2. Whether petitioner was denied the effective assistance of counsel at the punishment stage.

3. Whether petitioner was denied the effective assistance of counsel at the guilt-innocence stage.

4.  Whether the state court decision that excusing venireperson Treat for cause did not violate the Fourteenth Amendment was contrary to or involved an unreasonable application of Supreme Court precedent and was based on an unreasonable determination of the facts in light of the *voir dire* record.

5.  Whether the state court decision that petitioner was not prohibited from asking a proper question regarding victim impact and character evidence during the *voir dire* examination was contrary to or involved an unreasonable application of Supreme Court precedent and was based on an unreasonable determination of the facts in light of the voir dire record.

## STATEMENT OF FACTS

**A.  The Guilt-Innocence Stage**

Eighty-year-old Bertie Cunningham left her home in Garland in her car to go shopping on the afternoon of October 4, 2000 (47 R.R. 24-26).  She used her sister Frances Connor's credit card to make a purchase at J.C. Penney's at 2:55 p.m. (47 R.R. 43-47).  When she did not return home at the expected time, her sister Evelyn Shelton called the police and reported her missing (47 R.R. 30-33).

Petitioner had two drinks at a bar in Garland about 1:30 p.m. that day.   He told the bartender that he left his wallet in a cab, and he left the bar without paying for the second drink (47 R.R. 48-57).

Petitioner picked up Zach Mamot at his home in Richardson about 5:30 p.m. (47 R.R. 70-75).  Petitioner said that his girlfriend had given him the car he was driving and two credit cards (47 R.R. 89, 93-94).   They went to a store, where

4

petitioner used one of Cunningham's credit cards to buy three Go-Peds about 6:45 p.m. (47 R.R. 122-26, 134).  Petitioner told the clerk that the card belonged to his mother (47 R.R. 98-99).  Petitioner took Zach home, displayed a gun, and said that he was "wanted" and was going to Key West with his girlfriend (47 R.R. 102, 104).

Someone attempted to use Cunningham's credit card to make a withdrawal at an ATM machine in the late afternoon and evening of October 4 and in the early morning of October 5 but could not do so without the PIN number (47 R.R. 148-52).

Petitioner went to the home of Treshod Tarrant's grandmother in Edgewood on October 5 (47 R.R. 164-67, 201).  He had Cunningham's car; told Tarrant about his new girlfriend, Bertie; and showed him two credit cards—one in the name of Bertie Cunningham (47 R.R. 202, 204-05).  Petitioner and Tarrant went out, and petitioner used a card to make purchases at a liquor store, restaurant, and gas station (47 R.R. 152-53, 158-59, 207-12).

The police arrested petitioner at Tarrant's grandmother's home on the morning of October 6 and advised him of his rights (47 R.R. 172-73, 221; 48 R.R. 78-79).  The police saw blood on the rear bumper of Cunningham's car, opened the trunk, and smelled a pungent odor (48 R.R. 82-83).  Officer Jason Bonham, who knew petitioner from high school, persuaded him to take them to Cunningham's

body (50 R.R. 62, 70-71). Petitioner told Bonham, "It just went off, it was an accident" (50 R.R. 74). Petitioner directed the officers to a creek two or three miles away, where they found her body wrapped in a duffle bag (48 R.R. 86, 90-91). A justice of the peace advised petitioner of his rights (48 R.R. 21, 25-31).

The police found property belonging to Cunningham and petitioner in her car (49 R.R. 88-95). They did not find her watch and two rings, which she always wore (47 R.R. 37-38). She died as a result of a "loose contact" gunshot wound to the forehead (49 R.R. 39, 42, 44, 50).

Petitioner signed a statement at the police station at 11:30 a.m. (48 R.R. 174-81). He said that he was hitchhiking; Cunningham gave him a ride; he told her to pull into a parking lot and get into the trunk; and she complied (48 R.R. 182-83). As he transferred a gun from his right hand to his left hand and reached for the trunk lid, the gun discharged unintentionally (48 R.R. 183-84). He alluded to a lack of feeling in his left hand (48 R.R. 183).

Shirley Bard and Harlan Bailey, who previously worked with petitioner, testified that he used both hands as a welder and did not mention a problem with his left hand (49 R.R. 178-84, 186-89). Bailey testified that petitioner injured his left thumb at work on June 22, 2000, had surgery, and thereafter said that he had no feeling in his thumb (49 R.R. 189-91). Doctor William Vandiver, an orthopedic surgeon, testified that he successfully repaired a ruptured ulnar collateral ligament

in petitioner's left thumb in June of 2000 (49 R.R. 192-97).  Petitioner told Dr. Vandiver in July and August that he was unable to weld because of numbness; but nerve conduction studies in September did not conclusively show any damage (49 R.R. 197-201).

Dr. John Krusz, a neurologist, examined petitioner's left hand after his arrest (51 R.R. 7-9).  Nerve testing revealed severe neuropathy below the wrist, a loss of sensation, and numbness in the fingers and thumb that could cause difficulty in manipulating fine objects (51 R.R. 21-23).   Ed Hueske, a consulting forensic scientist, testified about how a firearm can discharge unintentionally (50 R.R. 90-95).

The court instructed the jury on capital murder, murder, and manslaughter (1 C.R. 181-83).  Defense counsel argued that the jury should convict petitioner of murder or manslaughter because he did not intentionally kill Cunningham (52 R.R. 31-36).  The prosecutor acknowledged that intent to kill was the only disputed issue and argued that petitioner needed money, abducted Cunningham, and killed her to eliminate a witness (52 R.R. 42-44).  Petitioner's conduct in leaving her body in a creek and using her credit cards was inconsistent with an accidental killing (52 R.R. 45-47).  The jury convicted him of capital murder.

**B.      The Punishment Stage**

Mandy Kirl testified that she and petitioner left a high school graduation party to obtain firewood in 1993 (54 R.R. 4, 6-7).[1]  They drove to a wooded area where he put a gun to her head and asked if she were afraid to die (54 R.R. 9, 11). She said, "No" (54 R.R. 11).  She said that she was ready to go back, and they returned to the party (54 R.R. 13).  She did not report this to the police because she was underage and drinking.  She told Treshod Tarrant about the incident, and he brought prosecutors to her home several weeks before she testified (54 R.R. 17-18).

Petitioner stole cash and jewelry from an unlocked safe at a friend's home on April 5, 1994, when he was 18 years old (53 R.R. 8-9, 11-15, 19).  He pled guilty to burglary of a habitation and was placed on probation for ten years (53 R.R. 54-55; 62 R.R. SX 128).

Petitioner participated in stealing property from a car on May 26, 1994 (53 R.R. 21-24, 37-38).  He pled guilty to burglary of a motor vehicle and was placed on probation for ten years (53 R.R. 52-53; 62 R.R. SX 128).

Petitioner was a passenger in a stolen truck that was stopped by the police on August 30, 1995 (53 R.R. 57-65).  He pled guilty to auto theft and was placed on probation for five years (53 R.R. 56; 62 R.R. SX 129).

---

[1] Petitioner was 17 years old at the time.

A police officer stopped a car driven by petitioner because of a traffic violation and found a bag of marijuana on March 14, 1996 (53 R.R. 67-76). He pled guilty to misdemeanor possession of marijuana and was sentenced to two days in jail and a $500 fine (62 R.R. SX 130).

An officer responding to a call regarding a disturbance at a trailer park on August 17, 1997, took a knife from petitioner and arrested him for assaulting his girlfriend, Chelsea Willis, and her friend, Jean Evans (53 R.R. 78-94). The charges were dismissed (53 R.R. 88, 90, 94).

Sheryl Wilhelm testified that a man forced her into her car in the parking lot of Arlington Memorial Hospital in Arlington on August 26, 1997, at 11:30 a.m. (53 R.R. 126-32). He choked her, made her get on the floor, and drove away (53 R.R. 136-40). She jumped out of the car on the highway, and the man kept driving (53 R.R. 142-43). She described the man to the police as a white male; 20-25 years old; dark hair, short on top, and shaved around the back and sides; an "after five" beard; 5'10"; thin; and wearing a hoop earring (53 R.R. 133, 144-45).

A man attacked 69-year-old Marjorie Ellis and stole her purse during a struggle outside Braum's Ice Cream Shop in Wichita Falls on August 26, 1997, shortly before 8:30 p.m. (57 R.R. 13-16, 32). Felix Ozuna chased the man a short distance before stopping (57 R.R. 20). Ellis and Ozuna described the man to the

police as a tall, slender, Hispanic or white male with an olive complexion (57 R.R. 22, 31).

Wilhelm's car, containing property belonging to Ellis, was found abandoned on the side of a highway in Wichita Falls on the morning of August 27, 1997 (57 R.R. 17, 24, 32).  Wilhelm worked with Detective Doug Ligon of the Arlington Police Department to make a composite sketch of her assailant on September 4, 1997 (53 R.R. 158, 166, 208-14; 62 R.R. SX 141).

Over three years later, Wilhelm saw petitioner on a televised news account of his arrest for kidnapping and killing Cunningham (53 R.R. 150).  She read a newspaper article about his arrest, researched him on the internet, and spoke to her mother, who told her that he looked like the man in her composite sketch (53 R.R. 151-52).  She called Detective John Stanton of the Arlington Police Department and provided this information (53 R.R. 151, 194).[2]

Detective Stanton showed Wilhelm a photospread containing six photos on November 3, 2000 (53 R.R. 178, 195-96).  She selected petitioner's photo (53 R.R. 179, 197-98).  She testified that she had no doubt that petitioner was her assailant

---

[2]     Dr. Leon Peek, a psychologist, testified that petitioner had two distinctive facial features—protruding ears and low, bushy eyebrows—that did not appear in the composite sketch of the assailant (54 R.R. 46-48).  Dr. Peek believed that what Wilhelm saw on television and read in the newspaper changed her memory from what it had been following the offense and that her identification of petitioner was based on her re-created memory (54 R.R. 51-52, 56-57).

when she identified him in the photospread and in court (53 R.R. 179).[3]  Stanton testified that her identification was one of the better ones he had seen in 16 years as a detective (53 R.R. 197).[4]

The prosecutor repeatedly asserted in his questions that petitioner robbed Ellis in Wichita Falls. After defense counsel elicited from Wichita Falls Police Department Detective Kyle Cook that Ellis gave a vague description of her assailant, the prosecutor elicited that Ellis subsequently gave a description that matched Wilhelm's (57 R.R. 22, 27-28). The prosecutor asked Chelsea Willis, petitioner's girlfriend, whether she would consider him to be a sweet person if she learned that he robbed an elderly woman in Wichita Falls on the same day that he kidnapped a woman in Arlington (57 R.R. 152).  He asked psychologist Mary Connell whether she tried to talk to Marjorie Ellis of Wichita Falls and whether petitioner ever mentioned robbing Ellis in Wichita Falls (58 R.R. 74, 100).  He asked psychiatrist Jaye Crowder whether his opinions or diagnosis of petitioner

---

[3]  Wilhelm initially failed to identify petitioner in the courtroom during a pretrial hearing (45 R.R. 106, 109-11, 114).  She explained to the jury that she failed to identify him because he was wearing glasses, his hairstyle was different, and she assumed that everyone at the counsel table was a lawyer (53 R.R. 157-58, 164, 176-77).

[4]  Dr. Peek testified that the photospread was unfair because three of the photos were not even close to Wilhelm's description of the assailant and the photos should have been shown to her sequentially instead of together (54 R.R. 52-54).

would change if he learned that petitioner robbed an elderly woman in Wichita Falls (58 R.R. 184).[5]

Shirley Bard, who previously worked with petitioner, testified that he cursed and threatened to kill her during an argument in 2000 (59 R.R. 190-203).   He subsequently apologized to her (59 R.R. 208).

The defense presented testimony regarding petitioner's troubled childhood. His father was an alcoholic who spanked him with a belt and beat his mother in front of him (57 R.R. 39, 72-73, 169-70, 229-31, 239-40).   When his parents divorced, they abandoned their six children (57 R.R. 38-39).   He lived with his paternal grandparents, went to an orphanage, and returned to his grandparents (57 R.R. 39-40).   The Tolar family adopted him when he seven or eight years old (57 R.R. 41).   Mr. Tolar was violent and mean, and his adoptive brothers beat him (57 R.R. 43-44, 75, 77).[6]   He next lived in a children's shelter (57 R.R. 44).   The Murphy family then adopted him (57 R.R. 45).   Mr. Murphy had a bad temper, abused his wife, and was strict with petitioner (59 R.R. 134-36).   When the Murphys' marriage failed, they used petitioner as a "pawn" in their divorce (59 R.R. 137).

---

[5]   The defense presented evidence that petitioner clocked out of work at Aavid Thermalloy Technologies (Aavid) in Terrell on August 26, 1997, at 8:02 a.m. and clocked back in at 11:54 p.m. (53 R.R. 206-07; 59 R.R. 102; 65 R.R. DX 68).

[6]   Terry Tolar testified that he never abused petitioner (59 R.R. 161).

12

Petitioner had long-standing problems with alcohol, marijuana, and pills (57 R.R. 113, 147).  He was hospitalized in several psychiatric facilities as a teenager (57 R.R. 67, 80, 85, 124, 237-38; 63 R.R. SX 145; 64 R.R. SX 146-47).

Petitioner was smart, funny, popular, and made good grades in school (54 R.R. 126, 131; 57 R.R. 103).  He was remorseful and apologetic after he mistreated Willis (57 R.R. 127-28).  He was a good father to his daughter, born in 1997, and Willis's other child (57 R.R. 115-116, 121-22, 219-20).

Petitioner demonstrated remorse when the police questioned him about Cunningham's murder (59 R.R. 103-04).  In an apparent suicide attempt, he cut his neck and wrist with a razor blade in the Dallas County Jail while awaiting trial (54 R.R. 75-82, 85).[7]

Mary Connell, a psychologist, testified that petitioner engaged in intermittent violence associated with drinking but was otherwise warm, outgoing, and loving (58 R.R. 51).  He had six different placements during childhood, was abused emotionally, and became chronically depressed (58 R.R. 21, 48-49, 67).  He felt abandoned by people close to him, perceived himself as unworthy of love, and became self-destructive (58 R.R. 51-52).

Jaye Crowder, a psychiatrist, testified that petitioner was chronically depressed, dependent on alcohol, narcissistic, and had a borderline personality

---

[7]  A jailer testified that this did not appear to be a serious suicide attempt (54 R.R. 114).

disorder with anti-social features (58 R.R. 135-36). He had a genetic predisposition to depression because of mental illness and alcohol abuse in his family (58 R.R. 137). He was abandoned by his parents and constantly displaced during childhood, which led to an insecure sense of self and a poorly formed identity, resulting in chronic instability during early adulthood with episodes of emotional and impulsive lack of control (58 R.R. 137, 141, 146-47). He probably would not be dangerous in prison but might be on the outside (58 R.R. 199, 201).[8]

Gilda Kessner, a clinical and forensic psychologist, testified that petitioner probably would not be dangerous in the future because he had not committed any assaults while confined, was amenable to mental health treatment, and had family support (59 R.R. 50, 57-58). He could be placed in closed custody, administrative segregation, or a "supermax" facility (59 R.R. 52-53).

## THE STATE HABEAS CORPUS PROCEEDING

Judge Harold Entz appointed Adam Seidel to represent petitioner on appeal and James Johnston, Jr, to represent him in the article 11.071 habeas corpus proceeding on June 30, 2001.[9] Judge Entz removed Johnston because he was no longer on the list of attorneys approved by the Court of Criminal Appeals for

---

[8] Dr. Crowder testified that conduct of this nature tends to remit when a person is in his thirties and forties, especially if he is in a controlled environment (58 R.R. 147).

[9] Article 11.071 of the Texas Code of Criminal Procedure governs death penalty habeas corpus proceedings.

appointment as death penalty counsel and appointed Robert Abbott on October 4, 2001.[10]   The Court of Criminal Appeals approved Abbott's appointment on November 7, 2001.

Seidel filed an appellate brief raising 20 points of error.  The State filed its brief on December 27, 2002.   The Court of Criminal Appeals affirmed the conviction on June 25, 2003.  The Supreme Court denied certiorari on March 22, 2004.

Abbott filed a habeas corpus application in the trial court on May 12, 2003.[11] He raised 23 grounds for relief.  Grounds one through four, which complained of the denial of challenges for cause to two veniremen, could have been but were not raised on appeal.  Grounds five through 23 re-urged issues that were raised and rejected on appeal.  The State filed an answer on November 7, 2003, asserting that every ground was procedurally barred, either because it was raised and rejected on appeal or could have been but was not raised on appeal.

Mary Miller, who assisted lead prosecutor Greg Davis at petitioner's trial, became the judge of the 194th District Court in November of 2002.  She recused

---

[10] A lawyer cannot be appointed in an article 11.071 habeas corpus proceeding unless he is on a list of attorneys approved by the Court of Criminal Appeals.

[11] The cover page of the document lists Jan Hemphill as co-counsel.  Hemphill testified at the state court evidentiary hearing that, although she was not appointed by the court, she assisted Abbott by reading the record, speaking to trial counsel, accompanying Abbott to interview petitioner, and speaking to a witness who was in jail (H.R.R. 201).

herself from petitioner's case on April 28, 2005.[12]

On June 9, 2006, the Court of Criminal Appeals held Abbott in contempt, fined him $500, and removed him as article 11.071 counsel in Ex Parte Sheldon Ward, No. WR-64,276-01, because he failed to timely file the application challenging Ward's conviction and death sentence. The court appointed new counsel for Ward and gave him 270 days to file the application. The court also removed Abbott from the list of attorneys approved for appointment as article 11.071 counsel.

Present counsel were hired to review petitioner's case in August of 2008. They discovered that Abbott had not timely filed the application; as a result, it was subject to dismissal. Article 11.071, section 4(a) of the Code of Criminal Procedure provides that the application must be filed in the trial court no later than the 180th day after counsel was appointed or the 45th day after the State's brief was filed on direct appeal, whichever date is later. The State's brief was filed on December 27, 2002. The application was due on February 10, 2003. It was filed on May 12, 2003. Section 4(b) permits one 90-day extension of time to file the application if requested "before the filing date that is applicable . . . ." Abbott filed a motion for extension of time on March 24, 2003, 42 days after the deadline to file the application. Thus, the motion was untimely, and the trial court lacked the

_____

[12] The case remained dormant until present counsel became involved in 2008.

16

authority to grant an extension.  See Ex Parte Reynoso, 257 S.W. 3d 715, 722 (Tex. Crim. App. 2008).

On October 10, 2008, present counsel filed a motion to substitute counsel conditioned on the Court of Criminal Appeals granting a 270-day extension of time to supplement Abbott's untimely application.  The State joined in that request and further requested that the trial court certify that the application filed by Abbott was untimely because the motion for extension of time was untimely.  Sitting by assignment, Judge Entz declined to take the statutorily mandated action suggested by the parties.  Instead, on October 15, 2008, he adopted the State's previously filed proposed findings of fact and conclusions of law and recommended that relief be denied on the application filed by Abbott.  The case was transferred to the Court of Criminal Appeals.

On February 4, 2009, the Court of Criminal Appeals entered an order that the application was untimely and that Abbott had to file an affidavit "setting out good cause for his failure to timely file the motion for extension which resulted in the untimely filing of applicant's application."

Abbott filed an affidavit on February 17, 2009.  He asserted that, if article 11.071 authorized extensions in 2003 only "before the filing date that is applicable," he never noticed it, and that it was "difficult to believe that language

was in the statute back in 2003."[13]   He further asserted that it was "common practice" in Dallas County for attorneys to file untimely motions for extension of time and suggested that he made "an honest mistake."   Not content simply to explain why he filed an untimely motion for extension of time, he made an impassioned plea that the court deny relief without allowing petitioner to file another application:

> I completely understand why Mr. Murphy and his new counsel want to start the habeas process all over again from the beginning.  Mr. Murphy has already received a six-year reprieve while his case lay dormant in the trial court.  It can only work to his benefit to get another year to investigate and prepare additional grounds, especially since the trial court has already entered unfavorable findings against him.  What I do not understand is the State's acquiescence in this.

> Mr. Murphy, of course, needs counsel to represent him in the remaining state habeas proceedings.  Since I am no longer on the list of attorneys qualified to handle 11.071 cases, this Court should either substitute new counsel or remand the cause to the trial court for the appointment of replacement counsel.  I, on the other hand, deserve to be paid for the work that I did six years ago to investigate, prepare, and file the writ application on Mr. Murphy's behalf.  This Court can accomplish both of these objectives and do substantial justice by the parties, however, without setting aside the current writ application and trial court findings.

> This Court should not turn back the clock to 2003 at the urging of Mr. Murphy's new counsel.  This would effectively vitiate the work by not only the undersigned appointed counsel and the State, but also the trial court who had the case under consideration for almost six years.

---

[13]   Article 11.071, section 4(b) required in 2003 that a motion for extension of time be filed "before the filing date that is applicable."  That Abbott swore under oath in 2009 that he did not believe that this statutory language existed in 2003, without reading the statute, demonstrated that he is not only lazy but also incompetent.

Even if 11.071 did not expressly authorize the trial court to grant a late extension motion in this case, such authority may be inferred. In addition, both parties waived any right to complain about this matter by not objecting for an extended period of time. The doctrine of laches also comes to mind. Habeas Counsel (me), the State and the trial court all treated Mr. Murphy's writ application as timely and valid for almost six years. This Court should hold that such circumstances prohibit substitute counsel from injecting himself into the cause now and raising the issue at this late juncture.

Moreover, neither side has suffered any harm as a result of the late extension motion: Mr. Murphy presented his habeas issues to the trial court, and the State obtained a favorable ruling. Only if this Court voids the existing writ application and the proceedings conducted thereon does Mr. Murphy suffer any harm to his habeas rights. To return to square one now constitutes a needless waste of time and judicial resources when Mr. Murphy suffered no prejudice from the extension motion being filed on March 23 rather then [sic] February 10.

Lastly, I note that nothing in article 11.071 prohibits this Court from exercising it's [sic] inherent power to regulate it's [sic] docket. Under the unusual circumstances of this case, this Court may grant an out-of-time extension to restore the parties to the same position they thought they were in before substitute counsel discovered the extension oversight. To retroactively return to the original date (February 10, 2003) and nullify everything since then sets a horrible precedent. Judge Entz apparently thought so too when he denied the "State's Proposed Statement By The Trial Court."

For all of the reasons detailed above, the undersigned counsel urges this Court to follow Judge Entz' [sic] lead. Otherwise, current and future 11.071 applicants will surely scour old records for extension motions or writ applications that were filed even a day late; they will seek a free "do over" many years afterward as Mr. Murphy seeks in the present case. This concept constitutes a giant step backwards to the days of "fundamental error," when convictions were routinely reversed years after the fact and without timely objection. Interpreting article 11.071 in this way would prolong and hinder the

disposition of habeas litigation rather than streamlining and expediting it as the Legislature intended.  I, for one, would consider such an outcome in this instance both a grave miscarriage of justice and a complete waste of precious judicial resources.

On March 25, 2009, the Court of Criminal Appeals denied habeas corpus relief even though it concluded that Abbott failed to timely file the motion for extension of time and that his "misreading" of the statute did not constitute good cause.[14]  Petitioner and the State opposed this result; only Abbott requested that relief be denied.

On April 6, 2009, petitioner filed a suggestion that the Court of Criminal Appeals reconsider on its own initiative the denial of habeas corpus relief.  The State notified the Court of Criminal Appeals that it did not oppose the relief requested.  Nonetheless, on June 17, 2009, the Court of Criminal Appeals declined to take action on the suggestion for reconsideration.

Petitioner filed a federal habeas corpus petition in this Court on January 28, 2010.  He raised unexhausted claims of ineffective assistance of counsel at the guilt-innocence and punishment stages and a claim that the prosecution suppressed favorable impeachment evidence and presented false testimony.  He requested, *inter alia*, that this Court stay and abate the federal proceeding so he could return to state court to raise the unexhausted claims.  The respondent joined in that

---

[14]  Abbott did not "misread" the statute; he ignored it.

request.  This Court stayed and abated the federal proceeding on June 8, 2010.

Petitioner filed a subsequent state habeas corpus application on July 13, 2010, raising for the first time claims of ineffective assistance of counsel at the guilt-innocence and punishment stages and that the prosecution suppressed favorable impeachment evidence and presented false testimony.  The Court of Criminal Appeals dismissed the ineffective assistance of counsel claims as an abuse of the writ without considering the merits.  It remanded the suppression of evidence/false testimony claim for an evidentiary hearing to determine whether the factual basis for the claim was ascertainable through the exercise of reasonable diligence on or before the date that the initial application was filed.[15]

Abbott testified at the hearing that he was appointed to represent petitioner in the state habeas corpus proceeding in October of 2001 (H.R.R. 179).  He met with petitioner in May of 2002.  He did not interview any witnesses, including those who testified at the punishment stage regarding the aggravated kidnapping of Sheryl Wilhelm (H.R.R. 189-90).[16]  The State did not disclose to him the information that is the subject of the suppression of evidence/false testimony claim (H.R.R. 186-88).  Had the State done so, he may have raised that claim in the

---

[15]  Petitioner was not allowed to present evidence to support the ineffective assistance of counsel claims at the hearing (H.R.R. 181-82, 194-99).

[16]  Abbott explained that, in his experience, prosecution witnesses in a capital murder case in Dallas County typically will not talk to defense counsel (H.R.R. 190).

initial application (H.R.R. 187).  It never crossed his mind to raise an ineffective assistance of counsel claim (H.R.R. 182-85).

Abbott further testified that he had accepted only one case since 2005, stopped practicing law in 2009 because he had no cases and was "burned out," stopped paying dues to renew his law license, and is currently unemployed (H.R.R. 175-79).  He represented in an affidavit filed in 2006 in the Court of Criminal Appeals in Ex parte Sheldon Ward that, in 2003 and 2004, he neglected the few cases he had due to his "general burnout of interest in pursuing a legal career" (H.R.R. 196-97).

The trial court found that the factual basis for the suppression of evidence/false testimony claim was available when Abbott filed the initial application (Findings 11 and 15 at page 10; Findings 20, 21, and 23 at page 12).[17] The Court of Criminal Appeals dismissed the suppression of evidence/false testimony claim as an abuse of the writ without considering the merits.

Petitioner was denied the effective assistance of counsel in the initial state habeas corpus proceeding.  Abbott was ineffective in failing to conduct an independent investigation, failing to interview any witnesses, failing to discover the factual basis for the suppression of evidence/false testimony claim, failing to

---

[17] These findings are clearly erroneous, as both Wilhelm and Stanton testified at the hearing that they would not have spoken at that time to a lawyer that they knew represented the defendant (H.R.R. 27-29, 63-64).

22

investigate and raise the ineffective assistance of counsel claims, filing an application that did not raise any cognizable claims for relief, opposing petitioner's request for an extension of time to file a new application, and urging the Court of Criminal Appeals to deny relief.  Because the ineffective assistance of counsel and suppression of evidence/false testimony claims were not raised in the initial application, the Court of Criminal Appeals dismissed the subsequent application without considering the merits.   Abbott's ineffectiveness constitutes good cause for the procedural default, and a federal habeas court can consider the unexhausted claims on the merits. See Martinez v. Ryan, ___U.S. ___, 2012 WL 912950, *11 (2012).

The Martinez Court observed that, under Arizona law, the issue of ineffective of assistance of trial counsel cannot be raised on direct appeal and must be raised in a habeas corpus proceeding.  Id. at *1. Similarly, this issue cannot be raised on direct appeal in Texas in the absence of an evidentiary hearing on a motion for new trial unless no sound trial strategy could justify the complained of acts or omissions.  See Thompson v. State, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999).  The Court of Criminal Appeals has advised post-conviction counsel to raise this issue in a habeas corpus proceeding where the record can be fully developed. Id. at 814-15.

Although Texas law does not prohibit an appellant from raising the issue of ineffective assistance of trial counsel on direct appeal, petitioner could not have done so as a practical matter.  He was sentenced to death on June 30, 2001.  He had only 30 days to file a motion for new trial.  <u>See</u> TEX. R. APP. P. 21.4.  Thus, appellate counsel had to file a motion for new trial by July 30, 2001.  It would be impossible to raise claims such as ineffective assistance of counsel or suppression of evidence/use of false testimony because the 65-volume Reporter's Record was not completed and filed with the district clerk until November 13, 2001.  The record consists of 42 volumes of *voir dire* examination encompassing about 4,100 pages; 16 volumes of testimony and argument encompassing about 2,400 pages; and five volumes of exhibits.  Because the record was not available to appellate counsel until more than three months after the time expired to file a motion for new trial, petitioner could not have raised on direct appeal the issues of ineffective assistance of trial counsel or suppression of evidence/use of false testimony.  <u>See</u> <u>Martinez</u>, 2012 WL 912950 at *8 ("Abbreviated deadlines to expand the record on direct appeal may not allow adequate time for an attorney to investigate the ineffective-assistance claim . . . .  Thus, there are sound reasons for deferring consideration of ineffective-assistance-of-trial-counsel claims until the collateral-review stage . . . .").

Abbott's ineffectiveness in the initial state habeas corpus proceeding constitutes good cause to excuse the procedural default occasioned by his failure to present petitioner's first three claims in the initial state application. These claims are substantial and require relief. See Martinez, 2012 WL 912950 at *8. Thus, this Court can consider the ineffective assistance of counsel and suppression of evidence/false testimony claims on the merits.[18]

## STANDARD OF FEDERAL HABEAS CORPUS REVIEW

A federal habeas court must defer to a state court adjudication on the merits of a claim unless it was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent if the state court's conclusion is opposite to that reached by the Supreme Court on a question of law or the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case or it unreasonably

---

[18] Although Martinez dealt only with a claim of ineffective assistance of trial counsel, its rationale applies with full force to a claim that the prosecution suppressed favorable evidence and used false testimony. Abbott's ineffectiveness in failing to conduct an adequate investigation also constitutes good cause for the procedural default in failing to discover and raise the suppression of evidence/false testimony claim in the initial state application.

extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. Id. at 408, 413. The federal court must decide whether the state court's application of the law was objectively unreasonable. Id. at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 786 (2011). A federal habeas court is authorized to issue the writ only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedent." Id.

A state court's determination of the facts is presumed to be correct unless the petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(a)(1). However, deference to a state court's fact findings does not preclude federal habeas relief. "A federal court can disagree with a state court's credibility determination and, when guided by the AEDPA, conclude that the decision was unreasonable." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

Where the state court adjudicated a claim on the merits, federal habeas review is "limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011). However, a federal habeas court may conduct an evidentiary hearing

regarding claims that were not adjudicated on the merits in state court provided that the petitioner diligently sought a hearing.  Id. at 1400 n.5, 1401.  A federal habeas court may conduct an evidentiary hearing on an ineffective assistance of trial counsel claim where, as a result of state habeas counsel's ineffectiveness, no hearing was conducted on the claim in state court and the state court did not adjudicate the claim on the merits.

Petitioner's case lies at the crossroads of Martinez v. Ryan and Cullen v. Pinholster.  The AEDPA standard of review applies to his *voir dire* examination claims (Grounds Four and Five) because they were adjudicated on the merits in state court on direct appeal.  The AEDPA standard does not apply to his ineffective assistance of counsel claims (Grounds Two and Three) and his suppression of evidence/false testimony claim (Ground One) because they were dismissed rather than adjudicated on the merits in state court.  This Court may consider the record of the state court evidentiary hearing held on the suppression of evidence/false testimony claim conducted pursuant to the Court of Criminal Appeals's remand order.  However, it must conduct an evidentiary hearing on the ineffective assistance of counsel claims because they were dismissed and were not the subject of the remand order.

Because the state court did not adjudicate the merits of the ineffective of assistance of counsel and suppression of evidence/false testimony claims, this

27

Court must consider them *de novo*.  See <u>Henderson v. Cockrell</u>, 333 F.3d 592, 600-01 (5th Cir. 2003) (deferential AEDPA standard of review does not apply where state court did not adjudicate merits of specific allegation of deficient performance in connection with ineffective assistance of counsel claim).

## <u>GROUND ONE</u>

**THE STATE SUPPRESSED EVIDENCE MATERIAL TO PUNISHMENT REGARDING SHERYL WILHELM'S UNCERTAINTY THAT PETITIONER WAS THE MAN WHO KIDNAPPED HER FROM A HOSPITAL PARKING LOT AND PRESENTED FALSE TESTIMONY THAT SHE WAS CERTAIN THAT HE WAS HER ASSAILANT.**

**A.    The Standard Of Review**

Suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.  <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963); U.S. CONST. amends. V and XIV.  The prosecution has a duty to disclose favorable evidence, even if it was not requested or was requested only in a general way, if the evidence would be "of sufficient significance to result in the denial of the defendant's right to a fair trial."  <u>United States v. Agurs</u>, 427 U.S. 97, 108 (1976).  Impeachment evidence must be disclosed under <u>Brady</u>. <u>Strickler v. Greene</u>, 527 U.S. 262, 281-82 (1999).  All information known to law enforcement authorities is imputed to the prosecution.  <u>Ex parte Adams</u>, 768 S.W.2d 281, 292 (Tex. Crim. App. 1989).  Regardless of any defense request,

favorable evidence is material, and constitutional error results from its suppression by the prosecution, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).  The prosecution has a duty to disclose evidence that could undermine its case on punishment.  See Jones v. State, 850 S.W.2d 223, 228 (Tex. App.—Fort Worth 1993, pet. ref'd) (new trial required where State suppressed victim impact statement in which deceased's wife described shooting as an accident).

The knowing use of false testimony by the prosecution violates due process. Giglio v. United States, 405 U.S. 150, 152-54 (1972) (prosecution used false testimony that key witness would not receive leniency for testimony); Adams, 768 S.W. 2d at 288-89 (prosecution used false testimony that witness identified defendant in lineup).   The prosecutor cannot knowingly allow a witness to create a false impression of the facts.   Alcorta v. Texas, 355 U.S. 28, 31-32 (1957) (prosecutor told witness not to volunteer that he frequently had sexual intercourse with defendant's wife unless he was asked; witness testified that he was not kissing defendant's wife at time of fatal encounter); Davis v. State, 831 S.W.2d 426, 439 (Tex. App.—Austin 1992, pet. ref'd) (prosecutor privately threatened witness with perjury and, after witness changed testimony, created false impression that witness did so on her own initiative).   The defendant must show that the testimony was

false or misleading, the prosecution knew it, and the testimony was material.   A showing of materiality does not require the defendant to prove that disclosure of the suppressed evidence or impeachment of the false testimony would have resulted in an acquittal or a lesser sentence.   The question is not whether he more likely than not would have received a different verdict, but whether he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.   Kyles v. Whitley, 514 U.S. 419, 434 (1995).

## B.   The Suppressed Evidence And False Testimony

### 1.   The Trial

Petitioner clocked out at work at Aavid in Terrell on August 26, 1997, at 8:02 a.m. (53 R.R. 206-07; 65 R.R. DX 168).

Sheryl Wilhelm testified that a man forced her into her car in the parking lot of Arlington Memorial Hospital in Arlington on August 26, 1997, at 11:30 a.m. (53 R.R. 126-32).   He choked her, made her get on the floor, and drove away (53 R.R. 136-40).   She jumped out of the car on the highway, and the man kept driving (53 R.R. 142-43).   She described the man to the police as a white male; 20-25 years old; dark hair, short on top, and shaved around the back and sides; an "after five" beard; 5'10''; thin; and wearing a hoop earring (53 R.R. 133, 144-45).

A man attacked 69-year-old Marjorie Ellis and stole her purse during a struggle outside Braum's Ice Cream Shop in Wichita Falls on August 26, 1997,

shortly before 8:30 p.m. (57 R.R. 13-16, 32). Felix Ozuna chased the man a short distance before stopping (57 R.R. 20). Ellis and Ozuna described the man to the police as a tall, slender, Hispanic or white male with an olive complexion (57 R.R. 22, 31).

Petitioner clocked back in at work at Aavid in Terrell at 11:54 p.m. (53 R.R. 206-07; 65 R.R. DX 68).

Wilhelm's car, containing property belonging to Ellis, was found abandoned on the side of a highway in Wichita Falls on the morning of August 27, 1997 (57 R.R. 17, 24, 32). Wilhelm worked with Detective Doug Ligon of the Arlington Police Department to make a composite sketch of her assailant on September 4, 1997 (53 R.R. 158, 166, 208-14; 62 R.R. SX 141).

Over three years later, Wilhelm saw petitioner on a televised news account of his arrest for kidnapping and killing Cunningham (53 R.R. 150). She read a newspaper article about his arrest, researched him on the internet, and spoke to her mother, who told her that he looked like the man in her composite sketch (53 R.R. 151-52). She called Detective John Stanton of the Arlington Police Department and provided this information (53 R.R. 151, 194).

Detective Stanton showed Wilhelm a photospread containing six photos on November 3, 2000 (53 R.R. 178, 195-96). She selected petitioner's photo (53 R.R. 179, 197-98). She testified that she had no doubt that petitioner was her assailant

when she identified him in the photospread and in court (53 R.R. 179).[19]  Stanton testified that her identification was one of the better ones he had seen in 16 years as a detective (53 R.R. 197).

The prosecutor repeatedly asserted in his questions that petitioner robbed Ellis in Wichita Falls.  After defense counsel elicited from Wichita Falls Police Department Detective Kyle Cook that Ellis gave a vague description of her assailant, the prosecutor elicited that Ellis subsequently gave a description that matched Wilhelm's (57 R.R. 22, 27-28).  The prosecutor asked Chelsea Willis, petitioner's girlfriend, whether she would consider him to be a sweet person if she learned that he robbed an elderly woman in Wichita Falls on the same day he kidnapped a woman in Arlington (57 R.R. 152).  The prosecutor asked psychologist Mary Connell whether she tried to talk to Marjorie Ellis of Wichita Falls and whether petitioner ever mentioned robbing Ellis in Wichita Falls (58 R.R. 74, 100).  The prosecutor asked psychiatrist Jaye Crowder whether his opinions or diagnosis of petitioner would change if he learned that petitioner robbed an elderly woman in Wichita Falls (58 R.R. 184).

The prosecutor cited the Wilhelm kidnapping during summation as evidence of petitioner's future dangerousness (60 R.R. 11, 13).

---

[19]  Wilhelm initially failed to identify petitioner in the courtroom during a pretrial hearing (45 R.R. 106, 109-11, 114).  She explained to the jury that she failed to identify him because he was wearing glasses, his hairstyle was different, and she assumed that everyone at the counsel table was a lawyer (53 R.R. 157-58, 164, 176-77).

**2.     The State Habeas Corpus Hearing**

Present habeas counsel interviewed Wilhelm in April and May of 2009. Wilhelm provided the following information to counsel that was not disclosed to the defense and the jury:

- When Wilhelm viewed the photospread, she told Detective Stanton, "This looks a lot like him and I'm pretty sure it's him."  She was (and remains) 95 percent sure that petitioner was her assailant. (State Habeas Exhibit 19 at pages 6-7).

- Prosecutor Greg Davis and an associate (investigator Willie Richardson) came to her home in May of 2001 before she testified at the punishment stage of the trial.  She asked whether she had identified the right man in the photospread, and they said, "Yes." This confirmed in her mind the accuracy of her identification of petitioner. (State Habeas Exhibit 19 at pages 4-5).

Wilhelm confirmed these matters during her testimony at the hearing (H.R.R. 24-25, 60).

Jane Little, petitioner's lead counsel at the punishment stage, testified at the hearing that the State did not disclose this information to the defense and that, had it been disclosed, she would have used it to impeach the testimony that Wilhelm had no doubt that petitioner was her assailant when she identified his photo in the photospread and identified him in court (H.R.R. 123-24, 155).  She considered Wilhelm to be the most important prosecution witness at the punishment stage (H.R.R. 117, 159).

Present habeas counsel interviewed Stanton in July and August of 2009. Stanton provided the following information to counsel that was not disclosed to the defense and the jury:

- When Stanton showed the photospread to Wilhelm, she said that petitioner's photo "looks a lot like him" and that she was "pretty sure it's him."  He considered this to be a strong tentative identification. (State Habeas Exhibit 7 at pages 7-8).

- He did not file kidnapping charges because he could not determine whether Wilhelm identified the man she saw on television a few days before or the man who kidnapped her more than three years before. (State Habeas Exhibit 7 at pages 7-8).

- The Tarrant County District Attorney's Office would not have accepted kidnapping charges under these circumstances; if it had, he could have successfully defended petitioner even though he is not a lawyer. (State Habeas Exhibit 7 at page 8).

Stanton confirmed these matters during his testimony at the hearing (H.R.R. 67-70, 73-75, 84, 87-89).

Little testified at the hearing that the State did not disclose this information to the defense and that, had it been disclosed, she would have used it to impeach Wilhelm's identification of petitioner (H.R.R. 122-24).[20]

## C.    Materiality

The Wilhelm kidnapping—and, to a lesser extent, the Ellis robbery—was

---

[20] Eric Holden, perhaps the preeminent polygraph examiner in Texas, administered a polygraph examination to petitioner on October 8, 2009.  He asked whether petitioner forcibly took Wilhelm in her car from the parking lot; whether petitioner drove her car from the hospital; and whether petitioner was in Arlington on August 26, 1997.  Petitioner answered "no" to each question. In Holden's opinion, petitioner was truthful. (State Habeas Exhibit 12).

the focal point of the State's argument that petitioner would be dangerous in the future.  Wilhelm testified that she had no doubt that petitioner was her assailant when she identified him in the photospread and in court.  Detective Stanton testified that her identification was one of the better ones he had seen in 16 years as a detective.  The defense and the jury were not informed that, when Wilhelm viewed the photospread, she told Stanton only that she was "pretty sure" that petitioner was her assailant and that Stanton considered this to be a strong tentative identification rather than a positive identification.  They also were not informed that Stanton did not file kidnapping charges because he could not determine whether Wilhelm identified the man that she saw on television a few days before or the man who kidnapped her more than three years before.  Finally, they were not informed that lead prosecutor Greg Davis and his investigator told Wilhelm before she testified that she had identified the right man in the photospread, thereby confirming in her mind the accuracy of her identification of petitioner.

Petitioner is actually innocent of kidnapping Wilhelm and robbing Ellis.  The above evidence, if disclosed to the defense and the jury, would have substantially undermined the accuracy of Wilhelm's identification and created reasonable doubt that petitioner committed these violent crimes.  Because the remaining punishment evidence presented by the State was not nearly as damaging as the evidence that he kidnapped Wilhelm and robbed Ellis, there is a reasonable

35

probability that at least one juror would have answered "no" to the future dangerousness special issue and petitioner would have been sentenced to life imprisonment.[21]   The prosecution's suppression of this evidence and presentation of false testimony that Wilhelm was absolutely certain that petitioner was her assailant undermines confidence in the death sentence imposed by the jury. Accordingly, petitioner is entitled to a new trial on punishment.

## GROUND TWO

### PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT STAGE.

### A.   The Standard Of Review

Petitioner had a right to the effective assistance of counsel at trial.   U.S. CONST. amends. VI and XIV; Powell v. Alabama, 287 U.S. 45 (1932).   Counsel must act within the range of competence demanded of counsel in criminal cases. McMann v. Richardson, 397 U.S. 759 (1970).

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court addressed the federal constitutional standard to determine whether counsel

---

[21]   Petitioner received probated sentences for burglary of a habitation and burglary of a motor vehicle in 1994 and for auto theft in 1995 (53 R.R. 11-19, 21-25, 37-38, 52-65; 62 R.R. SX 128, 129); and a two-day jail sentence and a fine for possession of marijuana in 1996 (53 R.R. 67-76; 62 R.R. SX 130).   He pointed a gun at a female companion after they left a high school graduation party in 1993 and asked if she was afraid to die; she did not report this to the police, and no charge was filed (54 R.R. 4-18).   He assaulted his girlfriend and her companion in 1997; the charges were dismissed (53 R.R. 78-94).   He cursed and threatened to kill a female co-worker during an argument in 2000; no charge was filed (59 R.R. 190-203, 208).

rendered reasonably effective assistance.   The defendant first must show that counsel's performance was deficient; that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense; that counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result.

The defendant must identify specific acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.   The reviewing court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance.   Ultimately, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome."   Strickland v. Washington, 466 U.S. at 694.

The Strickland standard applies to the determination of ineffective assistance of counsel as it impacts the punishment assessed.   Hernandez v. State, 988 S.W.2d 770, 772 (Tex. Crim. App. 1999).   Petitioner need not show a reasonable probability that, but for counsel's errors, he would have received a lesser sentence. Rather, the issue is whether he received a fair trial that produced a verdict worthy of confidence.   Cf. Kyles, 514 U.S. at 434.

**B.     Deficient Performance**

"To pass over the admission of prejudicial and arguably inadmissible evidence may be strategic; to pass over the admission of prejudicial and clearly inadmissible evidence . . . has no strategic value."   Lyons v. McCotter, 770 F.2d 529, 534 (5th Cir. 1985).

> **1.     Counsel failed to present testimony regarding the distances between particular locations in Arlington, Wichita Falls, and Terrell in order to demonstrate that petitioner could not have kidnapped Sheryl Wilhelm in Arlington at 11:30 a.m., robbed Marjorie Ellis in Wichita Falls at 8:30 p.m., and clocked in at work in Terrell at 11:54 p.m.**

Sheryl Wilhelm was kidnapped on August 26, 1997, at 11:30 a.m. at Arlington Memorial Hospital in Arlington (53 R.R. 126-32).  She testified that petitioner was the assailant (53 R.R. 179).

The defense presented testimony that a man attacked Marjorie Ellis and stole her purse during a struggle outside Braum's Ice Cream Shop in Wichita Falls on August 26, 1997, about 8:30 p.m. (57 R.R. 13-16, 32).  Wilhelm's car, containing property belonging to Ellis, was found abandoned on the side of a highway in Wichita Falls on the morning of August 27, 1997 (57 R.R. 17, 24, 32).

Petitioner clocked out at work at Aavid in Terrell on August 26, 1997, at 8:02 a.m.; he next clocked in at 11:54 p.m. (53 R.R. 206-07; 65 R.R. DX 68).

The prosecutor argued during summation that petitioner would be dangerous in the future because, *inter alia*, he kidnapped Wilhelm during a carjacking (60

R.R. 11, 13).   Defense counsel responded that petitioner had a limited amount of time to leave work, drive to Arlington, kidnap Wilhelm, drive to Wichita Falls, commit a robbery, abandon the car, and return to work in Terrell for his next shift (60 R.R. 28, 43).   However, the defense did not present testimony regarding the distances between and the time it takes to drive from Aavid to Arlington Memorial Hospital to Braum's Ice Cream Shop and back to Aavid.   The jury did not know that it was logistically impossible for petitioner to commit these crimes.

Present counsel assigned a law clerk, Ross Coddou, to determine the distances between and the time it takes to drive to these locations.   Coddou provided an affidavit in the state habeas corpus proceeding (State Habeas Exhibit 13).   He left Aavid at 8:13 a.m.; it took 57 minutes to drive 51.7 miles to Arlington Memorial Hospital.   He left Arlington Memorial Hospital at 11:59 a.m.; it took two hours and 14 minutes to drive 130.3 miles to Braum's Ice Cream Shop.   It took six minutes to drive 4.3 miles from Braum's Ice Cream Shop to 5000 Seymour Highway, where Wilhelm's car was abandoned.   He left 5000 Seymour Highway at 7:30 p.m.; it took three hours and nine minutes to drive 173.4 miles to Aavid.

If petitioner left work in Terrell, drove to Arlington and robbed Wilhelm, drove to Wichita Falls and robbed Ellis, and abandoned Wilhelm's car at 5000 Seymour Highway about 8:30 p.m., he had three hours and 24 minutes to drive 173.4 miles to Aavid to clock in at work at 11:54 p.m. He could have done so only

if someone picked him up on the side of the highway in Wichita Falls immediately after Wilhelm's car broke down and drove him directly to Aavid—an unlikely scenario if ever there was one.  Had counsel presented testimony regarding the distances between and the time it takes to drive to these locations, no rational juror would have found beyond a reasonable doubt that petitioner kidnapped Wilhelm and robbed Ellis.[22]

Counsel has a duty to conduct an independent investigation to discover favorable evidence.  See Ex parte Duffy, 607 S.W.2d 507, 518 (Tex. Crim. App. 1980).  Counsel must "make reasonable investigations or . . . make a decision that makes particular investigations unnecessary."   Strickland, 466 U.S. at 690-91.  Counsel performed deficiently in failing to present testimony regarding the relevant distances and times to demonstrate that petitioner could not have kidnapped Wilhelm, robbed Ellis, and clocked in at work when he did.  See State v. Thomas, 768 S.W.2d 335, 337 (Tex. App.—Houston [14th Dist.] 1989, no pet.) (counsel ineffective in failing to interview witnesses and present testimony in support of defense).  No sound strategy can justify counsel's failure to present readily available testimony that would have undermined Wilhelm's identification of petitioner.  Cf. Soffar v. Johnson, 237 F.3d 411, 440, n. 44 (5th Cir. 2000) (counsel's failure to elicit inconsistencies that would render defendant's confession

---

[22]   The court instructed the jury in the charge that it could not consider extraneous offenses unless it found beyond a reasonable doubt that petitioner committed them (1 C.R. 207).

implausible, if strategic, was "inexplicable").

> **2.    Counsel failed to correct the false impression that the prosecution created on cross-examination of psychologist Mary Connell that the leading experts in the country on the interpretation of the MMPI-II and MCMI-III evaluated petitioner's test results and concluded that he could not be controlled, successfully treated, or rehabilitated.**

Defense counsel hired Mary Connell, Ph.D., a psychologist, to evaluate petitioner with regard to the mitigation special issue.   Dr. Connell testified that she administered the MMPI-II and MCMI-III to him (58 R.R. 14-16).[23]

The MMPI-II consists of 567 true-false questions (58 R.R. 14-15).   Dr. Connell scored the results with a computer system to determine how petitioner compared to other people in a clinical setting (58 R.R. 15).   She compared his results to a clinical population of "people who have problems, who are coming for treatment, or who are in a mental hospital, people who are mentally disturbed, or who have emotional distress rather than people that are trying to seem normal" (58 R.R. 15).   He exhibited depression, anxiety, physical ailments, and paranoid thoughts (58 R.R. 16).   She initially thought that he might be exaggerating but ultimately concluded that he was not.

The MCMI-III consists of 175 questions pertinent to character development (58 R.R. 16-17).   The results suggested that petitioner has extreme emotional

---

[23]   The purpose of the MMPI-II is to determine current functioning (56 R.R. 42).   The purpose of the MCMI-III is to determine character pathology (56 R.R. 43).

distress and very disturbed functioning (58 R.R. 17). He did not appear to be malingering, as he did not attempt to look positive and was "his own harshest critic" (58 R.R. 17-19).

The prosecutor elicited on cross-examination that Dr. James Butcher, the leading expert in the country on the interpretation of the MMPI-II, interpreted the test that was administered to petitioner (58 R.R. 104).[24] The prosecutor elicited that Dr. Butcher reached the following damaging conclusions:

- Petitioner's responses to questions at the end of the test were exaggerated in comparison to some of his responses at the beginning of the test, indicating the possibility that he responded to the latter questions "either carelessly, randomly, or deceitfully, thereby invalidating that portion of the test." (58 R.R. 104-05);

- Petitioner "appears to be immature, aggressive, moody, and rebellious, and he has serious problems controlling his impulses and temper. He may be assaultive, and his acting-out behavior has probably caused him serious interpersonal problems. He may attempt to deny problems and blame others. He has a low tolerance for frustration, and he loses control easily." (58 R.R. 105);

- Petitioner "lacks genuine interpersonal warmth and manipulates people for his own gains, possibly through intimidation." (58 R.R. 106);

- Petitioner's profile matches the Megargee Type H offender, "one of the most seriously disturbed inmate types." (58 R.R. 106-07);

- Adjustment to prison appears to be difficult for the Megargee Type H offender. (58 R.R. 108); and

_____

[24] Dr. Connell gave a copy of Dr. Butcher's report to the prosecution before trial (58 R.R. 104).

- Inmates with this clinical profile are poor candidates for psychotherapy. "They are not very introspective and do not seek psychological treatment on their own. When they are forced into treatment, they may be marginally cooperative but their problems are ingrained and persistent. They tend to use denial a great deal and have little psychological insight. They are quite self-serving, selfish, and immature; they usually do not see a need for psychological therapy. Individuals with this profile pattern are not very amenable to changing their behavior. They have anger-control problems that are likely to interfere with treatment. Early termination of therapy is likely, possibly in anger. The manipulative behavior that patients with this profile exhibit is likely to interfere with the development of trust in relationships, making the treatment relationship stormy. Individuals with this profile may develop substance-abuse problems if treated with medication." (58 R.R. 109-10).

The prosecutor said that he was offering "the report of Dr. James Butcher that you [defense counsel] provided to me," and it was admitted without objection (58 R.R. 107-08).

The prosecutor also elicited on cross-examination that Dr. Theodore Millon created the MCMI-III and that Dr. Connell considered him to be authoritative (58 R.R. 111). The prosecutor had her identify "the report produced by Dr. Millon in this case," and it was admitted into evidence without objection. He elicited that Dr. Millon reached the following damaging conclusions:

- Petitioner "may have reported more psychological symptoms than objectively exist" because he is charged with capital murder. (58 R.R. 112-14);

- Petitioner's responses suggest "a moderate tendency toward self-deprecation and a consequent exaggeration of current emotional problems." (58 R.R. 114);

- Petitioner "appears to see himself as having had few of the opportunities that he perceives that others have had. This awareness may intrude on his thoughts and interfere with his behavior, creating anger and resentment and ultimately upsetting his capacity to cope in a satisfactory way with many of his life tasks." (58 R.R. 114);

- "Irritable, negative, and hostile, [petitioner] may employ drugs not only to help him unwind his tensions and undo his conflicts but also to serve as a statement of resentful independence from the constraints of social connection and expectation. In addition to freeing himself from feelings of ambivalence toward himself and others, drugs liberate him from whatever remnants of guilt he may experience over discharging his less charitable impulses and fantasies. Such defiant and hostile acts are undergirded in part by self-destructive elements. For example, these are evident in the careless disregard he may express about the consequences that drugs can create." (58 R.R. 115-16); and

- Petitioner has certain anti-social characteristics. (58 R.R. 117-18).

Counsel did not elicit testimony on redirect examination to counter the impression that Drs. Butcher and Millon personally evaluated petitioner's test results and reached the conclusions to which Dr. Connell testified (58 R.R. 126-31).

During the State's opening summation, prosecutor Mary Miller invited the jury to read the MMPI-II and MCMI-III reports (60 R.R. 15). She asserted that they were "chilling" with regard to what they said about petitioner—that his profile "matches that of the Megargee Type H offender, one of the most seriously disturbed inmate types," that "adjustment to prison appears to be difficult for them," and that he cannot be rehabilitated (60 R.R. 15-16).

Defense counsel did not mention the results of the psychological testing

conducted by Dr. Connell during their summation (60 R.R. 17-44). However, during the State's rebuttal summation, lead prosecutor Greg Davis emphasized these test results (60 R.R. 53-54):

> You know, all you have to do if you really have a question about what this guy's going to do in prison, if you look at the defense's own expert—now, these are not people that the State of Texas hired on his behalf, but you look at Dr. James Butcher who the defense hired and this report was brought out on cross-examination. And you remember what Dr. Butcher said? You know, he's the doctor, I suppose, who is not opposed to the death penalty. Here is what he says about the defendant. He says this man right here is a poor candidate for psychotherapy. Individuals with his profile are not very amenable to changing their behavior. You have a litany illustrating his behavior. He goes on to say this, they tend to be quite aggressive. And finally, if you have any question about what this man is all about in a confined setting, adjustment to prison appears to be difficult for them. Those aren't my words, ladies and gentlemen. That's not some expert that we hired. That's Dr. James Butcher hired by the defense to look at the tests administered to this man over here. So even if I look at that set alone, which each and every one of you told us you weren't going to do, but even if you do that, I mean their own expert says, that ain't going to fly in this case. This man is going to be a danger wherever he's going to be.

The prosecutor created the impression on cross-examination that Drs. Butcher and Millon personally evaluated petitioner's test results and reached the conclusions to which Dr. Connell testified. This impression was false, as neither doctor examined petitioner, evaluated his test results, reached conclusions about him, or prepared a report. Counsel should have had Dr. Connell explain the test results on redirect examination.

45

Dr. Connell provided an affidavit in the state habeas corpus proceeding (State Habeas Exhibit 15). She explained that, when petitioner completed these tests, she scanned his answers and fed the information into a database. Once the data was scored, she had to decide whether to request a report in profile form or a more extensive report that might include interpretations to generate hypotheses. She requested the interpretative reports. They were drawn from programs created by Drs. Butcher and Millon, and consequently bore their names. The reports contained descriptive narratives that compared petitioner's answers and profile with group profiles of research subjects with similar scores. Drs. Butcher and Millon did not review his test results or profile or render a professional opinion about him. The reports did not make specific findings about him but only suggested possible interpretations of the data.

Dr. Connell gave copies of the reports to defense counsel and the prosecutor before trial but does not recall whether she discussed the reports with defense counsel (State Habeas Exhibit 15). If she did, she would have explained how they were prepared. After reviewing her testimony, she believes that counsel did not realize that Drs. Butcher and Millon did not examine petitioner or review the test results and that the reports did not reflect their professional opinions.

Dr. Connell believes that the jury should have been informed that Dr. Butcher did not review petitioner's MMPI-II and Dr. Millon did not review

petitioner's MCMI-III, but that the reports were generated by comparing his responses to group statistical data (State Habeas Exhibit 15).  In view of her testimony that Drs. Butcher and Millon were the most authoritative sources for understanding the MMPI-II and MCMI-III, the jury was significantly misled about the content of the reports.  Counsel should have asked her to explain how the reports were prepared in order to correct the false impression that the nation's two leading authorities on these tests concluded that petitioner was violent and dangerous and that he manipulated and exploited others.  As a result of the cross-examination regarding the reports, her testimony appears to have harmed petitioner much more than it helped him.

Clearly, counsel did not understand the nature of the reports that bore the names of Drs. Butcher and Millon, did not prepare Dr. Connell to testify accurately about the reports, and did not correct on redirect examination the false impression created on cross-examination that Drs. Butcher and Millon personally evaluated petitioner's test results and authored reports that reached damaging conclusions about him.  Counsel performed deficiently in this regard.  Cf. Ex parte Guzmon, 730 S.W.2d 724, 734 (Tex. Crim. App. 1987) (counsel ineffective in failing to prepare witness); Perrero v. State, 990 S.W.2d  896, 899 (Tex. App.—El Paso 1999, pet. ref'd) (counsel ineffective in failing to prepare defendant to testify so he would not open door to prior convictions); Nance v. Ozmint, 626 S.E.2d 878, 881-

82 (S.C. 2006) (counsel ineffective in failing to prepare witness to testify about defendant's background).  No sound strategy could justify this omission.

### 3. Counsel made an unsound strategic decision to call psychiatrist Jaye Crowder to testify and to elicit and open the door to extremely prejudicial testimony.

Defense counsel presented considerable testimony regarding petitioner's background.  Petitioner's mother, brother, adoptive brother, sister, adoptive sister, and cousin testified about various aspects of his troubled childhood (57 R.R. 36-45, 88-100, 165-75, 206-12, 226-35; 59 R.R. 133-38).  His mother, girlfriend, and Alcoholics Anonymous sponsor testified about his substance abuse problems (57 R.R. 124-25, 180-88, 237-38).  His mother, girlfriend, and a friend testified about his good qualities (54 R.R. 125-28; 57 R.R. 110-16, 122-23, 127-28, 238).  Dr. Mary Connell testified about a psychological evaluation that related to the mitigation special issue (58 R.R. 10-69).  Dr. Gilda Kessner, a clinical and forensic psychologist, testified about the statistical probability that an inmate sentenced to life imprisonment for capital murder would be dangerous in the future (59 R.R. 4-58).

Counsel called Dr. Jaye Crowder, a psychiatrist, to testify to his evaluation of petitioner (58 R.R. 132, 134-35).  Dr. Crowder summarized on direct examination the testimony previously admitted regarding petitioner's troubled childhood, substance abuse problems, and emotional problems (58 R.R. 135-75).

Counsel elicited that petitioner is narcissistic and has a borderline personality disorder with some anti-social traits—such as, that he is manipulative, dishonest, irresponsible, and commits crimes (58 R.R. 136, 150-51, 153-54, 156, 171-75).

The prosecutor elicited on cross-examination that Dr. Crowder had testified for the defense in about 15 death penalty cases (58 R.R. 176).  Dr. Crowder was asked about the facts of four capital murder trials in which he testified that the defendant would not be dangerous in the future (58 R.R. 176-80).  Kenneth Thomas broke into a residence, stabbed and killed a couple, and sodomized the husband (58 R.R. 177); Robert Atworth robbed and shot a man, cut off his finger, and put it in the refrigerator (58 R.R. 178); Kim McCarthy broke into a home, stabbed a woman, cut off her finger and took her ring; ten years earlier, she stabbed and killed two elderly women (58 R.R. 179); and Robert Harris shot and killed five co-workers after previously killing a woman (58 R.R. 180).[25]

The prosecutor further elicited that counsel hired Dr. Crowder to evaluate whether petitioner would be dangerous in the future but did not ask for his opinion on the subject on direct examination (58 R.R. 198).  The prosecutor asked for his opinion.  Dr. Crowder responded that he could not testify that petitioner would not be dangerous in the future; if petitioner were confined in prison, the odds were

---

[25] After petitioner's trial, the Court of Criminal Appeals suggested that a prosecutor cannot properly ask a defense expert who testifies to an opinion on future dangerousness about the facts of other capital murder cases in which he had testified.  See Russeau v. State, 171 S.W.3d 871, 884-85 (Tex. Crim. App. 2005).

against it (58 R.R. 199).  However, he would be concerned about petitioner "on the outside" (58 R.R. 201).

Finally, the prosecutor read the names, previous offenses, and sentences of the Texas Seven and elicited that Dr. Crowder would not have predicted that any of them would have been dangerous in prison before they escaped, came to the Dallas area, and shot and killed a police officer (58 R.R. 202-04). [26]

The prosecutors argued during summation that, although Dr. Crowder testified that petitioner would not be a threat in prison, "society" extends beyond prison, and he would be a threat in the "free world"; and that Dr. Crowder would not have considered the Texas Seven to be dangerous in prison (60 R.R. 6-8, 54-55).

Although counsel's decision to call Dr. Crowder to testify was strategic, that strategy was unsound in view of the extremely prejudicial testimony that he gave. Counsel hired Dr. Crowder to evaluate whether petitioner would be dangerous in the future.  Because the evaluation was unfavorable, there was no sound strategic reason to call Dr. Crowder.  Nonetheless, counsel called him but did not elicit on direct examination his unfavorable opinion on future dangerousness.   His testimony  on direct examination added nothing of benefit that had not been

---

[26] The prosecutor also elicited that Dr. Crowder would expect that Cunningham experienced a lot of fear, anxiety, and thoughts of loved ones just before she died (58 R.R.192). Counsel did not object on the grounds of relevance and undue prejudice.

developed through other witnesses but informed the jury that petitioner was narcissistic and had a borderline personality disorder with some anti-social traits. The jury then learned on cross-examination that he had previously testified that four persons who committed brutal capital murders—two of whom had killed before—would not be dangerous in the future; that he would have predicted that the Texas Seven would not be dangerous in prison; but that he could not testify that petitioner would not be dangerous in the future and he would be concerned about petitioner outside of prison. His testimony eliminated any reasonable possibility that even one juror would find that petitioner would not be dangerous in the future.

The only sound strategy under the circumstances would have been for counsel not to call Dr. Crowder to testify. See St.Aubin v. Quarterman, 470 F.3d 1096, 1102-03 (5th Cir. 2006) (counsel made sound strategic decision not to present evidence of defendant's mental health history). Counsel performed deficiently in calling Dr. Crowder to testify, eliciting petitioner's aberrant character traits, and enabling the prosecutor to elicit Dr. Crowder's opinion that petitioner would be dangerous in the future. Cf. Fernandez v. State, 830 S.W.2d 693, 697-98 (Tex. App.—Houston [1st Dist.] 1992, no pet.) (counsel ineffective in calling defendant's wife, whose testimony implicated him); Jackson v. State, 857 S.W.2d 678, 683 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (counsel ineffective in calling CPS caseworker in attempt to prove that children "tell stories," but instead

only raised questions of child abuse).

### 4. Counsel failed to object to Detective Matt Myers' opinion testimony that petitioner was lying about not remembering the location of the abduction.

Counsel called Garland Police Department Detective Matt Myers to testify that petitioner confessed, was cooperative, and appeared to be remorseful during their interviews (59 R.R. 103-04).  The prosecutor elicited without objection on cross-examination that Myers did not think that petitioner was being "honest and genuine" when he said that he did not remember the location of the abduction (59 R.R. 125).  Counsel elicited on redirect examination that Myers thought that petitioner "knows a lot of things he hasn't told us" (59 R.R. 131).  The prosecutor argued during summation that the jury should not believe petitioner because "his memory lapses are very convenient" and, as Myers testified, ". . . there's things this man knows, he ain't telling.  And that's by his choice" (60 R.R. 48-49).

Neither a lay nor an expert witness may properly testify to an opinion that another person is telling the truth or lying.  See Schutz v. State, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997).  Counsel performed deficiently in failing to object to prejudicial opinion testimony that petitioner lied to the police about one aspect of the offense, which enabled the prosecutor to argue that the jury should not believe anything he said.  Cf. Garcia v. State, 712 S.W.2d 249, 253 (Tex. App.—El Paso 1986, pet. ref'd) (counsel ineffective in failing to object to detective's opinion that

witness was telling truth).  No sound strategy could justify this omission.

> **5.    Counsel failed to object to the prosecutor's argument that petitioner told the police that the shooting was an accident in an effort to be acquitted**.

The prosecutor argued without objection that, with regard to the defense assertion that petitioner was cooperative with the police, " . . . you have to know. . . that in this man's mind, . . . when he signs that statement and he says this was an accident, . . . if he can get one jury in Dallas County to buy that excuse, he walks smooth out of this courthouse, smooth out, not guilty, accident, forget it, and he's free again, isn't he?" (60 R.R. 47-48).

The prosecutor's argument grossly misstated Texas law.  Petitioner asserted in his written statement that he told Cunningham at gunpoint to get in the trunk of her car and, as he transferred the gun from his right hand to his left hand and reached for the trunk lid, the gun discharged unintentionally (48 R.R. 182-84).  A person commits aggravated kidnapping under section 20.04(b) of the Penal Code if he abducts an individual while exhibiting a deadly weapon.  A person commits felony murder under section 19.02(b)(3) of the Penal Code if he unintentionally causes the death of an individual in the course of committing a felony.  Thus, if petitioner unintentionally killed Cunningham in the course of kidnapping her, he was guilty of felony murder; he would not be acquitted and "walk smooth out of the courthouse."  The experienced prosecutor intentionally misstated the law in an

effort to deceive the jury.  Counsel performed deficiently in failing to object to this improper argument.  Cf. Ex parte Drinkert, 821 S.W.2d 953, 955-56 (Tex. Crim. App. 1991) (counsel ineffective in failing to object to argument that misstated law).  No sound strategy could justify counsel's failure to object to argument that misstates the applicable law.  Andrews v. State, 159 S.W.3d 98, 103 (Tex. Crim. App. 2005).

## C.    Prejudice

The verdict depended on the jury's answer to two special issues.  The first asked whether the jury found beyond a reasonable doubt "that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" (the future dangerousness special issue) (1 C.R. 212). The second asked whether the jury found, "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, if there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed" (the mitigation special issue) (1 C.R. 213-14).  The defense vigorously contested both issues.

The State sought to prove that petitioner kidnapped Wilhelm and robbed Ellis in order to convince the jury to return an affirmative answer to the future dangerous special issue.  Petitioner's prior convictions were for property crimes

that resulted in probated sentences and for possession of a small amount of marijuana.  Excluding the Wilhelm/Ellis extraneous offenses, the State offered testimony regarding three other unadjudicated extraneous offenses.  Two were never reported to the police and did not result in charges being filed; the third resulted in two misdemeanor assault charges that were dismissed.  Counsel argued that the State did not prove beyond a reasonable doubt that petitioner would be dangerous in the future and emphasized that neither Mandy Kirl nor Shirley Bard reported his alleged threats to the police (60 R.R. 25); that his probations for the property crimes were not revoked (60 R.R. 37-38); that he did not kidnap Wilhelm (60 R.R. 26-28, 43); and that he had not harmed anyone while confined in jail and would not be dangerous in prison (60 R.R. 18-23, 41-42).

Counsel's deficient performance contributed to the jury finding that petitioner would be dangerous in the future.  Had counsel presented testimony regarding the distances between and the time it takes to drive from Arlington Memorial Hospital in Arlington to Braum's Ice Cream Shop and 5000 Seymour Highway in Wichita Falls to Aavid Thermalloy Technologies in Terrell, no rational juror would have found beyond a reasonable doubt that petitioner kidnapped Wilhelm and robbed Ellis.  Had one or more jurors had a reasonable doubt that he committed these extraneous offenses, there is a reasonable probability that the jury would have returned a negative answer or deadlocked on the future dangerousness

special issue, in which event the court would have sentenced him to life imprisonment pursuant to article 37.071(e) of the Code of Criminal Procedure.

Counsel's deficient performance with regard to the mental health professionals also contributed to the jury finding of future dangerousness. Counsel failed to correct the false impression that the prosecution created on cross-examination of Dr. Mary Connell that Drs. James Butcher and Theodore Millon, the leading experts in the country on the interpretation of the MMPI-II and MCMI-III, personally evaluated petitioner's test results and concluded that he could not be controlled, successfully treated, or rehabilitated. Neither Dr. Butcher nor Dr. Millon examined petitioner, evaluated his test results, reached conclusions about him, or prepared a report. In addition, counsel called Dr. Jaye Crowder to testify, knowing that he had concluded that petitioner was narcissistic, had a borderline personality disorder with some anti-social traits, and would be dangerous in the future. Once the jury learned on cross-examination that Dr. Crowder had previously testified that four persons who committed brutal capital murders—two of whom had killed before—would not be dangerous in the future; that he would have predicted that the Texas Seven would not be dangerous in prison; but that he could not testify that petitioner would not be dangerous in the future and he would be concerned about petitioner outside of prison, there was no reasonable possibility that even one juror would find that petitioner would not be dangerous in the future.

Thus, counsel's deficiencies in performance, individually and collectively, significantly contributed to the jury's affirmative answer to the future dangerousness special issue.

The State sought to demonstrate that petitioner was exaggerating his troubled childhood and was not genuinely remorseful about the murder in order to convince the jury to return a negative answer to the mitigation special issue. Counsel argued that the jury should find that mitigating circumstances existed because petitioner was shuffled from one home to another and abused during childhood, which led to substance abuse problems (60 R.R. 29-31, 35-37); and that, following his arrest, he demonstrated remorse by confessing, crying, and leading the police to Cunningham's body (60 R.R. 39-40). The prosecutor countered that, based on Detective Myers' testimony that he believed that petitioner was withholding information, the jury should not believe petitioner (60 R.R. 48-49). In addition, the prosecutor deceptively argued that petitioner would have been acquitted and "walked smooth out of this courthouse" had the jury believed his assertion that the shooting was accidental. Counsel's deficiencies in performance significantly contributed to the jury's negative answer to the mitigation special issue.

But for counsel's deficiencies in performance, there is a reasonable probability that at least one juror would have persisted in a negative answer to the

future dangerousness special issue and/or an affirmative answer to the mitigation special issue and that petitioner would have been sentenced to life imprisonment. A death sentence imposed under these circumstances is not worthy of confidence. Accordingly, petitioner is entitled to a new trial on punishment.

## GROUND THREE

### PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-INNOCENCE STAGE.

**A.     The Standard Of Review**

The Strickland standard applies to the determination of ineffective assistance of counsel as it impacts the conviction.  Strickland, 466 U.S. at 694.  Petitioner need not show a reasonable probability that, but for counsel's errors, he would have been convicted of murder instead of capital murder.  Rather, the issue is whether he received a fair trial that produced a verdict worthy of confidence.  Cf. Kyles, 514 U.S. at 434.

**B.     Deficient Performance**

**1.     Counsel failed to object to testimony regarding petitioner's post-arrest silence.**

The police arrested petitioner at Treshod Tarrant's grandmother's home on the morning of October 6, 2000, and advised him of his rights (47 R.R. 172-73, 221; 48 R.R. 78-79).  Officer Jason Bonham, who knew petitioner from high school, persuaded him to take them to Cunningham's body (50 R.R. 62, 70-71).

Petitioner directed the officers to a creek two or three miles away, where they found Cunningham's body wrapped in a duffle bag (48 R.R. 86, 90-91).   The police notified Garland Police Department Detective Matt Myers that the body had been found, and he met them (48 R.R. 92-93).   After petitioner was arraigned by a justice of the peace, they returned to the creek to look for the murder weapon (48 R.R. 154-56).   Myers asked petitioner to get out of the car and show them where he threw the gun, but petitioner refused (48 R.R. 157).   They went to the police station, and petitioner gave a statement (48 R.R. 174).

Counsel elicited on cross-examination that the police conducted additional interviews with petitioner on October 7 and October 11 and that they attempted to interview him on October 13 to determine the locations of the abduction and the murder (60 R.R. 252-53).   The prosecutor elicited without objection on redirect examination that Myers advised petitioner of his rights and sought to interrogate him further on October 13, but he said that he did not want to speak to the police (48 R.R. 260).

Evidence of a defendant's post-arrest silence violates his right against self-incrimination and Texas evidentiary law.  See Doyle v. Ohio, 426 U.S. 610, 619 (1976); Sanchez v. State, 707 S.W.2d 575, 582 (Tex. Crim. App. 1986).   A defendant's post-arrest silence is insolubly ambiguous, Doyle v. Ohio, 426 U.S. at 617; and its prejudicial impact far outweighs its probative value.  United States v.

Hale, 422 U.S. 171, 180 (1975).  Counsel performed deficiently in failing to object to testimony that petitioner refused to get out of the car and show the police where he threw the gun and that, one week later, he refused to speak to the police at all. Cf. Brown v. State, 974 S.W.2d 289, 294 (Tex. App.—San Antonio 1998, pet. ref'd) (counsel ineffective in failing to object to testimony regarding defendant's post-arrest silence); Winn v. State, 871 S.W.2d 756, 764 (Tex. App.—Corpus Christi 1993, no pet.) (counsel ineffective in failing to object to portion of videotape in which defendant refused to answer officer's questions); White v. Thaler, 610 F.3d 890, 900 (5th Cir. 2010) (counsel ineffective in questioning defendant regarding post-arrest silence, which opened door to prosecutor's damaging cross-examination and argument).  No sound strategy could justify this omission.

### 2. Counsel opened the door to police opinion testimony that petitioner was not telling the truth.

Counsel elicited on cross-examination Detective Myers' opinion that petitioner was telling the truth as they drove around looking for the locations where he met and killed Cunningham (48 R.R. 243).  The prosecutor elicited without objection on redirect examination that Myers' opinion of petitioner's truthfulness changed over time, as petitioner did not answer "quite a few" questions and parts of his statement were false (48 R.R. 255).

Police opinion testimony that petitioner was not telling the truth would have

been inadmissible over timely objection under Texas Rule of Evidence 702. Neither a lay nor an expert witness may properly testify to an opinion that another person is telling the truth or lying.  See Schutz, 957 S.W.2d at 59.  Counsel performed deficiently in eliciting Myers' opinion that petitioner was telling the truth at one time, which opened the door to the prosecutor eliciting that Myers ultimately concluded that he was lying.  Cf. Miles v. State, 644 S.W.2d 23, 25 (Tex. App.—El Paso 1982, no pet.) (counsel ineffective in asking if defendant had ever been in trouble, which opened door to prior arrests); Riascos v. State, 792 S.W.2d 754, 757-58 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd) (counsel ineffective in asking alibi witness whether defendant carried gun and sold drugs, which opened door to her prior statements to that effect to her probation officer); Brown, 974 S.W.2d at 293 (counsel ineffective in eliciting testimony that defendant never had drug problem, which opened door to evidence of prior drug addiction).  No sound strategy could justify this conduct.

> **3.     Counsel failed to object to argument that the jury had to acquit petitioner of capital murder before it could consider the lesser included offenses.**

The jury was instructed in the charge to find petitioner guilty of capital murder if it believed beyond a reasonable doubt that he intentionally killed Cunningham in the course of committing or attempting to commit robbery or kidnapping.  "If you do not so believe, or if you have a reasonable doubt thereof,

you will next consider whether the defendant is guilty of murder, as included in the indictment" (1 C.R. 181).  The jury was then instructed on the lesser included offenses of murder and manslaughter (1 C.R. 181-82).  "If you find and believe from the evidence beyond a reasonable doubt that the defendant is guilty of capital murder, as charged in the indictment, or murder, or manslaughter, as included in the indictment, but you have a reasonable doubt as to which offense the defendant is guilty, you will resolve such doubt in the defendant's favor and find him guilty of manslaughter as included in the indictment" (1 C.R. 182-83).  The jury was not instructed that it had to acquit petitioner of capital murder before it could consider the lesser included offenses.

The prosecutor argued during summation without objection that the jury could consider the lesser included offenses only if it did not believe that the State proved capital murder beyond a reasonable doubt (52 R.R. 17).  The prosecutor asserted that petitioner was guilty of capital murder because he kidnapped Cunningham and intentionally shot her in the head (52 R.R. 17, 19).  Defense counsel responded that petitioner was guilty of murder or manslaughter because the State did not prove beyond a reasonable doubt that he specifically intended to kill Cunningham (52 R.R. 34-35).

The Court of Criminal Appeals has acknowledged that an instruction of this nature does not require the jury to acquit the defendant of capital murder before it

62

considers any lesser included offenses.  See Barrios v. State, 283 S.W.3d 348, 353 (Tex. Crim. App. 2009).  The prosecutor misstated the law in an effort to prevent the jury from considering the lesser included offenses.  Counsel performed deficiently in failing to object to this improper argument.  Cf. Drinkert, 821 S.W.2d at 955-56 (counsel ineffective in failing to object to argument that misstated law).  No sound strategy could justify counsel's failure to object to argument that misstates the applicable law.  See Andrews, 159 S.W.3d at 103. That the jury was correctly instructed in the charge that it did not have to acquit petitioner of capital murder before it could consider the lesser included offenses does not cure the harm resulting from the prosecutor's argument to the contrary. Cf. Brown, 974 S.W.2d at 294 (correct instruction on burden of proof in court's charge did not cure counsel's misstatement of law).

## C.    Prejudice

The prosecutor succinctly observed during his rebuttal summation that the "only real dispute" was whether petitioner intentionally or accidentally killed Cunningham (52 R.R. 42).  Defense counsel argued that the shooting was unintentional and that, as a result, petitioner was guilty of murder instead of capital murder.  The jury was instructed to acquit him of capital murder and convict him of murder if it believed or had a reasonable doubt that he unintentionally caused Cunningham's death.

The prosecutor emphasized that the only evidence that the shooting was unintentional was petitioner's statement to Myers that "the gun just discharged and it was an accident and I didn't mean to kill that woman" (52 R.R. 42). The jury's assessment of the credibility of petitioner's statement was adversely affected by inadmissible testimony that he refused to show the police where he threw the gun and that, one week after he made the statement, he refused to speak to the police; and by Detective Myers' inadmissible opinion that petitioner was lying because he did not answer "quite a few" questions and parts of his statement were false. Furthermore, because the prosecutor erroneously argued that the jury could consider the lesser included offenses only if it acquitted petitioner of capital murder, the jury may not have considered them at all.

But for counsel's errors, there is a reasonable probability that the jury would have convicted petitioner of murder or deadlocked. Had the court overruled timely objections to the testimony regarding petitioner's post-arrest silence and/or the improper argument, and the jury convicted petitioner of capital murder, there is a reasonable probability that the Court of Criminal Appeals would have reversed the conviction. A capital murder conviction obtained under these circumstances is not worthy of confidence. Accordingly, petitioner is entitled to a new trial.

## GROUND FOUR

**THE STATE COURT DECISION THAT EXCUSING VENIREPERSON TREAT FOR CAUSE DID NOT VIOLATE THE FOURTEENTH AMENDMENT WAS CONTRARY TO OR INVOLVED AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT AND WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE *VOIR DIRE* RECORD.**

The prosecutor asked venireperson Alena Treat how she would feel about participating in a trial that could result in the death penalty.  She responded, "Well, as far as the death penalty is concerned, I don't like there being a death penalty, but I also do not see that there's any logical alternative.  So I would not have a problem adhering to the letter of the law.  It seems like one of those necessary kinds of things.  I'm not an active proponent, but like I said, I don't see an alternative at this point" (12 R.R. 12).

Treat told the prosecutor that the death penalty would be appropriate in the case of a serial killer like Jeffrey Dahmer and acknowledged that some people cannot be rehabilitated (12 R.R. 13, 25).  She would not answer the future dangerousness special issue in the affirmative unless the State presented evidence that the defendant would likely commit or attempt to commit another murder (12 R.R. 16).

Defense counsel asked whether Treat thought that the definition of capital murder should be broadened to include additional types of murders.  She

65

responded, "Well, I don't feel that is my judgment.  The law is already written.  And if it's according to those—those things that are written in the law, those conditions, if it meets those conditions, then that's all there is to it.  I don't think it's up to me—without going through the legislative process to change the law.  It's not up to me to change that" (12 R.R. 32).

The judge asked whether Treat would consider assaultive conduct less serious than murder and attempted murder to be criminal acts of violence (12 R.R. 42).  She responded that she would not consider a fight in a pool hall or road rage to be; although criminal acts of violence need not result in death, they must reflect a pattern of conduct indicating that the person probably will kill again (12 R.R. 42-45).

Treat further acknowledged that she wrote in her juror questionnaire that she was in favor of the death penalty for a person who committed murder and would probably kill again and that intentionally disabling and rendering a person mentally incompetent could be a criminal act of violence (12 R.R. 46).  Although she considered rape, robbery, and aggravated assault to be criminal acts of violence, these crimes alone would not make the perpetrator a continuing threat to society so as to require an affirmative answer to the future dangerousness special issue (12 R.R. 49).

The court granted the State's challenge for cause on the ground that Treat would consider only murder and attempted murder to be criminal acts of violence (12 R.R. 50-52). Counsel objected that excusing her for cause violated the Fourteenth Amendment (12 R.R. 52-53).

Petitioner contended on appeal that excusing Treat for cause violated article 35.16(b)(3) of the Code of Criminal Procedure, which authorizes a challenge for cause if a venireman has a bias or prejudice against any law on which the State is entitled to rely for purposes of punishment. The Court of Criminal Appeals held that Treat was erroneously excused in violation of this statute, as she was entitled to determine for herself whether a finding of future dangerousness requires evidence that the defendant would likely commit or attempt to commit murder. Murphy, 112 S.W.3d at 598. However, the error was harmless absent proof that petitioner was deprived of a lawfully constituted jury. Id.

Petitioner further contended on appeal that excusing Treat for cause violated the Fourteenth Amendment as interpreted in Witherspoon v. Illinois, 391 U.S. 510 (1968), because her views on the death penalty would not prevent or substantially impair her ability to follow the court's instructions and her oath as a juror. The Court of Criminal Appeals overruled this point of error:

> Treat was excluded in this case because her own definition of the phrase "criminal acts of violence" would require evidence that appellant committed or attempted to commit other murders. While the phrase at issue is embedded within our capital death penalty

67

provision which itself is continually assessed for its ability to hold up against federal constitutional standards, the wrongful elimination of a juror for establishing her own definition of that phrase does not implicate <u>Witherspoon/Wainwright</u>. Treat harbored no general opposition to the death penalty. She was not excluded because her views on capital punishment in general would prevent or impair her performance. Point of error four is overruled.

<u>Murphy</u>, 112 S.W.3d at 599.

Excusing a venireman for cause "simply because [he] voice[s] general objections to the death penalty or expresses conscientious or religious scruples against its infliction" violates the Sixth and Fourteenth Amendments as long as his answers indicate that he can follow the law. <u>Witherspoon v. Illinois</u>, 391 U.S. at 522. A venireman cannot be excused for cause simply because he opposes capital punishment unless it "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." <u>Adams v. Texas</u>, 448 U.S. 38, 45 (1980); <u>Wainwright v. Witt</u>, 469 U.S. 412, 424 (1985). Excusing a venireman for cause in violation of <u>Witherspoon</u> is not subject to harmless error review. <u>Gray v. Mississippi</u>, 481 U.S. 648, 668 (1987).

Whether a venireman in state court was properly excused under <u>Witherspoon/Witt</u> is subject to deferential review under the AEDPA. <u>Ortiz v. Quarterman</u>, 504 F.3d 492, 501 (5th Cir. 2007). The state court's decision is presumed to be correct, and a federal habeas petitioner has the burden to rebut this presumption by clear and convincing evidence. <u>Id.</u>

68

Treat was excused for cause purportedly because she could not answer the future dangerousness special issue in the affirmative unless the evidence demonstrated that the defendant would probably commit or attempt to commit another murder.  Although she viewed the death penalty as a necessary evil, she made clear that her feelings about it would not prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath. Indeed, the Court of Criminal Appeals found that she was not biased against any law on which the State was entitled to rely for purposes of punishment.  The prosecutor had a legitimate basis to exercise a peremptory challenge on her, but there was no legal reason to excuse her for cause.  Accordingly, she was excused in violation of <u>Witherspoon</u> and <u>Witt</u>.

There was no principled basis for the Court of Criminal Appeals to conclude that Treat was improperly excused under the statute—which required petitioner to show harm to prevail on appeal—yet was properly excused under <u>Witherspoon/Witt</u>—which did not require him to show harm.  The state court decision that excusing Treat for cause did not violate <u>Witherspoon/Witt</u> was contrary to or involved an unreasonable application of Supreme Court precedent and was based on an unreasonable determination of the facts in light of the *voir dire* record.  No fairminded jurist could disagree that the state court decision

conflicts with clearly established Supreme Court precedent.   Accordingly, petitioner is entitled to a new trial on punishment.

## GROUND FIVE

**THE STATE COURT DECISION THAT PETITIONER WAS NOT PROHIBITED FROM ASKING A PROPER QUESTION REGARDING VICTIM IMPACT AND CHARACTER EVIDENCE DURING THE *VOIR DIRE* EXAMINATION WAS CONTRARY TO OR INVOLVED AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT AND WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE *VOIR DIRE* RECORD.**

Petitioner filed a motion for permission to ask the veniremen about victim impact and character evidence during the *voir dire* examination to ensure that the jurors would not improperly consider that evidence in answering the future dangerousness special issue and to challenge any veniremen who said that they would do so (2 C.R. 385-86).  The court prohibited counsel from asking questions on this subject (4 R.R. 12).

Before the *voir dire* examination commenced, the court commented that counsel wanted to ask, "Would victim character testimony cause you to reduce the State's burden of proof on Special Issue Number 1?  And follow-up question is that do you promise the Court that you would not do so?" (5 R.R. 8).  The prosecutor objected that these were improper commitment questions (5 R.R. 9).  Defense counsel responded that victim impact and character evidence is relevant

only to the mitigation special issue, and these questions were designed to ensure that jurors would not consider this evidence when answering the future dangerousness special issue.  The court again prohibited the questions.

The State presented testimony that Bertie Cunningham was 80 years old, a widow, lived alone, and, on the day she died, had gone to a mall to buy a robe for a disabled sister who suffered from dementia (47 R.R. 23-24, 26).  The prosecutor emphasized her good character at the conclusion of his summation at the punishment stage (60 R.R. 58-59):

> You know, again it's only natural to focus on him.  But, you know, Bertie Cunningham over here, this good and saintly woman over here, you know, there was a time not so long ago when she was still ours, wasn't she?  She was ours.  She was our neighbor, our helper. She was our sister.  She was our grandmother.  She was our mother. Even more than that, she was an example to all of us, I submit to you, on how you live your life with dignity and grace . . . .

Petitioner contended on appeal that the trial court's refusal to allow counsel to ask these questions during the *voir dire* examination violated his Sixth Amendment right to ensure that the jury was fair and impartial.  The Court of Criminal Appeals overruled this point of error:

> The trial court did not abuse its discretion in disallowing the questions.  Appellant did not state how "victim character testimony" would be defined nor did he state whether or not venirepersons would be informed of this area of law before being asked such questions.  Cf. Chambers v. State, 903 S.W.2d 21, 29 (Tex. Crim. App. 1995) (stating venireperson not shown biased or prejudiced against the law unless the law is first explained to them).  A proper explanation of the law is essential before asking a question upon

which a challenge for cause due to bias against the law might be based.  See id.  Prospective jurors would need to be informed that the standard of proof by which the State must prove its case remains constant; it may not be increased or reduced depending upon the presentation of a certain type of evidence.  In addition, because the standard of proof by which the State must prove its case is not affected by the presentation of any certain type of evidence, the trial court could reasonably have concluded that the questions would be confusing or misleading.  Point of error one is overruled.

Murphy, 112 S.W.3d at 596.

The Sixth Amendment provides, in pertinent part, that in all criminal prosecutions, the accused shall enjoy the right to trial by an impartial jury.  The *voir dire* examination provides an opportunity for counsel to exercise challenges for cause and ensure that the jury is impartial.  Mu'Min v. Virginia, 500 U.S. 415, 431 (1991).  To that end, counsel is entitled to question the veniremen on any subject that might reveal biases and prejudices that would lead to challenges for cause.  Aldridge v. United States, 283 U.S. 308, 313 (1931); Ham v. South Carolina, 409 U.S. 524, 527 (1973).

Victim impact and character evidence may be relevant to the jury's decision whether to impose the death penalty.  Payne v. Tennessee, 501 U.S. 808, 827 (1991).  Testimony about the victim's good character and the impact of the crime on others may have a critical effect on this decision.  Mickens v. Taylor, 535 U.S. 162, 182 (2002).

The law was clearly established at the time of petitioner's trial that victim impact and character evidence is relevant to the mitigation special issue to show the uniqueness of the victim and the harm caused by the defendant as well as to rebut any mitigating evidence.  Mosley v. State, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998).  This evidence is relevant to the future dangerousness special issue only if the defendant was aware of it when he committed the murder.  Id. at 261, n.16.  Because petitioner and Cunningham were strangers, he could not have been aware of her good character and the impact her death would have on others.

Counsel was entitled to ask the veniremen whether they could follow the law and consider any evidence of Cunningham's good character and the impact of her death on others only when answering the mitigation special issue.  Any venireman who would consider this evidence when answering the future dangerousness special issue would be subject to a challenge for cause.  Because the trial court improperly prohibited this inquiry, counsel had no vehicle to ensure that the jurors understood that they could not consider this evidence when answering the future dangerousness special issue.

The Court of Criminal Appeals observed that the trial court did not err in prohibiting these questions because it reasonably could have concluded that, if counsel did not properly explain the law to the veniremen, the proposed questions would be confusing or misleading.  Murphy, 112 S.W.3d at 596.  The *voir dire*

73

record reflects that the trial court initially explained the law to panels of veniremen; thereafter, it gave additional explanations of the law to each venireman during the individual *voir dire* examination.   The prosecutors then had extensive discussions regarding various legal principles with each venireman.   The Court of Criminal Appeals had no factual basis to conclude that counsel would not have properly explained the law applicable to victim impact and character evidence. Certainly, had counsel failed to do so, the trial court would have.

The state court decision that counsel failed to explain how victim impact and character evidence would be defined or how they would explain the law to the veniremen constituted an unreasonable determination of the facts in light of the *voir dire* record, as the trial court prohibited counsel from asking these questions and explaining the law.   Furthermore, the decision was contrary to or involved an unreasonable application of Mu'Min, Aldridge, and Ham, which establish that the defendant has a Sixth Amendment right to ask questions designed to reveal the veniremen's biases and prejudices.   No fairminded jurist could disagree that the state court decision conflicts with clearly established Supreme Court precedent. Accordingly, petitioner is entitled to a new trial on punishment.

## CONCLUSION

The Court should conduct an evidentiary hearing on the ineffective assistance of counsel claims.  Thereafter, the Court should grant habeas corpus relief and order a new trial or a new punishment hearing in state court.

Respectfully submitted,

/S/ Richard Wetzel       /S/ Randy Schaffer

Richard Wetzel         Randy Schaffer
State Bar No.  21236300      State Bar No. 17724500

1411 West Ave., Suite 100     The Schaffer Firm
Austin, Texas 78701       1301 McKinney, Suite 3100
(512) 469-7943         Houston, Texas 77010
(512) 474-5594 (facsimile)     (713) 951-9555
wetzel_law@1411west.com    (713) 951-9854 (facsimile)
               noguilt@swbell.net (e-mail)

Counsel for Petitioner<br>JEDIDIAH ISAAC MURPHY

## CERTIFICATE OF SERVICE

I certify that I electronically filed this document with the clerk of the United States District Court for the Northern District of Texas by using the electronic case filing system of the Court and on Fredericka Sargent, assistant attorney general, by electronic mail on April 18, 2012.

/S/ Randy Schaffer   <br>Randy Schaffer