IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JEDIDIAH ISAAC MURPHY,        §
                              §
        Petitioner,           §
                              §
v.                            §        Civil Action No. 3:10-CV-163-N
                              §            (Death Penalty Case)
LORIE DAVIS,                  §
                              §
        Respondent.           §

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

Jedidiah Isaac Murphy petitions the Court for a writ of habeas corpus, contending that his conviction and death sentence are unconstitutional because the prosecution suppressed exculpatory evidence regarding an extraneous offense, because Murphy received ineffective assistance of trial counsel, because the trial court improperly excused a potential juror for cause and improperly prohibited Murphy from asking potential jurors about victim impact and character evidence. Following an agreed abeyance to exhaust claims in state court, and due to the allegations raising a potential conflict under *Martinez v. Ryan,* 132 S. Ct. 1309 (2012), the matter was referred to the United States Magistrate Judge and independent counsel was appointed to investigate the issue affecting Murphy's representation before this Court. Having reviewed the record and the report of independent counsel, the Court adopts the recommendation of the United States Magistrate Judge and denies the requested relief.

### I. PROCEDURAL BACKGROUND

Murphy was convicted and sentenced to death for the capital murder of eighty-year-old Bertie Cunningham, who had given him a ride in her car. *State v. Murphy,* Cause No.

F-00-02424-NM (194th Jud. Dist. Ct., Dallas Cnty., Tex. June 30, 2001).  Sitting en banc, the Texas

Court of Criminal Appeals ("CCA") unanimously affirmed the conviction and death sentence.

*Murphy v. State,* 112 S.W.3d 592 (Tex. Crim. App. June 25, 2003), *cert. denied,* 541 U.S. 940

(2004).  During the pendency of his direct appeal, Murphy filed his first postconviction application

for a writ of habeas corpus in the state trial court in cause number W-00-02424-A on May 12, 2003.

(State Habeas Clerk's Record, "SHCR," at 2).  The CCA adopted the trial court's findings of fact

and conclusions of law to deny relief.  *Ex parte Murphy,* No. WR-70,832-01 (Tex. Crim. App. Mar.

25, 2009).

Murphy filed his original petition for a writ of habeas corpus in this Court on January 28,

2010, which included a request to stay these proceedings to exhaust his claims of (1) suppression

of evidence and use of false testimony by the prosecution, (2) ineffective assistance of counsel at

the punishment stage, and (3) ineffective assistance of counsel at the guilt-innocence stage.  (Pet.,

doc. 1; Pet. Br., doc. 3.)  Respondent filed his "Non-Opposition to Petitioner Murphy's Motion to

Stay and Abate Proceedings" (doc. 9).  The Court found that this agreement complied with *Rhines*

*v. Weber,* 544 U.S. 269 (2005), and stayed these proceedings to allow Murphy to exhaust these

claims.  (Order, doc. 10.)  Following abeyance, Murphy filed a subsequent state habeas application

which was dismissed by the CCA as an abuse of the writ following a remand and evidentiary

hearing, and Murphy returned to this Court.  *Ex parte Murphy,* No. WR-70832-02, 2012 WL 982945

(Tex. Crim. App. March 21, 2012) (per curiam).

The day before the CCA dismissed the subsequent state habeas application, the Supreme

Court issued its opinion in *Martinez v. Ryan,* 132 S. Ct. 1309 (2012*),* creating an exception to

procedural bar for claims of ineffective assistance of trial counsel that were not presented to the state

court in the initial-review collateral proceedings because of the ineffective assistance of state habeas counsel.  The following year, this exception was applied to Texas cases in *Trevino v. Thaler,* 133 S. Ct. 1911 (2013).  Because Murphy's current counsel allege that they represented Murphy before the CCA in the original state habeas proceedings and such allegation has support in the record, this case was referred to the United States Magistrate Judge for hearing, if necessary, and recommendation or determination to this Court on the question of whether Murphy desires the appointment of new, independent counsel to investigate whether any claims were not presented to the state court under *Martinez v. Ryan* because of the ineffective assistance of any attorney representing Murphy in this Court.  (Mem. Op. & Order, doc. 24.)  After Murphy and his counsel filed their notice of non-opposition (doc. 26), the Magistrate Judge appointed Don Vernay as independent counsel.  (Order, doc. 30.)

Vernay investigated this case, consulted with Murphy regarding the results of his investigation, and made a report to the Court.[1]  (Report, doc. 34.)  In his report, Vernay concluded that (1) "trial counsel conducted a vigorous, thorough and extremely competent pretrial investigation, voir dire and defense at trial in both the guilt and punishment phases," (2) "federal habeas counsel also investigated the Petitioner's case thoroughly and competently" and raised the ineffective assistance of counsel claims considered meritorious, (3) Murphy "is completely satisfied with the performance of his current counsel" and wishes to keep them as his attorneys of record, and (4) independent counsel could "find no additional cognizable claims of ineffective assistance of trial counsel that could or should have been raised by current habeas counsel in a state successor petition for habeas corpus or an amended federal petition for habeas corpus."  (Report at 9-10.)  The

---

[1]Independent counsel actually made a report (doc. 33) and filed an amended report (doc. 34) the next day.  For simplicity, the amended report is referred to in this order as the report.

Magistrate Judge reviewed that report and recommended that it be accepted by this Court. (Recommendation, doc. 35.) No objections have been made to the findings and recommendation of the Magistrate Judge.

This Court has reviewed the Findings, Conclusions and Recommendation of the Magistrate Judge (doc. 35) and the report of independent counsel (doc. 34), and ADOPTS the recommendation to accept the report of independent counsel.

## II. FACTUAL BACKGROUND

The state court described the facts of the offense as follows:

During the afternoon hours of Wednesday, October 4, 2000, Murphy kidnapped, robbed, and murdered 80-year-old Bertie Cunningham while Ms. Cunningham was on her way home from shopping at the Collin Creek Mall in Plano. Murphy forced Ms. Cunningham into the trunk of her car and shot her in the head. (RR47: 23-31, 44-47; RR49: 42-44). The medical examiner testified that although Ms. Cunningham's wound was fatal, her death was not instantaneous; she may have lived for several minutes or longer in a comatose state. (RR49: S0-51, 58-59).

Immediately after the shooting, Murphy repeatedly attempted to withdraw money from Ms. Cunningham's bank account using her ATM card. These attempts failed, but over the next two days, Murphy successfully used Ms. Cunningham's credit cards at various retail and restaurant locations. (RR47: 150-52, 156-61).

Shortly after shooting Ms. Cunningham and while she was still in the trunk, Murphy picked up his niece and two of her teenage friends and drove them around in Ms. Cunningham's car. He purchased beer for himself, then he purchased the two teenage boys motorized scooters from a Richardson sporting goods shop using Ms. Cunningham's credit card. (RR47: 89-99). The next day, Murphy drove to Van Zandt County to visit his friend Treshod Tarrant, and bought dinner, beer, and liquor. The police discovered Murphy at Tarrant's grandmother's house early the next morning and arrested him. (RR47: 202-211, 242-48; RR48: 78-80). Ms. Cunningham's vehicle was parked near the house.

Upon his arrest, Murphy admitted he had dumped Ms. Cunningham's body in a creek. (RR48: 84-90). He led police to the location of the body and subsequently executed a written statement in which he claimed he accidentally shot Ms. Cunningham while forcing her into the trunk. (RR48: 175-84; State's Exhibit 47).

4

(Subsequent State Habeas Record ("SSHR") at 20-22.)  These findings are entitled to deference.
*See* 28 U.S.C. § 2254(e)(1).

### III. CLAIMS

Murphy presents five claims for relief, arguing:

1.   The prosecution suppressed evidence that the victim of an extraneous offense admitted at the punishment stage she was uncertain regarding Murphy's identity, and presented false evidence that she was certain (Am. Pet. Br. at 28-36);

2.   Murphy was deprived of the effective assistance of counsel at the punishment phase of his trial (Am. Pet. Br. at 36-58);

3.   Murphy was deprived of the effective assistance of counsel at the guilt/innocense phase of his trial (Am. Pet. Br. at 58-64);

4.   The trial court violated Murphy's rights under the Fourteenth Amendment when it excused venireperson Treat for cause (Am. Pet. Br. at 65-70); and

5.   Murphy's counsel was prohibited from asking proper questions regarding victim impact and character evidence during the voir dire examination (Am. Pet. Br. at 70-74).

Murphy also requests an evidentiary hearing on the ineffective-assistance-of-counsel claims (Am. Pet. Br. at 26-27, 75).  Respondent asserts that the first three claims are defaulted and procedurally barred and in the alternative that they lack merit.  (Ans. at 22-63, 72-75, 82-84, 87-88, 90-92, 96, 98.)  Respondent also asserts that the fourth and fifth claims lack merit and were properly denied by the state court.  (Ans. at 103-114.)

### IV. STANDARD OF REVIEW

Federal habeas review of these claims is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This statute sets forth the preliminary requirements that must be satisfied before reaching the merits of a claim made in a

federal habeas proceeding.

## A. Exhaustion

Under this statute, a federal court may not grant habeas relief on any claim that the state prisoner has not first exhausted in the state courts. *See* 28 U.S.C. § 2254(b)(1)(A); *Harrington v. Richter*, 562 U.S. 86, 103 (2011). However, the federal court may deny relief on the merits notwithstanding any failure to exhaust. *See* 28 U.S.C. § 2254(b)(2); *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005).

## B. State-Court Procedural Determinations

If the state court denies a claim on state procedural grounds, a federal court will not reach the merits of the claim if it determines that the state-law grounds are independent of the federal claim and adequate to bar federal review. *See Sawyer v. Whitley*, 505 U.S. 333, 338 (1992); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). If the state procedural determination is based on state grounds that were inadequate to bar federal habeas review, or if the habeas petitioner shows that an exception to the bar applies, the federal court must normally resolve the claim without the deference that 28 U.S.C. § 2254(d) otherwise requires. *See Miller v. Johnson*, 200 F.3d 274, 281 n.4 (5th Cir. 2000); *but see Busby v. Dretke*, 359 F.3d 708, 721 n.14 (5th Cir. 2004) (affording deference to merits finding when state court "invoked a procedural bar as an alternative basis to deny relief"); *Rolan v. Coleman*, 680 F.3d 311, 319 (3rd Cir. 2012) (holding that "AEDPA deference [under § 2254(d)] applies when a state court decides a claim on procedural grounds and, alternatively, on the merits").

6

## C. State-Court Merits Determinations

If the state court denies a claim on the merits, a federal court may not grant relief unless it

first determines that the claim was unreasonably decided by the state court, as defined in § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant
> to the judgment of a State court shall not be granted with respect to any claim that
> was adjudicated on the merits in State court proceedings unless the adjudication of
> the claim——
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in the
> > State court proceeding.

*Id.* In the context of § 2254(d) analysis, "adjudicated on the merits" is a term of art referring to a

state court's disposition of a case on substantive rather than procedural grounds. *Green v. Johnson*,

116 F.3d 1115, 1121 (5th Cir. 1997). This provision does not authorize habeas relief, but restricts

this Court's power to grant relief to state prisoners by barring claims in federal court that were not

first unreasonably denied by the state courts. The AEDPA limits rather than expands the availability

of habeas relief. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007); *Williams v. Taylor*, 529 U.S. 362, 412

(2000). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state

court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Richter*, 562 U.S. at 98. "This

is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which

demands that state-court rulings be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S.

170, 181 (2011) (internal citations omitted) (quoting *Richter*, 562 U.S. at 102, and *Woodford v.

Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).

7

Under the "contrary to" clause, a federal court is not prohibited from granting federal habeas relief if the state court either arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *See Williams*, 529 U.S. at 412-13; *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). Under the "unreasonable application" clause, a federal court may also reach the merits of a claim on federal habeas review if "if the state court identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case." *White v. Woodall,* 134 S. Ct. 1697, 1705 (2014) (quoting *Williams*, 529 U.S. at 407-408). " '[C]learly established Federal law' for purposes of § 2254(d)(1) includes only 'the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions.' " *Woodall,* 134 S. Ct. at 1702 (quoting *Howes v. Fields,* 132 S. Ct. 1181, 1187 (2012)). The standard for determining whether a state court's application was unreasonable is an objective one and applies to federal habeas corpus petitions that, like the instant case, were filed after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

Federal habeas relief is not available on a claim adjudicated on the merits by the state court unless the record before that state court first satisfies § 2254(d). "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 563 U.S. at 185. The evidence required under § 2254(d)(2) must show that the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

## V.  Analysis

### A.  Extraneous Offense Evidence

In his first claim, Murphy contends that the prosecution suppressed exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), and presented false evidence in violation of *Giglio v. United States,* 405 U.S. 150 (1972).  (Am. Pet. Br. at 28-36.)  Respondent asserts that this claim is procedurally barred and, in the alternative, lacks merit.  (Ans. at 22-72.)

In *Brady,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S., at 87.  In *Strickler v. Greene,* 527 U.S. 263, 281-282 (1999), the Supreme Court set out three elements of a *Brady* claim:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  In *Giglio,* the Supreme Court condemned the knowing use of false testimony by the prosecution and made clear that the prosecutor's obligation to disclose exculpatory information under *Brady* extends to impeachment evidence.  405 U.S. at 153-55.

### 1.  Factual Background

This claim is based on an extraneous offense described by the state court.

> At 11:30 a.m. on Tuesday, August 26, 1997, Sherryl Wilhelm was kidnapped from the parking lot of Arlington Memorial Hospital, where she was employed as a medical transcriptionist.  (RR53: 127-134).  The kidnapper forced her into the passenger side of her vehicle, choked her when she attempted to exit, and drove the car out of the parking lot.  (RR53: 135-140).  At the point Wilhelm believed the kidnapper would soon be entering the highway, she opened the passenger door and jumped.  (RR53: 141-143).  Wilhelm believed she spent approximately 30 minutes with the kidnapper.  (RR53: 153-155). His face was not covered.  (RR53: 133, 173).

(1 SSHR at 22.)   Arlington police worked with Wilhelm to prepare a composite sketch of the perpetrator, and prepared a photo lineup, but nobody was identified until Wilhelm saw Murphy in news reports of his arrest for Bertie Cunningham's kidnapping and murder approximately three years later. (1 SSHR 22-23.) Wilhelm contacted Arlington Detective John Stanton the next morning to identify Murphy as her possible kidnapper.   Stanton prepared a photo lineup in which Wilhelm identified Murphy.

The prosecution called Wilhelm, Stanton and the police artist as punishment witnesses in Murphy's trial to prove the extraneous offense.  (53 RR 125-220.)  Stanton testified to Wilhelm's photo identification of Murphy, and Wilhelm identified Murphy in the courtroom during the trial. The defense challenged the identification procedures and photo lineup used by Stanton in pretrial motions and a *sub rosa* hearing, arguing that the lineup was impermissibly suggestive, and procuring an admission from Stanton that Wilhelm "identified the photo spread because she saw the picture on TV."  (2 CR 443-449; 53 RR 124 (*sub rosa* hearing).)   Defense counsel extensively cross examined Stanton and Wilhelm at trial, challenging her identification and suggesting that it was unreliable and based on her view of Murphy on TV and in the news rather than from the extraneous offense.  (53 RR 149-173, 199-204.)   Defense counsel also got Wilhelm to admit that she did not identify Murphy in the pretrial proceedings until after the prosecutor asked her to look around the room a second time and Wilhelm asked Murphy to remove his glasses.  (53 RR 162-165; 1 SSHR 23-24.)

### 2. **Claim**

Murphy claims that the prosecution suppressed favorable evidence in violation of *Brady* and presented false evidence regarding Sheryl Wilhelm's punishment-phase identification of Murphy

as the man who kidnapped her and stole her car.   Specifically, Murphy complains that the prosecution did not reveal (1) that when Wilhelm viewed the photo spread, she said, "[t]his looks a lot like him and I'm pretty sure it's him" (Am. Pet. Br. at 33), (2) that the prosecution did not disclose the opinion of the investigator that it was a "strong tentative identification" of Murphy (Am. Pet. Br. at 34), (3) that the investigator did not file kidnapping charges because he could not determine whether Wilhelm identified the man that she saw on television a few days before or the man who kidnapped her more than three years before (Am. Pet. Br. at 34), and (4) that lead prosecutor Greg Davis and his investigator told Wilhelm before she testified that she had identified the right man in the photo spread, thereby confirming in her mind the accuracy of her identification of Murphy (Am. Pet. Br. at 33).

### 3. State Court Proceedings

This claim was not raised in the initial postconviction state habeas proceedings, but was presented in subsequent state habeas proceedings.   The CCA remanded the claim to the state district court on habeas review ("state habeas court") to determine whether to apply the procedural bar or to grant relief on the merits.   *Ex parte Murphy,* No. WR-70,832-02, 2010 WL 3905152, at *1 (Tex. Crim. App. Oct. 6, 2010).   The state habeas court conducted an evidentiary hearing and found that the factual basis of his claim was "known to the defense team or ascertainable through the exercise of reasonable diligence at the time of trial when Wilhelm and Stanton appeared, testified, and were subject to cross-examination regarding the reliability and certainty of Wilhelm's identification of Murphy," and also available to Murphy prior to filing his original state habeas application.   (SSHR at 31.)

In the alternative, the state habeas court found that Murphy's claims lacked merit.   Regarding

11

Wilhelm's statement that "[t]his looks a lot like him and I'm pretty sure it's him," the state court found that this was a paraphrase, that she had actually said "this is him. I believe this is him. This looks a lot like him," and that she had made substantially similar statements in her testimony at the time of trial.[2]  (SSHR at 35.)  The state court concluded that this evidence was neither withheld nor material under *Brady*.  (SSHR at 36-38.)

Regarding the opinion of investigator Stanton that Wilhelm made a "strong tentative identification" of Murphy, the state court found that was not his actual opinion.  The state court found that those were the words of the attorney speaking with Stanton on the phone and did not accurately reflect Stanton's opinion.  (SSHR at 40-41.)  Stanton testified before the state habeas court that his opinion was more accurately expressed in his testimony at the time of trial.  (SSHR at 41-42.)  The state court found Stanton's testimony to be truthful and concluded that this evidence was neither withheld nor material under *Brady*.  (SSHR at 42.)

Regarding the reason that Stanton did not file the kidnapping charges against Murphy, the state court found that Stanton's decision not to submit the case was based on a variety of factors, including that Murphy had a pending charge for which he was subject to the death penalty and that three years had elapsed since the kidnapping occurred.  (SSHR at 45.)  The state court also found that Murphy's trial counsel knew that Stanton had not filed the kidnapping charges and obtained concessions from Stanton during cross-examination at trial that he thought Wilhelm's identification

---

[2] These findings included the following prior statements:  Wilhelm's pretrial testimony that "[Stanton] just told me to take my time, and look at the pictures and - - I just immediately saw the picture that I believed was him, and I pointed to it." (SSHR at 35); Wilhelm's testimony on cross-examination about why she picked Murphy's picture in the line-up that "[i]t was because he looked like the guy that abducted me. I thought that he looked like the guy that abducted me." (SSHR at 36).  The state court found that, in fact, her 2009 statement was stronger than her prior statements at the time of trial.  (SSHR at 36.)

was influenced by having seen Murphy's photo on television.  (SSHR at 43-44.)  The state court concluded that this evidence was neither withheld nor material under *Brady*.  (SSHR at 46.)

Regarding what lead prosecutor Greg Davis and his investigator told Wilhelm before she testified, the state court found that Wilhelm was not certain about what they said, but testified at the subsequent habeas hearing that when she asked the prosecutor about her identification of the guy in the photo lineup, she meant to ask whether she had identified the same person Dallas County was prosecuting for Bertie Cunningham's murder.  (SSHR at 47.)  Wilhelm also testified that she knew that the prosecutor had no way of knowing who her attacker was because she was the only person who saw the attacker during the offense.  (SSHR at 47.)  The state court also believed the testimony of the prosecutor at the subsequent writ hearing that neither he nor his investigator told Wilhelm at the pretrial interview she had identified the "right man" in the photo lineup.  (SSHR at 47.)  The state court further found that the trial prosecutor purposefully avoided doing things that might influence or taint Wilhelm's identification of Murphy, and would have avoided informing Wilhelm in any way about the accuracy of her identification.  (SSHR at 47-48.)  The state court found that, in fact, Wilhelm told writ counsel during their interview that she would have identified Murphy in the courtroom as her attacker regardless of her pretrial meeting with the prosecutor and the State's investigator, because she "knew it was him."  (SSHR at 48.)  The state court concluded that the evidence was neither withheld nor material under *Brady*.  (SSHR at 48-49.)

The CCA reviewed the record of the hearing and the findings of the state habeas court and implicitly adopted them, stating: "[b]ased upon the trial court's findings and conclusions and our own review, we conclude that Applicant has failed to satisfy the requirements of Article 11.071, § 5 of the Texas Code of Criminal Procedure."  *Ex parte Murphy,* 2012 WL 982945 at *1; *see also*

13

*Bledsue v. Johnson,* 188 F.3d 250, 255-57 (5th Cir.1999) (subsequent unexplained orders upholding a lower court's judgment are considered to rest on the same reasoning); *Renz v. Scott,* 28 F.3d 431, 432 (5th Cir. 1994) (the CCA's order denying relief "on the findings of the trial court" adopting the express findings of the trial court applying a procedural bar); *Braswell v. Dretke,* No. 3:02-CV-0342-M, 2004 WL 2583605, at *14 (N.D. Tex. Nov. 12, 2004), report and recommendation adopted, No. 3:02-CV-0342-M, 2005 WL 1058865 (N.D. Tex. May 2, 2005) (CCA adopted state habeas court's finding when denying habeas petition on the findings of the trial court).

### 4.  Analysis

In reviewing the claim found to be barred by the state procedural rule, the first issue is whether this Court may reach the merits of this claim.  If so, this Court must then determine whether it must defer to the state court's alternative merits analysis.

#### a.  Procedural Bar

This Court will not reach the merits of a claim that the state court denied on independent and adequate state procedural grounds, unless the habeas petitioner shows that an exception to the procedural bar applies.  *See Sawyer*, 505 U.S. at 338; *Coleman*, 501 U.S. at 729.  The United States Court of Appeals for the Fifth Circuit has repeatedly "held that 'the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar.'" *Canales v. Stephens,* 765 F.3d 551, 566 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008)).

Murphy argues that good cause exists for this court to consider the merits of his prosecutorial misconduct claim because the prosecution was responsible for the evidence not being disclosed to the defense in time to be included in the evidence at trial or in the original state habeas proceedings.

14

(Reply at 3 (citing *Banks v. Dretke,* 540 U.S. 668 (2004), and *Strickler,* 527 U.S. at 288-89.)

Murphy also argues that, applying the rationale of *Martinez v. Ryan,* 132 S.Ct. at 1320 (majority

opinion), 1321 (Scalia, J., dissenting), this evidence was not discovered in time to be presented in

the original state habeas proceedings. (Reply at 4.)

In his argument, Murphy mentions the element of whether state habeas counsel is ineffective

in failing to discover evidence, but it does not appear that he is making this as a contradictory

assertion that the failure to discover this evidence was due to his own attorney and not the

prosecutor. (Reply at 4.) It appears that he is merely making an argument that the rationale for

*Martinez* is similar to the rationale for excusing a procedural default when the elements of *Brady*

or *Giglio* are shown. To the extent that he is arguing for an extension of *Martinez* to include

prosecutorial misconduct, his argument is rejected. He has provided no authority in support of such

an extension of the limited exception recognized in *Martinez*, and current circuit precedent would

not allow it. *See Speer v. Stephens,* 781 F.3d 784, 785 n.4 (5th Cir. 2015) (noting Supreme Court's

emphasis on the limited nature of the exception to the procedural default rule); *In re Threadgill,* 522

F. App'x 236, 237 (5th Cir. 2013) (holding that the *Martinez* exception is narrow and does not

extend beyond claims of ineffective assistance of trial counsel); *Reed v. Stephens,* 739 F.3d 753, 778

n.16 (5th Cir.) (declining to extend *Martinez* to claims of ineffective assistance of appellate counsel),

*cert. denied,* 135 S. Ct. 435 (2014).

The evidence necessary to establish a *Brady* claim can, however, establish the cause and

prejudice necessary to avoid the procedural default of that claim.

> "[C]ause and prejudice" in this case "parallel two of the three components of the
> alleged *Brady* violation itself." *Id.,* at 282, 119 S.Ct. 1936. Corresponding to the
> second *Brady* component (evidence suppressed by the State), a petitioner shows
> "cause" when the reason for his failure to develop facts in state-court proceedings

> was the State's suppression of the relevant evidence; coincident with the third *Brady*
> component (prejudice), prejudice within the compass of the "cause and prejudice"
> requirement exists when the suppressed evidence is "material" for *Brady* purposes.
> 527 U.S., at 282, 119 S.Ct. 1936.  ...  Thus, if Banks succeeds in demonstrating
> "cause and prejudice," he will at the same time succeed in establishing the elements
> of his [] *Brady* death penalty due process claim.

*Banks,* 540 U.S. at 691.  The CCA remanded this claim to the state habeas court for a determination

on this question and the state habeas court conducted an evidentiary hearing.  *Ex parte Murphy,*

2010 WL 3905152 at *1 (Tex. Crim. App. Oct. 6, 2010).  The state court found that any such

evidence would have been available to trial and initial state habeas counsel.  (SSHR at 29-31.)

Murphy argues that "Wilhelm and Stanton would not have spoken with post-conviction

counsel at the time that both the motion for new trial and the initial state habeas application had to

be filed." (Reply at 4.)  This appears to be based on statements from Wilhelm and Stanton that were

considered by the state habeas court and go to the crux of its determination.  The state habeas court

granted an evidentiary hearing on this issue which allowed it to make the necessary credibility

determinations regarding these statements.  In resolving those credibility issues, the state court found

that, despite such statements, this evidence was available to Murphy's trial counsel and initial state

habeas counsel.  (SSHR at 29-31.)  Murphy disagrees with the state court's resolution of this factual

dispute (Reply at 2), but has not shown by clear and convincing evidence under 28 U.S.C. §

2254(e)(1) that these findings are incorrect.

After hearing the evidence and arguments of counsel, the state habeas court found that, to

the extent that the evidence relied upon in support of this claim exists, such evidence would also

have been available to trial and initial state habeas counsel.  (SSHR 29-31.)  These findings were

adopted by the CCA and are entitled to deference under 28 U.S.C. § 2254(e)(1).  *See Duncan v.*

*Cain,* 278 F.3d 537, 541 (5th Cir. 2002) (holding that a federal court defers to a state court's finding

made in imposing a procedural bar "unless rebutted by clear and convincing evidence.").[3]  Because

Murphy has not rebutted these findings by clear and convincing evidence, this Court finds that the

state fact findings are correct.

No exception to procedural bar is shown and this claim is DENIED as barred.

### b.  Alternative Merits Analysis

In the alternative, Murphy has not shown that his *Brady/Giglio* claim has merit.  He argues

that the state court findings are not entitled to deference because "the CCA dismissed the subsequent

application without addressing the merits of the prosecutorial misconduct claim."  (Reply at 5-6.)

Even if this distinction were to control the application of § 2254(d), however, it would have no

impact on the presumption of correctness required under § 2254(e)(1).

There are two AEDPA provisions that may require deference to state court findings.  One

applies to all factual findings made by a state court regardless of whether the finding is made in

connection with a state court's procedural or merits determination.

> In a proceeding instituted by an application for a writ of habeas corpus by a person
> in custody pursuant to the judgment of a State court, a determination of a factual
> issue made by a State court shall be presumed to be correct.  The applicant shall have
> the burden of rebutting the presumption of correctness by clear and convincing
> evidence.

28 U.S.C.A. § 2254(e)(1).  This presumption would apply to any factual findings made by a state

court, regardless of whether they are alternative findings.  *See Valdez v. Cockrell,* 274 F.3d 941,

949-50 (5th Cir. 2001) (applying the § 2254(e)(1) presumption to state court findings made without

a full and fair hearing); *Hudson v. Quarterman,* No. CIV A H-06-1901, 2007 WL 760366, at *7

---

[3] The Court of Appeals in *Duncan* addressed a situation similar to Murphy's.  In both cases, the state trial court conducted a hearing on the disputed factual issue upon which the procedural bar was imposed and made findings of fact that were relied upon by the state appellate court in imposing the procedural bar.

(S.D. Tex. Mar. 8, 2007) (applying the § 2254(e)(1) presumption to alternative findings).  Further, it appears that even the deference required under § 2254(d) applies to alternative findings.[4]

The United States Court of Appeals for the Fifth Circuit has held that when a state court adjudicates a claim on the merits, the fact "[t]hat the state habeas court also invoked a procedural bar as an alternative basis to deny relief does not deprive the state of the benefit of AEDPA's deferential standard" under § 2254(d).  *Busby,* 359 F.3d at 721 n.14.  The Court of Appeals has also applied the deference standard in § 2254(d) to alternative merits findings in an unpublished opinion, approving of the district court's application of that same standard.  *See Battaglia v. Stephens,* 621 F. App'x 781, 783 (5th Cir. 2015), *cert. denied,* 136 S. Ct. 803 (2016).

The other circuits to address the issue have concluded that the deference standard of § 2254(d) should be afforded to alternative merits findings, even when the primary disposition is procedural.  *See Rolan,* 680 F.3d at 319 (applying AEDPA deference under § 2254(d) "when a state court decides a claim on procedural grounds and, alternatively, on the merits"); *Stephens v. Branker,* 570 F.3d 198, 208 (4th Cir. 2009) ("we agree with our sister circuits that an alternative merits determination to a procedural bar ruling is entitled to AEDPA deference" under § 2254(d)); *Brooks v. Bagley,* 513 F.3d 618, 624-25 (6th Cir. 2008) (holding that the state "court's alternative merits ruling receives AEDPA deference" under § 2254(d)); *Zarvela v. Artuz,* 364 F.3d 415, 417 (2d Cir. 2004) (affording deference under § 2254(d) when state court found "claim to be unpreserved, and,

---

[4]AEDPA deference under § 2254(d) controls federal review of a state court's adjudication of the merits of a claim, even in the absence of specific factual findings.  This provision "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits' " and, therefore, entitled to deference. *Richter,* 562 U.S. at 100.  Therefore, while § 2254(e)(1) would apply only to actual findings of fact made by a state court, § 2254(d) would apply to the state court's ultimate decision and require the federal court to presume any reasonable basis to uphold it.  "If there is any objectively reasonable basis on which the state court could have denied relief, AEDPA demands that we respect its decision to do so."  *Amos v. Thornton,* 646 F.3d 199, 205 (5th Cir. 2011).

in any event, without merit"); *Johnson v. McKune,* 288 F.3d 1187, 1192 (10th Cir. 2002) (affording deference under § 2254(d) when "the state court relied on the merits as an alternative basis for its holding").  *Crawford v. Head,* 311 F.3d 1288, 1324 (11th Cir. 2002) ("Given that the state court rejected the claim both on the merits ... and on the basis of a procedural default ..., we must consider whether either of these grounds is reasonable and entitled to deference pursuant to § 2254(d)(1).");

The state habeas court found that the evidence relied upon by Murphy in making this claim was available to his trial and initial state habeas counsel and, therefore, should be dismissed on state procedural grounds.  (SSHR at 29, 31.)  It found, in the alternative, that each of these claims should be denied on their merits. (SSHR at 32-55.)  Although the CCA used language necessary for the federal court to respect its independent procedural grounds, it clearly relied upon the state habeas court's findings and did not exclude any from its disposition.  *Ex parte Murphy,* 2012 WL 982945 at *1.  Therefore, the deference required by § 2254(d) should apply in the instant case.

Murphy has not overcome the presumption of correctness set forth in § 2254(e)(1) to the specific factual findings made by the state court, much less the high AEDPA deference required under § 2254(d).  Murphy relies upon the argument that AEDPA deference does not apply to the state court findings and does not show that they are incorrect, much less by clear and convincing evidence.  Since Murphy has not rebutted the presumption of correctness afforded the state court findings under § 2254(e)(1), this Court finds that Murphy has not shown that any exculpatory evidence was withheld by the prosecution or that the evidence in question was material under *Brady* or that the state's evidence was false.  Further, the state habeas court's alternative merits adjudication has not been shown to be an unreasonable application of federal law or based on an unreasonable determination of fact under § 2254(d).  Accordingly, if Murphy's first claim were not

dismissed as procedurally barred, it would be denied for lack of merit.

## B. *Effective Assistance of Counsel - Punishment Stage*

In his second claim, Murphy contends that he was deprived of the effective assistance of counsel in the punishment phase of his trial. (Am. Pet. Br. at 36-58.) Respondent asserts that this claim is procedurally defaulted and, in the alternative, meritless. (Ans. at 72-92.)

### 1. **Claim**

Murphy complains that his trial counsel (1) failed to present testimony regarding the distances between particular locations to rebut extraneous offense allegations, (2) failed to correct the false impression that the prosecution created on cross-examination of psychologist Mary Connell regarding the interpretation of certain mental health test results, (3) made an unsound strategic decision to call psychiatrist Jaye Crowder to testify and opened the door to prejudicial testimony, (4) failed to object to Detective Matt Myers' opinion testimony that petitioner was lying about not remembering the location of the abduction, and (5) failed to object to the prosecutor's argument that petitioner told the police that the shooting was an accident in an effort to be acquitted. (Am. Pet. Br. at 38-54.) Respondent contends that this claim is procedurally defaulted because it was not presented in the original state habeas proceedings and was subsequently found to be barred by the Texas abuse-of-the-writ rule. (Ans. at 74-75, 82, 84, 88, 91.) Murphy responds that the claim comes within the exception to procedural bar set created in *Martinez v. Ryan,* 132 S.Ct. 1309 (2012). (Reply at 8-16.)

### 2. **State Court Proceedings**

This claim was not raised in the initial state habeas proceedings, but was presented in subsequent state habeas proceedings. The CCA found that Murphy had not met the criterion under

state law for a subsequent habeas application on this claim and dismissed it as an abuse of the writ

under Article 11.071, § 5 of the Texas Code of Criminal Procedure. *See Ex parte Murphy,* 2010 WL

3905152 at *1; *Ex parte Murphy,* 2012 WL 982945 at *1.

3**. Analysis**

a. **Procedural Bar**

Respondent asserts that this claim is procedurally defaulted, and Murphy acknowledges that

it was not presented to the state court in the original state habeas proceeding. The CCA's dismissal

of this claim as an abuse of the writ is consistent with its application of the Texas abuse-of-the-writ

doctrine as an independent and adequate state ground for imposing a procedural bar in federal court.

*See Canales,* 765 F.3d at 566; *Hughes,* 530 F.3d at 342. Murphy relies entirely on *Martinez* in

arguing that this claim comes within an exception to procedural bar. (Reply at 8-16.)

To show that a claim comes within this exception, a federal habeas petitioner must show that

a substantial claim of ineffective assistance of trial counsel was not presented to the state court in

the initial-review collateral proceeding, either because there was no counsel or because counsel in

that proceeding was ineffective. *Martinez,* 132 S. Ct. at 1320. The habeas petitioner must

"demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one,

which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 1318-19

(citing *Miller–El v. Cockrell,* 537 U.S. 322 (2003) (describing standards for certificates of

appealability to issue)). To determine whether a claim has some merit, this Court applies the

two-pronged standard by which a claim of ineffective assistance of counsel is measured as set forth

in *Strickland v. Washington,* 466 U.S. 668 (1984). The first prong of *Strickland* requires the

defendant to show that counsel's performance was deficient. *Id.* at 687. The second prong of this

test requires the defendant to show prejudice resulting from counsel's deficient performance. *Id.* at 694. The court need not address both prongs of the *Strickland* standard if the complainant has made an insufficient showing on one. *Id.* at 697.

In demonstrating that counsel's representation was deficient, a petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88; *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997). "It is well settled that effective assistance is not equivalent to errorless counsel or counsel judged ineffectively by hindsight." *Tijerina v. Estelle*, 692 F.2d 3, 7 (5th Cir. 1982). A court reviewing an ineffectiveness claim must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence or that, under the circumstances, the challenged action might be considered sound trial strategy. *Gray v. Lynn*, 6 F.3d 265, 268 (5th Cir. 1993); *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). There are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Richter*, 562 U.S. 106. In *Richter*, the Supreme Court noted the "wide latitude counsel must have in making tactical decisions" and the need to avoid judicial second-guessing. *Id.* (quoting *Strickland*, 466 U.S. at 689). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id.* at 110.

To satisfy the second prong of the *Strickland* test, the petitioner must show that counsel's errors were so egregious "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The test to establish whether there was prejudice is whether "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding

would have been different." *Id.* at 694.  A reasonable probability under this test is "a probability

sufficient to undermine confidence in the outcome." *Id.*

As set out in the alternate merits analysis below, this claim, including each of its subparts,

does not have any merit.[5]  And although Murphy's original state habeas counsel may not have

diligently represented Murphy in those proceedings, such counsel could not be found ineffective for

the purpose of the *Martinez* exception for failing to present a meritless claim.  *See Garza v.*

*Stephens,* 738 F.3d 669, 676 (5th Cir. 2013) (agreeing with the district court that "habeas counsel

was not ineffective in failing to raise [a] claim at the first state proceeding" because "there was no

merit to [the petitioner's] claim"); *Beatty v. Stephens,* 759 F.3d 455, 466 (5th Cir. 2014); *Braziel v.*

*Stephens,* No. 3:09-CV-1591-M, 2015 WL 3454115, at *10 (N.D. Tex.), *certificate of appealability*

*denied,* 631 F. App'x 225 (5th Cir. 2015), *cert. denied,* No. 15-8317, 2016 WL 777411 (May 2,

2016).  Therefore, the claim is DENIED as barred.

### b. Alternative Merits Analysis

In the alternative, Murphy has not shown that his claim, or any of its subparts, has merit.

### 1. Testimony Regarding Distances

Murphy complains that his trial counsel failed to introduce testimony regarding the actual

distances and times needed for him to log out from work, travel to commit two extraneous offenses

in two different cities and then return to work by the time he logged back in.  (Am. Pet. Br. at 38-

41.)  The distances and times that he contends it would have taken do not exclude him from the

possibility of having committed those offenses, and his trial counsel presented this logistical

---

[5]This Court's findings when granting the agreed stay to exhaust these claims that these allegations, if true, would "not appear to be plainly meritless" (Order, doc. 10, at 5) are, following further analysis, hereby withdrawn.

challenge at trial, introducing evidence of its impracticality and arguing the unlikelihood that he committed those offenses.

The defense attempted to prove that a different man kidnapped Sheryl Wilhelm in Arlington. They brought out evidence at trial that Wilhelm's car was found broken down in Wichita Falls the next morning having documents in it from Marjorie Ellis (53 RR at 172-73; 57 RR at 22-24), who had also been assaulted at the Braum's in Wichita Falls and had her purse stolen at 8:30pm on the day of Wilhelm's kidnapping.  (57 RR at 14, 32.)   They brought out evidence regarding the locations and times of these different events (53 RR at 205-208; 57 RR at 14, 18-20, 22, 29-30, 34), the fact that Wilhelm's car appeared broken down (57 RR at 30), and also a description of the suspect in Wichita Falls that did not match Murphy (57 RR at 31).  They also presented evidence from the diary of Chelsea Willis indicating normal days that Murphy would stay home during the day and work regular night shifts both nights before and after these extraneous offenses (57 RR at 118-19, 134-35).  This allowed trial counsel to argue that Murphy could not have committed these offenses and also worked normally for both of those shifts, especially since no mention of his absence was reflected in Chelsea's diary.  (60 RR 26-29, 43.)

Murphy argues that trial counsel was ineffective for not also providing evidence of times that it would take to normally drive these distances while obeying all traffic laws to show that it would have been physically possible for him to commit these offenses and make both of those shifts, but not likely.  (Am. Pet. Br. at 39-40.)  Focusing the jury's attention on this evidence may not have been a better trial strategy.  In fact, it could raise more questions for the jury regarding things such as whether the suspect would have been observing all traffic laws and driving in the same manner as appointed counsel's law clerk.  This additional evidence merely adds support to the evidence and

24

arguments presented at trial to show the unlikelihood of committing these extraneous offenses.  It does not show the impossibility of committing them.

In order to avoid the "distorting effects of hindsight," the United States Court of Appeals for the Fifth Circuit has cautioned:  "We must be particularly wary of arguments that essentially come down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing." *Carty v. Thaler,* 583 F.3d 244, 258 (5th Cir. 2009) (quoting *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir. 2000)); *see also Ward v. Stephens,* 777 F.3d 250, 265 (5th Cir.), *cert. denied,* 136 S. Ct. 86, 193 L. Ed. 2d 76 (2015).  Murphy's claim also comes down to a matter of degrees, relying upon precisely the sort of judicial second-guessing that *Strickland* was intended to avoid, particularly in light of counsel's task "to balance limited resources in accord with effective trial tactics and strategies." *Richter,* 562 U.S. at 107.  Even if this additional evidence might have helped, Murphy has not provided any reason to believe that counsel was not making a reasonable strategic decision to not invest the additional time needed to gather this evidence.  And it would not have changed the outcome of the trial, especially since it would not have shown an impossibility or that it was any more impractical than argued at trial.  Accordingly, Murphy has not satisfied either prong of *Strickland.*  If this portion of the claim were not procedurally barred, it would be denied for lack of merit.

## 2.  Examination of Expert

In the second subpart to this claim, Murphy contends that trial counsel should have corrected the way that his own expert explained the interpretation of mental health test results to the jury. During the trial testimony of defense expert Mary A. Connell, Ph.D., the prosecutor cross-examined

her regarding reports provided under the names of other experts, Dr. James Butcher and Dr. Theodore Millon.   (Am. Pet. Br. at 42-44.)   Murphy contends that Dr. Connell's testimony inaccurately explained the involvement of these other experts and resulted in a false impression created before the jury.

Murphy's trial counsel called Dr. Connell to provide mitigating evidence about Murphy, specifically regarding his tragic childhood and related mental impairments.   On direct examination, Dr. Connell testified that she administered tests including the Minnesota Multiphasic Personality Inventory, II (MMPI-II), and the Millon Clinical Multiaxial Inventory 3 (MCMI-III).   (58 RR at 14-15.)   These two tests indicated that Murphy suffered from various psychological ailments requiring treatment.

Dr. Connell explained at trial that she gave the MMPI-II test to Mr. Murphy and "scored the results with a computer system looking at the kind of clinical interpretation, how did he look compared to other people in a clinical setting."   (58 RR at 15.)   These results indicated that Murphy was extremely symptomatic.

> He subscribed to a broad range of symptoms, symptoms of depression, anxiety, physical ailments, aches and pains, physical distress, such as stomachache, headaches, back, neck.   He subscribed to paranoid thoughts, feeling that people were out to get him or plotting to do harm to him, that he was suspicious and guarded, couldn't trust other people easily.

(58 RR at 16.)   In describing the results of the MCMI-III, Dr. Connell explained,

> And again, Mr. Murphy subscribed to a broad range of symptoms.   He described himself in fairly harsh terms, made no effort to try to look good on either of these instruments.   ...

> And so in both of these tests the results were suggestive of very, very disturbed functioning, extreme emotional distress, and a great many symptoms. In both cases these results would be results that would cause you to make a referral for psychiatric consultation and would probably result in a person being medicated.

26

(58 RR at 17.)   Dr. Connell also conducted other testing and testified concerning Murphy's background and abuse, his father's abuse of his mother, his mother's abandonment of him, his placement in an orphanage and different homes, the abuse he endured from his first adoptive father, the break-up of his second adoptive family, his own marriage breaking down, his alcoholism, his feeling of falling into his father's pattern of abuse and alcoholism, his suicide attempts and placements for psychiatric treatment of his depression, psychosis and anxiety.

On cross examination, the prosecutor asked about a prior case where Dr. Connell testified as an expert for the defense in another capital murder trial.  (58 RR at 70-71.)  The prosecutor brought out Dr. Connell's potential bias and limited review of information that did not include certain medical records or direct consultations with law enforcement, victims, or any of Murphy's treating physicians or jail health care providers.  (58 RR at 72-73.)  And when she met persons accused of involvement in abusing Murphy, she did not question them about their alleged misconduct that she considered in making her opinions.  (58 RR at 74-76.)  The prosecutor also brought out ways in which Dr. Connell's prior testimony might be considered inaccurate or false, especially in light of information that she had not reviewed that conflicted with her conclusions.  (58 RR at 76-100.)

The prosecutor subsequently asked Dr. Connell about a report the expert obtained interpreting Murphy's answers to the MMPI-II.

> Q.   Doctor, who is James N. Butcher?
>
> A.   Butcher is probably the leading expert in the country on the interpretation of the MMPI.
>
> Q.   In fact, Dr. Butcher, interpreted the MMPI-2 that was administered to Jedidiah Murphy, didn't he?

A.     Yes.

(58 RR at 104.)   Similarly, when the prosecutor also asked Dr. Connell about an exhibit and "whether or not that is the report produced by Dr. Millon in this case," she responded "Yes, it is." (58 RR at 111.)

During habeas review, Dr. Connell provided an affidavit complaining about her testimony during the prosecutor's examination.

> The cross-examination left the impression with the jury that Drs. Butcher and Millon personally evaluated Murphy's test results and reached the conclusions about which I testified.  This impression was false as neither doctor examined Murphy evaluated his test results reached conclusions about him or prepared a report.

(SSHR at 160.)   Murphy now complains that his trial counsel did not expose during their redirect examination before the jury how this testimony by their own defense expert on mitigation was "false."  (Am. Pet. Br. at 45-47.)   However, that would not appear to have been necessary or an effective trial strategy.

Dr. Connell's post-trial affidavit recites that portion of each report that included a "cautionary statement" about its use and complained that this was not brought out before the jury, but the record indicates that it was.  Both of these reports, including the cited language, were admitted before the jury.  (58 RR at 108, 111.)  Following the admission of a report, the prosecutor pointed out unfavorable parts of these reports and asked Dr. Connell to explain their significance to the jury.  Regarding the first conclusion discussed in "Dr. Butcher's report," the following exchange occurred in which Dr. Connell specifically pointed out this cautionary statement in qualifying the nature of this report.

Q.     That was his -- that was his conclusion, wasn't it?

A.     Exactly, yes. Well, it wasn't a conclusion. It was his hypothesis.

28

> Q.    Well, that is his statement in this report?
>
> A.    But if you notice on the beginning of the report, it says that the interpretation that is offered is not meant to be a final interpretation, that, interview, observation, and history should be taken into account and so forth. So he offers these as hypotheses. He gives those as some possible reasons .... And *as I told you earlier*, I read through the items to try to understand which of those it might be.

(58 RR at 105) (emphasis added). This testimony appears to reference Dr. Connell's prior testimony where the prosecutor asked about the process for interpreting these test results.

> Q.    Have you reviewed the answers that [Murphy] gave to you on that MMPI-2?
>
> A.    Not on all 567 items, but on a number of -- what are called critical items that *my computer interpretative program spits out* to do some follow-up inquiry if you don't know what the person was referring to.

(58 RR at 103) (emphasis added). Regarding whether she reviewed Murphy's responses to the MCMI-III, Dr. Connell testified, "[a]gain, not all 175 of them, but instead the critical items that emerge as *it's computer scored*." (58 RR at 116) (emphasis added).

Dr. Connell also qualified her answers to the specific statements from this report, explaining "that based upon [Murphy's] answers and his description of himself, that would be a hypothesis about his personality." (58 RR at 106.) Dr. Connell also corrected the prosecutor's use of the report to assert certain conclusions that these were not final interpretations but merely guides for follow-up inquiries.

> You also left out, when you were reading in paragraph 2, number of personality characteristics associated with substance abuse or substance use problems, that the next sentence says, His scores on the addiction proneness indicators suggest that there is a possibility of his developing an addictive disorder. Further evaluation for the likelihood of a substance use or abuse disorder is indicated.

(58 RR at 107.)  Dr. Connell also explained that a suggested hypothesis, that such a person would

not acknowledge his problems or submit to treatment, could not be applied to Murphy and was being

used incorrectly by the prosecutor.

> And of course, we know that one is wrong, that is, that Mr. Murphy did in fact
> present himself for treatment on his own on at least one occasion.  And then the very
> next line where you left off is: "This MMPI - 2 interpretation can serve as a useful
> source of hypotheses about clients."  ***The hypotheses that are generated here*** are
> generated on the basis of Mr. Murphy's own admission of the problems and
> characteristics that you just summarized.

(58 RR at 110) (emphasis added).

Dr. Connell's examination regarding these reports showed that they included general

statements about personality types rather than specific evaluations of the facts of Murphy's case.

And the prosecutor's questions reading from the report generally addressed certain personality types

that were identified and the behavioral tendencies connected with those types.  After explaining the

normal application of these tests, Dr. Connell also explained the limited purpose for these

interpretive reports as aids to help know what to look for but not as containing an opinion or

diagnosis of an individual's condition.   "I don't know that these results should be considered

definitive for diagnosis, for example.  I find them useful in elucidating or illuminating some of his

personality characteristics ... ."  (58 RR at 113.)  Toward the end of the cross-examination, the

prosecutor specifically invited Dr. Connell to provide any additional information that "would help

the jury in understanding this testing." (58 RR at 127.)  Throughout her testimony, Dr. Connell was

given the opportunity to explain, and did explain, the proper application of the information in these

reports.

The topics and content of an attorney's examination of a witness is a matter of trial strategy.

*See Hamilton v. United States,* No. 7:10-CR-117-H, 2014 WL 6977757, at *2 (E.D.N.C. Dec. 9,

2014) ("The adequacy and content of the cross-examination is a matter of trial strategy within this category of claims."); *Kleinberg v. United States,* No. 00 CIV. 3621 (SHS), 2000 WL 686213, at *1 (S.D.N.Y. May 25, 2000) ("Although Kleinberg complains that the attorney did not cover certain areas, the subject of cross examination is a question of trial strategy for the defense attorney."); *Hemetek v. United States,* No. 3:08-CR-00198, 2012 WL 3870620, at *11 (S.D.W. Va. Apr. 25, 2012), *report and recommendation adopted,* No. CIV.A. 3:11-0579, 2012 WL 3870605 (S.D.W. Va. Sept. 6, 2012), *aff'd,* 527 F. App'x 261 (4th Cir. 2013) ("The content of cross-examination is a strategic judgment, squarely within the province of trial counsel.").

"Counsel should be permitted to rely upon the objectively reasonable evaluations and opinions of expert witnesses without worrying that a reviewing court will substitute its own judgment, with the inevitable hindsight that a bad outcome creates, and rule that his performance was substandard for doing so." *Rockwell v. Davis,* No. 4:14-CV-1055-O, 2016 WL 4398378, at *12 (N.D. Tex. Aug. 18, 2016) (quoting *Smith v. Cockrell,* 311 F.3d 661, 676-77 (5th Cir. 2002), overruled on other grounds by *Tennard v. Dretke,* 542 U.S. 274 (2004)). Counsel should not be expected to know better than their own experts regarding matters within the expert's area of expertise "[s]hort of hiring another expert to evaluate the first experts." *United States v. Gray,* 37 M.J. 730, 746-47 (A.C.M.R. 1992), *supplemented,* 37 M.J. 751 (A.C.M.R. 1993), *and aff'd,* 51 M.J. 1 (C.A.A.F. 1999).

Dr. Connell repeatedly explained the nature of these reports and the limited use that was proper. To the extent that Dr. Connell did not provide information that she was called upon to give at trial and that she now contends was needed to explain her testimony, Murphy has not provided sufficient reason to believe it to be anything other than a reasonable trial strategy to decline from

31

attempting to prove that your own expert's testimony was "false," unless ethically required to do so. In fact, such an attempt was not necessary because the relevant qualifying information was already before the jury, and the prosecutor's cross-examination attempted to show how her testimony was inaccurate and "false."   And because Dr. Connell explained these reports, the correct information was before the jury.   Counsel's failure to have her repeat those explanations or elaborate on them would not be prejudicial.

Murphy has not shown either the deficiency or the prejudice prong of *Strickland*.   If this portion of the claim were not procedurally barred, it would be denied for lack of merit.

### 3.   Decision to Call Expert

Murphy contends that trial counsel made an unsound tactical decision to call an expert that ended up testifying in such a way that prejudicial information about him was put before the jury. (Am. Pet. Br. at 48-52.)   Murphy concedes that counsel's decision was a strategic one, but argues that there was no sound strategic reason to call the expert at trial.   (Am. Pet. Br. at 50.)

Trial counsel called Jaye Douglas Crowder, M.D., during the punishment stage of his trial. Dr. Crowder was a psychiatrist with impressive credentials, including a faculty position at the University of Texas Southwestern Medical School in Dallas and peer recognized in professional associations and publications.   (58 RR at 133-34.)   He diagnosed Murphy as having major depression and dysthymic disorder.   (58 RR at 135.)   In addition, Murphy suffered from alcohol dependence, narcissistic and borderline personality disorder with some antisocial features.   (58 RR at 136.)   Dr. Crowder also explained the significance of these disorders to the jury.   He also was able to clear up matters brought out by the prosecutor in the cross examination of the defense psychologist, Dr. Connell.   Dr. Crowder provided confirmation in the records of an attention deficit

disorder diagnosis that the prosecutor had previously criticized in the cross examination of Dr. Connell as unconfirmed. (58 RR at 95-96, 137.) And Dr. Crowder testified that Murphy did not have psychopathy that the prosecutor had tried to establish in the cross examination of Dr. Connell. (58 RR at 118-23, 138-39.)

Dr. Crowder provided a different explanation for Murphy's criminal behavior. He explained with visual aids the significance of Murphy having been abandoned as a child, not growing up with a father figure, and the resulting problems from abandonment and being passed around from home to home, such as heightened insecurity, inability to trust authority, and borderline personality disorder. (58 RR at 139-41.) He brought together numerous factors arising from Murphy's tragic circumstances and alcoholism that impacted his neurological system and ability to make decisions. (58 RR at 141-46.) He also explained to the jury the meaning of certain records, the significance of certain witness interviews (58 RR at 147-71), and that there was hope for Murphy resulting from available treatment in a controlled environment. (58 RR at 146-47.)

On initial cross-examination, Dr. Crowder was asked about the facts and his opinions in several capital murder cases where he had previously testified as an expert. (58 RR at 176-82.) He was also asked about his hourly rate, whether he had personally interviewed certain law enforcement officials and health care providers or had just read their records, and whether certain extraneous offense allegations would change his opinions. (58 RR at 182-84, 91-92.) He was also asked about certain records from a children's shelter and whether they would change his opinions. (58 RR at 184-88.) He was also asked about certain neuropsychological tests he ordered that detected no brain damage. (58 RR at 188-91.) He was also asked for his opinions about the victim's emotions in the event that she was aware of what was happening. (58 RR at 192-93.)

33

Before this Court, Murphy emphasizes Dr. Crowder's testimony on cross-examination regarding future dangerousness. "Counsel hired Dr. Crowder to evaluate whether petitioner would be dangerous in the future. Because the evaluation was unfavorable, there was no sound strategic reason to call Dr. Crowder." (Am. Pet. Br. at 50.) The actual testimony, however, was that Murphy would not likely be a future danger in prison. The prosecutor got Dr. Crowder to acknowledge his prior testimony that outside of a prison setting, he would be "concerned" about Murphy, but not in prison. (58 RR at 199-201.)

> Q.      So as far as you're concerned, when it comes to Mr. Murphy, we just cannot predict what he is going to do in the future?
>
> A.      We can look at the odds though, and the odds are against his future dangerousness in prison.

(58 RR at 199.) Murphy's counsel then immediately followed up on re-direct examination where Dr. Crowder testified that Murphy would not be eligible for parole for a minimum of 40 years. (58 RR at 202.)

While Murphy is correct that *trial counsel* did not elicit on direct examination the testimony from Dr. Crowder that Murphy would not be a future danger in prison, it does provide some support for Murphy's lack of future dangerousness that might actually have been more effective coming in the prosecutor's cross-examination. Murphy also complains of the prosecutor's efforts to impeach this opinion through his further cross-examination of Dr. Crowder, over objection, regarding the "Texas Seven," a group of inmates that escaped from prison and then committed a murder. (58 RR at 202-204.) Even so, Dr. Crowder also provided, during this same cross-examination, statistical information of a very low likelihood of such an escape. (58 RR at 203-204.) And Murphy's trial counsel brought out the absence of any sign pointing to Murphy as an escape risk and that he had

34

not hurt anyone during his incarceration despite having the opportunity to do so.  (58 RR at 204-205.)

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland,* 466 U.S. at 690.  Murphy does not contend that his trial counsel had not conducted an adequate investigation regarding whether to call Dr. Crowder to testify, but merely asserts that there was "no sound strategic reason" to call this witness because his opinion on future dangerousness was "unfavorable."  (Am. Pet. Br. at 50.)  The mitigating evidence Dr. Crowder brought out in his testimony on direct examination, however, would amply support counsel's reasons to call this psychiatrist.  And Murphy has not established that the testimony in question was entirely unfavorable.  Dr. Crowder testified that Murphy would not be a future danger in prison, where he would be kept.  Murphy has not provided any reason to believe that counsel's decision to call Dr. Crowder was anything other than a reasonable strategic decision within the proper professional judgment of trial counsel.  Therefore, if this portion of the claim were not procedurally barred, it would be denied for lack of merit.

### 4.  Detective's Opinion Testimony

Murphy complains that his trial counsel failed to object to testimony elicited from a state's witness that he did not think Murphy was being truthful.  Specifically, Murphy complains that the prosecutor elicited during the cross-examination of Garland Police Department Detective Matt Myers without objection that Myers did not think that petitioner was being "honest and genuine" when he said that he did not remember the location of the abduction.  (Am. Pet. Br. at 52 (citing 59 RR at 125).)

35

Detective Myers was the lead detective in the case involving the death of Bertie Cunninham. (48 RR at 131.)   Murphy's cooperation with the police had been an issue throughout the trial. During the guilt phase the prosecutor elicited testimony that Murphy was cooperative in waiving his rights to remain silent and responding to the detective's efforts to get information,[6] even after trial counsel had advised Murphy against it.   (48 RR at 151-52, 159-62, 167-79, 193-95.)   On cross examination, trial counsel got the detective to admit that he thought Murphy was truthful in trying to locate the scene of the abduction and shooting, an important matter for the state to prove.

> Q.    And did you think at that point that he was telling you the truth when he was telling you these things?
>
> A.    Yes, I did.

(48 RR at 243.)   In response, the prosecutor on redirect brought out that the detective's opinion about Murphy's truthfulness changed over time.   (48 RR at 255.)

During the punishment stage, trial counsel got this detective to admit that Murphy was cooperative and remorseful.

> Q.    And when you were asking him questions, isn't [it] true that when he was answering you, he was forthright and direct?
>
> A.    I thought he was some of the times.
>
> Q.    Okay. And that again, he was also remorseful at times?
>
> A.    Well, he was emotional and he did - - you know, he cried.
>
> Q.    But he was remorseful , you thought?
>
> A.    Yes.

---

[6]On direct examination by the prosecutor, Detective Myers testified that Murphy "said that he -- he didn't want to hide anything, that he wanted to cooperate with us, and that he would answer any questions that I had for him."  (48 RR at 171.)  Murphy had been quiet in the car, but when he got to the police station, "He immediately opened up, said that he wanted to cooperate, was very talkative and easy to talk to from that point on really."  (48 RR at 195.)

> Q.     Okay. And is it true that the first thing that he told you was that he was the person that was responsible for Ms. Cunningham's disappearance and death?
>
> A.     He did admit to that pretty quickly, yes.

(59 RR at 104.)

Trial counsel also got the detective to admit that Murphy freely wrote out answers to what he was deceived into believing was a letter from the victim's family asking questions about the murder.  (59 RR at 105-14.)  The detective testified to one part of the "letter" as follows:

> Q.     The next question is: "The family would like to put up a cross or memorial stone either at the place you picked Bertie up or the place that she died.  We need your help to get this done.  Please tell me where you picked her up or where she died.  This would be a marker that we could put up to show our love for Bertie, and that we still think about her."  And what was his response to that?
>
> A.     It says:  "Sir or ma'am I'm very sorry for what has happened to your family. I've destroyed many many lives from this.  I will continue to work with Mr. Myers so I can at least give you peace, but as of right now I can't remember."

(59 RR at 112.)  Trial counsel also established that this "letter" was not written by any family member, but by unrelated police department personnel as an investigative tool to gather evidence against Murphy.  (59 RR at 107-109.)  In fact, they had not even informed the family that they would be using their identity in that manner.  (59 RR at 109.)

Asking the detective about this portion of the "letter that you used as an investigative tool" with Murphy, the prosecutor appears to have phrased Murphy's answers that he thought he was making to the family as though they were statements to the detective.

> Q.     And when he told you that he could not give you an abduction location for Ms. Cunningham, as you sit here today do you think he was being honest and genuine when he said he didn't remember?
>
> A.     No, I think he knows where the abduction site is.

37

(59 RR at 125.)  Murphy argues that this testimony about the defendant's truthfulness is inadmissible and that no sound strategy could justify trial counsel's failure to object.  (Am. Pet. Br. at 52-53.)

In support of his argument that the testimony was inadmissible, Murphy relies upon the rule against calling an expert to testify whether a testifying witness is truthful, particularly the child complaining witness in a sexual assault prosecution.  (Am. Pet. Br. at 52 (citing *Schutz v. State,* 957 S.W.2d 52, 59 (Tex. Crim. App. 1997)).)  In that case, the CCA held that "[e]xpert testimony does not assist the jury if it constitutes 'a direct opinion on the truthfulness' of a child complainant's allegations." *Schutz,* 957 S.W.2d at, 59.  The rule is different when considering the defendant's character in determining punishment.

"A defendant's truthfulness or mendacity while testifying on his own behalf, almost without exception, has been deemed probative of his attitudes toward society and prospects for rehabilitation and hence relevant to sentencing." *United States v. Grayson,* 438 U.S. 41, 50 (1978), abrogation on other grounds recognized in *Barber v. Thomas,* 560 U.S. 474, 482 (2010); *McGee v. State,* 233 S.W.3d 315, 318 (Tex. Crim. App. 2007).  The rule is even more relaxed in the punishment stage of a Texas capital murder trial.  "Article 37.071, V.A.C.C.P. authorizes the trial court to admit any evidence which is relevant to a defendant's deathworthiness and the jury is authorized to consider this evidence along with that adduced at the guilt-innocence stage of trial." *Burks v. State,* 876 S.W.2d 877, 909 (Tex. Crim. App. 1994).

Murphy has not shown that an objection would have excluded the testimony in question.  "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins,* 19 F.3d 959, 966 (5th Cir. 1994).  Further, counsel's decision whether to challenge

admission of evidence is a matter of trial strategy.  *See Morales v. Thaler,* 714 F.3d 295, 305 (5th Cir. 2013) (noting that defense counsel does not render ineffective assistance by strategically forgoing a Confrontation Clause objection).  Murphy has not provided any reason to believe that this is anything other than reasonable trial strategy.

Murphy has not shown that trial counsel's performance was deficient.  If a habeas petitioner has not made an adequate showing on one of the prongs of *Strickland*, the court need not consider the other.  406 U.S. at 697.  Even so, Murphy has not shown a reasonable probability that, but for trial counsel's failure to object, the result of the proceeding would have been different.  *Id.* at 694.  As explained above, Murphy has not shown that an objection would have prevailed, but even if it did, it would appear to have made little difference to the outcome of the trial.

Trial counsel elicited testimony from the detective in the guilt stage that Murphy was trying to be helpful and not evasive in answering the detective's questions.  (48 RR at 211.)  In response, the prosecutor on redirect established that the detective did not think Murphy had always been truthful. (48 RR at 255.)  In the punishment stage, trial counsel elicited testimony from the detective suggesting that Murphy had been forthright and cooperative.  (59 RR at 104.)  Murphy's trial counsel also exposed the deceitfulness of the police detective in using a certain "investigative tool." (59 RR at 107-109.)  The prosecutor's attempt to show that the lead detective in the prosecution did not believe that Murphy was being entirely "honest and genuine" himself in his freely given answers to the deceitful investigative method would not appear to be particularly damaging testimony, particularly in light of the entirety of the detective's testimony and other evidence admitted.  Considering the nature of the crime and other evidence of Murphy's bad acts, he has not shown that this testimony, even if improperly admitted, would have altered the result of his trial.

Murphy has not satisfied either prong of *Strickland.*  If this portion of the claim were not procedurally barred, it would be denied for lack of merit.

### 5. <u>Prosecutor's Argument</u>

Murphy also complains of trial counsel's failure to object to the prosecutor's argument at the punishment stage to rebut Murphy's argument that he was cooperative and gave a confession.  (Am. Pet. Br. at 53-54.)  Specifically, Murphy complains that,

> The prosecutor argued without objection that, with regard to the defense assertion that petitioner was cooperative with the police, " ... you have to know... that ***in this man's mind,*** ... when he signs that statement and he says this was an accident, ... if he can get one jury in Dallas County to buy that excuse, he walks smooth out of this courthouse, smooth out, not guilty, accident, forget it, and he's free again, isn't he?"

(Am. Pet. Br. at 53 (quoting 60 RR 47-48)) (emphasis added).  Murphy argues that this misstates Texas law and that there is no sound trial strategy for failing to object to the prosecutor's misstatement of the law.

In making this argument, Murphy relies on *Andrews v. State,* 159 S.W.3d 98 (Tex. Crim. App. 2005), which addressed an argument regarding the law that was directly relevant to an  issue before the jury in determining the length of the defendant's sentences, whether they could later be stacked.

> Under the extremely unusual circumstances of this case, the record contains all the information that we need to make a decision.  Trial counsel failed to object to the prosecutor's misstatement of the law regarding whether the appellant's sentences could be stacked, even though he knew that the State had filed a motion to cumulate the sentences.  There can be no reasonable trial strategy in failing to correct this false impression that was harmful to the appellant.

159 S.W.3d at 103.  Murphy also relies upon *Ex parte Drinkert,* 821 S.W.2d 953, 955 (Tex. Crim. App. 1991), in which counsel's conduct in failing to object to the prosecutor's argument to consider

40

the self-defense issue from the standpoint of the deceased victim that was contrary to the law and the court's charge that they were given.  In each of these cases, the misstatement of law pertained to an issue directly before the jury.

In Murphy's case, however, the issue at the time of this argument was not whether he would "walk smooth out of the courthouse." (Am. Pet. Br. at 53.)  The jury had already rejected the notion that the shooting was an accident by finding him guilty of having the specific intent to commit the murder. (1 CR at 169-70, 189.)  They were no longer considering whether to let him go free.  The prosecutor's argument at the punishment stage was solely to rebut the contention that Murphy had been cooperative in making a full confession.  To do that, he argued what was in Murphy's mind, that he was trying to get out of trouble in making that statement, not whether it was legally effective to do so.  The fact that Murphy was dead wrong in making that statement was of no moment.  The point being made was that he was trying to avoid the prosecution.

Murphy has not shown that an objection to this argument would have been sustained, much less that it would have made any difference at his trial.  Defense counsel may reasonably have wanted to avoid having the jury dwell on the prosecutor's argument by making an objection and letting the prosecutor argue further about Murphy's intent in making the statement that the shooting was an accident, even if it would have resulted in a prosecutor having to revise his argument and avoid saying that Murphy had made that statement trying to "walk smooth out of the courthouse." It would appear perfectly reasonable to avoid focusing on an issue that the jury had already found against your client, even if the objection could have been sustained.  And Murphy does not show any prejudice in that, even if an objection would have been sustained, it would have changed the result of the proceeding.  Therefore, Murphy has not satisfied either prong of *Strickland*.  Again, if

this portion of the claim were not procedurally barred, it would be denied for lack of merit.

## C. *Effective Assistance of Counsel - Guilt/Innocence Stage*

In his third claim, Murphy contends that he was deprived of the effective assistance of counsel in the guilt/innocence phase of his trial.  (Am. Pet. Br. at 58-64.)  Respondent asserts that this claim is procedurally defaulted and, in the alternative, meritless.  (Ans. at 92-103.)

### 1. Claim

Murphy complains that his trial counsel (1) failed to object to testimony regarding petitioner's post-arrest silence, (2) opened the door to police opinion testimony that petitioner was not telling the truth, and (3) failed to object to argument that the jury had to acquit petitioner of capital murder before it could consider the lesser included offenses.

### 2. State Court Proceedings

This claim was not raised in the initial state habeas proceedings, but was presented in subsequent state habeas proceedings.  The CCA found that Murphy had not met the criterion for a subsequent habeas application on this claim and dismissed it as an abuse of the writ.  *Ex parte Murphy,* 2012 WL 982945 at *1.

### 3. Analysis

#### a. Procedural Bar

As with the earlier claim, Respondent asserts that this claim is procedurally barred, and Murphy acknowledges that it was not presented to the state court in the original state habeas proceeding.  The CCA's dismissal of this claim as an abuse of the writ is consistent with its application of the procedural bar in these situations where the Texas courts have consistently applied its abuse-of-the-writ doctrine as an independent and adequate state ground for imposing a procedural

bar in federal court.  *See Canales,* 765 F.3d at 566; *Hughes*, 530 F.3d at 342.

Murphy also argues that this claim comes within the exception to procedural bar created in *Martinez*.  Again, as set out in the alternate merits analysis below, this claim, including its subparts, does not have any merit, and state habeas counsel is not ineffective in failing to present meritless claims.  *See Garza,* 738 F.3d at 676; *Beatty,* 759 F.3d at 466 (5th Cir. 2014).  Therefore, the claim is DENIED as barred.

### b.  Alternative Merits Analysis

In the alternative, Murphy has not shown that his claim, or any of its subparts, has merit.

### 1. <u>Testimony Regarding Silence</u>

Murphy complains about testimony by Detective Myers commenting on Murphy's post-arrest silence for the purpose of showing that Murphy's silence suggested guilt. (Am. Pet. Br. at 58-60.)  In addition to the procedural bar referenced above, Respondent asserts that this claim lacks merit.  (Ans. at 92-96.)

Prior to trial, Murphy moved to suppress his statements on the basis that they were involuntary, coerced, and had been obtained in violation of *Miranda v. Arizona,* 384 U.S. 436 (1966), and of his constitutional rights to counsel and to remain silent.  (1 CR 127-28.)  Murphy also raised the issues in a *sub rosa* hearing during the trial.  (48 RR at 2-20, 44-76.)  Upon receiving the trial court's findings and conclusions overruling their objections and motion to suppress, trial counsel asked for the issue to be included in the jury charge and submitted to the jury.  (48 RR at 76.)    The trial court approved the request (48 RR at 76), and the issue was included in the charge. (1 CR at 175-79.)  During the remainder of the guilt phase portion of the trial, the prosecutor examined witnesses before the jury regarding the *Miranda* warnings given to Murphy, the officers'

questioning of Murphy and his waiver of rights under *Miranda* before answering questions. Murphy's counsel also examined the lead detective regarding the fact that the police did not know where the offense had occurred despite their many attempts to get this information in connection with the prosecution's burden to prove that venue was proper in Dallas County.  (48 RR at 252-53; 1 CR 179-81.)

The prosecutor presented evidence that Murphy was cooperative, waived rights and answered questions, but also that the officers would respect Murphy's refusal to answer questions. Murphy makes the following complaint about this evidence.

> Counsel elicited on cross-examination that the police conducted additional interviews with petitioner on October 7 and October 11 and that they attempted to interview him on October 13 to determine the locations of the abduction and the murder ([48] R.R. 252-53).  The prosecutor elicited without objection on redirect examination that Myers advised petitioner of his rights and sought to interrogate him further on October 13, but he said that he did not want to speak to the police (48 R.R. 260).

(Am. Pet. Br. at 59.)

As discussed earlier, Murphy must show that trial counsel failed to make a valid objection that would have prevented the admission of prejudicial evidence.  *See Clark,* 19 F.3d at 966. Further, counsel's decision whether to challenge admission of evidence is a matter of trial strategy. *See Morales,* 714 F.3d at 305.  Murphy has not shown that an objection would have prevented the admission of evidence, much less that counsel's decision to not object was an unreasonable trial strategy.

A prosecutor is not generally permitted to use a defendant's silence as evidence of his guilt. *See Griffin v. California,* 380 U.S. 609, 615 (1965).  Also, once an accused is informed of his right to remain silent, the prosecutor may not use evidence that the accused later exercised his right to

remain silent as evidence of his guilt. *See Doyle v. Ohio,* 426 U.S. 610, 619 (1976). When a

defendant contests the voluntariness of his confession, however, the prosecutor may, and indeed

must, introduce evidence showing that the accused knowingly and voluntarily waived his *Miranda*

rights..

> The waiver inquiry "has two distinct dimensions": waiver must be "voluntary in the
> sense that it was the product of a free and deliberate choice rather than intimidation,
> coercion, or deception," and "made with a full awareness of both the nature of the
> right being abandoned and the consequences of the decision to abandon it."

*Berghuis v. Thompkins,* 560 U.S. 370, 382–83 (2010) (quoting *Moran v. Burbine,* 475 U.S. 412, 421

(1986)). In *Michigan v. Mosley,* 423 U.S. 96 (1975), the Supreme Court found that a person's "right

to cut off questioning" to be a critical safeguard in determining whether a waiver of *Miranda* rights

is voluntary.

> Through the exercise of his option to terminate questioning he can control the time
> at which questioning occurs, the subjects discussed, and the duration of the
> interrogation. The requirement that law enforcement authorities must respect a
> person's exercise of that option counteracts the coercive pressures of the custodial
> setting.

*Id.* at 103–04. Therefore, the fact that the officers respected Murphy's decisions regarding when to

allow and when to cut off questioning supports the voluntariness of Murphy's confessions.

Murphy has not shown that the purpose of the prosecutor's questioning was to use Murphy's

silence as evidence of his guilt. The prosecutor used Murphy's confessions to do that. Instead, this

evidence appears intended to show that the officers would have respected, and did respect, Murphy's

exercise of his rights under *Miranda,* and therefore did not coerce Murphy. Because this evidence

was relevant to the issue of the voluntariness of Murphy's confession and waiver of *Miranda* rights,

it appears to have been admissible at trial. Murphy has not shown that an objection to this evidence

would have prevailed.

Even if an objection would have prevailed, however, Murphy has not provided any reason to believe that trial counsel made anything other than a reasonable strategic decision to allow the evidence. In fact, Murphy's own questioning of this officer attempted to show to the jury that the police did not know, and still do not know, important facts such as where the offense occurred. He also used this evidence to argue that the prosecution had failed to prove that venue was proper in Dallas County, presented the issue to the jury, and raised it as an issue in his twelfth point of error on direct appeal. *Murphy v. State,* 112 S.W.3d at 603-604.

The failure to make a meritless objection cannot establish ineffective assistance of counsel. *See Clark,* 19 F.3d at 966. But even if it could, reasonable strategic reasons appear in the record to support trial counsel's decision to allow this evidence before the jury. If this portion of the claim were not procedurally barred, it would be denied for lack of merit.

## 2. Police Opinion Testimony

Murphy complains that trial counsel opened the door to police opinion testimony that he was not telling the truth. (Am. Pet. Br. at 60-61.) He contends that trial counsel's question to Detective Myers about whether he thought Murphy was telling the truth at one point was ineffective assistance because it allowed the prosecutor to ask Myers if he thought Murphy was lying at another time. Respondent points out that trial counsel's questioning showed not merely Murphy's truthfulness, but his remorse and cooperation with the police, which had a value beyond whether he was always truthful with the police. (Ans. at 97-98.)

As discussed above, Murphy's trial counsel ultimately sought to prove that he was cooperative with the police and remorseful. (59 RR 104.) Trial counsel also sought to show that the prosecution did not know where the offense occurred and would not be able to show that venue

46

was proper in Dallas County, Texas, despite repeatedly asking Murphy and driving him around potential locations. (48 RR at 241-44.) These strategies were served by getting the lead detective in charge of the case to admit that he thought Murphy was cooperative and telling the truth when he took him to these locations, but that despite their best efforts, they still didn't know. (48 RR at 244-45.) Trial counsel argued about each of these efforts to find out where the offense occurred to prove venue, and the prosecutor still couldn't prove that. (52 RR at 28-30.) Counsel also argued that they did not find the location of the offense because they did not take Murphy outside of Dallas County. (52 RR at 28-29.) This revealed not only the importance of the police not knowing the location of the offense to prove venue, but also highlighted Murphy's cooperation with multiple investigative efforts against him. These points would ultimately appear to help Murphy's defense in both stages of the trial.

Again, Murphy has not provided any reason to believe that trial counsel did not make a reasonable strategic decision, which is suggested by the record. Murphy has also not shown that the result of either stage of the trial would have been different. Therefore, he has not proven either prong of *Strickland.* If this portion of the claim were not procedurally barred, it would be denied for lack of merit.

### 3. Failure to Object to Argument

Murphy complains that trial counsel failed to object to the argument that the jury had to acquit petitioner of capital murder before it could consider the lesser included offenses. (Am. Pet. Br. at 61-64.) Respondent argues that the case authority relied upon by Murphy to complain that the prosecutor's argument was objectionable was not issued until 2009, eight years after Murphy's trial, that at the time of trial, the state of the law was that the argument was permissible, and that

since we are to measure counsel's conduct at the time it occurred, trial counsel could not be found ineffective for failing to make a meritless objection. (Ans. at 99-102.) Murphy responds that the law at the time of trial was essentially the same in this respect. (Reply at 24.)

The jury instructions in Murphy's case charged capital murder and the lesser included offenses of murder and manslaughter. It instructed the jury that if they found the evidence beyond a reasonable doubt for a higher offense they will find the defendant guilty of that higher offense, but "[i]f you do not so believe, or if you have a reasonable doubt thereof, you will next consider whether the defendant is guilty of" a lesser offense, and after the least offense charged, to find the defendant not guilty. (1 CR 181-182.) During the closing arguments, the prosecutor argued,

> Now, when you're looking at the Court's charge, ladies and gentlemen, there is something that's called the application paragraphs. And they start on page 13, and it starts with capital murder. That is the first offense you are to consider. Only if you do not believe the State has proven it beyond a reasonable doubt do you go to one of the lesser included offenses. The two lesser included offenses that are contained in this Court's charge are murder and manslaughter.

(52 RR at 17.)

*Strickland* requires that counsel's performance be evaluated "from counsel's perspective at the time." 466 U.S. at 689. This requirement counters the "natural tendency to speculate as to whether a different trial strategy might have been more successful." *Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993). This Court must apply this "rule of contemporary assessment of counsel's conduct." *Id.; see also Westley v. Johnson,* 83 F.3d 714, 723 (5th Cir. 1996) ("The deficiency prong of *Strickland* is judged by counsel's conduct under the law existing at the time of the conduct.").

Murphy complains that the prosecutor argued that the jury had to "acquit" the defendant of the higher charge before considering the lesser charge. (Am. Pet. Br. at 61, 62.) Although the prosecutor's argument did not include that term, the CCA in *Boyett v. State,* 692 S.W.2d 512 (Tex.

48

Crim. App. 1985), found that jury instructions should have included the term "acquit" in the sequential consideration of lesser-included offenses.

> We agree with appellant that the charge given in the instant case should have more explicitly instructed the jurors that if they did not believe, or if they had reasonable doubt of appellant's guilt of the greater offense, ***they should acquit appellant and proceed to consider whether appellant was guilty of the lesser included offense***. *See* 8 S. Willson, Criminal Forms Ann., Chapter 93 (Texas Practice 1977). If we were not reviewing this charge under a fundamental error standard, such error might well be reversible. However, the instruction given, although not a model charge, essentially instructed the jurors to acquit, without specifically using the word "acquit", by stating that if the jurors had a reasonable doubt as to the guilt of appellant to the greater offense, they should next consider the lesser included offense.

*Boyett,* 692 S.W.2d at 515-16. This suggested support for the type of argument made by the prosecutor, and at least one Texas appellate court so interpreted *Boyett.*

In *Harris v. State,* 287 S.W.3d 785, 790 (Tex. App. 2009), the appellate court upheld a jury charge "instructing the jury to agree unanimously to acquit appellant of manslaughter before determining whether appellant was guilty of the lesser-included offense of criminally negligent homicide." *Harris* was abrogated by the CCA in *Barrios v. State,* 283 S.W.3d 348, 353 (Tex. Crim. App. 2009), which criticized the use of the word "acquit" as "inartful," and interpreted *Boyett* differently and in the manner now being argued by Murphy.

In the instant case, the prosecutor's argument does not include the term "acquit" or expressly state that the jury must unanimously acquit of the higher charge before considering the lesser. Even so, such an argument would not appear to have obviously been prohibited by the law as it existed at the time of Murphy's trial. But even if trial counsel was deficient in failing to object, Murphy has not shown prejudice. He makes no argument that the actual jury charge was incorrect, and the state court would presume that the jury followed its instructions. *See Hutch v. State,* 922 S.W.2d 166, 170

(Tex. Crim. App.1996); *Ex Parte Damaneh,* No. WR-75134-01, 2011 WL 4063336 (Tex. Crim. App. 2011).

Murphy has not shown that the prosecutor's argument was clearly contrary to the law as it existed at the time, and that trial counsel performed deficiently in failing to object.  But even if trial counsel was deficient in failing to object, Murphy has not satisfied the prejudice prong of *Strickland.* If this portion of the claim were not procedurally barred, it would be denied on the merits.

### D.  Excusal of Venireperson for Cause

In his fourth claim, Murphy contends that he was deprived of his rights to due process under the Fourteenth Amendment when the trial court excused venireperson Alena Treat for cause.  (Am. Pet. Br. at 65-70.)  Respondent asserts that the state court reasonably denied this claim.  (Ans. at 103-110.)

Murphy complained that Treat was improperly excused in violation of *Witherspoon v Illinois,* 391 U.S. 510, 512 (1968), and *Wainwright v. Witt,* 469 U.S. 412, 424 (1985).  (Am. Pet. Br. at 69.)  The CCA found,

> During voir dire, Treat stated that her understanding of the phrase "criminal acts of violence" meant "the same type of crime" as the capital murder that the defendant would have been convicted of in the guilt phase.  Treat maintained that the State would have to prove that the defendant would commit or attempt to commit another murder in order to prove future dangerousness.  When questioned by the trial court, Treat stated that intentionally causing a person to become mentally disabled by giving them a drug that would put them into a coma would also rise to the level of a criminal act of violence but conceded later that even these circumstances essentially amounted to an attempted murder.

*Murphy,* 112 S.W.3d at 597.  Murphy does not appear to disagree with these facts, but argues that there was no "principled reason" for the CCA to rule that the potential juror was excused in violation of the state statute but not in violation of *Witherspoon* and *Witt.*  (Am. Pet. Br. at 69.)

The Supreme Court in *Witherspoon* held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. 391 U.S. at 522. In *Witt,* the Supreme Court clarified *Witherspoon* and held that a prospective juror may be excluded for cause because of his or her views on capital punishment when "the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. at 424.

The CCA explained that *Witherspoon* and *Witt* were not violated was because the potential juror was not excused based on her views regarding the death penalty but because of her interpretation of the statutory language.

> Treat was excluded in this case because her own definition of the phrase "criminal acts of violence" would require evidence that appellant committed or attempted to commit other murders. While the phrase at issue is embedded within our capital death penalty provision which itself is continually assessed for its ability to hold up against federal constitutional standards, the wrongful elimination of a juror for establishing her own definition of that phrase does not implicate *Witherspoon/Wainwright.* Treat harbored no general opposition to the death penalty. She was not excluded because her views on capital punishment in general would prevent or impair her performance.

*Murphy,* 112 S.W.3d at 599.

The Court agrees with the CCA's reasoning, but even if it didn't, Murphy has not shown this adjudication to be unreasonable. Under § 2254(d)(1), "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter,* 562 U.S. at 101 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

Murphy has not sustained his burden to show the state court's adjudication to be either contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court, or one that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, he has not overcome the AEDPA deference required under § 2254(d). Murphy's fourth claim is DENIED.

## E. Questions During Jury Selection

In his fifth claim, Murphy contends that he was deprived of his his Sixth Amendment right to trial by an impartial jury when the trial court refused to allow him to question the potential jurors regarding victim impact and character evidence. (Am. Pet. Br. at 70-74.) Framing it as a due process complaint, Respondent argued that the trial court did not abuse its broad discretion in limiting the questioning during jury selection. (Ans. at 112-14.) Specifically, because the sought questions did not pertain to issues of racial prejudice or pretrial news coverage, Murphy has not shown the state court's application of Supreme Court precedent to be unreasonable or that he was deprived of a fair trial. (Ans. at 113-14.)

Murphy asserts that he raised this as a point of error on direct appeal. (Am. Pet. Br. at 71.) The CCA set forth the facts in its opinion as follows:

> In a pretrial hearing, appellant sought permission from the trial court to ask prospective jurors the following two questions:
>
> > Would victim character testimony cause you to reduce the State's burden of proof on Special Issue Number 1?
> >
> > Do you promise the Court that you would not do so?
>
> The State objected on the ground that the questions sought commitments from the jurors. The court sustained the State's objection. Appellant argues that his questions simply inquired whether prospective jurors would hold the State to its burden of proof notwithstanding the presence of evidence of the victim's character.

*Murphy,* 112 S.W.3d at 596.  Special Issue Number 1 asks the jury about future dangerousness.

Murphy acknowledges that victim impact and character evidence is relevant to the mitigation special

issue but argues that it is not relevant to the future dangerousness special issue because he and the

victim were strangers.  (Am. Pet. Br. at 73.)

In denying this point of error, the CCA reasoned that the trial court did not abuse its

discretion in denying Murphy's request because the proposed questions were potentially misleading

or confusing.  The request did not provide the jury with the proper contextual information and

suggested that the standard of proof could change based on the type of evidence presented.

> The trial court did not abuse its discretion in disallowing the questions.
> Appellant did not state how "victim character testimony" would be defined nor did
> he state whether or not venirepersons would be informed of this area of law before
> being asked such questions.  *Cf. Chambers v. State,* 903 S.W.2d 21, 29
> (Tex.Crim.App.1995) (stating venireperson not shown biased or prejudiced against
> the law unless the law is first explained to them).  A proper explanation of the law
> is essential before asking a question upon which a challenge for cause due to bias
> against the law might be based.  *See id.*  Prospective jurors would need to be
> informed that the standard of proof by which the State must prove its case remains
> constant; it may not be increased or reduced depending upon the presentation of a
> certain type of evidence.  In addition, because the standard of proof by which the
> State must prove its case is not affected by the presentation of any certain type of
> evidence, the trial court could reasonably have concluded that the questions would
> be confusing or misleading.

*Murphy,* 112 S.W.3d at 596.

Thus, the CCA opinion did not endorse a refusal to allow counsel to ask potential jurors their

views about any particular subject, such as victim impact or character evidence, but simply required

counsel to present their proposed questions in a proper context and not in a potentially confusing

or misleading manner.  The state court required counsel to precede questions about whether a

potential juror would follow the law with an explanation of the law in question, citing its rule that

"a venireperson is not shown to be biased or prejudiced against the law unless that law has been

explained to them." *Chambers v. State,* 903 S.W.2d 21, 29 (Tex. Crim. App. 1995).  Further, the CCA observed that the questions were potentially confusing or misleading because they suggested that "the standard of proof by which the State must prove its case" could "be affected by the presentation of any certain type of evidence."  *Murphy,* 112 S.W.3d at 596.

Before this Court, Murphy has not overcome these bases for the CCA's ruling.  Regarding Murphy's failure to include the proper contextual information in his proposed questions, he simply argues that the CCA should have assumed that the proper contextual information would have been provided because it had apparently been provided for other unidentified questions.[7]  (Am. Pet. Br. at 74.)  Murphy does not, even now, provide the required information or show how the suggestion that the burden of proof could change would not be confusing or misleading to the potential jurors.  Instead, his argument relies upon speculation about what would have happened if the questions had been allowed.

Respondent's argument also reaches a potential federal issue that was not decided by the CCA, which is whether the trial court could have prohibited questioning on victim impact or character evidence.  Respondent points out that Murphy has not cited any Supreme Court case addressing this specific issue and suggests that there is none.  Respondent argues that because the only Supreme Court precedent outside of racial or publicity matters are only of the most general type, this Court could not find that the CCA opinion was an unreasonable application of any clearly established federal law as determined by the Supreme Court under § 2254(d)(1).  While this

---

[7]Murphy's arguments reverse the burden.  Murphy argues that the CCA should have found that the trial court abused its discretion not because the necessary information was provided to the trial court, but because there was "no factual basis" for these state courts to conclude that the necessary information would not eventually have been provided for these questions if they had been allowed.  (Am. Pet. Br. at 74.)  And Murphy complains that he should not have been required to explain how victim impact and character evidence would be defined or how they would explain the law to the veniremen until after the trial court decided to allow the potentially confusing questions.

argument may be correct, it is not necessary to address it because the CCA did not reach that issue. Instead, it decided the point of error as inadequately presented because of the absence of necessary contextual information.  This would be a procedural matter, a matter of state law, and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991).

In this case, Murphy does not point to anywhere in the record where he set forth the proper contextual basis at trial for asking the actual questions made the basis of his complaint to the CCA. He has not shown that the CCA's decision unreasonably applied federal law or was based on an unreasonable determination of the facts based on the record before the state court.   Therefore, he has not satisfied the requirements of § 2254(d).  Accordingly, Murphy's fifth claim is DENIED.

## VI.  REQUEST FOR EVIDENTIARY HEARING

Murphy requests an evidentiary hearing on his claims of ineffective assistance of trial counsel, which are presented in his second and third grounds for relief.  (Am. Pet. Br. at 75; Reply at 28.)  This Court has discretion to grant an evidentiary hearing if one is not barred under § 2254(e)(2).  *See Schriro v. Landrigan,* 550 U.S. 465, 468 (2007).  In exercising that discretion, the Court considers whether a hearing could enable petitioner to prove the petition's factual allegations which, if true, would entitle him to relief.  *Id.* at 474.  The Court also must consider the deferential standards which limit the Court's ability to grant habeas relief.  *Id.*

Murphy argues that a hearing is required because the state court did not conduct a hearing on these claims even though he requested it.  (Am. Pet. Br. at 27; Reply at 16-25.)  Murphy also argues that these claims come within the exception to bar created in *Martinez,* and that this Court should review these claims *de novo*, requiring an evidentiary hearing to receive testimony on matters

55

such as trial counsel's strategy. (Reply at 8-16.) The United States Court of Appeals for the Fifth Circuit has declined to hold that *Martinez* mandates an evidentiary hearing or opportunity for evidentiary development in federal court. *See Segundo v. Davis,* ___ F.3d ____, 2016 WL 4056397, at *3-4 (5th Cir. July 28, 2016). Instead, the narrow exception created in *Martinez* "merely allows" federal merits review of a claim that otherwise would have been procedurally defaulted.

"Reading *Martinez* to create an affirmative right to an evidentiary hearing would effectively guarantee a hearing for every petitioner who raises an unexhausted IATC claim and argues that *Martinez* applies." 2016 WL 4056397, at *3. And although the cause and prejudice inquire is fact-specific, that does not entitle habeas petitioners to evidentiary development, particularly when the record before the court is sufficient to show that the claims do not have any merit. 2016 WL 4056397, at *4. In light of the record and this Court's own review of the merits of these claims, the request for an evidentiary hearing is denied.

## VII. CONCLUSION

The Court denies Murphy's amended petition for a writ of habeas corpus.

In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the Court denies Murphy a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell,* 537 U.S. 322, 338 (2003); *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000); 28 U.S.C. § 2253(c)(2). If Murphy files a notice of appeal, he may proceed in forma pauperis on appeal.

SIGNED January 23, 2017.

David C. Godbey
United States District Judge