OFFICIAL NOTICE FROM COURT OF CRIMINAL APPEALS OF TEXAS
P.O. BOX 12308, CAPITOL STATION, AUSTIN, TEXAS 78711

9/10/2003
AP-74,145
MURPHY, JEDIDIAH ISAAC
COA No.   Tr. Ct. No. F00-02424-14
Dallas County, 194th District Court

I have this day, **SEP 1 6 2003** , received the mandate of the Court of Criminal Appeals in the above numbered and styled case.

**RETURN CARD IMMEDIATELY.**

Signature

Troy C. Bennett, Jr., Clerk
Court of Criminal Appeals
P.O. Box 12308, Capitol Station
Austin, Texas 78711

**ATTN: VERONICA ARELLANO**

# TEXAS COURT OF CRIMINAL APPEALS
## Austin, Texas

# M A N D A T E

**THE STATE OF TEXAS,**

**TO THE  194th JUDICIAL DISTRICT COURT OF DALLAS COUNTY  — GREETINGS:**

Before our **COURT OF CRIMINAL APPEALS**, on the **25th** day of **JUNE**, A.D. 2003, the cause upon appeal to revise or reverse your Judgment between:

### JEDIDIAH ISAAC MURPHY
### VS.
### THE STATE OF TEXAS

**CCRA NO. 74,145**

**TRIAL COURT NO. F00-02424-M**

was determined; and therein our said **COURT OF CRIMINAL APPEALS** made its order in these words:

"This cause came on to be heard on the record of the Court below, and the same being considered, because it is the Opinion of this Court that there was no error in the judgment, it is **ORDERED, ADJUDGED AND DECREED** by the Court that the judgment be **AFFIRMED**, in accordance with the Opinion of this Court, and that this Decision be certified below for observance."

Appellant's Motion for Rehearing is DENIED.

WHEREFORE, We command you to observe the Order of our said **COURT OF CRIMINAL APPEALS** in this behalf and in all things have it duly recognized, obeyed and executed.

WITNESS, **THE HONORABLE SHARON KELLER,**

Presiding Judge of our said **COURT OF CRIMINAL APPEALS,**

with the Seal thereof annexed, at the City of Austin,

this **10th** day of **SEPTEMBER**, A.D. 2003.

**TROY C. BENNETT, JR.**, Clerk



_____, Deputy Clerk

Veronica Arellano



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. 74,145

### JEDIDIAH ISSAC MURPHY, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM DALLAS COUNTY

**Johnson, J., *filed a concurring opinion in which* Womack and Cochran, J.J., *joined.***

### O P I N I O N

I join the opinion of the Court except as to points of error seven and eight and concur in the judgment of the Court as to those points.

In a capital murder trial in which the state seeks the death penalty, Texas law requires jurors to determine whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society . . .." Only if all jurors believe that the defendant will continue to be a danger can the trial court assess the death penalty. TEX. CODE .

CRIM. PROC., art. 37.071, §§ 2(b)(1) and 2(d)(2). Thus, it is imperative that jurors understand the difference between "probable" and possible."

While it is possible that I will win the lottery, it is not probable; indeed, it is highly improbable. There are several reports of people who receive mailings from Publishers Clearinghouse that say that they "may already be a winner" and, confusing possibility and probability, begin to spend as if they have won millions. For them, the inability to distinguish between "probable" and "possible" has a financial cost.

If a juror confuses "probable" and "possible" and also believes that there is a small chance that the defendant might commit violent acts in the future, even if that juror also believes that another violent act is unlikely, that juror may feel compelled to find that the defendant is a future danger. If that juror is also the twelfth vote, the cost of that confusion is the defendant's life.

In *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992), this Court stated that a prospective juror who cannot distinguish between probable and possible is properly challengeable for cause and that the trial court abused its discretion in denying such a challenge. Too, the legislature was very specific when it promulgated the procedures for assessing the death penalty, and this Court is bound by those procedures. The legislature required "probability," and so must this Court.

In this case, two jurors appear from the record to be unable to distinguish "probability" and "possibility." Brooks stated that the probability is "'a chance,'" while Williams "continued to reiterate that she believed probability and possibility mean the same thing." *Murphy v. State*, slip op. at 10, *supra*. Under *Hughes*, both Brooks and Williams were properly challengeable, and the trial court abused its discretion in denying appellant's challenges to them.

3

The next issue is harm.  Although I would find an abuse of discretion as to both Brooks and Williams, neither served on the jury, and appellant has not complained that he has suffered harm by the need to expend peremptory challenges.  He has therefore failed to establish harm, and I would find that the error in denying his challenges for cause was harmless.

Johnson, J.

Filed: June 25, 2003
En banc
Publish



# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. 74,145

### JEDIDIAH ISSAC MURPHY, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM DALLAS COUNTY

*Holcomb, J., delivered the opinion of the Court, in which Meyers, Price, Keasler, and Hervey, JJ., joined. Keller, P.J., concurred in the result with respect to Point of Error Number Three and otherwise joined the opinion of the Court. Johnson, J., filed an opinion, in which Womack and Cochran, JJ., joined, that concurred in the result with respect to Points of Error Numbers Seven and Eight and otherwise joined the opinion of the Court.*

## O P I N I O N

Appellant was convicted in June 2001 of capital murder. TEX. PENAL CODE ANN. §19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to

death. Art. 37.071 §2(g).[1]  Direct appeal to this Court is automatic.  Art. 37.071 §2(h).

Appellant raises twenty points of error.  We affirm.

In his first point of error, appellant claims the trial court violated his rights under the

Sixth Amendment to the United States Constitution by limiting his voir dire questioning

pertaining to the State's burden of proving beyond a reasonable doubt that appellant posed

a future danger.  In a pretrial hearing, appellant sought permission from the trial court to ask

prospective jurors the following two questions:

> Would victim character testimony cause you to reduce the State's burden of
> proof on Special Issue Number 1?

> Do you promise the Court that you would not do so?

The State objected on the ground that the questions sought commitments from the jurors.

The court sustained the State's objection. Appellant argues that his questions simply inquired

whether prospective jurors would hold the State to its burden of proof notwithstanding the

presence of evidence of the victim's character.

A trial court has broad discretion over voir dire, including the propriety of particular

questions.  *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002).  A trial court's

discretion is abused only when a proper question about a proper area of inquiry is prohibited.

*Id.*

---

[1]  Unless otherwise indicated, all references to articles refer to those in the Texas Code of
Criminal Procedure.

Murphy--3

The trial court did not abuse its discretion in disallowing the questions. Appellant did not state how "victim character testimony" would be defined nor did he state whether or not venirepersons would be informed of this area of law before being asked such questions. *Cf. Chambers v. State*, 903 S.W.2d 21, 29 (Tex. Crim. App. 1995)(stating venireperson not shown biased or prejudiced against the law unless the law is first explained to them). A proper explanation of the law is essential before asking a question upon which a challenge for cause due to bias against the law might be based. *See id.* Prospective jurors would need to be informed that the standard of proof by which the State must prove its case remains constant; it may not be increased or reduced depending upon the presentation of a certain type of evidence. In addition, because the standard of proof by which the State must prove its case is not affected by the presentation of any certain type of evidence, the trial court could reasonably have concluded that the questions would be confusing or misleading. Point of error one is overruled.

In his second point of error, appellant asserts the same argument he made in point of error one under Article I, Section 10 of the Texas Constitution. However, because appellant does not argue that the Texas Constitution provides, or should provide, greater or different protection than its federal counterpart, appellant's point of error is inadequately briefed. *See Heitman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991). Point of error two is overruled.

In his third and fourth points of error, appellant claims the trial court abused its discretion by granting the State's challenge for cause against venireperson Alena Treat, in

violation of Article 35.16 and the Fourteenth Amendment to the United States Constitution. The trial court granted the State's challenge for cause against Treat on the ground that she would require proof of another murder or attempted murder before finding appellant would commit criminal acts of violence that would pose a continuing threat to society. Appellant relies on the reasoning in *Garrett v. State*, 851 S.W.2d 853, 859 (Tex. Crim. App. 1996), and cites *Witherspoon v. Illinois*, 391 U.S. 510 (1969), to argue that Treat's views about the death penalty would not have prevented or substantially impaired her ability to follow the court's instructions or the law and her juror's oath.

During voir dire, Treat stated that her understanding of the phrase "criminal acts of violence" meant "the same type of crime" as the capital murder that the defendant would have been convicted of in the guilt phase. Treat maintained that the State would have to prove that the defendant would commit or attempt to commit another murder in order to prove future dangerousness. When questioned by the trial court, Treat stated that intentionally causing a person to become mentally disabled by giving them a drug that would put them into a coma would also rise to the level of a criminal act of violence but conceded later that even these circumstances essentially amounted to an attempted murder.

In *Fuller v. State*, 829 S.W.2d 191, 200 (Tex. Crim. App. 1992), *cert. denied*, 508 U.S. 941 (1993), the venireperson was challenged for cause on the ground that she would consider imposing capital punishment for serial murderers only. We said that "[b]ecause our law does not categorically reserve capital punishment only for those who have murdered

before, neither may individual jurors in a capital murder case." We accordingly held that under these circumstances, the trial court did not abuse its discretion in granting the State's challenge for cause. *Id.* at 201.

In *Garrett*, 851 S.W.2d at 859, the trial court granted the State's challenge for cause against a venireperson who testified that he could never answer the future dangerousness issue affirmatively based solely on the facts of the capital offense. The venireperson was struck for harboring a bias or prejudice against the law upon which the State was entitled to rely. We reversed, explaining that each juror must decide for himself what amount of proof would constitute the threshold of beyond a reasonable doubt:

> [T]hat the law permits jurors to find future dangerousness in some cases on the facts of the offense alone does not mean that *all* jurors must do so, or even consider doing so. A particular juror's understanding of proof beyond a reasonable doubt may lead him to require more than the legal threshold of sufficient evidence to answer the second special issue affirmatively. There is nothing unlawful about that; in fact, quite the opposite. As the trial judge himself explained to Bradley early in his voir dire, *an individual juror must determine what proof beyond a reasonable doubt means to him, for the law does not tell him[.] . . .* That an individual venireman would set his threshold higher than the minimum required to sustain a jury verdict does not indicate he has a bias or prejudice against the law.

*Id.* (emphasis added and footnotes and citations omitted).

In *Rachal v. State*, 917 S.W.2d 799, 811 (Tex. Crim. App.)(plurality opinion), *cert. denied*, 519 U.S. 1043 (1996), two venirepersons were challenged for cause by the State. Venireperson Terrell testified that even if she believed beyond a reasonable doubt that the State had proved future dangerousness, she would not answer the issue affirmatively unless

the State also presented evidence that the defendant had a prior felony conviction. *Id.* Venireperson Adams testified that even if convinced beyond a reasonable doubt that the defendant would be a future danger, he would nevertheless require evidence that the defendant would kill another human being before he would answer the issue affirmatively. The defendant conceded that under *Fuller*, the venirepersons were properly challenged, but argued that *Fuller* had been overturned by *Garrett*. A plurality of the Court disagreed, holding that *Fuller* controlled and *Garrett* was distinguishable. *Id.* at 811.

A year later, a majority of the Court in *Howard v. State*, 941 S.W.2d 102, 129 (Tex. Crim. App. 1996)(op. on reh'g), *cert. denied*, 535 U.S. 1065 (2002), reaffirmed the reasoning in *Garrett*, holding that:[2]

> A venireman who requires evidence of a prior murder has not demonstrated an inability to abide by the law if his requirement is predicated upon his personal threshold of reasonable doubt. The State must show more, *viz*: that the venireman's insistence on evidence of a prior murder will prevent him from honestly answering the special issue *regardless* of whether he was otherwise convinced beyond a reasonable doubt of future dangerousness, before it can be said it has met its burden to demonstrate the venireman cannot follow the law.

*Id.* Thus, under *Howard*, it is plain that prospective jurors may form their own definitions

---

[2] In so holding, the Court in *Howard* noted the existence of other circumstances that justified the challenges against the venirepersons at issue in *Fuller* and *Rachal*. *Howard*, 941 S.W.2d at 128 (referring to venireperson's tendency to "pay heed to his own conception of what the law ought to be rather than follow the legal criteria" as justifying challenges for cause). *Howard*, 941 S.W.2d at 128. In addition, the venireperson in *Fuller* was not fully questioned so that it was "impossible to tell whether her own personal preference or bias would likely prevent her from following the law." *Id.* at n.2.

of proof beyond a reasonable doubt and they are not challengeable for cause based upon the type and amount of evidence they require to reach that level of confidence. *Id.* at 127. Only if the venireperson would refuse to answer the issue "yes" unless a certain type of evidence is presented, even if the other evidence presented were sufficient to convince them of the special issue beyond a reasonable doubt, would the venireperson be challengeable for cause. *Id.*   Accordingly, the trial court erred in granting the State's challenge for cause against Treat.  Treat was entitled to determine for herself what future dangerousness meant to her.   That she would require a murder or attempted murder did not render her challengeable for cause. *Id.*

But Treat's exclusion from the jury may not necessarily be cause for reversal. *See Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997)(stating that except for certain federal constitutional errors labeled by United States Supreme Court as "structural," no error is categorically immune to harmless error analysis).   Appellant claims Treat's erroneous exclusion violates Article 35.16, *Witherspoon*, and the Fourteenth Amendment.   As to appellant's Article 35.16 claim, appellant must show that the erroneously granted challenge for cause deprived him of a lawfully constituted jury. *Feldman v. State*, 71 S.W.3d 738, 749 (Tex. Crim. App. 2002); *Brooks v. State*, 990 S.W.2d 278, 289 (Tex. Crim. App.), *cert. denied*, 528 U.S. 956 (1999); *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim. App. 1998), *cert. denied*, 582 U.S. 985 (1999).   He has made no such showing here.  Point of error three is overruled.

*Witherspoon* error, however, is not subject to a harm analysis under *Jones,* 982 S.W.2d at 391. We stated in *Jones* that, "[o]nly in very limited circumstances, when a juror is erroneously excluded because of general opposition to the death penalty ("*Witherspoon*" error), does the exclusion of a juror by an unintentional mistake amount to a constitutional violation." *Id.* Under *Witherspoon*, a venireperson would be excluded "only where they made it unmistakably clear they would automatically vote against the imposition of the death penalty, or where their attitude would preclude them from making an impartial determination of guilt or innocence." *Drinkard v. State*, 776 S.W.2d 181, 182 (Tex. Crim. App. 1989). In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court abandoned *Witherspoon's* substantive standard and its burden of proof requirement. *Id. Wainwright* reaffirmed the *Adams v. Texas*, 448 U.S. 38 (1980), standard for determining when a veniremember may be excluded for cause due to his or her views on capital punishment, holding that the critical inquiry is "whether a juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* (discussing *Wainwright*, 469 U.S. at 424).

Treat was excluded in this case because her own definition of the phrase "criminal acts of violence" would require evidence that appellant committed or attempted to commit other murders. While the phrase at issue is embedded within our capital death penalty provision which itself is continually assessed for its ability to hold up against federal constitutional standards, the wrongful elimination of a juror for establishing her own

definition of that phrase does not implicate *Witherspoon/Wainwright*. Treat harbored no general opposition to the death penalty. She was not excluded because her views on capital punishment in general would prevent or impair her performance. Point of error four is overruled.

In points of error five through eight, appellant claims the trial court erred by denying appellant's challenges for cause against four venirepersons. Appellant claims these venirepersons were all biased against the law and therefore his challenges for cause should have been granted.[3]

During the voir dire of venireperson Phillip Mays, defense counsel asked him about times when "the laws of man conflict with the laws of God, specifically the Ten Commandments." Pointing to Mays' statement that he was not sure where the two would conflict, but if they did, he would side with his religious beliefs, appellant concludes that Mays was therefore challengeable for cause on the ground that he would be impaired in his ability to follow the law.

Appellant failed to demonstrate that Mays was first informed that he would be required to take an oath that in the case of any conflict between the tenets of Mays' religion and the law on which Mays would be instructed, Mays would be required to follow the law. In the absence of a showing that Mays was fully informed as to the applicable law, appellant

---

[3] We assume, without deciding, that appellant preserved his complaints for review.

has failed to show that Mays was biased or prejudiced against the law. *See Curry v. State*, 910 S.W.2d 490, 493 (Tex. Crim. App. 1995); *Chambers v. State*, 903 S.W.2d 21, 29 (Tex. Crim. App. 1995).

Appellant claims venireperson John Robuck was challengeable for cause because he could not consider the full range of punishment. Appellant claims Robuck could not consider five years as a punishment for an intentional murder. But a review of the record reflects that when the trial court asked Robuck to consider some hypothetical scenarios in which five years might be an appropriate punishment, Robuck agreed that he could consider five years and stated that it "completely depends on the circumstance[s]." Appellant has not shown that Robuck could not consider the full range of punishment for murder.

Appellant claims veniremembers Thomas Brooks and Kimberly Williams each equated the term "probability" of future dangerousness with "possibility." He complains that the trial court should have granted his challenges for cause against them on that basis.

During the State's voir dire, Brooks explained his understanding of the term "probability" as meaning "not definite." During questioning by defense counsel, Brooks explained that it meant "[i]t's not a definite thing." He stated that it was something that was "possible in the future" but that he could not "put a number on it." He stated it was "a chance." During Williams' voir dire by the State, Williams stated that "probability" meant "it's possible it could, or could have not." Upon further questioning, she agreed that it would have to be more than fifty percent chance on a scale of zero to one hundred. When

questioned by defense counsel Williams reiterated that she would define probability as a

possibility. When questioned about percentages by the trial court, Williams could not say.

She continued to reiterate that she believed probability and possibility mean the same thing.

Appellant relies on *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992),

in which the Court reversed a conviction based upon an erroneous denial of a challenge for

cause against a venireperson who equated the term "probability" with "possibility." We held:

> [The venireperson's] answers during his voir dire indicate that he understood
> "probability" as any percent possibility rather than as a "likelihood" or "good
> chance[.]" In its usual acceptation, a "probability" is something more than a
> "possibility." As this Court stated in *Smith*, 779 S.W.2d 417, 421, in which we
> relied on *Cuevas[ v. State*, 742 S.W.2d 331 (Tex. Crim. App. 1987)], "we
> know that the second special issue calls for proof of more than a bare chance
> of future violence." Requiring more than a mere possibility that the defendant
> would commit criminal acts of violence and would constitute a continuing
> threat to society prevents the freakish and wanton assessment of the death
> penalty.
>
> Since [the venireperson] understood "probability" as only a
> "possibility", he was properly challengeable for cause. We hold the trial court
> abused its discretion in denying appellant's challenge.

*Id.* (footnotes omitted).

Assuming Brooks' and Williams' understandings of the term probability was

erroneous, appellant has not shown that he was entitled to strike them for cause. Although

we have held that the term "probability" need not be defined, we have also held that the terms

means "more than a mere possibility." *Id.* Further, it must be explained to the veniremember

that the law requires him to see and accept the distinction between the terms as set forth in

*Hughes.* Once explained the law, if the prospective jurors continue to insist upon an

definition or understanding of the term that is inconsistent with *Hughes*, then they may be challengeable for cause.   In these circumstances, where the law was not carefully or adequately explained to Williams and Brooks, the trial court did not abuse its discretion in denying appellant's challenges for cause.  Points of error five through eight are overruled.

In point of error nine, appellant claims he was denied effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, during voir dire, when his trial counsel used peremptory strikes against two venirepersons whom counsel erroneously believed he had unsuccessfully challenged for cause.  Stating that his challenge for cause against venireperson Mark Colditz had been denied, defense counsel utilized a peremptory strike against him.   But the record reflects that Colditz was not submitted for cause by appellant.  Also erroneously stating his challenge for cause against venireperson John Wilson was denied, defense counsel exercised a peremptory strike against him.

In order to prevail on a claim of ineffective assistance of counsel, appellant must prove by a preponderance of the evidence (1) that counsel's performance was deficient; and (2) that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984).  We have repeatedly stated that "[i]f counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Ortiz*

*v. State*, 93 S.W.3d 79, 88 (Tex. Crim. App. 2002).

Despite appellant's counsel's mistaken belief about the challenges for cause, he may have ultimately utilized peremptory challenges against Wilson and Colditz for any number of legitimate reasons. As the State points out, review of their voir dire examinations reflects a number of issues that the defense might legitimately have found warranted peremptory strikes. For instance, Wilson had been a witness in a murder case after finding the body of an employee who was shot by a disgruntled fellow employee. Wilson was also a strong supporter of the death penalty and believed it should be available as a penalty for non-capital intentional murders. He had previously served on two criminal juries, both of which returned convictions. Finally, Wilson's father had an "extensive career" with the Dallas Police Department. Venireperson Colditz held opinions that might be viewed as unfavorable to the defense. He testified he would have a hard time considering alcohol, drug use, or even mental retardation to be mitigating evidence. He also stated initially that he would be "reluctant" to acquit for a failure to prove venue or for a *Miranda* violation, both of which were contested issues in the case. In light of this record, "there is at least the possibility" that counsel's use of peremptory strikes on Wilson and Colditz was reasonable trial strategy and accordingly, we defer to counsel's decision. *See id.* Point of error nine is overruled.

In his tenth point of error, appellant claims this appeal should be abated until the trial court files findings of fact and conclusions of law as required by Article 38.22. Appellant filed pretrial motions seeking suppression of his oral and written statements on the ground

Murphy--14

that they were involuntarily made. The trial court held a hearing outside the jury's presence, but did not enter written findings of fact and conclusions of law regarding the admissibility of the statements. However, at the close of the hearing, the trial court dictated its findings and conclusions into the record. A trial court satisfies the requirements of Article 38.22 when it dictates its findings and conclusions to the court reporter, and they are transcribed and made a part of the statement of facts, filed with the district clerk and made a part of the appellate record. *Parr v. State*, 658 S.W.2d 620, 623 (Tex. Crim. App. 1983); *see also Andrade v. State*, 6 S.W.3d 584, 592 (Tex. App.--Houston [14th Dist.] 1999, pet. ref'd)(following *Parr*); *Lee v. State*, 964 S.W.2d 3, 11-12 (Tex. App.--Houston [1st Dist.] 1997, pet. ref'd)(following *Parr*); *Amunson v. State*, 928 S.W.2d 601, 608 (Tex. App.--San Antonio 1996, pet. ref'd)(following *Parr*). That has been done in this case. Point of error ten is overruled.

In his eleventh point of error, appellant claims his rights pursuant to the Sixth Amendment of the United States Constitution were violated when the prosecutors examined letters and notes written by appellant to his trial attorneys which were protected by attorney-client privilege. Before trial, written materials, notes and letters, including three pages of handwritten notes to appellant's attorneys, were seized from appellant's jail cell by jail personnel after appellant attempted a suicide. The documents were viewed by prosecutors before trial. Appellant claims the seizure amounted to a knowing and unlawful intrusion of the attorney-client privilege by the State, and he is therefore entitled to a reversal.

Murphy--15

During trial, the court held a hearing outside the presence of the jury. An employee of the Dallas County Sheriff's Department testified that pursuant to the customary practice of the Dallas County Jail in the case of an attempted suicide in jail, the cell is considered a crime scene and all evidence is confiscated. Both prosecutors in appellant's case testified that they reviewed the seized papers, but only one of the prosecutors testified that he reviewed portions of the three pages purportedly written to appellant's attorneys. At the top of Defense Exhibit 6A, is written, "Michael & Jane (Sorry if I've offended you by using your 1st names)." It was signed on the back, "Sincerely, Jim Ed." The prosecutor agreed that he knew appellant's attorneys were Michael Byck and Jane Little, and that Jim Ed was a name appellant was known to go by. Defense Exhibit 6B, began "Questions for my lawyers" and was followed by six numbered paragraphs, and signed at the bottom by "Jim." Defense Exhibit 6C, stated on the back: "To my lawyers! Please help me with the problems I'm having, the staff sees me only as a monster." The other side began its narrative writing, "Michael . . . ." Substantively, they pertain almost exclusively to appellant's desire to contact a psychiatrist to prescribe medication to stop his hallucinations and prevent him from "losing his mind." The prosecutor who reviewed the papers testified that he did not use any information contained in them in his prosecution of appellant. The trial court concluded that if there was any error, it was harmless beyond a reasonable doubt. The court did find, however, that Defense Exhibits 6A, 6B and 6C were attorney-client privileged, but questioned whether they were located "in a secure and confidential place."

The State's intrusion into the attorney-client relationship violates a defendant's constitutional right to counsel when the defendant is prejudiced by the violation. *United States v. Morrison*, 449 U.S. 361, 365-66 (1981); *Weatherford v. Bursey*, 429 U.S. 545, 555-59 (1977). The federal circuit courts of appeals are split on the issue of whether prejudice is presumed or must be proven. *Compare Briggs v. Goodwin*, 698 F.2d 486, 494-95 (D.C. Cir.)(stating that possession by government of confidential information is presumed detrimental to defendant), *vacated on other grounds*, 712 F.2d 1444 (1983); *United States v. Levy*, 577 F.2d 200, 210 (3rd Cir. 1978)(holding prejudice need not be shown) *with United States v. Dien*, 609 F.2d 1038, 1043 (2nd Cir. 1979)(holding defendants failed to show prejudice); *United States v. Davis*, 226 F.3d 346, 353 (5th Cir. 2000)(holding showing of prejudice required), *cert. denied*, 531 U.S. 1181 (2001); *United States v. Steele*, 727 F.2d 580, 586-87 (6th Cir.)(holding appellants failed to show prejudice), *cert. denied*, 467 U.S. 1209 (1984). Even where a presumption is applied, some courts allow it to be rebutted. *Briggs*, 698 F.2d at 495 n.29 (noting government free to rebut presumption).

In our view, calling for a showing of prejudice is the better rule in light of the wide variety of circumstances under which the privilege might be breached. Moreover, such rule is consistent with our own case law. *See Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997)(only errors that Supreme Court has designated as "structural" are categorically immune from harmless error analysis).

The evidence reflects no prejudice to appellant. The prosecutor who reviewed the

Murphy--17

privileged documents testified that he did not use any of the information in the three pages

of material in preparing the case.  When questioned specifically about an issue discussed at

trial that appellant's attorneys identified as potentially coming from the materials, the

prosecutor pointed to several other sources in which he had obtained the information:

> Q. [Defense attorney] Can you point out – outside of these letters that you said
> that you reviewed, can you point out to any place in your investigation that
> made mention of hallucinations?
>
> A. [Prosecutor] I can point to several instances. . . . First of all, the defendant's
> jail records, I've reviewed those.  When he was first booked into the Dallas
> County Jail, he made numerous complaints of hallucinations.  I've also
> reviewed numerous medical records from the defendant's past, various
> institutions, including Glen Oaks Hospital in Greenville, Texas; the Andrews
> Center in Tyler, Texas; Timberlawn Psychiatric Hospital in Dallas, Texas.
> And my recollection is in all of those documents he's made complaints about
> hallucinations.
>
> Q.  And, Mr. Davis, yesterday you also talked to or examined a number of
> witnesses regarding their knowledge or hearing of any alter ego or split
> personality from the defendant; is that correct?
>
> A.  Yes.
>
> Q.  And can you tell us what source, absent these letters that you reviewed, that
> you came across that information?
>
> A.  Glen Oaks Hospital records.

Because the proceedings were not adversely tainted by the intrusion into the attorney-client

privilege, appellant is not entitled to a reversal.  Point of error eleven is overruled.

In his twelfth point of error, appellant claims the evidence was insufficient to prove

venue.  At the close of the State's case, appellant sought a directed verdict on the ground that

the evidence was insufficient to prove venue in Dallas County. Appellant's motion for a

directed verdict was denied. The jury was charged that venue was proper in any one of the

following counties:

(1) in the county in which the offense was committed, or

(2) where the property is stolen in one county and removed by the offender to another, in the county where the defendant took the property or in any other county through or into which he may have removed the same, or

(3) if a person receives an injury in one county and dies in another by reason of such injury, in the county where the injury was received or where the death occurred, or in the county where the dead body is found, or

(4) in the county in which the kidnapping offense was committed, or in any county through, into, or out of which the person kidnapped may have been taken.

However, if an offense has been committed within this State and it cannot readily be determined within which county or counties the commission took place, trial may be held in the county in which the defendant resides, in the county in which he was apprehended, or in the county to which he was extradited.

Appellant objected to the charge, arguing that venue should be limited to the county where

the homicide occurred. Appellant's objections were overruled. Appellant does not complain

in this appeal about the court's instructions, but alleges only that the evidence is insufficient

to prove venue in Dallas County.

Under Article 13.18, if venue is not specifically stated, then the proper county for

prosecution is the county in which the offense was committed. In this appeal, appellant

reasons that since there is no statute specifically governing capital murder cases, Article

13.18 applies. Applicant argues that "the county in which the offense was committed" in a

capital murder case should be the county in which the homicide occurred. He further argues

that if venue were so restricted, the evidence would be insufficient to prove the homicide

occurred in Dallas County.

The State need prove venue only by a preponderance of the evidence. Art. 13.17. We

recently explained the effect and purpose of special venue provisions:

> In Texas, if the Legislature has not specified venue for a specific type of crime,
> then "the proper county for the prosecution of offenses is that in which the
> offense was committed." Special venue statutes, however, expand the number
> of counties in which an offense may be prosecuted. These special venue
> statutes have been enacted for various reasons, such as: 1) the difficulty of
> proving precisely where the offense was committed; 2) the location where
> evidence of the crime is found; 3) the effect that a crime may have upon
> several different counties; or 4) the effect that the actor may have upon various
> counties. Texas venue statutes are a species of codified "substantial contacts"
> jurisdiction; thus, for venue to lie, the defendant, his conduct, his victim, or the
> fruits of his crime must have some relationship to the prosecuting county. The
> Legislature has specified the types of contacts that satisfy this "substantial
> contacts" threshold for various offenses.

*Soliz v. State*, 97 S.W.3d 137, 141 (Tex. Crim. App. 2003)(footnotes omitted). While some

of the special venue statutes expressly apply to identifiable penal code offenses, other special

venue provisions apply by virtue of the particular facts of the case rather than the specifically

charged offense. *Compare* Art. 13.12 (applicable to false imprisonment and kidnapping

prosecution); Art. 13.13 (applicable to prosecution of criminal conspiracy); Art. 13.14

(applicable when prosecuting bigamy) *with* Art. 13.01 (applicable to "offenses committed

wholly or in part outside this State"); Art. 13.04 (applicable to "offenses committed on the

boundaries of two or more counties, or within four hundred yards thereof"); Art. 13.06 (applicable to offenses committed on rivers or streams); Art. 13.07 (applicable in case in which victim receives injury in one county and dies in another). There is no special venue statute expressly applicable to the prosecution of a capital murder. Nor is there any statute providing that in capital murder cases, venue occurs only where the homicide takes place. Any number of the special venue provisions may apply to a given capital murder case, depending upon its facts.

In the instant case, the victim was last seen alive in Collin County. In his confession, appellant stated that he was drinking at a bar called Bleachers. There was evidence that Bleachers Sports Grill is a bar located in Dallas County. According to his confession, appellant left Bleachers and hitched a ride with the victim "on the road beside Bleachers on [his] way to 635." Detective Myers testified that the area from Bleachers to 635 is located in Dallas County. Appellant's confession further states that appellant and the victim were driving toward 635 when he asked the victim to stop and get into the trunk, and he then shot her. The admission suggests that this occurred somewhere in the same area as the abduction- -between Bleachers and 635, within Dallas County. Appellant thereafter drove around in the victim's car to various locations in Collin and Dallas Counties, using the victim's credit cards and attempting to use her ATM card. The medical examiner testified that although the gunshot wound was fatal, the victim could have lived for several minutes or longer after the shooting. The victim's body was discovered in a creek in Van Zandt County. Finally, the

evidence showed that at the time of the offense, appellant's residence was in Dallas County.

Venue will stand if it is sufficient under any one of the venue provisions the jury was instructed upon. *Cf. Cardenas v. State*, 30 S.W.3d 384, 389 (Tex. Crim. App. 2000)(holding that in capital murder case, evidence must be sufficient to prove one of disjunctively alleged underlying offenses); *Brooks*, 990 S.W.2d at 384 (stating that when jury returns general guilty verdict on indictment disjunctively charging alternative theories of committing same offense, verdict stands if evidence supports any of theories charged). Article 13.19 provides that if an offense is committed within the state but "cannot readily be determined within which county or counties the commission took place," trial can be held in the county in which the defendant resides, the county where he is apprehended, or the county to which he is extradited. This provision was made a part of the trial court's charge. Given the difficulty of determining exactly where the offense occurred, a rational jury could have relied on this provision and concluded venue was proper in Dallas County, the county of appellant's residence. Point of error twelve is overruled.

In his thirteenth point of error, appellant claims the trial court abused its discretion by denying appellant's request during the punishment phase of the trial to suppress an out-of-court photographic identification of appellant made by Sherryl Wilhelm, in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. Wilhelm testified at a hearing outside the presence of the jury that in August of 1997, she went out to her car on lunch break while working at Arlington Memorial Hospital. When she opened her

car door, a man pushed her from behind and followed her into the car. Wilhelm made several attempts to open the passenger door until the man started to choke her. He ordered her onto the floor board with her face down in the seat, while he drove out of the parking lot. Wilhelm gradually worked her way upright onto the passenger seat and was allowed to sit up. When the car slowed down at a traffic light, Wilhelm jumped out and rolled onto the street. She received help from another motorist. She described her abductor as white, clean-cut with a short haircut, an earring, a five-o'clock shadow, slender build, medium to tall height and in his early twenties. Wilhelm said there was nothing obscuring his face and she was in the car with him for approximately thirty minutes. Douglas H. Ligon, a police officer trained in producing composite sketches, worked with Wilhelm in composing a drawing of her abductor. Ligon testified that Wilhelm also described the man as having dark hair and being olive-complected. In October 2000, while watching a television news report about the instant case, Wilhelm saw a composite drawing of the suspect for this offense and recognized him as the same man who had abducted her. She contacted Detective John Stanton, of the Arlington Police Department, who had investigated her case earlier.

Detective Stanton testified that he put together a lineup of six photos, including appellant's picture, for Wilhelm to view. He told Wilhelm that the suspect might or might not be in the lineup, and that it wasn't necessary for her to choose anyone. He testified that when Wilhelm viewed photo number five, appellant's photo, she stopped and there was a visible change in her demeanor. Stanton stated that Wilhelm said, "oh my God, I'm – I'm

virtually sure . . ." and that her voice was quivering.  Stanton asked her if she was sure and she said she was as sure as she could be after this amount of time.  Although appellant now asserts a number of reasons why the photo lineup was not reliable, at trial he objected solely on the ground that the photo lineup appeared to be made up of individuals of "different races."

Because appellant objected solely on this basis, we will address the reliability of the lineup on this ground alone.  The race of the suspects in the lineup is not stated in the record.  However, we have reviewed the photo lineup, and all of the suspects appear to be similarly-complected.  All of the suspects have short dark hair, slight facial hair, dark eyes, and are all about the same age.  All suspects are shown from the neck up.  Stanton testified that he was able to modify the photos by computer so that they all appeared similar in size, position, and background.  None of the suspects stands out as apparently of a different race from the other suspects.  The trial court did not abuse its discretion in overruling appellant's objection to the reliability of the lineup on the basis of race.  Point of error thirteen is overruled.

In his fourteenth point of error, appellant claims the trial court abused its discretion in denying his request for a jury instruction that would have required the jury to consider extraneous offenses only for the purpose of determining the future dangerousness special issue.  This  argument has been addressed and rejected previously.  *Jackson v. State*, 992 S.W.2d 469, 478 (Tex. Crim. App. 1999).  Point of error fourteen is overruled.

In point of error fifteen, appellant claims the trial court erred at punishment in failing

to submit to the jury definitions of the terms "probability," "criminal acts of violence," and "continuing threat to society." Appellant argues that without definitions for these critical terms, the statutory aggravating circumstances are not adequately narrowed, and the jury's verdict is not rationally reviewable. This Court has repeatedly held that these terms are not unconstitutionally vague and the jury is presumed to understand them without an instruction. *Feldman v. State*, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002); *Ladd v. State*, 3 S.W.3d 547, 572 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000). Point of error fifteen is overruled.

In his sixteenth point of error, appellant claims the Texas death penalty scheme violated his rights against cruel and unusual punishment and to due process of law under the Eighth and Fourteenth Amendments to the United States Constitution by requiring at least ten votes for the jury to return a negative answer to the future dangerousness special issue and to return an affirmative answer on the mitigation issue. We have addressed this issue and upheld this scheme as constitutional. *Prystash v. State*, 3 S.W.3d 522, 536-37 (Tex. Crim. App. 1999)(citing numerous cases in support), *cert. denied*, 522 U.S. 1102 (2000). Point of error sixteen is overruled.

In point of error seventeen, appellant claims the Texas death penalty scheme denied appellant due process of law, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution because of the impossibility of simultaneously restricting the jury's discretion to impose the death penalty while also allowing the jury unlimited

Murphy--25

discretion to consider all evidence mitigating against the imposition of the death penalty. Appellant relies solely on Justice Blackmun's dissent from the United States Supreme Court's denial of certiorari in *Callins v. Collins*, 510 U.S. 1141 (1994)(Blackmun, J., dissenting). We have addressed and rejected identical claims. *Ladd*, 3 S.W.3d at 575. Point of error seventeen is overruled.

In point of error eighteen, appellant makes the same claim under Article I, sections 13 and 19 of the Texas Constitution, that he asserts in point of error seventeen. Because appellant does not argue that the Texas Constitution provides or should provide any different or greater protection in this regard, appellant fails to adequately brief this claim. TEX. R. APP. PROC. 38.1(h). Point of error eighteen is overruled.

In points of error nineteen and twenty, appellant claims the cumulative effect of the above enumerated constitutional violations denied him due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and due course of law under Article I, section 19 of the Texas Constitution. Because we have found little or no error in the above-alleged points, there is no harm or not enough harm to accumulate. Points of error nineteen and twenty are overruled.

The judgment of the trial court is affirmed.

Delivered June 25, 2003

Publish

NO. 74,145

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

---

JEDIDIAH ISSAC MURPHY,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

ORIGINAL

FILED IN
COURT OF CRIMINAL APPEALS

JUL 2 8 2003

Troy C. Bennett, Jr., Clerk

---

## APPELLANT'S MOTION FOR REHEARING

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

COMES NOW Appellant, by and through counsel, and files this Motion for Rehearing in the above styled and numbered case, and would respectfully show the following:

### I.

Appellant's first Point of Error related to Appellant's request to ask prospective jurors whether they could follow the law by holding he State to its burden of proving future dangerousness beyond a reasonable doubt, notwithstanding the evidence of the victim's character. This Honorable Court overruled Appellant's issue first on the basis that

1

Appellant's trial counsel did not define "victim character testimony" or state on the record that this area of law would be explained before the question was asked. (Opinion, p. 3). With regard to what "victim character testimony" means, the record is absent of any indication of confusion on the part of the trial judge or the State as to its meaning. In fact, both sides knew going in that the trial record would bear out that the elderly victim in the case was a person of good character. At trial, the State introduced testimony that the victim was 80 years old at the time of the offense and lived alone. On the date of the offenses, she went to a mall far from home to pick up a robe for her disabled sister. She had loving family members and friends who were concerned about her welfare. (RXLVII,22-26). In closing argument, the State emphasized her good character, mentioning the fact that she was eighty-years old, totally innocent, and was helping her disabled sister at the time she was abducted. (R.LX,14-15). The State referred to her as a "good and saintly woman" who "was our neighbor, our helper. She was our sister. She was our grandmother. She was our mother. Even more than that, she was an example to all of us...on how you live your life with dignity and grace." (R.LX,58-59). It is no surprise that prior to voir dire, the record is absent of any confusion as to what Appellant meant with regard to "victim character testimony."

This Court further cites *Chambers v. State* and faults Appellant for not stating on the record that this particular area of the law would be explained to prospective jurors before Appellant asked the proposed questions. However, *Chambers* is clearly distinguishable since the analysis in that case revolved around the specific individual questioning of one

2

prospective juror who Chambers claimed should have been struck for cause. In the instant case, before the beginning of individual voir dire, the trial court judge himself explained in detail to all prospective jurors the law regarding the State's burden of proving future dangerousness beyond a reasonable doubt. Appellant reasonably wonders whether any fairly recent death penalty record could be found in which prospective jurors were *not* informed that the State bears the burden of proving future dangerousness beyond a reasonable doubt. To pour Appellant out for not simply stating on the record that this area of the law would first be explained ignores the reality of what actually occurred.

This Honorable Court's opinion further explains that since the standard of proof never changes, Appellant's questions asking whether jurors would change that standard could have been considered confusing or misleading. (Opinion, p. 3). Appellant asserts that simply asking whether prospective jurors can follow the law is hardly confusing or misleading. In fact, this Court has specifically approved asking jurors whether they can follow the law that requires them to disregard illegally obtained evidence, whether they could follow an instruction requiring corroboration of accomplice witness testimony, or whether they could follow the law that precludes jurors from considering a defendant's failure to testify. *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). Appellant's proposed questions asking whether jurors would hold the State to its burden of proving future dangerousness beyond a reasonable doubt can hardly be considered "confusing or misleading."

3

In considering Appellant's first Point of Error, this Court's opinion completely disregards the applicable analysis set out in *Standefer*. Pursuant to *Standefer*, Appellant's proposed questions were not improper since they sought only to determine whether prospective jurors could follow the law applicable in the case. Appellant's proposed questions were no different than asking whether jurors could give probation in a murder case, reject an illegally obtained confession, or find that accomplice witness testimony was not properly corroborated. Therefore, Appellant respectfully requests that this Court reexamine Appellant's first Point of Error and apply the analysis required by *Standefer*.

II.

As for Appellant's third and fourth Points of Error, this Honorable Court agrees that the trial court judge erred in granting the State's challenge for cause against venirmember Treat. However, this Court considers the error harmless where Appellant cannot show, pursuant to Article 35.16, that the trial court's error denied Appellant a lawfully constituted jury. (Opinion, p.7). Appellant asserts that the standard set out in *Jones* and its progeny sets a standard impossible for any appellant to overcome, and thereby gives trial courts the unlimited ability to improperly grant an unfounded challenges for cause by the State. While Article 35.16 may appear to withstand this analysis, Appellant asserts that the Fourteenth Amendment to the United States Constitution does not. Appellant respectfully requests that this Court review its analysis of Appellant's third and fourth Points of Error pursuant to Appellant's federal constitutional claim.

4

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully requests that this Honorable Court grant the foregoing motion for rehearing and upon rehearing, reverse the trial court judgement and remand the case for a new trial.

Respectfully Submitted,

Adam L. Seidel
Chateau Plaza, Suite 1400
2515 McKinney Avenue
Dallas, Texas 75219
ph. 214-237-0835
fax 214-237-0901
State Bar No. 17999290

COUNSEL FOR APPELLANT

5

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was mailed via first class mail to the Appellate Division, Dallas County District Attorney's Office, Frank Crowley Court's Building, 133 N. Industrial Blvd., LB19, Dallas, Texas, 75207, and to the Honorable Matthew Paul, State Prosecuting Attorney, P.O. Box 12405, Austin, Texas 78711 on this the 25th day of July 2003.

_____
Adam L. Seidel



MAXIMUM TIME ALLOWED

JUDGMENT_____

MNT_____

CLERK'S RECORD 60 DAYS____10·7____ 120 DAYS_____MT_____

REPORTERS RECORD 60 DAYS__10·7__120 DAYS_____MT__4·5·__

APPELLANT'S BRIEF_____

STATE'S BRIEF_____



# COURT OF CRIMINAL APPEALS

P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

SHARON KELLER
PRESIDING JUDGE

LAWRENCE E. MEYERS
TOM PRICE
PAUL WOMACK
CHERYL JOHNSON
MIKE KEASLER
BARBARA P. HERVEY
CHARLES R. HOLCOMB
CATHY COCHRAN
JUDGES

TROY C. BENNETT, JR.
CLERK
512 463-1551

RICHARD E. WETZEL
GENERAL COUNSEL
512 463-1600

February 24, 2003

Hon. Steven R. Emmert, Judge
31st Judicial District Court
P. O. Box 766
Wheeler, Texas 79096-0766

RE:   **CHRISTIPHER CHAD BRITTON**
CCA NO. 74,525
TRIAL CRT. NO. 2507

Dear Judge Emmert:

The Court has received the Clerk's Record in the above styled case. The record, however, does not contain an order appointing counsel pursuant to Article 11.072 Section 2.

Please advise this Court at your earliest convenience whether Appellant's has appointed counsel. If counsel has not been appointed please proceed under Article 11.072 Section 2, and appoint habeas counsel.

The list of attorneys approved by this Court for such appointments is located at this Court's web site (http://www.cca.courts.state.tx.us/rules/11071Rules/art11071.htm). Upon making the appointment, please provide a copy of the order to this Court for approval of the appointment.

Thank you for your assistance in this matter.

Sincerely yours,
Troy C. Bennett, Jr.
Clerk

By: _____
Abel Acosta, Chief Deputy Clerk

cc:   Warren L. Clark
Richard Roach
Charles Cole

# 31ˢᵀ JUDICIAL DISTRICT COURT

Gray, Hemphill, Lipscomb, Roberts and Wheeler Counties

P.O. Box 766
Wheeler, Texas 79096

(806) 826-5501
Facsimile (806) 826-5503
distct31@yft.net

Steven R. Emmert
Judge Presiding

Sandy Rose
Court Administrator

Toni McClendon
Court Reporter

Wayne Carter
Court Bailiff

Date:   April 15, 2003

To:     Troy C. Bennett, Jr.
        Clerk, Court of Criminal Appeals
        (512) 463-7061

From:   Hon. Steven R. Emmert

Re:     Case No. 74,525
        Britton, Christopher Chad

Memo:   Attached please find a copy of the Order Appointing Counsel for Writ of Habeas Corpus
        for your information.

        Please contact me if you need additional information in this regard.

                                    Sincerely,

                                    Steven R. Emmert
                                    31st District Judge

Original to follow:    ___ Yes
                       _X_ No

Total pages, including cover page:    2

### CONFIDENTIALITY NOTICE

THE DOCUMENTS ACCOMPANYING THIS FACSIMILE TRANSMISSION CONTAIN CONFIDENTIAL INFORMATION
WHICH IS LEGALLY PRIVILEGED. THE INFORMATION IS INTENDED ONLY FOR THE USE OF THE RECIPIENT
NAMED ABOVE. IF YOU HAVE RECEIVED THIS FACSIMILE TRANSMISSION IN ERROR, PLEASE IMMEDIATELY
NOTIFY US BY TELEPHONE TO ARRANGE FOR RETURN OF THE TELECOPIED DOCUMENTS, AND YOU ARE
HEREBY NOTIFIED THAT ANY DISCLOSURE, COPYING, DISTRIBUTION, OR THE TAKING OF ANY ACTION IN
RELIANCE ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED.

No. 2507

| | | |
|---|---|---|
| THE STATE OF TEXAS | ][ | IN THE 31ST DISTRICT COURT |
| | ][ | |
| VS. | ][ | IN AND FOR |
| | ][ | |
| CHRISTOPHER CHAD BRITTON | ][ | HEMPHILL COUNTY, TEXAS |

FILED
CHARLES COLE
CLERK _____ COURT
Hemphill County Texas
10:43 AM
APR 03 2003
B P Logan

### ORDER APPOINTING COUNSEL
### FOR WRIT OF HABEAS CORPUS

On the 3rd day of April, 2003, the court conducted a hearing on the record for the purpose of ascertaining the defendant's indigent status and whether defendant desires to have counsel appointed for the purpose of a writ of habeas corpus pursuant to Texas Code of Criminal Procedure Article 11.071, Section 2.

The court finds that defendant is indigent and that defendant desires to have counsel appointed for the purpose of a writ of habeas corpus pursuant to Texas Code of Criminal Procedure Article 11.071, Section 2.

IT IS, THEREFORE, ORDERED that L. Van Williamson, 1017 West 10th Avenue, Amarillo, Texas 79101-3112, (806) 372-4431, is appointed as counsel for the defendant in this cause for the purpose of a writ of habeas corpus.

SIGNED this 3rd day of April, 2003.

_____
Steven R. Emmert
Judge Presiding

FILED IN
COURT OF CRIMINAL APPEALS

APR 15 2003

Troy C. Bennett, Jr., Clerk

April 15, 2003

L. Van Williamson
1017 W 10th St
Amarillo, TX  79101

Warren L. Clark
P O Box 2408
Amarillo, TX  79105

RE: Case No. 74,525
    31ST DISTRICT COURT - 2507

Style: BRITTON, CHRISTOPHER CHAD

Dear Counsel:

    The order appointing, L. Van Williamson, counsel pursuant
to Article 11.071, V.A.C.C.P. in the above styled and
numbered cause has been received and approved by the Court.


                          Sincerely yours,

                          Troy C. Bennett, Jr., Clerk

                          By:
                            Deputy


cc: Richard J. Roach

July 07, 2003
Re: Case No. AP-74,145
COA#:
STYLE:  MURPHY, JEDIDIAH ISAAC

On this day, this Court has granted the Appellant's motion for an extension of time in which to file the motion for rehearing.  The time to file the said item has been extended to **July 25, 2003**.  NO FURTHER EXTENSIONS WILL BE ENTERTAINED.

Troy C. Bennett, Jr., Clerk


ADAM L. SEIDEL
ATTORNEY AT LAW
CHATEAU PLAZA  SUITE 1400
2515 MCKINNEY AVENUE
DALLAS TX  75201

NO. 74,145

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

ORIGINAL

FILED IN
COURT OF CRIMINAL APPEALS
JUL 07 2003
Troy C. Bennett, Jr., Clerk

---

JEDIDIAH ISSAC MURPHY,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

---

**APPELLANT'S FIRST MOTION FOR EXTENSION
OF TIME TO FILE MOTION FOR REHEARING**

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

COMES NOW the Appellant, by and through counsel, and files this Motion seeking to extend the time for filing a Motion for Rehearing in the above styled and numbered case, and would respectfully show the following:

I.

The current deadline for filing a Motion for Rehearing is July 10, 2003.

II.

The length of the extension sought is fifteen days, to July 25, 2003.

III.

The facts relied upon to reasonably explain the need for an extension are the

following:

1.      Counsel is lead counsel in a murder trial set the week of July 7th in the 204th
        Judicial District Court of Dallas County, styled State v. Jose Juarez.

2.      This Court's opinion addresses Appellant's twenty points of error and is
        contained in twenty-five pages. Counsel respectfully requests additional
        time in which to properly prepare a motion for rehearing.

IV.

No previous extensions to file a motion for rehearing have been requested or

granted.

WHEREFORE, PREMISES CONSIDERED, Appellant prays this

Honorable Court grant the foregoing Motion and extend the time for filing Appellant's

Motion for Rehearing to July 25, 2003.

Respectfully Submitted,

Adam L. Seidel
Chateau Plaza, Suite 1400
2515 McKinney Avenue
Dallas, Texas 75219
ph. 214-237-0835
fax 214-237-0901
State Bar No. 17999290

COUNSEL FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed via first class mail to the Appellate Division, Dallas County District Attorney's Office, Frank Crowley Court's Building, 133 N. Industrial Blvd., LB19, Dallas, Texas, 75207, and to the State Prosecuting Attorney, P.O. Box 12405, Austin, Texas 78711, on this the 1st day of July 2003.

_____
Adam L. Seidel

July 07, 2003
Re: Case No. AP-74,525
STYLE: BRITTON, CHRISTOPHER CHAD

The appellant's motion for extension of time within which to file the appellant's brief is granted. The time for filing the appellant's brief has been extended to **December 22, 2003**. NO FURTHER EXTENSIONS WILL BE ENTERTAINED. Failure to file appellant's brief may result in the issuance of a show cause order and/or judgment of contempt.

COURT OF CRIMINAL APPEALS
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

Troy C. Bennett, Jr., Clerk

SHARON KELLER
PRESIDING JUDGE

LAWRENCE E. MEYERS
TOM PRICE
PAUL WOMACK
CHERYL JOHNSON
MIKE KEASLER
BARBARA P. HERVEY
CHARLES R. HOLCOMB
CATHY COCHRAN
JUDGES

TROY C. BENNETT, JR.
CLERK
512 463-1551

RICHARD E. WETZEL
GENERAL COUNSEL
512 463-1600

WARREN L. CLARK
PO BOX 2408
AMARILLO TX 79105

# IN THE COURT OF CRIMINAL APPEALS

## AT AUSTIN

CHRISTOPHER CHAD BRITTON, §
       Appellant §
§
§
VS. §    NO. 74,525
§
THE STATE OF TEXAS, §
       Appellee §

FILED IN
COURT OF CRIMINAL APPEALS

JUL 03 2003

Troy C. Bennett, Jr., Clerk

## MOTION TO EXTEND TIME FOR
## FILING APPELLANT'S BRIEF

# ORIGINAL

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

COMES NOW, CHRISTOPHER CHAD BRITTON, Appellant herein, acting by and through his counsel of record, WARREN L. CLARK, and in accordance with Rules 10.5(b) and 38.6(d) of the TEXAS RULES OF APPELLATE PROCEDURE, hereby requests an extension of time in which to file Appellant's brief and would respectfully show the Court:

1. Name of trial court: 31st District Court of Hemphill County, Texas (181st District Court of Potter County, Texas on change of venue);

2. Date of Judgement: Sentence pronounced on August 8, 2002;

3. Trial court style: No. 2507, The State of Texas vs. Christopher Chad Britton in the 31st District Court in and for Hemphill County, Texas (No. 45373-B in the 181st District Court in and for Potter County, Texas on change of venue);

4. Offense: capital murder;

5. Punishment assessed: death by lethal injection;

6. Date of filing of Motion for New Trial: N/A

7. Present filing deadline: July 24, 2003;

MOTION TO EXTEND THE TIME FOR
FILING THE TRANSCRIPTION OF THE RECORD - Page 1

8.    Length of extension requested: six (6) months;

9.    Number of previous extensions:  None;

10.    Good cause for this extension is as follows:

Undersigned counsel is a solo practitioner.  He employs no law clerks or paralegals.  He is solely responsible for prosecution of the above-styled appeal.  The appellate record in this appeal is lengthy.  It consists of 37 volumes, not counting the exhibit volumes.  The pre-trial volumes run 283 pages.  The volumes containing all voir dire examination of all venirepersons run 4,748 pages.  The volumes containing testimony from the guilt-innocence and punishments phases run 1,838 pages.

As the Court may or may not be aware, undersigned counsel is also the responsible attorney on another capital appeal styled *The State of Texas v. Ryan Heath Dickson*, No. 73,533, pending in this Court.  On March 28, 2003, counsel requested and received a six-month extension to file his brief in that appeal.  The record in the *Dickson* appeal is in fact longer than the instant record.  Counsel is presently at work on this appeal and anticipates making the September 14, 2003 filing date.

This six month extension is necessary given the special demands of prosecuting the *Dickson* appeal in a timely fashion and needing sufficient time to review the instant record and prepare the brief on appeal.

Respectfully submitted,

WARREN L. CLARK
ATTORNEY AT LAW
203 W. 8th Ave., Ste. 320
P. O. Box 2408 (79105)
Amarillo, Texas  79101
806/379-7655
806/371-9610 (fax)

_____
Attorney for Appellant
SBN # 04300500

2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Motion for Extension of Time for Filing Appellant's Brief was provided to the office of the Hemphill County District Attorney on this the _27_ day of ___June___, 2003.

_____

Warren L. Clark

Tuesday, June 24, 2003
Re: Case No. AP-74,525
Tr. Ct. No. 2507
STYLE:  BRITTON, CHRISTOPHER CHAD

      I have this day received and filed the Reporter's Record in the above-styled and numbered cause.  The appellant's brief is due on **Thursday, July 24, 2003**.

                                    Troy C. Bennett, Jr., Clerk


                  J. LARRY PORTON
                  OFFICIAL COURT REPORTER
                  P O  BOX 614
                  WHEELER TX  79096-0614

March 10, 2003

Warren L. Clark
P O Box 2408
Amarillo, TX  79105

RE: Case No. 74,525
   31ST DISTRICT COURT - 2507

Style: BRITTON, CHRISTOPHER CHAD

Dear Counsel:

The Motion for Extension of Time to File the Reporter's Record is granted.  The time for filing the Reporter's Record has been extended to 06-08-03.  NO FURTHER MOTIONS FOR EXTENSION OF TIME WILL BE ENTERTAINED.  FAILURE TO FILE THE REPORTER'S RECORD BY THE DATE HEREIN SET FORTH MAY RESULT IN THE ISSUANCE OF A SHOW CAUSE ORDER AND/OR JUDGMENT OF CONTEMPT.

Sincerely yours,

Troy C. Bennett, Jr., Clerk

By:

Deputy

cc: Charles Cole
   Judge Presiding
   J. LARRY PORTON
   Richard J. Roach

## COURT REPORTER'S RQUEST FOR EXTENSION OF TIME
## TO FILE REPORTER'S RECORD

Appellate Case Number: **74,525**

Trial Court Number: **45,373-B**

Style:  THE STATE OF TEXAS

VS.

CHRISTOPHER CHAD BRITTON

Counsel Requesting Record:
Warren L. Clark
310 West 6th Avenue
P. O. Box 2408
Amarillo, Texas 79105
(806)379-7655

I, J. LARRY PORTON, Official Court Reporter for the 31st Judicial District, am unable to file the Reporter's Record in the above styled case by **04-08-2003** for the following reasons:

1.  Was told a Motion for New Trial had been filed.

2.  Designation of Record was not received until December 13, 2002.

3.  Length of record.

4.  Health problems.  Hospitalized November, 2002, January, 2003 and February 2003.  Pace maker implanted February 24, 2003 due to slow and irregular heartbeat. (See attached letter from physician.)

I estimate the record in this appeal to be approximately 10,000 pages.

The record covers eight (8) weeks of testimony.

It is respectfully requested that a 90 day extension be granted to **06-08-2003**, which would be the final date if Motion for New Trial had been filed.

J. Larry Porton, Official Court Reporter
31st District Court
P. O. Box 614
Wheeler, Texas 79096
(806)826-5501 Telephone
(806)826-5503 Fax

FILED IN
COURT OF CRIMINAL APPEALS

MAR 1 0 2003

Troy C. Bennett, Jr., Clerk

03-03-2003

**TO WHOM IT MAY CONCERN,**

Since the middle of January, Mr. Larry Porton has had considerable cardiovascular problems including hospitalization for atrial fibrillation with fast ventricular response, several visits to the family physician and cardiologist. He, also, was seen by Dr. Glen Friesen and had a pacemaker placement on 2-24-2003.

In light of the above health problems, I am requesting for this patient consideration of an extension for completion of court records.

Sincerely,

ROBERT C. GALUTIA, M.D.
Parkview Clinic
P.O. BOX 159
Wheeler, TX 79096

FILED IN
COURT OF CRIMINAL APPEALS

MAR 1 0 2003

Troy C. Bennett, Jr., Clerk

## IN THE COURT OF CRIMINAL APPEALS
## AT AUSTIN, TEXAS

| | | |
|---|---|---|
| **CHRISTOPHER CHAD BRITTON,** | X | |
| *Appellant* | X | |
| | X | |
| | X | |
| **VS.** | X | *NO. 74,525* |
| | X | |
| | X | |
| **THE STATE OF TEXAS** | X | |

FILED IN
COURT OF CRIMINAL APPEALS

MAR 1 0 2003

Troy C. Bennett, Jr., Clerk

### *A F F I D A V I T*

BEFORE ME, the undersigned authority, personally appeared Warren L. Clark, who, upon his oath, did depose and state the following:

My name is Warren L. Clark and I am a licensed lawyer in the State of Texas. I served as lead counsel for Appellant Christopher Chad Britton during his capital murder trial held in Potter County, Texas during the months of June through August of 2002. I have also been appointed by the 31st District Court to prosecute the appeal in the case to this Court.

On March 2, 2003, undersigned counsel received notice from the Court that the Reporter's Record had not been filed with the Court and that absent a properly filed Motion For Extension of Time, the court reporter faced the possible issuance of a Notice To Show Cause or Judgment of Contempt. I have been requested to submit this affidavit in support of the court reporter's anticipated motion to extend.

In December of 2002, undersigned counsel was appointed by the 47th District Court of Potter County to prosecute the appeal arising from a capital murder conviction in a case styled *Ryan Heath Dickson v. The State of Texas*, Trial Court No. 38,006-A. The Clerk's Record and Reporter's Record in this case will be, if not already, filed with this Court during this week, March 3, 2003. The record in this cause is huge, running well over 15,000 pages. It will necessarily take undersigned counsel several months to read and analyze the record, much less research potential error and reduce same in the form of a brief for the Court. Counsel anticipates requesting a length extension to prepare the brief in this particular case.

On the other hand, in the absence of an extension in the *Britton* appeal, counsel will be forced to prepare two appeals from two very lengthy records at virtually the same time. From personal experience, counsel estimates that the running length of the *Britton* appeal will run some 10,000 pages. Faced with this daunting task, undersigned counsel will most likely be unable to complete both tasks within the anticipated time framework and thus, may very well have to seek withdrawal from at least one of the appeals. This will force the trial court to appoint new counsel to plow, in effect, old ground and essentially duplicate efforts needlessly. Granting an extension up to six months to the court reporter in the instant case will permit undersigned to carry out his duties on both appeals, thereby providing effective

2

assistance of counsel to both indigent appellants.

Warren L. Clark

    SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the 4th day of March, 2003.

NOTARY PUBLIC in and for
STATE OF TEXAS

3

February 24, 2003


Warren L. Clark
P O Box 2408
Amarillo, TX  79105


RE: Case No. 74,525
    31ST DISTRICT COURT - 2507

Style: BRITTON, CHRISTOPHER CHAD

Dear Counsel:

  The Court Reporter has failed to file the reporters record in
the above referenced cause.  To avoid the issuance of a Notice
to Show Cause or Judgment of Contempt, the Court Reporter must
file a Motion for Extension of Time or such motion along with the
reporters record with this Court immediately.



                    Sincerely yours,


                    Troy C. Bennett, Jr., Clerk

                    By:_____
                       Deputy


cc: Charles Cole
    Judge Presiding
    J. LARRY PORTON
    Richard J. Roach

February 24, 2003

Warren L. Clark
P O Box 2408
Amarillo, TX  79105

RE: Case No. 74,525
   31ST DISTRICT COURT - 2507

Style: BRITTON, CHRISTOPHER CHAD

Dear Counsel:

   I have this day received and filed the Clerk's Record in
the above-styled and numbered cause.

                    Sincerely yours,

                    Troy C. Bennett, Jr., Clerk

                    By
                    Deputy

cc: Charles Cole
   Judge Presiding
   J. LARRY PORTON
   Richard J. Roach

January 9, 2003

Warren L. Clark
P O Box 2408
Amarillo, TX 79105

RE: Case No. 74,525
    31ST DISTRICT COURT - 2507

Style: BRITTON, CHRISTOPHER CHAD

Dear Counsel:

The District Clerk's Motion for Extension of time to file the
Clerk's Record has been granted. The time for filing the Clerk's
Record has been extended to 03-03-03.

Sincerely yours,

Troy C. Bennett, Jr., Clerk

By _____
   Deputy

cc: Charles Cole
    Judge Presiding
    J. LARRY PORTON
    Richard J. Roach

**HEMPHILL COUNTY &**
**31ST JUDICIAL DISTRICT CLERK**
*Charles Cole - Clerk*
*Donna Walser - Deputy Clerk / Brenda Perrin - Deputy Clerk*
*P.O. BOX 867 - 400 MAIN STREET*
*CANADIAN, TEXAS 79014-0867*
*PHONE [806] 323-6212*

FILED IN
COURT OF CRIMINAL APPEALS

JANUARY 6, 2003

JAN 9 2003

Troy C. Bennett, Jr., Clerk

STATE COURT OF CRIMINAL APPEALS
P. O. BOX 12308
AUSTIN, TEXAS 78711-2308

**CERTIFIED MAIL**
**7000 1670 0002 9437 4169**
**RETURN RECEIPT REQUESTED**

ATTENTION: MR. ABEL ACOSTA

SUBJECT:    AUTOMATIC APPEAL
            CAUSE NO. **2507**
            **THE STATE OF TEXAS vs. CHRISTOPHER CHAD BRITTON**
            FILED IN THE 31ST JUDICIAL DISTRICT COURT ON JUNE 28, 2001
            JUDGE PRESIDING: HONORABLE STEVEN R. EMMERT
            CHANGE OF VENUE TO POTTER COUNTY, TEXAS

MR. ACOSTA:

AS PER OUR TELEPHONE CONVERSATION ON JANUARY 2, 2003, I AM REQUESTING
AN EXTENSION OF SIXTY [60] DAYS FROM THIS DATE TO COMPLETE THE CLERK'S
RECORD REGARDING THE ABOVE CAPTIONED CAUSE.

PLEASE ADVISE OUR OFFICE IF THIS REQUEST IS GRANTED.

THANK YOU.

SINCERELY,

Charles Cole
Hemphill County / District Clerk

No. 45,373-B

| THE STATE OF TEXAS | § | IN THE 181ST DISTRICT COURT |
| | § | |
| | § | |
| VS. | § | IN AND FOR |
| | § | |
| | § | |
| CHRISTOPHER CHAD BRITTON | § | POTTER COUNTY, TEXAS |

FILED IN
COURT OF CRIMINAL APPEALS

JAN 2 2003

### *ORDER OF APPOINTMENT OF APPELLATE COUNSEL*

Troy C. Bennett, Jr., Clerk

CAME ON TO BE HEARD on this the _____ day of _____, 2002, the

matter of appointment of appellate counsel for Defendant CHRISTOPHER CHAD

BRITTON. The Court, after having consulted with Defendant's trial counsel, having

reviewed the Court's file and being familiar with performance of counsel during trial,

finds that good cause exists for the appointment of trial counsel Warren L. Clark to

represent Defendant on appeal.

In support of its finding of good cause, the Court concludes that trial counsel

is intimately familiar with the entire record in the case, including all proceedings at

the pre-trial, jury selection, guilt-innocence and punishment phases of the trial, and

that appointment of trial counsel will promote judicial economy and efficiency in the

appellate process. Further, the Court, being familiar with the record and performance

of counsel, finds no evidence of any conflict of interest which might preclude trial

counsel from rendering effective assistance of counsel on appeal.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Warren

371093

L. Clark is hereby appointed to represent Defendant Christopher Chad Britton on direct appeal to the Court of Criminal Appeals in Austin, Texas in the above-styled and numbered cause.

SIGNED AND ENTERED on this the 22nd day of _August_, 2002.

_____
JUDGE PRESIDING

2

371094

Cause No. 45,373-B (Single Count) **TRN 004198756X**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 181ST JUDICIAL |
| v. | § | DISTRICT COURT OF |
| CHRISTOPHER CHAD | § | POTTER COUNTY, TEXAS |
| BRITTON, DEFENDANT | | |
| <u>SID</u>: TX 06374511 | | |

# JUDGMENT OF CONVICTION BY JURY;
## SENTENCE BY JURY TO DEATH

| | |
|---|---|
| <u>DATE OF JUDGMENT</u>: | **August 8, 2002** |
| <u>JUDGE PRESIDING</u>: | **Steven R. Emmert** |
| <u>ATTORNEY FOR THE STATE</u>: | **John Neal and Mac Cobb** |
| <u>ATTORNEY FOR THE DEFENDANT</u>: | **Warren Clark and Mark Buzzard** |
| <u>OFFENSE</u>: | **CAPITAL MURDER** |
| <u>STATUTE FOR OFFENSE</u>: | **Section 19.03, Penal Code** |
| <u>DEGREE OF OFFENSE</u>: | **Capital Felony** |
| <u>APPLICABLE PUNISHMENT RANGE</u> | |
| <u>(including enhancements, if any)</u>: | **Life or Death** |
| <u>DATE OF OFFENSE</u>: | **June 17, 2001** |
| <u>CHARGING INSTRUMENT</u>: | **Indictment** |
| <u>PLEA TO OFFENSE</u>: | **Not Guilty** |
| <u>PLEA TO ENHANCEMENT</u> | **Not Applicable** |
| <u>PARAGRAPH(S)</u>: | |
| <u>VERDICT FOR OFFENSE</u>: | **Guilty** |
| <u>FINDING ON ENHANCEMENT</u>: | **Not Applicable** |
| <u>AFFIRMATIVE FINDING ON</u> | **Not Applicable** |
| <u>DEADLY WEAPON</u>: | |
| <u>OTHER AFFIRMATIVE</u> | **Not Applicable** |
| <u>SPECIAL FINDINGS</u>: | |
| <u>DATE SENTENCE IMPOSED</u>: | **August 8, 2002** |
| <u>PUNISHMENT AND PLACE OF</u> | **DEATH** |
| <u>CONFINEMENT</u>: | |
| <u>TIME CREDITED TO SENTENCE</u>: | **418 days** |
| <u>COURT COSTS</u>: | **See attached** |
| <u>TOTAL AMOUNT OF RESTITUTION</u>: | **$ N/A** |
| <u>NAME AND ADDRESS FOR</u> | |
| <u>RESTITUTION</u>: | |

FILED IN
COURT OF CRIMINAL APPEALS

JAN  2 2003

Troy C. Bennett, Jr., Clerk

The **Sex Offender Registration Requirements** under Chapter 62, CCP, **do not apply to** the Defendant. The age of the victim at the time of the offense was **not applicable**.

FILED
CAROLINE WOODBURN
DISTRICT CLERK

This sentence shall run **concurrently unless otherwise specified.**

2002 AUG -8  P 1: 04

On the date stated above, the above numbered and entitled cause was regularly reached and called for trial, and the State appeared by the attorney stated above, and the Defendant and the Defendant's attorney, as stated above, were also present. Thereupon both sides announced ready for trial, and the Defendant pleaded **not guilty** and a jury, to wit: Jimmy Muncy, and

TEXAS

DEPUTY

**363456**



4

eleven others, was duly selected, impaneled and sworn. Having heard the evidence submitted and having been duly charged by the Court, the jury retired to consider their verdict. Afterward, being brought into open court by the proper officer, the Defendant, the Defendant's attorney, and the State's attorney being present, and being asked if the jury had agreed upon a verdict, the jury answered it had and returned to the Court a verdict, which was read aloud, received by the Court, and is now entered upon the Minutes of the Court as follows:

We, the jury, find the Defendant, CHRISTOPHER CHAD BRITTON, guilty of the offense of CAPITAL MURDER as charged in the indictment.

Jimmy Muncy
Presiding Juror

Thereupon, the Defendant having previously elected to have the punishment assessed by the jury, pleaded to the enhancement paragraphs, if any, as stated above, and the jury was called back into the box and heard evidence related to the question of punishment. Thereafter, the jury retired to consider such question and, after having deliberated, the jury was brought back into open court by the proper officer, the Defendant, the Defendant's attorney, and the State's attorney being present, and being asked if the jury had agreed upon a verdict, the jury answered it had and returned to the Court a verdict, which was read aloud, received by the Court, and is now entered upon the Minutes of the Court as follows:

## SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, CHRISTOPHER CHAD BRITTON, would commit criminal acts of violence that would constitute a continuing threat to society?

Answer: We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "Yes".

Jimmy Muncy
Presiding Juror

## SPECIAL ISSUE NO. 2

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Answer: We, the jury, unanimously find that the answer to this Special Issue is "No".

Jimmy Muncy
Presiding Juror

369457

VERDICT: We, the jury, return in open court the above answers to the "Special Issues" submitted to us, and the same is our verdict in this case.

Jimmy Muncy
Presiding Juror


A presentence investigation report **was done according to Article 42.12, sec. 9, CCP.**

And thereupon the Court asked the Defendant whether the Defendant had anything to say why said sentence should not be pronounced upon said Defendant, and the Defendant answered nothing in bar thereof.  Whereupon the Court proceeded to pronounce sentence upon said Defendant as stated above.

It is therefore ORDERED, ADJUDGED and DECREED by the Court that the defendant is guilty of the offense stated above, the punishment is fixed as stated above, and the State of Texas do have and recover of said defendant all court costs in this prosecution expended, for which execution will issue.

It is ORDERED by the Court that the Defendant be taken by the authorized agent of the State of Texas or by the Sheriff of this county and be safely conveyed and delivered to the **Director, Institutional Division-TDCJ,** there to be confined in the manner and for the period aforesaid, and the said defendant is hereby remanded to the custody of the Sheriff of this county until such time as the Sheriff can obey the directions of this sentence.

The defendant is given credit as stated above on this sentence for the time spent in county jail. The Defendant also is ordered to pay restitution to the person(s) named above in the amount specified above.

**Furthermore, the following special findings or orders apply**:

None.

Signed on the *8th* day of August, 2002.


Judge Presiding


Defendant's right thumbprint


FILED
CAROLINE WOODBURN
DISTRICT CLERK

2002 AUG -8  P 4: 04

POTTER COUNTY, TEXAS

BY_____DEPUTY

DS4: Judgment of Conviction by Jury; Sentence By Jury, Cause No. 45,373-B; Page 3 of 3 Pages

**363458**



## BILL OF COSTS
## CRIMINAL

CAUSE NO. 045373-00-B

STYLE: THE STATE OF TEXAS VS CHRISTOPHER CHAD BRITTON

IN AND FOR THE: 181ST DISTRICT COURT

JUDGMENT DATE: AUGUST 8, 2002

TO: TDCJ

| | | |
|---|---|---|
| CLERK FEE | *$* | 40.00 |
| FUGITIVE APPREHENSION FUND | | 5.00 |
| JUVENILE JUSTICE CRIME CENTER | | .25 |
| STATE CONSOLIDATED CRIMINAL FEES | | 80.00 |
| CRIME VICTIM COMPENSATION FUND | | 45.00 |
| JUDICIAL/COURT PERSONNEL TRAINING FUND | | 2.00 |
| RECORDS PRESERVATION | | 20.00 |
| COURTHOUSE SECURTY FEE | | 5.00 |
| SHERIFF FEES | | 12.89 |
| ATTORNEY FEES (COURT APPOINTED) | | |
| FINE | | |
| LAW LIBRARY | | |
| JURY FEE | | 20.00 |
| CRIMINAL MANAGEMENT INSTITUTE | | |
| VISUAL RECORD BY ELECTRONIC DEVICE | | |
| APPEAL TRANSCRIPT | | |
| TIME PAYMENT FEE | | |
| GRAFFITI ERADICATION FEE | | |
| | TOTAL COSTS | 230.14 |
| | PRIOR PAYMENTS | |
| | BALANCE DUE | 230.14 |

I HEREBY CERTIFY THE ABOVE TO BE A CORRECT ACCOUNT OF THE FINE AND COSTS
IN THE ABOVE CAPTIONED CAUSE AS SHOWN IN THE RECORDS AS OF AUGUST 8,
2002.

ISSUED AND GIVEN UNDER MY HAND AND SEAL ON AUGUST 8, 2002.

CAROLINE WOODBURN, CLERK OF THE COURT
POTTER COUNTY, TEXAS

BY _____ DEPUTY

NO. 45,373-B

| THE STATE OF TEXAS | § | IN THE 181st DISTRICT COURT |
| VS. | § | IN AND FOR |
| CHRISTOPHER CHAD BRITTON | § | POTTER COUNTY, TEXAS |

## NOTICE OF APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant, CHRISTOPHER CHAD BRITTON, by and through his attorney of record, and files this his Notice of Appeal and would show the Court as follows:

### I.

On the 8th day of August, 2002, the Defendant was duly sentenced in the above-styled and numbered cause to death by lethal injection. Appeal in this case is automatic.

### II.

The Defendant, by and through his attorney of record, hereby gives written notice of appeal to the Court of Criminal Appeals at Austin, Texas.

Respectfully submitted,

WARREN L. CLARK
ATTORNEY AT LAW
203 W. 8th Ave., Ste. 320
P.O. Box 2408 (79105)
Amarillo, Texas 79101
806/379-7655
806/371-9610 (fax)

_____
Attorney for Defendant
SBN # 04300500

FILED IN
COURT OF CRIMINAL APPEALS

JAN 2 2003

Troy C. Bennett, Clerk

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing document was furnished to the office of the Hemphill County District Attorney on this the _17_ day of _September_, 2002.

Warren L. Clark

**Oral Argument Requested**

## NO. 74,145

## IN THE COURT OF CRIMINAL APPEALS
## OF TEXAS AT AUSTIN

### JEDIDIAH ISSAC MURPHY,
**Appellant**

### vs.

### THE STATE OF TEXAS,
**Appellee**

On appeal from the 194th Judicial District Court of
Dallas County, Texas
Cause No. F00-02424-NM

**STATE'S BRIEF**

FILED IN
COURT OF CRIMINAL APPEALS

DEC 2 7 2002

Troy C. Bennett, Jr., Clerk

Bill Hill
Criminal District Attorney
Dallas County, Texas

*Counsel of Record:*
Lisa Braxton Smith
Assistant District Attorney
State Bar No. 00787131

Frank Crowley Courthouse
133 N. Industrial Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3638
(214) 653-3643 (FAX)

ORIGINAL

## <u>INDEX OF AUTHORITIES</u>

### <u>CASES</u>

*Adams v. State*,
    448 U.S. 38 (1980) ................................................................. 11

*Banda v. State*,
    890 S.W.2d 42 (Tex. Crim. App. 1994) ................................. 22

*Barajas v. State*,
    No. 415-99, 2002 Tex. Crim. App. LEXIS 140
    (Tex. Crim. App. June 26, 2002) ........................................ 6, 9

*Barley v. State*,
    906 S.W.2d 27 (Tex. Crim. App. 1995) ................................. 55

*Bone v. State*,
    77 S.W.3d 828 (Tex. Crim. App. 2002) ................................. 32

*Boyle v. State*,
    820 S.W.2d 122 (Tex. Crim. App. 1989) ............................... 48

*Brewer v. State*,
    649 S.W.2d 628 (Tex. Crim. App. 1983) ............................... 47

*Brown v. State*,
    29 S.W.3d 251 (Tex. App. – Houston [14th Dist.] 2000, no pet.) ......................... 65

*Brown v. State*,
    64 S.W.3d 94 (Tex. App. – Austin 2001, no pet.) ........................................... 58, 63

*Caldwell v. State*,
    818 S.W.2d 790 (Tex. Crim. App. 1991) ............................... 69

*Callins v. Collins*,
    510 U.S. 1141 (1994) .......................................................... 72

*Cantu v. State*,
    738 S.W.2d 249 (Tex. Crim. App. 1987) ...................... 62, 63, 64, 66

*Cantu v. State*,
    842 S.W.2d 667 (Tex. Crim. App. 1992) ............................... 69

*Chamberlain v. State,*
  998 S.W.2d 230 (Tex. Crim. App. 1999)........................................................ 70, 72

*Cordova v. State,*
  733 S.W.2d 175 (Tex. Crim. App. 1987)................................................................ 21

*Craig v. State,*
  985 S.W.2d 693 (Tex. App. – Houston [1st Dist.] 1999, pet. ref'd) ................ 60, 66

*Cuevas v. State,*
  742 S.W.2d 331 (Tex. Crim. App. 1987)................................................................ 24

*Curry v. State,*
  30 S.W.3d 394 (Tex. Crim. App. 2000).................................................................. 54

*Cutillo v. Cinelli,*
  485 U.S. 1037 (1988) ............................................................................................ 41

*Davis v. State,*
  649 S.W.2d 380 (Tex. App. — Fort Worth 1983, pet. ref'd) ................... 42, 47, 58

*Delk v. State,*
  855 S.W.2d 700 (Tex. Crim. App. 1993)........................................................ 62, 65

*Dickson v. State,*
  492 S.W.2d 267 (Tex. Crim. App. 1973)................................................................ 58

*Drew v. State,*
  743 S.W.2d 207 (Tex. Crim. App. 1987)................................................................ 13

*Ex parte Watson,*
  601 S.W.2d 350 (Tex. Crim. App. 1980)................................................................ 51

*Feldman v. State,*
  71 S.W.3d 738 (Tex. Crim. App. 2002)........................................................ passim

*Fuller v. State,*
  829 S.W.2d 191 (Tex. Crim. App. 1992)................................................................ 13

*Gill v. State,*
  646 S.W.2d 532 (Tex. App. – Houston [1st Dist.] 1982, no pet.) .......................... 52

*Green v. State,*
  912 S.W.2d 189 (Tex. Crim. App. 1995)........................................................ 68, 69

*Hardin v. State,*
    951 S.W.2d 208 (Tex. Crim. App. 1997)................................................................. 32

*Hignite v. State,*
    522 S.W.2d 210 (Tex. Crim. App. 1975)............................................. 50, 51, 53, 54

*Hughes v. State,*
    24 S.W.3d 833 (Tex. Crim. App. 2000)................................................................. 16

*Hughes v. State,*
    878 S.W.2d 142 (Tex. Crim. App. 1995)......................................... 23, 26, 31

*Ibarra v. State,*
    11 S.W.3d 189 (Tex. Crim. App. 1999)................................................................. 63

*Jackson v. State,*
    33 S.W.3d 828 (Tex. Crim. App. 2000)........................................................ 7, 70

*Jackson v. State,*
    826 S.W.2d 751 (Tex. App. – Houston [14[th] Dist.] 1992, pet. ref'd) .............. 18, 67

*Jackson v. State,*
    992 S.W.2d 469 (Tex. Crim. App. 1999)................................................................. 67

*Janecka v. State,*
    739 S.W.2d 813 (Tex. Crim. App. 1987)................................................................. 17

*Jones v. State,*
    982 S.W.2d 386 (Tex. Crim. App. 1998)........................................................ 14, 18

*Jones v. United States,*
    144 L.Ed.2d 370 (1999) ................................................................................ 70

*Jurek v. State,*
    428 U.S. 262 (1976) ...................................................................................... 69

*King v. State,*
    29 S.W.3d 556 (Tex. Crim. App. 2000)........................................................ 10, 13

*Ladd v. State,*
    3 S.W.3d 547 (Tex. Crim. App. 1999)................................................................. 8

*Larrabee v. State,*
    746 S.W.2d 264 (Tex. App. – Amarillo 1988, pet. ref'd)....................................... 52

*Lawton v. State*,
    913 S.W.2d 542 (Tex. Crim. App. 1995)............................................................... 71

*Loserth v. State*,
    963 S.W.2d 770 (Tex. Crim. App. 1998)............................................................... 60

*Malik v. State*,
    953 S.W.2d 234 (Tex. Crim. App. 1997)............................................................... 54

*Mastrian v. McManus*,
    554 F.2d 813 (8th Cir. 1977).............................................................................. 41

*McCoy v. State*,
    996 S.W.2d 899 (Tex. App. – Houston [14[th] Dist.] 1999, pet. ref'd) .............. 37, 38

*Mills v. Maryland*,
    486 U.S. 367 (1988) ............................................................................................ 70

*Mosley v. State*,
    983 S.W.2d 249 (Tex. Crim. App. 1998)........................................................... 7, 67

*Neil v. Biggers*,
    409 U.S. 188 (1972) ......................................................................................... 55, 60

*Nonn v. State*,
    13 S.W.3d 434 (Tex. App. – Corpus Christi 2000),
    *vacated on other grounds*, 41 S.W.3d 677 (Tex. Crim. App. 2001) ..................... 38

*Ott v. State*,
    627 S.W.2d 218 (Tex. App. – Fort Worth 1981, pet. ref'd) .................................. 47

*Patrick v. State*,
    906 S.W.2d 481 (Tex. Crim. App. 1996)........................................................... 18, 26

*Perez v. State*,
    41 S.W.3d 712 (Tex. App. – Corpus Christi 2001, pet. ref'd)............................... 57

*Raby v. State*,
    970 S.W.2d 1 (Tex. Crim. App. 1998).................................................................... 8

*Rachal v. State*,
    917 S.W.2d 799 (Tex. Crim. App. 1996)................................................... 10, 11, 13

*Rocha v. State*,
    16 S.W.3d 1 (Tex. Crim. App. 2000)..................................................................... 16

*Rogers v. State*,
    774 S.W.2d 247 (Tex. Crim. App. 1989).................................................... 59, 66

*Rousseau v. State*,
    855 S.W.2d 666 (Tex. Crim. App. 1993)................................................... 71

*Roy v. State*,
    891 S.W.2d 315 (Tex. App. – Fort Worth 1994, no pet.) ....................... 21

*Simmons v. United States*,
    390 U.S. 377 (1968)................................................................................... 55, 60

*Standefer v. State*,
    59 S.W.3d 177 (Tex. Crim. App. 2001)..................................................... 6, 8

*State ex rel. Curry v. Carr*,
    847 S.W.2d 561 (Tex. Crim. App. 1992)................................................... 17

*State ex rel. Turner v. McDonald*,
    676 S.W.2d 371 (Tex. Crim. App. 1981)................................................... 17

*Stewart v. State*,
    44 S.W.3d 582 (Tex. Crim. App. 2001)..................................................... 49, 50

*Strickland v. Washington*,
    466 U.S. 668 (1984).................................................................................. 32

*Turner v. State*,
    No. 73,559, 2002 Tex. Crim. App. LEXIS 153
    (Tex. Crim. App. Sept. 11, 2002)............................................................. 72

*United States v. Briggs*,
    698 F.2d 486 (D.C. Cir. 1983) ................................................................. 41

*United States v. Dien*,
    609 F.2d 1038 (2nd Cir. 1979) ................................................................ 41

*United States v. Irwin*,
    612 F.2d 1182 (9th Cir. 1980)................................................................... 41

*United States v. Kilrain*,
    566 F.2d 979 (5th Cir. 1978)..................................................................... 42

*United States v. Levy*,
    577 F.2d 200 (3rd Cir. 1979) ................................................................... 41

*United States v. Mastroianni,*
    749 F.2d 900 (1st Cir. 1984)................................................................ 41

*United States v. Melvin,*
    650 F.2d 641 (5th Cir. 1981)................................................................ 42

*United States v. Morrison,*
    449 U.S. 361 (1981)............................................................................. 41

*United States v. Sander,*
    615 F.2d 215 (5th Cir. 1980)................................................................ 42

*United States v. Steele,*
    727 F.2d 580 (6th Cir. 1984)................................................................ 41

*Ward v. State,*
    474 S.W.2d 471 (Tex. Crim. App. 1971)............................................... 58

*Washburn v. State,*
    692 S.W.2d 576 (Tex. App. – Houston [1[st] Dist.] 1985, no pet.) .................... 52, 53

*Weatherford v. Bursey,*
    429 U.S. 545 (1977).......................................................................... 41, 42

*Webb v. State,*
    760 S.W.2d 263 (Tex. Crim. App. 1988)............................................... 65

*Whitley v. State,*
    635 S.W.2d 791 (Tex. App. – Tyler 1982, no pet.) ............................... 50

*Williams v. State,*
    773 S.W.2d 525 (Tex. Crim. App. 1988)............................................... 22

*Williams v. State,*
    937 S.W.2d 479 (Tex. Crim. App. 1996)............................................... 70

*Witherspoon v. Illinois,*
    391 U.S. 510 (1968)............................................................................. 10

*Zarychta v. State,*
    44 S.W.3d 155 (Tex. App. – Houston [14[th] Dist.] 2001, pet. ref'd),
    *cert. denied,* 122 S.Ct. 2312 (2002) ...................................................... 57

## STATUTES

TEX. CODE CRIM. PROC. ANN. art. 1.13 (Vernon Supp. 2002) ........................................ 17

TEX. CODE CRIM. PROC. ANN. art. 13.07 (Vernon 1977)............................................ 48, 50

TEX. CODE CRIM. PROC. ANN. art. 13.08 (Vernon 1977).................................................. 49

TEX. CODE CRIM. PROC. ANN. art. 13.12 (Vernon 1977)............................................ 49, 50

TEX. CODE CRIM. PROC. ANN. art. 13.17 (Vernon 1977).................................................. 48

TEX. CODE CRIM. PROC. ANN. art. 13.18 (Vernon 1977).................................................. 49

TEX. CODE CRIM. PROC. ANN. art. 13.19 (Vernon 1977)............................................ 49, 54

TEX. CODE CRIM. PROC. ANN. art. 35.13 (Vernon 1989)............................................ 16, 17

TEX. CODE CRIM. PROC. ANN. art. 35.15 (Vernon Supp. 2002) ...................................... 17

TEX. CODE CRIM. PROC. ANN. art. 35.16 (Vernon 1989 & Supp. 2002) ....... 10, 15, 18, 19

TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 1981).................................................. 49

TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon Supp. 2002) ........................ 68, 69, 70

TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 1979).................................................. 39

TEX. PENAL CODE ANN. § 19.03 (Vernon 1994) ............................................................. 68

## OTHER AUTHORITIES

TEX. CONST., art. I, § 10 ................................................................................... 6, 15

U.S. CONST. amend. V .................................................................................... 15, 55

U.S. CONST. amend. VI ................................................................................ 6, 10, 68

U.S. CONST. amend. VIII ............................................................................ 67, 68, 69

U.S. CONST. amend. XIV ............................................................................... passim

The State of Texas submits this brief to the Honorable Court of Appeals in reply to the brief of appellant, Jedidiah Issac Murphy.

## STATEMENT OF THE CASE

A jury convicted appellant of capital murder and, pursuant to the jury's answers to the special punishment issues, the trial court sentenced him to death. (CR: 215).

## STATEMENT OF FACTS

Appellant kidnapped, robbed, and murdered eighty-year-old Bertie Cunningham. Ms. Cunningham went shopping at Collin Creek Mall in Plano and was returning to her home in Garland when taken hostage by appellant. Ultimately, appellant forced Ms. Cunningham into the trunk of her car and shot her in the head. (RR47: 23-31, 44-47; RR49: 42-44).

Immediately afterwards, appellant repeatedly attempted to withdraw money from Ms. Cunningham's bank account using her ATM card. These attempts failed, but over the next two days, appellant successfully used Ms. Cunningham's credit cards[1] at various locations. (RR47: 150-52, 156-61).

Shortly after shooting Ms. Cunningham, appellant picked up his niece and two of her teenage friends, driving them around in Ms. Cunningham's car with Ms. Cunningham

---

[1] Appellant also stole a credit card belonging to Ms. Cunningham's sister. Ms. Cunningham used her sister's credit card to purchase a bathrobe for her sister. (RR47: 28).

1

in the trunk.  He bought some beer for himself, then he purchased himself and the two teenage boys motorized scooters from a Richardson sporting goods store.  (RR47: 89-99).  The next day, appellant drove to Van Zandt County to visit his childhood friend Treshod Tarrant, and bought dinner, beer, and liquor.  The police discovered appellant at Shod's grandmother's house early the next morning and arrested him.  (RR47: 202-211, 242-48; RR48: 78-80).

Upon his arrest, appellant admitted that Ms. Cunningham's body was located in a nearby creek.  (RR48: 84-90).  He also subsequently executed a written statement to the police in which he claimed he accidentally shot Ms. Cunningham while forcing her into the trunk.  (RR48: 175-84; State's Exhibit 47).

## SUMMARY OF ARGUMENT

*Points 1 & 2: Limitation of Appellant's Questioning of Venirepersons:*  The trial court did not abuse its discretion in preventing appellant from asking the prospective jurors (1) "Would victim character testimony cause you to reduce the State's burden of proof on Special Issue Number 1?" and (2) "Would you promise the Court that you would not do so?"  The questions sought to improperly discern what effect evidence of Bertie Cunningham's good character would have on a prospective juror's assessment of appellant's punishment.  Furthermore, the questions were merely "a license to go fishing" for facts that would prevent a prospective juror from assessing life.

*Points 3 & 4: Granting State's Challenges for Cause:*  The trial court properly granted the State's challenge for cause against venireperson Alena Treat.  Ms. Treat

2

indicated that she would only consider the death penalty for those capital murderers who would likely murder again. Thus, Ms. Treat possessed a bias against the law the State was entitled to rely upon. In any event, appellant demonstrated no deprivation of his right to a fair and impartial jury; nor did he demonstrate that Ms. Treat was excluded because of any general opposition to the death penalty. Therefore, error, if any, in excluding Ms. Treat was harmless.

*Points 5-8: Denial of Appellant's Challenges for Cause:* Appellant did not preserve his complaint regarding the denial of these challenges for cause because he belatedly requested additional peremptory strikes. Nevertheless, the trial court did not abuse its discretion in denying appellant's challenges for cause against venirepersons Phillip May, John Robuck, Thomas Brooks, and Kimberly Williams. Each of these venirepersons indicated a bias against the law applicable to the case. Furthermore, the additional strikes granted appellant at the outset of voir dire were sufficient to cure any error.

*Point 9: Effective Assistance of Counsel:* Appellant's attack on defense counsel's voir dire performance is unsubstantiated. The record supports the presumption that counsel's decision to peremptorily strike venirepersons Mark Colditz and John Wilson constituted reasonable trial strategy. Furthermore, appellant fails to demonstrate that, but for counsel striking Mr. Colditz and Mr. Wilson, the result of the proceeding would have been different.

*Point 10: Request for Abatement:* The request to abate is moot. This Court abated the appeal for the requested fact findings regarding the admissibility of appellant's

3

written and oral statements to the police. The trial court has prepared the ordered findings and forwarded them to this Court. Appellant filed no supplemental brief related to those findings.

**Point 11:  *Attorney-Client Privilege*:**  Appellant's constitutional right to counsel was not violated by the fact that the prosecutor saw three pages of confidential communications written by appellant to his attorney. Appellant made no showing of how the State used any of the information in these three pages. Furthermore, the record supports the prosecutor's testimony that he obtained no useful information from those pages. Thus, the record supports the trial court's conclusion that this intrusion did not injure appellant or benefit the State.

**Point 12:   *Proof of Venue:***   The evidence is sufficient to prove by a preponderance of the evidence that venue for this capital murder lay in Dallas County. The evidence shows that Ms. Cunninham was abducted, injured, and died in Dallas County, that appellant removed property he stole from Ms. Cunningham to Dallas County, and that appellant lived in Dallas County at the time of the murder. Even if the court should only have instructed the jury in accordance with the homicide venue statute, the evidence supports a finding of venue in Dallas County. Thus, under *Malik*, the evidence is still sufficient to prove venue.

**Point 13:   *Admissibility of Identification Testimony:***   The totality of the circumstances surrounding Sheryl Wilhelm's identification of appellant show that the lineup viewed by Ms. Wilhelm was not impermissibly suggestive and that, even if so, her

identification of him was nonetheless reliable.   Therefore, the trial court properly admitted evidence of this out-of-court identification of appellant.

**Point 14:  *Denial of Extraneous Offense Instruction:*** Extraneous offense evidence has relevance beyond appellant's future dangerousness.   Therefore, the trial court properly refused to limit the jury's consideration of extraneous offense evidence to the future dangerousness issue.

**Point 15:  *Denial of Instructions Defining Special Issue Terms:*** The trial court had no duty to submit instructions defining the terms "probability," "criminal acts of violence," and "continuing threat to society."   As repeatedly held by this Court, these terms are understood by their common meaning and require no special definition.

**Point 16:  *Constitutionality of 12/10 Rule:*** This Court has repeatedly held that the death penalty statute's "12/10" rule (which requires at least ten "no" votes for the jury to return a negative answer to special issues one and two, and at least ten "yes" votes for the jury to return an affirmative answer to the mitigation special issue) does not violate the federal or statute constitutions.

**Points 17 & 18:  *Constitutionality of Texas Death Penalty Scheme:*** Appellant's assertion that there is an irreconcilable tension between the constitutional requirements of eliminating caprice from the imposition of the death penalty and of allowing each juror a reasoned, moral response to the evidence, has been repeatedly rejected by this Court.

**Points 19 & 20:  *Cumulative Constitutional Error:*** A cumulative-error analysis aggregates only actual errors to determine their cumulative effect.   Because there is no

error in this case and because the alleged types of error have no synergistic effect, appellant's cumulative-error allegation is without merit.

## ARGUMENT

### POINTS 1 & 2: Limiting Appellant's Questioning of Jury Panel

Appellant contends the trial court violated his federal and state constitutional rights to interrogate and challenge members of the jury panel by prohibiting him from asking: (1) "Would victim character testimony cause you to reduce the State's burden of proof on Special Issue Number 1?" and (2) "Would you promise the Court that you would not do so?" (RR5: 8-9). *See* U.S. CONST. amend VI; TEX. CONST., art. I, § 10. This restriction on appellant's voir dire of the jury panel was not unconstitutional or otherwise improper.

Appellant's constitutional right to question the panel is not unlimited. The trial court possesses broad discretion over the jury selection process. Thus, the court's decision to limit questioning of the panel will not be disturbed absent an abuse of discretion. The court abuses its discretion only when it prohibits a question about a proper area of inquiry. Questions that seek to discover a potential juror's view on an issue applicable to the case are proper so long as (1) they do not improperly commit the potential juror to a particular verdict based on particular facts, and (2) they are not so vague or broad as to constitute a "global fishing expedition." *Barajas v. State*, No. 415-99, 2002 Tex. Crim. App. LEXIS 140, at *4 (Tex. Crim. App. June 26, 2002); *Standefer v. State*, 59 S.W.3d 177, 182-83 (Tex. Crim. App. 2001). .

Appellant argues that his questions were proper because they did not seek a commitment from the prospective jurors on the basis of any particular fact. He claims his questions sought only to determine if the prospective jurors could follow the law, namely, hold the State to its burden of proving appellant's future dangerousness. The reference in appellant's questions to the State's burden of proof is nothing but a smokescreen for an improper commitment question. Closer examination reveals the true intent of appellant's inquiry was to discern what effect evidence of Bertie Cunningham's good character would have on a prospective juror's assessment of appellant's punishment.

Appellant's contention that he was merely looking for jurors who could follow the law is inherently suspect. His inquiry was based on a false premise, namely, that evidence of Ms. Cunningham's character bore some relation to the future dangerousness issue; it bore none. A victim's character is relevant to the issue of a defendant's future dangerousness only to the extent that the defendant knew of his victim's character at the time of the offense. *See Jackson v. State*, 33 S.W.3d 828, 833-34 (Tex. Crim. App. 2000) (citing *Mosley v. State*, 983 S.W.2d 249, 261 n.16 (Tex. Crim. App. 1998)). Ms. Cunningham and appellant were strangers, and there was no evidence that appellant knew anything about her character as a person when he killed her.

On the other hand, evidence of Ms. Cunningham's good character was patently relevant to the mitigation special issue. *See Mosley*, 983 S.W.2d at 263 (holding "victim-related evidence" relevant to show that mitigating circumstances not 'sufficient' to warrant imposing a life sentence). Appellant had an interest in eliminating those prospective jurors who would consider evidence of Ms. Cunningham's good character as

7

weighing heavily against imposing a life sentence.   In answering appellant's first question, the prospective jurors would be identifying themselves as jurors who would either favorably or unfavorably view victim character evidence.   Thus, they would be committing themselves to treating victim character evidence in a particular way.   *See Standefer*, 59 S.W.3d at 179 (commitment questions include questions that ask the prospective juror to set the hypothetical parameters for his decision making).

A commitment question is proper only if it would lead to a valid challenge for cause.   *Standefer*, 59 S.W.3d at 182.   The manner in which a prospective juror might characterize or use victim character evidence in assessing punishment would never subject him to a challenge for cause.   The State has no burden of proof on the mitigation issue.   *See Ladd v. State*, 3 S.W.3d 547, 559 (Tex. Crim. App. 1999).   Moreover, the law does not require a juror to treat any particular type of evidence as mitigating.   *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998).   In fact, it precludes any inquiry into how a prospective juror would characterize or weigh a particular piece of evidence at punishment.   *See id.* (holding trial court properly refused to allow defendant to ask prospective jurors what types of evidence they would find mitigating).   Thus, the commitment appellant's questions sought was improper.   *See Standefer*, 59 S.W.3d at 182 ("victim impact evidence is a legitimate factor for a jury to consider in deciding whether to impose a life sentence instead of death (i.e. in answering the mitigation special issue), and a prospective juror cannot be asked whether such evidence would affect his resolution of that issue").

The trial court could also have reasonably concluded that appellant's queries would foster too broad a field of questioning. The question, "Would victim character testimony cause you to reduce the State's burden of proof on Special Issue Number 1?" could be repeated to include numerous other facts in a given case. For instance, in appellant's case, the question could be amended to ask if the victim's age, health, occupation, or associations with certain people would cause the prospective jurors to reduce the State's burden of proof. A line of questioning based on this "burden of proof" qualifier would be nothing but "a license to go fishing" for facts that would prevent a prospective juror from assessing life. *Compare with Barajas*, 2001 Tex. Crim. App. 140, at *11-12 (holding trial court acted within its discretion in prohibiting defendant from asking prospective jurors whether they "could be fair and impartial" under a given set of facts because question was not sufficiently tailored to any relevant issue in the case and constituted "a global fishing expedition").

In sum, appellant's questions improperly sought to commit prospective jurors to treating victim character evidence in a particular manner. Also, appellant's questions created the danger of unfettered exploration of the prospective juror's views regarding particular punishment evidence. Thus, the court's refusal to permit appellant's inquiry into victim character evidence was a justified limitation of appellant's voir dire of the jury panel.

9

## POINTS 3 & 4: Granting State's Challenge for Cause

Appellant contends the trial court erroneously granted the State's challenge for cause against venireperson Alena Treat.  The court agreed with the State that Ms. Treat was biased against the law because, in answering the future dangerousness special issue, she would consider only future murders or attempted murders as "criminal acts of violence that would constitute a continuing threat to society."  (RR12: 50-52).  Appellant argues Ms. Treat's exclusion violated article 35.16 of the criminal procedure code and his federal constitutional right to due process.  *See* U.S. CONST. amends VI & XIV; TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(3) (Vernon Supp. 2002).  Appellant insists Ms. Treat had no bias against the law and maintains that she was excused merely for her general opposition to the death penalty.  Appellant is wrong.

### *Veniremember Properly Excused*

The court's decision to excuse a venireperson for cause is given great deference and will be reversed only for abuse of discretion.  If the totality of the voir dire testimony supports the trial court's finding that the venireperson is unable to follow the law, as instructed, then the court's decision to excuse that venireperson will be upheld.  *King v. State*, 29 S.W.3d 556, 568 (Tex. Crim. App. 2000).

A venireperson may not be excused for her general opposition to the death penalty.  *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968); *Rachal v. State*, 917 S.W.2d 799, 810 (Tex. Crim. App. 1996).  But a venireperson may be excused based on her views about the death penalty if those views would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and her oath.

10

*Adams v. State*, 448 U.S. 38, 45 (1980); *Rachal*, 917 S.W.2d at 810; *see also* TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(3) (Vernon Supp. 2002) (authorizing State's challenge for cause based on venireperson's "bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment").

Ms. Treat demonstrated no general opposition to the death penalty. When the prosecutor asked her how she felt about participating in a trial in which her verdict might result in a death sentence, Ms. Treat said:

> Well, as far as the death penalty is concerned, I don't like there being a death penalty, but I also do not see that there's any logical alternative. So I would not have a problem adhering to the letter of the law. It seems like one of those necessary kind of things. I'm not an active proponent, but like I said, I don't see an alternative at this point.

She also stated that she believed we needed the death penalty to "protect society." (RR12: 12).

The remainder of Ms. Treat's voir dire reflects, however, that she held a bias against the law governing a defendant's eligibility for the death penalty. Ms. Treat stated that, in answering the future dangerousness special issue, she interpreted the term "criminal acts of violence" to mean a murder or attempted murder. (RR12: 15, 44-45). At one point, she acknowledged that mentally disabling someone for life would be a criminal act of violence. (RR12: 46). Ultimately, she even conceded that rape, armed robbery, and aggravated assault with a deadly weapon "could be" criminal acts of violence. (RR12: 47-49). But while acknowledging that crimes such as rape, armed robbery, etc., could be criminal acts of violence, she declared that only some of those offenses constituted "a continuing threat to society." (RR12: 49). Moreover, she

remained insistent throughout her voir dire that, in her mind, only those crimes so extremely violent that a person's life was put in danger constituted a criminal act of violence. (RR12: 17, 46).

In fact, she told the prosecutor that she would not answer the future dangerousness issue affirmatively unless the State showed her that the defendant was at least likely to attempt a murder in the future:

> [PROSECUTOR]: . . . [W]ell, let me just ask you, when answering Special Issue Number 1 then, is the State – is the State going to have [sic] show to you that there's a probability this man would commit a future murder in order for you to answer Special Issue Number 1 yes?  Is that what you're saying to me or not?
>
> [TREAT]:  I'm saying that the State would have – in my mind would have to prove that the person would be likely to at least continue to attempt the same kind of thing, whether he – well, I guess in this case he would succeed or not is not the issue.

(RR12: 16).

Ms. Treat never retreated from this remark.  Indeed, she reaffirmed it, stating that without some evidence that the defendant would commit murder again, she would answer the special issues in a manner that would result in a life sentence:

> [TREAT]: . . . What I'm trying to say is that I know that there is a different way of thinking on [special issue] Number 1 and Number 2, but if a person's character or the circumstances seemed to indicate that the same kind of scenario would not occur again, then I would have to answer that in such a way that it would be a life sentence.

(RR12: 19).

Appellant argues that these responses evince no bias against the law.  But the law does not reserve capital punishment only for those who will likely murder again. *Drew v.*

*State*, 743 S.W.2d 207, 211 (Tex. Crim. App. 1987). Factors other than those prescribed by law may not be made absolute prerequisites for imposition of the death penalty. *Fuller v. State*, 829 S.W.2d 191, 200 (Tex. Crim. App. 1992) (citing *Drew*). A juror must be able to set aside her personal preferences and biases to consider as death eligible all those defined as death eligible by section 19.03 of the penal code and article 37.071 of the criminal procedure code. *Rachal*, 917 S.W.2d at 812.

Jurors may believe what they want regarding the quantum of evidence necessary to impose death and the weight to give particular evidence, but they may not foreclose completely, through some personal bias, consideration of any evidence adduced at trial. *Rachal*, 917 S.W.2d at 812-13. If a potential juror states that she can never affirmatively answer an issue unless specific evidence she requires is introduced, then she has foreclosed consideration of other evidence of future dangerousness and, thus, her view conflicts with the law. *Id.* at 813 n.11.

By refusing to answer the special issues in a manner warranting a death sentence absent some evidence that appellant would probably commit or attempt to commit another murder, Ms. Treat categorically foreclosed her consideration of other future dangerousness evidence. Thus, Ms. Treat evinced a bias against the law that rendered her challengeable for cause. To the extent, if any, that some of Ms. Treat's other remarks could be interpreted as retreating from this expressed bias, the trial court was the fact finder during voir dire and, thus, free to resolve her conflicting answers in the State's favor. *See King*, 29 S.W.3d at 568 (particular deference is given to the trial court's conclusion that venireperson cannot follow law when venireperson's answers are

13

vacillating, unclear, or contradictory).   To conclude otherwise would controvert this Court's policy of encouraging trial court's to liberally grant challenges for cause rather than err by denying a challenge on a close question. *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim. App. 1998).

### *Any Error Harmless*

Even assuming Ms. Treat's excusal was erroneous, it was harmless.   The erroneous excusal of a venireperson warrants reversal only if the record shows that the error deprived the defendant of a lawfully constituted jury. *Jones*, 982 S.W.2d at 393. Appellant makes no such showing.   Ms. Treat was not challenged nor subsequently excused for her general opposition to the death penalty but because of her perceived bias against law on which the State was entitled to rely.  (RR12: 12, 50-53).  Also, appellant neither argues nor demonstrates that any venireperson who served on the jury was unfit for duty.  Thus, reversal is unwarranted. *See Feldman v. State*, 71 S.W.3d 738, 749 (Tex. Crim. App. 2002) (holding any error in excusing venireperson was harmless absent any showing that she was excused based on general opposition to death penalty or that any juror was unfit for jury duty).

### POINTS 5-8: Denial of Appellant's Challenges for Cause

Appellant contends the trial court erroneously denied his challenges for cause against venirepersons Phillip May, John Robuck, Thomas Brooks, and Kimberly Williams.  He argues that the denial of these four challenges for cause violated his federal and state constitutional rights to due process and article 35.16 of the criminal procedure

14

code. U.S. CONST. amends. V, XIV; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(9) & (c)(3) (Vernon 1989 & Supp. 2002).

Appellant failed to preserve his complaint for review. Nevertheless, the trial court properly denied appellant's challenges against these four venirepersons. Furthermore, error, if any, was harmless.

### *Complaint Not Preserved*

In order to preserve this complaint for appellate review, appellant had to demonstrate that: (1) he clearly and specifically challenged the complained-of venirepersons, (2) he peremptorily struck them, (3) he exhausted all his peremptory strikes, (4) the court denied his request for additional strikes, and (5) an objectionable juror sat on the jury. *Feldman*, 71 S.W.3d at 744. Appellant fails to preserve his complaint because he did not make the requisite request for additional strikes.

Appellant clearly and specifically challenged for cause Mr. May, Mr. Robuck, Mr. Brooks, and Ms. Williams. Then, after all challenges for cause were exercised by both sides, he peremptorily struck these four venirepersons. (RR17: 117; RR18: 63-65; RR28: 53-54; RR37: 188; RR44: 5, 8-10). Appellant subsequently exhausted all his peremptory challenges, including three extra peremptory strikes given to him by the court at the outset of voir dire. (RR4: 3; RR44: 12). Thereafter, appellant accepted the twelfth juror without first requesting any additional strikes. (RR44: 12-13).

Eventually, appellant did ask for two more strikes in addition to the eighteen he had been given. At this point, however, appellant had accepted all twelve jurors without complaint. (RR44: 13-14). In retrospect, appellant claimed two jurors, Richard

15

Bachmeyer (Juror No. 5) and Robert Mendro (Juror No. 6), were objectionable.[2] Yet appellant voluntarily accepted both men when he still had numerous peremptory strikes available to exercise.[3]  (RR44: 6-7). Thus, these two jurors were not forced on appellant because the court denied his request for two additional strikes.

Furthermore, appellant did not simply request more strikes; he asked to retroactively apply them.  The court could not legally grant this request.  Article 35.13 prescribes the procedure for exercising challenges, both for cause and peremptory, in a capital case.  Under this statute, a juror must be passed for acceptance or challenge first to the State and then to the defendant.  TEX. CODE CRIM. PROC. ANN. art. 35.13 (Vernon 1989).   The trial court may, as it did in this case, delay both parties' exercise of peremptory strikes until all challenges for cause have been made.  (RR44: 2-15).  Either method complies with article 35.13.[4]  *Hughes v. State*, 24 S.W.3d 833, 841 (Tex. Crim. App. 2000).

Granting appellant's request to retroactively peremptorily strike Mr. Bachmeyer and Dr. Mendro would have violated article 35.13.  *See Rocha v. State*, 16 S.W.3d 1, 6 (Tex. Crim. App. 2000) (trial court properly refused to grant defendant's request to

---

[2] Appellant did not identify why these two jurors were objectionable, and he challenged neither for cause. (RR22: 142; RR25: 46).

[3] Appellant had exercised only five of his eighteen peremptory strikes when he accepted Mr. Bachmeyer, and he had exercised only six of his eighteen strikes when he accepted Dr. Mendro. (RR44: 6-7).

[4] The trial court conducted voir dire in this manner at the request of appellant and over the State's objection. (CR1: 139-40; CR2: 420-22; RR4: 4-8; RR5: 5).

retroactively exercise a peremptory challenge in accordance with article 35.13).   Under the procedure mandated by article 35.13, a defendant must exercise peremptory strikes upon the examination of individual prospective jurors without the opportunity to evaluate the panel as a group. *Janecka v. State*, 739 S.W.2d 813, 833 (Tex. Crim. App. 1987). Allowing appellant to retroactively strike two venirepersons after twelve jurors had been selected would, in essence, provide him with the opportunity article 35.13 prohibits, to evaluate the panel as a group before the exercise of a strike.

Furthermore, it would infringe on the State's right to intelligently exercise its own strikes.   The legislature afforded both the defendant and the State the right to exercise peremptory challenges. TEX. CODE CRIM. PROC. ANN. art. 35.15 (Vernon Supp. 2002). While the procedure article 35.13 provides for exercising those challenges was designed to inure to the defendant's benefit, the legislature could not have intended that the State be precluded from employing any strategy in the exercise of its own challenges.

Indeed, the State is, itself, entitled to a jury trial. *See* TEX. CODE CRIM. PROC. ANN. art. 1.13 (Vernon Supp. 2002); *State ex rel. Curry v. Carr*, 847 S.W.2d 561, 562 (Tex. Crim. App. 1992) (citing *State ex rel. Turner v. McDonald*, 676 S.W.2d 371, 373-74 (Tex. Crim. App. 1981)).   Even though not constitutionally founded, that entitlement would be meaningless absent a fairly selected jury.   Allowing the defendant to go back to exercise strikes against previously accepted jurors, after the State had exhausted its own strikes, would nullify what strategy the State had employed earlier in the selection process.   Such an inequity would surely infringe on the State's right to a fairly selected jury. *Cf. Jackson v. State*, 826 S.W.2d 751, 752 (Tex. App. – Houston [14th Dist.] 1992,

17

pet. ref'd) (holding it would be inequitable to allow defendant, making an unsupported claim of mistake, to change peremptory strikes after learning which venirepersons were struck by State).

Thus, although appellant purportedly requested two additional strikes to correct the trial court's "error" in denying his challenges for cause, appellant made no request for extra peremptory strikes that could have been legally executed. Consequently, he fails to preserve error, if any, in the denial of his challenges for cause.

### *Defense Challenges for Cause Properly Denied*

Even if properly presented for this Court's review, the trial court did not erroneously deny any of the complained-of challenges for cause.

The trial court's decision to grant or deny a challenge for cause is reviewed for abuse of discretion. The reviewing court looks at the entire record to determine if there is sufficient evidence to support the court's ruling. *Feldman*, 71 S.W.3d at 744 (citing *Patrick v. State*, 906 S.W.2d 481, 488 (Tex. Crim. App. 1996)).

Appellant may challenge any venireperson who demonstrates a bias or prejudice against any phase of the law upon which he is entitled to rely. *See* TEX. CODE CRIM. PROC. 35.16(c)(2). But a challenged venireperson must be excused only if the bias or prejudice would substantially impair his ability to carry out his oath and instructions in accordance with the law. *Feldman*, 71 S.W.3d at 744. Furthermore, the law must be explained to the venireperson before he may be asked whether he can follow that law regardless of his personal views. *Id.* (citing *Jones*, 982 S.W.2d at 390).

18

### (1) Phillip May

Appellant contends the court should have excluded Mr. May for cause because he would follow his religious beliefs over the law.  Appellant is entitled to challenge for cause any venireperson who has a bias against any of the law applicable to the case upon with the defense is entitled to rely . . ."  TEX. CODE CRIM. PROC. art. 35.16(c)(2). However, appellant never established Mr. May's "religious" bias against any particular, applicable law upon which the defense was entitled to rely.

Throughout the entirety of his voir dire, Mr. May maintained that his responsibility as a juror to assess a death sentence, if appropriate, did not conflict with his religious beliefs.  When the prosecutor asked Mr. May how he felt about the death penalty, Mr. May said:

> My personal convictions, it is the right of the State to put somebody to death.  It's the responsibility of the State to keep order and peace over society.  As far as myself as a person, it's improper for me to do that, but working with the State in carrying out their responsibilities, that's an appropriate time.

(RR17: 72).

When the prosecutor asked Mr. May if he was the type of person who could personally take part in assessing a death sentence, Mr. May replied:

> . . . [W]hen I say I feel as a part of a jury that that would be my responsibility to decide.  As an individual, it's never my responsibility to decide whether a person should live or die, take the matters in my own hands.  But as a part of the jury, I think that would be my responsibility, and I feel I could do that.

(RR17: 73).

Mr. May also repeatedly stated that, if the evidence supported it, he could answer the special issues so that a death sentence was assessed. (RR17: 74, 84, 92). Moreover, he insisted that, ". . . I have not come here with any set beliefs about the case one way or the other and I'm open to trying to do what I believe is appropriate and right under the law." (RR17: 93-94).

Thereafter, defense counsel unsuccessfully tried to elicit some conflict between Mr. May's religious beliefs and the law applicable to this case. At the outset, Mr. May told defense counsel that his church had no policy against the death penalty. (RR17: 97). Undeterred, defense counsel asked Mr. May what he would do if "man's law" conflicted with "God's law." Defense counsel never identified to what particular "law of man" he was referring. Mr. May explained, however, that there was no conflict between the two regarding the death penalty. (RR17: 99-100).

Apparently unsatisfied with Mr. May's reply, defense counsel again asked him what he would do if forced to choose between some unidentified law and "God's law." Unable to discern what conflict defense counsel could be referring to, Mr. May replied, "Okay. I don't – in this instance I don't see how it would conflict with my religious beliefs. But I mean, if it did, then I would stand with my religious beliefs . . ." (RR17: 100-01). Defense counsel then asked Mr. May the same vague question again and, once again, Mr. May replied that if he "felt like that would occur," he would follow his religious beliefs. (RR17: 101).

This concession notwithstanding, Mr. May had stated no conflict with any particular law. *Compare with Roy v. State*, 891 S.W.2d 315, 326-27 (Tex. App. – Fort

20

Worth 1994, no pet.) (venireperson who unambiguously stated her religious opposition to death penalty demonstrated bias against law upon which State entitled to rely and, thus, court properly excluded her for cause). Moreover, Mr. May affirmed his ability to follow numerous laws upon which appellant was entitled to rely.

Mr. May told defense counsel that he could consider the five-year minimum punishment for the lesser-included offense of murder. (RR17: 108-09). He also said that he could acquit appellant if the State failed to meet its burden of proving any one of the requisite elements of the charged offense, even venue. (RR17: 114). Moreover, he assured defense counsel that he could disregard an involuntary confession, and he promised the trial court that he would consider and evaluate any mitigating evidence. (RR17: 67-68, 115).

Overall, Mr. May appeared to be a religious man, but he gave no indication that his beliefs would prevent or impair his ability to follow the law or his oath in this case. Consequently, the trial court acted well within its discretion when it concluded that Mr. May held no bias that warranted his exclusion. *Cf. Cordova v. State*, 733 S.W.2d 175, 183-84 (Tex. Crim. App. 1987) (trial court acted within its discretion in denying defense challenge for cause where, despite his belief in the religious maxim "an eye for an eye," venireperson insisted that he could follow law on special issues).

### (2) John Robuck

Appellant contends the court should have excluded Mr. Robuck because he could not consider the minimum punishment available for the lesser-included offense of murder. To qualify as a juror, a venireperson must be able to consider the full range of

21

punishment for any offense of which the accused might be found guilty.  *See Ladd*, 3 S.W.3d at 559.  A venireperson in a capital murder prosecution who cannot consider the minimum sentence authorized for the lesser-included offense of murder has a bias against the law which renders him challengeable for cause.  *See Williams v. State*, 773 S.W.2d 525, 536 (Tex. Crim. App. 1988).  Contrary to appellant's contention, Mr. Robuck clearly and firmly indicated his ability to consider the five-year minimum punishment for murder.

Initially Mr. Robuck told defense counsel that, even if he felt the minimum five-year punishment was deserved, he would not assess it in an intentional murder case. (RR18: 49-50).  At this point, however, the trial court intervened and provided Mr. Robuck with the hypothetical about euthanasia of a spouse.  Mr. Robuck responded to the court that he had "changed his mind" and that he could conceive of the minimum in such a case.  Thereafter, he repeatedly acknowledged that, under the right circumstances, he could assess the minimum for murder.  (RR18: 51-53).  At worst, Mr. Robuck's initial answer was contradictory.  The trial court, who is in the best position to observe the responses of the venirepersons and their demeanor, was free to reject that initial reply. That determination is entitled to deference.  Mr. Robuck's subsequent responses overwhelmingly support that determination.  *See Banda v. State*, 890 S.W.2d 42, 55 (Tex. Crim. App. 1994) (holding court did not abuse its discretion in denying challenge for cause alleging bias against law regarding minimum punishment for lesser-included offense of murder where venireperson first stated he could not consider it, but later stated he could assess it where appropriate).

### (3) Thomas Brooks and Kimberly Williams

Appellant contends the court should have excluded Mr. Brooks and Ms. Williams for cause because, in addressing the future dangerousness special issue, they would construe "probability" to mean "possibility."   A venireperson who cannot interpret "probability" as something more than a "possibility" would be impaired in evaluating the evidence offered to prove future dangerousness and, thus, possesses a bias against the law that renders him challengeable for cause. *Hughes v. State*, 878 S.W.2d 142, 147-48 (Tex. Crim. App. 1995).

Both Mr. Brooks and Ms. Williams gave conflicting responses regarding their interpretation of the term "probability."   At one point, both stated that they equated "probability" with "a possibility" or "chance."   But at other times, each also responded that they interpreted it as meaning more than a mere possibility.

*Brooks*

The prosecutor first questioned Mr. Brooks about his understanding of "probability."

> [PROSECUTOR]:  I want to talk to you just a moment about some of the words up here in [Special Issue] Number 1.    The reason I do that is because most of these words don't have legal definitions.  Judge Entz is not going to tell you what these words should mean.  You're going to – you're going to get to define them yourself.
>
> The word "probability" first of all, whether there's a probability that the defendant would commit criminal acts of violence.  Probability, a lot of jurors tell me that when they think of probability, that's – that's more likely than not going to happen.  There's a likelihood it's going to happen, as opposed to just a chance that it might happen.  You can see that I don't have to prove that there's an absolute certainty that the defendant would commit criminal acts of violence, just a probability.

23

How do you – how do you look at that word, Mr. Brooks?

[BROOKS]: Well, I think I'd look at it in that respect. It's not definite.

[PROSECUTOR]: Uh-huh.

[BROOKS]: There's only a probability that it will happen in the future.

(RR28: 20).

This exchange shows that Mr. Brooks agreed with the prosecutor's definition of "probability" as "more likely than not going to happen," "a likelihood it's going to happen, as opposed to just a chance that it might happen," and "not an absolute certainty." Thus, Mr. Brooks did evince a proper understanding of "probability." *See Cuevas v. State*, 742 S.W.2d 331, 346-47 (Tex. Crim. App. 1987) (venireperson's testimony that he would define probability as "strong potential for it to happen" and "stronger than possibly" demonstrated he did not have faulty understanding of term's meaning).

When subsequently examined by defense counsel, Mr. Brooks reaffirmed his earlier answer that "probability" means "only a probability" and not "a definite thing." (RR28: 50). But when defense counsel asked for a numerical definition of the term, Mr. Brooks became confused.

Mr. Brooks initially responded, "I think that would totally depend on the individual." Defense counsel told Mr. Brooks he did not understand his answer and pressed him further, asking, "Is it at least 51 percent?" Ultimately, Mr. Brooks replied, "No," but he also continued to insist, "I think – I still go back to the fact that I think it's

24

the individual case, the individual." At this point, Mr. Brooks told defense counsel he did

not understand the question and the court intervened. (RR28: 50-51).

The court asked Mr. Brooks, "What is a word that you would use as an equivalent

to probability? A synonym?," and Mr. Brooks replied:

> Well a probability would be something that's possible in the future, but – if
> I'm looking at a scale from 1 to 10, I couldn't say you as an individual
> speaking to me, what is that probability factor from 1 to 10, you know. I
> don't know what you might do. I don't think I can put a number on it.

(RR28: 52). Thus, even after the court's intervention, Mr. Brooks apparently

misunderstood the question to be how he would numerically define a particular

defendant's "probability" of being a future danger.

Immediately after the court's intervention, the following exchange occurred

between Mr. Brooks and defense counsel:

> [DEFENSE]: Could you put – if you can't put a number on it, could you
> say that probability is a chance or probability is more likely than not or
> probability is pretty certain?"
>
> [BROOKS]: I think it's only a chance.
>
> [DEFENSE]: Only a chance?
>
> [BROOKS]: Yes.
>
> [DEFENSE]: And that would be your definition?
>
> [BROOKS]: Yes.
>
> [DEFENSE]: And that would be the definition that you would use?
>
> [BROOKS]: Yes.

(RR28: 52).

By itself, this exchange reflects that Mr. Brooks equated "probability" with "possibility." The remainder of Mr. Brooks' voir dire indicates otherwise. *See Feldman*, 71 S.W.3d at 744 (must review ruling on challenge for cause in context of entire voir dire record). During the prosecutor's questioning, Mr. Brooks had a proper understanding of the term's meaning. Thus, at worst, the final exchange with defense counsel shows that Mr. Brooks gave conflicting answers about his understanding of "probability." *Compare with Patrick*, 906 S.W.2d at 489 (holding trial court abused its discretion in denying challenge against venireperson who "never indicated that she observed a distinction" between "probability" and "possibility"); *Hughes*, 878 S.W.2d at 146-48 (holding trial court abused its discretion in denying challenge for cause against venireperson who unequivocally and insistently maintained that he understood "probability" as only a "possibility").

The trial court, who witnessed Mr. Brooks' confusion firsthand, apparently determined that the final exchange was just the result of Mr. Brooks' continued confusion. That determination, entitled to great deference on appeal, is reasonable given the extent and nature of Mr. Brooks' confusion evinced by the record. *See Feldman*, 71 S.W.3d at 744 (particular deference is given to trial court's ruling on a challenge for cause when the potential juror's answers are vacillating, unclear, or contradictory).

### Williams

Like Mr. Brooks, Ms. Williams gave conflicting answers about her understanding of "probability." When the prosecutor first asked her what the word meant to her, Ms Williams replied, "It means it's possible it could, or could have not." (RR37: 146-47).

In response, the prosecutor explained to her that the future dangerousness special issue does not use the word "chance" or "possibility," but "probability." Then he asked her what numerical value, between zero and one hundred, that she would assign to it:

[WILLIAMS]: I would say 50.

[PROSECUTOR]: 50? Okay. All right. Probability is like a majority and a minority. To be a majority, would you agree with me that it has to be more than 50 percent to be a [sic] tea?

[WILLIAMS]: Yes.

[PROSECUTOR]: Anything less would be minority. Same kind of thing on probability. At least, to be a probability, can you see where it has to be at least greater than 50 percent? Now, it may be higher than that. If you want it to be higher, but can you agree with me it has to be at least greater than 50 percent? Anything less than that would simply be a possibility or a chance, which the law says I've got to prove more than that on Special Issue Number 1.

[WILLIAMS]: Yes.

(RR37: 147-48). Thus, early in her voir dire, Ms. William indicated that she agreed "probability" meant something greater than fifty percent.

Later, when examined by defense counsel, Ms. Williams repeated her previous statement that she would define "probability" as "a possibility" or "could happen again," but she denied that she would define it as "a mere chance." (RR37: 180). Defense counsel then began a line of questioning that served only to confuse both counsel and Ms. Williams:

[DEFENSE]: Okay. And that's even if you thought — you talked with Mr. Davis that, you know, that might be over 50 percent, but in those things does that mean possibility to you?

[WILLIAMS]: You're confusing me. Say that again.

27

[DEFENSE]: Okay.  I'm confusing myself.  For you, probability means possibility?

[WILLIAMS]: Correct.

[DEFENSE]: Okay.  So the State would have to prove in answering – prove to you in Special Issue Number 1 that there is a possibility that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

[WILLIAMS]: Yes.

[DEFENSE]: An when we're talking about possibility is – when you're talking about possibility, is that – if we said, you know, 10 chances, are we saying 5 out of 10 chances, are we saying 1 out of 10 chances, or just a possibility that it could happen again?

[WILLIAMS]: It's a possibility that it could happen.

[DEFENSE]: So would it be less than 5 chances out of 10?

[WILLIAMS]: I don't understand what you're asking me?

[DEFENSE]: Okay.

(RR37: 181).

At this point, the court interrupted defense counsel and unsuccessfully attempted to clear up Ms. Williams' confusion:

[COURT]: Would it be less than 50 percent, or 50 percent, or more than 50 percent, your possibility in the context of Special Issue Number 1?

[WILLIAMS]: I can't say.

(RR37: 181-82).

When the trial court failed, defense counsel made one last effort:

[DEFENSE]: Okay.  So basically just a possibility?

28

[WILLIAMS]: Yes.

[DEFENSE]: Okay.   Let's say if the weatherman said there was a 10 percent chance of rain, would that [sic] you say that's a probability of rain?

[WILLIAMS]: I'd say it's possible.

[DEFENSE]: Okay.  Possible in the context of Special Issue Number 1?

[WILLIAMS]: I would say it's possible.

[DEFENSE]: Okay.  So in your mind possible and probability – possibility, probability mean the same thing.

[WILLIAMS]: That it could or could not happen.

[DEFENSE]: Okay.

<div align="center">*          *          *          *</div>

[DEFENSE]: For you to answer Special Issue Number 1 no, that there is not a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, would we have to prove to you that that answer should be answered no, that he would not be a continuing threat?

[WILLIAMS]: Could you rephrase that, because I'm not understanding what you're asking?

[DEFENSE]: Okay.  This – I'm trying to figure out, and it may be just [sic] may be not understanding what you're saying.  What probability means in your mind.  Okay?  I'm trying to figure out if probability means more likely than not or probability means possibility, or if all those things mean the same thing to you.

[WILLIAMS]: Probability means to me it's possible that it could happen or it couldn't happen.  And until, you know, the evidence, you can't really say.

[DEFENSE]: Okay.  If we're talking about a – an even chance that it could happen, it could or it could not happen like – like flipping a coin that it could or could not happen, is that a probability or is that a possibility to you.  This is why people hate lawyers.

<div align="center">29</div>

[WILLIAMS]: It's a possibility.

[DEFENSE]: Okay. And that's the possibility that you would go by when you're talking about possibility in regard to probability in Special Issue Number 1?

[WILLIAMS]: Yes.

(RR37: 182-84).

It is apparent from this lengthy exchange that defense counsel, herself, had difficulty discerning Ms. Williams' definition of "probability." Also, Ms. Williams, like Mr. Brooks, apparently misunderstood the requests to assign a numerical value to "probability," insisting that she could not assign such a value without hearing the evidence first. Ms. Williams did make certain things clear, however. While repeatedly interchanging "probability" with "possibility," she expressly stated that neither term meant "a mere chance." Also, when asked how she would classify a weatherman's forecast of "a ten percent chance of rain," Ms. Williams stated that it was a "possibility," not a "probability." Thus, at one point, Ms. Williams indicated that she considered "probability" to mean something greater than "possibility."

Although Ms. Williams' voir dire testimony is sometimes unclear and contradictory, at times, she evinced an understanding that probability meant something "more than 50 percent," that "probability" and "possibility" were not synonymous, that possibility meant something more than a mere chance, and that probability meant something more than possibility. From these replies, the trial court could have reasonably concluded that Ms. Williams did not have a faulty understanding of "probability." Thus, the trial court acted within its discretion in denying appellant's

30

challenge. *See Feldman*, 71 S.W.3d at 744 (particular deference is given to trial court's ruling on a challenge for cause when the potential juror's answers are vacillating, unclear, or contradictory).

### *Any Error Harmless*

A defendant is harmed by the erroneous denial of a challenge for cause only if he uses a peremptory strike to remove the unsuccessfully challenged venireperson and then suffers a detriment from the loss of the strike. *Feldman*, 71 S.W.3d at 744. Although the trial court denied appellant's belated request for two more peremptory strikes, the court initially gave appellant three peremptory strikes in addition to the statutorily required fifteen. (RR4: 3). Thus, appellant must show that the court erroneously denied at least four of his challenges for cause. *Id.*; *see also Hughes*, 878 S.W.2d at 151 (opinion on rehearing) ("Where the court reinstates peremptory strikes, to show harm, the party complaining on appeal must show that one additional juror sat on the case than the number of reinstated peremptory strikes.").

As shown above, the denial of appellant's challenges for cause against venirepersons May, Robuck, Brooks, and Williams were all supported by the record. Appellant fails to demonstrate that even one of those denials was erroneous, much less all four. Thus, appellant demonstrates no harm. *See Feldman*, 71 S.W.3d at 748 (holding no harm from denial of three challenges for cause where defendant granted one extra peremptory strike and failed to show at least two were erroneously denied).

31

## POINT 9: Effective Assistance of Counsel

Appellant contends defense counsel rendered ineffective assistance at trial when he peremptorily struck venirepersons John Wilson (No. 36) and Mark Colditz (No. 44). He maintains counsel's performance was deficient because she erroneously believed that she had previously challenged Mr. Colditz and Mr. Wilson for cause.

To prevail on his ineffectiveness claim, appellant must show by a preponderance of the evidence that counsel's decision to strike these two venirepersons was unreasonable by objective professional standards and that it prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812-13 (Tex. Crim. App. 1999). The law presumes counsel's decision to strike constituted reasonable trial strategy. Thus, appellant must rebut that presumption and show a reasonable probability that, but for counsel striking these two venirepersons, the result of the proceeding would have been different. *Thompson*, 9 S.W.3d at 812-13. Absent some record evidence substantiating his claim that counsel's decision was unreasonable and prejudicial, appellant's ineffectiveness complaint must be rejected. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) (ineffectiveness claims must be firmly founded in the record, not built on retrospective speculation).

Peremptory strikes are limited in number, and the determination of which venirepersons warrant the exercise of this restricted resource is an inherently strategic decision. *Hardin v. State*, 951 S.W.2d 208, 211 (Tex. Crim. App. 1997). Contrary to appellant's contention, counsel's decision to strike Mr. Wilson and Mr. Colditz was consistent with reasonable trial strategy.

32

In support of the request for two more peremptory strikes, defense counsel told the court that the defense had been forced to use some of its eighteen strikes to correct the court's erroneous denial of the defense's challenges for cause against venirepersons Marlin Cannon (No. 4), Phillip May (No. 12), Thomas Brooks (No. 23), Robert Wright (No. 28), Kimberly Edge (No. 32), John Wilson (No. 36), and Mark Colditz (No. 44). (RR44: 13-14).  As asserted by appellant, the defense challenged neither Mr. Wilson nor Mr. Colditz for cause.  (RR37: 135; RR41: 51).  Counsel's misconception does not, by itself, establish that striking those two venirepersons was an unreasonable, unprofessional act.

The record reflects only that counsel misnamed those venirepersons struck by the defense because of a failed challenge for cause, not that she mistakenly struck them. Appellant hypothesizes that, if counsel had realized her mistake, she would not have struck Mr. Wilson and Mr. Colditz, but instead, Mr. Bachmeyer and Dr. Mendro, the two "objectionable" jurors she claimed the defense was forced to accept.   It is more reasonable to infer that she would merely have corrected her misstatement and named two other venirepersons, not previously named, whom the defense had also unsuccessfully challenged.

There were several other unnamed venirepersons that the defense unsuccessfully challenged and subsequently struck.[5]  Counsel could have been referring to any two of

---

[5] Gerald Smothers (No. 7), John Robuck (No. 13), Jon Clinton (No. 15), Douglas Layne (No. 18), Kimberly Williams (No. 37), and Alexander London (No. 38).  (RR14: 104; RR18: 63; RR20: 61; RR23: 52; RR37: 188; RR38: 61-62; RR44: 6-7).

these venirepersons. Counsel clearly had two specific venirepersons in mind when she named Mr. Wilson and Mr. Colditz. She even recounted the nature of the defense's challenges for cause against one of them.[6]

Furthermore, although Mr. Wilson and Mr. Colditz were not challenged by the defense, counsel very likely had other grounds for striking them. Indeed, counsel struck many unchallenged venirepersons,[7] and the voir dire responses of Mr. Wilson and Mr. Colditz gave the defense more than adequate grounds to eliminate them.

Mr. Wilson's voir dire revealed that his father worked as a Dallas police officer for over twenty-five years. (RR37: 87-88). Shockingly, Mr. Wilson was also a witness in a murder case; he found the body of a co-worker who had been shot by a disgruntled former employee. (RR37: 130-31).

Mr. Wilson strongly supported the death penalty; in fact, he believed it should be available for non-capital, intentional murders. (RR37: 89). He disagreed that anyone's "genetic circumstances of birth" should affect their punishment, insisting that someone's genes do not determine what they will do. (RR37: 132-34). In addition, he had previously served as a juror in two criminal trials, both of which resulted in convictions. (RR37: 135). Although Mr. Wilson insisted that he would be a fair and impartial juror,

---

[6] Counsel stated that the defense challenged Mr. Colditz "based on the probability issue." (RR44: 14).

[7] The following venirepersons were struck, but not challenged for cause, by the defense: Deborah Kappel (No. 22), Marilynn Chandler (No. 24), Connie Boales (No. 27), Ronnie Adair (No. 29), and Paula Kellner (No. 35). (RR27: 95; RR29: 52; RR31: 51; RR34: 58; RR37: 84; RR44: 8-10).

his familial connection to the police, his own personal encounter with another murder, his conservative opinions, and his service on two convicting juries made him highly unfavorable to appellant.

Mr. Colditz had no connections to the police or personal encounters with crime, but he had several opinions very unfavorable to the defense. He did not consider alcohol and drug use as mitigating facts, stating, "I don't go for those excuses at all." (RR41: 18). He even indicated that he did not consider severe mental retardation as mitigating, stating, "I just would have a great deal of [sic] problem with a person using an excuse for anything [sic] for violence." (RR41: 18-19). And although he ultimately stated that he would follow the law, Mr. Colditz acknowledged that he would be "reluctant" to acquit a defendant if the State failed to prove venue or if an officer failed to read one of the Miranda warnings before taking the defendant's confession. (RR41: 25-26, 40-43).

Proof of venue and the voluntariness of appellant's statements were contested issues at appellant's trial. Moreover, the defense strategy at punishment focused, in part, on appellant's alcohol and drug use. Thus, Mr. Colditz also gave the defense ample cause for concern.

By comparison, Mr. Bachmeyer and Dr. Mendro, the two "objectionable" jurors appellant claims counsel should have struck instead, appeared much more favorable to appellant. Mr. Bachmeyer believed the death penalty was a deterrent. He was Catholic, however, and stated that, although he "would if he had to," he would rather not participate in giving someone the death penalty. (RR22: 103). Thus, Mr. Bachmeyer indicated some reticence in assessing the death penalty.

35

Mr. Bachmeyer admitted that he would probably assess a harsher punishment if the victim were an eighty-year-old woman, and he stated that he would tend to answer the future dangerousness issue affirmatively if he found appellant guilty. (RR22: 130, 136). Yet he also said that he only considered conduct that actually harmed someone, versus mere threats, as "criminal acts of violence." (RR22: 107).

Furthermore, he indicated that he might favorably view the defense's punishment evidence of appellant's alcoholism and drug abuse. His brother was a recovered drug addict, and Mr. Bachmeyer believed that drug and alcohol abuse were diseases. (RR22: 111-12). He also responded that he would want to hear from a psychiatrist in the punishment phase and that he would consider as mitigating the fact that someone had not received treatment for a condition that was an underlying cause of his criminal conduct. (RR22: 130-31, 134-35). Lastly, he was unperturbed that a convicted capital murderer might serve only forty years on a life sentence. (RR22: 126).

Dr. Mendro, like Mr. Bachmeyer, revealed some reticence about the death penalty, stating, "It's not something I would willingly do if I had a choice otherwise." (RR25: 6). Furthermore, although he said he was in favor of the death penalty, he would reserve it for crimes "where there was . . . the high probability that this person would never have respect for human life again." (RR25: 29). He also said he disagreed with some death penalty verdicts he had heard about and that he could imagine there would be a capital case where a forty-year "life" sentence would be appropriate. (RR25: 38, 43).

Although Dr. Mendro would not consider age a mitigating factor in assessing punishment, he showed that he would be receptive to evidence of drug abuse. (RR25:

16-17).  And significantly, he believed that a defendant who suffered from a difficult upbringing and other personal problems should be punished differently than a defendant who had led a charmed life.  (RR25: 40-41).  In contrast, he would only base a guilty verdict on circumstantial evidence if it was "compelling."  (RR25: 23).

Dr. Mendro's nephew was a former Chicago police officer and now a Chicago fireman, but this connection to law enforcement was distant compared to Mr. Wilson's. (RR25: 24-25).  Moreover, Dr. Mendro had previously served on a jury in a criminal trial in which he acquitted someone of resisting arrest.  In fact, the State had given him a "bad juror" rating for his service in that case. (RR25: 25-26).

From the voir dire response of all four of these men, counsel could have reasonably concluded that Mr. Bachmeyer and Dr. Mendro would be more favorable to appellant than Mr. Wilson and Mr. Colditz would have been.  Thus, the record supports the presumption that counsel's decision to strike Mr. Wilson and Mr. Colditz rather than Mr. Bachmeyer and Dr. Mendro constituted sound trial strategy. *See McCoy v. State*, 996 S.W.2d 899, 900 (Tex. App. – Houston [14th Dist.] 1999, pet. ref'd) (holding counsel not ineffective for striking four venirepersons instead of others where no record evidence showed that the other venirepersons would have been more favorable than four that were struck).

Furthermore, appellant presents no evidence of which two venirepersons counsel chose to strike instead of Mr. Bachmeyer and Dr. Mendro.  Indeed, there were numerous other venirepersons struck by the defense, any of whom could have been struck in place of Mr. Bachmeyer and Dr. Mendro.  Thus, appellant fails to demonstrate that counsel

37

would have struck Mr. Bachmeyer and Dr. Mendro instead of Mr. Wilson and Mr. Colditz if she had realized that Mr. Wilson and Mr. Colditz had not been challenged for cause.

Even if the voir dire responses of Mr. Wilson and Mr. Colditz had been more favorable to the defense than those of Mr. Bachmeyer and Dr. Mendro, appellant's ineffectiveness claim still fails because he makes no showing that, but for the way counsel exercised strikes, the result of appellant's trial would have been different. Indeed, given the unfavorable responses of Mr. Wilson and Mr. Colditz, it is highly likely that the result would have been the same.  Therefore, appellant fails to prove counsel's decision to strike Mr. Wilson and Mr. Colditz prejudiced him.  *See McCoy*, 996 S.W.2d at 900 (overruling ineffectiveness claims where no showing outcome would have been different if different veniremen struck); *see also Nonn v. State*, 13 S.W.3d 434, (Tex. App. – Corpus Christi 2000), *vacated on other grounds*, 41 S.W.3d 677 (Tex. Crim. App. 2001) (holding appellant failed to prove counsel was ineffective for not striking venireperson where no record evidence showing that, but for counsel's failure to strike her, result of proceeding would have been different).

Because appellant neither rebuts the presumption of reasonable trial strategy nor demonstrates any prejudice, this Court should overrule his attack on counsel's effectiveness.

38

## POINT 10: Request for Abatement

Appellant contends this Court needs to abate the appeal so that the trial court can issue findings of fact and conclusions of law regarding the admissibility of appellant's oral and written statements to the police. On June 6, 2002, the Court granted appellant's request, abated the appeal, and ordered the trial court to prepare findings of fact and conclusions of law as required by article 38.22, section 6 of the criminal procedure code. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 1979). The trial court has since prepared the ordered findings and conclusions and forwarded them to the Court as directed. Therefore, appellant's tenth point of error is moot.[8]

## POINT 11: Attorney-Client Privilege

Appellant contends the State violated his Sixth Amendment right to counsel by reading privileged communications written by him to his attorneys. On May 6, 2001, approximately one month before trial began, appellant attempted suicide in the jail. Pursuant to office policy, sheriff's deputies treated appellant's cell as a crime scene, searched for a suicide note, and seized a number of items, including some papers. (CR4: 914; RR49: 2-4, 16). A week or two before trial began, the prosecutors assigned to appellant's case learned that items had been recovered and went to the jail to review them. (RR49: 34; RR50: 3-5, 8). Among the papers seized were letters received by

---

[8] Appellant filed no supplemental brief raising any complaint regarding the admission of the statements he made to the police.

appellant from his relatives, some religious materials, and three pages handwritten by appellant. (Defense Exhibits 6A, 6B, 6C).

Both prosecutors read the letters from appellant's family and reviewed the religious materials. One of them also reviewed the three handwritten pages, reading portions of them. The prosecutors neither requested nor obtained from the Sheriff's Office any copies of these three handwritten pages.[9] (RR49: 4-5; RR50: 5-7, 8-9). And the State did not offer the pages as evidence at trial.

Appellant moved to suppress all the items recovered from his cell, claiming they were the fruits of an improper warrantless search. He also argued that the three handwritten pages were protected by the attorney-client privilege.[10] The court found the search of appellant's cell lawful. Moreover, while finding that the three pages handwritten by appellant were protected by the attorney-client privilege, the trial court determined that the disclosure of these pages to the prosecution was "harmless." (RR51: 47-50).

On appeal, appellant claims the deputies' interception of these privileged pages and their subsequent disclosure to the State is, by itself, sufficient to establish a violation of his constitutional right to counsel. Appellant's complaint ignores more recent

---

[9] The State did obtain copies of the letters from appellant's relatives. (RR49: 4-5).

[10] Appellant requested only the suppression of the three handwritten pages. He never asked the court to declare a mistrial, nor did he move for a new trial based on this privilege claim. (CR1: 130-31, 219; RR50: 16-22, 47-48).

Supreme Court precedent and contrary authority from several federal circuit courts,
including the Fifth Circuit Court of Appeals.

The State's intrusion into the attorney-client relationship violates a defendant's
constitutional right to counsel only where the defendant was also prejudiced by the
intrusion. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *see also United States v.
Morrison*, 449 U.S. 361, 365 (1981). A defendant is prejudiced if there is a "realistic
possibility of injury" to him or "benefit to the State" as a result of the intrusion.
*Weatherford*, 429 U.S. at 558. What constitutes a sufficient showing of prejudice and
which party is responsible for proving prejudice or the lack thereof is a matter of dispute
among the federal circuit courts. *See Cutillo v. Cinelli*, 485 U.S. 1037, 1037-38 (1988)
(White, J., dissenting) (arguing that certiorari should be granted to resolve conflict among
circuit courts regarding which party bears burden of proving prejudice or lack thereof
from transmission of confidential attorney-client communications).

The D.C. and Third Circuit Courts of Appeals would presume prejudice from the
fact that privileged communications were intercepted and disclosed to the prosecution.
*See United States v. Briggs*, 698 F.2d 486, 494-95 (D.C. Cir. 1983); *United States v.
Levy*, 577 F.2d 200, 210 (3rd Cir. 1979). But the Fifth Circuit Court of Appeals, like
several other circuit courts,[11] has repeatedly and consistently refused to presume

---

[11] *United States v. Steele*, 727 F.2d 580, 586-87 (6th Cir. 1984); *United States v. Irwin*, 612 F.2d
1182, 1186-89 (9th Cir. 1980); *United States v. Dien*, 609 F.2d 1038, 1043 (2nd Cir. 1979);
*Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir. 1977). *See also United States v. Mastroianni*,
749 F.2d 900, 907-08 (1st Cir. 1984) (holding defendant bears initial burden of establishing
prima facie case of prejudice, then burden shifts to State to rebut prima facie showing).

41

prejudice and has placed the burden of proving prejudice on the defendant. *See, e.g.,* *United States v. Davis*, 226 F.3d 346, 353 (5th Cir. 2000); *United States v. Melvin*, 650 F.2d 641, 644 (5th Cir. 1981); *United States v. Sander*, 615 F.2d 215, 219 (5th Cir. 1980); *United States v. Kilrain*, 566 F.2d 979, 982 (5th Cir. 1978).

At the very least, some finding of prejudice must be made before appellant's conviction can be deemed unconstitutional. *See Weatherford*, 429 U.S. at 552 ("when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial"). Appellant made no such showing. And even if he had no duty to prove prejudice, the record affirmatively reflects that he suffered none.

Appellant argues that the State's intrusion was "egregious," but this characterization is unfounded. The record reflects that the prosecutors were not looking for privileged materials, but evidence related to appellant's suicide attempt. (RR49: 4-5). Also, the prosecutor who looked at the three handwritten pages did so believing them to be personal notes, rather than correspondence from appellant to his attorneys. (RR46: 30; RR48: 6-7; RR49: 6; RR50: 11-12, 14). The prosecutor who saw the pages did not read them in their entirety. He stated that he "glance[d] over" them, reading only portions. (RR49: 4; RR50: 9). And apparently, the prosecutor gleaned little from the portions he read. He stated that he realized they related to Detective Myers' testimony at the examining trial, but he recounted no other information contained within the pages. (RR49: 6; Defense Exhibit 6A). Furthermore, neither this information nor any other information within the three pages prejudiced appellant.

42

Appellant does not identify how any information in the pages injured him or helped the State. They were never admitted as evidence at trial. And although given the opportunity by the trial court, appellant neither asserted nor demonstrated how any particular piece of information was used. (RR50: 12-15). He claimed instead that harm was "implied" because the pages informed the State of the defensive theory and the weaknesses the defense perceived in the State's case. (RR51: 47-48). The record refutes this contention.

The prosecutor repeatedly and emphatically denied using any of the information in the three pages in preparing for trial or during trial. (RR49: 6-7; RR50: 13-15). This denial is affirmed by record evidence that the prosecutor did not even see these pages until approximately two weeks before trial began. (RR49: 3-4; RR50: 3; RR51: 42). At that point, the State's preparation for trial had been long underway, and the State had already received the information contained in these pages from other sources.

In the first of the three pages, appellant wrote that Detective Myers, the officer who interviewed him after his arrest, made false statements about appellant's interrogation. (Defense Exhibit 6A). In particular, appellant asserted that there was video and audio recording equipment in the interview room, that he was drunk and sleep-deprived, and that officers interviewed him until noon the next day.

The prosecutor expressly denied discussing this information with Detective Myers, using it to prepare the detective for cross-examination, or forming any strategy from it. (RR50: 14-15). The State examined the detective about the circumstances surrounding the taking of appellant's written confession, but appellant had filed a motion, months

43

before trial, challenging the voluntariness of the statement. (CR2: 436-37; RR45: 5-96; RR48: 130-203). Thus, as in any case where the defendant challenges the admissibility of his confession, the manner in which appellant's interview was conducted, as well as his physical and mental state, were facts crucial to the determination of his confession's admissibility.

Furthermore, the particular grounds upon which the defense challenged the voluntariness of appellant's confession were not revealed to the State by the pages found in appellant's cell. Those grounds were far from secret. The confession itself was replete with references to drunkenness and sleeplessness. Appellant stated that he began drinking before the murder and continued drinking over the next two days in an effort to "block out what had happened." Appellant also mentioned that he had been up for two days only to be awakened by the police. (State's Exhibit 47).

In addition, the investigators discovered, long before appellant's trial, that he had purchased alcohol with the stolen credit cards. (CR4: 755, 764-65, 776, 911-12). An investigator's notes revealed witnesses interviewed early on in the case who mentioned that appellant had been drinking heavily after the offense. (CR4: 764, 782). Moreover, a Van Zandt County Sheriff's Department report showed that appellant had been arrested at about 3:00 a.m., then arraigned, transported to the Garland Police Department, and interviewed at around 9:00 a.m. (CR4: 848-49). Also, appellant's medical records contained numerous references to his bouts with sleeplessness. (State's Exhibits 145, 146). Thus, the State had ample notice from other sources that appellant's wakefulness and sobriety when he confessed would be at issue at trial.

As for the recording devices appellant asserted were hidden in the interview room, appellant specifically moved for the disclosure of any evidence that such devices were used.[12]   One of these motions was filed the very day the prosecutor looked at the papers taken from appellant's cell.  (CR1: 19-23, 43-51).  Thus, the defense's intent to put in issue the presence of any recording was not a secret strategy revealed only by the privileged pages.

The rest of the information contained in the three pages was no more illuminating or helpful to the State.  On the back of the first page, appellant claims that "the person who is guilty of this lives within me," that he deals with "many different people and voices and visions," that he has wanted to die for years, and that he needs assistance obtaining medication from the jail psychiatrist.  This page ends with the statement, "[I]f honestly my choices are life or death I'm pleading guilty.  Life in prison is death to me anyway."  The remaining two pages are similar in content.

The second page, entitled "Questions for my lawyers," contains no questions or strategy suggestions.  (Defense Exhibit 6B).  It is nothing but a lengthy plea for

---

[12] In particular, the motion requests disclosure of

> 27.  Any videotape, audiotape or closed circuit television equipment available for use by the Garland Police Department in its interrogation rooms, whether or not used in this case, and a copy of the videotape or audiotape of the interrogation of Defendant, if one exists, or the names or addresses of those people who observed the interrogation of Defendant by closed circuit television, if they did; or the names and addresses of any one who observed the interrogation of Defendant but was not in the same room as defendant, and any reports made or notes taken of such observation."

(CR1: 21).

assistance in getting medication in jail. Appellant details his numerous mental disorders and claims he needs to be medicated. He asserts that "this happened" only because he quit taking his medications and that, without medication, he will lose his mind, black out, hallucinate, or suffer "auditory visions."

The third, untitled page is much like the second page. (Defense Exhibit 6C). Once again appellant claims he suffers from hallucinations and that he will lose his mind without medication. He asserts that he drinks voraciously "so that I don't have these problems," and he claims that, despite his efforts to seek help, the jail psychiatrist is not assisting him.

None of this information was news to the State. The State already had access to a plethora of medical records that contained an enormous amount of information about appellant's alcoholism, suicidal tendencies, and other mental disorders, including depression, dissociative identity disorder, bipolar disorder, and blackouts. (CR4: 863-64; State's Exhibits 145, 146). Indeed, when cross-examined by the defense from where else he could have obtained information about appellant's claimed hallucinations and "split personality," the prosecutor readily identified these medical records as the source of his information. He also noted that appellant had complained of hallucinations when he was booked into jail. (RR50: 12-13).

The possibility that appellant would present a defense related to his alcoholism, suicidal tendencies, and other mental disorders certainly came as no surprise to the State. Such a strategy was readily apparent from and revealed in appellant's confession and his pretrial motions. As previously noted, appellant's confession is replete with references to

46

drinking, sleeplessness, and suicidal thoughts. (State's Exhibit 47). Also, in the pretrial motion filed the same day as the prosecutor saw the pages from appellant's cell, appellant requested disclosure of any evidence of appellant's intoxication around the time of the offense, expressions of remorse, or suicidal tendencies. (CR1: 19-23).

Despite this overwhelming record evidence that appellant suffered no prejudice from the State's intrusion, appellant asks this Court to reverse and remand this case for a new trial. To do so, this Court would have to ignore the trial court's determination that the prosecutor truthfully obtained and used nothing from the three pages. (RR50: 22; RR51: 48). Reversal would also contravene legal precedent precluding such an extreme remedy in the absence of any prejudice to the defense. *Compare with Brewer v. State*, 649 S.W.2d 628, 632 (Tex. Crim. App. 1983) (holding right to counsel violated where prosecutor ordered confidential informant to record confidential conversations between defendant and his attorney and prosecutor used tapes to prepare for trial and introduced them as evidence).

Thus, as the trial court concluded, any intrusion was "harmless beyond a reasonable doubt." (RR51: 48). *See Davis*, 226 F.3d at 353 (holding right to counsel not violated by State's seizure of documents protected by attorney-client privilege where documents were sealed and not introduced as evidence and defendant failed to show how any document revealed his strategy or otherwise harmed him); *Ott v. State*, 627 S.W.2d 218, 223-24 (Tex. App. – Fort Worth 1981, pet. ref'd) (holding right to counsel not violated by State's seizure of defendant's trial notes left in deputy's squad car where prosecutor "took a look at them" shortly before trial ended and never used them in any

47

way).   Therefore, appellant's right to counsel was not violated, and this Court should overrule this attack on the constitutionality of his conviction.

### POINT 12: Proof of Venue

Appellant contends the evidence is insufficient to prove that venue for this offense lay in Dallas County.  He argues that the State had to prove venue lay in Dallas County under the homicide venue statute.  TEX. CODE CRIM. PROC. ANN. art. 13.07 (Vernon 1977).  The homicide venue statute permits prosecution in the county where the injury was inflicted, death occurred, or the body was found.  Appellant insists the evidence is insufficient to prove that Bertie Cunningham was injured, died, or found dead in Dallas County and that, therefore, he is entitled to a new trial.

Venue is not a criminative fact and, therefore, not an element of appellant's offense.  *Boyle v. State*, 820 S.W.2d 122, 140 (Tex. Crim. App. 1989).  Thus, it need be proved only by a preponderance of the evidence.  TEX. CODE CRIM. PROC. ANN. art. 13.17 (Vernon 1977).  Contrary to appellant's contention, the evidence is sufficient to prove venue in Dallas County under the homicide venue statute.  It is also sufficient to prove venue in Dallas County under several other venue statutes, all of which were applicable to this case.

The State charged appellant with capital murder, specifically, murder in the course of a kidnapping and robbery.  (CR1: 2).  Over appellant's objection, the trial court instructed the jury that the State may prove venue under the general venue statute, the theft venue statute, the homicide venue statute, the kidnapping venue statute, or the

48

"venue undeterminable" statute.  (RR52: 2-6).  *See* TEX. CODE CRIM. PROC. ANN. arts.

13.07, 13.08, 13.12, 13.18, & 13.19 (Vernon 1977).  In particular, the court instructed the

jury that venue for the offense of capital murder was proper:

> (1) in the county in which the offense was committed, or

> (2) where the property is stolen in one county and removed by the offender to another county, in the county where the defendant took the property or in any other county through or into which he may have removed the same, or

> (3) if a person receives an injury in one county and dies in another by reason of such injury, in the county where the injury was received or where the death occurred, or in the county where the dead body is found, or

> (4) in the county in which the kidnapping offense was committed or in any county through, into, or out of which the person kidnapped may have been taken.

> However, if an offense has been committed within this State and it cannot readily be determined within which county or counties the commission took place, trial may be held in the county in which the defendant resides, in the county in which he was apprehended, or in the county to which he was extradited.

(CR1: 179-80).

Appellant argues, as he did at trial, that submitting these five methods of proving

venue was improper.  (RR52: 2-4).  Appellant is incorrect.

The law requires the court to submit instructions "distinctly setting forth the law

applicable to the case."  TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 1981).  If

available, specific venue statutes must be applied.  *See* TEX. CODE CRIM. PROC. art.

13.18; *see also Stewart v. State*, 44 S.W.3d 582, 586-89 (Tex. Crim. App. 2001) (holding

specific theft venue statute controlled over general venue statute).  There is, however, no

"capital murder venue statute."  Thus, the law governing venue in a capital case is not

49

limited to any one statute. Furthermore, where appropriate, the law allows the application of multiple venue provisions. *See Hignite v. State*, 522 S.W.2d 210, 213-14 (Tex. Crim. App. 1975) (holding jury could have properly found venue in county of prosecution under either 13.08 or 13.19 in robbery case); *see also Whitley v. State*, 635 S.W.2d 791, 797 (Tex. App. – Tyler 1982, no pet.) (holding trial court properly instructed jury on venue under articles 13.01 and 13.19 in injury to a child case). Indeed, the venue statutes themselves use permissive, not mandatory, language. *See, e.g.*, TEX. CODE CRIM. PROC. art. 13.07 (stating that the offender "may" be prosecuted in a particular county).

The determination of which venue statutes apply in a particular case is a mixed question of law and fact. The trial court must examine the facts of the case and apply the statutory requirements to those facts to determine the appropriate venue statute. *Stewart*, 44 S.W.3d 586. In this capital murder case, any one of the five statutes the trial court submitted to the jury could have applied.

The State alleged a murder, so the homicide venue statute obviously applied. TEX. CODE CRIM. PROC. art. 13.07. But the State alleged that the murder occurred in the course of a kidnapping and a robbery. (CR1: 2). Thus, the venue statutes governing kidnapping and robbery were pertinent as well.

There is a venue statute specifically governing kidnapping, but none devoted solely to robbery. TEX. CODE CRIM. PROC. art. 13.12 ("false imprisonment and kidnapping" venue statute). Thus, robbery could be governed by either the general venue statute or the theft venue statute. *See Ex parte Watson*, 601 S.W.2d 350, 351 (Tex. Crim.

50

App. 1980) (holding venue for the offense of aggravated robbery is the county where the offense was committed); *Hignite*, 522 S.W.2d at 214 (holding theft venue statute could also apply in robbery case). Furthermore, there was clearly a factual uncertainty as to where this capital murder occurred. Consequently, the "venue undeterminable" statute was also germane. *See Hignite*, 522 S.W.2d at 214 ("if it can be validly argued that it is not clear just where the offense commenced or was completed, then venue was properly laid under the provisions of Article 13.19").

The State proved by a preponderance of the evidence that venue lay in Dallas County under each of these applicable venue provisions. As appellant notes, he never pinpointed for police the exact location of the abduction or the shooting. (RR48: 172-74, 210-11). There was evidence, however, from which the jury could have reasonably deduced that both of these acts occurred in Dallas County.

In his confession, appellant admitted that just before the offense, he was drinking at Bleachers. This is a bar located in Dallas County. (RR48: 171-72, 182; State's Exhibit 47). Appellant confessed that he left this bar on foot and encountered Ms. Cunningham "on the road beside Bleachers on my way to 635." (RR48: 182-83; State's Exhibit 47). Detective Myers explained that Bleachers is located on Arapaho Road and that Arapaho turns into North Garland Road, which intersects with 635 (LBJ Freeway). (RR48: 184). According to Detective Myers, this area from Bleachers to 635 is located in Dallas County. (RR48: 184-85). The jury could have inferred from this evidence that the abduction occurred in Dallas County. Thus, under the kidnapping venue statute, the jury could have found the evidence sufficient to prove venue in Dallas County. *See Larrabee*

51

*v. State*, 746 S.W.2d 264, 267-68 (Tex. App. – Amarillo 1988, pet. ref'd) (holding testimony of complainants that they "hitched" a ride, but then were held against their will and assaulted until their release in Ochiltree County, sufficient to prove venue in Ochiltree County under kidnapping venue statute).

Appellant's confession also supports the inference that the shooting occurred in Dallas County. Appellant admitted that he and Ms. Cunningham were driving toward 635 when he stopped, put her in the trunk, and shot her. (RR48: 183; State's Exhibit 47). This admission indicates that the shooting occurred somewhere within the same area of Dallas County – between Bleachers and 635 – as the abduction occurred. (RR48: 183-84). As previously noted, Detective Myers testified that this area was located within Dallas County. (RR48: 184-85). From this evidence, the jury could have inferred that the shooting, i.e., the injury, occurred in Dallas County and, thus, that venue lay in Dallas County under the homicide and general venue statutes. *See Washburn v. State*, 692 S.W.2d 576, 577 (Tex. App. – Houston [1st Dist.] 1985, no pet.) (holding evidence that victim received injuries in Harris County sufficient to prove venue in Harris County under homicide venue statute); *Gill v. State*, 646 S.W.2d 532, 533 (Tex. App. – Houston [1st Dist.] 1982, no pet.) (holding evidence sufficient to prove venue for robbery lay in Harris County where evidence showed defendant injured complainant while stealing her purse in downtown Houston).

The jury could have also deduced that Ms. Cunningham died in Dallas County. Appellant apparently left her in the trunk after the shooting and drove to various locations in Dallas County at which he used her ATM and credit cards. (RR47: 100, 132-33, 150-

51, 157-58; RR48: 261).  Furthermore, the medical examiner testified that, although Ms. Cunningham's wound was fatal, death was not instantaneous; she could have lived for several minutes or longer "in a comatose state."  (RR49: 50-51, 58-59).  From this evidence the jury could have deduced that Ms. Cunningham died in the trunk while appellant was driving around Dallas County.   Thus, once again, the jury could have concluded that venue lay in Dallas County under the homicide venue statute.  *See Washburn*, 692 S.W.2d at 576 (holding evidence sufficient to prove venue in Harris County under homicide venue statute where evidence showed victim died in Harris County).

Moreover, there is overwhelming evidence that appellant used Ms. Cunningham's car and her credit cards in Dallas County.  (RR47: 89, 98-99, 132-33, 150-51, 157-58; RR48: 261).  Thus, if appellant robbed Ms. Cunningham of her car and cards while in some county other than Dallas County, i.e., Collin County, the evidence shows that he removed this stolen property to Dallas County.  From this evidence, the jury could have found that venue was proper in Dallas County under the theft venue statute.  *See Hignite*, 522 S.W.2d at 214 (holding evidence that defendant car-jacked complainant in Dallas County and then drove to Collin County and shot complainant would be sufficient to prove venue in either Dallas or Collin County under theft venue statute).

Finally, record evidence shows that, at the time of the offense, appellant was living at his sister's home in Dallas County.  (RR48: 261; State's Exhibits 35, 36, 47).  Given the factual uncertainty regarding where Ms. Cunningham's abduction, shooting, and death occurred, the jury could have relied on evidence of appellant's residence as proof

53

that venue lay in Dallas County under the "venue undeterminable" statute.  *See* TEX.
CODE CRIM. PROC. art. 13.19 (providing for prosecution "in county in which defendant
resides"); *cf. Hignite*, 522 S.W.2d at 214 (holding evidence that defendant apprehended
in Collin County sufficient to prove venue in Collin County under article 13.19).

Even assuming the court should have omitted one or more of the above venue
provisions from the jury charge, the evidence is still sufficient to support appellant's
conviction. The sufficiency of the evidence is measured against the hypothetically correct
jury charge. *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997).  The hypothetically
correct charge is one that "accurately sets out the law, is authorized by the indictment,
does not unnecessarily increase the State's burden of proof or unnecessarily restrict the
State's theories of liability, and adequately describes the particular offense for which the
defendant was tried." *Id.* at 240.

Assuming the hypothetically correct jury charge would have incorporated only the
homicide venue statute, the evidence is still sufficient to prove venue as long as the
preponderance of the evidence shows that Ms. Cunningham was injured, died, or found
dead in Dallas County.  As previously noted, there is sufficient record evidence to
support a finding that Ms. Cunningham was injured and died in Dallas County.  Thus,
any error in the Court's venue instructions has no bearing on the sufficiency of the
evidence. *See Curry v. State*, 30 S.W.3d 394, 404-07 (Tex. Crim. App. 2000) (holding
hypothetically correct jury charge would have required proof of manner and means
allegation which was unlawfully struck from indictment, but evidence was sufficient to
prove omitted manner and means allegation and, thus, sufficient to support conviction).

For these reasons, this Court should overrule appellant's attack on the sufficiency of the State's proof of venue.

## POINT 13: Admissibility of Identification Testimony

Appellant contends the trial court should have excluded evidence of Sherryl Wilhelm's out-of-court photographic identification of him as the man who abducted her from an Arlington hospital parking lot in August 1997. Appellant argues admission of this evidence violated his federal due process right because the identification procedure was impermissibly suggestive. *See* U.S. CONST. amend. V.[13]

The admission of an out-of-court identification of the accused deprives him of due process only if (1) the out-of-court identification procedure was impermissibly suggestive, and (2) the procedure gave rise to a very substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). These two factors are determined by examining the totality of the circumstances surrounding the identification. *See Simmons v. United States*, 390 U.S. 377, 384 (1968). The accused bears the burden of proving them both by clear and convincing evidence. *Barley v. State*, 906 S.W.2d 27, 33-34 (Tex. Crim. App. 1995). Appellant proves neither.

---

[13] Appellant does not challenge the admission of Ms. Wilhelm's in-court identification of him as her abductor.

### *Procedure Not Impermissibly Suggestive*

While appellant asserts that the lineup from which Ms. Wilhelm identified him was impermissibly suggestive, he provides no argument or authority to support this assertion.  He does note, however, that he objected to the lineup at trial because it "appears to be different races . . ." (RR53: 125).  Also, he cites Dr. Leon Peek's punishment testimony that the other subjects in the lineup did not fit Ms. Wilhelm's description of her attacker, namely, two of them appeared to be Hispanic, a third had "rosy" cheeks, and one was considerably older. (RR54: 53-54).  Thus, the State assumes appellant is predicating his suggestiveness claim upon alleged differences in the race, complexion, and age of appellant and the remaining five subjects.  A review of the lineup refutes appellant's claim of suggestiveness on these or any other bases.

The lineup was composed and presented to Ms. Wilhelm by Detective John Stanton.   When Stanton showed Ms. Wilhelm the lineup, he in no way suggested appellant.  He told her that her abductor's photograph might or might not be in the lineup and that she did not have to select anyone.   Then he laid the lineup on a well-lighted surface and remained silent while she examined it. (RR45: 112-13; RR53: 102-03).

The lineup contains photographs of six different male subjects, one of which is appellant.  The lineup depicts only the head and neck of each man, and Stanton modified the pictures by computer, making them appear similar in position, size, and background. (RR53: 114; State's Exhibit 142).  Stanton testified that he chose the five remaining male subjects for their similarities to appellant in race, age, and hairstyle.  (RR53: 101).

Stanton's efforts to select subjects that resembled appellant and each other are reflected by the lineup.

Each subject has short, dark hair, dark eyes, and facial hair that is similar in style and length. And there are no variations in the subjects' appearances that single appellant out from the others. Appellant and two other subjects have receding hairlines, and at least five of the subjects, including appellant, appear to be of similar ages. Moreover, appellant's skin tone is not significantly lighter or darker than the remaining subjects. Arguably, two of the subjects have Hispanic features,[14] but the four remaining subjects, including appellant, do not. In sum, appellant is not distinguished from all the other subjects by his race or any other physical characteristic. *Cf. Zarychta v. State*, 44 S.W.3d 155, 170 (Tex. App. – Houston [14th Dist.] 2001, pet. ref'd), *cert. denied*, 122 S.Ct. 2312 (2002) (holding lineup not suggestive despite defendant's assertion that he was the only Caucasian in lineup, where lineup consisted of six subjects of varying degrees of dark hair and dark complexions and officer selected Hispanic subjects because he believed defendant was Hispanic); *Perez v. State*, 41 S.W.3d 712, 720-21 (Tex. App. – Corpus Christi 2001, pet. ref'd) (holding lineup not suggestive where only minimal difference in skin color between defendant and five other subjects and all, including defendant, were young, Hispanic men with comparable facial features and short, dark hair).

The appearance of each subject does vary somewhat from the others, but that fact does not render the lineup suggestive. Neither due process nor common sense requires

---

[14] The actual race of the lineup subjects is not reflected in the record.

that the subjects be identical.  A photographic lineup need only contain photographs of individuals fitting the rough description of the suspect.  *Dickson v. State*, 492 S.W.2d 267, 271 (Tex. Crim. App. 1973); *see also Brown v. State*, 64 S.W.3d 94, 100 (Tex. App. – Austin 2001, no pet.).  In this case, all of the subjects in the lineup fit the general description Ms. Wilhelm gave of her abductor.

Immediately after her kidnapping, Ms. Wilhelm described her abductor to police as a white male in his early to mid-twenties, five-feet ten-inches tall, thin to medium build, with dark eyes, tanned or olive complexion, an earring in one ear, one day's growth of beard, and short, black hair that was shaved shorter on the sides and had no part.  (RR45:145-47; RR53: 97, 144-45).  Neither the build nor height of the subjects is discernible from the photographs, and none of the subjects is wearing an earring.  But consistent with Ms. Wilhelm's description, each of the men in the lineup has dark eyes and short, dark hair with no part.  Moreover, although the skin tones of each subject vary slightly in shade, all could be described as "tanned" or "olive complected."

All of the subjects have more than a day's growth of beard, and one of the subjects could be described as older than in his mid-twenties.  But not every feature of every subject in the lineup must match the pre-identification description of the offender.  *Ward v. State*, 474 S.W.2d 471, 476 (Tex. Crim. App. 1971).  And in this case, the distinctions are insignificant.  Any age difference is minimal and, although all the subjects have more than a "five o'clock shadow," the facial hair of each is closely cut and similarly styled.  *See Davis v. State*, 649 S.W.2d 380, 382 (Tex. App. — Fort Worth 1983, pet. ref'd) (lineup not rendered impermissibly suggestive by inclusion of one subject about twenty

58

years older than defendant and another subject with full beard instead of "peach fuzz" described by witness).

In addition to purported variations in the subjects' physical appearances, appellant notes that Ms. Wilhelm viewed a photograph of him on television before identifying him in the lineup. That broadcast was related to Ms. Cunningham's murder, however, not Ms. Wilhelm's kidnapping. Also, appellant looked different in the televised photograph than he did in the photograph Stanton put in the lineup. Although both were apparently "mugshots," the lineup photograph was taken near the time of Ms. Wilhelm's 1997 kidnapping. And according to Ms. Wilhelm, appellant's hair was longer in televised photograph than it had been in 1997. [15] (RR53: 119-20, 151).

But more importantly, the television broadcast of appellant's photograph was an independent act of the media. It was not an official act by law enforcement designed to suggest appellant's identification to anyone. *See Rogers v. State*, 774 S.W.2d 247, 259-60 (Tex. Crim. App. 1989) (constitutional proscription against suggestive pretrial identification procedures applies only to procedures directed by law enforcement officials). Therefore, it had no bearing on the admissibility of Ms. Wilhelm's pretrial identification of appellant. *See id.* (lineup not rendered suggestive by publication of defendant's photograph in newspaper where no showing publication related to greater scheme by officer to suggest to unsuspecting public that defendant was, in fact, the

---

[15] The photograph released by the media was not offered or admitted at trial and, thus, is not a part of the appellate record.

murderer); *see also Craig v. State*, 985 S.W.2d 693, 694 (Tex. App. – Houston [1st Dist.] 1999, pet. ref'd) (lineup not rendered suggestive by witness' viewing of defendant's photograph on telecast of Crime Stoppers).

In short, neither the photographs themselves nor any other aspect of the pretrial identification procedure was suggestive, much less impermissibly so.   Even if impermissibly suggestive, however, Ms. Wilhelm's identification of appellant was still sufficiently reliable to warrant its admission.

### No Likelihood of Misidentification

An identification that stems from an impermissibly suggestive pretrial procedure must be excluded only if there exists a substantial likelihood of misidentification.   In other words, an identification that is reliable notwithstanding suggestive procedures is admissible. *Biggers*, 409 U.S. at 198.  Reliability is determined from the totality of the circumstances surrounding the identification, including, but not limited to:   (1) the witness' opportunity to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of her prior description of the criminal, (4) the level of certainty demonstrated when subsequently confronted with the criminal, and (5) the time between the crime and the confrontation. *Id.* at 199-200; *see also Simmons*, 390 U.S. at 383.  These factors are issues of fact that are to be reviewed in the light most favorable to the trial court's ruling. *Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998). Viewed in this light, the factors should then be weighed de novo against the corrupting effect of the suggestive pretrial procedure. *Id.* at 773-74.

Appellant contends Ms. Wilhelm's identification of him is unreliable because she had only a limited opportunity to view her abductor, she did not identify appellant as her abductor until after she saw his photograph on television, and she was initially unable to identify him in court.   Appellant mischaracterizes Ms. Wilhelm's ability to observe him during the kidnapping, and he ignores other relevant circumstances showing the dependability of her identification.

### Opportunity to View Abductor

The abduction occurred outside in broad daylight late one morning.  Ms. Wilhelm's abductor forced her into her car from behind, but she turned around to look at who was pushing her.  When she did so, she got a close-up, unobstructed view of her abductor.  His face was only inches from hers, and he wore no mask or other disguise. (RR45: 100-06; RR53: 132-33, 173).   It was only after this face to face confrontation that Ms. Wilhelm's abductor made her kneel on the floorboard and put her face down in the front passenger seat.  Moreover, she was in the car with him for approximately thirty minutes.  During that time, she gradually sat upright in the passenger seat, and her abductor did nothing further to obstruct her view of him.  (RR45: 103, 106; RR53: 137-38, 141, 145). Thus, Ms. Wilhelm had ample time and opportunity to closely observe her abductor.

### Degree of Attention

Moreover, Ms. Wilhelm was not a casual observer, but a victim.   She was kidnapped, and her abductor became enraged, choked her, and threatened to strike her. She so greatly feared for her life that she jumped from the vehicle even though it was

61

traveling between thirty and forty miles an hour.  (RR45: 100-04, 125; RR53: 135-39).

Certainly, the personal and emotionally charged nature of this crime heightened Ms.

Wilhelm's sense of awareness.  *See Cantu v. State*, 738 S.W.2d 249, 253 (Tex. Crim.

App. 1987) (high degree of attention indicated by fact that witness was not casual

observer but victim of armed robbery awakened by jabs from rifle).

Ms. Wilhelm's attentiveness is evident in the detailed description she gave of her

abductor.  She described his sex, age, race, height, weight, build, eye color, hair color,

hair length and style, facial hair, jewelry, and clothing.  (RR45: 145-47; RR53: 97).  Then

a week after her kidnapping, she helped the police create a composite sketch of her

abductor that further detailed his facial features.  (RR45: 131-35, 141-43; RR53: 98-99;

State's Exhibit 141).  *See Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App. 1993)

(witness' detailed description indicated she was very attentive when looking at the

suspect).

### Accuracy of Prior Description

Ms. Wilhelm's descriptions of her abductor were not just detailed but accurate.

To the extent his features are discernible from the lineup, appellant resembles both Ms.

Wilhelm's description of her abductor and the composite sketch.  (State's Exhibits 141,

142).  Appellant's lineup photograph shows no earring, but the record reflects that he has

pierced ears.  (RR53: 219-20).  The record also reflects that, consistent with Ms.

Wilhelm's description of a man in his early to mid-twenties, appellant was just days shy

62

of his twenty-second birthday on the date of the kidnapping (August 26, 1997).[16]   *See Ibarra v. State*, 11 S.W.3d 189, 196 (Tex. Crim. App. 1999) (reliability of identification supported by fact that witness' description of suspect's height, weight, clothing, race, and hair matched defendant's general appearance).

### *Level of Certainty at Confrontation*

In addition, Ms. Wilhelm exhibited certitude in her identification of appellant as her abductor. When shown the lineup, Ms. Wilhelm looked at each subject from right to left, beginning with the top row, and when she reached appellant's photograph, she had a strong emotional reaction. According to Stanton, her facial expression changed, and she said, "Oh my God, I'm virtually sure . . ." in a quivering voice. (RR53: 103). *See Cantu*, 738 S.W.2d at 253 (reliability of witness' pretrial identification of defendant in photographic lineup supported by officers' testimony that witness appeared visibly shaken when he saw defendant's photograph in lineup). Also, Ms. Wilhelm confirmed that, when she viewed the lineup, it did not take her long to identify him and that she had no doubt when she saw his photograph. (RR45: 113-14). *See Brown*, 64 S.W.3d at 101 (witness' prompt and certain identification of defendant when shown lineup indicative of pretrial identification's reliability).

At trial, Ms. Wilhelm identified appellant in court as the man who abducted and assaulted her in 1997, and she stated that she had no doubt that he was her abductor. (RR53: 147-48). As appellant notes, Ms. Wilhelm did initially fail to identify him during

---

[16] Appellant was born September 1, 1975. (Defense Exhibit 70A).

63

the pretrial hearing. However, she identified no one else in the courtroom during that hearing, and soonafter, she stated that but for his glasses, appellant looked like the man whose photograph she had seen on television. When appellant removed his glasses on the court's order, Ms. Wilhelm stated that she recognized him "from pushing her in the car." She explained that she had trouble identifying him in court because of his glasses; her abductor wore none. She also noted that appellant's hair was now longer, he wore no earring, and he was dressed differently. Once she saw him without his glasses, she had no doubt that he was the man who had abducted her in 1997. (RR45: 106-111; RR53: 157-58, 164-65). Thus, Ms. Wilhelm accounted for her initial failure to identify appellant in court. *See Cantu*, 738 S.W.2d at 253 (concluding evidence of witness' fear of defendant, whom he knew from neighborhood, adequately accounted for witness' failure to identify defendant first time he was shown lineup).

### *Time Between Crime and Confrontation*

Although unnoted by appellant, the period of time between the kidnapping and Ms. Wilhelm's identification of appellant in the lineup was not brief. A little over three years elapsed between the date of the offense (August 26, 1997) and the date Ms. Wilhelm identified appellant in the lineup (November 3, 2000). But this three-year gap is neither overwhelming nor otherwise persuasive evidence that Ms. Wilhelm's identification of appellant was untrustworthy.

Ms. Wilhelm's memory of her abductor did not fade during that three-year period. Since the offense, Ms. Wilhelm has repeatedly and consistently described her abductor in great detail. She gave a detailed description to the police in 1997 while she was

hospitalized immediately after the offense and again a week later when she helped create the composite sketch. Then in 2001, almost four years after the offense, she gave this same detailed description in court, once during the pretrial hearing and again during the guilt phase of trial. *See Delk*, 855 S.W.2d at 706 (holding eighteen-month delay between crime and witness' identification of defendant's photograph did not detract from reliability of identification given witness's ability to repeatedly and consistently recall details).

As previously noted, appellant's appearance is consistent with Ms. Wilhelm's description of her abductor. Furthermore, she has never identified anyone other than appellant. In fact, early on in the investigation, when shown a lineup containing another suspect's picture, she refused to identify anyone. (RR53: 106-07, 161-62). *See Webb v. State*, 760 S.W.2d 263, 272 (Tex. Crim. App. 1988) (reliability of witness' identification of defendant supported by fact that witness viewed many photographs without showing any propensity to misidentify others); *Brown v. State*, 29 S.W.3d 251, 256 (Tex. App. – Houston [14th Dist.] 2000, no pet.) (witness' certainty that perpetrator's photograph not in lineup not containing defendant's photograph supports reliability of witness' subsequent identification of defendant).

### *Other Considerations*

Appellant predicates his attack on the reliability of Ms. Wilhelm's identification of him largely on the fact that Ms. Wilhelm saw his photograph on television. Ms. Wilhelm saw a photograph of appellant once on television and once on the Dallas Morning News' website. (RR53: 151). Ms. Wilhelm testified, however, that she identified appellant in

the lineup and then again in court based on her recollection of him during the kidnapping. (RR45: 114-15; RR53: 165).  *See Cantu*, 738 S.W.2d at 254 (reliability of witness' identification of defendant supported by witness' unwavering testimony that he picked defendant's photograph and identified him at trial because he remembered defendant from night of offense).  These affirmations are supported by the fact that Ms. Wilhelm immediately recognized appellant despite the fact that the media coverage did not relate to her own kidnapping.  (RR45: 136-37; RR53: 151).

Most importantly, however, the broadcast and publication of appellant's photograph was not the result of any action by the police to suggest appellant's identity as the perpetrator of any offense, much less Ms. Wilhelm's kidnapping.  Thus, the constitutional sanction of inadmissibility is inapplicable, regardless of the extent, if any, to which Ms. Wilhelm's identification of him might have been rendered less reliable by her prior exposure to publicized photograph. *Rogers*, 774 S.W.2d at 260; *see also Craig*, 985 S.W.2d at 694.

Viewed in their totality, the surrounding circumstances show that the lineup viewed by Ms. Wilhelm was not impermissibly suggestive and that, even if so, her identification of him was nonetheless reliable.  Therefore, this Court should overrule appellant's thirteenth point of error.


## POINT 14: Denial of Extraneous Offense Instruction

Appellant contends the trial court erroneously denied his request for an instruction limiting the jury's consideration of extraneous offense evidence to the future

66

dangerousness special issue. (CR: 149; RR60: 2-3). Appellant argues that permitting the jury to consider his extraneous offenses in answering the mitigation special issue restricted the jury's ability to give effect to his mitigating evidence and, thus, violated his constitutional right to individualized sentencing. *See* U.S. CONST. amends. VIII & XIV. This Court has previously rejected such a complaint. *See Jackson v. State*, 992 S.W.2d 469, 478 (Tex. Crim. App. 1999).

As noted by this Court in *Jackson*, extraneous offense evidence has relevance beyond the future dangerousness issue. It is relevant to determine whether or not the mitigating circumstances offered are sufficient to warrant a life sentence. *Id.* Moreover, requiring the jury to look at mitigating evidence in a vacuum, i.e., excluding relevant aggravating circumstances from the mitigation determination, does not further an "individualized" assessment of punishment. If anything, it inhibits it. *Id.* (quoting *Mosley v. State*, 983 S.W.2d 249, 264 n.18 (Tex. Crim. App. 1998)).[17] Therefore, the trial court properly refused to limit the jury's consideration of extraneous offense evidence to the future dangerousness issue, and this Court should overrule appellant's fourteenth point of error.

---

[17] Footnote 18 of *Mosley* reads in part, "[T]he Supreme Court has never precluded the use of aggravating circumstances as part of the process of an individualized determination of culpability. Such a process could hardly be considered "individualized" if half of the equation (relevant aggravating circumstances) were excluded. . . . In determining whether to dispense mercy to a defendant after it has already found the eligibility factors in the State's favor, the jury is not, and should not be, required to look at mitigating evidence in a vacuum."

### POINT 15: Denial of Instructions Defining Special Issue Terms

Appellant contends the trial court should have submitted punishment instructions defining the terms "probability," "criminal acts of violence," and "continuing threat to society" for the jury.  Applicant argues that the failure to define these terms prevented a rational appellate review of the jury's answer to the special issues and, thus, violated his rights under the Sixth, Eighth, and Fourteenth Amendments.  U.S. CONST. amends. VI, VIII, XIV.

The omission of instructions defining these terms violated none of the asserted constitutional rights.   The Court has repeatedly held that the terms "probability," "criminal acts of violence," and "continuing threat to society" require no special definitions.  *See, e.g., Feldman*, 71 S.W.3d at 757.  The terms are applied in "their usual acceptation in common language."  *Id.*

Furthermore, applicant's complaint is grounded on the incorrect assertion that the special punishment issues in article 37.071 function as aggravating circumstances to circumscribe the class of persons eligible for the death penalty.   However, the aggravating circumstances that determine death-eligibility are found in penal code section 19.03, including:  murder of police officer or fireman, murder in the course of certain specified felonies, murder for remuneration, certain murders committed while incarcerated or escaping incarceration, multiple murders, and murder of a child.  *See* TEX. PENAL CODE ANN. § 19.03 (Vernon 1994); *Green v. State*, 912 S.W.2d 189, 196 (Tex. Crim. App. 1995) (Baird, J., concurring).  These circumstances genuinely narrow the

68

class of death-eligible defendants and pass constitutional muster with respect to the "eligibility decision." *Green*, 912 S.W.2d at 196.

The special punishment issues, on the other hand, permit the fact finder to further make an individualized determination as to the *appropriateness* of the death penalty. The future dangerousness issue allows the jury to consider the defendant's character and record, as well as the circumstances of the offense, and has been approved by the United States Supreme Court. *Id*. at 197 (citing *Jurek v. State*, 428 U.S. 262 (1976)). The second mitigation issue ensures that the jury can give effect to all types of mitigating evidence. *See id*. Thus, the "selection decision" to be made by the jury pursuant to the issues in article 37.071 ensures an individualized determination and passes constitutional muster. *See id*.

In sum, the trial court's refusal to provide the requested definitions poses no constitutional problems. *See Cantu v. State*, 842 S.W.2d 667, 691 (Tex. Crim. App. 1992) (rejecting assertion that judge should define "probability" and "criminal acts of violence"); *Caldwell v. State*, 818 S.W.2d 790, 798 (Tex. Crim. App. 1991) (rejecting assertion that judge should define continuing threat to "society"). Therefore, the Court should overrule appellant's fifteenth point of error.

## POINT 16: Constitutionality of 12/10 Rule

Appellant contends the Texas death penalty sentencing scheme violates his constitutional rights against cruel and unusual punishment and to due process of law. U.S. CONST. amends. VIII & XIV. Specifically, he maintains the ten-vote requirement

69

for the jury to return a "no" answer to the first special issue and a "yes" answer to the mitigation issue coerces minority "life" voters to vote with the majority in the belief that their vote is worthless without nine other jurors to join them.  *See* TEX. CODE CRIM. PROC. ANN. art. 37.071, § 2(d)(2), (f)(2) (Vernon Supp. 2002).  He also contends, contrary to existing law, that the jury should be informed that the failure to agree with respect to either issue results in a life sentence.  *See* TEX. CODE CRIM. P. ANN. art. 37.071, § 2(a)(1) (Vernon Supp. 2002) (jury may not be told the effect of a deadlock).

This Court has repeatedly decided these issues against appellant.  *See Jackson v. State*, 33 S.W.3d 828, 832 (Tex. Crim. App. 2000); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999); *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996).  In addition, the Supreme Court has held the Eighth Amendment does not require the jury to be instructed "as to the consequences of a breakdown in the deliberative process."  *See Jones v. United States*, 144 L.Ed.2d 370, 382-83 (1999).

Appellant complains nonetheless that the 12/10 rule acts as an improper dynamite charge in violation of *Mills v. Maryland*, 486 U.S. 367, 383 (1988).  The jury charge in *Mills* was determined to be unconstitutional because it prevented the jury from acting on mitigating evidence unless it unanimously agreed a particular factor was mitigating, thereby essentially allowing a single juror to impose a death sentence.  *See Mills*, 486 U.S. at 380.  The charge in *Mills* violated the rule that the sentencer may not be prevented from considering, as a mitigating factor, all relevant evidence.  *Id.* at 374-75.

Texas' 12/10 rule has already been discussed in relation to *Mills* and upheld.  *See Williams*, 937 S.W.2d at 490; *Rousseau v. State*, 855 S.W.2d 666, 687 n.26 (Tex. Crim.

App. 1993). The Texas statute allows a single juror to give effect to any piece of mitigating evidence by voting "no" on any special issue. *Id.* The jury was told specifically that they need not agree on what particular evidence supports a negative answer to special issue one or an affirmative answer to special issue two. (CR: 205-06).

It is true that the jury is instructed that they may not answer the special issues in a manner that would result in a life sentence unless ten jurors agree to that answer. (CR: 205-06). But the charge also informs the jurors that, in order to vote "yes" to special issue one and "no" to special issue two, i.e., vote for the death penalty, they must do so unanimously. (CR: 205-06, 213). Under these facts, appellant's argument that jurors will be misled lacks merit because every juror knows that capital punishment cannot be imposed without the unanimous agreement of the jury on both special issues. *See Lawton v. State*, 913 S.W.2d 542, 559 (Tex. Crim. App. 1995). While the jury is not informed of the consequences of a hung jury, each juror will know that, without his or her vote, the death sentence cannot be imposed. *Id.*

In sum, appellant's attack on the constitutionality of the 12/10 rule is meritless. Therefore, the Court should overrule appellant's sixteenth point of error.

### POINTS 17 & 18: Constitutionality of Texas Death Penalty Scheme

Appellant contends the Texas death penalty scheme violates his rights to due process and the proscription against cruel and unusual punishment because it is impossible to simultaneously restrict the jury's discretion to impose the death penalty while allowing the jury unlimited discretion to consider mitigating evidence.

71

Appellant's attack on the constitutionality of the Texas death penalty scheme is meritless. Appellant relies on Justice Blackmun's dissent in *Callins v. Collins* and urges this Court to declare the state scheme unconstitutional. *See Callins v. Collins*, 510 U.S. 1141 (1994). The Court has repeatedly rejected this very same contention. *See, e.g., Turner v. State*, No. 73,559, 2002 Tex. Crim. App. LEXIS 153, at *16-17 (Tex. Crim. App. Sept. 11, 2002). Appellant does not attempt to distinguish his case from this precedent, challenge the reasoning in existing case law, or assert any new or different arguments. Therefore, the Court should overrule appellant's seventeenth and eighteenth points of error.

## POINTS 19 & 20: Cumulative Constitutional Error

Appellant asks this Court to consider the cumulative effect of the multiple constitutional errors claimed above. He asserts that, considered together, they denied him due process of law and due course of law under the federal and state constitutions.

The Court has recognized the proposition that a number of errors may be found harmful in their cumulative effect. *See Chamberlain*, 998 S.W.2d at 238. Applicant has demonstrated no constitutional violations, however. Moreover, he fails to specify how any of the alleged errors combine to create a due process violation. He simply asks this Court to consider their cumulative effect. Because there are no errors and, thus, no harm to "cumulate," applicant's claim must fail. *See Turner*, 2002 Tex. Crim. App. LEXIS at *17 (rejected cumulative constitutional error complaint where Court found no

constitutional violation). For these reasons, this Court should overrule appellant's nineteenth and twentieth points of error.

## PRAYER

The State prays this Honorable Court will affirm the judgment of the trial court.

Respectfully submitted,

*Lisa B. Smith*

Bill Hill
Criminal District Attorney
Dallas County, Texas

Lisa Braxton Smith
Assistant District Attorney
State Bar No. 00787131
Frank Crowley Courthouse
133 N. Industrial Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3638
(214) 653-3643 (FAX)

## CERTIFICATE OF SERVICE

The State mailed a copy of this brief to Adam L. Seidel, attorney for appellant, Chateau Plaza, Suite 1400, 2515 McKinney Avenue, Dallas, Texas 75201, on December 19, 2002.

The State mailed a copy of this brief to Matthew Paul, State Prosecuting Attorney, P.O. Box 12405, Capitol Station, Austin, Texas 78711, on December 19, 2002.

*Lisa B. Smith*

Lisa Braxton Smith

73



NO. **74,145**

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

---

**JEDIDIAH ISSAC MURPHY,**
**APPELLANT**

VS.

**THE STATE OF TEXAS,**
**APPELLEE**

FILED IN
COURT OF CRIMINAL APPEALS

JUN 2 7 2002

Troy C. Bennett, Jr., Clerk

---

On Appeal From the 194th Judicial District Court
of Dallas County, Texas

Trial Court Cause No. F00-02424-NM

---

BRIEF FOR THE APPELLANT

---

**ADAM L. SEIDEL**
**CHATEAU PLAZA, SUITE 1400**
**2515 McKINNEY AVENUE**
**DALLAS, TEXAS 75201**

**TELEPHONE: (214) 528-3344**
**FAX (214) 528-3377**
**STATE BAR NO. 1799290**

**ATTORNEY FOR APPELLANT**

## IDENTITY OF PARTIES AND COUNSEL

This case is an appeal from a criminal conviction and therefore the only parties are the Appellant, JEDIDIAH ISSAC MURPHY, by and through his attorneys of record in the trial court, THE HONORABLE JANE RODEN, Chief Public Defender for Dallas County, along with Assistant Public Defenders at trial, JANE LITTLE, MICHAEL BYCK, and JENNIFER BALIDO, 133 N. Industrial Blvd., Dallas, Texas 75207; and Appellant's attorney on appeal, ADAM L. SEIDEL, Chateau Plaza, Suite 1400, 2515 McKinney Avenue, Dallas, Texas 75201; and the State of Texas, by and through WILLIAM T. "BILL" HILL, Criminal District Attorney of Dallas County, Texas, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB-19, Dallas, Texas 75207-4313, along with Assistant District Attorneys at trial, GREG DAVIS and MARY MILLER.

-i-

## TABLE OF CONTENTS

**PAGE**

IDENTITY OF PARTIES AND COUNSEL..................................................................i

INDEX OF AUTHORITIES..................................................................................ix

STATEMENT OF THE CASE.................................................................................2

POINTS PRESENTED............................................................................................3

### POINT OF ERROR NO. 1

THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS PURSUANT TO THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION BY LIMITING APPELLANT'S VOIR DIRE REGARDING THE STATE'S BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT APPELLANT POSED A FUTURE DANGER. (C.II,385)(R.V,8-10)(R.LX,14-15&58-59).

### POINT OF ERROR NO.2

THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS PURSUANT TO ARTICLE I, SECTION 10 OF THE TEXAS CONSTITUTION BY LIMITING APPELLANT'S VOIR DIRE REGARDING THE STATE'S BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT APPELLANT POSED A FUTURE DANGER. (C.II,385)(R.V,8-10)(R.LX,14-15&58-59).

### POINT OF ERROR NO. 3

THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING THE STATE'S CHALLENGE FOR CAUSE AS TO VENIREMEMBER ALENA TREAT, IN VIOLATION OF ARTICLE 35.16 OF THE CODE OF CRIMINAL PROCEDURE WHERE THE RECORD REFLECTS THAT THE VENIREMEMBER WAS NOT CHALLENGEABLE FOR CAUSE. (R.XII,12-21&42-50).

### POINT OF ERROR NO.4

THE TRIAL COURT ERRED BY GRANTING THE STATE'S CHALLENGE FOR CAUSE AS TO VENIREMEMBER ALENA TREAT, IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHERE THE RECORD REFLECTS THAT THE VENIREMEMBER WAS NOT CHALLENGEABLE FOR CAUSE. (R.XII,12-21&42-50).

### POINT OF ERROR NO. 5

THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER PHILLIP MAY. (R.XVII, 99-101).

### POINT OF ERROR NO. 6

THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER JOHN ROBUCK. (R.XVIII,47-53).

## POINT OF ERROR NO. 7

THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER THOMAS BROOKS. (R.XXVIII,49-52).

## POINT OF ERROR NO. 8

THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER KIMBERLY WILLIAMS. (R.XXXVII,146-148&180-184).

## POINT OF ERROR NO.9

APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION IN VOIR DIRE WHERE TRIAL COUNSEL USED PEREMPTORY STRIKES AGAINST TWO VENIREMEMBERS WHOM COUNSEL ERRONEOUSLY BELIEVED HAD BEEN UNSUCCESSFULLY CHALLENGED FOR CAUSE. (R.XXXVII,135), (R.XLV,45-48&51),(R.XLIV,13-14).

## POINT OF ERROR NO. 10

THIS APPEAL SHOULD BE ABATED UNTIL THE TRIAL COURT FILES FINDINGS OF FACT AND CONCLUSIONS OF LAW AS REQUIRED BY TEX. CODE CRIM. PRO. ARTICLE 38.22, §6.

## POINT OF ERROR NO.15

THE TRIAL COURT ERRED IN FAILING TO SUBMIT IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF TRIAL DEFINITIONS OF THE VAGUE, UNDEFINED TERMS USED IN THE SPECIAL ISSUES THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND IMPOSITION OF THE DEATH PENALTY.

## POINT OF ERROR NO. 16

THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND TO DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE  ANSWER TO THE PUNISHMENT SPECIAL ISSUES.

## POINT OF ERROR NO. 17

THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.

POINT OF ERROR NO. 18

THE TEXAS DEATH PENALTY SCHEME DENIED
APPELLANT DUE COURSE OF LAW, AND IMPOSED
CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF
ARTICLE I, SECTIONS 13 AND 19, OF THE TEXAS
CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF
SIMULTANEOUSLY RESTRICTING THE JURY'S
DISCRETION TO IMPOSE THE DEATH PENALTY WHILE
ALSO ALLOWING THE JURY UNLIMITED DISCRETION
TO CONSIDER ALL EVIDENCE MILITATING AGAINST
IMPOSITION OF THE DEATH PENALTY.

POINT OF ERROR NO. 19

THE CUMULATIVE EFFECT OF THE ABOVE-
ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED
APPELLANT DUE PROCESS OF LAW IN VIOLATION OF
THE FIFTH AND FOURTEENTH AMENDMENTS OF THE
UNITED STATES CONSTITUTION.

POINT OF ERROR NO. 20

THE CUMULATIVE EFFECT OF THE ABOVE
ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED
APPELLANT DUE COURSE OF LAW UNDER ARTICLE 1,
SECTION 19, OF THE TEXAS CONSTITUTION.

STATEMENT OF FACTS.......................................................................8

SUMMARY OF THE ARGUMENTS...............................................14

POINT OF ERROR NO. 1, RESTATED..............................................26

POINT OF ERROR NO. 2, RESTATED..............................................32

POINT OF ERROR NO. 3, RESTATED..............................................33

*Johnson v. State*,
    982 S.W.2d 403 (Tex. Crim. App. 1998)................................................28

*Jurek v. Texas*,
    428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)........................88,94

*Keeton v. State*,
    724 S.W.2d 58 (Tex. Crim. App. 1987)................................................88

*Knight v. State*,
    839 S.W.2d 505 (Tex. App.--Beaumont 1992, no pet.)........................70

*Lagrone v. State*,
    942 S.W.2d 602 (Tex. Crim. App. 1997)..............................................52

*Lewis v. Jeffers*,
    497 U.S. 766, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)......................92

*Lisenba v. California*,
    314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166, __ (1941)........................104

*Lockett v. Ohio*,
    438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)..................88-90,101

*Loserth v. State*,
    963 S.W.2d 770 (Tex. Crim. App. 1998)..............................................84

*Lowenfield v. Phelps*,
    484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988)........................96,97

*Marquez v. State*,
    725 S.W.2d 217 (Tex. Crim. App. 1987)..............................................87

*Maryland v. Cartwright*,
    486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988)....................92,93

*McLeskey v. Kemp*,
    481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)......................102

*Mills v. Maryland*,
    486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)....................96-98

*Mowbray v. State,*
    788 S.W.2d 658 (Tex. App.--Corpus Christi 1990), *cert. denied,*
    498 U.S. 1101, 111 S.Ct. 999, 112 L.Ed.2d 1082 (1991)............................................60

*Neil v. Biggers,*
    409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)....................................................85

*Nunfio v. State,*
    808 S.W.2d 482 (Tex. Crim. App.1991)......................................................................27

*O'Brien v. U.S.,*
    386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967)...................................................76

*Ott v. State,*
    627 S.W.2d 218 (Tex. App. - Ft. Worth 1982, pet. ref'd)...........................................76

*Penry v. Lynaugh,*
    492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)...........................................103

*Powell v. Sate,*
    898 S.W.2d 821(Tex. Crim. App. 1994)......................................................................87

*Reese v. State,*
    877 S.W.2d 328 (Tex. Crim. App. 1994)...................................................................104

*Roney v. State,*
    632 S.W.2d 598 (Tex. Crim. App. 1982).....................................................................93

*Rosales v. State,*
    4 S.W.3d 228 (Tex. Crim. App.1999)..........................................................................70

*Shipley v. State,*
    790 S.W.2d 604 (Tex. Crim. App.1990).....................................................................32

*Simmons v. United States,*
    390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).............................................84,86

*Sixta v. State,*
    875 S.W.2d 17 (Tex.App.--Houston [1st Dist.] 1994, pet. ref'd)................................80

*Skipper v. South Carolina*,
    476 U.S. 1, (1986)...............................................................................89,90

*Smith v. State*,
    703 S.W.2d 641 (Tex. Crim. App. 1985)...................................................27

*Smith v. State*,
    779 S.W.2d 417 (Tex. Crim. App. 1988)...................................................93

*Standefer v. State*,
    59 S.W.3d 177 (Tex. Crim. App. 2001)..............................................28,30

*State v. Williams*,
    392 So.2d 619 (La. 1980)........................................................................97

*Strickland v. Washington*,
    466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)..........................70,71

*Thompson v. State*,
    9 S.W.3d 808 (Tex. Crim. App. 1999).....................................................71

*Tong v. State*,
    25 S.W.3d 707 (Tex. Crim. App. 2000)....................................................70

*Tuilaepa v. California*,
    512 U.S. 967 (1994)................................................................................89

*U. S. v. Levy*,
    577 F.2d 200 (3rd Cir. 1978)...................................................................76

*U. S. v. Rosner*,
    485 F.2d 1213 (2nd Cir. 1973).................................................................76

*U. S. v. Zarzour*,
    432 F.2d 1 (5th Cir. 1970).......................................................................76

*Vuong v. State*,
    830 S.W.2d 929 (Tex. Crim. App.), *cert. denied*,
    506 U.S. 997, 113 S. Ct. 595, 121 L. Ed. 2d 533 (1992)..........................33

*Walton v. Arizona,*
    497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed2d 511 (1990)..............................................92

*Weeks v. Angelone,*
    528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000)..............................................89

*Witherspoon v. Illinois,*
    391 U.S. 519 (1969)..............................................48

*Zant v. Stephens,*
    462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)..............................................92

## **CONSTITUTIONS**

TEX. CONST. art. I, § 10..............................................51

U.S. CONST. Amend. XIV..............................................48,49

## **STATUTES**

TEX. CODE CRIM. PRO. article 3.01..............................................63

TEX. CODE CRIM. PRO. article 13.07..............................................80

TEX. CODE CRIM. PROC. article 13.18..............................................80

TEX. CODE CRIM. PRO. article 35.16(b)(3)..............................................33

TEX. CODE CRIM. PRO. art. 35.16(c)(2)..............................................30,52

TEX. CODE CRIM. PROC. art. 37.071..............................................45,86

TEX. CODE CRIM. PRO. art. 37.071, §2(b)..............................................29,95

## **OTHERS**

*Black's Law Dictionary* 1081 (5th ed. 1979)..............................................63

Gillers, *Deciding Who Dies*, 129 U.Pa.L.Rev. 1 (1980)..............................................103

*Webster's New Collegiate Dictionary* (1980)..............................................63

NO. <u>74,145</u>

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

---

JEDIDIAH ISSAC MURPHY,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

---

BRIEF FOR THE APPELLANT

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

Appellant Jedidiah Issac Murphy respectfully submits this Appellant's Brief in the above styled and numbered case. Appellant currently stands convicted in the trial court, in Cause Number F00-02424-NM, for the offense of capital murder, a capital felony, on appeal from the 194th Judicial District Court of Dallas County, Texas, the Honorable F. Harold Entz, Jr. presiding.

## STATEMENT OF THE CASE

Appellant was charge by indictment with capital murder in violation of TEX. PENAL CODE §19.03(a)(2). The indictment alleged that the offense occurred on or about October 4, 2000. (C.I,2).[1] A jury found Appellant guilty of capital murder as charged in the indictment. (C.I,189). At the punishment phase, the jury was charged pursuant to TEX. CODE CRIM. PROC. ANN. Art. 37.071, § 2(b)(1), (b)(2), (e). The jury answered special issue number one in the affirmative, and further found no mitigating circumstances that warranted imposition of a sentence of life rather than death. (C.I,214). On June 30, 2001, the trial court entered judgment imposing the death penalty. (C.I,215). Appeal to this Court is automatic pursuant to TEX. CODE CRIM. PROC. ANN. art. 37.071, §2(h).

---

[1]As used in this brief, **"C.I-IV"** refers to the Clerk's Record, of which there are four volumes. **"R.I-LXV"** refers to the reporter's record and exhibits, volumes one through sixty-five. The specific page number is then noted.

## POINTS PRESENTED

### POINT OF ERROR NO. 1

THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS
PURSUANT TO THE 6TH AMENDMENT TO THE UNITED
STATES CONSTITUTION BY LIMITING APPELLANT'S
VOIR DIRE REGARDING THE STATE'S BURDEN OF
PROVING BEYOND A REASONABLE DOUBT THAT
APPELLANT POSED A FUTURE DANGER.
(C.II,385)(R.V,8-10)(R.LX,14-15&58-59).

### POINT OF ERROR NO.2

THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS
PURSUANT TO ARTICLE I, SECTION 10 OF THE TEXAS
CONSTITUTION BY LIMITING APPELLANT'S VOIR DIRE
REGARDING THE STATE'S BURDEN OF PROVING
BEYOND A REASONABLE DOUBT THAT APPELLANT
POSED A FUTURE DANGER. (C.II,385)(R.V,8-10)(R.LX,14-
15&58-59).

### POINT OF ERROR NO. 3

THE TRIAL COURT ABUSED ITS DISCRETION BY
GRANTING THE STATE'S CHALLENGE FOR CAUSE AS
TO VENIREMEMBER ALENA TREAT, IN VIOLATION OF
ARTICLE 35.16 OF THE CODE OF CRIMINAL
PROCEDURE WHERE THE RECORD REFLECTS THAT
THE VENIREMEMBER WAS NOT CHALLENGEABLE FOR
CAUSE. (R.XII,12-21&42-50).

## POINT OF ERROR NO.4

THE TRIAL COURT ERRED BY GRANTING THE STATE'S CHALLENGE FOR CAUSE AS TO VENIREMEMBER ALENA TREAT, IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHERE THE RECORD REFLECTS THAT THE VENIREMEMBER WAS NOT CHALLENGEABLE FOR CAUSE. (R.XII,12-21&42-50).

## POINT OF ERROR NO. 5

THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER PHILLIP MAY. (R.XVII, 99-101).

## POINT OF ERROR NO. 6

THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER JOHN ROBUCK. (XVIII, 47-53).

## POINT OF ERROR NO. 7

THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER THOMAS BROOKS. (R.XXVIII,49-52).

## POINT OF ERROR NO. 8

THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER KIMBERLY WILLIAMS. (RXXXVII,146-148&180-184).

-4-

## POINT OF ERROR NO.9

APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION IN VOIR DIRE WHERE TRIAL COUNSEL USED PEREMPTORY STRIKES AGAINST TWO VENIREMEMBERS WHOM COUNSEL ERRONEOUSLY BELIEVED HAD BEEN UNSUCCESSFULLY CHALLENGED FOR CAUSE. (R.XXXVII,135), (R.XLV,45-48&51),(R.XLIV,13-14).

## POINT OF ERROR NO. 10

THIS APPEAL SHOULD BE ABATED UNTIL THE TRIAL COURT FILES FINDINGS OF FACT AND CONCLUSIONS OF LAW AS REQUIRED BY TEX. CODE CRIM. PRO. ARTICLE 38.22, §6.

## POINT OF ERROR NO. 11

APPELLANT RIGHTS PURSUANT TO THE 6TH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE INFRINGED WHERE THE TRIAL PROSECUTORS EXAMINED LETTERS AND NOTES WRITTEN BY APPELLANT TO HIS TRIAL ATTORNEYS, WHICH THE TRIAL COURT JUDGE DETERMINED WERE PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE.

## POINT OF ERROR NO. 12

THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT VENUE FOR THE OFFENSE WAS WITHIN THE BOUNDARIES OF DALLAS COUNTY. (C.I,179-180) (R.L,22) (R.LII,2).

### POINT OF ERROR NO. 13

THE TRIAL COURT ERRED IN THE PUNISHMENT PHASE BY DENYING APPELLANT'S REQUEST TO SUPPRESS THE UNDULY SUGGESTIVE PHOTOGRAPHIC IDENTIFICATION OF APPELLANT MADE BY COMPLAINANT SHERRYL WILHELM, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

### POINT OF ERROR NO. 14

THE TRIAL COURT ERRED IN THE PUNISHMENT PHASE BY DENYING APPELLANT'S REQUESTED JURY INSTRUCTION WHICH WOULD HAVE REQUIRED THE JURY TO CONSIDER EXTRANEOUS OFFENSES ONLY FOR THE PURPOSE OF DETERMINING FUTURE DANGEROUSNESS IN SPECIAL ISSUE NUMBER ONE.

### POINT OF ERROR NO. 15

THE TRIAL COURT ERRED IN FAILING TO SUBMIT IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF TRIAL DEFINITIONS OF THE VAGUE, UNDEFINED TERMS USED IN THE SPECIAL ISSUES THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND IMPOSITION OF THE DEATH PENALTY.

### POINT OF ERROR NO. 16

THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND TO DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT SPECIAL ISSUES.

## POINT OF ERROR NO. 17

THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.

## POINT OF ERROR NO. 18

THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I, SECTIONS 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.

## POINT OF ERROR NO. 19

THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

POINT OF ERROR NO. 20

THE CUMULATIVE EFFECT OF THE ABOVE ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE COURSE OF LAW UNDER ARTICLE 1, SECTION 19, OF THE TEXAS CONSTITUTION.


## STATEMENT OF FACTS

The Appellant was twenty-six years old at the time of trial. (R.XLVII,243). The complainant, Bertie Cunningham was 80 years old at the time of the offense. (R.XLVII,22-24). On October 4, 2000, she went to Collin Creek Mall in Plano, Texas. (R.XLVII,25-26). She left home and was expected to return at approximately 3:00 p.m.. When Bertie did not return by 4:00 pm, her sister called the Garland Police Department, and later canceled all her Bertie's credit cards except for one. While  calling the credit card companies, it was discovered that an unauthorized charge had already been made at an area  bicycle shop. (R.XLVII,32-35).

Meanwhile, a videotape from the J. C. Penney's at Collin Creek Mall showed the complainant arriving at the store at approximately 2:10 p.m. (R.XLVII,38-39). Additionally, a receipt indicated that the complainant made a purchase at 2:55 p.m.. (R.XLVII,43-47).

Later that day, there was an unsuccessful attempt to use one of Cunningham's credit card to withdraw cash from an ATM machine, resulting in a report being forwarded to the credit card company used in the attempt. (R.XLVII,58-67). The credit card company reported that the user was unsuccessful because the wrong personal identification number was used.

-8-

(R.XLVII,148-150). Records also showed another attempt to withdraw cash later in the day at a different ATM location on Harry Hines in Dallas. On the following day, Cunningham's card was again unsuccessfully used at a Bank One location on Harry Hines in Dallas. The card was then successfully used twice at "Chacho's" located in Terrell, Texas.

Meanwhile, Appellant was identified as the using the complainant's credit card at Richardson Motor Sports to purchase motorized skate-boards called "Go-Peds"(R.XLVII,121-125). In fact, Appellant signed his true name to the receipts and warranty documents. (R.XLVII,126). After the purchases, the Go-Peds were loaded into the back seat of a silver Honda which appeared the same as the one owned by Bertie Cunningham. (R.XLVII,135-136). When Appellant purchased the "Go-Peds, he was with fourteen-year-old Zach Mamot and Zach's friend, Ryan Hammonds.

Garland Police Detective Matt Myers was the lead detective in the case. Myers traveled to Colin Creek Mall because that was the last location where the complainant had been seen. He then traveled to the Richardson Motor Sports because he received information that one of the complainant's credit cards had used at that location. At Richardson Motor Sports, he obtained receipts for the purchases made by Appellant and developed Appellant's name as a suspect in the case. He later went to Edgewood, Texas because the complainant's car had been located at Ora Mae Milton's home which was in that area. After meeting with various law enforcement officers at the local Dairy Queen, Myers went to Milton's home where the complainant's car was parked.

Gary Rose of the Edgewood Police Department entered Ora Mae Milton's house,

awakened Appellant, and placed him in handcuffs. (R.XLVIII,77-79). After a short conversation with Appellant, Rose examined the complainant's silver Honda parked in front. He opened the trunk of the car after noticing blood on the rear bumper. Rose noticed a strong odor consistent with blood inside the truck. (R.XLVIII,81-83). It was later determined that the complainant's DNA matched blood samples taken from inside the trunk area. (R.XLIX,165-170). Rose recalled that when speaking with Appellant, Appellant lowered his head and said "it was an accident, I didn't mean to shoot her." (R.XLVIII,124-125). Latent fingerprints were later recovered from inside and outside the complainant's car and from various pieces of paper found inside the Honda. All of the recovered latent fingerprints matched Appellant. (R.XLIX,127-129).

Jason Bonham was a police officer who had been classmates with Appellant. Bonham offered to help arrest Appellant since they had been friends in school. (R.L,62-64). After Appellant was handcuffed, Bonham spoke with him in the bedroom in an attempt to determine the location of the complainant's body. Bonham reminded Appellant of a mutual friend who had committed suicide and whose body had been destroyed by animals prior to being discovered. Bonham mentioned that people would want to know where the body was before that could happen. Appellant began crying and told Bonham where the complainant was located. (R.L,69-71). Appellant also told Bonham that the shooting was an accident, stating that the gun "just went off." (R.L,74). The complainant's body was located approximately two miles from Milton's home in an area known as Livingston Creek. (R.XLVIII,87-90). The complainant's body was recovered was in Van Zandt county.

(R.XLVIII,123). She had suffered a single gun shot wound to right portion of the forehead. (R.XLIX,42). Gunpowder residue indicated that the barrel of the gun was lightly touching the skin when the gun fired. (R.XLIX,44). A single .22 caliber bullet was recovered during autopsy. (R.XLIX,65-66). The cause of death was the single gun shot wound. (R.XLIX,53-54).[2]

Appellant was taken to the Edgewood Police Department where Justice of the Peace Ozelle Wilcoxson arraigned Appellant on charges of credit card abuse and murder. Judge Wilcoxson advised Appellant of his "Miranda Rights." Later, Appellant agreed to go to a nearby creek area to assist in locating the weapon. (R.XLVIII,153-157). After leaving the creek area, Appellant was driven 45 minutes to the Garland Police Department where he was taken to an interview room where he again received his Miranda warnings. (R.XLVIII,158-162). After the warnings, Appellant indicated he wanted to cooperate. After a short time, Appellant was taken from the Garland Police Department and driven around in an attempt to ascertain the location where the complainant was abducted, however, Appellant was not able to identify the location where the abduction occurred. (R.XLVIII,170-173). Although they drove Appellant around to several locations in Dallas county, they were unable to establish any location in Dallas County where the Appellant abducted the complainant. Additionally, they were unable to establish any location within Dallas County where the

---

[2] Dr. Nizam Peerwani, who was employed as a medical examiner for Tarrant, Parker and Denton counties, believed that the complainant likely lost consciousness quickly after suffering the gunshot wound. (R.L,104-5&112).

complainant was shot. (R.XLVIII,210-211). Upon returning to the Garland Police Department, Appellant gave a written voluntary statement. (R.XLVIII,174-182). In Appellant's written statement, he indicated that after leaving Bleacher's Bar, he was walking towards highway 635 intending to hitch-hike to Wills Point when he encountered the complainant and asked for a ride. The complainant agreed and after some distance, they pulled into a parking lot. Appellant told the complainant he was putting her in the trunk and that he would later call police and notify them. While placing her in the trunk, Appellant held a gun in his right hand and switched hands because he had impaired use of his left hand and needed his right hand to close the trunk. As he reached for the trunk lid, he grabbed the gun with his left hand too hard and the gun went off accidently, shooting the complainant. (R.XLVIII,183-184). Det. Myers described that Arapaho is the road leading from Bleacher's Bar to 635, and is located in Garland. The area from Bleacher's south to 635 is located within the boundaries of Dallas County, Texas. (R.XLVIII,184-186).

Det. Myers interviewed Appellant again after Appellant met with two of his trial lawyers, Jane Little and Michael Byck. Myers had Appellant initial new Miranda warnings which included five additional questions written onto the Miranda warning sheet. Those questions included, in general, whether Appellant had met with lawyers and he responded yes and whether the lawyers advised him not to talk to police officers, and Appellant responded no. Finally, Myers had Appellant initial indicating that the lawyers advised Appellant to cooperate with police officers. (R.XLVIII,257-258).

Edward Hueske was forensic scientist on the faculty of the University of North Texas

-12-

in Denton in the Department of Criminal Justice.  He was also a training coordinator for the University of North Texas Policy Academy in Denton, a regional police training facility for police recruits.  Part of the training he conducted was in training officers to avoid unintentional discharges of firearms. (R.L, 90-92). One cause of accidental discharge is called "sympathetic firing, " which can occur when a person holding the weapon carries out some manipulation with the other hand, such as grabbing, squeezing, shoving, or pushing, which can cause the other hand holding the gun to simultaneously squeeze the trigger, causing an unintentional discharge. Because of sympathetic discharge, police officers are specifically taught not to carry out a manipulation with one hand while holding their weapon with their finger on the trigger in the other. (R.L, 91-95).

## SUMMARY OF THE ARGUMENTS

1. THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS PURSUANT TO THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION BY LIMITING APPELLANT'S VOIR DIRE REGARDING THE STATE'S BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT APPELLANT POSED A FUTURE DANGER. Appellant sought to ask prospective jurors whether they could follow the law applicable to the punishment phase of a death penalty case, by requiring that the State prove future dangerousness notwithstanding evidence of the victim's good character. Pursuant to this Court's recent ruling in *Standefer,* Appellant's proposed questions asked simply whether the prospective jurors could follow the law. Appellant did not inject specific facts into the analysis, nor did the proposed question seek to commit the jurors to a specific outcome on the basis of certain facts. An answer by a prospective juror indicating that  evidence of the victim's character would cause the juror to not require proof of future dangerousness beyond a reasonable doubt would have constituted proper grounds for a challenge for cause pursuant to  TEX. CODE CRIM. PRO. art. 35.16(c)(2). Appellant was denied the opportunity to ask a proper question, testing each prospective juror's ability to follow the law applicable to Special Issue No. 1. Harm is presumed because Appellant was  denied the ability to intelligently exercise peremptory strikes, pursuant to *Caldwell v. State.* The trial court judgement should be reversed and the case remanded for a new trial.

2. THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS PURSUANT TO ARTICLE I, SECTION 10 OF THE TEXAS CONSTITUTION BY LIMITING APPELLANT'S VOIR

DIRE REGARDING THE STATE'S BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT APPELLANT POSED A FUTURE DANGER. Here, Appellant asserts that the trial court precluded Appellant from asking a proper question, as set out in the previous Point of Error, and that the trial court thereby denied Appellant the right to counsel pursuant to the Texas Constitution. The trial court judgement should be reversed and the case remanded for a new trial.

3. THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING THE STATE'S CHALLENGE FOR CAUSE AS TO VENIREMEMBER ALENA TREAT, IN VIOLATION OF ARTICLE 35.16 OF THE CODE OF CRIMINAL PROCEDURE WHERE THE RECORD REFLECTS THAT THE VENIREMEMBER WAS NOT CHALLENGEABLE FOR CAUSE. Here, Appellant argues that while veniremember Treat indicated that a future murder would satisfy the requirement of "future dangerousness" applicable to Special Issue Number One, the record plainly shows that she would not have absolutely required evidence of a future murder before she could answer "yes" to the Special Issue. Veniremember Treat did not clearly demonstrate a bias against this part of the law, as was present in *Drew,* where this Court held that evidence of a future murder is not required for an affirmative answer to the future dangerousness issue. The trial court abused its discretion in granting the State's challenge for cause. The trial court judgement should be reversed and the case remanded for a new trial.

4. THE TRIAL COURT ERRED BY GRANTING THE STATE'S CHALLENGE FOR CAUSE AS TO VENIREMEMBER ALENA TREAT, IN VIOLATION OF THE

-15-

FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHERE THE RECORD REFLECTS THAT THE VENIREMEMBER WAS NOT CHALLENGEABLE FOR CAUSE. (R.XII,12-21&42-50). Here, Appellant asserts the same argument as that advanced in the preceding Point of Error and asserts that the trial court's abuse of discretion denied Appellant's due process rights pursuant to the Fourteenth Amendment to the United States Constitution. The trial court judgement should be reversed and the case remanded for a new trial.

5. THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER PHILLIP MAY. This prospective juror clearly indicated that in the event there were a conflict between the law contained in the Court's charge and the juror's view of God's law, the court's instructions would be disregarded in favor of God' law. Although the veniremember could not state a specific example of when a conflict may arise, May was clear that in the event there were in fact such a conflict, the court's instructions as to the law would be disregarded. Appellant's challenge for cause was denied, forcing Appellant to use a peremptory strike against this unqualified veniremember. Appellant exhausted his strikes, was denied additional strikes, and was thereby forced to accept an objectionable juror. The case should be reversed and the case remanded for a new trial.

6. THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER JOHN ROBUCK. This veniremember was clear in expressing his inability to consider a minimum sentence of five

-16-

years in a murder case. Appellant's challenge for cause was denied, forcing Appellant to use a peremptory challenge. Appellant was then forced to accept an objectionable juror. The trial court judgement should be reversed and the case remanded for a new trial.

7. THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER THOMAS BROOKS. Appellant submitted this veniremember for cause on the basis that he considered "probability" of future violence to be satisfied upon proof of a "possibility." This acted to lessen the State's burden of proof as to the first Special Issue. The trial court abused its discretion in denying Appellant's challenge for cause. The trial court judgement should be reversed and the case remanded for a new trial.

8. THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER KIMBERLY WILLIAMS. Again, Appellant submitted this veniremember for cause on the basis that she considered "probability" of future violence to be satisfied upon proof of a "possibility." This acted to lessen the State's burden of proof as to the first Special Issue. The trial court abused its discretion in denying Appellant's challenge for cause. The trial court judgement should be reversed and the case remanded for a new trial.

9. APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION IN VOIR DIRE WHERE TRIAL COUNSEL USED PEREMPTORY STRIKES AGAINST TWO VENIREMEMBERS WHOM COUNSEL ERRONEOUSLY

BELIEVED HAD BEEN UNSUCCESSFULLY CHALLENGED FOR CAUSE. Appellant's trial counsel exhausted all peremptory strikes and the trial judge denied Appellant's request for additional strikes, forcing Appellant to accept two objectionable jurors. However, counsel struck two veniremembers whom counsel incorrectly believed had been challenged for cause. As to one veniremember, not only does the record indicate that the veniremember was never challenged for cause, the record further shows the veniremember was favorable to the defense since he believed that "probability" of future violence required 70 to 80 percent proof. The record also shows that the other veniremember was never challenged for cause at all. Appellant argues that trial counsel's errors fell below the objective standard of reasonableness required by *Strickland* and cannot be dismissed simply as "trial strategy." Appellant was denied the effective assistance of counsel since voir dire is a critical stage and trial counsel essentially forced Appellant into accepting two objectionable jurors. The trial court judgement should be reversed and the case remanded for a new trial.

10. THIS APPEAL SHOULD BE ABATED UNTIL THE TRIAL COURT FILES FINDINGS OF FACT AND CONCLUSIONS OF LAW AS REQUIRED BY TEX. CODE CRIM. PRO. ARTICLE 38.22, §6. This Court granted Appellant's Motion To Abate and ordered the trial court to supplement the record with findings of fact and conclusions of law applicable to Appellant's Motion to Suppress the oral and written statements made by Appellant while in police custody. However, this Honorable Court denied Appellant's Motion to Extend the date for filing Appellant's Brief which sought to extend the deadline to a date after the record was properly supplemented. Counsel cannot adequately brief the

issues raised in Appellant's Motion to Suppress and Appellant's trial objections without the written findings. Therefore Appellant asserts that the entire appeal should be abated until the record is complete.

11. APPELLANT RIGHTS PURSUANT TO THE 6TH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE INFRINGED WHERE THE TRIAL PROSECUTORS EXAMINED LETTERS AND NOTES WRITTEN BY APPELLANT TO HIS TRIAL ATTORNEYS, WHICH THE TRIAL COURT JUDGE DETERMINED WERE PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE. Before trial, prosecutors examined personal writings made by Appellant which were protected by the attorney/client privilege. They gained access to the documents after the documents were seized by staff with the Dallas County Sheriff's Department. The trial prosecutors did not first seek a search warrant, nor did they first tender the documents to the trial court for an *in camera* inspection, despite the fact some documents were obviously attorney/client communication. The conduct by the trial prosecutors violated Appellant's due process rights and requires that the case be reversed and remanded for a new trial.

12. THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT VENUE FOR THE OFFENSE WAS WITHIN THE BOUNDARIES OF DALLAS COUNTY. Here, Appellant argues that the trail counsels' objections related to venue were sufficient to preserve the issue for appeal, and that the trial court erred in allowing the jury to find venue in several different ways beyond the venue statute applicable to a homicide case. Had the trial court instructed the jury only on venue applicable in a murder case, the evidence would have been

-19-

insufficient to prove venue in Dallas County, even by a preponderance of the evidence. Article 13.07 of the Code of Criminal Procedure, applicable in a murder case, would have required that the State prove the county where either the complainant was injured, where she died, or where the body was found. The only proof offered by the State was that her body was found in another county. Based on the insufficient proof of venue, the case should be reversed and remanded for a new trial.

13. THE TRIAL COURT ERRED IN THE PUNISHMENT PHASE BY DENYING APPELLANT'S REQUEST TO SUPPRESS THE UNDULY SUGGESTIVE PHOTOGRAPHIC IDENTIFICATION OF APPELLANT MADE BY COMPLAINANT SHERRYL WILHELM, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION. Here, Appellant argues that the trial court abused its discretion in denying Appellant's trial objection to a photographic lineup offered by the State to prove Appellant committed an extraneous kidnapping offense years before the instant offense. The complainant in the extraneous offense testified outside the presence of the jury and failed to identify Appellant in open court. Later, in front of the jury, the witness did identify Appellant and the State was allowed to bolster her identification with a photographic lineup which was unduly suggestive since the photographs included suspects of races different than Appellant. Considering the factors set out in *Biggers,* admission of the photographic line up in this case constituted an abuse of discretion. The trial court judgement should be reversed and the case remanded for a new trial.

14. THE TRIAL COURT ERRED IN THE PUNISHMENT PHASE BY DENYING APPELLANT'S REQUESTED JURY INSTRUCTION WHICH WOULD HAVE REQUIRED THE JURY TO CONSIDER EXTRANEOUS OFFENSES ONLY FOR THE PURPOSE OF DETERMINING FUTURE DANGEROUSNESS IN SPECIAL ISSUE NUMBER ONE. In *Jurek v. Texas,* the Supreme Court noted the significance of the jury's ability to consider and give effect to mitigation evidence applicable to the second special issue. Appellant's trial counsel asserted that the jury should have been instructed that evidence of extraneous offenses be considered only for purposes of determining the future dangerousness question presented by the first special issue, and that the trial court's failure to restrict consideration of the extraneous offense evidence precluded the jury from considering and giving effect to Appellant's mitigation evidence of his childhood abuse and abandonment by his mother. The case should be reversed and remanded.

15. THE TRIAL COURT ERRED IN FAILING TO SUBMIT IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF TRIAL DEFINITIONS OF THE VAGUE, UNDEFINED TERMS USED IN THE SPECIAL ISSUES THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND IMPOSITION OF THE DEATH PENALTY. THE TRIAL COURT ERRED IN FAILING TO SUBMIT IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF TRIAL DEFINITIONS OF THE VAGUE, UNDEFINED TERMS USED IN THE SPECIAL ISSUES THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND IMPOSITION OF THE DEATH PENALTY. At the conclusion of the punishment phase, the

trial court submitted to the jury the special issues concerning Appellant's future dangerousness, and the existence of mitigating circumstances to prevent imposition of the death penalty. The trial court, however, failed to define certain critical terms appearing in these questions, namely, "probability" and "criminal acts of violence." This failure to define the operative words and phrases violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of our most severe penalty. Because of the trial court's failure to charge the jury in a constitutionally adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death sentence upon Appellant in comparison to other defendants' cases in which a life sentence has been imposed. This failure to properly instruct the jury violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Accordingly, the vague and undefined terms incorporated in the second special issue invalidate the Texas death penalty scheme. As a result, Appellant is entitled to a new trial at which the court defines this language.

16. THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND TO DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE  ANSWER TO THE PUNISHMENT SPECIAL ISSUES. All twelve jurors must answer the future dangerousness issue affirmatively before

the trial court may impose the death penalty. A life sentence, on the other hand, requires that at least ten jurors answer a special issue negatively. Unanimity must also exist for the jury to enter a negative finding on the mitigation issue, while only ten jurors must vote to grant leniency. Neither the trial court, parties, nor counsel may disclose to the jury members that their failure to agree on an answer to any special issue results in a life sentence. A constitutional violation would occur under the Texas scheme if these instructions led reasonable jurors to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them. Reasonable jurors in this case could have believed that they had no ability to give mitigating effect to any and all types of mitigating circumstances unless at least nine other jurors also voted for life. Because of the reasonable likelihood that the jury applied these instructions in a way that prevented the consideration of constitutionally relevant mitigating evidence, Appellant was sentenced to death in an unconstitutional manner. The judgment of the trial court should be reversed and the cause remanded for a new trial.

17. THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE

-23-

DEATH PENALTY. The inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the federal constitution. The consistency and rationality required by due process are inversely related to the fairness owed the individual when considering a sentence of death. A step toward consistency is a step away from fairness. The federal constitution, by requiring a heightened degree of fairness to the individual, and also a greater degree of equality and rationality in the administration of death, demands sentencer discretion that is both generously expanded and severely restricted.  The federal constitution prohibits the imposition of the death penalty until someone designs a scheme capable of eliminating the sentencer's unbridled discretion to inflict death while simultaneously permitting unrestricted consideration of mitigating evidence. Consequently, this Court should commute Appellant's death sentence to imprisonment for life in the Institutional Division of the Texas Department of Criminal Justice.

18. THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I, SECTIONS 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY. For the same reasons discussed in

-24-

Point of Error No.11, this Court should hold that the Texas constitution prohibits the imposition of the death penalty until creation of a scheme capable of eliminating the sentencer's unbridled discretion to inflict death while simultaneously permitting unrestricted consideration of mitigating evidence. This Court, as a result, should commute Appellant's death sentence to imprisonment for life.

19. THE CUMULATIVE EFFECT OF THE ABOVE- ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION. Due process under the federal constitution requires that criminal defendants receive the fundamental fairness necessary to the due administration of justice. Appellant lists many constitutional and statutory violations in the preceding points of error. If this Court deems none of these reasons adequate to justify reversing the trial court's judgment, then please consider their cumulative effect. Constitutional breaches so permeated the voir dire and trial of Appellant's case so as to deprive him of the "fundamental fairness" implicit in the Fifth and Fourteenth Amendments. The trial court's judgment should thus be reversed, and the cause remanded for a new trial.

20. THE CUMULATIVE EFFECT OF THE ABOVE ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE COURSE OF LAW UNDER ARTICLE 1, SECTION 19, OF THE TEXAS CONSTITUTION. Due course of law under the state constitution requires that criminal defendants receive the fundamental fairness necessary to the due administration of justice. As discussed in Point of Error No. 13, Appellant requests

this Court consider the cumulative effect of these errors even if no one issue alone justifies reversal. Constitutional breaches so permeated the voir dire and trial of Appellant's case so as to deprive him of the "fundamental fairness" implicit in Article I, Section 19. Consequently, the trial court's judgment should be reversed, and the cause remanded for a new trial.

## POINT OF ERROR NO.1, RESTATED

**THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS PURSUANT TO THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION BY LIMITING APPELLANT'S VOIR DIRE REGARDING THE STATE'S BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT APPELLANT POSED A FUTURE DANGER. (C.II,385)(R.V,8-10)(R.LX,14-15&58-59).**

Appellant filed a pretrial motion related to the "future dangerousness" special issue, and the State's burden of proving beyond a reasonable doubt that Appellant would pose a future threat. Specifically, Appellant wanted to inquire of each potential juror as to whether the veniremember would follow the law by applying the applicable burden of proof despite evidence of the victim's good character.(C.II,385). In a pretrial hearing, Appellant stated the desire to specifically ask whether evidence of the victim's character would cause prospective jurors to lessen the State's burden of proof of beyond a reasonable doubt as to special issue number one, and further, whether the prospective juror could agree to follow the law and not lessen the State's burden of proof. (R.V,8-10). The State's objection was sustained and the

-26-

defense was prevented from asking the proposed questions. (R.V,10).

## *Applicable Law*

A defendant's federal constitutional right to counsel requires that counsel be permitted to question the members of the jury panel in order to intelligently exercise peremptory challenges. U.S. CONST., amend VI.; *See also Smith v. State,* 703 S.W.2d 641, 643 (Tex. Crim. App.1985). When an appellant challenges a trial judge's limitation on the voir dire process, the reviewing court must analyze the claim under an abuse of discretion standard, the focus of which is whether the appellant proffered a proper question concerning a proper area of inquiry. *Caldwell v. State,* 818 S.W.2d 790, 793 (Tex. Crim. App.1991), *cert. denied,* 503 U.S. 990, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992); *Cockrum v. State*, 758 S.W.2d 577, 584 (Tex. Crim. App.1988), *cert. denied*, 489 U.S. 1072, 109 S.Ct. 1358, 103 L.Ed.2d 825 (1989). A proper question is one which seeks to discover a veniremember's views on an issue applicable to the case. *Caldwell v. State,* supra at 794; *Guerra v. State,* 771 S.W.2d 453, 468 (Tex. Crim. App.1988). The propriety of the question asked is determinative of the issue, and a question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Nunfio v. State,* 808 S.W.2d 482, 484 (Tex. Crim. App.1991); *Beaver v. State,* 736 S.W.2d 212, 214 (Tex. App.-Corpus Christi 1987, no pet.). Error in the denial of a proper question which prevents the intelligent exercise of counsel's peremptory challenges is an abuse of discretion and is not subject to a harm analysis. *Nunfio,* 808 S.W.2d at 485. If a proper question is disallowed, harm to the appellant is presumed because appellant has been denied the ability to intelligently exercise peremptory strikes. *Caldwell v. State,* supra.

-27-

Determining whether a voir dire question constitutes an "improper commitment" question requires two steps. First, is the question a commitment question, and if so, does the question include facts--and only those facts--that lead to a valid challenge for cause? If the answers are "yes" to the first and "no" to the second, the question is improper. *Standefer v. State,* 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). "An attorney cannot attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts." *Id.,* citing *Allridge v. State,* 850 S.W.2d 471, 480 (Tex. Crim. App.1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). Commitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact. A commitment question can also be a question that asks a prospective juror to refrain from resolving an issue on the basis of a fact that might be used to resolve the issue. *Standefer v. State,* 59 S.W.3d at 179. Not all commitment questions are improper. For example, questions concerning a juror's ability to consider the full range of punishment for a particular offense meet the definition of commitment questions but are nevertheless proper. *Id.* at 181(footnote and citations omitted). For example, determining whether jurors can consider probation in a murder case is proper since the inquiry commits a prospective juror to following the law by considering the applicable punishment options. Jurors, after all, are required to follow the law or be challengeable for cause. *Id.*, citing *Johnson v. State*, 982 S.W.2d 403, 405 (Tex. Crim. App.1998). "The distinguishing factor is that the law requires jurors to make certain types of commitments. When the law requires a certain type of commitment from jurors, the attorneys may ask the prospective jurors whether they can

-28-

follow the law in that regard." *Id.* (footnote omitted). The defense could also legitimately ask prospective jurors whether they could follow a law that requires them to disregard illegally obtained evidence, whether they could follow an instruction requiring corroboration of accomplice witness testimony, or whether they could follow a law that precludes them from holding against the defendant his failure to testify. These types of questions are proper since they test the prospective jurors' ability to follow the law applicable in the case. *Id.* In short, a commitment question is proper if one of the possible answers to the question gives rise to a valid challenge for cause. *Id.* at 182 (footnote omitted).

### *Analysis*

In the punishment phase of a death penalty case, the State bears the burden of proving beyond a reasonable doubt that there is a probability the accused will commit further acts of violence that constitute a continuing threat. TEX. CODE CRIM. PRO. art. 37.071, §2(b). Here, the defense wanted the inquire whether prospective jurors could hold the state to its burden of proof notwithstanding the presence of evidence of the victim's character. Certainly, evidence of a victim's character can not act to lessen the State's burden of proof as to future dangerousness. Appellant's proposed questions asked simply whether the prospective jurors could follow the law. It injected no specific facts into the analysis, nor did the proposed question seek to commit the jurors to a specific outcome on the basis of certain facts. Instead, the defense sought only to ask whether the State would be held to its legal burden, as established by the Legislature in the punishment phase of a death penalty case. An affirmative answer by a juror, for example, that evidence of a victim's character *would*

cause the juror to answer yes to Special Issue No. 1, even in the absence of proof beyond a reasonable doubt, would have constituted proper grounds for a challenge for cause. TEX. CODE CRIM. PRO. art. 35.16(c)(2). Applying the test set out in *Standefer,* Appellant's proposed questions were not improper, since they sought only to determine whether prospective jurors could follow the law applicable in the case.[3] Therefore, Appellant was denied the opportunity to ask a proper question, testing each prospective juror's ability to follow the law applicable to Special Issue No. 1. The proposed question seeking to determine whether proposed jurors could follow the law was no different than asking whether they could give probation in a murder case, reject an illegally obtained confession, or find that accomplice witness testimony was not properly corroborated.

## *Harm*

As stated above, when counsel for an accused is precluded from asking a proper question, harm to the appellant is presumed because appellant has been denied the ability to intelligently exercise peremptory strikes. *Caldwell v. State,* supra. In a case where the State

---

[3] Compare in *Standefer,* where this Court specifically mentioned capital cases and cited the example of victim/impact testimony. *Standefer* cited the following as improper:

> Let us assume that you are considering in the penalty phase of any capital murder case, okay? And some of the evidence that has come in shows that the victim's family was greatly impacted and terribly grieved and greatly harmed by the facts....Can you assure us that the knowledge of those facts would not prevent you or substantially impair you in considering a life sentence in such a case?

*Standefer v. State,* 59 S.W.3d at 179-180 (citations omitted). In the instant case, Appellant sought only to determine whether each prospective juror would require the State to prove future dangerousness beyond a reasonable doubt, notwithstanding evidence of the victim's character.

-30-

seeks to impose the ultimate penalty, the harm can only be considered more pronounced. "Death is different,"and the protections afforded an accused during voir dire can only be considered more crucial where the accused faces the possibility of a death sentence. In this case, the State did offer evidence of the victim's character. For example, the State introduced testimony that the complainant, Bertie Cunningham, was 80 years old at the time of the offense and lived alone. On the date of the offenses, she went to a mall far from home to pick up a robe for her disabled sister. (RXLVII,22-26). She had several family members and close friends who became concerned when she did not return home on time. Additionally, the State repeatedly emphasized in closing argument on punishment how the victim was eighty-years old and totally innocent, that she was out helping her disabled sister at the time she was abducted, and how she suffered horribly at the hands of Appellant. (R.LX,14-15). In closing argument on punishment, the prosecutor argued "...[b]ut, you know, Bertie Cunningham over here, this good and saintly woman over here, you know, there was a time not so long ago when was still ours, wasn't she? She was ours. She was our neighbor, our helper. She was our sister. She was our grandmother. She was our mother. Even more than that, she was an example to all of us, I submit to you, on how you live your life with dignity and grace." (R.LX,58-59). The State's character evidence and argument is directly applicable to the questions Appellant's counsel attempted to address in voir dire when counsel sought to ask whether jurors could follow the law and hold the State to proving future dangerousness beyond a reasonable doubt. The trial court improperly limited Appellant's voir dire. The trial court judgement should be reversed and the case remanded for a new trial.

## POINT OF ERROR NO.2, RESTATED

**THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS PURSUANT TO ARTICLE I, SECTION 10 OF THE TEXAS CONSTITUTION BY LIMITING APPELLANT'S VOIR DIRE REGARDING THE STATE'S BURDEN OF PROVING BEYOND A REASONABLE DOUBT THAT APPELLANT POSED A FUTURE DANGER. (C.II,385)(R.V,8-10)(R.LX,14-15&58-59).**

Article I, § 10, of the Texas Constitution guarantees the right to counsel. Such right includes the right of counsel to question members of the venire panel in order to intelligently exercise peremptory challenges. *Ex parte McKay,* 819 S.W.2d 478 (Tex. Crim. App.1990); *Shipley v. State,* 790 S.W.2d 604 (Tex. Crim. App.1990). As stated in the preceding Point of Error, Appellant sought to inquire of each potential juror as to whether the veniremember would follow the law applicable to Special Issue No. 1, by applying the applicable burden of proof despite evidence of the victim's character. (C.II,385)(R.V,8-10). The State's objection was sustained and the defense was prevented from asking the proposed questions. (R.V,10). Appellant asserts that the trial court thereby violated Appellant's rights pursuant to Article I, Section 10 of the Texas Constitution. The trial court judgement should be reversed and the case remanded for a new trial.

-32-

## POINT OF ERROR NO.3, RESTATED

**THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING THE STATE'S CHALLENGE FOR CAUSE AS TO VENIREMEMBER ALENA TREAT, IN VIOLATION OF ARTICLE 35.16 OF THE CODE OF CRIMINAL PROCEDURE WHERE THE RECORD REFLECTS THAT THE VENIREMEMBER WAS NOT CHALLENGEABLE FOR CAUSE. (R.XII,12-21&42-50).**

Before a veniremember can be properly challenged by the State under TEX. CODE CRIM. PRO. article 35.16(b)(3)[4] the law must be explained and the veniremember must be asked whether he or she can follow that law regardless of their personal views. *See Chambers v. State*, 903 S.W.2d 21, 29 (Tex. Crim. App.1995). To show error in the trial court's granting of the State's challenge for cause, an appellant "must demonstrate that the trial judge applied the wrong legal standard in sustaining the challenge, or the trial court abused its discretion in applying the correct legal standard." *Vuong v. State*, 830 S.W.2d 929, 943 (Tex. Crim. App.), *cert. denied*, 506 U.S. 997, 113 S. Ct. 595, 121 L. Ed. 2d 533 (1992). In this case, the State successfully challenged for cause veniremember Alena Treat on the basis that she required proof of a future murder before finding that Appellant posed a future danger. The record shows the following:

---

[4] TEX. CODE CRIM. PRO., art 35.15(b) allows the State to challenge for cause on the basis

    "3. That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction."

*Voir dire of veniremember Treat:*

[VENIREMEMBER]: Well, as far as the death penalty is concerned, I don't like there being a death penalty, but I also do not see that there's any logical alternative. So I would not have a problem adhering to the letter of the law. It seems like one of those necessary kind of things. I'm not an active proponent, but like I said, I don't see an alternative at this point.

[STATE]:Okay. Your reasons then for being – I know you're not an advocate of the death penalty, but let me ask you why do you feel like we need to keep the death penalty here in Texas? What purpose do you think it serves?

A. Oh, to protect society. Protect society from the same kinds of acts being committed again by the same individual.

Q. Okay. And I believe that you had said in your questionnaire danger to society will probably kill again. Is that kind of what you're telling us this morning, to prevent further murders by that same individual?

A. Yeah. And if those questions are answered in the way that you said, then that would be the case. It could by the case, very likely would be.

Q. Can you – can you think of any cases maybe that you've heard about recently, maybe read in the newspaper, heard about on television, where you thought maybe the death penalty might be an appropriate punishment in that case?

A. I don't read the paper a whole lot, but – the one that comes to mind would be like the Jeffrey Dahmer case.

Q. Right, and I believe you had listed him and he was in fact a serial killer.

A. Right.

Q. And I take it that in that case that you thought he had showed the propensity obviously to kill and kill again.

-34-

A. Yes

Q. Let's talk a little bit more about these special issues over her. And Judge Entz has already told you that – I believe, that the only time that you will see these special issues is if you find the defendant guilty of capital murder.

A. Right.

Q. Obviously if you find him not guilty, he walks out, everyone goes home. If you find him guilty of a lesser included offense, such as murder or robbery or something of that order, then a different verdict form would be used. But in this case before you get down to Special Issues 1 and 2, you in this case will have already decided that this individual right over here, Jedidiah Murphy, intentionally killed a woman by the name of Bertie Cunningham, that he did so intentionally, that he did so during the course of either robbing her or kidnaping her, and that he did so by either shooting her with a handgun or by drowning her in water and he did so intentionally again. You see, capital murder is always an intentional murder plus something else. It's not – it's not negligent homicide. It's not reckless conduct. It has to be a situation where it's my specific intent to cause someone's death. And then I do everything necessary to take their life. Okay. So that's what you will have already decided in this case before you get down to Special Issue Number 1.

Now, having found that, do you have any feeling about how you would be looking at Special Issue Number 1? And the reason I say that is in the past I've had some people tell me if I find someone has intentionally killed someone in that way, when I get down to Special Issue Number 1, in my mind that's probably going to be the type of person that would be a future danger to society. If I fell like they've already done that in the past.

Do you have any feelings about that?

A.    The way I look at it it's a simple  – if the person has already been – if the jury has already decided that the person is – had been proven to be guilty of capital murder, and it's proven that there is a high probability that this person would do it again, I would not have a problem with coming up with a verdict.

-35-

Q. Okay.

A. And going on to Number 2.

Q. Right. When you look at the word "criminal acts of violence," what does that mean to you, Ms. Treat?

A. Criminal acts of violence doesn't mean to me like going out and beating up somebody. To me, it would be the same – probably the same kind of crime.

Q. Okay.

A. Extreme danger to society.

Q. Right. Another murder, is that what you're talking about?

A. Yeah.

Q. Okay. You know, let me just tell you there are no legal definitions to any of these words. That's the other tricky part here. What we do is leave that up to you to define these word any way you want to.

A. Yeah, and –

Q. You're certainly free to do that. A lot of the words in the first part of the trial in the guilt/innocence about what intentional means, what knowing means, what exactly is a robbery or kidnaping, Judge Entz will give you definitions that you will have to follow. But when we get down to these – these words, the legislature gave us the words, but they said we want the jurors to define them the way they want to.

Do I understand you – well, let me just ask you, when answering Special Issue Number 1 then, is the State – is the State going to have show to you that there's a probability this man would commit a future murder in order for you to answer Special Issue Number 1 yes? Is that what you're saying to me or not?

A. I'm saying the State would  – in my mind would have to

-36-

prove that the person would be likely to at least continue to attempt the same kind of thing, whether he – well, I guess in this case he would succeed or not is not the issue.

Q. Uh-huh. All right. So either attempt to commit a murder or actually commit a murder; is that what you're saying?

A. Well, yeah, but it says a threat to society. To me, threat means something that's very, very dangerous. It's not just something mild. This is – and to society it's – I know that's pretty broad – and there said a probability. To me that means a high probability. And that the defendant would – and it says criminal acts of violence. That's not just violence. That's something that would be under the Penal Code that would say they would be convicted of something really awful.

Q. So you're talking about something similar to what you've already convicted him of, correct?

A. Correct.

Q. Okay. And I think that you've said when you look at that, you're not talking about going out and punching somebody out or something of that order, correct?

A. Right.

Q. You're talking about something on the magnitude of what you've already found him – already have found in the first part of the trial; is that right?

A. Right.

\*       \*       \*       \*

Q. Okay. All right. Fair enough. Let's go to Special Issue Number 2, if we could. And again, when you get down to Special Issue Number 2, you're really two-thirds of the way to a death sentence essentially. You've already found him guilty of murder – of capital murder. You've already decided that he's going to constitute a continuing threat to society. If you answer

-37-

Special Issue Number 2 no, he gets death. If you answer it yes, he gets life.

In the past some people have told us, you know, some people say I can follow the law regardless of what I've decided about him being a threat to society. I can still look at Special Issue Number 2 with an open mind, call it the way I see it. I've had other people tell me if I truly honestly think that that man is going to continue to threaten society with serious criminal acts of violence, there is really no way I'm going to find that answer to be yes and give him life and put other people at risk by doing so. I just couldn't do that.

What are your feelings about Special Issue Number 2?

A.   Well, Special Issue Number 2 I do realize that there could be some kind of mitigating circumstances. There could be some reason. I don't know what that would be, but I think that a juror would have to keep an open mind on that and realize too that – I guess logically speaking that if person is likely to do – could commit another murder, that there wouldn't be – I don't think you could answer the Special Issue Number 2 to be – there is – there's a reason to give a life sentence.

What I'm trying to say is that I know that there is a different way of thinking on Number 1 and Number 2, but if a person's character or the circumstances seemed to indicate that the same kind of scenario would not occur agin, then I would have to answer that in such a way that it would be a life sentence.

Q. Uh-huh.

A. But like I said, if I really believed that person would commit a really awful crime again, extremely violent, that their character seemed to indicate that, that there was no special reason that it occurred, special crime of passion or something like that, and then that would have to be fine, too.

Q.   Well, let me just see if I understand. And again, some people have told me, and you tell me if you fit into this category or not, some people have told me if they honestly believe that somebody is likely to commit another murder in the future, that when they get down to Special Issue Number 2, there's not

-38-

going to be anything sufficient in the evidence at that point to change the death sentence to a life sentence if they really believe that person is likely to do that in the future.

Are you saying that, or are you saying something different?

A. Not exactly.  It's pretty close to that, but I'm saying that it would be the responsibility of a jurist to listen to the evidence.

Q. All right.

A. And then answer the question.

Q. Okay.

A. I don't think a person can make a decision beforehand.

Q. Okay.  Let me – let me touch on something –

A. At least I couldn't.

(R.XII,12-21)

\*      \*      \*      \*      \*      \*

THE COURT: Ms. Treat, I have a question in my mind for you, if I may, with regard to Special Issue Number 1.

VENIREPERSON: Okay.

THE COURT: Before answering Special Issue Number 1, would you require the State to prove to you that the defendant would commit or there's a probability that would commit another murder or attempted murder, or would a criminal act of assaultive behavior fit within your category of a criminal act of violence?

VENIREPERSON:  Assaultive behavior just meaning beating somebody up or something?  Well –

THE COURT: A pool hall fight.  That's a for instance just where they – would that be a criminal act of violence.

-39-

VENIREPERSON: No.

THE COURT:  – sufficient –

VENIREPERSON: I don't think so.

THE COURT: Where would you draw the line?

VENIREPERSON: ( no response)

THE COURT: I assume you wold not consider a property crime

VENIREPERSON: No.   No, I wouldn't –

THE COURT: Stealing a car for instance?

VENIREPERSON: No.

THE COURT: Or drug possession or drug dealer would not be a criminal act of violence, or would it in your opinion?

VENIREPERSON: No, but I can see how maybe – oh, this is big hypothetical.  Maybe intentionally causing a person to be mentally disabled for the rest of their life, maybe drugs –  by intentionally giving them some kind of drug to put them into a coma something.

THE COURT: That would be a criminal act of violence in your mind?

VENIREPERSON: Yes.  Yeah, that would be – because that person is  – is actually having some kind of violence being committed to them.  It's not just mild.  It's something –

THE COURT: With regard to person-to-person type assaultive behavior, where would you draw your mental line that regard?

VENIREPERSON:   Person-to-person  assaultive  behavior? Whether it fit Number 1?

THE COURT: Yes.

-40-

VENIREPERSON: Trying to kill them.  Yeah, that would be –

THE COURT: Anything less of person-to-person physical contact be sufficient in your mind or not?

VENIREPERSON: Person-to-person physical contact?  Could you give me an example of something that would be extremely violent?  You know – I'm having difficulty.

THE COURT: Having road rage, for instance, running somebody off the road.

VENIREPERSON: Running  – of –

THE COURT: You know, don't mean to kill them necessarily, but you've got road rage and had a bad day at the office or a bad day at school or coming home, things have gone wrong, person cuts you off right in front of you and that's it.  Run them off the road.  Don't mean to kill them.

VENIREPERSON: I don't think necessarily just road rage would do it, but if a person had a tendency to go off all the time in such a way that it was quite likely that the person could cause death because they are incorrigible, they cannot be rehabilitate – they can– it's not just rehabilitated.  They would have the tendency to continue to do things that could result in people's death.  I guess we're back to the same – I guess we're back to the same thing.  I know that a threat to society could be a person that would just blow up at the drop of a hat and beat them senseless,  somebody that would do that on a constant basis or have a hair trigger like that would be a threat to society, so I guess that is not necessarily something that would result in death, but a person who continues to do that kind of thing it's quite likely that eventually that they would kill somebody.

THE COURT: In light of the Court's questions, I will permit each side, if they wish , an additional five minutes of questions.
      Would the State care to exercise any additional time or not?

-41-

Redirect Examination

By Mr. Davis:

Q.  Let me ask you, Ms. Treat, because I've been listening to your answers.  When I talked with you about Special Issue Number 1. And really the Court is looking at criminal acts of violence there.  And when I looked at your questionnaire, you said only in favor of the death penalty if a person committing murder is a danger to society.  You put in parenthesis will probably kill again.

A.  That was an example.

Q.  Yeah.  And when I was talking with you earlier, I understood you to say that simply assaulting someone causing injury, serious bodily injury was not going to cut it for that, but really you're talking about murder and attempting to murder someone.  Have you changed your mind about that?

A.  Not exactly, but I can see that intentionally disabling somebody for the rest of their lives, like mentally making them incompetent, that would be a criminal act of violence.  But that's still to me pretty close to killing somebody, if you're killing their mind.

Q. Right.

A.  But that's – to me – but my first thought is still criminal act of violence to mean – means something so extremely violent that a person's life is in danger.

Q.  I think that you told me earlier that really what you're looking at is if something similar to what you've found they've done before.  Is that pretty much what you're talking about?

A.  It could be.

MR. DAVIS: That's all I have, Judge.

THE COURT: Mr. Byck.

-42-

<u>Recross-Examination</u>

By Mr. Byck:

Q. Ms. Treat, the law does not define criminal acts of violence. Criminal acts are acts the Penal Code. They range from – I don't know if the traffic code, that's not really in the Penal Code, but innocuous acts like trespassing on somebody's property when you've been told not to is a criminal act.

A. Right.

Q. Obviously there's no violence there.

A. Right.

Q. Goes all the way up to murder, where there is obviously violence. There are some criminal acts in the middle. Give you an example, arson. It's entirely possible that I could go burn down empty houses in the middle of nowhere where you might or might not consider that a criminal act of violence. Rape is a criminal act. I may not have any intent to kill my victim. I may under the delusion that my victim loves me and really is inviting this behavior. Armed robbery. I may be the nicest, most politist armed robber you ever saw, oh , please give me your money, but I am still pointing a knife at you. I don't want to hurt you. Is that a criminal act of violence? Is the rape a criminal act of violence?

A. There is a possibility that rape could be a criminal act of violence, but again, it would have to be proven that there's a probability that the defendant would commit further acts of violence.

Q. Right. Right.

A. And I guess – I guess –yeah, that's what I was looking for was some kind of definition of –

Q. There really isn't a definition.

A. – an act of violence. And it's also weighted. It should be

-43-

weighted as to how much is it really a threat to society. Is it a
– and the key word is continuing threat.

Q. Yes, that would all be subject to proof by the evidence.

A. Right.

Q. But essentially what we're all saying, all of us, the Court,
the District Attorney, and myself, is if you were shown of
evidence of a propensity to commit criminal acts of violence
that were less than murder or attempted murder, let's say they
involved robbery or burglary, you mentioned – or the Judge
mentioned a barroom brawl. Well, Ms. Treat, let me submit to
you there's all kinds of barroom brawls. There's a barroom
brawl between two people of equal size and strength and age.
There's a barroom brawl between, you know, young husky kids
and little old men. There's a barroom brawl when one person
has a weapon and the other doesn't. There are all kinds of
barroom brawls. What we want to know is do you consider or
if the evidence were to be presented, would consider acts other
than murder or attempted murder as criminal acts of violence.
I've given you rape, given you armed robbery, given you
aggravated assault with a deadly weapon. I haven't thrown in
beating up pregnant women, but I might as well. Can you see
where all of those would be criminal acts of violence?

A. All of those – I guess it depends on where on the scale that
particular crime would fall. Some of those you described are
acts of violence, but they aren't necessarily a continuing threat
to society.

Q. Well, that would have to – that's another issue. That would
have to be proved to you by the evidence.

A. Yeah. Some of those that you described are evidence of a
continuing threat to society. If a person –

Q. But remember, we're just talking about criminal acts of
violence.

A. Yeah. Right.

-44-

Q. Continuing threat to society is something added on.

A. Yeah.

Q. Let's start out with basic platform. Very frankly, what's a criminal act of violence? Is it something more than murder or attempted murder, like armed robbery, rape, aggravated assault with a deadly weapon?

A. Yeah, I think it really could be. But agin, that statute states that is has to be a criminal acts of violence and it also has to constitute a continuing threat.

Q. Oh, absolutely.

A. So it –

Q. Absolutely. That's exactly right.

A. So it would have to fit all the criteria.

MR. BYCK: I have nothing further, Your Honor.

(R.XII,42-50)

## *Application of Law to Facts*

TEX. CODE CRIM. PRO. Article 37.071(b)(2) requires jurors in a capital murder case to determine whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. Although the phrase "criminal acts of violence that would constitute a continuing threat to society" is not defined, there is no limitation that Article 37.071(b)(2) requires evidence of future murders. *See Drew v. State,* 743 S.W.2d 207, 211 (Tex. Crim. App. 1987). In *Drew,* this Court held that "[w]e do not  interpret the phrase 'criminal acts of violence that would constitute a continuing

-45-

threat to society' as by any means being limited to future murders. *Id.* However, unlike the instant case, the challenged veniremember in *Drew* was specific as to his personal requirement that the State prove a future murder in order to prove future dangerousness. The challenged veniremember in *Drew* stated as follows:

> TRIAL JUDGE: In other words, the only way they could possibly do that as far as your mind is concerned is to show you that he is liable to commit another murder, not some rape or robbery or assault but another murder, another taking of a person's life intentionally.    That's what they would have to show you before you would vote yes to that.   Is that what you are saying?
>
> A. *Yeah.    That's what I am saying.*
>
> Q. So, you are telling the State that there is no way that you can prove beyond a reasonable doubt to me that there is a probability he will commit future acts of violence that will be a continuing threat to society unless you show me he is going to do a murder;  is what (sic) what you are telling us?
>
> A. It is something like that.   Yes.
>
> Q. Is that what you are saying?
>
> A. *That's what I am saying.*
>
> Q. All right.   And then there is no way that you could answer that question any other way?
>
> A. Not at this time. (Emphasis supplied.)

*Id.* at 210.

The voir dire of veniremember Treat hardly reveals the type of "absolute prerequisites" of future murder mentioned in *Drew*. Veniremember Treat even offered an

-46-

example of future danger which was not a murder, such as drugging another person.

In apparent conflict with *Drew,* the Court of Criminal Appeals in *Garrett v. State,* 851 S.W.2d 853, 860 (Tex. Crim. App. 1993) held that it is error to grant the State's challenge for cause against a veniremember who would never answer "yes" as to future dangerousness where there was no evidence to prove future dangerousness apart from the capital murder offense for which the appellant was tried. A veniremember is not biased against the law if they believe that the offense on trial, by itself, can never establish that the accused is a continuing threat because "a particular juror's understanding of proof beyond a reasonable doubt may lead him to require more than the legal threshold of sufficient evidence to answer the [first] special issue in the affirmative." *Id.* at 859-60. Notwithstanding the inherent conflict between *Garrett* and *Drew,* the trial court erred in granting the State challenge for cause against veniremember Treat because the record in this case fails to show that Treat absolutely required proof of a future murder. Treat is less like the veniremember in *Drew,* and more like the one in *Garrett* who was not considered biased against the law since they believed that the offense on trial, by itself, can never establish future dangerousness. Therefore, the trial court abused its discretion in granting the State's challenge for cause. The case should be reversed and remanded for a new trial.

-47-

## POINT OF ERROR NO.4, RESTATED

**THE TRIAL COURT ERRED BY GRANTING THE STATE'S CHALLENGE FOR CAUSE AS TO VENIREMEMBER ALENA TREAT, IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WHERE THE RECORD REFLECTS THAT THE VENIREMEMBER WAS NOT CHALLENGEABLE FOR CAUSE. (R.XII,12-21&42-50).**

Due process of law, applicable to the states through the 14th Amendment, forbids the disqualification of a veniremember in a capital trial because the veniremember is opposed to the death penalty. *Witherspoon v. Illinois,* 391 U.S. 519 (1969). *Witherspoon* only allows the disqualification of such a juror when her views about the death penalty prevent or substantially impair her ability to follow the courts instructions and the juror's oath. *Witherspoon* establishes a constitutional limitation on a state's power to exclude a veniremember when a trial court finds the potential juror was disqualified under state law. The legal standards for imposing a death sentence must be explained to the veniremember, who must then be asked whether she can follow that part of the law before the veniremember can be removed for clause without a *Witherspoon* violation. See *Clark v. State*, 929 S.W.2d 5, 8-9 (Tex. Crim. App. 1996).

As set out in the previous Point of Error, the voir dire examination of veniremember Alena Treat does not demonstrate that Treat's views on the law applicable to the case prevented or substantially impaired her ability to follow the courts instructions and the juror's oath. (R.XII,12-21&42-50). To the contrary, she stated that she could find that

-48-

Appellant constituted a future threat, even in the absence of proof of a future murder. By granting the State's challenge for cause, the trial court violated Appellant's Due Process rights pursuant to the 14th Amendment to the United States Constitution. U.S. CONST. amend. XIV. The trial court judgement should be reversed and the case remanded for a new trial.

## POINT OF ERROR NO. 5, RESTATED

**THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER PHILLIP MAY. (R.XVII, 99-101).**

## POINT OF ERROR NO. 6, RESTATED

**THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER JOHN ROBUCK. (XVIII, 47-53).**

## POINT OF ERROR NO. 7, RESTATED

**THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER THOMAS BROOKS. (R.XXVIII,49-52).**

## POINT OF ERROR NO. 8, RESTATED

**THE TRIAL COURT ERRED IN VOIR DIRE BY DENYING APPELLANT'S REQUESTED CHALLENGE FOR CAUSE ON VENIREMEMBER KIMBERLY WILLIAMS. (RXXXVII,146-148&180-184).**

The selection of a jury for the trial of a criminal case invokes constitutional protections. The Sixth Amendment to the United States Constitution states in part that: "[i]n all criminal prosecutions the accused shall have a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law." The right embodied in this clause of the Sixth

-50-

Amendment is one that, under the Due Process Clause of the Fourteenth Amendment, states may not deny. *Duncan v. Louisiana*, 391 U.S. 145 (1968). Like its federal counterpart, the Bill of Rights in the Texas Constitution recognizes the right to trial by jury. "In all criminal prosecutions the accused shall have a speedy public trial by an impartial jury." TEX. CONST. art. I, § 10.

TEX. CODE CRIM. PROC. ANN. art. 35.16 (Vernon Supp. 1999) provides in part the following:

> (a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:
>
> 9.   That he has a bias or prejudice in favor of or against the defendant.
>
> (c) A challenge for cause may be made by the defense for any of the following reasons:
>
> 2.   That he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor.

The proper standard to be used in disqualifying prospective jurors in death penalty cases is whether their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and the oaths given. *Davis v. State*, 782 S.W.2d 211, 216 (Tex. Crim. App. 1989); *Bell v. State*, 724 S.W.2d 780, 794 (Tex. Crim. App. 1986), *cert. denied*, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). Great deference is given to the trial court which is in the best position to gauge the demeanor and

-51-

## *Appellant's voir dire of veniremember Phillip May*

**In the event of a conflict, veniremember May would follow God's law over law in the court's charge.**

[DEFENSE]: Okay. Let me ask you a question, and I always ask this question. I ran for Judge about three years ago and someone asked me this question. It's always a question I kind of almost daily deal with. In the situation we have right here is where we are in a courthouse and so thus we're dealing with laws.

A. Right.

Q. And we can term those laws of man.

A. Uh-huh.

Q. And there are sometimes that the laws of man conflict with the laws of God. And someone asked me one time if I felt like the laws of man conflicted with the laws of God, specifically the Ten Commandments, which ones would I adhere to. And so I'm going to kind of throw that question into your lap and see how you would answer that question.

A. Well, I think with regard to this case there's two – there's the Commandment obviously that says thou shalt not kill. I assume that's essentially what you're referring to. And I think that is a rule for an individual person, but in Romans 13, I believe it is, it also talks about that you are to abide by the government and to honor them and that they do not bear a sword without purpose of maintaining peace. And if you step outside of those bounds, then you should be – you should recognize and realize that the government may step in with it's sword to make sure that the peace is maintained. And so that's how I guess delineate between the two –

Q. Okay.

A. – as to – you know, the purpose of this court is that part of the government that bears the sword to say, hey, we will

maintain peace.

Q.  Okay.  That's kind of where I thought that you were basically trying to get to at the very beginning of your questioning with Ms. Miller.  So I guess basically what I'm asking you is, if you felt like you were instructed as to the law in regard to this case and the result of which would conflict with your own personal religious beliefs, would you follow the law that you're sworn to uphold as a juror or would you side with your religious beliefs in that situation?

A.  Okay.  I don't – in this instance I don't see how it would conflict with my religious beliefs.  But I mean, if it did, then I would stand with my religious beliefs.  Does that make sense?

Q.  Yes, that does make sense.

A.  Okay.

Q.  So as you take the oath of – when you're sworn in as a juror, you are sworn to a true verdict render based on the law and the evidence in this case.  And if you felt like your true verdict was in conflict with your religious beliefs, that you would go with your religious beliefs?

A.  If I felt like that would occur, yes.

(R.XVII, 99-101).

It is the burden of the challenging party to establish that a challenged veniremember is substantially impaired in their ability to follow the law. *Clark v. State,* 929 S.W.2d 5, 8 (Tex. Crim. App. 1996), citing *Hernandez v. State,* 757 S.W.2d 744, 753 (Tex. Crim. App. 1988). This veniremember was not sure whether the law applicable in the case would in fact conflict with his own religious beliefs. However, if so, the veniremember's religious beliefs would control, at the expense of the law given by the trial court judge. The veniremember's

-54-

answer clearly showed he would not follow the law applicable to the case if that law

conflicted with his own personally held religious beliefs. Therefore, the trial court abused

its discretion in overruling Appellant's requested challenge for cause. The trial court

judgement should be reversed and the case remanded for a new trial.

### Defense voir dire of veniremember John Robuck

#### Unable to consider five years for murder

> [DEFENSE]: Well, getting back to the original offense. Capital murder is a specific intent offense. And specific intent will be defined for you as – and I like to use myself in the example because I can't remember other people's names. It's too much of a hassle for me. That is when I act where it is my conscience objective or desire both to engage in the conduct and cause the result.
>
> Let me give you an example of that. My co-counsel has allergies. Well, I'm an extremely intemperate person mainly because I'm afflicted with them myself. You know, I've got no problem with my allergies, and I'm tired of hearing about hers. So I brooded about it all weekend. And I've decided, okay, if she comes in snarfling and coughing again, I'm going to kill her. So I go out this weekend and I buy a gun. And then I go to another store and I buy a box of shells, put the – load the shells into the gun. Then I sneak it in downstairs. Believe me, it wasn't that hard to do. And I come up here and here she is, red, snarfling, and doing her allergy thing and I say that's it. I pull out the gun and I point it at her. I don't do that to frighten her. I cock the gun and aim it at her and pull the trigger. I do not do that to wound her. I do it all to kill her. That is an intentional capital murder. That's an intentional murder if I steal her yellow Marks-A-Lot after I do that, that makes it a capital murder. Okay.
>
> If in the event an individual were charged with capital murder, but not convicted of the underlying offenses, that is, the kidnaping or the whatever, arson – it also goes to prison guards, police officers, fireman in the course of duty, children under 6,

serial murders and mass murders. Okay. If those underlying circumstances are not found, then I'm guilty of murder. I'm guilty of the murder of my co-counsel. In that situation, the range of punishment would be as the range of punishment for a regular murder, 5 years to 99 years or life.

Now, some people say, well, I could certainly give you life for that in a heartbeat, Mike, but I don't know about five years. Other people say, I don't know if I could give you anything less than 20 for doing something like that, man.

The question is: If in a case of an intentional murder, as I have described, if you were presented with facts and circumstances that as a bottom line you thought, yeah, gee, I think the person really ought to get five years for that, but I just can't give it to him, there's just, you know, something in my code that says I cannot sign off on five years.

Is that a possibility, or is your mind more of the set that, no, an intentional murder is certainly an obviously extremely serious offense. You know, just because you didn't prove you swiped the Marks-A-Lot doesn't mean that, you know, anything a whole lot short of capital. But in the appropriate facts and circumstance, if I believed it and I thought – if you committed a murder like that for whatever –whatever reasons you had were so good that I felt you ought to get five years in the penitentiary for you-- for it, I'd give you five years in the penitentiary for it.

Do you feel that way, or do you feel that, I'm sorry, I don't care what you show me, you're going to have to do more time than five years?

A. I think you have to spend more time than five years if it's intentional.

Q. If it's intentional?

A. If it's intentional.

Q. And again, what I'm saying is – you understand what intentional means?

A. Right.

Q. I've given you that example that – and this is the question :

-56-

I'm not asking you to envision a scenario –

A.  Okay.

Q.  –where, you know, five years would be appropriate because, you know, some people can, some people can't, but that's unfair to do anyway.  What I'm – the question that I'm asking you is that after hearing all the facts and the evidence, you say to yourself, well those are really good defense facts and evidence, and I as an individual feel that this guy ought to get – Mike ought to get five years in the penitentiary, but I can't give him five years in the penitentiary for an intentional murder.  It's just got to be more than that.  Is that a fair summation of the way you feel?

A.  Yes, sir.

Q.  Is there anything I'm going to be able to say to talk you out of that?  Or do you feel pretty strongly about that?

A.  Tough question.  I don't know. Five years is not really a long time for an intentional murder.

Q.  All right.  I agree.  I absolutely agree, but that's the range of punishment.

A.  Right.

Q.  And that's what I'm eligible for.

THE COURT:  May I offer you a couple of suggestions for you to consider?

VENIREPERSON: Sure

THE COURT:   Husband and wife married to one another, a very  committed  relationship  for  many,  many  years. Successfully raise and educate three or four children, all of whom are married, have children of their own, all doing well. Matriarch of this family develops a terminal illness, life support system, begs loving, committed husband to pull the plug.

-57-

VENIREPERSON: Right.

THE COURT: That's what they say down in Austin.  Prior to 1974, it was 2 to 99 years or life, as little as 2.  All kinds of circumstances and relationships between parties that result in an intentional killing.

Mr. Byck, give you your time back.

[DEFENSE]: Thank you, Your Honor.

VENIREPERSON: I'll change my answer then.

[DEFENSE]:Okay.  Would you change it just to the extent of the euthanasia example because obviously that's a very extreme example.

THE COURT: I admit.  I admit that.

[DEFENSE] I'm not accusing the Judge of – obviously, I've been sitting here thinking of some pretty extreme examples, too.

A.  I think it completely depends on the circumstance.

Q.  Okay.  But you could do it in situations other than euthanasia?

A. Nothing comes to mind right now, but I'm sure if it was the right circumstance.

Q.  Okay.  All right.  That's fair enough.  It 's a hard enough situation.   Let me see –

THE COURT: Nothing come to my mind that the stock market couldn't go down much lower than it is right now, but in your business, I'm sure you can figure out scenarios, earnings, public confidence, problems with China, foot and mouth disease, and all sorts of factors out there, right?

VENIREPERSON: Yes, sir.

(XVIII, 47-53).

-59-

A.  That's true.

Q.  Right?

A.  That's true.

Q.  Okay.  On a scale of one to a hundred in context of our capital murder trial, how would you define probability?  It would have to be a chance of at least 10 out of a hundred, 20 our of a hundred, 50 out of a hundred, 51 out of a hundred, 75 out of a hundred?  How would you define probability?

A.  I think that would totally depend on the individual.

Q.  I don't understand that answer.

A.  We're talking about one individual.  The probability of say you, for instance, committing another crime.

Q.  Uh-huh.

A.  I think a lot of it would have to do with you as an individual.

Q.  Well, yes, you're exactly right, because that's what we're asking is whether this individual or that individual is probably going to do something.  But the – my question is what is your definition of probable.

A.  Between one and a hundred.

Q.  Is it at least 51 percent?

A.  No.

Q.  It's not?

A.  I think – I still go back to the fact that I think it's the individual case, the individual.

Q.  Well, let's see if I can explore this a little bit with you –

-61-

A. Maybe you're not directing the question to where I totally understand it.

Q. That's my problem, and let me see if I can remedy that.

THE COURT: What is a word that you would use as an equivalent to probability? A synonym?

VENIREPERSON: Well, a probability would be something that's possible in the future, but – if I'm looking at a scale from 1 to 10, I couldn't say you as an individual speaking to me, what is the probability factor from 1 to 10, you know. I don't know what you might do. I don't think I can put a number on it.

[DEFENSE]: Could you– if you can't put a number on it, could you say that probability is a chance or probability is more likely than not or probability is pretty certain?

A. I think it's only a chance.

Q. It's only a chance?

A. Yes.

Q. And that would be your definitions?

A. Yes.

Q. And that would be the definition that you would use?

A. Yes.

(R.XXVIII,49-52).

### _Analysis_

In Special Issue No. 1, the term "probability" is not statutorily defined, and the trial court does not err in refusing to instruct the jury as to a definition. _See Earhart v. State,_ 823 S.W.2d 607, 632 (Tex. Crim. App.1991); _Caldwell v. State,_ 818 S.W.2d 790, 797 (Tex.

Crim. App.1991). Therefore, the term is to be taken and understood in its usual acceptation in common language. See TEX. CODE CRIM. PRO. article 3.01 ("All words, phrases and terms used in this Code are to be taken and understood in their usual acceptation in common language, except where specially defined.").

In *Cuevas v. State,* 742 S.W.2d 331 (Tex. Crim. App.1987), this Court recognized various dictionary definitions of the term "probability" when addressing the same issue presented here. "Dictionary definitions of 'probability' include: 'likelihood; appearance of reality or truth; reasonable ground of presumption; verisimilitude; consonance to reason.... A condition or state created when there is more evidence in favor of the existence of a given proposition than there is against it.' *Black's Law Dictionary* 1081 (5th ed. 1979); "Something that is probable, with 'probable' meaning 'supported by evidence strong enough to establish presumption but not proof; likely to be or become true or real.'"*Webster's New Collegiate Dictionary* (1980); Cuevas, 742 S.W.2d at 347.

In *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992), *cert. denied*, 511 U.S. 1152, 114 S.Ct. 2184 (1994), a veniremember indicated that he understood "probability" as any percent possibility rather than as a "likelihood" or "good chance". This Court pointed out that in its usual acceptation, "probability" is something more than a "possibility," therefore the veniremember was properly challengeable for cause and the trial court abused its discretion in denying appellant's challenge. *Id.* The case was reversed and remanded. *Id.* Similarly, in the instant case, veniremember Brooks considered probability of future violence to be satisfied upon proof of a possibility. The trial court abused its

-63-

discretion by denying Appellant's challenge for cause. The trial court judgement should be reversed and the case remanded for a new trial.

### *Voir dire of veniremember Kimberly Williams*

#### *"probability" = possibility*

[STATE]: Let's look at some of the words up here, and the reason we do that is these words don't have legal definitions. The legislature was kind enough to give us the words, but they didn't tell us what they meant. So what we'll do is we'll look to you to define these words. Okay? The first word I want to look at with you is the word "probability." Whether there is a probability that the defendant would commit criminal acts of violence. When you look at the word "probability" in Question Number 1, what other words come to mind? How would you define probability? What does that words mean to you?

A.. It means that it's possible it could, or could have not.

Q. Okay. Now, the legislature – you know, when they gave us the word, they could have chosen other words. They could have lowered the bar for the State so low as to say that all we have to prove is there's a chance that he would commit criminal acts of violence or that there's a possibility that he would commit criminal acts of violence. They've given us the word probability. Let me ask you, on a scale of zero to one hundred, zero being the very slightest chance ever, one hundred being an absolute certainty. Where on that scale between zero and one hundred would you put probability if you had to assign to that?

A.    I would say 50.

Q. 50? Okay. All right. Probability is like a majority and a minority. To be a majority, would you agree with me it has to be more than 50 percent to be a tea? [SIC]

A. Yes.

-64-

Q. Anything less would be minority.  Same kind of thing on probability.  At least, to be a probability, can you see where it has to be at least greater than 50 percent?  Now, it may be higher than that.  If you want it to be higher, but can you agree with me it has to be at least greater than 50 percent?  Anything less than that would simply be a possibility or a chance, which the law says I've got to prove more than that on Special Issue Number 1.

A. Yes.

(RXXXVII,146-148).

\*     \*     \*     \*     \*

[DEFENSE]: Okay.  When we're talking about the word "probability," you said that – initially you said that the words that you would use to describe that were possibility or could – possible or could happen again.
     Are those still the terms that you would use in – in defining probability?

A.. Yes.

Q. Okay.  Would you define it as mere possibility?  Well, possibility?

A. Possibility.

Q. Okay.  Or what about a mere chance?  Would you define it as that?

A. No.

Q. Okay.  But a possibility?

A. Possibility.

Q. Okay.  And that's even if you thought – you talked with Mr. Davis that, you know, that might be over 50 percent, but in those things does that mean possibility to you?

-65-

A. You're confusing me. Say that again.

Q. Okay. I'm confusing myself. For you, probability means possibility?

A. Correct.

Q. Okay. So the State would have to prove in answering – prove to you in Special Issue Number 1 that there is a possibility that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

A. Yes.

Q. And when we're talking about possibility is – when you're talking about possibility, is that – if we said, you know, 10 chances, are we saying 5 out of 10 chances, are we saying 1 out of 10 chances, or just a possibility that it could happen again?

A. It's a possibility that it could happen.

Q. So would it be less than 5 chances out of 10?

A. I don't understand what you're asking me.

Q. Okay.

THE COURT: Would it be less than 50 percent, or 50 percent, or more than 50 percent, your possibility in the context of Special Issue Number 1?

A. I can't say.

THE COURT: All right.

[DEFENSE]: Okay. So basically just a possibility?

A. Yes.

Q. Okay. Let's say if the weatherman said there was a 10 percent chance of rain, would that you say that's a probability

-66-

of rain?

A. I'd say it's possible.

Q. Okay. Possible in the context of Special Issue Number 1?

A. I would say it's possible.

Q. Okay. So in your mind possible and probability – possibility, probability mean the same thing?
A. That it could or could not happen.

Q. Okay.

THE COURT: Ms. Balido.

MS. BALIDO: Yes. Thank you, Judge.

[DEFENSE]: For you to answer Special Issue Number 2 no, would we have to prove to you that he would not commit criminal acts of violence?

THE COURT: Special Issue 2?

[DEFENSE]: I'm sorry, Special Issue Number 1.

MS. BALIDO: I'm sorry, Judge.

A. Could you repeat that question again?

Q. (By Ms. Balido) For you to answer Special Issue Number 1 no, that there is not a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, would we have to prove to you that that answer should be answered no, that he would not be a continuing threat?

A. Could you rephrase that, because I'm not understanding what you're asking.

Q. Okay. This – I'm trying to figure out, and it may be just

-67-

may be not understanding what you're saying. What probability means in your mind. Okay? I'm trying to figure out if probability means more likely than not or probability means possibility, or if all those things mean the same thing to you.

A. Probability means to me it's possible that it could happen or it couldn't happen. And until, you know, the evidence, you can' really say.

Q. Okay. If we're talking about a – an even chance that it could happen, it could or it could not happen, like – like flipping a coin that it could or could not happen, is that a probability or is hat a possibility to you? This is why people hate lawyers.

A. It's a possibility.

Q. Okay. And that's the possibility that you would go by when you're talking about possibility in regard to probability in Special Issue Number 1?

(R.XXXVII,180-184).

## *Analysis*

As with the previous veniremember, this individual was subject to a challenge for cause on the basis that they could not distinguish any difference between the mere *possibility* of future violence as opposed to the *probability* of violence occurring. The trial court abused its discretion in denying Appellant's requested challenge for cause. See *Hughes v. State*, *supra,* at 148. Therefore, the trial court judgement should be reversed and the case remanded for a new trial.

-68-

## POINT OF ERROR NO. 9, RESTATED

**APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE 6TH AND 14TH AMENDMENTS TO THE UNITED STATES CONSTITUTION IN VOIR DIRE WHERE TRIAL COUNSEL USED PEREMPTORY STRIKES AGAINST TWO VENIREMEMBERS WHOM COUNSEL ERRONEOUSLY BELIEVED HAD BEEN UNSUCCESSFULLY CHALLENGED FOR CAUSE. (R.XXXVII,135) (R.XLV,45-48&51) (R.XLIV,13-14).**

Appellant's trial counsel used all peremptory challenges, and then requested two additional strikes, which the trial court refused. Counsel asserted that two objectionable jurors sat on the jury, and that two peremptory strikes were used against veniremember 44, Mark Colditz, and veniremember 36, John Wilson. (R.XLIV,13-14). Counsel stated that the defense challenged veniremember Colditz for cause and therefore used a peremptory strike after the trial court refused the requested challenge. (R.XLIV,13-14). Trial counsel stated that peremptory challenges were used only against "the worst of the worst," and that Colditz fit that category due to unfavorable answers related to the definition of "probability" and future dangerousness. (R.XLIV,13-14). However, the record shows that Appellant's counsel never submitted Colditz for cause at all. (R.XLV,51). In fact, veniremember Colditz stated that "probability" of future violence required proof of a *70 or 80 percent* chance. (R.XLV,45-48). As for veniremember John Wilson, trial counsel believed the defense unsuccessfully challenged Wilson for cause, and counsel therefore used a peremptory challenge. (R.XLIV,13-14). Yet, the record shows that John Wilson was accepted by both

-69-

sides and was in fact never challenged for cause. (R.XXXVII,135). Trial counsel apparently

used two precious peremptory challenge against veniremembers whom counsel mistakenly

believed were adverse to the defense and whom the defense had unsuccessfully challenged

for cause.

### *Applicable law*

Voir dire is a critical stage of criminal proceedings for constitutional purposes. *See*

*Gomez v. United States,* 490 U.S. 858, 873, 109 S.Ct. 2237, 2246, 104 L.Ed.2d 923 (1989).

Both the Sixth Amendment of the United States Constitution and article 1, section 10 of the

Texas Constitution guarantee the assistance of counsel during this critical stage of criminal

proceedings. In reviewing the effectiveness of counsel during voir dire, the standard declared

in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and

adopted by Texas in *Hernandez v. State,* 726 S.W.2d 53, 56-57 (Tex. Crim. App.1986)

should be applied. See *Knight v. State*, 839 S.W.2d 505, 506 (Tex. App.--Beaumont 1992,

no pet.). To prevail on a claim of ineffectiveness, an appellant must prove by a

preponderance of the evidence (1) that his or her counsel's representation fell below an

objective standard of reasonableness and (2) that the deficient performance prejudiced his

or her defense. *Strickland*, 466 U.S. at 688; *Rosales v. State,* 4 S.W.3d 228, 231 (Tex. Crim.

App.1999). To meet this burden, the appellant must prove that his or her attorney's

representation fell below the standard of prevailing professional norms and that there is a

reasonable probability that, but for the attorney's deficiency, the result of the trial would have

been different. *Tong v. State,* 25 S.W.3d 707, 712 (Tex. Crim. App.2000). Under this

-70-

standard, a claimant must prove that counsel's representation so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Strickland,* 466 U.S. at 686.

Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State,* 9 S.W.3d 808, 813 (Tex. Crim. App.1999). As far as strategic or tactical reasons for counsel's action or inaction, in the absence of direct evidence of counsel's reasons for the challenged conduct, a reviewing court will assume a strategic motivation if any can be imagined. *Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App.2001). The challenged conduct will not constitute deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it. *Id.; see Thompson,* 9 S.W.3d at 814. The burden is on the appellant to identify the acts or omissions of counsel that are alleged to have constituted the ineffective assistance and then affirmatively prove that they fall below the professional norm for reasonableness. *Jackson v. State,* 973 S.W.2d 954 (Tex. Crim. App.1998). Then, the appellant must prove that counsel's errors, judged by the totality of the representation, denied him a fair trial. *Strickland,* 466 U.S. at 693.

### *Application of law to facts*

The record affirmatively shows that Appellant's trial counsel used peremptory challenges against the wrong veniremembers. On review, this Court is not required to attempt to imagine what strategic motivation, if any, lies behind trail counsel's actions. *Garcia v. State,* 57 S.W.3d at 440. Instead, trial counsel dictated into the record that a peremptory

-71-

challenge was used on veniremember Colditz because Colditz gave unfavorable answers regarding the definition of "probability," and the trial court refused to grant Appellant's challenge for cause. The record, however, is completely to the contrary. Appellant's counsel never submitted Colditz for cause, and Colditz defined "probability" of future dangerousness as requiring proof of a 70 to 80 percent chance. Meanwhile, counsel apparently believed that veniremember Wilson was submitted for cause, and therefore a peremptory challenge was used against Wilson. However, the record shows that Wilson was accepted as a prospective juror by both sides. The above errors cannot be characterized as "trial strategy"and the errors were significant because counsel effectively forced Appellant into accepting two"objectionable"jurors (# 17 - Richard Bachmeyer & #19 - Robert Mendro). (R.XLIV,13). Had counsel not mistakenly used two precious peremptory challenges against Colditz and Wilson, counsel would not have been forced into accepting these two objectionable jurors. Counsel's errors fell below an objective standard of reasonableness. The trial court judgement should be reversed and the case remanded for a new trial.

## POINT OF ERROR NO. 10, RESTATED

**THIS APPEAL SHOULD BE ABATED UNTIL THE TRIAL COURT FILES FINDINGS OF FACT AND CONCLUSIONS OF LAW AS REQUIRED BY TEX. CODE CRIM. PRO. ARTICLE 38.22, §6.**

Prior to trial in this case, Appellant filed pretrial motions seeking to suppress oral statements made by Appellant after his arrest, as well as the written statement signed by Appellant while in police custody. (C.I,11). On June 5, 2001, the trial court held a hearing outside the jury's presence in which evidence was presented regarding oral incriminating statements made by Appellant after his arrest, and regarding the written voluntary statement signed by Appellant while in police custody. Appellant testified and disputed the evidence offered by the State. In Appellant's oral statements, he told officers where the complainant's body was located. In his written statement, he admitted shooting the complainant, but explained that the shooting was accidental. The trial court denied Appellant's motion to suppress the oral and written statements and the State offered the statements into evidence. However, the Clerk's Record contains no written findings of fact and conclusions of law entered by the trial court with regard to the admissibility of 1) the oral statements made by Appellant after he was arrested and placed in handcuffs, and 2) the written statement signed by Appellant and offered into evidence as State's Exhibit No. 47. Apparently, the trial court judge never made written findings of fact and conclusions of law resolving the disputed evidence related to Appellant's oral and written statements.

Appellant's counsel on appeal filed a Motion to Abate this appeal, seeking remand

-73-

to the trial court for findings of fact and conclusions of law. At the same time, counsel filed a motion to extend the deadline for filing Appellant's Brief.

In an Order dated June 6, 2002, this Court granted Appellant's Motion to Abate "to the extent that the trial court is directed to prepare findings of fact and conclusions of law as required by Article 38.22, Section 6." A supplemental record containing the trial court findings was ordered to be filed by July 6, 2002. This Court, however, denied Appellant's motion to extend the filing of Appellant's Brief, which sought an extension until after the record was supplemented, and counsel had an adequate opportunity to review the findings.

Counsel asserts that Points of Error should be raised in Appellant's Brief with regard to the trial court's denial of Appellant's motions seeking to suppression of Appellant's oral and written statements at trial. Yet, counsel cannot effectively brief these issues without the trial court findings. Appellant therefore requests that the entire appeal be abated and the time for filing Appellant's Brief be extended.

## POINT OF ERROR NO. 11, RESTATED

**APPELLANT RIGHTS PURSUANT TO THE 6TH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE INFRINGED WHERE THE TRIAL PROSECUTORS EXAMINED LETTERS AND NOTES WRITTEN BY APPELLANT TO HIS TRIAL ATTORNEYS, WHICH THE TRIAL COURT JUDGE DETERMINED WERE PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE.**

Prior to trial, Appellant's written notes and letters were seized by staff in the Dallas County Jail after Appellant made a suicide attempt. The assigned prosecutors learned that Appellant's personal writings had been seized and contacted the Dallas County Sheriff's Department for the purpose of examining the notes. The trial prosecutors went to the sheriff's office where they inspected Appellant's writings. The prosecutors elected not to first tender the writings to the trial judge for an *in camera* inspection, nor did they first seek to obtain a search warrant based upon probable cause. The prosecutors also did not elect to inform Appellant's trial counsel of their intent to review Appellant's personal writings before doing so.

During trial, the trial court judge conducted a hearing in which he determined that some of the documents reviewed by the trial prosecutors were in fact protected by the attorney/client privilege. The two trial prosecutors testified and admitted reviewing the documents before trial but denied using any information contained in the documents in preparing the prosecution of the case. (See Appendix A). None of the seized items were

offered into evidence before the jury.

### *Applicable Law*

The right to counsel is violated when law enforcement officers knowingly intercept confidential attorney-client communications and disclose these to the prosecution. *See U. S. v. Zarzour*, 432 F.2d 1,3 (5th Cir. 1970)(citations omitted); *U. S. v. Levy*, 577 F.2d 200 (3rd Cir. 1978). The holdings in *Zarzour* and *Levy* turn on whether or not the intrusion was unlawful and for the sole purpose of determining defense strategy. *See Ott v. State,* 627 S.W.2d 218, 224 (Tex. App. - Ft. Worth 1982, pet. ref'd). In *Zarzour* the Fifth Circuit Court of Appeals held that an intrusion by government upon the confidential relationship between a defendant and his attorney is a violation of the Sixth Amendment right to counsel. *Id.* Meanwhile, in *U. S. v. Rosner*, 485 F.2d 1213 (2nd Cir. 1973), it was held that a finding of unlawful intrusion must be made before an intrusion into attorney- client communications would warrant a reversal under the Sixth Amendment.

In *O'Brien v. U.S.,* 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), a hidden government microphone revealed privileged conversations between the accused and his lawyers regarding the accused's upcoming trial. The Supreme Court reversed and remanded for a new trial even though the recorded conversations were never disclosed to the prosecutor who tried the case. 386 U.S. at 345, 87 S.Ct. at 1159.

Meanwhile, in *Black v. U.S.,* 385 U.S. 26,  87 S.Ct. 190, 17 L.Ed.2d 26 (1966), F.B.I. agents installed a listening device in a hotel suite. They monitored and taped conversations held in the hotel suite during the period in which an offense was being investigated,

beginning some two months before and continuing until one month after the evidence in the case was presented to a Grand Jury. 385 U.S. at 27, 87 S.Ct. at 191. During that period, agents overheard exchanges between the accused and his attorney. Recordings of such interceptions were later erased but notes summarizing and sometimes quoting the conversations were available. The summaries were not seen by prosecutors until after the trial began. The assigned prosecutors asserted that they found nothing in the F.B.I. reports or memoranda relevant to the particular investigation. 385 U.S. at 28-29, 87 S.Ct. at 191. Nevertheless, the Supreme Court reversed, finding a 6th Amendment infringement significant enough to warrant a new trial. 385 U.S. at 29, 87 S.Ct. at 192.

The instant case presents facts more egregious than the above cases since in those cases, the trial prosecutors were not actively seeking to discover privileged material. In the instant case, the trial prosecutors sought out Appellant's personal writings in what was obviously an effort to discover matter which could have assisted the State in preparing for trial. This effort took place before trial and after jail officials seized Appellants' personal writings from his living area. Whether motivated by a desire to discover defense strategy, or to accumulate more evidence against Appellant, the prosecutors' action were improper at best, considering that some documents were plainly titled "Michael & Jane" (Appellant's trial counsel), and "Questions for my lawyers." (R.L,10-12). The trial court judge correctly determined those particular documents to be protected by the attorney/client privilege, which necessarily leads to te conclusion that the State infringed upon the attorney/client privilege in this case.

Rather than first tendering the documents to the trial judge for an *in camera* inspection, and rather than attempting to seek a subpoena setting forth probable cause, the trial prosecutors, on their own accord, invaded the attorney/client relationship. To allow this infringement to go unchecked will only encourage this conduct in the future and will have a chilling effect on attorney/client communication between attorneys and citizens too poor to bond out of jail. Without the conditional freedom of a pretrial bond, detained citizens are limited in their ability to communicate with their attorneys. Many, like Appellant, must write notes "for my lawyers" while confined awaiting trial. To allow prosecutors unfettered freedom to review whatever personal writings the jailor seizes is a dangerous precedent.

The trial prosecutors, upon seeing that some of the documents were related to the attorney/client relationship, charged head-first into the protected and confidential relationship between attorney and client. In doing so, Appellant due process rights were violated. As a result, the trial court judgement should be reversed and the case remanded for a new trial.

## POINT OF ERROR NO. 12, RESTATED

## THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT VENUE FOR THE OFFENSE WAS WITHIN THE BOUNDARIES OF DALLAS COUNTY. (C.I,179-180) (R.L,22) (R.LII,2).

The jury charge authorized conviction upon proof that Appellant caused the complainant's death by shooting the complainant, while in the course of committing or attempting to commit kidnapping or robbery. (C.I,181). The jury charge further instructed the jury that venue was proper in the following counties:

1.      Where the offense was committed,

2.      Where property is stolen in one county and removed to another,

3.      Where a person is injured in one county and dies in another,

4.      Where a person was kidnapped and any county through which they were taken,

5.      Where the accused resides, was apprehended, or extradited.

(C.I,179-180).

As to venue, Appellant first objected at the close of the State's case and sought a directed verdict on the basis that the evidence was insufficient to prove venue in Dallas County. (R.L,22). Appellant's objection was overruled. Appellant next objected when the above venue options were included in the court' charge on guilt/innocence, and essentially asserted that venue should be limited to that applicable in a homicide. (R.LII,2). Counsel further asserted that if venue were restricted in the requested manner, the evidence was insufficient to prove venue in Dallas County. Appellant's objections to the charge were

-79-

overruled and the jury was allowed to consider all the above venue options.

### *Applicable Law*

There is a distinct difference between jurisdiction and venue. Jurisdiction concerns

the authority or power of a court to try a case, while venue has to do with the place or county

where a case may be tried. *Etchieson v. State*, 574 S.W.2d 753, 759 (Tex. Crim. App 1978).

A plea of not guilty puts in issue an allegation of venue and the State must prove a venue

allegation for a conviction to be warranted. *Black v. State,* 645 S.W.2d 789, 790 (Tex. Crim.

App.1983). A defendant's motion for instructed verdict that specifically challenges proof of

venue timely raises the issue and preserves it for appellate review. *Cunningham v. State,* 848

S.W.2d 898, 901 (Tex.App.-Corpus Christi 1993, pet. ref'd). Failure to prove venue in the

county of prosecution is reversible error. *Id.* at 792; *Sixta v. State,* 875 S.W.2d 17, 18

(Tex.App.--Houston [1st Dist.] 1994, pet. ref'd).

No specific venue statute sets forth the requirements for venue in capital murder

cases. Appellant therefore asserts that venue is determined by TEX.CODE CRIM. PROC.

art. 13.18, which provides that if venue is not specifically stated, the proper county for the

prosecution of offenses is the county in which the offense was committed. See *Id.*

Appellant asserted at trial that defining "the county in which the offense was

committed" should, in a capital murder case, be confined to that applicable to homicide.

TEX. CODE CRIM. PRO. article 13.07 provides that "[i]f a person receives an injury in one

county and dies in another by reason of such injury, the offender may be prosecuted in the

county where the injury was received or where the death occurred, or in the county where

the dead body is found." Appellant requested that venue in the case be restricted to the underlying homicide, not to the aggravating circumstances making the homicide offense a capital murder. If venue were restricted as requested by Appellant at trial, the evidence would have been insufficient to prove Dallas County.

The complainant was last seen alive in Collin County, Texas, at the Collin Creek Mall. (RXLVII,38-39). Her body was recovered was in Van Zandt county. (RXLVIII,123). When Appellant was in custody, he was driven around in an attempt to ascertain the location where the complainant was abducted and shot. Appellant was not able to identify any location in Dallas County where either the abduction or the shooting occurred. (RXLVIII,170-173&210-211). In Appellant's written statement, he indicated that after leaving Bleacher's Bar, he was walking towards highway 635 when he asked the complainant for a ride. The complainant agreed and after "some distance," they pulled into a parking lot. At that unknown location, Appellant first told the complainant he was putting her in the trunk and that he would later call police and notify them. While placing her in the trunk, the shooting occurred. (RXLVIII,183-184).

Appellant asserts that the above evidence is insufficient to prove venue in Dallas County, and that Appellant's timely objection to the trial court's venue instructions should have been sustained. Therefore, the trial court judgement should be reversed and the case remanded for a new trial.

## POINT OF ERROR NO. 13, RESTATED

**THE TRIAL COURT ERRED IN THE PUNISHMENT PHASE BY DENYING APPELLANT'S REQUEST TO SUPPRESS THE UNDULY SUGGESTIVE PHOTOGRAPHIC IDENTIFICATION OF APPELLANT MADE BY COMPLAINANT SHERRYL WILHELM, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION.**

In the punishment phase of trial, the State presented evidence that Appellant abducted Sherryl Wilhelm from a parking lot of a hospital in Arlington, Texas in August, 1997. Defense evidence showed that Appellant denied that he was in any way involved in this offense.

Sherryl Wilhelm was employed at Arlington Memorial Hospital in 1997. On August 26, 1997, during her lunch break, she walked out to the parking area, planning on having lunch in her car. As she opened her car door, she was pushed from behind and forced into the car. A man followed her into the car, telling her he would not harm her, that he just needed a ride. After she attempted to get out of the car, the man then put his hands around her neck and started to choke her. The man then ordered her to the floorboard as he drove the two out of the parking lot. After a short time, Wilhelm jumped out of the car. A motorist then stopped and helped her. Once at the hospital, she gave police officers a description of the individual. However, in October of 2000, Wilhelm was watching TV when she saw the news story about complainant Bertie Cunningham's disappearance. She then saw a

-82-

composite drawing of the suspect and recognized the individual from her own offense. She then contacted the police. (RLIII,125-153). However, at a hearing outside the presence of the jury, Wilhelm looked around the courtroom and failed to identify Appellant as the individual that abducted her. (R.XLV,106).

John Stanton was a detective for the City of Arlington and investigated the offense involving Wilhelm. He arranged to have Wilhelm meet with Officer Doug Ligon to create a composite sketch using a computer. (RLIII,184-185). In October of 2000, Wilhelm contacted Stanton and stated she had seen a recent TV news story involving complainant Bertie Cunningham and after seeing a suspect image on TV, she believed she recognized that individual as the same individual that kidnaped her. Stanton then obtained a photograph of Appellant from the Van Zandt County Sheriff's Department, placed it in a photographic lineup and showed it to Wilhelm. Wilhelm then picked Appellant's photograph from the lineup. In identifying Appellant, Wilhelm stated she was "virtually sure that was the guy." (RLIII,197).

After a pretrial hearing, Appellant objected to introduction of the photographic identification of Appellant on the basis that individuals of other races were included among the photographs, making the photographs unduly suggestive. (R.LIII,125). Appellant's objection was overruled and the State introduced the photographic line-up as State's Exhibit No. 142. (R.LIII,168-169).

In the punishment phase of trial, the record shows that Leon Peek, who held a Bachelor of Science in psychology, a Master of Science in Clinical Psychology and a Ph.D.

in psychology, was involved in research and study involving human memory in relation to perception. Part of his study involved police lineups.   (R.LIV,42-45). He reviewed Appellant's photograph which appeared in the photographic lineup viewed by Wilhelm years later. (R.LIV,45-46). Peek noted that the photographic lineup which was shown to Wilhelm was flawed because at least two of the individuals appeared to be Hispanic, while a third individual had "rosy" cheeks, all of which blatantly conflicted with the description given by Wilhelm to police. (R.LIV,53-54).   Additionally, one of the individuals in the photo spread appeared be considerably older than the age range Wilhelm gave police. (R.LIV,54).

### *Applicable Law*

When reviewing a trial court's ruling on the admissibility of an identification which has been attacked as having been the product of an impermissibly suggestive pre-trial identification procedure, "[t]he test is whether, considering the totality of the circumstances, 'the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Loserth v. State,* 963 S.W.2d 770, 772 (Tex. Crim. App.1998)(quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). The goal of the review is to determine the reliability of the identification procedure. *Id.* This Court has held that the following five non-exclusive factors should be weighed against the improper effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances:

1. The opportunity of the witness to view the criminal at the time of the crime;

2. The witness' degree of attention;

-84-

3. The accuracy of the witness' prior description of the criminal;

4. The level of certainty demonstrated by the witness at the confrontation, and

5. The length of time between the crime and the confrontation.

*Id.*, citing *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).Each of these "*Biggers* factors" are historical facts, and should be viewed deferentially, in the light most favorable to the trial court's ruling. *Id.* at 773. The application of the factors, and thus the "ultimate conclusion as to whether the facts as found state a constitutional violation, is a mixed question of law and fact." *Id.* Therefore, a trial court's application of the factors *is* reviewed *de novo. Id.* at 773-74.

### *Application of Law to Facts*

Applying the *Biggers* factors to the instant case, Appellant asserts that the factors preclude admission of the unduly suggestive lineup. Wilhelm did not had ample time to view the man who forced her from behind into her car, and who then forced her to place her head against the car seat. Further, it was not until she saw Appellant's picture on TV that she ever identified Appellant at all. It was only after seeing Appellant's picture on TV that she viewed a highly suggestive photo-spread and picked Appellant's photograph. Yet even after that, she was initially unable to identify Appellant in open court. Appellant asserts that even if viewed in a light favorable to the trial court's rulings, the trial court erred in refusing to suppress the photographic lineup and Wilhelm's out of court identification of Appellant. Not only was the photographic lineup unduly suggestive, the circumstances of the case indicate that Wilhelm's identification of Appellant was highly suspect. Appellant was denied due process

-85-

of law by the admission of the identification. *See Simmons,* 390 U.S. at 385-86, 88 S.Ct. 967. The case should be reversed and remanded.

## POINT OF ERROR NO.14, RESTATED

**THE TRIAL COURT ERRED IN THE PUNISHMENT PHASE BY DENYING APPELLANT'S REQUESTED JURY INSTRUCTION WHICH WOULD HAVE REQUIRED THE JURY TO CONSIDER EXTRANEOUS OFFENSES ONLY FOR THE PURPOSE OF DETERMINING FUTURE DANGEROUSNESS IN SPECIAL ISSUE NUMBER ONE. (C.I,213&148-150) (R.LX,2)**

In the punishment phase, the jury was instructed pursuant to TEX. CODE CRIM. PROC. art.37.071 as follows:

### Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

### Special Issue No. 2

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence

-86-

be imposed? (C.I, 213).

Appellant made a timely request that the jury's consideration of extraneous offenses be confined to determining whether the State proved Appellant's future dangerousness beyond a reasonable doubt. Appellant sought to have the jury instructed not to consider extraneous offenses in answering Special Issue No. 2. (R.LX,2)(C.I,148-150). Appellant's request was denied and the jury was thereby allowed to consider extraneous offense evidence in answering Special Issue No. 2.

## *Law*

Evidence of extraneous offenses can be relevant to the future dangerousness in the punishment phase of a capital case, and in most cases, extraneous offenses will be admitted to facilitate the prediction whether the defendant will constitute a future danger to society. *Ex parte Broxton*, 888 S.W.2d 23, 28 (Tex. Crim. App. 1994);*Powell v. Sate,* 898 S.W.2d 821, 830 (Tex. Crim. App. 1994); *Marquez v. State,* 725 S.W.2d 217, 226 (Tex. Crim. App. 1987). In fact, when predicting future dangerousness, the jury is permitted to consider several factors, including:

> (1) the circumstances of the capital offense, including the defendant's state of mind and whether he or she was acting alone or with others;
>
> (2) the calculated nature of the defendant's acts;
>
> (3) the forethought and deliberateness exhibited by the crime's execution;
>
> (4) the existence of a prior criminal record, and the severity of the prior crimes;

(5) the defendant's age and personal circumstances at the time of the offense;

(6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

(7) psychiatric evidence; and

(8) character evidence.

*See Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App.1987).

Special Issue Number Two, however, is fundamentally different than the issue of future dangerousness presented in the first Special Issue. In *Jurek v. Texas,* 428 U.S. 262, 272, 96 S.Ct. 2950, 2956, 49 L.Ed.2d 929 (1976), the Supreme Court determined that the constitutionality of Texas' death penalty scheme turns on whether the jury is allowed to consider particularized mitigating factors. *Jurek* concluded that Texas' sentencing scheme satisfied the Eighth Amendment on the basis that Texas courts would interpret the question concerning future dangerousness so as to allow capital juries to consider whatever mitigating circumstances a defendant may be able to show. *Id.,* at 272-273, 96 S.Ct., at 2956-2957. Supreme Court decisions since *Jurek* have reaffirmed that the Eighth Amendment mandates an individualized assessment of the appropriateness of the death penalty. In *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a plurality of the Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

-88-

less than death." *Id.,* at 604, 98 S.Ct., at 2964 (emphasis in original). The constitutionality of Texas' scheme "turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Supra,* 428 U.S., at 272, 96 S.Ct., at 2956.

The U.S. Supreme Court has consistently reaffirmed the fundamental principle that, in a capital case, "the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Weeks v. Angelone*, 528 U.S. 225, 233, 120 S.Ct. 727, 732, 145 L.Ed.2d 727 (2000); see also, *Hitchcock v. Dugger*, 481 U. S. 393, 394 (1987), *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986), *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982), *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). While the "State may structure the jury's consideration of mitigation" it may "not preclude the jury from giving effect to it." *Weeks*, 120 S.Ct. at 732. The Supreme Court has held that the U.S. Constitution permits states to institute jury instructions that "shape and structure" a capital jury's consideration of mitigating evidence. *Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702(1998). This "shaping and structuring" may not, however, impede the jury's consideration of mitigating evidence in any way. The Supreme Court's "consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence." *Id.* Therefore, there is a "need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination." *Id*, citing, *Tuilaepa v. California*, 512 U.S. 967, 971-73 (1994). Anything less "does not permit the type of individualized consideration of mitigating factors ... required by the Eighth and Fourteenth Amendments in capital cases." *Lockett*, 438 U.S. at

-89-

605.

The trial court's refusal to restrict consideration of extraneous offense evidence to consideration of future dangerousness precluded a fair consideration of the mitigation evidence applicable to Special Issue Number Two. Failure to limit extraneous offense evidence to Special Issue Number One crossed the line between permissible "structuring" of the jury's ability to consider mitigating evidence and unconstitutional "restriction" of the jury's ability to consider such evidence. By tethering the jury's ability to give effect to the substantial mitigating evidence presented, the trial court unconstitutionally restricted the jury's ability to give effect to Appellant's history of emotional problems arising out of the abuse he suffered as a child. Evidence of this type is unquestionably mitigating, since it potentially acted to serve "as a basis for a sentence less than death." *Skipper*, 476 U.S. at 4-5, quoting, *Lockett*, 438 U.S. at 604.

Appellant argues that without the requested instruction, the jury could not fully consider and give effect to the mitigating evidence of his abused childhood in rendering its sentencing decision where the jury was not required to consider mitigation apart from the extraneous offense evidence applicable to Special Issue Number 1. Therefore, the case should be reversed and remanded.

-90-

## POINT OF ERROR NO. 15, RESTATED

**THE TRIAL COURT ERRED IN FAILING TO SUBMIT IN THE JURY INSTRUCTIONS AT THE PUNISHMENT PHASE OF TRIAL DEFINITIONS OF THE VAGUE, UNDEFINED TERMS USED IN THE SPECIAL ISSUES THAT EFFECTIVELY DETERMINE THE DIFFERENCE BETWEEN A LIFE SENTENCE AND IMPOSITION OF THE DEATH PENALTY. (C.I, 213)**

At the conclusion of the punishment phase, the trial court submitted to the jury the two statutory special issues[5] as set out in Point of Error No. 14. (C.I, 213). The jury received no instructions concerning the meaning of the crucial terms in the special issues, specifically, the terms "probability," "criminal acts of violence," or "continuing threat to society."

This failure to define the operative words and phrases violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of the death penalty. *See Godfrey v. Georgia*, 466 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Because the trial court failed to charge the jury in a constitutionally adequate manner so that its determinations are rationally reviewable, there was no rational process justifying the imposition of the death sentence upon this Appellant in comparison to other cases in which other defendants received a life sentence. This failure to properly instruct the jury violated Appellant's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

---

[5]TEX. CODE CRIM. PROC. ANN. art.37.071, §3(b)(1), (b)(2), (e).

The Texas special issues applied in this case function as aggravating circumstances. An aggravating circumstance is any finding by a capital sentencer which "circumscribe[s]] the class of persons eligible for the death penalty." *Zant v. Stephens*, 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). An affirmative finding to the first special issue and a negative response to the second comprise a finding on an aggravating circumstance as defined by the Supreme Court in *Zant*. When an aggravating circumstance is vague, however, it fails to serve its constitutionally mandated narrowing function. A sentence of death may not be imposed using a vague aggravating factor unless the state court cures such vagueness by applying a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope. *Maryland v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988).

Because the Texas special issues contain terms that are unconstitutionally vague, any of the special issues are unconstitutional as applied to Appellant. His death sentence must therefore be vacated. *See Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed2d 511 (1990); *Lewis v. Jeffers,* 497 U.S. 766, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

In Texas, the Court of Criminal Appeals has held that the special issues perform the function of narrowing the class of death eligible defendants, and thereby comprise aggravating circumstances under the Constitution:

> [T]he function of Article 31.071 [is] to further narrow the class of death-eligible offenders to less than all those who have been found guilty of (capital murder) as defined under § 19.03 (capital murder

-92-

statute).

*Smith v. State*, 779 S.W.2d 417, 419 (Tex. Crim. App.1988); *Roney v. State*, 632 S.W.2d

598, 603 (Tex. Crim. App. 1982) (facts of crime alone do not provide death-eligibility,

otherwise every murder in the course of robbery would warrant capital sentence).

However the Texas special issues cannot suffice as a framework for the imposition

of the death penalty if the special issues themselves contain crucial terms that are undefined

and inherently vague.

The Texas Court of Criminal Appeals has refused to apply any limiting construction

to the unconstitutionally vague terms in the special issues. Special issues must channel

sentencing discretion by adequately informing juries "what they must find to impose the

death penalty." *Maryland v. Cartwright*, 486 U.S. at 362, 108 S.Ct. at 1858, 100 L.Ed.2d at

___; *Godfrey v. Georgia*, 466 U.S. at 428, 100 S.Ct. At 1765, 64 L.Ed.2d at ____.  Texas

allows its capital juries virtually unfettered discretion in construing the statutory aggravating

circumstances without the aid of specific definitions of crucial terms contained in the special

issues. *Roney v. State*, 632 S.W.2d at 603.  Yet that function is articulated through the use

of the special issue questions, which employ broad terms that result in standardless capital

sentencing determinations.  Such a result runs directly counter to the Eighth Amendment's

requirement that there be a rational process for juries and appellate courts to decide who lives

and who dies.

In the first special issue, the word "probability" has no common or uniform meaning.

Jurors in the instant case were left to apply any possible interpretations of the word,

-93-

including: about fifty percent; a substantial likelihood; or, technically, any chance at all. Additionally, jurors were denied any meaning for the phrase "criminal acts of violence" or "continuing threat to society."

The various words and phrases in the special issues, viewed individually or as a whole, did not provide the jury any uniform guidance in how to apply terms crucial to the decision to impose the ultimate sentence. In *Jurek v. Texas*, 428 U.S. at 272, 96 S.Ct. at 2956, 49 L.Ed.2d at___, a plurality of the Supreme Court noted that "[t]he Texas Court of Criminal Appeals has yet to define precisely the meanings of such terms as "criminal acts of violence" or "continuing threat to society." Twenty years later, the Court of Criminal Appeals still has not defined the vague terms in the first special issue *i.e.*, "probability," "criminal acts of violence," and "a continuing threat to society." Such failure has rendered the first special issue unconstitutional. Appellant's death sentence should be modified to life.

## POINT OF ERROR NO. 16, RESTATED

**THE TEXAS DEATH PENALTY SCHEME VIOLATED APPELLANT'S RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND TO DUE PROCESS OF LAW UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BY REQUIRING AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT SPECIAL ISSUES.**

### *Arguments and Authorities*

All twelve jurors must answer the first special issue (future dangerousness) affirmatively before the trial court may impose the death penalty; a life sentence, on the other hand, requires that at least ten jurors answer the special issue negatively. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071 § 2(d)(2) (Vernon Supp. 1999). Unanimity must also exist for the jury to enter a negative finding on the mitigation issue, while only ten jurors must vote to grant leniency. *See id.* § 2(f)(2). The trial court here instructed the jury accordingly. (C.I, 67-68). The failure of a capital jury to garner the requisite number of votes either way results in a life sentence. *See id.* § 2(g). Neither the trial court, parties, nor counsel may disclose to the jury members that their failure to unanimously agree on an answer to either special issue results in a life sentence. *See id.* § 2(a). This feature of article 37.071 creates the potential for considerable confusion among reasonable jurors.[6]

---

[6] The Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme. *See California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987); *Francis v. Franklin,* 471 U.S. 307, 315-16, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985).

A. The "Majority Rules" Harm Analysis

Texas's 12/10 Rule generates the danger that confused jurors otherwise predisposed to hold-out on voting for a death sentence will conform to a "majority-rules" mentality. Potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them. If a majority of other jurors are firmly voting "yes," holdouts may feel obligated to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict. See *Mills v. Maryland,* 486 U.S. 367, 383, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384, ___ (1988) ("common sense. . .suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation [citation omitted] unless they are expressly instructed to do so.").

Support for this argument regarding minority juror "coercion" is found in the Supreme Court cases criticizing the practice by trial courts of inquiring into the numerical division of deadlocked juries prior to sending the jury back for further deliberations. *See, e.g. Lowenfield v. Phelps,* 484 U.S. 231, 239-40, 108 S.Ct. 546, 552, 98 L.Ed.2d 568, __(1988); *Brasfield v. United States,* 272 U.S. 448, 450, 47 S.Ct. 135, 71 L.Ed. 345 (1926). In such cases, the Supreme Court has held that " inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear "in some degree, serious although not measurable, an improper influence upon the jury." *Lowenfield v. Phelps,* 484 U.S. at 239, 108 S.Ct. at 552, 98 L.Ed.2d at ___, *citing Brasfield v. United States,* 272 U.S. at 450, 47 S.Ct. at 136, 71 L.Ed.2d at ___.

-96-

Put another way, Texas's 12/10 Rule is a built-in impermissible "dynamite charge,"which has been recognized as a possible Eighth Amendment violation in the capital sentencing context. *See Lowenfield v. Phelps,* 484 U.S. at 240-41, 108 S.Ct. at 522, 98 L.Ed.2d at _____. In this way, Article 37.071's 12/10 Rule injects arbitrariness into the proceedings and creates the potential for unreliable sentencing determinations - a constitutional violation of the highest order in the capital sentencing context. *See State v. Williams,* 392 So.2d 619, 631 (La. 1980) (on rehearing). In *Williams,* the court stated:

> In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality. . .*Instead, the members of the sentencing body were left free to speculate as to what the outcome would be in the event there was no unanimity.* Under these circumstances, individual jurors could rationally surmise that in the event of a disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required. [emphasis added.] *Id.*

Such a risk of speculation and confusion was held to be a constitutional violation by the Louisiana Supreme Court. *Id.*

B. The *Mills* Principle

The 12/10 Rule also violates the Eighth Amendment principle in *Mills v. Maryland,* that it is unconstitutional to instruct capital sentencing jurors in a manner leaving reasonable jurors to believe that their individual vote in favor of returning a life sentence based on particular mitigating factors is worthless unless some threshold number of jurors agree that particular mitigating factors exist. That is, a constitutional violation occurs if a reasonable juror could interpret the jury charge to instruct the jury that there must be a meeting of the

-97-

minds among some threshold number of jurors[7] as to whether the mitigating evidence offered by the capital defendant warrants either a negative answer to the first special issue, or an affirmative response to the second, thus resulting in the imposition of a life sentence. *Mills v. Maryland,* 486 U.S. at 373-75, 108 S.Ct. at 1864-65, 100 L.Ed.2d at ____. Unless jurors are informed of the result of a deadlock in such a situation, the risk that one or more jurors will give into a "majority rules"mentality is too great under the Eighth Amendment.

C. The *Mills* Principle As Applied in Texas

Under *Mills,* a constitutional violation would occur under the Texas scheme if reasonable jurors who were instructed pursuant to Article 37.071 were led to believe that their votes in favor of a life sentence based on particular mitigating factors would be worthless unless at least nine other jurors joined them. In *Kubat v. Thierot,* 867 F.2d 351, 369-73 (7th Cir.), *cert. denied*, 493 U.S. 874 (1989), while finding a *Mills* violation, the Seventh Circuit was faced with a capital sentencing scheme similar to the one at issue in the present case:

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death. . .[T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

*Id.* at 373.

---

[7]Under *Mills*, the threshold number was twelve, while in Texas, the threshold number is ten.

Therefore, reasonable jurors could have believed that they had no ability to give mitigating effect to *any and all types of mitigating circumstances* unless at least nine other jurors also voted for life. Because "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant [mitigating] evidence," *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316, _____ (1990), Appellant was sentenced to death in an unconstitutionally manner. For these reasons, the judgment of the trial court should be reversed and the cause remanded for a new trial.

## POINT OF ERROR NO. 17, RESTATED

**THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE PROCESS OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.**

## POINT OF ERROR NO. 18, RESTATED

**THE TEXAS DEATH PENALTY SCHEME DENIED APPELLANT DUE COURSE OF LAW, AND IMPOSED CRUEL AND UNUSUAL PUNISHMENT, IN VIOLATION OF ARTICLE I, SECTIONS 13 AND 19, OF THE TEXAS CONSTITUTION BECAUSE OF THE IMPOSSIBILITY OF SIMULTANEOUSLY RESTRICTING THE JURY'S DISCRETION TO IMPOSE THE DEATH PENALTY WHILE ALSO ALLOWING THE JURY UNLIMITED DISCRETION TO CONSIDER ALL EVIDENCE MILITATING AGAINST IMPOSITION OF THE DEATH PENALTY.**

*Arguments and Authorities*

Justice Blackmun of the United States Supreme Court recently concluded that the death penalty, as currently administered in this country, is unconstitutional. *See Callins v. Collins*, 510 U.S. 1141, __ , 114 S.Ct. 1127, 1129, 127 L.Ed.2d 435, 449 (1994) (Blackmun, J., dissenting). Justice Blackmun summarized his position in the following excerpt:

-100-

...Twenty years have passed since this Court declared that the death penalty must be imposed fairly, and with reasonable consistency, or not al all, see *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct.2d 346 (1972), and, despite the effort of the States and courts to devise legal formulas and procedural rules to meet this daunting challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake. This is not to say that the problems with the death penalty today are identical to those that were present 20 years ago. Rather, the problems that were pursued down one hole with procedural rules and verbal formulas have come to the surface somewhere else, just as virulent and pernicious as they were in their original form. Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death, see *Furman v. Georgia, supra*, can never be achieved without compromising an equally essential component of fundamental fairness--individualized sentencing. See *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

It is tempting, when faced with conflicting constitutional commands, to sacrifice one for the other or to assume that an acceptable balance between them already has been struck. In the context of the death penalty, however, such jurisprudential maneuvers are wholly inappropriate. The death penalty must be imposed "fairly, and with reasonable consistency, or not all." *Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

To be fair, a capital sentencing scheme must treat each person convicted of a capital offense with that "degree of respect due to the uniqueness of the individual." *Lockett v. Ohio*, 455 U.S. at 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (plurality opinion). That means affording the sentencer the power and discretion to grant mercy in a particular case, and probing avenues for the consideration of any and all relevant mitigating evidence that would justify a sentence less than death. Reasonable consistency, on the other hand, requires that the death penalty be inflicted evenhandedly, in accordance with reason and objective standards, rather than by whim, caprice, or prejudice. Finally, because human error is inevitable, and

because our criminal justice system is less than perfect, searching appellate review of death sentences and their underlying convictions is a prerequisite to a constitutional death penalty scheme.

On their face, these goals of individual fairness, reasonable consistency, and absence of error appear to be attainable. Courts are in the very business of erecting procedural devices from which fair, equitable, and reliable outcomes are presumed to flow. Yet, in the death penalty area, this Court, in my view, has engaged in a futile effort to balance these constitutional demands, and now is retreating not only from the *Furman* promise of consistency and rationality, but form the requirement of individualized sentencing as well. Having virtually conceded that both fairness and rationality cannot be achieved in the administration of the death penalty, see *McLeskey v. Kemp*, 481 U.S. 279, 313, n 37, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Court has chosen to deregulate the entire enterprise, replacing, it would seem, substantive constitutional requirements with mere aesthetics, and abdicating its statutorily and constitutionally imposed duty to provide meaningful judicial oversight to the administration of death by the States.

From this day forward, I no longer shall tinker with the machinery of death. For more than 20 years I have endeavored--indeed, I have struggled--along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. [Footnote omitted.] Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed. It is virtually self-evident to me now that no combination of procedural rules or substantive regulations ever can see the death penalty from its inherent constitutional deficiencies. The basic question--does the system accurately and consistently determine which defendants "deserve" to die?--cannot be answered in the affirmative. It is not simply that his Court has allowed vague aggravating circumstances to be employed, *see, e.g. Arave v. Creech*, 507

-102-

U.S. __, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993), and relevant mitigating evidence to be disregarded, see, *e.g. Johnson v. Texas*, 509 U.S. __, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The problem is that the inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution. [Footnote omitted].

*Callins v. Collins*, 510 U.S. at ____, 114 S.Ct. at 1129-30, 127 L.Ed. At 437-39. Justice

Blackmun then discussed the "narrowing' of death-eligible offenders according to objective,

fact-bound criteria; and the jury's subsequent discretion to consider relevant mitigating

evidence. *Id.* at ___, 114 S.Ct. at 1134, 127 L.Ed.2d at 444.  Over time, Justice Blackmun

came to conclude that this procedure simply reduces, rather than eliminates, the number of

people subject to arbitrary sentencing. *Id.* at ___ & n.4, 114 S.Ct. at 1134, 127 L.Ed.2d at

444 (citing Gillers, *Deciding Who Dies*, 129 U.Pa.L.Rev. 1, 27-28 (1980) (inherent

arbitrariness of death penalty only magnified by post-*Furman* statutes allowing juries to

choose among similarly situated defendants). He concludes the opinion with a lengthy

reference to the role that racism plays in a defendant's chance of being executed, and the

diminished protection now afforded by federal courts exercising habeas corpus jurisdiction.

*Callins v. Collins*, 510 U.S. at ___, 114 S.Ct. at 1135-38, 127 L.Ed.2d at 446-49.

The Texas capital sentencing scheme fails to adhere to principled guidelines in

weighing punishment evidence.  The focus upon aggravating circumstances, to the exclusion

of mitigating evidence, clearly violates the constitutional mandate of individualized

sentencing. *See Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d

256, 278-79 (1989). The federal and state constitutions prohibit the imposition of the death penalty until a scheme is employed which eliminates the sentencer's total discretion to inflict death while simultaneously permitting unrestricted consideration of mitigating evidence. Therefore, this Court should commute Appellant's death sentence to imprisonment for life.

## POINT OF ERROR NO. 19, RESTATED

**THE CUMULATIVE EFFECT OF THE ABOVE-ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE PROCESS OF LAW IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

## POINT OF ERROR NO. 20, RESTATED

**THE CUMULATIVE EFFECT OF THE ABOVE ENUMERATED CONSTITUTIONAL VIOLATIONS DENIED APPELLANT DUE COURSE OF LAW UNDER ARTICLE 1, SECTION 19, OF THE TEXAS CONSTITUTION.**

### *Arguments and Authorities*

Due process in both the federal and state constitutions requires that Appellant receive the fundamental fairness necessary to the due administration of justice. *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166, ___ (1941); *Reese v. State,* 877 S.W.2d 328, 333 (Tex. Crim. App. 1994). Appellant cites many constitutional and statutory violations in the points of error contained in Appellant's Brief. If this Court deems

that none of these reasons taken alone justify reversing the trial court's judgment, then Appellant prays the Court consider the cumulative effect of the errors in the trial court. Constitutional breaches so permeated the voir dire and trial of Appellant's case so as to deprive him of the "fundamental fairness" implicit in the Fifth and Fourteenth Amendments, as well as Article I, Section 19. Consequently, the trial court's judgment should be reversed, and the cause remanded for a new trial.

<div align="center">

### PRAYER

</div>

WHEREFORE, PREMISES CONSIDERED, there being reversible error appearing in the record of the trial of the case, Appellant prays this Honorable Court reverse the judgement of the trial court and remand the case for a new trial.

Respectfully Submitted,

Adam L. Seidel
Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Appellant's Brief was deposited postage prepaid in the United States Mail, first class, in an envelope  properly addressed to the Appellate Division, Dallas County District Attorney's Office, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB19, Dallas, Texas, on this the 24th day of June 2002.

_____
Adam L. Seidel

## CERTIFICATE OF APPELLATE COUNSEL

I hereby certify that the foregoing Appellant's Brief was deposited postage prepaid in the United States Mail, first class, in an envelope properly addressed to the Clerk, Texas Court of Criminal Appeals, P.O. Box 12308, Capital Station, Austin, Texas, 78711, on this the 24th day of June 2002.

_____
Adam L. Seidel

# APPENDICES

## **APPENDIX A**

**Charles McKinney** was the Assistant Chief Deputy in charge of inmate housing at the Dallas county jail. (R.XLIX,11-12). With regard to papers in the possession of an inmate, the Dallas County Sheriff's Department's policy allows for certain instances where those papers can be seized. The first would be under a court order issued by a judge. The second instance would be in the event the paperwork became so great in an amount that it became a safety or health hazard. Finally, in the event the cell became a crime scene, the documents could be confiscated as physical evidence. (R.XLIX,15-16). A crime scene could include an attempted suicide. (R.XLIX,15-16). Any documents which may be seized by the Sheriff's department would not normally be turned over to the district attorney's office unless by subpoena or court order. (R.XLIX,20-22).

**Ray LaPere** was a deputy sheriff for Dallas county and was the property and evidence officer. (R.LI,41-42). On May 22, 2001 LaPere received a call from the prosecutors asking if they could view Appellant's writings. LaPere then met Miller and Davis in the property room where he opened the envelope, pulled out Appellant's paperwork and allowed the prosecutors to view the contents. (R.LI,42). The prosecutors did not have a subpoena for the documents nor any court order. Copies were made of whichever documents the prosecutors desired. (R.LI,45).

**Mary Miller**, Assistant District Attorney for Dallas County, was co-counsel in the trial involving Appellant. In preparing for trial, she became aware that certain items had

been seized from Appellant's cell in the Dallas County jail after Appellant made an apparent suicide attempt. (R.L,2-4). She consulted with the lead prosecutor, Greg Davis, and then contacted an individual with the Sheriff's Department to determine the location of the property seized from Appellant's cell. (R.L,4). She and Greg Davis subsequently had a meeting with representatives of the Sheriff's Department and examined the paperwork taken from Appellant. While examining the documents, Miller requested that certain papers be photocopied by Sheriff's Department personnel. The copies were made at Miller's request and provided to Miller. (R.L,5). All of Appellant's writings were reviewed by either Miller or Davis prior to trial. (R.L,7).

**Greg Davis**, lead prosecutor in the trial, testified that he became aware from Ms. Miller that items belonging to Appellant had been seized from Appellant's cell in the jail. He viewed all of the written items seized by the Sheriff including handwritten notes by Appellant. (R.L,8-9). Among the documents reviewed by Greg Davis was a document entitled "Michael and Jane" referring to Appellant's trial counsel. (R.L,10). In another document he examined was titled "Questions for my lawyer," which contained paragraphs number 1-6, along with various other notes to his lawyers. (R.L,12). Davis testified that he did not use any information from Appellant's writing in preparing for trial. (R.L,13-14).

Page 2 of 2

## APPENDIX B

## SUMMARY OF THE EVIDENCE

**Evelyn Shelton** had two sisters - the Complainant, Bertie Lee Cunningham, and Louise Frances Conner. Bertie Cunningham was 80 years old at the time of the offense. She resided in Garland, Texas and lived alone. (R.XLVII,22-24). On October 4, 2000, Shelton was visiting with her sisters, Bertie and Frances. Bertie indicated she intended to go to Collin Creek Mall and pick up an order from J. C. Penney's, as well as a robe for her sister, Frances. (R.XLVII,25-26). Bertie owned a 1996 Honda Accord. Bertie intended to use Frances' credit card to purchase items for Frances. Bertie also had her own credit cards as well. (R.XLVII,28). Bertie left the house and expected to return at approximately 3:00 p.m., so Shelton stayed with Frances. Shelton became concerned when Bertie did not return by 4:00 p.m. (R.XLVII,30-31). Shelton called the Garland Police Department when she became concerned about her sister. Some time later, she called back and made an official report of a missing person. Shelton then called credit card companies and canceled all her sister's credit cards except for the MasterCard which Shelton was not aware of. When calling the credit card companies, Shelton discovered that an unauthorized charge had already been made on Bertie Cunningham's card at a bicycle shop. (R.XLVII,32-35). When Bertie left the house that day, she was wearing her watch and ear rings which she normally wore. After Bertie's body was later found, Shelton never recovered the watch or rings. (R.XLVII,37-38). Shelton reviewed a videotape from J. C. Penney's at Collin Creek Mall and identified her sister arriving at the store at approximately 2:10 p.m. (R.XLVII,38-39).

Page 1 of 41

**Matt Tollesbol** was the Senior Lost Prevention Manager for the J. C. Penney's store located at Collin Creek Mall. On October 4, 2000, the J. C. Penney's store at the mall had security cameras throughout the store which recorded both pictures and time. Garland police officers asked him to recover the security tapes from the day of the offense and, having retrieved those tapes, Tollesbol turned them over to the police. Tollesbol also recovered a receipt showing a purchase made at 2:55 p.m. with use of a credit card belonging to Frances Conner. (R.XLVII,43-47).

**Kenneth Clancey** was a bartender for a bar called Bleachers Sports Grill located in Garland. Clancey was working at the bar on October 4th. At approximately 1:00 p.m., Appellant came into the bar by himself. (R.XLVII,48-51). Clancey recognized Appellant because Appellant had been in before. Appellant sat at the bar and ordered drinks. (R.XLVII,51-52). Appellant did not appear to be intoxicated when he arrived at the bar. Clancey recalled speaking with Appellant who told Clancey that he had left his wallet in a cab earlier in the day. Clancey called the cab company on Appellant's behalf in an effort to recover the wallet. Appellant paid for his first drink with cash and then ordered a second drink. Before paying for the second drink, Appellant left and did not return. (R.XLVII,54-57). Clancey later spoke with officers from the Garland Police Department after seeing Appellant's picture on the news. (RXLVII,59).

**Monty Dunn** was a security manager for Washington Mutual Bank. On October 4, 2000, Washington Mutual had a branch located at 1225 East Beltline Road in Richardson.

An ATM machine was available at that location.  The ATM machine required a personal identification number before dispensing cash.  (R.XLVII,63,65).  An unsuccessful attempt to withdraw cash from the machine would result in a report being forwarded to the credit card company used in the attempt.  (R.XLVII,67).

**Sandra Mamot** lived in Richardson at the time of the offense.  She was married and had two children, Zach (age 14) and Monica (age 11).  (R.XLVII,70).  On October 4, 2000 at approximately 5:30 p.m., Sandra was home with Zach when Appellant arrived.  Zach referred to Appellant as "Uncle Jim."  Appellant arrived in a car with his niece, Ashley. Appellant took Zach and Ashley and another person shopping.  (R.XLVII,71-74).  Appellant did not appear to be intoxicated or impaired in any way.  (R.XLVII,75).  Zach went with Appellant at approximately 5:30 p.m.  Sandra next saw Appellant and her son Zach at a nearby park riding "Go-Peds," which were motorized scooters.  Appellant apparently bought one for Zach. Sandra then met Zach back at home.  (R.XLVII,76-78).  Appellant was no longer with Zach.  The next day, officers with the Garland police department came over took possession of Zach's Go-Ped.  (R.XLVII,78).

**Zachery Mamot** was originally introduced to Appellant by Appellant's niece, Ashley Johnson. Over several months, Zach enjoyed playing basketball and other sports with Appellant.  On October 4, 2000 at approximately 5:00 p.m., Zach arrived home and shortly after that, Appellant arrived.  Appellant told Zach that Appellant had a new car and Appellant invited Zach to drive with him.  Appellant told Zach that he had obtained the car from Appellant's girlfriend.  Also with Appellant was his niece, Ashley Johnson.  The car

Page 3 of 41

that Appellant was driving was the type car owned by Bertie Cunningham. (R.XLVII,86-90). Appellant drove Zach and Ashley around, stopping first to buy beer and cigarettes. They then drove around looking for another friend, Ryan Hammonds, a friend of Zach's and Ashley's. They finally found Ryan who also got in the car and went riding with the group. While riding around, Appellant told the group again that he had obtained the car from his girlfriend and the Appellant also showed them two credit cards. (R.XLVII,90-93). The credit cards appeared to be similar to those belonging to Bertie Cunningham, although Zach never saw the name on the cards. (R.XLVII,93-94). Appellant said he had obtained the credit cards from his girlfriend who was allowing him to use them to purchase items. After dropping Ashley off at home, Appellant asked Zach and Ryan what they wanted to buy. Ryan suggested the Go-Peds and Appellant ultimately agreed. The group went to a Yamaha Shop on Central Expressway. (R.XLVII,94-95). Ryan and Zach each picked a Go-Ped as well as Appellant. Appellant used the credit cards to purchase the Go-Peds and when using the credit cards, Appellant informed the clerk that his last name was "Cunningham" and that the credit cards belonged to his mother. (R.XLVII,96-98). After purchasing the Go-Peds, the three test drove them on the side of the store before leaving. Upon leaving, Zach tried to open the trunk, but Appellant told him it was full. (R.XLVII,99-100). The group then dropped Ryan off at his house before returning to Zach's house. (R.XLVII,101). After that, Appellant and Zach rode their Go-Peds to Huffine's Park where they saw Zach's mom. After Zach and Appellant returned to Zach's house, Appellant showed Zach a gun that Appellant had in the middle compartment in the car. When showing the gun to Zach,

Page 4 of 41

Appellant stated "that's how wanted I am right now." (R.XLVII,102-104).  Appellant
claimed that "the mob" was after him because Appellant owed them money.
(R.XLVII,104).  After that, Appellant left Zach's house and Zach never saw him again.
(R.XLVII,105).  Before leaving, Appellant counseled Zach about making the right choices,
and informed Zach that Appellant had made many bad choices in his life and that Zach
should not do the same.  At that point, Appellant was crying and told Zach he would be
leaving for Florida and not returning.  (R.XLVII,105).

**Bobby Harp** worked at Richardson's Motor Sports and was the salesperson who sold
the Go-Peds to Appellant.  Appellant was the individual who used the credit cards to
purchase the Go-Peds. (R.XLVII,121-125).  Appellant used his real name when purchasing
the items and filling out the warranty papers.   (R.XLVII,126).  During the transaction,
Appellant did not appear to be intoxicated or under the influence of any drugs.
(R.XLVII,131).  After the purchase, the Go-Peds were loaded into the back seat of the car,
which was a four-door silver Honda.  The Honda appeared to be the same as the one owned
by Bertie Cunningham.  (R.XLVII,135-136).

**Cesar De La Torre** worked for Associates, assigned to monitoring and identifying
fraudulent accounts for the bank. The Associates was in the business of issuing credit cards
from the State of Delaware, usually MasterCard and Visas.  On October 11, 2000, De La
Torre was contacted by officers from the Garland Police Department and asked to do
research concerning a credit card issued to Bertie Cunningham.  Research was done on
Cunningham's Master Card issued on Washington Mutual Master Card account number

5544-2600-1025-5141. Research was done for activity involving the card on October 4 through 5, 2000. Research indicated that on October 4th, the card was used at a ATM machine at a Washington Mutual location at 1225 East Beltline Road in Richardson; however, use was unsuccessful since the PIN number was not known to the user. (R.XLVII,1148-150). Two attempts were made at that time. Another attempt to withdraw cash was made later in the day at a different ATM location on Harry Hines Blvd. in Dallas. The following day, October 5th, the card was again unsuccessfully used at a Bank One location on Harry Hines in Dallas. The card was next used at a merchant's called "Chacho's" located in Terrell, Texas at 6:35 and 6:43 p.m.

**Ozelle Wilcoxson** was a justice of the peace for Van Zandt county. On October 6, 2000, Judge Wilcoxson received a telephone call at approximately 3:00 a.m. from a deputy with the Van Zandt County Sheriff's Department. The judge was originally asked to conduct an inquest. The judge met a sheriff's deputy at the Dairy Queen in Edgewood and then was asked instead to arraign a suspect. The judge proceeded to the Van Zandt County Justice Center, then to the Edgewood Police Department. Appellant was arraigned by the judge on two charges, credit card abuse and murder. During each arraignment, Appellant was advised of his "Miranda Rights." Appellant did not appear to be intoxicated at the time. (R.XLVIII,21-32).

**Gary Rose** was the first law enforcement officer that had any contact with the Appellant at Ora Mae Milton's house on the morning the Appellant was arrested. When Rose walked into the room, Appellant was still asleep. Rose awakened Appellant and placed

Page 6 of 41

him in handcuffs. (RXLVIII,77-79). After a short conversation with Appellant, Rose proceeded outside to examine the complainant's silver Honda parked in front. Rose opened the trunk of the car after noticing blood on the rear bumper. Inside the trunk was a very strong odor consistent with blood. (R.XLVIII,81-83). After that, Rose had a conversation with police officer Jason Bonham, who told Rose that Bonham had spoken with Appellant at the scene and Appellant had stated the location of the complainant's body. Rose, Bonham, and Deputy Branch then drove to that location. (R.XLVIII,84-86). The three officers drove approximately two to three miles from Milton home to an area known as Livingston Creek. (R.XLVIII,87).     This is the location where the complainant's body was found. (R.XLVIII,90). Rose then notified officers with the Garland Police Department and met with Detective Matt Myers at the Dairy Queen in Edgewood. (R.XLVIII,92-94). Rose later went to the Edgewood Police Department where Appellant had been taken to appear before Judge Wilcoxson. (R.XLVIII,95). After the arraignment, Appellant was taken by Garland police officers to the Garland jail. The location where the complainant's body was recovered was in Van Zandt County and not in Dallas County. (R.XLVIII,123). Rose also asked Appellant where the complainant's body was located. Appellant lowered his head and said "it was an accident. I didn't mean to shoot her." (R.XLVIII,124-125). Rose then asked whether the complainant was dead and Appellant responded yes. Appellant then said he didn't know where the body was, that someone else had put her in the trunk of the car and dumped her in the Dallas area. (R.XLVIII,124-125).

Garland Police Detective **Matt Myers** was the lead detective in the case involving the complainant's death. The investigation began as a missing person investigation. Myers and Let. Thompson traveled to Colin Creek Mall because that was the last location where the complainant had been seen. They then traveled to Richardson Motor Sports because they had received information that one of the complainant's credit cards had used at that location. The investigators then checked various roads between the complainant's residence and Collin Creek Mall looking for evidence. They later traveled to the complainant's home and met with her sister, Evelyn Shelton. Later, Myers returned to Richardson Motor Sports where they received the receipts for the purchases made by Appellant. At that time, they developed Appellant's name as a possible suspect in the case. They determined that Appellant's last known address was 1718 Barclay in Richardson. Surveillance was then set-up at that location in an effort to search for the complainant's car and Appellant. After a short time, Myers then went to Apollo Junior High School and met with Ashley Johnson and Tonya Thorp. Myers then went home for the evening and at approximately 2:00 a.m., received a call and returned to the police department. Myers then went to Edgewood, Texas and met with various law enforcement officers at the Dairy Queen. The group then went to Ora Mae Milton's home where they observed the complainant's car parked in front. Myers proceeded into the residence where he came in contact with Appellant who was in a back bedroom. Myers had a conversation with Appellant who was handcuffed in the room. (R.XLVIII,130-147). Myers asked the Appellant where the complainant's credit cards were located and Appellant responded that they were located in the complainant's car outside.

Page 8 of 41

(R.XLVIII,151-152). The credit cards were in fact discovered inside the vehicle. Appellant was then taken to the Edgewood Police Department. Later, he was taken to a creek in the area. (R.XLVIII,153). The purpose of returning to the creek was to try to locate the murder weapon. (R.XLVIII,157). After leaving the creek, Appellant was driven 45 minutes to the Garland Police Department. He was later taken to an interview room where he received his Miranda warnings. (R.XLVIII,158-162). After the warnings, Appellant indicated he want to cooperate. After a short time, Appellant was taken from the Garland Police Department and driven around in an attempt to ascertain the location where the complainant was abducted. They drove by Bleacher's Bar which was located in Dallas County and drove around several other locations in Dallas County. However, Appellant was not able to identify the location where the abduction occurred. (R.XLVIII,170-173). Appellant was able to point out different areas he "recognized" but never identified any of the areas as the location of the abduction. All the areas were within the boundaries of Dallas County. (R.XLVIII,173-174). Upon returning to the Garland Police Department, Appellant gave a written voluntary statement. Appellant was left alone to hand write a statement for approximately 20 to 30 minutes. (R.XLVIII,174-182). In Appellant's written statement, he indicated that after leaving Bleacher's Bar, he was walking towards 635 in an effort to hitch-hike to Wills Point when he encountered the complainant and asked for a ride. The complainant agreed. After some distance, they pulled into a parking lot and Appellant told the complainant he was putting her in the trunk and that he would later call police and notify them. While placing her in the trunk, Appellant stated that he had a gun in his right hand and

that he switched hands because he has impaired use of his left hand and needed his right hand to close the trunk.  As he reached for the trunk lid, he grabbed the gun with his left hand too hard and the gun went off accidently shooting the complainant.  Appellant described how he ultimately placed the complainant "at the bottom of Livingston Hill." (R.XLVIII,183-184). The road leading from Bleacher's Bar to 635 is Arapaho and is located in Garland. The area from Bleacher's south to 635 was located within the boundaries of Dallas County, Texas.  (R.XLVIII,184-186). They were unable to establish any location in Dallas county where the Appellant abducted the complainant.  Additionally, they were unable to establish any location within Dallas county  where the complainant was shot. (R.XLVIII,210-211).

   After Appellant gave his written statement, Det. Myers became aware that attorneys representing Appellant had arrived at the Garland Police Department.   Appellant was immediately returned to the book-in area.  The attorneys present were two of Appellant's trial attorneys, Michael Byck and Jane Little.  (R.XLVIII,193-194). When Det. Myers interviewed a second time, the detective was aware Appellant had met with his lawyers. As a result, Det. Myers had Appellant initial new Miranda warnings which included five additional questions written onto the Miranda warning sheet.  Those questions included, in general, whether Appellant had met with lawyers and he responded "yes" and whether the lawyers advised him not to talk to police officers, and Appellant responded "no."  Finally, Myers had Appellant initial, indicating that the lawyers advised Appellant to cooperate with police officers. (R.XLVIII,257-258).

**Charles McKinney** was the Assistant Chief Deputy in charge of inmate housing at the Dallas county jail.  (R.XLIX,11-12).  With regard to papers in the possession of an inmate, the Dallas County Sheriff's Department's policy allows for certain instances where those papers can be seized.  The first would be under a court order issued by a judge.  The second instance would be in the event the paperwork became so great in an amount that it became a safety or health hazard. Finally, in the event the cell became a crime scene, the documents could be confiscated as physical evidence.  (R.XLIX,15-16).  A crime scene could include an attempted suicide.  (R.XLIX,15-16).  Any documents which may be seized by the Sheriff's department would not normally be turned over to the district attorney's office unless by subpoena or court order.  (R.XLIX,20-22).

**Jennie Duval** was a medical examiner for Dallas County. (RXLIX,32).   She performed an autopsy on the complainant on October 6,2000.  (R.XLIX,35).  Among the injuries noted by the doctor was a single gun shot wound to right portion of the forehead. (R.XLIX,42). Gunshot residue present at the wound location indicated that the barrel of the gun was against the skin when the gun was fired.  (R.XLIX,44).  A single .22 caliber bullet was recovered during the autopsy. (R.XLIX,53-54).  The single gunshot wound caused the death of the complainant.  (R.XLIX,54).

**Lannie Emanuel** was a firearm and toolmark examiner with the Southwestern Institute of Forensic Sciences.  (R.XLIX,64).   He examined the bullet recovered from the

complainant's body at autopsy and determined it to be consistent with a .22 caliber. (R.XLIX,65-66).

**James Rogers** was a forensic investigator with the Garland Police Department. On October 5, 2002, he went to 1718 Barclay in Richardson to collect evidence in the bathroom area of the home. He applied Luminal to the bathtub and shower wall for purposes of detecting the presence of blood. (R.XLIX,75-78). He noted a "very limited reaction" on the outside edge of the bathtub consistent with the presence of either blood or bleach. (R.XLIX,79). He next went to the home located at 2023 Portsmouth in Richardson to collect clothes and "Go-Peds." (R.XLIX,81). The following day he was dispatched to Edgewood, Texas at approximately 3:45 a.m. and ultimately went to the creek bed where the complainant's body was discovered. (R.XLIX,82-83). The complainant's body was located partially in the water in the creek. (R.XLIX,87). He then processed the complainant's car for evidence. (R.XLIX,88). Blood was detected inside the trunk area of the car as well as on the trunk lid. (R.XLIX,89-90). A bottle of Hennessy whiskey was recovered from inside the vehicle. Various items were recovered from inside the vehicle including beer and whiskey bottles and cigarettes packages. (R.XLIX,91-92). The complainant's purse was recovered from the trunk area. Also found in the complainant's purse were receipts from J.C. Penney's and Dillards both dated October 4, 2000, which included the purchase of a robe with a Discover card. (R.XLIX,97-98). Latent fingerprints were recovered from inside and outside the Honda Accord, as well as from cigarettes packages inside the vehicle. Latent prints were also recovered from various pieces of paper found inside the Honda. The

prints were then compared with the book-in fingerprints from Appellant. (R.XLIX,117-123). All of the recovered latent fingerprints matched those belonging to Appellant. (R.XLIX,127,129).

**David Davenport** was a criminalist with the Department of Public Safety Crime Lab in Garland, Texas. (R.XLIX,154). In November of 2000, he received several items from the Dallas County Medical Examiner's office related to the case, specifically, a blood sample belonging to the complainant as well as a known head hair sample also belonging to the complainant. He also received a sexual assault kit collected during the autopsy of the complainant. Examination of the sexual assault kit did not reflect any findings of sexual assault.(R.XLIX,155-156). Tests indicated that blood recovered from the trunk area of the complainant's car was human blood. Additionally, hair recovered from a rock near the complainant's body in the creek was consistent with the known hair samples from the victim. (R.XLIX,159-160).

**John Donahue** was a DNA analyst for the same crime lab. (R.XLIX,162). He received a DNA profile for the complainant and compared her DNA to blood samples from the trunk of her car, a J.C. Penney's bag recovered from the trunk and a white T-shirt also recovered from the trunk. The complainant's DNA matched blood samples from the trunk, the shopping bag and the T-shirt. (R.XLIX,165-170). Additionally, a blood stain recovered from 2025 Portsmouth was also consistent with that of the complainant. (R.XLIX,171). Also, DNA testing of hair recovered from the rock in the creek area also matched that of the complainant. (R.XLIX,172-173).

Page 13 of 41

**Shirley Bard** was employed as a welder at R&R Designs in Terrell, Texas through January of 2001. Appellant, who Bard knew as "Jim Hines," was also a welder at R&R in early 2000. In order to do the type of welding that both she and the Appellant did, both hands were required.  (R.XLIX,179-182).  Bard supervised Appellant at work after training him. She never detected that Appellant had any problem using his left hand at work. (R.XLIX,183-185).

**Harlan Bailey** was also a welder and was employed at Griffin Products in June of 2000 when Appellant began working there. Appellant was hired as a welder and in the course of his work, was required to use his left hand.  Bailey did not recall Appellant ever discussing an injury or problems with his left hand.  (R.XLIX,186-189).  While employed at Griffin, Appellant did injure his left thumb resulting in his leaving employment. (R.XLIX,189).  Appellant later had surgery on his left thumb.  (R.XLIX,190).  After the surgery, Bailey spoke with Appellant regarding the surgery.  Appellant indicated that he had no feeling in his left thumb and in fact hit it on a table indicating no feeling.  (R.XLIX,190).

**Dr. William Vandiver** was an orthopedic surgeon in Kaufman, Texas. (R.XLIX,192-193).  In June of 2000, Appellant saw the doctor as a patient after an accident at work involving his left thumb.  Examination of Appellant's left thumb indicated that surgery was required and the doctor later performed that surgery.  (R.XLIX,195).  The doctor's opinion was that the surgery was successful after he repaired the torn ligament in the thumb. (R.XLIX,196-197).  After the surgery, Appellant returned for an examination in July

complaining that his thumb was sore and that he had no sensation on the side of the thumb. (R.XLIX,197). Appellant returned again in August still complaining of numbness in his thumb. The doctor ordered that nerve conduction tests be performed on the left thumb in an effort to determine why Appellant had lost feeling in his thumb. Appellant told Dr. Vandiver that he had suffered a gun shot wound to his left hand in the palm area and that he had subsequently had several surgeries to that area involving the nerves. (R.XLIX,207-208). Records from 1996 indicated Appellant had suffered a puncture wound to the palm of his left hand as a result of being shot in the hand with a pellet gun. (R.XLIX,211).

**Kirsten Adams** was a worker's compensation adjustor for Trinity Insurance in Dallas. (R.XLIX,221). She adjusted the claim filed by Appellant related to his on-the-job thumb injury. As a result of the injury, Appellant did receive worker's compensation, but was subsequently released to return to light duty work after a period of time. Appellant's benefits ended shortly before the offense date. (R.XLIX,222-240).

### Hearing outside the presence of the jury

**Mary Miller**, Assistant District Attorney for Dallas County, was the chief prosecutor assigned to the trial court and was co-counsel in the trial involving Appellant. In preparing for trial, she became aware that certain items had been seized from Appellant's cell in the Dallas County jail after Appellant made an apparent suicide attempt. (R.L,2-4). She was aware that certain papers were seized along with a razor blade used in the apparent attempt. She consulted with the lead prosecutor, Greg Davis, and then contacted an individual with

the Sheriff's Department to determine the location of the property seized from Appellant's cell. (R.L,4). She subsequently had a meeting with representatives of the Sheriff's Department to examine the paperwork recovered from Appellant. Certain papers were copied by Sheriff's Department personnel at Miller's request and the copies were provided to Miller. (R.L,5). Between she and her lead counsel, Greg Davis, all of defendant's papers were reviewed prior to trial. (R.L,7).

**Greg Davis**, lead prosecutor in the trial, testified that he became aware from Ms. Miller that items belonging to Appellant had been seized from Appellant's cell in the jail. He viewed all of the written items seized by the Sheriff including handwritten notes by Appellant. (R.L,8-9). Among the documents reviewed by Greg Davis was a document entitled "Michael and Jane" referring to Appellant's trial counsel. (R.L,10). In another exhibit titled "Questions for my lawyer," there were paragraphs number 1-6, along with various other notes to his lawyers. (R.L,12). Davis testified that he did not use any information from Appellant's writing in preparing for trial in any manner. (L,13-14).

**Treshod Tarrant** first saw Appellant at his grandmother's house shortly before Tarrant's parole meeting. Appellant initially appeared normal, however, some time later, he appeared somewhat "glassy eyed." (R.L,25-26). Tarrant believed Appellant had been drinking for some time and Tarrant saw five beers left out of an eighteen-pack of Bud Light beer. (R.L,26-27). After Tarrant reported to his parole officer, he returned to his grandmother's house and again saw Appellant. After that, the two headed to Terrell. (R.L,28). At one point, Tarrant saw that Appellant had a credit card with the name "Bertie"

on it, but he did not question Appellant regarding the card. (R.L,29). When the two went for dinner and drinks, Appellant did not eat his meal or drink his beer. (R.L,31-32).

**Jason Bonham** was a police officer who worked for the Wills Point Police Department. (R.L,62). He had been classmates with Appellant. On the evening that Appellant was arrested, Bonham was working as an off duty security guard when he became aware that the arrest team was gathering at the Dairy Queen to discuss the arrest of the Appellant. Bonham stopped by and indicated he knew Appellant and would help participate in the arrest since he had known the Appellant in school. (R.L,62-64). After Appellant was handcuffed, Bonham went and spoke with him in the bedroom in an attempt to determine the location of the complainant's body. Bonham reminded Appellant of a mutual friend who had committed suicide and whose body had been destroyed by animals prior to being discovered. Bonham indicated that if it was Appellant's mother or Bonham's mother, people would want to know where the body was before that could happen. Appellant began crying and after that, told Bonham where the complainant was located. (R.L,69-71). Later, Appellant told Bonham that the shooting was an accident, stating that the gun "just went off." (R.L,74). Bonham wondered how Appellant could have handled complainant's body by himself based upon the weight and size of the complainant. When Bonham asked Appellant if anyone had helped him place the body in the creek, Appellant indicated he had help, but would not state from who. Bonham asked whether Tarrant had helped Appellant, but Appellant would not answer. (R.L,78).

**Edward Hueske** was forensic scientist on the faculty of the University of North Texas in Denton in the Department of Criminal Justice. He was also a training coordinator for the University of North Texas Policy Academy in Denton, the regional police training facility for police recruits. (R.L,90). He was a private forensic consultant for approximately five years prior to trial. In the course of actually training officers, he was aware of the danger of unintentional discharges of fire arms. (R.L,91-92). He was specifically involved in training police recruits on how to avoid the unintentional discharge of their firearm in the course of their duties. There are primarily three ways in which an individual holding a firearm with their finger on the trigger can unintentionally discharge the weapon. The first is if they are startled, they can accidentally fire the weapon. The second is when the individual holding a gun with their finger on the trigger loses their balance and in an attempt to regain their balance unintentionally squeezes the trigger causing the weapon to fire. The third way is what is called "sympathetic firing" where a person holding the weapon carries out some manipulation with the other hand such as grabbing or squeezing, shoving or pushing that causes the hand holding the gun to squeeze the trigger simultaneously, causing an unintentional discharge. (R.L,91-94). As a result of sympathetic discharge, police officers are specifically taught not to carry out manipulation with one hand while holding their weapon with their finger on the trigger in the other. (R.L,94-95).

**Dr. Nizam Peerwani** was employed as a medical examiner for Tarrant, Parker and Denton counties. (R.L,104-105). He was also the chief medical examiner for Tarrant county. He examined autopsy photographs and reports conducted on the complainant in this

Page 18 of 41

case. Having examined the evidence, Dr. Peerwani believed there was no evidence that the complainant died by drowning in water. (R.L,109). Having examined the gunshot wound that complainant suffered, the doctor believed that the complainant very quickly lost conscious after suffering the wound. (R.L,112). It could not be determined how long a person could have survived such an injury. (R.L,112-113). In fact, it would have been purely speculation to give an opinion on how long the complainant could have survived such an injury. (R.L,113).

**Dr. William Vanvider** examined medical records of Appellant and determined that one set of records conducted by Dr. Garrison indicated that Appellant's motor or nerve ability to move muscles in his hand were normal. Meanwhile, Dr. Krusz believed he saw abnormality in the nerves although slight. (R.L,127-128).

**Dr. John Krusz** was a board certified neurologist in private practice and an attending doctor at Presbyterian Hospital in Dallas. (R.LI,7-8). On June 1, 2001, he conducted a neurological evaluation of Appellant limited to his left upper extremity, specifically his left hand. Examination of Appellant indicated a significant decline in the ability to perceive light touch, temperature, pin-prick in all four digits on the left side of the left hand compared to his right hand. (R.LI,13). Nerve conduction studies performed on Appellant which comprised sending electrical impulses through the nerves of his hand indicated a "middle motor neuropathy." (R.LI,20). In fact, nerve conduction studies indicated a severe neuropathy below the wrist consistent with Appellant's history of injuries to his hand. (R.LI,22). Overall findings indicated finger strength to be weaker in the left hand. The

examination indicated the Appellant would loose some sensation or have some numbness in the fingers and thumb of his left hand. (R.LI,22-23). One affect could be that with eyes closed, the brain does not know where the tips of the fingers or where the side of the thumb is because the brain is depending on visual information where there's loss of feeling in the fingers and hand. (R.LI,23).

**Ray LaPere** was a deputy sheriff for Dallas county and was the property and evidence officer. (R.LI,41-42). There was an occasion in which the prosecutors assigned to the case came and looked at property seized from Appellant's cell. Specifically, on May 22, 2001 LaPere received a call from the prosecutors asking if they could view the evidence. He then met them in the property room where he opened the envelope, pulled out Appellant's paperwork and allowed the prosecutors to view the contents. (R.LI,42). They did not have a subpoena for the documents nor any court order. Additionally, copies were made of certain documents that the prosecutors desired. (R.LI,45).

**Punishment Evidence**

**Elisabeth Erwin** knew Appellant's parents before they adopted Appellant. (R.LIII,8-9). Appellant was approximately nine to eleven years old at the time he was adopted. He used to play and became friends with Erwin's son in Edgewood, Texas. On April 5, 1994, Erwin was living in Edgewood and t the time, the family had a safe they kept in the master bedroom. (R.LIII,10-11). Inside the safe was some cash, jewelry and significant documents. Erwin discovered that two payroll checks and some money, approximately $1,000 to $1,500

car.  (R.LIII,37).   She believed Tarrant had actually spent time in jail for the theft. (R.LIII,37).  Appellant was placed on probation as a result of the theft offense  and Erwin was to receive $900 of restitution as a result of the burglary of a motor vehicle charge. (R.LIII,38).    To-date, Erwin had received $215 of the $900 ordered as restitution. (R.LIII,40-41).

**Glenn Thompson** was a senior print technician for the Dallas County Sheriff's Department.  He obtained a set of fingerprints from Appellant during trial for purposes of comparison.  (R.LIII,47-49).  Appellant's fingerprints matched those contained in three different exhibits.  The exhibits were State's exhibits 128, 129, and 130. State's exhibit 128 was a "pen packet." (R.LIII,51-520).  Records indicated Appellant had a charge of burglary of a motor vehicle occurring on May 26, 1994, for which he received a sentence of boot camp. (R.LIII,52).  Paperwork indicated that after boot camp, Appellant was then placed on probation.  (R.LIII,53).  State's exhibit 129 was paperwork related to the State's jail felony offense of theft occurring on February 26, 1996 and a motion to revoke probation filed on October 6, 2000.  (R.LIII,53).  State's exhibit 130 appeared to be paperwork for a class B misdemeanor charge of driving without a license, to which Appellant entered a plea of no contest. (R.LIII,53-54).

**Mike Sullivan** was a sergeant with the DeSoto Police Department. On August 18, 1995, he was assigned to the auto theft task force as a detective for the Dallas County Commercial Auto Task Force.  (R.LIII,57-58).  On that date, he went to a Comfort Inn in Dallas searching for stolen cars and discovered a stolen car in the parking lot.  (R.LIII,58-

Page 22 of  41

59). The officer found a stolen Chevrolet pickup truck in the parking lot of the hotel. Later, two individuals got in the truck and left and were followed by police. However, the truck began to drive faster in an attempt to allude police. After three or four miles, the driver pulled onto the side of the road. The two individuals inside jumped out and began running. The truck continued to roll down the road in traffic. (R.LIII,59-62). Appellant was the passenger. (R.LIII,65).

**Donald Alberty** was a police officer for the City of Terrell. On March 14, 1996, he was on duty at approximately 10:15 p.m. when he saw a vehicle traveling with a headlight out. He followed the vehicle a short distance before coming in contact with Appellant who was the driver. (R.LIII,67-68). Appellant did not have proof of insurance nor did he have a driver's license. Additionally, the registration on the vehicle was expired. The steering column of the vehicle appeared to have been tampered with. Appellant allowed the officer to search the vehicle. Marijuana was discovered in a plastic bag on the back seat. There was a passenger seated in the front seat next to Appellant. (R.LIII,70-75). Appellant was charged with possession of marijuana and he subsequently pled guilty. (R.LIII,75-76).

**James Lee** was a police officer with the Wills Point Police Department. On August 17, 1997, he answered a call at 334 E. North Commerce in Wills Point, where he came in contact with Jean Evans and another woman who stated "he has a knife." The officer drew his weapon and entered the trailer. He went into a back bedroom and saw an individual standing with a knife in his hand. The officer was unable to identify Appellant in the courtroom. However, records indicated that the individual was named Jedidiah Isaac

Murphy. The officer ordered the individual to drop the knife. However the individual did not initially comply. The officer then sprayed the person with pepper spray, after which the individual fell to the floor and dropped the knife. Also present in the trailer was a female whose nose was bleeding, who stated that Appellant hit her. (R.LIII,77-86). The complainant, Chelsea Wills, later dropped charges. (R.LIII,88).

**Sherryl Wilheim** was employed at Arlington Memorial Hospital in 1997. On August 26, 1997, she was on her lunch break and walked to the parking lot to have lunch in her car. As she opened her car door, she was pushed from behind and penned to the driver's side of the car. A man followed her into the car telling her he was not going to harm her, that he just needed a ride. The man pushed her into the passenger side seat. After she attempted to get out of the car twice, the man then put his hands around her neck and started to choke her. He ordered her to the floorboard, then ordered her to place her head on the seat. The man then drove the two out of the parking lot area, and after a short time, she decided to jump out of the car. She started to open the door, but the driver accelerated to a faster pace. She nevertheless jumped out of the car and hit the pavement. A motorist then stopped and helped her. Once at the hospital, she gave the police officer a description of the individual. No one was ever apprehended in connection with the case. However, in October of 2000, Wilheim was watching TV when she saw a news story about complainant Bertie Cunningham's disappearance. She then saw a composite drawing of the suspect and believed she recognized the individual from her own offense. She then contacted the police. (R.LIII,125-153). However, in the instant case, at a hearing outside the presence of the jury, Wilheim

Page 24 of 41

looked around the courtroom and had failed to identify Appellant as the individual. She later identified Appellant with the jury present.

**John Stanton** was police detective for the City of Arlington. He investigated the offence involving Wilheim and had her meet with Officer Ligon to create a composite sketch using a computer. (R.LIII,184-185). In October of 2000, Wilheim contacted Stanton again and stated she had seen a recent TV news story involving complainant Bertie Cunningham and after seeing a suspect image on TV believed she recognized that individual as the same person that kidnaped her. Stanton then obtained a photograph of Appellant from the Van Zandt County Sheriff's Department, placed it in a photographic lineup and showed it to Wilheim who picked Appellant's photograph. (R.LIII,197).

**Mandy Kirl** attended a graduation party in Edgewood, Texas in May of 1993. At the time, she was 19 years old. At the end of the party, she went with Appellant to collect fire wood. The two drove into a wooded area where Appellant produced a gun from underneath the seat and put it to her head, asking if she were afraid to die. Appellant pulled the gun away and placed it back under the car seat and the two returned to the party. Mandy never called the police. (R.LIV,2-13). In fact, she saw Appellant several more times at various parties and friends' houses.

**Defense punishment evidence.**

**Leon Peek** held a Bachelor of Science in psychology, a Master of Science in Clinical Psychology and a Ph.D. in psychology. He was also involved in research and review of

forensic psychology.  Part of his research and study involved human memory in relation to perception. He also studied police lineups beginning in the mid-1980s. (R.LIV,42-45).  He was present in court during the testimony of Sherryl Wilheim related to her kidnaping.  He also reviewed many of the exhibits that had been admitted into evidence including the composite drawing prepared by the Arlington Police with Wilheim's assistance. He also reviewed Appellant's photograph which appeared in the photographic lineup viewed by Wilheim years later. (R.LIV,45-46). He noted distinct differences between Appellant's photograph and the composite drawing prepared by police, and believed that Wilheim's memory of the events that occurred in August, 1997 was substantially affected by the newspaper photographs that she viewed along with the television photographs. (R.LIV,47-48). Additionally, the photographic lineup which was shown to Wilheim was flawed because at least of two the individuals appeared to be Hispanic, while a third individual has "rosy" cheeks, all of which blatantly conflict with the description given by Wilheim to police. (R.LIV,53-54).   Additionally, one of the individuals in the photo spread appears be considerably older than the age range given by Wilheim to police.  (R.LIV,54).   Peek believed that Wilheim 's identification of Appellant in court, after having failed to identify him in an initial hearing, was consistent with her memory being affected by television, news and other sources of information which affected her memory of the identification of her attacker.  (R.LIV,55-56).

**Murinene Olugbode** worked as a jailer for the Dallas County Sheriff's Department. On May 6, 2001, at approximately 10:50 p.m. she was picking up inmate mail and request

forms when she walked into the middle of one of the "tanks" and noticed a pool of blood all over the floor and wall. She observed Appellant who was covered with a blood soaked blanket. She then called for her supervisor and others who responded to the location. (R.LIV,74-81). Appellant had suffered a cut on the neck and additionally had a cut on one of his wrist. (R.LIV,82). Appellant was later taken to Parkland Hospital for medical treatment. It was determined that Appellant inflicted the injuries upon himself with a razor blade. (R.LIV,84-85).

**Kristi Sheets** was a nurse assigned to the county jail. She responded to the call for a nurse when Appellant was discovered after his suicide attempt. When she arrived, Appellant was laying on his bunk covered with blood. Blood covered the floor. (R.LIV,93-94). She began to dress his injuries and an ambulance was called. Appellant returned from Parkland Hospital with stitches in his neck and wrist. (R.LIV,96-97).

**John Rainey** was also a deputy sheriff for Dallas county who worked in the jail. He was working in the jail control center when he heard repeated calls for a supervisor due to the incident involving Appellant. (R.LIV,98-100). He assisted Sergeant Gentry in dragging Appellant while on top of his mattress, out of the cell into an open area. He noticed a two inch laceration to the left side of Appellant's neck and another one inch cut on Appellant's left wrist. (R.LIV,102-103). The cut on the wrist was vertical, along the vein, consistent with a genuine attempt to kill himself. (R.LIV,104-105).

**Jason Bonham,** an officer with the Wills Point Police Department, arrived at the Dairy Queen as the arrest team was assembling to arrest Appellant. When he first heard that Appellant was the suspect in a capital murder, he believed the officers must have been "misinformed" because he had known Appellant ever since seventh grade and did not believe Appellant to be that type of person. (R.LIV,125). Bonham also believed that Appellant had help placing Bertie Cunningham's body in the creek area. (R.LIV,129).

**Larry Reed** was the chief investigator for the Dallas County Public Defender's Office and had been an investigator with that office for 18 years. Prior to that, he was a Dallas police officer for 13 years. He investigated the offense in which Appellant allegedly kidnapped Wilheim from Arlington Memorial Hospital. In addition to photographing the parking lot, he drove the route that Wilheim described taking after leaving the hospital parking lot. The distance from the hospital to the location where Wilheim jumped out of the car was 4 miles and took Reed just 10 minutes to reach traveling the speed limit. (R.LVII,10-12).

**Kevin Folmar** was a police officer with the Wichita Falls Police Department. On August 26, 1997, he was dispatched to a Braum's restaurant where he interviewed an elderly woman who stated she had been robbed. He also spoke with a witness who observed the perpetrator running with the victim's purse. The victim was approximately 69 or 70 years old at the time. (R.LVII,13-18).

**Kyle Cook** was a detective with the Wichita Falls Police Department and investigated the robbery at the Braum's. The elderly victim described her attacker as a tall slender male with olive colored skin, possibly Hispanic or Anglo. (R.LVII,21-22). Property stolen from the elderly individual was later found in complainant's Wilheim's vehicle which was taken from Wilheim in Arlington. (R.LVII,23-24). A potential suspect was identified as a John Warren, however, palm prints recovered from the vehicle did not match Warren and there was no other evidence linking him to the offense therefore no charges were filed against Warren. (R.LVII,28). A witness named Ozuna who witnessed the purse snatching incident described the perpetrator as a Hispanic male weighing a 170 pounds. (R.LVII,31).

**Roy Tolar** was Appellant's older brother. When he was approximately 7 years old, he and Appellant left their parent's home. He described his upbringing in the family home as "normal, " except for physical fights between their parents. (R.LVII,72-73). Divorce resulted in the family breaking apart. When the family split, he, Appellant and a sister went to live with their father's parents, Margaret Ed Kines. The children lived there for several years until the Kines became too old and ill. After that, Appellant, his brother, and their sister were all placed in an orphanage. At the time, Appellant was approximately 5 or 6 years old. After a period of time, they were later adopted by the Tolar family. After going to live with the Tolars, problems began. The Tolars were abusive to Appellant and his brother and treated them differently than their biological children. Roy recounted one incident in which he had to defend Appellant who was being attacked by two or three members of the Tolar family. Due to conflict between the Tolars, Appellant and Roy, the Tolars decided to remove

Page 29 of 41

Appellant and his brother from the home.  After leaving the Tolar home, Appellant and his brother went to Fruitvale, Texas to a children's shelter.  Sometime later, Appellant was adopted separately from his brother by Bob and Samantha Murphy of Edgewood, Texas. Roy went to live with a foster home who eventually raised him from that point forward. Neither he nor Appellant saw their mother again for many years, until Appellant was approximately 17 or 18 years old.  (R.LVII,36-49).

**Mat Murphy** was one of Appellant's adopted brothers in the Murphy home. Appellant came to live with his family in the fifth grade. When Appellant came to live in the Murphy home, things went very smoothly. Mat and Appellant had a genuinely good relationship as brothers. The two mowed lawns together and helped care for elderly woman who lived nearby. When he and Appellant were 17, the Murphys divorced. Mat went to live with the mother, Samantha Murphy, and Appellant went to live with the father. Appellant's decision to live with his father resulted in his adopted mother writing Appellant off. (R.LVII,88-102).

**Chelsea Willis** first met Appellant when she was 15 years old. They moved in together when she was approximately 19.  She became aware that Appellant had an alcohol addiction problem which led to confrontations between the two. Over the next several years, the two lived together off and on. Later, they had a child together named Alyssa, and Appellant was extremely involved in helping raise and support the child. She later had a second child with another man. As a result of Appellant's drinking, she and Appellant tried to admit Appellant to Terrell State Hospital but were refused admission. On two different

occasions, Chelsea had to have surgery and Appellant helped by either staying with her or babysitting the children.  Chelsea described Appellant as a gentle person expect when abusing alcohol, which Appellant was not able to control. On one occasion, Chelsea recalled Appellant attempting to kill himself, close to 1998 or 1999 by taking sleeping pills. (R.LVII,110-138).

**Pam Sherman** was Appellant's cousin was related to Appellant's father, Donny Kines, who she recalled as someone who had been "mean since he was a child." As a child, Kines tried to burn others with cigarettes, to kill pet cats, and even tried to drown Sherman in a small lake near their house. Kines and his wife "fought constantly" and drank heavily. She also recalled how Kines would beat the children including Appellant with a belt. When the family fell on hard times, Sherman helped find the Tolars to adopt Appellant and his brother. (R.XLVII,165-177).

**Randy Crow** knew Appellant for three to four years after meeting at "AA." Appellant approached him one evening looking for help and desiring a sponsor. Crow helped Appellant through a six-month period of sobriety before Appellant relapsed. (R.XLVII,180-190).

**Jerry Wood** was employed with the Kaufman County Sheriff's Department and arrested Appellant on May 13, 1999. He had been dispatched to the Faith Baptist Church regarding an attempted suicide. Appellant advised Wood that he had wanted to kill himself, and threatened that once he got out of jail he would kill himself at that time. (R.XLVII,197-200).

**Gary Kines** was also a cousin of Appellant's father. He learned about Appellant being charged in this offense when he was summoned as a potential juror for Appellant's capital murder trial. He previously had known Appellant's father and had known him to have a drinking problem. He had known Appellant's father to become intoxicated and get into fights. (R.XLVII,202-205).

**Tonya Thorp** was Appellant's sister. She recalled from early childhood that the family background was not good. She had a poor relationship with Appellant's father because of the way their father treated Appellant's mother. She recalled instances where Appellant's father badly beat their mother, including an incident in which he smashed her head against the wall. On another occasion, the father knocked their mother's teeth out. Ultimately, the abuse led to the family splitting apart. The children for awhile went to live with grandparents, but ultimately ended up at Buckner Orphanage. Their mother returned for some of the children, but left Appellant and his brother at the orphanage to be adopted by others. Years later, she renewed her relationship with Appellant. In fact, Appellant came to live with her for a short period when he was having problems with his wife, Chelsea. Appellant assisted his sister by watching her children when she worked late and preparing meals for the family. (R.XLVII,206-220). After Appellant was arrested in connection with this offense, she returned to her house and found a suicide note written by Appellant, which she turned over to Detective Matt Myers with the Garland Police Department. Additionally, in her garage she found hoses, such as her vacuum cleaner attachment hose and other hoses

which were unusual. She also noticed that the liquor in her house was missing. (R.XLVII,222-224).

**Hope Abbott** was Appellant's mother. Her husband was Donny Kines, and the two were married until Kines' death, although they separated two to three years before Kines' death. She recalled her marriage to Kines as "very brutal." In fact, at the time of trial, Hope had no teeth as a result of the abuse from her husband. He was physically abusive not only towards her but towards the children, including Appellant. After leaving the marriage, she took two jobs and would work from 6:30 in the morning until 11:15 at night. Ultimately, she suffered a stroke and was unable to care for her children any longer. Although she reclaimed some of her children later, she left Appellant and his brother behind for adoption. Appellant and his mother, Hope Abbott, ultimately were reunited when Appellant was approximately 18 years old. Appellant told his mother about serious problems he had as teenager, including problems with the law and a suicide attempt. After reuniting with his mother, he continued to have problems, including further suicide attempts and criminal issues. Abbott continued to suffer health problems which included congestive heart failure disease which was ongoing even to the time of trial. (R.XLVII,226-239). The Appellant was twenty-six years old at the time of trial. (R.XLVII,243).

**Mary Connell** was a Doctor of Psychology. She performed an evaluation on Appellant with regard to the mitigation special issue. She reviewed the offense, Appellant's background, his medical records and school records. Additionally, she met with Appellant on three occasions for purposes of interviewing and testing. Results indicated that Appellant

was truthful in answering the questions rather than exaggerating responses for purposes of manipulation. Testing revealed "very disturbed functioning" such that would normally result in a referral for psychiatric consultation and medication. (R.XLVIII,10-19). She also investigated Appellant's background, which included the abuse by his father against his mother, as well as the emotional abuse to Appellant. (R.XLVIII,20-21). She reviewed how when Appellant was five, his mother placed him along with his siblings at Buckner Children's Home where Appellant remained while Appellant's other siblings were later reclaimed by their mother. Appellant and his brother, Donny, were later adopted by the Tolar family, when Appellant was approximately eight years old. (R.XLVIII,23-26). Interviews of Mrs. Tolar indicated that the boys believed that they were placed with the Tolars because "their mama didn't love them, didn't want them." (R.XLVIII,28-29). All the information was that Appellant was an "extremely cooperative child." He was doing his best in the adoption situation and trying to adjust to the Tolar home. His brother Donny reported extreme physical abuse by Mr. Tolar directed at him and Appellant. In visiting with Celeste Tolar, she was able to obtain numerous photographs of Appellant as a child, most of which indicated that Appellant was not smiling, even around significant holidays, including his own birthday. Ultimately, the Tolars turned the children over to the Van Zandt County Children's Shelter when Appellant was 12 years old. (R.XLVIII,34). Later, Appellant was adopted by the Murphy family and was separated from his brother, Donny. Appellant reported that he was placed with the Murphys at age 12, and began drinking and using drugs at age 14. Ultimately, the Murphys divorced and Appellant blamed himself. Appellant lived with Mr.

Page 34 of 41

Murphy after the split causing his adopted mother to sever her relationship with Appellant. (R.XLVIII,36-37).

Connell interviewed Appellant's adopted brother, Matthew Murphy, who also reported that the parents engaged in physical fights in which Mr. Murphy would assault Mrs. Murphy. On one occasion, Matthew, in protecting his mother, struck his father in the face with his fist. Matthew reported that Appellant observed these instances of physical abuse between the Murphy parents. Appellant described to Dr. Connell his relationship with Chelsea, whom he met in grade school. He described their relationship as volatile and blamed himself and his alcohol abuse for the instances of confrontation between he and Chelsea. Chelsea reported that she herself participated, and in many instances, was the cause of some of the confrontation between she and Appellant. Chelsea also reported suicide attempts made by Appellant, although she did not characterize any of the attempts as "serious attempts." (R.XLVIII,45-47). Chelsea also reported that when Appellant was sober he took good care of their child and Appellant assisted her in caring for the child she had with another man. (R.LVIII,47-48). At approximately age nineteen, Appellant made a suicide attempt by taking approximately 40-to-60 pills which resulted in psychiatric treatment. Later, he was treated at Glen Oaks in Greenville twice for psychiatric disorders and was also treated at the Andrews Center in Canton, Texas, again for emotional difficulties. (R.LVIII,48-49). Appellant was also treated at Timberlawn Hospital for psychiatric disorders on two different occasions, and was prescribed several different psychotropic medications, mostly for depression and psychosis. Upon interviewing Appellant about the offense and reviewing the

police reports, Connell learned that Appellant had acknowledged killing the Complainant. His plan was to take his own life, and therefore he made no attempt to cover the use of the Complainant's credit cards, and signed his own name to the charges that he made. (R.LVIII,54).

**Jaye Crowder** was a psychiatrist on the faculty of Southwestern Medical School in Dallas. He examined Appellant on four different occasions and reviewed numerous records, investigative reports and medical records from Appellant spanning several years. He also interviewed several individuals associated with Appellant and the case. Dr. Crowder diagnosed Appellant with having major depression and dysthymic disorder, which means chronic depression spanning an extensive amount of time. Appellant also suffered from narcissistic and borderline personality disorder with some antisocial features. Crowder attributed depression to numerous factors, including a family history making Appellant genetically predisposed to suffering from depression. In addition, his early childhood experiences and loss of parental figures likely contributed to his later development of depression. Crowder attributed Appellant's general sense of worthlessness to having been abandoned and having been moved from one home to the next, never forming a lasting relationship with a father-figure, and not learning to trust. Medical records indicated suicide attempts by Appellant, and hallucinations in which he was seeing snakes attacking him. (R.LVIII,132-157).

**Gilda Kessner** was a clinical and forensic psychologist in private practice in Dallas. Based upon a risk assessment done of Appellant, she concluded that he posed a 23.8 to

29.1% probability of risk of serious violence over the course of a capital life term in prison. (R.LIX,4-11). Determination that Appellant's risk of 23.8 to 29.1 overall risk rate for lifetime was based upon the nature of his offense as well as his prior confinement in a TDC boot camp. (R.LVIII,49). The method applied was a scientific method much like the type of method used in assessing risk used by insurance companies. She examined studies of inmates confined in penal institutions for extended periods of time, including the "Furman" study, which examined 47 death-row inmates whose sentences had been changed to life sentences. Studies of those long-term death-row inmates indicated that only a small number of those individuals had any serious rule violations, and 75% of them did not have any serious rule violations over a ten- to eleven-year period of time after their sentence was commuted. (R.LVIII,19-24). Another study from Indiana looked at capital offenders with commuted sentences since 1972, which constituted 39 inmates. Seventy-four percent had no violent violations, and 62% were never put in any type of administrated segregation due to conduct. (R.LVIII,25). Another study looked at 90 Texas inmates on death-row whose sentences had been commuted, in comparison to rule violations across several high-security facility units in Texas. Comparison of offenders serving life sentences as opposed to those who had a death sentence commuted to life indicated that commuted death-row offenders had the lowest rate of rules violations. (R.LVIII,25-27). Other studies indicated that severity of the offense was not a good predictor in determining conduct in prison, nor is prior criminal history an accurate predictor of misconduct within prison systems. (R.LVIII,35-36). The essential conclusion was that commuted capital offenders had a very low rate of serious violent

infractions. The seriousness of the offense for which they are confined did not predict prison violence, and Texas prisoners in general have a low-rate of serious violence towards inmates and staff. In fact, rates of inmate and staff homicides in prison are significantly lower than the general population outside prison. Almost half of the long-term inmates in Texas were murderers. However, disciplinary rates were lower for long-term inmates than short-term inmates regardless of age at admission into the prison system. Additionally, as inmates aged, rule violations significantly dropped. So, the vast majority of violent offenders placed in long-term prison settings do not constitute a future danger within the prison system. (R.LVIII,43-44).

**Detective Matt Meyers** interviewed Appellant in the Garland jail and on at least two occasions, Appellant began crying during the interviews. Meyers believed that Appellant was remorseful. (R.XLVIII,103-104). Additionally, Appellant quickly admitted his responsibility for the disappearance and death of the Complainant. (R.XLVIII,104-105). Meyers also related how police officers composed a fictitious letter from family of the Complainant, signed by a person who purported to be the Complainant's sister. In the letter, the "family" asked that Appellant relate information to them in order to ease their mind and help them have closure with regard to the death of their family member. Meyers admitted that the letter was completely fictitious and used to trick Appellant into responding to specific questions about the offense. (R.XLVIII,107-110). Appellant voluntarily waived his rights and answered the questions in the "family" letter.

**Tracy Erwin** was one of Appellant's adopted sisters and resided with the Murphy family. She first came to know Appellant when he was 12 years old. (R.XLVIII,134-135). She confirmed that Appellant's adopted father, Bob Murphy, was abusive towards the mother. The father was also physically aggressive with the children and was generally "hard on them." (R.XLVIII,135-136). She believed that Appellant and his brother each went to live with one of the respective parents upon divorce out of an effort by the father to insure that no child support would be ordered. (R.XLVIII,135-137).

**Tim Erwin** was married to Tracy and came to know Appellant many years ago. In fact, he coached Appellant in Little League sports, and had been with him on camping and fishing trips. Erwin employed Appellant in his lawn care business. Appellant was approximately 11 or 12 years old when Erwin first came to know him, and he knew him to be "generally a good kid." (R.XLVIII,139-140).

**State's rebuttal**

In 1983, **Terry Tolar** and his wife adopted Appellant and his brother. He believed that Appellant adjusted well to the home and that he treated Appellant and his brother like his own children. However, Appellant's brother, Donny, had significant behavioral problems consistent with his diagnosis of attention deficit disorder. (R.XLVIII,146-156). Eventually, the boys were placed in the county children's shelter because of the disruptive nature of Donny's activities. Appellant elected to go with his brother rather than stay in the Tolar home. Tolar admitted that there were occasions when Appellant was "disciplined physically

more than he should have been" while in the Tolar home. (R.XLVIII,158-160). However, Tolar denied any physical abuse towards Appellant. (R.XLVIII,160-162).

**Nancy Sanders** was a nurse employed in the Dallas County Jail. On the morning of April 6, 2001, she saw Appellant in the infirmary in the jail. Appellant was complaining that he had not been able to urinate for several days, and that he had been previously treated at Parkland Hospital for his condition. The nurse checked Appellant's records and confirmed that he had not been treated at Parkland as he claimed, but had tried to seek treatment there in the past. Later the same day, she received information that Appellant had sought help, claiming he was ill and requesting an ambulance. When assistance arrived, Appellant was asked to step out of the cell area. Appellant began cursing. After his vital signs were checked, it appeared he was normal. (R.LIX,176-178). When Appellant was told he could not go to Parkland Hospital but would instead be returned to the jail, he became upset and combative with the officers. He kicked one individual and the officers had to wrestle him to the floor. (R.LIX,178-179).

**Sheryl Bard** knew Appellant from the welding business when Appellant was employed as a welder in the early 2000. On one occasion, she had a problem Appellant who had taken her"pallet, used for placing tools. When asked about taking her pallet, Appellant became confrontational with her and admitted taking her pallet. Later, while leaving her employment, Bard pulled out in her car in front of Appellant. The following day, Appellant threatened her with physical harm if she ever cut him off in traffic again. (R.LIX,189-194). When she reported the confrontation to her boss, Appellant later threatened that if she ever

Page 40 of 41

created more problems for him, he would kill her.  (R.LIX,195-196).   Appellant again

threatened her when he was fired from his job. (R.LIX,198).

**Defense Rebuttal Evidence**

    **Gilda Kessner** testified further that she examined records from Van Zandt county jail

which indicated that Appellant in fact had a urinary problem as early as 1995.

Page 1

1                  REPORTER'S RECORD

2               VOLUME 1 of 1 VOLUMES     

3          TRIAL COURT CAUSE NO. F00-02424-NM

4   THE STATE OF TEXAS         :        IN THE DISTRICT COURT

5   VS.                        :        DALLAS COUNTY, TEXAS

6   JEDIDIAH ISAAC MURPHY      :        194TH JUDICIAL DISTRICT

7               *********************

8     SUPPLEMENTAL RECORD REQUESTED BY APPELLANT ATTORNEY

9               *********************        FILED IN
                                          COURT OF CRIMINAL APPEALS
10  A P P E A R A N C E S:

11  HONORABLE BILL HILL, Criminal District Attorney    JUN 2 4 2002
            Crowley Criminal Courts Building
12          Dallas, Dallas County, Texas   75207   Troy C. Bennett, Jr., Clerk
            Phone:   214-653-3600
13  BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
            MS. MARY MILLER, A.D.A., SBOT # 21453200
14               FOR THE STATE OF TEXAS;

15  MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
    MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16  MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
    Dallas County Public Defender's Office
17          Phone:   214-653-9400
                 FOR THE DEFENDANT.

18

19               ********

20          On the 5th day of June, 2001, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable F. Harold Entz, Jr.,

23  Judge presiding, held in Dallas, Dallas County, Texas:

24          Proceedings reported by machine shorthand, computer

25  assisted transcription.

ORIGINAL

1

2

3

4

5

6

7

8

9

10                    COURT'S RECORD

11               JUROR QUESTIONNAIRE

12          Venireperson -  Alena Treat

13                  (Copy Attached)

14

15

16

17

18

19

20

21

22

23

24

25

# JUROR QUESTIONNAIRE

Juror No. 1167

*You have taken an oath to truthfully answer the following questions. Please answer each and every question as completely and accurately as you can. The information you give in this questionnaire will be kept confidential. After a jury has been selected, all copies of this questionnaire will be returned to the Court, and kept in confidence, under seal, not accessible to the public or the media.*

Name: __Treat__ __Alena__ __Rae__ _____
           Last            First            Middle        Maiden (If Applicable)

Sex: __F__                          Birthdate: __02__   __05__   __1953__
Age: __48__                                    Month        Day        Year
Race: __W__
                                        Birthplace: __Ft. Lewis (Tacoma Rural)__ __WA__
                                                        City/Town                State

Driver's License No. __17180285__
Social Security No. __431-__-4193__
Home Address: __9144   Rock Canyon Dr., Duncanville   75137__
                    Number  Street            City/Town            Zip

Home Number __(972) 572-5040__   Work Number __(972) 749-2614__

The individual in this case is accused of capital murder. If, and only if, the State proves its case beyond a reasonable doubt as to the defendant, the jury will decide punishment. There is no way of knowing whether the jury will even find the defendant guilty, but the law requires that you answer certain questions regarding your thoughts and feelings on the death penalty.

## DEATH PENALTY

Are you in favor of the death penalty? ☒ Yes ☐ No

Please explain your answer __Only in favor of the person committing__
__murder is a danger to society (will probably kill again),__
__+ he/she did not have kind of mitigating circumstance__
__that would indicate that there may have been a justifiable reason to__

Which of the following statements best represents your feelings about the death penalty: (Circle) __commit the crime__

1.   I believe that the death penalty should be imposed in all capital murder cases.
(2.)  I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case.
3.   Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.
4.   I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict which assessed the death penalty.
5.   I could never, under any circumstances, return a verdict which assessed the death penalty.

1

What is the best argument in favor of the death penalty? _likely to do it again - is incorrigible_

What is the best argument in opposition of the death penalty? _It is apparent that the person does not have a propensity to do this again or can be rehabilitated_

## LIFE CONFINEMENT IN PRISON

Which of the following statements best represents your feelings about life confinement in prison: (Circle )

1. I believe that life confinement in prison is never appropriate in any capital murder case.
2. I believe that life confinement in prison is never appropriate in any murder case.
3. I believe that life confinement in prison is appropriate in some capital murder cases and I could return a verdict resulting in life confinement in a proper case.

Do you think that the death penalty should be available for punishment upon conviction of other criminal offenses? ☐ Yes ☒ No   If yes, which ones? _____

_____

Do you have any moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being? ☐ Yes ☒ No

Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being? ☐ Yes ☒ No

Have you received any information regarding this case from any source outside of this courtroom, including, but not limited to, any newspaper articles, television news, internet site, or any other hearsay source? ☐ Yes ☒ No   Please list the source and the substance of the information _____

_____

_____

_____

Have you discussed any aspect of this case with anyone? ☐ Yes ☒ No

From hearsay, or otherwise, have you established in your mind such a conclusion as to the guilt or innocence of the Defendant as would influence you in finding a verdict? ☐ Yes ☒ No

2

# CRIMINAL JUSTICE SYSTEM

Please complete the following eight (8) statements:

The biggest problem in the criminal justice system is _the length of time it takes to go through the legal process._

The death penalty in Texas is _the law, instituted for specific to meet criteria, and is intended to help protect the citizens of Texas from ineligible_

Police officers _mainly serve to enforce the law and to protect citizens_

The burden of proof in a criminal case is _on the "shoulders" of the prosecution_

The prison system in Texas is _established to protect Texas citizens and to rehabilitate those who violate the law_

Prosecutors _serve to protect citizens from criminals and to bring violators of the law to justice_

Criminal defense attorneys _serve to protect and defend their clients and to ensure that everything possible is done to protect the rights of the clients and to "bring to light" (clarify) any circumstances (truths that will help their clients._

What makes a person dangerous? _A proven propensity to commit the crime (murder in this case) again, such as that person would most likely be a danger to society._

3

Please state your personal belief regarding the following ten (10) statements. (Check one answer in each question)

"I trust the criminal justice system in Dallas County."

☐ Strongly Agree   ☒ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"Criminal laws (including sentences and punishment) treat criminal defendants too harshly."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☒ Disagree   ☐ Strongly Disagree

"If someone is accused of Capital Murder, he should have to prove his innocence."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☐ Disagree   ☒ Strongly Disagree

"Persons determine their destiny or fate by choices they make in life."

☐ Strongly Agree   ☒ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing."

☐ Strongly Agree   ☐ Agree   ☒ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing as well as the choices that they make in life."

☐ Strongly Agree   ☒ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"Genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime."

☐ Strongly Agree   ☐ Agree   ☒ Uncertain   ☒ Disagree   ☐ Strongly Disagree

"If a person is brought to trial on murder charges, that person is probably guilty."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☐ Disagree   ☒ Strongly Disagree

"A defendant is innocent unless proven guilty beyond a reasonable doubt."

☒ Strongly Agree   ☐ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"It is the job of the jury to solve the crime."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☐ Disagree   ☒ Strongly Disagree

The law in the State of Texas says that "Voluntary Intoxication does not constitute a defense to the commission of crime". Do you agree with this law? ☒ Yes ☐ No

Please explain. The law is "the law" and exists to protect citizens. It is the individual citizen's duty to ensure that what he/she does, does not interfere with the safety of others.

The law in the State of Texas says that a person can be convicted of capital murder based <u>solely</u> on circumstantial evidence with <u>no</u> eyewitnesses if you believe the evidence beyond a reasonable doubt.

Do you agree with this law? ☒ Yes ☐ No

Please explain. Sometimes ~~the~~ a murder has no witnesses. Eliminating this (deterrent) would ~~enable~~ "open up the door" to more capital murders

The law in the State of Texas says that a person convicted of capital murder can receive the death penalty <u>solely</u> because of the facts and circumstances of the crime, even if he has committed <u>no</u> other crimes. Do you agree with this law? ☒ Yes ☐ No

Please explain. It depends on the circumstances. It is possible ~~for someone to commit their~~ that this would be the first murder & that this person would ~~have~~ be likely to do it again. It is also possible that the opposite would be true.

Do you believe the death penalty is applied fairly in the State of Texas? ☒ Yes ☐ No

Please explain. I learned a lot today with the judge's explanation & am impressed with how ~~this penalty~~ the application of this penalty is specifically defined.

Have you ever felt differently about the death penalty than you do now? ☐ Yes ☒ No
If yes, please explain what brought about this change and when the change occurred.

If you believe in using the death penalty, how strongly, on a scale of 1 to 10, do you hold that belief? (1 being the least and 10 being the strongest) 8    (I don't like it, but do not understand how it could ~~be any~~ ~~be~~ be any better protecting society is important.)

Rank the following objectives of punishment in order of their importance to you:

1 Rehabilitation    2 Deterrence    3 Punishment

In your opinion, What does The death penalty say about American Culture? _Serious about protecting our citizens_

The Constitution says an accused citizen does not have to testify on his or her own behalf. How do you feel about this constitutional privilege? _It's fair and should be up to the individual involved._

Do you think citizens accused of criminal offenses are afforded too many rights by the Constitutions of the United States and the State of Texas and the criminal laws of this state?

☐ Yes ☒ No. Please explain your answer. _Everyone should be presumed innocent until proven guilty, and should have every means available to protect him/her._

Have you, your spouse, any family members or close personal friends ever been accused, arrested or convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime **ABOVE** the level of a traffic ticket? ☐ Yes ☒ No

If yes, please give the following details:

| Person Charged | Charge | Date Accused | Outcome of Charge |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Have you, your spouse, any family members or close personal friends ever used the services of an attorney, been involved in litigation, or had friends or associates (professionally or socially) who are attorneys? ☒ Yes ☐ No

If yes, please give the following details:

| Person Using Attorney | Attorney | Reason Attorney Used |
|---|---|---|
| 1. Me (+ my family) | Col. (Retired) Myers ~~Don't remember name~~ | Lawsuit against a company whose driver ~~caused~~ an ~~avoidable~~ accident that killed my mother and almost killed my father (1974). Settled out of court. |
| 2. | | |
| 3. | | |

6

Do you know anyone who has been in jail or prison, or is in jail or prison?

☐ Yes ☒ No

If yes, please give the following details:

| Person Charged | Charge | Jail or Prison | Outcome of Charge |
|---|---|---|---|

1. _____

2. _____

3. _____

4. _____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national group opposed to the death penalty or any group dedicated to defendants' rights? ☐ Yes ☒ No  If yes, please give details. _____

_____

_____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national citizen law enforcement group such as a crime commission, group dedicated to victims' rights, traffic commission, neighborhood crime watch, Mothers Against Drunk Driving or police or sheriff's auxiliary? ☒ Yes ☐ No

If yes, please give details. Helped establish a Hate Crimes Commission Committee for Dallas (made recommendations for individuals/organizations to be represented in order to ensure appropriate representation.

Have you, your spouse, any family members or close personal friends ever been the victim of a crime, a witness to a crime or been interested in the outcome of a criminal case (either personally or through the media)? Have you ever used the services of this or any other District Attorney's office (hot checks, child support, protective order, etc.)?

☒ Yes ☐ No

If yes, please give details. Child support - in AR - to get ex husband to pay child support. Robbery - Had media equipment stolen from my home.

Have you, your spouse, any family members or close personal friends ever had any training in law enforcement, applied for employment in law enforcement or been employed in law enforcement (police officer, constable, deputy sheriff, security guard, prison or detention officer, parole officer, probation officer, secretary in police department, etc.)? ☐ Yes ☒ No

If yes, please give details. _____

_____

Have you or your spouse ever served on a grand jury? ☐ Yes ☒ No   If yes, please give dates and circumstances surrounding your service on the grand jury. _____

_____

_____

Have you or your spouse ever been a juror in a civil or criminal case?
☐ Yes ☒ No      If yes, please give the following details:

| Type of case | Verdict | Punishment | Whether Jury or Judge Set Punishment |
|---|---|---|---|

1. _____

2. _____

3. _____

If no verdict was reached, please explain why. _____

_____

_____

Did you feel you had all the information you needed to reach a verdict? ☐ Yes ☐ No

How would you feel if you later learned that you, as a juror, did not have all of the information available and the new information might have caused you to return a different verdict? _____

_____

_____

Were you the foreperson on any of those juries? ☐ Yes ☐ No     N/A

Regarding your jury service: (circle the number(s) which apply to you):
1.    I can tell pretty easily when a person is telling a lie.
2.    When I make up my mind, I rarely change it.
3.    I can frequently be influenced by the opinion of others.
4.    I always follow my own ideas rather than do what others expect of me.

Outside of your jury service, have you ever observed a court proceeding before? ☐ Yes ☒ No
Please give details: _____

_____

8

**BIOGRAPHICAL INFORMATION**

How long have you lived in Dallas County? _5 ½ yrs_

What other cities have you lived in, and how many years did you live in each city?
_Bedford (2 mos.), Richardson (4 mos.), Carbondale, KS (3 yrs.)
Little Rock AR (18 yrs.), N. Little Rock AR (3 yrs.), Fayetteville, AR
(5 yrs.), more (I'm an Army brat) in LA, CA, GA, OK, Germany_

Employer: _Dallas Public Schools (DISD)_

Occupation/Duties: _SOL Net (Speakers of Other Languages Network) Coordinator_

How long employed there? _6 yrs_

What other jobs have you held? _teacher, specialist, asst. coordinator,
Computer operator, mortgage loan clerk_

Marital Status: (Check one) ☐ Widowed ☐ Married ☐ Separated ☒ Divorced ☐ Single ☒

How long married? _16 yrs_     How many times married? _1_

List any last names you had from previous marriages, if applicable. _Boyd_

Spouse's Name: _____
　　　　　　　　Last　　　First　　　Middle　　　Maiden (If Applicable)

Birthdate: _____
　　　　　　Month　　　Day　　　Year

Spouse's Employer: _____

Occupation Duties: _____

**BROTHERS AND SISTERS**

| Full Name | Age | School or Occupation |
|---|---|---|
| 1. Randall Erle Treat | 47 | Systems Analyst |
| 2. Anthony Neal Treat | 45 | IRS Agent |
| 3. Loree Louise Treat | 44 | on disability (former landscaper) |
| 4. Candice Ann Murphy | 43 | house wife |
| 5. | | |

9

## CHILDREN INFORMATION

| Full Name | Age | School or Occupation |
|---|---|---|
| 1. Jerahtem Randolph Boyd | 23 | ① Sales Representative, Circuit City ② College student at U of AR in Little Rock |
| 2. | | |
| 3. | | |
| 4. | | |

## PARENTS

| Full Name | Age | Occupation (Before Retirement) |
|---|---|---|
| 1. Ralph Audson Treat | 69 | ① Lt. Col US Army ② Asst. Dean in Business Adm at Univ. of AR, Fayetteville, A |
| 2. | | |

Have you, any family member or close personal friend ever studied psychology, sociology, criminology or law (or worked for a person in one of these fields)? ☐ Yes ☒ No
If yes, please give details. _____

Have you, any family member or close personal friend ever undergone counseling or treatment for emotional, psychiatric, behavioral or substance abuse (alcohol or drug) problems?
☒ Yes ☐ No
If yes, please give details. I decided to seek assistance in dealing with memories & emotions from childhood abuse It was quite helpful.

What are your feelings, either positive or negative, about psychiatrists, psychologists or other mental health professionals? Mental health professionals can be of assistance to individuals

## EDUCATION
What is the highest grade level that you have completed in school, including trade or technical schools?

MEd plus — considering entering doctoral program

10

## MILITARY SERVICE

Please list branch, years of service, duties (including duty as military police and service on any court martial, including the nature of the charges), rank, type of discharge and whether you served in combat :

Yourself _____ N|A _____

Spouse _____

## RELIGIOUS, POLITICAL AND OTHER ACTIVITIES

Name and location of your church, synagogue or place of worship

_Various , esp. Unitarian Universalist_ _____

How often do you attend? _infrequently_ _____

Other than attendance, what other activities are you involved in at your church?

_____ N|A — none_ _____

Does your church, synagogue or place of worship have a position on the death penalty?

☐ Yes  ☒ No   If yes, please give details. _____

_____

Were you raised in some other faith or denomination? ☒ Yes ☐ No
If so, which one? _____ Methodist _____

Do you consider yourself politically liberal, conservative, or moderate? _moderate_

Do you consider yourself a Democrat, Republican, Independent, etc.? _Democrat at present time , former independent_

Are you registered to vote?  ☒ Yes ☐ No

Would you consider yourself as a leader or a follower? _leader_ _____

What are your hobbies, recreations or pastimes? _gardening, reading, logic problems, movies (video), video conferencing (Internet)_

What bumper stickers do you have on your vehicle? _None_ _____

_____

11

Have you had a special interest (personally or through the media) in any criminal case?

☒ Yes ☐ No    If yes, what was the case and what conclusions, if any, did you reach?

That I didn't have enough information to make a judgment one way or the other

List two (2) men and women who are publicly known whom you **MOST** respect:

Men:
Jose Plata
Martn Luther King

Women:
Sen. Hillary Clinton
~~Ellen~~ Representative ~~Ann Richard~~ Hanryette Ehrhart

List two (2) men and women who are publicly known whom you **LEAST** respect:

Men:
Jeffery Dommer (sp?)
George W. Bush

Women:
Katherine Harris
Squeaky Fromme

Have you ever owned or fired a gun? ☒ Yes ☐ No   Please explain the circumstances surrounding your answer. A friend let me shoot her gun on a firing range once. (I wasn't very good.)

**THIS CASE**

Do you know either of the prosecutors, Greg Davis and Mary Miller? ☐ Yes ☒ No

Do you know any of the defense attorneys, Mike Byck, Jane Little and Jennifer Balido?
☐ Yes ☒ No

Do you know, or think you might know, the defendant, Jedidiah Isaac Murphy, or any of his family?
☐ Yes ☒ No

Did you know the deceased, Bertie Cunningham, or any of her family? ☐ Yes ☒ No

Do you know Bill Hill, Dallas County District Attorney, or any other members of his staff?
☐ Yes ☒ No

If you have any plans to be out of Dallas County within the next six (6) months, please state the dates: ~~Entire~~ Scheduled to present week of April 21 (presenting at a Navajo Language Conference + providing technical assistance to the Utah (Navajo) component of my grant. - ~~can be~~ I can miss it though, if required to do so.

12

Are you currently taking any medication? ☒ Yes ☐ No

If yes, please give details. _expectorant + antihistamine – to help_
_eliminate cough from ~~bronchial~~ flu I had in Jan. (B)_

Do you have any personal or health problems (hearing, medications, etc.) that would prevent you from
giving your full attention to the testimony during the trial?   ☐ Yes ☒ No

If yes, please give details. _Not unless I couldn't eat_
_( I'm hypoglycemic.) at least every 3-4 hrs._

Do you know of any reason why you could not sit as a juror for this trial, be absolutely fair to the
Defendant and the State and render a verdict based solely upon the evidence presented to you?

☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Is there any reason why you would not want to serve as a juror in this case?   ☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Do you want to serve as a juror in this case? ☒ Yes ☐ No    If yes, why? _To have the_
_experience ~~of~~ being a juror, to think + weigh_
_facts, to analyze, etc._

13

**"I DECLARE UNDER PENALTY OF PERJURY THAT ALL OF MY ANSWERS IN THIS JUROR QUESTIONNAIRE ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF MY KNOWLEDGE."**

_(Signature)_

*Please review the attached list of names, and circle the names you know, or might know.*

I don't know any of them.

14

# POSSIBLE STATE'S WITNESSES

Civilians
Elizabeth Chaney Erwin
Debbie Armstrong
Treshod Tarrant
Gary Oats
Clint Wiggington
Brandon Zachery
Michael Wayne Williams
Mark Read
Brian Lane
Kenneth Crisler
Leslie Webster
Joseph Testa
Ray Bob Phillips
Chelsea Willis
Jeanne Evans
Sherryl Wilhelm
Leslie Dunkin
Dana Jones
Marjorie Ellis
Felix Ozuna
Evelyn Shelton
Jerry Conner
Francis Conner
Erika Erwin
Tonya Thorp
Zachary Mamot
Ryan Hammonds
Ashleigh Johnson
Bobby Harp
Phillip Shaun Cruz
Jennie Duval, M.D.
Tim Erwin
Kenneth Clance
Whalen Brunton
Jennifer Farnsworth
Cassye Erwin
Samantha Murphy
Charles Armitage
Brent Simmons
Logan Craft
Bob Murphy
Doha Aridi
Akram Aridi
Matt Tollesbol
Jerry Kwiechen
Jatora Yarborough
Ora Mae Milton

Civilians
Randy Crow
Christy Baugh
Derek Cruz
Lesa Flowers
Willard Gold, M.D.
Rathidevi Reddy, M.D.
Luke Peris, M.D.
Jeffrey DeHaan, M.D.
John Motley
Cindy Monds
William Vandiver, M.D.
James Garrison, M.D.
Stephen Farnes, M.D.
Shirley Bard
Terry Tolar
Celeste Tolar
Kenneth Fritcher
Steve Gipson
Joanna Gilmore
Kirsten Adames
Hooman Sedighi, M.D.
Kenneth Pruitt
Jan Brooks
William Estabrook, M.D.
Julie Gaynor
Mark Landrum
Kenneth Phillips
Richard Shollenberger
Jack Shellnut
George Poteet
Monty Dunn
Cesar De La Torre
Harlan Bailey
David Davenport
Robert Rabbel
Bud Farmer
Alan Cousins
Ozell Wilcoxson
Diana Langford
K. Pruitt
Stephen Vestal
Jan Brooks
Debra Murphy
John Donahue
Patricio Mamot
Sandra Mamot
Randy Hammond

Garland Police Dept
M. J. Meyers
J. S. Rogers
J. Mowery
J. L. Lay
J. Delmar
W. Brown
S. Tooke
V. Long
B. Rice
P. Parker
V. Standley
H. Tharp

Terrell Police Dept
D. Alberty

Van Zandt County Sheriff
G. Rose
J. Branch
R. Goodson
R. Goldey
R. Pool
J. DeCoux
D. Pool
D. Blaylock
K. Jackson

Edgewood Police Dept
J. Bonham
D. Corbett
M. Bates

Arlington Police Dept
D. Neese
J. Stanton

Wills Point Police Dept
James Lee
I. Medina
R. Keeney

Dallas Police Dept
W. Clifton
M. Poole
C. Garcia
B. Bedford

Kaufman County Sheriff
J. Wood
H. Tim

1

2

3

4

5

6

7

8

9

10                         COURT'S RECORD

11                      JUROR QUESTIONNAIRE

12              Venireperson -  Gerald Smothers

13                       (Copy Attached)

14

15

16

17

18

19

20

21

22

23

24

25

# JUROR QUESTIONNAIRE

**Juror No.** 2033

✓
5/31

*You have taken an oath to truthfully answer the following questions. Please answer underline each and every question as completely and accurately as you can. The information you give in this questionnaire will be kept confidential. After a jury has been selected, all copies of this questionnaire will be returned to the Court, and kept in confidence, under seal, not accessible to the public or the media.*

Name: **Smothers**  **Gerald**  **ALAN**
Last / First / Middle / Maiden (If Applicable)

Sex: **M**
Age: **35**
Race: **W**

Birthdate: **09  01  65**
Month / Day / Year

Birthplace: **Whittier  CA.**
City/Town / State

Driver's License No. **01859260**
Social Security No. **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**
Home Address: **2200 Wattenway Dr.  Mesquite  75181**
Number Street / City/Town / Zip

Home Number **(972) 122-6___** Work Number **(214) 688-7000**

The individual in this case is accused of capital murder. If, and only if, the state proves its case beyond a reasonable doubt as to the defendant, the jury will decide punishment. There is no way of knowing whether the jury will even find the defendant guilty, but the law requires that you answer certain questions regarding your thoughts and feelings on the death penalty.

## DEATH PENALTY

Are you in favor of the death penalty? ☑ Yes ☐ No .
Please explain your answer. **I feel if an individule takes another humans life without the fear of his/her own life that punishment should be available**

Which of the following statements best represents your feelings about the death penalty: (Circle)

1. I believe that the death penalty should be imposed in all capital murder cases.
2. (circled) I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case.
3. Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.
4. I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict which assessed the death penalty.
5. I could never, under any circumstances, return a verdict which assessed the death penalty.

1

What is the best argument in favor of the death penalty? _THE Ultimate punishment_

_& prevention of further loss._

What is the best argument in opposition of the death penalty? _____

_____

**LIFE CONFINEMENT IN PRISON**

Which of the following statements best represents your feelings about life confinement in prison: (Circle )

1.    I believe that life confinement in prison is never appropriate in any capital murder case.

2.    I believe that life confinement in prison is never appropriate in any murder case.

(3.)    I believe that life confinement in prison is appropriate in some capital murder cases and I could return a verdict resulting in life confinement in a proper case.

Do you think that the death penalty should be available for punishment upon conviction of other criminal offenses? ☐ Yes ☒ No   If yes, which ones? _____

_____

Do you have any moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being? ☐ Yes ☒ No

Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being? ☐ Yes ☒ No

Have you received any information regarding this case from any source outside of this courtroom, including, but not limited to, any newspaper articles, television news, internet site, or any other hearsay source? ☐ Yes ☒ No   Please list the source and the substance of the information_____

_____

_____

_____

Have you discussed any aspect of this case with anyone? ☐ Yes ☒ No

From hearsay, or otherwise, have you established in your mind such a conclusion as to the guilt or innocence of the Defendant as would influence you in finding a verdict? ☐ Yes ☒ No

## CRIMINAL JUSTICE SYSTEM

Please complete the following eight (8) statements:

The biggest problem in the criminal justice system is _N/A_

The death penalty in Texas is _I feel the death of a child should be raised up instead of 6yrs & younger._

Police officers _N/A_

The burden of proof in a criminal case is _N/A_

The prison system in Texas is _N/A_

Prosecutors _N/A_

Criminal defense attorneys _N/A_

What makes a person dangerous? _No respect for themselves._

3

Please state your personal belief regarding the following ten (10) statements: (Check one answer in each question)

"I trust the criminal justice system in Dallas County."

☐ Strongly Agree   ☑ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"Criminal laws (including sentences and punishment) treat criminal defendants too harshly."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"If someone is accused of Capital Murder, he should have to prove his innocence."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"Persons determine their destiny or fate by choices they make in life."

☑ Strongly Agree   ☐ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing."

☐ Strongly Agree   ☐ Agree   ☑ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing as well as the choices that they make in life."

☑ Strongly Agree   ☐ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"Genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"If a person is brought to trial on murder charges, that person is probably guilty."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☐ Disagree   ☑ Strongly Disagree

"A defendant is innocent unless proven guilty beyond a reasonable doubt."

☑ Strongly Agree   ☐ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"It is the job of the jury to solve the crime."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☑ Strongly Disagree

4

The law in the State of Texas says: "*Voluntary intoxication does not constitute a defense to the commission of crime*". Do you agree with this law? ☐ Yes ☐ No

Please explain. _____ N/A _____

The law in the State of Texas says that a person can be convicted of capital murder based <u>solely</u> on circumstantial evidence with <u>no</u> eyewitnesses if you believe the evidence beyond a reasonable doubt.

Do you agree with this law? ☑ Yes ☐ No

Please explain. _If the case leaves me with the mindset of beyond a reasonable doubt._

The law in the State of Texas says that a person convicted of capital murder can receive the death penalty <u>solely</u> because of the facts and circumstances of the crime, even if he has committed <u>no</u> other crimes. Do you agree with this law? ☑ Yes ☐ No

Please explain. _Death is Death regardless what type of past history the person has had._

Do you believe the death penalty is applied fairly in the State of Texas? ☑ Yes ☐ No

Please explain. _I feel the death penalty is watched very closely by the court system in Texas._

Have you ever felt differently about the death penalty than you do now? ☐ Yes ☑ No

If yes, please explain what brought about this change and when the change occurred.

If you believe in using the death penalty, how strongly, on a scale of 1 to 10, do you hold that belief? (1 being the least and 10 being the strongest) _10_

Rank the following objectives of punishment in order of their importance to you:

_1_ Rehabilitation    _3_ Deterrence    _2_ Punishment

5

In your opinion, what does the death penalty say about American Culture? _THINK about the results of your actions._

The Constitution says an accused citizen does not have to testify on his or her own behalf. How do you feel about this constitutional privilege? _I feel it is just that. Our constitutional privilege._

Do you think citizens accused of criminal offenses are afforded too many rights by the Constitutions of the United States and the State of Texas and the criminal laws of this state?

☑ Yes ☐ No. Please explain your answer. _If a person is found guilty by his peers one appeal is appropriate. To much time and money of the state is spent tied up in appeals._

Have you, your spouse, any family members or close personal friends ever been accused, arrested or convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime **ABOVE** the level of a traffic ticket? ☐ Yes ☑ No
If yes, please give the following details:

| Person Charged | Charge | Date Accused | Outcome of Charge |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Have you, your spouse, any family members or close personal friends ever used the services of an attorney, been involved in litigation, or had friends or associates (professionally or socially) who are attorneys? ☑ Yes ☐ No
If yes, please give the following details:

| Person Using Attorney | Attorney | Reason Attorney Used |
|---|---|---|
| 1. Myself | ? | Purchased Property |
| 2. | Alan Kaiser (friend) | Business Atty. |
| 3. | | |

6

Do you know anyone who has been in jail or prison, or is in jail or prison?

☑ Yes ☐ No

If yes, please give the following details:

| Person Charged | Charge | Jail or Prison | Outcome of Charge |
|---|---|---|---|

1. Several of the guys that work for me have

2. been in jail before. Most of them have been

3. for either traffic fines or drugs.

4. _____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national group opposed to the death penalty or any group dedicated to defendants' rights? ☐ Yes ☑ No  If yes, please give details. _____

_____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national citizen law enforcement group such as a crime commission, group dedicated to victims' rights, traffic commission, neighborhood crime watch, Mothers Against Drunk Driving or police or sheriff's auxiliary?  ☐ Yes ☑ No

If yes, please give details. _____

_____

Have you, your spouse, any family members or close personal friends ever been the victim of a crime, a witness to a crime or been interested in the outcome of a criminal case (either personally or through the media)? Have you ever used the services of this or any other District Attorney's office (hot checks, child support, protective order, etc.)?

☑ Yes ☐ No

If yes, please give details. always interested in what is going on

in our city & state.

Have you, your spouse, any family members or close personal friends ever had any training in law enforcement, applied for employment in law enforcement or been employed in law enforcement (police officer, constable, deputy sheriff, security guard, prison or detention officer, parole officer, probation officer, secretary in police department, etc.)?  ☐ Yes ☑ No

If yes, please give details. _____

_____

7

Have you or your spouse ever served on a grand jury? ☐ Yes ☑ No  If yes, please give dates and circumstances surrounding your service on the grand jury._____

_____

_____

Have you or your spouse ever been a juror in a civil or criminal case?

☑ Yes ☐ No      If yes, please give the following details:

| | Type of case | Verdict | Punishment | Whether Jury or Judge Set Punishment |
|---|---|---|---|---|

1. ___Spouse_____Do not rember the info on the case.___

2. _____

3. _____

If no verdict was reached, please explain why. _____

_____

_____

Did you feel you had all the information you needed to reach a verdict? ☐ Yes ☐ No

How would you feel if you later learned that you, as a juror, did not have all of the information available and the new information might have caused you to return a different verdict? _The___

verdict has to come from the info that is provided._____

_____

Were you the foreperson on any of those juries? ☐ Yes ☐ No

Regarding your jury service: (circle the number(s) which apply to you):
1.      I can tell pretty easily when a person is telling a lie.
②      When I make up my mind, I rarely change it.
3.      I can frequently be influenced by the opinion of others.
4.      I always follow my own ideas rather than do what others expect of me.

Outside of your jury service, have you ever observed a court proceeding before? ☑ Yes ☐ No
Please give details: _As an assignment when I was in_

_College._____

## BIOGRAPHICAL INFORMATION

How long have you lived in Dallas County? _35 yrs._

What other cities have you lived in, and how many years did you live in each city?

_Lived in Tyler 2 yrs. (college)_

Employer: _General Insulation_

Occupation/Duties: _BRANCH Manager_

How long employed there? _3 mos._

What other jobs have you held? _Branch Manager (comfort Supply) 14 yrs._

Marital Status: (Check one) ☐ Widowed ☑ Married ☐ Separated ☐ Divorced ☐ Single

How long married? _10 yrs._      How many times married? _1_

List any last names you had from previous marriages, if applicable. _____

Spouse's Name: _Smothers_    _Jamie_    _Lynn_    _Clifton_
                Last      First      Middle      Maiden (If Applicable)

Birthdate: _06_    _07_    _65_
           Month    Day    Year

Spouse's Employer: _Presby. Dallas Hospital._

Occupation Duties: _Secretary_

## BROTHERS AND SISTERS

| Full Name | Age | School or Occupation |
|-----------|-----|----------------------|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |

9

## CHILDREN INFORMATION

| Full Name | Age | School or Occupation |
|-----------|-----|----------------------|
| 1. Tyler Clifton Smothers | 8 | Casa View Baptist School |
| 2. | | |
| 3. | | |
| 4. | | |

## PARENTS

| Full Name | Age | Occupation (Before Retirement) |
|-----------|-----|-------------------------------|
| 1. Jack Warren Smothers | N/A | Grocery Buss. |
| 2. Karen Kay Smothers | 62 | Sales |

Have you, any family member or close personal friend ever studied psychology, sociology, criminology or law (or worked for a person in one of these fields)? ☐ Yes ☑ No
If yes, please give details. _____

_____

Have you, any family member or close personal friend ever undergone counseling or treatment for emotional, psychiatric, behavioral or substance abuse (alcohol or drug) problems?
☐ Yes ☑ No
If yes, please give details. _____

_____

_____

What are your feelings, either positive or negative, about psychiatrists, psychologists or other mental health professionals? I feel that it is a profession that is needed and there are good ones aswell as bad ones as with any other proffession

## EDUCATION
What is the highest grade level that you have completed in school, including trade or technical schools?

Associates in Applied Science

## MILITARY SERVICE

Please list branch, years of service, duties (including duty as military police and service on any court martial, including the nature of the charges), rank, type of discharge and whether you served in combat :

Yourself ___N/A_____

Spouse ___N/A_____

## RELIGIOUS, POLITICAL AND OTHER ACTIVITIES

Name and location of your church, synagogue or place of worship

CASA View Baptist Church        Dallas

How often do you attend? __Regular_____

Other than attendance, what other activities are you involved in at your church?

Royal Ambassadors  & Property & transportation comn.

Does your church, synagogue or place of worship have a position on the death penalty?

☐ Yes ☐ No  If yes, please give details._____

_____

Were you raised in some other faith or denomination? ☐ Yes ☑ No
If so, which one? _____

Do you consider yourself politically liberal, conservative, or moderate? _____

Do you consider yourself a Democrat, Republican, Independent, etc.? _Republican____

Are you registered to vote? ☑ Yes ☐ No

Would you consider yourself as a leader or a follower?_ leader_____

What are your hobbies, recreations or pastimes?_ Sports & outdoors____

_____

What bumper stickers do you have on your vehicle?_ Ø_____

_____

Have you had a special interest (personally or through the media) in any criminal case?

☐ Yes ☑ No          If yes, what was the case and what conclusions, if any, did you reach?

_____

_____

List two (2) men and women who are publicly known whom you **MOST** respect:

Men:                                          Women:

_____          _____

_____          _____

List two (2) men and women who are publicly known whom you **LEAST** respect:

Men:                                          Women:

_____          _____

_____          _____

Have you ever owned or fired a gun? ☑ Yes ☐ No   Please explain the circumstances surrounding
your answer. _Recreation_____

_____

**THIS CASE**

Do you know either of the prosecutors, Greg Davis and Mary Miller? ☐ Yes ☑ No

Do you know any of the defense attorneys, Mike Byck, Jane Little and Jennifer Balido?
☐ Yes ☑ No

Do you know, or think you might know, the defendant, Jedidiah Isaac Murphy, or any of his family?
☐ Yes ☑ No

Did you know the deceased, Bertie Cunningham, or any of her family? ☐ Yes ☑ No

Do you know Bill Hill, Dallas County District Attorney, or any other members of his staff?
☐ Yes ☑ No

If you have any plans to be out of Dallas County within the next six (6) months, please state the

dates: _____

_____

12

Are you currently taking any medication?  ☐ Yes  ☑ No
If yes, please give details. _____

_____

Do you have any personal or health problems (hearing, medications, etc.) that would prevent you from giving your full attention to the testimony during the trial?  ☐ Yes  ☑ No
If yes, please give details. _____

_____

_____

Do you know of any reason why you could not sit as a juror for this trial, be absolutely fair to the Defendant and the State and render a verdict based solely upon the evidence presented to you?
☐ Yes  ☑ No
If yes, please give details. _____

_____

_____

Is there any reason why you would not want to serve as a juror in this case?  ☐ Yes  ☑ No
If yes, please give details. _____

_____

_____

Do you want to serve as a juror in this case?  ☑ Yes  ☐ No     If yes, why?  _I feel it_
_is our responsibility as a citizen to be there if_
_needed._

**"I DECLARE UNDER PENALTY OF PERJURY THAT ALL OF MY ANSWERS IN THIS JUROR QUESTIONNAIRE ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF MY KNOWLEDGE."**

**(Signature)**

*Please review the attached list of names, and circle the names you know, or might know.*

14

# POSSIBLE STATE'S WITNESSES

Civilians
Elizabeth Chaney Erwin
Debbie Armstrong
Treshod Tarrant
Gary Oats
Clint Wiggington
Brandon Zachery
Michael Wayne Williams
Mark Read
Brian Lane
Kenneth Crisler
Leslie Webster
Joseph Testa
Ray Bob Phillips
Chelsea Willis
Jeanne Evans
Sherryl Wilhelm
Leslie Dunkin
Dana Jones
Marjorie Ellis
Felix Ozuna
Evelyn Shelton
Jerry Conner
Francis Conner
Erika Erwin
Tonya Thorp
Zachary Mamot
Ryan Hammonds
Ashleigh Johnson
Bobby Harp
Phillip Shaun Cruz
Jennie Duval, M.D.
Tim Erwin
Kenneth Clance
Whalen Brunton
Jennifer Farnsworth
Cassye Erwin
Samantha Murphy
Charles Armitage
Brent Simmons
Logan Craft
Bob Murphy
Doha Aridi
Akram Aridi
Matt Tollesbol
Jerry Kwiechen
Jatora Yarborough
Ora Mae Milton

Civilians
Randy Crow
Christy Baugh
Derek Cruz
Lesa Flowers
Willard Gold, M.D.
Rathidevi Reddy, M.D.
Luke Peris, M.D.
Jeffrey DeHaan, M.D.
John Motley
Cindy Monds
William Vandiver, M.D.
James Garrison, M.D.
Stephen Farnes, M.D.
Shirley Bard
Terry Tolar
Celeste Tolar
Kenneth Fritcher
Steve Gipson
Joanna Gilmore
Kirsten Adames
Hooman Sedighi, M.D.
Kenneth Pruitt
Jan Brooks
William Estabrook, M.D.
Julie Gaynor
Mark Landrum
Kenneth Phillips
Richard Shollenberger
Jack Shellnut
George Poteet
Monty Dunn
Cesar De La Torre
Harlan Bailey
David Davenport
Robert Rabbel
Bud Farmer
Alan Cousins
Ozell Wilcoxson
Diana Langford
K. Pruitt
Stephen Vestal
Jan Brooks
Debra Murphy
John Donahue
Patricio Mamot
Sandra Mamot
Randy Hammond

Garland Police Dept
M. J. Meyers
J. S. Rogers
J. Mowery
J. L. Lay
J. Delmar
W. Brown
S. Tooke
V. Long
B. Rice
P. Parker
V. Standley
H. Tharp

Terrell Police Dept
D. Alberty

Van Zandt County Sheriff
G. Rose
J. Branch
R. Goodson
R. Goldey
R. Pool
J. DeCoux
D. Pool
D. Blaylock
K. Jackson

Edgewood Police Dept
J. Bonham
D. Corbett
M. Bates

Arlington Police Dept
D. Neese
J. Stanton

Wills Point Police Dept
James Lee
I. Medina
R. Keeney

Dallas Police Dept
W. Clifton
M. Poole
C. Garcia
B. Bedford

Kaufman County Sheriff
J. Wood
H. Tim

1

2

3

4

5

6

7

8

9

10                                COURT'S RECORD

11                            JUROR QUESTIONNAIRE

12                    Venireperson -   Phillip May

13                             (Copy Attached)

14

15

16

17

18

19

20

21

22

23

24

25

DARLINE W. LABAR, OFFICIAL REPORTER

# JUROR QUESTIONNAIRE

Juror No. **1123**

*You have taken an oath to truthfully answer the following questions. Please answer <u>each and every question</u> as completely and accurately as you can. The information you give in this questionnaire will be kept confidential. After a jury has been selected, all copies of this questionnaire will be returned to the Court, and kept in confidence, under seal, not accessible to the public or the media.*

√5/31

Name: **MAY          PHILLIP          CHARLES**
　　　　　Last　　　　　First　　　　　Middle　　　　Maiden (If Applicable)

Sex: **M**
Age: **49**
Race: **W**

Birthdate: **9      20      51**
　　　　　　　Month　　Day　　Year

Birthplace: **DALLAS          TX**
　　　　　　　　City/Town　　　　　State

Driver's License No. **03102503**
Social Security No. **450 - 88 - 451~~7~~**
Home Address: **PO Box ~~1627~~          DALLAS          75~~2~~**
　　　　　　　　　Number/Street　　　　　City/Town　　　　Zip

Home Number **(214) 358-5723**　　Work Number **(    )  SAM**

The individual in this case is accused of capital murder. If, and only if, the State proves its case beyond a reasonable doubt as to the defendant, the jury will decide punishment. There is no way of knowing whether the jury will even find the defendant guilty, but the law requires that you answer certain questions regarding your thoughts and feelings on the death penalty.

## DEATH PENALTY

Are you in favor of the death penalty? ☑ Yes ☐ No

Please explain your answer. _____

**I BELIEVE AS AN INDIVIDUAL WE ARE REQUIRED TO FORGIVE ANOTHER PERSON FOR OFFENSES. YET, OUR GOVERNMENT IS PUT INTO PLACE TO OVERSEE THE PEACE + IS CHARGED W/ THE RESP. OF PUNISHING WRONG DOERS.**

Which of the following statements best represents your feelings about the death penalty: (Circle)

1.　I believe that the death penalty should be imposed in all capital murder cases.

②　I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case.

3.　Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.

4.　I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict which assessed the death penalty.

5.　I could never, under any circumstances, return a verdict which assessed the death penalty.

1

What is the best argument in favor of the death penalty? IT IS A DETERENCE TO CRIME, + IT IS A PROPER TOOL PART OF THE GOVT'S RESP TO MAINTAIN PEACE + ORDER.

What is the best argument in opposition of the death penalty? MANY WOULD SAY THAT THERE IS NEVER A too A REASON TO TAKE A PERSON LIFE. I BELEVE THAT DECISION REST IN THE RESP. OF GOVT.

## LIFE CONFINEMENT IN PRISON

Which of the following statements best represents your feelings about life confinement in prison: (Circle )

1.　　I believe that life confinement in prison is never appropriate in any capital murder case.

2.　　I believe that life confinement in prison is never appropriate in any murder case.

(3.)　I believe that life confinement in prison is appropriate in some capital murder cases and I could return a verdict resulting in life confinement in a proper case.

Do you think that the death penalty should be available for punishment upon conviction of other criminal offenses? ☑ Yes ☐ No  If yes, which ones?　TREASON

Do you have any moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being? ☐ Yes ☑ No

Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being? ☐ Yes ☑ No

Have you received any information regarding this case from any source outside of this courtroom, including, but not limited to, any newspaper articles, television news, internet site, or any other hearsay source? ☐ Yes ☑ No  Please list the source and the substance of the information_____

Have you discussed any aspect of this case with anyone? ☐ Yes ☑ No

From hearsay, or otherwise, have you established in your mind such a conclusion as to the guilt or innocence of the Defendant as would influence you in finding a verdict? ☐ Yes ☑ No

# CRIMINAL JUSTICE SYSTEM

Please complete the following eight (8) statements:

The biggest problem in the criminal justice system is _THE SLOWNESS OF_ _THE PROCESS FOR ALL INVOLVED._

The death penalty in Texas is _APPROPRIATE UNDER THE RIGHT CIRCUMSTANCES._

Police officers _ARE TO BE RESPECTED AND ARE AN IMPORTANT_ _PART OF OUR SOCIETY._

The burden of proof in a criminal case is _ON THE PROSECUTING ATTORNEYS,_

The prison system in Texas is _— I DON'T HAVE AN ADEQUATE KNOWLEDGE OR THE PRISON SYSTEM TO COMMENT._

Prosecutors _ARE AN INTEGRAL PART OF THE JUSTICE SYSTEM._

Criminal defense attorneys _ARE NECESSARY & IMPORTANT TO INSURE AND ASSIST IN A FAIR TRIAL FOR THE DEFENDANT_

What makes a person dangerous? _I DON'T KNOW. IT IS HARD TO THINK LIKE THAT. I SUPPOSE IT WOULD BE AN INABILITY TO MAKE DECISIONS CONSISTENT WITH THE LAW. POSSIBLY THE LACK OF CONCERN FOR THE SAFETY OR WELL BEING OF OTHERS. I DON'T KNOW._

3

Please state your personal belief regarding the following ten (10) statements. (Check one answer in each question)

"I trust the criminal justice system in Dallas County."

☐ Strongly Agree   ☑ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"Criminal laws (including sentences and punishment) treat criminal defendants too harshly."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"If someone is accused of Capital Murder, he should have to prove his innocence."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"Persons determine their destiny or fate by choices they make in life."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☐ Disagree   ☑ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing as well as the choices that they make in life."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"Genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"If a person is brought to trial on murder charges, that person is probably guilty."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"A defendant is innocent unless proven guilty beyond a reasonable doubt."

☐ Strongly Agree   ☑ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"It is the job of the jury to solve the crime."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

4

The law in the State of Texas says: "*Voluntary intoxication does not constitute a defense to the commission of crime*". Do you agree with this law?   ☑ Yes ☐ No

Please explain. _____

I BELIEVE A PERSON IS RESPONSIBLE FOR THEIR ACTIONS . IF

THEY CHOOSE TO DRINK THEY ARE RESP. FOR THEIR SUBSEQUENT
ACTIONS

The law in the State of Texas says that a person can be convicted of capital murder based solely on circumstantial evidence with no eyewitnesses if you believe the evidence beyond a reasonable doubt.

Do you agree with this law?   ☑ Yes ☐ No

Please explain. _____

1) NOT ALL CRIMES HAVE WITNESSES   2) THE GATHERING OF EVIDENCE

IS THE METHODOLOGY OF OUR CRIMINAL SYSTEM TO AID THE

JURY IN THE DECISION MAKING PROCESS.

The law in the State of Texas says that a person convicted of capital murder can receive the death penalty solely because of the facts and circumstances of the crime, even if he has committed no other crimes. Do you agree with this law?   ☑ Yes ☐ No

Please explain. BASED ON THE EVIDENCE PRESENTED , THE JURY IS CHARGED

WITH THE DETERMINATION OF A DEFENDANT'S GUILT OR INNOCENCE AND TO
                          ACCESSMENT OF THE

WHAT EXTENT HE/SHE SHOULD BE PUNISHED. IT IS A RESP OF THE

GOVT WITH WHICH THEY ARE TEMPORARILY EMPOWERED.

Do you believe the death penalty is applied fairly in the State of Texas?   ☑ Yes ☐ No

Please explain. I BELIEVE THE DEATH PENALTY SHOULD BE THE LAST RESORT

I BELIEVE THE DEATH PENALTY IS APPROPRIATE & SHOULD BE USED

BY THE STATE WHEN A CRIME WARRANTS IT.

Have you ever felt differently about the death penalty than you do now?   ☐ Yes ☑ No

If yes, please explain what brought about this change and when the change occurred.

_____

_____

If you believe in using the death penalty, how strongly, on a scale of 1 to 10, do you hold that belief?
(1 being the least and 10 being the strongest) ____7____

Rank the following objectives of punishment in order of their importance to you:

___1___ Rehabilitation   ___2___ Deterrence   ___3___ Punishment

5

In your opinion, what does the death penalty say about American culture?

THAT OUR GOV'T HAS THE RESP TO MAINTAIN PEACE + IS NOT AFRAID TO ENFORCE THAT RESP.

The Constitution says an accused citizen does not have to testify on his or her own behalf. How do you feel about this constitutional privilege?

I AGREE W/ IT,

Do you think citizens accused of criminal offenses are afforded too many rights by the Constitutions of the United States and the State of Texas and the criminal laws of this state?

☐ Yes ☑ No. Please explain your answer. I BELIEVE THEY SHOULD BE

AFFORDED DUE PROCESS.

Have you, your spouse, any family members or close personal friends ever been accused, arrested or convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime **ABOVE** the level of a traffic ticket? ☐ Yes ☑ No

If yes, please give the following details:

| Person Charged | Charge | Date Accused | Outcome of Charge |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Have you, your spouse, any family members or close personal friends ever used the services of an attorney, been involved in litigation, or had friends or associates (professionally or socially) who are attorneys? ☑ Yes ☐ No

If yes, please give the following details:

| Person Using Attorney | Attorney | Reason Attorney Used |
|---|---|---|
| 1. * BUSINESS ASSOCIATES | ? | BUSINESS, RELATED LITIGATION |
| 2. | | |
| 3. | | |

* I DO FINANCIAL AUDIT WORK SO I REVIEW LEGAL DOCUMENTS & BILLINGS AS A MATTER OF COURSE.

Do you know anyone who has been in jail or prison, or is in jail or prison?

☑ Yes ☐ No

If yes, please give the following details:

| | Person Charged | Charge | Jail or Prison | Outcome of Charge |
|---|---|---|---|---|
| 1. | CLAYTON JENKINS | DRUGS | ? | STILL ON PROBATION |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national group opposed to the death penalty or any group dedicated to defendants' rights? ☐ Yes ☑ No If yes, please give details. _____

_____

_____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national citizen law enforcement group such as a crime commission, group dedicated to victims' rights, traffic commission, neighborhood crime watch, Mothers Against Drunk Driving or police or sheriff's auxiliary? ☐ Yes ☑ No

If yes, please give details. _____

_____

Have you, your spouse, any family members or close personal friends ever been the victim of a crime, a witness to a crime or been interested in the outcome of a criminal case (either personally or through the media)? Have you ever used the services of this or any other District Attorney's office (hot checks, child support, protective order, etc.)?

☑ Yes ☐ No

If yes, please give details. ___DJ TRIAL (WIFE)_____

_____

Have you, your spouse, any family members or close personal friends ever had any training in law enforcement, applied for employment in law enforcement or been employed in law enforcement (police officer, constable, deputy sheriff, security guard, prison or detention officer, parole officer, probation officer, secretary in police department, etc.)? ☐ Yes ☑ No

If yes, please give details. _____

_____

7

Have you or your spouse ever served on a grand jury? ☐ Yes ☑ No  If yes, please give dates and circumstances surrounding your service on the grand jury._____

_____

Have you or your spouse ever been a juror in a civil or criminal case?

☐ Yes ☑ No    If yes, please give the following details:

| Type of case | Verdict | Punishment | Whether Jury or Judge Set Punishment |
|---|---|---|---|

1. _____

2. _____

3. _____

If no verdict was reached, please explain why. _____ N|A _____

_____

Did you feel you had all the information you needed to reach a verdict? ☐ Yes ☐ No  N|A

How would you feel if you later learned that you, as a juror, did not have all of the information available and the new information might have caused you to return a different verdict? _____

I BELIEVE IT WOULD BE THE JUSTICE! SYSTEM'S RESP TO REACCESS OUR DECISION & TO MAKE THE APPROPRIATE SUBSEQUENT DETERMINATION,

Were you the foreperson on any of those juries? ☐ Yes ☑ No

Regarding your jury service: (circle the number(s) which apply to you):
1.     I can tell pretty easily when a person is telling a lie.
2.     When I make up my mind, I rarely change it.
3.     I can frequently be influenced by the opinion of others.
④.     I always follow my own ideas rather than do what others expect of me.

Outside of your jury service, have you ever observed a court proceeding before? ☑ Yes ☐ No
Please give details: ___ VARIOUS MOCK TRIALS — VIEWING MEDIA ___

_____

8

## BIOGRAPHICAL INFORMATION

How long have you lived in Dallas County? _____ 48 YEARS

What other cities have you lived in, and how many years did you live in each city?

AUSTIN - 1 YEAR

Employer: SELF - EMPLOYED

Occupation/Duties: CPA

How long employed there? 12 OR 13 YEARS

What other jobs have you held? PART TIME CHURCH STAFF ( MUSIC MINISTER )

Marital Status: (Check one) ☐ Widowed ☑ Married ☐ Separated ☐ Divorced ☐ Single

How long married? 29 YEARS IN JULY _____ How many times married? 1

List any last names you had from previous marriages, if applicable. _____

Spouse's Name: MAY / BETTY / JANE / (TURD)
　　　　　　　　Last　　First　　Middle　　Maiden (If Applicable)

Birthdate: 2 / 22 / 53
　　　　Month　Day　Year

Spouse's Employer: N/A

Occupation Duties: _____

## BROTHERS AND SISTERS

| | Full Name | Age | School or Occupation |
|---|---|---|---|
| 1. | HENRY G MAY III | 51 | TILE WORK |
| 2. | MARTIN B MAY | 45 | COMPUTERS |
| 3. | CLINTON MAY | 43 | CHURCH STAFF |
| 4. | JENE MAY | 41 | HIRING SERVICES |
| 5. | | | |

9

## CHILDREN INFORMATION

| | Full Name | Age | School or Occupation |
|---|---|---|---|
| 1. | APRIL DAWN MAY | 27 | PERSONNEL TRAINING |
| 2. | PHILLIP C. MAY II | 26 | COMP-(CITY OF DALLAS) SECURITY |
| 3. | PETER TURN MAY | 18 | HOME SCHOOLED |
| 4. | AMBER JAYNE MAY | 16 | |
| | BRIAN ALYCE MAY | 9 | |

## PARENTS

| | Full Name | Age | Occupation (Before Retirement) |
|---|---|---|---|
| 1. | KENNY G MAY Jr. | 81 | TRAILER REPAIR |
| 2. | JENNY O MAY | 76 | N/A |

Have you, any family member or close personal friend ever studied psychology, sociology, criminology or law (or worked for a person in one of these fields)? ☑ Yes ☐ No
If yes, please give details. 6 HOURS IN COLLEGE

Have you, any family member or close personal friend ever undergone counseling or treatment for emotional, psychiatric, behavioral or substance abuse (alcohol or drug) problems?
☐ Yes ☑ No
If yes, please give details. _____

What are your feelings, either positive or negative, about psychiatrists, psychologists or other mental health professionals? _____

MIXED - I FEEL THEY DO SERVE A PURPOSE, BUT THEY ARE ONLY ONE OF A NUMBER OF ALTERNATIVES

## EDUCATION
What is the highest grade level that you have completed in school, including trade or technical schools?

BBA - BUSINESS ACT'G

10

**MILITARY SERVICE**

Please list branch, years of service, duties (including duty as military police and service on any court martial, including the nature of the charges), rank, type of discharge and whether you served in combat :

Yourself _____ N|A _____

Spouse _____ ✗ _____


**RELIGIOUS, POLITICAL AND OTHER ACTIVITIES**

Name and location of your church, synagogue or place of worship

_SHADY GROVE CHURCH — GRAND PRAIRIE_

How often do you attend? _WEEKLY_

Other than attendance, what other activities are you involved in at your church?

_NONE_

Does your church, synagogue or place of worship have a position on the death penalty?

☐ Yes ☐ No   If yes, please give details. _I DON'T KNOW._

_____

Were you raised in some other faith or denomination? ☑ Yes ☐ No
If so, which one? _BAPTIST_

Do you consider yourself politically liberal, conservative, or moderate? _CONSERVATIVE_

Do you consider yourself a Democrat, Republican, Independent, etc.? _NONE - THOUGH MY LEANING IS REPUBLICAN_

Are you registered to vote?   ☑ Yes ☐ No

Would you consider yourself as a leader or a follower? _LEADER_

What are your hobbies, recreations or pastimes? _HOMESCHOOLING ACTIVITIES_

What bumper stickers do you have on your vehicle? _NONE_

_____

11

Have you had a special interest (personally or through the media) in any criminal case?

☐ Yes  ☑ No      If yes, what was the case and what conclusions, if any, did you reach?

_____

_____

List two (2) men and women who are publicly known whom you **MOST** respect:

Men:                                          Women:

BILL GOTHARD _____        PHYLLES SCHAEFER (?) ____

GEORGE BUSH _____         SHIRLEY DOBSON _____

List two (2) men and women who are publicly known whom you **LEAST** respect:

Men:                                          Women:

BILL CLINTON _____        DEMI MOORE _____

SADAM HOSSEIN (?) _____           ? _____

Have you ever owned or fired a gun? ☑ Yes ☐ No   Please explain the circumstances surrounding

your answer. __I HAVE A SHOTGUN.  I HAVE SHOT SKEET?__

_____

## THIS CASE

Do you know either of the prosecutors, Greg Davis and Mary Miller? ☐ Yes ☑ No

Do you know any of the defense attorneys, Mike Byck, Jane Little and Jennifer Balido?

☐ Yes ☑ No

Do you know, or think you might know, the defendant, Jedidiah Isaac Murphy, or any of his family?

☐ Yes ☑ No

Did you know the deceased, Bertie Cunningham, or any of her family? ☐ Yes ☑ No

Do you know Bill Hill, Dallas County District Attorney, or any other members of his staff?

☐ Yes ☑ No

If you have any plans to be out of Dallas County within the next six (6) months, please state the

dates: ___WASH DC   3|28 — 4|1___

_____

Are you currently taking any medication?  ☐ Yes  ☑ No

If yes, please give details. _____

_____

Do you have any personal or health problems (hearing, medications, etc.) that would prevent you from giving your full attention to the testimony during the trial?  ☐ Yes  ☑ No

If yes, please give details. _____

_____

_____

Do you know of any reason why you could not sit as a juror for this trial, be absolutely fair to the Defendant and the State and render a verdict based solely upon the evidence presented to you?

☐ Yes  ☑ No

If yes, please give details. _____

_____

_____

Is there any reason why you would not want to serve as a juror in this case?  ☐ Yes  ☑ No

If yes, please give details. _____

_____ IT IS A VERY SUPERIOR THOUGHT. _____

_____

Do you want to serve as a juror in this case?  ☐ Yes  ☐ No    If yes, why? _____

_____ I WILL DO IT.  I AM SOBERED BY THE _____

_____ PROSPECT. _____

13

"I DECLARE UNDER PENALTY OF PERJURY THAT ALL OF MY ANSWERS IN THIS JUROR QUESTIONNAIRE ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF MY KNOWLEDGE."

**(Signature)**

*Please review the attached list of names, and circle the names you know, or might know.*

14

# POSSIBLE STATE'S WITNESSES

<u>Civilians</u>
Elizabeth Chaney Erwin
Debbie Armstrong
Treshod Tarrant
Gary Oats
Clint Wiggington
Brandon Zachery
Michael Wayne Williams
Mark Read
Brian Lane
Kenneth Crisler
Leslie Webster
Joseph Testa
Ray Bob Phillips
Chelsea Willis
Jeanne Evans
Sherryl Wilhelm
Leslie Dunkin
Dana Jones
Marjorie Ellis
Felix Ozuna
Evelyn Shelton
Jerry Conner
Francis Conner
Erika Erwin
Tonya Thorp
Zachary Mamot
Ryan Hammonds
Ashleigh Johnson
Bobby Harp
Phillip Shaun Cruz
Jennie Duval, M.D.
Tim Erwin
Kenneth Clance
Whalen Brunton
Jennifer Farnsworth
Cassye Erwin
Samantha Murphy
Charles Armitage
Brent Simmons
Logan Craft
Bob Murphy
Doha Aridi
Akram Aridi
Matt Tollesbol
Jerry Kwiechen
Jatora Yarborough
Ora Mae Milton

<u>Civilians</u>
Randy Crow
Christy Baugh
Derek Cruz
Lesa Flowers
Willard Gold, M.D.
Rathidevi Reddy, M.D.
Luke Peris, M.D.
Jeffrey DeHaan, M.D.
John Motley
Cindy Monds
William Vandiver, M.D.
James Garrison, M.D.
Stephen Farnes, M.D.
Shirley Bard
Terry Tolar
Celeste Tolar
Kenneth Fritcher
Steve Gipson
Joanna Gilmore
Kirsten Adames
Hooman Sedighi, M.D.
Kenneth Pruitt
Jan Brooks
William Estabrook, M.D.
Julie Gaynor
Mark Landrum
Kenneth Phillips
Richard Shollenberger
Jack Shellnut
George Poteet
Monty Dunn
Cesar De La Torre
Harlan Bailey
David Davenport
Robert Rabbel
Bud Farmer
Alan Cousins
Ozell Wilcoxson
Diana Langford
K. Pruitt
Stephen Vestal
Jan Brooks
Debra Murphy
John Donahue
Patricio Mamot
Sandra Mamot
Randy Hammond

<u>Garland Police Dept</u>
M. J. Meyers
J. S. Rogers
J. Mowery
J. L. Lay
J. Delmar
W. Brown
S. Tooke
V. Long
B. Rice
P. Parker
V. Standley
H. Tharp

<u>Terrell Police Dept</u>
D. Alberty

<u>Van Zandt County Sheriff</u>
G. Rose
J. Branch
R. Goodson
R. Goldey
R. Pool
J. DeCoux
D. Pool
D. Blaylock
K. Jackson

<u>Edgewood Police Dept</u>
J. Bonham
D. Corbett
M. Bates

<u>Arlington Police Dept</u>
D. Neese
J. Stanton

<u>Wills Point Police Dept</u>
James Lee
I. Medina
R. Keeney

<u>Dallas Police Dept</u>
W. Clifton
M. Poole
C. Garcia
B. Bedford

Kaufman County Sheriff
J. Wood
H. Tim

1

2

3

4

5

6

7

8

9

10                    COURT'S RECORD

11               JUROR QUESTIONNAIRE

12          Venireperson -  John Robuck

13                  (Copy Attached)

14

15

16

17

18

19

20

21

22

23

24

25

# JUROR QUESTIONNAIRE

Juror No. _1958_

You have taken an oath to truthfully answer the following questions. Please answer _each and every question_ as completely and accurately as you can. The information you give in this questionnaire will be kept confidential. After a jury has been selected, all copies of this questionnaire will be returned to the Court, and kept in confidence, under seal, not accessible to the public or the media.

Name: _ROBUCK_  _JOHN_  _HARBIN_
          Last            First         Middle      Maiden (If Applicable)

Sex: _M_

Age: _28_

Race: _C_

Birthdate: _09_ _06_ _72_
         Month   Day    Year

Birthplace: _DALLAS_ _TX_
        City/Town      State

Driver's License No. _449-19___

Social Security __

Home Address: _____ _RAVEN____ _DALLAS TX 75214_
        Number Street         City/Town    Zip

Home Number (_214_) _826-7135_   Work Number (_214_) _989-1629_

The individual in this case is accused of capital murder. If, and only if, the State proves its case beyond a reasonable doubt as to the defendant, the jury will decide punishment. There is no way of knowing whether the jury will even find the defendant guilty, but the law requires that you answer certain questions regarding your thoughts and feelings on the death penalty.

## DEATH PENALTY

Are you in favor of the death penalty? ☒ Yes ☐ No

Please explain your answer.

_It is the only way to restitute the murder of an innecent individual_

Which of the following statements best represents your feelings about the death penalty: (Circle)

1. I believe that the death penalty should be imposed in all capital murder cases.
2. I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case.
3. Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.
4. I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict which assessed the death penalty.
5. I could never, under any circumstances, return a verdict which assessed the death penalty.

1

What is the best argument in favor of the death penalty? _____

_____

What is the best argument in opposition of the death penalty? _Wrong verdict_

_____

**LIFE CONFINEMENT IN PRISON**
Which of the following statements best represents your feelings about life confinement in prison:
(Circle )
1. I believe that life confinement in prison is never appropriate in any capital murder case.
2. I believe that life confinement in prison is never appropriate in any murder case.
(3.) I believe that life confinement in prison is appropriate in some capital murder cases and I could return a verdict resulting in life confinement in a proper case.

Do you think that the death penalty should be available for punishment upon conviction of other criminal offenses? ☐ Yes ☒ No If yes, which ones? _____

_____

Do you have any moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being? ☐ Yes ☒ No

Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being? ☒ Yes ☒ No

Have you received any information regarding this case from any source outside of this courtroom, including, but not limited to, any newspaper articles, television news, internet site, or any other hearsay source? ☐ Yes ☒ No Please list the source and the substance of the information_____

_____

_____

_____

Have you discussed any aspect of this case with anyone? ☐ Yes ☒ No

From hearsay, or otherwise, have you established in your mind such a conclusion as to the guilt or innocence of the Defendant as would influence you in finding a verdict? ☐ Yes ☒ No

2

**CRIMINAL JUSTICE SYSTEM**

Please complete the following eight (8) statements:

The biggest problem in the criminal justice system is ___the lack amount of___
___time it takes to process a criminal case___

The death penalty in Texas is ___constitutional___

Police officers ___do a good job___

The burden of proof in a criminal case is ___in the hands of the prosecuting___
___attorneys___

The prison system in Texas is ___underfunded___

Prosecutors ___do their job___

Criminal defense attorneys ___have biases toward their client___

What makes a person dangerous? ___Intent to do harm___

3

Please state your personal belief regarding the following ten (10) statements: (Check one answer in each question)

"I trust the criminal justice system in Dallas County."
☐Strongly Agree  ☐Agree  ☐Uncertain  ☒Disagree  ☐Strongly Disagree

"Criminal laws (including sentences and punishment) treat criminal defendants too harshly."
☐Strongly Agree  ☐Agree  ☐Uncertain  ☐Disagree  ☒Strongly Disagree

"If someone is accused of Capital Murder, he should have to prove his innocence."
☐Strongly Agree  ☒Agree  ☐Uncertain  ☐Disagree  ☐Strongly Disagree

"Persons determine their destiny or fate by choices they make in life."
☒Strongly Agree  ☐Agree  ☐Uncertain  ☐Disagree  ☐Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing."
☐Strongly Agree  ☐Agree  ☐Uncertain  ☐Disagree  ☒Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing as well as the choices that they make in life."
☐Strongly Agree  ☐Agree  ☐Uncertain  ☒Disagree  ☐Strongly Disagree

"Genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime."
☐Strongly Agree  ☐Agree  ☐Uncertain  ☐Disagree  ☒Strongly Disagree

"If a person is brought to trial on murder charges, that person is probably guilty."
☐Strongly Agree  ☒Agree  ☐Uncertain  ☐Disagree  ☐Strongly Disagree

"A defendant is innocent unless proven guilty beyond a reasonable doubt."
☐Strongly Agree  ☒Agree  ☐Uncertain  ☐Disagree  ☐Strongly Disagree

"It is the job of the jury to solve the crime."
☐Strongly Agree  ☐Agree  ☐Uncertain  ☒Disagree  ☐Strongly Disagree

4

The law in the State of Texas says: "Voluntary intoxication does not constitute a defense to the commission of crime". Do you agree with this law? ☒ Yes ☐ No

Please explain. _____

_____You are still responsible for your actions_____

_____

The law in the State of Texas says that a person can be convicted of capital murder based solely on circumstantial evidence with no eyewitnesses if you believe the evidence beyond a reasonable doubt.

Do you agree with this law? ☒ Yes ☐ No

Please explain. _____

_____I believe that the DA's office is not going to bring someone to trail they think is innocent especially w/ the use of medical advances._____

The law in the State of Texas says that a person convicted of capital murder can receive the death penalty solely because of the facts and circumstances of the crime, even if he has committed no other crimes. Do you agree with this law? ☒ Yes ☐ No

Please explain. _____

_____Again, you are responsible for your own actions regardless of your past history_____

Do you believe the death penalty is applied fairly in the State of Texas? ☒ Yes ☐ No

Please explain. _____

_____Through the court systems, and medical advances w/ DNA, I believe it is fair_____

Have you ever felt differently about the death penalty than you do now? ☐ Yes ☒ No

If yes, please explain what brought about this change and when the change occurred.

_____

_____

If you believe in using the death penalty, how strongly, on a scale of 1 to 10, do you hold that belief? (1 being the least and 10 being the strongest) ___9___

Rank the following objectives of punishment in order of their importance to you:

___3___ Rehabilitation      ___2___ Deterrence      ___1___ Punishment

5

In your opinion, what does the death penalty say about American Culture? *That we*
*are going to punish people who do wrong.*

The Constitution says an accused citizen does not have to testify on his or her own behalf. How do
you feel about this constitutional privilege? *I disagree. I think it is*
*the responsibility of the accused to defend*
*themselves through testimony*

Do you think citizens accused of criminal offenses are afforded too many rights by the Constitutions
of the United States and the State of Texas and the criminal laws of this state?
☒ Yes ☒ No. Please explain your answer. *I think a fair trial by*
*jury is fair.*

Have you, your spouse, any family members or close personal friends ever been accused, arrested or
convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime
**ABOVE** the level of a traffic ticket? ☐ Yes ☒ No
If yes, please give the following details:

| Person Charged | Charge | Date Accused | Outcome of Charge |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Have you, your spouse, any family members or close personal friends ever used the services of an
attorney, been involved in litigation, or had friends or associates (professionally or socially) who are
attorneys? ☐ Yes ☒ No
If yes, please give the following details:

| Person Using Attorney | Attorney | Reason Attorney Used |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

6

Do you know anyone who has been in jail or prison, or is in jail or prison?

☐ Yes ☒ No

If yes, please give the following details:

| Person Charged | Charge | Jail or Prison | Outcome of Charge |

1. _____

2. _____

3. _____

4. _____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national group opposed to the death penalty or any group dedicated to defendants' rights? ☐ Yes ☒ No  If yes, please give details. _____

_____

_____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national citizen law enforcement group such as a crime commission, group dedicated to victims' rights, traffic commission, neighborhood crime watch, Mothers Against Drunk Driving or police or sheriff's auxiliary? ☒ Yes ☐ No

If yes, please give details. _____

My wife works for Child Protective Services through counceling

Have you, your spouse, any family members or close personal friends ever been the victim of a crime, a witness to a crime or been interested in the outcome of a criminal case (either personally or through the media)? Have you ever used the services of this or any other District Attorney's office (hot checks, child support, protective order, etc.)?

☒ Yes ☐ No

If yes, please give details. _Been a victim of burglary_

_____

Have you, your spouse, any family members or close personal friends ever had any training in law enforcement, applied for employment in law enforcement or been employed in law enforcement (police officer, constable, deputy sheriff, security guard, prison or detention officer, parole officer, probation officer, secretary in police department, etc.)? ☐ Yes ☒ No

If yes, please give details. _____

_____

Have you or your spouse ever served on a grand jury? ☐ Yes ☒ No  If yes, please give dates and circumstances surrounding your service on the grand jury._____

_____

_____

Have you or your spouse ever been a juror in a civil or criminal case?

☒ Yes ☐ No     If yes, please give the following details:

| Type of case | Verdict | Punishment | Whether Jury or Judge Set Punishment |
|---|---|---|---|
| 1. DWI - 3ᶦᵈ Offense | HUNG | — | |
| 2. | | | |
| 3. | | | |

If no verdict was reached, please explain why. 11 of the 12 jurors felt the accused was guilty — One did not.

_____

Did you feel you had all the information you needed to reach a verdict? ☒ Yes ☐ No

How would you feel if you later learned that you, as a juror, did not have all of the information available and the new information might have caused you to return a different verdict? _____

~~the~~ Bring the case to appeals court

_____

Were you the foreperson on any of those juries? ☐ Yes ☒ No

Regarding your jury service: (circle the number(s) which apply to you):
1.     I can tell pretty easily when a person is telling a lie.
②.     When I make up my mind, I rarely change it.
3.     I can frequently be influenced by the opinion of others.
4.     I always follow my own ideas rather than do what others expect of me.

Outside of your jury service, have you ever observed a court proceeding before? ☐ Yes ☒ No
Please give details: _____

_____

8

## BIOGRAPHICAL INFORMATION

How long have you lived in Dallas County? _My whole life_

What other cities have you lived in, and how many years did you live in each city?

Employer: _Dain Rauscher Inc ._

Occupation/Duties: _Business Analyst_

How long employed there? _One Year_

What other jobs have you held? _Banc One - Investments_

Marital Status: (Check one) ☐Widowed ☒Married ☐Separated ☐Divorced ☐Single

How long married? _1 year_                How many times married? _1_

List any last names you had from previous marriages, if applicable. _____

Spouse's Name: _Robuck____Carmina___James___James_
               Last        First       Middle    Maiden (If Applicable)

Birthdate: ___09_____04_____72___
           Month    Day    Year

Spouse's Employer: _Park Cities Baptist Church / Promise House_

Occupation Duties: _Canceler_

## BROTHERS AND SISTERS

| Full Name | Age | School or Occupation |
|---|---|---|
| 1. Richard Ney Robuck | 26 | Rice Graduate School |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |

9

## CHILDREN INFORMATION

| Full Name | Age | School or Occupation |
|-----------|-----|----------------------|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |

## PARENTS

| Full Name | Age | Occupation (Before Retirement) |
|-----------|-----|-------------------------------|
| 1. JOEL ROBUCK | 60 | REAL ESTATE |
| 2. LINDA ROBUCK | 53 | HOUSEWIFE |

Have you, any family member or close personal friend ever studied psychology, sociology, criminology or law (or worked for a person in one of these fields)? ☒ Yes ☐ No
If yes, please give details. _____
Wife studied psychology in Grad School

Have you, any family member or close personal friend ever undergone counseling or treatment for emotional, psychiatric, behavioral or substance abuse (alcohol or drug) problems?
☐ Yes ☒ No
If yes, please give details. _____

What are your feelings, either positive or negative, about psychiatrists, psychologists or other mental health professionals? _____
They are a good sorce of healing.

## EDUCATION

What is the highest grade level that you have completed in school, including trade or technical schools?
Graduated College

10

**MILITARY SERVICE**

Please list branch, years of service, duties (including duty as military police and service on any court martial, including the nature of the charges), rank, type of discharge and whether you served in combat :

Yourself _____

Spouse _____

**RELIGIOUS, POLITICAL AND OTHER ACTIVITIES**

Name and location of your church, synagogue or place of worship

_Park Cities Baptist Church_

How often do you attend? _WEEKLY_

Other than attendance, what other activities are you involved in at your church?

_Wednesday Night Programs / Saturday Night Services_

Does your church, synagogue or place of worship have a position on the death penalty?

☐ Yes  ☐ No   If yes, please give details._____

_UNKNOWN_

Were you raised in some other faith or denomination? ☒ Yes  ☐ No

If so, which one? _PRES BY TERIAN_

Do you consider yourself politically liberal, conservative, or moderate? _CONSERVATIVE MODERATE_

Do you consider yourself a Democrat, Republican, Independent, etc.? _REPUBLICAN_

Are you registered to vote? ☒ Yes  ☐ No

Would you consider yourself as a leader or a follower?_LEADER_

What are your hobbies, recreations or pastimes?_____

_GOLF  TENNIS_

What bumper stickers do you have on your vehicle?_College Sticker_

_College Emblem_

11

Have you had a special interest (personally or through the media) in any criminal case?

☐ Yes  ☒ No        If yes, what was the case and what conclusions, if any, did you reach?

_____

_____

List two (2) men and women who are publicly known whom you **MOST** respect:

Men: GEORGE BUSH _____   Women: _____

RON KIRK _____              _____

List two (2) men and women who are publicly known whom you **LEAST** respect:

Men: BILL CLINTON _____   Women: HILARY CLINTON _____

_____              _____

Have you ever owned or fired a gun? ☐ Yes ☒ No   Please explain the circumstances surrounding your answer._____

_____

**THIS CASE**

Do you know either of the prosecutors, Greg Davis and Mary Miller? ☐ Yes ☒ No

Do you know any of the defense attorneys, Mike Byck, Jane Little and Jennifer Balido?
☐ Yes ☒ No

Do you know, or think you might know, the defendant, Jedidiah Isaac Murphy, or any of his family?
☐ Yes ☒ No

Did you know the deceased, Bertie Cunningham, or any of her family? ☐ Yes ☒ No

Do you know Bill Hill, Dallas County District Attorney, or any other members of his staff?
☐ Yes ☒ No

If you have any plans to be out of Dallas County within the next six (6) months, please state the

dates: YES — MARCH 22-26 / APRIL 27-29

JULY 15-31

12

Are you currently taking any medication? ☐ Yes ☒ No

If yes, please give details. _____

_____

Do you have any personal or health problems (hearing, medications, etc.) that would prevent you from giving your full attention to the testimony during the trial? ☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Do you know of any reason why you could not sit as a juror for this trial, be absolutely fair to the Defendant and the State and render a verdict based solely upon the evidence presented to you?

☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Is there any reason why you would not want to serve as a juror in this case? ☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Do you want to serve as a juror in this case? ☒ Yes ☒ No    If yes, why? _____

___It's my duty as a U.S Citizen_____

_____

13

**"I DECLARE UNDER PENALTY OF PERJURY THAT ALL OF MY ANSWERS IN THIS JUROR QUESTIONNAIRE ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF MY KNOWLEDGE."**

**(Signature)**

*Please review the attached list of names, and circle the names you know, or might know.*

14

# POSSIBLE STATE'S WITNESSES

Civilians

Elizabeth Chaney Erwin
Debbie Armstrong
Treshod Tarrant
Gary Oats
Clint Wiggington
Brandon Zachery
Michael Wayne Williams
Mark Read
Brian Lane
Kenneth Crisler
Leslie Webster
Joseph Testa
Ray Bob Phillips
Chelsea Willis
Jeanne Evans
Sherryl Wilhelm
Leslie Dunkin
Dana Jones
Marjorie Ellis
Felix Ozuna
Evelyn Shelton
Jerry Conner
Francis Conner
Erika Erwin
Tonya Thorp
Zachary Mamot
Ryan Hammonds
Ashleigh Johnson
Bobby Harp
Phillip Shaun Cruz
Jennie Duval, M.D.
Tim Erwin
Kenneth Clance
Whalen Brunton
Jennifer Farnsworth
Cassye Erwin
Samantha Murphy
Charles Armitage
Brent Simmons
Logan Craft
Bob Murphy
Doha Aridi
Akram Aridi
Matt Tollesbol
Jerry Kwiechen
Jatora Yarborough
Ora Mae Milton

Civilians

Randy Crow
Christy Baugh
Derek Cruz
Lesa Flowers
Willard Gold, M.D.
Rathidevi Reddy, M.D.
Luke Peris, M.D.
Jeffrey DeHaan, M.D.
John Motley
Cindy Monds
William Vandiver, M.D.
James Garrison, M.D.
Stephen Farnes, M.D.
Shirley Bard
Terry Tolar
Celeste Tolar
Kenneth Fritcher
Steve Gipson
Joanna Gilmore
Kirsten Adames
Hooman Sedighi, M.D.
Kenneth Pruitt
Jan Brooks
William Estabrook, M.D.
Julie Gaynor
Mark Landrum
Kenneth Phillips
Richard Shollenberger
Jack Shellnut
George Poteet
Monty Dunn
Cesar De La Torre
Harlan Bailey
David Davenport
Robert Rabbel
Bud Farmer
Alan Cousins
Ozell Wilcoxson
Diana Langford
K. Pruitt
Stephen Vestal
Jan Brooks
Debra Murphy
John Donahue
Patricio Mamot
Sandra Mamot
Randy Hammond

Garland Police Dept

M. J. Meyers
J. S. Rogers
J. Mowery
J. L. Lay
J. Delmar
W. Brown
S. Tooke
V. Long
B. Rice
P. Parker
V. Standley
H. Tharp

Terrell Police Dept

D. Alberty

Van Zandt County Sheriff

G. Rose
J. Branch
R. Goodson
R. Goldey
R. Pool
J. DeCoux
D. Pool
D. Blaylock
K. Jackson

Edgewood Police Dept

J. Bonham
D. Corbett
M. Bates

Arlington Police Dept

D. Neese
J. Stanton

Wills Point Police Dept

James Lee
I. Medina
R. Keeney

Dallas Police Dept

W. Clifton
M. Poole
C. Garcia
B. Bedford

Kaufman County Sheriff
J. Wood
H. Tim

1

2

3

4

5

6

7

8

9

10                    COURT'S RECORD

11                 JUROR QUESTIONNAIRE

12          Venireperson -  Thomas Brooks

13                   (Copy Attached)

14

15

16

17

18

19

20

21

22

23

24

25

# JUROR QUESTIONNAIRE

Juror No. _77_

You have taken an oath to truthfully answer the following questions. Please answer *each and every question* as completely and accurately as you can. The information you give in this questionnaire will be kept confidential. After a jury has been selected, all copies of this questionnaire will be returned to the Court, and kept in confidence, under seal, not accessible to the public or the media.

Name: _Brooks_ _Thomas_ _A_
     Last        First      Middle    Maiden (If Applicable)

Sex: _M_
Age: _57_
Race: _C_

Birthdate: _11_ _26_ _43_ ✓ 6/1
        Month   Day   Year

Birthplace: _DeKalb_ _TX_
        City/Town    State

Driver's License No. _02776573_
Social Security No. _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_
Home Address: _2602 Amy_    _Rowlett_    _75088-5875_
     Number Street       City/Town    Zip

Home Number _(972) 475-7019_    Work Number _(214) 827-0813 ext 7177_

The individual in this case is accused of capital murder. If, and only if, the State proves its case beyond a reasonable doubt as to the defendant , the jury will decide punishment. There is no way of knowing whether the jury will even find the defendant guilty, but the law requires that you answer certain questions regarding your thoughts and feelings on the death penalty.

## DEATH PENALTY

Are you in favor of the death penalty? ☑ Yes ☐ No
Please explain your answer. _I feel it is a necessary tool in our justice_

_system_

Which of the following statements best represents your feelings about the death penalty: (Circle)
1. I believe that the death penalty should be imposed in all capital murder cases.
2. I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case.
3. Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.
4. I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict which assessed the death penalty.
5. I could never, under any circumstances, return a verdict which assessed the death penalty.

1

What is the best argument in favor of the death penalty? *PROVE CRIME WITHOUT A DOUBT*

*DOUBT*

What is the best argument in opposition of the death penalty? *REASONABLE DOUBT*

## LIFE CONFINEMENT IN PRISON

Which of the following statements best represents your feelings about life confinement in prison:
(Circle )

1. I believe that life confinement in prison is never appropriate in any capital murder case.
2. I believe that life confinement in prison is never appropriate in any murder case.
3. I believe that life confinement in prison is appropriate in some capital murder cases and I could return a verdict resulting in life confinement in a proper case.

Do you think that the death penalty should be available for punishment upon conviction of other criminal offenses? ☐ Yes ☒ No   If yes, which ones? _____

Do you have any moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being? ☐ Yes ☒ No

Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being? ☐ Yes ☒ No

Have you received any information regarding this case from any source outside of this courtroom, including, but not limited to, any newspaper articles, television news, internet site, or any other hearsay source? ☐ Yes ☒ No   Please list the source and the substance of the information_____

Have you discussed any aspect of this case with anyone? ☐ Yes ☒ No

From hearsay, or otherwise, have you established in your mind such a conclusion as to the guilt or innocence of the Defendant as would influence you in finding a verdict? ☐ Yes ☒ No

2

# CRIMINAL JUSTICE SYSTEM

Please complete the following eight (8) statements:

The biggest problem in the criminal justice system is _____

_____

_____

The death penalty in Texas is _NECESSARY_

_____

_____

Police officers _NEED MORE QUALIFIED OFFICERS_

_____

_____

The burden of proof in a criminal case is _evidence presented in THE CASE_

_____

_____

The prison system in Texas is _OVER CROWDED_

_____

_____

Prosecutors_____

_____

_____

Criminal defense attorneys_____

_____

_____

What makes a person dangerous? _ABILITY TO CONTINUE CRIMINAL ACTS_

_____

_____

3

Please state your personal belief regarding the following ten (10) statements: (Check one answer in each question)

"I trust the criminal justice system in Dallas County."

☑ Strongly Agree ☐ Agree ☐ Uncertain ☐ Disagree ☐ Strongly Disagree

"Criminal laws (including sentences and punishment) treat criminal defendants too harshly."

☐ Strongly Agree ☐ Agree ☐ Uncertain ☐ Disagree ☑ Strongly Disagree

"If someone is accused of Capital Murder, he should have to prove his innocence."

☑ Strongly Agree ☐ Agree ☐ Uncertain ☐ Disagree ☐ Strongly Disagree

"Persons determine their destiny or fate by choices they make in life."

☑ Strongly Agree ☐ Agree ☐ Uncertain ☐ Disagree ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing."

☐ Strongly Agree ☑ Agree ☐ Uncertain ☐ Disagree ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing as well as the choices that they make in life."

☐ Strongly Agree ☑ Agree ☐ Uncertain ☐ Disagree ☐ Strongly Disagree

"Genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime."

☐ Strongly Agree ☐ Agree ☐ Uncertain ☑ Disagree ☐ Strongly Disagree

"If a person is brought to trial on murder charges, that person is probably guilty."

☐ Strongly Agree ☐ Agree ☐ Uncertain ☐ Disagree ☑ Strongly Disagree

"A defendant is innocent unless proven guilty beyond a reasonable doubt."

☑ Strongly Agree ☐ Agree ☐ Uncertain ☐ Disagree ☐ Strongly Disagree

"It is the job of the jury to solve the crime."

☐ Strongly Agree ☐ Agree ☐ Uncertain ☐ Disagree ☑ Strongly Disagree

4

The law in the State of Texas says that "Voluntary intoxication does not constitute a defense to the commission of crime". Do you agree with this law? ☑ Yes ☐ No

Please explain. _____

_____

_____

The law in the State of Texas says that a person can be convicted of capital murder based <u>solely</u> on circumstantial evidence with <u>no</u> eyewitnesses if you believe the evidence beyond a reasonable doubt.

Do you agree with this law? ☑ Yes ☐ No

Please explain. _____

_____

_____

The law in the State of Texas says that a person convicted of capital murder can receive the death penalty <u>solely</u> because of the facts and circumstances of the crime, even if he has committed <u>no</u> other crimes. Do you agree with this law? ☑ Yes ☐ No

Please explain. _____

_____

_____

Do you believe the death penalty is applied fairly in the State of Texas? ☑ Yes ☐ No

Please explain. _____

_____

_____

Have you ever felt differently about the death penalty than you do now? ☐ Yes ☑ No

If yes, please explain what brought about this change and when the change occurred.

_____

_____

If you believe in using the death penalty, how strongly, on a scale of 1 to 10, do you hold that belief? (1 being the least and 10 being the strongest) __*10*__

Rank the following objectives of punishment in order of their importance to you:

__*2*__ Rehabilitation          __*1*__ Deterrence          __*3*__ Punishment

In your opinion, what does the death penalty say about American Culture? _____
_____
_____

The Constitution says an accused citizen does not have to testify on his or her own behalf. How do you feel about this constitutional privilege? ___ I agree _____
_____
_____

Do you think citizens accused of criminal offenses are afforded too many rights by the Constitutions of the United States and the State of Texas and the criminal laws of this state?

☐ Yes ☒ No. Please explain your answer. _____
_____
_____

Have you, your spouse, any family members or close personal friends ever been accused, arrested or convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime **ABOVE** the level of a traffic ticket? ☐ Yes ☒ No

If yes, please give the following details:

| Person Charged | Charge | Date Accused | Outcome of Charge |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Have you, your spouse, any family members or close personal friends ever used the services of an attorney, been involved in litigation, or had friends or associates (professionally or socially) who are attorneys? ☐ Yes ☒ No

If yes, please give the following details:

| Person Using Attorney | Attorney | Reason Attorney Used |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

6

Do you know anyone who has been in jail or prison, or is in jail or prison?

☐ Yes  ☒ No

If yes, please give the following details:

| Person Charged | Charge | Jail or Prison | Outcome of Charge |
|---|---|---|---|

1. _____

2. _____

3. _____

4. _____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national group opposed to the death penalty or any group dedicated to defendants' rights? ☐ Yes ☒ No  If yes, please give details. _____

_____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national citizen law enforcement group such as a crime commission, group dedicated to victims' rights, traffic commission, neighborhood crime watch, Mothers Against Drunk Driving or police or sheriff's auxiliary?    ☐ Yes  ☒ No

If yes, please give details. _____

_____

Have you, your spouse, any family members or close personal friends ever been the victim of a crime, a witness to a crime or been interested in the outcome of a criminal case (either personally or through the media)? Have you ever used the services of this or any other District Attorney's office (hot checks, child support, protective order, etc.)?

☐ Yes  ☒ No

If yes, please give details. _____

_____

Have you, your spouse, any family members or close personal friends ever had any training in law enforcement, applied for employment in law enforcement or been employed in law enforcement (police officer, constable, deputy sheriff, security guard, prison or detention officer, parole officer, probation officer, secretary in police department, etc.)?    ☐ Yes  ☒ No

If yes, please give details. _____

_____

7

Have you or your spouse ever served on a grand jury? ☐ Yes ☑ No If yes, please give dates and circumstances surrounding your service on the grand jury._____

_____

_____

Have you or your spouse ever been a juror in a civil or criminal case?

☐ Yes ☑ No    If yes, please give the following details:

| <u>Type of case</u> | <u>Verdict</u> | <u>Punishment</u> | <u>Whether Jury or Judge Set Punishment</u> |
|---|---|---|---|

1. _____

2. _____

3. _____

If no verdict was reached, please explain why. _____

_____

_____

Did you feel you had all the information you needed to reach a verdict? ☐ Yes ☐ No

How would you feel if you later learned that you, as a juror, did not have all of the information available and the new information might have caused you to return a different verdict? _____

_____

_____

Were you the foreperson on any of those juries? ☐ Yes ☐ No

Regarding your jury service: (circle the number(s) which apply to you):
1.    I can tell pretty easily when a person is telling a lie.
2.    When I make up my mind, I rarely change it.
3.    I can frequently be influenced by the opinion of others.
4.    I always follow my own ideas rather than do what others expect of me.

Outside of your jury service, have you ever observed a court proceeding before? ☐ Yes ☐ No
Please give details: _____

_____

## BIOGRAPHICAL INFORMATION

How long have you lived in Dallas County? _33 yrs_

What other cities have you lived in, and how many years did you live in each city?

_DeKalB, TX (18yr) DETROIT, MI (6yr)_

Employer: _JULIETTE FOWLER HOMES, IN_

Occupation/Duties: _MAINTENANCE_

How long employed there? _4_

What other jobs have you held? _Region CREDIT Mgr, Accounting CLERK_

Marital Status: (Check one) ☐Widowed ☑Married ☐Separated ☐Divorced ☐Single

How long married? _33 yr_ _____ How many times married? _1_

List any last names you had from previous marriages, if applicable. _____

Spouse's Name: _BROOKS_ _LINDA_ _Joyce_ _SANDERS_
_____Last_____First_____Middle_____Maiden (If Applicable)

Birthdate: _____4_____19_____40_____
_____Month_____Day_____Year

Spouse's Employer: _JULIETTE FOWLER HOMES, INC_

Occupation Duties: _SECRETARY_

## BROTHERS AND SISTERS

| Full Name | Age | School or Occupation |
|---|---|---|
| 1. CHARLES WILLIAM BROOKS | | MECHANIC |
| 2. DAVID Lynn BROOKS | | DOZER OPERATOR |
| 3. ALICE MARIE ROBERTS | | HOUSE WIFE |
| 4. | | |
| 5. | | |

9

## CHILDREN INFORMATION

| Full Name | Age | School or Occupation |
|-----------|-----|----------------------|
| 1. *Misty Marie' Henderson* | | *Branch Mgr - Bank* |
| 2. *Wendy Lorraine Neighbors* | | *Book Keeper* |
| 3. | | |
| 4. | | |

## PARENTS

| Full Name | Age | Occupation (Before Retirement) |
|-----------|-----|-------------------------------|
| 1. *John William Brooks* | | *Mechanic* |
| 2. *Mary Brooks* | | *House wife* |

Have you, any family member or close personal friend ever studied psychology, sociology, criminology or law (or worked for a person in one of these fields)? ☐ Yes ☒ No
If yes, please give details. _____

_____

Have you, any family member or close personal friend ever undergone counseling or treatment for emotional, psychiatric, behavioral or substance abuse (alcohol or drug) problems?

☐ Yes ☒ No
If yes, please give details. _____

_____

What are your feelings, either positive or negative, about psychiatrists, psychologists or other mental health professionals? *They are a needed profession*

_____

_____

## EDUCATION
What is the highest grade level that you have completed in school, including trade or technical schools?

*12th*

10

## MILITARY SERVICE

Please list branch, years of service, duties (including duty as military police and service on any court martial, including the nature of the charges), rank, type of discharge and whether you served in combat :

Yourself _Army ~ 2 yrs_____

Spouse _____

## RELIGIOUS, POLITICAL AND OTHER ACTIVITIES

Name and location of your church, synagogue or place of worship

_Spring Hill Baptist_____

How often do you attend? _Not Regular_____

Other than attendance, what other activities are you involved in at your church?

_____

Does your church, synagogue or place of worship have a position on the death penalty?

☐ Yes ☐ No   If yes, please give details._____

_____

Were you raised in some other faith or denomination? ☐ Yes ☑ No
If so, which one? _____

Do you consider yourself politically liberal, conservative, or moderate? _Conservative___

Do you consider yourself a Democrat, Republican, Independent, etc.? _Democrat_____

Are you registered to vote?   ☐ Yes ☑ No

Would you consider yourself as a leader or a follower? _Leader_____

What are your hobbies, recreations or pastimes? _Fishing, Sports_____

What bumper stickers do you have on your vehicle? _None_____

_____

11

Have you had a special interest (personally or through the media) in any criminal case?

☐ Yes ☒ No    If yes, what was the case and what conclusions, if any, did you reach?

_____

_____

List two (2) men and women who are publicly known whom you **MOST** respect:

Men:                                          Women:

_____        _____

_____        _____

List two (2) men and women who are publicly known whom you **LEAST** respect:

Men:                                          Women:

_____        _____

_____        _____

Have you ever owned or fired a gun? ☒ Yes ☐ No    Please explain the circumstances surrounding your answer. _HUNTING_____

_____

## THIS CASE

Do you know either of the prosecutors, Greg Davis and Mary Miller? ☐ Yes ☒ No

Do you know any of the defense attorneys, Mike Byck, Jane Little and Jennifer Balido?
☐ Yes ☒ No

Do you know, or think you might know, the defendant, Jedidiah Isaac Murphy, or any of his family?
☐ Yes ☒ No

Did you know the deceased, Bertie Cunningham, or any of her family? ☐ Yes ☒ No

Do you know Bill Hill, Dallas County District Attorney, or any other members of his staff?
☐ Yes ☒ No

If you have any plans to be out of Dallas County within the next six (6) months, please state the

dates: _____

_____

12

Are you currently taking any medication? ☒ Yes ☐ No

If yes, please give details. _LIPITOR - (CHLESTROL)_____

_____

Do you have any personal or health problems (hearing, medications, etc.) that would prevent you from giving your full attention to the testimony during the trial?   ☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Do you know of any reason why you could not sit as a juror for this trial, be absolutely fair to the Defendant and the State and render a verdict based solely upon the evidence presented to you?

☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Is there any reason why you would not want to serve as a juror in this case? ☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Do you want to serve as a juror in this case? ☒ Yes ☐ No    If yes, why? _____

_____

_____

"I DECLARE UNDER PENALTY OF PERJURY THAT ALL OF MY ANSWERS IN THIS JUROR QUESTIONNAIRE ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF MY KNOWLEDGE."

**(Signature)**

*Please review the attached list of names, and circle the names you know, or might know.*

14

# POSSIBLE STATE'S WITNESSES

<u>Civilians</u>
Elizabeth Chaney Erwin
Debbie Armstrong
Treshod Tarrant
Gary Oats
Clint Wiggington
Brandon Zachery
Michael Wayne Williams
Mark Read
Brian Lane
Kenneth Crisler
Leslie Webster
Joseph Testa
Ray Bob Phillips
Chelsea Willis
Jeanne Evans
Sherryl Wilhelm
Leslie Dunkin
Dana Jones
Marjorie Ellis
Felix Ozuna
Evelyn Shelton
Jerry Conner
Francis Conner
Erika Erwin
Tonya Thorp
Zachary Mamot
Ryan Hammonds
Ashleigh Johnson
Bobby Harp
Phillip Shaun Cruz
Jennie Duval, M.D.
Tim Erwin
Kenneth Clance
Whalen Brunton
Jennifer Farnsworth
Cassye Erwin
Samantha Murphy
Charles Armitage
Brent Simmons
Logan Craft
Bob Murphy
Doha Aridi
Akram Aridi
Matt Tollesbol
Jerry Kwiechen
Jatora Yarborough
Ora Mae Milton

<u>Civilians</u>
Randy Crow
Christy Baugh
Derek Cruz
Lesa Flowers
Willard Gold, M.D.
Rathidevi Reddy, M.D.
Luke Peris, M.D.
Jeffrey DeHaan, M.D.
John Motley
Cindy Monds
William Vandiver, M.D.
James Garrison, M.D.
Stephen Farnes, M.D.
Shirley Bard
Terry Tolar
Celeste Tolar
Kenneth Fritcher
Steve Gipson
Joanna Gilmore
Kirsten Adames
Hooman Sedighi, M.D.
Kenneth Pruitt
Jan Brooks
William Estabrook, M.D.
Julie Gaynor
Mark Landrum
Kenneth Phillips
Richard Shollenberger
Jack Shellnut
George Poteet
Monty Dunn
Cesar De La Torre
Harlan Bailey
David Davenport
Robert Rabbel
Bud Farmer
Alan Cousins
Ozell Wilcoxson
Diana Langford
K. Pruitt
Stephen Vestal
Jan Brooks
Debra Murphy
John Donahue
Patricio Mamot
Sandra Mamot
Randy Hammond

<u>Garland Police Dept</u>
M. J. Meyers
J. S. Rogers
J. Mowery
J. L. Lay
J. Delmar
W. Brown
S. Tooke
V. Long
B. Rice
P. Parker
V. Standley
H. Tharp

<u>Terrell Police Dept</u>
D. Alberty

<u>Van Zandt County Sheriff</u>
G. Rose
J. Branch
R. Goodson
R. Goldey
R. Pool
J. DeCoux
D. Pool
D. Blaylock
K. Jackson

<u>Edgewood Police Dept</u>
J. Bonham
D. Corbett
M. Bates

<u>Arlington Police Dept</u>
D. Neese
J. Stanton

<u>Wills Point Police Dept</u>
James Lee
I. Medina
R. Keeney

<u>Dallas Police Dept</u>
W. Clifton
M. Poole
C. Garcia
B. Bedford

Kaufman County Sheriff

J. Wood

H. Tim

1

2

3

4

5

6

7

8

9

10                    COURT'S RECORD

11                 JUROR QUESTIONNAIRE

12          Venireperson -  Kimberly Edge

13                  (Copy Attached)

14

15

16

17

18

19

20

21

22

23

24

25

5-8-01 8:30AM

# JUROR QUESTIONNAIRE

**Juror No.** _403_

*You have taken an oath to truthfully answer the following questions. Please answer each and every question as completely and accurately as you can. The information you give in this questionnaire will be kept confidential. After a jury has been selected, all copies of this questionnaire will be returned to the Court, and kept in confidence, under seal, not accessible to the public or the media.*

Name: _Edge_ _Kimberly_ _Sue_ _Wright_
       Last      First       Middle    Maiden (If Applicable)

Sex: _F_                  Birthdate: _September_ _01_ _1969_
Age: _31_                            Month    Day    Year
Race: _W_

6/1 vm at wk

Birthplace: _Springfield_ _Ohio_
            City/Town      State

Driver's License No. _02560700_
Social Security No. _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_
Home Address: _1117 West Park Drive_ _Garland_ _75040_
              Number Street              City/Town    Zip

Home Number _(972) 530-3186_  Work Number _(214) 840-6792_

The individual in this case is accused of capital murder. If, and only if, the State proves its case beyond a reasonable doubt as to the defendant, the jury will decide punishment. There is no way of knowing whether the jury will even find the defendant guilty, but the law requires that you answer certain questions regarding your thoughts and feelings on the death penalty.

## DEATH PENALTY

Are you in favor of the death penalty? ☑ Yes ☐ No
Please explain your answer. _A person should be responsible for their actions and suffer consequences depending on severity of the case._

Which of the following statements best represents your feelings about the death penalty: (Circle)
1. I believe that the death penalty should be imposed in all capital murder cases.
2. I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case.
3. Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.
4. I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict which assessed the death penalty.
5. I could never, under any circumstances, return a verdict which assessed the death penalty.

1

What is the best argument in favor of the death penalty? _Threat to society_

What is the best argument in opposition of the death penalty? _Mentally ill_

## LIFE CONFINEMENT IN PRISON

Which of the following statements best represents your feelings about life confinement in prison: (Circle )

1. I believe that life confinement in prison is never appropriate in any capital murder case.
2. I believe that life confinement in prison is never appropriate in any murder case.
3. I believe that life confinement in prison is appropriate in some capital murder cases and I could return a verdict resulting in life confinement in a proper case.

Do you think that the death penalty should be available for punishment upon conviction of other criminal offenses? ☐ Yes ☒ No   If yes, which ones? _____

_____

Do you have any moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being? ☐ Yes ☒ No

Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being? ☐ Yes ☒ No

Have you received any information regarding this case from any source outside of this courtroom, including, but not limited to, any newspaper articles, television news, internet site, or any other hearsay source? ☐ Yes ☒ No   Please list the source and the substance of the information ____

_____

_____

_____

Have you discussed any aspect of this case with anyone? ☐ Yes ☒ No

From hearsay, or otherwise, have you established in your mind such a conclusion as to the guilt or innocence of the Defendant as would influence you in finding a verdict? ☐ Yes ☒ No

2

# CRIMINAL JUSTICE SYSTEM

Please complete the following eight (8) statements:

The biggest problem in the criminal justice system is *too many people are given short sentences for crimes committed.*

The death penalty in Texas is *being used fairly.*

Police officers *serve our community & should be respected.*

The burden of proof in a criminal case is *that people could view evidence differently.*

The prison system in Texas is *fair*

Prosecutors *would like to see the defendant prosecuted.*

Criminal defense attorneys *defend their clients*

What makes a person dangerous? *Temper, mentality, offenses,*

3

Please state your personal belief regarding the following ten (10) statements. (Check one answer in each question)

"I trust the criminal justice system in Dallas County."

☐ Strongly Agree  ☑ Agree  ☐ Uncertain  ☐ Disagree  ☐ Strongly Disagree

"Criminal laws (including sentences and punishment) treat criminal defendants too harshly."

☐ Strongly Agree  ☐ Agree  ☐ Uncertain  ☑ Disagree  ☐ Strongly Disagree

"If someone is accused of Capital Murder, he should have to prove his innocence."

☐ Strongly Agree  ☐ Agree  ☑ Uncertain  ☐ Disagree  ☐ Strongly Disagree

"Persons determine their destiny or fate by choices they make in life."

☑ Strongly Agree  ☐ Agree  ☐ Uncertain  ☐ Disagree  ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing."

☐ Strongly Agree  ☐ Agree  ☐ Uncertain  ☐ Disagree  ☑ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing as well as the choices that they make in life."

☐ Strongly Agree  ☐ Agree  ☑ Uncertain  ☐ Disagree  ☐ Strongly Disagree

"Genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime."

☐ Strongly Agree  ☑ Agree  ☐ Uncertain  ☐ Disagree  ☐ Strongly Disagree

"If a person is brought to trial on murder charges, that person is probably guilty."

☐ Strongly Agree  ☐ Agree  ☐ Uncertain  ☑ Disagree  ☐ Strongly Disagree

"A defendant is innocent unless proven guilty beyond a reasonable doubt."

☑ Strongly Agree  ☐ Agree  ☐ Uncertain  ☐ Disagree  ☐ Strongly Disagree

"It is the job of the jury to solve the crime."

☐ Strongly Agree  ☑ Agree  ☑ Uncertain  ☐ Disagree  ☐ Strongly Disagree

The law in the State of Texas says: *"Voluntary intoxication does not constitute a defense to the commission of crime"*. Do you agree with this law? ☑ Yes ☐ No

Please explain. *A person needs to be accountable for their actions.*

The law in the State of Texas says that a person can be convicted of capital murder based <u>solely</u> on circumstantial evidence with <u>no</u> eyewitnesses if you believe the evidence beyond a reasonable doubt.

Do you agree with this law? ☑ Yes ☐ No

Please explain. *If there is enough evidence presented, there should not be need to be an eyewitness*

The law in the State of Texas says that a person convicted of capital murder can receive the death penalty <u>solely</u> because of the facts and circumstances of the crime, even if he has committed <u>no</u> other crimes. Do you agree with this law? ☑ Yes ☐ No

Please explain. *Just because a person hasn't previously committed a crime, doesn't mean that they should not be punished for the crime they did committ.*

Do you believe the death penalty is applied fairly in the State of Texas? ☑ Yes ☐ No

Please explain. *I feel that they death penalties given have fit the crime committed.*

Have you ever felt differently about the death penalty than you do now? ☐ Yes ☑ No

If yes, please explain what brought about this change and when the change occurred.

If you believe in using the death penalty, how strongly, on a scale of 1 to 10, do you hold that belief? (1 being the least and 10 being the strongest) *10*

Rank the following objectives of punishment in order of their importance to you:

*2* Rehabilitation       *3* Deterrence       *1* Punishment

5

In your opinion, what does the death penalty say about American culture? _will not tolerate murders._

The Constitution says an accused citizen does not have to testify on his or her own behalf. How do you feel about this constitutional privilege? _I feel it is fair._

Do you think citizens accused of criminal offenses are afforded too many rights by the Constitutions of the United States and the State of Texas and the criminal laws of this state?

☐ Yes  ☑ No. Please explain your answer. _Even criminals have to have rights_

Have you, your spouse, any family members or close personal friends ever been accused, arrested or convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime **ABOVE** the level of a traffic ticket?  ☐ Yes  ☑ No

If yes, please give the following details:

| Person Charged | Charge | Date Accused | Outcome of Charge |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Have you, your spouse, any family members or close personal friends ever used the services of an attorney, been involved in litigation, or had friends or associates (professionally or socially) who are attorneys?  ☑ Yes  ☐ No

If yes, please give the following details:

| Person Using Attorney | Attorney | Reason Attorney Used |
|---|---|---|
| 1. | Marialyne Barnard — | worked for her |
| 2. | Betsy Whitaker — | acquaitance |
| 3. | | |

6

Do you know anyone who has been in jail or prison, or is in jail or prison?

☒ Yes ☐ No

If yes, please give the following details:

| Person Charged | Charge | Jail or Prison | Outcome of Charge |
|---|---|---|---|
| 1. Jodie Clifford | Felony | Prison | Released. |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national group opposed to the death penalty or any group dedicated to defendants' rights? ☐ Yes ☒ No If yes, please give details. _____

_____

_____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national citizen law enforcement group such as a crime commission, group dedicated to victims' rights, traffic commission, neighborhood crime watch, Mothers Against Drunk Driving or police or sheriff's auxiliary?   ☐ Yes ☒ No

If yes, please give details. _____

_____

Have you, your spouse, any family members or close personal friends ever been the victim of a crime, a witness to a crime or been interested in the outcome of a criminal case (either personally or through the media)? Have you ever used the services of this or any other District Attorney's office (hot checks, child support, protective order, etc.)?

☐ Yes ☒ No

If yes, please give details. _____

_____

Have you, your spouse, any family members or close personal friends ever had any training in law enforcement, applied for employment in law enforcement or been employed in law enforcement (police officer, constable, deputy sheriff, security guard, prison or detention officer, parole officer, probation officer, secretary in police department, etc.)?   ☐ Yes ☒ No

If yes, please give details. _____

_____

7

Have you or your spouse ever served on a grand jury? ☐ Yes ☑ No  If yes, please give dates and circumstances surrounding your service on the grand jury._____

_____

_____


Have you or your spouse ever been a juror in a civil or criminal case?

☐ Yes ☑ No      If yes, please give the following details:

| Type of case | Verdict | Punishment | Whether Jury or Judge Set Punishment |
|---|---|---|---|

1. _____

2. _____

3. _____


If no verdict was reached, please explain why. _____

_____

_____


Did you feel you had all the information you needed to reach a verdict? ☐ Yes ☐ No

How would you feel if you later learned that you, as a juror, did not have all of the information available and the new information might have caused you to return a different verdict? _____

_____

_____


Were you the foreperson on any of those juries? ☐ Yes ☐ No

Regarding your jury service: (circle the number(s) which apply to you):
1.      I can tell pretty easily when a person is telling a lie.
2.      When I make up my mind, I rarely change it.
3.      I can frequently be influenced by the opinion of others.
4.      I always follow my own ideas rather than do what others expect of me.


Outside of your jury service, have you ever observed a court proceeding before? ☐ Yes ☐ No
Please give details: _____

_____

8

**BIOGRAPHICAL INFORMATION**

How long have you lived in Dallas County? 12

What other cities have you lived in, and how many years did you live in each city?

Springfield, Ohio — 18 years

Employer: KPMG LLP

Occupation/Duties: Admin assistant, assist partners & personel

How long employed there? 2 years

What other jobs have you held? Secretarial, food service

Marital Status: (Check one) ☐ Widowed ☑ Married ☐ Separated ☐ Divorced ☐ Single

How long married? 11 years                How many times married? ___

List any last names you had from previous marriages, if applicable. _____

Spouse's Name: Edge        Doyle        Wayne
                Last        First        Middle        Maiden (If Applicable)

Birthdate: 01        17        1966
           Month      Day       Year

Spouse's Employer: Prestige Ford

Occupation Duties: Parts Salesman

**BROTHERS AND SISTERS**

| Full Name | Age | School or Occupation |
|-----------|-----|----------------------|
| 1. Donald Eugene Wright | 32 | welder |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |

9

## CHILDREN INFORMATION

| Full Name | Age | School or Occupation |
|-----------|-----|---------------------|
| 1. Christopher Ryan Edge | 9 | Spring Creek Elem. |
| 2. | | |
| 3. | | |
| 4. | | |

## PARENTS

| Full Name | Age | Occupation (Before Retirement) |
|-----------|-----|-------------------------------|
| 1. Donald Eugene Wright, Sr. | 60 | inspector |
| 2. Stella June Wright. | 51 | housewife |

Have you, any family member or close personal friend ever studied psychology, sociology, criminology or law (or worked for a person in one of these fields)? ☐ Yes ☒ No

If yes, please give details. _____

Have you, any family member or close personal friend ever undergone counseling or treatment for emotional, psychiatric, behavioral or substance abuse (alcohol or drug) problems?

☐ Yes ☒ No

If yes, please give details. _____

What are your feelings, either positive or negative, about psychiatrists, psychologists or other mental health professionals? _Positive_ _____

## EDUCATION

What is the highest grade level that you have completed in school, including trade or technical schools?

_12_ _____

10

## MILITARY SERVICE

Please list branch, years of service, duties (including duty as military police and service on any court martial, including the nature of the charges), rank, type of discharge and whether you served in combat :

Yourself _NA_

Spouse _Marines — ?_

## RELIGIOUS, POLITICAL AND OTHER ACTIVITIES

Name and location of your church, synagogue or place of worship

_NA_

How often do you attend? _NA_

Other than attendance, what other activities are you involved in at your church?

_NA_

Does your church, synagogue or place of worship have a position on the death penalty?

☐ Yes ☐ No  If yes, please give details. _NA_

Were you raised in some other faith or denomination? ☐ Yes ☐ No
If so, which one? _NA_

Do you consider yourself politically liberal, conservative, or moderate? _Moderate_

Do you consider yourself a Democrat, Republican, Independent, etc.? _Independent_

Are you registered to vote?   ☐ Yes ☒ No

Would you consider yourself as a leader or a follower? _leader_

What are your hobbies, recreations or pastimes? _bowling, skating,_

What bumper stickers do you have on your vehicle? _None_

11

Have you had a special interest (personally or through the media) in any criminal case?

☐ Yes  ☒ No      If yes, what was the case and what conclusions, if any, did you reach?

_____

_____

List two (2) men and women who are publicly known whom you **MOST** respect:

Men:                                    Women:

George Bush                          Susan B. Anthony

_____

List two (2) men and women who are publicly known whom you **LEAST** respect:

Men:  NA                             Women:  NA

_____

Have you ever owned or fired a gun?  ☐ Yes  ☒ No    Please explain the circumstances surrounding your answer. _____

_____

**THIS CASE**

Do you know either of the prosecutors, Greg Davis and Mary Miller?  ☐ Yes  ☒ No

Do you know any of the defense attorneys, Mike Byck, Jane Little and Jennifer Balido?

☐ Yes  ☒ No

Do you know, or think you might know, the defendant, Jedidiah Isaac Murphy, or any of his family?

☐ Yes  ☒ No

Did you know the deceased, Bertie Cunningham, or any of her family?  ☐ Yes  ☒ No

Do you know Bill Hill, Dallas County District Attorney, or any other members of his staff?

☐ Yes  ☒ No

If you have any plans to be out of Dallas County within the next six (6) months, please state the dates:  NA  _____

_____

Are you currently taking any medication? ☐ Yes ☒ No

If yes, please give details. _____

_____

Do you have any personal or health problems (hearing, medications, etc.) that would prevent you from giving your full attention to the testimony during the trial? ☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Do you know of any reason why you could not sit as a juror for this trial, be absolutely fair to the Defendant and the State and render a verdict based solely upon the evidence presented to you?

☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Is there any reason why you would not want to serve as a juror in this case? ☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Do you want to serve as a juror in this case? ☐ Yes ☒ No    If yes, why? _____

_____

_____

13

**"I DECLARE UNDER PENALTY OF PERJURY THAT ALL OF MY ANSWERS IN THIS JUROR QUESTIONNAIRE ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF MY KNOWLEDGE."**

_____

**(Signature)**

*Please review the attached list of names, and circle the names you know, or might know.*

14

# POSSIBLE STATE'S WITNESSES

| Civilians | Civilians | Garland Police Dept |
|---|---|---|
| Elizabeth Chaney Erwin | Randy Crow | M. J. Meyers |
| Debbie Armstrong | Christy Baugh | J. S. Rogers |
| Treshod Tarrant | Derek Cruz | J. Mowery |
| Gary Oats | Lesa Flowers | J. L. Lay |
| Clint Wiggington | Willard Gold, M.D. | J. Delmar |
| Brandon Zachery | Rathidevi Reddy, M.D. | W. Brown |
| Michael Wayne Williams | Luke Peris, M.D. | S. Tooke |
| Mark Read | Jeffrey DeHaan, M.D. | V. Long |
| Brian Lane | John Motley | B. Rice |
| Kenneth Crisler | Cindy Monds | P. Parker |
| Leslie Webster | William Vandiver, M.D. | V. Standley |
| Joseph Testa | James Garrison, M.D. | H. Tharp |
| Ray Bob Phillips | Stephen Farnes, M.D. | |
| Chelsea Willis | Shirley Bard | **Terrell Police Dept** |
| Jeanne Evans | Terry Tolar | D. Alberty |
| Sherryl Wilhelm | Celeste Tolar | |
| Leslie Dunkin | Kenneth Fritcher | **Van Zandt County Sheriff** |
| Dana Jones | Steve Gipson | G. Rose |
| Marjorie Ellis | Joanna Gilmore | J. Branch |
| Felix Ozuna | Kirsten Adames | R. Goodson |
| Evelyn Shelton | Hooman Sedighi, M.D. | R. Goldey |
| Jerry Conner | Kenneth Pruitt | R. Pool |
| Francis Conner | Jan Brooks | J. DeCoux |
| Erika Erwin | William Estabrook, M.D. | D. Pool |
| Tonya Thorp | Julie Gaynor | D. Blaylock |
| Zachary Mamot | Mark Landrum | K. Jackson |
| Ryan Hammonds | Kenneth Phillips | |
| Ashleigh Johnson | Richard Shollenberger | **Edgewood Police Dept** |
| Bobby Harp | Jack Shellnut | J. Bonham |
| Phillip Shaun Cruz | George Poteet | D. Corbett |
| Jennie Duval, M.D. | Monty Dunn | M. Bates |
| Tim Erwin | Cesar De La Torre | |
| Kenneth Clance | Harlan Bailey | **Arlington Police Dept** |
| Whalen Brunton | David Davenport | D. Neese |
| Jennifer Farnsworth | Robert Rabbel | J. Stanton |
| Cassye Erwin | Bud Farmer | |
| Samantha Murphy | Alan Cousins | |
| Charles Armitage | Ozell Wilcoxson | **Wills Point Police Dept** |
| Brent Simmons | Diana Langford | James Lee |
| Logan Craft | K. Pruitt | I. Medina |
| Bob Murphy | Stephen Vestal | R. Keeney |
| Doha Aridi | Jan Brooks | |
| Akram Aridi | Debra Murphy | **Dallas Police Dept** |
| Matt Tollesbol | John Donahue | W. Clifton |
| Jerry Kwiechen | Patricio Mamot | M. Poole |
| Jatora Yarborough | Sandra Mamot | C. Garcia |
| Ora Mae Milton | Randy Hammond | B. Bedford |

Kaufman County Sheriff

J. Wood

H. Tim

1
2
3
4
5
6
7
8
9
10                    COURT'S RECORD
11                 JUROR QUESTIONNAIRE
12           Venireperson -  Kimberly Williams
13                   (Copy Attached)
14
15
16
17
18
19
20
21
22
23
24
25

051401    1PM

# JUROR QUESTIONNAIRE

Juror No. _278_

6/1 notified
Lalia Willis
co-worker

*You have taken an oath to truthfully answer the following questions. Please answer each and every question as completely and accurately as you can. The information you give in this questionnaire will be kept confidential. After a jury has been selected, all copies of this questionnaire will be returned to the Court, and kept in confidence, under seal, not accessible to the public or the media.*

Name: _Williams_     _Kimberly_     _Renea_
        Last        First      Middle    Maiden (If Applicable)

Sex: _F_     Birthdate: _06_  _12_  _64_
Age: _36_             Month   Day   Year
Race: _B_

Birthplace: _Dallas_     _TX_
              City/Town     State

Driver's License No. _126 77890_
Social Security No. _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_
Home Address: _4118 Saddle Head_     _DeSoto_     _75115_
         Number Street       City/Town    Zip

Home Number _(972) 223-2489_     Work Number _(972) 572-4262_

The individual in this case is accused of capital murder. If, and only if, the State proves its case beyond a reasonable doubt as to the defendant , the jury will decide punishment. There is no way of knowing whether the jury will even find the defendant guilty, but the law requires that you answer certain questions regarding your thoughts and feelings on the death penalty.

## DEATH PENALTY

Are you in favor of the death penalty? ☒ Yes ☐ No
Please explain your answer _Depends on the evidence of the case._

**37**

_____

_____

Which of the following statements best represents your feelings about the death penalty: (Circle)

1.    I believe that the death penalty should be imposed in all capital murder cases.
(2.)   I believe that the death penalty is appropriate in some capital murder cases and I could return a verdict resulting in death in a proper case.
3.    Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances.
4.    I believe that the death penalty is appropriate in some capital murder cases, but I could never return a verdict which assessed the death penalty.
5.    I could never, under any circumstances, return a verdict which assessed the death penalty.

1

What is the best argument in favor of the death penalty? *all evidence favorable*

What is the best argument in opposition of the death penalty? *all evidence not favorable*

## LIFE CONFINEMENT IN PRISON

Which of the following statements best represents your feelings about life confinement in prison: (Circle )

1. I believe that life confinement in prison is never appropriate in any capital murder case.
2. I believe that life confinement in prison is never appropriate in any murder case.
(3.) I believe that life confinement in prison is appropriate in some capital murder cases and I could return a verdict resulting in life confinement in a proper case.

Do you think that the death penalty should be available for punishment upon conviction of other criminal offenses? ☒ Yes ☐ No If yes, which ones? *aggravated offense*

Do you have any moral, religious or personal beliefs that would prevent you from sitting in judgment of another human being? ☐ Yes ☒ No

Do you have any moral, religious or personal beliefs that would prevent you from returning a verdict which would result in the execution of another human being? ☐ Yes ☒ No

Have you received any information regarding this case from any source outside of this courtroom, including, but not limited to, any newspaper articles, television news, internet site, or any other hearsay source? ☐ Yes ☒ No Please list the source and the substance of the information _____

Have you discussed any aspect of this case with anyone? ☐ Yes ☒ No

From hearsay, or otherwise, have you established in your mind such a conclusion as to the guilt or innocence of the Defendant as would influence you in finding a verdict? ☐ Yes ☒ No

**CRIMINAL JUSTICE SYSTEM**

Please complete the following eight (8) statements:

The biggest problem in the criminal justice system is _____

_____

_____

The death penalty in Texas is  *reasonable* _____

_____

Police officers  *are citizens so will heal to protect & serve* _____

_____

The burden of proof in a criminal case is  *determined by prosecuting attorneys* _____

_____

_____

The prison system in Texas is  *Okay* _____

_____

Prosecutors  *need to prove there case* _____

_____

Criminal defense attorneys  *need to prove there case* _____

_____

What makes a person dangerous?  *Having the intent to hurt or*

*harm another human.* _____

_____

3

Please state your personal belief regarding the following ten (10) statements: (Check one answer in each question)

"I trust the criminal justice system in Dallas County."

☐ Strongly Agree   ☑ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"Criminal laws (including sentences and punishment) treat criminal defendants too harshly."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"If someone is accused of Capital Murder, he should have to prove his innocence."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"Persons determine their destiny or fate by choices they make in life."

☐ Strongly Agree   ☑ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"A person's destiny or fate is determined by the circumstances of their birth and their upbringing as well as the choices that they make in life."

☐ Strongly Agree   ☑ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"Genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"If a person is brought to trial on murder charges, that person is probably guilty."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

"A defendant is innocent unless proven guilty beyond a reasonable doubt."

☐ Strongly Agree   ☑ Agree   ☐ Uncertain   ☐ Disagree   ☐ Strongly Disagree

"It is the job of the jury to solve the crime."

☐ Strongly Agree   ☐ Agree   ☐ Uncertain   ☑ Disagree   ☐ Strongly Disagree

4

The law in the State of Texas says "Voluntary intoxication does not constitute a defense to the commission of crime". Do you agree with this law? ☐ Yes ☒ No

Please explain. _If you volunteer to drink and you are involved in a accident and you hurt someone it is a crime._

The law in the State of Texas says that a person can be convicted of capital murder based <u>solely</u> on circumstantial evidence with <u>no</u> eyewitnesses if you believe the evidence beyond a reasonable doubt.

Do you agree with this law? ☒ Yes ☐ No

Please explain. _If all evidence is there_

The law in the State of Texas says that a person convicted of capital murder can receive the death penalty <u>solely</u> because of the facts and circumstances of the crime, even if he has committed <u>no</u> other crimes. Do you agree with this law? ☒ Yes ☐ No

Please explain. _They can recieve it if the jury agrees._

Do you believe the death penalty is applied fairly in the State of Texas? ☒ Yes ☐ No

Please explain. _based on all evidence of the state it is fair_

Have you ever felt differently about the death penalty than you do now? ☐ Yes ☒ No

If yes, please explain what brought about this change and when the change occurred.

If you believe in using the death penalty, how strongly, on a scale of 1 to 10, do you hold that belief? (1 being the least and 10 being the strongest) ___10___

Rank the following objectives of punishment in order of their importance to you:

___3___ Rehabilitation      ___2___ Deterrence      ___1___ Punishment

5

In your opinion, what does the death penalty say about American Culture? *handwritten*

*in X.*

---

The Constitution says an accused citizen does not have to testify on his or her own behalf. How do you feel about this constitutional privilege? *Its okay thats why they have*

*attorney*

---

Do you think citizens accused of criminal offenses are afforded too many rights by the Constitutions of the United States and the State of Texas and the criminal laws of this state?

☒ Yes ☐ No. Please explain your answer. *They have a right to a fair*

*trial.*

---

Have you, your spouse, any family members or close personal friends ever been accused, arrested or convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime **ABOVE** the level of a traffic ticket? ☐ Yes ☒ No

If yes, please give the following details:

| Person Charged | Charge | Date Accused | Outcome of Charge |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |

Have you, your spouse, any family members or close personal friends ever used the services of an attorney, been involved in litigation, or had friends or associates (professionally or socially) who are attorneys? ☒ Yes ☐ No

If yes, please give the following details:

| Person Using Attorney | Attorney | Reason Attorney Used |
|---|---|---|
| 1. *Self - Kimberly Williams* | *Brunson* | *malpractice* |
| 2. | | |
| 3. | | |

6

Do you know anyone who has been in jail or prison, or is in jail or prison?

☐ Yes  ☒ No

If yes, please give the following details:

| Person Charged | Charge | Jail or Prison | Outcome of Charge |
|---|---|---|---|

1. _____

2. _____

3. _____

4. _____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national group opposed to the death penalty or any group dedicated to defendants' rights? ☐ Yes  ☒ No  If yes, please give details. _____

_____

_____

Have you, your spouse or any close family member ever been associated with, or worked with any state, local or national citizen law enforcement group such as a crime commission, group dedicated to victims' rights, traffic commission, neighborhood crime watch, Mothers Against Drunk Driving or police or sheriff's auxiliary? ☒ Yes  ☐ No

If yes, please give details. *I worked for Dalla County Sheriffs Dept from 1986 to 1991.*

Have you, your spouse, any family members or close personal friends ever been the victim of a crime, a witness to a crime or been interested in the outcome of a criminal case (either personally or through the media)? Have you ever used the services of this or any other District Attorney's office (hot checks, child support, protective order, etc.)?

☐ Yes  ☒ No

If yes, please give details. _____

_____

Have you, your spouse, any family members or close personal friends ever had any training in law enforcement, applied for employment in law enforcement or been employed in law enforcement (police officer, constable, deputy sheriff, security guard, prison or detention officer, parole officer, probation officer, secretary in police department, etc.)? ☒ Yes  ☐ No

If yes, please give details. *I was a Detention Officer from 1986 to 1991*

_____

7

Have you or your spouse ever served on a grand jury? ☐ Yes ☒ No  If yes, please give dates and circumstances surrounding your service on the grand jury. _____

_____

_____

Have you or your spouse ever been a juror in a civil or criminal case?

☐ Yes ☒ No       If yes, please give the following details:

| Type of case | Verdict | Punishment | Whether Jury or Judge Set Punishment |
|---|---|---|---|

1. _____

2. _____

3. _____

If no verdict was reached, please explain why. _____

_____

_____

Did you feel you had all the information you needed to reach a verdict? ☐ Yes ☐ No

How would you feel if you later learned that you, as a juror, did not have all of the information available and the new information might have caused you to return a different verdict? _____

_____

_____

Were you the foreperson on any of those juries? ☐ Yes ☒ No

Regarding your jury service: (circle the number(s) which apply to you):
1.    I can tell pretty easily when a person is telling a lie.
2.    When I make up my mind, I rarely change it.
3.    I can frequently be influenced by the opinion of others.
④    I always follow my own ideas rather than do what others expect of me.

Outside of your jury service, have you ever observed a court proceeding before? ☒ Yes ☐ No
Please give details: _I was in a proceeding of malpractice._

_____

8

How long have you lived in Dallas County? _36 year_

What other cities have you lived in, and how many years did you live in each city?

_Dallas — 28 yrs          DeSoto — 8 yrs_

Employer: _Inspiring Body of Christ Children's College_

Occupation/Duties: _Teacher_

How long employed there? _1 year_

What other jobs have you held? _Detention Officer, Retail, Cashier_

Marital Status: (Check one) ☐ Widowed ☐ Married ☐ Separated ☐ Divorced ☒ Single

How long married? _N/A_                          How many times married? ____

List any last names you had from previous marriages, if applicable. _N/A_

_____

Spouse's Name: _N/A_ _____
                Last        First        Middle        Maiden (If Applicable)

Birthdate: _____
           Month        Day        Year

Spouse's Employer: _N/A_ _____

Occupation Duties: _N/A_ _____

## BROTHERS AND SISTERS

| Full Name | Age | School or Occupation |
|---|---|---|
| 1. Mary Brazile | 41 | Crime Prevention Specialist |
| 2. Carlos Vernon Williams | 38 | Postal service |
| 3. Anthony Wayne Williams | 37 | Police officer |
| 4. | | |
| 5. | | |

9

## CHILDREN INFORMATION

| | Full Name | Age | School or Occupation |
|---|---|---|---|
| 1. | Mychal Anthony Williams | 12 | Trinity Christian School |
| 2. | Mycha'la Artenes Williams | 5 | IBOC Childrens College |
| 3. | | | |
| 4. | | | |

## PARENTS

| | Full Name | Age | Occupation (Before Retirement) |
|---|---|---|---|
| 1. | Rosemary Williams | 58 | Crime Prevention Specialist |
| 2. | Johnny Williams | 60 | Coke Cola |

Have you, any family member or close personal friend ever studied psychology, sociology, criminology or law (or worked for a person in one of these fields)? ☐ Yes ☒ No
If yes, please give details. _____

Have you, any family member or close personal friend ever undergone counseling or treatment for emotional, psychiatric, behavioral or substance abuse (alcohol or drug) problems?
☐ Yes ☒ No
If yes, please give details. _____

What are your feelings, either positive or negative, about psychiatrists, psychologists or other mental health professionals? _All health proffesional are okay if they job and also recomend spiritual guidance_

## EDUCATION

What is the highest grade level that you have completed in school, including trade or technical schools?

_12th grade_

## MILITARY SERVICE

Please list branch, years of service, duties (including duty as military police and service on any court martial, including the nature of the charges), rank, type of discharge and whether you served in combat :

Yourself _N/A_

Spouse _N/A_

## RELIGIOUS, POLITICAL AND OTHER ACTIVITIES

Name and location of your church, synagogue or place of worship

_Inspiring Body of Christ Church   7710 S. Westmoreland_

How often do you attend? _3x a week_

Other than attendance, what other activities are you involved in at your church?

_Choir and I work there._

Does your church, synagogue or place of worship have a position on the death penalty?

☐ Yes  ☒ No  If yes, please give details. _____

Were you raised in some other faith or denomination? ☒ Yes  ☐ No
If so, which one? _Baptist_

Do you consider yourself politically liberal, conservative, or moderate? _Conservative_

Do you consider yourself a Democrat, Republican, Independent, etc.? _Demo_

Are you registered to vote? ☒ Yes  ☐ No

Would you consider yourself as a leader or a follower? _Leader_

What are your hobbies, recreations or pastimes? _Doing hair, Typing, Enjoying outdoors_

What bumper stickers do you have on your vehicle? _None_

11

Have you had a special interest (personally or through the media) in any criminal case?

☐ Yes ☒ No        If yes, what was the case and what conclusions, if any, did you reach?

_____

_____

List two (2) men and women who are publicly known whom you **MOST** respect:

Men:                                        Women:

_____        _____

_____        _____

List two (2) men and women who are publicly known whom you **LEAST** respect:

Men:                                        Women:

_____        _____

_____        _____

Have you ever owned or fired a gun? ☐ Yes ☒ No   Please explain the circumstances surrounding your answer._____

_____

## THIS CASE

Do you know either of the prosecutors, Greg Davis and Mary Miller? ☐ Yes ☒ No

Do you know any of the defense attorneys, Mike Byck, Jane Little and Jennifer Balido?
☐ Yes ☒ No

Do you know, or think you might know, the defendant, Jedidiah Isaac Murphy, or any of his family?
☐ Yes ☒ No

Did you know the deceased, Bertie Cunningham, or any of her family? ☐ Yes ☒ No

Do you know Bill Hill, Dallas County District Attorney, or any other members of his staff?
☐ Yes ☒ No

If you have any plans to be out of Dallas County within the next six (6) months, please state the

dates: _____

_____

Are you currently taking any medication? ☐ Yes ☒ No

If yes, please give details. _____

_____

Do you have any personal or health problems (hearing, medications, etc.) that would prevent you from giving your full attention to the testimony during the trial?   ☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Do you know of any reason why you could not sit as a juror for this trial, be absolutely fair to the Defendant and the State and render a verdict based solely upon the evidence presented to you?

☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Is there any reason why you would not want to serve as a juror in this case? ☐ Yes ☒ No

If yes, please give details. _____

_____

_____

Do you want to serve as a juror in this case? ☒ Yes ☐ No    If yes, why? *Because I*

*have never been a ~~juror~~ juror in any case.*

**"I DECLARE UNDER PENALTY OF PERJURY THAT ALL OF MY ANSWERS IN THIS JUROR QUESTIONNAIRE ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF MY KNOWLEDGE."**

*Kimberly P Williams*
**(Signature)**

*Please review the attached list of names, and circle the names you know, or might know.*

14

# POSSIBLE STATE'S WITNESSES

Civilians
Elizabeth Chaney Erwin
Debbie Armstrong
Treshod Tarrant
Gary Oats
Clint Wiggington
Brandon Zachery
Michael Wayne Williams
Mark Read
Brian Lane
Kenneth Crisler
Leslie Webster
Joseph Testa
Ray Bob Phillips
Chelsea Willis
Jeanne Evans
Sherryl Wilhelm
Leslie Dunkin
Dana Jones
Marjorie Ellis
Felix Ozuna
Evelyn Shelton
Jerry Conner
Francis Conner
Erika Erwin
Tonya Thorp
Zachary Mamot
Ryan Hammonds
Ashleigh Johnson
Bobby Harp
Phillip Shaun Cruz
Jennie Duval, M.D.
Tim Erwin
Kenneth Clance
Whalen Brunton
Jennifer Farnsworth
Cassye Erwin
Samantha Murphy
Charles Armitage
Brent Simmons
Logan Craft
Bob Murphy
Doha Aridi
Akram Aridi
Matt Tollesbol
Jerry Kwiechen
Jatora Yarborough
Ora Mae Milton

Civilians
Randy Crow
Christy Baugh
Derek Cruz
Lesa Flowers
Willard Gold, M.D.
Rathidevi Reddy, M.D.
Luke Peris, M.D.
Jeffrey DeHaan, M.D.
John Motley
Cindy Monds
William Vandiver, M.D.
James Garrison, M.D.
Stephen Farnes, M.D.
Shirley Bard
Terry Tolar
Celeste Tolar
Kenneth Fritcher
Steve Gipson
Joanna Gilmore
Kirsten Adames
Hooman Sedighi, M.D.
Kenneth Pruitt
Jan Brooks
William Estabrook, M.D.
Julie Gaynor
Mark Landrum
Kenneth Phillips
Richard Shollenberger
Jack Shellnut
George Poteet
Monty Dunn
Cesar De La Torre
Harlan Bailey
David Davenport
Robert Rabbel
Bud Farmer
Alan Cousins
Ozell Wilcoxson
Diana Langford
K. Pruitt
Stephen Vestal
Jan Brooks
Debra Murphy
John Donahue
Patricio Mamot
Sandra Mamot
Randy Hammond

Garland Police Dept
M. J. Meyers
J. S. Rogers
J. Mowery
J. L. Lay
J. Delmar
W. Brown
S. Tooke
V. Long
B. Rice
P. Parker
V. Standley
H. Tharp

Terrell Police Dept
D. Alberty

Van Zandt County Sheriff
G. Rose
J. Branch
R. Goodson
R. Goldey
R. Pool
J. DeCoux
D. Pool
D. Blaylock
K. Jackson

Edgewood Police Dept
J. Bonham
D. Corbett
M. Bates

Arlington Police Dept
D. Neese
J. Stanton

Wills Point Police Dept
James Lee
I. Medina
R. Keeney

Dallas Police Dept
W. Clifton
M. Poole
C. Garcia
B. Bedford

Kaufman County Sheriff
J. Wood
H. Tim

1              TRIAL COURT CAUSE NO. F00-02424-NM

2  THE STATE OF TEXAS           :        IN THE 194TH DISTRICT

3  VS.                          :        COURT OF DALLAS COUNTY

4  JEDIDIAH ISAAC MURPHY        :        T    E    X    A    S

5          I, Darline W. LaBar, Official Court Reporter of the

6  194th Judicial District Court, in and for Dallas County,

7  Texas do hereby certify that the foregoing exhibits

8  constitutes true and complete duplicates of the original

9  exhibits, excluding physical evidence, offered into evidence

10  during the Trial on the Merits in the above-entitled and

11  numbered cause as set out herein before the Honorable F.

12  Harold Entz, Jr., Judge of the 194th District Court of Dallas

13  County, Texas, and a jury trial, beginnining the 30th day of

14  May, A.D., 2000.

15          I further certify that the total cost for the

16  preparation of this Reporter's Record is $38.25 and will be

17  paid by Dallas County.

18          Witness my hand this the 17th day of June, A.D.,

19  2002.

20

21

22

23                              DARLINE W. LABAR
                                Official Court Reporter
24                              194th Judicial District Court
                                Dallas County, Texas
25                              (214) 653-5803

   Certification No. 1064 Expires December 31, 2002

─────────────────────────────────────────────

         DARLINE W. LABAR, OFFICIAL REPORTER

FORM 355A

JEDIDIAH ISAAC MURPHY       CAUSE NO. F00-02424-NM

VS:       IN THE 194TH JUDICIAL DISTRICT

THE STATE OF TEXAS       COURT OF DALLAS COUNTY, TEXAS

==========================================================

= MASTER =

= INDEX =

CAPTION       VOL. 1-01

TRUE BILL OF INDICTMENT (00 DEC 7)       VOL. 1-02

TRIAL DOCKET       VOL. 1-04

WRIT FOR SPECIAL VENIRE (15 DEC 00)       VOL. 1-08

WRIT OF SPECIAL VENIRE (3 JAN 01)       VOL. 1-09

LETTER FROM DLS CTY SHERIFF'S DEPT REGARDING
MAILING JURY SUMMONS (FEB 14 01)       VOL. 1-10

JACKSON V. DENNO MOTION FOR HEARING ON
VOLUNTARINESS OR ANY ADMISSION OR CONFESSION
WHETHER WRITTEN OR ORAL (01 MAY 31)       VOL. 1-11

STATE'S DISCOVERY MOTION (00 DEC 19)       VOL. 1-13

MOTION FOR DISCOVERY OF SPECIFIC ITEMS
(01 MAR 12)       VOL. 1-15

SECOND SPECIFIC MOTION FOR DISCOVERY (MAY 22 01)       VOL. 1-19

STATE'S RESPONSE TO DEFENDANT'S SECOND SPECIFIC
MOTION FOR DISCOVERY (MAY 29 01)       VOL. 1-24

THIRD MOTION FOR DISCOVERY OF SPECIFIC ITEMS
(CANNOT READ FILE DATE)       VOL. 1-33

STATE'S RESPONSE TO DEFENDANT'S THIRD MOTION
FOR DISCOVERY OF SPECIFIC ITEMS (MAY 25 01)       VOL. 1-36

DEFENDANT'S FOURTH MOTION FOR DISCOVERY
(JUNE 4 01)-ORDER       VOL. 1-38

DEFENDANT'S FIFTH MOTION FOR DISCOVERY (2001 JUN 27)       VOL. 1-41

SPECIFIC MOTION PURSUANT TO BRADY V. MARYLAND
(01 MAY 22)       VOL. 1-43

STATE'S RESPONSE TO DEFENDANT'S SPECIFIC MOTION
PURSUANT TO BRADY V. MARYLAND (MAY 20 01)       VOL. 1-53

DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS
OFFENSES REASONABLY CONTEMPLATED BY THE
PROSECUTION TO BE INTRODUCED AT TRIAL
(31 MAY 01)       VOL. 1-62

NOTICE OF INTENT TO USE EXTRANEOUS
UNADJUDICATED OFFENSES (00 DEC 19)       VOL. 1-67

FILED IN
COURT OF CRIMINAL APPEALS

NOV 0 5 2001

Troy C. Bennett, Jr., Clerk

FORM 355A

≈ CONTINUED ≈                                                PAGE 2

SUPPLEMENTAL NOTICE OF INTENT TO USE
EXTRANEOUS AND UNADJUDICATED OFFENSES (01 APR 12)      VOL. 1-71

SUPPLEMENTAL NOTICE OF INTENT TO USE EXTRANEOUS
AND UNADJUDICATED OFFENSES (01 MAY 9)                  VOL. 1-74

NOTICE OF INTENT TO USE CERTIFIED RECORDS
(00 DEC 19)                                           VOL. 1-76

MOTION TO DISCLOSE PLEA BARGAINS, DEALS AND/OR
GRANTS OF IMMUNITY (01 MAY 31)                        VOL. 1-78

MOTION FOR DISCOVERY OF CERTAIN INFORMATION
REGARDING POTENTIAL WITNESSES FOR THE STATE
PURSUANT TO BRADY V. MARLAND TEXAS CODE OF
CRIM PROCEDURE (01 MAR 1)                             VOL. 1-80

MOTION TO DISCLOSE EXPERT WITNESSES AND OPINIONS
(00 DEC 19)                                           VOL. 1-83

DISCLOSURE OF EXPERT WITNESSES (01 FEB 21)            VOL. 1-85

DISCLOSURE OF EXPERT WITNESSES (MAY 25 01)            VOL. 1-87

STATE'S MOTION TO TAKE DEFENSE EXPERT ON
VOIR DIRE (01 MAR 1)                                  VOL. 1-90

STATE'S MOTION TO AUTHORIZE DISCLOSURE OF
PATIENT INFORMATION (00 DEC 12)                       VOL. 1-92

MOTION REQUESTING NOTICE OF DEFENDANT'S
INTENT TO INTRODUCE FUTURE DANGEROUSNESS EXPERT
TESTIMONY (00 DEC 19)                                 VOL. 1-95

STATE'S SUPPLEMENTAL LIST OF POSSIBLE WITNESSES
(MAY 29 01)                                           VOL. 1-97

ORDER ALLOWING DEFENDANT'S CRIME SCENE EXPERT
ACCESS TO VICTIM'S CAR (01 MAY 17)                    VOL. 1-99

STATE'S MOTION IN LIMINE (01 MAR 1)                   VOL. 1-100

STATE'S MOTION IN LIMINE REGARDING MITIGATION
EVIDENCE (01 MAR 1)                                   VOL. 1-103

MOTION IN LIMINE REGARDING PHOTOGRAPHS (JUN 4 01)     VOL. 1-105

STATE'S RESPONSE TO DEFENDANT'S MOTION IN
LIMINE REGARDING PHOTOGRAPHS (01 MAR 1)               VOL. 1-107

MOTION IN LIMINE REGARDING EXTRANEOUS TRANS-
ACTIONS (JUN 4 01)                                    VOL. 1-111

MOTION IN LIMINE REGARDING ALLEGED EVIDENCE
OF SEXUAL ASSAULT OF VICTIM (JUN 4 01)                VOL. 1-114

STATE'S RESPONSE TO DEFENDANT'S MOTION IN
LIMIND REGARDING PUNISHMENT ARGUMENT (01 MAR 1)       VOL. 1-117

STATE'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE
REGARDING VICTIM IMPACT-CHARACTER TESTIMONY
(01 MAR 1)                                            VOL. 1-119

FORM 355A

= CONTINUED =                                      PAGE 3

1  STATE'S RESPONSE TO DEFENDANT'S MOTION TO
2  VOIR DIRE ON CHARACTER; VICTIM IMPACT TESTIMONY
   (01 MAR 1)                                          VOL. 1-122

3  MOTION TO SUPPRESS EVIDENCE SEIZED WITHOUT A
4  WARRANT (01 MAY 31)                                 VOL. 1-125

5  MOTION TO SUPPRESS STATEMENTS (01 MAY 31)           VOL. 1-127

6  MOTION TO SUPPRESS ITEMS SEIZED FROM DEFENDANT'S
7  CELL AT DALLAS COUNTY JAIL (01 JUN 6)               VOL. 1-130

8  MOTION TO ALLOW QUESTIONING OF VENIRE REGARDING
   SPECIFIC ISSURES IN THIS CASE (01 MAR 13)           VOL. 1-133

9  STATE'S RESPONSE TO DEFENDANT'S MOTION REGARDING
10 PRIOR JURY SERVICE (01 MAR 1)                       VOL. 1-137

11 STATE'S RESPONSE TO DEFENDANT'S REQUEST TO
   UTILIZE PEREMPTORY CHALLENGES FOLLOWING
12 EXAMINATION OF THE ENTIRE VENIRE (01 MAR 1)         VOL. 1-139

13 MOTION TO DENY TELEVISION CAMARAS FROM FILING
   ANY PART OF THE TRIAL (01 MAR 1)                    VOL. 1-142

14 ORDER CONCERNING MEDICAL EXPERTS AND EXAMINATIONS
15 (JUN 4 01)                                          VOL. 1-147

16 MOTION FOR JURY INSTRUCTIONS REGARDING EVIDENCE
   INTRODUCED AT PUNISHMENT FOR CONSIDERATION OF
17 SPECIAL ISSUES (01 JUN 12)                          VOL. 1-148

18 MOTION FOR MISTRAIL PURSUANT TO THE DECISION
   OF THE UNITED STATES SUPREME COURT IN PENRY II
19 (01 JUN 5)                                          VOL. 1-152

   CHARGE OF THE COURT (GUILT/INNOCENCE)(JUN 11 01)    VOL. 1-169
20
   JURY VERDICT ON GUILT                               VOL. 1-189
21
   NOTE FROM JURY TO COURT (01 JUN 30)                 VOL. 1-190
22
23 MOTION FOR MISTRIAL BASED ON UNCONSITUTIONAL
   APPLICATION OF PROSECUTORIAL DISCRETION IN
24 DEATH PENALTY CASES IN DALLAS COUNTY—EXHIBITS—
   (01 JUN 26)                                         VOL. 1-191
25
   CHARGE OF THE COURT (PUNISHMENT)                    VOL. 1-205
26
   JURY VERDICT ON GUILT                               VOL. 1-214
27
   JUDGMENT/SENTENCE (06-30-01)                        VOL. 1-215
28
29 DEFENDANT'S MOTION FOR NEW TRIAL/ORDER
   (JUL 30 01)                                         VOL. 1-219
30
   DEFENDANT'S NOTICE OF APPEAL AND PAUPER OATH
   APPOINTMENT OF ATTORNEY ON APPEAL/ORDER
31 (JUN 30 01)                                         VOL. 1-220

32 ORDER APPOINTING COUNSEL PURSUANT TO ARTICLE
   11.071 C.C.P. (12 SEP 01)                           VOL. 1-221C
33

ORM 355A

= CONTINUED =                                    PAGE 4

1     ORDER REMOVING COUNSEL (4 OCT 01)                  VOL. 1-222

2     ORDER APPOINTING COUNSEL PURSUANT TO ARTICLE
      11.071 C.C.P. (4 OCT 01)                           VOL. 1-223

3
4     DEFENDANT"S REQUEST FOR CLERK'S AND COURT
      REPORTER"S RECORD AND EXHIBITS ON APPEAL-ORDER
      (01 JUL 11)                                        VOL. 1-224

5     REQUEST FOR COURT REPORTER' RECORD (01 JUL 11)     VOL. 1-231

6
7     PEREMPTORY JURY CHALLENGE (DEFENSE) (01 MAY 31)    VOL. 1-232

      PEREMPTORY JURY CHALLENGE (STATE) (01 MAY 31)      VOL. 1-233

8
9     CLERK'S CERTIFICATE THAT APPELLATE RECORD IS
      TRUE AND CORRECT (10 25 01)                        VOL. 1-234

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

FORM 355A

JEDIDIAH ISAAC MURPHY        CAUSE NO. F00-02424-NM

VS:                      IN THE 194TH JUDICIAL DISTRICT

THE STATE OF TEXAS         COURT OF DALLAS COUNTY, TEXAS

=================================================================

= INDEX =

VOL. 2 OF 4: PAGES 235 THRO 460:

INDEX TO DEFENDANT'S PRETRIAL MOTIONS (FEB 27 01)     VOL. 2-235

MOTION TO PRECLUDE PROSECUTION FROM SEEKING
THE DEATH PENALTY (FEB 27 01)-ORDER            VOL. 2-239

MOTION TO QUASH BASED ON UNCONSTITUTIONALITY
OF TEX CAPITAL SENTENCING SCHEME-ORDER
(FEB 27 01)                           VOL. 2-246

MOTION TO DECLARE JURY SELECTION PROCEDURE
UNCONSTITUTIONAL-ORDER (FEB 27 01)             VOL. 2-257

DEFENDANT'S OBJECTION TO PROPOSED PUNISHMENT
CHARGE (FEB 27 01)                     VOL. 2-260

OMNIBUS PRETRIAL MOTION (FEB 27 01)           VOL. 2-272

MOTION FOR DISCOVERY, PRODUCTION AND INSPECTION
OF EVIDENCE (FEB 27 01)                  VOL. 2-282

SECOND MOTION FOR DISCOVERY AND INSPECTION OF
EVIDENCE (FEB 27 01)                     VOL. 2-297

DEFENDANT'S REQUEST FOR NOTICE OF EXTRANEOUS
ACTS AND CHARACTER EVIDENCE (FEB 27 01)      VOL. 2-313

MOTION FOR DISCOVERY RELATED TO DNA (FEB 27 01)   VOL. 2-314

MOTION REQUESTING NOTICE OF STATE'S INTENT TO
USE PRIOR CONVCITIONS FOR IMPEACHMENT (FEB 27 01)   VOL. 2-317

MOTION FOR INVENTORY OF ITEMS TAKEN AT THE
CRIME SCENES (FEB 27 01)                 VOL. 2-319

MOTION FOR DISCOVERY IN DEATH PENALTY CASE
(FEB 27 2001)                       VOL. 2-321

DEFENDANT'S MOTION TO PREVENT UNFAIR SURPRISE
DURING TRIAL (FEB 27 01)-ORDER             VOL. 2-330

MOTION IN LIMINE REGARDING DNA EVIDENCE
(FEB 27 01)                         VOL. 2-334

MOTION IN LIMINE REGARDING CHARACTER WITNESSES-
ORDER (FEB 27 01)                     VOL. 2-337

MOTION IN LIMINE REGARDING PRIOR CONVICTIONS-
ORDER (FEB 27 01)                     VOL. 2-339

MOTION IN LIMINE REGARDING STATEMENTS
(FEB 27 01)                         VOL. 2-341

FORM 355A

= CONTINUED =                                    PAGE 2

MOTION IN LIMINE REGARDING PUNISHMENT ARGUMENT
(FEB 27 01)                                      VOL. 2-343

MOTION IN LIMINE REGARDING PHOTOGRAPHS
(FEB 27 01)                                      VOL. 2-345

MOTION IN LIMINE-CHARACTER OF THE COMPLAINANT-
VICTIM IMPACT (FEB 27 01)                        VOL. 2-348

MOTION FOR PSYCHIATRIC EXPERT ASSISTANCE-ORDER
(FEB 27 01)                                      VOL. 2-353

MOTION FOR COURT REPORTER-ORDER (FEB 27 01)      VOL. 2-357

MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS
(FEB 27 01)                                      VOL. 2-360

MOTION FOR ELECTION OF PUNISHMENT-ORDER
(FEB 27 01)                                      VOL. 2-362

MOTION FOR APPOINTMENT OF APPELLATE ATTORNEY
PRIOR TO TRIAL (FEB 27 01)                       VOL. 2-364

MOTION TO ALLOW INCARCERATED DEFENDANT ACCESS
TO A HOT MEAL-ORDER (FEB 27 01)                  VOL. 2-367

MOTION TO ALLOW INCARCERATED DEFENDANT ACCESS
TO SHAVING-ORDER (FEB 27 01)                     VOL. 2-371

MOTION TO ORDER THE STATE TO DECIDE WHETHER TO
MAKE A CHALLENGE FOR CAUSE OR PEREMPTORY STRIKE
BEFORE DEFENDANT MUST DECIDE WHETHER TO MAKE A
CHALLENGE FOR CAUSE OR PEREMPTORY STRIKE-ORDER
(FEB 27 01)                                      VOL. 2-375

DEFENDANT'S MOTION REGARDING THE SUBMISSION OF
INDIVIDUAL JURORS FOR CHALLENGE FOR CAUSE IN
VOIR DIRE PROCEEDINGS (FEB 27 01)               VOL. 2-377

MOTION TO QUESTION VENIREMEN REGARDING MITIGATING
EVIDENCE (FEB 27 01)                             VOL. 2-379

MOTION TO QUESTION VENIREMEN REGARDING THE BURDEN
OF PROOF ON THE MITIGATION SPECIAL ISSUE
(FEB 27 01)                                      VOL. 2-382

MOTION TO VOIR DIRE VENIREMAN ON VICTIM
CHARACTER/IMPACT TESTIMONY (FEB 27 01)           VOL. 2-385

MOTION FOR DISCOVERY OF INFORMATION REGARDING
PRIOR JURY SERVICE (FEB 27 01)                   VOL. 2-389

DEFENDANT'S MOTION FOR INDIVIDUAL VOIR DIRE
(FEB 27 01)                                      VOL. 2-418

REQUEST TO UTILIZE PEREMPTORY CHALLENGES
FOLLOWING EXAMINATION OF THE ENTIRE VENIRE
(FEB 27 01)                                      VOL. 2-420

MOTION TO VOIR DIRE ON PAROLE LAW-40 YEAR MINIMUN
(FEB 27 01)                                      VOL. 2-423

C L E R K ' S    R E C O R D

Volume __ONE__ of __FOUR__

Trial Court Cause Number __F00-02424-NM__

In the __JUDICIAL__ District Court __#194__

of Dallas County, Texas,

Honorable __H. ENTZ__, Judge Presiding.

========================================================================

THE STATE OF TEXAS _____, Plaintiff

vs.

JEDIDIAH ISAAC MURPHY _____, Defendant

========================================================================

Appealed to the
Court of Criminal Appeals of Texas at Austin, Texas,
or Court of Appeals for the ___ District of Texas, at _____, Texas.

========================================================================

Attorney for Appellant

Name __ADAM SEIDEL__

Address __2515 MCKINNEY AVE, STE 1400, DLS, TX  75201__

Telephone No. __214-237-0835__

Fax No. __17999290__

SBOT No. __JEDIDIAH ISAAC MURPHY__

Attorney for: _____

**FILED IN
COURT OF CRIMINAL APPEALS**

NOV 0 5 2001

Troy C. Bennett, Jr., Clerk

========================================================================

Delivered to the Court of Criminal Appeals of Texas at Austin, Texas,
or Court of Appeals for the ____ District of Texas, at _____, Texas.
on the ____ day of _____, _____.

signature of clerk    _____

name of clerk    _____

title    _____

========================================================================

Appellate Court Cause No. _____

Filed in the Court of Criminal Appeals of Texas at Austin, Texas,
or Court of Appeals for the _5_ District of Texas, at _____, Texas,
this __25TH__ day of __OCTOBER__, __2001__.

JIM HAMLIN, DALLAS COUNTY DISTRICT CLERK

By __JANE MILLER__, Deputy

FORM 355A

JEDIDIAH ISAAC MURPHY                    CAUSE NO. F00-02424-NM

VS:                                      IN THE 194TH JUDICIAL DISTRICT

THE STATE OF TEXAS                       COURT OF DALLAS COUNTY, TEXAS

=====================================================================

= INDEX =

CAPTION                                              VOL. 1-01

TRUE BILL OF INDICTMENT (00 DEC 7)                   VOL. 1-02

TRIAL DOCKET                                         VOL. 1-04

WRIT FOR SPECIAL VENIRE (15 DEC 00)                  VOL. 1-08

WRIT OF SPECIAL VENIRE (3 JAN 01)                    VOL. 1-09

LETTER FROM DLS CTY SHERIFF'S DEPT REGARDING
MAILING JURY SUMMONS (FEB 14 01)                     VOL. 1-10

JACKSON V. DENNO MOTION FOR HEARING ON
VOLUNTARINESS OR ANY ADMISSION OR CONFESSION
WHETHER WRITTEN OR ORAL (01 MAY 31)                  VOL. 1-11

STATE'S DISCOVERY MOTION (00 DEC 19)                 VOL. 1-13

MOTION FOR DISCOVERY OF SPECIFIC ITEMS
(01 MAR 12)                                          VOL. 1-15

SECOND SPECIFIC MOTION FOR DISCOVERY (MAY 22 01)     VOL. 1-19

STATE'S RESPONSE TO DEFENDANT'S SECOND SPECIFIC
MOTION FOR DISCOVERY (MAY 29 01)                     VOL. 1-24

THIRD MOTION FOR DISCOVERY OF SPECIFIC ITEMS
(CANNOT READ FILE DATE)                              VOL. 1-33

STATE'S RESPONSE TO DEFENDANT'S THIRD MOTION
FOR DISCOVERY OF SPECIFIC ITEMS (MAY 25 01)          VOL. 1-36

DEFENDANT'S FOURTH MOTION FOR DISCOVERY
(JUNE 4 01)-ORDER                                    VOL. 1-38

DEFENDANT'S FIFTH MOTION FOR DISCOVERY (2001 JUN 27) VOL. 1-41

SPECIFIC MOTION PURSUANT TO BRADY V. MARYLAND
(01 MAY 22)                                          VOL. 1-43

STATE'S RESPONSE TO DEFENDANT'S SPECIFIC MOTION
PURSUANT TO BRADY V. MARYLAND (MAY 20 01)            VOL. 1-53

DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS
OFFENSES REASONABLY CONTEMPLATED BY THE
PROSECUTION TO BE INTRODUCED AT TRIAL
(31 MAY 01)                                          VOL. 1-62

NOTICE OF INTENT TO USE EXTRANEOUS AND
UNADJUDICATED OFFENSES (00 DEC 19)                   VOL. 1-67

FORM 355A

= CONTINUED = PAGE 2

SUPPLEMENTAL NOTICE OF INTENT TO USE
EXTRANEOUS AND UNADJUDICATED OFFENSES (01 APR 12)          VOL. 1-71

SUPPLEMENTAL NOTICE OF INTENT TO USE EXTRANEOUS
AND UNADJUDICATED OFFENSES (01 MAY 9)                      VOL. 1-74

NOTICE OF INTENT TO USE CERTIFIED RECORDS
(00 DEC 19)                                               VOL. 1-76

MOTION TO DISCLOSE PLEA BARGAINS, DEALS AND/OR
GRANTS OF IMMUNITY (01 MAY 31)                            VOL. 1-78

MOTION FOR DISCOVERY OF CERTAIN INFORMATION
REGARDING POTENTIAL WITNESSES FOR THE STATE
PURSUANT TO BRADY V. MARLAND TEXAS CODE OF
CRIM PROCEDURE (01 MAR 1)                                 VOL. 1-80

MOTION TO DISCLOSE EXPERT WITNESSES AND OPINIONS
(00 DEC 19)                                               VOL. 1-83

DISCLOSURE OF EXPERT WITNESSES (01 FEB 21)                VOL. 1-85

DISCLOSURE OF EXPERT WITNESSES (MAY 25 01)                VOL. 1-87

STATE'S MOTION TO TAKE DEFENSE EXPERT ON
VOIR DIRE (01 MAR 1)                                      VOL. 1-90

STATE'S MOTION TO AUTHORIZE DISCLOSURE OF
PATIENT INFORMATION (00 DEC 12)                           VOL. 1-92

MOTION REQUESTING NOTICE OF DEFENDANT'S
INTENT TO INTRODUCE FUTURE DANGEROUSNESS EXPERT
TESTIMONY (00 DEC 19)                                     VOL. 1-95

STATE'S SUPPLEMENTAL LIST OF POSSIBLE WITNESSES
(MAY 29 01)                                               VOL. 1-97

ORDER ALLOWING DEFENDANT'S CRIME SCENE EXPERT
ACCESS TO VICTIM'S CAR (01 MAY 17)                        VOL. 1-99

STATE'S MOTION IN LIMINE (01 MAR 1)                       VOL. 1-100

STATE'S MOTION IN LIMINE REGARDING MITIGATION
EVIDENCE (01 MAR 1)                                       VOL. 1-103

MOTION IN LIMINE REGARDING PHOTOGRAPHS (JUN 4 01)         VOL. 1-105

STATE'S RESPONSE TO DEFENDANT'S MOTION IN
LIMINE REGARDING PHOTOGRAPHS (01 MAR 1)                   VOL. 1-107

MOTION IN LIMINE REGARDING EXTRANEOUS TRANS-
ACTIONS (JUN 4 01)                                        VOL. 1-111

MOTION IN LIMINE REGARDING ALLEGED EVIDENCE
OF SEXUAL ASSAULT OF VICTIM (JUN 4 01)                    VOL. 1-114

STATE'S RESPONSE TO DEFENDANT'S MOTION IN
LIMIND REGARDING PUNISHMENT ARGUMENT (01 MAR 1)           VOL. 1-117

STATE'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE
REGARDING VICTIM IMPACT-CHARACTER TESTIMONY
(01 MAR 1)                                                VOL. 1-119

FORM 355A

= CONTINUED =                                        PAGE 3

STATE'S RESPONSE TO DEFENDANT'S MOTION TO
VOIR DIRE ON CHARACTER; VICTIM IMPACT TESTIMONY
(01 MAR 1)                                           VOL. 1-122

MOTION TO SUPPRESS EVIDENCE SEIZED WITHOUT A
WARRANT (01 MAY 31)                                  VOL. 1-125

MOTION TO SUPPRESS STATEMENTS (01 MAY 31)            VOL. 1-127

MOTION TO SUPPRESS ITEMS SEIZED FROM DEFENDANT'S
CELL AT DALLAS COUNTY JAIL (01 JUN 6)                VOL. 1-130

MOTION TO ALLOW QUESTIONING OF VENIRE REGARDING
SPECIFIC ISSURES IN THIS CASE (01 MAR 13)            VOL. 1-133

STATE'S RESPONSE TO DEFENDANT'S MOTION REGARDING
PRIOR JURY SERVICE (01 MAR 1)                        VOL. 1-137

STATE'S RESPONSE TO DEFENDANT'S REQUEST TO
UTILIZE PEREMPTORY CHALLENGES FOLLOWING
EXAMINATION OF THE ENTIRE VENIRE (01 MAR 1)          VOL. 1-139

MOTION TO DENY TELEVISION CAMARAS FROM FILING
ANY PART OF THE TRIAL (01 MAR 1)                     VOL. 1-142

ORDER CONCERNING MEDICAL EXPERTS AND EXAMINATIONS
(JUN 4 01)                                           VOL. 1-147

MOTION FOR JURY INSTRUCTIONS REGARDING EVIDENCE
INTRODUCED AT PUNISHMENT FOR CONSIDERATION OF
SPECIAL ISSUES (01 JUN 12)                           VOL. 1-148

MOTION FOR MISTRAIL PURSUANT TO THE DECISION
OF THE UNITED STATES SUPREME COURT IN PENRY II
(01 JUN 5)                                           VOL. 1-152

CHARGE OF THE COURT (GUILT/INNOCENCE) (JUN 11 01)    VOL. 1-169

JURY VERDICT ON GUILT                                VOL. 1-189

NOTE FROM JURY TO COURT (01 JUN 30)                  VOL. 1-190

MOTION FOR MISTRIAL BASED ON UNCONSITUTIONAL
APPLICATION OF PROSECUTORIAL DISCRETION IN
DEATH PENALTY CASES IN DALLAS COUNTY-EXHIBITS-
(01 JUN 26)                                          VOL. 1-191

CHARGE OF THE COURT (PUNISHMENT)                     VOL. 1-205

JURY VERDICT ON GUILT                                VOL. 1-214

JUDGMENT/SENTENCE (06-30-01)                         VOL. 1-215

DEFENDANT'S MOTION FOR NEW TRIAL/ORDER
(JUL 30 01)                                          VOL. 1-219

DEFENDANT'S NOTICE OF APPEAL AND PAUPER OATH
APPOINTMENT OF ATTORNEY ON APPEAL/ORDER
(JUN 30 01)                                          VOL. 1-220

ORDER APPOINTING COUNSEL PURSUANT TO ARTICLE
11.071 C.C.P. (12 SEP 01)                            VOL. 1-221C

FORM 355A

= CONTINUED =          PAGE 3

MOTION TO VIDEOTAPE THE INDIVIDUAL VOIR DIRE
(FEB 27 01)                              VOL. 2-427

MOTION FOR PRODUCTION OF WITNESS STATEMENTS
(FEB 27 01)                              VOL. 2-431

MOTION FOR PRODUCTION OF WITNESS STATEMENTS
(FEB 27 01)                              VOL. 2-431

MOTION TO SUPPRESS PHYSICAL EVIDENCE
(FEB 27 01)                              VOL. 2=434

MOTION TO SUPPRESS STATEMENTS (FEB 27 01)    VOL. 2-436

DEFENDANT'S MOTION FOR DISCOVERY OF BRADY
MATERIAL REGARDING CONFESSIONS, STATEMENTS
AND ORAL DECLARATIONS THAT LED TO PREVIOUSLY
UNDISCOVERED EVIDENCE (FEB 27 01)        VOL. 2-439

MOTION TO EXCLUDE EVIDENCE OF UNADJUDICATED
EXTRANEOUS OFFENSES DURING THE PUNISHMENT PHASE,
OR REQUIRE A LIVE-LINE-UP (FEB 27 01)    VOL. 2-443

MOTION FOR IDENTIFICATION HEARING AND TO
EXCLUDE EVIDENCE OF ILLEGAL IDENTIFICATION
(FEB 27 01)                              VOL. 2-448

DEFENDANT'S MOTION FOR LIST OF STATE'S WITNESSES
(FEB 27 01)                              VOL. 2-451

DEFENDANT'S MOTION REGARDING VICTIM CHARACTER/
IMPACT TESTIMONY AFTER MOSELY VS. STATE
(FEB 27 01)                              VOL. 2-456

CLERK'S CERTIFICATE THAT APPELLATE RECORD IS
TRUE AND CORRECT (25 OCT 01)             VOL. 2-460

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33

FORM 355A

| 1 | JEDIDIAH ISAAC MURPHY | CAUSE NO. F00-02424-MN |
| 2 | VS: | IN THE 194TH JUDICIAL DISTRICT |
| 3 | THE STATE OF TEXAS | COURT OF DALLAS COUNTY, TEXAS |

4  ================================================

5  = INDEX =

6  <u>VOL. 3 OF 4: PAGES 461 THRO 724:</u>

NOTICE OF FILING OF BUSINESS RECORDS PURSUANT
TO RULE 902(10)-AFFIDAVITS (00 DEC 19)          VOL. 3-461

NOTICE OF FILING OF BUSINESS RECORDS PURSUANT
TO RULE 902(10)-AFFIDAVIT (01 JAN 9)           VOL. 3-480

STATE'S PRODUCTION OF DOCUMENTS (01 JAN 16)    VOL. 3-519

NOTICE OF FILING OF BUSINESS RECORDS PURSUANT
TO RULE 902(10) (01 JAN 30)-AFFIDAVIT          VOL. 3-582

NOTICE OF INTENT TO USE CERTIFIED RECORDS
(01 APR 30)                                    VOL. 3-603

NOTICE OF FILING OF BUSINESS RECORDS PURSUANT
TO RULE 902(10)-AFFIDAVIT (01 MAY 2)           VOL. 3-642

CLERK'S CERTIFICATE THAT APPELLATE RECORD IS
TRUE AND CORRECT (10 25 01)                    VOL. 3-724

FORM 355A

JEDIDIAH ISAAC MURPHY          CAUSE NO. F00-02424-NM

VS:                            IN THE 194TH JUDICIAL DISTRICT

THE STATE OF TEXAS             COURT OF DALLAS COUNTY, TEXAS

==============================================================

= INDEX =

VOL. 4 OF 4: PAGES 725 THRO 916:

NOTICE OF FILING OF BUSINESS RECORDS PURSUANT
TO RULE 902(10)(00 DEC 12)                          VOL. 4-725

STATE'S PRODUCTION OF DOCUMENTS (01 MAR 13)         VOL. 4-727

STATE'S PRODUCTION OF DOCUMENTS (01 MAR 20)         VOL. 4-729

GARLAND POLICE DEPT INCIDENT/INVESTIGATION
REPORT (OCT 4 00)                                   VOL. 4-731

GARLAND POLICE DEPT INVESTIGATIVE NOTES             VOL. 4-735

GARLAND POLICE DEPT FORENSIC INVESTIGATIONS
UNIT EVIDENCE LOG                                   VOL. 4-785

CITY OF GARLAND POLICE DEPT INVENTORY OF
RECOVERED PROPERTY                                  VOL. 4-808

CITY OF GARLAND POLICE DEPT AFFIDAVIT IN
ANY FACT (5 OCT 00)                                 VOL. 4-813

VAN ZANDT COUNTY SHERIFF'S REPORT (OCT 10 00)       VOL. 4-845

TERRELL POLICE DEPT CRIM INVESTIGATION
DIVISION SUPPLEMENT REPORT (10 06 00)               VOL. 4-859

BUSINESS RECORD AFFIDAVIT (01 MAY 15)/MHMR          VOL. 4-862

BUSINESS RECORD AFFIDAVIT (01 MAY 15)/FRUITVALE
INDEPENDENT SCHOOL DISTRICT                         VOL. 4-865

BUSINESS RECORD AFFIDAVIT (01 MAY 15)-PRES
BYTERIAN HOSPITAL                                   VOL. 4-878

TIME SCHEDULE OF VICTIM AND DEFENDANT               VOL. 4-907

CRIME SCENE SEARCH REPORT BY CTY OF DLS SHEFIFF'S
DEPT (05 06 01)                                     VOL. 4-914

CLERK'S CERTIFICATE THAT APPELLATE RECORD IS
TRUE AND CORRECT (10 25 01)                         VOL. 4-916

FORM 355A

= CONTINUED =                                    PAGE 4

1   ORDER REMOVING COUNSEL (4 OCT 01)                    VOL. 1-222

2   ORDER APPOINTING COUNSEL PURSUANT TO ARTICLE
    11.071 C.C.P. (4 OCT 01)                             VOL. 1-223

3
    DEFENDANT"S REQUEST FOR CLERK'S AND COURT
4   REPORTER"S RECORD AND EXHIBITS ON APPEAL-ORDER
    (01 JUL 11)                                          VOL. 1-224

5
    REQUEST FOR COURT REPORTER' RECORD (01 JUL 11)       VOL. 1-231

6
    PEREMPTORY JURY CHALLENGE (DEFENSE) (01 MAY 31)      VOL. 1-232
7
    PEREMPTORY JURY CHALLENGE (STATE) (01 MAY 31)        VOL. 1-233
8
    CLERK'S CERTIFICATE THAT APPELLATE RECORD IS
9   TRUE AND CORRECT (10 25 01)                          VOL. 1-234

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

Caption:

The State of Texas          X

County of Dallas            X

= DEATH SENTENCE APPEAL =

In the ___194TH JUDICIAL DISTRICT COURT_____ of Dallas County, Texas, the

Honorable __HAROLD ENTZ_____, Judge Presiding, the following

proceedings were held and the following instruments and other papers were filed

in this cause, to wit:


Trial Court Cause No. ___F00-02424-NM_____

The State of Texas                    X          In the 194TH JUDICIAL
                                       X
vs.                                    X          District Court _____, of
                                       X
__JEDIDIAH ISAAC MURPHY_____     X          Dallas, County, Texas

00001

FORM 188-B

DEFENDANT __MURPHY, JEDIDIAH ISAAC   WM   090175__   CHARGE __CAP MUR FEL__

ADDRESS __1718 BARCLAY, RICHARDSON, TX__   LOCATION __REINDICTMENT__
                                                       __DSO__

FILING AGENCY __TX0571100__ DATE FILED __10/18/00__   COURT _____

COMPLAINANT __CUNNINGHAM, BERTIE__                    __F00-02424__

C/C _____

### TRUE BILL OF INDICTMENT

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS: The Grand Jury of Dallas County,

State of Texas, duly organized at the _____ __JULY__ _____ Term, A.D. 20 ___ __00__ ___ of the

___ __195TH JUDICIAL__ District Court _____, Dallas County, in said court at said

Term, do present that one                __JEDIDIAH ISAAC MURPHY__                , defendant,

on or about the ___ __4TH__ ___ day of __OCTOBER__ _____ A.D. 20 ___ __00__ in the County of Dallas and said State, did


unlawfully then and there knowingly and intentionally cause the death

of BERTIE CUNNINGHAM, an individual, hereinafter called deceased, by

shooting the said deceased with a firearm, a deadly weapon, and by

drowning the said deceased in water, and the defendant intentionally

did cause the death of the deceased while the said defendant was in

the course of committing and attempting to commit the offense of

**KIDNAPPING** and **ROBBERY** of the deceased,


against the peace and dignity of the State.

         **BILL HILL**
Criminal District Attorney of Dallas County, Texas.

                                                    Foreman of the Grand Jury 00002

                    COURT

MURPHY, JEDIDIAH ISAAC WM 050175

1718 BARCLAY, RICHARDSON, TX

TX05711100 10/18/00

CUNNINGHAM, BERTIE

CAP MUR FEL
REINDICTMENT
DSO

F00-02424

JULY 00

195TH JUDICIAL

JEDIDIAH ISAAC MURPHY

4TH OCTOBER 00

unlawfully then and there knowingly and intentionally cause the death of BERTIE CUNNINGHAM, an individual, hereinafter called deceased, by shooting the said deceased with a firearm, a deadly weapon, and by drowning the said deceased in water, and the defendant intentionally did cause the death of the deceased while the said defendant was in the course of committing and attempting to commit the offense of KIDNAPPING and ROBBERY of the deceased.

FILED
00 DEC -7 AM 10:02
JIM HAMLIN
DISTRICT CLERK
DALLAS CO., TEXAS
DEPUTY

BILL HILL

00003

TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

No. ___F00-02424-NN___

| BAIL STATUS: | JAIL | 00089353 | | | |
|---|---|---|---|---|---|
| STATE OF TEXAS | | ATTORNEYS | OFFENSE | | DATE OF FILING |
| JEDIDIAH ISAAC MURPHY | | | CAPITAL MURDER, A CAPITAL FELONY OFFENSE AS CHARGED IN THE INDICTMENT/FEL/REINDICTMENT | | DECEMBER 07, 2000 |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 12-13-00 | anna 12-14-00 def. arraigned to 14th |
| 12-14-00 | Jun 2-2-01 special term |
| 2-2-01 | " 3-2-01 |
| FEB 15 2001 | Love 2-2-01 " |
| 2-2-01 | M 2-22-01 |
| FEB 26 2001 | d) def prounc'mt - Def Appeal Mtg/Ct |
| | Reduc. Bond Defendant |
| 3-1-01 | Witness sworn for bond Def |
| 3-02-01 | Open Voir Dire Proper - Ct. aprvd |
| 3-12-01 | (individual questioning) |
| MAR 12 2001 | " |
| MAR 14 2001 | " |
| MAY 11 2001 | Roy Tolen sworn in return & A. |
| | Also: Tonya Thorp, Chelsea Wills, Cody Delazirah |

STATE OF TEXAS

vs. No. ____

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| 5/22/01 | |
| MAY 31 2001 | |
| JUN 4 2001 | |
| JUN 5 2001 | |
| JUN 6 2010 | |

00005

TRIAL DOCKET — CRIMINAL DISTRICT COURT — DALLAS COUNTY, TEXAS

No. F-00-02242-Y-NM

BAIL STATUS: **JAIL**

| STATE OF TEXAS | ATTORNEYS | OFFENSE | DATE OF FILING |
|---|---|---|---|
| JEDIDIAH ISAAC MURPHY | LISTLE-BUCK-BAIRD | CAPITAL MURDER | 12-07-00 |

| DATE OF ORDER | ORDERS OF COURT |
|---|---|
| JUN 6 2001 | (23) DOCKETIE JOHN (2) P.S. (26) JEY (BARD SHIRLEY) ORVIL (24) BAILEY HARLAN |
| JUN 6 2001 | (26) MAJ. DER VER M.D. RICHARD (27) ADAMS KIRSTEN - Sull lost - |
| JUN 7 2001 | (1) pamela (8) Wagner-NICHOLE (13) TARPOLI (noted) (3) BOLHAM (noted) |
| JUN 7 2001 | (11) HESKE (18) VAN DER... spener M.D. (noted) |
| JUN 8 2001 | (11) Ojeer yeaning... (1pm - Odd (6) 7RUSCZ M.D., JOHN - Deflect - |
| JUN 8 2001 | Odel's oben - (6) Wesserer... ber Wiley |
| JUN 11 2001 | Clear (12) Objently - Taylor - (6) Ketter - QUILTY-CAPITAL MURDER - |
| JUN 11 2001 | Allegren... (13) HUFFMAN - Vender - QUILTY-CAPITAL MURDER - Jury |
| JUN 12 2001 | Allber unduly... |
| JUN 12 2001 | (3) ROSE (US A) 1 HARROLD(6) LEE (SO) (3) SILVIA(4) ARRESTO(2) (3) ALBERT |
| JUN 12 2001 | 1/ ALBERT (TERDELL)(6) LEE (US)(4) Luis P. P.D. (5) STANTON, JOHN (Brandon) P.S. |
| JUN 13 2001 | (3) WILHELM SHIRO(4) STANTON JOHN(6) LIGAL DAUG(5) (Brandon) P.S. |
| JUN 13 2001 | (7.) KIRL (MAIN) - (6) LEE lost - (1) official (2) PEEK P.A., (US) (3) MURRAN, (05) O. |
| JUN 13 2001 | (3) SHEETS, CHRISTY (4) BAILEY, JOHN (SO) (3) BONHAM (noted) |

00006

STATE OF TEXAS

VS. No. ——

| DATE OF ORDER | ORDERS OF COURT |
|---|---|

JUN 13 2001

JUN 14 2001

JUN 15 2001

JUN 27 2001

JUN 28 2001

JUN 29 2001

JUN 30 2001

00007

CAUSE NO.  F00-02424-NM

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## WRIT FOR SPECIAL VENIRE

It appearing to the Court that a motion for Special Venire was filed in the above-numbered and styled cause, and;

It further appearing to this Court that this cause is a capital case;

**IT IS THEREFORE THE ORDER** of this Court that a writ for special venire be and hereby is granted;

**IT IS FURTHER ORDERED AND COMMANDED** that the Sheriff of Dallas County, Texas summon by mail 2300 persons to appear in the Central Jury Room, Dallas County, Texas at the Frank Crowley Criminal Courts Building, 133 North Industrial Blvd., Dallas, Texas at  9:00  a.m. on  Friday, February 2 , 2001 for jury duty in the above-numbered and styled cause.

**SIGNED** this the 15th day of  December ,
2000.

_____
HAROLD ENTZ, JUDGE
194TH JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

**WRIT FOR SPECIAL VENIRE** - Solo Page
k:\young\forms\writ4.spe

00008

CAUSE NO. __F00-02424-NM__

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### WRIT FOR SPECIAL VENIRE

It appearing to the Court that a motion for Special Venire was filed in the above-numbered and styled cause, and;

It further appearing to this Court that this cause is a capital case;

**IT IS THEREFORE THE ORDER** of this Court that a writ for special venire be and hereby is granted;

**IT IS FURTHER ORDERED AND COMMANDED** that the Sheriff of Dallas County, Texas summon by mail __2300__ persons to appear in the Central Jury Room, Dallas County, Texas at the Frank Crowley Criminal Courts Building, 133 North Industrial Blvd., Dallas, Texas at __9:00__ __a__.m. on __Friday, March 2__, 2001 for jury duty in the above-numbered and styled cause.

**SIGNED** this the __3rd__ day of __January__, 2001.

_____
HAROLD ENTZ, ( JUDGE
194TH JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

WRIT FOR SPECIAL VENIRE - Solo Page
k:\young\forms\writ4.spe

00009





*fet 3.2.01*

FILED
FEB 14 2001
JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
DEPUTY

*"Proudly Serving Since 1846"*
**DALLAS COUNTY SHERIFF'S DEPARTMENT**
FRANK CROWLEY COURTS BUILDING
133 NORTH INDUSTRIAL BOULEVARD, LB-31
DALLAS, TEXAS 75207-4313

**February 08, 2001**

Honorable Harold Entz
194th Judicial District Court
Frank Crowley Courts Building
133 N. Industrial Blvd.
Dallas, Texas 75207-4313

RE:   The State of Texas vs. JEDIDIAH ISAAC MURPHY
      Cause No. F00-02424-NM

Dear Judge Entz,

In regard to the referenced cause and your writ for a special venire dated January 3, 2001 this
Department did place in the U.S. Mail the special venire jury summons on Thursday, February 8,
2001 as ordered.

The list of two thousand three-hundred (2300) names was furnished from the jury wheel in Data
Services. The official jur6y summons commanded them to appear at 8:30 a.m. on March 2, 2001 in
the Central Jury Room at the Frank Crowley Courts building for jury duty.

Sincerely,

JIM BOWLES
SHERIFF
Dallas County, Texas

D.J. Chandler
Chief Deputy
Office of General Services

JB:DJC:SM

Telephone (214) 653-3462      Fax (214) 653-3420      E-MAIL: DALLASSHERIFF@JUNO.COM

00010

FILED

2001 MAY 31

JIM HAMLIN
DISTRICT CLERK
DALLAS, TEXAS

CAUSE NO. F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### *JACKSON V. DENNO* MOTION FOR HEARING ON VOLUNTARINESS OF ANY ADMISSION OR CONFESSION WHETHER WRITTEN OR ORAL

THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant in the above entitled and numbered causes, and respectfully

requests this Court to have a hearing before trial to determine the voluntariness of, or in the

alternative, excuse the jury before any evidence of:

    1.       Admissions (whether written or oral);

    2.       Confessions (whether written or oral).

Defendant makes this request based on the Fifth, Sixth, and Fourteenth Amendments to

the Constitution of the United States of America, Article I, § 10, 13, and 19 of the Constitution of

the State of Texas, and Articles 38.21, 38.22, and 38.23 of the Texas Code of Criminal

Procedure.

Defendant further requests the Court to instruct the prosecuting attorney and his assistants

to ask no questions in the presence of the jury concerning (1) admissions, and (2) confessions,

whether oral or written or whether criminative or exculpatory until a *Jackson v. Denno* hearing

has been given the Defendant with findings of fact and conclusions of law by the Court.

Defendant further says that at the time of various conversations with certain police

*JACKSON V. DENNO*--MOTION FOR HEARING ON
VOLUNTARINESS--Page 1 of 2 pages

officers, the Defendant was either under arrest or substantially deprived of his freedom by the

attendant conduct of the officers and the surrounding circumstances.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this motion be

granted.

Respectfully submitted,

JENNIFER BALIDO
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas 75207
(214)653-3550
SBN: 10474880

ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

A true and correct copy of the foregoing Motion has been hand-delivered to the Dallas
County District Attorney's Office on this the _31_ day of _May_____ 2001.

JENNIFER BALIDO

ORDER

Came to be heard Defendant's *Jackson v. Denno* Motion for Hearing on Voluntariness of
any Admission or Confession whether Written or Oral, and said Motion is hereby (GRANTED)
(DENIED).

SIGNED this the _____day of _____, 2001

JUDGE PRESIDING

JACKSON V. DENNO--MOTION FOR HEARING ON
VOLUNTARINESS--Page 2 of 2 pages



F00-02424-M

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## STATE'S DISCOVERY MOTION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory S. Davis, and files this Motion and respectfully shows:

I.

The State requests the Court to order the defendant to produce any and all business records which the defendant plans to introduce by affidavit under Rule 902(10) of the Texas Rules of Evidence.

II.

The State requests the Court to order the defendant to provide the State with the original or duplicates of any writing, recording or photograph of which the defendant plans to offer or summaries of the same under Rule 1006 of the Texas Rules of Evidence.

III.

The State requests the Court to order the defendant to provide the State with any written document the defense will use against a State's witness for the purpose of showing the witness's bias or interest under Rule 613(b) of the Texas Rules of Evidence.

STATE'S DISCOVERY MOTION - Page 1

00013

IV.

The State requests the defendant to provide the State with a written transcribed or recorded statement of each defense witness under Rule 615 of the Texas Rules of Evidence.

WHEREFORE, the State prays the Court grant this Motion.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 19th day of December, 2000.

GREGORY S. DAVIS

STATE'S DISCOVERY MOTION - Page 2

FILED

**F00-02424-M AND FOO-23910-M**

2001 MAR 12  PH 2: 24

JIM HAMLIN
DISTRICT CLERK
DALLAS COUNTY

BY _____

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## MOTION FOR DISCOVERY OF SPECIFIC ITEMS

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW the Defendant, in the above titled and numbered cause, by and through his

attorney of record, and makes this his Motion for Discovery of Specific Items, and in support of

said motion would show the following:

I.

Defendant requests that the following items be supplied to defense counsel, copies of

items supplied to defense counsel, or defense counsel be allowed to examine such items outside

the presence of the State:

1.   the monthly statement (or other record of purchases made) of any credit card

    belonging to complainant, Bertie Cunningham, for the dates surrounding her death

    and the arrest of Defendant;

2.   records of any jewelry allegedly taken from complainant, Bertie Cunningham, and

    the circumstances surrounding its recovery, if any;

3.   the car belonging to complainant, Bertie Cunningham, subsequently allegedly

    found in the possession of Defendant, any reports regarding any evidence

    retrieved from the car, including but not limited to: fingerprints taken from inside

00015

or outside the vehicle, blood evidence, and trace evidence. Specifically, to this item, the Defendant requests that his counsel and any other relevant party be allowed to personally view and inspect the vehicle outside the presence of the State.

4.  any and all photos to be used in the guilt/innocence stage or punishment stage of the trial;

5.  any and all police reports, offense reports, detective's notes, officer's notes, "whip out books", or other notes or reports from the following police agencies, including but not limited to Garland Police Department, Plano Police Department, Richardson Police Department, Collin County Sheriff's Office, Dallas County Sheriff's Office, Tarrant County Sheriff's Office, Kaufman County Sheriff's Office, Van Zandt County Sheriff's Office, Edgewood Police Department, Kaufman Police Department, Dallas Police Department, Arlington Police Department, Wichita Falls Police Department, and Wichita County Sheriff's Office;

6.  any videos allegedly depicting Defendant;

7.  any videos allegedly depicting complainant, Bertie Cunningham;

8.  a clear readable copy of any line-up shown to any witness and any report regarding any line-up shown to any witness in regard to this case, the alleged kidnaping in Arlington, Texas or the alleged robbery in Wichita Falls, Texas;

9.  any and all information regarding the complete criminal history of and present whereabouts of Howard McClesky or John Egbert Warren, two men questioned by the Wichita Falls, Texas Police in regard to the robbery of Margie Ellis on or

00016

about August 26, 1997 .

<div align="center">II.</div>

Defendant would show that each of the above mentioned items are in the exclusive control of the State and not available to the Defendant through any investigatory tool. Additionally, these items may lead to relevant evidence for the Defense that cannot be found without viewing these items.  Further, the denial of this Motion would deny the Defendant: the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution,  Article I, Section 10 of the Texas Constitution, and Article 1.05 of the Texas Code of Criminal Procedure; the right to a fair trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, Article I, Sections 10 and 15 of the Texas Constitution, and Articles 1.05 and 36.29 of the Texas Code of Criminal Procedure; and Due Process of Law under the Fifth and Fourteenth Amendments to the United States Constitution and Due Course of Law under Article I, Section 19 of the Texas Constitution, and Article 1.04 of the Texas Code of Criminal Procedure.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court grants his Motion in all things.

Respectfully Submitted,

*Jennifer Balido*

Jennifer Balido

00017

Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas 75207
(214) 653-3550
State Bar Number 10474880

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that I hand delivered a copy of the above motion to Greg Davis, Assistant

District Attorney of Dallas County, Texas on the same day of filing therewith.

_____
Jennifer Balido

## ORDER

Having considered the foregoing motion and arguments of counsel, if any, the Motion is

hereby _____(Granted/ Denied)

This the _____day of _____, 2001.

_____
Judge Presiding

00018

F00-02424-M

FILED

JUL 22 PM 1:41

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF TEXAS |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

DEPUTY

## SECOND SPECIFIC MOTION FOR DISCOVERY

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW THE DEFENDANT, by and through his counsel of record, and makes this, his Second Specific Motion for Discovery, and in support of this motion would show the following:

I.

Defendant requests the following items from the State:

1. Videotape of scene of discovery of victim's body in Van Zandt County, specifically mentioned in the statement prepared by Van Zandt County Sheriff's Officer DeCoux.

2. Any police report, notes or other statement generated by Jason Bonham of the Edgewood Police Department.

3. Any physical evidence (such as video or audio recordings or closed circuit television capability) or notes, reports, whip out books, etc. reflecting any and all attempts to interview or actual interviews of Defendant regarding the facts surrounding this case.

4. Videotape of Defendant and Zachary Mamot allegedly riding mopeds in Huffines Park in Richardson.

5. Any and all physical evidence that Defendant waived his rights under 38.22 of the Texas Code of Criminal Procedure and *Miranda v. Arizona*, including any signed waivers, signed statements by person allegedly giving those warnings, any notes, memoranda, or reports reflecting that those warnings were or were not given and when, any "Dear Chief" letters regarding this interrogation;

6. Items given by Defendant to Phillip Cruz to give to Defendant's daughter on or

00019

about October 6, 2000;

7.   The Affidavits of Christy Baugh, Paul Previtt, and Treshod Tarrant;

8.   The Affidavits of Ashley Thorpe and Tonya Thorpe, Zachary Mamot and Ryan Hammond;

9.   Any information regarding "Lisa, telephone number 903-567-4133" in Van Zandt County police report;

10.  Any police report generated by any member of the Edgewood Police Department.

11.  Any handwritten or typewritten notes, whip-out books, "Dear Chief" letters, reports or other memorandum generated by any one of the officers that constituted the arrest team of Defendant, including, but not limited to Rose, Goodson, D. Pool, R. Pool, Godley and DeCoux of the Van Zandt County Sheriff's Office and Heath Burton (civilian) of the Van Zandt County Sheriff's Office; Strange of the Delta County Sheriff's Office; Keener of the Wills Point Police Department; Bonham of the Edgewood Police Department; Lay, Myers, and Tooke of the Garland Police Department; Peavy of the Terrell Police Department;

12.  The total number of times any member of a police agency attempted to speak to Defendant while in custody, regardless of whether counsel had been appointed or whether counsel had communicated with Defendant;

13.  Any "crimestoppers" information from Dallas, Kaufman, of Van Zandt counties regarding the events of this case;

14.  Any information, including entire criminal history, *modus operandi,* and any other information tying suspects McClesky and Warren to the purse-snatching or robbery that occurred on or about August 27, 1997 in Wichita Falls, Texas and involved the vehicle stolen earlier from Sherryl Wilhelm in Arlington, Texas;

15.  Any "crimestoppers" information regarding the alleged kidnapping of Sheryl Wilhelm in Arlington, Texas on or about August 26, 1997;

16.  The names and locations of interviews of any person incarcerated in the Dallas County Jail and interviewed by the State or its agents;

17.  The name and address of any person interviewed by the State or its agents who was told by the Defendant that he ACCIDENTALLY caused the death of Bertie Lee Cunningham;

18.  The name and address of any person interviewed by the State or its agents who was told by the Defendant that he was INTOXICATED at the time of the offense;

19. The name and address of any person who has told the State or its agents that Defendant was REMORSEFUL OR SAD about the death of the victim, Bertie Cunningham; or was REMORSEFUL OR SAD at the time surrounding the death of Bertie Cunningham;

20. The name and address of any person who has told the State or its agents the Defendant seemed suicidal on the days preceding or the day of October 4, 2000.

21. The name and address of any person who has told the State or its agents that Defendant or any of his siblings, birth or adopted, were physically, sexually, or emotionally abused at any point in their lives;

22. Any attempt made, successful or unsuccessful, to talk to any person incarcerated by the State of Texas or its agents in any capacity, or on probation or parole supervised by the State of Texas or its agents, in regard to this case;

23. The criminal history contained in TCIC or NCIC of any witness the State has interviewed (including police officers or other government agents), whether or not the State intends to call them as witnesses in their case;

24. Any and all reports from the sexual assault examination kit taken from the victim, Bertie Cunningham, including any conclusions drawn from the results of such examination.

25. The name and address of any person employed by any police agency in this or any county, or the District or County Attorney's office in this or any county, or any person employed by the Texas Board of Pardons and Paroles who has evaluated the credibility and believability of Treshod Tarrant, and had determined that he is not credible or not believable.

26. The criminal record of Treshod Tarrant, including, but not limited to, TCIC and NCIC, any alleged involvement of criminal activity, or any allegation that he was engaged in, either alone or as a party, any criminal activity, any crime in which he was a suspect, and any recommendations or evaluations made by any employee of the Texas Board of Pardons and Paroles in regard to his current parole status;

27. Any videotape, audiotape or closed circuit television equipment available for use by the Garland Police Department in its interrogation rooms, whether or not used in this case, and a copy of the videotape or audiotape of the interrogation of Defendant, if one exists, or the names or addresses of those people who observed the interrogation of Defendant by closed circuit televison, if they did; or the names and addresses of any one who observed the interrogation of Defendant but was not in the same room as defendant, and any reports made or notes taken of such observation;

28. The internal procedures of the Garland Police Department in regard to the interrogation of suspects and the taking of a voluntary statement;

29. The internal procedures of the Arlington Police Department in regard to the creation of a composite drawing used in the investigation of a criminal offense.

II.

Defendant asserts that these items are in the exclusive possession of the State of Texas or its agents, and that the discovery of such items is possible only through the granting of Defendant's motion.

III.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court grant his second motion for discovery in all things.

Respectfully Submitted,

Jennifer Balido
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas 75207
(214)653-3550
SBN 10474880

ATTORNEY FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that I served by my own hand a copy of the foregoing motion on the

Dallas County District Attorney's Office on the _____22_____ day of _May_____, 2001.

_____

Jennifer Balido

**ORDER**

Having considered the foregoing motion, relevant case law and arguments of counsel,

that motion is hereby _____.

This the _____ of _____, 2001.

_____

Presiding Judge, 194th Judicial District Ct.

00023



F00-02424-M

THE STATE OF TEXAS      §      IN THE 194th JUDICIAL

§

§

V.      §      DISTRICT COURT OF

§

§

JEDIDIAH ISAAC MURPHY      §      DALLAS COUNTY, TEXAS

## STATE'S RESPONSE TO DEFENDANT'S
## SECOND SPECIFIC MOTION FOR DISCOVERY

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this its Response to Defendant's Second Specific Motion for Discovery and

respectfully shows:

I.

1. No videotape was made of the crime scene.

2. All reports generated by the Edgewood Police are attached hereto.

3. All physical evidence reflecting any and all attempts to interview or actual interviews of Defendant have previously been provided to counsel for Defendant.

4. The State is not in possession of any videotape of Defendant and Zachary Mamot allegedly riding mopeds (gopeds?) in Huffines Park in Richardson.

5. All signed waivers, signed statements, notes, memoranda or reports reflecting that warnings were given to Defendant had previously been provided to counsel for Defendant,

6. All items collected in this case are available for inspection by counsel for Defendant..

7. The State is not in possession of any affidavits from Christy Baugh, Paul Previtt or

**STATE'S RESPONSE TO DEFENDANT'S SECOND**
**SPECIFIC MOTION FOR DISCOVERY - Page 1**

00024

Treshod Tarrant.

8.  The affidavits of Ashley Thorp (Johnson?), Tonya Thorp, Zachary Momot and Ryan Hammond have been tendered to counsel for Defendant on May 25, 2001.

9.  The State has no additional information regarding "Lisa, telephone number 903-567-4133" in Van Zandt County police report.

10. All reports generated by the Edgewood Police are attached hereto.

11. All notes, whip-out books, reports and memoranda have previously been tendered to counsel for Defendant..

12. The total number of times any member of a police agency attempted to speak with Defendant while in custody are reflected in the reports previously tendered to counsel for Defendant.

13. Any "crimestoppers" information regarding the events of this case is reflected in the reports previously tendered to counsel for Defendant.

14. The State has no information tying "suspects McClesky and Warren" to the robbery that occurred in Wichita Falls on or about August 27, 1997.

15. The State has no "crimestoppers" information regarding the kidnaping of Sherryl Wilhelm..

16. No interview of any person incarcerated in the Dallas County Jail has revealed any Brady material. Therefore, this information remains the privileged work product of the State.

17. All names and addresses of any person interviewed by the State or its agents who was told by the Defendant that he accidentally caused the death of Bertie Lee Cunningham are reflected in the reports and documents previously tendered to counsel for Defendant.

18. All names and addresses of any person interviewed by the State or its agents who was told by the Defendant that he was intoxicated at the time of the offense are reflected in the reports and documents previously tendered to counsel for Defendant

19. All names and addresses of any person who told the State or its agents that Defendant was remorseful or sad about the death of the victim, or was remorseful or sad at the time surrounding the death of the victim are reflected in the reports and documents previously tendered to counsel for Defendant.

**STATE'S RESPONSE TO DEFENDANT'S SECOND**
**SPECIFIC MOTION FOR DISCOVERY - Page 2**

20.  All names and addresses of any person who has told the State or its agents that Defendant seemed suicidal on the days preceding or the day of October 4, 2000, are reflected in the reports and documents previously tendered to counsel for Defendant.

21.  No person has told the State or its agents that Defendant or any of his siblings, birth or adopted, were physically, sexually, or emotionally abused at any point in their lives.

22.  No interview of any person incarcerated by the State of Texas or its agents in any capacity, or on probation or parole supervised by the State of Texas has revealed any Brady material. Therefore, this information remains the privileged work product of the State.

23.  Federal law prohibits the disclosure of the NCIC and TCIC reports.

24.  All reports from the sexual assault examination kit taken from the victim have been tendered to counsel for Defendant on May 25, 2001.

25.  No person has determined that Treshod Tarrant is not credible or not believable.

26.  The criminal history of Treshod Tarrant of which the State is aware is attached hereto. Federal law prohibits the State from disclosing Treshod Tarrant's NCIC and TCIC records.

27.  There is no videotape, audiotape or closed circuit television equipment available for use by the Garland Police Department in its interrogation rooms, and the interrogation of Defendant was not videotaped, audiotaped or observed by closed circuit television.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Dallas County, Texas
Bar No. 05493550

STATE'S RESPONSE TO DEFENDANT'S SECOND
SPECIFIC MOTION FOR DISCOVERY - Page 3

00026

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 29th day of May, 2001.

GREGORY S. DAVIS

PublicData.Com [ Texas Criminal [alias] Detail ]          http://www4.publicdata.com.au/cgi-win/pd....&dlnumber=0055798282&distate=1X&id=88648...

# PUBLICDATA.com

➡ **Texas Criminal [alias] Detail**

| Name | | | | | | Sid number |
|------|---|---|---|---|---|-----------|
| TARRANT,SHOD MONTRELL | | | | | | 04570472 |

| Race | Sex | Eyes | Hair | Height | Weight | Birth Date |
|------|-----|------|------|--------|--------|-----------|
| Black | M | Brown | Black | 509 | 280 | Jan 16 1974 |

| Alias Names | Alias Date of Births |
|-------------|---------------------|
| TARRANT,SHOD<br>TARRANT,SHAD M<br>TARRANT,TRESHOD MONTRELL<br>TARRANT,SHOD MOTRELL<br>TARRANT,TRESHOD | 19741106 |

| Cause number | Court offense literal<br>ARSON | | General offense character for court offense<br>none found |
|--------------|-------------|---|--------------|
| Court disposition date<br>19921208 | Final plea to offense | Level and degree of offense<br>Uncoded | |
| Agency | State | County<br>none found | |
| Court offense number<br>20000000 | Offense<br>ARSON-(FREE TEXT) | | |
| Citation | Statute | Active<br>YYYYMMDD | Modified<br>UNKNW |
| Level and degree of offense<br>Uncoded | Statute citation for offense | | |
| Court disposition number<br>310 | Definition<br>SUBJECT HAS BEEN FOUND GUILTY OF A CRIMINAL CHARGE, EITHER UPON A CRIMINAL TRIAL, A PLEA OF GUILTY, OR A PLEA OF NOLO CONTENDERE. | | |
| Date of sentence | Court sentence suspended - time | Court sentence suspended - fine | |
| Court confinement<br>30D | Court probation<br>5Y | Court fine | |
| Court cost | Court provision literal<br>SPLIT SENTENCE | | |
| Court provision numeric<br>338 | Definition<br>THE MONETARY AMOUNT TO BE PAID IS A COMBINATION OF FINE AND COURT COSTS. | | |
| Date case appealed | Disposition during appeal | Definition<br>none found | |
| Final disposition on appeal case<br>Uncoded | Multiple sentence<br>Single sentence | | |
| Agency | State | County | |

| | | none found |
|---|---|---|

| Cause number | Court offense literal <br> BURGLARY OF BUILDING | General offense character for court offense <br> none found |
|---|---|---|
| Court disposition date <br> 19921208 | Final plea to offense | Level and degree of offense <br> Uncoded |
| Agency | State | County <br> none found |
| Court offense number <br> 22000000 | Offense <br> BURGL-(FREE TEXT) | |

| Citation | Statute | Active <br> YYYYMMDD | Modified <br> UNKNW |
|---|---|---|---|

| Level and degree of offense <br> Uncoded | Statute citation for offense | |
|---|---|---|

| Court disposition number <br> 310 | Definition <br> SUBJECT HAS BEEN FOUND GUILTY OF A CRIMINAL CHARGE, EITHER UPON A CRIMINAL TRIAL, A PLEA OF GUILTY, OR A PLEA OF NOLO CONTENDERE. |
|---|---|

| Date of sentence | Court sentence suspended - time | Court sentence suspended - fine |
|---|---|---|
| Court confinement <br> 30D | Court probation <br> 5Y | Court fine <br> 1500 |
| Court cost | Court provision literal <br> SPLIT SENTENCE | |

| Court provision numeric <br> 347 | Definition <br> SUBJECT MUST PAY RESTITUTION AND COURT COSTS. |
|---|---|

| Date case appealed | Disposition during appeal | Definition <br> none found |
|---|---|---|
| Final disposition on appeal case <br> Uncoded | Multiple sentence <br> Single sentence | |
| Agency | State | County <br> none found |

00029

PublicData.Com [ Texas Criminal [alias] Detail ]                    http://www4.publicdata.av/cgi-win/pd....&dlnumber=0055798z8&dlstate=TX&id=88643.

| Cause number 931379 | Court offense literal | | General offense character for court offense none found |
|---|---|---|---|
| Court disposition date 19960920 | | Final plea to offense G | Level and degree of offense Misdemeanor - Class B |
| Agency KAUFMAN CO CRT AT LAW | | State TX | County KAUFMAN |
| Court offense number 23000018 | | Offense THEFT >= $20 BUT < $200 | |

| Citation 31.03(a) | Statute PC | Active YYYYMMDD | Modified UNKNW |
|---|---|---|---|
| Level and degree of offense Uncoded | Statute citation for offense | | |

| Court disposition number 310 | Definition SUBJECT HAS BEEN FOUND GUILTY OF A CRIMINAL CHARGE, EITHER UPON A CRIMINAL TRIAL, A PLEA OF GUILTY, OR A PLEA OF NOLO CONTENDERE. |
|---|---|

| Date of sentence 19960920 | | Court sentence suspended - time | Court sentence suspended - fine |
|---|---|---|---|
| Court confinement | | Court probation | Court fine |
| Court cost 175 | | Court provision literal 5D JAIL - SERVED | |
| Court provision numeric | Definition none found | | |
| Date case appealed | Disposition during appeal | Definition none found | |
| Final disposition on appeal case Uncoded | | Multiple sentence Single sentence | |
| Agency | | State | County none found |

00030

11/13/2000 2:20 PM

05/23/2001  10:45   9838967377          EDGEWOOD POLICE DEPT          PAGE  02

## OFFENSE/INCIDENT REPORT

PAGE NO.   1     PAGES

| NO. 98-9164 | Agency Assist | NO. 98-9164 |
|---|---|---|
| 10/9/98 | CLASSIFICATION | |

**DATE OF REPORT**

| 1 COMPLAINANT OR FIRM | AGE/RACE/SEX | DOB | 2 PHONE(BUSINESS) |
|---|---|---|---|
| State of Texas/E. P, D./V.Z.CO-S.O/ Garland PD | — | | 903-885-4189 |

| 3 COMPLAINANT'S ADDRESS | 4 CITY | 5 PHONE(RESIDENCE) |
|---|---|---|
| 106 N.E. Front St. | Edgewood TX 75117 | — |

| 6 COMPLAINANT'S BUSINESS/SCHOOL | ADDRESS | JOB TITLE(GRADE) | WILL COMPLAINANT PROSECUTE? |
|---|---|---|---|
| Law Enforcement | S3 | Patrolman | NO ☑ YES ☐ |

| 7 OFFENSE/INCIDENT(AS REPORTED) | ADDRESS | 8 TYPE PREMISES |
|---|---|---|
| Agency Assist | 806 Lamar | Residence |

| 10 DAY/DATE/TIME OF OFFENSE | 11 REPORTED BY | 12 REPORTED TO. | 13 HOW REPORTED |
|---|---|---|---|
| Friday 10/09/98 2:00 am | 9802 | 9303 | Person |

| 14 BODILY   YES ☑  VICTIM TAKEN TO | 15 TRANSPORTED BY | 16 DESC INJURIES | 17 CONDITION |
|---|---|---|---|
| INJURIES  NO ☐   — | | — | — |

| 18 M/O     HOW DONE     FORCE USED     WITH WHAT TOOL OR WEAPON     OTHER ACTS OR TRADEMARKS |
|---|
| Information given on residence and possible occupants |

| 19 VEHICLE INVOLVED? OWNER | 20 YEAR COLOR MAKE MODEL BODY STYLE LIC NO YEAR STATE VIN NO |
|---|---|
| NO ☐  YES ☑ | 1996 Silver Honda Accord TXLP YLD44Y     NFI |

| CODES: | S-STOLEN PROPERTY | D-DAMAGED PROPERTY | L-LOST PROPERTY | F-FOUND PROPERTY |

**21 PROPERTY SECTION**

| CODE: S-D-L-F | QTY | DESCRIPTION (SIZE, COLOR, MODEL, STYLE, MATERIAL, CONDITION) | SERIAL NO | WHERE PURCHASED | VALUE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 22 DISPOSITION OF PROPERTY | 23 TOTAL VALUE |
|---|---|
| — | — |

| 24 WITNESSES NAME | BEST CONTRACT ADDRESS | AGE | BEST PHONE | OTHER PHONE |
|---|---|---|---|---|
| | | — | — | — |
| WITNESSES NAME | BEST CONTRACT ADDRESS | AGE | BEST PHONE | OTHER PHONE |
| | | | | |

| 25 NAME AND ADDRESS OF SUSPECT(S) (AGE, RACE, DESCRIPTION, RELATION TO COMPLAINANT OR WITNESS) |
|---|
| Murphy, Jedidiah Isaac  W/M/25  5-10, 142 Brown, Brown,     NFI |
| 2                                    — |

**26 DETAILS NOT COVERED ABOVE**

| 27 INVESTIGATING OFFICER(S)     J.A. Bonham, Badge #9303 | 28 REPORT MADE BY | DATE     10/9/98 |
|---|---|---|

| 29 CASE FILED | 30 THIS CASE IS | 31 APPROVED BY | BADGE NO |
|---|---|---|---|
| NO ☐  YES ☑ | CLEARED BY ARREST ☑ UNFOUNDED ☐ INACTIVE ☐ OTHER ☐ | | 391 |

00031

**SUPPLEMENTARY INVESTIGATION REPORT**

PAGE NO 1 of 2

NO. 00-0144  Classification **Agency Assist**  NO. 00-0144

Name of Complainant / Address / Phone No.
State of Texas/Edgewood Police Dept./Van Zandt Co. Sheriffs Dept./ Garland PD

Offense **Agency Assist**  Case Assigned To: J. A. Bonham Badge # 303

DETAILS OF OFFENSE, PROGRESS OF INVESTIGATION, ETC.

Date 10-6-00

On October 6, 2000 at approximately 2:00 am, I was on my way home from Dallas working an off duty job. As I entered Edgewood I noticed Joey Branch of the Van Zandt Sheriffs Department along with Wills Point Officer Raymond Keener parked at the Dairy Queen. I asked what was going on, Deputy Branch advised that Garland Police Department had a homicide working, and that the suspect, a Jim Murphy (a class mate of mine) was at Shod Tarrants' house. I was asked if I knew the area. I said yes, very well. I was then advised that the victim was an 80 year old women and that her location was not known.

I was then asked to draw a diagram of the house and the surrounding area of the house. I advised Chief Deputy Gary Rose then and there of the best route for officers to safely approach the rear of the house. Gary then asked me if I would guide the officers so they wouldn't be detected going through the brush. I then guide the Officers to the rear of the house. Gary Rose, along with Sheriff's Office personnel made contact and entry to the home located at 509 Lamar.

Gary advised me that Murphy was lying to him and asked me if I would talk to him to possibly get the location of the victim. I did so and was advised by Murphy the body was in a creek on Livingston Road. Sheriff's Office personnel was unsure of the location and asked if I would show them. I did so.

While at the location Deputy Branch asked if I would stay at the scene with him while Gary met with Garland Police Department investigators already in Edgewood and brought them to the scene. We were without car or radio at this time securing the scene for Garland Officers.

About 30 minutes later, Deputy Desue of Van Zandt County Sheriffs Office arrived and told me to get in. I advised that Garland Officers or Van Zandt County Sheriffs Office personnel had Judge Wilcoxson JP3 at the Police Department and was asked if they could use the office to arraign Murphy.

Arriving at the Police Department we entered. I then called the Sheriffs Department and asked if Chief Knox had been notified. Dispatch advised a message had been left on the answering machine. I then notified SGT. Fipps by phone as to what was going on.

J.A. Bonham, Badge #303

27 INVESTIGATING OFFICERS SIG.  28 REPORT MADE BY  DATE 10/06/0

29 CASE FILED  30 THIS CASE IS  31 APPROVED BY  BADGE # 302
Yes [ ] No [X]  Cleared by arrest [X] Unfounded [ ] Inactve [ ] Other [ ]

Form No. 130  ORDER FROM
LAW ENFORCEMENT SYSTEMS, INC. • P.O. BOX 1625, CORSICANA, TEXAS 75151-1625

00032

F00-02424-M AND FOO-23910-M

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| V. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## THIRD MOTION FOR DISCOVERY OF SPECIFIC ITEMS

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW the Defendant, in the above titled and numbered cause, by and through his attorney of record, and makes this his Motion for Discovery of Specific Items, and in support of said motion would show the following:

I.

Defendant requests that the following items be supplied to defense counsel, copies of items supplied to defense counsel, or defense counsel be allowed to examine such items outside the presence of the State:

1.   On two previous occasions, Defendant has requested access to complainant's vehicle for inspection by counsel and Defendant's Trace Evidence Expert. On Thursday, May 17, counsel for the State orally notified Defendant's counsel that the vehicle had been returned to the complainant's family and that vehicle had subsequently been sold to an unknown party. Due to the inability of Defendant to adequately investigate the vehicle, he requests the following items: any pictures of the trunk, the passenger compartment, the exterior, or other part of Complainant's vehicle; any reports, notes or memoranda regarding the evidence found in the

vehicle; any reports, notes or memoranda regarding scientific tests performed on

any evidence found in Complainant's vehicle; any reports, notes or memoranda

regarding any conclusions made regarding any evidence found in Complainant's

vehicle;

2.      The ownership of the blue shirt found in the creek;

3.      The ownership of the duffel bag found in the creek;

4.      Any reports, notes, or memoranda regarding the "brownish stain" on the back seat

of Complainant's vehicle; any scientific tests run on such stain; any reports, notes,

or memoranda regarding any conclusions made as to the origin of the "brownish

stain";

<p style="text-align:center;">II.</p>

Defendant would show that each of the above mentioned items are in the exclusive

control of the State and not available to the Defendant through any investigatory tool.

Additionally, these items may lead to relevant evidence for the Defense that cannot be found

without viewing these items.  Further, the denial of this Motion would deny the Defendant: the

effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the

United States Constitution,  Article I, Section 10 of the Texas Constitution, and Article 1.05 of

the Texas Code of Criminal Procedure; the right to a fair trial guaranteed by the Sixth and

Fourteenth Amendments to the United States Constitution, Article I, Sections 10 and 15 of the

Texas Constitution, and Articles 1.05 and 36.29 of the Texas Code of Criminal Procedure; and

Due Process of Law under the Fifth and Fourteenth Amendments to the United States

Constitution and Due Course of Law under Article I, Section 19 of the Texas Constitution, and

<p style="text-align:right;">00034</p>

Article 1.04 of the Texas Code of Criminal Procedure.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court grants his Motion in all things.

Respectfully Submitted,

*Jennifer Balido*

Jennifer Balido
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas 75207
(214) 653-3550
State Bar Number 10474880

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that I hand delivered a copy of the above motion to Greg Davis, Assistant District Attorney of Dallas County, Texas on the same day of filing therewith.

*Balido*

Jennifer Balido

## ORDER

Having considered the foregoing motion and arguments of counsel, if any, the Motion is hereby _____ (Granted/ Denied)

This the _____ day of _____, 2001.

_____
Judge Presiding

00035

F00-02424-M

**FILED**
MAY 25 2001
JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
DEPUTY

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

**STATE'S RESPONSE TO DEFENDANT'S**
**THIRD MOTION FOR DISCOVERY OF SPECIFIC ITEMS**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this its Response to Defendant's Third Motion for Discovery of Specific Items and

respectfully shows:

I.

1. Counsel for Defendant have previously examined all photos of the trunk, passenger compartment, exterior or other part of Complainant's vehicle. The State has previously tendered to Counsel for Defendant all reports, notes or memoranda regarding any evidence found in the vehicle, scientific tests performed on the evidence and conclusions made regarding the evidence.

2. The State has no additional information regarding the ownership of the blue shirt found in the creek.

3. The State has no additional information regarding the ownership of the duffel bag found in the creek.

4. The State has previously tendered to counsel for Defendant all reports, notes or memoranda regarding the "brownish stain".

STATE'S RESPONSE TO DEFENDANT'S THIRD
MOTION FOR DISCOVERY OF SPECIFIC ITEMS - Page 1

00036

Respectfully submitted,


GREGORY S. DAVIS
Assistant District Attorney
Dallas County, Texas
Bar No. 05493550


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 25th day of May, 2001.


GREGORY S. DAVIS

**STATE'S RESPONSE TO DEFENDANT'S THIRD MOTION FOR DISCOVERY OF SPECIFIC ITEMS - Page 2**

F00-024240-M AND F00-29310-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| v. | § | DISTRICT COURT OF |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY TEXAS |

## DEFENDANT'S FOURTH MOTION FOR DISCOVERY

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW the Defendant, in the above entitled and numbered cause and presents in and to this Court this his Fourth Motion for Discovery, and in support of such motion, would show this Court the following:

I.

Sometime during the weeks preceding the filing of this motion, the Dallas Sheriff's Department entered the cell or tank of Defendant and removed all personal items from the cell or tank. Such items included pictures, drawings, letters to family, and, most importantly, *notes or memoranda prepared by Defendant at the request of his defense counsel of record.* Defendant would ask for an inventory of the items taken, notice of the reason such items were taken, and return of the items as soon as practicable. Moreover, Defendant would object to the taking of the notes and memoranda prepared by Defendant at the request of his defense counsel of record as violation of attorney/client privilege, and would ask this court to suppress any use of this information at the trial of his case.

II.

Defendant would also request that he be given a clear audible copy of the videotape taken

00038

at Chacho's convenience store, or any other videotape the State intends to introduce into

evidence at his trial.  The State has given a copy of the Chacho's videotape to defense counsel

upon previous request; however, the tape is not audible and does not run at a normal speed.  The

defense has reason to believe that the State has procured a clear audible copy from a video lab,

but has yet to tender such tape to Defendant.

<div align="center">III..</div>

Defendant asserts that these items are in the exclusive possession of the State, and that

such items are not available by any other investigatory tool.  Additionally, these items may lead to

relevant evidence for the Defense that cannot be found without viewing these items.  Further, the

denial of this Motion would deny the Defendant: the effective assistance of counsel guaranteed by

the Sixth and Fourteenth Amendments to the United States Constitution,  Article I, Section 10 of

the Texas Constitution, and Article 1.05 of the Texas Code of Criminal Procedure; the right to a

fair trial guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution,

Article I, Sections 10 and 15 of the Texas Constitution, and Articles 1.05 and 36.29 of the Texas

Code of Criminal Procedure; and Due Process of Law under the Fifth and Fourteenth

Amendments to the United States Constitution and Due Course of Law under Article I, Section

19 of the Texas Constitution, and Article 1.04 of the Texas Code of Criminal Procedure.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court grants his

Motion in all things.

Respectfully Submitted,

*Jennifer Balido*

Jennifer Balido
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas 75207
(214) 653-3550
State Bar Number 10474880

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that I hand delivered a copy of the above motion to Greg Davis, Assistant

District Attorney of Dallas County, Texas on the same day of filing therewith.

*Balido*

Jennifer Balido

## ORDER

Having considered the foregoing motion and arguments of counsel, if any, the Motion is

hereby _____ (Granted/ Denied)

This the _____ 4 _____ day of _____ June _____, 2001.

Judge Presiding

00040

F00-024240-M AND F00-29310-M

| | |
|---|---|
| THE STATE OF TEXAS | IN THE 194TH JUDICIAL |
| v. | DISTRICT COURT OF |
| JEDIDIAH ISAAC MURPHY | DALLAS COUNTY TEXAS |

FILED
2001 JUN 27
JIM HAMLIN
DISTRICT
DALLAS, TEXAS

## DEFENDANT'S FIFTH MOTION FOR DISCOVERY

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW the Defendant, in the above entitled and numbered cause and presents in and to this Court this his Fifth Motion for Discovery, and in support of such motion, would show this Court the following:

The full legal name and date of birth of State's witness Mandy Kirl (or Kurl).

Respectfully Submitted,

Jennifer Balido
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas 75207
(214) 653-3550
State Bar Number 10474880

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that I hand delivered a copy of the above motion to Greg Davis, Assistant District Attorney of Dallas County, Texas on the same day of filing therewith.

Jennifer Balido

00041

**ORDER**

Having considered the foregoing motion and arguments of counsel, if any, the Motion is

hereby _____(Granted/ Denied)

This the _____day of _____, 2001.


_____
Judge Presiding

F00-02424-M

FILED

[stamp] MAY 22 PM 1:41
JIM [illegible]
[illegible]
[illegible] DEPUTY

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## SPECIFIC MOTION PURSUANT TO *BRADY V. MARYLAND*

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW THE DEFENDANT, by and through his counsel of record, and makes this, his Specific Motion Pursuant to *Brady v. Maryland*, and in support of this motion would show the following:

I.

A. Prosecutor's Duty to Disclose

Under *Brady v. Maryland*, a prosecutor has an affirmative duty to turn over material, exculpatory evidence. *See Brady v. Maryland*, 373 U.S. 83, 86 (1963); *McFarland v. State*, 928 S.W. 2d 482, 511 (Tex. Crim. App. 1996); *Ex parte Kimes*, 872 S.W.2d 700, 702 (Tex. Crim. App. 1993). Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed. 2d 291 (1973), or in the Compulsory Process or Confrontation clauses of the sixth Amendment, *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed. 2d 1019 (1967); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 1479, 1485, 104 S.Ct. 2528, 2532, 81 L.Ed. 2d 413 (1984); *cf. Strickland v. Washington*, 466 U.S. 668. 684-685, 104 S.Ct. 2052, 2062-2063, 80 L.Ed. 2d 674 (1974)("The Constitution guarantees a fair

trial through the Due Process Clause, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment."). No new ground is broken in observing that an essential component of procedural fairness is an opportunity to be heard. *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507-508, 92 L.Ed. 2d 682 (1948); *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). That opportunity would be an empty one if the State, for example were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to defendant's claim of innocence. In the absence of any valid state justification, exclusion of *ANY TYPE* of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed. 2d 657 (1984). *See also Washington v. Texas*, supra, at 22-23, 87 S.Ct. At 1924-1925; *Crane v. Kentucky*, 476 U.S. 683, 690-691, 106 S.Ct. 2142, 2146-2147, 90 L.Ed. 2d 636 (1986); *U.S. v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed. 2d 413 (1988). *Brady* includes disclosure of any favorable information int ehpossession of police agencies or other parts of the "prosecutorial team." *Kyles v. Whitley*, 514 U.S. 419, 437-38, 115 S.Ct. 1555, 131 L.Ed. 2d 490, 508 (1995). Knowledge of governmental agents of exculpatory evidence is imputed to the prosecution. *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991); *U.S. v. Auten*, 632 F.2d 478 (5th Cir. 1980).

The State has an affirmative duty to turn over evidence in its possession *or available to it* that is material and favorable to the defense. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963); *McFarland v. State*, 928 S.W.2d 482, 511 (Tex. Crim. App. 1996). The Supreme Court has held that the duty to disclose such evidence is applicable even though there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49

L.Ed. 2d 342 (1976).

In the present case, defense has filed a general *Brady* Motion and served the Dallas County District Attorney's Office with a copy of such motion. *See* Court Jacket of F00-02424-M, styled *The State of Texas v. Jedidiah Isaac Murphy*.  Although the State has allowed the Defendant's attorneys access to the exhibits it intends to offer at trial, as  of the date of the filing of this motion, the State has not tendered to defense counsel any formal document giving notice of any exculpatory or mitigating evidence.

Defendant asserts that the information requested by this motion is not fully available to the defendant nor could it be obtained through reasonable diligence, and thus subject to *Blackmon v. Scott*, 22 F.2d 560 (5th Cir. 1994)(*cert. denied,* 115 S.Ct. 671, 513 U.S. 1060, 130 L.Ed. 2d 604).

## B. Evidence is Favorable to Accused

Favorable evidence is any evidence that, if disclosed and used effectively, may make the difference between conviction and acquittal.  It includes both exculpatory and impeachment evidence. *Wyatt v. State*, 23 S.W.3d 18 (Tex. Crim. App. 2000); *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992); *U.S. v. Bagley*, 483 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985).  Exculpatory evidence is testimony or other evidence that tends to justify, excuse,  or clear the defendant from guilt; impeachment evidence is that offered to disparage, deny or contradict. *Welch v. State*, 2000 WL 661047, No Publication, (Tex. App.–Texarkana, May 23, 2000)(No. 06-99-00106-CR).  Evidence can be favorable to the accused either on guilt or on punishment. *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. 1194.  Impeachment evidence is favorable even if cumulative. *Smith,* 904 F.2d at 964-69.

In *Bagley, supra*, the U.S. Supreme Court expressed concern with "any adverse effect that

00045

the prosecutor's failure to respond (with exculpatory evidence) might have had on the

preparation of the defendant's case." 473 U.S. 683, 105 S.Ct. at 3384.

## C. Materiality

The materiality inquiry is not just a matter of determining whether, after discounting the

inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to

support the jury's conclusions; rather, the question is whether "the favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine confidence in

the verdict." *Strickler*, 119 S.Ct. at 1952 (quoting *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555).

## II.

Defendant stands charged with Capital Murder.  The State of Texas has given notice that

it intends to seek the death penalty if Defendant is found guilty as charged in the indictment.

Defendant hereby formally requests,  pursuant to the prosecutor's duty to turn over exculpatory,

impeachment or mitigating evidence, that the State of Texas, by and through the Dallas County

District Attorney's Office turn over to Defendant the following information:

1. The reason Officers Franey and Mendoza of the Garland Police Department,
   Peavy of the Terrell Police Department, and Vanek of the Edgewood Police
   Department are not listed on the witness list and therefore the State does not
   intend to call those Officers to testify at trial;

2. Items given by Defendant to Phillip Cruz to give to Defendant's daughter on or
   about October 6, 2000;

3. The Affidavits of Christy Baugh, Paul Previtt,  and Treshod Tarrant;

4. The Affidavits of Ashley Thorpe and Tonya Thorpe, Zachary Mamot and Ryan Hammond;

5. Any information regarding "Lisa, telephone number 903-567-4133" in Van Zandt County police report;

6. Any police report generated by any member of the Edgewood Police Department.

7. Any handwritten or typewritten notes, whip-out books, "Dear Chief" letters, reports or other memorandum generated by any one of the officers that constituted the arrest team of Defendant, including, but not limited to Rose, Goodson, D. Pool, R. Pool, Godley and DeCoux of the Van Zandt County Sheriff's Office and Heath Burton (civilian) of the Van Zandt County Sheriff's Office; Strange of the Delta County Sheriff's Office; Keener of the Wills Point Police Department; Bonham of the Edgewood Police Department; Lay, Myers, and Tooke of the Garland Police Department; Peavy of the Terrell Police Department;

8. The total number of times any member of a police agency attempted to speak to Defendant while in custody, regardless of whether counsel had been appointed or whether counsel had communicated with Defendant;

9. Any "crimestoppers" information from Dallas, Kaufman, of Van Zandt counties regarding the events of this case;

10. Any information, including entire criminal history, *modus operandi,* and any other information tying suspects McClesky and Warren to the purse-snatching or robbery that occurred on or about August 27, 1997 in Wichita Falls, Texas and involved the vehicle stolen earlier from Sherryl Wilhelm in Arlington, Texas;

11. Any "crimestoppers" information regarding the alleged kidnapping of Sheryl

Wilhelm in Arlington, Texas on or about August 26, 1997;

12. The names and locations of interviews of any person incarcerated in the Dallas County Jail and interviewed by the State or its agents, in which the subject of the interview stated that Jedidiah Murphy told him that he ACCIDENTALLY caused the death of Bertie Lee Cunningham; that he was INTOXICATED at the time of the offense; or any statement or other information from such interviews that are relevant to Special Issue # 1 (the lack of future dangerousness) or Special Issue # 2 (sufficient mitigating circumstances to warrant a life sentence);

13. The name and address of any person interviewed by the State or its agents who was told by the Defendant that he ACCIDENTALLY caused the death of Bertie Lee Cunningham;

14. The name and address of any person interviewed by the State or its agents who was told by the Defendant that he was INTOXICATED at the time of the offense.

15. The name and address of any person who has told the State or its agents that Defendant was REMORSEFUL OR SAD about the death of the victim, Bertie Cunningham; or was REMORSEFUL OR SAD at the time surrounding the death of Bertie Cunningham;

16. The name and address of any person who has told the State or its agents the Defendant seemed suicidal on the days preceding or the day of October 4, 2000.

17. The name and address of any person who has told the State or its agents that Defendant or any of his siblings, birth or adopted, were physically, sexually, or emotionally abused at any point in their lives;

18. Any attempt made, successful or unsuccessful, to talk to any person incarcerated

00048

by the State of Texas or its agents in any capacity, or on probation or parole
supervised by the State of Texas or its agents, in regard to this case;

19.   The criminal history contained in TCIC or NCIC of any witness the State has
interviewed (including police officers or other government agents), whether or not
the State intends to call them as witnesses in their case;

20.   Any and all reports from the sexual assault examination kit taken from the victim,
Bertie Cunningham, including any conclusions drawn from the results of such
examination.

21.   The name and address of any person employed by any police agency in this or any
county, or the District or County Attorney's office in this or any county, or any
person employed by the Texas Board of Pardons and Paroles who has evaluated
the credibility and believability of Treshod Tarrant, and had determined that he is
not credible or not believable.

22.   The criminal record of Treshod Tarrant, including, but not limited to,  TCIC and
NCIC, any alleged involvement of criminal activity, or any allegation that he was
engaged in, either alone or as a party, any criminal activity, any crime in which he
was a suspect, and any recommendations or evaluations made by any employee of
the Texas Board of Pardons and Paroles in regard to his current parole status;

23.   Any videotape, audiotape or closed circuit television equipment available for use
by the Garland Police Department in its interrogation rooms, whether or not used
in this case, and a copy of the videotape or audiotape of the interrogation of
Defendant, if one exists, or the names or addresses of those people who observed
the interrogation of Defendant by closed circuit televison, if they did; or the names

00049

and addresses of any one who observed the interrogation of Defendant but was not in the same room as defendant, and any reports made or notes taken of such observation;

24. The internal procedures of the Garland Police Department in regard to the interrogation of suspects and the taking of a voluntary statement;

25. The internal procedures of the Arlington Police Department in regard to the creation of a composite drawing used in the investigation of a criminal offense.

### III.

Defendant asserts that the above information is either exculpatory, mitigating, or impeaching evidence of the State's case at the guilt/innocence portion or the punishment stage of the trial. Additionally, Defendant asserts that this information is in the possession of the State of Texas, represented by the Dallas County District Attorney's Office, or any police agency involved in the investigation of this case. Defendant asserts, moreover, that this information is not available to Defendant through other means regardless of the diligence of his investigation of this case and preparation for trial.

IV.

WHEREFORE, PREMISES CONSIDERED, Defendant respectfully requests that this motion be granted in all things, and that the State of Texas dutifully turn over each and every piece of exculpatory, mitigating, or impeaching evidence, whether listed in this motion or not.

Respectfully Submitted,

Jennifer Balido
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas 75207
(214)653-3550
SBN 10474880

ATTORNEY FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that I served by my own hand a copy of the foregoing motion on the Dallas County District Attorney's Office on the _____22_____ day of _____May_____, 2001.

Jennifer Balido

00051

### ORDER

Having considered the foregoing motion, relevant case law and arguments of counsel,

that motion is hereby _____.

This the _____ of _____, 2001.

_____
Presiding Judge, 194th Judicial District Ct.



F00-02424-M

FILED

MAY 29 2001

JIM HAMLIN CO., TEXAS
DEPUTY

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194th JUDICIAL DISTRICT |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## STATE'S RESPONSE TO DEFENDANT'S
## SPECIFIC MOTION PURSUANT TO *BRADY V. MARYLAND*

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files its this Response to Defendant's Specific Motion Pursuant to *Brady v. Maryland*

and respectfullly shows:

I.

The State has previously disclosed to counsel for Defendant any and all *Brady* material.

II.

1. The State's reason for calling or not calling a potential witness is the privileged work product of the State.

2. All items collected in this case are available for inspection by counsel for Defendant.

3. The State is not in possession of any affidavits from Christy Baugh, Paul Previtt or Treshod Tarrant.

4. The affidavits of Ashley Thorp (Johnson?), Tonya Thorp, Zachary Momot and Ryan Hammond have been tendered to counsel for Defendant on May 25, 2001.

5. The State has no additional information regarding "Lisa, telephone number 903-567-4133" in Van Zandt County police report.

STATE'S RESPONSE TO DEFENDANT'S SPECIFIC
MOTION PURSUANT TO *BRADY V. MARYLAND* - Page 1

00053

6. All reports generated by the Edgewood Police are attached hereto.

7. All notes, whip-out books, letters reports and memoranda were previously tendered to counsel for Defendant.

8. The total number of times any member of a police agency attempted to speak with Defendant while in custody are reflected in the reports previously tendered to counsel for Defendant.

9. Any "crimestoppers" information regarding the events of this case is reflected in the reports previously tendered to counsel for Defendant.

10. The State has no information tying "suspects McClesky and Warren" to the robbery that occurred in Wichita Falls on or about August 27, 1997.

11. The State has no "crimestoppers" information regarding the kidnaping of Sherryl Wilhelm.. Affidavit.

12. All names and addresses of any person interviewed by the State or its agents who was told by the Defendant that he accidentally caused the death of Bertie Lee Cunningham or that he was intoxicated at the time of the offense are reflected in the reports and documents previously tendered to counsel for Defendant.

13. All names and addresses of any person interviewed by the State or its agents who was told by the Defendant that he accidentally caused the death of Bertie Lee Cunningham are reflected in the reports and documents previously tendered to counsel for Defendant.

14. All names and addresses of any person interviewed by the State or its agents who was told by the Defendant that he was intoxicated at the time of the offense are reflected in the reports and documents previously tendered to counsel for Defendant

15. All names and addresses of any person who told the State or its agents that Defendant was remorseful or sad about the death of the victim, or was remorseful or sad at the time surrounding the death of the victim are reflected in the reports and documents previously tendered to counsel for Defendant.

16. All names and addresses of any person who has told the State or its agents that Defendant seemed suicidal on the days preceding or the day of October 4, 2000, are reflected in the reports and documents previously tendered to counsel for Defendant.

STATE'S RESPONSE TO DEFENDANT'S SPECIFIC
MOTION PURSUANT TO *BRADY V. MARYLAND* - Page 2

00054

17. No person has told the State or its agents that Defendant or any of his siblings, birth or adopted, were physically, sexually, or emotionally abused at any point in their lives.

18. No interview of any person incarcerated by the State of Texas or its agents in any capacity, or on probation or parole supervised by the State of Texas has revealed any Brady material. Therefore, this information remains the privileged work product of the State.

19. Federal law prohibits the State from disclosing the requested NCIC and TCIC records.

20. All reports from the sexual assault examination kit taken from the victim have been tendered to counsel for Defendant on May 25, 2001.

21. No person has determined that Treshod Tarrant is not credible or not believable.

22. The criminal history of Treshod Tarrant of which the State is aware has been tendered to counsel for Defendant. Federal law prohibits the State from disclosing Treshod Tarrant's NCIC and TCIC records.

23. There is no videotape, audiotape or closed circuit television equipment available for use by the Garland Police Department in its interrogation rooms, and the interrogation of Defendant was not videotaped, audiotaped or observed by closed circuit television.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Dallas County, Texas
Bar No. 05493550

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 29th day of May, 2001.

GREGORY S. DAVIS

PublicData.Com [ Texas Criminal [alias] Detail ]    http://www4.publicdata.com.av/cgi-win/pd....dinumber=0055/9828&distate=TX&id=17699840

# PublicData.com

➡ **Texas Criminal [alias] Detail**

| Name | | | | | | Sid number |
|---|---|---|---|---|---|---|
| TARRANT,SHOD MONTRELL | | | | | | 04570472 |
| Race | Sex | Eyes | Hair | Height | Weight | Birth Date |
| Black | M | Brown | Black | 509 | 280 | Jan 16 1974 |
| Alias Names | | | | | | Alias Date of Births |
| TARRANT,SHOD<br>TARRANT,SHAD M<br>TARRANT,TRESHOD MONTRELL<br>TARRANT,SHOD MOTRELL<br>TARRANT,TRESHOD | | | | | | 19741106 |

| Cause number | Court offense literal | | General offense character for court offense | |
|---|---|---|---|---|
| | ARSON | | Uncoded | |
| Court disposition date | | Final plea to offense | Level and degree of offense | |
| 19921208 | | | Uncoded | |
| Agency | | State | County | |
| | | | none found | |
| Court offense number | | Offense | | |
| 20000000 | | ARSON-(FREE TEXT) | | |
| Citation | | Statute | Active | Modified |
| | | | YYYYMMDD | UNKNW |
| Level and degree of offense | | Statute citation for offense | | |
| Uncoded | | | | |
| Court disposition number | Definition | | | |
| 310 | SUBJECT HAS BEEN FOUND GUILTY OF A CRIMINAL CHARGE, EITHER UPON A CRIMINAL TRIAL, A PLEA OF GUILTY, OR A PLEA OF NOLO CONTENDERE. | | | |
| Date of sentence | Court sentence suspended - time | Court sentence suspended - fine | | |
| Court confinement | Court probation | Court fine | | |
| 30D | 5Y | | | |
| Court cost | Court provision literal | | | |
| | SPLIT SENTENCE | | | |
| Court provision numeric | Definition | | | |
| 338 | THE MONETARY AMOUNT TO BE PAID IS A COMBINATION OF FINE AND COURT COSTS. | | | |
| Date case appealed | Disposition during appeal | Definition | | |
| | | none found | | |
| Final disposition on appeal case | | Multiple sentence | | |
| Uncoded | | Single sentence | | |
| Agency | | State | County | |

05/24/2001 1:38 PM

00057

PublicData.Com [ Texas Criminal [alias] Detail ]     http://www4.publicdata.com.au/cgi-win/pd....dnumber=005579828&dlstate=TX&id=17699840

none found

| Cause number | Court offense literal BURGLARY OF BUILDING | | General offense character for court offense Uncoded |
|---|---|---|---|
| Court disposition date 19921208 | | Final plea to offense | Level and degree of offense Uncoded |
| Agency | | State | County none found |
| Court offense number 22000000 | | Offense BURGL-(FREE TEXT) | |
| Citation | | Statute | Active YYYYMMDD | Modified UNKNW |
| Level and degree of offense Uncoded | | Statute citation for offense | |
| Court disposition number 310 | Definition SUBJECT HAS BEEN FOUND GUILTY OF A CRIMINAL CHARGE, EITHER UPON A CRIMINAL TRIAL, A PLEA OF GUILTY, OR A PLEA OF NOLO CONTENDERE. | | |
| Date of sentence | | Court sentence suspended - time | Court sentence suspended - fine |
| Court confinement 30D | | Court probation 5Y | Court fine 1500 |
| Court cost | | Court provision literal SPLIT SENTENCE | |
| Court provision numeric 347 | Definition SUBJECT MUST PAY RESTITUTION AND COURT COSTS. | | |
| Date case appealed | Disposition during appeal | Definition none found | |
| Final disposition on appeal case Uncoded | | Multiple sentence Single sentence | |
| Agency | | State | County none found |

05/24/2001 1:38 PM
00058

PublicData.Com [ Texas Criminal [alias] Detail ]     http://www4.publicdata.com.au/cgi-win/pd....dinumber=0055798z&distate=1X&id=1799840

| Cause number | Court offense literal | | General offense character for court offense |
|---|---|---|---|
| 931379 | | | Uncoded |

| Court disposition date | | Final plea to offense | Level and degree of offense |
|---|---|---|---|
| 19960920 | | G | Misdemeanor - Class B |

| Agency | | State | County |
|---|---|---|---|
| KAUFMAN CO CRT AT LAW | | TX | KAUFMAN |

| Court offense number | Offense | | |
|---|---|---|---|
| 23000018 | THEFT >= $20 BUT < $200 | | |

| Citation | Statute | Active | Modified |
|---|---|---|---|
| 31.03(a) | PC | YYYYMMDD | UNKNW |

| Level and degree of offense | Statute citation for offense | |
|---|---|---|
| Uncoded | | |

| Court disposition number | Definition | | |
|---|---|---|---|
| 310 | SUBJECT HAS BEEN FOUND GUILTY OF A CRIMINAL CHARGE, EITHER UPON A CRIMINAL TRIAL, A PLEA OF GUILTY, OR A PLEA OF NOLO CONTENDERE. | | |

| Date of sentence | Court sentence suspended - time | Court sentence suspended - fine | |
|---|---|---|---|
| 19960920 | | | |

| Court confinement | | Court probation | Court fine |
|---|---|---|---|
| | | | |

| Court cost | Court provision literal | |
|---|---|---|
| 175 | 5D JAIL - SERVED | |

| Court provision numeric | Definition | |
|---|---|---|
| | none found | |

| Date case appealed | Disposition during appeal | Definition |
|---|---|---|
| | | none found |

| Final disposition on appeal case | Multiple sentence | |
|---|---|---|
| Uncoded | Single sentence | |

| Agency | State | County |
|---|---|---|
| | | none found |

00059

05/24/2001 1:38 PM

05/23/2001   10:45   9038967377          EDGWOOD POLICE DEPT          PAGE   02

## OFFENSE/INCIDENT REPORT

PAGE NO   1   PAGES

NO. 00-0144                          Agency Assist                          NO. 00-0144
10/6/00                              CLASSIFICATION

DATE OF REPORT

| 1 COMPLAINANT OR FIRM | AGE/RACE/SEX | DOB | 2 PHONE(BUSINESS) |
|---|---|---|---|
| State of Texas/E. P, D./V.Z.CO.S.O/ Garland PD | — | | 900-800-4100 |
| 3 COMPLAINANT'S ADDRESS | 4 CITY | | 5 PHONE(RESIDENCE) |
| 105 N.E. Front St. | Edgewood TX 78117 | | — |
| 6 COMPLAINANT'S BUSINESS/SCHOOL | ADDRESS | JOB TITLE(GRADE) | WILL COMPLAINANT PROSECUTE? |
| Law Enforcement | 53 | Patrolman | NO [ ] YES [ ] |
| 7 OFFENSE/INCIDENT(AS REPORTED) | | ADDRESS | 9 TYPE PREMISES |
| Agency Assist | | 506 Lamar | Residence |

| 10 DAY/DATE/TIME OF OFFENSE | 11 REPORTED BY | 12 REPORTED TO | 13 HOW REPORTED |
|---|---|---|---|
| Friday 10/06/00 2:00 am | 9802 | 6303 | Person |
| 14 BODILY   YES [X]   VICTIM TAKEN TO | 15 TRANSPORTED BY | 16 DESC INJURIES | 17 CONDITION |
| INJURIES  NO [ ]     — | | — | — |
| 18 M/O   HOW DONE   FORCE USED | WITH WHAT TOOL OR WEAPON | OTHER ACTS OR TRADEMARKS | |
| Information given on residence and possible occupants | | | |

| 19 VEHICLE INVOLVED? OWNER | 20 YEAR COLOR MAKE MODEL BODY STYLE LIC NO YEAR STATE VIN NO |
|---|---|
| NO [ ]   YES [X] | 1995 Silver Honda Accord TXLP YLD94Y      NFI |

CODES:   S-STOLEN PROPERTY   D-DAMAGED PROPERTY   L-LOST PROPERTY   F-FOUND PROPERTY

| 21 PROPERTY SECTION | | | | | |
|---|---|---|---|---|---|
| CODE:   S-D-L-F | QTY | DESCRIPTION   SEX, COLOR, MODEL, STYLE, MATERIAL, CONDITION | SERIAL NO | WHERE PURCHASED | VALUE |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 22 DISPOSITION OF PROPERTY | | | 23 TOTAL VALUE |
|---|---|---|---|
| — | — | — | |

| 24 WITNESSES NAME | BEST CONTRACT ADDRESS | AGE | BEST PHONE | OTHER PHONE |
|---|---|---|---|---|
| | | — | | — |
| WITNESSES NAME | BEST CONTRACT ADDRESS | AGE | BEST PHONE | OTHER PHONE |
| | | — | | — |

25 NAME AND ADDRESS OF SUSPECT(S) (AGE, RACE, DESCRIPTION, RELATION TO COMPLAINANT OR WITNESS)
Murphy, Jedidiah Isac   W/M/25  5-10, 142 Brown, Brown,   NFI
2                                                              —
26 DETAILS NOT COVERED ABOVE

| 27 INVESTIGATING OFFICER(S)   J.A. Bonham, Badge 9303 | 28 REPORT MADE BY | DATE   10/6/00 |
|---|---|---|

| 29 CASE FILED | 30 THIS CASE IS | 31 APPROVED BY | BADGE NO |
|---|---|---|---|
| NO [ ]   YES [X] | CLEARED BY ARREST [X]  UNFOUNDED [ ]  INACTIVE [ ]  OTHER [ ] | | 301 |

00060

05/23/2001  10:45    9038967377    EDGWOOD POLICE DEPT    PAGE  03

**SUPPLEMENTARY INVESTIGATION REPORT**    PAGE NO  1 of 2

| NO. 00-0144 | Agency Assist | 00-0144 |
|---|---|---|

Name of Complainant: State of Texas/Edgewood Police Dept./Van Zandt Co. Sheriffs Dept./ Garland PD

| Offense: Agency Assist | Case Assigned To: J. A. Bonham Badge # 303 |
|---|---|

DETAILS OF OFFENSE, PROGRESS OF INVESTIGATION, ETC.

Date: 10-6-00

On October 6, 2000 at approximately 2:00 am, I was on my way home from Dallas working an off duty job. As I entered Edgewood I noticed Joey Branch of the Van Zandt Sheriffs Department along with Wills Point Officer Raymond Keener parked at the Dairy Queen. I asked what was going on, Deputy Branch advised that Garland Police Department had a homicide working, and that the suspect, a Jim Murphy (a class mate of mine) was at Shod Tarrants' house. I was asked if I knew the area. I said yes, very well. I was then advised that the victim was an 80 year old women and that her location was not known. I was then asked to draw a diagram of the house and the surrounding area of the house. I advised Chief Deputy Gary Rose then and there of the best route for officers to safely approach the rear of the house. Gary then asked me if I would guide the officers so they wouldn't be detected going through the brush. I then guide the Officers to the rear of the house. Gary Rose, along with Sheriff's Office personnel made contact and entry to the home located at 509 Lamar.

Gary advised me that Murphy was lying to him and asked me if I would talk to him to possibly get the location of the victim. I did so and was advised by Murphy the body was in a creek on Livingston Road. Sheriffs Office personnel was unsure of the location and asked if I would show them. I did so.

While at the location Deputy Branch asked if I would stay at the scene with him while Gary met with Garland Police Department investigators already in Edgewood and brought them to the scene. We were without car or radio at this time securing the scene for Garland Officers.

About 30 minutes later, Deputy Deuse of Van Zandt County Sheriffs Office arrived and told me to get in. I was advised that Garland Officers or Van Zandt County Sheriffs Office personnel had Judge Wilcoxson JP3 at the Police Department and was asked if they could use the office to arraign Murphy.

Arriving at the Police Department we entered. I then called the Sheriffs Department and asked if Chief Knox had been notified. Dispatch advised a message had been left on the answering machine. I then notified SGT. Fipps by phone as to what was going on

BY INVESTIGATING OFFICERS: J.A. Bonham, Badge #303    A REPORT MADE BY:    DATE 10/06/0

| CASE FILED Yes [ ] No [X] | THIS CASE IS Cleared by arrest [X] Unfounded [ ] Inactive [ ] Other [ ] | APPROVED BY: | BADGE NO 302 |
|---|---|---|---|

Form No. 130    ORDER FROM LAW ENFORCEMENT SYSTEMS, INC. • P.O. BOX 1625, CORSICANA, TEXAS 75151-1625

00061

FILED

**CAUSE NO. F00-02424-M**

THE STATE OF TEXAS

JIM HAMLIN
DISTRICT CLERK
DALLAS CO. TEXAS

JEDIDIAH ISAAC MURPHY

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

**DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS OFFENSES
REASONABLY CONTEMPLATED BY THE PROSECUTION TO BE
INTRODUCED AT TRIAL**

THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant in the above entitled and numbered causes, by and through

his attorney of record and moves this Honorable Court to order the State of Texas to give the

Defendant notice of any extraneous offenses or evidence of other crimes which it reasonably

anticipates it may seek to introduce into trial of this cause for the following reasons:

I.

NOTICE

The Defendant, under the Sixth and Fourteenth Amendments of the United States

Constitution and Article I, §§ 10, 13, and 19 of the Texas Constitution, is entitled to advance

notice of the charges against which he must defend himself. If, in proving those charges, the

prosecution reasonably anticipates that it may be using evidence of extraneous offenses or

evidence of other crimes not in the charging paper, then the Defendant will have no notice of them

unless notice is given at this time. Further, lack of notice will constitute a denial of the

Defendant's constitutional right to notice under the United States and Texas Constitutions.

DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS
OFFENSES--Page 1 of 5 pages

00062

DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS
OFFENSES--Page 1 of 5 pages

<div align="center">II.</div>

## EFFECTIVE ASSISTANCE OF COUNSEL

Should the State be allowed to introduce evidence of other crimes or extraneous offenses
in this cause, then this Honorable Court will charge to the jury, bu written instructions, that they
may not use evidence of the extraneous offense unless they find the Defendant guilty of those
offenses beyond a reasonable doubt. *Ernest v. State*, 308 S.W. 2d 33. The effect of that
instruction is to litigate that issue. In order to litigate that issue, the Defendant must be entitled to
the effective assistance of counsel in litigating that issue. He must reasonably be given the
opportunity to persuade the jury that the Defendant is not guilty of the offense beyond a
reasonable doubt. By failing to give the Defendant notice of the extraneous offense, if any, which
the State reasonably may introduce in this cause, the State and this Court deprives the Defendant,
in addition to notice, of the effective assistance of counsel which is his right under the Sixth and
Fourteenth Amendments of the United States Constitution and Article I, §§ 10, 13, and 19 of the
Texas Constitution.

<div align="center">III.</div>

## THE RIGHT TO PRESENT DEFENSIVE EVIDENCE

It is fundamental under the Sixth and Fourteenth Amendments of the United States
Constitution and Article I, §§ 10, 13, and 19 of the Texas Constitution that the Defendant has the
right to present defensive evidence. *Chambers v. Mississippi*, 404 U.S. 284 (1973). When the
State tries to prove the guilt of that extraneous offense beyond a reasonable doubt, under
*Chambers*, the Defendant would be entitled to present defensive evidence in his behalf to show

<div align="center">00063</div>

DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS
OFFENSES--Page 2 of 5 pages

the fact finder that he is not guilty of that offense. In order to gather that defensive evidence, the

Defendant must know of that extraneous offense in advance of trial. Deprivation of that notice

would make it impossible for him to prepare the varied defensive evidence which is his right under

the Texas and United States Constitutions to present.

IV.

CONFRONTATION

Under the Sixth and Fourteenth Amendments of the United States Constitution and

Article I, §§ 10, 13, and 19 of the Texas Constitution, the Defendant is entitled to confront and

cross-examine his accusers. If the State of Texas chooses to litigate the issue of the extraneous

offense, the Defendant must be able, under the Sixth Amendment and its Texas counterpart, to

intelligently confront and cross-examine the accusers on that separate charge. If the Defendant is

given no notice of that charge, then not only is his right under the Sixth Amendment to notice, his

right to effective assistance of counsel, and his fundamental right to present defensive evidence

denigrated, his absolute right to confront and cross-examine his accusers is severely undercut by

his lack of any opportunity to prepare for such confrontation.

V.

CONTINUANCE TO SECURE RIGHTS

If the Defendant is not given notice of the additional extraneous offenses which the State,

in good faith, reasonably believes that it may attempt to litigate at trial, then the Defendant will be

forced to move this Honorable Court for a continuance under the Sixth and Fourteenth

Amendments to the United States Constitution and Article I, §§ 10, 13, and 19 of the Texas

DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS
OFFENSES--Page 3 of 5 pages

Constitution in order to obtain notice of additional charges, securing the effective assistance of

counsel in litigating the issue of Defendant's guilt of the additional charges beyond a reasonable

doubt, to secure his Sixth Amendment right to present defensive evidence, and to prepare

adequately to intelligently cross-examine his accusers of the additional crimes.

VI.

UNNECESSARY TRIAL DELAY

If at trial, in order to secure these rights, the trial court agrees that the Defendant is

entitled to a continuance, then the trial will be delayed unnecessarily, a result which can easily be

avoided by notice to Defendant at the pre-trial hearing of additional crimes which the prosecution,

in good faith, reasonably expects may attempt to prove at trial.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully moves this

Honorable Court to grant a continuance of this case until such time as the prosecutor provides the

above-referenced information reasonably requested in this cause so that the Defendant will not be

"convicted after less than the meticulously fair trial that the Constitution demands." *Gannett*

*Company Inc. v. Depasquale*, ___ U.S. ___, 99 S.Ct. 2898 (1979).

Respestfully submitted,

JENNIFER BALIDO
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas 75207
SBN: 10474880

DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS
OFFENSES--Page 4 of 5 pages

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing Motion has been hand-delivered to the Dallas County District Attorney's Office on this the *31* day of *May* 2001.

_____
JENNIFER BALIDO

## ORDER

Came to be heard Defendant's Motion for Notice of Extraneous Offenses, and Motion is hereby (GRANTED) (DENIED).

SIGNED this the _____ day of _____, 2001.

_____
JUDGE PRESIDING

DEFENDANT'S MOTION FOR NOTICE OF EXTRANEOUS
OFFENSES--Page 5 of 5 pages



F00-02424-M

FILED

2000 DEC 19 AM 9: 17

DISTRICT CLERK
DALLAS CO. TEXAS
DEPUTY

THE STATE OF TEXAS §  IN THE 194TH JUDICIAL

      §

V.       §  DISTRICT COURT OF

      §

JEDIDIAH ISAAC MURPHY §  DALLAS COUNTY, TEXAS

## NOTICE OF INTENT TO USE
## EXTRANEOUS AND UNADJUDICATED OFFENSES

TO THE HONORABLE JUDGE OF SAID COURT:

  COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and pursuant to Rule 404(b), Texas Rules of Criminal Procedure and Art. 37.07, Code of

Criminal Procedure files this Notice of Intent to Use Extraneous and Unadjudicated Offenses  and

respectfully shows:

<div align="center">I.</div>

  The State of Texas may offer proof of the following bad acts or unadjudicated offenses

committed by Defendant at the guilt/innocence or punishment stage of this case:

  1.  Date: On or about October 4, 2000
    County: Dallas
    Victim: Bertie Cunningham
    Offense or Act: Credit Card Abuse

  2.  Date: On or about October 5, 2000
    County: Dallas
    Victim: Bertie Cunningham
    Offense or Act: Credit Card Abuse

NOTICE OF INTENT TO USE EXTRANEOUS
AND UNADJUDICATED OFFENSES - Page 1

00067

3.   Date: On or about October 5, 2000
     County: Dallas
     Victim: Francis Conner
     Offense or Act: Credit Card Abuse

4.   Date: On or about October 5, 2000
     County: Kaufman
     Victim: Bertie Cunningham
     Offense or Act: Credit Card Abuse

5.   Date: On or about May 13, 1999
     County: Kaufman
     Victim: State of Texas
     Offense or Act: DWLS / Evading Arrest

6.   Date: On or about May 13, 1999
     County: Kaufman
     Victim: Shirley Bard
     Offense or Act: Terroristic Threat

7.   Date: On or about August 26, 1997
     County: Tarrant
     Victim: Sherryl Wilhelm
     Offense or Act: Kidnaping / UUMV

8.   Date: On or about August 26, 1997
     County: Wichita
     Victim: Marjorie Ellis
     Offense or Act: Robbery

9.   Date: On or about August 17, 1997
     County: Van Zandt
     Victim: Chelsea Willis / James Lee
     Offense or Act: Aggravated Assault

10.  Date: On or about March 14, 1996
     County: Kaufman
     Victim: State of Texas
     Offense or Act: Possession of Marihuana

11.  Date: On or about August 19, 1995
     County: Dallas
     Victim: Leslie Webster
     Offense or Act: Theft

12.  Date: On or about June 2, 1994
     County: Van Zandt
     Victim: Kenneth Chrisler
     Offense or Act: Theft

13.  Date: On or about June 2, 1994
     County: Van Zandt
     Victim: Mark Read
     Offense or Act: Burglary of a Vehicle

14.  Date: On or about June 2, 1994
     County: Van Zandt
     Victim: Gary Oats
     Offense or Act: Burglary of a Habitation

15.  Date: On or about May 26, 1994
     County: Van Zandt
     Victim: Debbie Armstrong
     Offense or Act: Burglary of a Vehicle

16.  Date: On or about April 5, 1994
     County: Van Zandt
     Victim: Elizabeth Erwin
     Offense or Act: Burglary of a Habitation

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Dallas County, Texas
Bar No. 05493550

NOTICE OF INTENT TO USE EXTRANEOUS
AND UNADJUDICATED OFFENSES - Page 3

00069

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 19th day of December, 2000.

GREGORY S. DAVIS

FILED
F00-02424-M
2001 APR 12  AH 8: 31

JIM HAMLIN
DISTRICT CLERK
DALLAS CO. TEXAS
DEPUTY

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### SUPPLEMENTAL NOTICE OF INTENT TO USE
### EXTRANEOUS AND UNADJUDICATED OFFENSES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and pursuant to Rule 404(b), Texas Rules of Criminal Procedure and Art. 37.07, Code of

Criminal Procedure files this Supplemental Notice of Intent to Use Extraneous and Unadjudicated

Offenses and respectfully shows:

I.

The State of Texas may offer proof of the following bad acts or unadjudicated offenses

committed by Defendant at the guilt/innocence or punishment stage of this case:

    1.    Date: On or about April 6, 2001
           County: Dallas
           Victim: Lt. T. Thompson
           Offense or Act: Failure to obey jail disciplinary rules

00071

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Dallas County, Texas
Bar No. 05493550

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 12th day of April, 2001.

GREGORY S. DAVIS

## SUPPLEMENTAL WITNESS LIST

Nancy Sanders
Daryl Watson
Brian Sanders
Michael Pittman
T. Thompson
Bill Parker
Dep. Clifton

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### SUPPLEMENTAL NOTICE OF INTENT TO USE
### EXTRANEOUS AND UNADJUDICATED OFFENSES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and pursuant to Rule 404(b), Texas Rules of Criminal Procedure and Art. 37.07, Code of

Criminal Procedure files this Supplemental Notice of Intent to Use Extraneous and Unadjudicated

Offenses and respectfully shows:

I.

The State of Texas may offer proof of the following bad acts or unadjudicated offenses

committed by Defendant at the guilt/innocence or punishment stage of this case:

1. Date: On or about May 6, 2001
   County: Dallas
   Victim: State of Texas
   Offense or Act: Possession of jail contraband, attempted suicide

00074

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Dallas County, Texas
Bar No. 05493550

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to

opposing counsel on the 9th day of May, 2001.

GREGORY S. DAVIS

FILED

2000 DEC 19 AM 9: 17

EARLIN
DISTRICT CLERK
DALLAS TEXAS
DEPUTY

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### NOTICE OF INTENT TO USE CERTIFIED RECORDS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Notice of Intent to Use Certified Records, and respectfully shows:

I.

The State of Texas may offer the following certified records at the trial of this cause:

1.  Judgment and Sentence in Cause Nos. 14,854, 14,852, 96CL-412, 99CL-1706
    and F95-75692-QM..

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Dallas County, Texas
Bar No. 05493550

NOTICE OF INTENT TO USE
CERTIFIED RECORDS - Page

00076

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 19th day of December, 2000.

GREGORY S. DAVIS

FILED CAUSE NO. F00-02424-M

2000 MAY 31  AM 8:59

JIM HAMLIN
DISTRICT CLERK
DALLAS CO. TEXAS
_____ DEPUTY

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| v. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## MOTION TO DISCLOSE PLEA BARGAINS, DEALS AND/ OR GRANTS OF IMMUNITY

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant, by and through his attorney of record, and moves this court to order the District Attorney to disclose any plea bargains, deals, and/or grants of immunity given to its witnesses or informants with respect to this action and in support thereof would respectfully show unto this Honorable Court the following:

Defendant would show that if there is any information which the District Attorney's Office has, reflecting that any witness it may or may not call has plea-bargained, made a deal with, or was granted immunity regarding such witness' activities in the case, this testimony or fact could be used by the Defendant for impeachment purposes or to shed light on the credibility of such witness in this cause.  If the District Attorney does not reveal this information to Defendant, he will be secreting evidence which could alter the verdict in this action.

WHEREFORE, PREMISES CONSIDERED, the Defendant, respectfully moves the Court to order the District Attorney's Office to reveal any plea bargains, deals, or grants of immunity which were made to any witness or possible witness in this case.

MOTION TO DISCLOSE PLEA BARGAINS, DEALS,
AND/OR GRANTS OF IMMUNITY--Page 1 of 2 pages

00078

Respectfully submitted,

_JENNIFER BALIDO_
Assistant Public Defender
133 N. Industrial Blvd., LB 2
Dallas, Texas 75207
(214)653-3550
SBN: 10474880

ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

A true and correct copy of the foregoing Motion has been hand-delivered to the Dallas County District Attorney's Office on this the _31_ day of _May_, 2001.

_JENNIFER BALIDO_

ORDER

Came to be heard Defendant's Motion to Disclose Plea Bargains, Deals, and/or Grants of Immunity, and said Motion is hereby (GRANTED) (DENIED).

SIGNED this the _____ day of _____, 2001.

_____
JUDGE PRESIDING

MOTION TO DISCLOSE PLEA BARGAINS, DEALS,
AND/OR GRANTS OF IMMUNITY--Page 2 of 2 pages

FILED

2001 MAR -1  AM 9:43

JIM HAMLIN
DISTRICT CLERK
DALLAS CO. TEXAS

_____ DEPUTY

**F00-02424-M AND F00-23910-M**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## MOTION FOR DISCOVERY OF CERTAIN INFORMATION REGARDING POTENTIAL WITNESSES FOR THE STATE PURSUANT TO *BRADY V. MARYLAND* TEXAS CODE OF CRIMINAL PROCEDURE

COMES NOW the Defendant, in the above numbered and styled cause, by and through

the undersigned attorney, and presents this his Motion for Discovery of Information Regarding

Potential Witnesses for the State, and in support of said motion, states the following:

I.

The State of Texas has given notice to Defendant that it intends to offer evidence

regarding an extraneous offense allegedly committed by Defendant which occurred on or about

August 26, 1997, in the city of Arlington, Tarrant County, Texas.  The complainant in that

alleged offense is Sherryl Wilhelm.

II.

The Defendant requests this Court to compel the State of Texas, through her agent, the

Dallas County District Attorney's Office, the Arlington Police Department, and the Tarrant

County District Attorney's Office to investigate the following:

1.  Whether Ms. Wilhelm has ever been a complaining witness or a witness to any
    other criminal offense, and if so, the name of the defendant, case number, and type
    of case;

00080

2.   Whether any member of the Dallas County District Attorney's Office, the Arlington Police Department or the Tarrant County District Attorney's Office ever made a reference to Ms. Wilhelm's credibility, either good or bad, or her competence as a witness;

3.   Whether any member of the Dallas County District Attorney's Office, the Arlington Police Department or the Tarrant County District Attorney's Office ever failed to investigate a case, file a case, or proceed with a case based on the evaluation of Ms. Wilhelm as a good or bad, credible or incredible, or competent or not competent witness.

Moreover, the Defendant urges this court to order that, after the aforementioned agencies conduct such an investigation, those results be turned over to the Defendant for his own investigation and use at trial, under the doctrine of *Brady v. Maryland* that Defendant is entitled to any information in the possession of the State and its agents that is exculpatory or will lead to exculpatory evidence.

III.

Defendant would show that such information is solely in possession of the State of Texas and its above mentioned agents, and cannot be discovered by Defendant without this Court's order.  Further, Defendant would argue that such information is critical to the effective assistance of trial counsel to competently cross-examine Ms. Wilhelm at trial.  Without such information, the Defendant would be denied his rights under the Due Process Clause of the Fifth and Fourteenth Amendment to the United States Constitution,  the Due Course of Law provision of Article I, § 19 and of the Texas Constitution, and Article 1.04 of the Texas Code of Criminal Procedure; the right to Effective Assistance of Counsel and right to Confrontation and Cross-Examination under the Sixth Amendment to the United States Constitution, Article I, § 10 of the Texas Constitution, and Article 1.05 of the Texas Code of Criminal Procedure; and the right to a Fair Trial under the Sixth Amendment to the United States Constitution, Article I, §§ 10 and 15

of the Texas Constitution and Article 1.05 and 36.29 of the Texas Code of Criminal Procedure.

WHEREFORE, PREMISES CONSIDERED Defendant asks that this Court grant his motion for the reasons set out above.

Respectfully Submitted,

*Jennifer Balido*

Jennifer Balido
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas  75207
State Bar Number 10474880

ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that I hand-delivered the foregoing motion to Greg Davis, Assistant District Attorney on the same day of filing herewith.

*Balido*

Jennifer Balido

## ORDER

Having considered the foregoing motion, that motion is hereby _____ (GRANTED/DENIED). This the _____ day of _____, 2001.

_____
Judge Presiding

00082



F00-02424-M

THE STATE OF TEXAS                          IN THE 194TH JUDICIAL

V.                                          DISTRICT COURT OF

JEDIDIAH ISAAC MURPHY                       DALLAS COUNTY, TEXAS

## MOTION TO DISCLOSE EXPERT WITNESSES AND OPINIONS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and pursuant to Art. 39.14, Code of Criminal Procedure files this Motion to Disclose Expert

Witnesses and Opinions and respectfully shows:

I.

The State of Texas requests that the defendant disclose the name and address of each person

the defendant may use at trial to present evidence under Rules 702 of the Texas Rules of Evidence.

II.

The State of Texas requests the defendant disclose each expert's opinions and facts and data

underlying his opinions prior to his testimony to the jury pursuant to Rule 705 of The Texas Rules

of Evidence.

WHEREFORE, PREMISES CONSIDERED, the State requests that the Court grant this

motion.

MOTION TO DISCLOSE EXPERT WITNESSES - Page 1

00083

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Dallas County, Texas
Bar No. 05493550

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 19th day of December, 2000.

GREGORY S. DAVIS

MOTION TO DISCLOSE EXPERT WITNESSES - Page 2

FILED

**CAUSE NO. F00-02424-M**
**CAUSE NO. F00-23910-M** FEB 21  PH 2: 31

DISTRICT CLERK
DALLAS CO. TEXAS

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE 194TH JUDICIAL** |
| **VS.** | § | **DISTRICT COURT OF** |
| **JEDIDIAH ISAAC MURPHY** | § | **DALLAS COUNTY, TEXAS** |

## DISCLOSURE OF EXPERT WITNESSES

**TO THE HONORABLE JUDGE OF SAID COURT:**

    **COMES NOW,** the Defendant, **JEDIDIAH ISAAC MURPHY,** and responds to the

States Motion to Disclose Expert Witnesses:

    The Defense experts so far are:

> Jay Crowder, MD
> 2201 Inwood Road
> Dallas, Texas 7235
>
> Mary Connell, Ed. D
> Water Gardens Place
> Suite 635
> 100 East Fifteenth Street
> Fort Worth, Texas, 76102-6566

This case is set for trial on **June 4, 2001.** The Defense will provide other experts as they

become available.

           Respectfully submitted,

           *Jane Little*

           **JANE LITTLE**
           State Bar No. 12424210
           Assistant Public Defenders
           133 N. Industrial Boulevard
           Suite C-1., LB 2
           (214) 653-3550
           Dallas, Texas 75207

**CERTIFICATE OF SERVICE**

I hereby certify to the Court that a true and correct copy of the above and foregoing Motion was served on the District Attorney of Dallas County by personal delivery on the same date of filing herewith.

Jane Little

**ORDER**

On _____,the Court having considered the above and foregoing Motion finds the same is hereby [   ] GRANTED   [   ] DENIED.

_____
Judge Presiding



CAUSE NO. F00-02424-M
CAUSE NO. F00-23910-M

FILED

MAY 25 2001

JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
DEPUTY

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| VS. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### DISCLOSURE OF EXPERT WITNESSES

TO THE HONORABLE JUDGE OF SAID COURT:

    COMES NOW, the Defendant, JEDIDIAH ISAAC MURPHY, and responds to the States

Motion to Disclose Expert Witnesses:

    Additional experts are:

        Leon Peek, Ph. D
        207 W. Hickory
        Denton, Texas 76201

        Dr. Gilda Kessner
        2525 Ross
        Dallas, Texas 75222

        Nizam Peerwani, M.D.
        200 Felix Ghozdz Place
        FT. Worth, Texas

        Edward Hueske
        Forensic Science Association
        541 Halifax Lane
        Coppell, Texas 75019

00087

Jay Wimbish, Ph.D. DABFT
Diplomate American Board of
Forensic Toxicology
609 Cosby Road
Milford, Texas 76670

This case is set for trial on June 4, 2001.  The Defense will provide other experts as they

become available.

Respectfully submitted,

*Jane Little*

JANE LITTLE
State Bar No. 12424210
Assistant Public Defender
133 N. Industrial Blvd.
Suite C-1., LB 2
(214) 653-3550
Dallas, Texas 75207

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Disclosure

of Expert Witness was served on the District Attorney of Dallas County by personal delivery

on the same date of filing herewith.

*Jane Little*

JANE LITTLE

00088

**ORDER**

On the _____ day of _____, 2001, the said Disclosure of

Expert Witnesses heard, and same is hereby GRANTED/DENIED, to which action the

Defendant excepts.

<div style="text-align: right">

_____
JUDGE PRESIDING

</div>

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### STATE'S MOTION TO TAKE
### DEFENSE EXPERT ON VOIR DIRE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Motion to Take Defense Expert on Voir Dire and respectfully shows:

I.

Pursuant to Rule 705(b) of the Texas Rules of Evidence, the State requests of the Court

permission to take each expert witness offered by the defense on voir dire.

WHEREFORE, the State prays the Court grant this Motion..

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

FILED
2001 MAR -1 PM 1: 51
JIM HAMLIN
DISTRICT CLERK
DALLAS, TEXAS
_____ DEPUTY

**STATE'S MOTION TO TAKE DEFENSE**
**EXPERT ON VOIR DIRE - Page 1**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the ___1st___ day of March , 2001.

GREGORY S. DAVIS

FILED

F00-02424-M

2000 DEC 12  AM 9: 23

GM HAMLIN
DISTRICT CLERK
DALLAS CO. TEXAS
_____ DEPUTY

THE STATE OF TEXAS

V.

JEDIDIAH ISAAC MURPHY

§
§
§
§
§

IN THE 194TH JUDICIAL

DISTRICT COURT OF

DALLAS COUNTY, TEXAS

## STATE'S MOTION TO AUTHORIZE
## DISCLOSURE OF PATIENT INFORMATION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory S. Davis, and files this Motion and respectfully shows:

I.

Defendant stands charged with the offense of Capital Murder in Dallas County, Texas.

II.

Defendant has received treatment at the Andrews Center in Canton, Texas - a facility providing treatment for alcohol abuse, drug abuse and emotional disorders. There is a reasonable likelihood that the records of the Andrews Center will disclose information of substantial value in the investigation of this case, including possible exculpatory and/or mitigating evidence which the State has a statutory and Constitutional duty to investigate.

III.

The State has attempted, without success, to obtain these records through a Subpoena Duces Tecum issued by the Dallas County Grand Jury to Lisa Flowers, Custodian of Medical Records of

**STATE'S DISCOVERY MOTION - Page 1**

the Andrews Center. The Andrews Center refuses to disclose the requested records without an order and subpoena issued in accordance with 42 CFR §2.65. Therefore, other ways of obtaining the information are not available or would not be effective.

IV.

The potential injury to Defendant, to the physician-patient relationship and to the ability of the Andrews Center to provide services to other patients is outweighed by the public interest and need for the disclosure given the seriousness of the offense and the statutory and Constitutional duty on the part of the State to investigate possible exculpatory and mitigating

V.

The Andrews Center has been afforded the opportunity to be represented by independent counsel, but has declined.

WHEREFORE, the State prays the Court grant this Motion.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

STATE'S DISCOVERY MOTION - Page 1

00093

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel and faxed to the Andrews Center on the 12th day of December, 2000.

GREGORY S. DAVIS

000094



F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## MOTION REQUESTING NOTICE OF DEFENDANT'S INTENT
## TO INTRODUCE FUTURE DANGEROUSNESS EXPERT TESTIMONY

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Motion and respectfully shows:

I.

Pursuant to *Lagrone v. State*, the Court may order the Defendant to submit to a state-

sponsored psychiatric exam on future dangerousness "when the defense introduces, *or plans to*

*introduce*, its own future dangerousness expert testimony".

II.

The State believes the Defendant may introduce future dangerousness expert testimony in this

cause. In particular, the State believes the Defendant may undergo a psychiatric exam, or engage the

services of a medical doctor or other health care professional to testify about the Defendant's lack of

future dangerousness. Unless the State is given timely notice of the Defendant's intention to offer

evidence regarding future dangerousness, it will be denied the opportunity to request that the

Defendant submit to a state-sponsored psychiatric exam prior to the defense offering its own

**MOTION REQUESTING NOTICE OF**
**FUTURE DANGEROUSNESS TESTIMONY - Page**

testimony regarding future dangerousness.

WHEREFORE, the State prays the Court grant this Motion, and order the Defendant to give the State timely notice of his intention to introduce future dangerousness expert testimony in this cause.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 19th day of December, 2000.

GREGORY S. DAVIS

**MOTION REQUESTING NOTICE OF
FUTURE DANGEROUSNESS TESTIMONY - Page**

F00-02424-M

**FILED**

MAY 29 2001

JIM HAMAN
DIST. CLERK, DALLAS CO., TEXAS
DEPUTY

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

<u>STATE'S SUPPLEMENTAL LIST OF POSSIBLE WITNESSES</u>

TO THE HONORABLE JUDGE OF SAID COURT:

     COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Supplemental List of Possible Witnesses:

| | |
|---|---|
| Richard Ingrim, MD | <u>Dallas Sheriff's Office</u> |
| Daniel Thorn | Sgt. R. Lachman 5346 |
| John Thompson | Sgt. S. Gentry 1648 |
| Weldon Barker | DSO Rainey 724 |
| Richard Mullin | DSO Olugbode 5859 |
| Billy Hendrix | Dep. K. Cook 360 |
| Wylie Bone | DSO Jones 5757 |
| Daniel Dehart | DSO Omorojie 5745 |
| Christopher Wilcox | DSO Boozer 5823 |
| Christy Sheets | DSO Norman 5083 |
| Sandra Washington | Dep. Clements 631 |
| Dr. Moss | |
| Royce Smithey | <u>Edgewood Police Department</u> |
| Bob Murphy | Off. Vanek |

<u>Garland Police Department</u>
Off. Franey
Off. Mendoza

**STATE'S SUPPLEMENTAL LIST
OF POSSIBLE WITNESSES - Page 1**

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Dallas County, Texas
Bar No. 05493550


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the 29th day of May, 2001.

GREGORY S. DAVIS

CAUSE NUMBER F00-02424-M

THE STATE OF TEXAS

V.

JEDIDIAH ISAAC MURPHY

§

§

§

§

§

IN THE 194TH JUDICIAL

DISTRICT COURT OF

DALLAS COUNTY, TEXAS

FILED
2001 MAY 17  AM 9: 23
JIM HAMLIN
CLERK
DALLAS TEXAS
DEPUTY

## ORDER ALLOWING DEFENDANT'S CRIME SCENE EXPERT ACCESS TO VICTIM'S CAR

This Court, having previously approved funds for Defendant to procure the services of a Crime Scene Expert, hereby orders the State to allow Defendant's Expert full access to the victim's car or make arrangements with the victim's family to provide Defendant's Expert full access to the victim's car no later than Thursday, May 24, 2001 at 5:00 p.m.

The Honorable Harold Entz
Presiding Judge
194th Judicial District Court

00099

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194th JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### STATE'S MOTION IN LIMINE

TO THE HONORABLE JUDGE OF SAID COURT:

     COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Motion in Limine and respectfully shows:

I.

     The State of Texas moves the Court to order the Defendant, his attorneys and his witnesses

to not attempt to offer or refer in any manner to any of the following items until the Court has had

an opportunity to rule on their admissibility:

1.     Any statement that the term "society" includes only prison populations.
*Smith v. State*, 898 S.W.2d 838 (Tex. Crim. App. 1995).

2.     Any statement that non-prison populations can be considered a part of "society" only if the State proves that the Defendant will be outside the penitentiary, or have influence outside the penitentiary.
*Smith v. State*, 898 S.W.2d 838 (Tex. Crim. App. 1995).

3.     Any statement that the State has a burden of proving that the Defendant will be outside the penitentiary, or have influence outside the penitentiary on the special issue of future dangerousness.
*Smith v. State*, 898 S.W.2d 838 (Tex. Crim. App. 1995).

STATE'S MOTION IN LIMINE - Page 1

4.     Any statement that the State has a burden of proof on the special issue of mitigation. *Penry v. State*, 903 S.W.2d 766 (Tex. Crim. App.), cert. Denied, 516 U.S.977, 116 S. Ct. 480, 133 L.Ed. 2d 408 (1995); *Ladd v. State*, 3 S.W.3d 547 (Tex. Crim. App. 1999).

5.     Any statement that a particular circumstance must be considered mitigating. *Green v. State*, 934 S.W.2d 92 (Tex. Crim. App. 1996).

6.     Any inquiry into how a venire person would respond to particular circumstances presented in a hypothetical question. *Cadoree v. State*, 810 S.W.2d 786 (Tex. Crim. App. 1991).

7.     Any inquiry into whether a venire person would consider victim impact testimony or how much weight or effect he would give it on the issue of future dangerousness or mitigation. *Atkins v. State*, 951 S.W.2d 787 (Tex. Crim. App. 1997)

8.     Any statement that the law does not allow jurors to give certain classes of witnesses a slight edge in terms of credibility. *Ladd v. State*, 3 S.W.3d 547 (Tex. Crim. App. 1999).

9.     Any statement that the law does not allow a venire person to be predisposed toward the death penalty when answering the issue of future dangerousness. *Maldonado v. State*, 998 S.W.2d 239 (Tex. Crim. App. 1999).

10.    Defendant's childhood or family photographs. *Rhoades v. State*, 934 S.W.2d 113 (Tex. Crim. App.1996).

11.    Testimony from Defendant's family or friends regarding their feelings on the prospect of a death sentence or the impact Defendant's execution would have on them. *Fuller v. State*, 827 S.W.2d 919 (Tex. Crim. App. 1992).

WHEREFORE, the State prays the Court grant this Motion and order the Defendant, his attorneys and witnesses not to mention or allude in any way to such evidence without first advising the Court of this intention, so that the jury may be removed and a hearing held to determine the admissibility of the evidence.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to

opposing counsel on the _____ day of March, 2001.

GREGORY S. DAVIS

**STATE'S MOTION IN LIMINE - Page 3**

00102

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194th JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

**STATE'S MOTION IN LIMINE**
**REGARDING MITIGATION EVIDENCE**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory S. Davis, and files this Motion in Limine Regarding Mitigation Evidence and respectfully shows:

I.

The State has reason to believe that the defendant will attempt to offer so-called "expert" testimony regarding the issue of mitigation.

II.

The trial court is required under Texas Rule of Criminal Evidence 702 to conduct a hearing outside the presence of the jury and determine whether proffered scientific evidence is reliable and relevant to assist the jury. *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992); *Jordan v. State*, 928 S.W.2d 550 (Tex. Crim. App. 1996).

III.

The State believes such so-called "expert" testimony will lack any valid underlying scientific theory and will amount to nothing more than a self-serving, re-telling of Defendant's life story which

**STATE'S MOTION IN LIMINE**
**REGARDING MITIGATION EVIDENCE - Page 1**

is neither probative nor relevant.

WHEREFORE, the State prays the Court conduct hearing under Rule 702 and grant this

Motion in Limine.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to

opposing counsel on the ___1st___ day of March, 2001.

GREGORY S. DAVIS

**STATE'S MOTION IN LIMINE**
**REGARDING MITIGATION EVIDENCE - Page 2**

NO. F00-02424-M

STATE OF TEXAS

VS.

JEDIDIAH ISAAC MURPHY



IN THE 194TH JUDICIAL

DISTRICT COURT

DALLAS COUNTY, TEXAS

FILED

JUN 4 2001

JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
_____ DEPUTY

### MOTION IN LIMINE REGARDING PHOTOGRAPHS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant in the above-styled and numbered cause, by and through his attorney of record, and moves the Court to order the State not to proffer crime scene photographs in the presence of the jury until the Court has conducted a hearing and had an opportunity to rule on their admissibility, and in support of such motion Defendant would show:

I.

The Defendant believes that at some point in the trial the State may attempt to introduce crime scene and autopsy photographs depicting the body of the complainant in the above referenced case..

II.

These crime scene and autopsy photographs are highly prejudicial in that they would influence and inflame the jury to convict and punish the Defendant out of all proportion to their weight as probative evidence in a burglary of a habitation case. For this reason, Defendant would be denied a fair trial if such photographs were admitted.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully prays that the Court grant this motion and order the State not to mention or allude to any such photographs, display any such photographs in the presence of the jury or proffer any such photographs without first advising the Court of this intention, so that the jury may be removed and a hearing held to determine the admissibility of the photographs.

Respectfully submitted,

Jennifer Balido
Public Defenders Office
133 N.Industrial Blvd.,LB 2
Dallas, Texas 75207
(214) 653-3550
State Bar No. 10474880

ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify to the Court that a true and correct copy of the above and foregoing Motion was served on the Dallas County District Attorney's Office by personal delivery on the same date of filing herewith.

ORDER

On the _____, the Court having considered the above and foregoing Motion finds the same is hereby **GRANTED / DENIED.**

_____
Judge Presiding

00106

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194th JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |



### STATE'S RESPONSE TO DEFENDANT'S MOTION
### IN LIMINE REGARDING PHOTOGRAPHS

TO THE HONORABLE JUDGE OF SAID COURT:

      COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Response to Defendant's Motion in Limine Regarding Photographs and

respectfully shows:

<div align="center">I.</div>

      The admissibility of photographs is within the sound discretion of the trial judge. *Williams v.*

*State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). When determining whether these exhibits should

be admitted, the question is not whether the exhibits are more prejudicial than probative, but rather

whether the probative value is substantially outweighed by the danger of unfair prejudice. *Salazar v.*

*State*, No. 73,451 (Tex. Crim. App. 2001). In determining whether the probative value of photographs

is substantially outweighed by the danger of prejudice, trial courts should consider several factors,

including but not limited to: (1) the number of exhibits offered; (2) their gruesomeness, size, and

detail; (3) whether they are in black and white or color; (4) whether they are closeup; (5) whether the

body is naked or clothed; and (6) the availability of other means of proof and the circumstances

STATE'S RESPONSE TO DEFENDANT'S MOTION
IN LIMINE REGARDING PHOTOGRAPHS - Page 1

unique to each case. *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996).

## II.

Generally, a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible. *Long v. State*, 823 S.W.2d 259, 271-72 (Tex. Crim. App. 1991). Photographs of the crime scene aid the jury in determining the manner and means of death of the victim, the force used, and sometimes the identity of the perpetrator. *Williams*, at 195. In this case, the crime scene photographs will aid the jury in determining the cause of death, and the force used, They will also assist the jury in answering the special issues at the punishment phase. The photographs depict the deceased's body lying in a creek. Only two crime scene photographs depict the body. The photographs are taken at a distance, and show little detail. They are not overly gruesome. They are 8"x10" color photographs. They are taken at a distance. The deceased is fully clothed. The probative value of the crime scene photographs is not substantially outweighed by the danger of prejudice.

## II.

Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Rojas v. State*, 986 S. W. 2d 241, 249 (Tex. Crim. App. 1998). In *Salazar* the Court held that photographs of some of the victim's internal organs after their removal from the victim's body were admissible. The injuries depicted in the autopsy photographs in this case were not caused by the autopsy itself. Instead, the injuries were caused by the direct actions of the Defendant; namely, shooting the deceased in the head with a handgun, and disposing of her body in a creek where it would be subject to decomposition and attack by aquatic animals. They will assist the jury in determining the cause of death, force used, and answering the special issues at the punishment phase. Although the photographs are somewhat gruesome, that fact alone does not render

STATE'S RESPONSE TO DEFENDANT'S MOTION
IN LIMINE REGARDING PHOTOGRAPHS - Page 2

them more prejudicial than probative. *May v. State*, (Tex. App. - Dallas 2000).

WHEREFORE, the State prays the Court deny Defendant's Motion in Limine Regarding

Photographs and allow admission of crime scene and autopsy photographs.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

00109

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the ___1st___ day of March, 2001.

GREGORY S. DAVIS

F00-02424-M

STATE OF TEXAS

V.

JEDIDIAH ISAAC MURPHY



IN THE 194TH JUDICIAL

DISTRICT COURT

DALLAS COUNTY, TEXAS

FILED
JUN 4 2001
JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
DEPUTY

MOTION IN LIMINE REGARDING EXTRANEOUS TRANSACTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant, in the above-styled and numbered cause, by and through his attorney of record, and respectfully requests that the Court instruct the State not to mention, allude to, or refer in any manner to any extraneous transaction on the part of the Defendant until the Court has conducted a hearing and had an opportunity to rule on its admissibility and in support of such motion Defendant would show:

I.

Defendant anticipates that at some point in the trial, the State may attempt to introduce evidence that the Defendant is guilty of an offense other than the offense on trial.

II.

Defendant objects to the admission of such extraneous offense evidence under Rules 401, 402, and 403(b) of the Texas Rules of Criminal Evidence and requests the State to prove and articulate that such evidence has relevance other than proving the character of the defendant and to show he acted in conformity therewith.

III.

If the Court overrules the objection in paragraph II above, Defendant hereby requests that the Court make findings of fact and conclusions of law supporting its determination that the evidence (1) establishes an elemental fact, (2) establishes an evidentiary fact that inferentially leads to an elemental fact, (3) rebuts a defensive theory, or (4) has some other logical relevance.

IV.

00111

Further, Defendant requests that the Court properly instruct the jury to confine and limit its consideration of such evidence to the purpose articulated by the State. Defendant asks that such instruction be given at the time the evidence is admitted in front of the jury and again in the Court's charge to the jury.

V.

Still further, Defendant would also, due to the Court admitting such evidence, object because of the unfair prejudice, confusion, misleading nature, delay and/or cumulation resulting from this evidence. Additionally, Defendant requests the Court make findings of fact and conclusions of law with regard to this evidence causing unfair prejudice, confusion, misleading, delay and/or cumulation.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Motion be granted.

Respectfully submitted,

Jennifer Balido
Public Defenders Office
133 N. Industrial Blvd., LB 2
Dallas, TX 75207
214-653-3550
State Bar No.10474880

ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify to the Court that a true and correct copy of the above and foregoing motion was personally delivered to the Dallas County District Attorney's Office on the same date of filing herewith.

Motion in Limine Regarding Extraneous Transactions – Page 2 of 2

00112

ORDER

On _____, the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED / DENIED**.

_____
Judge Presiding

F00-02424-M

STATE OF TEXAS                                                 IN THE 194TH JUDICIAL

V.                                                            DISTRICT COURT

JEDIDIAH ISAAC MURPHY                                        DALLAS COUNTY, TEXAS



FILED

JUN 4 2001

JIM HAMLIN
DIST. CLERK DALLAS CO., TEXAS
_____ DEPUTY

## MOTION IN LIMINE REGARDING ALLEGED
## EVIDENCE OF SEXUAL ASSAULT OF VICTIM

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the Defendant, in the above-styled and numbered cause, by and through his attorney of record, and respectfully requests that the Court instruct the State not to mention, allude to, or refer in any manner to any extraneous transaction on the part of the Defendant until the Court has conducted a hearing and had an opportunity to rule on its admissibility and in support of such motion Defendant would show:

I.

Defendant anticipates that at some point in the trial, the State may attempt to introduce evidence that the Medical Examiner found evidence of an injury or abnormality in the genitalia of the victim, Bertie Cunningham. Further, Defendant has found through discovery that no other evidence exists that the victim was sexually assaulted or that Defendant attempted to sexually assault her. Defendant asserts that the mere mention of the existence of this alleged injury would so inflame the jury as to deny him a fair trial. Since there is not even a scintilla of evidence that an attempted or completed sexual assault occurred, Defense would urge that the State not be allowed to mention this evidence at any time until an evidentiary hearing can be held to determine whether or not adequate evidence exists to present this issue to the jury.

II.

Defendant objects to the admission of such extraneous offense evidence under Rules 401, 402, and 403(b) of the Texas Rules of Criminal Evidence and requests the

00114

State to prove and articulate that such evidence has relevance other than proving the character of the defendant and to show he acted in conformity therewith.

III.

If the Court overrules the objection in paragraph II above, Defendant hereby requests that the Court make findings of fact and conclusions of law supporting its determination that the evidence (1) establishes an elemental fact, (2) establishes an evidentiary fact that inferentially leads to an elemental fact, (3) rebuts a defensive theory, or (4) has some other logical relevance.

IV.

Further, Defendant requests that the Court properly instruct the jury to confine and limit its consideration to the purpose articulated by the State. Defendant asks that such instruction be given at the time the evidence is admitted in front of the jury and again in the Court's charge to the jury.

V.

Still further, Defendant would also, due to the Court admitting such evidence, object because of the unfair prejudice, confusion, misleading nature, delay and/or cumulation resulting from this evidence. Additionally, Defendant requests the Court make findings of fact and conclusions of law with regard to this evidence causing unfair prejudice, confusion, misleading, delay and/or cumulation.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Motion be granted.

Respectfully submitted,

Jennifer Balido
Public Defenders Office
133 N. Industrial Blvd., LB 2
Dallas, TX 75207
214-653-3550
State Bar No.10474880

ATTORNEY FOR DEFENDANT

00115

## CERTIFICATE OF SERVICE

I hereby certify to the Court that a true and correct copy of the above and foregoing motion was personally delivered to the Dallas County District Attorney's Office on the same date of filing herewith.

_____

## ORDER

On _____, the Court having considered the above and foregoing motion, finds the same is hereby **GRANTED / DENIED**.

_____
Judge Presiding

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194th JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## STATE'S RESPONSE TO DEFENDANT'S MOTION
## IN LIMINE REGARDING PUNISHMENT ARGUMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Response to Defendant's Motion in Limine Regarding Punishment Argument

and respectfully shows:

I.

Society includes both prison and non-prison populations. *Smith v. State*, 898 S.W.2d 838

(Tex. Crim. App. 1995). The State has no burden of proving that the defendant will be outside the

penitentiary or have influence outside the penitentiary regarding the issue of future dangerousness.

*Smith.* Therefore, the State is entitled to argue that the jury can consider both prison and non-prison

populations regarding the issue of future dangerousness.

WHEREFORE, the State prays the Court deny Defendant's Motion in Limine Regarding

Punishment Argument.

STATE'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE
REGARDING PUNISHMENT ARGUMENT - Page 1

FILED
2001 MAR -1 PH 1:51
JIM HAMLIN
DISTRICT CLERK
DALLAS CO. TEXAS
DEPUTY

00117

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the _1st_ day of March, 2001.

GREGORY S. DAVIS

**STATE'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE
REGARDING PUNISHMENT ARGUMENT - Page 2**

00118

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194th JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## STATE'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE
## REGARDING VICTIM IMPACT-CHARACTER TESTIMONY

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Response to Defendant's Motion in Limine Regarding Victim Impact-

Character Testimony and respectfully shows:

I.

The Eighth Amendment erects no per se bar to the admission of victim impact testimony.

*Payne v. Tennessee*, 501 U.S. 808, 825, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991); *Mosley v. State*,

983 S.W.2d 249, 261-65 (Tex. Crim. App. 1998), cert. Denied, 526 U.S. 1070, 119 S. Ct. 1446, 143

L. Ed. 2d 550 (1999). In *Payne* the Court noted that information about the victim can be an important

humanizing factor essential for just decision-making in a death penalty trial. The Court in *Payne* also

noted "that evidence about the victim and about the impact of the murder on the victim's family is

relevant to the jury's decision as to whether or not the death penalty should be imposed".

II.

In *Mosley* the Court held that no distinction existed between impact and character evidence

STATE'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE
REGARDING VICTIM IMPACT-CHARACTER TESTIMONY - Page 1

00119

and that all such evidence was relevant to the statutory mitigation issue. The Court held that both types of evidence were admissible to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence.

III.

In *Jackson v. State*, 33 S.W.3d 828 (Tex. Crim. App. 2000) the Court held that testimony from the grandmother of two of the victims about the reaction of her son to his daughter's death was admissible and not barred by the Eighth Amendment.

WHEREFORE, the State prays the Court deny Defendant's Motion in Limine and allow the State to present victim impact and character evidence as allowed by current caselaw.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

00120

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the _/st_ day of March, 2001.

GREGORY S. DAVIS

00121

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194th JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

**STATE'S RESPONSE TO DEFENDANT'S MOTION
TO VOIR DIRE ON CHARACTER/VICTIM IMPACT TESTIMONY**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory S. Davis, and files this Response to Defendant's Motion to Voir Dire on Character/Victim Impact Testimony and respectfully shows:

I.

Questions 1 and 2 are misstatements of law, confusing and improper since victim character/impact testimony has been held to be relevant to only the issue of mitigation. *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998), cert. denied, 526 U.S. 1070, 119 S. Ct. 1446, 143 L. Ed. 2d 550 (1990).

II.

Questions 3 and 4 are misstatements of law, confusing and improper since victim character/impact has been held to relevant at only the punishment phase. *Mosley* at 263-64.

III.

Question 4 is a misstatement of law, confusing and improper since the State has no burden

on the issue of mitigation. *Ladd v. State*, 3 S.W.3d 547 (Tex. Crim. App. 1999).

WHEREFORE, the State prays the Court deny Defendant's Motion to Question Venireman

on Character/Victim Impact Testimony.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the _1st_ day of March, 2001.

GREGORY S. DAVIS

**STATE'S RESPONSE TO DEFENDANT'S MOTION TO QUESTION**
**VENIREMEN ON CHARACTER VICTIM/IMPACT TESTIMONY - Page 3**

00124

FILED

F00-02424-M

THE STATE OF TEXAS

2001 MAY 31  AM 8: 59

JIM HAMLIN
DISTRICT CLERK
DALLAS CO, TEXAS
DEPUTY

IN THE 194TH JUDICIAL

V.

DISTRICT COURT OF

JEDIDIAH ISAAC MURPHY

§
§
§
§
§
§

DALLAS COUNTY, TEXAS

## MOTION TO SUPPRESS EVIDENCE SEIZED WITHOUT A WARRANT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant in the above styled and numbered cause and moves this court to suppress the following evidence:

I.

Any and all contraband seized from his person and any evidence seized after Defendant made any post-arrest statements.

II.

Defendant would show the Court that said evidence was seized without a search warrant and was the fruit of an illegal oral or written statement by law enforcement agents while in custody.  All evidence was seized without a search warrant, and such seizure was in violation of the Fourth and Fourteenth Amendments to the United States Constitution, Article I, Section 9 of the Texas Constitution, Article 1.06 of the Texas Code of Criminal Procedure, and Article 38.23 of the Texas Code of Criminal Procedure.

III.

Defendant would further show that the search by police officers was without probable cause or exigent circumstances and that , in the absence of a search warrant or an exception to the search warrant requirement, and any and all statements, oral or written, by the defendant and all

00125

other evidence is inadmissible.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this motion be granted

in all things.  Defendant further requests that the Court make and file written Finding of Facts and

Conclusions of Law regarding these matters.

Respectfully Submitted,

Jennifer Balido
Assistant Public Defender
133 North Industrial, LB 2
Dallas, Texas 75207
214-653-3550
State Bar Number 10474880

## CERTIFICATE OF SERVICE

I hereby certify to the Court that a true and correct copy of the above and foregoing

Motion to Suppress Evidence Seized Without a Warrant was served on the Dallas County District

Attorney's Office by personal delivery on the same day of filing herewith.

_____
Jennifer Balido

## ORDER

On _____, 2001, the Court, having considered the above

and foregoing Motion to Suppress Statements finds the same is hereby _____.

_____
Judge Presiding

00126

FILED F00-02424-M

| | |
|---|---|
| **THE STATE OF TEXAS** 2001 MAY 31  AM 8: 59 | IN THE 194TH JUDICIAL |
| | |
| **V.** JIM HAMLIN<br>DISTRICT CLERK<br>DALLAS CO. TEXAS | **DISTRICT COURT OF** |
| **JEDIDIAH ISAAC MURPHY** DEPUTY | **DALLAS COUNTY, TEXAS** |

<u>**MOTION TO SUPPRESS STATEMENTS**</u>

TO THE HONORABLE JUDGE OF SAID COURT:

 COMES NOW, Defendant in the above styled and numbered cause and moves this court to excuse the jury before any evidence of an admission or confession by the Defendant, whether written or oral, is admitted into evidence in order to determine the admissibility of such statements.  Defendant makes this request based on the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States constitution, Article I, Sections 9, 10 and 19 of the Texas Constitution, and articles 38.21 through 28.23 of the Texas Code of Criminal Procedure.  In support of this motion, Defendant would show:

<div align="center">I.</div>

 At the time these statements were made by the Defendant, he was under arrest, in custody and substantially deprived of his freedom.

<div align="center">II.</div>

 These statements were made without the Defendant being warned of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 694 (1966) and Article 38.22 of the Texas Code of Criminal Procedure.

<div align="center">III.</div>

 These statements were involuntary and the result of pressure and coersion by law

00127

enforcement agents.

IV.

These statements are the direct fruit of an illegal arrest of the Defendant under the United States and Texas Constitutions and Chapter 14 of the Texas Code of Criminal Procedure.

V.

These statements were taken in violation of the Defendant's right to remain silent under the United States and Texas Constitutions.

VI.

These statements were taken inviolation of the Defendant's right to counsel under the United States and Texas Constitutions.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this motion be granted and all statements made by him to any law enforcement agent be suppressed. Defendant further requests that the Court make and file written Finding of Facts and Conclusions of Law regarding these matters.

Respectfully Submitted,

*Balido*

Jennifer Balido
Assistant Public Defender
133 North Industrial, LB 2
Dallas, Texas 75207
214-653-3550
State Bar Number 10474880

00128

## CERTIFICATE OF SERVICE

I hereby certify to the Court that a true and correct copy of the above and foregoing

Motion to Suppress Statements was served on the Dallas County District Attorney's Office by

personal delivery on the same day of filing herewith.

_____

Jennifer Balido

## ORDER

On _____, 2001, the Court, having considered the above

and foregoing Motion to Suppress Statements finds the same is hereby _____.

_____

Judge Presiding

FILED

F00-02424-M

2001 JUN -6  AM 8: 28

JIM HAMLIN
DISTRICT CLERK
DALLAS CO.. TEXAS

_____ DEPUTY

THE STATE OF TEXAS

v.

JEDIDIAH ISAAC MURPHY

§
§
§
§
§
§
§

IN THE 194TH JUDICIAL

DISTRICT COURT OF

DALLAS COUNTY, TEXAS

### MOTION TO SUPPRESS ITEMS SEIZED FROM DEFENDANT'S CELL AT DALLAS COUNTY JAIL

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW Defendant, in the above entitled and numbered cause and presents to this Court this, his Motion to Suppress Items Seized from Defendant's Cell at Dallas County Jail, and in support of his motion, would show the Court the following:

I.

Defendant has been incarcerated in the Dallas County Jail since October 16, 2000. Defendant asserts that, during the month of May, certain items were seized from his cell in the Dallas County Jail. Further, Defendant asserts that the seizure of such items was a improper warrantless search and seizure of his property, to which there is no exception to the warrant requirement. Defendant asserts that he has the reasonable expectation of privacy in his jail cell based on his subjective beliefs, the policies of the Dallas County Jail, and his experience having been incarcerated by Dallas County for the past eight months. Defendant asserts that the seizure of such items was a improper warrantless search and seizure of his property, to which there is no exception to the warrant requirement. Seizure of such property at that time, or any other time, was in violation of Defendant's rights guaranteed by Article I, Section 9 of the Texas Constitution, Articles 14.01 to 14.06 of the Texas Code of Criminal Procedure and article 38.23 of the Code of Criminal Procedure and the Fourth and Fourteenth Amendments to the United

States Consititution.

II.

Defendant also asserts that some or all of the materials seized in the illegal search were covered under the Attorney-Client Privilege.  Defendant asserts that some or all of the materials seized were made at the request of his attorneys and prepared for that purpose.  As such, Defendant would move to suppress the use of such materials, and the use of any evidence that was based on or directed to by the illegally seized and privileged evidence.  The use of such evidence would violate his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article I, sections 10, 13, 15 and 19 of the Texas Constitution, and Articles 1.04, 1.05, 38.08, and 38.23 of the Texas Code of Criminal Procedure.

WHEREFORE PREMISES CONSIDERED, Defendant prays that this Court grant his motion in all things.

Respectfully Submitted,

Jennifer Balido
Public Defender's Office
133 N. Industrial, LB 2
Dallas, Texas 7507
State Bar Number 10474880

**CERTIFICATE OF SERVICE**

I hereby certify that I hand-delivered to the District Attorney a copy of this motion the same date of filing herewith.

_____

**ORDER**

Having considered the foregoing motion, that motion is hereby _____.

    This the _____ day of _____, 2001.

_____
Judge Presiding

F00-02424-M AND F00-23910-M

THE STATE OF TEXAS

V.

JEDIDIAH ISAAC MURPHY

§
§
§
§
§
§

IN THE 194TH JUDICIAL

DISTRICT COURT OF

DALLAS COUNTY, TEXAS

## MOTION TO ALLOW QUESTIONING OF VENIRE REGARDING SPECIFIC ISSUES IN THIS CASE

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW Defendant in the above entitled and numbered cause and presents to this Court this Motion to Allow Questioning of Venire Regarding Specific Issues in this Case, and in support of said motion, shows the following:

I.

Defendant would like to ask each potential juror in this case the following question, and any other question that might be relevant to the potential juror's answer:

**"In a hypothetical case, could you be a fair and impartial juror if the evidence was such that the victim in the case was an 80-year-old woman?"**

II.

Defendant asserts that he is entitled to ask this question of the potential jurors, and denial of the ability to question the potential jurors in this way violates his right to a fair and impartial jury under Article I, § 10 of the Texas Constitution, the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article 35.15 of the Texas Code of Criminal Procedure, and the holdings of the Texas Court of Criminal Appeals in the cases of *Nunfio v. State*, 808 S.W.2d 482

00133

(Tex. Crim. App. 1991), *Maddux v. State*, 862 S.W.2d 590 (Tex. Crim. App. 1993, *reh'g denied*); and *Howard v. State*, 941 S.W.2d 102 (Tex. Crim. App. 1997).

A question on voir dire is proper if its purpose is to discover a juror's views on an issue applicable in the case. *McKay v. State*, 819 S.W.2d 478, 482 (Tex. Crim. App. 1991), and *Nunfio v. State*, 808 S.W.2d 482, 484 (Tex. Crim. App. 1991). The trial court must not restrict proper questions which seek to discover a juror's views on an issue applicable to the case. *Boyd v. State*, 811 S.W.2d 105, 115 (Tex. Crim. App. 1991). The Court of Criminal Appeals has held that the right to pose proper questions during voir dire examination is included in the right to counsel under Article I, §10 of the Texas Constitution. *Howard v. State*, 941 S.W.2d 102, 108 (Tex. Crim. App. 1997).

In *Nunfio*, the Texas Court of Criminal Appeals held that denial of proper voir dire questions as to possible juror bias or prejudice in favor of the victim, in that case, a nun, was reversible error, in that it denied the defendant the ability to intelligently exercise his peremptory challenges. The Court found that the harm lies in the denial of the ability to intelligently exercise the peremptory strikes, and in that case, found that "this is one error which requires reversal of the conviction without the necessity of an inquiry into harmfulness." *Nunfio v. State*, 808 S.W.2d at 485.

The Court of Criminal Appeals further made clear, in *Maddux*, that their holding in *Nunfio* was applicable to non-testifying witnesses such a s deceased victims. *Maddux v. State*, 862 S.W.2d at 590. The victim in the *Maddux* case was a two and one-half year old child. The trial court prevented defense counsel from asking the venire members questions regarding a victim's status as a child. The Court found that the question sought to be asked in that case was proper because it sought to elicit potential bias in favor of the deceased's status as a child.

*Maddux v. State*, 862 S.W.2d at 591.  Further, the Court stated that it was reaffirming their

holding in *Nunfio* that **defense counsel is entitled to discover a veniremember's bias in favor**

**of the complainant's status,** *e.g.*, **as a nun in** *Nunfio*, **or in the** *Maddux* **case, a child.**

Moreover, the Court averred that it was **not** "in any way, abrogating the long standing

rule prohibiting counsel from committing the veniremembers to a certain verdict to a certain

verdict given particular facts, *citing, e.g., Allridge v. State*, 762 S.W.2d 146, 162-64 (Tex. Crim.

App. 1988), but held that the trial court abused its discretion when it prevented defense counsel

from asking his question regarding the status of the victim. *Maddux v. State*, 862 S.W.2d at 592.


III.

In the present case, defendant desires to question veniremembers regarding their bias in

favor of the complainant's status, being an 80-year-old woman.    Denial of such questioning of

potential jurors in this case would deny his right to counsel under Article I, § 10 of the Texas

Constitution, the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and

Article 35.15 of the Texas Code of Criminal Procedure.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that this Court grant this motion in all things.

Respectfully Submitted,

*Jennifer Balido*

Jennifer Balido
133 N. Industrial, LB 2
Dallas, Texas 75201
214-653-3550
State Bar Number 10474880

## CERTIFICATE OF SERVICE

I hereby certify that I hand-delivered the foregoing motion to Greg Davis, Assistant District Attorney for Dallas County, on the same day of filing herewith.

*Jennifer Balido*

## ORDER

Having considered the foregoing motion, that motion is hereby (GRANTED/DENIED).

_____
Judge Presiding

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194th JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## STATE'S RESPONSE TO DEFENDANT'S MOTION
## REGARDING PRIOR JURY SERVICE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Response to Defendant's Motion Regarding Prior Jury Service and respectfully

shows:

I.

The State has no obligation to furnish counsel for accused with information he has in regard

to prospective jurors. *Martin v. State*, 577 S.W.2d 490 (Tex. Crim. App. 1979).

WHEREFORE, the State prays the Court deny Defendant's Request for Discovery of

Information Regarding Prior Jury Service.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

STATE'S RESPONSE TO DEFENDANT'S MOTION
REGARDING PRIOR JURY SERVICE - Page 1

00137

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to

opposing counsel on the ___ day of March, 2001.

GREGORY S. DAVIS

**STATE'S RESPONSE TO DEFENDANT'S MOTION
REGARDING PRIOR JURY SERVICE - Page 2**

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194th JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

**STATE'S RESPONSE TO DEFENDANT'S REQUEST TO
UTILIZE PEREMPTORY CHALLENGES FOLLOWING
EXAMINATION OF THE ENTIRE VENIRE**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW the State of Texas by and through her Assistant District Attorney, Gregory

S. Davis, and files this Response to Defendant's Request to Utilize Peremptory Challenges Following

Examination of the Entire Venire and respectfully shows:

I.

Article 35.13 of the Texas Code of Criminal Procedure controls the **order** and **timing** of

peremptory challenges in capital cases. *Busby v. State*, 990 S.W.2d 263 (Tex. Crim. App. 1999);

*Grijalva v. State*, 614 S.W.2d 420 (Tex. Crim. App. 1980). In *Grijalva* the Court held:

> "It is clear that in capital cases each party must exercise any peremptory challenge at
> the time the particular prospective juror has been qualified. The parties may not wait
> until all prospective jurors have been examined before exercising peremptory
> challenges as is allowed in non-capital cases".

II.

The statutory procedure controlling the order and timing of peremptory challenges

STATE'S RESPONSE TO DEFENDANT'S REQUEST TO
UTILIZE PEREMPTORY CHALLENGES FOLLOWING
EXAMINATION OF THE ENTIRE VENIRE - Page 1

JIM HAMLIN
DISTRICT CLERK
DALLAS CO., TEXAS

2001 MAR -1 PH 1:50

FILED

00139

in capital cases is not absolute and may be waived by the parties. *Busby.* However, in this case, the

State is **not** waiving the procedures set forth in Art. 35.13. This Court, therefore, is bound by Art.

35.13, and each party must exercise any peremptory challenge at the time the particular prospective

juror has been qualified.

WHEREFORE, the State prays the Court deny Defendant's Request to Utilize Peremptory

Challenges Following Examination of the Entire Venire, and require each party to exercise its

challenge at the time the particular prospective juror has been qualified.

Respectfully submitted,

GREGORY S. DAVIS
Assistant District Attorney
Bar No. 05493550

00140

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true copy of the foregoing instrument was hand-delivered to opposing counsel on the _1st_ day of March, 2001.

GREGORY S. DAVIS

STATE'S RESPONSE TO DEFENDANT'S REQUEST TO
UTILIZE PEREMPTORY CHALLEGES FOLLOWING
EXAMINATION OF THE ENTIRE VENIRE - Page 3

00141

F00-02424-M AND F00-23910-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### MOTION TO DENY TELEVISION CAMERAS FROM FILMING ANY PART OF THE TRIAL

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW the Defendant in the above entitled cause, represented by Defendant's counsel, and makes this his Motion to Deny Television Cameras from Filming Any Part of his Trial, and in support of this motion would show the Court the following:

I.

Defendant stands charged with the offense of Capital Murder. The State of Texas has given notice to Defendant of its intention to seek the Death Penalty. The case is currently set for trial for May 29, 2001, with jury selection to begin March 2, 2001.

II.

On today's date, February 28, 2001, the Court informed Defendant's counsel that a local television station requested the ability to film (without sound) the general portion of *voir dire* and to film (**with** sound) the evidentiary portions of the trial. Defendant objects to any television coverage of this case.

III.

The offense in this case is alleged to have occurred on October 4, 2000. While there was considerable publicity regarding the offense surrounding the offense date, in the past few months,

there has been little, if any, publicity regarding the upcoming trial date.  As a result of the lack of

pretrial publicity, counsel for Defendant has not seen the need to file a motion to transfer venue

to a different county pursuant to Texas Code of Criminal Procedure Chapter 31.  At this point,

Defendant has no way of knowing or no way of predicting how much publicity will be generated

if this Court grants the request of the television station, whether the coverage will be extensive,

widespread or inflammatory, or how much affect it will have on the potential jurors in this case

and the ability to obtain a fair trial at this place of venue.  Since Texas courts have failed to

recognize that mid-trial publicity is subject to a motion to transfer venue, *Herbst v. State*, 941

S.W.2d 371 (Tex. App–Beaumont 1997), after the commencement of jury selection (and hence

after the first television filming and broadcast) the Defendant essentially has no procedural

vehicle to combat the potential prejudice of pre-trial or mid-trial publicity.  Defendant hereby

asks the Court not to allow television filming inside the courtroom or outside the courtroom

during any part of the trial.

<center>IV.</center>

If this Court allows television media access to this trial, Defendant argues that he would

be prejudiced for the reasons set out in his counsel's *ex parte* affidavit attached to this motion.

This affidavit is being filed *ex parte* due to matters in the affidavit being covered by the Work

Product doctrine.

<center>V.</center>

The television media has requested that it be granted access to the General Voir Dire

portion of the trial.  That portion of the trial is scheduled for March 2, 2001.  Individual Voir

Dire is not to commence until March 12, 2001 and evidence in the case is not to be heard until

May 29, 2001.  It is assumed by the Defendant that, along with the footage of General Voir Dire,

the media will include alleged circumstances surrounding the case and matters that may not be

admissible in the evidentiary part of the trial.  Prejudice from this information being heard by

potential jurors cannot be cured by an instruction.  Additionally, the answers of the potential

jurors on the questionnaires to questions regarding pretrial publicity may be different during the

individual voir dire in coming weeks than the answers they will give on the questionnaire, thus

rendering the question of pretrial publicity on the questionnaire as moot.  The Defendant thus

requests that, if this Court grants the television media access to the voir dire portion of the trial,

the potential jurors on the jury panel be sequestered until they have been struck by either

party or otherwise discharged from service in this case.

<div align="center">VI.</div>

    News reporters have a right under the First Amendment to attend a public criminal trial

and publish stories about it, but the trial judge has the authority to exclude the media from the

courtroom to protect the defendant's "superior right" to an impartial jury. *Richmond News v.*

*Virginia*, 448 U.S. 555, 564 (1980)(judge must consider alternative means of protecting

defendant's rights before he excludes press from public trial); *see also Gannett v. DePasquale*,

443 U.S. 369, 378-79 (1979)(exclusion of press from pretrial hearings is "often one of the most

effective methods" for protecting defendant's right to an impartial jury).  In the case at bar,

Defendant is not trying to bar the press from the courtroom, but rather to limit the **type** of

coverage allowed to the press.  Surely the Defendant's right to a fair trial and a fair and impartial

jury would supercede the media's right to choose the most inflammatory type of press coverage.

VII.

Further, Defendant would argue that he has not been given adequate notice or opportunity to be heard on the question of whether it will violate his constitutional right to an impartial jury, as mandated under *Chandler v. Florida*, 449 U.S. 560, 577 (1981).  Counsel was notified of the media's request orally by the Court on February 28, 2001, with the General Voir Dire to commence on March 2, 2001.

VIII.

If this Court decides to allow the television media access to the General Voir Dire and the evidentiary portions of the trial, Defendant will be denied his rights under the Due Process Clause of the Fifth and Fourteenth Amendment to the United States Constitution,  the Due Course of Law provision of Article I,  § 19 of the Texas Constitution, and Article 1.04 of the Texas Code of Criminal Procedure; the right to Effective Assistance of Counsel and right to Confrontation and Cross-Examination under the Sixth Amendment to the United States Constitution, Article I, § 10 of the  Texas Constitution, and Article 1.05 of the Texas Code of Criminal Procedure; and the right to a Fair Trial under the Sixth Amendment to the United States Constitution, Article I, §§ 10 and 15 of the Texas Constitution and Article 1.05 and 36.29 of the Texas Code of Criminal Procedure.

Defendant urges this Court not to grant television media access to this trial.  If the Court grants the television media's request, Defendant requests that, in the interest of justice, this Court sequester all potential jurors until such time that they have been struck by either party or otherwise discharged from service in this case.

00145

WHEREFORE, PREMISES CONSIDERED Defendant asks that this Court grant his motion for the reasons set out above.

Respectfully Submitted,

*Jennifer Balido*

Jennifer Balido
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas  75207
State Bar Number 10474880

ATTORNEY FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that I hand-delivered the foregoing motion to Greg Davis, Assistant District Attorney on the same day of filing herewith.

*Jennifer Balido*
Jennifer Balido

### ORDER

Having considered the foregoing motion, that motion is hereby _____
(GRANTED/DENIED).  This the _____ day of _____, 2001.

_____
Judge Presiding

00146

**CAUSE NO. F00-O2424**

| STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| VS. | § | DISTRICT COURT OF |
| JEDIDIAH I. MURPHY | § | DALLAS COUNTY, TEXAS |

**ORDER**

Based on Defendant's previously filed and granted Ex Parte Motions concerning Medical Experts and Examinations and for good cause shown, it is the order of this court that the Dallas County Sheriff's Office transport from the Dallas County Jail to Parkland Memorial Hospital the person of Jedidiah I. Murphy, defendant in the above styled and numbered cause, where he shall be examined by an orthopedic surgeon specializing in the hand, and given an E.M.G. test and a Nerve Conduction test and any other medically necessary test or procedure to determine the medical condition of said defendants left hand. Said transport and examination to be completed by June 4, 2001.

Thomas Thorpe, Judge Sitting for
Sitting for Harold Entz, Judge
194th Judicial District Court

5/24/01

FILED

F00-02424-M

2001 JUN 12 AM 8:33

JIM HAMLIN
DISTRICT CLERK
DALLAS CO., TEXAS
_____ DEPUTY

**THE STATE OF TEXAS**          § IN THE 194TH JUDICIAL

**V.**          § DISTRICT COURT OF

**JEDIDIAH ISAAC MURPHY**          § DALLAS COUNTY, TEXAS

<u>**MOTION FOR JURY INSTRUCTIONS REGARDING EVIDENCE**
**INTRODUCED AT PUNISHMENT FOR CONSIDERATION OF SPECIAL ISSUES**</u>

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW Defendant, by and through his appointed counsel, in the above entitled

and numbered cause and presents in and to this Court his Motion for Jury Instructions Regarding

Evidence Introduced at Punishment for Consideration of Special Issues, and in support of such

motion, would show the following:

I.

Defendant was convicted in this case by this jury of the felony offense of Capital Murder.

The State of Texas has given notice at an earlier date that it will seek the Death Penalty upon

such a guilty verdict.  The State of Texas is scheduled to begin to introduce evidence and present

testimony this morning, June 12, 2001 for the jury's consideration of the Special Issues

mandated by the Texas Capital Sentencing Statute (Texas Code of Criminal Procedure 37.071).

The State of Texas has given Defendant notice (both oral and written) that it plans on introducing

a number of extraneous offenses in its punishment evidence.

II.

In regard to any evidence that would constitute a prior bad act or extraneous offense, the

00148

Defendant would ask the Court to instruct the jury that they cannot consider an unadjudicated

offense or other misconduct unless the State proves beyond a reasonable doubt that appellant

committed the alleged acts.

### III.

Further, the Defendant would request that the Court instruct the jury that they may only

apply evidence of extraneous offenses, other misconduct, or other bad acts, in consideration of

Special Issue Number One (usually termed the "future dangerousness" issue), as follows:

> The State has introduced evidence that the defendant has committed unadjudicated
> criminal offenses and/or bad acts. You shall only consider such evidence in answering
> the first special issue that deals with the issue of a continuing threat to society, if it helps
> you answer that issue.

The purpose of a limiting instruction is to ensure that the jury does not make use of admitted

evidence for an impermissible purpose. *Lane v. State*, 822 S.W.2d 35, 40 (Tex. Crim. App.

1991). The Court of Criminal Appeals, however, held that, since the evidence could be

considered on the additional issue of whether or not the actions of Lane were deliberate (under

the prior Texas capital sentencing statute), the instruction was not proper. *Lane v. State*, 822

S.W.2d at 40. Such is not the case here. In the present case, the only issue to which extraneous

offense evidence might be admissible and relevant is the future threat to society issue; thus, the

above instruction would be proper in this case.

### IV.

Defendant requests this additional charge, as well:

> In deciding whether the defendant committed any alleged unadjudicated extraneous
> offenses or bad acts, the jury must not consider the fact that the defendant committed the

capital murder alleged in the indictment.  That is, you should not presume that the defendant has a propensity to commit criminal acts generally, merely because you have convicted him of capital murder.  The state must prove to you that the defendant committed any unadjudicated extraneous offenses beyond a reasonable doubt.

Furthermore, if you find that the defendant committed one or more unadjudicated extraneous offenses, you must not consider that fact in deciding whether he committed other unadjudicated extraneous offenses alleged by the state.

Defendant would request that the above instruction be given to the jury at the beginning of the punishment phase of the trial.  Additionally, Defendant would request that the above instruction be given at any time that the State re-offers for the jury's consideration, all of the evidence from the guilt-innocence portion of the trial.   Moreover, Defendant requests that this instruction be given to the jury each and every time the State presents evidence regarding extraneous offenses, bad acts, or acts of misconduct.

WHEREFORE, PREMISES CONSIDERED, Defendant prays that his Motion be granted in all things.

Respectfully Submitted,

Jennifer Balido
133 N. Industrial, LB 2
Dallas, Texas 75201
214-653-3550
State Bar Number 10474880

### CERTIFICATE OF SERVICE

I hereby certify that I hand-delivered the foregoing motion to Greg Davis, Assistant District

Attorney for Dallas County, on the same day of filing herewith.

### ORDER

Having considered the foregoing motion, that motion is hereby (GRANTED/DENIED)

_____

Judge Presiding

F00-02424-M

FILED

2001 JUN -5   AM 8: 16

**THE STATE OF TEXAS**                                    **IN THE 194TH JUDICIAL**

**v.**                                                    **DISTRICT COURT OF**

**JEDIDIAH ISAAC MURPHY**                                 **DALLAS COUNTY, TEXAS**

## MOTION FOR MISTRIAL, PURSUANT TO THE DECISION
## OF THE UNITED STATES SUPREME COURT IN *PENRY II*

TO THE JUDGE OF THIS HONORABLE COURT:

      COMES NOW, THE Defendant, by and through his court appointed counsel, and

presents in and to this Court, this his Motion for Mistrial Pursuant to the Decision of the United

States Supreme Court in *Penry v. Johnson*, No. 00-6677 (U.S. Sup. Ct. June 4, 2001), and in

support of such motion, would show the following:

<div align="center">I.</div>

      Defendant is charged with Capital Murder.  The State of Texas has given this Court and

the Defendant notice that it intends to seek the Death Penalty, pursuant to Texas Code of

Criminal Procedure 37.071.  Jury selection for this case commenced on March 3, 2001.

Individual questioning of potential jurors began on March 12, 2001.  Pursuant to the Texas

Capital Murder Sentencing Statute and relevant case law at the time of jury selection, jurors were

questioned as to whether or not they could follow the law regarding the two applicable special

issues in the punishment phase of the trial.

<div align="center">II.</div>

      During individual questioning of potential jurors, counsel for Defendant repeatedly

attempted to inquire of the jurors not only whether they could "consider" mitigating

circumstances, but rather whether they could "consider and give effect to [a defendant's

00152

mitigating] evidence", pursuant to the U.S. Supreme Court's decision in *Penry v. Lynaugh*, 492

U.S. 302 (1989)(*Penry I*).  On every occasion, while this Court required answers to questions

whether the juror could consider mitigating evidence such as age, mental illness, mental

retardation, alcohol or drug addiction, remorse, defendant's character and background, *ad*

*infinitum*, the trial court did not require (and more importantly **did not allow**) answers to

questions whether the juror would consider and give effect to such evidence.

<center>III.</center>

Defendant asserts that the jury selection process in this case is in conflict with the United

States Supreme Court's decision handed down June 4, 2001, the first day of testimony in this

case, in *Penry v. Johnson*, No. 00-6677 (U.S. Sup. Ct. June 4, 2001).  In that case, the majority

writes:

> *Penry I* did not hold that the mere mention of "mitigating circumstances" to a capital
> sentencing jury satisfies the Eighth Amendment.  Nor does it stand for the proposition that
> it is constitutionally sufficient to inform the jury that it may "consider" mitigating
> circumstances in deciding the appropriate sentence.  Rather, the key under *Penry I* is that
> the jury be able to "consider and *give effect to* [a defendant's mitigating] evidence in
> imposing sentence." 492 U.S. at 319 (emphasis added).  See also *Johnson v. Texas*, 509
> U.S. 350, 381 (1983) (O'Connor, J., dissenting)("[A] sentencer [must] be allowed to give
> *full* effect to mitigating circumstances" (emphasis in original)).  For it is only when the
> jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in
> rendering its desision," *Penry I*, 492 U.S. at 328, that we can be sure that the jury "has
> treated the defendant as a 'uniquely individual human being' and has made a reliable
> determination that death is the appropriate sentence," *id.*, at 319 (quoting *Woodson v.*
> *North Carolina*, 438 U.S. 280, 304, 305 (1976)).

No. 00-6677 at 6.

<center>IV.</center>

Further, Defendant asserts that the second special issue (regarding mitigation), is "at the

very least, 'a reasonable likelihood that the jury [could apply] the...instruction in a way that

prevent[s] the consideration' of Defendant's mitigating evidence to be developed at trial. *Boyde v.*

*California*, 494 U.S. 370, 380 (1990).  Instructions of the Texas Capital Murder Sentencing

Statute provides an inadequate vehicle for the jury to make a reasoned moral response to

Defendant's mitigating evidence. *Penry II*, No. 00-6677 at 6.  Such inadequacy is evidence when

it is noted that the same evidence that can be considered and given effect as mitigating in Special

Issue Two can be considered as aggravating or proof of future dangerousness under Special Issue

One.

      WHEREFORE, PREMISES CONSIDERED, Defendant urges this Court hereby declares

a mistrial and allow jury selection to commence immediately allowing questions to be posed to

potential jurors regarding their ability to consider and give full mitigating effect to any evidence

relevant to Special Issue Number Two.

      Respectfully Submitted,

Jennifer Balido
Assistant Public Defender
133 North Industrial, LB 2
Dallas, Texas 75207
214-653-3550
State Bar Number 10474880

**ATTORNEY FOR DEFENDANT**

00154

## CERTIFICATE OF SERVICE

I hereby certify that I personally served upon Greg Davis, Assistant District Attorney for

Dallas County, a copy of the foregoing motion on the same date of filing herewith.

_Jennifer Balido_
Jennifer Balido

## ORDER

Having considered the foregoing motion, relevant case law, and arguments of counsel, the

motion is hereby _____.

This the _____day of _____, 2001.

_____
JUDGE PRESIDING

v. JOHNSON                                    http://sur~ law.cornell.edu/supct/html/00-6677.ZO.html





Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

## No. 00—6677

## JOHNNY PAUL PENRY, PETITIONER *v.* GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 4, 2001]

Justice O'Connor delivered the opinion of the Court.

In 1989, we held that Johnny Paul Penry had been sentenced to death in violation of the Eighth Amendment because his jury had not been adequately instructed with respect to mitigating evidence. See *Penry* v. *Lynaugh*, 492 U.S. 302 (1989) *(Penry I)*. The State of Texas retried Penry in 1990, and that jury also found him guilty of capital murder and sentenced him to death. We now consider whether the jury instructions at Penry's resentencing complied with our mandate in *Penry I*. We also consider whether the admission into evidence of statements from a psychiatric report based on an uncounseled interview with Penry ran afoul of the Fifth Amendment.

### I

Johnny Paul Penry brutally raped and murdered Pamela Carpenter on October 25, 1979. In 1980, a Texas jury found him guilty of capital murder. At the close of the penalty hearing, the jury was instructed to answer three statutorily mandated "special issues":

" '(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

v. JOHNSON                                     http://supct.law.cornell.edu/supct/html/00-6677.ZO.html

" '(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

" '(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.' " *Id.,* at 310 (quoting Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon 1981 and Supp. 1989)).

The jury answered "yes" to each issue and, as required by statute, the trial court sentenced Penry to death. 492 U.S., at 310—311.

   Although Penry had offered extensive evidence that he was mentally retarded and had been severely abused as a child, the jury was never instructed that it could consider and give mitigating effect to that evidence in imposing sentence. *Id.,* at 320. Nor was any of the three special issues broad enough in scope that the jury could consider and give effect to the mitigating evidence in answering the special issue. *Id.,* at 322—325. While Penry's mental retardation was potentially relevant to the first special issue–whether he had acted deliberately–we found no way to be sure that the jurors fully considered the mitigating evidence as it bore on the broader question of Penry's moral culpability. *Id.,* at 322—323. As to the second issue–whether Penry would be a future danger–the evidence of his mental retardation and history of abuse was "relevant only as an *aggravating* factor." *Id.,* at 323 (emphasis in original). And the evidence was simply not relevant in a mitigating way to the third issue–
whether Penry had unreasonably responded to any provocation. *Id.,* at 324—325.

   The comments of counsel also failed to clarify the jury's role. Defense counsel had urged the jurors to vote "no" on one of the special issues if they believed that Penry, because of the mitigating evidence, did not deserve to be put to death. The prosecutor, however, had reminded them of their "oath to follow the law and ... answe[r] these questions based on the evidence and following the law." *Id.,* at 325 (internal quotation marks omitted).

   "In light of the prosecutor's argument, and ... in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty," we concluded that "a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.,* at 326, 328. We thus vacated Penry's sentence, confirming that in a capital case, "[t]he sentencer must . . be able to consider and give effect to [mitigating] evidence in imposing sentence," so that " 'the sentence imposed ... reflec[ts] a reasoned *moral* response to the defendant's background, character, and crime.' " *Id.,* at 319 (quoting *California* v. *Brown,* 479 U.S. 538, 545 (1987) (O'Connor, J., concurring) (emphasis in original)).

   Penry was retried in 1990 and again found guilty of capital murder. During the penalty phase, the defense again put on extensive evidence regarding Penry's mental impairments and childhood abuse. One defense witness on the subject of Penry's mental impairments was Dr. Randall Price, a clinical neuropsychologist. On direct examination, Dr. Price testified that he believed Penry suffered from organic brain impairment and mental retardation. App. 276—279; 878. In the course of cross-examining Dr. Price, the prosecutor asked what records Price had reviewed in preparing his testimony. Price cited 14 reports, including a psychiatric evaluation of Penry prepared by Dr. Felix Peebles on May 19, 1977. *Id.,* at 327. The Peebles report had been prepared at the request of Penry's then-counsel to determine Penry's competency to stand trial on a 1977 rape charge–unrelated to the rape and murder of Pamela Carpenter. *Id.,* at 55—60, 125. The prosecutor asked Dr. Price to read a specific portion of the Peebles report for the jury. Over the objection of defense counsel, Dr. Price recited that it was Dr. Peebles' "professional opinion that if Johnny Paul Penry were released from custody, that he would be dangerous to other persons." *Id.,* at 413. The prosecutor again recited this portion of the Peebles report during his closing argument. *Id.,* at 668.

   When it came time to submit the case to the jury, the court instructed the jury to determine Penry's sentence by answering three special issues–the same three issues that had been put before the jury in *Penry I.* Specifically, the jury had to determine whether Penry acted deliberately when he killed Pamela

00157

Carpenter; whether there was a probability that Penry would be dangerous in the future; and whether Penry acted unreasonably in response to provocation. App. 676—678. Cf. *Penry I*, 492 U.S., at 320.

The court told the jury how to determine its answers to those issues:

"[B]efore any issue may be answered 'Yes,' all jurors must be convinced by the evidence beyond a reasonable doubt that the answer to such issue should be 'Yes.' … [I]f any juror, after considering the evidence and these instructions, has a reasonable doubt as to whether the answer to a Special Issue should be answered 'Yes,' then such juror should vote 'No' to that Special Issue." App. 672—673.

The court explained the consequences of the jury's decision:

"[I]f you return an affirmative finding on each of the special issues submitted to you, the court shall sentence the defendant to death. You are further instructed that if you return a negative finding on any special issue submitted to you, the court shall sentence the defendant to the Texas Department of Corrections for life. You are therefore instructed that your answers to the special issues, which determine the punishment to be assessed the defendant by the court, should be reflective of your finding as to the personal culpability of the defendant, JOHNNY PAUL PENRY, in this case." *Id.*, at 674—675.

The court then gave the following "supplemental instruction":

"You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues." *Id.*, at 675.

A complete copy of the instructions was attached to the verdict form, and the jury took the entire packet into the deliberation room. Tr. of Oral Arg. 31. The verdict form itself, however, contained only the text of the three special issues, and gave the jury two choices with respect to each special issue: "We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is 'Yes,' " or "We, the jury, because at least ten (10) jurors have a reasonable doubt as to the matter inquired about in this Special Issue, find and determine that the answer to this Special Issue is 'No.' " App. 676—678.

After deliberating for approximately 2½ hours, the jury returned its punishment verdict. See 51 Record 1948, 1950. The signed verdict form confirmed that the jury had unanimously agreed that the answer to each special issue was "yes." App. 676—678. In accordance with state law, the court sentenced Penry to death.

The Texas Court of Criminal Appeals affirmed Penry's conviction and sentence. There are court rejected Penry's claim that the admission of language from the 1977 Peebles report violated Penry's <u>Fifth Amendment</u> privilege against self-incrimination. The court reasoned that because Dr. Peebles had examined Penry two years prior to the murder of Pamela Carpenter, Penry had not at that time been "confronted with someone who was essentially an agent for the State whose function was to gather evidence that might be used against him in connection with the crime for which he was incarcerated." *Penry* v. *State*, 903 S. W. 2d 715, 759—760 (1995) (internal quotation marks and citation omitted).

The court also rejected Penry's claim that the jury instructions given at his second sentencing hearing were constitutionally inadequate because they did not permit the jury to consider and give effect to his mitigating evidence of mental retardation and childhood abuse. The court cited *Penry I* for the

v. JOHNSON                                         http://sur~law.cornell.edu/supct/html/00-6677.ZO.html

proposition that when a defendant proffers "mitigating evidence that is not relevant to the special issues or that has relevance to the defendant's moral culpability beyond the scope of the special issues ... the jury must be given a special instruction in order to allow it to consider and give effect to such evidence." 903 S. W. 2d, at 765. Quoting the supplemental jury instruction given at Penry's second trial, see *supra*, at 5—6, the court overruled Penry's claim of error. The court stated that "a nullification instruction such as this one is sufficient to meet the constitutional requirements of *[Penry I]*." 903 S. W. 2d, at 765.

In 1998, after his petition for state habeas corpus relief was denied, see App. 841 (trial court order); *id.*, at 863 (Court of Criminal Appeals order), Penry filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1994 ed. and Supp. V) in the United States District Court for the Southern District of Texas. The District Court rejected both of Penry's claims, finding that the Texas Court of Criminal Appeals' conclusions on both points were neither contrary to, nor an unreasonable application of, clearly established federal law. App. 893, 920. After full briefing and argument, the United States Court of Appeals for the Fifth Circuit denied a certificate of appealability. 215 F.3d 504 (2000).

We stayed Penry's execution and granted certiorari to consider Penry's constitutional arguments regarding the admission of the Peebles report and the adequacy of the jury instructions. 531 U.S. 1010 (2000).

II

Because Penry filed his federal habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, the provisions of that law govern the scope of our review. Specifically, 28 U.S.C. § 2254(d)(1) (1994 ed., Supp. V) prohibits a federal court from granting an application for a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."

Last Term in *Williams* v. *Taylor*, 529 U.S. 362 (2000), we explained that the "contrary to" and "unreasonable application" clauses of §2254(d)(1) have independent meaning. *Id.*, at 404. A state court decision will be "contrary to" our clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id.*, at 405—406. A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.*, at 407—408.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.*, at 409. Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable. *Id.*, at 410—411.

Although the District Court evaluated the Texas Court of Criminal Appeals' disposition of Penry's claims under a standard we later rejected in *Williams*, see App. 882 (stating that an application of law to facts is "unreasonable 'only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect' " (citation omitted)), the Fifth Circuit articulated the proper standard of review, as set forth in §2254(d)(1) and clarified in *Williams*, and denied Penry relief. Guided by this same standard, we now turn to the substance of Penry's claims.

III

A

Penry contends that the admission into evidence of the portion of the 1977 Peebles report that referred to Penry's future dangerousness violated his Fifth Amendment privilege against self-incrimination

00159

because he was never warned that the statements he made to Dr. Peebles might later be used against him. The Texas Court of Criminal Appeals disagreed, concluding that when Dr. Peebles interviewed Penry, Peebles was not acting as an agent for the State in order to gather evidence that might be used against Penry. 903 S. W. 2d, at 759.

Penry argues that this case is indistinguishable from *Estelle* v. *Smith*, 451 U.S. 454 (1981). In *Estelle*, we considered a situation in which a psychiatrist conducted an ostensibly neutral competency examination of a capital defendant, but drew conclusions from the defendant's uncounseled statements regarding his future dangerousness, and later testified for the prosecution on that crucial issue. We likened the psychiatrist to "an agent of the State recounting unwarned statements made in a postarrest custodial setting," and held that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.,* at 467—468. The admission of the psychiatrist's testimony under those "distinct circumstances" violated the Fifth Amendment. *Id.,* at 466.

This case differs from *Estelle* in several respects. First, the defendant in *Estelle* had not placed his mental condition at issue, *id.,* at 457, n. 1, whereas Penry himself made his mental status a central issue in both the 1977 rape case and his trials for Pamela Carpenter's rape and murder. Second, in *Estelle*, the trial court had called for the competency evaluation and the State had chosen the examining psychiatrist. *Id.,* at 456—457. Here, however, it was Penry's own counsel in the 1977 case who requested the psychiatric exam performed by Dr. Peebles. Third, in *Estelle*, the State had called the psychiatrist to testify as a part of its affirmative case. *Id.,* at 459. Here, it was during the cross-examination of Penry's own psychological witness that the prosecutor elicited the quotation from the Peebles report. And fourth, in *Estelle*, the defendant was charged with a capital crime at the time of his competency exam, and it was thus clear that his future dangerousness would be a specific issue at sentencing. Penry, however, had not yet murdered Pamela Carpenter at the time of his interview with Dr. Peebles.

We need not and do not decide whether these differences affect the merits of Penry's Fifth Amendment claim. Rather, the question is whether the Texas court's decision was contrary to or an unreasonable application of our precedent. 28 U.S.C. § 2254(d)(1) (1994 ed., Supp. V). We think it was not. The differences between this case and *Estelle* are substantial, and our opinion in *Estelle* suggested that our holding was limited to the "distinct circumstances" presented there. It also indicated that the Fifth Amendment analysis might be different where a defendant "intends to introduce psychiatric evidence at the penalty phase." 451 U.S., at 472. Indeed, we have never extended *Estelle's* Fifth Amendment holding beyond its particular facts. Cf., *e.g., Buchanan* v. *Kentucky*, 483 U.S. 402 (1987) (*Estelle* does not apply, and it does not violate the Fifth Amendment, where a prosecutor uses portions of a psychiatric evaluation requested by a defendant to rebut psychiatric evidence presented by the defendant at trial). We therefore cannot say that it was objectively unreasonable for the Texas court to conclude that Penry is not entitled to relief on his Fifth Amendment claim.

Even if our precedent were to establish squarely that the prosecution's use of the Peebles report violated Penry's Fifth Amendment privilege against self-incrimination, that error would justify overturning Penry's sentence only if Penry could establish that the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht* v. *Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos* v. *United States*, 328 U.S. 750, 776 (1946)). We think it unlikely that Penry could make such a showing.

The excerpt from the Peebles report bolstered the State's argument that Penry posed a future danger, but it was neither the first nor the last opinion the jury heard on that point. Four prison officials testified that they were of the opinion that Penry "would commit criminal acts of violence that would constitute a continuing threat to society." App. 94, 104, 138; 47 Record 970. Three psychiatrists testified that Penry was a dangerous individual and likely to remain so. Two were the State's own witnesses. See App. 487, 557. The third was Dr. Price–the same defense witness whom the prosecutor had asked to read from the Peebles report. Before that recitation, Dr. Price had stated his own opinion that "[i]f [Penry] was in the free world, I would consider him dangerous." *Id.,* at 392.

00160

While the Peebles report was an effective rhetorical tool, it was by no means the key to the State's case on the question whether Penry was likely to commit future acts of violence. We therefore have considerable doubt that the admission of the Peebles report, even if erroneous, had a "substantial and injurious effect" on the verdict. *Brecht* v. *Abrahamson, supra*, at 637. Accordingly, we will not disturb the Texas Court of Criminal Appeals' rejection of Penry's <u>Fifth Amendment</u> claim.

**B**

Penry also contends that the jury instructions given at his second sentencing hearing did not comport with our holding in *Penry I* because they did not provide the jury with a vehicle for expressing its reasoned moral response to the mitigating evidence of Penry's mental retardation and childhood abuse. The Texas Court of Criminal Appeals disagreed. The court summarized *Penry I* as holding that when a defendant proffers "mitigating evidence that is not relevant to the special issues or that has relevance to the defendant's moral culpability beyond the scope of the special issues … the jury must be given a special instruction in order to allow it to consider and give effect to such evidence." 903 S. W. 2d, at 765. The court then stated that the supplemental jury instruction given at Penry's second sentencing hearing satisfied that mandate. Ibid.

The Texas court did not make the rationale of its holding entirely clear. On one hand, it might have believed that *Penry I* was satisfied merely by virtue of the fact that a supplemental instruction had been given. On the other hand, it might have believed that it was the substance of that instruction which satisfied *Penry I.*

While the latter seems to be more likely, to the extent it was the former, the Texas court clearly misapprehended our prior decision. *Penry I* did not hold that the mere mention of "mitigating circumstances" to a capital sentencing jury satisfies the Eighth Amendment. Nor does it stand for the proposition that it is constitutionally sufficient to inform the jury that it may "consider" mitigating circumstances in deciding the appropriate sentence. Rather, the key under *Penry I* is that the jury be able to "consider and *give effect to* [a defendant's mitigating] evidence in imposing sentence." 492 U.S., at 319 (emphasis added). See also *Johnson* v. *Texas,* 509 U.S. 350, 381 (1993) (O'Connor, J., dissenting) ("[A] sentencer [must] be allowed to give *full* consideration and *full* effect to mitigating circumstances" (emphasis in original)). For it is only when the jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision," *Penry I,* 492 U.S., at 328, that we can be sure that the jury "has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence," *id.,* at 319 (quoting *Woodson* v. *North Carolina,* 428 U.S. 280, 304, 305 (1976)).

The State contends that the substance of the supplemental instruction satisfied *Penry I* because it provided the jury with the requisite vehicle for expressing its reasoned moral response to Penry's particular mitigating evidence. Specifically, the State points to the admittedly "less than artful" portion of the supplemental instruction which says:

"If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability *at the time you answer the special issue.* If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, *as reflected by a negative finding to the issue under consideration,* rather than a death sentence, is an appropriate response to the personal culpability of the defendant, *a negative finding should be given to one of the special issues.*" App. 675 (emphasis added). See also Brief for Respondent 16.

We see two possible ways to interpret this confusing instruction. First, as the portions italicized above indicate, it can be understood as telling the jurors to take Penry's mitigating evidence into account in determining their truthful answers to each special issue. Viewed in this light, however, the supplemental instruction placed the jury in no better position than was the jury in *Penry I.* As we made clear in *Penry I,* none of the special issues is broad enough to provide a vehicle for the jury to give mitigating effect to the evidence of Penry's mental retardation and childhood abuse. Cf. 492 U.S., at 322—325. In the words of Judge Dennis below, the jury's ability to consider and give effect to Penry's mitigating evidence was

00161

still "shackled and confined within the scope of the three special issues." 215 F.3d, at 514 (dissenting opinion). Thus, because the supplemental instruction had no practical effect, the jury instructions at Penry's second sentencing were not meaningfully different from the ones we found constitutionally inadequate in *Penry I.*

Alternatively, the State urges, it is possible to understand the supplemental instruction as informing the jury that it could "simply answer one of the special issues 'no' if it believed that mitigating circumstances made a life sentence … appropriate … regardless of its initial answers to the questions." Brief for Respondent 16. The Texas Court of Criminal Appeals appeared to understand the instruction in this sense, when it termed the supplemental instruction a "nullification instruction." 903 S. W. 2d, at 765. Even assuming the jurors could have understood the instruction to operate in this way, the instruction was not as simple to implement as the State contends. Rather, it made the jury charge as a whole internally contradictory, and placed law-abiding jurors in an impossible situation.

The jury was clearly instructed that a "yes" answer to a special issue was appropriate only when supported "by the evidence beyond a reasonable doubt." App. 672. A "no" answer was appropriate only when there was "a reasonable doubt as to whether the answer to a Special Issue should be … 'Yes.' " *Id.,* at 673. The verdict form listed the three special issues and, with no mention of mitigating circumstances, confirmed and clarified the jury's two choices with respect to each special issue. The jury could swear that it had unanimously determined "beyond a reasonable doubt that the answer to this Special Issue is 'Yes.' " *Id.,* at 676—678. Or it could swear that at least 10 jurors had "a reasonable doubt *as to the matter inquired about in this Special Issue*" and that the jury thus had "determin[ed] that the answer to this Special Issue is 'No.' " *Ibid.* (emphasis added).

In the State's view, however, the jury was also told that it could ignore these clear guidelines and–even if there was in fact no reasonable doubt as to the matter inquired about–answer any special issue in the negative if the mitigating circumstances warranted a life sentence. In other words, the jury could change one or more truthful "yes" answers to an untruthful "no" answer in order to avoid a death sentence for Penry.

We generally presume that jurors follow their instructions. See, *e.g., Richardson* v. *Marsh,* 481 U.S. 200, 211 (1987). Here, however, it would have been both logically and ethically impossible for a juror to follow both sets of instructions. Because Penry's mitigating evidence did not fit within the scope of the special issues, answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental instruction. And answering the special issues in the mode prescribed by the supplemental instruction necessarily meant ignoring the verdict form instructions. Indeed, jurors who wanted to answer one of the special issues falsely to give effect to the mitigating evidence would have had to violate their oath to render a " 'true verdict.' " Tex. Crim. Proc. Code Ann., Art. 35.22 (Vernon 1989).

The mechanism created by the supplemental instruction thus inserted "an element of capriciousness" into the sentencing decision, "making the jurors' power to avoid the death penalty dependent on their willingness" to elevate the supplemental instruction over the verdict form instructions. *Roberts* v. *Louisiana,* 428 U.S. 325, 335 (1976) (plurality opinion). There is, at the very least, "a reasonable likelihood that the jury … applied the challenged instruction in a way that prevent[ed] the consideration" of Penry's mental retardation and childhood abuse. *Boyde* v. *California,* 494 U.S. 370, 380 (1990). The supplemental instruction therefore provided an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence.

Even though the Texas Court of Criminal Appeals focused solely on the supplemental instruction in affirming Penry's sentence, the State urges us to evaluate the instruction contextually, with reference to the comments of the prosecutor and defense counsel, as well as the comments of the court during *voir dire.* Indeed, we have said that we will approach jury instructions in the same way a jury would–with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.,* at 381. *Penry I* itself illustrates this methodology, as there we evaluated the likely effect on the jury of the comments of the defense counsel and prosecutor. 492 U.S., at 325—326. As we did there, however, we conclude that these comments were insufficient to clarify the confusion caused by the instructions

00162

v. JOHNSON                                http://sup**.law.cornell.edu/supct/html/00-6677.ZO.html

themselves.

*Voir dire* was a month-long process, during which approximately 90 prospective jurors were interviewed. See 3 Record (index of transcripts). Many of the veniremembers–including each of the 12 jurors who was eventually empaneled–received a copy of an instruction largely similar to the supplemental instruction ultimately given to the jury. After each juror read the instruction, the judge attempted to explain how it worked. See, *e.g.,* 18 Record 966—967 ("[I]f you thought the mitigating evidence was sufficient … you might, even though you really felt those answers [to the three special issues] should be yes, you might answer one or more of them no … so [Penry] could get the life sentence rather than the death penalty"). The prosecutor then attempted to explain the instruction. See, *e.g., id.,* at 980 ("[E]ven though [you] believe all three of these answers are yes, [you] don't think the death penalty is appropriate for this particular person because of what has happened to him in the past … . [The] instruction is to give effect to that belief and answer one or all of these issues no"). And with most of the jurors, defense counsel also gave a similar explanation. See, *e.g., id.,* at 1018 ("[I]f you believe[d] [there] was a mitigating circumstance … you [could] apply that mitigation to answer–going back and changing an answer from yes to a no").

While these comments reinforce the State's construction of the supplemental instruction, they do not bolster our confidence in the jurors' ability to give effect to Penry's mitigating evidence in deciding his sentence. Rather, they highlight the arbitrary way in which the supplemental instruction operated, and the fact that the jury was essentially instructed to return a false answer to a special issue in order to avoid a death sentence.

Moreover, we are skeptical that, by the time their penalty phase deliberations began, the jurors would have remembered the explanations given during *voir dire,* much less taken them as a binding statement of the law. *Voir dire* began almost two full months before the penalty phase deliberations. In the interim, the jurors had observed the rest of *voir dire,* listened to a 5-day guilt-phase trial and extensive instructions, participated in 2½ hours of deliberations with respect to Penry's guilt, and listened to another 5-day trial on punishment. The comments of the court and counsel during *voir dire* were surely a distant and convoluted memory by the time the jurors began their deliberations on Penry's sentence.

The State also contends that the closing arguments in the penalty phase clarified matters. Penry's counsel attempted to describe the jury's task:

"If, when you thought about mental retardation and the child abuse, you think that this guy deserves a life sentence, and not a death sentence, … then, you get to answer one of … those questions no. The Judge has not told you which question, and you have to give that answer, even if you decide the literally correct answer is yes. Not the easiest instruction to follow and the law does funny things sometimes." App. 640.

Again, however, this explanation only reminded the jurors that they had to answer the special issues *dis*honestly in order to give effect to Penry's mitigating evidence. For the reasons discussed above, such a "clarification" provided no real help. Moreover, even if we thought that the arguments of defense counsel could be an adequate substitute for statements of the law by the court, but see *Boyde* v. *California, supra,* at 384, the prosecutor effectively neutralized defense counsel's argument, as did the prosecutor in *Penry I,* by stressing the jury's duty "[t]o follow your oath, the evidence and the law." App. 616. At best, the jury received mixed signals.

Our opinion in *Penry I* provided sufficient guidance as to how the trial court might have drafted the jury charge for Penry's second sentencing hearing to comply with our mandate. We specifically indicated that our concerns would have been alleviated by a jury instruction defining the term "deliberately" in the first special issue "in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability." 492 U.S., at 323. The trial court surely could have drafted an instruction to this effect. Indeed, Penry offered two definitions of "deliberately" that the trial court refused to give. See Tr. of Oral Arg. 12, 14—15.

A clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I.*

00163

v. JOHNSON                                                http://sup~ law.cornell.edu/supct/html/00-6677.ZO.html

Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference. Texas now requires the jury to decide "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." Tex. Code Crim. Proc., Art. 37.071(2)(e)(1) (Vernon Supp. 2001).* Penry's counsel, while not conceding the issue, admitted that he "would have a tough time saying that *[Penry I]* was not complied with under the new Texas procedure." Tr. of Oral Arg. 16. At the very least, the brevity and clarity of this instruction highlight the confusing nature of the supplemental instruction actually given, and indicate that the trial court had adequate alternatives available to it as it drafted the instructions for Penry's trial.

Thus, to the extent the Texas Court of Criminal Appeals concluded that the substance of the jury instructions given at Penry's second sentencing hearing satisfied our mandate in *Penry I*, that determination was objectively unreasonable. Cf. *Shafer* v. *South Carolina,* 532 U.S. ___, ___ (2001) (slip op., at 2, 12) (holding on direct review that the South Carolina Supreme Court "incorrectly limited" our holding in *Simmons* v. *South Carolina,* 512 U.S. 154 (1994), because the court had mischaracterized "how the State's new [capital sentencing] scheme works"). The three special issues submitted to the jury were identical to the ones we found constitutionally inadequate as applied in *Penry I*. Although the supplemental instruction made mention of mitigating evidence, the mechanism it purported to create for the jurors to give effect to that evidence was ineffective and illogical. The comments of the court and counsel accomplished little by way of clarification. Any realistic assessment of the manner in which the supplemental instruction operated would therefore lead to the same conclusion we reached in *Penry I:* "[A] reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." 492 U.S., at 326.

The judgment of the United States Court of Appeals for the Fifth Circuit is therefore affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

---

## Notes

*. * Another recent development in Texas is the passage of a bill banning the execution of mentally retarded persons. See Babineck, Perry: Death-penalty measure needs analyzing, Dallas Morning News, May 31, 2001, p. 27A. As this opinion goes to press, Texas Governor Rick Perry is still in the process of deciding whether to sign the bill. Ibid.





legal information institute

| v. JOHNSON (00-6677) |
| --- |
| 215 F.3d 504, affirmed in part, reversed in part, and remanded. |

| Syllabus | Opinion [O'Connor] | Other [Thomas] |
| --- | --- | --- |
| HTML version PDF version | HTML version PDF version | HTML version PDF version |

Opinion of Thomas, J.

# SUPREME COURT OF THE UNITED STATES

No. 00—6677

### JOHNNY PAUL PENRY, PETITIONER *v.* GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION

**ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

[June 4, 2001]

Justice Thomas, with whom The Chief Justice and Justice Scalia join, concurring in Parts I, II, and III—A, and dissenting in Part III—B.

Two Texas juries have now deliberated and reasoned that Penry's brutal rape and murder of Pamela Carpenter warrants the death penalty under Texas law. And two opinions of this Court have now overruled those decisions on the ground that the sentencing courts should have said more about Penry's alleged mitigating evidence. Because I believe the most recent sentencing court gave the jurors an opportunity to consider the evidence Penry presented, I respectfully dissent.

As a habeas reviewing court, we are not called upon to propose what we believe to be the ideal instruction on how a jury should take into account evidence related to Penry's childhood and mental status. Our job is much simpler, and it is significantly removed from writing the instruction in the first instance. We must decide merely whether the conclusion of the Texas Court of Criminal Appeals–that the sentencing court's supplemental instruction explaining how the jury could give effect to any mitigating value it found in Penry's evidence satisfied the requirements of *Penry I*–was "objectively unreasonable." *Williams* v. *Taylor*, <u>529 U.S. 362</u>, 409 (2000). See also <u>28 U.S.C. § 2254</u>(d)(1) (1994 ed., Supp. V).

At Penry's first sentencing, the court read to the jury Texas' three special issues for capital sentencing.[1] The court did not instruct the jury that "it could consider the evidence offered by Penry as

00165

*mitigating* evidence and that it could give mitigating effect to that evidence in imposing sentence." 492 U.S., at 320. The prosecutor also did not offer any way for the jury to give mitigating effect to the evidence, but instead simply reiterated that the jury was to answer the three questions and follow the law. In *Penry I*, this Court concluded that, "[i]n light of the prosecutor's argument, and in the absence of appropriate jury instructions, a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.*, at 326.

At Penry's second sentencing, the court read to the jury the same three special issues. In contrast to the first sentencing, however, the court instructed the jury at length that it could consider Penry's proffered evidence as mitigating evidence and that it could give mitigating effect to that evidence. See *ante*, at 5—6. The Texas Court of Criminal Appeals concluded that this supplemental instruction "allow[ed] [the jury] to consider and give effect to" Penry's proffered mitigating evidence and therefore was "sufficient to meet the constitutional requirements of [*Penry I*]."[2] *Penry* v. *State*, 903 S. W. 2d 715, 765 (1995). In my view, this decision is not only objectively reasonable but also compelled by this Court's precedents and by common sense.

"In evaluating the instructions, [a court should] not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would–with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.' " *Johnson* v. *Texas*, 509 U.S. 350, 368 (1993) (quoting *Boyde* v. *California*, 494 U.S. 370, 381 (1990)). The Texas court's instruction, read for common sense, or, even after a technical parsing, tells jurors that they may consider the evidence Penry presented as mitigating evidence and that, if they believe the mitigating evidence makes a death sentence inappropriate, they should answer "no" to one of the special issues. Given this straightforward reading of the instructions, it is objectively reasonable, if not eminently logical, to conclude that a reasonable juror would have believed he had a "vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." 492 U.S., at 326.

It is true that Penry's proffered evidence did not fit neatly into any of the three special issues for imposing the death penalty under Texas law.[3] But the sentencing court told the jury in no uncertain terms precisely how to follow this Court's directive in *Penry I*. First, the sentencing court instructed the jury that it could consider such evidence to be mitigating evidence. See App. 675 ("[W]hen you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case"). Next, the court explained to the jury how it must give effect to the evidence. *Ibid.* ("If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue"). And finally, the court unambiguously instructed: "If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, *a negative finding should be given to one of the special issues.*" *Ibid.* (emphasis added). Without performing legal acrobatics, I cannot make the instruction confusing. And I certainly cannot do the contortions necessary to find the Texas appellate court's decision "objectively unreasonable."[4] I simply do not share the Court's confusion as to how a juror could consider mitigating evidence, decide whether it makes a death sentence inappropriate, and respond with a "yes" or "no" depending on the answer.

Curiously, this Court concludes that the supplemental instruction "inserted 'an element of capriciousness' into the sentencing decision, 'making the jurors' power to avoid the death penalty dependent on their willingness' to elevate the supplemental instruction over the verdict form instructions." *Ante*, at 16 (quoting *Roberts* v. *Louisiana*, 428 U.S. 325, 335 (1976) (plurality opinion)). Any reference to *Roberts*, however, is wholly misplaced. *Roberts* involved a situation in which the jury was told to find the defendant guilty of a lesser included offense, unsupported by any evidence, if the

v. JOHNSON                                              h'tp://sur~+.law.cornell.edu/supct/html/00-6677.ZX.html

jury did not want him to be sentenced to death. *Id.*, at 334—335. In Penry's case there was no suggestion, express or implied, made to the jury that it could *disregard* the evidence. On the contrary, it was instructed on how to *give effect to* Penry's proffered evidence, as required by this Court in *Penry I.* Tellingly, the *Roberts* plurality stated in full that "[t]here is an element of capriciousness in making the jurors' power to avoid the death penalty dependent on their willingness to accept this invitation to *disregard the trial judge's instructions.*" 428 U.S., at 335 (emphasis added). In Penry's case, the judge's instructions included an explanation of how to answer the three special issues and how to give effect to the mitigating evidence.

Finally, contrary to the Court's claim that the jury received "mixed signals," *ante*, at 18, it appears that it is the Texas courts that have received the mixed signals. In *Jurek* v. *Texas*, 428 U.S. 262 (1976), this Court upheld the Texas sentencing statute at issue here against attack under the Eighth and Fourteenth Amendments. The joint opinion in *Jurek* concluded that the statute permits the jury "to consider whatever evidence of mitigating circumstances the defense can bring before it" and "guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Id.*, at 273—274 (opinion of Stewart, Powell, and Stevens, JJ.). Then, while purporting to distinguish, rather than to overrule, *Jurek*, this Court in *Penry I* determined that the same Texas statute was constitutionally insufficient by not permitting jurors to give effect to mitigating evidence. 492 U.S., at 355. See also *id.*, at 355—356 (Scalia, J., dissenting) (explaining how *Penry I* contradicts *Jurek*'s conclusions). According to the Court, an instruction informing the jury that it could give effect to the mitigating evidence was necessary. 492 U.S., at 328. And in today's decision, this Court yet again has second-guessed itself and decided that even this supplemental instruction is not constitutionally sufficient.

## Notes

1. The special issues are: " '(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; " '(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and " '(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.' " *Penry I*, 492 U.S. 302, 310 (1989) (quoting Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon 1981 and Supp. 1989)).

2. This Court's suggestion that the Texas court may have believed that any supplemental instruction, regardless of its substance, would satisfy *Penry I*'s requirement, see *ante*, at 12, is specious. The Texas court explained that a "jury must be given a special instruction *in order to allow it to consider and give effect to such evidence;*" it quoted the full text of the supplemental instruction; and it concluded that "a nullification instruction *such as this one* is sufficient to meet the constitutional requirements of [*Penry I*]." 903 S. W. 2d, at 765 (emphasis added). It is quite obvious that the court based its legal conclusion on the content of the supplemental instruction.

3. I am still bewildered as to why this Court finds it unconstitutional for Texas to limit consideration of mitigating evidence to those factors relevant to the three special issues. See *Graham* v. *Collins*, 506 U.S. 461, 478 (1993) (Thomas, J., concurring). But we need not address this broader issue to uphold Penry's sentence.

4. I think we need not look beyond the court's instructions in evaluating the Texas appellate court's decision. But even if there were any doubt as to whether the instruction led the jurors to believe there was a vehicle for giving mitigating effect to Penry's evidence, the instruction was made clear " 'in the light of all that ha[d] taken place at the trial.' " *Johnson* v. *Texas*, 509 U.S. 350, 368 (1993). The judge and prosecutor fully explained how to give effect to mitigating evidence during the *voir dire* process, and defense counsel made the instruction clear in closing: "[i]f, when you thought about mental retardation and the child abuse, you think that this guy deserves a life sentence, and not a death sentence,

00167

v. JOHNSON                                         http://sup~~ law.cornell.edu/supct/html/00-6677.ZX.html

... then, you get to answer one of ... those questions no," App. 640. Even if the jurors had forgotten
what they had been told at *voir dire,* see *ante,* at 17—18, an assumption that I find questionable given
our presumptions about jurors' ability to remember and follow instructions, see, *e.g., Weeks* v. *Angelone,*
528 U.S. 225, 234 (2000), the defense counsel's explanation from closing arguments would have been
fresh on their minds. Despite the Court's assertion that defense counsel told the jurors to answer the
questions dishonestly, *ante,* at 18, it seems to me that the jurors reasonably could have believed that they
could honestly answer any question "no" if they found that the death sentence would be inappropriate
given the mitigating evidence. They could follow their " 'oath, the evidence and the law,' " *ibid.,*
(quoting the prosecutor's statement, App. 616), by truthfully concluding that the evidence of Penry's
childhood and mental status did not warrant the death penalty and by writing "no" next to one of the
special issues.

Page 1

IN THE 194TH JUDICIAL DISTRICT COURT

OF DALLAS COUNTY, TEXAS

THE STATE OF TEXAS                    :

VS.                                   :   CAUSE NO. F00-02424-M

JEDIDIAH ISAAC MURPHY                 :

### CHARGE OF THE COURT

MEMBERS OF THE JURY:

The defendant, Jedidiah Isaac Murphy, stands charged by indictment with the offense of capital murder, alleged to have been committed on or about the 4th day of October, 2000, in Dallas County, Texas.

To this charge the defendant has pleaded not guilty.

You are instructed that the law applicable to this case is as follows:

A person commits the offense of murder if he: (1) intentionally or knowingly causes the death of an individual; or (2) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

You are instructed that the phrase "specific intent to kill" or the "specific intention of killing" means that it was the defendant's conscious objective or desire to cause the

Page 2

death of the deceased.

A person commits the offense of capital murder when the person intentionally commits murder as defined above during the course of committing or attempting to commit the offense of robbery.

A person commits the offense of capital murder when the person intentionally commits murder as defined above during the course of committing or attempting to commit the offense of kidnapping.

For Jedidiah Isaac Murphy to be convicted of capital murder in this case, it must be proved beyond a reasonable doubt that he had the specific intent to kill Bertie Cunningham by shooting her with a firearm, a deadly weapon, and that he intentionally caused the death of Bertie Cunningham while in the course of committing or attempting to commit robbery and/or kidnapping of Bertie Cunningham.

If it is found beyond a reasonable doubt that the defendant intentionally caused the death of Bertie Cunningham by shooting her with a firearm, a deadly weapon, but it is not found beyond a reasonable doubt that the defendant intentionally caused the death of Bertie Cunningham while in the course of committing or attempting to commit robbery and/or kidnapping of Bertie Cunningham, then the defendant cannot be found guilty of capital murder.

A person commits the offense of kidnapping if he

Page 3

intentionally or knowingly abducts another person.

The term "abduct" means to restrain a person with intent to prevent her liberation by (a) secreting or holding her in a place where she is not likely to be found; or (b) using or threatening to use deadly force.

The term "restrain" means to restrict a person's movements without consent, so as to interfere substantially with her liberty, by moving her from one place to another or by confining her. Restraint is without consent if it is accomplished by force, intimidation, or deception.

A person commits the offense of robbery if, in the course of committing theft and with intent to obtain or maintain control of the property of another, he intentionally, knowingly or recklessly causes bodily injury to another.

A person commits the offense of theft if with intent to deprive the owner of property he appropriates the property unlawfully.

The term, "in the course of committing theft," means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft.

An "attempt" to commit an offense occurs where one, with specific intent to commit an offense, does an act amounting to more than mere preparation that tends, but fails, to effect the commission of the offense intended.

Page 6

from the standard of care than an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Intent may be inferred from acts done, words spoken, or both.

You may consider all relevant facts and circumstances surrounding the killing and any previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense, if any.

A person is criminally responsible if the result would not have occurred but for his conduct and if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different offense was committed.

An allegation that an offense occurred "on or about" a certain date allows proof that the offense occurred any time before the presentment of the indictment and within the statute of limitations.  The indictment in this case was presented on December 7th, 2000.  There is no time limitation in prosecutions for capital murder, murder, or manslaughter.

The term "intoxication" means the disturbance of mental or physical capacity resulting from the introduction of any substance into the body.  You are instructed that voluntary intoxication does not constitute a defense to the commission of

00174

Page 7

a crime.

You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the knowledge or intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

You are instructed that a witness may be impeached by showing that he has previously been convicted of a felony offense or a crime involving moral turpitude. Such impeachment evidence may be considered by you to aid you in determining (if it does so) the weight, if any, to be given the testimony of the witness at trial and his credibility.

"You are instructed that under our law a statement or confession of a defendant made while he was in jail or other place of confinement, or in the custody of an officer, shall be admitted in evidence if it appears that the same was freely and voluntarily made without compulsion or persuasion.

Now, If you find from the evidence, or you have a reasonable doubt thereof, that at the time of the statement of

the defendant in this case, if such statement there was, to Officer Jason Bonham and/or M.J. Myers, the defendant was under the influence of alcohol and/or marijuana to such extent as to be reduced to a condition of mental impairment such as to render his statement not wholly voluntary, then such statement would not be freely and voluntarily made, and in such case you will wholly disregard the alleged statement referred to and not consider it for any purpose nor any evidence obtained as a result of such oral or written statement.

You are instructed that under our law a written confession of a defendant made while the defendant was in jail or other place of confinement or in the custody of an officer shall be admissible in evidence if it appears that the same was freely and voluntarily made, without compulsion or persuasion, provided, however, that it be made in writing and signed by the accused, and show that the accused has been warned prior to making such statement or confession, by the person to whom the same is made that;

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial; and

(2) any statement he makes may be used as evidence against him in court; and

(3) he has the right to have a lawyer present to advise him prior to and during any questioning; and

Page 9

(4) he may have his own lawyer, or, if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview or questioning at any time.

Now, in this case, if you find and believe from the evidence, or if you have a reasonable doubt thereof, that prior to the time the defendant gave the alleged written statement or confession to M.J. Myers, if he did give it, the said M.J. Myers did not warn the defendant in the respects just outlined, or as to any one of such requirements just outlined, or that the confession was not freely and voluntarily made without compulsion or persuasion, then you will wholly disregard the alleged statement or confession and not consider it for any purpose nor any evidence obtained as a result thereof.  If, however, you find beyond a reasonable doubt that the aforementioned warnings were given the defendant prior to his having made such statement, if he did make it, still, before you may consider such statement as evidence in this case, you must find from the evidence beyond a reasonable doubt that prior to and during such statement, if any, the defendant knowingly, intelligently and voluntarily waived the rights hereinabove set out in the said warning, and unless you so find, or if you have a reasonable doubt thereof, you will not consider the statement or confession for any purpose whatsoever

Page 10

or any evidence obtained as a result of same.

You are instructed that under our law an oral confession of a defendant made while he was in jail or in custody of an officer and while under interrogation shall be admissible in evidence if it appears that the same was freely and voluntarily made without compulsion or persuasion. However, before a confession made orally to officers may be considered voluntary, it must be shown by evidence beyond a reasonable doubt that, prior to make such oral statement, the accused has been warned by the person to whom the statement is made, or by a magistrate, that;

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial; and

(2) any statement he makes may be used as evidence against him in court; and

(3) he has the right to have a lawyer present to advise him prior to and during any questioning; and

(4) he may have his own lawyer, or, if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview or questioning at any time.

So, in this case, if you find from the evidence, or if you have a reasonable doubt thereof, that prior to the time the

defendant gave the alleged oral statement or confession to
Jason Bonham, if he did give it, the said Gary Rose did not
warn defendant in the respects enumerated above, or as to any
one of such requirements, then you will wholly disregard the
alleged confession or statement and not consider it or any
purpose nor any evidence obtained as a result thereof.  If,
however, you find beyond a reasonable doubt that the
aforementioned warning was given the defendant prior to his
having made such statement, if he did make it, still, before
you may consider such statement as evidence in this case, you
must find from the evidence beyond a reasonable doubt that
prior to making such statement, if he did, the defendant
knowingly, intelligently and voluntarily waived the rights
hereinbefore set out in the warning, and unless you so find, or
if you have a reasonable doubt thereof, you will not consider
the statement or confession for any purpose whatsoever or any
evidence obtained as a result of the statement, if any.

        Venue is the county where the prosecution of a
criminal offense is begun and tried.  You are further charged
as the law in this case that the venue for the trial of the
offense of capital murder is proper in one of the following
counties:

        (1)  in the county in which the offense was committed, or

        (2)  where property is stolen in one county and removed by
the offender to another county, in the county where the

Page 12

defendant took the property or in any other county through or
into which he may have removed the same, or

(3)  if a person receives an injury in one county and dies
in another by reason of such injury, in the county where the
injury was received or where the death occurred, or in the
county where the dead body is found, or

(4)  in the county in which the kidnapping offense was
committed, or in any county through, into, or out of which the
person kidnapped may have been taken.

However, if an offense has been committed within this
State and it cannot readily be determined within which county
or counties the commission took place, trial may be held in the
county in which the defendant resides, in the county in which
he was apprehended, or in the county to which he was
extradited.

The burden of proof is on the State to prove venue by
a preponderance of the evidence.

The term "preponderance of the evidence" means the
greater weight of the credible evidence.

Now, therefore, if you find from the evidence that the
State has proved venue as alleged by a preponderance of the
evidence, you will next consider whether the State has proved
the elements of the offense as set out below.

If you do not so find and believe by a preponderance
of the evidence then you will find the defendant not guilty and

Page 13

so say by your verdict.

Now, therefore, if you find from the evidence beyond a reasonable doubt that on or about the 4th day of October, 2000, the defendant, Jedidiah Isaac Murphy, did unlawfully then and there intentionally cause the death of Bertie Cunningham, an individual, hereinafter called deceased, by shooting the said deceased with a firearm, a deadly weapon, and the defendant intentionally did cause the death of the deceased while the said defendant was in the course of committing or attempting to commit the offense of robbery and/or kidnapping of the deceased, you will find the defendant guilty of capital murder, as charged in the indictment.

If you do not so believe, or if you have a reasonable doubt thereof, you will next consider whether the defendant is guilty of murder, as included in the indictment.

A person commits the offense of murder as previously defined.

If you find and believe from the evidence beyond a reasonable doubt that the defendant, Jedidiah Isaac Murphy, on or about October 4th, 2000, intentionally or knowingly caused the death of Bertie Cunningham, an individual by shooting the said deceased with a firearm, a deadly weapon, you find the defendant guilty of murder as included in the indictment, or, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Jedidiah Isaac Murphy, on or about

Page 14

October 4th, 2000, committed or attempted to commit a felony, robbery and/or kidnapping, and in the course of, and in furtherance of, the commission or attempt to commit robbery and/or kidnapping to Bertie Cunningham, Jedidiah Isaac Murphy committed an act clearly dangerous to human life by shooting the said Bertie Cunningham in the head with a firearm, a deadly weapon, and thereby cause the death of Bertie Cunningham, an individual, you will find the defendant guilty of murder, as included in the indictment.

If you do not so find, or if you have a reasonable doubt thereof, you will next consider whether the defendant is guilty of manslaughter, as included in the indictment.

A person commits the offense of manslaughter if he recklessly causes the death of an individual.

If you find and believe from the evidence beyond a reasonable doubt that Jedidiah Isaac Murphy, on or about the 4th day of October, 2000, recklessly caused the death of Bertie Cunningham by shooting her in the head with a firearm, a deadly weapon, you will find the defendant guilty of manslaughter, as included in the indictment.

If you do not so find, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

If you find and believe from the evidence beyond a reasonable doubt that the defendant is guilty of capital murder, as charged in the indictment, or murder, or

manslaughter, as included in the indictment, but you have a reasonable doubt as to which offense the defendant is guilty, you will resolve such doubt in the defendant's favor and find him guilty of manslaughter as included in the indictment.

If you have a reasonable doubt as to whether defendant is guilty of any offense defined in this charge, then you should acquit the defendant and say by your verdict, "Not Guilty."

In all criminal cases the burden of proof is on the State.

At times throughout the trial the Court has been called upon to pass on the question of whether or not certain offered evidence might properly be admitted.  You are not to be concerned with the reasons for such rulings and are not to draw any inferences from them.  Whether offered evidence is admissible is purely a question of law.  In admitting evidence to which an objection is made, the Court does not determine what weight should be given such evidence; nor does it pass on the credibility of the witness.  As to any offer of evidence that has been rejected by the Court, you, of course, must not consider the same.  As to any question to which an objection was sustained, you must not conjecture as to what the answer might have been or as to the reason for the objection.

You are instructed that you are not to allow yourselves to be influenced in any degree whatsoever by what

Page 16

you may think or surmise the opinion of the Court to be.   The
Court has no right by any word or any act to indicate any
opinion respecting any matter of fact involved in this case,
nor to indicate any desire respecting its outcome.   The Court
has not intended to express any opinion upon any matter of fact
in this case, and if you have observed anything which you have
or may interpret as the Court's opinion upon any matter of fact
in this case, you must wholly disregard it.

       All persons are presumed to be innocent and no person
may be convicted of an offense unless each element of the
offense is proved beyond a reasonable doubt.   Venue is not an
element of the offense and must be proved by a preponderance of
the evidence.   The fact that a person has been arrested,
confined, or indicted for, or otherwise charged with, the
offense gives rise to no inference of guilt at his trial.   The
law does not require a defendant to prove his innocence or
produce any evidence at all.   The presumption of innocence
alone is sufficient to acquit the defendant, unless the jurors
are satisfied beyond a reasonable doubt of the defendant's
guilt after careful and impartial consideration of all the
evidence in the case.

       The prosecution has the burden of proving the
defendant guilty and it must do so by proving each and every
element of the offense charged beyond a reasonable doubt and if
it fails to do so, you must acquit the defendant.   Venue is not

00184

Page 17

an element of the offense and must be proved by a preponderance of the evidence.

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.

A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case.  It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.

Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict "Not guilty".

You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony, but you are bound to receive the law from the Court, which is herein given you, and be governed thereby.

You have been permitted to take notes during the testimony in this case.  In the event any of you took notes,

Page 18

you may rely on your notes during your deliberations.  However,
you may not share your notes with the other jurors and you
should not permit the other jurors to share their notes with
you.  You may, however, discuss the contents of your notes with
the other jurors. You shall not use your notes as authority to
persuade your fellow jurors.  In your deliberations, give no
more and no less weight to the views of a fellow juror just
because that juror did or did not take notes.  Your notes are
not official transcripts. They are personal memory aids, just
like the notes of the judge and the notes of the lawyers.
Notes are valuable as a stimulant to your memory.  On the other
hand, you might make an error in observing or you might make a
mistake in recording what you have seen or heard.  Therefore,
you are not to use your notes as authority to persuade fellow
jurors of what the evidence was during the trial.

        Occasionally, during jury deliberations, a dispute
arises as to the testimony presented.  If this should occur in
this case, you shall inform the Court and request that the
Court read the portion of disputed testimony to you from the
official transcript.  You shall not rely on your notes to
resolve the dispute because those notes, if any, are not
official transcripts.  The dispute must be settled by the
official transcript, for it is the official transcript, rather
than any juror's notes, upon which you must base your
determination of the facts and, ultimately, your verdict in

Page 19

this case.

        After you retire to the jury room, you will select one
of your members as your presiding juror.  It is the presiding
juror's duty to preside at your deliberations, vote with you,
and when you have unanimously agreed upon a verdict, to certify
to your verdict by using the appropriate form attached hereto,
and signing the same as presiding juror.

        After you retire to consider your verdict, no one has
any authority to communicate with you except the officer who
has you in charge.  During your deliberations in this case, you
must neither consider, discuss, nor relate any matters not in
evidence before you.  You should neither consider nor mention
any personal knowledge or information you may have about any
fact or person connected with this case which is not shown by
the evidence.

Page 20

After you have retired, you may communicate with this
Court in writing through the bailiff who has you in charge.
Your written communication must be signed by the presiding
juror.  Do not attempt to talk to the bailiff, the attorneys,
or the Court regarding any question you may have concerning the
trial of the case.  After you have reached a unanimous verdict
or if you desire to communicate with the Court, please use the
jury call button on the wall and one of the bailiffs will
respond.

_____
F. HAROLD ENTZ, JR., JUDGE
194th Judicial District Court
Dallas County, Texas



FILED

JUN 11 2001

JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
DEPUTY

00188

Page 21

### V E R D I C T   F O R M S

We, the jury, find the Defendant, Jedidiah Isaac Murphy, guilty of capital murder, as charged in the Indictment.

*Nichole Marie Briscoe*
_____
Presiding Juror
PRINTED NAME: *Nichole Marie Briscoe*

-OR-

We, the jury, find the Defendant, Jedidiah Isaac Murphy, guilty of murder, as included in the Indictment.

_____
Presiding Juror
PRINTED NAME: _____

-OR-

We, the jury, find the Defendant, Jedidiah Isaac Murphy, guilty of manslaughter, as included in the Indictment.

_____
Presiding Juror
PRINTED NAME: _____

-OR-

We, the jury, find the Defendant, Jedidiah Isaac Murphy, not guilty.

_____
Presiding Juror
PRINTED NAME: _____

Can we please have Wilhelm
line up & a August photo
brought be Chelsea.

Nichole Briscoe

DEPUTY
DALLAS CO. TEXAS
DISTRICT CLERK
JIM HAMLIN

2001 JUN 30  PM 12: 06

FILED

00190

FILED
F00-02424-U

2001 JUN 26  AM 9: 51

...HAMLIN
...ST CLERK
...D.. TEXAS
DEPUTY

THE STATE OF TEXAS                          IN THE 194TH JUDICIAL

V.                                          DISTRICT COURT OF

JEDIDIAH ISAAC MURPHY                       DALLAS COUNTY, TEXAS

### MOTION FOR MISTRIAL BASED ON UNCONSTITUTIONAL APPLICATION OF PROSECUTORIAL DISCRETION IN DEATH PENALTY CASES IN DALLAS COUNTY

TO THE JUDGE OF THIS HONORABLE COURT:

COMES NOW, Defendant in the above entitled and numbered cause and presents in and to this Court his Motion for Mistrial Based on the Unconstitutional Application of Prosecutorial Discretion in Death Penalty Cases in Dallas County, and in support of this motion would present the following:

I.

Defendant has been found guilty of capital murder by a jury. The State has indicated that it intends to seek the death penalty against the Defendant.

II.

On numerous occasions, counsel for Defendant has offered a plea agreement with the State of Texas, represented by Greg Davis. Those negotiations have included an offer from the defense to plead guilty to two offenses, capital murder and aggravated robbery, to be served *consecutively*, one after another, resulting in Defendant serving a capital murder life sentence (forty calendar years before considered for parole) *and* an aggravated life sentence (thirty calendar years before considered for parole) resulting in seventy calendar years before defendant

00191

would be considered for parole.  On each occasion, the prosecutor, Greg Davis, has rejected the offer.

III.

On Friday, June 22, 2001, George West, chief felony prosecutor in Dallas County, entered into a plea agreement with DeMarcus Kennard Joe, a man accused of the bludgeoning death of Me Hyee Lee, aged 66 and her son Houng Sae Lee, aged 36, where Mr. Joe pled guilty in exchange for consecutive live prison sentences. (See Defense Exhibit A, a copy of the article regarding the offense in the June 23, 2001 edition of *The Dallas Morning News)*.  Ms. Lee and her son were bound and gagged in their DeSoto Home, beaten with a hammer and Mrs. Lee had been sexually assaulted.  Mr. Joe confessed to the murders.  An examination of Dallas County Criminal Records shows that Mr. Joe was on community supervision at the time of the capital murder; his probation was dismissed as a part of the plea bargain. (See Defense Exhibit B, a copy of the "JI55" printout from the Dallas County Computer).

Defendant in this case was accused and convicted of the killing of Bertie Lee Cunningham, an 80-year-old woman, by shooting her in the head during the course of a kidnaping or a robbery.  Defendant admitted to killing Ms. Cunningham, but stated in his Voluntary Statement (and many times prior to and following that statement) that the shooting was an accident.  nningham was not bound or tortured.  Ms. Cunningham was not sexually assaulted.  Additionally, Ms. Cunningham was the only victim in the offense.  Moreover, Defendant, like Mr. Joe, was on probation for the State Jail Felony Offense of Unauthorized Use of a Motor Vehicle at the time of this offense.  Defendant was also on probation out of another county for the felony offense of Burglary of a Habitation.

00192

IV.

The Dallas County District Attorney's Office is also in the process of prosecuting the infamous "Texas 6", six inmates from a Texas state penitentiary who escaped from that facility and traveled to Dallas where they are accused of killing an Irving police officer during the course of a robbery of an Oshmans Sporting Goods Store. Allegedly, two of the accused "Texas 6" were merely present at the robbery and had no part in the killing of the police officer. The Dallas County District Attorney's Office is treating all the defendants the same, seeking the death penalty against each defendant, without regard to the actions of the individual defendants.

V.

Further still, the Dallas County District Attorney's Office routinely decides not to seek the death penalty, regardless of the heinous nature of the offense, if the victim has a criminal record or is not of sound character. Undersigned counsel has personally participated in one such case, defending the accused in the case of *The State of Texas v. Kerry Cheatham*, cause number F99-00536-U. Mr. Cheatham and his co-defendants, Roderick Earl and Rodney Else, were convicted of capital murder and sentenced to life confinement in the penitentiary because the State of Texas, represented by the Dallas County District Attorney's Office, did not seek the death penalty. Mr. Cheatham and his co-defendants were accused and convicted of kidnaping two men after a drug deal went bad, tying one man's hands behind his back, beating him severely, putting him in the trunk, taking him to a remote location, pouring gasoline on him and setting him afire, all while the other victim watched. The burning victim lived long enough to stand, walk to a nearby street and flag down a motorist who called 911. The victim waited for police and medical help while his burnt skin began dropping from his fingers and feet. He was

transported to the hospital where he lived for approximately 18 hours, begging for the doctors to

help him and keep him alive.  He did not survive the attack.

VI.

Defendant asserts that the facts stated, above, shows that the Dallas County District

Attorney's Office decides which cases to prosecute for the death penalty in an arbitrary and

capricious manner, violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the

United States Constitution.  Specifically, the Dallas County District Attorney's Office is not

applying the laws of the State of Texas equally to all persons accused of the offense of Capital

Murder, and thus is prosecuting Defendant in violation of the Equal Protection and Due Process

Clauses of the United States Constitution.  As such, Defendant would ask this Court to order the

Dallas County District Attorney's Office to show, through evidence and testimony, why this case

is any more deserving of the death penalty than Mr. Joe's capital murder case or any other case in

which the State of Texas is *not* seeking the death penalty in a capital murder case.  Further, the

State of Texas should be ordered to show how Defendant presents more of a "future danger" to

society that seeking the death penalty is warranted in this case rather than other cases similarly

situated.  Moreover, the State of Texas should be ordered to show that sufficient mitigating

evidence does not exist, thereby showing that seeking the death penalty is warranted in this case

rather than other cases similarly situated.  Absent such a showing, Defendant would ask this

Court to find that the actions of the Dallas County District Attorney's Office in regard to this

case against Jedidiah Isaac Murphy violates the Equal Protection and the Due Process Clauses of

the United States Constitution and sentence Defendant to Life Confinement in the penitentiary.

WHEREFORE PREMISES CONSIDERED, Defendant would ask this Court to order a hearing at the earliest date, and, absent a showing by the Dallas County District Attorney's Office that they apply the Texas Capital Murder Statute in a manner that is not violative of the Equal Protection of the United States Constitution, sentence Jedidiah Isaac Murphy to Life Confinement in the Institutional Division of the Texas Department of Criminal Justice.

Respectfully Submitted,

Jennifer Balido
Assistant Public Defender
133 N. Industrial, LB 2
Dallas, Texas 75207
(214) 653-3550
State Bar Number 10474880

ATTORNEY FOR DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that I hand delivered a copy of the above motion to Greg Davis, Assistant District Attorney of Dallas County, Texas on the same day of filing therewith.

Jennifer Balido

**ORDER**

Having considered the foregoing motion and arguments of counsel, if any, the Motion is hereby _____(Granted/ Denied)

This the _____ day of _____, 2001.

_____
Judge Presiding

00195

The Dallas Morning News

©2001, The Dallas Morning News

dallasnews.com

Saturday, June 23, 2001

III —    ····    31 A

# Metropolitan

**INSIDE METRO**
■ Pro wrestler indicted for manslaughter in woman's death
**PAGE 37A**

**TEXAS & SOUTHWEST**
■ Navy looks at S. Texas coast as possible replacement for bomb range
**PAGE 33A**

**OVERNIGHT**
■ Everything goes right at Ballet Concerto performance
**PAGE 39A**

# Killer bargains for life terms

## Plea deal riles victims' family

**By Tim Wyatt**
*Staff Writer*

Family members of a mother and a son murdered in DeSoto accused Dallas County prosecutors of abandoning the death-penalty case Friday for a last-minute plea bargain with the 19-year-old confessed killer.

During a 30-minute hearing in state District Judge Faith Johnson's court, Marcus Kennard Joe pleaded guilty to the bludgeoning deaths of Me Hyee Lee, 63, and her son, Hong Sae Lee, 36, in exchange for consecutive life prison sentences.

Marcus Kennard Joe

According to members of the Lee family, lead prosecutor George West backed out of taking the capital murder case to trial, citing a huge workload of death-penalty cases and a lack of evidence to ensure a conviction. Mr. Joe's plea bargain leaves 10 death-penalty cases pending in Dallas County.

Mr. West said the facts of the case warranted the plea bargain, which ensured Mr. Joe would have to serve 70 years before being eligible for parole. District Attorney Bill Hill could not be reached for comment Friday.

Hae-sun Richardson, Mrs. Lee's daughter, said Mr. West told her the district attorney's office was overloaded with capital murder cases because six prison escapees will be tried in the murder of an Irving police officer. She said he also told her that he was concerned whether evidence in the case could bring a conviction.

"I asked him what that meant, and he said to me, 'If he's acquitted, he

**Please see KILLER, 38A.**

00196

*DEFENSE EXH "A" p1*

# Killer bargains for 2 life terms; victims' family objects

Continued from Page 31A.

could be eating breakfast at McDonald's the next day," Ms. Richardson said. "I left me with the impression that, if my brother and mother weren't Koreans and living in DeSoto, we would have gotten a better response from the district attorney."

Mr. West said he sympathized with the family.

"I understand their feelings," he said. "But my duties as a district attorney are to put my personal feelings aside and go with the facts of the case."

Mr. West would not discuss his conversations with the family boy who all gave videotaped and said the cases against two other suspects are still under investigation by his office.

The bodies of Mrs. Lee and her son were discovered bound and gagged in their DeSoto home March 3 after an anonymous caller alerted DeSoto police. The two had been beaten to death with a hammer in separate rooms of the house. Mrs. Lee, the owner of an Oak Cliff dry cleaning business, had also been sexually assaulted.

A day later, detectives tracked

down two men and a 15-year-old boy who all gave videotaped confessions to the crime. A mored for jury selection for Mr. Joe's trial. Individual interviews were slated to begin next month, and it was expected that testimony could begin in late August.

In May, prosecutors decided to seek the death penalty for two of the suspects, Mr. Joe and 20-year-old Kenneth Dewayne Edgan and informed her a plea was in the works. When she voiced her family's wishes to take the case to trial, she said Mr. West indicated on capital murder charges, and the 15-year-old boy faces similar charges in juvenile court.

Last week, almost 600 Dallas County residents were summoned for jury selection for Mr. Joe's trial. Individual interviews were slated to begin next month, and it was expected that testimony could begin in late August.

Ms. Richardson said prosecutors left word for her to call them the day before jury selection began and informed her a plea was in the works. When she voiced her family's wishes to take the case to trial, she said Mr. West told her, "That's just lawsuit.

"But when the jury selection began the next day, we thought

they had dropped the idea," she said. "Then I got a call yesterday telling me that the plea bargain was going to be signed."

John Richardson, Mrs. Lee's son-in-law, stood up in court to give a victim impact statement after Mr. Joe received his sentences. But instead of addressing Mr. Joe, he turned to Judge John-son.

"I congratulate the state for having agreed to the deal, despite the family's objections," Mr. Lollar said. "It was the right thing to do."

Brad Lollar, one of three defense attorneys appointed to represent Mr. Joe, said his client

was obviously guilty and had been requesting a plea bargain from prosecutors for weeks. In effect, he said, Mr. Joe received a life sentence without the possibility of parole with the consecutive sentences.

"I don't agree with the plea bargain," he said. "I don't think this is just."

Mr. Joe must serve 40 years for the capital murder of Mrs. Lee before he begins serving a minimum of 30 years for the murder of Mr. Lee.

A ρ 2

```
CXJI56  NAME ENTERED JOE DEMAR                    NAME TYPE DF
LN                        ARC RS  DOB    CASE/BOND   CT  CHARGE          DISP
01 JOE DEMARCUS KENARD          BM  010182  F-0121550    FW  CAP MUR FEL      PGBC
02 JOE DEMARCUS KENARD          BM  010182  F-0121546    FW  CAP MUR MULT     PGBC
03 JOE DEMARCUS KENARD          BM  010182  F-0049647    FW  UUMV            NFOG


         * * * E N D   O F   R E C O R D S   R E T R I E V E D * * *
```

LINE NO 01

```
CJI66        DA CASE ID F-0121550        JUDCL CASE ID F-0121550
             A010 DEF NAME JOE DEM        C010 DEF NAME JOE DEM
             J U D I C I A L   I N F O R M A T I O N

A010-020-030-040                                  FILE DATE 031201
DEF NAME JOE_DEMARCUS_KENARD_____ RACE B SEX M DOB 01011982  AGE  19
DEF ADR1 2758_EXETER_DR_____       AC ___ PH _____ SS __ _____
DEF CITY DALLAS_____ ST TX  ZIP ____  DLNUM _____02433591 DLST TX
OFF CAP_MUR_FEL_____ DT 030201 TYP/CL F X COC/CAT _ _ CODE MR000000
COMT _____ SID NUM _____ OF AMT _____
COMPLAINANT _____ TAPE # _____ ARREST DATE 030401
JUV STAT _ REPEAT OFFENDER _ CAREER OFFENDER _ ORIG-LOC DSO___ CURR-LOC J
FILING AGENCY TX0570800 SER/CAS NO _____001220  ARREST NUM _____010351
LAI NUM _____0865006  DSO NUMBER _____0865006  BOOKIN NUM _____01018390
JP FILE DATE 000000 JP CASE ID _____ JP COURT ID __ FED _ EVH _ AFF _
MAGISTRATE DATE 030601  MAGIS COURT OH   MAGIS JUDGE LUSK_____  BOUND OVER _
EXAM TRIAL DATE 000000  EXAM COURT __   EXAM JUDGE _____ IND METH IND
GJ/H/R DT 040601 N GJ# _0167_A1 GJ/N/FILE 040901 GJ DISP T DA DISP _ DA ACCPT Y
JUDCL DISP DATE 000000   MISDEMEANUR REDUCTION _  SENTENCE PROBATED _
JUDCL CASE ID F-0121550  GJ CT FT  PROS STAT C 310  PROS NAME FOX_L_____
COURT ASSIGNED TO FW  DATE ASSIGNED 032101   ASSIGNED BY M  REASON C
PRECEDING DA CASE ID _____    SUCCEEDING DA CASE ID _____
TRN 907576944X  TRS ____    WARRANT STATUS S STATE OFF CD 09990008_
                           NEXT
CJI66        DA CASE ID F-0121550        JUDCL CASE ID F-0121550
             A010 DEF NAME JOE DEM        C010 DEF NAME JOE DEM
                           BONDS
B050
DATE BOND SET 030601  AMT _500000.00 TYPE __  SET BY COURT OH JUDGE LUSK_____
                                              REC NO 01          _
B050
DATE BOND SET 032201  AMT _750000.00 TYPE __  SET BY COURT __ JUDGE _____
                                              REC NO 01          _
                      SETS AND PASSES
```

00198

DEFENSE EXH " B "

```
SET FOR DATE 032201   SET FOR TIME 0900   SET TYPE EXAM   PASSED TO DATE _____
SET DISPOSITION CODE __   PASSED GENERA''''   COMMENTS TO_BE_HEARD_IN_CCC#6__
STATES RECOMMENDATION _____         REC NO 01            _
  B060
SET FOR DATE 061501   SET FOR TIME 0830   SET TYPE OTHE   PASSED TO DATE _____
SET DISPOSITION CODE __   PASSED GENERALLY _   COMMENTS PICK_JURY_PANEL_____
STATES RECOMMENDATION _____         REC NO 01            _
                              NAMES
  B070
ASSOCIATED NAME LOLLAR_BRAD_____   NAME REF CODE CD0103070
CT APPOINTED Y   BAR NO _____ BOND MAKER _   DT BOND MADE _____   _


                              NEXT
      [JI66       DA CASE ID F-0121550        JUDCL CASE ID F-0121550
                  A010 DEF NAME JOE DEM        C010 DEF NAME JOE DEM
                              NAMES
  B070
ASSOCIATED NAME ALLEN_SCOTTIE_(2ND_CHAIR)_____   NAME REF CODE CD0104090
CT APPOINTED Y   BAR NO _____ BOND MAKER _   DT BOND MADE _____   _
  B070
ASSOCIATED NAME LOLLAR_BRAD_____   NAME REF CODE CD0104110
CT APPOINTED Y   BAR NO _____ BOND MAKER _   DT BOND MADE _____   _
  B070
ASSOCIATED NAME FOX_LISA_____   NAME REF CODE LP0103260
CT APPOINTED _   BAR NO _____ BOND MAKER _   DT BOND MADE _____   _
  B070
ASSOCIATED NAME FOX_L_____   NAME REF CODE LP0105090
CT APPOINTED _   BAR NO _____ BOND MAKER _   DT BOND MADE _____   _
                        GENERAL COMMENTS              WS  DATE
  B080 3-23-01_BOND_SET_AT_$750,000_____ X 032301 01 _
                              CHARGE
  C010
DEF NAME JOE_DEMARCUS_KENARD_____ OFFENSE CD MR000000 STATE CD 09990008__
DESC CAP_MUR_FEL_____   COMT _____   TYP/CL F X   COC _
GJ COURT FT   CURRENT COURT FW   PREVIOUS COURTS _____ CHOV DT _____


                              NEXT
      [JI66       DA CASE ID F-0121550        JUDCL CASE ID F-0121550
                  A010 DEF NAME JOE DEM        C010 DEF NAME JOE DEM
                           DISPOSITION
  C020-01-02                                            CT DISP NO 01
VERDICT DATE 062201 BY JG DISP PGBC YC __ DISM TYP ____ VOL 260 PAGE 46__
SENTENCE DATE 062201 BY JG TO L YEARS ___ MTHS ___ DAYS ___ HOURS ___
SENTENCE TO BEGIN 062201 SENTENCE VOL ___ PAGE ___ DISCHARGE N TYPE _ NUM __
PROBATED SENTENCE TO _ YEARS ___ MONTHS ___ DAYS ___       MULT SENT C
PROBATED FOR YEARS ___ MONTHS ___ DAYS ___ PROBATION START DATE _____
SPEC COND 1 _____ FOR ___ 2 _____ FOR __ _
FINE CODE _ AMT _____0.00   COST CODE N  AMT __222.25   PAYMENT DUE _____
                        REDUCED/ENHANCED CHARGE
DESC _____ COMT _____ TYP/CL _ _ COC _
          COUNTY CODE _____    STATE CODE ____
PROBATION REVOCATION FILE DATE _____ WARRANT ISSUED DATE _____

DISPOSITION COMMENT _____
                        GENERAL COMMENTS
  C080 041001_REPORTERS_RECORD_FILED_VOLUME_1_OF_1_____
_____  DATE 041001                       _



                              NEXT
      [JI66       DA CASE ID F-0121550        JUDCL CASE ID F-0121550
                  A010 DEF NAME JOE DEM        C010 DEF NAME JOE DEM
                        GENERAL COMMENTS
  C080 6-22-01 NATURE OF JURY 260/45
```

```
                                    NEXT
     [JI66        DA CASE ID F-0121548        JUDCL CASE ID F-0121548
                  A010 DEF NAME JOE DEM        C010 DEF NAME JOE DEM
                     J U D I C I A L   I N F O R M A T I O N

   A010-020-030-040                                  FILE DATE 031201
   DEF NAME JOE_DEMARCUS_KENARD_____ RACE B SEX M DOB 01011982  AGE  19
   DEF ADR1 2758_EXETER_DR_____  AC ___ PH _____ SS ___ __ ____
   DEF CITY DALLAS_____  ST TX  ZIP _____  DLNUM _____02433591 DLST TX
   OFF CAP_MUR_MULT_____ DT 030201 TYP/CL F X CDC/CAT _ _ CODE MR000000
   CDMT _____ SID NUM _____ OF AMT _____
   COMPLAINANT _____ TAPE # ____ ARREST DATE 030401
   JUV STAT _ REPEAT OFFENDER _ CAREER OFFENDER _ ORIG-LOC DSO____ CURR-LOC J
   FILING AGENCY TX0570800 SER/CAS NO _____001220  ARREST NUM _____010351
   LAI NUM _____0865006 DSO NUMBER _____0865006  BOOKIN NUM ____01018390
   JP FILE DATE 000000 JP CASE ID _____  JP COURT ID __ FED _ EVH _ AFF _
   MAGISTRATE DATE 030601 MAGIS COURT 0H  MAGIS JUDGE LUSK_____ BOUND OVER _
   EXAM TRIAL DATE 000000 EXAM COURT __  EXAM JUDGE _____ IND METH IND
   GJ/B/E DT 040601 H GJ# _0170_A1 GJ/R/FILE 040901 GJ DISP T DA DISP _ DA ACCPT Y
   JUDCL DISP DATE 000000       MISDEMEANOR REDUCTION _ SENTENCE PROBATED _
   JUDCL CASE ID F-0121548  GJ CT FT  FEOS STAT _ ___ PROS NAME _____
   COURT ASSIGNED TO FW  DATE ASSIGNED 032101    ASSIGNED BY M  REASON C
   PRECREDING DA CASE ID _____        SUCCEEDING DA CASE ID _____
   TRN 907576944X  TRS ____         WARRANT STATUS S STATE OFF CD 09990015__
                                    NEXT
     [JI66        DA CASE ID F-0121548        JUDCL CASE ID F-0121548
                  A010 DEF NAME JOE DEM        C010 DEF NAME JOE DEM
                                   BONDS
   B050
   DATE BOND SET 030601 AMT _500000.00  TYPE __  SET BY COURT 0H  JUDGE LUSK____
                                                         REC NO 01             _
   B050
   DATE BOND SET 032201 AMT _750000.00  TYPE __  SET BY COURT __  JUDGE _____
                                                         REC NO 01             _
                             SETS AND PASSES
   B060
   SET FOR DATE 032201  SET FOR TIME 0900  SET TYPE EXAM  PASSED TO DATE 000000
   SET DISPOSITION CODE __  PASSED GENERALLY _  COMMENTS TO_BE_HEARD_IN_CCC#6__
   STATES RECOMMENDATION _____       REC NO 01             _
   B060
   SET FOR DATE 061501  SET FOR TIME 0830  SET TYPE OTHE  PASSED TO DATE _____
   SET DISPOSITION CODE __  PASSED GENERALLY _  COMMENTS TO_PICK_JURY_PANEL____
   STATES RECOMMENDATION _____       REC NO 01             _
                                   NAMES
   B070
   ASSOCIATED NAME LOLLAR_BRAD_____  NAME REF CODE CD0103070
```

```
                              NEXT
     IJI66        DA CASE ID F-0121548          JUDCL CASE ID F-0121548
                  A010 DEF NAME JOE DEM         C010 DEF NAME JOE DEM
                              NAMES
     B070
ASSOCIATED NAME ALLEN_SCOTTIE_(2ND_CHAIR)_____   NAME REF CODE CD0104090
CT APPOINTED Y   BAR NO _____ BOND MAKER _  DT BOND MADE _____
     B070
ASSOCIATED NAME LOLLAR_BRAD_____   NAME REF CODE CD0104110
CT APPOINTED Y   BAR NO _____ BOND MAKER _  DT BOND MADE _____
     B070
ASSOCIATED NAME FOX_LISA_____   NAME REF CODE LP0103260
CT APPOINTED _   BAR NO _____ BOND MAKER _  DT BOND MADE _____
                          GENERAL COMMENTS            WS   DATE
     B080 3-22-01_BOND_SET_AT_$750,000_____  X 032301 01 _
                              CHARGE
     C010
DEF NAME JOE_DEMARCUS_KENARD_____ OFFENSE CD MR000000 STATE CD 09990015__
DESC CAP_MUR_MULT_____ CDMT _____ TYP/CL F X  GDC _
GJ COURT FT   CURRENT COURT FW   PREVIOUS COURTS _____ CMOV DT _____
```

```
                              NEXT
     IJI66        DA CASE ID F-0121548          JUDCL CASE ID F-0121548
                  A010 DEF NAME JOE DEM         C010 DEF NAME JOE DEM
                           DISPOSITION
     C020-01-02                                       CT DISP NO 01
VERDICT DATE 062201  BY JG  DISP PGBC  TC __  DISM TYP ____  VOL 260  PAGE 44__
SENTENCE DATE 062201  BY JG  TO L YEARS ___  MTHS ___  DAYS ___  HOURS ___
SENTENCE TO BEGIN 062201  SENTENCE VOL __  PAGE ___ DISCHARGE N TYPE _ NUM __
PROBATED SENTENCE TO _ YEARS ___  MONTHS ___  DAYS ___    MULT SENT C
PROBATED FOR YEARS ____ MONTHS ____ DAYS ____ PROBATION START DATE _____
SPEC COND 1 __ _____ FOR __  2 __ _____ FOR __ _
FINE CODE _ AMT _____0.00  COST CODE N  AMT __222.25   PAYMENT DUE 000000
                      REDUCED/ENHANCED CHARGE
DESC MURDER_____ CDMT _____ TYP/CL F 1 GDC _
               COUNTY CODE MR000000    STATE CODE 09990001__
PROBATION REVOCATION FILE DATE 000000   WARRANT ISSUED DATE 000000

DISPOSITION COMMENT _____   _
                        GENERAL COMMENTS
     C080 041001_REPORTERS_RECORD_FILED_VOLUME_1_OF_1_____
_____   DATE 041001                             _
```

```
                              NEXT
     IJI66        DA CASE ID F-0121548          JUDCL CASE ID F-0121548
                  A010 DEF NAME JOE DEM         C010 DEF NAME JOE DEM
                        GENERAL COMMENTS
     C080 6-22-01_WAIVER_OF_JURY_260/43_____
_____   DATE 062201                             _
```

00201

R n4

```
                              NEXT
    CJI66        DA CASE ID F-0049647        JUDCL CASE ID F-0049647
                 A010 DEF NAME JOE DEM       C010 DEF NAME JOE DEM
                       J U D I C I A L   I N F O R M A T I O N

    A010-020-030-040                                  FILE DATE 053100
  DEF NAME JOE_DEMARCUS_KENARD_____ RACE B SEX M DOB 01011982 AGE  19
  DEF ADR1 2758_EXTER_____ AC ___ PH _____ SS 466 55 7362
  DEF CITY DALLAS_____ ST TX ZIP _____ DLNUM _____02433591 DLST TX
  OFF UUMV_____ DT 053000 TYP/CL F S GOC/CAT _ _ CODE AU000000
  COMT _____ SID NUM 05903313 OF AMT _____
  COMPLAINANT _____ TAPE # _____ ARREST DATE 053000
  JUV STAT _ REPEAT OFFENDER _ CAREER OFFENDER _ ORIG-LOC DSO___ CURR-LOC J
  FILING AGENCY TXDPD0000 SER/CAS NO _____406340J  ARREST NUM _____033136
  LAI NUM _____0865006  DSO NUMBER _____0865006  BOOKIN NUM _____01001761
  JP FILE DATE 000000 JP CASE ID _____ JP COURT ID __ FED _ EVH _ AFF _
  MAGISTRATE DATE 053000 MAGIS COURT 92  MAGIS JUDGE CAMPOS___ BOUND OVER _
  EXAM TRIAL DATE 000000 EXAM COURT __  EXAM JUDGE _____ IND METH IHD
  GJ/H/R DT 061300 H GJ# _4431_B1 GJ/H/FILE 061500 GJ DISP T DA DISP _ DA ACCPT Y
  JUDCL DISP DATE 000000      MISDEMEANUR REDUCTION _  SENTENCE PROBATED _
  JUDCL CASE ID F-0049647  GJ CT FU  PROS STAT C 531  PROS NAME BENAVIDES_D____
  COURT ASSIGNED TO FW   DATE ASSIGNED 032101    ASSIGNED BY M   REASON C
  PRECEDING DA CASE ID _____       SUCCEEDING DA CASE ID _____
  TRN 0041264762 . TRS A001    WARRANT STATUS R STATE OFF CD 24110003__
                              NEXT
    CJI66        DA CASE ID F-0049647        JUDCL CASE ID F-0049647
                 A010 DEF NAME JOE DEM       C010 DEF NAME JOE DEM
                              BONDS
   B050
  DATE BOND SET 053000  AMT ___1500.00  TYPE __  SET BY COURT 92  JUDGE CAMPOS___
                                              REC NO 01
                         SETS AND PASSES
   B060
  SET FOR DATE 062800  SET FOR TIME 0900  SET TYPE FIRS  PASSED TO DATE _____
  SET DISPOSITION CODE __  PASSED GENERALLY _  COMMENTS _____
  STATES RECOMMENDATION _____        REC NO 01
   B060
  SET FOR DATE 071800  SET FOR TIME 0900  SET TYPE PLEA  PASSED TO DATE _____
  SET DISPOSITION CODE __  PASSED GENERALLY _  COMMENTS OPEN_____
  STATES RECOMMENDATION _____        REC NO 01
   B060
  SET FOR DATE 011001  SET FOR TIME 0900  SET TYPE VIOL  PASSED TO DATE _____
  SET DISPOSITION CODE __  PASSED GENERALLY _  COMMENTS PV_____
  STATES RECOMMENDATION _____        REC NO 01        _


                              NEXT
    CJI66        DA CASE ID F-0049647        JUDCL CASE ID F-0049647
                 A010 DEF NAME JOE DEM       C010 DEF NAME JOE DEM
                              NAMES
   B070
  ASSOCIATED NAME ABDAL-KHALLAQ_HAMID_____ NAME REF CODE CD0006020
  CT APPOINTED Y   BAR NO _____ BOND MAKER _  DT BOND MADE _____ _
   B070
  ASSOCIATED NAME LOLLAR_BRAD_____ NAME REF CODE CD0103290
  CT APPOINTED Y   BAR NO _____ BOND MAKER _  DT, BOND MADE _____ _
```

00202
Bb5

```
CT APPOINTED _   BAR NO _____ BOND MAKER _   DT BOND MADE _____  _
 B070
ASSOCIATED NAME BENAVIDES D_____         NAME REF CODE LF0006150
CT APPOINTED _   BAR NO _____ BOND MAKER _   DT BOND MADE _____  _
                          GENERAL COMMENTS            WS DATE
 B080 10/18/00 P/V MOTION (TO PROCEED) FILED AND WARRANT_____ A 101800 01 _
 B080 1/10/01 AMENDED P/V MOTION FILED_____ X 011001 01 _
 B080 1/10/01_ P/V MOTION WITHDRAWN, CONT. ON PROBATION_____ R 011001 02 _
 B080 040601 P/V MTPW/ADJ WARRANT NO BOND_____ A 040601 01 _


                            NEXT
    CJI66        DA CASE ID F-0049647      JUDCL CASE ID F-0049647
                 A010 DEF NAME JOE DEM     C010 DEF NAME JOE DEM
                          GENERAL COMMENTS          WS  DATE
 B080 6-22-01 P/V WITHDRAWN-WARRANT RECALLED_____ R 062201 01 _
                            CHARGE
 C010
DEF NAME JOE_DEMARCUS_KENARD_____ OFFENSE CD AU000000 STATE CD 24110003__
DESC UUMV_____ COMT _____ TYP/CL F S  GDC _
 GJ COURT FU   CURRENT COURT FW   PREVIOUS COURTS _____FP CHOV DT _____


                            NEXT
    CJI66        DA CASE ID F-0049647      JUDCL CASE ID F-0049647
                 A010 DEF NAME JOE DEM     C010 DEF NAME JOE DEM
                          DISPOSITION
 C020-01-02                                       CT DISP NO 01
VERDICT DATE 071800 BY MG  DISP MADG TC __  DISM TYP ____ VOL 380  PAGE 67__
SENTENCE DATE 071800 BY MG  TO _  YEARS ___ MTHS ____ DAYS ____ HOURS ____
SENTENCE TO BEGIN 000000 SENTENCE VOL __ PAGE ___ DISCHARGE N TYPE _ NUM __
PROBATED SENTENCE TO $  YEARS ____ MONTHS ____ DAYS ____    MULT SENT _
PROBATED FOR YEARS ___3 MONTHS ____ DAYS ____ PROBATION START DATE 071800
SPEC COND 1 __ _____ FOR ___ _ 2 __ _____ FOR ___ _
FINE CODE N  AMT ____300.00  COST CODE N  AMT __350.00   PAYMENT DUE 000000
                     REDUCED/ENHANCED CHARGE
DESC _____ COMT _____ TYP/CL _ _ GDC _
        COUNTY CODE _____   STATE CODE _____
PROBATION REVOCATION FILE DATE 040601   WARRANT ISSUED DATE 040601

DISPOSITION COMMENT _____  _


                            NEXT
    CJI66        DA CASE ID F-0049647      JUDCL CASE ID F-0049647
                 A010 DEF NAME JOE DEM     C010 DEF NAME JOE DEM
                          DISPOSITION
 C020-01-02                                       CT DISP NO 02
```

00203

R. 1

```
SENTENCE DATE _____ BY __ TO _ YEARS ____ MTHS ____ DAYS ____ HOURS ___
SENTENCE TO BEGIN _____ SENTENCE VOL ____ PAGE ____ DISCHARGE N TYPE _ NUM _
PROBATED SENTENCE TO _ YEARS ____ ML  : ____ DAYS ____      MULT SENT _
PROBATED FOR YEARS ____ MONTHS ____ DAYS ____ PROBATION START DATE _____
SPEC COND 1 __ _____ FOR ___ _ 2 __ _____ FOR ____ _
FINE CODE _ AMT _____0.00  COST CODE _ AMT ____0.00  PAYMENT DUE _____
                        REDUCED/ENHANCED CHARGE
DESC _____ COMT _____ TYP/CL _ _ GOC _
            COUNTY CODE _____    STATE CODE _____
PROBATION REVOCATION FILE DATE _____ WARRANT ISSUED DATE _____

DISPOSITION COMMENT _____  _



                            NEXT
       CJI66      DA CASE ID F-0049647      JUDCL CASE ID F-0049647
                  A010 DEF NAME JOE DEM     C010 DEF NAME JOE DEM
                          DISPOSITION
     C020-01-02                                    CT DISP NO 03
VERDICT DATE 062201 BY JC  DISP DISM  TC __  DISM TYP NFOG  VOL 260 PAGE 30__
SENTENCE DATE _____ BY __ TO _ YEARS ____ MTHS ____ DAYS ____ HOURS ___
SENTENCE TO BEGIN _____ SENTENCE VOL __ PAGE ____ DISCHARGE N TYPE _ NUM _
PROBATED SENTENCE TO _ YEARS ____ MONTHS ____ DAYS ____      MULT SENT _
PROBATED FOR YEARS ____ MONTHS ____ DAYS ____ PROBATION START DATE ____
SPEC COND 1 __ _____ FOR ___ _ 2 __ _____ FOR ___ _
FINE CODE _ AMT _____0.00  COST CODE _ AMT ____0.00  PAYMENT DUE _____
                        REDUCED/ENHANCED CHARGE
DESC _____ COMT _____ TYP/CL _ _ GOC _
            COUNTY CODE _____    STATE CODE _____
PROBATION REVOCATION FILE DATE _____ WARRANT ISSUED DATE _____

DISPOSITION COMMENT _____  _
                       GENERAL COMMENTS
C080 071800_WAIVER_OF_JURY_330/68_C/C_OF_$197.25_SERVED_IN_JAIL_____
_____ DATE 071800                        _



                            NEXT
       CJI66      DA CASE ID F-0049647      JUDCL CASE ID F-0049647
                  A010 DEF NAME JOE DEM     C010 DEF NAME JOE DEM
                       GENERAL COMMENTS
C080 081500_E/O_MOD_COF_384/67_____
_____ DATE 090100                        _
  C080 1/10/01_E/O_MOD._CUND._392/124-SERVE_45_DAYS_IN_DA_CO_JAIL_BEG_1/10/01_WOR
K____RELEASE_GRAN_____ DATE 011001                        _
  C080 3-21-01_E/O_RECEIVING_FROM_203RD_252/22_____
_____ DATE 032101                        _
```

                                                      00204

Page 1

IN THE 194TH JUDICIAL DISTRICT COURT

OF DALLAS COUNTY, TEXAS

THE STATE OF TEXAS

VS.                              CAUSE NO. F00-02424-M

JEDIDIAH ISAAC MURPHY

**CHARGE OF THE COURT**

MEMBERS OF THE JURY:

The defendant, Jedidiah Isaac Murphy, has been found guilty by you of the offense of capital murder. You are instructed that a sentence of life confinement or death is mandatory on conviction for capital murder. In order for the Court to assess the proper punishment, two questions or special issues are submitted to you. Before answering these questions or special issues, you will consider the following instructions:

The burden of proof in this phase of the trial is on the State as to Special Issue 1; and the State has the burden of proof to prove beyond a reasonable doubt that the answer to Special Issue 1 submitted to the jury should be "Yes". The jury may not answer the Special Issue 1 "Yes" unless the jury agrees unanimously on such answer. Further, you may not answer this Special Issue 1 "No" unless (10) or more jurors agree. It is not necessary that members of the jury agree on what particular evidence supports a negative answer - that is, an answer of "No" - to Special Issue 1.

00205

Special Issue 1 has been submitted to you requiring the State to prove the issue beyond a reasonable doubt, and on the issue of reasonable doubt you are instructed as follows:

A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case.  It is the kind of doubt that makes a reasonable person hesitate to act in the most important of his affairs.

Proof beyond a reasonable doubt must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

In the event that you have a reasonable doubt as to the issue under consideration by you, you will find against the State on that issue and not consider the testimony relating to that issue for any purpose.

The jury may not answer Special Issue 2 "No" unless the jury agrees unanimously on such answer.  The jury may not answer Special Issue 2 "Yes" unless ten or more jurors agree. It is not necessary that members of the jury agree on what particular evidence supports an affirmative answer - that is, an answer of "Yes" - to Special Issue 2.  In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

Page 3

In answering the Special Issues hereinafter submitted, you may consider all of the evidence admitted during the first phase of the trial, before your verdict of guilty, as well as all of the evidence admitted during the second phase of the trial.

In arriving at the answers to the issues submitted, it will not be proper for you to fix the same by lot or chance or any other method than a full, fair, and free exchange of the opinion of each individual juror.

You are further instructed that if there is testimony before you in this case regarding the defendant having committed other acts or participated in other transactions other than the offense alleged against him in the indictment in this case, that you cannot consider such other acts or transactions, if any, unless you first find beyond a reasonable doubt, as that term has heretofore been defined, that the defendant committed such acts or participated in such transactions, if any, but if you do not so believe, or if you have a reasonable doubt thereof, you will not consider such testimony for any purpose.

In deciding whether the defendant committed any alleged unadjudicated extraneous offenses or bad acts, the jury must not consider the fact that the defendant committed the capital murder alleged in the indictment.  That is, you should not presume that the defendant has a propensity to commit

00207

Page 4

criminal acts generally, merely because you have convicted him
of capital murder.  The state must proved to you that the
defendant committed any unadjudicated extraneous offense beyond
a reasonable doubt.

Furthermore, if you find that the defendant committed
one or more unadjudicated extraneous offenses, you must not
consider that fact in deciding whether he committed other
unadjudicated extraneous offenses alleged by the state.

Our law provides that a defendant may testify in his
own behalf if he elects to do so. This, however, is a privilege
accorded a defendant; and, in the event he elects not to
testify, that fact cannot be taken as a circumstance against
him.

In this case, the defendant has elected not to
testify; and you are instructed that you cannot and must not
refer or allude to that fact throughout your deliberations or
take it into consideration for any purpose whatsoever as a
circumstance against him.

Under the law applicable in this case, if the
defendant is sentenced to imprisonment in the Institutional
Division of the Texas Department of Criminal Justice for life,
the defendant will become eligible for release on parole, but
not until the actual time served by the defendant equals 40
years, without conderation of any good conduct time.  It cannot
accurately be predicted how the parole laws might be applied to

00208

Page 5

this defendant if the defendant is sentenced to a term of
imprisonment for life because the application of those laws
will depend on decisions made by prison and parole authorities,
but eligiblity for parole does not guarantee that parole will
be granted.

You are further instructed that you are not to be
swayed by mere sentiment, conjecture, sympathy, passion,
prejudice, public opinion, or public feeling in considering all
the evidence before you and in answering the special issues.

After reading this charge, you shall not be permitted
to separate from each other, nor shall you talk with anyone not
of your jury.  After argument of counsel, you will retire and
consider your answers to the issues submitted to you.  It is
the duty of your presiding juror to preside in the jury room
and vote with you on the answers to the issues submitted.

You have been permitted to take notes during the
testimony in this case.  In the event any of you took notes,
you may rely on your notes during your deliberations.  However,
you may not share your notes with the other jurors and you
should not permit the other jurors to share their notes with
you.  You may, however, discuss the contents of your notes with
the other jurors. You shall not use your notes as authority to
persuade your fellow jurors.  In your deliberations, give no
more and no less weight to the views of a fellow juror just
because that juror did or did not take notes.  Your notes are

not official transcripts. They are personal memory aids, just
like the notes of the judge and the notes of the lawyers.
Notes are valuable as a stimulant to your memory.  On the other
hand, you might make an error in observing or you might make a
mistake in recording what you have seen or heard.  Therefore,
you are not to use your notes as authority to persuade fellow
jurors of what the evidence was during the trial.

        Occasionally, during jury deliberations, a dispute
arises as to the testimony presented.  If this should occur in
this case, you shall inform the Court and request that the
Court read the portion of disputed testimony to you from the
official transcript.  You shall not rely on your notes to
resolve the dispute because those notes, if any, are not
official transcripts.  The dispute must be settled by the
official transcript, for it is the official transcript, rather
than any juror's notes, upon which you must base your
determination of the facts and, ultimately, your verdict in
this case.

Page 7

After you have retired, you may communicate with this
Court in writing through the bailiff who has you in charge.
Your written communication must be signed by the presiding
juror.  Do not attempt to talk to the bailiff, the attorneys,
or the Court regarding any question you may have concerning the
trial of the case.  After you have reached a verdict or if you
desire to communicate with the Court, please use the jury call
button on the wall and one of the bailiffs will respond.


_____
F. HAROLD ENTZ, JR., JUDGE
194th Judicial District Court
Dallas County, Texas

FILED
2001 JUN 30  AM 9:51

00211

Page 8

The Special Issues, with the forms for your answers, are as follows:

### SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

### ANSWER TO SPECIAL ISSUE NO. 1

We, the Jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "Yes."

_Nichole Marie Briscoe_
Presiding Juror

We, the Jury because at least ten (10) jurors have a reasonable doubt as to the matter inquired about in this Special Issue, find and determine that the answer to this special issue is "No."

_____
Presiding Juror

00212

Page 9

You are to answer the following issue <u>only if</u> you have
returned an affirmative finding on Special Issue No. 1 above.

Concerning Special Issue 2, you are instructed that
neither the Defendant nor the State bears the burden to prove
or disprove the existence of mitigating circumstances.  Neither
does our law assign a standard of proof on the existence of
mitigating circumstances.

<u>SPECIAL ISSUE NO. 2</u>

Do you find from the evidence, taking into consideration
all of the evidence, including the circumstances of the
offense, the defendant's character and background, and the
personal moral culpability of the defendant, that there is a
sufficient mitigating circumstance or circumstances to warrant
that a sentence of life imprisonment rather than a death
sentence be imposed?

You are instructed that in answering this issue, you shall
answer this issue "Yes" or "No."  You may not answer the issue
"No" unless the jury unanimously agree, and you may not answer
the issue "Yes" unless ten or more jurors agree. The jury need
not agree on what particular evidence supports an affirmative
finding on this issue.  The jury shall consider mitigating
evidence to be evidence that a juror might regard as reducing
the defendant's moral blameworthiness.

Page 10

**ANSWER TO SPECIAL ISSUE NO. 2**

We, the Jury, unanimously find that the answer to this Special Issue is "No."

_Nichole Marie Briscoe_
Presiding Juror

We, the Jury, because at least ten (10) jurors agree as to the matter inquired about in this Special Issue, find that the answer to this Special Issue is "Yes."

_____
Presiding Juror

**VERDICT OF THE JURY**

We, the Jury, having answered the foregoing issues, return the same into Court as our verdict.

_Nichole Marie Briscoe_
Presiding Juror

00214

FORM 3                                                                                    TDC
(REV.  09/01/94)    T H I S   C A S E   I S   O N   A P P E A L
                              F-0002424-NM

THE STATE OF TEXAS                          IN THE 194TH JUDICIAL DISTRICT

VS.                                         COURT                        OF

JEDIDIAH ISAAC MURPHY                       DALLAS COUNTY, TEXAS


                    JUDGMENT ON JURY VERDICT OF GUILTY
           PUNISHMENT FIXED BY COURT OR JURY - NO PROBATION GRANTED

                                      JULY      TERM, A.D., 2001

JUDGE PRESIDING:  HAROLD ENTZ            DATE OF JUDGMENT: 06/30/01

ATTORNEY                      ATTORNEY
FOR STATE:  GREG DAVIS/MARY MILLER   FOR DEFENDANT: JANE LITTLE, MICHAEL BYCK &
                                                    JENNIFER BALIDO

OFFENSE
CONVICTED OF:       CAPITAL MURDER


   DEGREE: A CAPITAL FELONY           DATE OFFENSE COMMITTED:   10/04/00

CHARGING
INSTRUMENT: INDICTMENT                PLEA: NOT GUILTY

JURY VERDICT:       GUILTY            FOREMAN: NICHOLE MARIE BRISCOE

PLEA TO ENHANCEMENT                   FINDINGS ON
PARAGRAPH(S):   N/A                   ENHANCEMENT: N/A

FINDINGS ON        THE JURY  FINDS  THAT  DEFENDANT HEREIN USED OR EXHIBITED
DEADLY WEAPON,      A DEADLY  WEAPON  DURING THE  COMMISSION OF SAID
BIAS OR PREJUDICE,  OFFENSE TO-WIT: FIREARM.
AND/OR
FAMILY VIOLENCE:

PUNISHMENT            -  SEE SPECIAL ISSUES ATTACHED HERETO AND
ASSESSED BY:       JURY     INCORPORATED BY REFERENCE.

DATE SENTENCE
IMPOSED:           06/30/01                        COSTS: YES

PUNISHMENT AND   DEATH
PLACE OF
CONFINEMENT: CONFINEMENT  IN  THE INSTITUTIONAL DIVISION  DATE TO
             OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE  COMMENCE:   06/30/01
             AND A FINE OF - 0 -

TIME CREDITED: 101600-063001
                              RESTITUTION/REPARATION: NO

CONCURRENT UNLESS OTHERWISE SPECIFIED.

PA                                      VOL. 475  PAGE 106

00215

NO F-0002424-NM

ON THIS DAY, SET F'TH ABOVE, THE ABOVE STYLED AND NUMBERED CAUSE CAME TO TRIAL. THE STATE OF TEXA AND DEFENDANT APPEARED BY D THROUGH THE ABOVE-NAMED ATTORNEYS AND ANNOUNCED READY FOR TRIAL. DEFENDANT APPEARED IN PERSON IN OPEN COURT. WHERE DEFENDANT WAS NOT REPRESENTED BY COUNSEL, DEFENDANT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED THE RIGHT TO REPRESENTATION BY COUNSEL. WHERE SHOWN ABOVE THAT THE CHARGING INSTRUMENT WAS BY INFORMATION INSTEAD OF INDICTMENT, THE DEFENDANT DID, WITH THE CONSENT AND APPROVAL OF HIS ATTORNEY WAIVE HIS RIGHT TO PROSECUTION BY INDICTMENT AND AGREE TO BE TRIED ON AN INFORMATION; ALL SUCH WAIVERS, AGREEMENTS AND CONSENTS WERE IN WRITING AND FILED IN THE PAPERS OF THIS CAUSE PRIOR TO THE DEFENDANT ENTERING HIS PLEA HEREIN. DEFENDANT IN OPEN COURT WAS DULY ARRAIGNED, AND ENTERED THE ABOVE SHOWN PLEA. WHERE SHOWN ABOVE THAT DEFENDANT ENTERED A PLEA OF GUILTY, DEFENDANT WAS ADMONISHED BY THE COURT OF THE CONSEQUENCES OF THE SAID PLEA AND DEFENDANT PERSISTED IN ENTERING SAID PLEA, AND IT PLAINLY APPEARING TO THE COURT THAT DEFENDANT IS MENTALLY COMPETENT AND SAID PLEA IS FREE AND VOLUNTARY, THE SAID PLEA WAS ACCEPTED BY THE COURT AND IS NOW ENTERED OF RECORD AS THE PLEA HEREIN OF DEFENDANT. THERE-UPON A JURY WAS DULY SELECTED, IMPANELED AND SWORN, WHO, HAVING HEARD THE CHARGING INSTRUMENT, AS SHOWN ABOVE PRESENTED, AND DEFENDANT'S PLEA THERETO, AND HAVING HEARD THE EVIDENCE SUBMITTED, AND HAVING BEEN DULY CHARGED BY THE COURT AS TO THEIR DUTY TO DETERMINE THE GUILT OR INNOCENCE OF THE DEFENDANT AND AFTER HAVING HEARD THE ARGUMENTS OF COUNSEL, RETIRED IN CHARGE OF THE PROPER OFFICER TO CONSIDER OF THEIR VERDICT, AND AFTERWARD WERE BROUGHT INTO OPEN COURT, BY THE PROPER OFFICER, DEFENDANT AND HIS COUNSEL BEING PRESENT, AND IN DUE FORM OF LAW RETURNED INTO OPEN COURT THE ABOVE SHOWN VERDICT, WHICH WAS RECEIVED AND ACCEPTED BY THE COURT, AND IS HERE AND NOW ENTERED UPON THE MINUTES OF THE COURT.

AND WHEN SHOWN ABOVE THAT THE CHARGING INSTRUMENT CONTAINS ENHANCE-MENT PARAGRAPHS(S), WHICH WERE NOT WAIVED OR DISMISSED, THE COURT, AFTER HEARING THE DEFENDANT'S PLEA TO SAID PARAGRAPH(S) AS SET OUT ABOVE, AND AFTER HEARING FURTHER EVIDENCE ON THE ISSUE OF PUNISHMENT, THE COURT, OR JURY, MAKES ITS FINDING AS SET OUT ABOVE; IF TRUE, THE COURT, OR JURY, IS OF THE OPINION AND FINDS DEFENDANT HAS BEEN HERETOFORE CONVICTED OF SAID OFFENSE(S) ALLEGED IN THE SAID ENHANCEMENT PARAGRAPH(S) AS MAY BE SHOWN ABOVE.

WHEN IT IS SHOWN ABOVE THE DEFENDANT IS GUILTY OF THE OFFENSE SET FORTH ABOVE, IT IS CONSIDERED BY THE COURT THAT SAID DEFENDANT IS ADJUDGED TO BE GUILTY OF THE OFFENSE SET FORTH ABOVE, AND THAT DEFENDANT COM-MITTED THE OFFENSE ON THE DATE SET FORTH ABOVE AS CHARGED IN THE INSTRUMENT SHOWN ABOVE, AND THAT DEFENDANT WAS PREVIOUSLY CONVICTED WHEN SHOWN ABOVE IN THE MANNER ABOVE, AND THAT SAID DEFENDANT BE PUNISHED AS HAS BEEN DETERMINED, SAID PUNISHMENT BEING ASSESSED BY THE ABOVE SHOWN ASSESSOR OF PUNISHMENT, AS ELECTED IN WRITING BY DEFENDANT, AND BE CONFINED IN THE PLACE OF CONFINEMENT SHOWN ABOVE FOR THE TERM OF TIME SET FORTH ABOVE, AND THAT THE STATE OF TEXAS DO HAVE AND RECOVER OF THE SAID DEFENDANT ALL COSTS IN THIS PROSECUTION EXPENDED INCLUDING ANY FINE SHOWN FOR WHICH LET EXECUTION ISSUE. THE COURT FURTHER MAKES ITS FINDING AS TO DEADLY WEAPON AS SET FORTH ABOVE BASED UPON THE JURY'S VERDICT OR THE FINDINGS OF THE COURT WHEN PUNISHMENT FIXED BY THE COURT. THE COURT MAKES ITS FINDINGS AS TO FAMILY VIOLENCE AND BIAS OR PREJUDICE AS SET FORTH ABOVE.

WHEN IT IS SHOWN ABOVE THAT RESTITUTION HAS BEEN ORDERED, BUT THE COURT DETERMINES THAT THE INCLUSION OF THE VICTIM'S NAME AND ADDRESS IN THE JUDGMENT IS NOT IN THE BEST INTEREST OF THE VICTIM, THE PERSON OR AGENCY WHOSE NAME AND ADDRESS IS SET OUT IN THIS JUDGMENT WILL ACCEPT AND FORWARD THE RESTITUTION PAYMENTS TO THE VICTIM.

AND WHEN IT IS SHOWN BELOW THAT PAYMENT OF THE COSTS OF LEGAL SERVICES PROVIDED TO THE DEFENDANT IN THIS CAUSE HAS BEEN ORDERED, THE COURT FINDS THAT THE DEFENDANT HAS THE FINANCIAL RESOURCES TO ENABLE THE DEFENDANT TO OFFSET SAID COSTS IN THE AMOUNT ORDERED.

THEREUPON THE SAID DEFENDANT WAS ASKED BY THE COURT WHETHER HE HAD ANYTHING TO SAY WHY SAID SENTENCE SHOULD NOT BE PRONOUNCED AGAINST HIM, AND HE ANSWERED NOTHING IN BAR THEREOF, AND IT APPEARING TO THE COURT THAT THE DEFENDANT IS MENTALLY COMPETENT AND UNDERSTANDING OF THE PROCEEDINGS.

IT IS THEREFORE, CONSIDERED AND ORDERED BY THE COURT, IN THE PRESENCE OF DEFENDANT, AND HIS ATTORNEY, THAT SAID JUDGMENT AS SET FORTH ABOVE, IS HEREBY IN ALL THINGS APPROVED AND CONFIRMED, AND THAT DEFENDANT, WHO HAS

NO F-0002424-NM

BEEN ADJUDGED GUILTY OF THE ABOVE NAMED OFFENSE, AS SHOWN ABOVE, AND WHOSE PUNISHMENT HAS BEEN ASSESSED BY THE COURT OR THE JURY AS SHOWN ABOVE, THAT SAID DEFENDANT BE PUNISHED IN ACCORDANCE WITH THE PUNISHMENT SET FORTH ABOVE, AND THAT DEFENDANT SHALL BE DELIVERED BY THE SHERIFF TO THE DIRECTOR OF THE INSTITUTIONAL DIVISION OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE, OR OTHER PERSON LEGALLY AUTHORIZED TO RECEIVE SUCH CONVICTS FOR THE PUNISHMENT ASSESSED HEREIN, AND SAID DEFENDANT SHALL BE CONFINED FOR THE ABOVE-NAMED TERM IN ACCORDANCE WITH THE PROVISIONS OF LAW GOVERNING SUCH PUNISHMENTS. IT IS FURTHER ORDERED THAT THE DEFENDANT PAY THE FINE, COURT COSTS, COSTS AND EXPENSES OF LEGAL SERVICES PROVIDED BY THE COURT APPOINTED ATTORNEY IN THIS CAUSE, IF ANY, AND RESTITUTION OR REPARATION, AS SET FORTH HEREIN, FOR WHICH LET EXECUTION ISSUE.

DEFENDANT IS HEREBY ORDERED REMANDED TO JAIL UNTIL SAID SHERIFF CAN OBEY THE DIRECTIONS OF THE JUDGMENT.

FOLLOWING THE DISPOSITION OF THIS CAUSE THE DEFENDANT'S FINGERPRINT WAS, IN OPEN COURT, PLACED UPON A CERTIFICATE OF FINGERPRINT. SAID CERTIFICATE IS ATTACHED HERETO AND IS INCORPORATED BY REFERENCE AS A PART OF THIS JUDGMENT.

WHEN REQUIRED, A PRESENTENCE INVESTIGATION WAS CONDUCTED IN ACCORDANCE WITH THE APPLICABLE PROVISIONS OF LAW.

DEFENDANT EXCEPTS AND GIVES NOTICE OF APPEAL TO THE COURT OF APPEALS, FIFTH DISTRICT OF TEXAS AT DALLAS.

COURT COSTS IN THE AMOUNT OF $242.25

*Immediately upon release, defendant must report in person to the Felony Collections Dept., 2nd fl., Rm. C2-3, Crowley Courts Bldg., Dallas, TX, for payment arrangement of court ordered costs, fines and/or attorney fees.

JUDGE PRESIDING

00217

JUDGMENT

CERTIFICATE OF THUMBPRINT

CAUSE NO. *F00 02424M*

THE STATE OF TEXAS

VS.

*VEDI DIAH / ISAAC MURPHY*

IN THE 194th

JUDICIAL DISTRICT COURT

DALLAS COUNTY, TEXAS



Right
Thumb*

Defendant's *RIGHT* hand

THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-
NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION
OF THE ABOVE STYLED AND NUMBERED CAUSE.

DONE IN COURT THIS *30* DAY OF *June* ,2001.

_____
BAILIFF/DEPUTY SHERIFF

*Indicate here if print other than defendant's right thumbprint
is placed in box:

☐ left thumbprint          ☐ left/right index finger

☐ other, _____

00218

478/135

38

THE STATE OF TEXAS      CAUSE NO. _F00-02424-M_

VS.      _194th_ DISTRICT COURT_____

_Jedidiah Murphy_      DALLAS COUNTY, TEXAS

### DEFENDANT'S MOTION FOR NEW TRIAL

TO THE HONORABLE JUDGE OF SAID COURT:

    Now comes the Defendant in the above cause and by his Attorney, and moves the Court

to grant him a New Trial herein for the good and sufficient reason that the verdict is contrary to

the law and the evidence.

    Wherfore, Defendant prays the Court grant a new trial herein.

Respectfully submitted,

_Adam Seidel_

Attorney for Defendant
Adam Seidel
SB# 17999290
2515 McKinney Av #1400
Dallas, TX 75201
ph 214-537-0835

**FILED**

JUL 30 2001

JIM HAMLIN
DIST. CLERK DALLAS CO., TEXAS
_____ DEPUTY

### ORDER

The above Motion is hereby (granted) (overruled).    AUG 0 6 2001

_____
Judge

00219

JUDGMENT / SENTENCE D ∿ June 30, 2001

MOTION FOR NEW TRIAL FILED _____ YES ✓ NO   DATE _N/A_

_Alexander_

Deputy District Clerk

DRAWER #40

THE STATE OF TEXAS

VS.

_Jedidiah Isaac Murphy_

CAUSE NO. _F00-02424-M_

_Judicial_ DISTRICT COURT _194_

DALLAS COUNTY, TEXAS

## DEFENDANT'S NOTICE OF APPEAL AND PAUPER OATH

## APPOINTMENT OF ATTORNEY ON APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Defendant in the above cause and states: I am the defendant in the above cause; I was convicted in this cause and now give Notice of Appeal to the Texas Court of Appeals for the Fifth Supreme Judicial District of Texas at Dallas, Texas, and that I am penniless, destitute and indigent person, too poor to employ counsel to represent me on the appeal, and too poor to pay for or give security for the Statement of Facts and a true copy thereof herein.

WHEREFORE, I pray that the Court will appoint an attorney to represent me in this appeal and that the Court will order the Court Reporter of this Court to prepare and deliver to me or my appointed Counsel the original and a true copy of the Statement of Facts in this case, together with all exhibits attached thereto if practical.

_Jedidiah S. Murphy_
Defendant

BEFORE ME, the undersigned authority, personally appeared the above Defendant, known to me to be the person whose signature appears above, and after being duly sworn on oath states that he is the defendant in the above cause, and that the matters and things set forth in the foregoing are true and correct in all things.

BILL LONG
DISTRICT CLERK
Dallas County, Texas

**FILED**
JUN 30 2001
JIM HAMLIN
DIST. CLERK DALLAS CO., TEXAS
_____ DEPUTY

By _Alexander_
Deputy District Clerk

## ORDER

214-231-0835

The Defendant having requested the Court to appoint Counsel,

It Is Ordered the Honorable _ADAM SEIDEL_

Address _2515 McKinney  Suite 1400  Dallas, TX 75201_

a regular licensed and practicing attorney of Texas, be, and he is hereby appointed to represent Defendant in prosecuting his appeal herein, and it is further Ordered that the Court Reporter is hereby directed to transcribe all of the notes as same may appertain to this cause and as taken during the trial of this cause which began on

_February 26, 2001_, and make Statement of Facts in duplicate and furnish same to Defendant or his appointed Counsel.

_____
Judge

00220

F-00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| v. | § | DISTRICT COURT |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

### ORDER APPOINTING COUNSEL
### PURSUANT TO ARTICLE 11.071 C.C.P.

The Defendant having been convicted of capital murder and sentenced to death, it is the duty of this court pursuant to Article 11.071 0f the Code of Criminal Procedure to appoint counsel for the purpose of preparing and filing a writ of habeas corpus on the defendant's behalf; and

The Court, having determined that the Defendant is indigent;

IT IS THEREFORE ORDERED that the Honorable _JAS. A. JOHNSTON, JR._ , telephone no. 214-939-9232 is hereby appointed to represent the Defendant for the purpose of a writ of habeas corpus pursuant to Article 11.071 0f the Code of Criminal Procedure.

IT IS FURTHER ORDERED that the Clerk of this Court shall immediately send a copy of the judgment in this case along with a copy of this order to the Court of Criminal Appeals in Austin, Texas.

SIGNED this _12_ day of September, 2001.

HAROLD ENTZ, JUDGE
194TH JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

00221

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE 194TH JUDICIAL |
| V. | : | DISTRICT COURT |
| JEDIDIAH ISAAC MURPHY | : | DALLAS COUNTY, TEXAS |

## ORDER REMOVING COUNSEL

Subsequent to the Court appointing the Hon. James A. Johnston, Jr., Dallas, TX, telephone no. 214-939-9232 to represent Jedidiah Isaac Murphy pursuant to Article 11.071 C.C.P., counsel apprised the Court that he had withdrawn his name from the list of attorneys authorized to represent indigent defendants in capital habeas corpus writs, therefore James A. Johnston, Jr. is removed as Attorney of Record for Jedidiah Isaac Murphy and the Hon. Robert Abbot is hereby appointed to represent the Defendant for the purpose of a writ of habeas corpus pursuant to Article 11.071 of the Texas Code of Criminal Procedure.

Signed this the 4th day of October, A.D., 2001.

Harold Entz, Judge
194th District Court
Dallas County, Texas

00222

F-00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| v. | § | DISTRICT COURT |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## ORDER APPOINTING COUNSEL
## PURSUANT TO ARTICLE 11.071 C.C.P.

The Defendant having been convicted of capital murder and sentenced to death, it is the duty of this court pursuant to Article 11.071 Of the Code of Criminal Procedure to appoint counsel for the purpose of preparing and filing a writ of habeas corpus on the defendant's behalf; and

The Court, having determined that the Defendant is indigent;

IT IS THEREFORE ORDERED that the Honorable _Robt. Abbot_ _____, telephone no. _____, is hereby appointed to represent the Defendant for the purpose of a writ of habeas corpus pursuant to Article 11.071 Of the Code of Criminal Procedure.

IT IS FURTHER ORDERED that the Clerk of this Court shall immediately send a copy of the judgment in this case along with a copy of this order to the Court of Criminal Appeals in Austin, Texas.

SIGNED this _4_ day of _Oct_ _____, 2001.

HAROLD ENTZ, JUDGE
194TH JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

06223

FILED

2001 JUL 11  AM 10: 10

*Appeals*

CAUSE NO. F00-02424-M

| | |
|---|---|
| STATE OF TEXAS | 194th JUDICIAL DISTRICT |
| V. | COURT OF |
| JEDIDIAH MURPHY | DALLAS COUNTY, TEXAS |

### DEFENDANT'S REQUEST FOR CLERK'S AND COURT REPORTER'S RECORD AND EXHIBITS ON APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, the Defendant in the above styled cause, and files this Request For Clerk's And Court Reporter's Record pursuant to the Texas Rules of Appellate Procedure, and respectfully requests that the Clerk and Court Reporter of this Honorable Court make and prepare as a part of the record in the appeal of this cause, true copies of the following items to be included in the appellate record:

1.      Indictment or criminal information.

2.      All motions and pleadings filed by the Defendant, including,

      a.      Motion For Discovery.
      b.      Motion For Production and Inspection of Evidence and Information which
              may lead to Evidence (Brady v. Maryland).
      c.      Motion For List of State's Witnesses.
      d.      Motion For Court Reporter to Transcribe Proceedings.
      e.      Motion for Election as to Punishment.
      f.      Motion For Severance.
      g.      Motion For Continuance.
      h.      Motion To Suppress Evidence.
      i.      Motion To Suppress Statements.
      j.      Motion To Suppress Extraneous Offenses.
      k.      Motion In Limine.
      l.      Exceptions To The Indictment and Motion To Quash.
      m.      Motion Challenging In Court Identification.
      n..      Application For Probation.
      o.      Motion To Disclose Identity of Informer.
      p.      All written trial objections.
      q.      Motion To Shuffle Jury Panel.
      r.      Motion For Hearing On Reputation/Character Witnesses.
      s.      Written Rule 609 request.
      t.      Motion For Change of Venue.
      u.      Motion For Instructed Verdict.

00224

3.   State's pleadings, including the Motions In Limine and all rulings of the Court.

4.   Court's docket sheet and all entries made by the Court.

5.   List of the venire persons, including the lists of the Court, State, and Defendant.

6.   The strike lists reflecting the strikes made by the state and defense, and the list of those persons who sat as jurors.

7.   Transcription of voir dire examination of the panel, including all statements and arguments of the State, defense, the Court, and the venire persons.

8.   Transcription of the hearing challenging the composition of the jury, including any Batson challenge, and the rulings of the Court thereon.

9.   Transcription of the opening statements of counsel.

10.  Transcription of the testimony of each witness, and of all evidence introduced, during all pretrial hearings and trial proceedings, including:

   a.   hearing on Defendant's Motion to Suppress.
   b.   hearings on admissibility of in court identifications.
   c.   hearings on admissibility of extraneous offenses.
   d.   hearings on admissibility of Defendant's statements.
   e.   hearings challenging the sufficiency of the indictment or information.
   f.   all hearings conducted on each defense motion.

11.  Transcription of the testimony of all witnesses and all evidence introduced at trial in the guilt/innocence and punishment phases.

12.  Transcription of the testimony of all hearings held outside the presence of the jury, including the rulings of the Court.

13.  All verbal and written communication between the jury and the Court.

14.  All communication between the Court and counsel for the State and defense.

15.  All defense objections made by the defense to the Charge of the Court, submitted to the jury during trial on the issues of guilt and punishment and all rulings of the Court.

16.  All defense requested instructions made by the defense to the charge on guilt/innocence and on punishment.

17.  All jury arguments of counsel during guilt/innocence and punishment phases.

18.  The verdicts of the jury at guilt and at punishment.

19.   All notes from the jury to the Court, all responses thereto, and all objections by the defense to any such response of the Court.

20.   A transcription of all proceedings in conjunction with any plea of guilty by the Defendant.

21.   All defense pleadings in conjunction with any plea of guilty by Defendant, including the jury waiver, plea, judicial confession, plea agreement and the Court's admonition of rights.

22.   A transcription of all hearings in connection with Defendant's probation revocation.

23.   The judgment and sentence of the Court.

24.   The Motion For New Trial and all Amended Motions For New Trial.

25.   Transcription of all hearings on Defendant's Motion and Amended Motions for New Trial and the rulings of the Court thereon.

26.   Defendant's Notice of Appeal.

27.   The original of all exhibits introduced into evidence at trial.

28.   The original of all exhibits introduced at any hearing before the Court.

29.   Defendant's affidavit of Indigency and Motion for Free Transcript.

30.   Defendant's Request for Clerk's and Court Reporter's Record and Exhibits on Appeal.

WHEREFORE, PREMISES CONSIDERED, the Defendant prays the Clerk and the Court Reporter be ordered to make and prepare the foregoing materials and include them in the appellate record in this cause on appeal.

Respectfully submitted,

Adam L. Seidel
Chateau Plaza, Suite 1400
2515 McKinney Avenue
Dallas, Texas 75201
Ph. 214-237-0835
Fax 214-237-0901
State Bar No. 17999290

00226

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was hand delivered to the District Attorney's Office, Appellate Section, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB19, Dallas, Texas, 75207, on this the 11th day of July, 2001.

Adam L. Seidel

**CAUSE NO. F00-02424-M**

STATE OF TEXAS                                            194th JUDICIAL DISTRICT

V.                                                                       COURT OF

JEDIDIAH MURPHY                                         DALLAS COUNTY, TEXAS

### <u>ORDER</u>

The foregoing Defendant's Request for Clerk's and Court Reporter's Record and
Exhibits on Appeal filed by the Defendant was properly and timely brought to the
attention of the Court and the Court finds that the same has merit. It is hereby ORDERED
that the Clerk and each Court Reporter involved in the proceedings herein make and
prepare all matters set forth in the Defendant's Request for Clerk and Court Reporter's
Record and Exhibits on Appeal, and file said matters with the Clerk of the Court of
Appeals immediately upon completion, and that the Clerk and each Court Reporter furnish
a copy of said documents to counsel for the Defendant.

Signed and entered this the _____ day of July, 2001.


_____
Judge Presiding

00228

17. All jury arguments of counsel during guilt/innocence and punishment phases.

18. The verdicts of the jury at guilt and at punishment.

19. All notes from the jury to the Court, all responses thereto, and all objections by the defense to any such response of the Court.

20. A transcription of all proceedings in conjunction with any plea of guilty by the Defendant.

21. All defense pleadings in conjunction with any plea of guilty by Defendant, including the jury waiver, plea, judicial confession, plea agreement and the Court's admonition of rights.

22. A transcription of all hearings in connection with Defendant's probation revocation.

23. The judgment and sentence of the Court.

24. The Motion For New Trial and all Amended Motions For New Trial.

25. Transcription of all hearings on Defendant's Motion and Amended Motions for New Trial and the rulings of the Court thereon.

26. Defendant's Notice of Appeal.

27. The original of all exhibits introduced into evidence at trial.

28. The original of all exhibits introduced at any hearing before the Court.

29. Defendant's affidavit of Indigency and Motion for Free Transcript.

30. Defendant's Request for Clerk's and Court Reporter's Record and Exhibits on Appeal.

Please feel free to contact me regarding any questions you may have. Thank you.

Sincerely Yours,

Adam L. Seidel

00229

s.    Written Rule 609 request.
t.    Motion For Change of Venue.
u.    Motion For Instructed Verdict.

3.    State's pleadings, including the Motions In Limine and all rulings of the Court.

4.    Court's docket sheet and all entries made by the Court.

5.    List of the venire persons, including the lists of the Court, State, and Defendant.

6.    The strike lists reflecting the strikes made by the state and defense, and the list of those persons who sat as jurors.

7.    Transcription of voir dire examination of the panel, including all statements and arguments of the State, defense, the Court, and the venire persons.

8.    Transcription of the hearing challenging the composition of the jury, including any <u>Batson</u> challenge, and the rulings of the Court thereon.

9.    Transcription of the opening statements of counsel.

10.   Transcription of the testimony of each witness, and of all evidence introduced, during all pretrial hearings and trial proceedings, including:

      a.    hearing on Defendant's Motion to Suppress.
      b.    hearings on admissibility of in court identifications.
      c.    hearings on admissibility of extraneous offenses.
      d.    hearings on admissibility of Defendant's statements.
      e.    hearings challenging the sufficiency of the indictment or information.
      f.    all hearings conducted on each defense motion.

11.   Transcription of the testimony of all witnesses and all evidence introduced at trial in the guilt/innocence and punishment phases.

12.   Transcription of the testimony of all hearings held outside the presence of the jury, including the rulings of the Court.

13.   All verbal and written communication between the jury and the Court.

14.   All communication between the Court and counsel for the State and defense.

15.   All defense objections made by the defense to the Charge of the Court, submitted to the jury during trial on the issues of guilt and punishment and all rulings of the Court

16.   All defense requested instructions made by the defense to the charge on guilt/innocence and on punishment.

**ADAM L. SEIDEL, P.C.**
ATTORNEY AND COUNSELOR AT LAW
CHATEAU PLAZA, SUITE 1400
2515 McKINNEY AVENUE
DALLAS, TEXAS 75201

ADAM L. SEIDEL

2001 JUL 11  AM 10: 10

GU... RAMLIN
DISTRICT CLERK
DALLAS CO. TEXAS
DEPUTY

PH 214-237-0835
FAX 214-237-0901

July 11, 2001

Official Court Reporter
194th Judicial District Court
Frank Crowley Courts Bldg.
133 N. Industrial Blvd.
Dallas, Texas 75207

Re: State v. Jedidiah Murphy; Cause Number F00-02424-M

To the Official Court Reporter,

Pursuant to Texas Rule of Appellate Procedure 34.6, please accept this written request on behalf of the Defendant to prepare the reporter's record accurately transcribing all trial court proceedings in the above referenced cause, including all proceedings relating to the following:

1. Indictment or criminal information.

2. All motions and pleadings filed by the Defendant, including,

   a. Motion For Discovery.
   b. Motion For Production and Inspection of Evidence and Information which may lead to Evidence (Brady v. Maryland).
   c. Motion For List of State's Witnesses.
   d. Motion For Court Reporter to Transcribe Proceedings.
   e. Motion for Election as to Punishment.
   f. Motion For Severance.
   g. Motion For Continuance.
   h. Motion To Suppress Evidence.
   i. Motion To Suppress Statements.
   j. Motion To Suppress Extraneous Offenses.
   k. Motion In Limine.
   l. Exceptions To The Indictment and Motion To Quash.
   m. Motion Challenging In Court Identification.
   n. Application For Probation.
   o. Motion To Disclose Identity of Informer.
   p. All written trial objections.
   q. Motion To Shuffle Jury Panel.
   r. Motion For Hearing On Reputation/Character Witnesses.



00231

CAUSE NO.   F00-02424M

FILED

THE STATE OF TEXAS 2001 MAY 31  AM 9: 39 )(          IN THE DISTRICT OF

    vs.          JIM HAMLIN )(          DALLAS COUNTY, TEXAS
             DISTRICT CLERK
             DALLAS CO. TEXAS
JEDIDIAH ISAAC MURPHY/TM DEPUTY )(          194TH JUDICIAL DISTRICT

<u>PEREMPTORY JURY CHALLENGE</u>

TO THE HONORABLE JUDGE OF SAID COURT:

      Jury voir dire having been completed, comes now The Defendant in the above cause and would show the Court that he does here and now exercise his peremptory challenges herein on the following jurors:

| Challenge Number | Juror Number | Name of Juror |
|---|---|---|
| 1. | #350 | M. CANNON |
| 2. | 2033 | G. SMOTHERS |
| 3. | 1123 | P. MAY |
| 4. | 1958 | J. ROBUCK |
| 5. | 1779 | J. CLINTON |
| 6. | 857 | D. LAYNE |
| 7. | 119 | D. KAPPEL |
| 8. | 77 | T. BROOKS |
| 9. | 1678 | M. CHANDLER |
| 10. | 62 | C. BOALES |
| 11. | 161 | R. WRIGHT |
| 12. | 362 | R. ADAIR |
| 13. | 403 | K. EDGE |
| 14. | 971 | P. KELLNER |
| 15. | 1026 | J. WILSON |
| 16. | 278 | K. WILLIAMS |
| 17. | 1131 | A. LONDON |
| 18. | 1115 | M. COLDITZ |

Respectfully Submitted,

*Jane Little*

Attorney for the Defendant

_____
    Harold Entz, Judge
194TH Judicial District Court

00232

FILED

2001 MAY 31  AM 9: 48

CAUSE NO.   F00-02424M

THE STATE OF TEXAS )(  IN THE DISTRICT OF

vs. )(  DALLAS COUNTY, TEXAS

JEDIDIAH ISAAC MURPHY )(  194TH JUDICIAL DISTRICT

### PEREMPTORY JURY CHALLENGE

TO THE HONORABLE JUDGE OF SAID COURT:

     Jury voir dire having been completed, comes now The State in the above cause and would show the Court that he does here and now exercise his peremptory challenges herein on the following jurors:

| Challenge Number | Juror Number | Name of Juror |
|---|---|---|
| 1. | 5 | GREG GRIFFING |
| 2. | 6 | JUDY MORTON |
| 3. | 8 | ANDREA BIGGERSTAFF |
| 4. | 10 | MICHAEL UPCHURCH |
| 5. | 11 | PATRICK SKEETERS |
| 6. | 16 | PATRICIA THRONEBERRY |
| 7. | 20 | JACK WEBB |
| 8. | 21 | LLOYD FAKER JR |
| 9. | 26 | ANNETTE MORTON |
| 10. | 33 | GLORIA SMITS |
| 11. | 39 | ORVIS REYNOLDS |
| 12. | 41 | JAMI MASSEY |
| 13. | 42 | BILL PITTILLO |
| 14. | 43 | CLARK REYNOLDS |
| 15. | 45 | WILLIAM SHERR |

Respectfully Submitted,

_____
Attorney for the State

_____
Harold Entz, Judge
194TH Judicial District Court

00233

Certification

The State of Texas                    X

County of Dallas                      X


VOL. 1:01-234

I, Jim Hamlin, Clerk of the ___194TH JUDICIAL DISTRICT COURT___ of Dallas County,

Texas do hereby certify that the documents contained in this record to which this

certification is attached are all of the documents specified by Texas Rule of

Appellate Procedure 34.5 (a) and all other documents timely requested by a party

to this proceeding under Texas Rule of Appellate Procedure 34.5 (b).


GIVEN UNDER MY HAND AND SEAL at my office in Dallas County, Texas this ___25TH___

day of _____OCTOBER_____, 20_01_.


Signature of clerk _Jane Miller_

Name of clerk ___JANE MILLER___

Title ___DEPUTY CLERK___

## MAXIMUM TIME ALLOWED

JUDGMENT_____
MNT_____

CLERK'S RECORD 60 DAYS_____ 120 DAYS_____MT_____

REPORTERS RECORD 60 DAYS _____120 DAYS_____MT_____

APPELLANT'S BRIEF_____6-3-02_____

STATE'S BRIEF_____1-23-02_____

November 7, 2001


Robert P. Abbott                Adam L. Seidel
120 S Denton Tap Road             Chateau Plaza
Suite 450C-188                  Suite 1400
Coppell, TX 75019-3225            Dallas, TX 75201


RE: Case No. 74,145
   194TH DISTRICT COURT - F00-02424-14

Style: MURPHY, JEDIDIAH ISAAC

Dear Counsel:

   The order appointing, Robert Abbott, counsel pursuant to Article 11.071, V.A.C.C.P. in the above styled and numbered cause has been received and approved by the Court.



            Sincerely yours,


            Troy C. Bennett, Jr., Clerk

            By:_____
             Deputy


cc: Jim Hamlin
    Judge Presiding
    Darline W. King
    Bill Hill

F-00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| v. | § | DISTRICT COURT |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## ORDER APPOINTING COUNSEL
## PURSUANT TO ARTICLE 11.071 C.C.P.

The Defendant having been convicted of capital murder and sentenced to death, it is the duty of this court pursuant to Article 11.071 0f the Code of Criminal Procedure to appoint counsel for the purpose of preparing and filing a writ of habeas corpus on the defendant's behalf; and

The Court, having determined that the Defendant is indigent;

IT IS THEREFORE ORDERED that the Honorable _____ *Rob T. Abbon* _____, telephone no._____, is hereby appointed to represent the Defendant for the purpose of a writ of habeas corpus pursuant to Article 11.071 0f the Code of Criminal Procedure.

IT IS FURTHER ORDERED that the Clerk of this Court shall immediately send a copy of the judgment in this case along with a copy of this order to the Court of Criminal Appeals in Austin, Texas.

SIGNED this ___4___ day of ___Oct___, 2001.

_____
HAROLD ENTZ, JUDGE
194TH JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

NOV 0 7 2001

Troy C. Bennett, Jr., Clerk

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE 194TH JUDICIAL |
| V. | : | DISTRICT COURT |
| JEDIDIAH ISAAC MURPHY | : | DALLAS COUNTY, TEXAS |

### ORDER REMOVING COUNSEL

Subsequent to the Court appointing the Hon. James A. Johnston, Jr., Dallas, TX, telephone no. 214-939-9232 to represent Jedidiah Isaac Murphy pursuant to Article 11.071 C.C.P., counsel apprised the Court that he had withdrawn his name from the list of attorneys authorized to represent indigent defendants in capital habeas corpus writs, therefore James A. Johnston, Jr. is removed as Attorney of Record for Jedidiah Isaac Murphy and the Hon. Robert Abbot is hereby appointed to represent the Defendant for the purpose of a writ of habeas corpus pursuant to Article 11.071 of the Texas Code of Criminal Procedure.

Signed this the 4th day of October, A.D., 2001.

Harold Entz, Judge
194th District Court
Dallas County, Texas

FILED IN
COURT OF CRIMINAL APPEALS
NOV 0 7 2001
Troy C. Bennett, Jr., Clerk

September 19, 2001

James A. Johnston          Adam L. Seidel
3301 Elm St.              Chateau Plaza
Dallas, TX  75226            Suite 1400
                     Dallas, TX  75201


RE: Case No. 74,145
    194TH DISTRICT COURT - F00-02424-14

Style: MURPHY, JEDIDIAH ISAAC

Dear Counsel:

    The order appointing, James A. Johnston, Jr.,  counsel pursuant to Article 11.071,
V.A.C.C.P. in the above styled and numbered cause has been
received and approved by the Court.



              Sincerely yours,


              Troy C. Bennett, Jr., Clerk

        By: _____
              Deputy


cc: Jim Hamlin
     Judge Presiding
     Darline W. King
     Bill Hill



F-00-02424-M

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE 194TH JUDICIAL** |
| **v.** | § | **DISTRICT COURT** |
| **JEDIDIAH ISAAC MURPHY** | § | **DALLAS COUNTY, TEXAS** |

### ORDER APPOINTING COUNSEL
### PURSUANT TO ARTICLE 11.071 C.C.P.

The Defendant having been convicted of capital murder and sentenced to death, it is the duty of this court pursuant to Article 11.071 0f the Code of Criminal Procedure to appoint counsel for the purpose of preparing and filing a writ of habeas corpus on the defendant's behalf; and

The Court, having determined that the Defendant is indigent;

IT IS THEREFORE ORDERED that the Honorable ___JAS. A.___ ___JOHNSTON, JR.___, telephone no. 214-939-9232 is hereby appointed to represent the Defendant for the purpose of a writ of habeas corpus pursuant to Article 11.071 0f the Code of Criminal Procedure.

**IT IS FURTHER ORDERED** that the Clerk of this Court shall immediately send a copy of the judgment in this case along with a copy of this order to the Court of Criminal Appeals in Austin, Texas.

SIGNED this ___12___ day of September, 2001.

HAROLD ENTZ, JUDGE
194TH JUDICIAL DISTRICT COURT
DALLAS COUNTY, TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

SEP 19 2001

Troy C. Bennett, Jr., Clerk

THE STATE OF TEXAS

/S.

JEDIDIAH ISAAC MURPHY

IN THE 194TH JUDICIAL DISTRICT

COURT                                OF

DALLAS COUNTY, TEXAS

### JUDGMENT ON JURY VERDICT OF GUILTY
### PUNISHMENT FIXED BY COURT OR JURY - NO PROBATION GRANTED

JULY          TERM, A.D., 2001

JUDGE PRESIDING:  HAROLD ENTZ

DATE OF JUDGMENT: 06/30/01

ATTORNEY
FOR STATE:  GREG DAVIS/MARY MILLER

ATTORNEY
FOR DEFENDANT: **JANE LITTLE, MICHAEL BYCK & JENNIFER BALIDO**

OFFENSE
CONVICTED OF:        CAPITAL MURDER

DEGREE: A CAPITAL FELONY              DATE OFFENSE COMMITTED:   10/04/00

CHARGING
INSTRUMENT: INDICTMENT              PLEA: NOT GUILTY

JURY VERDICT:        GUILTY              FOREMAN: NICHOLE MARIE BRISCOE

PLEA TO ENHANCEMENT                FINDINGS ON
PARAGRAPH(S):   N/A                ENHANCEMENT: N/A

FINDINGS ON              THE JURY FINDS  THAT  DEFENDANT HEREIN USED OR EXHIBITED
  DEADLY WEAPON,          A DEADLY  WEAPON  DURING THE  COMMISSION OF SAID
  BIAS OR PREJUDICE,      OFFENSE TO-WIT: FIREARM.
  AND/OR
  FAMILY VIOLENCE:

PUNISHMENT
ASSESSED BY:        JURY   —  **SEE SPECIAL ISSUES ATTACHED HERETO AND
                               INCORPORATED BY REFERENCE.**

DATE SENTENCE
IMPOSED:        06/30/01                              COSTS: YES

PUNISHMENT AND   **DEATH**
PLACE OF
CONFINEMENT: CONFINEMENT  IN  THE  INSTITUTIONAL DIVISION   DATE TO
             OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE  COMMENCE:   06/30/01
             AND A FINE OF — 0 —

TIME CREDITED: 101600-063001                  RESTITUTION/REPARATION: NO

CONCURRENT UNLESS OTHERWISE SPECIFIED.

PA                                              VOL. 475  PAGE 106

ON THIS DAY, SET F' 'TH ABOVE, THE ABOVE STYLED AND NUMBERED CAUSE CAME TO TRIAL. THE STATE APPEARED BY HER DISTRICT ATTORNEY, THROUGH THE ABOVE-NAMED ATTORNEYS AND ANNOUNCED READY FOR TRIAL. DEFENDANT APPEARED IN PERSON IN OPEN COURT. WHERE DEFENDANT WAS NOT REPRESENTED BY COUNSEL, DEFENDANT KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY WAIVED THE RIGHT TO REPRESENTATION BY COUNSEL. WHERE SHOWN ABOVE THAT THE CHARGING INSTRUMENT WAS BY INFORMATION INSTEAD OF INDICTMENT, THE DEFENDANT DID, WITH THE CONSENT AND APPROVAL OF HIS ATTORNEY WAIVE HIS RIGHT TO PROSECUTION BY INDICTMENT AND AGREE TO BE TRIED ON AN INFORMATION; ALL SUCH WAIVERS, AGREEMENTS AND CONSENTS WERE IN WRITING AND FILED IN THE PAPERS OF THIS CAUSE PRIOR TO THE DEFENDANT ENTERING HIS PLEA HEREIN. DEFENDANT IN OPEN COURT WAS DULY ARRAIGNED, AND ENTERED THE ABOVE SHOWN PLEA. WHERE SHOWN ABOVE THAT DEFENDANT ENTERED A PLEA OF GUILTY, DEFENDANT WAS ASDMONISHED BY THE COURT OF THE CONSEQUENCES OF THE SAID PLEA AND DEFENDANT PERSISTED IN ENTERING SAID PLEA, AND IT PLAINLY APPEARING TO THE COURT THAT DEFENDANT IS MENTALLY COMPETENT AND SAID PLEA IS FREE AND VOLUNTARY, THE SAID PLEA WAS ACCEPTED BY THE COURT AND IS NOW ENTERED OF RECORD AS THE PLEA HEREIN OF DEFENDANT. THEREUPON A JURY WAS DULY SELECTED, IMPANELED AND SWORN, WHO, HAVING HEARD THE CHARGING INSTRUMENT, AS SHOWN ABOVE PRESENTED, AND DEFENDANT'S PLEA THERETO, AND HAVING HEARD THE EVIDENCE SUBMITTED, AND HAVING BEEN DULY CHARGED BY THE COURT AS TO THEIR DUTY TO DETERMINE THE GUILT OR INNOCENCE OF THE DEFENDANT AND AFTER HAVING HEARD THE ARGUMENTS OF COUNSEL, RETIRED IN CHARGE OF THE PROPER OFFICER TO CONSIDER OF THEIR VERDICT, AND AFTERWARD WERE BROUGHT INTO OPEN COURT, BY THE PROPER OFFICER, DEFENDANT AND HIS COUNSEL BEING PRESENT, AND IN DUE FORM OF LAW RETURNED INTO OPEN COURT THE ABOVE SHOWN VERDICT, WHICH WAS RECEIVED AND ACCEPTED BY THE COURT, AND IS HERE AND NOW ENTERED UPON THE MINUTES OF THE COURT.

AND WHEN SHOWN ABOVE THAT THE CHARGING INSTRUMENT CONTAINS ENHANCE-MENT PARAGRAPHS(S), WHICH WERE NOT WAIVED OR DISMISSED, THE COURT, AFTER HEARING THE DEFENDANT'S PLEA TO SAID PARAGRAPH(S) AS SET OUT ABOVE AND AFTER HEARING FURTHER EVIDENCE ON THE ISSUE OF PUNISHMENT, THE COURT, OR JURY, MAKES ITS FINDING AS SET OUT ABOVE, IF TRUE, THE COURT, OR JURY, IS OF THE OPINION AND FINDS DEFENDANT HAS BEEN HERETOFORE CONVICTED OF SAID OFFENSE(S) ALLEGED IN THE SAID ENHANCEMENT PARAGRAPH(S) AS MAY BE SHOWN ABOVE.

WHEN IT IS SHOWN ABOVE THE DEFENDANT IS GUILTY OF THE OFFENSE SET FORTH ABOVE, IT IS CONSIDERED BY THE COURT THAT SAID DEFENDANT IS ADJUDGED TO BE GUILTY OF THE OFFENSE SET FORTH ABOVE, AND THAT DEFENDANT COM-MITTED THE OFFENSE ON THE DATE SET FORTH ABOVE AS CHARGED IN THE INSTRUMENT SHOWN ABOVE, AND THAT DEFENDANT WAS PREVIOUSLY CONVICTED WHEN SHOWN ABOVE IN THE MANNER ABOVE, AND THAT SAID DEFENDANT BE PUNISHED AS HAS BEEN DETERMINED, SAID PUNISHMENT BEING ASSESSED BY THE ABOVE SHOWN ASSESSOR OF PUNISHMENT, AS ELECTED IN WRITING BY DEFENDANT, AND BE CONFINED IN THE PLACE OF CONFINEMENT SHOWN ABOVE FOR THE TERM OF TIME SET FORTH ABOVE, AND THAT THE STATE OF TEXAS DO HAVE AND RECOVER OF THE SAID DEFENDANT ALL COSTS IN THIS PROSECUTION EXPENDED INCLUDING ANY FINE SHOWN FOR WHICH LET EXECUTION ISSUE. THE COURT FURTHER MAKES ITS FINDING AS TO DEADLY WEAPON AS SET FORTH ABOVE BASED UPON THE JURY'S VERDICT OR THE FINDINGS OF THE COURT WHEN PUNISHMENT FIXED BY THE COURT. THE COURT MAKES ITS FINDINGS AS TO FAMILY VIOLENCE AND BIAS OR PREJUDICE AS SET FORTH ABOVE.

WHEN IT IS SHOWN ABOVE THAT RESTITUTION HAS BEEN ORDERED, BUT THE COURT DETERMINES THAT THE INCLUSION OF THE VICTIM'S NAME AND ADDRESS IN THE JUDGMENT IS NOT IN THE BEST INTEREST OF THE VICTIM, THE PERSON OR AGENCY WHOSE NAME AND ADDRESS IS SET OUT IN THIS JUDGMENT WILL ACCEPT AND FORWARD THE RESTITUTION PAYMENTS TO THE VICTIM.

AND WHEN IT IS SHOWN BELOW THAT PAYMENT OF THE COSTS OF LEGAL SERVICES PROVIDED TO THE DEFENDANT IN THIS CAUSE HAS BEEN ORDERED, THE COURT FINDS THAT THE DEFENDANT HAS THE FINANCIAL RESOURCES TO ENABLE THE DEFENDANT TO OFFSET SAID COSTS IN THE AMOUNT ORDERED.

THEREUPON THE SAID DEFENDANT WAS ASKED BY THE COURT WHETHER HE HAD ANYTHING TO SAY WHY SAID SENTENCE SHOULD NOT BE PRONOUNCED AGAINST HIM, AND HE ANSWERED NOTHING IN BAR THEREOF, AND IT APPEARING TO THE COURT THAT THE DEFENDANT IS MENTALLY COMPETENT AND UNDERSTANDING OF THE PROCEEDINGS.

IT IS THEREFORE, CONSIDERED AND ORDERED BY THE COURT, IN THE PRESENCE OF DEFENDANT, AND HIS ATTORNEY, THAT SAID JUDGMENT AS SET FORTH ABOVE, IS HEREBY IN ALL THINGS APPROVED AND CONFIRMED, AND THAT DEFENDANT, WHO HAS

BEEN ADJUDGED GUILTY OF THE ABOVE NAMED OFFENSE, AS SHOWN ABOVE, AND WHOSE PUNISHMENT HAS BEEN ASSESSED AS SHOWN ABOVE, IT IS THE ORDER OF THE COURT THAT SAID DEFENDANT BE PUNISHED IN ACCORDANCE WITH THE PUNISHMENT SET FORTH ABOVE, AND THAT DEFENDANT SHALL BE DELIVERED BY THE SHERIFF TO THE DIRECTOR OF THE INSTITUTIONAL DIVISION OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE, OR OTHER PERSON LEGALLY AUTHORIZED TO RECEIVE SUCH CONVICTS FOR THE PUNISHMENT ASSESSED HEREIN, AND SAID DEFENDANT SHALL BE CONFINED FOR THE ABOVE-NAMED TERM IN ACCORDANCE WITH THE PROVISIONS OF LAW GOVERNING SUCH PUNISHMENTS. IT IS FURTHER ORDERED THAT THE DEFENDANT PAY THE FINE, COURT COSTS, COSTS AND EXPENSES OF LEGAL SERVICES PROVIDED BY THE COURT APPOINTED ATTORNEY IN THIS CAUSE, IF ANY, AND RESTITUTION OR REPARATION, AS SET FORTH HEREIN, FOR WHICH LET EXECUTION ISSUE.

DEFENDANT IS HEREBY ORDERED REMANDED TO JAIL UNTIL SAID SHERIFF CAN OBEY THE DIRECTIONS OF THE JUDGMENT.

FOLLOWING THE DISPOSITION OF THIS CAUSE THE DEFENDANT'S FINGERPRINT WAS, IN OPEN COURT, PLACED UPON A CERTIFICATE OF FINGERPRINT. SAID CERTIFICATE IS ATTACHED HERETO AND IS INCORPORATED BY REFERENCE AS A PART OF THIS JUDGMENT.

WHEN REQUIRED, A PRESENTENCE INVESTIGATION WAS CONDUCTED IN ACCORDANCE WITH THE APPLICABLE PROVISIONS OF LAW.

DEFENDANT EXCEPTS AND GIVES NOTICE OF APPEAL TO THE COURT OF APPEALS, FIFTH DISTRICT OF TEXAS AT DALLAS.

COURT COSTS IN THE AMOUNT OF $242.25

*Immediately upon release, defendant must report in person to the Felony Collections Dept., 2nd fl., Rm. C2-3, Crowley Courts Bldg., Dallas, TX, for payment arrangement of court ordered costs, fines and/or attorney fees.

JUDGE PRESIDING

JUDGMENT

CERTIFICATE OF THUMBPRINT

CAUSE NO. *F00 02424M*

THE STATE OF TEXAS

VS.

*JEDIDIAH ISAAC MURPHY*

_____



Right
Thumb*

Defendant's *RIGHT* hand

THIS IS TO CERTIFY THAT THE FINGERPRINTS ABOVE ARE THE ABOVE-
NAMED DEFENDANT'S FINGERPRINTS TAKEN AT THE TIME OF DISPOSITION
OF THE ABOVE STYLED AND NUMBERED CAUSE.

DONE IN COURT THIS *30* DAY OF *June* ,2001.

_____
BAILIFF/DEPUTY SHERIFF

*Indicate here if print other than defendant's right thumbprint
is placed in box:

☐  left thumbprint          ☐  left/right index finger

☐  other, _____

IN THE 194TH JUDICIAL DISTRICT COURT

OF DALLAS COUNTY, TEXAS

THE STATE OF TEXAS

VS.                                    CAUSE NO. F00-02424-M

JEDIDIAH ISAAC MURPHY

### CHARGE OF THE COURT

MEMBERS OF THE JURY:

The defendant, Jedidiah Isaac Murphy, has been found guilty by you of the offense of capital murder. You are instructed that a sentence of life confinement or death is mandatory on conviction for capital murder. In order for the Court to assess the proper punishment, two questions or special issues are submitted to you. Before answering these questions or special issues, you will consider the following instructions:

The burden of proof in this phase of the trial is on the State as to Special Issue 1; and the State has the burden of proof to prove beyond a reasonable doubt that the answer to Special Issue 1 submitted to the jury should be "Yes". The jury may not answer the Special Issue 1 "Yes" unless the jury agrees unanimously on such answer. Further, you may not answer this Special Issue 1 "No" unless (10) or more jurors agree. It is not necessary that members of the jury agree on what particular evidence supports a negative answer - that is, an answer of "No" - to Special Issue 1.

Special Issue 1 has been submitted to you requiring the State to prove the issue beyond a reasonable doubt, and on the issue of reasonable doubt you are instructed as follows:

A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that makes a reasonable person hesitate to act in the most important of his affairs.

Proof beyond a reasonable doubt must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

In the event that you have a reasonable doubt as to the issue under consideration by you, you will find against the State on that issue and not consider the testimony relating to that issue for any purpose.

The jury may not answer Special Issue 2 "No" unless the jury agrees unanimously on such answer. The jury may not answer Special Issue 2 "Yes" unless ten or more jurors agree. It is not necessary that members of the jury agree on what particular evidence supports an affirmative answer - that is, an answer of "Yes" - to Special Issue 2. In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

In answering the Special Issues hereinafter submitted, you may consider all of the evidence admitted during the first phase of the trial, before your verdict of guilty, as well as all of the evidence admitted during the second phase of the trial.

In arriving at the answers to the issues submitted, it will not be proper for you to fix the same by lot or chance or any other method than a full, fair, and free exchange of the opinion of each individual juror.

You are further instructed that if there is testimony before you in this case regarding the defendant having committed other acts or participated in other transactions other than the offense alleged against him in the indictment in this case, that you cannot consider such other acts or transactions, if any, unless you first find beyond a reasonable doubt, as that term has heretofore been defined, that the defendant committed such acts or participated in such transactions, if any, but if you do not so believe, or if you have a reasonable doubt thereof, you will not consider such testimony for any purpose.

In deciding whether the defendant committed any alleged unadjudicated extraneous offenses or bad acts, the jury must not consider the fact that the defendant committed the capital murder alleged in the indictment. That is, you should not presume that the defendant has a propensity to commit

criminal acts generally, merely because you have convicted him of capital murder.  The state must proved to you that the defendant committed any unadjudicated extraneous offense beyond a reasonable doubt.

Furthermore, if you find that the defendant committed one or more unadjudicated extraneous offenses, you must not consider that fact in deciding whether he committed other unadjudicated extraneous offenses alleged by the state.

Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded a defendant; and, in the event he elects not to testify, that fact cannot be taken as a circumstance against him.

In this case, the defendant has elected not to testify; and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him.

Under the law applicable in this case, if the defendant is sentenced to imprisonment in the Institutional Division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without conderation of any good conduct time.  It cannot accurately be predicted how the parole laws might be applied to

this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligiblity for parole does not guarantee that parole will be granted.

You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling in considering all the evidence before you and in answering the special issues.

After reading this charge, you shall not be permitted to separate from each other, nor shall you talk with anyone not of your jury.  After argument of counsel, you will retire and consider your answers to the issues submitted to you.  It is the duty of your presiding juror to preside in the jury room and vote with you on the answers to the issues submitted.

You have been permitted to take notes during the testimony in this case.  In the event any of you took notes, you may rely on your notes during your deliberations.  However, you may not share your notes with the other jurors and you should not permit the other jurors to share their notes with you.  You may, however, discuss the contents of your notes with the other jurors. You shall not use your notes as authority to persuade your fellow jurors.  In your deliberations, give no more and no less weight to the views of a fellow juror just because that juror did or did not take notes.  Your notes are

not official transcripts. They are personal memory aids, just like the notes of the judge and the notes of the lawyers. Notes are valuable as a stimulant to your memory.  On the other hand, you might make an error in observing or you might make a mistake in recording what you have seen or heard.  Therefore, you are not to use your notes as authority to persuade fellow jurors of what the evidence was during the trial.

Occasionally, during jury deliberations, a dispute arises as to the testimony presented.  If this should occur in this case, you shall inform the Court and request that the Court read the portion of disputed testimony to you from the official transcript.  You shall not rely on your notes to resolve the dispute because those notes, if any, are not official transcripts.  The dispute must be settled by the official transcript, for it is the official transcript, rather than any juror's notes, upon which you must base your determination of the facts and, ultimately, your verdict in this case.

After you have retired, you may communicate with this Court in writing through the bailiff who has you in charge. Your written communication must be signed by the presiding juror. Do not attempt to talk to the bailiff, the attorneys, or the Court regarding any question you may have concerning the trial of the case. After you have reached a verdict or if you desire to communicate with the Court, please use the jury call button on the wall and one of the bailiffs will respond.

_____
F. HAROLD ENTZ, JR., JUDGE
194th Judicial District Court
Dallas County, Texas

FILED
2001 JUN 30 AM 8:51
JIM HAMLIN
DISTRICT CLERK
DALLAS CO., TEXAS

The Special Issues, with the forms for your answers, are as follows:

### SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society?

### ANSWER TO SPECIAL ISSUE NO. 1

We, the Jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "Yes."

_Nichole Marie Briscoe_
Presiding Juror


We, the Jury because at least ten (10) jurors have a reasonable doubt as to the matter inquired about in this Special Issue, find and determine that the answer to this special issue is "No."

_____
Presiding Juror

You are to answer the following issue <u>only if</u> you have returned an affirmative finding on Special Issue No. 1 above.

Concerning Special Issue 2, you are instructed that neither the Defendant nor the State bears the burden to prove or disprove the existence of mitigating circumstances.  Neither does our law assign a standard of proof on the existence of mitigating circumstances.

<u>SPECIAL ISSUE NO. 2</u>

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

You are instructed that in answering this issue, you shall answer this issue "Yes" or "No."  You may not answer the issue "No" unless the jury unanimously agree, and you may not answer the issue "Yes" unless ten or more jurors agree. The jury need not agree on what particular evidence supports an affirmative finding on this issue.  The jury shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.

## ANSWER TO SPECIAL ISSUE NO. 2

We, the Jury, unanimously find that the answer to this Special Issue is "No."

_____
Presiding Juror

We, the Jury, because at least ten (10) jurors agree as to the matter inquired about in this Special Issue, find that the answer to this Special Issue is "Yes."

_____
Presiding Juror

## VERDICT OF THE JURY

We, the Jury, having answered the foregoing issues, return the same into Court as our verdict.

_____
Presiding Juror



**DALLAS COUNTY**
DISTRICT ATTORNEY
BILL HILL

February 14, 2003

Troy C. Bennett, Jr., Clerk
Court of Criminal Appeals
P.O. Box 12308
Capitol Station
Austin, Texas 78711

<div align="right">

**FILED IN**
**COURT OF CRIMINAL APPEALS**

FEB 1 8 2003

Troy C. Bennett, Jr., Clerk

</div>

Re:   *Jedidiah Isaac Murphy v. State*
      No. 74,145

Mr. Bennett:

The State files this supplemental letter brief to correct an assertion the State made in its previously filed brief in response to appellant's tenth point of error.

In his tenth point of error, appellant complained that the trial court failed to file findings of fact and conclusions of law as required by article 38.22, section 6 of the criminal procedure code. On June 6, 2002, this Court ordered the trial court to prepare and file such findings. The Court also ordered the trial court clerk to prepare and forward a supplemental clerk's record containing the findings and conclusions.

The undersigned counsel for the State responded to appellant's tenth point of error believing this Court had received a supplemental clerk's record containing the court's findings and conclusions. Counsel has since learned that, instead of forwarding a supplemental record, the trial court sent this Court a letter on June 24, 2003, citing the location in the previously filed reporter's record where the findings and conclusions may be found.

In short, the trial court chose to dictate its findings and conclusions to the court reporter during trial rather than prepare a separate written order. (RR48: 74-75). That recitation satisfies the requirements of article 38.22, section 6. *See Parr v. State*, 658 S.W.2d 620 (Tex. Crim. App. 1983). Therefore, notwithstanding this correction, the State still maintains appellant's tenth point of error is moot.

**ORIGINAL**

Frank Crowley Courts Building,  LB 19,  Dallas, Texas  75207-4399                    [214] 653-3600

Respectfully submitted,

*Lisa B. Smith*

Lisa Braxton Smith
Assistant District Attorney
Dallas County
SBT 00787131


c:      Adam Seidel
        Chateau Plaza, Suite 1400
        2515 McKinney Ave.
        Dallas, Texas 75201

**ADAM L. SEIDEL**
ATTORNEY AND COUNSELOR AT LAW
CHATEAU PLAZA, SUITE 1400
2515 MCKINNEY AVENUE
DALLAS, TEXAS 75201

BOARD CERTIFIED IN CRIMINAL LAW BY THE
TEXAS BOARD OF LEGAL SPECIALIZATION AND
BY THE NATIONAL BOARD OF TRIAL ADVOCACY

OFFICE 214-528-3344
FACSIMILE 214-528-3377

February 13, 2002

Troy C. Bennett, Jr., Clerk
Court of Criminal Appeals
P.O. Box 12308, Capitol Station
Austin, Texas 78711

Re: No. 74,145; Jedidiah Murphy v. State

Dear Mr. Bennett:

Please be advised that Appellant desires oral argument in the above referenced case, and intends to argue Points of Error Nos. 1 and 10 raised in Appellant's Brief.

FILED IN
COURT OF CRIMINAL APPEALS

FEB 1 9 2003

Troy C. Bennett, Jr., Clerk

Sincerely yours,

Adam L. Seidel

cc:    Bill Hill
       District Attorney



**DALLAS COUNTY**
DISTRICT ATTORNEY
BILL HILL

February 14, 2003

Honorable Troy Bennett, Jr., Clerk
Court of Criminal Appeals
P.O. Box 12308, Capital Station
Austin, Texas 78711-2548

*FILED IN*
*COURT OF CRIMINAL APPEALS*

*FEB 1 8 2003*

*Troy C. Bennett, Jr., Clerk*

Re:  *Jedidiah Isaac Murphy v. State*
      Appeal No. 74,145

Mr. Bennett:

The State requests oral argument in the above-cited case scheduled for submission on March 6, 2003 at 1:30 p.m.  Counsel for the State will argue only those issues that defense counsel expresses his intent to focus on.

Sincerely,

*Lisa B. Smith*

Lisa Braxton Smith
SBT# 00787131
Assistant District Attorney
Appellate Division
Dallas County, Texas

cc:     Adam L. Seidel
        Chateau Plaza, Suite 1400
        2515 McKinney Avenue
        Dallas, Texas 75201



**SHARON KELLER**
PRESIDING JUDGE

**LAWRENCE E. MEYERS**
**TOM PRICE**
**PAUL WOMACK**
**CHERYL JOHNSON**
**MIKE KEASLER**
**BARBARA P. HERVEY**
**CHARLES R. HOLCOMB**
**CATHY COCHRAN**
JUDGES

# COURT OF CRIMINAL APPEALS
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

**TROY C. BENNETT, JR.**
CLERK
512 463-1551

**RICHARD E. WETZEL**
GENERAL COUNSEL
512 463-1600

FEBRUARY 6, 2003

ADAM L. SEIDEL
ATTORNEY AT LAW
2515 MCKINNEY AVENUE
DALLAS, TEXAS 75201

BILL HILL
DISTRICT ATTORNEY
133 N. INDUSTRIAL BLVD LB 19
DALLAS, TEXAS 75207-4399

No. 74,145
Trial Court No.   F00-2424-M

STYLED:   JEDIDIAH ISAAC MURPHY V. THE STATE OF TEXAS

Dear Counselors:

The above case is set for submission to the Court on **THURSDAY**, **MARCH 6, 2003 at 1:30 P.M.** *The Court will be hearing oral arguments at the SMU School of Law.*

ORAL ARGUMENT IS PERMITTED.

All parties **shall** notify the Clerk of this Court, in writing, within **10 days** after the date of this notice, **whether or not** oral argument is desired. **If oral argument is desired,** a party **must** include in this notice which points of error will be argued.

Requesting arguments on briefs or pleadings is NOT sufficient. **FAILURE TO SEND THE PROPER WRITTEN REQUEST WITHIN THE TIME PERIOD SET OUT ABOVE WILL CONSTITUTE A WAIVER OF ORAL ARGUMENT.** You will not be further contacted regarding this matter.

-2-

**Twenty minutes will be permitted for each party properly requesting oral argument.** Oral argument is not the Court's first exposure to a case as bench memorandums setting forth the points of error, the authorities relied upon, the facts, etc. are prepared for each argued case and distributed to every judge. Prepare your argument with this in mind. **The Court appreciates brevity.**

Sincerely,

TROY C. BENNETT, JR.
Clerk

By: _____
          Chief Deputy Clerk

cc:     Judge Presiding
        Jim Hamlin
        Robert P. Abbott



**DALLAS COUNTY**
DISTRICT ATTORNEY
BILL HILL

February 14, 2003

Troy C. Bennett, Jr., Clerk
Court of Criminal Appeals
P.O. Box 12308
Capitol Station
Austin, Texas 78711

Re:   *Jedidiah Isaac Murphy v. State*
      No. 74,145

Mr. Bennett:

The State files this supplemental letter brief to correct an assertion the State made in its previously filed brief in response to appellant's tenth point of error.

In his tenth point of error, appellant complained that the trial court failed to file findings of fact and conclusions of law as required by article 38.22, section 6 of the criminal procedure code. On June 6, 2002, this Court ordered the trial court to prepare and file such findings. The Court also ordered the trial court clerk to prepare and forward a supplemental clerk's record containing the findings and conclusions.

The undersigned counsel for the State responded to appellant's tenth point of error believing this Court had received a supplemental clerk's record containing the court's findings and conclusions. Counsel has since learned that, instead of forwarding a supplemental record, the trial court sent this Court a letter on June 24, 2003, citing the location in the previously filed reporter's record where the findings and conclusions may be found.

In short, the trial court chose to dictate its findings and conclusions to the court reporter during trial rather than prepare a separate written order. (RR48: 74-75). That recitation satisfies the requirements of article 38.22, section 6. *See Parr v. State*, 658 S.W.2d 620 (Tex. Crim. App. 1983). Therefore, notwithstanding this correction, the State still maintains appellant's tenth point of error is moot.



Frank Crowley Courts Building, LB 19, Dallas, Texas 75207-4399                    [214] 653-3600

Respectfully submitted,

*Lisa B. Smith*

Lisa Braxton Smith
Assistant District Attorney
Dallas County
SBT 00787131

c:    Adam Seidel
       Chateau Plaza, Suite 1400
       2515 McKinney Ave.
       Dallas, Texas 75201

July 30, 2002

Robert P. Abbott
120 S Denton Tap Road
Suite 450C-188
Coppell, TX  75019-3225

Adam L. Seidel
Chateau Plaza
Suite 1400
2515 McKinney Avenue
Dallas, TX  75201

RE: Case No. 74,145
    194TH DISTRICT COURT - F00-02424-14

Style: MURPHY, JEDIDIAH ISAAC

Dear Counsel:

ORDER

The State's Motion for Extension of time within which to file
the State's brief was granted. The time for filing the state's
brief has been extended to 12-20-02.

Sincerely yours,

Troy C. Bennett, Jr., Clerk

By:_____
    Deputy

cc: Jim Hamlin
    Judge Presiding
    Bill Hill

**NO. 74,145**

| | | |
|---|---|---|
| JEDIDIAH MURPHY | § | IN THE TEXAS COURT OF |
| V. | § | CRIMINAL APPEALS |
| THE STATE OF TEXAS | § | AT AUSTIN, TEXAS |

## STATE'S MOTION FOR EXTENSION OF TIME TO FILE BRIEF

**TO THE HONORABLE JUDGES OF SAID COURT:**

THE STATE OF TEXAS, by and through the Criminal District Attorney of Dallas County, respectfully requests that the time for filing the State's brief be extended. In support of this motion, the State would show the following:

I.

Appellant was convicted of capital murder in the 194th Judicial District Court of Dallas County, Texas, and sentenced to death. Appeal to this Court is automatic. Appellant filed his brief on June 27, 2002, and the State's brief is due on July 27, 2002.

II.

The State requests an extension of time of 146 days, until December 20, 2002. No previous extension of time has been requested by the State in this case.

III.

The State relies on the following grounds to reasonably explain its need for an extension:

FILED IN
COURT OF CRIMINAL APPEALS

JUL 3 0 2002

Troy C. Bennett, Jr., Clerk

**ORIGINAL**

(1) Since appellant filed his brief, undersigned counsel has prepared the State's response direct appeal brief in *Hugo Ordonez Tapia v. State* (05-01-01675-CR), *Arturo Lopez v. State* (05-01-01869 through 05-01-01873-CR), and *John Edwards v. State* (08-01-00417-CR).

(2) Counsel must file the State's brief in *Tarrance Whitlock v. State* (0066-42) in which this Court granted petition for discretionary review. The State's response is due July 31, 2002.

(3) Counsel is currently assigned to prepare the State's brief on direct appeal in *Eric Ray Martinez v. State* (05-01-01770-CR and 05-01-01771-CR), due August 16, 2002.

(4) Counsel must prepare the State's response to applicant's original application for writ of habeas corpus in *Leon David Dorsey v. State* (W98-69472-L(A)), a death penalty case. Undersigned counsel anticipates the State's writ response in this case will be due November 29, 2002.

(5) Counsel reviews Governor's warrants for the extradition of fugitives and represents the State at hearings concerning applications for writs of habeas corpus concerning extraditions. Counsel reviews several warrants a month and cannot anticipate or predict the number of cases requiring a hearing.

(6) Lastly, counsel is assisting in the prosecution of Joseph Garcia, one of the seven Texas prison escapees charged with the Christmas Eve murder of Irving police officer Aubrey Hawkins. Jury selection in *Joseph Garcia v. State* is scheduled to begin in November 2002.

WHEREFORE, PREMISES CONSIDERED, the State respectfully requests that the time for filing the State's brief be extended until December 20, 2002.

Respectfully submitted,

By: *Lisa B. Smith*

Lisa Braxton Smith
Assistant District Attorney
State Bar No. 00787131
Frank Crowley Courts Bldg,
133 N. Industrial Blvd., LB 19
Dallas, Texas 75207-4399
(214) 653-3638
(214) 653-3643 (FAX)

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of this motion has been served on Adam Seidel, attorney for appellant, Chateau Plaza, Ste. 1400, Dallas, Texas 75201 by depositing same in the United States mail, postage paid, on July 23, 2002.

*Lisa B. Smith*

Lisa Braxton Smith

NO. 74,145

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

---

JEDIDIAH ISSAC MURPHY,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

**FILED IN**
**COURT OF CRIMINAL APPEALS**

JUN 2 7 2002

Troy C. Bennett, Jr., Clerk

---

## APPELLANT'S MOTION FOR
## EXTENSION OF TIME TO FILE APPELLANT'S BRIEF

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

COMES NOW, the Appellant and respectfully requests that the Court extend the

time for filing the Appellant's Brief, and would respectfully show the following:

I.

1.    Trial Court: 194th Judicial District Court, Dallas County, Texas.
2.    Date of Judgement and Sentence: June 30, 2001.
3.    Trial Court Cause Number: F00-02424-M
4.    Style of Cause: State v. Jedidiah Issac Murphy
5.    Offense: Capital Murder.
6.    Punishment Assessed: Death
7.    Date Motion for New Trial Filed: July 27, 2001.
8.    Date Notice of Appeal Filed: June 30, 2001.
9.    Deadline For Filing Document: June 3, 2002.
10.   Number of Extension Previously Granted: 1.

11.     Facts relied upon to explain the need for an extension:

    a.      On May 29, 2002, counsel mailed a motion to abate the appeal, seeking
            remand to the trial court for written findings of fact and conclusions of law.
            This Honorable Court granted the motion to abate, in part, by ordering the
            trial court judge to supplement the record. However, Appellant's Motion to
            Extend the deadline for filing Appellant's Brief was denied. Counsel then
            completed and mailed Appellant's Brief on June 24, 2002.

        WHEREFORE, PREMISES CONSIDERED, Appellant prays this Honorable
Court grant the foregoing Motion and extend the time for filing Appellant's Brief.

                                    Respectfully Submitted,


                                    _____
                                    Adam L. Seidel
                                    Chateau Plaza, Suite 1400
                                    2515 McKinney Avenue
                                    Dallas, Texas 75219
                                    ph. 214-237-0835
                                    fax 214-237-0901
                                    State Bar No. 17999290

                                    COUNSEL FOR APPELLANT



SHARON KELLER
PRESIDING JUDGE

LAWRENCE E. MEYERS
TOM PRICE
PAUL WOMACK
CHERYL JOHNSON
MIKE KEASLER
BARBARA P. HERVEY
CHARLES R. HOLCOMB
CATHY COCHRAN
JUDGES

# COURT OF CRIMINAL APPEALS
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

TROY C. BENNETT, JR.
CLERK
512 463-1551

RICHARD E. WETZEL
GENERAL COUNSEL
512 463-1600

Adam L. Seidel
Chateau Plaza, Suite 1400
2515 Mckinney Avenue
Dallas, Texas 75201

Dear Mr. Seidel:

Enclosed please find the trial court's response to this Court's order dated June 6, 2002.  Please call if you have any questions.

Very truly yours,

Abel Acosta
Chief Deputy Clerk



**HAROLD ENTZ, JUDGE**

ONE HUNDRED NINETY FOURTH

JUDICIAL DISTRICT COURT

FRANK CROWLEY CRIMINAL COURTS BUILDING

133 NORTH INDUSTRIAL BOULEVARD, LB 26

DALLAS, TEXAS 75207-4313

RECEIVED IN
COURT OF CRIMINAL APPEALS

JUN 24 2002

June 19, 2002

Troy C. Bennett, Jr., Clerk

Mr. Troy C. Bennett, Jr.
Clerk, Court of Criminal Appeals
P.O. Box 12308, Capitol Station
Austin, TX  78711

RE:  No. 74,145
Jedidiah Isaac Murphy v. The State of Texas

Members of the Court:

In response to your *per curiam* order dated June 6, 2002, I call your attention to Volume 48, pages 74 and 75.

Sincerely,

F. Harold Entz

dkl/FHE



# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. 74,145

### JEDIDIAH ISAAC MURPHY, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM DALLAS COUNTY

*The order was entered per curiam.*

### ORDER

The above-styled and numbered cause is pending before this Court as a result of appellant's capital murder conviction and resulting sentence of death in the 194th District Court of Dallas County, Cause No. F00-02424-NM, styled The State of Texas v. Jedidiah Isaac Murphy. Appellant has filed a motion to abate the appeal and remand for the trial court to file findings of fact and conclusions of law as required by Article 38.22, Section 6 of the Texas Code of Criminal Procedure.

Upon due consideration, appellant's motion is granted to the extent that the trial

Murphy – 2

court is directed to prepare and file findings of fact and conclusions of law as required by

Article 38.22, Section 6. The trial court clerk must then prepare, certify, and file in this

Court a supplemental clerk's record containing the findings and conclusions. This

supplemental clerk's record is to be filed within 30 days of the date of this order. *See*

TEX. R. APP. P. 34.5(c).

IT IS SO ORDERED THIS THE 6th DAY OF JUNE, 2002.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed via first class mail to the Appellate Division, Dallas County District Attorney's Office, Frank Crowley Court's Building, 133 N. Industrial Blvd., LB19, Dallas, Texas, 75207, on this the 24th day of June 2002.

Adam L. Seidel

NO. 74,145

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

---

JEDIDIAH ISSAC MURPHY,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

**FILED IN**
**COURT OF CRIMINAL APPEALS**

MAY 3 1 2002

**Troy C. Bennett, Jr., Clerk**

---

## APPELLANT'S MOTION TO ABATE APPEAL AND FOR REMAND FOR FINDINGS OF FACT AMD CONCLUSIONS OF LAW

TO THE HONORABLE TEXAS COURT OF CRIMINAL APPEALS:

COMES NOW Appellant Jedidiah Issac Murphy, by and through appointed counsel on appeal, and files this motion requesting that this appeal be abated and remanded to the trial court, and would respectfully show as follows:

I.

Prior to trial in this case, Appellant filed pretrial motions seeking to suppress oral statements made by Appellant after his arrest, as well as the written statement signed by Appellant while in police custody. (Clerk's Record, Vol. I, p.11). On June 5, 2001, the trial

-1-

court held a hearing outside the jury's presence in which evidence was presented regarding oral incriminating statements made by Appellant after his arrest, and regarding the written voluntary statement signed by Appellant while in police custody. Appellant testified and disputed the evidence offered by the State. (Reporter's Record, volumes 45 & 48). In Appellant's oral statements, he told officers where the complainant's body was located. In his written statement, he admitted shooting the complainant, but explained that the shooting was accidental. The trial court denied Appellant's motion to suppress the oral and written statements and the State offered the statements into evidence. However, the Clerk's Record contains no written findings of fact and conclusions of law entered by the trial court. Apparently, the trial court judge never made written findings of fact and conclusions of law resolving the disputed evidence related to Appellant's oral and written statements. Therefore, Appellant respectfully requests that the appeal be abated and the case be remanded to the trial court for findings of fact and conclusions of law with regard to the admissibility of 1.) the oral statements made by Appellant after he was arrested and placed in handcuffs, and 2.) the written statement signed by Appellant and offered into evidence as State's Exhibit No. 47.

<div align="center">II.</div>

### *Applicable Law*

The determination of whether a statement is voluntary is a mixed question of law and fact, i.e., an application of law to a fact question. *Garcia v. State,* 15 S.W.2d 533 (Tex. Crim. App. 2000).

<div align="center">-2-</div>

TEX. CODE. CRIM. PROC. art. 38.22, § 6 provides in relevant part:

> In all cases where a question is raised as to the voluntariness of
> a statement of an accused, the court must make an independent
> finding in the absence of the jury as to whether the statement
> was made under voluntary conditions. If the statement has been
> found to have been voluntarily made and held admissible as a
> matter of law and fact by the court in a hearing in the absence
> of the jury, the court must enter an order stating its conclusion
> as to whether or not the statement was voluntarily made, along
> with the specific finding of facts upon which the conclusion was
> based, which order shall be filed among the papers of the cause.

"[D]etermination by the trial judge of the defendant's confession prior to its admission

in evidence is a constitutional and statutory requirement, and such determination must

distinctly appear in the record." *McKittrick v. State*, 535 S.W.2d 873, 875 (Tex. Crim. App.

1976), *citing, Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964); *Sims

v. Georgia*, 385 U.S. 538, 87 S. Ct. 639, 17 L. Ed. 2d 593 (1967); Article 38.22, § 6,

V.A.C.C.P., supra. Article 38.22, § 6, supra, is mandatory in its language and requires a

trial court to file its findings of fact and conclusions of law regarding the voluntariness of a

confession whether or not the defendant objects to the absence of such omitted filing.

*Wicker v. State*, 740 S.W.2d 779 (Tex. Crim. App. 1987), *cert. denied*, 485 U.S. 938, 108

S. Ct. 1117, 99 L. Ed. 2d 278 (1988), *citing, McKittrick v. State*, supra, at 876; *Dykes v.

State*, 649 S.W.2d 633, 636 (Tex. Crim. App. 1983). The procedures used in the trial court

to determine the voluntariness of a defendant's confession must "be fully adequate to insure

a reliable and clear-cut determination of the voluntariness of the confession, including the

resolution of the disputed facts upon which the voluntariness may depend." *Jackson v.

-3-

*Denno*, 378 U.S. at 391, 84 S. Ct. at 1788, 12 L. Ed. 2d at 924. In *Wicker*, this Court stated:

> [w]hether the trial court files findings insufficient in detail to allow an appellate court to resolve the dispute upon which an appealing party predicates his appeal, as in *Hester v. State*, supra, and *Quinn v. State*, 558 S.W.2d 10 (Tex. Crim. App. 1977), or no findings are made to support the ruling of the trial court on the voluntariness issue, as in *Figueroa v. State*, 473 S.W.2d 202 (Tex. Crim. App. 1971); *Davis v. State*, 499 S.W.2d 303 (Tex. Crim. App. 1973) (opinion on original submission); *McKittrick v. State*, supra, the duty of the appellate court is clear. The proper procedure is that the appeal will be abated and the trial judge will be directed to reduce to writing his findings on the disputed issues surrounding the taking of appellant's confession. *McKittrick v. State*, supra, at 876; *Bonham v. State*, 644 S.W.2d 5, 8 (Tex. Crim. App. 1983).

*Wicker*, 740 S.W.2d at 784.

Appellant therefore respectfully requests that this Honorable Court abate this appeal and remand the case, ordering the trial court to enter findings of fact and conclusions of law with regard to the voluntariness of Appellant's oral and written statements, and that the record thereafter be supplemented with the written findings and conclusions made by the trial court judge.

WHEREFORE, PREMISES CONSIDERED, Appellant prays this Court grant the foregoing motion to abate and remand this case to the trial court for entry of written findings of fact and conclusions of law.

Respectfully submitted,

Adam L. Seidel
Chateau Plaza, Suite 1400
2515 McKinney Avenue
Dallas, Texas 75201
ph (214) 528-3344
fax (214) 528-3377
State Bar No. 17999290

Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing motion was mailed to the Appellate Division, Dallas County District Attorney's Office, Frank Crowley Courts Building, 133 N. Industrial Blvd., LB19, Dallas, Texas, on this the 29th day of May, 2002.

_____
Adam L. Seidel

## CERTIFICATE OF APPELLATE COUNSEL

I hereby certify that the foregoing motion was deposited postage prepaid in the United States Mail, first class, in an envelope properly addressed to the Clerk, Texas Court of Criminal Appeals, P.O. Box 12308, Capital Station, Austin, Texas, 78711, on this the 29th day of May, 2002.

_____
Adam L. Seidel

COURT OF CRIMINAL APPEALS
P.O. BOX 12308, CAPITOL STATION
AUSTIN, TEXAS 78711

January 9, 2002

SHARON KELLER
PRESIDING JUDGE

LAWRENCE E. MEYERS
TOM PRICE
PAUL WOMACK
CHERYL JOHNSON
MIKE KEASLER
BARBARA P. HERVEY
CHARLES R. HOLCOMB
CATHY COCHRAN
JUDGES

TROY C. BENNETT, JR.
CLERK
512 463-1551

RICHARD E. WETZEL
GENERAL COUNSEL
512 463-1600

Jedidiah Isaac Murphy
TDC #999392
Polunsky Unit
12002 FM 350 South
Livingston, TX   77351

Re:   Our Cause No. 74,145

Dear Mr. Murphy:

The Court is in receipt of your correspondence dated January 2, 2002.  The record on appeal in your capital murder conviction has been filed.  The brief by your counsel is currently due on June 3, 2002.

The direct appeal of capital murder convictions is mandated by statute.  An appeal must take place.  Therefore, you will not be permitted to end the appellate proceedings.

In the event you no longer desire to be represented by counsel, arrangements can be made for you to represent yourself on appeal.  In any case, you cannot waive the appeal.

Thank you for your attention and cooperation in this matter.

Sincerely,

Richard E. Wetzel
General Counsel

REW/bh

cc:    Robert P. Abbott
Attorney at Law
120 South Denton Tap, Ste. 450-C-188
Coppell, TX 75019-3225

Bill Hill
    Attn: Lori Ordiway
District Attorney
Dallas County
Appellate Section
133 N. Industrial, LB 19
Dallas, TX 75207

June 5, 2002

Robert P. Abbott                    Adam L. Seidel
120 S Denton Tap Road               Chateau Plaza
Suite 450C-188                      Suite 1400
Coppell, TX 75019-3225              2515 McKinney Avenue
                                    Dallas, TX 75201


RE: Case No. 74,145
    194TH DISTRICT COURT - F00-02424-14

Style: MURPHY, JEDIDIAH ISAAC

Dear Counsel:

     The Appellant's motion for extension of time within
which to file the appellant's brief is denied.


                         Sincerely yours,

                         Troy C Bennett Jr., Clerk

                    By: _____
                         Deputy


cc: Jim Hamlin
     Judge Presiding
     Bill Hill

Denied
6-5-02
P.C.

NO. 74,145

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

JUN  5 2002

Troy C. Bennett, Jr., Clerk

JEDIDIAH ISSAC MURPHY,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

**APPELLANT'S SECOND MOTION FOR
EXTENSION OF TIME TO FILE APPELLANT'S BRIEF**

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

COMES NOW, the Appellant and respectfully requests that the Court extend the

time for filing the Appellant's Brief, and would respectfully show the following:

I.

1.    Trial Court: 194th Judicial District Court, Dallas County, Texas.
2.    Date of Judgement and Sentence: June 30, 2001.
3.    Trial Court Cause Number: F00-02424-M
4.    Style of Cause: State v. Jedidiah Issac Murphy
5.    Offense: Capital Murder.
6.    Punishment Assessed: Death
7.    Date Motion for New Trial Filed: July 27, 2001.
8.    Date Notice of Appeal Filed: June 30, 2001.
9.    Deadline For Filing Document: June 3, 2002.
10.   Number of Extension Previously Granted: 1.

11.   Facts relied upon to explain the need for an extension:

a.   On May 29, 2002, counsel mailed a motion to abate the appeal, seeking remand to the trial court for written findings of fact and conclusions of law. Appellant therefore seeks an extension of time in which to file Appellant's Brief to a time after which the trial court has supplemented the record in this case.

WHEREFORE, PREMISES CONSIDERED, Appellant prays this Honorable Court grant the foregoing Motion and extend the time for filing Appellant's Brief.

Respectfully Submitted,

Adam L. Seidel
Chateau Plaza, Suite 1400
2515 McKinney Avenue
Dallas, Texas 75219
ph. 214-237-0835
fax 214-237-0901
State Bar No. 17999290

COUNSEL FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed via first class mail to the Appellate Division, Dallas County District Attorney's Office, Frank Crowley Court's Building, 133 N. Industrial Blvd., LB19, Dallas, Texas, 75207, on this the 3rd day of June 2002.

Adam L. Seidel

Jedidiah I. Murphy
Polunsky Unit #999392
12002 F.M.350 South
Livingston, Texas 77351


Texas Court Of Criminal Appeals
Court Clerk, Troy C. Bennett, Jr.
Box 12308
Capital Station
Austin, Texas 78711


RE: Death Penalty Case
    NO. F00-02424-M


January 02, 2002

Mr. Bennett:

    Counselor Robert P. Abbott has been appointed to re-
present my case on Direct Appeal. Enclosed is my letter
to Counselor Abbott asking that these procedures end be-
fore they get too far along.

    I think the letter is self-explanatory. Please see
to it that the Judges be made aware of my decision. I
thank you for your time and please notify me if there is
anything else that I am required to do.


*Jedidiah I. Murphy*

Jedidiah Isaac Murphy
T.D.C.J. #999392

CERTIFIED MAIL #7000 1670 0002 9511 5495

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN 8 2002

Troy C. Bennett, Jr., Clerk


g.w.

Mr. Jesus Ledesma Aguilar
Polunsky Unit #999392
12002 F.M.350 South
Livingston, Texas 77351

Honorable Robert P. Abbott
Attorney at Law
120 South Denton Tap, Suite 450C-188
Coppell, Texas 75019-3225

RE: Cause NO. F00-02424-M on Appeal
    Notification of dismissal of appellate procedures

January 02, 2002

RECEIVED IN
COURT OF CRIMINAL APPEALS

JAN   8 2002

Troy C. Bennett, Jr., Clerk

Counselor Abbott:

    This is a form letter that I am sending out to the
respective addresses that I have listed on a separate page
and have included in this envelope.

    With a sound mind, I have given my situation consid-
erable thought and have reached the following conclusion;
I wish to end these appellate proceedings so that my sent-
ence of death, by leathal injection, may be carried out as
soon as practicable.

    I have underwent psychological and sociological eval-
uations to prove that I was competent to stand trial. Also,
there is an I.Q. test that I took and scored at least aver-
age or better.

    I submit this information for reference and proof as
to my continued competence and that this request be carried
out posthaste.

    I wrote a confession to this crime at the very onset
on any investigations. This confession was not used against
my interests, nor was it ever entered as evidence. I refer
to this statement to show that I have never tried to duck
responsibility for my actions.

    I have had my day in court. I was afforded the oppor-
tunity to testify. I was represented by competent counsel
during trial proceedings. I had investigators assigned to
my case. I was allowed to cross-examine all witnesses that
were against me. I had a fair trial.

PAGE 1 of 3

Being convicted of Capital Murder, a jury of my peers have decided that I deserve death by leathal injection. I am ready to accept their decision without further delay.

[If] any Motions are required to be entered to the Texas Court of Criminal Appeals on this matter, I do now authorize my respective appellate attorneys to do so on my behalf. I at least need to be notified, with expedience, that Motions are required in order to end these appellate procedures.

The above and foregoing are my thoughts and wishes. In no way have I been coerced nor am I under any duress from anyone concerning this decision. My signature and right thumb print below signifies authenticity of this letter.

CERTIFIED MAIL #7000 1670 0002 9511 5075

*Jedidiah S. Murphy*
Jedidiah Isaac Murphy
T.D.C.J. #999392


Right Thumb

g.w.

PAGE 2 of 3

cc:   TEXAS COURT OF CRIMINAL APPEALS
      Court Clerk, Troy C. Bennett, Jr.
      Box 12308
      Capital Station
      Austin, Texas 78711

      Bill Hill
      District Attorney Dallas County
      Attn: Lori Ordiway
      Appellate Section
      133 N. Industrial, LB 19
      Dallas, Texas 75207

      Jim Hamlin
      District Clerk Dallas County
      Frank Crowley Courts Bldg.
      133 N. Industrial Blvd. LB 12
      Dallas, Texas 75207-4313

      Gena Bunn
      Assistant Attorney Gerneral
      Capitol Litigation
      Price Daniel, Sr. Building
      Austin, Texas 78711

      Honorable Harold Entz
      Presiding Judge Criminal District Court#194
      Dallas County
      133 N. Industrial Blvd.
      Dallas, Texas 75207

      Adam L. Seidel P.C.
      Appellate Counsel
      Chateau Plaza, Suite 1400
      2515 M$^C$Kinney Avenue
      Dallas, Texas 75201

g.w.

PAGE 3 of 3

November 5, 2001

James A. Johnston      Adam L. Seidel
3301 Elm St.          Chateau Plaza
Dallas, TX 75226     Suite 1400
               Dallas, TX 75201

RE: Case No. 74,145
     194TH DISTRICT COURT - F00-02424-14

Style: MURPHY, JEDIDIAH ISAAC

Dear Counsel:

     I have this day received and filed the Clerk's Record in
the above-styled and numbered cause.  The Reporter's Record is
due on 06-03-02.

            Sincerely yours,

            Troy C. Bennett, Jr., Clerk

            By:
            Deputy

cc: Jim Hamlin
     Judge Presiding
     Darline W. King
     Bill Hill

NO. <u>74,145</u>

In the

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

---

JEDIDIAH ISSAC MURPHY,
APPELLANT

VS.

THE STATE OF TEXAS,
APPELLEE

---

## MOTION FOR EXTENSION OF <u>TIME TO FILE APPELLANT'S BRIEF</u>

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

COMES NOW, the Appellant and respectfully requests that the Court extend the

time for filing the Appellant's Brief, and would respectfully show the following:

I.

1. Trial Court: 194th Judicial District Court, Dallas County, Texas.
2. Date of Judgement and Sentence: June 30, 2001.
3. Trial Court Cause Number: F00-02424-M
4. Style of Cause: State v. Jedidiah Issac Murphy
5. Offense: Capital Murder.
6. Punishment Assessed: Death
7. Date Motion for New Trial Filed: July 27, 2001.
8. Date Notice of Appeal Filed: June 30, 2001.
9. Deadline For Filing Document: January 4, 2002.
10. Length of Time Requested for Extension: 6 months.

FILED IN
COURT OF CRIMINAL APPEALS

JAN 3 2002

Troy C. Bennett, Jr., Clerk

11.     Number of Extension Previously Granted: 0.

12.     Facts relied upon to explain the need for an extension:

   a.     This is the direct appeal of a death penalty case. The reporter's record
          contains sixty-five volumes. Counsel asserts that the above requested
          extension of time is necessary to adequately review the entire record
          and prepare Appellant's Brief.

        WHEREFORE, PREMISES CONSIDERED, Appellant prays this Honorable
Court grant the foregoing Motion and extend the time for filing Appellant's Brief to July
4, 2002.

                                        Respectfully Submitted,


                                        _Adam Seidel_____
                                        Adam L. Seidel
                                        Chateau Plaza, Suite 1400
                                        2515 McKinney Avenue
                                        Dallas, Texas 75219
                                        ph. 214-237-0835
                                        fax 214-237-0901
                                        State Bar No. 17999290

                                        COUNSEL FOR APPELLANT

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed via first class mail to the Appellate Division, Dallas County District Attorney's Office, Frank Crowley Court's Building, 133 N. Industrial Blvd., LB19, Dallas, Texas, 75207, on this the 28th day of December 2001.

_____

Adam L. Seidel

December 5, 2001

Robert P. Abbott  Adam L. Seidel
120 S Denton Tap Road  Chateau Plaza
Suite 450C-188  Suite 1400
Coppell, TX 75019-3225  Dallas, TX 75201

RE: Case No. 74,145
 194TH DISTRICT COURT - F00-02424-14

Style: MURPHY, JEDIDIAH ISAAC

Dear Counsel:

 I have this day received and filed the Reporter's Record in the above-styled and numbered cause. The appellant's brief is due on 01-04-02.

   Sincerely yours,

   Troy C. Bennett, Jr., Clerk

   By:
    Deputy

cc: Jim Hamlin
 Judge Presiding
 Darline W. King
 Bill Hill

11-05-01
GRANTED
12-3-01 ℐ. ℒ.



**DARLINE W. LABAR, CSR**
**OFFICIAL COURT REPORTER**
**194TH JUDICIAL DISTRICT COURT**
**FRANK CROWLEY COURTS BUILDING**
**133 N. INDUSTRIAL BLVD. LB 26**
**DALLAS, TEXAS 75207-4313**
(214) 653-5802
FAX (214) 653-5805

October 29th, 2001

Court of Criminal Appeals
Troy C. Bennett, Jr., Clerk
Supreme Court Building
201 W. 14th Street
Austin, Texas  78721

**FILED IN**
**COURT OF CRIMINAL APPEALS**

NOV 0 5 2001

Troy C. Bennett, Jr., Clerk

RE:   Extension for filing Reporter's Record
      The State of Texas vs. Jedidiah Isaac Murphy
      Trial Court Number F00-02424-NM

Dear Mr. Bennett:

Please accept this letter as an Extension for filing the Reporter's Record in the above trial court cause number.   The sentencing date on the above case was June 30th, 2001, with a Motion for New Trial Filed, making the Reporter's Record due October 29th, 2001.

This record is a death penalty capital murder trial and will be 65 Volumes, totalling approximately 6,400 pages.   I have been unable to complete the record within the time allowed due to its size and other obligations.   The record is in its final preparation and I would respecfully request until December 3rd, 2001 to file the reporter's record.

Sincerely,

Darline W. LaBar, CSR

dkl/file

November 5, 2001

James A. Johnston                    Adam L. Seidel
3301 Elm St.                         Chateau Plaza
Dallas, TX  75226                    Suite 1400
                         Dallas, TX  75201


RE: Case No. 74,145
    194TH DISTRICT COURT - F00-02424-14

Style: MURPHY, JEDIDIAH ISAAC

Dear Counsel:

    The Motion for Extension of Time to File the Reporter's
Record has been granted.  The time for filing has been extended
to 12-03-01.


                    Sincerely yours,


                    Troy C. Bennett, Jr., Clerk

                    By:_____
                    Deputy


cc: Jim Hamlin
    Judge Presiding
    Darline W. King
    Bill Hill

November 5, 2001

James A. Johnston            Adam L. Seidel
3301 Elm St.                 Chateau Plaza
Dallas, TX 75226             Suite 1400
                             Dallas, TX 75201

RE: Case No. 74,145
    194TH DISTRICT COURT - F00-02424-14

Style: MURPHY, JEDIDIAH ISAAC

Dear Counsel:

    I have this day received and filed the Clerk's Record in
the above-styled and numbered cause.

                    Sincerely yours,

                    Troy C. Bennett, Jr., Clerk

                    By:_____
                      Deputy

cc: Jim Hamlin
    Judge Presiding
    Darline W. King
    Bill Hill

JUDGMENT / SENTENCE DATE _June 30, 2001_
MOTION FOR NEW TRIAL FILED __ YES __ NO __ DATE _7-30-01_

Deputy District Clerk

COURT OF APPEALS

AUG 1 5 2001

LISA MATZ
CLERK, 5th DISTRICT

RECEIVED
COURT OF APPEALS
AUG 1 5 2001
LISA MATZ, **DRAWER #40**
CLERK, 5th DISTRICT

THE STATE OF TEXAS

LISA MATZ
CLERK, 5th DISTRICT

VS.

_Jedidiah Isaac Murphy_

CAUSE NO. _F00-02424-M_

_Judicial_ DISTRICT COURT _194_

DALLAS COUNTY, TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

### DEFENDANT'S NOTICE OF APPEAL AND PAUPER OATH

SEP 1 0 2001

#### APPOINTMENT OF ATTORNEY ON APPEAL

Troy C. Bennett, Jr., Clerk

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now Defendant in the above cause and states: I am the defendant in the above cause; I was convicted in this cause and now give Notice of Appeal to the Texas Court of Appeals for the Fifth Supreme Judicial District of Texas at Dallas, Texas, and that I am penniless, destitute and indigent person, too poor to employ counsel to represent me on the appeal, and too poor to pay for or give security for the Statement of Facts and a true copy thereof herein.

WHEREFORE, I pray that the Court will appoint an attorney to represent me in this appeal and that the Court will order the Court Reporter of this Court to prepare and deliver to me or my appointed Counsel the original and a true copy of the Statement of Facts in this case, together with all exhibits attached thereto if practical.

x _Jedidiah S. Murphy_
Defendant

BEFORE ME, the undersigned authority, personally appeared the above Defendant, known to me to be the person whose signature appears above, and after being duly sworn on oath states that he is the defendant in the above cause, and that the matters and things set forth in the foregoing are true and correct in all things.

**BILL LONG
DISTRICT CLERK**
Dallas County, Texas

FILED
JUN 30 2001
JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
_____ DEPUTY

By _Alexander_
Deputy District Clerk

#### ORDER

214-231-0835

The Defendant having requested the Court to appoint Counsel,

it is Ordered the Honorable _ADAM SEIDEL_

Address _2515 McKinney Suite 1400 Dallas, TX 75201_
a regular licensed and practicing attorney of Texas, be, and he is hereby appointed to represent Defendant in prosecuting his appeal herein, and it is further Ordered that the Court Reporter is hereby directed to transcribe all of the notes as same may appertain to this cause and as taken during the trial of this cause which began on

_February 26, 2001_, and make Statement of Facts in duplicate and furnish same to Defendant or his appointed Counsel.

_____
Judge

Called Adam

ADAM 40

RECEIVED IN
COURT OF APPEALS, 5th Dist.

AUG 2 1 2001

LISA MATZ
CLERK, 5th DISTRICT

THE STATE OF TEXAS

VS.

JEDIDIAH ISAAC MURPHY

IN THE 194TH JUDICIAL DISTRICT

COURT

OF

DALLAS COUNTY, TEXAS

JUDGMENT ON JURY VERDICT OF GUILTY
PUNISHMENT FIXED BY COURT OR JURY - NO PROBATION GRANTED

JUDGE PRESIDING: HAROLD ENTZ

JULY       TERM, A.D., 2001

DATE OF JUDGMENT: 06/30/01

ATTORNEY
FOR STATE:   GREG DAVIS/MARY MILLER

ATTORNEY
FOR DEFENDANT: JANE LITTLE, MICHAEL BYCK &
JOHN GARROLD

FILED IN
COURT OF CRIMINAL APPEALS

SEP 1 0 2001

Troy C. Bennett, Jr., Clerk

OFFENSE
CONVICTED OF:          CAPITAL MURDER

DEGREE: A CAPITAL FELONY

DATE OFFENSE COMMITTED:   10/04/00

CHARGING
INSTRUMENT: INDICTMENT

PLEA: NOT GUILTY

JURY VERDICT:          GUILTY

FOREMAN: NICHOLE MARIE BRISCOE

PLEA TO ENHANCEMENT
PARAGRAPH(S):   N/A

FINDINGS ON
ENHANCEMENT: N/A

FINDINGS ON
DEADLY WEAPON,
BIAS OR PREJUDICE,
AND/OR
FAMILY VIOLENCE:

THE JURY FINDS THAT DEFENDANT HEREIN USED OR EXHIBITED
A DEADLY WEAPON DURING THE COMMISSION OF SAID
OFFENSE TO-WIT: FIREARM.

PUNISHMENT
ASSESSED BY:          JURY     -   SEE SPECIAL ISSUES ATTACHED HERETO AND
INCORPORATED BY REFERENCE.

DATE SENTENCE
IMPOSED:          06/30/01

COSTS: YES

PUNISHMENT AND     DEATH
PLACE OF
CONFINEMENT: CONFINEMENT  IN  THE  INSTITUTIONAL DIVISION   DATE TO
OF THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE   COMMENCE:   06/30/01
AND A FINE OF - 0 -

TIME CREDITED: 101600-063001

RESTITUTION/REPARATION: NO

CONCURRENT UNLESS OTHERWISE SPECIFIED.

FA

VOL. 475   PAGE 106

Fax the report To 214 145 1-8-.

If any question call   214 712 3422

\*\* Transmit Conf. Report \*\*

P.1                                    Aug 21 2001  8:58

| Fax/Phone Number | Mode | Start | Time | Page | Result | Note |
|---|---|---|---|---|---|---|
| 18882867128 | NORMAL | 21, 8:58 | 1'31" | 4 | * O K | |

**J I M  H A M L I N**
**D A L L A S  C O U N T Y  D I S T R I C T  C L E R K**

## FACSIMILE TRANSMISSION SHEET

Date: _8-21-01_                    Fax Number: _____

Company faxed to: _5ᵗʰ Ct of APPEALS_

Contact Person: _KATHY HENDERSON_

From: _Jane Miller_

Comments: _As Requested - Judgment_
_Showing · Death ·_

Number of pages (excluding cover sheet): _1_

If you do not receive all pages, please call (214) 653-5969.

133 North Industrial Blvd., Dallas, Texas 75207-4313
Telephone: (214) 653-5969   Fax: (214) 653-5986
E-Mail: jhamlin@dallascounty.org
Web Site: www.dallascounty.org/distclerk/index.html



**FILED IN**
**COURT OF CRIMINAL APPEALS**

## Court of Appeals
### Fifth District of Texas at Dallas

SEP 10 2001

Troy C. Bennett, Jr., Clerk

## JUDGMENT

JEDIDIAH ISAAC MURPHY, Appellant

No. 05-01-01294-CR          V.

THE STATE OF TEXAS, Appellee

Appeal from the 194th Judicial District Court of Dallas County, Texas. (Tr.Ct.No. F00-02424-M).

Opinion delivered by Justice FitzGerald, Justices Kinkeade and Wright participating.

Based on the Court's opinion of this date, we **DISMISS** the appeal for want of jurisdiction.

The Clerk of this Court is **ORDERED** to forward all documents filed in this case with this Court to the Court of Criminal Appeals.

Judgment entered August 28, 2001.

KERRY P. FITZGERALD
JUSTICE

DISMISS and Opinion Filed August 28, 2001

FILED IN
COURT OF CRIMINAL APPEALS

SEP 1 0 2001

Troy C. Bennett, Jr., Clerk



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-01-01294-CR

### JEDIDIAH ISAAC MURPHY, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 194th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F00-02424-M**

## MEMORANDUM OPINION

Before Justices Kinkeade, Wright, and FitzGerald
Opinion By Justice FitzGerald

A jury convicted Jedidiah Isaac Murphy of capital murder. Sentence of death was imposed. Appellant filed a notice of appeal, which was forwarded to this Court and docketed as cause no. 05-01-01294-CR. We have no jurisdiction over criminal cases in which the death penalty has been assessed. *See* TEX. CODE CRIM. PROC. ANN. art. 4.03 (Vernon Supp. 2001). "The judgment of conviction and sentence of death shall be subject to automatic review by the Court of Criminal Appeals." *Id.* art. 37.071(h). Accordingly, we dismiss the appeal for want of jurisdiction.

KERRY FITZGERALD
JUSTICE

Do Not Publish
TEX. R. APP. P. 47