1
REPORTER'S RECORD

**74145**

2
VOLUME 1 OF 65 VOLUMES

3
TRIAL COURT CAUSE NO. F00-02424-NM

4
THE STATE OF TEXAS                    :          IN THE DISTRICT COURT

5
VS.                                   :          DALLAS COUNTY, TEXAS

6
JEDIDIAH ISAAC MURPHY                 :          194TH JUDICIAL DISTRICT

7
********************       FILED IN
                           COURT OF CRIMINAL APPEALS

8
MASTER INDEX              DEC  5 2001

9
********************  Troy C. Bennett, Jr., Clerk

10
A P P E A R A N C E S:

11
HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building

12
        Dallas, Dallas County, Texas  75207
        Phone:  214-653-3600

13
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200

14
            FOR THE STATE OF TEXAS;

15
MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500

16
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office

17
        Phone:  214-653-9400
            FOR THE DEFENDANT.

18

19
                    *********

20
        On the 26th day of February, through the 30th day of

21
June, 2001, the following proceedings came on to be heard in

22
the above-entitled and numbered cause before the Honorable F.

23
Harold Entz, Jr., Judge presiding, held in Dallas, Dallas

24
County, Texas:  Proceedings reported by machine shorthand,

25
computer assisted transcription.

ORIGINAL

```
 1                          INDEX

 2   VOLUME 1 - MASTER INDEX                    PAGE      VOL.

 3   Reporter's Certificate.......................... 53        1

 4   VOLUME 2 - February 26th, 2001             PAGE      VOL.

 5   Proceedings..................................... 2         2

 6   Reporter's Certificate.......................... 4         2

 7   VOLUME 3 - March 2nd, 2001                 PAGE      VOL.

 8   GENERAL VOIR DIRE:

 9   Proceedings..................................... 2         3

10   Potential Panel Sworn........................... 5         3

11   Reporter's Certificate.......................... 69        3

12   VOLUME 4 - March 8th, 2001                 PAGE      VOL.

13   Proceedings..................................... 2         4

14   Arraignment By Mr. Davis........................ 28        4

15   Reporter's Certificate.......................... 30        4

16   VOLUME 5 - March 12th, 2001                PAGE      VOL.

17   INDIVIDUAL VOIR DIRE:

18   Proceedings..................................... 2         5

19   State no challenge for cause - Ms. Nisbet........ 65        5

20   Defense no challenge for cause - Ms. Nisbet...... 65        5

21   Emilia Juror Nisbet Prospective Juror No. 1...... 67        5

22   Reporter's Certificate.......................... 72        5

23   VOLUME 6 - March 13th, 2001                PAGE      VOL.

24   INDIVIDUAL VOIR DIRE:

25   Proceedings..................................... 2         6
```

1    Ms. Parker Excused From Consideration............ 16         6

2    State no challenge for cause - Ms. Jennings...... 71         6

3    Defense no challenge for cause - Ms. Jennings.... 71         6

4    Dorothy Jennings Prospective Juror No. 2......... 71         6

5    Reporter's Certificate........................... 74         6

6    VOLUME 7 - March 14th, 2001                   PAGE      VOL.

7    INDIVIDUAL VOIR DIRE:

8    Proceedings...................................... 2          7

9    Mr. Woodard Excused From Consideration........... 11         7

10   State no challenge for cause - Ms. Hunter........ 58         7

11   Defense no challenge for cause - Ms. Hunter...... 58         7

12   Kathy Hunter Prospective Juror No. 3............. 58         7

13   Reporter's Certificate........................... 61         7

14   VOLUME 8 - March 15th, 2001                   PAGE      VOL.

15   INDIVIDUAL VOIR DIRE:

16   Proceedings...................................... 2          8

17   Ms. Broome Excused From Consideration............ 15         8

18   Reporter's Certificate........................... 16         8

19   VOLUME 9 - March 19th, 2001                   PAGE      VOL.

20   INDIVIDUAL VOIR DIRE:

21   Proceedings...................................... 2          9

22   Ms. Stevens Excused From Consideration........... 15         9

23   Reporter's Certificate........................... 16         9

24   VOLUME 10 - March 20th, 2001                  PAGE      VOL.

25   INDIVIDUAL VOIR DIRE:

| # | | | |
|---|---|---|---|
| 1 | Proceedings...................................... 2 | 10 |
| 2 | State no challenge for cause - Mr. Cannon........ 74 | 10 |
| 3 | Defense challenge for cause - Mr. Cannon......... 74 | 10 |
| 4 | Challenge for Cause Denied....................... 76 | 10 |
| 5 | Marlin Cannon Prospective Juror No. 4............ 76 | 10 |
| 6 | State no challenge for cause - Mr. Griffing..... 118 | 10 |
| 7 | Defense no challenge for cause- Mr. Griffing.... 118 | 10 |
| 8 | Gregory Griffing Prospective Juror No. 5........ 118 | 10 |
| 9 | Reporter's Certificate.......................... 121 | 10 |
| 10 | VOLUME 11 - March 21st, 2001              PAGE    VOL. |
| 11 | INDIVIDUAL VOIR DIRE: |
| 12 | Proceedings...................................... 2 | 11 |
| 13 | Ms. Lacy Excused From Consideration............. 23 | 11 |
| 14 | Reporter's Certificate.......................... 27 | 11 |
| 15 | VOLUME 12 - March 22nd, 2001              PAGE    VOL. |
| 16 | INDIVIDUAL VOIR DIRE: |
| 17 | Proceedings...................................... 2 | 12 |
| 18 | State challenge for cause - Ms. Treat........... 50 | 12 |
| 19 | Court Grants Challenge for Cause................ 52 | 12 |
| 20 | Additional Challenge for Cause - Mr. Cannon...... 54 | 12 |
| 21 | Ms. Lawrence Excused from Consideration......... 65 | 12 |
| 22 | State challenge for cause - Ms. Foard.......... 118 | 12 |
| 23 | Challenge for Cause Granted.................... 118 | 12 |
| 24 | Ms. Hampson Excused From Consideration......... 131 | 12 |
| 25 | Reporter's Certificate......................... 132 | 12 |

1    VOLUME 13 - March 29th, 2001        PAGE    VOL.

2    INDIVIDUAL VOIR DIRE:

3    Proceedings.................................... 2      13

4    Mr. Lamoreaux Excused From Consideration........ 37     13

5    Mr. Marsh Excused From Consideration............ 49     13

6    Ms. Clark Excused From Consideration............ 64     13

7    Mr. Leewright Excused From Consideration........ 68     13

8    Reporter's Certificate.......................... 69     13

9    VOLUME 14 - April 2nd, 2001        PAGE    VOL.

10    INDIVIDUAL VOIR DIRE:

11    Proceedings.................................... 2      14

12    State no challenge for cause - Ms. Morton........ 59     14

13    Defense challenge for cause - Ms. Morton........ 59     14

14    Challenge for cause denied...................... 60     14

15    Judy Morton Prospective Juror No. 6............. 60     14

16    State no challenge for cause - Mr. Smothers..... 104    14

17    Defense challenge for cause - Mr. Smothers...... 104    14

18    Challenge for Cause Denied...................... 104    14

19    Gerald Smothers Prospective Juror No. 7......... 104    14

20    Mr. Sandlin Excused From Consideration......... 111    14

21    Reporter's Certificate......................... 112    14

22    VOLUME 15 - April 3rd, 2001        PAGE    VOL.

23    INDIVIDUAL VOIR DIRE:

24    Proceedings.................................... 2      15

25    State no challenge for cause Ms. Biggerstaff..... 50    15

1    Defense no challenge for cause Ms. Biggerstaff... 50        15

2    Andrea Biggerstaff Prospective Juror No. 8....... 51        15

3    State no challenge for cause - Ms. Briscoe....... 89        15

4    Defense no challenge for cause Ms. Briscoe....... 89        15

5    Nichole Briscoe Prospective Juror No. 9.......... 89        15

6    Reporter's Certificate........................... 92        15

7    VOLUME 16 - April 4th, 2001                      PAGE     VOL.

8    INDIVIDUAL VOIR DIRE:

9    Proceedings...................................... 2        16

10   State no challenge for cause - Mr. Upchurch...... 57        16

11   Defense no challenge for cause Mr. Upchurch...... 57        16

12   Michael Upchurch Prospective Juror No. 10........ 57        16

13   State no challenge for cause - Mr. Skeeters...... 97        16

14   Defense no challenge for cause Mr. Skeeters...... 97        16

15   Patrick Skeeters Prospective Juror No. 11........ 97        16

16   Reporter's Certificate........................... 100       16

17   VOLUME 17 - April 5th, 2001                      PAGE     VOL.

18   INDIVIDUAL VOIR DIRE:

19   Proceedings...................................... 2        17

20   Ms. McLarty Excused From Consideration........... 15        17

21   State no challenge for cause - Mr. Cooper........ 56        17

22   Defense challenge for cause - Mr. Cooper......... 58        17

23   Challenge for Cause Granted...................... 59        17

24   State no challenge for cause - Mr. May.......... 116       17

25   Defense challenge for cause - Mr. May.......... 117       17

1    Challenge for Cause Denied...................... 117        17

2    Phillip May Prospective Juror No. 12............ 117         17

3    State no challenge for cause - Mr. Leyva........ 157         17

4    Defense challenge for cause - Mr. Leyva......... 157         17

5    Challenge for Cause Granted..................... 157         17

6    Reporter's Certificate.......................... 158         17

7    VOLUME 18 - April 9th, 2001                     PAGE         VOL.

8    Proceedings..................................... 2           18

9    Ms. Land Excused From Consideration............. 14          18

10   State no challenge for cause - Mr. Robuck........ 63         18

11   Defense challenge for cause - Mr. Robuck......... 63         18

12   Challenge for Cause Denied...................... 65          18

13   John Robuck Prospective Juror No. 13............ 65          18

14   Reporter's Certificate.......................... 68          18

15   VOLUME 19 - April 10th, 2001                    PAGE         VOL.

16   Proceedings..................................... 2           19

17   State no challenge for cause - Ms. Garcia........ 58         19

18   Defense no challenge for cause - Ms. Garcia...... 58         19

19   Colleen Garcia Prospective Juror No. 14.......... 58         19

20   Mr. Boyd Excused From Consideration............. 83          19

21   Ms. Horn Excused From Consideration............. 106         19

22   Reporter's Certificate.......................... 107         19

23   VOLUME 20 - April 11th, 2001                    PAGE         VOL.

24   INDIVIDUAL VOIR DIRE:

25   Proceedings..................................... 2           20

1    State no challenge for cause - Mr. Clinton....... 61      20

2    Defense challenge for cause - Mr. Clinton........ 61      20

3    Challenge for Cause Denied...................... 62      20

4    Jon Clinton Prospective Juror No. 15............. 62      20

5    General Voir Dire By the Court.................. 65      20

6    Reporter's Certificate......................... 87      20

7    VOLUME 21 - April 12th, 2001                    PAGE    VOL.

8    GENERAL VOIR DIRE:

9    Proceedings..................................... 2      21

10   Voir Dire By The Court.......................... 2      21

11   Reporter's Certificate......................... 23      21

12   VOLUME 22 - April 16th, 2001                    PAGE    VOL.

13   INDIVIDUAL VOIR DIRE:

14   Proceedings..................................... 2      22

15   Mr. Lozano Excused From Consideration............ 5      22

16   Ms. Arnold Excused From Consideration........... 12      22

17   State no challenge for cause Ms. Throneberry..... 48      22

18   Defense no challenge for cause Ms. Throneberry... 48      22

19   Patricia Throneberry Prospective Juror No. 16.... 48      22

20   State no challenge for cause - Ms. Kirkpatrick... 99      22

21   Defense challenge for cause - Ms. Kirkpatrick.... 99      22

22   Challenge for Cause Granted..................... 99      22

23   State no challenge for cause - Mr. Bachmeyer.... 142     22

24   Defense no challenge for cause - Mr. Bachmeyer.. 142     22

25   Richard Bachmeyer Prospective Juror No. 17...... 142     22

1    Reporter's Certificate.......................... 145        22

2    VOLUME 23 - April 17th, 2001                  PAGE      VOL.

3    INDIVIDUAL VOIR DIRE:

4    Proceedings..................................... 2          23

5    State no challenge for cause - Mr. Layne........ 52         23

6    Defense challenge for cause - Mr. Layne......... 52         23

7    Challenge for Cause Denied...................... 55         23

8    Douglas Layne Prospective Juror No. 18.......... 55         23

9    Reporter's Certificate.......................... 58         23

10   VOLUME 24 - April 18th, 2001                  PAGE      VOL.

11   INDIVIDUAL VOIR DIRE:

12   Proceedings..................................... 2          24

13   Mr. Camp Excused From Consideration............. 21         24

14   Reporter's Certificate.......................... 22         24

15   VOLUME 25 - April 19th, 2001                  PAGE      VOL.

16   INDIVIDUAL VOIR DIRE:

17   Proceedings..................................... 2          25

18   State no challenge for cause - Mr. Mendro....... 46         25

19   Defense no challenge for cause - Mr. Mendro..... 46         25

20   Robert Mendro Prospective Juror No. 19.......... 46         25

21   Mr. Brown Excused From Consideration............ 71         25

22   State challenge for cause - Mr. Colbert......... 83         25

23   Challenge for Cause Granted..................... 83         25

24   Reporter's Certificate.......................... 84         25

25   VOLUME 26 - April 23rd, 2001                  PAGE      VOL.

1    INDIVIDUAL VOIR DIRE:

2    Proceedings.................................... 2      26

3    Mr. Horton Excused From Consideration........... 21     26

4    Mr. Murphy Excused From Consideration........... 36     26

5    State no challenge for cause - Mr. Webb......... 85     26

6    Defense no challenge for cause - Mr. Webb....... 86     26

7    Jack Webb Prospective Juror No. 20.............. 86     26

8    Defense challenge for cause - Ms. Gomez........ 119     26

9    Challenge for Cause Granted.................... 120     26

10   Reporter's Certificate......................... 123     26

11   VOLUME 27 - April 24th, 2001                  PAGE    VOL.

12   INDIVIDUAL VOIR DIRE:

13   Proceedings.................................... 2      27

14   State no challenge for cause - Mr. Eaker........ 41     27

15   Defense no challenge for cause - Mr. Eaker...... 42     27

16   Lloyd Eaker Prospective Juror No. 21............ 42     27

17   State no challenge for cause - Ms. Kappel....... 94     27

18   Defense no challenge for cause - Ms. Kappel..... 94     27

19   Deborah Kappel Prospective Juror No. 22......... 95     27

20   Reporter's Certificate......................... 97     27

21   VOLUME 28 - April 25th, 2001                  PAGE    VOL.

22   INDIVIDUAL VOIR DIRE:

23   Proceedings.................................... 2      28

24   Ms. Card Excused From Consideration............. 8      28

25   State no challenge for cause - Mr. Brooks....... 53     28

1   Defense challenge for cause - Mr. Brooks......... 53        28

2   Challenge for Cause Denied....................... 54        28

3   Thomas Brooks Prospective Juror No. 23........... 55        28

4   State no challenge for cause - Mr. Mecom........ 105        28

5   Defense challenge for cause - Mr. Mecom......... 105        28

6   Challenge for Cause Granted..................... 105        28

7   State challenge for cause - Mr. Parks........... 113        28

8   Challenge for Cause Granted..................... 113        28

9   State challenge for cause - Mr. Hale............ 122        28

10  Challenge for Cause Granted..................... 122        28

11  Mr. Kines Excused From Consideration............ 152        28

12  Reporter's Certificate.......................... 153        28

13  VOLUME 29 - April 26th, 2001              PAGE    VOL.

14  INDIVIDUAL VOIR DIRE:

15  Proceedings...................................... 2        29

16  State no challenge for cause - Ms. Chandler...... 52        29

17  Defense no challenge for cause Ms. Chandler...... 52        29

18  Marilyn Chandler Prospective Juror No. 24........ 52        29

19  State no challenge for cause - Mr. Gabel........ 109        29

20  Defense challenge for cause - Mr. Gabel......... 110        29

21  Challenge for Cause Granted..................... 110        29

22  State no challenge for cause - Ms. Lawley....... 152        29

23  Defense no challenge for cause - Ms. Lawley..... 152        29

24  Jo Lawley Prospective Juror No. 25.............. 153        29

25  Reporter's Certificate.......................... 155        29

| 1 | VOLUME 30 - April 30th, 2001 | PAGE | VOL. |
|---|---|---|---|
| 2 | INDIVIDUAL VOIR DIRE: | | |
| 3 | Proceedings....................................... 2 | | 30 |
| 4 | State challenge for cause - Ms. Shelton.......... 60 | | 30 |
| 5 | Challenge for Cause Granted...................... 60 | | 30 |
| 6 | State no challenge for cause - Ms. Morton....... 109 | | 30 |
| 7 | Defense no challenge for cause - Ms. Morton..... 110 | | 30 |
| 8 | Annette Morton Prospective Juror No. 26......... 110 | | 30 |
| 9 | Mr. Hiller Excused From Consideration........... 141 | | 30 |
| 10 | Reporter's Certificate.......................... 142 | | 30 |
| 11 | VOLUME 31 - May 1st, 2001 | PAGE | VOL. |
| 12 | INDIVIDUAL VOIR DIRE: | | |
| 13 | Proceedings....................................... 2 | | 31 |
| 14 | State no challenge for cause - Ms. Boales....... 51 | | 31 |
| 15 | Defense no challenge for cause - Ms. Boales..... 51 | | 31 |
| 16 | Connie Boales Prospective Juror No. 27.......... 51 | | 31 |
| 17 | Mr. Roberts Excused From Consideration.......... 57 | | 31 |
| 18 | Reporter's Certificate.......................... 58 | | 31 |
| 19 | VOLUME 32 - May 2nd, 2001 | PAGE | VOL. |
| 20 | INDIVIDUAL VOIR DIRE: | | |
| 21 | Proceedings....................................... 2 | | 32 |
| 22 | Mr. Newman Excused From Consideration........... 18 | | 32 |
| 23 | State challenge for cause - Ms. Alvarado........ 29 | | 32 |
| 24 | Challenge for Cause Granted..................... 29 | | 32 |
| 25 | Ms. Alder Excused From Consideration............ 38 | | 32 |

1  Ms. Rash Excused From Consideration............. 44       32

2  General Voir Dire By The Court.................. 44        32

3  Ms. Campbell Excused From Consideration......... 78        32

4  Reporter's Certificate.......................... 79        32

5  VOLUME 33 - May 3rd, 2001                        PAGE      VOL.

6  INDIVIDUAL VOIR DIRE:

7  Proceedings..................................... 2         33

8  Ms. Hamilton Excused From Consideration......... 24        33

9  Mr. Garcia Excused From Consideration........... 29        33

10 State no challenge for cause - Mr. Wright....... 77        33

11 Defense challenge for cause - Mr. Wright........ 77        33

12 Challenge for Cause Denied...................... 77        33

13 Robert Wright Prospective Juror No. 28.......... 78        33

14 State no challenge for cause - Ms. Lentz....... 122        33

15 Defense challenge for cause - Ms. Lentz........ 122        33

16 Challenge for Cause Granted.................... 123        33

17 Reporter's Certificate......................... 124        33

18 VOLUME 34 - May 7th, 2001                        PAGE      VOL.

19 INDIVIDUAL VOIR DIRE:

20 Proceedings..................................... 2         34

21 Ms. Tatum Excused From Consideration............ 6         34

22 Ms. Morones Excused From Consideration.......... 11        34

23 State no challenge for cause - Mr. Adair........ 58        34

24 Defense no challenge for cause - Mr. Adair...... 58        34

25 Ronnie Adair Prospective Juror No. 29.......... 58         34

```
 1   State no challenge for cause - Mr. Metcalf...... 106      34

 2   Defense challenge for cause - Mr. Metcalf....... 106      34

 3   Challenge for Cause Granted.................... 107       34

 4   State no challenge for cause - Mr. Garza........ 156      34

 5   Defense no challenge for cause - Mr. Garza...... 156      34

 6   Andre Garza Prospective Juror No. 30............ 156      34

 7   Reporter's Certificate......................... 159       34

 8   VOLUME 35 - May 8th, 2001                    PAGE      VOL.

 9   INDIVIDUAL VOIR DIRE:

10   Proceedings..................................... 2       35

11   Ms. Burton Excused From Consideration............ 6       35

12   Ms. Howard Excused From Consideration........... 11       35

13   State no challenge for cause - Mr. Rasco........ 54       35

14   Defense no challenge for cause - Mr. Rasco...... 54       35

15   Marcus Rasco Prospective Juror No. 31........... 54       35

16   State no challenge for cause - Ms. Edge........ 104       35

17   Defense challenge for cause - Ms. Edge......... 104       35

18   Challenge for Cause Denied..................... 105       35

19   Kimberly Edge Prospective Juror No. 32......... 105       35

20   Reporter's Certificate......................... 108       35

21   VOLUME 36 - May 9th, 2001                    PAGE      VOL.

22   INDIVIDUAL VOIR DIRE:

23   Proceedings..................................... 2       36

24   Ms. Piazza Excused From Consideration............ 6       36

25   State no challenge for cause - Ms. Smits........ 20       36
```

1    Defense no challenge for cause - Ms. Smits....... 20        36

2    Gloria Smits Prospective Juror No. 33............ 20        36

3    Ms. Lazarus Excused From Consideration........... 27        36

4    State no challenge for cause - Mr. Jones......... 70        36

5    Defense no challenge for cause - Mr. Jones....... 71        36

6    Mark Jones Prospective Juror No. 34............. 71        36

7    Reporter's Certificate.......................... 84        36

8    VOLUME 37 - May 14th, 2001                    PAGE      VOL.

9    INDIVIDUAL VOIR DIRE:

10   Proceedings...................................... 2        37

11   Mr. Hix Excused From Consideration............... 18       37

12   Ms. Randolph Excused From Consideration.......... 36       37

13   State no challenge for cause - Ms. Kellner....... 84       37

14   Defense no challenge for cause Ms. Kellner....... 84       37

15   Paula Kellner Prospective Juror No. 35........... 84       37

16   State no challenge for cause - Mr. Wilson....... 135       37

17   Defense no challenge for cause - Mr. Wilson..... 135       37

18   John Wilson Prospective Juror No. 36............ 137       37

19   State no challenge for cause - Ms. Williams..... 187       37

20   Defense challenge for cause - Ms. Williams...... 188       37

21   Challenge for Cause Denied...................... 188       37

22   Kimberly Williams Prospective Juror No. 37...... 189       37

23   Mr. Trimble Excused From Consideration.......... 194       37

24   Reporter's Certificate.......................... 196       37

25   VOLUME 38 - May 15th, 2001                    PAGE      VOL.

INDIVIDUAL VOIR DIRE:

Proceedings..................................... 2        38

Mr. Carpenter Excused From Consideration........ 12       38

State no challenge for cause - Mr. London....... 61       38

Defense challenge for cause - Mr. London........ 61       38

Challenge for Cause Denied...................... 62       38

Alexander London Prospective Juror No. 38....... 62       38

General Voir Dire By The Court.................. 64       38

Reporter's Certificate.......................... 87       38

VOLUME 39 - May 16th, 2001                       PAGE     VOL.

INDIVIDUAL VOIR DIRE:

Proceedings..................................... 2        39

State no challenge for cause - Mr. Reynolds...... 16      39

Defense no challenge for cause Mr. Reynolds...... 16      39

Orvis Reynolds Prospective Juror No. 39.......... 16      39

State no challenge for cause - Mr. Turner....... 72       39

Defense no challenge for cause - Mr. Turner...... 72      39

Henry Turner Prospective Juror No. 40........... 72       39

State no challenge for cause - Ms. Massey....... 103      39

Defense no challenge for cause - Ms. Massey..... 103      39

Jami Massey Prospective Juror No. 41............ 103      39

Mr. Koegl Excused From Consideration........... 117       39

Mr. Loveless Excused From Consideration........ 128       39

Mr. Thompson Excused From Consideration........ 138       39

Dr. Hawn Excused From Consideration............ 143       39

1    Ms. Miller Excused From Consideration.......... 148        39

2    Reporter's Certificate......................... 150        39

3    VOLUME 40 - May 17th, 2001                    PAGE      VOL.

4    INDIVIDUAL VOIR DIRE:

5    Proceedings.................................... 2          40

6    State challenge for cause - Mr. Pitillo.......... 33        40

7    Defense no challenge for cause Mr. Pitillo....... 35        40

8    Challenge for Cause Denied....................... 35        40

9    Bill Pitillo Prospective Juror No. 42............ 35        40

10   Mr. Thomas Excused From Consideration........... 52        40

11   Mr. Gardner Excused From Consideration.......... 64        40

12   State challenge for cause - Mr. Reynolds......... 89        40

13   Defense no challenge for cause Mr. Reynolds...... 89        40

14   Challenge for Cause Denied....................... 89        40

15   Clark Reynolds Prospective Juror No. 43.......... 89        40

16   Mr. Jacobs Excused From Consideration........... 102        40

17   Mr. Quinones Excused From Consideration........ 108        40

18   Ms. Ledbetter Excused From Consideration........ 120        40

19   Reporter's Certificate......................... 121        40

20   VOLUME 41 - May 18th, 2001                    PAGE      VOL.

21   INDIVIDUAL VOIR DIRE:

22   Proceedings.................................... 2          41

23   State no challenge for cause - Mr. Colditz....... 51        41

24   Defense no challenge for cause - Mr. Colditz..... 51        41

25   Mark Colditz Prospective Juror No. 44............ 51        41

1    State no challenge for cause - Mr. Sherr......... 62      41

2    Defense no challenge for cause - Mr. Sherr....... 63      41

3    William Sherr Prospective Juror No. 45.......... 63      41

4    Mr. Myers Excused From Consideration............ 76      41

5    State no challenge for cause Mr. Hernandez...... 118      41

6    Defense challenge for cause Mr. Hernandez....... 118      41

7    Challenge for Cause Granted..................... 118      41

8    Reporter's Certificate.......................... 119      41

9    VOLUME 42 - May 29th, 2001                      PAGE    VOL.

10   INDIVIDUAL VOIR DIRE:

11   Proceedings..................................... 2      42

12   Mr. Mokate Excused From Consideration............ 5      42

13   Ms. Slaughter Excused From Consideration........ 16      42

14   Ms. Hoke Excused From Consideration............. 27      42

15   Ms. Patrick Excused From Consideration.......... 31      42

16   State challenge for cause - Ms. Terrell......... 67      42

17   Defense challenge for cause - Ms. Terrell....... 67      42

18   Challenge for Cause Granted..................... 68      42

19   State no challenge for cause - Ms. Hinckley..... 106      42

20   Defense no challenge for cause Ms. Hinckley..... 106      42

21   Shannon Hinckley Prospective Juror No. 46....... 107      42

22   Ms. Williams Excused From Consideration......... 114      42

23   State no challenge for cause - Ms. Wicks........ 158      42

24   Defense no challenge for cause - Ms. Wicks...... 158      42

25   Joyce Wicks Prospective Juror No. 47............ 158      42

1   Mr. Smith Excused From Consideration........... 167      42

2   State challenge for cause - Mr. Selby.......... 189      42

3   Challenge for Cause Granted.................... 189      42

4   Reporter's Certificate......................... 190      42

5   VOLUME 43 - May 31st, 2001                  PAGE     VOL.

6   INDIVIDUAL VOIR DIRE:

7   Proceedings...................................... 2      43

8   State challenge for cause - Ms. Jones........... 30      43

9   Defense challenge for cause - Ms. Jones......... 30      43

10  Challenge for Cause Granted..................... 30      43

11  Ms. Smith Excused From Consideration............ 36      43

12  State no challenge for cause - Mr. Ferrell...... 81      43

13  Defense no challenge for cause Mr. Ferrell...... 82      43

14  Richard Ferrell Prospective Juror No. 48........ 82      43

15  Mr. Ward Excused From Consideration............. 88      43

16  State no challenge for cause - Mr. Galey....... 106      43

17  Defense no challenge for cause - Mr. Galey..... 106      43

18  Kelly Galey Prospective Juror No. 49........... 106      43

19  Reporter's Certificate......................... 109      43

20  VOLUME 44 - May 31st 2001                   PAGE     VOL.

21  PEREMPTORY CHALLENGES - SEATING OF JURY:

22  Proceedings...................................... 2      44

23  Emilia Nisbet - Juror Number 1.................. 3      44

24  Dorothy Jennings - Juror Number 2............... 4      44

25  Kathy Hunter - Juror Number 3................... 4      44

1   Nichole Briscoe - Juror Number 4.................. 5      44

2   Richard Bachmeyer - Juror Number 5............... 7      44

3   Robert Mendro - Juror Number 6................... 7      44

4   Jo Lawley - Juror Number 7....................... 8      44

5   Andre Garza - Juror Number 8..................... 9      44

6   Marcus Rasco - Juror Number 9................... 10      44

7   Mark Jones - Juror Number 10.................... 10      44

8   Henry Turner - Juror Number 11.................. 11      44

9   Shannon Hinckley - Juror Number 12.............. 13      44

10  Joyce Wicks - Alternate Juror................... 15      44

11  Batson Objection By The Defense................. 15      44

12  Request Denied By The Court..................... 18      44

13  Batson Objection By The Defense................. 18      44

14  Request Denied By The Court..................... 29      44

15  Batson Objection By The State................... 30      44

16  Request Denied By The Court..................... 31      44

17  Batson Objection By The State................... 31      44

18  Request Denied By The Court..................... 33      44

19  Reporter's Certificate.......................... 35      44

20  VOLUME 45 - May 31st, 2001                  PAGE    VOL.

21  PRETRIAL HEARING:

22  Proceedings...................................... 2      45

23  Reporter's Certificate........................ 152      45

24  VOLUME 46 - June 4th, 2001                  PAGE    VOL.

25  PRETRIAL HEARING:

```
 1   Proceedings.................................... 2      46

 2   Arraignment By Mr. Davis....................... 3      46

 3   Arraignment By Mr. Davis....................... 3      46

 4   Reporter's Certificate......................... 53     46

 5   VOLUME 47 - June 4th, 2001              PAGE    VOL.

 6   Proceedings.................................... 2      47

 7   Jurors finally sworn........................... 3      47

 8   Arraignment By Mr. Davis....................... 4      47

 9   Arraignment By Mr. Davis....................... 5      47

10   Jury Instructions.............................. 5      47

11   Reporter's Certificate......................... 257    47

12   VOLUME 48 - June 5th, 2001              PAGE    VOL.

13   Proceedings.................................... 2      48

14   Arguments on Voluntariness of Statement........ 71     48

15   Reporter's Certificate......................... 267    48

16   VOLUME 49 - June 6th, 2001              PAGE    VOL.

17   Proceedings.................................... 2      49

18   State of Texas Rests........................... 240    49

19   Reporter's Certificate......................... 242    49

20   VOLUME 50 - June 7th, 2001              PAGE    VOL.

21   Proceedings.................................... 2      50

22   Reporter's Certificate......................... 148    50

23   VOLUME 51 - June 8th, 2001              PAGE    VOL.

24   Proceedings.................................... 2      51

25   Defense Rests.................................. 38     51
```

```
 1  Both Sides Close................................. 38     51

 2  Reporter's Certificate.......................... 51     51

 3  VOLUME 52 - June 11th, 2001              PAGE    VOL.

 4  Proceedings...................................... 2     52

 5  Objections to Court's Charge..................... 2     52

 6  Charge of the Court Read........................ 11     52

 7  Argument By Ms. Miller.......................... 11     52

 8  Argument By Mr. Byck............................ 21     52

 9  Argument By Ms. Balido.......................... 24     52

10  Argument By Mr. Davis........................... 37     52

11  Verdict of the Jury on Guilt/Innocence.......... 50     52

12  Reporter's Certificate.......................... 62     52

13  VOLUME 53 - June 12th, 2001              PAGE    VOL.

14  Proceedings...................................... 2     53

15  Reporter's Certificate......................... 222     53

16  VOLUME 54 - June 13th, 2001              PAGE    VOL.

17  Proceedings...................................... 2     54

18  State Rests in Punishment....................... 19     54

19  Reporter's Certificate......................... 137     54

20  VOLUME 55 - June 14th, 2001              PAGE    VOL.

21  Proceedings...................................... 2     55

22  Reporter's Certificate.......................... 25     55

23  VOLUME 56 - June 15th, 2001              PAGE    VOL.

24  Proceedings...................................... 2     56

25  Reporter's Certificate.......................... 58     56
```

1   VOLUME 57 - June 27th, 2001                    PAGE        VOL.

2   Proceedings...................................... 2        57

3   Reporter's Certificate........................... 267       57

4   VOLUME 58 - June 28th, 2001                    PAGE        VOL.

5   Proceedings...................................... 2        58

6   Reporter's Certificate........................... 208       58

7   VOLUME 59 - June 29th, 2001                    PAGE        VOL.

8   Proceedings...................................... 2        59

9   Defense Rests in Punishment...................... 146       59

10  State Rests in Rebuttal.......................... 212       59

11  Defense Rests in Rebuttal........................ 218       59

12  Both Sides Close in Punishment................... 218       59

13  Close of Testimony............................... 218       59

14  Reporter's Certificate........................... 221       59

15  VOLUME 60 - June 30th, 2001                    PAGE        VOL.

16  Proceedings...................................... 2        60

17  Objections to Court's Charge..................... 2        60

18  Charge of the Court Read......................... 4        60

19  PUNISHMENT ARGUMENTS:

20  Argument By Ms. Miller........................... 4        60

21  Argument By Ms. Balido........................... 17       60

22  Argument By Ms. Little........................... 33       60

23  Argument By Mr. Davis............................ 44       60

24  Jury Verdict in Punishment....................... 61       60

25  Jury Polled Individually......................... 62       60

1    Defendant Sentenced.............................. 70      60

2    Reporter's Certificate........................... 72      60

3    VOLUME 61 - Exhibit Volume                   PAGE      VOL.

4    State's Exhibit PT1 through State's Exhibit 72

5    Reporter's Certificate........................... 77      61

6    VOLUME 62 - Exhibit Volume                   PAGE      VOL.

7    State's Exhibit 73 through State's Exhibit 144

8    Reporter's Certificate........................... 74      62

9    VOLUME 63 - Exhibit Volume                   PAGE      VOL.

10   State's Exhibit 145 (303 pages)

11   Reporter's Certificate........................... 3       63

12   VOLUME 64 - Exhibit Volume                   PAGE      VOL.

13   State's Exhibit 146 through 151

14   Reporter's Certificate...........................  8      64

15   VOLUME 65 - Exhibit Volume                   PAGE      VOL.

16   Defendant's Exhibit 1 through 70A

17   Reporter's Certificate........................... 75      65

18

19                    CHRONOLOGICAL VENIREPERSON INDEX

20                       STATE        DEFENSE              VOL.

21   EMILIA NISBET        17           43                   5

22   JANET PARKER         12                                6

23   DOROTHY JENNINGS     25           53                   6

24   JIMMY WOODARD        10                                7

25   KATHY HUNTER         20           43                   7

| | | | | |
|---|---|---|---|---|
| 1 | BEVERLY BROOME | 12 | | 8 |
| 2 | RHONDA STEVENS | 10 | | 9 |
| 3 | MARLIN CANNON | 20 | 45 | 10 |
| 4 | GREGORY GRIFFING | 78 | 104 | 10 |
| 5 | CARNITA LACY | 11 | | 11 |
| 6 | ALENA TREAT | 10, 45 | 28, 46 | 12 |
| 7 | SHARON LAWRENCE | 61 | | 12 |
| 8 | CATHERINE FOARD | 77 | 99 | 12 |
| 9 | EMILY HAMPSON | 118 | | 12 |
| 10 | BRIAN LAMOREAUX | 12 | | 13 |
| 11 | CAL MARSH | 38 | | 13 |
| 12 | MARY CLARK | 60 | | 13 |
| 13 | DAVID LEEWRIGHT | 64 | | 13 |
| 14 | JUDY MORTON | 14 | 37 | 14 |
| 15 | GERALD SMOTHERS | 63 | 85 | 14 |
| 16 | TERRY SANDLIN | 107 | | 14 |
| 17 | ANDREA BIGGERSTAFF | 13 | 35 | 15 |
| 18 | NICHOLE BRISCOE | 53 | 76 | 15 |
| 19 | MICHAEL UPCHURCH | 23 | 44 | 16 |
| 20 | PATRICK SKEETERS | 60 | 87 | 16 |
| 21 | MAURICA MCLARTY | 11 | | 17 |
| 22 | THOMAS COOPER | 16 | 37 | 17 |
| 23 | PHILLIP MAY | 69 | 94 | 17 |
| 24 | RIGOBERTO LEYVA | 119 | 143 | 17 |
| 25 | JEWELL LAND | 10 | | 18 |

| | | | | |
|---|---|---|---|---|
| 1 | JOHN ROBUCK | 15 | 39 | 18 |
| 2 | COLLEEN GARCIA | 10 | 35 | 19 |
| 3 | JOEL BOYD | 60 | 82 | 19 |
| 4 | FRANKIE HORN | 100 | | 19 |
| 5 | JON CLINTON | 13 | 37 | 20 |
| 6 | HOMERO LOZANO | 3 | | 22 |
| 7 | LORI ARNOLD | 6 | | 22 |
| 8 | PATRICIA THRONEBERRY | 14 | 38 | 22 |
| 9 | LINDA KIRKPATRICK | 51 | 79 | 22 |
| 10 | RICHARD BACHMEYER | 100 | 124 | 22 |
| 11 | DOUGLAS LAYNE | 7, 51 | 30 | 23 |
| 12 | CAREY CAMP | 6 | | 24 |
| 13 | ROBERT MENDRO | 4 | 27 | 25 |
| 14 | EMMETT BROWN | 56 | | 25 |
| 15 | LESTER COLBERT | 79 | | 25 |
| 16 | DONALD HORTON | 4 | 19 | 26 |
| 17 | JOHNNY MURPHY | 24 | | 26 |
| 18 | JACK WEBB | 40 | 64 | 26 |
| 19 | LISA GOMEZ | 91 | | 26 |
| 20 | LLOYD EAKER | 4 | 26 | 27 |
| 21 | DEBORAH KAPPEL | 47 | 74 | 27 |
| 22 | JANET CARD | 5 | | 28 |
| 23 | THOMAS BROOKS | 11 | 34 | 28 |
| 24 | KENNETH MECOM | 59 | 85 | 28 |
| 25 | EDDIE PARKS | 109 | | 28 |

DARLINE W. LABAR, OFFICIAL REPORTER

| | | | | |
|---|---|---|---|---|
| 1 | BILLY HALE | 116 | | 28 |
| 2 | GARY KINES | 126 | 150 | 28 |
| 3 | MARILYN CHANDLER | 8 | 32 | 29 |
| 4 | WILLIAM GABEL | 66 | 90 | 29 |
| 5 | JO LAWLEY | 110 | 137 | 29 |
| 6 | VICKI SHELTON | 28 | 52 | 30 |
| 7 | ANNETTE MORTON | 63 | 89 | 30 |
| 8 | SCOTT HILLER | 115 | | 30 |
| 9 | CONNIE BOALES | 4 | 29 | 31 |
| 10 | JOHN ROBERTS | 55 | | 31 |
| 11 | RANDALL NEWMAN | 4 | | 32 |
| 12 | ROSA ALVARADO | 20 | 26 | 32 |
| 13 | CARLA ALDER | 31 | | 32 |
| 14 | CAROLYN RASH | 41 | | 32 |
| 15 | YAVONDA CAMPBELL | 66 | | 32 |
| 16 | REBEKAH HAMILTON | 22 | | 33 |
| 17 | BENITO GARCIA | 27 | | 33 |
| 18 | ROBERT WRIGHT | 32 | 57 | 33 |
| 19 | ANN LENTZ | 82 | 105 | 33 |
| 20 | CHERIE TATUM | 3 | | 34 |
| 21 | RITA MORONES | 8 | | 34 |
| 22 | RONNIE ADAIR | 13 | 38 | 34 |
| 23 | DAVID METCALF | 62, 103 | 85 | 34 |
| 24 | ANDRE GARZA | 109 | 137 | 34 |
| 25 | WANDA BURTON | 3 | | 35 |

| | | | | |
|---|---|---|---|---|
| 1 | GLENDA HOWARD | 9 | | 35 |
| 2 | MARCUS RASCO | 14 | 38 | 35 |
| 3 | KIMBERLY EDGE | 60 | 84 | 35 |
| 4 | BEVERLY PIAZZA | 4 | | 36 |
| 5 | GLORIA SMITS | 9 | | 36 |
| 6 | JUDITH LAZARUS | 25 | | 36 |
| 7 | MARK JONES | 30 | 53 | 36 |
| 8 | BETTY WILLIAMS | 75 | | 36 |
| 9 | ROBERT HIX | 4 | | 37 |
| 10 | JUNE RANDOLPH | 21 | | 37 |
| 11 | PAULA KELLNER | 38 | 62 | 37 |
| 12 | JOHN WILSON | 88 | 113 | 37 |
| 13 | KIMBERLY WILLIAMS | 141 | 165 | 37 |
| 14 | DAVID TRIMBLE | 192 | | 37 |
| 15 | MICHAEL CARPENTER | 3 | | 38 |
| 16 | ALEXANDER LONDON | 14 | 40 | 38 |
| 17 | ORVIS REYNOLDS | 4 | 13 | 39 |
| 18 | HENRY TURNER | 20 | 46 | 39 |
| 19 | JAMI MASSEY | 76 | 102 | 39 |
| 20 | DAVID KOEGL | 107 | | 39 |
| 21 | CHARLES LOVELESS | 119 | | 39 |
| 22 | JAMES THOMPSON | 130 | | 39 |
| 23 | CHARLES HAWN | 141 | | 39 |
| 24 | BARBARA MILLER | 146 | | 39 |
| 25 | BILL PITILLO | 4 | 21 | 40 |

| | | | | |
|---|---|---|---|---|
| 1 | JAMES THOMAS | 40 | | 40 |
| 2 | LORENZO GARDNER | 54 | | 40 |
| 3 | CLARK REYNOLDS | 66 | | 40 |
| 4 | KIRK JACOBS | 93 | | 40 |
| 5 | JORGE QUINONES | 105 | | 40 |
| 6 | HETTIE LEDBETTER | 110 | | 40 |
| 7 | MARK COLDITZ | 3 | 26 | 41 |
| 8 | WILLIAM SHERR | 54 | | 41 |
| 9 | WALTER MYERS | 66 | | 41 |
| 10 | HOMER HERNANDEZ | 78 | 104 | 41 |
| 11 | STEVEN MOKATE | 3 | | 42 |
| 12 | DEBRA SLAUGHTER | 7 | | 42 |
| 13 | LEE ANNA HOKE | 20 | | 42 |
| 14 | MARY PATRICK | 30 | | 42 |
| 15 | CYNTHIA TERRELL | 34 | 59 | 42 |
| 16 | SHANNON HINCKLEY | 71 | 94 | 42 |
| 17 | THENIA WILLIAMS | 110 | | 42 |
| 18 | JOYCE WICKS | 116 | 139 | 42 |
| 19 | WILLIE SMITH | 162 | | 42 |
| 20 | FREDERICK SELBY | 169 | | 42 |
| 21 | NANCY JONES | 3 | 25 | 43 |
| 22 | JULIE SMITH | 32 | | 43 |
| 23 | RICHARD FERRELL | 38 | 60 | 43 |
| 24 | WILLIAM WARD | 85 | | 43 |
| 25 | KELLY GALEY | 90 | 103 | 43 |

ALPHABETICAL VENIREPERSON INDEX

| | STATE | DEFENSE | VOL. |
|---|---|---|---|
| RONNIE ADAIR | 13 | 38 | 34 |
| CARLA ALDER | 31 | | 32 |
| ROSA ALVARADO | 20 | 26 | 32 |
| LORI ARNOLD | 6 | | 22 |
| RICHARD BACHMEYER | 100 | 124 | 22 |
| ANDREA BIGGERSTAFF | 13 | 35 | 15 |
| CONNIE BOALES | 4 | 29 | 31 |
| JOEL BOYD | 60 | 82 | 19 |
| NICHOLE BRISCOE | 53 | 76 | 15 |
| THOMAS BROOKS | 11 | 34 | 28 |
| BEVERLY BROOME | 12 | | 8 |
| EMMETT BROWN | 56 | | 25 |
| WANDA BURTON | 3 | | 35 |
| YAVONDA CAMPBELL | 66 | | 32 |
| CAREY CAMP | 6 | | 24 |
| MARLIN CANNON | 20 | 45 | 10 |
| JANET CARD | 5 | | 28 |
| MICHAEL CARPENTER | 3 | | 38 |
| MARILYN CHANDLER | 8 | 32 | 29 |
| MARY CLARK | 60 | | 13 |
| JON CLINTON | 13 | 37 | 20 |
| LESTER COLBERT | 79 | | 25 |

| | | | | |
|---|---|---|---|---|
| 1 | MARK COLDITZ | 3 | 26 | 41 |
| 2 | THOMAS COOPER | 16 | 37 | 17 |
| 3 | LLOYD EAKER | 4 | 26 | 27 |
| 4 | KIMBERLY EDGE | 60 | 84 | 35 |
| 5 | RICHARD FERRELL | 38 | 60 | 43 |
| 6 | CATHERINE FOARD | 77 | 99 | 12 |
| 7 | WILLIAM GABEL | 66 | 90 | 29 |
| 8 | KELLY GALEY | 90 | 103 | 43 |
| 9 | BENITO GARCIA | 27 | | 33 |
| 10 | COLLEEN GARCIA | 10 | 35 | 19 |
| 11 | LORENZO GARDNER | 54 | | 40 |
| 12 | ANDRE GARZA | 109 | 137 | 34 |
| 13 | GREGORY GRIFFING | 78 | 104 | 10 |
| 14 | LISA GOMEZ | 91 | | 26 |
| 15 | BILLY HALE | 116 | | 28 |
| 16 | REBEKAH HAMILTON | 22 | | 33 |
| 17 | EMILY HAMPSON | 118 | | 12 |
| 18 | CHARLES HAWN | 141 | | 39 |
| 19 | HOMER HERNANDEZ | 78 | 104 | 41 |
| 20 | SCOTT HILLER | 115 | | 30 |
| 21 | SHANNON HINCKLEY | 71 | 94 | 42 |
| 22 | ROBERT HIX | 4 | | 37 |
| 23 | LEE ANNA HOKE | 20 | | 42 |
| 24 | FRANKIE HORN | 100 | | 19 |
| 25 | DONALD HORTON | 4 | 19 | 26 |

| | | | | |
|---|---|---|---|---|
| 1 | GLENDA HOWARD | 9 | | 35 |
| 2 | KATHY HUNTER | 20 | 43 | 7 |
| 3 | EMILIA NISBET | 17 | 43 | 5 |
| 4 | KIRK JACOBS | 93 | | 40 |
| 5 | DOROTHY JENNINGS | 25 | 53 | 6 |
| 6 | MARK JONES | 30 | 53 | 36 |
| 7 | NANCY JONES | 3 | 25 | 43 |
| 8 | DEBORAH KAPPEL | 47 | 74 | 27 |
| 9 | PAULA KELLNER | 38 | 62 | 37 |
| 10 | GARY KINES | 126 | 150 | 28 |
| 11 | LINDA KIRKPATRICK | 51 | 79 | 22 |
| 12 | DAVID KOEGL | 107 | | 39 |
| 13 | CARNITA LACY | 11 | | 11 |
| 14 | BRIAN LAMOREAUX | 12 | | 13 |
| 15 | JEWELL LAND | 10 | | 18 |
| 16 | JO LAWLEY | 110 | 137 | 29 |
| 17 | SHARON LAWRENCE | 61 | | 12 |
| 18 | DOUGLAS LAYNE | 7, 51 | 30 | 23 |
| 19 | JUDITH LAZARUS | 25 | | 36 |
| 20 | HETTIE LEDBETTER | 110 | | 40 |
| 21 | DAVID LEEWRIGHT | 64 | | 13 |
| 22 | ANN LENTZ | 82 | 105 | 33 |
| 23 | RIGOBERTO LEYVA | 119 | 143 | 17 |
| 24 | ALEXANDER LONDON | 14 | 40 | 38 |
| 25 | CHARLES LOVELESS | 119 | | 39 |

| | | | | |
|---|---|---|---|---|
| 1 | HOMERO LOZANO | 3 | | 22 |
| 2 | PHILLIP MAY | 69 | 94 | 17 |
| 3 | CAL MARSH | 38 | | 13 |
| 4 | JAMI MASSEY | 76 | 102 | 39 |
| 5 | MAURICA MCLARTY | 11 | | 17 |
| 6 | KENNETH MECOM | 59 | 85 | 28 |
| 7 | ROBERT MENDRO | 4 | 27 | 25 |
| 8 | DAVID METCALF | 62, 103 | 85 | 34 |
| 9 | BARBARA MILLER | 146 | | 39 |
| 10 | STEVEN MOKATE | 3 | | 42 |
| 11 | RITA MORONES | 8 | | 34 |
| 12 | ANNETTE MORTON | 63 | 89 | 30 |
| 13 | JUDY MORTON | 14 | 37 | 14 |
| 14 | JOHNNY MURPHY | 24 | | 26 |
| 15 | WALTER MYERS | 66 | | 41 |
| 16 | RANDALL NEWMAN | 4 | | 32 |
| 17 | JANET PARKER | 12 | | 6 |
| 18 | EDDIE PARKS | 109 | | 28 |
| 19 | MARY PATRICK | 30 | | 42 |
| 20 | BEVERLY PIAZZA | 4 | | 36 |
| 21 | BILL PITILLO | 4 | 21 | 40 |
| 22 | JORGE QUINONES | 105 | | 40 |
| 23 | JUNE RANDOLPH | 21 | | 37 |
| 24 | MARCUS RASCO | 14 | 38 | 35 |
| 25 | CAROLYN RASH | 41 | | 32 |

| | | | | |
|---|---|---|---|---|
| 1 | CLARK REYNOLDS | 66 | | 40 |
| 2 | ORVIS REYNOLDS | 4 | 13 | 39 |
| 3 | JOHN ROBERTS | 55 | | 31 |
| 4 | JOHN ROBUCK | 15 | 39 | 18 |
| 5 | TERRY SANDLIN | 107 | | 14 |
| 6 | FREDERICK SELBY | 169 | | 42 |
| 7 | WILLIAM SHERR | 54 | | 41 |
| 8 | VICKI SHELTON | 28 | 52 | 30 |
| 9 | PATRICK SKEETERS | 60 | 87 | 16 |
| 10 | DEBRA SLAUGHTER | 7 | | 42 |
| 11 | JULIE SMITH | 32 | | 43 |
| 12 | WILLIE SMITH | 162 | | 42 |
| 13 | GLORIA SMITS | 9 | | 36 |
| 14 | GERALD SMOTHERS | 63 | 85 | 14 |
| 15 | RHONDA STEVENS | 10 | | 9 |
| 16 | CHERIE TATUM | 3 | | 34 |
| 17 | CYNTHIA TERRELL | 34 | 59 | 42 |
| 18 | JAMES THOMAS | 40 | | 40 |
| 19 | JAMES THOMPSON | 130 | | 39 |
| 20 | PATRICIA THRONEBERRY | 14 | 38 | 22 |
| 21 | ALENA TREAT | 10, 45 | 28, 46 | 12 |
| 22 | DAVID TRIMBLE | 192 | | 37 |
| 23 | HENRY TURNER | 20 | 46 | 39 |
| 24 | MICHAEL UPCHURCH | 23 | 44 | 16 |
| 25 | WILLIAM WARD | 85 | | 43 |

```
 1   JACK WEBB            40           64                  26

 2   JOYCE WICKS         116          139                 42

 3   BETTY WILLIAMS       75                              36

 4   KIMBERLY WILLIAMS   141          165                 37

 5   THENIA WILLIAMS     110                              42

 6   JOHN WILSON          88          113                 37

 7   JIMMY WOODARD        10                               7

 8   ROBERT WRIGHT        32           57                 33

 9

10

11            CHRONOLOGICAL WITNESS INDEX

12                 DIRECT       CROSS        VD      VOL.

13   MATT MYERS           5           48                  45

14   SHERRYL WILHELM     100          115                 45

15   DOUGLAS H. LIGON    140          147                 45

16   EVELYN SHELTON       22                              47

17   MATT TOLLEFSBOL      43                              47

18   KENNETH CLANCE       48           60                 47

19   MONTY CARL DUNN      63           68                 47

20   SANDRA JO MAMOT      70           80                 47

21   ZACHERY MAMOT     86, 118        106                 47

22   BOBBY DOUGLAS HARP 121, 142      136                 47

23   DEBRA MURPHY        144                              47

24   CESAR DE LA TORRE   148                              47

25   RICHARD SHOLLENBERGER 155        162                 47
```

| | | | | | |
|---|---|---|---|---|---|
| 1 | ORA MAE MILTON | 164 | 176 | | 47 |
| 2 | TRESHOD TARRANT | 198 | | | 47 |
| 3 | AKRAN ARIDI | 225 | 238 | | 47 |
| 4 | GARY ROSE | 242 | 249 | | 47 |
| 5 | GARY ROSE | 14 | | | 48 |
| 6 | OZELLE WILCOXSON | 21 | 35 | | 48 |
| 7 | JASON BONHAM | 45 | | | 48 |
| 8 | JEDIDIAH ISAAC MURPHY | 52, 70 | 57, 70 | | 48 |
| 9 | GARY ROSE | 77, 121, 124 | 99, 123, 126 | | 48 |
| 10 | MATT MYERS | 130, 254 | 204, 261 | 196 | 48 |
| 11 | CHARLES MCKINNEY | 11, 23 | 22 | | 49 |
| 12 | DR. JENNIE DUVAL | 32 | 56 | | 49 |
| 13 | LANNIE EMANUEL | 64, 70, 73 | 67, 71, 74 | | 49 |
| 14 | JAMES ROGERS | 75, 148 | 129 | 84, 94 | |
| 15 | | | 151 | 125 | 49 |
| 16 | DAVID DAVENPORT | 154 | 161 | | 49 |
| 17 | JOHN DONAHUE | 162 | 173 | | 49 |
| 18 | SHIRLEY BARD | 178 | | | 49 |
| 19 | HARLAN BAILEY | 186 | 191 | | 49 |
| 20 | DR. WILLIAM VANDIVER | 192 | | | 49 |
| 21 | KIRSTEN ADAMES | 221 | | | 49 |
| 22 | MARY ERIN MILLER | 2 | | | 50 |
| 23 | GREG DAVIS | 8 | | | 50 |
| 24 | TRESHOD TARRANT | 25, 59 | 57 | | 50 |
| 25 | JASON BONHAM | 62 | 79 | | 50 |

| | | | | |
|---|---|---|---|---|
| 1 | EDWARD HUESKE | 87 | | 50 |
| 2 | EDWARD HUESKE | 90 | 95 | 50 |
| 3 | DR. NIZAM PEERWANI | 100 | | 50 |
| 4 | DR. NIZAM PEERWANI | 104 | 113 | 50 |
| 5 | DR. WILLIAM VANDIVER | 122 | 128 | 50 |
| 6 | DR. JOHN KRUSZ | 2 | | 51 |
| 7 | DR. JOHN KRUSZ | 7, 37 | 24 | 51 |
| 8 | JEDIDIAH ISAAC MURPHY | 39 | | 51 |
| 9 | RAY LaPERE | 41, 45 | 44 | 51 |
| 10 | ELISABETH ERWIN | 8 | 17 | 53 |
| 11 | DEBBIE ARMSTRONG | 19, 40 | 33, 41 | 53 |
| 12 | JAMES ROSE | 43 | | 53 |
| 13 | GLENN THOMPSON | 47 | 51 | 53 |
| 14 | MIKE SULLIVAN | 57, 66 | 64 | 53 |
| 15 | DONALD ARTHUR ALBERTY | 67, 76 | 75, 76 | 53 |
| 16 | JAMES LEE | 77, 90 | 89, 93 | 53 |
| 17 | JOHN STANTON | 95 | 109 | 53 |
| 18 | SHERRYL WILHELM | 126, 173 | 149 | 53 |
| 19 | JOHN T. STANTON | 182, 205 | 199 | 53 |
| 20 | DOUGLAS H. LIGON | 208, 218 | 214, 220 | 53 |
| 21 | MANDY KIRL | 2 | 15 | 54 |
| 22 | LEON ASHLEY PEEK | 20 | | 54 |
| 23 | LEON ASHLEY PEEK | 42, 72 | 57 | 54 |
| 24 | MURINENE OLUGBODE | 74, 90 | 84, 92 | 54 |
| 25 | KRISTI SHEETS | 93 | | 54 |

| | | | | |
|---|---|---|---|---|
| 1 | JOHN RAINEY | 98, 115 | 108 | 54 |
| 2 | JASON BONHAM | 124, 135 | 130 | 54 |
| 3 | GILDA KESSNER | 2 | 23 | 55 |
| 4 | J. DOUGLAS CROWDER | 3 | | 56 |
| 5 | MARY CONNELL | 25 | | 56 |
| 6 | ROY MATHEW | 4 | 8 | 57 |
| 7 | LARRY REED | 10 | 12 | 57 |
| 8 | KEVIN FOLMAR | 13, 18 | 15 | 57 |
| 9 | KYLE COOK | 21, 29, 34 | 26, 32 | 57 |
| 10 | ROY DONALD TOLAR | 36, 70, 82 | 49, 78, 84 | 57 |
| 11 | MATT MURPHY | 88 | 102 | 57 |
| 12 | CHELSEA WILLIS | 110, 158, 164 | 139, 161, 164 | 57 |
| 13 | PAM SHERMAN | 165 | 177 | 57 |
| 14 | RANDY CROW | 180, 193, 194 | 190, 193 | 57 |
| 15 | JERRY WOOD | 197 | 200 | 57 |
| 16 | GARY KINES | 202 | | 57 |
| 17 | TONYA THORP | 206, 222, 225 | 220, 224 | 57 |
| 18 | HOPE ABBOTT | 226 | 239 | 57 |
| 19 | MARY A. CONNELL | 256 | | 57 |
| 20 | MARY A. CONNELL | 10 | 70 | 58 |
| 21 | DR. JAYE CROWDER | 132, 193, | 176, 198, 202 | 58 |
| 22 | | 201, 204 | | 58 |
| 23 | GILDA KESSNER | 2 | | 59 |
| 24 | GILDA KESSNER | 4, 93 | 58 | 59 |
| 25 | MATT MYERS | 103, 123, 132 | 123, 131 | 59 |

| | | | | |
|---|---|---|---|---|
| 1 | TRACY ERWIN | 133 | 138 | 59 |
| 2 | TIM ERWIN | 139, 145 | 143 | 59 |
| 3 | TERRY TOLAR | 146 | 162 | 59 |
| 4 | NANCY SANDERS | 170 | 186 | 59 |
| 5 | SHIRLEY BARD | 189, 211 | 205 | 59 |
| 6 | JEDIDIAH MURPHY | 214 | | 59 |
| 7 | GILDA KESSNER | 216 | | 59 |

8

9                    ALPHABETICAL WITNESS INDEX

| | | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|---|
| 10 | | DIRECT | CROSS | VD | VOL. |
| 11 | HOPE ABBOTT | 226 | 239 | | 57 |
| 12 | KIRSTEN ADAMES | 221 | | | 49 |
| 13 | DONALD ARTHUR ALBERTY | 67, 76 | 75, 76 | | 53 |
| 14 | AKRAN ARIDI | 225 | 238 | | 47 |
| 15 | DEBBIE ARMSTRONG | 19, 40 | 33, 41 | | 53 |
| 16 | HARLAN BAILEY | 186 | 191 | | 49 |
| 17 | SHIRLEY BARD | 178 | | | 49 |
| 18 | SHIRLEY BARD | 189, 211 | 205 | | 59 |
| 19 | JASON BONHAM | 45 | | | 48 |
| 20 | JASON BONHAM | 62 | 79 | | 50 |
| 21 | JASON BONHAM | 124, 135 | 130 | | 54 |
| 22 | KENNETH CLANCE | 48 | 60 | | 47 |
| 23 | MARY CONNELL | 25 | | | 56 |
| 24 | MARY CONNELL | 256 | | | 57 |
| 25 | MARY CONNELL | 10 | 70 | | 58 |

| | | | | |
|---|---|---|---|---|
| 1 | KYLE COOK | 21, 29, 34 | 26, 32 | 57 |
| 2 | RANDY CROW | 180, 193, 194 | 190, 193 | 57 |
| 3 | J. DOUGLAS CROWDER | 3 | | 56 |
| 4 | DR. JAYE CROWDER | 132, 193, | 176, 198, 202 | 58 |
| 5 | | 201, 204 | | 58 |
| 6 | DAVID DAVENPORT | 154 | 161 | 49 |
| 7 | GREG DAVIS | 8 | | 50 |
| 8 | JOHN DONAHUE | 162 | 173 | 49 |
| 9 | MONTY CARL DUNN | 63 | 68 | 47 |
| 10 | DR. JENNIE DUVAL | 32 | 56 | 49 |
| 11 | LANNIE EMANUEL | 64, 70, 73 | 67, 71, 74 | 49 |
| 12 | ELISABETH ERWIN | 8 | 17 | 53 |
| 13 | TIM ERWIN | 139, 145 | 143 | 59 |
| 14 | TRACY ERWIN | 133 | 138 | 59 |
| 15 | KEVIN FOLMAR | 13, 18 | 15 | 57 |
| 16 | BOBBY DOUGLAS HARP | 121, 142 | 136 | 47 |
| 17 | EDWARD HUESKE | 87 | | 50 |
| 18 | EDWARD HUESKE | 90 | 95 | 50 |
| 19 | GILDA KESSNER | 2 | 23 | 55 |
| 20 | GILDA KESSNER | 2 | | 59 |
| 21 | GILDA KESSNER | 4, 93 | 58 | 59 |
| 22 | GILDA KESSNER | 216 | | 59 |
| 23 | GARY KINES | 202 | | 57 |
| 24 | MANDY KIRL | 2 | 15 | 54 |
| 25 | DR. JOHN KRUSZ | 2 | | 51 |

DARLINE W. LABAR, OFFICIAL REPORTER

| | | | | | |
|---|---|---|---|---|---|
| 1 | DR. JOHN KRUSZ | 7, 37 | 24 | | 51 |
| 2 | RAY LaPERE | 41, 45 | 44 | | 51 |
| 3 | JAMES LEE | 77, 90 | 89, 93 | | 53 |
| 4 | DOUGLAS H. LIGON | 140 | 147 | | 45 |
| 5 | DOUGLAS H. LIGON | 208, 218 | 214, 220 | | 53 |
| 6 | SANDRA JO MAMOT | 70 | 80 | | 47 |
| 7 | ZACHERY MAMOT | 86, 118 | 106 | | 47 |
| 8 | ROY MATHEW | 4 | 8 | | 57 |
| 9 | CHARLES MCKINNEY | 11, 23 | 22 | | 49 |
| 10 | MARY ERIN MILLER | 2 | | | 50 |
| 11 | ORA MAE MILTON | 164 | 176 | | 47 |
| 12 | DEBRA MURPHY | 144 | | | 47 |
| 13 | JEDIDIAH ISAAC MURPHY | 52, 70 | 57, 70 | | 48 |
| 14 | JEDIDIAH ISAAC MURPHY | 39 | | | 51 |
| 15 | JEDIDIAH MURPHY | 214 | | | 59 |
| 16 | MATT MURPHY | 88 | 102 | | 57 |
| 17 | MATT MYERS | 5 | 48 | | 45 |
| 18 | MATT MYERS | 130, 254 | 204, 261 | 196 | 48 |
| 19 | MATT MYERS | 103, 123, 132 | 123, 131 | | 59 |
| 20 | MURINENE OLUGBODE | 74, 90 | 84, 92 | | 54 |
| 21 | LEON ASHLEY PEEK | 20 | | | 54 |
| 22 | LEON ASHLEY PEEK | 42, 72 | 57 | | 54 |
| 23 | DR. NIZAM PEERWANI | 100 | | | 50 |
| 24 | DR. NIZAM PEERWANI | 104 | 113 | | 50 |
| 25 | JOHN RAINEY | 98, 115 | 108 | | 54 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | LARRY REED | 10 | 12 | | 57 |
| 2 | JAMES ROGERS | 75, 148 | 129 | 84, 94 | |
| 3 | | | 151 | 125 | 49 |
| 4 | GARY ROSE | 242 | 249 | | 47 |
| 5 | GARY ROSE | 14 | | | 48 |
| 6 | GARY ROSE | 77, 121, 124 | 99, 123, 126 | | 48 |
| 7 | JAMES ROSE | 43 | | | 53 |
| 8 | NANCY SANDERS | 170 | 186 | | 59 |
| 9 | KRISTI SHEETS | 93 | | | 54 |
| 10 | EVELYN SHELTON | 22 | | | 47 |
| 11 | PAM SHERMAN | 165 | 177 | | 57 |
| 12 | RICHARD SHOLLENBERGER | 155 | 162 | | 47 |
| 13 | JOHN STANTON | 95 | 109 | | 53 |
| 14 | JOHN STANTON | 182, 205 | 199 | | 53 |
| 15 | MIKE SULLIVAN | 57, 66 | 64 | | 53 |
| 16 | TRESHOD TARRANT | 198 | | | 47 |
| 17 | TRESHOD TARRANT | 25, 59 | 57 | | 50 |
| 18 | GLENN THOMPSON | 47 | 51 | | 53 |
| 19 | TONYA THORP | 206, 222, 225 | 220, 224 | | 57 |
| 20 | ROY DONALD TOLAR | 36, 70, 82 | 49, 78, 84 | | 57 |
| 21 | TERRY TOLAR | 146 | 162 | | 59 |
| 22 | MATT TOLLEFSBOL | 43 | | | 47 |
| 23 | CESAR DE LA TORRE | 148 | | | 47 |
| 24 | DR. WILLIAM VANDIVER | 192 | | | 49 |
| 25 | DR. WILLIAM VANDIVER | 122 | 128 | | 50 |

```
 1   OZELLE WILCOXSON        21              35                  48

 2   SHERRYL WILHELM        100             115                  45

 3   SHERRYL WILHELM        126, 173        149                  53

 4   CHELSEA WILLIS         110, 158, 164 139, 161, 164          57

 5   JERRY WOOD             197             200                  57

 6

 7                          EXHIBIT INDEX

 8   STATE'S                      OFFERED      ADMITTED     VOL.

 9     PT1    Juror History         74           74          10

10     PT2    Juror History         50                       15

11     PT3    Juror History         46                       25

12     PT4    Juror History         54                       28

13     PT5    Juror History         56                       35

14     PT6    Juror History         20                       36

15     PT7    Juror History        135                       37

16     PT8    Juror History        158                       42

17      1     Photo of Complainant  27           28          47

18      2     Autopsy Photo (R)     41           41          47

19      2     Autopsy Photo         55           55          49

20      3     Map of Garland        27           28          47

21      4     Discover Card (FC)    29           29          47

22      5     Discover Card (BC)    29           29          47

23      6     Master Card (BC)      29           29          47

24      7     Photo of Honda        27           28          47

25      8     Videotape @ JCPenney  45           45          47
```

| | | | | | |
|---|---|---|---|---|---|
| 1 | 10 | Photo of Bleachers | 49 | 49 | 47 |
| 2 | 11 | Photograph | 64 | 65 | 47 |
| 3 | 12 | Photograph | 124 | 124 | 47 |
| 4 | 13 | Receipt | 133 | 133 | 47 |
| 5 | 14A | Go-Ped Warranty | 128 | 129 | 47 |
| 6 | 14B | Go-Ped Warranty | 128 | 129 | 47 |
| 7 | 14C | Go-Ped Warranty | 128 | 129 | 47 |
| 8 | 15 | Map of Dallas | 145 | 145 | 47 |
| 9 | 16 | Photo of Racetrac | 146 | 146 | 47 |
| 10 | 17 | Transaction Report MC | 154 | 154 | 47 |
| 11 | 18A | Transaction Report DC | 156 | 157 | 47 |
| 12 | 18B | Transaction Report DC | 156 | 157 | 47 |
| 13 | 20 | Photo 509 Lamar | 175 | 175 | 47 |
| 14 | 21 | Photo of Chacho's | 213 | 213 | 47 |
| 15 | 22 | Photo of Cowboys | 213 | 213 | 47 |
| 16 | 23 | Photo Cole Mountain | 213 | 213 | 47 |
| 17 | 26 | Videotape Fast Speed | 234 | 234 | 47 |
| 18 | 26A | Videotape Slow Speed | 234 | 234 | 47 |
| 19 | 27 | Map of Edgewood | 122 | 122 | 48 |
| 20 | 28 | Crime Scene Photo | 88 | 88 | 48 |
| 21 | 29 | Crime Scene Photo | 88 | 88 | 48 |
| 22 | 30 | Crime Scene Photo | 88 | 88 | 48 |
| 23 | 31 | Crime Scene Photo | 84 | 85 | 49 |
| 24 | 32 | Crime Scene Photo | 84 | 85 | 49 |
| 25 | 33 | Crime Scene Photo | 84 | 85 | 49 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 34 | Crime Scene Photo | 84 | 85 | 49 |
| 2 | 35 | Magistrate Warnings | 26 | 27 | 48 |
| 3 | 36 | Magistrate Warnings | 26 | 27 | 48 |
| 4 | 38 | Vacuum Hose | 190 | 190 | 48 |
| 5 | 39 | Heater Hose | 190 | 190 | 48 |
| 6 | 40 | Blue Towel | 190 | 190 | 48 |
| 7 | 41 | Miranda 10-6-00 | 24 | 24 | 45 |
| 8 | 41 | Miranda Warning Sheet | 162 | 167 | 48 |
| 9 | 42 | Photo of Defendant | 196 | 198 | 48 |
| 10 | 43 | Photo of Defendant | 196 | 198 | 48 |
| 11 | 44 | Photo of Defendant | 196 | 198 | 48 |
| 12 | 45 | Photo of Defendant | 196 | 198 | 48 |
| 13 | 46 | Photo of Defendant | 196 | 198 | 48 |
| 14 | 47 | Statement | 34 | 34 | 45 |
| 15 | 47 | Voluntary Statement | 180 | 180 | 48 |
| 16 | 48 | Miranda 10-7-00 | 39 | 39 | 45 |
| 17 | 48 | Miranda Warning Sheet | 257 | 257 | 48 |
| 18 | 49 | Map 10-7-00 | 46 | | 45 |
| 19 | 50 | Miranda 10-11-00 | 259 | 260 | 48 |
| 20 | 51 | Miranda 10-13-00 | 260 | 261 | 48 |
| 21 | 52 | Receipt Cole Mountain | 201 | 201 | 48 |
| 22 | 53 | Receipt Cowboys | 201 | 201 | 48 |
| 23 | 54 | Autopsy Report | 36 | 36 | 49 |
| 24 | 55 | Autopsy Photo | 41 | 41 | 49 |
| 25 | 58 | Autopsy Photo | 41 | 41 | 49 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 59 | Autopsy Photo | 41 | 41 | 49 |
| 2 | 60 | Autopsy Photo | 41 | 41 | 49 |
| 3 | 61 | Autopsy Photo | 41 | 41 | 49 |
| 4 | 62 | Autopsy Photo | 41 | 41 | 49 |
| 5 | 63 | Autopsy Photo | 41 | 41 | 49 |
| 6 | 63A | Bullet | 53 | 54 | 49 |
| 7 | 65 | Addison Harrington | 205 | 205 | 49 |
| 8 | 66 | Bank Records | 239 | 239 | 49 |
| 9 | 69 | Vandiver Records | 194 | 194 | 49 |
| 10 | 70 | Kaufman Hosp. Records | 196 | 196 | 49 |
| 11 | 71 | Hospital Records | 210 | 210 | 49 |
| 12 | 72 | Dr. Dehaan Records | 210 | 210 | 49 |
| 13 | 73 | Wadley Hospital | 210 | 210 | 49 |
| 14 | 74 | St. Michaels Records | 210 | 210 | 49 |
| 15 | 75 | Photo of Bathtub | 210 | 210 | 49 |
| 16 | 77 | Photo of Honda | 88 | 88 | 49 |
| 17 | 78 | Photo of Honda | 88 | 88 | 49 |
| 18 | 79 | Photo of Honda | 88 | 88 | 49 |
| 19 | 80 | Photo of Honda | 88 | 88 | 49 |
| 20 | 81 | Photo of Honda | 88 | 88 | 49 |
| 21 | 82 | Photo of Honda | 88 | 88 | 49 |
| 22 | 83 | Photo of Honda | 88 | 88 | 49 |
| 23 | 83A | Tan Purse | 93 | 93 | 49 |
| 24 | 84 | Photo of Honda | 88 | 88 | 49 |
| 25 | 85 | Photo of Honda | 88 | 88 | 49 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 86 | Brown Leather Wallet | 93 | 94 | 49 |
| 2 | 88 | Insurance Card | 96 | 97 | 49 |
| 3 | 89 | Church Offering | 96 | 97 | 49 |
| 4 | 90 | JCPenney Receipt | 97 | 97 | 49 |
| 5 | 91 | JCPenney Bag | 100 | 100 | 49 |
| 6 | 91A | Blue Robe | 100 | 100 | 49 |
| 7 | 91B | JCPenney Bloody Bag | 101 | 101 | 49 |
| 8 | 91C | White t-shirt | 102 | 102 | 49 |
| 9 | 93 | Dillard's Plastic Bag | 99 | 100 | 49 |
| 10 | 94 | Dillard's Receipt | 97 | 97 | 49 |
| 11 | 97 | Duffle Bag | 150 | 150 | 49 |
| 12 | 98 | Suitcase w/clothing | 149 | 150 | 49 |
| 13 | 99 | Receipt | 105 | 105 | 49 |
| 14 | 101 | Checkbook Cover | 106 | 106 | 49 |
| 15 | 102 | Checkbook Register | 106 | 106 | 49 |
| 16 | 103 | Citizens Bank Receipt | 107 | 107 | 49 |
| 17 | 104 | Defendant's ID Card | 108 | 108 | 49 |
| 18 | 105 | Wizard's Card | 108 | 108 | 49 |
| 19 | 106 | Cowboy's Receipt | 112 | 112 | 49 |
| 20 | 107A | Check Receipt | 113 | 114 | 49 |
| 21 | 107B | Check Receipt | 113 | 114 | 49 |
| 22 | 107C | Check Receipt | 113 | 114 | 49 |
| 23 | 107D | Check Receipt | 113 | 114 | 49 |
| 24 | 107E | Check Receipt | 113 | 114 | 49 |
| 25 | 109 | Dr. Lee Paper | 110 | 110 | 49 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 110 | Featherston's Card | 109 | 109 | 49 |
| 2 | 111 | Lynk Systems Paper | 112 | 112 | 49 |
| 3 | 112 | Yellow Paper | 111 | 111 | 49 |
| 4 | 113 | Yellow Paper | 111 | 111 | 49 |
| 5 | 114A | Money Order Receipt | 111 | 112 | 49 |
| 6 | 114B | Money Order Receipt | 111 | 112 | 49 |
| 7 | 115 | Print (Hood) | 118 | 118 | 49 |
| 8 | 116 | Print (Rear Window) | 118 | 118 | 49 |
| 9 | 117 | Print (Rear Window) | 118 | 118 | 49 |
| 10 | 118 | Print (Door Handle) | 118 | 118 | 49 |
| 11 | 119 | Print (Cigarette Pkg) | 118 | 118 | 49 |
| 12 | 120 | Prints from Jail | 123 | 123 | 49 |
| 13 | 121 | Pkg. Cigarettes | 105 | 105 | 49 |
| 14 | 122 | Pkg. Cigarettes | 105 | 105 | 49 |
| 15 | 123 | Trash Bag of Clothes | 150 | 150 | 49 |
| 16 | 124 | Duffle Bag w/clothes | 151 | 151 | 49 |
| 17 | 125 | Claim's Interview | 235 | 235 | 49 |
| 18 | 126 | Autopsy Photo | 117 | 117 | 50 |
| 19 | 127 | Photograph | 16 | 17 | 53 |
| 20 | 128 | Blue Back | 50 | 51 | 53 |
| 21 | 129 | Blue Back | 50 | 51 | 53 |
| 22 | 130 | Blue Back | 50 | 51 | 53 |
| 23 | 131 | 10-Print Card | 50 | 51 | 53 |
| 24 | 132 | Hospital Photo | 129 | 130 | 53 |
| 25 | 133 | Wilhelm Photo | 146 | 146 | 53 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 134 | Wilhelm Photo | 146 | 146 | 53 |
| 2 | 135 | Wilhelm Photo | 146 | 146 | 53 |
| 3 | 136 | Mapsco Board | 129 | 130 | 53 |
| 4 | 137 | Sketch Form | 211 | 211 | 53 |
| 5 | 138 | Business Records | 205 | 206 | 53 |
| 6 | 139 | Dr. Peek Vita | 73 | 73 | 54 |
| 7 | 141 | Composite | 144 | 144 | 45 |
| 8 | 141 | Composite | 168 | 169 | 53 |
| 9 | 142 | Line-up | 105, 168 | 106, 169 | 53 |
| 10 | 144 | Copied Photographs | 54 | 54 | 56 |
| 11 | 145 | Glen Oaks Records | 67 | 67 | 57 |
| 12 | 146 | Timberlawn Records | 80 | 80 | 57 |
| 13 | 147 | Oak Haven Records | 85 | 85 | 57 |
| 14 | 148 | Dr. Ingram Records | 246 | 246 | 57 |
| 15 | 149 | Chelsea's Diary | 141 | 142 | 57 |
| 16 | 150 | Butcher Report | 108 | 108 | 58 |
| 17 | 151 | Millon Report | 111 | 111 | 58 |
| 18 | DEFENDANT'S | | OFFERED | ADMITTED | VOL. |
| 19 | 1 | Warrant | 89 | 89 | 45 |
| 20 | 2 | Questionnaire | 151 | 151 | 45 |
| 21 | 2 | Questionnaire | 106 | 106 | 59 |
| 22 | 3 | Miranda 10-11-00 | 151 | 151 | 45 |
| 23 | 4 | Miranda 10-13-00 | 151 | 151 | 45 |
| 24 | 5 | Wilhelm - Map | 139 | 140 | 45 |
| 25 | 6A | Handwritten Note | 10 | 10 | 50 |

| 1 | 6B | Handwritten Note | 10 | 10 | 50 |
| 2 | 6C | Handwritten Note | 10 | 10 | 50 |
| 3 | 9 | Dr. Duval Letter | 62 | 62 | 49 |
| 4 | 10 | Dr. Krusz Records | 25 | 25 | 50 |
| 5 | 11 | File Composite | 216 | 216 | 53 |
| 6 | 12 | File Composite | 216 | 216 | 53 |
| 7 | 13 | File Composite | 216 | 216 | 53 |
| 8 | 14 | File Composite | 216 | 216 | 53 |
| 9 | 15 | File Composite | 216 | 216 | 53 |
| 10 | 16 | File Composite | 216 | 216 | 53 |
| 11 | 17 | File Composite | 216 | 216 | 53 |
| 12 | 18 | File Composite | 216 | 216 | 53 |
| 13 | 19 | File Composite | 216 | 216 | 53 |
| 14 | 20 | File Composite | 216 | 216 | 53 |
| 15 | 21 | File Composite | 216 | 216 | 53 |
| 16 | 22 | File Composite | 216 | 216 | 53 |
| 17 | 23 | File Composite | 216 | 216 | 53 |
| 18 | 24 | File Composite | 216 | 216 | 53 |
| 19 | 25 | File Composite | 216 | 216 | 53 |
| 20 | 26 | File Composite | 216 | 216 | 53 |
| 21 | 27 | File Composite | 216 | 216 | 53 |
| 22 | 28 | File Composite | 216 | 216 | 53 |
| 23 | 29 | File Composite | 216 | 216 | 53 |
| 24 | 30 | File Composite | 216 | 216 | 53 |
| 25 | 31 | File Composite | 216 | 216 | 53 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 32 | File Composite | 216 | 216 | 53 |
| 2 | 33 | File Composite | 216 | 216 | 53 |
| 3 | 34 | File Composite | 216 | 216 | 53 |
| 4 | 35 | File Composite | 216 | 216 | 53 |
| 5 | 36 | File Composite | 216 | 216 | 53 |
| 6 | 37 | Dr. Peek Vita | 21 | | 54 |
| 7 | 38 | No Disciplinary | 117 | 117 | 54 |
| 8 | 39 | Gilda Kessner Vita | 24 | | 55 |
| 9 | 39 | Gilda Kessner Vita | 94 | 94 | 59 |
| 10 | 40 | Crowder Vita | 20 | 20 | 56 |
| 11 | 40 | Dr. Crowder Vita | 135 | 135 | 58 |
| 12 | 41 | Connell Vita | 24 | 24 | 56 |
| 13 | 41 | Dr. Connell Vita | 70 | 70 | 58 |
| 14 | 42 | Wall Chart | 19, 32 | 19, 32 | 57 |
| 15 | 43 | Polaroid | 26 | 26 | 57 |
| 16 | 44 | Polaroid | 26 | 26 | 57 |
| 17 | 45 | Stipulation | 35 | 35 | 57 |
| 18 | 46 | Digital Jail Photo | 5 | 5 | 57 |
| 19 | 47 | Digital Jail Photo | 5 | 5 | 57 |
| 20 | 48 | Digital Jail Photo | 5 | 5 | 57 |
| 21 | 49 | Digital Jail Photo | 5 | 5 | 57 |
| 22 | 50 | Digital Jail Photo | 5 | 5 | 57 |
| 23 | 51 | Digital Jail Photo | 5 | 5 | 57 |
| 24 | 52 | Digital Jail Photo | 5 | 5 | 57 |
| 25 | 53 | Digital Jail Photo | 5 | 5 | 57 |

| 1 | 54 | Digital Jail Photo | 5 | 5 | 57 |
| 2 | 55 | Digital Jail Photo | 5 | 5 | 57 |
| 3 | 56 | Digital Jail Photo | 5 | 5 | 57 |
| 4 | 57 | Digital Jail Photo | 5 | 5 | 57 |
| 5 | 58 | Digital Jail Photo | 5 | 5 | 57 |
| 6 | 59 | Diary Sheet | 130 | 131 | 57 |
| 7 | 60 | Diary Sheet | 130 | 131 | 57 |
| 8 | 61 | Diary Sheet | 130 | 131 | 57 |
| 9 | 62 | Small Photo | 135 | 135 | 57 |
| 10 | 63 | Dr. Connell Report | 131 | 131 | 58 |
| 11 | 64 | Gilda Kessner Report | 94 | 94 | 59 |
| 12 | 65 | Behavior Sheet | 95 | 95 | 59 |
| 13 | 66 | Behavior Sheet | 95 | 95 | 59 |
| 14 | 67 | Behavior Sheet | 95 | 95 | 59 |
| 15 | 68 | Business Records | 101 | 102 | 59 |
| 16 | 70 | Connell Presentation | 212 | 212 | 59 |
| 17 | 70A | Above/Photos Removed | 212 | 213 | 59 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

1                        Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4             I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13            I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16            Witness my hand this the 27th day of November. A.D.,

17   2001.

18

19

20   _____
     DARLINE W. LABAR
21   Official Court Reporter
     194th Judicial District Court
22   Dallas County, Texas
     (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002

---

DARLINE W. LABAR, OFFICIAL REPORTER

1          REPORTER'S RECORD          **74145**

2          VOLUME 2 OF 65 VOLUMES

3        TRIAL COURT CAUSE NO. F00-02424-NM

4   THE STATE OF TEXAS          :          IN THE DISTRICT COURT

5   VS.                         :          DALLAS COUNTY, TEXAS

6   JEDIDIAH ISAAC MURPHY       :          194TH JUDICIAL DISTRICT

7          ********************          **FILED IN
                                         COURT OF CRIMINAL APPEALS**

8               PRETRIAL HEARING

                                         DEC  5 2001

9          ********************

                                         Troy C. Bennett, Jr., Clerk

10  A P P E A R A N C E S:

11  HONORABLE BILL HILL, Criminal District Attorney
            Crowley Criminal Courts Building
12          Dallas, Dallas County, Texas  75207
            Phone:  214-653-3600
13  BY:     MS. MARY MILLER, A.D.A., SBOT # 21453200
                FOR THE STATE OF TEXAS;
14
15  MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
    MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16  MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
    Dallas County Public Defenders Office
17  Dallas, Texas  75207
            Phone:  214-653-9400
            FOR THE DEFENDANT.
18

19                    *********

20       On the 26th day of February, 2001, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable F. Harold Entz, Jr.,

23  Judge presiding, held in Dallas, Dallas County, Texas:

24       Proceedings reported by machine shorthand, computer

25  assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER          **ORIGINAL**

1                          INDEX VOLUME 2

2    February 26th, 2001                              PAGE      VOL.

3    Proceedings...................................... 2         2

4    Reporter's Certificate........................... 4         2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Cause F00-02424-NM, styled the

 3   State of Texas versus Jedidiah Isaac Murphy.

 4            Let the record reflect the State is present and

 5   represented by Chief Prosecutor 194th District Court, the

 6   Honorable Mary Miller.

 7            The record reflect the defendant is represented by

 8   three co-counsels:  Lead counsel, the Honorable Jane Little

 9   is present in court; the Honorable Michael Byck is present in

10   court; and the Honorable Jennifer Balido is also present in

11   court.

12            Is your name Jedidiah Isaac Murphy?

13            THE DEFENDANT:  Yes, sir.

14            THE COURT:  Mr. Murphy, pursuant to Texas Code

15   of Criminal Procedure Article 34.04, the Court is now

16   presenting to you the list of jurors for petit jury service

17   in this matter.

18            Does either side object to the Court tendering the

19   list, or does either side require or ask that Donna Roach,

20   the Dallas County Jury Services administrator, present the

21   list to me and me in turn to the defense?

22            MR. BYCK:  The defense would have no objection

23   to the Court presenting the list, Your Honor.

24            MS. MILLER:  The State has no objection, Your

25   Honor.
```

```
 1                  THE COURT:  Mr. Murphy, the list of jurors is
 2   now being presented to you.  Do you acknowledge receipt of
 3   the list?
 4                  THE DEFENDANT:  Yes, sir.
 5                  THE COURT:  Hearing is adjourned.  We will
 6   resume Friday this week.
 7                  (Recess of proceedings.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                         Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4            I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13           I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16           Witness my hand this the 2nd day of October, A.D.,

17   2001.

18

19

20                   _____

21                   DARLINE W. LABAR
                     Official Court Reporter
                     194th Judicial District Court
22                   Dallas County, Texas
                     (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002

─────────────────────────────────────────────
                DARLINE W. LABAR, OFFICIAL REPORTER

1                    REPORTER'S RECORD  **74145**

2                  VOLUME 3 OF 65 VOLUMES

3              TRIAL COURT CAUSE NO. F00-02424-NM

4    THE STATE OF TEXAS         :      IN THE DISTRICT COURT

5    VS.                        :      DALLAS COUNTY, TEXAS

6    JEDIDIAH ISAAC MURPHY       :      194TH JUDICIAL DISTRICT

7                    *********************

8                    GENERAL VOIR DIRE

9                    *********************

10   A P P E A R A N C E S:

11   HONORABLE BILL HILL, Criminal District Attorney
            Crowley Criminal Courts Building
12          Dallas, Dallas County, Texas  75207
            Phone: 214-653-3600
13   BY:    MR. GREG DAVIS, A.D.A., SBOT # 05493550
            MS. MARY MILLER, A.D.A., SBOT # 21453200
14              FOR THE STATE OF TEXAS;

15   MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
     MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16   MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
     Dallas County Public Defenders Office
17   Dallas, Texas  75207
            Phone: 214-653-9400
18              FOR THE DEFENDANT.

19                    *********

20        On the 2nd day of March, 2001, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable F. Harold Entz, Jr.,

23   Judge presiding, held in Dallas, Dallas County, Texas:

24        Proceedings reported by machine shorthand, computer

25   assisted transcription.

FILED IN
COURT OF CRIMINAL APPEALS

DEC   5 2001

Troy C. Bennett, Jr., Clerk

DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

1                                    INDEX VOLUME 3

2        March 2nd, 2001                                    PAGE      VOL.

3        GENERAL VOIR DIRE:

4        Proceedings........................................ 2         3

5        Potential Panel Sworn............................. 5         3

6        Reporter's Certificate............................ 69        3

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2         MR. BYCK:  We want to waive on the -- Your
 3  Honor, may the record reflect that after seeing the jury
 4  seated prior to the beginning of voir dire the defense will
 5  waive and give up its right to a shuffle.
 6         We have waived our right to a shuffle.
 7         MR. DAVIS:  Oh, okay.  The State has no
 8  request for a shuffle.
 9         THE COURT:  The Court is calling for trial at
10  this time cause numbered F00-02424-NM, case styled the State
11  of Texas versus Jedidiah Isaac Murphy.
12       Is the State prepared to begin?
13         MR. DAVIS:  The State's ready, Your Honor.
14         THE COURT:  Is the defense prepared to begin?
15         MR. BYCK:  Defense ready, Your Honor.
16         THE COURT:  The record reflect the person of
17  the accused, Jedidiah Isaac Murphy, is present in the Central
18  Jury Room of the Frank Crowley Criminal Courts Building at
19  this time.  He will be at all times during these proceedings
20  absent my dictating the contrary into the record.
21         Ladies and gentlemen, before I swear you in as
22  prospective jurors in this matter, let me give you a bit of
23  an overview of the proceedings you can anticipate
24  experiencing this morning.  After I have sworn you in as
25  prospective jurors, I will then be going over the statutory
```

1    requirements of jury service.  I will also be going over the

2    exemptions that the legislature has placed for consideration

3    by qualified prospective jurors.  The Court in the presence

4    of counsel however will not entertain those questions about

5    your eligibility or exemptions until that period of time when

6    a majority of you will be filling out a questionnaire.  At

7    that time, and I will make reference to when that procedure

8    will begin, going to ask that you form a single file to the

9    far right and on a one-by-one basis, presence of the court

10   reporter, counsel for the State, counsel for the defense, we

11   will hear what your particular circumstance might be.

12   Depending upon the circumstance and the applicable law, a

13   ruling will be made by the Court that will either excuse you

14   or cause you to be considered a continuing prospective juror.

15          Ladies and gentlemen, after I go over the statutory

16   qualifications of jury service and exemptions, pursuant to

17   Texas law I'm required to propound certain principles about

18   the case that is on trial.  After I have completed that and

19   explained to you the procedures that will be by law utilized

20   in this particular matter, questionnaires will be handed

21   out.  Each of you should have by this time a clipboard and

22   some sort of a writing instrument.  Call your attention that

23   when you fill out that questionnaire, you will by that time

24   have been placed under oath so your responses will be under

25   oath subject to the law of perjury such as is applicable in

1   the State of Texas.

2          After the questionnaires have been completed, we

3   will take approximately a one-hour break.   There is a

4   cafeteria located on the first floor of this building which

5   you may want to chance.   Those of you who have been down here

6   before know where of I speak.   More I choose to say not.

7   After we have had about a one hour break, we'll ask that you

8   return.   You need not necessarily sit in the same order that

9   you now find yourselves.   During that one hour break those

10   whom you see up here before me, whom I will be introducing

11   momentarily, and I and my court staff will be going through

12   the questionnaires.   A number of you will be called back at a

13   later time for individual questioning.   Hopefully the

14   procedure that we will be engaged in today will be over by

15   early, early afternoon at the latest.   A number of you will

16   not be called back, a great many of you will, for individual

17   questioning as is provided by the Texas Code of Criminal

18   Procedure in a case of this type.

19          Ms. Debbie Daily is the Court Administrator.   She

20   and a staff will be working so that four of you will be

21   summoned to come down in a morning, four in the afternoon.

22   If on the date that you are summoned to return, some

23   particular difficulty complicates your return, the attorneys

24   and I understand.   Please call Ms. Daily, make her aware of

25   what the circumstance is.   And with the assistance of the

1    attorneys and the Court, we will be reschedule you for a time

2    that's more appropriate.  I realize that accidents may occur

3    or may be a personal emergency, such as a death in the

4    family.  Matters such as that are not contemplated or

5    planned, but they happen.  If that should be your

6    circumstance, please do not hesitate in letting us know about

7    what the circumstance is so that we may accommodate you.

8    Those of you that are not given a date and time to return

9    will be excused from further jury service as relates to this

10   case and will be free to go back home, back to work as the

11   case may be, and forget about this experience other than what

12   you've experienced this morning.

13          With that as a bit of a profile of what procedures

14   you can expect this morning, may I ask all of you to please

15   rise and raise your right hands.

16          Ladies and gentlemen, for purposes of your

17   individual religious belief, or matters of personal

18   conscience, at your option the operative verb will be either

19   "swear" or "affirm."

20          Do each of you solemnly swear or affirm that you

21   will make true answers to such questions as may be propounded

22   to you by the court or under its directions touching your

23   service and qualifications as a juror, so help you God.

24                  (Potential Panel Sworn)

25          THE COURT:  Thank you.  Please lower your

Page 6

1    hands and again please be seated.

2            Ladies and gentlemen, I am first going to begin with

3    the statutory qualifications of jury service, followed

4    thereafter by the exemptions.  Again, please, for the benefit

5    of your fellow jurors' time and the entire proceedings this

6    morning, hold your specific problem until we get to the

7    questionnaire portion.  At that time we would welcome,

8    entertain what comments that you may have as relates to your

9    particular circumstance.

10            To be a prospective qualified juror, you must be 18

11    years of age or older.  You must currently reside within

12    Dallas County, Texas.  And you must be a citizen of the

13    United States of America.  Up until a few years ago we had

14    little problem with this particular provision because only

15    those individuals that were registered voters were those from

16    whom the list of prospective jurors were called.  The

17    legislature a few years ago included the pool of prospective

18    jurors to be not only registered voters, but also those

19    individuals that had a Texas drivers license.

20            I am well aware, I trust you are as well, that there

21    are many, many individuals lawfully, and I emphasize that

22    adverb, lawfully living in Dallas County who possess a valid

23    Texas drivers license but are not citizens of the United

24    States of America, but by virtue of the drivers license

25    received a summons, and wanting to avoid the punitive aspects

1    of failing to show up, present themselves nevertheless.  So

2    if you are not a citizen, not 18 years of age or older, and

3    don't presently live within Dallas County, you are not a

4    prospective qualified juror.

5         Next requirement is that you must be of sound mind.

6    Unless you have been declared mentally incompetent by a

7    court, should be no problem, I would hope.

8         Next requirement is a literacy requirement.  49 of

9    the 50 jurisdictions that make up this the United States of

10   America have some form or fashion of this particular

11   provision.  Texas is about as bland as most.  We but say one

12   must be able to read and write.  No requirement you've

13   graduated from high school or have a GED.  Rule of thumb

14   utilized in all 254 counties of Texas is the following:  If

15   upon receiving your jury summons without having to depend

16   totally upon the literacy efforts of a spouse or relative or

17   neighbor or a friend, but as a result of your reading your

18   summons you're here today, such should be sufficient for this

19   particular requirement.

20        Next requirement deals with prior petit or trial

21   jury service, different types of courts, different time

22   periods.  If you have served as a petit or trial juror for

23   five days during the preceding 3 months in a county court, a

24   6-person court, or 5 days during the preceding 12 months in a

25   12-person or a district court, be it civil, criminal,

1  juvenile, or family law, until those time periods have

2  elapsed, you are not again a qualified juror.

3       Next requirement is that you have not been convicted

4  of a felony.  Ladies and gentlemen, there are two broad

5  categories of criminal offenses.  One known as a misdemeanor,

6  which is a criminal offense punishable by jail time and/or a

7  fine.  A felony, on the other hand, is a criminal offense

8  punishable by penitentiary time.

9       Next requirement is that you have not been convicted

10  of theft, be it misdemeanor or felony, nor that you be under

11  any legal accusation, on bond, if you will, for a felony at

12  this present time.

13       Ladies and gentlemen, under Texas law, some, not

14  all, but some hot checks are considered under the Penal Code

15  to be a theft.  Having though said that if you and a business

16  have had a bit of difficulty about a check and resolved it

17  without anybody intervening in the criminal justice field, no

18  problem.  If however the matter escalated to the point where

19  it was brought to the attention of a court through a justice

20  of the peace or a county criminal court or a district court,

21  such as the court over which I preside, you paid a fine,

22  court costs, maybe were given time for the short period of

23  time that you were in custody, in addition to restitution for

24  the face amount of the check, that may well be considered a

25  theft conviction, thereby disqualifying you.  On the other

1  hand, though, if you and the business handled it through a

2  phone call, came up and made good on the check and paid X

3  number of dollar amount return check fee, no problem.

4       If in the past you've been on probation for a felony

5  or theft and have successfully lived out that probationary

6  period and are no longer on probation, assuming you meet the

7  statutory qualifications I have previously discussed or

8  mentioned, no problem.

9       So much for the statutory qualifications for jury

10  service.  I'm now going to be moving into the area of

11  exemptions.

12       Ladies and gentlemen, exemptions differ markedly

13  from qualifications.  If you are qualified and fall within

14  one of the areas that the legislature has designated as an

15  exemption and wish to claim that exemption, your request will

16  be granted.  On the other hand, just because you have an

17  exemption does not mean that you must claim it.  And frankly

18  and selfishly, I would hope that those of you, depending upon

19  the exemption that have one, would choose not to claim it but

20  would continue to participate with us in this particular

21  proceeding.

22       If you are 70 years of age or older, you may claim

23  your senior age status an exemption and be excused.  Just

24  because you are 70, if you are otherwise qualified, you are

25  not required to claim age as an exemption and be excused.

1       This next one for I think obvious reasons the

2   attorneys and I would hope that you would claim.  If you have

3   custody of a child or children under the age of 10 and if by

4   virtue of your presence down here a child or children are

5   left without adequate supervision or care, obviously we would

6   hope you would claim that exemption and be excused.

7       I have been privileged to be a trial judge for

8   nearly 28 years now.  I've had individuals disqualify

9   themselves under all of the provisions I previously

10  mentioned, every exemption save and except this one.  Maybe

11  the string will be broken this morning.  If you are a high

12  school student and have such a burning desire to get back to

13  chemistry and physics and calculus and would choose not to

14  participate in the democratic form of government as a

15  prospective juror, come on up.  Let me know.  I want to shake

16  your hand and send you on your way back to school.

17  Seriously, high school students may claim an exemption by

18  virtue of that status.

19       If you are enrolled and attending an accredited

20  college.  Ladies and gentlemen, the Supreme Court and Court

21  of Criminal Appeals on a couple of occasions have indicated

22  this refers to daytime classes.  If you are a --

23  hypothetically a student going to, taking enrichment classes,

24  maybe getting a Masters degree at S.M.U. or taking some type

25  of an adult education class at one of the community colleges

1   at the nighttime, I assure you your participation down here

2   in this process of jury service will not interfere or

3   conflict with that.

4        Talk about having a good lobby.  If you are an

5   employee of the legislative branch of state government, not

6   the judicial branch, not the executive branch, but the

7   legislative branch of state government, you may claim that

8   employment as an exemption.

9        Ladies and gentlemen, there is an error

10  unfortunately in the summons that came out.  We caught it

11  after the particular provision the printer -- current summons

12  went to print.  If you have served as a petit juror, trial

13  juror, not a grand juror, petit juror in any court, be it a

14  municipal court, a county court, a district court, even a

15  Federal district court, since July 1st the year 2000, you may

16  claim an exemption of that prior jury service.  It's not a

17  disqualification.  The legislature the last session drafted

18  for some reason -- the legislative history is a bit murky,

19  but nevertheless this is now a particular provision in the

20  government code which you are free to claim if it's

21  applicable to you.

22        So much for the statutory qualifications required to

23  be a prospective juror.  So much for the exemptions.

24        Again, as I indicated, please hold your questions in

25  that regard until we begin the questionnaire portion of the

DARLINE W. LABAR, OFFICIAL REPORTER

1  proceedings this morning.

2          Ladies and gentlemen allow me, if I may, to

3  introduce those individuals whom you see seated before you at

4  this time.  To my immediate right is the defendant, the

5  accused, if you will.  Based upon some pretrial matters

6  having previously gone on prior to today, I have come to know

7  this individual as Jedidiah Isaac Murphy.

8          Mr. Murphy, will you please rise, let the members of

9  the panel see you, please.

10         Thank you, you may be seated.

11         Ladies and gentlemen, three members of the Dallas

12  County Public Defenders Office are present on behalf of their

13  client, Mr. Murphy.  Lead counsel for the defense, a former

14  Chief Prosecutor in the Dallas District Attorneys Office

15  before she went to work with the Dallas County Public

16  Defenders Office, the Honorable Jane Little.

17         Ms. Little, if you please.

18             MS. LITTLE:  Good morning.

19             THE COURT:  Assisting Ms. Little, to her right

20  as you look at them, a veteran attorney here in Dallas

21  County, the Honorable Mike Byck.

22             MR. BYCK:  Good morning.

23             THE COURT:  Unlike the pen, his name is not

24  spelled B-i-c, it's B-y-c-k.

25             The third member of the Dallas County Public

1   Defenders Office representing Mr. Murphy is the Honorable

2   Jennifer Balido.

3          Ms. Balido.

4              MS. BALIDO:   Good morning.

5              THE COURT:   Ladies and gentlemen, the counsel

6   table to the right of the defense attorneys are two senior

7   members of the Dallas County District Attorney's Office.   One

8   of the most Senior Prosecutors in the Dallas District

9   Attorneys Office is lead counsel for the State, the Honorable

10  Greg Davis.

11         Mr. Davis, if you please.

12             MR. DAVIS:   Good morning.

13             THE COURT:   Assisting Mr. Davis with regard to

14  this prosecution is at the present time and has been for some

15  few years now the Chief Prosecutor assigned to the 194th

16  District Court, the court over which I am privileged to

17  preside, the Honorable Mary Miller.

18         Ms. Miller.

19             MS. MILLER:   Good morning, ladies and

20  gentlemen.

21             THE COURT:   To my immediate left is the

22  official court reporter for the 194th District Court, Ms.

23  Darline King.   She is taking down not only the comments that

24  I'm making to you at this time for purposes of the trial

25  record, but in addition when those of you have questions for

1    the attorneys and I about your eligibility to be a qualified

2    juror and to claim an exemption, she will be taking down your

3    comments as well.  Now, the attorneys and I are well aware

4    that when those of you that come up to the side, some of you

5    may be discussing with us matters of a personal nature which

6    would be a bit embarrassing to have a room full of strangers

7    be made aware.  That be the case, we understand.  We do

8    though for purposes of the trial record respectfully ask that

9    you speak loud enough so that not only the attorneys and I,

10   but also Ms. King can get your response, thereby making

11   certain that we have a complete trial record for appellate

12   purposes if that should become necessary.

13          Ladies and gentlemen, I have already introduced to

14   you the accused.  Jedidiah Isaac Murphy has been indicted by

15   a Dallas County Grand Jury for the offense of capital murder.

16   The State has made known its intent to seek the death

17   penalty.  That is the purpose of this special venire.  For

18   those of you that have been down here before and think these

19   proceedings are a little bit different than what you've

20   experienced in the past, you're correct.  Because Texas

21   legislature through the Code of Criminal Procedure has

22   required that a different procedure with regard to death

23   penalty cases be implemented which we are complying with at

24   the present time.

25          I am required now by virtue of Article 35.17,

1    Section 2, of the Texas Code of Criminal Procedure to make

2    you aware of certain matters I hope and trust we were all

3    taught when we were in junior high or middle school or high

4    school taking a government class.  But nevertheless, given

5    the importance of the proceedings and the requirement in the

6    Texas Code of Criminal Procedure, I do so again.

7           Previously indicated that the defendant has been

8    indicted by a Dallas County Grand Jury.  An indictment in and

9    of itself is no evidence of guilt at all.  An indictment

10   apprises a defendant of the offense charged against him.

11   That same document, the indictment, puts the State on notice

12   of those matters which they must place in evidence and

13   convince a jury beyond a reasonable doubt before a jury is

14   entitled to return a verdict of guilty.  The indictment also

15   confers jurisdiction or judicial authority, if you will, upon

16   a District Court.  So, therefore, Mr. Murphy is aware that he

17   has been charged with capital murder.  He's not been charged

18   with drug possession or burglary or sexual assault.  He

19   understands, as does his attorneys, that he has been charged

20   with capital murder.

21          He as he sits before you today, the indictment

22   notwithstanding, must be presumed to be innocent.  Every

23   individual indicted, including Mr. Murphy, or it would be any

24   one of you were you seated where he now finds himself, must

25   be guaranteed that same right.

1          The burden of proof, the responsibility of proving

2     the allegations in the indictment and endeavoring, if they

3     can, to overcome the presumption of innocence, lies with the

4     State in the persons of the prosecutors, Mr. Davis, Ms.

5     Miller, and their witnesses, and any scientific evidence that

6     is offered which the Court deems admissible.  The State has

7     the responsibility of proving any defendant guilty, be it a

8     misdemeanor, a felony, including but not limited to a capital

9     murder case.  The amount of evidence that the jury must hear

10    and believe before a verdict of guilty can be returned,

11    before the presumption of innocence can be overcome, is proof

12    beyond a reasonable doubt.  Not the Perry Mason standard of

13    beyond a shadow of a doubt, not 100 percent certainty.

14    Because I submit to any one of you that if you were 100

15    percent certain of the allegations in the indictment, you

16    would not be seated where you now find yourselves, but would

17    be on the list of prospective witnesses in this particular

18    prosecution.

19          If after hearing the evidence you have a reasonable

20    doubt as to one of the constituent parts of the indictment,

21    by law the jury must return a verdict of not guilty.  On the

22    other hand, if after hearing the evidence, receiving the

23    instructions from the Court, called the Court's charge, and

24    after deliberating with your 11 fellow jurors, you become

25    convinced beyond a reasonable doubt that all of the

1    applicable portions, which we call elements in the

2    indictment, the charging document, have been satisfied to

3    your belief beyond a reasonable doubt, the presumption of

4    innocence is overcome, by law, pursuant to the oath that the

5    jurors will by that time have taken, obligates you to return

6    a verdict of guilty.

7            Ladies and gentlemen, 1972 the United States Supreme

8    Court ruled that regular, quote, unquote, murder cases

9    violated the United States Constitution.  Case is Furman

10   versus Georgia, 1972.  The Supreme Court in that opinion

11   indicated that without, quote, unquote, guided discretion,

12   too much authority or power was in the hands of the

13   prosecutors.  And on somewhat a random, inconsistent basis,

14   individuals were being sentenced to death and executed.

15           After that rather block buster opinion came out,

16   legislatures around the country who wanted by virtue of

17   public opinion, political opinion to implement a capital

18   scheme consistent with the constitutional mandates developed

19   by the United States Supreme Court, came up with a number of

20   different schemes.  There are basically three schemes that

21   are now in place throughout the country, one being the Texas

22   scheme which is also utilized by Oregon, also have the

23   Georgia scheme and also have the Florida scheme.

24           .  Basically the Supreme Court said there must be

25   something more than just the taking of a human life before

1   the ultimate punishment would pass constitutional muster.  A

2   number of states, Florida being the primary one, have adopted

3   a number of what they call aggravating factors which are put

4   in place at the penalty stage of the trial, depending upon

5   the jury verdict, in that a recommendation is made to the

6   Florida trial judge as to whether or not, based upon the

7   evidence and the aggravating and mitigating factors, death or

8   life should be the result.

9         Texas, on the other hand, did it a bit differently.

10   Texas put what are called the aggravating factors into the

11   indictment.  And not only that, and I'll get into the penalty

12   stage of a capital scheme momentarily.  To be a valid

13   indictment for capital murder, the indictment in Texas must

14   allege murder plus.  Now, what is that plus?

15         Plus can be another felony offense during the

16   commission of the murder, such as robbery or kidnapping or

17   sexual assault or burglary.  Status is also protected.  A

18   peace officer or a fireman during the lawful discharge of

19   their duties, if murdered, can be a capital case.  Mass

20   killing also can be a capital case.  Age can also be a

21   status.  The intentional taking of the life of a person under

22   the age of 6 can be a capital case.  Also, for remuneration,

23   kill for hire, or a serial killer could be a capital case.

24         The indictment present in this particular case

25   alleges murder during the course of robbery or kidnapping.

1    The State may plead in the conjunctive or -- no, and, robbery

2    or kidnapping, but only need to prove one, disjunctive.

3    Therefore, if the State in this case proves a murder,

4    kidnapping or robbery as a part thereof, that makes it a

5    capital case.

6         If you as a jury find murder but not the added

7    factor, in this case kidnapping or robbery, it would be a

8    verdict of guilty of murder but not capital murder.  And

9    there's a significant difference with regard to punishment.

10        Murder, not capital murder is a first degree felony

11   under the Penal Code of the State of Texas, which means an

12   individual found guilty of murder in Texas is looking at a

13   penalty range of not less than 5 nor 99 years or life, with

14   an optional fine not to exceed $10,000.

15        On the other hand, an individual found guilty of

16   capital murder, but two options, life or death.  An

17   individual in Texas found guilty of capital murder and

18   sentenced to life in the penitentiary by law must serve 40

19   calendar years in confinement before being eligible for

20   consideration on parole.  On the other hand, an individual

21   convicted of murder, not capital murder, must serve 50

22   percent of the calendar time of the sentence, but not more

23   than 30 years before being eligible for consideration on

24   parole.  Very appropriately, in my judicial opinion, the

25   legislature in the State of Texas, with regard to the death

1    sentence, has fashioned our law in such a way that a life

2    sentence as opposed to a death sentence is the preferred

3    outcome.  Because the State under our scheme and it's not

4    just Dallas County, but statewide, just because the jury

5    returns a verdict of capital murder does not equal death.

6    Under our statute there are other matters that the jury must

7    take into consideration before they make that ultimate,

8    ultimate decision.

9           If you are selected as a juror in this case, and if

10   the jury returns a verdict of capital murder, each side is

11   entitled to present additional evidence for the consideration

12   of the jury on the matter of punishment.  At the conclusion

13   of the evidence in the penalty stage of the trial, another

14   instruction will be given by the Court, the assistance of the

15   attorneys, at which in a case of this type, the jury will be

16   called upon to answer two questions.  These questions are

17   statutory, not just something that I dreamed up driving down

18   to the courthouse to be with you this morning.

19          The first question the jury will be called upon to

20   answer is as follows:  Whether there is a probability that

21   the defendant would commit criminal acts of violence that

22   would constitute a continuing threat to society.  That would

23   be a type of case -- hypothetically, penalty stage, jury had

24   found the defendant guilty of capital murder, that would be

25   the question, the first question.  Again, whether there is a

1    probability that the defendant would commit criminal acts of

2    violence that would constitute a continuing threat to

3    society.

4            If the 12 jurors do not unanimously answer that in

5    the affirmative, it's a life sentence and that's it with

6    regard to the trial.  On the other hand, if the jury after

7    answering that first question, the answer results 12 yeses,

8    all affirmative, then and only then need the jury get to the

9    second question.

10           And that question is as follows, quoting:  "Whether

11   taking into consideration all of the evidence, including the

12   circumstances of the offense, the defendant's character and

13   background, and the personal moral culpability of the

14   defendant, there is a sufficient mitigating circumstance or

15   circumstances to warrant that a sentence of life imprisonment

16   rather than a death sentence be imposed."

17           Therefore, ladies and gentlemen, bit of a recap.

18   Just because an individual in Texas has been indicted and is

19   found guilty by a jury of capital murder does not

20   automatically equate death.  These special issues must be

21   considered by the jury, and only if answered unanimously

22   first one yes, second one no, does death result.  Unlike

23   Florida in which the juries give a recommendation to the

24   trial judge, not so in Texas.  Given the populist background

25   that we have in this state the trust and faith that we as a

1    body politic give in our citizens, whatever the decision of

2    the jury is, is final.  A trial judge may not serve, if you

3    will, as a thirteenth juror, either way.  Either way.

4         To be a prospective qualified juror, you must be

5    willing to tell yourself, most importantly, therefore the

6    attorneys and Mr. Murphy, that you are willing to listen and

7    consider mitigating circumstances or evidence if that is

8    presented.  Because if you say I don't care what mitigating

9    evidence is presented, the United States Supreme Court has

10   said that is not a qualified -- a death qualified juror.  If

11   you hear mitigating evidence and decide that it is not

12   sufficient to give the defendant a life sentence, that's

13   fine.  That's your call.  But you must be willing to be a

14   death qualified juror, pursuant to the United States Supreme

15   Court, be willing to listen and then determine whether or not

16   the mitigating circumstances rise to that level as a result

17   of which in this case Mr. Murphy should live and not die.

18   Realizing that a life sentence is 40 years, flat time, and I

19   mean day-for-day, week-for-week, month-for-month.

20        Awful quiet out there, isn't it?  I realize, as the

21   attorneys do, that this is a difficult matter to

22   contemplate.  You know, we don't go around at social settings

23   say what do you think about the death penalty, you know.  A

24   little bit macabre, yes.  I assure you, I had a lot more hair

25   before I started these than I do now.  It's been said by a

1    very, very prominent legal philosopher that second only to

2    serving our country on the field of battle during wartime is

3    the responsibility we call upon our fellow citizens to serve

4    as a juror in a death penalty case.  I've thought about that

5    a lot over the last many, many years, and I think that's

6    pretty true.  I've been called upon in my judicial capacity

7    to preside over quite a few of these.  They are not easy for

8    the Judge, I promise you.  They are not easy for the lawyers.

9    And they are not easy for the jurors.  We, though, as a

10   body politic call upon you who have been randomly selected.

11   We don't go out and pick and choose you, I assure you.  We

12   ask only that you reach into your heart of hearts and give

13   your best.  I am not here to advance the cause of the death

14   penalty, nor to be a passivist and say I don't care what the

15   circumstances are.

16          On the front page of the questionnaire that you'll

17   be receiving shortly you will see what over a number of years

18   attorneys, be they prosecutors or defense attorneys, and

19   judges have come up with, with regard to basically how we

20   have found over a number of years of conducting trials of

21   this kind how jurors feel.  None of the attorneys nor I know

22   how any one of you feel about this.  The questionnaires will

23   be handed out to you momentarily.  Recall if you will that

24   you are under oath.  The 12 that will serve as jurors will

25   not be selected today.

```
 1          The questionnaires will be kept confidential.
 2    Available only to the Court, the attorneys for the State and
 3    the defense.  Upon the conclusion of the trial, only for
 4    trial record purposes, will the original be kept.  I will
 5    require the State and the defense to turn over to me their
 6    copies, and they will be shredded and destroyed.  Therefore
 7    your responses will be kept confidential only to the limited
 8    extent that, if necessary, some appeals court somewhere down
 9    the line may want to take a look at an individual's
10    questionnaire, but for no other reason.  No other reason.
11    Not be turned over to some doctoral student at some college
12    or university to make an analysis of prospective death
13    penalty jurors in Dallas County.  Trust me.
14          Likewise, from a procedural standpoint, the
15    attorneys, though we will be -- they and I will be going over
16    briefly the questionnaires during the one-hour break, next
17    week they will be looking over the questionnaires in a bit
18    more detail.  If you today are summoned back subsequent to
19    which there's some other matters in your questionnaire that
20    will negate your having to return, please be certain you put
21    a good telephone number on your questionnaire so that Ms.
22    Daily, the Court Administrator, can call you because
23    obviously we want to avoid having your coming down here if we
24    know you're not going to be needed for individual
25    questioning.
```

 1            The attorneys will be spending next week going over

 2    the questionnaires with a fine tooth comb.  I will not be

 3    going over that.  I already have a trial scheduled.

 4    Following Monday we'll begin individual questioning.

 5            Now, this process of individual questioning for a

 6    capital jury in Texas can be a bit time-consuming.  Based on

 7    past experience we hopefully anticipate that not only will

 8    the process be completed to give the attorneys a couple of

 9    last two weeks to get all of their evidence in order,

10    probably testimony in this matter will begin the day after

11    Memorial Day.  The day after Memorial Day, a Tuesday.  Those

12    of you between now and then, that after your individual

13    questioning we'll tell you whether or not you remain under

14    consideration.  Feel free to call the Court on a regular

15    basis if you wish to see how the process is being -- how it

16    is being completed and how far along the road we are.

17            Each side under Texas law in a capital case in which

18    death is being sought have 15 peremptory challenges.  A

19    peremptory challenge is the excusing by one side or the other

20    of an otherwise qualified juror as long as the challenge is

21    not utilized for racial or gender purposes.  Neither side can

22    say because the prospective qualified juror is a male, a

23    female, African American, Asian American, whatever, cannot

24    utilize that as a constitutionally permissible exercise of a

25    peremptory challenge.  Does not mean that individuals of an

1   identifiable ethnic background cannot be peremptorily

2   excused, but ethnicity cannot be the reason.  Must be a

3   reason other than ethnicity.

4            Sam, are we ready on the questionnaires?

5            Ladies and gentlemen, the questionnaires will be

6   handed out by representatives of the Dallas Sheriff's

7   Department and some of my court staff.  Please recall, if you

8   will, that you are under oath while you're answering these

9   questions.  As soon as you have completed the questionnaire,

10  if you'd please put it on the table to the right.

11           It is 10:15.  Let me ask that all of you be back in

12  this Central Jury Room say 11:45.  Is that fair?   11:45.

13  And at that time we will go over the questionnaires and I'll

14  call out the names and that will hopefully give us enough

15  time to put up the list with regard to individual questions.

16           Sheriff, if you please, the questionnaires.

17           Those of you who have questions about your statutory

18  qualifications and exemptions, wait until the questionnaires

19  have been handed out and then if you'd come up to your far

20  right and make a single line and will take your circumstances

21  as you present them to us.

22                 (Side Bar Conference)

23           THE COURT:  May I have a representative of the

24  State and the defense?

25           The record reflect these hearings are being

DARLINE W. LABAR, OFFICIAL REPORTER

1  conducted in the presence of the State and the defense, Mr.

2  Murphy is not present in such a manner that he can hear the

3  prospective jurors.

4          Does the defense have any objection to Mr. Murphy

5  sitting where he is?

6                  MS. BALIDO:  I think under the statute he's

7  supposed to be, Judge.

8                  THE BAILIFF:  If y'all will, just back up just

9  a bit.

10                 THE COURT:  Does he want to be over here, Mr.

11  Byck?   Does he want to be over here?

12                 MR. BYCK:  No.

13         I'll stand behind you.

14                 THE COURT:  What is your name, please?

15                 VENIREPERSON:  Vanessa Willis.

16                 THE COURT:  What is your circumstance?

17                 VENIREPERSON:  You said if you have a theft

18  and I'm still on paper, I shouldn't be a juror.

19                 THE COURT:  Are you on theft probation?

20                 VENIREPERSON:  Uh-huh.

21                 THE COURT:  Either side?  Theft probation.

22                 MS. MILLER:  I didn't hear her name.

23                 THE COURT:  Vanessa Willis.

24                 MR. DAVIS:  We don't have any objection.

25                 MS. LITTLE:  Just for the record, how much

```
1    money are we talking about here?  Is it a misdemeanor or a

2    felony?

3                    VENIREPERSON:  It's a misdemeanor, but he said

4    misdemeanor or felony.

5                    MS. LITTLE:  Okay.

6                    THE COURT:  And you're on probation at the

7    present time?

8                    VENIREPERSON:  Yes.

9                    THE COURT:  You are excused.  Just leave this

10   here.

11                   VENIREPERSON:  So can you give me a release?

12                   THE COURT:  They'll give it to you.

13                   VENIREPERSON:  Thank you.

14                   (Venireperson brought forward.)

15                   THE COURT:  What is your name?

16            Juror 1837, Queen Elizabeth Sewell.  What is your

17   circumstance?

18                   VENIREPERSON:  I just got off work.  I work at

19   7:00 at night to 7:00 in the morning.  And I just recently

20   moved to Arlington.

21                   THE COURT:  You live in Arlington now?

22                   VENIREPERSON:  Yes.  I brought my check stub

23   for you.

24                   THE COURT:  We trust you.  Yeah, just leave it

25   here.
```

```
1              Next.

2                   VENIREPERSON:  Hello.

3                   THE COURT:  What is your name, please?

4                   VENIREPERSON:  Claire Page.

5                   THE COURT:  Claire Page.

6                   VENIREPERSON:  Yes.

7                   THE COURT:  What is your circumstance?

8                   VENIREPERSON:  I leave on March the 8th for a

9    business trip to England until March 26th.

10                  THE COURT:  No problems.  Stay with us, we'll

11   work with you.

12                  VENIREPERSON:  Okay.  Stay here?

13                  THE COURT:  Stay here and fill it out.

14                  VENIREPERSON:  Oh, gosh.

15                  THE COURT:  Next.

16                  (Venireperson brought forward.)

17                  THE COURT:  What is your name, please?

18                  VENIREPERSON:  Deborah Riley, R-i-l-e-y.

19                  THE COURT:  Thank you.  What is your

20   circumstance?

21                  VENIREPERSON:  I have tickets to go to Italy

22   that leave on Sunday, March 4th, and I won't be back until

23   March 14th.

24                  THE COURT:  No problem.  Stay with us.

25                  VENIREPERSON:  And also my daughter is
```

1    graduating from college in California on April the 27th.

2                    THE COURT:  We'll work with you.  Thank you.

3    Just stay here.

4            Next.

5                    (Venireperson brought forward.)

6                    THE COURT:  Good morning.  What is your name,

7    please?

8                    VENIREPERSON:  Michelle Gross.

9                    THE COURT:  Michelle Gross.  Michelle, what is

10   your situation?

11                   VENIREPERSON:  I have two questions.

12                   THE COURT:  Sure.

13                   VENIREPERSON:  The first is if the case was to

14   start on June 1st, how long would it last, because I have to

15   go to a high school graduation in June and I'm probably going

16   to fly out -- if it's more than two weeks.

17                   MS. LITTLE:  Shouldn't be more than two weeks.

18                   VENIREPERSON:  So it's no more than 10 days?

19                   THE COURT:  No.  Thank you.

20                   (Venireperson brought forward.)

21                   THE COURT:  What is your name, please?

22                   VENIREPERSON:  William Charles Sergeant.

23                   MR. DAVIS:  We have no objections.

24                   MS. LITTLE:  Nor do we.

25                   THE COURT:  You are excused.  Thank you.  You

1    may take this with you.

2                    THE COURT:  Next.

3                    (Venireperson brought forward.)

4                    THE COURT:  What is your name, please?

5                    VENIREPERSON:  Karen Kingston.

6                    THE COURT:  Karen Kingston.  Ms. Kingston,

7    what is your circumstance?

8                    VENIREPERSON:  I just wanted the Court to be

9    aware that I will be out of the country from the 16th of

10   March to the 15th of April.

11                   THE COURT:  No problem.  We'll work with you.

12   Thank you.

13                   (Venireperson brought forward.)

14                   VENIREPERSON:  Carolyn Dawson.

15                   THE COURT:  Carolyn Dawson.  What is your

16   circumstance, please?

17                   VENIREPERSON:  I have, I think two or

18   whatever, theft by check.

19                   THE COURT:  What's the status of those?  Are

20   they pending?

21                   VENIREPERSON:  Oh, no.

22                   THE COURT:  Are they over?

23                   VENIREPERSON:  Yes.

24                   THE COURT:  What happened?

25                   VENIREPERSON:  I had to pay a court fine.  It

```
 1   was in the JP court.  It was in the JP court.  Theft by

 2   check.

 3                   MR. DAVIS:  No objections.

 4                   THE COURT:  Either side care to her being

 5   excused?

 6                   MR. BYCK:  No objection.

 7                   MS. LITTLE:  Okay.

 8                   THE COURT:  Thank you.  You are excused.

 9                   MS. BALIDO:  In whose court was it?

10                   MS. MILLER:  JP.

11                   MS. BALIDO:  Those are IBC's.

12                   (Venireperson brought forward.)

13                   VENIREPERSON:  Batot, B-a-t-o-t, first name

14   Paul.  I will be commencing treatment for prostate cancer.

15                   THE COURT:  When?

16                   VENIREPERSON:  Next week.

17                   THE COURT:  How long will the treatment last?

18                   VENIREPERSON:  I don't know.  The doctor says

19   it depends what it looks like when it gets started.  Could be

20   two to three months.

21                   MR. BYCK:  We would agree.

22                   MS. LITTLE:  We agree.

23                   MR. DAVIS:  We agree.

24                   THE COURT:  Thank you.

25         Next.
```

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1                    (Venireperson brought forward.)

 2                    VENIREPERSON:  My name is Jeremiah Gonzalez.

 3                    THE COURT:  Yes, sir.

 4                    VENIREPERSON:  I have three children, and I

 5       have to pick them up everyday at 3 o'clock.

 6                    THE COURT:  Can your wife make arrangements to

 7       pick them up?

 8                    VENIREPERSON:  She works.

 9                    THE COURT:  You pick them up everyday?

10                    VENIREPERSON:  Everyday.  Her job is to drop

11       them off.  My job is to pick them up.

12                    THE COURT:  How old are they?

13                    VENIREPERSON:  I have an 11-year-old, I have a

14       7-year-old and a 5-year-old.

15                    THE REPORTER:  I'm sorry, what was his name?

16                    THE COURT:  Jeremiah Gonzales.

17              You are excused.

18                    VENIREPERSON:  Thank you.

19                    (Venireperson brought forward.)

20                    THE COURT:  What is your name, please?

21                    VENIREPERSON:  Brenda Ball, B-a-l-l.

22                    THE COURT:  Thank you.

23                    VENIREPERSON:  I'm sorry, I'm emotional being

24       here.  I'm self-employed.  And I don't believe in the death

25       penalty.  I just can't.
```

1            THE COURT:  Just fill it out.  That's all we

2   need.   Thank you.  Just return to your seat.  Thank you.

3            (Venireperson brought forward.)

4            VENIREPERSON:  My name is hard to spell.

5   Margaret Gulsvig.  And I currently don't reside in Dallas

6   County.

7            THE COURT:  You don't?

8            VENIREPERSON:  No.

9            THE COURT:  Thank you.  You're excused.  Thank

10  you.

11        Next.

12            (Venireperson brought forward.)

13            THE COURT:  What is your name, please?

14            VENIREPERSON:  Jack Donaldson.

15            THE COURT:  Jack Donaldson.

16            VENIREPERSON:  I actually live in Denton

17  County.

18            MS. LITTLE:  Well, ta-ta, Mr. Donaldson.

19            VENIREPERSON:  I tried to tell them.  They

20  said come, so I came.

21            MR. BYCK:  Thank you, sir.

22            THE COURT:  Next.

23            (Venireperson brought forward.)

24            THE COURT:  What's your name, please?

25            VENIREPERSON:  Well, it's Pam McAfee.

```
 1                    THE COURT:  Pam McAfee.  Your circumstances?
 2                    VENIREPERSON:  I have a bad back.  I can't
 3   sit, stand, lay, or anything for any time at all.  I'm
 4   qualified disability through Social Security.
 5                    THE COURT:  Counsel?
 6                    MR. BYCK:  No objection.
 7                    MS. LITTLE:  Okay.
 8                    MR. DAVIS:  Excused.
 9                    THE COURT:  Okay.  You're excused.
10         Next.
11                    (Venireperson brought forward.)
12                    VENIREPERSON:  My name is David Turner.
13                    THE COURT:  What is your circumstance, Mr.
14   Turner?
15                    VENIREPERSON:  I served as a petit juror in
16   July or August of this past summer.
17                    THE COURT:  Do you want to claim that as an
18   exemption, or do you want to stay with us?
19                    VENIREPERSON:  I want to claim that.
20                    THE COURT:  What court?
21                    VENIREPERSON:  I don't remember right now.
22                    THE COURT:  Was it civil or criminal?  Was it
23   this building?
24                    VENIREPERSON:  It was criminal case in this
25   building.  I went through voir dire.  I wasn't selected for
```

1    the panel, for the jury panel itself.

2                    THE COURT:  Oh, then you weren't a petit

3    juror.

4                    VENIREPERSON:  No?

5                    THE COURT:  No.  Have a seat.  Fill out the

6    questionnaire for us.  Thank you.

7                    (Venireperson brought forward.)

8                    VENIREPERSON:  Hi.

9                    THE COURT:  What is your name, please.

10                   VENIREPERSON:  R-a-z-a, I-m-r-a-n.

11                   THE COURT:  Yes, sir.

12                   VENIREPERSON:  I am Muslim and I have send a

13   letter, my beliefs contradict with the -- I'm Muslim so I

14   contradict with the beliefs.

15                   THE COURT:  Just fill it out.  We'll take care

16   of it.

17                   VENIREPERSON:  Okay.

18                   (Venireperson brought forward.)

19                   THE COURT:  What is your name, please?

20                   VENIREPERSON:  Peggy Fredrickson.

21                   THE COURT:  Peggy Fredrickson.  Yes.

22                   VENIREPERSON:  I'm a teacher.  I have

23   conferences in the morning and afternoon everyday for the

24   next two weeks.

25                   THE COURT:  We'll work with you.  We'll work

1    with you.

2                    VENIREPERSON:  All right.

3                    THE COURT:  Just fill it out.  Stay with us.

4    Thank you.

5                    (Venireperson brought forward.)

6                    THE COURT:  Hi.  What is your name, please?

7                    VENIREPERSON:  Larry E. Lewis.

8                    THE COURT:  Larry E. Lewis.

9                    VENIREPERSON:  I no longer live in Dallas

10   County.

11                   THE COURT:  You don't?  Where do you live?

12                   VENIREPERSON:  In Euless.

13                   MR. BYCK:  Have a nice drive home, Mr. Lewis.

14                   THE COURT:  Next.

15                   (Venireperson brought forward.)

16                   THE COURT:  What is your name, please?

17                   VENIREPERSON:  John Green.

18                   THE COURT:  What is your circumstance, Mr.

19   Green?

20                   VENIREPERSON:  I am a single parent, and I

21   don't believe -- I have to be home to --

22                   MR. BYCK:  How old is your child?

23                   VENIREPERSON:  He's 11.

24                   MR. BYCK:  And no one else cares for that

25   child?

1          VENIREPERSON:  No.  I work at night, and my

2   girlfriend stays with him at night.

3          THE COURT:  He's 11.  There is nothing we can

4   do to help you out.  Have a seat back there.  Thank you.

5          (Venireperson brought forward.)

6          THE COURT:  Your name, please?

7          VENIREPERSON:  Sandra Vail.

8          THE COURT:  Sandra Van?

9          VENIREPERSON: Sandra Vail, V-a-i-l.

10         THE COURT:  What is your circumstance?

11         VENIREPERSON:  Is this trial taking place

12  during the summertime?   I'm a stay-at-home mother during the

13  summer.  I have a 10-year-old daughter who was 10 in

14  January.  I also have a son who has just finished

15  chemotherapy for testicular cancer.  He'll be having another

16  cat scan in March.  If the cancer returns, I will be

17  unavailable because I will have to be back with him.  I spent

18  all last summer with him in North Carolina.

19         THE COURT:  Counsel?

20         MR. DAVIS:  We'll agree.

21         MS. LITTLE:  Okay, that's fine.

22         THE COURT:  Counsel?

23         MS. LITTLE:  It's okay.

24         THE COURT:  You are excused.  Thank you.

25     Next.

```
1                    (Venireperson brought forward.)

2                    THE COURT:  Your name, please?

3                    VENIREPERSON:  Barbara Conley.

4                    THE COURT:  Barbara Connally?

5                    VENIREPERSON:  Conley, C-o-n-l-e-y.

6                    THE COURT:  Thank you.  What's your

7    circumstance?

8                    VENIREPERSON:  I had an insufficient check 15,

9    20 years ago.  I had to go to court to pay it.

10                   THE COURT:  Put on probation?

11                   VENIREPERSON:  Yeah.

12                   MS. LITTLE:  What type of check?

13                   VENIREPERSON:  It wasn't very much, less than

14   a hundred dollars.

15                   THE COURT:  Lived out probation?

16                   VENIREPERSON:  Oh, yeah, no problem.

17                   THE COURT:  No problem.  Stay back with us.

18                   MS. LITTLE:  Good try.

19                   VENIREPERSON:  May I go to the rest room right

20   quick?

21                   THE COURT:  Sure.

22                   (Venireperson brought forward.)

23                   THE COURT:  Your name, please.

24                   VENIREPERSON:  Sheila Palmer.

25                   THE COURT:  All right.
```

1    VENIREPERSON:  My husband and I are selling

2  our home this afternoon, at which time I'll be a resident of

3  Tarrant County.

4    THE COURT:  The heck you will.

5    VENIREPERSON:  Sorry.

6    THE COURT:  Congratulations.  You're excused.

7    VENIREPERSON:  Thank you.

8    (Venireperson brought forward.)

9    THE COURT:  Your name, please.

10    VENIREPERSON:  My name is Lewis.  James Lewis.

11    MS. LITTLE:  He's the one that moved here.

12    VENIREPERSON:  And I've been convicted of

13  several felonies, no violent crime or nothing like that, but

14  still felonies.

15    THE COURT:  What was the felony?

16    VENIREPERSON:  DWI and --

17    THE COURT:  How many DWI's?

18    VENIREPERSON:  One.

19    THE COURT:  It's a misdemeanor.

20    VENIREPERSON:  Well, I still got a probation

21  and also I had a -- for possession of marijuana.

22    THE COURT:  How much?

23    VENIREPERSON:  Probably a couple of ounces

24  back in the early 70's, and also I don't believe in capital

25  punishment.

1           THE COURT:  That would be a felony conviction

2     back then.

3           VENIREPERSON:  Yes, sir.

4           THE COURT:  Thank you.  You are excused.

5           VENIREPERSON:  All right.

6           THE COURT:  Sam, he's excused.

7           (Venireperson brought forward.)

8           THE COURT:  Your name, please?

9           VENIREPERSON:  Lugo Braulio.  B-r-a-u-l-i-o.

10          THE COURT:  What's your circumstances?

11          VENIREPERSON:  I'm a -- not a U.S. citizen.

12          THE COURT:  You're not a citizen?

13          VENIREPERSON:  No, sir.

14          THE COURT:  A citizen of where, Mexico?

15          VENIREPERSON:  Mexico.  I'm a resident, but

16    I'm not a U.S. citizen.

17          THE COURT:  You are excused.  Thank you.

18          (Venireperson brought forward.)

19          THE COURT:  Jacob John.

20          VENIREPERSON:  I have two kids.  I have to

21    pick one up from school right now, like 12 o'clock, and then

22    another one at 2:15.

23          MS. LITTLE:  How old are they?

24          VENIREPERSON:  Huh?

25          MS. LITTLE:  How old are your children?

```
 1                    VENIREPERSON:  The first one -- the first one

 2      is 8 and she is in second grade.  And the other one, the

 3      second one is like 4 and a half.

 4                    MS. LITTLE:  Okay.

 5                    THE COURT:  You are excused.  Thank you.

 6                    (Venireperson brought forward.)

 7                    THE COURT:  Sir?

 8                    VENIREPERSON:  Andres Aleman Garcia.

 9                    THE COURT:  What is your circumstance, Mr.

10      Garcia?

11                    VENIREPERSON:  My what?

12                    THE COURT:  What is your --

13                    VENIREPERSON:  Well, I don't want to serve.

14                    THE COURT:  Huh?

15                    VENIREPERSON:  I can't read and write real

16      English, you know.

17                    THE COURT:  Are you a citizen?

18                    VENIREPERSON:  Yes.  But I can't -- I only go

19      to 6th grade in Mexico.

20                    MS. LITTLE:  It's okay.

21                    MR. DAVIS:  We'll agree.

22                    THE COURT:  You are excused.  Whoops.  Next.

23                    (Venireperson brought forward.)

24                    THE COURT:  What is your name, please?

25                    VENIREPERSON:  James C. Clark.
```

1          THE COURT:  James Clark.  What is your

2   circumstance, sir?

3          VENIREPERSON:  I have a 6-year-old son I have

4   full custody of, and there is no way that I can --

5          THE COURT:  Who takes care of him while you

6   work during the day?

7          VENIREPERSON:  Right now he's in school, and

8   then I got to go pick him up.

9          THE COURT:  What time?

10          VENIREPERSON:  I pick him up by 3:30.

11          THE COURT:  Everyday?

12          VENIREPERSON:   Well, I try get him picked up

13   by 3:30.  I spend as much time as I can with him.

14          THE COURT:  You can't make any arrangements

15   for a family member or relative to pick him up?

16          VENIREPERSON:  I could.

17          THE COURT:  Please try that.  Have a seat.

18          (Juror brought forward.)

19          THE COURT:  Your name, please?

20          VENIREPERSON:  Theresa Westbrook.

21          THE COURT:  Theresa Westbrook.  What is your

22   circumstance?

23          VENIREPERSON:  I have to pick my daughter up

24   everyday after school, and I'm sick today.

25          THE COURT:  Can you make arrangements to have

```
 1    somebody else pick the child up?

 2                  VENIREPERSON:  There is no one else.  She is

 3    out of district.  She's going to a talented and gifted

 4    school.

 5                  THE COURT:  I'm sorry?

 6                  VENIREPERSON:  She's going to a talented and

 7    gifted school.

 8                  THE COURT:  Are there any relatives or friends

 9    that pick her up due to your jury service?

10                  VENIREPERSON:  No.

11                  THE COURT:  None at all?

12                  VENIREPERSON:  No.  They are all working.

13                  THE COURT:  All right.  You are excused.

14          Sam --

15                  MS. LITTLE:  You should have told them when we

16    thought the trial would take to.

17                  THE COURT:  Next.

18                  (Venireperson brought forward.)

19                  VENIREPERSON:  You said something about --

20                  THE COURT:  What is your name, please?

21                  VENIREPERSON:  Patrick Heck.

22                  THE COURT:  Patrick Allen Heck, H-e-c-k.

23          Yes, sir.

24                  VENIREPERSON:  You said something about being

25    convicted of misdemeanor theft.
```

1                    THE COURT:  Yes.

2                    VENIREPERSON:  I have been.

3                    THE COURT:  Went to jail?

4                    VENIREPERSON:  Yes.

5                    THE COURT:  Not placed on probation?

6                    VENIREPERSON:  I did time served and

7    probation.

8                    THE COURT:  Counsel, what do you think?    Want

9    to check it out?

10                   MR. BYCK:  What was it?

11                   MS. LITTLE:  Theft.  Misdemeanor theft?

12                   VENIREPERSON:  Yes, ma'am.  It was $200, and

13   it got dropped to Class C.

14                   MR. DAVIS:  We'll agree.

15                   MR. BYCK:  We'll agree.

16                   THE COURT:  You are excused.  Thank you.

17                   (Venireperson brought forward.)

18                   THE COURT:  Linda Lee Headrick Houston.

19         What is your circumstances?

20                   VENIREPERSON:  I have a 90-year-old mother

21   that was in hospital last month and diagnosed with congestive

22   heart failure.  At this time my sister and I are her primary

23   caregivers, and my sister has a trip planned for Hawaii, so I

24   will be the primary caregiver for a while.

25                   MR. BYCK:  We'll agree.

1          MR. DAVIS:  We agree.

2          THE COURT:  You are excused.

3          VENIREPERSON:  Thank you much.

4          (Venireperson brought forward.)

5          THE COURT:  What is your name, please?

6          VENIREPERSON:  Nguyen Thi Clay.

7          THE COURT:  Nguyen Thi Clay.

8     What is your circumstance, please?

9          VENIREPERSON:  (No response.)

10         THE COURT:  What do you want to tell us?

11         VENIREPERSON:  We don't understand.

12         MS. LITTLE:  Do you speak English?

13         VENIREPERSON:  Yes, a little bit.

14         MS. LITTLE:  Okay.

15         MR. DAVIS:  We'll agree.

16         MR. BYCK:  We'll agree.

17         THE COURT:  Thank you.  You are excused.

18    Sam, he's excused.

19    Good morning.

20         (Venireperson brought forward.)

21         VENIREPERSON:  Good morning.

22         THE COURT:  Your name for the court reporter,

23    please?

24         VENIREPERSON:  Melinda Hugonoit.

25         THE COURT:  Melinda H-u-g-o-n-i-o-t.  What is

1    your circumstance, please?

2                    VENIREPERSON:  As of the day after Memorial

3    Day, I'll be enrolled at U.T.A. full time for summer school.

4    Right now I'm taking one night class, but I'll be doing

5    full-time summer school.

6                    MS. LITTLE:  When does it begin?

7                    VENIREPERSON:  It begins the day after

8    Memorial Day.

9                    THE COURT:  You are excused.

10          Sam, excused.

11                    (Venireperson brought forward.)

12                    THE COURT:  Get your name, first.

13                    VENIREPERSON:  Kyle Greathouse.

14                    THE COURT:  What is your circumstances, sir?

15                    VENIREPERSON:  My wife and my -- and she is

16    severely mentally ill.  She just got out of Rusk State

17    Hospital, Tyler State Hospital.  She can't go without daily

18    supervision.  I can't stay a long way from her.  I don't have

19    anybody to watch her.

20                    THE COURT:  Do you work?

21                    VENIREPERSON:  Yes, sir, I work for short

22    periods of time.  Yes.

23                    THE COURT:  Counsel, what is your pleasure?

24                    MR. DAVIS:  We'll agree.

25                    THE COURT:  You are excused.

1      VENIREPERSON:  Thank you very much.

2      THE COURT:  That's interesting.  Talking about

3   an invalid.  It doesn't mention age.

4      (Venireperson brought forward.)

5      THE COURT:  Your name is?

6      VENIREPERSON:  Guadalupe Marquez.

7      VENIREPERSON:  I have a 5-year-old to pick up

8   at 11:00.

9      THE COURT:  Everyday?

10      VENIREPERSON:  Yes, I have to get off of work

11   and pick him up and take him to the day care.

12      THE COURT:  Don't have anybody that could do

13   it for the short period of time that you're down here as a

14   juror?

15      VENIREPERSON:  No.  And I can't read and write

16   100 percent.  I do understand.

17      MR. DAVIS:  We'll agree.

18      THE COURT:  You are excused.  Here, take this.

19      (Venireperson brought forward.)

20      THE COURT:  Good morning.

21      VENIREPERSON:  Good morning, Judge.

22      THE COURT:  What is your name, please?

23      VENIREPERSON:  Virginia Boyd.

24      THE COURT:  Yes, ma'am.

25      VENIREPERSON:  Back in 1994 my younger brother

DARLINE W. LABAR, OFFICIAL REPORTER

1    was killed by the police in Grapevine, Texas, and I feel like

2    in some way my feelings concerning the police changed at that

3    point because I do feel like they may --

4                    MR. DAVIS:  Judge, we'll agree.

5                    THE COURT:  Thank you.  You are excused.

6                    VENIREPERSON: Thank you.

7                    (Venireperson brought forward.)

8                    THE COURT:  Good morning.

9                    VENIREPERSON:  Good morning.

10                   THE COURT:  What is your name?

11                   VENIREPERSON:  Henrick Gonzales.

12                   THE COURT:  Henrick Emmanuell Gonzales.

13                   VENIREPERSON:  And I was going to ask if I can

14   be excused.  I don't know how to read the English language.

15   I don't know how to write.

16                   THE COURT:  Literacy.  Read and write.

17                   MR. BYCK:  We'll agree.

18                   MR. DAVIS:  We'll agree.

19                   THE COURT:  You're excused.

20                   VENIREPERSON:  Thank you.

21                   (Venireperson brought forward.)

22                   THE COURT:  Good morning, how are you?  Just a

23   minute.  Let's get your name first for the court reporter.

24          Turahn Dorsey.

25                   VENIREPERSON:  I have a 74-year-old mother

Page 50

```
 1   that is in Richardson with complete knee surgery which was
 2   done on Tuesday and in rehabilitation, and I am now also
 3   taking care of 90-year-old grandmother at the house.
 4             THE COURT:  Place full?
 5             VENIREPERSON:  Place full.
 6             MS. LITTLE:  At least you've got longevity
 7   going for us.
 8             MR. DAVIS:  We'll agree.
 9             THE COURT:  You are excused.  Thank you very
10   much, Mr. Dorsey.
11             (Venireperson brought forward.)
12             THE COURT:  Good morning.
13             VENIREPERSON:  Hi, how are you today?
14             THE COURT:  Doing fine.  Get your name for the
15   court reporter, please, to begin with.
16        Lisa Gonzales.
17             VENIREPERSON:  I can't do this.  I had a
18   friend of mine recently murdered, and I can't do this.  I
19   can't give a fair judgment on anything.
20             MS. LITTLE:  We'll agree.
21             VENIREPERSON:  I'll also tell you, the lady
22   next to me, she wanted me to tell you she can't speak
23   English.
24             MR. DAVIS:  You just got your pay back there.
25             (Venireperson brought forward.)
```

1          THE COURT:  You're name?

2          (Paper handed to Judge.)

3     Norma Rivas.

4     You're not a citizen of the United States?

5          VENIREPERSON:  No.

6          THE COURT:  What is your country of origin?

7          MS. LITTLE:  Where are you from?

8     Let me shout a little louder.

9          THE COURT:  You are excused.

10         (Venireperson brought forward.)

11         THE COURT:   What's your name, first?

12         VENIREPERSON:  Cecelia Moxley.

13         THE COURT:   Whoops.  Hang on to that for right

14    now.

15         VENIREPERSON:  I have a minor medical

16    disability.  Basically I have Texas Workman's Compensation

17    order to doctor's appointment Monday.  Also, I have a

18    incontinence.

19         MR. DAVIS:  Is it a chronic condition?

20         VENIREPERSON:  Yes.

21         MR. DAVIS:  We'll agree.

22         MS. LITTLE:  We will agree.

23         THE COURT:  You are excused.  Thank you.

24         (Venireperson brought forward.)

25         THE COURT:  Good morning.

Page 52

```
 1              Is your name Chu, C-h-u, Collins?  What is your
 2   circumstance?
 3                    VENIREPERSON:  I'm not much understand.
 4                    THE COURT:  You can't read and write English?
 5                    VENIREPERSON:  This one I can do that, but I
 6   don't understand these things.
 7                    THE COURT:  Either side have any objection to
 8   her being excused?
 9                    MR. DAVIS:  We'll agree.
10                    MS. LITTLE:  We'll agree.
11                    MR. BYCK:  Thank you.
12                    THE COURT:  You are excused.
13                    (Venireperson brought forward.)
14                    VENIREPERSON:  My problem is --
15                    THE COURT:  Just a second.  Javier Mora,
16   M-o-r-a.
17              All right.  What is your circumstance?
18                    VENIREPERSON:  My circumstance is my English
19   is a problem.
20                    MR. DAVIS:  We'll agree.
21                    MS. LITTLE:  Okay.
22                    THE COURT:  You are excused.  Thank you.
23                    (Venireperson brought forward.)
24                    THE COURT:  Sir?
25                    VENIREPERSON:  I don't know if I'm supposed to
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    take my hat off or not.

2                    THE COURT:  Just a moment.  Let's get your

3    name first.  This is Bruce Alan Spaulding,

4    S-p-a-u-l-d-i-n-g.  What's the circumstance, Mr. Spaulding?

5                    VENIREPERSON:  Now, I have medical

6    appointments -- I will have medical appointments on the 13th,

7    19th, and -- and I have partial disability in that I have an

8    artificial hip replacement joint and it keeps me from getting

9    up and down easily.  Not more down, but up.

10                   MS. LITTLE:  We'll agree.

11                   MR. DAVIS:  We'll agree.

12                   THE COURT:  You are excused.  Thank you.

13                   (Venireperson brought forward.)

14                   VENIREPERSON:  How are you doing?

15                   (Paper handed to Judge)

16                   THE COURT:  Calvin Ray Delk.

17          Mr. Delk, what is your circumstance, please?

18                   VENIREPERSON:  Well, this is very complicated

19    questions.

20                   THE COURT:  Uh-huh.

21                   VENIREPERSON:  I feel the way I look at it,

22    it's my belief and everything like that -- my mind won't be

23    on this here.

24                   MR. DAVIS:  We'll agree.

25                   THE COURT:  You are excused.

DARLINE W. LABAR, OFFICIAL REPORTER

Page 54

1                MS. LITTLE:  Agree.

2                (Venireperson brought forward.)

3                THE COURT:  Good morning.

4           Marilyn Arnetta Bolton.

5                VENIREPERSON:  Uh-huh.

6                THE COURT:  What's your circumstances?

7                VENIREPERSON:  Well, I have a lung disease and

8     I have to do breathing, puffing things three or four times a

9     day.  Right now I'm doing good, but I probably wouldn't,

10    so --

11               MR. DAVIS:  The State agrees.

12               MR. BYCK:  We'll agree.

13               THE COURT:  You are excused.

14               VENIREPERSON:  Thank you.

15               THE COURT:  Next.

16               (Venireperson brought forward.)

17               THE COURT:  This is Anita Oliver.

18         What's your circumstances?

19               VENIREPERSON:  Well, I have family members in

20    prison that's been there --

21               MR. DAVIS:  We'll agree.

22               MR. BYCK:  We'll agree.

23               THE COURT:  You are excused.

24               (Venireperson brought forward.)

25               THE COURT:  Good morning.  Get your name,

DARLINE W. LABAR, OFFICIAL REPORTER

1  first, before we begin.

2          Sanya O-d-u-m-u-s-u.

3                  VENIREPERSON:  M-o-s-u.

4                  THE COURT:  M-o-s-u.

5                  VENIREPERSON:  M-o-s-u.

6                  THE COURT:  What is your circumstance?

7                  VENIREPERSON:  Well, I would not be fair

8  because I am an accountant and they will not pay me because I

9  am a contractor, so --

10                  MR. DAVIS:  We'll agree.

11                  MR. BYCK:  We agree.

12                  MS. LITTLE:  We agree.

13                  THE COURT:  You are excused.

14                  MS. MILLER:  He was a five.

15                  (Venireperson brought forward.)

16                  THE COURT:  Martha Lee Murphy.

17          What is your circumstance, Ms. Murphy?

18                  VENIREPERSON:  I have a 6th grade education,

19  and I don't understand a lot of this.

20                  MS. LITTLE:  We'll agree.

21                  MR. DAVIS:  We agree.

22                  THE COURT:  You are excused.

23                  MR. BYCK:  Thank you, ma'am.

24                  (Venireperson brought forward.)

25                  THE COURT:  Larry Donnell Lockett.

1          What is your circumstance, Mr. Lockett?

2                    VENIREPERSON:   I have been convicted of a

3     felony.

4                    THE COURT:   Of what?

5                    VENIREPERSON:   (Inaudible.)

6                    THE COURT:   Did you go to the penitentiary?

7                    VENIREPERSON:   Yes, sir.   Been about 14 years

8     now.

9                    THE COURT:   Have you been pardoned?

10                   VENIREPERSON:   No, sir.   Judge Keasler was the

11    Judge at the time.

12                   THE COURT:   You are disqualified.   You are

13    excused.   Thank you.

14                   MR. BYCK:   Thank you, sir.

15                   (Venireperson brought forward.)

16                   THE COURT:   Good morning.   How are you, sir?

17        This is Leemon Byrd, Jr., B-y-r-d.   What is your

18    circumstances?

19                   VENIREPERSON:   I don't know how to fill out

20    the application.   I don't read and write.

21                   MR. DAVIS:   We'll agree.

22                   MS. LITTLE:   Agree.

23                   THE COURT:   You are excused.

24                   VENIREPERSON:   Thank you.

25                   MR. BYCK:   Thank you, sir.

1                    (Venireperson brought forward.)

2                    THE COURT:  Good morning.

3                    VENIREPERSON:  Good morning.  Can I ask you a

4    couple of --

5                    THE COURT:  Let's get your name.  No problem,

6    it's not your fault.

7              This is Christine A. Henderson.

8              Yes, ma'am?

9                    VENIREPERSON:  Did I say something -- or hear

10   you say something about serving within -- if you were on a

11   jury within the last five years?

12                   THE COURT:  No.

13                   VENIREPERSON:  I misunderstood.

14                   THE COURT:  If you have a -- if you have

15   served as a petit juror in the -- When did you serve?

16                   VENIREPERSON:  I think it's been about three

17   years ago.

18                   THE COURT:  Yeah, no problem with that.  Stay

19   with us.  You're fine.

20                   VENIREPERSON:  Okay.

21                   (Venireperson brought forward.)

22                   THE COURT:  Good morning.

23                   VENIREPERSON:  Hi, Your Honor.

24                   THE COURT:  Get your name.

25                   VENIREPERSON:  It's Mike McBrayer.

Page 58

1        And after hearing what you told us this morning, I'm

2    scheduled to be in Japan for 10 days starting next week.

3               THE COURT:  No problem.  We'll work with you.

4               VENIREPERSON:  Okay.  That's fine.  I just

5    wanted to make sure.  I've had a cruise planned for months.

6               THE COURT:  No problem.  We'll work with you.

7    I can't afford to go to Japan.

8               (Venireperson brought forward.)

9               THE COURT:  Rosa Wilson Davis.

10        Yes, ma'am.

11               VENIREPERSON:  I'm an uncontrolled diabetic.

12    My husband is going blind, and I really need to stay with

13    him.

14               MR. DAVIS:  We'll agree.

15               MS. LITTLE:  We'll agree.

16               THE COURT:  You are excused.  Thank you.

17               VENIREPERSON:  Thank you.  What do I do with

18    this?

19               THE COURT:  Give it to my bailiff.  Thank you.

20               (Venireperson brought forward.)

21               THE COURT:  Good morning.

22               VENIREPERSON:  Good morning, Your Honor.

23               THE COURT:  Get your name first and then we'll

24    start.  John Charles Broad.

25               VENIREPERSON:  Your Honor, I was just on a

Page 59

```
 1     jury a year and a half ago in the federal court building.  I
 2     wanted to let you know that my wife and I are going to Europe
 3     in the early part of June on a cruise, and under these
 4     circumstances --
 5                    THE COURT:  When in June?
 6                    VENIREPERSON:  June 1st through the 12th.
 7                    MS. MILLER:  How wonderful.
 8                    THE COURT:  Can you take a few of us with
 9     you?  You are excused.  You are excused.
10                    VENIREPERSON:  Thank you, Your Honor.
11                    MS. BALIDO:  Can we be the mouse in your
12     pocket?
13                    (Venireperson brought forward.)
14                    THE COURT:  Let's give this to the court
15     reporter, first.
16           Carla Ann Braziel.  What is your circumstance?
17                    VENIREPERSON:  What do you mean?
18                    THE COURT:  Why did you come up?  Why did you
19     want to talk to us?
20                    VENIREPERSON:  I was bringing this paper.  Do
21     I need to bring this?
22                    THE COURT:  Just hand it over there, and we'll
23     talk to you later.
24                    MS. MILLER:  She was a five.
25                    THE BAILIFF:  Was she excused?
```

```
 1                    THE COURT:  No.

 2                    (Venireperson brought forward.)

 3                    VENIREPERSON:  I haven't completed this.

 4                    THE COURT:  Did you want to talk to us about

 5        something?  Doretha Faye Germany.

 6                Doretha Germany.

 7                    VENIREPERSON:  You mentioned the idea if you

 8        had a returned check or anything and I did go to -- over Zang

 9        about it, so I did talk to the Judge about it.  So --

10                    MS. LITTLE:  JP court.

11                    THE COURT:  Either side have any objection to

12        her being excused?

13                    MR. DAVIS:  We'll agree.

14                    MR. BYCK:  We agree.

15                    THE COURT:  You are excused.

16                    (Juror excused.)

17                    THE COURT:  Ma'am --

18                    VENIREPERSON:  Hi.

19                    THE COURT:  It's Genether Spivery.  What is

20        your circumstance?

21                    VENIREPERSON:  Well, I had a family member

22        that was murdered, and I -- I just -- I wanted the person to

23        really suffer and stay in prison and not go through a death

24        penalty, so --

25                    MR. DAVIS:  Judge, we'll agree.
```

1          MS. LITTLE:  We'll agree.  We agree.

2          THE COURT:  You are excused.  Okay.

3          (Venireperson brought forward.)

4          THE COURT:  This is Mr. Micheal Dewayne Culton

5     C-u-l-t-o-n.

6          Mr. Culton, what's your circumstance?

7          VENIREPERSON:  I don't think I would be good

8     because I'm a foster parent and I'm constantly getting kids

9     everyday.  Before I came here, I was supposed to get one this

10    weekend, so I don't think I would be able to do it.

11         MR. DAVIS:  We'll agree.

12         MR. BYCK:  Okay.  Agree.

13         THE COURT:  You are excused.

14         (Venireperson brought forward.)

15         THE COURT:  Good morning.

16         VENIREPERSON:  See, I started --

17         THE COURT:  Just a second, we'll get to you.

18    This is Lydia, middle initial R, surname Garcia.

19         VENIREPERSON:  Okay.  I started filling it

20    out, but I don't understand a lot of it.  And another thing

21    that I was -- I wanted to ask, like I have an elder person

22    that I take for therapy and stuff and to the doctor and take

23    myself to therapy.  Am I going to be still into this?

24         MR. DAVIS:  The State agrees.

25         MS. LITTLE:  We agree.

1          THE COURT:  You are excused.

2      Sir --

3          (Venireperson brought forward.)

4          THE COURT:  Just a moment.  Harley, middle

5  initial Z, surname Cunniff, two N's, two F's.  What's your

6  circumstance, sir?

7          VENIREPERSON:  I've got diverticulitis.

8  Sometimes that causes diarrhea.  I also have two artificial

9  legs, knees, and my back is not real good.  I don't think I

10  could sit in a courtroom all day.

11          MR. DAVIS:  We'll agree.

12          MR. BYCK:  We'll agree.

13          THE COURT:  You're excused.  Thank you.

14          MR. BYCK:  Thank you, sir.

15          THE COURT:  Sam, excused.

16          (Venireperson brought forward.)

17          VENIREPERSON:  Hi.

18          THE COURT:  Good morning.

19          VENIREPERSON:  Good morning.

20          THE COURT:  Just a second.

21      This is Edward Aleman, A-l-e-m-a-n.

22          VENIREPERSON:  I don't have any problems

23  serving as juror, but if it comes down to reading and writing

24  correctly, I cannot do that.  My spelling is not very good.

25          MR. DAVIS:  We'll agree.

1              MS. LITTLE:  You can't read the

2    questionnaire?

3              VENIREPERSON:  Well, I can, but there are

4    some words --

5              MS. LITTLE:  That you don't know?

6              VENIREPERSON:  I don't understand.

7              MS. LITTLE:  We'll agree.

8              THE COURT:  You are excused.  Thank you.

9              VENIREPERSON:  Thank you.

10             THE COURT:  Sam, excused.

11             (Venireperson brought forward.)

12             VENIREPERSON:  Is this one of those that she

13   doesn't know if it makes a difference or not?

14             THE COURT:  Just a minute.

15        This is Linda Mae Weld, W-e-l-d.

16             VENIREPERSON:  Linda Mae Weld had her house

17   burglarized a year and a half ago, checks stolen.  Wal-Mart

18   has filed because they used -- not only my checks, but my

19   passport.  I had to go to JP court and sign my name about 150

20   times and claim this as forgery.  I never heard one thing or

21   the other, so I don't know.

22             MS. LITTLE:  You would have heard.

23             MR. BYCK:  Yeah, they're real good about

24   getting back to you on things like that.

25             VENIREPERSON:  Well, when you don't hear, it's

```
1    sort of like --
2                    THE COURT:  Stay with us.  You'll hear from
3    us.
4                    (Venireperson brought forward.)
5                    THE COURT:  Next.
6                    VENIREPERSON:  I'm --
7                    THE COURT:  Just a minute.  We need to get
8    your name again for the record.
9         Michael Alan White.
10        Yes, sir.
11                   VENIREPERSON:  I'm a friend with Tom D'Amore.
12   He's with the District Attorneys Office.  Does that have an
13   effect on whether I could be a juror or not?
14                   THE COURT:  You claim friendship with Mr.
15   D'Amore?
16                   VENIREPERSON:  I play soccer with him.
17                   MS. MILLER:  Oh, you do?
18                   THE COURT:  No problem.
19                   VENIREPERSON:  That's no problem.  Okay.
20   Thank you.
21                   (Venireperson walks away.)
22                   MS. MILLER:  Other than he was a one --
23                   MS. LITTLE:  One?
24                   (Venireperson brought forward.)
25                   VENIREPERSON:  Excuse me.  You said about the
```

1  circumstance a while ago.  Okay.  I have a reading

2  disability.

3            THE COURT:  A reading disability?

4            VENIREPERSON:  You brought it up a little

5  while ago about reading, so --

6            THE COURT:  How far did you go in school?

7            VENIREPERSON:  I went to 12, but I was in

8  special education, but I was slow.

9            THE COURT:  Carla Braziel.

10           MS. LITTLE:  You filled out the questionnaire

11 okay, though, didn't you?

12           VENIREPERSON:  Yeah, the basic, what I can do.

13           MS. LITTLE:  Were you able to fill out

14 everything?

15           VENIREPERSON:  The basic, but as far as

16 writing in what you need to -- the reason on something.

17           MS. LITTLE:  We'll agree.

18           THE COURT:  You are excused.  Thank you.

19           MR. DAVIS:  She already turned it in.

20           (Venireperson brought forward.)

21           THE COURT:  Just a minute.  Diana Gail Bandy,

22 B-a-n-d-y.

23      Yes, ma'am.

24           VENIREPERSON:  I did pay a fine for writing a

25 bad check before.  And I didn't know if I would be

1    disqualified or not.

2                    THE COURT:  Theft conviction?

3                    VENIREPERSON:  Yeah.

4                    MS. LITTLE:  We'll agree.

5                    THE COURT:  You are excused.  Thank you.

6            Sam, she is excused.

7                    (Venireperson brought forward.)

8                    THE COURT:  Yes, sir.

9                    VENIREPERSON:  Hi.

10                   THE COURT:  Wait a minute.  Get your name

11   first for the court reporter.

12           Richard Melvin Dishman.

13                   VENIREPERSON:  Yeah, it was like 25 years ago,

14   26 years ago, I had a misdemeanor.

15                   THE COURT:  What?

16                   VENIREPERSON:  It was for lewd contact.

17   That's what they called it.  That's what it was called.

18                   THE COURT:  Doesn't disqualify you.

19                   VENIREPERSON:  I just wanted to make sure.

20   Fine.

21                   (Recess taken.)

22                   VENIREPERSON:  My dad has pancreatic cancer.

23   He's in the hospital.

24                   MS. MILLER:  Sorry to hear that.

25           We can agree.  She is a four, Judge.

1          MS. BALIDO:  We can agree.

2          THE COURT:  You are excused.  Thank you.

3     R-u-b-a-r-t-s.

4              (Recess taken.)

5          THE COURT:  I need your name.

6          VENIREPERSON:  Vivian Fields Pruitt.

7          THE COURT:  Vivian Fields Pruitt.  What is

8     your circumstance?

9          VENIREPERSON:  I'm a heart patient, and this

10    kind of thing just gets the best of me.  I've got a son that

11    has a -- I have a son that got killed, but it wasn't a

12    murder.  He was killed on his motorcycle, but then after that

13    I've had two heart attacks.  Soon it will be 11 years, and

14    this kind of thing just gets on me.  I'm under the doctor.

15         MS. BALIDO:  Are you on medication?

16         VENIREPERSON:  Oh, yes, I have high blood

17    pressure, bad.  If you need me to, I can drop -- I got some

18    out in the car -- some of my medications out in the car.

19         THE COURT:  Oh, we trust you.

20         VENIREPERSON:  I go to Parkland.

21         MR. BYCK:  We'll agree.

22         MS. MILLER:  The State will agree.

23         MS. BALIDO:  Defense will agree.

24         THE COURT:  You are excuse.  Thank you very

25    much.

```
1                    VENIREPERSON:  I appreciate it.  If there is
2        anything else I can do.  Maybe stand on the outside and not
3        in here and I'll be all right.  Thank you.
4                    (Recess of proceedings)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                        Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4           I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13          I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16          Witness my hand this the 3rd day of October, A.D.,

17   2001.

18

19

20                    _____
                      DARLINE W. KING
21                    Official Court Reporter
                      194th Judicial District Court
22                    Dallas County, Texas
                      (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002

1   REPORTER'S RECORD   **74145**

2   VOLUME 4 OF 65 VOLUMES

3   TRIAL COURT CAUSE NO. F00-02424-NM

4   THE STATE OF TEXAS   :   IN THE DISTRICT COURT

5   VS.   :   DALLAS COUNTY, TEXAS

6   JEDIDIAH ISAAC MURPHY   :   194TH JUDICIAL DISTRICT

7   ********************

8   PRETRIAL HEARING   FILED IN
COURT OF CRIMINAL APPEALS

9   ********************   DEC 5 2001

10   A P P E A R A N C E S :   Troy C. Bennett, Jr., Clerk

11   HONORABLE BILL HILL, Criminal District Attorney
            Crowley Criminal Courts Building

12            Dallas, Dallas County, Texas  75207
            Phone:  214-653-3600

13   BY:      MR. GREG DAVIS, A.D.A., SBOT # 05493550
            MS. MARY MILLER, A.D.A., SBOT # 21453200

14               FOR THE STATE OF TEXAS;

15   MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
     MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500

16   MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
     Dallas County Public Defenders Office

17   Dallas, Texas  75207
            Phone:  214-653-9400

18               FOR THE DEFENDANT.

19                   *********

20        On the 8th day of March, 2001, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable F. Harold Entz, Jr.,

23   Judge presiding, held in Dallas, Dallas County, Texas:

24        Proceedings reported by machine shorthand, computer

25   assisted transcription.

DARLINE W. LABAR,  OFFICIAL REPORTER   ORIGINAL

1                     INDEX VOLUME 4

2    March 8th, 2001                          PAGE      VOL.

3    Proceedings........................................ 2         4

4    Arraignment By Mr. Davis......................... 28         4

5    Reporter's Certificate........................... 30         4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURT:  This hearing is being conducted in

 3   open court, Cause Number F00-02424-NM, styled the State of

 4   Texas versus Jedidiah Isaac Murphy.

 5            The State is represented by the Honorable Greg

 6   Davis, the Honorable Mary Miller.

 7            Lead counsel for the accused, the Honorable Jane

 8   Little, is present in court with her co-counsel, the

 9   Honorable Michael Byck, Jennifer Balido.

10            As is required by the Texas Code of Criminal

11   Procedure, Jedidiah Isaac Murphy is in court during this

12   pretrial hearing and will be at all times absent my dictating

13   the contrary into the record.

14            The State prepared to proceed in the hearing?

15                    MR. DAVIS:  The State's ready, Your Honor.

16                    THE COURT:  Defense prepared to proceed?

17                    MS. BALIDO:  The defense is ready, Your Honor.

18                    THE COURT:  It's my understanding the request

19   for a hearing was occasioned by the defense; am I correct?

20                    MS. BALIDO:  At first, yes, Judge, and then

21   agreed to by the State.

22                    THE COURT:  All right.

23                    MS. BALIDO:  Judge, we would like to -- before

24   we commence with the individual voir dire on Monday, we would

25   like for you to consider our voir dire motions that we have
```

1    previously filed.

2         First, beginning with the motion to order the State

3    to decide whether to make a challenge for cause or peremptory

4    strike before the defendant must decide whether to make a

5    challenge for cause or peremptory strike, which I believe is

6    about page 135 in your motions.

7              THE COURT:  State care to be heard on this?

8              MR. DAVIS:  Well, Judge, I think that's -- I

9    think the Court knows you have discretion in that matter as

10   to whether you will require us to make both of those choices

11   prior to the defense making a choice, and we'll leave that to

12   your discretion.

13             THE COURT:  Defense have anything further to

14   offer before the Court comments?

15             MS. BALIDO:  No, Judge.

16             THE COURT:  The Court will proceed with regard

17   to the number of peremptory challenges allotted to each side

18   as follows:  The State will be given, pursuant to the

19   requirements of the Code of Criminal Procedure, 15 peremptory

20   challenges.  Though the statute grants the defense the right

21   to 15, out of an abundance of trial court and, if necessary,

22   appellate court evaluation of the Court's exercise of the

23   challenges for cause, the Court will grant the defense 18

24   challenges.  We will proceed to qualify 48 --

25             MR. DAVIS:  I'm sorry, Your Honor, I'm not

1   agreeing to this portion.

2                  THE COURT:  I understand.

3                  MR. DAVIS:  Okay.  And what I -- as I

4   understood the defense, they've asked you to look at their

5   motion to order the State to decide whether to make a

6   challenge for cause for peremptory strike before the

7   defendant's takes a strike.  That I have no objection to.

8                  THE COURT:  That part is granted.

9                  MR. DAVIS:  Yes, sir.  If we're talking about

10  another motion as to --

11                 THE COURT:  I thought we were just kind of

12  collectively taking them all up.

13                 MS. BALIDO:  There's a separate motion on that

14  too, Judge.

15                 THE COURT:  The State will be required to

16  exercise its peremptory challenges prior to the State -- I

17  mean, prior to the defense.

18                 MS. BALIDO:  Judge, then I guess then we need

19  to go ahead and get into the issue as to -- which is our

20  request to utilize peremptory challenges following the

21  examination of the entire venire.

22                 THE COURT:  Mr. Davis, I understand the State

23  wishes to be heard on that.

24                 MR. DAVIS:  Yes, sir, we do.  I filed a

25  response, and in that response I've cited case law pursuant

1   to Busby v. State and Grijalva v. State.  It's clear, as the

2   courts have said, that Article 35.13 controls in this matter,

3   that the statutory procedure would require that the

4   challenges be made at the time that that juror is questioned.

5   The Court has stated that that is a provision that may be

6   waived by the parties, but in this case the State is not

7   waiving the provisions of Article 35.13.  And for that reason

8   we're asking that you deny the defendant's request.

9           And in Grijalva the Court clearly stated it's clear

10  in a capital case each party must exercise any peremptory

11  challenge at the time the particular prospective juror has

12  been qualified.  The parties may not wait until all

13  prospective jurors have been examined before exercising

14  peremptory challenges as is allowed in non-capital cases.

15  And so -- again, the State is not going to waive the

16  provisions of article 35.13.

17          THE COURT:  The Court will hold its ruling

18  until Monday morning.

19          MS. BALIDO:  Judge, can I respond to the

20  State's argument?

21          THE COURT:  You may.

22          MS. BALIDO:  Judge, there's a new case that's

23  come out of the Texas Court of Appeals, Tong versus State, 25

24  S.W.3d 707.  In that case the Court of Criminal Appeals --

25          THE COURT:  25 --

1              MS. BALIDO:  S.W.3d, 707.

2              THE COURT:  Yes.

3              MS. BALIDO:  In that case they were talking

4    about different jury issues, but in a footnote -- Footnote

5    Number 1 they went back and they -- and they addressed this

6    issue.  I think that the cases that Mr. Davis relies upon for

7    the State in saying that both parties can waive this issue, I

8    think his reliance on that -- on those cases to say that the

9    State can waive this or object to it is misplaced basically

10   because the cases that he relies upon, the State -- the Court

11   says that the defense failed to object and so therefore

12   cannot gripe later.  And therefore it's inferring from that

13   that both parties have the right to object or waive that.

14   And that's not exactly what those cases say.

15             Further, the Court -- the Court of Criminal Appeals

16   has said that 35.13 is not mandatory.  It is -- it's not an

17   absolute requirement, and, in fact, the case that the State

18   cites, Busby versus State, Busby held that although the

19   practice varies from the statutory procedure for capital

20   cases, the Court found that the procedure controlling the

21   order and timing of the exercise of peremptory strikes --

22   challenges is not an absolute requirement and therefore

23   strict adherence to the law is not required.

24             In Tong, the new case, they looked back and they --

25   they looked back at a case called Sanne, which is S-a-n-n-e,

1   versus State, 609 S.W.2d 762, which is a 1980 case, which had

2   basically since 1980 been rejected by the Court of Criminal

3   Appeals.  But the Court has now returned to that case and

4   said that the issues regarding the way that this is done in

5   capital murder cases, that you strike right after individual

6   voir dire, in relationship to the way that it's done in

7   non-capital cases where you look at the entire voir dire --

8   the entire venire, that there may be some constitutional

9   issues involved that the Court of Criminal Appeals is

10  concerned about.  And that they even say in the footnote in

11  Tong may have some merit.  One being that it violates equal

12  protection of the laws under the United States Constitution

13  and Article 1, Section 3, of the Texas Constitution, that it

14  violates due process under the 14th Amendment and the 5th

15  Amendment and the 6th Amendment of the United States

16  Constitution.  And it violates the due course of law

17  provision Article 1, Section 10, of the Texas Constitution.

18          And we would -- if you find that we are not to

19  exercise our peremptory strikes after the entire venire has

20  been looked at, we would object under those reasons and for

21  the reasons under Tong versus State.

22          Most of the time, whether the State finds against

23  the defense in this sort of thing, it's because they can't

24  show harm.  And we would say that harm can be shown, that we

25  cannot effectively use strikes without seeing the makeup of

1  the panel.

2  THE COURT:  As a whole?

3  MS. BALIDO:  As a whole.  And also that it is

4  difficult for us and the Court to see whether or not the

5  State is using their peremptory strikes in a Batson type

6  manner, for either race, gender, or any other kind of pattern

7  that can be shown after the peremptory strikes are seated for

8  the whole panel itself.  It also comes into making note of

9  desparate questioning and where those types of things are

10  concerned under the Batson cases.  So we would just stand on

11  our motion asking to use our challenges after the following

12  venire, plus the cases that we brought to your attention

13  here.

14  THE COURT:  Will reread the cases both the

15  State and defense have cited.  I'll make my determination

16  prior to the individual questioning of the first juror

17  Monday, I guess, it will be afternoon.

18  Next matter.

19  MS. BALIDO:  Oh, Judge, we also had a motion

20  to videotape the individual voir dire.

21  THE COURT:  State's position?

22  MR. DAVIS:  I don't have any objections to

23  it.  I think that's within the discretion of the Court,

24  though.

25  THE COURT:  Granted.  So the defense will make

1    arrangements for that?

2                    MS. BALIDO:  Can we --

3                    THE COURT:  Parenthetically I assume in light

4    of the debate that is being occasioned by the Commissioners

5    Court with regard to certain expenditures by the District

6    Judges of Dallas County with regard to a totally related

7    matter, have you visited this issue with the Dallas County

8    Commissioners Court, Ms. Balido?

9                    MS. BALIDO:  No, we have not, Judge.  But --

10                   THE COURT:  I was not saying you have to, and

11   the Court is not bound by their fiscal decision, but I was

12   just curious, knowing your political closeness with a number

13   of members of that court.

14                   MS. BALIDO:  I haven't brought it up to them,

15   Judge.

16                   THE COURT:  I'm not surprised.

17                   MS. BALIDO:  Additionally, Judge, the next, I

18   guess, in order is Defendant's motion regarding individual

19   jurors challenge for cause in voir dire proceedings.

20   Basically we're asking, which is about on page 139 -- we're

21   asking that any submission for cause be held outside the

22   presence and observation of the juror and outside the hearing

23   and the awareness of the juror.

24                   THE COURT:  I assume the State has no

25   objection to that?

```
 1              MR. DAVIS:  The State has no objection.
 2              THE COURT:  Been the practice of this court,
 3    and absent any statutory or case law to the contrary, upon
 4    the conclusion of the individual examination, the bailiffs
 5    assigned to this court, Ms. Madore, Mr. Rees, will excuse the
 6    juror from the courtroom.  I will thereafter give each side
 7    any necessary reasonable time to counsel with their
 8    co-counsels with regard to matters dealing with a challenge
 9    for cause.  Outside the presence of the individually
10    questioned juror, I will first ask the State if they have a
11    challenge for cause, will make, if necessary, a ruling upon
12    their challenge.  If I find their challenge to be sustained,
13    it's over.  If, however, they neither challenge the juror for
14    cause or I overrule their challenge, I will then ask the
15    State -- I mean, the defense, excuse me, as to their position
16    with regard to a challenge for cause.  If I sustain the
17    defense challenge for cause, it's over.  If I overrule the
18    defense challenge or there is no objection, that person will
19    remain a qualified juror.  And depending upon my ruling, we
20    will then go back to the State and ask them if they wish to
21    exercise their peremptory challenge and then the defense.
22    But all of this will be done outside the prospective juror's
23    presence whether or not that individual decides to go to the
24    former system, if you will, and exercise -- have peremptory
25    challenges exercised immediately then or if not, if they
```

Page 11

1    remain under consideration, bring the jury back in and tell

2    that individual juror he or she, as the gender of the juror

3    may be, whether or not they remain under consideration and

4    give them further instructions.

5              Off the record.

6              (Discussion off the record.)

7              MS. BALIDO:  Judge, I think the next motion is

8    motion to question veniremen regarding mitigating evidence.

9              THE COURT:  Granted.  I think it is

10   ineffective counsel for your failure to do so.  And if you

11   had not done that, I would have gone on the record to ask

12   if -- for strategic reasons or otherwise why you were not

13   doing it.  However, we do not have a racial disparity, do we,

14   between the victim and --

15             MS. BALIDO:  No.

16             THE COURT:  We don't have that issue then?

17             MS. BALIDO:  And our next motion is motion to

18   question the veniremen regarding the burden of proof on

19   mitigation issues.

20             MR. DAVIS:  We certainly object to that

21   because there is no burden of proof on the State of Texas

22   with regard to the mitigation evidence.  That would be a

23   misstatement of law.  It would be very misleading to any

24   prospective juror to question them along those lines.

25             THE COURT:  Defense request is denied.

DARLINE W. LABAR, OFFICIAL REPORTER

1          MS. BALIDO:  Our next motion is motion to voir

2    dire veniremen on victim character impact testimony.

3          MR. DAVIS:  Again, our objections are as

4    stated in our response.  First of all, if you question them

5    with regards to either guilt/innocence or to future

6    dangerousness, again, I believe the courts have held

7    consistently with the issue of mitigation -- the issue of

8    victim impact character testimony goes on to mitigation

9    issue.  It's not relevant to the issue of guilt/innocence.

10   It's not relevant to the issue of future dangerous.  Again,

11   it would be a misstatement of the law to imply it would

12   somehow be relevant.  I would be misleading and confusing to

13   any prospective jurors.  That type of testimony, as I

14   understand it, is relevant only to the mitigating issue.

15         THE COURT:  Per Payne versus Tennessee, the

16   defense request is denied.

17         MS. BALIDO:  Judge, can I just be heard a

18   little bit on -- with Payne since it's not really a Texas

19   case dealing with the Texas special issues?  Basically what

20   our argument is, is that we have given notice to the State or

21   asked for notice from the State as to any character impact or

22   victim impact evidence or victim character evidence that they

23   plan to introduce, be it either in their case in chief or on

24   punishment or in response to any mitigation that we bring

25   forward.  We don't know about that at this time, other than

DARLINE W. LABAR, OFFICIAL REPORTER

Page 13

1    what is part and context of the offense.   Under Article 1,

2    Section 10, of the Texas Constitution the parties are given

3    wide latitude about questioning the jurors about anticipated

4    facts that might be brought into the case.   And it's

5    important that we uncover potential bias or prejudice that

6    may arise because of anticipated facts without -- without

7    getting the juror to agree as to what their verdict would be

8    or how they would be --

9              THE COURT:   Pre-committing them?

10             MS. BALIDO:   Yes.   We wouldn't commit them to

11   anything.   But it's -- and courts have held in Noonfield

12   versus State, 808 Southwest 2d 482, a Texas Court of Criminal

13   Appeals case, that these sorts of questions framed in the

14   manner of if the evidence -- you know, if you heard evidence

15   as to this, could you be fair and impartial.   That way you're

16   not committing the jurors to anything, but you're trying to

17   weed out any kind of bias or impartiality as to certain

18   anticipated facts that may come before them.

19             THE COURT:   May I ask the defense prior to the

20   commencement of individual voir dire to make a proffer of the

21   types of specific questions they would like to ask a

22   prospective individual juror, and I'll make my determination

23   at that point?

24             MS. BALIDO:   Okay.   There are some listed in

25   the motion, but I'll also kind of flush that out a little

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1   bit.  And that's on page 145, Judge.  That was that motion.

 2              THE COURT:  Thank you.

 3              MS. BALIDO:  The next motion is motion for

 4   discovery of information regarding prior jury service.  And

 5   that is on page 148 of your handbook -- 149.  I'm sorry,

 6   Judge.

 7              THE COURT:  Interesting 1997 case response

 8   from the State.  Do you wish to be heard, Mr. Davis?

 9              MR. DAVIS:  We will object to that under the

10   grounds of Martin v. State, Texas Court of Criminal Appeals

11   case.  To my knowledge, that has not been overruled.  That is

12   privileged information with regard to discovery.  And we're

13   simply going to object to that on those grounds.  There has

14   been no provision, no case law that I'm aware of that would

15   destroy the privilege that we have with regards to our work

16   product.

17              THE COURT:  I have intended, though my trial

18   schedule this week has not permitted me, to discuss this

19   matter with my staff attorneys.  Let me have the benefit, if

20   I may, Monday morning of visiting this issue with them.

21              MR. DAVIS:  Yes, sir.

22              THE COURT:  Before I confer with them, let me

23   tell you some of the ambivalence I feel on both sides, and I

24   don't know which side I'm coming down on.  On one hand, I

25   very, very much obviously respect the work product principle,
```

1    on either side.  The same token, I am extremely mindful of

2    the two dozen plus United States Supreme Court cases in which

3    they say that death is different.  We all realize that there

4    is a different due process body of law as relates to capital

5    litigation by virtue of the nature of the possible

6    punishment.

7             So I'm somewhat driven by those two countervailing

8    arguments in my own mind.  And let me have the benefit of

9    counsel with my staff attorneys and I'll let both sides know

10   prior to the questioning of the first juror.

11            MR. DAVIS:  Yes, sir.

12            MS. BALIDO:  Judge, our next motion, which is

13   on page 178 in your book, is defendant's motion for

14   individual voir dire.

15            THE COURT:  Granted.

16            MS. BALIDO:  We've taken care of the next

17   motion and the next motion.  And then the motion on page 183

18   of your book is motion to voir dire on parole law.

19            THE COURT:  That is the 40 years?

20            MS. BALIDO:  Yes, sir.

21            THE COURT:  I have already mentioned that to

22   them last Friday.  I will again mention it to them before

23   individual questioning.  Granted.  Plus, there is a provision

24   Code of Criminal Procedure that it must be contained in the

25   charge.

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1              Off the record.
 2                  (Discussion off the record.)
 3              THE COURT:  Back on the record.
 4              MR. DAVIS:  We have the State's Motion in
 5   Limine.  A lot of these issues do deal with voir dire.
 6              THE COURT:  All right.
 7              MR. DAVIS:  Issue Number 1 would be of any
 8   statement by the defense that the term "society" as included
 9   in Special Issue Number 1 includes only prison populations.
10   I think the case law is pretty clear that it can include
11   prison, as well as non-prison populations.
12              MS. BALIDO:  Can I be heard on that one,
13   Judge?
14              THE COURT:  Sure.
15              MS. BALIDO:  Judge, specifically the case that
16   Mr. Davis has cited is a 1995 case that was instituted before
17   the parole law being before the jury.  And so the Smith
18   versus State case specifically based its ruling on the fact
19   that parole is not a consideration for a jury in a sentencing
20   phase and so therefore anything about inside prison
21   population and outside prison population in the definition of
22   society -- and we say they left it up to the legislature to
23   change that.  And the legislature did change that and allows
24   parole to be talked about with the jury.  And we would argue
25   that that would then turn all the cases like Smith on their
```

1  head because they are all based on the fact that you can't

2  talk about parole, but now that you can talk about parole.

3  We say that the State would have to prove that Jedidiah

4  Murphy would be actually out in society and would be a

5  continuing threat to society at that point.

6                 THE COURT:  Defense objection is overruled.

7            State request is granted.

8                 MR. DAVIS:  Number 2, again, goes to the word

9  "society."  This goes to what Ms. Balido just said, we're

10  going to object to any statement from the defense that

11  non-prison population can be considered by the jury only if

12  the State proves the defendant will actually be outside the

13  penitentiary or have influence outside the penitentiary.

14  And, again, that would place the burden on the State that the

15  legislature has not placed on us at this point.

16                 MS. BALIDO:  And, Judge, we would argue that

17  they have placed that burden on the State because they

18  changed the law.  All the cases say we're going to leave that

19  to the legislature and they change the law.

20                 THE COURT:  Defense objection is overruled.

21            State's request is granted.

22                 MR. DAVIS:  And Number 3 actually is going to

23  be a rewording of the same motion, Your Honor, again, placing

24  the burden on the -- on the State to prove the defendant

25  would be outside or have influence outside the penitentiary

```
 1   on Special Issue Number 1 which we've already concluded
 2   regards future dangerousness.
 3                  MS. BALIDO:  Objection.
 4                  THE COURT:  Overruled.
 5        Granted.
 6                  MR. DAVIS:  Number 4 would go to any statement
 7   from the defense that the State has the burden of proof on
 8   the issue of mitigation, Your Honor.
 9                  THE COURT:  The Court has previously ruled on
10   it.
11                  MR. DAVIS:  Yes, sir.  Any statement that a
12   particular circumstance must be considered as being
13   mitigating.
14                  MS. BALIDO:  Judge, I don't have a problem
15   with that Motion in Limine as it's worded.
16                  THE COURT:  Okay.
17                  MR. DAVIS:  Number 6, any inquiry into how a
18   venireperson would respond to a particular circumstance
19   presented in a hypothetical question.  Again, the law is
20   pretty clear.  They can ask any hypothetical that they want
21   to illustrate or to explain a law, but it is improper the
22   courts have held to commit that venireperson to that
23   hypothetical and to ask them to commit themselves to a
24   particular set of circumstances.  And that's what we would
25   object to, not the hypotheticals, but the commitment within
```

```
 1    those.
 2                 MS. BALIDO:  Judge, I don't have a problem
 3    with us committing to a certain set of facts, but I do have a
 4    problem with us not being allowed to talk about certain
 5    anticipated facts that might be an issue in this case.  Just
 6    to determine whether or not there is bias or prejudice.
 7                 THE COURT:  Permit me to give you latitude on
 8    that, but as to commitment, would you if you heard thus and
 9    so do X, that --
10                 MR. DAVIS:  That's mainly what I'm objecting
11    to, yes.
12                 THE COURT:  The State's request in that regard
13    is granted.
14                 MR. DAVIS:  Yes, sir.
15                 THE COURT:  The State may continue.
16                 MR. DAVIS:  Yes, sir.  Number 7 will go back
17    to the issue of victim impact testimony.  And again, we're
18    going to object to any attempt on the part of the defense to
19    commit the jurors to tell us how much weight or to exactly
20    what affect that type of testimony would have on the issues
21    of future dangerousness and mitigation.  Again, it's not even
22    relevant to future dangerousness, but I think it's an
23    improper attempt to commit them to that specific issue.
24                 THE COURT:  The Court is not going to permit
25    either side to raise questions on individual voir dire the
```

1   result of which would commit them.  But I think with regard

2   to the matter of mitigation, I'm going to be very, very

3   careful in listening to the responses of the prospective

4   jurors during individual questioning as to whether or not

5   they would be willing to listen to mitigating evidence, if

6   presented, and then determine whether or not it's

7   believable.  And, Number 2, if it rises to the level that is

8   anticipated if we get to the penalty stage of the trial.  And

9   if they're not going to be willing to listen to it, I want to

10  tell you right up front the Court will be constitutionally

11  obligated, as I understand the Supreme Court, to grant a

12  challenge for cause.  Just because they hear it, they don't

13  have to believe it.

14           MR. DAVIS:  Right.

15           THE COURT:  They don't have to believe it

16  rises to the level for an answer of yes to the second

17  question, but I think this is one of the leading

18  constitutional edges and they must be willing to listen and

19  consider it before they make a determination rather than just

20  turn their back on it, say phooey, based upon the facts

21  presented during the guilt/innocence phase, I've made up my

22  mind.  Then we kind of got to look at the circumstances

23  through a different light, that is, mitigating evidence, if

24  any is presented, and then determine whether or not it rises

25  to the level to give weight to it in appropriate defense

1    favorable response.

2                MR. DAVIS:  Don't have a problem with any of

3    that.  The problem would be if you take it to the next step

4    to ask that juror exactly what type of weight would you give

5    that type of evidence.

6                THE COURT:  Oh, no.

7                MR. DAVIS:  See, that's the problem, and

8    that's what I want to cut off.

9                THE COURT:  Grant the State's request in that

10   regard.

11               MR. DAVIS:  Yes, sir.

12               THE COURT:  I want both sides to be very

13   mindful I'm going to be listening very careful -- I want

14   conscientious jurors that are willing to listen to mitigating

15   evidence, if such is presented, if we get to the penalty

16   phase of the trial.

17               MR. DAVIS:  Right.  Number 8 is going to go

18   down to any statement that the law does not allow jurors to

19   give certain classes of witness slight edge in terms of

20   credibility.  This will go to questions I've heard regarding,

21   you know, would you start these people equally, will you

22   start them ahead of each other.  The law says it's allowable

23   to give a certain class of witnesses a slight edge.  What's

24   not allowable is to say you'll automatically believe that

25   person because they are contained in a special class or

1    you're automatically going to disbelieve them.  I believe

2    that's what the standard is under Ladd v. State.

3              MS. BALIDO:  Judge, can I respond?  Ladd v.

4    State was dealing with the issue as to whether the juror in

5    that case said that we give a doctor or police officer

6    testimony more credibility if they were testifying based on

7    their expertise and did not address the issue as to whether

8    or not they would believe them just because they were police

9    officers which has been traditionally the question asked.

10   Would you believe a police officer to be more credible

11   because they're police officers.  I think we're entitled to

12   go into would you believe a doctor just because he's a

13   doctor, more than just a regular Joe Smoe witness.  I don't

14   think Ladd has changed that because if you look at the facts

15   of the case, you look at the questions that were actually

16   asked that jury in Ladd, I think that we're entitled to go

17   into that.

18             THE COURT:  Let me reread Ladd.

19             MR. DAVIS:  I don't have a problem asking that

20   question, would you give a police officer a bit of an edge.

21   That's proper for peremptory challenges.  The difficulty

22   would be to say the law does not allow you to give a police

23   officer a slight edge.  The law does not allow you to give a

24   certain class.  Now, juror, what would you do?  Because that

25   is a misstatement of the law.  They can ask about their

DARLINE W. LABAR, OFFICIAL REPORTER

1    feelings about certain classes.  I think that's proper.

2            THE COURT:  Let me reread Ladd.

3            MR. DAVIS:  Number 9, any statement that the

4    law does not allow the venireperson to be predisposed towards

5    the death penalty in answering the issue of future

6    dangerousness.  You know, I've heard this question phrased a

7    lot of different ways in which, you know, based on the fact

8    that you've found the defendant guilty of capital murder now,

9    you know -- you know, the law is not going to allow you, you

10   know, to be leaning one way or the other.  And the case law

11   here again recently in Maldanado v. State has come out to say

12   it is allowable, in fact, for a venireperson to be

13   predisposed.  What they have to be able to truthfully say is

14   that they will base their decision in Special Issue Number 1

15   on all of the evidence after they have heard all the

16   evidence, and that is the proper standard now, not whether

17   they're leaning when they get down to Special Issue Number 1,

18   but whether or not they'll keep an open mind and after all

19   the evidence will they force the State of Texas to meet its

20   burden of proof.

21           THE COURT:  Well, doesn't that cut both ways?

22   Predisposed either for the death penalty or against the death

23   penalty?

24           MR. DAVIS:  Well, it could.  And again, it's a

25   proper question to say, how are you going to feel about

DARLINE W. LABAR, OFFICIAL REPORTER

1    Special Issue Number 1.  Are you going to be leaning one way

2    or the other?  I mean, both sides are entitled to ask that

3    question, but what would be improper is that the law says

4    that you are not allowed to feel that way when you get down

5    to Special Issue Number 1.

6              THE COURT:  Depending upon how its phrased,

7    does the defense have any objection?

8              MS. BALIDO:  Yes.  And it kind of seems like

9    to me that the State is trying to have its cake and eat it

10   too because they asked a question on the questionnaire about

11   whether or not you could -- you know, basically are some

12   capital murders so --

13             MR. BYCK:  Solely based on the facts.

14             MS. BALIDO:  -- solely based on the facts of

15   the capital murder, could you give death just solely on the

16   facts of that one case, and then not allow us to talk about

17   the facts of the case and whether or not you're predisposed

18   then to -- into giving death at that point.

19             MR. DAVIS:  I'm not objecting to that.  Again,

20   I'm not objecting to questions about how they feel, whether

21   they are predisposed or not, but what I am objecting to

22   saying is, you know, now, juror, let me tell what you the law

23   says.  The law says when you get down to Question Number 1

24   you cannot be leaning either way.  The law -- the law does

25   not say that.  They're entitled to say how are you going to

```
1    feel.  Do you think that you will be leaning when you get

2    there.

3                 THE COURT:  Ask an open-ended question without

4    a pre-commitment, I'll permit that.

5                 MS. BALIDO:  Okay.  We might have to kind of

6    experiment with that a little bit.

7                 THE COURT:  Fine.

8                 MS. BALIDO:  Oh, I'm sorry.

9                 MR. DAVIS:  Number 10 and Number 11 really

10   will go to punishment issues.  I think they're pretty

11   straightforward though.  Number 10 is going to go to the

12   defendant's childhood or family photographs.  That would be

13   with regard to punishment evidence by the defense, I suppose

14   for mitigation.  Again, I believe the case law is pretty

15   clear.  That's just not relevant information for the jury to

16   have.

17                 THE COURT:  They can introduce it later on.

18   You're not saying they can't do that?

19                 MR. DAVIS:  I'm saying -- I'm saying that on

20   punishment --

21                 THE COURT:  On punishment --

22                 MR. DAVIS:  -- on punishment with regards to

23   mitigation, and I anticipate that will occur in this case,

24   that there will be an attempt at some point to offer

25   childhood or family photographs to tell his life story.  I
```

1   anticipate that, and what I'm saying is that's improper.  The

2   courts have held such in Rose v. State.

3                  MS. BALIDO:  Judge, I think the case in Rose

4   was there was basically just the family and childhood

5   photographs that didn't have any tie into how it tied into

6   mitigating the offense.  So I would agree that there was an

7   issue in Rose that the photographs themselves were trying to

8   be mitigation evidence.  I mean, I don't know at this point

9   how much mitigating evidence we're going to have.  And if

10  it's relevant -- I don't have a problem with approaching the

11  bench and having a hearing about it, but I don't want any

12  kind of --

13                 THE COURT:  The Court will sustain the State's

14  request.  However, if the defense wishes the Court to revisit

15  this after a proffer outside the jury's presence, I will

16  reconsider the relevance of the proffered evidence.

17                 MR. DAVIS:  Number 11 is going to go to

18  testimony from the defendant's family or friends regarding

19  their feelings on the prospect of the death penalty or the

20  impact the defendant's execution would have on them.  Again,

21  the courts have held in Fuller v. State that that is not

22  relevant testimony.

23                 MS. BALIDO:  Judge, if I could just direct the

24  Court's attention to -- Fuller was decided before Mosley, and

25  things have changed since Mosley as to what is mitigating and

1    what is not.  And also certainly if the victim impact --

2    depends on how much victim impact comes in as to whether or

3    not we want to bring that up in our rebuttal of the State's

4    rebuttal.

5              THE COURT:  Does the State anticipate -- I

6    mean does the defense anticipate asking a question such as is

7    anticipated in Number 11 during voir dire?

8              MS. BALIDO:  No, not during voir dire.

9              THE COURT:  Should the defense choose to offer

10   evidence of the type made reference in Fuller v. State, the

11   Court is going to sustain the State's objection at this

12   point.  However, I will revisit the issue of the proffer

13   outside the jury's presence and revisit the issue and will

14   consider reversing myself, depending upon the proffer.

15             MR. DAVIS:  Judge, I believe that's all the

16   pretrial motions we have that would impact in any way to jury

17   selection.

18             THE COURT:  All right.  My we -- since we are

19   outside of the presence of a prospective juror, we've not yet

20   proceeded with arraignment in these matters.  Both sides have

21   any objection to carrying all the cases together, or do you

22   want just out of an abundance of caution just to do the

23   capital case?

24             MS. LITTLE:  Let's just do the capital case.

25             THE COURT:  Well, you can think about it over

1    the weekend.

2            The arraignment in Cause F00-02424-NM, styled the

3    State of Texas versus Jedidiah Isaac Murphy, will be

4    conducted in open court, outside the presence and hearing of

5    any prospective juror or jury panel.

6            Mr. Davis.

7                MR. DAVIS:   Thank you.

8            "True bill of indictment, in the name and by the

9    authority of the State of Texas..."

10                (Arraignment By Mr. Davis.)

11                MR. DAVIS:   "...do present that one, Jedidiah

12   Isaac Murphy --

13            Is that your true name?

14                THE DEFENDANT:   Yes, sir.

15                (Continued Arraignment.)

16                MR. DAVIS:    "...against the peace and dignity

17   of the State, signed Bill Hill, Criminal District Attorney of

18   Dallas County, Texas, and by the foreman of the grand jury."

19                THE COURT:   To that indictment, Jedidiah Isaac

20   Murphy, how do you plead, sir?

21                THE DEFENDANT:   Not guilty.

22                THE COURT:   Thank you.   The record will so

23   reflect.

24            This matter -- pretrial matter concluded for the

25   day?

1            MS. BALIDO:   Yes, Your Honor.

2            MR. DAVIS:   Yes, Your Honor.

3            (Recess of proceedings.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4         I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13        I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16        Witness my hand this the 3rd day of October, A.D.,

17   2001.

18

19

20                         DARLINE W. LABAR
21                         Official Court Reporter
                           194th Judicial District Court
22                         Dallas County, Texas
                           (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002

DARLINE W. LABAR, OFFICIAL REPORTER

1          REPORTER'S RECORD

2        VOLUME 5 of 65 VOLUMES        **74145**

3      TRIAL COURT CAUSE NO. F00-02424-NM

4   THE STATE OF TEXAS          :        IN THE DISTRICT COURT

5   VS.                         :        DALLAS COUNTY, TEXAS

6   JEDIDIAH ISAAC MURPHY       :        194TH JUDICIAL DISTRICT

7            *********************        **FILED IN**
                                          **COURT OF CRIMINAL APPEALS**
8            INDIVIDUAL VOIR DIRE

9            *********************        DEC  5 2001

10   A P P E A R A N C E S :              Troy C. Bennett, Jr., Clerk

11  HONORABLE BILL HILL, Criminal District Attorney
            Crowley Criminal Courts Building
12          Dallas, Dallas County, Texas  75207
            Phone:  214-653-3600
13  BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
            MS. MARY MILLER, A.D.A., SBOT # 21453200
14              FOR THE STATE OF TEXAS;

15  MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
    MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16  MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
    Dallas County Public Defender's Office
17          Phone:  214-653-9400
                FOR THE DEFENDANT.

18

19                  *********

20       On the 12th day of March, 2001, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable F. Harold Entz, Jr.,

23  Judge presiding, held in Dallas, Dallas County, Texas:

24       Proceedings reported by machine shorthand, computer

25  assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

```
1                        INDEX VOLUME 5

2    March 12th, 2001                           PAGE    VOL.

3    INDIVIDUAL VOIR DIRE:

4    Proceedings........................................ 2      5

5    State no challenge for cause - Ms. Nisbet........ 65     5

6    Defense no challenge for cause - Ms. Nisbet...... 65     5

7    Emilia Juror Nisbet Prospective Juror No. 1...... 67     5

8    Reporter's Certificate........................... 72     5

9

10              CHRONOLOGICAL VENIREPERSON INDEX

11                    STATE        DEFENSE             VOL.

12   EMILIA NISBET        17            43               5

13

14              ALPHABETICAL VENIREPERSON INDEX

15                    STATE        DEFENSE             VOL.

16   EMILIA NISBET        17            43               5

17

18              *NO EXHIBITS THIS VOLUME*

19

20

21

22

23

24

25
```

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Those of you that are witnesses in

 3    the Jedidiah Isaac Murphy case, may I ask that you rise,

 4    please come forward and be sworn, please.

 5              Good morning, may I ask those of you that anticipate

 6    being witnesses to raise your right hand and be sworn in,

 7    please.

 8              Each of you solemnly swear or affirm that you will

 9    give correct testimony to the jury impaneled once they are

10    impaneled in this trial, so help you God?

11                    (Witnesses sworn.)

12              THE COURT:  Thank you.  Lower your hands.

13              May I ask that you individually give your name to

14    Ms. King, the court reporter, after which I'll give you some

15    additional instructions.  May we start with you, sir?

16              THE WITNESS:  Mark Scott Read, R-e-a-d.

17              THE WITNESS:  Dale, D-a-l-e, Corbett,

18    C-o-r-b-e-t-t, Wills Point PD.

19              THE WITNESS:  James R. Lee, L-e-e, Wills Point

20    Police Department.

21              THE WITNESS:  Donald Alberty, A-l-b-e-r-t-y.

22              THE WITNESS:  Jerry Wood, W-o-o-d.

23              THE WITNESS:  George Poteet, P-o-t-e-e-t.

24              THE WITNESS:  Elisabeth Erwin, E-r-w-i-n.

25              THE WITNESS:  Shirley Bard, B-a-r-d.
```

```
 1                    THE WITNESS:  Bobby Harp, H-a-r-p.

 2                    THE WITNESS:  Akran Aridi, A-k-r-a-n,

 3    A-r-i-d-i.

 4                    THE WITNESS:  Kenneth Clance, C-l-a-n-c-e.

 5                    THE WITNESS:  Debbie Armstrong.

 6                    THE WITNESS:  Treshod Tarrant, T-r-e-s-h-o-d,

 7    T-a-r-r-a-n-t.

 8                    THE WITNESS:  Sherryl, S-h-e-r-r-y-l, Wilhelm,

 9    W-i-l-h-e-l-m.

10                    THE WITNESS:  Ora, O-r-a, Mae, M-a-e, Milton,

11    M-i-l-t-o-n.

12                    THE WITNESS:  Richard Shollenberger,

13    S-h-o-l-l-e-n-b-e-r-g-e-r.

14                    THE WITNESS:  Debra Murphy.

15                    THE COURT:  Is there anybody that has not

16    given the court reporter their name?  Nope.  Thank you.

17                 Ladies and gentlemen, we're going to begin

18    individual questioning today of prospective jurors, so from

19    our standpoint, it will be a bit of a time consuming

20    process.  We hopefully anticipate completing this process way

21    before May 29th, but -- counsel, is that the date that we

22    have tentatively -- day after Memorial Day is celebrated, we

23    anticipate beginning presentation of testimony to the

24    impaneled jury.  So if you would kind of put that on your

25    calendars to make yourself available beginning the 29th until
```

1  your presentation, whatever part it may be, is completed.  If

2  something however on the date that you're to return should

3  prevent you coming back, such as illness or incapacitated by

4  virtue of an injury or some sort of family emergency such as

5  a funeral, I understand those things.  Please see that you

6  personally or have somebody on your behalf remain in contact

7  with the court or either the District Attorneys Office, Mr.

8  Davis or Ms. Miller, we'll work with you anyway that we can.

9          Now that you've been sworn as a witnesses, if you

10 should up and fail to return, by law I am obligated to inform

11 you that an attachment can issue which is kind of like an

12 arrest warrant and the Sheriff's Department will come out

13 pick you up and you will remain in custody until you finish

14 testifying.  Obviously, we don't want that to happen.  So if

15 there is anything we can do to work with you, please don't

16 hesitate to let us know.

17          MR. BYCK:  Your Honor, may we approach?

18          THE COURT:  You may.

19          MR. BYCK:  Very briefly.

20          (Side bar conference.)

21          THE COURT:  If you have future discussions

22 with the District Attorneys Office with regard to your

23 testimony, please have it on a one-on-one basis as opposed to

24 two or more of you being together in an effort somewhat to

25 avoid comparative testimony.  Thank you so much.  You are all

1    excused.

2              (Recess of witnesses.)

3              THE COURT:  With regard to a couple of

4    housekeeping chores before we begin, will be impaneling or

5    qualifying a number of jurors before the peremptory

6    challenges by either side will be made.

7              With regard to the request by the defense that they

8    have the benefit of the prior jury history record information

9    of prospective jurors --

10             MR. BYCK:  Judge, do we need the defendant?

11             THE COURT:  Yes.

12             With regard to this, I will make my decision

13   verbally which anticipate will make neither side totally

14   happy.

15             (Defendant brought into courtroom.)

16             THE COURT:  In an effort to level the playing

17   field in a legal sense and in light of the super due process

18   that the Texas Supreme Court has on a number of occasions

19   discussed with regard to capital cases, going to honor the

20   State's request and they will not be required by the Court to

21   turn over the information having been gleaned over decades

22   with regard to the history of prospective jurors in criminal

23   cases.

24             The other side of the coin is this.  For every

25   prospective qualified juror for which the State has history

1  with regard to their criminal jury service, that the State

2  chooses not for work product reasons to share with the

3  defense, I will be giving the defense an additional

4  peremptory challenge.  Therefore, if the State wishes to up

5  the information, defense does not get an additional

6  peremptory challenge.  For strategic purposes, if the State

7  does not wish to share that information, based on work

8  product, I understand it, but I will give the defense an

9  additional peremptory challenge as compensation.

10            MS. BALIDO:  Judge, can I ask a question?

11            THE COURT:  Sure.

12            MS. BALIDO:  Does that mean that the defense

13  will be placed in the position that we have to specifically

14  ask every single juror whether or not a jury history has been

15  run?

16            THE COURT:  The Court will ask the State after

17  the Court has determined -- after the Court has heard any

18  additional challenges for cause.

19            MS. BALIDO:  At this time the defense will ask

20  for specific findings of fact and conclusions of law on each

21  of the grounds that we asked for this information in our

22  motion.

23            THE COURT:  The Court will later on formulate

24  those.  I will take that under advisement at this time.

25            MR. DAVIS:  I do have one other matter

1    regarding videotaping of the jurors.  It's my understanding

2    the defense will be videotaping --

3                    MR. BYCK:  No.

4                    MS. LITTLE:  No.

5                    MR. BYCK:  As a matter of fact, we'll withdraw

6    that motion.

7                    MR. DAVIS:  Okay.

8                    MS. BALIDO:  Judge, just with one caveat.

9                    THE COURT:  Let the record so reflect.

10           Ms. King is grateful.

11                   MS. BALIDO:  The one thing we would like to do

12   since we're going to qualify an entire panel is take a

13   Polaroid shot of the jurors so we can be refreshed with their

14   photograph.

15                   THE COURT:  Request granted.

16                   MR. BYCK:  Your Honor, may the record reflect

17   that due to the Court's ruling that we will be qualifying 48

18   jurors and making peremptory challenges --

19                   THE COURT:  May be 48 plus.

20                   MR. BYCK:  48 plus.  After the challenges for

21   cause, will all have been heard in that group together, the

22   defense will waive its right to have the jurors seated in

23   voir dire in order, and we will therefore agree with the

24   order this afternoon, where we're going to speak to Juror

25   Number 19, Juror Number 77, and Juror Number 208, they may

---

```
 1   not be in exact numerical order --
 2                THE COURT:  Thank you.
 3                MR. BYCK:  -- but we will waive that right due
 4   to the Court's ruling.
 5                THE COURT:  Thank you.  I think those other
 6   matters the Court will continue, and as soon as I have made
 7   those decisions for the benefit of counsel, I will put those
 8   on the record as well.
 9                MS. LITTLE:  Your Honor, I need to submit to
10   the Court one mitigation question --
11                THE COURT:  Has the State seen the question?
12                MS. LITTLE:  Actually no.
13                MR. DAVIS:  No, Your Honor.
14                THE COURT:  Would you like me to read it?
15                MS. LITTLE:  That would be -- if you read it
16   in the record, I would appreciate it, Your Honor.
17                THE COURT:  The defense has proposed to the
18   Court they desire to ask prospective jurors the following
19   question:  Quote, would victim character testimony cause you
20   to reduce the State's burden of proof on Special Issue Number
21   1?  And follow-up question is that do you promise the Court
22   that you would not do so?
23                MR. DAVIS:  Well, again, I would object to
24   that obviously because what it asks for is a commitment on
25   whether they will consider it, whether they will give it
```

```
 1   effect, and, you know, it's a clear attempt to commit a juror
 2   to a specific type of evidence.  It's obviously -- you know,
 3   it would be nothing different than me, you know, asking a
 4   juror if you found that an individual had committed another
 5   prior act of violence, would you give that effect on Special
 6   Issue Number 1.  And I'm not allowed to do that.  I mean,
 7   that's just a clear attempt to commit a juror.  I don't think
 8   there is any question about that.
 9                THE COURT:  Ms. Little, do you care to further
10   be heard?
11                MS. LITTLE:  Yes, sir.  I would submit to the
12   Court that in essence and, you know, whatever terms of art we
13   choose here, the State does have the burden of proof on the
14   first issue.  Although the law doesn't provide a burden of
15   proof on the mitigation for either side, I think as a
16   practical matter what does matter is if there is a weighing
17   process that can go on, I would submit to the Court this is
18   an attempt on our part to discover if they really are going
19   to consider mitigating evidence in making a decision and if
20   they're biased against the law on mitigation because it's
21   relevant to mitigation, Special Issue Number 1 -- Number 2
22   and not 1.
23                THE COURT:  The Court is going to sustain the
24   State's objection on Number 1, and I will be visiting with
25   the prospective individual jurors before you-all have at them
```

1   and try to flush them out an exit.

2           30 minutes a side with a warning after 25 minutes

3   unless you're close on the needle and need a little more.   Is

4   that fair?

5           Mr. Davis, is that fair?

6                   MR. DAVIS:  Yes, sir.

7                   THE COURT:  30 minutes -- and if you're close

8   on the bubble and need a little more time, I'll give it to

9   you.

10                  MR. BYCK:  That's agreeable.

11                  THE COURT:  Sheriff, may we have the first

12  prospective juror, please?

13                  (Discussion off the record.)

14                  THE COURT:  Good morning.

15                  THE WITNESS:  Good morning.

16                  THE COURT:  Sorry to keep you waiting.  Raise

17  your right hand, please.

18                  (Venireperson sworn.)

19                  VENIREPERSON:  I do.

20                  THE COURT:  Lower your hand.  What is your

21  name, please?

22                  VENIREPERSON:  I'm Emilia Nisbet.

23                  THE COURT:  Thank you, Ms. Nisbet.  Ms.

24  Nisbet, let me reintroduce the individuals whom you see at

25  the counsel tables and then we'll proceed right into the

1  matters at hand.  At the table to the far left, lead counsel

2  for the State in this prosecution is Mr. Greg Davis.

3          MR. DAVIS:  Good morning.

4          VENIREPERSON:  Good morning.

5          THE COURT:  He is assisted by the Chief

6  Prosecutor assigned at the present time to this the 194th

7  District Court, Ms. Mary Miller.

8          MS. MILLER:  Good morning.

9          THE COURT:  Moving on to the next table, we

10 have first the lead counsel for the defense, the Honorable

11 Jane Little.

12         MS. LITTLE:  Good morning.

13         THE COURT:  She is assisted by co-counsel, and

14 to her right as we look at them is the Honorable Mike Byck.

15         MR. BYCK:  Good morning, ma'am.

16         THE COURT:  And seated behind Mr. Byck is the

17 third defense attorney, the Honorable Jennifer Balido.

18         MS. BALIDO:  Good morning.

19         VENIREPERSON:  Good morning.

20         THE COURT:  Gentleman to the far right of Mr.

21 Byck in the blue shirt, suit coat, red tie, is the accused,

22 Jedidiah Isaac Murphy.

23         THE DEFENDANT:  Good morning.

24         VENIREPERSON:  Good morning.

25         THE COURT:  Ms. Nisbet, let's move right into

DARLINE W. LABAR, OFFICIAL REPORTER

1    the matter at hand and if we can somewhat speed forward.  Let

2    us assume for purposes of hypothetical that you've been

3    selected as a juror.  Furthermore, 11 other jurors have been

4    selected.  Evidence has been presented at the guilt/innocence

5    stage of the trial.  After hearing the evidence, the Court's

6    instructions, deliberation with your other 11 jurors, you

7    have reached the conclusion -- and again we're speaking of

8    hypotheticals.

9                   VENIREPERSON:  Uh-huh.

10                  THE COURT:  That the defendant is guilty of

11   capital murder.  So we've crossed that bridge, if you will,

12   figuratively.  As I indicated to the panel a week ago last

13   Friday, the jury would then be called upon to listen to

14   additional evidence, take into consideration that evidence

15   that has previously been presented in the guilt/innocence,

16   additional evidence which either side may present in the

17   penalty stage of the trial, to determine whether or not the

18   defendant will get a life sentence or a death sentence.

19   There is a built-in predisposition in the law of Texas toward

20   a life sentence.  And I think all us agree in light of the

21   enormity of the ultimate punishment, that's the way it should

22   be.  So there is a bias, if you will, in favor of life and

23   not death.

24                  VENIREPERSON:  Okay.

25                  THE COURT:  A life sentence for capital murder

DARLINE W. LABAR, OFFICIAL REPORTER

1   in Texas equals 40 calendar years in the penitentiary before

2   being eligible for consideration on parole.   40 flat years,

3   day-for-day, week-for-week, month-for-month.   Does not mean

4   at the end of that 40 years the penitentiary doors will open

5   up, but the process of eligibility then commences.

6            Before a life sentence is changed to death, certain

7   special issues must be determined by the jury.   The two

8   special issues that the attorneys and I contemplate the jury

9   in this case will be called upon to address you see to the

10   far left.   Can you read them from where you now find

11   yourself?   Read them to yourself if you would, please.

12               (Venireperson allowed time to read)

13           THE COURT:   Those are not questions that we

14   just dreamed up for this particular trial.   This is what the

15   legislature down in Austin has placed into the statute and

16   the United States Supreme Court and Texas Court of Criminal

17   Appeals have reviewed ad nauseam.

18           VENIREPERSON:   Okay.

19           THE COURT:   Let me explain to you the effect

20   of these special issues, just put all our cards on the table.

21   We want nothing to be hidden from any prospective juror.   If

22   the jurors during their deliberations in the penalty phase

23   answer Special Issue Number 1 in the affirmative or yes, by

24   law they are then obligated to go on to Special Issue Number

25   2.   On the other hand, if the jury answers Special Issue

1    Number 1 in the negative, it's all over and it will be a life

2    sentence, not death.  But if the jury answers Special Issue

3    Number 1 in the affirmative or yes, the jury as a whole must

4    then deal with Special Issue Number 2.

5         Special Issue Number 2 is what we call the

6    mitigation issue.  The United States Supreme Court on a

7    number of occasions have said that to be a qualified

8    prospective juror, a juror must be willing and able in their

9    heart of hearts to listen to mitigating evidence, if any is

10   presented, and then determine whether or not it rises to the

11   level as a result of which the defendant, in this case Mr.

12   Murphy, should live and not die.

13        Special Issue Number 2 is in so many words a last

14   chance question.  Because if the jury answers Special Issue

15   Number 1 yes and Special Issue Number 2 no, a death sentence

16   is the result.  And unlike other states where a jury's

17   answers to special issues are but recommendations to the

18   court, Florida being the prime example, not so in Texas.

19   Given our fervent populist belief in the will of the people,

20   we give awesome responsibility to the jury.  You don't do it

21   alone.  Whereas Arizona the Judge alone would determine alone

22   whether it's life or death.  So you would, if you are one of

23   the jurors, to be one of 12 persons to be called upon under

24   my hypothetical to answer these questions.

25        Do you understand the effect that those two

1    questions would have?

2              VENIREPERSON:  I do, sir.

3              THE COURT:  Are you as you sit here willing to

4    tell us that you would be willing to listen to mitigation

5    type evidence and decide -- listen to it carefully and only

6    after carefully factoring that into your mental determination

7    answer Special Issue Number 2?

8              VENIREPERSON:  Yes.

9              THE COURT:  The Supreme Court of the United

10   States has said we cannot define what mitigation evidence is.

11   Mitigation is kind of like beauty.  It's in the eye of the

12   beholder.  Whatever you consider mitigation evidence is

13   mitigating evidence.  Could be alcoholism, drug abuse, fetal

14   alcohol syndrome, learning disability.  It covers a water

15   front.  Just because it's presented does not mean that you

16   need automatically to give effect to it.  But to be a

17   prospective qualified juror, you must listen to it, give it

18   serious consideration, and then make a collective

19   determination with your fellow jurors whether or not it rises

20   to the level as a result of which the defendant, in this case

21   Mr. Murphy, should live or not die.

22             I realize this is a Monday morning.  We've kind of

23   had a nasty weekend, and you've probably been -- a little bit

24   of trepidation and fear about this type of situation.  We

25   want you to know up front that there are no right or wrong

1    answers to the questions that they will be asking.

2            VENIREPERSON:  I understand.

3            THE COURT:  This is not a citizenship test.

4    We don't grade people whether or not they're good or not good

5    citizens by virtue of how they feel about the death penalty,

6    so we don't want any -- we don't want -- none of us want you

7    to take the questions personally, but we understand and

8    appreciate you know the serious business at hand and we trust

9    and know that you will take it in the manner that I have just

10   presented it to you.

11           VENIREPERSON:  Thank you.

12           THE COURT:  Do you have any questions of me

13   before the attorneys begin?

14           VENIREPERSON:  No.

15           THE COURT:  We anticipate beginning the

16   testimony in this trial -- hopefully the jury will be

17   selected way before then, but the Tuesday after the Monday

18   that Memorial Day is celebrated.  Do you at this point know

19   of any irreversible problem that would prevent your altering

20   your schedule and make certain you are available if you are

21   selected as one of the 12 jurors?

22           VENIREPERSON:  There is one issue.  I work at

23   a model home sales office.

24           THE COURT:  Yes.

25           VENIREPERSON:  I am the only other person

1    other than the sales counselor.  I'm her assistant.  There is

2    nobody there today answering the phones or anything.  I could

3    not get anybody in.  So from that standpoint, that will be a

4    hardship for us.

5              THE COURT:  Given this amount of time, do you

6    think you might be able to make some arrangements?

7              VENIREPERSON:  May be able to.

8              THE COURT:  All right.  We will begin with the

9    State, Mr. Davis, followed by the defense.

10             MR. DAVIS:  May it please the Court.

11             THE COURT:  You may proceed.

12                       EMILIA NISBET

13   was called as a venireperson by the Court and, after having

14   been first duly sworn, testified as follows:

15                    Voir Dire Examination

16   By Mr. Davis:

17        Q.   Morning again, Ms. Nisbet.  How are you?

18        A.   Good morning.  I'm just fine.

19        Q.   As the Judge told you, my name is Greg Davis.  Along

20   with Mary Miller, I represent the State of Texas in this

21   case.  For the next 30 minutes or so I'll have a chance to

22   speak with you.  We're going to go over a number of things

23   that the Judge just talked to you about.  We'll talk about

24   your questionnaire a little bit and talk to you in a little

25   bit greater detail about the death penalty.  And then you'll

DARLINE W. LABAR, OFFICIAL REPORTER

1   be passed to the other side.  They'll have an opportunity to

2   talk to you also for about 30 minutes.

3           And really, as the Judge told you, we're going to be

4   dealing, or at least I will, how you feel about things, what

5   your opinions are, and believe me, I've heard enough of this

6   that I know there aren't any right or wrong answers.  We need

7   to know how you truly feel about this.  All right?

8       A.   Okay.

9       Q.   Let me just begin and ask you, you know, it's been

10  some time since you came down to that Central Jury Room and

11  filled out the questionnaire and you've probably had a little

12  bit of time to think about this now.  And let me just ask

13  you, Ms. Nisbet, having had some time to reflect, how do you

14  really feel about sitting on this type of jury where the

15  State is seeking the death penalty, where if the State

16  prevails in this case, there will come a day when Jedidiah

17  Isaac Murphy will lie dead on a gurney in Huntsville, Texas?

18  How do you feel about that?

19      A.   Since the day I answered the questionnaire, at that

20  time you're not thinking about all this.  Since that time

21  I've thought a lot more.  It's a tough situation.  I think

22  it's an awesome responsibility to give to a jury.

23      Q.   I've heard that -- I don't think any of us would

24  want a juror who would take this lightly.  I've heard jurors

25  say it's not something that I necessarily want to do, but I

1  accept it as my civic responsibility if you choose me.   I'm

2  the type of person who can follow the law.   I'll listen to

3  the evidence, and I'll come up with a verdict that is best.

4       Do you feel like you could do that in this type of

5  case?

6       A.   I believe I could do that.

7       Q.   Fair enough.   You know -- and as we talk about

8  opinions, it's fair to say that everybody feels differently

9  about some of these things that we're going to talk about.

10  Some people have strong opinions one way or the other, but

11  the key is going to be in this case, as a juror, if

12  necessary, could you set aside your feelings and could you

13  follow the instructions given to you by the Judge because

14  see, there will be two judges here really.   You'll be the

15  judge of the facts.   You'll listen to all the facts,

16  determine what you believe the truth to be.   But Judge Entz

17  will give you certain written instructions, and he'll give

18  you certain definitions that you need to work from.   He'll

19  give you instructions on what this law means, how you're to

20  apply that law.   And as a juror, your duty bound to follow

21  the law given to you by the Judge.

22       Now, in general do you feel like you're the type of

23  person who could and would follow the instructions given to

24  you by Judge Entz?

25       A.   Yes.

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.   Ms. Nisbet, you know, again, the reality is the

2     State is seeking the death penalty.  We're not going to

3     change our position in this case.  I can assure you of that.

4     At the punishment phase, if we reach that phase, I'll make

5     you a promise that I will be standing before you asking you

6     to answer those special issues in such a way that the Judge

7     will be duty bound again by the law to impose a sentence of

8     death on Jedidiah Isaac Murphy.  As he just told you, there's

9     no wiggle room there.  If you answer these questions yes and

10    no, he is obligated under the law to impose a sentence of

11    death.  Any other combination will mean a life sentence.

12          And again, a number of people come down and they'll

13    say, you know, in the abstract I believe in the death penalty

14    law.  I think it's necessary.  I'm glad that we have it.  It

15    serves a useful purpose.  But as you can see, as you look at

16    Mr. Murphy, there is nothing abstract about him.  He's a

17    living, breathing human being.  And again, if we prevail, he

18    will die some day in Huntsville.  And again, do you feel like

19    you're the type of person who could look at the facts, apply

20    the law given to you by Judge Entz, and answer these

21    questions according to your conscience and the evidence in

22    this case?

23    A.   Yes.

24    Q.   And that's even if that results in the death

25    sentence for Mr. Murphy?

DARLINE W. LABAR, OFFICIAL REPORTER

1     A.   Yes.

2     Q.   Fair enough.  Ms. Nisbet, just in general -- I know

3 that you're in favor of the death penalty.  Can you -- can

4 you -- can you think of any cases recently perhaps that

5 you've heard about or followed in the media where you thought

6 maybe the death penalty might be an appropriate punishment

7 for that type of case?

8     A.   No, sir, I really can't.  I really can't think of a

9 case.

10    Q.   Okay.

11    A.   A specific case.

12    Q.   Right.  In this case I believe the Judge has already

13 explained to you that we've alleged that the capital murder

14 involves the intentional murder of an individual by the name

15 of Bertie Cunningham.  And that murder occurred during the

16 course of the commission or attempted commission of two

17 separate felonies, either a robbery or a kidnapping.  And I

18 believe as you recall back in the large panel, that's what

19 makes a capital murder.  It's always an intentional murder

20 plus something else, and the something else in this case is

21 the commission of a robbery or a kidnapping.

22         Now, in general does that seem like the type of

23 category of case where you think the death penalty might be

24 appropriate, depending upon the facts that you hear about

25 that case?

1    A.   Well, again, I wouldn't know until I heard all the

2    facts.

3    Q.   Exactly.  And that's the type of juror that we're

4    waiting for here, that we're looking for, somebody that tells

5    us I'm not going to prejudge anything.  I want to hear the

6    facts.  You give me the facts, then I'll make my decision.

7    Is that fair enough?

8    A.   Yes.

9    Q.   Let me ask you just a bit of a hypothetical question

10   maybe.  In Dallas County right now, Ms. Nisbet, do you

11   believe that it might be possible that there are people here

12   in this county who would kill another individual to obtain

13   their property?  Do you think it's possible there might be

14   people like that living in Dallas County today?

15   A.   To protect their property?

16   Q.   No, ma'am.  In order to take their property, in

17   order to rob them, do you think there are people who would

18   take another human beings' life?

19   A.   Yes.

20   Q.   Do you think it's possible that there are people who

21   a would do that, kill another person to obtain their

22   property, and then have absolutely no remorse at all about

23   having done that?

24   A.   Again, I would have to hear a specific case.  I

25   can't make some broad judgment.

DARLINE W. LABAR, OFFICIAL REPORTER

1  Q.  Okay.  Okay.  Do you think just in general that

2  people should be held responsible or accountable for their

3  actions?

4  A.  Yes.

5  Q.  Okay.  And I believe that we had a question here on

6  the questionnaire about use of alcohol and the fact that it's

7  not a defense in the State of Texas.  Intoxication is not a

8  defense.  I believe that you've agreed with that law.  Do

9  you -- in general do you believe that people should be held

10  responsible for their actions, even if they do take alcohol

11  or perhaps another controlled substance of some sort?

12  A.  Yes.

13  Q.  For instance, if I go out today and I voluntarily

14  become intoxicated, or I voluntarily take a banned drug, such

15  as cocaine or heroin or marijuana or whatever it might be and

16  then I go out and I commit a crime, perhaps a murder, in

17  general do you think that I should be held accountable for my

18  actions?

19  A.  Yes.

20  Q.  I need to talk to you for just a moment about the

21  lesser included offense of murder.  Okay.  The reason I do

22  that is because, remember, a capital murder is always murder

23  plus something else.  Now, in this type of case, let's say,

24  for instance, that the State could prove that a murder

25  occurred, but for whatever reason we failed to prove that it

DARLINE W. LABAR, OFFICIAL REPORTER

1    occurred during the robbery or kidnapping.  Well, in that

2    kind of situation the Judge would instruct you if you found

3    the defendant guilty of murder, that you would have to assess

4    his punishment.  And it would be a little bit different than

5    it is in a death penalty case because actually you'd hear

6    evidence at the punishment phase.  And then you'd have a

7    verdict form, Ms. Nisbet, and you would actually write in the

8    number of years that you thought was the proper sentence.

9    And the Judge would instruct you for the offense of murder

10   that that could range anywhere between 5 years in the

11   penitentiary, all the way up to 99 years or life in the

12   penitentiary.  Very wide range obviously.  And he would --

13   you would also be entitled, when you think about the

14   punishment, you could consider all the facts of the case that

15   you've heard.  You could consider the defendant's background,

16   his character, anything that is relevant on punishment.  Does

17   he have a criminal background?  Does he not have a criminal

18   background?  What was the relationship between the two

19   parties?  Any number of things could come into play.  And

20   then you would go back, you'd take the verdict form, you'd

21   write in the sentence that you thought was proper.

22          And again, what we would ask you to do on a murder

23   case is this, have the same open mind that you do here today.

24   Go back there with the understanding I'm not predisposed

25   toward any particular sentence.  I want to hear the

---

DARLINE W. LABAR, OFFICIAL REPORTER

1   evidence.  And if that evidence tells me that's the type of

2   case where the minimum should be given, as low as 5 years, if

3   I truly believe that that's the proper sentence, that's the

4   sentence that I'll give.  If it's somewhere in between, I'll

5   give that.  And if I truly believe, based on the facts of

6   that particular case for that particular defendant that I

7   think the maximum is called for, I can do that, too.

8         Do you believe in a murder case -- and again, we

9   can't go into specific facts, but do you believe in general

10   in a murder case that you would have an open mind, that you

11   could consider anything between 5 years up to 99 years or

12   life, depending on the facts that you heard in that

13   particular case?

14      A.   Yes.

15      Q.   Okay.  Good.  That's really all we ask to you do is

16   have an open mind and say until I hear it, I don't know what

17   I'm going to do.  You give me the facts, then I'll give you

18   the sentence.  You seem to be the type of person that could

19   do that, correct?

20      A.   Yes.

21      Q.   Okay.  Fair enough.  Ms. Nisbet, let's -- let's turn

22   our attention then to the punishment phase in this case, to

23   the special issues over here on the board.  And as the Judge

24   has told you, if a defendant is found guilty of capital

25   murder, there are only two possible sentences at that point.

1   It's either going to be a life sentence or a death sentence.

2   In a death penalty case it would depend on how you answer

3   these special issues.  Again, if you answer Special Issue

4   Number 1 yes and Special Issue Number 2 no, that's the death

5   sentence.  Any other combination results in an automatic life

6   sentence.  So far you understand the scheme?

7       A.   Yes.

8       Q.   Let's talk then in a little bit greater detail about

9   Special Issue Number 1.  Special Issue Number 1 -- first of

10  all, let's talk about the burden of proof.  The burden of

11  proof is on the State of Texas on Special Issue Number 1.

12  Special Issue Number 1 is presumed to be answered no until

13  the State of Texas proves beyond a reasonable doubt that it

14  should be answered yes.  It's our burden of proving to you

15  that it should be answered yes.  If we meet our burden of

16  proof, then you answer it yes.  If we fail to meet our burden

17  of proof, you answer it no.

18         Do you believe that you would again wait until you

19  hear all of the facts and then determine if the State of

20  Texas has proved its burden of proof?  If we proved it should

21  be yes, could you answer it yes?  And if we failed to meet

22  that burden of proof, could you answer it no?

23      A.   Yes.

24      Q.   Okay.  With regards to some of these words, I'll

25  tell you most of them don't have legal definitions.  I guess

1    that's the good news.  You get to define them any way that

2    you want to.  But I do want to key on a couple of words

3    because these words were given to us by the legislature.  The

4    first word is probability.  Whether there is a probability

5    that the defendant would commit criminal acts of violence

6    that would constitute a continuing threat to society.

7         Now, you see the legislature could have given us

8    different words.  They could have said whether there is a

9    certainty that the defendant would do that.  They could have

10   gone the low side, and they could have said whether there is

11   a chance or a possibility, mere possibility, but what they've

12   done is you can see they've kind of come down in the middle.

13        A lot of jurors have told me in the past that

14   probability to them means something that is more likely than

15   not going to happen.  It's greater than 50 percent odds, if

16   you will.

17        Does that seem fair to you on probability?

18   A.   Yes.

19   Q.   The next phase I'd like to look at would be commit

20   criminal acts of violence.  Now, the legislature again could

21   have forced the State to prove that this defendant would

22   commit future murders or future capital murders before you

23   could answer that question yes.  They haven't done that.

24   They could again have gone on the low side to say is he going

25   to commit any criminal acts at all?  Is he going to jaywalk.

1    You can think of a number of nonviolent crimes.  But what

2    they've done is would he commit criminal acts of violence.

3    When you think of acts of violence, Ms. Nisbet, what type of

4    things come to your mind?  How would you differentiate a

5    violent as opposed to a nonviolent act?

6         A.   Violence could be an assault, murder, rape,

7    violence.

8         Q.   Something involving another person?

9         A.   Yes.  Generally -- generally speaking.

10        Q.   As opposed to if I go out to maybe an abandoned car

11   someplace and I jimmy the lock, get inside, there's nobody

12   around.  Is that kind of the differentiation that you see

13   there?

14        A.   Yes.

15        Q.   The last word that I would like to look at is the

16   word "society."  When you think of society, who comes to

17   mind?

18        A.   All of us.

19        Q.   Everybody here.  And that certainly can be a

20   component of society.  Everybody in what I would call the

21   free world, if you will, that lives out here with us.   In

22   terms of Special Issue Number 1, though, can you see how that

23   could also include people that could be in a prison setting,

24   essentially anywhere that the defendant may find himself?

25   Would you agree that that could be his society?

1        A.    Yes.

2        Q.    And what I need to know, I guess, is this.  Do you

3    believe that people in a prison -- now, these may be people

4    who have been convicted of other felony offenses who are

5    serving long sentences themselves, inmates, if you will.  It

6    could be guards.  It could be other employees of the prison

7    system.  It could be visitors, contractors, anybody that

8    finds themselves in that prison system.

9             Do you think that those individuals are deserving of

10   protection also against criminal acts of violence?

11       A.    Certainly.

12       Q.    Okay.  So if I hear you correctly, and correct me if

13   I'm wrong, society to you that could include is, it could

14   include everybody essentially, even in a prison setting?

15       A.    Society encompasses everybody.

16       Q.    Okay.  One other question on Special Issue Number 1,

17   and I'm going to give you a lot of authority here.  I'm going

18   to make you the queen of Texas here for a moment.  Okay?  You

19   get to write all the laws here for a second.  But if you had

20   that kind of power in answering Special Issue Number 1, what

21   types of things do you think might be helpful to you in

22   knowing before you had to answer Special Issue Number 1?

23   What type of things -- say I'd like to know about this or

24   that before I have to answer Special Issue Number 1.  What do

25   you think might be helpful to you?

1     A.   I really don't know without hearing the particulars

2   regarding his crime.  I really don't know what I would be

3   looking for.

4     Q.   All right.  Let me tell you the types of things that

5   the law would allow you to look at, and you can tell me

6   whether or not they would be helpful or not.  First of all,

7   the law says that you can consider the crime that you just

8   found him guilty of.  What are the facts and circumstances of

9   that offense, for instance?  What's the nature of it?  What

10   type of relationship did the killer have to the victim?  Did

11   they have a long, good relationship?  Did they have a long,

12   bad relationship?  Were they strangers.  How did the murder

13   occur?  Where did it occur?  Why did it occur?  Was it

14   particularly brutal?  You know, you get to look at all of

15   those factors about that offense itself.  Was it planned?

16   Does it appear to be some sort of spur of the moment?  You

17   see?

18     A.   All that.

19     Q.   All that.  But the law would allow you to look at

20   the defendant himself.  What's his background?  What's his

21   character?  I guess common sense might tell you you have

22   somebody that's never been in trouble with the law before.

23   This is the only scrape he's ever had with the law.  He has

24   no prior arrests, no prior convictions.  He's never been

25   involved with the criminal justice system whatsoever.  Or on

1    the other hand, you may have a person that has a long track

2    history, if you will, of criminal acts and perhaps even prior

3    criminal acts of violence in the past.  So you get to look at

4    those types of things, also.

5         Do you think that those would be helpful to you in

6    answering Special Issue Number 1?

7         A.   Yes.

8         Q.   Ms. Nisbet, before we go on to Special Issue Number

9    2, do you have any questions about Special Issue Number 1,

10   about our burden of proof, what you're going to be asked to

11   look at in Special Issue Number 1?

12        A.   No.

13        Q.   Okay.  Thank you.  Let's look at Special Issue

14   Number 2 then for a moment.  And as the Judge said, I think

15   of it as kind of a safety net, if you will.  First of all,

16   it's different than Special Issue Number 2 because there's no

17   burden of proof.  The State has no burden of proving to you

18   that it should be answered no.  The defense has no burden of

19   proving that it should be answered yes.  Essentially what the

20   law asks you to do is forget everything else that you've done

21   in the case, forget about how you voted on guilt/innocence,

22   forget about your answer to Special Issue Number 1, and step

23   back and take another good long look at all the evidence, no

24   matter where it came from, and ask yourself the question, is

25   there something in that evidence, and you can see -- you can

1    look at the offense again.  You can look at the defendant's

2    character, his background, personal moral culpability.  You

3    can look at all those things and ask yourself is there

4    something in there that I think is sufficiently mitigating

5    that I should give a life sentence instead of a death

6    sentence.  That's really what it asks you to do.  Keep an

7    open mind, look at the evidence again.  If it's there, you

8    answer it yes, give him life.  If it's not there in your

9    mind, you answer it no and he gets death.

10          Do you think you can go through that process in this

11   case?

12       A.   I believe so.

13       Q.   As Judge Entz told you, there is no laundry list of

14   things that we consider to be mitigating, because what is

15   mitigating to one person could be aggravating to another

16   person.  I believe the Judge talked about alcohol use or drug

17   use.  There could well be people who think that's mitigating

18   in some fashion.  But I can tell you there may also be an

19   equal number of people that think it's very aggravating if an

20   individual knowingly ingests something like that and commits

21   a violent act.  So that's a very personal thing for you to

22   decide.  If something is proposed as being mitigating, as the

23   Judge said, you don't have to consider it mitigating.  You

24   may say it has no effect.  You may say in your own mind it's

25   aggravating.  But even if you think it's mitigating in some

1    way, you still have to ask that question, do I believe that

2    it rises to such a level in my own mind where it's sufficient

3    to change a death sentence to a life sentence.  That's really

4    the inquiry that you have to make at that point.

5            And I hear you saying that you are the type of

6    person who has the discipline necessary to look at everything

7    again, weigh whether it's mitigating or not, even if it is

8    mitigating, does it rise to that level or not, and then

9    answer the question accordingly.  Can you do that?

10   A.    Yes.

11   Q.    And again, you don't have to consider anything to be

12   mitigating or not.  That's a personal decision there.  You

13   may not be able to think of anything right now that you would

14   give that effect to.  That's really not the chore today

15   because we can't go over the specific facts in this case.  We

16   can't commit you to any set of facts in this case.  All we

17   can ask you to do is say, Ms. Nisbet, if you're on a case

18   like this and if you heard the evidence and you truly thought

19   it was sufficiently mitigating to change death to life, you'd

20   do that.  And if you didn't, then you'd answer it no.  Fair

21   enough?

22   A.    Yes.

23   Q.    Okay.  Ms. Nisbet, let me -- let me just take a

24   couple of minutes and let's go through some of the general

25   principles that the Judge went through before.  First of all,

1    the burden of proof.  As he told you, the burden of proof in

2    guilt/innocence is on the State of Texas.  I've got to prove

3    beyond a reasonable doubt that Mr. Murphy is guilty.  If I do

4    that, you find him guilty.  If I fail to do that, you find

5    him not guilty.  Right now he's presumed innocent.  That

6    presumption alone is enough to find him not guilty if I fail

7    to meet my burden of proof.

8         Can you assure me that you will hold me to my burden

9    of proof in this case?

10   A.   Yes.

11   Q.   As the Judge told you, the indictment is no evidence

12   of guilt in this case.  It's just a piece of paper.

13   Essentially it tells me as a prosecutor what I have to

14   prove.  It tells Mr. Murphy what he's charged with so he can

15   defend himself.  I know what it says because I personally

16   drafted that indictment in this case.  Okay?  Mr. Murphy has

17   been served with a copy, so we're both on the same page

18   here.

19        Can you assure us in this case here that the

20   indictment will be no evidence of guilt to you?

21   A.   Yes.

22   Q.   Okay.  One of your -- one of your primary functions

23   will be to judge the credibility of witnesses.  I mean,

24   that's how we'll be presenting our testimony for the most

25   part.  We'll have people sitting in that chair.  We'll be

1   asking them questions.  There may be other exhibits, those

2   sorts of things.  But you get to decide whether you believe

3   that witness.  You can believe all of what they say, none of

4   what they say, part of what they say.  That's up to you.

5   What we ask you to do again is to keep an open mind.  Wait

6   until you hear that person to decide whether or not you're

7   going to believe them or not.

8          Do you feel like you could do that?

9      A.   Yes.

10     Q.   And that would -- that would mean even if it's a

11  police officer, basically they get the same treatment from

12  you as maybe an electrician, a plumber, whoever.  Maybe

13  you've had a bad experience.  My dad was an electrician.

14  I've worked with him.  Not everybody likes us when they get

15  the bill.  So -- but, you know, you kind of put that aside

16  and you say whoever they are, I'll listen to them.  I'll

17  decide after I listen to them.

18         Can you do that?

19     A.   Yes.

20     Q.   One of the things that happens in cases such as this

21  one from time to time would be dealing with a piece of

22  evidence, a confession, if you will.  And let me talk to you

23  for a moment about that, explain the law to you.  You are

24  probably familiar if you watch any of these cops shows or

25  lawyer shows that there are certain warnings that have to be

DARLINE W. LABAR, OFFICIAL REPORTER

1    given to the defendant.  They are called Miranda warnings.

2         Let's say in a case such as this one that I went

3    out, I -- I robbed a 7-11 store.  No one saw me do it.  I'm

4    not captured.  I go back to the store a few days later.  A

5    police officer is there.  I tell him, hey, you know a few

6    days ago I robbed the store.  Let me give you a statement.

7    He takes me downtown.  He doesn't give me all of my

8    warnings.  Okay.  And then the confession is brought into

9    court.  Well, the Judge in that case would instruct you that

10   if you find that all the warnings weren't given properly,

11   then you can't give effect to that confession.  That's the

12   bottom line on that situation.  It may be a hard situation,

13   but that's the only evidence you have against me.  You know

14   that I'm guilty, but the Judge has now told you, you can't

15   consider that confession even though it may result in a

16   guilty verdict.  The law in that kind of case, even though it

17   may not be a pleasant thing for you to do, would require you

18   to find the defendant not guilty.  Again, that's where some

19   people have strong opinions perhaps, but the law would tell

20   you you can't consider it.  If there's not enough besides

21   that confession, you have to find him not guilty.

22         Even in that type of situation, Ms. Nisbet, do you

23   think you can follow the law?

24   A.   Yes.

25   Q.   We talked a little bit about burden of proof, types

DARLINE W. LABAR, OFFICIAL REPORTER

1    of evidence, and there are all types of evidence.  It could

2    be from a witness who saw something, heard something, but in

3    a lot of cases it could be the form of a confession.  Could

4    be other circumstantial evidence.  In general I think we ask

5    about circumstantial how you felt about that, but could you

6    just tell me again what are your general feelings when you

7    hear the word "circumstantial evidence" in a case such as

8    this one?

9        A.   Well, there would be different things that would

10   probably suggest that he committed the crime, and I can't

11   come up with specifics, but that would be circumstantial.

12   That's what circumstantial would mean to me.

13       Q.   All right.  You know they could include any number

14   of things.  It could include -- I believe that you listed DNA

15   for instance?

16       A.   Exactly.

17       Q.   Blood evidence is a form of circumstantial evidence.

18   DNA could also be in the form of fingerprints for instance.

19   Kind of as a general term it could be just the circumstances

20   themselves.

21            Let me just give you an example.  Let's say that

22   you're coming home from work and you see me stepping out of

23   your front door and I've got your television set in my arms

24   and I'm running away from your house.  You didn't see me go

25   in, but I'm in possession of your goods and I'm leaving your

1    place.   That would be a circumstance of my guilt.   You see?

2            And again, do you feel if that circumstantial

3    evidence were strong enough, if we could prove our case

4    through that alone, do you feel like you could base a verdict

5    of guilty on circumstantial evidence alone, or do you think

6    regardless of how strong the circumstantial evidence is that

7    you would always need an eyewitness to corroborate that?

8            A.   It would depend upon the circumstantial evidence.

9            Q.   Okay.   If you listened to it, you thought it was

10   compelling enough, if you were convinced that we had proven

11   our case beyond a reasonable doubt, do you think that you

12   could base a verdict of guilty on that?

13           A.   Perhaps.   Uh-huh.

14           Q.   Okay.   Because I've had some people come down and

15   they honestly say I understand what the law says, I

16   understand that you can base a verdict of guilty on a

17   circumstantial evidence alone, I know that the State has the

18   burden of proving this case beyond a reasonable doubt, not a

19   shadow of a doubt, but I know this is a capital murder case

20   and I'm just telling you up front this is different in my

21   mind and you're going to have to show me more than beyond a

22   reasonable doubt.   You're going to show me more than just

23   circumstantial evidence, even though I know the law doesn't

24   require that.   How do you feel about that?

25           A.   It would have to be compelling --

1    Q.   Uh-huh.

2    A.   -- circumstantial evidence.

3    Q.   Okay.  Ms. Nisbet, let me just kind of take a moment

4  here and give you an opportunity to ask me any questions that

5  you might have.  I've done a lot of talking I'm afraid.  But

6  do you have any questions about what you're going to be asked

7  to do if you're chosen as a juror in this case?

8    A.   No, I think it's been made very clear what the

9  duties of a juror would be.

10   Q.   I suppose my final question to you would be, do you

11 think that you're going to be a fair juror to both sides if

12 you were sitting over here in my seat representing the State

13 of Texas, the victim's family in this case, would you be the

14 type of person that you would want on this jury?

15   A.   Probably.

16   Q.   Okay.  Ms. Nisbet, I appreciate your time this

17 morning, your patience with us, your candor.  I know it's not

18 easy to talk about a lot of these things, but we really do

19 depend on that, trying to select 12 jurors that will be fair

20 to both sides.  So I appreciate it.

21          VENIREPERSON:  Thank you.

22          THE COURT:  Ms. Nisbet, would you like to take

23 a little stretch break before we get started?

24          VENIREPERSON:  That would be wonderful.  Could

25 I go back into the juror room?

DARLINE W. LABAR, OFFICIAL REPORTER

1    THE COURT:  Yes.

2    VENIREPERSON:  Oh, wonderful.  Thank you.

3    THE COURT:  Counsel, five minutes.

4    (Recess taken.)

5    THE COURT:  Good morning.

6    THE WITNESS:  Pardon for being late.

7    THE COURT:  No problem.  Raise your right

8  hands, please.

9        Do you and each of you solemnly swear that you will

10  make true answers to such questions as may be -- oops, I

11  don't need that one.  Solemnly swear that the evidence you

12  give in this matter will be the truth, so help you God?

13    THE WITNESS:  I do.

14    THE COURT:  I apologize.  Will you give the --

15  your names, gentlemen, to the court reporter, individually,

16  please?

17    THE WITNESS:  Ryan Hammonds, H-a-m-m-o-n-d-s.

18    THE WITNESS:  Randy Hammonds, H-a-m-m-o-n-d-s.

19    THE COURT:  Gentlemen, we have just begun

20  questioning of individual jurors.  As soon as we have 12

21  jurors and a couple of alternates selected, we will begin the

22  testimony.  We anticipate finishing the early part of May.

23  I'd like to give the attorneys on both sides a bit of time to

24  get their ducks in a row, if you will, after the jury has

25  been selected just so witnesses and the jurors are not

1    further inconvenienced.  We anticipate beginning the

2    testimony in this trial on the 29th of May.  If you would

3    please kind of keep your calendars open for that day.

4            Now, if something should happen that prevents your

5    coming down on the 29th, such as illness or you've been

6    involved in an accident or family emergency, such as

7    attending to a funeral of a family member or friend, we

8    understand those things.  But just stay in touch with Mr.

9    Davis -- I guess Mr. Richardson, is he the --

10                   INVESTIGATOR:  Yes, sir.

11                   THE COURT:  Is he the investigator?

12                   INVESTIGATOR: Yes, sir.

13                   THE COURT:  Do you know how to get ahold of

14    either of them, if necessary?

15                   THE WITNESS:  Yes, Your Honor.

16                   THE COURT:  Do you have any questions for me,

17    gentlemen?

18                   THE WITNESS:  No.

19                   THE COURT:  Okay.  Thank you.

20                   MS. BALIDO:  Judge, we would ask that you give

21    them the same instruction --

22                   THE COURT:  If you have any further interviews

23    with Mr. Davis or Ms. Miller on behalf of the State,

24    one-on-one outside the presence of either both of you or any

25    other witness.

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1              THE WITNESS:  Yes, sir.

 2              THE COURT:  Talk with them as much as you

 3    want, but one-on-one.

 4              (Recess of proceedings.)

 5              MS. BALIDO:  Judge, if I can be heard real

 6    quick on this.  Judge, these last two witnesses were known to

 7    the defendant, but we'd object to any jurors being sworn in

 8    in the presence of the defendant since there might be an

 9    identity issue later on.

10              THE COURT:  Any other witnesses?

11              MS. BALIDO:  Any other witnesses.

12              THE COURT:  All right.

13              MS. BALIDO:  The one -- the big group this

14    morning was not in the presence of the defendant.  We don't

15    want it to taint the I.D.

16              THE COURT:  Mr. Davis, if there's future

17    witnesses about whom that made reference swearing in, let's

18    do it outside the defendant's presence.

19              MR. DAVIS:  He wants it outside his presence?

20              THE COURT:  Yes.  Who will be beginning on

21    behalf of the defendant?

22              MR. BYCK:  I will, Your Honor.

23              (Venireperson returned.)

24              THE COURT:  Ms. Nisbet, we will continue with

25    the defense in the person of the Honorable Michael Byck.
```

```
 1              Mr. Byck.

 2                   MR. BYCK:  Thank you, Your Honor.

 3                        Cross-Examination

 4   By Mr. Byck:

 5        Q.   Good morning again, Mrs. Nisbet.

 6        A.   Good morning.

 7        Q.   Again, my name is Michael Byck.  And together with

 8   my co-counsel, Jane Little and Jennifer Balido, who is not in

 9   the room right now, we are representing our client, Jedidiah

10   Isaac Murphy in this the trial for his very life.  I

11   appreciated the seriousness and the concentration in which

12   you answered Mr. Davis's questions, as well as the questions

13   we asked you on the juror questionnaire.  I'm going to ask

14   you some of the same questions, some very different

15   questions.  But very frankly, let me start out at the very

16   beginning.

17              That is that I'm not going to get on this jury.  I'm

18   really not.  You might.  So what I say very frankly while I

19   may like to hear myself talk, I'd rather like to hear you

20   talk.  So if you have something you want to say, please, I

21   want to hear it.  Okay?

22        A.   Uh-huh.

23        Q.   Okay.  I noticed you were born in Detroit.

24        A.   Yes.

25        Q.   How long have you lived in Dallas?
```

```
 1        A.    Eight years.

 2        Q.    Eight years.  And where did you live before that?

 3        A.    Kansas City -- Lawrence, Kansas.  It's a bedroom

 4   community of Kansas City.

 5        Q.    And how long were you there?

 6        A.    13 years.

 7        Q.    Were you also in real estate up there?

 8        A.    No.  No, this is brand new for me.

 9        Q.    Brand new?

10        A.    I was a homemaker there in Kansas.

11        Q.    Okay.  And how long have you been in the real estate

12   business?

13        A.    Just since November.

14        Q.    Okay.  This is again one of those questions that

15   nobody knows the answer to but you, and, believe me, we are

16   not trying to trick you or get something out of you that you

17   don't want to say.  But on the other hand, it is important

18   that you be honest with us.  The reason why is it could come

19   back to haunt you later.  This is the question I'm going to

20   ask you.

21              Due to your job and the pressures that you have due

22   to income, to keep your position in the company, or whatever

23   other pressures that you have -- which very frankly I'm not

24   in the real estate business and I don't understand that -- is

25   that going to be something where you cannot afford to spend,
```

1    oh, probably a good five to seven working -- five to eight

2    working days with us?  At the end of May and the beginning of

3    June, where it will be something that -- and I know you've

4    been called on capital murder case.  You're obviously a

5    conscientious lady.  You wouldn't want to be distracted.  You

6    wouldn't want to have other things on your mind, but if you

7    would, if you did, that obviously would not be of benefit to

8    my client.  And very frankly, I don't think it would be a

9    benefit to the State of Texas either.  You tell us where you

10   are in your business, the pressures that you have on you, and

11   do you think you could afford this seven, eight working days

12   in the beginning of June?

13        A.   Okay.  Where I stand is I'm hourly.  I'm not like

14   when you say real estate business.  Working as a sales

15   assistant in a model home.  I'm just an hourly employee with

16   no benefits.

17        Q.   Uh-huh.

18        A.   So basically if I serve on jury, I will have no

19   income for the entire period of time I'm on the jury.

20        Q.   Will that serve as a substantial distraction to you?

21        A.   That will serve as a hardship for me.

22        Q.   Okay.  We're buzzing around a little bit deciding

23   your fate; is that okay?

24        A.   Yes.

25        Q.   Okay.  And I think you understand that we respect

1  your desire to serve on a jury as a civic duty.  Believe me,

2  that's -- that's of paramount importance.  But on the other

3  hand, there are all kinds of cases that you can serve on,

4  some not so burdensome, some not so complicated.  I'm going

5  to be asking people about this, whether there's anything

6  especially about a capital murder that would render them

7  unfit in that case.  I have no doubt that you would be a fine

8  juror in most cases.  I also have no doubt that you would not

9  be a fine juror in all cases.  Nobody would.  I wouldn't.

10 I'm sure the members of the State wouldn't either, as fair

11 and impartial as they try to be.  So -- so let's continue

12 on.

13         And let me ask you something, you -- we ask a bunch

14 of questions.  They are known as our page 4 questions about

15 whether you trust the criminal justice system.  And in some

16 of the questions -- let me read the questions to you and your

17 answer.

18     A.   Okay.

19     Q.   You said that if someone is accused of capital

20 murder, he should have to prove his innocence.  And you

21 strongly disagreed with that.  You said that a defendant is

22 innocent unless proven guilty beyond a reasonable doubt.  You

23 strongly agreed with that.  However, you had one answer that

24 very frankly troubled me.

25     A.   Okay.

1    Q.    You said that if a person is brought to trial on

2  murder charges, that person is probably guilty.  And you were

3  uncertain about that answer.  Could you explain that to me?

4    A.    Yes, because I think before the court system would

5  actually bring somebody to trial, they would have to have

6  probably substantial evidence, circumstantial or eyewitnesses

7  or something that would -- in other words, I don't think the

8  State would enter into a case lightly.  I think that to bring

9  somebody -- there's probably, you know, some sufficient

10  evidence there.

11    Q.    Okay.  Now, you were down in the Central Jury Room

12  last Friday and you were present --

13          THE COURT:  A week ago.

14    Q.    (By Mr. Byck)  Pardon me, a week ago Friday.  And

15  you were present when we called 2300 people.  Now, 2300

16  people didn't show up.  About 600, give or take, showed up.

17  You heard the indictment read to you.  You heard that it was

18  murder in the course of a robbery, kidnapping, certain manner

19  or means.  You are now the first of a big long list of

20  jurors.  You've seen the printed special issues that we have

21  up there.

22    A.    Uh-huh.

23    Q.    Let me ask you.  If I were to ask you to vote right

24  now whether Jedidiah -- whether you would vote Jedidiah

25  Murphy innocent or guilty, how would you vote?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    I would have to make a decision now -- how could I

2    make a decision when I haven't heard anything?

3    Q.    That's not a bad question.  That's not a bad

4    question at all to ask.  What I'm saying is, there is a

5    presumption of innocence.

6    A.    Yes.

7    Q.    There is a presumption of innocence that attaches to

8    people who are charged with traffic tickets, to people who

9    are charged with driving while intoxicated, to people who are

10   charged with -- with robbery, without guns or hurting

11   anybody, and also people who are charged with capital

12   murder.   That presumption of innocence says that right now,

13   at 10:23 in the morning on this date, if you were asked to

14   vote --

15   A.    Oh, okay.

16   Q.    -- would you -- how would you vote?

17   A.    You focused me.   Innocence -- or innocent.

18   Q.    There is no problem with that.   Okay.   You talked to

19   us also about the death penalty.   And you said that you

20   really don't have an argument in favor of the death penalty.

21   You have an argument against one which is probably that thou

22   shalt not kill.   And you said that on a scale of 1 to 10, if

23   you believed in using the death penalty, how strongly do you

24   feel about that and you put 5.   You put right in the middle.

25   And do you still feel that way?

```
 1     A.   Yes, I do.

 2     Q.   Okay.  Is there any particular reason why you didn't

 3  write 10 or you didn't write 1 or any other number, or -- is

 4  that just accurate about the way you feel?

 5     A.   Just accurate about the way I feel.  That, you know,

 6  I would have to hear everything.

 7     Q.   Okay.  Further on your questionnaire I notice that

 8  you knew two individuals, a Mr. Foster and Mr. Tubert that

 9  were charged with conspiracy.

10     A.   One was conspiracy.  The Foster was a conspiracy,

11  and Tubert, I'm not exactly sure what his charges were.  It

12  might have been to do with like white collar kind of bribery

13  or something.  I'm not really certain.

14     Q.   How do you know these people?

15     A.   Mark Foster was my husband's son-in-law.

16     Q.   Uh-huh.

17     A.   So it's my second husband, his son-in-law.  And

18  Frank Tubert was a business associate of my husband's.

19     Q.   Okay.  So were you married at the time to your

20  husband when that son-in-law was convicted?

21     A.   Yes.

22     Q.   And you were concerned in the case; is that right?

23     A.   Concerned in it?

24     Q.   Concerned with it?

25     A.   Oh, certainly.
```

Page 56

```
 1        Q.    Okay.  You weren't -- you had nothing to do with the

 2    situation that got them to where they were with the federal

 3    government or anything like that?

 4        A.    No.

 5        Q.    Do you feel they were treated fairly from what you

 6    knew?

 7        A.    From what I knew, yes.

 8        Q.    Okay.  Any -- what do they call it these days,

 9    hidden inventories?

10        A.    Pardon me?

11        Q.    Hidden inventories, grudges you were carrying about

12    that?

13        A.    Oh, no.

14        Q.    Okay.  I see you've made some contributions to

15    Mother's Against Drunk Driving.

16        A.    Yes.

17        Q.    Any particular reason that you donated to that

18    particular cause?

19        A.    Simply to -- they inform people -- yes, because

20    drunk driving kills people.

21        Q.    Do you know anybody that drunk driving has killed?

22        A.    Yes.

23        Q.    What were the situations -- what was the

24    circumstances?

25        A.    This was many years ago.  My -- one of my best
```

1    friends, her son-in-law was killed by a drunk driver a week

2    after getting back from his honeymoon.

3         Q.   I could well see where that would make an impression

4    on you.

5              What happened on that case?  Was that individual

6    charged, tried, convicted, punished?

7         A.   You know, I really don't know all the circumstances

8    regarding the outcome of that, because shortly thereafter I

9    moved from Detroit to Kansas, so I didn't -- I didn't want to

10   question or talk to her about that.  I felt it would bring up

11   a troubling subject for her.

12        Q.   Okay.  Let's talk a little bit about the offense of

13   capital murder, at least in a guilt or innocence phase.  You

14   understand, as Judge Entz has told you, that capital murder

15   is murder plus.  Murder plus something else.  And that in a

16   capital murder case the law is very, very careful in defining

17   words for you.  They will tell you what the words on or about

18   mean or they will tell what you the phrase means in the

19   course of committing means.  But capital murder is a rather

20   unique offense.  And that is what is known as a specific

21   intent or a result oriented offense, at least in terms of the

22   murder.  Okay.

23             Now, there are several ways of committing murder.

24   One can intentionally commit a murder.  One can knowingly

25   commit a murder.  And what we're talking about there are

1    mental states that accompany the murder.  Plus there's all

2    kinds of ways to commit murders with guns and knives or

3    whatever.  But what I'm talking about here is a mental state.

4    Because capital murder is unique, or almost unique in that it

5    requires a specific mental state, that mental state being

6    specific intent to kill.  As it is put in the law and you

7    will be charged by the Court, the definition of intent in

8    that situation is when it is one's conscience objective and

9    desire to both engage in the conduct and cause the result.

10           Let me give you an example.  Please do not be afraid

11   for Mrs. King.  Mrs. King is our court reporter.  She is well

12   protected by our bailiffs and while it may appear that I'm

13   threatening her, I'm really not.  Okay.  All right.  I don't

14   like Mrs. King, haven't liked her for a long time, and I

15   decided, well, today is the day we're going to settle that

16   hash.  I'm going go out and I'm going to buy a gun.  I'm not

17   only going to go out and buy a gun, I'm going to buy some

18   bullets.  I take the gun and the bullets and I load them.

19   And somehow, probably not involving a whole lot of

20   cleverness, I sneak it into this courthouse.  Okay.  I bring

21   the gun up here.  And as we're having voir dire, I have all

22   sorts of varieties of nervous twitches and things that Mrs.

23   King doesn't like, so she finally says something that pushes

24   me over the edge and I take out my gun and I show it to Mrs.

25   King.  I don't want to frighten her.  That's not my object.

1   I point the gun at her.  Again, I don't want to scare her.  I

2   cock the hammer back.  I aim the gun.  And I pull the

3   trigger.  I do not want to hurt Ms. King.  I want to kill

4   her.  I want her to die.  All those things I have done in

5   preparation and in furtherance of my one intent, my one goal.

6   I don't want to scare her, I don't want to hurt her, don't

7   want to wound her, I want to kill her.  That is the kind of

8   intent that is necessary for a capital murder.  There are

9   other kinds of intent that fall a little bit lower.  One is

10  called whether an individual knowingly does something.  I

11  could do -- knowingly do something that the results were

12  foreseeable.  Oh, I don't know, let's say in the example with

13  our court reporter, I just take the gun and I don't really

14  intend on killing her way, way down deep in my heart, but I

15  sure don't like her anymore so I fire the gun at her five

16  times.  Right?   Well, I happen to hit her and kill her.

17  It's, you know, pretty much, you know, foreseeable that if

18  I'm going to fire a gun in a person's direction, I could hit

19  them and kill them.  I could be guilty of murder.  The exact

20  same kind of murder that would get me from 5 years to 99

21  years that Mr. Davis talked about.  That's not capital

22  murder.  Capital murder has to be a very specifically

23  intended kind of murder.  Okay?

24       A.   Yes.

25       Q.   Okay.  Also, the State of Texas has to prove all the

Page 54

```
 1    elements in the indictment.  And the elements in the
 2    indictment are fairly simple, that on or about a specific
 3    date, at a specific place, Dallas County, Texas, a named
 4    individual with the intent to commit the offense of murder,
 5    and that is the specific intent.  All right.  Did by manner
 6    and means shoot with a gun, stab with a knife, run over with
 7    an automobile, whatever is alleged, those are known as the
 8    manner and means, killed a person who was alive at the time
 9    and that was done in the course of committing another
10    offense.  So a robbery, a kidnapping, a rape, a burglary of a
11    habitation, whatever.  All those are elements.  Every one of
12    those elements has to be proved beyond a reasonable doubt.
13         The State must prove -- the State says they have the
14    burden of proof.  They do.  They have the burden of proving
15    beyond a reasonable doubt each and every one of those
16    elements.  So if the State of Texas were to prove that a
17    named individual was guilty of murder of a named person that
18    happened on or about a certain date and in the manner and
19    means alleged in the indictment, but they don't prove that it
20    happened in Dallas County, that individual is not guilty of
21    the offense of murder as it is alleged and indicted in that
22    indictment.  That may be very, very difficult for some
23    people.  You know, because they may say, yeah, he killed a
24    person, there is no doubt about that.  He did it -- you know,
25    while he was trying to rob the person, but it was -- I don't
```

1   know, it was 400 yards over the line into Tarrant County or

2   something, right on the line in Arrington.  And if that is

3   not alleged and if that is not proven up, the defendant is

4   entitled to a verdict of not guilty.  While it certainly

5   wouldn't, I imagine, make you happy to have to do something

6   like that, are you the kind of person that would follow the

7   Judge's instructions because believe me, the Judge's

8   instructions are going to swing both ways.  And he's going to

9   tell you that if you find or if you cannot find beyond a

10  reasonable doubt any one of those elements, got to vote not

11  guilty.  Will you be able to do that?

12      A.   I'm confused.

13      Q.   Sure.  How --

14      A.   Well, if -- you just said if it wasn't proven that

15  the murder took place in Dallas County, but might have been

16  over the State or county line into Tarrant County, if that

17  were the case, why wouldn't the indictment happen in Tarrant

18  County?  I'm confused.

19      Q.   That's exactly right.  Why wouldn't it happen in

20  Tarrant County?  It should have happened in Tarrant County if

21  those were in truth and in fact the facts.  But Dallas County

22  for some reason made a mistake.  They said, well, it happened

23  here.  It just didn't happen there.

24           THE COURT:  One of the elements -- one of the

25  requirements the State must prove, what we call venue

DARLINE W. LABAR, OFFICIAL REPORTER

1    location.

2                    VENIREPERSON:  Okay.

3                    THE COURT:  So if the evidence shows that the

4    murder was committed other than in Dallas County, you're

5    seeing two former prosecutors.  They would probably be

6    terminated.  But that's one of the things that the State must

7    prove.  It's part of their burden of proof.

8              Do you follow me?

9                    VENIREPERSON:  I do.

10      Q.    (By Mr. Byck)  Wouldn't be easy, but you could do

11   it?

12      A.    I could.

13      Q.    And if the Judge instructed you that you had to find

14   all those things beyond a reasonable doubt and you in good

15   conscience could not find beyond a reasonable doubt that it

16   happened in Dallas County or that it was done in a certain

17   way, you know, shooting with a gun, stabbing with a knife,

18   running over with an automobile, whatever they alleged, that

19   you would say to the State of Texas, hi, guys, you proved

20   five out of seven or seven out of eight, but you didn't prove

21   every one of them, I have to vote not guilty and that's the

22   way I'm voting?

23      A.    Yes.

24      Q.    Okay.  My co-counsel are very interested in a couple

25   of other answers that you had on the questionnaire.

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    Uh-huh.

2    Q.    We're just asking, no right or wrong.

3    A.    Certainly.

4    Q.    You were talking about the roles of various court

5    personnel, judges, lawyers, prosecutors.  And as to criminal

6    defense attorneys, you say they have enormous responsibility

7    to their clients and more so to society.  What do you mean

8    more so to society?

9    A.    Again, when we answer these questions, a lot is

10   given to you in a short period of time where you haven't

11   given a lot of thought.  What I was thinking was, you know,

12   the awesome responsibility or enormous responsibility, sure,

13   they have a responsibility to their client and while they're

14   defending that client, what I meant by the awesome was in the

15   event that person is found not guilty by defense, but the

16   person really were in fact a murderer, that's an incredible

17   or awesome responsibility to society as well as to their

18   client.

19   Q.    I see exactly what you mean.

20         You also stated in a series of questions that I

21   haven't figured out very well, it's that we're talking about

22   a person's destiny or fate.  And sometimes it's determined by

23   their birth and upbringing, sometimes it's determined by

24   choices that they make in life, sometimes genetics is thrown

25   into the pot, a little environment, too.  I mean, I just

1   can't imagine a more general question.  But we do ask you

2   genetics, circumstances of birth, upbringing, and environment

3   should be considered when determining the proper punishment

4   of someone convicted of a crime.  And you say you were

5   somewhat uncertain about that.

6          And this question really ties to Question Number 2,

7   or our Special Issue Number 2, about taking into

8   consideration all of the evidence, including the

9   circumstances of the offense, the defendant's character and

10  background, and the personal moral culpability of the

11  defendant.  And I guess somewhere there's a question, but I

12  don't know what it is.

13      A.   I don't know either.

14      Q.   Do you see some kind of a relation --

15      A.   I do.

16      Q.   -- between birth, upbringing, environment, and

17  genetics?

18      A.   I do.

19      Q.   Okay.  It's interesting when we talk in Special

20  Issue Number 2.  We all know what the circumstances of the

21  offense is going to be.  That's essentially what the State

22  will prove to you in guilt or innocence.  We will -- you know

23  pretty much what a defendant's character and background are.

24  Character is, you know, he has the character or reputation,

25  what other people think about him.  Historical facts.  Were

they into Boy Scouts?  Were they in any prior crimes?

Whatever it happens to be.  However, we do ask about the

personal moral culpability of the defendant, and that there's

no definitions.  Remember I said as specific as we talked

about mental states and the intent to kill, and the law is

very, very specific on that, it also asks you about personal

moral culpability of the defendant.  There is no definition

to that phrase or those words.  Just as Mr. Davis said, there

aren't any definitions to the words in any of the special

issues.  It's very odd in our capital murder scheme.  I

submit that the law defines everything in the first part and

hardly anything in the second part.  Sort of strange.

        Well, I wanted to ask you about what you thought or

what you felt about an individual's personal moral

culpability?  What might you use or what might you be

interested in hearing to judge something like that?

        A.   Could you give me some examples?  I'm sitting here

just -- give me an example what I'm looking for.

        Q.   Let's see, personal moral culpability.  What would I

put in there?  Well, for example, I might put remorse in

there.  If after an offense the defendant was seen walking

down the street chuckling up his sleeve, ha, ha, ha, ha,

guess what I've done, right, versus an individual who you

know was just crushed, just absolutely flattened, you know,

by the -- assuming the guilt and the responsibility of what,

1    you know -- of what had turned out he had done.  I submit

2    that those two differences, in terms of remorse, either

3    having some or not having any at all, might bear on an

4    individual's personal moral culpability, something like that.

5         Do you see anything that raises a flag with you that

6    might bear on personal moral culpability?

7    A.    Oh, yeah, chuckling down your sleeve would raise a

8    flag.

9    Q.    That's just an example.

10   A.    Right.

11   Q.    I could ask you, well, if you saw some things that

12   would bear on personal moral culpability, would you consider

13   it in your jury deliberations?  You've already shown me you

14   could do that, Ms. Nisbet.  So what I would like to do is

15   close with you on this job application for a job that you

16   don't want by asking you just a couple of general questions.

17   I could literally sit here all day today and all day tomorrow

18   until my voice just completely went out on me and I ran out

19   of my little menthol cough drops, without asking you the one

20   question that might be key in your mind.  The general

21   question is, is there any reason you can think of, ma'am, any

22   reason at all where you could not be a fair and impartial

23   juror in this procedure?  Whether it's, you know, you don't

24   like being harangued by an overweight man with a beard for

25   half an hour or you don't like -- you got social obligations,

1   you've got family obligations, you've got financial

2   commitments, you know, it happens to be one personal thing.

3   And let me throw in a personal thing.

4   　　　　　As Mr. Davis has told you, we are not allowed to

5   tell you about the facts of this offense.  We are allowed to

6   ask you some particular facts if in fact they might bear on

7   your -- on your decision.  And what I'm really asking about

8   is the facts and circumstances of this offense may show the

9   victim to be an 84-year-old woman.  Is there anything about

10  that fact alone that would, if you knew it beforehand or if

11  you found out about it during the trial, would just operate

12  sort of like a light switch, just sort of say, I can't be

13  fair in this circumstance?

14  　　　　　MR. DAVIS:  I'm sorry, I've got to object now

15  to going into specific facts.

16  　　　　　THE COURT:  Sustained.

17  　Q.　(By Mr. Byck)  On the other hand, if the facts and

18  evidence were to prove that it was a small child that was the

19  victim in this offense, would there be anything about that

20  particular fact that would render you incapable of returning

21  a fair and impartial verdict?

22  　A.　I'd have to hear all the circumstances.  I mean, the

23  age of the person I don't think is a factor.  A death is a

24  death.

25  　Q.　Okay.

Page 62

1    A.    A murder is a murder.

2    Q.    Believe me, that's fair enough, Ms. Nisbet, because

3    what I'm really asking about -- there are some people who

4    just through certain feelings that they have in life would be

5    able to say, you know, yes, I can sit in the capital murder

6    if the individual was a male or a female civilian.  I could

7    do it if they were a child.  I could do it if they were a

8    fireman.  I could do it if they were a prison guard.  I could

9    do it in most circumstances, but I cannot do it if they are a

10   police officer.  If you show me a police officer has died,

11   then somebody has got to die.  It's just the way that I feel

12   about it.  And what I'm just trying to make sure is you don't

13   feel that way about any particular --

14   A.    I don't believe I do.

15   Q.    Okay.

16             THE COURT:  Wind it up.

17             MR. BYCK:  Judge, I have just one more

18   question that I need to ask.

19   Q.    (By Mr. Byck)  And that is -- and I'm going to be

20   honest with you, you don't have any prior jury experience.

21   Very frankly, you don't know if you are to sit on this jury

22   who the other 11 members of the jury are going to be.  We

23   don't know either.  However, Judge Entz will insist that your

24   deliberations be carried on in the climate of civility, that

25   he is not going to allow and through his court personnel is

DARLINE W. LABAR, OFFICIAL REPORTER

1   not going to allow any jurors to be intimidated or denigrated

2   or subjected to, you know -- what's the best way -- power

3   sales techniques, for want of a better phrase.  All right?

4        A.   Uh-huh.

5        Q.   I wanted to tell you that, not only, A, because it

6   is true, but, B, it's -- well, it's an opportunity to avail

7   yourself of our bailiffs.  If you are in a situation where

8   you feel that you are being overpowered, that you are -- you

9   know, I don't mean threatened to the point of physical

10  violence, but if you have had enough dealings in your

11  business life to know that some people can sit across the

12  table and converse civilly with you and other people can sit

13  across the table and it's almost like dealing with a caged

14  tiger, right?

15       A.   Yes.

16       Q.   Okay.  If you run into the caged tiger situation,

17  push the button, raise your hand, say, Mr. Bailiff, this

18  person is in my face, on my back, and I'm just not able, you

19  know, to make a decision back here.  Believe me, the Court

20  will not allow that to happen.

21            But just like the defendant has rights, the State of

22  Texas has rights, the Court definitely has rights and

23  privileges, well, so do you.  So do you as a juror.  And in

24  this most important decision and deliberation of a young

25  man's life, there is just no way that this Court is going

1    allow you to be bullied or threatened.

2         Will you promise us that if you are subjected to a

3    situation like that, or, God forbid, you should see somebody

4    else if you are to sit on this jury, subjected to a situation

5    like that, you will tell our court personnel and you will let

6    us know?

7         A.   Yes.

8         Q.   Okay.  Last question, last get out of jail free card

9    I can spring.  Is there any reason, any reason that you could

10   think of that you want to tell the Court that would prevent

11   you from being a fair and impartial juror?

12        A.   No.

13        Q.   Fair enough.  Do you have any questions you want to

14   ask me?

15        A.   Well, the only thing I would like to say again is

16   with the work schedule.  And as far as no income for any

17   prolonged period of time at all, that is a concern for

18   myself.

19             THE COURT:  If that should become necessary,

20   could I have your permission to talk with your employer?

21             VENIREPERSON:  Certainly.

22             THE COURT:  Ms. Madore, excuse --

23        Ms. Nisbet, the attorneys will counsel with their

24   co-counsel with regard to your availability.

25             VENIREPERSON:  Okay.

DARLINE W. LABAR, OFFICIAL REPORTER

1      THE COURT:  After they've made the Court aware

2  of your situation, I'll bring you in and let you know whether

3  you remain under consideration.

4      VENIREPERSON:  Thank you.

5      THE COURT:  If you'd be excused with Ms.

6  Madore, please.

7      (Venireperson excused from courtroom)

8    Is the State --

9      MS. BALIDO:  Do we want to take one picture of

10  her, or are we going to take two pictures?

11      THE COURT:  One picture will be enough if she

12  is a keeper.  The State --

13      MR. DAVIS:  The State has no challenges for

14  cause.

15      MR. BYCK:  Can we have a couple of minutes to

16  talk about this?

17      THE COURT:  Two minutes.

18      MR. BYCK:  Can we have four minutes?

19      THE COURT:  No, you can have a cigarette after

20  that.

21      MR. BYCK:  We're just going to talk right now.

22      (Recess)

23      THE COURT:  Good morning.  Ask witnesses to

24  raise their right hand, please.  Do you swear the testimony

25  that you may give in this matter will be the truth, so help

```
 1    you God?

 2                    THE WITNESS:  Yes.

 3                    THE COURT:  Thank you.  Lower your hands.

 4    You've been sworn in now as a witness in the case the State

 5    of Texas versus Jedidiah Isaac Murphy.  Would you

 6    individually please give your name to Ms. King, the court

 7    reporter.  Your name, please, ma'am?

 8                    THE WITNESS:  Sandra Mamot, M-a-m-o-t.

 9                    THE WITNESS:  Zachery Mamot.

10                    THE WITNESS:  Pat Mamot, P-a-t, M-a-m-o-t.

11                    THE COURT:  Thank you.  Now that you've been

12    sworn in as witnesses, we are in the process of individual

13    jury selection in this particular trial.  We hopefully

14    anticipate that the jury selection will be completed at the

15    first or at the latest the middle part of May.  We anticipate

16    that the testimonial stage of the trial will begin Tuesday,

17    May 29th.  Please keep that date open.  You will be required

18    to return to court, offer testimony, whatever role you play

19    in this matter, at that time.  If however something should

20    happen to you that prevents your coming down on that day,

21    such as illness or a mishap, an accident that incapacitates

22    you or a family emergency, such as a funeral or something

23    like that, we're aware of those kinds of problems.  So stay

24    in touch with Mr. Davis and make him aware if something

25    prevents your coming down because if you fail to come down on
```

1   the 29th without letting us know what the circumstances are,

2   an attachment will issue which is kind of like an arrest

3   warrant and you will go to jail until you testify.

4   Obviously, we want to avoid that if at all possible.

5        Do any of you have a question for me, please?

6   Questions at all?  No?  All right.  Of course, Mr. Davis,

7   the gentleman at the prosecutor's table, stay in touch with

8   him if you have a problem.  If you confer with Mr. Davis or

9   his co-counsel, Ms. Miller, prior to your testifying, please

10  talk with them on a one-on-one basis outside the presence of

11  any other witness.  Okay.  Just one-on-one.  Okay.

12                THE WITNESS:  Okay.

13                THE COURT:  Any questions for me?  None?

14  Okay.  Thank you.

15       The State having accepted the juror, what says the

16  defense?

17                MR. BYCK:  We have no peremptory challenges --

18  no challenges for cause at this time, Your Honor.

19                THE COURT:  Ms. Nisbet remains under

20  consideration.

21       Sheriff, would you ask her to return, please?

22                (Recess.)

23                THE COURT:  Ms. Madore, if you'd please bring

24  Ms. Nisbet back in, please.

25                THE BAILIFF:  Yes, sir.

DARLINE W. LABAR, OFFICIAL REPORTER

1          (Venireperson returned.)

2          THE COURT:  Ms. Madore has brought the

3    prospective juror back into the courtroom.

4          Ms. Nisbet, based upon the attorneys' comments to

5    me, the Court has determined that you will remain under

6    further consideration as a juror in this case.  With your

7    permission, I'm going to ask that you allow Mr. Rees, the

8    gentleman bailiff, to take a Polaroid picture of you and I'll

9    tell you why.  We're going to be going through this process

10   until we get 48 prospective jurors.  Then the list will be

11   narrowed down to the 12 plus the 2 alternates.

12         VENIREPERSON:  Okay.

13         THE COURT:  I can assure you that the

14   attorneys and I will be talking to quite a few people and

15   after about a month or so of this, it gets a little bit

16   blurry.  May we take your Polaroid picture so that we in the

17   future can refer back to you with regard to the -- and I

18   assure you, once the jury has been selected, trust me, they

19   will be shredded and destroyed, will not be made public for

20   any purpose at all.

21         Do we have your permission to do that?

22         VENIREPERSON:  Yes.

23         THE COURT:  Also going to ask, Sam, if you

24   would confirm with my Court Administrator, Mrs. Daily, if you

25   change phone numbers or addresses between now and May 29th,

1   we'll let you know of course way in advance -- if at any time

2   you want to know how we're proceeding with this process,

3   contact Mrs. Daily and she'll let you know where you fall in

4   this process.

5               VENIREPERSON:  Thank you.

6               THE COURT:  Do you have any questions of me at

7   this point?

8               VENIREPERSON:  No.

9               THE COURT:  Do not discuss with relatives,

10  neighbors, or friends anything about what went on today.

11  Obviously, you can tell your spouse or coworkers that you

12  remain under consideration, but don't allow anybody to

13  influence your decision.  Do not go back to the Dallas

14  Morning News and look at the publications as to the

15  circumstances of this case, please.  Any questions?

16              VENIREPERSON:  No, sir.

17              THE COURT:  Thank you very much.  Have a nice

18  day.

19              VENIREPERSON:  Thank you.

20              (Recess.)

21              MS. LITTLE:  We'd like for each of the

22  questionnaires in this case to be made a part -- we'd offer

23  them all for record purposes.

24              THE COURT:  Even the ones, fours, and fives?

25              MS. LITTLE:  No, the ones that are actually

DARLINE W. LABAR, OFFICIAL REPORTER

1    scheduled to come.

2                THE COURT:  Granted.

3          May I have counsels' permission to cause to be

4    shredded those that were not -- will not be brought down, the

5    ones, four, fives, and sixes?

6                MR. DAVIS:  Yes, sir.

7                MR. BYCK:  No objection, yes, sir.

8                THE COURT:  They will be.

9                MS. LITTLE:  I think we provided all those

10   that we've gone through also last week to the Court for

11   shredding.

12               THE COURT:  Can't get one more today, guys?

13               MR. BYCK:  No.  We could waste a lot of the

14   Court's time.

15               MR. DAVIS:  Can we read then into the record

16   our agreements.  The State and defense have agreed to excuse

17   Juror Number 77, Donna Graham, and Juror Number 208, Mary

18   Caldwell.

19               THE COURT:  Sheriff, if you would excuse both

20   of them, please.

21               THE BAILIFF:  Yes, sir.

22               MR. DAVIS:  Then on these questionnaires, who

23   do you want to give these to, Sam?

24               THE COURT:  Either that or you can give them

25   to me.

                DARLINE W. LABAR, OFFICIAL REPORTER

1          MR. DAVIS:  Okay.

2          THE COURT:  I'll put them over here.

3          (Recess for the day.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4            I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13           I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16           Witness my hand this the 13th day of November, A.D.,

17   2001.

18

19

20                        DARLINE W. LABAR
21                        Official Court Reporter
                          194th Judicial District Court
22                        Dallas County, Texas
                          (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002


                    DARLINE W. LABAR, OFFICIAL REPORTER

REPORTER'S RECORD   **74145**

VOLUME 6 of 65 VOLUMES.

TRIAL COURT CAUSE NO. F00-02424-NM

THE STATE OF TEXAS              :        IN THE DISTRICT COURT

VS.                            :        DALLAS COUNTY, TEXAS

JEDIDIAH ISAAC MURPHY          :        194TH JUDICIAL DISTRICT

********************

INDIVIDUAL VOIR DIRE

********************

**FILED IN**
**COURT OF CRIMINAL APPEALS**

DEC 5 2001

A P P E A R A N C E S:

Troy C. Bennett, Jr., Clerk

HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building
        Dallas, Dallas County, Texas  75207
        Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
                FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
        Phone:  214-653-9400
                FOR THE DEFENDANT.


                *********

        On the 13th day of March, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

        Proceedings reported by machine shorthand, computer

assisted transcription.


DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

```
 1                        INDEX VOLUME 6

 2   March 13th, 2001                          PAGE    VOL.

 3   INDIVIDUAL VOIR DIRE:

 4   Proceedings..................................... 2     6

 5   Ms. Parker Excused From Consideration........... 16    6

 6   State no challenge for cause - Ms. Jennings...... 71   6

 7   Defense no challenge for cause - Ms. Jennings.... 71   6

 8   Dorothy Jennings Prospective Juror No. 2......... 71   6

 9   Reporter's Certificate........................... 74   6

10

11              CHRONOLOGICAL VENIREPERSON INDEX

12                    STATE        DEFENSE           VOL.

13   JANET PARKER           12                        6

14   DOROTHY JENNINGS        25            53          6

15

16              ALPHABETICAL VENIREPERSON INDEX

17                    STATE        DEFENSE           VOL.

18   DOROTHY JENNINGS        25            53          6

19   JANET PARKER           12                        6

20

21              *NO EXHIBITS THIS VOLUME*

22

23

24

25
```

```
1                    P R O C E E D I N G S

2              THE COURT:  Before we begin the individual

3    questioning, let the record to reflect a motion has been

4    presented to me by the defense -- I trust ethically a copy

5    has been given to the State -- dealing with regard to a

6    specific, the age of the victim.

7              The defense care to be further heard other than the

8    allegations in the motion?

9              MS. BALIDO:  No, we'll stand on our motion,

10   Judge.

11             THE COURT:  Defense have --

12         The State have any reply to the --

13             MR. DAVIS:  No, sir, we don't have any

14   objection to the motion at all.  I believe it's a proper

15   question.

16             THE COURT:  Granted.

17         May we have the first prospective juror, Janet

18   Proline Parker, please, Sheriff.

19             Mr. Murphy, Ms. Little is a bit under the weather

20   and I have assured her that her physical condition is of

21   paramount concern.  That's why you have three attorneys, all

22   three of whom in the Court's opinion are most adequate to

23   represent your interest.  So if Ms. Little's physical

24   condition becomes such that she cannot continue, permission

25   of the Court, she will be excused to attend to her physical
```

```
 1    condition.

 2            Ms. Parker, good afternoon.

 3                    VENIREPERSON:  Hi.

 4                    THE COURT:  Let me ask that you raise your

 5    right hand.

 6                    (Venireperson sworn.)

 7                    THE COURT:  Ms. Parker, I know from having

 8    done this on a number of previous occasions individuals have

 9    come in and have expressed to all of us a bit of fear or

10    trepidation or concern about where you now find yourself.  I

11    want to try to make you, as much as I can, at ease, realizing

12    that this is presumably a new experience for you I assume.

13                    VENIREPERSON:  Uh-huh.

14                    THE COURT:  So I want you to take a deep

15    breath and relax.  And all of us in this courtroom will do

16    our dead level best to make you as comfortable mentally and

17    physically as we possibly can.  Okay?

18                    VENIREPERSON:  Yes, sir.

19                    THE COURT:  If at any time during this

20    interview process you want to take a stretch break, don't

21    hesitate to let me know.

22                    VENIREPERSON:  Okay.

23                    THE COURT:  I'll be more than happy to let you

24    get up, stretch your legs, take a rest room break if need be,

25    let you catch your breath mentally and physically, and we'll
```

1    continue.   Okay?

2                    VENIREPERSON:   Okay.

3                    THE COURT:   Let me begin by reintroducing the

4    individuals whom we see seated at the counsel table.   I

5    introduced them before, but I don't know where you were

6    sitting down in the Central Jury Room, but you are a bit

7    closer to them now.

8            Let's begin with the table to the far left.   The

9    dark suit, the gentleman, lead prosecutor for the State in

10   this matter, the Honorable Greg Davis.

11                   MR. DAVIS:   Good afternoon.

12                   THE COURT:   Seated next to him is his

13   co-counsel, the Chief Prosecutor presently assigned by

14   District Attorney Bill Hill to this the 194th District Court,

15   the Honorable Mary Miller.

16                   MS. MILLER:   Good afternoon.

17                   THE COURT:   Moving on to the next table we

18   first have lead counsel for Mr. Murphy, a former senior

19   prosecutor in the District Attorneys Office, now Dallas

20   County Public Defenders Office, a board certified criminal

21   law specialist, Ms. Jane Little.

22                   MS. LITTLE:   Hi.

23                   VENIREPERSON:   Hi.

24                   THE COURT:   She is a little bit under the

25   weather and she will be staying with us as long as her health

1   permits, but if, Ms. Parker, Ms. Little should excuse

2   herself, we all understand that she is fighting a bit of a

3   bug.

4          Moving next to Ms. Little is another one of the

5   defense attorneys, again, board certified criminal law

6   specialist, the Honorable Michael Byck.

7          MR. BYCK:  Good afternoon.

8          THE COURT:  Seated behind Mr. Byck is the

9   third attorney on behalf of Mr. Murphy, the Honorable

10  Jennifer Balido.

11         MS. BALIDO:  How are you?

12         VENIREPERSON:  Hi.

13         THE COURT:  Seated immediately next to Mr.

14  Byck, to the right as we look at them, is the accused,

15  Jedidiah Isaac Murphy.

16         THE DEFENDANT:  Good morning, ma'am.

17         THE COURT:  Ms. Parker, let's jump right in to

18  some matters.  After my comments, the attorneys will be given

19  an opportunity to talk to you.  Let me assure you that when

20  I'm asking you some questions, the attorneys are asking you

21  questions, no right or wrong answers.

22         VENIREPERSON:  Okay.

23         THE COURT:  We don't give individuals -- we

24  don't grade them on citizenship as to whether or not they are

25  death penalty jurors, death penalty qualified, not that at

1  all.   We only ask that you be honest with yourself and of

2  course thereby being honest with the attorneys and of course

3  Mr. Murphy as well.   We're now in the process of individual

4  questioning, which is allowed by Texas law at the request of

5  either the State or the defense.   Both sides in this case

6  have indicated to me that they are availing themselves of

7  that portion of the law, so that's why we're in individual

8  questioning.

9          We anticipate completing this jury selection within

10  a few weeks hopefully.   Based on past experience that I've

11  had in a number of these matters, I like to give the

12  attorneys a little bit of time after the jury has been

13  selected before we begin right full blown into the

14  testimonial stage of the trial, thereby avoiding the delay

15  with regard to matters of evidence and witnesses, schedules

16  and matters such as that.   Having said that, we anticipate

17  beginning the testimonial stage of the trial on Tuesday, the

18  29th of May.   That's the day after Memorial Day will be

19  celebrated.   Anticipate the trial will last five to seven

20  work days, absent media coverage that I hopefully will not

21  result in the jury being sequestered.   Not going to get

22  locked up at night.   I always have to leave that out there

23  and hopefully anticipate that will not happen.

24          If the attorneys should determine you to be one of

25  the 12 individuals to take a seat over to the left, is there

1    anything in your personal or professional or business

2    schedule that would prevent your returning on the 29th to

3    participate as a juror in this case?

4              VENIREPERSON:  Not to my knowledge.

5              THE COURT:  Okay.  Fine.  Ms. Parker, I've

6    already indicated to you that the Supreme Court of the United

7    States has indicated that to be constitutionally permissible,

8    before an individual can be given the death sentence, there

9    must, number one, be a murder as opposed any other kind of

10   criminal act, but it must be something in addition to murder,

11   an aggravating factor the Court has indicated a number of

12   times.

13             In this case the State has alleged in the

14   indictment, the charging document, the allegation against Mr.

15   Murphy, that it was a murder during the course of kidnapping

16   and/or robbery.  Failing to prove the kidnapping or the

17   robbery would make it murder, not capital murder.  Punishment

18   5 to 99 years or life.  Only if it's murder plus an

19   aggravating factor, either kidnapping and/or robbery, would

20   it then be elevated to a death penalty eligible situation.

21             VENIREPERSON:  Okay.

22             THE COURT:  Are you with me so far?

23             VENIREPERSON:  Yes.

24             THE COURT:  For the sake of your valuable

25   time, let us assume hypothetically that you're a juror, you

1    and the other 11 jurors have completed the guilt/innocence

2    stage of the trial and you have found, based upon the law and

3    the evidence, Mr. Murphy guilty of capital murder.  The only

4    two options that would be open on the matter of punishment

5    would be either life or death.  And a life sentence under

6    Texas law means that an individual would serve 40 calendar

7    years in confinement before being eligible for release on

8    parole.  There is no guarantee after 40 years the

9    penitentiary doors would fling open and he would be let go.

10   But the eligibility under the law would begin at that time.

11          There is a built-in preference, statutorily, when

12   going into the penalty stage of a capital case.  The statute

13   favors a life sentence as opposed to death.  And I think

14   there is no one in this room who would disagree without being

15   presumptive -- I'm not including you, but the rest of us

16   would think that inasmuch as death is the optimum punishment

17   that society can inflict on a fellow human being, that's the

18   way it should be.  It shouldn't be easy, quote, unquote, to

19   get a death sentence.

20          VENIREPERSON:  Right.

21          THE COURT:  And Texas law realizes that

22   certain matters in the penalty stage of a trial might be

23   satisfied to the jury's satisfaction before death as opposed

24   to life can be imposed.  Are you with me?

25          VENIREPERSON:  Yes.

DARLINE W. LABAR, OFFICIAL REPORTER

Page 3

1          THE COURT:  If at any time I'm going too fast,

2   tell me to slow down, say stop --

3          VENIREPERSON:  Okay.

4          THE COURT:  -- and we'll go over it again.

5      Look with me, if you will, to your left at the

6   special issues.  The attorneys and I anticipate, if indeed we

7   get to the penalty stage of this trial, the capital verdict,

8   that the jury will be called upon to answer those two

9   questions.  Why don't you read those to yourself after which

10  I'll have a comment or two, after which the attorneys will

11  have some comments as well.

12          VENIREPERSON:  Okay.

13          THE COURT:  Have you completed it?

14          VENIREPERSON:  Yes.

15          THE COURT:  Thank you.  Now, Ms. Parker, let

16  me explain to you Special Issue Number 1.  The responsibility

17  of proving that in the affirmative or as a yes lies with the

18  State, Mr. Davis, Ms. Miller.  If they are able to satisfy

19  the jury that Special Issue Number 1 should be answered in

20  the affirmative or yes, only then need the jury go on to

21  Special Issue Number 2.

22          VENIREPERSON:  Okay.

23          THE COURT:  Unlike Special Issue Number 1,

24  Special Issue Number 2, neither side has -- well it would be

25  called the burden of proof, the responsibility of convincing

DARLINE W. LABAR, OFFICIAL REPORTER

1   the jury either way.  If in answer to Special Issue Number 2,

2   at the conclusion of the deliberations by the jury, all 12

3   jurors decide that that issue should be answered no, having

4   previously answered Special Issue Number 1 yes, a yes to one,

5   a no to Number 2 requires under Texas law that I sentence in

6   this case Mr. Murphy to death.  Any other configuration of

7   answers other than yes and no, it's a life sentence.

8            Are you with me?

9            VENIREPERSON:  Yes.

10           THE COURT:  Now, to be a prospective qualified

11   juror, to be what the United States Supreme Court on a number

12   of occasions has said, quote, unquote, death qualified, a

13   juror must have no preconceived notions going into the trial.

14   Let me give you a secret.  The quickest way to eliminate

15   yourself from consideration is for you to tell us you want to

16   be on this jury.  Oh, all of us involved in this process have

17   heard jurors, prospective jurors seated where you now find

18   yourself, question is asked, would you like to be a juror on

19   this case, and I mean they're just chomping at the bit.

20   Whoa, they've got an agenda.

21           VENIREPERSON:  Right.

22           THE COURT:  We don't know necessarily what it

23   is, but we are not looking for people that are going to stand

24   in line wanting to be a juror in a capital case.  We are

25   looking for individuals that will be sincere, will be

DARLINE W. LABAR, OFFICIAL REPORTER

1   conscientious, will be honest with themselves, carefully

2   evaluate the evidence, and let the chips fall where they may.

3   We require -- the law requires to be a prospective qualified

4   juror, especially with regard to Special Issue Number 2, you

5   must tell yourself and thereby us, yes, if mitigating

6   evidence is presented, I will listen to it.  I will carefully

7   evaluate it, and if I determine the mitigating evidence,

8   whatever it is, and it's not going to be defined, so it's

9   whatever you, Ms. Parker, say it is, the whole water front is

10  open.  If you say it's mitigating, it's mitigating.  You must

11  be willing to listen to evidence that is presented from

12  whatever source.  If you decide it's mitigating and rises to

13  that level as a result of which Mr. Murphy should live, not

14  die, give effect to that careful consideration and answer

15  Special Issue Number 2 yes.

16          See, if you answer Special Issue Number 1 yes and

17  Special Issue Number 2 yes, it's a life sentence.  A yes to

18  Number 1 and a no to Number 2 is death.

19          Are you willing as a prospective juror to tell Mr.

20  Murphy, the attorneys, and I that if mitigating evidence is

21  presented, that you will listen to it, evaluate it, and then

22  decide whether as a result of it the defendant should live

23  and not die?  Are you willing to do that?

24          VENIREPERSON:  Yes, I think I can do that.  I

25  feel pretty strongly that if it's proven that a person takes

1    another person's life, that they should pay the same way.

2    But I would listen to all of the evidence --

3                    THE COURT:  Do you think just because a person

4    has been found guilty of murder, they should in all cases

5    automatically get a death sentence?

6                    VENIREPERSON:  No.

7                    THE COURT:  But in some cases they should?

8                    VENIREPERSON:  Yes.

9                    THE COURT:  Do you think it's on a

10   case-by-case basis?

11                   VENIREPERSON:  Yes.

12                   THE COURT:  Without further adieux, allow me

13   to reintroduce from the Dallas District Attorneys Office --

14   Mr. Davis, will you be handling the questions or will Ms.

15   Miller?

16                   MR. DAVIS:  Yes, Your Honor, I will.

17                   THE COURT:  Thank you.  Mr. Davis.

18                            JANET PARKER

19   was called as a venireperson by the Court and, after having

20   been first duly sworn, testified as follows:

21                   Voir Dire Examination

22   By Mr. Davis:

23        Q.   Good afternoon again, Ms. Parker.  How are you?

24        A.   Fine.

25        Q.   As the Judge told you, my name is Greg Davis.  Along

---

DARLINE W. LABAR, OFFICIAL REPORTER

1    with Mary Miller, I represent the State of Texas in this

2    case.  I've been given about 30 minutes to speak with you.

3    During that time we'll talk a little bit more about the death

4    penalty in Texas.  We'll talk about some general principles

5    that apply in all criminal cases.  And then we may go over

6    some of the information that you have in your questionnaire.

7    As best you can, just relax.  There are no right or wrong

8    answers here.  Most of the questions that I'm going to be

9    asking this afternoon deal with how you feel about something,

10   what's your opinion about something.  And I've heard enough

11   of these responses to know that everybody feels differently.

12   And as long as you tell us how you honestly feel, that's

13   really all we need this afternoon.  Okay?

14       A.    Okay.

15       Q.    Let me -- let me just be very up front with you and

16   tell you what the State's position in this case is because

17   it's not going to change.  It's going to remain the same

18   throughout this case.  The State of Texas feels that it has

19   the type of evidence in this case that will persuade a jury

20   to find the defendant guilty of capital murder.  We also feel

21   that we have the type of evidence that we'll persuade the

22   jury that the proper answers to Special Issue Numbers 1 and 2

23   are yes and no, which would result in a death sentence in

24   this case.  That is our position.  It will not change.  And

25   at the punishment phase of this trial, I can guarantee you

DARLINE W. LABAR, OFFICIAL REPORTER

1    that will be our position.  If you will, simply recall what

2    the Judge says.  We'll ask you to base your verdict on the

3    evidence that you hear in this case, nothing more, nothing

4    less.  Okay?

5         A.   Okay.

6         Q.   Ms. Parker, let me just go back about a week and a

7    half to when you came to the Central Jury Room, and let me

8    ask you, when the defendant, Jedidiah Isaac Murphy, was

9    introduced to you by Judge Entz and you were told that the

10   State was seeking the death penalty against him, can you tell

11   me what went through your mind at that time?  What was your

12   first impression of these proceedings?

13        A.   It was a new experience for me.  I had never been

14   called for jury to a capital murder case where the death

15   penalty is an issue.

16        Q.   Uh-huh.

17        A.   I had a lot of curiosity to -- to know what the

18   details were, but other than that, really no decision or

19   impression.

20        Q.   Okay.  You've had some time to reflect on the

21   situation, I guess, now before you come down and you've been

22   kind enough to tell Judge Entz what you're feelings are and

23   let me just tell you that people come down here with all

24   sorts of feelings about the death penalty.  I've had some

25   people who say they don't like the death penalty

1    particularly.  I've had some people who say they're very much

2    in favor of the death penalty.  All those people can be

3    qualified jurors as long as they can tell us honestly that

4    they can follow the law given to them by Judge Entz.  That's

5    really the key, because we may all disagree about some parts

6    of the law, but when it comes to the law, he'll have the

7    final say on it.  And if he tells you the law is such and

8    such, you're duty bound by your oath as a juror to follow

9    that law.

10           Some people tell us I don't think I'm disciplined

11   enough where I can do that.  Other people tell us I am the

12   kind of person who has the necessary discipline to follow the

13   law given by the Judge to be on a case like this.

14           In general, Ms. Parker, do you feel like you are the

15   type of person who is disciplined enough to follow the law

16   given to you by Judge Entz?

17        A.   Yes.

18        Q.   And I believe you've told us you believe in this

19   case if the State of Texas meets its burden of proof and we

20   prove to you beyond a reasonable doubt that Jedidiah Isaac

21   Murphy is guilty of capital murder, I take it that you could

22   find him guilty as required by the law, couldn't you?

23        A.   Yes.

24        Q.   And if the evidence was such that Special Issues

25   Number 1 and 2 in your mind should be answered yes and no,

1  resulting in a death sentence, that you could return those

2  answers also; is that also fair?

3      A.   Yes.

4      Q.   Ms. Parker, let's take a few minutes then and let's

5  talk about some general principles that apply in this case

6  and every case here in the State of Texas.   The first one is

7  the presumption of innocence.   And a lot of these things

8  Judge Entz has already gone over, but just in an abundance of

9  caution to be fair here, because I think everybody is in

10  agreement this is a very serious matter.   I've been through

11  enough of these to know that in these proceedings no matter

12  what happens, whatever the outcome is, it's very important

13  that we all be able to leave this courtroom knowing that all

14  the rules were followed properly and Jedidiah Murphy received

15  a fair trial.   Would you also agree with that?

16      A.   Yes.

17      Q.   First of all, the presumption of innocence.   As he

18  sits right here, Mr. Murphy is presumed to be innocent of the

19  offense of capital murder, and he is -- he's entitled to that

20  presumption --

21          MR. DAVIS:   Your Honor, if we could, we've got

22  a matter to take before the Court.

23          (Side bar conference.)

24          THE COURT:   Thank you, Ms. Parker.   You are

25  excused from consideration as a juror.

```
1              MR. DAVIS:  Thank you.

2              VENIREPERSON:  Uh-huh.

3              (Venireperson excused from courtroom.)

4              MR. DAVIS:  If the record could reflect, Your

5    Honor, that the State and defense agreed to excuse Juror

6    Number 144.

7              MR. BYCK:  So agreed, Your Honor.

8              (Venireperson brought forward.)

9              THE COURT:  Good afternoon.

10             VENIREPERSON:  Hi.

11             THE COURT:  Name Dorothy Jennings?

12             VENIREPERSON:  Yes, sir.

13             THE COURT:  Welcome back.  Ms. Jennings, may I

14   ask that you raise your right hand and be sworn in, please.

15             (Venireperson sworn.)

16             VENIREPERSON:  I swear.

17             THE COURT:  Thank you.  You may lower your

18   hand.

19        Ms. Jennings, I want to you sit back, relax as much

20   as you can.  I trust when I informed you that you were among

21   those March 2nd that remain under consideration, perhaps a

22   lump came into your throat and you thought, uh-huh, what did

23   I either do or not do in my questionnaire that -- how come

24   those people get to go and I have to come back.  Got a call

25   from my Court Administrator and maybe lost a little bit of
```

1    sleep last night.  I hope not.

2                  VENIREPERSON:  No.

3                  THE COURT:  I assure you we want to make your

4    stay down here with us for the next hour as comfortable

5    physically and mentally as we can under the circumstances

6    make it.

7                  VENIREPERSON:  Okay.

8                  THE COURT:  Let me introduce you or

9    reintroduce the individuals whom you see seated at the

10   counsel tables before you begin.  Table to the left,

11   gentleman in the dark suit, lead prosecutor for the State in

12   this matter, the Honorable Greg Davis.

13                 MR. DAVIS:  Good afternoon.

14                 THE COURT:  Seated next to him is his

15   co-counsel, the Chief Prosecutor assigned to this the 194th

16   District Court, the Honorable Mary Miller.

17                 MS. MILLER:  Good afternoon.

18                 THE COURT:  Moving on to the next table, we

19   have two of the three attorneys representing Mr. Murphy.

20   Absent is an attorney by the name of Jane Little.  Ms. Little

21   is a former Chief Prosecutor in the District Attorneys

22   Office, board certified criminal law specialist.  She is a

23   little bit under the weather and to avoid us catching

24   whatever she has, we have suggested to her that perhaps her

25   health is such that she should excuse herself, return with us

                  DARLINE W. LABAR, OFFICIAL REPORTER

1  when she is a bit -- a bit better equipped to do so.  Two

2  attorneys, we'll begin with the Honorable Jennifer Balido.

3              MS. BALIDO:  How are you?

4              VENIREPERSON:  Fine.

5              THE COURT:  The Honorable Michael Byck, with

6  the grey hair, mustache, also a board certified criminal law

7  specialist.

8         And to the right going down the line is the accused,

9  as I've previously introduced to you and the other panel

10  members, Mr. Jedidiah Isaac Murphy.

11             THE DEFENDANT:  Good afternoon, ma'am.

12             THE COURT:  Ms. Jennings, let's jump right

13  into the matters at hand.

14             VENIREPERSON:  Okay.

15             THE COURT:  Texas law provides that when the

16  State is seeking a death sentence in a capital murder case,

17  upon request by either side, either the State or the defense,

18  prospective jurors can be questioned individually.  I want to

19  assure you that the attorneys on both sides in this case have

20  utilized that provision of the law, so I don't want you to

21  think that it's either the State or the defense or me that's

22  making you go through this ordeal.  If you have anybody to

23  complain to, it's the legislature, I hope you won't subscribe

24  any fault in them as a result because of the serious

25  questions involved.  Let's assume hypothetically a few things

```
 1    at the outset.  May we?
 2                   VENIREPERSON:  Okay.
 3                   THE COURT:  Let's assume that the jury has
 4    been selected and that you are one of the 12 jurors.  We
 5    hopefully anticipate that process will be completed within a
 6    matter of a few weeks.  All of us here have gone through
 7    these matters in one form or fashion, and it's somewhat a
 8    laborious and tedious process.  But we anticipate finishing
 9    it within a few weeks.  I like, based on past experience, to
10    give the attorneys for both sides a couple of weeks for final
11    preparation so a timely flow of evidence can be presented to
12    the jury so they won't be inconvenienced by unnecessary
13    recesses.
14         Having said that, we anticipate beginning the
15    testimonial stage of the trial on Tuesday, the 29th of May,
16    the day after Memorial Day is celebrated.  Do you know of
17    anything in your schedule that if you're selected as a juror
18    that would prevent your coming back on the 29th?
19                   VENIREPERSON:  No, sir.
20                   THE COURT:  Likewise, knocking on wood, we
21    anticipate the jury will not be sequestered.  I must leave
22    that out as an option -- but we're not anticipating you will
23    be locked up at night so you will be free to go home, free to
24    be home, with friends and family at least as this trial
25    progresses, at least at the outset.
```

1      Ms. Jennings, let's furthermore assume not only that

2   you're a juror but you and your fellow 11 jurors have

3   completed the -- what we call the guilt/innocence stage of

4   the trial and that you have found in this case Mr. Murphy

5   guilty of capital murder.  By that I mean you have found

6   beyond a reasonable doubt that Mr. Murphy took the life of a

7   certain named individual during the course of which there was

8   a kidnapping and/or a robbery.  If you were to find that the

9   aggravating factors, the kidnapping or robbery, had not been

10   proven to your satisfaction beyond a reasonable doubt, but

11   you did find that he committed a murder, would not be a

12   capital case.  It would be what we call under the Penal Code

13   a first degree murder and the penalty range would be 5 to 99

14   years or life, with an optional fine not to exceed $10,000.

15   But if based upon the law and the evidence in concert with

16   the other 11 jurors you found him guilty of capital murder,

17   then we would go into the penalty stage of this trial.

18      Statutorily the legislature has created a preference

19   for a life sentence as opposed to death.  And with a few

20   exceptions -- because obviously we don't want to be

21   presumptive about how you feel about it, but we think that is

22   the correct way statutorily for the law to be because of the

23   ultimate seriousness of a death sentence, the finality.  So

24   going into the penalty stage of a capital murder case, the

25   defendant begins with a life sentence.  In a life sentence if

1   you'll recall when I said back on the 2nd of this month, of

2   March, 40 calendar years, day-for-day, week-for-week,

3   month-for-month before the eligibility of parole is

4   occasioned.  Doesn't mean 40 years, the penitentiary doors

5   swing open and out you go.  Eligibility begins then.  Only if

6   certain matters are brought to a jury's satisfaction, what we

7   call special issues, does that life sentence change to a

8   death sentence.

9          The attorneys and I anticipate that if the jury

10  returns in this case a verdict of guilty of capital murder,

11  the two special issues you see to the left will be called

12  upon by the jury to answer.  Let me ask to you take a moment

13  or two of your time, read them to yourself, after which

14  we'll -- I'll talk about them a little bit, the attorneys

15  will a bit more.  Read them to yourself, if you will, please.

16               (Venireperson given time to read.)

17               THE COURT:  Have you completed that?

18               VENIREPERSON:  Uh-huh, yes, sir.

19               THE COURT:  For a moment let me mention

20  Special Issue Number 1.  The responsibility of proving that,

21  if they can, lies with the State.  If based upon the

22  evidence, you and your fellow 11 jurors answer Special Issue

23  Number 1 in the affirmative or a yes, only then do you need

24  to go on to Special Issue Number 2.  Because if you've

25  answered Special Issue Number 1 no, it's an automatic life

Page 23

1    sentence and there's no need for to you go to Number 2.   If

2    however you answer Special Issue Number 1 yes, then you and

3    your fellow 11 jurors go to Special Issue Number 2.

4            Neither side has what we call the burden of proof or

5    the responsibility of going forth with the evidence on Number

6    2.   I will not be giving you in the Court's charge, the

7    instructions, a definition of mitigating evidence.

8    Mitigating evidence is whatever a juror believes it to be.

9    If you say it's mitigating, it's mitigating, period.   End of

10   discussion.

11           The United States Supreme Court on a number of

12   occasions have said that to be a constitutionally qualified

13   juror in a capital proceeding, a juror must tell us that they

14   are willing to listen to mitigating evidence if it is

15   presented and then determine if as a result of which it rises

16   to the level as a result of which a defendant should live and

17   not die.

18           Are you willing, if mitigating evidence is

19   presented, to listen carefully, evaluate it, and make that

20   determination?

21           VENIREPERSON:   Yes, I am.

22           THE COURT:   Some people indicate, well, if

23   you're guilty of capital murder, it's automatic death.   Well,

24   that's not the law in the United States, nor in Texas.   And I

25   assure you, 194th District Court.   Only if Special Issue

1   Number 1, apologize for pointing my finger, is answered by

2   the jury yes and Special Issue Number 2 by law, as the

3   elected Judge of this particular court, I'm required to

4   sentence Mr. Murphy to death.  That's the law.  Unlike a

5   number of other states, the jury's answers are not

6   recommendations to the trial judge.  The jury makes the

7   determination.  Not alone.  12 of you collectively.  But each

8   of you have an independent voice.  If all of those

9   independent voices coalesce or come together, that's the

10   result.  We have no secrets.  I want to you know the effect

11   of those answers so you'll know going in what the results

12   are.

13       Now, you cannot however say after you've heard the

14   guilt/innocence stage of the trial, well, I've heard enough,

15   I'm going to fashion my answers such that he gets the death

16   sentence.  Whoops, uh-oh, we've got a problem.  You can't do

17   that.  You've got to take those Special Issues 1 and 2 after

18   you have heard evidence in the penalty stage of the trial --

19   oh, you can utilize the facts and circumstances that you

20   heard in the first stage of the trial, but you cannot go into

21   the penalty stage deliberations or penalty stage of the trial

22   saying, well, I am going to automatically fashion my answers

23   to give either life or death.  You can't do that.  You've got

24   to look at it through a different set of glasses, if you

25   will.

Page 25

```
 1              Are you willing to do that?

 2                   VENIREPERSON:  Yeah, I am.

 3                   THE COURT:  It's tough.  Do you want me to

 4     tell you how to get off of this jury?  If you would tell us

 5     that you want to be a juror.  We've had people, those of us

 6     in here involved with this in the past, we've heard persons

 7     say, oh, I want to be a juror in a capital case.  Whoops.

 8     They've got an agenda.  Oftentimes we know what that agenda

 9     is.  Sometimes we don't.  We want individuals who can and

10     will be conscientious, will be sincere.  And if you will, let

11     the chips fall where they may.

12              Are you willing to do that?

13                   VENIREPERSON:  Yes.

14                   THE COURT:  Reluctantly?

15                   VENIREPERSON:  Yeah.

16                   THE COURT:  We will begin with the State.  Mr.

17     Davis.

18                   MR. DAVIS:  Yes, Your Honor.

19              Thank you.  May it please the Court.

20                        DOROTHY JENNINGS

21     was called as a venireperson by the Court and, after having

22     been first duly sworn, testified as follows:

23                   Voir Dire Examination

24     By Mr. Davis:

25          Q.   Good afternoon again, Ms. Jennings.  How are you?
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    I'm fine.   Thank you.

2    Q.    My name is Greg Davis.   Along with Mary Miller, I

3    represent the State of Texas in this case.   And for the next

4    30 minutes, I'll have a chance to speak with you and we'll go

5    over the death penalty law in a little bit greater detail.

6    We'll talk about your questionnaire a little bit.   And we'll

7    talk about the general principles that apply in this case and

8    any other case.   And I want you to relax and understand there

9    are no right or wrong answers.   Most of the questions that

10   I'm going to ask you this afternoon deal with how you feel

11   about something, what your opinions are.   And I've done

12   enough of these to know that people have different opinions

13   about these matters.   Don't worry about that.   As long as we

14   know how you honestly feel about this, that's all we really

15   need from you.   Okay?

16   A.    Okay.

17   Q.    Let me tell you up front what our position is,

18   because it's not going to change.   The State of Texas in this

19   case firmly believes that we have the type of evidence that

20   will persuade a jury to find the defendant guilty of capital

21   murder in this case.   Further, we think that we have the type

22   of evidence that will persuade a jury to answer Questions

23   Number 1 and Number 2 yes and no, which will require Judge

24   Entz to impose a sentence of death against Mr. Murphy.

25   That's our position.

DARLINE W. LABAR, OFFICIAL REPORTER

1          On punishment I will stand before you and I will ask

2     you to answer Special Issues Number 1 and 2 yes and no,

3     knowing that a death sentence will result.  That's our

4     position.  Obviously, the defendant has three very fine

5     attorneys.  There's a difference of opinion.  That's why we

6     need 12 jurors to make this decision in this type of case.

7          Ms. Jennings, I want to go back with you just a few

8     days to when you were in the Central Jury Room.  You remember

9     that mob scene where everybody was in there?

10    A.    Oh, yes.

11    Q.    And go back to the time where the defendant was

12    introduced to you and the time when Judge Entz told you that

13    the State was seeking the death penalty against him.  And do

14    you remember what was going through your mind when you

15    learned that we were trying to take the life of Jedidiah

16    Isaac Murphy in this case?

17    A.    First thing that probably went through is this is my

18    first time to jury duty and, boy, did I get picked.

19    Q.    You drew the black bean real quick, didn't you?

20    You've had some time now, I guess, to reflect on the matter

21    and think about some of these issues, I trust.  And I just

22    want to kind of give you an opportunity now to tell us how

23    you feel about participating in this type of case.  I take it

24    from your answers to Judge Entz this isn't something that you

25    necessarily want to do; is that right?

1     A.   Correct.

2     Q.   But I've heard a lot of people express, well, it may

3 not be something that I want to do, but understand as a

4 citizen I have certain obligations and if you choose me to

5 sit on the jury, then I'll do my civic duty, I'll listen to

6 the evidence and I'll render my decision accordingly.  Is

7 that kind of where you fit in on this?

8     A.   Correct.

9     Q.   I want to talk to you a little bit about more about

10 the death penalty, about your feelings about that, because I

11 note from talking to people that there are -- a lot of people

12 come down here and they have told us like you have, that you

13 believe in the death penalty, that you think it's appropriate

14 in some cases, but I know sometimes it can be different when

15 you're sitting in that chair and it gets to be a bit

16 personal.  You know, in the abstract a lot of people tell us

17 that they're glad we gave it, wouldn't change it, glad you're

18 having the trial.  But if you look at Mr. Murphy, you see

19 there's nothing abstract about him.  He's a living, breathing

20 human being.  If the State of Texas prevails in this case,

21 there will be come a day in Huntsville, Texas, when he will

22 be strapped on a gurney, his life will taken from him.

23 That's the reality.  I don't go through that with jurors to

24 be morbid or grim, but that's the reality of it in Texas.

25 We've had a number of executions already.  And I have every

1    reason to believe if a death sentence is handed down in this

2    case, it will be carried out some date in the future.

3           Having said that, most of the people have told me

4    that now that I'm down here, I don't think that I could

5    personally take part in that.  Maybe another kind of case I

6    would make a great juror, but not in this kind of case.  To

7    those jurors I always say there's no shame in that.  I

8    respect your opinion.  If that's how you honestly feel, at

9    that time we'll go on to the next juror and eventually we'll

10   get our 12 jurors in this case.

11          I just need to know from you whether this is the

12   type of case, Ms. Jennings, that you think you can

13   participate on.

14      A.    Well, that's what everybody asked me.  Can you live

15   with this?  As long as the evidence is given to me and there

16   is no shadow -- there is no doubt in my mind, I feel that I

17   can.

18      Q.    Okay.  All right.  We'll talk about that in just a

19   second, about the presumption of proof -- about the

20   presumption of innocence, burden of proof in this case.  And

21   let's just go on with that right now.  I think the Judge has

22   gone over some of this, but again, just to be -- just to be

23   careful, just to be fair, because I think it's important.  No

24   matter what the result is in this case, and I've been through

25   enough of these to know it's important to know when we leave

1   this courtroom on that last day that we have no second

2   guessing about what happened, we have no doubt that all the

3   rules were followed, that Mr. Murphy received a fair trial.

4          Would you agree with me there?

5      A.   Yes.

6      Q.   One of the first rights and protections that he has

7   is he has the presumption of innocence.  As he sits here

8   right now, Mr. Murphy is presumed innocent of the offense.

9   Now, that's notwithstanding the fact that we know several

10  things have already happened.  He's already been arrested for

11  the offense of capital murder.  He's been charged with that

12  offense.  And he's been indicted by the Dallas County grand

13  jury.  And we've already begun jury selection.  But still, as

14  he sits here today, he's presumed innocent.  He remains

15  innocent in the law's eyes until the State of Texas proves

16  his guilt beyond a reasonable doubt.  And when we do that,

17  that presumption of innocence disappears.

18         Can you assure all of us that as he sits right here

19  right now that you can presume the defendant innocent of this

20  offense?

21     A.   Yes.

22     Q.   As I've just told you, the burden of proof is on the

23  State of Texas.  We have to prove all the allegations in the

24  indictment beyond a reasonable doubt.

25         Now, you've said on your questionnaire about

DARLINE W. LABAR, OFFICIAL REPORTER

1    total -- total doubt or shadow of a doubt.  That's not the

2    burden of proof.  I've heard some people say, you know, I can

3    live with the burden of reasonable doubt in maybe a traffic

4    ticket or misdemeanor or maybe some other felony offense, but

5    when it comes down to capital murder, I'm going to hold the

6    State of Texas to a higher burden even though the law doesn't

7    require me to do that.  You know, that's fine if you feel

8    that way.  And you can understand this is a very serious

9    matter, but again, what we have to do is prove this case

10   beyond a reasonable doubt.

11          I'd submit to you that the only way you could have

12   absolutely zero doubt about it would to have been an

13   eyewitness to this.  Can you see that?

14        A.   Yes.

15        Q.   All right.  And again, reasonable doubt is a very

16   high standard in this type of case, and we would fully expect

17   you and want you to hold us to that burden of proof.  We

18   don't need any help.  We'll meet our burden of proof.  And

19   what I need to know is will you hold the State of Texas to

20   that burden of proof?

21        A.   Yes, I will.

22        Q.   Okay.  If we prove our case beyond a reasonable

23   doubt, you can find the defendant guilty, I take it; is that

24   right?

25        A.   Yes.

1    Q.   And if we fail to meet that burden of proof, you'll

2    find him not guilty; is that right, also?

3    A.   Yes.

4    Q.   Now, let me just -- let me just tell you in this

5    case in general what we have to prove.  We have to prove that

6    on or about a certain day in Dallas County, Texas, that this

7    defendant, Jedidiah Isaac Murphy, intentionally took the life

8    of a woman by the name of Bertie Cunningham and that he did

9    so by shooting her with a firearm or by drowning her in

10   water.  And that -- all that was done in the commission or

11   attempted commission of the offense of robbery or kidnapping.

12   That's what we've got to prove in this case.

13        Now, it's important to remember that we've got to

14   prove everything in that indictment.  Let me give you an

15   example, and I may give you some examples this afternoon.  I

16   don't think any of these will come to pass.  Some of them are

17   kind of ridiculous, but they point out a principle here.

18        Let's say in a case like this, capital murder case,

19   we proved everything to your satisfaction that we have the

20   right person, we proved how that individual was killed, that

21   they were killed during the course of a robbery or a

22   kidnapping, all to your satisfaction, but we failed to prove

23   that the offense occurred in Dallas County, Texas.

24        Now, a couple of things would happen.  Probably Ms.

25   Miller and I would be looking for a new job.  That's the

1    first thing.  But the second thing would be this, under that

2    circumstance, since the State did not prove all of the

3    allegations in that indictment beyond a reasonable doubt, the

4    law would require you to go back to that jury room and find

5    the defendant not guilty.  You see how that would be very,

6    very difficult?  You know, you have a very dangerous

7    individual who has taken a life, who has committed a capital

8    murder, but still the law -- your oath as a juror to render a

9    true verdict according to the law and the evidence would

10   require you to say not guilty.  And that would be our

11   responsibility.  That would be our fault.  But still, you'd

12   have the duty of saying not guilty.

13           Even under that kind of extreme circumstance, do you

14   still feel like you could hold the State to its burden of

15   proof?

16       A.   Yes.

17       Q.   And again, I don't anticipate that happening.

18   That's kind of an extreme example, but it does point out we

19   have to prove everything beyond a reasonable doubt here.

20           Let's talk about another right that the defendant

21   has, and that's the right to remain silent.  In this country

22   no one can force a defendant to give testimony against

23   himself to incriminate himself.  He has the protection of the

24   5th Amendment.  The law in this case is going to say that if

25   this defendant chooses not to testify, that you can't

1    consider that and you can't hold that fact against him.

2         Do you feel like you could follow that law?

3    A.   Yes, I do.

4    Q.   Essentially what the law says, look to the other

5    evidence presented.  If the State has proved its case beyond

6    a reasonable doubt, you find him guilty.  If we haven't met

7    our burden of proof, you find him not guilty.

8         Does that sound fair to you?

9    A.   Yes.

10   Q.   I know in your questionnaire we asked -- I think the

11   question was asked about people not testifying, and I believe

12   that you said I would hope that you could testify in your own

13   behalf, but believe that our lawyers can really twist things

14   around and anger you into saying things that could be taken

15   wrong.

16   A.   Right.

17   Q.   You're right.  Lawyers can do that at times.  That

18   may be one reason why a person wouldn't want to testify.

19   Maybe they're afraid their words will be twisted.  We can go

20   through a lot of other examples.  Maybe they don't speak

21   English.  Maybe they stutter.  There could be other reasons.

22   Maybe they know that they're guilty and they're going to be

23   lying -- or caught lying if they testify.  That's another

24   reason.  Another reason could be under law if an individual

25   has prior felony convictions, those facts can be brought out

1   while testifying.  They can be used by a jury to judge an

2   individual's credibility.  There are a lot of reasons why.

3   But again, the law says if an individual doesn't testify,

4   disregard it, try it based on the facts presented.

5         I take it you don't have any problem with that?

6   A.   Right.

7   Q.   Let's talk about another right that all defendants

8   have.  They have a right to discovery.  I know a lot of

9   people come down here and they think the powerful State of

10  Texas and the poor citizen accused over here and what an

11  imbalance there is.  But let me tell you about the right of

12  discovery that all defendants have.  First of all, under the

13  law I'm obligated as the prosecutor, if I know of any

14  evidence that tends to show that this defendant is not

15  guilty, I'm duty bound to turn it over to them as soon as I

16  know about it.  That's one right he's got.  If I know about

17  evidence that tends to mitigate his punishment, anything that

18  may be an issue there in Special Issue Number 2 in a death

19  penalty case, again, I'm obligated by the law to turn that

20  over as soon as I learn about it, also.  I'm also obligated

21  to give them a complete list of all potential witnesses that

22  will be called by the State of Texas in this case.  And I'm

23  obligated to do that before this trial ever begins.  I'm also

24  obligated to show them all exhibits that may be offered

25  during the course of the trial so they can examine them prior

1    to trial, too.  And finally prior to this trial, this

2    defendant will have all the police reports.  He'll have all

3    the scientific reports generated on behalf of the State of

4    Texas before the first witness is ever called.

5              Now, we don't have reciprocal discovery in the State

6    of Texas, so the defendant does not have the same obligations

7    to me.  That's fine.  But I want you to understand that there

8    are certain rights and procedures here that we go through to

9    insure that people like Jedidiah Murphy receive a fair

10   trial.

11             Does that seem fair?

12        A.   Yes.

13        Q.   Let's talk about one of your main duties as a juror

14   would be to judge the credibility of witnesses.  And that is

15   an important thing.  You'll have to listen to witnesses to

16   determine if you believe them or not.  Something you do in

17   everyday life, I'm sure.  You'll do the same thing here.

18             And what the law asks you to do there, Ms. Jennings,

19   is to keep an open mind, listen to the person, see what they

20   have to say before you decide whether you want to believe

21   them or not.  You see, the problem would be if you said, you

22   know, I just don't like, let's say bankers or plumbers,

23   whoever it may be, and for that reason, I don't care what

24   that person says, I'm never going to believe a word out of

25   their mouth.  Okay.  The law says you can't do that.

1            One other thing the law says with regards to

2    defendants testifying, is even though a defendant is presumed

3    to be innocent at the beginning of a trial, he is not

4    presumed to be a truth teller when he hits that stand up

5    there.  You're to judge him by the same standards that you

6    judge all the other witnesses in a case.  Everybody gets

7    equal treatment under the law.

8            Do you think that you could do that in this type of

9    a case?

10       A.    Yes, I do.

11       Q.    I want to talk a little bit about your experience in

12   judging credibility of individuals.  Ms. Jennings, have you

13   ever dealt with anybody who you believed was a habitual liar?

14       A.    Yes.

15       Q.    Okay.  Somebody that doesn't matter what they're

16   talking about, they're going to lie about it to some degree

17   or another?

18       A.    Yes.

19       Q.    Were you able to make some determination about when

20   they were telling you the truth and when they were lying?

21       A.    To some degree, yes.

22       Q.    Kind of tough, isn't it?

23       A.    Yeah, it is.

24       Q.    Can you think of some ways that might be helpful in

25   determining whether somebody is habitually lying about a

1    matter?   Some things that might be helpful to know?

2        A.    Well, the more, of course, you know about them, if

3    you know people around them.

4        Q.    Right.   What do other people think about them for

5    instance?

6        A.    Correct.

7        Q.    What their reputation is in the community?

8              How about if you found out that person told you one

9    thing and he went back and told another individual an exact

10   opposite story, for instance?

11       A.    That happens.

12       Q.    It happens.   How about if you found that they've

13   told several different versions of the story to several

14   different people?   Do you think that might help in

15   determining whether that person has told you the truth or

16   not?

17       A.    Yes.

18       Q.    Do you think it's possible that people charged with

19   criminal offenses might be motivated to lie to gain some

20   advantage here in the criminal justice system?

21       A.    Yes.

22       Q.    Do you think that might be particularly true if

23   they're facing a possible death sentence?

24       A.    Yes.

25       Q.    Have you ever known anyone who claimed to have

1    amnesia about certain matters?

2       A.   No.

3       Q.   Again, do you think it might be helpful to know with

4    regards to whether or not they're telling you the truth about

5    amnesia, just what their memory may be about other events?

6    Do you think that might be helpful?

7       A.   Yes.

8       Q.   For instance, if I came to you and told you that I

9    remember waking this morning, I remember getting dressed,

10   I've got absolutely no memory about what I had for breakfast,

11   but I remember the next 20 things that happened right after

12   breakfast for instance.  Do you think you might doubt whether

13   I really have amnesia about what I had for breakfast or not?

14      A.   I would.

15      Q.   Okay.  All right.  One other question with regards

16   to the burden of proof in this case.  I need to know whether

17   you could fairly apply the law in this case, whether you

18   would hold the State of Texas to its burden of proof if you

19   found out that the victim was an 80-year-old female?  Could

20   you still do it even in that event?

21      A.   Yes.

22      Q.   Okay.  Thank you.  Let's talk about some other

23   matters.  When it comes to death penalty, Ms. Jennings, can

24   you think of any cases maybe that you've recently heard about

25   in the media where you thought maybe if I knew more about the

1    facts, maybe the death penalty might be an appropriate

2    punishment in that case?

3         A.    If I had to think of one right off the top of my

4    head, no, I couldn't.

5         Q.    That's good to know that you don't sit around your

6    home thinking about these types of things.

7         A.    Yeah.

8         Q.    It's shows you're very normal.  Let me talk to you

9    about a case that occurred recently.  It's called the Texas 7

10   or Connelly 7.  Do you remember that case?

11        A.    Yes.

12        Q.    Those were inmates who were serving very long prison

13   sentences.  In fact, some of them were serving life sentences

14   in a prison unit in South Texas.  They escaped from that

15   prison unit.  They went to Houston, committed an aggravated

16   robbery in Houston.  They came to Dallas, to Irving, where

17   they actually murdered the police officer outside the

18   Oshman's.  Are you familiar with that kind of case?

19        A.    Yes, I am.

20        Q.    Having heard about that, do you think the death

21   penalty would be appropriate for those individuals?

22        A.    Yes, I do.  I think the death penalty would be

23   appropriate.

24        Q.    Okay.  Let's talk a little bit about types of

25   evidence, get your feelings about some of these matters

DARLINE W. LABAR, OFFICIAL REPORTER

1    because criminal cases can be proven through all sorts of

2    evidence.  We may have cases where there are eyewitnesses who

3    come into the courtroom, they sit there on the witness stand

4    and tell you what they saw, what they heard, and then you can

5    take them for whatever you want to.  Certainly that occurs in

6    some cases, but there are a number of criminal cases that

7    there are absolutely zero eyewitnesses.  The individual that

8    commits the crime makes the decision that he's going to

9    commit the crime in a place and time where no one else would

10   be there to see him or hear him.

11          Do you think that's possible?

12       A.   Yes.

13       Q.   In those types of cases the State can rely on what's

14   called circumstantial evidence.  And when I say

15   circumstantial evidence, what types of things come to your

16   mind?  What do you conjure up when I say circumstantial

17   evidence?

18       A.   If there was any clothing left behind, footprints,

19   any kind of DNA, or anything like that.

20       Q.   Okay.  Certainly all those could be.  You've

21   mentioned a couple things, DNA or blood.  That's becoming, I

22   guess, more common as we go through and we become more

23   sophisticated in blood and DNA analysis.

24          What is your general feeling about the reliability

25   of DNA evidence?

1        A.    I think over the years it's been pretty much

2    proven -- I think it's reliable.

3        Q.    How about fingerprints?  And again, they would fall

4    in -- you talk about shoe prints or footprints, fingerprints

5    would certainly fall in that category.  Do you have any

6    feelings about the reliability of fingerprints?

7        A.    From what I know, I believe it's reliable.

8        Q.    There's another kind of broad category here.  I'm

9    going to call them circumstances, you know.  Could be

10    something like -- let's say that this evening as you come

11    home, you see me walking out of your front door or running

12    out of your front door and I've got your television under my

13    arm and I'm running towards the car.  Okay?  Certainly you

14    didn't see me go into your home, you didn't see me pick your

15    television up inside your home, but the circumstances I'm in

16    recent possession of your property and I'm heading out at a

17    fast rate.  That can also be a circumstance indicating my

18    guilt.

19            Can you see where there may be circumstances that

20    come together that show an individual's guilt?

21        A.    Yes.

22        Q.    Another category would be written confessions or

23    written statements given by an accused.  You know, in the

24    State of Texas we have certain requirements that have to be

25    met before a jury can consider those sorts of things.  But

1   you can see a situation where let's say I commit an offense,

2   no one sees me commit the offense, but later I go down to the

3   police station and say I want to confess that I committed an

4   armed robbery two days ago and I sit down and I give a very

5   detailed statement about everything that I did.  That

6   statement could be used as evidence against me.  It's

7   circumstantial in a way because it's not an eyewitness, it's

8   not direct testimony.

9         But can you see how that might also possibly be

10  useful in determining an individual's guilt?

11      A.   Yes.

12      Q.   Do you -- when we talk about confessions, let's talk

13  about one other matter.  And I guess it goes to the

14  credibility or believability of a statement.  Do you think

15  that there might be situations where an individual comes in

16  and gives a written statement to a police officer where

17  perhaps 80 percent of that statement may be accurate, may be

18  truthful, but the other 20 percent that individual simply

19  decides not to tell the truth to that police officer for

20  whatever reason?

21      A.   Yes.

22      Q.   Do you think that might be possible, particularly if

23  an individual is facing a very serious criminal charge?

24      A.   It could be possible.

25      Q.   I guess the bottom line, when we come down on

1    circumstantial evidence, it goes back to the burden of proof

2    in this case, Ms. Jennings, which is this:  Do you feel in

3    this type case, capital murder case, if you find a person

4    guilty, there are only two possible sentences, life or

5    possibly death, do you feel you can base your verdict of

6    guilt on circumstantial evidence alone if that circumstantial

7    evidence was strong enough to show you that that person was

8    in fact guilty?

9        A.   If it was strong enough, yes.

10       Q.   Okay.  Fair enough.

11            Let's talk for just a little bit then, Ms. Jennings,

12   about Special Issues Number 1 and 2.  We'll talk about

13   capital murder.  Capital murder, remember as the Judge has

14   explained to you, is always two things.  It's always an

15   intentional murder plus something else.  In the State of

16   Texas if you had as what I'm going to refer to as a simple

17   murder, if I kill someone without anything else happening,

18   that's not a death penalty case.  If I turn to Ms. Miller and

19   I don't like her hair style today, I shoot her six times, get

20   up and laugh about what I've done, that may be a very

21   horrible offense, but I cannot receive the death penalty in

22   the State of Texas.  It must be something else with that.  In

23   this case we've said that other thing is that this murder

24   occurred during course of either a robbery or the course of a

25   kidnapping.  That's what makes this different.  If we prove

DARLINE W. LABAR, OFFICIAL REPORTER

1    that along with the murder, makes it a capital murder.

2          Let's take a step back.  Let's say in a capital

3    murder case for some reason the State can't prove that other

4    thing that makes it capital.  Now we're left with a murder

5    case.  Then the punishment is a bit different, and the Judge

6    would instruct you at the end of the punishment phase that

7    you're to go back and actually on a verdict form you'd write

8    in the number of years that you thought was a proper sentence

9    based on all the evidence that you heard.  He would also

10   instruct you on that type of case the range of punishment

11   would be anywhere between 5 years in the penitentiary up to

12   99 years or life in the penitentiary, plus an optional fine

13   not to exceed $10,000.  That's the range.  It's a very wide

14   range.  And you'd have to base that verdict on everything

15   that you heard.

16          Now, here is the key to be a qualified juror, and

17   that is to honestly be able to tell us you have an open mind

18   to the full range of punishment.  You see some people come

19   down here and they've already pre-judged and they tell us if

20   you show us an intentional murder case, I'm never going to

21   consider something as little as five years.  I don't care

22   what type of facts you have, I don't know how good the

23   defendant was, how sorry the victim was, I've already decided

24   in my mind.  I've had people tell me on the other end they

25   could never consider a life sentence.  They're not qualified

1    to sit on this type of jury because they've already

2    pre-judged the situation.  And the things to keep in mind

3    there is this.  You don't know what facts that you'll hear,

4    you don't know the relationship between the parties.  Did

5    they have a good relationship over the years, bad

6    relationship, no relationship whatsoever?  Was it a spur of

7    the moment kind of situation?  Was it a very well thought

8    out, planned, premeditated kind of murder?  Did the defendant

9    have a lengthy background where you might want to go high on

10   the punishment, or did he have absolutely no criminal

11   background?  Had lived a spotless life up to that point,

12   maybe he'd been a pillar of the community and for whatever

13   reason intentionally took someone else's life.  So as you can

14   see, there's a lot of variables, a lot of unknowns.

15        What I need to know from you this afternoon, Ms.

16   Jennings, is do you feel like you could wait until all the

17   facts came in a murder case until you decided what the proper

18   punishment was?  And then if you heard the case and you

19   thought a life sentence was called for, you could give life.

20   If you thought something less than life was called for, you

21   could give that.  And if you thought that was the minimum

22   type of case, that you could give as little as five years?

23   Do you feel that you can do that?

24        A.    Yes.

25        Q.    And a lot of people say, well, it might take a

DARLINE W. LABAR, OFFICIAL REPORTER

1    pretty rare case to get to five years.  That's fine.  You may

2    be predisposed to do something more.  But you have to be open

3    to that possibility that that case could come down the line

4    some time and if you heard it, in your heart of hearts, you

5    said this is it, I thought maybe I'd never hear it, but this

6    case right here tells me that 5 years is enough and the

7    evidence tells me I can do it here.  Can do you that?

8        A.    Yes.

9        Q.    Let's talk about Special Issue Number 1.  I think

10   you've already told us that you understand the burden of

11   proof is on the State and you'll hold us to that.  I would

12   like for you to consider the types of evidence that you think

13   might be helpful to you in answering Special Issue Number 1.

14   Can you think of some things that you might like to know

15   about, that might help you in deciding Special Issue Number

16   1?

17       A.    Well, of course, you'd like to know has he had a

18   prior record.

19       Q.    Uh-huh.  Right.  Okay.

20       A.    That would really be the only thing I can think of

21   right now.

22       Q.    Okay.  The law would entitle you to do that.  His

23   lack of a criminal history or the existence of a criminal

24   history, maybe whether he's been through the system before,

25   maybe whether there have been efforts to rehabilitate him

DARLINE W. LABAR, OFFICIAL REPORTER

1    before.   You'd be entitled to hear that.   You would be

2    entitled to consider how brutal the murder itself was.   You

3    get to look at all those facts and circumstances, certainly

4    in deciding Special Issue Number 1.

5         A couple of things let's go through very quickly,

6    the word "probability."   The legislature gave us that word.

7    What I would like to point out to you is they're not saying

8    that the State of Texas has to prove that there is a

9    certainty that this person would commit future criminal

10   acts.   We don't have that burden.   It has to be more than

11   just a mere possibility or mere chance.   A probability.   A

12   lot of people tell me it's a greater likelihood -- it's more

13   likely than not going to happen.

14        Criminal acts of violence.   Again, the legislature

15   could have required us to prove this person is going to

16   commit a future murder before you could answer the question.

17   We don't have to prove that.   We have to prove commit

18   criminal acts of violence in the future.   Most people tell me

19   that an offense occurring with someone else, where you put

20   someone else's life in danger or harm them in some way, as

21   opposed to going into a vacant case and taking something when

22   nobody is there.

23        Again, the word "society."   The word "society" the

24   law has told us means everybody.   It can mean people like you

25   and I who live in the free world.   It can also mean people in

DARLINE W. LABAR, OFFICIAL REPORTER

1    a prison setting.  Really, anywhere that a defendant would

2    find himself can be his society.  You know, we talk about

3    people here in the free world deserve to be free from violent

4    crime.

5            Do you think that people in a prison setting should

6    be free from violent crimes also?

7        A.    Yes.

8        Q.    Let's look at Special Issue Number 2.  Again,

9    there's no burden of proof on Special Issue Number 2.

10   There's no laundry list of things that may or may not be

11   mitigating.  I know in the past some people have told me that

12   things such as age or drug addiction or alcoholism, any

13   number of things may or may not be mitigating.  I can tell

14   you an equal number of people say that's not mitigating to me

15   at all.  It's aggravated, if anything, to me.  You can see --

16   what are your feelings?  Can you think of anything right

17   offhand that kind of jumps out when you hear the word

18   "mitigation" or "mitigating circumstances"?

19       A.    No, not right now I couldn't.

20       Q.    Okay.  Let me go through a couple of things.  You

21   know, some people tell us if the person is relatively young,

22   that that might make it difficult for them in some way.  Do

23   you feel that way?

24       A.    No.

25       Q.    Or do you think age should be something you look

1    at?  If it's relevant, it's relevant.  If it's not, it's not?

2        A.    No.

3        Q.    Same thing for drugs and alcohol.  Some people make

4    a distinction.  Maybe I've never taken drugs, never had

5    anything to drink before.  I don't know what the effects

6    would be on me.  I go out and commit a crime.  I'm still

7    responsible under the law.  But some people might say, well,

8    he didn't don't know how it would affect him.  Maybe it would

9    be mitigating.

10        Other people say, you know, if I'm a longtime user

11   and I know how that stuff affects me and I go out and commit

12   a violent offense, too bad.

13        Do you have any feelings one way or the other there?

14       A.    No, just what you said.

15       Q.    Let me talk about to you about sexual abuse,

16   physical abuse.  You know, those claims can certainly be

17   made.  Do you think that it might be possible for people to

18   lie about having been sexually abused or physically abused in

19   the past?

20       A.    Yes, I do.

21       Q.    Is that something you would want to know all the

22   facts about and determine whether or not it's true or not?

23       A.    Yes.

24       Q.    Same thing goes for mental illness.  Do you think

25   there are people who might actually fake a mental illness to

1   gain advantage even in the criminal system?

2       A.   Yes.

3       Q.   Do you think there are people who are skillful

4   enough at lying, might even be skillful enough to fake mental

5   illness?

6       A.   Yes.

7                THE COURT:   30 minutes, Mr. Davis.

8                MR. DAVIS:   Thank you, Judge.

9       Q.   (By Mr. Davis)   Just a couple of more issues here

10  very quickly.   Sometimes people tell us maybe remorse might

11  be an issue that they would want to look at, you know, is

12  somebody truly sorry and repentant for what they've done.   I

13  guess you could see a situation, maybe a person commits an

14  offense, they stay at the scene, they immediately call 911,

15  they turn themselves in, they give a total confession,

16  they're crying when the first police officer arrives at the

17  scene.   There may be other instances where that remorse may

18  not show up for a period of time.

19           Have you ever heard the term "jailhouse conversion,"

20  Ms. Jennings?

21      A.   No.

22      Q.   That would be a situation where a person finds the

23  Lord or finds God after he's housed in the county jail.   Do

24  you think there might be instances where people might be a

25  bit dishonest about their conversion if they're facing a very

1    serious offense such as capital murder?

2         A.    Yes.

3         Q.    Is that something you'd want to hear all the facts

4    about before you make that type of judgment?

5         A.    Yes.

6         Q.    Ms. Jennings, I appreciate your answers this

7    afternoon, appreciate your time and patience.  More than

8    anything, I appreciate your candor because, believe me,

9    that's the only way that we can intelligently try to find 12

10   persons to sit in this case.

11                 THE COURT:  Ms. Jennings, before we begin,

12   would you like to take a stretch break, stretch a little

13   bit?

14                 VENIREPERSON:  No, I'm okay.

15                 THE COURT:  Are you sure?

16                 VENIREPERSON:  Yeah.

17                 THE COURT:  Would like something to drink?

18                 VENIREPERSON:  No thank you.

19                 (Recess)

20                 THE COURT:  Ms. King, are you ready?

21                 COURT REPORTER:  Yes.

22                 THE COURT:  Mr. Byck, will you be handling?

23                 MR. BYCK:  Yes, Your Honor.

24                 THE COURT:  The Honorable Michael Byck.

25                 MR. BYCK:  Thank you, Your Honor.

1                        Cross-Examination

2    By Mr. Byck:

3        Q.    Ms. Jennings, again, my name is Michael Byck and

4    together with Ms. Balido, we represent Jedidiah Isaac Murphy

5    in this the trial for his very life.

6             Now, I appreciate the seriousness in which you've

7    answered Mr. Davis's questions and the questionnaire.  I'm

8    going to be asking you a few of the same questions, a few

9    different questions.  Again, you must understand that this is

10   not a test of good citizenship.  This is not -- there aren't

11   any right or wrong answers.  There really are not.

12            What I'm interested in because I'm not going to sit

13   on this jury, I can promise you that.  What I'm interested in

14   is your heart felt feelings, because very frankly, Ms.

15   Jennings, if you want to lie to me you probably can, you

16   probably can do it successfully, and you can probably get on

17   this jury, for whatever reason you might have to do that.  I

18   would hope that you would not do that.  As a matter of fact,

19   I really don't believe that you would do that, but I'm going

20   to ask you some very difficult questions.  I'm not asking

21   them to you because I want to see you jump through hoops or

22   over hurdles or see how far I can push you.  What I do want

23   to see is how you feel about some very, very important issues

24   that we have in this case.

25            They are issues where not only does not everybody

1   have to agree on these issues, a lot of people just don't

2   agree.  A lot of people feel very, very different regarding

3   the capital murder statute, regarding appropriateness of

4   punishment, regarding all kinds of things like that.  And

5   very frankly, let's start with that idea.  And let's start

6   not at the beginning but at the very, very end.

7        The very end is Special Issue Number 2.  Whether

8   taking into consideration all of the evidence, including the

9   circumstances of the offense and the defendant's character

10  and background and the personal moral culpability of the

11  defendant.  Let's talk about the phase "personal moral

12  culpability of the defendant."

13       I'd submit to you that there may be differences in

14  moral culpability between defendants, almost -- or committing

15  exactly the same kind of offense.  Let me give you an

16  example.  See if you agree with me or not.  If you don't,

17  say, Mike, I don't agree with that.  If you do, fine.

18       Ms. Balido and I are identical twins.  We were

19  separated at birth.  We have exactly the same I.Q.  We have

20  exactly the same talents, but Ms. Balido got to go with a

21  very nice family, very loving family that cared for her, they

22  nurtured her, they educated her, they had a lot of

23  wherewithal.  They sent her to private schools.  They sent

24  her to private colleges and universities.  And she graduated.

25  I, on the other hand, was not so lucky.  I was adopted by

DARLINE W. LABAR, OFFICIAL REPORTER

1      people who were not very intelligent.  They were abusive to

2      me, whether physically or psychologically or even sexually.

3      I'm as smart as Ms. Balido is.  We have exactly the same

4      I.Q., but I never had a chance to live in a home where books

5      were appreciated and I never had a chance to go to private

6      schools or any schools that I got along very well in.

7               We both go and commit a bank robbery.  Walk into two

8      different banks on different ends of the same block on the

9      same day and we both produce weapons.  And I say, give me

10     your money or I'll kill you.  I say that in my bank, and I

11     rob my bank.  We each get, oddly enough, in this hypothetical

12     situation, exactly the same amount of money, $10,000.  And we

13     both exit the bank where we both are immediately arrested,

14     one by the Dallas police and one by the Dallas County

15     Sheriff's Office.  Give our bailiffs equal time over here.

16     Okay?

17              We both go to trial.  We're both guilty.  There's no

18     doubt about that.  However, a jury may feel that I should be

19     punished somewhat differently from Ms. Balido because I

20     didn't have the benefits that she had.  I had more problems

21     in my life than she had.  Other jurors may feel, they did the

22     same crime, they should get exactly the same punishment

23     because it was a kooky kind of deal.  They said the same

24     words, had the same gun, you know, number of bullets in the

25     gun, everything else.

1          What do you feel about a situation like that?

2    Without saying whether my punishment should be higher or

3    lower, do you feel that one of our punishments might be

4    different than the others, or do you know?

5          A.    I feel that it could, yes.

6          Q.    Okay.  That's fair enough.  Depending on what

7    circumstances I could show you as to my bad upbringing and my

8    disadvantages; am I correct in saying that?

9          A.    Correct.

10         Q.    Okay.  That's fair enough.

11         Continuing forward, backwards -- backwards, forward,

12   whichever, let's go to Question Number 1.

13         Question Number 1 says whether there's a probability

14   that the defendant would commit criminal acts of violence

15   that would constitute a continuing threat to society.  First

16   of all, talk about probability.  And Mr. Davis got you to

17   agree that probability would mean more likely than not.

18         Let me tell you why that is so important.  While in

19   the first phase of the trial, what is called the

20   guilt/innocence phase, Judge Entz will define almost every

21   word in the charge.  He will tell you what on or about

22   means.  He will tell you what intentional means.  He will

23   tell you what robbery means, what kidnapping means.  He will

24   define all these words for you.  Oddly enough in the second

25   phase, if we get to the second phase of this trial, the

1    punishment phase, hardly any words are defined for you.  In

2    fact, no words are, to be perfectly honest with you.  And it

3    is very important, for example, in the word probability

4    because the State has to prove beyond a reasonable doubt that

5    this word exists, this probability word exists.  Well, some

6    people think that probability means more likely than not.

7    Some people think that, wait a minute, this is a capital

8    murder case here.  In order for me to say that a person is

9    probably going to be a future danger, I'm going to need

10   something more than is going make it more likely than not.

11   I'm going to have to see something that I'm sure and certain

12   about, that I'm really convinced about.  Which is just fine,

13   certainly fine with the defense.

14           The problem comes in when an individual says -- and

15   very frankly there is a scientific basis for saying this --

16   actually it's mathematical.  It's really not scientific.

17   Where people say, well, probability means probably.  If it is

18   not impossible, it's probable.  Mathematicians use that, and

19   use you can see, the State has a very difficult burden of

20   proof.  They readily accept that burden of proof, but what's

21   going on here in the punishment phase of the trial is a

22   calculus.  It's not an addition and subtraction.  It's not a

23   multiplication and division.  It's a calculus, where there

24   are a lot of factors and these factors change values and they

25   change weights, depending on, A, the evidence that you hear,

1    and, B, the weight that you choose to give them.

2           For example, one juror could hear a fact and

3    consider that fact in terms of mitigation.  And by the way,

4    let me make sure you know what the word mitigation means.

5    Mitigation means to alleviate or to lessen or lighten a

6    sentence.  Sometimes we don't tell our jurors that.  And

7    since mitigation is not a word that's often used in, you

8    know, regular discourse, I want you to be sure and understand

9    that.  That's what we're talking about when we're talking

10   about mitigating evidence.  Evidence would cause you to

11   lighten the load on the defendant if you found him guilty, to

12   change the punishment from death to life.  Okay.

13          Getting back to the problem of probability.  It is

14   very, very dangerous for a defendant to have jurors thinking

15   probability means it could happen.  There's a chance.  It's

16   not impossible, so it's probable.  It may not be very

17   probable, but that question doesn't say strong probability,

18   weak probability, very -- not very much, whatever, it says

19   probable.  And as the Judge said, there is the built-in

20   assumption that this answer should be no, unless and until

21   the State can prove it beyond a reasonable doubt.  There is a

22   built-in idea in the Texas capital murder scheme that the

23   answer should be life and not death.  But it is -- those

24   built-in safeguards go completely by the wayside if we don't

25   have jurors who have a strong and a sincere definition of

1   some of these words that we use.

2          Probability is one of them.  I take you at your

3   word, as you told Mr. Davis, that probability would at least

4   mean to you more likely than not.

5          THE COURT:  You have to answer yes or no.

6   A.    Correct, yes.

7   Q.    (By Mr. Byck)  We talked about criminal acts of

8   violence.  There's all kinds of criminal acts of violence.

9   Obviously, if I shoot my co-counsel, Ms. Balido because she

10  got a better deal than I got in my last hypothetical

11  question, then, yeah, that's a criminal act of violence.

12  Some things obviously aren't criminal acts of violence.

13  Jaywalking, you know, minor traffic violations, and things

14  like that.

15         However let me give you a short hypothetical

16  question.  It is now 2:30 in the afternoon.  And our voir

17  dire is going to go on for a little while.  After our voir

18  dire is over, I'm going to go out to get a Coca-Cola because

19  my throat is a little dry.  And I put my 75 or 80 cents or

20  whatever extortionate amount these people want in the

21  Coca-Cola machine and I don't get a Coca-Cola.  Well, I don't

22  have another 80 cents, and the machine isn't making change.

23  And there isn't anybody else around.  So you are going to see

24  a criminal act of violence out of me.  I'm going to scream.

25  I'm going to yell.  I'm going to kick that machine, and it's

```
 1    going to be violent.  I'm going to do damage to that machine
 2    which will be criminal and, you know, that just may fulfill,
 3    you know, all the -- all the requirements of a criminal act
 4    of violence.  Except, on the other hand, there isn't anybody
 5    around, and I'm not hurting anybody but myself and the shine
 6    on my own shoes.
 7            Do you see what I mean?
 8        A.  Yes, I do.
 9        Q.  Okay.  We go further.  We talk about a continuing
10    threat to society.  And very frankly, Ms. Jennings, I don't
11    want to sit here for the next hour and a half and talk to you
12    about continuing, which, you know, does that mean it will
13    happen every third week for the next ten years.  Does it
14    matter -- does it mean it's going to happen sporadically?
15    Once every three months, and then it's not going to happen?
16    Maybe only once a year, whatever.  I will trust you to give a
17    fair meaning to the word "continuing."
18            However, we run into the word "society."  And Mr.
19    Davis said it perfectly when he said society is defined in
20    Special Issue Number 1 as where the defendant is.  Because if
21    the -- if we're worried about -- oh, let's pick a society.
22    How about the society of rich aristocrats in Europe?  Rich
23    French speaking aristocrats in Europe.  They live, you know,
24    in castles and they jet set from place to place.  And they
25    only drink the finest of wines.  In order for me to be a
```

1    threat to that society, I'm going have to have some kind of

2    intrigue to that society.  I'm going to have to get to Europe

3    and get a suit of clothes to get past the first line of

4    guards.  And I better learn a little French.  You can see

5    where if I'm not there, if I'm not around there, it would be

6    very difficult for me to get around them, then I'm not really

7    much of a threat to them, am I?

8        A.   Correct.

9        Q.   So as long as we talk about where the defendant is

10   in terms of a threat, because you don't impress me as a woman

11   who is going to be easily frightened, very frankly, about

12   saying society is all of us, something could happen.

13            Now, there's a couple of odd situations in that.

14   First of all, there's the -- we call it the John Gotti

15   situation.  Do you know who John Gotti is?

16       A.   No.

17       Q.   He's the godfather in New York, a big crime boss who

18   literally could be in the cellar in the penitentiary in

19   Atlanta, Georgia, and if this guy had access to a telephone,

20   he could tap on something, that somebody else could get a

21   message to get it back to his gang to get rewarded, then Mr.

22   Gotti could very well be even in the basement of the Atlanta

23   penitentiary, a very, very dangerous person.  Right?

24       A.   Correct.

25       Q.   But there has to be some kind of evidence to that?

1        A.    Right.

2        Q.    Otherwise it's mere speculation.  Okay?

3        A.    Uh-huh.

4        Q.    All right.  Let me see what else do I want to talk

5    to you about.  Let's talk about your questionnaire a little

6    bit, lighten up on this a little bit.  All right.

7              If -- what's the best way to put this?  Which would

8    you rather be a queen or a princess?

9        A.    A princess.

10       Q.    If you are princess of the State of Texas, you write

11   the laws, you're not answerable to the legislature, and, oh,

12   what a lucky woman you are in that respect, would you have

13   the death penalty for the State of Texas?

14       A.    Yes.

15       Q.    Okay.  Would you have life without parole in the

16   State of Texas?

17       A.    Yes.

18       Q.    Okay.  You said in your questionnaire that -- well,

19   the question is, quote, if you believe in using the death

20   penalty, how strongly on a scale of 1 to 10 would you hold

21   that belief, 1 being the least of 10, the 10 being the

22   strongest.  You said you believed to the extent of a 9.  What

23   did you mean by that?

24       A.    Well, each case -- I mean, I was looking at it as

25   each case -- if I had one ahead of me or in front of me, that

1  maybe if I did not have totally enough evidence to give the

2  death penalty.

3      Q.   Uh-huh.  You would of course -- this is going to

4  sound real strong.  You would of course believe in the

5  verdict that you returned?

6      A.   Correct.

7      Q.   You would not return a verdict that you didn't

8  believe in?

9      A.   Correct.

10     Q.   There is no doubt about that.  That's how I took you

11 to mean the number 9?

12     A.   Correct, yes.

13     Q.   Mr. Merit got some prison time for DWI?

14     A.   Yes.

15     Q.   What is your relationship with him?

16     A.   He's a cousin.

17     Q.   Did you go to the trial?

18     A.   Oh, no.

19     Q.   Do you think that individual was treated fairly by

20 the law or --

21     A.   Yes.

22     Q.   -- or too leniently or too harshly?

23     A.   I don't know everything, but I know it was -- I

24 don't know, his third offense or something, but, yes.

25     Q.   Okay.  Mr. Davis asked you and I'll ask you again

1   because you are fortunate to have a mother who is still

2   alive, an elderly lady.   If the facts were to show that the

3   victim of this offense was an elderly woman, that wouldn't

4   compromise your ability to be fair and impartial, would it?

5       A.   No, it wouldn't.

6       Q.   Okay.  Okay.  That's fair enough.  Everybody has a

7   mother.  And some of us are lucky and our mother's are still

8   alive and some of us are not and they're not alive.  But we

9   are trying Jedidiah Murphy for the murder of Ms. Bertie

10  Cunningham.  And, you know -- you understand what I'm talking

11  about --

12      A.   Yes.

13      Q.   -- in terms of that?   Okay.

14           Back to Question Number 2.  We talked about

15  mitigating evidence and mitigation meaning lighten or lessen

16  a punishment.  There is a laundry list of mitigating

17  evidence.  There's all kinds of evidence that -- well, let me

18  just read you the list instead of telling you about it then.

19  We have age; intoxication; abuse, whether mental, physical,

20  or sexual; mental illness or mental retardation; remorse;

21  family background and upbringing; cooperation with

22  authorities.  There's all sorts of things.

23           Would you consider and give what weight you felt it

24  was worth to each one of these items if they were presented

25  into evidence without any preconceptions in terms of -- well,

```
 1    I just absolutely refuse to consider this.  Or, you know,

 2    I -- I really think, you know, Number 3 on the list is

 3    really, really important and that might override several

 4    other things.   In other words, what I'm asking is will you be

 5    very impartial and hear the evidence and attach to it --

 6    first of all, consider it, consider the evidence, and attach

 7    to it what weight you think is important?    Will do you that?

 8        A.    Yes.

 9        Q.    Okay.

10              MR. BYCK:   Judge, what kind of time am I

11    looking at here?

12              THE COURT:  Time?  You have 9 minutes.

13              MR. BYCK:   10?

14              THE COURT:  9.

15        Q.   (By Mr. Byck)  Man, how time flies when we're having

16    fun.   Okay.

17              You may hear some evidence regarding what we call

18    victim impact.  Victim impact evidence is essentially where

19    the members of a victim's family would testify as to their

20    loss, essentially.  It is very, very important when you

21    consider victim impact testimony to remember a couple of

22    things, number one, that testimony is only relevant and only

23    applies to the first special issue.

24              MR. DAVIS:  I'm sorry.  That's a misstatement

25    of the law.  It does not apply to the first special issue.
```

1              MR. BYCK:  Pardon me, I'm terribly sorry.

2     He's exactly right.

3         Q.   (By Mr. Byck)  It applies to the second special

4     issue.  It does not apply to the first special issue, and you

5     cannot apply it to the first special issue.

6         A.   Okay.

7         Q.   All right.  The second thing is that there is a

8     danger in victim impact testimony.  And the danger being not

9     in the words that come out of the victim's mouth, but in the

10    interpretation, or actually the -- this is another part of

11    the calculus that goes on, that jurors may make of it.

12    Because we feel in America that every citizen is worth every

13    other citizen.  One man, one vote.  Your vote is just as good

14    as mine is.  Your opinion is just as valid as mine is.  And

15    very frankly, your life is worth just what mine is.  We don't

16    have princesses and kings in this state, except for you for a

17    couple of minutes, but that's okay.  It is very important if

18    you hear victim impact testimony that you don't get into what

19    we call doing a comparative moral worth calculation.  By

20    saying that, okay, we've got an innocent victim on one hand

21    who's the president of a university and educated a whole

22    bunch of children, and attended and participated and enriched

23    all these school children's lives and gave to charity and

24    went to church regularly and all the rest of that stuff

25    versus a defendant who's, gee, he's, you know, in and out of

1    the penitentiary a couple of times, and, you know, has

2    fathered a couple of illegitimate children, may or may not

3    support them or whatever.  What I'm saying here is you can't

4    make a comparative moral worth judgment.  You can't say,

5    well, this person is worth five times that person's life or

6    this person should be killed eight times over for destroying

7    just another valuable human life.  Do you see the danger in

8    doing that?

9        A.    Yes.

10                    (Reporter changes paper.)

11       Q.    Okay.  To be perfectly honest with you, Ms.

12   Jennings, we don't think that our court reporter's machine

13   has anything to do with what she does.  She has a really good

14   memory, but she needs a couple of minutes every now and then

15   to fiddle with her machine so we let her.

16            I have just two more -- actually one more question

17   and a statement to you.  You have never been on a jury

18   before; is that correct?

19       A.    That's correct.

20       Q.    Okay.  Jurors are compilations of 12 individuals, 12

21   different people from 12 walks of life who may or may not

22   know each other.  They live, each of them, in very different

23   worlds and have very different sets of life experiences.

24   Some of them very frankly -- thank you, Your Honor -- may be

25   overbearing, pushy, and just generally a real pain in the

1    neck to get along with.  Well, you've run into people like

2    that in your life and, you know, we figure you're a big

3    princess and you can deal with that.  The problem comes when

4    you get somebody back in that jury room who goes further than

5    that, who decides that they're right and you're wrong or

6    you're misguided and they can see straight and true and

7    clear, and all of the sudden they start intimidating you or

8    denigrating what you say, or subjecting you to high pressure

9    sales techniques or whatever has gotten them along in their

10   lives, they decided to use the same tricks on you.

11          Ms. Jennings, this whole trial is about the rights

12   that Jedidiah Murphy has.  This trial is also about the

13   rights that the State of Texas has.  Mr. Davis told you about

14   how he had obligations to supply certain things to the

15   defense.  The defense has obligations also.  We have rights.

16   The State has rights.  Well, by gosh, you ought to have some

17   rights, too, as a juror and you do.  You have the right to a

18   civilized and reasoned discussion and discourse on the facts

19   of this case.  You have the right not to be bullied, not to

20   be pushed around, not to be insulted, and not to be dragooned

21   into something you don't want to do merely because another

22   individual or groups of individuals are just, you know --

23   they're just tougher or meaner or whatever.

24          Where I'm going with this is that if you are

25   selected to sit on our jury and if, God forbid, it does

1    happen that one of your fellow jurors does try this -- to

2    intimidate you or to dragoon you or to push you around or to

3    belittle you or there are all kinds of different techniques

4    of making people feel futile and ineffective and worthless

5    than what they really are worth.  If that happens, we have

6    two bailiffs in this court.  They don't work for me, believe

7    me.  They work for the Dallas Sheriff's Office and Judge

8    Entz.  And Judge Entz will ensure that there is decorum and

9    order in this courtroom, and he would also ensure that you as

10   a juror have an opportunity to have a civilized discourse and

11   you don't have to put up with being pushed around or

12   manipulated or talked down to or denigrated or intimidated or

13   whatever.  And if that happens, will you feel -- not only to

14   yourself but if you see somebody doing it to somebody else,

15   will you notify our bailiffs who will notify Judge Entz and

16   we will put a stop to that behavior?

17       A.   Yes.

18       Q.   Like I say, you have rights too.  And the State of

19   Texas does not want their trial decided by some authoritarian

20   ham-handed fool back in that jury box, or that juror

21   deliberation room, and we don't either.  You don't deserve to

22   be treated like that.  So if that arises, you won't have any

23   hesitation in letting us know about that, will you?

24       A.   No, I will not.

25       Q.   Ms. Jennings, the final last -- this is -- if I'm

1    ever going to throw you a life-preserver, this is the toss.

2    Ms. Jennings, is there anything that you can think of,

3    personal, social, emotional, physical, whatever, anything

4    that would cause you to be a less than fair and impartial

5    juror over the period of time that we've talked about in this

6    case?  Is there any problem that I literally can sit here and

7    talk to you another 10 hours and if I didn't stumble over it,

8    I wouldn't know exactly what it was?  Is there anything that

9    you want to tell the Court or the prosecution and defense

10   about your possibility, very distinct possibility of serving

11   as a juror in this case?  Anything at all?

12        A.   No.

13        Q.   So be it.

14             MR. BYCK:   Thank you, Your Honor.  I conclude

15   my voir dire.

16             THE COURT:   Ms. Madore, will you excuse the

17   juror, Ms. Jennings, momentarily.

18             Ms. Jennings, in your absence the attorneys will

19   notify me whether or not you will remain under consideration.

20   We're going through a process of getting up to 48 qualified

21   jurors, at the conclusion of which we have 48, the attorneys

22   will then by their peremptory challenges narrow it down to

23   12, so if you'll excuse yourself with Ms. Madore, I'll bring

24   you in within a few minutes and let you know whether you

25   remain under consideration.

1                    VENIREPERSON:   Thank you.

2                    THE COURT:   If you'll be excused with the

3       bailiff.

4                    (Venireperson excused from courtroom.)

5                    MR. DAVIS:   The State has no challenge for

6       cause.

7                    MR. BYCK:   We have no challenge for cause,

8       Your Honor.   Two in the pool.

9                    THE COURT:   Dorothy Jennings is Prospective

10      Juror Number 2.

11                   MR. BYCK:   Do you find we're excused?

12                   THE COURT:   I have no problem with you being

13      excused.   I'm going to bring Debbie in and confirm a

14      telephone number and whatnot.

15                   MS. BALIDO:   And we need a picture.

16                   THE COURT:   May we have Ms. Jennings.

17           Debbie, do you want to take her questionnaire just

18      to confirm her telephone?   Debbie, here is her questionnaire

19      if you just want to take her and confirm her --

20                   COURT COORDINATOR:   Yes, sir.

21                   (Venireperson brought forward.)

22                   THE COURT:   Attorneys responses to the

23      Court -- the Court's determination after conferring with the

24      attorneys, you remain under consideration as a prospective

25      juror in this case.   I've asked Ms. Daily to come in and just

```
 1   confirm telephone numbers so we can get ahold of you.  If you
 2   should change phone numbers, work or home phone number before
 3   you're notified as to the final decision, if you would please
 4   let Ms. Daily know so we can keep up with you.  We have one
 5   other favor to ask of you if we may.
 6               VENIREPERSON:  Okay.
 7               THE COURT:  As I indicated to you, we're going
 8   to be going through this process until we get 48 qualified
 9   jurors of which you are -- will be one of the 48.  After
10   we've gone through a number of these interviews, you can well
11   imagine it's kind of confusing to try to put faces with the
12   name on the questionnaire.  May we have your permission to
13   take a Polaroid picture of you so that once the 48 have been
14   selected, we will be able to put a picture with the face.  I
15   assure you that once the jury has been selected, these will
16   be totally destroyed and will not be made public for any
17   purpose whatsoever.  May we have your permission to do so?
18               VENIREPERSON:  Yes.
19               THE COURT:  Thank you.
20        Ms. Madore will take your picture after which Ms.
21   Daily will confirm some telephone numbers after which you're
22   free to go home, back to work as the case may be.
23               VENIREPERSON:  Okay.
24               THE COURT:  Do not go back to the archives of
25   the Dallas Morning News and find out circumstance of the
```

1    case.  May feel free to tell your spouse, your children, your

2    coworkers that you remain under consideration, but do not

3    allow anybody whatsoever to influence what your decision may

4    be because you may be one of the 12 jurors in this case,·Ms.

5    Jennings.

6               VENIREPERSON:  Yes, sir.

7               THE COURT:  Any questions for me?

8               VENIREPERSON:  No.

9               THE COURT:  Ms. Madore, Ms. Daily, if you

10   would take care of Ms. Jennings after which you are excused.

11               (Venireperson recessed from courtroom.)

12               THE COURT:  May he be excused?

13               MR. DAVIS:  Yes.

14               MR. BYCK:  Yes, he may.

15               (Recess for the day.)

16

17

18

19

20

21

22

23

24

25

                         Reporter's Certificate

STATE OF TEXAS:

COUNTY OF DALLAS:

        I, Darline W. LaBar, Official Court Reporter of the
194th Judicial District Court, in and for Dallas County,
Texas do hereby certify that the foregoing volume constitutes
a true, complete and correct transcript of all portions of
evidence and other proceedings requested in writing by
counsel for the parties to be included in the statement of
facts, in the above styled and numbered cause, all of which
occurred in open court or in chambers and were reported by
me.

        I further certify that this transcription of the
record of the proceedings truly and correctly reflects the
exhibits, if any, offered by the respective parties.

        Witness my hand this the 13th day of November, A.D.,
2001.




                         DARLINE W. LABAR
                         Official Court Reporter
                         194th Judicial District Court
                         Dallas County, Texas
                         (214) 653-5803


Certification No. 1064 Expires December 31, 2002

_____
                DARLINE W. LABAR, OFFICIAL REPORTER

1              REPORTER'S RECORD

2           VOLUME 7 of 65 VOLUMES          **74145**

3        TRIAL COURT CAUSE NO. F00-02424-NM

4   THE STATE OF TEXAS          :        IN THE DISTRICT COURT

5   VS.                         :        DALLAS COUNTY, TEXAS

6   JEDIDIAH ISAAC MURPHY       :        194TH JUDICIAL DISTRICT

7              ********************

8           INDIVIDUAL VOIR DIRE

9              ********************

10  A P P E A R A N C E S:

11  HONORABLE BILL HILL, Criminal District Attorney
            Crowley Criminal Courts Building
12          Dallas, Dallas County, Texas  75207
            Phone:  214-653-3600
13  BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
            MS. MARY MILLER, A.D.A., SBOT # 21453200
14              FOR THE STATE OF TEXAS;

15  MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
    MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16  MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
    Dallas County Public Defender's Office
17          Phone:  214-653-9400
                FOR THE DEFENDANT.

18

19              *********

20          On the 14th day of March, 2001, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable F. Harold Entz, Jr.,

23  Judge presiding, held in Dallas, Dallas County, Texas:

24          Proceedings reported by machine shorthand, computer

25  assisted transcription.

FILED IN
COURT OF CRIMINAL APPEALS

DEC  5 2001

Troy C. Bennett, Jr., Clerk

DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

```
 1                         INDEX VOLUME 7

 2    March 14th, 2001                          PAGE    VOL.

 3    INDIVIDUAL VOIR DIRE:

 4    Proceedings.................................... 2      7

 5    Mr. Woodard Excused From Consideration........... 11     7

 6    State no challenge for cause - Ms. Hunter........ 58     7

 7    Defense no challenge for cause - Ms. Hunter...... 58     7

 8    Kathy Hunter Prospective Juror No. 3............. 58     7

 9    Reporter's Certificate........................... 61     7

10

11            CHRONOLOGICAL VENIREPERSON INDEX

12                    STATE        DEFENSE             VOL.

13    JIMMY WOODARD         10                          7

14    KATHY HUNTER          20           43             7

15

16            ALPHABETICAL VENIREPERSON INDEX

17                    STATE        DEFENSE             VOL.

18    KATHY HUNTER          20           43             7

19    JIMMY WOODARD         10                          7

20

21            *NO EXHIBITS THIS VOLUME*

22

23

24

25
```

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1                   P R O C E E D I N G S
 2              THE COURT:  May we have Mr. Woodard, Sheriff.
 3              (Venireperson brought into courtroom.)
 4              THE COURT:  Is your name Jimmy C. Woodard?
 5              VENIREPERSON:  Yes, uh-huh.
 6              THE COURT:  Good afternoon, welcome back.
 7              VENIREPERSON:  All right.
 8              THE COURT:  Ask to you raise your right hand,
 9    be sworn in, please.
10              (Venireperson sworn.)
11              THE COURT:  Thank you.  Lower your hand.  Mr.
12    Woodard, although I've previously introduced those
13    individuals whom we see seated at the counsel table, for your
14    benefit, allow me to do it again --
15              VENIREPERSON:  All right.
16              THE COURT:  -- if I may.  Let me begin with
17    the table to the left as we look at them.  The gentleman to
18    the far left at the table to the left, one of the senior
19    prosecutors in the Dallas District Attorneys Office, the
20    Honorable Greg Davis.
21              MR. DAVIS:  Good afternoon.
22              VENIREPERSON:  How are you doing?
23              THE COURT:  Seated next to him is a fellow
24    Assistant District Attorney, matter of fact the Chief
25    Prosecutor presently assigned to this the 194th District
```

```
 1   Court, the Honorable Mary Miller.

 2               MS. MILLER:  Good afternoon.

 3               VENIREPERSON:  Hi.

 4               THE COURT:  Moving on to the next table, we

 5   have co-counsel for the defendant, beginning first with the

 6   Honorable Jennifer Balido.

 7               MS. BALIDO:  How are you, sir?

 8               VENIREPERSON:  Fine, and you?

 9               THE COURT:  Seated next to Ms. Balido,

10   continuing down the line, is a fellow defense attorney and

11   board certified criminal law specialist, the Honorable

12   Michael Byck.

13               MR. BYCK:  Good afternoon, sir.

14               THE COURT:  To Mr. Byck's right as we look at

15   the table is their client, the defendant, previously

16   introduced, Mr. Jedidiah Isaac Murphy.

17               THE DEFENDANT:  Good afternoon, sir.

18               VENIREPERSON:  How are you doing?

19               THE COURT:  Mr. Woodard, there is a third

20   attorney that is on the defense team.  Her name is Jane

21   Little.  She is under the weather today and is unable to be

22   with us because of sickness.

23               Mr. Woodard, we have begun the individual

24   questioning of prospective jurors a couple of days ago.

25   We're well in the process.  We anticipate it will be several
```

1     more weeks before this process has been completed.

2               VENIREPERSON:  Yes.

3               THE COURT:  Before you leave us today, I will

4     notify you whether the attorneys will continue to have you

5     under consideration as a juror in this case.

6               VENIREPERSON:  Okay.

7               THE COURT:  Testimony is anticipated to begin

8     on Tuesday, the 29th of May, though we anticipate of course

9     having the jury sometime before then, but I like to give

10    attorneys on both sides a couple of weeks after jury

11    selection has been completed to finalize their order of

12    evidence that they anticipate presenting so the jury won't

13    be, you know, delayed by scrambling around trying to get

14    witnesses, matters such as that.  Anticipate that the

15    testimony in the trial will last, oh, five to seven, maybe

16    eight days.

17         Do you know of anything in your schedule, if

18    selected by the attorneys as a juror, that would prevent your

19    returning the last Tuesday in May and completing -- staying

20    down here until you've completed a trial?  I'm not suggesting

21    that you're going to be sequestered or locked up at night.

22    Hopefully go and sleep in your own bed at night.  Of course,

23    do you know of any reason if you're selected that you cannot

24    return on the 29th to be a juror?

25              VENIREPERSON:  No.  Other than financially,

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1   no.
 2              THE COURT:  We understand that.  If that
 3   becomes a problem, I assure you I'll be more than happy, as I
 4   have on a number of occasions, to talk to your employer, see
 5   if we can help you out.  Is that fair?
 6              VENIREPERSON:  Yes, sir.
 7              THE COURT:  Okay.  Mr. Woodard, let's move
 8   right into the matter at hand.  You are well aware of what
 9   this procedure is all about.  Let's kind of jump forward in
10   the interest of your time.  Let us hypothetically assume that
11   you're one of the jurors.  Okay?
12              VENIREPERSON:  Okay.
13              THE COURT:  Let's assume that you and your 11
14   jurors have heard evidence in the first stage of the trial.
15   After hearing my instructions to you which we call the
16   Court's charge, you and your other 11 jurors have completed
17   your deliberations and you have found the defendant guilty of
18   capital murder.  Let's just --
19              VENIREPERSON:  Okay.
20              THE COURT:  -- assume that as a hypothetical.
21   Okay?
22              VENIREPERSON:  All right.
23              THE COURT:  You and the other 11 jurors would
24   then be called upon to determine whether or not a life
25   sentence is appropriate or a death sentence.  Texas law is
```

1    structured in such a way that going into the punishment stage

2    of a capital murder trial, a life sentence is preferred at

3    the outset as opposed to death.  And given the seriousness of

4    a death sentence, most of us in this room, if not all of us,

5    we know not of course how you may feel, but we think that's

6    the right way it should be.

7                    VENIREPERSON:  Uh-huh.

8                    THE COURT:  If as a result of a jury's

9    determination a life sentence is the result, Mr. Murphy will

10   be sentenced by me to life in the penitentiary, and he will

11   by law not be eligible for release on parole under

12   supervision, if you will, until he's served 40 calendar years

13   in the penitentiary, day-for-day, week-for-week,

14   year-for-year, until 40 years have been completed.

15        Are you with me so far?

16                    VENIREPERSON:  Yes, uh-huh.

17                    THE COURT:  Before a death sentence can be

18   imposed by me in this case, special issues -- you see over to

19   the left -- can you read them where you find yourself?

20                    VENIREPERSON:  Yes, uh-huh.

21                    THE COURT:  Why don't you read them to

22   yourself after which I'll explain the effect of them.  If

23   you'd read them to yourself.

24                    VENIREPERSON:  Okay.

25                    THE COURT:  And I'll talk to you a little bit

1    about them and the attorneys will talk to you about them

2    momentarily.

3                    (Venireperson given time to read.)

4                    THE COURT:  Have you completed that?

5                    VENIREPERSON:  Yes, uh-huh.

6                    THE COURT:  Now, the responsibility lies with

7    the District Attorneys Office representing the State of Texas

8    to convince you, if they can, that Special Issue Number 1

9    should be answered yes.  If after you and your fellow jurors

10   have completed your deliberations and answer Special Issue

11   Number 1 yes, only then do you go to Special Issue Number 2.

12                   VENIREPERSON:  Oh, okay.

13                   THE COURT:  Because if you answer Special

14   Issue Number 1 no, it's a life sentence and you need not go

15   to Special Issue Number 2.

16                   VENIREPERSON:  Oh, okay.  All right.

17                   THE COURT:  All right.  Now, let's furthermore

18   assume that you and your other 11 jurors have decided

19   unanimously that Special Issue Number 1 should be answered,

20   based upon the evidence presented, yes.

21                   VENIREPERSON:  All right.

22                   THE COURT:  Then you go to Special Issue

23   Number 2.  I call Special Issue Number 2 the -- for lack of a

24   better term, the mercy question.  Special Issue Number 2

25   requires a qualified juror, and that's what we're here to

1    talk to you about.  To be a qualified juror as relates to

2    Special Issue Number 2, the United States Supreme Court has

3    said that all death qualified jurors must be willing to

4    listen to mitigation evidence which is like lessening the

5    punishment or matters such as that.  Be willing to listen to

6    it, in a thoughtful, considerate manner, and if as a result

7    of the mitigation evidence you think the defendant in this

8    case, Mr. Murphy, should live and not die, answer it

9    accordingly and he will live.  But if you answer, you and the

10   other 11 jurors answer Special Issue Number 1 yes and Special

11   Issue Number 2 no, by law I am required to sentence Mr.

12   Murphy to death.  Serious business.

13                    VENIREPERSON:  Okay.

14                    THE COURT:  Series, serious business we're at.

15                    VENIREPERSON:  Okay.

16                    THE COURT:  Do you understand the effect that

17   those answers would have --

18                    VENIREPERSON:  Yes.

19                    THE COURT:  -- if you're a juror?

20                    VENIREPERSON:  Yes.

21                    THE COURT:  Do you have any questions for me

22   before we begin the questioning by the lawyers?

23                    VENIREPERSON:  No.

24                    THE COURT:  Let me tell before we start the

25   attorneys asking the questions, there are no right or wrong

1    answers to their questions.

2               VENIREPERSON:  Okay.

3               THE COURT:  We don't give individuals

4    citizenship grades by virtue of their answer.  We only insist

5    the oath that you've taken -- we only ask that you tell us

6    the truth.

7               VENIREPERSON:  All right.

8               THE COURT:  Worry not about the effects of

9    your answers as long as they're honest.

10              VENIREPERSON:  Okay.

11              THE COURT:  Is that fair?

12              VENIREPERSON:  Yes.

13              THE COURT:  Sit back, relax as much as you

14   can.  Hope you haven't lost a whole lot of sleep worrying

15   about what this afternoon would be.  I want to assure you

16   that you have some of the most skillful, talented lawyers in

17   the country that will be handling the questioning of you this

18   afternoon.

19              VENIREPERSON:  All right.

20              THE COURT:  Are you ready to begin?

21              VENIREPERSON:  Yes.

22              THE COURT:  We'll begin with Mr. Davis.

23              MR. DAVIS:  Thank you.  May it please the

24   Court.

25              THE COURT:  Mr. Davis.

1                          JIMMY WOODARD

2    was called as a venireperson by the Court and, after having

3    been first duly sworn, testified as follows:

4                        Voir Dire Examination

5    By Mr. Davis:

6        Q.    Good afternoon again.  How are you?

7        A.    Good.

8        Q.    As the Judge told you, my name is Greg Davis.  Along

9    with Mary Miller, we represent the State of Texas in this

10   case.  For the next 30 minutes or so I'm going to talk with

11   you.  I want to repeat what the Judge just told you.  There

12   aren't any right or wrong answers.  Most of the questions I

13   ask you will deal with how you feel about something, what's

14   your opinion.  Believe me, I've talked to a lot of people

15   about these issues.  Everybody has different opinions and

16   feelings.  And as long as you tell us how you honestly feel

17   about something, that's all we as attorneys need to know.

18   Okay?

19       A.    All right.

20       Q.    If I ask something -- if I don't make myself clear,

21   and usually I'll do that at least, you know -- I'll do that

22   at least once in a 30-minute period.  If I do that, you ask

23   me to repeat it, rephrase it.  All right?

24       A.    All right.

25       Q.    Excuse me just a second.

                   DARLINE W. LABAR, OFFICIAL REPORTER

```
 1                    MR. DAVIS:  Judge, I think we have a matter to
 2   bring up to the Court's attention.  If we could approach.
 3                    THE COURT:  You may.
 4                    (Side bar conference.)
 5                    (Mr. Woodard Excused From Consideration)
 6                    THE COURT:  Mr. Woodard, the attorneys have
 7   requested that I excuse you from further consideration.
 8   Thank you.  You're free to go home, back to work, whatever
 9   the case may be.
10                    VENIREPERSON:  Thank you.
11                    MR. DAVIS:  Thank you, sir.
12                    VENIREPERSON:  All right.
13                    (Juror excused.)
14                    MR. DAVIS:  Your Honor, may the record please
15   reflect the State and defense agreed to excuse Juror 183, as
16   well as the next juror, 303, Barbara Shehane.
17                    THE COURT:  The record so reflect.
18                    MS. BALIDO:  We're in agreement, Judge.
19                    (Juror brought into courtroom.)
20                    THE COURT:  Is your name Kathy Lynn Hunter?
21   Ask you to raise your right hand, please.
22                    (Venireperson sworn.)
23                    THE COURT:  Thank you.  You may lower your
24   hand.
25                    Ms. Hunter, welcome back.  By the time that you
```

1    leave us within an hour or so, I will inform you whether or

2    not you remain under consideration.  We're in the first week

3    of this individual questioning process, moving right along.

4    Anticipate that it will be a few more weeks before we have

5    completed the panel of 48 from which the ultimate 12 will be

6    selected.  We anticipate that the testimonial stage of the

7    trial will begin on Tuesday, the 29th of May.  The day before

8    is when Memorial Day is going to be officially celebrated in

9    this country so we'll begin the day after that.

10            Do you know at this stage any reason why if you are

11   selected that you could not return on the 29th to serve as a

12   juror in this case?

13            VENIREPERSON:  No, sir.

14            THE COURT:  Anticipate the trial will last

15   four to maybe eight days, hopefully anticipating that the

16   jury will not be sequestered, locked up at night, but of

17   course that possibility always exists if some media attention

18   obligates me to alter what I hopefully anticipate will not be

19   a sequestered jury.

20            Let me introduce the individuals whom you see at the

21   counsel tables.  Let me introduce them.  Previously

22   introduced them, but maybe you were at a distance that you

23   didn't get a real good look at them, a bit closer to them

24   now, and you'll be dealing with several of them very shortly.

25            Beginning with the counsel table to the left, senior

1   prosecutor in the Dallas District Attorneys Office, the

2   Honorable Greg Davis.

3               MR. DAVIS:  Good afternoon.

4               THE COURT:  Seated next to him is the Chief

5   Prosecutor presently assigned by Dallas District Attorney

6   Bill Hill to this the 194th District Court.  This is the

7   Honorable Mary Miller.

8               VENIREPERSON:  Hello.

9               THE COURT:  Moving on to the defense table,

10  there are two of the three attorneys that are representing

11  Mr. Murphy in this trial.  In absentia let me introduce she

12  who is absent, the Honorable Jane Little.  Ms. Little became

13  rather ill yesterday afternoon, went home.  Her physical

14  condition has not successfully improved to the point where

15  she is able to return.  Mr. Murphy's two other attorneys,

16  though, are at the counsel table, the Honorable Jennifer

17  Balido.

18              MS. BALIDO:  How are you?

19              VENIREPERSON:  Fine, thank you.

20              THE COURT:  And seated next to Ms. Balido is

21  another one of the defense attorneys, a board certified

22  criminal law specialist in Texas, the Honorable Michael Byck.

23              MR. BYCK:  Good afternoon, ma'am.

24              THE COURT:  And seated next to Mr. Byck,

25  opposite Ms. Balido is the accused, Jedidiah Isaac Murphy.

1          THE DEFENDANT:  Good afternoon, ma'am.

2          VENIREPERSON:  Hello.

3          THE COURT:  Ms. Hunter, let's jump right into

4     the matters at hand.  Of course you know the reason that

5     you're down here, to determine whether or not you'll be one

6     of the 12 jurors in a capital murder case in which the State

7     is seeking the death penalty.

8          Hypothetically let's make a couple of assumptions up

9     front, and then we'll get into the matter of the penalty

10    stage of a capital trial procedurally as it plays itself out

11    under the laws of the State of Texas.  Let's hypothetically

12    assume jury selection has been completed, as a result of

13    which you are one of the 12 jurors.  Furthermore you and the

14    other 11 jurors have heard all of the evidence in what we

15    call the guilt/innocence stage and you find that the

16    defendant has been guilty of murdering Bertie Cunningham

17    during the course of a robbery or kidnapping or both.

18    Hypothetically let's assume that water is over the dam.

19    Okay?  In that event you and the other 11 jurors would return

20    to court with a verdict of guilty of capital murder.  The

21    same 12 jurors would then be called upon to determine whether

22    or not Mr. Murphy should get a life sentence or a death

23    sentence.

24          Going into the penalty stage of a capital trial the

25    law is so structured to favor a life sentence and not a death

1    sentence.  And because of the finality of death, the

2    attorneys and I involved in these matters think that's the

3    proper structure that the law should give to this serious of

4    an import.  We know not obviously how you may feel about it.

5    If as a result of the jury's answering special issues in such

6    a way that it's a life sentence, by law I am required to

7    sentence Jedidiah Isaac Murphy to life in the penitentiary.

8    And an individual sentenced to life in Texas for capital

9    murder before being eligible for supervised release on parole

10   must serve 40 calendar years before being allowed, if you

11   will, to breathe free air.  That 40 years, there is no

12   gimmicks or funny stuff, no good conduct time and all that,

13   40 years, day-for-day, week-for-week, month-for-month,

14   year-for-year until 40 years have been served.

15          Are you with me so far?

16          VENIREPERSON:  Yes, sir.

17          THE COURT:  Okay.  Before the guaranteed life

18   sentence can turn into a death sentence, the jury is called

19   upon to answer up to three special issues.  Based upon the

20   circumstances of this case, we anticipate that the jury will

21   be called upon only to answer two of the three statutory

22   questions.  Third question as required by the United States

23   Constitution under certain circumstances which the

24   circumstances of this case do not indicate that that question

25   will be -- need to be answered by the jury.

1           We have for your benefit though the special issues

2      blown up and you see them to your left.  Can you see them

3      from where you -- you're seated?

4                VENIREPERSON:  Yes, sir.

5                THE COURT:  Let me ask that you read them to

6      yourself and then I'm going to explain the effect of the

7      answer in regard to the sentence.  Would you read them to

8      yourself, please, and then we'll discuss it a bit and the

9      attorneys a little bit more later?

10                    (Venireperson given time to read issues.)

11                THE COURT:  Have you done it?

12                VENIREPERSON:  Yes.

13                THE COURT:  Okay.  Special Issue Number 1

14     begins at the outset with the answer to that question being

15     no.  The responsibility of changing that from no to yes, if

16     it can be done, based on the evidence presented, lies with

17     the District Attorneys Office representing the State.  We say

18     therefore that the State has the burden of proof, the

19     responsibility of going forth with evidence to prove, if they

20     can, to the jury unanimously that Special Issue Number 1

21     should be answered yes.  If after deliberations the jury --

22     and they've contemplated the evidence that they've heard, not

23     only in the penalty stage of the trial, but take into

24     consideration the evidence in the guilt/innocence stage of

25     the trial, if the answer to Special Issue Number 1 remains

1    no, activate the jury call button, jury will come in, say we

2    answer Special Issue Number 1 no, it's a life sentence, trial

3    is all over.   Only if the jury answers Special Issue Number 1

4    yes are they then required to go on to Special Issue Number

5    2.

6              For a number of these types of trials, a number of

7    years, I've come to call Special Issue Number 2 the mercy

8    question.   The United States Supreme Court on a number of

9    occasions have said to be a constitutionally qualified juror

10   in a death penalty case, be it Texas, California, or

11   wherever, a juror to be constitutionally qualified must be

12   willing to listen and evaluate mitigating evidence, if any is

13   presented from any source, as opposed just to turning your

14   back on it and saying, well, I found the defendant guilty of

15   capital murder so it's automatic.   Can't do that to be a

16   constitutionally qualified juror.   You must be willing to

17   tell yourself, and thereby us, that you would be willing to

18   listen and evaluate in a conscientious manner mitigating

19   evidence.   And if as a result of that mitigation evidence, as

20   a result of which you think in this case Mr. Murphy should

21   live and not die, give effect to that mitigation evidence and

22   answer Special Issue Number 2 accordingly.   Because, Ms.

23   Hunter, if you answer Special Issue Number 1 yes and Special

24   Issue Number 2 no, by law I am required to sentence Mr.

25   Murphy to death.   Unlike a number of states where the jury's

1    special issues are recommendations in quotes to the trial

2    judge, not so in Texas.  Believing as strongly as we do in

3    the collective wisdom of the jury, we give that power to the

4    jury in Texas.  Awesome responsibility.

5                    VENIREPERSON:  Absolutely.

6                    THE COURT:  Can you tell us as you sit in

7    court here today that you would be willing to listen to

8    mitigation evidence, if any is presented, and then determine

9    if as a result of it Mr. Murphy should be given a life

10   sentence and not death?

11                   VENIREPERSON:  Yes, I could.

12                   THE COURT:  Are you willing to do that?

13                   VENIREPERSON:  Yes, sir.

14                   THE COURT:  Let me go one step further with

15   regard to mitigation evidence.  Unlike a number of words in

16   the Court's charge in which there's specific legal

17   definitions, there is no legal definition to guide you with

18   regard to what mitigation evidence is.  Mitigation evidence

19   is whatever you say therefore it is.  And let your mind be

20   expansive in considering it.  An individual say, well, yeah,

21   I would if evidence was presented consider fecal (sic)

22   alcohol syndrome or crack baby or a learning disability -- I

23   mean, you can see just whatever a juror determines to be

24   mitigation evidence, is mitigating.  But then have you to

25   decide does it rise to the level because of which, in this

1    case Mr. Murphy should live and not die.  Follow me?

2              VENIREPERSON:  Yes, sir.

3              THE COURT:  Special Issue Number 1, yes,

4    Special Issue Number 2, no, equals death sentence.  Any other

5    manner of responses by the jury is a life sentence, and

6    that's it.  I am not a thirteenth juror.  I will not overrule

7    what you and the other 11 jurors determine the answer should

8    be.  Nor can any appellate court overrule what you have

9    determined to be the answers for those questions.  Jurors

10   don't get reversed on appeal.  Judges for some legal error

11   get reversed.  Jurors are never reversed.

12         Now, I want to give you an answer to a secret.  The

13   quickest way for you to get off the jury is to tell us, oh, I

14   want to be a juror in this case.  We've had people almost beg

15   literally to be on a death penalty jury.  Whoops, they've got

16   an agenda.  We sometimes know what it is.  But we appreciate

17   the fact that you have -- perhaps a bit reluctantly, but have

18   returned.  The attorneys will be asking you some questions.

19   To their questions there are no right or wrong answers as

20   long as they are truthful.  We don't give prospective jurors

21   grades in citizenship based on their responses so I don't

22   want you to think that we're going to think one way or

23   another about your character or citizenship by virtue of your

24   answers.  Okay?

25             VENIREPERSON:  Okay.

DARLINE W. LABAR, OFFICIAL REPORTER

1          THE COURT:   Well-intentioned honest people

2    have differences of opinion about the death penalty, about

3    abortion, about some other serious social issues that face

4    the country and members of society.  We appreciate that.  And

5    we hope you understand that we appreciate it as well.  So

6    take a breath.  You will be questioned by two of what I

7    consider to be two of the finest attorneys anywhere in the

8    country with regard to death penalty litigation.  You will be

9    questioned by the best.  Not suggesting they're tricky or

10   anything like that.  They are as sincere as we know and hope

11   that you will be as well.

12          Are you ready to go?

13               VENIREPERSON:  Yes, sir.

14               THE COURT:  Begin with Mr. Davis.

15               MR. DAVIS:  Thank you.  May it please the

16   Court.

17                       KATHY HUNTER

18   was called as a venireperson by the Court and, after having

19   been first duly sworn, testified as follows:

20                    Voir Dire Examination

21   By Mr. Davis:

22       Q.   Good afternoon, again, Ms. Hunter.  How are you?

23       A.   Fine, thank you.

24       Q.   As the Judge told you, my name is Greg Davis.  Along

25   with Mary Miller, I represent the State of Texas in this

1   case, and for the next 30 minutes or so I'll have a chance to

2   talk with you about what Judge Entz talked to you about.

3   We'll talk about the death penalty here in Texas.  We'll talk

4   about some general principles that apply in this case.  And

5   finally we'll talk a little bit about your questionnaire.

6   And as he just told you, there aren't any right or wrong

7   answers.  Believe me, most of these questions deal with how

8   do you feel about something, what are your opinions on

9   something.  I've done this enough, and I've talked to enough

10  people to know that everybody feels differently about these

11  things.  And that's okay as long as we know how you honestly

12  feel, that's all we as attorneys expect from you.  All right?

13      A.   Okay.

14      Q.   Ms. Hunter, let me first of all tell you what our

15  position is because it's not going to change in this case.

16  The State of Texas fully expects that we have the type of

17  evidence that will persuade a jury to find the defendant

18  guilty of capital murder.  We also feel that we have the type

19  of evidence that will persuade the jury to answer Questions 1

20  and 2 yes and no which will result in a death penalty in this

21  case.

22          At the punishment phase of this trial I will stand

23  before you and I will ask you to answer those questions in

24  that way, knowing that Judge Entz will then have to impose a

25  sentence of death on Jedidiah Murphy.  That's our position.

1    It's not going to change.  And as the Judge has just told

2    you, if you do answer those questions yes and no, certain

3    things do begin to occur.  He will be required by law to

4    impose a sentence of death on the defendant.

5         Let me just begin -- and let's go back to the

6    Central Jury Room.  You remember when we had, I guess, a

7    small intimate group there, 500 or so of you.  Do you

8    remember what was your first impression when the Judge

9    introduced Mr. Murphy and then told you that the State of

10   Texas was seeking the death penalty against him?

11        A.   I really didn't have any opinion.

12        Q.   Okay.  You've had a little bit of time now to think

13   about the process, I suppose.  You filled out the

14   questionnaire of course and had some time.  You know, I'll be

15   honest with you.  I've had a lot of people in the past who

16   have answered the questionnaire pretty much like you have,

17   said they were in favor of the death penalty, said we need

18   it, it's necessary.  And yet when they come down here and

19   they're sitting in that chair that you are, it becomes a bit

20   personal.  They maybe had a bit of a change of heart.  You

21   know, in the abstract it's one thing to be in favor of the

22   death penalty, but as you can see, Jedidiah Murphy is not

23   abstract.  He's a living, breathing human being.  If the

24   State of Texas prevails in this case, there will come a day

25   in Huntsville where he will lie dead on a gurney.  That's the

```
 1   cold hard facts in this case.  So let me take this

 2   opportunity to ask you, Ms. Hunter, how do you feel about

 3   that?

 4        A.   I don't have a problem with that if you can prove to

 5   me beyond a reasonable doubt that he is guilty.

 6        Q.   Then you can find him guilty, correct?

 7        A.   Right.

 8        Q.   If the evidence persuades you or shows you that the

 9   answers should be yes and no, then you can answer them that

10   way, also; is that correct?

11        A.   Yes, sir.

12        Q.   Fair enough.  Let's talk a little bit about Special

13   Issues 1 and 2, get into that in a little bit greater detail.

14   When you look at Special Issue Number 1, I guess that you can

15   see it's asking you to some degree to look to the future?

16        A.   Correct.

17        Q.   Fair enough.  If you could come up with say a wish

18   list of things that you would like to hear about, that you

19   think might be helpful to you in answering Question Number 1,

20   what types of things would you like to know about?

21        A.   Possibly if there is any criminal -- previous

22   criminal history.

23        Q.   Uh-huh.

24        A.   If so, what type.

25        Q.   Uh-huh.
```

1        A.    If it's a recurring offender.

2        Q.    Okay.  That's fair enough.  A lot of people tell us

3    that.  A lot of people would say the best indicator for the

4    future is past behavior.  Do they have a track record of

5    doing something like this?  And the law would allow you to

6    look to the defendant's background, his character.  And as

7    you said, maybe there's a history, a continuing history of

8    criminal -- criminal acts.  Maybe there's an escalation

9    even.  You would be entitled to know has that person been

10   through the criminal justice system before.  Perhaps have

11   there been any efforts to rehabilitate that offender in the

12   past.  What's been -- what has been his reaction to those

13   attempts.  Has he been cooperative or has he pretty much

14   disregarded those attempts?  You get to look at all of that.

15   And the law even says that another thing you can look at

16   would be the facts of the murder itself, that case where

17   you've just found him guilty.  And a lot of people will tell

18   me, you know, I want to know who the victim was, why was she

19   murdered, under what circumstances was she murdered.  Did

20   they know each other?  Was this a long-standing relationship

21   maybe that had gone sour?  Was it a bad relationship, or was

22   it a stranger on stranger sort of occurrence?  A lot of

23   people have told me in the past I want to know is there some

24   sign that the murder may have been planned in some way,

25   carried out in some planned method, or does it appear to be

1    something that's very spur of the moment.  All those things

2    you're entitled to consider.  And again, you can look at the

3    background, you can look at the offense itself in order to

4    answer Special Issue Number 1.  Does that seem fair to you?

5         A.    Yes, sir.

6         Q.    Okay.  Let's look at some of the words there.  And

7    as the Judge told you, most of these words don't have legal

8    definitions which I guess in a way is a good thing.  But of

9    course you've got to define them.

10            The word "probability" is the first word I would

11   like to look at with you.  And again, all these words were

12   given to us by the legislature.  I guess they could have

13   chosen other words, but when you get down to probability, you

14   see they could have given us the phrase whether there is a

15   certainty.  Is there a certainty this person would re-offend,

16   or is there something on the other side?  Is there a mere

17   chance or a possibility that that person will re-offend?

18   They didn't do that.  What they've done is come down

19   somewhere in the middle and said there is a probability they

20   are going to commit criminal acts of violence in the future.

21   A lot of people -- most people have told me the phrase

22   probability to them means that something is more likely than

23   not going to happen, there is a greater than 51 percent

24   chance that it's going to happen, if you will.  Otherwise, if

25   it's less than 50 percent can you see it's a possibility at

1    that point?

2        A.    (Nods head.)

3        Q.    Is that definition agreeable to you?  Are you going

4    to want to make it more likely than not before it's a

5    probability to you?

6        A.    Yes.

7        Q.    Okay.  The next phrase, let's see, that would be

8    commit criminal acts of violence.  And again, they could have

9    gone down on maybe extreme ends there, also.  They could have

10   forced the State of Texas to prove to you that this defendant

11   would commit future murders or capital murders before you

12   could answer question Number 1 yes.  They could have gone as

13   low as to say if the State shows that they would commit any

14   criminal acts whatsoever, how trivial they are, how minor

15   they are, that's enough.  Jaywalking.  You can think of a

16   number of things that would be trivial, but they didn't do

17   that either.  What they did was make them criminal acts of

18   violence.  And again, in the past a lot of people have told

19   me -- kind of the line that separates that is criminal acts

20   of violence would deal with another person, someone doing

21   something to someone else, either physically harming or

22   physically threatening them with harm in some way.  That's

23   the distinction between the property crime where I go into an

24   abandoned house and steal something with somebody around.

25            How do you look at criminal acts of violence, Ms.

1    Hunter?

2         A.    Definitely involve threatening bodily harm to

3    another individual.

4         Q.    Okay.  Fair enough.  Continuing threat to society,

5    and that last word is the word I would like to talk to you

6    about for a moment.  Society.  When you think of who is in

7    society, who comes to mind?

8         A.    Any human being.

9         Q.    Is there any group you would leave out of there?

10        A.    No, sir.

11        Q.    That's pretty much how the law looks at society,

12   also.  That could include people, you and I that live in the

13   free world.  Also could be people that live in a prison.

14   Sometimes people don't include that, but it could include

15   inmates, people in prison for a criminal offense, nurses

16   guards, secretaries, visitors, anybody that happens to be

17   within a prison setting could also be a part of society.  And

18   what I like to ask jurors is this:  Do you think that people

19   in a prison, maybe even felony offenders, have a right to be

20   free from violent crime, also?

21        A.    Yes.

22        Q.    And what the law says about society is this, again,

23   that you have a right as a juror to consider everyone to be a

24   part of society.  There is no need for you to exclude people

25   in a prison setting.  No reason to exclude people in the free

1   world.  Sometimes I've heard people say, well, you can

2   consider people in the free -- that that person would be in

3   the free world or have access to the free world.  I've heard

4   that argued before.  That's not the way the law looks at it.

5   The law says you have a right to consider wherever that

6   defendant might find himself, you can consider that as part

7   of society.

8           Does that seem fair to you?

9       A.   Yes.

10      Q.   Before we move to Special Issue Number 2, Ms.

11  Hunter, do you have any questions about what you're going to

12  be required to look at with regard to Special Issue Number 1?

13      A.   No, sir.

14      Q.   Let's turn and talk to -- a little bit about Special

15  Issue Number 2 then.  The Judge has, I think, very correctly

16  stated that Special Issue Number 2 is kind of like a safety

17  net, if you will, because have you to remember where you are

18  before you get to Special Issue Number 2.  You've already

19  found this defendant guilty of capital murder.  You've

20  already decided he's a future danger.  You've also answered

21  Special Issue Number 1 yes.  You're really two-thirds of the

22  way to a death sentence at that time.  If you answer no on

23  Special Issue Number 2, it's a death sentence.  Yes is a life

24  sentence.

25          What the law asks you to do is this:  Basically

1   forget what you've done before and agree to take one last

2   long look at all the evidence presented to you in the case,

3   no matter where it came from, and decide is there something

4   in that evidence that is sufficiently mitigating in my mind

5   where I think that death sentence should be changed to a life

6   sentence.  That's really what the law asks you to do, and

7   it's asking you to take that question seriously.  You know,

8   some people will tell me very honestly, I don't care what the

9   law requires of me, when I get to Special Issue Number 2, I'm

10  going to answer it in such a way that I make sure the guy

11  gets a death issue.  I know what the law says.  I'm going to

12  make sure the guy let's a life sentence and I'll answer it so

13  he gets life.  The law doesn't contemplate that.  They

14  contemplate you have an open mind.  By that what I mean if

15  there's a mitigating circumstance that you see, if you think

16  it's sufficiently mitigating that you change it to life, you

17  do that.  If you don't see something mitigating, sufficient

18  to change it to life, you change it to yes.  If you have an

19  open mind when you get to Special Issue Number 2, take a look

20  at all the evidence.  And if a mitigating circumstance is

21  there, fine, you give him life.  If it's not there, you give

22  him death.

23          Do you think you can do that?

24      A.   Yes, sir.

25      Q.   Judge Entz has told you there are no -- there's no

1    lists of things that we consider to be mitigating.  And the

2    reason for that is what's mitigating and what's not

3    mitigating is a very personal issue.  Again, from talking to

4    people in the past I've talked about different issues and

5    some people have said to me, yeah, I would consider that

6    mitigating.  I've had other people tell me just the

7    opposite.  That's not mitigating.  In fact, that might be

8    actually aggravating.

9         Give you an example, person's age.  You can see from

10   looking at Mr. Murphy he's a relatively young man here.  I've

11   had some people say to me, well, if it's a young man, I might

12   consider that to be mitigating because maybe he's got a

13   better chance to rehabilitate than an older offender.  I've

14   had other people tell me when he reaches the age when he

15   knows right from wrong and he can understand the consequences

16   of his actions, that's really all I need to know.  So they've

17   said that's really not an issue that I'm going to consider

18   that much.

19        Do you have any general feelings about age perhaps

20   being a mitigating circumstance?

21   A.   No, sir.

22   Q.   Okay.  Another issue that we've talked about in the

23   past with some jurors would be the use of alcohol or drugs.

24   And I know we ask in the questionnaire about the fact that

25   it's not a defense in the State of Texas that you're

1    intoxicated when you go out and commit a criminal offense.

2    If I got drunk today or if I got high on drugs voluntarily

3    and I went out and murdered somebody, that's not a defense.

4           Now, in punishment you have the option of looking at

5    it as possible mitigation, maybe lessening my punishment if

6    you wanted to.  Again, I've had some people say, well, maybe

7    I'm going to look at that as mitigating particularly if it's

8    a situation where maybe that person hasn't had that much to

9    drink in the past or hasn't used drugs, they don't know how

10   those substances affect them mentally.  I've had other people

11   say that -- other people say that's a voluntary action.  You

12   know, when you take the drugs, you take the alcohol

13   voluntarily.  You have to take the circumstances,

14   particularly if you've used these substances in the past and

15   you know how they're going to affect your mind.

16          Do you have any general feelings about that?

17   A.    No.

18   Q.    It be a situation where you would simply want to

19   listen to all the facts, determine whether you think it's

20   mitigating or not.

21   A.    Yes.

22   Q.    Okay.  Fair enough.  Another -- another issue that

23   sometimes comes up in cases such as this will be a claim that

24   an individual had to be the victim of sexual abuse as a

25   child.  Okay.  And that claim may be presented to you as

1    possible mitigation for this type of offense.  First of all,

2    Ms. Hunter, have you ever known anyone who has been the

3    victim of sexual abuse?

4        A.   No, sir.

5        Q.   Have you known anyone who has ever made a claim of

6    sexual abuse?

7        A.   No, sir.

8        Q.   Okay.  Do you believe, Ms. Hunter, that it may be

9    possible that there are people who would make those claims

10   falsely to gain some benefit for themselves?

11       A.   Possibly.

12       Q.   Do you think there may be some people who have

13   claimed that in the past who have made false claims against

14   other individuals?

15       A.   I'm sure they probably have.

16       Q.   Okay.  All right.  Do you think as a general rule,

17   that a person may make a false claim, particularly if he's

18   facing certain criminal sanctions or stiff sentences such as

19   a life sentence or a death sentence?

20       A.   Possibility, but maybe not anymore than somebody

21   just trying to gain attention.

22       Q.   Okay.  That may be one factor right there, just to

23   gain attention or sympathy for themselves.

24       A.   Right.

25       Q.   Another -- another issue that sometimes comes up

1    will be the mental health of an individual.  Actually Special

2    Issue Number 2 came about because of a defendant, Johnny Paul

3    Penry, who claimed he was mentally retarded and the courts

4    said, well, in order to give juries such as yourself the

5    opportunity to consider those sorts of things, let's have

6    Special Issue Number 2.  But sometimes you'll see that come

7    up.  And again, with claims of mental illness, have you ever

8    known anyone who's been treated for mental illness?

9         A.    No, sir.

10        Q.    Do you think again that it may be possible that

11   individuals might make a claim of mental illness to either,

12   A, get attention or sympathy, or, B, to avoid responsibility

13   for their actions?

14        A.    I would think that to be a possibility, yes.

15        Q.    Okay.  When looking at that type of claim, would you

16   like to know as much about that individual as possible to try

17   to determine whether his claim is valid or not?

18        A.    Yes.

19        Q.    Medical records.  Do you think they would be helpful

20   to you?

21        A.    Possibly, yes.

22        Q.    Okay.  What that individual may have said to the

23   doctors, do you think that might be pertinent to you?

24        A.    Yes.

25        Q.    Do you think it might be helpful to know whether

1    that person has told consistent stories to different people

2    or whether he's changing his story as he goes from person to

3    person?

4        A.    Yes.

5        Q.    A couple of more things on Special Issue Number 2.

6    Some people have told me that remorse may be something that

7    they would want to know about it or consider.  You know, if

8    an individual, for instance -- let's say you had a

9    hypothetical case such as this and I commit a murder.  And I

10   stay at the scene.  I don't try to flee.  I immediately call

11   the police on 911.  I stay there at the scene until the

12   police get there.  I fully cooperate with the police.  I

13   don't try to lie to them or avoid responsibility for my

14   actions.  I'm crying.  I'm tearful.  I'm highly emotional as

15   I talk to the police officer, and that's all immediately

16   after I've committed the offense.  Sometimes people may look

17   upon that as genuine remorse or sympathy for what I've done.

18   And some people have said I might want to consider that.  I

19   guess you can see there may be other situations where the

20   lack of remorse may be something that you would like to

21   consider.  Maybe that person did none of those things.  Maybe

22   they've shown absolutely no remorse whatsoever, until say --

23   let's say until they got caught and then all of a sudden you

24   have -- well, lack of a better term maybe the term is

25   jailhouse conversion, where they're facing a very serious

1   charge and all of a sudden they start expressing a lot of

2   sympathy.

3        Do you see there might be all different types of

4   situations that you could look at?

5   A.   Yes.

6   Q.   Again, when you look at that issue, would you like

7   to look at all the circumstances, when the remorse was

8   expressed and how it was expressed and whether it's valid or

9   not?

10  A.   Yes.

11  Q.   Finally on Special Issue Number 2, one of the things

12  that you might be asked to consider is how the individual

13  awaited in the county jail -- awaiting his trial.   Sometimes

14  that may be presented as evidence maybe that he's turned his

15  life around or he's not going to be a threat in the future

16  because he's basically behaved in the county jail.   Just use

17  your common sense, Ms. Hunter.   How would you expect a

18  defendant to behave in a county jail when he's waiting for a

19  trial when the jury is going to be able to -- how would you

20  expect him to behave?

21  A.   Good behavior.

22  Q.   Again, that's something you can consider with

23  regards to Special Issue Number 1, whether there is going to

24  be a future threat.   And that's also an issue that you can

25  consider on Special Issue Number 2, if you wanted to.

```
 1              Before we leave Special Issue Number 2 then, Ms.

 2    Hunter, do you have any questions about -- again, anything

 3    that Judge Entz said to you or anything I've said to you or

 4    what the law is going to ask you to do with regards to

 5    Special Issue Number 2?

 6        A.    No, sir.

 7        Q.    Let's -- I had a couple of questions on your

 8    questionnaire.

 9        A.    Okay.

10        Q.    Change gears just a little bit.  I know that we

11    asked you about your prior jury service.

12        A.    Yes, sir.

13        Q.    And you had indicated both a civil and a criminal

14    trial.  Was that for yourself or for your spouse or --

15        A.    No, I served as a juror.

16        Q.    As a juror?

17        A.    Uh-huh.

18        Q.    Okay.  In the civil case, do you remember what the

19    substance of that was?

20        A.    It was some farmers suing a cotton gin company.

21        Q.    All right.  It sounds very interesting.  Was that in

22    Dallas County?

23        A.    Yes.

24        Q.    Okay.  We still have farmers.  That's interesting.

25    I know that you reached a verdict.  What was your -- what was
```

1    your decision in that case?

2        A.   In that case -- gosh, this is way back in the 70's.

3    I believe the verdict was in favor of the cotton gin company.

4        Q.   That was being sued?

5        A.   Yes.

6        Q.   In the criminal case can you tell us about that?

7        A.   It was a murder case.  An individual had been shot

8    at a service station in Oak Cliff.  They ended up settling

9    out of court.

10       Q.   Uh-huh.

11       A.   They had --

12       Q.   I'm sorry.  So before you actually got the case to

13   deliberate, they reached some sort of plea bargain?

14       A.   Right.  We went through several days of testimony

15   before.

16       Q.   What -- what was your overall impression having

17   served on that jury, even though you didn't get to

18   deliberate?  What were your feelings about your service

19   there?

20       A.   Basically I just felt like I was doing my job as a

21   citizen of Dallas County.

22       Q.   Yeah.

23       A.   Just listening to all the evidence and to come up

24   with a decision as to whether the individual was guilty or

25   not.

1    Q.   Okay.  All right.  Any impression about how the

2    attorneys presented their evidence, anything like that that

3    stayed with you?

4    A.   No.

5    Q.   Okay.  Well, let's -- let's turn then and talk about

6    some of the same general principles that you were told about

7    in that case because they apply in this one also.  I know

8    that Judge Entz has gone through these with you, too.  But in

9    this type of case I think it's better to be safe than sorry.

10   And one of the things that I'd like to highlight here is I

11   think it's very important.  No matter what the results are in

12   this case, I've been through enough of these cases to know

13   that on the last day when that last verdict is returned, it's

14   very important that all us, including the jurors, be able to

15   walk out of this courtroom knowing that the right thing was

16   done, all the rules were followed, and we don't have to

17   second guess anything that we did in this case.

18        Do you think that would be important?

19   A.   Very important.

20   Q.   Well, let's talk about some of the protections that

21   Mr. Murphy has then for just a moment.  As the Judge told

22   you, he has the right to be presumed innocent at this time.

23   That's an absolute presumption.  Even though we know common

24   sense tells us he's been arrested for the offense of capital

25   murder, he's been charged with that offense, he's been

1    indicted by a Dallas County grand jury, we've begun jury

2    selection, Ms. Hunter, he's still presumed to be innocent of

3    the offense.   That presumption is strong enough that if I

4    stop the proceedings right now and presented no testimony,

5    then you'd be duty bound or the Judge would be duty bound to

6    find him not guilty because that presumption alone is enough

7    to find him not guilty if I don't meet my burden of proof.

8            Can you tell all of us and assure us that you will

9    give Mr. Murphy that presumption of innocence?

10    A.   Yes.

11    Q.   Secondly, as I told you, the burden of proof is on

12    the State of Texas.   I've got to prove his guilty beyond a

13    reasonable doubt.

14            Now, some jurors have told me maybe that's okay in

15    another kind of case where you're not talking about a man's

16    life, but when it comes to capital murder, I want something

17    more.   You're going to have to prove that case beyond a

18    shadow of a doubt or beyond all doubt.   Well, that's fine to

19    feel that way, but the law requires me to prove it beyond a

20    reasonable doubt.   And I guess you can see why.   Because in

21    order to get to that other higher 100 percent standard, you'd

22    probably need to be a witness to the offense yourself.

23            Can you see how that would apply?

24    A.   Yes.

25    Q.   Okay.   Can you assure Mr. Murphy and his attorneys

1    and myself that in this case that you will make me prove my

2    case beyond a reasonable doubt before you find this man

3    guilty?

4         A.   Yes, I will.

5         Q.   You know, these types of cases, can we prove through

6    any -- any types of evidence, Ms. Hunter, could be direct

7    testimony, eyewitnesses.  A lot of these cases don't have

8    eyewitnesses though.  And those cases the State has to rely

9    upon circumstantial evidence.  That can take many different

10   forms.  It can be blood evidence.  It can be DNA evidence.

11   It can be fingerprint evidence.

12             In general, how do you feel about the reliability of

13   DNA evidence and fingerprint evidence?

14        A.   I don't have any problem -- I mean, I feel that they

15   are probably 99 percent accurate.

16        Q.   Okay.  In general do you feel like if the State

17   presents a case that's strong enough, based on circumstantial

18   evidence alone, that you can find the defendant guilty, again

19   if the evidence persuaded you that he was guilty?

20        A.   Yes.

21        Q.   Let me -- let me ask you -- have you ever known an

22   individual who has used illegal drugs?

23        A.   No.

24        Q.   Okay.  Do you have any -- any knowledge or

25   understanding about what effects the drugs -- marijuana,

1    cocaine, or LSD would have on the human mind?

2        A.    Other than just what I've read or heard.

3        Q.    Uh-huh.

4        A.    Nothing other than that.

5        Q.    Okay.   Have you heard about any cases in the press

6    maybe recently where you thought, you know, depending on what

7    I heard in that case, that might be the kind of case where

8    the death penalty might be appropriate?

9        A.    No.

10       Q.    How about this case that recently occurred -- they

11   call it the Texas 7, the inmates who broke out of prison and

12   killed a police officer in Irving.   Have you been following

13   that?

14       A.    Not real close.

15       Q.    Right.   Those were individuals who were serving very

16   long prison sentences -- in fact, some of them were serving

17   life sentences.   They escaped, committed a robbery in

18   Houston, came to Arlington and killed a police officer and

19   escaped to Colorado.   One area very briefly before I -- in my

20   comments with you, it will be one of your duties as a juror

21   to judge the credibility of witnesses.   You may have any kind

22   of numbers of witnesses.   It may be police officers.   I like

23   to tell people my dad was an electrical contractor, and I see

24   your dad is, too.   Some people don't like electricians.   Some

25   people say if it's a plumber, I'll believe them, but

1   electricians, huh-uh.  What I would like to ask you to do is

2   listen -- to hear that person before you decide whether you

3   can believe them or not.

4          Do you believe you can keep an open mind and do

5   that?

6      A.   Yes.

7      Q.   With regards to a defendant testifying, no one can

8   force a defendant to testify against himself.  He has the

9   right to remain silent.  But if he does testify, the law says

10  he has no presumption of being a truth teller.  You're to

11  judge him like you would any other witness.

12         Do you think you can do that, also?

13     A.   Yes.

14     Q.   And with regards to him not testifying, the law says

15  you can't hold that fact against him, can't consider it for

16  any reason, because as you can understand, there may be a

17  number of reasons they don't testify.  Maybe they don't speak

18  English.  Maybe they stutter, speak poorly in public.  It

19  could be as simple as they know they're guilty, they don't

20  want to get caught in a lie.  And another one is the State

21  says if a defendant has prior felony convictions, those can

22  be brought out when he's testifying and the jury can use that

23  to consider his credibility.  There are a number of reasons.

24  What we need to know is can you follow the law as given to

25  you by Judge Entz and can you go back to that jury room if he

DARLINE W. LABAR, OFFICIAL REPORTER

Page 43

1    doesn't testify and basically forget about that and look at

2    all the other evidence in determining whether or not we've

3    proven our case beyond a reasonable doubt?

4        A.   Yes.

5        Q.   Ms. Hunter, I think that we've covered everything

6    that I needed to talk to you about.  Is there anything that

7    I've covered that I maybe have muddied the waters on a little

8    bit or maybe it's raised a question in your mind that we need

9    to talk about?

10       A.   No, sir.

11       Q.   I appreciate your time, and more importantly on

12   behalf of all of us, I appreciate your candor because that's

13   really what we do depend upon to get 12 fair and impartial

14   jurors.

15             THE COURT:  Ms. Hunter, before we begin the

16   defense questioning, would you like to take a little break,

17   stretch your legs, rest room break?

18             VENIREPERSON:  I'm fine.

19             THE COURT:  Do you need a glass of water?

20             VENIREPERSON:  No, I'm fine.

21             THE COURT:  Ready to continue.

22                    <u>Cross-Examination</u>

23   By Mr. Byck:

24       Q.   Ms. Hunter, again, I'm Mike Byck.  Along with my

25   co-counsel Ms. Balido and the absent Ms. Little, we represent

1   Mr. Murphy in this trial for his very life.  I appreciate the

2   seriousness and candor that you answered Mr. Davis's

3   questions.  I imagine you'll do the same for me.  I'm going

4   ask you a couple of the same questions, a couple of very

5   different questions, and some very different attitudes.  And

6   again, there are no right or wrong answers here.  We all know

7   that because it's all your opinion.  This is not a legal

8   exam.  You are not being graded for correctness or accuracy

9   or even neatness or originality for that matter.  But on the

10  other hand, your answers are very, very important to us.  I'm

11  not going to be on this jury.  I promise you that.  You just

12  very well may.  So we want to hear what you have to say about

13  some of these issues.

14          First of all, and I think how we deal this, we'll go

15  backwards, forward -- instead of forward, backwards.  I'll

16  show you what I mean in a second.  Question Number 2, or

17  Special Issue Number 2, is as Judge Entz says the -- the

18  mercy question, the fail safe question, the question where

19  jurors who essentially are called upon by our law, by the

20  United States Supreme Court to give a reasoned moral

21  response.  Informing that reasoned moral response, jurors can

22  use a lot of different kinds of information.  For example,

23  and it's listed in Special Issue Number 2, the circumstances

24  of the offense.  Whether it was planned, whether it was spur

25  of the moment, whether it was inflicted with needless cruelty

1    and torture, or whether it was not done that way.

2              The defendant's character and background.  Character

3    is what other people essentially think about you.  It's a

4    shorthand description of your everyday behavior.  Background,

5    as you can well imagine, his school records, medical records,

6    psychological-psychiatric records, if any, things like that.

7              Then we come to a -- kind of an odd phrase.  Now,

8    remember, none of the words in the second stage of this

9    trial, the punishment stage, are defined for you.  That's

10   very strange because in Texas law Judge Entz will define

11   every term in the guilt or innocence phase.  He will tell you

12   what on or about means.  He will tell you what in the course

13   of committing means.  He will define for you the word

14   intentionally.  He'll tell what you manner and means mean.

15   All those things are done by the Court so there won't be any

16   doubt or dispute amongst the jurors.

17             However, when we get to the punishment stage, Texas

18   law does not do that.  Mr. Davis has already talked to you

19   about probability and special issues in Special Issue Number

20   1.  What I want to talk about is this concept of personal

21   moral culpability.  Some people don't believe in personal

22   moral culpability.  And let me explain to you what that

23   means.  I know it doesn't appear this way, but Ms. Balido and

24   I are really identical twins.  We were born of the same

25   parents.  And as soon as we were born, we were both adopted

1   out.  Ms. Balido got adopted by some wonderful people who

2   live in Highland Park who are very well educated and they

3   nurture her.  They -- you know, they would spend nights with

4   her sitting in their lap, reading books together.  And they

5   would go do family things together.  And, you know, they were

6   just wonderful to her.  They sent her to good schools.  They

7   made sure she got her teeth straightened and got glasses if

8   she needed it.  And she finally went on to college and

9   finally graduated from law school.  I, on the other hand, was

10  not so lucky.  While we are identical twins, I was treated

11  very differently.  I was adopted by a family that was

12  dysfunctional to say the least.  I was abused, perhaps

13  sexually, certainly psychologically and verbally.  Sometimes

14  I didn't get the proper medical care that I needed.  That's

15  why I have to wear glasses and she doesn't.  I didn't get to

16  go to very good schools.  As a matter of fact, even though we

17  are about of the same general I.Q., I had to drop out of high

18  school because my dysfunctional family got themselves in a

19  bunch of trouble with the law and I had to go out on my own.

20  Okay.  From that point X number of years later in our

21  hypothetical question both Ms. Balido and I show up on the

22  opposite corners of a street in downtown Dallas where there

23  are two banks.  They are regular banks.  They're not Federal

24  Reserve banks because even though I wasn't well educated, I'm

25  not stupid enough to think that I can rob a Federal Reserve

```
 1    bank with anything short of a semi truck and front loader.

 2    I'm not smart enough to drive a semi truck or work a front

 3    loader.  We rob a couple of banks.  You don't have any --

 4    you're in the Federal Reserve, right?  Anyway we both go into

 5    the bank armed with the same gun -- two different guns, but

 6    the same caliber, the same type.  We both say the exact same

 7    things to the bank teller, which is give me your money or

 8    I'll kill you.  We both get about the same amount of money,

 9    oddly enough, turn around, walk out the door where we both

10    run into several very different members of the Dallas Police

11    Department who disarm us, put us under arrest, and take us

12    down to the police station.

13            Now, we are both indubitably guilty of bank

14    robbery.  There is no doubt about that.  But can you see

15    where Ms. Balido's sentence and my sentence perhaps ought not

16    be the same?  All other things being equal.  We might ought

17    to get different sentences, due to our backgrounds or due to

18    some things that were beyond our control.  Or do you feel,

19    no, you both did the same crime, you both ought to get the

20    same time.  How do you feel about that?

21        A.    I would have to hear the evidence.

22        Q.    Okay.  And that is fair enough.  That is fair

23    enough.  But can you see in my hypothetical question that

24    perhaps -- just perhaps one of us ought to get a different

25    sentence than the other?
```

1        A.    Depending on what the evidence was.

2        Q.    Right, of course.  Of course.  Okay.  At least you

3   believe in the concept, and that's what I'm talking about, is

4   that you do recognize and understand that concept of personal

5   moral culpability.

6        A.    Yes, I understand.

7        Q.    Okay.  Because that essentially is what Question

8   Number 2 really is all about.  Question Number 2 is saying,

9   yes, I found the individual guilty of capital murder.  Yes, I

10  believe this individual is going to commit criminal acts of

11  violence that's going to constitute a continuing threat to

12  society.  However, if I hear evidence that I feel rises to a

13  level where a life sentence should be imposed for whatever

14  reason, and believe me, there could be all kinds of reasons.

15  I was talking to a juror once who said, well, yeah, if I

16  believe that, you know, the individual was guilty of the

17  capital murder, was going to be a terrible threat to society,

18  but what if this individual was like Michael Angelo or

19  something, that he was an absolute artistic genius, someone

20  through the strength and power of their training could really

21  transform people, then, you know, I might consider answering

22  the Special Issue Number 2 where an individual might get life

23  instead of death.  That's kind of an extreme example of a

24  mitigating factor that we call our testability.  It's about

25  as rare as the occurrences of Michael Angelo in our society,

1    but nevertheless it could happen.

2           All kinds of things can be mitigating.  The things

3    that Mr. Davis talked about.  Remember age, he talked about

4    intoxication, he talked about, you know, abuse as a child, an

5    individual's mental health, remorse, jailhouse behavior.

6    That's part of the laundry list.  You can also talk about

7    mental illness, family love or lack of it, cooperation with

8    the authorities.  I believe he talked about that and jail

9    behavior.  The list can go on.  It's what you consider

10   mitigating.  That's what's important.  And if once you

11   consider it mitigating, is it important enough for you to say

12   I think this person ought to live instead of die.

13          What I'm asking you is if you see that kind of

14   evidence, will you give voice to it in your deliberations and

15   will you share your feelings about that evidence with the

16   other members of the jury panel?

17   A.    Yes, I will.

18   Q.    Okay.  Now, Ms. Hunter, let's go all the way back to

19   the beginning.  You understand what capital murder is.  It's

20   murder plus.  There is murder in the course of committing

21   another offense, rape, robbery, or kidnapping, or murder of a

22   special person, a child, policeman, fireman, something like

23   that.  Okay?

24          Murder, capital murder, and we are talking about is

25   a very peculiar kind of an offense because there are several

1  ways to commit murder.  I could pull out a gun and I can

2  shoot my co-counsel.  That's murder.  It's not capital

3  murder.  I could pull out a gun and shoot my co-counsel six

4  or eight times and jump up and down on her dead body.  That

5  is still just murder, even though it's a little uglier than

6  the first one.  It's still nevertheless murder.

7          One of the things that murder and capital murder

8  have in common, although it is exclusively capital murder, is

9  the requirement that the crime be intentional.  Capital

10  murder -- while all murders are either knowing or

11  intentional, capital murders have to be specifically intended

12  to cause the result.  Let me give you an example.  I -- you

13  know, I still harbor a grudge because my nonidentical twin

14  over here got a better deal than I did in life, so I bring my

15  gun to court.  I went out and bought that gun.  Then I went

16  out and bought some bullets that fit it.  Then I deliberately

17  loaded that gun, tucked it in my pocket, and somehow managed

18  to sneak it by our security guards.  That probably wasn't

19  very difficult.  Be that as it may.  I bring my gun up here,

20  and I have just absolutely had it with her, you know,

21  discussions of her fancy law school education.  So I pull out

22  my gun and she sees it.  I aim it at her and she sees that

23  and I fire the gun.  Ms. Hunter, I don't mean to frighten her

24  by seeing the gun.  I don't mean to threaten her by pointing

25  it at her.  I don't mean to wound her by shooting her.  I

1    want her dead.  And I kill her, and she dies.  That's my

2    intent.  When it is my conscience objective and desire to

3    both engage in the conduct, bang, and cause the result.  Ms.

4    Balido falls over dead.  That's specific intent.  That's the

5    intent.  The mental state, if you will, that is necessary for

6    a capital murder.  Okay?

7         A.   Okay.

8         Q.   Okay.  There are other ways of committing murders.

9    You know, Ms. Balido could be walking down the street with a

10   bunch of her snotty law school educated friends, and I can

11   drive by and shoot at them, bang, bang, bang, and maybe I was

12   aiming for Ms. Balido.  And maybe I hit somebody else.  That

13   could still be murder.  It's not specific intent because I

14   didn't even know the other person, but it was -- I was doing

15   an act clearly dangerous to human life.  There is easily a

16   consequence or result.  But that's a murder, but it would not

17   be a capital murder, unless I killed more than one person.

18        That mental intent is going to be very, very

19   important in this case.  And what I wanted to do is ask you

20   if you in your deliberations, pursuant to the Judge's

21   instructions, because believe me, the Judge will tell you all

22   about this, if you will keep at the forefront of your

23   deliberations this very, very strong requirement for specific

24   intent.

25        Will do you that, if you are so instructed by the

```
 1    Judge?
 2         A.    Yes, sir.
 3         Q.    Okay.  Do you have any questions for me?
 4         A.    No, sir.
 5         Q.    Okay.  Let me go over your questionnaire real quick.
 6    Ms. Hunter, we do not tell you very much about this offense.
 7    If you'll notice, Mr. Davis didn't say, well, it happened at
 8    such a such a person and such a time and place and give you
 9    some companies where you might remember.  I am allowed to ask
10    you one question, and that is if the evidence were to show
11    that the victim in this case was an 80-year-old woman, would
12    you still be able to be a fair and impartial juror?
13         A.    Yes.
14         Q.    Okay.  The reason why we ask that is because, you
15    know, sometimes we have capital murder involving children or
16    police officers or nuns or something like that where an
17    individual will say, listen, you want to try a murder case
18    with a liquor store owner or truck driver or whatever, that's
19    fine with me, but don't talk to me about killing children.  I
20    will suddenly cease to be fair.  You don't feel that way?
21         A.    No.
22         Q.    Okay.  I want to go over just a few more things.
23    I'll warn you right now, Ms. Hunter, you're a real good
24    candidate to being the third juror in the jury pool in this
25    case.  So while you're sitting up there saying, you know,
```

1    gee, it's fun to be well liked, but I don't want to be on

2    this deal.  If anything comes to your mind you need to tell

3    us about -- literally I could sit here all week long and ask

4    you questions, and if I asked you all day long, the question

5    wouldn't come up, but if there is something in your mind of a

6    social, personal, financial, health, whatever it is, that

7    might interfere with your being a fair and impartial juror in

8    this case, please let us know.  I'll give you plenty of

9    opportunities for that.  Okay?

10       A.   (Nods head.)

11       Q.   Now that you're warned, let me tell you a little bit

12   about -- the offense of capital murder states about seven or

13   eight elements.  The elements that we call them, we being

14   lawyer, in capital murder are, on or about a date certain, in

15   Dallas County, a named individual was killed, that is, was a

16   human being, they were born alive.  They were killed by a

17   specific manner and in a certain means -- manner and means

18   stabbing with knife, driving over them with a truck, beating

19   them to death with a baseball bat, something like that.

20   Okay?  And that a named individual did it in the course of

21   committing whatever the offenses are that are alleged.  Each

22   one of those things are known as elements to the offense.

23   Each one of them must be proved.  They must be proved by the

24   State.  They must be proved beyond a reasonable doubt.

25            I take it from your answers that if the State failed

 1   to prove -- if we had an indictment that said so-and-so was

 2   charged with capital murder by stabbing them with a knife and

 3   the State of Texas proved to you beyond a reasonable doubt

 4   that the individual ran over them with a truck and then

 5   backed over them again a couple of times, but there was no

 6   knife involved, there was no stabbing involved, that you

 7   would not be able to find the individual guilty of capital

 8   murder.  You would have to say, you said stabbing with a

 9   knife, you proved running down with a truck.  I cannot find

10   you guilty because you have not proved that element beyond a

11   reasonable doubt.  Right?

12       A.   Right.

13       Q.   Okay.  We run into another problem, and that problem

14   is with confessions.  It's entirely possible that a

15   confession may be sought to be introduced in this case.

16   Confessions -- and I'm talking about a written document --

17   come with some very particular rules involved with them.  The

18   rules are as you have probably heard if you're any kind of

19   fan of L.A. Law or police shows or anything.  Remember when

20   they arrest somebody, they say put your hands behind your

21   back and they give them their Miranda warnings.  They're

22   Miranda warning is, quote, you have the right to remain

23   silent.  Anything you say can be used against you.  You have

24   the right to have an attorney be with you during your

25   questioning.  And if you're too poor to a hire an attorney,

1    we'll appoint one for you.  And you have the right to

2    terminate this interview at any time.  Generally that's the

3    four warnings that the individual is warned before a written

4    statement can be taken.  Okay?

5        A.    Okay.

6        Q.    Very technical rules.  If we were to have a

7    situation where a confession was sought to be introduced and

8    you and your fellow jurors made some findings about this

9    confession, you found, number one, that it was not a coerced

10   confession, that is nobody took the defendant in and beat him

11   with a baseball bat until he signed the document, no physical

12   violence, nobody sat on his chest and hit him until he

13   confessed because that's coerced confessions.  And uncoerced

14   confessions are very different.  I don't know how many

15   warnings you give in a coerced confession.  If you use

16   physical violence on somebody, we're not talking about that.

17   We're talking about where an individual is questioned by the

18   police and the police say, okay, I think I remember those

19   warnings and they go you have the right to remain silent, got

20   the right to have an attorney, and if you're too poor, we'll

21   give you an attorney.  And they don't remember the fourth

22   one.  And the fourth one, you have the right to terminate the

23   interview at any time, and the officer when he testifies in

24   front of the jury says, yeah, I gave him three out of the

25   four, but I don't remember giving him the fourth.  And if I

1    don't remember, I probably didn't, but I really don't know.

2    But he never asked to stop the interview anyway.  And this

3    confession -- I mean, it's literally the only evidence of the

4    individual's guilt.  Otherwise, there is nothing to connect

5    that individual with the offense.  If you were presented with

6    a situation like that, where the Judge were to instruct you

7    you've got to find all four warnings that are given, you

8    found three of the four were given, you find the fourth was

9    not proved to you beyond a reasonable doubt, but on the other

10   hand, didn't appear to be important anyway, since the person

11   never asked to stop the interview, would you be able to say,

12   well, according to the Court's instructions I'm just going to

13   have to not consider this confession.  And if I can't

14   consider the confession, then there isn't any evidence

15   against this person.  And if there isn't any evidence against

16   this person, except the confession that, you know, I believe

17   it's true, I know it wasn't forced, but on the other hand, I

18   know just as well it doesn't comport to the law that the

19   Judge gave me.  That said, all four warnings have to be

20   given.  I'm just not going to consider that confession and

21   I'm going to turn the person loose.  Obviously, that's not

22   going to be an easy thing to do.  But if that's the way the

23   cards -- the chips fall -- if that's the way the chips fell,

24   would you be able to do that?

25        A.   If that was the instructions of the yes, Judge.

1    Q.   Okay.  All right.  Ms. Hunter, last chance, anything

2    you can think of, anything at all?  I can give you the list,

3    personal, financial, social, maybe have something to do with

4    somebody that was never mentioned in this questionnaire.

5    Have you a -- you know, a sick brother someplace or

6    something, whatever it was, anything that is going to

7    distract you from the last day of May and through the five to

8    eight days -- trial days of this case?  Anything that is

9    going to distract you take your mind away from what you're

10   doing?

11   A.   No, sir.

12   Q.   Okay.  Any reason at all you want to give for

13   getting out of this, because literally the boat is leaving

14   the dock, ma'am?

15   A.   No.

16   Q.   Okay.  Thank you, Ms. Hunter.  I appreciate it.

17   Thank you.

18               MR. BYCK:  Your Honor, that concludes my voir

19   dire.

20               THE COURT:  Ms. Madore, will you excuse Ms.

21   Hunter momentarily.

22          Ms. Hunter, the attorneys will confer with their

23   respective co-counsels.  Then we'll determine if you remain

24   under consideration.  You may be excused for a moment.

25               (Venireperson excused from courtroom.)

1                    (State no challenge for cause - Ms. Hunter)

2                    MR. DAVIS:  Your Honor, the State has no

3     challenges for cause.

4                    (Defense no challenge for cause - Ms. Hunter)

5                    MS. BALIDO:  The defense has no challenges for

6     cause.

7                    (Recess taken.)

8                    (Kathy Hunter Prospective Juror No. 3)

9                    THE COURT:  Ms. Hunter, the attorneys have

10    authorized me to inform you that you do remain under

11    consideration as one of the jurors in this case.

12                   VENIREPERSON:  Okay.

13                   THE COURT:  With your permission, I'm going to

14    ask that you allow the bailiff to take a Polaroid picture of

15    you, and let me tell you why.  We talk to an awful lot of

16    people, at the conclusion of which it gets a little bit

17    blurry about, well, was this person, I remember the

18    questionnaire, but it sure would help if I had a picture of

19    this individual to place with the information.  With your

20    permission, I'm going to ask that you allow the bailiff, Mr.

21    Rees, to take a Polaroid picture of you for the limited

22    purpose of when we've gotten down to this 48-person pool,

23    they will look at the picture and then again match it up with

24    the information and the questionnaires, plus the notes that

25    they've taken today after which I promise you, they will be

1    destroyed.

2              VENIREPERSON:  Okay.

3              THE COURT:  May we have your permission to

4    take your picture for that limited --

5              VENIREPERSON:  Yes, sir.

6              THE COURT:  Ms. Hunter, we have a home number,

7    work number, and given the circumstances of your employment

8    and whatnot, we don't anticipate a likelihood of you leaving

9    or changing, but if you should change telephone numbers,

10   would you notify the court so we can keep you abreast of this

11   jury selection process?

12             VENIREPERSON:  Yes, sir, I will.

13             THE COURT:  Any questions for me?

14             VENIREPERSON:  No, sir.

15             THE COURT:  You see the indictment right

16   before you.  Please do not get in touch with the Dallas

17   Morning News archives and go back and get a copy of the paper

18   about that date.  Any decision you make as a juror must be

19   based only on evidence that you hear in the courtroom.  If

20   you're one of the jurors and you recall, oh, I remember

21   hearing about this, this, and this, that's fine, as long as

22   you will disregard that which you have read or seen or heard

23   in print or electronic media and decide the case based upon

24   the evidence presented in the courtroom alone.

25             Is that fair?

1          VENIREPERSON:  Yes, sir.

2          THE COURT:  Feel free to tell obviously your

3    spouse and other folks at the Federal Reserve that you remain

4    under consideration, but if you're a juror only what you hear

5    in the evidence in the courtroom as opposed to any extraneous

6    outside influence may be taken into consideration by you in

7    determining a verdict in the case.

8          VENIREPERSON:  All right.

9          THE COURT:  Is that fair?

10         VENIREPERSON:  Yes, sir.

11         THE COURT:  All right.  Free to go home, back

12   to work as the case may be.

13         Any word about what the chairman may do with regard

14   to the interest rates, or you can't talk?

15         VENIREPERSON:  No, I don't know.  I don't keep

16   up with it I'll be quite honest.  Just do whatever he says.

17         THE COURT:  As we all do.

18         (Juror recessed.)

19         THE COURT:  Tomorrow, 1 o'clock?

20         MR. BYCK:  Tomorrow, 1 o'clock.

21         (Recess of proceedings.)

22

23

24

25

1                    Reporter's Certificate

2   STATE OF TEXAS:

3   COUNTY OF DALLAS:

4        I, Darline W. LaBar, Official Court Reporter of the

5   194th Judicial District Court, in and for Dallas County,

6   Texas do hereby certify that the foregoing volume constitutes

7   a true, complete and correct transcript of all portions of

8   evidence and other proceedings requested in writing by

9   counsel for the parties to be included in the statement of

10  facts, in the above styled and numbered cause, all of which

11  occurred in open court or in chambers and were reported by

12  me.

13       I further certify that this transcription of the

14  record of the proceedings truly and correctly reflects the

15  exhibits, if any, offered by the respective parties.

16       Witness my hand this the November 13th, 2001 A.D.,

17  2001.

18

19

20

21       DARLINE W. LABAR
         Official Court Reporter
22       194th Judicial District Court
         Dallas County, Texas
         (214) 653-5803

23

24

25  Certification No. 1064 Expires December 31, 2002


DARLINE W. LABAR, OFFICIAL REPORTER

Page 1

REPORTER'S RECORD

**74145**

VOLUME 8 of 65 VOLUMES

TRIAL COURT CAUSE NO. F00-02424-NM

| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

*********************

INDIVIDUAL VOIR DIRE

*********************

FILED IN
COURT OF CRIMINAL APPEALS

DEC  5 2001

Troy C. Bennett, Jr., Clerk

A P P E A R A N C E S :

HONORABLE BILL HILL, Criminal District Attorney
          Crowley Criminal Courts Building
          Dallas, Dallas County, Texas  75207
          Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
            FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
          Phone:  214-653-9400
            FOR THE DEFENDANT.


*********

         On the 15th day of March, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

         Proceedings reported by machine shorthand, computer

assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER   ORIGINAL

1                         INDEX VOLUME 8

2    March 15th, 2001                          PAGE    VOL.

3    INDIVIDUAL VOIR DIRE:

4    Proceedings....................................... 2       8

5    Ms. Broome Excused From Consideration........... 15        8

6    Reporter's Certificate........................... 16       8

7

8              CHRONOLOGICAL VENIREPERSON INDEX

9                    STATE        DEFENSE            VOL.

10   BEVERLY BROOME        12                            8

11

12             ALPHABETICAL VENIREPERSON INDEX

13                   STATE        DEFENSE            VOL.

14   BEVERLY BROOME        12                            8

15

16              *NO EXHIBITS THIS VOLUME*

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Sheriff, may we have the jurors,
 3    please.   Ladies, may I ask each of you to raise your right
 4    hand before you have a seat.
 5              (Venirepersons sworn.)
 6              THE COURT:   Thank you.   Please lower your
 7    hands, ladies, and be seated.
 8              Ladies, good afternoon.   Before we begin with the
 9    individual questioning, it's been my practice over a number
10    of years to set the stage, if I may, hopefully to put you a
11    bit at ease, if I may, realizing from past experience that
12    individuals come down here having previously been notified
13    that they remain under consideration as a prospective juror
14    in a capital case in which the State is seeking death that
15    there is a little bit of normal trepidation, I guess, that
16    accompanies that status in any normal human being.  I want to
17    try to put you at ease as much as I can and let you know that
18    before you leave us this afternoon, you will be told whether
19    or not the attorneys and I will continue to keep you under
20    consideration as a prospective juror in this case.  Because
21    what we are doing is working our way towards a pool of
22    qualified jurors, that number 48, after which the attorneys
23    will be allotted their statutory right to 15 peremptory
24    challenges per side, plus an additional one or two as I deem
25    necessary under the circumstances.  At the conclusion of that
```

1    process the 12 ultimate individuals jurors that will be in

2    this case will be identified.  So we will let you know before

3    you leave us today whether you are in that pool ultimately of

4    the 48.

5           We'll probably be involved in this process for the

6    next several weeks.  Been my practice also over a number of

7    years to give the attorneys on both sides, after the jury has

8    been selected, in the interest of the jurors' time, a week or

9    so to get their final trial preparation in order where so

10   that there's not a delay in presentation of witnesses and

11   evidence that would delay the jury once those 12 individuals

12   have been selected.  Therefore, we anticipate beginning the

13   testimonial stage of this trial Tuesday, the 29th of May.

14   It's the day after Memorial Day is celebrated.

15           Do any of you have any insurmountable scheduling

16   problems that you know of right now that would prevent your

17   returning back the last week in May for anywhere from four to

18   seven days?  Not anticipating, knock on wood, that you'll be

19   sequestered.  I don't see an abundance of media attention

20   yet, but of course by law I must always keep that possibility

21   open.  But at this stage, with the cooperation of the print

22   and electronic media, I'm hoping that the jury will not be

23   sequestered.  So you'll be able to put your head on your own

24   pillow at night and sleep in your own bed.

25           Do any of you have a problem at the outset?    None?

1          Let's jump right into the matters at hand.  Let's

2     assume a few hypothetical matters, if we may.  Let's assume

3     jury selection has been completed.  You are 3 of the 12

4     jurors in this case.  The guilt/innocence stage of the trial

5     has been completed at the conclusion of which you find beyond

6     a reasonable doubt the guaranteed presumption of innocence

7     has been overcome.  Each of the allegations in the indictment

8     have been satisfied to your satisfaction beyond a reasonable

9     doubt, as a result of which it may be one of you, the

10    presiding juror affixes her name on the verdict form.  We,

11    the jury, find the defendant, Jedidiah Isaac Murphy, guilty

12    of capital murder as charged in the indictment.  Return to

13    court.  That decision will be memorialized by me to be the

14    verdict.  I will poll the jury individually and each member

15    of the jury affirms that that is their individual verdict as

16    evidenced by the presiding juror on the verdict form.

17         That same jury will then convene in the penalty

18    stage of the trial.  Under current Texas law an individual

19    found guilty by a jury of capital murder in the penalty stage

20    there are but two options.  Unlike other offenses which --

21    excuse me, there's a vast penalty range, and many offenses,

22    not so in a capital murder case.  It's either/or.  Either

23    life in the penitentiary, or death by lethal injection.

24         In my opinion, quite properly, the legislature has

25    fashioned the procedure in a penalty case with regard to a

1   capital case wherein going into the penalty stage of a

2   capital case, the law prefers or is biased toward, if you

3   will, a life and not a death sentence.  And I would hope that

4   each of the three of you, given the ultimate of the

5   punishment of death, would agree that the legislature has

6   fashioned it properly such that death is not an easy burden

7   or a prosecution to prove or for a jury ultimately to render.

8          Before a death sentence can be pronounced by the

9   trial judge, under Texas law, the jury is called upon to

10  answer certain special issues.  Statutorily there are three

11  special issues.  However, one can be under the circumstances

12  presented deleted, and that factor will not be a concern in

13  this particular case.  So the jury will be called upon to

14  answer one or two questions, depending on their answer to the

15  first questions.

16         Ladies, to your right you see the two special

17  issues.  Under the hypothetical, and we're going to assume

18  that you're jurors, you're in the penalty stage of the trial,

19  you are looking at either life or death.  Let me ask each of

20  you to read to yourself the special issues, after which I'll

21  give you a brief overview of their significance.

22                   (Venirepersons given time to read.)

23                   THE COURT:  Have you-all completed that?

24                   (Venirepersons nod head.)

25                   THE COURT:  Going into the penalty stage of

the

1   the trial, Special Issue Number 1 at the outset is answered

2   in the negative.  It's the burden of proof, the

3   responsibility of going forth in an effort, if they can, to

4   convince the jury that question -- Special Issue Number 1

5   should be answered in the affirmative lies with the

6   prosecution.  If the prosecution is able to convince all 12

7   jurors that Special Issue Number 1 should be answered yes,

8   only then does the jury next have to consider Special Issue

9   Number 2.

10          Special Issue Number 2, by varying sources, has been

11  called the safety net, the mercy question, or words and

12  phases to that effect.  Neither side has the burden nor the

13  responsibility of coming forth with evidence with regard to

14  Special Issue Number 2.  Mitigating evidence can be presented

15  by either side from any source.  Mitigation evidence will not

16  be in the charge defined by me to you and your fellow jurors.

17  Mitigation evidence is whatever you consider it to be.

18          Now, the United States Supreme Court on a number of

19  occasions has made it very plain and clear to attorneys and

20  judges that before an individual, be it Texas or any State in

21  the Union that has a capital sentencing procedure, before an

22  individual may be constitutionally qualified to serve as a

23  juror in a death penalty case, that juror must understand and

24  appreciate that they must be willing to listen to and

25  seriously consider and evaluate mitigating evidence.  And

1    then decide if as a result of the mitigation evidence a

2    defendant should live and not die.

3         Because, ladies, if the jury answers Special Issue

4    Number 1 yes, the defendant will be a continuing threat, if

5    you will, and Special Issue Number 2 no, there are no

6    mitigating circumstances as a result of which a death

7    sentence should not be imposed.  By law, as the trial judge

8    over this particular case, I am required to sentence Jedidiah

9    Isaac Murphy to death.  Unlike a number of other states, the

10   most commonly referred to is Florida, the jury makes a

11   recommendation, if you will, to the trial judge, not so

12   Texas.  Believing as a body politic, having so much faith in

13   our fellow citizens, we, the legislature, have given to the

14   12 jurors the ultimate responsibility of making a life and

15   death decision.  It's awesome.  It's awesome.

16        Special Issue Number 1 yes, Special Issue Number 2

17   no, death.  Any other configuration of responses is a life

18   sentence.  And if you recall with me, as I told you back on

19   March 2nd, a life sentence for capital murder in Texas means

20   the individual so sentenced must serve 40 calendar years in

21   the penitentiary before being eligible for release under

22   supervision called parole.  Doesn't mean 40 years automatic

23   out -- you know, the doors open and out you go.  Eligibility

24   begins though after 40 calendar years, and that's

25   day-for-day, week-for-week, month-for-month, forty 365-day

DARLINE W. LABAR, OFFICIAL REPORTER

1    years, other than leap years.

2         Are you with me so far?

3         Let me reintroduce those individuals whom you see

4    seated at the counsel table.  I have previously introduced

5    them back on March 2nd, however, depending where you may have

6    been seated in that rather large Central Jury Room, you may

7    or may not have gotten a good look at them.  Beginning with

8    the table closer to you, prosecutor's table, if you will,

9    lead prosecutor for the State in this case is the Honorable

10   Greg Davis.

11             MR. DAVIS:  Good afternoon.

12             THE COURT:  Seated next to him is the Chief

13   Prosecutor presently assigned by Dallas District Attorney

14   Bill Hill to this the 194th District Court, the Honorable

15   Mary Miller.

16             MS. MILLER:  Good afternoon.

17             THE COURT:  Moving on to the next table there

18   are three attorneys that collectively represent the

19   defendant, Mr. Murphy.  Lead counsel for the defense, former

20   chief prosecutor in the Dallas District Attorneys Office,

21   board certified criminal law specialist, the Honorable Jane

22   Little.

23             MS. LITTLE:  Good afternoon.

24             THE COURT:  Seated next to her in the grey

25   sport coat is one of the co-counsels, again board certified

1   criminal law specialist, the Honorable Michael Byck.

2              MR. BYCK:  Good afternoon.

3              THE COURT:  Seated behind those two attorneys

4   in the black attire is their third co-counsel, the Honorable

5   Jennifer Balido.

6              MS. BALIDO:  How are y'all?

7              THE COURT:  And next to Mr. Byck in the blue

8   shirt and red tie, dark jacket, the accused, Jedidiah Isaac

9   Murphy.

10             THE DEFENDANT:  Good afternoon.

11             VENIREPERSON:  Good afternoon.

12             THE COURT:  Ladies, on an individual basis

13  we'll begin with the State, followed by the defense.  They

14  and I want to assure each of you at the outset that to their

15  questions there are no right or wrong answers as long as they

16  are truthful.  We've been at this, I have and the attorneys

17  as well, for a good number of years.  I assure you we don't

18  grade fellow citizenships on whether or not they are on a

19  death penalty jury or not.  Not that at all.

20             Let me give you a secret up front.  Quickest way to

21  get off this jury, for your consideration, is for you to tell

22  us, yeah, I want to be on this jury.  Oh, we've had people in

23  the past, whoops, they have an agenda.  They have an agenda.

24  Sometimes we're able to tell what that agenda is.  Sometimes

25  not.  But we would hope that those individuals ultimately

1    that sit on this jury say, well, you know, I'm not going to

2    break the door down to do this, but if it's a part of my

3    civic duty and responsibility, I conscientiously will listen

4    to the evidence, determine whether or not Mr. Murphy is

5    guilty or not guilty.  If based upon the law and the evidence

6    I find him guilty, I will look to the special issues very

7    seriously, discuss in good faith with my fellow jurors the

8    evidence presented, the ramifications of the responses, and

9    let the chips fall where they may.  If ultimately it be a

10   life sentence, so be it.  If based upon the law and the

11   evidence statutorily the scheme is such that I find the

12   responses to the special issues result in death, won't be

13   happy about it, but I will feel that I have done my duty as a

14   citizen.  That's all we can ask for.

15          With regard to this mitigation business, are you

16   individually willing to listen to, carefully evaluate

17   mitigation evidence, if such is presented, and then determine

18   whether or not it rises to the level as a result of which Mr.

19   Murphy should be given a life sentence as opposed to a death

20   sentence?  Is there anybody that is unwilling to take that

21   responsibility upon their shoulders?  None of you are adverse

22   to that type of an evaluation?  Nobody at all?   Nope.

23          Ladies and gentlemen, the bailiff will be excusing

24   two of you.  We will begin by virtue of the number being the

25   lowest.  Who is Ms. Gabel?  Ms. Gabel, we'll begin first with

1    you.

2            Ms. Broome, Ms. Emeing, if you'd excuse yourself

3    with the bailiff, Ms. Madore.  As soon as you are completed

4    with Ms. Gabel, each of you will be brought in individually.

5            Ms. Gabel, if you'd have a seat right here on the

6    witness stand.  Might be a little more comfortable.  We'll

7    move the special issue over to the left.

8                    MS. BALIDO:  Judge, can we have a second

9    outside the presence of the juror, please?

10                    THE COURT:  Yes.

11                    THE BAILIFF:  Go ahead and step back here.

12   Okay.

13                    (Recess taken.)

14                    MR. DAVIS:  We've agreed to excuse Ms. Gabel,

15   Juror 262.  We've agreed to excuse Juror 346.

16                    THE COURT:  Ms. Emeing?

17                    MS. MILLER:  Yes.

18                    MR. DAVIS:  Yes, Your Honor.  We've also

19   agreed to excuse two jurors for Monday.  That would be Juror

20   277, Karen Gray, as well as Juror 275.

21                    THE COURT:  Norma Rivera.

22                    MR. DAVIS:  Yes, Your Honor.

23                    MS. MILLER:  Yes.

24                    THE COURT:  Sheriff, you may excuse Ms. Gabel,

25   Ms. Emeing, and if you'd invite Mrs. Broome in.

```
 1              (Venireperson brought into courtroom.)

 2              THE COURT:  Ms. Broome, we'll begin with the

 3    State, again the Honorable Greg Davis.

 4         Mr. Davis.

 5              MR. DAVIS:  Thank you.

 6              THE COURT:  Mr. Davis, Ms. Broome.

 7              MR. DAVIS:  May it please the Court.

 8                   BEVERLY BROOME

 9    was called as a venireperson by the Court and, after having

10    been first duly sworn, testified as follows:

11                   Voir Dire Examination

12    By Mr. Davis:

13         Q.   Again, Ms. Broome, how are you?  As the Judge told

14    you, I'm Greg Davis.  Along with Mary Miller, I represent the

15    State of Texas.  And for the next 30 minutes or so I'll have

16    a chance to speak with you about some of the issues in this

17    case.  We'll talk about your questionnaire a little bit.

18    We'll talk about the death penalty in a little greater

19    detail.  And we'll probably talk about some of the general

20    principles that apply in this case.  And as the Judge said,

21    there are no right or wrong answers honestly.  Most of my

22    questions will be how you feel about something, what your

23    opinion is about something.  I've been at this long enough

24    and talked to enough people to know that everybody has

25    differing opinions.  And as long as you tell us how you
```

1    honestly feel about it, that's all we as attorneys can expect

2    from you.  Okay?

3         Ms. Broome, let me go back to the day you were in

4    the Central Jury Room, and at the time that Judge Entz

5    introduced Jedidiah Murphy to you, and at the time that he

6    announced to the large group that the State was seeking the

7    death penalty against Mr. Murphy, do you recall what your

8    first reaction to that was?

9         A.    I was a little bit stunned.

10        Q.    Okay.  Had you ever served on a jury before?

11        A.    Yes.

12        Q.    Okay.  But certainly not in a death penalty case?

13        A.    No.

14        Q.    Okay.  You've had some time now to think about the

15   proceedings, think about what the Judge has told you that

16   day.  And I know again from experience that a number of

17   people may have a change of heart over the two or three-week

18   period here, and I know a lot of people may have feelings

19   about the death penalty in the abstract.  They may be against

20   it.  They may be for it.  But I'd like to remind people that

21   now it's become a bit personal because as you can see,

22   Jedidiah Murphy over here, there is nothing abstract about

23   him.  He's a living, breathing human being.  And if the State

24   of Texas prevails in this case, if a death sentence is handed

25   out, I expect that it will be carried out, and there will

1    come a day in Huntsville when he's going to lie dead on a

2    gurney as a result of the verdict rendered in this court.

3             Now, having said all of that, I need to ask you, Ms.

4    Broome, how you honestly feel about participating in this

5    type of case whereas the Judge said you may be required to

6    actually take pen in hand, sign a verdict form which will

7    ultimately result in the death of this man seated to my far

8    left, Jedidiah Murphy.

9         A.   I'm very uncomfortable about it.

10        Q.   Can you share a little bit more about what is

11   actually making you uncomfortable about the prospect?

12        A.   Well, first of all, not knowing this person, not

13   knowing anything about this person until you actually hear --

14   life is -- death is part of life.

15        Q.   Uh-huh.

16        A.   And we're all terminal.

17        Q.   Uh-huh.

18        A.   And I -- you know, you just don't -- I just don't

19   feel like it's for me to decide that someone else should die.

20        Q.   And I appreciate that.  I like to tell jurors

21   because I have heard that expressed before, that I appreciate

22   you being honest with us.  We would not want to put anyone in

23   the position where they would be compelled to violate their

24   conscience, their moral beliefs, religious beliefs, or

25   anything of that order.

1            Let me just ask you kind of a base line question

2   here.  Do you feel like your feelings are strong enough and

3   they are such that they would genuinely compromise your

4   ability to serve on this type of a jury?

5        A.   Yes, they are very strong.

6        Q.   Okay.  And I take it that they are feelings -- Ms.

7   Broome, I think again and all of the attorneys down here are

8   sensitive to that.  None of us would want to put you in this

9   kind of situation.  Mr. Byck has indicated to me that we're

10   going to agree to excuse you.  We're not going to force you

11   to serve on this jury.  I do want to thank you for coming

12   down.  I want to thank you for your honesty.  We thank you

13   very much.

14            THE COURT:  Thank you, Ms. Broome, you are

15   excused.

16

17            (Recess for the day.)

18

19

20

21

22

23

24

25

1                         Reporter's Certificate

2     STATE OF TEXAS:

3     COUNTY OF DALLAS:

4          I, Darline W. LaBar, Official Court Reporter of the

5     194th Judicial District Court, in and for Dallas County,

6     Texas do hereby certify that the foregoing volume constitutes

7     a true, complete and correct transcript of all portions of

8     evidence and other proceedings requested in writing by

9     counsel for the parties to be included in the statement of

10    facts, in the above styled and numbered cause, all of which

11    occurred in open court or in chambers and were reported by

12    me.

13         I further certify that this transcription of the

14    record of the proceedings truly and correctly reflects the

15    exhibits, if any, offered by the respective parties.

16         Witness my hand this the 15th day of November, A.D.,

17    2001.

18

19

20                    DARLINE W. LABAR
21                    Official Court Reporter
                      194th Judicial District Court
22                    Dallas County, Texas
                      (214) 653-5803
23

24

25    Certification No. 1064 Expires December 31, 2002

REPORTER'S RECORD

**74145**

VOLUME 9 of 65 VOLUMES

TRIAL COURT CAUSE NO. F00-02424-NM

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

**FILED IN
COURT OF CRIMINAL APPEALS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEC 5 2001

A P P E A R A N C E S:

Troy C. Bennett, Jr., Clerk

HONORABLE BILL HILL, Criminal District Attorney
          Crowley Criminal Courts Building
          Dallas, Dallas County, Texas  75207
          Phone:  214-653-3600
BY:    MR. GREG DAVIS, A.D.A., SBOT # 05493550
          MS. MARY MILLER, A.D.A., SBOT # 21453200
               FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
          Phone:  214-653-9400
               FOR THE DEFENDANT.


               \*\*\*\*\*\*\*\*\*

     On the 19th day of March, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

     Proceedings reported by machine shorthand, computer

assisted transcription.

ORIGINAL

```
 1                    INDEX VOLUME 9

 2   March 19th, 2001                       PAGE    VOL.

 3   INDIVIDUAL VOIR DIRE:

 4   Proceedings.................................... 2      9

 5   Ms. Stevens Excused From Consideration........... 15    9

 6   Reporter's Certificate........................... 16    9

 7


 8            CHRONOLOGICAL VENIREPERSON INDEX

 9                    STATE        DEFENSE          VOL.

10   RHONDA STEVENS       10                          9

11


12            ALPHABETICAL VENIREPERSON INDEX

13                    STATE        DEFENSE          VOL.

14   RHONDA STEVENS       10                          9

15


16            *NO EXHIBITS THIS VOLUME*

17

18

19

20

21

22

23

24

25
```

                    P R O C E E D I N G S

              THE COURT:  Ms. Stevens, Mr. Sullivan, may I
ask that you remain seated, raise your right hand and be
sworn in, please.

              (Venirepersons sworn.)

              VENIREPERSONS:  I do.

              THE COURT:  Thank you.  You may lower your
hands.  Welcome back.

         Ms. Stevens, Mr. Sullivan, let me kind of jump start
the proceedings, if I may.  Let us for purposes of our
discussion this morning consider a hypothetical scenario.
Let's assume that jury selection in this trial has been
completed, at the conclusion of which becomes your fate that
you are 2 of the 12 jurors.

              Furthermore, for sake of discussion this morning,
let's assume the guilt/innocence stage of the trial has been
completed, after hearing the evidence the instructions given
to the jury by me, summations, arguments, if you will, by the
attorneys, and the deliberations that you've conducted with
your other fellow jurors, you've reached the conclusion that
the presumption of innocence has been overcome, each of the
allegations made a part of the indictment in this case has
been proven to your satisfaction, and collectively the
satisfaction of the jury, beyond a reasonable doubt, as a
result of which you would be obligated to return to court,

1   indeed one of you may be the presiding juror, affix your name

2   to the verdict form wherein you indicate on behalf of your

3   fellow jurors and yourself that Jedidiah Isaac Murphy is

4   guilty of capital murder.  Under Texas procedure that same

5   12-person jury of which under my hypothetical you are 2 of

6   the 12 would be then called upon to determine whether or not

7   Mr. Murphy receives a life sentence or a death sentence.  The

8   statute is so structured going into the penalty stage of the

9   trial to favor a life sentence and not a death sentence

10  because of the obvious irrevocability of a death sentence.

11  Depending upon the answers that the jurors make to two

12  special issues, which have been given to us by the

13  legislature, will determine whether or not by law I am

14  required to sentence in this case Mr. Murphy to life or

15  death.  Unlike a number of states where the jury's

16  recommendation is just that, a recommendation to the Judge

17  and it's not binding upon the Judge, not so in Texas.

18  Believing in the value of the individual citizens as strongly

19  as we do, given our populist tradition, jurors make the

20  determination and not a Judge.  Though the United States

21  Supreme Court has on a number of occasions indicated that you

22  do not have a constitutional right to have a jury set the

23  punishment, they never said that jurors cannot

24  constitutionally exercise that right.  And that's the side of

25  the coin that Texas has come down to favor.

1          For your benefit we have put the two special issues

2     up to your right.  Let me ask that you read them to

3     yourselves, at conclusion of which I'll explain to you the

4     effect the answers will have.

5               (Venirepersons given time to read questions.)

6               THE COURT:  Have you completed it?  Okay.  Ms.

7     Stevens, Mr. Sullivan, unlike virtually every other criminal

8     offense in an assaultive offense or a drug offense or a

9     property crime in Texas wherein there is a range of

10    punishment, first degree 5 to 99 years or life, or a second

11    degree felony -- and I'm not going to give you a laundry

12    list, 2 to 20, third degree is 2 to 10.  Not so in capital.

13    It's either/or.  Either life or death.

14          Recall with me, if you will, back on March 2nd, I

15    indicated a life sentence for capital murder in Texas results

16    in that individual being sentenced to 40 calendar years in

17    the penitentiary before being eligible for release on

18    supervision called parole.  That's 40 years day-for-day,

19    week-for-week, month-for-month, year-for-year.

20          Taking Special Issue Number 1 into consideration,

21    jurors may take into consideration all of the evidence

22    they've heard in the first stage of the trial and other

23    evidence that may or may not be presented in the second stage

24    of the trial, but taking all the evidence that is offered

25    which the Court determines relevant and admissible, at the

1   conclusion of the deliberations on Special Issue Number 1,

2   the unanimous answer by each 12 jurors is yes, then and only

3   then must the jury go on to consider Special Issue Number 2.

4   Because my instructions in the Court's charge will be such

5   that if you answer Special Issue Number 1 no, it remains a

6   life sentence.  But if you answer Special Issue Number 1 yes,

7   then you go on to Special Issue Number 2, the State has the

8   burden of proof, the requirement of going forth with the

9   evidence, if you will, on Special Issue Number 1.  Neither

10  side has the burden on Question Number 2.

11          United States Supreme Court on a number of occasions

12  have told us all that to be a constitutionally qualified

13  juror in a death penalty case, Texas, California, Florida,

14  anywhere in between -- to be a constitutionally qualified

15  juror with regard to Special Issue Number 2, and it's got

16  different forms and fashions that the 38 states that have

17  some form or fashion of the death penalty, jurors must state

18  to all of us before the trial begins that they're willing to

19  listen to determine whether or not mitigating evidence is

20  presented, and then if they determine that mitigating

21  evidence rises to the level because of which the defendant

22  should live and not die, give effect to that mitigating

23  evidence.  On the other hand, having answered Special Issue

24  Number 1 yes and Special Issue Number 2 no, after considering

25  the mitigating evidence under my hypothetical, a yes to

1    Number 1, a no to Number 2 equals under Texas law a death

2    sentence being pronounced by me.  Any other differing

3    configuration is a life sentence, the 40 years.

4            Are each of you willing to tell us at the outset,

5    though we cannot and I will not be defining mitigating

6    evidence -- mitigating evidence is whatever you determine it

7    to be.  Some individuals have told us abuse as a child,

8    learning disability, born as a crack baby.  Matters such as

9    that may be considered by them as mitigating evidence.  I

10   don't know whether any of that falls within your inventory of

11   which you may consider mitigating evidence or something else.

12   Mitigating evidence is whatever you determine it to be.

13           Are each of you willing to tell Mr. Murphy, the

14   attorneys, and I that if selected as a juror, you are willing

15   to listen to determine whether or not mitigating evidence is

16   presented and then if presented, evaluate it in light of

17   Special Issue Number 2?

18                   VENIREPERSON:  Yes.

19                   THE COURT:  Ms. Stevens, are you?

20                   VENIREPERSON:  I'll try.

21                   THE COURT:  That's all we ask.  Just because

22   you hear mitigating evidence doesn't mean, whoops, bingo,

23   automatic.  If it rises to that level as a result of which,

24   in this case Mr. Murphy, should live and not die, are you

25   willing to give effect to it?  It's kind of a mercy question

1    or safety net, if you will.  That will be your last chance.

2    It's a last chance question.

3              Are you with me so far?

4              Going to introduce those individuals whom you see

5    seated at the counsel table.  They have previously been

6    introduced to you, but it's been a little while ago and

7    depending where you were seated in the Central Jury Room, how

8    good a look you got at them, I don't know.

9              Beginning with the table closer to you, the lead

10   prosecutor for the State, the Honorable Greg Davis.

11             MR. DAVIS:  Good morning.

12             THE COURT:  He is joined by a colleague who

13   had a little bit of traffic problems and called me and

14   indicated to me that she, as soon as the traffic problems

15   permitted, coming from far north part of the county, she'd

16   get here, the Honorable Mary Miller.

17             MS. MILLER:  Good morning.

18             THE COURT:  Moving on to the defense table, we

19   have first lead counsel for the defense, former chief

20   prosecutor in the Dallas District Attorneys Office, board

21   certified criminal law specialist from the State Bar of

22   Texas, the Honorable Jane Little.

23             MS. LITTLE:  Good morning.

24             VENIREPERSON:  Hi.

25             THE COURT:  Seated next to Ms. Little is a

1  co-counsel, also a board certified criminal law specialist,

2  the Honorable Michael Byck.

3                  MR. BYCK:  Good morning.

4                  THE COURT:  And seated next to Mr. Byck is

5  their client, the accused, Jedidiah Isaac Murphy.

6                  THE DEFENDANT:  Good morning.

7                  VENIREPERSON:  Hi, morning.

8                  THE COURT:  I anticipate there may well be a

9  third defense attorney, the Honorable Jennifer Balido will be

10 coming in, to my understanding.  She's doing some work on

11 this case as I speak, I think.

12          We will begin with individual questioning.  To the

13 attorneys' questions, let me tell you up front, there are no

14 right or wrong answers.  I hope you didn't loose any sleep

15 worrying about it.

16          Mr. Sullivan, do you have a question for me, sir?

17                  VENIREPERSON:  Yes, I was going to tell you

18 that I have a speech impediment, but I will get the answers

19 out.  Okay.

20                  THE COURT:  We work with people like that on a

21 regular basis, so we want you not to be embarrassed.

22                  VENIREPERSON:  Okay.

23                  THE COURT:  We are very sympathetic.  We are

24 very understanding, I assure you.

25                  VENIREPERSON:  Okay.

1          THE COURT:  We don't grade citizenship.

2    Citizenship by virtue of the responses.  The only incorrect

3    answer to a question is an untruthful answer.  It may not be

4    everybody's cup of tea.  Let me give you a hint.  The

5    quickest way to get off this jury is to tell the attorneys

6    and me, oh, I want on this jury.  Trust me, all of us have

7    been at this, you know, more than a year or so.  If an

8    individual seated up there shows an aggressive desire to get

9    on the jury, we back off.  They have some sort of agendas.

10   Most likely we know what it is, but we trust that you will

11   look upon this as perhaps a reluctant, but necessary

12   obligation of citizenship.  Assure you that the attorneys

13   that will be questioning you are some of the best not only

14   that Dallas County but Texas, but this country has to offer.

15   You will be treated to some of the best lawyering that you

16   could ever hope to witness and be a part of.

17          Ms. Stevens, only because your number is lower than

18   Mr. Sullivan, we will begin with you.  If you would please

19   have a seat up here in the jury box.

20          Mr. Sullivan, if you would be kind enough to excuse

21   yourself with Mr. Rees, the bailiff.  And as soon as we've

22   completed the questioning of Ms. Stevens, Mr. Sullivan, we'll

23   invite you in.

24          VENIREPERSON:  I don't want to go first.

25          (Venireperson seated.)

```
 1                    THE COURT:  Ms. Stevens, have a seat.  Be as
 2   comfortable as you can.  Are you ready to proceed?
 3                    VENIREPERSON:  Yes.
 4                    THE COURT:  Relax as much as you can.  Okay?
 5                    VENIREPERSON:  Okay.
 6                    THE COURT:  We will begin with State and the
 7   Honorable Greg Davis.
 8            Mr. Davis.
 9                    MR. DAVIS:  Good morning.
10                    MR. DAVIS:  May it please the Court.
11                         RHONDA STEVENS
12   was called as a venireperson by the Court and, after having
13   been first duly sworn, testified as follows:
14                    Voir Dire Examination
15   By Mr. Davis:
16       Q.   Good morning again, Ms. Stevens.  How are you?
17       A.   Fine.
18       Q.   As the Judge said, you know, there's no reason to be
19   nervous up there.  Most of the questions that I'm going to
20   ask you this morning are going to deal with how you feel
21   about something, what your opinions are, and I've been at
22   this long enough to know that everybody feels differently
23   about different things.  So as long as you tell us how you
24   honestly feel, that's all we expect.  Okay?
25       A.   Okay.
```

1    Q.   Ms. Stevens, it's been sometime since you filled out

2    the questionnaire.  I guess over a couple of weeks.  And

3    sometimes people have some time to think about these

4    matters.  Sometimes they change how they feel.  And the

5    question I'd like to ask you first of all this morning is,

6    having had a chance to think about the proceedings, how do

7    you really feel about participating in this kind of case

8    where the State of Texas is seeking the death penalty against

9    Mr. Murphy?

10   A.   I would rather not be on the jury.  I'd rather

11   someone else do it, but -- I feel like I have an obligation,

12   that if I'm called, that I should show up and do my job.

13   Q.   Okay.  If the State of Texas proves Mr. Murphy's

14   guilt beyond a reasonable doubt, if we meet our burden of

15   proof, could you find him guilty of capital murder, if we met

16   our burden of proof?

17   A.   I probably could, but it would be the last resort.

18   I mean, I would really think about it a long, long time.

19   Q.   Okay.  Well, we certainly don't want anybody to take

20   this lightly.  You know, the burden of proof is beyond a

21   reasonable doubt.  And that's a high burden of proof.  And we

22   certainly don't want jurors who will help us by lowering that

23   burden of proof.  But the law says if we meet our burden of

24   proof, if we prove those things beyond a reasonable doubt,

25   then we're entitled to a guilty verdict and I just need to be

1    assured that if we do meet our burden of proof, that you can

2    find this man guilty knowing that you're that much closer to

3    a possible death sentence?

4         A.   Yes, you would have to prove it.

5         Q.   Okay.  Fair enough.  Now, on Questions 1 and 2, if

6    the evidence persuaded you that the answers should be yes and

7    no which would result in a death sentence, if the evidence

8    showed that, could you answer Questions 1 and 2 yes and no,

9    knowing that that will result in an automatic death sentence

10   to be implied -- to be imposed by Judge Entz?  Could you do

11   that also?

12        A.   It would be very hard, but I could do it.

13        Q.   And again, we don't expect anybody to take this

14   lightly.  This is a very serious matter.  I can also tell you

15   the one thing we're very serious about is we want Mr. Murphy

16   to receive a fair trial.  We want everyone at the end of this

17   trial to be able to leave this courtroom knowing that all the

18   rules were followed, that he was afforded every right that

19   the law gives him, and that we don't have to second guess

20   what we did.  So we want everybody to take this very

21   seriously.  Does that seem fair to you also?

22        A.   Uh-huh.

23        Q.   Let me ask you:  Have you heard of any cases

24   recently, maybe you've seen them in the newspaper, read about

25   them, maybe you saw them on television, where you heard about

1  a capital murder case and you thought to yourself, you know,

2  depending on what the facts are, I think that might be a

3  death penalty case?  Have you heard anything like that

4  lately?

5      A.   The only thing I remember is on the news saying a

6  child a trial lasted 27 weeks and I thought, whoa, that's a

7  long time.  And that's the only thing I remember seeing on

8  TV.

9      Q.   That was probably in California.

10      A.   Yes, it was a long time.

11      Q.   That wouldn't be here in Dallas County, I can assure

12  you.  You know, I know after the O.J. Simpson trial, we had a

13  lot of jurors coming down and they were pretty concerned this

14  may last six months.  That simply doesn't happen.  This case

15  here -- I would anticipate -- I think the Judge may have

16  already told you, I would anticipate that the evidence could

17  be concluded in about a week and a half.  That's what we're

18  anticipating here.  Having tried a case with Judge Entz, he

19  keeps things moving.  We won't waste your time so I don't

20  anticipate any 27 weeks.

21          Some people have told us in the past few days that

22  they've heard about the Texas 7 case.  You know, the inmates

23  that escaped from the prison system?  Some of those

24  individuals were actually serving life sentences when they

25  escaped, came up to Dallas, killed a police officer, and then

1    escaped up to Colorado.  Of course, that would be a capital

2    murder because they've killed a police officer while he was

3    discharging his official duties.

4            Do you have any feelings about that particular case?

5        A.   I heard about it on the news.  I don't know all the

6    details.  I just heard bits and pieces about it.

7        Q.   Okay.

8        A.   That's all I can tell you.

9        Q.   Okay.  All right.  Let me -- let me just ask you in

10   general, do you think that there are people here in Dallas

11   County, Ms. Stevens, who are capable of killing another

12   person to get their property from them?

13       A.   I hope not.

14       Q.   Okay.  Do you think that it's possible that there

15   may be people who could kill another person to get their

16   property and then have absolutely no remorse at all about

17   having done that?

18       A.   On the trials in the past that I have seen on the

19   news and all it seems like some people don't, but you're not

20   there to hear all the details, so I'm not sure.

21       Q.   Right.

22            MR. DAVIS:  Excuse me just a moment, Ms.

23   Stevens.

24            Your Honor, could we approach?

25               (Side bar discussion, then juror excused.)

---

DARLINE W. LABAR, OFFICIAL REPORTER

Page 15

1                    THE COURT:  Thank you, Ms. Stevens.  You are

2    excused from further consideration.

3                    VENIREPERSON:  Thank you.

4                    (Ms. Stevens Excused From Consideration)

5                    THE COURT:  May we have Mr. Sullivan, please,

6    Sheriff?

7                    (Mr. Sullivan excused during recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          Reporter's Certificate

STATE OF TEXAS:

COUNTY OF DALLAS:

           I, Darline W. LaBar, Official Court Reporter of the

194th Judicial District Court, in and for Dallas County,

Texas do hereby certify that the foregoing volume constitutes

a true, complete and correct transcript of all portions of

evidence and other proceedings requested in writing by

counsel for the parties to be included in the statement of

facts, in the above styled and numbered cause, all of which

occurred in open court or in chambers and were reported by

me.

           I further certify that this transcription of the

record of the proceedings truly and correctly reflects the

exhibits, if any, offered by the respective parties.

           Witness my hand this the 15th day of November, A.D.,

2001.


                         DARLINE W. LABAR
                         Official Court Reporter
                         194th Judicial District Court
                         Dallas County, Texas
                         (214) 653-5803


Certification No. 1064 Expires December 31, 2002


                 DARLINE W. LABAR, OFFICIAL REPORTER

1                    REPORTER'S RECORD          **74145**

2              VOLUME 10 of 65 VOLUMES

3           TRIAL COURT CAUSE NO. F00-02424-NM

4    THE STATE OF TEXAS          :        IN THE DISTRICT COURT

5    VS.                          :        DALLAS COUNTY, TEXAS

6    JEDIDIAH ISAAC MURPHY        :        194TH JUDICIAL DISTRICT

7              * * * * * * * * * * * * * * * * * * * *

8                   INDIVIDUAL VOIR DIRE   **FILED IN**
                                          **COURT OF CRIMINAL APPEALS**
9              * * * * * * * * * * * * * * * * * * * *
                                            DEC  5 2001
10   A P P E A R A N C E S:
                                     Troy C. Bennett, Jr., Clerk
11   HONORABLE BILL HILL, Criminal District Attorney
              Crowley Criminal Courts Building
12            Dallas, Dallas County, Texas  75207
              Phone:  214-653-3600
13   BY:      MR. GREG DAVIS, A.D.A., SBOT # 05493550
              MS. MARY MILLER, A.D.A., SBOT # 21453200
14                  FOR THE STATE OF TEXAS;

15   MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
     MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16   MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
     Dallas County Public Defender's Office
17            Phone:  214-653-9400
                   FOR THE DEFENDANT.
18

19                  * * * * * * * * *

20            On the 20th day of March, 2001, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable F. Harold Entz, Jr.,

23   Judge presiding, held in Dallas, Dallas County, Texas:

24            Proceedings reported by machine shorthand, computer

25   assisted transcription.

ORIGINAL

```
1                    INDEX VOLUME 10

2  March 20th, 2001                    PAGE    VOL.

3  INDIVIDUAL VOIR DIRE:

4  Proceedings...................................... 2      10

5  State no challenge for cause - Mr. Cannon........ 74     10

6  Defense challenge for cause - Mr. Cannon........ 74     10

7  Challenge for Cause Denied...................... 76     10

8  Marlin Cannon Prospective Juror No. 4........... 76     10

9  State no challenge for cause - Mr. Griffing..... 118    10

10 Defense no challenge for cause- Mr. Griffing.... 118    10

11 Gregory Griffing Prospective Juror No. 5........ 118    10

12 Reporter's Certificate.......................... 121    10

13

14          CHRONOLOGICAL VENIREPERSON INDEX

15                   STATE       DEFENSE           VOL.

16 MARLIN CANNON         20          45             10

17 GREGORY GRIFFING      78         104             10

18

19          ALPHABETICAL VENIREPERSON INDEX

20                   STATE       DEFENSE           VOL.

21 MARLIN CANNON         20          45             10

22 GREGORY GRIFFING      78         104             10

23

24

25
```

Index-2

```
1                        EXHIBIT INDEX

2    STATE'S                    OFFERED      ADMITTED      VOL.

3      PT1    Juror History        74           74         10

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2             THE COURT:  Let me ask each of you to remain
3    seated, raise your right hands, and again be sworn in.
4                    (Venirepersons sworn.)
5             VENIREPERSON:  I do.
6             THE COURT:  Thank you.  Lower your hands.
7    Good morning and welcome back.
8             VENIREPERSON:  Good morning.
9             THE COURT:  Before I introduce the individuals
10   whom we see seated at the counsel table, in absentia those
11   that are on their way, having already called in and
12   apparently there's a terrible automobile accident and
13   attendant problems in a couple of directions, so in the
14   interest of your time we'll begin a little bit shorthanded
15   from an attorney standpoint, but nevertheless we'll move
16   right ahead.
17        We are now into the second week of individual
18   questioning.  This is a procedure that is allowed by the Code
19   of Criminal Procedure, and both the State and the defense
20   have taken advantage of this provision and have elected, as
21   virtually is done in 100 percent of capital cases tried
22   throughout the States, individual questioning.  Before you
23   leave us the latest -- by late morning you will know whether
24   you remain under consideration.
25        We plan on qualifying 48 prospective jurors, after
```

1    which each side will be allotted their peremptory

2    challenges.  These are excusing otherwise qualified jurors

3    other than by race or gender, and the resulting process will

4    narrow down the pool of 48 to the 12 that will be jurors in

5    this case.  You may be well 2 of the 12 that are ultimately

6    selected.  And for the sake of my hypothetical examination,

7    let's assume that has happened.

8              Let's assume, if we may, hypothetically, jury

9    selection has been completed, both of you are among the 12

10   individuals that will be jurors in the case.  Incidently

11   although we anticipate this process will end far, of course,

12   before we begin the trial, we plan on beginning testimony in

13   the trial on the 29th of May, a Tuesday.  Congress has

14   declared that the 28th will be that day this year that

15   Memorial Day is officially, in quotes, celebrated in the

16   United States.  Anticipate the trial will last probably

17   through that week, and maybe a bit into the next week, but

18   unlike some trials about which we've heard in California and

19   other states, be nothing like a California type process.

20             Do either of you know of any reason why right now if

21   you're selected as a juror that you could not return on the

22   29th to serve as a juror in the case?  Either of you?

23                  (Venireperson nods head.)

24             THE COURT:  Therefore hypothetically let's

25   assume not only that you're on the jury, but the first stage

DARLINE W. LABAR, OFFICIAL REPORTER

1   of the trial has been completed, what we call the

2   guilt/innocence stage.   Individually each of you, along with

3   the other 10 that make up the jury, have reached the

4   conclusion, based upon the law and the evidence of the law

5   given to you by me, that the defendant, Mr. Murphy, has been

6   found guilty of capital murder, that is, he committed a

7   murder of a named individual, Bertie Cunningham, on or about

8   a date certain Dallas County, Texas, during the commission of

9   a robbery and/or kidnapping.

10          Let's assume hypothetically that water has gone over

11   the dam.  You and the other 10 jurors would then be called

12   upon to determine the punishment.  Unlike virtually every

13   other criminal offense in Texas that has a varying range of

14   punishment, not less than X nor more than X or Y, optional

15   fine not to exceed $10,000 in the case of felonies, not so in

16   a capital case.  It's an either/or.  Either life in the

17   penitentiary or death by lethal injection.

18          As I told you on March 2nd when we were assembled

19   down in the Central Jury Room, the State has made known its

20   intent in this case to seek the death penalty.  Going into

21   the penalty stage of a capital trial in which the State is

22   seeking death, the law is so structured to favor a life

23   sentence and not death.  And I think all of us would agree

24   that because of the irrevocability of a death sentence, that

25   is the proper legal structure that we can appreciate.

Page 5

1            Depending upon the answers to special issues, unlike

2    a number of states where the jury makes a recommendation to

3    the Judge as to whether or not it's life or death, Florida

4    being the classic example, not so in Texas.  Given our

5    populist tradition, faith in the people, if you will, jury

6    instructs the Judge as to what the punishment should be.  I'm

7    not a thirteenth juror.  Nor is any trial judge.  Nor is any

8    appellate judge for that matter.  The jury says life, it's

9    life.  If as a result of the answers to special issues the

10   sentence is death, is death.

11           Under Texas law in a capital case if it is a life

12   sentence that is the result.  By law a defendant must serve

13   40 calendar years.  It's day-for-day, week-for-week,

14   month-for-month, in custody before being eligible for release

15   on supervision called parole.  Does not mean 40 years,

16   penitentiary doors fling open, and out a defendant goes.

17   Process of parole eligibility commences on that day.

18           We have for your benefit the two special issues that

19   the jury will be called upon -- again, and I emphasize under

20   this hypothetical basis because that's the thrust of which

21   you'll be talking about with the attorneys and me

22   individually in a few moments.  We have the two special

23   issues that the jury will be called upon to address to your

24   right.  Let me ask that you read them to yourselves, at the

25   conclusion of which I will explain the import or effect that

```
 1    each of them have.

 2                    (Venirepersons given time to read issues.)

 3                    THE COURT:  Have you both completed that?

 4                    (Venirepersons nod head.)

 5                    THE COURT:  Special Issue Number 1 begins with

 6    the jury having that question answered in the negative.

 7    That's the way it begins.  The State -- the prosecutor --

 8                    MS. LITTLE:  Your Honor, may I approach,

 9    please?

10                    (Attorneys approach the side of the bench.)

11                    THE COURT:  Sheriff, will you retire the

12    jurors momentarily?

13                    (Recess taken.)

14                    THE COURT:  Trial record reflect that Mr.

15    Murphy indicated to the bailiffs that he was feeling ill, as

16    a result of which he was excused from the courtroom.

17           Mr. Murphy, do you feel that you're well enough that

18    we can continue?

19                    THE DEFENDANT:  Yes, sir.

20                    THE COURT:  If you feel again becoming ill, if

21    you'll let the bailiffs know, and obviously we will address

22    your concerns as they become apparent.

23           Sheriff, may we have the jury, please?

24                    THE BAILIFF:  Yes, sir.

25                    THE COURT:  As circumstances permit.
```

```
 1                    (Venirepersons returned to courtroom.)

 2                    THE COURT:  Continuing where we left off with

 3       the two special issues.  The responsibility of proving, if

 4       they can, that special issues should be answered in the

 5       affirmative or yes lies with the State, the District

 6       Attorneys Office, the prosecutors, if you will.  Jurors may

 7       take into consideration all of the evidence they have heard

 8       in the guilt/innocence stage of the trial, other evidence

 9       presented in the penalty stage of the trial in determining

10       the answer to Special Issue Number 1.  If after deliberation

11       the jurors are not convinced that Special Issue Number 1

12       should be changed from a no to a yes, but should remain no,

13       you terminate your deliberations, return to the courtroom,

14       presiding juror would make us aware of that decision, and a

15       life sentence will result.  Need not go on to Special Issue

16       Number 2.

17                    Only if after deliberation the jurors are unanimous

18       in their agreement that Special Issue Number 1 should be

19       answered yes, need the jury go on to Special Issue Number 2.

20                    Special Issue Number 2 has been variously described

21       as the safety net, the mercy question, or phrases to that

22       effect.  Neither side has the burden of proof, the

23       responsibility of going forth with the evidence as it relates

24       to Special Issue Number 2.  United States Supreme Court on a

25       number of occasions of recent note have indicated to all of
```

1   us that to be a constitutionally qualified juror in a death

2   penalty case in which the State is seeking death, to be

3   qualified, a juror must in their heart of hearts tell

4   themselves and thereby us that they would be willing to

5   evaluate all of the evidence, to evaluate whether or not

6   mitigating evidence is presented, and if mitigating evidence

7   is presented, give it careful consideration, and then

8   determine if as a result of that mitigating evidence it rises

9   to the level as a result of which the defendant, in this case

10  Mr. Murphy, should live and not die.

11          United States Supreme Court has said that trial

12  judges need not, indeed should not, define mitigating

13  evidence.  Mitigating evidence therefore is somewhat like

14  beauty.  It's in the eye of the beholder.  Whatever therefore

15  a juror determines to be mitigating evidence is mitigating

16  evidence.  Examples in the past, we have heard, child abuse,

17  physical, sexual, or the like; crack baby, matters such as

18  that; alcoholism; drug addiction.  Some think that's

19  aggravating, others think, well, under certain circumstances

20  I could consider it mitigating.

21          Let me ask you this:  Per the Supreme Court, are

22  each of you willing to listen to determine whether or not

23  mitigating evidence is presented and then give it a fair and

24  impartial consideration before answering Special Issue Number

25  2?  Are both of you willing to do that?

```
 1                    VENIREPERSON:  Yes.

 2                    THE COURT:  Ms. Cohlmia are you?

 3                    VENIREPERSON:  Sir, yes.

 4                    THE COURT:  Are both of you willing to do it?

 5                    VENIREPERSON:  Will you repeat the question?

 6                    THE COURT:  Are you willing to listen to see

 7    whether or not mitigating evidence is presented, and if

 8    mitigating evidence is presented that rises to the level

 9    because of which in this case Mr. Murphy should live and not

10    die, give effect to that mitigating evidence?

11                    VENIREPERSON:  Yes, sir.

12                    THE COURT:  Because if you answer Special

13    Issue Number 1 yes and Special Issue Number 2 no, by law I am

14    required to sentence Mr. Murphy to death.

15                    VENIREPERSON:  No, I couldn't do that.

16                    THE COURT:  All right.  Any other

17    configuration -- if you answer yes to the continuing threat

18    to society and yes to mitigating evidence, it's a life

19    sentence.  See, when you get to Special Issue Number 2, that

20    is really the last chance the jury will have in essence from

21    a legal structured standpoint to give him a life sentence.

22                    MR. BYCK:  Your Honor --

23                    MS. MILLER:  Judge, can we approach?

24                    MR. BYCK:  -- may we approach?

25                    (Side bar discussion.)
```

```
 1              THE COURT:  Ms. Madore, if you would excuse

 2   the jurors.

 3         Ladies and gentlemen, thank you very much.  You are

 4   excused from consideration.

 5              (Morning recess.)

 6              (Venirepersons brought into courtroom.)

 7              VENIREPERSON:  This is it?

 8              THE COURT:  This is it.  A lot more

 9   comfortable than out there.  Good afternoon, welcome back.

10              VENIREPERSON:  Hello.

11              VENIREPERSON:  Hello.

12              THE COURT:  Let me ask each of you if you'd

13   remain seated, raise your right hands and be sworn in,

14   please.

15         Gentlemen, do you swear or affirm that you will make

16   true answers to such questions as may be propounded to you by

17   the Court touching your service and qualifications as a

18   juror, so help you God?

19              VENIREPERSON:  I will.

20              (Venirepersons sworn.)

21              THE COURT:  Thank you, gentlemen.  Lower your

22   hands.

23         Gentlemen, we're now in the second week of

24   individual questioning.  We will continue until we have

25   identified 48 qualified prospective jurors in this case.
```

1    Once that number has been reached, the attorneys will be

2    asked to exercise their peremptory challenges, at the

3    conclusion of which the first 12 that survive, for lack of a

4    better voice of verbs, this process will be the jurors in the

5    case.  The peremptory challenges, per the United States

6    Supreme Court, can be based neither on race or ethnic

7    background or gender.  Does not mean that individuals of

8    color cannot be peremptory challenged, but that cannot be the

9    basis of the challenge.  Supreme Court in a number of cases

10   has made that very, very plain to both the State and the

11   defense in criminal cases and both sides in civil cases as

12   well.

13           Though we hopefully anticipate this jury selection

14   process will end way before the end of May, we anticipate

15   beginning the testimonial stage of the trial on Tuesday, May

16   29th.  United States Congress has declared that the Monday

17   before is the date this year that Memorial Day will be

18   officially celebrated throughout the United States, so the

19   day after Memorial Day is celebrated we'll begin the

20   testimony.  At this stage the attorneys have indicated they

21   anticipate probably the trial will last somewhere between

22   five and eight working days.  Given the absence of media

23   attention so far, and I see nobody in the media out in the

24   gallery area, hopefully you will not be sequestered.  However

25   that probability always exists, regardless of the trial, but

1    we are not anticipating the jury will be sequestered in this

2    case.  So you'll be able to put your heads on your own pillow

3    in your own bed every night.

4            Do either of you gentlemen know any reason now that

5    would prevent your returning back on the 29th of May to

6    participate as jurors if you are selected as one of the 12

7    jurors in the case?  Either of you know of any reason?

8            VENIREPERSON:  No.

9            VENIREPERSON:  No.

10           THE COURT:  Good.  Gentlemen, let's move right

11   in, if we may, to the matter at hand this afternoon.  Before

12   you leave us, after your individual interview, you will know

13   whether or not you remain under consideration, be free to go

14   back home, use your, you know, your regular work schedule

15   until return, if you are selected ultimately as one of the

16   jurors in the case.  We hope that you would not go back to

17   the Dallas Morning News and read the archives of the paper,

18   when the incident occurred, to otherwise further inform

19   yourself about the circumstances, but would rely, if a juror,

20   solely on the evidence presented in the courtroom to make

21   your decision, which I trust both of you understand the

22   purpose for that.

23           Let's fast forward on a hypothetical scenario or

24   proposition if we may.  Let's assume that jury selection has

25   been completed.  Turns out that you are 2 of the 12 jurors.

1   After hearing the evidence in the guilt/innocence stage of

2   the trial, have heard the instructions read to you by me,

3   called the Court's charge, you have furthermore heard the

4   summations by the attorneys, completed your deliberations.

5   Each of you individually, along with the other 10 members of

6   the jury, have reached the conclusion that the presumption of

7   innocence which every defendant is entitled has been overcome

8   by the evidence and you find each of the significant

9   allegations in the indictment which we call elements have

10  been satisfactorily proven to your mind beyond a reasonable

11  doubt as a result of which you and your other fellow 10

12  jurors return into this courtroom with a verdict that says,

13  Jedidiah Isaac Murphy, we, the jury, find you guilty of

14  capital murder.  Again, this is just a scenario to get us

15  into the matter at hand with regard to what we call

16  disqualifying a jury.

17          Unlike virtually every other criminal offense in

18  Texas which has a range of punishment, not less than so many

19  years, nor more than so many years, depending on the type of

20  offense, capital murder is unique.  An individual found

21  guilty of capital murder has only two possible punishments:

22  Life in the penitentiary or death by lethal injection.  Going

23  into the penalty stage of the trial under this hypothetical

24  we're discussing this afternoon, because of the seriousness

25  of the ultimate punishment, death, the Texas legislature has

1    structured the statute so that a life sentence is preferred

2    at the outset and not death.  It doesn't start at death and

3    then work back to life.  It starts at life, and then based

4    upon the jury's decision may become death.  Unlike most other

5    states where the jury's recommendation on punishment is just

6    that, a recommendation to the trial judge, not so in Texas.

7    The jury's answer to certain special issues which we'll talk

8    about with you gentlemen momentarily, absolutely requires

9    based upon the answers to the questions, the trial judge

10   sentencing a defendant either to life or death.

11            Trial judge is not a thirteenth juror.  I cannot

12   overrule a jury.  Jury's decision is final.  Words of the

13   late President Harry Truman, the buck stops with the jury.

14   Your decision is it.  Is it.  Neither I nor any appellate

15   court will second guess your decision with regard to life and

16   death.  It rests upon your shoulders, gentlemen, and the

17   other 10.

18            Now, we have for your benefit blown up and have to

19   your right the special issues.  Let me ask that you read them

20   to yourselves, at the conclusion of which I will explain to

21   you the import or the significance of your answers.

22                 (Venirepersons read issues.)

23            THE COURT:  Have you completed them?  Fine.

24            Gentlemen, at the commencement of the penalty stage

25   of the trial, Special Issue Number 1 is answered in the

1    negative, no.  It remains a negative or no unless or until

2    evidence is presented to you that convinces you beyond a

3    reasonable doubt that the issue should be answered yes.  The

4    State of Texas, the prosecutors, the Dallas District

5    Attorneys Office, has the responsibility, we call it the

6    burden of proof, of proving, if they can, to each individual

7    juror that Special Issue Number 1 should be answered yes.  If

8    they fail to do so, the answer remains no.  And if that

9    should be the case, you need not ever get into worrying or

10   discussing or deliberating on Special Issue Number 2.

11   Because if after hearing the evidence, deliberating, the jury

12   thinks that Question Number 1 or Special Issue Number 1

13   should remain no, the result will be a life sentence.

14         Gentlemen, let me remind you, as I did back on March

15   2nd, a life sentence to a capital murder conviction equals 40

16   calendar years in the penitentiary before in this case Mr.

17   Murphy will be eligible for consideration for release on

18   parole.  40 calendar years is day-for-day, week-for-week,

19   month-for-month, year-for-year.  40 -- 40 calendar years.  If

20   the jury, after deliberation, answers Special Issue Number 1

21   yes, only then need they go on to Special Issue Number 2.

22   Neither side has what we call the burden of proof or

23   responsibility of going forth with the evidence on Special

24   Issue Number 2.

25         You will not be receiving from me a definition of

1    what mitigating evidence is.  United States Supreme Court has

2    said that you use the common ordinary understanding that the

3    words mitigating evidence has in common ordinary

4    conversation.  Mitigating mean lessening if you will.

5    Therefore mitigating evidence is whatever, gentlemen, you

6    decide it to be.  Kind of like what is beauty.  Well, beauty

7    is in the eye of the beholder.  To some people a painting is

8    beautiful.  Others think, oh, that's awful, I can't stand

9    that.  Well, who am I to say that either one of them is

10   correct or incorrect?  It's whatever you individually

11   perceive it to be.  Same way somewhat with this.

12            In the past individuals have told us that they

13   would, if evidence was presented, consider a learning

14   disability, being born as a crack baby, fetal alcohol

15   syndrome born child, various and sundry forms of sexual abuse

16   as a child could be under certain circumstances considered as

17   mitigation.  The United States Supreme Court though has given

18   us very clear guidance that to be a qualified prospective

19   juror in a capital case, jurors must tell us that they would

20   be willing to listen to mitigating evidence, regardless of

21   the source from which it is derived, and after carefully

22   evaluating it, decide if as a result of that mitigating

23   evidence does that evidence rise to the level in their mind

24   as a result of which the defendant, in this case Mr. Murphy,

25   should live and not die.  Because, gentlemen, if you

1    answer -- you, second person, plural -- the jury answers

2    Special Issue Number 1 yes and answer Special Issue Number 2

3    no, by law the jury is requiring me in this case to sentence

4    the defendant to death.  That's the effect of those answers.

5    Got no secrets.  We're not hiding any cards under the table.

6    This is not any kind of a con game.  Everything is out in the

7    open.  No secrets.  A yes to Number 1, a no to Number 2,

8    equals death sentence.

9           Gentlemen, are each of you of a mind that can tell

10   us that you're willing with regard to Special Issue Number 2

11   to evaluate mitigating evidence, if presented, and then

12   determine whether or not as a result of which this case Mr.

13   Murphy should live and not die?  Are both of you willing to

14   do that?

15                VENIREPERSON:  Yes.

16                VENIREPERSON:  Yes.

17                THE COURT:  The Court sees both of the

18   prospective jurors nodding their heads in the affirmative.

19          Gentlemen, let me introduce those of you -- those

20   whom I have previously introduced whom you see seated at the

21   counsel table.  We'll begin with the counsel table nearer to

22   you.  Beginning first with lead counsel for the State from

23   the Dallas District Attorneys Office, senior prosecutor, the

24   Honorable Greg Davis.

25                MR. DAVIS:  Good afternoon.

1           VENIREPERSON:  Hi.

2           THE COURT:  Seated next to him is co-counsel.

3    At the present time she occupies the position of Chief

4    Prosecutor in this the 194th District Court, the Honorable

5    Mary Miller.

6           MS. MILLER:  Good afternoon.

7           VENIREPERSON:  Good afternoon.

8           THE COURT:  Moving on to the next counsel

9    table, there are three attorneys that represent the

10   defendant.  First, lead counsel, a former Chief Prosecutor in

11   the Dallas District Attorneys Office, board certified

12   criminal law specialist, the Honorable Jane Little.

13          MS. LITTLE:  Hi.

14          VENIREPERSON:  Hi.

15          THE COURT:  Seated next to Ms. Little is one

16   of her co-counsel, again, a board certified criminal law

17   specialist, the State Bar of Texas, the Honorable Mike Byck.

18          MR. BYCK:  Good afternoon.

19          THE COURT:  Seated behind Mr. Byck is the

20   third attorney representing Mr. Murphy, the Honorable

21   Jennifer Balido.

22          MS. BALIDO:  How are y'all?

23          THE COURT:  Seated next to Mr. Byck in the red

24   tie, blue shirt, the defendant, Jedidiah Isaac Murphy.

25          THE DEFENDANT:  Good afternoon.

1              VENIREPERSON:  Hi.

2              VENIREPERSON:  Hello.

3              THE COURT: Gentlemen, the attorneys will be

4   asking you some questions individually.  At the outset they

5   and I wish to assure each of you that to their questions

6   there are no right or wrong answers so long as they are

7   truthful.  We don't grade individuals with regard to their

8   answers on some sort of a citizenship scale, if you will, as

9   to whether or not -- depending upon their feelings about the

10  death penalty.  We don't do that at all.

11             Only because Mr. Cannon has the lower number, we

12  will begin with Mr. Cannon.

13             Mr. Griffing, I'm going to ask that you be excused

14  back into the Central Jury Room with the bailiff, Ms. Madore.

15             Mr. Cannon, can I invite you for the benefit of the

16  attorneys to have a seat in the jury or the witness stand

17  right here.  The bailiffs will move the special issue board

18  over to your left for easier reference.

19             Okay.  Mr. Griffing, I want when you return -- Mr.

20  Cannon, right now, I want to tell you to relax.  Be as

21  comfortable as you possibly can be.  I hope you haven't lost

22  a whole lot of rest and sleep in coming down.

23             VENIREPERSON:  Yes.

24             THE COURT:  You will be treated to some of the

25  best lawyers.  We'll begin with Mr. Davis.  Mr. Greg Davis,

1    Mr. Marlin Cannon.

2                        MARLIN CANNON

3    was called as a venireperson by the Court and, after having

4    been first duly sworn, testified as follows:

5                    Voir Dire Examination

6    By Mr. Davis:

7        Q.   And, Mr. Cannon, again, how are you?

8        A.   Okay.

9        Q.   Good.  As the Judge told you, I'm Greg Davis.  Along

10   with Mary Miller, I represent the State of Texas in this

11   case.  The way this is going to work is I'm going to have 30

12   minutes to speak to you this afternoon.  After that, Mr. Byck

13   or one of the other attorneys will have a chance to speak to

14   you for 30 minutes also.  And Judge Entz is right.  There are

15   no right or wrong answers to these questions.  We find that

16   most of the questions I'm going to ask this afternoon really

17   deal with how you feel about something or what your opinion

18   is.  And I've talked to a number of people over the years and

19   so I understand everybody feels differently.  As long as we

20   know how you honestly feel, that's all we need.  All right?

21            I'm just curious before we get into some of these

22   other -- Naples, where is --

23       A.   Morrow County.  It's east of here about, oh, 140

24   miles.

25       Q.   Is it out near Lufkin or Longview?

DARLINE W. LABAR, OFFICIAL REPORTER

Page 21

```
 1                    THE COURT:  North.

 2                    MR. DAVIS:  North.  Okay.

 3        A.   It's -- I would believe it would be what, east of

 4   Dallas.  No, it's not near.

 5        Q.   Okay.  All right.  What we'll be doing this

 6   afternoon, Mr. Cannon, is we'll talk about your questionnaire

 7   a little bit.  We'll talk about the death penalty in a little

 8   more detail.  And then we'll talk about some general

 9   principles that apply in this case.  But before we begin, I'd

10   like to go back to that day in the Central Jury Room.

11   Remember when that large group was gathered and Judge Entz

12   introduced everybody, told you why we were here?

13            Do you remember what your reaction was when the

14   Judge introduced Mr. Murphy to you and told you that we were

15   trying to seek the death penalty against him?

16        A.   Do I remember my reaction?

17        Q.   Yes, sir.  What did you think when you learned that

18   we were seeking the death penalty against this individual

19   right over here?

20        A.   Well, I looked at him and -- by looking at him, I

21   just assume that he doesn't look like a person that could do

22   that, but you really can't look at someone and tell --

23        Q.   Uh-huh.

24        A.   -- as to the type of individual they are.

25        Q.   Right.
```

1        A.    And shocked.

2        Q.    Shock being called down to that kind of case, I

3   suppose?

4        A.    Yes.

5        Q.    You've had a little bit of time to think about the

6   proceedings, I suppose, and what I like to ask jurors is

7   this.  Because I understand over the last two or three weeks,

8   you know, you may have had some feelings about serving on

9   this type of jury.  The Judge has told you very accurately

10  what our position is, and it will not change in this case.

11  The State is actively seeking the death penalty against

12  Jedidiah Murphy.  We're not going to change that stance.

13  When we get down to punishment, I will stand before you and I

14  am going to ask you to answer those questions in such a way

15  that Judge Entz will be required by law to impose a sentence

16  of death.  That will occur.

17           And, you know, I know a lot of people in the past

18  when I talked with them, you know, they say it's one thing

19  when I answer these questionnaires.  It's kind of in the

20  abstract.  I honestly do believe in the death penalty.  I

21  think it's necessary.  It serves a function.  I'm all for

22  it.  I've had people when they come down here face to face

23  with it, if you will, express a little reservation in taking

24  part in it personally.  Mr. Murphy is not abstract.  He's a

25  living, breathing human being.  There will come a day in

1    Huntsville, Texas, when he's going to lie dead on a gurney

2    because of the verdict in this case.

3              So if you could tell me honestly, how do you feel

4    about serving on this case when you know that the State is

5    seeking that?

6        A.    I have no problem participating.

7        Q.    Let me take that.  If we prove this man's guilty

8    beyond a reasonable doubt, if we meet our burden of proof

9    then, you can find him guilty, correct?

10       A.    Yes.

11       Q.    And if the evidence is such in this case that you

12   honestly believe that Special Issues 1 and 2 should be

13   answered yes and no, even though that's going to result in

14   the death sentence, you can do that also, right?

15       A.    Yes.  Yes.

16       Q.    In general, Mr. Cannon, are you the kind of person

17   who likes to hear all the facts before you make up your mind

18   about something?

19       A.    Yes.

20       Q.    All right.  That's very important in this case?

21       A.    Yes.

22       Q.    Obviously this is a very serious matter.  Obviously

23   everyone included, including the State of Texas, wants to

24   make sure that Jedidiah Murphy receives a fair trial.  Having

25   gone through a number of these, it's very important I think

1    that we all be able to leave this courtroom on that last day

2    knowing it was a fair proceeding.   All the rules were

3    followed.   All of his legal rights were protected.   And that

4    we don't have to second guess anything that happened.

5            Do you agree that that would be an important thing?

6        A.   Right.   Yes.

7        Q.   I know that on your questionnaire you indicated a

8    couple of things.   You were a little bit concerned, and I

9    know I've had some other answers very similar to this, you

10   were a little bit concerned about maybe the disparity between

11   the rich and the poor when it comes to criminal matters.

12   Would that be fair?

13       A.   Yes.

14       Q.   All right.   That I think you said money buys the

15   best defense and it may well do that.   The three attorneys

16   representing Mr. Murphy work for the Public Defenders

17   Office.

18       A.   Uh-huh.

19       Q.   And you've heard that they are very qualified.   They

20   are very experienced.   They're board certified in fact which

21   is a specialty that they've chosen to attain so obviously he

22   has very, very capable counsel.

23       A.   I can believe that, yes.

24       Q.   Do you think knowing the qualifications of these

25   individuals that you'd have any concern about the quality of

1    representation that he's going to receive in this type of

2    trial?

3         A.   Well, can I elaborate on that?

4         Q.   Sure, please.

5         A.   I do believe that they would be qualified to

6    represent him.  I think what a difference come in with the

7    money and the person say with more money, they are able to

8    maybe extend the trial longer.

9         Q.   Uh-huh.

10        A.   And -- but I do think they are probably -- and I

11   know they probably are qualified because I do have a relative

12   that is an attorney.

13        Q.   Uh-huh.

14        A.   And he does that, also.

15        Q.   What type of --

16        A.   And I have a lot of confidence in him.

17        Q.   And the public defender is just a little bit

18   different than a private law firm.  They have investigators

19   on the staff.

20        A.   Yes.

21        Q.   They have some of the same staff we have, so it's

22   not a situation where you might envision there are two or

23   three court-appointed lawyers and they don't have much to

24   work with.

25        A.   Right.

1    Q.   Do you understand this situation is a little bit

2  different?

3    A.   Yes.

4    Q.   You indicated your brother is an attorney?

5    A.   Yes.

6    Q.   Where does he practice?

7    A.   In California.

8    Q.   In California.  Does he do criminal work?

9    A.   He's a federal --

10   Q.   Is he a federal public defender?

11   A.   Yes.

12   Q.   How long has he been a public defender?

13   A.   Oh, about a year, year and a half.  He did private

14  practice before that.

15   Q.   Okay.  And I take it then he'll handle a wide

16  variety of criminal cases; is that right?

17   A.   Yes.

18   Q.   Do you get a chance to talk with your brother about

19  his career, what he's doing in California?

20   A.   Not really.  I think in the last three months we

21  had -- my father passed in January, so we were together for

22  that, for about a month.  But his practice and what did he

23  was not discussed because of the other circumstances.

24   Q.   Right.

25   A.   So not at all, not at all.

1    Q.   I think that you said that you had one daughter who

2    is a probation officer; is that right?

3    A.   Yes.

4    Q.   Where is she a probation officer?

5    A.   Here in Dallas County.  Her office is, you know, in

6    the southeast area, south -- South Dallas area, somewhere

7    over in there.

8    Q.   So she's going to be in one of the satellite offices

9    then?

10   A.   Yes.

11   Q.   How long has she been a probation officer?

12   A.   About three years.

13   Q.   Do you talk with her about her work?

14   A.   No.

15   Q.   About any of her clientele, any case load, anything

16   like that?

17   A.   No.

18   Q.   And I guess kind of balance everything.  You've got

19   a daughter that is a police officer, too?

20   A.   Yes.

21   Q.   Is she a Dallas Police Officer?

22   A.   Yes.

23   Q.   Is she a patrol officer?

24   A.   Yes.

25   Q.   And do you know which division?

1      A.   Southwest.

2      Q.   Southwest.  How long has she been with the Dallas

3   Police Department?

4      A.   About six years, six or seven years.

5      Q.   And again, you keep up with what she's doing?

6      A.   Kind of, yes.

7      Q.   Kind of parent/child --

8      A.   Yes.  I have a grandchild -- so she has a son, so I

9   keep him quite a bit, so --

10     Q.   Okay.

11     A.   So I see her quite a bit.

12     Q.   Let's talk for just a minute about these special

13   issues?

14     A.   Okay.

15     Q.   And I think that you indicated that you generally

16   understand them.  You understand what the burden of proof is?

17     A.   Yes.

18     Q.   And so you sound like you can follow the law.  When

19   you look at Special Issue Number 1, Mr. Cannon, if you kind

20   of had your druthers, what would you like to know about --

21   what do you think might be helpful to you in actually

22   answering Special Issue Number 1?  What sorts of things would

23   you like to hear about?

24     A.   Well, actually why the act was really committed, you

25   know -- I would like to know the circumstances.

         1        Q.    Uh-huh.

         2        A.    Okay.  I guess it would come out why this happened.

         3   And then I guess then to Number 2, you know, if there

         4   possibly was something in that background --

         5        Q.    Uh-huh.

         6        A.    -- that prompted that.

         7        Q.    Let me tell you on Special Issue Number 1 the law

         8   says you can certainly consider the murder itself, why was it

         9   committed --

        10        A.    Yeah.

        11        Q.    -- who's the victim, what are the circumstances, was

        12   it a brutal killing, was it very spontaneous, does it appear

        13   to have been planned out, motive.  You get to look at all of

        14   those things --

        15        A.    Okay.

        16        Q.    -- to determine Special Issue Number 1.  A lot of

        17   people tell me, too, that in answering Number 1, they'd like

        18   to know about the person's background, has he ever been in

        19   trouble before.  So you might have a person that's never been

        20   in trouble before.  He's lived a tremendous life, been an

        21   asset to the community, and for whatever reason commits a

        22   capital murder.  That can happen.  You can see where you

        23   might have someone else who's been in trouble or a long time,

        24   picked up a number of cases, maybe he's even been through the

        25   criminal justice system, maybe there have been efforts to

1   rehabilitate him already that he hasn't taken advantages of.

2   You get to take all of those things into account, if you

3   wish, in answering Number 1.

4           Do you think that all of those things would be

5   helpful to you?

6       A.   Yes.

7       Q.   Let's look at a couple of these words in Special

8   Issue Number 1 because they don't have legal definitions.

9   They are going to be left up to you.  The word

10  "probability."  You see, the legislature, when they gave us

11  this question, they said whether there's a probability that

12  the defendant would commit criminal acts of violence in the

13  future.  Not whether there is a certainty.  We don't have to

14  prove that, because a certainty he's going to do that in the

15  future.  We have to do more than there's just a mere chance

16  or mere possibility.  So the legislature kind of came down in

17  the middle there.

18          Do you see that?  Do you see that the State does not

19  have to prove that there's a certainty that this person is

20  going to go off --

21      A.   Yes.

22      Q.   -- in the future and commit criminal acts?

23      A.   Yes.

24      Q.   Criminal acts of violence.  The other thing is the

25  legislature could have forced the State to prove that this

1    man is going to commit future murders or capital murders.  We

2    don't have to prove that.  All we have to prove is that there

3    is a probability that he would commit criminal acts of

4    violence in the future.

5         And thirdly, the word "society."  When you think of

6    society and who makes up society, Mr. Cannon, who comes to

7    mind?

8    A.   Who comes to mind in society?

9    Q.   Yes, sir.  Uh-huh.

10   A.   Men, women, children.

11   Q.   All right.  Is there anybody that you would leave

12   out of that?

13   A.   No.

14   Q.   All right.  The reason I ask is because society with

15   regards to Issue Number 1, a lot of people will tell me,

16   well, obviously people like you and I that I'm going to say

17   live in the free world if you will.  But in context to Number

18   1, can you see how that might also include people inside of a

19   prison?  The Judge has told that you a life sentence equates

20   to 40 years for instance.  Can you see that people serving

21   other felony sentences, guards, nurses, secretaries, that

22   those people also might be a part of society and they might

23   also be deserving of protection from crimes of violence, too.

24   A.   Yes.

25   Q.   Now, I've heard it argued a couple of ways on

1    society.  I've heard it argued that jurors should not

2    consider the free world to be part of society on Question

3    Number 1, unless the State actually proves to you that that

4    person would be in the free world at some time or have access

5    to the free world, that somehow you ought to just kind of lop

6    off that and just look at prison as being society.  That's

7    not the way that the law looks at it.  I think the way the

8    law looks at that is this, that you consider society to be

9    anywhere that the defendant might find himself to be as being

10   society.  And so you have the freedom to consider the free

11   world as well as the prison without regards to what the State

12   is proving about where he's going to be.

13          Does that seem fair to you?

14   A.    Yes.

15   Q.    Okay.  Any questions on Special Issue Number 1

16   before we go down to the next one, Mr. Cannon?

17   A.    No.

18   Q.    Special Issue Number 2.  Like the Judge said, it's

19   kind of like a safety net because by the time you get down to

20   Special Issue Number 2, you're well on your way to a death

21   sentence.  You've already found the defendant guilty.  You've

22   already determined he's going to be a future danger to

23   society.  And now you've got to go down to Special Issue

24   Number 2.  If you answer it no, this man is going to get

25   death.  If you answer it yes, he gets life.

1          Now, I have had people in the past tell me if I find

2    someone has intentionally killed someone during a robbery or

3    kidnapping, such as in this case, and if I truly believe he's

4    a future threat to society, that pretty much does it for me.

5    I'm going to answer it no to make sure he gets death.  I've

6    had people say that.  I've had other people say I'm kind of

7    ambivalent of the death penalty so regardless of what I've

8    done in the past, I'm going to always answer that yes to make

9    sure he gets life.

10          How do you honestly look at Special Issue Number 2

11   when you get down there?

12        A.   Relative to committing the crime of murder, I would

13   be kind of weak on that as far as taking that under

14   consideration.

15        Q.   Okay.

16        A.   If he does a hideous crime like that.

17        Q.   And again, I don't want to put words in your mouth,

18   I hear you saying this --

19        A.   In other words, I wouldn't put too much emphasis on

20   it.

21        Q.   All right.  I take it that you would be leaning

22   towards a no if you found that he's committed a hideous crime

23   and he's truly going to be a threat in the future that you're

24   likely to go with a no; is that correct?

25        A.   No as --

1    Q.   As a death -- you'd be more likely to answer that so

2  he would get death?  Is that what you're saying to me?

3    A.   Yes.

4    Q.   Okay.

5    A.   But I would listen.

6    Q.   Right.  Are there any things that come to mind when

7  you think about mitigation?  Are there any items that come to

8  mind where you say, you know, that's the kind of thing that I

9  might think of as mitigating?  Anything that really comes to

10  mind?

11    A.   Self-defense.

12    Q.   Okay.  Let me tell you, if it was self-defense --

13    A.   Then we wouldn't be here.

14    Q.   Right.  He would be found not guilty.  That's a

15  defense to the crime.

16        Let me go through a few of the things -- some the

17  Judge has gone over previously that I've heard people express

18  in the pass and kind of get your feelings about it.  I've had

19  some people tell me if the defendant is relatively young,

20  that might be mitigation.  I've had other people tell me,

21  that doesn't matter to me.  As long as that man is old enough

22  to be accountable as an adult, know what he's doing, that

23  pretty much answers it for me.

24        How do you feel about age?

25    A.   Age, I think if they've done the crime, they know

1    what they're doing.

2         Q.   Some people have expressed some concerns about maybe

3    alcohol use or drugs.

4         A.   No.

5         Q.   Okay.  And I took that from your answer that you

6    basically said that's your choice, right?

7         A.   Yes.

8         Q.   If you do the drugs and do you the alcohol and you

9    commit a crime, that's too bad?

10        A.   Right.

11        Q.   Some people have -- well, they've talked about

12   things like mental illness.  See, we have Special Issue

13   Number 2 because there was a defendant who was mentally

14   retarded so the court said, well, we want juries to at least

15   be free to think about that if they want to.

16             Just as a general question, have you ever known

17   anyone who's truly suffered from a mental illness, maybe

18   friend of the family, coworker, anything like that?  That you

19   can think of?

20        A.   Well, would you call a nervous breakdown or

21   something like that as mental?

22        Q.   Okay.  Yeah, that could be.

23        A.   Well, yes.

24        Q.   All right.  Do you think that there are some people

25   who might be capable of faking a mental illness to gain an

1    advantage?  Particularly let's say hypothetically a person is

2    facing a possible death sentence or other criminal

3    punishments, do you think there might be some people that are

4    motivated to maybe exaggerate their condition to avoid

5    responsibility for their actions?

6        A.   Well, I don't know of anyone that -- with a mental

7    condition that I think would -- well, I don't know of

8    anyone -- I don't know anyone that I -- that would fake a

9    mental, but I do think that there are people that could fake

10   it.

11       Q.   Uh-huh, okay.  When it comes down to something like

12   mental illness, would it be fair to say you'd want to know as

13   much about that issue as you could --

14       A.   Yes.

15       Q.   -- before you decide whether it's viable or not?

16       A.   Most definitely.

17       Q.   In cases like this there may be claims of sexual

18   abuse or physical abuse.  Maybe someone comes in here and

19   claims that as a young child they were abused in some way.

20   Again, have you ever known anybody who's made that kind of

21   claim?

22       A.   Sexual abuse?

23       Q.   Yes.

24       A.   Yes.

25       Q.   Okay.  Was that somebody in your family or friend

1    or --

2        A.    A friend, yes.

3        Q.    Okay.  Did you ever make any judgment about whether

4    that had actually occurred to them or not?

5        A.    No.  Because -- when the statement was made I

6    went -- it's been discussed.  On something like that, I feel

7    you have to be very careful on your first statement you say

8    to this person.

9        Q.    Uh-huh.

10       A.    Because if they came to you with that information,

11   you have to be careful.  Really, really think about it before

12   you make a judgment because the first thing you say could

13   have an effect on that person --

14       Q.    Right.

15       A.    -- as to the way they feel about you and the other

16   person that it happened -- that did the crime.

17       Q.    In a case like this, if you heard something like

18   that, again, would it be important to know as much about that

19   as possible before you determine whether it's believable or

20   not to you?

21       A.    I don't know if I would want to know -- if

22   someone -- I don't know.  I don't know.

23       Q.    Well, for instance, just in general if somebody were

24   making a claim like that --

25       A.    Okay.  Okay.

1   Q.   -- would it be important to you to know just how

2   quickly did they make the claim, did they make it

3   immediately --

4   A.   Okay.  Yes.

5   Q.   -- or did they wait years before that's popped up?

6   A.   Yeah.

7   Q.   Okay.  Would you like to know what the circumstances

8   were maybe when they made the claim, was there some reason

9   for them to make the claim?  Maybe they were under a criminal

10  indictment or maybe they were looking at some pen time or

11  something before they started making those kind of claims?

12  A.   Yeah, I would want to know that.

13  Q.   Some people have told me on Special Issue Number 2

14  that they might want to look at whether that person is really

15  remorseful.  Are they really sorry for what they did?  I've

16  had some people tell me that's just too bad, you know, once a

17  crime is done, I don't want to care.

18       How do you feel about that?

19  A.   I would take that into consideration, yes.

20  Q.   For instance, you know, you could have a situation

21  where a person commits a murder, stays at the scene, maybe

22  they're sorry immediately, they call the police themselves,

23  they wait at the scene, they talk to the police, they fully

24  cooperate with them, police officer comes in and says when I

25  got to the scene, the man was crying and very remorseful and

1     sorry -- I mean, you could have that, or you could have just

2     the opposite where the man shows no remorse at all.  I mean,

3     shows no emotion maybe until he gets arrested later, or maybe

4     until he's in jail.  You see how that could vary there?

5          A.   Yes.

6          Q.   What are your feelings about all that?

7          A.   I could think -- I would think that maybe -- I would

8     really have to look at the situation because the person could

9     say, okay, I've done this crime.  I better fake sorrow.

10         Q.   Uh-huh.

11         A.   And I would really have to look at the evidence and

12    see, you know.

13         Q.   All right.

14         A.   So they might say I've done this crime and right

15    away start thinking, okay, if I show some sympathy, maybe --

16    I wouldn't let them off simply because they show sympathy or

17    show some remorse.

18         Q.   Just in general in a case like this where an

19    individual is facing either a life or death sentence, how

20    would you expect that person to act while they're confined in

21    the county jail awaiting trial?  Would you expect them to be

22    on their best behavior, or would you expect them to be --

23         A.   Yes.

24         Q.   -- raising cain everyday up there?

25         A.   Sure, if they -- sure.

1        Q.     Before we leave and go to something else, Mr.

2   Cannon, do you have any questions there about Special Issue

3   Number 2, or do you feel like you understand what's going to

4   be expected of you?

5        A.     I understand.

6        Q.     Let's talk for a minute about burden of proof.  You

7   know, the Judge has told you our burden of proof is proving

8   this man's guilty beyond a reasonable doubt.  That's a high

9   standard.

10       A.     Yeah.

11       Q.     It's not beyond a shadow of a doubt or beyond all

12  doubt.  I guess you can understand the only way to get to

13  that point probably is if you were actually a witness to it

14  and you see it yourself.  And there's a lot of ways the State

15  can prove a case.  There might be eyewitness testimony

16  sometimes, but not always.  You can see where an individual

17  committing a murder such as this one might do it where no

18  one -- no one is present.  He may have wanted to conceal his

19  identity in some way.  So there are instances where the State

20  has to rely on circumstantial evidence in one form or

21  another.

22             What's your general feeling about the reliability of

23  circumstantial evidence in a case like this?

24       A.     I think it can be -- I would consider it.

25       Q.     Okay.  You know, it can take a lot of different

1    forms.

2         A.    Uh-huh.

3         Q.    It could be something like fingerprint evidence --

4         A.    Would that be circumstantial?

5         Q.    That could be circumstantial evidence, yes.  Uh-huh.

6    When I say circumstantial, I'm saying anything but eyewitness

7    testimony.

8         A.    Oh, okay.

9         Q.    So fingerprints could be circumstantial evidence.

10   Blood evidence may be circumstantial.  DNA evidence may be

11   circumstantial.

12         What are your feelings about just those types of

13   evidence?  You think they could be reliable?

14        A.    Yes.

15        Q.    Okay.  It could just be a circumstance.

16        A.    Okay.

17        Q.    Let's say you're coming home from work one day and

18   you see me walking out of your door, running out of your

19   front door and I'm carrying your TV under my arm and I'm

20   running.  You didn't see me go in.  You didn't see me pick

21   your TV up, but the circumstances are pretty clear I'm in

22   possession of your goods and I'm running away so that could

23   be a circumstance of guilt, also.

24         You could also have a written statement.  Let's say

25   that no one saw me take your TV, but I come in later to the

1    police and I give them a written statement about what

2    happened.  And I actually confess to that.

3         Do you see how that could also be circumstantial

4    evidence there?

5         A.   Uh-huh.

6         Q.   Have you -- let me just kind of go through a couple

7    of things here.  Have you ever known anyone who has used

8    illegal drugs such as marijuana, cocaine, or LSD?

9         A.   Yes.

10        Q.   Okay.  Do you have any knowledge about how any of

11   those drugs could affect a human's mind?  How it might have a

12   long-term effect on them?

13        A.   I have my -- yes, I -- I have my opinion, and I seen

14   how it does affect a person, each one of them.

15        Q.   How has it affected them?

16        A.   Deteriorated the person totally, you know, to the

17   point where -- they were just not -- they were just

18   functionally out of it.

19        Q.   And again, I guess did you believe that was kind of

20   one of those choices that they had made --

21        A.   I do believe it was, because, you know, I've been in

22   that situation where something could have been done about it

23   to help them.

24        Q.   Right.  When you -- you know, when you look at this

25   case -- and I know your mother is, what, 76; is that right?

1        A.   Yes.

2        Q.   Okay.   One question that we sometimes ask in this

3   case is:  Do you still feel that you could be fair to both

4   sides if it developed that the victim in this case was 80

5   years old, that Bertie Cunningham, the woman who was

6   murdered, was 80 years old?  Do you think that would affect

7   you -- your ability to be fair, or do you think you could

8   look at that and still be fair to both sides?

9        A.   I could.  I could.

10       Q.   You know, that indictment that's up there in front

11  of you really tells you what we have to prove in this case.

12  One thing I want to talk to you very briefly is this:   In

13  this case we have to prove that this defendant intentionally

14  took the life of Bertie Cunningham, that he did so during the

15  course of either robbing her or kidnapping her.  You know, we

16  may prove that both of them happened, but we just have to

17  prove that one of them happened.  Then we have the option,

18  two, of showing that he either shot her with a pistol to

19  cause her death or that he drowned her in water to cause her

20  death.  That's what we have to prove in this case.  If we

21  prove those things to you beyond a reasonable doubt, then we

22  are entitled to a guilty verdict.  If we fail, hey, that's

23  it.

24            And let me just tell you I'm not looking for someone

25  to help me with the burden of proof.  I want somebody that

1    makes me meet that burden of proof.  Don't make it easy.

2    Make we prove what's in that indictment.  I drafted it, so I

3    know exactly what's in there, what I've got to prove.

4              Do you feel like you're the kind of person that

5    could do that?

6         A.   Yes.

7         Q.   Let me just conclude here, and I'm just going to ask

8    you kind of a broad question here.  If you were seated over

9    here in my chair, Mr. Cannon, and you represented the State

10   and you represented the victims in this crime, do you feel

11   like you're the kind of person that you would want to sit on

12   this jury?

13        A.   Yes.

14        Q.   Okay.  Same thing, if you were over here on this

15   table and you're representing the defendant, do you think

16   that you're the kind of person that will give this man a fair

17   trial, make the State prove their case before you give

18   that -- those answers?

19        A.   I think that I could be fair.

20        Q.   Is there anything that we've gone over that's raised

21   some questions in your mind or maybe that I've muddied the

22   waters in some way or --

23        A.   No.

24        Q.   Anything that you want to ask me, Mr. Cannon?

25        A.   No.

1    Q.   Sir, I appreciate your time.  More importantly, I

2    appreciate your candor because we really do depend upon that.

3    Thank you.

4                    THE COURT:  Before we continue, Mr. Cannon,

5    with the questions by Mr. Byck on behalf of Mr. Murphy, do

6    you want to take a stretch break, go to the men's room?

7                    VENIREPERSON:  No, I'm fine.

8                    THE COURT:  Ready to continue?

9                    VENIREPERSON:  Yes.

10                    THE COURT:  Let me reintroduce on behalf of

11   the accused, the Honorable Michael Byck.

12                    MR. BYCK:  Thank you, Your Honor.

13                          Cross-Examination

14   By Mr. Byck:

15   Q.   Again, Mr. Cannon, I'm Mike Byck.  And together with

16   my co-counsel, Jane Little, seated to my immediate right, and

17   Ms. Jennifer Balido, seated behind me, we represent Mr.

18   Jedidiah Murphy in this the trial for his very life.  I

19   appreciate the serious and honest answers I believe you gave

20   Mr. Davis and the District Attorneys Office.  I certainly

21   hope that you will do the same with me because as Mr. Davis

22   said, there aren't any right or wrong answers.  This is not a

23   civics test or a citizenship test.  I'm going to ask you some

24   questions probably fairly similar to the questions that Mr.

25   Davis asked you.  I want you to understand, sir, that what

1  we're looking for are your feelings or your ideas.  Neither

2  Mr. Davis nor myself are going to be on this jury.  We've got

3  our own ideas.  We've honed them over the years, and we've

4  got them down pat.  But our ideas really are not important.

5  It's your ideas that are important.  So if you'll just answer

6  me honestly.  And if I mumble or confuse you, which I'm prone

7  to do, just say wait a minute, Mike, let's start over again,

8  would you mind explaining that.  Okay?

9      A.   Sure.

10     Q.   Okay.  Mr. Davis (sic), you understand we're talking

11  about capital murder.  Capital murder is murder plus.

12     A.   Cannon.  No problem.

13     Q.   Oh, I'm sorry.  Mr. Cannon.  He's Mr. Davis.  I'll

14  get them straight one of these days.

15          Mr. Cannon, you understand that capital murder is

16  murder plus?  If, for example, I were to --

17     A.   Murder plus.

18     Q.   -- pull out a pistol and kill -- sir?

19     A.   Murder plus?

20     Q.   Murder plus.  I'm going to tell you about the plus

21  right now.

22     A.   Okay.

23     Q.   If I were, for example, to reach into my pocket and

24  pull out my pistol and kill my co-counsel here -- no, that's

25  not good enough.  Let's say I get up and yell at her, swear

1    at her, and shoot her 10, 12 times in the head.  That's

2    pretty bad.  That's murder.  That's not capital murder.  I'm

3    not eligible for the death penalty if do that.  The State of

4    Texas says that in order to be eligible for the death

5    penalty, it has to be murder plus.  Murder plus robbery,

6    murder plus rape, murder plus arson, murder plus burglary, or

7    murder of a special kind of person, a child, a prison guard,

8    a police officer, or fireman, all in the line of their duty.

9    Or other special kind of murders, serial murders where I

10   don't like women attorneys, okay, so I kill my co-counsel

11   today and I'll take a shot at Mrs. Balido next week sometime

12   and then I'll be out to visit Mrs. Miller later on in the

13   month.  If I kill all those people, that's a serial murderer,

14   a mass murderer, or if I kill them all at the same time.  For

15   those offenses and for only those offenses I would be

16   eligible for the death penalty.

17          Now, there are all different kinds of murder.  I'm

18   sure you know most of them.  Some of them in terms that you

19   wouldn't ordinarily use, but you're still familiar with the

20   murder.  I'm driving down the street drunk.  I don't know

21   you're on the street and I run into you.  That's a murder.

22   It's a kind of murder called negligent homicide or

23   manslaughter.  Right?  It's still a murder.  I've still taken

24   your life.  I just did it with the mental element of

25   recklessness -- recklessness or negligence.  I just wasn't

1    really thinking of what I was doing.  Okay.  There are other

2    kinds of murders.  I see you in a group of people and I don't

3    like you, so I whip out my AK 47 and I open fire on all of

4    you and you're a little luckier than most, you got behind a

5    light pole or something.  I didn't hit you.  But I did hit

6    somebody else, and I killed them.  That too is a murder.

7    That is what is known as a knowing murder.  That's where I

8    did an act clearly dangerous to human life, taking a shot at

9    all of you people, trying to kill you and killing somebody

10   else.

11          Those kind of murders that I described are not

12   capital murders.  The reason why is because of the mental

13   element, or what we call the intent.  In a capital murder I

14   have to have very specific intent to kill.  Let's go back to

15   me and my co-counsel Ms. Little.  I go out and I buy a gun.

16   I buy some bullets.  I load the gun.  I sneak the gun past

17   the security guards downstairs.  No great feat, but I do it

18   anyway.  And I come up here.  And Ms. Little is writing me a

19   note, and I'm -- I've had it with her notes.  I've just had

20   it with them.  And I pull out my gun.  She sees the gun.  At

21   that point I do not intend to frighten Ms. Little by her

22   seeing the gun.  I aim the gun at her and fire it.  At that

23   point I do not intend to wound Ms. Little.  I intend to kill

24   her.  That is my intent.  It is my conscience objective and

25   desire when I engage in the conduct, pulling the gun, aiming

1    it, cocking it, pulling the trigger, to cause the result.

2    Ms. Little is not frightened.  She is not wounded.  She is

3    dead.  A very specific intent.

4            Are you with me so far?

5    A.    Oh, yes.

6    Q.    Okay.  The intent is going to be very important

7    later.  Well, it's important at that particular stage because

8    you can't find me guilty of capital murder without that very

9    specific intent.

10           Do you understand the requirement for this very

11   specific mental element in capital murder?  You can't have an

12   accidental capital murder.  You cannot have a mistaken

13   capital murder.  You got to have a capital murder that is --

14   is contemplated and intended where every -- where what you do

15   is aimed at getting the result you want, which is death,

16   nothing else.  Not robbing her, not insulting her, not

17   anything else but killing her.  Okay.  All right.

18           Now, let me be honest with you.  Once you have found

19   an individual guilty of capital murder -- let's talk about

20   me.  All right.  You found me guilty of intentionally killing

21   Ms. Little, and I steal her -- her pad of paper while I'm at

22   it.  That makes it -- since I have a gun, it makes it a

23   robbery.  I am guilty of capital murder at that point.

24           Then we go on to the first question, whether there's

25   a probability I would commit criminal acts of violence that

1    would constitute a continuing threat to society.  Well,

2    you've seen me here.  You've watched me kill Ms. Little.  You

3    know that I really don't have any remorse, that I really

4    don't care.  That I'm really angry at Ms. Little, and I want

5    her dead.  I did all those things, including sneaking a gun

6    into this courtroom, to kill her and, in fact, I killed her.

7    And you could decide just by listening to me talk that, boy,

8    this guy Byck is a menace.  You know, you give -- you give

9    him another gun and he'll be killing other people for sheets

10   of notebook paper for crying out loud.

11             In my hypothetical trial, capital murder trial, you

12   have found me guilty of capital murder, an intentional

13   murder.  You have also found through whatever evidence that

14   I'm going to be a continuing threat to society.  I really

15   don't feel very bad about killing her at all.  As a matter of

16   fact, I enjoyed it.  I may want to do it again.  After you've

17   reached that point, let me ask you something very seriously,

18   Mr. Cannon, and you give me an honest answer.  Is there

19   anything, anything on this planet that I could show you in

20   mitigation of the intentional murder and the fact that you

21   believe beyond a reasonable doubt that I am going to be a

22   danger in the future?  Is there anything, sir, that I could

23   show you to get you to answer Special Issue Number 2 yes --

24        A.    Okay --

25        Q.    -- where I get a life sentence?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    Answer?  No.

2    Q.    There is nothing you would consider --

3    A.    From the hypothetical situation you just gave me,

4  you came in, you intentionally shot her --

5    Q.    Right.

6    A.    -- you took her pad.

7    Q.    Right.  That's a murder and a robbery, so I'm guilty

8  of capital murder.

9    A.    Yes.

10    Q.    And then let's go on --

11    A.    And then you want to know if there is anything in

12  Special Number 2 that would change my mind --

13    Q.    No, remember --

14    A.    -- as to whether you would be a threat to society?

15    Q.    No, remember, we're doing this step by step.  You've

16  found me guilty of capital murder.  The first step after that

17  is you answer Special Issue Number 1.

18    A.    Uh-huh.

19    Q.    Whatever evidence there is, it's the State's burden

20  of proof to prove to you beyond a reasonable doubt that, yes,

21  I am going to probably commit criminal acts of violence that

22  would constitute a future threat to society.

23    A.    Uh-huh.

24    Q.    Same words.  I mix them up different every time I

25  say them.  They've proved to you that about me.  They've

1    proved to you I'm an intentional murderer.  They proved to

2    you I'm going to be a future danger.

3           Question Number 2 now --

4       A.   Do I think there is anything in Number 2 that would

5    change my mind?

6       Q.   Is there anything I can --

7       A.   Is that your question?

8       Q.   -- show you in Question Number 2 that would make you

9    change your mind?

10      A.   I don't think so.

11      Q.   That's a fair answer.  There are, you understand,

12   all kinds of mitigating evidence.  Mr. Davis went over a long

13   list of them.  Some people may think they're aggravating.

14   Some people may think they're mitigating.  I could bring you

15   my mommy who would cry and, you know, I could show you all

16   kinds of problems that I've had in my youth, and, you know,

17   maybe I've been drinking, maybe I've been using drugs.  I'm

18   not very young.  I'm not going to get away with that one, I'm

19   afraid.  I'm a little crazy.  I'll go for that.  I love my

20   family.  I was really good when the cops got me, gave them

21   the gun and all that, whatever, but that really doesn't

22   matter, does it, or it wouldn't to you?

23      A.   In a hypothetical situation you just gave me?  No.

24              THE COURT:  Mr. Cannon, do I understand you to

25   say that regardless of the mitigating evidence presented, you

```
 1    would not consider?

 2                    VENIREPERSON:  Yes.  Well, I don't think I

 3    would really, given the situation that he gave me, that he

 4    just came in, he intentionally went and got the gun, he

 5    brought it, he sneaked it in, and he came in, he got angry,

 6    he shot a woman, and he stole her pad.  If I'm understanding

 7    correctly, that's capital murder.  Now --

 8                    THE COURT:  It's capital murder.

 9                    VENIREPERSON:  Yes.

10                    THE COURT:  It's capital murder, right.  But

11    capital murder does not automatically under every case equal

12    death.

13                    VENIREPERSON:  Okay.  Okay.  So if there is

14    any --

15                    THE COURT:  That would guarantee a life

16    sentence period, would not automatically guarantee a death

17    sentence.

18                    VENIREPERSON:  Okay.  Okay.

19                    THE COURT:  But if they answer Special Issue

20    Number 1 to your satisfaction, yeah, he's going to be a

21    future danger --

22                    VENIREPERSON:  Uh-huh.

23                    THE COURT:  -- Mr. Byck's question to you with

24    regard to Number 2, is there anything -- about to sneeze --

25    in the realm of evidence presented that you could consider to
```

1   be mitigating evidence such that he would get a life sentence

2   and not death?

3                   VENIREPERSON:  No.

4                   THE COURT:  Regardless?

5                   VENIREPERSON:  Regardless.

6                   THE COURT:  He's going to die.

7           Defense may continue.

8                   MR. BYCK:  May we approach at this point very

9   briefly?

10                  (Side bar discussion.)

11                  THE COURT:  Let the record reflect an

12  unreported hearing occurred at the side of the bench, outside

13  the presence hearing of the reporter, the defendant, the

14  prospective juror.

15          The defense may continue.

16  Q.    (By Mr. Byck)  Mr. Cannon, I want to be sure and

17  state this to you fairly.  And I think I have stated it to

18  you fairly.

19          The law requires -- well, before I say something

20  like the law requires or for you to be a qualified juror,

21  want you to understand something, and that is that the law

22  will never ever require you to surrender your deeply held

23  beliefs or violate your conscience or reject your strong

24  personal feelings.

25  A.    Uh-huh.

1      Q.    The law is just not going to require you to do

2   that.   If you feel strongly, the law may say you may not be a

3   qualified juror, but is not going to jump on your back and

4   whip you with a stick and say you have got to do this in

5   spite of how you feel and how you believe and what your

6   conscience says.   Okay.   Hypothetically, you have found me

7   guilty of a capital murder.   Hypothetically, you have found

8   that the State has carried their burden of proof on Special

9   Issue Number 1 and that you believe beyond a reasonable doubt

10  me to be a danger in the future.   Okay.

11          In this hypothetical examination, like I said, I

12  have a lot of mitigating evidence.   I told you about my mom.

13     A.    Okay.

14     Q.    I told you about how well I got along in jail and I

15  told you I'm a little bit crazy and I may have been using

16  drugs and alcohol, and whatever, but let me add a few other

17  things, too.   I'm a really good artist.   I'm not a bad

18  playwright, got a couple of plays.   May or may not be

19  produced some day.   If -- if in our hypothetical situation,

20  after having found me guilty and after seeing me beyond a

21  reasonable doubt to be a danger in the future, if you saw

22  some mitigating evidence that I presented to you and you were

23  really impressed with, you thought, well, this is pretty

24  impressive stuff here.   I believe what I'm going to say is

25  that I think it's sufficient enough to warrant a life

1    sentence, or in all honesty is that just absolutely

2    impossible, absent from a signed letter from God that says

3    Mike really has some mitigating evidence that, you know,

4    ought to put him over the top here and that you are honor

5    bound to believe that you're my loyal servant.  If I don't

6    have a letter that says that, and believe me, I'm never ever

7    going to get one that says something like that and nobody

8    else is either.

9         But if you find something that you feel is

10   mitigating, do you think you could say, yes, I believe that's

11   mitigating enough for me to give the answer of yes to Special

12   Issue Number 2, meaning I would not get a death sentence or

13   would you be compelled to say found him guilty of capital

14   murder, I found he's going to be dangerous in the future, he

15   does not have a letter from God, and I can never ever find

16   anything mitigating enough to answer Special Issue Number 2

17   yes?

18       A.   Okay.  I could answer yes, but now -- let me see if

19   I understand this now.  Are you asking me if I could use

20   mitigating circumstances in Number 2 to determine if he gets

21   life or death?  Is that your question?

22       Q.   Yes, that's half of what I'm asking.

23       A.   Okay.

24       Q.   Can you do that after you have already found him

25   guilty and after you have already answered Special Issue

1   Number 1 to be yes?

2       A.    Excuse me, you're asking me if I can still find

3   him -- can I still say death?  Is that what you're asking?

4       Q.    No.  Can you say life?

5       A.    Can I say life?

6       Q.    After finding me guilty and after finding that I'm

7   going to be a future danger.

8       A.    Death is not considered in this situation?

9       Q.    Remember, it's the answers to the questions that

10  determine life or death?

11      A.    Okay.

12      Q.    If you answer Question Number 1 as --

13      A.    Yes.

14      Q.    If you answer -- find me guilty, answer Question

15  Number 1 yes --

16      A.    Okay.

17      Q.    -- and in your answer to Question Number 2 you find

18  that there is sufficient mitigating circumstances to warrant

19  a life sentence --

20      A.    Okay.

21      Q.    -- would you be able to give me a life sentence or

22  would you have to say I found him guilty, he's going to be a

23  future danger, I don't care what he shows me?

24      A.    I would consider it.

25      Q.    You would consider it?

1       A.     I would consider it.

2       Q.     So you would be able to do that?

3       A.     Yes.

4       Q.     If you found sufficient mitigating circumstances,

5  right?

6       A.     Yes.

7       Q.     I'm not asking you how high the bar is?

8       A.     I would consider it, yes.

9       Q.     Okay.  That's all we can ask you to do.

10      A.     I would consider it, yes.

11      Q.     If -- let me take this one little step further.  If

12  in the consideration of your mitigating circumstances, could

13  you ever find any mitigating circumstance or circumstances

14  sufficient to in the face of a guilty and a yes, he's going

15  to be a danger in the future, give me life?

16      A.     That mitigating circumstances -- to give you life?

17      Q.     Right.

18      A.     This hypothetical situation here?

19      Q.     Uh-huh.

20      A.     I don't think so.

21      Q.     Mr. Cannon, as you can see, I'm sure you can see --

22      A.     Am I confuse -- am I not understanding?

23      Q.     No, I think you are understanding it, I think you

24  are.  But we're just checking with each other to make sure

25  that we're getting it to you in the most simple way and that

1    you understand the law because, believe me, I don't know if

2    I'm capable of confusing you, Mr. Cannon, but I am certainly

3    capable of confusing myself.  Okay.  All right.  So that's

4    why we're trying to figure out --

5        A.   Okay.

6        Q.   -- if we've given you enough information because

7    there is no tricking you here, very frankly.  If the Judge

8    thinks that I'm tricking you, believe me, you're going right

9    back to Mr. Davis and he's going to clean it up.

10       A.   Okay.  And I'm trying to understand.

11       Q.   Right.  Okay.  You get a fair question, and then we

12   get a fair answer.

13       A.   Okay.

14       Q.   Okay.  My co-counsel told me that I've succeeded in

15   confusing them, so let me run this by you one more time to

16   make sure that you understand.

17       A.   Okay.

18       Q.   You find me guilty of capital murder, an intentional

19   murder.

20       A.   Okay.

21       Q.   You find that the State has shouldered their burden

22   of proof and proved to you beyond a reasonable doubt that

23   there is a probability that I would commit criminal acts of

24   violence just like it says in that question.

25       A.   Okay.

1      Q.    Okay.   Then we get to the second question.

2      A.    Okay.

3      Q.    After you have found me guilty and found the answer

4    to the first question, we get to the second question.

5      A.    Okay.

6      Q.    And you hear mitigating evidence.

7      A.    Okay.

8      Q.    Whatever it is.

9      A.    Okay.

10      Q.    Let's not even talk about what kind of mitigating

11    evidence it is.

12      A.    Okay.

13      Q.    But you hear mitigating evidence.  You not only hear

14    this mitigating evidence, but this mitigating evidence is

15    very attractive to you.  It makes sense to you.  It raises to

16    the level where if you were not in a capital murder

17    situation, you might just find that, yes, there is sufficient

18    mitigating evidence that I should get a life sentence.  But

19    however in the capital murder context, can you say to us,

20    yes, if I hear evidence, I'm going to consider it.  If I

21    consider it and I rate it or I personally weigh this evidence

22    to be such that I really think the person ought to get a life

23    sentence instead of a death sentence, I'm going to give him a

24    life sentence.  Or is your thought about that, listen, I

25    found him guilty of capital murder, I found that he's going

1    to be of future dangerousness, of course I will listen and

2    consider to hear mitigating evidence, but unless you bring me

3    a letter from God, all right, I'm not going for it.  Anything

4    short of that, I am not going to go for it.  Even though I

5    considered it, I liked it, I listened to it, whatever.  We're

6    talking about a capital murder, and I'm not giving you a life

7    sentence after I found you guilty and you're going to be a

8    future danger.  I just can't do that.

9          Where do you feel?  Where do you fit in there?

10   A.    Where do I fit in that situation there?  Again, I

11   would listen, consider, weigh it, and I'd have to think about

12   it long and hard as to whether I would change from -- now, am

13   I talking about a death penalty here or just life in prison?

14   Q.    You're talking either life or death.

15   A.    Life or death.

16   Q.    That's exactly right because the answer to that

17   question, Special Issue Number 2 --

18   A.    I would consider it.  I would consider it.

19   Q.    If you considered it and you found that, yeah,

20   that's pretty good evidence, you know, I know he did it

21   intentionally and I know he's going to be a danger in the

22   future, but there is some evidence that raises to the level

23   of mitigation where I feel he ought to have a life sentence.

24   Can you write life down?  In other words, can you answer --

25   A.    I hear, I understand.

Page 62

1    Q.    Can you answer no --

2              THE COURT:  Yes.

3              MR. BYCK:  Yes.

4    Q.    (By Mr. Byck)  One or the other.  You see what -- I

5    mean, we're getting ourselves confused now.  But what I'm

6    saying is you found me guilty, Question Number 1 to be yes?

7    A.    Right.

8    Q.    You hear mitigating evidence.  You consider it.  You

9    listen to it.

10   A.    Uh-huh.

11   Q.    Not only that, you feel that it raises to the level

12   where I ought not to get a death sentence.

13   A.    No.

14   Q.    Is that ever going to happen?

15   A.    Is that ever going to happen?

16   Q.    Yes.

17   A.    Possibly.  Possibly.  But you have to -- as far as

18   to say yes or no --

19   Q.    I know that.  Believe me, I know that.  It's very

20   difficult.

21   A.    But I would lean strongly towards the death penalty,

22   yes.

23   Q.    One last question about Special Issue Number 2.  The

24   law says that there is no burden of proof on Special Issue

25   Number 2.  I don't have to prove that mitigation raises to a

1    certain level.

2         A.    Uh-huh.

3         Q.    I don't even have to bring any mitigating evidence.

4    The State could bring it.  You know, the State could say --

5    well, let's see, what's a stupid piece of mitigating or

6    aggravating.  He's got a beard, right?

7         A.    A beer?

8         Q.    A beard.

9         A.    Oh, beard.  Okay.

10        Q.    So the State proves that I've got a beard, and some

11   people on the jury feel, well, people that have beards are

12   nice people, they're not bad.  And other people on the jury

13   go, no, people with beards are bad people and they're always

14   bad.  All right.  The law says that in proving Special Issue

15   Number 2, no one has a burden of proof.  They don't have to

16   prove it.  We don't have to prove it.  If it's there, you

17   listen to it and consider it.

18             Would you in the context of the capital murder,

19   again where you don't even get to Special Issue Number 2

20   until you've already found me guilty of intentional murder

21   and found that I'm going to be a future danger, would you

22   say, well, it's your burden to prove something to me,

23   defense, you better prove that mitigation to me, it's your

24   burden to show it to me.

25        A.    No.

```
 1      Q.    You wouldn't do that?

 2      A.    No.

 3      Q.    Okay.  All right.  Let me --

 4            MR. BYCK:  What kind of time am I running

 5  here, Judge?

 6            THE COURT:  You have three minutes left.

 7            MR. BYCK:  Oh, boy.

 8      Q.    (By Mr. Byck)  Let me ask you a couple of real quick

 9  questions.  Okay?  All right.

10            It is possible that an individual may confess to an

11  offense.  A confession is a written statement against

12  interest saying that on a date certain I did such and such to

13  so and so in such and such a manner.  You know what a

14  confession is.  In order for a confession to be legal in

15  Texas, some things have to have happened.  Number one, it

16  cannot be a coerced confession.  That is, somebody can't sit

17  on my chest and beat my head against the floor until I

18  finally decide to sign a piece of paper.  It has to be

19  uncoerced.  That's number one.

20            Number two through five is that it's got to be

21  warned.  An individual giving a written statement has to be

22  given the Miranda warnings.  You've probably heard your

23  daughter reciting them, trying to memorize them.  You've got

24  the right to remain silent.  Anything you say can be held

25  against you.  You have the right to have an attorney
```

1  appointed during this questioning. If you're too poor to

2  afford to have an attorney, we'll appoint one for you. You

3  have the right to terminate the questioning at any time. I

4  think that's four. I always get the numbers confused. Okay.

5       I'm going to give you a hard, hard case situation,

6  because believe me, I haven't cut you any slack that's for

7  sure. I've asked you some real hard questions and you've

8  given me some real honest answers and I appreciate it.

9       I'm an arsonist. I'm a school arsonist. All

10 right. I like to burn down elementary schools. I'm just

11 that kind of guy. So they catch me out at the school one

12 night or the burning embers of what's left of the school, and

13 all my little arson stuff is burned up. And they come up and

14 they go, gee, we see you standing around these burned out

15 schools all the time. What's going on here? And I make some

16 indications that I just might be guilty of something, namely

17 I wreak of gasoline. Okay?

18    A.    Okay.

19    Q.    Whatever other indications I have. My eyes are

20 glazed. I'm looking at the fire and not the policeman. So

21 they're starting to wonder about me so they take me

22 downtown. And they -- number one, they don't beat me up, so

23 you can forget about that part of the question. Okay.

24    A.    Uh-huh.

25    Q.    But they give me some Miranda warnings. They only

1   give me three of them.   They don't tell me that I have the

2   right to terminate the interview at any time.

3        A.   Uh-huh.

4        Q.   They start talking to me about the crime.

5        A.   Uh-huh.

6        Q.   I tell them about the crime, and I don't ask to stop

7   the questions.   I don't ask for an attorney.   All right.   I

8   don't refuse to speak to them or anything like that.   So they

9   don't beat me up.   They know that I knew I had the right to

10   have an attorney, that if I didn't have any money, that they

11   would give me an attorney.   They knew that this stuff could

12   be used against me, and I knew all of that.   But I really

13   didn't know that I could stop.   I never even asked to stop.

14   Okay.

15              Before my trial, I'm upstairs in the Dallas County

16   Jail.   And I'm asking everybody, all my jail buddies, what

17   kind of school is in your neighborhood.   Is it a wood

18   school?   Are there many fire escapes?   Is there any dry

19   leaves or paper or paint cans anywhere around this school?

20   And then we come down, and we have my trial.   It is proven

21   that I was at the scene, that confessed to the officers.   I

22   was only given three of the warnings.   I was not given the

23   fourth warning.   Plus you know some other things about me.

24   You know very well that if you let me go, I'm going right out

25   the door with my Bic lighter and I'm heading to the first

1    elementary school I can find out because I made it obvious to

2    everybody upstairs in jail exactly where my head is at about

3    this.   There is no other evidence to that burned out school

4    except my confession.   Everything else went up in flames.   No

5    fingerprints, no matches, no gasoline, no nothing.   There is

6    nothing but my statement that I burned the school down and I

7    had a wonderful time doing it.

8            You're sitting on my jury, and the facts are just as

9    I have given them to you.   The Judge in his written charge to

10   you says, Mr. Cannon and the other 11 members of the jury,

11   you have got to believe, number one, that this confession

12   wasn't beaten, kicked, stomped, or whatever out of Mr. Byck,

13   which is true, it wasn't.   They didn't lay a glove on me.

14   And you've also got to believe that the other four warnings

15   of the Miranda warnings were given.   If you do not believe

16   that, you cannot use the confession.   You know if you don't

17   use the confession there isn't any evidence against me.

18   Nothing at all.   You know if you do not use that confession,

19   I'm walking out the door with you.   Well, I probably won't be

20   going out with you.   I've got to go back up to the jail and

21   get my cigarette lighter before I leave.

22           What would you do?   Would you use the confession?

23       A.   Yes.

24           MR. DAVIS:   I'm sorry, I've got to object.

25   That's an improper statement, improper questioning --

Page 68

```
 1                    THE COURT:  Sustained.

 2                    MR. DAVIS:  I'm going to object to the form of

 3      it.

 4                    THE COURT:  Sustained.

 5                    MR. BYCK:  What's the problem?

 6           Q.    (By Mr. Byck)  I love asking you a 20-minute

 7      question and getting a 5-second objection and then having to

 8      do it all over again, so let me see if I can piece it

 9      together for you.

10                    We've got the same arson problem.  We've got the

11      same exact same deal that you heard, right?

12           A.    Okay.

13           Q.    The law says that in order for to you use a

14      confession, this confession has to be voluntarily and it has

15      to be properly warned under Section 38.22 of the Texas Code

16      of Criminal Procedure.  Right?  The warnings are set out in

17      38.22.  There are four of them.  I was only given three.

18           A.    Okay.

19           Q.    You are now sitting there with my confession in one

20      hand and the law in the other.  And the law says it's got to

21      be voluntary.  That means it wasn't beaten out of me, and

22      you've got to have four warnings.  It's undisputed in the

23      testimony I only got three warnings.

24                    My question to you, sir, is can you follow the law

25      if that's what the law says, disregard my confession, there
```

1    being no other evidence, find me not guilty?  Or will you say

2    to your other 11 members of the jury, listen, they didn't

3    beat it out of him.  They gave him three out of the four and

4    he never even asked for the fourth one.  He didn't ask to

5    terminate the interview.  There is no evidence of that.  We

6    know the damage he's done to this school.  We also know with

7    evidence that we've heard from people upstairs in jail with

8    him -- see, when police officers talk to me, I make a

9    confession, they got to warn me.  When civilian, other jail

10   inmates talk to me and I make the statement against interest,

11   they don't have to give me any warnings, right, because

12   they're not police.  And they're not acting like police.  So

13   you hear the evidence of these other people saying, yeah, he

14   was talking about burning down elementary schools, wanting to

15   know if they were made of· wood or whatever.

16        Would you use the confession or would you follow the

17   precepts of the law under the facts that I've given you in

18   this hypothetical and throw the confession out and turn me

19   loose?

20             MR. DAVIS:  Same objection, Your Honor.

21             THE COURT:  Sustained.

22             MR. BYCK:  Your Honor, may we ask for a

23   specific objection here?

24             THE COURT:  Mr. Cannon, the law is that if the

25   full Miranda warnings as required by the United States

1    Supreme Court are not given to and understood by the person

2    that gives the confession, the jury may not consider the

3    confession as any evidence at all.  Could you follow that

4    instruction?

5                    VENIREPERSON:  I understand that.

6                    THE COURT:  Time is up.  If you would excuse

7    Mr. Cannon.

8                    MS. LITTLE:  Your Honor, just for

9    clarification, I think Mr. Cannon said that he understood

10   it.  I don't know that he said --

11                   THE COURT:  Could you follow it?

12                   VENIREPERSON:  Yes.

13                   MR. BYCK:  Your Honor, may I beg the Court's

14   indulgence and have a couple of more minutes?

15                   THE COURT:  Two minutes.

16                   MR. BYCK:  Thank you.

17       Q.   (By Mr. Byck)  Two more things, Mr. Cannon, one of

18   which is -- I'm going to give you last one first in this

19   backward presentation -- is that there may be any number of

20   reasons that you may not feel comfortable or want to sit on

21   this jury that I could literally sit here for the next five

22   hours and ask you questions about and I wouldn't raise the

23   topic.  Sir, if there is anything, I'm not asking you the

24   question now, this will be the last question.  If there is

25   anything in your background, in your history, your personal

1  finances, in your relationship with people, in your feeling

2  that you're just tired of getting badgered by some bearded

3  overweight attorney for an hour and a half or however long

4  you feel you've been sitting up there, whatever the reason

5  is, if you feel you can't be a fair and impartial juror, tell

6  us.   Okay?   That's the question I will ask you after I say

7  one more thing to you.

8         And that is, Mr. Cannon, everybody's got rights

9  here.   The defendant has rights.   They're in the

10  Constitution.   The State has rights.   They're in the --

11  codified in law books.   They have the right to make

12  objections.   You heard them do that, right?   The Judge has

13  rights.   He has rights to have order in this court.   You,

14  sir, as a juror have rights also.   You have the right and --

15  well, you're going to be dealing with 11 other strangers.

16  Believe me, they're not going to know you.   You're not going

17  to know them.   Some of them may be -- I don't know, gee, I

18  hope you don't sell cars for a living, sir, but some of them

19  for want of a better term just may be some real roughshod

20  used car salesmen who will get up in your face, insult you,

21  deface you, diminish you, and try to coerce you or force you

22  into going along with them, using whatever tricks they use.

23  All right?   I'm not saying this is going to happen.   I am

24  saying this has happened before.

25         You have the right, sir, to deliberate with

1   dignity.   You have the right to consider a young man or a

2   young woman's fate under the law without anybody intimidating

3   you, without anybody harassing you, without anybody demeaning

4   you or dissing you or whatever, manipulative techniques they

5   may use to get you to swing around to their point of view.

6   What I'm asking you, sir, is that knowing that you have those

7   rights, if anybody -- if you were to sit on this jury, if

8   anybody back in that jury room were to pull a stunt like that

9   on you, or if you were to see that happen to another juror,

10   would you inform our bailiffs?

11       A.   Yes.

12       Q.   That something is just not right in here, somebody

13   is getting powered out, somebody is getting arm twisted,

14   somebody is getting, you know, cajoled or fueled, tricked or

15   whatever into doing something that they don't want to do.

16   Would you up that to us?

17       A.   Your question is would I tell you that?

18       Q.   Right.

19       A.   Yes.

20       Q.   Well, tell the bailiffs?

21       A.   Yes.  Yes.

22       Q.   Okay.  Finally, I'm going to ask you the question I

23   promised to ask you five minutes ago.

24       A.   Okay.

25       Q.   Is there anything reason you can think of, anything

1    at all, personal, financial historical, medical, who knows,

2    where you would not be a fair and impartial juror in this

3    case?  Anything you may know?

4       A.   No.

5       Q.   Fair enough, sir.

6              MR. BYCK:  Pass the witness, Your Honor.

7              THE COURT:  Ms. Madore, if you would excuse

8    Mr. Cannon.

9          Mr. Cannon, the attorneys will confer with their

10    respective co-counsel, will then inform me whether or not

11    they wish you to be considered and I'll make the

12    determination as well whether you'll be considered as a

13    future juror.  If you'd excuse yourself with Ms. Madore.

14              MS. LITTLE:  Is this a juror who had -- who

15    was checked for -- is this a juror who was checked for jury

16    service?

17              MS. MILLER:  There is -- Judge, for record

18    purposes, we have run and there is nothing in our data bank

19    that shows that he was evaluated as a juror.  And we can

20    offer this into the record if you would like.

21              THE COURT:  Fine.

22              MS. LITTLE:  Okay.  That would be good.  As

23    what?

24              MR. DAVIS:  Why don't you just put -- could we

25    label this as P as Pretrial 1?

```
 1                    THE COURT:  Yeah.

 2                    MS. LITTLE:  And of course this questionnaire

 3    is part of the record.

 4                    THE COURT:  Yes.

 5          Mr. Davis.

 6                    MR. DAVIS:  The State has -- well, we'll offer

 7    State's P1 there for the record.

 8                    (State's Exhibit No. P1 offered)

 9                    THE COURT:  Admitted.

10                    (State's Exhibit No. P1 admitted)

11                    (State no challenge for cause - Mr. Cannon)

12                    MR. DAVIS:  And the State has no challenge for

13    cause of this juror.

14                    (Defense challenge for cause - Mr. Cannon)

15                    MS. BALIDO:  Judge, we'd like to make a

16    challenge for cause on this juror, based on the answer to his

17    question in regard to Special Issue Number 2.  I believe he

18    said on a number of occasions that if he found the defendant

19    guilty of capital murder and answered Special Issue Number 1

20    yes, that there would be nothing to make him answer Special

21    Issue Number 2 in such a way to give him a life sentence.

22    That was propounded to him on two separate occasions.  And

23    additionally, it was only after it was posed to him in such a

24    situation or in such a way that he believe -- he found there

25    was to be mitigating circumstances would he consider it, but
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    he still did say that he would still be leaning towards a

2    death verdict in that case.  We believe what that does is,

3    number one, he cannot follow the law.  And, number two, that

4    it places an unfair burden on the defense to prove to him

5    that he must answer that question in such a way to give a

6    life sentence.

7            And additionally, this is backed up in the

8    questionnaire on page number 4, that the questions dealing

9    with mitigation, specifically a person's destiny or fate is

10   determined by the circumstances of their birth and

11   upbringing.  He disagreed with that statement.  And

12   additionally genetics -- circumstances of birth, upbringing

13   and environment, should be considered when determining the

14   proper punishment of someone convicted of a crime, he marked

15   that he disagreed with that.

16           We believe his answers on the stand initially and

17   his answers on the questionnaire show that he could not

18   follow the law and the case and only after he realized that

19   he was about to be struck did he change his answer to such

20   that he figured out what he needed to say to be on this jury

21   and we'd object to him and we would say that we proved up

22   enough to show that he can't follow the law.

23           THE COURT:  With regard specifically to the

24   matters about which the defense makes reference on page 4 of

25   the questionnaire, I found Mr. Cannon, in an effort to honor

1    the desire of Dr. Martin Luther King, that we have a color

2    free biased society and find his answers to be appropriate in

3    light of Dr. King's vote for the future of this country.   I

4    find based upon the totality of the questions by counsel for

5    both sides, in light of the United States Supreme Court

6    admonishments of Wainwright versus Wit, challenge for cause

7    by the defense is denied.   Mr. Cannon will be Prospective

8    Juror Number 4.

9                        (Challenge for Cause Denied)

10                  MS. BALIDO:   Judge, we'd also like to make an

11   additional motion to strike for cause based on his answer in

12   the -- in the questionnaire, specifically page number 3, that

13   the burden of proof in a criminal case is up to the accused.

14   And we'd say that he should be disqualified for that reason.

15                  (Marlin Cannon Prospective Juror No. 4)

16                  THE COURT:   The Court will stand on its

17   previous ruling.   I note that the defense had ample -- had 30

18   minutes of time to bring that question to the attention --

19   find the defense had ample opportunity in 30 minutes to make

20   that question, chose for whatever reason strategic not to and

21   I find they have waived that objection by virtue of no

22   questions.

23                  If you would bring Mr. Cannon back in.

24                  (Venireperson returned to courtroom.)

25                  THE COURT:   Mr. Cannon, have a seat for just a

DARLINE W. LABAR, OFFICIAL REPORTER

1    moment or two if you would, please, sir.  Mr. Cannon, you

2    will remain under consideration as a prospective juror in the

3    case.  I've asked Ms. Daily, the Court Administrator, to come

4    in, to confirm some home phone numbers, work phone numbers

5    with you.  And with your permission, going to ask that you

6    would allow Mr. Rees, the bailiff, to take a Polaroid picture

7    of you.  Let me tell you why.  Until we get to this 48, the

8    attorneys will then exercise their peremptory challenges.  We

9    talk to an awful lot of people.  Sometimes we start

10   forgetting whose face matches up with information the

11   attorneys have gotten during the questioning and the

12   questionnaires.  Once that jury has been selected, assuming

13   you allow us to take your picture, I promise you it will be

14   shredded, will not be used for any purpose.  With your

15   permission, may the bailiff take your picture for this

16   limited purpose?

17                    VENIREPERSON:  Yes.

18                    THE COURT:  Ms. Daily, if you would confirm

19   phone numbers with Mr. Cannon.

20             Mr. Cannon, do not go to the Dallas Morning News

21   archives and get a copy of the paper.  Don't discuss with

22   anybody, family members or friends, including your police

23   officer daughter, police officer community supervision

24   relative, nor your brother, that you remain under

25   consideration as a juror in this case.  Okay?

1              VENIREPERSON:  Okay.

2              THE COURT:  Any questions for me?

3              VENIREPERSON:  No.

4              THE COURT:  Thank you.  After the little

5    housekeeping chores have been completed, you're free to go

6    home, back to work as the case may be.

7              VENIREPERSON:  Okay.  Thank you.

8              THE COURT:  Thank you.

9              (Recess taken.)

10              THE COURT:  Mr. Griffing, have a seat if you

11   will, please.

12         Mr. Griffing, we'll move right into individual

13   questioning.  Again, we begin with the State, from the Dallas

14   District Attorneys Office, the Honorable Mary Miller.

15              MS. MILLER:  Yes, sir.

16              THE COURT:  Ms. Miller.

17                   GREGORY GRIFFING

18   was called as a venireperson by the Court and, after having

19   been first duly sworn, testified as follows:

20                   Voir Dire Examination

21   By Ms. Miller:

22      Q.   Good afternoon, Mr. Griffing.  How are you doing?

23      A.   Good.

24      Q.   One real quick question off of your questionnaire,

25   you didn't check whether or not you knew either Mr. Davis or

1   myself and I didn't know if that was a mistake or whether you

2   thought you did and you needed another opportunity or --

3        A.    No, I don't know either of you.

4        Q.    Okay.  Just -- I just wanted to do that for clerical

5   purposes.

6             Mr. Griffing, back when -- do you remember when we

7   met in the Central Jury Room when they brought about 500

8   people in and Judge Entz introduced all of us and then he

9   also introduced the defendant, Jedidiah Murphy, and said that

10  the State was seeking death against the defendant.  This was

11  a capital murder case.  Do you remember what your first

12  impression was?  What you thought when you heard that, Mr.

13  Griffing?

14       A.    Well, I've never been to any -- this is a new

15  experience for me, so -- what was my first thought?  I sort

16  of felt, you know, the gravity of the situation come on me.

17  I felt -- you know, it became a very serious thing.  It

18  changed the complexion of the whole thing.  My wife was

19  picked as a juror, but it was a drug trafficking case.  And I

20  think she got a sentence and that was -- that was pretty

21  serious, but this is an entirely different ballgame for me.

22       Q.    And when your wife -- and I noticed in your

23  questionnaire that you said your wife was picked in a drug

24  trafficking case.  Do you recall whether or not that was here

25  in Dallas County or another county?  And whether it was

 1    county court or --

 2        A.    It was in Houston, Texas.

 3        Q.    It was in Houston.  Okay.  And did she tell you

 4    anything at all about it other than it was drug trafficking?

 5        A.    No, not that -- the only thing she said was a lady

 6    had been caught at the rail station with a briefcase full of

 7    cocaine and there was another man with some money and they

 8    were going to make an exchange and the police arrested them

 9    and that's about all she said about it.

10        Q.    Okay.  But you yourself have no personal experience

11    as far as sitting as a juror; is that correct?

12        A.    No.  No, ma'am.

13        Q.    Now, when you said that when you heard that this was

14    a capital murder case, that it kind of changed the severity

15    or gravity of --

16        A.    Right.

17        Q.    -- your thoughts.  And that's fully understandable

18    because this is obviously the most serious type of case that

19    we have in our criminal justice system because -- and just so

20    you'll understand, the State is going to be asking that you

21    answer Special Issues Number 1 and Number 2 in such a way,

22    yes and no, that the defendant, Jedidiah Murphy, will be

23    sentenced to death.  And that if the State prevails, that

24    someday in the future the defendant, Jedidiah Murphy, will

25    die down in Huntsville, will lay dead on a gurney.

1              Now, I understand what you put in your questionnaire

2      about the death penalty and that you believed that it was in

3      fact appropriate in certain cases; is that correct?

4          A.    Yeah, if it's likely that it's going to recur.  You

5      know, it's -- and that's really Special Issue Number 1.  And

6      that was my opinion when I wrote that before I -- before I

7      heard about the -- I think the Judge did mention the special

8      issues, but they didn't really register with me at that time

9      so that was my opinion that I wrote in the questionnaire, is

10     if it was going to be a repeat thing, you know, and there's

11     no chance of reform.

12         Q.    Well, let's talk about the special issues since you

13     brought those up.  Special Issue Number 1, whether there is a

14     probability that the defendant would commit criminal acts of

15     violence that would constitute a continuing threat to

16     society.

17         A.    Uh-huh.

18         Q.    Okay.  There's a couple of terms there.  First of

19     all, what would you like to hear in order to answer that

20     question?  What type of evidence would you like to see?

21         A.    Gosh, how can you tell if somebody is going to do

22     something like that again?  I guess if they've had a past

23     history of grievous offenses, you know, you might infer they

24     might do something else in the future if -- if there is

25     something in their psychological makeup that you think can't

1    be changed by therapy or something.  Maybe that was the cause

2    of the criminal act.

3         Q.   Okay.  So you said whether they have commit acts --

4    criminal acts in the past?

5         A.   Uh-huh.

6         Q.   And a lot of people -- I'm sorry?

7         A.   Maybe there was an escalation of criminal acts up

8    until that.  And if you had the feeling that escalation would

9    continue if released, you know.

10        Q.   Okay.  A lot of people say that the best predictor

11   of the future is the past.

12        A.   Uh-huh.

13        Q.   Looking at somebody's criminal history, whether or

14   not they have been given the opportunity to rehabilitate --

15   be rehabilitated, whether they took that opportunity.

16        A.   Uh-huh.

17        Q.   Is that something that you would like to look at?

18        A.   Absolutely.

19        Q.   Well, there are other people also, Mr. Griffing, who

20   say, well, that person might not have ever been in trouble

21   before, but the offense itself is severe enough.

22        A.   Uh-huh.

23        Q.   The facts of the offense alone are such that I could

24   answer that question yes.  How do you feel about that?

25        A.   You mean in terms of the cruelty of the act, what

1   would be -- what would be an offense that you would think

2   that -- a one-time offense that would --

3       Q.   When we're talking about Special Issue Number 1,

4   we're talking about capital murder.  You have found the

5   person guilty of capital murder.

6       A.   Uh-huh.

7       Q.   And as the Judge told you before, it's murder plus

8   something else.  And we'll get into those -- into that in a

9   minute, but you have found the person specifically intended

10  to kill another person and they did that in the course of

11  committing another offense.  And in this particular case we

12  have alleged during the commission of robbery or kidnapping.

13      A.   Uh-huh.

14      Q.   Okay.  So say for purposes of this question, you

15  have already found the person guilty of specifically

16  intending to kill, take another person's life, and they did

17  it during the commission of another offense such as robbery

18  or kidnapping.  And that person has not ever been in trouble

19  before.  There is no prior criminal history.

20      A.   Uh-huh.

21      Q.   There are some people who say the facts of the

22  offense alone could be heinous enough to answer that question

23  yes.  How do you feel about that?

24      A.   Well, I guess if they like had very detailed plans,

25  you know, prior to the event, that would -- if -- it wasn't

1    a -- you know, a murder out of passion or anger, something,

2    some emotional trigger but instead was a calculated crime,

3    then I could -- I could see going with it, but I'm not -- I'm

4    not sure what other circumstances there are.

5        Q.    And that's fine, Mr. Griffing.  I'm not asking you

6    to be able to tell me or articulate what the specific set of

7    circumstances are, but do you believe that there could be

8    facts heinous enough that those standing alone without

9    necessarily a prior criminal history could make you answer

10   that question yes?

11       A.    Yes, I do, and I gave you an example of it.

12       Q.    Okay.  Now, let's look -- there's a couple of terms

13   in there.  It says probability.  You see, the legislature

14   didn't say that there is a certainty that the defendant would

15   commit criminal acts.  They didn't say that there's a mere

16   chance or possibility, but they came down right in the middle

17   with probability.  A lot of people, or most people say

18   probability means more likely than not.

19           Is that basically what it means to you?

20       A.    Yes.  Chances are.

21       Q.    Okay.  And there it says would commit criminal acts

22   of violence.  You see, it doesn't just say criminal acts.  It

23   doesn't say murders.  It doesn't say aggravated robberies.

24   It says criminal acts of violence which could -- what does

25   that mean to you?

1     A.   Well, you injure someone else in pursuit of a crime,

2  you know, you do something violent.

3     Q.   Okay.

4     A.   So I guess it wouldn't -- if not murder maybe --

5  maybe you mug someone.  Would that be a criminal act of

6  violence?

7     Q.   And so that's what it would be to you, anything from

8  like an assault all the way up to murder?

9     A.   That's the way I would interpret that statement,

10  yes, ma'am.

11     Q.   Okay.  But not just murders in and of themselves?

12     A.   Yeah, that's -- that was my original interpretation

13  when I first read it, but now that you've explained it to me,

14  I can see a broader definition.

15           THE COURT:  Would you consider a property

16  crime such as writing a hot check to be a crime of violence

17  or not or would you --

18           VENIREPERSON:  No.

19           THE COURT:  -- person on person type --

20           VENIREPERSON:  Yeah, violence is you injure

21  someone.

22           THE COURT:  All right.

23     Q.   (By Ms. Miller)  And then it says continuing threat

24  to society.  What does society mean to you?

25     A.   Well, your -- the other people around you, the

1   people you know -- innocent bystanders that, you know, get

2   caught in your violent acts.

3       Q.    Okay.  Can you see where -- the Judge already told

4   that you if a person is found guilty of capital murder,

5   they're looking at a minimum life sentence which equals 40

6   years.  Do you see where society could include people in the

7   penitentiary, such as prison guards, nurses, other inmates,

8   chaplains, anyone who may find themselves in the

9   penitentiary?

10      A.    They are part of society, sure.

11      Q.    Okay.  And do you think that they should be

12  protected also from criminal acts of violence?

13      A.    Oh, sure, absolutely.

14      Q.    Now, there are some people who say that because the

15  defendant is going to be at least minimally confined for 40

16  years, that society should only be the people in the

17  penitentiary and not people out in the world who are walking

18  free, but that's not what the law says.  It's anyone the

19  defendant might have a chance of coming in contact with.

20           Do you agree with that, Mr. Griffing?

21      A.    Uh-huh.  Yes, ma'am.

22      Q.    Do you have any questions about Special Issue Number

23  1?

24      A.    No, I think that sums it up.

25      Q.    Okay.  And on Special Issue Number 1 the State has

1    the burden of proof just as in the guilt/innocence phase.  We

2    have the prove the answer to that should be yes, and we have

3    to prove that beyond a reasonable doubt.

4         Can you hold the State to that burden of proof, Mr.

5    Griffing?

6         A.   Yes, ma'am.

7         Q.   Okay.  Let's look at Special Issue Number 2, whether

8    taking into consideration all of the evidence, including the

9    circumstances of the offense, defendant's character and

10   background, personal moral culpability of the defendant,

11   there is sufficient mitigating circumstance or circumstances

12   to warrant that a sentence of life imprisonment rather than a

13   death sentence be imposed.  Okay.  When you get to Special

14   Issue Number 2 you have already found the defendant guilty of

15   capital murder, you've already answered Special Issue Number

16   1 yes.  You have said, okay, he specifically intended to kill

17   someone and he did it in the commission of another offense.

18   I have found beyond a reasonable doubt that he is -- there is

19   a probability that he will commit criminal acts of violence

20   and be a continuing threat to society.

21        Then Special Issue Number 2 is basically a safety

22   net.

23        A.   Uh-huh.

24        Q.   It has you look and see whether or not there is

25   sufficient mitigating circumstances to warrant the death

1   sentence being changed to life.  Okay.  Do you understand

2   that part?

3       A.   Uh-huh.

4       Q.   You have to answer out for the court reporter.

5       A.   Yes, I do.

6       Q.   Okay.  Now, there is no burden of proof on Special

7   Issue Number 2.  Basically the mitigating evidence can come

8   from either side.  The State may put on a witness who

9   testifies, and they may bring out some very aggravating

10  circumstances, but then also during that testimony there may

11  be mitigating circumstances, also.

12          Can you consider the mitigating circumstances no

13  matter where it comes from?

14      A.   You mean some other issue compelled that person to

15  do that crime?

16      Q.   Well, it may be not that they compelled them to

17  commit the crime, but there -- some people say, and there is

18  no laundry list of mitigating circumstances, Mr. Griffing.

19  Some people say drug use or alcohol use may be a mitigating

20  circumstance.  Other people say that's aggravating.  Some

21  people say that mental illness is a mitigating circumstance.

22  Other people say that's aggravating.  Some people say the

23  fact that the person was raised in a good home, went to good

24  schools and had every advantage is a mitigating

25  circumstance.  Other people say, no, that's aggravating.  So

1    there is nothing that says you -- this is mitigating or this

2    is aggravating.  It's basically what you think that it is.

3    So people may present it and try to convince you that it's

4    mitigating.

5         Can you consider the evidence as it's presented?

6    A.   Yes, I believe I could.

7    Q.   Okay.  And if it is sufficiently mitigating because

8    you see, there can be mitigating circumstances, but that

9    doesn't mean that they are sufficiently mitigating to change

10   a death sentence to life.  Do you see that, also?

11   A.   Uh-huh.  Yes, ma'am.

12   Q.   And just because it's presented as mitigating, can

13   you consider it and make that determination as to whether you

14   consider it mitigating or not?

15   A.   Yes, I could make that.

16   Q.   Okay.  Let's talk about some of the things that

17   people say might be mitigating.  Some people say age.  How do

18   you feel about that?

19   A.   As in someone that's young?

20   Q.   The age of the defendant.

21   A.   If it's a really young person, they don't know what

22   they're doing?

23   Q.   Right.  Some people say, well, they're young

24   therefore they shouldn't be held accountable or to the same

25   standard.  Other people say, hey, they have reached the legal

1  age, they -- therefore they should be held accountable the

2  same as anyone else.

3      A.   I think in the case of that child in California, I

4  think he was 15, 16 years old, I could understand that as

5  being mitigating circumstance, because to him maybe the gun

6  is a toy.  He sees people use it on television and he doesn't

7  know it's a for real thing and it causes someone else

8  injury --

9              THE COURT:  You talking about the recent young

10  man at Santee High School that was killing the students?

11              VENIREPERSON:  He took his father's pistol in

12  and shot a bunch of people.  I don't know what his age was.

13  But I could see if he was young enough, that would be a

14  mitigating situation.

15      Q.   (By Ms. Miller)  Well, and in that particular case

16  he's a juvenile.  And in Texas juveniles cannot be tried for

17  death.  So you're talking about someone who is basically of

18  the legal age in order to be trying someone for death.  So

19  does that affect your --

20      A.   No.   Then the age wouldn't be mitigating.

21      Q.   Okay.

22      A.   I mean, if they're old enough to know what they're

23  doing, you know, they're not a teenager, then age is not

24  mitigating.

25      Q.   Mr. Griffing, do you know anyone that has used any

1    illegal substances, such as marijuana, cocaine, heroin,

2    things like that?

3        A.    Not personally, no.

4        Q.    Okay.  Do you have -- what are your feelings about

5    that?  Do you know or do you have an opinion as to how that

6    might affect someone?

7        A.    I guess some of the really strong drugs could make

8    someone lose their sense of reality and do things they

9    wouldn't do otherwise.

10       Q.    I believe on page 5 your voluntary intoxication does

11   not constitute a defense to a commission of a crime, you said

12   that you agreed with that law.  That if a person voluntarily

13   ingested a controlled substance or alcohol, that they should

14   still be held accountable.  And is that the way you still

15   feel, Mr. Griffing?

16       A.    Yeah, but I guess there are drugs that -- maybe like

17   LSD or something that are strong enough that a person's

18   understanding of what's going on may be confused.

19       Q.    Okay.  So if they voluntarily ingested that --

20       A.    Oh, I see.

21       Q.    -- do you think that that -- that they therefore

22   shouldn't be held accountable, if they voluntarily took that

23   drug?

24       A.    There you go.  If they do it again, they do the

25   crime again, so I guess the fact they chose to take the drug

1   doesn't excuse them from the crime.  I guess I would agree

2   with that.

3        Q.   Do you think that it might make a difference as to

4   whether or not the person had used the drugs in the past and

5   perhaps knew how it affected them?

6        A.   Oh, absolutely.

7        Q.   As opposed to as you were saying a first time user?

8        A.   Absolutely.

9        Q.   Okay.  Is that something that you would perhaps want

10  to know, if they were trying to say drug or alcohol use was

11  perhaps a mitigating factor?  As to how much that they had

12  used, whether it was the first time, that type thing?

13       A.   Well, if they have a long history of using drugs,

14  obviously they are going to continue to use it, so they're

15  going to be a continuing threat to society, because likely

16  they'll use it in the future if allowed to.

17       Q.   How about sexual abuse?  Do you know anyone who has

18  made a claim of sexual abuse?

19       A.   No, ma'am.

20       Q.   Okay.  Do you believe, Mr. Griffing, that there are

21  people who might falsely make an accusation of sexual abuse?

22       A.   I read about one --

23       Q.   Okay.

24       A.   -- in the paper this last week.  This man was

25  arrested and put in prison for nine years and they had some

1    DNA testing done and he's been released by the Texas penal

2    system.  And he was accused of rape, and the woman that he

3    supposedly raped said she -- you know, picked him out of a

4    lineup, so that's a case I read about.

5         Q.   Okay.  How about someone claiming they were a victim

6    of sexual abuse?  Do you think that there are people out

7    there who could falsely claim that they were a victim of

8    sexual abuse?

9         A.   I could see that happening, yes.

10        Q.   Do you think there are people out there who could

11   falsely claim that if they are perhaps in a criminal

12   situation looking at a large sentence?

13        A.   I'm sorry, come again.

14        Q.   Do you think there are people out there who might

15   falsely claim that they were a victim of sexual abuse in

16   order to basically mitigate their punishment if they're

17   facing a criminal sentence?

18        A.   Yes, I do.

19        Q.   And if you're looking at sexual abuse, would you

20   want to know how -- well, when the sexual abuse allegedly

21   occurred, how long it took for the person to make an outcry?

22   In other words, was it several years before they made the

23   claim?  Was it after they had criminal charges against them?

24   Those types of things.  Are those the types of things you

25   would want to look at in making a determination as whether

DARLINE W. LABAR, OFFICIAL REPORTER

1    the sexual abuse was in fact -- whether you believed it was

2    in fact -- did in fact happen?

3        A.   In other words, did the person that was -- that made

4    the claim make it almost immediately after the event or much

5    later?

6        Q.   Right.

7        A.   Does that make a difference?  I can see where

8    something could happen -- you know, sexual abuse could happen

9    and it's much later that they get the courage to bring it

10   up -- to, you know, tell the authorities that this happened.

11   I could see that could happen.

12       Q.   Is that something that you would want to know in

13   making a determination, basically looking at all the facts

14   and circumstances as to when the outcry was, were they --

15   what did they have going on in their life?  Were they facing

16   criminal charges when they suddenly made this accusation?

17       A.   Oh, yes, ma'am.  I see, yes, definitely.  I would

18   want to know that.

19       Q.   Okay.  Mental illness.  Do you know -- and obviously

20   that's -- it's a serious problem nowadays, and it's come much

21   more to the forefront.  Do you know anyone who has suffered

22   from mental illness?

23       A.   No, not personally.

24       Q.   Okay.  Do you believe that there are some people who

25   are able to fake or fool doctors regarding mental illness?

1    A.    I would imagine so.  I think some people can control

2    their behavior to the point that they can fool most anybody

3    for anything.

4    Q.    Just as with sexual abuse, would you basically want

5    to look at the history, doctors' reports, medical reports,

6    those types of things in making the determination as to

7    whether or not you believed the mental illness was in fact

8    properly diagnosed?

9    A.    Yes, I would.

10    Q.    How about remorse?  Some people say that remorse is

11    a mitigating factor.  They feel sorry.  They're very sorry.

12    Claim that they're sorry for what they have done.  One of the

13    things you might look at is did the person after the offense

14    was committed stay there, call 911, crying, very remorseful,

15    fully cooperative with the police versus someone who fled the

16    scene, noncooperative with the police, were basically caught

17    not due to anything that -- anything that they did to help

18    turn themselves in.  Is that -- how do you feel about that?

19    A.    Well, I guess that's Issue Number 1.  I mean, if

20    they have remorse, that means there's a chance that they may

21    stop that behavior, so it does have an affect.

22    Q.    When you're looking at remorse, Mr. Griffing, would

23    you want to look at when the claims of remorse took place?

24    A.    Sure, because they may be fictitious.

25    Q.    Okay.  How would you expect a defendant who is

1    waiting trial on a capital murder to act while they're in

2    jail?  Would you expect them to be on their best behavior?

3    Would you expect them to be causing a ruckus and creating all

4    kinds of problems?

5        A.    Oh, best behavior.

6        Q.    Okay.  To go back to what we were talking about as

7    far as the death penalty goes -- and now that we've talked

8    about the special issues, when you were asked to fill out the

9    questionnaire, obviously the death penalty was in the

10   abstract.  And a lot of people say I believe in the death

11   penalty.  I think it's good.  I think that there is a purpose

12   for it here in society.  However, that was in the abstract.

13   Now that I'm sitting here facing the defendant, I can see

14   that he's a living, breathing human being.  There is

15   nothing -- Jedidiah Murphy is not abstract.

16           How do you feel about it now, participating in this

17   type of case, knowing that if the State succeeds, the

18   defendant will lay dead on a gurney in Huntsville?

19       A.    It does make a serious impact.  It does make you --

20   you know, when you read articles in the paper and whatnot and

21   magazines and stuff, it's -- like you said, if it's abstract,

22   it's easy to say, oh, yeah, I agree with that, it does make

23   you pause and consider.

24       Q.    When you say it makes you pause and consider,

25   obviously you haven't taken an oath to be a juror yet, Mr.

1    Griffing.

2        A.    Right.

3        Q.    Is it the type of thing that if the State proved to

4    you beyond a reasonable doubt that the defendant was in fact

5    guilty of capital murder and we proved Special Issue Number 1

6    should be answered yes, and you did not find any mitigating

7    evidence sufficient to change a death sentence to life, do

8    you have the fortitude to do that?

9        A.    When I say pause to consider, I would consider the

10   evidence more carefully now that I realize it's a real

11   person, but under the right set of circumstances I could

12   still answer yes and no to those two.

13       Q.    Okay.  The burden of proof, as we said, is on the

14   State to prove it beyond a reasonable doubt.  It's not 100

15   percent certain.  It's not beyond a shadow of doubt like a

16   lot of the TV shows show because if you -- basically if you

17   had to be 100 percent certain, you would have been a witness

18   in this case, you wouldn't be qualified to sit as a juror.

19            So can you hold the State to beyond a reasonable

20   doubt?

21       A.    Yes, ma'am.

22       Q.    Do you have any questions about that?

23       A.    No, I think I understand what you mean by reasonable

24   doubt.

25       Q.    Okay.  Again, the defendant has certain rights, and

Page 98

```
 1    one of them is the right to remain silent.  We cannot force
 2    the defendant to take the stand.  His attorneys cannot force
 3    him to take the stand.  And the Court will admonish you that
 4    you cannot hold that against the defendant or use it for any
 5    reason.
 6          Can you follow that law?
 7    A.    Yes, ma'am.
 8    Q.    Okay.  Have you -- and just because a defendant
 9    takes the stand does not mean that he's presumed to be a
10    truth teller.  You judge him by the same yardstick that you
11    judge every other witness.
12          Can you do that, Mr. Griffing?
13    A.    Yes, I can.
14    Q.    Okay.  Witness credibility.  Things we talked about
15    you judge the defendant by the same yardstick as you do any
16    other witness.  The law says that you don't automatically
17    believe or disbelieve a witness because of who they are, but
18    you wait to listen to what they have to say and then make the
19    determination whether you choose to believe all, part, or
20    none of what they say.  Some people say, well, police
21    officers, I would automatically believe them because of who
22    they are.  Other people say I wouldn't believe a thing that
23    they say because of who they are, because of the experiences
24    that they've had.
25          Can you wait, listen to each witness, and make the
```

1    determination as to whether or not you believe them based on

2    what you hear and their demeanor on the stand?  Can you do

3    that, Mr. Griffing?

4         A.   Yes, I can.

5         Q.   And so regardless of what the witness's profession

6    is, you're not going to believe them just because of who they

7    are?

8         A.   That's correct.

9         Q.   Is that correct?

10        A.   Yes.

11        Q.   Okay.  Have you ever met anyone who you think is a

12   pathological liar, Mr. Griffing?

13        A.   Yes, I have.

14        Q.   Okay.  And do you -- do you think then that there

15   are people who habitually lie?

16        A.   Oh, I know there are.

17        Q.   And can you think of a reason why people might lie?

18        A.   The person I knew did it -- it was an attention

19   getting thing.  I don't understand a motivation for it, but

20   he -- he did it -- even when it was obvious he was lying, he

21   would lie.

22        Q.   Okay.  Do you think there are ways to determine

23   whether a person is lying or not?

24        A.   With time, sure.

25        Q.   Okay.  Can you -- can you think of other reasons why

1    a person might lie?

2         A.   Well, if they're trying to cover something up,

3    trying to hide -- hide the truth because of the consequences

4    of it, if it comes to light, if the truth comes to light, the

5    consequences they're trying to avoid.

6         Q.   To avoid criminal punishment or accountability?

7         A.   Yes.

8         Q.   Okay.  Now, one of the things that you said is

9    proving the case beyond a reasonable doubt.  What do you

10   think of when you hear the term "circumstantial evidence"?

11        A.   I guess I just think of evidence as a little bit

12   weak, you know, it's not completely convincing in itself.

13   But maybe if there is enough of it or there is other

14   evidence, that circumstantial may complement the stronger

15   evidence.

16        Q.   And, Mr. Griffing, that -- I hear that quite a lot.

17   I've been doing this for a long time, and a lot of people

18   think circumstantial evidence is weak.  Did you know that DNA

19   is circumstantial evidence?

20        A.   No, I did not.

21        Q.   Did you know that fingerprints are circumstantial

22   evidence?

23        A.   No, I did not.

24        Q.   Basically anything other than eyewitness testimony

25   is circumstantial evidence.  Would that change your thoughts

1    on circumstantial?

2         A.   Oh, absolutely.  I did not know that.

3         Q.   Do you believe that you could base your verdict

4    solely on circumstantial evidence without an eyewitness?

5         A.   Well, if it's like DNA and fingerprints, of course,

6    yes.

7         Q.   We talked about murder plus.  Capital murder is

8    murder plus another -- in this particular case, offense

9    robbery or kidnapping.  If the State fails to prove the

10   underlying offense, such as robbery or kidnapping, and just

11   proves murder, the penalty range is anywhere from 5 years up

12   to 99 years or life, whereas if you answered Special Issue

13   Number 1 yes and Number 2 no, then the Judge has no choice

14   but to sentence the Defendant to death.  However, if the jury

15   finds the defendant guilty of murder and not capital murder,

16   the jury would then be called upon to assess the punishment

17   somewhere within the penalty range anywhere from 5 years up

18   to 99 years or life.  We're not asking you whether you can

19   conceive of a set of circumstances where the minimum, 5 years

20   is appropriate, or the maximum 99 years or life is

21   appropriate, but could you keep an open mind, wait to hear

22   all of the evidence, and then assess your punishment

23   somewhere within that range based on the facts that you hear?

24        A.   Sure.

25        Q.   In other words, you're not foreclosed to a 5-year

1    sentence on murder, and you're not foreclosed to 99 years or

2    life if you heard a proper set of circumstances?

3         A.   With the right circumstances, sure.

4         Q.   Okay.  And that's all that we're asking to you do.

5              THE COURT:  Please wind it up, Ms. Miller.

6              MS. MILLER:  Okay.

7         Q.   (By Ms. Miller)  Are there any questions that you

8    have, Mr. Griffing?  Have I thoroughly confused you on

9    anything or do you have any questions?

10        A.   I'm just curious.  There's so much in the news about

11   DNA.  Is that a common technique now like fingerprints in

12   terms of evidence?  Is that commonly presented in courtrooms

13   now, or is that sort of leading edge?

14        Q.   It's much more common now than it used to be.

15        A.   Okay.  I see.

16        Q.   Does that answer your question?

17        A.   Yes, ma'am.

18             THE COURT:  But DNA evidence is not always

19   available, depending on the circumstances.

20        Q.   (By Ms. Miller)  I should say if there's sufficient

21   evidence for DNA to be tested, because there has to be

22   certain amounts in order for a proper test to be done.

23             Is there anything else?

24        A.   No, that's it.

25        Q.   Thank you, Mr. Griffing.

1         A.    Thank you.

2               THE COURT:  Mr. Griffing, let me kind of

3    follow up on that if I may.  Been at this for a number of

4    years.  Given the seriousness of the possible punishment in a

5    case such as this type, I want you to rest assured that if

6    the request were to be made by the defense for a DNA test to

7    be done, assuming there is that evidence in existence, and if

8    it's not in existence, there's nothing to test.  You

9    understand that?

10              VENIREPERSON:  Sure.

11              THE COURT:  If there is evidence in existence

12   that would assist the jury, DNA type evidence request were to

13   be made, I would order it to be done.  Because the United

14   States Supreme Court have on over two dozen cases utilized

15   this phrase "death is different."  So I want you to be

16   assured that if a request is made, I will see to it that

17   funds are made available to do a DNA test.

18          Does that make you feel any better?

19              VENIREPERSON:  Sure.

20              THE COURT:  And I don't think there's any

21   Judge that I know of, surely in Dallas County, that does not

22   feel exactly the same way that I do.  I would like to say

23   that's true statewide and nationwide.  Can't say that because

24   obviously I don't know those men and women as well as I know

25   my 14 colleagues here in Dallas County.  But rest assured

1   that there's not a single one of the 15 of us that have this

2   type of judicial responsibility in Dallas County if it were

3   available would not see to it that that type of test was

4   performed.  Okay?

5                  VENIREPERSON:  Yes, sir.

6                  THE COURT:  Begin on behalf of Mr. Murphy with

7   the Honorable Michael Byck.

8                  MR. BYCK:  Thank you, Your Honor.

9                 Cross-Examination

10   By Mr. Byck:

11     Q.   Mr. Griffing, I've got a bunch of things to go over

12   with you, and I need to go over them with you very quickly

13   because I have a limited amount of time.

14        First of all, I want to thank you.  I want to thank

15   you, A, for showing up down here.  You really didn't even

16   have to do that because we don't arrest the people that we

17   summons as jurors who do not show up.  I also want to thank

18   you for the answers that you've given to Ms. Miller.  I've

19   noticed the seriousness and the concentration that you've

20   given them.  I would only ask that you would do the same for

21   me.  Fair enough?

22     A.   You bet.

23     Q.   It's getting late in the day.  I'm going to undo my

24   tie a little bit.  If I start to mumble or confuse you, just

25   say, just a minute, Mr. Byck, would you mind starting that

1    over again because it doesn't make any sense to me.   Okay?

2       A.    Okay.

3       Q.    In going over your questionnaire, I noticed a couple

4    of things.   One of the things that I noticed was that in your

5    comments on attorneys, prison systems, police officers, death

6    penalty, things like that, you talked about prosecutors.   And

7    you said that prosecutors are villainized.

8             Where do you draw that conclusion?

9       A.    I don't know.   It's just a feeling I have.

10   Sometimes it's like they're the sharks and the defense

11   attorneys have to fight off the sharks.   That's just kind of

12   a feeling I get.   Maybe -- maybe it's my naivete, you know,

13   having not really experienced the legal system.   But it's

14   just kind of a general idea of what things are like.

15      Q.    I see.   All right.   You mentioned here what's the

16   best argument in favor of the death penalty, that the

17   individual would likely murder again.   And let me ask you, am

18   I correct in assuming that you have a science-math

19   background?

20      A.    That's true.

21      Q.    Okay.   And in terms of Question Number 1 we talked

22   about whether there is a probability.   And Ms. Miller talked

23   to you about probability and you agreed that probability

24   meant more likely than not.   I trust your statement of that,

25   but let me tell you why that is so important.   The

1    legislature of the State of Texas insists and the law of the

2    State insists that Judge Entz define every word in his jury

3    charge on guilt or innocence, so you will know as you read

4    that indictment that says he intentionally did something, you

5    will know what the word "intentionally" means.  The Judge

6    will define it for you.  You will know what the phrase "on or

7    about" means.  You will know what the phrase "in the course

8    of committing" means.  Oddly enough, we do not do that -- the

9    law does not do it and the legislature hasn't allowed it in

10   the second stage.  We can argue -- I can say I think the

11   words are just as important in the second stage as the

12   first.  Most people would probably agree with me, but that's

13   the point.  The point is that the legislature has not done

14   it.

15        When Mrs. Miller asked you about your definition of

16   probability and you agreed that probability meant more likely

17   than not, this is why that is important.  Because as a math

18   and science major, you know anything that is not possible --

19   pardon me, anything that is possible, that is not impossible

20   is probable.  The degree of probability might be very, very

21   low.

22        A.   Right.

23        Q.   It might be almost nonexistent, but nevertheless it

24   still is some sort of probable.

25        I submit to you, sir, that what you will be called

1   upon to do if you in fact find my client guilty of the

2   offense of capital murder, and we'll talk about what capital

3   murder is, is you're going to have to do a calculus.  You're

4   not going to do an addition or multiplication.  You are going

5   to do something very much more complicated than that.

6   Because you're going to have to define probability to

7   yourself.  And you've already said it means more likely than

8   not.  You may feel after a point in time that we're talking

9   about somebody's life and it ought to be higher than that.

10  You ought to be pretty sure or fairly certain or whatever.

11  That's completely up to you.  That is completely up to you.

12  What I'm concerned about, and I take your word that words

13  means what you say that they mean to you, and it will fall no

14  further than more likely than not.

15          We're talking about criminal acts of violence, and

16  the Judge asked you about criminal acts of violence because

17  very frankly -- what is it, about 3:30 in the afternoon.  If

18  I went out around the corner and put my dollars in the Coke

19  machine and I didn't get my Coke, you would see a criminal

20  act of violence right before your eyes.

21      A.    Right.

22      Q.    I would swear I would yell.  I would physically

23  attack that machine.  I would jump up and down on it and

24  hopefully it wouldn't electrocute me.  I don't think that's

25  what they're talking about in Special Issue Number 1, do you?

```
 1        A.    No, I do not.

 2        Q.    Okay.  That's fair enough.

 3        A.    I think I said to another person.

 4        Q.    Right.  Right.  Well, you know, four people could be

 5   standing around and that machine could theoretically fall

 6   over them?

 7        A.    Right, but that would be --

 8        Q.    We would take it they would have enough sense to get

 9   out of the way.

10        A.    My interpretation was if they intentionally injure

11   another person, if they do something and a Coke machine falls

12   and accidentally do something, that's something else versus

13   intentionally injuring that person.

14        Q.    Okay.  Further, Special Issue Number 1 goes on and

15   talks about constitute a continuing threat to society.  And I

16   don't want to get into a discussion of continuing threat

17   versus a periodic or a sporadic threat versus an infrequent

18   threat, an occasional threat, you know, whatever term of

19   curiosity you want to use to describe it.  I would hope that

20   you would take continuing threat as words of substance to

21   mean a substantial long-lasting relatively frequently

22   occurring kind of threat, not something that's going to

23   happen once every leap year, right, or, you know, once every

24   ten years or something like that.  But again, that's up to

25   you.
```

1          There again, we talked about society.  And again,

2   Ms. Miller was 100 percent correct in saying, you know -- and

3   you were correct in your definition of society.  As a matter

4   of fact, you were perfect.  I don't even know why I'm talking

5   about it.  It's who I'm around, and that's exactly point that

6   I want to make.  Anybody could be a threat to anything

7   anywhere if they had a little access to it, if they had a

8   little opportunity to get there.  But if they don't, they're

9   not a threat, and I take it that you would --

10         A.   If they have access -- I'm sorry.

11         Q.   Well, let me give you an example.  You've convicted

12  me of capital murder, and you've got to decide whether I get

13  life or death.  We all know what death means.  And now we

14  know what life means.  Life means 40 years in the

15  penitentiary.  So if we go back to the jury room in my

16  hypothetical thing and somebody says, well, Mike is --

17  actually I'm 55 years old, but let's say I was 25 years old.

18  Somebody might say, you know, he's 25 years old -- let's make

19  it 30, keep the numbers straight.  He has to do 40 in the

20  penitentiary.  He's going to be 70 years old.  Changes the

21  calculus of my dangerousness if I were to get out, right?

22  70 versus 30 or 35 or 40 or something like that.  I'm glad

23  that you can see that point for openers.  Because society

24  really doesn't mean where I am.  If you're considering --

25              MS. MILLER:  Your Honor, we're going to

1    object.  It's not necessarily where the person is.  The law

2    says anyone that he may come into contact with.

3                THE COURT:  Come in contact with.

4                MS. MILLER:  The State also does not have to

5    prove that the defendant has access to the person.

6                MR. BYCK:  I didn't say the State did.

7                MS. MILLER:  I believe he said access -- or a

8    little bit earlier in his hypothetical to the juror.

9                THE COURT:  Let's move on.

10   Q.   (By Mr. Byck) As Ms. Miller said, that's a correct

11   statement of the law.  It's essentially the same thing that I

12   would be saying to you.

13   A.   Can I ask you something earlier, Ms. Miller, you

14   said something about age being a mitigating circumstance.

15   Well, if a person served 40 years and they're 70 when they

16   get out, does that age, that age of being 70, is that a

17   mitigating circumstance --

18   Q.   If it --

19   A.   -- if you have to decide that.

20   Q.   If it is to you, sir, it is.  If it's not to you --

21   A.   It's a juror's interpretation.

22   Q.   That's exactly right.  That's exactly right.

23   Because as the State has been saying, mitigation goes back

24   and forth.  What I consider mitigating, they consider

25   aggravating, and vice versa.  So we, of course, are going to

1   feel about various pieces of evidence the way that it would

2   support our case and support our point of view.  That's why

3   we don't get to go back in the jury room with you.  That's

4   why you-all have the final decision.

5          Let's talk about Question Number 2, and we can talk

6   all day long about mitigation.  We don't have time.  There is

7   a concept in Question Number 2 that very frankly some people

8   believe in and some people do not.  And that con -- that

9   concept is personal moral culpability.  And let me see if I

10  can give you sort of a quasi scientific fact setup that would

11  demonstrate that to you.

12         Ms. Little and I, my co-counsel, are nonidentical

13  twins.  We were separated at birth.  Adopted by two different

14  families.  The family that adopted her was a really nice

15  family.  I mean, they were loving, nurturing, they taught her

16  to read.  They would walk her to school, and they worked

17  hard, gave her the best lessons at home and sent her to good

18  schools, made sure that she had all kinds of intellectual

19  cultural, social enrichment programs.  I on the other hand,

20  didn't get adopted by such a good family.  As a matter of

21  fact, they were the dysfunctional duo.  All right.  They

22  argued and fought all the time.  They abused me.  They did

23  not provide me with, you know, any kind of nurturing or

24  reinforcement or education or anything.  They were just as

25  happy I was watching the Flintstones as reading a book.  They

1    really didn't care as long as I stayed out of their hair.

2    They didn't encourage me to do a whole lot.  They didn't

3    expect much of me.  They certainly didn't have the

4    wherewithal to send me to any good schools or anything like

5    that.  Okay.

6              My nonidentical twin and I don't see each other for

7    25 years.  At the end of 25 years oddly enough we wind up on

8    different corners of the same block of the streets in Dallas.

9    On those two different corners there are two different

10   banks.  We are both standing outside those banks with a gun

11   in our pocket and we go into those banks at the same time and

12   say oddly enough the exact same thing, give me the money or

13   I'll kill you.  We get let's say the same amount of money,

14   $25,000 from a properly terrorized bank teller in each of the

15   respective banks.  We take the bank bags, put them in our

16   pockets, and we go out the door where we are immediately

17   arrested by the Dallas Police Department in exactly -- almost

18   exactly cookie cutter arrests.  Put up your hands, you're

19   under arrest.  Okay.  The money is in my pocket.  The gun is

20   in my other pocket.  Don't shoot.  That's it.  No fights.  No

21   fuss.  We are both charged with the offense of bank robbery.

22             Do you see or do you not see where we are both

23   guilty of exactly the same offense, but our punishments may

24   be different, due to the individual facts and characteristics

25   of my life versus the individual facts and characteristics of

1    my nonidentical twin's life?  You see where --

2       A.    Is this a nurture?  Is that a nurture versus nature

3    argument?

4       Q.    No.  It's should she be treated differently than I?

5       A.    Because she had the privileged life and you didn't

6    have the privileged life, there is a bit more leniency?

7       Q.    That's the answer.  The question is do you believe

8    that?

9       A.    Sure, I believe your environment does impact you as

10   a person.

11      Q.    And should it be considered in punishment?  In terms

12   of personal moral culpability?

13      A.    It could be a factor in causing you to do that crime

14   maybe, yes.

15      Q.    Would you consider it in punishment if you heard it?

16      A.    Yes, I would.

17      Q.    Okay.  Fair enough.  Let me see, what else do I want

18   to cover?

19            You -- in your questionnaire asked -- we asked you

20   do you think the death penalty should be available for

21   punishment upon conviction of other criminal offenses.  You

22   said yes.  And in one of the more -- I don't mean to

23   compliment you, but in one of the more thoughtful answers

24   that I've seen on the questionnaire, you said, yes, for

25   espionage.  Let me see if I can parse that a little bit.

1          There's a couple of different types of espionage.

2    There's the espionage where I'm giving out secrets, but the

3    secrets aren't very important.  And the other side really

4    doesn't use that secret information very much even though I'm

5    telling secrets.  That's for sure.  And no secret agents,

6    none of our secret agents get killed as a result of my

7    disclosure of my espionage.  There is another kind of

8    espionage that's a whole lot different that Aldrich Ames and

9    those other guys commit.  In truth and in fact the

10   information was used, it was valuable, it did change the

11   other side's behavior, and to the extreme, American agents

12   died because of that espionage.

13         Do you see where there would be a difference -- or

14   do you think that if you had to judge two individual cases of

15   espionage, that you would consider the harm done, the use

16   that was made of the information, things like that?

17   A.   Oh, absolutely.

18   Q.   In terms of punishment?

19   A.   Like that guy that worked for the FBI and for 20

20   years or something was giving over secrets and American spies

21   were being put to death in prison in Russia, that's certainly

22   a more heinous crime than someone who gives a secret away for

23   some bomber that really is kind of ineffectual anyway.

24   Q.   Fair enough.  We're almost done.  You are about to

25   be asked on a board for a job that you may not want, so I

1    always give you the last question second to the last and let

2    you think about it.

3          Can you think of any reason, personal, political,

4    social, economic, family, whatever it is -- believe me, I can

5    sit here for an hour and a half ask you questions and I would

6    never come up with it?  Can you think of any reason, anything

7    you can think of where you would not be a fair and impartial

8    juror?  I'm going to ask you that question in a minute.

9          Last thing I'm going to say to you before I ask you

10   that question is that while this is a capital murder trial of

11   the utmost seriousness to my client, Jedidiah Murphy,

12   obviously his life is at stake here and he has certain

13   rights.  Those rights will be protected by Judge Entz.  Those

14   rights will be seriously advocated by Ms. Little and myself.

15   And very frankly, those rights will not be lightly trampled

16   by the State because they're just not lawyers like that.  The

17   defense attorneys have rights.  The State's lawyers have

18   rights.  The people of the State of Texas as is put in the

19   indictment have rights.  The Court has rights.  You know, the

20   Court has a right to have this trial conducted in a civil and

21   calm and rational manner.  You know, people don't stand up in

22   the back and yell I did it, I did it, crazy things like that.

23   In other words, it's not carried on like it is, you know, on

24   Al Pacino's set in Hollywood.

25          You, sir, also have rights.  You have a right as a

1    juror to a non-hostile, non-threatening deliberation.   And

2    I'm sure your life experience, if you've ever bought a used

3    car, you'll certainly know what I'm talking about.   You have

4    run into people that have completely different ways of either

5    expressing themselves or trying to get their point across or

6    trying to get you to do something than other people do.   Most

7    of your friends, I'm sure, you would like for them to talk

8    you into something using sweet reason and rationality,

9    right?   Other people will use psychological motivations and

10   tricks, salesmanship ploys I call them.   Other people are

11   used to just straight in your face confrontation where you

12   know they'll ridicule you, denigrate you, or try to brow beat

13   you or however you want to put it into -- you know, into

14   doing what they want you to do, voting the way they want you

15   to do or whatever.   What I'm asking you, sir, is if that

16   happens to you, if somebody tries to intimidate you or

17   degrade you or use these power sales techniques that they

18   learn in these -- you know, wherever they learn those

19   techniques.   I don't know, used car salesman school or

20   wherever.   Will you tell our bailiffs that, listen, I'm back

21   here in a situation where, you know, I can't make a rational

22   decision.   One guy is yelling in my ear, and the other guy is

23   threatening me with physical violence.   It won't get that

24   bad, believe me, but if something like that were to happen,

25   would you inform our bailiffs?

1    A.    Sure.  My dad was a car dealer.

2    Q.    Okay.  Okay.

3    A.    Not a used car dealer.

4    Q.    Not a used car.

5    A.    No.

6    Q.    New dealer.  Well, not all car dealers are the same.

7          What's more even important because you're a big tall

8    man, you can take care of yourself, is that if that happens

9    to you or somebody else on the jury that isn't as able to

10   defend themselves or stand up for their own rights or just --

11   you know, it's not a weakness of character irrelevant, but it

12   just may be a weakness of personality.  You do the same thing

13   and inform our bailiffs.  Because, believe me, our Judge is

14   not going to put up with that kind of stuff.  We're not going

15   to have anybody browbeat you into a verdict in this case.

16   A.    Sure.

17   Q.    We're back to the last question.  This is the escape

18   clause.  This is if you ever wanted out of this deal, raise

19   the flag now.  Any reason -- any reason, sir, that you can

20   think of where you would not be a fair and impartial juror?

21   A.    None that I can think of.

22   Q.    Fair enough.

23         MR. BYCK:  Pass the witness.

24         THE COURT:  Ms. Madore, would you retire the

25   juror momentarily.  In your absence the attorneys will confer

1    with their respective co-counsels.  They will then tell me

2    whether they consider you to be a constitutionally qualified

3    juror.  I ultimately make that call.

4                    VENIREPERSON:  Yes, sir.

5                    THE COURT:  When you return into the courtroom

6    in the next few minutes, I'll let you know whether you remain

7    in consideration.  If you'll excuse yourself momentarily with

8    Ms. Madore.

9                    (Venireperson excused from courtroom.)

10                   THE COURT:  Ms. Miller.

11                   MS. MILLER:  We have no challenges for cause.

12                   (State no challenge for cause - Mr. Griffing)

13                   MR. BYCK:  We have no challenges for cause.

14                   (Defense no challenge for cause- Mr. Griffing)

15                   MS. LITTLE:  Was there a jury evaluation?

16                   MS. MILLER:  He never sat on one, and his wife

17   was in Houston.

18                   MS. LITTLE:  Okay.

19                   THE COURT:  Let me explain to you -- Darline,

20   off the record.

21                   (Discussion off the record.)

22                   (Gregory Griffing Prospective Juror No. 5)

23                   THE COURT:  Mr. Griffing, if you would retake

24   your seat for a moment, please.

25                   Mr. Griffing, you remain under consideration by the

1    Court as a juror in this case.  With your permission, before

2    you leave, I'm going to ask a couple of things.  Ms. Daily

3    has come into the courtroom.  She is going to confirm home

4    and office work numbers.  If they should change before you're

5    notified one way or the other, if you would please give her a

6    call and let her know so we can keep up with you.

7          Also, with your permission, I'm going to ask if you

8    would allow Mr. Rees, the bailiff, to take a Polaroid picture

9    of you.  Let me tell you why.  We're working our way towards

10   48 qualified jurors from which the 12 will ultimately be

11   selected.  The attorneys and I talk to an awful lot of

12   people, and we sometimes blur the faces of persons with the

13   questionnaires and the notes that we've all taken.  For the

14   limited purpose of re-familiarizing ourselves once the 48

15   have been selected, may I have your permission to have the

16   bailiff take a Polaroid picture of you?  At the conclusion of

17   this process, promise you it will be shredded, not be made a

18   part of any research project of any college or university on

19   jury selection.

20              VENIREPERSON:  Sure.

21              THE COURT:  May we have your permission to do

22   that?   Do you have any questions for us?

23              VENIREPERSON:  No, sir, I don't.

24              THE COURT:  Please, obviously you need to tell

25   your spouse and employer that you remain under

1  consideration.  Do not however go to the Dallas Morning News

2  and get copies of the newspapers back on the date and time of

3  the incident that forms the basis of this indictment.  If

4  you're a juror, your decision, along with the other jurors,

5  must be based only on that presented in the courtroom as

6  opposed any extraneous outside matters that you hear in the

7  media, be it print or electronic.  Any questions?

8              VENIREPERSON:  No, sir.

9              THE COURT:  Okay.  Fine.  You're excused.  If

10  you would confirm the information, plus your picture, you're

11  free to go home, back to work as the case may be.

12              VENIREPERSON:  Thank you, sir.

13              THE COURT:  You're welcome.  Thank you.

14              (Recess of proceedings.)

15

16

17

18

19

20

21

22

23

24

25

1                          Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4              I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13             I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16             Witness my hand this the 15th day of November, A.D.,

17   2001.

18

19

20                    DARLINE W. LABAR
21                    Official Court Reporter
                      194th Judicial District Court
22                    Dallas County, Texas
                      (214) 653-5803

23

24

25   Certification No. 1064 Expires December 31, 2002