1                    REPORTER'S RECORD   **74145**

2                    VOLUME 29 OF 65 VOLUMES

3                TRIAL COURT CAUSE NO. F00-02424-NM

4    THE STATE OF TEXAS          :        IN THE DISTRICT COURT

5    VS.                         :        DALLAS COUNTY, TEXAS

6    JEDIDIAH ISAAC MURPHY       :        194TH JUDICIAL DISTRICT

7                    *********************

8                    INDIVIDUAL VOIR DIRE   FILED IN COURT OF CRIMINAL APPEALS

9                    *********************   DEC 5 2001

10   A P P E A R A N C E S:

                                            Troy C. Bennett, Jr., Clerk

11   HONORABLE BILL HILL, Criminal District Attorney
            Crowley Criminal Courts Building
12          Dallas, Dallas County, Texas  75207
            Phone:  214-653-3600
13   BY:    MR. GREG DAVIS, A.D.A., SBOT # 05493550
            MS. MARY MILLER, A.D.A., SBOT # 21453200
14              FOR THE STATE OF TEXAS;

15   MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
     MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16   MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
     Dallas County Public Defender's Office
17          Phone:  214-653-9400
                FOR THE DEFENDANT.
18

19                    *********

20          On the 25th day of April, 2001, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable F. Harold Entz, Jr.,

23   Judge presiding, held in Dallas, Dallas County, Texas:

24          Proceedings reported by machine shorthand, computer

25   assisted transcription.

                    DARLINE W. LABAR, OFFICIAL REPORTER

                                        ORIGINAL

INDEX VOLUME 29

April 26th, 2001                                   PAGE    VOL.

INDIVIDUAL VOIR DIRE:

Proceedings........................................ 2        29

State no challenge for cause - Ms. Chandler...... 52        29

Defense no challenge for cause Ms. Chandler...... 52        29

Marilyn Chandler Prospective Juror No. 24........ 52        29

State no challenge for cause - Mr. Gabel........ 109        29

Defense challenge for cause - Mr. Gabel......... 110        29

Challenge for Cause Granted..................... 110        29

State no challenge for cause - Ms. Lawley....... 152        29

Defense no challenge for cause - Ms. Lawley..... 152        29

Jo Lawley Prospective Juror No. 25.............. 153        29

Reporter's Certificate.......................... 155        29


                    CHRONOLOGICAL VENIREPERSON INDEX

                        STATE         DEFENSE              VOL.

MARILYN CHANDLER          8             32                  29

WILLIAM GABEL            66             90                  29

JO LAWLEY               110            137                  29


                    ALPHABETICAL VENIREPERSON INDEX

                        STATE         DEFENSE              VOL.

MARILYN CHANDLER          8             32                  29

WILLIAM GABEL            66             90                  29

1 | JO LAWLEY                110              137                        29

2

3                          *NO EXHIBITS THIS VOLUME*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Good morning.  Please have a seat.
 3    Welcome.  May I ask you to raise your right hand and again be
 4    sworn in.
 5              (Venireperson additionally sworn.)
 6              VENIREPERSON:  Yes, sir.
 7              THE COURT:  Thank you.  You may lower your
 8    hand.
 9         Let me introduce to you again those whom we see
10    seated at counsel tables.  Beginning to the far left, we have
11    a senior prosecutor with the Dallas District Attorneys
12    Office, lead counsel for the State, the Honorable Greg Davis.
13              MR. DAVIS:  Good morning.  How are you?
14              VENIREPERSON:  Fine.
15              THE COURT:  He is joined as co-counsel in this
16    matter by the Chief Prosecutor assigned to this court by
17    Dallas District Attorney Bill Hill.  Her name is Ms. Mary
18    Miller.
19              MS. MILLER:  Good morning.
20              VENIREPERSON:  Good morning.
21              THE COURT:  Moving on to the next table, we
22    begin first with two attorneys representing the accused or
23    the defendant.  We begin first with Ms. Jennifer Balido.
24              MS. BALIDO:  Good morning.
25              VENIREPERSON:  Good morning.
```

1    THE COURT:  Seated next to Ms. Balido is the

2    Honorable Michael Byck.  Mr. Byck is a board certified

3    criminal law specialist, also present on behalf of the

4    defendant who is seated next to him, Mr. Jedidiah Isaac

5    Murphy.

6              THE DEFENDANT:  Good morning.

7              VENIREPERSON:  Good morning.

8              THE COURT:  The third attorney representing

9    Mr. Murphy who's not here with us this morning, she is

10   addressing other matters as relates to this trial outside the

11   courthouse.  Her name is Jane Little.

12        Mr. Gwaltney, we anticipating completing this jury

13   selection stage in the next couple of weeks or so, though

14   testimony will not again until Tuesday, May 29th.  The day

15   before, Monday before, United States Congress has determined

16   that Memorial Day will be celebrated this year in the

17   country.

18        Do you know of any reason why your schedule could

19   not be altered such to make you available to return if

20   selected as a juror on May 29th and be down here for anywhere

21   from five to maybe eight days?

22              THE DEFENDANT:  Five to eight days?

23              THE COURT:  That's how long the trial will

24   last.

25              VENIREPERSON:  I don't think I can take off

1    work five to eight days.

2                THE COURT:  Why not?

3                VENIREPERSON: ' Because I work nights.  And we

4    don't really have that many people to replace me.

5                THE COURT:  Will you let me see if I could get

6    with the Exxon people and see if we can work something out

7    for you?

8                VENIREPERSON:  Yeah, I guess.

9                THE COURT:  I'll do my best.  We will proceed

10   with the --

11               MR. DAVIS:  We agree.

12               THE COURT:  Sir?

13               MR. BYCK:  We have an agreement.

14               MR. DAVIS:  We have an agreement, Your Honor.

15               THE COURT:  Okay.  Mr. Gwaltney, go back to

16   work.

17               VENIREPERSON:  Thank you.

18               MR. BYCK:  You're welcome, Mr. Gwaltney.

19               (Venireperson brought into the courtroom.)

20               THE COURT:  Good morning, Ms. Chandler.  Ask

21   you to raise your right hand and be sworn in.

22               (Venireperson additionally sworn.)

23               VENIREPERSON:  Yes.

24               THE COURT:  Thank you.  You may lower your

25   hand.

```
 1            Let me reintroduce the individuals who we see seated

 2    at the counsel table.  Though they have been previously

 3    introduced, it's been a little while so let me refresh your

 4    memory if I may.

 5                    VENIREPERSON:  Okay.

 6                    THE COURT:  Beginning at the table to the far

 7    left, we have lead prosecutor for the State in this

 8    particular case, the Honorable Greg Davis.

 9                    MR. DAVIS:  Good morning.

10                    THE COURT:  One of the senior prosecutors in

11    the Dallas District Attorneys Office at the present time.

12            He is assisted by co-counsel, the Chief Prosecutor

13    assigned to this the 194th District Court, the Honorable Mary

14    Miller.

15                    MS. MILLER:  Good morning.

16                    THE COURT:  Moving on to the next table, we

17    have first two of the three attorneys representing the

18    defendant.  We begin first with the Honorable Jennifer

19    Balido.

20                    MS. BALIDO:  Good morning.

21                    THE COURT:  Seated next to Ms. Balido is a

22    co-counsel, a board certified criminal law specialist, so

23    designated by the State Bar of Texas, the Honorable Michael

24    Byck.

25                    MR. BYCK:  Good morning, Ms. Chandler.
```

1          THE COURT:   Seated next to Mr. Byck, opposite

2   Ms. Balido, is their client, the accused, the defendant, if

3   you will, Jedidiah Isaac Murphy.

4          THE DEFENDANT:   Good morning.

5          THE COURT:   There is a third attorney involved

6   in this matter on behalf of the defense not present with us

7   this morning.   She is addressing some pertinent matters that

8   relates to this case outside the courthouse.   Her name is

9   Jane Little.

10         Ms. Chandler, I note that your home address is in

11  Garland.   Case involves a woman whom I understand the

12  evidence will show lived in Garland by the name of Bertie

13  Cunningham.   Did you follow that case at all when --

14         VENIREPERSON:   No.

15         THE COURT:   -- the news accounts, be they

16  radio or television or the newspapers handled it?

17         VENIREPERSON:   Not that I recall.

18         THE COURT:   Okay.   Fine.   Ms. Chandler, we

19  anticipate completing this jury selection process in the next

20  couple of weeks.

21         VENIREPERSON:   Uh-huh.

22         THE COURT:   After which the attorneys will

23  narrow the list down to those 12 that will be jurors in the

24  case.   Anticipate that the testimonial or the evidence stage

25  of the trial will begin on Tuesday, the 29th of May.   The day

1    before Congress has determined Memorial Day will be

2    celebrated, otherwise we'd start on the 28th.  But for that

3    fact it will start on the 29th.  The attorneys and I

4    anticipate that the trial will last anywhere from five to

5    maybe eight days, depending upon how long the jury may

6    deliberate.

7                    VENIREPERSON:  Uh-huh.

8                    THE COURT:  Do you, Ms. Chandler, know of

9    anything in your schedule that could not be rearranged or

10   altered such that if you are a juror would prevent your

11   coming back to participate as a juror in this case?

12                   VENIREPERSON:  No.  School will be out.

13                   THE COURT:  Ms. Chandler, you will know before

14   you leave us this morning whether or not you remain under

15   consideration.  Remind you, as I did the other jurors when

16   you were back here a couple of weeks ago, no right or wrong

17   answers to their questions as long as they're truthful and we

18   have no reason to believe that you will be utterly candid

19   with yourself and therefore with us with regard to their

20   questions.

21            Are you ready to go?

22                   VENIREPERSON:  I guess.

23                   THE COURT:  Relax.  They will not be asking

24   you any Rambo type -- all this horror stories you hear about

25   lawyers grilling people, no.  You will find them to be

1    extremely civil and courteous.  And if not, I have two

2    bailiffs that will take care of them, I assure you.

3                    VENIREPERSON:  Good.

4                    THE COURT:  So relax as much as you can.  We

5    will proceed with the State as required by law, the Honorable

6    Greg Davis.

7            Mr. Davis, Mrs. Chandler.

8                    MR. DAVIS:  Thank you.  May it please the

9    Court.

10                   MARILYN CHANDLER

11   was called as a venireperson by the Court and, after having

12   been first duly sworn, testified as follows:

13                   Voir Dire Examination

14   By Mr. Davis:

15       Q.   Good morning, Ms. Chandler.  How are you?

16       A.   Fine.

17       Q.   Ms. Chandler, just looking at your questionnaire

18   here I was curious, see you're a librarian, Garland School

19   District?

20       A.   Yes.

21       Q.   Are you assigned to any particular school?

22       A.   I was at North Garland High School for 20 years, but

23   for the last three years I've been elementary librarian and

24   then I travel to the largest libraries and help them out.

25       Q.   Okay.  The reason I ask I went to that school

 1    district, and it's been a few years since I've been there,

 2    but I was at Williams Elementary.  I don't know if you're

 3    familiar with that, then Sam Houston and Garland High School,

 4    so you may have stocked my library for all I know.

 5        A.   I may have.

 6        Q.   Ms. Chandler, let me just ask you or tell you, what

 7    we're doing here is obviously we're trying to find 12 people

 8    who can be fair to both sides in this case.  And we're

 9    looking for people who have the ability to make their

10    decisions based upon the law in this case and the evidence

11    that they hear in this case.  That's very important.  If

12    you're chosen to sit in -- on this jury, you'll take an oath

13    which will require you to render a true verdict according to

14    the law that Judge Entz gives you in this case, as well as

15    the evidence that you hear in this case.

16             Sometimes people come down here and they have

17    opinions about these matters.  I would expect people to have

18    opinions about the law.  I would expect people to be in favor

19    of law enforcement, hopefully.  And sometimes people have

20    very strong feelings, and that's fine.  I want you to know

21    that.  Sometimes those opinions may come in conflict with

22    what the Judge's instructions will be.

23             Let me give you a couple of examples what I'm

24    talking about.  Sometimes people come down here and they say,

25    you know, there are just too many technicalities in the law.

---

DARLINE W. LABAR, OFFICIAL REPORTER

1   There are too many loopholes in the law.   Well, you see, all

2   of those rules are there for a reason.   We as attorneys know

3   what those rules are.   Judge Entz knows what they are.   I'm

4   prepared to try this case according to all those rules, even

5   if some people, you know, may feel that they are

6   technicalities.

7         Those rules are set in place to make sure that this

8   man over here receives a fair trial, and that's a very

9   important thing obviously.   We're talking about possibly

10   taking his life.   I would hope that these proceedings would

11   be fair.   I've tried a death penalty case with Judge Entz

12   before, so I know that he's going to enforce the rules

13   fairly.   He will insure that Mr. Murphy receives a fair

14   trial.

15         I want to go through some of those rules with you,

16   just explain them to you.   I think that you've already sat on

17   a jury before, haven't you?

18      A.   Yes.

19      Q.   So you're probably familiar with a lot of these, but

20   just to be safe --

21      A.   No, it's been awhile.

22      Q.   -- just to be safe, let's go through some of them

23   again.   The first rule is this, all defendants, including

24   Jedidiah Murphy, are presumed innocent until proven guilty

25   beyond a reasonable doubt.   That means that as he sits here

 1    right now, he's presumed innocent even though a number of
 2    things have already happened.  We know that he's been
 3    arrested for capital murder.  We know he's been charged with
 4    that.  We know that he's been indicted by the Dallas County
 5    grand jury for capital murder.  We're about halfway through
 6    jury selection here.  And yet as he sits here right now, he's
 7    still presumed innocent.  That presumption is so strong that
 8    if we were to stop the proceedings right now, if I did not
 9    put on any evidence, that presumption by itself would be
10    strong enough that a jury would be required by law to find
11    him not guilty based on that presumption alone.
12            I know in your questionnaire, and I've seen this
13    before, but, you know, we ask you if someone is accused of
14    capital murder should they be required to prove their
15    innocence.  And you said you agreed with that statement.  And
16    I kind of understand what you're talking about.  But again,
17    the law says this.  The law says this man down here is not
18    required to do anything.  All he's required to do is show up
19    everyday.  His attorneys aren't required to do anything
20    either.  And that's because the burden of proof is always
21    with this table right over here, always.  They don't have to
22    show anything.  They don't have to do anything.  They don't
23    have to prove anything.  It's not a matter where he has to
24    prove his innocence.  I have to prove his guilt.  And
25    that's -- that's the burden, and I understand that.  Because

DARLINE W. LABAR, OFFICIAL REPORTER

1    we brought the charges, we have to do the proving.  If we

2    fail to meet our burden of proof, a jury has to find him not

3    guilty whether he does anything or not.  I mean, he could sit

4    over there and doodle.  He could work crossword puzzles.  His

5    lawyers could do the same thing.  They won't because they're

6    fine attorneys, but in theory they could do that.  And if I

7    failed to meet my burden of proof, that's what you look at.

8    You look at what I presented, not what they presented, and

9    determine did the State proof their case or not.

10         Do you feel like you can give this man his

11   presumption of innocence in is this particular type of case?

12        A.   Yes.

13        Q.   Okay.  If he does nothing, you know, and for

14   whatever reason you feel like I didn't quite prove my case

15   beyond a reasonable doubt, even if he does nothing, can you

16   still say not guilty if I do not meet my burden of proof in

17   this case?

18        A.   Say that again.

19        Q.   All right.  Again, I have to prove my case beyond a

20   reasonable doubt.  If I fail to do that --

21        A.   Okay.

22        Q.   -- if I don't put on enough evidence to persuade you

23   that this man is guilty, can you find him not guilty, even if

24   he sits there and does absolutely nothing?

25        A.   Yeah.

```
1        Q.    Again, because he's not required to do anything.   I
2   understand that.

3             Here's a second thing that is important.   He has a
4   right to remain silent.   Again, it goes down to he doesn't
5   have to prove his innocence.   He doesn't have to do
6   anything.   I've been a defense attorney before.   I've
7   represented individuals.   There's a number of reasons why
8   someone may not testify.   They may not speak English well.
9   They may stutter in front of people.   You know, there's a
10  host of reasons why somebody may not get up there and
11  testify.   I know that from talking to other jurors sometimes
12  they'll say, well, if I was accused of something like that,
13  I'd sure want to have my say about it.   I'd want to get up
14  there and tell my side.   And I think that's normal, but I'm
15  just saying the law would look at it differently.   And the
16  law would say if you're a accused of a crime, you don't have
17  to get up there, no one can force you to testify.   And if you
18  don't testify, the Judge would say the jury cannot hold that
19  fact against a defendant.   They can't go back to the jury
20  room and wonder -- I wonder why he didn't testify.   I wonder
21  what he would have said.   He's probably hiding something.
22  I'll hold that against him, or I'll help the State prove his
23  guilt.

24             If this man doesn't testify, can you follow the law
25  and can you assure us that you won't hold that against him?
```

1      A.    Yeah.   I don't know that I would want to testify,

2   so -- yeah.

3      Q.    Okay.   Fair enough.   Here's another requirement.

4   That is that I have to prove his guilt beyond a reasonable

5   doubt.   Essentially I've got to prove what's in the

6   indictment.   That indictment is a piece of paper that tells

7   me what I have to prove in this case.   It tells Mr. Murphy

8   what he's been charged with in this case.   There's several

9   things that I have to prove.   All of them are important.

10          One of the things that I have to prove is that this

11   offense happened in Dallas County, Texas.   Now, that's one of

12   those things again that may seem like a technicality, but

13   it's not.   And again, I understand the requirement.   It's

14   just as important that I prove that element as it is to prove

15   that this man down here is the person who did the killing.   I

16   want to give you an example, just to show you how important

17   that is.

18          Let's say I put on a capital murder case, and I'm

19   going to make this extreme for a reason.   Okay?   It doesn't

20   mean that this is what will happen here.   Let's say that I

21   have a case, Ms. Chandler, and in the case I show you that an

22   individual went out to a church and fire bombed that church,

23   killed a hundred people inside that church, meant to do every

24   bit of it.   And there's no doubt when you get down there to

25   the trial that he did it.   I mean, you hear enough evidence

1   to show that -- excuse me, again, that he did the crime,

2   there is no doubt, and yet you have some doubt about whether

3   it happened in Dallas County or not.  Okay.  So you're

4   looking at a defendant who is dangerous, someone who's fire

5   bombed a church, someone you may despise, but let's say for

6   whatever reason that the State is unable to prove that it

7   happened in Dallas County.  Maybe they just don't ask the

8   question.  Maybe the church was in Dallas County, but no one

9   ever asks the question.  Or maybe the church turned out to be

10  in Kaufman County or some other county.  But for whatever

11  reason the State can't prove that, so when you go back to the

12  jury room what do you have?  Well, you've got a Judge that's

13  going to give you some instructions, and he'll tell you that

14  if the State fails to prove that this offense happened in

15  Dallas County, Texas, if they prove everything else, but they

16  fail to prove that fact, you've got to say not guilty.

17          Now, when you say not guilty, you know in your heart

18  of hearts you're going to let a very dangerous man go free.

19  Maybe there's some statement that he's given to the police in

20  which he says, you know, if I ever get out, I'm going to the

21  first church that I find and I'm going to blow it up and I'm

22  going to wait until Sunday morning before I do it because I

23  want to kill as many people as I can find.  And you know

24  that.  So you know you're going to let a very dangerous man

25  go free.  He's going to walk out of the courtroom right after

1    you do, but you also know this, that the oath requires you to

2    follow the oath.  And the law says if they don't prove Dallas

3    County, you have to say not guilty.  That's one of those

4    things we were talking about where your emotions or feelings

5    may come in conflict with the law.

6         Now, some people say I don't care what the law is,

7    I'm not going to follow the law.  I'm not going to let a

8    dangerous man go free, not me.

9         Let's just make it even worse for you.  Let's say

10   all the other 11 people back there with you are saying forget

11   the law, we're not letting anyone dangerous go free either.

12   You do what you want to do, but not us.  You're the lone

13   person who's saying back there, but the law says if they fail

14   to prove Dallas County, you're to say not guilty.

15        Now, what are you going to do?  Are you going to

16   follow the law, say not guilty, or are you going to go along

17   with the crowd and say guilty?

18        A.   I would stay with the law.

19        Q.   Yes, ma'am.

20        A.   I guess I'd have to go along with it.

21        Q.   Okay.  Say not guilty?

22        A.   Say not guilty.

23        Q.   Okay.  I would expect you in that kind of case to

24   find that to be a very difficult thing to do.

25        A.   Yeah.

1    Q.    Very unpleasant thing to do.  Again, if you respect

2    the law, if you respect the oath that you've taken --

3    A.    Uh-huh.

4    Q.    -- you have no other choice but to say not guilty?

5    A.    Right.

6    Q.    You may blame the State of Texas, you may blame the

7    police officers, they've made a horrible mistake, but if

8    you're going to be true to the law, you have to say not

9    guilty.

10         Let me give you another example.  This is going to

11   be another extreme example.  Let's say that -- oh, I'll just

12   use myself this time.  Let's say that I go out, I'm a fire

13   bug and I hate kids.  And I go out to the closest school I

14   can find.  Maybe it's in the Garland school district.  Maybe

15   it's one of my old schools, and I wait until the busiest

16   period, maybe it's the lunch hour -- again, I burn it to the

17   ground and I kill every child in there.  And I laugh and I

18   carry on as I'm going back to my home.  No one saw me do it.

19   I got away scot-free, but let's say a couple of days later

20   the police come in contact with me and through whatever means

21   they figure out that maybe I'm the suspect in that case.

22   They bring me down to the police station.  They begin talking

23   with me, and I decide, I'll go ahead and give them a

24   confession.  They didn't force me to give the confession.

25   They haven't threatened me.  They didn't promise me anything

1    and I decided, yeah, I'll go ahead and give it to you.  And I

2    proceed to give them a confession.  Now, you know, if you've

3    watched these television shows, you're probably familiar with

4    the Miranda warnings, what the police officers have to tell a

5    suspect.

6              Let's say the officer on duty that I talked with

7    means to give me the warnings.  He really does intend to.

8    Let's just say he's been working overtime.  He's tired.

9    Let's say that he has to tell me four different things, four

10   different warnings.  And let's say that he tells me three of

11   those warnings, but he forgets to give me the fourth one.

12             Now, I want to go ahead and give the statement

13   anyway.  Let's say that he forgets to tell me I have the

14   right to remain silent.  I don't care.  I want to go ahead

15   and talk anyway, but he doesn't tell me that warning.  He

16   gets down to trial, and he's honest enough to say he just

17   walked in off the streets, I didn't have to apprehend him.

18   He walked to give me the statement.  He couldn't wait to give

19   me the statement.  But, you know, in all honesty, I didn't

20   give him that fourth statement -- that fourth warning.  I

21   gave him three of them.  It's clear he didn't want to remain

22   silent anyway, but in all honesty, I did not tell him he had

23   the right to remain silent.  You hear the statement, you hear

24   some very grisly details.  There's no doubt that I did it.

25   Maybe I'm giving details only the murderer would know.  Maybe

1    in the statement again I say, you know, I did it and I'm glad

2    I did it and I'll do it again the first opportunity I get.

3           Here's what the law would say to you there.  The law

4    would say that if you have a doubt about whether any of those

5    warnings were given, you have to disregard that statement.

6    That's the law.

7           Now, in this case obviously there's no testimony --

8    there's in fact testimony the fourth warning was not given.

9    Okay.  That's before you, and you know that.  So there's a

10   reasonable doubt about whether all of them are given.  You're

11   required by the law to throw that statement out.  The problem

12   with my case is that's all you have to prove my guilt.  You

13   know that if you throw that statement out that I've given,

14   and you know it's true.  You know every word in there is

15   probably true.  If you toss that aside because one warning

16   wasn't given, there's no evidence left against me.  It's the

17   same situation as before.  You're going to let a very

18   dangerous man walk free.  He's going to head out maybe to the

19   first school that he sees and he may do it again.  But again,

20   the law says if a warning is not given, you've got to toss

21   this document out.  There's nothing else left.  The State

22   hasn't met their burden of proof, obviously.

23          Now, the predicament is, let's say all 11 other

24   people again, I'll just put you in the box again, let's say

25   all the 11 others are saying that's a technicality, that's a

1  loophole, that's silly, you know, we all know he wanted to

2  give the statement anyway.  It's not even an issue.

3        Right to remain silent.  He's the one that initiated

4  the conversation, for goodness sakes.  But you're over there

5  saying, you know, but Judge Entz, he said that if we find not

6  all the warnings were given, we've got to toss this thing

7  out.  That's what the law is asking us to do.  It's asking us

8  to do a very tough thing.

9        I guess the bottom line question is are you going to

10 follow the law in that case, toss it out, and let me walk

11 free, or will you it's a technicality anyway and my

12 conscience isn't going to allow me to let some crazy

13 dangerous person walk free.

14 A.    I understand all the ramifications of the law.  And

15 I guess I don't agree with all of them, but again, I respect

16 it.  I think I would let him go free.

17 Q.    Okay.

18        THE COURT:  Ms. Chandler, let me make you a

19 little more comfortable.  Do you agree with everything in the

20 Internal Revenue code?

21        VENIREPERSON:  Pardon?

22        THE COURT:  Do you agree with everything in

23 the tax law?

24        VENIREPERSON:  In the tax law?  No.

25        THE COURT:  You follow it though, don't you?

```
 1                    VENIREPERSON:  Sure.

 2                    THE COURT:  You follow it though, don't you?

 3                    VENIREPERSON:  Oh, yeah, I do, sure.  I had to

 4       pay a lot this year.  I didn't agree with it.

 5                    THE COURT:  This Garland High School graduate

 6       makes it touch on a teacher, doesn't he?

 7                    VENIREPERSON:  He does.

 8                    THE COURT:  Teach him well, you reckon?

 9                    VENIREPERSON:  I guess.

10                    THE COURT:  All right.  We'll continue.

11                    MR. DAVIS:  Okay.

12            Q.   (By Mr. Davis)  Let me talk to you about another

13       issue.  Maybe this will be a bit easier.  I'll try to ease up

14       a little bit here.  Okay?

15                    THE COURT:  Please do.

16                    MR. DAVIS:  Yes.

17            Q.   (By Mr. Davis)  Here's -- in a murder case, if

18       you -- if you had simply a murder without a capital murder,

19       there's no death penalty, Ms. Chandler.  You know, if I

20       turned and I just didn't like Ms. Miller's outfit today and I

21       shot her and I intended to kill her, that by itself is

22       murder, but it's not capital murder because capital murder is

23       always two things.  It's always an intentional murder plus

24       something else.  In this case it's an intentional murder

25       committed in the course of a robbery or kidnaping.  When you
```

1    combine those two things, you have a capital murder, but if

2    you just kill someone intentionally, that's just murder.  You

3    can't get the death penalty for that.

4         A.    I know.

5         Q.    Okay.  You know, there could be a number of other

6    things that go along with an intentional murder.  For

7    instance, if you intentionally kill a police officer, that's

8    capital murder.  If you intentionally kill a child younger

9    than the age of 6, that's a capital murder.  But when we talk

10   about intentional murder, that's not a death penalty case by

11   itself.  The range of punishment is very wide.  It can range

12   anywhere between 5 years up to 99 years or life in the

13   penitentiary.  That's what the law says a jury can assess for

14   a murder case.

15        Intentional murder is just that.  It's where I

16   intend to take someone's life, and then I do everything

17   necessary to accomplish that.  But again, the range of

18   punishment, 5 years to 99 years or life.

19        Now, the question I'd like to ask you is this.

20   Because the law says to be a qualified juror in that type of

21   case, you have to have an open mind to the full range of

22   punishment if you will.  You have to be able to honestly say

23   in a murder case if the facts called for it, you could give

24   as much as life or you can give as little as 5 years,

25   depending on the facts that you hear.

1              In general, let me just ask you, are you the type of

2    person, Ms. Chandler, when you make a decision, that you want

3    to know all the facts before you decide what to do?

4         A.   Yeah.

5         Q.   Murder cases would be no different.  I've had some

6    people that would come down and tell me, you know, if it's an

7    intentional murder, I don't care what the facts are, I'm

8    never ever going to give something as little as 5 years

9    because people who kill don't deserve that.  They deserve

10   much more than that.  But you have to understand in murder

11   cases -- having tried a few of these myself, every person is

12   different, every defendant is different, their backgrounds,

13   their characters, whether they've been in trouble or not,

14   whether they've lived a spotless life before, that's all

15   different.

16             Can you agree with me that everybody who may be

17   convicted of murder should be looked at as a unique

18   individual, first of all?

19        A.   Yeah.

20        Q.   Every crime is different.  I mean, it could be as

21   extreme as me just hating somebody and intended to kill them

22   or it could be a number of other situations that could be an

23   intentional murder, too.  There could be a lot of different

24   motivations for that.  But here is the key.   If you heard a

25   murder case, an intentional murder case, and we're not

1  talking about an accident, we're not talking about

2  self-defense, we're not talking about someone being insane,

3  that somebody who intended to take a life for whatever

4  reason.  If you heard that kind of case and you -- after you

5  heard all the facts, you thought, you know, I never did think

6  about that before, but, you know, now that I've heard that

7  case, I truly think that that defendant right there should be

8  punished by 5 years in the penitentiary.  Maybe it's a case

9  where you said I didn't really think I'd hear that kind of

10  case but I did and I'm convinced now that he deserves 5

11  years.  Could you give five years?  That's the key.

12      A.    Yeah, I guess so.

13      Q.    Okay.  And here's the thing about it.  You don't

14  have to be able to tell us what kind of case that would be.

15  And frankly, you may be sitting there thinking it would be a

16  rare day when you thought that 5 years would be appropriate.

17  That's okay, too.  But you see, we could sit here and I could

18  give you a number of examples of things where you said, well,

19  you know, now that I see it -- one example would be, just

20  like I said, it's just a cold-blooded killing.  That could be

21  an intentional killing.  Let's say my motivation is far

22  different.  Let's say I come home and I find somebody has

23  come into my neighborhood and sold crack cocaine to my

24  14-year-old son and got him hooked on crack cocaine.  And I

25  find out about it.  I my son is now hooked on crack, and his

1    life is ruined.  And I decide to go out there and take

2    justice into my own hands.  And I find that crack dealer and

3    I intend to kill him.  I've done nothing else in my entire

4    life that's wrong.  See, that's an intentional killing.  I

5    intended to kill a crack dealer for instance.  So there could

6    be a lot of situations.  That's my point, that you may not

7    have thought of before.  But I hear you saying if the facts

8    are there, that's the key.  If you think the facts are there

9    that justify a 5-year sentence, that you'll carry through and

10   you will assess a 5-year sentence if you think it's right.

11         Am I correct, there?

12   A.    Yeah, I have gotten upset if I read in the paper

13   that it's just a 5-year sentence or something like that, but

14   I don't know the facts.

15   Q.    Okay.  That's correct.  Fair enough.  Let's talk

16   then about these special issues for a little bit because this

17   is really at the heart of the punishment phase of the death

18   penalty case.  If you find someone guilty of capital murder,

19   Ms. Chandler, then we go to a punishment phase and then both

20   sides are allowed to offer more types of testimony.

21   Generally it concerns a defendant's background, his

22   character, what he's done or not done in the past.  And after

23   we finish all those facts, then we ask you to answer these

24   special issues.

25         Now, Special Issue Number 1, I believe the Judge has

1   already told you there's a presumption there that it should

2   be answered no.  It's kind of like the presumption of

3   innocence.  Even though he's been arrested and charged and

4   indicted, he's still presumed innocent.  Even though he's

5   been found guilty of capital murder, that issue's still

6   presumed to be answered no.

7          Now, some people have a problem with that.  And some

8   people say, if I find someone intentionally killed a woman

9   during the course of a kidnapping or a robbery, that's the

10  type of person in my mind who will always be a threat to

11  society.  I don't care what the facts about his background

12  are.  I don't care what he did why it.  That automatically

13  always will answer Special Issue Number 1 for me, and I'm

14  going to answer yes regardless of what the facts are.

15  There's a problem obviously there because they're not waiting

16  to hear all the facts before they answer Special Issue Number

17  1.

18          What the law would ask to you do is this, wait until

19  you hear all of the facts.  Don't answer Special Issue Number

20  1 automatically one way or another just because you found

21  someone guilty.

22          Let me give you an example.  Okay?  And this

23  would -- again, this is an extreme example.  Let's say that

24  I go in and I rob a store and I shoot the clerk during the

25  course of that robbery.  I've committed a capital murder.

1    Let's say I've committed a hundred prior robberies.  I'm

2    known to be violent, always have been violent.  And as I walk

3    out of that store, I'm laughing about killing that clerk, but

4    I don't notice the police car coming around the corner

5    answering that silent alarm.  That police car runs me over,

6    I'm rendered a quadriplegic.  I don't have the use of any of

7    my limbs anymore.  I'm going to be in a wheelchair sucking a

8    straw the rest of my life.

9           Now, you see that's an extreme example of a

10   situation where you have no doubt at all that I'm guilty of

11   capital murder.  Pretty easy to find me guilty.  But now you

12   hear about the fact that I'll always be in a wheelchair, I

13   can't move my limbs, I'm helpless, maybe I can't even speak

14   without the aid of a computer.  Am I really a threat to

15   anybody?  You see how I can be guilty and yet you might not

16   think I'm going to constitute a continuing threat to anybody

17   for the rest of my life, I'm confined to a wheelchair.  But

18   that's just an example.

19          So my ask to you on Special Issue Number 1 is this,

20   can you wait for all the facts before you answer Special

21   Issue Number 1?

22          A.    Yeah.

23          Q.    Okay.  Let's talk about some of these words for just

24   a moment.  The word "probability."  The word "probability" is

25   just that.  It's not just a possibility.  If it was a

1    possibility, the legislature would have just X'd that word

2    out and said possibility.  The legislature would have said,

3    you know, whether there's a possibility the defendant would

4    commit.  They didn't say that, clearly.  They could have said

5    whether there's a chance the defendant would commit it.  They

6    didn't use that word.  They used a word that's higher than

7    that.  It's a probability.

8           A lot of jurors tell me, Ms. Chandler, probability

9    means something is more likely than not going to happen.  If

10   I said it's probably going to rain tomorrow, you know, that

11   has a certain meaning I'm sure.  A lot of jurors tell me that

12   that means that it has to be more likely than not going to

13   rain.  Has to be at least 51 percent of a chance, if you

14   will, that it's going to rain.  Anything less than that and

15   it's just possible.  It's more likely than not that it's not

16   going to rain.

17          Can you see that?

18          Now, when you look at probability, are you going to

19   consider it to be a probability or are you going to consider

20   it to be something less like a chance or a possibility?

21       A.   I don't know if I'm understanding what you're asking

22   me.

23       Q.   Okay.  Well, what I'm saying is probability

24   obviously means something more than a possibility.  Do you

25   see the distinction between those two things?

1     A.   Yes.

2     Q.   What I'm saying to you is, are you going to consider

3  it to be a probability like it's written, or are you going to

4  consider it to be something less than that?

5     A.   I guess like it's written.

6     Q.   Okay.

7           THE COURT:  Ms. Chandler, let me see if I can

8  help if I may.  What would you consider to be a word or a

9  phrase that would be a synonym for probability?

10          VENIREPERSON:  Likely to happen, I guess.

11          THE COURT:  Likely to happen.

12          VENIREPERSON:  Uh-huh.

13          MR. DAVIS:  Okay.  Thank you.

14     Q.   (By Mr. Davis)  All right.  Let's look at criminal

15  acts of violence.  Criminal acts of violence, again, the key

16  word there is violence.  Most people tell me criminal acts of

17  violence have to be aimed against another person.  You know,

18  if I go out and jaywalk today, I've committed a crime, but

19  it's not a crime of violence, is it?  No one else is

20  involved.  Robberies, assaults, other murders, kidnapping

21  where someone is actually harmed or put in threat of harm

22  most people tell me that they consider those to be acts of

23  violence.

24          Would you agree with that, or would you include

25  something else?

1        A.    No, I agree with that.

2        Q.    Okay.  Let's talk about Special Issue Number 2 for a

3    moment, Ms. Chandler, kind of in conclusion here.  Special

4    Issue Number 2, here's where you are.  You've already decided

5    the person is guilty.  You've already decided beyond any

6    reasonable doubt that that person is a continuing threat to

7    society.  You know he's a danger.  Special Issue Number 2 is

8    going to ask you to do something maybe a little bit

9    difficult, but it's going to say forget about everything

10   else.  Even if you think that man is as dangerous as they

11   come, can you take another look at all of the evidence and

12   determine if there's something in that evidence that shows

13   you the man should get a life sentence instead of a death

14   sentence.

15          Again, some people have a problem.  And the problem

16   is they say if I think someone is that dangerous, I don't

17   care what they show me, I don't care what the evidence is,

18   I'm never giving a life because I'm not taking a chance with

19   him victimizing anyone ever again.  They're entitled to think

20   that way, but that's not the way the law asks them to look at

21   that question.  The law says regardless of how dangerous he

22   is, look at everything again.  The reason they do that -- let

23   me give you an example.  We have that question because of a

24   man who was mentally retarded.  And the court said we want

25   the jury to be able to look at that fact and decide if maybe

```
 1    a life sentence is more appropriate than a death sentence.

 2              Let's say you had a 40-year-old man who was severely

 3    mentally retarded.  He knows right from wrong.  He knows that

 4    when he killed that person it was wrong to do that.  But

 5    let's say he's working at the equivalent of a 4-year-old or

 6    5-year-old, kindergartner.  You may think he's dangerous.

 7    You may think he's guilty, but do you really want to sentence

 8    that man to death?  There may be something in his past that

 9    is so -- so shocking, maybe about the way he was raised or

10    his -- whatever it may be where you say to yourself, oh, he's

11    a danger, but there's something in his background, something

12    about this man's mental history that tells me that his

13    punishment should be reduced to a life sentence.

14              Do you think that you'd be able to do that, go

15    through that kind of examination of the evidence, or do you

16    think you'd just automatically say if he's a danger, he's

17    going to die, period?

18         A.   No, to me a life sentence is almost as bad as the

19    death sentence.  I don't know that I would -- no, I could do

20    that.

21         Q.   Okay.  I guess the bottom -- bottom line question --

22    this will be my last question for you.

23         A.   Okay.

24         Q.   You're probably happy about that.  I'm sorry I've

25    had to ask you so many tough questions today.  But if you got
```

1    down to a murder -- a capital murder case where you found the

2    man guilty, you thought he was a danger, and if you saw

3    something, whatever it may be, and you said to yourself

4    that's the thing that I needed to say life sentence instead

5    of death sentence, could you say I'm going to give him life?

6        A.    Yeah.

7        Q.    Ms. Chandler, I appreciate your time.  I appreciate

8    your patience with me, and I appreciate your answers and your

9    honesty here.  That's really what we do depend upon.

10            THE COURT:  Ms. Chandler, would you like to

11   take a stretch break or rest room break before we continue?

12            VENIREPERSON:  No, I'm fine.

13            THE COURT:  Do you want to proceed?  You're

14   the boss.  Continue, get it over with.

15        The Honorable Jennifer Balido.

16                        Cross-Examination

17   By Ms. Balido:

18        Q.    Ms. Chandler, as the Judge has told you, my name is

19   Jennifer Balido.  And along with Mike Byck and also Jane

20   Little, we represent this man over here, Jedidiah Isaac

21   Murphy.  We call him Jim.  That's what his family calls him.

22            And I want to talk to you a little bit about your

23   answers on the questionnaire and then your answers to Mr.

24   Davis because when I first read your questionnaire, it seemed

25   like to me that you were an eye-for-an-eye person, that

1    basically in your questionnaire you stated that I believe if

2    someone planned and willingly took another life, they don't

3    deserve life themselves.  And then you also said on page 2

4    that the best argument in favor of the death penalty is a

5    person should be responsible for their actions, why should

6    they be allowed to live if they have taken someone else's

7    life.

8              Can you kind of tell me if your opinion is the same

9    today as it was back when you filled out this questionnaire?

10        A.   I believe in the death penalty, but I believe in

11   looking at the facts, too.

12        Q.   Okay.  And you also said when you were talking to

13   Mr. Davis and he was explaining you -- to you the difference

14   between capital murder and murder that --

15        A.   I didn't know the difference.

16        Q.   Okay.

17        A.   I really didn't know.

18        Q.   Right.  And you said you didn't know the difference

19   and you didn't know that just -- if there's just a murder, an

20   intentional murder like he described shooting Ms. Miller,

21   that you didn't know that you couldn't get the death penalty

22   for that.

23        A.   Uh-huh.

24        Q.   Okay.  If -- do you think that the death penalty

25   should be available for that type of crime?

1      A.    I don't know.

2      Q.    Okay.  Let me just kind of go over some of the

3  things that you've talked to Mr. Davis about.  And I'm kind

4  of one of those people that I want to hear more about what

5  you have to say, you know, because I -- I don't care if you

6  agree with the law, I really don't.  I just want to know what

7  you really and truly believe.

8           When we're talking about capital murder and we're

9  talking about murder plus, we're talking about that you -- as

10  it's in that indictment, that you cause the death of another

11  person in the course of another criminal offense, in this

12  case kidnapping or robbery.  Okay?   And what we're talking

13  about in this case is that Mr. Murphy had the specific intent

14  to kill somebody.  Okay?  I'm kind of going all around.  Let

15  me see if I can get my thoughts together.

16           Let's say that I've just had it with Mr. Byck.

17  Okay?  He's driving me crazy, and his handwriting is

18  horrible.  And as a fellow nice handwriting person, you know

19  that that can drive people insane sometimes.  But let's just

20  say I've had it with him.  I go out and I buy a gun.  I go

21  out and buy bullets.  And I come into the courtroom with this

22  gun in my purse.  I pull out a gun, and I shoot Mr. Byck.

23  When I pull out that gun, I'm not trying to scare him.  I'm

24  not saying if you write another note to me, I'm going to kill

25  you.  I don't threaten him with it.  I don't shoot him in the

 1   foot because I want to hurt him.  I shoot him because I want
 2   to kill him.  Okay?  I have the specific intent to kill him.
 3   It's not an accident.  You know, we weren't playing with it.
 4   We weren't playing Russian roulette or anything like that.
 5   But I have the specific intent to pull out a gun, do the
 6   thing to cause his death.  And that's the kind of intent that
 7   the State must prove beyond a reasonable doubt, if they can,
 8   before you can find Mr. Murphy guilty of capital murder.
 9   Okay?  And when we're talking about that sort of specific
10   intent, do you think someone that can form that specific
11   intent to kill somebody is always going to be a future danger
12   to society?
13        A.   I don't know.  I can't imagine being angry enough to
14   kill someone, but I guess there are extenuating circumstances
15   and it could be a one-time -- one-time thing.
16        Q.   Okay.  Do you think when you're thinking about an
17   intentional killing and in this case what we're talking about
18   is that -- that Mr. Murphy is accused of intentionally
19   killing Bertie Cunningham by either shooting her in the head
20   or drowning her in water in the course of a robbery or a
21   kidnapping.  If you think you'd find somebody guilty of that
22   type of offense, do you think looking at Special Issue Number
23   1, do you think that you could ever say no, I don't think
24   that he's going to be a future danger to society?
25        A.   I don't think that everybody that has committed a

1    criminal act is going to continue being a criminal.

2        Q.    Okay.  You think that everyone that's committed a

3    capital murder is going to continue to commit criminal acts

4    of violence?

5        A.    Not necessarily.

6        Q.    Okay.  And when we're talking about Special Issue

7    Number 1 -- and I'll kind of do it backwards since we're

8    already here.  When we're talking about Special Issue Number

9    1.  The State has the burden of proof on that issue.  They

10   must prove to you beyond a reasonable doubt that there is a

11   probability that the defendant would commit criminal acts of

12   violence that would constitute a continuing threat to

13   society.  Okay?  That is their burden and their burden alone.

14        Beyond a reasonable doubt.  Mr. Davis didn't talk

15   about it very much, but it's important so I'm going to.

16   Beyond a reasonable doubt, the burden of proof is the level

17   of proof of the believable evidence that they have to satisfy

18   before, number one, you can find him guilty of capital

19   murder, and, number two, before you can answer Special Issue

20   Number 1 yes.

21        We used to have a definition about beyond a

22   reasonable doubt.  Now we don't.  Basically whatever is in

23   the juror's mind which is kind of hard to explain because,

24   you know, it's kind of -- you won't know it unless you see

25   it.  But I think we can all agree that proof beyond a

1    reasonable doubt means that the State removes all reasonable

2    doubt from your mind.  Okay.  And it becomes important

3    because there's -- when we're talking about criminal law,

4    we're talking about whether or not the State can prove its

5    case.  A lot of times jurors feel like, you know, it's their

6    job to determine did he do it or did he not do it.  And

7    that's not really the case, and that kind of gets stuck in

8    some people's craw.  The issue is can the State prove it

9    beyond a reasonable doubt.  Okay.

10         How do you feel about that being the question and

11   not whether did he do it or not do it?

12        A.   I'm not supposed to say whether he did it or whether

13   he didn't do it?  I'm just supposed to -- if they prove their

14   case beyond a reasonable doubt?

15        Q.   Right.  And see -- and that's kind of how Mr. Davis

16   was talking about -- about, you know, if they prove

17   everything and you know that he did it, but they don't prove

18   Dallas County, well, they haven't proved their case beyond a

19   reasonable doubt.

20         Do you see how kind of when you look at it that way,

21   all the things that Mr. Davis was talking about kind of

22   become more real?  How do you feel about that?

23        A.   Well, what are you asking me?  Can I say guilty or

24   not guilty?

25        Q.   Well --

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    Is that what you're saying?

2      Q.    -- let me -- I'm sorry.  I'm being so confusing this

3  morning.  It's my fault.  Sometimes I do this and it's hard

4  for me to get back on track.  Let's say that you're sitting

5  on this case, and the State presents its case -- I mean,

6  presents its case, presents all the evidence they have and

7  they rest and close.  And you get back there in the jury room

8  and you say, you know, I know that he did it, everything

9  points to him that he did it, but the State just didn't prove

10  its case beyond a reasonable doubt.  Okay.  They didn't prove

11  that it was in Dallas County, State of Texas, or they didn't

12  prove that it was committed in the course of a robbery --

13  well, that's a bad example.  They didn't prove that he

14  intentionally caused the death of this individual.  Okay.

15  They just didn't prove it.  You know, but I think he's

16  guilty, but the State didn't just prove it.  Just didn't

17  prove it.  The Judge says that if the State doesn't prove its

18  case beyond a reasonable doubt, you have to find him not

19  guilty.

20          How would that make you feel?

21      A.    I guess I could do it.

22      Q.    But it probably wouldn't make you feel --

23      A.    No, I probably wouldn't be very happy about it,

24  but --

25      Q.    Okay.  And it doesn't make jurors feel very happy

1    because I've had jurors both when I was a prosecutor and as a

2    defense lawyer say, you know, I thought he was a bad person.

3    I thought he was guilty of something, but they just didn't

4    prove their case beyond a reasonable doubt.  And it's a hard

5    thing to do, but you think you can do that if the State

6    doesn't prove its case?

7         A.   I think so.

8         Q.   And when we're talking about beyond a reasonable

9    doubt, we're talking about proof -- well, let me get at it

10   this way.  When we're talking about civil cases, when people

11   are just fighting about money --

12        A.   Uh-huh.

13        Q.   -- the proof in that case is more likely than not.

14   Okay.  It's called a preponderance of the evidence.

15   Sometimes people say 51 percent.  When we're talking about

16   when the State of Texas like the D.A.'s office through its

17   Child Welfare Division wants to take your children away,

18   that's clear and convincing evidence which is some people say

19   75 percent.  It's more than more likely than not.  It's not

20   as -- it's more than that.  It's clear and convincing

21   evidence.  Beyond a reasonable doubt is proof such which is

22   more than that.  We don't have any kind of numeric value, but

23   it's something more than that.  More than just fighting about

24   money, more than taking your kids away.  Beyond a reasonable

25   doubt.  It's the highest burden because we're talking about

1   the most important things.  We're talking about life and

2   liberty.

3          Can you hold the State to its burden of proof on

4   that, with that kind of being an idea of what reasonable

5   doubt is, make their case beyond a reasonable doubt?

6      A.   Yeah.

7      Q.   And that's the kind of proof that we're talking

8   about also on Special Issue Number 1.

9          Now, Special Issue Number 2, Mr. Davis kind of ran

10  out of time and so I'm going to talk a little bit about that.

11  Special Issue Number 2 is whether taking into consideration

12  all of the evidence, including the circumstances of the

13  offense, the defendant's character and background, and the

14  personal moral culpability of the defendant there is a

15  sufficient mitigating circumstance or circumstances to

16  warrant that a sentence of life imprisonment rather than a

17  death sentence be imposed.

18         Now, you said when you were talking to Mr. Davis,

19  and I was glad to hear you say it, that you thought a life

20  sentence was almost as bad as a death sentence.  Is that --

21  is that how you feel?

22     A.   To me it is.

23     Q.   Okay.  And what we're talking about here is we're

24  talking about life confinement in prison.

25     A.   Right.

```
1        Q.   And life confinement in prison --

2        A.   Is not much of a life.

3        Q.   Exactly, is not very much of a life.  So I -- do you

4   believe that when we're talking about an intentional murder,

5   we're talking about a capital murder, that both death by

6   lethal injection and life imprisonment are both adequate

7   punishments for that sort of crime?

8        A.   Yeah.

9        Q.   Okay.  Let me talk to you a little bit about Special

10  Issue Number 2.  Now, after you've -- when you get to Special

11  Issue Number 2, you've, number one, found him of an

12  intentional -- found him guilty of an intentional murder,

13  plus something else.  And, number two, you've answered

14  Special Issue Number 1, yes, that he's going to constitute a

15  continuing threat to society.

16       A.   Uh-huh.

17       Q.   And then we get to Special Issue Number 2, and it's

18  taking a look at everything.  Now, Ms. Chandler, after you've

19  found him guilty and after you've found that he's going to be

20  a future danger, can you look at the case again and look at

21  his -- the circumstances of the offense and the defendant's

22  character and background and the personal moral culpability

23  of the defendant and determine whether or not he should

24  receive a life sentence or a death sentence?  Do you think

25  you can do that after finding him guilty and finding that
```

1    he's a danger to society?

2        A.    You're asking me if I can -- what are you asking me

3    exactly?

4        Q.    I'm asking you, do you -- do you think that there's

5    anything that you think would be mitigating after finding him

6    guilty of capital murder, of killing this person in the

7    course of a robbery or kidnapping?

8        A.    Uh-huh.

9        Q.    You've found that the evidence shows you that he's

10   going to be a contributing -- continuing threat to society.

11   Do you think that there's anything that could be shown to you

12   to cause you to answer that question so that he gets life

13   instead of death?  Is there anything mitigating?

14       A.    I don't really know.

15       Q.    Okay.  Let me -- let me kind of get at it this way.

16   There -- there are a number of things that have been

17   considered mitigating in the past that jurors have told us

18   that they thought was mitigating.  One of the things is what

19   Mr. Davis talked about which was the mental retardation --

20       A.    Uh-huh.

21       Q.    -- case.  And the case that he was referring to, Mr.

22   Penry, he is still on death row and the State is still trying

23   to kill him.  And the case is being considered by the United

24   States Supreme Court.

25            Do you think in situations that someone's mental

1    retardation could be mitigating?

2         A.    Yeah.

3         Q.    What about sometimes people think that mental

4    illness, either schizophrenia or bipolar disorder or

5    something like that or just having some mental problems that

6    weren't ever addressed is sometimes mitigating.  What do you

7    feel about?

8         A.    I don't think you can condone their actions just

9    because -- or let them off just because of that.

10        Q.    Right.  And when we're talking about, quote, letting

11   them off, I mean, the decision in this case is not whether or

12   not they're going to go free, but whether it's life

13   imprisonment or the death penalty.

14              Do you think that could be a consideration in that?

15        A.    If there is something mental you're saying?

16        Q.    If there's something mental, yes, ma'am.

17        A.    Huh.  I guess it would depend on the degree of the

18   mental retardation or whatever.

19        Q.    Okay.

20              THE COURT:  Ms. Chandler, what about child

21   abuse?  Have you seen the examples in your educational career

22   where you've seen individuals who were sexually or physically

23   abused as children and it affected them adversely as a

24   result?  Or have you not?

25              VENIREPERSON:  I don't guess I really have

1    personally, no.

2                    THE COURT:  Are you willing, with regard to

3    Special Issue Number 2, to listen to evidence and determine

4    whether or not, number one, it is true, number two, if it's

5    mitigating, and then decide if as a result of it the

6    defendant should live and not die?

7                    VENIREPERSON:  I'll listen as carefully as I

8    can.

9                    THE COURT:  Evidence may show that somebody is

10   a -- has the musical composing talent of a Beethoven or

11   Schumann or Mozart or may have tremendous artistic talent as

12   a Michelangelo, be an absolute international travesty not to

13   permit this individual for the 40 years in the penitentiary

14   to contribute to society.  And those are extremes.

15                   VENIREPERSON:  Yeah.

16                   THE COURT:  All right.  But this -- Special

17   Issue Number 2 is set up for just extreme type situations if

18   they exist.  And I'm not saying that every case is extreme,

19   but this is the safety net.  Look, because of this, fill in

20   the blanks.

21                   VENIREPERSON:  You're saying let them go

22   because they have all --

23                   THE COURT:  Not go, live and not die.

24                   VENIREPERSON:  Oh, okay.

25                   THE COURT:  See, when you get to this, they're

```
 1   looking at 40 years or death.  Either/or, so they're not -- I
 2   mean, this is not a get out of jail free card.
 3                VENIREPERSON:  Okay.
 4                THE COURT:  This is a live and not die card.
 5   Okay.
 6                VENIREPERSON:  Uh-huh.  Okay.
 7                THE COURT:  The defense may continue.
 8                MS. BALIDO:  Thank you, Judge.
 9        Q.   (By Ms. Balido)  And that's what -- I think
10   sometimes people think of mitigation as an excuse or
11   justification or something like that.  They think that
12   Special Issue Number 2 is trying to make excuses, and that's
13   not really what it's for.  You know, Special Issue Number 2,
14   like the Judge said, it's the decision that someone is going
15   to get life and not death because of some sort of sufficient
16   mitigating circumstance in their background that -- or just
17   something that's in the case that you say, well, you know,
18   this to me means that this person deserves to live and not
19   die.  That's basically what it is.
20            Let me -- let me give you an example, and what I'm
21   kind of keying on is the personal moral culpability of the
22   defendant when I'm giving you this example.  Let's say that
23   Mr. Byck and I are nonidentical twins.  We're born of the
24   same mother who had some alcohol problems and maybe some drug
25   problems while she was pregnant with us.  When we're born,
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    she decides that we're just too much trouble and we get

2    adopted out to two separate families.  Mr. Byck is adopted by

3    a family who loves children, loves to read to children.  It's

4    a house where love is communicated.  No violence in the

5    home.  No abuse in the home.  Goes to good schools with good

6    teachers, finds a couple of those teachers that make a

7    difference in people's lives.

8         A.    Uh-huh.

9         Q.    And goes off to college and graduates from college.

10            I, on the other hand, am not so lucky.  I am adopted

11   into a family where love is not communicated or ever spoken

12   about.  We're exposed to violence on TV, exposed to violence

13   between the other siblings in the home, exposed to violence

14   with our parents.

15        A.    Uh-huh.

16        Q.    Committing violence on each other and on us.  There

17   is physical abuse.  There is sexual abuse.  Those things go

18   untreated.  I go to school, but I just kind of go through

19   school without, you know, any real bumps in the road.  Never

20   make an impact.  No one ever makes an impact on me.  And I go

21   off and live my own life.

22            Let's just suppose with this kind of extreme example

23   that we end up -- Mr. Byck and I end up on opposite corners

24   in downtown Dallas and we rob two separate banks unbeknownst

25   to each other.  We do the exact same thing.  We walk in.  We

1    threaten the people in the bank with a gun.  We walk out,

2    we're arrested, and we confess.  The jury finds us guilty,

3    and the jury is supposed to assess our punishment in separate

4    trials.

5           Do you think that we should be sentenced the same or

6    differently based on our character and background?

7    A.    I probably would say the same because a lot of

8    people have bad backgrounds but have risen above it.

9    Q.    Right.

10   A.    I don't think that's -- I would probably say the

11   same.

12   Q.    Okay.  Let me ask you, do you think that the -- our

13   different characters and our different backgrounds should

14   have any impact on how the jury views that case or how you as

15   a juror would view that case, or do you think you do the

16   crime, you know, you do the time?

17   A.    Well, I think I can weigh it both ways, but I still

18   don't think that your background has a lot to do with how you

19   turn out.

20   Q.    Okay.  What do you think has a lot to do with what

21   you turn out, if your background doesn't have very much to do

22   with it?

23   A.    Well, now that's hard to say.  I know a lot of

24   people blame their background on their parents and -- for

25   their actions in their adult life, but I also know that a lot

1   of people -- and I don't know how they've done it, but have

2   risen above that and have made something of themselves.

3       Q.   Right.  Do you think that you could consider -- when

4   we get to Special Issue Number 2, that you could consider the

5   defendant's character and background in answering Special

6   Issue Number 2?

7       A.   Say that again.

8       Q.   Do you think that you could -- knowing how you feel

9   about, you know, people and their background and how they've

10  risen above it, do you think you can even consider the

11  defendant's character and background?

12      A.   Yes, I think I can consider it.

13      Q.   But you'd have to weigh it out with everything else?

14      A.   Uh-huh.

15      Q.   Are you pretty much, Ms. Chandler, a person who sees

16  shades of grey --

17              MS. BALIDO:  Thank you, Judge.

18      Q.   (By Ms. Balido)  -- shades of grey or kind of a

19  black and white on issues?

20      A.   I think I'm kind of a black and white.

21      Q.   I used to be a black and white person until I

22  started working in the criminal justice field.  Now I'm kind

23  of a shades of grey person.

24      A.   You can see both sides; is that what your saying?

25      Q.   I think I can.  Having been on both sides, I think I

1  can see both sides now.

2       A.   Yeah.

3       Q.   Let me ask you, when we're talking about judging the

4  facts of this case and we're talking about holding the State

5  to its burden of proof -- and when I'm asking you this

6  question I'm asking specifically about the guilt/innocence

7  phase of this trial, whether or not the State can prove its

8  case beyond a reasonable doubt that he's guilty of capital

9  murder.

10      Would your ability to be fair and impartial be

11 changed if you learned that the victim in this case was an

12 80-year-old woman?

13      A.   Would that make a difference in how I felt about

14 it?

15      Q.   Would it make a difference in your ability to be

16 fair and impartial in judging the facts of this case?

17      A.   I don't know that it would make a difference.

18      Q.   Okay.  Let me ask you, also, you look at that

19 indictment and you say that -- and you see that what we're

20 talking about is we're talking about Ms. Cunningham who was

21 killed and the State has alleged that her cause of death was

22 either shooting with a gun or drowning in water.  And when

23 we're talking about those two methods of death or ways that

24 somebody died, those -- as you can understand, they might be

25 pretty gruesome.

1          Do you think you can look at graphic pictures in

2    this case, and some people can and some people can't, and be

3    able to judge those pictures for their evidentiary value and

4    not be swayed by mere sympathy or emotion in viewing those

5    photographs?

6          A.   I've never looked at any photographs like that.  I

7    don't know how I would react, really.

8          Q.   Okay.  And basically -- you know, I ask that

9    question just because the Judge will tell you or the law says

10   that you can't be swayed by mere sympathy or emotion, you

11   should judge the facts.  And so it's kind of a question

12   that's also kind of a warning sort of situation.

13          Let me check real quick and see if there was

14   anything else I wanted to ask you about, Ms. Chandler.

15          A.   Okay.

16          Q.   Ms. Chandler, my last question is, we've talked a

17   lot about the rights of people accused of crimes in this

18   State, the 5th Amendment privilege, the right to be presumed

19   innocent before -- you know, unless and until the State can

20   prove its case beyond a reasonable doubt.  And you said on

21   your questionnaire that you thought that citizens accused of

22   criminal offenses were afforded too many rights because it

23   seems that pleas go on and on.

24          Can you kind of explain that to me?

25          A.   I guess -- I guess after they're convicted, I

1    guess --

2                    THE COURT:   Appeals go on and on?

3         A.    Appeals go on.   I meant appeals rather than pleas go

4    on and on.

5         Q.    (By Ms. Balido)   Okay.

6         A.    Sometimes that's just disconcerting to me, I guess.

7         Q.    Do you think that when we're talking about a death

8    penalty case where --

9         A.    I'm sure I would want to appeal --

10        Q.    Pardon?

11        A.    I said I'm sure I would want the appeals if I was on

12   the other side.

13        Q.    Yes.   Yes.   And do you think that the State should

14   have to dot all its I's and cross all its T's and do

15   everything right before they can be allowed to put somebody

16   to death in this State?

17        A.    Yeah.

18        Q.    I appreciate your time.   Thank you very much.

19                    THE COURT:   Ms. Chandler, was there anything

20   about your jury experience in the burglary case some years

21   ago that would impact you adversely to either side as an

22   impartial juror in this case?

23                    VENIREPERSON:   No.

24                    THE COURT:   None at all?

25                    VENIREPERSON:   No.

1          THE COURT:  All right.  Thank you very much.

2    If you'd excuse yourself with Ms. Madore momentarily.  The

3    attorneys will confer with co-counsel and then we'll bring

4    you back and I'll let you know whether you remain under

5    consideration.

6               (Venireperson leaves the courtroom.)

7               (State no challenge for cause - Ms. Chandler)

8          MR. DAVIS:  The State has no challenges for

9    cause.

10          MS. MILLER:  And for record purposes, there is

11    no jury --

12          THE COURT:  Evaluation?

13          MS. MILLER:  -- history information.

14               (Defense no challenge for cause Ms. Chandler)

15          MS. BALIDO:  Judge, unfortunately we don't

16    have any challenge for cause either.

17               (Venireperson brought into courtroom.)

18               (Marilyn Chandler Prospective Juror No. 24)

19          THE COURT:  Ms. Chandler, you remain under

20    consideration as a prospective juror in the case.

21          We've asked Mrs. Daily, the Court Administrator, to

22    come in.  She has done so.  She's going to be confirming some

23    phone numbers with you just so we can keep up with you.  And

24    if they should change, if you would be kind enough to call

25    the court and let us know they've changed, whatever it may

1    be.

2              With your permission, and only with your permission,

3    I'm going to ask that you allow Ms. Madore, the bailiff, the

4    lady to your left, to take a Polaroid picture of you for the

5    benefit of the attorneys.  We talk to an awful, awful lot of

6    folks.

7              VENIREPERSON:  You don't remember.

8              THE COURT:  And it kind of blends in faces

9    with information on the questionnaires and personal notes

10   that the attorneys have taken.  They would like to have the

11   benefit of a Polaroid picture when they exercise their

12   peremptory challenges and say, oh, I remember this lady.  May

13   we have your permission to do so?  I assure you that once

14   this 48 qualified jurors have been identified, Polaroid

15   pictures, all of them will be destroyed, shredded, not even

16   be made a part of the trial record in the matter.

17             VENIREPERSON:  Okay.

18             THE COURT:  Also avoid the temptation of

19   contacting the Dallas Morning News with regard to back

20   issues.

21             VENIREPERSON:  I haven't done that.

22             THE COURT:  Involving news stories that

23   appeared about the time of the event that causes this

24   indictment to be returned.

25             Also, you're going to have to tell associates,

DARLINE W. LABAR, OFFICIAL REPORTER

1    family members that you remain under consideration.  But do

2    not allow anybody outside the courtroom influence your

3    decision if you're selected as a juror.

4                    VENIREPERSON:  Okay.

5                    THE COURT:  Fair enough.  Any questions for

6    me?

7                    VENIREPERSON:  I don't believe so.  Thank you.

8                    THE COURT:  Enjoyed having you this morning.

9    We'll be back in touch with you.

10                    VENIREPERSON:  Thank you.

11                    (Recess of proceedings.)

12                    (Venirepersons brought into courtroom.)

13                    THE COURT:  Good afternoon.  Please have a

14   seat.  Welcome back.  Ask each of to you raise your right

15   hands and again be sworn in, please.

16                    (Venirepersons additionally sworn.)

17                    VENIREPERSON:  I do.

18                    THE COURT:  Thank you.  You may lower your

19   hands.

20            Though the individuals at the counsel tables have

21   been previously introduced, it's been a little while,

22   especially for a couple of you.  Allow me therefore, if I

23   may, to reintroduce them to you again this afternoon.

24            Beginning first with the counsel table nearer to

25   you, we begin first with the lead counsel for the State in

1    this prosecution, one of the Senior Prosecutors in the Dallas

2    District Attorneys Office at the present time, the Honorable

3    Greg Davis.

4              MR. DAVIS:  Good afternoon.

5              VENIREPERSON:  Good afternoon.

6              THE COURT:  Seated next to him is his

7    co-counsel during this particular trial.  At the present time

8    this lady occupies the position of Chief Prosecutor assigned

9    to this the 194th District Court by Dallas County District

10   Attorney Bill Hill, the Honorable Mary Miller.

11             MS. MILLER:  Good afternoon.

12             THE COURT:  Moving on to the defense table, we

13   find first two of the three defense attorneys representing

14   the accused.  We begin first with the Honorable Jennifer

15   Balido.

16             MS. BALIDO:  How are you?

17             THE COURT:  Seated next to Ms. Balido is one

18   of her co-counsels, a board certified criminal law

19   specialist, so designated by the State Bar of Texas as a

20   result of training, experience, and a very difficult test

21   which he has successfully completed, the Honorable Michael

22   Byck.

23             MR. BYCK:  Good afternoon, ladies and

24   gentlemen.

25             VENIREPERSON:  Good afternoon.

1        THE COURT:  Seated next to Mr. Byck, opposite

2   Ms. Balido, is the accused, the defendant, if you will, Mr.

3   Jedidiah Isaac Murphy.

4        THE DEFENDANT:  Good afternoon.

5        VENIREPERSON:  Afternoon.

6        THE COURT:  There is a third attorney

7   representing Mr. Murphy who is not with us this afternoon.

8   She is attending to matters germane to this case outside the

9   courthouse as we speak.  I will introduce her by name and in

10  her absence, the Honorable Jane Little.

11       Mr. Gabel, ladies, let us, if we may, move right

12  into the matters at hand.  I will be making some preliminary

13  comments to you, after which on an individual basis we will

14  proceed with the individual questioning and you will know

15  before you leave us this afternoon whether the attorneys and

16  the Court will continue to consider you as a prospective

17  juror on this particular case.

18       We've been at this, trust me, for a number of weeks

19  in a very laborious, tedious responsible manner.  We are

20  working our way up to 48 constitutionally qualified jurors.

21  When that number has been reached, the attorneys will be

22  given an opportunity to exercise their peremptory

23  challenges.  These are the excusing of otherwise qualified

24  jurors other than for racial or ethnic or gender reasons.

25  Does not mean that a person of color cannot be excused, but

1    it cannot be as a basis of that that they are excused.

2         Though we anticipate this process to be completed

3    within the next couple of weeks or so, we don't anticipate

4    the testimony in the trial to begin until Tuesday, May 29th.

5    The day before the United States Congress has designated that

6    Memorial Day will be celebrated in this country.

7         Do any of you know of any reason in your own

8    personal or business schedules that could not be altered in

9    such a manner that if selected, would prevent you from

10   returning on the 29th for a period of anywhere for four or

11   five, as many as eight days, depending upon how long the jury

12   deliberates?  What might your problem be, ma'am?

13             VENIREPERSON:  I'm subject to subpoena from

14   the Fifth District of Illinois as a witness.

15             THE COURT:  We'll work with them.  Trust me.

16   Anybody else?  Nope.  All right.

17        Let me, if I may, therefore somewhat fast forward

18   and get into the matters at hand as it deals with the death

19   penalty, the statutory scheme in Texas.  Allow me at the

20   outset, if I may, Mr. Gabel, ladies, to make a few

21   hypothetical assumptions and they're merely that,

22   hypothetical and assumptions.

23        Let us assume this jury process has been completed.

24   It turns out that all three of you are jurors in the case.

25   Furthermore, let's again hypothetically assume that evidence

DARLINE W. LABAR, OFFICIAL REPORTER

1   has been presented in the guilt/innocence stage of the trial,

2   you find after hearing the evidence, and receive the

3   instructions from me which we call the charge of the Court,

4   you and your other 9 jurors have completed your

5   deliberations.  You have, again hypothetically, reached the

6   following conclusions:  The presumption of innocence has been

7   overcome.  Each of the operative portions of the charging

8   document, the indictment, we call them elements, have been

9   proven to your individual satisfaction beyond a reasonable

10  doubt as a result of which you return with your other fellow

11  jurors into the courtroom with a verdict that the defendant,

12  Jedidiah Isaac Murphy, is guilty of capital murder.  The jury

13  would shortly then reconvene to determine the matter of

14  punishment.

15       Unlike virtually every other violation of the Penal

16  Code in the State of Texas, capital murder has only an

17  either/or possibility for punishment.  Either on one hand

18  life in the penitentiary, or on the other hand death by

19  lethal injection.  I trust you will agree with me the latter

20  speaks for itself.

21       Under current Texas law a life sentence for capital

22  murder results in the defendant so sentenced being required

23  to serve 40 calendar years in the penitentiary in custody

24  before being eligible for release on supervision which we

25  call parole.  No guarantee that after 40 years the

1    penitentiary doors will fly open and the defendant will walk

2    out.   Regardless of the good conduct that an inmate might

3    display during those 40 years, 40 calendar years,

4    day-for-day, week-for-week, month-for-month, then the

5    eligibility process begins.

6             Unlike many states Texas does not have life without

7    parole.   A life sentence though, I'm informing each of you

8    right up front, we're hiding no cards, everything is up

9    front, 40 calendar years.

10            Because of the absolute irrevocability of death, the

11   legislature, with the approval of the United States Supreme

12   Court, has fashioned our punishment phase of a capital murder

13   trial to favor at the commencement of the penalty stage of

14   the trial a life sentence and not death.   Therefore, an

15   individual going into the punishment or penalty phase of a

16   death penalty in Texas is at the beginning of that penalty

17   stage guaranteed a life sentence, and it only becomes a death

18   sentence depending upon certain circumstances which we're

19   about to discuss.   It doesn't start at death and move down to

20   life.   It stays at life and then only upon certain

21   circumstances being brought to the jury's attention can it

22   rise to death.

23            In the penalty phase of a capital murder case in

24   Texas, jurors are asked, after hearing additional evidence,

25   to consider at least two, sometimes depending upon the

1    circumstances, three questions which the legislature has

2    called special issues.  Based upon what we understand the

3    circumstances to be in this case, there will only be two

4    questions.  These are not questions that the attorneys and I

5    happened to dream up driving to the courthouse one morning or

6    sitting around some Friday afternoon and decide, hell, you

7    know, let's ask this jury the following question.  It's true

8    all 254 counties in Texas.

9           The two special issues that the jury will be called

10   upon, again under my hypothetical scenario, after having

11   found the defendant guilty of capital murder which again

12   we're making a tremendous hypothetical leap forward, but

13   we're doing it in the interest of your time this afternoon,

14   are the special issues that you see to your right.  Let me

15   ask each of you to read them to yourselves, after which I'll

16   explain to each of you the legal significance of those

17   questions.

18                (Venirepersons given time to read issues.)

19                THE COURT:  Have you completed that?  Okay.

20          Special Issue Number 1, grammatically I would

21   suggest to you that it is constructed in such a way that by

22   beginning with the word "whether," when you begin as a jury

23   to deliberate, the answer to that question -- at the outset

24   the answer to that question is no.  Note with me whether

25   there is a probability.  It's not there is a probability.

1    You are called upon to determine whether there is a

2    probability.  So grammatically it starts at a negative or no.

3         Just as the burden of proof or, if you will, the

4    responsibility of presenting evidence in the guilt/innocence

5    stage of the trial lies with the District Attorneys Office,

6    the prosecutors, Mr. Davis, Ms. Miller, responsibility also

7    lies upon their shoulders to convince the jury, if they can,

8    based upon the evidence, that the answer to that question

9    should be yes and not no.  But keep in mind that before you

10   get to this special issue, you've already found this

11   defendant under my hypothetical scenario guilty of committing

12   murder during the course of a robbery or kidnapping.  Already

13   found that.  To be a constitutionally qualified juror, you

14   cannot say just because I found him guilty of capital murder,

15   I am automatically going to answer that question yes.  Can't

16   do that to be a qualified juror.  I'm not here trying to talk

17   you out of your conscientious beliefs.  Don't get me wrong.

18   But this is what we're going to be exploring this afternoon.

19        Let me give you an example from the past.  Perhaps

20   you recall a few years ago there were two military cadets,

21   Tarrant County, Mansfield, I believe, that were accused,

22   indicted, found guilty of kidnapping a young girl and

23   shooting her because there had been a -- some kind of a

24   sexual relationship between the young man who I think went to

25   the Air Force Academy and had a girlfriend that went to the

1    Naval Academy, and they got -- lured this girl out of her

2    house and took her to some remote area and shot and killed

3    her.  Murder during the course of a kidnapping, capital

4    murder.  The Tarrant County District Attorney did not even

5    seek the death penalty in this case.  And talking to him, he

6    said, look, we would like to think the young men and women

7    that go to our military academy are some of the elite of the

8    elite that we have.  Say, look, I couldn't prove the answer

9    to Special Issue Number 1 should be answered yes, so I even

10   didn't seek death.

11            If, however, you answer as a jury, you, first person

12   plural, jury, answer Special Issue Number 1 yes, you're

13   two-thirds of the way to a death sentence.  Two-thirds of the

14   way.  You've already found the defendant guilty of capital

15   murder, murder during the course of a robbery or kidnapping,

16   already found under my hypothetical if you get to Special

17   Issue Number 2, continuing threat to society.  Special Issue

18   Number 2, I have for a number of years when talking with

19   prospective jurors just like you, called it the mercy

20   question, the safety net question, the last chance question.

21            To be a constitutionally qualified juror when you

22   get to Special Issue Number 2, you must tell yourselves, and

23   therefore of necessity of course us as well, that you would

24   be willing to listen to mitigating evidence, if presented,

25   decide whether or not it's true, then decide if as a result

1    of that mitigating evidence it rises to the level because of

2    which the defendant should live and not die, give effect to

3    that mitigating evidence, and answer it accordingly.  Because

4    I want to make each of the three of you abundantly aware, and

5    the attorneys too as well, that if the jury answers Special

6    Issue Number 1 yes, after conscientiously evaluating the

7    mitigating evidence, if presented in Special Issue Number 2,

8    answer no, I by law am required to sentence the defendant to

9    death.

10         Texas is not a jury recommending state.  Florida, if

11   but 7 of the 12 jurors for instance recommend that a death

12   sentence be imposed, the Judge can go along with it, can

13   overrule it, as the Judge sees fit.  Not so Texas.  Being the

14   populist traditional state that we are, we give tremendous

15   responsibility to each of the 12 jurors to make a decision of

16   life or death.  Any configuration of answers other than yes

17   and no, again I'm not a thirteenth juror.  I don't overrule

18   the jury's decision.  If it's other than yes and no, life

19   sentence.

20         If you answer Special Issue Number 1 no as it

21   begins, you don't even have to get to Special Issue Number

22   2.  Just come out in the courtroom and say, look, we don't

23   think he's going to be a continuing threat to society, 40

24   years, life sentence, that's it.

25         Have I confused all of you?  I hope not.

DARLINE W. LABAR, OFFICIAL REPORTER

1          We're about to begin the individual questions.  Let

2     me assure each and every one of you to the attorneys'

3     questions there are no right or wrong, in quote, answers as

4     long as they're truthful.  We don't give prospective jurors

5     such as yourself grades on a citizenship scale, if you will,

6     as a result of your answers.  We only ask that you be

7     brutally honest with yourself and us with regard to these

8     questions, and that's why this process takes so long.  And

9     I've done a number of these cases, and obviously we can all

10    appreciate the fact of the seriousness of the allegations,

11    the seriousness of the consequences, and we're not going to

12    rush to judgment.  But whatever the outcome, I want to assure

13    you as Judge of this Court, I will see to it to the best of

14    my knowledge and ability and experience, it's done correctly,

15    regardless of the outcome.  And I would hope that you would

16    want a Judge to look upon it that way.

17          Any questions for me?  Nope.

18          Let me assure you before we begin the questions, the

19    attorneys will be treating you with great deference and

20    respect.  There have been some comments in the media the last

21    few years about the, quote, unquote, Rambo tactics that

22    litigators use with regard to behavior in the courtroom which

23    has occasioned the disgust of not only many citizens but also

24    lawyers.  And I can assure you, the judiciary, you will be

25    treated during the questioning by some of the finest

1    attorneys that not only do we find in Dallas, but Texas, and

2    I'm privileged to teach a course of this type for the

3    American Bar Association from California to South Carolina.

4    Seen a lot of these types of presentations.  You will find

5    the treatment by the attorneys, their probing questions, may

6    be a little difficult to answer, but they will be done with

7    great deference, respect, and professionalism.  So I trust

8    that you will take that to heart.

9          As it turns out, we are not being very gallant it

10   appears with Mr. Gabel.  You have the lowest number so we'll

11   start with you ladies.  If we can excuse you, go into the

12   jury room.  And as soon as questions have been completed with

13   Mr. Gabel -- incidently, Ms. Lawley, you'll be next.  And,

14   Ms. Neff, you will be the third one this afternoon.

15         Mr. Gabel, may I invite you to have a seat over here

16   in the witness stand.

17         And, Sheriff, may we move the special issues over

18   into the jury box, please?

19               THE BAILIFF:  Yes, sir.

20               THE COURT:  Mr. Gabel, have a seat if you

21   would.

22               VENIREPERSON:  Thank you.

23               THE COURT:  And make yourself as comfortable

24   as circumstances permit.  Are you ready to begin?

25               VENIREPERSON:  Yes, sir.

---

DARLINE W. LABAR, OFFICIAL REPORTER

1          THE COURT:  We will begin with the State in

2    the Honorable Greg Davis.

3          Mr. Davis, Mr. Gabel.

4          MR. DAVIS:  Thank you.  May it please the

5    Court.

6                    WILLIAM GABEL

7    was called as a venireperson by the Court and, after having

8    been first duly sworn, testified as follows:

9                 Voir Dire Examination

10   By Mr. Davis:

11        Q.   Good afternoon, Mr. Gabel.  How are you?

12        A.   Very well, sir.  Thank you.

13        Q.   Good.  As the Judge just told you, I'll have a

14   chance to speak with you for a few minutes this afternoon.

15   If necessary, you can take a break after that and Mr. Byck or

16   Ms. Balido will speak to you on behalf of Mr. Murphy.

17        What the Judge just said about right and wrong

18   answers, that's exactly right.  None of these questions have

19   right or wrong answers.  Most of them deal with how you feel

20   about an issue, what your opinions are.  I've done enough of

21   these cases, I've talked to enough people to know that

22   everybody feels differently.  You'll find as we talk about

23   your opinions there will come a time probably when I'll ask

24   you another question.  That will be can you follow the law in

25   this case.  Because everybody who comes down here has

1    opinions.  Some of them are very strong opinions from time to

2    time.  And there's certainly nothing wrong with that.  But if

3    you're selected as a juror in this case, you'll take another

4    oath.  So far you haven't taken this oath.  That oath will

5    instruct you to find a true verdict according to the law and

6    the evidence in this case.  Judge Entz will give you the

7    law.  He'll tell you what words mean.  He'll tell you what

8    you're required to do, what the burden of proof is in this

9    case.  And even if there's a conflict between maybe how you

10   feel about an issue and the law that he gives you, that oath

11   would require you to follow the law instead of how you may

12   personally feel about an issue.

13        The second thing will be to base a verdict on the

14   evidence that you hear.  And that's part of your job also, to

15   listen to witnesses, determine what the facts are in this

16   case, and then apply that to the law that he gives you.

17        In general, sir, do you feel like you're the type of

18   person who will be able to follow the law given to you by

19   Judge Entz?

20   A.    Yes, sir.

21   Q.    Okay.  Let's talk about some of the legal

22   requirements in this case.  Most of these have been discussed

23   with you by Judge Entz, but let's go over them again because

24   these are the rights that insure that Jedidiah Murphy will

25   receive a fair trial, and that's very important, obviously,

1   in this kind of case.

2          The first right that he has is he has the right to

3   be presumed innocent of this offense.  As he sits here right

4   now, he's presumed innocent.  Even though we all know a

5   certain number of things have already happened.  He's been

6   arrested for the offense of capital murder.  He's been

7   charged with that offense.  He's been indicted by the Dallas

8   County grand jury for the offense of capital murder.

9   Regardless of all of that, he's still presumed innocent of

10  the offense.  No jury can find him guilty until the State of

11  Texas proves his guilt beyond a reasonable doubt.  If we meet

12  that burden and if we prove his guilt beyond a reasonable

13  doubt, you find him guilty.  If we fail to meet that burden

14  of proof, you find him not guilty.

15         Let me -- let me just address something on your

16  questionnaire and -- because sometimes this comes in conflict

17  with presumption of innocence.  You indicated -- we asked you

18  a question.  You probably don't recall this, but we asked you

19  a question on the questionnaire, if someone is accused

20  capital murder, he should have to prove his innocence.  And

21  you answered that you strongly agreed with that.  And, you

22  know, and I've had that response before.  And I guess it's

23  only natural from watching TV that perhaps defendants somehow

24  prove their innocence or they come up with a witness and

25  whatnot, but you need to understand what the law says.  The

1   law says that Mr. Murphy does not have to do one single thing

2   in this trial.

3       A.   Uh-huh.

4       Q.   He never has the burden of proof himself.  His

5   attorneys could sit there and do crossword puzzles.  They

6   could doodle.  They could never ask a question.  And if I put

7   on witnesses and I failed to prove his guilt, that

8   presumption of innocence would be strong enough to say not

9   guilty.

10          So my question to you is this.  Do you believe that

11  you can wait, listen to the evidence, and make the State of

12  Texas prove this man's guilt beyond a reasonable doubt before

13  you'll find him guilty?

14      A.   Yes, I believe I could.

15      Q.   Okay.  Are you going to require Jedidiah Murphy or

16  his attorneys to do anything in order to prove his innocence,

17  because the law says he doesn't have to do that because again

18  remember, the burden of proof in this case will always be

19  right here with the State of Texas.

20      A.   Right.

21      Q.   Can you assure me -- for instance, if I put a case

22  on and it doesn't quite come up to the standards of beyond a

23  reasonable doubt, maybe I get close, but I don't quite get

24  there, but the defense does nothing, can you assure me that

25  you'll simply look at my evidence, and if I don't meet that

DARLINE W. LABAR, OFFICIAL REPORTER

1   burden, you'll say not guilty even if he sits there and does

2   nothing?  Can you assure me that you can do that also?

3       A.   Yes.

4       Q.   Here's the second thing that would play into that.

5   It's Mr. Murphy's right to remain silent.  Okay.  No

6   defendant can be forced to testify against himself.  Now, I

7   know from experience again a lot of jurors say, you know, if

8   it were me and if I were charged with something as serious as

9   capital murder, I'd want to get on that stand.  I'd sure want

10  to tell the jury my story if I was not guilty, if I were

11  innocent of the charges.  I think that's a natural reaction,

12  but the law doesn't look at it that way.  The law says again,

13  because I've got the burden of proof, this man doesn't have

14  to get on the witness stand, he doesn't have to ask

15  questions.  I've represented -- as a defense attorney a few

16  years ago I represented defendants.  And I had to counsel

17  them about testifying or not testifying.  Frankly, I had

18  clients that would have made terrible witnesses.  Some didn't

19  speak English.  Some of them didn't speak well.  There may be

20  any number of reasons why someone doesn't testify.

21           What the law would require you is this.  If the

22  defendant chooses not to testify, you cannot hold that fact

23  against him.  Here's what would be wrong.  It would be wrong

24  to go back there in the jury room and say, well, he didn't

25  testify, he must be hiding something.  Even though the State

1    maybe didn't quite get to beyond a reasonable doubt, I'm

2    going to couple his silence with that proof and I'm going to

3    boost the State over that barrier.  You can't do that.

4         Can you assure me that if Mr. Murphy does not

5    testify in this case, that you will not consider that and you

6    will not hold that against him for any reason?

7         A.   That is correct.

8         Q.   Another premise here is that I have to prove his

9    guilt beyond a reasonable doubt by proving the elements in

10   that indictment beyond a reasonable doubt.  There's a number

11   of things that I have to prove.  That document tells me what

12   I have to prove.  It tells Mr. Murphy what he's charged with.

13   But among other things, Mr. Gabel, I've got to show that on

14   or about a certain date in Dallas County, Texas, that

15   Jedidiah Isaac Murphy intentionally killed a woman by the

16   name of Bertie Cunningham, that he did so during the

17   commission or the attempted commission of either a robbery or

18   kidnapping.  That's what I have to prove.

19        Some people would say you mean to tell me that you

20   have to prove this happened in Dallas County, Texas?  Doesn't

21   that sound a bit like a technicality?  I know it may sound

22   that way, but I'm telling you that I know that the law will

23   require me in this case to prove that this offense occurred

24   in Dallas County, Texas.  If I fail to prove that, Judge Entz

25   will instruct you that you have to say not guilty if I fail

DARLINE W. LABAR, OFFICIAL REPORTER

1    to prove that beyond a reasonable doubt.

2            Let me give you a couple of examples, and Judge Entz

3    alluded to the fact some of these questions may be hard.  Let

4    me give you a hard example here.  Let's say -- let's say that

5    I go out and I go to the nearest school and it's full of

6    school children and I fire bomb that school and I kill 500

7    children inside that school building.  Okay?  And I'm brought

8    to trial.  There's no doubt in your mind that I have taken

9    all 500 lives.  There's no doubt in your mind after you see

10   the facts that I'd probably go out and do that again.  You're

11   looking at an extremely dangerous individual.  But let's say

12   for whatever reason the State of Texas failed to prove that

13   that school was in Dallas County, Texas.  Maybe it happened

14   to be in Kaufman, Texas, or Ellis County, or maybe the State

15   just never asked the question.  They just didn't ask the

16   question necessary to get that information into evidence.

17   You can see it's going to be a hard situation because you

18   know that I did that and you know I'm as dangerous as I can

19   possibly be, but you also know that the Judge has instructed

20   you that if you have a doubt about whether that school was in

21   Dallas County, Texas, you'd have to say not guilty.

22           Let me make it just a little bit harder for you.

23   Let's say all other 11 jurors back there say to you, we don't

24   care.  We don't care what the Judge says.  We don't care what

25   the law is.  We're not about to let a dangerous man go free

1    and go out here to the next school building and burn it down,

2    too.  So forget the law.  Let's do what's right.  Let's

3    follow our conscience.  You're put in a pretty tough

4    situation.  You know what the law requires of you.  You know

5    what your oath as a juror requires you to do, and that is to

6    say not guilty because the State didn't prove Dallas County.

7    You also know that I'm a very dangerous person.

8          Some people frankly say they don't think they could

9    do it, they don't think that they could follow the law.  They

10    say their conscience wouldn't allow it.  They say they just

11    don't have the discipline necessary to do it, whatever

12    reason.

13          What I need to know, Mr. Gabel, is, do you feel like

14    even under those kinds of extreme situations that you could

15    follow the law, say not guilty even though it may leave a

16    very sick feeling in the pit of your stomach, could you still

17    do that?

18    A.    Yes, I believe so.

19    Q.    Let me give you another example.  Let's say the same

20    situation.  Let's say, again this, time there's no problem,

21    that you know the school building is in Dallas County.  Let's

22    say again I go out, I fire bomb, and I kill 500 children.

23    Nobody sees me do, though.  There's no witnesses, but a

24    couple of days later I'm stopped by a police officer.  He

25    starts talking with me.  I go down to the station with him

1    and I said, you know, I'll give you a statement, I'll admit

2    that I killed all 500 of those children.  He didn't force me

3    to do that.  I just decided on my own I wanted to get it off

4    my chest and tell them what I did.  So I go in, the detective

5    starts taking my statement.  But if you watch these

6    television shows, you probably know about these Miranda

7    warnings, what the police have to tell the suspects.

8            Let's say there are four different things that the

9    officer has to tell me.  Let's say he's been overworked, he's

10   a bit tired, he forgets to give me one of those warnings.

11   Maybe he forget to tell me that an attorney would be

12   appointed for me if I couldn't afford to hire my own lawyer.

13   I didn't want a lawyer.  Everybody knows I didn't want a

14   lawyer.  I said I didn't want a lawyer, you know, just forget

15   it.  But he forgets to give me that warning.  And in that

16   statement I lay out all the facts necessary to prove my

17   guilt.  I'm brought to trial.  The detective is testifying.

18   There's no eyewitnesses.  Really, my guilt depends on that

19   confession alone.  And let's say he's honest.  He gets on

20   that witness stand and says he came in there voluntarily, I

21   didn't threaten him, I didn't promise him anything, but I did

22   not give him all of his warnings.  I just flat forgot to give

23   the last one to him.

24           You've got another kind of similar situation, and

25   you know I'm as guilty as I can be.  You know I'm dangerous.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Maybe in that statement I said if I ever get out, I'll fire

2    bomb the very first building I see when I get out of here.

3    You know I'm dangerous, but you also know this, the Judge

4    would instruct you that if all of those warnings were not

5    given, you'd have to take that confession and you'd have to

6    toss it aside, disregard it, and look at any other remaining

7    evidence.  Well, in my case there is no remaining evidence,

8    obviously.  So there is no other evidence of my guilt.  All

9    other 11 jurors are saying, you mean to tell me we're going

10   to let the man go, because he didn't get a warning given to

11   him?  He didn't ask for a attorney.  That's silliness.  Well,

12   I'm saying to you that the law would require you to do that.

13   Again, it's the very same kind of question.

14          Would you have the kind of discipline necessary even

15   in that kind of situation to say, I'm following the law, even

16   though he's dangerous, I can't consider the confession, there

17   is no other evidence, not guilty?  Could you do that?

18        A.    That is correct.  Yes.

19        Q.    Thank you.  Let's talk for a moment about the

20   offense of murder.  Remember, capital murder, as the Judge

21   has told you, capital murder is always an intentional murder

22   plus something else.  It could be the intentional murder of a

23   police officer.  It could be the intentional murder of a

24   child younger than 6 years of age.  In this case it's the

25   intentional murder, plus the fact it was committed during the

DARLINE W. LABAR, OFFICIAL REPORTER

1   commission or the attempted commission of either robbery or

2   kidnapping.  So those two things together join to form a

3   capital murder.

4          Let's say you found someone guilty of intentional

5   murder alone without the other aggravating circumstances.

6   That's not a death penalty case.  Let's say somebody is

7   sitting in the jury box over here.  I don't know them.  I've

8   never talked to them in my life, but I just don't like the

9   way they look.  I pull out a gun, I shoot them in the head

10  ten times, I stand up, and I laugh about it.  As bad as that

11  may be, that's not a capital murder because it's an

12  intentional murder, but there's not that other factor

13  together with it.

14         The law says in that kind of situation that I could

15  get anywhere between 5 years in the penitentiary up to 99

16  years or life in the penitentiary.  That's -- that's the

17  range of punishment.  Some people have said intentional

18  murder, there's no way that I'm ever going to give something

19  as little as 5 years in the penitentiary.  Life is just too

20  sacred for that.  And that's fine.

21         THE COURT:  Now, Mr. Gabel, you may not think

22  5 years is appropriate under the scenario that Mr. Davis just

23  hypothecated with you.

24  Q.   (By Mr. Davis)  Right.  I mean, in that situation,

25  you may say that's just a senseless killing and give me the

DARLINE W. LABAR, OFFICIAL REPORTER

1    maximum.  But what I'm trying to get around to is this.

2    There are all sorts of murders.  I've prosecuted a number of

3    them.  All the circumstances are different.  Why they were

4    committed, how they were committed, the relationship between

5    the people.  Maybe they were just pure strangers like this

6    situation or maybe we knew each other.  Maybe there had been

7    an ongoing feud for years.  Maybe there's some other event

8    that has occurred that has caused that to occur.  All

9    defendants are different, too.  Like the Judge said, going

10   back to the academy cadets.  Maybe the individual has been an

11   asset to the community, maybe a family man, active member in

12   the church, and something snapped and caused him to commit a

13   capital murder, so every one is different.

14          The key here would be -- is this, to be

15   constitutionally qualified in a murder case, could you keep

16   an open mind to the full range of punishment?  And that

17   really means this.  If you heard an intentional murder case,

18   and after hearing all of the facts of that case, you decided

19   in your heart that that case and that defendant deserved 5

20   years, and maybe you thought you'd never see a case like

21   that, but, by golly, this is the one that you never did

22   expect.  If you found that to be the case, could you follow

23   through and could you actually assess 5 years if you thought

24   that was the right thing to do?

25          A.   If it was the right thing to do, yes.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Okay.  You know, again, it comes down to not

2    prejudging, waiting for the facts, honestly telling us, it

3    really depends on the facts that I hear.  I'll match the

4    verdict in that case to the facts that I hear.  You know, and

5    again, intentional means just that.  It's not an accident.

6    It's not self-defense.  It's not insanity.  There can be any

7    number of scenarios here.  I've given a scenario that I think

8    might illustrate that.  I give you this one here, but on the

9    other end, you could have something as dissimilar as perhaps

10   I'm a parent of a teenage girl.  And I found out that an

11   individual has sold her crack cocaine and got her hooked on

12   crack to the extent that she's never going to be the same.

13   Maybe there's a brain damage as a result of that.  And I find

14   out who did it, and I intend to go out there and kill that

15   person.  I do exactly that.

16         Can you see how that might be a very -- that might

17   be a far different situation than I have here?  You may look

18   at me and say he's never done anything like this again.  I

19   don't think he'll ever be a harm to anybody.  I'm going to

20   give the man the minimum.  That's why I say wait until you

21   hear the facts.  Okay?

22   A.   Okay.

23   Q.   Let's talk about these special issues for just a

24   minute, Mr. Gabel.  I know the Judge has gone over them in

25   some detail, so we don't have to spend a lot of time, but do

1    you feel like you understand the burden of proof on Special

2    Issue Number 1?

3        A.   Yes.

4        Q.   Okay.  You understand it's presumed to be no, you

5    understand that you have to wait for all the evidence and see

6    if the State of Texas has shown that it should be answered

7    yes beyond a reasonable doubt, correct?

8        A.   That is correct.

9        Q.   Would you wait for all of the evidence to come in,

10   or would you be one of those people who would automatically

11   answer it yes just because you found someone guilty of

12   capital murder?

13       A.   I would believe I would want to wait for all the

14   evidence to come in before a final conclusion.

15       Q.   All right.  And, you know, in that regard you have

16   to understand this is a two-part trial.  The first part deals

17   with the guilt or innocence of the defendant.  The evidence

18   that we're going to show you will be focused on that

19   particular issue.

20            When we get to the punishment phase, the law says

21   other types of evidence can become admissible.  Generally

22   speaking, that deals with background or the character of the

23   defendant.  Has he been in trouble before?  What sort of

24   trouble has he been in?  Has he been through the criminal

25   justice system before?  Have there been efforts by the system

1    to help him or try to rehabilitate him?  You get to hear that

2    after you've found an individual guilty.  And that may be

3    helpful to know in deciding Special Issue Number 1.

4            When you look at that issue, Mr. Gabel, and don't

5    worry about the legalities or the rules of evidence or

6    anything else, but if you had your druthers, what sort of

7    things would you like to know about before you had to answer

8    Special Issue Number 1?  What do you think might be helpful

9    in knowing?

10    A.    Well, I think as you mentioned the background would

11    be critical to know what track record the individual has had

12    in light of any crimes or misdemeanors, whether there is a

13    historical element or elements involved in this whole thing

14    that led up to this situation.

15    Q.    Okay.  And a lot of jurors tell me that.  And

16    secondly, you have to understand you can still consider the

17    facts of this particular capital murder, too.  How was it

18    committed?  Why was it committed?

19    A.    Right.

20    Q.    Who is the victim?  And let me tell you this, I'm

21    not permitted to go into the -- all the details of this case,

22    but I am permitted to ask you one question.  If the facts in

23    this case showed you that Bertie Cunningham, the victim, was

24    an 80-year-old woman at the time of her death, if that fact

25    turned out to be true, could you still be fair and impartial

1    to Mr. Murphy, or would that fact by itself raise such

2    emotion or sympathy in your mind that you just simply

3    couldn't be looking at the facts to determine whether he's

4    guilty, innocent, or what the proper punishment should be?

5        A.    I feel I would probably need to have more

6    information other than just that one specific situation.

7        Q.    Okay.   Fair enough.

8        A.    Age factor.

9        Q.    Yes, sir.   Let me talk to about some of the words in

10   Special Issue Number 1.   The reason I do that is most of

11   these words do not have legal definitions.   A lot of the

12   words in the first part of the trial will.   The Judge will

13   define what murder is, what a robbery or kidnapping is, what

14   intentional means.   But when we get down to these words,

15   we're going to leave these up to you.   That's what the

16   legislature has done.   They've given us the questions, but

17   they don't give us the definitions.

18            The first word is probability.   The legislature

19   could have written that to say whether there is a possibility

20   or whether there's a chance.   That's not what probability

21   means, obviously, because they've used the word

22   "probability."   They could have made the burden of proof so

23   high as to make the State prove that there's a certainty that

24   the defendant would commit criminal acts of violence.   We

25   don't have to go quite that far.   But the important thing is

1    can you see the distinction between probability and something

2    less, like a possibility or a chance?

3        A.   Yes.

4        Q.   Okay.  And a lot of jurors tell me to be a

5    probability, there has to be a likelihood of something

6    happening, as opposed to a chance or a just possibility of

7    something happening here.  Are you comfortable with that?

8        A.   Yes, I am.

9        Q.   Criminal acts of violence.  Again, they could have

10   gone to the extreme to say any criminal act will do.  I guess

11   jaywalking or littering would qualify, but it has to be

12   something more than that, obviously.  They could have said

13   that the State has to prove something as specific as murder

14   or capital murder, and I don't have to do that.  Criminal

15   acts of violence, most jurors tell me that involves someone

16   else either being harmed or threatened with harm.  That's

17   really kind of the distinction.

18            Do you see that as the distinction, or do you see

19   that differently?

20       A.   I would agree with your comment, yes.

21       Q.   Finally the word "society."  Society can mean

22   everyone.  It can mean people like and I that live in the

23   free world.  It can mean people in a prison.  Some people

24   said they've never thought of prison as being part of

25   society, but if you think about what the Judge just told you

1    about a life sentence on capital murder, it means 40 calendar

2    years before an individual becomes eligible for parole.  I

3    like to think of society as being anywhere the defendant may

4    find himself, anyone he may come in contact with.  So can you

5    see that both prison and the free world may be part of his

6    society?

7         A.   Yes.

8         Q.   Some people say, well, really giving the life

9    sentence for capital murder, prison should be the only part

10   of society that jurors should consider.  You don't have to

11   limit it to that extent.  I like to ask jurors if they've

12   heard about the Texas 7, for instance, the case where the

13   inmates broke out of the prison system in South Texas and

14   came up here and killed the Irving police officer over the

15   Christmas holidays.  You see, some of those individuals were

16   actually serving life sentences when they escaped and

17   committed another capital murder up here.

18        Do you feel like you'd be excluding any part of

19   society, or do you feel like you would be including both the

20   free world and prison when you looked at the word "society"?

21        A.   I would include both of them.

22        Q.   Let's go on to Special Issue Number 2, then.  I

23   believe the Judge again has indicated that what the law is

24   going to ask you to do is to take another serious look at all

25   the evidence, even though you've found this defendant guilty,

1    even though you think beyond a reasonable doubt he's going to

2    be a continuing threat to society, we ask you to take another

3    look at all of the evidence, no matter where it came from,

4    and ask yourself this question.  Is there something in that

5    evidence that rises to the level where I think this man

6    should get a life sentence instead of a death sentence.

7    That's really the inquiry that we ask you to make.

8            First of all, do you think that you would still be

9    able to make that inquiry even if you found someone guilty

10   and even if you think they're a threat, could you still take

11   one more look at the evidence and see if there is something

12   mitigating enough to spare his life?

13       A.   Yes, I could.

14       Q.   Okay.  The reason we ask that is because some people

15   say if I really think he's a threat and if I'm that close to

16   death, I don't care what the evidence is, I'm going to make

17   sure he dies.  Well, again, they're free to think that, but

18   that's not what the law is asking you to do.  There may be

19   something there that you want to take another look at.

20           Let me ask you, when you think of mitigating

21   circumstances, do any things come to your mind, Mr. Gabel?

22       A.   Anything that might limit or lessen the situation

23   that might raise a question as to the magnitude of the crime

24   to where -- in turn -- I think as you're putting it, the

25   second consideration or at least go through the process of

1    thinking once more in light of the fact that we're talking

2    about a life or death situation.

3         Q.   Right.

4         A.   To exhaust that.

5         Q.   You know, among other things, again, you can go back

6    there, you can look at the circumstances of the offense

7    again.  Maybe it's the type of offense where it was a very

8    spur of the moment, maybe there was a kind of a crime of

9    passion if you will.  Maybe there was a long-standing feud.

10   Maybe there's something about the offense itself that leads

11   you to believe that the man's life should be spared.  You can

12   also look again at the defendant's character and background.

13   Again, may it's kind of like the academy cadets where they

14   have lived just spectacular lives up to that point, never

15   been in trouble with the law, been a credit to everyone that

16   they've been around.  Maybe that's a situation, too.

17            And then again, the personal moral culpability of

18   the defendant, that's really just how blameworthy is he for

19   this particular offense.  You see in the offense that the

20   Judge was talking to you about where there were two people,

21   it's not uncommon to have one person actually do the physical

22   act of killing while the other person may assist them in some

23   way.  And sometimes jurors will kind of draw a distinction of

24   blameworthiness between the person that actually does the

25   shooting or does the stabbing, as opposed to somebody who

1    maybe was the lookout or assisting in some way.  That's kind

2    of what we're talking about.

3         Let me talk to you about some things that jurors

4    have mentioned to me in the past and just get your general

5    reaction to these things.  Sometimes jurors will tell me a

6    person's age may be mitigating in some fashion.  The thought

7    being that younger people are more capable of being

8    rehabilitated than older people.  I've had other people tell

9    me that they don't think it really would be, that as long as

10   they've reached the legal age where they know right from

11   wrong, they're responsible for their actions.  And then I've

12   had other people just say it's something that they kind of

13   want to look at, what the age is, look at the individual.

14        How do you feel about that?

15   A.    I think once a person reaches that legal age and --

16   that there has to be accountability for their actions,

17   whatever that outcome might be.

18   Q.    Okay.  All right.  Let me talk to you about drug and

19   alcohol use.  Sometimes people will say it's a disease.  They

20   can't help themselves.  If they went out and got high, if

21   they got drunk and they committed an offense.  Maybe I'd cut

22   them some slack for that.  I've had other people say that's a

23   choice they made.  Whether it's a disease process or not,

24   they made the choice to take that substances, especially if

25   they've been taking it maybe a long time and they know

1    exactly how they react when they take drugs or take alcohol.

2         Do you have any feelings about that?

3    A.    Yeah, I would feel strongly about the accountability

4    issue.

5    Q.    Now, let me -- let me tell you the next issue really

6    deals with mental health, and that's really the reason why we

7    have Special Issue Number 2.  There was a defendant by the

8    name of John Paul Penry.  He claimed that he was retarded.

9    We didn't have Special Issue Number 2 when he was first

10   tried, so the courts said we want some mechanism where juries

11   can that sort of thing into account.  For instance, you can

12   have an individual who's 40 years old, but he's so severely

13   mentally retarded.  Maybe he's functioning on the level of a

14   6 or 7-year-old.  He knows right from wrong, you know, but he

15   just is of that intellect you see.  A jury might decide,

16   yeah, he did it, no question, maybe they even think he's a

17   threat, but do I really want to sentence to death a man who's

18   functioning at the age of a 6-year-old, so that's what we're

19   talking about there.

20        Do you think that -- you think that mental issues

21   might be something that you might be willing to look at, at

22   least, you know, look at the severity, look at the legitimacy

23   of them, and if you believe them, then take that into account

24   in some fashion?

25   A.    Yes, I can.

```
 1        Q.    Sometimes jurors talk about remorse.  You know, do
 2   they actually feel sorrow for what they've done?  Have they
 3   demonstrated a willingness to turn their life around, if you
 4   will.  You can have a situation where somebody does a
 5   terrible killing and instantly they regret everything that
 6   they've done.  Maybe it was a crime of passion.  They sit
 7   there.  They call the police.  They wait for the police.
 8   They fully cooperate.  They're a hundred percent honest with
 9   the police.  Maybe the police officer testifies that when he
10   got there, that the individual was just crying and praying to
11   God for forgiveness for what he's done.  On the other hand,
12   you may have a case where there's absolutely no remorse at
13   all.  Or maybe the first remorse that a defendant shows is
14   when he's told he's charged with capital murder and he's
15   handcuffed.  But again, that's up to you.
16             See, mitigation is personal.  Everybody looks at it
17   differently.  What I look at as mitigating, you may look at
18   as aggravating.  There's no list that we go down.  All we ask
19   you to do is this, Mr. Gabel, be willing to honestly say that
20   if you took a look at all the evidence in this case and you
21   saw something, whatever it was, that you thought was
22   mitigating enough -- maybe it was that retardation we talked
23   about, if you saw something like that and you thought it was
24   worthy of saving this man's life, would you go ahead and
25   answer Special Issue Number 2 yes, so that he would get a
```

DARLINE W. LABAR, OFFICIAL REPORTER

1   life sentence?  Would you be able to do that?

2       A.   Yes, I believe I could.

3       Q.   Mr. Gabel, I think I've about run through my time

4   with you.  Do you have any questions from me?  Maybe it's

5   something we went over pretty quickly that leaves a question

6   in your mind, or maybe something I didn't get to that you've

7   been wondering about since you filled out the questionnaire?

8       A.   No.

9       Q.   Okay.  I appreciate your time.  I appreciate your

10  answers, your honesty.  That's really what we depend upon

11  when we try to select 12 fair jurors here.

12      A.   Thank you, sir.  I appreciate it.

13              THE COURT:  Mr. Gabel, before we begin with

14  the questioning by Mr. Byck, do you want to take a stretch

15  break or go to the rest room?

16              VENIREPERSON:  No, I'm fine.  Thank you, Your

17  Honor.

18              THE COURT:  You want a cup of water?  Are you

19  ready to continuing?

20              VENIREPERSON:  Yes, sir.

21              THE COURT:  All right.  We'll proceed on

22  behalf of the accused, Jedidiah Isaac Murphy, the Honorable

23  Michael Byck.

24          Mr. Byck.

25              MR. BYCK:  Thank you, Your Honor.  May it

DARLINE W. LABAR, OFFICIAL REPORTER

 1    please the Court.

 2                        Cross-Examination

 3    By Mr. Byck:

 4        Q.    Again, good afternoon, Mr. Gabel.

 5        A.    Good afternoon.

 6        Q.    My name is Mike Byck.  And together with my

 7    co-counsel Jennifer Balido, we represent our client, Jim

 8    Miller -- pardon me, Jim Murphy -- it's going to be a long

 9    afternoon -- in this trial for his very life.

10              I've appreciated the honest and deliberate responses

11    that you gave to the Assistant District Attorney.  I would

12    ask that you do the same for me.  Again, there are no right

13    or wrong answers, sir.  We're not grading your test.  And it

14    occurs to me that we say around here very often, as a matter

15    of fact almost every other sentence, well, in order to be a

16    qualified juror -- well, very frankly, sir, you don't have to

17    be on this jury.  No individual has to be on this jury.  And

18    it's especially important when you consider that, number one,

19    you're going to be required to do a very difficult job.

20    Number two, it's probably a job that you don't to do.  And,

21    number three, and this is the thing that I don't think a lot

22    of people understand, is that we as the law and we as the

23    lawyers in this court will not require you to surrender your

24    deeply held beliefs.  It will not require you to violate your

25    conscience or your personal moral philosophy.  This Court

1    will not require you to put aside your strong personal

2    feelings or feel that you're being intellectually dishonest.

3    And you don't have to commit any ethical wrongs or any

4    offensive acts.  You just don't have to do that.

5          Now, we all have to pay our income taxes.  That's

6    too bad.  But we don't all have to sit on juries.  I would

7    submit something to you, with all due respect, that there is

8    no doubt in my mind that you would be a fine juror in most

9    cases.  There is also no doubt in my mind that you would not

10   be a fine juror in all cases.  No one would.  Due to their

11   backgrounds, due to their upbringings, due to their personal

12   philosophies, their educations, whatever.  They're just --

13   there may be some cases out there that you may not be a good

14   juror on.

15              THE COURT:  You wouldn't be very good on

16   embezzlement from a bank, would you?

17          Go ahead, Mr. Byck.

18              MR. BYCK:  Thank you, Your Honor.

19   Q.    (By Mr. Byck)  We asked you, are you in favor of the

20   death penalty and you told us yes.  We asked you to explain

21   your answer, and you filled nothing in.  I imagine since the

22   time you've been down here, you've been thinking about this.

23   A.    Yes.

24   Q.    I take it that you are still in favor of the death

25   penalty.  Could you tell me why?

1    A.    I think probably the major thing -- I know there's a

2    lot of controversy on whether it really is a deterrent, but I

3    do think that probably it would act as a deterrence for --

4    for people to think second, twice of committing a murder.

5    Q.    Uh-huh.

6    A.    And I think it should be incorporated into our -- as

7    far as a possible punishment in cases of those proven capital

8    murders.

9    Q.    Okay.  That leads me directly to another question,

10   and you have already said that you would have the capital

11   murder, the death penalty in our statutory scheme.

12        Let me ask you, sir, you understand how our capital

13   setup is, that we have a guilt or innocence phase.  And only

14   upon being found guilty of an intentional murder while in the

15   course of either rape, robbery, arson, burglary, whatever it

16   happens to be, or murder of a special person, a fireman,

17   policeman, child under 6, mass murder, multiple murder, or

18   murder for hire, it's only after being found guilty beyond a

19   reasonable doubt that we proceed to these questions.  And

20   these questions dictate the answers to whether an individual

21   will receive the death penalty or life in the penitentiary.

22   So no one is going to escape any accountability.  Nobody is

23   escaping any responsibility.  It's a question of whether the

24   individual should get the death penalty or not.

25        Let me ask you, if we didn't have these questions,

DARLINE W. LABAR, OFFICIAL REPORTER

1    if we didn't have Special Issue Number 1 and Special Issue

2    Number 2, are there any crimes that you would have

3    essentially an automatic death penalty for?  If an individual

4    was convicted of this offense, that individual gets the death

5    penalty.  He, of course, is entitled and gets a fair trial.

6    And he, of course, is entitled to and gets any appeals that

7    are appropriate.  But we don't have a punishment phase.  We

8    don't have the sentencing phase.  We go straight from your

9    guilty to you're dead.

10           Let me give you an example.  Since you're sharing

11   with me, I'll share with you.  It is my personal opinion that

12   treason in the time of war ought to have an automatic death

13   penalty.  I think that if some citizen gives aid and comfort

14   to the enemy and another citizen is hurt or killed or

15   anything like that as a result, that that individual ought to

16   be given a fair trial.  And if that individual is found

17   guilty, that individual ought to be able to pursue all

18   avenues of appeal that are appropriate.  But at the end of

19   that time, that's it, take them out and shoot them.  That's

20   my personal feeling.  It does not happen to be the law in

21   this State.  I don't think it has to be the law in any state

22   to be perfectly honest with you.  But that happens to be the

23   way that I feel about it.

24           THE COURT:  It would not be constitutional

25   anywhere.

1          MR. BYCK:  Well, I'm not sure about that, Your

2    Honor.

3          THE COURT:  Well, we'll debate that later.

4          MR. BYCK:  Very well, sir.

5    Q.    (By Mr. Byck)  Are there any other offenses that you

6    feel that we really ought not to have the questions about?

7    If you're guilty and we find you guilty, that's the end of

8    that.

9    A.    I think what I've -- liked hearing this afternoon is

10   the fact that as we go through this thought process of life,

11   death, that what this is actually doing for me is after you

12   go through that first phase of guilt, of actually questioning

13   for a second time are you really sure that indeed this is the

14   situation as you see it, and reevaluating what has occurred

15   and trying to be understanding of all the facts that have

16   been presented, and I think -- at least in my mind, it would

17   give me more confirmation that ultimately whatever my

18   decision would be would be the correct one.

19   Q.    I see.  Essentially, when we're talking about a

20   capital murder case, we're talking about two different

21   phases, the guilt or innocence phase and then the punishment

22   phase.  The guilt/innocence phase is really not interested in

23   the individual as an individual.  It's interested in the

24   elements of the offense as you see them written on that

25   paper.  Did it happen in Dallas County?  Did a named person

do it?  Did a named person do it to another named person?
Did they do it in the manner and means that we specified?  It
is -- and nobody asks, you know, if that person had an abused
childhood or one thing or another.  It's only when we get to
the special issues that we reach those questions.

        In Texas we had a real problem before the last
couple of years, and that is upon conviction of a capital
murder, an intentional murder plus an underlying felony,
there were two punishments, just like there are now.  One was
death.  Everybody knew what that meant.  The other one was
life in the penitentiary, and we are forbidden to tell our
jurors what life in the penitentiary meant.  Well, we were
faced with a bunch of people of good conscience who come down
here to volunteer to serve their county, to sit in judgment
of another human being.  They hear a horrific murder case and
another underlying offense, and then they are presented a
punishment option which goes lethal injection or life in the
penitentiary, whatever life in the penitentiary means.  And
there are a lot of people our age, very frankly, that
remember when you went to the penitentiary for life and got
out in 5 years or 7 years or 10 years.  There are a lot of
people who had no idea how long it would take for a life
sentence to be served.

        We were then presented -- we were then presenting
our juries with what I would consider an impossible situation

1   where they were trying to determine whether an appropriate

2   punishment, that is, death, should be given versus a

3   punishment that they very frankly didn't know whether it was

4   appropriate or not.  If I write a Penal Code where I say the

5   offense is murder and the punishment is either death or a

6   slap on the hand, gosh, guess what's going to happen?  A lot

7   of people are going to die if they get convicted of murder,

8   because the other punishment is not appropriate.  It just

9   isn't.

10          Well, we don't have that problem now because now you

11  know that life in the penitentiary means 40 years without

12  parole.  And that is also assuming, A, that the individual

13  may or may not get that first parole at the end of 40 years.

14  They may never get paroled.  Or, B, they may never survive 40

15  years in the penitentiary to ever get to that stage.

16          What I'm asking you is what you know now about what

17  life is, do you consider the life sentence as opposed to the

18  death sentence an appropriate punishment alternative?

19  A.     Yes.  After given all the facts presented and that

20  was a conclusion based on how it was presented in this here.

21  Q.     All right.  What I'm saying is we don't have a

22  situation in your mind where the individual either ought to

23  get death or a slap on the hand.  We don't have that

24  situation; am I correct?

25  A.     That's correct.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.    You understand, of course, that -- as I've already
2  said about three or four times, capital murder is an
3  intentional murder plus the underlying offense.  As I said to
4  you before, we are not going to require you to violate your
5  conscience or your personal moral philosophy.  And we
6  sometimes run into problems in the law that essentially do
7  violate people's moral philosophy.  And while they may be
8  legal, they're not very rational.  And they don't make a
9  whole lot of sense sometimes.  The law is a lot of things,
10  but logical it may not be.  That's what I believe.

11      Let me give you a really good example of that.  Mr.
12  Davis alluded to it, and let me use myself as the perpetrator
13  because if I use somebody else's name, I'll get terribly
14  confused and we'll be here all afternoon.  I'm an arsonist,
15  I'm a school arsonist, and that's what I like to do is burn
16  schools.  I've been out burning schools, and I've burned a
17  couple of them.  They haven't caught me.  I went out a couple
18  or three nights ago, and I put together my super school
19  burning solution which is special chemicals that only I know
20  what goes into them.  And I went into a school and I laced it
21  with my chemicals and I waited until classes started and I
22  set it on fire and people got hurt and killed and the school
23  burned to the ground.  And being a connoisseur of my own
24  handicraft or penmanship or whatever, I'm standing around
25  watching.  Well, the police department and fire department

1    not only show up with hooks and ladders and water, they also

2    show up with a video camera.  They pan it around to everybody

3    who's watching the fire to see that -- you know, to compare

4    them with other videotapes of fires and start seeing the same

5    faces might be putting two and two together, especially if

6    they're not in the same neighborhoods.  And that's exactly

7    what happens.  They put together my face.  And they don't

8    know who I am, but I'm walking down the street and one of

9    them sees me, calls a police officer, the police officer

10   calls me over and I say, sure, I'll come talk to you.  So I

11   go down to the police station and I'm really full of myself

12   and, you know, happy with the smell of charred flesh and

13   burning wood.  And I tell them all about it.  He gives me my

14   warnings, but like Mr. Davis said, there are four Miranda

15   warnings.  You have the right to remain silent, you have the

16   right to have an attorney appointed or you have the right to

17   have an attorney present while we're talking to you, if

18   you're too poor to afford an attorney, we'll appoint one for

19   you, and finally, you have the right to terminate the

20   interview.  Well, I'm having a good time down there, you

21   know, I'm attracting a lot of police attention and they're

22   buying me Coca-cola's and crackers and all that and I'm

23   telling them about all my great arson exploits.  Give them

24   the secret formula, right, and they, of course, call the

25   lab.  The lab says, yeah, that's exactly what it was that was

1  used as the accelerant in this fire and nobody could have

2  known that except the person who set the fire.  So they want

3  me to sign a confession, and I do.  And they give me my

4  Miranda rights, but they don't give me the last one.  They

5  don't tell me I can terminate the interview.  I don't ask to

6  terminate the interview.  As a matter of fact, one of the

7  officers says, listen, my hand is getting cramped, I'd like

8  to go outside and take a 5-minute break and I say, no, no,

9  no, sit down because this is even going to be better for

10  you.  And I don't let him -- don't let him terminate the

11  interview.  Okay.

12         We go to trial.  Nobody saw me set the fire.  I left

13  no fingerprints.  There is no DNA.  There is no scientific

14  evidence, except the internally consistent evidence of me

15  putting in my confession that I used the specific chemicals

16  and sure enough they bring a chemist down here to say it was

17  those chemicals in those proportions that were used.  There's

18  also a few other things that you get to know about me in my

19  trial.  You get to know that while I've been upstairs in jail

20  awaiting trial, I've been setting fires.  And not only have I

21  been doing that, but I've been asking my cell mates or unit

22  mates or whatever they're called, fellow prisoners, what kind

23  of schools they have in their neighborhoods.  Are they brick

24  schools or perhaps wooden schools?  Are they old and in need

25  of repainting, a lot of younger kids go there, things like

1    that?  When we have my trial, there is no other evidence

2    except my confession.  There really isn't.  The Judge will

3    instruct you that you've got to find beyond a reasonable

4    doubt that all four warnings were given.  If you don't find

5    so, you cannot use the confession.

6            Let me throw in one more fact, and that is no way

7    did the police department sit on my chest and bang my head

8    against the floor until I confess.  This was not a forced or

9    coerced confession by any stretch of the imagination, because

10   those you can never use under any circumstances, if they are

11   beaten out of you.  So you go back in the jury room and you

12   say, well, we've got us a real problem here.  We've got us a

13   school arsonist.  He's good at it.  And not only that, but he

14   seems to want to do it again.  We know he did it.  We know he

15   did it because of the chemical evidence, because of the

16   description that he gave in the confession, we know he did

17   it.  We also know that there isn't any other evidence that

18   connects except this written confession, and we know that

19   confession wasn't beaten out of him.  We know they gave him

20   all the real warnings, but they didn't give him the warning

21   about not wanting to terminate -- or having the right to

22   terminate the interview.  This guy not only didn't want to

23   terminate, didn't ask to terminate the interview, he didn't

24   want to terminate the interview.  And when the police officer

25   offered to terminate the interview because his hand was

1    getting tired of writing all this horrible stuff down, the

2    defendant said, no, keep on going, I'm having too good a

3    time.  Well, the other 11 members of your jury panel are all

4    equally conscientious, equally fair-minded, equally

5    civic-minded individuals, and they go back there and they

6    say, Mr. Gabel, we cannot follow the Judge's instructions.

7    It violates down to the very moral center of my being letting

8    this mass murdering child killing arsonist loose on the

9    flimsiest technicalities that he not only didn't ask for, but

10   he deliberately denied when it was almost mistakenly given to

11   him.  Because, you know, if you find me not guilty, I can't

12   be tried for that offense again.  And you also know deep in

13   your heart as soon as I get out of jail, I'm going right over

14   to the 7-Eleven, buy a Bic lighter, and head for your

15   neighborhood or somebody else's neighborhood that might have

16   kids and live nearby.  This is serious stuff.  And your jury

17   foreman and your other 10 members of the jury say won't you

18   please join with us in slowing this monster down.  Won't you

19   please join with us in doing the right thing, the rational

20   thing, the reasonable thing, but not necessarily the legal

21   thing and finding this guy guilty, using that confession that

22   he gave, finding him guilty, and then let the law take its

23   course from there, by at least he ain't going home with us

24   tonight.  Or would you say, sorry, guys, you know, we've got

25   to be rigid.  We've got to rigidly adhere to what the Judge

1    says.  If the Judge says we can't consider it, we've can't

2    consider it.  We've got to throw it all out, got to find him

3    not guilty, he goes home with us.

4         That's a tough ethical question.  It really is.

5    What would you do?

6    A.    Well, I do feel strongly that there is a reason why

7    we have the laws.  I think there's a reason why the Judge's

8    comments should prevail.  And again, because it is a life or

9    death type of situation that we're dealing with, that we

10   should literally exhaust every possibility or possibilities.

11   And as well if there are situations that arise in which

12   there's question, again it's got to be proven beyond -- the

13   cause and everything to insure that we're doing the right

14   thing.

15   Q.    You'd turn me loose?

16   A.    If that's the way --

17   Q.    You'd vote not guilty?

18   A.    If that's the way the law was, yes.

19   Q.    Okay.  Let's talk a little bit about Special Issue

20   Number 1.  That, of course, is only found and you only

21   consider that after you find an individual guilty.  And at

22   that point, sir, something very strange is going to happen

23   because while Judge Entz is going to define every word in the

24   document in front of you, he's going to tell you what on or

25   about means.  He's going to tell what you kidnapping means.

---

DARLINE W. LABAR, OFFICIAL REPORTER

1    He's going to give you the elements of robbery.  He's

2    going -- he's going the define every word that you need to

3    have defined.  And he will do it exhaustively and completely

4    with every -- everything that you need to know to find an

5    individual innocent or guilty.  When it comes to punishment

6    stage, he's not going to define anything for you.  He is not

7    going to give you a written definition of any of those

8    words.  Therefore, the definition of those words are up to

9    you.  And they are not susceptible to any judicial

10   second-guessing or hand-holding or direction finding or

11   whatever you want to call it.  You're going to get no help

12   from the Court in the meaning of those words.

13           In the context of our capital murder situation you

14   are going to be asked, after you find somebody guilty,

15   whether there is a probability that the defendant would

16   commit criminal acts of violence that would constitute a

17   continuing threat to society.  The Judge is not going to tell

18   you what society means.  He is not going to tell what you a

19   continuing threat means, versus an occasional threat, versus

20   an every once in a while threat, versus a -- whatever.  He's

21   not going to tell you what those words mean.  He's not going

22   to tell you what a criminal act of violence is, and he's not

23   going to tell you what probability means.

24           In the context of Special Issue Number 1, after the

25   conviction of an individual for capital murder, what do you

1    think the word "probability" means?

2         A.    That it's something that could occur without

3    necessarily a specific date, timing, or place down the road.

4         Q.    Okay.   Probability is a tough word to handle for a

5    couple of reasons, one of which is pretty good and that is

6    it's a word of art in mathematics.   It has a very special

7    meaning, and its meaning is in mathematics if it's not

8    impossible, it's probable.   And whether it's highly probable

9    or less likely probable or a little bit probable or a lot of

10   probable is -- that's what mathematics is all about in terms,

11   you know, of what that specific stage is.

12        Here I think we have a continuum choice of words

13   from mere chance to possibility, to probability, to

14   substantial certainty, to faith certain, you know, whatever,

15   100 percent, it's going to happen.   Some people use the

16   continuum as a continuum of numbers.   Possibility, you know,

17   chance 2 percent, possibility 20 percent, probability over 51

18   percent, or less than 51 percent, depending on your

19   definition.   And then certainty certainly higher percentage.

20   If you had to give a percentage probability to the definition

21   of probability -- boy, does that sound off -- where would you

22   fix it in terms of numbers, in the context of this question?

23   How probable would probable have to be in order to convince

24   you that the probability existed in this question?

25        A.    I don't think I would give a specific percentage, a

1    number to that.

2         Q.   Okay.

3         A.   Because it -- even the slightest, I think, is what I

4    would have to evaluate at that point.

5         Q.   Okay.  Let's talk about that.  You are unwilling to

6    say that probability means more than 51 percent likelihood?

7         A.   Yes, that is correct.

8         Q.   Right.  You define the word "probability" to mean as

9    something that could occur, a chance that it could occur.

10        A.   Uh-huh.

11        Q.   A mere chance, a little chance, a big chance, or

12   just any chance at all?

13        A.   I think any chance would be my --

14        Q.   Any chance at all?

15        A.   Uh-huh.

16        Q.   Okay.

17             (Discussion between defense counsel.)

18        Q.   (By Mr. Byck)  If you could pick a synonym for the

19   word "probability" as you would define it and as you would

20   utilize it if you were a juror in a capital murder case in

21   Question Number 1, what synonym would you use for the word

22   "probability"?

23             THE COURT:  What word or words or phrase?

24        A.   Probably the word "chance."  The possibility of an

25   occurrence, the possibility of that chance that it would

1    occur.

2       Q.   (By Mr. Byck)  Possibility or chance then?

3       A.   Uh-huh.

4       Q.   All right.  Fair enough.

5            THE COURT:  Would you be comfortable with more

6    like than not, or not?

7            VENIREPERSON:  Probably more likely than not,

8    more.

9            THE COURT:  Would you consider that as a

10   phrasal equivalent to probability in the context of Special

11   Issue Number 1 or not?

12           VENIREPERSON:  Yes, I would.

13           THE COURT:  Defense may continue.

14      Q.   (By Mr. Byck)  All right.  Now, I'm getting a little

15   confused here.  You said probability was a chance, and then

16   you said probability meant more likely than not.  If we have

17   a stack of likelies and a stack of unlikelies, all right, the

18   more likelies than not would have to out number the likelies.

19   Right?  And if we had a hundred of them, various likelies and

20   unlikelies, we would have to have 51 likelies and 49

21   unlikelies.  Or would we have to have less likelies in order

22   to reach your definition of probability?  I know you don't

23   like to be quantified.  Nobody likes to be quantified.

24   It's -- sometimes it's really almost -- it's almost

25   impossible to ask somebody to quantify an ideal like this.

1    But still, we've got to know because a mere chance -- or, you

2    know, is one chance out of a hundred to me.  A chance is five

3    chances out of a hundred.  A good chance is 20 chances out of

4    a hundred.  And I'm still 30 away from more likely than not.

5    A possibility, since anything is possible, is from one chance

6    out of a hundred to 49 chances outside of a hundred.  If it

7    goes beyond possibility, in my mind, it goes to a

8    probability.  That is a more likely than not situation, but

9    I'm not on this jury, sir, and I'm not defining probability.

10   It's not my definition that's important or that counts.  It's

11   yours.  And that's why I need to know as clearly as you can

12   tell me in the context of how we've been talking about it,

13   what does probability mean to you.

14        A.   If we're trying to use the term of "beyond a

15   reasonable doubt," for example, I think what we're trying to

16   do with the word "probability" is exhaust all of that and

17   whether that's a greater percentage or a smaller percentage,

18   I think it's again insuring in your own mind that you've kind

19   of weighed everything possible to arrive at, you know, that

20   word "probability."

21        Q.   Well, let me give you -- let me give you an example,

22   and that's a very good answer.  I'm not disputing your

23   answer.  My problem is, is I'm dealing a capital murder jury

24   where they have already found an individual guilty of the

25   offense of capital murder, and they are in good conscience

DARLINE W. LABAR, OFFICIAL REPORTER

1    trying to resolve whether this individual is going to be a

2    threat to the future of such a character and of such a danger

3    that they ought to kill him rather than give him a life

4    sentence in the penitentiary.  And I can have people saying,

5    listen, that was a really bad offense, a really, really

6    horrible, horrible offense.  And I think this kid ought to

7    die, so therefore I'm going to make probability mean a mere

8    chance.  If it could happen, and they prove to me beyond a

9    reasonable doubt there's a possibility, there's a snowball's

10   chance in Hades that it could happen.  I'm going to vote yes

11   to Question Number 1, right?   There are other people who

12   think, well, you know, yeah, that was a terrible offense, but

13   human life is sacred and we can't bring back the victim's

14   life, so, you know, I don't want somebody to die unless you

15   prove to me probability means that he's so likely to do it as

16   to bet against it would be stupid.  I don't want to get back

17   to numbers again, but I think you can see the difference.

18        A.    Uh-huh.

19        Q.    You know, there are -- and both definitions fit the

20   word "probability," and that's why I need to know if

21   probability means more likely than not, which means greater

22   than a 50 percent chance, a 51 percent chance, or does it

23   mean a mere chance, less than that, any possibility, any

24   possibility at all, or a little bit bigger possibility, but

25   something less than a 50/50 coin toss.  And I'm going for

1   yes.  Is that the way you think about it, or not?

2       A.   I would follow your former statement.

3       Q.   Which was?

4       A.   Which basically if there's any possibility or any

5   inkling or chance that this could occur, whether it's a day

6   from day or month from now or year from now situation, but in

7   your own mind feeling that based on the facts presented, that

8   you would believe or I would believe that this could occur or

9   could occur again.

10      Q.   Fair enough.  Fair enough.  We've run around on this

11  issue, and very frankly I think I've been the one that's been

12  doing most of the running.  I think you pretty much stated

13  your position, and, you know, sometimes I'm trying to pound

14  little round pegs into square holes for legal reasons, but

15  believe me, sir, if anybody has been unclear down here, it's

16  been me.  It has not been you.  And I appreciate that.

17           MR. BYCK:  And I'll pass the venireman, Your

18  Honor.

19           THE COURT:  Mr. Madore, if you'd excuse the

20  prospective juror momentarily, please.

21           VENIREPERSON:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23           (Venireperson leaves the courtroom.)

24           (State no challenge for cause - Mr. Gabel)

25           MR. DAVIS:  The State has no challenges for

```
 1    cause.
 2                    (Defense challenge for cause - Mr. Gabel)
 3              MS. BALIDO:  Judge, the defense would
 4    challenge for cause based on his own definition of
 5    probability as to any inkling that the defendant could do it
 6    again.
 7                    (Challenge for Cause Granted)
 8              THE COURT:  Defense challenge for cause
 9    granted.
10                    (Venireperson brought into courtroom.)
11              THE COURT:  Hello, Ms. Lawley.  You've been
12    waiting long and patiently for us.  I trust you're ready to
13    proceed; am I correct?
14              VENIREPERSON:  That's correct.
15              THE COURT:  We're ready as well.  We'll begin
16    with the State.  Again, on behalf of the State, the Honorable
17    Mary Miller.
18                          JO LAWLEY
19    was called as a venireperson by the Court and, after having
20    been first duly sworn, testified as follows:
21                    Voir Dire Examination
22    By Ms. Miller:
23         Q.   Good afternoon, Ms. Lawley.  I just want to remind
24    you and reiterate what the Judge had said earlier, that there
25    are no right or wrong answers to any of the questions as long
```

1    as you let us know what your true feelings are about the

2    areas that we question you about.  Make your yourself

3    comfortable.  A lot of people get kind of nervous when

4    they're up there, but if you don't understand something, let

5    me know and I'll be more than happy to rephrase it for you.

6              Now, you were one of them that was brought in with

7    about the 500 other people about a month and a half ago; is

8    that right?

9         A.   That's right, in March.

10        Q.   So you've had a while to sit and think --

11        A.   I never thought I would be here.

12        Q.   The wheels turn slowly.  And I think you had even

13   put in here that that might be one of the problems or

14   whatever.

15             I want to -- I want to direct your attention back to

16   when you were in the Central Jury Room and Judge Entz made

17   introductions with everyone, and he -- in particular when he

18   introduced the defendant, Jedidiah Isaac Murphy, and told you

19   that basically you were here for a capital murder case, that

20   the State of Texas was in fact seeking death against the

21   defendant.

22             Do you recall what your first impression was when

23   the Judge told you that?

24        A.   No, I didn't have any adverse feeling one way or the

25   other.

1    Q.    Okay.  Just, okay, well, I'm here --

2    A.    Yeah.  Yes.

3    Q.    -- type thing?

4    A.    Yes, that's right.

5    Q.    Now, I notice that you have been on a jury before.

6  You had put armed robbery.  Was that here in Dallas?

7    A.    Yes, it was.

8    Q.    Do you recall how long ago that that was?

9    A.    Oh, it's been a long time, 25 years maybe.

10   Q.    Was there anything about that particular situation

11 or jury service that might affect you in this case?

12   A.    No.

13   Q.    Okay.  Nothing about -- no grudges against the

14 defense or the State or anything like that?

15   A.    Definitely not.

16   Q.    Okay.  Because some people have very bad experiences

17 on prior jury service such that they say, look, because of my

18 experience I can't serve.

19   A.    No.

20   Q.    When you filled out the questionnaire, and I realize

21 it's been a month and a half ago, but you originally said

22 that you were in favor of the death penalty.  And it said

23 please explain your answer and you didn't put anything

24 there.

25   A.    No.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.    You've obviously had about a month and a half now to

2    think about it, and a lot of people, when they are filling

3    out the questionnaire say, yeah, I do in fact believe in the

4    death penalty, don't have any problem with it, as a matter of

5    fact, in certain circumstances I think it is in fact

6    appropriate.

7         Now you've had about a month and a half to think

8    about it and you're actually in the hot seat now and it

9    becomes a little more real.  It's not quite so abstract.  And

10   if you look over at the defendant, you can see there's

11   nothing abstract about him.  He's a living, breathing human

12   being.  And if the State prevails in this case and the jury

13   finds the defendant guilty and answers Special Issues Number

14   1 yes and 2 no, the defendant -- the defendant will be

15   sentenced to die because the Judge will have no other legal

16   choice but to follow the jury's verdict.  And as you know, in

17   Texas the death penalty is a reality.  As a matter of fact,

18   there was a death row inmate who was executed late last night

19   or early this morning.  Unlike California where people can be

20   sentenced to death, but then it's never really carried out,

21   it is here in Texas.  So if the State of Texas succeeds in

22   the prosecution, there will come a day in the future where

23   the defendant is basically taken to Huntsville, strapped down

24   on a gurney, have an I.V. placed in his arm, have the I.V.

25   turned on, and within about 15 minutes he would lay dead on

```
 1   that gurney.

 2          Now, as I said, there's people who think in the

 3   abstract, no problem.  But there may come a day where you

 4   actually have to take pen in hand and sign your name to that

 5   verdict, such that the Judge would be required to sentence

 6   the defendant to death.

 7          How do you personally feel about being able to

 8   participate in that?  Some people say I still believe in it

 9   in the abstract, I just can't do it.  Other people say, I

10   don't have any problem participating.  Either way, we'll say

11   fine, okay.  If you can, great.  If you can't, great.  We'll

12   go on to the next person also.

13          Now, how do you personally feel, Ms. Lawley?

14      A.    I think that if the verdict is reached that it's

15   guilty and that I would have no problem --

16      Q.    Okay.

17      A.    -- saying -- or signing my name to a death -- if

18   that was what was warranted.

19      Q.    Okay.  So if the State proved that it should be so,

20   that he was in fact guilty beyond a reasonable doubt and that

21   we proved that Special Issue Number 1 should in fact be

22   answered yes and then after looking at all the evidence, you

23   decided Special Issue Number 2 should be answered no, such

24   that the defendant would receive a death sentence, you --

25   you're basically telling me you do not have a problem being
```

1    able to participate in that?

2        A.    That's correct.

3        Q.    Okay.   Now that you've had a chance to think about

4    it, do you have an explanation as to why you are in favor of

5    the death penalty?

6        A.    I don't know how to put it into words.   I think that

7    there are circumstances that warrant a death penalty.   And I

8    guess after all the evidence is presented, that, yes, I think

9    that a person should pay for it --

10       Q.    All right.

11       A.    -- if that's indicated.

12       Q.    Well, and as the Judge said, the death penalty is

13   only available for capital murder.   It's not available for

14   just plain murder.

15       A.    I understand.

16       Q.    Plain murder, the penalty range is anywhere from 5

17   years up to 99 years or life.   Capital murder, you have to

18   have the murder plus something else.   In this particular case

19   it's murder during the commission of a robbery or a

20   kidnapping.

21            Let's talk about regular murder for an instant --

22   for a minute.   In murder you have a specific intent to take

23   someone's else's life.   I take a gun out and I kill Ms. King,

24   shoot her ten times for whatever reason and I'm jumping up

25   and down, laughing, clapping, and really bragging about it.

1    That's a very heinous offense, but it's still just murder

2    because there is not that additional element such as if I

3    took her computer or took the money from her purse.  That

4    would make it capital murder.  But just the mere fact that I

5    shot her ten times, even though I intended to kill her, that

6    is murder and not capital murder.

7             Do you see the difference?

8        A.   Yes, ma'am.

9        Q.   Okay.  Now, for regular murder, as I said, the

10   penalty range is anywhere from 5 to 99 years or life.  There

11   can be a different type of specific intent to kill, too.  I'm

12   mother of two.  I know that you have some children, also.

13   Say that one of my children is 12 years old.  And one of the

14   neighborhood kids we find out is a drug dealer.  And as much

15   as I try and keep my 12-year-old away from the neighbor, the

16   neighbor gets my child involved with crack cocaine.  The

17   neighborhood child is a crack dealer and gets my child hooked

18   on crack cocaine such that my child will never be the same

19   again.  I go down and I have tried everything through the

20   legal system, through talking with that person's parents,

21   everything.  And I am just at my wit's end and I go down

22   there and kill the crack dealer.  That's a specific intent to

23   kill, also.  A little bit different perhaps than me shooting

24   Ms. King ten times just because.

25             Some people would say, well, that's a little more

1    justified, it was just a drug dealer and you were a parent

2    who was concerned about your child and frustrated.  Also, you

3    can have a euthanasia, a 90-year-old --

4                    MS. BALIDO:  Judge, I'm going to object to the

5    use of this.  Trying to qualify a juror on euthanasia --

6                    THE COURT:  Again, overruled.

7    Q.    (By Ms. Miller) -- a 90-year-old husband who's been

8    married to an 89-year-old woman, had been married for a long

9    time, had raised children, beautiful grandchildren children,

10   but she was diagnosed with terminal cancer.  The doctors

11   could do nothing further to help keep her from suffering.

12   They discuss it one evening and she begs him to help put her

13   out of her misery.  He is -- he doesn't really want to do it,

14   but he can't stand to see her suffer anymore, so he turns off

15   the machine.  Morally justifiable?  Most people would say

16   yes, that that was an act of love.  But it still is a

17   specific intent to kill.  It was not legally justified.  That

18   is still murder.  So you see, you have three different fact

19   scenarios that I've given you just here.  There's a million

20   different fact scenarios, and that's why the legislature has

21   given us such a wide range of punishment for murder, 5 years

22   to 99 years or life.

23                    What we need to know is, can you wait and listen to

24   the facts and assess your verdict -- if it was just murder

25   that the defendant was found guilty of, can you assess your

1    verdict somewhere within that penalty range and give as

2    little as 5 years in the penitentiary for an intentional

3    murder, all the way up to 99 years or life?

4            Now, we don't -- you don't have to tell us what you

5    think -- what type of murder you think would be worth 5

6    years, but if you heard it and in your heart of hearts you

7    believed that it was -- that 5 years was appropriate, could

8    you and would you give it?

9    A.    Yes.

10   Q.    Okay.  All the way up to 99 years or life?  Some

11   people say, look, I could never give that much, but if you

12   felt that it was appropriate, based on the facts, could you

13   and would do you that?

14   A.    Yes.

15   Q.    So if I hear you correctly, you're saying that you

16   would want to hear all of the facts and circumstances, you

17   would wait, consider the entire range, and then basically

18   reach your verdict according to what you felt was

19   appropriate, based on the law and the evidence?

20   A.    Absolutely.

21   Q.    Okay.  Now, when you talked about what's the best

22   argument in opposition of the death penalty, it says

23   circumstances of self-defense.  Self-defense is basically a

24   legal justification or excuse for murder or capital murder.

25   And if you believed that the defendant was acting in

1    self-defense, then he would be found not guilty so you

2    wouldn't even get to the punishment phase of the trial.

3            Do you understand that part?

4        A.    Yes.

5        Q.    Okay.   Let's talk about the special issues over

6    here.   Once you get to the special issues, you have already

7    found the defendant guilty of capital murder.   And the

8    indictment is right there on the stand there in front of

9    you.   That's what the State must prove beyond a reasonable

10   doubt in order for you to find the defendant guilty.   And

11   each and every one of those elements is just as important as

12   any other.   You notice it says Dallas County in there.   We

13   have to prove that beyond a reasonable doubt, just like we

14   would have to prove that it was the defendant.   That it was a

15   shooting or a drowning.   That it was during the course of a

16   robbery or kidnapping.   Because see, we have the burden of

17   proof.   The defendant doesn't have to prove anything, and I

18   see you shaking your head yes.   And I assume you agree with

19   that part of the law?

20       A.    Yes.

21       Q.    In your questionnaire, you had said that you agreed

22   that the defendant didn't have to prove his innocence.

23   That's because the State must in fact prove his guilt beyond

24   a reasonable doubt.   So when you're looking at that

25   indictment, some people call it a technicality.   Say that we

1    proved to you beyond a reasonable doubt each and every

2    element in there other than Dallas County.  Say that myself

3    or Mr. Davis just flat forgot to ask it, or even though you

4    know it occurred in Dallas County or it occurred -- actually

5    occurred in Tarrant County, some people would call that a

6    technicality, but if we did not prove that to you beyond a

7    reasonable doubt, also, just like everything else in that

8    indictment, then the Judge would tell you that according to

9    your oath and according to the law, you would have to find

10   the defendant not guilty because we did not meet our burden

11   of proof.  You might not like it, you might be mad as all get

12   out at us.  We wouldn't have our jobs anymore if that's what

13   we had done.

14          But do you have the strength and moral fortitude and

15   mental discipline to say even though I don't like having to

16   do it, I can in fact follow the law and find the defendant

17   not guilty?

18          A.   I can do that.

19          Q.   Okay.  So when we get over here to the special

20   issues, you've already found the defendant specifically

21   intended to kill Bertie Cunningham, that it was with a -- by

22   a shooting or a drowning, and it was during the commission of

23   a robbery or a kidnapping.  Okay?

24          A.   All right.

25          Q.   Then we're not interested in the guilt/innocence

DARLINE W. LABAR, OFFICIAL REPORTER

1  anymore.  We're looking at the punishment phase.  Should the

2  defendant receive the death penalty, or is he going to

3  receive life in the penitentiary.  And as the Judge said, in

4  Texas we assume it's going to be life in the penitentiary

5  unless and until these two special issues are answered such

6  that the defendant should receive death.

7        Now, looking at Special Issue Number 1, to remind

8  you, as the Judge had said, we have the burden of proof.

9  When you go into Special Issue Number 1, you have to presume

10  that it should be answered no.  So even though you've already

11  found this person guilty of committing a horrendous capital

12  murder, a lot of people say, well, look, I would always

13  answer that yes because if they could do that, then I'm going

14  to think they're always going to be a future danger.  But

15  what the law requires you to do, Ms. Lawley, is step back and

16  take a new look, a separate look at the evidence, because

17  some of the evidence that may be important won't come in

18  until the punishment phase of the trial, as I'm sure you're

19  aware of when you sat on the trial before.  The defendant's

20  prior criminal history does not come in until the punishment

21  phase.

22        A.   Right.

23        Q.   Character evidence, those types of things are not

24  admissible until then.  So even though you may not have --

25  even though a person -- a defendant might not have a prior

1    criminal history and you may say, look, the facts of the

2    offense alone are heinous enough that I could answer that

3    yes, what you have to do is make sure that the State has

4    proved it to you beyond a reasonable doubt through the

5    evidence.

6         Do you have the discipline to require the State to

7    do that?

8    A.   Yes.

9    Q.   Or are you going to be one of the types of people,

10   and if you are that's okay, and we need to know that.  Are

11   you always going to answer Special Issue Number 1 yes, just

12   because you found somebody guilty of that offense?

13   A.   No.

14   Q.   Okay.  When you're looking at Special Issue Number

15   1, what types of evidence or things -- and don't worry about

16   whether it's legal or not, but what types of things do you

17   think you would want to hear in order to be able to answer

18   Special Issue Number 1?

19   A.   Well, whether or not there has been a previous

20   history of crime and anything else relating to the

21   individual, his personality type, his violence or whether --

22   in that respect.  I guess that's all.

23   Q.   Okay.  And that's -- that's the same thing a lot of

24   people have told us when we've been questioning them.  They

25   say the best predictor of the future, which is what this is

1   really asking you to look at, is the past.  And as I said,

2   you may have a defendant who has been a pillar of the

3   community.  He has led an exemplary life, always held a job,

4   has never been in trouble before and this was the first time

5   he had ever been in trouble, but he did it big time this time

6   and committed a capital murder.  Or -- but you may think that

7   the murder -- the capital murder was heinous enough that you

8   still think he's going to be a future danger.  You may think,

9   no, this was something without anything else in his

10  background, I don't think he's going to be a future danger.

11  Or you may have someone who has been in and out of trouble

12  for his whole life, who has been within the system, the

13  system has given him opportunities to try and rehabilitate

14  himself, and he's thumbed his nose at it.

15          Are those the kind of things that you're saying

16  you'd like to know?

17      A.   Yes.  I'd just have to know some more of the

18  evidence.

19      Q.   Okay.

20      A.   And what's there.

21      Q.   Well, when you see the word "probability," you

22  notice that the legislature -- in the first phase of the

23  trial, and as I'm sure you remember when you got that jury

24  charge, there were a whole bunch of legal definitions in that

25  jury charge when you served on a jury before.  And you'll

```
 1    have a whole bunch of definitions in the jury charge during

 2    the guilt/innocence phase, also, where the Judge will be

 3    defining different legal terms.  However, when we get to the

 4    special issues here, most of the terms are not going to have

 5    a legal definition, and it's going to be basically kind of

 6    whatever you say it is.

 7              However, I want to point out a couple of things

 8    here.  Probability, the legislature didn't say that the State

 9    had to prove it to a certainty.  They also didn't say that we

10    had to prove it by only a mere chance or possibility.  But

11    they used the word "probability."

12              Now, some people say probability to them is any

13    chance whatsoever, even a mere inkling, but you see there

14    that they used the term "probability," and most people say

15    probability to them is more likely than not, or 51 percent.

16    Like when you hear the weatherman, Troy Dungan or whoever it

17    happens to be, say there is a 50 percent chance of rain.

18    Well, it's just as likely that it might rain as not.  It

19    doesn't become probable or more likely than not until it gets

20    to a 51 percent chance of rain.  Of course, in Texas we never

21    know with those percentages.

22         A.   That's right.

23         Q.   But that's an example that sometimes people use.

24    When you're looking at Special Issue Number 1 and you see the

25    term "probability" that the defendant would commit criminal
```

1   acts of violence, is the more likely than not basically the

2   kind of definition, the 51 percent that you would be looking

3   at?

4       A.   That's what probability means to me.

5       Q.   Okay.  Criminal acts of violence.  You see there

6   that the legislature didn't say that we had to prove that the

7   defendant would commit future capital murders.  They also

8   didn't say that we would have to prove that he would commit

9   future murders, but they also didn't say that we would only

10  have to prove that he would commit criminal acts.  They added

11  that qualifier criminal acts of violence.

12          When you hear that phrase or term, what originally

13  comes to mind for you?

14      A.   Criminal acts of violence?

15      Q.   Yes, ma'am.

16      A.   Well, I think violence is criminal, so --

17      Q.   Okay.

18      A.   Any sort of abuse -- I guess physical abuse.  I

19  don't know.

20      Q.   Basically would -- some people say, well, really to

21  be a criminal act of violence, it needs to be perpetrated

22  against or towards someone.  Any type of criminal act that

23  would place another in fear of imminent injury or actually

24  injure someone else, versus there can be an act of what some

25  people consider violence.  If I took a sledge hammer and

1    started beating up the Coke machine because it took my 65

2    cents, that's -- you know, most people would say that's not

3    really -- even though it might have been violent, it wasn't a

4    criminal act of violence because it wasn't really perpetrated

5    toward a human being.

6         A.   A person.   That's right -- I mean, yes, that's the

7    way I feel.

8         Q.   That's the way you feel?

9         A.   Yeah.

10        Q.   Now, society.   The term "society."   As I said, the

11   Judge isn't going to give you a definition for that, but when

12   you read Special Issue Number 1 and you look at the term

13   "society," what definition or -- usually comes -- or comes

14   to mind for you?

15        A.   Well, the general public, your neighbor, your

16   business associates.

17        Q.   Okay.   Some people say that because when you're

18   looking at Special Issue Number 1, you know the defendant is

19   looking at a life sentence now because you've already found

20   him guilty.   And as the Judge told you, the life sentence in

21   a capital case is a minimum of 40 years.   So some people say

22   society should be limited to people in the penitentiary

23   because that's where the defendant is going to be confined.

24   The legislature and law does not require society to be

25   limited to that.

1          However, do you think that people that are in the

2    penitentiary, chaplains, nurses, wardens, guards, and even

3    other inmates have the right to be free from criminal acts of

4    violence being perpetrated against them?

5          A.    Yes, I guess so.

6          Q.    Okay.  Just because they might have broken the law,

7    does that mean that they should have --

8          A.    No.

9          Q.    -- people being able to beat up on them or commit

10   acts of violence against them?

11         A.    No.

12         Q.    Other people say, no, society shouldn't be just

13   limited to people in prison.  It should include everyone?

14         A.    Yes.

15         Q.    Have you heard of Texas 7?  Now it's down to six, I

16   guess, since one killed himself.  Some of those -- some of

17   those defendants were actually serving life sentences in the

18   penitentiary.  They were able to escape, made their way to

19   Arlington, committed an aggravated robbery, and then

20   killed --

21              THE COURT:  Irving.

22         Q.    (By Ms. Miller)  I'm sorry, Irving.  -- and killed

23   an officer during the commission of that.  Some people say

24   society basically should include anywhere the defendant may

25   find himself or anyone the defendant may come in contact

1  with.  In other words, everyone.  It shouldn't be limited in

2  its scope.

3          How do you feel about that when you're looking at

4  Special Issue Number 1?

5     A.   Well, if he's -- if he's not in -- to me, that says

6  society is the world around.  I mean, it does not necessarily

7  mean include prison, because he's not in prison when we're

8  discussing this --

9     Q.   Okay.

10    A.   -- special issue.  We have to decide whether he

11  should be or she should be a threat to the general public

12  first because that's where they are, not in prison at that

13  time.

14    Q.   But when you're looking at Special Issue Number 1,

15  and I'm not arguing with you.

16    A.   It's okay.

17    Q.   Just so -- because I'm sure it will be pointed out

18  to you if I don't point it out to you that when you're

19  looking at Special Issue Number 1, he is already going to be

20  serving a minimum of 40 years in the penitentiary when you

21  get to Special Issue Number 1 because you've found him

22  guilty.

23    A.   Okay.

24    Q.   So you know that's where he's going to be housed if

25  he doesn't receive the death -- well, he'll be there even if

1    he receives the death penalty.  But do you see where they're

2    saying that prison should also be and the general public

3    because you never know, could escape, could do a lot of

4    different things?

5         A.   Okay.

6         Q.   Are you going to exclude people from the

7    population --

8         A.   That would never even enter my mind.

9         Q.   Okay.  Do you see where that might be included in

10   the word "society"?

11        A.   Might be.

12        Q.   All right.  Do you have any questions about Special

13   Issue Number 1?

14        A.   No.

15        Q.   Have I thoroughly confused you?

16        A.   Uh-huh.  No, not really.

17        Q.   Sorry about that.

18        A.   Not really.

19        Q.   Okay.  Let's look at Special Issue Number 2.  If the

20   State has -- if you've answered Special Issue Number 1 yes,

21   okay, you've already found the defendant guilty of a capital

22   murder and you've answered Special Issue Number 1 yes because

23   the State proved it to you beyond a reasonable doubt.  The

24   defendant is going to be sentenced to death at that point.

25   What Special Issue Number 2 does is acts as a safety net.  It

1     basically asks the jury to re-examine all of the evidence,

2     regardless of when it came into evidence or how it came into

3     evidence, be it from the State's witnesses or the defense

4     witnesses.  And in Special Issue Number 2, neither side has

5     the burden of proof, so even though we've had as the State

6     the burden of proof of proving beyond a reasonable doubt that

7     the defendant was in fact guilty and we have to prove beyond

8     a reasonable doubt that the defendant is going to -- probably

9     going to be a future danger, we don't have to prove -- we

10    don't have the burden of proof that Special Issue Number 2

11    should be answered no in order for the defendant to receive

12    death.  But neither does the defense have the burden of

13    proving that it should be answered yes such that you change

14    your death sentence back to one of life.  Basically you just

15    take all of the evidence, no matter where it came from, look

16    at it, sift through it, and say, hey, I understand that I

17    said that he was guilty.  I understand that I said he's

18    probably going to be a future danger to society, and, boy,

19    that might be very hard, but I have the discipline to look at

20    all of the evidence again and say, whoa, you know, wait a

21    minute, there is something sufficiently mitigating that I am

22    going to change a death sentence back to one of life.

23              Some people say, huh-uh, if I found him guilty and I

24    think that they're a future danger, I will never answer that

25    question yes such that he would receive life instead of

1    death.   But see, that's not what the law contemplates and

2    that's not what the law requires.   It requires you to make

3    that separate evaluation.

4            Ms. Lawley, do you have the discipline to be able to

5    do that?   Even though you've said that he's going to be a

6    future danger and he may have committed a very heinous

7    capital murder, can you still change a death sentence to one

8    of life if you think that there are sufficient mitigating

9    circumstances to warrant it?

10   A.   I wish I could say no, but I'd have to say yes.   I

11   do have the discipline to do that.

12   Q.   Okay.   And we aren't asking you what those

13   mitigating circumstances would be because you might not be

14   able to tell us.

15   A.   That's right.

16   Q.   But if you heard them and in your heart of hearts

17   you thought that that was in fact appropriate, you're telling

18   this Court and you're telling us that even though you might

19   not be real happy about it, you could do it?

20   A.   I could do it.

21   Q.   Okay.   Let's look -- look at mitigating

22   circumstances as -- what the Judge told you is there's not a

23   laundry list of mitigating circumstances.   It's basically

24   whatever you say they are.   You may say something is

25   mitigating, and I make look at that very same piece of

1   evidence and I say that's not mitigating, that's

2   aggravating.  A third juror may look at it and say, well,

3   it's not mitigating or aggravating, it's just kind of a wash.

4   So when you're looking at Special Issue Number 2, you're

5   going to first of all decide whether you believe the

6   evidence.  Just because evidence comes in doesn't mean that

7   you have to believe it.  So you have to determine the

8   credibility or believability of the evidence first.

9         Do you see that?

10   A.    (Nods head.)

11   Q.    Second -- and that's obviously something you did on

12   your last jury service.

13         Second, you're going to have to determine whether or

14   not you believe that evidence is mitigating.  Since you're

15   not going to have definition of mitigating or a list of what

16   mitigating evidence is, it's basically whatever you say it's

17   going to be.  So you have to look and see whether you believe

18   it's believable and credible and then you have to see whether

19   you think it in fact mitigating.  Thirdly, you have to look

20   and see whether it's sufficiently mitigating to change a

21   death sentence back to life.  Just because you think it's

22   mitigating, you might not think it's sufficiently mitigating.

23         Now, you may have a hundred pieces of mitigating

24   evidence, but you don't think that it rises to the level of

25   sufficient to change death to life, or you may have one piece

1    of mitigating evidence and you think, hey, that's

2    sufficiently mitigating.  So it doesn't matter the quantity.

3    What matters really more is the quality, as to whether you

4    think that it is sufficiently mitigating to change death back

5    to life.

6              One of the mitigating circumstances that people say,

7    and I think the Judge said, was age.  Some people say if an

8    offender is extremely youthful, then that may be mitigating.

9    Other people say, no -- and in Texas a person has to be 17

10   years of age before they can receive the death penalty.  Some

11   people say, no, if that person has reached the age of

12   accountability, they understand the consequences of their

13   actions, then age really doesn't play any factor as far as

14   mitigation to me.

15             How do you feel about that, Ms. Lawley?

16        A.   I don't think age, just off the top of my head.

17        Q.   Right.

18        A.   Really.

19        Q.   We're not trying to commit you one way of another.

20   I'm just kind of telling you some of the different things

21   that people have said might be mitigating.  Some people say

22   age wouldn't.  Some people say, well, I'd have to hear more

23   facts.  Some people say age in of itself wouldn't be.

24             Drugs and alcohol -- and your daughter, I believe it

25   was, had a problem; is that correct?

1   A.   That's correct.

2   Q.   And you said that she had been clean for 10 years?

3   A.   That's right.

4   Q.   Had gone through a treatment program?

5   A.   That's right.

6   Q.   Did she go through it because of -- was it a drug

7   related offense that she was arrested for and it was dropped?

8   A.   No, they were separate.

9   Q.   Okay.  Was she required to go through --

10   A.   No.

11   Q.   Okay.  Did she do it voluntarily?

12   A.   Yes.

13   Q.   Okay.  Do you think that all people can be

14   rehabilitated?

15   A.   From what?

16   Q.   From anything?

17   A.   That's a pretty broad statement.  Do I -- you want

18   to restate that?

19   Q.   Do you think all people are capable of being

20   rehabilitated?

21   A.   No, I do not believe that all people are capable of

22   being rehabilitated.

23   Q.   What do you think might make the difference between

24   one person being capable of it and another not?

25   A.   When you're speaking of rehabilitation, I think it's

1   a difference between rehabilitation for drugs, rehabilitation

2   for criminal acts.  And I think that, no, not all people can

3   be rehabilitated from drugs.

4        Q.   Okay.

5        A.   And why?  Because some people are stronger than

6   others and they have more of a desire.  They have perhaps for

7   some reason or other have a better self image of themselves

8   than others, so those could be rehabilitated.  People with --

9   from drugs or alcohol.  And as far as pedophiles, I have a

10  hard time thinking that they could be rehabilitated.

11       Q.   Okay.

12       A.   If you want to give me more specifics, I can tell

13  you --

14       Q.   Okay.

15       A.   -- what my feeling is on that, but I think each one

16  of them has its own --

17            THE COURT:  Ms. Lawley, have you been talking

18  to my court reporter about pedophiles?  She seems to fall in

19  the same category as you.  I just wondered if you -- no?

20  Okay.

21            VENIREPERSON:  No, really I haven't.

22       Q.   (By Ms. Miller)  Ms. Lawley, let me ask you this.

23       A.   Okay.

24       Q.   Do you think through the drugs and alcohol that a

25  person -- or any other type of rehabilitation that a person

1    has to want to be rehabilitated before --

2        A.    Yes.

3        Q.    -- they can?

4            Would you want to know if a person had been given

5    the opportunity to rehabilitate themselves in making a

6    determination as to whether you considered like drugs,

7    alcohol, those types of things mitigating evidence?

8        A.    I'm sorry.  You lost me on that.

9        Q.    Okay.  Well, some people say drug or alcohol use or

10   abuse might be mitigating evidence such to change a death

11   sentence to one of life.  I'm not saying you do, but -- and

12   you said you thought some people could be rehabilitated and

13   some couldn't.

14           Would you want to know whether the person had been

15   given the opportunity to rehabilitate themselves and whether

16   they had tried or whether they had just basically thumbed

17   their nose at it?

18       A.    In this particular case?

19       Q.    Well, just in a case?

20       A.    It might be of some consequence.

21       Q.    Do you think that it's a disease, or do you think

22   that it's a conscience choice?  Or do you think that it's a

23   conscience choice that perhaps might become a disease?

24       A.    Are we talking about drugs?

25       Q.    Drugs and alcohol?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    I think there are two different ones.

2    Q.    Okay.

3    A.    I mean, I don't compare -- I don't put drugs and

4  alcohol in the same category.

5    Q.    Okay.  How about drugs --

6    A.    Because I think alcohol can be hereditary.  Drugs, I

7  think, is choice.

8    Q.    Okay.  So if a person voluntarily takes drugs or

9  even voluntarily takes alcohol, do you think they should

10  still be held accountable for their actions under the

11  influence of drugs or alcohol?  Say I go out and drink and

12  use cocaine and I go out and kill someone, should I still be

13  held accountable for my actions?

14    A.    I think so.

15    Q.    Even though I might have been intoxicated at the

16  time?

17    A.    It was your choice to get that way.

18    Q.    Okay.  All right.  Ms. Lawley, thank you very much.

19          Do you have any other questions?

20    A.    No.

21    Q.    Okay.  Thank you.

22          THE COURT:  You may begin questioning the

23  juror.

24          MS. BALIDO:  Thanks, Judge.

25                    <u>Cross-Examination</u>

1   By Ms. Balido:

2       Q.   Ms. Lawley, as the Judge told you, my name is

3   Jennifer Balido.  And along with Mr. Byck back here, I

4   represent Mr. Murphy, who is the man who is accused of this

5   crime.

6       A.   Uh-huh.

7       Q.   And what we're talking about today.  Let me just

8   tell you just starting off that I have enjoyed watching you

9   answer Ms. Miller's questions because you wouldn't believe

10  how many un -- let's see -- how many -- yeah, how we have to

11  have so many like dead fish faces kind of and you can't tell

12  anything about a person, but I really do appreciate your

13  personality and the way that you are because I can kind of

14  see when things confuse you and that sort of thing and so

15  hopefully we can talk about some of those things.

16          And along those lines, you kind of had a quizzical

17  look on your face when Ms. Miller told that you if you answer

18  these questions in such a way that the death penalty is the

19  ultimate result, that there is nothing that the Judge can do

20  but give him the death penalty.

21          Did that surprise you?

22      A.   No.

23      Q.   Okay.

24      A.   I thought he -- the Judge, I thought, explained that

25  earlier.

1    Q.   Okay.

2    A.   That that was --

3    Q.   You just kind of looked quizzical.  And what the

4 situation is, is that the jury needs to know and it's

5 important to know that the decision on the facts that the 12

6 jurors make in this case --

7    A.   Uh-huh.

8    Q.   -- whether or not he's guilty or not guilty, whether

9 or not he's a future danger or not, and whether or not

10 there's mitigating circumstances or not, there's nobody else

11 basically that change that decision.  The decision on the

12 facts is solely on the jurors.  And I know that you mentioned

13 in your questionnaire that you thought that -- you kind of

14 had a bad feeling about the appellate process and the number

15 of appeals and how long it takes.

16    A.   That's right.

17    Q.   Can you kind of tell me what you base that on?  As

18 an appellate lawyer, I'm kind of interested.

19    A.   Well, I may not know the correct nomenclature for

20 all of this.  I just think to keep someone on death row for

21 ten years is wrong.  I mean --

22    Q.   Okay.

23    A.   If you're going to -- I mean, I think that the

24 appeals should take less time than that.

25    Q.   Okay.

1        A.   I think it's wrong for the criminal.   I think it's

2   wrong for the families.   I think it's wrong for the families

3   of the victims.

4        Q.   Okay.

5        A.   If it were murder or whatever.

6        Q.   And I agree with you there, because I think that

7   sometimes people say that one of the -- one of the goals of

8   the death penalty is to be a deterrent for other people.   And

9   I think that when people see how long it takes, it kind of

10  loses some of it deterrent effect.

11       Do you agree with me on that?

12       A.   I do agree with you.

13       Q.   Okay.   Would you agree that although they take a

14  long time, that when we're talking about appeals of cases

15  where the death penalty is the ultimate -- is the ultimate

16  punishment, that the State of Texas should dot every I and

17  cross every T before they take someone's life?

18       A.   Yes.

19       Q.   Okay.   And that kind of gets back around to the

20  State in its burden of proof.   The State has got to prove its

21  case beyond a reasonable doubt, that Mr. Murphy is guilty of

22  capital murder before we even get to these special issues.

23       A.   I understand that.

24       Q.   And we used to have a definition of reasonable

25  doubt, and we don't have one anymore.   The Court took it away

DARLINE W. LABAR, OFFICIAL REPORTER

1    from us for reasons only known to themselves.  And so now

2    basically reasonable doubt is kind of like in the eye of the

3    beholder.  Everybody's definition is different.  It's just

4    whatever you think reasonable doubt is and what proof beyond

5    a reasonable doubt is.  I can tell you what reasonable doubt

6    is not though.

7              When we're talking about fighting about money, suing

8    people or car wrecks or that kind of thing, the person that's

9    trying to get money from another person has to prove their

10   case by a preponderance of the evidence.  Some people say 51

11   percent, kind of like we're talking about probability.  When

12   the State of Texas through its Child Welfare Division is

13   trying to take your children away from you, they've got to

14   prove it more than a preponderance of the evidence.  They've

15   got to prove it by clear and convincing evidence.  And when

16   the State of Texas is trying to take away your liberty or

17   your life as in this case, they've got to prove their case

18   beyond a reasonable doubt, which is something more than a

19   preponderance, something more than clear and convincing.

20        A.    Uh-huh.

21        Q.    And you told the State and you told the Judge and I

22   guess I just need one more reassurance.  Can you told the

23   State to its burden of proof?

24        A.    I can.

25        Q.    Okay.  And really it's a hard question and it's a

```
 1    question that sticks in the craw of somebody's throat and

 2    it's one of those questions that my mom says that's why

 3    people hate lawyers, but the question that you're going to

 4    answer at the end of this trial, if you are a juror, and

 5    you're very close to being a juror on this case is --

 6                    THE COURT:  Just what you wanted to hear,

 7    wasn't it?

 8                    VENIREPERSON:  Yeah, can I answer -- which way

 9    can I get out of this?

10                    MS. BALIDO:  Exactly.

11                    THE COURT:  You've crossed that bridge.

12    You've had plenty of opportunity before now.  You didn't bail

13    out so you're going to stay in the boat with us.

14        Q.    (By Ms. Balido)  It's not didn't Mr. Murphy do it.

15    The question is not that.

16        A.    Okay.

17        Q.    The question is whether or not the State can prove

18    it beyond a reasonable doubt.  And like I said, that's one of

19    those questions that my mother tells me that's why people

20    hate lawyers.  Because it's -- it's a question that people --

21    you know, they think, well, he did it, you know, which can

22    crystallize what Ms. Miller was saying that, you know, if

23    they don't prove Dallas County, State of Texas, it's going to

24    be hard but the Judge is going to instruct you to find him

25    not guilty.
```

DARLINE W. LABAR, OFFICIAL REPORTER

1          Can you do that?

2     A.    Yes.

3     Q.    Okay.  And if the only evidence that is -- that ties

4  this person to the crime is a confession that was illegally

5  gained, okay, and you've got to toss that out, then you've

6  got to find him not guilty as well.

7          You understand that?

8     A.    (No response.)

9               MS. BALIDO:  Did she give --

10              THE COURT:  No.

11              MS. BALIDO:  I'm sorry.  Did she not do it?

12    Q.    (By Ms. Balido)  I'm sorry.  We do so many of these

13  I couldn't remember if she gave it or not.

14              THE COURT:  She did not.

15    Q.    (By Ms. Balido)  Okay.  Let me give you an example.

16  Let's say -- I won't use myself so you won't hate me.  I'll

17  use Mr. Byck as an example.

18    A.    Okay.

19    Q.    Let's say Mr. Byck loves to burn down schoolhouses.

20  That's just his deal and he's real good at it and he makes a

21  special potion up of certain chemicals that only he knows and

22  he goes out to a schoolhouse and he burns it down.  And let's

23  say a hundred kids are killed.  Somehow or another the police

24  bump into him and they -- you know, around the neighborhood

25  or whatever and they say why don't you come down and talk

1   with us and he says okay.  He goes down there.  He's in

2   custody and he starts talking to the police and he starts

3   telling them how he burn down this schoolhouse and how he

4   made this special potion of things.  The -- if you watch any

5   of these crime shows, you've heard of the Miranda warnings.

6   The police officer gives all of them but one.  Okay?  And

7   that one might be that you -- or that -- one of them is that

8   you can end the interview at any time, end the questioning at

9   any time.  And he just forgets to give that one to them.

10  They take the confession.  Mr. Byck never says I want to stop

11  the interview at any time.  And so therefore, you know, they

12  arrest him, they put him in jail, they bring him for trial,

13  and you're sitting as a juror on this case.  The only

14  evidence that is present in the case is this confession that

15  he did it, he did it in a certain way, he did it in Dallas

16  County, he did it on a certain -- at a certain time, he did

17  it, and he liked doing it.  And then the officer gets up and

18  this is one of the honest officers and he gets up and he

19  says, okay, I gave him all his Miranda warnings but one and I

20  just made a mistake.  It was just, you know, one of those

21  days and I just made a mistake and I didn't give them all to

22  him.  So you get the jury charge in this case.  And the jury

23  charge from the Judge tells you that unless you believe all

24  four of the warnings, every single warning required under the

25  law was given to him, then you must throw out that confession

1   and not consider it for any purpose.  So you're basically

2   sitting there in a situation that if you follow the law,

3   you've got to throw out that confession and find Mr. Byck who

4   loves to -- you know, loves to burn down schoolhouses not

5   guilty.  Or you can do -- you can basically follow the text

6   of the confession and know -- you know that he's guilty.  You

7   know that he did it.  You know that he likes it.  You know

8   he's going to do it again.  And find him guilty and go on.

9            Can you see that that's kind of a moral dilemma?

10  A.   Yeah, and that's what's wrong with the law, but you

11  have to go by what the law says.

12  Q.   Okay.

13  A.   So if you have to throw it out, you have to throw it

14  out.  No, I wouldn't like it.

15  Q.   You wouldn't like it?

16  A.   I wouldn't like it, but that's what it says to do.

17  Q.   Right.

18  A.   You have to do.

19  Q.   Right.  And I've had --

20            THE COURT:  You're still in the boat.

21            VENIREPERSON:  Isn't that terrible?  I wish I

22  could lie about that.

23  Q.   (By Ms. Balido)  And that's one of those things that

24  I've had juries both as a -- when I was a prosecutor and as a

25  defense lawyer.  I've had juries that said, you know, I

1    didn't like it.  I thought that guy was dangerous.  I thought

2    that he committed the crime, but the State just didn't prove

3    it beyond a reasonable doubt for whatever reason.  And, you

4    know, that's a situation -- and they find that person not

5    guilty.  And it's hard to do, but you're telling me that you

6    can do that if that's what the law --

7         A.   If I have to do it, yeah.  I mean, if that's --

8         Q.   All right.  Let me also talk to you a little bit

9    about -- about what is required -- what they have to prove in

10   this case.  There are all sorts of ways to kill people, okay,

11   under the law and all sorts of types of homicide, I guess I

12   can call it that way.  There are homicides that are committed

13   with criminal negligence where someone should have known

14   better or made a mistake.  There are homicides that are

15   committed by accident.  There are homicides that were

16   committed recklessly.  And there are homicides that were

17   committed knowingly, where you knew that it was dangerous

18   whatever you were doing and you still did it, so you should

19   be held accountable.  All those types of homicides are --

20   require lesser mental states than what we're talking about

21   here.  What we're talking about here -- and it says it in the

22   indictment in front of you -- intentionally causing the death

23   of somebody.  And what that means is specifically causing the

24   event and intending the result.  Okay?  So if I, again,

25   picking on Mr. Byck if he's still there -- picking on Mr.

1    Byck, if I decide that I've just had it with him and I go and

2    I buy a gun and I buy bullets and I sneak it into the

3    courthouse and I sit here and he's just finally driven me to

4    the brink of insanity but not quite legally insane and I pull

5    out my gun and I shoot him dead right here, I intended to

6    cause the result.

7            Now, if I pull out my gun and I threaten him with

8    it, that's not the specific intent to kill.  If I shoot him

9    in the foot to injure him, my specific intent is to injure

10   him, not to kill him.  But until and unless the State proves

11   to you beyond a reasonable doubt that Mr. Murphy had the

12   specific intent to kill, if they can do that, then they

13   haven't proven their case beyond a reasonable doubt.

14           And can you agree with that?  Can you hold them to

15   that burden?

16   A.   That's right.

17   Q.   Okay.  Let me just ask you some basic questions and

18   then we'll kind of move on to the special issues again.  As

19   you can tell by the indictment that's sitting in front of

20   you, all murders are bad and I can kind of see you wince

21   every time Ms. Miller called something a simple murder or a

22   regular murder because there are no simple or regular

23   murders, because it's hard to classify these as either

24   capital murders or murders without using those terms.  But

25   you can see by the indictment that Mr. Murphy is indicted

Page 146

1  with the crime of capital murder by causing the death of
2  Bertie Cunningham, by either shooting her with a gun or
3  drowning her in water during the course of a robbery or a
4  kidnapping.  So just on that indictment, when we're talking
5  about shooting in the head and drowning in water, I think
6  that you can probably assume that the pictures in this case
7  may be of a graphic nature.  And let me just tell you,
8  pictures of any murder are graphic.
9       What I need to know from you is if you think that
10  you can judge pictures like that for their evidentiary value
11  and not be swayed simply on emotion or sympathy?  I mean, I
12  think everyone is going to have a reaction, but can you
13  judge -- you know will it sway your opinion one way or
14  another is what I'm saying?  Just simply the --
15       A.   Can I tell a lie and say yes?
16       Q.   No.
17       A.   No, I'm sorry, it won't.
18       Q.   Okay.  And let me also ask you if the evidence in
19  this case was to show you that the victim in this case was an
20  80-year-old woman, would that cause you not to be fair and
21  impartial in this case?
22       A.   No.
23       Q.   Okay.  Let me go on and just talk to you a little
24  bit about Special Issue Number 1 and Special Issue Number 2.
25  And talk to you a little bit about probability again.

1          Would you -- can you give me some words that you

2    would -- or a phrase that you would use instead of the word

3    "probability" in Special Issue Number 1?

4         A.   Possibility is one word that comes to mind.

5         Q.   Okay.

6         A.   More chances than not.  What else do I say?

7              MS. BALIDO:  Just one second.

8              THE COURT:  You're still in the boat.

9         Q.   (By Ms. Balido)  Okay.  And when you were taking to

10   Ms. Miller about Special Issue Number 1, you told her that

11   even after finding someone guilty of capital murder -- and

12   what we're taking about is the intentional murder of somebody

13   in the course of a kidnapping or a robbery by shooting her in

14   the head or drowning her in water, that even after hearing

15   that kind of case and finding somebody guilty in that kind of

16   case, that you would not automatically answer Special Issue

17   Number 1 yes in that situation and find that he's a

18   continuing threat automatically?  Is that what you said?

19        A.   That's what I said.

20        Q.   Okay.  And let me kind of go over with special --

21   just one thing in Special Issue Number 2 that I wanted to

22   talk with you about.  You said when you were talking with Ms.

23   Miller about rehabilitation and you talked about that you

24   thought that the use of drugs and alcohol was a different

25   situation just because you felt like alcohol was hereditary?

```
 1        A.    Can be hereditary.

 2        Q.    So the rehabilitation issues are different in that

 3   situation.  And also, then you said that it was different

 4   also with criminal behavior.  And you mentioned pedophiles

 5   and so I really don't want to talk about pedophiles.  I never

 6   want to talk about pedophiles.  But let's not talk about it

 7   right now.

 8               THE COURT:  Mr. Cryer?

 9               MS. BALIDO:  Sir, I don't want to talk about

10   that.

11        Q.    (By Ms. Balido)  I've got a case he's messing with

12   me about.  I want to talk about actual -- do you think that

13   criminals, outside of pedophiles or sex offenders, criminals

14   or people that commit criminal acts can be rehabilitated?

15        A.    See, you keep putting everything into one big lump

16   sum.  I mean, lump, and --

17        Q.    Well, let me ask you this, then.  Do you think

18   someone who has committed murder, intentional murder in the

19   past, can be rehabilitated?

20        A.    Intentional murder?  I think there are different

21   reasons for committing murder.

22        Q.    Okay.

23        A.    So it depends on what went before that.

24        Q.    Okay.  I have just one last question, and when

25   we're -- when we're talking about accountability in this
```

1  case, if the State proves beyond a reasonable doubt that Mr.

2  Murphy is guilty of capital murder, he will be held

3  accountable for his actions and he'll be held accountable in

4  one of two ways, either life confinement in the penitentiary

5  or the death penalty.  And it used to be that people didn't

6  know what life confinement in the penitentiary meant.

7  Sometimes it was 5 years, sometimes it was 20 years,

8  sometimes it was 30 years.  But the legislature, thank

9  goodness, has allowed us now to tell you that life

10  confinement in the penitentiary is 40 calendar years without

11  the possibility of parole.

12       A.   Okay.

13       Q.   And that's not even saying after 40 years the doors

14  are going to swing wide.  They still have to go through the

15  parole process.

16       A.   Uh-huh.

17       Q.   Do you think that when we're talking about a capital

18  murder case, that both the death penalty and a 40-year

19  confinement is -- they are both appropriate punishment

20  alternatives?

21            THE COURT:  Depending upon the circumstances.

22       Q.   (By Ms. Balido)  Yeah, depending on the case?

23       A.   Yes.

24       Q.   So you could not say -- I mean, you could -- if you

25  felt like it was a life case, you could give somebody life.

1  If you felt like it was a death case, you could give somebody

2  death?

3      A.   Yes.

4      Q.   That's all I just wanted to talk to you about.   I

5  appreciate it, Ms. Lawley, very much.

6      A.   Okay.

7            THE COURT:   Ms. Madore, if you'd excuse Ms.

8  Lawley momentarily.

9            Ms. Lawley, you will be excused in the company of

10  the bailiff momentarily.   The attorneys will confer with

11  their immediate co-counsel, after which they will inform me I

12  will later inform you whether you remain under

13  consideration.   It will be less than five minutes, I

14  anticipate.

15            VENIREPERSON:   Okay.

16            (Venireperson leaves the courtroom.)

17            (State no challenge for cause - Ms. Lawley)

18            MS. MILLER:   The State has no challenge.

19            (Defense no challenge for cause - Ms. Lawley)

20            MS. BALIDO:   The defense has no challenge for

21  cause.

22            MR. BYCK:   As long as the juror is not allowed

23  to speak or get anymore candies or anything else from our

24  court reporter.

25            THE COURT:   We need Ms. Lawley, please.

1          (Venireperson returned to courtroom.)

2          (Jo Lawley Prospective Juror No. 25)

3          THE COURT:  Ms. Lawley, you remain under

4    consideration by the Court as a prospective juror in this

5    case.

6          With your permission, I'm going to ask that you

7    allow Ms. Madore to take a Polaroid picture of you for the

8    limited purpose of assisting the attorneys in identifying

9    faces with jurors when they exercise their peremptory

10   challenges in a couple of weeks.

11         Also, I've asked Ms. Daily, the Court Administrator,

12   to come in.  She going to confirm some -- your home phone

13   number.  If for whatever reason your phone number changes,

14   I'm not anticipating, but there's no reason to believe that

15   it might not, depending on whatever the circumstances may

16   be.  If it should change, if you'd please let her know.

17   We'll keep you apprised in the future and keep track of you.

18         Also, avoid the temptation of contacting the Dallas

19   Morning News with regard to back issues that treated the

20   incident as a news story which forms the basis of the

21   prosecution.

22         Questions for me?  Do you have any questions for me?

23         VENIREPERSON:  No.  Didn't you read that last

24   one when it said, no, I didn't want to serve on this trial?

25         THE COURT:  If it said, yeah, I want on it,

1   that would have got a get out of jury card.

2                    MR. DAVIS:  With the Court's permission, we

3   have reached an agreement on Ms. Neff.

4                    THE COURT:  She is acceptable to both sides

5   without question?

6                    MS. BALIDO:  That's not the agreement.

7                    MR. BYCK:  No, Your Honor, we're not stapling

8   our law license to that one either.  We'd ask Ms. Neff be

9   excused.

10                    THE COURT:  Because of her antitrust jury

11  obligations?

12                    MR. BYCK:  Yes.

13                    MR. DAVIS:  Exactly.

14                    (Recess of proceedings.)

15

16

17

18

19

20

21

22

23

24

25

1                          Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4              I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13             I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16             Witness my hand this the 18th day of April, A.D.,

17   2001.

18

19

20                        DARLINE W. LABAR
21                        Official Court Reporter
                          194th Judicial District Court
22                        Dallas County, Texas
                          (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002


                    DARLINE W. LABAR, OFFICIAL REPORTER

REPORTER'S RECORD

VOLUME 30 of 65 VOLUMES **74145**

TRIAL COURT CAUSE NO. F00-02424-NM

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

********************

INDIVIDUAL VOIR DIRE

********************

FILED IN
COURT OF CRIMINAL APPEALS

DEC   5 2001

Troy C. Bennett, Jr., Clerk

A P P E A R A N C E S:

HONORABLE BILL HILL, Criminal District Attorney
          Crowley Criminal Courts Building
          Dallas, Dallas County, Texas  75207
          Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
        MR. TOBY SHOOK, A.D.A., SBOT #
          FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
          Phone:  214-653-9400
            FOR THE DEFENDANT.

*********

        On the 30th day of April, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

        Proceedings reported by machine shorthand, computer

assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

INDEX VOLUME 30

April 30th, 2001                                    PAGE    VOL.

INDIVIDUAL VOIR DIRE:

Proceedings...................................... 2      30

State challenge for cause - Ms. Shelton.......... 60     30

Challenge for Cause Granted...................... 60     30

State no challenge for cause - Ms. Morton....... 109     30

Defense no challenge for cause - Ms. Morton..... 110     30

Annette Morton Prospective Juror No. 26......... 110     30

Mr. Hiller Excused From Consideration........... 141     30

Reporter's Certificate.......................... 142     30

CHRONOLOGICAL VENIREPERSON INDEX

| | STATE | DEFENSE | VOL. |
|---|---|---|---|
| VICKI SHELTON | 28 | 52 | 30 |
| ANNETTE MORTON | 63 | 89 | 30 |
| SCOTT HILLER | 115 | | 30 |

ALPHABETICAL VENIREPERSON INDEX

| | STATE | DEFENSE | VOL. |
|---|---|---|---|
| SCOTT HILLER | 115 | | 30 |
| ANNETTE MORTON | 63 | 89 | 30 |
| VICKI SHELTON | 28 | 52 | 30 |

*NO EXHIBITS THIS VOLUME*

```
 1                   P R O C E E D I N G S
 2            THE COURT:  This is a continuation of
 3   F00-02424-NM, styled the State of Texas versus Jedidiah Isaac
 4   Murphy.
 5            Is the State prepared for the panel to return to the
 6   courtroom?
 7                 MR. DAVIS:  The State's ready, Your Honor.
 8                 THE COURT:  Is the defense ready, Ms. Little?
 9                 MS. LITTLE:  Yes, Your Honor.
10                 THE COURT:  Let the record reflect Mr.
11   Jedidiah Isaac Murphy, the defendant, is present in court and
12   will be at all times during the Court's presentation unless I
13   dictate the contrary into the record.
14            Sheriff, may we have the jury panel, please.
15               (Venirepersons brought into courtroom.)
16            THE COURT:  Counsel may be seated if you wish.
17        Good morning, ladies and gentlemen.  I'm Judge
18   Harold Entz.  I am pleased on behalf of the attorneys whom
19   I'll be introducing momentarily -- take this opportunity in
20   welcoming each of you to this the 194th District Court.  This
21   is one of 15 courts in this building given constitutional
22   responsibility of presiding over criminal cases classified as
23   felonies.  There are 13 county criminal courts in this
24   building.  Constitutionally they are created to handle what
25   we call misdemeanor cases.
```

```
 1              A misdemeanor, by contradistinction from a felony,

 2   is any criminal offense the punishment for which is either

 3   jail time and/or a fine.  On the other hand, the 15 district

 4   courts, this being one of them handling felony cases, handle

 5   cases that are classified as felonies.  And by felony, I mean

 6   any criminal offense the punishment for which includes time

 7   in the penitentiary.

 8              Before I introduce the attorneys and the defendant

 9   and go into the matters at hand with some preliminary jury

10   instructions, may I ask all of you again to please rise,

11   raise your right hands, and be prepared to take an oath.

12   And, ladies and gentlemen, for purposes of your individual

13   religious belief or matters of personal conscience at your

14   option, your option, the operative verb will be either

15   "swear" or "affirm."

16              Do each of you solemnly swear or affirm that you

17   will make true answers to such questions as may be propounded

18   to you by the Court or under in directions touching your

19   service and qualifications as a juror, so help you God.

20                    (Venirepersons sworn.)

21              THE COURT:  Thank you.  Please lower your

22   hands and again be seated.

23              Ladies and gentlemen, allow me, if I may, at the

24   commencement of the proceedings this morning to introduce

25   those whom you see seated at the counsel table.  We'll begin
```

1   with the counsel table to the right as you look at them.

2   Begin first with the lead prosecutor in this particular

3   prosecution, a Senior Prosecutor in the Dallas District

4   Attorneys Office, the Honorable Greg Davis.

5          Mr. Davis.

6               MR. DAVIS:   Good morning.

7               THE COURT:   Seated next to Mr. Davis is

8   co-counsel on behalf of the State with regard to this

9   prosecution.   At the present time this lady occupies the role

10  of Chief Prosecutor assigned to this the 194th District Court

11  by Dallas District Attorney Bill Hill.   I present now the

12  Honorable Mary Miller.

13         Ms. Miller.

14              MS. MILLER:   Good morning, ladies and

15  gentlemen.

16              THE COURT:   Moving on to the next table, I

17  will introduce first the three attorneys representing the

18  defendant.   And last I will introduce the defendant to you.

19         Begin with lead counsel for the defense, a former

20  Chief Prosecutor in the Dallas District Attorneys Office, so

21  designated by the State Bar of Texas by virtue of experience,

22  training, and having passed a very difficult examination, a

23  board certified criminal law specialist, lead counsel for the

24  defense, the Honorable Jane Little.

25         Ms. Little.

 1                MS. LITTLE:   Good morning, ladies and

 2     gentlemen.

 3                THE COURT:   Seated next to Ms. Little is a

 4     fellow defense attorney, also a board certified criminal law

 5     specialist, the Honorable Michael Byck.

 6          Mr. Byck.

 7                MR. BYCK:   Good morning.

 8                THE COURT:   Seated behind Mr. Byck is the

 9     third attorney representing the defendant, the Honorable

10     Jennifer Balido.

11          Ms. Balido.

12                MS. BALIDO:   Good morning.

13                THE COURT:   Seated next to Mr. Byck, opposite

14     Ms. Little, is the accused, the defendant, if you will,

15     having previously come to my attention, by the name of

16     Jedidiah Isaac Murphy.

17                THE DEFENDANT:   Good morning.

18                THE COURT:   Mr. Murphy, if you'd be kind

19     enough to make yourself --

20          Ladies and gentlemen, get right to the point of the

21     matter at hand.   You have been summoned as a prospective

22     panel on our continuing effort to impanel a jury in a case

23     styled the State of Texas versus Jedidiah Isaac Murphy.   Mr.

24     Murphy has been indicted by a Dallas County grand jury for

25     capital murder.   The State has made known its intent of

1   seeking the death penalty.  I by law am required pursuant to

2   the Code of Criminal Procedure this morning to explain to you

3   certain principles of criminal law that are applicable in all

4   cases, including but not limited to a capital murder case, at

5   the conclusion of which by virtue of the clipboards that you

6   were asked to bring in we will hand out questionnaires.

7   After you've completed the questionnaires, we will take a

8   short break.  You will then be asked to return, and at that

9   time I will call out the names of when those of you that will

10  need to return for purposes of individual questioning.

11          Ladies and gentlemen, the Texas Code of Criminal

12  Procedure is very, very clear that in a capital murder case

13  in which the State is seeking the death penalty, upon request

14  either by the prosecution or the defense, prospective jurors

15  may be individually questioned.

16          We have been at this process now for a little over a

17  month with regard to individual questioning.  We are working

18  up to a panel of 48 constitutionally qualified jurors, at the

19  conclusion of which the attorneys will be allowed obviously

20  under law or given the opportunity to exercise their

21  peremptory challenges.  And the 12 that remain from the pool

22  of those that have been constitutionally qualified will serve

23  as jurors in this particular case.

24          Comment or two at the outset about capital murder

25  statutorily in the State of Texas.  Ladies and gentlemen, in

1    1972 in a case called or styled as we in the law business

2    say, Furman versus Georgia, the United States Supreme Court

3    ruled that all state capital murder schemes then in place

4    were unconstitutional for a couple of reasons.  Realize we

5    have I think only one lawyer on the panel.  I think Mr. Hill

6    is the only lawyer.  There may be others that I failed to

7    ascertain when I was in a very cursory manner glancing over

8    the questionnaire or the information that you gave.  But

9    basically in 1972, without giving you a constitutional

10   lecture, the United States Supreme Court said that the

11   schemes in place and they utilized Georgia, but as it turned

12   out it meant every other state that had the death penalty,

13   was unconstitutional the way it was so statutorily

14   constructed because it was a violation of the 8th Amendment,

15   cruel and unusual punishment; violation of the 14th

16   Amendment, due process.  Essentially the United States

17   Supreme Court back then said that the schemes under place in

18   the United States at that time gave the prosecution unbridled

19   discretion, that there needed to be some sort of a guided

20   discretion that would narrow the possible pool of cases of a

21   murder variety for which the death penalty could even be

22   constitutionally considered.

23            Well, a number of states after reading Furman versus

24   Georgia, the next time their legislatures met, took this

25   opinion in hand and tried to craft a scheme by which the

1    scheme could pass United States Constitutional approval.

2         1976, there were a trilogy of cases, including a

3    case called Jurek versus Texas, in which the United States

4    Supreme Court approved of the scheme that is utilized in

5    Texas.

6         Now, let me explain to you how the scheme works in

7    Texas.  At the outset let me tell you that murder standing

8    alone in and of itself cannot any one of the 254 counties in

9    the State of Texas be eligible for the death penalty.   In

10   Texas and every other State for there to be a

11   constitutionally accepted death penalty murder statute, there

12   must be murder plus one or more aggravating factors.

13        Well, a number of states put the aggravating factors

14   into the penalty stage of the trial.  Florida and Georgia

15   being the two most notable that utilize those kind of

16   schemes.   Those two states basically a jury hears a murder

17   case, if they find the defendant guilty, if the State has

18   given the defense 90 days notice that they will seek to

19   convince a jury that aggravating factors outweigh the

20   mitigating factors, it's a recommendation to the trial judge

21   in those two states and virtually every other state that has

22   the death penalty other than Texas and Oregon.  It's a

23   recommendation to the trial Judge from the jury, as opposed

24   to the scheme that we now have.  Florida and Georgia if the

25   recommendation for the jury is life, it's life.  If the

1    recommendation is death, it's death.  But in those states the

2    Judge can overturn the jury's verdict either way.  Either

3    way.  So it's just a recommendation.  It's not a requirement

4    as it is in Texas.

5           Now, let me explain to you how we do it in Texas.

6    And this is I say we, it's not just the 194th District Court,

7    not just Dallas County, it's the whole State.  Here is the

8    way a death penalty case works.  Number one, to pass

9    constitutional muster even to be eligible for a death

10   penalty, it's got to be murder plus, murder and something

11   else.  Well, what is that something else?  Well, it could be

12   murder during the commission of a number of other enumerated

13   felony offenses.  Murder during the course of a robbery, a

14   burglary, a kidnapping, an arson, or a sexual assault, which

15   we used to call rape.  That's the murder plus.  Or status is

16   also a protected area with regard to death penalties.  If a

17   murder is committed and the victim is a fireman, or woman, or

18   a police officer in the lawful discharge of their duties, or

19   a penal guard during an escape, those classification of

20   persons or occupations are protected and that can be a death

21   penalty case.

22          Likewise, age is a protected status.  If the victim

23   is a child under the age of 6, that can be a death penalty

24   eligible type constitutionally approved case.  Also, mass

25   murders like Timothy McVeigh.  Well, it doesn't have to be

1    168 as he did, two or more.  Serial murders.  Can be like the

2    Ted Bundys and the Jeffrey Dahmers.  Those kinds of actions

3    can be a capital murder case.  Murder for hire may be one.

4    Murder for remuneration.  You kill somebody in an effort to

5    get insurance money, matters such as that.  So, number one,

6    it's always murder, has to be murder, but it always has to be

7    something plus.

8          In this case that we have before us, about which

9    we're going to be talking more this morning, and most of you

10   will be brought back and we will go into it with finite

11   detail.  The allegation in the indictment is murder during

12   the course of either a robbery and/or a kidnapping.  Now,

13   under our statutory procedure, if the jury impaneled to hear

14   the case hears the case and decides it's a murder, but there

15   is not this plus, there's not a kidnapping or a robbery, the

16   jury would not find the defendant not guilty, but would find

17   that the defendant in this case under my hypothetical

18   scenario guilty of murder but not capital murder.

19         Murder, not capital murder, in the State of Texas is

20   what the legislature has designated a first degree felony

21   which means that the penalty range for murder, not capital

22   murder, but murder is not less than 5, nor more than 99 years

23   or life in the penitentiary, with an optional fine not to

24   exceed $10,000.

25         Ladies and gentlemen, for those of you thinking, my

DARLINE W. LABAR, OFFICIAL REPORTER

1   goodness, 5 years for a murder, I've been at this for nearly

2   28 years now, let me tell you there are all types of

3   relationships between individuals and circumstances that

4   could -- and I have seen juries a number of times do it, find

5   a defendant guilty and give the minimum punishment, just as

6   I've seen a number of them horrendous and have been 99 years

7   or life.  So trust me when I tell you the legislature was

8   very, very wise -- I could be nasty and say for a change, but

9   I won't, but they say it's 5 to 99 years or life, that takes

10  into every possible scenario you can imagine.

11          Now, under my hypothetical let's assume a jury finds

12  a defendant in Texas guilty at the first stage of the trial

13  of capital murder.  Murder plus.  That does not -- and let me

14  emphasize to the best I possibly can articulate or make you

15  aware, when a jury finds a defendant guilty of capital

16  murder, does not automatically mean a death sentence.  Far

17  from it.  Far from it.

18          The two options however a jury has in a capital

19  murder case, the matter of punishment is either life or

20  death.  The latter I would submit to you speaks for itself.

21  In Texas it's death by lethal injection.  On the other hand,

22  a life sentence for capital murder in the State of Texas by

23  law means the individual must serve 40 calendar years in

24  custody before being eligible for release on parole.

25          Now, that 40 calendar years, ladies and gentlemen,

1    that's day-for-day, week-for-week, month-for-month,

2    year-for-year, regardless of the rehabilitation efforts the

3    defendant has made while in custody or good conduct.  We're

4    looking at a flat 40 calendar years before being eligible for

5    consideration on supervision called parole.  Does not mean

6    that if the defendant survives 40 years in the penitentiary,

7    that doors just automatically fling open and out the

8    defendant goes.  Eligibility process though commences after

9    the 40 years.

10            Now, in those capital cases in which the State is

11   seeking death, the same jury that heard the guilt/innocence

12   stage of the trial reconvenes to hear additional evidence

13   that either side cares to present to determine whether or not

14   the sentence should remain at life or should become death.  A

15   defendant in any capital murder prosecution going into the

16   penalty stage of the trial has a life sentence to begin with,

17   and it only -- only becomes a death sentence upon certain

18   matters being brought to the attention of the jury, which

19   they believe and answer accordingly.  Only then does it

20   become a death sentence.  So I want to emphasize a capital

21   murder guilty verdict does not equal death.  Life, and maybe

22   death, depending upon certain circumstances.

23            Now, here are the circumstances.  We have them for

24   your benefit blown up.  They're called special issues.

25   Stealing from civil courts that term, civil cases in Texas,

1    jurors are asked to answer certain questions which are called

2    special issues.  We call them special issues for purposes of

3    capital murder on the criminal side of the docket.

4            Not that you can't read, because that's the

5    constitutional requirement even to get up here, but for some

6    of you may be a little bit ways away and your eyesight may

7    not be real good, let me read the special issues for you.

8            Special Issue Number 1 reads as follows:  Quoting,

9    whether there is a probability that the defendant would

10   commit criminal acts of violence that would constitute a

11   continuing threat to society, close quote.

12           Special Issue Number 2 reads, quote:  Whether,

13   taking into consideration all the evidence, including the

14   circumstances of the offense, the defendant's character and

15   background, and the personal moral culpability of the

16   defendant, there is a sufficient mitigating circumstance or

17   circumstances to warrant that a sentence of life imprisonment

18   rather than a death sentence be imposed, close quote.

19           Now, the jury only gets to these special issues if

20   they have found a defendant guilty of capital murder.  If

21   obviously it's a not guilty verdict, the trial is all over,

22   we go about our business.  We go to the next case on the

23   trial docket of the court.  If a verdict of murder, that is

24   murder without the aggravating factors have been returned,

25   then you don't have these special issues either.  You just

1    have 5 to 99 years or life and take into consideration all

2    the evidence presented and you, to be a qualified juror, must

3    be willing to consider the full 5 to 99 years or life and

4    have the requisite discipline and say that you'd wait until

5    you hear the evidence, and, yeah, if I think 5 is fine, and

6    say it sounds a little bit low to me, Judge, but if you can

7    show me one, I can buy it, or 99 or life.

8            Only if the jury finds a defendant guilty of capital

9    murder are they obligated to deal with these special issues.

10   Everybody with me so far?  I know a Monday morning you came

11   down here, it was a beautiful weekend and you come down and

12   say, well, it's a Monday morning, you know, I'll go in.  It

13   will be some little misdemeanor case.  It might be a

14   shoplifting at a grocery store something and you come in and

15   get slapped in the face verbally with a Judge talking about

16   the death penalty.  Well, I apologize if I have slapped you

17   in the face verbally, but this is very serious matters and

18   that is what I'm trying to impress upon all of you.

19           Now, as I said before, going into the penalty phase

20   of a capital murder case the defendant starts out his

21   guarantee of a life sentence.  It only becomes a death

22   sentence if the jurors in answer to Special Issue Number 1

23   answer yes.  I would submit to you grammatically it is

24   constructed in such a way -- at the beginning of the jury's

25   deliberations the legislature has so structured Special Issue

1   Number 1 that it begins with a no.  It doesn't say there is a

2   probability.  It's whether there is a probability.

3        The burden of proof, the responsibility, if you

4   will, of going forth with the evidence in an effort to

5   convince the jury that Special Issue Number 1 should be

6   answered yes, as opposed to no, lies with the prosecution,

7   Mr. Davis, Ms. Miller.  If they are unable to convince all 12

8   jurors that the answer to Special Issue Number 1 should be

9   changed from no to yes, the jury comes back into the

10  courtroom with that decision, make it known to the Court, and

11  it's a life sentence.  Doesn't get off scot-free.  That's 40

12  years.  40 years.

13       Only if the jury during their deliberations in the

14  penalty phase of the trial changes Special Issue Number 1

15  from no to yes must the jury go on to Special Issue Number 2.

16       Now, let me talk a minute or two about Special Issue

17  Number 2.  Special Issue Number 2 has by law school

18  professors and other legal scholars, judges, prosecutors, and

19  defense attorneys been variously called the mercy question,

20  the safety net, the safety valve, matters such as that.

21  Ladies and gentlemen, let me tell you where you are

22  hypothetically if you are a juror and you get to Special

23  Issue Number 2.

24       You have found, number one, in the guilt/innocence

25  stage by virtue of finding a defendant guilty of capital

DARLINE W. LABAR, OFFICIAL REPORTER

1    murder, found the defendant guilty of capital murder, that's

2    number one.

3         Number two, if you answer Special Issue Number 1 in

4    the affirmative, that the defendant is a continuing threat to

5    society, you are two-thirds of the way to a death sentence.

6    I would submit to you the legislature in enacting Special

7    Issue Number 2 has given all of us in Texas in a matter as

8    serious as death penalty, because of the absolute

9    irrevocability of a death sentence, an opportunity in Special

10   Issue Number 2 to sit back, pause, reflect, and indeed those

11   of you are of such of a mind to pray and decide, look, taking

12   everything into consideration, everything into consideration,

13   have I heard of a circumstance or circumstances because of

14   which the defendant should live and not die.  This gives you

15   a chance to act on that type of evidence if presented.  For

16   those of you who are saying what in the world, I've already

17   found the defendant guilty of murder plus, already found he's

18   going to be a continuing threat to society, what in the world

19   could be brought to my attention in the matter of evidence

20   that would ever cause me to answer Special Issue Number 2

21   yes.  I'm not going to give you a laundry list.  You can

22   probably think of a number better than I, but I'm going to

23   give you some examples of what some individuals have said

24   that they would consider.

25        Mental retardation; mental health; abuse as a child,

DARLINE W. LABAR, OFFICIAL REPORTER

1    be it emotional, sexual, physical, could rise to the level

2    because of which.  Or the circumstances may be such, Eagle

3    Scout, alter boy, attended Sunday school and church

4    faithfully, and this is just a fluke, an aberration of his

5    conduct because of which I'm going to answer Special Issue

6    Number 2 yes.  Because, ladies and gentlemen, let me be very

7    candid with each of you to tell you that under Texas law if a

8    defendant has been found guilty of capital murder, and if a

9    jury after hearing the evidence decides that Special Issue

10   Number 1 should be answered yes and Special Issue Number 2

11   should be answered no, unlike Florida and Georgia, the jury

12   does not make a recommendation to me.  I am not a thirteenth

13   juror.  Yes to Special Issue 1, no to Special Issue Number 2,

14   by law I am required to sentence the defendant to death.

15   That's the way it works in Texas, and it has for a number of

16   years.

17           So, number one, to emphasize, capital murder is

18   murder plus, can't just be a murder.  Cannot be such that if

19   I happen to get angry with the court reporter because she

20   needs to put a little more WD-40 on those keys that she's

21   taking down my comments, say, Ms. King, I've just had enough,

22   I told you the last two weeks that you're going to have to

23   get that fixed, I've had it with you, reach in and pull out a

24   gun which I do not have, go bang, bang, bang, bang, bang,

25   kill her.  Horrendous murder in front of all of you.  Not

1   capital.  Most I could get is life.  It's got to be murder

2   plus.

3         If I then go over and rob her of her jewelry or

4   Stenograph machine or something like that, yeah, then it

5   could be the plus.  Number one, murder plus.  And then it

6   only becomes a death sentence depending upon special issues.

7         So that -- those are the hurdles that the jury is

8   obligated to jump, if you will, before a death sentence can

9   be imposed.  Not every capital murder case obviously is a

10  death sentence.  For those of you that have lived in the

11  North Central Texas area for a few years, perhaps recall a

12  tragic incident a couple of years ago, the two military

13  cadets who were found guilty in Tarrant County of kidnapping

14  and murdering a young lady.  Found out about it after one of

15  them had gone to the Air Force Academy.  The other had gone

16  to the Naval Academy, as I recall.  Came back, were tried for

17  capital murder, did not seek the death penalty.  They got 40

18  years.  Why was death not sought?  Tarrant County District

19  Attorney personally told me there was no way that he felt and

20  his prosecutors felt that they could prove Special Issue

21  Number 1.  This was an aberration.  This was a

22  boyfriend/girlfriend type thing and the girlfriend egged the

23  boyfriend into, well, if you really love me, you'll get rid

24  of the rival and unfortunately they did it.  Couldn't prove a

25  future dangerousness, but they got 40 years.  They were found

1    guilty of murder during a kidnapping.

2           This case, the State has made known its intent to

3    seek death.  All depends upon a jury whether or not a death

4    sentence is the result.

5           Before we get to the questionnaires, a reminder of a

6    number of statutory safeguards that every defendant,

7    regardless of the offense, enjoys.

8           The presumption of innocence.  As Mr. Murphy sits

9    before you today, though he's been indicted by a grand jury,

10   the indictment is no evidence of guilt.  The indictment puts

11   a defendant on legal notice of the charges against him,

12   thereby giving him through his attorneys an opportunity to

13   prepare a defense.  Likewise, it notifies the State of those

14   allegations, those operative terms that they must prove

15   before a jury by law is entitled to return a verdict of

16   guilty.  Same indictment makes the jury aware of the specific

17   allegations.  And if they find that one or more of the

18   allegations in the indictment have not been proven to their

19   satisfaction beyond a reasonable doubt, the jury is by law

20   required to return a verdict of not guilty.

21          A couple of extreme examples to make my point.  If

22   all of the evidence shows that this defendant committed the

23   murder -- and incidently this is not one of the Connally 6.

24   It's -- the defendant is alleged to have committed the murder

25   on the person of a Bertie Lee Cunningham.  If you find that

1    the defendant committed the murder in the manner and means as

2    alleged in the indictment, but it occurred in downtown Fort

3    Worth, Tarrant County, Texas, though Mr. Davis, Ms. Miller,

4    would be fired before the sun goes down that day, the jury

5    must return under that circumstance a verdict of not guilty.

6    The saying in the law the allegata must comport with the

7    probata.  The allegation must support the proof.  Allegation

8    of the manner and means of death is shooting with a gun or

9    drowning with water.  The evidence from the medical examiner

10   hypothetically shows that the victim was killed by stabbing

11   with a knife, again prosecutors have lost their job by

12   sundown, but the jury must return under that circumstance a

13   verdict of not guilty.  Murphy knows that he's not on trial

14   for bank robbery.  He's not on trial for possessing a kilo of

15   cocaine.  He is on formal notice of the allegations in the

16   indictment, murder of a named individual, Dallas County,

17   Texas, on or about a date certain, by shooting her with a gun

18   or drowning her in water.  Failure of the State to convince

19   the jury of those allegations obligates, requires the jury to

20   find the defendant not guilty.  It may be a little

21   uncomfortable having to do that, but we are a society of laws

22   and not of men and women.  And we must all abide by the

23   written law.

24            Presumption of innocence.  The beginning of the

25   trial must by each of you be considered not guilty.  The

DARLINE W. LABAR, OFFICIAL REPORTER

1    burden of proof, the responsibility of proving, if they can,

2    the allegations in the indictment lies with the District

3    Attorneys Office.  Jury will be called upon to return a

4    verdict of guilty or not guilty, about which I think a

5    matter -- comment or two should be stated.

6              Ladies and gentlemen, from a communication

7    standpoint, not guilty unfortunately has come to mean in our

8    jargon or our language innocence.  And that's not it in a

9    legal sense.  I would submit to you that in the United

10   Kingdom, England and Scotland, Wales, the verdict is perhaps

11   a bit more accurate.  Judges over in the United Kingdom in a

12   criminal case ask the jury whether or not the Crown, the

13   District Attorneys Office, the prosecutors, if you will, have

14   proven the case beyond a reasonable doubt or have they failed

15   to prove the case beyond a reasonable doubt.  Somehow coming

16   across the Atlantic this failure to prove the case beyond a

17   reasonable doubt became not guilty.  So people say not

18   guilty.  It means he didn't do it?  Well, no, it doesn't mean

19   that.  It means that the jury in the case of a jury trial or

20   a Judge, if a jury has been waived, which incidently cannot

21   be done in Texas in a capital murder case, not guilty means

22   that each and every one of the elements have not been proven

23   beyond a reasonable doubt.

24             Ladies and gentlemen, if there are any of you who

25   recall having heard, read, or seen anything about this case,

```
 1   unless you can set aside that which you have read, seen, or

 2   heard, you cannot be a constitutionally qualified juror.

 3   United States Supreme Court case, case called M-u, capital

 4   M-i-n, MuMin versus Virginia, have said that regardless of

 5   what a juror has read, seen, or heard, if they can set that

 6   aside and realize that it is only a journalist's

 7   interpretation of what happened as opposed to evidence in a

 8   courtroom, you are for purposes of media attention

 9   constitutionally qualified.  If on the other hand, you have

10   become so close to this matter -- and we have had some jurors

11   that we have questioned individually that were intimately

12   familiar with the circumstances of the case by virtue of a

13   number of associations that they had with some people

14   involved in this case, they cannot set that aside, have a

15   fixed opinion one way or the other, you cannot be a

16   protective qualified juror.

17          Before we get into the questionnaires, just a

18   reminder, United States there is no way I would submit a

19   legislature, United States Congress, or any State legislature

20   could pass a capital murder statute that would meet the

21   approval of the United States Supreme Court where a verdict

22   of guilty of capital murder would automatically result in a

23   death sentence.  Reading the Supreme Court opinions as I do

24   and have and have taught this course to judges from

25   California to South Carolina and will be going out the latter
```

---

DARLINE W. LABAR, OFFICIAL REPORTER

1    part of next month to teach a number of judges as well, I

2    submit to you there is no way a legislative body could draft

3    a statute where automatically it would be death without

4    taking into consideration matters such as the special issues

5    that we have up here to the left, especially special issue in

6    Texas Number 2, the mitigating circumstances.  They must

7    always be given to the jury, I submit, constitutionally that

8    opportunity out there if there are mitigating circumstances

9    that there be a life as opposed to a death sentence.

10         One of the attorneys involved whom I will not name

11   is staunchly in favor of there being an automatic death

12   sentence for treason in the time of war.  Sounds very

13   appealing, not war.  But a death sentence under that rather

14   graphic set of circumstances, if a treason involved the harm

15   or death of a United States citizen.  I don't think even that

16   would pass United States Supreme Court constitutional muster

17   without having a mitigating circumstance type of issue

18   factored into it.  But no recent President has asked me to

19   accept a position on the United States Supreme Court.  I

20   don't anticipate one will.  So I leave that to the good

21   judgment of the high nine up in Washington D.C.

22         Ladies and gentlemen, the bailiffs are going to be

23   handing out to you the questionnaires.  Let me, before you

24   begin answering these questions, on behalf of the attorneys

25   and they in the past have asked that I do so and I do that

1    for them and selfishly for me as well.  Ladies and gentlemen,

2    there are no right or wrong answers to the questions that you

3    will be asked to answer.  A number of them are very

4    subjective.  A number of them are rather specific, such as

5    occupation, matters such as that, but there are a number of

6    questions that are very subjective.  We do not grade

7    individuals with regard to their answers in this

8    questionnaire or as it relates to individual questioning on a

9    curve whether or not they are a good or not good citizens.

10   It's been said by a very, very prominent legal scholar that

11   second only to serving our country during a time of war in

12   the field of battle, the second highest civic obligation we

13   can impose upon a citizen is to ask him or her to serve as a

14   juror in a capital murder case.  Think seriously about that.

15   We realize that this is very, very serious matters.  Nobody

16   in here you can see at the counsel table has had a big smile

17   on their face.  And I want to tell you, when I started this

18   business a number of years ago, I had a whole lot more hair

19   than I have right now.  These are serious matters.  We have

20   every reason to believe you'll be conscientious, you'll be

21   honest to the marrow of your bones with regard to answering

22   these questions.

23           As soon -- take as long as you need in answering the

24   questionnaire.  No time limit, such as an examination while

25   we were students.  For those of you that are teachers, well,

1  students, you have X number of minutes to answer this.

2  Answer all of the questions, please.  Answer them

3  truthfully.  When you have completed the questionnaire, the

4  bailiffs will be available, just hand that back to them.  I

5  would guess based upon past experience, ladies and gentlemen,

6  it's going on about 11 o'clock.  If all of you would

7  assemble -- that have completed, let's say assemble not later

8  than 12:15 outside the second set of double doors, based on

9  past experience, most, if not all of you, should find that to

10  be sufficient time to finish the questionnaires.  After you

11  finish the questionnaires, please feel free to excuse

12  yourselves, stretch your legs.  There are rest rooms.  If you

13  go out to the left and left again, if you need to take a rest

14  room break or stretch your legs before you've answered the

15  questionnaires, please let the bailiff know that you're doing

16  that and just leave your clipboard and the questionnaire

17  where you find yourself and just come back in.  Make yourself

18  as comfortable as you wish.

19       Those of you that wish to step outside and fill in

20  the questionnaire outside without being so cramped, you're

21  free to do that as well.  Thank you very much.  We'll see all

22  of you outside the second set of double doors about 12:15.

23            (Panel recessed to fill out questionnaire.)

24            THE COURT:  Good afternoon, Ms. Shelton.

25  Welcome back.

1              VENIREPERSON:  Hi.

2              THE COURT:  Ask you to raise your right hand,

3    please.

4              (Venireperson additionally sworn.)

5              VENIREPERSON:  I do.

6              THE COURT:  Thank you.  Lower your hand, Ms.

7    Shelton.

8         Ms. Shelton, allow me to reintroduce the individuals

9    whom we see seated at the counsel table.  They've been

10   previously introduced.  It's been a little while so let me

11   refresh your memory if I may.

12        Beginning with the table to the far left, lead

13   prosecutor for the State, the Honorable Greg Davis.

14             MR. DAVIS:  Good afternoon.

15             THE COURT:  One of the Senior Prosecutors at

16   the District Attorney office at the present time.  He will be

17   joined momentarily by co-counsel, the Chief Prosecutor in

18   this court, the Honorable Mary Miller.

19        Moving on to the next table, we begin first with the

20   two of the three defense attorneys on behalf of the

21   defendant, beginning first with the Honorable Jennifer

22   Balido.

23             MS. BALIDO:  How are you?

24             VENIREPERSON:  Fine.  How are you?

25             THE COURT:  Seated next to Ms. Balido, one of

1    her co-counsels, board certified criminal law specialist, the

2    Honorable Michael Byck.

3                    MR. BYCK:  Good morning -- I mean, good

4    afternoon.

5                    THE COURT:  It's already been a long day for

6    us, trust me.

7              Continuing down the table, the defendant, the

8    accused, Jedidiah Isaac Murphy.

9                    THE DEFENDANT:  Good afternoon.

10                   VENIREPERSON:  Hi.

11                   THE COURT:  Lead counsel for the defense whom

12   I anticipate will be present shortly, though is not here with

13   us right now, the Honorable Jane Little.

14             Ms. Shelton, before we begin with the individual

15   questioning, there is an attorney that practices in this

16   court and the other criminal courts that has -- how should I

17   gently phrase this -- caused herself a lot of unflattering

18   publicity by virtue of some alleged behavior that she may or

19   may not have engaged in.  This attorney's name has the same

20   surname as yours.  And just to clear the air, do you know or

21   are you in any way related to a criminal defense attorney in

22   Dallas County, Catherine Shelton?

23                   VENIREPERSON:  If I am, I have no knowledge of

24   it.  I've only been married for almost two years and had this

25   name, so I don't know of anybody named that in the family.

1          THE COURT:  I will choose not to make any

2     further comment or it may be -- you may be lucky.

3          Ms. Shelton, we will begin with the individual

4     questioning.  Statutorily, we begin with the State, the

5     Honorable Greg Davis.

6          Mr. Davis, Ms. Shelton.

7          MR. DAVIS:  Thank you.  May it please the

8     Court.

9               VICKI SHELTON

10    was called as a venireperson by the Court and, after having

11    been first duly sworn, was questioned as follows:

12              Voir Dire Examination

13    By Mr. Davis:

14    Q.   Good afternoon again, Ms. Shelton.  How are you?

15    A.   Fine.  How are you?

16    Q.   Good.

17         Ms. Shelton, for the next 30 minutes or so I'll have

18    an opportunity to speak with you.  And during that period of

19    time, we'll talk about the death penalty in a little greater

20    detail, we'll talk about some general legal principles that

21    apply in this case, and thirdly, we may talk about your

22    questionnaire a bit.

23         Let me just tell you up front, there are no right or

24    wrong answers to any of these questions.  Most of the

25    questions deal with how you feel about an issue, what your

1    opinions are.  As long as you tell us how you honestly feel

2    about something, that's all we can expect from you.  Okay?

3          Ms. Shelton, I want to take you back to the day when

4    you came with the rest of the jurors, when you filled out

5    your questionnaire, to that time when the Judge told you that

6    you had been summoned on a capital murder case where the

7    State was seeking the death penalty against Jedidiah Isaac

8    Murphy.  Can you remember what your initial reaction was to

9    that?

10        A.   I think I was a little surprised because I only had

11   jury duty once before and I wasn't selected and just to know

12   it was a case that big, I was kind of surprised.

13        Q.   Okay.

14        A.   That's all I really felt.

15        Q.   Okay.  You know, sometimes jurors will tell us very

16   honestly that they're in favor of the death penalty, but

17   sometimes they also say, I don't know if I can personally

18   serve myself and perhaps be a part of a verdict that results

19   in the ultimate death of an individual.  You know, as you can

20   see, Jedidiah Isaac Murphy is an individual.  He's a living,

21   breathing human being.  The State's position is not going to

22   change in this case.  We are going to actively seek the death

23   penalty.  At the punishment phase, I'll be asking you to

24   answer the special issues in such a way that Judge Entz will

25   be required by law to impose a sentence of death.  I think

1   it's only fair in the State of Texas to assume that if a

2   death penalty is handed down, that it will be carried out at

3   some date in the future.

4          How do you honestly feel about participating and

5   possibly rendering a verdict that would result in the death

6   of Mr. Murphy?

7          A.   Well, probably like everyone, I have mixed emotions

8   because no one wants to feel like they themselves could be

9   directly responsible for that result, but at the same time I

10  know that if I as well as everybody else on the jury were to

11  come to an agreement that that's what we felt should be done,

12  I believe that I can carry that out.  I also believe that

13  we're only temporarily here and that we have a higher judge

14  and that things are going to turn out the way they're

15  supposed to turn out and that I'm not ultimately in control

16  of that, but I do believe that I could issue that as a

17  sentence.

18         Q.   Okay.  All right.  That's fair enough.  Ms. Shelton,

19  let me talk to you then in a little bit greater detail about

20  the special issues over here the Judge has mentioned to you

21  previously.  As you will recall, he's told you that before

22  you reach these two special issues, you will have already

23  found the defendant guilty of capital murder.  If you find

24  him not guilty, obviously that stops the trial, we all go

25  home.  If you find him guilty of something less than capital

DARLINE W. LABAR, OFFICIAL REPORTER

1   murder, we have a different punishment scheme.  But if you

2   find him guilty of capital murder, then you'd be asked to

3   consider additional testimony at the punishment phase and to

4   answer these two special issues.

5         If you'll recall, the Judge has told you Special

6   Issue Number 1 is presumed to be answered no.  The State of

7   Texas has the burden of proof on Special Issue Number 1,

8   which means that if we produce enough evidence that persuades

9   you beyond a reasonable doubt that it should be answered yes,

10  you answer yes.  If we fail to do that, you answer it no.

11        First of all, do you think that you could follow

12  that law and make the State of Texas prove beyond a

13  reasonable doubt that it should be answered yes before you

14  would answer yes?

15        A.    I do.

16        Q.    Okay.  Some people say, you know, if I find someone

17  intentionally killed another individual during the course of

18  a robbery or kidnapping, that's automatically going to answer

19  that special issue for me.  I don't care what else I hear,

20  that's the type of person that I would think would be a

21  future threat regardless.  That's fine.  But those people are

22  not qualified jurors because what the law asks you to do

23  again is to wait until you hear all the evidence.  There may

24  be something in the evidence that you hear at the punishment

25  phase for instance that tells you even though you think that

1  person is guilty, no doubt about it, for whatever reason you

2  don't think he's going to pose a future threat to society and

3  so you answer it no.

4       And as we look at Special Issue Number 1, let's go

5  through some of these words, Ms. Shelton.  They have no legal

6  definitions.  We're going to rely upon your definitions for

7  these words.  But I want to point out a few things to you.

8       First of all, the word "probability."  The

9  legislature gave us that word.  I think they gave it to us

10  for a reason.  They could have used other words.  They could

11  have said to the State of Texas, you have to prove to an

12  absolute certainty that this person would commit future

13  criminal acts of violence.  The burden is not that high.

14       Now, on the other end of the scale, they could have

15  said -- instead of using the word "probability," they could

16  have said whether there is a chance, whether there is a

17  possibility.  Those are words that they could have used also.

18  That's not the meaning of probability, obviously, or they

19  would have used those words.  Probability -- let me just tell

20  you, I look upon that as meaning a likelihood, something is

21  more likely than not going to happen.  It's kind of like if

22  you think about majority and minority -- I mean, to be a

23  majority out of 100 you have to have how many, 51?

24  A.    Uh-huh.

25  Q.    Okay.  You think about that in terms of probability,

1    I think it's the same thing.  Anything less than 51 percent

2    obviously would be just a possibility.  They're even odds, if

3    you will, at that point.

4           Can you agree with me that probability means just

5    that, a probability?  It does not mean a possibility or a

6    chance?

7    A.    I do.

8    Q.    Would you also agree with me that probability has to

9    mean on a scale of zero to a hundred at least 51 percent,

10   anything less would be less than a probability?

11   A.    Yes.

12   Q.    Criminal acts of violence.  Again, some people say,

13   well, you know, in any criminal act will do.  Well, no, the

14   legislature could have said, State, just prove any criminal

15   act whatsoever and that's enough.  But they have qualified

16   that with of violence.  A lot of people in the past have told

17   me that that means someone else has to actually be harmed in

18   some way or at least put in threat of harm.

19          Does that sound reasonable to you also?

20   A.    It does.

21   Q.    Okay.  Finally, the word "society."  Society can

22   mean everyone.  It can certainly mean people like you and I

23   who live in the free world.  But if you recall Judge Entz

24   telling that you a life sentence on a capital murder charge

25   means the defendant will have to serve at least 40 calendar

1    years before he becomes eligible for parole.

2          Can you see in the context of that that society

3    could also mean prison?

4          A.   Uh-huh.

5          Q.   It could also mean other inmates who are around the

6    defendant.  It could be guards, nurses, secretaries, people

7    who visit a prison.  I like to think of society as meaning

8    anywhere the defendant may find himself.  Anyone who he may

9    come in contact with as being his society.

10         Now, I've had it -- I've heard it argued that really

11   society should mean only prison.  Since 40 years, calendar --

12   I mean, calendar for calendar before you become eligible for

13   parole.  Again, as a juror, you're free to look at it that

14   way, but you're not obligated to because if you go back to

15   wherever he may find himself to be, you're free as a juror to

16   include the free world when you think of society.  Have you

17   heard about the Connally 7, the men to escaped, came up and

18   killed the Irving officer?

19         A.   Uh-huh.

20         Q.   Some of those people were actually serving life

21   sentences at the time that they escaped from the prison

22   system.

23         Ms. Shelton, one last thing on Special Issue Number

24   1, and don't worry about the rules of evidence here, any of

25   the legalities, but if you had your druthers, what sorts of

1   things would you like to hear about before you had to answer

2   Special Issue Number 1?

3        A.    Probably what his past had been like.  Had he ever

4   been in trouble before.

5        Q.    Okay.

6        A.    What the circumstances were that led up to the

7   crime.  You know, all that kind stuff, just to see where was

8   he at that time and what had his life been up to that point.

9        Q.    And, you know, a number of people tell me this same

10  thing.  I've had people say in the past the best indicator of

11  the future is the past, what an individual has done in the

12  past is something they want to look at.  Let me tell you that

13  normally that type of information will not be presented at

14  the first part of the trial dealing with his guilt or

15  innocence.  Normally it will be presented at the second

16  phase, the punishment phase.  That is normally when the State

17  of Texas is entitled to offer evidence about prior criminal

18  convictions, prior criminal arrests, any bad acts, any bad

19  character evidence.  That normally will become admissible at

20  the second part of the trial.  So by the time you get down to

21  Special Issue Number 1, you will know has he been in trouble

22  before or not.  What sort of offenses has he been arrested

23  for.  Is there some sort of pattern developing.  Are there

24  other criminal acts of violence in his past.  Has the

25  criminal justice system dealt with him.  Have we attempted to

DARLINE W. LABAR, OFFICIAL REPORTER

1    rehabilitate him.  What's been his reaction to those

2    efforts.  You get to know all those things.

3         Secondly, as you just indicated, you get to look at

4    the crime itself, just what led up to this case.  Is this

5    some sort of relationship that's existed for a long time that

6    went bad for whatever reason.  Or is this a

7    stranger-on-stranger, very random kind of offense.  What's

8    the motivation for the offense.  Who is the victim.  How was

9    the crime carried out.  What was the defendant's reaction

10   after he committed the crime.  Was he remorseful.  Was he not

11   remorseful.

12        Now, I can't tell about the specific facts in this

13   case.  Obviously, we want you to wait until you're a juror to

14   hear those facts, but I am entitled to ask you one question.

15   And the question is this, because we want jurors to base

16   their verdict on the law that is given to them by Judge Entz,

17   as well as the facts.  We do not want jurors to render

18   verdicts merely on sympathy or emotion.

19        Now, if the evidence in this case showed, Ms.

20   Shelton, that the victim, Bertie Cunningham, was an

21   80-year-old woman at the time that she was murdered, would

22   you still be able to look at the evidence and be fair and

23   impartial to both sides, or do you think that you'd simply

24   decide the case on emotion or sympathy?

25        A.    I think I could look at it and be fair.

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.   Okay.  You know, obviously that may be a

2   circumstance that you would want to take into account on

3   punishment because you are entitled to look at the

4   circumstances of the offense.  But as far as guilt/innocence,

5   you're still going to make the State of Texas prove our case

6   beyond a reasonable doubt, correct?

7     A.   Uh-huh.  That's correct.

8     Q.   Let's look then at Special Issue Number 2.  By the

9   time you get down there, Ms. Shelton, you're two-thirds of

10   the way to a death sentence.  You've already found the

11   defendant guilty.  You've already decided beyond any

12   reasonable doubt that he will constitute a continuing threat

13   to society.  What the law would ask you to do at that point

14   is to forget your verdict for guilt, forget how you answered

15   Special Issue Number 1.  Take another look at all of the

16   evidence in this case and then decide is there something in

17   that evidence, regardless of what it is, regardless of where

18   it came from, is there something in that evidence that

19   persuades you that this man should get a life sentence

20   instead of a death sentence.  That's what we really ask you

21   to do.

22         A problem some jurors have expressed to me is this,

23   they have told me, if I think a man is really that dangerous,

24   that he's going to constitute a continuing threat to society,

25   I'm not going to look at the evidence because I'm going to

1    make sure he gets death.  I'm just not going to take a

2    chance.  Morally I couldn't put another person in harm's way

3    so to speak.  Well, they're not qualified jurors obviously

4    because the law does ask you to keep an open mind.  It may be

5    a situation where right now as you sit there, you can't think

6    of what that circumstance would be that would change your

7    mind.  You're not -- you're not required at this time to tell

8    us what that would be.  But what you are required to say is

9    this, and that if you got down to that point, that you would

10   look at the evidence again.  And if you did see something, no

11   matter what it is, and you truly thought it was important

12   enough to spare this man's life, that you would do that and

13   that you would answer Special Issue Number 2 yes and give him

14   a life sentence.

15          Do you feel like you could go through that process

16   and keep an open mind?

17       A.    I do.

18       Q.    Okay.  Now, as we look at mitigating circumstances,

19   those are very personal.  We don't have a list of things

20   we're going to ask you to check boxes on.

21          When you hear that phrase, does anything come to

22   mind right off -- offhand?

23       A.    Maybe not particularly in this particular case, but

24   I think there can be times when a person would commit a crime

25   that they would not normally commit because of another factor

DARLINE W. LABAR, OFFICIAL REPORTER

1    driving them like, you know, I've heard of maybe a man trying

2    to support his family and everything falling apart and as a

3    last ditch effort, he goes out and commits a crime he

4    wouldn't usually do just to try to save his family.

5        Q.    Right.

6        A.    I'm not saying that that would be a murder or

7    whatever, but that's a mitigating circumstance.  Other things

8    going on in the life that force a person to make decision

9    that they wouldn't normally make.

10       Q.    Right.  You know, and again as you see in Special

11   Issue Number 2, you get to look at his background, his

12   character.  Maybe the person you're talking about has never

13   been in trouble before, and, yeah, he has starving children

14   at home and so he goes and steals food and whatever it may be

15   and you'd certainly want to -- not excuse that, but at least

16   maybe lessen his punishment for that.  But you do get to look

17   at the background and character.  You get to look at the

18   circumstances of the offense, why was it was committed.

19   Again, was it out of some sort of necessity.  Is it a crime

20   of passion of some sort.  You get to look at all those

21   things.

22            Let me go through some of the things that jurors

23   have mentioned to me in the past and just get your reaction

24   to those.  Sometimes people tell me that age is a mitigating

25   factor, the thought being that a younger person can more

1    easily rehabilitate himself than an older person.  On the

2    other hand, I've had just as many people tell me, age doesn't

3    matter.  As long as that person is old enough to know what

4    he's doing, to know the consequences of his actions, he still

5    must be held accountable.  I can tell you in the State of

6    Texas you have to be at least 17 years of age before you can

7    be tried for death in the State of Texas.

8            How -- what are your feelings about age?

9        A.    I tend to go more with a younger person, even though

10   they can know what they're doing, they don't have all of

11   life's experiences to draw on that an older person.  And if

12   someone older did that, in my mind there would be probably

13   more of a chance that they might have done something similar

14   in the past, because it wouldn't be just something they woke

15   one day and decided.  I think sometimes younger people don't

16   fully think through the consequences of their actions more

17   than older person.

18       Q.    Yeah.  When you say younger person, what sort of age

19   are you talking about in your mind?

20       A.    In my mind up into the twenties.

21       Q.    Okay.  So teenager, is that the kind of person

22   you're talking about?

23       A.    Teenager, up to 25 or 26, somewhere like that.  I

24   would think -- and I guess I look at that based on the

25   children I have and their ages and the decisions they make

DARLINE W. LABAR, OFFICIAL REPORTER

1    and that kind of stuff.  I don't think that young people of

2    that age always make real adult decisions.

3        Q.    Okay.  Some people have talked about alcohol or drug

4    abuse.  What are your feelings about that?

5        A.    I think it bad.  I think it leads to a lot of things

6    that without those substances would not occur.  I've had

7    personal dealings with that, and at least things that

8    shouldn't happen.

9        Q.    I believe your stepson had had a problem; is that

10   correct?

11       A.    That's correct.

12       Q.    Can you tell me a little bit more about that case?

13       A.    Sure.  He was a driver.  He was 18 years old, and he

14   was driving with I believe two or three other boys in the

15   backseat of the car.  He doesn't live with me.  He lives with

16   his mom in Rowlett.  But he was driving and they had been

17   drinking and they had gone to a Halloween party and coming

18   home from there, he lost control of his car and flipped it

19   and ejected one of his best friends from the backseat of the

20   car resulting in his death.  He was put in jail for I think a

21   month and he was let out on probation and told that if he got

22   picked up again, he would go back longer.  Well, he did.  He

23   did not do something of that nature, but he was horsing

24   around in his truck got stopped and went to spend six more

25   months in jail and that was January through June last year.

1    You know, it's hard -- it's hard to be the parent, step

2    parent, whatever, and watch something like that happen, but I

3    also felt like justice was served because he needs to learn

4    the consequences of his actions and deal with those things.

5    And hopefully he's going to make better choices from here,

6    but it has been close to me.

7         Q.    Right.  Do you think that alcoholism is a disease or

8    drug use is a disease?

9         A.    I do.

10        Q.    Okay.  I believe that you had also mentioned that

11   your husband had gone through an alcohol rehab program?

12        A.    That's correct.

13        Q.    Was that recently?

14        A.    It is.  He's been sober for about -- almost two and

15   a half years.  I've been married to him for almost two

16   years.  He had been sober about six months when we married.

17        Q.    Okay.  If the evidence in this case showed that

18   alcohol or drugs had possibly been used in connection with

19   this offense, would you still be able to be fair and

20   impartial?

21        A.    I think that I would, because I do believe it's a

22   disease.  And I believe that it's something that sometimes

23   people can't quit just because they want to.  It takes a lot

24   higher power than that.

25        Q.    Okay.  Some people have mentioned how a person was

DARLINE W. LABAR, OFFICIAL REPORTER

1    brought up.   Specifically, oh, I've had some people tell me

2    if a person grew up in poverty perhaps, deprived childhood,

3    that might be a mitigating factor.

4              What are your feelings there?

5        A.    I agree with that, but not necessarily poverty

6    because I think a lot of people were raised in poverty that

7    grow up to be very upstanding people and vice versa.

8    Probably that's true with anything, but I think more being

9    raised in violence and being raised subjected to horrible

10   cruel things might give a person more propensity to repeat

11   that kind of behavior.

12       Q.    Okay.   In that regard some people tell me about

13   abuse, if they've been the victim of sexual abuse or mental

14   or physical abuse.   Is that what you're talking about?

15       A.    Yes.

16       Q.    Okay.   Have you ever known anyone who has had that

17   situation occur to them?

18       A.    I really can't think that I have.

19       Q.    Okay.   Do you think that it might be possible that

20   an individual might make that claim falsely against another

21   person?

22       A.    Say that they had been abused by another person?

23       Q.    Yes, ma'am, when it never happened?

24       A.    There are people I'm sure that would do that, but I

25   think of children mostly in that situation and I don't think

1   it's very often that you find a child that would make up a

2   situation like that, unless that child was a little bit

3   mentally ill in the first place.  I mean, I feel like most of

4   those things, they come from somewhere.  The child doesn't

5   dream them up.

6        Q.   Right.  Let me -- let me talk to you for a little

7   bit about some of the legal requirements in this case.  These

8   are principles that will assure Mr. Murphy receives a fair

9   trial.  The first one is the presumption of innocence.  The

10  State of Texas, I believe the Judge has told you, has the

11  burden of proof in this case.  We have to prove Mr. Murphy's

12  guilt beyond a reasonable doubt.  If we fail to do that,

13  then, you know, you're required by law to find him not

14  guilty.  Some people, you know, tell me that's no problem for

15  them.  Some people take a little bit different attitude.

16  They say, well, after all something has to already occur.  I

17  mean, police don't just go out at random and snatch people in

18  the middle of the night and charge them with capital murder.

19  And in this case obviously Mr. Murphy has been arrested of

20  the offense of capital murder, he's been charged with that

21  offense, he's already been indicted by the Dallas County

22  grand jury for the offense, so a number of things have

23  already occurred.

24           And I noted in your questionnaire that you in

25  response to this question, if someone is accused of capital

1    murder, he should have to prove his innocence.  And you

2    agreed with that statement.

3            Can you tell me a little bit more about your

4    feelings there?

5        A.   I think that just because everybody else thinks that

6    someone is guilty of something, until you've heard all sides,

7    you really can't reach that verdict.  And I think that, you

8    know, all the facts have to come out.  And I think the person

9    being accused has every right to be able to let all those

10   facts come out and everybody to weigh that out and make a

11   decision from there, because it's their life that you're

12   talking about.

13       Q.   And I've had people tell me that if they were

14   accused of capital murder, that they would certainly want to

15   get up there on the witness stand and tell their story if

16   they were innocent.  They can't imagine why someone would not

17   testify.  And I see you kind of shaking -- you're nodding

18   your head too.

19           Is that kind of the way you feel, too?

20       A.   Definitely.

21       Q.   In this case one of the rights that Mr. Murphy has

22   is the right to remain silent.  The Judge would tell you if

23   he doesn't testify that you cannot consider that for any

24   reason, couldn't hold that against him.  And again, some

25   people have said, that's fine, they can follow the law.  And

1   I've had other people tell me they don't know if they would

2   be able to do that.  Again, you know, if they were there,

3   they would want to testify.  They can't imagine why someone

4   else would not testify.  And I've had people say that's just

5   something that's going to be very difficult for me to put out

6   of my mind if I go back there on a charge such as this one.

7   If the defendant does not testify, that's something I'm going

8   to be thinking about, I'm going to wonder about.  And it

9   might influence the way I look at the State's evidence.  It

10  may influence me with how strong I think the State's case

11  is.

12          How do you honestly feel about that, Ms. Shelton?

13          A.    I think it would make it difficult because you're

14  not going to hear his side and, you know, it's going to be

15  everybody else's words and not his words.  And in a way I

16  would wonder why would a person, if they were innocent, not

17  want to speak up on behalf of their own innocence.  But, you

18  know, I guess I'd have to kind of do some soul searching and

19  think about if I were accused of something that I had done,

20  what would I feel at the time, would I be able to talk, would

21  I be emotionally not able to do it or whatever, but I do

22  think it would be difficult to not be able to hear that

23  input.

24          Q.    Okay.  Let me go through another -- another area

25  with you then, and that deals with the proof in this case.

1  The State has to prove all the elements of the indictment

2  beyond a reasonable doubt.

3          Now, in this case that means I've got to prove a

4  number of things.  I have to prove that this individual over

5  here is the person who did the killing, how he did the

6  killing, and I've got to show that it occurred during a

7  robbery or kidnapping.  There's a number of other things I've

8  got to prove.  I've got to prove that it happened on or about

9  a certain date, and I have to prove that it happened in

10  Dallas County, Texas.  And I want to give you an example, and

11  these examples are not meant to imply that this is what's

12  going to happen in this case.  It's simply to illustrate the

13  law in this case.

14          Let's say that you had a case such as this, a

15  capital murder case, and let's just -- let's say that I'm the

16  defendant.  Let's say that I go out and I decide one day

17  that -- maybe I just have a hatred toward children.  And I

18  go out and I intentionally pick out a child care facility

19  where there are a hundred small children and I decide that

20  I'm going to fire bomb that facility and I do that and I do

21  that with the hope that every child in there will die.  No

22  one sees me.  I get away scot-free, but let's say that, oh, a

23  few days later the police stop me for some -- for some reason

24  and I begin to talk about the issue.  Maybe I'm just starting

25  to brag and I'm going to tell somebody what I did.  I'm

1    feeling so good about it.  And they take me down to the

2    station, and let's say that in the course of that

3    conversation I say I'll give you a written statement.  Now,

4    if you keep up with these police shows and lawyer shows, you

5    know, there's certain warnings that have to be given on a

6    case such as that.

7            Let's say that the officer forgets to give me one of

8    the four warnings necessary.  He forgets to tell me that I

9    have a right to remain silent.  Now, I didn't want to remain

10   silent.  I wanted to talk.  I mean, I was bragging.  I was

11   happy that he would know about that situation.  Well, he

12   takes my statement.  I get arrested.  I get charged.  I get

13   indicted, and I'm brought to trial.  The detective is up

14   there on the witness stand talking about it, and he honestly

15   says on questioning, you know, I don't remember giving him

16   that particular warning.  I didn't really see a need to.  I

17   mean, after all, he wanted to talk to me anyway.  I couldn't

18   stop him even if I wanted to.  Well, the Judge in that kind

19   of case would tell you that if all the warnings were not

20   given, you'd have to disregard that statement.

21           Now, the fact of the matter would be in that case

22   let's say that confession gives details that only the killer

23   would know.  You don't have any doubt in your mind that I

24   have done exactly that.  Maybe in the statement I've even

25   gone so far as to say if I get another chance, if I ever get

1    free again, I'm going to the nearest child care center and

2    I'll do it again until they stop me.  You go back to that

3    jury room, you got 11 other people back there saying we're

4    not about to let a dangerous individual like that run free

5    and kill children in this county.  The Judge has told you

6    you've got to throw that statement out.  The other 11 are

7    saying we don't really care because there is no way if we

8    throw that statement out, there is no other evidence, that

9    man is going to go free.  And I've had people tell me that

10   their conscience simply would not allow them to do that.  It

11   just simply violates their conscience to the degree that they

12   don't believe they can follow that law and let a dangerous

13   man walk out of this courthouse and perhaps kill again.  I've

14   had other people say they could.  Again, the situation would

15   be in that case if you follow the law, I walk free, I go out,

16   I can possibly do it again.  And, you know, it's just a

17   situation where everyone's conscience and belief systems are

18   a bit different.

19          Can you tell me what your feelings are about that

20   situation, Ms. Shelton?

21   A.    I probably would have a real hard time being able to

22   not find you guilty based on everything you just told me, and

23   I guess that enters into where the law comes in and what you

24   have to do because the law says it.  But, you know, of

25   course, you're playing on my emotion, too, of children and if

1    I thought you had a strong propensity to go out and kill

2    kids, I wouldn't want you to be back on the street to do it

3    again.

4         Q.    Okay.   Same thing, I guess, if I told you that I had

5    prove it happened in Dallas County.   Let's say for whatever

6    reason the child care center was in Tarrant County or Kaufman

7    County and the case was wrongly filed in Dallas County.   Or

8    maybe it was in Dallas County, but the prosecutor just didn't

9    ask the right question to prove that.   You have the same kind

10   of dilemma there where you know good and well I'm as guilty

11   as I can be.   There is no doubt about my guilt in your mind.

12   And yet because the State of Texas failed to ask one

13   question, you see, it's another one of these loophole

14   technicality kind of situations that most people tell us

15   about where they say, you know, I know what the law is going

16   to require me to do, go back there and say not guilty because

17   I didn't prove Dallas County.   Well, everybody knew it was in

18   Dallas County.   That's crazy.   Or what does it matter that it

19   was over here in Tarrant County.   You've still got a very

20   dangerous individual.   That's just one of those situations

21   where my conscience and my beliefs come in conflict with the

22   law where I don't feel that I can -- I can follow that law.

23   So you haven't taken an oath yet to follow the law in this

24   case.   All you've done is take an oath to tell us the truth,

25   and I appreciate the fact that you have.   We're not going to

1    put you in a situation in a case such as this where you're

2    going to be forced to violate your conscience.  No one wants

3    to do that.  In that kind of case where the State proves

4    everything necessary to show you that again I'm a very

5    dangerous individual, I've committed a capital murder, you

6    know what the truth truly is.  If they fail to prove it

7    happened in Dallas County, Texas, are you going to be able to

8    really say not guilty and watch me walk out of the courtroom,

9    or do you feel like it's another situation where you're just

10   going to have a very difficult time of actually doing that?

11       A.   I'm probably going have a difficult time.  The one

12   thing I would be concerned about I guess is if that hasn't

13   been done in the appropriate way, were there any other parts

14   of it that might have been done wrong, too, which can put

15   doubt in your mind that might not have been there otherwise.

16   If that makes sense.

17       Q.   Yes, ma'am, it does.  Ms. Shelton, I think that's my

18   time.  I appreciate your time this afternoon.  More

19   importantly, I appreciate your honesty in answering my

20   questions.

21            THE COURT:  Ms. Shelton, do you want to take a

22   break before we continue with the defense?

23            VENIREPERSON:  No.

24            THE COURT:  You're only halfway through.

25            VENIREPERSON:  Okay.  That's fine.  I'll

Page 52

1    stay.

2                        THE COURT:  You ready?  Okay.  You need to

3    take a stretch break or rest room break?

4                        VENIREPERSON:  No, I'm fine.  I've never done

5    this before, so I didn't know what I was doing.

6                        THE COURT:  We understand.

7              Mr. Byck.

8                   MR. BYCK:  Thank you, Your Honor.

9                            Cross-Examination

10   By Mr. Byck:

11       Q.   Ms. Shelton, I just have a couple of very brief

12   questions for you, ma'am.

13                   You stated on page 13 of your questionnaire that it

14   would be somewhat difficult making some child care

15   arrangements in the afternoon.  As the Judge has told you, we

16   expect this case to go from five to eight working days, and

17   that -- those are usually I guess from 8 o'clock in the

18   morning to 4:30, 5 o'clock in the afternoon.  The problem

19   comes, ma'am, when the jury goes back to deliberate.  It will

20   do that on at least one occasion and perhaps two.  On those

21   occasions it's totally in the jury's hands.  If the jury

22   wants to sit back there and yell and scream at each for 36

23   hours in a row, they get to do that and we have absolutely no

24   say about what they do while they're deliberating.

25                   Is this something that's going to be of a concern to

1   you in this situation if you were to be on a jury?

2       A.    It's a concern to me, but it's not something that I

3   can't work with.  If I have the notice to take care of the

4   child care, it's something that I can arrange and make good

5   arrangements for my son, but it is a concern.

6       Q.    Okay.  Mr. Davis asked you a couple of questions

7   about technicalities.  And very frankly, you know, what is

8   one person's technicality is another person's constitutional

9   safe guard.  And while different people feel different

10  thoughts about them, and any thought is okay, believe me,

11  it's your opinion, not everybody can go along with that kind

12  of a situation.  I thought I heard you to answer Mr. Davis

13  one way, but I just want to make sure about it.

14          We were talking about -- or Mr. Davis was talking

15  about the situation where he's an arsonist.  And let me use

16  my name instead of his, because if I do, I'll get it all

17  confused and we'll be here all afternoon.

18          If I'm an arsonist and I go out and I burn down a

19  school and I get apprehended.  I come back and the police

20  want to talk to me.  In order for them to use any statement

21  that I give them, they have to give you what is known as the

22  Miranda warnings.  And the Miranda warnings, I'm sure you've

23  heard them a million times, but they're you have the right to

24  remain silent; if you choose not to remain silent, you have

25  the right to have an attorney to be with you during

DARLINE W. LABAR, OFFICIAL REPORTER

1    questioning; if you are too poor to afford an attorney, we'll

2    appoint one for you; and finally, you have the right to

3    terminate the questions.

4         Well, let's say I'm taking over Mr. Davis's role as

5    the arsonist.  And I have listened to these officers and I

6    want to talk to them and they're telling me that I have the

7    right to remain silent and I have the right to have an

8    attorney and I say I don't want to remain silent and I don't

9    want to have an attorney.  And they say if you're too poor,

10   we'll appoint an attorney.  And I say don't be calling me

11   poor, I've got plenty of money to hire an attorney.  Well, we

12   never get to the point where they say you have the right to

13   terminate the interview.  I never wanted to terminate the

14   interview.  I want to talk.  I want to tell you about it, you

15   know, the great fun I have burning down schools and killing

16   little children because I'm a sick puppy, ma'am.

17        Now, I'm going to go a couple of steps further.  You

18   believe that I was given three of the four warnings.  You

19   also believe that I was not given the fourth warning.  You

20   believe that I did the crime.  You believe that because I

21   told the police that I used a special concoction, my special

22   school concoction I call it.  And they brought a chemist in

23   who after the building had cooled off was able to collect

24   some samples and do some chemicals tests and say, yes, the

25   accelerate used to start this fire was chemicals X, Y, and Z

1   about -- only about which I knew and only about which I was

2   the one that told.  Okay.  You also know there's a couple of

3   other things about me.  That is while during my trial I was

4   up in jail starting fires.  And you knew about that because

5   the State brought a couple of jail inmates down who were just

6   absolutely terrified about going to sleep at night with me

7   anywhere on the floor.  And they also had something else to

8   tell you, too.  They said, you know, Ms. Shelton, and ladies

9   and gentlemen of the jury -- of course, they couldn't address

10  you personally.  But they said while Mr. Byck was upstairs,

11  he was asking us questions like what kind of schools do you

12  have in your neighborhoods, are they brick schools or are

13  they wooden schools, are they in good repair, any fire

14  hydrants near them because I've obviously got something in

15  mind.  Okay.  You come down here and the Judge says that

16  y'all have to believe beyond a reasonable doubt all four of

17  those warnings were given.  You know beyond a reasonable

18  doubt three of them were.  You know also that the fourth one

19  was not.  You know what kind of person I am from what I've

20  been doing up in jail.  You know what kind of person I want

21  to be from what I've been asking the other jail inmates up

22  there.  And you get back, you're the last juror out of the

23  box and you get back into jury room and before you even have

24  a chance to go through that door, the bailiff shuts the door

25  behind you and you're in the jury room and all 11 members of

1    the jury turn as one person on you and say, Ms. Shelton, we

2    got to get this guy off the streets.  This guy is really,

3    really dangerous.  I have kids.  You have kids.  We can't let

4    him out there anymore.  Now, the Judge has given us some

5    story about some little technicality.  And it was a

6    technicality, Ms. Shelton, that he didn't even ask for.  He

7    could have asked for it at any time.  As a matter of fact, he

8    sort of asked against it.  He sort of said, no, I don't want

9    to stop talking.  Maybe there's a piece of evidence in there

10   where somebody said, hey, you want a break for five minutes

11   and get a cup of coffee or Coca-Cola and I said, no, I want

12   to keep on talking.  So you go back there and they say, Ms.

13   Shelton, the 11 other of us have decided we're going to vote

14   him guilty because we cannot in good conscience let him out

15   the door and into the streets, can't do it.

16           Would you go along with them, vote me guilty?

17       A.   Oh, gosh, that's a hard question.  I guess --

18       Q.   I thought you answered Mr. Davis that, yes, you

19   would --

20       A.   I would, but, you know, if you said do you believe

21   we didn't give us -- we didn't give this one piece of

22   evidence or we didn't ask this one thing of him that we were

23   supposed to, do you believe that, and I say, yes, I believe

24   you forgot to do that and you did not provide him that right,

25   and then you say do you believe, you know, he should be

1    locked up, yes, I do.  But if one negates the other one, then

2    I'm going to have to go with what the law says.  If that

3    makes any sense.  I mean, my heart is still going to be

4    thinking the same as the jurors are thinking, he needs to be

5    locked up.

6         Q.   It does.  It does make some sense, ma'am.  And it's

7    a very difficult decision.  And I appreciate that.  I thought

8    I heard you answer one way, but now I've heard you answer

9    another.  And you are telling me that you would be compelled

10   personally, ethically, morally, whatever, to follow the

11   Judge's instructions, even though you knew if you voted not

12   guilty, I could never be tried again.  And while you and I

13   went down in the elevator, you are going out to your car, I

14   was going across the street to 7-Eleven to get myself a

15   couple of disposable lighters, you could still vote me not

16   guilty in that situation?

17        A.   If I thought you were going to be able to walk free,

18   I couldn't.  If I thought you were going to get life in

19   prison, there would be some comfort there knowing that you

20   weren't out on the street.

21        Q.   Well, let's go back a little bit.  Let's make sure

22   we get your -- we get you clear in this situation.  The

23   situation that I set up with the confession and only I knew

24   what was going on and the three warnings, all go to the point

25   that the only evidence there is against me is that

```
 1    confession.  Nobody saw me do it.  They didn't find any
 2    fingerprints.  They didn't find my magic potion in the back
 3    of my car, in my living room, or anything like that.  I made
 4    no other statements to anybody.  No one else can convict me
 5    of that crime.  There is no other evidence to that crime
 6    except my confession.
 7                  THE COURT:  This is in the guilt/innocence
 8    phase of the trial, not the penalty phase, Ms. Shelton.
 9        Q.    (By Mr. Byck)  In my confession, in order to even
10    consider my confession, the Judge is going to instruct you,
11    you have to believe beyond a reasonable doubt that all four
12    of those warnings were given.  And they weren't.  Three of
13    them weren't, and I didn't want the other one.  But we also
14    have the problem of what you're afraid that I'm going to do
15    if I am found not guilty, because remember, if there is no
16    evidence, I have to be found not guilty.  If I'm found not
17    guilty, I can never be tried for that offense again.  So in
18    other, you words -- I don't want to say this in exactly this
19    way, but you and that jury have given me a shot at another
20    free school.
21                  Now, it's a -- this is a very difficult question.
22    It's a very hard one, and believe me, I understand.  I
23    understand it is.  In that situation where that confession
24    was the only evidence, in that situation where you knew I was
25    going to go free unless you used that confession, in that
```

1    situation with the other 11 members of the jury said, Ms.

2    Shelton, we can't let him go, we just can't do it.  We all

3    live here.  What would you do?

4        A.    Gosh, like I said, I would more want to say that you

5    were guilty, but I could not say to a Judge I believe the

6    fourth one was given when I knew it had not because I can't

7    lie.

8        Q.    Well, that's exactly right.  But on the other hand,

9    you are not asked for a specific verdict like that.  You are

10   only asked for a verdict of is he guilty, is he not guilty.

11   You would never be asked that technical question of whether

12   you believed three out of the four or whether you found that

13   as a fact or whatever.  So if you didn't have to answer that

14   specific question, but you just had to answer innocent or

15   guilty, what would you do?

16       A.    I'd probably have to go with guilty.

17       Q.    Okay.  That's fair enough, ma'am.  We appreciate

18   that.

19             MR. BYCK:  Thank you, Your Honor.  That

20   concludes my questioning.

21             THE COURT:  You would not be able to follow

22   the Court's instructions and disregard the confession and let

23   this arsonist or future arsonist go?

24             VENIREPERSON:  It's hard to say.  I don't

25   think that I could, though, based on all of that, based on

```
 1   hearing him say he's going to go out and do it again.  What
 2   if it's my kid's school next?
 3                    THE COURT:  That's right.
 4                    VENIREPERSON:  You know, I -- so I don't --
 5   you know, I don't.
 6                    THE COURT:  Sheriff, you may excuse Ms.
 7   Shelton.
 8                    (Venireperson excused from courtroom.)
 9                    THE COURT:  Mr. Davis.
10                    (State challenge for cause - Ms. Shelton)
11                    MR. DAVIS:  The State submits the juror for
12   cause.
13                    (Challenge for Cause Granted)
14                    THE COURT:  State's challenge is granted.
15                    MS. MILLER:  The next two, Mr. Hiller and Ms.
16   Morton, both said that they have served on criminal juries in
17   the past, but we do not have any juror evaluations on either
18   one of them.
19                    THE COURT:  Thank you.  Do you so note, Ms.
20   Balido?
21                    MS. BALIDO:  Yes, Your Honor.
22                    THE COURT:  Annette Morton is next, I believe.
23                    (Venireperson brought into courtroom.)
24                    THE COURT:  Ms. Morton, welcome back.
25                    VENIREPERSON:  Hi.
```

1              THE COURT:  How are you?  Ms. Morton, may I

2    ask you to raise your right hand and again be sworn in,

3    please?

4              (Venireperson additionally sworn.)

5              VENIREPERSON:  I so swear.

6              THE COURT:  Thank you.  You may lower your

7    hand, Ms. Morton.

8         Let me reintroduce the individuals whom we see

9    seated at counsel table.  We have a couple of vacancies, and

10   I'll introduce their vacant seats and who I anticipate that

11   they will be coming before you leave us this afternoon.

12        Beginning first to the left, Ms. Morton, we begin

13   with lead prosecutor for the State, Senior Prosecutor in the

14   Dallas District Attorneys office at the present time, the

15   Honorable Greg Davis.

16             MR. DAVIS:  Good afternoon.

17             THE COURT:  He, I anticipate, will be joined

18   shortly by co-counsel, the Chief Prosecutor assigned to this

19   court by Dallas District Attorney Bill Hill.  Mr. Davis's

20   co-counsel is the Honorable Mary Miller.

21        Moving on to the next table, we begin first with one

22   of the three defense attorney, the Honorable Jennifer Balido.

23             MS. BALIDO:  Good afternoon.

24             VENIREPERSON:  Hi.

25             THE COURT:  Seated next to Ms. Balido is her

```
 1    client, the accused, the defendant, Mr. Jedidiah Isaac
 2    Murphy.
 3                THE DEFENDANT:   Good afternoon.
 4                VENIREPERSON:  Hello.
 5                THE COURT:  Anticipate that Ms. Balido will be
 6    joined momentarily by one of her co-counsels, the Honorable
 7    Michael Byck, and may well in addition be joined by the third
 8    and remaining attorney on behalf of the defense, the
 9    Honorable Jane Little.
10           Ms. Miller from the District Attorneys Office --
11                MS. MILLER:  Hi.
12                THE COURT:  -- has just walked in and has
13    joined Mr. Davis at the prosecutor's table.
14           Ready to begin?
15                VENIREPERSON:  Sure.
16                THE COURT:  You will know before you leave us
17    within an hour or so whether or not you remain under
18    consideration as a juror in this case.
19           We'll begin again with the Honorable Greg Davis.
20           Mr. Davis.
21                MR. DAVIS:  Thank you.  May it please the
22    Court.
23                        ANNETTE MORTON
24    was called as a venireperson by the Court and, after having
25    been first duly sworn, was questioned as follows:
```

<u>Voir Dire Examination</u>

By Mr. Davis:

    Q.   Good afternoon again, Ms. Morton.  How are you?

    A.   I'm just fine.

    Q.   Good.  Ms. Morton, for the next 30 minutes or so I'll have a chance to speak with you about some of the issues in this case.  One thing I want to say to you is there are no right or wrong answers this afternoon.  We're not going to grade your papers.  Most of the questions that I'll ask you today deal with how you feel about something, what your opinions are.  I've done enough of these to know that everyone has differing opinions.  So as long as we know how you honestly feel, that's all that we expect.  Okay?

        Ms. Morton, I want to take you back to the time that you came up on the jury panel and Judge Entz told you that we were seeking the death penalty against Mr. Murphy down here. Do you remember what your first reaction to that was?

    A.   Trepidation.

    Q.   Uh-huh.

    A.   I've never served on such a jury and so that --

    Q.   Just because of the nature of the case, the seriousness of the case?

    A.   The seriousness of the verdict.

    Q.   Uh-huh.  Right.

    A.   And therefore the seriousness of the case.

1      Q.   Right.  You've had a little bit of time, I guess, to

2   think about your possible service on this case.  I know that

3   some jurors have told me that while they're in favor of the

4   death penalty, they're not sure that they could personally

5   take part in a case such as this one.  If necessary, take a

6   pen in hand, sign a verdict form that would require Judge

7   Entz to impose a sentence of death on Mr. Murphy.  As you

8   know, in the State of Texas executions happen on a regular

9   basis, so I think it's only fair to assume that if a death

10  sentence is handed down in this case, it will be carried out

11  at some date in the future.

12          Ms. Morton, if you would, could you tell me how

13  you -- how you honestly feel about taking part in this

14  particular case where you may be required to return a verdict

15  that results in the eventual death of this individual down

16  here?

17     A.   I -- I would not choose that that would happen.  I

18  would -- and the reason I'm here is because I feel it's a

19  duty for me as a citizen of the United States to participate

20  in the legal system.  I would not relish it.  If I were

21  selected, I would do the best I could --

22     Q.   Uh-huh.

23     A.   -- according to the legal ramifications and

24  following whatever guidelines I was given.

25     Q.   Okay.

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Do I want to do this?  Probably not.

2    Q.   Okay.  Here is what I would expect from jurors on

3    this case.  First of all, if I prove Mr. Murphy's guilt

4    beyond a reasonable doubt, if I meet my standard of proof in

5    this case, I would expect a jury to vote guilty, knowing that

6    they've now taken one step closer to a possible death

7    sentence.

8         If I proved this man's guilt beyond a reasonable

9    doubt, could you and would you find him guilty?

10   A.   Yes.

11   Q.   Okay.  If I proved to you beyond a reasonable doubt

12   that Special Issue Number 1 should be answered yes, would you

13   answer it yes?

14   A.   Yes.

15   Q.   If you looked at all the evidence on Special Issue

16   Number 2 and decided after you looked at all the evidence

17   that there were no sufficient mitigating circumstances, could

18   you answer it no at that point knowing that a death sentence

19   would be imposed on Mr. Murphy?

20   A.   No.  I would follow whatever the guideline was.

21   Q.   Okay.  So if you looked at all the evidence and you

22   said I don't believe there are any sufficient mitigating

23   circumstances to change death to life, you'd answer no.  If

24   you felt like there were mitigating circumstances, you'd

25   answer it yes; is that correct?

1      A.    Yes.

2      Q.    Okay.  Ms. Morton, can you tell me why you're in

3   favor of the death penalty?

4      A.    Because I think there are crimes against society

5   that deserve the death penalty.

6      Q.    Can you give me an example of a type of crime that

7   you think would fit into that category?

8      A.    I believe the Oklahoma City bombing is one of those

9   such crimes.

10      Q.    Uh-huh.  Right.  Any other cases perhaps that you've

11   heard about in the media beside the Timothy McVeigh case?

12      A.    No, I really haven't.  I don't read the newspaper

13   very often.

14      Q.    Okay.  In this case what we've done is we've alleged

15   that this is a capital murder because it's an intentional

16   murder committed during the course of a robbery or a

17   kidnapping.  So it's actually an intentional murder plus

18   another felony offense.  Now, without going into the specific

19   facts of the case, do you feel like this is the type of case

20   where a death penalty might be warranted, depending on the

21   facts that you heard?

22      A.    I really have no idea.  I think it really would

23   depend.  Personally it would depend on the facts of the case.

24      Q.    Okay.  Let me -- let me tell you, I'm not permitted

25   to go into the specific facts with you.  Obviously, we want

1    you to wait until you hear all the facts from the jury box

2    over here.  But I am entitled to ask you this question.  If

3    the evidence in this case showed that the victim, Bertie

4    Cunningham, was an 80-year-old woman, do you feel like you

5    could remain objective and fair to both sides, or do you

6    think that might affect your ability to be fair and

7    impartial?

8         A.    I think I would be as fair and objective as I

9    could.  I don't think a person's age would make a difference.

10        Q.    Ms. Morton, have you ever known anyone who's used

11   illegal drugs?

12        A.    No.

13        Q.    Okay.  Do you have any sense of how cocaine or

14   heroin or LSD or speed might affect an individual's brain?

15        A.    No, other than typical television shows, movies,

16   that kind of thing.  So I don't have any firsthand experience

17   either personally or from a medical relationship or anything

18   like that.

19        Q.    Do you think that it's possible that there may be

20   people in Dallas County, Texas, today who are capable of

21   going out and intentionally killing another human being just

22   to get their property from them?

23        A.    Yes.

24        Q.    Do you think it's possible that people could do

25   that, intentionally kill to rob a person and then walk away

DARLINE W. LABAR, OFFICIAL REPORTER

1  and have absolutely no feeling at all about having done that?

2      A.   Yes.

3      Q.   Let me talk to you a bit more about these special

4  issues, Ms. Morton.  Special Issue Number 1 and 2, remember

5  you've already found the defendant guilty of capital murder

6  before you get these two special issues.  All right.  We've

7  already found the individual guilty.  We've also gone through

8  a punishment phase.  Punishment phase is a little bit

9  different from the guilt/innocence phase because some types

10 of evidence may now become admissible in the punishment phase

11 that were not admissible at the first part of the trial.

12 Generally that deals with the defendant's background and his

13 character, criminal convictions, commissions of other bad

14 acts or other crimes.  Those sorts of things become

15 admissible.  If they are available, then the State can tell

16 you about that at the second part of the trial.  Then we come

17 to the special issues.

18     Ms. Morton, as you look at Special Issue Number 1,

19 can you think -- without regard to any legal rules or rules

20 of evidence, can you tell me what sort of things you would

21 like to hear about in order to answer Special Issue Number 1?

22     A.   I would probably want to know if there were a

23 history of criminal acts of violence in the past, how long

24 the history had been, the kinds of crimes committed, and

25 perhaps the potential for that continuing to occur.

1    Q.    Uh-huh.  Okay.  A lot of people have told me the

2    very same thing.  Among other things, you'd also be able to

3    see has he been through the criminal justice system before.

4    Has the system tried to help him in the past.  Have we tried

5    to rehabilitate him.  What was his reaction.  Did he agree to

6    the rehabilitation, or did he say I don't want any part of it

7    for instance.  You get to hear all those sorts of things.

8          The other thing you'd be entitled to look at would

9    be the circumstances of the offense itself.  Why was it

10   really committed.  Who was it committed against.  How was it

11   committed.  You know, you could have all sorts of

12   situations.  Maybe it's been a long-standing relationship

13   that went sour for whatever reason and an individual gets

14   killed.  It could be a stranger-on-stranger, very random kind

15   of selection process for a victim.  And I've told you the age

16   of the victim in this case.  How was it committed.  Again,

17   what was his reaction after he committed it.  You may have a

18   situation where somebody is instantly remorseful for what

19   they've done.  They stay at the scene.  They call the

20   police.  They cooperate with the police fully.  They answer

21   all the questions honestly.  Or I guess you could have a

22   situation where the person actually runs off or hides or does

23   other things that are inconsistent with the feeling of

24   remorse.

25          Do you feel like those sorts of things might also be

1    helpful to you in answering Special Issue Number 1?

2        A.   I think it would be helpful.

3        Q.   Ms. Morton, looking at a few of these words in

4    Special Issue Number 1, they don't have legal definitions.

5    We're going to rely upon your definitions of these words.

6    And so I want to go through some of these with you.

7             The first word is probability.  The legislature gave

8    us that word.  I guess they could have picked something on

9    the extreme if they wanted to.  They could have forced the

10   State to prove to an absolute certainty that this person

11   would commit criminal acts of violence in the future.  The

12   burden is not that high.  They could have gone very low and

13   said, State, all you have to show is there's a chance or mere

14   possibility that the defendant would commit criminal acts of

15   violence.  They obviously didn't do that.

16            So would you agree with me that if you look at that

17   and take it on its face, probability does not mean a chance

18   or probability, does it?

19       A.   I agree with you that probability doesn't mean a

20   chance.  It means a probability that it will happen again.

21       Q.   Criminal acts of violence.  Most people tell me that

22   involves other people either actually being harmed in some

23   way or being threatened with harm.  That's different than

24   just a property crime.  If I go out and jimmy the door on an

25   automobile today and steal a radio when no one is around,

1    most people see a distinction.

2           Do you also see that kind of distinction?

3    A.    Yes, I do.

4    Q.    Finally, the word "society."  That means everyone.

5    It means people like you and I that live in the free world,

6    but if you'll remember, Judge Entz has already told you a

7    capital life sentence means a 40-year period before you

8    become eligible for parole.

9           So can you see how prison can also be part of

10   society?

11   A.    I hadn't thought about it --

12   Q.    Uh-huh.

13   A.    -- but I presume that it could be a part of society,

14   yes.

15   Q.    If you think of society as being anywhere the

16   defendant may find himself to be or anyone he may come in

17   contact with, can you see how both prison and the free world

18   could be part of society?

19   A.    I believe it's a part of society.  I think it's a

20   different kind of part of society.  Obviously, the freedoms

21   you have in the non-prison society are quite a bit different

22   than prison.

23   Q.    I like to ask, do you think that people in a prison

24   should be free from violence?  And we're talking even inmates

25   who are serving felony time or guards or secretaries or

1    nurses?  Do you think they have the right to be safe, too?

2        A.    I think they have the right to be safe.

3        Q.    Ms. Morton, I've heard it argued sometimes that

4    society should really mean only prison.  You're entitled to

5    do that if you want to.  Have you heard about the Connally 7,

6    the inmates that escaped from the South Texas prison and came

7    up and murdered the Irving police officer?

8        A.    I heard about that, and I don't know what the

9    disposition of that was, so I'll -- I presume that -- that

10   was just recent so I don't know if they've been -- whoever

11   was finally caught was proven innocent or guilty or --

12       Q.    Right.

13       A.    I've heard of that --

14       Q.    Right.

15       A.    -- incident, obviously.

16       Q.    They haven't come to trial yet.  They're going to

17   start up this summer sometime.  But the point being some of

18   those individuals who were actually serving life sentences at

19   the time that they escaped to come up here to commit that

20   capital murder.

21            Any questions on Special Issue Number 1, Ms. Morton?

22       A.    No.

23       Q.    Feel like you understand what the burden of proof is

24   on that case -- on this special issue?

25       A.    I believe so.

1    Q.    Let's look at Special Issue Number 2 for a little

2    bit.  When you think of the word "sufficient mitigating

3    circumstances," does anything come to mind when you hear that

4    phrase?

5    A.    Unfortunately, I really can't define it.  I can't

6    imagine what circumstance that I would need to hear in order

7    for that to happen, so --

8    Q.    Uh-huh.

9    A.    I'm sorry, I can't think of anything.

10   Q.    Here's the good news.  You don't have to be able to

11   think of one on your own right now.

12   A.    Thank God.

13   Q.    I would hope that you don't sit around your home

14   thinking about mitigating circumstances and the death penalty

15   that much.

16          Let me just go through some things that jurors have

17   mentioned in the past and get your reaction to those.   Okay?

18   Some jurors have told me that age might be a mitigating

19   circumstance, some jurors thinking that a younger person is

20   more capable of being rehabilitated than an older person.

21   I've had just as many people on the other hand tell me that

22   age is not mitigating in their mind because as long as a

23   person is old enough to know what they're doing, to know the

24   consequences of their actions, that that's enough for them.

25   I can tell you in the State of Texas you have to be at least

DARLINE W. LABAR, OFFICIAL REPORTER

1   17 years of age before we can seek the death penalty against

2   you.

3          What are your general feelings about age?

4      A.    In relationship to age for a very young defendant,

5   and I would say that it would be under the age of 17, I think

6   there might be mitigating circumstances, because I'm not sure

7   a person that young would be able to determine the outcome of

8   their actions.

9      Q.    Okay.  We're talking --

10     A.    Once we reach 17, I don't think there's really any

11  difference between 17, 20, 50, 60, age wise.

12     Q.    Fair enough.  Alcohol and drug use.  Some people say

13  that that might be mitigating.  Some people have told me they

14  think it's a disease process, that someone can't help

15  themselves.  Other people say, now, that's a conscious

16  decision.  I've had other people kind of come down the middle

17  and say they'd like to hear all the facts, because perhaps

18  you have someone is not experienced with those items,

19  maybe -- let's take myself.  Let's say that I've never had a

20  drink or never taken drugs before.  I don't know how those

21  substances would act within me, as opposed to maybe I've been

22  a long-term user.  Maybe I've abused them in the past.  Maybe

23  I've even told people that I know exactly how I act when I

24  get drunk or I get high.

25          What are your general feelings there?

```
 1        A.    I -- I would think that if a person had never taken

 2   any controlled substance of any kind, that they would not

 3   know perhaps how they would react.  I think that if they use

 4   alcohol or drug use of some kind for an extended period of

 5   time and there are periods of time when they are not under

 6   the influence --

 7        Q.    Uh-huh.

 8        A.    -- that in fact based upon the consequences of

 9   whatever actions they've taken, they should be able to judge

10   how they act while under the influence of either one of those

11   two.

12        Q.    All right.  Some people tell me they'd like to look

13   at the person's upbringing.  Specifically some people say if

14   there's evidence that person has been sexually abused,

15   physically abused in some way, I'd like to know that.

16             What are your feelings about those types of issues?

17        A.    Obviously, if I were on a jury making this decision,

18   I would want to know everything I could about the individual.

19        Q.    Uh-huh.

20        A.    And -- and their upbringing and any mitigating

21   circumstances that would result from that or result in that.

22        Q.    See, one of your duties as a juror is going to be

23   determine what the facts are in this case.  You get to listen

24   to the witnesses.  You get to determine if you believe them

25   or not.  That might be true of the issue of abuse.  Let's say
```

1    that issue were raised in this case.  Claim that an

2    individual had been sexually abused or physically abused as a

3    child.  You'd have to listen to that evidence.  Determine if

4    you thought the abuse even occurred.  You might conclude

5    after you heard all the evidence that you didn't believe the

6    claim.  Some people have gold me with that regard that maybe

7    they'd like to know just when did it supposedly occur.  When

8    is the first time that person actually made an outcry that

9    he'd been abused.  Who did he tell.  Did he tell consistent

10   or inconsistent stories.  Was there some motivation for his

11   story.  For instance, was he under legal indictment the first

12   time that he started making these claims.

13         Are those the types of things that you might also

14   like to know about, if you have to judge the validity of an

15   abuse claim?

16       A.   I would want to know all of that.  I would hope that

17   I would also have expert opinion, based upon whatever

18   circumstances there were, in order to help me formulate some

19   kind of opinion because I'm not an expert on anything of that

20   nature.

21       Q.   Maybe for instance a doctor who had examined the

22   person looking for signs of abuse?

23       A.   Absolutely.

24       Q.   Finally, some jurors tell me about remorse again.

25   That the person's actually expressed sorrow for what he's

1    done, if it's genuine.  I've had some people tell me that's

2    something they may want to take into account.  I've had other

3    people say that's too bad, you know, whatever you've done

4    later is -- that's really not relevant.

5              What are your feelings about that?

6         A.   Obviously, I would listen to that and consider it as

7    a factor and -- it would be one of the other factors that I

8    would be asked to consider.

9         Q.   You know, with regards to Special Issue Number 1 and

10   Number 2, sometimes jurors tell me they may want to look at

11   how that person -- the defendant has been acting in the

12   county jail awaiting trial.  Obviously, if he's been acting

13   well, perhaps that might be used in his favor on Special

14   Issue Number 1 or Number 2.

15             Just using your common sense for a moment, Ms.

16   Morton, how do you think an individual would probably act in

17   the Dallas County Jail awaiting trial for capital murder

18   knowing that his behavior could be used for or against him in

19   Special Issues 1 and 2?

20        A.   Well, I think it would behoove anyone that was in a

21   situation to behave in whatever manner that they thought

22   appropriate and -- if they could in order to -- to have the

23   end result as being beneficial to that person of whatever

24   crime they were accused of.

25        Q.   Ms. Morton, I know that you had indicated in your

1    questionnaire that you had sat on a jury before, a drug case;

2    is that right?

3         A.    Yes, I had.   It was a sentencing jury.

4         Q.    All right.   So had the defendant entered a plea of

5    guilty then, and then you were asked as a jury to sentence

6    him?

7         A.    Either the person entered a guilty plea or was found

8    guilty by -- in a different jury setting.   I simply was on

9    the sentencing, and I don't remember frankly.

10        Q.    Okay.   I think you indicated that the sentence you

11   thought was a 25-year sentence; is that right?

12        A.    I believe so.   I just don't remember.   It was

13   several -- four, five years ago or so.

14        Q.    Was there anything about your service on that case

15   that you think would affect your ability to sit on this type

16   of case?

17        A.    Not that I know of.

18        Q.    All right.   Let me talk to you for a little bit

19   about -- about some of the -- some of the general principles

20   in this -- this type of case.   First of all, the defendant's

21   presumed to be innocent as he sits here right now.   You have

22   to presume him not guilty of this offense.   The State hasn't

23   proven his guilt beyond a reasonable doubt.

24             Can you assure all us that you will not find this

25   man guilty until the State of Texas proves his guilt beyond a

1    reasonable doubt?  Can you do that?

2         A.    That's absolutely correct, yes.

3         Q.    The law would also say if he chooses not to testify

4    in this case, that fact cannot be held against him.  Everyone

5    has a right to remain silent.

6              Do you feel in this case if he does not testify that

7    you can go back to the juror room and not consider that for

8    any reason?  Could you do that, too?

9         A.    I believe so.

10        Q.    Okay.  You know, some people have said in the past

11   that they're just not sure about that, that they would want

12   to testify themselves if they were on trial.  Some people

13   have said, I would be wondering about why he didn't testify.

14   That may be normal or a natural reaction, but the Judge will

15   instruct you, you simply cannot consider that.

16              Can you put that out of your mind?

17        A.    I believe so.

18        Q.    Another issue that sometimes comes up in a case like

19   this deals with written statements, confessions given by

20   defendants.  And, you know, the law, if you watch these TV

21   shows is that certain warnings have to be given to the

22   suspect before the statement can be taken.  Let's say that

23   you a case, a capital murder case where a person -- let's say

24   myself, went out and I fire bombed a child care center.  And

25   I killed a hundred children in there.  I intended to kill

1    them, too.  I did all of that.  No one saw me.  I got away

2    scot-free.  Somehow two or three days later I come in contact

3    with a police officer.  I get to talking.  I decide I'll just

4    tell him all I know because I'm happy and I'm proud of what I

5    did.  He takes me down.  He sits me down with the detective,

6    and the detective for whatever reason gives me three out of

7    the four necessary warnings.  Maybe he forgot to tell me that

8    I had a right to remain silent.  He didn't have to tell me.

9    I wasn't going to listen anyway.  I wanted to give a

10   statement.  I was in a mood to talk.  Anyway, he takes the

11   statement from me.  I'm arrested, charged, indicted for

12   capital murder.  I come to trial.  Detective gets up there on

13   the witness stand and during his testimony says, honestly, I

14   did not give him that last warning.  I got in a hurry that

15   day.  I did not tell him he had a right to remain silent, and

16   that's my fault.

17          The law in that type of case would be this, unless

18   all of those warnings are given, you can't consider the

19   statement.  In my case there are no other eyewitnesses.

20   There's no other evidence of my guilt.  All you have is my

21   statement.  From the details in that statement, you know it's

22   true.  You know that I did it.  Maybe even in that statement

23   I said I'm proud of what I did and the first moment I get a

24   chance, I'm going to do it again, so watch out.  You go back

25   there to the jury room.  The other 11 people say, you know,

1    we've got a very dangerous man on our hands here.  He's a

2    child killer.  He's going to do it again.  There's no way

3    that we're going to let this guy go free.  The law again

4    would be warnings were not given, the statement has to be

5    tossed aside.  You've got to look at the remaining evidence,

6    Ms. Morton, and there is no other legally admissible evidence

7    available.  The law would require you to find me not guilty,

8    knowing that I'm going to walk right out of that courtroom

9    and I can never be tried for that offense again.

10            Some people frankly have said they can do it.  I've

11   had other people tell me that that just violates their

12   conscience to the degree that there is no way they would want

13   to take part in a process where they let a dangerous man go

14   back out on the street to harm children.

15            What do you do in that situation?

16   A.    To follow the law.

17   Q.    Okay.  Might be difficult, right?

18   A.    You bet.

19   Q.    Okay.  That's the real key down here.  A lot of

20   times we have things that are difficult to do.  And we ask

21   jurors, if necessary, to put aside their feelings and do just

22   that.

23            Let me talk to you about the offense of murder for a

24   moment.  Murder by itself is not a capital offense.  If I

25   intentionally kill another person, maybe someone sitting in

DARLINE W. LABAR, OFFICIAL REPORTER

1    the jury box, I don't like their tie, I shoot them ten times,

2    I laugh about it, brag about it.  As bad as that may be,

3    that's an intentional murder, but it's not a capital murder

4    because there is not something else to go along with that.

5    There's not a robbery or kidnapping or something like that.

6          The law says that I can get anywhere between 5 years

7    up to 99 years or life in the penitentiary, but I can't get

8    death.  To be a qualified juror, you have to have an open

9    mind to the full range of punishment.  And we're talking

10   about an intentional murder here.  We're not talking about

11   self-defense.  I'm not talking about insanity.  I'm not

12   talking about an accident or negligence.  I'm talking about

13   an intentional murder where I intend that someone is going to

14   die and then I do everything necessary to take their life.

15   That's an intentional murder.

16          I've had some people tell me, no problem with the

17   maximum, I can give life for that kind of murder, intentional

18   murder.  But I've had some people tell me they're not sure

19   they could ever give anything as low as 5 years, that just

20   seems like it's just too little for an intentional murder,

21   life is worth too much.

22          Do you feel like an intentional murder case, Ms.

23   Morton, that you could give something as little as 5 years,

24   or do you think that you would set a higher minimum for that

25   type of killing?

1    A.   I personally think a higher minimum would be

2  appropriate.

3    Q.   Okay.  Now, here is the key, I guess.  It would be

4  this.  You know, the law is going to ask you to try to remain

5  open-minded about it.  The law would ask you if you heard a

6  case, an intentional murder case, that you be able to set a

7  5-year sentence if you thought it was proper.  I guess -- I

8  guess the problem comes in that some people tell me, oh, I

9  can do that, but the trouble is if you show me an intentional

10 murder, because of the way I feel about the taking of human

11 life, there's not going to be a case where I think 5 years is

12 a proper sentence.

13        Is that what you're telling me, or are you telling

14 me something different?

15    A.   Well, unless I heard all the facts of any case, I'm

16 not -- I can't tell you that -- that I would choose one

17 number of years over another number of years.

18    Q.   Uh-huh.

19    A.   If the range were 5 to 99, I presume I would look at

20 whatever the circumstances were and determine whether I could

21 set a 5-year sentence for whatever this kind of murder was.

22        THE COURT:  Is your mind not closed to the

23 minimum of 5 years?

24        VENIREPERSON:  No, it's not closed.  Given the

25 example --

1    Q.    (By Mr. Davis)   Yeah, I didn't mean to say that was

2   the only case, because there may be a lot of other -- oh, in

3   that case there, you may think I ought to get life for just

4   senselessly killing a stranger.  And what I was trying to say

5   to you is that the law asks you when you look at an

6   intentional -- and there are a lot of things that could be

7   intentional.  I mean, besides, that's kind of an extreme

8   case.  But I hear you saying you'll look at all the facts,

9   and if the facts tell you that it ought to be a 5-year case,

10   then that's exactly what you're going to do; is that correct?

11    A.    That's correct.

12    Q.    Fair enough.  Ms. Morton, just kind of going through

13   your questionnaire here, are there any things that maybe

14   you've thought about since you answered the questionnaire

15   that you think we need to talk about this afternoon?

16    A.    Well, I think it's the very last question on the

17   form.

18    Q.    All right.  What would that question be?

19    A.    And that would have been do you want to serve on

20   this jury.

21    Q.    I believe you said you thought it was your duty to

22   live in this country, although you wouldn't relish it,

23   correct?

24    A.    That's correct.  And so the word is not want.  The

25   word is will.

1    Q.    Uh-huh --

2    A.    Do I want to serve on this jury?  No.

3    Q.    Okay.

4    A.    But I will --

5              THE COURT:  Do you want to let me in on a

6    little secret?

7              VENIREPERSON:  Yeah.  Nobody probably wants

8    to.

9              THE COURT:  Yeah, they do.

10             VENIREPERSON:  Oh.

11             THE COURT:  Those that want to serve on a

12   capital murder jury, we have reason to think they've got some

13   kind of agenda.  Sometimes more likely than not hidden, but

14   if you had said, boy, I want to be one of the 12, sign me up,

15   I'll be -- start tomorrow morning, huh-uh, huh-uh.

16             VENIREPERSON:  Well, that's the huh-uh for me.

17             THE COURT:  Those people scare us.

18   Q.    (By Mr. Davis)  Yeah, I just tell you, if you had

19   told us that you wanted to be on the jury, I would probably

20   spend my entire 30 minutes trying to find a way to take you

21   off the jury and so would Mr. Byck or Ms. Balido.  That's the

22   honest truth.

23             THE COURT:  That's right.

24   Q.    (By Mr. Davis)  I mean, we really do look for people

25   who say it's not what I choose to do, but I understand my

1   civic duty and I'm not going to shirk my duty.  That's kind

2   of what you're saying.

3       A.   That's exactly what I'm saying.

4       Q.   Let me just ask you, I always like to look at the

5   people that are most respected and least respected.  And you

6   had a couple of interesting pairings I thought.  You had

7   Barbara Jordan and Nancy Reagan as people -- as the women

8   that you most respected.  What are the qualities about those

9   two women?  They seem a bit different on the face of things.

10      A.   Well, actually I think they're both courageous in --

11  perhaps Nancy Reagan more courageous at the end of her public

12  life than during the entire stint.  Certainly supporting a

13  husband and keeping his dignity, I think it's very

14  admirable.  So, and I really couldn't think of names that

15  everyone knew frankly.

16      Q.   Well, the two men that you least respect I think

17  we've all heard of those, Rush Limbaugh and Jerry Springer.

18  That's quite a grouping there.

19      A.   Well, I think they prey upon the marketability of

20  dissent and division.

21      Q.   Just final couple of questions here.  I want to tell

22  you that I want Jedidiah Murphy to receive a fair trial.  I'm

23  very serious about that.  That's why we go over these

24  principles with you.  When we leave this courtroom on the

25  final day, Ms. Morton, I want all of us to be able to walk

1   out of here knowing that the rules were followed.  We're

2   fortunate that Judge Entz is hearing this case.  I've tried a

3   death penalty case with him before.  The rules will be

4   followed here.

5          Do you feel like you can give Jedidiah Murphy a fair

6   trial?

7   A.   If I were selected, I would try to do my best to

8   do -- to follow whatever the rules are, to follow the law.

9   Q.   Note -- I know you said you thought you had heard a

10  newscast about this case; is that right?

11  A.   Yes.

12  Q.   And I know that both sides are probably interested

13  in this.  Let me just ask you.  Do you remember what you

14  heard about this case?

15  A.   I'll tell you what I can remember.  I believe this

16  was an elderly lady who was missing and her daughter or

17  granddaughter appeared on television -- I think it was this

18  case, wondering where she was, and I believe she was found

19  dead in a car.

20  Q.   Uh-huh.

21  A.   That's -- that's what I think I remember hearing,

22  but that's it.

23  Q.   Did you form any opinions at all about the case as a

24  result of what you heard?

25  A.   No.

1      Q.   Okay.  So can we be assured that when you listen to

2   this case, you're really going to be hearing the facts for

3   the first time if you're on this jury, correct?

4      A.   I believe so, for the most part.

5      Q.   Okay.  And I guess the key question is, have you

6   formed any opinion about the guilt or innocence of Jedidiah

7   Murphy based on what you've heard?

8      A.   Actually I have no idea if he was ever involved.  I

9   haven't heard anything.  In fact, the only -- I don't even

10   remember the lady's name, so you've said it several times so

11   I presume that's the right news report.

12      Q.   It's Bertie Cunningham is her name.  Right.

13           Final question is this, can you be fair to the State

14   of Texas because, you know, obviously the State of Texas and

15   the victims in this case are looking for justice also.  If

16   you were sitting where I'm sitting today looking at yourself,

17   would you have any hesitation about your ability to be fair

18   to both sides in this case, including the State?

19      A.   I guess if I were the State, what I would want to

20   know about me is that -- that in order to consider Special

21   Issue 1 and Number 2, that you would have to prove to me that

22   we have gone through and I've answered those questions to I

23   presume the positive.

24      Q.   Ms. Morton, I appreciate your time.  I appreciate

25   your candor with us this afternoon.  Thank you.

```
1                    MR. DAVIS:  Pass the venireperson.

2                    THE COURT:  Need a break before the defense

3    begins their questioning?  Need a stretch break or rest room

4    break, or you want to continue?

5                    VENIREPERSON:  I'd love some water.

6                    THE COURT:  You will have it --

7                    VENIREPERSON:  -- so just five minutes would

8    be fine.

9                    THE COURT:  -- momentarily.

10                   VENIREPERSON:  Okay.

11                   THE COURT:  Ready?

12                   VENIREPERSON:  Ready.

13                   THE COURT:  Ms. Balido.

14                       MS. BALIDO:  May it please the Court.

15                          Cross-Examination

16   By Ms. Balido:

17      Q.   Ms. Morton, my name is Jennifer Balido.  And along

18   with Mr. Byck, we represent the defendant in this case,

19   Jedidiah Isaac Murphy.  Our other co-counsel, Ms. Little, is

20   off with our investigator working on some things involved in

21   this case.

22           And so what I'm going to do is I'm going to ask you

23   some questions in regard to your questionnaire and then also

24   ask you some questions about what you discussed with Mr.

25   Davis.  If you don't understand anything -- or sometimes I
```

1    tend to over talk and make things more complicated than they

2    are, if I do that, please just stop me and we'll try to

3    communicate as well as we can.

4            Let me start off by saying, Ms. Morton, that you

5    being here and the way that you've answered the questions and

6    talking about how you're going to be open-minded and look at

7    all the facts in this case, you are probably dangerously

8    close to being on this jury.  I don't want to say that to

9    scare you or to change your answers.

10   A.    Well, you did.  You scared me, so --

11   Q.    But it's important to know about that and to kind of

12   know where you are in the process just -- just in case there

13   is anything that comes to your mind that would cause you not

14   to believe that you could be fair and impartial in this case.

15           And let me just start off by talking a little bit

16   about the two options that are available for punishment in

17   this case.  Because it kind of brings up something that you

18   talked about on your questionnaire.  It used to be in Texas

19   that the Judge was not allowed and the parties were not

20   allowed to discuss with a juror what, quote, a life sentence

21   meant.  And people would hear horror stories all the time in

22   the news or just by word of mouth that a life sentence could

23   be, you know, 20 years, it could be 10 years, it could be 5

24   years.  You know, no one really knew what a life sentence

25   meant.  So it placed the jurors in death penalty cases kind

1  of in a -- a quandary because their choice in the case was

2  either death by lethal injection, which I think does not need

3  a definition of what that means, or life imprisonment.  And

4  we can't tell what you that means.  And so you're just kind

5  of left to your own imagination what that means.  But

6  thankfully since the courts wouldn't do it, the legislature

7  stepped in and said that the jurors will be told that in a

8  capital murder case where life confinement is the punishment,

9  then life confinement will mean 40 calendar years before the

10  convicted person is eligible for parole and that's just

11  eligible.  I mean, that doesn't mean that he's going to get

12  it, but that just means 40 calendar years day-for-day and --

13  until he's eligible for parole.

14      A.    Uh-huh.

15      Q.    And you mentioned on your questionnaire that one of

16  the biggest problems with the criminal justice system is a

17  juror does not know that the sentence often doesn't reflect

18  the actual time served or will be served.  So I guess my

19  question is to you, when we're talking about capital murder

20  and we're talking about the intentional killing of somebody

21  in the course of committing another offense, in this case

22  robbery or kidnapping, do you think both death by lethal

23  injection and life confinement in prison which means 40

24  calendar years are both appropriate or adequate punishments

25  for that type of crime?

DARLINE W. LABAR,  OFFICIAL REPORTER

Page 92

```
 1        A.    I believe they are the legal definition of the --

 2   the types of punishment I presume if a person is found

 3   guilty, so the minimum is 40 years and the maximum is the

 4   lethal injection.

 5        Q.    Okay.

 6        A.    If that's what your saying.

 7        Q.    Yes --

 8        A.    And it would depend on any mitigating circumstances

 9   whether the range of that would be appropriate up to and

10   including a lethal injection.

11        Q.    Okay.  So basically you can see that in some cases

12   lethal injection might be the proper punishment and in some

13   cases life confinement might be the proper punishment?

14        A.    Yes.

15        Q.    Depending upon the facts?

16        A.    Yes.

17        Q.    Let me go ahead and just talk to you a little bit

18   about -- and focus on a little bit of the guilt/innocence

19   part of this trial.  And Mr. Davis didn't talk very much

20   about the burden of proof in this case.  And the burden of

21   proof in all criminal cases is the State must prove its case,

22   each and every element of its case, beyond a reasonable

23   doubt.  And now we've -- you -- we used to have a definition

24   of what beyond a reasonable doubt meant, but now we don't

25   have one anymore.  And so basically a reasonable doubt is
```

1    something that may be different to every single person

2    sitting in the jury box.  But I can tell you what beyond a

3    reasonable doubt is not end of the law.

4          When people are fighting about money and they're

5    over in the civil courthouse and they're suing each other

6    about money, that -- the party bringing the lawsuit must

7    prove their case by a preponderance of the evidence.  And the

8    law says that's basically about 51 percent.  Okay.  More

9    likely than not is what we talk about.  When the State of

10   Texas through their Child Welfare Section of the Juvenile

11   Department is trying to take your children away from you for

12   whatever reason, they must prove their case by clear and

13   convincing evidence, which is more than 51 percent.

14   Sometimes people say it's about 75 percent.  But when someone

15   is trying to take your liberty and in this case the State of

16   Texas is trying to take the life away from Mr. Murphy, they

17   must prove their case beyond a reasonable doubt which is

18   basically, you know, we don't ask you to place your common

19   sense outside the jury deliberation room.  So it's basically

20   proving to you beyond a reasonable doubt that the case is --

21   that they've proven their case.  And it all kind of ties into

22   the presumption of innocence as well, because the defense

23   (sic) is presumed innocent unless and until the State can

24   prove each and every element of its case beyond a reasonable

25   doubt.  And that becomes important because there are times --

DARLINE W. LABAR, OFFICIAL REPORTER

1    sometimes and it's happened in cases that I tried both as a

2    prosecutor and as a defense lawyer where the State of Texas

3    has proved its case on every element except for one.  Now,

4    just as a -- as a kind of outrageous example -- well, I don't

5    know if it's outrageous, but it does happen sometimes.  If

6    the State proves its case beyond a reasonable doubt, proves

7    every single element of the indictment, except doesn't prove

8    that it happened in Dallas County, Texas, then the Judge will

9    instruct you if you have a reasonable doubt of the element of

10   the offense, you're supposed to find him not guilty.  And

11   sometimes that kind of gets caught in people's throat, these

12   sort of technicalities.

13           How do you feel about that sort of thing?

14       A.   I have one question.

15       Q.   Sure.

16       A.   We were talking about the -- not a reasonable doubt,

17   but preponderance of the evidence and --

18       Q.   Right.

19       A.    -- you were talking about a verdict of lethal

20   injection and the -- the verdict is first guilty and not

21   guilty, right?

22       Q.   Right.

23       A.   And then -- then you weigh lethal injection after in

24   fact there is a guilty verdict?

25       Q.   Yes, that's correct.

```
 1        A.    So the guilty verdict is based upon the

 2   preponderance of evidence.

 3                 THE COURT:   Beyond -- no, beyond a reasonable

 4   doubt.

 5        Q.    (By Ms Balido)   Beyond a reasonable doubt.

 6        A.    Beyond a reasonable doubt.

 7        Q.    Right.

 8        A.    Okay.   Well, then I understand that part of it.

 9        Q.    Okay.

10        A.    Okay.

11                 THE COURT:   If I were suing you for -- we had

12   an automobile accident and I thought that you had -- you were

13   at fault, so I decided I'm going to sue you.   Our insurance

14   company is going to get together so I'm going to sue you.

15   Before I could prevail, before you could be required to pay

16   me, I would have to prove by a preponderance of the evidence

17   that you had caused the accident.

18                 VENIREPERSON:   And --

19                 THE COURT:   Not beyond a reasonable doubt --

20                 VENIREPERSON:   Right.

21                 THE COURT:   -- but just the greater weight of

22   the believable evidence.   If I failed to do that, if it was

23   an unavoidable accident or both of us were equally guilty,

24   boom, I lose.   I lose.

25                 VENIREPERSON:   Right.
```

```
 1              THE COURT:  But if I had more of the

 2   believable evidence than you, I win.  You have more of the

 3   believable evidence, then I -- you win.  Not so in a criminal

 4   case.  Higher standard.  Not a mathematical standard.  Not

 5   the Perry Mason beyond a shadow of a doubt.  Not a hundred

 6   percent certainty, because guess what?  If you were a hundred

 7   percent certain, you would be on the witness list, not as a

 8   prospective fair and impartial juror deciding --

 9              VENIREPERSON:  Right.

10              THE COURT:  -- the case.

11              VENIREPERSON:  Well, I guess what I was trying

12   to say is I understand that.

13        Q.   (By Ms. Balido)  Okay.

14        A.   And I believe I would understand the definition of

15   what -- what I would need to determine to either find guilty

16   or not guilty, number one.  Number two, I don't like

17   technicalities.  I don't like that.

18        Q.   Uh-huh.

19        A.   But I'm a technical person.  And if in fact the law

20   said that someone had to be indicted in the county of --

21   where either the crime or the victim lived or whatever --

22        Q.   Uh-huh?

23        A.   -- and that wasn't the case, then it's the law.

24   It's not the case.  So whether or not I like something or I

25   like technicalities probably doesn't make any difference.
```

1    Q.    Okay.  And so you're saying you could follow the

2    law, and if the Judge instructed you if they didn't prove

3    their case, then find him not guilty even if it was on a

4    technicality?

5    A.    Yes.

6    Q.    Going kind of along with that, if you'll take a look

7    at the indictment that's sitting in front of you, Mr. Murphy

8    is being charged with capital murder and there's a lot of --

9    by the name and the authority of the State of Texas at the

10   very top, but what I'm getting to is kind of down in the meat

11   of the indictment.

12                (Venireperson reads indictment.)

13   A.    Okay.

14   Q.    (By Ms. Balido)  What I'm going to focus on

15   specifically at this point is what we call the mental state

16   which is in this case intentionally.  He's accused of

17   intentionally causing the death of Ms. Cunningham.

18          Now, under the law there are many different ways

19   that a homicide can take place, causing the death of someone

20   can take place.  It can either be through criminal negligence

21   where somebody should have appreciated the risk but didn't.

22   There can be also by accident and that sort of thing.

23   Knowingly can also be a mental state where someone might know

24   that what they were doing was wrong and can hurt somebody,

25   but did it anyway.

1          And what we're talking about here is we're talking

2     about the specific intent to kill someone, intentionally

3     cause the death of someone.  And that is the type of mental

4     state the State has to prove beyond a reasonable doubt that

5     Mr. Murphy had before you can find him guilty of this

6     offense.

7          Let me just kind of give you an example.  Say I'm

8     tired of Mr. Byck bothering me and writing notes to me all

9     the time.  He's just driving me crazy.  So I go out and I buy

10    a gun, and I buy bullets at a different store.  I sneak it in

11    downstairs, and that's not too hard to do in this building.

12    And I get in here and he just pushes me to the edge just one

13    too many times by writing me a note and it's driving me, as I

14    said, crazy.  And I pull out my gun, and I point it at him.

15    At that time I don't intend to scare him.  I don't intend to

16    threaten him with that gun.  I don't intend to injure him

17    with that gun, but I pull the trigger, you know, straight in

18    the head, and I intentionally cause his death.  That's the

19    type of specific intent to kill that we're talking about in

20    this case, that the State must prove beyond a reasonable

21    doubt.

22          I guess -- do you understand that?

23    A.    I understand that.

24    Q.    Okay.  Now, let me talk to you a little bit about

25    kind of getting over to the special issues, but before we get

1    there I just need to kind of approach something with you.  On

2    your questionnaire you mentioned that the best argument in

3    opposition of the death penalty is that the murder was

4    unplanned and/or unintentional.  Okay.  And I want to talk to

5    you a little bit more about intent.

6         Before we can get the Special Issue Number 1 or

7    Number 2, the State has got to prove to you that it wasn't an

8    accident, that it wasn't a mistake, that it was a specific

9    intentional crime and the specific intent to kill.  So I

10   guess my question is, if they prove that to you, that it was

11   an intentional killing, is someone automatically going to get

12   the death penalty?

13        A.   No.

14        Q.   Okay.  I was just asking because of what you said on

15   your questionnaire.

16        A.   Okay.

17        Q.   Okay.  And let me go on and ask you a little bit

18   more, talking specifically about that indictment.  Before you

19   can get to Special Issue Number 1, which is whether there is

20   a probability that the defendant would commit criminal acts

21   of violence that would constitute a continuing threat to

22   society, you have already found him guilty on that

23   indictment, that he intentionally caused the death of Bertie

24   Cunningham in the course of either a kidnapping or a robbery

25   and either did it by drowning her in water or shooting her in

```
 1    the head.  So that's what type of case we're talking about.

 2            Now some people tell us all the time that, you know,

 3    if we're talking about that sort of case, I get to Special

 4    Issue Number 1, you bet we're talking about an intentional

 5    killing in the course of robbery or kidnapping, you know,

 6    he's going to be a continuing threat to society.  And other

 7    people say, no, you know, I'd have to see more, I'd want to

 8    know more before I could answer that question either yes or

 9    no.

10            What's your opinion about that?

11       A.   I would have to know more.

12       Q.   Okay.

13       A.   I'm -- I'm a pretty logical person.

14       Q.   Okay.

15       A.   I -- first of all --

16       Q.   You said you're a very technical person also?

17       A.   Yeah.  I would have to -- it's my understanding that

18    the first step is guilty or not guilty.

19       Q.   Uh-huh.

20       A.   And then if there's a guilty verdict, that you move

21    to Special Issue Number 1 and Special Issue -- and then if

22    Special Issue Number 1 is answered in one manner, then you

23    move to Special Issue Number 2.

24       Q.   Right.

25       A.   Seems pretty straightforward to me.
```

1    Q.    Okay.  And so you see that there are different steps

2    involved.  Some people don't get it, and some lawyers don't

3    get it.

4    A.    I understand.

5    Q.    People that do this all the time.  So you seem to

6    have a very clear understanding of what's required.

7          Now, on Special Issue Number 1 just as the State had

8    the burden of proof on guilt/innocence, Special Issue Number

9    1, the State as has the burden of proof on that as well.  And

10   that again is beyond a reasonable doubt.  They must prove to

11   you beyond a reasonable doubt whether there is a probability,

12   that there is a probability.  Okay?  So sometimes people get

13   caught up thinking, well, they just have to prove

14   probability.  And that's true.  But they have to prove it

15   beyond a reasonable doubt.  So that's -- that's their burden

16   of proof in that question.

17         Are we kind of clear, or am I --

18   A.    I understand.

19   Q.    Okay.

20   A.    Beyond a reasonable doubt doesn't mean the amount of

21   probability which would be a hundred percent, but it would be

22   that the amount of reasonable doubt that there is a

23   probability and a high probability of that occurring.

24   Q.    Okay.

25   A.    That's as well as I can interpret it right now.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.   Okay.  And as you said, if you answered Special

2   Issue Number 1 no, then he gets the 40-year confinement and

3   that's the end of it.  If the jury answers Special Issue

4   Number 1 yes, that's when we move to Special Issue Number 2.

5   And sometimes people have a problem with mitigation, with

6   what we're taking about mitigating circumstances and

7   mitigation, because a lot of times people think of it as an

8   excuse or a justification.  But under the law if there was

9   any kind of legal excuse or legal justification, that would

10   have been dealt on guilt/innocence.  You see, it would have

11   been a defense to the crime.  But what we're basically

12   looking at here is we're looking at the personal moral

13   culpability of the defendant and whether or not there are any

14   factors that reduce that or even aggravate that if you think

15   so.  And on that special issue there is no burden of proof.

16   That -- that evidence can come from anywhere in the testimony

17   or the evidence.

18           Let me ask you, basically do you think you're a

19   person that sees black and white, or are you a person that

20   sees various shades of grey?

21      A.   I hate to tell you this, but sometimes I think an

22   issue is black and white and then I think in shades of grey,

23   also.

24      Q.   Okay.

25      A.   So I can't tell you that in any one instance I would

1  think in either way.

2     Q.   Okay.  Do you think that there is a difference

3  between someone who is a bad person and someone who is a good

4  person that does bad things sometimes?

5     A.   I think it's pretty hard to be a good person and to

6  do bad things a lot of times.

7     Q.   Okay.  Is that another one of those shades of grey,

8  you have to hear everything and --

9          THE COURT:  Kind of eliminates the definition

10  of being a good person, doesn't it?

11          VENIREPERSON:  Yeah, that's what I'm

12  thinking.  I mean, if you're a bad person, you probably do

13  some good things every now and then.  But if you're a good

14  person, it doesn't seem to me that you would do bad things a

15  lot.  Not that you wouldn't do a bad something, because I'm

16  sure I've done a bad thing or two that I wouldn't want -- you

17  know, I'm sorry, I did that.  I really didn't mean it.  Or it

18  was intentional, and I thought, gee, that was really

19  terrible.

20     Q.   (By Ms Balido)  Uh-huh.

21     A.   But I think for the most part, if you're a good

22  person, you don't do bad things a lot of the times.

23     Q.   Okay.  Let me kind of give you an example that we

24  use when you're talking about mitigation and we're talking

25  about sufficient mitigating circumstances or circumstances to

DARLINE W. LABAR, OFFICIAL REPORTER

1   warrant that the sentence of life imprisonment rather an

2   death sentence be imposed.  Let's just take this example.

3           Suppose Mr. Byck and I are nonidentical twins.  We

4   are both born of the same mother, who abused alcohol while

5   she was pregnant with us.  When we were born, we were just

6   kind of too much to handle so she placed us for adoption.

7   And we were adopted by two separate families.  Mr. Byck was

8   adopted by a family where love was a word that was spoken in

9   the family and love was shown throughout the family.  He was

10  read to when he was a child.  Whatever issues there was from

11  the fetal alcohol syndrome were addressed by doctors or

12  therapists as need be.  He went to good schools with good

13  teachers, found a couple of those teachers that really make a

14  difference.  Whatever issues he had growing up were resolved

15  or he was counseled with them.  There was no abuse in the

16  family, either physical or verbal or that sort of thing.  And

17  he went to a good college and graduated from college.

18          I, on the other hand, was not so lucky.  I was

19  placed in a home where I never felt love, never was given the

20  ability to give love.  There was violence on TV all the time

21  at our house.  Violence inside the home both by the parents

22  and the other siblings.  Never got to -- got to address my

23  issues about fetal issue alcohol syndrome.  It was never

24  diagnosed, never had an issue.  Went to good schools, but

25  never really quite caught that one teacher that might could

1    make a difference in my life.  Kind of rambled through

2    school, graduated, and did kind of little else.  And was --

3    throughout my life was physically abused or -- and/or

4    sexually abused.

5              As this example goes, Mr. Byck and I end up on

6    opposite corners in downtown Dallas robbing two separate

7    banks at the same time unbeknownst to each other.  We both

8    did the exact same thing.  We walk in with a gun, we demand

9    money, we get money, don't hurt anybody, but threaten a lot

10   of people.  Walk out, immediately were arrested.  And we are

11   both found guilty of aggravated robbery.

12             Do you think or do you not think that we should be

13   sentenced the same or punished the same?

14        A.   I would probably say the punishment should be the

15   same for the same crime.

16        Q.   Uh-huh.

17        A.   Personally I have a tendency to believe that the

18   person who had the better advantage might -- might deserve a

19   stronger sentence.

20        Q.   Okay.

21        A.   Because of the advantages that they've had in life.

22        Q.   Okay.  Do you see how some of those things might be

23   kind of what Special Issue Number 2 is driving at when we're

24   talking about some of those situations may be mitigating,

25   some may be aggravating, that sort of thing?

DARLINE W. LABAR, OFFICIAL REPORTER

Page 106

```
 1        A.    Yeah, and I think the example certainly is an
 2   extreme.
 3        Q.    Yes.
 4        A.    So it's like black and white.
 5        Q.    Yes.
 6        A.    I don't think there is a black and white.  And even
 7   though you're an identical twin, who you are personally
 8   differs from whoever the other person is personally.
 9        Q.    Okay.
10        A.    And the choices that that person makes are the
11   choices they make and need to be responsible for.
12        Q.    Okay.
13        A.    So, you know, the hypothetical is black and white,
14   and I don't think there necessarily is.
15        Q.    Okay.  All right.  Let me just kind of close with
16   talking to you about this.  There are -- well, we talk about
17   rights in this case.  We talk about the defendant's rights.
18   We talk about the State's right to a fair trial.  The
19   victim's rights.  The Judge sometimes mentions that you're
20   not going to be subjected to any Rambo litigation tactics.
21   We're not going to embarrass you.  So you as a juror also
22   have rights.  And let me just kind of start this off by
23   saying or end this up by saying that each one of those chairs
24   over there in the jury box is separate.  And as we talk about
25   the jury system or we talk about people that are going to be
```

1   on this jury, we talk about it as kind of one group.  But

2   what it really is, is a situation of 12 individuals coming

3   together.  And where that becomes important is when we're

4   talking about the burden of proof.  And what may be

5   reasonable doubt to one person, may not be reasonable doubt

6   to another.  And maybe everyone agrees that there's

7   reasonable doubt on the case, but those things -- you don't

8   agree as to the same piece of evidence that causes reasonable

9   doubt.  But that's still reasonable doubt.

10         Additionally, when we get down to Special Issue

11  Number 2 and we're talking about mitigating circumstances,

12  you may think one thing is mitigating and your next door

13  juror may think something else is mitigating.  But you all

14  agree that something in this case is mitigating enough to

15  give somebody a life sentence rather than a death sentence.

16  And that's kind of how the 12 come into it.

17         Once you're back in the jury deliberation room, you

18  know, we're talking about some heavy stuff here.  We're

19  talking about life and death.  We're talking about the death

20  of the victim already.  And we're talking about whether or

21  not Mr. Murphy should live or die, you know, if we get to

22  that point on Special Issue Number 1 and Special Issue Number

23  2.  So emotions can play a part of it.  And there have been

24  situations in the past that some stronger jurors not --

25  certainly not saying you -- have either intimidated or

DARLINE W. LABAR, OFFICIAL REPORTER

1    denigrated the process and the people back in the jury box to

2    such a degree that people don't feel like they can speak

3    freely or speak their mind or vote the way that they want

4    to.  After talking to you, I don't think that's going to

5    happen with you, because I think you're a very strong

6    individual and I think that you can stand up for yourself.

7    But sometimes some other people are not as lucky in that

8    situation.

9            And I guess what I'm just asking is -- or telling

10   you is that you have the right and every juror has the right

11   to be heard and also to be able to speak freely about their

12   feelings of the case.  And if that does happen or if that

13   does not happen and people are threatened or cajoled or hard

14   sales tactics are being used back there, you have the right

15   through your leadership to try to take care of that.  But if

16   it kind of gets out of your hand, you also have the right to

17   contact the bailiff.  And can you tell me that you can either

18   try to deal with it within the confines of the jury and if

19   that doesn't work, that you can come out and contact one of

20   the bailiffs, if necessary?

21        A.   If I thought someone was being abused emotionally,

22   yeah, I -- I mean, if I thought something wrong was

23   happening, I would say something to someone.

24        Q.   Okay.

25        A.   Perhaps my biggest drawback to being on the jury is

1    that I'm opinionated and I will try to argue what I believe

2    is probable or mitigating or, you know, I would share my

3    views and I would try to strongly support whatever those

4    views were.

5        Q.    They call the jury deliberation room a deliberation

6    room for a reason because that's exactly what needs to go

7    back there.  But everyone has the right to be heard and

8    everyone has the right to do so in a very professional

9    manner.

10       A.    That's right.

11       Q.    Okay.  I think I'm out of time and I'm out of

12   questions, so I appreciate your time.  And thank you very

13   much for all your consideration in answering all the

14   questions in this case.

15              THE COURT:  Ms. Morton, you may excuse

16   yourself in the company of the bailiff momentarily.  The

17   attorneys will confer with their respective co-counsel.

18   Within a couple of minutes bring you back, let you know

19   whether you remain under consideration.  You may go with Ms.

20   Madore.

21              (Venireperson excused from courtroom.)

22              THE COURT:  Mr. Davis.

23              (State no challenge for cause - Ms. Morton)

24              MR. DAVIS:  The State has no challenges for

25   cause.

DARLINE W. LABAR, OFFICIAL REPORTER

1          THE COURT:  Ms. Balido.

2          (Defense no challenge for cause - Ms. Morton)

3          MS. BALIDO:  Defense has no challenges for

4  cause.

5          (Venireperson returned to courtroom.)

6          (Annette Morton Prospective Juror No. 26)

7          THE COURT:  Ms. Morton, please have a seat.

8          THE COURT:  What do you think?  Do you think

9  you're under consideration, or do you think you're excused?

10         VENIREPERSON:  I don't know.  I tell you what

11  I hope.

12         THE COURT:  Guess what?  You're wrong.  You

13  remain under consideration.

14         VENIREPERSON:  Okay.

15         THE COURT:  Ms. Morton, with your permission

16  I'm going to ask that you allow Ms. Madore to take a Polaroid

17  picture of you for the benefit of the attorneys.

18         VENIREPERSON:  Sure.

19         THE COURT:  We talk to an awful, awful lot of

20  people.  Some remain under consideration, others like the

21  first lady today was excused based on some responses that she

22  gave us which were fine, but she is no longer under

23  consideration, but you are.  So with your permission, I'm

24  going to ask you that you allow a picture to be taken of you.

25  Just as soon as the attorneys put their information with the

1    questionnaire, their notes, match that up, oh, I remember Ms.

2    Morton.  Remember her coming down that Monday afternoon,

3    they'll be destroyed.  So they're not going to made a part of

4    the trial record for any purpose.

5              VENIREPERSON:  Okay.

6              THE COURT:  May we have your permission to use

7    your Polaroid picture for that limited purpose?

8              VENIREPERSON:  For the two attorneys, yes.

9              THE COURT:  Let me ask Ms. Daily to come into

10   the courtroom.  She'll be calling you, notifying you once we

11   reach this number of 48 and the attorneys exercise their

12   peremptory challenges whether you make the final cut as one

13   of the 12 jurors.  If you should change phone numbers, work

14   or residence, before Ms. Daily calls you back, if you'd be

15   kind enough to call her so we can keep up with you.

16             Also, please avoid the temptation -- she'll confirm

17   the phone numbers before you leave.

18             VENIREPERSON:  Okay.

19             THE COURT:  Also, avoid the temptation of

20   contacting the Dallas Morning News with regard to back issues

21   that ran some stories dealing with the incident which forms

22   this prosecution.

23             VENIREPERSON:  Haven't done that, and I won't

24   do it.  I didn't even tell my husband which case this was,

25   because I don't want to talk about it.

DARLINE W. LABAR, OFFICIAL REPORTER

1          THE COURT:  Good.  Ms. Daily, if you would

2   confirm the phone numbers with Ms. Morton, then you're

3   excused.   Thank you very much.

4          VENIREPERSON:  Thank you.

5          (Venireperson brought into courtroom.)

6          THE COURT:  Good afternoon, Mr. Hiller, and

7   welcome back.  Ask you to raise your right hand and again be

8   sworn in, please.

9          (Venireperson additionally sworn.)

10         THE COURT:  Thank you.  You may lower your

11  hand.

12        Mr. Hiller, let me reintroduce individuals whom you

13  see seated at the counsel table and one new member who wasn't

14  present with us when we had the large panel a week or so

15  ago.

16        Beginning with the table to the far left, lead

17  prosecutor for the State, the Honorable Greg Davis.

18         MR. DAVIS:  Good afternoon.

19         VENIREPERSON:  Hi.

20         THE COURT:  One of the Senior Prosecutors in

21  the Dallas District Attorney office.  He is assisted this

22  afternoon by a fellow Senior Prosecutor in the Dallas

23  District Attorneys Office, Mr. Toby Shook.

24         MR. SHOOK:  Good afternoon.

25         VENIREPERSON:  Hello.

---

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1              THE COURT:  He's substituting this afternoon
 2   during this jury selection for the Chief Prosecutor assigned
 3   to this court who has some maternal responsibilities with
 4   regard to some children and some medical appointments that
 5   were a conflict with her being with us this afternoon.  You
 6   might recall that when you were down here before, the counsel
 7   assisting Mr. Davis was a young lady by the name of Ms. Mary
 8   Miller.
 9              Moving on to the defense table, we have the first
10   two individuals I'll be introducing are two of the three
11   defense attorneys.  First is a board certified criminal law
12   special list, so designated by the State Bar, by virtue of
13   experience, training, and having passed a very difficult
14   examination, the Honorable Michael Byck.
15              MR. BYCK:  Good afternoon, Mr. Hiller.
16              VENIREPERSON:  Hi.
17              THE COURT:  Seated next to him is a
18   co-counsel, the Honorable Jennifer Balido.
19              MS. BALIDO:  Good afternoon.
20              VENIREPERSON:  Hello.
21              THE COURT:  There's a third attorney
22   representing the defendant who is working with the
23   investigator with regard to some evidentiary matters with
24   arrested to this case.  I understand she will not be with us
25   this afternoon, but I introduce her in absentia by name only,
```

1    the Honorable Jane Little.

2            Seated next to Ms. Balido, opposite Mr. Byck, is the

3    accused, the defendant, if you will, Mr. Jedidiah Isaac

4    Murphy.

5            THE DEFENDANT:  Good afternoon.

6            VENIREPERSON:  Good afternoon.

7            THE COURT:  Mr. Hiller, we will begin with the

8    State's presentation.  Again, I emphasize to you as I did

9    with the panel when you were down here before, as is true

10   with the questionnaires, true with their questions to you

11   this afternoon, no right or wrong answers as long as they're

12   honest.

13           You will know before you leave us this afternoon

14   whether or not you remain in the pool from which ultimately

15   12 will be selected after the peremptory challenges have been

16   exercised that will serve as jurors in this case.  Been

17   waiting patiently for us for a good little while.  Are you

18   ready to go?

19           VENIREPERSON:  Yes.

20           THE COURT:  All right.  We are as well.  We

21   will proceed with Mr. Shook.

22           MR. SHOOK:  Yes, Judge.  Thank you.

23                   SCOTT HILLER

24   was called as a venireperson by the Court and, after having

25   been first duly sworn, was questioned as follows:

Voir Dire Examination

By Mr. Shook:

    Q.   Mr. Hiller, again my name is Toby Shook, and I'll be asking you questions on behalf of the State of Texas this afternoon.  And if you have any questions on anything I go over, feel free to ask the questions.  Now is the appropriate time.  We get half an hour each to talk with you.  We like it to be kind of a give and take situation.  We want you to feel comfortable and answer our questions whenever you have them, but we do need to give you a lot of information in a short amount or period of time so sometimes we get a little carried away, so feel free to stop us at any time you want to if something is not clear or if you want to clarify.  And as the Judge said, we're just looking for your honest opinions on this.

    A.   Okay.

    Q.   You've taken the time to fill out a lengthy questionnaire.  We appreciate that.  That's given us a lot of information.  And what I'll do is continue on with some of the information you've given us.  Obviously, we're going to be concerned about how you feel about capital murder and the death penalty.

    A.   Uh-huh.

    Q.   And how do you feel about the laws and rules that apply to these types of cases.  By your questionnaire, you've

1    put that you are in favor of the death penalty as a law and

2    feel it's appropriate in some circumstances.  If you would in

3    your own words, tell me why you feel the death penalty is

4    appropriate or why you favor the death penalty as a law.

5         A.    Well, I think that in certain points if somebody

6    makes a determination to go ahead and turn their back on

7    society and do so in such a way that inflicts suffering or

8    shows no mercy or is just cruel outside of any sort of laws

9    of decency or anything that comes out of the Bible or

10   anything that is just morally wrong at some point society has

11   to say that that is a -- something that can't be there.

12        Q.    Okay.  Would you, if it were up to you, reserve the

13   death penalty just for certain types of murder cases, or

14   would you enlarge it to other types of crimes?

15        A.    I think that's hard to say.  I think it all depends

16   on what the circumstance are.

17        Q.    Okay.

18        A.    Clearly the taking of another life is something that

19   starts biblically or, just, you know, whatever you are

20   brought up with between right and wrong.  I don't know that I

21   could extend that without knowing the circumstances around

22   it.

23        Q.    Okay.  Would -- and let me ask you this, were you

24   brought up with the belief in the death penalty?  Is it

25   something you were raised that that's a law that we should

DARLINE W. LABAR, OFFICIAL REPORTER

1  have, or is that something that you developed later on as you

2  grew up?

3      A.    It developed later on.

4      Q.    Okay.  What specifically caused you to feel that

5  way, if you know?

6      A.    I don't recall what made me feel that way.  I mean,

7  I remember there was a lot of discussion about it in college

8  and school and things like that when there were a lot of

9  people that were just so violently opposed against it, it

10 almost required you to think about why that might be.

11     Q.    Okay.

12     A.    But then as I became a husband and a father later

13 on, you know, and you just -- unfortunately see different

14 things or hear different things, you kind of are forced to

15 pick sides.

16     Q.    Are there -- have there been any cases that you

17 followed in the news or the media that you felt were

18 appropriate cases for the death penalty?

19     A.    Well, I've read on the Manson killings and I guess I

20 felt that that was a circumstance.  You know, it's always

21 third hand so I can't say directly.

22     Q.    All right.

23     A.    And I guess I felt that what went on in Oklahoma

24 City --

25     Q.    Right.

1     A.     -- was dad went on there was something -- especially

2  where children were involved.

3     Q.     Okay.

4     A.     Others, it's kind of hard to comment on because

5  you're so removed, so I just kind of reserve judgment until I

6  get better than just third-hand representation.

7     Q.     Okay.  In Texas there are only certain crimes which

8  are appropriate for the death penalty.  They have to be

9  murder cases, intentional killings, and not every murder case

10  is a death penalty case.  In fact, a great majority of the

11  murder cases probably are just that, murder cases which carry

12  a punishment range of 5 to life.  There are certain types of

13  murder cases, ones that what we call that have aggravating

14  circumstances which make them eligible for the death

15  penalty.

16          First of all, it has to be an intentional killing

17  without legal justification.  That is, it's not done in

18  self-defense, something like that.  It's not an accident.

19  It's an intentional killing.  It has to be done with an

20  aggravating fact, such as murder during the course of a

21  felony, such as robbery.  A guy goes in and robs a 7-Eleven

22  store and shoots the clerk.  That would be a death penalty

23  case.  Murder during a burglary.  Someone breaks into

24  someone's house, murders someone in the house, it can be that

25  offense.  During a kidnapping or during a sexual assault.

1   Those types of cases could be capital murder cases.

2           There's also situations where it's a specific type

3   of victim, such as a police officer, a fireman while they're

4   on duty, murder during -- while they're on duty, that can be

5   a capital murder case.  Murder of a child under the age of 6

6   can be a capital murder case.  If you murder someone for

7   money like a hitman situation, or if you hire someone to

8   murder for money, that could be a situation for the death

9   penalty.  But those are about the types of cases that are

10  reserved for the death penalty.

11          Is there anything on that list which you would --

12  from your own opinion say, no, I don't really agree with that

13  in those types of cases, or do those cases from your own

14  point of view sound about right for consideration?

15      A.   The only thing I would disagree with is I don't know

16  why somebody selected 6 years and under for.  A child is a

17  child.

18      Q.   Okay.

19      A.   So that's the only thing --

20               THE COURT:  Where would you put the age?

21  You're king for the day.  No legislature to worry about.

22               VENIREPERSON:  I think that any time you rob

23  anybody of innocence, but I would think 12 and under.

24      Q.   (By Mr. Shook)  Okay.  The way the statute is set up

25  is a trial is divided into two parts, and I believe you've

1    been on a criminal jury before; is that right?

2         A.    I was on the drunk driving jury.

3         Q.    Okay.  A misdemeanor offense?

4         A.    Yes, I believe --

5                   THE COURT:  Six-person jury, Mr. Hiller?  Do

6    you recall?

7                   VENIREPERSON:  Yes, sir.

8         Q.    (By Mr. Shook)  It's still a criminal offense.  In

9    fact, even though it's a misdemeanor, the same principles --

10   legal principles will apply to it just as they would here.

11             Now, the setup is different for punishment.  Did you

12   even consider punishment in that case, or did the Judge do

13   that?

14        A.    That was the Judge.  We just had to rule on whether

15   or not he was guilty or innocent.

16        Q.    That's often the case in misdemeanor DWI's.

17   Obviously, in a death penalty case the jury decides both

18   issues, and the trial is divided in two portions.  The

19   guilt/innocence stage is the same as would be in your case,

20   the misdemeanor case.  That is, the rules are the same.  The

21   State has the burden of proof, that sort of thing.  And the

22   only issue at that time is has the State proven the

23   allegation, the indictment.  If you believe the State hasn't,

24   have a reasonable doubt about it, then you find the defendant

25   not guilty and everyone goes home.

1          If you believe the State has proven the indictment

2     beyond a reasonable doubt, that's when you move to the second

3     portion of the trial.  That's where a capital murder case

4     gets a little different because you can hear additional

5     testimony at that time about the person's background, that

6     sort of thing.  And at the close of that you get these

7     special issues which we'll go over in a minute.

8          But if you answer those special issues yes and no,

9     that is, if you believe the State has proven that the

10    defendant's a continuing danger to society, that's Question

11    Number 1 basically.

12         Number 2 is, is there mitigating evidence that you

13    think a life sentence should be assessed rather than a death

14    sentence.  If you answer it yes and no, that is, he's a

15    danger and there's not sufficient mitigating evidence, the

16    defendant will receive a death sentence.  If you answer the

17    questions any other way, the defendant will get a life

18    sentence.  Once you have find the defendant guilty of capital

19    murder, there are only two choices.  It's either going to be

20    a death sentence or a life sentence, and that depends on how

21    you answer those questions.

22         Is that clear to you?

23    A.    Yes.

24    Q.    Okay.  Are you familiar with the method of execution

25    in Texas?

1      A.     It's lethal injection.

2      Q.     That's correct.  It's has gotten a lot of publicity,

3  I think mainly because of President Bush's election, the

4  media seemed to really scrutinize sometimes.  From my

5  personal point of view, they like to make controversy, and

6  that's something that might be controversial.  But whatever

7  reasons, the media has really scrutinized it in the last

8  couple of years.

9          In Texas the method is the same.  If you find the

10  defendant guilty, if you answer those questions yes and no,

11  the Judge wouldn't have a choice.  He would sentence the

12  defendant to death.  At some point in time after all the

13  appeals are out, he would be executed in the same manner.

14  You may have read about that.  Oftentimes when an execution

15  takes place, it will appear locally in the Dallas Morning

16  News.  Sometimes if they're -- get enough coverage.  Back

17  when they occurred, the news media -- electronic media will

18  cover it also.

19          But the method of execution is the same.  After 6:00

20  p.m., a defendant will be brought into the death chamber,

21  he'll be strapped on a gurney.  There would be witnesses from

22  both sides, the defendant's relatives and also the victim's

23  relatives if they chose to be there.  Hypodermic needles

24  would be placed in his arms, and at the appropriate time

25  lethal substances would be injected into his body.  This is

1    something that happens I would say on a regular basis.  As

2    many as 42 have occurred in one year in Texas.  As little as

3    just three or four before.  But it's something that occurs

4    monthly now I'd say.  So we're not talking about an abstract

5    idea when we talk about the death penalty in Texas.  It's

6    very real that's very real.  And if you sit on a jury and

7    find the defendant guilty and answer those questions yes and

8    no, you can fully expect that will happen to the defendant in

9    this -- in that case.  And we must say from our point of

10   view, that's our goal in this case.  We want the defendant to

11   be executed someday and feel we have the evidence that will

12   prove that to you.

13         You've told us philosophically you believe in the

14   death penalty as a law and as a just punishment in certain

15   types of cases.  Do you feel you can sit as a juror and

16   answer those question yes and no, knowing that when you did

17   that some day the defendant in this case would be executed?

18      A.   Yes.

19      Q.   Okay.  Let me go over some of the rules that apply

20   in this case.  First of all, as I said before, the trial is

21   divided into two portions.  The State must prove the case

22   beyond a reasonable doubt.  That burden of proof applies to

23   every criminal case.  It applied to the DWI case you sat on.

24   The State had that burden of proof, and it applies to this

25   case.  It's a cornerstone of our Constitution.  That burden

1    of proof never shifts.  It never goes to the defense.  The

2    burden of proof always stays at this table.

3              Do you agree with that law?

4        A.   Yes.

5        Q.   Do you feel you can follow that law?

6        A.   Yes.

7        Q.   Okay.  If we fail to meet our burden of proof, would

8    you find the defendant not guilty?

9        A.   Yes.

10       Q.   Okay.  The burden of proof goes to every portion of

11   the indictment.  The Judge will tell you that if we fail to

12   prove any portion of the indictment to you beyond a

13   reasonable doubt, you must find the defendant not guilty.

14             Let me give you a couple of examples.  One would be

15   we have to prove the identity of the defendant, who committed

16   this crime.  Obviously, if you had a reasonable doubt about

17   that at the close of the trial, it would be pretty much of a

18   no brainer, you'd find him not guilty.  But it goes to more

19   than that.  For instance, we have to prove what county it

20   occurred in, Dallas County.  The law says the county it

21   occurred in, as well as the identity of the defendant, are

22   equal under the eyes of the law.  If we proved every part of

23   the indictment, but failed to prove to you beyond a

24   reasonable doubt that it occurred in Dallas County, you'd be

25   obligated to find the defendant not guilty.  Perhaps the

1    evidence showed that maybe it happened in Collin County or

2    Ellis County, but you had a reasonable doubt about that in

3    that situation.

4            Would you be able to find the defendant not guilty

5    if you had a reasonable doubt on a portion of the indictment?

6        A.    You'd have to.

7        Q.    Okay.  You understand that it's just as important on

8    one portion as it would be the identity?

9        A.    Completely.

10       Q.    Give you the same example on manner and means.  We

11   might have, let's say in an indictment, alleged that the

12   defendant shot the deceased wherein the medical evidence

13   showed the actual killing was done by a stabbing death.  Some

14   people might view that as a technicality, but it's not under

15   law.  The Judge would be quite clear that if have a

16   reasonable doubt -- even about that issue, you'd have to find

17   the defendant not guilty.

18           Could you follow that rule of law?

19       A.    You'd have to.

20       Q.    Okay.  The defendant has a right to testify if they

21   want to.  No one can stop them in their trial.  Did the

22   defendant testify in the DWI trial that you sat on?

23       A.    No, he did not.

24       Q.    Okay.  Then the same rule of law applied.  I don't

25   know if you remember it, but you would be given an

1    instruction in that case, as well as if the defendant didn't

2    testify in this case that if a defendant chose -- chooses not

3    to testify, you can't hold that against him.  You can't use

4    that as evidence against him.  The reason we have that is

5    because there can be many reasons that a person may not

6    choose to testify obviously.  They may be real guilty and

7    they don't want to answer questions.  They may not be very

8    educated and could be made to look guilty.  They may be very

9    shy and look bad in front -- their lawyer might tell them I

10   don't want you to testify because I don't think the State has

11   proven the case and relies on their expert opinion.  The law

12   takes care of that by just instructing the jurors you can't

13   consider that.

14          Could you follow that rule of law?

15      A.   Yes.

16      Q.   Okay.  You might hear evidence of confession in a

17   case.  You might be able to consider that.  You might get an

18   instruction that a defendant has to be given his rights

19   before he confesses.  You've probably heard that, the Miranda

20   rights.  If you grew up watching Dragnet like I did, you

21   every -- every time that show came on.  A person has to be

22   fully informed of his rights and give those up before he can

23   give an incriminating statement against himself.  And the

24   Judge will instruct you in that manner.

25          If you believe that maybe the defendant wasn't given

1   his full rights, maybe he wasn't informed of his right to

2   counsel, that sort of thing, then the Judge would instruct

3   you, you would have to disregard that confession and just

4   consider all the other evidence you heard.  That might even

5   require you to find the defendant not guilty even though you

6   heard his confession because you disregard that particular

7   piece of evidence.

8          Could you do that if you felt that was the -- that

9   was the evidence that you heard, that you did have a

10  reasonable doubt about whether he given his full rights on a

11  confession?

12      A.   Again, you'd have to.

13      Q.   Okay.  Now, the -- as I said, the burden of proof is

14  beyond a reasonable doubt on the first part.  If we meet that

15  burden, we then move to the second part where you get these

16  special issues.  And let's talk about those for a second.  If

17  you'd take a moment and read Special Issue Number 1 to

18  yourself.

19      A.   Okay.

20      Q.   That is a question that we call the future danger

21  question.  It asks the jurors to make a prediction about the

22  future, how the defendant is going to behave.  The burden of

23  proof is again on the State on that question.  We have to

24  prove beyond a reasonable doubt it should be answered yes.

25  That is, you have to presume it should be answered no.  The

1  State has to overcome that presumption.

2      A.    Right.

3      Q.    We do that by -- again, there might be new evidence

4  about the defendant's background we can put on in the

5  punishment stage, but also you get to consider everything

6  you've heard in the guilt/innocence stage, the crime itself

7  to determine that question.

8          Do you think you could answer that question if

9  you're given sufficient information to make that type of

10  prediction?

11      A.    Yes.

12      Q.    What types of things would you want to know before

13  you answered that question?

14      A.    Well, I think here you've got to be looking at the

15  entire set of circumstances around it.

16      Q.    Okay.

17      A.    I don't ascribe to the idea that somebody being a

18  career criminal and going from theft to murder makes them a

19  likely to continue down that path.  However, to judge whether

20  or not a single incident is predictive of a continuance, it

21  really depends on what the State's introduced as evidence and

22  how the State has done their job and whether or not you could

23  conclude reasonably that if left alone to their own devices,

24  whether or not that's going to occur again.

25      Q.    Okay.

1    A.    I don't think it's an easy thing to do, but you

2    still have to look at it in the abstract I guess.

3    Q.    What types of things would you want to hear?  What

4    types of evidence would you want to know, if it were up to

5    you?

6    A.    I think you'd want to know really what were the

7    circumstances that prompted the act.

8    Q.    Okay.

9    A.    Is it something that somebody woke up one morning

10   and decided to do something.  Is it something that obviously

11   has been building and there's an indication that it's going

12   to continue.  Is there something, you know, that's obvious

13   like -- like a situation with the Manson case where it didn't

14   take you long to figure out that that was kind of part of

15   what the personality had become.

16   Q.    Okay.

17   A.    Again --

18   Q.    So the facts of the crime itself would be very

19   important to you?

20   A.    Yes, it would.

21   Q.    How about the brutality of the crime, would that

22   come into play?

23   A.    Most definitely.

24   Q.    What about the type of victim, if you had a very

25   innocent victim?  You brought up children as an example.  You

1    thought it should be even raised higher because of the fact

2    they are children?

3        A.    Absolutely.

4        Q.    Okay.

5        A.    But that all gets into the whole situation of

6    crossing that border over what's right and what's wrong.   If

7    they had absolutely trashy morality in that case, then it's

8    taking you down that path of making that decision.

9        Q.    Also, other than just the facts of the case, you get

10   to hear about a defendant's prior criminal history if it

11   exists.

12       A.    Uh-huh.

13       Q.    We can bring up those things.   The law allows us to

14   bring in witnesses for other crimes that may have occurred.

15   You get to hear good things also.   It's kind of like the old

16   show, This Is Your Life, good things, bad things.   You get to

17   consider all those things when looking at this question.

18            The definitions in this question are going to be

19   left up to you.   You know, you'll get plenty of legal

20   definitions in the first part of the trial.

21       A.    Uh-huh.

22       Q.    But here, the legislature has decided that the

23   definitions should be left up to you and the other jurors.

24   We have to prove beyond a reasonable doubt -- let's talk

25   about it, that there's a probability --

1     A.    Uh-huh.

2     Q.   -- that the defendant would commit criminal acts of

3  violence.  When you see the word "probability" in the context

4  of that question, what does it mean to you?

5     A.    Well, it means that there's a likelihood that

6  something like that's going to happen, but then you're

7  getting into stages.  Two percent likelihood of something

8  happening is far different than 75 percent likelihood of

9  something happening.

10     Q.   You won't be given the definition that they have to

11  prove 75 percent of that thing, but we can give you a few

12  guidelines.

13     A.    Right.  Things that begin to stack up that show a

14  pattern of behavior.

15     Q.   I can tell you the law says that the State does not

16  have to prove it's a certainty.

17     A.    Uh-huh.

18     Q.   I don't think we can ever prove that, but obviously

19  it's more than a possibility, more than just a chance.  It

20  has to be a probability.

21     A.    Right.

22     Q.   Do you feel comfortable with that?

23     A.    Yes.

24     Q.   And would you require the State to prove that it's a

25  probability?

1   A.   Yes.

2   Q.   Okay.   We'd have to prove that the defendant would

3   commit criminal acts of violence.   What do criminal acts of

4   violence mean to you?

5   A.   Well, I guess it goes beyond things like taking down

6   signs and throwing rocks through windows.

7   Q.   Right.

8   A.   You're getting into again something whether it's a

9   degree of maliciousness and it's not --

10                  THE COURT:   Person-to-person type --

11                  VENIREPERSON:   I think it goes to --

12                  THE COURT:   -- assaultive behavior or

13   something like that?

14                  VENIREPERSON:   Blowing up somebody's car

15   because you don't like them.   If that's person-to-person, I

16   would put that in that case.

17                  THE COURT:   Would you consider forgery or

18   writing a hot check a criminal act of violence?

19                  VENIREPERSON:   I don't think I would consider

20   that violent.   It would be a criminal act.

21                  THE COURT:   Or jaywalking?

22                  VENIREPERSON:   That's correct.

23                  THE COURT:   Spitting on the sidewalk?

24                  VENIREPERSON:   No.

25                  THE COURT:   Okay.   The State may continue.

1    Q.   (By Mr. Shook)   Now, let's move on to the second

2    question.   That's the one that's a little bit longer.   If

3    you'd take a moment to read that to yourself.

4    A.   Okay.

5    Q.   That's the mitigation question.   Now, this question

6    is different.   The State does not have the burden of proof on

7    this question.   And the defense doesn't have the burden of

8    proof.   It's kind of the safety net, we call it sometimes.

9    You don't reach that question until you've found the

10   defendant guilty of capital murder, until you've found beyond

11   a reasonable doubt that he's a continuing threat to society,

12   and then you decide -- you look back over the facts of the

13   offense and all the background evidence and decide is there

14   sufficient mitigating evidence that tells you a life sentence

15   is more appropriate than a death sentence.

16   A.   Uh-huh.

17   Q.   Does anything come to mind when we talk about

18   sufficient mitigating evidence that you might -- anything

19   come up that you think, you know, this might be mitigating

20   evidence?   Can you think of any types of evidence?

21   A.   Drug abuse, fetal alcohol syndrome, mental

22   instability in a family, demonstrable mental illnesses.   I

23   mean -- getting smacked by your father for doing something

24   wrong not necessarily, but getting smacked by your father

25   every day of your life just because you woke up, yes.

1    Q.    Okay.

2    A.    It really needs to be a presentation of what's going

3    on in the context of what's happened.

4    Q.    What about -- let's talk about the first thing you

5    brought up, drug use.  What are some situations where you

6    feel that might be mitigating?

7    A.    If -- if the particular person was a crack baby,

8    something like that.  If the particular person was under the

9    influence of some hallucinogenic or something like that when

10   this act occurred.

11   Q.    That brings up one point.  The law says that if a

12   person commits a crime under the influence of drugs or

13   alcohol --

14   A.    Uh-huh.

15   Q.    -- if they voluntarily take these things, that's not

16   a legal defense to the crime.  Some people disagree with

17   that.  Some people think it is actually a legal defense to

18   the crime.  But the law states it is not.

19          First of all, let me ask you that.  How do you feel

20   about that?  Do you agree with the law?

21   A.    I agree with that.

22   Q.    Okay.  But you can take that as a mitigating

23   circumstance in certain situations.  It just depends on how

24   you feel about it.  Some jurors tell us if they voluntarily

25   take drugs, if they've had a history of doing that or

1     alcohol, then, no, it's not mitigating to me.   Other people

2     tell us, you know, it depends on the extent, if it's first

3     time.   Other people feel, yeah, if it's committed while

4     they're under -- if they're a drug addict, heroin addict, and

5     they commit this crime, then, yeah, I think that is

6     mitigating.   Other people tell us, no, if you're knowingly

7     doing these things, I'm going to hold you responsible.   It's

8     not going to be an excuse.

9            How do you feel about those situations as far as the

10    punishment issues?

11    A.    Well, I think it definitely -- a lot of what could

12    be presented bears thinking that through.   You know, if

13    somebody has been treated for a chemical dependency and they

14    committed a crime and they were sprung from jail early, but

15    that chemical dependency had not really been cured, then, you

16    know, who is bearing an issue there?   If there's an addiction

17    that somebody can't control themselves, but yet they were let

18    go early from their sentence because they -- maybe the

19    prisons were overcrowded.   There's an issue that's sitting in

20    there.   I don't know the answer to that issue off the bat,

21    but if you willingly take drugs or you willingly get yourself

22    drunk, you willingly did that, so, you know, number one, you

23    did that.

24    Q.    Okay.

25    A.    And you're responsible for your acts.

---

DARLINE W. LABAR, OFFICIAL REPORTER

1          Now, the influence of that to the point of where

2     you've lost the ability to make a moral decision, then I

3     think you're getting into a grayer area, and it's a lot of

4     things that you need to spend a whole lot of time thinking

5     about before you say yes or no or --

6          Q.   You talking about growing up with physical abuse,

7     and it could be emotional abuse, too, but physical abuse by a

8     father.   Let's say you got hit everyday as you grew up.

9          A.   Uh-huh.

10         Q.   Some people say that is mitigating, and it depends

11    on the severity of it, obviously.   Other people tell us

12    people grow up in those bad situations, yet they still know

13    right from wrong and don't commit these types of acts when

14    they grow up.

15         Go with me a little further about how you feel about

16    that type of physical or how a person might be raised in that

17    environment.

18         A.   Well, I think it all depends on what else you're

19    surrounded by in the course of that.   People have clearly

20    been abused and they've turned themselves the right way, but

21    normally there's another set of circumstances that caused

22    them to go down that different path.   If you're surrounded by

23    nothing but abuse, and I'm not presuming that there aren't

24    other factors that come in, but if that's all you've ever

25    known in your life and your come from begins and ends with

1   that, there's an issue there.  And you're getting into again

2   shades of right, wrong, and indifference.  But, you know,

3   obviously there is mitigating circumstances that you need to

4   consider very heavily before you say number two.  You know,

5   the answer is the death sentence more warranted than life

6   imprisonment.

7        Q.   Okay.  Would it be important to you if a person has

8   had treatment and things of that nature, if they came from

9   that situation?

10       A.   I think that's demonstrable to the fact that an

11  attempt is being made to undo damage that's been done.  It

12  may not be successful, but an attempt is an attempt.

13       Q.   All right.  Let me get into one other area, and this

14  issue may or may not come up.  Sometimes jurors consider what

15  we call lesser included offenses.  The lesser included

16  offense of capital murder is murder itself.

17       A.   Uh-huh.

18       Q.   Maybe you were -- you might be on a capital case and

19  might have a reasonable doubt about the underlying felony,

20  but not about the murder.  Might find the defendant guilty of

21  murder, instead of capital murder.  That changes the penalty

22  range.  You don't have the special issues that -- it won't be

23  life or death.  What it will be is 5 years in prison up to 99

24  years or life.  A very wide penalty range obviously, and

25  we're still talking about an intentional killing.

1          MR. SHOOK:  May I have one moment, Judge?

2          THE COURT:  You may.

3      Q.    (By Mr. Shook)  And we can't get into the facts of

4  any type of offense, can't pin you down to the facts, but

5  obviously when you -- considering a punishment in a murder

6  case, the penalty range is very wide because it can be a lot

7  of different types of circumstances.  It can be a very brutal

8  killing, very cold-blooded killing with a very innocent

9  victim, could have a long criminal history, that sort of

10 thing.

11     A.    Uh-huh.

12     Q.    You might have a lot of mitigating factors.  Young

13 age.  Maybe there's drug abuse.  The type of mitigating

14 factors that you've talked about that could come up.  And

15 therefore that's why we have this wide range from 5 years in

16 prison, all the way to 99 years or life.  You're not required

17 to think of a situation in which you might give the maximum

18 or a situation where you might give the minimum.  But what

19 you have to be able to tell the Court is can you keep your

20 mind open to that full range of punishment, and if you think

21 it's appropriate, you'll give 99 years or life for murder or

22 if you think 5 years is appropriate for murder, an

23 intentional killing, you could give as little as 5 years or

24 anything else in between.

25          Do you feel you could follow that law and keep your

1  mind open, wait until all the evidence is in, and then decide

2  what's the appropriate punishment?

3      A.   I think you're obliged to.

4      Q.   Okay.  Again, you don't have to think of a

5  situation.  It might be one in a thousand cases where you

6  might think that 5 years is appropriate for murder.  As long

7  as you see that situation and think that's what's

8  appropriate, you can assess that.

9      A.   Uh-huh.

10      Q.   Okay.  Oh, let me ask you on the --, you said on the

11  criminal case found that person guilty.  The medical

12  malpractice, was that a civil case?

13      A.   Yes.

14      Q.   And the finding of not guilty, you found in favor of

15  the defense, I guess?

16      A.   The -- we found in favor of the doctor that he did

17  not do wrong.

18      Q.   Okay.  The one question we ask is about -- you're

19  obviously -- things you've witnessed or a family member has

20  witnessed and if you would, looks like back -- you grew up in

21  New Jersey; is that correct?

22      A.   Yes.

23      Q.   Your home was broken into and your mother was

24  beaten.  And you had 5-year-old brother that witnessed that?

25      A.   Uh-huh.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Did you witness that in any way or --

2    A.   I didn't see that.  I saw what remained after that.

3    Q.   Okay.

4    A.   But -- and everything that transpired after that,

5  which deteriorated.

6    Q.   Was that person caught and prosecuted?

7    A.   That person lived two doors down.

8    Q.   Okay.

9    A.   And -- I was hoping you'd bring this up.  The

10  defendant here bears an incredible resemblance to the father

11  of that person.  And after this person was caught, there

12  was -- there were several incidences.  My family was

13  threatened.  I know we went for a couple of weeks with a

14  loaded shotgun behind the door because of things that were

15  going on.  And the police couldn't do anything because they

16  were restrained.

17            THE COURT:  Because they what?

18            VENIREPERSON:  There just -- it was hard to

19  prove what was going on.  There were threatening phone calls,

20  there were dead animals that came flying over the fence,

21  things like that.  The mother tried to run me over with her

22  car crossing the street.  It was just one thing after another

23  that finally led to the family moving away, but --

24            THE COURT:  Your family or the other family?

25            VENIREPERSON:  Our family and my father -- the

1   decision that my father made was that he wasn't going to do

2   something that would make a bad situation worse.  And so

3   we -- my mom and dad went out and found another home and they

4   moved us away at night.

5              THE COURT:  Would you be able to set aside

6   that unpleasant experience?

7              VENIREPERSON:  I'm having a problem with that.

8   I've been -- when I first saw the defendant.

9              THE COURT:  Only you know if you can.

10             VENIREPERSON:  I don't think I can, Judge,

11  because you're talking about a situation where as I

12  understand it, a woman was traumatized and this whole -- this

13  whole experience has just pulled some scars off of some

14  things where just -- to be just completely honest, I don't

15  know that I could, depending on the intensity of the case,

16  condemn somebody and still have in the back of my mind

17  whether or not I was able to set all of that aside.  I just

18  can't say so.  I've been grappling with it for the last

19  couple of weeks and had a few sleepless nights.

20             MR. BYCK:  We'll agree.

21             THE COURT:  Your candor is very refreshing.

22  You are excused.

23             (Mr. Hiller Excused From Consideration)

24             VENIREPERSON:  Thank you, sir.

25             (Recess of proceedings.)

DARLINE W. LABAR, OFFICIAL REPORTER

1                          Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4            I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13           I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16           Witness my hand this the 19th day of November, A.D.,

17   2001.

18

19

20                         _____
                           DARLINE W. LABAR
21                         Official Court Reporter
                           194th Judicial District Court
22                         Dallas County, Texas
                           (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002

REPORTER'S RECORD **74145**

VOLUME 31 OF 65 VOLUMES

TRIAL COURT CAUSE NO. F00-02424-NM

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

**FILED IN**
**COURT OF CRIMINAL APPEALS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEC   5 2001

Troy C. Bennett, Jr., Clerk

A P P E A R A N C E S :

HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building
        Dallas, Dallas County, Texas  75207
        Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
            FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
        Phone:  214-653-9400
            FOR THE DEFENDANT.


\*\*\*\*\*\*\*\*\*

        On the 1st day of May, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

        Proceedings reported by machine shorthand, computer

assisted transcription.


DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

```
 1                     INDEX VOLUME 31

 2   May 1st, 2001                        PAGE    VOL.

 3   INDIVIDUAL VOIR DIRE:

 4   Proceedings..................................... 2     31

 5   State no challenge for cause - Ms. Boales....... 51    31

 6   Defense no challenge for cause - Ms. Boales...... 51   31

 7   Connie Boales Prospective Juror No. 27.......... 51    31

 8   Mr. Roberts Excused From Consideration.......... 57    31

 9   Reporter's Certificate.......................... 58    31

10

11            CHRONOLOGICAL VENIREPERSON INDEX

12                   STATE        DEFENSE          VOL.

13   CONNIE BOALES        4           29            31

14   JOHN ROBERTS        55                         31

15

16            ALPHABETICAL VENIREPERSON INDEX

17                   STATE        DEFENSE          VOL.

18   CONNIE BOALES        4           29            31

19   JOHN ROBERTS        55                         31

20

21            *NO EXHIBITS THIS VOLUME*

22

23

24

25
```

DARLINE W. LABAR, OFFICIAL REPORTER

P R O C E E D I N G S

1
2        THE COURT:  Good afternoon.  Welcome back.
3    Ask you to again raise your right hand and to be sworn in.
4            (Venireperson additionally sworn.)
5        VENIREPERSON:  I do.
6        THE COURT:  Thank you.  Though it's been just
7    a bit over 24 hours ago, let me reintroduce those whom we see
8    at the counsel table.
9        Beginning at the far left, the Honorable Greg Davis.
10        MR. DAVIS:  Good afternoon.
11        THE COURT:  Lead prosecutor for the State,
12    Senior Prosecutor in the Dallas D.A.'s office.
13        He is joined and assisted by co-counsel, the Chief
14    Prosecutor in the 194th District Court, the Honorable Mary
15    Miller.
16        MS. MILLER:  Good afternoon.
17        VENIREPERSON:  Good afternoon.
18        THE COURT:  Moving on to the defense table, we
19    begin first with one of the three defense attorneys, the
20    Honorable Jennifer Balido.
21        MS. BALIDO:  Good afternoon.
22        VENIREPERSON:  Good afternoon.
23        THE COURT:  Seated next to Ms. Balido is one
24    of her co-counsels, a board certified criminal law
25    specialist, the Honorable Michael Byck.

DARLINE W. LABAR, OFFICIAL REPORTER

1      MR. BYCK:  Good afternoon.

2      VENIREPERSON:  Good afternoon.

3      THE COURT:  Seated next to Mr. Byck, opposite

4  Ms. Balido, is the accused, the defendant, Jedidiah Isaac

5  Murphy.

6      THE DEFENDANT:  Good afternoon.

7      VENIREPERSON:  Good afternoon.

8      THE COURT:  Third attorney on the defense team

9  is out of the courthouse this afternoon doing some work with

10  regard to some anticipated evidence to be presented once the

11  trial begins.  Her name is Jane Little.

12      Ms. Boales, I know you maybe were a little bit taken

13  aback yesterday when I informed you and the other panel

14  members what this was all about.  I want you to relax as much

15  as you can.  As I indicated to you and the other panel

16  members yesterday, to the attorneys' questions there are no

17  right or wrong answers.  You will be treated by the attorneys

18  with greatest respect, professionalism that possibly can be

19  displayed.  Ready to begin?

20      VENIREPERSON:  I guess so.

21      THE COURT:  Worry not.  Worry not.  No right

22  or wrong answers as long as they're honest.

23      We'll begin with the State, the Honorable Greg

24  Davis.

25      Mr. Davis, Ms. Boales.

1                   MR. DAVIS:  Thank you.  May it please the

2      Court.

3                        CONNIE BOALES

4      was called as a venireperson by the Court and, after having

5      been first duly sworn, was questioned as follows:

6                     Voir Dire Examination

7      By Mr. Davis:

8          Q.   Good afternoon again, Ms. Boales.

9          A.   Good afternoon.

10         Q.   Let me just first of all repeat what the Judge just

11     told you because it is true.  There are no right or wrong

12     answers this afternoon.  Most of the questions that I'm going

13     to ask you deal with how you feel about a subject, what your

14     opinions are.  I've done enough of these and I've talked to

15     enough people to know that everybody has differing opinions.

16     They may agree with us.  They may disagree.  But as long as

17     we know how you honestly feel, that's all that we as

18     attorneys really need this afternoon.  Okay?

19              Ms. Boales, I want to start off and just talk a

20     little bit about the death penalty with you, and I know that

21     when you came in here yesterday, I'm sure the last thing you

22     thought you'd hear would be that you'd been called up here as

23     a potential juror on a death penalty case.

24              Can you tell me, what your initial reaction when

25     Judge Entz told you that that was the type of case we were

1    trying this afternoon?

2         A.    I guess the best word to describe it would be

3    shock.  It wasn't what I expected.  The only time I had been

4    in court was on a traffic violation so --

5         Q.    Okay.

6         A.    -- just didn't expect it at all.

7         Q.    And I know you told us you're in favor of the death

8    penalty.  I know also from experience, I had a number of

9    people me that even though they in favor of the death penalty

10   in the abstract, they think it serves a worthwhile purpose,

11   they're in agreement with it, think it's necessary at times,

12   maybe they feel differently when they're actually in the

13   position that you are, possibly sitting on this type of

14   jury.  Because if you look at Mr. Murphy down here, you can

15   see there's nothing abstract about him.  He's a living,

16   breathing human being.  Our position is very clear.  We're

17   actively seeking the death penalty against him.  That

18   position will not change.

19          At the punishment phase I'm going to ask you to

20   answer these special issues yes and no which would result in

21   Judge Entz having to impose a sentence of death on him.  And

22   again, some people say I'm in agreement with what you're

23   doing, but I don't think that I can take part in that myself,

24   I don't want to have to bear that, I don't want to have the

25   possibility of waking up years from now and seeing him on

DARLINE W. LABAR, OFFICIAL REPORTER

1    television, knowing that my verdict has eventually led to his

2    death.

3            Can you just tell me how you honestly feel about

4    personally taking part in this kind of case?

5        A.    Well, after yesterday, I really thought quite a bit

6    about that last night.  And I really feel like I could take

7    part in a decision like that, that I could look at the

8    evidence and see and weigh it to the best of my ability and

9    take part in that kind of a decision.

10       Q.    Fair enough.  Here's what I would expect jurors to

11   be able to do in this case.  If the State of Texas proves Mr.

12   Murphy's guilt beyond a reasonable doubt, if we meet our

13   standard of proof in this case, then I would expect a jury to

14   find him guilty if the facts are there.

15           Do you feel like you could do that?

16       A.    Yes, I do.

17       Q.    I would also expect jurors to answer Special Issue

18   Number 1 yes if I prove beyond a reasonable doubt that it

19   should be answered yes.

20           Do you feel that you can do that, too?

21       A.    Yes, I do.

22       Q.    And thirdly, I would expect jurors on Special Issue

23   Number 2 to be able to look at all the evidence again,

24   determine if there's a mitigating circumstance or not where

25   his life should be spared.  If there is no mitigating

1   circumstance, then I would expect a juror to answer that no

2   resulting in a death sentence.

3          Could you do that, also?

4   A.   Yes, I could.

5   Q.   Ms. Boales, can you tell me just briefly why are you

6   in favor of the death penalty?

7   A.   I feel it is to be used as a deterrent to severe

8   crimes against persons, bodily harm, death.  I feel like

9   people make choices in their life.  And if they choose to

10  take a life, then they should suffer the consequences, that

11  they know beforehand what those consequences are.  And just

12  like any other thing that we do in life, we know what we do

13  we bear a responsibility for and we must step forward and

14  take that responsibility.

15  Q.   Okay.  Now, understanding in the State of Texas and

16  I believe Judge mentioned this yesterday, if an individual is

17  found guilty of capital murder, we don't have automatic

18  death.  What we have in effect is automatic life.  And then

19  if certain requirements are met, Special Issues 1 and 2, then

20  that would be a death sentence.

21         And I take it from your questionnaire you're not

22  saying, are you, that on every capital murder case the person

23  should die, are you?

24  A.   No.

25  Q.   Okay.  What you're saying, I guess, is I hear you

1    saying you're a very strong believer in personal

2    responsibility?

3        A.    Yes.

4        Q.    And again, the proper type of capital murder case,

5    if the facts are there, then you could assess a death penalty

6    if you thought that was the right thing; is that right?

7        A.    Correct.

8        Q.    Let's -- let's talk a little bit more about these

9    special issues then, because this is really where the death

10   penalty is different than other types of felony cases.

11   Again, before you get to these special issues you will have

12   already decided in this type of case that the defendant is

13   guilty of capital murder.  That means in this case you will

14   have decided beyond any reasonable doubt that this defendant

15   intentionally took the life of a woman by the name of Bertie

16   Cunningham, either by shooting her or by drowning her and

17   that he did so during the commission of either a robbery or

18   kidnapping, so you've decided that's true beyond any

19   reasonable doubt.  We move to the punishment phase.

20            Now, in the punishment phase there may be additional

21   testimony, additional evidence that you hear that maybe you

22   couldn't hear in the first part of the trial.  Generally

23   speaking, the State cannot offer evidence of a defendant's

24   prior convictions or prior criminal history until the second

25   phase of the trial.  If it's available, then you may hear

1    whether that individual has -- has been convicted of other

2    criminal offenses, has he been arrested before --

3              THE COURT:  Or not.

4        Q.   (By Mr. Davis)  Or not.  That's true.  Has he been

5    through the criminal justice system or not.  Has the system

6    had an opportunity to try to help him.  What has been his

7    reaction to all those things.  And from the other side, the

8    defense has an opportunity to present testimony to you that

9    they think would be favorable to him.  So you get all of

10   those -- all those facts.  Then we give you these special

11   issues.

12             When you look at Special Issue Number 1, Ms. Boales,

13   and this question -- I want you to think without regard to

14   what the rules of evidence may be or what the legalities may

15   be, but if you had your druthers about the type of evidence

16   that you'd like to hear and to have available to you when you

17   answer Special Issue Number 1, what are some of the things

18   that you'd like to know?

19       A.   Well, I would definitely want to know history.  I

20   think with the history and with evidence available in this

21   particular case that would probably be enough.

22       Q.   You know, and as the Judge indicated, you may have a

23   person who's never been in trouble before.  In fact, I guess

24   in theory you could have someone who's been an absolute

25   wonderful citizen.  People come in here and tell you he has

1   been a foundation, a pillar of that community, done wonderful

2   things for people, been a wonderful family man, accomplished

3   a great deal in his life, and somehow he's committed a

4   capital murder.  On the other hand, as we've talked about,

5   the opposite could be true.  You also get to look at the

6   particular facts of this particular crime itself, and that

7   may be important to you.  Just how was it committed.  Who was

8   the victim.  Did they have a relationship or not, you know.

9   Again, you could have a situation where the deceased and the

10   defendant knew each other.  Maybe they had a good

11   relationship that went sour.  Maybe they had a terrible

12   relationship, or maybe there's no relationship at all.  It's

13   a stranger-on-stranger, very randomly selected victim of some

14   sort.  You get to look at that, too.  What was the

15   defendant's reaction after he committed the crime.  I suppose

16   you could have someone who's instantly remorseful, waits,

17   calls the police, cooperates with them.  Maybe the officer

18   even comes in here and tells you this guy was on his hands

19   and knees praying to God for forgiveness when I encountered

20   him for the first time.  Or again, the opposite may be true.

21   Maybe he didn't stay at the scene.  The police had to hunt

22   the man down.  When they did, he wasn't showing any remorse.

23   So you can see there's a lot of things there.

24          Do you think that might be helpful to you also?

25     A.   Yes.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Ms. Boales, I want to look with you and talk about

2  three particular words or phrases here in Special Issue

3  Number 1.  The reason I do that is because none of these

4  words or phrases have legal definitions.  Some of the words

5  and phrases in the first part of the trial will be defined to

6  you by Judge Entz.  These will not, so we kind of like to get

7  an idea of how you look at these things.

8         The first word is probability.  The legislature has

9  given us these words.  Whether there is a probability that

10  the defendant would commit criminal acts of violence.  Now,

11  they could have said to us -- to the State of Texas that we

12  have to prove to you that there's an absolute certainty that

13  this defendant would commit criminal acts of violence.  The

14  standard is not that high.

15         Now, they could have gone lower and they could have

16  said it's enough for the State to prove that there's a

17  possibility or a mere chance that this defendant would commit

18  criminal acts of violence.  I know that I have to prove more

19  than that.  I know going into here that probability does not

20  mean possibility or chance.  I know that.  On a scale of zero

21  to a hundred because sometimes we ask, you know, if you had

22  that to look at, where would you put probability, obviously,

23  to be a probability, it has to be greater than 50 percent.

24  Anything less would be a possibility.  It's kind of like

25  majority, minority.

1          Would you agree with me that probability, if you

2   look at that kind of scale, would have to be greater than 50

3   percent in order to be a probability as opposed to a

4   possibility or a chance?

5       A.   Yes.

6       Q.   Okay.  Is that what you're going to require in this

7   case, a probability, not a mere possibility or a chance?

8       A.   Yes.

9       Q.   Okay.  Criminal acts of violence.  Most people tell

10   me the way they look at that, that means someone else is

11   involved.  Either someone else is actually harmed or someone

12   else is put in threat of harm.  The distinction being if you

13   had a property crime, maybe someone broke into an abandoned

14   house where no one is around, stole something, there's really

15   no violence to that.

16          Do you see that distinction, also?  You need to

17   answer out for the court reporter.  I'm sorry.

18       A.   Yes.

19       Q.   Now, word "society."  Continuing threat to society.

20   When you think of society, who comes to mind?

21       A.   Everybody, people.

22       Q.   All right.  Could be people like you and I who kind

23   of live in a free world.  In the context of Number 1, though,

24   can you see how prison may also be part of society?

25   Sometimes people don't think of that, but remember yesterday

1    the Judge told you that a capital life sentence means a

2    person has to spend at least 40 calendar years in prison

3    before he becomes eligible for parole.

4            I like to think of it this way and see if you

5    agree.  It's wherever the defendant may find himself.  It's

6    whoever he may come in contact with.  That could be a

7    prison.  It could be the free world.  Sometimes people say,

8    well, now that I think about it, that life sentence, I've

9    heard it argued society should only mean prison, that you

10   should forget the free world.  But again, that's not the way

11   the law looks at it.  You're free to consider the free

12   world.

13           Have you heard about the case involving the Connally

14   7, the seven inmates who escaped from the prison system?

15       A.    Yes, I did.

16       Q.    Some of those inmates actually were serving life

17   sentences when they escaped and came up to Irving and killed

18   a police officer.  So you can see how society could also

19   encompass the free world, I suppose?

20       A.    Yes.

21       Q.    Do you have any questions on Special Issue Number 1

22   before we go to Number 2?

23       A.    No, sir.

24       Q.    Again, remember the burden of proof on Special Issue

25   Number 1 is on the State of Texas.  You have to wait all of

DARLINE W. LABAR, OFFICIAL REPORTER

1    the evidence is in, including what you hear at the punishment

2    phase, then you look at it and you say, has the State proven

3    to me beyond a reasonable doubt that Number 1 should be

4    answered yes.  If so, you answer it yes.  If we fail to meet

5    our burden of proof, you say no.

6            Could you do that?

7        A.    Yes, I could.

8        Q.    The reason I ask that is because sometimes people

9    will say, you know, I find that someone intentionally killed

10   during the course of a kidnapping, that's the type of person

11   in my mind that's always going to be a continuing threat.

12   He's going to be a danger.  I don't care what other evidence

13   I hear, that's always going to be the case.  I'll

14   automatically answer Special Issue Number 1 yes.  Now, I

15   don't hear you saying that.  I hear you saying that you want

16   to wait and you want to hear all the evidence before you

17   answer that; is that right?

18       A.    That's true.

19       Q.    Special Issue Number 2.  When you get down there,

20   you're two-thirds of the way to a death sentence.  You've

21   already found the defendant guilty.  You've already decided

22   beyond a reasonable doubt he's going to constitute a

23   continuing threat to society.  Now what the law asks you to

24   do again is to step back, take another long look at all the

25   evidence, no matter what it is or where it came from, and

1    determine is there something in that evidence that you feel

2    rises to the level where that person should be given a life

3    sentence instead of the death sentence.  It could be personal

4    to you.  You get to decide what that is.  We don't have a

5    list of things that you mark off as mitigating or not.

6    That's a personal decision for you to make.

7              But the key is to be able to make that kind of

8    inspection, don't go down there automatically saying, well,

9    if they're a danger, they're getting death, I don't care what

10   I see because I'm not taking a chance with that person.  The

11   law again says, even if you think they're a threat, take a

12   look, maybe there's something there that you haven't figured

13   in yet that you want to look at.

14             Do you feel like you could do that?

15   A.    Yes, I do.

16   Q.    You look at all the things that you can look at when

17   you make that decision.  Again, you get to look at this

18   offense, the circumstances of the offense, the types of

19   things that we talked about before.  The defendant's

20   character and his background.  Again, the same types of

21   things.  Does he have a history?  Does he not have a

22   history?  His personal moral culpability.  That's really just

23   how blameworthy is he for this particular crime.

24             Give you an example of what we're talking about.  If

25   two people go out and commit a capital murder, maybe someone

 1   is the getaway driver, the other person actually pulls the

 2   trigger, I've had some people tell me there's kind of a

 3   degree.  They're both guilty, but as far as punishment, maybe

 4   they see something of a distinction there.  So there's a

 5   blameworthiness that attaches to the gunner instead of to the

 6   driver.

 7        So you look at all those things and then you say is

 8   it there or not.  When you look at the phrase "mitigating

 9   circumstances," what sort of things, if any, come to your

10   mind, Ms. Boales?

11   A.   What were the causes, what happened before, what

12   happened during the incident that caused the cases before

13   us.  You know, it's -- things happen.  Life happens, so --

14   Q.   Let me go through some of things that some people

15   have mentioned to me.  Some people would say alcohol or drug

16   use.  Some people say it's a disease.  People can't control

17   themselves.  If they've had that problem, maybe they'd look

18   upon that as mitigating.  That's one extreme.  I've had other

19   people say on the other hand, no, it's a personal choice that

20   someone makes to either take alcohol or drugs and so I'm not

21   going to give them credit for it.  And there's another group

22   that kind of comes down in the middle and they say, well, I

23   want to look at all the facts.  Maybe there's a distinction.

24   If the person has never used before, they don't know how the

25   substances would affect them.  They go out.  They get high.

1    They do something they normally would not do.  And they see a

2    distinction perhaps between others who are maybe a longtime

3    user, knows exactly how that substance will affect him.

4    Maybe he's even told other people that he gets wild or

5    violent when he gets high or drunk.

6            How do you view that kind of issue?

7        A.    I think I would be one of the middle of the

8    roaders.  I would want to know background.  I would want to

9    know -- I would want to know everything before I made a

10   decision.

11       Q.    That's a good way to do everything is to look at

12   everything in this case.  Take all the facts into account.

13           Some people have told me that maybe age would be a

14   consideration.  I guess the thought being that younger people

15   are more capable of being rehabilitated.  I've had probably

16   an equal number of people who tell me age really probably

17   would not be a factor as long as that person is old enough to

18   know the consequences of his action.  As long as he knows

19   that, that's really what they're looking for.  I've had

20   people say, for instance, people in their teen years who are

21   young, maybe can't appreciate what they're doing as much as

22   someone who's over the legal age, which is 17 in the State of

23   Texas.  No one younger than 17 could be sentenced to death in

24   the State of Texas.

25           What are your feelings there?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    I hadn't really thought about that too much.    Age

2    might be a consideration for me.    I think maturity, too.

3    Because you can have young people who are very mature and

4    very aware, worldly.    So again, I'd have to look carefully.

5    Q.    I guess maybe you might want to couple that with the

6    background --

7    A.    Exactly.

8    Q.    -- maybe to see have they been through the criminal

9    justice for instance.    Have they done something that has put

10   them in that position.    Have there been efforts made to deal

11   with them, to help them, to rehabilitate them.

12   A.    Exactly, yes.

13   Q.    Is that the kind of thing you're looking at?

14   A.    Yes.

15   Q.    Some other people have mentioned just a person's

16   upbringing.    Issues of abuse come into play sometimes.    I've

17   had people say they want to look at, look at all the facts.

18   And when I talk to them about that, I'd like for you to

19   understand, part of your job will be to determine what the

20   facts are in this case.    You get to do that.    The Judge will

21   tell what you the law is, but you get to determine the facts.

22          When it comes down to the issue of abuse, if that's

23   raised, for instance, you get to listen to the witnesses,

24   decide if you believe that claim or not.    You may listen to

25   the witnesses and determine that you don't think it ever

DARLINE W. LABAR, OFFICIAL REPORTER

1    happened, and that's your choice.  Sometimes jurors tell me

2    that in that regard they'd like to know when did that person

3    first make that claim.  I mean, did he do it fairly quickly,

4    or did he wait years and years.  Who did he tell.  Was there

5    some motivation for him to make that claim.  Did he have some

6    advantage or some gain in mind when he made the claim.

7         And the question I also like to ask is, do you think

8    that sometimes people make those claims falsely against other

9    people?  They claim to be the victim of abuse when no abuse

10   ever took place?

11   A.   Yes, I do.

12   Q.   Lastly, and I think we've already talked about

13   remorse, but lastly at times there may be an issue about how

14   an individual has acted waiting for trial.  How has he

15   behaved in the county jail.  You can see, I guess, how it

16   might be a negative against him or for him in Special Issue

17   Number 1 or 2, the thought being if a person has been behaved

18   and been a model prisoner in the county jail, maybe he won't

19   pose as great a threat in the prison system if he's placed

20   there.  Just the opposite being true perhaps, if he can't

21   even behave himself waiting for trial, knowing that those

22   issues will be raised for or against him, then maybe that's

23   another indicator.

24        How do you look at that?  How would you expect an

25   individual to act in the county jail if he knew that his

1    behavior could be used for or against him in this trial?

2        A.    I would certainly expect him to behave himself if he

3    knew it could be used against him.

4        Q.    Right.  Do you have any questions on Special Issue

5    Number 2?

6        A.    No, I don't think so.

7        Q.    Pretty much feel like you understand what the law is

8    going to ask you to do and the types of things that you'll be

9    entitled to look at as possible mitigating circumstances?

10       A.    Yes.

11       Q.    Ms. Boales, I want to go through some of the legal

12   protections that Mr. Murphy has.  These are very important

13   because they insure that he's going to get a fair trial.  And

14   that, I can assure you, is very important to everyone in this

15   courtroom.  Again, it's very important that when we end this

16   trial, no matter what the verdict is, if it's death, that we

17   all be able to leave this courtroom knowing that all his

18   legal rights were protected, he got a fair trial.  We don't

19   have to second guess anything that happened.  And the good

20   news is Judge Entz -- I've tried a case -- death case with

21   him before.  You won't find a better arbiter of the law than

22   Judge Entz.  Every legal protection will be protected to its

23   fullest.

24             So let's go through some of these rights.  The right

25   to presumption of innocence.  As he sits right here right

```
 1    now, he's presumed innocent.  Even though we all know certain
 2    things have already happened, he's been arrested and charged
 3    with the offense of capital murder, he's been indicted for
 4    capital murder.  We're about halfway through jury selection,
 5    but notwithstanding all that, he is still presumed innocent
 6    of the offense.
 7              Can you give him that presumption?
 8        A.   Yes.
 9        Q.   That presumption means you can't find him guilty
10    until the State of Texas proves his guilt beyond a reasonable
11    doubt.  If we do it, fine.  If we don't do it, then you find
12    him not guilty.
13              Could do you that, too?
14        A.   Yes, I could.
15        Q.   He has the right to remain silent.  No one can force
16    a defendant to testify against himself.  If he doesn't
17    testify in this case, Judge Entz will instruct you that you
18    cannot hold that against him or consider it for any reason.
19              Can you do that, too?
20        A.   Yes, I can.
21        Q.   When I said that I have to prove the case beyond a
22    reasonable doubt, I've got to prove all the essential
23    elements of that indictment beyond a reasonable doubt.  They
24    are all very important.
25              Let me give you an example of just how important all
```

1   of them are.   In this case I have to prove to you first that

2   this offense happened in Dallas county, Texas.   If I fail to

3   do that, even if I prove everything else, you still have to

4   say not guilty.   I've had some people say, you know,

5   that's -- you know, you're pushing me pretty hard for what I

6   would term a technicality or a loophole.   You mean to tell me

7   that if you even prove this defendant maybe very brutally

8   killed an individual, intentionally killed an individual

9   during the commission of a robbery or kidnapping, I have

10   absolutely no doubt this person is a continuing danger

11   wherever he is, you mean to tell me that if you don't prove

12   Dallas County, I've got to say not guilty?   That's exactly

13   what I'm saying to you.

14           If you're selected on this jury, you'll take an

15   oath.   You haven't taken it yet.   That oath would make you

16   render a true verdict according to the law and the evidence

17   in this case.   Some people they've got the discipline to

18   follow the law.   Some people say, I don't know.   My emotions

19   maybe would catch up with me.   I don't think that morally I

20   could find someone not guilty if I knew in my heart of hearts

21   that they really did something.   That's kind of one of those

22   places where, you know, the law comes in conflict maybe with

23   our feelings.   But the law in that kind of instance would

24   require you to go back there -- even if all 11 people were

25   against you, and they said forget the law, look at your

DARLINE W. LABAR, OFFICIAL REPORTER

1    common sense, you'd have to vote not guilty if you are going

2    to be true to your oath.

3          Could you do that?

4    A.    Yes, I could.

5    Q.    Let me give you another example.  Sometimes this

6    occurs in a case like this where you might have a written

7    statement taken from a defendant.  The law in that kind of

8    case would say before you can consider the statement, it has

9    to be shown beyond a reasonable doubt that all of the

10   statutory warnings were given to the suspect before he gave

11   the statement.  You know, a lot of these television shows,

12   the police shows, NYPD Blue, you can name them, you know, you

13   can probably tell me what the Miranda warnings are from

14   memory, too.  But let's say in a case -- and I'm going to

15   make this pretty extreme to make a point.  Let's say I went

16   out today and fire bombed a child care center and I killed a

17   hundred children intentionally.  No one saw me do it.  I got

18   away scot-free.

19         A couple of days later the police stopped me for

20   some reason, and I'm just of a mind to tell them what I did.

21   Maybe I want to brag about it.  And I go down to that police

22   station voluntarily.  They put me under some sort of custody

23   and they start talking about the offense.  And I say, I'll

24   give you a statement.  And the detective -- let's say he's

25   just been overworked and forgets to give me one of the

1   warnings, maybe the warning that you've got the right to have

2   an attorney appointed if you can't afford one.  I don't want

3   an attorney.  I never asked for an attorney.  I go ahead and

4   give the statement to him freely.  He doesn't threaten me.

5   Doesn't promise anything to me.  I give the statement.  He

6   files the charges.  I get charged.  I get to trial.  The

7   detective testifies, and he testifies to the jury that he

8   gave only three of the four warnings and he's very honest

9   about it.  Says I just forgot to give that warning.  He never

10  asked for an attorney, so I didn't think anything of it.  You

11  go back and that's the only evidence you have against me.

12  There's no fingerprints, there's no DNA, there's no

13  photographs, there's no eyewitnesses, nothing else.  And the

14  Judge instructs you that that warning wasn't given and you

15  know it's not, you've got to toss that statement aside, look

16  at the other remaining evidence.  Problem is in my case there

17  is no other evidence.  So if you throw the statement out, I

18  go scot-free.  I walk out there.  Maybe I've even made a

19  statement in that voluntary confession that if I ever see the

20  free world again, I'm going to fire bomb the first child care

21  center I see.  You go back there to the deliberation room and

22  the other jurors says there's no way I'm letting him out

23  around my children.  You see the predicament again.  It's the

24  same kind of predicament.  You know I'm guilty.  No doubt in

25  your mind.  But again, your oath requires you to say not

1    guilty because of one of those technicalities.

2          But trust me, we know what the rules are here.

3    We're prepared to play by them.  No problem there.  Even in

4    that kind of situation could you say not guilty, if

5    necessary?

6    A.    I wouldn't like it, but, yeah, I would feel like I

7    had to.

8    Q.    I wouldn't expect to you like it.  I know that would

9    be very difficult.  We put jurors in difficult situations

10   sometimes.  But really, the key is, and I can give you a

11   hundred examples probably, but the key is to be able to

12   follow the law.  One last thing --

13          THE COURT:  Voice was gentle, but the

14   questions were tough, weren't they?

15          VENIREPERSON:  Yeah.

16          THE COURT:  Go ahead.

17          MR. DAVIS:  Thank you.

18   Q.    (By Mr. Davis)  Last situation I want to talk to you

19   about is the offense of murder.  Remember, capital murder is

20   always an intentional murder plus something else.  Could be

21   the intentional murder of a child younger than 6.  It could

22   be the intentional murder of a police officer.  In this case

23   it's the intentional murder of Bertie Cunningham while in the

24   course of committing a kidnapping or robbery.  You join those

25   two things together, you get a capital murder.

1          Now, first of all, let me tell you in this case or

2    ask you if you found out in this case or if it turned out

3    that Ms. Cunningham was an 80-year-old woman -- I want you to

4    assume for a moment Ms. Bertie Cunningham was 80 years old at

5    the time of her death, would you still be able to be fair and

6    impartial?  The reason I ask that is this.  We don't want

7    jurors who will make decisions based solely upon sympathy or

8    their emotions.  We want jurors to be able to look at the

9    evidence on guilt/innocence, punishment, look at all of it,

10   consider it, and then make your decision.  It would be proper

11   perhaps to consider the victim's age on punishment.  That

12   would be very proper.  But I guess primarily on

13   guilt/innocence could you still look at all the evidence

14   fairly and impartially and decide whether this man is guilty,

15   even if the victim turns out to be 80?

16        A.   I believe I could.

17        Q.   Secondly, on murder case -- let's say that you have

18   just a murder case, not a capital murder case.  Let's say

19   there's an intentional murder of somebody for whatever

20   reason, range of punishment would be different.  It would be

21   5 years in the penitentiary up to 99 years or life in the

22   penitentiary.  The key here is to have a open mind to that

23   full range of punishment, understanding -- again, we can go

24   through a lot of examples here, but the key is this, every

25   defendant is different, their backgrounds, their characters

DARLINE W. LABAR, OFFICIAL REPORTER

Page 27

1  are all different, they're unique.  I can assure you, having

2  tried a bunch of these, they're all different.

3          Secondly, the facts and circumstances of every crime

4  are different.  The reasons why they're committed, who

5  they're committed against, the relationship, the rest of it,

6  it's all different.  I might be able to give you examples of

7  things that are intentional that might just shock you,

8  intentional meaning it's no accident.  It's not negligence.

9  It's not self-defense.  It's not insanity.  You intend to

10 kill somebody for whatever reason.  It could be motivated by

11 love or concern or hatred or greed, but you do that.  You're

12 facing that kind of situation.

13         Could you listen to all the evidence, weigh it all

14 about the offense, about the defendant, and give anything

15 within that range of punishment if you thought it was

16 proper?  And that means this, and I'll put it to you

17 bluntly.  Even if you found that someone intentionally took

18 another human life, could you give something as low as 5

19 years in the penitentiary, if you found after you heard all

20 the evidence that you thought that was the right thing to

21 do?

22         Now, you may sitting there right now saying I can't

23 envision that situation.  I don't know what the facts would

24 be.  It might be a rare day when that happens.  We don't ask

25 you to tell us what kind of case you would do that on.

DARLINE W. LABAR, OFFICIAL REPORTER

1    That's the good news.  All we ask you to do is to say if you

2    saw that case, okay, and you thought 5 years was the right

3    thing to do, could you follow your convictions and actually

4    give 5 years?

5        A.   I believe I could.

6        Q.   Sometimes people say, you know, 5 years is just too

7    little for killing.  I don't care if I hear the facts or the

8    circumstances.  Obviously, they aren't qualified because

9    they've already closed off their mind to part of the range of

10   punishment.

11            And I hear you saying, I don't know what it would

12   take, but I'm open to the proposition that the case may be

13   out there someplace.  And if I hear it, I will give it.  Same

14   on the high side.  If I hear a maximum case, I can give the

15   maximum, right?

16       A.   Yes.

17       Q.   Ms. Boales, I think my time is up.  Do you have any

18   questions for me, maybe something we went over a little

19   quickly, or maybe it's something I just didn't even get to

20   that you've been waiting here for 30 minutes for me to ask

21   you?

22       A.   No, I don't believe so.

23       Q.   I thank you for your time.  I appreciate your

24   answers.

25                 THE COURT:  Ms. Boales, do you want to take a

DARLINE W. LABAR, OFFICIAL REPORTER

1    stretch break, go to the rest room, or --

2                    VENIREPERSON:  No, I'm fine.

3                    THE COURT:  -- cup of water, or are you ready

4    to continue?

5                    VENIREPERSON:  Yes, sir.

6                    THE COURT:  You're the boss.  You ready to

7    go?

8                    VENIREPERSON:  Yes, sir.

9                    THE COURT:  We'll continue with the Honorable

10   Jennifer Balido.

11          Ms. Balido.

12                    MS. BALIDO:  Thank you, Judge.

13                    <u>Cross-Examination</u>

14   By Ms. Balido:

15      Q.   Ms. Boales, my name is Jennifer Balido, as the Judge

16   told you.  And along with Mike Byck and another lawyer by the

17   name of Jane Little, we represent Jedidiah Murphy who's the

18   accused in this case.

19          I'm going to ask you about some questions about some

20   things that you put on your questionnaire and also about some

21   of the answers that you gave Mr. Davis.  If you have any

22   questions or don't understand kind of where I'm going, I tend

23   to over talk a little bit you so I may confuse you more than

24   I help you.  So let me know and we'll try to get it all

25   straightened out.  Okay?

1          Tell me a little bit about when you were at the

2    University of Auburn in Montgomery studying criminology.

3    What all did you study?

4          A.    I studied constitutional law and criminology and

5    recidivism in the penitentiary system.  I was doing it as a

6    course to try and become a paralegal.  We had moved to

7    Auburn, and I was trying to get out of education at the time,

8    teaching.

9          Q.    Okay.

10         A.    And my husband was going to school full time as

11    well, so --

12         Q.    All right.  Did you ever -- after studying

13    criminology, did you ever yourself try to be a police officer

14    or try to go into that kind of field?

15         A.    No.

16         Q.    But you said that your husband did?

17         A.    Yes, he did.

18         Q.    Okay.  Where was that?

19         A.    It was in Killeen, Texas.  It was before we moved to

20    Alabama.  He was a police officer for six months, and then

21    received a job offer that was better suited to the family

22    situation we were in.

23         Q.    Okay.  Because being a police officer is kind of

24    hard to be -- the family aspect of being a police officer is

25    hard.

1    A.    Exactly.   The hours were not conducive to a good

2    family life for us at that time.   We had a 2-year-old

3    daughter, and we were trying to have another baby at the time

4    as well.

5    Q.    Okay.   Did he ever do any kind of part-time security

6    work or anything like that after that?

7    A.    He did.   In Alabama he was security for a chicken

8    processing plant in Alabama part-time to help pay for school.

9    Q.    Okay.   Any other law -- you said that your brother

10   or your brother-in-law is a state trooper?

11   A.    Yes, he is.

12   Q.    Where is that?

13   A.    In Houston.

14   Q.    I'm trying to make a couple of notes, just a second.

15        Let me ask you a little bit just about police

16   officers because, you know, the type of case that we're

17   talking about -- and then also the witness list that you've

18   had a chance to look over has a number of police officers'

19   names on it.

20        Do you think that all police officers are truthful?

21   A.    I believe all police officers, like all humans, try

22   to be as truthful as possible.

23   Q.    Okay.   And since they're like all humans, they

24   are -- they're just as fallible as other people?

25   A.    I believe so, yes.

1    Q.    Okay.  Do you think that you would believe a police

2    officer -- well, let me put it a different way.  Do you think

3    that a police officer just simply because they are police

4    officers are more credible than your just run-of-the-mill

5    citizens?

6    A.    Honestly, no.

7    Q.    Okay.  When you studied about constitutional law,

8    did y'all study about the death penalty and those sorts of

9    things and protections and all that kind of stuff?

10   A.    You know, to be honest, I hardly remember the course

11   at all.

12   Q.    Okay.

13   A.    It was a quarter course.  I took it.  I haven't even

14   looked at it since, so I don't remember much about it.  It

15   was 16 years ago.

16   Q.    Okay.  Let me ask you specifically about what you

17   put down on your questionnaire.  You stated that the best

18   argument in favor of the death penalty is that it's used as a

19   deterrent for criminal acts and punishment for the worst

20   crimes.  And then you said what's the best argument in

21   opposition of the death penalty, if it was a true deterrent,

22   then there would be anyone to put to death.  I don't know if

23   I understood --

24   A.    In other words, if it was a true deterrent, then

25   there wouldn't be any reason to have a death penalty because

1    nobody would do anything that would cause that penalty to be

2    enforced.

3        Q.   Okay.  All right.  And then also you -- you

4    mentioned that -- you felt like the prison system is -- in

5    Texas is not utilized effectively when prisoners are released

6    at 95 percent capacity rather than a hundred percent.  Tell

7    me where you kind of got your opinion and kind of facts

8    behind it.

9        A.   For a long time in the news it was related that when

10   the court had a ruling that when the prison system reached 95

11   percent, it was considered at full capacity and prisoners

12   were being released at that point.  And to me, it didn't make

13   any sense.  If it was only 95 percent, why did we leave 5

14   percent empty before we started letting people go?  I would

15   assume that you would want a hundred percent before you

16   started releasing.

17       Q.   And what is your feeling about the prison system and

18   the way that it's run?  Do you think that they're -- do you

19   think that people who are in the prison system have too many

20   rights or too many opportunities, that they watch TV too

21   much, they just sit around and not do anything, or what's

22   your kind of feeling?

23       A.   You know, I've heard so many differing things, I

24   really can't form a valid opinion because I don't know what's

25   true and what's not.  You know, I've heard some stories that

1    that's what they do, they sit around, they exercise all day,

2    they don't do anything.  I've heard others where, you know,

3    they have jobs, they work, so I really don't know which way

4    to go because I don't know what's true.  I haven't ever been

5    there.  I haven't looked at it.  I don't know.

6         Q.   Okay.

7         A.   So I can't -- I can't make a true statement on that.

8         Q.   Okay.  Let me talk to you a little bit specifically

9    about when we're talking about this case, when we're talking

10   about a capital murder case.  Years ago when we were talking

11   about a death penalty case, jurors were kind of faced with an

12   impossible question to answer fairly, I would say.  In the

13   fact that they had the choice between either life

14   imprisonment, which no one really knew what that meant.  I

15   mean, it could mean, you know, just like you hear horror

16   stories.  It could mean 5 years, it could mean 7 years.  If

17   the prison is full, it could mean tomorrow.  I mean -- and

18   then also on the other hand they had the option of death by

19   lethal injection which I think everybody kind of knows what

20   that means.  And luckily the legislature stepped in, and

21   because the courts wouldn't do it, and they said that jurors

22   have the right to know that on a capital murder case that

23   life confinement in prison means 40 calendar years before the

24   possibility of parole.  And that doesn't mean they are going

25   to get parole.  That doesn't mean they are going to live 40

1    years.    That just means that they're going to have to spend

2    40 calendar years day-for-day, year-for-year before they're

3    eligible for parole.

4           But back before we had this law, you were kind of

5    placed as a juror in the situation of either death by lethal

6    injection or life imprisonment, whatever that means.    Okay.

7    Now that we have this law, and you know as a juror that life

8    confinement in prison is at least 40 calendar years.

9           Do you think when they're talking about death

10   penalty cases that both the option of the death penalty by

11   lethal injection and 40 calendar years in the penitentiary

12   are both adequate punishment alternatives?

13       A.    Meaning the minimum of 40?

14       Q.    Meaning the minimum of 40?

15       A.    Yes, I think I do.

16       Q.    Okay.    Do you think if you had your druthers, if you

17   could make your -- make the law in the State, would you

18   rather see it be a situation where it's a possibility of life

19   without parole?

20       A.    As a third option?

21       Q.    As a third option?

22       A.    Yeah, that would be acceptable.

23       Q.    Okay.

24       A.    Because again, it goes with the 5 to 99.    You'd have

25   to weigh everything and see what fit.

1    Q.   Okay.  And so you could see not telling -- not

2  asking you to write anything in stone, but you can see a

3  situation with the law that we have now where if you thought

4  the case -- that this was such a case that 40 years -- that a

5  40-year life confinement sentence was appropriate, you could

6  assess that in this case?

7    A.   Yes.

8    Q.   Okay.  And if you felt like the death penalty should

9  be imposed, that you could assess that as well?

10    A.   Yes.

11    Q.   Okay.  And basically it's important to kind of talk

12  about things that way because as the Judge told you

13  yesterday, he's not sitting as a thirteenth juror.  Once

14  everybody makes a decision over there about the facts and how

15  to answer Number 1 whether or not he's guilty or not guilty,

16  and Number 2, how to answer these special issues, there's

17  nobody else that's going to come along and say, you know, oh,

18  they were wrong, they should have put more stress on, you

19  know, his sexual abuse as a child or something like that.

20  There's nobody that's going to do that.  That's solely up to

21  the jury's decision.

22         You understand that?

23    A.   Yes.

24    Q.   Okay.  Let me talk to you a little bit about what --

25  what Mr. Davis was talking to you about, and talk just for a

DARLINE W. LABAR, OFFICIAL REPORTER

1    short time about the guilt/innocence phase of this trial.

2    Because sometimes we get caught up in the special issues and

3    we forget to look at the fact that the State's got to prove

4    its case beyond a reasonable doubt and that the defendant is

5    presumed innocent unless and until the State can do that.

6    And it kind of bothers some jurors sometime that, you know,

7    the question that we're talking about in this courtroom is

8    not whether or not Mr. Murphy did this crime.  It's whether

9    the State can prove it beyond a reasonable doubt.

10         Can you see how that's the kind of question that's

11   being asked?

12        A.   Yes.

13        Q.   And sometimes that gets caught in people's throats

14   and it kind of bothers them.  But I think you're kind of

15   familiar enough with the system that you understand that's

16   what we're looking at.  And when we're talking about proof

17   beyond a reasonable doubt, we're talking about -- let's say a

18   doubt based on reason and common sense after looking at all

19   the evidence.

20         Can you agree with me there?  When we're talking

21   about a reasonable doubt?

22        A.   Yeah.  I don't know the legal definition.

23        Q.   Well, really there is no legal definition.  It's

24   kind of up to whatever you think it is.  But I can tell you

25   what it's not basically.  It's not proof by a preponderance

1    of the evidence which is about 50 or a little over 50

2    percent.   That's the kind of proof that's necessary in a

3    civil case.   And it's not -- like if the State of Texas

4    through their Child Welfare Department was trying to take

5    away your child, they would have to -- the legal of proof

6    that they would have to rise to is clear and convincing

7    evidence, which is more than a preponderance of the evidence.

8    You know, if they're trying to take your child away,

9    something that important.

10            But proof beyond a reasonable doubt is more than

11   that.   It's more than a preponderance of the evidence.   It's

12   more than clear and convincing evidence.   It's beyond a

13   reasonable doubt, that they eliminate all reasonable doubts

14   from your mind.

15            A.    Okay.

16            Q.    Okay.   So can you hold the State to its burden of

17   proof in that case?

18            A.    I believe so.

19            Q.    Okay.   And what they have to prove to you

20   specifically is the things that are sitting there on that

21   indictment that's in front of -- in front of you.   Basically

22   kind of just as a summary what that basically says is they've

23   got to prove to you on or about a certain date in Dallas

24   County, Texas, that Mr. Murphy caused the death of Ms. Bertie

25   Cunningham in the course of either a robbery or a kidnapping,

1    and did so by either shooting her in the head or drowning her

2    in water.  Okay.  Those are the things that they have to

3    prove beyond a reasonable doubt.

4           And what I want to talk to you specifically about is

5    what we call the mental state which is that he intentionally

6    called the death of Bertie Cunningham.  Okay.  Because Mr.

7    Davis talked to you a little bit and -- you know, that's what

8    we're dealing with right here.  We're not dealing with an

9    accident.  You know, I could bring a gun, pull out a gun, be

10   showing it to Mr. Byck and it accidentally goes off.  I did

11   not have the specific intent to kill him.  I could be tired

12   of all his snorting and sniffing over here and I could pull

13   out a gun and try to shoot his nose off and try to injure

14   him, maybe, and accidentally kill him, you know.  So I

15   probably should have known that I shouldn't have done that,

16   but that was just kind of a mistake on my part because, you

17   know, I wasn't trying to hurt him -- I mean, I was trying to

18   hurt him, but I wasn't trying to kill him.  But if I actually

19   pull out a gun and stick it up to his chest and just pump a

20   round into him, wanting to kill him, not scare him or hurt

21   him, but kill him, that's the kind of specific intent to kill

22   that we're -- we're talking about in this case.

23          Can you hold the State to its burden of proof on

24   that?

25      A.    I believe I can.

```
 1        Q.    Okay.  Let me ask you specifically, do you think

 2   when we ask this on the questionnaire, do you think

 3   eyewitness testimony is infallible?

 4        A.    No.  Not always, no.

 5        Q.    All right.  I wonder if you have heard about the

 6   recent case that was in the Dallas Morning News about a

 7   Monday who just got released from prison after 15 years.  He

 8   was -- a woman was raped at a college.  She said it was an

 9   African American man in a green jacket.  Soon after they

10   found an African American man in a green jacket, brought him

11   by, and she identified him as the person that perpetrated

12   this crime on her.  And then later on down the road DNA comes

13   along, gets better, we have some DNA tests, and it proves

14   that it's not him.  I mean, have you read about cases like

15   that in the news?

16        A.    I haven't heard about that specific case, but I have

17   heard of cases --

18        Q.    Okay.

19        A.    -- where that has happened.

20        Q.    And, you know, I'm sure that that girl walked in and

21   identified him just as clear as a bell and I don't fault the

22   jury on any kind of cases like that, because I'm sure the

23   victim thought that she was very -- being very truthful.  But

24   cases like that do happen sometimes.

25             Let me also ask you, when we're talking about this
```

1    type of case and we're talking about obviously a murder case,

2    so you can assume that you're going to see some pictures from

3    autopsies and that sort of thing.  And additionally, when

4    we're talking about the manner and means that the State has

5    alleged the way Ms. Cunningham died, shooting in the head

6    and/or drowning in water, I think that we can probably assume

7    that the pictures are going to be a little graphic when we're

8    talking about those sorts of things.

9         Do you think that you can judge graphic pictures for

10   their evidentiary value and not be swayed by emotion or some

11   sort of emotional reaction that you might have to those?

12   A.   I believe I could.

13   Q.   Okay.  It's not going to be pretty, and it's not

14   going to be fun, I can tell you, because I've seen them.

15        Let me kind of move away from the guilt/innocence

16   phase and talk to you again about Special Issue Number 1.

17   And as we've talked about it, before you can get to Special

18   Issue Number 1, you have to find that he's guilty of capital

19   murder.  Not murder, but capital murder in the course of

20   either a kidnapping or a robbery.  And, you know, there are a

21   lot of people who say, you know, we're talking about this

22   case about -- about Mr. Murphy causing the death of Ms.

23   Cunningham and either shooting her in the head or drowning

24   her in water, and it's done either to try to take her

25   property through robbing her or kidnapping her.  Okay.

1          When we're talking about that kind of case, do you

2     think that there is a way that you could ever say that

3     someone that could do such a thing would not be a continuing

4     threat to society?

5          A.   Again, I'd want to know more background information,

6     what were the circumstances, things like that.

7          Q.   Okay.

8          A.   But, yeah, I think you have to look at everything

9     before you can make a decision like that.

10         Q.   And when you see the word "probability" -- well,

11    first let me kind of tell you this.  On Special Issue Number

12    1 the State has the burden of proof.  And there is that word

13    "probability" which we've kind of talked about what that

14    means.  But they've got to prove beyond a reasonable doubt

15    that there is a probability.  Okay?  So there's the burden of

16    proof that they have to prove a probability.  Sometimes

17    people kind of get confused and say they have to prove a

18    simple probability.

19         If you had the choice of substituting a word or a

20    phrase for probability, what would that word or phrase be?

21         A.   Definite likelihood.

22         Q.   Okay.  And those are such things that -- it's kind

23    of hard because probability kind of encompasses a large

24    amount of things.  Let's say you that found Mr. Murphy guilty

25    of capital murder in this case and you've answered Special

1    Issue Number 1 yes, that there is a probability that he would

2    commit further -- commit criminal acts of violence that would

3    constitute a continuing threat to society.  And you've

4    answered that question yes.  Okay.  So you feel like he's a

5    continuing threat.

6         Do you think that there is a situation after

7    answering that question yes and finding him guilty of this

8    sort of crime that you think there is anything that would be

9    sufficiently mitigating to allow him to live instead of die?

10   A.    Again, I would want to know more information.

11   Q.    Okay.

12   A.    You know, like I told them, you have to look at

13   everything, you can't look at just what he did then.

14   Q.    Okay.  And I think what -- what this question is

15   trying to get to is, is, you know, sometimes people say that

16   people try to present mitigating circumstances, trying to

17   excuse their behavior or to justify their behavior.  And

18   that's not really it at all.  I mean, if there was a legal

19   justification or a factual justification or a legal excuse or

20   factual excuse, you know, it would be presented in a

21   situation that the person may be not guilty.  And that's not

22   what we're talking about.

23        But I guess my mamma always used to say that you are

24   who you grow up to be.  So I guess that kind of takes into

25   account how you grew up and who you are because of how you

1    grew up.

2          Can you see how that question kind of answers that,

3    or asks that?

4        A.    Yes.

5        Q.    Okay.  Let me kind of give you an example of -- that

6    we've been kind of using to kind of see how people feel about

7    certain things when we're talking about Special Issue Number

8    2.  Let's suppose that Mr. Byck and I are nonidentical

9    twins.  We were born of the same mother, have relatively the

10   same I.Q.  Our mother abused drugs and alcohol when we were

11   babies -- I mean, when we were inside her womb.  And once we

12   are born, then we're just too much than she can handle.  And

13   so she adopts us out to two separate families.  Mr. Byck is

14   adopted into a family that has two parents, very loving

15   parents.  He's read to.  Love is something that is shown in

16   his household.  Good schools.  Siblings that love him.  And

17   any issues that may be remaining from fetal alcohol syndrome

18   or drug abuse by the mother are taken care of by the

19   pediatrician, good medical care.  They kind of take care of

20   all the problems when they crop up, that sort of thing.  He

21   graduates from high school and goes to college, gets a good

22   education.

23          I, on the other hand, am not so lucky.  I'm adopted

24   into a family, it may be single parent.  There may be

25   multiple parents that come and go.  There is really no

DARLINE W. LABAR, OFFICIAL REPORTER

1    medical care, no -- no real identification of any problems.

2    I'm just basically kind of termed a bad kid.  Love is not

3    something that's spoken or shown in my household.  There's,

4    in fact, violence inside the household, violence is basically

5    all we watch on TV.  Physical abuse, mental abuse, from both

6    the parents and the siblings.  There is some sexual abuse at

7    different points in my life.  I go to school, you know, and I

8    kind of make okay grades, but never quite catch that one

9    teacher that can really kind of change a child's life as we

10   know that can happen.  And I graduate from high school and

11   kind of meander from job to job.

12            As luck would have us or I guess as bad luck would

13   have it in our -- in this example, Mr. Byck and I decide to

14   rob banks on opposite corners of downtown Dallas.  We walk in

15   with a gun.  We threaten the people inside the bank.  We get

16   money, and we walk out.  We're immediately arrested.  And of

17   course we don't know that each other is doing this because we

18   haven't seen each other.  We're immediately arrested, and

19   we're put on trial and found guilty of aggravated robbery.

20            Now comes the point of sentencing.  Do you think

21   that we should be sentenced the same or differently for the

22   crime that we committed?

23       A.    I'd have say the same.

24       Q.    Okay.  And so it's kind of -- you do the time, you

25   do the crime -- I mean, you do the crime, you do the time

1    sort of situation?

2         A.    Yeah.   For the most part, yeah.

3         Q.    Do you think -- let's say that we killed somebody

4    inside the bank and so now we're charged with capital murder

5    and you're faced with these two questions.   You've already

6    found us both guilty separately of capital murder.   Both

7    Special Issue Number 1 for whatever reason you believe we're

8    going to be a continuing danger to society, do you think that

9    the issues that you talk about in Special Issue Number 2 are

10   going to be different because our backgrounds are different?

11   I'm not trying to get you to say the results are different,

12   just do you think you would consider different things when

13   you're considering Special Issue Number 2?

14        A.    Possibly.   I can't give a definite answer.

15        Q.    Okay.   Well, that's fine.   What kind of effect do

16   you think in talking about Special Issue Number 2 -- do you

17   think that the defendant's --

18             MS. BALIDO:   Thank you, Judge.

19        Q.    (By Ms. Balido)   Do you think the defendant's

20   character and background is a consideration that you would

21   need to look at in answering Special Issue Number 2?

22        A.    Yes, I believe you have to.

23        Q.    Okay.

24        A.    Yeah.

25        Q.    And then also the circumstances of the offense?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    But you didn't go into character, you just went into

2    background.

3      Q.    Okay.  So I guess you would want to -- well --

4      A.    I would want to know more about what you were like

5    as a person as well.  I'd want to hear some things about

6    that.

7      Q.    Okay.  Like school records or --

8      A.    Yeah.

9      Q.    -- those sorts of things?

10     A.    Yeah, history.

11     Q.    To try to get a personal history of what --

12     A.    Exactly.

13     Q.    All right.

14     A.    Exactly.

15     Q.    Okay.  And that's probably my fault for not making

16   that kind of more clear.

17           Do you think that the personal moral culpability of

18   someone is affected by their character or their background or

19   the things that have happened to them in their lives?

20     A.    I believe it can be, yes.

21     Q.    Okay.  I just have a few more minutes, and let me

22   kind of -- just kind of end up by talking about some basic

23   general things.  I see that you live in Garland?

24     A.    Yes.

25     Q.    Okay.  Do you have any inkling of any publicity or

1    any kind of news stories that you might have heard about this

2    case?

3          A.    I travel quite a bit.

4          Q.    Okay.

5          A.    And I don't read the newspaper.

6          Q.    Okay.

7          A.    So I don't know anything about it.

8          Q.    All right.  Okay.  Well, as you can see on the

9    witness list, there are a number of Garland police officers

10   involved.  And so, you know, it's likely to -- and so since

11   you're from Garland, I just thought I'd ask if you had any

12   kind of knowledge or heard anything on the radio or TV about

13   it.

14         A.    No.

15         Q.    Let me just kind of finish up by saying this.  We

16   talk about the jury being kind of one group of people.  And

17   that's not really what it is.  It's a group, yes, but it's

18   also 12 individuals that make up that group.  And so there

19   may be a situation that you get back into the jury room, and

20   some people, you know, maybe six of you think, well, the

21   State didn't prove its case beyond a reasonable doubt because

22   they -- because they didn't prove that it happened in Dallas

23   County, Texas.  And the other six may say, well, the State

24   didn't prove its case beyond a reasonable doubt because they

25   proved stabbing instead of either drowning or shooting.  And

DARLINE W. LABAR, OFFICIAL REPORTER

1   that kind of sounds farfetched kind of from here, but it --

2   when you're looking at it kind of abstractly, but what you

3   still agree on is that the State didn't prove their case.

4   You know, there may be an inkling in the back of your mind

5   that the State just didn't quite get there.  And that's an

6   individual thing, but everyone agrees or maybe three or four

7   people agree that there is just no -- the State hasn't proved

8   its case beyond a reasonable doubt.  So those are things that

9   you don't have to -- you don't have to agree on specifics,

10  but just that there is reasonable doubt.  And that kind of

11  goes along the same with sufficient mitigating circumstances

12  or a circumstance.  Something may be mitigating to you.

13  There may be something that just -- you know, once you hear

14  it, you say, okay, I've heard it now.  He deserves a life

15  sentence instead of a death sentence.  And there may be

16  somebody else that's heard something totally different.  It

17  may have even come from, you know, the case in chief, just

18  something that happened that he may think that's mitigating.

19  And even though y'all don't agree on what is mitigating,

20  y'all both see there's a mitigating circumstance so you don't

21  have to agree on that sort of thing, either.

22          And also, I would just like to kind of make you

23  aware of kind of the situation that has happened in the past,

24  you know.  We're talking about some serious stuff here.

25  We're talking about the death of an individual, someone has

1    already died.  And then we're also talking about whether Mr.

2    Murphy is going to live or die.  And that, of course, brings

3    forth a lot of emotions on a lot of people.  And sometimes

4    there are people with strong personalities that prey on those

5    emotions and emotions of people that might be more soft

6    spoken than you are or more -- not as strong of a personality

7    as you are.  And if that happens and there is some

8    domineering or some hard sales tactics that are really kind

9    of outside the confines of the jury instructions, I'd hope

10   that you'd try to deal with that and just make sure everyone

11   could have their own voice.

12          Can you agree that you'll do that?

13   A.    Oh, yes.

14   Q.    Okay.  If it gets just totally out of hand which I

15   don't expect that it will, but sometimes it does, and you

16   don't feel like that y'all can handle on your own, I'd ask

17   that you just ask the bailiff to alert the Judge that that

18   sort of thing is going on back in the jury deliberation room?

19   A.    Yes.

20   Q.    Okay.  Ms. Boales, I appreciate it.  I appreciate

21   your time and the thoughtful way that you filled out your

22   questionnaire.  You'd be amazed how many blanks we see on

23   these questionnaires, and I do appreciate that you took the

24   time to fill out as much as you could and to answer our

25   questions fully today.  Thank you.

1           VENIREPERSON:   Thank you.

2           THE COURT:   Ms. Boales, excuse you in the

3    company of the bailiff momentarily.   The attorneys will

4    confer with their co-counsel, and then they will ask me

5    whether they think you should be continued under

6    consideration and I'll make the final consideration.

7           VENIREPERSON:   Okay.   Thank you.

8           THE COURT:   If you'd retire with the bailiff.

9           (Venireperson leaves the courtroom.)

10          (State no challenge for cause - Ms. Boales)

11          MR. DAVIS:   The State has no challenges for

12   cause.

13          (Defense no challenge for cause - Ms. Boales)

14          MS. BALIDO:   Defense has no challenge for

15   cause.

16          (Venireperson returned to courtroom.)

17          (Connie Boales Prospective Juror No. 27)

18          THE COURT:   Ms. Boales, you remain under

19   consideration as a prospective juror.

20          VENIREPERSON:   Okay.

21          THE COURT:   With your permission, at the

22   request of the attorneys, I'm going to ask that you allow Ms.

23   Madore, the bailiff to your left, to take a Polaroid picture

24   of you for the purpose only of assisting the attorneys once

25   we reach this level of 48 qualified prospective jurors, will

1    exercise their peremptory challenges.  We talk to -- they

2    talk to an awful, awful lot of people.  We've been at this

3    for a while.  Kind of starts to blend in from time to time

4    with regard to faces and information.  Once they -- the jury

5    has been selected, the Court Administrator, Ms. Daily, who

6    has come in, will shred it.  Won't even be made a part of the

7    trial record, so I don't want you to worry about it being

8    made a part of the trial record for any purpose whatsoever.

9          I've asked Ms. Daily to come in also and confirm

10   your home and work phone number.  If they should change

11   before she calls you back with the ultimate decision whether

12   you are or are not one of the 12 jurors, if you would be kind

13   enough to give her a call so we can keep up with you as need

14   be.

15         Also, obviously you're going to have to tell your

16   spouse and family and employers that you remain under

17   consideration as a prospective juror.  Do not, however,

18   please, please, contact the Dallas Morning News and get back

19   copies of the newspapers that had stories about the incident

20   which forms this prosecution.

21         Have you any questions for us?

22              VENIREPERSON:  Don't believe so.

23              THE COURT:  All right.  Thank you.

24   Ms. Daily, Ms. Boales.

25         Let's take a 10-minute break, and then we'll proceed

1   with Mr. Roberts.

2               (Recess of process.)

3               THE COURT:  Mr. Roberts, good afternoon.

4   Welcome back.

5               VENIREPERSON:  Thank you.

6               THE COURT:  You're welcome.  Sorry to keep you

7   waiting, but we haven't been exactly twiddling our thumbs.

8               VENIREPERSON:  I was busy.

9               THE COURT:  You're working a crossword

10   puzzle.  We see that's one of your hobbies.

11       Ask that you raise your right hand and be sworn in

12   again, please.

13       Mr. Roberts, you solemnly swear -- you may be seated

14   if you wish.

15               VENIREPERSON:  Oh --

16               (Venireperson additionally sworn.)

17               VENIREPERSON:  I do.

18               THE COURT:  Thank you.  You may lower your

19   hand, Mr. Roberts.

20       A little over 24 hours ago, Mr. Roberts, I

21   reintroduced or I introduced those whom we see seated at the

22   counsel tables.  Allow me though to refresh your memory and

23   reintroduce them momentarily, if I may.

24       Beginning to the far left, one of the Senior

25   Prosecutors in the Dallas District Attorneys Office, the lead

1    prosecutor in this case, the Honorable Greg Davis.

2              MR. DAVIS:  Good afternoon.

3              THE COURT:  Seated next to him is co-counsel

4    at the present time.  This lady occupies the role of Chief

5    Prosecutor in this the 194th District Court, the Honorable

6    Mary Miller.

7              MS. MILLER:  Good afternoon.

8              THE COURT:  Mr. Roberts, moving on to the

9    defense table, we begin first with one of the defense

10   attorneys, the Honorable Jennifer Balido.

11             MS. BALIDO:  How are you, Mr. Roberts?

12             THE COURT:  Seated next to Ms. Balido is one

13   of the other defense attorneys representing the defendant.

14   This man is a board certified criminal law specialist, so

15   designated by the State Bar of Texas, experience, training,

16   and having passed a very difficult examination.  Gentleman's

17   name is Michael Byck, B-y-c-k.

18             MR. BYCK:  Mr. Roberts.

19             THE COURT:  Seated next to Mr. Byck, opposite

20   Ms. Balido, is the accused, the defendant, if you will,

21   Jedidiah Isaac Murphy.

22             THE DEFENDANT:  Good afternoon.

23             THE COURT:  There is a third defense

24   attorney.  Her name is Jane Little.  She's also a board

25   certified criminal law specialist.  However, as we are joined

1   one another this afternoon in the courtroom, she is out

2   working with regard to some matters of interviewing some

3   witnesses that she anticipates presenting to the jury once

4   the testimonial stage of the trial begins.

5        Are you ready to begin?

6             VENIREPERSON:  Yes, sir -- Your Honor, I

7   mean.

8             THE COURT:  The attorneys are ready as well,

9   Mr. Roberts.  We'll begin with the State and the Honorable

10  Greg Davis.

11       Mr. Davis, Mr. Roberts.

12            MR. DAVIS:  Thank you.  May it please the

13  Court.

14                  JOHN ROBERTS

15  was called as a venireperson by the Court and, after having

16  been first duly sworn, was questioned as follows:

17              Voir Dire Examination

18  By Mr. Davis:

19     Q.   Mr. Roberts, how are you today?

20     A.   Fine.  Thank you, sir.

21     Q.   Mr. Roberts, I'm going to have some time to talk

22  with you today and just remind you what the Judge has told

23  you previously.  There are no right or wrong answers.  Most

24  of the questions that I'm going to ask you deal with how you

25  feel about something, what your opinions are.  As long as you

1    tell us how you honestly feel about a subject, that's all
2    that we as attorneys can expect from you.   Okay?
3             Mr. Roberts, let me first of all just ask you -- I
4    see that you're in favor of the death penalty from your
5    questionnaire.   Can you tell me why you're in favor of death
6    penalty?
7             A.   I'm in favor of the death penalty?
8             Q.   Yes, sir.  Or are you in favor of the death penalty?
9             A.   Well, if I put it on my questionnaire, apparently
10   it's true.  But I don't have a blanket feeling that I'm in
11   favor of the death penalty.   You see, in a society we live
12   in, I believe life should be respected.   That is, from the
13   criminal towards the victim, as well as the Court toward the
14   criminal.   So life should be respected both ways.   But
15   however in life -- in the life that we live in, if a person
16   says that they have a flat out -- I see on television people
17   flat out says, oh, get rid of the death penalty, we don't
18   want the death penalty for anyone, they say.   You know, some
19   of the people, you know, talking.  I say we should have a
20   respect for life because in our life it happens rarely, but
21   it happens that sometimes people or things or animals go mad.
22            When I was a child, up and down my street there was
23   a dog that went mad.   He walked up and down the street with
24   stuff coming out of his mouth, you know.   I can't even --
25   some people take their hand and do a fly, you know, bam, or

1    they take their hand and do an ant, bam.  I can't do that.

2    They take their hand or foot and do a roach.  I can't do

3    that.  My father once told me to go out and kill the

4    Thanksgiving turkey.  You put him under a big tub and stick

5    his head out and chop his head off.  Well, I can't do that

6    either, but I have the realization that in society I can't

7    even kill a bug.  But I have the sense to know that sometimes

8    things, animals, people, or plants go mad.  And sometimes we

9    have to make the ultimate sacrifice as people and do such

10   things as we call the death penalty.  Because sometimes --

11   sometimes people or things go mad.

12       Q.    Okay.  Thank you.

13                  (Mr. Roberts Excused From Consideration)

14                  MR. DAVIS:  Judge, I believe we have an

15   agreement.

16                  MR. BYCK:  So agreed, Your Honor.

17                  THE COURT:  Mr. Roberts, the attorneys have

18   authorized me to inform you that we appreciate your return

19   this afternoon.  You are excused.

20                  VENIREPERSON:  Thank you.

21                  THE COURT:  You're welcome.

22                  (Recess of proceedings.)

23

24

25

1                      Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4         I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13        I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16        Witness my hand this the 19th day of November, A.D.,

17   2001.

18

19

20                    DARLINE W. LABAR
21                    Official Court Reporter
                      194th Judicial District Court
22                    Dallas County, Texas
                      (214) 653-5803

23

24

25   Certification No. 1064 Expires December 31, 2002

REPORTER'S RECORD

**74145**

VOLUME 32 OF 65 VOLUMES

TRIAL COURT CAUSE NO. F00-02424-NM

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN
COURT OF CRIMINAL APPEALS**

DEC  5 2001

Troy C. Bennett, Jr., Clerk

A P P E A R A N C E S :

HONORABLE BILL HILL, Criminal District Attorney
          Crowley Criminal Courts Building
          Dallas, Dallas County, Texas  75207
          Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
          MS. MARY MILLER, A.D.A., SBOT # 21453200
                FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
          Phone:  214-653-9400
                FOR THE DEFENDANT.

\*\*\*\*\*\*\*\*\*

     On the 2nd day of May, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

     Proceedings reported by machine shorthand, computer

assisted transcription.

ORIGINAL

```
 1                         INDEX VOLUME 32

 2    May 2nd, 2001                            PAGE     VOL.

 3    INDIVIDUAL VOIR DIRE:

 4    Proceedings.................................... 2      32

 5    Mr. Newman Excused From Consideration........... 18     32

 6    State challenge for cause - Ms. Alvarado........ 29     32

 7    Challenge for Cause Granted..................... 29     32

 8    Ms. Alder Excused From Consideration............ 38     32

 9    Ms. Rash Excused From Consideration............. 44     32

10    General Voir Dire By The Court.................. 44     32

11    Ms. Campbell Excused From Consideration......... 78     32

12    Reporter's Certificate.......................... 79     32

13

14                 CHRONOLOGICAL VENIREPERSON INDEX

15                       STATE       DEFENSE           VOL.

16    RANDALL NEWMAN            4                        32

17    ROSA ALVARADO            20          26            32

18    CARLA ALDER              31                        32

19    CAROLYN RASH             41                        32

20    YAVONDA CAMPBELL         66                        32

21

22                 ALPHABETICAL VENIREPERSON INDEX

23                       STATE       DEFENSE           VOL.

24    CARLA ALDER              31                        32

25    ROSA ALVARADO            20          26            32
```

DARLINE W. KING, OFFICIAL REPORTER

```
1   YAVONDA CAMPBELL        66                                    32

2   RANDALL NEWMAN          4                                     32

3   CAROLYN RASH            41                                    32

4

5               *NO EXHIBITS ADMITTED THIS VOLUME*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DARLINE W. KING, OFFICIAL REPORTER

```
 1                      P R O C E E D I N G S
 2              THE COURT:  Good morning, Mr. Newman.  Welcome
 3    back.
 4         How long has it been since you were in Perry?
 5              VENIREPERSON:  Last year.
 6              THE COURT:  Really?
 7              VENIREPERSON:  Yeah.  Going back probably
 8    sometime this summer.
 9              THE COURT:  I was born and raised in Waterloo.
10              VENIREPERSON:  Oh, were you, really?  Well,
11    good.
12              THE COURT:  Would you raise your right hand,
13    please?
14              (Venireperson additionally sworn.)
15              THE COURT:  Thank you.  Mr. Newman, I have
16    previously introduced, but it's been a couple of days.  Let
17    me refresh your recollection and reintroduce those whom we
18    see seated at the counsel tables.
19         To the far left, Mr. Greg Davis.
20              MR. DAVIS:  Good morning.
21              VENIREPERSON:  Senior Prosecutor with the
22    Dallas District Attorneys Office, lead prosecutor in this
23    particular case.
24         He is assisted by co-counsel, at the present time
25    Chief Prosecutor assigned by District Attorney Bill Hill to
```

```
 1   this the 194th District Court, the Honorable Mary Miller.

 2               MS. MILLER:  Good morning.

 3               VENIREPERSON:  Good morning.

 4               THE COURT:  Moving on to the next table, we

 5   begin first with one of the three defense attorneys, a board

 6   certified criminal law specialist, so designated by the State

 7   Bar of Texas by experience, training, and successfully

 8   passing a rather difficult examination, the Honorable Michael

 9   Byck.

10               MR. BYCK:  Good morning, Mr. Newman.

11               VENIREPERSON:  Good morning.

12               THE COURT:  Next to Mr. Byck is one of the

13   other attorneys representing the defendant, the Honorable

14   Jennifer Balido.

15               MS. BALIDO:  Good morning.

16               VENIREPERSON:  Good morning.

17               THE COURT:  Seated next to Ms. Balido,

18   opposite Mr. Byck, is their client, the accused, the

19   defendant, if you will, Jedidiah Isaac Murphy.

20               THE DEFENDANT:  Good morning.

21               VENIREPERSON:  Good morning.

22               THE COURT:  There is a third defense attorney,

23   Jane Little, also a board certified criminal law specialist,

24   not with us this morning.  She is addressing other matters

25   with regard to this case, other than jury selection as we
```

Page 4

1    speak.

2            VENIREPERSON:  All right.

3            THE COURT:  Mr. Newman, recall if you will, I

4    mentioned to you a couple of days that there will be no right

5    or wrong answers to the attorneys' questions.  You will know

6    before you leave us this morning whether or not you remain

7    under consideration as a prospective juror in the case.

8            Are you ready to go?

9            VENIREPERSON:  Sure.

10           THE COURT:  All right.  We'll begin as we are

11   obligated by law to do with the State in the Honorable Greg

12   Davis.

13           Mr. Davis, Mr. Newman.

14           MR. DAVIS:  Thank you.  May it please the

15   Court.

16                   RANDALL NEWMAN

17   was called as a venireperson by the Court and, after having

18   been first duly sworn, was questioned as follows:

19                   Voir Dire Examination

20   By Mr. Davis:

21      Q.    Good morning again, Mr. Newman.  How are you?

22      A.    I'm doing fine.

23      Q.    Mr. Newman, for the next few minutes, I'll have a

24   chance to speak with you about some of the issues involved in

25   this case.  Just to reiterate what the Judge had previously

1    told you, there are no right or wrong answers.  Most of these

2    questions deal with how you feel about an issue, what your

3    opinions are.  I've done enough of these to know that

4    everybody feels differently about these issues.

5         A.   Okay.

6         Q.   So as long as we know honestly how you feel, that's

7    all we really need.  Okay?

8         A.   Okay.

9         Q.   First of all, let me just begin, and again, tell you

10   what our position is in this case because it's not going to

11   change.  The State is actively seeking the death penalty

12   against Mr. Murphy.  At the punishment phase I will be asking

13   you to answer these special issues yes and no which would

14   require Judge Entz to impose a sentence of death on Mr.

15   Murphy.  You know -- and I have some people who come down,

16   they fill out a questionnaire, and they do honestly tell me

17   they're in favor of the death penalty, but perhaps it gets to

18   be a little bit different when you're sitting up where you

19   are --

20        A.   Right.

21        Q.   -- looking to be a prospective juror.  And I have

22   had some jurors tell me that in the abstract that's one

23   thing.  Personally they're not sure.  You know, Mr. Murphy is

24   not an abstract object.  He's a living, breathing human

25   being.  The reality is that if the State of Texas prevails in

1    this case, there will come a day in Huntsville where he's

2    going to lie dead on a gurney as a result of the verdict

3    rendered in this particular case.

4            So if you would just -- just tell me how you

5    honestly feel about personally participating in this kind of

6    case.

7        A.    That's kind of vague, but I think -- would I be able

8    to do it?  Is that the question?

9        Q.    Yes.  Yes, sir.

10       A.    Yeah, I would be able to do it.

11       Q.    Okay.  I know that you've told us that you are in

12   favor of the death penalty.  Can you tell me -- tell me why

13   you're in favor of the death penalty?

14       A.    I think it's somewhat of a deterrent.  I think

15   people should pay for what they've done, if they've done it.

16       Q.    Are there any cases maybe that you followed in the

17   news where you thought to yourself that may well be a death

18   penalty case?

19       A.    I generally don't watch much of the news, sometimes

20   some highlights and stuff like that.  Dahmers and stuff like

21   that, I think that was definitely.

22       Q.    Have you always felt the same way about the death

23   penalty?

24       A.    Pretty much, yeah.

25       Q.    Okay.  I know that you're married.

1      A.    Uh-huh.

2      Q.    How does your wife feel about this kind of issue?

3      A.    Well, we talked about it a little bit, but she's not

4    for or against it as such, strongly so.

5      Q.    Uh-huh.  Okay.  Let me -- let me just go through

6    some of these issues then, and let's talk about the two up

7    here on the board.  This is really where the death penalty is

8    different than other kinds of felony cases.  Normally in a

9    felony case if you found someone guilty, then the Judge would

10   give you a range of punishment to work with.  You'd hear all

11   the evidence, then you'd decide what the proper sentence

12   was.

13          For instance, in a murder case, you'd have to set a

14   punishment somewhere between 5 years up to 99 years or life.

15   You'd actually just write in the number of years you thought

16   the proper sentence would be.  But as the Judge has explained

17   in death, there's a little bit different procedure.  Once you

18   find someone guilty of capital murder, we go to a punishment

19   phase.  You hear other evidence if it's available, either a

20   criminal history, no criminal history, what's the person's

21   background, etcetera.  Then you go to these issues.

22   Depending on how you answer them, that really dictates the

23   verdict in this particular case.

24          When you look at Special Issue Number 1, Mr. Newman,

25   can you tell me just in your own words what do you think

DARLINE W. LABAR, OFFICIAL REPORTER

1    Special Issue Number 1 is asking you to do?

2       A.    If he's a continuing threat, you know, that would

3    definitely -- be a probability he would commit another

4    crime.   That's what it states.

5                 THE REPORTER:  I'm sorry, sir, I couldn't

6    understand you.

7       A.    It wasn't really a good sentence anyways.   If the

8    person is capable of committing another crime of this such.

9       Q.    (By Mr. Davis)  With -- without regards to what the

10   legal rules may be --

11      A.    Uh-huh.

12      Q.    -- or the rules of evidence, just forget that for a

13   moment.  Can you tell me what sort of things do you think

14   would be helpful to know before you have to answer Special

15   Issue Number 1?

16      A.    Pretty much everything --

17      Q.    Uh-huh.

18      A.    -- that deals with the case, you know, the evidence

19   and what took place and stuff like that, if the person was

20   definitely guilty or not.

21      Q.    Yeah.   Okay.  And certainly you'd be entitled to

22   look at all the facts of this case, how was this murder

23   carried out, who was the victim, why was it carried out, what

24   was the -- what was the defendant's response after he did the

25   killing.  You get to look at all of those things.

```
 1              You know, some people would tell me maybe it would
 2    make a difference, you know, as to whether these people knew
 3    each other or not.  Maybe they had known each other for
 4    years.  They had been feuding over something, and finally it
 5    resulted in a murder.  Maybe they had been -- maybe they'd
 6    had a great relationship that somehow went sour.  Maybe they
 7    were strangers.  Maybe this person was randomly selected to
 8    be a victim.  You know, was the defendant remorseful.  Was he
 9    not remorseful.  Those are the types of things some people
10    tell me about.
11              Is that the kind of thing that you're talking about,
12    also?
13        A.    Yeah, that sounds right.
14        Q.    I can't go into all the facts in this case with
15    you.  We want you to hear those for the first time when
16    you're a juror.
17        A.    Uh-huh.
18        Q.    But I can tell you or ask you this question.  If it
19    turned out that the victim in this case was an 80-year-old
20    woman, would you still be able to be fair and impartial, or
21    do you think that might affect you in some way?
22        A.    I don't think age would matter to me.
23        Q.    All right.  Certainly the age of the victim may not
24    have any bearing on guilt/innocence, whether this person
25    actually committed the offense or not, but you'd be entitled
```

1    to take that into account, if you wanted to, on punishment,

2    because I've had some people tell me maybe I'd want to factor

3    that in.  I've had people say was the victim innocent, was

4    the victim helpless in some way.  So you'd be entitled to

5    look at it that way if you wanted to.

6        Special Issue Number 1, too, would allow you to look

7    into the defendant's background and his character.  Some

8    people have told me that perhaps the best indicator of the

9    future would be what he's done in the past.  Is there some

10   sort of pattern that's developed over time, or perhaps this

11   man's never done anything before and this is just a blip

12   that -- an aberration if you will.

13       A.   Uh-huh.

14       Q.   And there's really no likelihood that something like

15   this is ever going to happen again.  Do you think that would

16   be helpful to know, too?

17       A.   Sure.

18       Q.   When you look at -- when you look at these issues,

19   Mr. Newman, probability, it's a word that I'd like to talk to

20   you about.  None of these words have legal definitions.

21   We're going to rely on your definitions.

22       A.   Uh-huh.

23       Q.   The legislature gave us these questions, but they

24   didn't give us definitions to go along with them.  In the

25   context of Special Issue Number 1, how would you define

```
 1   probability?  What does that mean to you?

 2       A.   A greater chance than not that he would, or she

 3   would do something.

 4       Q.   Okay.  Criminal acts of violence.  What sort of

 5   criminal acts come to mind when you think of that term?

 6       A.   Real serious stuff, murder, rape, armed robbery.

 7       Q.   Okay.  Yeah, some people kind of fall into a trap of

 8   saying, well, criminal acts of violence, he has to do the

 9   exact thing again, murder or capital murder.  The law doesn't

10   require that.  I think you've kind of listed some other

11   things.  A lot of people tell me that criminal acts of

12   violence, regardless of the severity, has to involve another

13   person.  Either that person's physically harmed in some way

14   or they're at least put in threat of harm, could be a robbery

15   or could be an assault of some sort.

16            Is that the kind of thing you're thinking of, too?

17       A.   Right.

18       Q.   Finally, society.  Who comes to mind when you think

19   of society?

20       A.   Everybody who's in the general public.

21       Q.   Okay.  Society could mean that.  It could mean

22   people like you and I that are in the general -- general

23   population.

24       A.   Uh-huh.

25       Q.   The Judge has previously told you that a life
```

1    sentence means a person has to spend at least 40 calendar

2    years in the prison system before they become eligible for

3    parole.

4          Now, in that kind of context can you see how prison

5    may also be a part of society with regard to that question?

6    A.    A part of society, but not my society as such.

7    Q.    Right.  See, not your society.  But we're talking

8    about the defendant's society.  Here's the way I like to

9    think about it.  See if you agree with me.  I like to think

10   of society -- the defendant's society as being anywhere he

11   may find himself, anyone he may come in contact with.  That

12   may be in a prison, may be in a free world.

13         Does that make sense to you?

14   A.    Uh-huh.

15   Q.    Okay.  A question that sometimes I'll ask would be

16   do you think people inside of prison, and it may be other

17   felons, could be guards, it could be nurses or secretaries,

18   do you think that they also have the right to be free from

19   violent crime?

20   A.    Sure.

21   Q.    Mr. Newman, do you have any questions about Special

22   Issue Number 1 before we go to Special Number 2?

23   A.    No.

24   Q.    Special Number 2, again, deals -- I think the Judge

25   has described it as the safety net.  By the time you get

1   there, you're already two-thirds of the way to a death

2   sentence.  You've already found the person guilty of capital

3   murder.  You've already decided beyond any reasonable doubt

4   this person is going to constitute a continuing threat to

5   society.  If you answer Special Number 2 no, he gets death.

6   If you answer it yes, he gets life.  The law would ask you to

7   be able to go down there, look at all the evidence again,

8   decide is there something in that evidence, whatever it may

9   be, wherever it may come from, that is important enough in

10   your mind where this person should get a life sentence

11   instead of a death sentence.

12          Some people would tell me if they truly believed

13   someone is a continuing threat beyond any reasonable doubt,

14   they just couldn't justify giving him a life sentence and

15   therefore perhaps putting someone else at risk of harm in the

16   future.  Other people tell me they can go ahead and go

17   through that process and look at the evidence anyway.

18          How do you feel about that?

19   A.    I would definitely look to see if there was some

20   other circumstances to take into consideration that.

21   Q.    All right.  Can you think of any things right

22   offhand that might be important enough to spare a man's life

23   in this kind of case?  Mitigating circumstances.  What comes

24   to mind?

25   A.    It depends on somewhat the circumstance of what

DARLINE W. LABAR, OFFICIAL REPORTER

Page 14

1    happened, the person that it happened to, and the

2    relationship.  I guess without knowing anything, it would be

3    real hard -- how the relationship between the defendant and

4    the other person was.  You know, was there some other case

5    that happened.  There could have been a right reason, but

6    maybe a reason in his mind or her mind that --

7        Q.   Well, let me give you an example.  See if this is

8    kind of what you're talking about.  This may be an extreme

9    example, but let's say that -- let's say I've got a teenage

10   daughter and I find out that a neighbor perhaps has sold her

11   crack cocaine, maybe gotten her hooked on cocaine.  And I

12   find out about that.  And I decide that I'm going to go out

13   and intentionally kill that person.  Maybe my daughter has

14   been ruined, maybe brain dead or whatever, because of that.

15   And I go in and I break into his home and I murder him.

16            Now, I've committed a capital murder because I

17   committed a burglary in addition to capital murder.

18       A.   Uh-huh.

19       Q.   So technically, you see, I've committed a capital

20   murder, but you may want to look at the relationship and the

21   reasons why I did that.

22            Is that kind of what you're talking about, even

23   though that may be an extreme example?  Or are you talking

24   about something different?

25       A.   You can say that.  Say someone raped my daughter and

DARLINE W. LABAR, OFFICIAL REPORTER

1    I go out and I want to kill that person, that would be

2    somewhat --

3         Q.    Yeah.   Okay.   I want to go through some of the

4    things that other jurors have mentioned to me and get your

5    reaction to them.   Sometimes jurors will tell me that the age

6    of the defendant may be a mitigating circumstance, the

7    thinking being a younger person may be more capable of being

8    rehabilitated than an older person.

9         What are your feelings about age as a possible

10   mitigating circumstance?

11        A.    If it's a young teenager, I think it's possible, but

12   someone who is over 18 or so, I don't know if it's possible.

13        Q.    In the State of Texas you have to be at least 17

14   before we can seek the death penalty against an individual

15   anyway.

16        Sometimes people will tell me that drug use or

17   alcohol use may be a mitigating circumstance.   I guess there

18   are two extremes here.   I've had people tell me they think

19   it's a disease process.

20        A.    Uh-huh.

21        Q.    Therefore it would be a mitigating circumstance.

22   I've had others tell me it's a personal choice and you have

23   to make that decision so they don't particularly think of it

24   as mitigating.

25        What are your feelings there?

---

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    It's a personal choice, influence the way you are,

2  take what you do.

3    Q.    Sometimes in cases like this, again, remorse may be

4  a mitigating circumstance to some people.  You know, if a

5  person -- and let me give you an example.  If a person

6  committed a horrible murder, for instance, maybe it was done

7  in the heat of passion, if you will, or spontaneously, and

8  they're instantly sorry for what they've done.  They truly

9  regret their actions.  They stay there at the crime scene.

10 They call the police.  The police get there.  They fully

11 cooperate with the police.  Maybe the police officer even

12 says when I got there, the poor man was on his hands and

13 knees praying to God for forgiveness and crying.  That would

14 be one situation.

15      Maybe on the other extreme you have a situation

16 where it's a planned out killing of some sort.  The person

17 doesn't stay at the scene.  Maybe they flee.  Maybe the

18 police have to find them, hunt them down.

19      Can you see how there may be all shades of remorse

20 there?

21   A.    Yes.

22   Q.    How -- how do you feel about that as a possible

23 mitigating circumstance?

24   A.    I don't think the show of remorse would have an

25 affect on me, because it would be faked possibly.

1    Q.   All right.  Another issue that sometimes comes up in

2  a case like this, and this deals with the defendant's

3  upbringing.   Sometimes a defendant might claim that he's been

4  the victim of sexual abuse or physical abuse as a child.

5  And, of course, like any issue in this case, you're going to

6  have to determine what the facts truly are.   You may hear the

7  testimony concerning abuse and find that there's just no

8  basis for it.  Maybe you don't believe it.  Maybe you think

9  again that's being faked for some advantage.  But again,

10  that's your call.

11        Do you think in general that there may be some

12  people out there that falsely claim to be the victims of

13  sexual or physical abuse?

14    A.   This one kind of touches home, but, yeah, I think

15  it's possible to be faked.

16    Q.   You say it sort of touches home.  Without getting

17  too personal, can you tell me what kind of connection you may

18  have had with that?

19    A.   I have not been experienced with any of the sexual

20  thing, but I do have a brother and some siblings who were

21  involved in some stuff, just of late, so --

22    Q.   Were they -- were they victims or were they --

23    A.   It was between each other --

24    Q.   Yes, sir.  You know, again, I can't go into the

25  evidence here, but just from experience, again it's not

```
 1    uncommon to have testimony where an individual may claim that

 2    perhaps as a young child he was victimized in some way,

 3    either sexually or physically.  There may be some testimony I

 4    guess you can imagine that may be somewhat graphic --

 5         A.    Uh-huh.

 6         Q.    -- at the punishment phase of this sort of trial.

 7    And I guess only you know since you have had the involvement,

 8    do you think that that's the kind of issue that hits home

 9    close enough for you that you might have trouble listening to

10    that objectively?

11         A.    No.

12         Q.    Or it might -- it might bring out some emotions in

13    you in some fashion?

14         A.    No, I don't think so because even though something

15    happened to some person, you still have a choice and you can

16    overcome what happened to you.

17         Q.    One other thing with regards to that, you know, some

18    people have told me if they look at that, obviously they'd

19    want to know all the facts of the case.  And some people have

20    said, well, I want to know when did the person first make the

21    claim of abuse.

22              MR. DAVIS:  We have an agreement.

23              MR. BYCK:  We have an agreement, Your Honor.

24              (Mr. Newman Excused From Consideration)

25              THE COURT:  Thank you.  You are excused, sir.
```

1          VENIREPERSON:  All right.

2          THE BAILIFF:  Do you know how to get out?

3          VENIREPERSON:  No.

4          (Venireperson excused from courtroom.)

5          (Venireperson brought into courtroom.)

6          THE COURT:  Good morning.  Welcome back.  Ask

7    you to raise your right hand, please.

8          (Venireperson additionally sworn.)

9          THE COURT:  You may lower your hand.  Ms.

10   Alvarado, let me reintroduce the individuals seated before us

11   at the counsel tables.

12          Beginning at the far left, lead counsel for the

13   State, a Senior Prosecutor in the Dallas District Attorneys

14   Office, Mr. Greg Davis.

15          MR. DAVIS:  Good morning.

16          VENIREPERSON:  Good morning.

17          THE COURT:  Seated next to him is co-counsel,

18   Chief Prosecutor at the present time assigned to this the

19   194th District Court, the Honorable Mary Miller.

20          MS. MILLER:  Good morning.

21          THE COURT:  Moving on to the next table, we

22   begin first with one of the defense attorneys, board

23   certified criminal law specialist, so designated by the State

24   Bar of Texas, the Honorable Michael Byck.

25          MR. BYCK:  Good morning.

DARLINE W. LABAR, OFFICIAL REPORTER

1          VENIREPERSON:   Good morning.

2          THE COURT:   Seated immediately next to him is

3    one of the defense attorneys as well, the Honorable Jennifer

4    Balido.

5          MS. BALIDO:   Good morning, Ms. Alvarado.

6          VENIREPERSON:   Good morning.

7          THE COURT:   Next to Ms. Balido, opposite Mr.

8    Byck, is the accused, the defendant, Jedidiah Isaac Murphy.

9          THE DEFENDANT:   Good morning.

10          VENIREPERSON:   Good morning.

11          THE COURT:   This is a third attorney

12    representing the defense.  Her name is Jane Little.  Also a

13    board certified criminal law specialist.  She is working on

14    some other aspects of the case outside the courthouse other

15    than jury selection.

16          Ms. Alvarado, we'll begin with the State in the

17    person of the Honorable Greg Davis.

18          MR. DAVIS:   Yes, sir.

19          THE COURT:   Mr. Davis.

20          MR. DAVIS:   May it please the Court.

21                    ROSA ALVARADO

22    was called as a venireperson by the Court and, after having

23    been first duly sworn, was questioned as follows:

24              Voir Dire Examination

25    By Mr. Davis:

1    Q.    Good morning again, Ms. Alvarado.  How are you?

2    A.    Fine, thank you.

3    Q.    Ms. Alvarado, I'm going to talk to you for a little

4    bit about the issues that the Judge has already talked with

5    you about.  But before I do, just looking at your

6    questionnaire, kind of getting your general attitudes about

7    the death penalty, I just want to start and ask you how you

8    really feel about participating in this type of case.  I do

9    that because I've had people that are -- that tell me they're

10   in favor of the death penalty strongly, but when they come

11   down here and it gets to be a real possibility that they're

12   going to be on this jury, tell me I just don't think

13   personally that I can do this, I don't want to do it.

14   Because the State is seeking the death of Jedidiah Murphy.

15   That's our goal.  It's not going to change.  At the

16   punishment phase I'm going to ask the jurors to answer these

17   questions in such a way that Judge Entz will be required by

18   law to impose a sentence of death on Jedidiah Murphy.  If

19   that happens, he'll be transported to death row.  He'll stay

20   there until the date that's been assigned for his death.  On

21   that date he's going to be taken to the death chamber in

22   Huntsville, Texas.  He's going to be strapped down on a

23   gurney.  He's going to have a needle put into his arm.  He is

24   going to lie on that gurney no matter what he's doing.  He

25   may be praying for forgiveness.  He may be screaming, but

1   he's going to be strapped down.  He's going to have a needle

2   placed into his arm and within 15 minutes, he's going to be

3   dead on a gurney because of the verdict rendered in this type

4   of case.  And I've had jurors tell me even though they favor

5   the death penalty, there's no way that they could sit there

6   and hear this type of evidence, have that on their conscience

7   knowing that they participated in this kind of verdict.

8   Maybe years later have to wake up and watch the television

9   and see that Mr. Murphy was executed because of their

10  verdict.

11          So I want to first of all give you this opportunity

12  to tell me how you personally feel because we don't want to

13  put anyone in a position where service on this jury is going

14  to violate their conscience in some way.  Can you tell me how

15  you really feel about being on this type of jury?

16      A.   Well, I don't feel too good about it because in a

17  way I'm -- I'm for the death penalty, but there's also part

18  of me that thinks it's not a way out of things.

19      Q.   Right.

20      A.   So in a way I agree wit, but there's a lot of

21  reasons why I don't agree with it either.

22      Q.   That's kind of what I've heard.  You know, because

23  I've had people say, you know, kind of in a philosophical way

24  I'm agreeable to parts of the death penalty, but I mean

25  there's nothing philosophical about this man.  He's a living,

```
 1   breathing human being, and our goal is to take his life.
 2            Do you really think that this is the type of case
 3   where you could sit there and listen to that evidence and it
 4   may be necessary to take a pen in your hand and actually sign
 5   a verdict form, you know, that results in his death.  Do you
 6   really think you can do that, or not?  If you couldn't, you
 7   know, just tell us and, you know, we'll understand because
 8   we've had other people say that also.
 9        A.   I think I could.
10        Q.   You think you could?
11        A.   (Nods head.)
12        Q.   Okay.  Let me talk to you then for a little bit
13   about the death penalty, how it operates here in the State of
14   Texas, the special issues that we have involved in this
15   case.  Special Issue Numbers 1 and 2 over here, this is what
16   we have to deal with in a death penalty case.  First of all,
17   let me ask you, what types of cases do you think would be
18   proper for the death penalty?
19        A.   I would think it would be somebody who has, you
20   know, like went into somewhere and committed murder, one
21   murder, just didn't have no heart to kill more than one
22   person, because sometimes you're in situations where you have
23   no way out.
24        Q.   Uh-huh.
25        A.   You know, that's your only choice, but some people
```

1    have a choice and they decide to take the wrong one.  And I

2    think that's the people that should be punished.

3         Q.   Uh-huh.  You know, some people tell me that, you

4    know, in the -- oh, the case of Timothy McVeigh where he

5    killed over a hundred people at one time, kind of a multiple

6    of some sort and that, you know, maybe in a case like that

7    they would be in favor of the death penalty.

8              Is that kind of what you're saying?

9         A.   Uh-huh.

10                   COURT REPORTER:  I need you to say yes or no.

11        A.   Yes.

12        Q.   (By Mr. Davis)  Any other types of capital murders

13   that you think the death penalty is appropriate for, or do

14   you think in the other types that a life sentence would be

15   more appropriate?

16        A.   I think sometimes a life sentence would be more

17   appropriate.

18        Q.   You see in this case, and there are capital murder

19   cases where the State can prove that more than one person was

20   killed during the same criminal transaction, during the same

21   crime.  I've had cases -- the last one I tried, as a matter

22   of fact, was a case over in Irving where the man went into

23   the car wash and killed five people at one time.  I guess in

24   that kind of case you're saying you could probably consider

25   the death penalty in that one where he killed five people,

1    right?

2         A.    No.   Not in that one.   I mean, just in one where

3    it's just one person, but stuff like that, that person it's

4    not safe for society for that person to be out and have the

5    chance to break out of jail.

6         Q.    Right.   If a person only kills one person though, do

7    I understand -- if I went in and just killed one person

8    instead of four or five people, do you think that's a

9    situation where --

10        A.    I think what I'm really trying to say is the way the

11   person does it, because there are sometimes when, like I say,

12   you have no way out, but there are other times where you just

13   do it out of the coldhearted mind you have.

14        Q.    Uh-huh.   Okay.   Let me ask you, you know, in some of

15   the legal rights that we have down here.   First of all, I

16   think the Judge has already told that you this person is

17   presumed innocent of this offense.   Some people tell me they

18   think the defendant should have to do something to prove his

19   innocence.   I believe you indicated on your questionnaire

20   that you believed that way.

21              Do you think in this kind of case that you would

22   need some evidence from the defendant before you could decide

23   whether he's guilty or not guilty?

24        A.    Yes, I do.

25        Q.    Okay.   Let me just give you an example.   Let's say

1    that for some reason the defense doesn't put any testimony

2    on.  They don't call the defendant to the stand.  He doesn't

3    testify.  All right.  Of course, the law is going to require

4    you to go back there and not hold that against him or

5    consider it, but I do know that, you know, from experience a

6    lot of people tell me if that were me, you know, I'd sure be

7    up there if I wasn't guilty and I'd want my say in the

8    courtroom.  And I've had a lot of people tell me if the

9    defendant does not testify, that's something they're going to

10   be thinking about in a case like this where it's this

11   serious.  And if a man doesn't testify, they're going to be

12   wondering just what did he have that he didn't tell me.

13          Is that what you're saying to me, or are you not

14   saying that to me?

15        A.   No, that's what I'm saying.

16        Q.   Okay.  That's just something you're not going to be

17   able to put out of your mind, are you?

18        A.   To be honest, no.

19        Q.   Okay.

20             MS. BALIDO:  Judge, I'd like to question her.

21             THE COURT:  Okay.

22                    Cross-Examination

23   By Ms. Balido:

24        Q.   Ms. Alvarado, my name is Jennifer Balido, and I

25   represent Mr. Murphy in this case.  I'm just going to ask you

1    some questions about some of the stuff you've been talking

2    about with Mr. Davis.

3           Basically the State has the burden of proof in this

4    case.  Okay.  Before you can find Mr. Murphy guilty of

5    capital murder, the State has got to prove beyond a

6    reasonable doubt that he committed the offense.  All right?

7    You understand that?

8           A.   Uh-huh.

9           Q.   You need to say yes or no for the court record.

10          A.   Yes.

11          Q.   And if they don't prove the case beyond a reasonable

12   doubt, then you have to find him not guilty.  Do you

13   understand that?

14          A.   Yes.

15          Q.   Okay.  And basically what we're talking about is,

16   you know, I think everybody agrees that they would like to

17   hear both sides of the story.  And that's fine, and it sounds

18   to me like you'd like to hear both sides of the story,

19   correct?

20          A.   Yes.

21          Q.   But to be a constitutionally qualified juror and to

22   sit on this jury, what you have to be able to say is, well,

23   you know, I have this opinion, but I can follow the law and I

24   can do what the Judge tells me.  And what the Judge will tell

25   you in this case is that the State has the burden of proof in

1    this case.  And that if the State does not prove its case

2    beyond a reasonable doubt, then you'd have to find him not

3    guilty.

4          Now, what you were talking about with Mr. Davis is

5    the defendant and his 5th Amendment privilege to choose to

6    testify or not testify.  No one can make him testify.  Mr.

7    Davis can't make him testify.  I can't make him testify.  The

8    Judge cannot compel him to testify.  Okay?  And what the

9    Judge will instruct you is that if he chooses not to testify

10    for whatever the reason, you know, he could not speak English

11    very well, he could not be very smart.  There's just a whole

12    host of reasons that you'll never know.  And the Judge will

13    instruct you that if he does -- if he chooses not to testify,

14    that you are not to consider that for any purpose.  All

15    right.

16          If the Judge instructs you that you are not to

17    consider that for any purpose, could you follow that

18    instruction?

19    A.    I don't think I could, because it would still be the

20    doubt in the mind of why not.

21    Q.    Okay.  I just wanted to kind of clear that up.

22          MS. BALIDO:  That's fine, Judge.

23          THE COURT:  Thank you very much, Ms.

24    Alvarado.  You are excused.

25          VENIREPERSON:  Uh-huh.

```
 1                     (State challenge for cause - Ms. Alvarado)

 2                     MR. DAVIS:  For the record, the State will

 3    submit the juror for cause.

 4                     (Challenge for Cause Granted)

 5                     THE COURT:  Granted.

 6                     (Venireperson brought forward.)

 7                     THE COURT:  Please be seated.  Good morning.

 8    Welcome back.

 9                     VENIREPERSON:  Good morning.

10                     THE COURT:  Ask you to raise your right hand,

11    please.

12                     (Venireperson additionally sworn.)

13                     VENIREPERSON:  I do.

14                     THE COURT:  Thank you.  Lower your hand.

15    Allow me, if I may, to reintroduce the individuals whom we

16    see seated at the counsel table.

17            Begin with the far left, lead prosecutor for the

18    State, a Senior Prosecutor, Dallas District Attorneys Office,

19    the Honorable Greg Davis.

20                     MR. DAVIS:  Good morning.

21                     VENIREPERSON:  Good morning.

22                     THE COURT:  He is joined this morning by

23    co-counsel, present time occupying the position of Chief

24    Prosecutor assigned to the 194th District Court, the

25    Honorable Mary Miller.
```

1              MS. MILLER:  Good morning.

2              VENIREPERSON:  Good morning.

3              THE COURT:  Going to the next table, we begin

4     first with one of the defense attorneys, the Honorable

5     Jennifer Balido.

6              MS. BALIDO:  Good morning.

7              THE COURT:  Seated next to Ms. Balido is her

8     client, the accused, the defendant, if you will, Mr. Jedidiah

9     Isaac Murphy.

10             THE DEFENDANT:  Good morning.

11             VENIREPERSON:  Good morning.

12             THE COURT:  Ms. Balido is joined in the

13    defense of Mr. Murphy by two other attorneys, one of whom I

14    anticipate will be returning shortly, a board certified

15    criminal law specialist, so designated by the State Bar of

16    Texas as a result of experience and training and having

17    passed a rather difficult examination.  His name is Mr.

18    Michael Byck, B-y-c-k.

19             There is a third attorney representing Mr. Murphy

20    who is not with us today.  She is working in other parts of

21    the case involving the defense outside the courthouse today,

22    also a criminal law specialist.  Her name is Jane Little.

23             Are you ready to proceed with the questions by the

24    attorneys?

25             VENIREPERSON:  Yes.

1          THE COURT:  At the conclusion of which you

2     will be notified by me whether or not you remain under

3     consideration as one of the possible 12 jurors in the case.

4          We'll begin with the State, the Honorable Mary

5     Miller.

6          Ms. Miller.

7                         CARLA ALDER

8     was called as a venireperson by the Court and, after having

9     been first duly sworn, was questioned as follows:

10                   <u>Voir Dire Examination</u>

11    By Ms. Miller:

12         Q.    Good morning, Ms. Alder?

13         A.    Alder.

14         Q.    Did I say it correctly?  You sound like most of us

15    around here.  I assume it's allergies?

16         A.    I think it's a head cold.

17         Q.    Oh, okay.  If you can't hear me or whatever or don't

18    understand what I say, just let me know.  I'll be happy to

19    rephrase it or try and speak louder.

20          And I just want to reiterate what the Judge said,

21    there are no right or wrong answers.  Both myself and Ms.

22    Balido are going to be asking you basically questions that

23    deal with what your opinions and feelings are regarding

24    certain areas of the law and principles of the law that are

25    going to be applicable in this particular case.

1          And I want to direct your attention back to the

2     other day when you were brought in with the panel of 60

3     people and you were asked to fill out the questionnaire.

4     When Judge Entz initially introduced the defendant, Jedidiah

5     Isaac Murphy, and told you that this was a death penalty case

6     and the State was seeking death against the defendant, what

7     was your initial reaction?

8          A.   I was actually surprised.  You don't come in

9     expecting that as he said.  I mean, it was a surprise, but I

10    mean not really surprising just -- for the situation at the

11    time.

12         Q.   I notice when you filled out your questionnaire, you

13    said that you were in fact in favor of the death penalty.

14         Why -- why do you believe the death penalty is

15    appropriate in some cases?

16         A.   Well, I figure that it's a law that is already

17    existing and there are people that are in our prisons that

18    are waiting on death row with no chance of parole that are

19    just sitting there and then we have the issue of the over

20    crowded prisons.  There's nothing that I can do about it, and

21    I do agree with it.  I mean, I just think that if it's going

22    to be a case, it needs to be -- it needs to be handled.  I

23    think our prisons are extremely over crowded to have them

24    just sitting there.  I mean, that may sound harsh or cruel,

25    but --

1    Q.   So if I'm understanding you correctly, you think

2    that perhaps the death penalty, once it is assessed, should

3    be carried out quicker than it is?

4    A.   Absolutely.

5    Q.   Okay.  And a lot of people when they fill out their

6    questionnaire, they say they are in fact in favor of the

7    death penalty in the abstract, but when they are called upon

8    to sit in that particular chair -- you need a glass of water?

9    A.   No.

10    Q.   When they're called upon to sit in that particular

11   chair, they realize there's nothing abstract about it because

12   you can look over there, Jedidiah Isaac Murphy is a living,

13   breathing human being.  There's nothing abstract about him.

14   And they say, well, look, when I filled that out, I

15   believed -- and I still do believe in the death penalty, but

16   it's a little bit different now that I am being called upon

17   to actually participate in it.  And even though I believe in

18   it and it's appropriate in some cases, I could not personally

19   participate in a case where if the State succeeds, the

20   defendant, Mr. Murphy, will lay dead in Huntsville some day

21   in the future.  Other people say, well, I believe in it, I

22   don't have any problem participating in it.

23        How do you feel about it, Ms. Alder?

24   A.   I wouldn't want to solely be the only person that

25   made that decision, but I feel that people are innocent until

1    proven guilty and I believe that if you can convince 12

2    people who actually believe that, that this man is innocent,

3    if you can convince 12 people that he is guilty, then I don't

4    see where there would be a problem with that.

5         Q.   Okay.  So -- so if you were required to take pen in

6    hand and actually sign the verdict form that would result in

7    the Judge assessing a death sentence against this defendant,

8    are you telling us that you could do that?

9         A.   I could do that as -- I mean, that's my right.

10   That's my opinion.

11        Q.   Okay.  And that's all we need to know because there

12   are some people who say I could not personally participate in

13   it, knowing some day in the future I may wake up and hear

14   that the defendant has been put to death and it was a result

15   of my actions.

16        A.   Uh-huh.

17        Q.   But you're saying --

18        A.   Well, it's not a result of my actions solely.  It's

19   a result of his actions.

20        Q.   Okay.  And that's fine, Ms. Alder, and I understand

21   that.  Some people just take it upon themselves that it's

22   much more personal to them.

23        A.   Uh-huh.

24        Q.   Let's talk about the special issues over here.  Now,

25   once we get to the special issues, as the Judge has told you,

1    you have already found the defendant guilty of the offense of

2    capital murder.   The State has already proven to you and the

3    11 other jurors that the defendant did in fact -- was in fact

4    guilty of the offense.   We proved each and every element to

5    you beyond a reasonable doubt.   And then we get over to these

6    special issues over here.

7            Special Issue Number 1.   When you read Special Issue

8    Number 1, what do you think it's asking you to do?

9        A.   It's asking me to take into consideration whether

10   it's safe or not safe -- as far as a threat to society goes.

11       Q.   What type of information, regardless of whether it

12   would be legal or not, what type of information do you think

13   that you would like to know in order to be able to answer

14   Special Issue Number 1?

15       A.   Definitely about the person, the type of life-style,

16   just in general what kind of person it was.   I mean, you

17   can't make a decision like that without knowing somebody.

18       Q.   And lot of people say background.   Background would

19   be very important, a person's prior history.   The best

20   predictor of the future which a lot of people say that's

21   asking you to look to the future and predict the future.

22   They say the best predictor of that is a person's background

23   or past or history.

24            When you're looking at Special Issue Number 1, you

25   may have a person who has been a pillar of the community, has

DARLINE W. LABAR, OFFICIAL REPORTER

1   raised a family, has never been in trouble before.  And this

2   is what some people would call an aberration, that they

3   committed that particular capital murder.  Or you may have on

4   the other hand a person who has been in and out of trouble,

5   in and out of the criminal justice system, in and out of

6   opportunities for rehabilitation.  Perhaps the system had

7   been given -- had given them chances to rehabilitate

8   themselves.  They thumbed their nose at it.

9            Are those the different types of things that you

10  would want to know?

11       A.   I feel that -- I mean, everybody at one point in

12  time I'm sure in their life or another finds themselves in a

13  situation where, oops, but that doesn't necessarily make you

14  a bad person.  I just don't think that -- what you've done in

15  the past has something to do with it, but it doesn't solely

16  base on that.

17       Q.   What -- what are some of the other things that as

18  far as background that you would want to be looking at?

19       A.   Violent natures.  Jobs that they've held.  The

20  amount of time that they've held them, just security

21  matters -- I mean, issues that come up in your life that show

22  whether you're a stable person or not.  What type of things

23  have occurred in the past would be an issue, but it wouldn't

24  be the only issue.  Family.  Is there any?  Is there not

25  any?

1      Q.   Ms. Alder, when you said that some people can do
2   something and it's whoops type thing, when you're looking at
3   Special Issue Number 1, even you've already found the
4   defendant had the specific intent to kill --
5      A.   Uh-huh.
6      Q.   -- and did in fact take someone's life, in this
7   particular case during the course of a robbery or a capital
8   murder, some people say that they would always therefore
9   answer Special Issue Number 1 yes.  But it sounds to me like
10  you would follow the law and basically say as the law
11  requires you, no, I'm going to presume that's no, make the
12  State prove it beyond a reasonable doubt, that it should be
13  answered yes, and look at all of the information.  Or are you
14  going to be one who says, no, if you commit a capital murder,
15  I'm going to answer it yes automatically?
16     A.   There is no automatic answers in my opinion.  I --
17  even with people that I meet off the street, I'm going to
18  assume that they are nice and innocent people until they
19  prove to me otherwise.  I don't --
20     Q.   What facts of this particular type of offense are
21  going to be important to you, Ms. Alder?
22     A.   Well, probably most of them.  I mean, I wouldn't --
23  there has to be a bunch of facts that -- to prove to me --
24     Q.   Would the relationship between the parties -- you
25  might have a defendant who has -- who knows the victim,

1  perhaps has had a long running history, feud between the

2  complainant and the defendant.  Or you might have a victim

3  who's a stranger, total stranger to the defendant.

4          Are those some of the types of things that would be

5  important to you?

6      A.   Well, the relationship between the two absolutely.

7      Q.   How about the motive?

8      A.   Well, the reason why is not necessarily important.

9  It's whether I can believe that it happened or not.

10     Q.   Okay.

11          MS. MILLER:  Judge, I believe we have an

12  agreement.

13          MR. BYCK:  So agreed, Your Honor.

14          (Ms. Alder Excused From Consideration)

15          THE COURT:  Thank you very much.  Appreciate

16  it.  You are excused.

17          MS. MILLER:  Thank you, Ms. Alder.

18          VENIREPERSON:  Thank you.

19          (Recess of proceedings.)

20          THE COURT:  Good morning, Ms. Rash.  Welcome

21  back.

22          VENIREPERSON:  Thank you.

23          THE COURT:  Ask you to raise your right hand

24  and again be sworn in, please.

25          (Venireperson additionally sworn.)

```
 1              VENIREPERSON:  I do.

 2              THE COURT:  Thank you.  Lower your hand.

 3         Ms. Rash, allow me, if I may, at the outset to

 4    reintroduce the individuals we see seated at the counsel

 5    tables.

 6         Beginning at the far left, we have a Senior

 7    Prosecutor in the Dallas District Attorneys Office, lead

 8    counsel for the State, the Honorable Greg Davis.

 9              MR. DAVIS:  Good morning.

10              VENIREPERSON:  Good morning.

11              THE COURT:  He is joined by co-counsel,

12    present time occupying the position of Chief Prosecutor

13    assigned to this the 194th District Court, Honorable Mary

14    Miller.

15              MS. MILLER:  Good morning.

16              VENIREPERSON:  Good morning.

17              THE COURT:  Moving on to the next table, we

18    begin first with one of the three defense attorneys.

19    Gentleman is a board certified criminal law specialist, so

20    designated by the State Bar of Texas, result of experience,

21    training, and completing successfully a very competitive,

22    difficult examination, the Honorable Michael Byck.

23              MR. BYCK:  Good morning, ma'am.

24              VENIREPERSON:  Good morning.

25              THE COURT:  Seated next to Mr. Byck is one of
```

1        his co-counsel, the Honorable Jennifer Balido.

2                      MS. BALIDO:  How are you?

3                      VENIREPERSON:  Just fine.

4                      THE COURT:  Moving down the table, opposite

5        Ms. Balido from Mr. Byck, is the accused, the defendant,

6        Jedidiah Isaac Murphy.

7                      THE DEFENDANT:  Good morning.

8                      VENIREPERSON:  Good morning.

9                      THE COURT:  There is a third attorney defense

10       attorney also, as is true of Mr. Byck, a board certified

11       specialist.  Her name is Jane Little.  She is working on

12       other matters germane to this case outside the courthouse

13       during the procedures we're engaged in today.

14            Ms. Rash, we will begin shortly with the State

15       asking you questions.  You will know before you leave us this

16       morning whether or not you remain under consideration as a

17       juror.  We hopefully anticipate this rather laborious

18       time-consuming process to end shortly.  We have not yet -- we

19       hopefully anticipate that the testimonial stage of the trial

20       will begin on Tuesday, the 29th of May.  The day before the

21       United States Congress has designated Memorial Day will be

22       honored or celebrated throughout the country.

23            Do you know of any reason why your schedule could

24       not be, if necessary, altered or arranged such to return on

25       the 29th?

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1                    VENIREPERSON:  No.

 2                    THE COURT:  We will begin with the State.

 3   Again, the Honorable Greg Davis.

 4           Mr. Davis, Mrs. Rash.

 5                    MR. DAVIS:  Thank you.  My it please the

 6   Court.

 7                         CAROLYN RASH

 8   was called as a venireperson by the Court and, after having

 9   been first duly sworn, was questioned as follows:

10                    Voir Dire Examination

11   By Mr. Davis:

12       Q.    Good morning again, Ms. Rash.  How are you?

13       A.    Just fine.

14       Q.    Good.  Ms. Rash, for the next 30 minutes or so, I'll

15   have a chance to speak with you about some of the issues

16   involved in this type of case.  To reiterate what the Judge

17   has previously told you, there are no right or wrong answers

18   this morning.  Most of the questions that we'll ask of you

19   deal with how you feel about a subject, what your opinions

20   are.  I've done enough of these cases, I've talked to enough

21   people to know that everybody feels differently about some

22   issues here.  So as long as we know how you honestly feel,

23   that's all that we expect from you.  Okay?

24       A.    Okay.

25       Q.    Ms. Rash, before we get into the subject matter of
```

1    this case, I just want to talk to you about something that

2    you indicated on your questionnaire.  We asked if you knew

3    any of the attorneys involved in the case or any members of

4    the D.A. staff.  You told us you knew Karen Wise who is a

5    member of our office, works in the appellate division.

6            How long have you known Karen Wise?

7        A.   Oh, probably about 5 years.  She's a member of

8    Altrissa (phonetic) which is an organization that I belong

9    to.  So as long as she's been a member.

10       Q.   All right.  I'm not familiar with the organization.

11   What's its purpose?

12       A.   It's a classified service organization.  It was the

13   first organized for women.  It's similar to rotary in the

14   fact that -- it's classified in fact that only 20 percent of

15   the members can be only in any one occupation so you get a

16   cross-section of the community.

17       Q.   You also indicated that Jane Little had been a

18   member of Altrissa with you; is that correct?

19       A.   That's correct.

20       Q.   How long -- how long ago was that?

21       A.   I was trying to remember how long ago it's been.

22   It's probably been -- I think either she brought in Karen or

23   Karen brought her in, so it's probably five or six years.

24   She was only a member for a short time.

25       Q.   Okay.  I guess you can see my concern here, and why

1    I'm asking about this.

2         A.    Uh-huh.

3         Q.    Do you feel like your relationship with Jane Little

4    since she is the lead prosecutor on the other side and I

5    would expect her to be asking questions, I would expect her

6    to be making arguments during this case, being in a position

7    to ask you to do certain things on behalf of her client.  Do

8    you feel like that relationship would influence you in any

9    way, perhaps giving her more credibility perhaps, listening

10   to her arguments more closely, giving them a bit more

11   credence than you would to the State of Texas?

12        A.    I don't believe so, but it might.

13        Q.    Okay.  I guess -- let me just put you in maybe a

14   tough position here.  Let's say you're sitting at this table

15   in my position and you're representing a family who has lost

16   a loved one and tell you in this case that the victim in this

17   case was an 80-year-old woman, so you can understand that

18   there may well be family members -- that you're sitting here,

19   trying to select a jury, trying to find 12 people that can

20   give the State of Texas a fair trial as well as Mr. Murphy.

21   Are you going to feel comfortable enough about yourself

22   knowing what you know to actually select yourself as a juror

23   in this case?  Because that's really the question I'm going

24   to have to make.  I'm going to have to answer that question

25   myself in just a little bit perhaps.

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    I think it would be difficult to chose me if I knew

2   the defense.

3      Q.    Okay.  Listen, I appreciate your honesty, and I

4   appreciate you telling us about the relationship because

5   otherwise we're sitting down here just running blind if you

6   will.  And I'll tell you this from looking at your

7   questionnaire, I think you'd make an excellent juror.  I

8   think you've served on a jury before, haven't you?

9      A.    Uh-huh.

10     Q.    And I think if this relationship were not present in

11  this case, there would no problem at all, but I think we've

12  agreed as attorneys to release you so we're not going to put

13  you in that position.  Okay?

14             MR. BYCK:  Yes, sir.

15             (Ms. Rash Excused From Consideration)

16             THE COURT:  Thank you, Ms. Rash.  You are

17  excused.

18             (Recess of proceedings.)

19             (General Voir Dire By The Court)

20             THE COURT:  Counsel may be seated if you wish.

21         Does either side have any objection to going with

22  the 59 prospective jurors that are in the courtroom at this

23  time?

24             MR. DAVIS:  No, Your Honor.

25             MR. BYCK:  No objection.

```
 1                    THE COURT:  Ms. King, are you ready?

 2              This is a continuation of Cause F00-02424-MM, case

 3      styled the State of Texas versus Jedidiah Isaac Murphy.

 4              Is the State prepared to continue?

 5                    MR. DAVIS:  The State's ready, Your Honor.

 6                    THE COURT:  Mr. Byck, sir is the defense

 7      prepared to continue?

 8                    MR. BYCK:  Ready, Your Honor.

 9                    THE COURT:  The record reflect the person of

10      the accused, Jedidiah Isaac Murphy, will be in court at all

11      times during this hearing absent my dictating the contrary

12      into the record.

13              Good morning, ladies and gentlemen.  I'm Judge

14      Harold Entz.  I'm pleased to welcome each of you to this the

15      194th District Court.

16              May I ask that all of you please rise, raise your

17      right hands, and be prepared to take an oath.

18              Ladies and gentlemen, before I begin with the oath,

19      let me assure you that the operative verb in the oath,

20      subject to your religious belief or conscience, at your

21      discretion will be either "swear" or "affirm."

22                    (Oath given to venirepersons.)

23                    THE COURT:  Thank you.  Please lower your

24      hands and again please be seated.

25              Ladies and gentlemen, let's proceed right into the
```

1    matters at hand.  Allow me, if I may, at the outset to

2    introduce the four individuals whom you see seated at the

3    counsel table.  I will be introducing two other individuals

4    as well in absentia that are very important components of

5    this particular trial.

6         Begin however with the counsel table to the right as

7    you look at the two tables, the gentleman to the far right is

8    the lead prosecutor for the State in this particular case,

9    one of the Senior Prosecutors at the present time in the

10   Dallas District Attorneys Office, the Honorable Greg Davis.

11        Mr. Davis.

12             MR. DAVIS:  Good morning.

13             THE COURT:  Seated next to him is co-counsel

14   in this prosecution.  At the present time this prosecutor has

15   been assigned the role by Dallas District Attorney Bill Hill

16   as the Chief Prosecutor assigned to this the 194th District

17   Court.  Assisting Mr. Davis in this prosecution, I'm pleased

18   at this time to introduce the Honorable Mary Miller.

19        Ms. Miller.

20             MS. MILLER:  Good morning, ladies and

21   gentlemen.

22             THE COURT:  Moving on to the next table, there

23   are one of three attorneys representing the defendant in this

24   particular matter.  Pleased at this time to introduce a board

25   certified criminal law specialist, so designated by the State

```
 1  Bar of Texas, as a result of not only experience and

 2  training, but also having successfully completed a rather

 3  difficult written examination.  Pleased at this time to

 4  introduce the Honorable Michael Byck.

 5              MR. BYCK:  Good morning, ladies and gentlemen.

 6              THE COURT:  Seated next to Mr. Byck is the

 7  defendant, the accused, if you will, Mr. Jedidiah Isaac

 8  Murphy.

 9              THE DEFENDANT:  Good morning.

10              THE COURT:  Mr. Murphy.

11        Mr. Byck is assisted by two other attorneys

12  representing Mr. Murphy in this matter.  Though not present,

13  I will introduce them by name.  Lead counsel for the defense

14  in this matter, a former Chief Prosecutor in the Dallas

15  District Attorneys Office, a board certified criminal law

16  specialist, as is Mr. Byck, the Honorable Jane Little.

17        The third attorney representing Mr. Murphy in this

18  particular matter is a former Assistant District Attorney

19  whose name is Jennifer Balido.

20        Ladies and gentlemen, Mr. Murphy, the defendant, who

21  sits before you at counsel table has been indicted by a

22  Dallas County grand jury.  A Dallas County grand jury has

23  indicted Mr. Murphy for capital murder.  The State has made

24  known its intent to seek the death penalty.  You have been

25  summoned to this court as prospective jurors in a capital
```

1    murder case in which the State is seeking the death penalty.

2    By law I am at this point before we get into the matters of

3    the questionnaires for which you have been given the

4    clipboards, will be given the questionnaires momentarily --

5    by law I am required to make certain matters known to you

6    before we proceed any further.

7              1972, the United States Supreme Court in a very well

8    known case to those of us in the law called Furman versus

9    Georgia ruled that all -- when they actually were just

10   dealing with the Georgia statute at the time, but by

11   implication made effect to all of the other states that had

12   the death penalty at the time, that the manner by which those

13   statutes were so constructed did not pass constitutional

14   muster.   Reason being, so said the then members of the

15   Supreme Court, it's a violation of the 8th Amendment and the

16   14th Amendment of the United States Constitution.   Giving you

17   a Reader's Digest version of that opinion, in essence the

18   Supreme Court said that the way that the statutes were so

19   constructed gave the prosecutors unbridled discretion with

20   regard to those cases in which the ultimate punishment, the

21   death penalty, could be imposed.

22             A number of legislatures addressed that particular

23   opinion, including but not limited to Texas.   And in 1976 the

24   United States Supreme Court in a trilogy or three cases, one

25   being Texas -- case in Texas is Jurek versus Texas.   The

1    United States Supreme Court ruled that the death penalty

2    procedure post-Furman versus Georgia implemented by the Texas

3    legislature did in their opinion, the Supreme Court, satisfy

4    constitutional -- United States constitutional safeguards.  A

5    number of states have different manners of implementing the

6    death penalty.  Texas and Oregon basically are the only two

7    states that have the same type of system.  Quite different

8    from Georgia and Florida, California, and 30 plus other

9    states that have the death penalty.

10          The Supreme Court in 1972 in the Furman versus

11    Georgia case said to all of us throughout the country that

12    murder alone without any sort of an accompanying aggravating

13    factor could not be a death case.  The Supreme Court told us

14    all that there must be an aggravating factor or factors that

15    accompany the homicide, the murder, before the defendant

16    would be eligible constitutionally to be put to death.  A

17    number of states have put these aggravating factors as a

18    laundry list in the penalty stage of their murder trials.

19    Texas both put the aggravating factors at the penalty phase

20    and incorporated them in the guilt/innocence phase.  Texas

21    wanted to be extremely cautious and certain that the Texas

22    scheme was constitutional, so the legislature said that for

23    an individual to be subject in Texas to the death penalty

24    must be, number one, a murder, must be first and foremost a

25    murder committed during the commission of a robbery, a

1  burglary, sexual assault, arson, or kidnapping.

2         Legislature also said that a homicide committed

3  towards the person of protected classes could be an

4  aggravating factor for which the death penalty could be

5  appropriate.  Those statuses or occupations that are

6  protected are police officers, firemen, and penal officers

7  during the lawful discharge of their duties.  Supreme Court

8  also said that the killing of two or more persons in a single

9  criminal episode, such as the Timothy McVeigh type situation

10 up in Oklahoma City a few years ago, was death penalty

11 eligible.  Keep in mind I'm saying eligible, because I'm

12 going to be getting into the other matters with regard to

13 punishment momentarily.

14        Also, serial murders, the Ted Bundy type situation,

15 the Henry Lee Lucas type situation, the Jeffrey Dahmer

16 situation up Milwaukee.  Murder for hire could also be

17 considered an aggravating factor.  Also, murder for

18 remuneration, kill somebody for their insurance money as a

19 for instance.  Also, age is a protected status.  The murder

20 of an individual under the age of 6 can be a death penalty

21 eligible case.  So keep in mind that to pass constitutional

22 approval by the Supreme Court, must be murder and must have

23 an aggravating factor.

24        Now, I said that in Texas a murder during the course

25 of one of these aggravating factors makes a defendant so

1    found guilty eligible for the death penalty, but far from

2    having that the end result.  A person found guilty anywhere

3    in Texas, not just this the 194th District Court or not just

4    Dallas County but all 254 counties, an individual found

5    guilty of capital murder is looking at an either/or

6    punishment.  Either on the one hand life in the penitentiary,

7    or on the other hand, death by lethal injection.  Life or

8    death.  The only type of criminal offense in the Penal Code

9    of the State of Texas in which there is not a range of

10   punishment.  For instance, murder, not capital murder --

11   murder, without the aggravating factor, has a penalty range

12   set by the legislature not less than 5, nor more than 99

13   years or life, with an optional fine not to exceed $10,000.

14        The legislature realizing -- and I've been at this

15   27 and a half years -- all kinds of relationships can exist

16   between persons involved in a homicide.  To make room for

17   every conceivable type of a relationship or circumstance, the

18   legislature has given a vast, vast penalty range.  You can

19   have a total stranger-on-stranger.  You could have two dope

20   dealers killing over turf -- I mean, all kind of scenarios

21   that you could possibly imagine come to play in a homicide

22   case.  Legislature, with which I do not always agree, I think

23   in this case was very wise in giving a full latitude in

24   giving we the body politic an option to take everything into

25   consideration, the circumstances, relationships between the

DARLINE W. LABAR, OFFICIAL REPORTER

1    parties, in a homicide case, a murder.

2              But in a capital murder case, as I said a moment or

3    so ago, it's either life or death.  An individual found

4    guilty of capital murder, punishment ultimately is life in

5    the penitentiary.  Must by law, before becoming eligible for

6    release on supervision called parole, serve 40, 4, zero,

7    calendar years before being eligible for parole.

8    Day-for-day, week-for-week, month-for-month, year-for-four,

9    regardless of good conduct while in custody, regardless of

10   efforts to rehabilitate him or herself, 40 years.  No

11   guarantee 40 years the penitentiary doors fly open and out

12   the defendant goes.  40 years must be served before being

13   eligible for consideration for parole.

14             In my opinion, and I think this is shared by most

15   individuals in the criminal justice field in Texas, when

16   going into the penalty stage of a trial in which the State is

17   seeking death, the procedure is so constructed at the outset

18   to favor at the outset a life sentence and not death.

19   Doesn't start at death and then work back to life.  Starts at

20   life.  May end there, depending upon some issues that we're

21   going to be discussing momentarily.  And only then, depending

22   upon certain circumstances, does it rise to a death sentence.

23             I would submit to you based upon the opinions of the

24   United States Supreme Court over the last 20 years, surely

25   over the last 10 years, there is no state or no United States

1    Congress could pass a death penalty statute that said if you

2    commit this offense, it's death automatically.  Supreme

3    Court, as I read their opinions, said no way.

4            There is one prominent individual in the courtroom

5    who feels that treason during a time of war that results in

6    the harm or death of a United States citizen should be

7    automatic death.  Some of you may feel that way as well.

8    While treason during time of war is a death penalty eligible

9    type case under the federal system, but at this point it's

10   not automatic.  Not automatic.

11           Before, under Texas state law, a death sentence can

12   be imposed, during the penalty stage of the trial the

13   12-person jury is called upon to evaluate the evidence

14   presented in the full stage of the guilt/innocence stage of

15   the trial and other additional evidence that may not be

16   admissible at that stage of the trial but does become

17   admissible in the penalty stage of the trial, in answer of

18   these two special issues.  Sometimes there is a third, but

19   that's not -- the third question statutorily is not

20   appropriate in this particular case, so the jury will be

21   called upon, if they find Mr. Murphy guilty of capital

22   murder, to address these two issues.

23           I'm not suggesting that you are unable to read, but

24   sometimes eyesight of people in the back of the courtroom

25   given the size of the print, makes it a bit difficult, so

DARLINE W. LABAR, OFFICIAL REPORTER

1    allow me, if I may, to read it to you at this time.

2          Special Issue Number 1 reads as following, quoting,

3    whether there is a probability that the defendant would

4    commit criminal acts of violence that would constitute a

5    continuing threat to society, close quote.

6          Special Number 2 reads, quote, whether, taking into

7    consideration all the evidence, including the circumstances

8    of the offense, the defendant's character and background, and

9    the personal moral culpability of the defendant, there is a

10   sufficient mitigating circumstance or circumstances to

11   warrant that a sentence of life imprisonment rather than a

12   death sentence be imposed, period, close quote.

13         Now, only if a jury in Texas finds a defendant

14   guilty of capital murder in the guilt/innocence stage of the

15   trial is a jury ever called upon to answer these special

16   issues.  Only in determining whether life or death is

17   appropriate.  In a capital murder case in which the State is

18   not seeking death, the jury is not called upon to answer

19   these two questions.  Say, well, give me a for instance,

20   Judge.  When that would not be?  For those of you that have

21   been in North Central Texas or Metroplex area the last

22   several years, perhaps you recall the two military cadets who

23   were found guilty of kidnapping a classmate of one of them,

24   lovers quarrel of some sort, apparently reading the media,

25   kidnapped the victim, shot and killed her, capital murder.

1    District Attorney in Tarrant County determined that the -- he

2    did not have sufficient evidence in his mind such that a

3    death penalty was appropriate so he only sought capital

4    murder guilty which he did in both cases, from a jury in Fort

5    Worth, 40 calendar years.  And each of those two former

6    military cadets are in the penitentiary as we speak.  Capital

7    murder, 40 years before they're eligible for release.

8            I would submit to you that Special Issue Number 1

9    has been grammatically constructed by the legislature that at

10   the commencement of the deliberations in the penalty stage of

11   the trial, the answer to that question at the beginning of

12   your deliberations or jury deliberations is no.  Because the

13   special issue begins with the word "whether."  It doesn't say

14   there is a probability.  It says whether there is a

15   probability.

16           Now, as is true with the guilt/innocence stage of

17   the trial in which the burden of proof, the responsibility of

18   going forth with the evidence to prove the allegations in the

19   indictment, lies with the District Attorneys Office, Mr.

20   Davis, Ms. Miller, so, too, the burden of proof or

21   responsibility lies with the District Attorneys Office in an

22   effort to prove, if they can, beyond a reasonable doubt to

23   all 12 jurors that Question Number 1, Special Issue Number 1,

24   should be answered yes.  We call that the future

25   dangerousness question.

DARLINE W. LABAR, OFFICIAL REPORTER

1          If the State is unable to convince all 12 jurors

2     that Special Issue Number 1 should be changed from no to yes,

3     the jury returns to the courtroom with that decision, a life

4     sentence is the result.  A life sentence is the result.

5          If, on the other hand, after deliberation jury

6     unanimously reaches the conclusion that Special Issue Number

7     1 should be changed from no to yes, only then need the jury

8     go on to Special Number 2.

9          Now, let's sit back and pause and take a deep breath

10    and think where a jury is if they get to Special Number 2.

11    In the guilt/innocence stage of the trial they've already

12    found the defendant guilty of capital murder.  In this

13    particular case the indictment alleges a murder during the

14    course of either a robbery or a kidnapping.  If the jury

15    finds those allegations in the guilt/innocence stage to be

16    proven beyond a reasonable doubt and return a verdict of

17    guilty, the defendant is looking at either life or death.  If

18    during the deliberations in the punishment stage of the

19    trial, the jury answers Special Issue Number 1 yes, future

20    dangerousness, a Texas jury under that circumstance is

21    two-thirds of the way to a death penalty.

22          Special Issue Number 2 has been variously described

23    by legal, scholars professors in law school, judges, defense

24    attorneys, prosecutors, the like, in varying terms along the

25    following, the mercy question, the safety valve, the safety

1   net, if you will.

2           Special Number 2 gives a jury, if you will, a last

3   chance opportunity to look at all of the evidence and decide

4   if as a result of evidence being presented, a circumstance or

5   circumstances or the defendant's background is such because

6   of which the defendant should live and not die, give effect

7   to that mitigating evidence, act upon it appropriately, and

8   say, look, you're a capital murderer.  Already found you

9   guilty of that.  Already found you're a danger to society by

10  answering Special Issue Number 1 yes.  But because of the

11  mitigating evidence or circumstances that have been

12  presented, because of which we think you should live and not

13  die, give effect to that evidence, answer it yes in which a

14  life sentence is a sentence by law I am required to impose.

15          Ladies and gentlemen, let me be very, very blunt and

16  candid as I possibly can be.  If a jury answers Special Issue

17  Number 1 yes and Special Number 2 no, a trial judge in Texas

18  is required to sentence a defendant to death.  I'm not a

19  thirteenth juror.  Unlike in Florida where the jury makes a

20  recommendation in the matter of punishment to the trial judge

21  and the trial judge can either accept it or reject it, in

22  Florida doesn't even have to be unanimous.  If seven persons

23  say death, it's death, subject to the Judge overruling it.

24  Seven say life, it's life, unless the Judge overrules it to

25  death.  Not so Texas.  Given our populist tradition, our firm

1  belief in the body politic, 12 jurors, they make the

2  decision.  They make the decision.  And I administer

3  judicially the punishment according to the jury's decision.

4          I would submit to you, ladies and gentlemen, that

5  over the last four or five years the United States Supreme

6  Court on a number of opinions has made it very, very clear to

7  all of us in this country that to be a prospective qualified

8  juror in a capital murder case as relates to Special Number

9  2, all 12 jurors must be willing to listen to, give serious

10  consideration to mitigating evidence, if presented, and if

11  presented and if the jury feels it rises to that level,

12  because of which the defendant should live and not die, give

13  effect to that.  To do otherwise would mean a nullity.  It

14  would be just an automatic, and that's not the way the law

15  is.  Just because an individual is found guilty of capital

16  murder does not automatically equate a death sentence.

17  Texas, far from it.  The number of executions we have in

18  Texas notwithstanding.

19          These are the legal hurdles that a jury must work

20  through before they ever get to the death penalty.  Some

21  columnists, especially in the eastern press have thought,

22  boy, you know, what do you do down there in Texas?  Do you

23  just automatically put them on a conveyor belt and that's

24  it?  I leave that rhetorical question for you to answer.

25          Guilty of capital murder, either life or death.

```
 1   Only becomes death if the jury to a person believes Special

 2   Issue Number 1 a continuing threat.  It's another safety

 3   valve, if you will.  Special Issue Number 2, are there any

 4   mitigating circumstances.

 5           Mitigating circumstances in the context of death

 6   penalty litigation is a very interesting concept.  I say

 7   interesting because the United States Supreme Court on a

 8   couple of occasions have said, judges, don't define

 9   mitigating evidence to the jurors.  Oh, we define everything

10   else, on or about, or manner and means.  And I mean, we

11   define all of that in the jury's instructions, but mitigating

12   circumstances, Supreme Court has said no.  They said and we

13   want to tell you Judges why we don't want you to do that.

14   Because mitigating circumstances with regard to Special

15   Number 2, and various other forms in other states, is kind of

16   like beauty in the eye of the beholder.  Mitigating

17   circumstances are whatever a juror believes them to be.  So

18   far in impaneling prospective jurors in this particular case,

19   we've had jurors say, well, mental health might be a

20   mitigating circumstance, you know, in a case-by-case basis.

21   Mental retardation.  As a matter of fact, that's how we get

22   Special Number 2.  Case out of Livingston County, Texas,

23   Johnny Ray Penry.  That's how we get Number 2.  But it's not

24   just limited to mental health and mental health issues.

25           Sexual abuse as a child, prospective jurors have
```

1    told us in their opinion.  An individual born as a crack

2    baby, fetal alcohol syndrome baby.  Does not overcome that

3    type of unfortunate birth circumstance through counseling or

4    otherwise.  Case-by-case basis.  What one individual may

5    think is mitigating evidence, another may think is

6    aggravating.  That's fine, the Supreme Court says.  This just

7    gives the jury a full opportunity to evaluate everything and

8    then decide the proper punishment in the case, on a

9    case-by-case basis, case-by-case basis.

10           Not alone.  You have the collective shoulders of 11

11   other persons to rely upon.  So it's not an individual

12   decision.

13           Here is a little bit of a scary situation.  Arizona,

14   jury finds either guilty or not guilty of capital murder, if

15   they say guilty of capital murder.  Not Texas.  Arizona,

16   Judge alone decides life or death.  Talking to some of my

17   Arizona judicial colleagues, said what about this.  They say,

18   well, Harold, nobody put a gun to my back and said I had to

19   be a trial judge in Arizona.  That's tough.  Alone.  No

20   constitutional right, the United States or state

21   constitutional right to have a jury assess the punishment.

22   But given our belief in the goodness of jurors, we give them

23   that duty and responsibility.

24           Ladies and gentlemen, remind -- let me remind you of

25   a few other factors involving all criminal prosecutions.

1    Said that Mr. Murphy had been indicted by a grand jury.  The

2    indictment is no evidence of guilt.  Indictment is a legal

3    document that gives a defendant formal notice of the

4    allegations against him.  Mr. Murphy, through his attorneys,

5    is aware that he's been charged with capital murder.  He's

6    been not charged with bank robbery or possession of a kilo of

7    cocaine or burglary, but he knows exactly the allegations

8    against him.

9          That same indictment puts the State on notice of the

10   operative allegations, we call them elements, each of which

11   the State must prove to such a convincing nature beyond a

12   reasonable doubt.  Not the Perry Mason standard of beyond a

13   shadow of a doubt, or beyond all doubt.  If you were a

14   hundred percent certain, ladies and gentlemen, you'd find

15   your name on the witness list in that questionnaire as

16   opposed to being a potential juror.  If the jury finds that

17   one or more of the elements, the operative portions of the

18   indictment have not been proven to the satisfaction of the

19   jury beyond a reasonable doubt, which is true in all cases,

20   not just capital murder, jury must find the defendant not

21   guilty.

22         The burden of proof, the responsibility of going

23   forth with the evidence in all criminal cases lies with the

24   State, the District Attorneys Office.  Ladies and gentlemen,

25   this is not one of the Connally 7 cases about which there has

DARLINE W. LABAR, OFFICIAL REPORTER

1   been a good bit of media attention in the recent past.  This

2   is a case, I can tell you, the victim, complainant, if you

3   will, whose name finds itself in the indictment is Bertie Lee

4   Cunningham.  If there are any of you who recall having read,

5   seen, or heard anything in the media about this particular

6   case, that in and of itself will not disqualify you unless

7   your relationship to the circumstances by virtue of media

8   attention or independent knowledge you may have about the

9   case is such that it would compromise your impartiality as a

10  juror.  And if you remember, well, I think I may have heard

11  something about that, that's fine.  If you have not made up

12  your opinion one way or the other, one way or the other.

13          Ladies and gentlemen, the bailiffs are going to be

14  handing out momentarily some questionnaires.  That's the

15  reason you've been given a clipboard.  Be absolutely brutally

16  candid and honest with yourself in answering these questions.

17  Let me assure you, and the attorneys have asked me to do this

18  as well, no right or wrong answers to the questions that

19  you're going to be asked.  Oh, there's some statistical stuff

20  such as your address, matters such as that, but there's going

21  to be some questions posed to you about certain opinions that

22  you may have about the criminal justice system and they're

23  open-ended questions.  We don't grade individuals on a

24  citizenship scale, pass, fail or A or an F.  The only thing

25  you are obligated to do by virtue of your oath is to tell the

1    truth.  Tell the truth, whatever that may be.  Whatever that

2    may be.

3          Ladies and gentlemen, before the questionnaires are

4    passed out, I want to pass on this one final comment to you.

5    Very, very prominent legal scholar once said that second only

6    to serving our country on the field of battle during the time

7    of war, the next greatest responsibility we impose upon a

8    citizen in the United States is serving as a juror in a

9    capital murder case.  As I look out there, I realize that all

10   of you appreciate the seriousness of the task at hand.  You

11   got dressed this morning, you came down to the courthouse.

12   I'm sure few, if any of you thought, boy, I can't wait to get

13   down there and put on a panel on a possible death penalty

14   case.  I don't think so.  I don't think so.  And I've been

15   doing this for a good little while.  I assure you I had a lot

16   more hair before I was called upon constitutionally to

17   preside over cases such as this.  I know you take the job

18   seriously.  I promise you the attorneys and I take this

19   matter very, very seriously.  I know you will as well.

20         Sheriff, may I ask that you hand out the

21   questionnaires.

22         Ladies and gentlemen, we all realize you're a little

23   bit confined and you're going to have to be writing and

24   whatnot.   Those of you therefore who want to excuse yourself

25   and go to the bunches outside to have a little more elbow

DARLINE W. LABAR, OFFICIAL REPORTER

1    room, feel free to do it.  After you have finished the

2    questionnaires, if you would please bring them back in and

3    give them to the bailiffs, then have a bite of lunch.  Let me

4    ask that all of you be back here hopefully let's say -- let's

5    say 1:30.  That should give you enough time to fill out the

6    questionnaires and get a bite of lunch.  And we will see you

7    all back at 1:30, and we will continue at that time.

8                     (Recess of proceedings.)

9                     (Venireperson brought into courtroom.)

10                THE COURT:  Good afternoon, Ms. Campbell, and

11   welcome back.

12        Ms. Campbell, please remain seated, but may I ask

13   that you raise your right hand and again be sworn in.

14                     (Venireperson additionally sworn.)

15                VENIREPERSON:  I do.

16                THE COURT:  Thank you.  Ms. Campbell, let me

17   reintroduce those that we see seated at the counsel table.

18        Beginning at the far left, we have the lead

19   prosecutor for the State, a Senior Prosecutor in the Dallas

20   D.A.'s office, Mr. Greg Davis.

21                MR. DAVIS:  Good afternoon.

22                THE COURT:  Seated next to him is co-counsel

23   Chief Prosecutor at the present time, assigned by Bill Hill,

24   the Dallas District Attorney, to this the 194th District

25   Court, the Honorable Mary Miller.

```
1              MS. MILLER:  Hi.

2              VENIREPERSON:  Hi.

3              THE COURT:  Moving on to the next table, we

4    begin first with one of the defense attorneys, the Honorable

5    Jennifer Balido.

6              MS. BALIDO:  How are you, Ms. Campbell?

7              VENIREPERSON:  Hi, fine.

8              MS. BALIDO:  Good.

9              THE COURT:  Seated next to Ms. Balido, a

10   co-counsel on behalf of the defense, a board certified

11   criminal law specialist, so designated by the State Bar of

12   Texas, as a result of experience and passing a rather

13   difficult examination, the Honorable Michael Byck.

14             MR. BYCK:  Ms. Campbell, how are you?

15             VENIREPERSON:  Fine.

16             THE COURT:  Seated next to Ms. Byck, opposite

17   Ms. Balido, is the defendant, the client, the accused, if you

18   will, Jedidiah Isaac Murphy.

19             THE DEFENDANT:  Good afternoon, ma'am.

20             VENIREPERSON:  Hi.

21             THE COURT:  Ms. Campbell, the -- there is a

22   third attorney on behalf of the defense, Jane Little, a

23   former Chief Prosecutor in the Dallas District Attorneys

24   Office, also board certified.  She, however, is outside the

25   courthouse working on some other aspects of this case on
```

1   behalf of her client, Mr. Murphy, and won't, I understand, be

2   with us this afternoon.

3        Are you ready to proceed with the individual

4   questioning?

5                  VENIREPERSON:  Yes.

6                  THE COURT:  Ready as you're ever going to be,

7   huh?

8                  VENIREPERSON:  Uh-huh.

9                  THE COURT:  We'll begin with the State, the

10  Honorable Greg Davis.

11       Mr. Davis.

12                 MR. DAVIS:  Thank you.  May it please the

13  Court.

14                      YAVONDA CAMPBELL

15  was called as a venireperson by the Court and, after having

16  been first duly sworn, was questioned as follows:

17                  Voir Dire Examination

18  By Mr. Davis:

19       Q.   Good afternoon again, Ms. Campbell.  Ms. Campbell, I

20  just want to kind of set your mind at ease here and let you

21  know there are no right or wrong answers first of all.  Most

22  of my questions will deal with what your feelings are about a

23  subject, what your opinions are about a subject.  I've done

24  this long enough, I've talked to enough people to know that

25  everybody thinks differently.  That's okay.  As long as we

1    know how you feel.   Okay?

2         A.   Okay.

3         Q.   Ms. Campbell, when you came down here earlier on the

4    big panel and Judge Entz told you that you had been summoned

5    to hear a capital murder case where the State was seeking the

6    death penalty against Mr. Murphy, do you remember what was

7    your first thought when he told you that?

8         A.   I said, ooh, why me.   That's what I thought.

9         Q.   Okay.   I guess that's a pretty common thought.   I'm

10   sure that you didn't come down here expecting to be a

11   potential juror on a death penalty case.

12        A.   Huh-uh.

13        Q.   You've had a little bit of time I guess to think

14   about possibly serving on this jury since Judge Entz told you

15   we're still in the pool to be considered.   I know that you're

16   for the death penalty here on your questionnaire, but I also

17   know from experience that some people give this a little

18   thought and maybe when they're sitting up there where you

19   are, you know, it becomes a little bit more real, because

20   this man down here is real, as you can see.   He's not an

21   abstract object.

22             If the State of Texas prevails here, he'll be taken

23   to the death chamber one day.   He'll be placed on a gurney,

24   and he'll be executed as a result of the verdict in this

25   case.   So I just want to let you have a moment to tell me how

1    you honestly feel about really taking part in this case and

2    potentially sitting on this jury and maybe even signing the

3    verdict form that results in Jedidiah Murphy's death.

4         How do you feel about participating?

5    A.    I don't want to.  I don't want to make that

6    decision, I don't.  I don't.

7    Q.    And you know again that's -- that's really what --

8    A.    It's hard.  It's just hard.

9    Q.    Right.  Dealing with kind of your feelings about the

10   death penalty, you know, it's -- I guess it's the one verdict

11   that can never be reversed, I suppose.

12        Is that kind of what's giving you some misgivings

13   here about that process and not wanting to actually be in

14   judgment of somebody else and making that decision?  Is that

15   kind of what I'm hearing you say?

16   A.    Uh-huh.  I just don't want to judge him, not that

17   way, not to death.

18   Q.    Right.  You know, a lot of people come down and they

19   say to us, if I get called on another case that's not

20   involving death, maybe a robbery case or maybe a theft case

21   or something like that, I would be happy to serve, but my

22   feelings are strong enough about this that I don't know that

23   I can sit there and listen to the evidence and make that kind

24   of decision.  Even if the facts are there, I wouldn't want to

25   be the one put in that position.

1    Is that what you're telling me this afternoon?  Am I

2  understanding you correctly?

3    A.   Yes, I don't, huh-uh.

4    Q.   Okay.  Let me talk to you about a couple of things

5  here because first of all, we don't want anybody to have to

6  serve on this jury you'd have a problem with.  That's the

7  last thing I want to do is have somebody in the box who's

8  worried about having to make that decision or possibly living

9  with the consequences.  We have enough people down here in

10  the pool that we can get 12 jurors without making somebody do

11  that.

12    You said in here in response to one of these

13  questions that if someone is accused of capital murder, he

14  should have to prove his innocence.  And you said that you

15  strongly agreed with that statement.

16    Can you tell me a little bit more about your

17  feelings there, how you feel about that?

18    A.   Well, I have known -- not from experience, but what

19  I've read, some people go to jail for something they didn't

20  do.

21    Q.   Uh-huh.

22    A.   And it's important for the defense to prove his

23  innocence, if he's innocent.  Of course, you have to prove

24  he's guilty.

25    Q.   Right.

1    A.    But if he's not innocent -- I mean, if he's not

2    guilty, I would want to know that.   I would want to be able

3    to make the right decision if I'm picked to be up there.

4    Q.    Right.

5    A.    So --

6    Q.    And again, I've heard a lot of people say that, that

7    in order to make a decision in this case, they're going to

8    have to have both sides present evidence to them.   They want

9    to hear something from the defense over here.   They want to

10   hear from the defendant.   I've had people say, you know, if I

11   were accused of something like capital murder where my life

12   is on the line and I'm not guilty, I'd be up on that witness

13   stand.   I want to tell my side of the story.

14        The law is going to say that, you know, the burden

15   of proof is on the State and this man doesn't have to

16   testify.   You know, that's the law, but I know some people

17   have very strong feelings about these things, just the way

18   they look at the process.

19        If Mr. Murphy down here does not testify, you know,

20   if he doesn't take the witness stand, are you going to be

21   able to go back there to that jury deliberation room and put

22   that out of your mind, or are your feelings such that if that

23   happens, that you're going to be thinking about that and

24   wondering why didn't he get up there and tell me what

25   happened?   I mean, you tell me honestly how you're going to

1    feel about that.

2        A.    Oh, it wouldn't matter, because it's his choice.    He

3    has the right -- so -- and some people just can't get up here

4    and explain themselves.

5        Q.    Right.

6        A.    They can't do it.    Even if they're innocent, they'll

7    come up here and look guilty.

8        Q.    Right.

9        A.    So --

10       Q.    Let me give you -- and it goes back again to the

11   State having to prove their case.    And that is the law,

12   obviously.    Let me give you a couple of examples of what I'm

13   talking about.    You know, in this case the indictment tells

14   me what I've got to prove.    And there are several things I've

15   got to prove.    You know, obviously I've got to prove that

16   Jedidiah Murphy did the killing.    I've got to show you that

17   he killed a woman by the name of Bertie Cunningham, that he

18   killed her by either shooting her or drowning her.    And that

19   all that happened during the course of a robbery or

20   kidnapping.    Now, that's what the law says I've got to

21   prove.

22            But the law also says that I've got to show you that

23   it happened in Dallas County, Texas, and it happened on or

24   about a certain day.    All those things are important.    They

25   all have to be proved.    If I don't prove any of them, you've

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1   got to say not guilty.  There is a problem here that some
 2   people have had.  I'm going to run a couple of things by you
 3   and see how you feel about these things.
 4         Let's say in a capital murder case -- let me just
 5   give you an example.  Let's say -- and I'll use myself --
 6   let's say that I wake up one day and I'm a violent individual
 7   and I hate children, and I go out and find the first child
 8   care center that I can find.  There's a hundred children in
 9   there playing, and I fire bomb that thing.  I burn it to the
10   ground.  I kill every child and every care giver in that
11   place.  Nobody sees me do it.  You know, I get away
12   scot-free.  I'm happy with myself.  I go home and celebrate.
13   A couple of days later, oh, let's say I'm out and I see a
14   police officer and I decide, what the heck, I'll just tell
15   him what I've done.  I'm proud of it.  So I go down to the
16   police station.  I'm introduced to a detective.  You know, if
17   you watch these shows, the NYPD Blues and all the lawyer
18   shows, you know that certain rights have to be given -- the
19   Miranda warnings have to be given to suspects.
20         Let's say that the detective who talks with me,
21   maybe he's just been tired and he forgets to tell me that
22   I've got a right to a lawyer, and that if I can't afford one,
23   the Court will appoint one for me.  I didn't want a lawyer,
24   obviously.  I went up and started talking to the officer,
25   started telling him what I had done.  So obviously I didn't
```

1    want one there.  He didn't tell me I had a right, but it was

2    never really an issue with me.  If he had told me that, it

3    wouldn't have mattered anyway.  I go on to tell him exactly

4    how I fire bombed that child care center.  I go on to say in

5    the last part of it, I'm happy I did it, and if I ever get

6    out of jail, the first thing I'm going to do is fire bomb

7    another one.  There is no doubt that I'm as dangerous as

8    dangerous can be.  I'm brought to trial.  The only evidence

9    against me, obviously is the confession that's been used.

10   Now, there's no eyewitness.  There's no sort of

11   fingerprints.  There's no anything, except my confession.  In

12   that situation, now, the Judge would tell you, if you have a

13   doubt that all those warnings were given, you've got to throw

14   that statement out.

15          The problem you can obviously see, and let's say the

16   statement is in such detail that it leaves no doubt in your

17   mind that the only person that would know those things would

18   be the person who fire bombed the child care center.  So you

19   know good and well I'm guilty as I can be.  You know I'm as

20   dangerous as dangerous can be.  And you know if I walk out

21   that courtroom, chances are I may be heading to where maybe

22   your child is or someone else's child and I'm going to do it

23   again.  But the Judge has told you, you've got to throw the

24   statement out if all the warnings weren't given.  If you do,

25   there's no evidence of my guilt there.

1              Now, a lot of people -- some people at least have

2    said to me that's one of those things where I don't know if

3    my conscience could get square with what the law is.  Do you

4    mean to tell me I've got to go back there and throw away my

5    common sense of what I really know to be true and say not

6    guilty and walk a dangerous man right out of this

7    courthouse?  You mean to tell me I've got to do that?  Some

8    people have said, I'm just going to be honest with you.  I

9    don't think I could do it if it came down to that.  Some

10   people say they can.  Some people say they can't.

11             I'm going to put you on the jury right now, Ms.

12   Campbell, and I'm going to put you in that situation.  Say

13   the other 11 are saying ain't no way we're going to let a

14   dangerous man like that -- that's not going to be on our

15   conscience.  We're going to say guilty or whatever.  If they

16   want to reverse that case and do something else down the

17   line, fine, but we're not going to help him walk out of here

18   and hurt somebody else.

19             What are you going to do in that situation?

20   A.    You've got to go by the law.

21   Q.    Are you going to say --

22   A.    You have to abide by the laws, you have to go by --

23   but the Bible also say you have to go by the law of the land,

24   so --

25   Q.    That's fair enough.  That's what the law would ask

1    you to do.  It might be real tough, right?

2        A.    Uh-huh.

3        Q.    But you have to do that if you're going to be

4    faithful to your oath there.  Let's talk about these special

5    issues for a moment.  And this is where -- again, this is

6    where the death penalty is different than any other felony

7    case, because if you find someone guilty of capital murder,

8    then we go to a punishment phase.  You might hear more

9    evidence.  You might not.  And then you've got to answer

10   these questions.

11            Now, the first question I want to ask you is this.

12   And I can't go into all the facts of this case.  We're not

13   allowed to.  Obviously, we want you to hear them for the

14   first time when you're a juror.  But I want you to assume for

15   a moment that the victim in this case, Bertie Cunningham, was

16   an 80-year-old woman at the time that she was killed.

17            Do you think that you could still be fair and

18   impartial to the defendant knowing that the deceased was 80

19   years old at the time of her death, or do you think that

20   might affect the way that you look at things?

21       A.    No.

22       Q.    All right.  Special Issue Number 1.  Again, you've

23   found in this case that the defendant intentionally killed a

24   woman by the name of Bertie Cunningham, intentionally killed

25   her during the course of a robbery or kidnapping.  And when

1   we talk about intentional, we're not talking about an

2   accident.  We're not talking about negligence.  We're not

3   talking about self-defense, not talking about a situation

4   where somebody is insane, where they don't know right from

5   wrong.  Intentional means just that.  That it's my conscious

6   desire and intent to take another human life, and I do

7   everything necessary to do that.  So you have to assume that

8   you've already decided that the defendant is guilty of doing

9   that beyond any reasonable doubt.  You get down to Special

10  Issue Number 1.  Let me just kind of give you a choice here.

11          Some people have said to me in the past,

12  notwithstanding what the Judge has already told you about

13  that, that anyone who would take the life of another

14  individual intentionally, you know, during the course of a

15  robbery or kidnapping will always be a continuing threat to

16  society.  That's just the type of person they are.  So if

17  they find that to be true in a case like this, when they get

18  down to Special Issue Number 1, they're automatically going

19  to answer that yes because that's the type of person in their

20  mind that will always be a continuing threat to society just

21  by the nature.  Anybody capable of doing it once, they've

22  kind of shown their true colors, so to speak.

23          How do you feel about that, Ms. Campbell?

24      A.   Well, if he did it on purpose and if he -- whatever

25  the reason, if he was robbing her or kidnapping her or say if

1    it was a robbery and he killed her, he might continue to rob

2    and somebody get in his way, he might continue to kill.

3         Q.    Uh-huh.

4         A.    So --

5         Q.    And so --

6         A.    He would be a threat.  I think he would.

7         Q.    Okay.  So I guess the key is just believing that he

8    did it, correct?

9         A.    Uh-huh.

10        Q.    If you believed in your heart of hearts that this

11   man over here really did kill this woman intentionally, no

12   accident about it, and he did that during -- during the time

13   he was either robbing her or kidnapping her, when you get

14   down to Special Issue Number 1, do I hear you saying that

15   you're going to answer yes, that's enough for you to answer

16   that special issue yes?

17        A.    Yep.

18        Q.    Okay.  All right.  Let me -- let me ask you, too,

19   when you're taking about Special Issue Number 1, okay, some

20   of these words over here, they don't have legal definitions.

21   So guess what?  You're going to get to define them yourself.

22   Okay?  And I want to kind of talk with you about some of

23   these words and see how you might look at them.  Whether

24   there is a probability that the defendant would commit

25   criminal acts of violence --

1          MR. DAVIS:  Judge, I believe that we have an

2    agreement at this time.

3                    (Ms. Campbell Excused From Consideration)

4          THE COURT:  Thank you, Ms. Campbell.  The

5    attorneys have authorized me to excuse you from further

6    consideration.

7          VENIREPERSON:  Oh, good.  Thank you.

8          MR. DAVIS:  Thank you, Ms. Campbell.

9          MR. BYCK:  Judge, we agree on Mr. Rose.

10                   (Recess of proceedings.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4              I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13             I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16             Witness my hand this the 19th day of November, A.D.,

17   2001.

18

19

20                      _____
                            DARLINE W. LABAR
21                          Official Court Reporter
                            194th Judicial District Court
22                          Dallas County, Texas
                            (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002

REPORTER'S RECORD

VOLUME 33 OF 65 VOLUMES    **74145**

TRIAL COURT CAUSE NO. F00-02424-NM

THE STATE OF TEXAS              :         IN THE DISTRICT COURT

VS.                             :         DALLAS COUNTY, TEXAS

JEDIDIAH ISAAC MURPHY           :         194TH JUDICIAL DISTRICT

********************

INDIVIDUAL VOIR DIRE

********************

FILED IN
COURT OF CRIMINAL APPEALS

DEC  5 2001

Troy C. Bennett, Jr., Clerk

A P P E A R A N C E S:

HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building
        Dallas, Dallas County, Texas   75207
        Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
             FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
        Phone:  214-653-9400
             FOR THE DEFENDANT.


*********

    On the 3rd day of May, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

    Proceedings reported by machine shorthand, computer

assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

```
 1                      INDEX VOLUME 33

 2    May 3rd, 2001                            PAGE     VOL.

 3    INDIVIDUAL VOIR DIRE:

 4    Proceedings...................................... 2      33

 5    Ms. Hamilton Excused From Consideration.......... 24     33

 6    Mr. Garcia Excused From Consideration............ 29     33

 7    State no challenge for cause - Mr. Wright........ 77     33

 8    Defense challenge for cause - Mr. Wright......... 77     33

 9    Challenge for Cause Denied....................... 77     33

10    Robert Wright Prospective Juror No. 28........... 78     33

11    State no challenge for cause - Ms. Lentz........ 122     33

12    Defense challenge for cause - Ms. Lentz......... 122     33

13    Challenge for Cause Granted..................... 123     33

14    Reporter's Certificate.......................... 124     33

15


16               CHRONOLOGICAL VENIREPERSON INDEX

17                    STATE        DEFENSE              VOL.

18    REBEKAH HAMILTON      22                           33

19    BENITO GARCIA         27                           33

20    ROBERT WRIGHT         32           57              33

21    ANN LENTZ             82          105              33

22


23              ALPHABETICAL VENIREPERSON INDEX

24                    STATE        DEFENSE              VOL.

25    BENITO GARCIA         27                           33
```

Index 2

| 1 | REBEKAH HAMILTON | 22 | | 33 |
| 2 | ANN LENTZ | 82 | 105 | 33 |
| 3 | ROBERT WRIGHT | 32 | 57 | 33 |

5                          *NO EXHIBITS THIS VOLUME*

<pre>
1                    P R O C E E D I N G S
2              THE COURT:  Counsel may be seated.
3              (Venire panel brought into courtroom.)
4              THE COURT:  Ms. King, are you ready?
5              THE REPORTER:  Yes, sir.
6              THE COURT:  Continuation of Cause
7   F00-02424-NM, case styled the State of Texas versus Jedidiah
8   Isaac Murphy.
9         Is the State prepared to continue?
10             MR. DAVIS:  The State's ready, Your Honor.
11             THE COURT:  Is the defense prepared to
12  continue?
13             MS. BALIDO:  Defense is ready, Your Honor.
14             THE COURT:  Let the record reflect absent my
15  dictating the contrary into the record the person of the
16  accused, Jedidiah Isaac Murphy, will be in court at all times
17  during this hearing.
18        Good morning, ladies and gentlemen.  I'm Judge
19  Harold Entz.  I'm pleased to welcome all of you to this the
20  194th District Court.  May I ask all of you to please rise,
21  raise your right hands, be prepared to take an oath as a
22  prospective juror.
23         Ladies and gentlemen, for purposes of your
24  individual religious belief or personal conscience, at your
25  option, the operative verb will be either "swear" or
</pre>

1    "affirm."

2                    (Oath given to venire panel.)

3                    THE COURT:  Thank you.   Please lower your

4    hands and again be seated.

5                    Ladies and gentlemen, at the outset allow me, if I

6    may, to introduce the individuals whom you see seated at the

7    counsel tables before you.

8                    Will begin with the counsel table to the far right.

9    Both of these individuals are Dallas County Assistant

10   District Attorneys, beginning first with lead counsel for the

11   State in this prosecution, one of the Senior Prosecutors in

12   the Dallas District Attorneys Office, the Honorable Greg

13   Davis.

14                   Mr. Davis.

15                   MR. DAVIS:  Good morning.

16                   THE COURT:  Seated next to Mr. Davis is his

17   co-counsel in this prosecution.  At the present time she

18   occupies the role of Chief Prosecutor assigned to this the

19   194th District Court, so designated by Dallas District

20   Attorney Bill Hill.  Pleased at this time to introduce the

21   Honorable Mary Miller.

22                   Ms. Miller, if you please.

23                   MS. MILLER:  Good morning, ladies and

24   gentlemen.

25                   THE COURT:  Moving on to the defense table, we

1    begin first with two of the three defense attorneys in this

2    matter, beginning first with the Honorable Jennifer Balido.

3          Ms. Balido.

4                MS. BALIDO:   Good morning.

5                THE COURT:   Ms. Balido is a former Assistant

6    District Attorney.

7                Moving down the table, we have next another one of

8    the defense attorneys.   This gentleman is a board certified

9    criminal law specialist, so designated by the State Bar of

10   Texas, as a result of experience, training, and having

11   successfully completed a very competitive and difficult

12   examination.   I'm pleased at this time to introduce the

13   Honorable Michael Byck.

14               MR. BYCK:   Good morning.

15               THE COURT:   Seated next to Mr. Byck, opposite

16   Ms. Balido, is the accused, the defendant, if you will, Mr.

17   Jedidiah Isaac Murphy.

18               THE DEFENDANT:   Good morning.

19               THE COURT:   There is a third attorney

20   representing Mr. Murphy who is not with us this morning.   Her

21   name is Jane Little.   She is a former Chief Prosecutor in the

22   Dallas District Attorneys Office.   As is true with Mr. Byck,

23   Ms. Little also is a board certified criminal law

24   specialist.   She is addressing other matters with regard to

25   this particular trial outside the courthouse today, and I

1    anticipate and have reason to believe that she may well not

2    be with us during the proceedings here this morning.

3          Ladies and gentlemen, we will move right into the

4    matters at hand.  Let me explain to you right up front, leave

5    no card unturned, you have been summoned to this courtroom as

6    a prospective juror in a case styled the State of Texas

7    versus Jedidiah Isaac Murphy.  Mr. Murphy has been indicted

8    by a Dallas County grand jury.  He has been indicted for the

9    offense of capital murder.  The State has made known its

10   intention to seek the death penalty.

11         A comment or two must be made by me at this time

12   pursuant to the Code of Criminal Procedure about certain

13   aspects of this type of a prosecution.  A bit of

14   constitutional history.

15         Ladies and gentlemen, almost 30 years ago, 1972 to

16   be exact, the United States Supreme Court in Washington,

17   D.C., in a case styled or titled or called Furman versus

18   Georgia, ruled at that time that the capital murder statute

19   in place in Georgia was unconstitutional, saying that it was

20   a violation of the 8th Amendment and the 14th Amendment of

21   the United States Constitutions.  In reading that case in

22   became very apparent to those of us outside Georgia that that

23   particular opinion was applicable also to every other state

24   in the Union at that time that had the death penalty.

25   Legislatures throughout the country taking that opinion into

DARLINE W. LABAR, OFFICIAL REPORTER

Page 6

1    effect, various and sundry means, endeavored on a

2    state-by-state basis to fashion a capital murder statute that

3    would pass United States Supreme Court approval.

4            In 1976 there were a trilogy or three cases, one of

5    which Jurek versus Texas, which the United States Supreme

6    Court ruled that the statutory means that the Texas

7    legislature had put in place post-Furman versus Georgia did

8    meet constitutional muster or approval.  We have refined in

9    Texas, or the legislature has, the Texas statute since that

10   time.

11           Back in 1972 one of the faults that the United

12   States Supreme Court had with Georgia and by implication with

13   all the other states in their capital murder statute was that

14   the statutes then in place gave what the United States

15   Supreme Court called unbridled discretion with regard to the

16   imposition of the death penalty.  In an effort to address

17   that constitutional complaint from the nine members of the

18   Supreme Court, those that were on the court at that time,

19   states have now to pass constitutional muster or approval,

20   have had to do several things, not the least of which murder

21   alone, without any kind of an aggravating factor, and I'll

22   get into those momentarily, is not the type of a homicide for

23   which the death penalty is even possible.

24           The United States Supreme Court has said that there

25   must be a homicide, an intentional murder, plus some sort of

1    an aggravating factor or factors before a death penalty can

2    be constitutionally inflicted.  Various states have addressed

3    it in different manners.

4            Georgia and Florida, for instance, have a laundry

5    list, if you will, of aggravating factors that the jurors are

6    called upon to consider in the penalty stage of the trial.

7    And in those two states if the jury determines the

8    aggravating factors outweigh the mitigating factors, the

9    recommendation, and I put that in quotes, from the jury to

10   the Judge is either life or death.  Not so Texas.

11           Texas addressed it in a little bit different

12   fashion.  Texas not only do we put the aggravating factor as

13   a part of the original indictment, but there are also some

14   additional circumstances which must be taken by a jury into

15   consideration before a death penalty can be inflicted.

16           Now, how does the Texas statute work?  Number one,

17   for there to be a death penalty it, number one, must be a

18   murder.  That's a given.  Used to be sexual assault or what

19   we used to call rape could be considered a murder -- could be

20   considered death penalty, no longer.  Number one, it must be

21   a murder.  And in Texas the aggravating factors are as

22   follows:  A murder, number one, during the commission of a

23   robbery, a burglary, a kidnapping, an arson, or a sexual

24   assault.  The status of certain individuals that are victims

25   of an intentional murder are also those aggravating factors

1    for which the death penalty can be imposed.  A police officer

2    or a fireman or a guard in a penal institution murdered

3    during the course of their duties can be a capital murder,

4    death penalty eligible case.

5         Also, age is an aggravating factor.  The intentional

6    killing of a child under the age of 6 can be death penalty

7    eligible.  Note I said eligible.  Doesn't mean that it's

8    automatically imposed.  And we're going to be getting into

9    that momentarily.  Also, the murder of two or more persons in

10   the same criminal episode, taking into consideration not only

11   two, but the Timothy McVeigh tragedy of a few years ago, that

12   type of a situation.  Serial murders, the Ted Bundys, the

13   Jeffrey Dahmers, individuals such as that.  A continuing

14   course of conduct of murders can be death penalty.  Also,

15   murder for hire.  Hire a hitman or one as the case may be to

16   kill somebody.  Also, if you take the life of an individual

17   for remuneration, for insurance money, matters such as that,

18   that is a death penalty eligible case.

19        Now, just because a jury, not only the 194th

20   District Court, this particular court, but anywhere in this

21   building or anywhere in Texas, just because a jury hearing a

22   capital murder case finds a defendant guilty of capital

23   murder, that does not any way, shape, or form automatically

24   equate into a death penalty.  Far from it.  Far from it.

25   Many capital cases are tried in Dallas County and throughout

1    Texas wherein the State does not seek the death penalty.  An

2    individual in Texas found guilty by a jury or a court, if the

3    jury is waived, guilty of capital murder, has only two

4    options available statutorily for punishment, either life in

5    the penitentiary or death by lethal injection.  The latter, I

6    think, speaks for itself.

7          A life sentence for capital murder in Texas, again

8    murder plus the aggravating factor or factors, resulting in a

9    life sentence results at the present time in Texas and it has

10   been for a number of years now, 40 -- four zero, calendar

11   years in custody before being eligible for release on

12   supervision called parole.  No guarantee that after 40 years

13   if an individual incarcerated that long survives is going to

14   automatically get out in 40 years.  Regardless of

15   rehabilitation efforts, regardless of good conduct, matters

16   such as that during those 40 years, doesn't do anything to

17   lessen it to other than 40 years.  Doesn't even get it down

18   to 39 years, 364 days.  40 years, day-for-day, week-for-week,

19   month-for-month.

20         Now, what are the circumstances under the Texas

21   statutory process that changes a life sentence to death?

22   Again, keeping in mind that a verdict of guilty of capital

23   murder is either life or death.  Not automatic death.  And I

24   would submit to you that the United States Supreme Court has

25   made it abundantly clear to all of us in this country that

1    there is no way a State legislature or the United States

2    Congress could craft or put into place a statute where if you

3    commit the offense of murder and the aggravating factor,

4    automatically without question it's a death case.  Would not

5    pass constitutional approval.

6           There is an individual in this courtroom who is

7    convinced that that should not be the law.  This particular

8    individual.  I will not name who this individual is.  This

9    individual believes that espionage, treason, if you will,

10   during the time of war and if that treasonable act or

11   traitorous act results in the harm or death of any United

12   States citizen, you should take them out and shoot them after

13   a trial, after appeal, but regardless -- and it's not I who

14   thinks that.  I don't condone treason, but there is a

15   constitutional impediment that precludes that, and that's the

16   matter of mitigating circumstances which we'll get into

17   momentarily.

18          Now, if in Texas a jury finds a defendant, and this

19   is not just this court, this is not just something that the

20   attorneys and I dreamed up this morning while waiting for you

21   folks to come up here from the Central Jury Room.  But in a

22   capital murder case which the State is seeking death, before

23   the sentence can be death and not life, certain circumstances

24   must be brought to the attention of the jury and depending

25   upon their answers to special issues, the result is either a

1    life or a death sentence.

2            Now, I mentioned a moment or so ago that in Georgia

3    and Florida and other states the jury makes a, quote,

4    unquote, recommendation to the trial judge.  Not so Texas.

5    Not so Texas.  Other states the Judge acts, if you will, as a

6    thirteenth juror.  Say, no, ladies and gentlemen of the jury,

7    I don't think this should be death, I think it should be

8    life.  No, ladies and gentlemen, I don't think it should be

9    life, I think it should be death.  Not so Texas.  Not so

10   Texas.  Jury does not make a recommendation to a trial

11   judge.  Their decision is either life or death, depending

12   upon their answers to the special issues that you see to my

13   left.

14           Not that you can't read, but some of you may have

15   not brought your eyeglasses with you, may be a bit small, so

16   let me read it to you, after which I'll explain the effect of

17   the answers.

18           Ladies and gentlemen, Special Issue Number 1 reads

19   as follows.  This is statutory.  This is what the legislature

20   down in Austin has given us.  These are the matters about

21   which the United States Supreme Court has pored over and

22   considered, debated, and has approved.  Number one, whether

23   there is a probability that the defendant would commit

24   criminal acts of violence that would constitute a continuing

25   threat to society.

1          Special Issue Number 2 reads whether, taking into

2     consideration all the evidence, including the circumstances

3     of the offense, the defendant's character and background, and

4     the personal moral culpability of the defendant, there is a

5     sufficient mitigating circumstance or circumstances to

6     warrant that a sentence of life imprisonment rather than a

7     death sentence be imposed.

8          All right.  Let's take momentarily Special Issue

9     Number 1.  I would submit to each of you that the way that

10    Special Issue Number 1 is grammatically constructed, the

11    answer at the commencement of the deliberations by the jury

12    in the penalty stage of the trial, the answer to that

13    question is no.  It's not there is a probability.  The

14    question is posed whether there is a probability.

15          The burden of proof, the responsibility of going

16    forth with the evidence on Special Issue Number 1 lies with

17    the prosecuting attorneys, Mr. Davis, Ms. Miller.  Jury may

18    take into consideration all of the evidence presented at the

19    guilt/innocence stage of the trial and also other evidence

20    that may not be admissible in the guilt/innocence stage of

21    the trial, but is under the rules of evidence in Texas

22    admissible in the penalty stage of the trial.  Therefore

23    taking all of that evidence into consideration, if the jury

24    unanimously decides Special Issue Number 1 should be answered

25    yes, only then need the jury go on to address the matters

1    presented in Special Issue Number 2.

2           Legal scholars, attorneys, judges have said Special

3    Issue Number 1 is the future dangerousness question, somewhat

4    asking the jury to predict the future conduct of the

5    defendant.  If the answer to that question, after

6    deliberation, is no, it remains no.  Where it begins or in

7    the penalty stage of the trial the jury comes out in the

8    courtroom with that decision, it's a life sentence.  40

9    years.  40 years.  If the jury though, after considered

10   deliberation, answers Special Issue Number 1 yes, only then

11   need the jury go on to address the matters contained in

12   Special Issue Number 2.

13          Now, let's think where a jury is if they get to

14   Special Issue Number 2.  By virtue of finding a defendant

15   guilty of capital murder, they've already found a murder with

16   an aggravating factor.  In this case the indictment alleges a

17   murder during the course of a robbery and/or a kidnapping.

18   You've already found that by virtue under my hypothetical

19   scenario of guilty of capital murder.  Before you get to

20   Special Issue Number 2, you have already determined -- and

21   once again, this is a hypothetical, that the defendant is a

22   future danger.  You're two-thirds of the way to a death

23   sentence.

24          Special Issue Number 2 gives in Texas jurors an

25   opportunity to sit back, reflect, reconsider all of the

1   evidence presented at the entire trial, and determine whether

2   or not there is mitigating evidence presented, circumstance

3   or circumstances, if you will, as a result of which the

4   defendant should live and not die.  Not going to get on the

5   elevator and go down and go home.  We've got 40 years.  The

6   United States Supreme Court in a couple of cases over the

7   last two or three years have instructed trial judges

8   throughout the country not to define mitigating

9   circumstances.  Mitigating circumstances therefore whatever

10  the jury determines it to be.

11          To be a constitutionally qualified juror in a

12  capital murder case, a juror must be willing to tell

13  themselves and then of necessity the rest of us, that they

14  would be willing to listen and consider, if presented,

15  mitigating evidence and then determine whether as a result of

16  it a defendant should live and not die.

17          Let me give you an example of some matters that

18  jurors have suggested to us not only in this trial, but I've

19  tried a number of these cases over the past few years.  Have

20  suggested to us under a case-by-case basis they might

21  consider mitigating.  Mental health.  Mental retardation.

22  Other types of mental health issues or concerns.  Abuse as a

23  child, be it sexual, physical, or the like.  Circumstances of

24  the defendant's past.  This be an aberration, might have been

25  an Eagle Scout, might have been an alter boy, gone to church,

1    Sunday School, perfect attendance, that might be a mitigating

2    circumstance.  Mitigating evidence is whatever a juror

3    determines it -- determines it to be.  Just because a juror

4    hears mitigating evidence does not mean that they have to

5    give, pursuant to this instruction, a life sentence, but it

6    gives the jury a safety valve, a safety net.  This is a mercy

7    question.  Let's admit to us, ourselves, what it is.  This is

8    a mercy question.  Is there something because of which this

9    defendant should live and not die?  This gives the jury an

10   opportunity.  This is their out.  But if there is no

11   circumstance or circumstances, at least they've considered

12   it, made a determination that it is not present, and so be

13   it.

14        Because, ladies and gentlemen, let me make certain

15   each of you are abundantly clear of this, if a jury answers

16   Special Issue Number 1 yes, future dangerousness in the

17   affirmative, and answers Special Issue Number 1 no (sic), I

18   am required to sentence a defendant to death.  And again, I'm

19   not a thirteenth juror.  That is the stark reality of the

20   answers to those questions.  Any other configuration of

21   answers other than yes and no is a life sentence.

22        I don't want anybody to think that the attorneys or

23   I are hiding any cards under the table.  We are not.  We have

24   no secrets.  We require in Texas an informed jury so they

25   exactly know what the circumstances are going into it.

1 That's why in Texas, unlike most other states, it takes so

2 very long to pick a jury in a capital murder case.  Because

3 of all of the procedural hurdles that we jump to make certain

4 we have an intelligent, informed jury knowing the

5 circumstances of their decision.

6   In a moment or so the bailiffs are going to hand out

7 the questionnaires.  That's why you have a clipboard and have

8 a -- given a pen on your way in.  Comment or two though

9 before the questionnaires are handed to you.

10   These are matters about which we all should have

11 learned in middle school or high school, a refresher.  Though

12 Mr. Murphy has been indicted, the indictment, the legal

13 document charging him with a felony offense, is no evidence

14 of guilt.  The indictment is not self-proving.  The

15 indictment gives the defendant specific notice of the

16 criminal allegation pending against him.  That same document

17 gives the State notice of those matters about which they

18 must, if they can, convince a jury beyond a reasonable

19 doubt -- not the Perry Mason standard of beyond a shadow of a

20 doubt or not a hundred percent certainty -- beyond a

21 reasonable doubt before a jury may find a defendant guilty.

22   As Mr. Murphy sits before you this morning, he must

23 by each of you be presumed to be innocent.  That presumption

24 remains with him, as it does any defendant, any criminal

25 case, be it down in municipal court on a traffic infraction,

1   or a capital murder case, the presumption of innocence is
2   guaranteed to each of us at the commencement or beginning of
3   a criminal prosecution.   The responsibility of proving the
4   allegation, if they can, lies with the prosecuting
5   authorities, the District Attorneys Office, if you will.   Mr.
6   Murphy is not obligated to prove his innocence.   It's the
7   obligation of the State though to prove him, if they can,
8   guilty beyond a reasonable doubt.
9           If a jury in a case such as this should find beyond
10  a reasonable doubt the murder part to have been
11  satisfactorily proven to them but not the aggravating factor,
12  jury does not just say not guilty.   But if they find under a
13  hypothetical murder, but not the aggravating factor, the jury
14  returns with a verdict of what we call a lesser included
15  offense, that being murder.   Not capital murder, but murder.
16  Murder, not capital murder, in Texas is one of a number of
17  offenses in the Penal Code of Texas designated by the
18  legislature as a first degree felony.   A first degree felony
19  murder, not capital murder, has a penalty range not less than
20  5 nor more than 99 years or life, with an optional fine not
21  to exceed $10,000.   Did not want any of you to think, well,
22  if they prove murder but don't prove the aggravating factor,
23  you know, does this murderer go home?   No.   Five to 99 years
24  or life.   You may think, wow, 5 years for murder.   Ladies and
25  gentlemen, just a second.

1          I don't agree with everything that the legislature

2    does, I assure you, and I would be surprised if any of you

3    did as well.  But in this aspect I do.  By leaving the

4    penalty range for murder so wide, 5 to 99 years or life, the

5    legislature has given juries in Texas every opportunity to

6    consider all kinds of circumstances and relationships that

7    exist between parties in determining the punishment of a

8    murder case.  Been a trial judge for 27 and a half years,

9    about half of which on the district bench before that I was

10   on a misdemeanor bench.  The last number of years presiding

11   over, I can't tell you how many murder cases, I have seen

12   cases in which jurors have, and I totally agreed, 5 years in

13   the penitentiary.  Not going to go into circumstances, but

14   trust me, there are relationships such that 5 years under the

15   circumstances can be and has been found by 12 folks just like

16   you to be very appropriate.  We're not asking you at this

17   point to figure out a circumstance.  If you want to give me a

18   call on the telephone, I'll be more than happy to share with

19   you after this trial has been completed some circumstances in

20   which I think you would agree with me that 5 years is

21   extremely appropriate.

22          You have taken an oath.  You are under oath when you

23   fill out the questionnaire.  There are no right or wrong

24   answers to the questions.  Oh, there's a few about address

25   and matters such as that, which, of course, is either a right

1   or wrong.  But you'll be asked about your opinion about

2   various and sundry aspects of the criminal justice system.

3   Neither the attorneys nor I grade prospective jurors on a

4   citizenship level with regard to their answers, with regard

5   to their feelings and opinions about the death penalty.  We

6   don't do that.  We only ask that you be candid and honest

7   with yourself and therefore with us when you answer these

8   questions.

9            It has been said by a very prominent legal scholar

10  that second only to representing our country on the field of

11  battle during the time of war, the next highest civic duty we

12  can impose upon a citizen is to serve as a juror in a capital

13  murder case.  The attorneys, Mr. Murphy, and I are aware that

14  you look upon this as a very serious matter.  Very serious to

15  the person of the accused, Mr. Murphy.  It's very serious to

16  the family of the victim, the survivors, if you will.

17           As a juror you are not an advocate.  You will be

18  along with me, during this trial, a judge.  It will be your

19  responsibility, if selected as one of the 12 jurors, to be

20  one of the absolute 12 judges of the facts.  On the other

21  hand, I am obligated by virtue of holding this office to be

22  the Judge or arbiter of questions of law.  So together, the

23  12 judges called jurors and I will work through this very,

24  very difficult procedure.

25           Questionnaires will now be handed out to you.  We

1    realize that you are a little bit confined and you may need a

2    little more elbow room.  So those of you that wish to excuse

3    yourself and go out to the hallway to perhaps have a little

4    more room, you're invited and welcome to do that.  As I look

5    at my watch it's about 10:30, 10:31 the clock on the wall.

6    Let me ask you after you've completed the questionnaire, if

7    ask you would come back into the courtroom, those of you that

8    leave or those of you that chose to remain in the courtroom

9    after you've completed the questionnaire completely, hand it

10   to one of the bailiffs, you're then excused.  Let me ask that

11   all of you be back at here at 12 o'clock.  We will continue

12   at that time.

13          Sheriff, may I ask that you turn -- present the

14   questionnaires to the jurors.

15              (Recess of panel with times to return)

16              THE COURT:  Good afternoon, Ms. Hamilton.

17   Welcome back.  May I ask you to raise your right hand and

18   again be sworn in.

19              (Venireperson additionally sworn.)

20              THE COURT:  Thank you.  Lower your hand.

21        Ms. Hamilton, let me reintroduce the individuals at

22   the counsel table.  It's been a little while since you were

23   last here.

24          Far left, lead prosecutor or the State, a Senior

25   Prosecutor in the Dallas District Attorneys Office, Mr. Greg

1    Davis.

2                    MR. DAVIS:  Good afternoon.

3                    THE COURT:  Ms. Hamilton, moving down the

4    counsel table -- excuse me, next have co-counsel for the

5    State, Chief Prosecutor, 194th District Court, the Honorable

6    Mary Miller.

7                    MS. MILLER:  Good afternoon, Ms. Hamilton.

8                    THE COURT:  Moving on to the defense table, we

9    begin first with one of the three defense attorneys, the

10   Honorable Jennifer Balido.

11                   MS. BALIDO:  Good afternoon.

12                   THE COURT:  Next to Ms. Balido is one of her

13   co-counsels, board certified criminal law specialist here in

14   Texas, the Honorable Michael Byck.

15                   MR. BYCK:  Good afternoon, ma'am.

16                   THE COURT:  Seated next to Mr. Byck, opposite

17   Ms. Balido, is the accused, the defendant, Jedidiah Isaac

18   Murphy.

19                   THE DEFENDANT:  Good afternoon.

20                   THE COURT:  There is a third attorney

21   representing Mr. Murphy not with us this afternoon, working

22   on some matters pertinent to this case outside the

23   courthouse -- excuse me, this afternoon.  Her name is Jane

24   Little.  She is also a board certified criminal law

25   specialist and former Chief Prosecutor in the Dallas District

1    Attorneys Office.

2           Ms. Hamilton, we will begin, assuming you're ready,

3    with the State.  Are you ready?

4                 VENIREPERSON:  I'm ready.

5                 THE COURT:  Mr. Davis.

6                 MR. DAVIS:  Thank you.  May it please the

7    Court.

8                      REBEKAH HAMILTON

9    was called as a venireperson by the Court and, after having

10   been first duly sworn, was questioned as follows:

11                  Voir Dire Examination

12   By Mr. Davis:

13       Q.   Good afternoon again, Ms. Hamilton.  How are you?

14       A.   I'm okay.

15       Q.   All right.  Well, just relax, because I think the

16   Judge has previously told you, there aren't going to be any

17   right or wrong answers this afternoon.  There may be some

18   questions that may require you to think a bit and to -- they

19   may be tough questions, but there aren't any right or wrong

20   answers.  As long as you tell us how you honestly feel about

21   a subject, that's all we expect from you.  Okay?

22                 THE COURT:  May be tough, but they'll be very

23   fair.

24       Q.   (By Mr. Davis)  Ms. Hamilton, just to start off

25   with, I see that you work for Love Field Antique Mall.  I

1  didn't realize that Jerry Beason owned the mall.

2      A.   Yes, he does.

3      Q.   You know, I've known Jerry Beason for a number of

4  years, had cases with him several years ago.  I take it that

5  your employment by Mr. Beason, he's an attorney, he practices

6  down here, or at least he used to, would that have any affect

7  whatsoever on you hearing a case like this?

8      A.   (Nods head.)

9      Q.   Okay.  Let's just start and let's talk about the

10 death penalty a little bit.  I see from your questionnaire

11 that you're in favor of the death penalty.

12          Can you tell me a little bit why you're in favor of

13 the death penalty?

14     A.   I think sometimes there's nothing else that we can

15 do as a society, other than a death penalty.

16     Q.   Uh-huh.  Secondly, you know, sometimes people will

17 tell me they're in favor of the death penalty, but they're

18 not sure that they can personally take part in a case like

19 this.  You know, they'll say I agree with the law, think it

20 serves a worthwhile purpose, but it's another matter perhaps

21 to sit on a jury and have to return a verdict that might

22 return -- might, you know, result in the death of another

23 individual.

24          How do you feel about that?

25     A.   Well, I have to say since I was here last, that has

1    weighed heavily on my mind.  It's like worst case scenario.

2    If I were on the jury and the defendant were found guilty

3    beyond a reasonable doubt, I think that would be a very

4    difficult decision to make.

5         Q.   Okay.  Well, and again only -- okay.  I think that

6    Mr. Byck, on behalf of Mr. Murphy, is in agreement with me to

7    excuse you, with the Court's approval.  And the reason being,

8    we certainly don't want to put somebody in that kind of

9    position where they're going to have some moral dilemma in

10   reaching a verdict here, and, you know, we have other people

11   to talk to this afternoon.  And I know that you've served on

12   a jury before.

13        A.   Yes, I did.

14        Q.   So obviously you've made a fine juror in the past,

15   and any other type of case I'm sure you would also so I

16   appreciate --

17        A.   Well, I appreciate it.

18                    (Ms. Hamilton Excused From Consideration)

19                    THE COURT:  Thank you, Ms. Hamilton.

20                    VENIREPERSON:  And I have to say I'm so

21   relieved.

22                    (Venireperson excused.)

23                    THE COURT:  Benito Garcia.

24                    (Venireperson brought into the courtroom.)

25                    THE COURT:  Good afternoon, Mr. Garcia.

1    Welcome back.

2              VENIREPERSON:  Good afternoon, everybody.

3              THE COURT:  Raise your right hand, please.

4              (Venireperson additionally sworn.)

5              THE COURT:  You may lower your hand.  Mr.

6    Garcia, allow me to reintroduce the individuals whom we see

7    seated at the counsel table.

8         Beginning with the table to the left as we look at

9    them, begin first with the lead prosecutor for the State in

10   this case, the Honorable Greg Davis.

11             MR. DAVIS:  Afternoon.

12             THE COURT:  One of the Senior Prosecutors at

13   the present time in the Dallas District Attorneys Office.

14        Co-counsel in this case is the Chief Prosecutor --

15   excuse me, assigned to this the 194th District Court, the

16   Honorable Mary Miller.

17             MS. MILLER:  Good afternoon.

18             VENIREPERSON:  Hello.

19             THE COURT:  Moving on to the next table, Mr.

20   Garcia, we begin first with one of the attorneys representing

21   the defendant, the Honorable Jennifer Balido.

22             MR. BYCK:  How are you, Mr. Garcia?

23             VENIREPERSON:  Hello, ma'am.

24             THE COURT:  Next attorney going down the

25   table, the Honorable Michael Byck, board certified criminal

1   law specialist, so designated by the State Bar of Texas.

2           Mr. Byck.

3               MR. BYCK:  Good afternoon, sir.

4               VENIREPERSON:  Yes, sir.

5               THE COURT:  Seated next to Mr. Byck, opposite

6   Ms. Balido, is their client, the accused, the defendant, if

7   you will, Jedidiah Isaac Murphy.

8               THE DEFENDANT:  Good afternoon.

9               VENIREPERSON:  Hello, sir.

10              THE COURT:  Mr. Garcia, there's a third

11  attorney representing Mr. Murphy, in addition to the two whom

12  I've introduced, Jane Little, a former Chief Prosecutor and

13  board certified criminal law specialist, is also on the

14  defense team.  She is attending to some matters with regard

15  to the case outside the courthouse this afternoon.  So she --

16  if you're one of the jurors, you'll see her at the counsel

17  table in a very active trial capacity once the testimony

18  begins.

19          Mr. Garcia, we're about to begin with your

20  individual questioning.  To their questions, there's no right

21  or wrong answers as long as they're honest.  We have no

22  reason to doubt they'll be anything other than that.

23  Assuming you're ready to begin, we're ready.

24          Are you set to go?

25              VENIREPERSON:  Yeah.

1    THE COURT:   Take a deep breath.   Don't worry.

2   The questions may be difficult from an ethical standpoint,

3   but they won't cause you to have any other difficulties other

4   than -- may put you in some little ethical moral dilemma, but

5   that's just the nature of the type of case.   We begin with

6   State, the Honorable Greg Davis.

7         Mr. Davis.

8            MR. DAVIS:   Thank you.   May it please the

9   Court.

10               BENITO GARCIA

11   was called as a venireperson by the Court and, after having

12   been first duly sworn, was questioned as follows:

13               Voir Dire Examination

14   By Mr. Davis:

15       Q.   Good afternoon, Mr. Garcia.   How are you?

16       A.   Fine, sir.   Yourself?

17       Q.   Good.   Mr. Garcia, for the next few minutes I'm

18   going to talk with you.   As the Judge indicated, we'll talk a

19   little bit about the death penalty here in Texas, may talk

20   about some general principles that apply in this type of

21   case.   As he just told you, there aren't any right or wrong

22   answers.   As long as you tell us how you honestly feel, then

23   that's all we can expect from you.   Okay?

24          Mr. Garcia, I just want to start off and have you

25   tell me, how do you honestly feel about the death penalty in

1   Texas?  Are you for it?  Against it?  How do you honestly

2   feel about it?

3       A.   I don't oppose it because I guess we all have our

4   choices to make, the right choice, you know, and if you do

5   something that -- I believe that we all have time to think

6   about it, really, even though you're mad, and you can still

7   stop what you're doing.

8       Q.   Uh-huh.

9       A.   And if -- you know, if you did it -- did do it -- I

10  mean, if you -- you have to pay.  We can't judge you, but,

11  you know, if you take my life, I hope somebody tries to, you

12  know, make sure that you get punished for it.

13      Q.   Right.  Okay.  Are there any cases that you've heard

14  about recently, maybe you've seen it in the news, that you

15  thought might be the kind of case where the death penalty

16  might be appropriate?

17      A.   Well, cold-blooded murders, yeah.  Like that one

18  lady that those kids just took her car and killed her for no

19  reason.  I mean, that's pretty bad.

20      Q.   Okay.  Let me just -- let me talk to you about

21  possibly serving on this jury because I've had people in the

22  past who have told me that they're in favor of the death

23  penalty, but they're not sure that they'd like to sit on this

24  type of jury and actually return a verdict that would result

25  in someone else's death because that's really what we're

1   seeking in this case.  The State is seeking the death penalty

2   against Jedidiah Murphy.  We hope that the jury will return a

3   verdict that requires Judge Entz to sentence him to death.

4   And our goal is to see that he dies in Huntsville due to

5   lethal injection.

6          How do you honestly feel about sitting on this jury

7   and returning a verdict against this man that might result in

8   his death?

9   A.   You got to really -- you know, you got to really

10  believe that he did it.

11  Q.   Uh-huh.

12  A.   And if it was a cruel way to do it -- I mean, if

13  it's -- it's kind of hard, but, you know, it's --

14  Q.   Let me just -- let me just --

15          (Mr. Garcia Excused From Consideration)

16          THE COURT:  Mr. Garcia, the attorneys have

17  authorized me to inform you that they have excused you from

18  consideration.

19          VENIREPERSON:  Thank you.

20          (Venireperson excused from courtroom.)

21          (Venireperson returned to courtroom.)

22          THE COURT:  Good afternoon and welcome back.

23  Ask that you raise your right hand again and be sworn in,

24  please.

25          (Venireperson additionally sworn.)

1          THE COURT:  Thank you.  Lower your hand, Mr.

2     Wright.

3          Mr. Wright, let me reintroduce the individuals whom

4     you see seated at the counsel tables.

5          Beginning with the with the counsel table to the

6     left, we have lead counsel for the State, a Senior Prosecutor

7     in the Dallas District Attorneys Office, the Honorable Greg

8     Davis.

9          MR. DAVIS:  Good afternoon.

10          THE COURT:  Next to him is co-counsel, present

11     time occupying the role Chief Prosecutor in this the 194th

12     District Court, the Honorable Mary Miller.

13          MS. MILLER:  Good afternoon.

14          THE COURT:  Moving on to the next table, a

15     former Assistant District Attorney, one of the three

16     attorneys representing the defendant in this case, the

17     Honorable Jennifer Balido.

18          MS. BALIDO:  How are you, Mr. Wright?

19          VENIREPERSON:  Fine.

20          MS. BALIDO:  Good.

21          THE COURT:  Seated next to Ms. Balido, a

22     co-counsel, board certified criminal law specialist, by

23     training, experience, and competitively passing a very

24     difficult examination, the Honorable Michael Byck.

25          MR. BYCK:  Good afternoon, sir.

```
 1              THE COURT:  Seated next to Mr. Byck, opposite
 2    Ms. Balido, is their client, the accused, the defendant, if
 3    you will, Mr. Jedidiah Isaac Murphy.
 4              THE DEFENDANT:  Good afternoon.
 5              THE COURT:  The third attorney representing
 6    Mr. Murphy who's not with us this afternoon, a former Chief
 7    Prosecutor in the Dallas District Attorneys Office.  Also as
 8    is true with Mr. Byck, she also is a board certified criminal
 9    law specialist.  Her name is Jane Little.  She is attending
10    to some matters with regard to this case outside the
11    courthouse this afternoon.
12              Mr. Wright, before you leave us in about an hour or
13    so you will know whether or not you remain under
14    consideration by the Court as a prospective juror in this
15    case.  If you're prepared to proceed, we are as well.
16              VENIREPERSON:  Okay.
17              THE COURT:  Are you set to go?
18              VENIREPERSON:  Yeah.
19              THE COURT:  We'll begin with the State, the
20    Honorable Greg Davis.
21           Mr. Davis.
22              MR. DAVIS:  Thank you.  May it please the
23    Court.
24                    ROBERT WRIGHT
25    was called as a venireperson by the Court and, after having
```

Page 34

1    been first duly sworn, was questioned as follows:

2                        Voir Dire Examination

3    By Mr. Davis:

4        Q.    Good afternoon again, Mr. Wright.  How are you?

5        A.    Fine.  Thank you.

6        Q.    Good.  Mr. Wright, for the next 30 minutes or so I'm

7    going to talk to you about some of the issues involved in

8    this case.  At that time after I conclude, then either Mr.

9    Byck or Ms. Balido will speak to you on behalf of Mr.

10   Murphy.  A lot of the questions that I'll ask you today deal

11   with how you feel about a subject, what your opinions are.

12   We do need to hear how you honestly feel.

13            Another thing that I will be asking you throughout

14   the questioning today will be whether you can conform your

15   beliefs to the law in this case.

16            Now, if you're selected as a juror in this case,

17   you'll be required to take another oath.  You haven't taken

18   it yet.  And that oath will say to render a true verdict

19   according to the law and the evidence in this case.  The law

20   will be given to you by Judge Entz.  And in that law he'll

21   explain to you what murder is, what robbery is, what a lot of

22   these definitions are.  He'll also explain some of the legal

23   rights that Mr. Murphy has.  He'll explain how you're to

24   apply that to the facts that you hear in this case.

25            Now, as a juror, you will have the authority to

 1    decide what the facts are.  You'll listen to the witnesses.

 2    You'll decide who you want to believe, who you don't want to

 3    believe.  You get to decide the facts, but Judge Entz will be

 4    the final source for all of the law in this case.

 5          Now, as a general rule, are you the type of person

 6    who can follow the instructions from the Court here, even if

 7    it might disagree with your own personal opinions?

 8          A.   Yes, I believe I can.

 9          Q.   See, a lot of people come down here with opinions,

10    and I would expect them to have opinions.  Sometimes they

11    have very strong feelings about some of these matters.  Maybe

12    they have a perception of the criminal justice system maybe

13    from observing it, reading about cases or whatnot.

14          Now, we as attorneys know what the rules are.  I'm

15    fully prepared to abide by all the rules.  I know what I have

16    to do in this case.  Let me go into some of these rules with

17    you right off the bat.  Okay?  Because they are very

18    important rules.  These rules insure that Mr. Murphy will get

19    a fair trial.  Obviously, there's a lot on the line here.  If

20    the State of Texas prevails in this case, they'll come a day

21    where he will be put to death in Huntsville, so obviously

22    it's very important that he be given a fair trial.  We want

23    him to get a fair trial.  We want 12 fair jurors.

24          The first thing I want to talk to you about is the

25    presumption of innocence.  In all criminal cases, every

1    single defendant who comes in here is presumed innocent of

2    the offense.  I don't care whether there have been a hundred

3    eyewitnesses, I don't care if it's been on videotape, once a

4    man walks into this courtroom, he's got no burden of doing

5    anything.  It's all on the State of Texas.  The old saying is

6    those who bring the charges have to do the proving.  We have

7    brought the charges.  We have the burden of proof in this

8    case.  If we fail to meet our burden of proof, that

9    presumption of innocence is so strong that you'd have to say

10   not guilty.

11           Now, in this particular case, without going into

12   specific facts, obviously some things have already happened.

13   Mr. Murphy has been arrested for the offense of capital

14   murder.  He's been charged with that offense.  He's been

15   indicted by a Dallas County grand jury.  The case has been

16   referred to this court.  We're a little over halfway through

17   the jury selection, but he's still presumed innocent.  That

18   presumption is so strong as he sits here right now, if we

19   started this trial and Judge Entz said State ready and I said

20   yes, and he said present your evidence, and I said I don't

21   want to or I don't want have any evidence, you'd have to say

22   not guilty because again, the burden is on the State of

23   Texas.

24           In this particular case can you assure all of us

25   that you will presume Jedidiah Murphy to be innocent of this

1    offense?

2         A.    Yes.

3         Q.    Will you make the State of Texas prove its case

4    beyond a reasonable doubt before you find him guilty?

5         A.    Yes.

6         Q.    Sometimes jurors come down and they say, well, I'd

7    like to hear from both sides before I have to make a decision

8    like this.  I think that's only natural, so would I.  But you

9    have to understand the legal requirements here.  The legal

10   requirements are that I've got to put on the evidence.  Mr.

11   Murphy can sit there with his attorneys and literally they

12   can doodle the entire trial.  They don't have to say a single

13   word.  They have no burden of proof.  They will never have a

14   burden of proof in this particular case.  That extends to Mr.

15   Murphy testifying or not testifying.

16              Again, I have a lot of jurors who come down and say

17   I would like to hear from the defendant, see what he has to

18   say.  I have some jurors who go as far as to say, well, you

19   know, if he doesn't testify, maybe he's hiding something.

20   I've been a defense attorney, too.  I've had clients, and

21   I've had to counsel them about testifying or not testifying.

22   Some of my clients would have made great witnesses.  Some of

23   them would have made horrible witnesses.  Some of them

24   couldn't speak English.  Some of them froze up when they

25   started talking, so there are a number of reasons why

1    somebody might not testify in a case like this.

2         What the law is going to say to you is this.  If a

3    defendant chooses not to testify for whatever reason, when

4    you go back there to that jury room, you cannot hold that

5    against him in any way.  You can't consider it.  You can't

6    use his silence and add it to the evidence that I present to

7    push me over the burden of proof in this case.

8         In this case would you be able to do that?

9    A.    I believe so.

10   Q.    Okay.  And again, it may be natural to think if I

11   were in that position, you'd do something different perhaps,

12   but in this case if he doesn't testify, you'll be duty bound

13   to go back there and just not consider it.  Look to the

14   evidence that I presented because again, I've got the burden

15   of proof in this type of case.  And when it comes to the

16   burden of proof, what I have to prove is on that indictment

17   in front of you.  There's several things that I have to show

18   to you beyond a reasonable doubt.

19        Now, I've got to show you, for instance, in this

20   case that it occurred in Dallas County, Texas, on or about a

21   certain date, that Mr. Murphy is the person who intentionally

22   took the life of Bertie Cunningham, that he killed Ms.

23   Cunningham by shooting her or drowning her.  That did he that

24   during the course of either robbing her or kidnapping her.  I

25   have to show all of those things.  If I fail to show any of

 1   those essential elements, even though I may hit nine out of

 2   10, that's not good enough.  And this particular case, and I

 3   understand this going in, I've got to hit 10 out of 10 or I

 4   lose.  I expect to lose if I don't get all 10.

 5          Let me illustrate how important that is.  Let's say

 6   in a case like this, and I'm going to make these -- these are

 7   going to be examples that I think you're going to see are

 8   very extreme.  And they'll be somewhat difficult maybe.  But

 9   they do illustrate how important these rights are.

10          I'll use myself for this example.  Let's say that I

11   go out and I'm a fire bug and I don't like children.  And I

12   go out to a child care center and I fire bomb it and I kill a

13   hundred children inside.  I'm brought to trial.  There is no

14   doubt after you hear the evidence that I did it, that I

15   intended to do it, I'm as guilty of capital murder as guilty

16   can be.  There is no doubt about the fact that they have the

17   right person.  Maybe even I've indicated I'll do it again.

18   I'm a dangerous individual.  And yet let's say for whatever

19   reason, it turns out that child care center was in Kaufman

20   County perhaps, or Denton County, it is not in Dallas County,

21   the State was required to prove that my act occurred in

22   Dallas County.  Maybe it was in Dallas County, but maybe the

23   prosecutor never asked the right question.  Maybe he's over

24   there sleeping and just forgot to ask a question.  Again, you

25   go back to the jury room.  Your common sense tells you you're

1    looking at an extremely dangerous person, but you also know

2    that Dallas County has not been proven up.  I know from your

3    questionnaire, and this -- I know you indicated sometimes

4    people get off because of technicalities.  And that is one

5    way of looking at it.  But again, I guess as attorneys, we

6    look at it as that's an essential element to prove.  It's

7    just as important as proving that I did it in that case.

8    What the law is going to require you to do may not be easy

9    here.  And it may come in conflict with a lot of feelings and

10   emotions that you have.  And you may say to yourself that's

11   an extremely dangerous person.  But the Judge would instruct

12   you in that case, if there is a reasonable doubt about

13   whether that happened in Dallas County, you have to say not

14   guilty, notwithstanding everything else that you've heard in

15   that case.  And this is I guess where the rubber meets the

16   road.  Some people say that might be the hardest thing I've

17   ever got to do in my life, but if I'm going to take an oath

18   to be true to the law and the evidence then I'll do that.

19   Other people say I don't think I have the discipline

20   necessary to do that.  I don't think that my conscience could

21   live with that.  And I don't care what the law says, I don't

22   care what the rules say, I'm not going to obey them.  I'm not

23   going to let the man go free.  You can see the dilemma there?

24        A.   Uh-huh.

25        Q.   So my question to you very simply is, if you're in

Page 38

 1  that situation -- I'll make it even tougher for you if it's

 2  not tough enough already.  All other options --

 3                  THE COURT:  How tough do you want him to make

 4  it?

 5                  MR. DAVIS:  This would be my last --

 6                  THE COURT:  Does that top it off so far?

 7                  VENIREPERSON:  That's pretty tough.

 8      Q.   (By Mr. Davis)  My last addition to that will be you

 9  go back there and the other 11 people are saying, okay, Mr.

10  Wright, we're not going to let him go.  We're not about to go

11  out here in this community knowing that this guy is walking

12  out of the courthouse.  We don't care what the Judge says.

13  We don't care what the document says.  Let the next group

14  deal with it.  He can only be tried once.  And if we say not

15  guilty, that's it.  What do you do?

16      A.   Well, I mean that's a tough question, obviously.

17  I've always been a firm believer in doing what the right

18  thing is.  And the law says that this is what it is, I've

19  always been a believer in that.  As much as I would disagree

20  with it or be opposed to it, I feel like I could uphold what

21  the law says.

22      Q.   That's important because, you know, this justice

23  system does not work unless people try to do the right thing.

24      A.   Of course, I've never been in a position where I've

25  had to make that kind of decision either.  And I don't know

1    for sure that I would, but I believe that I would.

2        Q.    Okay.  Let me just reassure you, of course, these

3    examples I don't expect any of them to occur.

4        A.    Sure.

5        Q.    I wouldn't expect you to be put in that kind of

6    position.  On the same -- on the same vein, sometimes written

7    statements or confessions are taken from defendants down

8    here.  And there are rules that apply there before the

9    confession can be considered as evidence.  You're probably

10   familiar with Miranda warnings if you watch any of these

11   shows.  And, you know, there's several things that the

12   suspects have to be been told.  Let's say again in my case, I

13   fire bombed the child care center.  There is not an eye

14   witness around when I do it.  I get away scot-free.  I talk

15   with the police later, and I decided I'll just brag about

16   what I did.  I don't care who knows, and I go in there and

17   start talking to a detective, maybe he's been on duty too

18   long.  He's just tired.  He doesn't remember to give me all

19   of the warnings, he gives me three out of the four necessary

20   warnings but maybe he forgets to tell me that I can have an

21   attorney appointed if I can't afford one.  I don't want an

22   attorney.  I don't ask for an attorney.  But he fails to give

23   me that warning.  We come to trial -- that's the only

24   evidence that the State has against me is my written

25   statement.  Well, the Judge is going to instruct you there,

1    unless all of those warnings were given, you got to throw

2    that statement out.

3            Let's say the detective very honestly says, I just

4    didn't give him the warning.  I don't have a good explanation

5    for it.  I just flat forget.  He never asked for an attorney,

6    it was never an issue, but in all honestly, I just never did

7    say that to him.  Judge Entz would say if it wasn't given,

8    you've got to throw the statement out.  Again, that problems

9    is if you through that statement out against me, there's

10   nothing else left.  Same situation, very dangerous

11   individual.  Maybe I've threatened to do it.  And the very

12   first child care center I get to when I walk out of here, I'm

13   going to go for it again and you know that.  If it comes down

14   the doing the right thing, we're not doing the right thing

15   there, too.

16           Could you do the right thing there also?

17   A.    I believe so.

18   Q.    Fair enough.  I think that's probably the hardest

19   question I'll ask you this afternoon.  Okay?  So just relax.

20   Let's talk for a moment about the offense of murder.

21           THE COURT:  You can wipe that sweat off your

22   forehead that you've been sweating.

23   Q.    (By Mr. Davis)  Let's talk about the offense of

24   murder.  Because if you'll recall, Judge Entz told you

25   capital murder is always an intentional murder plus something

1    else.  An intentional murder by itself, no matter how bad it

2    is, is never a death penalty case.  It has to be another

3    aggravating circumstance to go along with it.  So if I saw

4    someone sitting over here in this jury box and I just didn't

5    like the color of their hair and I shot them ten times in the

6    head, intending to kill them.  As bad as that may be, it's

7    still not a death penalty case.

8              Now, there are all types of intentional murders.  I

9    mean, we can sit here and we can talk about any number of

10   circumstances and motivations for taking another human life.

11   Some of them might actually surprise you.  You know, it can

12   be as bad as this where I just hate somebody for no reason

13   and that fuels my anger and I kill them.  Motivation may be

14   very different.  Let's say I've got a teenage daughter and I

15   find out that the neighbor down the street is a crack dealer

16   and he's been supplying her with crack cocaine.  He's got her

17   hooks and maybe she's got brain damage -- permanent brain

18   damage as a result of using crack cocaine.  I find out about

19   it, and I think to myself there is no way I'm going to let

20   him sell to anyone else.  And I very methodically decide to

21   take his life, and I go down there and shoot him.  Well, I

22   intended to kill him, but you see, the motivations and

23   thought processes were very different.  So there are any

24   number of these situations out there.

25              When we talk about the intentional taking of a life,

1    we're talking about a situation that's not an accident.  It's

2    not negligence.  It's not self-defense.  It's not insanity.

3    It's an intentional act.  You know, besides the crimes being

4    different, every defendant is different.  I mean, I've

5    tried -- I can't tell you how many murder cases I've tried

6    over the years.  I can tell you one thing, every defendant is

7    unique.  His background, his character, is all different.

8    You may have an individual who has lived a spotless life.

9    Let's say the situation with the crack dealer.  Maybe I've

10   been a deacon in my church, pillar of the community.  I'd

11   never think about doing this otherwise, but I've taken a

12   human life.  I've committed a capital murder perhaps or a

13   murder.  And all the way down to the other end of the scale,

14   maybe you've had an individual who's been in trouble most of

15   his adult life.  Maybe even as a juvenile even.  He's

16   escalating out of control.  Maybe he's been through the

17   criminal justice system, maybe not.  So they come in all

18   shades and sizes there.

19            The key again is this, and the reason I'm going

20   through this is if you're a juror on a murder case, to be

21   constitutionally qualified to sit as a juror, you have to

22   have an open mind to the full range of punishment.  You have

23   to honestly be able to say to us if you heard a murder case

24   and you thought the right thing to do in that case was to

25   give the maximum, that you could do it.  If you thought

1   something less was called for, you would give that also.  And

2   if you heard a murder case and you thought that that

3   particular defendant in that particular fact situation called

4   for the minimum of 5 years, you could do that, also.

5        Now, honestly I've had jurors who have sat up there

6   and told me I don't care what facts I hear, I don't care if

7   that defendant has been a Boy Scout, Eagle Scout, and been

8   the best citizen in all of Dallas County, I'm never ever

9   going to give 5 years for an intentional killing, I don't

10  care to hear the facts.  Obviously, that person has already

11  prejudged what they're going to do.  They're not qualified

12  because you have to have an open mind.  But the key is if you

13  heard that case, and it may be a rare case -- you don't even

14  have to be able to sit up there and tell us what fact

15  situation would actually make you think 5 would be the right

16  thing to do, but you have to be able to say I'm open to the

17  idea that a case might come across, a murder case, where 5

18  years would be the right thing to do.  And if I saw that case

19  and if I thought 5 was the right thing to do, then that's

20  exactly what I would do because I would think that is the

21  right thing to do today.  Could you do that?

22       A.   Yes, sir.

23       Q.   Mr. Wright, let's switch gears a little bit and talk

24  about these special issues.

25       A.   Okay.

```
 1        Q.    That's really where the death penalty is different

 2   than other felonies cases.  Normally, if you find someone

 3   guilty, we go to a punishment phase and then the Judge will

 4   give you the range of punishment like for murder.  And you'd

 5   have a verdict form and you'd actually write in the number of

 6   years that you thought was the right sentence for that

 7   person.  But in death if you find someone guilty of capital

 8   murder, we go to a punishment phase.  The evidence may be

 9   different.  You may get to hear things about the defendant's

10   background, his character, that are not admissible in the

11   first part of the trial.  After you've heard that, you're

12   faced with Special Issue Number 1.

13        Now, in the past again -- let me just tell where you

14   some people have a problem, see if you fall into this

15   category.  Some people would say if I find an individual has

16   intentionally taken another life during the course of a

17   robbery or kidnapping, that by itself without any other

18   evidence tells me always that the answer to Special Issue

19   Number 1 will be yes and I will automatically say yes

20   regardless of what I hear at the punishment phase.

21        Now again, at the punishment phase both sides have

22   the ability to offer more evidence.  If the State has

23   evidence of prior convictions, you know, we have an

24   opportunity at that time to tell you.  If the defense wishes

25   to offer testimony that the man has no criminal history or
```

1    perhaps character witnesses who come down to talk about his

2    past, whatever it may be, they're entitled to do that, too.

3         The question then simply is if you find someone

4    guilty of capital murder, are you going to automatically

5    answer Special Issue Number 1 yes?  Or will you wait for all

6    the evidence and will you base your answer to Number 1 on all

7    of the evidence that you hear?

8         A.    I think I would base it on the evidence.

9         Q.    And again, the State of Texas has the burden of

10   proof here.  If we prove to you beyond a reasonable doubt

11   through all of the evidence that we present that it should be

12   answered yes, you answer it yes.  If we fail to meet our

13   burden of proof, it's kind of like the presumption of

14   innocence again.  It's presumed to be no.  If we fail to meet

15   our burden of proof, then you answer it no.  And I hear you

16   saying that's exactly what you would want to do is wait for

17   all the evidence hear, and your answer will depend on the

18   evidence that you hear, correct?

19        A.    Yes.

20        Q.    Let's talk about some of the words up here because

21   even though the questions have been given to us by the

22   legislature, they weren't kind enough to give us legal

23   definitions for a lot of these words.  So we depend on jurors

24   to tell us how they look at these things.  First of all, the

25   word "probability."  Whether there is a probability that the

1   defendant would commit criminal acts of violence.

2          Now, the legislature could have chosen other words

3   for us.  They could have said to the State of Texas, we're

4   going to put the bar up so high that the State has to prove

5   that there is an absolute certainty, 100 percent certainty

6   that the defendant would commit criminal acts of violence.

7   Obviously, they didn't do that.  They could have made it so

8   low as to say all the State has to prove is that there is

9   a -- the slightest chance or the slightest possibility or a

10  mere possibility that the defendant would commit criminal

11  acts of violence.  They did not do that also.  And I like to

12  point out to jurors when they said probability, they meant

13  exactly that.  Not a possibility.  Not a chance.

14          I see that you're an engineer, correct?

15  A.   Yes.

16  Q.   Okay.  I started off as an engineer before I

17  switched majors a long time ago.  I know as an engineer we

18  might have looked at things a bit differently

19  mathematically.  Probability means something a little bit

20  different here.  But when we're talking about this up here, a

21  lot of jurors have told me probability to them, if we're

22  talking about numbers, to be a probability on a scale of zero

23  to a hundred, it has to be at least 51 percent.  Anything

24  less than that really is not a probability.  It gets down to

25  the point of a possibility.  It's kind of like a majority

```
 1    minority.  I mean, if it's 51 percent, it's a majority.   If

 2    it's less than that, it's a minority.   Same kind of

 3    thinking.   A likelihood as opposed to chance or a

 4    possibility.

 5         How do you look at the word "probability" in the

 6    context of Question Number 1?

 7    A.    Well, I don't think there is -- that you can assign

 8    a numeric value to anything in that.   It's more of a

 9    likelihood or based on past performance or past actions that

10    leads the possibility -- not possibility, but leads evidence

11    that the person would be likely to commit an additional

12    crime.

13    Q.    Exactly.   Really I think the words that you used

14    "likelihood" or "likely" are very much in line with that.

15    The only reason I use the scale is, can you see anything less

16    than 51 percent would be a possibility?

17    A.    I don't know how would you assign a scale --

18    Q.    Right.

19    A.    -- for that.

20    Q.    Well, zero being the very slightest chance ever.

21    100 percent being -- now, you're entitled to think of it as

22    higher than 51 percent.   I mean, I've had jurors, some of

23    them say 70 or 80, whatever --

24    A.    Well, I would think it would have to be 51 at a

25    minimum --
```

1    Q.    Yes.

2    A.    -- if you're trying to do some type of numerical

3  assignment to it.

4    Q.    Criminal acts of violence.  You see again they could

5  have said we have to prove that this person is going to

6  commit another murder, another capital murder.  They could

7  have written that in, but they didn't.  They could have gone

8  as low as to say any criminal act will do -- I mean,

9  littering, jaywalking, anything.  That's not a criminal act

10 of violence, obviously.  Most jurors tell me to be a criminal

11 act of violence, there has to be another individual involved,

12 either they are physically harmed in some way or they're

13 threatened with harm in some fashion.

14        Are you comfortable with that.

15   A.    Yes.

16   Q.    Finally the word "society."  Continuing threat to

17 society.  Let me tell you society can mean everyone.  It can

18 mean people like you and I who live in the free world.  In

19 the context of this question, if you'll remember, the Judge

20 has told you a capital life sentence means at least 40

21 calendar years.  Think of it like this.  Society for the

22 defendant can be anywhere he may find himself, anyone he may

23 come in contact with.

24        Can you see how that may also include prison?

25   A.    Yes.

1    Q.   Okay.   Now, you're entitled to continue to think of

2    the free world as being part of society.   And I like to ask

3    people if they've heard about Connally 7, inmates who escaped

4    and killed the Irving officer.   Some of those inmates were

5    actually serving life sentences when they escaped and came up

6    here to Dallas County and killed the police officer.

7         Before we go on to Number 2, do you have any

8    questions, Mr. Wright, about Special Issue Number 1?

9    A.   No.

10   Q.   Special Issue Number 2, I believe the Judge has

11   reminded you when you get down there, you're really

12   two-thirds of the way to a capital murder death sentence.

13   What -- what really the law is going to ask you to do there

14   is to forget what you've done previously.   Agree to take

15   another look at all the evidence, and decide is there

16   something in that evidence, no matter what it may be, no

17   matter where it came from, is there something important

18   enough to you that changes a death sentence to life

19   sentence.   That's really the question.   What that thing is,

20   is totally personal.   There's no list of things we ask you to

21   mark off as being mitigating or aggravating or

22   non-mitigating.   That's really your decision to make.

23        It works this way.   You get down there, you see

24   something, you decide it is sufficiently mitigating for

25   whatever reason, you answer it yes, the man gets life.   If

```
 1   you make that examination and you don't see anything that's
 2   sufficiently mitigating, you say no, he gets death.  Some
 3   jurors, problems that they've had on this question, some
 4   jurors have told me, if they think someone is honestly guilty
 5   of capital murder, if they think beyond any reasonable doubt
 6   that that person will constitute a continuing threat to
 7   society, they don't care about what evidence there may be.
 8   They're never going to take a chance with that person.  They
 9   will always answer that question no and make sure that guy
10   gets death.  They're entitled to think about that, but
11   they're not qualified jurors.  Because what the law is going
12   to require you to do there is even if a person is incredibly
13   dangerous, maybe the most dangerous person you've encountered
14   in your life, you need to look at the evidence again.  And
15   there can be any number of things there.  Maybe there's --
16   maybe there's no doubt that he's guilty, maybe you think he's
17   just as dangerous as he can be, but maybe there is that one
18   issue that you didn't really think about that persuades you
19   now.  I think life really is more appropriate.
20            See, the reason we have Special Issue Number 2 is
21   because of a case involving a person by the name of John Paul
22   Penry.  John Paul Penry committed a horrible capital murder
23   down in Southeast Texas.  A rape/murder, just a horrible set
24   of facts.  But in his trial there was an issue about whether
25   he was mentally retarded or not.  And before he went to trial
```

1    the first time, we didn't have Special Issue Number 2.  And

2    the court said we want jurors to have a mechanism by which

3    they can consider things like mental retardation.  And if

4    they think it's important enough to save his life, then they

5    can do it.  I guess you could have somebody who's 40 years of

6    age chronologically, but yet mentally he's functioning at the

7    rate of a 4 or 5-year-old.  He's just profoundly retarded.

8    You may look upon him as guilty and very dangerous, but you

9    may decide in your own that you can't justify putting him to

10   death.

11        Do you think you can go through that type of

12   process, even if you thought someone was dangerous?

13        A.   I think I could.  Of course, obviously, I've never

14   had to make that kind of decision, but I feel like I'm pretty

15   open-minded to -- to things.

16        Q.   All right.  Let me go through some of the things

17   that other jurors have mentioned to me in the past and kind

18   of get your initial reactions to these things.  Sometimes

19   people will talk about alcohol or drug use as possibly

20   mitigating.  Kind of on the extremes here I've had some

21   people say that they think it's a disease process and they

22   think it's as mitigating as it can be.  I've had other people

23   tell me that's a conscious decision.  It's a personal

24   choice.  They don't think of it as mitigating.  I've had

25   other people come down the middle and say I want to hear the

1   facts about it.  Maybe they can see a distinction between

2   maybe a young person who's not used to using, maybe doesn't

3   know how the substances would affect him, versus someone who

4   is a little older, who has a lot of experience, and maybe

5   knows full well how those things affect him.

6        Any feelings about that?

7   A.   Yeah.  I've always been a strong believer in

8   personal responsibility, and I believe if you make the

9   decision to use those kinds of substances, you could and

10  should be held responsible for your actions.

11  Q.   All right.  Mental illness.  Some people mention

12  that.  Again, it kind of goes back with mental retardation.

13  We're talking about a situation where -- oh, you know, person

14  knows right from wrong.  He's not legally insane.  But again,

15  maybe he is so profoundly retarded that you just can't

16  justify a death sentence.  Maybe he's had some severe mental

17  illness that maybe has affected him.

18       Are you at least willing to listen to that type of

19  evidence, and then you can make your own judgment.  Maybe it

20  just doesn't rise to the level that you want it to rise to,

21  or maybe it's something that you'd really want to take into

22  account.

23       Could you do that?

24  A.   I'm willing to listen.

25  Q.   Okay.  And I know that you've said in the past

1    sometimes, you know -- sometimes people use mental issues as

2    a crutch.   Okay.   Again, this goes back to your duty as a

3    juror, and that's to listen to the evidence.   Because if that

4    kind of issue is raised, you've got to listen to the

5    testimony, you've got to decide whether you believe it or

6    not.   It may be a situation where you listen to the testimony

7    and you just don't believe that the evidence is there to

8    support it.   Or maybe there's enough evidence that you agree

9    that maybe there is an issue of mental illness.   Then you get

10   to decide just how important is that in relationship to

11   Special Issue Number 2.

12          Let's go through your questionnaire here just a

13   little bit.   You know, as I go through here, you know, it's

14   obvious to me that you are in favor of the death penalty.   I

15   can see that you are a big believer in personal

16   accountability here.   The real question that it comes down to

17   again because everybody is entitled to opinions -- I think it

18   would be pretty strange if we had somebody who didn't have an

19   opinion.   I would be wondering, you know, where have they

20   been spending their life.   But the real key is can you be

21   fair to both sides?

22      A.   I believe so.

23      Q.   And, you know, I'll just ask if right now -- I mean,

24   if you were sitting over there next to Mr. Murphy and having

25   to defend him for instance, you know, would you be confident

1    about your own ability to be fair and listen to the testimony

2    and give him his legal protections that he's entitled to?

3        A.    That's really hard to answer.  I really don't -- I

4    don't know.

5        Q.    It really comes down to this and following the law,

6    because the Judge is going to tell you what those protections

7    are.  He'll tell you what you need to do.  And it gets down

8    to this, making the State prove its case on guilt/innocence,

9    affording him his presumption of innocence, affording him his

10   right to remain silent under the law.

11             Do you think you can do that?

12       A.    Yes.

13       Q.    I guess the other extreme, too, would be if he

14   testifies.  What I tell jurors there is this, he's not

15   presumed to be a truth teller, but I would expect a jury to

16   listen to him like they would any other witness and judge his

17   testimony accordingly.  You judge it.  Does it make any sense

18   to you?  Does it square with the other evidence in this

19   case?

20             Do you feel like you can do that, or if he gets on

21   the witness stand you're just going to automatically decide

22   he's not telling you the truth, or are you willing to listen?

23       A.    I'm willing to listen to both sides.

24       Q.    Last question for you is this.  Again, I've told you

25   I cannot go into specific facts here, but I am entitled to

```
 1   ask you one question.  The reason I'm going to ask you this
 2   question is very simple.  We want jurors who can be fair and
 3   impartial, who can really base their verdict on the evidence
 4   that they hear.  It would be wrong for jurors to come down
 5   here and base their verdict simply on sympathy or emotion for
 6   either side.  Some of these issues that you're going to hear
 7   about are going to be very graphic.  They're going to be very
 8   difficult.  By those allegations, you can tell it's not going
 9   to be an easy case to listen to.  I am entitled to ask you
10   this.  If it turned out in this case that Ms. Bertie
11   Cunningham, the victim, if she was an 80-year-old woman at
12   the time of her death, could you still be fair and impartial
13   to Mr. Murphy?
14         Now, before you answer, you would be free to take
15   that into account on punishment because I've had a lot of
16   jurors tell me the age of the victim, the helplessness, the
17   innocence of the victim, I'm going to think about that, and
18   that's all -- that's all proper.  I guess it really plays in
19   more to guilt/innocence here.
20         A.   I don't think the age should have any bearing on it
21   at all.
22         Q.   Simply going to look at the facts presented, and if
23   they're there to prove his guilt, find him guilty; and if
24   they're not there, you can find him not guilty.
25         A.   Correct.
```

1      Q.    Mr. Wright, do you have any questions for me?

2      A.    No, I don't think so.

3      Q.    I appreciate your time, sir.  I appreciate your

4   answers this afternoon.

5              THE COURT:  Mr. Wright, do you need a rest

6   room break or a stretch break?

7              VENIREPERSON:  No, I'm fine.

8              THE COURT:  Or are you ready to continue

9   with --

10             VENIREPERSON:  Yes.

11             THE COURT:  -- Mr. Byck?

12         Mr. Byck.

13             MR. BYCK:  Thank you, Your Honor.  May it

14   please the Court.

15                    Cross-Examination

16   By Mr. Byck:

17      Q.    Mr. Wright, again, my name is Mike Byck.  And

18   together with Ms. Balido who is absent from the courtroom

19   right now and Ms. Jane Little who's been absent for a while,

20   we represent Mr. Murphy in this trial for his very life.

21   I've appreciated the consideration and the attention that you

22   paid to Mr. Davis's questions.  I'd ask that you do the same

23   for me.  Because as Mr. Davis said, this is not a citizenship

24   examination.  We're not reporting out your good grades to any

25   clubs or any organizations, whether you answer questions

1    right or wrong because there are no right or wrong answers to

2    these questions, but it is important that you tell us how you

3    feel.

4           Mr. Davis started at the beginning and worked to the

5    end.   I'm going to start at the end and work back toward the

6    beginning.   On page 13 we asked you if you wanted to serve as

7    a juror in this case and you said, not particularly.   I'm

8    concerned that it will interfere with my business.   You have

9    heard the Court's projected schedule, that we are going to

10   start the day after Memorial Day.   The trial will go probably

11   between five to eight days.   That does not include the amount

12   of time that the jury might or might not deliberate.

13          Is there anything going on in your business in that

14   period of time that is so important to you or would be so

15   distracting to you that you could not fully concentrate your

16   attention and your energy on this case?

17   A.    Well, I don't think so.   I mean, our business right

18   now though is incredibly busy.   We've got a tremendous amount

19   of work going on, and it's just kind of very hectic around

20   the office.

21          THE COURT:   No layoffs in your business?

22          VENIREPERSON:   Not yet.   May be as -- if these

23   other layoffs continue.   We're in the development oriented

24   business and land stuff and -- it's still going very well

25   right now.

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.   (By Mr. Byck)  You know your business best.  I know

2    your business not at all.

3     A.   Uh-huh.

4     Q.   What if --

5     A.   Let me ask one question, when you say this is five

6    to eight days, is this from 8 o'clock in the morning to 5

7    o'clock in the night?

8     Q.   Yes.

9     A.   Or is it until 9 o'clock at night or --

10            THE COURT:  No.

11     A.   Okay.

12            THE COURT:  No, because I have a court

13    reporter.  I have other staff.  Yeah, we'll probably be from

14    9:00, maybe 9:30 until 4:00, 4:30, depending upon the flow of

15    evidence.

16     A.   I mean, I don't know what will happen with my

17    business in that time frame.  That's a month off or

18    approximately.  And I just don't know, to be honest with

19    you.  I mean, I --

20     Q.   (By Mr. Byck)  Well, you know your business best.

21     A.   I mean, I don't -- I don't -- I would like to think

22    that it wouldn't affect my judgment or my outlook on things

23    because I'm sitting here.  It would be a hardship to me, but

24    I don't think it will --

25     Q.   I appreciate that.  And, sir, let me tell you that I

```
 1    will submit to you that most people would be good jurors in
 2    most cases.  I will also submit to you that no juror would be
 3    a good juror in all cases for all kinds of reasons.  For the
 4    immediate point in time that they're in, their background,
 5    their particular outlook on things.  They may not be a good
 6    juror.  You don't have to be on this jury.  And this is not a
 7    question that I have a decision over or Mr. Davis has a
 8    decision over.  It's a question you have a decision over.  If
 9    you want to say, listen, Mr. Byck, I'm really, really, really
10    busy now and I've got -- I've got people to supervise and
11    I've got things going on that I need to concentrate on, I
12    want to come down, I want to do my duty as a citizen.
13    Believe me, sir, we already know that because you're here.
14    If you didn't feel that way, you wouldn't be here and we
15    wouldn't do anything about it.  But you're here, so, you
16    know, you've convinced us that you're sincere.  But if you
17    are at a point in your business or, you know -- likewise, I'm
18    going to ask you at the end of our conversation is there
19    anything else that might interfere, things that I would never
20    know about, one of your children is ill.  I have no idea what
21    it would be.  But you know your business.  You know the point
22    in time that you're at.
23              Can you tell me that you will promise me, because
24    that's what I'm going to ask for, sir, not I believe I could,
25    because I've got a young man over here whose life is in my
```

1    hands and I've got to know and I've got to know fate certain

2    are you going to be able to devote a hundred percent of your

3    attention to the trial of this case if you were chosen to sit

4    as a juror, or would you have to say, Mike, some other case

5    some other time?

6        A.    No.   If I'm chosen, I will devote my time, whatever

7    time is necessary to serve on this case.

8        Q.    And you don't feel that there's any problems out

9    there that --

10       A.    No, I mean --

11       Q.    -- that would distract you?

12       A.    -- just from a purely personal reason, it would be a

13   hardship on me, but I believe in doing my -- fulfilling my

14   responsibilities to serve and I will do the best of my

15   ability to -- to render a verdict or whatever is necessary.

16       Q.    Very good.   Very good.

17             Let's talk a little bit about technicalities.   On

18   page 3 we asked you about eight statements.   And out of the

19   eight statements, three of the eight you were concerned with

20   technicalities.   We asked you the biggest problem with the

21   criminal justice system is, that criminals are released due

22   to technicalities and they don't serve the appropriate length

23   of sentence.   We'll talk about that later.   We also asked you

24   about prosecutors.   You said they are limited by

25   technicalities.   And asked about criminal defense attorneys,

```
 1    and you say they have been successful in guilty people being
 2    released.
 3                    THE REPORTER:  I'm sorry.  Repeat that.
 4        Q.   (By Mr. Byck)  We asked you about criminal defense
 5    attorneys, and you said, quote, they have been successfully
 6    in guilty people being released, which I imagine is another
 7    problem with technicalities.
 8              You're obviously very sincere about this.  Many,
 9    many people are.  Many people don't really understand that
10    the law, while trying to be reasonable, is not always
11    logical.  And there are some technicalities that particularly
12    gall some people.  And due to these technicalities, people
13    are -- have been released, have escaped from the justice that
14    they might or might not been due for their offense.
15              What are your feelings about these technicalities?
16    How do you feel about them?
17        A.   Well, I mean, I'm opposed -- and I say not opposed
18    to them, but it's disappointing to me that there are people
19    who go free because of some technicality.  People are not
20    made to pay the price, so to speak.  I think Mr. Davis's
21    example is an extreme example of one where I feel like I
22    could say, yes, they are free.  As much as I dislike the
23    verdict, I believe in the law.  I believe in upholding the
24    law.  And unfortunately, sometimes that's -- can be very
25    distasteful.
```

1    Q.   So I'm going to run Mr. Davis's scenario by you

2    again.   I'm going to put a little bit of a different twist on

3    it.   And let's see if we come to the same result.   Okay?

4         I, like Mr. Davis, am an arsonist.   I like to burn

5    down elementary schools.   That's my forte.   So I go out and I

6    find myself an elementary school.   I cook up my special

7    cocktail of school burning material.   And I go by there one

8    night and I spread it around.   I put a timer in there and the

9    next day the kids come in and the school goes up in flames.

10   The fire department immediately responds and the firemen

11   along with bringing hooks, ladders, and water hoses, also

12   bring a videotape because I don't know if you know this, but

13   at the scene of major fires there will be one fireman

14   designated to videotape everybody around just to make sure if

15   they've had five fires in the last year --

16   A.   Uh-huh.

17   Q.   -- five majors, the same face doesn't show up on all

18   five.   Well, sure enough, my face shows up as being from

19   another fire.   So they try to put my face to a name and

20   they're having a little bit of problems with it because I

21   don't have a real bad record.   So there's is another fire and

22   more kids are lost.   And this time the fireman recognizes me

23   and this time they come over and they say can we talk to you

24   and I say you certainly may.   And then the police comes over

25   and they say will you come with us and I say I certainly

```
 1   will.  And they take me downtown.  And as you were told about
 2   the Miranda warnings, there are four Miranda warnings.  You
 3   have the right to remain silent; if you do not chose to
 4   remain silent, anything you say can be used against you.
 5   That's Number 1.  You have the right to have an attorney.
 6   That's Number 2.  Present during the questioning.  Number 3
 7   is if you are too poor to afford an attorney, we'll appoint
 8   one for you during this questioning.  And the fourth one is
 9   you have the right to terminate the interview.
10           Well, I go down to the police station and the police
11   are talking to me and they say do you want an attorney.  I
12   say, no.  They say, if you're too poor -- and I say I'm not
13   too poor.  I've got plenty of money in my back pocket.  They
14   say, well, you know, whatever.  You want to talk to us.  And
15   I say, oh, yes, let me tell you what a good arsonist I am.
16   And I proceed to tell them not only about the places that
17   I've burned by my secret chemicals.  Now, they call the lab,
18   the fire lab, and very efficient group of people -- believe
19   me, you give them ashes and they can tell you what burned the
20   ashes.  And they come back and they say there are three
21   different things in here, the same exact things -- the same
22   exact proportions that I have in my statement.  Only the
23   burner would know that.
24           At the trial, if you were on the jury, you'd learn
25   some other things about me.  Not only about the confessions
```

1    and the taking of the confession, you would also learn from

2    inmates upstairs that I've been setting fires upstairs, too.

3    You'd also learn from some other inmates that I show a very

4    peculiar interest in the schools in their neighborhoods, want

5    to know if they're brick or wood, want to know if they've

6    been recently painted, whether they're well kept up, and

7    things like that.  The Judge will tell you in his

8    instructions that you have to believe beyond a reasonable

9    doubt that all four of those warnings were given for that

10   confession to be usable.  Otherwise, you've got to disregard

11   it.  And just like Mr. Davis said, there is no other

12   evidence.  That's it, just my statement.  And you go back

13   into the jury room and you say, listen, we got to follow the

14   law, guys.  The law says that all four have to be given.  And

15   the jury foreman, who happened to be you, says, you know, Mr.

16   Wright, you're right, that's correct.  You know, they all do

17   have to be given.  But there is one problem.  This guy out

18   here is dangerous, number one; and, number two, he never even

19   asked to terminate the interview.  We're not talking about a

20   confession where they beat it out of him.  Nobody touched me.

21   We're not talking about a confession where they tricked me.

22   Nobody tricked me.  We're not talking about a confession

23   where I didn't know that I didn't have a right to have an

24   attorney.  They tricked me.  Or even if I did, I was too poor

25   to afford one and they didn't tell me I could still have one.

```
 1    The least one of those rights is the right to terminate that
 2    interview, and I never showed any signs of wanting to
 3    terminate the interview because I was real proud of all those
 4    kids I had killed and all those schools that I had burned.
 5    And you know very well that if you don't use the confession,
 6    you got to find me not guilty.  And if you find me not
 7    guilty, I can never be charged for that offense or those
 8    deaths again.  And the other 11 members of your jury panel
 9    say very frankly, Mr. Wright, we respect your upholding of
10    the law, but we are not letting that miserable arsonist loose
11    because my kids are out there and your kids are out there and
12    he's going to kill some more.  And it's just that simple.
13    And we've all thought about it.  We all heard the same
14    evidence you did.  And the Judge said you have to believe all
15    four and we believe three, and three out of the four is good
16    enough to get that arsonist off the street.
17         What do you do?
18    A.   Well, since I'm only one of 12, I would express my
19    opinions.
20    Q.   Okay.  It's voting time.  How do you vote?
21    A.   If I believed that one of the premises was not met
22    under your scenario, I would have to vote not guilty.
23    Q.   And you would vote not guilty?
24    A.   Yes.
25    Q.   Under those circumstances --
```

1    A.    As much as I would disagree with it, I would,

2  because I believe the law should be upheld.

3    Q.    Mr. Wright, the starting point of every criminal

4  trial in the State of Texas, as well as the United States, is

5  that an individual is presumed to be innocent.  That

6  presumption is nothing I can, you know, cross-examine you

7  about or open one of your veins and get some blood out and

8  show that, yes, you truly believe in that presumption versus

9  you don't truly believe in that presumption.  However, I am

10  troubled very frankly by your responses to the questions

11  we've asked you on page 4.

12         One of the questions is if someone is accused of

13  capital murder, he should have to prove his innocence.  And

14  you said you were uncertain about that.  We asked you further

15  if a person is brought to trial on murder charges, that

16  person is probably guilty.  And you agreed with that

17  statement.

18         Now, you know, very frankly a lot of people feel

19  where there's smoke there's fire.  You know, if I'm brought

20  in on a traffic ticket or a misdemeanor, I don't know

21  whether, you know, the guy ran the stop line or the stop

22  sign, or I don't know, you know, whether he was drinking

23  after hours or had too many drinks he was trying the car, but

24  when it comes down to a murder prosecution, that's something

25  else.  Because I was up here with 59 other jurors.  I heard

```
 1    the Judge say we've been doing for six weeks.  I heard the
 2    State say that, you know, we can prove you this and prove you
 3    that and prove other things.  And that this may be a
 4    different situation where -- if it's gone this far, where if
 5    they're in the sixth or seventh week of their jury selection,
 6    that maybe there is really smoke where there's fire.  Maybe
 7    the guy did do something.
 8         How do you feel?
 9    A.    Well, I don't think anybody can come here with a
10    total blank mind.  I think that if we're to this point,
11    there's always going to be a -- I don't want to say doubt,
12    but there's got to be a smidgen of evidence or something that
13    we would have gotten to this point.  And I think any person,
14    myself included, is going to say in the back of their mind
15    that where there is smoke there may be a fire.
16    Q.    And you think it's possible all the jury selection,
17    everything that you've heard about before you, that my client
18    may be guilty?
19    A.    Well, I would think if we're at this point there is
20    some presumption that there is enough evidence to stand
21    trial.  And I don't think anybody can say that they are going
22    to come in here with a totally absolute blank mind that there
23    is at least not one shred of feeling that the defendant may
24    be guilty.
25    Q.    Well, I have two responses to that.  Number one, I'm
```

1    not accusing you of being prejudiced or a bigot, and, number

2    two, I'm not interested in what anybody else thinks.   I'm

3    only interested in what you think.   And if you think where

4    there's smoke there's fire, just tell me.

5         A.    I believe that, yes, where there's smoke there's

6    fire.   That is my first inclination.

7         Q.    All right.   And you feel that there may be some

8    evidence that has caused this to go as far as it has?

9         A.    Yes.

10                  (Discussion between counsel.)

11        Q.    (By Mr. Byck)   Let me ask you, sir, the presumption

12   of innocence is fundamental in this country.   It's where

13   everybody gets to start from.

14        A.    Yes.

15        Q.    If I were sitting in this chair, if you were charged

16   with this offense and the other Mr. Wright was up on the

17   witness stand and he was asked, do you presume my client to

18   be innocent, how would that other Mr. Wright answer?

19        A.    Well, I think that I'm open -- let me go back and

20   re-answer this a little differently.   I may have a

21   presumption of guilt.   And if I was sitting -- if I were

22   sitting in the other chair and things were reversed, I would

23   hope that the person up here would admit that they are

24   willing to listen to the testimony, they're willing to make a

25   decision on the facts in the case, regardless of what their

1    perception is before the trial starts.

2         Q.   Okay.  See, I appreciate that.  And believe me, when

3    I first said, you know, I'm not accusing you of being

4    prejudiced, that's exactly what I meant.  There is no doubt

5    in my mind that you will listen to the evidence.  But my

6    problem is where do you start out from?

7         A.   I mean, I know nothing about the case or anything,

8    so I --

9         Q.   I understand that.  Do you start off thinking --

10        A.   I have no starting point other than -- than an

11   indictment and we're at this point.

12        Q.   All right.  You understand the indictment is no

13   evidence of guilt?

14        A.   That's correct.  I understand.

15        Q.   And if you were asked to vote right now --

16        A.   I couldn't vote because there's -- I don't know

17   anything.

18        Q.   You couldn't vote not guilty?

19        A.   Well, if you go on the premise that they're innocent

20   until proven guilty, I'd have to vote not guilty because

21   nothing has been proven.

22        Q.   Okay.  And you do go on that premise?

23        A.   Yes.

24        Q.   Okay.  And you can tell the Judge and tell me with

25   clear conscience, pure heart, that, yes, I presume your

1    client to be innocent?   No reservations, not unless he shows

2    me something, unless he does this --

3        A.   I can presume him to be innocent until I hear the

4    evidence.

5        Q.   Okay.  And you do presume him to be innocent?

6        A.   I know nothing else other than that he's innocent.

7        Q.   All right.  And then you do think if a person is

8    brought to trial on murder charges, that person is probably

9    guilty.  You don't agree with that statement any longer?

10       A.   Well, I mean -- there's matters of presumption.

11   Now, I'm not saying that I presume that he's guilty.  I

12   presume that there's something gone on, obviously, because we

13   wouldn't be here for a trial.

14       Q.   Okay.  And that's --

15            THE COURT:  Something other than he just -- a

16   person by the name of Jedidiah Isaac Murphy happened to get

17   snatched off the street --

18            VENIREPERSON:  And thrown in here.

19            THE COURT:  -- and thrown into this chair

20   without anything happening?

21            VENIREPERSON:  Right.

22       Q.   (By Mr. Byck)  Something more than that, you presume

23   something more than that?

24       A.   Yes.

25       Q.   You were an expert witness?

1      A.   Yes, actually it was a dispute on some drainage

2  issues on two construction projects.  We were the engineer on

3  it.  I was not a true expert witness.  I guess I was just

4  called as part of the case to give my explanation of what

5  happened.

6      Q.   And what was -- what was your resulting feeling from

7  that experience?

8      A.   It was interesting.  Back to the deal about

9  technicalities, most of my testimony -- all of my testimony

10  was disallowed because of -- I believe the term was

11  settlement and compromise, that when we went to the -- we had

12  a meeting at the job site and the attorneys were there for

13  the two feuding landowners.  And because the attorneys were

14  there and they were discussing the case, anything that I said

15  after the fact was part of the settlement and compromise

16  discussions and therefore was in admissible.

17      Q.   Kind of frustrating?

18           THE COURT:  Darn civil technicalities.

19           THE WITNESS:  Oh, it was very frustrating.

20  Waste of two to three days time.

21      Q.   (By Mr. Byck)  I'm sure it would be.

22           Finally, sir, I just have a couple of more minutes.

23           MR. BYCK:  Do I have anymore time at all?

24           THE COURT:  You do.

25           MS. BALIDO:  Seven minutes.

1        Q.    (By Mr. Byck)   I have a couple of more minutes.   Let

2    me ask, you do you understand that every capital murder is an

3    intentional murder plus the underlying offense or the status

4    involved, whether you get paid or it's a jail guard or a

5    child or something like that.   Okay.   You understand that the

6    word "intentional" and you understand that every word in that

7    indictment will be completely defined for you by the Court.

8    The Court will tell you that the word "intentional" means

9    when it is an individual's conscious objective or desire to

10   both engage in the conduct and cause the result.   And let me

11   show you how high a standard this is.   There are, of course,

12   all kinds of homicides.   We're not talking about accidents.

13   We're not talking about self-defense.   We're not talking

14   where an individual it's legally insane, doesn't know the

15   difference between right and wrong.   Those are all defenses

16   to a crime where if proven, the individual would never be

17   found guilty.

18        We're talking about an unjustifiable, unexcusable

19   taking of a human life and it has to rise to this specific

20   intent.   There are basically two kinds of murders.   There is

21   a knowing murder, and there is an intentional murder.   A

22   knowing murder is where an individual does something

23   dangerous to human life and he really should have known or

24   foreseen the consequences.   Five people are walking down the

25   street.   I don't like one of them.   I pull out a gun and fire

1    at the five people.  Another person, not the one that I

2    intended to shoot, but somebody else falls over and dies.

3    That's a knowing murder.  That is not enough for a capital

4    murder conviction.

5         A capital murder has to be the individual's specific

6    intent to both engage in the conduct, bring the gun, load the

7    gun, aim the gun, cock the gun, and cause the result.  When

8    the gun goes off, I don't want to scare anybody.  I don't

9    want to wound anybody.  I want them dead, and they die.

10   That's an intentional offense.

11        Having found an individual guilty of an intentional

12   murder plus an underlying offense, theft, robbery, rape,

13   whatever, kidnapping, whatever it happens to be, when you're

14   called upon to answer Special Issue Number 1, whether there

15   is a probability that the defendant would commit criminal

16   acts of violence that would constitute a continuing threat to

17   society, how would you define that probability?

18        A.   Well, you haven't presented any other evidence that

19   shows the likelihood of other crimes occurring.

20        Q.   Well, maybe people would say anybody who would do

21   something like that, that's an automatic likelihood.  You

22   know, if that dog bit me once, he's going to bite again.

23        A.   Well, that's not necessarily true.

24        Q.   No, I'm not saying that it is.  But how would you

25   define probability in the context of Special Issue Number 1?

1    You've talked about likelihood.  Well, I submit to you that

2    there is a likelihood of all kinds of things happening, some

3    of which are distinctly improbable.  You know, this rather

4    painful interview could be terminated by an asteroid hitting

5    us right now.  It's possible.  There may be a likelihood of

6    it somewhere .00, you know, 3 feet down the line to the left,

7    but it's not probable.  That's not probable, sir.  And

8    what -- what concerns me is that after finding an individual

9    guilty with all these defined words, that they look at

10   Special Issue Number 1 and they say, whether there is a

11   probability.  Well, that means a chance the defendant would

12   commit criminal acts of violence.  You've agreed that

13   criminal acts of violence involve people, right?  So it just

14   doesn't involve any criminal acts.  That would constitute a

15   continuing threat to society.  And some people would say,

16   listen, I found him guilty of an intentional murder while

17   he's doing something else.  Is it probable that he's going to

18   do something more?  Yes, it is.  Or, no, it's not.  Depending

19   on how they feel about the particular murder.

20            What I need to know is your definition of

21   probability.

22       A.   I don't have a definition of probability at this

23   point.  I think every case and every circumstance is unique

24   and has to be evaluated on its own.

25       Q.   Well, it --

1      A.   I mean, if he had a long history of prior crimes and

2  this was just the culmination of a long history, obviously

3  that's a high probability that he will continue to do those.

4  If he has no prior history -- you just have to look at the

5  whole circumstance of situations to make.  And I don't

6  know -- I just -- I can't give a straight answer because

7  you're not in the circumstance or not know all the

8  circumstances or --

9      Q.   Okay.

10     A.   All right.

11     Q.   You can't give a numerical answer, and I understand

12  that.  Would you at least agree with me that if you were

13  called upon to sit on this jury, that you would define

14  probability as, quote, more likely than not to happen?

15     A.   Yes.

16     Q.   Okay.  Fair enough.

17          Last chance, anything you can think of, moral,

18  social, political, economic, family, personal, whatever,

19  anything you can think of that would make you a less than

20  fair and impartial juror in this case?

21     A.   I can't think of anything right now.

22     Q.   Thank you, sir.

23          MR. BYCK:  Pass the venireman.

24          THE COURT:  Ms. Madore, would you excuse Mr.

25  Wright momentarily?

```
 1              Mr. Wright, as soon as the attorneys confer with

 2      their respective co-counsels, they will inform me whether

 3      they wish you to remain under consideration.  The buck stops

 4      with me.  I make the determination.  If you'd excuse yourself

 5      with the bailiff momentarily.

 6                        (State no challenge for cause - Mr. Wright)

 7                        MR. DAVIS:  The State has no challenge for

 8      cause.

 9                        (Defense challenge for cause - Mr. Wright)

10                        MS. BALIDO:  Judge, the defense would submit

11      the juror for cause based on his answers that were gone over

12      on the questionnaire regarding the presumption of innocence

13      and the technicalities and those sorts of things.  And in

14      addition to his answers that he gave on the stand, we believe

15      he cannot presume this defendant innocent and that his -- the

16      difference between his answers on his questionnaire and his

17      answers on the stand establishes him as a vacilating juror

18      answering different questioned -- the same question different

19      ways.  We would submit that he's not qualified to sit on the

20      jury, and we do so under the relevant Code of Criminal

21      Procedures provisions on capital murder jury selection, the

22      4th -- I mean, excuse me, the 5th, 6th, 8th, and 14th

23      Amendments of the United States Constitution and Article 1,

24      Section 10, 13, and 19 of the Texas Constitution.

25                        (Challenge for Cause Denied)
```

```
 1                    THE COURT:  Defense challenge for cause is

 2    denied.

 3                    (Venireperson returned to courtroom.)

 4                    (Robert Wright Prospective Juror No. 28)

 5                    THE COURT:  Mr. Wright, you remain under

 6    consideration by the Court as a prospective juror on this

 7    matter.

 8         Ms. Daily has just come in the courtroom.  She will

 9    be before you leave, be confirming home and work phone

10    numbers.  If they should change before this process has been

11    ultimately completed, if you would be kind enough to contact

12    her and bring her up to date with a current telephone, either

13    work or home.

14         For the benefit of the attorneys, also with your

15    permission, I'm going to ask if you'd allow Mr. Rees, the

16    bailiff, to take a Polaroid picture of you.

17                    VENIREPERSON:  Okay.

18                    THE COURT:  We're working our way up to 48.

19    And then with the peremptory challenges will be conducted.

20    And we talk to an awful, awful lot of people, and sometimes

21    it starts to get a little blurry with regard to information,

22    questionnaires, and notes.  May we have your permission to do

23    that?

24                    VENIREPERSON:  Sure.

25                    THE COURT:  It will be destroyed just as soon
```

1    as that process has been completed, won't even be made a part

2    of the trial record.

3              Also, avoid the temptation of contacting the Dallas

4    Morning News with regard to back issues that covered this

5    incident as a news story.

6              VENIREPERSON:   Okay.

7              THE COURT:   Be back in touch with you.

8              VENIREPERSON:   Can I ask a question?

9              THE COURT:   Sure.

10             VENIREPERSON:   What's the next step?

11             THE COURT:   The next step is you'll get a

12   couple from Ms. Daily in the next couple of weeks as to where

13   we are in the process.  If at any time you have a question,

14   give her a call.

15             VENIREPERSON:   Okay.

16             THE COURT:   She will let you know when you are

17   on or not on -- make the final cut of the 12.

18             VENIREPERSON:   Okay.

19             THE COURT:   For the benefit of the reporter,

20   let's take about a ten-minute break.

21             (Recess of proceedings.)

22             THE COURT:   Ms. Lentz, good afternoon.  You've

23   been very patient waiting on us.  We appreciate that, and we

24   will proceed forthwith.

25             Ask you to raise your right hand and again be sworn

1    in.

2                    (Venireperson additionally sworn.)

3              THE COURT:   Thank you, Ms. Lentz.

4         Allow me, if I may, at the outset to reintroduce the

5    individuals whom we see seated at the counsel table.

6         Only one of the two prosecutors presently is in the

7    courtroom.   We have on behalf of the State of Texas, the

8    Chief Prosecutor assigned to this the 194th District Court,

9    the Honorable Mary Miller.

10             MS. MILLER:   Good afternoon.

11             VENIREPERSON:   Hello.

12             THE COURT:   Ms. Lentz, I anticipate and will

13   be a bit surprised if Ms. Miller's co-counsel does not return

14   before you complete your interview with us this afternoon.

15   Ms. Miller's co-counsel in this case is a gentleman by the

16   name of Greg Davis.

17        Moving on though to the next table, we begin first

18   with two of the three defense attorneys representing the

19   defendant, beginning first with a former prosecutor in the

20   Dallas District Attorneys Office, now with the Dallas County

21   Public Defenders Office, the Honorable Jennifer Balido.

22             MR. BYCK:   How are you?

23             VENIREPERSON:   Fine.   Thank you.

24             THE COURT:   Seated next to Ms. Balido is one

25   of her co-counsel, a board certified criminal law specialist,

1    the Honorable Michael Byck.

2                    MR. BYCK:  Good afternoon, Ms. Lentz.

3                    VENIREPERSON:  Hello.

4                    THE COURT:  Seated next to Mr. Byck, opposite

5    Ms. Balido, is the defendant, the accused, if you will,

6    Jedidiah Isaac Murphy.

7                    THE DEFENDANT:  Good afternoon.

8                    VENIREPERSON:  Hello.

9                    THE COURT:  The third defense attorney, though

10   not present, I wish to introduce my name and in absentia, a

11   board certified criminal law specialist, as is Mr. Byck, her

12   name is Jane Little.  Ms. Little is out addressing some

13   pertinent matters with regard to this case outside the

14   courthouse in anticipation of the commencement of the

15   testimonial stage of the trial.

16           Ms. Lentz, if you're prepared to being, we are as

17   well.  Are you ready to go?

18                    VENIREPERSON:  I surely am.

19                    THE COURT:  Have been waiting a long time,

20   haven't you?

21           We will begin with the State, as is required by law,

22   the Honorable Mary Miller.

23                    ANN LENTZ

24   was called as a venireperson by the Court and, after having

25   been first duly sworn, was questioned as follows:

Voir Dire Examination

By Ms. Miller:

Q.   Good afternoon, Ms. Lentz.  And I just want to reiterate what Judge Entz said, there are no right or wrong answers to any of these questions.  We just want to know what your true feelings and opinions are regarding the different areas and principles of law that we're going to be talking about.

I notice when you filled out your questionnaire that you said that you were in favor of the death penalty.  And a lot of people agree with that when they originally fill out their questionnaire.  They say, you know, in theory or hypothetically in the abstract I have no problem with the death penalty.  I believe that it's proper in certain circumstances.  And I believe that's what you also said, under certain circumstances I believe it should be used. However you've had a few days to think about it since you filled out the questionnaire.  And as you can see, there's nothing abstract about the defendant in this particular case, Jedidiah Isaac Murphy.  He is a living, breathing human being.  And a lot of people, once they get actually in that chair where you're seated and realize that it's actually not abstract and they're the ones that are actually being called upon to participate, personally participate in a death penalty case, say, hum, you know, in the abstract I believe

1     it's okay, but I couldn't personally participate in it.

2          Other people say, yeah, I don't have any problem

3     participating.

4          How do you feel, Ms. Lentz?

5     A.     I don't have any problem participating in it.

6     Q.     Okay.  And back on page 13 you said that you would

7     not want to serve as a juror in this case because of fear of

8     retaliation.  I've been doing this quite a long time, and I

9     haven't had any juror r prospective juror really be

10    retaliated against -- just if that --

11         Can you tell me a little bit about what your fear is

12    or --

13    A.     Well, you know, we had to answer those -- we had so

14    many questions.

15    Q.     Right.

16    A.     And it was difficult to really think through some of

17    them, you know, to the degree that I really thought you

18    should, you know, in order to answer them correctly, but I

19    think my first thought was I watch a lot of TV, and, you

20    know, you see these deals where they come back against some

21    of the jurors and that -- but I have never known anybody

22    personally to be involved.

23    Q.     Well, like I said, I've been doing this a long time

24    and I think Judge Entz has been doing it 20 some odd years

25    and I think he'd probably tell you that hasn't seen it happen

1    either, just to allay your fears a little bit.

2         A.   Okay.

3         Q.   So even though you had originally written that down,

4    you think that you could, if you were selected as a juror on

5    this particular case, just listen to the evidence, base your

6    verdict on the evidence and the law that the Judge gives you?

7         A.   Absolutely.

8         Q.   Okay.  Because in order to be a qualified juror for

9    this -- for this or any other type of case, and I notice that

10   you have served on a jury before for -- you wrote stealing so

11   I assume it was theft.

12        A.   It was theft, and I was on a jury for another

13   situation that I -- it was custody of -- child custody or

14   something.

15        Q.   And is that the one that settled out of court?

16        A.   Uh-huh.

17        Q.   You wrote "settled out of court."  Okay.  How long

18   was the theft or stealing or whatever jury that you were on?

19   Do you recall?

20        A.   Oh, dear, I just don't -- I don't have a clue.

21        Q.   That's okay, Ms. Lentz.  Anything about that

22   particular experience serving on that jury that so affected

23   you from being able to sit on this jury if you were selected?

24        A.   No.

25        Q.   Because some jurors have bad experiences from prior

DARLINE W. LABAR, OFFICIAL REPORTER

1   jury service and say, I just can't do it again.  But you

2   don't have that problem?

3       A.   No, I don't.

4       Q.   Okay.  So I'm sure a lot of these principles and

5   areas of the law that we're going to cover were probably

6   covered with you back then, but we're going to go over some

7   of them again.

8           When you filled out the questionnaire, you said that

9   you didn't have any problem presuming the defendant

10  innocent.  And as the Judge told you, the defendant as he

11  sits here today is presumed to be innocent.  The State has

12  the burden of proof in this case.  We must prove the

13  defendant is guilty beyond a reasonable doubt.  We must prove

14  each and every element.  We're not asking you to give us a

15  leg up.  We know what the burden is.  We fully expect to meet

16  that burden.  And if we don't meet it, then we would expect

17  to you find him not guilty, just as if we do meet it, we

18  would expect you to find him guilty.

19          So can you tell this court and tell us that as the

20  defendant sits here right now, you can give him that

21  presumption of innocence?

22      A.   Absolutely.

23      Q.   Okay.  And another one of the basic rights that the

24  defendant has is the right to remain silent or the 5th

25  Amendment right not to incriminate himself.  I see you

1    shaking your head.  That goes along with the burden of

2    proof.  The defendant, once again, doesn't have to do

3    anything.  All he has to do is basically just show up.  And I

4    don't anticipate his attorneys doing this, but they could sit

5    there twiddling their thumbs, doodle, do whatever, but again,

6    the burden of proof is still on the State.

7           And some -- human nature is, listen, I want to hear

8    from both sides, but you might not be get to hear from the

9    defendant because he has that right and there could be a

10   million different reasons why he does not testify.  He might

11   not be very articulate.  He might have a prior criminal

12   history that would be able to be used as far as credibility.

13   But the law says that you would not be able to consider that

14   for any reason.  Still keep the burden of proof on the

15   State.  But some people say, well, look, if the State got

16   real close, but it was kind of -- you know, there was just

17   that little bit and the defendant didn't testify, that would

18   help push the State over the top.  But that's not what the

19   law says.  The law is you cannot consider the defendant's

20   silence for any reason.

21          Can you follow that law?

22     A.    Absolutely.

23     Q.    Okay.  Witness credibility.  Just because the

24   defendant's presumed to be innocent doesn't mean that he's

25   presumed to be a truth teller.  Some prospective jurors say,

1   well, since he has the right to remain silent and no one can

2   force him to take the stand, if he does take the stand, then

3   I'm going to give him a little bit of a leg up because, look,

4   he's getting up there so he must be kind of truthful and so I

5   might give him, you know, a little bit more credibility than

6   any other witness.  But what the -- how do you feel about

7   that?

8        A.   I don't think that's the case.  I think it's usually

9   a strategy, you know, that legally is used.

10       Q.   Okay.  So you could start the defendant off on the

11  same footing as any other witness that testifies?

12       A.   Right.

13       Q.   On your questionnaire you had said as far as -- and

14  this goes to credibility of witnesses, also.  Police officers

15  are people of authority to be respected.  Some people say,

16  and most of us were brought up to trust officers, believe

17  police officers, but when it comes to their testimony,

18  they're to be judged just like any other witness.  You don't

19  give them a leg up or believe them just because they are a

20  police officer, because they're humans first and obviously

21  have the job of a police officer.

22            Can you wait and listen to what every witness says,

23  start them all off on equal footing, including police

24  officers, and then determine whether or not you choose to

25  believe all, part, or none of what they say?

1    A.    Yes, I do.

2    Q.    Okay.  So you're not going to automatically give a

3    police officer a leg up just because they're a police

4    officer?

5    A.    No.

6    Q.    Okay.  Ms. Lentz, let's look at the special issues

7    over here.  Well, let me go back for a minute.  As I said,

8    the burden of proof, we must prove our elements to you beyond

9    each -- each and every element to you beyond a reasonable

10   doubt.  And you've got the indictment there in front of you.

11   And since you have sat on a criminal jury before, you know

12   that the State must prove each and every one of those.  And

13   as I said before, each element is just as important as any of

14   the other.  And if we don't prove one of those elements to

15   you beyond a reasonable doubt, you must follow your oath and

16   find the defendant not guilty.

17        Let's take a farfetched example, but say we prove

18   everything to you but that it occurred in Dallas County.  For

19   one reason or another we just forgot to ask what county it

20   was in or it was proved that it was in Tarrant County.  We

21   proved that -- everything else, it was the defendant, had the

22   specific intent to kill, did it by shooting with a gun or

23   drowning in water, that it was during the course of a robbery

24   or kidnapping, proved everything else except Dallas County.

25   The Judge would tell you that if we did not prove Dallas

1   County beyond a reasonable doubt, you would have to find the

2   defendant not guilty.  Some people consider that a

3   technicality.  But that is part of the burden of proof that

4   we have taken upon our shoulders to prove.

5          Could you, as hard as it might be and distasteful as

6   it might be and you might be very angry at us for screwing

7   that up and we probably wouldn't have our jobs anymore if

8   that were the case, too, but could you follow your oaths and

9   follow the law and find the defendant not guilty even if we

10  didn't prove the county or something like that?

11      A.    I believe so.

12      Q.    Okay.  Because there are times when jurors have --

13  have a moral dilemma between what the law says and what their

14  conscience says they should do.  But in order to be a

15  qualified juror, you have to be able to set aside your

16  personal feelings and follow the law that the Judge gives you

17  and the oath to a true verdict render according to the law

18  the evidence.

19          Are you the type of person that you think you have

20  the moral and mental discipline to do that?

21      A.    Yes, I do.

22      Q.    Okay.  Now, let's look at these special issues.  You

23  have already found the defendant guilty of capital murder.

24  You have already found that he's had the specific intent to

25  kill.  And as we said, the murder plus.  In this particular

1    case we've alleged that it's plus, that during the commission

2    of a robbery or kidnapping.

3         Now, as the Judge told you in Special Issue Number

4    1, you have to presume that that should be answered no.  The

5    State must prove to you beyond a reasonable doubt that it

6    should be answered yes.  This is what we call the future

7    dangerousness question.  A lot of people say, well, if I've

8    already found him guilty of capital murder, I'm automatically

9    going to answer that yes.  If I already found that he

10   specifically intended to kill someone and it was during the

11   course of a robbery or capital -- or a kidnapping, then I'm

12   going to think they're always going to be a future danger.

13        However, the law says, no, wait a minute.  You've

14   got to stop.  You've got to re-examine the evidence, and also

15   there's a lot of evidence that doesn't come in during the

16   guilt/innocence phase that come in during the punishment

17   phase, such as prior criminal history, character evidence of

18   the defendant, different things like that.  So you would have

19   additional information that you might not have had during the

20   guilt/innocence phase.  So that's why it says wait, you've

21   got to re-examine.

22        Can you do that?  Or are you one of the type of

23   people who's going to automatically answer it yes just

24   because you've already found them guilty?

25        A.   I don't have a problem with that.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.   Okay.  So you can presume it should be no --

2    answered no and you would require the State to prove that it

3    should be answered yes beyond a reasonable doubt?

4      A.   Right.

5      Q.   Okay.  When you're looking at Special Issue Number

6    1, Ms. Lentz, what types of information or evidence, and

7    don't worry about whether it's legally admissible or not, but

8    just what types of evidence or information would you like to

9    hear in order to be able to answer Special Issue Number 1?

10     A.   Well, I think it would depend a great deal on prior

11   history, as far as behavior and conduct.  That's about --

12   that's what I think --

13     Q.   Okay.

14     A.   -- you know, you'd want to know the prior history of

15   what had been done and --

16     Q.   And that's what a lot of prospective jurors tell me

17   us, Ms. Lentz.  They say, well, really, you're looking at the

18   future as far as this question.  You're being -- asking us to

19   kind of predict the future.  And a lot of people say the best

20   predictor of the future is past, past behavior.  You may have

21   a case where the defendant has been a fine upstanding

22   citizen, has never been in trouble with the law before, has

23   been a pillar of the community, a minister in his church,

24   different things like that.  And this is the first offense

25   that that person has ever been -- has ever committed.  But

1    you found him guilty of capital murder.  You may say that the

2    offense alone, once you do a re-examination, is still

3    sufficient to say, yes, he will be.  Or you may have a

4    defendant who has been in and out of trouble with the law,

5    has been in the system, the system has tried or has given him

6    many opportunities to try and rehabilitate himself.

7            Are those some of the types of things you're talking

8    about as far as background and conduct?

9        A.   Yes, that's correct.

10       Q.   Okay.  Now, when you're looking at Special Issue

11   Number 1, Ms. Lentz, you see that the legislature there used

12   the term "probability," whether there is a probability that

13   the defendant would commit criminal acts of violence.  You

14   notice there that the legislature didn't use the word

15   "certainty."  They also didn't use the word "mere

16   possibility" or "chance."  Most people say probability is

17   more likely than not, 51 percent.  Kind of like if we were

18   talking about the weather, 51 percent chance of rain is more

19   likely than not.  If it was 50/50, that would just be an even

20   chance.  If it was something less than that, it would be just

21   a mere possibility.  Some people say anything over zero

22   percent is a probability.

23           However, the legislature there specifically used the

24   word "probability," not possibility or mere chance.  Do you

25   agree with the fact that it is or with the definition

1   basically because the Judge isn't going to give you a legal

2   definition of probability, that it's more likely than not, or

3   51 percent or higher?

4       A.   Yes, I do.

5       Q.   Okay.  So it's not just a mere chance or

6   possibility?

7       A.   Excuse me.

8       Q.   Is that how you see it?

9       A.   Right, uh-huh.

10      Q.   Okay.  Criminal acts of violence.  When you hear

11  that or read that term, what comes to mind as far as Special

12  Issue Number 1, Ms. Lentz?

13      A.   Well, it seems like it goes without saying, kidnap,

14  murder, say brutal beatings, let's see -- say a robbery that

15  goes awry and it becomes a more violent situation.

16      Q.   Okay.  You notice there that the legislature didn't

17  say that we -- that he would commit future murders or future

18  capital murders.  They didn't limit it to that.  They also

19  didn't just say criminal acts because criminal acts could be

20  anything from jaywalking, traffic tickets, those types of

21  things, but they added that qualifier, criminal acts of

22  violence.  A lot of people look at that and say, well,

23  basically that's -- I look at it where it has to basically

24  place another human being in fear of being injured or

25  actually causing some type of injury.  Because I may pull out

1    a gun and say, give me your money.  I haven't injured you,

2    but have I placed you in fear.  Most people would say that's

3    a criminal act of violence, whereas if I just go break into

4    your car and steal your stereo, most people wouldn't consider

5    that a criminal act of violence.  You weren't anywhere

6    around.

7              Is that kind of what you are looking at or thinking

8    of when you look at Special Issue Number 1?

9        A.   That's correct, because I -- as you were talking, I

10   had already thought to myself, something that causes bodily

11   harm.

12       Q.   All right.  How about if it's just the threat of

13   bodily harm?  Because an aggravated robbery might just be a

14   threat of bodily harm without any actual bodily harm being

15   caused.  Pulling a gun out and pointing at you but not

16   pulling the trigger.

17       A.   Well, that's still violent.

18       Q.   Okay.  And that's what I'm -- I'm just asking.  I

19   mean, you know -- so, well, no, and the Judge isn't going to

20   give you a definition of what that is either, so we're just

21   trying to find out where you fall as far as different people

22   and we've heard different things, you know.  Some people say,

23   no, it's got to be another capital murder or another murder.

24   But you're saying basically if it threatens another with

25   bodily injury or actually causes, that's what you're kind of

1    thinking of when you're looking at that term?

2        A.   That's right.

3        Q.   Now, look at society.  When you read that term

4    "society," what -- what comes to your mind when you're

5    looking at that?

6        A.   Well, it's the world that we live in.

7        Q.   Okay.  And that's what most people say.  Now, there

8    are some people who say, well, wait a minute, you are

9    already -- the defendant is already going to be sentenced to

10   life in the penitentiary when you've gotten to Special Issue

11   Number 1 here, because you've already found him guilty of

12   capital murder, and so he's looking at life in the

13   penitentiary.  And as the Judge told you, that means 40

14   calendar years.  So some people say society should be limited

15   to other people in the penitentiary because that's where the

16   defendant is going to be serving his time, but the

17   legislature didn't -- does not put that burden on us.

18            But let me ask you this.  Do you think that other

19   people who are confined in the penitentiary, guards,

20   chaplains, nurses, could be secretarial staff, and other

21   inmates also have a right to be free from having criminal

22   acts of violence perpetrated upon them?

23       A.   Now, as I understand it, you're asking do I think

24   that they -- they should certainly have the same rights that

25   you or I do.

```
1        Q.    Okay.

2        A.    Even though they're working there or even though

3    they're an inmate.

4        Q.    Okay.  Okay.  And that's what I'm getting at because

5    some people say, well, look, we -- the State should have to

6    prove that he's going to be a continuing threat to society.

7    And when you look at society, that should only include people

8    in the penitentiary because that's where the defendant is

9    going to be.  The legislature doesn't -- doesn't require

10   that.  Other people say -- have you heard of Texas 7?

11       A.    Yes.

12       Q.    Okay.  Some of those people were serving life

13   sentences in the penitentiary.  Obviously, they were able to

14   get out, came up here to Irving, and have been accused of

15   killing an Irving officer.  Other people say society should

16   not be limited just to people in the penitentiary, but it

17   should be -- it should include everyone, anyone -- anywhere

18   that the defendant may find himself or anyone the defendant

19   may come in contact with either in or out of the

20   penitentiary.

21             How do you feel about that, Ms. Lentz?

22       A.    Well, I'm not real sure what you're actually asking

23   me on that.

24       Q.    Okay.  I think --

25       A.    Because I agree with your assessment.
```

1        Q.    Basically what I'm asking is, are you going to limit

2    society as far as Special Issue Number 1 goes strictly to

3    people in the penitentiary, that he's going to be a future

4    threat to only people in the penitentiary, or are you going

5    to include everybody, both in and out of the penitentiary?

6        A.    I think it should be everybody.

7        Q.    Okay.  And like I said, the Judge isn't going to

8    give you a definition of what society should be.  We're just

9    kind of trying to find out where you come on that issue.

10            Do you have any questions about Special Issue Number

11    1?

12        A.    No, I don't.

13        Q.    Okay.  Now, let's get down to Special Issue Number

14    2.  As the Judge said, a lot of times this is called the

15    mercy question or the safety net.  You only get to Special

16    Issue Number 2 if you've already found the defendant guilty

17    of capital murder and you have found that he's going to

18    basically be a future danger.

19            Now, some people say, okay, if I've already found

20    that he intentionally took someone else's life during the

21    course of a robbery or kidnapping in this particular case,

22    and I've already said he's going to be a future danger, then

23    I am always going to answer Special Issue Number 2 no so he

24    will get the death penalty.  Because I'm not ever going to

25    give him a chance to perhaps get out and if I already think

1    he's going to be a future danger.  But what the law requires

2    you to do, Ms. Lentz, is to -- regardless of what you have

3    done in the past, regardless of the fact you've already found

4    him guilty, and you have found that he is in all probability

5    going to be a future danger, is step back, basically forget

6    that you did those two things, and re-examine all of the

7    evidence again and look and see whether or not there is

8    anything within that evidence that would warrant you changing

9    a death sentence back to one of life.  Because when you get

10   down to Special Issue Number 2, the defendant is looking at a

11   death sentence.  And Special Issue Number 2 basically says

12   re-examine all of the evidence and is there something that

13   you believe warrants changing that death sentence back to one

14   of life.

15           Now, when you get down to Special Issue Number 2,

16   there is no burden of proof.  The State does not have to

17   prove it should be answered no.  The defense does not have to

18   prove it should be answered yes.  Neither side has the burden

19   of proving it should be answered one way or another.  You

20   just examine the evidence, and then call it like you see it.

21           Do you think that you have the discipline to be able

22   to do that?

23       A.    I do.

24       Q.    Even if you've already found that he's going to be a

25   future danger and you've found him guilty of capital murder?

---

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    I do.

2      Q.    Okay.  Some people -- as the Judge said, you're not

3    going to have a laundry list of what mitigating circumstances

4    are.  It's whatever you believe it is.  You may believe

5    something is mitigating.  Another person may think it's

6    aggravating.  Another juror may say, well, it doesn't really

7    have any bearing one way or another.  I want to talk about a

8    couple of them that the Judge had talked about earlier.

9            Age.  In Texas a person has to be 17 years of age

10   before he or she can -- before the State of Texas can seek

11   the death penalty against that person.  Some people say the

12   young age of a defendant could be mitigating.  Other people

13   say, no, once they've reached the age of accountability, they

14   understand the consequences of their actions, age really

15   doesn't play any factor as far as I'm concerned.

16           How do you feel about that, Ms. Lentz?

17     A.    Age has nothing to do with it --

18     Q.    Okay.

19     A.    -- as far as I'm concerned.  Because there's too

20   many that do things and say I'm not 17 yet.

21     Q.    Okay.

22     A.    I've heard them say it.

23     Q.    How about drug or alcohol use or abuse?  Some people

24   say it's a disease and therefore should be a mitigating

25   circumstance.  Other people say, no, it's a conscious

```
 1   choice.  It's a conscious decision.  Never going to consider

 2   it as mitigating.  Other people say, well, I'd really want to

 3   know some of the facts and circumstances around it.  Was this

 4   the first time the defendant had ever used alcohol or drugs?

 5   Perhaps he didn't know how it affected him and that's when he

 6   went out and committed the crime.  Or had this person used

 7   alcohol or drugs in the past, knew how it affected him, had

 8   even talked to people about how drugs or alcohol affected

 9   him, and then he goes out and commits a crime?

10          How do you feel about drug or alcohol use?  Do you

11   think it's a choice?  Do you think it's a disease?

12      A.   Well, it's two of those things that you said.  It's

13   a disease.  It's also a choice.

14      Q.   Okay.

15      A.   In my -- the way I feel about it.

16      Q.   So do you think it's a conscious choice when you

17   first begin using it?

18      A.   Yes.

19      Q.   That perhaps -- okay.  Do you think that people can

20   be rehabilitated?

21      A.   Yes, I do.

22      Q.   Do you think all people can be rehabilitated?

23      A.   No.

24      Q.   What do you think what might make the difference?

25      A.   The support group that they have.
```

1    Q.   Okay.  Do you believe that the person has to want to

2  be rehabilitated?

3    A.   Yes, definitely.

4    Q.   Would it make a difference to you whether the person

5  had been offered opportunities at rehabilitation and whether

6  they had tried to avail themselves of it or basically just

7  thumbed their nose at it?

8    A.   That would definitely be an influence to me

9  because --

10    Q.   Okay.

11    A.   -- you know, if they had the opportunity and did not

12  avail themselves of it, well --

13    Q.   Okay.  How about mental and physical or sexual

14  abuse?  Some people say that can be a mitigating

15  circumstance.

16         Have you ever known anyone who's been physically or

17  sexually abused or claimed to have been?

18    A.   Well, I -- yes.

19    Q.   Okay.  Did you have an opportunity to judge the

20  credibility of that claim or believability?

21    A.   I didn't really examine it to that degree.  I had

22  only known one person.

23    Q.   Okay.

24    A.   And that's a very -- not a real close acquaintance.

25    Q.   Okay.  Do you believe, Ms. Lentz, that there are

```
 1   people who can make false claims about sexual or physical
 2   abuse?
 3       A.   Oh, I do.
 4       Q.   Would it make a difference to you, or would you want
 5   to know if you were going to look at it as perhaps a
 6   mitigating circumstance or not when the claim was originally
 7   made, how close to the alleged abuse was it, was the person
 8   consistent in their claims of abuse?  In other words, was
 9   their story the same every time they told it, or did it
10   differ, depending upon who they were talking to?  When was
11   the initial outcry?  Was the person under legal accusation or
12   looking at some type of legal punishment when the original
13   outcry came out?
14            Are those some of the types of things that you would
15   want to know?
16       A.   Yes.
17       Q.   How about mental illness?  Have you ever known
18   anyone to be mentally ill?
19       A.   I don't believe -- Alzheimer's is not included in
20   that, or is it?
21       Q.   If you include it, that's up to you.
22       A.   I mean, I don't think it really qualifies.
23       Q.   Okay.
24       A.   I mean, it's a disease.
25       Q.   All right.  Okay.  Do you -- like physical or sexual
```

1  abuse, do you believe that people could make false claims of

2  mental illness?

3      A.   Oh, but of course.

4      Q.   Okay.  And are -- would you also want to know the

5  history or background about that, too, before you made a

6  decision?

7      A.   Yes.

8      Q.   Okay.  Ms. Lentz, just one other thing I wanted to

9  ask about real quickly.  I notice that you had said in your

10 questionnaire that you had -- some 15 years ago you had

11 personally been through some substance abuse; is that

12 correct?

13     A.   That's correct.

14     Q.   And I don't mean to get real personal or prying or

15 anything was it alcohol or some prescriptions, or can you

16 tell us what it was?

17     A.   It was alcohol.

18     Q.   Okay.  And -- but you have been clean for -- or

19 sober for 15 years; is that correct?

20     A.   Uh-huh.

21     Q.   I'm sorry.  You have to answer yes or no for the

22 court reporter.

23     A.   Oh, I'm sorry.  I'm sorry.  Well, I wouldn't say

24 that I have been -- no, I have not been sober for 15 years.

25     Q.   Okay.

1          A.    I've not done that, but I was -- I went in and went

2     through detox and was in there a month.  And I was

3     probably -- I probably stayed sober about three years, and

4     then I still -- I still socially drink every now and again.

5          Q.    Okay.  Anything about that particular experience

6     that would affect you one way or another if drug or alcohol

7     use or abuse was brought up as a mitigating circumstance or

8     somehow brought up in this particular case?

9          A.    Well, I think the more we know about anything -- I

10    mean, we have to use our past experience in our judgments, so

11    I'm not real sure how to answer that.

12         Q.    Okay.  Well, basically you would have to set your

13    past experience aside.  You couldn't tell other jurors your

14    own personal experience.  They have to base and you would

15    have to base your verdict on the evidence that's presented

16    within the courtroom.

17         A.    Right.

18         Q.    Could do you that?

19         A.    Yes.

20         Q.    Okay.  Ms. Lentz, have I thoroughly confused you?

21         A.    No.  It's very -- it's very interesting.

22         Q.    Okay.  Do you have any questions?

23         A.    I don't believe so.  Not at this time.  I'll have a

24    thousand later.

25         Q.    Okay.  Ms. Lentz, thank you very much.

1            MS. MILLER:  I pass the juror.

2            THE COURT:  Ms. Lentz, you need to -- nope,

3   nope, you're only halfway through.

4            VENIREPERSON:  Oh.

5            THE COURT:  Unless you need to take a rest

6   room break or --

7            VENIREPERSON:  Oh, no, no.  I'm fine.

8            THE COURT:  If you do, we'll be more than

9   happy to accommodate you.

10        Ms. Balido, will you be questioning Ms. Lentz?

11           MS. BALIDO:  I will, Judge.

12           THE COURT:  Do you have any questions for

13  her?

14           MS. BALIDO:  I do.

15           THE COURT:  I'm sure you do.  You may

16  continue.

17                    Cross-Examination

18  By Ms. Balido:

19     Q.   Ms. Lentz, as the Judge told you, my name is

20  Jennifer Balido.  And along with Michael Byck and Jane Little

21  who is the other attorney, we represent Mr. Murphy here.

22  Okay?

23           I'm just going to ask you some questions about some

24  of the things that you talked about with Ms. Miller and also

25  some things on your questionnaire and just some other things

```
 1    about -- about this case specifically.

 2              First, you said that you watch a lot of TV.  What

 3    kind of TV do you watch?

 4        A.    Well, not a daytime soap opera type thing.  Usually,

 5    let's see -- oh, let me just go down the list, JAG.

 6        Q.    Okay.

 7        A.    That jet pilot deal.

 8        Q.    Okay.

 9        A.    Let's see, Law & Order.

10        Q.    My favorite.

11        A.    Millionaire, of course.

12        Q.    Yes.

13        A.    Walker Texas Ranger.

14        Q.    Uh-huh.

15        A.    West Wing.  Oh, I can nearly tell you the nights.

16        Q.    You're kind of going over -- I'm addicted to 9

17    o'clock TV because my kids are in bed by then.  So Law &

18    Order.  You know, West Wing, I have to make my husband put

19    them to bed, that kind of stuff, so you and I are kind of on

20    the same page watching TV.

21              And you also mentioned in your questionnaire that

22    you had kind of kept up with the O.J. Simpson case.

23        A.    Yes, I did.  I watched it -- I missed very little of

24    it at that time because at that point I had been just been

25    down sized from my job.
```

1    Q.    Right.

2    A.    And of course it came along and there was, you

3    know, -- it was great, I watched it, you know, the whole

4    thing.

5    Q.    I was on maternity during that trial, so I got to

6    watch a lot of it, too, when I was at home with my baby.

7    What did you think about that trial, and do you think that he

8    should have been found guilty, or do you think that he --

9    that the jury made the right decision in that case?

10   A.    Well, I think they made the right -- I mean, the

11   decision that they were -- that they should have.

12   Q.    Okay.

13   A.    Under the circumstances.

14   Q.    Okay.  So you didn't have a problem with them

15   finding him not guilty under the circumstances?

16   A.    Well, I -- that's true.  I felt personally that

17   perhaps he was involved in some way, but that was only a

18   personal feeling.

19   Q.    Okay.  All right.

20   A.    It wasn't -- you know, I guess the jury.

21   Q.    Okay.  When we talked -- when you were talking with

22   Ms. Miller, you were taking about all sorts of different

23   aspects of the law and things.  And you said on your

24   questionnaire that you felt like that under certain

25   circumstances the death penalty should be used and that --

1    I'm assuming the person convicted of capital murder and

2    sentenced to death should not be a burden on taxpayers for

3    years.  And then you also kind of -- well, first let me ask

4    you, have you read anything or -- that's kind of made your

5    opinion this way?

6        A.   Well, I must have read certain things that have made

7    me come to this conclusion.

8        Q.   Right.

9        A.   I couldn't say specifically what.

10       Q.   Okay.

11       A.   But just the fact that people are in the prison for

12   all those many years, they have no life, and the taxpayers --

13   our prisons are over crowded.

14       Q.   Right.

15       A.   And it is a tremendous expense.

16       Q.   Okay.  And are you talking specifically about people

17   that are on death row and waiting for all their appeals to be

18   exhausted, or are you just talking about so many people that

19   are just in there for other crimes that are incarcerated in

20   jail?

21       A.   I'm really speaking specifically of the ones on

22   death row and also to a degree regarding the ones that are in

23   there for the rest of their life.

24       Q.   Right.  So you think probably that the death penalty

25   should be used on some other cases instead of life in prison

1    or how -- what do you kind of think about that?

2        A.   Well, I think would depend on the situation.

3        Q.   Okay.  Let me kind of just go over a few things

4    about what we've been talking about here.  And I'm going to

5    start off just by -- when we're talking about the part of the

6    trial, the guilt/innocence part of the trial where the

7    State's got to prove beyond a reasonable doubt that Mr.

8    Murphy is guilty of this offense.  Okay.  And when you talked

9    to Ms. Miller, you said that you could presume the defendant

10   innocent of this charge, unless and until the State proved

11   its case beyond a reasonable doubt; is that right?

12       A.   Right.

13       Q.   Okay.  And then I guess what I kind of want to know

14   is what -- do you have something in your mind that -- where

15   you can kind of define what proof beyond a reasonable doubt

16   means to you?  I know that's kind of hard, and it's one of

17   those things that you just kind of -- it's kind of your gut

18   instincts kind of deal.  But let me kind of tell you this

19   this way.  There's not a definition for beyond a reasonable

20   doubt.  We used to have one, and the court took it away for

21   whatever reason.  But basically what proof beyond a

22   reasonable doubt is not -- okay -- I can't really tell you

23   what it is, but what it is not is when people are fighting

24   about money, somebody suing somebody else over in the civil

25   courthouse, they've got to prove their case by a

```
1   preponderance of the evidence, something like more likely
2   than not.  Okay.  51 percent maybe.  If the State of Texas
3   was trying to take away children from a family because of
4   neglect or some reason like that, they have to prove their
5   case by a clear and convincing evidence which is more than a
6   preponderance, less than beyond a reasonable doubt, but we're
7   talking about something real important.  We're talking about
8   where these children are going to live.  If they're going to
9   live with their parents or not.  And some people say that's
10  about 75 percent.
11        Beyond a reasonable doubt is something higher than
12  that.  Okay?  It's higher than a preponderance.  It's higher
13  than clear and convincing, and it's up to a reasonable doubt
14  and beyond a reasonable doubt.  Okay.  And they've got to
15  prove to you every single thing that's in the indictment, as
16  Ms. Miller told you.  If they don't prove Dallas County,
17  State of Texas, you have to find him not guilty.
18        And you said you didn't have a problem with that,
19  correct?
20        A.   That's correct.
21        Q.   Okay.  If they don't prove -- let's say that -- like
22  in this indictment, they've alleged that -- that Ms.
23  Cunningham was either killed by being shot in the head or
24  drowned in water.  And let's say they proved stabbing
25  instead.  And it's still -- it's a technicality, but you'd
```

1    still have to find him not guilty under the law.

2           Do you understand that?

3       A.    Yes, I do.

4       Q.    Okay.  How does that make you feel that the law is

5    so technical that way?

6       A.    Well, I'm sure there is a -- there's such a fine

7    line in there.  And I know that you have to have rules.

8       Q.    Right.

9       A.    And unfortunately, sometimes they don't always play

10   to the way you would like things.

11      Q.    Right.

12      A.    So you have to just go by the line and go right down

13   the line with it.

14      Q.    Okay.

15      A.    And so I have no problem with that.

16      Q.    Okay.  All right.  Let me ask you and talk to you a

17   little bit about -- in that indictment it says that the

18   State's got to prove that Mr. Murphy -- Mr. Murphy

19   intentionally caused the death of Ms. Cunningham.  And when

20   we're talking -- there are a lot of different ways that you

21   can kill somebody, unfortunately.  You can do it by

22   negligence, by not paying attention to what you're doing, do

23   it kind of by accident.  You can do it through -- let's say

24   by negligence because you were intoxicated.  You might have

25   been driving a car, maybe killed somebody.  You didn't intend

1    to kill that person, but your actions were such that you

2    should have known better basically.

3            There's -- as I said, a bunch of different ways to

4    do that, but what we're talking about in this case is we're

5    talking about the specific intent to kill and the State must

6    prove that Mr. Murphy had the specific intent to kill, if

7    they can prove that. And what we're talking about when we're

8    talking about specific intent to kill is basically this.

9    Let's say that I've just had it with Mr. Byck. Okay. We've

10   been at this a long time, and he's just driving me out of my

11   head. And so I decide to bring a gun into the courtroom. I

12   have bought the gun. I have bought the bullets. And then he

13   just does one more thing, he whispers in my ear one too many

14   times and I pull out my gun and I put it up to his chest and

15   I shoot him.

16           Now, at that time I did not intend to scare him.

17   Okay. I didn't shake it at him or anything like that. At

18   that time I did not intend to wound him because of my

19   actions. I was doing everything that I could to cause the

20   death of this individual, and I had the specific intent to

21   kill him. So that's the kind of specific intent that we're

22   talking about that the State must prove to you beyond a

23   reasonable doubt that Mr. Murphy had when he -- or if he

24   committed this offense.

25           Do you understand that?

1    A.    Oh, yes.

2    Q.    Okay.  And do you think that you can hold the State

3  to its burden of proof?

4    A.    Yes, I do.

5    Q.    Okay.  Just a couple of more things about -- when

6  we're talking about the guilt/innocence phase of this trial.

7  Do you think -- and I think that you are a very honest woman

8  and I think that you have laid out what you believe and that

9  you can follow the law.  And I think that you've done that

10  very clearly.

11        Would your ability to be fair and impartial in this

12  case change if you learned from the evidence that the victim

13  in this case was an 80-year-old woman?

14    A.    The -- her age shouldn't have anything at all to do

15  with it.

16    Q.    Okay.  And basically I ask this question because

17  sometimes people hold older people in a little different

18  esteem than they do other people.

19    A.    Oh, I understand.

20    Q.    Yes, and so -- and this -- so we kind of ask that

21  question just to make sure.  You know, we've had a couple of

22  jurors that had problems with that.

23        And let me also ask you, when you look at this

24  indictment and you see what he's accused of.  You see that

25  he's accused of causing the death of an individual, Ms.

1    Bertie Lee Cunningham, by either shooting her in the head or

2    drowning her in water in the course of a kidnapping or a

3    robbery.  Now, we can't go into the specifics of the case,

4    Ms. Lentz, but just reading that indictment when we're

5    talking about shooting someone in the head and/or drowning

6    them in water, you can imagine that the pictures in this case

7    might be of a graphic nature.

8            And so do you think that you can look at these

9    pictures and look at them for their evidentiary value and

10   whether or not they prove anything or whether or not they

11   prove what the State says they prove, without being swayed by

12   the emotion of them or the graphic nature of them?

13       A.   I don't have a problem with it.  I don't believe

14   that I would.

15       Q.   Okay.

16       A.   I watch that CSI on TV all the time.

17       Q.   Right.

18       A.   And I realize these things do happen.  And I have

19   never been a person with a weak stomach or --

20       Q.   Okay.  All right.  Let me also ask you in specifics

21   to testimony and evidence, do you believe that eyewitness

22   testimony is infallible?

23       A.   No.

24       Q.   Okay.  And I think that a lot of these shows that

25   you watch that I watch -- my husband can't believe that I do

DARLINE W. LABAR, OFFICIAL REPORTER

1    this for a living and I go home and watch all this stuff on

2    TV.  But I think that there are some cases like that and

3    cases also in the news where you see that sometimes people

4    that -- you know, I think five different people could

5    describe an event five different ways.

6         A.    Absolutely.

7         Q.    Okay.  Let me go ahead and move on to -- well, let

8    me kind of start -- finish up with this on guilt/innocence.

9    If the State proves its case beyond a reasonable doubt that

10   Mr. Murphy is guilty of capital murder, then we move on over

11   to the special issues when we're dealing with capital

12   murders, to decide whether or not life or death is

13   appropriate.  If the State fails to prove the part of the

14   indictment that alleges the kind of secondary offense, if

15   they prove that Mr. Murphy caused the death of this

16   individual, but they fail to prove that it happened during

17   the course of a robbery or kidnapping, then -- and the

18   Judge -- and the jury finds him guilty of just murder, and

19   just murder sounds weird, but the charge of murder without

20   the underlying offense, then we won't get to the special

21   issues.  And what we deal with is we'll deal with the

22   punishment phase of the trial where the range of punishment

23   the legislature has set out is no less than 5 nor more than

24   99 years in the penitentiary or life confinement in the

25   penitentiary.  Okay?

1          And the legislature kind of set that up for a reason

2    to kind of have a wide -- you know, 5 to 99 years, that's a

3    lot of leeway there.

4          Do you think that as a juror if you found Mr. Murphy

5    guilty of murder only, that you could consider the entire

6    range of punishment, from 5 years to 99 years or life, or do

7    you think one -- do you think 5 is too low?  Do you think

8    life is too high?  Or what's your opinion on that?

9          A.    Well, I would feel like 5 was far too low.

10         Q.    Okay.

11         A.    And that it should be much more.

12         Q.    Okay.  And when we're talking about this, we're

13   talking about -- you know, the intentional causing of the

14   death of an individual, and, you know, it wasn't an accident,

15   it wasn't a mistake, you know, he wasn't legally insane at

16   the time, you know, there's no kind of legal justification,

17   it's just an intentional murder.

18         Do you think that you could ever give 5 years,

19   depending on what the case may be, for an intentional murder?

20         A.    Well, if -- you'd have to base it on the -- I mean,

21   I would -- emotionally would be against it, but I would in

22   the other sense realize that it -- the burden of proof lays

23   with the prosecutor.

24         Q.    Yes, ma'am.

25         A.    And that I would have to go by the evidence and what

 1   was done.

 2       Q.    Okay.

 3                 THE COURT:  Ms. Lentz, let me ask you this.

 4   Are you telling me that you're willing to wait and listen to

 5   the circumstances, the relationship between the parties, and

 6   then decide what the penalty range should be, or are you

 7   telling me that regardless, period, as a matter of intellect

 8   and conscience, you would never ever consider 5 years, or are

 9   you willing to wait and listen to the evidence and then make

10   a determination?

11                 VENIREPERSON:  I'm not sure I understand

12   exactly.  Are you saying -- I'm --

13                 THE COURT:  Legislature has said the penalty

14   range for murder, not capital murder, but murder, the

15   intentional taking of another human life, no self-defense, no

16   defense of a third party, no necessity, I mean, murder, 5 to

17   99 years or life, optional fine not to exceed $10,000.  The

18   legislature did that 25 plus years ago realizing that there

19   are virtually an infinity of relationships and circumstances

20   that result in a homicide called murder.

21                 VENIREPERSON:  Right.

22                 THE COURT:  To accommodate all of those

23   possibilities, the legislature has said, look, here's this

24   vast penalty range to accommodate virtually everything that's

25   under the sun.  We are not asking you to hypothecate in your

1    mind a 99-year case or a life or a 5, but to be a qualified

2    juror, must be willing to say, I'll wait until I hear the

3    case and then if I determine it's 5 years, I could do it, or

4    6 or 10 or 20, as opposed to, oh, I could consider on my way

5    home tonight running by the Rolls Royce dealership and buying

6    a Rolls Royce.  Oh, I could consider it.  Yeah, really.  No,

7    not realistically.  I'm not talking about that kind of a

8    considering.  You know, well, it's out there, but can you

9    seriously give consideration realistically, a realistic

10   consideration to as little as 5 years and do that if you felt

11   the circumstances presented in court obligated you to do so?

12              VENIREPERSON:  If I were obligated to do so, I

13   would do so.

14              THE COURT:  You haven't closed your mind to

15   it?

16              VENIREPERSON:  No.

17              THE COURT:  Counsel may continue.

18   Q.   (By Ms. Balido)  So, Ms. Lentz, if you thought the

19   case was worth -- if you thought in your heart of hearts the

20   case was worth 5 years, you wouldn't have a problem giving 5

21   years?

22   A.   I don't believe that I would.

23   Q.   Okay.  Let me -- let me go ahead and talk to you a

24   little bit about if the State proves its case that it's

25   actually capital murder, okay, that he's guilty of actually

1   capital murder.  We had a situation up until this past year

2   that in the situation where someone is found guilty of

3   capital murder, obviously the two choices are either life

4   confinement in the penitentiary or the death penalty.  And I

5   think everybody kind of knows what the death penalty is.

6   It's death by lethal injection.  And in Texas, you know, you

7   can't turn on the TV without hearing that somebody else is

8   being put to death.  So it's a reality in Texas.  But what

9   the problem used to be is that nobody knew what life

10  confinement meant.

11          THE COURT:  Jurors didn't know.

12      Q.   (By Ms. Balido)  Jurors -- jurors didn't and --

13          THE COURT:  We couldn't tell them.

14      Q.   (By Ms. Balido)  The legislature would not allow us

15  to tell them what life -- life confinement in the

16  penitentiary meant.  Until --

17          THE COURT:  If the legislature still had their

18  way, we wouldn't.  But the courts have said, look, we're

19  going to be honest with jurors, if they're going to make

20  these life and death decisions, we want them to be informed.

21  We have a right to know.

22          Go ahead, Ms. Balido.

23      Q.   (By Ms. Balido)  So now we're allowed to tell the

24  jurors that if someone is convicted of capital murder and

25  sentenced to life confinement in the penitentiary, then what

1    that means is it's confinement for 40 calendar years until

2    the possibility of parole.  He does every single day of that

3    40 years.  And even after that, he's got to go through the

4    parole process before parole might be able to be granted to

5    him or not.

6           Knowing that, do you think when we're talking about

7    capital murder, we're talking about the intentional killing

8    of someone during the course of in this case a robbery or a

9    kidnapping, do you think both the death penalty and life

10   confinement, 40 calendar years, are both appropriate

11   punishments for this type of crime?

12   A.    That's a hard question to answer because I really

13   feel that it should be the death penalty.

14   Q.    Okay.  And not have the possibility of life

15   confinement for a capital murder?

16   A.    No, I think it should be the death penalty.

17          THE COURT:  So you don't think we should

18   consider the special issues?

19          VENIREPERSON:  Well, then -- that's what I was

20   saying, it was hard to answer that.

21   Q.    (By Ms. Balido)  Uh-huh --

22   A.    -- because it would depend on how the circumstances

23   were presented and if the prosecution was able to fulfill

24   it's obligation in the indictment.  I don't really know where

25   to go with that except that if someone kills someone

1   intentionally and with no -- I mean, this is hard to say, but

2   I feel very strongly about the death penalty for somebody who

3   kills someone else.

4                   THE COURT:  Defense may continue.

5        Q.   (By Ms. Balido)  So if I'm understanding what you're

6   saying, Ms. Lentz, if you find someone guilty of capital

7   murder, you think that they should get the death penalty?

8        A.   Yes.

9        Q.   Okay.  Do you think they should get the death

10  penalty for just a murder, not a murder plus, not in the

11  course of a kidnapping or a robbery or an arson or something

12  like that, but just all murders?

13       A.   Well, the circumstances would make a difference.

14       Q.   Okay.  But on a capital murder, if he's found guilty

15  on that indictment, you think he should get the death

16  penalty?

17       A.   Yes.

18       Q.   Without any consideration of the special issues?

19       A.   Well, I know we would have to do that; isn't that

20  correct?

21       Q.   That is correct.

22       A.   But I mean as far as my feeling about it, the way I

23  feel, I feel it should be the death penalty.

24       Q.   Okay.  So after you've already found him guilty of

25  capital murder, are you saying that you would want us to

1   prove to you that it should be life and not death after you

2   found him guilty of capital murder?

3       A.   Now, you're asking me -- that you -- you're asking

4   me if you would have to come back and try to convince me

5   during the sentencing part of it --

6       Q.   Uh-huh.

7       A.   -- that you would have to convince me of a life

8   sentence rather than a death sentence; is that what you're

9   saying?

10      Q.   Yes, that's what I'm asking.

11      A.   Well, I guess I would have to see something because

12  I feel very strongly about the death penalty.  I do.

13      Q.   Well, and I appreciate your honesty.

14              MS. BALIDO:  Any further questions, Judge?

15              THE COURT:  Ms. Madore, you may excuse the

16  juror.  The attorneys willing make representations to the

17  Court.  I will notify you whether or not you remain under

18  consideration.  If you would excuse yourself with Ms. Madore

19  momentarily.

20              (Venireperson excused from courtroom.)

21              (State no challenge for cause - Ms. Lentz)

22              MS. MILLER:  The State has no challenge, Your

23  Honor.

24              (Defense challenge for cause - Ms. Lentz)

25              MS. BALIDO:  Defense would challenge her for

1    cause based on her answer to the last few questions.

2                    (Challenge for Cause Granted)

3                    THE COURT:   Defense challenge for cause

4    granted.

5                    (Recess of proceedings.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4           I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13          I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16          Witness my hand this the 19th day of November, A.D.,

17   2001.

18

19

20
                              DARLINE W. LABAR
21                            Official Court Reporter
                              194th Judicial District Court
22                            Dallas County, Texas
                              (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002
```

DARLINE W. LABAR, OFFICIAL REPORTER