REPORTER'S RECORD

**74145**

VOLUME 43 OF 65 VOLUMES

TRIAL COURT CAUSE NO. F00-02424-NM

THE STATE OF TEXAS          :          IN THE DISTRICT COURT

VS.                        :          DALLAS COUNTY, TEXAS

JEDIDIAH ISAAC MURPHY      :          194TH JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

INDIVIDUAL VOIR DIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEC 5 2001

Troy C. Bennett, Jr., Clerk

A P P E A R A N C E S:

HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building
        Dallas, Dallas County, Texas  75207
        Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
              FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
        Phone:  214-653-9400
              FOR THE DEFENDANT.

\*\*\*\*\*\*\*\*\*

On the 30th day of May, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand, computer

assisted transcription.

1                          INDEX VOLUME 43

2     May 31st, 2001                          PAGE      VOL.

3     INDIVIDUAL VOIR DIRE:

4     Proceedings....................................  2        43

5     State challenge for cause - Ms. Jones........... 30        43

6     Defense challenge for cause - Ms. Jones......... 30        43

7     Challenge for Cause Granted..................... 30        43

8     Ms. Smith Excused From Consideration............ 36        43

9     State no challenge for cause - Mr. Ferrell...... 81        43

10    Defense no challenge for cause Mr. Ferrell...... 82        43

11    Richard Ferrell Prospective Juror No. 48........ 82        43

12    Mr. Ward Excused From Consideration............. 88        43

13    State no challenge for cause - Mr. Galey........ 106       43

14    Defense no challenge for cause - Mr. Galey...... 106       43

15    Kelly Galey Prospective Juror No. 49............ 106       43

16    Reporter's Certificate.......................... 109       43

17

18                CHRONOLOGICAL VENIREPERSON INDEX

19                      STATE        DEFENSE                 VOL.

20    NANCY JONES          3            25                    43

21    JULIE SMITH         32                                  43

22    RICHARD FERRELL     38            60                    43

23    WILLIAM WARD        85                                  43

24    KELLY GALEY         90           103                    43

25

ALPHABETICAL VENIREPERSON INDEX

| | STATE | DEFENSE | VOL. |
|---|---|---|---|
| RICHARD FERRELL | 38 | 60 | 43 |
| KELLY GALEY | 90 | 103 | 43 |
| NANCY JONES | 3 | 25 | 43 |
| JULIE SMITH | 32 | | 43 |
| WILLIAM WARD | 85 | | 43 |

*NO EXHIBITS THIS VOLUME*

```
 1                    P R O C E E D I N G S

 2           THE COURT:  Good morning.

 3           VENIREPERSON:  Good morning.

 4           THE COURT:  Welcome back.  Ms. Jones, may I

 5  ask you to raise your right hand and be sworn in, please.

 6              (Venireperson additionally sworn.)

 7           VENIREPERSON:  I do.

 8           THE COURT:  Thank you.  You may lower your

 9  hand, please.

10        Let us begin by reintroducing those whom we see

11  seated at the counsel table.

12        Beginning at the far left, we have lead prosecutor

13  for the State, one of the Senior Prosecutors presently in the

14  Dallas District Attorneys Office, the Honorable Greg Davis.

15           MR. DAVIS:  Good morning.

16           THE COURT:  Anticipate that Mr. Davis will be

17  joined shortly by co-counsel, Chief Prosecutor presently

18  assigned to this court, the Honorable Mary Miller.

19           MS. MILLER:  Good morning.

20           THE COURT:  Walking in the door as we speak.

21        Moving on to the next table, we have first one of

22  the defense attorneys, a board certified criminal law

23  specialist, the Honorable Michael Byck.

24           MR. BYCK:  Good morning.

25           VENIREPERSON:  Good morning.
```

1          THE COURT:  Sitting next to him is a former

2   Assistant District Attorney, also a defense attorney in this

3   matter, the Honorable Jennifer Balido.

4          MS. BALIDO:  Good morning.

5          VENIREPERSON:  Good morning.

6          THE COURT:  Seated next to Ms. Balido,

7   opposite Mr. Byck, is the accused, the defendant, if you

8   will, Jedidiah, otherwise known as Jim, Isaac Murphy.

9          THE DEFENDANT:  Good morning.

10          VENIREPERSON:  Good morning.

11          THE COURT:  There is a third attorney on the

12   defense team, Jane Little.  If she should come in before you

13   leave this morning, I will make her presence known to you.

14      Ms. Jones, assuming you're ready, we're about to

15   proceed with the individual questioning.  Are you ready?

16          VENIREPERSON:  Yes, sir.

17          THE COURT:  As is required by law, we'll begin

18   with the State, Mr. Davis.

19          MR. DAVIS:  May it please the Court.

20                      NANCY JONES

21   was called as a venireperson by the Court and, after having

22   been first duly sworn, was questioned as follows:

23                Voir Dire Examination

24   By Mr. Davis:

25      Q.   Good morning again, Ms. Jones.  How are you?

1     A.   I'm fine, thank you.

2     Q.   Good.  Ms. Jones, for the next few minutes I'm going

3 to speak with you about some of the issues that are involved

4 in this case, talk to you about the death penalty in a little

5 bit greater detail, talk about your questionnaire perhaps.

6 As the Judge has previously told you, there are no right or

7 wrong answers this morning.  Most of the questions deal with

8 how you feel about issues, what your opinions are.  From time

9 to time I'll be explaining the law to you, and the reason I

10 do that is just to simply determine if you can follow the

11 law.  To be qualified, certainly you have to be able to take

12 an oath that you'll render a true verdict according to the

13 law given you by the Judge, as well as the evidence that you

14 hear in this case.

15         Just take a moment, if you will, I guess you

16 probably thought about possibly serving on this jury.  Tell

17 me your feelings about perhaps sitting in this jury box,

18 listening to this case, and having to return a verdict which

19 would ultimately result in the death of Jedidiah Murphy.

20 Because that's our goal, and that's what I'll be asking the

21 jury to do at the conclusion of this case.

22     A.   Some mixed feelings.  I've never done this before,

23 so, yes, I have thought about it.  But it's -- it's really

24 tough.  It's really tough to put into words.  I mean, it's a

25 heavy responsibility.

1    Q.    And I would expect it to be.  I've done a number of

2    these cases.  Having talked to jurors afterwards, I can tell

3    that this is not something that we ask that's easy to do.

4         Do you look upon it primarily as a civic obligation,

5    if you're called upon to serve, that you will serve?  Is that

6    kind of where you're coming from?

7    A.    Yes, sir.

8    Q.    Okay.  Ms. Jones, let me -- let me just talk to you

9    and ask you, why do you favor the death penalty in Texas?

10   A.    It -- it's tough to put into words, but the -- I

11   think there's a balance, if you will, or should be a balance

12   that if you take a life, then yours should be taken as well.

13   I mean, there's a -- an accountability I guess is the way

14   that I view it.

15   Q.    Right.

16   A.    And I personally don't think the taking of a life

17   should be something that's thought of lightly or just viewed

18   as something that can be gotten away with I guess is the way

19   to put it.

20   Q.    Well, from your questionnaire I take it that you

21   don't think that every single capital murder case should

22   result in a death penalty, do you?

23   A.    Probably not.  Never -- I'm not one to -- to -- I'm

24   afraid I don't keep up with the news that closely and never

25   had any great interest in -- in doing that where I would --

1   would say follow a case in the news all the way through a

2   trial and that sort of thing, but I would think that there

3   would be different circumstances, different variations.

4   There's a lot of talk about if someone is found mentally ill,

5   I think there can be reasons.

6       Q.   Uh-huh.

7       A.   But I think from my reading the term "cold-blooded,"

8   if it's just uncaring, just a matter of expedience.

9       Q.   In general then you really want to listen to all the

10  facts, determine if there are circumstances that would merit

11  a death penalty or facts that might merit a life sentence; is

12  that a fair representation?

13      A.   That's a fair representation, yes.

14      Q.   Let's talk about these special issues in just a

15  little greater detail.  As you'll recall, these special

16  issues come into play if you find someone guilty of capital

17  murder.  The Judge has previously told you, I believe, that

18  at the beginning Special Issue Number 1 is presumed to be

19  answered no.  It's a lot like the presumption of innocence.

20  Right now as he sits here, Jedidiah Murphy is presumed

21  innocent.  Even though a number of things have already

22  happened to bring him to the court.  He's been arrested and

23  charged with capital murder.  He's been indicted for capital

24  murder.  We're nearly finished with jury selection.  But he's

25  still presumed innocent until proven guilty beyond a

1    reasonable doubt.  The State has the burden of proof in this

2    case on the guilt portion of the case.  The same is true on

3    Special Issue Number 1.  Even though you would have already

4    found him guilty of capital murder, he's still presumed in

5    that question to not be a threat to society.  You have to

6    look at what evidence that the State produces for you to

7    determine have we shown you beyond a reasonable doubt this

8    person really will constitute a continuing threat to society.

9          You see, all criminal cases in Texas are divided

10   into two parts.  The first part deals with guilt and

11   innocence.  Second part then deals with punishment.  And in

12   the second phase, after you've found someone guilty,

13   generally that's when you hear testimony about his background

14   and his character and that may be very important to you in

15   determining is this person really going to constitute a

16   threat or not.  You could have somebody who's been a model

17   citizen for instance.  Maybe this is just a pure aberration

18   in behavior.  Or you could have somebody who's shown a track

19   record.  So the guilt -- the guilty verdict really is only

20   half the story.  You still have a lot of other information

21   that may come into play before you answer Special Issue

22   Number 1.

23         The first question is this, do you believe simply

24   because you find someone guilty of capital murder, that

25   you're always going to think that they're going to be a

```
1    continuing threat to society?  Or do you feel that there may
2    be other circumstances that you could hear about that would
3    help you make that determination about whether this person
4    really would be a threat or not?
5         A.   I guess if the -- if in the trial that wasn't
6    evident or wasn't shown, that would you have to have other
7    information --
8         Q.   Uh-huh.
9         A.   -- to answer that one.
10        Q.   Right.
11        A.   Yes.
12        Q.   Because when I ask people what sort of information
13   do you want on Special Issue Number 1 to help you, a lot of
14   people tell me they're going to take into account just how
15   the crime was committed.  And that's very proper to do.  But
16   a lot of people also tell me I'd like to know about his
17   background, what has he done in the past, has he shown good
18   character, good behavior in the past.  Or has he been through
19   the criminal justice system, has he been convicted before,
20   has he committed other acts of violence.  And a lot of people
21   tell me that that would also help them make up their mind
22   about whether this man is really going to be a threat or
23   not.
24             Do you think those types of things would also be
25   helpful to you?
```

1      A.    Yes.

2      Q.    Looking at some of these words over here, I'm going

3    to go through some of them because they don't have legal

4    definitions.  And so we need to get an idea generally about

5    how you're going to view these words.  The first word is

6    probability.

7            Now, the legislature gave us that word.  They could

8    have given us other words.  They could have made the barrier

9    so low for the State as to say is there any chance at all

10   that he's going to commit criminal acts of violence, is there

11   just a possibility that that could happen.  But they've

12   raised the bar somewhat, and they've said probability.

13           First of all, do you see a distinction between a

14   probability and something that's just possible or something

15   that just has a chance of occurring?  Do you see a difference

16   there?

17     A.    Yes.

18     Q.    Okay.  Do you see probability as being higher than a

19   possibility and a chance?

20     A.    Yes.

21     Q.    Sometimes we ask jurors to envision a scale of zero

22   to a hundred.  Go back to math class here I guess for a

23   moment, with zero being the slightest chance ever, 100

24   percent being an absolute certainty.  And sometimes we ask

25   people to place probability on that scale.  And I guess first

1    of all can you see that there has to be some sort of minimum

2    there for it to be a probability as opposed to a possibility

3    or a chance?

4        A.   Yes.

5        Q.   Okay.  I kind of envision it this way, sort of like

6    a majority and a minority.  Out of a hundred, to be a

7    majority, it has to be at least 51, correct?  Anything less

8    than that would be either equal or a minority.  Same thing I

9    guess when it comes to probability.  Personally I see a

10   probability as having to be at least a 51 percent chance.

11          Do you also see that?

12       A.   Yes.

13       Q.   Now, you can assign a higher number than 51 if you

14   want to.  A lot of people tell me they're more comfortable in

15   that question with 60, 70, 80, whatever you're comfortable

16   with.  But at the very minimum, can you assure us that you're

17   looking at probability as being at least 51 percent there?

18       A.   Yes.

19       Q.   Criminal acts of violence.  What sort of offenses do

20   you think of, Ms. Jones, when you -- when you think of

21   criminal acts of violence?

22       A.   Well, obviously murder, but there would be other

23   things besides murder.

24       Q.   Uh-huh.

25       A.   If you're -- torture --

1      Q.     Yeah.

2      A.     Anything where there's a bodily attack, I guess.

3      Q.     Some sort of -- some sort of physical harm to

4   someone else?

5      A.     Yes.   Thank you.

6      Q.     All right.   Society.   That can mean people like you

7   and I who live in the free world.   It can also mean people in

8   a prison.   Think back, Judge has told you the life sentence

9   means the person has to spend at least 40 years in prison

10  before they become eligible for parole.

11          Now, I like to think of society as being anywhere

12  the defendant may find himself, or anyone he may come in

13  contact with.   So in that context can you see how people

14  inside a prison may also constitute a part of a defendant's

15  society?   And that might include inmates, guards, nurses,

16  secretaries, any number of people.

17          Do you think that even those people, and maybe other

18  inmates who are serving time, do you think they have the

19  right to be free from violent crime themselves?

20     A.     Yes.

21     Q.     One other thing on Special Issue Number 1, and this

22  goes back always to the burden of proof.   Burden of proof is

23  always with the State of Texas in this case, always.   The

24  defendant never has the burden of proof.   They don't have to

25  prove their innocence for instance in the first part of the

1   trial.  On Special Issue Number 1, the State again has all of

2   the burden of proof.  Sometimes jurors will tell us, well,

3   I'm open on Special Issue Number 1, I want to hear all the

4   evidence.  But, you know, I'm going to need to hear something

5   from the defendant to persuade me he's not going to be a

6   continuing threat to society.  That's really not the way the

7   law looks at it.  It's kind of like jurors saying, well, I'm

8   open to him being innocent, but he's going to have to show me

9   something.  You know, he doesn't have to do that.  And on

10  Special Issue Number 1, my question to you is this, are you

11  going to -- are you going to force the defendant to show you

12  anything on Special Issue Number 1, or can you follow the law

13  and look to what the State brings you in determining whether

14  he's going to be a threat or not?  Now, let me just say

15  because I'm -- this is kind of a -- kind of a rational

16  problem.  Sometimes jurors will say, well, you know, if it's

17  going to be helpful to the defendant, well, how is it going

18  to come from the State of Texas.  I guess that's kind of a

19  logical problem.  Well, it can.  It can come through a

20  State's witness who perhaps says something that is

21  detrimental to the defendant on the one hand.  Maybe on the

22  next question he says something favorable.  Maybe it's

23  brought through a State's witness that has been a criminal or

24  he's held high positions in the community where he's been a

25  good family member.  It could come through a State's witness

1    or through some sort of State's evidence.

2          I guess the question is, if it came through that,

3    that type of witness, could you consider it just as the same

4    as if it came through a defense witness?

5          A.   Yes, I would think so.

6          Q.   Okay.   I know -- and we're going to have kind of the

7    same situation on Number 2.   It's kind of hard to envision

8    where -- how would the State be producing evidence that's

9    favorable to a defendant.   It's kind of hard to envision, but

10   it can happen.   But the key is just to be open to evidence

11   from wherever it comes from.   And then you factor it in on

12   Special Issue Number 1, whatever way that you want to.

13   Okay?

14         Special Issue Number 2 really deals with -- again,

15   this is kind of the safety net question.   You've already

16   found the defendant guilty.   You've already decided now that

17   he will constitute a continuing threat to society.   That's

18   the only way that you can get to Special Issue Number 2.

19   Because if you have decided in Number 1 that he will not be a

20   threat to society, that ends the process.   He gets an

21   automatic life sentence.   So when you get down to Special

22   Issue Number 2, what we ask you to do and what the law

23   requires you to do is to take one more look at all of the

24   evidence, even though he's dangerous, and determine is there

25   something in that evidence, no matter what it is, where it

1  came from, is there something there that tells you as a juror

2  that this man should receive a life sentence instead of a

3  death sentence.

4  Now, you mentioned for instance mental illness,

5  mental retardation.  And that's really where Special Issue

6  Number 2 came from.  And it came from a case involving a John

7  Paul who committed a very horrible rape-murder down in

8  Southeast Texas several years ago.  Now, at his trial he

9  claimed he was severely mentally retarded.  The jurors did

10  not have Special Issue Number 2 at the time.  He got a death

11  sentence.  The courts, including the Supreme Court, said,

12  well, we want jurors to have some sort of question or

13  mechanism through which they can consider things like mental

14  retardation if they want to spare someone's life.  So that's

15  how we came up with Special Issue Number 2.

16  So I guess in theory you could have a very horrible

17  crime committed like in the Penry case.  You could consider

18  him to be a continuing threat to society and yet there may be

19  something, perhaps he is profoundly mentally retarded, maybe

20  there's something else that jumps out at you where you say,

21  you know, given all the facts and circumstances, I just don't

22  think a death penalty is appropriate in this kind of case so

23  I'm going to give him a life sentence.

24  My question to you simply is, even if you believe

25  the person is guilty, and if you believe he's going to be a

Page 15

1    continuing threat to society, can you still agree at that

2    point that you'll look at all the evidence again, look for a

3    possible mitigating circumstance.  If it's there and if it's

4    sufficient in your mind to change a death sentence to a life

5    sentence, can you do that?

6         A.   Yes, I think so.

7         Q.   Okay.  Because that's really what we ask you to do.

8    You don't have to be able to come up with a list of things

9    right now.  I know you've already mentioned the mental

10   condition of the defendant as being something that you want

11   to look at.  But what we ask you to do is just be open and

12   take the question seriously.  The problem that some people

13   have frankly is they say, if I really think the man is

14   dangerous, I'm not going to look for mitigating

15   circumstances.  He's going to get death regardless.  Because

16   I'm just not going to take a chance with him.  I hear you

17   saying that even if you get down to that point, you're still

18   willing to take that question seriously, correct?

19        A.   Yes.

20        Q.   When we talk about mitigating circumstances, a lot

21   of people -- a lot of people in the past have mentioned

22   mental retardation or mental illness as a question they want

23   to look at.  Some people have mentioned age as a possible

24   mitigating circumstance.  Some people have said, you know,

25   the younger person is, the better chance there is to

 1   rehabilitate.  On the other end of the scale, I've had some

 2   people say it's never going to be a situation I'm going to

 3   look at.  Then I've kind of had the middle ground where

 4   there's people that say, I'm not sure.  I'd like to see how

 5   it plays into everything else.  And I'd kind of like to look

 6   at the sophistication level of the defendant.  You know, had

 7   he been through the criminal justice system before.  What was

 8   his level of intelligence.  Those sorts of things.  And kind

 9   of play into it.

10          Just in general, can you tell us how you look at age

11   in that context?

12      A.   Well, I've never really thought about it before.  I

13   guess it would play some, but once again -- I'm sorry, I

14   can't give you a definitive answer.  For me, I would think it

15   would be part of the whole package.

16      Q.   Uh-huh.

17      A.   That it wouldn't be one -- the one thing that would

18   sway me over anything else.

19      Q.   Okay.  Same thing goes for, I guess, alcohol and

20   drug use.  I've had people on one extreme to the other say

21   it's a disease.  I've had other people on the other end of

22   the scale say it's a personal choice.  And in the middle

23   there's kind of a camp that says I want to look at the whole

24   package, what's his history.  For instance, I guess you could

25   have a first time user who has no idea how the substances

1  would affect him, versus someone who had used a long period

2  of time, knows exactly how the substances affect him, maybe

3  he's even made statements to people that it makes him violent

4  or wild.

5          Is that a subject that you'd just want to look at

6  the whole context with?  Or what's your general feeling?

7      A.   I probably would have more prejudice when it comes

8  to that because I have very strong feelings on both alcohol

9  and drug abuse.

10     Q.   Kind of tend toward the idea that it is a personal

11 choice?

12     A.   Yes, sir.

13     Q.   I hear you saying as far as mental history, that is

14 something that you'd like to know about; is that correct?

15     A.   Yes.

16     Q.   Okay.  With regards to mental illness or mental

17 retardation, let me go into another subject that people

18 mention that's abuse.  There are people that have told me

19 that they would like to know about that.  Just

20 hypothetically, it's not unheard of in a case such as this

21 one that the defendant would claim that he was the victim of

22 abuse, either sexual abuse or physical abuse, mental abuse as

23 a child.  Part of your job as a juror will be to determine

24 what the facts are in this case.  You'll listen to the

25 witnesses, decide who you want to believe, not believe.  That

1   may be true on the abuse issue also.  You could come to the

2   conclusion, after you hear the evidence, that it just never

3   did occur.  If you do believe it occurred, then you have to

4   make a decision, just how important a factor is it.  When it

5   comes to abuse, those sorts of claims, would you want to know

6   as much about that as possible before you had to determine

7   whether it's possibly mitigating or not?

8        A.   Probably, simply because information can't hurt you,

9   as long as it's true, hopefully.  But I do have to tell you

10   that from a personal standpoint I'm not very tolerant of

11   adults that choose, in my opinion, not to get past some of

12   that.

13        Q.   Uh-huh.  Just in general when it comes to

14   rehabilitation, I sense that you think that again is a choice

15   someone has to make in their life to be rehabilitated; is

16   that correct?

17        A.   That would be correct.

18        Q.   Okay.  Special Issue Number 2.  Go back very

19   quickly.  You recall about the burden of proof.  There is no

20   burden of proof on either party in Special Issue Number 2.

21   And because really we just envision that you'll just take

22   another good objective look at all the evidence.  And again,

23   this is where jurors sometimes say, well, how would there

24   ever be mitigating circumstances in a trial if the defense

25   isn't putting on witnesses or if the defendant is not

1    testifying.  Again, let me give you an example of how that

2    could play in.

3           Perhaps the State calls a witness to talk about some

4    issue.  Maybe through his testimony it comes out that the

5    person was mentally retarded or has been treated for some

6    sort of retardation.  Perhaps the police officer testifies

7    the defendant was crying, sobbing uncontrollably at the scene

8    of the crime, maybe praying for forgiveness immediately.

9    There could be all sorts of things.  The key is you can't

10   require anything of the defendant there either.  You just

11   have to look at the evidence, wherever it came from.

12          Do you think you can do that?

13   A.    I think so.

14   Q.    Okay.  I'll talk to you for a moment about murder

15   and capital murder.  Capital murder is always two things, Ms.

16   Jones.  It's always an intentional murder plus something

17   else.  It could be the intentional murder of a police

18   officer, intentional murder of a child younger than 6 years

19   of age, a number of other things.  In this case we've alleged

20   it's the intentional murder committed during the course of

21   either a robbery or a kidnaping.  That's what makes it a

22   capital murder.  An intentional murder standing by itself is

23   never a death penalty case in the State of Texas.  No matter

24   what the circumstances, it can never result in a death

25   penalty.

DARLINE W. LABAR, OFFICIAL REPORTER

1            The range of punishment for murder in this State is

2    very wide, 5 years in the penitentiary up to 99 years or life

3    in the penitentiary.  Why is it so wide?  Because every

4    single murder case is different, why it's committed, how it's

5    committed, who it's committed against.  They always vary.

6            And secondly, every single defendant is different.

7    They are all unique.  They all have different backgrounds,

8    characters, histories.  Everything is always different.  And

9    I think the legislature envisioned that jurors would sit down

10   very carefully, look at all the facts and circumstances of

11   the case, as well as all the history about the defendant, and

12   then decide just what's the proper sentence for that person

13   in that particular crime.

14           Now, to be qualified, you have to have an open mind

15   to the full range of punishment, be able to truly set a

16   minimum if you think that's the right thing to do, be able to

17   set a maximum if you think that's the right thing to do.

18   I've had some people down here on both ends of the scales to

19   say, intentional murder where it's not an accident, it's not

20   self-defense, it's an intentional murder where you intend to

21   take someone's life.  It's their conscious objective and

22   desire to do that.  I've had jurors say I've never given

23   anything as low as five and I've had some jurors tell me I'm

24   never doing anything as high as life.  They're entitled to

25   their feelings, but again, they're not qualified, because we

1    do want people who can honestly tell us, I will wait until I

2    hear all the facts.  If those facts that day tell me that the

3    right thing to do is 5 years, I'll do it.  If it tells me to

4    do something higher, I'll do that.  If it tells me to do the

5    maximum, I can and will do that, too.

6         I can give you a lot of examples of what might

7    constitute an intentional murder, and we'd be here all day

8    long.  Really, I guess, without even doing that, let me just

9    ask you, do you think that honestly you could wait, consider

10   all the facts, and that you could actually give 5 years if

11   you thought the facts of that particular case called for it?

12        A.   Yes, I would think so.

13        Q.   Okay.  You're not automatically ruling out a 5-year

14   sentence without hearing the facts; is that kind of what I'm

15   hearing?

16        A.   Correct.

17        Q.   I mean, obviously all of this is a very serious

18   matter.  I could ask you right now, what sort of punishment

19   are you going to set against Jedidiah Murphy.  How do you

20   know?  You've heard none of the facts, have you?

21        A.   Correct, I --

22        Q.   Okay.

23        A.   I wouldn't be able to give you a number.

24        Q.   Right.  Okay.  Very briefly, I want to talk to you

25   about a couple of issues.  It goes back to following the

1    law.  I think you've already -- we've already discussed the

2    presumption of innocence.  Can you truly give this man his

3    presumption of innocence and make the State prove its case

4    before you find him guilty?

5        A.    I think so.

6        Q.    Okay.  Is there some hesitation there?

7        A.    Well, it -- it goes back to never having done this

8    before.

9        Q.    Okay.

10       A.    And perhaps too much TV and too much reading of John

11   Grisham.

12       Q.    Okay.  All right.  Well --

13       A.    It's a theory, you know.

14       Q.    Right.  Right.  It's very important.  I mean, I

15   truly expect, and I'm being honest, I expect the jury when I

16   stand up there on opening statement and begin my statement, I

17   expect them to look at this man as he's 100 percent innocent

18   and you make me do my job.  I don't need you to start me

19   ahead by any margin.  I don't need jurors who are saying he's

20   probably a little guilty at the beginning.  Make me do my

21   entire job.

22            Do you think that you could do that in this case?

23       A.    I think so, yes.

24       Q.    Okay.  Secondly, he has a right to remain silent.

25   If he doesn't testify, you're not to consider that.  You're

1    not to think about that for any reason because there can be a

2    hundred different reasons why somebody doesn't testify.   If

3    he doesn't testify, can you truly go back there to the jury

4    room, disregard that, and again look to what I present?   And

5    you make the determination whether or not I presented enough

6    to prove his guilt beyond a reasonable doubt.   Can you do

7    that, too?

8         A.   I think so.

9         Q.   Lastly, and I'll just do this very briefly.   You

10   know, there are rules down here that sometimes people look at

11   as technicalities.   For instance, if a confession is taken

12   and a warning is not given, you're supposed to be able to

13   throw that confession out.   Sometimes jurors think of those

14   as technicalities.   Maybe because I'm here and I've done this

15   a long time, I look at it differently.   It's one of the rules

16   that I know has to be followed in a case like this.   I would

17   expect a jury, even let's say in the Timothy McVeigh case, if

18   that's all they had against Timothy McVeigh where he's killed

19   over a hundred people is his confession and it was no good

20   because the police officer failed to give him a warning, I

21   would expect a jury to be able to throw it out and see him

22   walk out of that courthouse.   It would probably be very

23   difficult to do, but it's what the laws and the Constitution

24   of this country would demand.   And if we let 12 jurors have

25   12 separate sets of rules, it's like anarchy down here.

1          The other thing would be on proof in this case.

2    Believe it or not, I've got to prove that this occurred in

3    Dallas County, Texas.  That may seem like a given, but it's

4    not.  And ever since I began as a prosecutor in 1977, I've

5    understood every single case that I prove has to include

6    that.  And if I fail to prove it, I expect a jury to go back

7    there -- even if I prove everything beyond a shadow of a

8    doubt, I expect a jury to go back and follow the law and say

9    not guilty, watch that man walk out of the courtroom.  They

10   can go upstairs and blame me, my boss, ask that I be fired.

11   I would expect it from a jury.

12          I guess my general question to you is this, do you

13   feel like you are the type of person even if it's a

14   distasteful thing to do, you can honestly follow the law and

15   live up to your oath, render a true verdict according to the

16   law that Judge Entz gives us and the evidence that you find

17   in this case?

18   A.    Yes.

19   Q.    Ms. Jones, I appreciate your time and I appreciate

20   your answers this morning.

21               THE COURT:  Ready to continue, need a stretch

22   break, or --

23               VENIREPERSON:  No.

24               THE COURT:  -- go to the rest room, or

25   continue with Ms. Balido?

1          MS. BALIDO:  Thank you, Judge.

2                    Cross-Examination

3    By Ms. Balido:

4          Q.    Ms. Jones, my name is Jennifer Balido.  And along

5    with Mike Byck, who just left, and Jane Little, we represent

6    Jedidiah Murphy.

7                I'm going to ask you some questions about your

8    answers on your questionnaire and then also about some of the

9    things that you discussed with Mr. Davis.  And if you don't

10   understand any of my questions, please let me know and I'll

11   try to make them more clear.  I tend to talk over myself and

12   confuse people sometimes.

13               Looking first at your questionnaire, you said that

14   the biggest problem with the criminal justice problem is that

15   often events and situations are not clear-cut, but are

16   subject to interpretation.

17               Can you kind of give me a background on where you're

18   coming from on that statement?

19         A.    Well, since I've already said I've never served on a

20   jury, I mean it's not -- doesn't come so much from personal

21   experience, but just from hearsay.  I think it's part of the

22   explanation from before.  There has to be some frustration

23   whether -- whether if you're sitting on a jury and there is a

24   technicality, that you do -- you do follow the law, you do

25   have to follow that.  But I would think that you would have

DARLINE W. LABAR, OFFICIAL REPORTER

1   to be heart sick that that technicality blocked the justice.

2   I guess is the way to put it.

3       Q.   Okay.  So --

4       A.   If that makes any sense.

5       Q.   It does make -- it makes a lot of sense.  So I

6   guess -- let me start off by this way.  Do you think that

7   the District Attorneys Office is ever wrong in their

8   prosecution of cases?

9       A.   I would assume so because it's made up of human

10  beings.

11      Q.   Do you think that they bring cases that they can't

12  prove, or they're leaving it into the hands of the jury?

13      A.   I've never really thought of it in that way.  If

14  they were doing their job correctly, I would think, no.

15  Whether it actually happens it or not --

16      Q.   Okay.

17      A.   -- I don't know and I've never really thought --

18  once again, I guess because they're human beings doing a

19  job.  I mean, they're as libel to make mistakes as anybody.

20      Q.   And you can see kind of the nature of a trial

21  itself.  Basically the State of Texas is saying that Jedidiah

22  Murphy is guilty of capital murder and that he deserves to

23  die by lethal injection.  And obviously, we don't agree with

24  that.  Okay?  So can you kind of see how that kind of

25  concerns me with what you're saying about -- about --

1    A.    Yes.

2    Q.    Okay.  Let's talk over some things and kind of see

3    how this all fits together.  You understand that the State of

4    Texas must prove their case beyond a reasonable doubt?

5    A.    Yes.

6    Q.    And that my client, Mr. Murphy, is presumed innocent

7    until and unless the State can prove its case beyond a

8    reasonable doubt.  You understand that?

9    A.    Yes.

10   Q.    Okay.  And that presumption is so strong that if the

11   State fails to prove just one of its elements, that you must

12   say by your verdict not guilty.  That's what the Judge will

13   instruct you that if they just fail to prove just one, that

14   you must say not guilty.

15   A.    Yes.

16   Q.    Okay.  And that becomes important when we start

17   talking about things like confessions or we start talking

18   about things like technicalities.  Let me just kind of give

19   you a factual example.  Let's say that I'm a fire bug.

20   Okay.  That I love to set fires.  And I hate children, for

21   whatever reason.  And that's not true because I've got two,

22   and even though they drive me crazy sometimes, I still love

23   them and love children very much.  But let's say that I don't

24   love children so I decide I'm going to make my very best fire

25   bomb and I'm going to go bomb a day care center.  I make it

1   up with special ingredients.  I kind of stake out the day

2   care center.  And I throw the bomb in there.  It explodes.

3   It kills all the children and all the caretakers inside the

4   day care center.  Somebody just happens to be going down the

5   street in downtown Dallas, sees me standing outside with a

6   car bomb, pulls out their videotape recorder and videotapes

7   me fire bombing this day care center.  There is absolutely no

8   doubt in your mind as a juror that I'm guilty of that, but

9   the State, for whatever reason, either a lackadaisical

10  attitude or maybe there's just some reason that they can't

11  show you definitively that this day care center was in Dallas

12  County, Texas.  Okay.  You know that I did it.  You watched

13  me on videotape did it.  You watched the carnage as they

14  brought all those kids out there and all those day care

15  workers out there.  And the Judge instructs you that if the

16  State fails to prove Dallas County, State of Texas, that you

17  must by your verdict say not guilty.  So you get back there

18  and sit with your other jurors and all 11 say, you know, to

19  heck with the law, we watched that happen.  You know,

20  somebody says, well, I'm familiar with that area, I know it's

21  Dallas County, Texas.  And you're sitting there, and you know

22  that the State has not proved Dallas County Texas to you.

23  Okay.

24          Could you find him not guilty if the Judge

25  instructed you if the State didn't prove its case as to

1    Dallas County, Texas, you had to find him not guilty?

2         A.   That would be really tough.

3         Q.   I know.

4         A.   I'm not really sure, to tell you the truth.

5         Q.   Okay.  Do you think that you could place your

6    personal feelings aside and follow the law in that case and

7    if the Judge said if they don't prove it, you know, you must

8    find him not guilty, or do you think that your feelings, you

9    know, whatever they are, if it's a technicality or just that

10   you know that he's guilty would cloud that and you would not

11   be able to do that?

12        A.   Once again, I'm not -- I'm not really sure.  I know

13   that I would be torn.  For me, the example that you gave me,

14   I mean, you know, just for me personally whether -- I mean, I

15   know it's the law, but whether it was truly in Dallas County

16   is not as big a technicality to me as, you know -- as

17   something else.  So given that example, I'm not sure I could

18   set my feelings aside.

19        Q.   Okay.  This is one of those situations that we kind

20   of need a yes or no answer.

21        A.   Oh --

22        Q.   And it doesn't -- whatever your answer is, it

23   doesn't make you a bad person or anything else.  It's just

24   one of things that gets caught in people's throat and I've

25   had jurors that said they could do it.  I've had jurors that

1  said they couldn't do it.  I've had juries on my cases say

2  that they -- and throw out cases based on small

3  technicalities like that.  And I've had people that haven't

4  done it.  So you're not alone on anywhere you fall on this

5  issue.

6           But do you think that you could -- that you could

7  say by your verdict not guilty if the State failed to prove

8  beyond a reasonable doubt that the offense occurred in Dallas

9  County, State of Texas?

10  A.    Probably not.

11  Q.    Okay.

12  A.    Not given -- not given those circumstances, no.

13  Q.    Okay.

14           MS. BALIDO:  Judge, I'll pass the venireman.

15           THE COURT:  You may be excused to the hall.

16           (Venireperson excused to hallway.)

17           THE COURT:  Mr. Davis.

18           (State challenge for cause - Ms. Jones)

19           MR. DAVIS:  The State submit the juror for

20  cause.

21           MS. BALIDO:  We agree, Judge.

22           (Defense challenge for cause - Ms. Jones).

23           (Challenge for Cause Granted)

24           THE COURT:  Dual challenge for cause granted.

25           (Recess.)

1          (Venireperson brought into courtroom.)

2          THE COURT:  Good morning, Ms. Smith.  Welcome

3     back.

4          May I ask that you raise your right hand, please.

5          (Venireperson additionally sworn.)

6          VENIREPERSON:  I do.

7          THE COURT:  Thank you.  Lower your hand.

8          Ms. Smith, may I begin by reintroducing those we see

9     seated at the counsel tables.

10         Beginning with the table to the left, we have Chief

11    Prosecutor assigned to this the 194th District Court, the

12    Honorable Mary Miller.

13         Anticipate that she will be joined shortly by

14    co-counsel, Mr. Greg Davis.  Mr. Davis is one of the Senior

15    Prosecutors with the Dallas District Attorneys Office

16    presently.

17         Moving over to the next table, we begin first with

18    the Honorable Jennifer Balido.

19         MS. BALIDO:  Good morning, Ms. Smith.

20         VENIREPERSON:  Good morning.

21         THE COURT:  She's a former Assistant District

22    Attorney, one of the three attorneys representing individual

23    seated next to her, the defendant, Jedidiah, otherwise known

24    as Jim, Isaac Murphy.

25         THE DEFENDANT:  Good morning.

1          THE COURT:  Seated next to Ms. Balido an empty

2    chair with a blue jacket on it, I anticipate it will be

3    occupied before you leave by one of Ms. Balido's

4    co-counsels.  Man's name is Mike Byck.

5          There's a third attorney representing Mr. Murphy who

6    is not with us this morning, presumably working on matters

7    germane to this case outside the courtroom.  Her name is Jane

8    Little.

9          Ms. Smith, if you are ready to begin with the

10   individual questions, I believe the attorneys are as well.

11   Are you ready?

12          VENIREPERSON:  Uh-huh.

13          THE COURT:  All right.  We'll begin with Ms.

14   Miller.

15                    JULIE SMITH

16   was called as a venireperson by the Court and, after having

17   been first duly sworn, was questioned as follows:

18              Voir Dire Examination

19   By Ms. Miller:

20      Q.   Good morning Ms. Smith.  I just want to join in with

21   what the Judge said about there are no right or wrong answers

22   as long as you tell us what your true feelings and opinions

23   are regarding the areas that we're going to question you

24   about.  If you don't understand something that I ask you,

25   just let me know and I'll try to rephrase it.

1           The other thing I'm going to ask is if you can pull

2    that microphone around towards the front of you, because they

3    have to -- the court reporter has to take down everything

4    that you say.  And so you can't just nod your head.  You have

5    to answer yes or no, also.  Okay?

6       A.   Okay.

7       Q.   Now, Ms. Smith, when you were first brought up on

8    the panel of about 60 people and the Judge introduced the

9    defendant, Jedidiah Isaac Murphy, to you and said that this

10   was a capital murder case and that the State was seeking the

11   death penalty, do you remember what the first thing that went

12   through your mind was, what your first impression was?

13      A.   I was scared really.

14      Q.   You were scared?

15      A.   Uh-huh.

16      Q.   Why were you scared, Ms. Smith?

17      A.   I don't know.  Just the idea of murder, you know, it

18   just scared me.  I don't know.

19      Q.   Now, you have never been on a jury before; is that

20   right?

21      A.   No.

22      Q.   Okay.  Have you ever been called down for jury duty

23   before?

24      A.   Yes, once, but I had a 4-year-old son so I couldn't

25   attend.  So this will be my first time ever, you know, going

---

DARLINE W. LABAR, OFFICIAL REPORTER

1    all the way with it.

2        Q.    Now, when you filled out your questionnaire, Ms.

3    Smith, I noticed that you were in fact in favor of the death

4    penalty.

5        A.    Yes.

6        Q.    Can you tell me why you're in favor of the death

7    penalty?

8        A.    Well, I think if it's necessary -- I think, you

9    know, I'm in favor of it.  Like if someone take someone else

10   life, you know, I think, well, they deserve for their life to

11   be taken too, because they took someone else's life, unless

12   it was an accident or something like that, so I believe in

13   the death penalty.

14       Q.    Okay.  Well, and, Ms. Smith, a lot of people say the

15   same thing that you do, that they believe in it, but when it

16   comes to actually participating in it themselves, they say,

17   look, even though I believe in it in the abstract, I don't

18   know that I could personally participate in it.

19       A.    Uh-huh.

20       Q.    Let somebody else do that.  I could not do it.  How

21   do you feel?  Do you think that you could personally

22   participate and answer the questions such that the Judge

23   would require -- the Judge would be required to sentence the

24   defendant to death?

25       A.    Well, it's hard to say.  I really don't know.  If I

1    had all the facts and stuff, you know, I really don't know.

2    I can't say.

3         Q.   Let's look at Special Issue Number 1 over here, Ms.

4    Smith.  You said that as long as it's not an accident.

5         A.   Uh-huh.

6         Q.   That someone should basically give up their life,

7    also, if they take someone's -- someone else's life.  When

8    you look at Special Issue Number 1, whether there is a

9    probability that the defendant would commit criminal acts of

10   violence that would constitute a continuing threat to

11   society.  As the Judge said, a lot of times we call that the

12   future dangerousness question.

13        A.   Uh-huh.

14        Q.   And a lot of people say, Ms. Smith, when they're

15   looking at that, if I found that somebody intentionally took

16   someone else's life, to me that's enough that I'm going to

17   say that they're a future danger.  And I see you shaking --

18        A.   Yes, that's what I'm -- yes.

19        Q.   So the mere fact alone that you found the defendant

20   guilty of taking someone's life, as long as it was not an

21   accident, you would say they're going to be a future danger?

22        A.   Yes.

23        Q.   Okay.  Ms. Smith, and that's all we needed to know.

24   We appreciate that.

25             MS. MILLER:  And, Judge, we have an agreement.

1                    MS. BALIDO:  Yes, Judge.

2                    (Ms. Smith Excused From Consideration)

3                    THE COURT:  Thank you, Ms. Smith.  You are

4    excused.

5                    VENIREPERSON:  Thank you.

6                    (Venireperson excused from courtroom.)

7                    (Venireperson brought into courtroom.)

8                    THE COURT:  Please be seated.  Good morning,

9    Mr. Ferrell.

10                   VENIREPERSON:  Good morning.

11                   THE COURT:  Ask you to raise your right hand,

12   please.

13                   (Venireperson additionally sworn.)

14                   VENIREPERSON:  I will.

15                   THE COURT:  Thank you.  Lower your hand, sir.

16         Mr. Ferrell, let me begin, if I may, by

17   reintroducing those we seated before us.

18              Beginning at the far left, we begin with the lead

19   prosecutor for the State.

20                   MR. DAVIS:  Good morning.

21                   THE COURT:  A Senior Prosecutor in the Dallas

22   District Attorneys Office, the Honorable Greg Davis.

23                   MR. DAVIS:  Good morning.

24                   VENIREPERSON:  Good morning.

25                   THE COURT:  Seated next to him is co-counsel,

1   presently serving as the Chief Prosecutor assigned to this
2   the 194th District Court, the Honorable Mary Miller.
3                MS. MILLER:  Good morning.
4                THE COURT:  Moving on to the next table, we
5   begin first with one of the three defense attorneys, a former
6   Assistant District Attorney, the Honorable Jennifer Balido.
7                MS. BALIDO:  Good morning.
8                VENIREPERSON:  Good morning.
9                THE COURT:  Seated next to Ms. Balido is the
10  accused, the defendant, Jedidiah, otherwise known as Jim,
11  Isaac Murphy.
12               THE DEFENDANT:  Good morning.
13               THE COURT:  The vacant seat with the blue
14  jacket on it, anticipate will be occupied shortly by one of
15  the defense attorneys, a board certified criminal law
16  specialist, Mr. Michael Byck.
17       Third defense attorney is not with us this morning,
18  handling matters germane to the case outside the courthouse.
19  Her name is Jane Little.
20       Mr. Ferrell, if you're ready to begin with the
21  individual questioning, I believe the attorneys and the Court
22  are as well.
23               VENIREPERSON:  All right.
24               THE COURT:  Are you ready?
25               VENIREPERSON:  Yes.

1          THE COURT:  We'll begin with the State, Mr.

2   Davis.

3          MR. DAVIS:  Thank you.  May it please the

4   Court.

5                RICHARD FERRELL

6   was called as a venireperson by the Court and, after having

7   been first duly sworn, was questioned as follows:

8                Voir Dire Examination

9   By Mr. Davis:

10     Q.   Good morning, Mr. Ferrell.  How are you?

11     A.   Fine.

12     Q.   Good.  Mr. Ferrell, for the next few minutes I'm

13  going to talk to you about some of the issues involved in

14  this case.  We'll talk about the death penalty in a little

15  greater detail.  We'll talk about your questionnaire.  Talk

16  about some general principles.  I'll be asking a lot of

17  questions that deal with how you feel about an issue, what

18  you're opinions are.  I'll also be talking to you about what

19  the law is in this case.

20          The reason we'll do that is because we're trying to

21  determine if you're qualified to sit on this jury.  And a lot

22  of that deals with whether you're able to follow the law in

23  this case.  As we go through, you'll see I'm going to set up

24  some examples for you that may bring your feelings into

25  conflict with the law quite frankly.  And the reason again

1    I'm going to do that is I'm going to test you, if you will,

2    under extreme circumstances to determine whether you can

3    follow the law even if it may leave a bad feeling with you.

4    But we'll go through that as the morning progresses here.

5            Mr. Ferrell, if you would, just tell me how do you

6    personally feel about possibly serving on this type of jury

7    where the State is actively seeking the death penalty and

8    where on punishment I will be asking you to answer these

9    special issues in such a way that Judge Entz will be required

10   by law to impose a sentence of death on this man down here?

11       A.   How do I feel about it?

12       Q.   Yes, sir.

13       A.   Well, I'm -- I feel civically responsible in serving

14   in that regard.

15       Q.   Okay.  You know, and a lot of people tell me that.

16   People tell me it's not something I choose to do, but I see

17   that I have a duty to participate down here.

18       A.   That would be my response.  I wouldn't volunteer to

19   do it, but I'm happy to do it.

20       Q.   Okay.  Fair enough.  I want to -- I want to start

21   off with you, go through some of the general principles that

22   are going to apply in this case.  These general principles

23   are important because they're set up to ensure that every

24   single defendant in this country receives a fair trial.

25            And first one is presumption of innocence.  As he

1    sits here now, Jedidiah Murphy is presumed innocent of this

2    offense.  He doesn't have to prove a single thing.  He's

3    presumed innocent until the State proves his guilt beyond a

4    reasonable doubt.  Now, we differ from other countries in

5    this world.  You know, there are countries like communist

6    China, etcetera, a lot of tyrannies around the world that

7    presume people to be guilty and they have to come into a

8    courtroom and somehow try to prove their innocence.  We've

9    never been that way in this country.  The State always has

10   the burden of proof in a criminal case.  Defendants have to

11   do nothing.

12        As he sits here right now, can you truly presume

13   that Jedidiah Murphy is innocent and make the State of Texas

14   prove his guilt beyond a reasonable doubt?

15        A.   Yes.

16        Q.   Okay.  Sometimes jurors say, well, you know,

17   obviously some things have happened so maybe he's a little

18   bit guilty.  We don't ask you to put your common sense

19   aside.  Obviously, he's been arrested and charged and

20   indicted for capital murder, but I truly expect when I stand

21   up on opening argument in this case that for jurors to truly

22   look at this man as though he is presumed innocent and make

23   me prove my case a hundred percent before they find him

24   guilty.

25        Secondly, he has the right to remain silent.  No one

Page 41

1   can force a defendant to testify against himself.  And again,

2   that's not true in other countries around the world.  But in

3   this country defendants have the right to remain silent.  And

4   again, it goes back to the old adage that the State has to

5   prove the case against him.  He doesn't have to prove

6   anything to prove his innocence.  If he doesn't testify in

7   this case, the Judge will instruct you that you cannot

8   consider that for any reason, you cannot find that to be any

9   evidence of guilt against him.

10          Can you assure all us that if Mr. Murphy doesn't

11  testify, that you will not hold that against him or consider

12  it in this case?

13          A.    Yes.

14          Q.    Thirdly, when it goes to proof beyond a reasonable

15  doubt.  The indictment in this case tells the State what it

16  has to prove.  I know exactly what's on that indictment

17  because I'm going to tell you right now, I drafted it myself,

18  so I know what's required.  Among other things in this case,

19  I have to prove that the offense occurred in Dallas County,

20  Texas.

21          Now, here is the going to be the first time we'll

22  set up an example or you.  I'm going to tell you, I'm going

23  to give you two examples and they're both going to be very

24  extreme.  And they're extreme for a reason again because

25  they're really going to see how you'll perform, if you will,

DARLINE W. LABAR, OFFICIAL REPORTER

1  under very extreme circumstances.

2          I want you to assume -- and I'm going to use myself,

3  I wouldn't want to make anybody else the bad guy in this

4  scenario, so let's assume that I love bombs and I hate

5  children.  Okay.  I wake up one morning.  I go out to my

6  garage, and I make a bomb.  And I then take it up to the

7  nearest child care facility.  I place the bomb.  I detonate

8  it, and it kills a hundred children.  The police arrest me.

9  They build case against me, and it's a very, very strong case

10  because I've left my fingerprints at the scene.  Matter of

11  fact I've been videotaped actually doing the crime.  I'm

12  brought to trial.  The videotape is shown to the jury.  The

13  fingerprints, maybe there's DNA left at the scene.  I mean,

14  it's an airtight case against me, except for one thing.  The

15  State didn't prove that that child care facility was in

16  Dallas County, Texas.  And that is one of the things that has

17  to be proven in every criminal case in Dallas County.  I know

18  that.  I mean, I know that that is not a mere technicality.

19  I know that it's something that has to be proven beyond a

20  reasonable doubt.  But in my case, for whatever reason, that

21  wasn't proven against me.

22          Now, the law is going to be this.  The Judge would

23  instruct you that if the State failed to prove that the

24  offense happened in Dallas County, Texas, your oath as a

25  juror would require that you find me not guilty.  Again, some

1   people view that as a technicality or some sort of silly

2   business.  I don't because I know it's one of those legal

3   requirements.

4           You go back to the jury room.  You've got 11 other

5   citizens that are yelling at you, hey, Mr. Ferrell, forget

6   that, we all know he did it, we're not going to put our

7   common sense aside, we're not about to let this dangerous man

8   go free again.  He can never be tried again because of double

9   jeopardy, etcetera, etcetera, etcetera.  Well, the conflict,

10  you know, is going to be I'm sure it would be a very

11  difficult thing to do to watch me walk out of the courthouse

12  free and maybe even go to the next child care center down the

13  street.  The law says you have to do it.

14          The question simply put is:  Under those extreme

15  circumstances, can you still follow the law and make the

16  State of Texas prove every single element of its case,

17  including the County?  Can you do that?

18      A.   Yes, sir.

19      Q.   Okay.  The second example, same sort of scenario --

20               THE COURT:  You're really going to like this

21  one.

22      Q.   (By Mr. Davis)  Same fire bombing, everything is the

23  same, except this time there is no evidence against me.

24  There is no physical evidence.  No videotape.  I get away

25  scot-free for a period of time.  A couple of days later I

DARLINE W. LABAR, OFFICIAL REPORTER

1    wander into the police department because, hey, I'm going to

2    tell the whole world what I got away with.  And so I demand

3    to see a detective so I can tell him what I've done.  He sits

4    down with me.  He starts to give me my Miranda warnings which

5    you're probably familiar with.  He gets called away in the

6    middle of the interview, and he forgets to finish it.  Maybe

7    let's say he forgot to tell me that I have a right to

8    terminate the interview at any time.  That's one of the

9    statutory warnings that has to be given.  That he got called

10   away and when he got back, he just forgot to give me the

11   warning.  He starts to take the statement from me.  And he

12   finishes the statement.  I'm charged with the crime.  I'm

13   brought to trial.

14        Well, the only evidence the State has this time is

15   my statement.  It's read into evidence.  When you hear the

16   statement, you've got no doubt at all that it is accurate 100

17   percent and that I am the man who set the bomb off.  But the

18   detective very honestly says he forgot to give that last

19   statutory warning.

20        Now, there is no evidence that I ever wanted to

21   terminate the interview.  In fact, I wouldn't have.  I wanted

22   to tell my side.  I was proud of what I did.  But he forgot

23   to give me one of those warnings.  Go back to the jury room.

24   The Judge now instructs you, the State has to prove beyond a

25   reasonable doubt that every warning was given before that

1    statement can be considered as evidence.  Obviously, not all

2    the warnings were given.  The statement was illegally

3    obtained because of that reason.  Your duty as a juror would

4    be to disregard the statement, except obviously the problem

5    is, if do you that in my case, there is no evidence left of

6    my guilt and I go free again to walk out on the streets.

7    It's the same kind of dilemma I suppose.

8         Do you follow the law, even though it may result in

9    a dangerous man going free, or do you go with the mob and

10   with your feelings perhaps and say I don't care what the law

11   says, I'm not going to let the guy go free.

12        What do you do, Mr. Ferrell?

13   A.    I would let him go.  I'd follow the law.

14   Q.    You'd follow the law?

15             THE COURT:  You'd let him go?

16             VENIREPERSON:  If that's the law and I've been

17   instructed by the Judge to consider that law, that's how I

18   feel.

19             THE COURT:  Okay.

20   Q.    (By Mr. Davis)  Well, I want you to relax to some

21   extent because that's the hardest example I've got in my

22   trick bag there.

23        Let me just -- let me talk to you for a moment now

24   about murder and capital murder.  Capital murder is always

25   two things.  It's always an intentional murder plus something

DARLINE W. LABAR, OFFICIAL REPORTER

1    else.  If you just have an intentional murder standing by

2    itself, it's never a death penalty case in the State of

3    Texas.  No matter how horrendous it may be, it's never a

4    death penalty case.

5         Now, we could come up with a lot of examples.  You

6    know.  If I turn over here and I shoot a man ten times in the

7    head just because I don't like the color of his tie, I intend

8    to kill him, it's not an accident, it's not self-defense, I'm

9    not legally insane.  It's an intentional act, clearly.  I

10   can't get death for that.

11        Now, for an intentional murder, the law prescribes a

12   very wide range of punishment, 5 years in the penitentiary up

13   to 99 years or life in the penitentiary is what a jury can

14   assess in a murder case.  Why is the range so wide?  Because

15   first of all, I can tell from you experience, every murder

16   case, the facts and circumstances are different, on why it

17   was committed, who it was committed against, how it was

18   committed.  They always vary.

19        And secondly, every single defendant is unique.  I

20   mean, they all have different background, character,

21   personality.  Everything is different about them.  And I

22   think the law envisions that you take all of those facts and

23   circumstances and all of the character traits of a defendant

24   into account before you set punishment.  You see, you could

25   have an intentional murder case like this over here where you

1    may want to throw the book at me.  Maybe I've got a long

2    criminal history to back this up and maybe I've done this

3    before.  And you say life is what that man deserves.

4           I can give you another example.  Let's say that I'm

5    a businessman.  I come home one day.  I find my 14-year-old

6    daughter, and she's unconscious on the bed.  I can't wake

7    her.  I take her to the hospital.  Doctor says she's got

8    brain damage, permanent brain damage, because someone has now

9    given her crack cocaine.  Well, I do some investigating.  I

10   find the neighbor up the street is the one that's been

11   selling the dope to her.  I see other kids going in and out

12   of that house.  And I'm not about to let another child or

13   another parent have to go through that.  And so I walk up

14   there a couple of days later and I put a gun to his head and

15   I kill him.  I've never committed an offense in my life.  I'm

16   a model citizen, deacon in my church, etcetera.

17          Can you see how you may want to judge me a bit

18   differently than you do this situation over here?  And it

19   just really goes to illustrate that it's hard to envision

20   every set of circumstance that might constitute an

21   intentional murder.

22          The question is this, to be a qualified juror, you

23   have to have an open mind to the full range of punishment.

24   You have to be truly be able to say if you heard a murder

25   case, an intentional murder case, and you thought the facts

1   of that particular case and that defendant called for the

2   minimum of 5 years in the penitentiary, that you could and

3   you would assess that if you thought that was the right thing

4   to do?  All the way up to the maximum of life if you thought

5   that was the right thing to do.

6           Tell you right now, some people have a problem.

7   Some people say I don't care what facts you show me, you're

8   never going to show me an intentional murder case for a

9   defendant who deserves something as little as 5 years for an

10  intentional murder.  No way.  I'm going to automatically cut

11  that part of the range of punishment off.  I'm not going to

12  consider it.  I don't care what the law prescribes.

13          My question to you is, are you really going to be

14  able to consider the full range of punishment and give as

15  little as 5 years if you thought that case really called for

16  it?

17      A.   Yes, I could do that.

18      Q.   I want to turn your attention now, Mr. Ferrell, to

19  these special issues here.  Remembering that before you get

20  to them, you've already found the defendant guilty of capital

21  murder.

22      A.   Okay.

23      Q.   Anything less than that we go to another system.

24  Not guilty, we all go home.  Murder, you set a punishment

25  within the range of punishment.  But if you find someone

1    guilty, we go through the punishment phase.  You hear

2    evidence concerning the defendant's background, his

3    character, those sorts of things.  Then you consider these

4    special issues.

5           Special Issue Number 1 is presumed to be answered no

6    at the beginning.  It's a bit like the presumption of

7    innocence.  Even though a number of things have already

8    occurred, when we start this trial this man is presumed

9    innocent until I prove his guilt beyond a reasonable doubt.

10          Special Issue Number 1, even though you found him

11   guilty of capital murder, it's still presumed to be answered

12   no.  Why is that?  Well, I submit to you, the guilty verdict

13   is only --

14      A.   May I pause and read --

15      Q.   Yes, sir.  Yeah, go ahead and read both of them

16   because I'll be talking about both of them.  Yes, sir.

17      A.   Okay.

18               (Venireperson reads special issues.)

19               VENIREPERSON:  Okay, I'm ready.

20      Q.   (By Mr. Davis)  Let me -- let me just remind you

21   again, still presumed to be answered no, even though you

22   found him guilty because --

23               THE COURT:  Special Issue Number 1 he's

24   talking about.

25      Q.   (By Mr. Davis)  Right.  The guilty verdict really is

DARLINE W. LABAR, OFFICIAL REPORTER

1    only half the story.  Because at the punishment phase you

2    still may hear a lot of different types of evidence.  If he

3    has a good background, if he has good character witnesses,

4    there's an opportunity for you to hear that.  If he has a

5    criminal history of some sort, the State has an opportunity

6    to present that to you, also.

7         Here is the problem that some people have.  Some

8    people tell us anyone that commits a capital murder, anyone

9    who intentionally kills during the course of a robbery or

10   kidnaping, that person in their mind will always be a

11   continuing threat regardless of anything else they hear.  The

12   guilty verdict is always going to be enough to say continuing

13   threat to society.

14        Now, they're entitled to that belief, but that's not

15   the way the law asks you to look at that question.  The law

16   really asks you to look differently, to say even if you find

17   someone guilty, you still presume that they're not a threat

18   to society until you look at all of the evidence produced,

19   then you ask yourself this question, has the State produced

20   enough evidence to persuade me beyond a reasonable doubt that

21   person really will be a continuing threat to society.

22        Question for you is this, can you hold the State of

23   Texas to its burden of proof?  Can you wait and look at all

24   of the evidence before you decide how you're going to answer

25   Special Issue Number 1?

1    A.   Yes, I can do that.

2    Q.   Okay.  Here's one of the problems that some people

3  have.  Some people will say, well, I'm open to the idea that

4  that question can be answered no, but I'm going to require

5  something of the defendant to get me to a no.  You can't do

6  that.  Two reasons.  They never have a burden of proof here,

7  do they?  You can never ever require the defendant to give

8  you anything in this case.  You always have to require the

9  proof to come from the State.

10         THE COURT:  True in all criminal cases, Mr.

11  Ferrell, not just capital cases.

12    Q.   (By Mr. Davis)  In this case, too, you remember that

13  the question is already starting with the presumption of no,

14  so they don't have to do anything to switch it to a no.  It's

15  starting there until I push that bar high enough to get it to

16  a yes.  So are you going to require anything of the defense

17  on Special Issue Number 1?

18    A.   No.

19    Q.   Let's talk about some of these words.  They don't

20  have legal definitions.  That's why we'll discuss the

21  meanings with you a little bit.  Probability is the first

22  word I want to look at with you.  The legislature had a

23  choice here.  They could have given us a lot of other words

24  to work with.  They could have lowered the bar for the State,

25  to the point where all I have to prove is that there is a

1  chance or a mere possibility.  That bar is higher than that.

2  Probability at least in my mind, perhaps in yours, means

3  something more than just a possibility or a chance.  It means

4  a likelihood to me.

5      A.    Uh-huh.

6      Q.    Sometimes we discuss with jurors a sliding scale of

7  zero to a hundred, zero being the very slightest chance of an

8  occurrence, a hundred percent being an absolute certainty.

9  Sometimes we ask jurors to place probability on that sliding

10  scale.  I kind of think about it like a majority/minority.

11  Majority of a hundred people has to be at least 51.  Anything

12  less and it's just even.  Anything less than 50 is a

13  minority.

14          Can you agree with me, or do you agree that

15  probability on that scale sliding scale at the very minimum

16  has to be at least 51 percent?

17      A.    Yes.

18      Q.    You're free to move it up higher.  I've had some

19  jurors say my comfort level is going to make me in this kind

20  of case move it higher, but at least 51 percent.

21      A.    I think the word means at least 51 percent.

22      Q.    Okay.  Criminal acts of violence.  A lot of people

23  tell me that's something directed against another person,

24  where they're either physically harmed in some way or at

25  least threatened with physical harm.  It's not just a

1   property offense where no one is really put at risk.

2            Do you see that distinction, also?

3       A.   I'm sorry.  Would you repeat that, also?

4       Q.   The distinction being on criminal acts of violence

5   that it's something directed against a person as opposed to

6   maybe like -- oh, I go out this afternoon to steal a radio.

7   I go into an old abandoned home.  Nobody has ever been there,

8   and I steal a radio.  Do you see that distinction, too?

9       A.   Yes.

10      Q.   Society can mean everybody -- people like you and I

11  who live in the free world.  It could mean people in a prison

12  since a life sentence means somebody is going to spend at

13  least 40 years in the penitentiary.  Can you see that --

14            THE COURT:  Wrongs --

15      Q.   (By Mr. Davis)  Can you see that both segments can

16  be a part of a defendant's society, prison and free world?

17      A.   Can I see that?

18      Q.   Yes.

19      A.   I wouldn't have expected that to mean that, but if

20  you tell me that that's it means.

21      Q.   Well, think of it this way.  This may help you a

22  little bit.  This is the way I look at it.

23            It's anywhere the defendant may find himself.

24      A.   Okay.

25      Q.   It's anyone he may come in contact with.  In the

1    context of the sentencing scheme for capital murder, can you

2    see how that may include other inmates, guards, or other

3    nurses, or other individuals that may find themselves --

4        A.    Yes.

5        Q.    Any questions on Special Issue Number 1?

6        A.    I don't believe so.

7        Q.    Okay.  Number 2 is really the safety net question.

8    It's the last chance.  When you get down to Special Issue

9    Number 2, you're really two-thirds of the way to a death

10   sentence.  You've already found him guilty.  You've already

11   determined that he's going to constitute a continuing threat

12   to society.  If you've answered Special Issue Number 1 no, he

13   gets an automatic life sentence.  That stops the process.

14   Number 2, here's what the law asks you to do.  The law asks

15   you essentially to forget how you voted on guilt.  Forget how

16   you answered Special Issue Number 1.  And just agree.  Take

17   one more look at all of the evidence in this case, and

18   determine for yourself is there something that is mitigating

19   enough in your mind where a death sentence should be changed

20   to a life sentence.  That's really the process we ask you to

21   go through.

22            And you know what that is, that's up to you.  It

23   could be anything that you decide is important enough to

24   change a death sentence to a life sentence, but at the very

25   minimum we ask you to be willing to take Special Issue Number

1    2 seriously.  Even if you think he's a danger, look for

2    possible mitigating circumstances.  And if they're there, you

3    act upon them accordingly.  If they're not there, you answer

4    the question no, even if it's a death sentence.  Again, the

5    problem have had in the past is this, some people say if they

6    find someone was truly dangerous, they're never going to take

7    a chance with them again.  They're not going to look for

8    mitigating circumstances because they're going to make sure

9    that he gets a death sentence regardless of the mitigating

10   circumstances available.  Again, they're free to think that

11   way, but they're not free to be on this jury because we

12   expect jurors to take Number 2 seriously.

13          Let me kind of back up and tell you how we got

14   Special Issue Number 2, and this may help you a little bit.

15   We got Special Issue Number 2 because of a case involving a

16   person by the name of John Paul Penry.  And Mr. Penry

17   committed a horrible crime down in Southeast, Texas.  He

18   raped and murdered a woman down there.  He was brought to

19   trial, death penalty case, the jury did not have Special

20   Issue Number 2 available to them.  Mr. Penry alleged in his

21   trial that he was severely mentally retarded.  That was his

22   claim.  He was given the death penalty.  The courts decided

23   that the jury should have had a question like Number 2 to

24   look at so they could consider things like mental

25   retardation.  So now we have Special Issue Number 2

DARLINE W. LABAR, OFFICIAL REPORTER

1    available, just for that reason.

2            Now, it could be mental retardation.  It could be

3    any number of other factors that some jurors tell me, you

4    know, if the person had been severely abused all their

5    childhood, if that could be proven, that's might be something

6    that they would want to take into account.  You know,

7    obviously retardation -- if a man is 40 years old, but he's

8    acting like a 4 or 5-year-old.  I've had some people tell me,

9    I don't care if he's dangerous or not, there is no way in

10   good conscience that I could sentence a man to death who's

11   functioning as the level of 4 or 5-year-old.  So you can see

12   the circumstances.

13           The question I need to know, that I need to ask you

14   is, do you really think that you could keep an open mind and

15   look for mitigating circumstances, even if you thought he was

16   a dangerous individual?

17       A.   I think I could.

18       Q.   Okay.  And again, they may be retardation.  They may

19   be severe abuse.  There can be any number of things.  The

20   thing that I would remind you as a juror, you are the fact

21   finder.  It's not uncommon in a case such as this for

22   evidence to be presented concerning some of these claims.

23   You have to determine if they're true or not.

24           One other thing to remember on Special Issue Number

25   2.  There is no burden of proof on either side there.  Most

1    importantly, the defense doesn't have to show you anything to

2    be mitigating.  And that somehow -- sometimes it creates a

3    difficulty because I've had jurors say, well, how in the

4    world or why would the State ever bring me mitigating

5    circumstances to consider.  Well, that evidence can come from

6    any source.

7            Let's say I called a police officer to testify about

8    the arrest of the individual and in the course of his

9    testimony, he tells the jury that the defendant was down on

10   his hands and knees begging for forgiveness or crying over

11   the body when he arrested him.  You might want to consider

12   that.  Or maybe another witness for the State brings out the

13   fact that the person was mentally retarded.  Again, you can

14   never require the defendant to bring you anything on these

15   special issues.  Just be willing to say, if it's there, no

16   matter where it came from, I'll look at it, seriously

17   consider it, and then I'll act accordingly.  Can you do that?

18       A.   Yes, sir.

19       Q.   Okay.  Briefly, one of your -- one of your duties

20   will be to judge the credibility of witnesses.  That would

21   mean to start everyone off equally.  Sometimes jurors have a

22   problem with police officers because they say police officers

23   are infallible.  I mean, they never make mistakes.  They

24   never tell a lie.  I'm always going to believe a police

25   officer regardless.  Really, what the law asks you to do is

1    to wait until you hear everyone who testifies.  If they're a

2    police officer, a ditch digger, it doesn't matter.  Just wait

3    until you listen to them.  Does it make sense?  Does their

4    testimony, is it corroborated by other bits of evidence?

5            Do you feel like you could do that?

6        A.   Oh, yes, uh-huh.

7        Q.   Finally, sometimes we ask jurors, you know, the

8    sentencing scheme here in Texas says that a life sentence

9    with a 40-year incarceration without the possibility of

10   parole, that that's one of the options in a capital murder

11   case.

12           Do you think in general that that's a viable option

13   for some capital murder cases, or do you think that every

14   single murder case automatically should go to the death

15   penalty?

16       A.   No, I don't believe that.  I think that's an option.

17       Q.   Lastly, I'm not permitted to go over the individual

18   facts with you in the case, because we don't want you to sit

19   there and, you know, tell us how you would vote necessarily.

20   But I am entitled to go over one fact with you, and I want to

21   do this in particular with you, because I see that your

22   mother is 80 years old, correct?

23       A.   Yes, uh-huh.

24       Q.   Okay.  I want you to assume that the victim in this

25   case was 80 years old, Ms. Bertie Cunningham was 80 years old

Page 59

```
 1     at the time of her death.  One of the premises down here is

 2     we want jurors who will base their verdict on the evidence,

 3     not on their emotion or sympathy or outrage.  Particularly

 4     we're talking about guilt/innocence here.  The fear would be

 5     that if you heard the victim was 80 years old that regardless

 6     of what the evidence showed, you'd rush to find this man

 7     guilty or rush to give him a death penalty.  We would hope

 8     that you would remain fair and impartial and base your

 9     verdict on the evidence.

10          Could you do that in this case?

11     A.   Yes.

12     Q.   Mr. Ferrell, do you have any questions for me, sir?

13     A.   I don't believe I do.

14     Q.   I appreciate your time and your answers.

15               THE COURT:  Mr. Ferrell, need a stretch break,

16     go to the men's room, or do you wish to continue?

17               VENIREPERSON:  I'm fine.

18               THE COURT:  All right.  See two people who you

19     least respect, one Senator Daschle.  Can I trade you Iowa, my

20     home state, for his state South Dakota?  I don't think we

21     good Iowans would --

22               VENIREPERSON:  I'd add Senator Jeffords to

23     that this week.

24               THE COURT:  Several of us in this room would

25     as well.
```

1          Ms. Balido, you may begin.

2                    MS. BALIDO:  Thank you, Judge.

3                          Cross-Examination

4     By Ms. Balido:

5          Q.   Mr. Ferrell, as the Judge told you, my name is

6     Jennifer Balido.  Along with Mike Byck and Jane Little, who

7     aren't with us right now, we represent Jedidiah Isaac

8     Murphy.  Some of his family and friends call him Jim.

9                I'm going to ask you some questions in regard to

10    some of your answers that you gave Mr. Davis and also about

11    some of your answers on this questionnaire.  If I don't make

12    myself clear, please let me know and I'll try --

13         A.   Okay.

14         Q.   -- make myself more clear.

15               On your questionnaire you first started out and you

16    said that you were in favor of the death penalty, correct?

17    And then you said --

18                    THE COURT:  You have to answer yes or no.

19                    VENIREPERSON:  Yes, I'm sorry.

20                    THE COURT:  We saw you nod your head, but she

21    needs to take it.

22                    VENIREPERSON:  Yes.

23         Q.   (By Ms. Balido)  And then you said that I believe it

24    represents a deterrent to crimes of this nature.  I have no

25    value or faith reasons not to render it.

1          Can you tell me kind of the background of that

2     statement?

3          A.   The first part with respect to deterrence?

4          Q.   Uh-huh.

5          A.   That's just a belief based on observation of life.

6     I think that it does deter.  I think punishment is a

7     deterrent, not universally, but I think absent it, I think

8     we'd see more murder.

9          Q.   Okay.  And what about that you have no value or

10    faith reason not to render it?

11         A.   I know that some people do.

12         Q.   Okay.

13         A.   I personally am not conflicted in my personal faith

14    in rendering that decision.

15         Q.   Okay.  Would that mean that you are leaning towards

16    the death penalty in a capital murder case or just kind of

17    leaning neutral or --

18         A.   I'm not leaning.  I think I am neutral.  I

19    understand -- I am gaining understanding under what

20    circumstances it can be applied and should be, per the law.

21         Q.   Okay.

22         A.   I had none before I came in here the last time, but

23    I have no bias opinion in either direction.

24         Q.   Okay.  And then we also ask the question what's the

25    best argument in opposition of the death penalty, and you

DARLINE W. LABAR, OFFICIAL REPORTER

1    said that you couldn't offer one or couldn't offer it.  After

2    learning more about it, do you think there's any argument

3    against the death penalty?

4        A.   I am still in favor of it in a society.

5        Q.   Okay.  Let me ask you also about your feelings about

6    the criminal justice system and also about the way that the

7    death penalty is applied in the State of Texas.  You said

8    that you have confidence in our government, its servants and

9    their integrity, and the very sober and serious that all seem

10   to address themselves when conducting it.

11            Is that still your opinion?

12       A.   Yes.

13       Q.   Have you ever heard of the various, I guess

14   notorious cases coming out of Dallas County like the Randall

15   Dale Adams case where Dallas County convicted a man of

16   killing a police officer and then it was reversed on a writ

17   of habeas corpus based on prosecutorial misconduct?

18       A.   Are you asking me if I've heard of that case?

19       Q.   Have you heard of that case?

20       A.   No.

21       Q.   Okay.  Or the Linell Jeter case where someone was

22   later found to be not guilty by a --

23       A.   I don't have a present memory of either of those

24   cases, no.

25       Q.   Okay.  Does that change your opinion or your

1    confidence in the governmental officials in Dallas County and

2    the way that they conduct business?

3        A.    Not at all.

4        Q.    Let me also ask you, you said that you had some

5    acquaintances who were basically convicted of the S&L scandal

6    and fraud; is that correct?

7        A.    Yes.

8        Q.    Did any of those people -- were any of those people

9    represented by Bill Hill, the sitting District Attorney, who

10   basically made his living representing those types of

11   defendants?

12       A.    I wouldn't know.

13       Q.    Okay.  Let me go ahead and ask you some questions

14   specifically about the issues in this case.  You understand

15   that Mr. Murphy sits here, and as he sits here, he's presumed

16   to be innocent?

17       A.    Yes.

18       Q.    Okay.  And before a jury can find someone guilty of

19   capital murder, the State must prove to you and each and

20   every member beyond a reasonable doubt that he is in fact

21   guilty.  They must prove each and every element of the

22   indictment beyond a reasonable doubt.

23       A.    Yes.

24       Q.    Okay.  And sometimes -- and it's kind of an odd

25   situation and an odd question, but the issue really isn't

 1    whether or not Mr. Murphy did it.  But actually can the State

 2    prove it beyond a reasonable doubt.

 3            Do you see that there's a difference between those

 4    two?

 5        A.   I can make the distinction, yes.

 6        Q.   Okay.  And sometimes people, it kind of gets caught

 7    in their throat or it makes them mad or angry that they may

 8    think in their mind that somebody did it, but the State

 9    didn't prove it beyond a reasonable doubt and the law

10    commands that you find him not guilty.  But you're saying

11    that you can do that?

12        A.   Yes.  That was his question while ago.

13        Q.   Yes.

14        A.   Yes, I can do that.

15        Q.   Okay.  Let me ask you -- well, let me talk to you a

16    little bit about one of the elements that they must prove

17    beyond a reasonable doubt, and it's not Dallas County,

18    Texas.  What I want to talk to you a little bit about is that

19    they have accused him of intentionally causing the death of

20    Ms. Cunningham.  Okay.  And the Judge will tell you basically

21    what the law is.  And the Judge will explain to you that

22    intent means it was his conscious objective and desire to

23    first engage in the conduct, and secondly, cause the result.

24    Okay?  And they must prove to you that he had the specific

25    intent to kill Ms. Cunningham.  Okay?  That's one of their

1    burdens that they have to prove beyond a reasonable doubt.

2           Let's say that -- let me give you kind of an

3    example.  Let's say that I've just gotten tired of Mr. Byck

4    getting up and walking out in the middle of voir dire and I

5    decide that I'm going to kill him.  I go home.  I get my

6    husband's gun.  I go to the store, and I buy bullets for it.

7    I bring it into the courthouse which I submit to you was not

8    very hard to do in this courthouse.  And I sit here and once

9    he leans over and whispers in my ear that he's going to get

10   up and walk out yet again, I pull out a gun.  I point it at

11   him, and I shoot him.  Okay?  At that point it is my

12   conscious objective and desire to engage in the conduct, pull

13   out the gun and point it at him in such a way and fire it and

14   cause the result, which is his death.  Okay?  When I pulled

15   out the gun, I didn't mean to scare him and keep him in his

16   chair, make him stay here.  I didn't mean to injure him by

17   shooting off his toe or something like that, to make him not

18   be able to walk away.  But it was my conscious objective and

19   desire to cause his death.  And that's the sort of intent,

20   the specific intent that the State of Texas must prove before

21   you can find my client guilty of capital murder.

22          Do you understand that?

23   A.    Okay.  Yes.

24   Q.    Okay.  And will you hold them to that burden?

25   A.    Yes.

1      Q.   All right.  Before we move on, I want to talk to you

2  a little bit about police officers and your opinion about the

3  integrity of the system and integrity of the District

4  Attorneys Office.  You said that you could start off police

5  officers on the same level and wait until they testify before

6  you can judge their credibility.

7      A.   Same level as --

8      Q.   As any other witness?

9      A.   Yes.

10     Q.   Okay.  What about the defendant?  If the

11 defendant -- we've talked about how the defendant does not

12 have to testify in this case.  And you can't hold it against

13 him for any reason if he chooses not to testify.  But if he

14 chooses to testify, are you going to believe or not believe

15 or just kind of judge his credibility just like anybody else,

16 or do you think he's got a built-in kind of reason to lie?

17     A.   I'll accept with neutrality anything -- any of the

18 testimony, any -- of any witness.

19     Q.   Okay.  From whichever table it comes from?

20     A.   That's correct.

21     Q.   All right.  You also said in your questionnaire that

22 there are a number of murders that happen without any

23 witnesses, and so therefore you believe that circumstantial

24 evidence could be enough to convict someone.

25          Is that -- is that kind of paraphrasing from what

1   you remember from the questionnaire?

2       A.   I don't remember that question, but I think I agree

3   with that statement.

4       Q.   Okay.   Let me kind of turn that question on its head

5   a little bit and ask you if you think all eyewitness

6   testimony is infallible?

7       A.   No.

8       Q.   Okay.   And you can see that sometimes, let's say

9   five different people see the same event, there could be five

10  different versions of what happens?

11      A.   I understand that.

12      Q.   Okay.   I want to kind of go back a little bit and

13  talk about intentionally in regard to punishment issues.   The

14  State has charged that he intentionally caused the death of

15  Ms. Cunningham.   Okay.   What that -- what that means is

16  they've said that he did not do it by accident.   He didn't do

17  it by some sort of mistake.   He did not cause the death of

18  Ms. Cunningham by any kind of criminal negligence, by maybe

19  driving drunk or that sort of thing, or did so by doing an

20  act knowing that it could cause death, but -- but not really

21  intending to cause the death.   Those are all different kinds

22  of mental states that they could allege.   But what we're

23  talking about is we're talking about the State has alleged

24  that he specifically intended to cause her death.   Okay?

25  And if they prove that, if they prove that he specifically

1    intended to cause the death of Ms. Cunningham, but they

2    failed to prove that it happened in the course of a

3    kidnapping or a robbery, that's the situation that we come to

4    where -- and I hate this term because there are no simple

5    murder, but that's just simply murder.  Okay.  It's not

6    capital murder.  It's just murder.  And that's when this

7    range of punishment from 5 years to 99 years comes into

8    play.

9           And so you told Mr. Davis, and I'm asking you again,

10   when we're talking about an intentional murder, not a

11   mistake, not any kind of recklessness or negligence, but an

12   intentional murder, can you honestly consider the entire

13   range of punishment all the way down to 5 years in the

14   penitentiary, in a certain case?

15        A.    Yes.

16        Q.    Okay.  Now, let's assume that the State did prove

17   its case beyond a reasonable doubt.  They proved that Mr.

18   Murphy intentionally caused the death of Ms. Cunningham, did

19   so either by shooting her with a gun or drowning her in

20   water, and did so in the course of committing either a

21   robbery or a kidnapping.  Okay?  Standing there at that

22   point, you found him guilty of that sort of offense.  Do you

23   believe at that point that he would be a continuing threat to

24   society?

25        A.    I don't think I can answer that question yes or no.

 1    I think that where I would be in responding to that at that

 2    time would be based on the full range of what's been put on

 3    in front of me.

 4        Q.   Okay.

 5        A.   And at that time, just based on the fact that you've

 6    said that -- just the fact that he's guilty of those two

 7    things, I don't think I would -- I can go from that position

 8    and leap automatically to whether or not he's a continuing

 9    threat to society.

10        Q.   Okay.  Okay.

11             THE COURT:  Kind of the idea just because a

12    dog bites once, doesn't mean he's going to bite twice?

13        A.   Uh-huh, I understand that.

14        Q.   (By Ms. Balido)  Let me ask you this question,

15    having found someone guilty of capital murder, and in this

16    case causing the death of Ms. Cunningham by shooting her with

17    a gun or drowning her in water during the course of a

18    kidnapping or robbery, do you think that you would have to

19    hear something from the defense, or the defendant, make us

20    prove to you that he would not be a continuing threat to

21    society?

22        A.   Would you repeat that?

23        Q.   Okay.  Having found this man guilty of capital

24    murder as charged in the indictment, do you think that you

25    would require the defense or the defendant to put on any

1    evidence or testimony to show you that he would not be a

2    continuing threat to society before you could answer that

3    question no?

4         A.    You know, Mr. Davis gave me some rule on that, by

5    which I think to make that decision -- and I've already

6    forgotten what it was.

7         Q.    Okay.  Basically what the situation is, is that the

8    State has the burden of proof in --

9         A.    Okay.  I couldn't remember whether they did or they

10   didn't.

11        Q.    Yes.

12        A.    They have the burden of proof.

13        Q.    They have the burden of proof on guilt/innocence and

14   on Special Issue Number 1.  Okay?  Which is the future

15   dangerous question.

16        A.    Right.

17        Q.    What I'm asking is if they've proven their case

18   beyond a reasonable doubt that he's guilty of capital

19   murder --

20        A.    Uh-huh.

21        Q.    Okay.  And we get to Special Issue Number 1?

22        A.    Number 1.

23        Q.    Number 1?

24        A.    Okay.

25        Q.    Do you think that you would have to hear something

1    from the defense or require us to bring you evidence that

2    that question should be answered no, that he's not a future

3    danger, before you can answer that question no?

4        A.    And you -- no, I wouldn't.  I wouldn't.  If the

5    burden is on the prosecution to do that.

6        Q.    Okay.

7        A.    Then I wouldn't require that of you.

8        Q.    Okay.  And having found -- let me kind of explain to

9    you what the danger is.  The danger is on the guilt/innocence

10   stage of the trial when we're talking about intentionally,

11   we're talking about words -- terms of art like on or about or

12   those sorts of things.  The Judge is going to give you the

13   instructions and the definitions for every single word that's

14   in the indictment.  Okay?  Now, when we get to the special

15   issues --

16                  THE COURT:  Well, almost -- not exactly.

17                  MS. BALIDO:  Well, I think they leave out and,

18   maybe.

19       Q.    (By Ms. Balido)  But if we get to the special issues

20   and all those words right there, there's no definitions.  The

21   law doesn't allow for there to be any definitions.  So quite

22   frankly, what the problem is, is that we can sit here and

23   talk about abstracts, about what probability means or what

24   continuing acts of violence means, and all that kind of

25   stuff, but what happens is once you've found somebody guilty

DARLINE W. LABAR, OFFICIAL REPORTER

1    of capital murder, can you see how sometimes jurors change

2    those terms to fit the case?  Whereas they may think in the

3    abstract that probability may mean 51 percent, but once they

4    see the evidence and they see -- and they see actually, you

5    know, the pictures or whatever, they can say, well,

6    probability -- you know, to me then it means a chance in

7    their mind.  Do you see how that's kind of the danger?

8         A.    Uh-huh.  I think -- it may seem to be crafted in

9    order to allow for subjectivity.

10        Q.    Right.  Can you -- can you tell me that if you sit

11   as a juror on this case, that you will look at probability as

12   you said before, kind of a 51 percent more likely than not

13   situation, and hold the State to that sort of burden?

14        A.    As I'm sitting here today, I think I can be --

15        Q.    Okay.

16        A.    -- neutral in that respect.

17        Q.    Just so you recognize the problem and see how those

18   things can happen.

19        A.    I understand.

20        Q.    All right.  Now, the situation then becomes that --

21   and this is how it kind of goes along in progression that the

22   State -- before you -- well, let's do it this way.  Before

23   you can get to Special Issue Number 2, two things have

24   happened.  Number one, you've found Mr. Murphy guilty of

25   capital murder, causing the death of Ms. Cunningham in the

1   course of a kidnapping or a robbery.  And number two, you've

2   answered Special Issue Number 1 yes, that he is a future

3   danger, that you feel like he would constitute a continuing

4   threat to society.  And then we're faced with Special Issue

5   Number 2.  Okay.

6           And Special Issue Number 2 is a chance for you to

7   look at all the evidence and see if there's something of the

8   sufficient mitigating nature to warrant a life sentence

9   rather than a death sentence.  Okay?

10      A.   Yes.

11      Q.   Do you think that you can honestly consider Special

12  Issue Number 2 having found him guilty of capital murder and

13  having found him a future danger?

14      A.   Yes, I do.

15      Q.   Okay.  And sometimes -- what do you think about

16  that?  What do you think about the whole idea of sufficient

17  mitigating circumstances?  Do you think that it's -- you

18  know, some jurors have come in here and said, you know, well,

19  it seems like -- like in that situation someone might be

20  trying to excuse their actions, maybe trying to look for some

21  sort of excuse in their background or their character that

22  caused them to do this and kind of check out of the

23  responsibility.  Do you feel that way or do you think -- or

24  can you see kind of where the legislature was going or

25  actually the Supreme Court was going?

1       A.   Well, I think -- I think that it's a wonderful law

2  in the sense that there should be a pretty high burden on the

3  State to take a person's life.  On the other hand -- so I

4  think that the burden is as it should be on them.  On the

5  other hand, you brought up that example where the jury didn't

6  have -- used, I think mental, retardation there.

7       Q.   Uh-huh.

8       A.   I think that those things can be considered.  I

9  think I can consider one.

10      Q.   Okay.  Let me talk to you a little bit about the

11  situation because also again in this situation, mitigating

12  circumstances is not defined under the law.

13      A.   Right.

14      Q.   Mitigation is basically kind of one of those things

15  you'll know it when you see it and it's something different

16  for each person.  I would submit to you some people have said

17  age can be a mitigating factor.  Age of the defendant can be

18  a mitigating factor.

19           Do you agree with that?  Do you see how age can play

20  into it?

21      A.   If you're talking about a 3-year-old, yes.

22      Q.   But when we're talking about a young adult -- in the

23  State of Texas the State can't try anyone younger than 17 for

24  death.  Do you think that 17, 18-year-olds, that's something

25  you could not consider in relation to Special Issue Number

1    2?

2         A.    I think a 17-year-old can be tried as an adult.

3         Q.    Okay.  What about someone that was the victim of

4    sexual or physical abuse as a child?  Do you think that would

5    be something that you could consider in Special Issue Number

6    2?

7         A.    Yeah, I would be -- maybe, yes.

8         Q.    Okay.

9         A.    I could consider it, yes.  The answer to the

10   qualifier of consider would be yes.

11        Q.    And you say consider and you're stressing consider.

12   What's your opinion of that?  Do you think --

13        A.    Of abuse, child abuse and how it affects behavior?

14        Q.    Yes.

15        A.    Well, I know it can have profound behavior.

16   That's -- that's -- that's a tougher area, you know -- a

17   mitigating -- extreme mitigating thing when it's down to say

18   life sentence versus the death penalty.

19        Q.    Okay.

20        A.    And, you know, I don't know where it would be.  It

21   would depend on the whole trial.

22        Q.    Okay.  Depend on the evidence that you heard?

23        A.    Uh-huh.

24        Q.    All right.  What about drug and alcohol use?  Some

25   people say that -- that --

1      A.    I think I've answered that.  I thought that was in

2    the questionnaire.  I don't think that should be a mitigating

3    circumstance --

4      Q.    Okay.

5      A.    -- for me.

6      Q.    And basically where it came out in the questionnaire

7    is if you think -- the law says on guilt/innocence that

8    voluntary intoxication is not a defense to a crime.  What I'm

9    talking about is something a little bit different.  I'm

10   talking about do you think that you could consider drug or

11   alcohol use or abuse in consideration of Special Issue Number

12   2?

13     A.    Well, you know, I don't know.  I -- again, you're

14   asking me to pass judgment on a hypothetical, but I would be

15   less inclined than I would say somebody who's been child

16   abused severely.

17     Q.    Okay.

18     A.    Just comparing the two.

19     Q.    Okay.  Let me kind of throw out an example to you

20   and just kind of see where you fall and see if you think -- I

21   think you'll see what I'm getting at by this example.

22          Let's say that me and this lady back here, that

23   we're nonidentical twins.  Okay?  We're both born of the same

24   mother, but we -- well, we're born of the same mother, but

25   we're not identical twins.  Our mother abused alcohol when

1    she was pregnant with us so there's some ramifications of

2    fetal alcohol syndrome.  Once we're born, we're just a little

3    too much that she can handle.  And she adopts us out to two

4    separate families.  Let's say that this lady back here is

5    identified -- I'm sorry, adopted by a family that shows love,

6    and love is something that is inside that household.  There

7    is very little violence shown on TV in that house and

8    certainly no violence inside the house.  Good schools.  You

9    know, I'm not talking about private schools, but what I'm

10   talking about is good schools with good teachers that care

11   about the kids and want to do a good job.  Whatever kind of

12   physical or psychological problems stemming out of the fetal

13   alcohol syndrome are addressed by the family doctor.

14   Basically good medical care, you know, good education

15   throughout her life.

16        I, on the other hand, am not so lucky.  I'm adopted

17   by a family that never shows love to anyone in the family.

18   Not only is violence shown on TV and it's a nightly thing in

19   the house, there's violence in the living room.  There's

20   physical and sexual abuse going on between the children and

21   also the parents on the children.  Those things are never

22   addressed by any sort of health care professional.  I kind of

23   float through school and graduate from high school.  You

24   know, never really get one of those true teachers that make a

25   difference in somebody's life or a Girl Scout leader or

1    something like that.

2           Let's say we both end up on opposite ends of a block

3    in Dallas County.  And we rob two separate banks unbeknownst

4    to each other.  We walk in, we both demand money with a gun,

5    walk out with money, instantly arrested.  We are both tried

6    separately and found guilty.  Now, the jury is to assess our

7    punishment.  Do you think that we should be, that the --

8    well, let me ask you -- ask it this way.  Do you think that

9    the considerations of the jury as to our respective character

10   and background or personal moral culpability, those kind of

11   things that we're talking about in Special Issue Number 2, do

12   you think those things should be handled differently based on

13   the differentness of our upbringing and background and I

14   guess physical situation, or do you think that you do the

15   time -- I mean, you do the crime you do the time?

16       A.   Well, I don't know what you mean by handle.  I know

17   as a jurist in that I wouldn't consider the circumstance of

18   the twin that went into the bad family as mitigating.

19       Q.   Okay.

20       A.   I really -- I don't, I -- you've brought some

21   examples up that I would consider mitigating.  I don't think

22   that's one of them.

23       Q.   Okay.  So do you think anything about a defendant's

24   character or background -- well, let me split those in two

25   things.  Do you think evidence of a defendant's character is

1   relevant in consideration of Special Issue Number 2?

2       A.   Yes, using Mr. Davis's deal where -- where his child

3   OD'd and went down and one aberration in his whole life --

4       Q.   Okay.

5       A.   -- fit of passion, I would consider that a

6   mitigating thing.

7               MS. BALIDO:   Thank you, Judge.

8       Q.   (By Ms. Balido)   What about a defendant's background

9   and his upbringing?   Well, let's first say background.   Would

10  that kind of fit into what you were talking about --

11      A.   Well, it would certainly be from which you would

12  consider what would be a mitigating circumstance, but just --

13  I guess you'll have to tighten the question a little bit for

14  me.

15      Q.   Okay.   What about -- what about someone's upbringing

16  and home life as a child growing up, do you think that's

17  relevant in regard to Special Issue Number 2?

18      A.   Is it relevant?   It just depends on the unique -- to

19  me, what it is.   We use child abuse.   You used another one

20  that I -- which I think might.

21      Q.   Okay.

22      A.   You used a different example where lack of good

23  teachers and good parents, TV on and all that, I wouldn't

24  think so, so --

25      Q.   Okay.   Okay.   I think I kind of know where you're

1    coming from.  Let me end up this way.

2         We talk about the jury as one -- one entity.  The

3    jury does this.  The jury came back with a verdict.  That

4    sort of thing.  But as you notice over there in the jury box,

5    there are 12 different chairs that are separate, so there --

6    so basically what that symbolizes to me 12 different people

7    that have to come up with 12 different verdicts.  And where

8    that becomes important is this.  The State has the burden of

9    proof on guilt/innocence, and they must prove their case

10   beyond a reasonable doubt.  They must eliminate every

11   reasonable doubt from your mind as a juror before you can

12   find someone guilty.  Something that's reasonable doubt to

13   you may not be reasonable doubt to another person.  Okay.

14   You may think it's reasonable doubt because they didn't prove

15   intentionally, you know, they didn't prove specific intent to

16   kill.  The person next to you may not believe that they

17   proved Dallas County, State of Texas.  Still another person

18   may believe, you know, I don't believe that police officer, I

19   don't believe he gave him those warnings, I'm going to throw

20   out the confession and they just don't get there without the

21   confession.

22        A.   Uh-huh.

23        Q.   So you can see how everyone agrees on -- that there

24   is reasonable doubt, but they don't agree on necessarily what

25   that reasonable doubt is.  Can you see how that can be there?

1      A.    Okay.

2      Q.    Okay.  The same thing kind of goes along with

3  mitigation.  You may think one thing is mitigating, some of

4  the things that we've talked about here today.  Someone else

5  may think that the remorse that someone shows is mitigating.

6  Someone else may say, well, their character, you know, they

7  didn't really have the tools to become the kind of citizen or

8  just, you know -- they didn't have the tools in their

9  childhood or shown the tools on how to be a good citizen or

10 even follow the law or know what was right and wrong.  That

11 might be mitigation to them.

12      Can you see how you agree that there's something

13 mitigating to warrant a life sentence?  It may not just be

14 the same thing.

15      A.    Okay.

16      Q.    Okay.  Mr. Ferrell, I appreciate it, and I

17 appreciate your time and your honest answers to my questions.

18      A.    Okay.

19             THE COURT:  Mr. Ferrell, you may be excused in

20 the company of the bailiff.  The attorneys will confer with

21 their co-counsels.  We'll bring you back in.  We'll let you

22 know then whether you remain under consideration.

23             VENIREPERSON:  Okay.

24             (Venireperson removed from courtroom.)

25             (State no challenge for cause - Mr. Ferrell)

1                MR. DAVIS:  The State has no challenges for

2  cause.

3                (Defense no challenge for cause Mr. Ferrell)

4                MS. BALIDO:  Judge, we don't have any

5  challenges for cause.

6                (Venireperson returned to courtroom.)

7                (Richard Ferrell Prospective Juror No. 48)

8                THE COURT:  Mr. Ferrell, have a seat.  You

9  remain under consideration as a prospective juror in this

10  matter.

11        We're going to ask your permission, if we may, to

12  have the bailiff to your left, Mr. Rees, take a Polaroid

13  picture of you.  We're working our way up to a pool of 48

14  qualified jurors.  We have one more to go, at the conclusion

15  of which the attorneys will exercise their peremptory

16  challenges.  We've talked to an awful lot of people over the

17  last couple of months.  Yes, couple of months.  Sometimes

18  they start blending in with one another.

19                VENIREPERSON:  Sure.

20                THE COURT:  So may we have your permission for

21  the limited purpose -- and once the peremptory challenges

22  have been exercised, all pictures will be shredded,

23  destroyed.

24        I've asked Mrs. Daily, the Court Administrator, to

25  come in as well.  She's going to be confirming these phone

 1    numbers because you will be getting a call either from her or

 2    Ms. Madore, the bailiff, later on this week.  We anticipate

 3    testimony will begin next Monday so you may want to kind of

 4    keep that a bit open, because you may be a juror in this

 5    case.  Questions for me?

 6                    VENIREPERSON:  No, nothing.

 7                    THE COURT:  Avoid the temptation of contacting

 8    the Dallas Morning News with regard to back issues --

 9                    VENIREPERSON:  Okay.  I will.

10                    THE COURT:   -- that covered this matter as a

11    news story.

12                    Ms. Daily, if you confirm the information with Mr.

13    Ferrell, please.

14                    Take a ten-minute break.

15                        (Recess taken.)

16                        (Venireperson brought into courtroom.)

17                    THE COURT:  Mr. Ward, good morning and welcome

18    back.  You've been patiently waiting, and we appreciate that.

19                    Ask you to raise your right hand, please, sir.

20                        (Venireperson additionally sworn.)

21                    VENIREPERSON:  Yes.

22                    THE COURT:  Thank you.  You may lower your

23    hand.

24                    Mr. Ward, may I begin by reintroducing those we see

25    seated at the counsel tables.

1          Beginning at the far left, lead prosecutor for the

2     State, a Senior Prosecutor at the Dallas District Attorneys

3     Office, the Honorable Greg Davis.

4               VENIREPERSON:  Good morning.

5               THE COURT:  Seated next to him is a fellow

6     Coppell resident of yours, Honorable Mary Miller.  She is the

7     Chief Prosecutor assigned to this 194th District Court.

8               MS. MILLER:  Hi.

9               THE COURT:  Moving on to the next table, we

10    begin first with one of the three attorneys representing the

11    defendant.  The Honorable Michael Byck is a board certified

12    criminal law specialist, so designated by the State Bar of

13    Texas.

14          Seated next to him is a fellow defense attorney.

15    She was previously an Assistant District Attorney here in

16    Dallas County, Honorable Jennifer Balido.

17               MS. BALIDO:  Mr. Ward, how are you?

18               THE COURT:  Seated next to Ms. Balido,

19    opposite Mr. Byck, is the accused, the defendant, if you

20    will, Jedidiah, also known as Jim, Isaac Murphy.

21               THE DEFENDANT:  Good morning.

22               THE COURT:  Third attorney representing Mr.

23    Murphy is not in the courtroom this morning.  Her name is

24    Jane Little.  If she should come in, Mr. Ward, before you

25    leave us, I will make her presence known to you.

DARLINE W. LABAR, OFFICIAL REPORTER

1         If you are ready to proceed with the individual

2    questions, I believe the attorneys are as well.

3         Are you ready?

4              VENIREPERSON:  Uh-huh.

5              THE COURT:  We will begin with Ms. Miller or

6    Mr. Davis?

7              MR. DAVIS:  I will, Your Honor.  Thank you.

8    May it please the Court.

9                        WILLIAM WARD

10   was called as a venireperson by the Court and, after having

11   been first duly sworn, was questioned as follows:

12                   Voir Dire Examination

13   By Mr. Davis:

14        Q.   Good morning, Mr. Ward.  How are you?

15        A.   A little tired right now.

16        Q.   All right.  Well, hopefully we won't take that long

17   this morning.

18        A.   I understand.

19        Q.   I've just got a few questions for you.  I want to

20   begin, sir, and just -- I want to ask you to go back to when

21   you were on the large panel when you came up and the Judge

22   told you that you were here on a capital murder case in which

23   the State was seeking the death penalty against Mr. Murphy.

24   Okay.  What was your initial thought or your initial reaction

25   when you heard that was the type of case you had been called

1   for?

2        A.   Extremely scared.  Just didn't really know what to

3   think about it.  I was really not sure what to say.

4        Q.   Okay.  Had you ever been called for jury service

5   before?

6        A.   Yes, I have.

7        Q.   Okay.

8        A.   Probably -- maybe six months ago.

9        Q.   Was it -- was it the nature of the case that caused

10  some apprehension for you, the fact that it was a death

11  penalty case?

12       A.   The other one?

13       Q.   No, sir, this case right here.

14       A.   Absolutely.  Yeah.

15       Q.   Okay.  I've had a chance to look at your

16  questionnaire.  I want to ask you, really to give me your

17  honest opinion about how you feel about having to serve on

18  this jury because you're in line as a potential juror.  I've

19  had jurors tell me, even jurors who very strongly favor the

20  death penalty, that after they filled out the questionnaire,

21  they got to thinking about the process and they just became

22  uncertain about actually sitting in one of these chairs and

23  having to render a verdict which would mean the death of this

24  person down here because maybe it's one thing to think about

25  it in the abstract, you think, well, maybe I can do that.

1   But this is no abstract exercise here.  This is a living,

2   breathing human being.

3       A.   Yes, sir.

4       Q.   And very flatly put, the State is trying to kill

5   him.  And that's our goal.  Our goal is to see him dead on a

6   gurney one day in Huntsville.  So I want you to tell me, and

7   I won't think anything less of you and I'll respect your

8   opinion no matter what you tell me, but do you think this is

9   really a case where you can sit over here and actually take

10  part in a verdict that will result in this man's death?  I'll

11  take you at your word, whatever you tell me.

12      A.   I've thought a lot about this over the last two

13  weeks -- or I'm not sure how many weeks it's been.  I've had

14  some sleepless nights over it.  I've really thought about

15  this long and hard.  Didn't sleep very much last night.  I'm

16  seriously honestly struggling with this issue.  It's been

17  difficult to deal with this, and it's something I haven't

18  really -- needed to think much about in the past.  I've spent

19  the last two weeks --

20      Q.   Well --

21      A.   If you can feel my hands right now.

22      Q.   Okay.  Okay.  Listen, you have proven, you know,

23  your citizenship by coming down with the large panel.  You've

24  proven your citizenship again by coming down here this

25  morning.  The last thing that we as attorneys want to do is

1   put a person in a position where they're in some sort of

2   moral or personal dilemma.  We're not going to do that in

3   this case.  We are going to agree to excuse you.  Okay?

4        A.   I really appreciate that.  Thank you very much.

5        Q.   I appreciate your honesty.

6                  (Mr. Ward Excused From Consideration)

7                  THE COURT:  You are excused.

8             So agreed by the defense?

9                  MS. BALIDO:  Yes, sir.

10                 MR. BYCK:  So agreed, Your Honor.

11                 MR. DAVIS:  Is that all for this morning?

12                 THE COURT:  1 o'clock.

13                 MR. DAVIS:  Yes, sir.

14                 (Recess.)

15                 (Venireperson brought into courtroom.)

16                 THE COURT:  Good afternoon.  Welcome back.

17            Would you raise your right hand and again be sworn

18   in, please.

19                 (Venireperson additionally sworn.)

20                 VENIREPERSON:  I do.

21                 THE COURT:  Thank you.  Lower your hand.

22            Let's begin by reintroducing those whom we see

23   seated at the counsel tables.

24                 Beginning at the far left, lead prosecutor for the

25   State, a Senior Prosecutor in the Dallas District Attorneys

1    Office, the Honorable Greg Davis.

2                MR. DAVIS:   Good afternoon.

3                THE COURT:   Seated next to him is co-counsel,

4    presently the Chief Prosecutor assigned to this the 194th

5    District Court, the Honorable Mary Miller.

6                MS. MILLER:   Good afternoon.

7                THE COURT:   Moving on to the next table, we

8    begin first with one of the defense attorneys, a board

9    certified criminal law specialist, the Honorable Mike Byck.

10               MR. BYCK:   Good afternoon.

11               THE COURT:   Seated next to him is a defense

12   co-counsel, former Assistant District Attorney here in Dallas

13   County, the Honorable Jennifer Balido.

14               MS. BALIDO:   Good afternoon.

15               THE COURT:   Seated next to Ms. Balido,

16   opposite Mr. Byck, is the accused, the defendant, if you

17   will, Jedidiah, or more commonly known as Jim, Isaac Murphy.

18               THE DEFENDANT:   Good afternoon.

19               VENIREPERSON:   Hi.

20               THE COURT:   The third attorney on the defense

21   team, Jane Little, by name, not with us at present.  If she

22   should come in before you leave, I will make her presence

23   known to you and further introduce her.

24          Assuming you're ready to proceed with individual

25   questioning, I think the attorneys are as well.  Are you

1 ready to begin?

2 　　　　　VENIREPERSON:  Yes, I am.

3 　　　　　THE COURT:  Begin as required by law with the

4 State, Mr. Davis.

5 　　　　　MR. DAVIS:  May it please the Court.

6 　　　　　　　　　KELLY GALEY

7 was called as a venireperson by the Court and, after having

8 been first duly sworn, was questioned as follows:

9 　　　　　　　　Voir Dire Examination

10 By Mr. Davis:

11 　　Q.　　Good afternoon, Mr. Galey.  How are you?

12 　　A.　　Just fine, thanks.

13 　　Q.　　Good.  Mr. Galey, I'm going to talk with you for

14 just a few minutes here about some of the procedures we'll

15 use in this case, some of the principles that need to be

16 applied in this case.

17 　　　　　Before we get into that, though, I want to address

18 something that you put on your questionnaire concerning your

19 work schedule.  You had indicated that you would suffer

20 professionally if you were away from your job for any length

21 of time over one week.  Can you tell me a little bit more

22 about that?

23 　　A.　　In my work I'm -- I'm a specialist.  I'm a color

24 specialist at a printing company and I manage the color for

25 that company.  The -- my superiors, they attach a great deal

1   of importance to what I do and they get antsy if I'm gone for

2   more than a week.  So I'm sure you hear that a lot.

3        Q.   Sure.  I would anticipate this case could take as

4   long as six, seven, perhaps eight working days to complete.

5   If that were the case, let me just kind of put you in a

6   position here.  Let's say you're on this jury and the case

7   does go longer than a week, is it a situation where your mind

8   would be going to your work or -- where you would be unable

9   to concentrate fully on this case?  You know, some people say

10  because of other concerns outside of the case, I'm not sure

11  that I can give this thing my full undivided attention.  And

12  you tell me, and I'll kind of take it from there.

13       A.   My -- the greatest distraction that would be caused

14  would be if they were calling me at home at night because

15  they're having problems.  I mean, it's not that they don't do

16  that anyway, but if -- as long as -- I guess if my employers

17  were sensitive to my needing to be treated as if I was on

18  vacation and out of town, then I don't guess it would be a

19  problem.

20       Q.   Yeah.  Do you think they're going to be sensitive to

21  that?  I mean, you know better than I do.  Is it a situation

22  where you're going to have to come down here and serve all

23  day and then have to go home and answer the telephone from

24  them or do you think they'll actually leave you alone?

25       A.   I think -- I think that, you know, if that actually

DARLINE W. LABAR, OFFICIAL REPORTER

1    came to me serving on this trial, that they would -- they

2    would figure it out for themselves.

3        Q.    Okay.  Good.  I just want to start off and talk a

4    little bit about your feelings about serving on this type of

5    jury.  When you first came up on the large panel and Judge

6    Entz told you that this was a capital murder case where we

7    were seeking the death penalty, do you remember what was your

8    initial reaction to that?

9        A.    I don't really remember exactly what my reaction

10   was.

11       Q.    Uh-huh.

12       A.    I was surprised -- I guess I could tell you that I

13   was surprised that I had been thrown into a -- the

14   possibility of being in -- to such a serious case.

15       Q.    I know a lot of times jurors tell me after they fill

16   out the questionnaire, before they come down, they do a

17   little bit more thinking about this trial, maybe the

18   possibility of serving.  I've had some jurors tell me that

19   given a little bit more thought to it, they're not quite sure

20   this is the type of case that they could personally take part

21   in.  I've had people, even who strongly believe in the death

22   penalty, tell me that.  And I've certainly heard that a lot.

23   I respect the people for their honesty.  Not everyone is

24   suited for every type of case.  We've gone through hundreds

25   and hundreds of people obviously to get down to this point.

1    So not everyone is qualified or well suited for this case.

2    You know, some people say in the abstract that's one thing

3    and I agree with the law, I see it -- I see it has a purpose,

4    but we're talking about a living, breathing human being.

5    He's not abstract.  Our goal very simply put is to see that

6    he receives the death penalty, that it's carried out, that he

7    dies by lethal injection one day in Huntsville.

8          So I just want to take a moment and ask you, how do

9    you really feel about sitting on this type of jury and

10   possibly returning a verdict which would result in the

11   ultimate death of Jedidiah Murphy down here?

12   A.    I think that that is a -- that's a mountain of

13   something that you'd have to prove.

14   Q.    Okay.

15   A.    You know -- that's a tremendous responsibility

16   that's on you.

17   Q.    Uh-huh.

18   A.    It's a responsibility that would be on me and other

19   people to hear the argument and to make a decision.

20   Q.    Let me ask you then, do you recall what the Judge

21   told you about Special Issue Number 1?  If you would, why

22   don't you just read Special Issue Number 1 for just a moment

23   and I'll talk to you about it.

24   A.    Whether there is a probability --

25            THE COURT:  No, just read it to yourself.

1        VENIREPERSON:   Okay.   Yes, sir.

2        Q.   (By Mr. Davis)   Can you see that Special Issue

3   Number 1 to some degree is going to ask you to make a

4   prediction about future behavior?

5        A.   Yes.

6        Q.   I've had some people tell me -- these are people who

7   perhaps hold certain views about the death penalty, about

8   their participation.   I've had some people tell me that they

9   do not believe that that question by its very nature is

10   really capable of being proven beyond a reasonable doubt.

11   And understanding proven beyond a reasonable doubt is the

12   highest standard that we have in the legal system here in

13   this country.   It's much higher than a preponderance of the

14   evidence or a clear and convincing standard.   It's a very

15   high standard beyond a reasonable doubt.   And that is the

16   State's burden of proof on Special Issue Number 1.

17        Now, given -- maybe given your beliefs about this

18   proceeding, let me ask you, do you think that the State of

19   Texas could ever really prove that beyond a reasonable doubt,

20   that that question should be answered yes, or do you think

21   it's just not capable of being proven to that degree of

22   certainty?

23        A.   I think that -- I think that it could be -- that it

24   could be demonstrated in the case of, you know, serial acts.

25   You know, if you can prove serial acts, then you can

1    demonstrate such a case.

2        Q.   All right.  Okay.  Special Issue Number 2.  Special

3    Issue Number 2 goes to mitigation.  It's really the safety

4    net for a life sentence instead of a death sentence for

5    instance.  Can you think of any things offhand that you might

6    consider to be mitigating circumstances that would reduce a

7    punishment from a death penalty to a life sentence?     .

8        A.   Specifics?

9        Q.   Well, just in general.  Some people say, for

10   instance, if you -- if the evidence showed the person was

11   profoundly mentally retarded for instance.  Even if he were a

12   danger to society, if he was mentally retarded, I've had some

13   people tell me they're just not going to sentence somebody

14   like that to death, for instance.  That might be something

15   they would want to take into account.

16       A.   You know, I couldn't -- I couldn't predict what I

17   would say if a case like that came up.  I couldn't possibly

18   predict if -- which way I would go or what I would think

19   after I heard evidence and seen the --

20       Q.   Right.

21       A.   -- circumstances.

22       Q.   Let me talk to you in general about some things that

23   people have mentioned to me in the past.  Some people say

24   that age might be a mitigating circumstance, the theory being

25   that younger people are more capable of being rehabilitated

DARLINE W. LABAR, OFFICIAL REPORTER

1    than older people.  Then I've had some people say it's never

2    going to play a part because as long as you're old enough

3    under the law to receive the death penalty, you're old enough

4    to know the consequences, that's really all those folks are

5    looking at.

6              What are your general feelings about age as a

7    possible mitigating circumstance?

8        A.   I don't think that it really plays a part.  If --

9    because isn't the alternative to death penalty here a life in

10   prison?

11       Q.   Yes, sir, it is.

12       A.   In which case it doesn't matter if you're 20 or

13   you're 60.

14       Q.   Sometimes people mention drug and alcohol use.  I've

15   had people, for instance, tell me that drug and alcohol use

16   or abuse is a disease.  People can't help themselves.  For

17   that reason maybe it should reduce their punishment.  I've

18   had other people tell me it's a personal choice.

19             What are your -- what are your views on the use of

20   alcohol or drugs as a possible mitigating circumstance to

21   reduce punishment?  It's not a legal defense obviously, but

22   just as far as reducing punishment, what are your feelings

23   there?

24       A.   I don't see that as something that would reduce a

25   punishment.

1      Q.    Sometimes people say the person's upbringing, how

2   they were raised as a child.  Specifically, if they were

3   abused on a constant basis, if they were sexually or

4   physically abused perhaps on a daily basis or a regular basis

5   as a young child, I've had some people tell me that might

6   reduce punishment.  I've had other people say, you know, as

7   you grow older, perhaps you need to deal with those issues

8   and it's really not an excuse for future behavior.

9          Do you have any general feelings there about an

10  issue such as that?

11     A.    No, I don't think that would excuse criminal

12  behavior.

13     Q.    Okay.  You know, just in general, can you think of

14  any particular capital murders recently, maybe in the news or

15  that you've heard of, where you thought, you know, depending

16  on exactly what the facts of that case are, that -- that

17  might be the type of case where the death penalty would be

18  the appropriate punishment?  Any cases that come to mind?

19     A.    No, but I -- you know, I don't watch a lot of news.

20     Q.    Okay.  You mentioned earlier about if the State

21  could prove serial actions.  What sort of actions are you

22  talking about?  Are you talking about serial murders or

23  perhaps a history of some sort of criminal behavior?

24     A.    Serial behavior.

25     Q.    Okay.  You know, on Special Issue Number 1, for

1    instance, you're entitled to take into account the facts of

2    the offense itself.  You can look at how the capital murder

3    was committed, why it was committed, who's the victim.  And

4    at the punishment phase generally at that point both sides

5    have the opportunity to present evidence about the

6    defendant's background or his character.  So generally that

7    type of information is provided to you after you find a

8    defendant guilty of capital murder.  And in that instance,

9    you know, if the State has available testimony about prior

10   convictions, prior bad acts, perhaps that person has been

11   through the criminal justice system before, maybe the

12   criminal justice system has attempted to rehabilitate him in

13   the past.  Generally at the punishment phase you get to hear

14   that type of information.

15           Do you think that having that information would be

16   helpful to you in answering Special Issue Number 1?

17       A.    Yeah, absolutely.

18       Q.    Okay.  In general, Mr. Galey, do you think that

19   there may be people in Dallas County today who are capable of

20   intentionally killing an individual to rob them?  Do you

21   think there are people out there that are capable of doing

22   that?

23       A.    Yeah, absolutely.

24       Q.    Do you think there are people who for lack of a

25   better term are cold-blooded enough to do that and then walk

1    away and have absolutely no remorse at all about killing that

2    person?

3        A.    Yes.

4        Q.    Concerning rehabilitation, do you think that

5    everyone is capable of being rehabilitated, or do you think

6    there's some people for whatever reason simply cannot or will

7    not be rehabilitated?  How do you view rehabilitation just in

8    general, the process?

9        A.    I think that -- to be real clear, I believe that

10   some people can be rehabilitated and some cannot.

11       Q.    What do you think would be some -- oh, some key

12   factors in determining whether someone could be rehabilitated

13   or not?

14       A.    I would assume that you would try to rehabilitate

15   everybody who went through the system, and they would fail on

16   their own if they were going to fail.  .

17       Q.    I guess it comes down to rehabilitation generally

18   being a personal choice again.  You have to make a personal

19   decision that you want to change your life.  Would that be

20   fair?

21       A.    If it's going to work, yes.

22       Q.    And in that regard do you think a case like this it

23   would be helpful to know whether the criminal justice system

24   has given a defendant opportunities to rehabilitate himself

25   or not in the past?

1        A.   Yes.

2        Q.   And would you like to know what his reaction to

3    those efforts have been?

4        A.   Yes.

5        Q.   For instance, has he succeeded, has he helped

6    himself, or has he declined or refused the help that's been

7    provided by the system.  Would you like to know those sorts

8    of things?

9        A.   I think it would be necessary to know those things.

10       Q.   All right.  Have you ever served on a jury before?

11       A.   Yes, sir.

12       Q.   Okay.  What sort of jury have you -- have you served

13   on?

14       A.   It was a criminal jury.  It was a -- basically a

15   case of trespassing.

16       Q.   All right.  And I think you indicated that it was a

17   hung jury.  Can you tell me a little bit about that, how that

18   came about?

19       A.   Just very simply we couldn't -- we, the jury,

20   couldn't come to agreement on whether to find the defendant

21   guilty or not guilty.

22       Q.   Do you recall what the break down was on

23   guilt/innocence there?

24       A.   No, I don't recall.

25       Q.   What were your feelings after you -- having gone

1  through that experience, what were your feelings about jury

2  service and the criminal justice system?

3      A.   I thought that -- I thought and I still think that

4  jury service -- serving on a jury is an obligation that --

5  it's an obligation that all citizens have that makes our --

6  or helps our justice system work.

7      Q.   Uh-huh.

8      A.   And I guess I had a very favorable feeling about it

9  when it was all over with.

10     Q.   I can't go over the specific facts with you in this

11 case, but I am entitled to ask you to consider one thing.  I

12 want you to assume for a moment, Mr. Galey, that the victim

13 in this case, Ms. Cunningham, was 80 years old at the time of

14 her death.  And the question I have for you is, knowing that

15 do you still feel that you could be fair and impartial in --

16 in this trial toward the defendant in your view of the

17 evidence?

18     A.   I don't think that the victim's age would play a

19 part.

20     Q.   Okay.  Certainly on the punishment issues over here

21 you'd be entitled to look at that as a possible factor.  I've

22 had some jurors tell me perhaps they'd want to look at just

23 who the victim was, was she innocent or not, was she doing

24 anything illegal perhaps at the time of her death, was she

25 helpless, those sorts of things.  You'd be entitled to take

1    that into account if you wished, but really the problem would

2    be in factoring in the age on guilt/innocence, because again,

3    we have the burden of proof.  The age of the victim is really

4    not something that has to be proved one way or another in

5    this type of case.

6            Mr. Galey, a final couple of questions for you.  Do

7    you know of any reason why you can't be fair to Jedidiah

8    Murphy in this case?

9    A.    No.

10   Q.    Because I'm very serious about wanting him to

11   receive a fair trial.  I've done a number of these cases.  I

12   know it's important at the end of this process, especially

13   the death sentence is handed down, we all be able to leave

14   here knowing that he got a fair trial and we don't have to

15   second guess any of the procedures that we used in this type

16   of case.  Would that be important to you, also, knowing that

17   he did receive a fair trial at the end?

18   A.    Yes.  Yes.

19   Q.    Secondly, my question would be, do you know of any

20   reason why you cannot be fair to the State of Texas and to

21   the victims in this case?

22   A.    No, there's no reason.

23   Q.    Mr. Galey, I appreciate your time this afternoon,

24   sir.  Thank you.

25   A.    Thank you.

1          THE COURT:  Mr. Byck.

2          MR. BYCK:  Thank you, Your Honor.

3                    <u>Cross-Examination</u>

4    By Mr. Byck:

5      Q.   Mr. Galey, again, I want to introduce myself.  I'm

6    Michael Byck.  And together with my co-counsel, Ms. Jennifer

7    Balido, we represent our client, Jim Murphy, in this the

8    trial for his very life.

9                    Now, I've appreciated the seriousness and

10   deliberation in which you've thought about and answered Mr.

11   Davis's questions.  Very frankly, he has covered almost

12   everything that I was going to cover with you, except I did

13   want to ask you, sir, about your prior jury service.

14                   Did you have a jury that worked well together, or

15   were there factions going off in different directions?

16     A.   No, we weren't really divided in the room or

17   anything.  We -- we got along well.

18     Q.   Getting along well, that's exactly the point that I

19   was -- that I was going to make with you.

20                   You have heard, Mr. Galey, about rights when you

21   come down to this courthouse.  You've heard about Jim's

22   rights, the right to remain silent, right to have a jury

23   trial, rights like that.

24                   The State of Texas has rights, also.  They have the

25   right to subpoena power.  They have the right to convene a

1    grand jury, conduct investigations.

2            This court, Judge Entz, has rights.  He has the

3    right to insist that proceedings in his court are held in a

4    civil and a reasonable and rationale fashion, that they're

5    not screaming and yelling and throwing things at each other.

6            And finally, sir, I would submit to you that jurors

7    have rights.  That when deliberating -- and deliberating I

8    define as when you share your feelings and ideas and

9    perceptions about the case that you have heard with the other

10   11 members of your jury panel and listen to them share their

11   feelings and ideas and perceptions with you.  You all, that

12   is you 12 jurors, have the right to conduct your

13   deliberations in the climate of civility.  That -- and I'm

14   not saying that you would do this.  Nor am I saying that it

15   would be done to you.  However, it might occur in the jury

16   room where some individuals in order to -- I don't know when

17   a logical point or just their manner of dealing with other

18   people involves intimidation or denigration or sarcasm or

19   something like that, where the other individual's ideas and

20   perceptions really weren't respected.  And they were, you

21   know, they were somewhat humiliated and some were treated

22   very badly.  And that -- I'm not saying you would do that,

23   and I'm not saying that that could be done to you.  What I am

24   saying, though, is if that does happen and you are on a jury

25   and you can't resolve that among your fellow jurors and among

1  the people that are engaging in -- and I do hope you're not

2  involved in the used car business because I -- the kind of

3  used car pressure sales tactics that are used by people.

4  That if you see something like that happen, you'll knock on

5  the door and you'll let our bailiffs know because I assure

6  you, judge Entz will insist that the deliberations that go on

7  in his jury room go on in a civil and dignified and a

8  peaceful atmosphere and that he will not allow people to be

9  run down or manhandled or dragooned or whatever word you want

10 to use to -- you know, when people are forced or coerced into

11 making agreements that they really don't believe in or they

12 really don't want in, so if you see something like that

13 happen, will you let our bailiffs know?

14      A.   Of course.

15      Q.   Finally, the last question.  Is there any reason,

16 Mr. Galey, any reason that you can think of that I can sit

17 here all afternoon and ask you about, personal, financial,

18 social, historical, business, I don't know what it is, is

19 there anything that would prevent you from being a fair and

20 impartial juror to my client, Jim Murphy?

21      A.   No, nothing -- nothing would prevent me from being

22 fair to your defendant.

23      Q.   Likewise, to the State of Texas?

24      A.   Yes, sir.

25              MR. BYCK:  Fair enough, sir.  I have no

1    further questions of this venireman.

2                    THE COURT:  Ms. Madore.

3          The attorneys will confer with their respective

4    co-counsel.  They'll notify me whether they wish you to

5    remain under consideration.  I'll make the final call.

6                    VENIREPERSON:  Thank you.

7                    (Venireperson excused from courtroom.)

8                    MR. DAVIS:  This is what you've been waiting

9    for for eight weeks now, for me to say --

10                   THE COURT:  We don't get your paycheck?

11                   (State no challenge for cause - Mr. Galey)

12                   MR. DAVIS:  No, I told you he'd qualify.  I

13   told you next man out here would qualify.  Uh-huh.  The State

14   has no challenges for cause on the final juror here.

15                   MR. BYCK:  Your Honor, the defense would

16   submit the juror on the following grounds.

17                   (Defense no challenge for cause - Mr. Galey)

18                   MS. BALIDO:  Judge, for the record, we don't

19   have any challenge for cause for the benefit of the court

20   reporter.

21                   (Discussion off the record.)

22                   (Venireperson brought into courtroom.)

23                   (Kelly Galey Prospective Juror No. 49)

24                   THE COURT:  Mr. Galey, you remain under

25   consideration by the Court as a prospective juror.

1              You should receive a phone call either from Mrs.

2      Daily, the lady that just came in the courtroom over to the

3      side, Court Administrator, or Ms. Madore probably tomorrow

4      afternoon notifying you whether or not you will be one of the

5      12 jurors.  Testimony, we anticipate, will begin Monday, the

6      4th of June, next Monday morning at 9:00 a.m., if you are a

7      juror.

8                        VENIREPERSON:  Okay.

9                        THE COURT:  Any questions?

10                       VENIREPERSON:  Would this -- you wouldn't

11     convene over the weekend?

12                       THE COURT:  No.

13                       VENIREPERSON:  Okay.

14                       THE COURT:  No.  With your permission, I'm

15     going to ask that you allow, Mr. Rees, the bailiff, to take a

16     Polaroid picture of you.  I don't think there will be much

17     need for the attorneys since it's so recent.  They're going

18     to be making their peremptory challenges in open court

19     tomorrow morning.  We have 48 qualified jurors now, you being

20     the 48th.  They will exercise their peremptory challenges,

21     and after that process has been completed, the 12 that are

22     left standing, if you will, will be the jurors in the case.

23             Mrs. Daily, if you be kind enough to confirm phone

24     numbers with Mr. Galey so we can give you a call tomorrow

25     probably at work.

---

DARLINE W. LABAR, OFFICIAL REPORTER

1               VENIREPERSON:  Okay.

2               THE COURT:  I assume you'll be working

3    tomorrow?

4               VENIREPERSON:  Yes, sir.

5               THE COURT:  Okay.  And avoid the temptation of

6    contacting the Dallas Morning News with regard to back issues

7    concerning their news story.  Okay?

8               VENIREPERSON:  Thank you.

9               THE COURT:  Thank you very much.

10              THE BAILIFF:  Step right here against this

11   wall here.

12              (Recess of proceedings.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Reporter's Certificate

STATE OF TEXAS:

COUNTY OF DALLAS:

     I, Darline W. LaBar, Official Court Reporter of the 194th Judicial District Court, in and for Dallas County, Texas do hereby certify that the foregoing volume constitutes a true, complete and correct transcript of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in the statement of facts, in the above styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     Witness my hand this the 23rd day of November, A.D., 2001.

DARLINE W. LABAR
Official Court Reporter
194th Judicial District Court
Dallas County, Texas
(214) 653-5803

Certification No. 1064 Expires December 31, 2002

DARLINE W. LABAR, OFFICIAL REPORTER

1                  REPORTER'S RECORD

2           VOLUME 44 OF 65 VOLUMES     **74145**

3         TRIAL COURT CAUSE NO. F00-02424-NM

4   THE STATE OF TEXAS        :       IN THE DISTRICT COURT

5   VS.                   :       DALLAS COUNTY, TEXAS

6   JEDIDIAH ISAAC MURPHY     :       194TH JUDICIAL DISTRICT

7               *********************

8       PEREMPTORY CHALLENGES - SEATING OF JURY

9               *********************

FILED IN
COURT OF CRIMINAL APPEALS
DEC 5 2001
Troy C. Bennett, Jr., Clerk

10   A P P E A R A N C E S:

11   HONORABLE BILL HILL, Criminal District Attorney
          Crowley Criminal Courts Building

12           Dallas, Dallas County, Texas  75207
          Phone:  214-653-3600

13   BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
          MS. MARY MILLER, A.D.A., SBOT # 21453200

14              FOR THE STATE OF TEXAS;

15   MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
   MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500

16   MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
   Dallas County Public Defender's Office

17           Phone:  214-653-9400
          FOR THE DEFENDANT.

18

19                 *********

20       On the 31st day of May, 2001, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable F. Harold Entz, Jr.,

23   Judge presiding, held in Dallas, Dallas County, Texas:

24       Proceedings reported by machine shorthand, computer

25   assisted transcription.

 

DARLINE W. LABAR, OFFICIAL REPORTER    ORIGINAL

INDEX VOLUME 44

May 31st 2001                                    PAGE     VOL.

PEREMPTORY CHALLENGES - SEATING OF JURY:

Proceedings....................................... 2      44

Emilia Nisbet - Juror Number 1.................... 3      44

Dorothy Jennings - Juror Number 2................. 4      44

Kathy Hunter - Juror Number 3..................... 4      44

Nichole Briscoe - Juror Number 4.................. 5      44

Richard Bachmeyer - Juror Number 5................ 7      44

Robert Mendro - Juror Number 6.................... 7      44

Jo Lawley - Juror Number 7........................ 8      44

Andre Garza - Juror Number 8...................... 9      44

Marcus Rasco - Juror Number 9..................... 10     44

Mark Jones - Juror Number 10...................... 10     44

Henry Turner - Juror Number 11.................... 11     44

Shannon Hinckley - Juror Number 12................ 13     44

Joyce Wicks - Alternate Juror..................... 15     44

Batson Objection By The Defense................... 15     44

Request Denied By The Court....................... 18     44

Batson Objection By The Defense................... 18     44

Request Denied By The Court....................... 29     44

Batson Objection By The State..................... 30     44

Request Denied By The Court....................... 31     44

Batson Objection By The State..................... 31     44

Request Denied By The Court....................... 33     44

Reporter's Certificate........................... 35      44

*NO EXHIBITS THIS VOLUME*

1                       P R O C E E D I N G S

2               THE COURT:   I would like the record to reflect

3      that on March 12th of this year, the first qualified juror

4      was accepted by the Court for consideration, that

5      approximately 1:30 p.m., on May 30th, 2001, the 48th, or 49th

6      qualified juror was accepted by the Court.   After being

7      identified as a constitutionally qualified juror, Juror

8      Number 14, Mrs. Colleen Garcia Wilhite contacted Mrs. Debbie

9      Daily, the Court Administrator for the 194th District Court.

10     She informed Mrs. Daily, subsequent to which confirmation was

11     received from Ms. Wilhite's physicians, that she would be

12     required to undergo a major surgical procedure that would

13     effectively prevent her serving as a juror, assuming she was

14     not peremptorily challenged.   With the consent of counsel for

15     the State and the defense, though identified as a qualified

16     juror, Juror Number 14, Colleen Garcia Wilhite, has been

17     excused for medical reasons as a prospective juror.

18              The record further reflect at all times during the

19     jury selection process, the defendant has been present.   At

20     no time am I aware that he was absent from the courtroom when

21     counsel for either the State or the defense was questioning a

22     prospective juror, be it one that was subsequently identified

23     as a qualified juror or questioned and based upon the

24     questioning was disqualified because of either Wainwright

25     versus Witt or one of the other appropriate United States

1    Supreme Court or Court of Criminal Appeal cases dealing with

2    prospective qualified jurors.

3            We are next to proceed with the exercise of

4    peremptory challenges.  I will call off the name of the

5    jurors in the exact manner in which they were accepted by the

6    Court, sometimes over objection by either the State or the

7    defense with regard to their qualifications.

8            The State prepared to proceed with the exercise of

9    peremptory challenges in the case?

10                   MR. DAVIS:  The State's ready, Your Honor.

11                   THE COURT:  Ms. Little, as lead counsel for

12   the defense, is the defense prepared to proceed with the

13   exercise of peremptory challenges?

14                   MS. LITTLE:  Yes, Your Honor.

15                   THE COURT:  We begin with Juror Number 1,

16   Emilia Nisbet.  What says the State.

17                   MR. DAVIS:  The State accepts.

18                   THE COURT:  What says the defense?

19                   MS. BALIDO:  Defense accepts.

20                   (Emilia Nisbet - Juror Number 1)

21                   THE COURT:  Emilia Nisbet is Juror Number 1.

22           Next, proceeding Dorothy Jennings, what says the

23    State?

24                   MR. DAVIS:  The State accepts.

25                   MS. BALIDO:  Defense accepts.

DARLINE W. LABAR, OFFICIAL REPORTER

1              (Dorothy Jennings - Juror Number 2)

2              THE COURT:   Dorothy Jennings is Juror Number

3    2.

4         Kathy Hunter.   What says the State?

5              MR. DAVIS:   The State accepts.

6              MS. BALIDO:   Defense accepts.

7              (Kathy Hunter - Juror Number 3)

8              THE COURT:   Kathy Hunter is Juror Number 3.

9         Marlin Cannon.   What says the State?

10             MR. DAVIS:   The State accepts.

11             MS. BALIDO:   Defense strikes.

12             THE COURT:   Defense exercised Strike Number 1

13   on Marlin Cannon.

14        Gregory Griffing.   What says the State?

15             MR. DAVIS:   The State strikes.

16             THE COURT:   The State exercises Peremptory

17   Challenge Number 1 on Gregory Griffing.

18        Judy Morton.   What says the State?

19             MR. DAVIS:   The State strikes.

20             THE COURT:   The State exercises Peremptory

21   Challenge Number 2 on Judy Morton.

22        Gerald Smothers.

23             MR. DAVIS:   The State accepts.

24             THE COURT:   What says the defense?

25             MS. BALIDO:   Defense strikes.

1          THE COURT:  Defense exercises Peremptory

2   Challenge Number 2 on Gerald Smothers.

3          Andrea Biggerstaff.  What says the State?

4          MR. DAVIS:  The State strikes.

5          THE COURT:  The State exercises Peremptory

6   Challenge Number 3 on Andrea Biggerstaff.

7          Nichole Briscoe.

8          MR. DAVIS:  The State accepts.

9          MS. BALIDO:  Defense accepts.

10          (Nichole Briscoe - Juror Number 4)

11          THE COURT:  Nichole Briscoe is Juror Number 4.

12          Michael Upchurch.

13          MR. DAVIS:  The State strikes.

14          THE COURT:  The State exercises Peremptory

15   Challenge Number 4 on Michael Upchurch.

16          Patrick Skeeters.  What says the State?

17          MR. DAVIS:  The State strikes.

18          THE COURT:  The State exercises Peremptory

19   Challenge 5 on Patrick Skeeters.

20          Phillip May.  What says the State?

21          MR. DAVIS:  The State accepts.

22          MS. BALIDO:  Defense strikes.

23          THE COURT:  Defense exercises Peremptory

24   Challenge Number 3 on Phillip May.

25          John Robuck.  What says the State?

1          MR. DAVIS:  The State accepts.

2          MS. BALIDO:  Defense strikes.

3          THE COURT:  Defense exercises Peremptory

4  Challenge Number 4 on John Robuck.

5          Colleen Garcia Wilhite has been excused by the

6  Court, consent of counsel for the State and defense, for

7  medical reasons.

8          Moving on, Jon Clinton.  What says the State?

9          MR. DAVIS:  The State accepts.

10          MS. BALIDO:  Defense strikes.

11          THE COURT:  Defense exercises Peremptory

12  Challenge Number 5 on Jon Clinton.

13          Patricia Throneberry.  What says the State?

14          MR. DAVIS:  The State strikes.

15          THE COURT:  The State exercises Peremptory

16  Challenge Number 6 on Patricia Throneberry.

17          Richard Bachmeyer.  What says the State?

18          MR. DAVIS:  The State accepts.

19          MS. BALIDO:  Judge, can I have just one

20  second?

21          THE COURT:  You may.

22          Off the record, Darline.

23              (Discussion off the record.)

24          THE COURT:  What says the defense?

25          MS. BALIDO:  The defense accepts Mr.

1  Bachmeyer.

2           (Richard Bachmeyer - Juror Number 5)

3           THE COURT:   Richard Bachmeyer is Juror Number

4  5.

5       Douglas Layne.   What says the State?

6           MR. DAVIS:   The State accepts.

7           MS. BALIDO:   Defense strikes.

8           THE COURT:   Defense exercises Peremptory

9  Challenge Number 6 on Douglas Layne.

10       Robert L. Mendro.   What says the State?

11           MR. DAVIS:   The State accepts.

12           THE COURT:   What says the defense?

13           MS. BALIDO:   I just need one second, Judge.

14           THE COURT:   The record further to reflect that

15  counsel for both the State and the defense have the benefit

16  of the Polaroid pictures of each of the prospective jurors

17  whose names I'm calling out.

18           MS. BALIDO:   Defense accepts.

19           (Robert Mendro - Juror Number 6)

20           THE COURT:   Robert Mendro is Juror Number 6.

21       Jack Webb.   What says the State?

22           MR. DAVIS:   The State strikes.

23           THE COURT:   The State exercises Peremptory

24  Challenge Number 7 on Jack Webb.

25       Lloyd Eaker.   What says the State?

Page 8

1              MR. DAVIS:   The State strikes.

2              THE COURT:   The State exercises Peremptory

3    Challenge Number 8 on Lloyd Eaker.

4         Deborah B. Kappel.   What says the State?

5              MR. DAVIS:   The State accepts.

6              MS. BALIDO:   Defense strikes.

7              THE COURT:   Defense exercises Peremptory

8    Challenge Number 7 on Deborah Kappel.

9         Thomas Brooks.   What says the State?

10             MR. DAVIS:   The State accepts.

11             MS. BALIDO:   Defense strikes.

12             THE COURT:   Defense exercises Peremptory

13   Challenge Number 8 on Thomas Brooks.

14        Marilyn Chandler.   What says the State?

15             MR. DAVIS:   The State accepts.

16             MS. BALIDO:   Defense strikes.

17             THE COURT:   Defense exercises Peremptory

18   Challenge Number 9 on Marilyn Chandler.

19        Jo Lawley.   What says the State?

20             MR. DAVIS:   The State accepts.

21             MS. BALIDO:   Defense accepts.

22             (Jo Lawley - Juror Number 7)

23             THE COURT:   Jo Lawley is Juror Number 7.

24        Annette Morton.   What says the State?

25             MR. DAVIS:   The State strikes.

1          THE COURT:  The State exercises Peremptory

2    Challenge Number 9 on Annette Morton.

3          Connie Boales.  What says the State?

4              MR. DAVIS:  The State accepts.

5              MS. BALIDO:  Defense strikes.

6              THE COURT:  Defense exercises Peremptory

7    Challenge Number 10 on Connie Boales.

8          Robert Wright.  What says the State?

9              MR. DAVIS:  The State accepts.

10             MS. BALIDO:  Defense strikes.

11             THE COURT:  Defense exercises Peremptory

12   Challenge Number 11 on Robert Wright.

13         Ronnie Adair.  What says the State?

14             MR. DAVIS:  The State accepts.

15             THE COURT:  What says the defense?

16             MS. BALIDO:  The defense strikes.

17             THE COURT:  Defense exercises Peremptory

18   Challenge Number 12 on Ronnie Adair.

19         Andre Garza.  What says the State?

20             MR. DAVIS:  The State accepts.

21             THE COURT:  What says the defense?

22             MS. BALIDO:  Defense accepts.

23             (Andre Garza - Juror Number 8)

24             THE COURT:  Andre Garza is Juror Number 8.

25         Marcus Rasco.  What says the State?

DARLINE W. LABAR, OFFICIAL REPORTER

1              MR. DAVIS:  The State accepts.

2              THE COURT:  What says the defense?

3              MS. BALIDO:  Defense accepts.

4              (Marcus Rasco - Juror Number 9)

5              THE COURT:  Marcus Rasco, Juror Number 9.

6         Kimberly Edge.  What says the State?

7              MR. DAVIS:  The State accepts.

8              THE COURT:  What says the defense?

9              MS. BALIDO:  Defense strikes.

10             THE COURT:  Defense exercises Peremptory

11   Challenge Number 13, Kimberly edge.

12        Gloria Smits.  What says the State?

13             MR. DAVIS:  The State strikes.

14             THE COURT:  The State exercises Peremptory

15   Challenge Number 10 on Gloria Smits.

16        . Mark Jones.  What says the State?

17             MR. DAVIS:  The State accepts.

18             THE COURT:  What says the defense?

19             MS. BALIDO:  Defense accepts.

20             (Mark Jones - Juror Number 10)

21             THE COURT:  Mark Jones is Juror Number 10.

22        Paula Kellner.  What says the State?

23             MR. DAVIS:  The State accepts.

24             MS. BALIDO:  Defense strikes.

25             THE COURT:  Defense exercises Peremptory

1   Challenge Number 14 on Paula Kellner.

2           John Wilson.  What says the State?

3               MR. DAVIS:  The State accepts.

4               MS. BALIDO:  Defense strikes.

5               THE COURT:  Defense exercises Peremptory

6   Challenge Number 15 on John Wilson.

7           Kimberly Williams.  What says the State?

8               MR. DAVIS:  The State accepts.

9               MS. BALIDO:  Defense strikes.

10              THE COURT:  Defense exercises Peremptory

11  Challenge Number 16 on Kimberly Williams.

12          Alexander London.  What says the State?

13              MR. DAVIS:  The State accepts.

14              MS. BALIDO:  Defense strike.

15              THE COURT:  Defense exercises Peremptory

16  Challenge Number 17 on Alexander London.

17          Orvis Reynolds.  What says the State?

18              MR. DAVIS:  The State strikes.

19              THE COURT:  The State exercises Peremptory

20  Challenge Number 11 on Orvis Reynolds.

21          Henry Turner.  What says the State?

22              MR. DAVIS:  The State accepts.

23              THE COURT:  What says the defense?

24              MS. BALIDO:   Defense accepts.

25              (Henry Turner - Juror Number 11)

Page 12

1          THE COURT:   Henry Turner is Juror Number 11.

2          Jamie, J-a-m-i, surname Massey.   What says the

3    State?

4          MR. DAVIS:   The State strikes.

5          THE COURT:   The State exercises Peremptory

6    Challenge Number 12, Jami Massey.

7          Bill Pitillo.   What says the State?

8          MR. DAVIS:   The State strikes.

9          THE COURT:   The State exercises Peremptory

10   Challenge Number 13 on Bill Pitillo.

11         Clark Reynolds.   What says the State?

12         MR. DAVIS:   The State strikes.

13         THE COURT:   The State exercises Peremptory

14   Challenge Number 14 on Clark Reynolds.

15         Mark Colditz.   What says the State?

16         MR. DAVIS:   The State accepts.

17         MS. BALIDO:   Defense strikes.

18         THE COURT:   Defense exercises Peremptory

19   Challenge Number 18 on Mark Colditz.

20         William Sherr, S-h-e-r-r.   What says the State?

21         MR. DAVIS:   The State strikes.

22         THE COURT:   The State exercises Peremptory

23   Challenge Number 15 on William Sherr.

24         Shannon Hinckley.

25         MR. DAVIS:   The State accepts.

1    MS. BALIDO:  Defense accepts.

2    (Shannon Hinckley - Juror Number 12)

3    THE COURT:  Shannon Hinckley is Juror Number

4    12.

5    Three remain.  Give each side one peremptory

6    challenge with regard to one alternate.  Beginning with --

7    MS. BALIDO:   Judge, before we do that, at

8    this time the defendant, Jedidiah Isaac Murphy, would request

9    that he be granted two additional strikes.  We have exercised

10   our strikes in such a way due to trial strategy to strike the

11   worst of the worst.  We would ask this request -- ask -- or

12   make this request based on the fact that we challenged the

13   following jurors for cause.  That challenge for cause was not

14   granted by the defense -- I mean, by the Judge.  And we think

15   wrongfully so, so therefore we were forced to strategize and

16   use our peremptory strikes in such a way to strike those

17   people.  And for the record -- and we've had to accept an

18   unacceptable juror that we would have otherwise struck, that

19   being Number 17, Richard Bachmeyer, and Number 19, Robert

20   Mendro, that we would have struck or would have been able to

21   struck (sic) had the Judge granted our challenge for cause on

22   one of the following jurors:  Number 4, Marlin Cannon.  We

23   asked for a strike for cause and were denied.  Number 12,

24   Phillip May.  We asked for a challenge for cause and were

25   denied.  Both those people we also subsequently struck with

1   peremptory strikes.  Number 23, Thomas Brooks.  We objected

2   for cause, were denied and had to use a peremptory strike.

3   Number 28, Robert Wright.  We challenged him for cause.  That

4   challenge was denied, and we had to use a peremptory strike.

5   Number 32, Kimberly Edge.  We challenged for cause.  Our

6   challenge was denied, and we had to use a peremptory strike.

7   Number 36, John Wilson.  We made a motion for a strike for

8   cause.  We were denied by the Court and had to use a

9   peremptory strike.  Number 44, Mark Colditz.  We challenged

10  him for cause based on the probability issue.  We were denied

11  a challenge for cause and had to use a strike.

12        And based on the Court's ruling on the challenge for

13  cause in those situations, we were forced to take two jurors

14  that we do not wish to take.  We had to exercise our

15  peremptory strikes in such a way to strike people that were

16  also challenged for cause but were worse than the people that

17  were challenged for cause, those two individuals, and we were

18  forced to accept them on this jury and we'd make a motion for

19  two additional peremptory strikes, based on that reason.

20        THE COURT:  The record reflect prior to the

21  commencement of individual questioning, the Court informed

22  counsel for the State and the defense that the Court,

23  consistent with case law from the Court of Criminal Appeals

24  in Texas, would allot the defense three additional peremptory

25  challenges, more than the 15 allotted statutorily.  Defense

```
 1    has used their 18 strikes.  The request for additional

 2    strikes is at this time denied.

 3              Proceeding with the alternates.  Joyce Wicks.  What

 4    says the State?

 5                   MR. DAVIS:  The State accepts.

 6                   MS. BALIDO:  Defense accepts.

 7                   (Joyce Wicks - Alternate Juror)

 8                   THE COURT:  Joyce Wicks will be the single

 9    alternate juror.

10              Take a short recess so that I may get this list to

11    Mrs. Daily so she may begin the phone calls.

12                   MS. BALIDO:  Judge, before we --

13                   THE COURT:  I'm going to ask that jurors be

14    here Monday morning, say 9:30.  That will give us a little

15    bit of --

16              Off the record, Darline.

17                   (Discussion off the record.)

18                   MS. BALIDO:  Judge, we have a Batson issue if

19    you'd like to take it up now.

20                   THE COURT:  Yeah, I'd be glad to.

21                   MS. BALIDO:  So are we on the record?

22                   THE COURT:  Back on the record.

23                   (Batson Objection By The Defense)

24                   MS. BALIDO:  Judge, comes now the defendant,

25    Jedidiah Isaac Murphy, and pursuant to Batson versus
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    Kentucky, makes the following objection to the State's

2    peremptory challenges, specifically on two grounds.  First,

3    the State's challenge for cause of Orvis Reynolds, a black

4    male.  At the time that the State exercised their peremptory

5    challenge, there were two black males on the panel and they

6    struck one.  And we believe that that establishes -- by

7    striking 50 percent of the available African Americans at the

8    time, that establishes discriminatory intent and therefore

9    we'd ask to hear a race neutral reason as to why they struck

10   Mr. Reynolds at the time.

11              THE COURT:  Request granted.  Mr. Davis,

12   pursuant to Batson versus Kentucky and Burkett versus Elam,

13   may I ask you to explain your striking in a race neutral

14   fashion, assuming there is one?

15              MR. DAVIS:  Yes, sir.  Be happy to.  There are

16   several race neutral reasons why I struck Mr. Reynolds.

17   First of all, Mr. Reynolds rated himself a Number 3.  The

18   State -- it's my policy in all the cases I've ever tried in

19   this county, I will never take a Number 3 regardless of

20   race.

21              Secondly, Mr. Reynolds stated upon questioning that

22   everyone could be rehabilitated.  That certainly would

23   concern me on Special Issue Number 2 with regards to

24   mitigation.  He believed also upon questioning that he

25   thought that alcoholism and drugs was a disease process,

1    rather than a personal choice.  Again, that would cause a

2    great deal of concern to the State of Texas on Special Issue

3    Number 2, since I anticipate that there will be testimony

4    with regards to the defendant's use of alcohol, possible

5    alcoholism at an early age in this case.  He further stated

6    he thought that food could be an addiction which troubled

7    me.  If food can be an addiction, I could envision that just

8    about everything could be termed to be an addiction in a

9    possible mitigating circumstance.

10           He believed that remorse would be a mitigating

11   circumstance.  I would anticipate some testimony with regards

12   to the issue of remorse.  Further, he failed to disclose a

13   prior charge of aggravated sexual assault.  That was not

14   listed on his questionnaire.  In fact, that case was not only

15   filed, but according to Mr. Reynolds, that case was actually

16   tried here in Dallas County, case in which he claims that he

17   was found innocent when he went before the Judge.  And

18   certainly his nondisclosure and I would suspect his failure

19   to be candid and honest on the questionnaire, certainly I

20   would never take a juror who would lie to me on the

21   questionnaire.  So those are the race neutral reasons for the

22   State's strike.

23           MS. BALIDO:  Judge, I'd like to point out --

24   into the record that -- and I'd like to go last reason first.

25   Mr. Reynolds did state on his questionnaire that he had used

1   a lawyer before, a well-known criminal defense lawyer, David

2   Smith.  That's what keyed the State into knowing that he had

3   been under charges before.  According to JI55, he was charged

4   with aggravated sexual assault and was found innocent in a

5   trial before the Court.  He was very candid with that.  When

6   asked about it, he therefore did not lie about it.  There is

7   no telling what the Judge told him when he found him not

8   guilty, that he didn't have a record or he didn't have to

9   tell.  There's no way of knowing.  And so therefore Mr.

10  Reynolds certainly could have had a good faith basis in not

11  disclosing that at the time, but he was very honest about it

12  when the State brought it up.

13          Additionally, Your Honor, not just Mr. Reynolds or

14  any of the African American people, but also white males and

15  females indicated that they thought that alcoholism was a

16  disease, and therefore we would again put the burden on the

17  State to show other members of the Anglo or Caucasian race

18  that they struck based on that criteria.

19                  (Request Denied By The Court)

20          THE COURT:  The Court finds as a matter of law

21  consistent with Burkett versus Elam, United States Supreme

22  Court case, that the exercise of the strike was race

23  neutral.  The defense request is denied.

24                  (Batson Objection By The Defense)

25          MS. BALIDO:  Judge, I have an additional

1    challenge under Batson.  It's a little bit different so if

2    you'll bear with me for a minute.

3           Judge, I would like to challenge or object to the

4    State's challenge for cause on Juror Number 43, Clark

5    Reynolds, and Juror Number 45, William Sherr.  We -- based on

6    the questionnaire and the questioning done of these two

7    individuals, they were the two outwardly gay members of the

8    panel.  And we believe that since the State struck both of

9    the outwardly and openly gay members of the panel, that they

10   did so in a discriminatory manner and therefore should have

11   to state into the record why they struck those persons,

12   absent their sexual preference.

13           THE COURT:  Does the State care to respond?

14           MR. DAVIS:  Well, my response, first of all,

15   would be there is no case law that would give them any sort

16   of protected status in this type of case.  Both of them are

17   both white males.  I will state for the record that their

18   sexual orientation really had nothing to do with the strikes

19   in this case.  And I would also state into the record that in

20   past cases I have accepted gay members.  I've had a gay juror

21   be the foreman of a case in the past.  And so sexual

22   orientation is not taken into account.  Their views on the

23   special issues were the reasons for the strikes, but I'll be

24   happy to -- if you want further detail, if the Court wishes.

25           THE COURT:  Out of abundance of caution for

1   the trial record, may I invite you to do so.  If you wish a

2   little time to prepare your response, Mr. Davis, I will grant

3   you that request.

4             MR. DAVIS:  No, sir, I'm ready.

5             THE COURT:  On the other hand, if you're ready

6   extemporaneously to --

7             MR. DAVIS:  If we could just have a moment.

8   Ms. Miller has got some additional notes.  I made my own

9   notes, but I think hers may be a little for extensive since I

10  believe I actually talked with both of these individuals.

11            (Ms. Miller steps out of the courtroom and returns.)

12            MR. DAVIS:  And, Your Honor, for the record,

13  just so defense will have an opportunity to prepare, I will

14  be presenting my own Batson motions against the defense in

15  this matter.

16            If the Court please, with regard to Juror 2514,

17  Clark Reynolds, the following reasons were used for the

18  excusal or the strike on Mr. Reynolds:  With regards to his

19  answers that he gave on page 13 of his questionnaire, first

20  of all, he indicated that he was presently taking

21  medication -- several medications in fact.  Two of those

22  medications went for the treatment of depression, Wellbutrin

23  and Effexor.  The defendant in this case has in the past

24  taken Effexor.  He may presently be taking that medication.

25  I would strongly suspect, given the medical records in my

1    possession, that the defendant will make a claim -- part of

2    the mitigation in this case will be a claim of depression,

3    long-standing chronic depression, mental illness.  My

4    decision at the time was that I don't want a member of the

5    jury up here who is presently suffering from a mental disease

6    on this jury, given the fact that mental disease in all

7    probability will be claimed as a mitigating circumstance in

8    this case.

9           Secondly, on page 13 if -- the question was asked is

10   there any reason why you would not want to serve on this

11   jury -- serve as a juror in this case.  Mr. Reynolds had

12   indicated then, I don't want the responsibility, nor do I

13   want to take this time away from work.  Again, indicated to

14   me that he would have a problem actually assessing death.  My

15   notes at the time were that I thought Mr. Reynolds was acting

16   strangely on the witness stand.  He acted as though he had

17   taken too much medication prior to the time that he had come

18   down here.  I also thought at the time Mr. Reynolds was not

19   being totally honest with me.  I've made a notation I thought

20   he was a liar at the time of his questioning.

21          On page 3 of his questionnaire the response to his

22   thoughts of prosecutor were very troubling to me also because

23   he said, "prosecutors may be arguing against an innocent

24   person," which would lead me to believe that he has a doubt

25   in the integrity of the State of Texas and would in fact be

1    biased against the State of Texas in this matter.

2         On page 5 on a scale to 1 to 10 with regards to how

3    strongly he believed in the death penalty, Mr. Reynolds rated

4    himself as a 3, which again would give me some great concern

5    about his actual ability to assess a death penalty in this

6    case.

7         And finally, on page 10 -- this goes back to his

8    history of mental illness, disturbance.  And I believe this

9    is backed up in his testimony to me the fact that he has seen

10   a therapist for a long -- on a long-term basis over the last

11   10 years or so, which again, I anticipate, based on the

12   medical records in my possession, that Mr. Murphy will have a

13   history of having seen different counselors, therapists,

14   psychiatrists, and psychologists over an extended period of

15   time.  My thinking there would be that this juror would

16   identify with the defendant because of that matter.

17        I'm ready to proceed on William Sherr if the Court

18   would like.

19             THE COURT:  You may.

20             MR. DAVIS:  Thank you.

21        Mr. William Sherr is white male.  He's 28 years of

22   age.  First of all, on page 10 of his questionnaire, Mr.

23   Sherr indicated that he had sought treatment, psychological

24   treatment or psychiatric treatment for addiction issues with

25   regards to a sexual addiction while he was in college.  And

1   certainly again with regards to this defendant having sought

2   treatment for addiction issues with regards to drugs and

3   alcohol, my fear would be that this juror also would be

4   identifying with the defendant and his past psychiatric

5   problems.

6           On page 5 of his questionnaire, Mr. Sherr on a scale

7   of 1 to 10 rated himself as only a 4 with regards to the

8   death penalty.  When I first asked Mr. Sherr his honest

9   thoughts about how he felt about being called down on this

10   type of case and actually being put in place of having to

11   assess a death penalty, his remark at the time to us was he

12   considered that to be a scary thing to do, which to me, based

13   upon my experience of questioning prospective jurors,

14   indicates an unwillingness or great difficulty in actually

15   assessing the death penalty in a case such as this.  He also

16   indicated a very strong belief in rehabilitation, that he

17   thinks that rehabilitation is the route that should be taken

18   with individuals.  I would anticipate very strong arguments

19   from the State -- from the defense in that regard, that the

20   State has not done enough to try to rehabilitate Mr. Murphy

21   throughout his constant long-term association with the

22   criminal justice system in this case.  My fears there would

23   be Mr. Sherr would be leaning towards mitigation and towards

24   rehabilitation which I believe would be opposed to the

25   position of the State of Texas.

1        He also upon questioning could not think of any

2    cases that were death penalty appropriate that he's heard

3    about recently, although that's not the sole factor.  That is

4    one of the indicators that I do use to judge the strength of

5    a juror with regards to his feelings about the death penalty.

6            MS. BALIDO:  Judge, can I be heard on the

7    record?

8            THE COURT:  You may.

9            MS. BALIDO:  Judge, in regard to both Mr.

10   Reynolds and Mr. Sherr, I'd like the record to reflect -- I'm

11   sure it will reflect the disparate questioning that was done

12   on the two jurors -- once it became apparent to the State

13   that these people were actively engaged in a homosexual

14   life-style, the questioning basically stopped.  It was just

15   rudimentary, very short, very brief, and so we would say that

16   the showing of the pretext of their strikes and the pretext

17   of their reasons is shown in their disparate questioning of

18   these people in regard to other jurors.  Additionally --

19   specifically in regard to Mr. Reynolds and the State's reason

20   for striking them based on medication, Judge, on this panel

21   there were 22 people on this panel of 48 that were taking

22   some sort of medication for various and sundry number of

23   reasons.  Some people were taking -- some of the women were

24   taking hormones.  Ms. Hunter, for example, that could be used

25   both for depression and also hormone replacement therapy.

1    Ms. Morton was also on some sort of hormones or depression

2    drug.  And those are the ones -- and those are the ones that

3    I can see just on a cursory looking at.  So therefore, we'd

4    say that that reason was pretextual as well.

5         Mr. Davis also used the -- the race neutral reason

6    of not wanting the responsibility or taking away from work.

7    But two people that the State did not strike, Mr. Colditz who

8    the defense had to use a strike on and Mr. Layne, also the

9    defense had to use a strike on, also voiced those concerns to

10   both the State and the defense and had the same reaction,

11   that -- but they could serve if needed to.

12        Additionally on Mr. Sherr, he had talked about that

13   the State said that it was no cases that the death penalty

14   would be appropriate and while that's not the only reason,

15   that isn't a reason that they cited which was one of the

16   questions that they asked every juror.  And I would submit to

17   the Court that those -- that other jurors that were left on

18   were not struck by the State were -- their answers were the

19   same or similar.

20        And that is in our response to their response to us,

21   but I'd also like to be heard on how even though you've

22   granted us this hearing in an abundance of caution, why we

23   would still make our objection on constitutional grounds,

24   Judge.

25             THE COURT:  Anything further?

1              MS. BALIDO:  Yes, I do, Judge.

2              THE COURT:  Go ahead.

3              MS. BALIDO:  Judge, basically we make this

4    objection for striking these two gay males based on Batson

5    versus Maryland which dealt with racial discrimination,

6    J.E.B. --

7              THE COURT:  How about Batson versus Kentucky?

8              MS. BALIDO:  I'm sorry, Batson versus Kentucky

9    which was the racial discrimination.  J.E.B. versus Alabama,

10   ex rel. TB, which was gender.  And looking at the reasoning

11   in that case, in addition to the 9th Circuit Court of Appeals

12   decision in Johnson versus Campbell which is 92 F.3d 951 in

13   1996, where in that case the Ninth Circuit did not find --

14             THE COURT:  You're citing Ninth Circuit for

15   authority?

16             MS. BALIDO:  I am citing it for persuasive

17   authority, Judge.

18             THE COURT:  The most reversed circuit by far

19   by the United States Supreme Court.

20             MS. BALIDO:  That's not the only one that I'm

21   citing, Judge.

22             THE COURT:  All right.

23             MS. BALIDO:  The Ninth Circuit Supreme Court

24   where they did not find that there was enough evidence to

25   show from the trial record that the State struck based on

1    homosexuality, but did assume that homosexuality would fall

2    underneath the protection of Batson.  We would base it on

3    that.  In addition to the California equivalent of the Texas

4    Court of Appeals -- Texas Court of Criminal Appeals, in the

5    People versus Wheeler which is 583 Pacific Reporter 2d 798 --

6    or 748, excuse me, where the California State Court of

7    Appeals found that homosexuality is a recognizable group for

8    Batson purposes.

9            We would additionally make this objection based on

10   the fact that the State legislature in this State, the State

11   of Texas, has passed and the governor has signed legislation

12   which recognizes homosexuality or sexual orientation as a

13   protected class under its newest hate crime statute.  And

14   therefore there is some authority in Texas State law to find

15   that homosexuality is a protected class, based on the reason

16   of the recent State law and Batson's arguments of equal

17   protection and due process and the U.S. Supreme Court's

18   opinion that a cognizable group -- and this is in Castaneda

19   versus Partida, 430 U.S. 482, a 1977 case, a cognizable group

20   is one that is recognizable, has a distinct class and is

21   singled out for different treatment under the law, either

22   written or applied.

23            THE COURT:  Grand jury composition case,

24   correct?

25            MS. BALIDO:  That's correct, Judge.  And I'd

DARLINE W. LABAR, OFFICIAL REPORTER

1    also point the Court to the language in the J.E.B. case, that

2    it's not just the right of the defendant to have these people

3    serve on their jurors -- on their jury, but it's potential

4    jurors as well as litigants have an equal protection right to

5    jury selection procedures that are free from State sponsored

6    stereotypes rooted in and reflected of historical prejudice.

7         We would also point out to the Court that the

8    defendant is entitled to a representative cross-section of

9    the community and by striking these people, these homosexual

10   men from the panel in the way that was done, systematically

11   excludes them from the venire.  And we would object on that

12   basis.

13        And finally, Judge, we would cite Peters versus

14   Kipp, 307 U.S. 493 --

15             THE COURT:  Another grand jury composition

16   case.

17             MS. BALIDO:  Another 1974 case that said

18   exclusion from jury service of a substantial and identifiable

19   class of citizens has a potential impact that is too subtle

20   and too persuasive to admit of confinement -- of confinement

21   to a particular issue or particular cases.  When any large

22   and identifiable segment of the community is excluded from

23   jury service, the effect is to remove from the jury room

24   qualities of human nature and varieties of human experience

25   the range of which is unknown and perhaps unknowable.  It is

1    not necessary to assume that the excluded group will

2    consistently vote as a class in order to conclude as that

3    court did that it's exclusion deprives the jury of a

4    prospective of human -- on human events that may have

5    unsuspected importance in any case that may be presented.

6    Judge --

7         THE COURT:  And the class that was being

8    discussed in that case was what, Ms. Balido?

9         MS. BALIDO:  I don't have that information.

10        THE COURT:  African American.

11        MS. BALIDO:  Okay.  Based on the expansion of

12    Batson to both gender and J.E.B. and the consideration,

13    although the rejection of the consideration of religion in

14    this State, we would say that homosexuals are a recognizable

15    class that are protected under Texas State law and therefore

16    should be protected under Batson.  And we object to the State

17    striking both openly gay males from the panel.

18             (Request Denied By The Court)

19        THE COURT:  Assuming arguendo that homosexuals

20    are a protected class, the Court finds the reasons for the

21    exercise of the peremptory challenge by the State to be

22    consistent with the United States Supreme Court opinion in

23    Burkett versus Elam and the challenges of the two allegedly

24    gay males are denied.

25        MS. BALIDO:  Judge, we'd also just for the

1    record like to make that objection under the State

2    Constitution, Article 1, Section 10, 13, and 19, and the due

3    course of law provisions under the -- the Texas Constitution.

4                    THE COURT:   The record so reflect.   Anything

5    further?

6                    (Batson Objection By The State)

7                    MR. DAVIS:   Yes, sir.   As I indicated earlier,

8    I will have a Batson challenge on the strikes taken by the

9    defense in this case.   With regards, first of all, to Juror

10   1115, Mark W. Colditz.   The record will reflect that of the

11   49 people who were qualified in this case, 48 remaining after

12   the dismissal of Ms. Wilhite, there was only one individual

13   of Asian heritage.   That was Mark Colditz.   Certainly the

14   Asian community is a large segment of Dallas County at this

15   time.   The defense has chosen to strike the only individual

16   of Asian heritage.   And I would challenge that on Batson

17   grounds.

18                    MS. BALIDO:   Assuming his challenge --

19                    THE COURT:   More specifically under Georgia

20   versus McCollum.   And the alleged race neutral reason for the

21   peremptory challenge on Mr. Colditz, Ms. Balido.

22                    MS. BALIDO:   Judge, first and foremost, he

23   said that -- on his questionnaire that he was -- would not

24   like to serve because he enjoyed his work and he had a lot of

25   work to do, and --

1          THE COURT:  Isn't that what --

2          MS. BALIDO:  I know, Judge --

3          THE COURT:  Isn't that the argument you used

4   against the State --

5          MS. BALIDO:  It is, but --

6          THE COURT:  -- on one of theirs?

7          MS. BALIDO:  -- but the second part of that

8   answer is once he got on the stand, he said he was ahead at

9   work and that wouldn't be a problem.  And I personally don't

10  trust anybody that's ahead in their job, since I like to work

11  on a day-to-day basis.  But we believe that his background,

12  working for the FAA, the civil engineer, his -- and this is

13  all a combination, Judge, his service as a U.S. Army officer,

14  in addition to the fact that he had a prior jury service on a

15  forgery case where he gave life and the fact that he had a --

16  he said he could consider mitigating circumstances, but he

17  did not truly -- could not really think of any mitigating

18  circumstance that he would give some weight to.  It's for

19  those reasons that we exercised our strike against Mr.

20  Colditz.

21              (Request Denied By The Court)

22          THE COURT:  The Court finds that the

23  explanation by the defense is sufficiently race neutral to

24  overrule the State's challenge.

25              (Batson Objection By The State)

1              MR. DAVIS:  Yes, sir.

2         Additionally, the State now would challenge the

3    strikes that were exercised against two African Americans by

4    the defense in this case, that being against Juror 350,

5    Marlin Cannon, who was a 61-year-old African American male,

6    as well as Juror 278, Kimberly Williams, a 26-year-old black

7    female.  The record will reflect that of the individuals who

8    were qualified, there were four African Americans.  The

9    record will reflect that the State accepted three of them.

10   The record will also reflect that of those who were

11   qualified, that the defense struck two of the African

12   Americans so in effect the defense has struck 50 percent of

13   all available African Americans for service on this jury.

14             THE COURT:  Ms. Balido, the burden of

15   persuasion falls upon the defense to justify race neutral

16   reasons for the exercise of strikes about which the State

17   makes reference.

18             MS. BALIDO:  First, Judge, in regard to Marlin

19   Cannon, the record will reflect we tried to strike him for

20   cause and did in fact submit him for cause, and that was

21   denied by the Court.  And therefore we turned around and

22   struck him.

23         Secondly, they were both conservative Republicans.

24   Not that there's anything wrong with that, Judge, but -- and

25   additionally they had --

Page 93

1            THE COURT:  Is that not kind of like a gay

2    person in an identifiable group who's rights deserve to be,

3    pursuant to the defense, protected as gays?

4            MS. BALIDO:  No, Judge, not if you --

5            THE COURT:  Just a minute, conservative

6    Republicans don't have a right, but gay men do.  Okay.

7            MS. BALIDO:  Okay.  Judge, additionally they

8    both have significant --

9            THE COURT:  Just want the high nine to have a

10    little matter to pensively reflect upon.

11            MS. BALIDO:  And I'm sure they will, Judge.

12        They both had significant ties to law enforcement.

13    First, Marlin Cannon, whose daughter is a Dallas Police

14    officer.  And also had a daughter that was a probation

15    officer.  And additionally Kimberly Williams was a former

16    Dallas Sheriffs Officer.  And we believe their ties to law

17    enforcement were significant.  They were both very strong on

18    law and order.  They were some of the strongest jurors that

19    we saw, therefore that's why we struck, regardless of their

20    race.

21            (Request Denied By The Court)

22            THE COURT:  The Court acknowledges the reasons

23    for the strikes to be pursuant to Burkett versus Elam, race

24    neutral, and the State challenge of the defense peremptory

25    challenges are denied.

1                    MR. DAVIS:  That's all the challenges we had,

2     Your Honor.

3                    MS. BALIDO:  That's all the challenges we

4     have.

5                    THE COURT:  Let's take about a ten-minute

6     break so that Mrs. Daily may begin calling jurors.

7                    (Recess of hearing.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          Reporter's Certificate

2   STATE OF TEXAS:

3   COUNTY OF DALLAS:

4          I, Darline W. LaBar, Official Court Reporter of the

5   194th Judicial District Court, in and for Dallas County,

6   Texas do hereby certify that the foregoing volume constitutes

7   a true, complete and correct transcript of all portions of

8   evidence and other proceedings requested in writing by

9   counsel for the parties to be included in the statement of

10  facts, in the above styled and numbered cause, all of which

11  occurred in open court or in chambers and were reported by

12  me.

13         I further certify that this transcription of the

14  record of the proceedings truly and correctly reflects the

15  exhibits, if any, offered by the respective parties.

16         Witness my hand this the 23rd day of November, A.D.,

17  2001.

18

19

20  _____

21             DARLINE W. LABAR
             Official Court Reporter
22           194th Judicial District Court
             Dallas County, Texas
             (214) 653-5803

23

24

25  Certification No. 1064 Expires December 31, 2002

---

DARLINE W. LABAR, OFFICIAL REPORTER

REPORTER'S RECORD

**74145**

VOLUME 45 of 65 VOLUMES

TRIAL COURT CAUSE NO. F00-02424-NM

THE STATE OF TEXAS       :       IN THE DISTRICT COURT

VS.       :       DALLAS COUNTY, TEXAS

JEDIDIAH ISAAC MURPHY       :       194TH JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PRETRIAL HEARING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

DEC 5 2001

Troy C. Bennett, Jr., Clerk

A P P E A R A N C E S:

HONORABLE BILL HILL, Criminal District Attorney
      Crowley Criminal Courts Building
      Dallas, Dallas County, Texas  75207
      Phone:  214-653-3600
BY:      MR. GREG DAVIS, A.D.A., SBOT # 05493550
      MS. MARY MILLER, A.D.A., SBOT # 21453200
           FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
      Phone:  214-653-9400
           FOR THE DEFENDANT.

\*\*\*\*\*\*\*\*\*

On the 31st day of May, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

      Proceedings reported by machine shorthand, computer

assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

1                          INDEX VOLUME 45

2    May 31st, 2001                              PAGE     VOL.

3    PRETRIAL HEARING:

4    Proceedings...................................... 2      45

5    Reporter's Certificate.......................... 152    45

6

7                    CHRONOLOGICAL WITNESS INDEX

8                    DIRECT        CROSS        VD      VOL.

9    MATT MYERS              5            48                45

10   SHERRYL WILHELM        100          115               45

11   DOUGLAS H. LIGON       140          147               45

12

13                   ALPHABETICAL WITNESS INDEX

14                   DIRECT        CROSS        VD      VOL.

15   DOUGLAS H. LIGON       140          147               45

16   MATT MYERS              5            48                45

17   SHERRYL WILHELM        100          115               45

18

19                      EXHIBIT INDEX

20   STATE'S                  OFFERED      ADMITTED     VOL.

21      41     Miranda 10-6-00      24          24         45

22      47     Statement            34          34         45

23      48     Miranda 10-7-00      39          39         45

24      49     Map 10-7-00          46                     45

25      141    Composite           144         144         45

DARLINE W. LABAR, OFFICIAL REPORTER

| | | DEFENDANT'S | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | 1 | Warrant | 89 | 89 | 45 |
| 3 | 2 | Questionnaire | 151 | 151 | 45 |
| 4 | 3 | Miranda 10-11-00 | 151 | 151 | 45 |
| 5 | 4 | Miranda 10-13-00 | 151 | 151 | 45 |
| 6 | 5 | Wilhelm - Map | 139 | 140 | 45 |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |
| 14 | | | | | |
| 15 | | | | | |
| 16 | | | | | |
| 17 | | | | | |
| 18 | | | | | |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

```
 1                  P R O C E E D I N G S
 2              THE COURT:  The record reflect that during a
 3   scheduling hearing in chambers, outside the presence and
 4   hearing of Mr. Murphy, attorneys for both the State and the
 5   defense brought to the Court's attention that given the
 6   nature of the circumstances involving witnesses in the
 7   pretrial matter, that the Court may not be in a position,
 8   prior to the commencement of the testimonial stage of the
 9   trial, to make a definitive ruling one way or another as it
10   relates to matters brought to the Court's attention in
11   pretrial.  The Court will take cognizance of counsels'
12   representation in that regard.
13              And for purposes of the trial record, at the
14   conclusion of the pretrial matters today, the 31st of May,
15   and tomorrow, June 1st, the year 2001, the Court may not be
16   after these hearings -- these two days in a position to make
17   a definitive ruling with regard to the admissibility of
18   certain anticipated proffered items of evidence.
19              With that caveat or warning, for purposes of the
20   trial record, the State and the defense prepared to proceed
21   on the Jackson-Denno hearing?
22                   MR. DAVIS:  The State's ready.
23                   THE COURT:  Is the defense ready?
24                   MS. BALIDO:  Well, Judge --
25                   THE COURT:  Subject to the matters that -- of
```

1    scheduling?

2                    MS. BALIDO:  Oh, yes, Judge.

3                    THE COURT:  Are you ready?

4         The record further reflect that Mr. Murphy is

5    present in court and will be, as required by the Code of

6    Criminal Procedure, at all times during these hearings,

7    unless I dictate the contrary into the record.

8         The State may call its first witness.

9                    MR. DAVIS:  The State calls Detective Matt

10   Myers.

11                   (Witness brought forward.)

12                   THE COURT:  Good morning, sir.  Ask you to

13   raise your right hand, please.

14                   (Witness sworn.)

15                   THE COURT:  Invite your taking a seat to my

16   left, please.

17        Before we proceed with this witness, though counsel

18   for both sides is aware of the Court's concern, I wish to

19   dictate into the record for trial record purposes the Court's

20   concern that given the number of various law enforcement

21   agencies who had various and sundry different roles with

22   regard to this prosecution, would ask the State to make

23   doubly and triply aware that the United States Supreme Court

24   ruling with regard to, quote, unquote, materiality, close

25   quote, as the United States Supreme Court has ruled in the

DARLINE W. LABAR, OFFICIAL REPORTER

Page 4

1    Bagley, B-a-g-l-e-y, case, and Brady versus Maryland, be

2    faithfully and completely observed.  As we speak, the federal

3    court system and the FBI are somewhat of a tenuous

4    embarrassing position with regard to the matters of the

5    Timothy McVeigh case that were, according to media reports

6    and confirmation from the agents involved, not turned over to

7    the prosecution in a timely and responsible fashion.  Given

8    the nature of a capital case in which the United States

9    Supreme Court on more than two dozen separate cases has used

10   the phrase "death is different," end quotes, I implore the

11   prosecution to make certain that Kyles v. Whitley and

12   Strickler versus Green are complied with not only the intent

13   but the letter of the law.

14           Knowing the prosecutors and Mr. Richardson, the lead

15   investigator for the Dallas District Attorneys Office, feel

16   those comments that I am making are unnecessary.  I don't

17   want my comments to be cast in any light of my criticizing

18   prosecutors in this case or investigators or law enforcement

19   personnel at all.  However, out of an abundance of trial

20   court caution, I'm placing these comments in the trial

21   record.

22           Having said that, the State may begin with the

23   examination of the witness.

24           MR. DAVIS:  Thank you.

25

MATT MYERS

was called as a witness by the State and, after having been

first duly sworn, testified as follows:

<u>Direct Examination</u>

By Mr. Davis:

    Q.   Sir, would you please tell us your full name?

    A.   My name is Matt Myers.

    Q.   Mr. Myers, how are you employed?

    A.   I'm a detective with the Garland Police Department.

    Q.   First of all, how long have you been with the
Garland Police Department?

    A.   I've just started my 24th year.

    Q.   How long have you been in the Investigative Unit of
the police department?

    A.   I've been a detective since 1988.

    Q.   What are your duties and responsibilities at this
time?

    A.   I'm currently assigned to Crimes Against Persons
Unit.  We investigate major assaults, robberies, some of the
more major cases that come through to our department.

    Q.   Detective Myers, were you assigned to investigate
the murder of the victim in this case, Bertie Cunningham?

    A.   Yes, I was.

    Q.   Sir, did you first become aware of this case on
October the 5th of 2000?

1      A.   Yes, I did.

2      Q.   And I want to direct your attention now forward one

3  day to October the 6th.  On that date is that the first

4  occasion that you actually came in contact with the defendant

5  in this case, Jedidiah Murphy?

6      A.   That's correct, yes.

7      Q.   Do you see him here in the courtroom this morning?

8      A.   Yes, I do.

9      Q.   Please point him out for the Court.

10     A.   He's seated right here.  He's dark hair, glasses,

11  and has -- dressed in orange.

12          MR. DAVIS:  Your Honor, may the record please

13  reflect this witness has identified the defendant in open

14  court.

15     Q.   (By Mr. Davis)  Direct your attention more

16  specifically now October the 6th, year 2000, 2:00 a.m.  At

17  that time, sir, did you learn that the defendant had been

18  located in Edgewood?

19     A.   Yes, I did.

20     Q.   Did you and other Garland officers then proceed to

21  go to Edgewood?

22     A.   Yes, sir.

23     Q.   Approximately 3:00 a.m., did you meet with certain

24  members of the Van Zandt County Sheriff's Department?

25     A.   Yes, we did.

 1      Q.   Did you have some discussions about the defendant's

 2  location at that time?

 3      A.   Yes, we did.

 4      Q.   Did you go to a location with those officers?

 5      A.   Yes, we did.

 6      Q.   What location did you go to?

 7      A.   It was at a residence on Lamar Street.

 8      Q.   Okay.  509 Lamar?  Does that sound familiar to you?

 9      A.   Yes, sir, I believe that was the address.

10      Q.   Were there police officers already present at that

11  location?

12      A.   Yes, there was.

13      Q.   And once at that location, did you in fact come in

14  contact with the defendant?

15      A.   Yes, I did.

16      Q.   Where was the defendant located when you first

17  contacted him?

18      A.   He was in a bedroom at the residence at 509 Lamar

19  Street.

20      Q.   Were there other individuals at the residence

21  besides police officers?

22      A.   Yes, there was.

23      Q.   Do you recall a black male by the name of Treshod

24  Tarrant being present?

25      A.   Yes, he was present.

1      Q.   Was there a black female -- actually Mr. Tarrant's

2  grandmother, Ora Mae Milton, was she present?

3      A.   Yes, she was present.

4      Q.   In fact, was that her home?

5      A.   I understood that it was.

6      Q.   First of all, describe, if you will, the defendant's

7  appearance when you first saw him in the bedroom of that

8  home.

9      A.   Mr. Murphy was sitting on a bed.  He had been

10  handcuffed.  He was awake, sitting upright on the edge of the

11  bed.

12     Q.   Okay.  General demeanor, was he crying?

13     A.   No, he was not.

14     Q.   Appear to be upset?

15     A.   No.

16     Q.   Did you proceed to talk with him?

17     A.   The first words that I spoke to him was to Mirandize

18  him.  We did that verbally in the presence of my

19  supervisors.  I asked him one question after that.

20     Q.   Let me just stop you then.  When you Mirandized Mr.

21  Murphy, he's still in the bedroom, correct?

22     A.   That's correct.

23     Q.   Did you give him his Miranda warnings by memory, or

24  do you use a card to give those warnings to suspects?

25     A.   At that time it was done by memory.

1      Q.   All right.  Do you remember the warnings that you in

2   fact gave him?

3      A.   Yes.

4      Q.   Can you please state for the Court the warnings that

5   you gave to Mr. Murphy that morning?

6      A.   I would have said, Mr. Murphy, you're under arrest,

7   that you have the right to remain silent and not make any

8   statement, that any statement that do you make may and

9   probably will be used as evidence against you at the trial --

10  at your trial.  You have the right to have an attorney

11  present to counsel with you prior to and during any

12  questioning.  If you cannot afford an attorney, the State

13  would appoint an attorney to counsel with you.  You also have

14  the right to terminate this interview at any time.

15     Q.   Okay.  I notice that you're giving those warnings

16  this morning without the aid of any card or any assistance,

17  correct?

18     A.   Yes, sir.

19     Q.   You're doing it by memory again this morning?

20     A.   Yes, sir.

21     Q.   Was Mr. Murphy looking at you while you gave him

22  those warnings?

23     A.   He was -- we were facing each other, but he was not

24  making eye contact with me.

25               THE COURT:  How far away from him were you,

1    Detective, when you gave him these warnings --

2                    THE WITNESS:  Less than two feet.

3                    THE COURT:  -- if you recall?  Less than two

4    feet?

5                    THE WITNESS:  Yes, sir.

6        Q.   (By Mr. Davis)  Okay.  When you finished giving the

7    warnings to him, did he acknowledge that he had heard the

8    warnings?

9        A.   He did.

10       Q.   And what sort of acknowledgment did he make?

11       A.   He verbally said yes and shook his head.

12       Q.   All right.  And did -- was it your understanding at

13   that time that he had heard and had understood the warnings?

14       A.   Yes, it was.

15       Q.   All right.  Did he ask you any questions about the

16   warnings or make any sort of verbal indication that he had

17   not understood the warnings?

18       A.   No, he did not.

19       Q.   Did Mr. Murphy at that time then agree to speak with

20   you?

21       A.   I did ask him one question at that time.

22       Q.   What question did you ask him?

23       A.   I asked him where the credit cards were.

24       Q.   And did Mr. Murphy respond to you?

25       A.   Yes, he did.

1    Q.   And what response did he give?

2    A.   He said, "they're in the car."

3    Q.   Now, the credit cards that you were referring to,

4  were those credit cards belonging to the victim, Bertie

5  Cunningham?

6    A.   Yes.

7    Q.   And was it your understanding when you asked that

8  question, that Ms. Cunningham's cards had been used in

9  Richardson and -- as well as in Dallas and Terrell to make

10  certain purchases or in an attempt to obtain cash from ATM

11  machines?

12    A.   Yes, sir, that's correct.

13    Q.   Did you ask any other questions of Mr. Murphy at

14  that time while you were in the residence with him?

15    A.   No, I did not.

16    Q.   Now, at that time did you have an opportunity to

17  observe Mr. Murphy?

18    A.   Yes, I did.

19    Q.   First of all, during the time that you were speaking

20  with him, he was awake; is that right?

21    A.   Yes, he was.

22    Q.   Have you had an opportunity in your 20 plus years

23  experience as a police officer to see individuals who were

24  intoxicated?

25    A.   Yes.

1     Q.   On few or many occasions?

2     A.   Many occasions.

3     Q.   In your observations of Mr. Murphy did he appear to

4 be intoxicated at the time that you gave him his Miranda

5 warnings?

6     A.   No, I did not believe he was intoxicated.

7     Q.   Did he appear to be under the influence of drugs at

8 the time that you gave him his Miranda warnings?

9     A.   No, sir, he did not.

10     Q.   All right.  And what did you base your conclusion

11 on?

12     A.   Well, I was -- when I went into the room, it was one

13 of the first things I did was to observe his demeanor.  I

14 looked -- I looked at his face to see if his eyes were

15 bloodshot or watery.  I got -- I tried to get close enough to

16 his face to try and smell alcohol.  I did not smell any

17 alcohol.  And he was -- he was sitting under his own power on

18 the edge of the bed.  When he stood -- when he stood up, he

19 didn't appear to be shaking or under the influence of

20 anything at that time.

21     Q.   How long did you remain with the defendant at the

22 residence?

23     A.   I think we -- we were inside the residence, it was a

24 very short time.  I would have to estimate it at maybe five

25 minutes.

1     Q.    Did you go somewhere with the defendant at that

2  time?

3     A.    Yes, we did.  When we left the residence, we did go

4  to another location.

5     Q.    Okay.  Where did you go to?

6     A.    We went to the City of Edgewood Police Department.

7     Q.    And what was the purpose of going to the police

8  department?

9     A.    We were meeting a Magistrate there to have Mr.

10  Murphy arraigned.

11     Q.    All right.  Did you actually transport the defendant

12  to the police station or not?

13     A.    Yes, I did.

14     Q.    All right.  Again, during the time that you were

15  transporting him to the police station, was he giving you any

16  indications that he was intoxicated, under the influence of

17  drugs, or impaired in any way?

18     A.    No, he did not.

19     Q.    Did you have a conversation with him on the way to

20  the police station?

21     A.    No, I did not.

22     Q.    Didn't ask him any questions?

23     A.    No, sir.

24     Q.    When you got to the police station with Mr. Murphy,

25  was the Magistrate already there, or did you have to wait for

1   him?

2       A.   We had to wait.

3       Q.   About how long did you have to wait for the Judge to

4   get there?

5       A.   I think we waited for about 30 minutes.

6       Q.   Where was Mr. Murphy during this 30-minute period?

7       A.   He was seated in the car.

8       Q.   Was that parked outside the police station?

9       A.   Yes.

10      Q.   Who was in the car with him?

11      A.   No one.

12      Q.   All right.  My question then would be during the

13  time that you were at the police station waiting for the

14  Judge to appear, did any member of law enforcement attempt to

15  question or to talk with Mr. Murphy?

16      A.   No, sir.

17      Q.   When the Judge arrived, do you know her to be a

18  Judge Ozell Wilcoxson?  Does that sound familiar to you?

19      A.   Yes, sir.

20      Q.   When Judge Wilcoxson appeared there at the police

21  station, what was done with the defendant?

22      A.   He was then removed from the car and taken inside

23  the police department.

24      Q.   Was he questioned on the way into the police

25  station?

1     A.   No, he was not.

2     Q.   The police station there, just for the Court's

3 benefit, would it be fair to say that is a very small police

4 station there?

5     A.   Yeah, I would describe it as being small.  Yes, sir.

6     Q.   All right.  What is it, perhaps two rooms?  Is

7 that -- does that sound fair?

8     A.   Yes.

9     Q.   We're talking about a space totally -- would the

10 total space of that police station be smaller than this

11 courtroom?

12     A.   Absolutely, yes.

13     Q.   Was the defendant then taken directly before Judge

14 Wilcoxson?

15     A.   Yes, he was.

16     Q.   Was he standing at the time that he was before her?

17     A.   He was standing.

18     Q.   Was he having any difficulty standing that you could

19 observe?

20     A.   No, he did not.

21     Q.   If you would then, tell the Court what transpired

22 when the defendant was taken before Judge Wilcoxson.

23     A.   Well, at that time Judge Wilcoxson was in charge of

24 what was happening there, so she just went through the formal

25 arraignment proceeding.

1     Q.   If you could, give us the details that you remember

2  about that arraignment proceeding.  What did she do

3  precisely?

4     A.   Well, she had some documents that she was writing

5  on.  She told Mr. Murphy what he was charged with.  She then

6  advised him of his Miranda warnings again, asked him if he

7  understood them.

8     Q.   Were those the same Miranda warnings that you'd

9  previously given to him at 509 Lamar?

10     A.   Yes.

11     Q.   You say that she asked him if he understood them,

12  correct?

13     A.   Yes.

14     Q.   What was his response?

15     A.   He said that he did.

16     Q.   And did she tell him that he had been charged with

17  two offenses, credit card abuse as well as capital murder?

18     A.   Yes.

19     Q.   Did he indicate that he understood the charges

20  against him?

21     A.   He did.

22     Q.   Once the Judge had told Mr. Murphy what he was

23  charged with, had given him his Miranda warnings, had

24  received the indication from him that he understood his

25  warnings, what occurred next?

1    A.    Well, I believe Mr. Murphy signed -- as I recall, he

2   signed the arraignment sheet.  Judge Wilcoxson said that the

3   proceeding was over, wished Mr. Murphy luck, and we left.

4    Q.    All right.  And did you leave with the defendant?

5    A.    Yes.

6    Q.    Where did you go with the defendant then?

7    A.    When we left the Edgewood Police Department, we went

8   back to the crime scene where Ms. Cunningham's body had been

9   located.

10    Q.    Was that a creek on the northeast side of Edgewood?

11    A.    Yes, it is.

12    Q.    What officers went with you out there to the creek

13   in the same car with the defendant?

14    A.    That would have been Detective Tooke.

15    Q.    Is he a member of the Garland Police Department?

16    A.    Yes, he is.

17    Q.    On the way out there to the creek, were you or

18   Investigator or Detective Tooke actually talking with the

19   defendant?

20    A.    No, we were not.

21    Q.    All right.  So as I understand, en route from the

22   police department to the creek, no questions were asked of

23   the defendant; is that right?

24    A.    That's correct.

25    Q.    No statements were made to the defendant; is that

1   right?

2       A.   None.

3       Q.   Did he make any statements or ask any questions of

4   you on the way out to the creek?

5       A.   No, he did not.

6       Q.   When you got out to the creek, was Ms. Cunningham's

7   body still in the creek?

8       A.   Yes, it was.

9       Q.   Did you have the defendant get out of your car once

10  you got to the creek?

11      A.   Well, I asked him to, but he did not get out of the

12  car.

13      Q.   All right.  Did you -- did you ask him any questions

14  once you got to the creek?

15      A.   Yes, I did.

16      Q.   What questions did you ask him?

17      A.   I was -- I was interested in where the location of

18  the murder weapon or the gun might have been, and I asked him

19  where the gun was located at.  And I wanted him to show me --

20  he had verbalized at that time that he threw the gun, and I

21  asked him to get out of the car and show me the approximate

22  area where he had thrown the gun, but did he not.

23      Q.   Did you ask him any other questions?

24      A.   No, I did not.

25      Q.   Did he make any other statements to you at the

1  creek?

2      A.   Only that he didn't want to get out of the car.

3      Q.   How long did you remain at the creek with the

4  defendant?

5      A.   I would say approximately five minutes.

6      Q.   And during that period of time, understand he stayed

7  in the car, never got out of the car, right?

8      A.   That's correct.

9      Q.   At the end of that five minutes then, where did you

10  go with the defendant?

11      A.   We then -- myself and Detective Tooke then left that

12  scene and drove to the Garland Police Department.

13      Q.   Did you make any stops on the way?

14      A.   No, we did not.

15      Q.   Did you question the defendant in any manner during

16  the time that you were in transit from the creek to the

17  Garland police station?

18      A.   No, I did not ask any questions.

19      Q.   How about Detective Tooke, he ask any questions of

20  the defendant en route?

21      A.   No, he did not.

22      Q.   Did the defendant ask you any questions?

23      A.   No, he did not.

24      Q.   Did he make any statements to you en route to the

25  police station?

1    A.    No, he did not.

2    Q.    Approximately how long did that trip take from the

3    creek in Edgewood to the time that you arrived at the Garland

4    Police Department?

5    A.    Excuse me, that's -- I want to estimate that at

6    about a 40 to 45-minute drive.

7    Q.    Approximately then what time did you, Detective

8    Tooke, and the defendant arrive back at the police station?

9    Was it before noon?

10    A.    Oh, yes.  It was in the early morning hours.

11    Q.    And once you -- once you arrived at the police

12    station, where did you take the defendant?

13    A.    He was taken to the jail area and processed there,

14    booked in.

15    Q.    How long did that process take?

16    A.    I would say about 15 or 20 minutes.

17    Q.    In general, could you just outline the procedures

18    that are used when a suspect's brought into the Garland

19    police station and they're booked in, exactly what's done

20    with them?

21    A.    It's just merely obtain the person who is in

22    custody, obtain their name and date of birth and address,

23    personal information.  The jail then records the charges.

24    Q.    Okay.  So during the book-in process, were any

25    questions asked specifically about the facts of this case?

1    A.   No.

2    Q.   The questioning would have gone to general matters

3  such as name, date of birth, that the jail actually needs to

4  record that that person is now in their custody, correct?

5    A.   Yes, that's correct.

6    Q.   Did you stay with the defendant during the book-in

7  process?

8    A.   Yes, I did.

9    Q.   Have a chance to observe him?

10    A.   Yes, I did.

11    Q.   Was there any change in his -- his demeanor or his

12  appearance from when you had first seen him there at 509

13  Lamar?

14    A.   No.

15    Q.   He still appear not to be under the influence of

16  drugs or alcohol; is that right?

17    A.   That's right.

18    Q.   Having any difficulty standing?

19    A.   No, he did not.

20    Q.   Did he have any difficulty providing the jail

21  personnel with his name or his date of birth?

22    A.   No, he did not.

23    Q.   Did he in fact give that information to the jail

24  personnel so they could complete the book-in process?

25    A.   Yes, he did.

1       Q.   After the book-in process was completed, where did

2   you take the defendant?

3       A.   We took to -- we went to an interview room or

4   interrogation room that's located on the second floor of the

5   police department.

6       Q.   If you could, just kind of describe the room.  How

7   large a room?

8       A.   It's a room that -- there's no pictures on the

9   wall.  It's about 10 feet by 12 feet.

10      Q.   Furniture in there?

11      A.   A desk and a couple of chairs.

12      Q.   Did you remain in the interrogation room with the

13  defendant when you first took him in?

14      A.   Yes, I did.

15      Q.   Did Detective Tooke stay with y'all?

16      A.   Yes, Detective Tooke was present.

17      Q.   And did you then begin to have a discussion with the

18  defendant?

19      A.   Well, the first thing we did when we went into the

20  room was he was Mirandized again actually before we talked.

21      Q.   Now, do you actually have written forms that are

22  used by the Garland Police Department to inform suspects of

23  the Miranda warnings?

24      A.   Yes, we do.

25      Q.   Are these forms that you keep there at the police

1   station?

2      A.   Yes.

3      Q.   The second time that you Mirandized him then, this

4   time being at the police station, did you in fact use one of

5   the written forms to do that?

6      A.   Yes, we did.

7            MR. DAVIS:   May I approach, Your Honor?

8            THE COURT:   You may.

9      Q.   (By Mr. Davis)  Detective Myers, looking at what has

10  been marked as State's Exhibit Number 41, do you recognize

11  that form, sir?

12     A.   Yes, I do.

13     Q.   Is this the written form that you used on October

14  the 6th of the year 2000 to inform Mr. Murphy of his Miranda

15  warnings at the Garland police station?

16     A.   Yes, it is.

17     Q.   Okay.  The date is listed as October 6th, 2000; is

18  that correct?

19     A.   Yes, sir.

20     Q.   The time indicated is 8:52 a.m.; is that also right?

21     A.   Yes.

22     Q.   Your name, M.J. Myers, is that you?

23     A.   Yes.

24     Q.   As well as the defendant's name of Jedidiah Isaac

25  Murphy are present; is that right, also?

 1          A.    Yes.

 2          Q.    Are the four Miranda warnings then listed underneath

 3    that information?

 4          A.    Yes, they are.

 5          Q.    Is there then a statement, "I understand all of the

 6    above explained rights," and is there a place for the

 7    defendant to sign on that form?

 8          A.    Yes.

 9          Q.    And is the signature of Jedidiah I. Murphy present

10    on that form?

11          A.    Yes, it is.

12          Q.    And did Mr. Murphy sign State's Exhibit Number 41 in

13    your presence after -- after you had gone over the contents

14    of State's Exhibit Number 41 with him?

15          A.    Yes, he did.

16                MR. DAVIS:   Your Honor, at this time we will

17    offer State's Exhibit Number 41.

18                (State's Exhibit No. 41 offered)

19                MS. BALIDO:   Judge, we have no objection for

20    the purposes of this hearing.

21                THE COURT:   Admitted for the purposes of this

22    hearing.

23                (State's Exhibit No. 41 admitted)

24          Q.    (By Mr. Davis)  Detective Myers, can you tell us

25    specifically, how did you go over this form with Mr. Murphy?

1    Did you read the contents of the form to him?  Did you allow

2    him to read them to himself?  Just how did you do that?

3        A.   I would present this form to him, ask him to read

4    it, tell him that if he had any questions about any of that

5    information or if he didn't understand something that was on

6    that form to tell me.

7        Q.   Okay.  Did you then give State's Exhibit Number 41

8    to the defendant?

9        A.   Yes.

10       Q.   Was he seated at a table or -- at the time that you

11   gave the form to him?

12       A.   He would have been seated in a chair, yes, sir.

13       Q.   Did it appear to you that Mr. Murphy was in fact

14   reading State's Exhibit Number 41 in your presence?

15       A.   Yes.

16       Q.   What indications did you have that he was reading

17   through the contents of State's Exhibit Number 41?

18       A.   Well, I was sitted -- seated just a couple of feet

19   from him.  I could see that his eyes were going across the

20   page and -- it took the amount of time for him to read that

21   that I would expect it would have taken.

22       Q.   Did you have any indications prior to the time that

23   you gave State's Exhibit Number 41 to him that he had any

24   difficulties reading or writing the English language?

25       A.   No, I did not.

1    Q.   When he finished moving his eyes over that document,

2    State's Exhibit Number 41, what did he do?

3    A.   He then -- he then signed it.

4    Q.   Did he have any questions for you about the contents

5    of that document before he signed it?

6    A.   No, he did not.

7    Q.   Did he say anything to you that would indicate that

8    he had not understood the contents of State's Exhibit Number

9    41?

10   A.   No, he did not.

11   Q.   Okay.  So then he signed the document, and did you

12   then begin to speak with him or to question him?

13   A.   Yes.

14        MR. DAVIS:   Judge, do you want to see this?

15   Q.   (By Mr. Davis)  When you began talking with the

16   defendant, was Detective Tooke still in the room?

17   A.   Yes, he was.

18   Q.   Who began talking with the defendant?  Did you begin

19   talking with him or did Detective Tooke talk with him also?

20   A.   I would have been the person asking the questions.

21   Q.   What was the nature of the -- of the conversation

22   that you began to have with the defendant then?

23   A.   We started off -- I just asked Mr. Murphy how he

24   would like for me to address him.  I had heard some different

25   people refer to him different names.  And one of those names

1   being Jim, and I asked him how he got that name and if that's

2   how he wanted me to address him and he said he did.

3       Q.   What's the next thing that you said or did?

4       A.   As I recall, basically just said, well, Jim, you

5   know, you're -- it seems to me that you're -- that you're

6   kind of caught on this deal.  I just need to know do you want

7   to talk to us about it, do you want to cooperate with us or

8   not, and he indicated that he did.

9       Q.   When you say he indicated that he did, what do you

10  remember him saying about that?

11      A.   He just said, I'm not -- I'm not going to try to

12  hide anything from you.  I'm going to tell you what you --

13  what you need to know and -- and I want to cooperate with

14  you.  I want to get this over with.

15      Q.   Did -- did you ask him whether or not he would give

16  you a written voluntary statement to that effect?

17      A.   At that time I did not.

18      Q.   Okay.  Did you just then continue to talk with him

19  in general terms about the case?

20      A.   Well, I actually went right into it.  The first

21  thing I wanted to do was to try and establish where Ms.

22  Cunningham had been abducted and/or shot.  And I asked him if

23  he could recall that location.  He said that he thought he

24  might be able to.  It was after that I asked him if he -- if

25  he would agree to get in a police car or an unmarked car with

1    myself and Detective Tooke and we would leave the building

2    and try to locate those two -- those two locations, the

3    abduction site and the site where the shot was fired.

4        Q.   What did y'all do?  Did y'all actually leave the

5    police station at that time?

6        A.   Yes, we did.

7        Q.   My understanding then from what you've just said is

8    it's you, the defendant, and Detective Tooke; is that right?

9        A.   That's correct.

10       Q.   And where did -- where did the three of you go then?

11       A.   Well, we drove -- we drove back into the North

12   Garland area where Ms. Cunningham lived.  We drove some

13   possible routes.  We knew that she had last been seen at a

14   mall in Plano so we were driving up down north and south and

15   east and west, trying to see if Mr. Murphy would -- would see

16   any areas that he might recall or remember.

17       Q.   Are you or Detective Tooke actually asking questions

18   of the defendant as you're driving around?

19       A.   I was asking questions, but in the nature of what do

20   you remember about where you got in the car at, what do you

21   remember about the abduction location.

22       Q.   What do you remember the defendant saying to you?

23       A.   Well, he was kind of -- he was being very vague

24   about it, but he was describing some buildings.  And I would

25   ask him if he was actually at the mall.  He said he was not.

1  We were just talking about the different descriptions of

2  different areas.  As we were going by, I would ask him if he

3  recognized this building or this intersection or -- if we'd

4  be in a parking lot, I'd ask him if he remembered that.

5      Q.  Did you ever come to a location there in North

6  Garland where the defendant indicated he did recognize it as

7  being the place he had abducted Ms. Cunningham?

8      A.  No, we did not.

9      Q.  Approximately how long did you, Detective Tooke, and

10  the defendant then drive around North Garland looking for

11  this location?

12      A.  I think we were an hour and a half, maybe a little

13  bit more, maybe a little less.

14      Q.  Okay.  And at the -- and as I understand it, you

15  never did find the location that he could identify as being

16  the place where he had picked this woman up, correct?

17      A.  No, we did not.

18      Q.  At the end of that time period then, where did you

19  and Detective Tooke and the defendant go?

20      A.  We went back to the police department.

21      Q.  And where did you take the defendant then?

22      A.  We went back to the interview room on the second

23  floor.

24      Q.  Same room?

25      A.  Yes, same room.

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.   Did the -- Detective Tooke stay with you?

2     A.   Yes, he did.

3     Q.   Okay.  Just pick us up then what happened when the

4 three of you got back up to the interrogation room?

5     A.   Well, when we got back, it was at that time that I

6 asked Mr. Murphy if he would provide a voluntary written

7 statement, and he said that he would.

8     Q.   Okay.  Can you tell us please what process did you

9 use in the taking of the voluntary statement in this case?

10    A.   Well, I would have presented the forms to him, let

11 him look them over.  We filled in some -- there's some blanks

12 to fill in.  We filled in those blanks.  There's some

13 warnings on the form.  We went over those warnings again.

14 And then I basically just told him that it was his

15 statement.  He could write whatever he wanted to on it.  And

16 he was left alone to write that statement.

17    Q.   So actually in this case the defendant was allowed

18 to hand write his own statement; is that right?

19    A.   Yes, sir.

20    Q.   Using the forms that you provided to him?

21    A.   That's correct.

22    Q.   Neither you nor Detective Tooke stayed in the room

23 while he wrote this statement out; is that my understanding?

24    A.   That's correct.

25    Q.   So he was left alone to write whatever he wanted to

1    about this case; is that right?

2        A.   Yes.

3        Q.   And approximately how long then did you leave him

4    alone so that he could write this statement?

5        A.   I think it took him about 20 minutes -- 20, 25

6    minutes.  It wasn't a very long time.

7        Q.   Okay.  How did he indicate to you that he was

8    finished and ready to have you come back in the room?

9        A.   He really wasn't able to communicate with me.  I was

10   outside the room so I would just check on him.  I would just

11   go back to the room and open the door, ask him if he was

12   finished, yes or no.

13       Q.   And so after 20 or 25 minutes then when you came in

14   to check with him, he indicated he was finished; is that

15   right?

16       A.   Yes.

17       Q.   What did you do then?

18       A.   I took the statement that he had written.  I read

19   it.  I asked him if he was done with it, if he wanted to add

20   anymore information to it.  He indicated that he was

21   finished.  At that time Detective Tooke came back into the

22   room and then asked Mr. Murphy to sign it, to put his

23   signature on the statement.

24       Q.   So that -- did he then sign the forms?

25       A.   Yes, he did.

1    Q.   Did you witness his signature?

2    A.   Yes, I did.

3    Q.   Did Detective Tooke also witness his signature?

4    A.   Yes.

5    Q.   Before he signed the document, did you give him an

6    opportunity to make any changes, deletions, additions,

7    anything to the statement?

8    A.   Yes.

9    Q.   Detective Myers, let me just ask you now, at any

10   time prior to the giving of this statement did you threaten

11   Jedidiah Murphy in any way in order to have him give you this

12   written statement?

13   A.   No, sir.

14   Q.   Did you make any promises of any nature to the

15   defendant, any promises of leniency, any promises whatsoever

16   in order to get this man to give you this written statement?

17   A.   No, I did not.

18   Q.   Did Mr. Murphy freely and voluntarily give you the

19   written statement which will be State's Exhibit Number 47 in

20   this case?

21   A.   Yes, he did.

22   Q.   Did it appear to you during the time that you spoke

23   with him that he did in fact understand his Miranda warnings

24   that you had previously given to him?

25   A.   Yes.

1    Q.   Did it appear to you at the time that you gave him

2  this form -- did he appear in any way to be impaired, either

3  through alcohol, drugs, lack of sleep, or any -- any type of

4  impairment, sir?

5    A.   No, he did not.

6    Q.   Had he ever indicated in the time prior to giving

7  the statement that he didn't understand something that you

8  had said to him?

9    A.   No.

10              MR. DAVIS:  May I approach, Your Honor?

11              THE COURT:  You may.

12    Q.   (By Mr. Davis)  Detective Myers, if you would,

13  please, look over State's Exhibit Number 47.  Does that

14  document appear to be the voluntary statement given to you by

15  Jedidiah Murphy on October 6th, 2000?

16    A.   Yes, it does.

17    Q.   Okay.  For the record, this is a five-page document;

18  is that right?

19    A.   Yes.

20    Q.   Each and every page bears the signature of Jedidiah

21  Isaac Murphy; is that correct?

22    A.   Yes, that's correct.

23    Q.   And did Mr. Murphy sign each and every page in your

24  presence?

25    A.   Yes, he did.

1      Q.   Does your signature appear on each and every page of

2   this document?

3      A.   Yes, it does.

4      Q.   And in the witness slot does the signature of

5   Detective Tooke appear on each and every page?

6      A.   Yes, it does.

7      Q.   The time indicated on the top of this form, sir, is

8   October 6th, 2000, the time being 11:30 a.m.   What does that

9   time indicate?

10      A.   That's the time that we signed -- that he would have

11   signed the form.

12      Q.   Okay.

13              MR. DAVIS:   Your Honor, at this time for

14   purposes of this hearing the State will offer State's Exhibit

15   Number 47.

16              (State's Exhibit No. 47 offered)

17              MS. LITTLE:   No objection.

18              THE COURT:   Admitted for purposes of this

19   hearing.

20              (State's Exhibit No. 47 admitted)

21      Q.   (By Mr. Davis)   Detective Myers, each page is

22   identical as far as the form; is that right?

23      A.   Yes.

24      Q.   Okay.   The actual typed portion, the fill in the

25   banks, those are all similar, correct?

1    A.   Yes.

2    Q.   And on each form, the same date, the same time, the

3 location of 217 North Fifth Street in Garland.  Is that the

4 location of the Garland Police Department?

5    A.   Yes, it is.

6    Q.   Mr. Murphy's name, Jedidiah Isaac Murphy, has been

7 printed in, as well as his age of 25 years and his address is

8 718 Barclay in Richardson, Texas; is that right?

9    A.   That's correct.

10    Q.   Is that information you had printed into the form?

11    A.   Yes, it is.

12    Q.   The handwritten portion that appears on each of

13 these pages, that is actually handwriting of the defendant,

14 Jedidiah Isaac Murphy, right?

15    A.   That's correct.

16    Q.   Looking at the document, does it appear that Mr.

17 Murphy made any corrections prior to signing this document?

18    A.   There is one scratch mark on the first page, a word

19 has been scratched out, but that's the only attempt I see at

20 any correction on any of the pages.

21    Q.   Over the scratch out mark on the first page, do the

22 initials JM appear?

23    A.   Yes, they do.

24    Q.   You said that at the time that you presented this

25 form to him, you would have gone over the warnings on the

1  form; is that right?

2      A.    That's correct.

3      Q.    Are the Miranda warnings again printed on each page

4  of this statement?

5      A.    Yes, they are.

6      Q.    How did you go over these warnings with the

7  defendant?  Did you let him read them, or did you again read

8  them in his presence?

9      A.    I believe that I asked him to read them.

10      Q.    And did it appear to you that Mr. Murphy was reading

11  the warnings that were contained on State's Exhibit Number

12  47?

13      A.    Yes.

14      Q.    What were the indications that he was actually

15  reading the warnings?

16      A.    Well, once again, he was holding the page in front

17  of his face.  I could see that his eyes were going from left

18  to right across the page as if he were reading them.  It took

19  him about the amount of time to read that that I would expect

20  it would take.

21      Q.    The process that you used with you Mr. Murphy --

22  first of all, let me ask you, have you taken other written

23  voluntary statements from suspects?

24      A.    Yes.

25      Q.    Few or many?

1     A.   Many.

2     Q.   The procedures that you used with Mr. Murphy, did

3 they differ from the procedures that you normally use with

4 suspects?

5     A.   No, it would have been the same.

6     Q.   Is it your practice if the suspects want to write

7 out their own statements, that you'll allow them to do that

8 in private?

9     A.   Yes.

10    Q.   After the conclusion of taking the statement,

11 State's Exhibit Number 47, did you remain in contact with the

12 defendant that day?

13    A.   No, I did not.  He -- after he signed the

14 statement, he was returned to -- returned to the book-in jail

15 area.

16    Q.   Let me direct your attention forward then one day to

17 October 7, 2000.  I believe this is going to be a Saturday.

18 Approximately 9:00 a.m. that morning did you again have

19 contact with the defendant?

20    A.   Yes, I did.

21    Q.   Where did you talk with him?

22    A.   I went to the jail area, had Mr. Murphy removed from

23 his cell, and he and I went to the interview room on the

24 second floor.

25    Q.   Same room?

1    A.   Yes.

2    Q.   And when you took him to the room, did you give him

3    his Miranda warnings again?

4    A.   Yes, I did.

5    Q.   Did you use another printed form?

6    A.   Yes, I did.

7              MR. DAVIS:   May I approach, Your Honor?

8              THE COURT:   You may.

9    Q.   (By Mr. Davis)   Detective Myers, State's Exhibit

10   Number 48, do you recognize that to be the written form that

11   you used to inform Mr. Murphy of his Miranda warnings on

12   October 7th, the year 2000, at approximately 11:30 a.m.?

13   A.   Yes.

14   Q.   Again, it's basically the same form as State's

15   Exhibit Number 41, right?

16   A.   Basically.

17   Q.   Okay.   The printed material is the same.   What's

18   been handwritten differs; is that right?

19   A.   Yes, sir.

20   Q.   It bears the signature of Jedidiah Isaac Murphy,

21   correct?

22   A.   Yes, it does.

23   Q.   As well as your signature, M.J. Myers?

24   A.   Yes, sir.

25              MR. DAVIS:   Your Honor, at this time for

Page 53

1    purposes of this hearing, we'll offer State's Exhibit Number

2    48.

3                    (State's Exhibit No. 48 offered)

4                    MS. BALIDO:  We don't have any objections for

5    purposes of the hearing, based on the State's assertion that

6    they're going to clear up who wrote what on the bottom of the

7    sheet.

8                    THE COURT:  The Court will take that under

9    advisement.

10                   (State's Exhibit No. 48 admitted)

11                   MR. DAVIS:  Okay.

12                   THE COURT:  You may proceed.

13                   MR. DAVIS:  Yes, sir.  Thank you.

14       Q.   (By Mr. Davis)  First of all, at the top of the form

15   in handwritten form are two notations, two cups coffee, one

16   cigarette.  Who wrote that on the form?

17       A.   I did.

18       Q.   What does that indicate?

19       A.   It just indicates to me that I offered Mr. Murphy

20   during this -- during this interview those comforts and that

21   was what he accepted.

22       Q.   All right.  There's also a notation -- first of all,

23   the initials MJM.  Are those your initials?

24       A.   Yes, they are.

25       Q.   Underneath that is written "return to cell at 12:05

1    P.M."  Is that in your handwriting also?

2         A.   Yes.

3         Q.   Does that indicate when you finished interviewing

4    the defendant that day?

5         A.   Yes, it does.

6         Q.   Now, we've already indicated that the date of

7    October 7, 2000, 11:30 o'clock a.m., again your name, M.J.

8    Myers, as well as the defendant's name of Jedidiah Isaac

9    Murphy, are printed -- or actually handwritten in.  Did you

10   write that?

11        A.   Yes, I did.

12        Q.   Signature's Mr. Murphy and yourself appear on the

13   document, correct?

14        A.   Yes.

15        Q.   Underneath your signature we have additional

16   handwriting.  First notation being, "Did you meet with a

17   lawyer or lawyers yesterday?"

18             Did you write that yourself?

19        A.   Yes, I did.

20        Q.   And out beside that is the word "yes" with the

21   initials of JM.  Is that the defendant's handwriting?

22        A.   Yes, it is.

23        Q.   And underneath that, Number 2, does the lawyer,

24   lawyers represent you, there was an indication again -- is

25   that your handwriting?

Page 41

```
 1        A.   Yes, it is.

 2        Q.   Out to the side the words "yes" with JM, correct?

 3        A.   Yes.

 4        Q.   Is that in defendant's handwriting?

 5        A.   Yes, it is.

 6        Q.   Underneath that then Number 3, "Did the

 7   lawyer/lawyers advise you not to talk to police officers?"

 8   Is that your handwriting?

 9        A.   Yes, it is.

10        Q.   Out to the side, again to the left-hand side, now is

11   the word "no," with the initials JM.  Is that the defendant's

12   handwriting?

13        A.   Yes, it is.

14        Q.   Number 4 underneath, "Did the lawyer/lawyers advise

15   you to cooperate with police officers?"  Again your

16   handwriting?

17        A.   Yes, it is.

18        Q.   To the left-hand side of that is the word "yes" with

19   the initials JM, the defendant's handwriting?

20        A.   Yes, it is.

21        Q.   Finally Number 5 underneath, "Will you talk to

22   police officer today."  Your handwriting?

23        A.   Yes.

24        Q.   Out to the left-hand side again the words "yes,"

25   with the initials JM.  Was that in the defendant's
```

1   handwriting?

2     A.   Yes, it is.

3     Q.   Why did you choose to write out these five questions

4   for the defendant on State's Exhibit Number 48?

5     A.   Well, I knew that Mr. Murphy had met with an

6   attorney the previous day.  I knew that attorneys were

7   present at the police department, so he, during my first

8   interview, had never indicated that he did not want to talk

9   to us, so I just needed to clarify that issue before I

10   attempted a second interview that he did in fact want to talk

11   to me even though he had been talking to a lawyer.

12     Q.   Now, prior to -- prior to writing these five items

13   at the bottom, had you had him read through the Miranda

14   warnings --

15     A.   Yes.

16     Q.   -- contained on State's Exhibit Number 48?

17     A.   Yes.

18     Q.   Again, these are the same Miranda warnings that you

19   had given him previously, correct?

20     A.   That's correct.

21     Q.   He indicated that he understood them?

22     A.   Yes.

23     Q.   Have any questions about them?

24     A.   No, he did not.

25     Q.   Ever indicate to you that he didn't want to talk

1   with you or terminate the interview?

2       A.   No, he did not.

3       Q.   You then wrote out these five questions for him to

4   answer; is that right?

5       A.   That's correct.

6       Q.   Did he verbally indicate the answers that he later

7   wrote in his own handwriting?

8       A.   Yes, he did.

9       Q.   Had any lawyers come to you either on October the

10  6th or October 7 to tell you that they represented Mr. Murphy

11  and they did not want you to talk with him?

12      A.   No, they did not.

13      Q.   Had you been contacted by any lawyers who claim to

14  be representing Mr. Murphy?

15      A.   No, I had not.

16      Q.   Ever contacted by any members of his family and were

17  told that they had retained attorneys and that they were not

18  wishing for you to talk with Mr. Murphy?

19      A.   No, I had not.

20           THE COURT:   Had any of your colleagues given

21  you any indication that they had been contacted by attorneys

22  on Mr. Murphy's behalf?

23           THE WITNESS:   Your Honor, I knew that the

24  attorneys were present in the building and had spoken to my

25  supervisors, but my supervisor did not ever indicate to me

DARLINE W. LABAR, OFFICIAL REPORTER

1   that the lawyers had indicated to him that we weren't to talk

2   to Mr. --

3                   THE COURT:  Who were the attorneys, if you

4   recall?

5                   THE WITNESS:  I believe -- at least both of

6   them -- I believe both of them are present in the room today.

7                   THE COURT:  All right.

8                   THE WITNESS:  I do absolutely recognize one,

9   I'm not sure about the other, but I think they're both

10  present.

11      Q.   (By Mr. Davis)  Who do you recognize?

12      A.   I recognize the attorney seated at the center

13  table.  I recognized her that day.

14      Q.   Just for the record, that would be Jane Little.

15  Okay.  Do you recognize any other members of the defense

16  team?

17      A.   Well, I think the gentleman sitting right there was

18  also there that day.  He was the one I wasn't quite sure in

19  my memory if he was.  I thought he was, but I wasn't sure.

20      Q.   You're indicating to Mr. Mike Byck, correct?  That

21  is his name --

22                  THE COURT:  The man in the white shirt?

23                  THE WITNESS:  Yes, sir.

24                  THE COURT:  The record reflect he's referring

25  to Mr. Michael Byck, one of the defense attorneys.

Page 45

1    Q.   (By Mr. Davis)  Okay.  So after answering those five

2   questions for you, did Mr. Murphy indicate that he wanted to

3   continue talking with you?

4    A.   Yes, he did.

5    Q.   And what was the purpose of the conversation with

6   him that day?

7    A.   Well, we still hadn't settled the issue of where the

8   abduction had taken place and where the shot had been fired

9   and so that was the -- really the purpose of the interview.

10    Q.   Did you begin talking with him or questioning him

11   about these locations?

12    A.   Yes, I did.

13    Q.   And did he start to give you information about

14   possible locations?

15    A.   Yes, he did.

16    Q.   And at a certain stage in the conversations, did you

17   ask him to draw you some sort of map that would assist you in

18   trying to find this location?

19    A.   Yes, I did.

20    Q.   And did he agree to produce a map for you?

21    A.   Yes, he did.

22    Q.   Did he do that in your presence?

23    A.   Yes, he did.

24        MR. DAVIS:  May I approach again, Your Honor?

25        THE COURT:  You may.

1     Q.   (By Mr. Davis)  State's Exhibit Number 49, Detective

2  Myers, is this in fact the map that the defendant produced

3  for you on October 7th, 2000?

4     A.   Yes, it is.

5          MR. DAVIS:  Your Honor, at this time we'll

6  offer State's Exhibit Number 49 for purposes of this

7  hearing.

8               (State's Exhibit No. 49 offered)

9          MS. BALIDO:  Judge, I'd like to see it just

10  for a second.  Judge, just for the record, the defense has

11  served on the State numerous motions regarding any sort of

12  attempt or notes regarding an attempt to talk to our client

13  on a second or third occasion.  There has been a State's

14  response to that request.  These materials, both State's

15  Exhibit Number 48 and State's Exhibit Number 49 for record

16  purposes only, have not been included in those materials, so

17  this is the first time that we've seen them.  And I just want

18  to make that clear on the record, based on your statement at

19  the beginning of this hearing regarding material issues in

20  regard to this trial.

21          THE COURT:  The Court takes note as requested.

22     Q.   (By Mr. Davis)  So Mr. Murphy, I take it, then

23  actually produced State's Exhibit 49 in your presence, right?

24     A.   Yes, he did.

25     Q.   And after he had finished up his map, did you and

1    Mr. Murphy go to some of the locations in Garland again?

2        A.   No, we did not.

3        Q.   What did you do with State's Exhibit Number 49 then?

4        A.   Well, I actually left the police department by

5    myself on that day in an attempt to locate an area that

6    might -- that I could find off of this map.

7        Q.   You indicated there I think 12:05 p.m. then on that

8    date you released him back into the jail, right?

9        A.   Yes.

10       Q.   Did you see him again that day?

11       A.   No, I did not.

12       Q.   Did you take any -- any additional written

13   statements from the defendant in this case?

14       A.   No, I did not.

15       Q.   Did he produce any other written documents for you,

16   such as the map there?

17       A.   No, sir.

18       Q.   And again on October the 7th of 2000, did you

19   promise Mr. Murphy anything in order to have him produce that

20   map for you, State's Exhibit Number 49?

21       A.   No, I did not.

22       Q.   Did you threaten him in any way?

23       A.   No, sir.

24       Q.   Did Mr. Murphy appear to be impaired in any way on

25   October 7th?

1     A.   No, he did not.

2     Q.   Didn't appear to be under the influence of alcohol

3 or drugs?

4     A.   No, sir.

5     Q.   Did he -- did he appear to have any problems

6 understanding what you were saying to him?

7     A.   No, he did not.

8     Q.   Did he ever ask any questions or make any statements

9 that you thought were inappropriate?

10     A.   No, he did not.

11           MR. DAVIS:  I'll pass the witness, Your Honor.

12                  Cross-Examination

13 By Ms. Balido:

14     Q.   Detective Myers, my name is Jennifer Balido, and I

15 represent Mr. Murphy in regard to the defense of this case.

16 And I'm going to ask you some questions about your testimony

17 and about some of the reports in this case reflecting issues

18 that you've talked about in your testimony and also your

19 examining trial transcript.  If I don't make myself clear or

20 you don't understand what I say -- sometimes I ask questions

21 that have like four or five different questions in them, just

22 stop me and tell me to start over and I will.  Okay?

23     A.   Yes, ma'am.

24     Q.   When you first went to Edgewood early that

25 morning -- well, before you even got to Edgewood, were you

1    the person that talked to the Edgewood or the Van Zandt

2    County Police Department or Sheriff's Department, or was that

3    Commander Lay or another person at the Garland Police

4    Department?

5        A.    It was another person.

6        Q.    Okay.  And were your instructions to those members

7    of those police agencies not to enter the house that you

8    thought Mr. Murphy was in before y'all got there, if at all

9    possible?

10       A.    I didn't speak to them, so I didn't give any

11   instructions to those officers.

12       Q.    Okay.  Do you know who did?

13       A.    Well, I think Commander Lay did, but I'm not

14   absolutely sure about that.  I believe it was him.

15       Q.    Okay.  And before y'all got to Edgewood and out to

16   the house on Lamar or actually the trailer out on Lamar, they

17   had actually gone into that building; is that correct?

18       A.    They meaning the Van Zandt County people?

19       Q.    Yes.  The Van Zandt County people and some members

20   of the Edgewood Police Department?

21       A.    Yes, it was my understanding that they had.  Yes,

22   ma'am.

23       Q.    And one or two members of the Van Zandt County

24   Sheriff's Department or the Edgewood Police Department spoke

25   to Mr. Murphy before you spoke to Mr. Murphy; is that

1  correct?

2      A.    That's correct.

3      Q.    And in your estimation how long of an opportunity

4  did they have to speak with Mr. Murphy before the Garland

5  Police Department arrived?

6      A.    Well --

7      Q.    If you know?

8      A.    I don't really know exactly, but once again, the

9  trip from Garland to Edgewood would have taken us about 45

10 minutes, so they had at least that amount of time because we

11 were traveling.

12     Q.    Okay.  When you arrived at the trailer on Lamar,

13 were there officers searching the car at that time?

14     A.    No.

15     Q.    Okay.  To your knowledge, had the car been opened at

16 that time?

17     A.    No.  To my knowledge, it had not been.

18     Q.    To your knowledge, had Detective Rose or Officer

19 Rose or Sheriff Rose of the Van Zandt County Sheriff's

20 Department talked to Mr. Murphy?

21     A.    (No response.)

22     Q.    And I may have where he works wrong.

23     A.    Well, I was aware after we got there that Mr. Rose

24 had talked to Mr. Murphy.  I was made aware of that after we

25 arrived.

1    Q.   Okay.  And additionally an off-duty Edgewood police

2    officer by the name of Jason Bonham had also talked to the

3    defendant; is that correct?

4    A.   Yes.  I am familiar with that name.  I wasn't aware

5    that he was off duty, but I am familiar with that name and

6    that he's a police officer with the Edgewood P.D., yes,

7    ma'am.

8    Q.   Okay.  And they had both spoken to Mr. Murphy before

9    you got there and Mirandized him?

10    A.   I was advised of that, yes, ma'am.

11    Q.   Okay.  Do you know of any other law enforcement

12    officer, be it Van Zandt County Sheriff's Department,

13    Edgewood Sheriff's Department, the jailer that rode along for

14    the ride out there to the scene, any person involved with law

15    enforcement that spoke to Mr. Murphy before you go there,

16    besides those two people, Rose and Bonham?

17    A.   I'm not aware of any.

18    Q.   And when you came into contact first with Mr.

19    Murphy, it was in a bedroom towards the back of the trailer?

20    A.   It's actually not a trailer, but --

21    Q.   Well --

22    A.   I would describe it as being toward the rear, yes,

23    ma'am.

24    Q.   Okay.  And was Mr. Tarrant still in that bedroom, or

25    was he in a different room?

1    A.    He was in a different room.

2    Q.    Okay.  Could you tell if he was intoxicated?

3    A.    I never even spoke to Mr. Tarrant that night.

4    Q.    Okay.

5    A.    I saw him there, but I did not speak to him.

6    Q.    Okay.  And Ms. Ora Mae Milton, who is Mr. Tarrant's

7    grandmother, was also there; is that correct?

8    A.    I saw her.  I saw a lady, but I did not identify

9    her.

10   Q.    Okay.  And you said that when you first saw him, he

11   was sitting handcuffed on the bed?

12   A.    Yes.

13   Q.    Okay.  And the first words spoken, and I'm using

14   your words -- the first words spoken were the Miranda

15   warnings?

16   A.    Yes.

17   Q.    You didn't identify yourself or tell him what he was

18   under arrest for or anything like that?

19   A.    Yes, I did tell him who we were and where we were

20   from.  I'm sure he didn't know.

21   Q.    Okay.

22   A.    So I told him we were from the Garland Police

23   Department.

24   Q.    Did you tell him what he was under arrest for?

25   A.    Yes.

1    Q.   And what was that?

2    A.   I told him he was being taken into custody on the

3 warrant we had obtained and that he also would be charged

4 with the investigation of capital murder.

5    Q.   The warrant you had obtained was credit card fraud

6 or credit card abuse?

7    A.   Yes.  I'm not sure of the exact title.  It was a

8 credit card -- I think the exact title is credit card abuse,

9 yes.  I don't work credit card cases, but I think that's how

10 they title their -- that offense.

11    Q.   Let me ask you a little bit about your knowledge,

12 because you did do a little bit of investigation regarding

13 the credit cards, didn't you?

14    A.   Did I personally?

15    Q.   Yeah.

16    A.   No, I did not.

17    Q.   Who did that, Delmar or --

18    A.   Yes, Detective Delmar conducted the investigation,

19 gathered the information about the credit cards.

20    Q.   But was it your understanding that the credit cards

21 were being used at different locations, including at least

22 two convenience stores, to buy beer?

23    A.   Yes.

24    Q.   Okay.  And about a 20-dollar purchase of beer,

25 correct, at each place, approximately?

1      A.    It was in that neighborhood.  I mean, we have some

2   receipts, so I'm not sure of the exact amount, but, yes,

3   ma'am, in the area of $20.

4      Q.    Okay.  And you said that you orally gave him the

5   warnings at that time, the Miranda warnings or 38.22

6   warnings?

7      A.    Yes, ma'am.

8      Q.    Okay.  Any written indication that you gave him

9   those warnings at that time?

10     A.    No, there are not.

11     Q.    Okay.  No whip-out books, no nothing like that that

12   can indicate that?

13     A.    I have a -- I have a notation, a handwritten note

14   that I Mirandized him in the presence of my supervisors at

15   that time.

16     Q.    Okay.  And do you have that with you?

17     A.    I think I do.

18     Q.    Okay.  Can I see it?

19     A.    I'd have to leave the bench to get it.

20                 THE COURT:  You may.

21                 MR. DAVIS:  The notation has already been

22   given to you.

23                 MS. BALIDO:  I can't recognize the writing.

24                 MR. DAVIS:  It says orally Mirandized in the

25   bedroom on Lamar Street.

```
 1                    (Short recess.)
 2                    MS. BALIDO:   Judge, may I approach the
 3    witness?
 4                    THE COURT:   You may.
 5         Q.   (By Ms. Balido)   Officer, you have retained or
 6    gotten the piece of paper that you were talking about; is
 7    that correct?
 8         A.   Yes, ma'am.
 9         Q.   Okay.  And it's on a short little piece of paper and
10    it's the same thing kind of written on here on this copy that
11    I've been tendered by the State?
12         A.   It appears to be a copy of that, yes, ma'am.
13         Q.   Okay.  And that was your indication that you orally
14    Mirandized him in the bedroom?
15         A.   Yes.
16         Q.   And when did you write that down?
17         A.   As soon -- I would have written it down at that
18    time.  I think right after we did that.
19         Q.   Although there is no date or no time or anything
20    like that?
21         A.   No, there's not.
22         Q.   And that's also to indicate that Lieutenant Thompson
23    and Commander Lay were both there present when you Mirandized
24    him?
25         A.   Yes.
```

Page 56

1      Q.   And you said that when you Mirandized him that you

2  were looking -- facing each other and that you were less than

3  two feet away?

4      A.   Yes.

5      Q.   Any smell of an alcoholic beverage on or about his

6  person?

7      A.   No, I did not smell alcohol.

8      Q.   Any smell of an alcoholic beverage on or about the

9  room which he was occupying?

10     A.   No, I did not smell any.

11     Q.   Okay.  Did you see any indication at all in the

12  house that a large amount of alcohol had been consumed the

13  night before?

14     A.   I do not recall any at all, no.

15     Q.   Okay.  No beer cans?

16     A.   I did not see any.

17     Q.   Okay.  Do you recall seeing any whiskey bottles or

18  anything like that?

19     A.   I did see a bottle, but not inside the house.  I

20  later saw a bottle in the back of the car.

21     Q.   Okay.  In the backseat of what you later identified

22  to be Ms. Cunningham's car?

23     A.   Yes.

24     Q.   Okay.  Was that full or empty?

25     A.   It was -- it was about half full or half empty,

1    however you want to look at it.  But it was on the floor, and

2    I didn't touch it.  I just saw it using my flashlight through

3    the window.

4        Q.   Okay.  Without getting bogged down on that, did you

5    get that and preserve it for evidence?

6        A.   Well, I did not personally do that, but that was

7    done.

8        Q.   Okay.  Any reports that you've seen regarding

9    fingerprints on that bottle?

10       A.   Yes, I'm sure that there is a report somewhere

11   regarding the fingerprints on that bottle.

12       Q.   But you don't recall right offhand who's

13   fingerprints, if any, came back identifying anybody?

14       A.   No, not sitting here right now I don't -- I don't

15   know what that report says.

16       Q.   Is it back with the rest of your notes in the -- in

17   your prosecution report?

18       A.   It may possibly be.

19       Q.   Okay.  And back there also would you also have the

20   actual hard copy of the warrant that you were placing Mr.

21   Murphy under arrest for?

22       A.   The actual -- the actual warrant would be in the

23   custody of the municipal court in Garland, so I do not have

24   that.

25       Q.   Do you have a copy of the warrant that you were

1    seeking to serve on Mr. Murphy at that time?

2        A.   I might.  I'd have to look.

3        Q.   Okay.

4                MS. MILLER:  May I approach, Judge?

5                THE COURT:  Sure.

6                MS. BALIDO:  Judge, let the record reflect

7    State's counsel, Mary Miller, has tendered to the witness a

8    three-inch three-ring binder that looks like full of

9    investigatory notes.

10       Q.   (By Ms. Balido)  Can you look and see if you can

11   locate any report that has to do with fingerprints on the

12   bottle that was found in Ms. Cunningham's car?

13       A.   Yes, it's going to take --

14               MR. DAVIS:  I'm going to object.  It's just

15   outside the scope of this hearing.

16               THE COURT:  Sustained at this point, noted as

17   Jackson v. Denno.

18               MS. BALIDO:  Judge, first, it goes to the

19   level of intoxication, if any, of this defendant at the time

20   that he was questioned.  And so it would be relevant for that

21   purpose.

22               And also number two, we would assert that we haven't

23   seen any such report and any report eliminating Mr. Murphy as

24   a suspect as in possession of that would be Brady material

25   and may lead to other evidence that could be Brady material.

1          THE COURT:  The Court will stand on its

2    previous ruling.

3          MR. DAVIS:  And I'll state for the record that

4    I provided all investigative reports to the defense prior to

5    this hearing, including any fingerprint or forensic reports

6    that I was in possession of.

7          MS. BALIDO:  Judge, does your ruling go as

8    well as to the warrant actually being served on our client?

9          THE COURT:  I'll permit the warrant.

10   Q.   (By Ms. Balido)  Okay.  Do you have a copy of the

11   warrant that you were attempting to serve on Mr. -- or did

12   serve on Mr. Murphy at the time?

13   A.   It's going to take me a minute.

14   Q.   Okay.

15   A.   Yes, ma'am.  There's a copy of the warrant.

16          MS. BALIDO:  May I approach the witness?

17          THE COURT:  You may.

18   A.   This is -- this is actually a one page -- the

19   original is one page, but this is a copy, front and back,

20   so -- this being the front, this being the back of the

21   original warrant.

22   Q.   (By Ms. Balido)  And is there any probable cause

23   affidavit that's also attached to that regarding the arrest

24   of this person, setting out the reasons for the -- you wanted

25   him arrested?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    Yes, there is.

2      Q.    Okay.  And is that also included in your --

3      A.    Yes, it's here also.

4      Q.    Okay.  Can you take this out of your notebook and we

5  can make copies for the Court, but I'd like to make it an

6  exhibit for the court.

7      A.    Yes, I can do that.

8      Q.    And then also the probable cause affidavit.

9            MS. BALIDO:  Judge, let the record reflect the

10  detective has tendered to me a four-page document regarding

11  the warrant for arrest and also affidavit in support

12  thereof.  I'm going to give it to them to go make copies to

13  the district attorneys intern.

14     Q.    (By Ms. Balido)  Let me go ahead and ask you some

15  more questions in regard to -- also, let me ask you, in house

16  was there any kind of indication, any smell of any burnt

17  marijuana, or anything like that?

18     A.    I did not smell it.

19     Q.    Okay.  Was there any sort of evidence regarding drug

20  use, any drug paraphernalia, anything that would lead you to

21  believe that there was drug use being done, let's say in the

22  previous 24 hours?

23     A.    I didn't see any.

24     Q.    Okay.  Let me ask you specifically about -- you said

25  that you walked in and the only question that you asked him

Page 61

```
 1    after you gave him his Miranda warnings were -- well, I guess
 2    was, you asked him where are the credit cards.
 3        A.   Yes.
 4        Q.   And he indicated to you where the credit cards were?
 5        A.   He said they were in the car.
 6        Q.   Okay.  Did you ever ask him where Ms. Cunningham's
 7    body was, if he knew?
 8        A.   No, I did not.
 9        Q.   Did you know at that time if he had already
10    indicated he knew where the body was to another member of any
11    law enforcement organization?
12        A.   Yes, I did.
13        Q.   Okay.  And who had that information for you?
14        A.   I was -- I was informed that Mr. Murphy had told
15    Officer Bonham where the body was located.
16        Q.   And it was your understanding at that time that he
17    was under -- he was in custody at that time when he told that
18    to Officer Bonham?
19        A.   Yes.
20        Q.   Okay.  And did you talk at that time with Officer
21    Bonham as to whether or not he had Mirandized the defendant
22    before he made those statements?
23        A.   I actually did not talk to Officer Bonham that
24    night.  I talked to Deputy Rose, but I did not talk to Mr.
25    Bonham.
```

1    Q.   Okay.  So you don't know whether or not he

2  Mirandized him before -- when I say he, you don't know if

3  Bonham Mirandized him before he made these statements to

4  Officer Bonham?

5    A.   I did not talk to Mr. Bonham.

6    Q.   Okay.  So after you got the information on the

7  credit cards from the defendant, is that what -- did you go

8  out and search the car, or what happened after that?

9    A.   No, I did not search the car.  After Mr. Murphy was

10  in my custody, we stayed at the scene for several minutes.

11  He was seated in -- in one of our City of Garland cars.  I

12  talked to -- conversed with my supervisors and arrangements

13  were being made to have him arraigned at the police

14  department, so he was transported there by myself and

15  Detective Tooke.

16    Q.   Let me ask you a little bit about the car you were

17  in.  Was it a standard Garland police car or -- I mean, with

18  lights and a siren and that sort of thing?

19    A.   No, it was not.  It was a -- it was an unmarked car,

20  detectives car.

21    Q.   Okay.  And so a detectives car, would it or would it

22  not have one of those fancy in car video things that -- or

23  machines that are now being used to videotape the scenes of

24  like DWI's and also what goes on inside the car?

25    A.   It does not.

1    Q.   Okay.  Do y'all have cars that have that sort of

2  equipment, if you know?

3    A.   We have no detective cars with that equipment.  We

4  do have -- I understand we have, I've never been in one since

5  they've developed that technology, but I understand we do

6  have that technology in our marked squad cars.

7    Q.   And you also have -- do y'all have hand-held

8  recorders that you can carry around to record interviews or

9  record things that are going on, and I'm talking about audio

10  recorders?

11    A.   I do have a hand-held microcassette recorder.

12    Q.   And did you use it that night?

13    A.   No, I did not.

14    Q.   Did you use it at any time during this investigation

15  or your interviews with the defendant, Mr. Murphy?

16    A.   No, I did not.

17    Q.   Okay.  What about video equipment, do y'all have

18  video equipment available to take videotapes of crime scenes

19  or interviews or what's going on in an investigation?

20    A.   Well, I think that was two different questions.  We

21  do have video equipment that's in possession of our forensics

22  and our crime scene people that they would videotape a crime

23  scene.  But we do not have video equipment in place in -- to

24  interview witnesses or prisoners in the interrogation rooms.

25  That's not there.

1        Q.    Okay.  So you have video equipment that the forensic

2   people or the Physical Evidence Section might use in an

3   investigation of criminal offenses?

4        A.    Yes.

5        Q.    Was one used in this case?

6        A.    You know, I'm not absolutely sure.  I would take an

7   educated guess and say that one was made at the crime scene,

8   but I'm not really sure about that.  We'd have to ask the

9   crime scene people that.

10        Q.    Let me ask you specifically in regard to the

11   interrogation of Mr. Murphy, was there any sort of audio or

12   video recording made of any of the questions that you asked

13   Mr. Murphy, either at the scene, in the car, at the Edgewood

14   Police Department, at the scene of finding the body, or at

15   the Garland Police Department or the Garland jail?

16        A.    To my knowledge, there was none at any of those

17   locations.

18        Q.    Was there any video used at any other location that

19   I did not make aware to you in that previous question?

20        A.    If there would have been video made anywhere, it

21   would have been made by the forensics people.  And I'm not

22   familiar with any of it.

23        Q.    Okay.  Now, you said that there was no talking going

24   on.  Was there any sort of -- and I'm not talking about

25   custodial interrogation, but I'm talking about any sort of

1   banter back and forth that might lead you to believe that Mr.

2   Murphy was either intoxicated or not intoxicated at the time

3   when you were sitting in the car or he was sitting in the car

4   or y'all were driving to a certain location?

5       A.   Well, that's one you're going to have to rephrase

6   for me.

7       Q.   Okay.  I'm sorry.  Did you ever -- outside any

8   custodial interrogation, did you talk with him in any way

9   that might lead you to believe or -- did you talk with him

10  besides just asking him questions about the offense?

11      A.   At the time that he was in the car?

12      Q.   Yes.

13      A.   No.

14      Q.   Okay.  Did you smell any alcoholic beverage at that

15  time?

16      A.   No, I did not.

17      Q.   Okay.  When you got down to the police department in

18  Edgewood, did anyone attempt to talk with Mr. Murphy

19  regarding the facts of this offense besides you?

20      A.   No.

21      Q.   No other member of the Edgewood Police Department or

22  any friend that he might have in the Edgewood Police

23  Department attempt to talk to him in your presence?

24      A.   Not after he was in our custody, no, ma'am.

25      Q.   Is there any videotape or audiotape recording of the

1      formal arraignment proceeding done by JP Wilcoxson?

2          A.   Not to my knowledge.  That's something you're going

3      to have ask her, but I don't recall a tape recorder being

4      there.  And to my knowledge, there is not one.

5          Q.   And at that time he was formally arraigned and

6      charged with credit card -- a credit card charge -- let's

7      just say, and then also an investigation of capital murder;

8      is that correct?

9          A.   Yes, ma'am.

10         Q.   And he was arraigned on both those charges?

11         A.   Yes.

12              MS. MILLER:  Judge, while they're taking a

13     break, here is the copy for record purposes.

14         Q.   (By Ms. Balido)  Detective Myers, let me ask you,

15     after he was arraigned, you immediately took him to the crime

16     scene or where the scene of -- where the body was found?

17         A.   Yes.

18         Q.   Is that correct?

19         A.   Yes, ma'am.

20         Q.   Okay.  And basically you were directed to go there

21     or actually the police officers were directed to go there

22     from what Mr. Murphy allegedly told Officer Bonham of the

23     Edgewood Police Department?

24         A.   Yes, there were already officers there.

25         Q.   When you arrived?

1   A.   Yes.

2   Q.   Okay.  When you were going over there, did you talk

3   with him at any point about, you know, why -- why are we over

4   here, what is over here, are you familiar with this area, or

5   anything like that?

6   A.   Yeah, we had -- I did tell him where we were going

7   and why we were going there.  He needed to know that.  I

8   needed to inform him.

9   Q.   So basically there was some conversation, but there

10  wasn't any additional custodial interrogation at that time?

11  A.   Yeah, I wouldn't describe it as -- that I was

12  questioning him.  I was -- I was really informing him of

13  where we were going and what the purpose of us going there

14  was.

15  Q.   Did he have any reaction to you either verbal or

16  physical?

17  A.   No, I don't think he responded at all, either way.

18  Q.   And let me ask you a little bit about -- about the

19  situation of him not getting out of the car.  You asked him

20  some questions regarding where the gun might be; is that

21  correct?

22  A.   That's correct.

23  Q.   Okay.  And did he in fact draw you a picture of

24  where the gun might be in relationship to the culvert?

25  A.   Well, he just said that he had tossed it into the

1    water.

2        Q.    Okay.  And did he give you some general idea of

3    where he may have tossed it?

4        A.    He just said he tossed it in the water near her

5    body.

6        Q.    Okay.  Did you question him at that time regarding

7    how he could get a woman that weighed more than him out of

8    the back of a car and put her in the culvert, any kind of

9    questions like that?

10       A.    No.

11       Q.    Okay.  Did he subsequently draw any map for you as

12   to where he thought the location of the gun might be?

13       A.    No, he did not.

14       Q.    Okay.  Now, we've been tendered some documents in

15   regard to that.  There's like a drawing of where the gun

16   might be.  Was that made by somebody at the scene or somebody

17   other than the defendant?

18       A.    You'd have to show it to me.  I think there's a

19   drawing at that scene that I think I made.

20       Q.    If I can find it, I'll show it to you.  And let me

21   ask you his demeanor while he was sitting in the car at the

22   scene.  How long did y'all stay there, do you think?

23       A.    How long were we at that -- at the scene?

24       Q.    Yes.

25       A.    Five minutes.

1    Q.   Okay.  Were there times that he went to sleep or

2    lost consciousness during the time that you were at the scene

3    where the body was found?

4    A.   Not that I'm aware of.

5    Q.   Okay.  Were you with him the entire time?

6    A.   No.

7    Q.   Were there times when you were driving in the car

8    that he either fell asleep or lost consciousness for any

9    reason while y'all were together?

10   A.   He could have.  He was in the backseat of the car.

11   I was in the front seat.  And we were silent for the whole

12   ride, so he could have been asleep and I didn't know it.

13   Q.   And where was Tooke at that time?  Was he in the

14   backseat with him, or was he up in the front seat with you?

15   A.   He was in the front seat.  Detective Tooke was

16   driving.  I was the passenger in the front seat.

17   Q.   Okay.  And about what time did you arrive at the

18   Garland Police Department?

19   A.   Well, as I recall, I think we got there -- I'm going

20   to estimate it based on when he signed the first Miranda

21   sheet which I think was 8:52 or 8:32.  It would have been

22   about probably 30 minutes or less prior to that.

23   Q.   Okay.  And you booked him into the jail; is that

24   correct?

25   A.   As I recall, yes, ma'am.

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.    Okay.  Were there any sort of sobriety tests or

2  anything given to him when you booked him into jail?

3     A.    No.

4     Q.    Okay.  Is it normal to -- to describe his general

5  demeanor or his general appearance when he enters into the

6  jail, like bloodshot eyes or something like that, just for

7  your own record purposes and also protection of the jail for

8  something -- for maybe some accusation later on down the

9  road?

10    A.    It's not something that I normally do as a

11 detective, but I think there is a -- some questioning during

12 the book-in process by those jail personnel, along the lines

13 of are you under the influence of any drugs or medications

14 right now, are you allergic to any drugs or medications, so

15 they're going to ask -- they would ask some questions along

16 those lines.

17    Q.    Do you know of any report that indicates that he

18 either answered either yes or no to maybe one of the

19 questions, are you under the influence of any drugs or

20 alcohol at this time?

21    A.    I'm not aware of that report.  I haven't even seen

22 that.

23    Q.    Okay.  So it's not a part of your notebook that you

24 know of?

25    A.    I don't think it's anything -- I can dig and look.

 1   It could be something that the jail provided to me and it's

 2   there.  I'm not sure if it's in there.  I don't think it is.

 3        Q.   No request to see the nurse or anything like that,

 4   to your knowledge?

 5        A.   No, not at that time.

 6        Q.   Okay.  Were there requests at later times to see the

 7   nurse?

 8        A.   During one of the -- one of the interrogations, one

 9   of the interviews, I think it was the second one, he

10   indicated that he wanted to see his psychiatrist or

11   psychologist.

12        Q.   Okay.  When was the first time that you became aware

13   that he was under a psychiatrist or psychologist care?

14        A.   I would say probably when he -- I'd have to go

15   through some notes on that, but I think it was during that

16   second -- that second interview with him when he indicated

17   it.

18        Q.   Did he indicate to you that he was on prescription

19   medicine while under a psychiatrist or psychologist care?

20        A.   Well, I made some notes, and I remember him saying

21   that he had in the past been taking medication, but he wasn't

22   currently taking medication.

23        Q.   Okay.  So you didn't see any need to try to delve in

24   that further, that he needed to be on medication or not

25   needed to be on medication at that time that you were

DARLINE W. LABAR, OFFICIAL REPORTER

1    interviewing him?

2        A.    I just asked him if he was taking medication at this

3    time.  He said he was not.

4        Q.    Okay.  Let me ask you a little bit about the

5    interrogation room.  You said there's no pictures on the wall

6    of this like 10 by 12 room; is that correct?

7        A.    Yes, ma'am.

8        Q.    Is there any sort of way that people can look in and

9    observe what's going on in the room without the occupants of

10   the room knowing that they are being watched?

11       A.    No, there is not.

12       Q.    There is no peephole or anything like that?

13       A.    No.

14       Q.    No window or anything like that?

15       A.    No.

16       Q.    Okay.  Is there surveillance cameras in other parts

17   of the jail that record the actions that are going on in

18   other parts of the jail or the Garland Police Department?

19       A.    Yes, in the jail area there are.

20       Q.    Okay.  In the -- in the actual interrogation rooms

21   is there any sort of camera equipment for safety purposes or

22   any other purpose inside those interrogation rooms?

23       A.    No.

24       Q.    In your experience as a Garland police officer has

25   there ever been video equipment or audio equipment in those

1   rooms that have subsequently been taken out?

2       A.   There has never been video equipment.   There has in

3   the past been audio recording equipment.

4       Q.   Okay.   And when was that taken out?

5       A.   Quite a long time ago, five, six years.

6       Q.   And what occasioned that equipment being taken out

7   of the Garland Police Department?

8       A.   What was the reason it was taken out?

9       Q.   Yes.

10      A.   I really don't know.   It's a -- the decision is not

11  made by me.   I don't know the reason we took it out.

12      Q.   Who makes that decision?

13      A.   Well, I guess ultimately the chief of police makes

14  it or the assistant chief of police over the Criminal

15  Investigations Division would make that.

16      Q.   Detective Tooke was present during the entire time

17  of questioning Mr. Murphy?

18      A.   During the first interview, yes, ma'am.

19      Q.   Okay.   And is it true that it's the policy of the

20  Garland Police Department to have another police officer

21  witness the -- any written statement made and not a civilian

22  witness witness any statement made by an accused or a

23  witness?

24      A.   Well, there's not a written policy of whether the

25  person that's going to witness that statement be a police

1    officer or civilian.  There is not a written policy that

2    states that that should happen.

3        Q.   Is it just basically left up to the individual

4    investigating officer?

5        A.   It's that along with -- yeah, with the

6    circumstances.  It's the discretion of the investigating

7    officer, whether he needs a civilian witness and/or a police

8    witness.

9        Q.   So basically that was your decision to make?

10       A.   Yes.

11       Q.   At any time -- I know that you've told Mr. Davis

12   that you had not promised Mr. Murphy anything before

13   questioning him.  Did you at any time make any statements

14   like it would be -- it would go easier for him if he would

15   just confess or easier for him if he would just cooperate

16   with the police?

17       A.   No.

18       Q.   Okay.  Did you ever indicate to him that he was

19   being charged with capital murder?

20       A.   Yes.

21       Q.   Did you ever indicate to him that it was going to be

22   your contention that the State of Texas should seek the death

23   penalty on this case?

24       A.   That it was my contention that they would?

25       Q.   Did you ever tell him an opinion one way or another?

1    A.   No, I did not.

2    Q.   Did you ever tell him that was an option that the

3  State could seek the death penalty?

4    A.   Yes.

5    Q.   And when did that occur?

6    A.   Oh, I think -- I think during -- during the first

7  interview and maybe again during the second interview.   I

8  know we had conversations about the death penalty.

9    Q.   Okay.  Is there -- are there notes in your notebook

10  that indicate or memorialize that you actually had those

11  types of conversations with him or that you talked to him

12  about being -- or did not talk to him about being helpful or

13  that sort of thing?

14    A.   I don't think so.

15    Q.   Okay.  Anything besides his written statement to

16  indicate what was discussed between you and him during that

17  first interview session?

18    A.   There are -- there are some written notes that I

19  made.

20    Q.   Okay.  And are those the same type of notes -- did

21  you make it on that same little whip-out book sheet or was

22  there another sheet of paper sort of thing --

23    A.   No, I think this was on a different -- a different

24  sheet of paper.

25    Q.   Okay.  Can you -- did you review those before coming

1    to court today?

2         A.   Yes.

3         Q.   Okay.  Can you look through those and see if there's

4    any indication that you discussed the use or the -- not use

5    of the death penalty or that the death penalty may be

6    available in regard to your questioning of this witness or

7    that he needed to cooperate in regards to this case?

8         A.   Yes, I can look.

9         Q.   Okay.

10             THE COURT:  We'll stand in recess until let's

11   say 1:15.

12             (Lunch recess taken.)

13             THE COURT:  Ms. Balido, you may continue,

14   ma'am.

15        Q.   (By Ms. Balido)  Can you please state your name for

16   the record?

17        A.   Matt Myers.

18        Q.   And you're the same Matt Myers that was testifying

19   previously in this hearing?

20        A.   Yes, ma'am.

21        Q.   Mr. Myers, I want to get back into when you were

22   talking with Mr. Murphy down at the Garland jail.  You said

23   that you left the Garland jail at what time -- this is the

24   first interview.  What time did you leave the Garland jail to

25   take Mr. Murphy out to various different locations in North

1    Dallas County?

2        A.    I would say we did that probably within 10 or 15

3    minutes of him signing the Miranda sheet.

4        Q.    Okay.

5        A.    It was pretty quick.

6        Q.    And you had discussions with him before that about

7    what kind of area y'all were looking at?

8        A.    I think -- I think maybe we did briefly.  We talked

9    about it more in the car.

10       Q.    Okay.  And so there was some discussion in the car

11   initially about what -- what part of Dallas County y'all --

12   y'all were -- he was directing you to.  Was he doing the

13   directions or were you doing the directions at that point?

14       A.    Well, actually I was trying to let him direct as

15   much as he possibly could.

16       Q.    Okay.  Did he seem coherent or incoherent?  Was he

17   trying to help you or not help you?  What was kind of his

18   attitude at that point?

19       A.    I would say that he was coherent and trying to help.

20       Q.    Okay.  But he was unable to at that point really

21   pinpoint a location about anything?

22       A.    Well, we did pinpoint a location, but not the

23   location of the abduction or of the location where the shot

24   was fired.

25       Q.    And what -- what location did you pinpoint?

1      A.    He was able to direct us to a sports bar.

2      Q.    And this is the Bleachers Sports Bar where he kind

3  of started his day at about 1 o'clock that afternoon?

4      A.    That's what he said, yes, ma'am.

5      Q.    Okay.  Was he able at that time to -- well, let me

6  ask you this.  Do you think that he was being uncooperative,

7  or do you think he was really trying to help, he just didn't

8  have any idea where all this supposedly took place?

9      A.    At that time I thought he was being cooperative.

10     Q.    Did that opinion change at some time?

11     A.    Yeah.  I have a little different opinion right now

12  about -- about -- I would describe his cooperation of the

13  overall investigation at the end of it as being somewhat

14  limited.

15     Q.    So do you have your notes that reflect what he was

16  telling you during the time that you were in the car driving

17  through all these North Dallas County locations?  Do you have

18  any notes that reflect that?

19     A.    No.

20     Q.    That's just basically from your memory?

21     A.    Yes.

22     Q.    Any -- so you don't have any notes indicating at

23  this point in your investigation that any of the offense

24  itself occurred in Dallas County, State of Texas?

25     A.    Actually I do, yes.

1        Q.    Okay.  What is that?

2        A.    Let me find that.  I have a written note here that

3    says that he walked eastbound on Arapaho, that there was

4    congestion and much construction in the area, and those are

5    just some written notes of the area that he was describing to

6    me after he left the Bleachers Sports Bar.

7        Q.    Okay.  But nothing specifically dealing with either

8    a kidnapping or acts that constituted a kidnapping or robbery

9    or acts that constituted the cause of death of Ms. Cunningham

10   at this point?  You don't have any notes indicating that any

11   of that happened in Dallas County, Texas?

12       A.    Well, I can -- I can read you some of my notes here

13   that I have.  I do have some notes that -- once again, that

14   he walked eastbound on Arapaho.  I remember him specifically

15   telling me that he started to travel southbound after he had

16   walked eastbound on Arapaho.  That would have definitely put

17   him within our city limits.

18       Q.    Did he tell you that or is that -- was he directing

19   you there, or how did that note get generated?

20       A.    Well, that's a result of a conversation between the

21   two of us.  He's answering questions that I'm asking him,

22   what he did after he left the Bleachers Sports Bar.

23       Q.    And I couldn't remember if Tooke was with you at

24   this time, or if it was just you and the defendant?

25       A.    Well, at that -- no, at that time Tooke would have

1   been there.

2       Q.   Okay.

3       A.   Yes.

4       Q.   And are there anymore notes that indicate what he

5   told you at that time?

6       A.   Well, I have some notes here that he said when he

7   stopped the car, he told her I'll put you in the trunk and

8   call the police.  He said he gave her her glasses.  I made

9   a -- I made a specific written note here that she made the

10  statement that marriage means I do until you make me mad.

11  But these are some notes that I had made of him describing

12  the area where he abducted her and the area where the shot

13  was fired.  He made a notation here that -- I wrote here the

14  shooting was an accident.

15      Q.   Was that the first time that he had indicated to you

16  that it was an accident, or had he mentioned that to you

17  before?

18      A.   Oh, this was probably -- this was probably a result

19  of the first time, this note was.

20      Q.   Okay.  Let me ask you about -- y'all then went back

21  to -- what was the occasion that led you to go back to the

22  police department?

23      A.   On the first day, during the first interview?

24      Q.   Uh-huh, yes.

25      A.   It was a result of we couldn't find the location.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.    Okay.

2      A.    We drove as far and -- as far in four different

3   directions, north, south, east, and west and covered all the

4   areas that I thought he possibly could have traveled on

5   foot.  We actually approached all those areas from a couple

6   of different angles to see if -- just that he would recognize

7   something, but the reason we went back to the station, we

8   couldn't find the location.

9      Q.    Okay.  When he mentioned that it might have been an

10  accident, did you give any kind of verbal response to him

11  like, oh, that's good, or, yeah, that sounds reasonable, or

12  anything to encourage him to tell you more about that?

13     A.    Not that I recall.

14     Q.    Once you got back to the Garland Police Department,

15  how long was it from the time that you entered the

16  interrogation room to the time that you actually laid down a

17  piece of paper and pen in front of him and asked him to write

18  a statement?

19     A.    That was probably pretty quick, about five or ten

20  minutes.

21     Q.    Did he indicate to you that he wanted to make a

22  statement, or did you indicate to him that he needed to make

23  a statement?

24     A.    I believe I asked him to.

25     Q.    And he agreed?

1          A.    Yes.

2          Q.    And then I believe -- did you Mirandize him yet

3     another time at that point?

4          A.    Yes, he would have been Mirandized from the front of

5     the statement form.

6          Q.    Okay.  And that's the voluntary statement form that

7     is kind of the base sheets for the written statement that

8     you've already tendered to the Court?

9          A.    Yes, ma'am.

10         Q.    Okay.  Did you ever tell Mr. Murphy that --

11    something to the effect of seeing how it was an accident or

12    that you're saying it's an accident, you don't have anything

13    to worry about by writing anything down in this statement?

14         A.    No, I wouldn't have said that.

15         Q.    Okay.  Did Mr. Tooke or Officer Tooke say that?

16         A.    I didn't hear him say that.

17         Q.    Did you see any indications at that point that he

18    had -- was having any effect for any lack of sleep or getting

19    tired, any laying down in the back of the car or anything

20    like that?

21         A.    No, quite the contrary.  I thought he was kind of

22    hyped a little bit, actually.

23         Q.    Okay.  What was the seating arrangement in the car

24    on the way back to the Dallas -- to the Garland Police

25    Department?

1      A.   The same as before.   Tooke was driving.   I was in

2   the front passenger.   Mr. Murphy was in the backseat.

3      Q.   Okay.   And you went back to the same interview room;

4   is that correct?

5      A.   Yes, I believe so.

6      Q.   Okay.   And so there was no audio equipment or video

7   equipment for the exact -- for the actual taking of the

8   statement?

9      A.   No, there was not.

10      Q.   And you said that you left him alone and told him to

11   write his statement down?

12      A.   Yes.

13      Q.   What were your exact instructions as to what -- how

14   he should go about writing down his statement?   Did you tell

15   him to include everything, include what he thought was

16   important, include everything you had talked about?   Or can

17   you recall?

18      A.   Well, generally when I'm in that circumstance, I

19   just tell the person if they want to write a statement, that

20   they can start the statement wherever they want to start the

21   story, end it wherever they want to end it, and tell the

22   story however they want to tell it.   It's their story.   And

23   so I don't really give him instructions on what to say or how

24   to say it.

25      Q.   Okay.   And that took about 20 or 25 minutes?

1    A.    I would say about that, yes.

2    Q.    When you enter the interrogation room, do you have

3 your gun on or is your gun locked out in one of those lockers

4 outside?

5    A.    It's not -- it's really a -- I don't know that we

6 have a written policy.  We probably do, but it's -- I

7 wouldn't have had my gun on.  I would never have my gun on in

8 an interrogation room.

9    Q.    But when you're out driving around with a suspect in

10 your car, you probably had your gun on then?

11    A.    Yes.

12    Q.    How did he indicate that he was finished?  Did you

13 walk in and say, are you finished?  Did he knock on the door,

14 or how did that all happen, or do you recall?

15    A.    Well, I really don't recall.  I probably would have

16 just gone back to the room and cracked the door and asked him

17 if he was done or not done.  If he wasn't done, I would just

18 have closed the door and left him alone.

19    Q.    And after he finished the statement, you left him

20 alone for that day?

21    A.    Yes, I did not talk to him again that day.

22    Q.    Okay.  What occasioned you to go back and ask him

23 additional information?

24    A.    What was the reason?

25    Q.    Uh-huh.

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.   I didn't have all the answers to all the questions.

2   I still did not know where the abduction location was

3   exactly.   I still did not know the exact location of where

4   the shot was fired.   I didn't know the location of the -- of

5   the gun, so I had unanswered questions, so -- and that was

6   the reason to go back and talk to him again.

7      Q.   Okay.   Let me kind of back up just for a second and

8   go back to the first interview.   The first interview he

9   started this statement at approximately what time, according

10  to -- just kind of roughly?

11     A.   Well, it's timed -- I think it was timed 11:00 --

12  11:32 or something like that.

13     Q.   And then you signed and dated it at what time?   Do

14  you recall?

15     A.   I think that's the -- actually the time that he

16  signed the statement was 11:32, so he would have started just

17  prior to that, 20 minutes prior to that.

18     Q.   At that time did you know whether or not Mr. Byck

19  and Ms. Little were on their way to the Garland Police

20  Department or were at the Garland Police Department at that

21  time to talk to Mr. Murphy?

22     A.   Myself and Mr. Murphy were in the interrogation

23  room.   He had signed the statement.   That's when I was

24  notified by either Lieutenant Thompson or Commander Lay, I'm

25  not sure which, that the attorneys were there and that's when

1    I returned him to the book-in area.

2         Q.   So there was none of the time that you were outside

3    the interrogation room in the hall or whatever, that you

4    were -- that you were notified that the attorneys were

5    actually there?

6         A.   No.

7         Q.   That you can recall?

8         A.   No.

9         Q.   Okay.  Did you see the attorneys there that day?

10        A.   Uh-huh.  Yes, I did.

11        Q.   Okay.  Did you speak to them?

12        A.   No, I did not.

13        Q.   All right.  Did anyone from the Garland Police

14   Department, either Commander Lay or any other person, tell

15   you not to speak with Mr. Murphy again after his attorneys

16   spoke to him?

17        A.   No.

18        Q.   Okay.  Do you know if anyone from the Garland Police

19   Department was told by one of his attorneys, either Ms. --

20   Mr. Byck or Ms. Little, that they did not want anyone else

21   from the Garland Police Department talking with Mr. Murphy

22   again after they discussed things with him?

23        A.   No, I don't know that.

24        Q.   Okay.  So that wasn't personally to you -- told to

25   you either by them or by any other person?

Page 87

1      A.    No, it was not.

2      Q.    But you knew he had talked to his attorneys and

3  that's why you came in with this handwritten questions as to

4  whether or not he would talk to you after speaking to his

5  lawyers?

6      A.    Yes.

7      Q.    Did it surprise you he said, yes, that he would talk

8  to you?

9      A.    I don't know if I should -- I would say I was

10  surprised, but I didn't think that he would.

11     Q.    Okay.  But you thought you'd just give it a shot

12  anyway?

13     A.    I still had some questions, and I wanted to know if

14  he still wanted to talk or not.

15     Q.    And so aside from the map, what oral statements did

16  he give to you regarding this offense on the second

17  interview?

18     A.    Well, we talked about -- the purpose of the

19  interview was to try and locate that abduction site so we

20  talked primarily about that.  He drew the map.  We -- that's

21  when he first mentioned to me that he had a past

22  psychological history.

23     Q.    How did you react to that?

24     A.    Well, he -- he actually told me that he thought that

25  he would like to talk to his psychologist at that time.

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.  And did you make arrangements for him to talk to his

2  psychologist at that time?

3     A.  Well, what I told Mr. Murphy was that we did not

4  have a psychologist available to the police department, that

5  if he had some type of physical or medical ailment and he

6  needed to see a medical doctor, that we would make

7  arrangements to take him to see a doctor.  He said that he

8  did not have any -- any medical evidence.  I then told him he

9  probably -- he would need to contact his psychologist himself

10  or contact his family and have the family make contact for

11  him.  I actually called his sister also to notify her of

12  that.

13     Q.  Let me talk to you a little bit about the interview

14  on the second day as well.  You did not have him write down

15  any additional information on any sort of voluntary

16  statement, paper, or any other paper in regard to what you

17  discussed on that second interview, did you?

18     A.  No.

19     Q.  Was there ever any sort of questionnaire or

20  questions from Ms. Cunningham's family that you discussed

21  with the defendant on that second --

22     A.  Yes, there was.

23     Q.  Okay.  Do you have a list of those questions and the

24  answers that he gave?

25     A.  Yes, I do.

Page 89

```
 1        Q.    May I see those, please?

 2        A.    This is actually not from the second day, but I do

 3   have those -- that information here.

 4        Q.    Okay.

 5              MS. BALIDO:   Judge, may I approach the

 6   witness?

 7              THE COURT:   You may.

 8              MS. BALIDO:   Judge, I would like to be clear.

 9   I'd like to mark as Defense Exhibit Number 1, the warrant of

10   arrest and probable cause affidavit, and offer it into

11   evidence for the purposes of this hearing as Defense Number

12   1.

13              (Defendant's Exhibit No. 1 offered)

14              MR. DAVIS:   No objection.

15              THE COURT:   Admitted.

16              (Defendant's Exhibit No. 1 admitted)

17        Q.    (By Ms. Balido)   I'm showing you what's been marked

18   for identification as Defendant's Exhibit Number 2, and ask

19   if you recognize this?

20        A.    I do.

21        Q.    And this is the questionnaire that was prepared by

22   who, the family of Ms. Cunningham?

23        A.    No, actually that was prepared by my supervisor.

24        Q.    Okay.  But it was written in the voice -- well, the

25   first letter is, I'm writing you this letter in hopes that
```

DARLINE W. LABAR, OFFICIAL REPORTER

1  you can shed light on the death of my sister?  Is that

2  correct?

3      A.   Yes.

4      Q.   And so it's prepared by your supervisor, but it's

5  written in the voice of one of the family members of the

6  victim; is that correct?

7      A.   That's correct.

8      Q.   Is this the only written information regarding --

9  hold on before I get there -- and who wrote down the written

10  parts of the answers to the questions?

11     A.   Mr. Murphy did.

12     Q.   Okay.  Does this complete the entire inventory of

13  whatever Mr. Murphy wrote to you regarding this offense or

14  any other offense that you questioned him about on any time

15  that you questioned him during the course of this

16  investigation?

17     A.   I believe that it does.

18     Q.   Can you kind of double check so we can be sure.

19     A.   Yes, ma'am.   I have another Miranda sheet with his

20  signature on it.

21     Q.   Is that from the third time that you went to go talk

22  with him?

23     A.   Yes.  That's prior to the letter that you just took.

24     Q.   Okay.

25     A.   It's dated October the 11th.

1    Q.    Okay.  So let's see if we get it all straight.  You

2    talked to him first and took a statement from him and had him

3    sign a Miranda sheet on the morning of the first interview,

4    the morning of his arrest?

5    A.    That's correct.

6    Q.    Okay.  And then you went back the next day, after he

7    had been hired -- after his lawyers had talked to him, had

8    him sign another Miranda sheet, also assumably waiving right

9    to counsel, and you interviewed him again?

10   A.    That's correct.

11   Q.    And that was in regard to the map and more kind of

12   fleshing out Dallas County?

13   A.    That's correct.

14   Q.    And the third sheet that you have is October the

15   11th, the year 2000, in regard to this interview?

16   A.    Yes.

17   Q.    Okay.  Is there any other interview that you either

18   attempted to do or did in fact do in regard to this offense

19   or anything stemming from this offense where you interviewed

20   Mr. Murphy and he wrote anything down?

21   A.    Yes.

22   Q.    Okay.  Can you show that to me?

23   A.    It's October the 13th.

24   Q.    Okay.  First, can you pull this -- this one out?

25   A.    Yes.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.    The October the 11th?

2      A.    Yes.

3      Q.    I show you what's been marked for identification as

4    Defendant's Exhibit Number 4 and ask if you recognize this?

5      A.    Yes.

6      Q.    And this is the Miranda sheet that you prepared, I

7    guess in preparation for an interview that never really took

8    place on October the 13th of the year 2000; is that correct?

9      A.    That's correct.

10      Q.    Okay.  And with all the exhibits that are now into

11    evidence, is this the totality of the papers that you had Mr.

12    Murphy write, any kind of written statement in regard to this

13    case or any other case stemming from this investigation?

14      A.    I believe so.

15      Q.    Can you look and just be sure?

16      A.    I don't think there's anything else.

17      Q.    Okay.  And on October the 13th, the year 2000, what

18    was your purpose in attempting to talk to Mr. Murphy on that

19    day?

20      A.    Once again to get the answers to the questions that

21    we didn't have.

22            MS. BALIDO:  Judge, if I can have about two

23    minutes to review Defendant's Exhibit Number 2.  I've never

24    seen it before.

25      Q.    (By Ms. Balido)  Detective Myers, it looks like at

DARLINE W. LABAR, OFFICIAL REPORTER

1    the end of page 2 of State's Exhibit -- excuse me, Defense

2    Exhibit Number 2 that Mr. Murphy wrote something down and it

3    seems like he starts another sentence with three words and

4    doesn't finish.  Was there something that interrupted him

5    from finishing that?

6        A.   No.

7        Q.   That's just where he chose to end it?

8        A.   Yes.

9        Q.   And are you testifying that he understood that --

10   his response to these questions could be held against him in

11   a court of law?

12       A.   Yes.

13       Q.   What was your discussion outside the Miranda

14   warnings in regard to whether or not he should answer these

15   questions?  Did you talk to him any about the feelings of the

16   family or anything like that?

17       A.   I just told him that this was a questionnaire

18   provided by the family.  He could answer it or not answer

19   it.  He could write on it or not write on it.  It was his

20   decision to make.  He wasn't required to do that.  He decided

21   that he would -- did want to do that and would do that, and

22   so he was left alone during that -- during that time that he

23   responded to that.

24       Q.   And did you make it clear to him outside the Miranda

25   warnings that these answers could and would be used against

1    him in a court of law, or did you just leave that up to the

2    Miranda warnings?

3        A.    I just left that up to the Miranda warnings.

4        Q.    Okay.  And as far as you know, this is all the

5    written words, including any diagrams or anything else, that

6    he may have prepared in result of your questioning to him?

7        A.    Yes.

8              MS. BALIDO:  Judge, do you want to see these?

9        Q.    (By Ms. Balido)  Are those three interviews or

10   attempted interviews the only times that you or the Garland

11   Police Department attempted to talk to him about the details

12   of this offense?

13       A.    Yes, there was the three interviews and then the one

14   attempted interview.

15       Q.    Okay.  Yeah, you're right, the three actual

16   interviews and then -- and the one attempted interview.  And

17   your testimony is that at no time did you tell Mr. Murphy

18   that if he cooperated with you either through drawing a

19   diagram or answering the family's questions, that it would

20   make it easier for him with his case pending?

21       A.    Did not.

22       Q.    Let me ask you a question.  When -- when did y'all

23   make the decision to actually transfer him down here to the

24   Dallas County Jail?

25       A.    That decision probably would have been after he --

1    after he refuses -- exercises his rights at that attempted

2    last interview.  We knew we weren't going to interview him

3    anymore after that and so the determination would have been

4    after that to transfer.

5         Q.   So is it fair to say if he kept talking to you, that

6    he still may be in the Garland City Jail right now?

7         A.   No, I wouldn't say that's fair.  I don't think he'd

8    still be there now, but he may have been there after the day

9    that we transferred, that's possible.

10        Q.   And is it true or not true that lawyers have an

11   easier access of getting into the Dallas County Jail to see

12   their clients than at the Garland jail?

13        A.   Well, I don't know what the procedure is at the

14   Dallas County Jail.  I actually would think it would be

15   easier to get into the Garland jail, but I don't do that, so

16   I don't know the answer to that, really.

17        Q.   And at the time that you made the second, third,

18   and -- the second and third interview and the first

19   attempted interview, you knew that he had counsel appointed

20   to him?

21        A.   I knew that a lawyer had visited with him, yes.

22        Q.   And you knew that they had actually conversed?

23        A.   Yes, I did.

24        Q.   And during the first interview you were still in Mr.

25   Murphy's presence when you were told that his lawyers were

1    there that morning; is that true or is that not true?

2        A.    Was he present when I was advised that the lawyers

3    were there?

4        Q.    Yes.

5        A.    No, he probably was not present.   I probably would

6    have been called from the room.

7        Q.    But were you still interviewing him or talking to

8    him about the offense when you found that out?

9        A.    Yes.

10       Q.    And did you end the interview, or did you continue

11   the interview after that?

12       A.    No, I ended it then and returned him to the book-in

13   area.

14       Q.    And why did you do that?

15       A.    Because I was advised by my supervisor that there

16   were attorneys there to talk to him.

17       Q.    And that was Commander Lay?

18       A.    Yes.

19            MS. BALIDO:   Judge, I don't have anymore

20   questions at this time, but I would ask that he be subject to

21   recall.

22            THE COURT:   Oh, I think he'll probably be

23   within a call of the Court.

24            MS. BALIDO:   And, Judge, also, just so the

25   record is clear, until this morning we did not have any

DARLINE W. LABAR, OFFICIAL REPORTER

1    copies of the paperwork in regard to the Miranda warning on

2    the first interview, the Miranda warning and the map of the

3    second interview, the Miranda warning and the questionnaire

4    of the third interview, and the Miranda warning for the

5    attempted interview.  And based on that and based on all the

6    motions for production, the specific requests for any

7    statements by the defendant that were filed all the way back

8    in March in regard to this case, we would ask the State to

9    first produce anything else that they have that has been

10   subject to a motion for production that has not been so

11   produced.  And also, we would ask for a complete copy of the

12   investigation file of Detective Myers either be tendered to

13   us or at least tendered to the Court to determine if any

14   Brady material has been -- is in there, because -- because we

15   have relied on the good faith of the State, and I'm not

16   saying that it's been done on purpose, but there have been

17   some things that have been left out of the production,

18   motions and things that have been turned over to us.  And

19   just to insure that we have everything, we would like to have

20   a copy of everything.

21             THE COURT:  Is there any other documents in

22   the State's possession about which a motion has been filed

23   that have not been tendered other than those about which Ms.

24   Balido makes reference?

25             MR. DAVIS:  No, Your Honor.


DARLINE W. LABAR, OFFICIAL REPORTER

1          THE COURT:  The Court will look at Detective

2     Myers' investigatory notes in camera and determine if there's

3     any Brady or Bagley or Kyles v. Whitley about which the

4     defense makes reference.

5          MS. BALIDO:  Judge, we also act -- the State

6     has granted us permission, and we have been up to Mr. Davis's

7     office to look at any exhibits that they plan on admitting in

8     this case, but obviously since these items that were not

9     tendered to us have State's exhibit stickers on it, we would

10    ask that if tomorrow he can make a time we can review those

11    documents that he plans to offer into evidence so we don't

12    have to waste the Court's time in looking at them and making

13    an objection and that sort of thing.

14         MR. DAVIS:  Well, I want the record to reflect

15    here that I have not limited the defense to inspecting items

16    that I intend to offer.  In fact --

17         MS. BALIDO:  That's true, Judge.

18         MR. DAVIS:  The defense has been in my

19    office.  They've reviewed all the photographs in my

20    possession, whether I intended to offer them or not.  And

21    I've made it clear to the defense now through my motions that

22    all the physical evidence has been available for their

23    inspection.  It's upstairs.  To my knowledge, no request has

24    been made to look at that physical evidence, but it remains

25    there and available if they want to come up there and look at

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1   it.

 2                MS. BALIDO:  Then we will.

 3                THE COURT:  Thank you.  May the detective be

 4   excused at this time?

 5                MR. DAVIS:  No objection.

 6                MS. BALIDO:  No objection.

 7                THE COURT:  Thank you.  You are excused.

 8                MR. DAVIS:  The State rests at this time in

 9   this hearing.

10                MS. BALIDO:  Judge, subject to our

11   housekeeping scheduling, we would just ask for a recess to

12   such time as we can procure our witnesses here.

13           Let me make sure I get all these back to you.

14                (Discussion off the record.)

15                MS. LITTLE:  Judge, may I do this to get

16   something from upstairs?

17                (Discussion off the record.)

18                (Defendant put in street clothes.)

19                THE COURT:  Good afternoon.  May I ask you to

20   raise your right hand.

21                (Witness sworn.)

22                THE COURT:  Thank you.  You may lower your

23   hand.

24           Mr. Davis.

25                MR. DAVIS:  Thank you.
```

SHERRYL WILHELM

was called as a witness by the State and, after having been

first duly sworn, testified as follows:

Direct Examination

By Mr. Davis:

Q.   Will you please tell us your full name?

A.   Sherryl Wilhelm.

Q.   And would you please spell your last name for the

court reporter?

A.   W-i-l-h-e-l-m.

Q.   Ms. Wilhelm, directing your attention back to 1997.

At that time were you employed at the Arlington Memorial

Hospital?

A.   Yes.

Q.   In what capacity?

A.   Transcriptionist in radiology.

Q.   And that hospital, is that located in the 800 block

of Randol Mill Road in Arlington?

A.   Yes.

Q.   More specifically now directing your attention

August the 26th of 1997, I believe that would have been a

Tuesday.  Were you at work that day?

A.   Yes.

Q.   What were your hours to work?

A.   8:00 to 4:30.

1     Q.   8:00 in the morning to 4:30 in the afternoon?

2     A.   Yes.

3     Q.   Did you -- did you drive yourself to work that day?

4     A.   Yes.

5     Q.   What type of automobile were you driving?

6     A.   Grand Am, I believe it's 1999.

7     Q.   And where in proximity to the hospital did you park

8 your car?

9     A.   In the employees parking lot to the -- I can't

10 remember the direction --

11     Q.   Just in reference to the hospital, without regard to

12 direction, where would it have been.

13     A.   Just across the street from the hospital.

14     Q.   So it would have been across Randol Mill from the

15 hospital?

16     A.   Right.

17     Q.   That day did you take a lunch break?

18     A.   Yes.

19     Q.   About what time did you take your lunch break?

20     A.   Around 11:30 in the morning.

21     Q.   And do you remember where you took your lunch break

22 that day?

23     A.   I was on my way out to my car to have a break out

24 there at my car.

25     Q.   So it's approximately 11:30 in the morning,

1    correct?   You went out to your car which is parked across

2    the street from the hospital; is that right?

3        A.   Right.

4        Q.   When you got out to your car, Ms. Wilhelm, did

5    something unusual occur?

6        A.   Yes.

7        Q.   If you would, just please tell the Judge what

8    happened to you when you got out there to your car?

9        A.   I was opening my car door, and I was just fixing to

10   sit in my car.  And someone came from behind me and pushed me

11   into the car.  And I turned around and I saw this guy and he

12   was saying "get in, get in, I'm not going to hurt you, I just

13   need a ride."  And I thought it was a joke.  I thought

14   someone was playing a practical joke on me, but he continued

15   to push me over to the passenger side of the car.  And I was

16   so stunned.  I just said wait, wait a minute, you know, and I

17   kept thinking this was a joke or something.  And he said,

18   "I'm not going to hurt you, I just need a ride to Fort Worth

19   and I'll let you off down here."  And I tried to open up the

20   car door on the passenger side.  And by that time he had

21   gotten in and sat down and he locked the door.  And I tried

22   to open the door again and he locked the door again.  And he

23   got angry and started yelling and said, "I'm not going to

24   hurt you.  I told you I wasn't going to hurt you."  And then

25   he -- at one point started to choke me and I said okay, okay,

 1    you know,· I wouldn't try to open the door again.  So he told

 2    me to get down into the floorboard of the car and put my head

 3    in the seat, with my face down into the seat, and I did, and

 4    I immediately just prayed, dear God, please help me, and he

 5    seemed to get angry when I said that.  And he held up his

 6    hand and said, I told you I was not going to hurt you.  I

 7    just want a ride.  And I told him, I said I have money, you

 8    can have the money.  And he didn't really say anything to

 9    that.  And then I could tell we -- we were driving out of the

10    parking lot.  And as we continued to go down Randol Mill

11    Road, I kept trying to see if we would get to a red light

12    because I was going to try to get out of the car again.

13    And -- but we never did make a complete stop at a red light,

14    and I just felt the car turning right somewhere.  I wasn't

15    sure where we were, but I had gradually got myself up into

16    the seat.  And he looked at me and he said, okay, you can sit

17    up now, you can get up now.  And from where I was sitting, I

18    could just see an expressway or highway, and I knew if I

19    didn't get out of the car then, I would probably never get

20    out of the car.  And I opened the door.  And as I opened the

21    door, he put on the accelerator and I jumped out.  And then

22    I -- a car came up behind.  I rolled on to the pavement, and

23    I was pretty battered.  And a car had pulled up behind and

24    stopped and the lady was -- had a look of shock on her face.

25    And I got myself up and tried to walk over to her car.  And

```
 1    she came over to help me, and I told her, I said, could you

 2    please help me?  I've been abducted, and another woman pulled

 3    up behind her in a van and she got out and she said let's put

 4    her into my van.  And they -- she -- asked what I needed.  I

 5    said drive me to the hospital.  I work at Arlington Memorial

 6    Hospital.  And then another car pulled up and a man called

 7    the police on his cell phone.  And this one woman took me to

 8    the hospital.

 9         Q.   Okay.

10              THE COURT:  In the van?

11              THE WITNESS:  In the van.

12         Q.   (By Mr. Davis)  And did you receive medical care

13    there?

14         A.   Yes.

15         Q.   Now, Ms. Wilhelm, I want to -- I want to talk about

16    this man who actually abducted you and put you in your car.

17    Was it just one man?

18         A.   Uh-huh.

19         Q.   You need to answer yes or no for the court

20    reporter.

21         A.   Yes.

22         Q.   Okay.  Was the man white?  Was he African American,

23    Hispanic, Asian?  What was he?

24         A.   White.

25         Q.   And do you remember in general what he looked like
```

1    that day?

2        A.   He -- to me, when I first saw him, he looked

3    clean-cut.  He had an earring in one of his ears.  I can't

4    remember which one now.  He -- he looked like he had gotten a

5    pretty recent haircut, clean-looking haircut, but I could see

6    like an after 5 o'clock shadow.

7        Q.   What color hair?

8        A.   Dark.

9        Q.   With just a little bit of growth of beard, like 5

10   o'clock shadow?

11       A.   Yes.

12       Q.   Any moustache, beard, anything of that sort?

13       A.   No.

14       Q.   Could you get an idea about his build, heavy-set,

15   medium, slim build?

16       A.   He looked slender, very slender.

17       Q.   How about height, any approximate height?  Was he

18   tallish, medium height, short?

19       A.   I would say in between medium and tall.

20       Q.   Okay.  And finally approximate age of the person who

21   abducted you?

22       A.   At the time I felt like he was in his early

23   twenties.

24       Q.   This person, did he wear anything that obscured his

25   face?  Was he wearing a mask or any sort of disguise where

1    you couldn't see his face clearly?

2        A.    No.

3        Q.    When you were in the car with him, Ms. Wilhelm, how

4    close to his face were you?

5        A.    Very close.   I mean --

6        Q.    Within two to three feet?

7        A.    Yeah.   Yes.

8        Q.    And again, nothing obscuring his face, right?

9        A.    Correct.

10       Q.    How long were you actually with this individual from

11   the time that you turned around at your car, saw the

12   individual, you were placed in your car, you drove to where

13   you actually escaped from the vehicle, approximately how long

14   do you think that you were in the presence of this person?

15       A.    Approximately 30 minutes.

16       Q.    Okay.   You heard the individual speak to you?

17       A.    Yes.

18       Q.    All right.   Ms. Wilhelm, if you would, would you

19   please look around the courtroom this afternoon and tell me,

20   do you see the person in the courtroom this afternoon that

21   placed you in your car on August 26th, 1997, and started

22   driving away with you?

23       A.    No.

24       Q.    Okay.   The person who -- the hairstyle of the person

25   who actually abducted you, close cut, burr haircut, what sort

1   of hairstyle would you say?

2        A.    It was -- at the time it was close cut on the top

3   and then almost burr around the back.

4        Q.    Uh-huh.  Was the person wearing glasses at the time?

5        A.    No.

6        Q.    He was wearing a loop earring in one of his ears; is

7   that correct?

8        A.    Yes.

9        Q.    What sort of clothing was this person wearing?

10       A.    Jeans and a blue T-shirt.

11       Q.    All right.  You sought medical care, correct?

12       A.    Correct.

13       Q.    After the incident did you come in contact with a

14   Detective John Stanton of the Arlington Police Department?

15       A.    Yes.

16       Q.    And did you give him a description of the person who

17   had abducted you?

18       A.    Yes.

19       Q.    And did he actually have you sit down with a -- with

20   a member of the Arlington Police Department to try and

21   prepare a composite sketch of the suspect?

22       A.    Yes, that was about a week later.

23       Q.    And prior to the time that you actually sat down

24   with this -- with this artist from the Arlington Police

25   Department had the police shown you any photographs of

1   possible suspects to look at?

2        A.   No.

3        Q.   If you would, go through the procedures that the

4   artist used with you.  Was he showing you photographs?  Was

5   he asking you questions?  How did you come up with a

6   composite sketch of this suspect?

7        A.   He was showing me on the computer certain types of

8   eyebrows and lips and chins and that type of thing.  Was it

9   bushy eyebrows, thin eyebrows?  And that's how we came up

10  with what I thought he looked like.

11       Q.   So as I understand, he asked you does this look like

12  right, does this look right, and then you would indicate

13  either yes or no; is that correct?

14       A.   Correct.

15       Q.   And then if you said correct, he would make that a

16  portion of the stretch for you; is that right?

17       A.   Right.

18       Q.   And did you and the artist then finally come up with

19  a final composite that you were satisfied with?

20       A.   Yes.

21       Q.   Now, fast forward, if you will, now to last October,

22  year 2000, and I'm going to ask you if you were at home

23  sometime after October the 6th of the year 2000 where you saw

24  a photograph on your television set that jogged your memory

25  about the incident that you had been the victim of?

1    A.    Yes.

2    Q.    Tell me about that, if you will.

3    A.    I had recently heard on the news that a woman -- an

4    elderly woman from Garland had been missing and I wanted

5    to -- I -- when I hear of anybody missing, I try to stay

6    glued to what's going on.  And I was watching the news, and

7    they were saying something about this woman.  I believe they

8    had found her body, and they flashed up quickly a picture of

9    the man that had stolen her credit cards and murdered her.

10   And I saw the picture, and I told whoever was sitting in the

11   room with me, one of my children, that I thought it looked

12   like the guy that had abducted me.

13   Q.    Okay.  And did you then call Detective Stanton and

14   tell him?

15   A.    Yes.

16   Q.    And again, I want you to look around the courtroom

17   this afternoon.  Do you see a person in this courtroom who

18   matches the photograph that you saw on your television screen

19   back in October of the year 2000?

20   A.    Who matches the photograph.  This person looks

21   similar, but he has on glasses.

22   Q.    Uh-huh.  Are you referring to the person at the end

23   of the counsel table over here?

24   A.    Yes.

25   Q.    Is he wearing sort of a brownish colored shirt?

Page 220

```
 1      A.   Yes.

 2                MS. LITTLE:  Let me object to the leading,

 3    pointing the person out that -- let her identify, please.

 4                THE COURT:  Objection is overruled.

 5      A.   If he could take off his glasses.

 6                THE COURT:  Take your --

 7      Q.   (By Mr. Davis)  Does that help you?

 8      A.   Yes.

 9      Q.   Okay.  Do you recognize --

10      A.   Yes.

11      Q.   -- this person?

12      A.   Yes.

13      Q.   And the individual, the defendant who's just now

14    taken off his -- taken off his glasses, where do you

15    recognize him from, Ms. Wilhelm?

16      A.   From pushing me in the car.

17      Q.   This is the person who abducted you on August the

18    26th of 1997?

19      A.   Yes.

20      Q.   You initially had some trouble identifying him.  Can

21    you tell me why?

22      A.   Because I -- he had on glasses, and I -- at the time

23    when he did that to me there was no glasses.  So --

24      Q.   Is his hairstyle different?

25      A.   It looks longer right now.
```

1      Q.   Uh-huh.  And I believe the record would reflect he's

2  not wearing any earrings either today in the courtroom, is

3  he?

4      A.   No.

5      Q.   And is he dressed differently -- as far as you can

6  see anyway, is he dressed differently than he was back on

7  August 26th?

8      A.   He had on a T-shirt at the time.

9      Q.   Okay.  Having had a chance to look at him now

10 without his glasses, do you have any doubt at all that this

11 is the person who abducted you in Arlington back in 1997?

12     A.   No.

13     Q.   Any doubt -- well, first of all, was it the

14 defendant's picture that you saw on your television screen

15 back in October of 2000?

16     A.   It was a picture -- I'm not sure -- the picture that

17 was from the newspaper.

18     Q.   How much of a look at that photograph did you have?

19 Was this something that you got to look at over an extended

20 period of time when it was on your television screen, or was

21 it something that you looked at briefly?  Give me some --

22 some sort of estimate of the time that you were able to

23 simply look at this photograph and look at it on your

24 television screen.

25     A.   I would say a few seconds.  I mean, they flashed it

1    up pretty quick.

2        Q.    And you then called the detective.  Did Detective

3    Stanton later come to your home and show you a photographic

4    lineup?

5        A.    Yes.

6        Q.    Do you recall whether or not that would have been on

7    or about November the 3rd of the year 2000?  Does that sound

8    about right?

9        A.    Yes.

10       Q.    When the detective came over, if you would just tell

11   me what he said to you, what instructions, if any, that he

12   gave you with regards to the photographic lineup.

13       A.    He just told me to take my time and look at the

14   pictures and -- I just immediately saw the picture that I

15   believed was him, and I pointed to it.

16       Q.    The pictures -- do you remember how many pictures

17   were in the lineup?

18       A.    Maybe seven or eight, something like that.

19       Q.    Were all of the suspects the same race?  Were they

20   all white?

21       A.    I think there might have been some Hispanic in

22   there, but I can't remember for sure.

23       Q.    Okay.  When he -- when he asked you to look at the

24   photographic lineup, did he tell you that you had to pick

25   someone out of the lineup?

DARLINE W. LABAR, OFFICIAL REPORTER

1        A.    No.

2        Q.    Did he give you any indication of who you should

3   pick out of the lineup?

4        A.    No.

5        Q.    Did he tell you that the person who had abducted you

6   was in the lineup?

7        A.    No.

8        Q.    My understanding then is that he just gave you the

9   lineup and asked you to look at it and tell him if you could

10  recognize anyone; is that right?

11       A.    Correct.

12       Q.    And that was done at your home?

13       A.    Yes.

14       Q.    And was it your testimony that you looked and that

15  you instantly identified one of the individuals in that

16  lineup as the person who had abducted you; is that right?

17             MS. BALIDO:   Objection to leading.

18             THE COURT:   Sustained as to the form of the

19  question.

20       Q.    (By Mr. Davis)   How long did it take you when you

21  looked at the photographic lineup to identify someone?

22       A.    Not very long at all.

23       Q.    Did you pick out more than one person?

24       A.    No.

25       Q.    Did he ask to you write something on the form to

1    indicate which person that you were picking out?  Or do you

2    remember?

3        A.    I don't remember.

4        Q.    Did you have any doubt at the time that you looked

5    at the lineup that the person that you were picking was the

6    person who had abducted you?

7        A.    No.

8        Q.    Have you seen the lineup since -- since Detective

9    Stanton showed it to you that day?

10        A.    You mean the same pictures?

11        Q.    Yes, ma'am.

12        A.    No.

13        Q.    Ms. Wilhelm, I want to ask you now, when you

14    identified the defendant down here, I need to ask you some

15    questions about why you're identifying him today.

16        A.    Okay.

17        Q.    Are you basing your identification on having had the

18    opportunity to see him during the abduction on August the

19    26th of 1997?  Is that the reason that you're picking this

20    man out this afternoon?

21        A.    He looks like the man.

22        Q.    If you had not been shown the photographic lineup by

23    Detective Stanton or hadn't seen the person's picture on the

24    television screen, would you still be able to come in here

25    this afternoon and identify the defendant because of your

1    opportunity to see him during the abduction?

2       A.   Yes.

3       Q.   And as far as opportunities, have you seen the

4    defendant down here in person since the date of the

5    abduction?

6       A.   No.

7            MR. DAVIS:  I'll pass the witness, Your Honor.

8            MS. LITTLE:  May I proceed, Your Honor?

9                        Cross-Examination

10   By Ms. Little:

11      Q.   Ms. Wilhelm --

12      A.   Yes.

13      Q.   -- my name is Jane Little.  We've never met before

14   or anything.  I do represent Jim Murphy, along with Jennifer

15   Balido and Mike Byck who was here a moment ago.

16           MS. BALIDO:  He's over here.

17           MS. LITTLE: Oh, he's over here.

18      Q.   (By Ms. Little)  If I ask you anything that doesn't

19   seem clear, would you let me know and I'll try to do a little

20   better job.  Okay?

21           That day that you were going to have lunch in your

22   car, you said it was a Grand Am?

23      A.   Yes.

24      Q.   Was it a four-door car, Ms. Wilhelm?

25      A.   Yes.

1      Q.    How does the locking system work on that car?

2      A.    The driver's side has control over all four doors.

3      Q.    Okay.  And when you open the door, does it open all

4   the doors when you -- did you have a punch button or did you

5   have to put the key in the lock?

6      A.    There's an automatic lock.  Is that what you mean?

7      Q.    Well, yeah.  Do you have a -- is it on your key ring

8   where you punch a button and the door opens or do you

9   punch --

10      A.    No, it's on the door panel.

11      Q.    So how did you actually get in?  What did you do to

12   get in?

13      A.    Well, to open the car door, I unlocked it from the

14   outside.

15      Q.    Okay.  And then before you could get in, you felt

16   the shove from behind?

17      A.    Yes.

18      Q.    Did you see any other people around you in the lot

19   at all?

20      A.    No.

21      Q.    Do people commonly take breaks at their cars and

22   maybe have lunch out there?

23      A.    There's people that go to their cars to leave for

24   lunch or coming and going, but at that particular moment I

25   didn't --

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1      Q.   You didn't notice?

 2      A.   I didn't notice anyone.

 3      Q.   When you were pushed, what position did that leave

 4  you in in your front seat?

 5      A.   Pretty much to where I had to scoot into the car.   I

 6  mean, where I was like -- kind of like on my knees.

 7      Q.   Okay.  How close to the edge of the seat would you

 8  say your knees were when you first landed?  The edge of the

 9  seat towards the door?

10      A.   Well, he had pushed me to where I was toward the

11  middle of the car.  And I had like some items to move out of

12  the way because he had pushed me into those items, like -- I

13  think it was a Tupperware dish that had something to eat in

14  it and a few things like that.

15      Q.   Were those items already in the car, or had you

16  taken them with you?

17      A.   I had taken them with me.

18      Q.   And then were you allowed to turn over to look at

19  whoever was behind you, or what happened next?

20      A.   Well, I just immediately turned.

21      Q.   Okay.  Were you prevented from doing that in any

22  way?

23      A.   To turn around and look at him?

24      Q.   Uh-huh.

25      A.   No.
```

1    Q.   I'm picturing you, if you'll bear with me, Ms.

2  Wilhelm, sort of like on your hands, you know, not up, but

3  more prone than up.  Would that be inaccurate?

4    A.   When I felt someone pushing me into the car, that's

5  when I immediately turned around to see.

6    Q.   Okay.  So you got to turn around and look?

7    A.   Right.

8    Q.   Okay.  And then you landed -- were you crawling

9  across the seat?

10   A.   That's the best way to put it.

11   Q.   Okay.  And then were you allowed to get into a

12  sitting position in the car?

13   A.   Yes.  After --

14   Q.   Where you had your feet on the passenger side of the

15  floor?

16   A.   Right.

17   Q.   And was the other person in the car by this time?

18   A.   Yes.

19   Q.   Were you talking at that time?

20   A.   I -- yes.  I mean, I was begging him to let me get

21  out of the car.

22   Q.   Uh-huh.

23   A.   And he just kept saying he just needed a ride.

24   Q.   And were you still sitting up and looking at him, or

25  were you looking straight ahead when you were talking to him?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   I was probably looking at him and -- looking over at

2  the door trying to get out, trying to open the door.

3    Q.   Okay.  So the primary thing on your mind would have

4  been to try to get out?

5    A.   Right.

6    Q.   How do you -- where are the buttons to unlock your

7  door on the passenger side?  Where on the door are they?

8    A.   They're on the door panel.

9    Q.   The handle or on the door itself?

10    A.   The handle is on the door itself.

11    Q.   And do you have to use the handle to lift it up?

12    A.   Right.

13    Q.   Or is there a button?

14    A.   You have to lift the handle, but you -- to unlock

15  it, you have to punch the button.

16    Q.   Okay.  How long would you estimate it took you to

17  get out of the hospital parking lot?  Is there a gate or

18  anything that you have to go through to get out?

19    A.   No.

20    Q.   That's two questions, really, but --

21    A.   No, I don't know how long it took to get out, maybe

22  10 minutes, 15.

23    Q.   And what's involved in the drive getting out of the

24  hospital lot?

25    A.   Just that it's a big parking lot and driving through

```
 1    the cars.
 2                    MS. LITTLE:  Could I approach the witness,
 3    Your Honor?
 4                    THE COURT:  You may.
 5         Q.   (By Ms. Little)  I need you to try to help me here.
 6    It doesn't matter if you can't draw.  Okay?  Because I can't
 7    either.
 8         A.   Okay.
 9         Q.   Let's pretend that this pink line on this piece of
10    paper that I'll mark Defense Exhibit 3 --
11                    MS. BALIDO:  Defendant's Exhibit --
12                    THE REPORTER:  May I mark it, please?
13                    (Defendant's Exhibit No. 5 marked)
14         Q.   (By Ms. Little)  This is going to be Defense Exhibit
15    5.  Okay?  Pretend that this pink line is the street.  Was it
16    Randol Mill that y'all pulled out onto?
17         A.   Yes.
18         Q.   Okay.  Would you draw where the hospital is, the
19    general shape on that, or is it that side of the hospital
20    that you went out?
21         A.   No.
22         Q.   Show me -- show me what -- show me how it works.
23         A.   Okay.  The hospital is across the street, and this
24    is Randol Mill.
25         Q.   Okay.
```

```
 1        A.    Right.

 2        Q.    Okay.

 3        A.    And then the parking lot is back over in here.

 4        Q.    Okay.

 5        A.    And I was parked pretty much down in here.

 6        Q.    Okay.

 7        A.    And then there's rows of cars here, rows of car

 8   here, like that.

 9        Q.    Would you put an H on the hospital for me?

10        A.    (Witness so indicates.)

11        Q.    And what's back here behind this parking lot?

12        A.    I know there's doctors offices on this side.

13        Q.    Okay.

14        A.    I'm not sure if there's a school or a building of

15   some sort.  I can't quite remember what is there.

16        Q.    Okay.  How long -- thank you.  That will do it for

17   now.  I think I have an idea.

18              How long did it take you to walk out to your car?

19        A.    There --

20                   THE COURT:  From the hospital to the car?

21        Q.    (By Ms. Little)  Yes, I'm sorry.  From the hospital

22   to the car?

23        A.    There is -- there's a bridge that goes over the top

24   of -- over Randol Mill --

25        Q.    Okay.
```

1    A.    -- Randol Mill Road to get across, so it might have

2  taken me seven to ten minutes.

3    Q.    And can you estimate feet or anything that it is

4  from the hospital to the street Randol Mill?

5    A.    From the hospital to Randol Mill?

6    Q.    Uh-huh.

7    A.    I -- I don't know.

8    Q.    Okay.  And you never saw anybody around you until

9  you got pushed from the -- from behind; is that right?

10   A.    Correct.

11   Q.    Was there any kind of line to get out of the parking

12  lot?

13   A.    No.

14   Q.    So you were able to travel in the car directly to

15  the exit on Randol Mill and get out on Randol Mill; is that

16  right?

17   A.    I'm sorry, would you repeat that?

18   Q.    I'm just trying to understand how long it takes to

19  get out of the lot.  And you had said that you didn't have to

20  wait to get out.

21   A.    Right.

22   Q.    So you traveled across the lot and got onto Randol

23  Mill Road --

24   A.    Right.

25   Q.    -- is that right?

1          And did you go north, south, east, or west?  I'm not

2     sure --

3          A.   I believe it would be west.

4          Q.   And when was the first time that you tried to open

5     the door?

6          A.   Immediately.

7          Q.   Okay.  So you would have been looking at the door at

8     that time?

9          A.   I looked at him, and then I looked at the door.

10         Q.   Okay.  And when you did -- did you punch the button

11    and pull the handle, or did you just pull the handle, or what

12    did you do that first attempt?

13         A.   I tried to, I think, go ahead and pull the handle,

14    just out of response.

15         Q.   Okay.  And did the person next to you say anything

16    to you at that time?

17         A.   He locked the door and said, I told you I'm not

18    going to hurt you, I just need a ride.

19              And I said, well, then let me out.

20         Q.   Uh-huh.

21         A.   And he didn't say anything.  He -- then he said I

22    will let you out down here, and I tried again.

23         Q.   And were you able to get out that time?

24         A.   No.

25         Q.   Because the door was locked?

```
 1        A.    Right.  He locked it.

 2        Q.    Okay.  How many times did he lock it before you got

 3   out of the parking lot?

 4        A.    Two or three.

 5        Q.    So it appears it was kind of a you're trying to open

 6   the door, he's locking you back in, you're trying to open the

 7   door, he's locking you back in?

 8        A.    Yes.

 9        Q.    Is that kind of how it went?

10        A.    Yes.

11        Q.    So your primary focus of your attention was getting

12   out of that car, wasn't it?

13        A.    Yes.

14        Q.    Do you have a parking sticker for your car in that

15   lot?

16        A.    Yes.

17        Q.    Do you have to show any I.D. or anything to get out

18   at the --

19        A.    No.

20        Q.    -- gate?

21        A.    No.

22        Q.    You just drive out?

23        A.    Yes.

24        Q.    And went west, you said?

25        A.    Yes.
```

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.   Did you notice anything distinctive about the voice

2   of the person who had taken you?

3      A.   It sounded like when I kept trying to get out and

4   telling him that I -- there -- I could sense some rage as far

5   as he sounded angry at the time when I kept trying to get out

6   and I just asked God to help me, he sounded enraged.

7      Q.   Did you ask out loud?

8      A.   Yes.

9      Q.   And what was he saying when he sounded enraged at

10  that time?

11     A.   He screamed, I'm not -- "I told you I was not going

12  to hurt you."  But at one point he raised his hand to me and

13  said, "I'm not going to hurt you."

14     Q.   Would you demonstrate how that -- how he raised his

15  hand?

16     A.   Like this, like he was going to hit me.

17     Q.   Like he was going to come across his --

18     A.   Yes.

19     Q.   -- own chest and backhand you?

20     A.   Yes.

21     Q.   And what did you do in response to that?

22     A.   I was just stunned at all this.  I just would say

23  "okay, okay."

24     Q.   And where in the car were you at this time?  What

25  part of Randol Mill?

1     A.   On -- on Randol Mill?

2     Q.   Uh-huh.  Weren't you on Randol Mill by this time?

3     A.   I don't think so.  I think we were still in the

4 parking lot.

5     Q.   Okay.  And when was it you were first told to get

6 down?

7     A.   Probably the second time that I tried to open the

8 door and -- and he put his hands around my neck.

9     Q.   Both of them?

10    A.   Yes.

11    Q.   What was the car doing while this was happening?

12    A.   It was parked.  It wasn't moving.

13    Q.   Okay.  Did you ever see any weapons at all?

14    A.   No.

15    Q.   Were you ever threatened with a weapon at all?

16    A.   No.

17    Q.   And how long were your hands -- were the hands on

18 your neck?

19    A.   I -- a few seconds.  I told him "okay, okay."  I was

20 struggling to say okay, okay, with his hands around my neck,

21 and that is the time when he told me to get in the

22 floorboard.

23    Q.   Did he put the car in park before he turned to choke

24 you?

25    A.   I don't remember.  I mean, I know the car wasn't

DARLINE W. LABAR, OFFICIAL REPORTER

1  moving.  I don't know if it was in park or not.

2       Q.   I'm assuming that your car had a bench seat in the

3  front; is that right?  Not bucket seats, but one bench seat?

4       A.   No, there was a console in the middle.

5       Q.   Okay.  When you said "okay, okay," what happened

6  then and where were you?

7       A.   Then he -- we were still in the parking lot, and

8  then he took his hands away.  And he told me to get down in

9  the floorboard and put my head with my face down in the seat.

10      Q.   And did you try to do that?

11      A.   Yes, I did.

12      Q.   Tell me -- you don't have to try to do it, Ms.

13  Wilhelm, but what did you physically do to comply with what

14  you were told to do?

15      A.   I put my knees in the floorboard.  I sat -- was on

16  my knees in the floorboard.

17      Q.   So you're facing the front of the car.

18      A.   I'm facing the seat.

19      Q.   Okay.

20      A.   Of the car.  And then I put my head down in the

21  seat.

22      Q.   Okay.  I see.  And that's the last you saw the

23  outside -- you need some water or something?

24      A.   Oh, no, I'm fine.

25      Q.   Do you -- that was the last you saw of what was

1   going past you until you --

2       A.   Yeah.

3       Q.   -- got out of the car; is that right?

4       A.   Yes.

5       Q.   And did you keep your head down until you were able

6   to jump out?

7       A.   Yes.  Until I gradually got myself back up to jump

8   out.

9       Q.   And how did you do that?  Would you describe that?

10      A.   I'm not exactly sure.  I just sat there and asked

11  God to help me over and over and just gradually turned myself

12  to see if I could see where we were at --

13      Q.   Uh-huh.

14      A.   -- on the street, and that's when he said, yes, you

15  can get up now.

16      Q.   Okay.  Which way did you turn to look out, to look

17  out the side passenger window --

18      A.   Right.

19      Q.   -- or the front?  Your window?

20      A.   Yes.

21      Q.   Was there anything else distinctive?  Was he enraged

22  at that time?

23      A.   No, he didn't seem to be.

24      Q.   And then you were able to get out?

25      A.   After he drove a little ways, a little tiny ways and

1    then I could see highway and I knew if I didn't get out then,

2    I would never get out.

3         Q.   So you were sitting back in the passenger seat

4    riding as a regular passenger --

5         A.   Yes.

6         Q.   -- for a little ways; is that right?

7         A.   Uh-huh, uh-huh.

8         Q.   And then you just punched the button, pulled the

9    thing, and jumped out the car; is that what happened?

10        A.   Yes.

11        Q.   Where -- where did you land, do you think, when you

12   actually fell out of the car, trying to get out of the car?

13        A.   It was on the highway, on the pavement, and I

14   actually rolled and stopped.  I just kept rolling and rolling

15   and then finally stopped and I had -- I hurt all over my

16   body, hurt all over.

17        Q.   Did you have to have stitches and things --

18        A.   Yes.

19        Q.   -- of that nature?

20        A.   Yes.

21        Q.   Were any bones broken?

22        A.   A toe was broken.  I injured a -- all the tissue in

23   my left hip, was unable to walk.

24        Q.   I actually meant my question a little bit less

25   literally.  Do you know about -- were you still on Randol

1    Mill when you bailed out?

2         A.   No, we had turned.   I'm not exactly sure -- I think

3    it was Green Oaks.

4         Q.   You think you were on Green Oaks when you jumped out

5    of the car?

6         A.   Right.

7         Q.   Which direction would that be going, Ms. Wilhelm?

8         A.   From Randol Mill we were -- he turned right, so I'm

9    not sure what direction that would be.   North, I guess.

10        Q.   Going in what direction?

11        A.   Okay.   If we were going down Randol Mill --

12        Q.   Uh-huh.

13        A.   -- going west and then I felt him turn, that would

14   be towards the north, I think.

15        Q.   Okay.   Going towards Fort Worth?

16        A.   Pretty much towards --

17        Q.   Sort of towards Fort Worth?

18        A.   Yeah, towards Fort Worth.

19        Q.   And you say -- how long did you say you thought you

20   were in the car with him?

21        A.   Approximately 30 minutes.

22        Q.   And how much of that time was in the parking lot, if

23   you can estimate?

24        A.   10 to 15, maybe.

25        Q.   When you were -- you said you were -- well, I guess

Page 131

1    you were, of course, terrified, were you not?

2        A.    Yes.

3        Q.    Other than the time in the parking lot, the rest of

4    the ride was primarily with you in the floor with your head

5    in the seat; is that right?

6        A.    Yes.

7        Q.    Did you have any other conversation with this

8    person?

9        A.    No, other than that -- begging to get out, and he

10   was telling me he would drop me off, you know, this type of

11   thing.

12       Q.    Did you leave your purse in the car?

13       A.    No, I took my purse.

14       Q.    And then how many days later do you think it was

15   that you saw the composite drawing or did the composite?

16       A.    I think it was about a week later.  I had several

17   doctors appointments.  I couldn't even walk.  I had to get a

18   wheelchair, several things, and I'm thinking it was about a

19   week later.

20       Q.    Did you go to the police station, or did someone

21   come to your home?

22       A.    I went to the police station.

23       Q.    And who contacted you to do that, if you know?

24       A.    I think it was Detective Stanton, but I cannot

25   remember for sure.

1     Q.    What -- did he -- is he the one that did the

2   composite?

3     A.    No, Detective Stanton is the one that was there

4   immediately after all this had happened, and another officer

5   did the composite drawing.

6     Q.    I know you said a little bit about how that process

7   occurred.  Did you have a conversation just generally with

8   that police officer before you began the composite work?

9     A.    Just how are you doing type of things.

10    Q.    Just greetings?

11    A.    Yes.

12    Q.    Did he ask you for a description of the person?

13    A.    Yes.

14    Q.    And what did you tell him?

15    A.    I described him like I did in here earlier, and then

16   we got on the computer.

17    Q.    Do you recall the color of the clothing that you saw

18   that day?

19    A.    Of --

20    Q.    The color of the clothing?

21    A.    That he had on?

22    Q.    Uh-huh.

23    A.    The guy that abducted me?

24    Q.    Yes.

25    A.    Yeah, I believe it was a blue T-shirt and blue

1    jeans.

2        Q.    Blue jeans and blue T-shirt.  Okay.  And you told

3    that to the detective, I guess?

4        A.    Yes.

5        Q.    And you described him as being a medium height or

6    more?

7        A.    Medium to tall.  I couldn't tell.

8        Q.    Did you say what color of hair and eyes?

9        A.    Dark.

10       Q.    Dark as to both or --

11       A.    Dark hair and dark eyes.

12       Q.    Did you give any other description of this person

13   before he turned his computer on?

14       A.    I told him that he had what I called an after 5:00

15   shadow.

16       Q.    Uh-huh.

17       A.    His cheeks, to me, were hollow.

18       Q.    Did he make notes of these things as you talked to

19   him, the police officer?

20       A.    I can't remember.  I just don't remember, but we

21   tried to pull up things that would go along with what I

22   thought he looked like.

23       Q.    And what was the first thing -- what first physical

24   item of a person did you start with?

25       A.    I think we started -- I can't remember for sure, but

1    I think it was like the type of face shape, oval type or

2    round type.  I think that's how we started on it.

3        Q.    And then what did you work on next?  Let me go back,

4    Ms. Wilhelm.  How many oval or hollow face shapes did you

5    look at?

6        A.    I didn't look at any of those.  That's what I told

7    him I thought that this guy had, so he came up with whatever

8    it is on the computer that looked like this type of shaped

9    face that I thought he had.

10       Q.    Did he print it from a little thing where that shape

11   came up, or did he draw it on there?

12       A.    There was a picture of it on the computer screen.

13       Q.    Okay.  So you said thin face and a picture

14   appeared?  Is that how it worked?

15       A.    Yeah.  I described the outline of the shape of the

16   face, and so he brought up a face that was like what I

17   described.

18       Q.    And was the first one he brought up --

19       A.    I can't remember if it was the first or not.

20       Q.    Do you have any idea how many different eyes or

21   noses you looked at?

22       A.    No, I couldn't.  I'm sure we looked at a few, you

23   know, but I mean, when you get in there and there's a million

24   different types of noses and chins and all this, it's -- it's

25   a little harder to do than you think, but I thought that I

DARLINE W. LABAR, OFFICIAL REPORTER

1    got it pretty much like how I thought he looked.  I mean, you

2    don't think about a million different shapes of eyebrows and

3    chins and things like that.

4         Q.    Then were you given the composite drawing?

5         A.    No.  You mean after he finished --

6         Q.    Uh-huh.

7         A.    -- the whole thing?  No.

8         Q.    Were you ever given the composite drawing?

9         A.    No, I don't think so.  I mean, the next time I saw

10   it I think I saw it in the paper.

11        Q.    You saw the composite drawing in the paper?

12        A.    Uh-huh.

13        Q.    Was it in the Arlington newspaper or in the Fort

14   Worth paper or which paper?

15        A.    I think it might have been in both.

16        Q.    Okay.  So it appeared in at least one and possibly

17   two newspapers?

18        A.    Yes.

19        Q.    And then did you have any further -- what was the

20   next connection you had with that face?

21        A.    The next time I saw anything about that face is when

22   I saw him on the news recently.

23        Q.    You said that was on the 7th or the 6th, did you

24   say, or do you recall what day it was?

25        A.    I don't remember exactly.

1    Q.   You said you had earlier heard though that there was

2    a kidnapping and an elderly --

3    A.   Yes.

4    Q.   -- lady was missing?

5    A.   I heard there was an elderly woman missing.

6    Q.   And that just sort of makes your radar go up?

7    A.   Exactly.

8    Q.   As far as you know nobody had ever been apprehended

9    or thought to be a suspect in your case?

10   A.   No.   I just thought I'd never see or hear anything

11   else again.

12   Q.   Do you know how often you saw him on TV or heard on

13   the news about it?

14   A.   About the woman?

15   Q.   Uh-huh.

16   A.   A few times I had heard about it.

17   Q.   What channel do you watch on the news usually?

18   A.   I usually watch Channel 5 or Channel 8.

19   Q.   And then ultimately having heard about it for a

20   couple or three days, you saw a picture; is that right?

21   A.   Yes.

22   Q.   You said -- what did you say to yourself exactly?

23   A.   I said that looks like the guy.

24   Q.   Did you immediately then call the police or --

25   A.   No, this was in the -- in the evening.

1      Q.    Uh-huh.

2      A.    On the evening news.  I didn't immediately.  At that

3  time I had been so busy -- I waited a few days to see if I

4  could see a picture of him in the paper.  And my mother had

5  called me from Amarillo.  She had seen the picture in the

6  paper, and she thought it looked like my composite drawing.

7  And I --

8      Q.    That it looked like -- your mother thought it looked

9  like your composite drawing?

10     A.    Yes.

11     Q.    So she reinforced the identification for you?

12     A.    Yes.  I told her, I said I think this looks like

13 him.  And she said, I think it does, too.

14     Q.    Were you ever -- which newspaper did you see?

15     A.    I believe it was the Dallas paper.

16     Q.    The Dallas Morning News?  What kind of photograph

17 was it, Ms. Wilhelm?

18     A.    I think it was taken after they had picked him up.

19     Q.    Was it like a mug shot kind of picture?

20     A.    Yes.

21     Q.    Were you ever given a copy of the composite at any

22 time?

23     A.    No.  I had a copy as far as what was in the paper.

24     Q.    Okay.  You didn't have any actual composite?

25     A.    Right.

1    Q.   And then about how much later was it, Ms. Wilhelm,

2  that you saw the photo spread that you were shown where there

3  was more than one picture and you were asked to look at it?

4    A.   I'm not sure.  November, something like that.

5    Q.   Was it very long before the police contacted you

6  after you called them?

7    A.   No, he -- he contacted me and told me he was

8  checking things out.

9    Q.   When was the first time, as best you know, you

10  talked to a police officer in Arlington about the Dallas case

11  or the Garland case?

12    A.   Right after I saw the picture on the news, I called

13  Detective Stanton.

14    Q.   Uh-huh.

15    A.   And I think that was about in October.

16    Q.   Okay.  And did you -- did he come right out or what

17  happened?

18    A.   Not right away.  I think it was maybe a couple of

19  weeks -- well, no, he called me back, I believe first, and

20  talked to me a little bit about it.  He said that he was

21  checking some things out, you know, this type of thing.  And

22  then I believe it was in November when he came out and

23  brought the pictures.

24    Q.   Did you see further things about this murder and

25  kidnapping between that time and the time that you --

1      A.   I tried to look up things on the computer, and I

2  didn't find a whole lot more about it, but a little bit.

3      Q.   What kind of things did you find out?

4      A.   I just read what was on the computer as far as what

5  was in the paper, where he was from, where they found this

6  lady's body, that type of thing.

7               THE COURT:  Was your vehicle ever recovered or

8  returned to you?

9               THE WITNESS:  I think it was about six weeks

10 later it was -- well, that night it was found in Wichita

11 Falls, and I didn't get my car back until six weeks later.

12              MS. LITTLE:  Your Honor, at this time these

13 are all the questions I have.

14              THE COURT:  Anything further from the State?

15              MR. DAVIS:  Nothing further, Your Honor.

16              THE COURT:  Thank you very much you.  You may

17 step down, ma'am.

18              THE REPORTER:  Could your spell your first

19 name for me, please?

20              THE WITNESS:  S-h-e-r-r-y-l.

21              THE REPORTER:  Thank you.

22              MS. LITTLE:  Let me go ahead and offer this

23 Defense Exhibit Number 5 just for record purposes right now.

24              (Defendant's Exhibit No. 5 offered)

25              THE COURT:  You may.

```
 1              MS. LITTLE:  If that's okay.

 2              MR. DAVIS:  The State has no objection.

 3         (Defendant's Exhibit No. 5 admitted)

 4              THE COURT:  The State may call its next

 5    witness.

 6              MR. DAVIS:  The State calls Officer Ligon.

 7              THE COURT:  Good afternoon, sir.  May I ask

 8    you to raise you right hand, please?

 9                   (Witness sworn.)

10              THE COURT:  Thank you, sir.  Invite your

11    having a seat to my left, please.

12         Mr. Davis.

13                   DOUGLAS H. LIGON

14    was called as a witness by the State and, after having been

15    first duly sworn, testified as follows:

16                   Direct Examination

17    By Mr. Davis:

18         Q.   Sir, will you please tell us your name?

19         A.   Douglas H. Ligon, L-i-g-o-n.

20         Q.   How are you employed?

21         A.   Police officer with the City of Arlington, Texas.

22         Q.   What are your duties and responsibilities?

23         A.   At present time I am one of three background

24    investigators that does background investigations for

25    incoming officers that we hire.
```

1      Q.   Okay.  Do you have some -- some training in

2  producing composite sketches?

3      A.   Yes.

4      Q.   Okay.  What sort of training do you have?

5      A.   Well, as far as formal training, through some formal

6  agency or entity, no.  Training in the actual produced --

7  production of composites using computerized software that the

8  PD uses and purchased, or leased rather.

9      Q.   What sort of experience do you have doing that?

10     A.   I probably did it for approximately a year, year and

11  a half when I was assigned to the Domestic Crimes Unit of the

12  police department.  And I was trained by the officer -- the

13  outgoing officer that was going to another unit or had been

14  reassigned.

15     Q.   Were you doing composite sketches back -- back in

16  either -- sometime in August or September of 1997?

17     A.   Yes.

18     Q.   And sometime during that time period did you meet a

19  person you later came to know as Sherryl Wilhelm?

20     A.   Yes.

21     Q.   And did you -- after meeting with Ms. Wilhelm, did

22  you produce a composite sketch with her assistance?

23     A.   Yes.

24     Q.   If you would, just outline the procedures that you

25  used with Ms. Wilhelm that day.

1        A.    As I did with all of them, the victim, Ms. Wilhelm,

2   the victim in this particular instance, comes in, gives me a

3   general description.  I've usually by that time read the

4   offense and familiarized myself with a few of the details, if

5   there's any suspect information in there that would pertain

6   to the composite that I was about to do.  But in essence, I

7   sat her down with me in front of the computer screen and she

8   views the image as we produce the image -- as she describes

9   it, I will simply bring up -- I have a catalog or a library,

10  if you will, of parts, facial parts, ears, eyes, noses.  As

11  we go to each part, she views a series of different parts,

12  facial parts.  She chooses the one that she believes best

13  fits the person, and we just simply plug it into the drawing

14  as we go along.  And we go through the whole face that way

15  and then we tweak it, if you will.  At the end if she doesn't

16  like something, we'll change it, elongate something, fatten

17  something, widen something, add this, add that.

18        Q.    Had you participated in the investigation of her

19  abduction?

20        A.    No.

21        Q.    So this is the first time you had met her; is that

22  correct?

23        A.    Yes, that day that we did the composite, that's

24  correct.

25        Q.    Was this the first time that you became aware of her

1   case?

2       A.   Yes, to my knowledge -- my recollection, yes.

3       Q.   So that I understand, were you supplying any

4   information to her or was she the person supplying the

5   information for you?

6       A.   I tried to avoid making suggestions.  I simply

7   produced or presented her with the parts, if you will, and

8   let her choose.  The only suggestions that I might make would

9   be something to the effect, well, let's narrow his eyes up

10  and see if that makes it look a little better to you,

11  something to that effect.

12      Q.   But the finished product would be her product; is

13  that right?

14      A.   I never end it until I ask the person, is this as

15  close as you can get?  Is this -- do you like this?  Always.

16      Q.   And she did complete a final composite for you,

17  didn't she?

18      A.   Yes.

19              MR. DAVIS:   May I approach, Your Honor?

20              THE COURT:   You may.

21      Q.   (By Mr. Davis)  Officer Ligon, if you would, State's

22  Exhibit 141, do you recognize State's Exhibit 141?

23      A.   Yes.

24      Q.   Is that the composite sketch that you produced with

25  the assistance of Ms. Wilhelm?

1      A.    Yes.

2      Q.    Does it bear your signatures and your badge number

3  there at the top right-hand corner?

4      A.    Actually that's John Stanton's, not mine.

5      Q.    All right.  But no doubt this is the composite that

6  you produced --

7      A.    Yes.

8      Q.    -- with Ms. Wilhelm?

9            MR. DAVIS:  Your Honor, at this time we'll

10  offer State's Exhibit Number 141.

11           (State's Exhibit No. 141 offered)

12           MS. LITTLE:  No objection for purposes of this

13  hearing.

14           THE COURT:  Admitted.

15           (State's Exhibit No. 141 admitted)

16      Q.    (By Mr. Davis)  Do you recall right offhand what --

17  what description Ms. Wilhelm gave you that day?

18      A.    Really, I can't.  I do have a information sheet that

19  I typically fill out which I believe you already have.

20  Without referring to that, I wouldn't --

21      Q.    You don't --

22      A.    -- care to make a comment.

23      Q.    You don't have any independent recollection?

24      A.    Other than a white male -- a young white male with

25  slight facial hair.  Other than that, no.

1          MR. DAVIS:  May I approach again?

2          THE COURT:  You may.

3          MR. DAVIS:  Thank you.

4     Q.    (By Mr. Davis)  If you would, I'm now coming forward

5     to you with a document.  It's Arlington Police Department

6     Witness Composite Information.  Is this one of the forms that

7     you were using with people that were trying to do a composite

8     sketch with you?

9     A.    Yes, sir.

10    Q.    Having looked at this document, if you would, does

11    that refresh your memory about what this woman may have told

12    you that day?

13    A.    Yes.  It has the basic information in my

14    handwriting.  This is obviously a document that I produced.

15    Q.    Right.  For instance, as far as race and sex, what

16    did she tell you?

17    A.    White male.

18    Q.    And what height did she give you?

19    A.    Five foot 10.  As I recall, she said he was

20    approximately my height and weight.  Five foot 10, 160 pounds

21    which I weigh more than that now.

22    Q.    Build, what did she tell you --

23    A.    Medium build.

24    Q.    Did you ask her for an age?

25    A.    Yes, I did.

1    Q.   What age did she give you?

2    A.   20 to 25.

3    Q.   What hair color did she give you?

4    A.   Black.

5    Q.   What -- what length of hair did she give you?

6    A.   Short.

7    Q.   Did you ask her for an eye color?

8    A.   Yes, I did.

9    Q.   What did she tell you?

10   A.   She wasn't specific other than to say dark in color.

11   Q.   Skin tone, what did she tell you?

12   A.   Olive, olive complected.

13   Q.   Did you ask her whether the person was wearing a hat

14   or not?

15   A.   Yes, I did.

16   Q.   What did she say?

17   A.   She told me that he was not.

18   Q.   Did you ask her for jewelry that he may have been

19   wearing?

20   A.   Yes, and she told me that he had a small loop

21   earring in his left ear.

22   Q.   Did you ask her for pants description?

23   A.   Said he was wearing blue jeans with blue pullover

24   T-shirt.

25   Q.   How about the shirt -- any other comments that she

DARLINE W. LABAR, OFFICIAL REPORTER

1    made about his appearance?

2        A.    She said that he was -- as she described it, heavy

3    beard, was one day growth, something of that effect, but

4    other than that, short hair on the sides, that's the only

5    notes -- other notes that I made.

6        Q.    What does it say, fade on the top?

7        A.    Fade on the top, no parts.  Okay.

8            MR. DAVIS:  I'll pass the witness, Your Honor.

9                        Cross-Examination

10   By Ms. Little:

11       Q.    Detective Ligon, when you -- you say no parts here,

12   and then you say bowl.  What does that indicate?

13       A.    To me a bowl haircut is the old typical where it

14   would just follow around the head, the top of the head.

15       Q.    Not necessarily Moe Howard, but -- or would it be

16   Moe Howard in your mind?

17       A.    No, no.  No, I don't take it as that at all.  Maybe

18   just shorter on the sides.  A fade typically refers to shaven

19   maybe closer on the sides and then longer on top, in a bowl

20   shape perhaps.

21       Q.    How -- do you have any memory or did you make any

22   notes at all -- let me ask you, did you make any notes at

23   all?

24       A.    Other than what -- other than that sheet, no.

25       Q.    Okay.  About how many different face shapes did you

1   have available to you to show any person who wanted to

2   know -- wanted to try to identify somebody?

3       A.   I think that software had possibly had 20 or 30

4   different facial shapes in like three different categories,

5   oval, fat, things of that nature.

6       Q.   All right.

7       A.   Categories of that style, rather.

8       Q.   And what were all the facial features and head

9   shapes?  How many different things could you actually try to

10  have identifiers for, eyes, eyebrows, nose, face hair, ears,

11  hair?  What all things could you do?

12      A.   All of the above.  I mean, I can -- anything that is

13  on the human face, even to facial hair, moles, tattoos,

14  scars, blemishes, can be -- is available to the user.

15      Q.   Okay.  Did you give the original of this particular

16  composite to the District Attorneys office?

17      A.   Meaning your -- this District Attorneys Office?

18      Q.   This --

19      A.   I did not.

20      Q.   Okay.  Who has that now?

21      A.   Detective -- I gave this composite to Detective

22  Stanton --

23      Q.   Okay.

24      A.   -- who, in turn, I assume, gave it to the District

25  Attorneys Office.

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1        Q.   Okay.  So as far as you know, they've got the

 2   original --

 3        A.   Yes, ma'am.

 4        Q.   -- right now?

 5             MS. LITTLE:  That's all I have at this time.

 6             MR. DAVIS:  Nothing further, Your Honor.

 7             THE COURT:  May he be excused, subject to

 8   recall?

 9             MR. DAVIS:  Yes, Your Honor.

10             THE COURT:  Thank you, Officer.  You are

11   excused, sir.

12             MR. DAVIS:  Your Honor, that's all the

13   witnesses we have at this time.

14             THE COURT:  The State wishes to reserve its

15   right to present testimony on this issue until a later time?

16             MR. DAVIS:  Yes, Your Honor.

17             MS. LITTLE:  Yes, sir.

18             THE COURT:  Okay.  Anything further this

19   afternoon?

20             MS. BALIDO:  Judge, what do you want to do

21   about the pretrial motions?

22             THE COURT:  Can we do that Monday morning,

23   8:30?

24             MS. LITTLE:  That's fine with me.

25             MS. BALIDO:  That's fine, Judge.
```

1          MS. LITTLE:  We just need to have time to --

2    pretty much Greg has indicated to me, Judge, that he doesn't

3    anticipate he's objecting to anything we've asked for, except

4    of course the constitutional issues and a few small items

5    like that, but we do still need to be --

6          THE COURT:  Invite both sides in good faith

7    tomorrow to get together informally and go over these matters

8    so we can kind of narrow the issues for Monday morning at

9    8:30.

10          Debbie has called all of the jurors, all 12, plus

11    the alternate.  One juror, forget what her name is, but she

12    is the spouse of a retired OB-GYN specialist.  May have some

13    kind of a conflict which she is trying to work through next

14    Friday.  So in the event that that is something that just

15    cannot be worked through, we may take off a week from

16    tomorrow from the trial and resume the following Monday.  She

17    is trying to work through that.  I have also caused to be

18    sent out to all 12 jurors, plus the alternate, a letter

19    confirming the telephone conversation.  Darline prepared

20    that.  Debbie has typed the envelopes.  They are going out as

21    we speak.

22          MR. BYCK:  Your Honor, may we respectfully

23    request that a copy of that letter be made a part of the

24    record?

25          THE COURT:  Sure.

DARLINE W. LABAR, OFFICIAL REPORTER

Page 151

```
 1              MR. BYCK:    Thank the Court.

 2              THE COURT:   This confirms that they are --

 3    been selected as a juror and please arrange to be in the jury

 4    room of the 194th District Court not later than 9:30 a.m.,

 5    Monday, June 4th, 2001, that after being sworn in and opening

 6    statements are offered, preliminary instructions, they will

 7    be given notebooks, appropriate instructions on how to

 8    conduct themselves with the notebook, and we'll start the

 9    testimony of the trial.

10              The jury will be sequestered for lunch.  Those of

11    you that want to order from the same purveyor of the lunch,

12    get your orders in in a timely fashion.

13              MR. BYCK:  Can we --

14              THE COURT:   The County however will not pay

15    for your lunches.

16              MS. BALIDO:   Judge, I do have just one thing

17    to put on the record.

18              THE COURT:   All right.

19              MS. BALIDO:   And I'll go directly off the

20    record, which is I don't think it was clear on the record

21    that in the Jackson v. Denno hearing I offered Defendant's

22    Exhibits Number 1 through 4 into evidence and --

23              THE COURT:   For purpose of this hearing, they

24    are admitted.

25              (Defendant's Exhibit No. 1 through 4 admitted)
```

Reporter's Certificate

STATE OF TEXAS:

COUNTY OF DALLAS:

     I, Darline W. LaBar, Official Court Reporter of the 194th Judicial District Court, in and for Dallas County, Texas do hereby certify that the foregoing volume constitutes a true, complete and correct transcript of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in the statement of facts, in the above styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

     I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     Witness my hand this the 2nd day of June, A.D., 2001.

DARLINE W. LABAR
Official Court Reporter
194th Judicial District Court
Dallas County, Texas
(214) 653-5803

Certification No. 1064 Expires December 31, 2002

DARLINE W. LABAR, OFFICIAL REPORTER

1                    REPORTER'S RECORD       **74145**

2                 VOLUME 46 of 65 VOLUMES

3              TRIAL COURT CAUSE NO. F00-02424-NM

4    THE STATE OF TEXAS          :        IN THE DISTRICT COURT

5    VS.                         :        DALLAS COUNTY, TEXAS

6    JEDIDIAH ISAAC MURPHY       :        194TH JUDICIAL DISTRICT

7                    * * * * * * * * * * * * * * * * * * * *

8                    PRETRIAL HEARING        **FILED IN**
                                             **COURT OF CRIMINAL APPEALS**

9                    * * * * * * * * * * * * * * * * * * * *

                                             DEC  5 2001
10   A P P E A R A N C E S:
                                             Troy C. Bennett, Jr., Clerk
11   HONORABLE BILL HILL, Criminal District Attorney
             Crowley Criminal Courts Building
12           Dallas, Dallas County, Texas  75207
             Phone:  214-653-3600
13   BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
             MS. MARY MILLER, A.D.A., SBOT # 21453200
14                   FOR THE STATE OF TEXAS;

15   MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
     MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16   MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
     Dallas County Public Defender's Office
17           Phone:  214-653-9400
                     FOR THE DEFENDANT.

18

19                         * * * * * * * *

20        On the 4th day of June, 2001, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable F. Harold Entz, Jr.,

23   Judge presiding, held in Dallas, Dallas County, Texas:

24        Proceedings reported by machine shorthand, computer

25   assisted transcription.

ORIGINAL

1                          INDEX VOLUME 46

2    June 4th, 2001                              PAGE     VOL.

3    PRETRIAL HEARING:

4    Proceedings....................................... 2      46

5    Arraignment By Mr. Davis.......................... 3      46

6    Arraignment By Mr. Davis.......................... 3      46

7    Reporter's Certificate........................... 53      46

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Cause Numbers F00-02424-NM and
 3      F00-24042-NM, each styled the State of Texas versus Jedidiah
 4      Isaac Murphy.
 5              The State is represented by the Honorable Greg
 6      Davis, the Honorable Mary Miller.
 7              The defendant is represented by the Honorable Jane
 8      Little, the Honorable Michael Byck, the Honorable Jennifer
 9      Balido.
10              Person the Court has come to know as Jedidiah Isaac
11      Murphy is present in court at this time.
12              The State prepared to proceed with the arraignment
13      in both matters?
14              MR. DAVIS:  The State's ready, Your Honor.
15              THE COURT:  Is the defense prepared to proceed
16      with arraignment in both matters?
17              MS. LITTLE:  Yes, sir.  Did the Court want to
18      read the revocation, too?
19              THE COURT:  Carry the revocation with it as
20      well?
21              MR. DAVIS:  Yes, sir, we can do that.
22              THE COURT:  Begin first with the arraignment
23      in 02424, the Honorable Greg Davis.
24              MR. DAVIS:  "True bill of indictment, in the
25      name and by the authority of the State of Texas..."
```

1              (Arraignment By Mr. Davis)

2              MR. DAVIS:  "...do present that one Jedidiah

3    Isaac Murphy --"

4          Is that your true name?

5              THE DEFENDANT:  Yes, sir.

6              (Continued Arraignment By Mr. Davis)

7              MR. DAVIS:  "...against the peace and dignity

8    of the State, signed Bill Hill, Criminal District Attorney of

9    Dallas County, Texas, and by the foreman of the grand jury."

10             THE COURT:  Jedidiah Isaac Murphy, to that

11   allegation how do you plead, sir, guilty or not guilty?

12             THE DEFENDANT:  Not guilty.

13             THE COURT:  The record so reflect.

14         Arraignment will next be conducted in Cause 24042.

15   Again, Mr. Davis.

16             MR. DAVIS:  "True bill of indictment, in the

17   name and by the authority of the State of Texas..."

18             (Arraignment By Mr. Davis)

19             MR. DAVIS:  "...do present that one Jedidiah

20   Isaac Murphy --"

21         Is that your true name?

22             THE DEFENDANT:  Yes, sir.

23             (Continued Arraignment By Mr. Davis)

24             MR. DAVIS:  "...against the peace and dignity

25   of the State, signed Bill Hill, Criminal District Attorney of

1    Dallas County, Texas, and by the foreman of the grand jury."

2                    THE COURT:  To that allegation, how do you

3    plead, sir, guilty or not guilty?

4                    THE DEFENDANT:  Not guilty.

5                    THE COURT:  The record so reflect.

6        Cause Number F95-75692-QM, styled the State of Texas

7    versus Jedidiah Isaac Murphy, the Court takes judicial notice

8    of a docket entry dated February 26th, 1996.  On that date

9    before Chief Magistrate of Dallas County, Boyd Patterson,

10   Jr., an individual identifying himself as Jedidiah Isaac

11   Murphy appeared with counsel, the Honorable Greg Shumbert,

12   subsequent to a plea of no contest to an allegation alleging

13   a State jail offense of theft and pursuant to a plea bargain

14   agreement which I subsequently approved, Jedidiah Isaac

15   Murphy was assessed two years confinement in a Texas state

16   jail facility probated for a period of five years.  In

17   addition, a fine of $100 was imposed and restitution required

18   in the sum of $200.

19       Are you one and the same Jedidiah Isaac Murphy who

20   subsequent to a plea of no contest was placed on probation as

21   I've indicated?

22                    THE DEFENDANT:  Yes, sir.

23                    THE COURT:  Mr. Murphy, after being placed by

24   the Magistrate on probation, sir, were you subsequently given

25   a copy of the terms and conditions of probation?

1           THE DEFENDANT:  Yes, sir.

2           THE COURT:  It's been since alleged while on

3    probation you have allegedly violated terms or conditions of

4    probation.

5           Are you familiar with those allegations?

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  To the allegations, do you plead

8    true or not true?

9           THE DEFENDANT:  Not true.

10          THE COURT:  May I have a document executed

11   reflecting that counsel at an appropriate time?

12          MS. BALIDO:  I'll get it, Jane.

13          THE COURT:  Do you wish to have the specific

14   allegations waived at this time, Ms. Little?

15          MS. LITTLE:  Yes, sir.

16          THE COURT:  The Court will be carrying the

17   revocation allegation along with the trial on the merits of

18   the other two matters.

19          Thank you.  You may be seated if you wish.

20          Off the record, Darline.

21          (Discussion off the record.)

22          THE COURT:  Back on the record.

23          MR. DAVIS:  Yes, sir, for the record, the

24   State will be offering two photographs of the crime scene

25   that will actually show the body of Bertie Cunningham.  Those

1    will be labeled as State's Exhibits 33 and 34.   For the

2    record, State's Exhibit 33 will show Ms. Cunningham in the

3    creek from a distance.   State's Exhibit 34 will show Ms.

4    Cunningham from a closer angle.   Both of them depict her body

5    actually laying in the water in the creek in which she was

6    found.

7            With regards to the autopsy photographs, the State

8    will be offering State's Exhibit Number 55 which is a

9    photograph showing two-thirds of the body from the knees up

10   of Ms. Cunningham.   She is clothed.

11           State's Exhibit Number 56 will show the injuries to

12   Ms. Cunningham's left forearm which will be due to aquatic

13   action as well as decomposition.

14           State's Exhibit Number 57 is a photograph of Ms.

15   Cunningham's face which again will show aquatic action as

16   well as decomposition to the left side of her face.

17           State's Exhibit Number 58 is a close-up of the right

18   half of -- right half of Ms. Cunningham's face.   It will

19   depict bruising to her right eye, as well as a gunshot wound

20   to the right side of her forehead.

21           State's Exhibit Number 59 will show the right

22   portion of Ms. Cunningham's forehead, and it shows in greater

23   detail the gunshot wound to her forehead.

24           State's Exhibit Number 60 is a photograph of the top

25   portion of Ms. Cunningham's head and will show certain

1   lacerations that were -- that were caused, the State will

2   allege, as she was taken down into the creek area.

3           State's Exhibits 61 and 62 show bruising to Ms.

4   Cunningham.  State's Exhibit Number 61 in particular shows

5   bruising to the right portion of Ms. Cunningham's chest, as

6   well as some bruising to her right arm.  State's Exhibit

7   Number 62 shows extensive bruising to the left arm of Ms.

8   Cunningham.

9           And finally, State's Exhibit Number 63 will show

10  certain lacerations or scratches to the abdomen of Ms.

11  Cunningham.

12          At this time I'll tender these photographs to the

13  Court for its preview and inspection.

14              THE COURT:  The Court acknowledges receipt of

15  the aforementioned photographs at this time.

16              MS. LITTLE:  Your Honor, also regarding the

17  hearing this morning, Mike did go Friday afternoon to see

18  about reaching our medical examiner.

19              MR. BYCK:  Yes.

20              MS. LITTLE:  And came down to talk with the

21  Court about that, but was unable to get with the Court.

22              THE COURT:  Did you try me at home?  I was

23  home all afternoon.

24              MR. BYCK:  No, no need to bother you at home.

25              MS. BALIDO:  Judge, we do have a number of

1    pretrial motions, even though we have been up to the State's

2    office and looked at their file, just for record purposes and

3    just so the record is clear.

4                    THE COURT:  All right.  I have the bound index

5    to defendant's pretrial motions.  Any specific order that you

6    wish them to be --

7                    MS. BALIDO:  Judge, if you'll just call them

8    out, I'll go with you.

9                    THE COURT:  All right.  Motion to preclude

10   prosecution seeking the death penalty.  Defense care to be

11   heard further in addition to the motion?

12                   MS. BALIDO:  No, Judge, we'll stand on our

13   motion.

14                   THE COURT:  Motion is denied.

15          Motion to quash based on constitutionality of Texas

16   capital sentencing scheme.  Does the defense care to be heard

17   in addition to their rather comprehensive motion?

18                   MS. BALIDO:  No, Your Honor, we'll stand on

19   our motion.

20                   THE COURT:  The motion is denied.

21          Motion to declare jury selection procedure

22   unconstitutional.  Anything further in addition to the

23   contents of the motion?

24                   MS. BALIDO:  No, Judge, we'll stand on our

25   motion.

---

DARLINE W. LABAR, OFFICIAL REPORTER

1               THE COURT:  Motion denied.

2               MS. BALIDO:  Judge, in regard to the

3   constitutional motions, as you are well aware, the United

4   States Supreme Court is considering the Penry case, Penry II,

5   as we speak --

6               THE COURT:  And the North Carolina case which

7   is a variation.

8               MS. BALIDO:  Yes, Judge.  And we would just

9   like it to be clear on the record that although we are filing

10  these motions now, that if something comes down from the U.S.

11  Supreme Court, we'd ask leave of the Court to file additional

12  motions.

13              THE COURT:  Request granted.

14        Next motion, defendant's objection to proposed

15  punishment charge.  The Court will hold its ruling on that.

16        Omnibus pretrial motion.  I am now on page 34 of the

17  bound binding for counsels' reference.

18        Number I, exculpatory or mitigating evidence.

19  Granted.

20        Identification hearing.  Either side care to be

21  further heard on that?

22              MS. BALIDO:  Judge, it's our understanding

23  that when the time comes for there to be an in court

24  identification, specifically in regard to the extraneous

25  offense involving Sherryl Wilhelm, that we would seek to have

1    further -- a further hearing outside the presence of the jury

2    at that time.

3              THE COURT:  The Court will hold its ruling

4    therefore with regard to Roman Numeral II.

5              Roman Numeral III.  Do you wish to be heard at a

6    later time as well?

7              MS. BALIDO:  Judge, are we on confessions?

8              THE COURT:  Right.

9              MS. BALIDO:  Yes, Judge.

10             THE COURT:  Roman Numeral IV, disclosure of

11   physical evidence and test results.  Granted.

12             Roman V as to witnesses.  Granted.

13             MS. BALIDO:  Judge, we've been tendered

14   initial State's list of witnesses and then also a

15   supplemental State -- list of State's witnesses.  We'd ask

16   the State at this point if they have any additional

17   witnesses.

18             MR. DAVIS:  Judge, just for the record, Friday

19   afternoon I advised the defense of an extraneous offense

20   occurring back in 1994.  The victim's name in that case was

21   Mandy Kirl.  The offense occurred in Van Zandt County,

22   Texas.  The time period being in 1994 prior to the time that

23   the defendant was taken to the boot camp in Wichita Falls.

24   The nature of that was that the defendant placed a gun up to

25   the head of Mandy Kirl.  And in regards to that extraneous

1   offense, I do intend to be calling Ms. Kirl as a witness in

2   punishment.

3                  THE COURT:  The Court will at this time

4   require the State to make a proffer outside the jury's

5   presence before that is offered.

6                  MS. BALIDO:  And, Judge, also, when the time

7   comes outside the presence of the jury, we'd like to make

8   a -- our argument as to adequate notice at that point, as we

9   would with any extraneous offenses that may come about.

10                 THE COURT:  Okay.  Roman Numeral VI,

11  impeachment, evidence/extraneous offenses.  Granted.

12             Jury shuffle is waived, I assume?

13             MR. BYCK:  Yes, Your Honor.

14                 THE COURT:  Arraignment outside the jury's

15  presence, granted.

16             Complete record of trial.  Granted.

17             Roman Numeral 10, written statements/reports made or

18  read by witnesses.  Granted.

19             Roman Numeral XI, grand jury testimony.  Will the

20  witness or witnesses who appeared before the grand jury be

21  testifying?

22                 MR. DAVIS:  Your Honor, Detective Myers who is

23  the Garland officer, he will be testifying.

24                 THE COURT:  I hopefully assume that his

25  testimony has been prepared by the reporter of the grand

```
 1   jury.
 2           Purpose of the record, defense request is granted.
 3           Roman Numeral XII, proof of legality of seizure of
 4   physical evidence.  May the Court carry that with the
 5   testimony presented before the jury?
 6           MS. BALIDO:  Judge, the only thing -- the only
 7   caveat to that would be that if the Court finds that the oral
 8   statements given by the defendant are not proper, then
 9   therefore we would seek to suppress anything that led from
10   that.  So it's going to be carried along with the Motion to
11   Suppress statements.
12           THE COURT:  Fine.
13           Roman Numeral XIII, impeachment evidence of State's
14   witnesses.  Granted.
15           MS. BALIDO:  Judge, also as a caveat to that,
16   the defense has requested and the State has responded, we've
17   requested the TCIC and NCIC records regarding any State's
18   witness that may be called to testify on behalf of the State.
19   The defense -- excuse me, the State has responded that under
20   federal law it is not allowed to disclose that information,
21   the TCIC and the NCIC records.  We would request this court
22   to order the State to turn over such records, especially any
23   record that could be used to impeach the credibility of any
24   witness that would testify, including any pending charges in
25   this county, in this State, or any other State that may be
```

1    used to impeach or develop bias of a witness for testifying

2    for the State.

3                    THE COURT:  The Court understands the State's

4    position under federal law.  Anything further the State

5    wishes to place in the record before I make my ruling?

6                    MR. DAVIS:  No, sir.  Our position is that

7    without a court order, I'm not allowed to do so.

8                    THE COURT:  Defense request is granted.

9            Roman Numeral XIV, certified documents.  Granted.

10           Roman Numeral XV, election of punishment in the

11   matter depending upon the jury's verdict.  It is required

12   under one sentencing scheme, however lesser included, if it

13   should come to that, the request that the jury assess the

14   punishment is granted.

15           Roman Numeral XVI, request for reasonable

16   expenditures.  Granted.

17           Roman Numeral XVII, request for defendant to be free

18   of impeachment.  Denied.

19           Batson hearing.  Granted and has been complied with.

20                   MS. BALIDO:  Judge, just -- just so the record

21   can be clear, along with this general Batson motion and also

22   the specific Batson motions and discovery motions that we

23   filed that are going to come up in this case, the defense has

24   filed numerous motions on the State or served them on the

25   State, and at various times, including I guess the last time

1     that there was a specific response on May the 25th, the year

2     2001, the State of Texas asserted that any information

3     reflecting any Brady material, be it exculpatory material or

4     mitigating material, had been previously tendered to

5     counsel.  I think it's clear from the hearing on June the

6     1st -- or actually May the 31st, the year 2001, that the

7     defense was not aware that a map was drawn by the defendant

8     and that also that a questionnaire either prepared by the

9     family or by the Garland police was submitted to the

10    defendant and the defendant responded to the questions

11    therein.  We would assert that at least the questionnaire and

12    the defendant's answers to the questionnaire were mitigating

13    and exculpatory and that it establishes evidence of an

14    accident defense and we just want that to be clear on the

15    record that we did not have that, even though the State had

16    asserted in its response on May the 25th that we had all such

17    evidence.

18               THE COURT:  Defense comments speak for

19    themselves.

20          Moving on, next motion I have is entitled Motion for

21    Discovery, Production, and Inspection of Evidence.

22               MS. BALIDO:  Judge, I'm sorry, before we move

23    on --

24               THE COURT:  Are some of these duplicitous?

25               MS. BALIDO:  Yes, Judge, some of them are.

1          THE COURT:  In reading them over the weekend,

2    I surmised as such.

3          MS. BALIDO:  Judge, before move on, on the

4    Brady issue, I would ask that the Court this morning order

5    the -- make a formal order of the State to turn over any

6    additional Brady material, including any mitigating material,

7    anything that can be used for impeachment on any witness

8    called by the State or anything that is exculpatory.

9          THE COURT:  Pursuant to Brady versus Maryland,

10   Bagley case, as materiality has been delineated by Kyles v.

11   Whitley and Strickler versus Greene, G-r-e-e-n-e, the last

12   two cases, I find, and am assured by academicians alike, are

13   virtually indistinguishable with regard to their factual

14   scenario, but exactly opposite in their results.  The State

15   is instructed to comply with the United States Supreme

16   Court's rulings and the previously mentioned cases.  The

17   State is so ordered.

18         MS. BALIDO:  Judge, we'd also make a request

19   of this Court at this time, based on those cases and based on

20   what we believe is the fallacy of Batson and -- and those

21   cases that you cited, that the State is the one that's in

22   control of that information and the State is the person that

23   is determining what is exculpatory or mitigating and what is

24   material.  And we would suggest to this Court or ask this

25   Court to order that not only the exhibits that the State

1   intends to offer into evidence in the course of this trial be

2   submitted to the Court for a Brady analysis, but also any

3   exhibits or any witness statements that the defense -- I

4   mean, excuse me, that the State does not intend to use in the

5   trial of this case to determine exculpatory value, mitigating

6   value, impeachment value, and as -- as the cases will show

7   also that those -- any evidence that those exhibits or

8   information that the State has in its possession could lead

9   to exculpatory or mitigating evidence and make it a part of

10  this trial record for appellate purposes, if necessary.

11          THE COURT:  Under Kyles v. Whitley and

12  Strickler versus Greene, I am less concerned judicially with

13  the State turning over to the defense exculpatory materials.

14  My greater concern is that officers in the field having

15  worked bits and pieces of the case may have inadvertently

16  failed to turn over to their superiors and ultimately to the

17  state matters of an exculpatory or mitigating nature.

18          Does the State have any objection to turning over

19  its entire case file for perusal, Mr. Davis?

20          MR. DAVIS:  No, sir, with the exceptions of

21  whatever would constitute work product on my part.

22          THE COURT:  All right.

23          MR. DAVIS:  And for the record, also,

24  Investigator Richardson, pursuant to the Court's instructions

25  last week, did go back and contact all of the officers who

---

1   may have produced any sort of written reports, notes,

2   whip-out books, etcetera, and he was advised personally that

3   none of those officers had any such notes.

4        Now, the only officer that was out of town was

5   Arlington Detective John Stanton.  And my understanding is

6   that he may have notes.  We're not able to determine that at

7   this point, but assuming that he's in town today, that

8   determination will be made.  If he has any additional notes

9   or any written materials, we'll certainly provide those to

10  the defense.  But at this time I can represent to the Court

11  that I've been advised no other notes exist in this case.

12        MS. BALIDO:  Judge, in regard to the State's

13  issue of work product, and it comes up on a later motion, I

14  specifically asked in a discovery motion for the reason why a

15  certain officer was not called.  It's not on the State's

16  witness list.  The State in its response claimed that that

17  was work product and he didn't have to turn that over.

18  That's the kind of danger that I'm talking about, that if

19  there's a witness that doesn't fit into the State's theory of

20  the case, or they --

21        THE COURT:  Ms. Balido, why don't you call

22  that witness outside the presence of the jury and find out

23  whatever he or she has to offer?

24        MS. BALIDO:  Thank you, Judge.  Basically,

25  Judge, when we're moving on to Motion for Discovery,

1  Production, and Inspection of Evidence, I think the first six

2  issues deal with the statement of defendant just based on

3  what we found on the hearing on Thursday.  I'd like to have

4  formal rulings on that, at least that part of the motion.

5          THE COURT:  We've not completed that hearing?

6  It's my understanding you had some evidence you wanted to

7  present to the Court before I made a ruling.

8          MS. BALIDO:  That's true, Judge.

9          THE COURT:  So the Court declines to make a

10  ruling until I hear all the evidence.

11          Moving on to B, witnesses and their statements.

12          MS. BALIDO:  I believe that's been covered by

13  another motion, Judge.

14          THE COURT:  All right.

15          THE COURT:  C, objects or tangible things.  I

16  trust the State has made available to the defense all

17  tangible property they anticipate presenting for the jury or

18  in the alternative tangible items that they have reason

19  constitutionally they're obligated to turn over to the

20  defense as being exculpatory.  And for reasons I've just

21  stated, the motion is granted.

22          MS. BALIDO:  Judge, there's just one thing in

23  regard to Number XVI.  There was a -- Friday afternoon we did

24  meet with the State's attorney Mary Miller upstairs and

25  looked over all the tangible evidence in this case with our

1   crime scene expert.  There was one exhibit that was -- it

2   seemed to us an empty plastic bag contained in another empty

3   plastic bag.  And it was not clear at that time what it was,

4   and we'd just ask if they plan on using it or what it was, if

5   they have found out.

6            MR. DAVIS:  I'm not even aware right now of

7   what she's referring to.  I mean, we had a lot of items that

8   have been stored in plastic bags, so -- if she -- Ms. Miller

9   is telling me it's something from the ME's office, so I'm

10  assuming probably at some point it may have had clothing in

11  it or some other items that I may have pulled out.  I'm now

12  being told it's a very small item.  Maybe Ms. Miller can

13  further respond to it, because I'm not really sure what that

14  is.

15            MS. MILLER:  Judge, I'm not sure what it was

16  either.  It had the Southwestern Institute of Forensic

17  Sciences lab number on it, and there is a small -- probably

18  two inch by three inch bag inside maybe a five inch by six

19  inch bag that has, as I have come to know during my career,

20  the unique laboratory numbers that do correspond with the

21  SWIFS numbers in this particular case.  But I have not been

22  able to ascertain what exactly it is.  I don't know if there

23  was some fiber evidence in there or what, because I did not

24  have access to the forensic reports at that time to be able

25  to tell what it was.  But we do know that it was Number 4 on

1    the SWIFS numbering system.

2              MR. DAVIS:  The only item that I'm aware of

3    that may not have been up here Friday would have been the

4    bullet.  My understanding is that bullet is out there at

5    SWIFS.  It's being examined by Lannie Emanuel.  We produced

6    that report for the defense on that matter, but I'm not aware

7    of any other items that would not have been upstairs Friday

8    afternoon.

9              MS. BALIDO:  Were the hoses received from Ms.

10   Thorp's property up there?

11             MR. DAVIS:  Yes, they were.

12        Number 4, looking at the report generated by the

13   Texas Department of Public Safety on December the 8th of

14   2000, I'm led to believe from this report from the numbering

15   an item 608-4 -- I'm sorry, DCME-4, which if that number four

16   matches up what they're referring to, would be a known blood

17   specimen from the victim.  So that may well have been the

18   item that they were referring to.

19             THE COURT:  Anything further, Ms. Balido?

20             MS. BALIDO:  Judge, I believe in regard to

21   the -- to the rest of the objects or tangible things, we have

22   been granted access to those items by the State of Texas and

23   also given what we know to be all the reports in regard to

24   any scientific tests run on such items.

25             THE COURT:  Purpose of the record --

DARLINE W. LABAR, OFFICIAL REPORTER

1           MS. LITTLE:  With one exception Your Honor,

2    there's some prints in an extraneous.  It's Item Number 30.

3    We don't have that.  And I'm not sure whether the State has

4    that either at this time, but we don't have it.

5           MS. BALIDO:  What Ms. Little is referring to

6    is the prints regarding the -- that were taken in regard to

7    the extraneous offense that happened in Wichita Falls, Texas.

8           MR. DAVIS:  Well, I know that the defense has

9    been in contact with members of the Wichita Falls Police

10   Department.  They were here in the court last week and were

11   sworn in.  I have to assume that they've interviewed those

12   witnesses with regards to those fingerprints, palmprints,

13   etcetera.  I'm not in possession of any of those physical

14   items.  I am aware that none of the prints have matched the

15   prints obtained from the defendant.  Other than that, I have

16   no knowledge of whose prints they may belong to.

17          MS. BALIDO:  I believe that the rest of that

18   section is taken care of.  I believe that --

19          THE COURT:  All right.

20          MS. BALIDO:  -- G, the prior records has been

21   taken care of by a previous ruling of this court this

22   morning.

23          Exculpatory evidence, we've covered, I think, and

24   will continue to cover.

25          And then specifically, Judge, the location of the

1    recovery, Section I, I believe that that is -- has been --

2    has been tendered to us through the tendering of police

3    reports and PES or Physical Evidence Section reports by the

4    State.

5              THE COURT:  Granted.

6              MS. BALIDO:  There's some specific items that

7    Mr. Byck has to -- would like to address at this point.

8              MR. BYCK:  May it please the Court.  We need a

9    list of the experts of the State or at least designate them

10   on the -- their list of witnesses.  We can tell who the

11   doctors were.  Are there any other experts on that we need to

12   know about?

13             MR. DAVIS:  The only other experts will be the

14   individuals from the Texas Department of Public Safety who

15   will be testifying concerning the serology and the DNA in

16   this case.  And those things have been previously tendered to

17   the defense.  Specifically, John Donahue, who's an employee

18   of the Texas Department of Public Safety, will testify as to

19   DNA.  And David Davenport will testify about the retrieval of

20   certain blood items in this case.  Dr. Jennie Duval will

21   testify from the Medical Examiners Office.  John Rogers will

22   testify.  He is a police officer, going to be testifying

23   about fingerprints, part of his specialty.  Lannie Emanuel

24   will testify from Southwestern Institute of Forensic Sciences

25   with regards to firearms examination.

1          At this time I know of no other experts that the

2   State will call.  Certainly that's subject to rebuttal once I

3   listen to any experts that the defense may call with regards

4   to mental health, mitigation, future dangerousness, on

5   punishment.  Quite frankly, I have not been advised as to

6   what those individuals will testify to.  Several names were

7   given to me approximately a week ago, but I've got no

8   explanation on what topics they're going to be testifying

9   to.  With regards to that, I would also remind the Court that

10  I have previously filed a motion under the case of State v.

11  Lagrone which will require the defense to advise me if they

12  intend to tender testimony in this case regarding future

13  dangerousness.  I was led to believe originally that -- from

14  the names that were provided to me that the testimony would

15  be limited to mitigation, but if that's changed, I'd like to

16  be advised at this time so that I might engage the services

17  of a psychiatrist or psychologist to interview the

18  defendant.

19          MS. LITTLE:  Your Honor, if I could respond to

20  that.  We did tender to the State two experts, Jay Crowder

21  and Mary Connell, a couple of months ago.  We continue to

22  work, and we did provide another list which includes Gilda

23  Kessner, who is a future danger actuarial person, and Ed

24  Hueske, who is a crime scene expert.  We also gave the name

25  of Wimbish which was a toxicologist.

1          MR. BYCK:  And the ME.

2          MS. LITTLE:  And the medical examiner, Nijam

3    Peerwani, N-i-j-a-m, P-e-e-r-w-a-n-i.  And he's of course our

4    medical examiner expert on photographs.  So --

5          MR. BYCK:  Your Honor, we might also add one

6    more name to that list, and that would be Dr. John Claude

7    Krusz, K-r-u-s-z, who conducted a nerve compression

8    physiological test on the defendant Friday afternoon.  And

9    Dr. Krusz, if he were to be called to testify or we use his

10   report in examination of -- or cross-examination of the

11   State's experts, would just merely be a scientific evaluation

12   of the defendant's hand.  He would not testify as to any

13   ultimate fact issues as to how things were handled or what

14   exactly happened in this case.

15         THE COURT:  All right.

16         MS. BALIDO:  Judge, there may be one

17   additional one.  I don't know if he can be determined an

18   expert or not, but Mike Koonze, K-o-o-n-z-e, of the -- who's

19   head of classification and records of the Texas Department of

20   Criminal Justice, has been contacted.  He will testify in

21   this case as well regarding classification of persons in TDC.

22         THE COURT:  All right.

23         MS. LITTLE:  And I don't know that I said

24   this, but I think Greg does know, he's dealt with her before,

25   Mary Connell does a presentation of biographical background

---

DARLINE W. LABAR, OFFICIAL REPORTER

1   and mitigation, things such as that.

2            MR. DAVIS:   I previously filed a motion in

3   limine with regards to her testimony.   I believe that much of

4   that testimony would be hearsay, would be self-serving, and

5   essentially what it does is allows the defendant to testify

6   through an expert as to what his history is.   And I've

7   previously filed a motion for the Court to take that up in a

8   705 hearing so that the Court will make some determination at

9   that time.

10           THE COURT:   I will hear the proffer and make a

11  determination.

12           MR. BYCK:   Your Honor, we'd further ask were

13  there any scientific or medical tests done on a brown or dark

14  stain on the back seat of the Honda?

15           MR. DAVIS:   No.

16           MR. BYCK:   Could we have identified as such

17  list of witnesses the State would call that were fellow

18  inmates with the defendant and would testify as to anything

19  of a -- of a confession nature or statements against interest

20  that the defendant made?   We are not specifically referring

21  to bad behavior in jail which we figure will be testified to

22  by guards and other officials.

23           THE COURT:   Is that not ascertainable by the

24  defense under a request of the Sheriff's Department?

25           MS. BALIDO:   Judge, we have made that

1    request.  We have served a subpoena on -- on Chief McKinney.

2    I don't have my notes as to what the situation is.  I asked

3    him specifically for anybody who he was in contact with --

4    the record will reflect the subpoena in the Court's file --

5    in regard to anybody that the -- that the defendant had come

6    in contact with while he's been in jail, either incarcerated

7    or as guards.  The representative from the Sheriff's

8    Department called me and told me that that would cost

9    thousands of dollars and thousands of man-hours to put

10   together.  I then told him what I wanted was I wanted to know

11   who the State of Texas was taking over to the District

12   Attorneys Office or meeting with over at the jail.  He

13   assured me that he would get that to me, and all he gave me

14   was his discipline records.  So that's another issue that

15   we'll -- that we may have to take up with that witness --

16             THE COURT:  Now, I'm inclined, if the State is

17   going to put on that type of evidence, money and man-hours

18   notwithstanding, better get the Sheriff's Department behind

19   it and get that information to the defense, because, quote,

20   death is different.

21             MR. DAVIS:  Well, certainly, you know, the

22   defendant --

23             THE COURT:  Can't have it both ways.

24             MR. DAVIS:  No, certainly not.  And in this

25   case though, the defendant knows who he has been in contact

---

DARLINE W. LABAR, OFFICIAL REPORTER

1    with.  I mean, that's what makes a difference.  If the State

2    were trying to determine that information, we'd certainly be

3    at the disadvantage because we haven't spoken to them.  The

4    defendant obviously has spoken to them.  He knows who he has

5    spoken to.  And I'm very reluctant at this time to give over

6    names of individuals who are still housed up there in that

7    Dallas County Jail who may come down here and testify against

8    this man.  Now, I've already listed them in my list of

9    witnesses, but I'm very reluctant at this time for security

10   reasons, for their own safety, to sit down here this morning

11   and to proffer their testimony in open court knowing that

12   this defendant who is charged with capital murder is going to

13   go right back up there to that Lew Sterrett Jail this

14   evening.

15            THE COURT:  The Court finds the State makes a

16   compelling argument.

17            MS. BALIDO:  Judge, the situation is, is that

18   there are many people that the defendant comes into contact

19   with that he doesn't know their name or be it a guard or

20   anybody else.  And what motivates somebody to contact the

21   District Attorneys Office and testify whether or not, you

22   know, the basis of that is true or not, we need some

23   reasonable time to investigate.

24            THE COURT:  The Court will hear the proffer

25   outside the jury's presence and then determine whether or not

1    a recess is necessary to respond in kind.

2              MR. BYCK:  Your Honor, further we would like

3    all the police reports, statements made on both the Mandy

4    Kirl incident and the Shirley Bard incident.  If you have any

5    of those, Greg.

6              MR. DAVIS:  No reports were generated on

7    either of those instances.

8              MR. BYCK:  Were any statements by the

9    complainant given to the District Attorney?

10             MR. DAVIS:  No.

11             MR. BYCK:  If the District Attorney would have

12   any information from the employer of Shirley Bard and Jim

13   Murphy at the time of the alleged Bard incident, I believe it

14   was R&R Welding, if you have any termination file, company

15   reports, anything like that, incident reports?

16             MR. DAVIS:  I have records from R&R Designs in

17   Terrell, Texas.

18             MR. BYCK:  And may those be given to the

19   defense, Your Honor?

20             THE COURT:  The State have any objection?

21             MR. DAVIS:  No objections.  I can state

22   there's nothing exculpatory or mitigating or Brady.

23             THE COURT:  Request granted.

24             MR. BYCK:  Your Honor, and I'm certainly not

25   blaming the State of Texas for this, at least the prosecution

1    anyway, but about three weeks ago the defendant in the Dallas

2    County Jail had his letters and written material and other

3    personal material confiscated.  And from our understanding

4    these have not been returned.  We'd like to know if the State

5    was made aware of this, if the State was given this.  If it

6    is, can we have it back?  Is the State going to use it?

7                   MS. BALIDO:  Included in that, Judge, was we

8    believe some notes and memoranda that was generated at our

9    request which constitutes work product and is privileged.

10                  MR. DAVIS:  The State has -- the State has

11   viewed that material that was seized by the Dallas County

12   Sheriff's Department.  The State has also copied portions of

13   those letters.  And again, these are all letters that were

14   written by the defendant himself.  There is no -- well, there

15   are -- I'm sorry, there are records -- there are letters that

16   are written by the defendant.  There are also letters that

17   are written to the defendant by relatives.  The State has

18   copied the materials that were written to the defendant by

19   relatives.  They're upstairs.  And I'll certainly make those

20   available to the defense, even though the defendant has

21   previously viewed them obviously since they were in his cell

22   when they were confiscated.

23                  MS. BALIDO:  Judge, we'd ask that there be a

24   hearing outside the presence of the jury before any such

25   letters would be admitted into evidence, if they are.

1          THE COURT:  Granted.

2          MS. BALIDO:  And we'd also ask that if any of

3    those letters are letters generated at the request of the

4    defense lawyers or to the defense lawyers, that those be

5    turned over immediately and not used for any purpose.

6          MR. DAVIS:  I can state to the Court that on

7    the face of those documents they were not obvious that they

8    had been made at the request of anyone.  They appear to be

9    documents that the defendant generated on his own with some

10   intentions apparently to turn them over to defense counsel at

11   some time, but those were generated months ago.  My opinion

12   at the time was they simply had been personal notes he had

13   made and decided not to transmit to his defense counsel at

14   that time.

15         MS. BALIDO:  Judge, that's an assumption of

16   the prosecutor.

17         MR. DAVIS:  That was my assumption, yes.

18   That's the reason I read the letters.

19         MR. BYCK:  Your Honor, we would respectfully

20   submit we are most concerned about this.

21         THE COURT:  Ask that the State forthwith

22   tender those documents over to the defense.

23         MR. DAVIS:  Yes, sir.  They're in the

24   possession of the Dallas County Sheriff's Department.

25         MR. BYCK:  We would ask leave to inquire the

1  legality of the Sheriff's Department seizure and its

2  subsequent use at a later time.

3                    THE COURT:  Request granted.

4                    MS. LITTLE:  We know a time certain when we're

5  going to get those letters.

6                    THE COURT:  Pardon me?

7                    MS. LITTLE:  Do we know a time certain when

8  we're going to get those letters?

9                    MR. DAVIS:  We'll call the Sheriff's

10  Department this morning and ask the custodian to bring them

11  up here to court.

12                    THE COURT:  Thank you.

13                    MR. BYCK:  We ask for notice of any other

14  extraneous offenses that the State might have.  They gave us

15  the notice of two extraneous offenses Friday, Bard and the

16  Mandy Kirl offense.

17                    MR. DAVIS:  I'm sorry, the notice of the --

18                    MS. LITTLE:  We had Bard notice, Your Honor.

19  I saw that this morning.  That's not the D.A.'s -- we've had

20  that notice.  Just the Mandy Kirl is the one we didn't have.

21                    MR. BYCK:  Are there any others?

22                    MR. DAVIS:  There's no others.

23                    MS. BALIDO:  And, Judge, let the record

24  reflect that we received oral notice of that extraneous

25  offense regarding Mandy or Nandy Kirl Friday afternoon,

1    the -- June the 1st at 3:30 in the lobby of the District

2    Attorneys Office.

3             THE COURT:   Everything I'm hearing is just

4    absolutely classic example of the Texas legislature with

5    their pigheadedness not amending Article 39.14.   If the Texas

6    legislature or the Court of Criminal Appeals would utilize

7    their backbone and adopt the Model Rules of Criminal

8    Discovery in State cases as enunciated by the American Bar

9    Association, used very, very effectively by primarily the

10   State of Florida, we would have none of this gamesmanship

11   going on.   This is absolutely --

12            MR. DAVIS:   Let me state for the record.

13            THE COURT:   -- unfortunate, but I realize

14   you're playing by the rules.   I'm just saying the rules

15   stink.

16            MR. DAVIS:   No, sir, I'm not -- I am not

17   playing any games with the defense.   And I want to make it

18   very clear that we didn't learn of Mandy Kirl until last

19   week.

20            THE COURT:   I --

21            MR. DAVIS:   We did not interview Mandy Kirl

22   until Friday morning.

23            THE COURT:   Both sides could be given the

24   opportunity as the Model Rules of Criminal Discovery and is

25   utilized in Florida, depositions, we would have none of this

1  type of goings on.  It's unfortunate.  The legislature has

2  been invited to change it time and time and time again.  And

3  for reasons known only to them they have opted not to do it.

4  Texas is absolutely the laughing stock of the country with

5  regard to criminal discovery.

6              MR. BYCK:  May we continue?

7              THE COURT:  You may.

8              MR. BYCK:  Your Honor, we would respectfully

9  request of the State --

10             THE COURT:  I say that on both sides by the

11  way.

12             MR. BYCK:  -- to provide to the defense any

13  expert testimony or any technical testimony that relates to

14  the identification of a map drawn by our defendant on or

15  about October the 9th or 10th of the year 2000, to any

16  specific intersection, plat, diagram, map, or anything else

17  that would identify the area located in that map as an area

18  located in Dallas County.

19             THE COURT:  Is this the map about which

20  reference was made during the hearing last week?

21             MR. BYCK:  Yes, Your Honor.

22             THE COURT:  You want to know specifically

23  what?

24             MR. BYCK:  Whether the State has identified

25  that map with any particular location in Dallas County in the

1    expert testimony or the topographers or cartographers --

2                    THE COURT:  It's my understanding they hadn't

3    last week, based on the testimony of the witness.

4                    MR. DAVIS:  We have no new information this

5    week.  We have no specific location as depicted on that map.

6                    MR. BYCK:  We would ask for any and all signed

7    Miranda waivers, if we don't have them all.  Which was the

8    ones --

9                    THE COURT:  Were there any Miranda warnings

10   other than those about which testimony produced last week,

11   Mr. Davis?

12                   MR. DAVIS:  Sir?

13                   THE COURT:  Any other Miranda warnings signed

14   by Mr. Murphy?

15                   MR. DAVIS:  No, sir, the only -- the only

16   other documents that are signed by the defendant are the

17   magistrates warnings.

18                   THE COURT:  Thank you.

19                   MR. DAVIS:  They will be produced when the

20   Judge arrives.

21                   MR. BYCK:  We'd ask if the State has any

22   fingerprints of the car in Wichita Falls.  I think that's

23   already been asked and answered.

24                   MS. LITTLE:  That's already been dealt with.

25                   MR. BYCK:  We would ask that we be allowed to

1    see an inventory, the physical items allegedly left by the

2    defendant on August -- on October the 4th of the year 2000

3    with an individual by the name of Shawn Cruz, C-r-u-z.

4    Evidently was a box of items for his daughter.

5                    MR. DAVIS:  To my knowledge, I'm not in

6    possession of those items.  They weren't seized by the

7    Garland police.  All the items that were seized by the

8    Garland Police Department are in my possession, it's my

9    understanding.  They're all upstairs, so if those items were

10    seized, then they are upstairs and they have been viewed by

11    the defense.

12                    MR. BYCK:  And I would -- I would take it from

13    the photographs that the District Attorney has asked the

14    Court preview, that there will be no allegations to a sexual

15    assault or anything of that nature?

16                    MR. DAVIS:  That's correct.

17                    MR. BYCK:  That may leave us with a small

18    problem with the autopsy report.

19            Greg, would you have any objection to redacting that

20    part of the autopsy report?

21                    MR. DAVIS:  What portion are you speaking of?

22                    MR. BYCK:  Isn't there something in there that

23    says sexual --

24                    MS. BALIDO:  She's got an injury at the 9

25    o'clock and 3 o'clock portion of the opening of the vagina.

1        MR. DAVIS:  I mean, that's an injury that was

2   noted.  The testimony is going to be during the course of

3   this trial that that injury was not caused.  There's no

4   evidence of any sexual assault.  But I cannot rule out the

5   defendant caused those injuries, so I'm not going to redact

6   or can't agree to redact.

7        MR. BYCK:  That's fine.  As long as we have

8   the District Attorney's representation that it's not going to

9   involve sexual assault, then that's -- that's fine with us.

10        THE COURT:  All right.

11        MS. BALIDO:  Are you done?

12        MR. BYCK:  I believe I am.

13        MS. BALIDO:  Judge, during Mr. Byck's talking,

14   I reviewed the State's second motion for discovery and

15   inspection of evidence that has been filed, and I think we've

16   got it all covered with the other motions.

17        THE COURT:  Thank you.

18        MS. BALIDO:  Judge, we do have some additional

19   motions that I would like to be heard on.  I guess the next

20   is defendant's request for notice of extraneous as to

21   character evidence.  I believe that's been covered by other

22   motions today.

23        THE COURT:  Correct.

24        MR. BYCK:  The motion for discovery related to

25   DNA.  I believe that all those reports have been turned over

1    to defense counsel.

2            Motion for the inventory of items taken at the crime

3    scene.  We have been tendered --

4            THE COURT:  Page 81 of the defense motion.  Go

5    ahead.

6            MS. BALIDO:  We have been tendered numerous

7    inventory reports, and I'd just ask if the State has any

8    additional items that they have in their possession that they

9    plan -- that are not included on those inventory reports.

10           MR. DAVIS:  No, sir.

11           MS. BALIDO:  There is also a motion for -- the

12   next says motion for discovery in a death penalty case.

13           THE COURT:  Page 83, yes.

14           MS. BALIDO:  The only thing that I would -- I

15   believe that all the records that are in the State's

16   possession have been tendered to the defense.  It's my

17   understanding that they do not have the boot camp, the TDC

18   boot camp records, but --

19           THE COURT:  Is that correct, Mr. Davis?

20           MR. DAVIS:  That is correct, Your Honor.

21           THE COURT:  All right.

22           MS. BALIDO:  The only thing that that does

23   apply to that has not been addressed in other issues is if

24   there is any sort of juvenile reports or anything that's

25   not --

1          THE COURT:  Are there any juvenile records

2  that the State has in its possession, either exculpatory or

3  otherwise?

4          MR. DAVIS:  No, sir.

5          MS. BALIDO:  Judge, specifically in the motion

6  for discovery in death penalty case, Section 1 -- Roman

7  Numeral I, Number 2, there's a request for any statement,

8  whether written or oral, of any possible witness which

9  indicates directly or indirectly that the defendant has

10  previously expressed that he has committed or will commit any

11  acts of violence.  I would assume that would include the

12  extraneous offenses that the State has already tendered to

13  defense counsel, but if there are any other -- any other

14  witnesses that the State plans to call.

15          MR. DAVIS:  No, sir.  They are included within

16  the extraneous offenses.

17          THE COURT:  Purposes of the record, the

18  request is granted.

19          MS. BALIDO:  I believe also Number 3, directly

20  below that, is not covered by any other -- any other motion.

21          THE COURT:  Other than the attempted suicide?

22          MR. DAVIS:  The -- with regards to Number 3, I

23  anticipate some testimony from Mandy Kirl in that regard,

24  certain statements that were made, specifically --

25          THE COURT:  Having a hearing outside the

---

1     jury's presence on that.

2                    MR. DAVIS:  Yes, sir.  In general that

3     statement was, are you ready to die before he put the gun to

4     her head.

5                    THE COURT:  The defense hear that?

6                    MS. BALIDO:  Outside the presence of the jury.

7                    THE COURT:  Did you hear what Mr. Davis said

8     the proffer he anticipates will include?

9                    MS. BALIDO:  And I believe Mr. Davis also

10    indicated that he said I'm going to blow your head off or

11    something to that effect as well.

12                   THE COURT:  Is that a yes, Mr. Davis?

13                   MR. DAVIS:  Well, I mean, specifically what I

14    have been told was that he asked Ms. Kirl if she was ready to

15    die, that he then pulled a gun out and stuck it up to her

16    head and then put the gun back up.  That's what I anticipate

17    the testimony to show.

18                   MS. BALIDO:  Also, Number 4 is an issue that

19    hasn't been addressed by any other motions.

20                   THE COURT:  Does the State have any specific

21    evidence with regard to the request in Number 4?

22                   MR. DAVIS:  I don't have any objections to the

23    Court granting that.  I believe those will be covered in the

24    extraneous offenses.

25                   THE COURT:  Granted.

```
 1                    MS. BALIDO:  And also Number 5, Judge.

 2                    MR. DAVIS:  Same response from the State

 3    there, Your Honor.

 4                    THE COURT:  Granted.

 5                    MS. BALIDO:  And I would assume the same

 6    response Number 6, Mr. Davis?

 7                    MR. DAVIS:  Yes.

 8                    THE COURT:  Granted.

 9                    MS. BALIDO:  Judge, I believe in regard to

10    Number 7 that we have in our possession specific instances of

11    misconduct in the form of incident reports in the Dallas

12    County Jail.  In addition, I would suppose the State would

13    offer evidence regarding the extraneous offenses in regard to

14    Number 7, but absent or excluding those issues, if the State

15    has any additional evidence in regard to Number 7.

16                    MR. DAVIS:  No, sir.  Those will be included

17    within the extraneous offenses.

18                    THE COURT:  Granted.

19                    MS. BALIDO:  And I assume that 8 would be

20    answered the same way as well?

21                    MR. DAVIS:  Same response from the State.

22                    THE COURT:  Granted.

23                    MS. BALIDO:  Judge, Number 9.  Since the

24    defendant -- since the State has admitted that -- or not

25    admitted but announced to the Court that the letters to and
```

1    from the defendant have been seized in this case, we would

2    ask that any -- any letters in regard to Number 9 or any

3    mitigating evidence be turned over to the defense.

4                    MR. DAVIS:  No objections.

5                    THE COURT:  Granted.

6                    MS. BALIDO:  And can we have a date certain as

7    to when those should be turned over, Judge, by the end of

8    business --

9                    MR. DAVIS:  They'll be turned -- they'll be

10   turned over by the end of today, Your Honor.

11                   THE COURT:  Not later than 4:00 p.m., June

12   4th, 2001.

13                   MS. BALIDO:  Judge, I don't believe 10 has

14   been specifically --

15                   THE COURT:  Employment records.  Are these not

16   discoverable by the defense?

17                   MS. BALIDO:  Judge, I believe that the

18   employment records are -- have we had any trouble getting

19   records?  Okay.

20              Judge, that is available to the defense and we have

21   them.  I was just worried with that one as to if the State

22   had any original copies that we were not privy to.  I don't

23   think that's the case.

24                   THE COURT:  11.

25                   MS. BALIDO:  And --

1          THE COURT:  School records.  Are they not

2    discoverable by the defense as well?

3          MS. BALIDO:  They are, Your Honor.

4          THE COURT:  12 is going to be turned over by 4

5    o'clock, if such exists.

6          MS. BALIDO:  And also Number 13, Judge.

7          THE COURT:  13 is a bit global and vague, but

8    I assume that that will be included if there is anything in

9    those letters.

10          MS. BALIDO:  And, Judge, I believe 14 we've

11    covered by another motion, or at least an explanation to the

12    Court.

13          I believe that we have in our possession Number 15.

14          Is that correct?

15          MS. LITTLE:  We do.

16          MS. BALIDO:  Okay.  I don't believe Number 16

17    has been addressed by any issue, Judge.

18          MR. DAVIS:  I believe previously I had

19    provided the defense with copies of the police reports with

20    regards to the offenses committed by the defendant in Van

21    Zandt County as well as Kaufman County and Dallas County.

22          THE COURT:  Defense acknowledge receipt of

23    that?

24          MS. LITTLE:  Yes, sir, we have the offense

25    report from the Dallas case and we have a lot of paperwork

DARLINE W. LABAR, OFFICIAL REPORTER

1   from Edgewood and some of those places.

2                  THE COURT:  Purpose of the record, it's

3   granted.

4                  MS. BALIDO:  Judge, I believe just 17 makes it

5   clear that not only in the State's case in chief on

6   guilt/innocence, but also in punishment, that we'd like the

7   names -- at least the names of the -- of the people.

8                  MR. DAVIS:  The State's -- the State's list of

9   witnesses that's previously provided to the defendant

10  includes the names of witnesses at the punishment phase.

11                 MS. BALIDO:  I believe Number 18 has not

12  specifically been ruled on to the death of -- of the issue,

13  Judge.

14                 MR. DAVIS:  Well, with regards to subsection

15  A, the defendant does have a significant history of prior

16  violent criminal activity.  I have no evidence other than the

17  defendant's statements that he committed this offense while

18  he was under the influence of extreme mental or emotional

19  disturbance.  There is absolutely no evidence that the victim

20  in this case was a participant in the defendant's conduct

21  towards her.  There is no evidence that there was an

22  accomplice who participated in this offense.

23                 With regards to subsection E, there is no evidence

24  that the defendant acted under extreme duress or under the

25  substantial combination of another person in this case.

1    Subsection F, given all the information that I have

2    from interviews conducted with civilians and police officers,

3    it's my understanding that the defendant did have the ability

4    to appreciate the criminality of his conduct or to conform

5    his conduct to the requirements of the law.

6    And subsection G, I have -- I have no evidence that

7    would partially or totally negate any evidence offered by the

8    State in support of its allegations of aggravated

9    circumstances.

10    MS. BALIDO:  Judge, I believe Number 19, since

11    there are no indicted codefendants, doesn't apply in this

12    case.

13    THE COURT:  Withdrawn?

14    MS. BALIDO:  Withdrawn.

15    Judge, I believe Number 20 could be covered by

16    Brady, but we'd like a ruling on it.

17    THE COURT:  Granted.

18    MS. BALIDO:  Also, Number 21 is the same.

19    THE COURT:  Granted.

20    THE REPORTER:  I need you to keep your voice

21    up for me, please.

22    MS. BALIDO:  I'm sorry.

23    THE COURT:  That conclude that particular

24    motion?

25    MS. BALIDO:  Yes, Judge.

1          THE COURT:  Next motion, quote, Defendant's

2   Motion to Prevent Unfair Surprise During Trial, close quote.

3          MS. BALIDO:  Judge, I believe that you can

4   cover this by -- by imposing or just pointing to the State's

5   continuing duty to make us aware of any mitigating,

6   impeachable evidence or exculpatory evidence that they may

7   discover throughout the course of this trial, as well as

8   their investigation.  As it seems that it's an ongoing --

9          THE COURT:  The State's well aware of the

10  Court's position in this regard, counsel?

11         MR. DAVIS:  Yes, Your Honor.

12         THE COURT:  Purpose of the record, the request

13  in the motion is granted.

14      Next is motion in limine regarding DNA evidence.

15  Have you been given a copy of all the lab reports on DNA and

16  run your independent inspection examination as requested?

17         MS. BALIDO:  As far as I know, Judge, we have.

18         THE COURT:  Request granted, complied with.

19      Next, motion in limine regarding character

20  witnesses.

21      The State have any objection?

22         MR. DAVIS:  No, Your Honor.

23         THE COURT:  Granted.

24      Prior convictions.  I assume that that has been

25  tendered to the defense -- to the defense satisfaction?

1          MS. BALIDO:  Yes, Your Honor.

2          THE COURT:  Granted.

3          Statements.  The Court is carrying that at this

4     time.

5          Motion in limine regarding punishment argument.

6          MS. BALIDO:  Judge, can we take that up at

7     punishment?

8          THE COURT:  The Court will hold its ruling.

9          Interesting twist on Caldwell versus Mississippi.

10         Motion in Limine regarding photographs.  We're going

11    to be taking that up at a later time.

12         MR. BYCK:  Yes, Your Honor.

13         THE COURT:  Victim impact.  Take that up at a

14    later time.

15         MR. BYCK:  Yes, Your Honor.

16         MS. BALIDO:  That's based on -- just based on

17    the assumption that the State is going to bring up any of

18    that in its case in chief which I don't expect it to.

19         THE COURT:  Motion for psychiatric expert

20    assistance.  Request has previously been granted by the

21    Court.

22         Motion for court reporter.  Granted.

23         Remind counsel if at any time during the trial there

24    is a hearing at the side of the bench that you want reported,

25    if you would please make the Court aware so that either the

1    jury can be excused or the reporter may position herself in a

2    manner that a complete record can be preserved.

3           Motion for leave to file additional motions.

4    Granted, if necessary.

5           Election of punishment has been previously ruled

6    upon, is granted again.

7           Motion for appointment of appellate attorney prior

8    to trial.  There's three trial attorneys.  The Court deems

9    that three is sufficient for trial and to preserve appellate

10   issues.

11          Motion to allow incarcerated defendant access to a

12   hot meal with the assistance of the Sheriff's Department.

13   Denied.

14          Motion to allow access to shaving.  Previously been

15   ruled upon and granted.

16               MS. LITTLE:  Your Honor, could I have just a

17   moment?  If a hot meal is going to be denied Mr. Murphy in

18   the evening, would it be possible for him to have lunch

19   brought in like a lot of the other jurors, such as the court

20   staff?

21               THE COURT:  The Court will take that into

22   consideration.

23          Next is motion to order the State to decide whether

24   to make a challenge for cause or peremptory challenge to the

25   their strikes before defense counsel.  Granted previously.

```
 1                    MS. BALIDO:  I think all the voir dire
 2    motions, Judge --
 3                    THE COURT:  Granted.
 4                    MS. BALIDO:  -- you granted previously --
 5                    THE COURT:  Or ruled on.
 6                    MS. BALIDO:  -- or you ruled on previously.
 7          And I believe that the statements and identification
 8    motion you have are carrying.
 9                    THE COURT:  Granted.
10                    MS. MILLER:  Judge, for record purposes, Ray
11    LePere is here.  He is the custodian, and he's the one who
12    has the letters that were previously talked about that were
13    seized.  But he needs the release signed.  I said that it
14    needs to be signed by one of the defense since that's who
15    it's being turned over to.
16                    THE COURT:  Right.  May I ask that --
17                    MR. BYCK:  I'll execute the release for Mr.
18    LePere, Your Honor.
19                    THE COURT:  Any further defense motions?
20                    MR. LePERE:  Thank you, Judge.
21                    THE COURT:  Thank you, Ray.
22                    MS. BALIDO:  Judge, there is a mitigation
23    issue, but I think we can take that up at punishment.
24                    THE COURT:  All right.
25                    MR. BYCK:  There are some additional
```

1   continuous -- as I've termed, kind of continuous discovery

2   and Brady motions that the State and I have been passing back

3   and forth to each other.  I believe the first one is -- the

4   first one is the second -- defendant's second specific motion

5   for discovery.  And there is a response from the State.  The

6   State's response to defendant's second specific motion for

7   discovery.

8                  THE COURT:  I have the response and the

9   motions.

10                  MS. BALIDO:  Judge, specifically I would just

11  like to -- on -- I think that most of it has been taken care

12  of in your -- in your rulings to other motions, but I would

13  like the Court to review our request and the State's response

14  individually to determine whether or not the Court feels that

15  they have come into compliance.  I know that it's time

16  consuming.  If you'd rather just do it --

17                  THE COURT:  Let me carry it with the trial.

18  If I find that there's something that has been deleted or not

19  turned over, I will stop the proceedings, if necessary, give

20  the defense sufficient time to address the Court's concerns.

21                  MS. BALIDO:  Basically, also, Judge, there's

22  a -- there's a specific motion pursuant to Brady versus

23  Maryland which basically asks for the same things in the

24  State's second motion for discovery, just does so under Brady

25  and specific requests.  And there has been a response from

```
 1    the defense -- I mean, I'm sorry, from the State.
 2              THE COURT:  The State.
 3              MS. BALIDO:  And then there's also a third --
 4    defendant's third motion for discovery of specific items, and
 5    there's a -- where there was a State's response, and then
 6    there's a defendant's fourth motion for discovery that takes
 7    up two things.  First, the material that we've just been
 8    tendered by the Sheriff's Department, and then secondly, a
 9    clear copy of the Chachos convenience store tape.  We were
10    tendered a copy, but it was one of those in-store copies that
11    was so fast we couldn't read it and we couldn't hear anything
12    on it.  And as far as I can tell, I have not been served with
13    any kind of response or any sort of videotape with a clear
14    and audible copy.
15              THE COURT:  When do you anticipate in your
16    trial strategy of presenting that for the jury's
17    consideration?
18              MR. DAVIS:  It's probably going to be
19    tomorrow.  I have -- I have a second tape that we've had
20    produced that -- it's not -- it's not that clear, but it does
21    slow down the action and it does at least allow us to hear
22    audio in a clearer fashion.  I won't represent that it's a
23    clear fashion necessarily, but I'll certainly let the defense
24    view that today.  I don't anticipate using that until
25    tomorrow sometime.
```

1          THE COURT:  Defense request is granted.

2          MS. BALIDO:  And then, Judge, there were --

3    there were a couple of motions that I filed just this morning

4    that were motions in limine that I can't seem to place my

5    hands on my copy, but I did tender them to the State.

6          MR. DAVIS:  Judge, actually I'm in possession

7    of two.  One Motion in Limine regarding alleged evidence of

8    sexual assault of the victim.  I believe that we've handled

9    that.  I know of no evidence that the victim in this case

10   actually was the victim of a sexual assault.  As a matter of

11   fact, the serologist from the Texas Department of Public

12   Safety will testify that he did not detect any evidence of

13   such assault.

14         Secondly is the Motion in Limine regarding

15   photographs, which I believe is -- the Court is still

16   carrying at this time.

17         THE COURT:  Correct.

18         MS. BALIDO:  And the other one's regarding

19   extraneous transactions that I think we've discussed that

20   we'll have a hearing outside the presence of the jury before

21   such evidence is brought before the Court.

22         THE COURT:  Correct.

23         MS. BALIDO:  The only other issue, Judge, is I

24   believe the court reporter was preparing a record of the

25   hearing on Thursday and we have not been tendered a copy

1    regarding Detective Myers' testimony and also Ms. Wilhelm's

2    and just -- would like to know if that is available to us.

3                    (Discussion off the record.)

4                    THE COURT:  Anything further?

5                    MS. BALIDO:  No, Judge.  I think that does it

6    for us.

7                    THE COURT:  State have anything?

8                    MR. DAVIS:  No, Your Honor.

9                    MR. BYCK:  May we have a few minutes, Your

10   Honor, before --

11                   THE COURT:  The jury?  All the jury here?

12                   THE BAILIFF:  Grace is checking on it, Judge.

13                   THE COURT:  Yeah.  15 minutes.

14

15

16

17

18

19

20

21

22

23

24

25

1                          Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4            I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13           I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16           Witness my hand this the 11th day of October, A.D.,

17   2001.

18

19

20           _____
             DARLINE W. LABAR
21           Official Court Reporter
             194th Judicial District Court
22           Dallas County, Texas
             (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002

1           REPORTER'S RECORD    **74145**

2         VOLUME 47 OF 65 VOLUMES

3      TRIAL COURT CAUSE NO. F00-02424-NM

4  THE STATE OF TEXAS     :    IN THE DISTRICT COURT

5  VS.               :    DALLAS COUNTY, TEXAS

6  JEDIDIAH ISAAC MURPHY   :   194TH JUDICIAL DISTRICT

7         *********************

**FILED IN**
**COURT OF CRIMINAL APPEALS**

8      TRIAL ON THE MERITS BY JURY

DEC 5 2001

9         *********************

Troy C. Bennett, Jr., Clerk

10  A P P E A R A N C E S:

11  HONORABLE BILL HILL, Criminal District Attorney
          Crowley Criminal Courts Building
12         Dallas, Dallas County, Texas  75207
         Phone:  214-653-3600
13  BY:    MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
14         FOR THE STATE OF TEXAS;

15  MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
    MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16  MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
    Dallas County Public Defenders Office
17  Dallas, Texas  75207
         Phone:  214-653-9400
18         FOR THE DEFENDANT.

19          *********

20     On the 4th day of June, 2001, the following

21  proceedings came on to be heard in the above-entitled and

22  numbered cause before the Honorable F. Harold Entz, Jr.,

23  Judge presiding, held in Dallas, Dallas County, Texas:

24     Proceedings reported by machine shorthand, computer

25  assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER   ORIGINAL

INDEX VOLUME 47

| June 4th, 2001 | PAGE | VOL. |
|---|---|---|
| Proceedings...................................... | 2 | 47 |
| Jurors finally sworn............................. | 3 | 47 |
| Arraignment By Mr. Davis......................... | 4 | 47 |
| Arraignment By Mr. Davis......................... | 5 | 47 |
| Jury Instructions............................... | 5 | 47 |
| Reporter's Certificate.......................... | 257 | 47 |

CHRONOLOGICAL WITNESS INDEX

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| EVELYN SHELTON | 22 | | | 47 |
| MATT TOLLEFSBOL | 43 | | | 47 |
| KENNETH CLANCE | 48 | 60 | | 47 |
| MONTY CARL DUNN | 63 | 68 | | 47 |
| SANDRA JO MAMOT | 70 | 80 | | 47 |
| ZACHERY MAMOT | 86, 118 | 106 | | 47 |
| BOBBY DOUGLAS HARP | 121, 142 | 136 | | 47 |
| DEBRA MURPHY | 144 | | | 47 |
| CESAR DE LA TORRE | 148 | | | 47 |
| RICHARD SHOLLENBERGER | 155 | 162 | | 47 |
| ORA MAE MILTON | 164 | 176 | | 47 |
| TRESHOD TARRANT | 198 | | | 47 |
| AKRAN ARIDI | 225 | 238 | | 47 |
| GARY ROSE | 242 | 249 | | 47 |

ALPHABETICAL WITNESS INDEX

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| AKRAN ARIDI | 225 | 238 | | 47 |
| KENNETH CLANCE | 48 | 60 | | 47 |
| MONTY CARL DUNN | 63 | 68 | | 47 |
| BOBBY DOUGLAS HARP | 121, 142 | 136 | | 47 |
| SANDRA JO MAMOT | 70 | 80 | | 47 |
| ZACHERY MAMOT | 86, 118 | 106 | | 47 |
| ORA MAE MILTON | 164 | 176 | | 47 |
| DEBRA MURPHY | 144 | | | 47 |
| GARY ROSE | 242 | 249 | | 47 |
| EVELYN SHELTON | 22 | | | 47 |
| RICHARD SHOLLENBERGER | 155 | 162 | | 47 |
| TRESHOD TARRANT | 198 | | | 47 |
| MATT TOLLEFSBOL | 43 | | | 47 |
| CESAR DE LA TORRE | 148 | | | 47 |


EXHIBIT INDEX

| STATE'S | | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 1 | Photo of Complainant | | 27 | 28 | 47 |
| 2 | Autopsy Photo (R) | | 41 | 41 | 47 |
| 3 | Map of Garland | | 27 | 28 | 47 |
| 4 | Discover Card (FC) | | 29 | 29 | 47 |
| 5 | Discover Card (BC) | | 29 | 29 | 47 |
| 6 | Master Card (BC) | | 29 | 29 | 47 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 7 | Photo of Honda | 27 | 28 | 47 |
| 2 | 8 | Videotape @ JCPenney | 45 | 45 | 47 |
| 3 | 10 | Photo of Bleachers | 49 | 49 | 47 |
| 4 | 11 | Photograph | 64 | 65 | 47 |
| 5 | 12 | Photograph | 124 | 124 | 47 |
| 6 | 13 | Receipt | 133 | 133 | 47 |
| 7 | 14A | Go-Ped Warranty | 128 | 129 | 47 |
| 8 | 14B | Go-Ped Warranty | 128 | 129 | 47 |
| 9 | 14C | Go-Ped Warranty | 128 | 129 | 47 |
| 10 | 15 | Map of Dallas | 145 | 145 | 47 |
| 11 | 16 | Photo of Racetrac | 146 | 146 | 47 |
| 12 | 17 | Transaction Report MC | 154 | 154 | 47 |
| 13 | 18A | Transaction Report DC | 156 | 157 | 47 |
| 14 | 18B | Transaction Report DC | 156 | 157 | 47 |
| 15 | 20 | Photo 509 Lamar | 175 | 175 | 47 |
| 16 | 21 | Photo of Chacho's | 213 | 213 | 47 |
| 17 | 22 | Photo of Cowboys | 213 | 213 | 47 |
| 18 | 23 | Photo Cole Mountain | 213 | 213 | 47 |
| 19 | 26 | Videotape Fast Speed | 234 | 234 | 47 |
| 20 | 26A | Videotape Slow Speed | 234 | 234 | 47 |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

```
1                   P R O C E E D I N G S
2             THE COURT:  Let the record reflect this
3   hearing is being conducted in open court, continuing outside
4   the jury's presence.
5             MR. DAVIS:  Judge, I wanted to advise the
6   Court that Detective John Stanton, Arlington Police
7   Department, arrived this morning.  I'm in the process of
8   having his entire file copied at this point.  From reviewing
9   it, he had perhaps three pages of handwritten notes basically
10  detailing what his action in this case had been, so as soon
11  as they're finished this morning, I should be able to provide
12  those to the defense within -- certainly within the next 30
13  minutes or the next break.
14            THE COURT:  Thank you.
15            MS. BALIDO:  Judge, also on Thursday during
16  the hearing I believe the State granted -- I mean, the Court
17  granted the defense motion for the -- Detective Myers to
18  tender to his -- to the Court his notebook.  And I don't know
19  if that had been done.
20            MR. DAVIS:  His notebook is back there in the
21  workroom.
22            THE COURT:  I have not --
23            MS. BALIDO:  Okay.  And so --
24            THE COURT:  I may have it --
25            MR. DAVIS:  I think --
```

```
 1                    THE COURT:  -- at a break.

 2                    MR. DAVIS:  I think it was left in the

 3    workroom so that it could be tendered to the Court.

 4                    THE COURT:  Sheriff, may we have the jury,

 5    please.

 6                    THE BAILIFF:  Yes, sir.

 7                    THE COURT:  Begin first with the presentation

 8    of the capital murder indictment, followed by the credit card

 9    allegation.

10                    (Jury brought into courtroom.)

11                    THE COURT:  Let me ask the jurors to remain

12    standing.

13              Mr. Murphy, counsel, visitors of the gallery,

14    however, you may be seated at this point.

15              Ladies and gentlemen of the jury, may I ask you

16    to -- ma'am, would you rise, please -- raise your right hand

17    and be sworn in?

18                    (Jurors finally sworn)

19                    JURORS:  I do.

20                    THE COURT:  Thank you.  Please lower your

21    hands and again please be seated.

22              Ladies and gentlemen, we proceed with the formal

23    stage of the matters with the presentation of the allegation,

24    true bill of indictment.  Present the indictment in Cause

25    02424-NM, from the State of Texas, the Honorable Greg Davis.
```

1          Mr. Davis.

2               MR. DAVIS:  Thank you, Judge.  May it please

3     the Court.

4               Ladies and gentlemen, I'm now going to read to you

5     the true bill of indictment which has been returned in this

6     case by the Dallas County Grand Jury.  It reads as follows:

7     "True bill of indictment, in the name and by the authority

8     of the State of Texas..."

9                    (Arraignment By Mr. Davis)

10              MR. DAVIS:  "...against the peace and dignity

11    of the State."

12              It's signed by Bill Hill, Criminal District Attorney

13    of Dallas County, Texas, and by the foreman of the grand

14    jury.

15              THE COURT:  Mr. Byck, on behalf of the

16    defendant, how does the defendant plead?

17              MR. BYCK:  Not guilty, Your Honor.

18              THE COURT:  The record so reflect.

19              Ladies and gentlemen of the jury, carried with the

20    indictment about which Mr. Davis has just presented to you,

21    there is a companion case which we'll proceed with the

22    presentation of the indictment at this time in Cause 24042.

23    Again, Mr. Greg Davis.

24              MR. DAVIS:  "True bill of indictment, in the

25    name and by the authority of the State of Texas..."

DARLINE W. LABAR, OFFICIAL REPORTER

1                    (Arraignment By Mr. Davis)

2                    MR. DAVIS:  "...against the peace and dignity

3    of the State."

4              Again, it's signed by Bill Hill, Criminal District

5    Attorney of Dallas County, Texas, and by the foreman of the

6    grand jury.

7                    THE COURT:  Mr. Byck, to that allegation

8    contained in the indictment, how does the defendant plead?

9                    MR. BYCK:  Not guilty.

10                   (Jury Instructions)

11                   THE COURT:  The record so reflect.

12             Mr. Murphy, counsel, you may be seated.

13             Ladies and gentlemen, as is required by the code --

14   by the Court of Criminal Appeals in Austin, your having been

15   given notebooks, though the instructions are in the notebook,

16   by law I'm required to read the following into the record:

17             Ladies and gentlemen of the jury, because of the

18   potential usefulness of taking notes, you may take notes

19   during the presentation of evidence in these cases.  However,

20   you may not take notes during the arguments of the lawyers or

21   when the jury charges are read to you.  Moreover, to ensure a

22   completely fair and impartial trials, I will instruct you to

23   observe the following limitations:

24             Number one, note taking is permitted but not

25   required.  Each of you may take notes.  However, no one is

1    required to take notes.

2            Two, take notes sparingly.  Do not try to summarize

3    all of the testimony.  Notes are for the purpose of

4    refreshing memory.  They are particularly helpful when

5    dealing with measurements, times, distances, identities, and

6    relationships.

7            Three, be brief.  Overindulgence in note taking may

8    be distracting.  You, the jurors, must pass on the

9    credibility of witnesses.  Hence, you must observe the

10   demeanor and appearance of each person on the witness stand

11   to assist you on passing on his or her credibility.  Note

12   taking must not distract you from that task.  If you wish to

13   make a note, you need not sacrifice the opportunity to make

14   important observations.  You may make your note after having

15   made the observation itself.  Keep in mind that when you

16   ultimately make a decision in these cases, you will rely

17   principally upon your eyes, your ears, and your mind and not

18   upon your fingers.

19           Four, do not take your notes away from the court.

20   At the end of each day please leave your notes in the

21   notebook provided to you.  The court officer will be directed

22   to take the notebooks to a safe place and return them at the

23   beginning of the next session of the cases unopened.

24           Five, your notes are for your own private use only.

25   It is improper for you to share your notes with any other

1    juror during any phase of the trials other than jury

2    deliberations.  You may however discuss the contents of your

3    notes during jury deliberations.

4          Ladies and gentlemen, the State will at this time

5    make an opening statement.  The defense has previously

6    notified the Court and the State that they will reserve their

7    right to make an opening statement until the defense rests

8    its case in chief.

9          Mr. Davis.

10          MR. DAVIS:  Thank you.  May it please the

11    Court.

12          THE COURT:  Mr. Davis.

13          MR. DAVIS:  Ladies and gentlemen, I anticipate

14    that the evidence in this case will show the following:  It

15    will show that shortly after noon on October 4th, the year

16    2000, Ms. Bertie Cunningham left her North Garland home to go

17    to the Collin Creek Mall in Plano.  Now, she was going to go

18    up there to pick up a blue robe for her sister Frances

19    Conner.  She was going to use Ms. Conner's credit card at the

20    JC Penney's to actually pick up that item.  You'll hear from

21    Ms. Cunningham's sister Evelyn Shelton who will tell you that

22    Ms. Cunningham that day left by herself.  She drove herself

23    in her Honda Accord automobile to the -- to the mall.  The

24    records will indicate that she got there at approximately

25    2:10 in the afternoon.  Records will also indicate that she

1    did in fact pick up the blue robe for her sister Ms. Conner,

2    that she did so around 2:55 p.m. that afternoon.

3          She then left Collin Creek Mall and began driving

4    home to her home in North Garland.  Now, the evidence will

5    show that about that same time, that this individual here,

6    Jedidiah Isaac Murphy, was leaving or had shortly left a bar

7    in North Garland by the name of Bleachers.  Kenneth Clance,

8    who was waiting on Mr. Murphy that afternoon, will testify

9    that Mr. Murphy came into his bar at about 1 o'clock that

10   afternoon, that he had a good opportunity to observe Mr.

11   Murphy.  Mr. Murphy was not impaired in any fashion when he

12   came into that bar.  Mr. Clance will tell you that Mr. Murphy

13   was in no way disturbed or upset or intoxicated at the time

14   that he began to serve him that afternoon.  Mr. Clance will

15   also tell you that Mr. Murphy ordered two drinks that

16   afternoon, both Jagermeister, that he paid for the first

17   drink with cash, that he failed to pay for the second drink,

18   that the defendant claimed that on a cab ride over to the

19   bar, that he had left his billfold in the cab.  Mr. Clance

20   will tell you that he attempted to contact the cab company on

21   Mr. Murphy's behalf.  That about that same time that Mr.

22   Murphy indicated that he was going to leave the bar for a

23   short period of time and that he would be coming back to

24   clear up the matter with Mr. Clance.

25          Mr. Clance will tell you that at the time that Mr.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Jedidiah Murphy exited his bar, he was not impaired, did not

2    seem upset, and was not intoxicated at that point in time.

3            Now, the evidence will show that Mr. Murphy never

4    did re-enter Bleachers bar.  And instead the evidence will

5    show that this individual right down here, Jedidiah Murphy,

6    shortly after he left Bleachers bar in North Garland, came in

7    contact with Ms. Bertie Cunningham.  We don't know the exact

8    location that he came in contact with Ms. Cunningham, but the

9    evidence will indicate that that was in the North Garland

10   area, which will be in Dallas County, that he then abducted

11   Ms. Cunningham.  The evidence will show that he then forced

12   Ms. Cunningham to get into the trunk of her own automobile.

13   And that after placing Ms. Cunningham into the trunk, he then

14   took out a .22 caliber pistol that earlier that day he had

15   obtained from his sister's home at 1718 Barclay in

16   Richardson, Texas.  He then held that gun on Ms. Cunningham

17   and shot her in the forehead once.  Not only shot her in the

18   forehead, but the evidence will show that basically shot her

19   at point blank range by actually placing the barrel of that

20   gun up next to the forehead of Ms. Cunningham, firing once,

21   striking her in the head.  He then again kept her in the

22   trunk of her automobile and began driving that Honda Accord

23   around to various locations in Dallas County.

24           Now, the evidence is going to indicate to you that

25   no later than 4:01 p.m. this individual again, Jedidiah Isaac

1    Murphy, was attempting to use Ms. Cunningham's credit cards

2    at an ATM machine at a Washington Mutual Bank in Richardson,

3    Texas, near Richardson Square Mall.  He attempted several

4    times to obtain cash using Ms. Cunningham's card, but he

5    failed because he didn't have her personal identification

6    number.  So he left that location in Richardson, and the

7    evidence will show he then went to another location in

8    Richardson where he came in contact actually with his niece,

9    Ashley Johnson.  That he picked her up, started driving her

10   around town.  They then went to another home in Richardson

11   that was occupied by the Mamot family.  At that location he

12   came in contact with Sandra Mamot, the mother there at that

13   home, as well as her son Zachery Mamot.  And he indicated

14   that he wanted to -- he wanted to drive Zach Mamot around

15   Richardson and give him a ride in his new car.  And Zachery

16   Mamot will testify to you that he got in that Honda

17   automobile with the defendant and with Ashley Johnson, that

18   this man down here indicated that car belonged to his

19   girlfriend and that his girlfriend had given it to him to

20   ride around in that day.  This man also told that child, that

21   teenage boy out there that day, that he had credit cards,

22   that he was prepared to use them, that they had a high limit,

23   and that he wanted to do some shopping that day.  So that's

24   exactly what they did.

25            First of all, they picked up another teenager by the

1   name of Ryan Hammonds.  The three of them then drove around

2   for a while.  Mr. Murphy then dropped off his niece and so

3   now we have Jedidiah Murphy, we have Ryan Hammonds, and we

4   have Zachery Mamot driving around in this Honda automobile

5   sometime after 5:00 p.m., again on October the 4th.

6           The evidence will show that sometime after 6:00 p.m.

7   those three individuals ended up at Richardson Motor Sports

8   in Richardson, Texas, which is going to be -- basically it's

9   on the west service road of North Central Expressway between

10  Belt Line Road and Spring Valley Road.  Richardson Motor

11  Sports was already closed for the night, but what they did

12  was this.  They went up to the window.  They caught the

13  attention of the employees of that establishment.  They

14  showed them the credit cards that they were ready to use, and

15  the employees decided to let this individual down here in,

16  along with Ryan Hammonds and Zachery Mamot.

17          Bobby Harp, who was the employee on duty that

18  evening, will tell you this individual, along with those two

19  teenagers, proceeded to order three motorized skate boards.

20  They're actually called Go-Peds.  In essence, if you've seen

21  the skateboards, they're the size of a skateboard, they have

22  a handle and they have motor on it.  The three of them

23  totaled $1700.  And this individual right here used Ms.

24  Cunningham's credit card to make that purchase.  Bobby Harp

25  will tell you that at the time he dealt with Jedidiah Murphy,

1  he was not intoxicated, did not seem impaired in any fashion,

2  had no trouble completing that transaction, and in fact

3  during the course of that transaction filled out multiple

4  copies of warranty papers to go along with those Go-Peds.

5          The three then left that establishment.  They took

6  Ryan Hammond home.  They then went back over to Zachery

7  Mamot's home.  And the defendant and Zachery Mamot decided to

8  try out their Go-Peds.  What they did was they went from the

9  location basically in North Richardson, they rode those

10  Go-Peds several miles down to Huffhines Park which again is

11  north of the Richardson Square Mall.  They tried them out.

12  They talked with Sandra Mamot.  They asked Sandra Mamot if

13  Zach could keep the Go-Ped.  She had some concerns about

14  that.  They talked for a while, and then Zach Mamot and

15  Jedidiah Murphy again rode that Go-Ped all the way back up to

16  the Mamot home.  And at that point Zach Mamot will tell you

17  that this individual made some statements to him.  He made

18  some statements about going to Florida, that he was ready to

19  leave town, he had to go to Florida for work.  Started having

20  that discussion with him, and in the course of that

21  discussion talked about some trouble that he supposedly had

22  with some mobsters or with some criminals.  And told Zach

23  Mamot that he needed protection.  And he actually pulled out

24  that .22 caliber pistol and showed that gun to Zach Mamot,

25  the same gun that he had previously used on Bertie Cunningham

1    that day.  Following that discussion, this individual left.

2         First of all, he went to another friend's home in

3    North Garland, had a short discussion with him about 9

4    o'clock.  And after that we know through credit card records

5    again that the next time we see Jedidiah Murphy, he's down at

6    a Racetrac Service Station on Harry Hines Boulevard in

7    Dallas, Texas.  What's he doing?  He's attempting to obtain

8    more money by using again the credit cards belonging not only

9    to Bertie Cunningham, but also the credit card belonging to

10   Frances Conner.  At 11:31 that evening he attempts to get

11   cash from that ATM machine unsuccessfully again because he

12   still does not have the personal identification number.  The

13   next time we know this person's location is at 4:30 in the

14   morning.  We're now talking about October the 5th.  The same

15   Racetrac Service Station, the same ATM machine, and again,

16   he's using the credit cards of Bertie Cunningham and Frances

17   Connor in an attempt to obtain cash money again.

18   Unsuccessful again because he has no personal identification

19   number.

20        So at 4:30 he leaves that location.  We know that

21   following that, he then goes to his sister's home.  The home

22   belongs to Tonya Thorp.  That's his sister living at 1718

23   Barclay.  He then goes in there that morning.  Among other

24   things, he changes clothes, he showers, cleans up.  He also

25   makes some effort or some appearance of an apparent suicide

1    attempt over at Tonya Thorp's home.  He rigs up some sort of

2    contraption with hoses which are found in the garage of Tonya

3    Thorp's home.  There is no evidence that they were ever used

4    or attempted to be used that morning.  He leaves what I will

5    term a suicide note.

6            MS. BALIDO:  Judge, I'm going to object to

7    jury argument as for the terms a "suicide note".

8            THE COURT:  Overruled.

9            MR. DAVIS:  He leaves a note for his sister to

10   find.  And then he leaves that location there in Richardson,

11   and he leaves.  And we don't know his whereabouts until

12   sometime later that afternoon when he shows up in Edgewood,

13   Texas.  And he shows up out there because the evidence will

14   show to you that he had been living in East Texas sometime

15   prior to actually coming to live with his sister in

16   Richardson.  We know that he shows up out there, and he comes

17   in contact with one of his old high school friends by the

18   name of Treshod Tarrant.  And Treshod is living there at that

19   location in Edgewood with his grandmother, Ora Mae Milton.

20           Ms. Milton will testify that she was at home, that

21   this individual arrived at her doorstep that afternoon, that

22   she asked him why he was there, and that he very calmly told

23   her, well, you know, I just had a day off, I had some time to

24   kill, and I just wanted to come down here and visit with you

25   today.  Ms. Milton didn't think anything of it.  She saw her

1    grandson Treshod come into contact with him also.  Treshod

2    again asked him the same type of question.  What you doing

3    down here today?  Same response from the defendant, just

4    wanted to come down and visit.  Treshod will tell you though

5    that when he looked at the Honda automobile that this person

6    was still driving, he noticed something unusual.  He noticed

7    some blood actually on the trunk area of that vehicle.  And

8    he went to Jedidiah Murphy and he said, how did that get

9    there, you been having some problems or what?  And Jedidiah

10   Murphy responded to him, no, I haven't had any real problems,

11   I just ran over a deer on the way down here, had to shoot him

12   several times, put him in the trunk, it got a little bit

13   messy, I'll clean it up, don't worry about it.  And the

14   evidence is actually going to show that all during the

15   evening when he was at his friend's home in North Garland,

16   while he's over on Harry Hines Boulevard, while he's at his

17   sister's in Richardson the next morning, and while he's

18   standing there telling that story to Treshod Tarrant, that

19   Ms. Bertie Cunningham's body is still in that trunk.  And

20   Treshod tells him, hey, I need to go down, I'm going to have

21   to report to my parole officer in Canton.  I'll be back in a

22   while.  They agree to meet later.  Again, in Ms. Milton's

23   house which they do.

24          And sometime between 5:00, 5:30, or 6:00, Jedidiah

25   Murphy and Treshod Tarrant then decide to head to Terrell.

1   And they decide to go there because they're going to have

2   some dinner and they want to pick up something to drink.   And

3   you'll see evidence that actually Jedidiah Murphy later that

4   evening, approximately 6:00, 6:30, is in Terrell.   He's in a

5   liquor store by the name of Chacho's.   He goes into that

6   liquor store twice.   He goes in there the first time to buy

7   two 18-packs of beer.   He attempts to use the Discover Card

8   belonging to Bertie Cunningham, but he's told by the clerk,

9   "we don't take Discover cards."   They have a discussion.   He

10  then indicates I've got another credit card outside.   He goes

11  out to the Honda, comes back in.   This time he has Ms.

12  Cunningham's MasterCard with him.   The clerk indicates that

13  will finish the transaction.   He does.   This man down here,

14  Jedidiah Murphy, walks right out of that place with two

15  18-packs of beer.   He has a short discussion with Treshod

16  Tarrant.   Treshod Tarrant asked him please to go back in

17  there and to get him something else to drink, so the

18  defendant goes back into Chacho's, deals with the very same

19  clerk again, indicates this time he wants to buy some

20  Hennessy Cognac.   The clerk indicates that will be fine.

21  Again, they complete the transaction with the same MasterCard

22  again.   And Treshod Tarrant and Jedidiah Murphy now leave

23  that location.   They go to two more locations in Terrell,

24  Texas.

25           First of all, they go to a Cowboys Quick Stop which

1    is a service station where they buy gas again, using Ms.

2    Cunningham's credit card.  And then they go have dinner at a

3    place called Cole Mountain.  And the evidence will indicate

4    that this person down here in fact bought a nice rib dinner,

5    some drinks, and French fries over there using again Ms.

6    Cunningham's credit card.  After that, they go back to

7    Edgewood.  Treshod Tarrant is going to tell you that he then

8    used that automobile while the defendant was still at the

9    house.  He used the automobile to go out and purchase some

10   marijuana.  He and his friends smoked the marijuana for a

11   little bit.  He then came home, still to find Jedidiah Murphy

12   there.  Jedidiah Murphy asked Ora Mae Milton can I please

13   stay here the rest of the night before I have to leave.  Ms.

14   Milton says no problem, but you're going to have to get up a

15   little bit early because my granddaughters need to get up and

16   get ready for work and school.  He said, no problem.  So then

17   he then took up the front bedroom of that residence.  And

18   that's where he went to sleep that night.  And he remained

19   asleep until about 3:00 in the morning.  And that's when

20   members of the Van Zandt County Sheriff's Department, as well

21   as members of the Garland Police Department caught him and

22   found him in Ms. Milton's house.

23          And the officers will indicate to you that they had

24   a conversation with Jedidiah Murphy, that they asked him

25   first of all where the credit cards were that belonged to Ms.

1    Cunningham, that he told them that they were in the car.

2    They then asked him where the body of Ms. Cunningham was.

3    That at first he refused to tell them the location, and then

4    later admitted that the body was to be found in a creek on

5    the northeast side of Edgewood.  They then went to that

6    location.  Those officers will testify that they found the

7    body of Ms. Bertie Cunningham actually laying in a certain

8    amount of water in that creek.  She had the gunshot wound to

9    the head.  She had various other injuries that had resulted

10   from a turtle actually eating away at her flesh after she had

11   been placed in that creek.  They then retrieved her body for

12   autopsy.

13          The evidence will show to you that this individual

14   was taken to the Garland Police Department after being

15   arraigned by a Magistrate in Van Zandt County and being told

16   of his charges, as well as being told of his Miranda warnings

17   by Judge Ozelle Wilcoxson.  He was transported to the Garland

18   Police Department where he met Detective Matt Myers.

19   Detective Myers will tell you that he sat down and began

20   having a conversation with Mr. Murphy, that they discussed

21   the location of the abduction of Ms. Murphy -- of Ms.

22   Cunningham, that the defendant agreed to go start riding

23   around town trying to show him the location, that they went

24   to several locations within Garland, North Garland area near

25   the Bleachers bar.  That the defendant was unable to give him

1   a specific location for where he first came in contact with

2   Ms. Cunningham.  He then took him back to the Garland Police

3   Department where he then proceeded to interview the

4   defendant.  The defendant agreed to give him a voluntary

5   statement.

6          And in that voluntary statement, you'll find that

7   this defendant admitting -- admitted abducting Ms. Cunningham

8   that day.  He admitted shooting Ms. Cunningham.  But in that

9   statement he claimed that it was an accident.  He claimed

10  that he was too intoxicated that day to know exactly where he

11  had come in contact with Ms. Cunningham.  They finished the

12  taking of that voluntary statement.

13         Now, in addition to that, additional work was done

14  by police agencies in this case.  The lab work regarding

15  certain items with blood on them were conducted by the Texas

16  Department of Public Safety.  And you'll find that certain

17  items were found at the location where Zach Mamot lives, some

18  items with blood on them.  There were other items retrieved

19  from the trunk of that automobile.  The DNA expert there will

20  indicate that all of that blood came back as matching Ms.

21  Cunningham's blood.

22         With regards to the statements that the defendant

23  made that this was an accidental shooting, more specifically

24  the evidence will show that the defendant claimed to

25  Detective Myers that he had the gun in his left hand, that he

1   had no feeling in his left hand due to a prior injury to his

2   left hand, and that the gun accidentally discharged striking

3   Ms. Cunningham.  That's the claim that he made to Detective

4   Myers in that statement.

5          The State of Texas will produce to you medical

6   records from that prior injury, as well as medical testimony

7   from Dr. William Vandiver, an orthopaedic surgeon who had

8   previously treated the defendant for an injury.  The doctor

9   will testify that nerve conduction tests run in the year 2000

10  of that summer indicated the defendant had no nerve damage to

11  his left thumb.  The records will also indicate from the

12  prior injury that had occurred back actually some years

13  prior, that the defendant had shot himself with a pellet in

14  his palm, that the pellet didn't even penetrate his hand,

15  that it was removed without any damage being done to his

16  nerve in the hand.  The doctor's records will also indicate

17  that initially the defendant was claiming of some numbness in

18  his third, fourth, and fifth fingers, not to his trigger

19  finger or to his thumb.  That two weeks later when he was

20  seen by a doctor again in Texarkana for that same injury,

21  that this time he was only claiming numbness to his fourth

22  and his fifth fingers.  Not to his third, his second, or to

23  his thumb.

24          That is the evidence that the State of Texas will

25  present to you during the course of this case.  And at the

1    conclusion of this case, ladies and gentlemen, I will be

2    asking you to find the defendant guilty of capital murder.

3              The State's ready to proceed, Your Honor.

4              THE COURT:  Defense again choose to reserve

5    its right to make an opening statement until --

6              MR. BYCK:  Yes, Your Honor, we do.

7              THE COURT:  The State may call its first

8    witness.

9              MS. LITTLE:  We'll invoke the Rule at this

10   time, Your Honor.

11             THE COURT:  The Rule is being invoked.  May I

12   invite both sides in light of their number of witnesses to

13   inform their respective witnesses that the Rule has been

14   invoked.

15             MR. DAVIS:  Yes, sir.

16             THE COURT:  Other than those witnesses about

17   whom the counsel has made the Court aware.

18             MR. DAVIS:  For the record, the State will be

19   calling Evelyn Shelton.

20             (Witness brought forward.)

21             THE COURT:  Ms. Shelton, may I ask you to

22   raise your right hand and be sworn in, please.

23             (Witness sworn.)

24             THE COURT:  Thank you, ma'am.  Have a seat to

25   my left, if you please.

1            MR. DAVIS:  Yes, ma'am, just have a seat right

2   up here.

3                (Witness takes the stand.)

4                    EVELYN SHELTON

5   was called as a witness by the State and, after having been

6   first duly sworn, testified as follows:

7                     Direct Examination

8   By Mr. Davis:

9        Q.    Ma'am, would you please tell us your full name?

10       A.    Mary Evelyn Harmon Shelton.

11       Q.    Okay.  Ms. Shelton, where do you reside at this

12   time?

13       A.    3119 Big Oaks Drive, Garland, Texas.

14       Q.    Generally what part of Garland is that?

15       A.    Well, it's just right on the border of Richardson

16   and Garland, right off of Jupiter Road.

17       Q.    So generally would that be the North Garland area?

18       A.    Definitely, North Garland area.

19       Q.    How long have you lived there?

20       A.    Since 1988.

21       Q.    Are you married at this time?

22       A.    No.

23       Q.    Were you previously married?

24       A.    Yes.

25       Q.    Okay.  And are you widowed at this time?

1    A.   Yes.

2    Q.   Do you have any children?

3    A.   Yes.

4    Q.   How many children do you have?

5    A.   Two sons.

6    Q.   Do they live here in the Dallas area?

7    A.   Neither one of them live in the Dallas area.

8    Q.   Do you have sisters or brothers?

9    A.   I have a sister that still lives in the Dallas area.

10   Q.   And what is her name?

11   A.   Louise Frances Conner.

12   Q.   And where does she live at this time?

13   A.   At this point in time she's in an assisted living

14   care facility.

15   Q.   Does she have some health problems that prevent her

16   from living on her own or --

17   A.   Yes.

18   Q.   What sort of problems does she have?

19   A.   She has some dementia, and she has osteoporosis.

20   It's just hard for her to maintain her home.

21   Q.   You indicated that you had one sister living.  At

22   one point did you have another sister?

23   A.   Yes.

24   Q.   And what was her name?

25   A.   Bertie Lee Cunningham.

1    Q.    Now, if I may ask, how old is Frances Connor at this

2    time?

3    A.    Frances Connor at this time is 85.

4    Q.    And at the time of her death, how old was your other

5    sister Bertie Cunningham?

6    A.    At the time of her death she was 80.

7    Q.    At the time of her death, where was Ms. Cunningham

8    living?

9    A.    She was living 27, I believe 69 -- I know it just as

10   well.  Laurel Oaks Drive in Garland.

11   Q.    How close to your home was that?

12   A.    Oh, about a block or so away.

13   Q.    So again, she lived in the North Garland area?

14   A.    Same area I lived in.

15   Q.    Was Ms. Cunningham married at the time?

16   A.    No.

17   Q.    Had she previously been married?

18   A.    Yes.

19   Q.    Was she also a widow?

20   A.    Yes.

21   Q.    Did she have children living -- living with her at

22   that time, or was she living by herself?

23   A.    She was living by herself.  Her children were not in

24   the area, either.

25   Q.    Let me -- let me ask you to direct your attention,

1   if you will, back to October the 4th of the year 2000.  Do

2   you recall that day?

3       A.   Oh, yes.

4       Q.   On that day did you have an occasion to be with your

5   sisters at some point?

6       A.   Oh, yeah, I was with them both that morning up

7   through lunchtime.

8       Q.   All right.  And where were -- where did you see

9   them?

10      A.   At -- at Bertie Lee Cunningham's home.

11      Q.   Okay.  So did you actually then walk over about a

12  block to her home or drive over there?

13      A.   Well, I drove over there because I had been to the

14  shopping center, the Richardson shopping center, so I stopped

15  by.

16      Q.   In your discussions with -- with Bertie Cunningham

17  that day, did she indicate to you that she was going to leave

18  and go someplace?

19      A.   Yes, she did.  And since I was there and staying

20  with the sister, she thought she had a good opportunity to

21  leave for a short while to go on an errand.

22      Q.   Okay.  What exactly was that errand?

23      A.   That errand basically was to go to -- well, she had

24  two, to go to Collin Creek and pick up an order from JC

25  Penney's, and also to see if she could trade a pair of house

DARLINE W. LABAR, OFFICIAL REPORTER

1    shoes at Dillard's that we had picked up that were not the

2    right size for my other sister.

3        Q.    Was it your understanding that both those errands

4    were going to be run at the Collin Creek Mall in Plano?

5        A.    Yes, very definitely.

6        Q.    Do you know exactly what items she was going to be

7    picking up for Ms. Connor?

8        A.    It was a robe.

9        Q.    And was that a robe that had already been ordered?

10       A.    It had been ordered and she had gotten news it come

11   in and that was why she was anxious to go ahead and pick it

12   up.

13       Q.    Now, Ms. Cunningham, back on October the 4th, was

14   she still driving herself around?

15       A.    Oh, yes.

16       Q.    Was she a fairly independent woman then?

17       A.    Oh, very independent.

18       Q.    What type of automobile did she own?

19       A.    She owned a '96 Honda Accord.

20       Q.    And was it your understanding that she would be

21   driving that car up to the Collin Creek Mall?

22       A.    Oh, she was definitely driving it.

23            MR. DAVIS:  May I approach, Your Honor.

24            THE COURT:  You may.

25       Q.    (By Mr. Davis)  Ms. Shelton, first, let me show you

DARLINE W. LABAR, OFFICIAL REPORTER

1    a photograph, State's Exhibit Number 1.  Do you recognize

2    this to be a photograph of your sister Bertie Cunningham?

3        A.   Yes.

4        Q.   Yes.  Secondly, State's Exhibit Number 3 -- well,

5    okay, do you recognize that to be a map that represents the

6    northern portion of Garland, as well as a portion of

7    Richardson, as well as the southern edge of Plano?

8        A.   Yeah.

9        Q.   So I understand that -- just so the court reporter

10   is clear, the -- it does show Belt Line -- Belt Line Road, as

11   well as Buckingham Road, Jupiter Road, Plano Road, and North

12   Central, as well as the Bush Turnpike?

13       A.   And Belt Line is this right here.

14       Q.   Okay.

15            Finally, State's Exhibit Number 7, the automobile

16   depicted in State's Exhibit Number 7, do you recognize that

17   to be your sister's Honda Accord?

18       A.   Well, it's kind of a hazy picture, but definitely is

19   the Honda Accord.

20       Q.   Thank you.

21            MR. DAVIS:  The State at this time will offer

22   State's Exhibits 1, 3, and 7.

23            (State's Exhibit No. 1, 3, and 7 offered)

24            MR. BYCK:  We have no objections to State's 1,

25   3, or 7.

```
 1                    THE COURT:  State's 1, 3, and 7 are admitted.

 2                    (State's Exhibit No. 1, 3, and 7 admitted)

 3       Q.   (By Mr. Davis)  Now, Ms. Shelton, did your -- did

 4   your sister have credit cards?

 5       A.   Yes.

 6       Q.   I'm talking about Bertie Cunningham now.

 7       A.   Yes, she did.

 8       Q.   Did Frances Connor also have a credit card?

 9       A.   She had one of my sister's credit cards -- other

10   sister's credit card in her possession, too.

11       Q.   All right.  So that when Ms. Cunningham went to the

12   Collin Creek Mall, was it your understanding that she would

13   use Ms. Connor's credit card to complete the transaction

14   since the item belonged to Ms. Connor?

15       A.   I think -- I think that was why she took the other

16   credit card.

17                    MR. DAVIS:  May I approach again, Your Honor.

18                    THE COURT:  You may.

19       Q.   (By Mr. Davis)  Ms. Shelton, let me show you three

20   credit cards here, two of them being Discover cards and the

21   third one being a MasterCard.  First of all, State's Exhibit

22   Number 6, the MasterCard bearing the name of Bertie L.

23   Cunningham, do you recognize that to be a credit card that

24   belonged to your sister?

25       A.   Yes.
```

1    Q.    State's Exhibit Number 4, being a Discover Card

2    bearing the name of Frances Louise Connor, do you recognize

3    that item to be a credit card belonging to your sister, Ms.

4    Connor?

5    A.    Yes.

6    Q.    Finally, State's Exhibit Number 5, Discover Card

7    bearing the name of Bertie Cunningham, do you recognize that

8    item to be credit card belonging to your sister?

9    A.    Yes, yes.

10            MR. DAVIS:  Your Honor, at this time the State

11   will offer State's Exhibits 4, 5, and 6.

12            (State's Exhibit No. 4 through 6 offered)

13            MR. BYCK:  No objection to 4, 5, and 6.

14            THE COURT:  State's Exhibit 4, 5, and 6 are

15   admitted.

16            (State's Exhibit No. 4 through 6 admitted)

17   Q.    (By Mr. Davis)  Generally what kind of condition did

18   your sister keep her Honda in?  Was it -- was it normally

19   clean?  Was it messy?  Was it --

20   A.    The car?

21   Q.    Yes, ma'am.

22   A.    Oh, she kept it clean, reasonably clean.

23   Q.    All right.  As a rule, as a habit, was it her habit

24   to leave empty Coke cans or bottles or trash laying around in

25   her automobile?

1     A.    No way.

2     Q.    Did your sister smoke?

3     A.    No.

4     Q.    All right.  So I take it, it would not be her habit

5  to leave packs of cigarettes lying around or -- or smoked

6  cigarettes?

7     A.    No, not in the house.

8     Q.    Did your sister drink alcohol?

9     A.    No.

10    Q.    Would it be fair to say it was not her habit to

11 leave empty beer cans or half empty Cognac bottles in her

12 automobile, either?

13    A.    She would not leave them in her automobile, have no

14 reason to have them there.

15    Q.    When your sister left, did she leave by herself?

16    A.    She left by herself.

17    Q.    Were you expecting her back at a certain time?

18    A.    Well, I really was because she dressed very

19 hurriedly because she didn't want to -- she thought if I had

20 something else to do, she wanted to be back and she told me I

21 could leave at 3 o'clock if I wanted to because she would be

22 around at that point.

23    Q.    Uh-huh.

24    A.    But I did not leave.  And she did not come back at 3

25 o'clock.

1    Q.   So besides the errand to Collin Creek Mall, were you

2   aware of any other errands that she was going to be running

3   while she was out that day?

4    A.   I was not aware of any, but I wouldn't have been

5   surprised if she had made a short stop at a drug store or

6   grocery store on the way home.

7    Q.   Now, did your sister Ms. Cunningham, did she return

8   back as planned at 3:00 p.m.?

9    A.   Oh, no.

10    Q.   Okay.  Were you concerned initially when she didn't

11   get back at 3:00, or what was your reaction at that point?

12    A.   Well, I was a little concerned, but knowing how we

13   were, I gave her a little bit of time before I really got

14   concerned.  But when she wasn't home around 4 o'clock, I

15   became concerned.

16    Q.   Okay.  What, if anything, did you do at that time?

17    A.   Did I do?

18    Q.   Yes, ma'am.  Did you do anything specific because of

19   your concern?

20    A.   Well, I think I waited a little while, and then I --

21   assumed that maybe she had been in a car accident, and so I

22   did call 911 to check if there had been any accidents

23   reported.  And there had been no accidents reported.  And I

24   wasn't satisfied with that, so I started calling the

25   emergency hospitals at Plano, some hospitals in Plano that I

DARLINE W. LABAR, OFFICIAL REPORTER

1  could find in the directory, and Richardson and Garland, and

2  they had no one in there that was not identified and they --

3  they -- so -- and they had no one with her name there.

4      Q.   All right.  So after making the calls, did you have

5  any knowledge about your sister's whereabouts?

6      A.   No.

7      Q.   What, if anything, did you do next in that regard,

8  then?

9      A.   Well, at that point I called the police

10 department --

11     Q.   The Garland Police Department?

12     A.   -- the Garland Police Department because we live in

13 Garland.

14     Q.   Okay.

15     A.   Told them that my sister was missing, and they asked

16 some questions.  And, you know, they advised me to wait a

17 little while before I made an official report.

18     Q.   Okay.  Do you know about what time that day that

19 call would have been made?

20     A.   As best I can remember, somewhere probably between

21 4:30 and -- well, between 4:30 and 5:00, somewhere in that

22 period of time.  It's a little hazy, but somewhere in that

23 period of time.

24     Q.   Did your sister return after you made that call to

25 Garland Police Department?

1   A.   No, no.

2   Q.   What did you do next then?

3   A.   Well, I -- well, I had called my nephew and told him

4   about it.  And he also said, well, I'll call back in about an

5   hour because he was saying give her another hour.  And so

6   then I finally got ahold of the Garland Police Department and

7   reported that she was missing.  And they took all the

8   information.

9   Q.   Okay.  Were you concerned by that time?

10  A.   I knew something had happened by that time.  There

11  wasn't any question in my mind.

12  Q.   So you actually made a missing persons report to the

13  police department?

14  A.   I made a missing persons report.

15  Q.   And did you get any response back from the police

16  department?

17  A.   Well, this is where I -- at that -- as soon as I

18  made the report, then I knew I had to cancel those credit

19  cards.  And as soon as I got there -- but I was first going

20  to get the police department -- the report to the police

21  department.  So after that -- well, I did start calling on

22  the credit cards.  I did not know about her second credit

23  card.  I knew she had one, but I didn't know she had it with

24  her and I didn't know which bank it was with and so forth.

25  So I called and canceled both of my sisters' credit cards.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Now, when you talk about the second credit card

2  belonging to Ms. Cunningham, would that be the Discover Card

3  or the MasterCard?

4    A.   The MasterCard was the one that was not canceled at

5  that time.

6    Q.   So you knew that -- you knew that both sisters had

7  Discover cards, correct?

8    A.   I knew both sisters had the Discover cards.

9    Q.   And so did you call the companies that had issued

10 the Discover cards?

11   A.   Yes.

12   Q.   And actually put them on notice and actually

13 canceled them, correct?

14   A.   Yes.

15   Q.   And did you have any other discussions with the

16 credit cards companies at that time?

17   A.   Yes, with -- with both of them.  And the first --

18 Bertie Cunningham credit card, they did tell me that they had

19 already been a charge made.  And they told me the company

20 that the charge was made to.

21   Q.   Do you remember that company?

22   A.   Oh, it's some kind of -- I don't remember.  It's

23 some kind of bicycle parts or something similar to that.

24 Sports -- it was some kind of sports --

25   Q.   When -- when they told you that a charge had already

1    been made on Ms. Cunningham's card at that -- at that

2    establishment, did you call the police?  Did you do something

3    else?  Just tell us what you did at that point.

4         A.   Well, I think at that point that I called my nephew

5    or else he called back before I had a chance to do anything.

6    And I told him about the charge that was on the credit card.

7    And he called the Garland police right away and told them

8    about it.

9         Q.   Your sister never came back that evening, did she?

10        A.   Oh, no.

11        Q.   Ms. Shelton, I want to ask you a little bit more

12   about your sister's habits.

13        A.   Okay.

14        Q.   Ms. Cunningham's habits.  When she was driving

15   around town, do you know whether or not it was her habit to

16   keep her doors locked, her car doors locked?

17        A.   I would believe that she did, yes.

18        Q.   Was Ms. Cunningham generally a careful individual?

19        A.   She was a careful individual, yes.

20        Q.   Do you know whether or not it was her habit to pick

21   up strangers that might be standing on the corners asking for

22   rides?

23        A.   I feel like she would never have picked up a

24   stranger.

25        Q.   Do you know what -- what routes that your sister

1  would take when she would go to and from the Collin Creek

2  Mall from her home?  Were there certain streets that she

3  would normally take or not take?

4      A.   As a general rule, she would always use Jupiter.

5           MR. BYCK:  Your Honor, I'm going to have to

6  object to this part of testimony if she does not know

7  exactly.

8           THE COURT:  Objection is overruled.

9      Q.   (By Mr. Davis)  Okay.  What --

10          THE COURT:  You may answer.

11     Q.   (By Mr. Davis)  What was her habit?  What roads

12 would she use?

13     A.   There were two that she could have used to go to

14 Collin Creek.  One was Plano, and one was Jupiter Road.

15     Q.   Did your sister make it a habit to drive on North

16 Central Expressway?

17     A.   Oh, no, never.  No.

18     Q.   That day, as best you can remember, do you remember

19 what kind of clothing that Ms. Cunningham was wearing?

20     A.   Yes, it was very, very casual.  And I even remember

21 when she put on her blouse, she looked at herself and she

22 said, I haven't had a chance to really iron this.  But she

23 went ahead because she was in such a hurry that she went

24 ahead and wore it and didn't take it off.  It was a light

25 colored blouse and some kind of light colored cream or khaki

1    pants that she put on and just slipped hurriedly into them

2    where she could get out to the mall and back.

3        Q.    Did she have a purse and a billfold with her?

4        A.    Yes, she had her purse.  She had a crocheted purse.

5        Q.    Would it be dark in color or light in color?  Do you

6    recall?

7        A.    Well, it was light -- it was a light color.

8        Q.    With regards to money, was it -- was it your

9    sister's habit to have some money on her person at all times?

10       A.    She would have some money, possibly not a whole lot.

11       Q.    Now, that day did you notice whether or not Ms.

12   Cunningham was wearing any jewelry when she left the home to

13   go to Collin Creek Mall?

14       A.    She didn't where a whole lot of jewelry, but she

15   always had her watches and rings on.

16       Q.    Okay.  So do you recall that she was actually

17   wearing, first of all, a watch that day?

18       A.    She always wore a watch.  I'm sure she had her

19   watch.

20       Q.    And you said rings?

21       A.    And definitely rings.

22       Q.    How -- how many rings was she wearing?

23       A.    To the best of my knowledge, I believe she never

24   ever had over two and she -- there were two that she usually

25   had.  One on one hand and one on the other.

1   Q.   If you wouldn't mind, describe those rings for the

2   members of the jury.  They have stones in them?

3   A.   One of them was a combination ring, you know, with

4   the diamond with the little diamonds around it.  And the

5   other one, it wasn't her ruby ring.  I'm not really positive

6   about -- because that's the ring she changed, but the one on

7   her left hand is the one that she never changed and it was a

8   diamond ring with circles on it.

9   Q.   Ms. Shelton, after you were advised that your

10  sister's body had been found down in Edgewood, did you have

11  an opportunity to look around her home to see if you could

12  find the watch and the two rings in her home?

13  A.   The watch has never been found and that ring has not

14  been found, the one I am describing.  And the -- and I'm not

15  really positive about the other ring.

16  Q.   Okay.  But you know for a fact that the watch and

17  one of those rings has never been found, correct?

18  A.   Yes, sir.

19  Q.   Prior to coming in to testify this morning, did I --

20  did I ask you to look at a videotape that we obtained from JC

21  Penney's in Collin Creek Mall?

22  A.   Yes, you did.

23  Q.   I believe for the record that will be State's

24  Exhibit Number 8.  And when you had an opportunity to review

25  the tape, did you actually see your sister portrayed on that

1    videotape?

2        A.    I saw her immediately.

3        Q.    And is she wearing the same clothing that you just

4    described, the light colored pants and the light colored

5    blouse?

6        A.    Yes.

7        Q.    And I believe we made a note of the time that's

8    indicated.  Was it 2:10 when we first see her come into the

9    mall?

10       A.    That's about the time she would have arrived at

11   Collin Creek Mall.

12       Q.    And would it be fair to say we see her again at a

13   different location within that store sometime afterwards?

14       A.    Yes.

15       Q.    A couple of more questions, Ms. Shelton.  Your

16   sister on that date, was she a living, breathing human being?

17       A.    Oh, yes.

18       Q.    Did she have any serious health problems?

19       A.    No serious health problems.

20       Q.    Do you recall just how tall and how much your sister

21   weighed, just approximately?

22       A.    At least 150 pounds.

23       Q.    Okay.

24       A.    Plus or minus a little, maybe.

25       Q.    She have any recent cuts on her head that you're

1   aware of?

2      A.   Not that I'm aware of, no.

3      Q.   Had she sustained any serious head injuries in the

4   recent past?

5      A.   Oh, no, no.

6      Q.   Did she have any recent cuts on her abdomen that

7   you're aware of?

8      A.   Other than operations.

9      Q.   Okay.  Do you know whether or not she had any recent

10   bruising to her chest or to her arms that you were --

11      A.   No, she had none.

12      Q.   And finally, I want you to please look at the

13   individual seated down here.  I believe he's wearing a dark

14   coat and a red tie this morning.  Do you know that

15   individual?  Have you ever personally met that person?

16      A.   No.

17      Q.   To your knowledge, did your sister Ms. Cunningham

18   know him?

19      A.   She did not know him.

20      Q.   To your knowledge, did your sister Ms. Cunningham

21   ever give this individual down here, the defendant in this

22   case, the use of her credit cards, either the Discover Card

23   or the MasterCard?

24      A.   No.

25      Q.   Ms. Shelton, I have one other matter.  I'm going to

1   have to ask you to look at a photograph.

2            MR. DAVIS:  May I approach, Your Honor.

3            THE COURT:  You may.

4     Q.   (By Mr. Davis)  Ms. Shelton, I want to apologize.

5   If you would just briefly look at this photograph and my

6   question to you will be, does this photograph show your

7   sister Bertie Cunningham?

8     A.   Did I see the hair?

9     Q.   Yes, ma'am.

10    A.   Yes.

11    Q.   Okay.  Thank you.

12            MR. DAVIS:  We would offer State's Exhibit

13  Number 2 for record purposes only, Your Honor.

14            (State's Exhibit No. 2 offered)

15            MR. BYCK:  No objection record purposes only.

16            THE COURT:  Admitted.

17            (State's Exhibit No. 2 admitted)

18            MR. DAVIS:  I'll pass the witness, Your Honor.

19            MR. BYCK:  We have no questions of Ms.

20  Shelton, Your Honor.

21            THE COURT:  You may step down, Ms. Shelton.

22            MR. DAVIS:  May this witness be excused from

23  the Rule?

24            MR. BYCK:  We have no objection excusing her

25  from the Rule.

1          THE COURT:  You may remain in the courtroom.

2    Be careful when you step down from the witness stand.  We've

3    had some mishaps in the past.

4          The State may call its next witness.

5          MR. DAVIS:  The State will call Matt

6    Tollesbol.

7               (Witness brought forward.)

8          THE COURT:  Raise your right hand, please.

9          (Witness sworn.)

10         MR. BYCK:  Your Honor, may Mr. Davis and I

11   approach very briefly?

12         THE COURT:  On the record, or --

13         MR. BYCK:  No, off the record.

14         (Discussion off the record.)

15         THE COURT:  Unreported hearing occurred at the

16   bench, outside the presence and hearing of the reporter, the

17   witness, the jury, defendant at this time.

18         Consistent with counsels' representation, you may

19   proceed.

20         MR. DAVIS:  Thank you.

21

22

23

24               (No omission.)

25

1                          MATT TOLLEFSBOL

2     was called as a witness by the State and, after having been

3     first duly sworn, testified as follows:

4                          Direct Examination

5     By Mr. Davis:

6          Q.   Sir, would you please tell us your full name?

7          A.   Matthew Olaf Tollefsbol.

8          Q.   And could you please spell your last name for the

9     court reporter?

10         A.   It's T-o-l-l-e-f-s-b-o-l.

11              THE REPORTER:  Spell your middle name.

12              THE WITNESS:  O-l-a-f.

13         Q.   (By Mr. Davis)  Sir, can you tell us how you're

14    employed?

15         A.   I'm the senior loss prevention manager for the JC

16    Penney Company at the Plano store in Collin Creek Mall.

17         Q.   What are your duties and responsibilities in loss

18    prevention?

19         A.   I'm responsible for protecting the store, protecting

20    the customers, protecting the merchandise, the apprehension

21    of shoplifters, apprehension of associates who commit theft

22    against the company.

23         Q.   Now, directing your attention back to October 4th of

24    2000, did the JC Penney store in Collin Creek Mall have

25    security cameras?

1      A.    Yes, sir.

2      Q.    More than one?

3      A.    Yes, sir.

4      Q.    Were they located in different areas of the store?

5      A.    Yes, sir.

6      Q.    And back on that date were they operational?

7      A.    Yes, sir.

8      Q.    As part of the display, besides the picture that
9 they regenerate, would you also have a time generated from --
10 from the images?

11     A.    Yes, sir.  The CCTV system does have a time system
12 on it.

13     Q.    So we basically -- it's like a photograph.  We have
14 a time stamping system for the cameras, right?

15     A.    Yes, sir.

16     Q.    Now, back on that date or shortly afterwards, did
17 members of the Garland Police Department ask you to retrieve
18 the security tapes from October the 4th, the year 2000?

19     A.    Yes, sir.

20     Q.    And did you in fact retrieve videotapes and provide
21 them to the Garland Police Department?

22     A.    Yes, sir.

23              MR. DAVIS:  May I approach, Your Honor.

24              THE COURT:  You may.

25     Q.    (By Mr. Davis)  Mr. Tollefsbol, State's Exhibit

1    Number 8, is this in fact the videotape that you provided to

2    the Garland Police Department showing different locations for

3    October 4th, the year 2000?

4        A.    Yes, sir.

5                    MR. DAVIS:  Your Honor, at this time we will

6    offer State's Exhibit Number 8.

7                    (State's Exhibit No. 8 offered)

8                    MR. BYCK:  No objection.

9                    THE COURT:  Admitted.

10                   (State's Exhibit No. 8 admitted)

11                   MR. DAVIS:  Ask permission to publish, Your

12   Honor.

13                   THE COURT:  You may.

14       Q.    (By Mr. Davis)  Mr. Tollefsbol, can you see the

15   television over here?

16       A.    Yes, sir.

17       Q.    The tape is now running, and can you tell us

18   generally -- can we see a time stamp of 2:10 with a few

19   seconds here recorded on the tape?

20       A.    Yes, sir, in the upper left-hand corner.

21       Q.    What are we looking at right here, that doorway?

22       A.    What is happening right now is when there are no

23   officers actually on the cameras, they place them on what's

24   called a sequence, which runs through each entryway on a

25   cycle.

1     Q.    Okay.  Do we see an individual now entering the

2  doorway?

3     A.    Uh-huh, yes, sir.

4     Q.    We see that individual now in the foreground, is

5  that correct, walking?

6     A.    Yes, sir.

7     Q.    And that was shortly after 2:10 p.m.; is that right?

8     A.    Correct.

9     Q.    We're now moving forward.  I believe the time is

10  somewhere in the neighborhood of 2:20; is that correct?

11     A.    I believe so, yes, sir.

12     Q.    We see another individual again, elderly woman in

13  light colored pants, correct?

14     A.    Yes, sir.

15     Q.    At 2:29.

16              (Tape ends.)

17     Q.    (By Mr. Davis)  So the individual that I had just

18  pointed out we saw her at the entryway at approximately 2:10

19  p -- 2:10 p.m., and then at another location -- where was

20  that second location we saw her at at 2:29?

21     A.    That was the upstairs mall entryway.

22     Q.    Mr. Tollefsbol, did you also at the Garland Police

23  Department's request retrieve a receipt showing a purchase

24  that had been made at 2:55 p.m.?

25     A.    Yes, sir.

1    Q.   And was that a receipt indicating that the purchase

2    had been made using a credit card belonging to a Frances

3    Connor?

4    A.   Yes, sir.

5    Q.   And did you provide that to the Garland Police

6    Department, also?

7    A.   Yes, sir, I did.

8              MR. DAVIS:   Pass the witness, Your Honor.

9              MR. BYCK:   We have no questions of this

10   witness.

11             THE COURT:   May he be excused, subject to

12   recall --

13             MR. BYCK:   No objection.

14             THE COURT:   -- should either side deem it

15   necessary?

16             MR. DAVIS:   No objection.

17             MR. BYCK:   No objection.

18             THE COURT:   Thank you.   You are excused,

19   subject to recall.

20             MR. DAVIS:   The State will call Kenneth

21   Clance.

22             (Witness brought forward.)

23             THE COURT:   Good morning.   May I ask you to

24   raise your right hand, please.

25             (Witness sworn.)

```
 1                    THE COURT:  Lower your hand.  Have a seat to
 2   my left, please.
 3                    THE COURT:  Mr. Davis.
 4                    MR. DAVIS:  Thank you.
 5                         KENNETH CLANCE
 6   was called as a witness by the State and, after having been
 7   first duly sworn, testified as follows:
 8                       Direct Examination
 9   By Mr. Davis:
10        Q.   Please tell us your full name.
11        A.   Kenneth Emerson Clance.
12        Q.   Mr. Clance, if you would, sit forward in that chair
13   and speak right into that microphone so everyone here on the
14   jury can hear you.
15             Where do you reside at this time?
16        A.   What's that?
17        Q.   Where do you live?
18        A.   Garland.
19        Q.   And how are you employed?
20        A.   I'm a bartender at Bleachers Sports Grill.
21        Q.   How long have you been employed there at Bleachers
22   Sports Grill?
23        A.   Three and a half years.
24        Q.   And where is Bleachers located?
25        A.   It's at the corner of Jupiter and Arapaho.
```

1   Q.   Is that in the city limits of Garland?

2   A.   Yes, sir.

3            MR. DAVIS:  May I approach, Your Honor.

4            THE COURT:  You may.

5   Q.   (By Mr. Davis)  Mr. Clance, first of all, State's

6   Exhibit Number 10, is that a photograph of Bleachers?

7   A.   Yes, sir.

8   Q.   Where you work?

9   A.   Yes.  Correct.

10           MR. DAVIS:  We'll offer State's Exhibit Number

11  10, Your Honor.

12           (State's Exhibit No. 10 offered)

13           MR. BYCK:  No objection.

14           THE COURT:  Admitted.

15           (State's Exhibit No. 10 admitted)

16           MR. DAVIS:  I'd like to publish briefly.

17           THE COURT:  Granted.

18  Q.   (By Mr. Davis)  I believe you said you had been

19  working there about three and a half years; is that right?

20  A.   Yes.

21           THE COURT:  Ladies and gentlemen of the jury,

22  all items of physical evidence both offered and admitted into

23  evidence you'll be allowed to take with you when you begin

24  your deliberations later on in the trial.

25  Q.   (By Mr. Davis)  Mr. Clance, State's Exhibit Number 3

DARLINE W. LABAR, OFFICIAL REPORTER

1     is a map.  Do you recognize the location on this map of

2     Jupiter and Arapaho?

3          A.   Yes, sir.

4          Q.   If you would, if you could just put an X and write

5     out beside it "Bleachers" to indicate the location of your --

6     your place of your employment.

7          A.   (Witness so indicates.)

8          Q.   Okay.  Thank you.

9               Now, Mr. Clance, I want to direct your attention

10    back to October the 4th, year 2000.  Were you working at

11    Bleachers that day?

12         A.   Yes, sir.

13         Q.   What were your duties that day as a bartender?

14         A.   Just normal lunch crowd serving drinks for happy

15    hour.

16         Q.   What time did you come on work that day?

17         A.   10:30.

18         Q.   10:30 in the morning?

19         A.   Yes, sir.

20         Q.   How long were you to stay that day?

21         A.   Until about 5:30 or 6:00.

22         Q.   Directing your attention to, oh, the time around

23    1:00, 1:30, were you at work at that time?

24         A.   Yes.

25         Q.   Were there a lot of patrons inside the bar?

Page 51

```
 1        A.    No, there weren't.

 2        Q.    How would you characterize it?  Was it a very light

 3   crowd that day?

 4        A.    Yes, about four or five people.

 5        Q.    And did an individual come in there that you later

 6   came to know as Jedidiah Murphy or Jim Murphy?

 7        A.    Yes.

 8        Q.    Do you see that person in the courtroom this

 9   morning?

10        A.    Yes, sir.

11        Q.    Could you please point out what he's wearing, where

12   he's sitting?

13        A.    A suit with a red tie.

14        Q.    Over here at the counsel table?

15        A.    Yes, sir.

16             MR. DAVIS:  Your Honor, may the record please

17   reflect this witness is identifying the defendant in open

18   court.

19        Q.   (By Mr. Davis)  Now, when -- when Mr. Murphy came in

20   there, was he with someone or was he by himself?

21        A.    By himself.

22        Q.    Had you seen him before inside the bar?

23        A.    I had seen him once before.

24        Q.    Had he been a customer up there?

25        A.    Yes, sir.
```

1    Q.    And so when he came in that day, it was a face that

2    you recognized, correct?

3    A.    Yes.

4    Q.    Did you know his name at the time?

5    A.    No, I didn't.

6    Q.    Did you know either first or last name?

7    A.    No.

8    Q.    And did he come in there and order something?

9    A.    Yes, he did.

10   Q.    Where was he sitting?  Was he -- do you have tables

11   there in the bar?

12   A.    Yes, sir.

13   Q.    Do you also have an actual bar where customers can

14   come and sit?

15   A.    Yes, I do.

16   Q.    Where did the defendant come and sit that day?

17   A.    He sat at the very corner of one of our credit card

18   machines.

19   Q.    Would that be at the bar?

20   A.    Yes.

21   Q.    And were you actually working behind the bar?

22   A.    Yes, I was.

23   Q.    Do you remember what the defendant ordered when he

24   came in?

25   A.    He ordered Jagermeister.

1     Q.   All right.  What exact -- what kind of drink is

2   Jagermeister?

3     A.   It's licorice liqueur.

4     Q.   And when he ordered that drink, first of all, did

5   you have a chance to look at the defendant and his

6   appearance, his demeanor that day?

7     A.   Yes, sir.

8     Q.   And would it be important for you to determine

9   whether someone who tried to order drinks from you was in

10   fact intoxicated?

11     A.   Yes.

12     Q.   What's the importance of that?

13     A.   A big fine, jail time.

14     Q.   If you serve someone --

15     A.   If you serve an intoxicated person.

16     Q.   Have you had training in observing people for signs

17   of intoxication?

18     A.   Yes, sir.

19     Q.   What sort of training have you undergone?

20     A.   TABC course.

21     Q.   And is that the Texas Alcoholic Beverage Commission?

22     A.   Yes, sir.

23     Q.   What sort of course do they put on for bartenders

24   and people who work in bars?

25     A.   Just to let everybody know about the signs of

```
 1    drunk -- of drunkness, stuff like that.

 2         Q.   And that's a course you had completed, right?

 3         A.   Yes, mandatory.

 4         Q.   When you looked at the defendant that day before you

 5    ever served him anything, was he showing any signs of being

 6    intoxicated?

 7         A.   No, sir.

 8         Q.   Bloodshot eyes?

 9         A.   No.

10         Q.   Slurred speech?

11         A.   No, sir.

12         Q.   Was he having trouble walking steady with his

13    balance?

14         A.   No, sir.

15         Q.   Have an odor on his breath or any odor of alcohol

16    about him?

17         A.   No, sir.

18         Q.   If he had been showing you any of those signs, would

19    you have served him that day?

20         A.   No.

21         Q.   So did you then give him a shot of Jagermeister?

22         A.   Yes.

23         Q.   Did he stay there at the bar to drink it?

24         A.   Uh-huh.

25         Q.   Okay.  You need to answer yes or no for the court
```

1    reporter.

2         A.   Yes.

3         Q.   Were there other customers there at the bar?

4         A.   Yes.

5         Q.   How many?

6         A.   About four or five.

7         Q.   During the time that the defendant was drinking

8    Jagermeister, did you have a chance to talk with him?

9         A.   Yes, I did.

10        Q.   And what was his demeanor?  Did he appear to be

11   upset, confused?  Was there anything that caught your

12   attention about the way he was acting that day?

13        A.   No, sir.

14        Q.   Do you remember what conversation that you did have

15   with him?

16        A.   He left his wallet in a cab, and I was calling the

17   cab company to try to retrieve his wallet.

18        Q.   All right.  Now, had he paid for the first shot of

19   Jagermeister?

20        A.   Yes, he did.

21        Q.   Did he pay with a credit card, cash, or how did he

22   pay?

23        A.   Cash.

24        Q.   How much did the drink cost?

25        A.   I believe it was 4.25.

1   Q.   So you had some conversation with him about the fact

2   that he had left his billfold in a cab?

3   A.   Yes, sir.

4   Q.   Do you remember any other conversations about where

5   the defendant might be going in the future?

6   A.   Yes, sir.  He said he was going to Miami to paint a

7   club.

8   Q.   He was going to Miami --

9   A.   Yes.

10   Q.   -- to paint a club?

11   A.   Yes.

12   Q.   Did he appear to be upset when he was telling you

13   that?

14   A.   No, sir.

15   Q.   Did he mention anything about going to Wills Point?

16   A.   No.

17   Q.   Did he mention anything about going to see his

18   daughter or his ex-wife?

19   A.   No.

20   Q.   So the only location that he told you about was

21   going to Miami to paint a club, correct?

22   A.   Yes.

23   Q.   Did he order any other drinks from you?

24   A.   He ordered one more shot.

25   Q.   Same kind?

1      A.   Same kind.

2      Q.   And did he pay for this second shot of Jagermeister?

3      A.   No, sir.

4      Q.   Why not?

5      A.   He said he would be right back and walked out the

6  door and I never saw him again.

7      Q.   So he left the bar without paying you?

8      A.   Yes, sir.

9      Q.   He said he was going to be right back?

10     A.   Yes.

11     Q.   When you saw him walk out, was he having trouble

12  walking?

13     A.   No.

14     Q.   Did he appear to be unsteady?

15     A.   No.

16     Q.   After the two shots of Jagermeister -- Did he

17  actually drink the second shot?

18     A.   Yes.

19     Q.   After the second shot of Jagermeister, did you

20  believe that he was intoxicated at that time?

21     A.   No, I didn't.

22     Q.   Was he having difficulty speaking with you?

23     A.   No.

24     Q.   Was he having any trouble appearing to understand

25  what you were saying to him?

```
1      A.    No.

2      Q.    And you said that you agreed to call the cab

3   company; is that right?

4      A.    Yes, sir.

5      Q.    Did you actually call a cab company for him?

6      A.    Yes, I did.

7      Q.    And was the defendant still there at the bar when

8   you finished talking with the cab company?

9      A.    Yes, he was.

10      Q.    And was it then after that that he left the --

11      A.    Yes.

12      Q.    -- the bar.

13            Did he have anything with him?

14      A.    Not inside.

15      Q.    Okay.  I'm referring -- duffle bag with him?

16      A.    No, sir.

17      Q.    Any bags or plastic bags, anything of that sort?

18      A.    No, sir.

19      Q.    Did he leave by himself or with someone?

20      A.    By himself.

21      Q.    Did he appear -- did he appear to be having some

22   sort of mental problems or being very upset when he left the

23   bar?

24      A.    No, he didn't.

25      Q.    Had his demeanor changed at all from the time that
```

```
 1   he first came in there?
 2        A.   No.
 3        Q.   Did you ever see the defendant again that day?
 4        A.   No, I didn't.
 5        Q.   Later did you see the defendant's picture on
 6   television?
 7        A.   Yes.
 8        Q.   And did you later talk with the Garland Police
 9   Department?
10        A.   Yes, I did.
11        Q.   And did you essentially tell them what you've told
12   the members of the jury about your actions with the defendant
13   that day?
14        A.   Yes.
15        Q.   Have you had an opportunity to talk with any of the
16   attorneys representing the defendant?
17        A.   Yes.
18        Q.   Which of these attorneys have you talked to?
19        A.   The gentleman on the end.
20        Q.   Mr. Byck?
21        A.   Yes.
22        Q.   And do you recall how long ago that meeting took
23   place?
24        A.   It was a few days ago.
25        Q.   And did you tell him essentially the same thing that
```

1 | you've told us?

2 |     A.   Yes, I did.

3 |     Q.   Just approximately how long do you think that the

4 | defendant stayed in your bar that day?

5 |     A.   About 25, 30 minutes.

6 |           MR. DAVIS:  Thank you, Mr. Clance.

7 |           I'll pass the witness, Your Honor.

8 |           THE COURT:  Are there any documents generated

9 | by Mr. Clance to which the defense is entitled for

10 | cross-examination?

11 |     Q.   (By Mr. Davis)  Mr. Clance, you didn't give an

12 | actual written statement, did you?

13 |     A.   No, sir.

14 |     Q.   Just talk to the police department?

15 |     A.   Yes, sir.

16 |           MR. DAVIS:  We're not aware of any written

17 | statements at this time, Your Honor.

18 |           THE COURT:  Thank you.

19 |           Mr. Byck.

20 |           <u>Cross-Examination</u>

21 | By Mr. Byck:

22 |     Q.   Mr. Clance, again my name is Mike Byck.   You

23 | remember me?

24 |     A.   Yes.

25 |     Q.   I saw you a couple of weeks ago.

1      A.   Yes.

2      Q.   When Jim came into that bar, describe the bar as

3   best you can for the jury.   Describe the physical setup of

4   it.

5      A.   Physical setup.   There's a big room when you walk in

6   to the right, a smaller build up, and the bar straight ahead.

7      Q.   And that bar has seats, if I'm not mistaken, around

8   three sides of it?

9      A.   Yes.

10      Q.   Then there's liquor against the fourth side?

11      A.   Yes, sir.

12      Q.   Now, if you were standing behind the bar to your

13   left and back would be -- is that where the credit card

14   machine is?

15      A.   If I'm looking at the back wall where the liquor

16   is?

17      Q.   No, if you're looking -- looking at -- Otherwise,

18   we're going to get real confused with right and left.   If

19   you're looking out from the bar, away from the liquor --

20      A.   Yes.

21      Q.   -- that would be off to your left?

22      A.   It would be off to my left.

23      Q.   And do you remember where the other three or four

24   people were seated while Jim was in that bar or --

25      A.   I believe there were two in the very front corner,

DARLINE W. LABAR, OFFICIAL REPORTER

Page 62

1    the left front corner, and there were three on the far side.

2        Q.   And the seat that Jim took was -- first of all, it

3    was right up against a wall, wasn't it?

4        A.   Yes.

5        Q.   It's not a very desirable seat, is it?

6        A.   No, it's not.

7        Q.   Did he always sit there?

8        A.   No.

9        Q.   But he did sit there that day?

10       A.   Yes, he did.

11       Q.   He didn't talk to anybody else, did he?

12       A.   No, sir.

13       Q.   Did he make any efforts at conversation or --

14       A.   No.

15       Q.   -- join in any general discussions or anything?

16       A.   No, sir.

17       Q.   Okay.  And I believe you said that you saw Jim's

18   picture on television the next day?

19       A.   Yes.

20       Q.   Did you call the police, or did they come to you?

21       A.   They came in that day.

22       Q.   They came that day?

23       A.   Yes.

24       Q.   Thank you, Mr. Clance.

25                  MR. BYCK:  Pass the witness.

1          MR. DAVIS:  No further questions, Your Honor.

2          THE COURT:  May he be excused, subject to

3    recall?

4          MR. DAVIS:  No objection.

5          MR. BYCK:  No objection.

6          THE COURT:  Thank you, Mr. Clance.  You are

7    excused, subject to recall.

8          MR. DAVIS:  The State will call Monty Dunn.

9          (Witness brought forward.)

10          THE COURT:  Raise your right hand, please.

11          (Witness sworn.)

12          THE COURT:  Have a seat to my left, please.

13       Mr. Davis.

14          MR. DAVIS:  Thank you.

15                 MONTY CARL DUNN

16   was called as a witness by the State and, after having been

17   first duly sworn, testified as follows:

18                 Direct Examination

19   By Mr. Davis:

20       Q.   Sir, please tell us your full name.

21       A.   Monty Carl Dunn.

22       Q.   Mr. Dunn, how are you employed?

23       A.   I'm the security manager for Washington Mutual Bank,

24   Texas regions.

25       Q.   All right.  And what are your duties and

1    responsibilities in that regard?

2        A.    I handle both physical security and investigations

3    for the bank.   That would include alarm problems, things

4    likes that, camera situations, and also any type of fraud

5    that would happen.

6        Q.    Does Washington Mutual have several locations here

7    in the Dallas/Fort Worth area?

8        A.    Yes, sir, we do.

9        Q.    Are you familiar with those locations?

10       A.    Yes, sir, I am.

11       Q.    Specifically back on October the 4th, year 2000, did

12   Washington Mutual have a branch located at 1225 East Belt

13   Line Road in Richardson, Texas?

14       A.    Yes, sir, we do -- we did.

15              MR. DAVIS:   May I approach, Your Honor.

16              THE COURT:   You may.

17       Q.    (By Mr. Davis)   Mr. Dunn, if you would, State's

18   Exhibit Number 11, is this a photograph of the branch that we

19   just referred to at 1225 East Belt Line in Richardson, Texas?

20       A.    Yes, sir, it is.

21              MR. DAVIS:   Your Honor, at this time we'll

22   offer State's Exhibit Number 11.

23              (State's Exhibit No. 11 offered)

24              MR. BYCK:   No objection to State's 11.

25              THE COURT:   Admitted.

DARLINE W. LABAR, OFFICIAL REPORTER

1               (State's Exhibit No. 11 admitted)

2                MR. DAVIS:  Permission to publish, Your Honor.

3                THE COURT:  Granted.

4     Q.   (By Mr. Davis)  Sir, State's Exhibit Number 11, does

5  the Washington Mutual have an ATM machine?

6     A.   Yes, sir, it does.

7     Q.   Is that basically where I'm pointing at this time on

8  the side of the building?

9     A.   Yes, sir.  It would be on the east side.

10    Q.   Mr. Dunn, the ATM machine, would that take -- for

11  instance, if we looked at State's Exhibit Number 6, the

12  credit card issued by Washington Mutual MasterCard, could you

13  access that ATM machine with a card similar to State's

14  Exhibit Number 6?

15    A.   Yes, sir.  You can get the card in there.  The

16  access, you'd have to define that.

17    Q.   Well, could you actually obtain cash?

18    A.   If you had the proper identification to go with

19  that, like a PIN number, yes, you could.  That type of card,

20  along with a PIN number will allow you to get cash.

21    Q.   So if I went up to that machine -- if I place the

22  machine into the -- if I place the card into the machine, I

23  would still be required or I would be requested to give a

24  personal identification number, right?

25    A.   Yes, sir, that's correct.

Page 66

1    Q.   If I had it, if I punched it in, actually be able to

2  get cash, correct?

3    A.   Yes, sir, assuming there was cash in the account.

4  Yes, sir.

5    Q.   And if I didn't have that PIN though, what sort of

6  message would come back to me?

7    A.   The first message would come back and ask you for

8  the PIN.  If you failed to put in the proper PIN, it would

9  default and would not allow you to get cash.  Say "unable to

10  process."

11    Q.   Okay.  Mr. Dunn, looking at State's Exhibit Number 3

12  which is a map showing North Garland, Richardson, as well as

13  part of Plano, looking at Belt Line, this -- the intersection

14  that this branch is located, would it be fair to say that

15  it's near the intersection of Plano Road and Belt Line?

16    A.   Yes, sir.

17    Q.   Just to the west; is that correct?

18    A.   Correct.

19    Q.   If we look here on this map, looking at Belt Line,

20  at Plano, could you place an X here with a notation

21  Washington Mutual just to show the jurors where this branch

22  is located?

23    A.   This is Belt Line here.

24    Q.   Correct, yes, sir.

25    A.   About right in here.

1    Q.   Okay.  Just place an X there.  Yes, sir.

2    A.   It's right on the corner.

3    Q.   Okay.  Just Washington Mutual if you don't mind.

4  Okay.  Thank you.  And you've put a star with W --

5    A.   W-A, Washington Mutual.

6    Q.   WaMu.  Okay.

7    A.   Yes, sir.

8    Q.   I think didn't you just take in Bank U, also?

9    A.   Yes, sir.

10   Q.   Okay.  I thought I saw that.

11           MR. DAVIS:  May I publish just briefly, Your

12  Honor?

13           THE COURT:  You may.

14           MR. DAVIS:  The locations for Bleachers and

15  for Washington Mutual branch that day.

16           (Map published to jury.)

17   Q.   (By Mr. Davis)  Again, sir, if I went up there and I

18  attempted to get cash from the machine, but I was

19  unsuccessful, would that machine actually generate a report

20  to my credit card company indicating that I made an attempt

21  for cash?

22   A.   It would actually show a denial and that would be

23  reported to Visa, MasterCard, whichever particular company

24  that you would be using.

25           MR. DAVIS:  Thank you, Mr. Dunn.

1       I pass the witness, Your Honor.

2                   Cross-Examination

3   By Mr. Byck:

4       Q.    Mr. Dunn, the ATM machine will not keep the credit

5   card if an invalid PIN or no PIN is submitted; is that

6   correct?

7       A.    Not unless the card -- if the card has been reported

8   stolen and that's coded in some cases -- and that usually

9   takes a 24-hour period, it can do that.  That is not an

10  automatic thing, no, sir.

11      Q.    Does the ATM machine at 1225 East Belt Line Road

12  near Plano Road have any video capabilities?

13      A.    The answer is, yes, it does now.  At that time it

14  did not.

15      Q.    Thank you, sir.

16      A.    We had purchased a savings and loan and had not

17  upgraded it at that time.  It has all been upgraded now.

18      Q.    And I take it a transaction where cash was sought to

19  be obtained off that card without the proper PIN number would

20  not be a transaction that would be reduced to paper where

21  anybody would handle it at the time the transaction was

22  attempted; is that correct?

23      A.    Yes, sir.  It only shows that that occurred at that

24  time.  You can go in and access it on the computer if you

25  wait 30 days and that disappears because there was no actual

1    transaction that occurred.

2        Q.    I see.

3                    MR. BYCK:  Thank you, sir.  Pass the witness.

4                    MR. DAVIS:  No further questions.

5                    THE COURT:  May Mr. Dunn be excused, subject

6    to recall?

7                    MR. DAVIS:  No objection.

8                    MR. BYCK:  No objection.

9                    THE COURT:  Thank you.  You are excused, sir.

10                   THE WITNESS:  Thank you.

11                   THE COURT:  You're welcome.

12          The State may continue.

13                   MR. DAVIS:  The State will call Sandra Mamot.

14                   (Witness brought forward.)

15                   THE COURT:  Good morning.  Raise your right

16    hand, please.

17                   (Witness sworn.)

18                   THE COURT:  Thank you.  Invite your taking a

19    seat to my left, please.

20          You may want to pull the microphone down a little

21    bit.  You're not going to break it.  Just pull it closer to

22    you.  Thank you.

23          Mr. Davis.

24                        SANDRA JO MAMOT

25    was called as a witness by the State and, after having been

1    first duly sworn, testified as follows:

2                        Direct Examination

3    By Mr. Davis:

4        Q.   Would you please tell us your full name?

5        A.   Sandra Jo Mamot.

6        Q.   And spell your last name for the court reporter,

7    please.

8        A.   M-a-m-o-t.

9        Q.   Ms. Mamot, where do you live?

10       A.   At 2023 Portsmouth in Richardson.

11       Q.   Are you married?

12       A.   Yes.

13       Q.   Do you have children?

14       A.   Yes.

15       Q.   How many children are living with you at that

16   location?

17       A.   I have two children.

18       Q.   What are their names?

19       A.   Zach and Monica.

20       Q.   What is Monica's age?

21       A.   11.

22       Q.   And what is Zach's age?

23       A.   14.

24       Q.   Now, this past school year, was Zach attending

25   school in Richardson?

1    A.   Yes.

2    Q.   Where was he attending school?

3    A.   Apollo Junior High.

4    Q.   Are you employed?

5    A.   Yes.

6    Q.   How are you employed?

7    A.   I'm a kindergarten teacher in Dallas.

8    Q.   Okay.  Ms. Mamot, let me direct your attention back

9  to October 4th, 2000, approximately 5:30 p.m. that day, were

10  you home?

11    A.   Yes.

12    Q.   Was anyone else at home with you?

13    A.   Yes, Zach was with me.

14    Q.   Had he gotten home from school then?

15    A.   Yeah.

16    Q.   Did someone come over to your home that afternoon

17  asking for Zach?

18    A.   Yes.

19    Q.   Who was that?

20    A.   Well, Uncle Jim had called.  He called him.

21    Q.   Okay.  Zach referred to this person as Uncle Jim?

22    A.   Uh-huh.

23    Q.   You need to answer out yes or no for the court

24  reporter.

25    A.   I'm sorry, yes.

1      Q.   Thank you.   Do you see that person in the courtroom

2  this morning?

3      A.   Yes.

4      Q.   All right.   And what is he wearing?

5      A.   A suit --

6      Q.   What --

7      A.   -- a dark suit.

8      Q.   What color tie?

9      A.   Red.

10          MR. DAVIS:   Your Honor, may the record please

11  reflect this witness is identifying the defendant in open

12  court.

13     Q.   (By Mr. Davis)   Has his appearance changed from when

14  he came over to your home on October the 4th?

15     A.   Yes.

16     Q.   How has it changed?

17     A.   Well, I think -- I don't know, just maybe longer

18  hair.

19     Q.   Do you remember him wearing that style of glasses?

20     A.   No.   No.

21     Q.   So different glasses, and his hair style and length

22  is now different; is that right?

23     A.   Yes.

24     Q.   What was his hair style back then?

25     A.   I think it was just longer.

1     Q.    Had you seen the defendant before he came over that

2    day?  Had you ever met him before, seen him?

3     A.    Once.

4     Q.    Do you recall where that had been?

5     A.    It was walking in our neighborhood.

6     Q.    Do you know whether or not anyone was with the

7    defendant when he came over?

8     A.    His niece was in the car.

9     Q.    Do you know her name to be Ashley?

10     A.    Uh-huh.  Yes.

11     Q.    Okay.  Had you met Ashley before?

12     A.    Oh, yes.

13     Q.    How did you know Ashley?

14     A.    Ashley is a good friend of Zach's.

15     Q.    Did you know where Ashley was living?

16     A.    Yes.

17     Q.    Where was that?

18     A.    Well, it was -- I don't know the name of the

19    street.  It was close to our house, in the neighborhood close

20    to our -- where we live.

21     Q.    Did you know Ashley's mother, Tonya Thorp?

22     A.    I just think I just met her once.

23     Q.    Did the defendant come walking up to the house, or

24    was he driving an automobile when he came up there that day?

25     A.    He was driving, and then he walked up -- up to the

 1   house.

 2       Q.   What kind of car did he come up in that day?

 3       A.   A light colored car.  I didn't really notice.

 4       Q.   Do you think you would be able to identify it if you

 5   saw it again, or did you really just not take that much

 6   notice?

 7       A.   I don't really -- no, I don't pay that much

 8   attention.

 9       Q.   Did you have a conversation with him?

10       A.   Yes.

11       Q.   And what did the two of y'all talk about?

12       A.   Well, he just asked for Zach and -- well, I don't

13   really remember.  I think nothing important.  He just was

14   waiting for Zach.

15       Q.   Okay.  Why did he want to talk with Zach?

16       A.   Well, he was picking up Zach.  He was going to take

17   Ashley and Zach and a friend shopping.

18       Q.   Did -- did the defendant appear to be intoxicated to

19   you when you spoke with him that afternoon?

20       A.   No.

21       Q.   Did he appear to be unsteady on his feet, or did he

22   smell of alcohol when you talked with him?

23       A.   No.

24       Q.   Was he acting unusual in any way?

25       A.   No.

1      Q.    How would you describe his demeanor, upset, calm,

2    happy?

3      A.    He just seemed like he was in a hurry, kind of

4    rushed.

5      Q.    Uh-huh.  If you had thought there had been something

6    wrong with the defendant, perhaps he had been intoxicated,

7    would you have -- would you have allowed your son to go with

8    him that day?

9      A.    No.

10     Q.    Did you end up actually letting Zach go with him?

11     A.    Yes, I did.

12     Q.    And while you're talking with -- with the defendant,

13   did he mention anything about going to visit his ex-wife or

14   his daughter that day?

15     A.    Not that I remember.

16     Q.    He make any mention of having amnesia that day?

17     A.    No.

18     Q.    So you let your son go, and this is sometime after

19   5:30 that day; is that correct?

20     A.    Yes, uh-huh.

21     Q.    Okay.  Did you stay at the home, or did you go

22   somewhere later on?

23     A.    Well, I took -- I went to my daughter's -- to a

24   football game with my daughter.

25     Q.    Okay.  Where was that?

1      A.   It was over at Huffhines.

2      Q.   And Huffhines Park, is that in Richardson?

3      A.   Yes.

4      Q.   In relationship to Richardson Square Mall, is that,

5  what, about a mile north?

6      A.   Yes.

7      Q.   And when you got there, at some point did you see

8  your son and the defendant again while you were at Huffhines

9  Park?

10      A.   Yes, they came over on two Go-Peds.

11      Q.   When you're talking about Go-Peds, if you could just

12  describe them to the jury.  What are we talking about there?

13      A.   They're scooters with a little motor on the back.

14      Q.   And when you say they came up on these -- on these

15  Go-Peds, were they actually riding them?

16      A.   Yes, they were riding them.

17      Q.   Did you have a chance to talk with your son and with

18  the defendant again?

19      A.   Yes.

20      Q.   And what did y'all discuss?

21      A.   Well, they had these Go-Peds, and he said that he

22  had bought them and he had bought one for Zach.

23      Q.   And this is the defendant talking to you, correct?

24      A.   Yes.

25      Q.   What was your reaction to that?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Well, I was just shocked.  I mean, I couldn't

2  imagine why he would buy Zach a -- you know, they're

3  expensive Go-Peds, and I didn't see any reason.  It just

4  didn't seem appropriate to me, so I just --

5    Q.   Did your son want to keep his?

6    A.   Oh, yes.

7    Q.   And what was -- what was your response when he said

8  that to you?

9    A.   Well, I just told him that it was really too much or

10  it was too generous and I -- you know, I said that he could

11  ride it, but we would have to talk to his dad is how I left

12  it.

13    Q.   When you were talking with the defendant this time

14  there at the park, was there anything unusual about his

15  behavior?  Had his behavior or his demeanor changed in any

16  way?

17    A.   No.

18    Q.   Still seemed to be okay to you?

19    A.   He seemed okay to me.

20    Q.   Did you have any concerns about your son staying

21  with him?

22    A.   No.

23    Q.   How long did you stay -- well, first of all, did the

24  defendant and your son leave the park then?

25    A.   They left on the Go-Peds back to our house.  Zach --

1    Zach was just going to go home.

2         Q.   Uh-huh.  Did you return home?

3         A.   Yes.

4         Q.   And when you go home, was your son Zach there?

5         A.   He wasn't there and -- which kind of worried me, but

6    in a few minutes I heard the Go-Ped and he had been out

7    riding around on it, so he came home.

8         Q.   Okay.  Was the defendant still with him, or had he

9    left?

10        A.   No, he wasn't there.

11        Q.   Now, the next day on October the 5th, 2000, did the

12   Garland Police Department come over to your home?

13        A.   Yes.

14        Q.   And did they take possession of the Go-Ped that your

15   son had?

16        A.   Yes.

17        Q.   Did they also look outside your home for evidence of

18   blood?  Did y'all discuss that with the police?

19        A.   I think they did, yes.

20        Q.   Is it possible that they may have actually collected

21   samples from out around your home or you're not sure?

22        A.   I'm not sure.  I don't know.

23        Q.   Did you tell the police generally what you have told

24   the members of the jury about what you had seen and heard on

25   October the 4th?

---

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Yes.

2    Q.   Did they ask you to give any kind of written

3  statement, or did they simply talk with you?

4    A.   Oh, I didn't talk to the police.  My son talked to

5  the police.  I'm sorry.

6    Q.   So actually Zach was the one that was talking with

7  them the next day?

8    A.   Right.

9    Q.   And this address at Portsmouth, what would be the

10  major intersections near your home?

11    A.   Campbell and Jupiter.

12             MR. DAVIS:  May I approach, Your Honor.

13             THE COURT:  You may.

14    Q.   (By Mr. Davis)  Ms. Mamot, looking at State's

15  Exhibit Number 3, and we see several intersections here.  We

16  see Campbell Road.  We see Plano Road.  If you could, if you

17  could just put an X in a general location where your home at

18  Portsmouth would be.

19    A.   (Witness so indicates.)

20    Q.   And if you could just write "Mamot" out by the side.

21    A.   (Witness so indicates.)

22    Q.   Okay.  Thank you.

23             MR. DAVIS:  I'll pass the witness, Your Honor.

24             THE COURT:  Mr. Byck.

25             MR. BYCK:  Thank you, Your Honor.

<u>Cross-Examination</u>

By Mr. Byck:

Q.   Ms. Mamot, my name is Mike Byck.  I represent Jim
Murphy.

You say you only saw Jim one other time?

A.   Yes.

Q.   And did you talk to him for any length of time?

A.   No.

Q.   Your kids called, or Zach called him Uncle Jim?

A.   Yes.

Q.   Is that right?   Is that because Ashley called him
Uncle Jim?

A.   I think so.

Q.   Okay.  Did -- how long was it before this incident
you were aware of Jim Murphy?  Were you -- obviously
Ashley -- or Zach told you about him hanging out with them;
is that correct?

A.   Yes, Zach would go over to Ashley's house.

Q.   Uh-huh.

A.   And he was there -- he was there when Zach would go
over there.

Q.   Now, naturally you're concerned about the people
that your children are around?

A.   Yes.

Q.   Of course.  And you asked Zach about Uncle Jim?

1    A.    Yes.

2    Q.    What did Zach tell you?

3    A.    That he was Ashley's uncle and that he would play

4  basketball with him sometimes when they -- he and his friends

5  would go over to Ashley's.

6    Q.    Did he say anything else you can remember about him?

7    A.    Just he seemed to like him.

8    Q.    Okay.  Didn't tell you anything that caused you any

9  concern or alarm or suspicion or anything like that?

10    A.    No.

11    Q.    Okay.  Now, when you saw Jim the second time, you

12  saw him drive up to your house; is that right?

13    A.    Yes.

14    Q.    And was there anything peculiar or strange about the

15  way he drove up, parked the car?

16    A.    Well, I didn't see him drive up and park the car.  I

17  looked out the window and the car was sitting out there.

18    Q.    Okay.  And you came out and talked to him?

19    A.    He came into the house.

20    Q.    He came into the house.  Approximately how far away

21  from you was he at his closest?

22    A.    Well, he was right in the house.  I guess to the end

23  of this corner right here.

24    Q.    Three, four feet away; is that fair?

25    A.    Yeah.

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.   And you had an occasion to observe him close up?

2     A.   Yes.

3     Q.   And you saw nothing that -- what's -- what's the

4  expression, that would appear on your radar?  You didn't see

5  anything that you noticed, anything that struck you as odd,

6  anything like that?

7     A.   No.

8     Q.   Okay.  Definitely did not smell any alcohol?

9     A.   No, I didn't.

10    Q.   I couldn't imagine you allowing your son to leave

11  with somebody in an automobile if you smelled alcohol; is

12  that correct?

13    A.   Yes.

14    Q.   Okay.  And you said that Jim was in a hurry or

15  seemed in a hurry; is that right?

16    A.   Yes.

17    Q.   Describe how he appeared that way to you.  Did he

18  talk quickly, or did he make quick gestures, or was he

19  abrupt?  How in your description did he appear to be in a

20  hurry?

21    A.   I guess he just talked kind of fast, and I thought

22  he came up to tell -- to get Zach to hurry.

23    Q.   Okay.  He wanted Zach to hurry along with him?

24    A.   Yes.

25    Q.   Okay.  Anything else that you can think of, Ms.

1    Mamot, anything at all that happened out there?

2       A.   No.

3       Q.   Okay.  Where did he park his car in front of your

4    house?  Literally right in front of it?

5       A.   Right in front of the house.

6       Q.   Okay.  And not in the driveway?  Or do y'all have a

7    driveway?

8       A.   Our driveway is in the back.

9       Q.   In the back.  When you saw him later on with your

10   son driving the mopeds -- Go-Peds, whatever they are, did you

11   notice anything peculiar about the way they were driving?

12      A.   No.

13      Q.   Had you seen your -- ever seen your son drive a

14   Go-Ped before?

15      A.   No.

16      Q.   I imagine like every other athletic 14-year-old, he

17   did it very well?

18      A.   Yes.

19      Q.   Okay.  Did you get the same impression about Jim, or

20   did you get any impression at all about whether -- how he was

21   driving it or how well or anything like that?

22      A.   No, I just heard the sound of the motor, and I

23   turned around, they just pulled right up.  So I really didn't

24   see them and they just -- when they left, they just pulled

25   away and --

```
 1        Q.    Okay.  And during the brief conversation that you

 2    had, did you smell any alcohol on Jim?

 3        A.    No.

 4        Q.    Did you notice anything strange?

 5        A.    No, other than that he bought my son this Go-Ped.

 6        Q.    An expensive Go-Ped.  I imagine you were quite

 7    concerned about that?

 8        A.    Yes.

 9        Q.    When you asked him, well, Jim, do you have the

10    money, or, Jim, do you think this is right, or I don't think

11    this is right or whatever you said to him, I mean, parental

12    concerns you expressed to him, did he respond appropriately?

13    Did he say, oh, that's okay, I have enough money or I wanted

14    to give it to him, or it was a special event or anything like

15    that?

16        A.    He -- I think he said he would be offended if we

17    didn't take it and that he could afford to buy it.  I don't

18    know what his exact words were.

19        Q.    I understand.  That was the sum and substance of

20    what he said?

21        A.    Yes.

22        Q.    Did it allay your concern, or I noticed when you

23    talked to Mr. Davis, you said, well, we finally left it up to

24    his father.  So did you just say to your son when you get

25    back to the house, put the Go-Ped up and don't use it anymore
```

1   and we'll talk about it later, or what do you recall saying?

2       A.   I just said he can ride it.  He can borrow it.  He

3   could ride it.  So I didn't know, you know, if it would be at

4   the house.  If he would leave it at the house or not.

5       Q.   Okay.  And finally, did Jim have anything further to

6   say to you about where the Go-Ped should be kept or that he

7   should have it or any parting shots as he left?

8       A.   No, I think we just left it at that.

9       Q.   Okay.  And you don't remember if anybody happened to

10  have fallen off one of those Go-Peds that you knew about?

11      A.   Not that I know of.

12      Q.   Thank you, Ms. Mamot.

13               MR. BYCK:  We'll pass the witness, Your Honor.

14               MR. DAVIS:  No further questions.

15               THE COURT:  May she be excused, subject to

16  recall?

17               MR. DAVIS:  No objection.

18               MR. BYCK:  No objection.

19               THE COURT:  Thank you, Ms. Mamot.  You are

20  excused, subject to recall.

21           The State will continue.

22               MR. DAVIS:  The State will call Zachery Mamot.

23               (Witness brought forward.)

24               THE COURT:  Ask you to raise your right hand,

25  please, sir.

```
1              Zach, if you'd have a seat up there, please.

2                   THE WITNESS:  Yes, sir.

3                   THE COURT:  You may want to pull the

4    microphone down a little bit.  Talk right into the microphone

5    for the benefit of the jury.

6                   THE WITNESS:  All right.

7                        ZACHERY MAMOT

8    was called as a witness by the State and, after having been

9    first duly sworn, testified as follows:

10                      Direct Examination

11   By Mr. Davis:

12       Q.   Tell us your name, please.

13       A.   Zach Mamot.

14       Q.   And, Zach, where do you live?

15       A.   My address?

16       Q.   Yes, sir.

17       A.   2023 Portsmouth.

18                  THE COURT:  Excuse me.  Zach, allow the court

19   reporter to give you a Kleenex to spit out your gum.  Thank

20   you.

21       Q.   (By Mr. Davis)  So you live there with your mother

22   and father; is that right?

23       A.   Yes, sir.

24       Q.   Last year what grade did you attend?

25       A.   8th.
```

1       Q.    Were you going to Apollo Middle School in

2    Richardson?

3       A.    Yes.

4       Q.    Where are you going to go this year now?

5       A.    It's still Apollo.

6       Q.    So they've got 7th, 8th, and 9th grade over there?

7       A.    Yes, sir.

8       Q.    Zach, do you know the person seated down here with

9    the blue coat and the red tie?

10      A.    Yes, sir.

11      Q.    What do you know his name to be?

12      A.    Jim.

13      Q.    Do you know what his last name is?

14      A.    Murphy.

15      Q.    Jim Murphy is how you know him?

16      A.    Yes, sir.

17            MR. DAVIS:  Your Honor, may the record please

18   reflect this witness is identifying the defendant in open

19   court.

20      Q.    (By Mr. Davis)  How did you -- how did you meet Jim

21   Murphy?

22      A.    My friend Ashley called me one day and told me that

23   her Uncle Jim was in town and just wanted me to meet him and

24   so I went over there.

25      Q.    Is this Ashley Johnson?

```
 1      A.    Oh, yes.

 2      Q.    So you actually went to school with Ashley, right?

 3      A.    Oh, yes.

 4      Q.    Did you go over there and meet Ashley and her uncle

 5 then?

 6      A.    Yes.

 7      Q.    Do you know about what time this would have been?

 8 Was this in -- was this last year sometime?

 9      A.    I think it was before, like the previous year.  I

10 met him a year back.

11      Q.    Did you see -- did you see the defendant on other

12 occasions?

13      A.    Yes, sir.

14      Q.    How many -- how many other times had you seen or

15 been with the defendant then?

16      A.    A lot of times.  I lost count.

17      Q.    What would y'all do when you got together?

18      A.    Play basketball, football, just stuff.

19      Q.    A lot of physical things?

20      A.    Yeah, sports.

21      Q.    The defendant, did he ever have any problems playing

22 those sports with you?

23      A.    Huh-uh.

24      Q.    You need to say yes or no for the court reporter.

25      A.    No, sir.
```

```
 1      Q.    Would he shoot the basketball with you?

 2      A.    Yes, sir.

 3      Q.    Would he throw and catch the football with you?

 4      A.    Yes, sir.

 5      Q.    Did he ever tell you that he couldn't do that

 6   because his left hand was hurt so bad that he couldn't feel

 7   anything in his hand or he couldn't play basketball or

 8   football with you?

 9      A.    He told me his left hand was hurt, but I thought he

10   was right handed.

11      Q.    He have any problems playing with you, though?

12      A.    No, sir.

13      Q.    I want to direct your attention to October the 4th,

14   2000, and about 5 o'clock that day did you arrive at home?

15      A.    Yes, absolutely.

16      Q.    So you had football practice that day, right?

17      A.    Yes, sir.

18      Q.    Was anybody home when you got there?

19      A.    My mom.

20      Q.    Sometime later did the defendant come over and talk

21   with you?

22      A.    Yes.

23      Q.    And what did he want to do with you?

24      A.    He told me he got a new car that his girlfriend

25   bought him and he just wanted to see if I wanted to go ride
```

1   with him.

2       Q.   So he said that his girlfriend had given him a new

3   car; is that right?

4       A.   Yes, sir.

5       Q.   Was anybody with him?

6       A.   Yes, Ashley.

7       Q.   Did you talk with your mom about whether it would be

8   okay to go with him or not?

9       A.   Yes.  He came in the house and talked to my mom,

10  too.

11      Q.   And did your mom then let you go with him?

12      A.   Yes.

13      Q.   Did you get to see the car that he was driving?

14      A.   Yes, I was in it.

15           MR. DAVIS:  May I approach, Your Honor.

16           THE COURT:  You may.

17      Q.   (By Mr. Davis)  Zach, State's Exhibit Number 7, the

18  automobile shown in this photograph, does that appear to be

19  the same automobile that the defendant was driving over to

20  your mother's house on October the 4th of 2000?

21      A.   Yes, sir.

22           THE REPORTER:  I need you to keep your voice

23  up real loud.  Okay?

24           THE WITNESS:  Yes, ma'am.

25      Q.   (By Mr. Davis)  Yeah, if you would, Zach, make sure

1   that you keep it up loud enough so this last juror down here

2   can hear.   Okay?

3        A.   Okay.

4        Q.   That did appear to be the same car, right?

5        A.   Yes.

6        Q.   So did you get in the car with the defendant?

7        A.   Yes, sir.

8        Q.   Was he driving?

9        A.   Yes, sir.

10       Q.   Where were you sitting in the car?   Do you remember?

11       A.   Behind the passenger seat in the back seat.

12       Q.   And where was Ashley sitting?

13       A.   Front seat, passenger.

14       Q.   Did y'all start -- did you just start riding around

15   that day?

16       A.   No.   Actually we turned around and we were going

17   north -- yeah, north on Jupiter.   And then at the

18   intersection of Renner and Jupiter there is a gas station and

19   we stopped and he got himself a six-pack of beer and I think

20   a pack of cigarettes.

21       Q.   Okay.   Where did y'all go next?

22       A.   We went to -- looking for Ryan Hammonds.   We were --

23   we thought he was at Cliff's house, Cliff Cobble, our friend,

24   so we went to his house and he wasn't -- he wasn't at Cliff's

25   house.

1    Q.   Is Ryan a friend of yours?

2    A.   Yes, sir.

3    Q.   Did Ashley also know him?

4    A.   Yes.

5    Q.   And did the defendant know him, too?

6    A.   Yes.

7    Q.   But you say that Ryan wasn't at home or wasn't at

8    Cliff's house?

9    A.   He wasn't at Cliff's house.

10   Q.   Where else did y'all go then?

11   A.   Then we thought he was at my friend Jordan Petit's

12   house, so we went -- we started to the direction of his

13   house.  And on the entrance of the neighborhood of his we saw

14   his mom's car going the opposite direction and we saw him in

15   the car so we went around.  We turned around, and I got out

16   of the car and went to the window and Jordan was going to

17   soccer practice and Ryan wasn't with him, so I was just --

18   Q.   Did y'all eventually hook up with Ryan?

19   A.   Yes, we went to his house after Jordan Petit.

20   Q.   So he was actually at his house, right?

21   A.   Yes.

22   Q.   Did the -- did Ryan get in the car with y'all and

23   start riding around with you?

24   A.   Yes.

25   Q.   While -- while y'all are riding around, did the

DARLINE W. LABAR, OFFICIAL REPORTER

1    defendant say anything to y'all about what you were going to

2    do or anything more about the car?

3        A.   Well, yes.  He told us again that his girlfriend

4    bought it and he showed us two credit cards.

5        Q.   Do you remember the colors of those credit cards?

6        A.   Silver.

7        Q.   Silver color?

8        A.   Yes.

9                MR. DAVIS:  May I approach.

10               THE COURT:  You may.

11       Q.   (By Mr. Davis)  Showing you now State's Exhibit 4,

12   5, and 6.  Would they be similar to State's Exhibits 4, 5,

13   and 6?

14       A.   I only saw two.

15       Q.   All right.  So two of them?

16       A.   Yes.

17       Q.   Which ones look similar to the cards that he showed

18   you?

19       A.   This one and this one.

20       Q.   Okay.  So you're talking about State's Exhibit 6 and

21   State's Exhibit 5, correct?

22       A.   Yes, sir.

23       Q.   Did you get a chance to look at the name that was on

24   the credit card?

25       A.   Never did.

1    Q.   But they were just the same color and appeared to be

2  similar to those two exhibits, right?

3    A.   Yes, sir.

4    Q.   What did he say about the cards when he showed them

5  to you?

6    A.   That his girlfriend gave it to him so he could spend

7  money.

8    Q.   His girlfriend gave him the cards so he could spend

9  money?

10    A.   Yes.

11    Q.   When he was telling you that, Zach, did he appear to

12  be real upset about having those credit cards?

13    A.   No, sir.

14    Q.   Was he crying?

15    A.   Not at the time.

16    Q.   Did he say anything like I sure am sorry I have

17  these credit cards?

18    A.   No, sir.

19    Q.   Appear to be real nervous about having those two

20  credit cards?

21    A.   Not at all, sir.

22    Q.   Just how was he acting then?

23    A.   Like he always did, happy, didn't seem like he had a

24  care in the world.

25    Q.   At some point while y'all are riding around, did

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1   y'all decide to drop Ashley off?

 2        A.   Yes, right after Ryan's house.

 3        Q.   And where was she living at the time?

 4        A.   On Barclay off of Yale.

 5        Q.   On Barclay.  Was that in Richardson, too?

 6        A.   Yes, sir.

 7        Q.   So after -- after y'all dropped Ashley off, did you

 8   and Ryan stay with the defendant?

 9        A.   Yes, sir.

10        Q.   And did you start riding around with him?

11        A.   We were going up Yale and he was asking us what we

12   wanted to go get with the credit cards.

13        Q.   And so what did y'all say?

14        A.   Ryan said Go-Peds.  And at first Jim was like, naw,

15   no.  And then Ryan said it again, and then he agreed.

16        Q.   Did you know where to get the Go-Peds?

17        A.   Yes.

18        Q.   Where was that?

19        A.   Yamaha Shop on Central.

20        Q.   So did y'all drive over there?

21        A.   First, we stopped at a food like convenience store

22   to call Ryan's mom.

23        Q.   What was the purpose of that, just to let her know

24   where he was?

25        A.   And to ask if he can get them, and ask if it was all
```

1    right.

2        Q.    So y'all eventually then went over to this Yamaha

3    shop, right?

4        A.    Yes, sir.

5        Q.    When you got there, was the stop still open or had

6    it been closed?

7        A.    It had been closed.

8        Q.    What did y'all do then?

9        A.    Knocked on the door a lot.  And he looked at us and

10   looked at us and he didn't make any attempt to open the

11   door.  And then Jim came up and held up one of the two credit

12   cards and they opened the door.

13       Q.    So there are still employees inside the store,

14   right?

15       A.    Yes.

16       Q.    They opened the door after the defendant showed them

17   that he had a credit card, right?

18       A.    Yes, sir.

19       Q.    Did all three of you go inside the store then?

20       A.    All three of us.

21       Q.    What happened when you got inside the store?

22       A.    We looked at the Go-Peds, and we decided on getting

23   three Go-Peds.

24       Q.    Now, had you ever had a Go-Ped before?

25       A.    No, sir.

```
 1       Q.    Did y'all -- did each of you then choose a Go-Ped?

 2       A.    Yes.

 3       Q.    Did you and Ryan get the same type of Go-Ped?

 4       A.    Yes, sir, the Sport.

 5       Q.    Did y'all get the same colors or different colors?

 6       A.    No, sir.  Ryan got the red one.  I got the blue one.

 7       Q.    How about the defendant, did he buy himself one of

 8  the Go-Peds?

 9       A.    Yes, sir.

10       Q.    Did he buy himself the same type of Go-Ped that --

11  or a different kind?

12       A.    Different kind.  It was a Yellow Liquidmatic.

13       Q.    Yellow Liquidmatic.

14       A.    Yes, sir.

15       Q.    How is -- how is that different than a Sport model

16  that you two got?

17       A.    The Sport models don't have a clutch so you can't

18  put the wheel on the ground to go under two -- under two

19  miles an hour.  With the Liquidmatic you could.

20       Q.    So the defendant chose to get a different kind, the

21  Liquidmatic, right?

22       A.    Yes, sir.

23       Q.    Do you know how the defendant paid for those three

24  Go-Peds?

25       A.    With the credit cards that he showed us.
```

1    Q.   Do you remember what he said about the credit cards,

2  if anything?  Did the clerk ask him about them, or did the

3  defendant say anything about whose credit card that it was?

4    A.   The employee asked for I.D., and he said he did not

5  have any.  And he asked for just an I.D., that his last name

6  was Cunningham, which I thought it was his girlfriend's last

7  name.  He's like, oh, this is my mom's and she knows I have

8  them.

9    Q.   All right.  So the clerk actually asked for

10  something with the name Cunningham on it to complete the

11  purchase, right?

12    A.   Yes, sir.

13    Q.   And the defendant told the clerk that his mother's

14  name was Cunningham?

15    A.   Yes, sir.

16    Q.   Right?  So did the clerk then take the credit card

17  and complete the sale?

18    A.   No, sir.  He went out of the store and went to the

19  car --

20    Q.   Now you say he, who is he?

21    A.   Oh, Jim.  Jim went out of the store and into the

22  car.  And then I just proceeded to talk to Ryan, really

23  didn't pay attention until he came back in.  And then he

24  said, "I don't have one."

25    Q.   And what did the clerk say then when he said he

1    didn't have anything with the name Cunningham on it?

2        A.    "Can I take your word for it?"

3        Q.    That's what the clerk said?

4        A.    Yes.

5        Q.    What did Jim say?

6        A.    "Yes, you can take my word for it, honest to God."

7        Q.    So the clerk then sold the three Go-Peds to Jim,

8    right?

9        A.    Yes, sir.

10       Q.    Did y'all then leave the store with the Go-Peds?

11       A.    No, first we test drove them out on the side of the

12   store.

13       Q.    Okay.  All three of you get on the Go-Peds?

14       A.    Yes, sir.

15       Q.    Jim down here, did he get on his Liquidmatic?

16       A.    Yes, sir.

17       Q.    Did he have any trouble testing it out on the

18   parking lot?

19       A.    Yes, sir.  I think he must have hit a bump or

20   something because he fell -- almost fell.  He stumbled, but

21   he caught himself.

22       Q.    Eventually did you finish testing the Go-Peds and

23   put them in the car?

24       A.    Yes, sir.

25       Q.    Was there any discussion about where you should put

DARLINE W. LABAR, OFFICIAL REPORTER

1    the Go-Peds?

2        A.    Yes, sir.

3        Q.    What was said?

4        A.    I reached for the trunk and asked him if he could

5    pop the trunk.  And he said, no, it was full.

6        Q.    That it was full?

7        A.    Uh-huh.

8        Q.    Did you ever get a chance to look inside the trunk

9    then?

10       A.    Never did.

11       Q.    So where did y'all put the Go-Peds?

12       A.    In the back seat behind the driver's seat.

13       Q.    And when you -- when you finished doing that, where

14   did y'all go to next, Zach?

15       A.    We went to drop Ryan off.

16       Q.    Did you see any car that caught the defendant's

17   attention when you were leaving the Yamaha shop?

18       A.    A police car.

19       Q.    Where was the police car?

20       A.    Heading north on the service road next to the

21   highway, Central, you know.

22       Q.    Would that be at Spring Valley and Central?  Does

23   that sound right?

24       A.    I don't remember the street we turned around on, but

25   it was Belt Line or Spring Valley, somewhere.

1    Q.    Did the defendant actually see the car?

2    A.    Yes, sir.

3    Q.    Did he say anything when he saw this police car?

4    A.    He -- Jim said, "uh-oh."

5    Q.    Uh-oh?

6    A.    Uh-huh.

7    Q.    Did he tell you why he was saying uh-oh in seeing a

8    police car?

9    A.    No, sir.

10   Q.    Did the police car appear to be coming come after

11   you?  Did he have his emergency lights on or anything like

12   that?

13   A.    No, sir, he was in front of us.

14   Q.    But the defendant still made the statement "uh-oh"?

15   A.    Yes, sir.

16   Q.    What did he do then?

17   A.    He didn't do anything.  He just kept driving.

18   Q.    Did y'all drop Ryan off at his house?

19   A.    Yes, sir.

20   Q.    Did he take his Go-Ped with him?

21   A.    Yes, sir.

22   Q.    Where did y'all go next then?

23   A.    My house.

24   Q.    What did y'all do, you and the defendant, when you

25   got back to your house?

1    A.    Well, he went into the alley and he asked -- and he

2    told me, he goes -- he says, "what would you do if I told you

3    that you were never ever going to see me again after today."

4    Q.    And what did you say to that?

5    A.    I said -- I said, "I'd laugh and say you're crazy."

6    Q.    What did the defendant say then?

7    A.    He says, okay, and then goes to my driveway and

8    parks the car in the driveway.

9    Q.    Did he ever mention that he might be going to

10   Florida?

11   A.    Key West with his girlfriend.

12   Q.    Key West with his girlfriend, right?

13   A.    Yes, sir.

14   Q.    And did he tell you why he might be going there with

15   his girlfriend?

16   A.    No, sir.

17   Q.    Did y'all ever -- did you and the defendant ever

18   ride down to Huffhines Park?

19   A.    Yes, sir.  As soon as he parked the car and -- in my

20   driveway, we got the Go-Peds out and drove them to Huffhines

21   Park to ask my mom if I could keep it.

22   Q.    You got any idea, Zach, how far that would be from

23   your house down to Huffhines?

24   A.    Not really, mile -- mile or two.

25   Q.    All right.  Did you have any trouble on the way down

```
 1   to the park?
 2        A.   He skimmed a curb and fell off.
 3        Q.   The defendant did?
 4        A.   Yes -- or Jim did.
 5        Q.   Okay.  How fast was he going when he did that?  Got
 6   any idea?
 7        A.   15 to 20 miles-an-hour.
 8        Q.   All right.  So he fell off and you see what part of
 9   his body that he skinned?
10        A.   He landed in the grass that time, the first time.
11        Q.   Okay.  Did he fall off some other point?
12        A.   Yes.  After we asked my mom and she agreed to just
13   say yes and then we'll ask my dad.  And then we were going
14   down Yale -- going north on Yale and I guess he hit a bump
15   because I was looking down and I heard a rattling noise and
16   looked down and the next thing I looked up, he was on the
17   ground holding his head like right here.
18        Q.   All right.  And you assumed that he must have hit a
19   bump or a rock or something?
20        A.   Yes, sir.
21        Q.   Did you have any problems, did you take any spills
22   on the way to or from the park?
23        A.   Almost, you know.
24        Q.   Almost.
25        A.   Because it's hard to control sometimes.
```

1    Q.    Okay.  When you -- when you were talking with the --

2   with the defendant, did he ever show you anything?

3    A.    Yes.  After we got back to my house, we were talking

4   for a while and he showed me a gun from the middle

5   compartment in the car.

6    Q.    Describe the gun to the members of the jury.  Big

7   gun, small gun?

8    A.    It was a small gun, brown handle, and the color was

9   black, but the handle was brown, yeah.

10   Q.    Have you ever seen a .22 caliber pistol before?

11   A.    No, sir.

12   Q.    So you wouldn't know the caliber on that gun, would

13   you?

14   A.    No, sir.

15   Q.    What -- did he give you a reason why he's carrying

16   around a pistol in the car?

17   A.    He only told me that he -- he pointed -- he had the

18   gun on his lap and pointed to it, and Jim says "that's how

19   wanted I am right now."

20   Q.    That's how wanted I am?

21   A.    Wanted, yes.

22   Q.    Did he tell you who was after him?

23   A.    He told me the mob was after him.  That's all he

24   said.  That he owed them money or something.

25   Q.    That it was a money deal of some kind?

DARLINE W. LABAR, OFFICIAL REPORTER

1     A.    Yes.

2     Q.    Did you eventually go back in your house?

3     A.    Yes.

4     Q.    Did you keep the Go-Ped that he had bought for you?

5     A.    Yes, in my garage.

6     Q.    What about the defendant's Liquidmatic?  Did he

7  still have that in the car when you left him?

8     A.    Yes, sir, he put it on the back seat.

9     Q.    Do you know about how much those three Go-Peds cost

10  that night?

11     A.    Let's see, 15, 1600.

12     Q.    Now, after -- after the defendant left that night,

13  did you ever see him again?

14     A.    Never did.

15     Q.    And at any time did you see this man crying when he

16  was with you that day?

17     A.    Yes, sir.  After we came back from Huffhines, he was

18  telling me, well, I'm going to Key West.  And I was like, are

19  you leaving early.  And Jim says, yes.  And Jim was telling

20  me all of this stuff like I've made a lot of bad choices in

21  my life, don't do what I -- don't do the stuff I've been

22  doing and always stay right, never go wrong.  And by that

23  point he was crying.

24          MR. DAVIS:  I'll pass the witness, Your Honor.

25

Cross-Examination

By Mr. Byck:

Q.   Zach, my name is Mike Byck, and I represent Jim.

     How long have you known Jim?

A.   A year or two.

Q.   And over that year or two, about how many times did you see him?

A.   Like I said, I've lost count.  I've seen him a lot of times.

Q.   A lot of times?

A.   Yes.

Q.   Okay.  Did Jim ever have a car before that last time?

A.   No, sir.

Q.   And what would you-all do together?

A.   Just play sports, basketball, football, anything that was, you know, sounded fun at the time.

Q.   Did you sit around and talk?

A.   Oh, yes, sir.

Q.   What did you talk about?

A.   What did we talk about?

Q.   Uh-huh.

A.   Just stories about him playing football in high school and told me about -- just football and stories about how he like had a bunch of cars when he was a teenager, but

1    crashed a bunch of them.

2        Q.    Uh-huh.

3        A.    And just --

4        Q.    You talk about other friends that you have that Jim

5    knew?

6        A.    Chad and Ryan.

7        Q.    Okay.  Did you talk about girls?

8        A.    Some of the times just -- you know.

9        Q.    Okay.  Jim ever say anything to you before this

10   happened, Ryan -- Jim ever say anything to you --

11               THE COURT:  This is Zach.

12       Q.    (By Mr. Byck)  Pardon me, Zach.  Ryan is next.

13       A.    Yes.

14       Q.    That was weird or odd that you thought -- ever come

15   with any off-the-wall stuff, anything that you thought was

16   strange?

17       A.    Just out of blue questions or --

18       Q.    Just stuff that you thought was real weird.

19       A.    No, sir.

20       Q.    Okay.  Did you feel safe around him?

21       A.    Yes.

22       Q.    Y'all went to the park to play -- play catch, play

23   football, whatever, right?

24       A.    We played in front of Ashley's house.

25       Q.    Okay.  Did y'all ever go to the store with him?

1     A.   Did I ever go to the store with him?

2     Q.   Uh-huh.

3     A.   Yes.  Yes, I did.  I went to Walgreens with him one

4  time.

5     Q.   Okay.  And you say this last time you went to the

6  store, he bought some cigarettes and some beer?

7     A.   Yes, sir.

8     Q.   Is that right?

9     A.   Yes, sir.

10    Q.   Did he offer you any cigarettes or beer?

11    A.   Never did.

12    Q.   Did he offer Ashley any cigarettes or beer?

13    A.   Never did.

14    Q.   Did he offer Ryan any cigarettes or any beer?

15    A.   No, sir.

16    Q.   Did he ever offer any kids that you know of any

17  cigarettes or beer or alcohol?

18    A.   No, sir.

19    Q.   Anything like that?

20    A.   No, sir.

21    Q.   Okay.  Jim comes over and picks you up.  Ashley is

22  in the car, right?  You haven't seen Ryan yet?

23    A.   No, sir.

24    Q.   Okay.  Jim and you take Ashley home.  Was Ryan in

25  the car, or do you remember?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.   Yes, Ryan was in the car when we dropped Ashley off.

2      Q.   Ryan was in the car.  And why were you y'all

3 dropping Ashley off?  Did she have something to do or --

4      A.   I think she said her mom didn't want her to go with

5 Jim in the first place, that she had to be home to watch

6 Mandy, her little sister.

7      Q.   Her little sister?

8      A.   Uh-huh.

9      Q.   All right.  And then you all -- well, were you with

10 Jim when he stopped by Ryan's house?

11      A.   Yes.

12      Q.   Okay.  And you saw him talk to Ryan's mom?

13      A.   Yes.

14      Q.   That was outside in the yard, right?

15      A.   Yes, sir.

16      Q.   Okay.  And then y'all get in the car and you drive

17 to the convenience store.  And Ryan said that he had to call

18 his mom, didn't he?

19      A.   Yes.

20      Q.   And did Jim try to talk him out of doing that?

21      A.   Never did.

22      Q.   As a matter of fact, didn't Jim give him the money

23 to make the phone call or do you remember?

24      A.   Yes, he gave him the dollar to make the change.

25      Q.   Okay.  All right.  Now, on the way over to that

1  convenience store, Zach, do you remember at any time that Jim

2  was driving the car that he wasn't doing a very good job of

3  driving the car?

4       A.   Yes, he was driving kind of fast.

5       Q.   He was driving fast?

6       A.   Yes.

7       Q.   Okay.  Did he hit anything?

8       A.   No.  But when Ryan said he needed to call his mom,

9  we were going about 40 miles-an-hour and the turn was

10  right -- you know, right then.  He slammed on the brakes and

11  tried to make it, but he jumped up on the sidewalk and then

12  he just got right back off and made the regular turn on the

13  intersection.

14       Q.   Okay.  Did you ask him about that peculiar driving

15  move?

16       A.   Yes, "what are you doing."

17       Q.   What did he say?

18       A.   He just laughed and said "sorry."

19       Q.   Okay.  I don't imagine, Zach, that you have a whole

20  lot of experience with alcohol, being around alcohol or

21  people who are drinking alcohol, do you?

22       A.   No, sir.

23       Q.   Or do you?

24       A.   No, sir.

25       Q.   You don't?  Would you be able to tell me if you

DARLINE W. LABAR, OFFICIAL REPORTER

1   noticed whether you thought Jim had been drinking?

2       A.   No, sir.  I didn't see any evidence that he had been

3   drinking.

4       Q.   Okay.  And you didn't smell anything real weird?

5       A.   Nope.  No, sir.

6       Q.   And you didn't notice any strange behavior other

7   than driving a little fast, and then he went up on the curb

8   and came right back down; is that right?

9       A.   Yes, sir, that's all I --

10      Q.   Okay.  Did he ever actually crash the car, hit

11  anything with it?

12      A.   No, sir.

13      Q.   Now, y'all went and got the Go-Peds, and tell me

14  about that.  I mean, it's not everyday that somebody goes out

15  and buys you a 5 or $600 motorcycle, motorbike, whatever?

16      A.   Motor scooter, yeah.

17      Q.   How did this all happen?  Tell -- tell the people on

18  the jury how this happened as you were driving around with

19  Jim and Ryan.

20      A.   How this --

21      Q.   Yeah, Jim says, I've got a couple of credit cards my

22  girlfriend gave me that I can spend some cash, right?

23      A.   Uh-huh.

24      Q.   Okay.  And how did you get from going shopping,

25  spending a little cash, to buying Go-Peds?  Do you remember

DARLINE W. LABAR, OFFICIAL REPORTER

1    what the conversation was at all?

2        A.    Ryan said, "Do you want to get Go-Peds?"  And Jim

3    said, "no."  And then Ryan just immediately asked again, "Do

4    you want to get some Go-Peds?"  And then Jim said, "yeah."

5        Q.    What did you think about this, when this was going

6    on?

7        A.    I think that he was just giving us Go-Peds.

8        Q.    Did you think that -- did you think that something

9    strange was going on or did you think that -- I don't know,

10   this is a really neat thing to happen.  You know, this guy

11   wanted to buy you a Go-Ped just because he was a friend of

12   yours.  Was that the feeling you got?

13       A.    Yes, sir, I did.

14       Q.    You didn't think that there were think any strings

15   attached, did you?

16       A.    No, sir.

17       Q.    Okay.  You didn't think that anything weird was

18   going on.  He was just sort of as a buddy?

19       A.    Yes, sir.

20       Q.    Just had the wherewithal to do something like that;

21   is that right?

22       A.    Yes, sir.

23       Q.    Okay.  Now, after you get the -- buy the Go-Peds or

24   he presents the credit card, you took them for a little test

25   drive around the -- around the parking lot of the store?

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1       A.    Uh-huh.

 2       Q.    Did Jim have any trouble driving his Go-Ped?

 3       A.    Yes, he hit a bump and stumbled, but caught himself

 4   before he totally hit the ground.

 5       Q.    Before he fell off?

 6       A.    Yes.

 7       Q.    And then he completed the transaction, loaded the

 8   Go-Peds in the car.  He told you not to put them in the

 9   trunk, that the trunk was full; is that right?

10       A.    Yes, sir.

11       Q.    All right.  Then you-all -- you took Ryan home,

12   right?

13       A.    Yes, sir.

14       Q.    Unloaded one Go-Ped there.  Went back to your house,

15   unloaded the other two Go-Peds, and then you and Jim rode

16   down to Huffhines Park, right?  And he had a little trouble

17   driving down there, too, didn't he?

18       A.    Yes.

19       Q.    Again, hitting bumps and almost falling off or, no,

20   one time you said he did fall off, didn't you?

21       A.    Yes, just skimmed a curb.  Like the curb was right

22   here.  I guess he was trying to get real close to it and he

23   kind of scraped it and fell off.

24       Q.    Okay.  And did he have any trouble restarting the

25   Go-Ped?
```

1     A.   Yes, because the -- the top of the filter had fallen

2   off, and it was -- it's hard to start with the filter just

3   wide open like that.

4     Q.   But you finally got it started again?

5     A.   Yes.

6     Q.   Okay.  Then you went and both of you talked to your

7   mom; is that right?

8     A.   Yes, sir.

9     Q.   Okay.  And then y'all drove the Go-Peds back?

10    A.   Yes, sir.

11    Q.   You put yours in the garage?

12    A.   No, I didn't have it in the garage yet.  I was with

13  it on the driveway.

14    Q.   Okay.  And Jim took his Go-Ped and loaded it into

15  the back --

16    A.   Yes.

17    Q.   -- of the Honda Accord; is that right?

18    A.   Yes, the back seat.

19    Q.   Okay.  Now, is it -- is it right around that time or

20  is it a little bit before where he shows you this .22 pistol

21  or this gun -- pardon me, you don't know whether it's a .22?

22    A.   It was -- he put the Go-Ped in -- he put the Go-Ped

23  in the back seat before he showed me the gun.

24    Q.   Okay.  And then he says -- is that when he says what

25  would you say if I never see you again, I'll say you're

DARLINE W. LABAR, OFFICIAL REPORTER

1    crazy?

2         A.   Uh-huh.

3         Q.   And that's when -- that's when he shows you the gun.

4    He doesn't ever hand you that gun to touch or hold, does he?

5         A.   No, sir.

6         Q.   Okay.  And you say he started crying?

7         A.   Yes, sir.

8         Q.   Have you ever seen him cry before?

9         A.   No, sir.

10        Q.   Was it fair to say that he was upset, or do you

11   think that he was faking it?

12        A.   Very upset, it looked like.

13        Q.   It looked like he was upset?

14        A.   Yes, sir.

15        Q.   And he said don't do -- I've made a lot of bad

16   choices, don't you make them, don't do the wrong things or

17   take the wrong turns that I -- that I took?

18        A.   Yes, sir, that's what he said.

19        Q.   And he was crying all the time that he said that?

20        A.   Yes, sir.

21        Q.   And -- well, Zach, what did you think about that?

22        A.   I was confused.

23        Q.   I mean, here's a guy that, first of all, he's a lot

24   older than you are.  He's about ten years older than you

25   are.  But hasn't had a car up until that day, right?

1     A.   Yes, sir.

2     Q.   Okay.  And he comes and collects you and says that

3 he's -- he now has a car, his girlfriend gave him some credit

4 cards, and you go out and buy probably the thing of your

5 dreams, right?  Everybody would like to have a Go-Ped, right?

6     A.   Yes, sir.

7     Q.   And then you come back and you drop Ryan off.  He

8 brings you back and he shows you a gun and he tells you

9 what -- and certainly correct me if I'm wrong here, Zach,

10 but you impress me as a very mature young man.

11     A.   Yes, sir.

12     Q.   Certainly seem to have a good head on your shoulders

13 and you know what's going on.  Somebody comes up and says the

14 mob is after them and owes them a lot of money and --

15     A.   And that's when I started getting scared, and I

16 didn't know -- that's when I didn't know what happened.  I

17 was totally confused.

18     Q.   Uh-huh.

19     A.   I didn't have any idea what was happening.

20     Q.   And did he say anything else about wanting to go to

21 someplace where it was peaceful or something like that?

22     A.   Oh, yes, he told me -- well, I'm going to go to Key

23 West.  And you're never going to see me again.  And then told

24 me, I'm just going to go fill up my gas -- fill up my gas

25 tank, go give my daughter a big hug and a kiss and tell her

1    good-bye, and then go to Key West.  And then I was like,

2    well, what are you going to do about gas when you need it to

3    get to Key West.  He said, no, you can make it to Key West on

4    a single tank of gas.  I was like, I didn't think you could.

5    I know you can't.

6        Q.    Right.  That doesn't make any sense at all to you,

7    did it?

8        A.    No, and then he said -- well, if I don't feel like

9    I'm going to make it and I've been driving for two hours and

10   I don't think I'm going to make it, I'm going to find a nice

11   secluded place and end it right there.

12       Q.    Did that upset you?

13       A.    (Nods head.)

14       Q.    I bet it did.  I mean here's your friend and he's

15   talking like this.  Did you say, Jim, why are you talking

16   like this?  What's going on?

17       A.    I asked him what was going on.  He said, I can't

18   tell you.

19       Q.    He said I can't tell you, but I owe the mob money

20   and they're going to get me, something like that?

21       A.    He said that, but then he said I can't tell you.

22       Q.    All right.  When you asked him specifically what's

23   going on, he said I can't tell you.  And he was crying at

24   that time?

25       A.    And before he left, he said, "you'll be reading

1   about it soon."

2       Q.   Really?  Anything else you can remember that he

3   said, Zach?

4       A.   No.

5                MR. BYCK:  Thank you, sir.  I'll pass the

6   witness.

7                <u>Redirect Examination</u>

8   By Mr. Davis:

9       Q.   Zach, I guess that when you were with him that day,

10   I guess you assumed that he had been telling you the truth,

11   right?

12       A.   (Witness nods head.)

13       Q.   Is that a yes?

14       A.   Yes.

15                THE COURT:  You have to answer yes or no.

16       A.   Yes.

17       Q.   (By Mr. Davis)  I mean, did you know that he had

18   lied to you about where that car had come from?

19       A.   I had no idea he lied about it.

20       Q.   Did you know that he lied to you about whose credit

21   cards they were?

22       A.   No, sir.

23       Q.   Did you know that when he was inside that Yamaha

24   shop, that he lied to the clerk about that credit card?

25       A.   Well, when he said it was his mom's, but he told me

1   it was his girlfriend's, I didn't say anything.  Because we

2   were getting a Go-Ped, and I thought he was just doing it.

3       Q.   When he -- when he showed you the gun and told that

4   you the mob was after him, did you know that he was lying

5   about that and about why he had the gun that day?

6       A.   No, sir.

7       Q.   And when he told you about going down to Key West

8   with his girlfriend, did you know that he was lying to you

9   about that?

10      A.   No, I didn't.

11      Q.   Did you know as you sat there in that car that this

12  man had just put a gun up to the head of an 80-year-old woman

13  and shot her to death?

14              MS. BALIDO:  Judge, I object to argumentative.

15              THE COURT:  Sustained.

16              MS. BALIDO:  Assumes facts not in evidence.

17              THE COURT:  Sustained.

18      Q.   (By Mr. Davis)  Did this man ever act like he had

19  just shot anyone to you?

20      A.   No.

21      Q.   Thank you, Zach.

22              MR. DAVIS:  Pass the witness.

23              MR. BYCK:  I have nothing further of this

24  witness at this time, Your Honor.

25              THE COURT:  You may step down, sir.

1    Sheriff, will you retire --

2    Lunch.

3              THE BAILIFF:  All rise.

4              THE COURT:  Counsel, I know not how long it

5    will take to get lunch here, but let's try to aim at not

6    later than 1:15.

7              MR. DAVIS:  Yes, sir.

8              (Recess taken.)

9              THE COURT:  Sheriff, may we have the jury,

10   please?

11             THE BAILIFF:  Yes, sir.

12             (Jury returned to courtroom.)

13             THE COURT:  Let the record reflect the jurors

14   are being returned to the courtroom at this time.

15        Jurors may be seated.

16        Mr. Murphy, counsel, visitors in the gallery, you

17   may be seated.

18        The State may call its next witness.

19             MS. MILLER:  Call Bobby Harp to the stand.

20        Have you been sworn?

21             THE COURT:  Raise your right hand, please.

22             (Witness sworn.)

23             THE COURT:  Have a seat to my left, please.

24        The State may continue.

25


DARLINE W. LABAR, OFFICIAL REPORTER

1                          BOBBY DOUGLAS HARP

2     was called as a witness by the State and, after having been

3     first duly sworn, testified as follows:

4                          Direct Examination

5     By Ms. Miller:

6          Q.    Could you please introduce yourself to the jury?

7          A.    My name is Bobby Douglas Harp.

8          Q.    And can you spell your last name for the court

9     reporter?

10         A.    H-a-r-p.

11         Q.    Mr. Harp, tell the jury how you're employed.

12         A.    I work at Richardson Motor Sports.

13         Q.    Can you tell the jury a little bit about what

14    Richardson Motor Sports is?

15         A.    We sell Yamaha motorcycles, Seadoo Watercraft, and

16    Eaton four-wheelers, Polaris four-wheelers.

17         Q.    How long have you worked at Richardson Motor Sports?

18         A.    Two and a half years.

19         Q.    And can you tell the jury where Richardson Motor

20    Sports is located?

21         A.    408 South Central Expressway in Richardson, Texas.

22               MS. MILLER:  May I approach, Your Honor.

23               THE COURT:  You may.

24         Q.    (By Ms. Miller)  Mr. Harp, I'm going to show you

25    what's marked as State's Exhibit Number 3.  And is this a map

1    of the area where Richardson Motor Sports is located?

2         A.   Yes, ma'am.

3         Q.   Okay.  And is it located on the west side of Central

4    Expressway?

5         A.   Yes, ma'am.

6         Q.   Can you use a pen and mark where -- roughly where

7    Richardson Motor Sports would be located?  Okay.  And can you

8    put "motor sports" out beside that?

9         A.   (Witness so indicates.)

10             MS. MILLER:  May I publish, Your Honor.

11             THE COURT:  You may.

12        Q.   (By Ms. Miller)  Mr. Harp, can you tell the jury

13   what hours Richardson Motor Sports is open for business?

14        A.   8:30 to 6:00 Monday through Friday, 8:30 to 5:00 on

15   Saturday.

16        Q.   Back on October 4th of 2000, was Richardson Motor

17   Sports open?

18        A.   Yes, ma'am.

19        Q.   And were you working there?

20        A.   Yes, ma'am.

21        Q.   In what capacity?

22        A.   I'm the parts manager.

23        Q.   Can you tell the jury what a parts -- the parts

24   manager --

25        A.   I handle all the parts and accessories for the

DARLINE W. LABAR, OFFICIAL REPORTER

1    motorcycles, ATV's, and the boats.

2              THE REPORTER:  I'm going to need you to slow

3    down just a little bit for me, please.

4              THE WITNESS:  Sorry.

5         A.   I handle all the accessories and parts for stuff

6    that we sell.

7         Q.   (By Ms. Miller)  Did you have -- what hours did you

8    work that day?

9         A.   8:30 to about 7:00.

10        Q.   Did you have another employee working with you when

11   you were closing the store?

12        A.   Yes, ma'am.

13        Q.   What time did you close the store that day?

14        A.   We close at 6:00.

15        Q.   After you had closed the store at 6:00, did you have

16   three people come up wanting to buy something?

17        A.   Yes, ma'am.

18        Q.   Okay.  And can you describe for the jury, were they

19   adults, children?

20        A.   Two children and one adult.

21        Q.   Okay.  And how did they get your attention to let

22   you know they wanted to buy something?

23        A.   They came and knocked on the glass window.

24        Q.   And was a credit card shown to you at that time?

25        A.   Yes, ma'am.

Page 124

```
 1     Q.   Did you let them in at that point?

 2     A.   Yes, ma'am.

 3     Q.   Are you on commission?

 4     A.   Yes, ma'am.

 5     Q.   Okay.  Is that why you let them in after hours?

 6     A.   I guess so.

 7     Q.   And who was the other employee working with you?

 8     A.   Mark Cannon.

 9               MS. MILLER:  May I approach, Your Honor.

10               THE COURT:  You may.

11     Q.   (By Ms. Miller)  Mr. Harp, I'm going to show you

12   what's marked as State's Exhibit Number 12 and ask if you can

13   identify that?

14     A.   Richardson Motor Sports.

15               MS. MILLER:  Your Honor, at this time we offer

16   State's 12, tender to opposing counsel.

17               (State's Exhibit No. 12 offered)

18               MS. BALIDO:  No objection.

19               THE COURT:  Admitted.

20               (State's Exhibit No. 12 admitted)

21     Q.   (By Ms. Miller)  Mr. Harp, when you let the three

22   people come in, did they -- did they tell you what they

23   wanted to buy?

24     A.   Yes, ma'am.

25     Q.   And what was it?  What was your understanding?
```

1      A.    It was Go-Peds.

2      Q.    And can you tell the jury what a Go-Ped is?

3      A.    Motorized skateboard with a handle on it.

4      Q.    Okay.  And do you see one of the people that came in

5  and used the credit card in your store back on October 4th of

6  2000?

7      A.    Yes, ma'am.

8      Q.    Could you point him out and describe what he's

9  wearing?

10     A.    He's wearing a red tie and suit over there.

11           MS. MILLER:  Your Honor, we'd ask the record

12  to reflect that the witness has identified the defendant in

13  open court.

14     Q.    (By Ms. Miller)  Now, was he the adult that went

15  into the store?

16     A.    Yes, ma'am.

17     Q.    Can you describe the other two?

18     A.    Two children, I'd say between 10 and 12 years old.

19     Q.    Okay.

20     A.    One was blond headed.  The other was Hispanic

21  descent.

22     Q.    And were they both boys?

23     A.    Yes.

24     Q.    Who did most of the talking when they came into the

25  store?

1       A.    The little blond headed boy did most of the talking.

2       Q.    And did you show them the Go-Peds, or did they go

3    right to them?

4       A.    They walked right to them.

5       Q.    And did you show them how these Go-Peds worked?

6       A.    Sure.

7       Q.    Now, when you -- did you later come to find out that

8    the person that you identified was Jedidiah Isaac Murphy?

9       A.    Yes, ma'am.

10      Q.    Did you know him by that name that evening?

11      A.    No, ma'am.

12      Q.    Did he use the name Isaac Murphy when he was filling

13   out some warranty papers?

14      A.    Yes, ma'am.

15      Q.    Now, when they decided what type of Go-Peds they

16   wanted, can you tell the jury what they bought?

17      A.    They bought two Sports and one Liquidmatic.

18      Q.    Can you tell the jury what the difference is

19   between --

20      A.    A sport model is red or blue and it does not idle

21   when you come to a stop.  The Liquidmatic is a yellow Go-Ped

22   that will idle when you come to a stop.

23      Q.    Now, did one of the boys lead you to believe that he

24   was related to the defendant?

25      A.    Yes, ma'am.

1      Q.   And what led you to believe that he was related?

2      A.   He called him his uncle.

3      Q.   Called him his uncle?

4      A.   Yes, ma'am.

5      Q.   Did you ever -- any reason to question that

6  relationship?

7      A.   No, ma'am.

8      Q.   So when they made -- when they picked out the two

9  Sports and the Liquidmatic, what did you do then?

10      A.   We take them back to the back, add fuel to them,

11  make sure they're, you know, in sound mechanical condition.

12  We test the brakes, make sure everything is working on the

13  unit before we give it to the customer.

14      Q.   As when you were prepping the machines in the back,

15  what did you have the defendant do?

16      A.   He was filling out the warranty paperwork.

17      Q.   Okay.  And was there a warranty -- was there

18  warranty paperwork for each one of the Go-Peds that was

19  purchased?

20      A.   Yes, ma'am.

21      Q.   And did the defendant, to your knowledge, fill out

22  each one of those?

23      A.   Yes, ma'am.

24              MS. MILLER:  May I approach, Your Honor.

25              THE COURT:  You may.

1   Q.   (By Ms. Miller)  Mr. Harp, I'm going to show you

2  what's marked as State's Exhibits Number 14A, B, and C, and

3  ask if you can identify those?

4   A.   That's our warranty paperwork.

5   Q.   Okay.  And State's 14A, B, and C, did the defendant

6  fill out the purchaser's name, phone number, address, city,

7  and state, sign it at the bottom, date it at the bottom, and

8  put the initials on there?

9   A.   Yes, ma'am.

10   Q.   Okay.  As far as the model description, the serial

11  number, the dealer number, and the date of sales, did you

12  fill those out?

13   A.   Yes, ma'am.

14   Q.   Do you see any changes, deletions, or alterations to

15  these in any way?

16   A.   No, ma'am.

17   Q.   Okay.  And did the police come pick these up from

18  you?

19   A.   Yes, ma'am.

20   Q.   Let me finish.  On October 5th the next morning?

21   A.   Yes, ma'am.

22           MS. MILLER:  Your Honor, at this time we would

23  offer State's 14A, B, and C, tender to opposing counsel.

24           (State's Exhibit No. 14A, B, and C offered)

25           MS. BALIDO:  No objection.

1          THE COURT:  14A, B, and C are admitted.

2          (State's Exhibit No. 14A, B, and C admitted)

3     Q.   (By Ms. Miller)  Mr. Harp, on these warranty papers

4  that are filled out here at the top, does one copy go with

5  the defendant after it's filled out?

6     A.   Yes, ma'am.

7     Q.   And these -- the three of these, 14A, B, and C, say

8  manufacturers's copy.  What's done with these?

9     A.   They are sent to our warranty center and they keep

10  them on file where if they have any problems, they can send

11  it back and get their warranty to cover most of their

12  problems.

13     Q.   Since the purchase was done after hours on the 4th

14  and they were picked up in the early morning hours of the

15  5th, is that why they weren't sent to the manufacturer yet?

16     A.   Yes, ma'am.

17     Q.   Now, if you look at State's Exhibits 14B and C, they

18  have one address on it and 14A has a different address on

19  it.  Did you notice that the defendant had filled them out

20  differently --

21     A.   No, ma'am.

22     Q.   -- at the time?  Is that something that you would

23  take note of?

24     A.   Not usually because when people buy Go-Peds,

25  sometimes they buy them for other people and they can put

1    whatever address they want for the warranty paperwork.

2        Q.   When you go into Richardson Motor Sports and a

3    person is making a transaction, is there a counter where that

4    is done?

5        A.   Sure.

6        Q.   And do you stand behind the counter when you are

7    ringing up the purchase?

8        A.   Yes, ma'am.

9        Q.   How close did you get to the defendant when you were

10   ringing up his purchase of these Go-Peds?

11       A.   Within two feet.

12       Q.   As you -- did you carry on a conversation with him

13   while you were showing him the Go-Peds and then again while

14   you were ringing up the transaction?

15       A.   Yes, ma'am.

16       Q.   Approximately how long did you have contact with the

17   defendant?

18       A.   Well, they were in the store for a total of 30

19   minutes.  I would say out of that 30 minutes, 20 minutes we

20   actually talked back and forth.

21       Q.   What's the closest that you stood to the defendant

22   within that 20-minute period?

23       A.   Within one foot.

24       Q.   When you were talking with the defendant, did you

25   notice anything unusual about his demeanor?

1      A.    No, ma'am.

2      Q.    Did you notice whether or not he was intoxicated?

3      A.    No, ma'am.

4      Q.    Okay.  You didn't notice, or, no, he did not appear

5   to be?

6      A.    He did not appear intoxicated to me.

7      Q.    Did you smell any odor of an alcoholic beverage on

8   him?

9      A.    No, ma'am.

10     Q.    Did he appear under the influence of any drug or

11  narcotic?

12     A.    No, ma'am.

13     Q.    Did he appear -- how did he appear to you?  What was

14  his demeanor at the time?

15     A.    He seemed normal to me.

16     Q.    Okay.  Just kind of happy go lucky?

17     A.    Yes, ma'am.

18     Q.    Was he crying, upset?

19     A.    No, ma'am.

20     Q.    Did you have a conversation with him regarding what

21  he did for a living?

22     A.    Yes, he told me he was an underwater welder.

23     Q.    Okay.  And do you recall what brought that up?

24     A.    I just -- in the conversation between, you know,

25  owner and somebody buying things, you just bring up stuff in

1    conversation.

2        Q.   When the defendant was making the purchase of these

3    Go-Peds, did he -- how did he purchase them?

4        A.   Paid with a credit card.

5        Q.   Okay.  And when he gave you the credit card, did you

6    ask for some form of identification?

7        A.   Yes, ma'am.

8        Q.   And was he able to provide one at that time?

9        A.   He showed me an I.D., yes, ma'am.

10       Q.   Okay.  Do you recall what type of I.D. he showed

11   you?

12       A.   It was a -- just a regular form of I.D., another

13   credit card, I do believe.

14       Q.   Now, did you ring up the transaction on the credit

15   card?

16       A.   Yes, ma'am.

17            MS. MILLER:  May I approach, Your Honor.

18            THE COURT:  You may.

19       Q.   (By Ms. Miller)  I'm going to show you what's marked

20   as State's Exhibit Number 13, and ask if you can identify

21   that?

22       A.   It's a sales ticket.

23       Q.   Is this a sales ticket that -- that you caused to be

24   made for the sale of the three Go-Peds to the defendant that

25   you identified?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Yes, ma'am.

2    Q.   And I'm going to show you what's marked as State's

3  Exhibit Number 5.  Do you recognize this?

4    A.   Yes, ma'am.

5    Q.   Is this the credit card that the defendant gave you

6  to purchase the Go-Peds?

7    A.   Yes, ma'am.

8    Q.   And did you compare the two numbers, the number on

9  State's Exhibit Number 5, the credit card with the number on

10  the receipt that you caused to be made?

11    A.   Yes, ma'am.

12    Q.   Are there any changes, deletions, or alterations to

13  State's 13 since the last time you saw it?

14    A.   No, ma'am.

15    Q.   And is the defendant the one who signed State's

16  Exhibit Number 13 as he was purchasing the Go-Peds on October

17  the 4th of 2000?

18    A.   Yes, ma'am.

19         MS. MILLER:  Your Honor, at this time we'd

20  offer State's 13, tender to opposing counsel.

21         (State's Exhibit No. 13 offered)

22         MS. BALIDO:  No objection.

23         THE COURT:  Admitted.

24         (State's Exhibit No. 13 admitted)

25    Q.   (By Ms. Miller)  Mr. Harp, on State's Exhibit Number

1    13, is there a time stamp on there?

2        A.   Yes, ma'am.

3        Q.   And at what time was the credit card purchase made?

4        A.   6:49 p.m.

5        Q.   And you're the one who actually rang the credit card

6    transaction up?

7        A.   Yes, ma'am.

8        Q.   Now, after you rang up the transaction for the

9    Go-Peds -- and can you tell the jury exactly how much that

10   cost?

11       A.   It was 1,728.75.

12       Q.   Okay.  After you rang the transaction up, did you

13   have some further contact with the defendant and the two boys

14   out in the parking lot?

15       A.   Yes, ma'am.

16       Q.   Can you tell the jury what happened out there?

17       A.   I took the three Go-Peds they purchased out to their

18   car and loaded them up in the car.

19       Q.   Okay.  Prior to loading them up in the car, did they

20   test them out in the parking lot?

21       A.   Not really.  We're really not allowed to let them

22   ride in the parking lot because of insurance purposes.

23       Q.   Now, when they were taken out to the car, are you

24   the one who took all three of them out to the car?

25       A.   Yes, ma'am.

1     Q.   Do you recall which one of the Go-Peds the defendant

2  picked out for himself?

3     A.   I believe it was the yellow Liquidmatic.

4     Q.   And is the Liquidmatic -- you said it's the one that

5  has the clutch; is that right?

6     A.   That's right.

7     Q.   Is that more expensive than the Sports?

8     A.   Yes, ma'am.

9     Q.   Now, you said that you loaded them into the back

10  seat; is that correct?

11     A.   That's correct.

12     Q.   Okay.  And do you recall where the boys got?

13     A.   Where the boys what?

14     Q.   Where the boys went.  Did they get in the back seat

15  with the Go-Peds?

16     A.   No, they got in the front.

17     Q.   Do you recall when the -- when you were loading the

18  Go-Peds, whether any mention was made of the trunk?

19     A.   No, ma'am.

20     Q.   And where was the car parked?

21     A.   Along the outside of our glass.

22     Q.   And do you recall what type of vehicle it was?

23     A.   It was a four-door silver Honda.

24           MS. MILLER:  May I approach, Your Honor.

25           THE COURT:  You may.

1    Q.    (By Ms. Miller)  Mr. Harp, I'm going to show you

2  what's marked as State's Exhibit Number 7.  And I know it's a

3  little bit dark, but does State's Exhibit Number 7 look like

4  the same vehicle you saw the defendant and two boys in when

5  they were purchasing the Go-Peds?

6    A.    Yes, ma'am.

7              (Photograph published to jury.)

8    Q.    (By Ms. Miller)  Was there anyone else in the car

9  with the defendant and the two boys?

10   A.    No, ma'am.

11   Q.    Mr. Harp, there in front of you, 14A through C, can

12  you -- can you tell the jury what addresses are on the

13  warranty papers?

14   A.    726 Northeast Frank in Terrell, Texas.  That's 14A.

15  727 Northeast -- I really can't read his writing on this one.

16  Something in Terrell, Texas.  727 Northeast, it looks like

17  Commerce, Terrell, Texas.  And 727 Northeast -- it looks like

18  Commerce again in Terrell, Texas.

19   Q.    Okay.  Thank you, Mr. Harp.

20             MS. MILLER:  We'll pass the witness.  And,

21  Judge, his statement has already been tendered to opposing

22  counsel.

23                    Cross-Examination

24  By Ms. Balido:

25   Q.    Mr. Harp --

1          MS. BALIDO:  May it please the Court.

2          THE COURT:  It may.

3     Q.   (By Ms. Balido)  Mr. Harp, my name is Jennifer

4  Balido, and I represent Jedidiah Isaac Murphy in this case.

5  I'm going to ask you some questions.  If you don't understand

6  any of my questions, please let me know and I'll try to

7  repeat them for you.  Okay?

8          So you have been working at the Richardson Motor

9  Sports for about two and a half years; is that correct?

10    A.   Yes.

11    Q.   And you're the working parts manager?

12    A.   That's correct.

13    Q.   Does that also authorize you to make sales?

14    A.   Yes, ma'am.

15    Q.   Okay.  You said that you had spent a pretty fair

16  amount of time with the defendant while he was in the shop;

17  is that correct?

18    A.   That's correct.

19    Q.   About 20 minutes out of the 30 minutes that they

20  spent in there?

21    A.   Yes, ma'am.

22    Q.   Okay.  And you said that you didn't smell any

23  alcoholic beverage?

24    A.   No, ma'am.

25    Q.   And that you didn't -- did you smell any cigarettes

1  on him?

2      A.   No, ma'am.

3      Q.   Did you smell any beer smell on him?

4      A.   No, ma'am.

5      Q.   Do you know what Jagermeister smells like?

6      A.   No, ma'am.  I'm not a drinker.

7      Q.   Okay.  And you say that you didn't seem to notice

8  anything that would indicate that he was intoxicated?

9      A.   That's correct.

10     Q.   Okay.  Now, you also testified that he had used the

11 name Isaac Murphy, is that correct --

12     A.   That's correct.

13     Q.   -- when he filled out the paperwork?  Is that

14 correct?

15     A.   That's correct.

16             MS. BALIDO:  May I approach the witness, Your

17 Honor.

18             THE COURT:  You may.

19     Q.   (By Ms. Balido)  Again, Mr. Harp, I want to direct

20 your attention to State's Exhibit 14A, 14B and 14C.  And at

21 the top of these sheets there is a name placed into the

22 purchaser's name; is that correct?

23     A.   Correct.

24     Q.   And it does clearly say Isaac Murphy, but the first

25 letter of it is a J; is that correct?

1     A.    It looks like a J, yes.

2     Q.    Okay.  And that's both on 14A, 14B, and 14C; is that

3   correct?

4     A.    Correct.

5     Q.    So it says J. Isaac Murphy on all three of these?

6     A.    Uh-huh.

7     Q.    You need to say yes or no for the record, sir.

8     A.    Yes.

9     Q.    And then also when he signed down at the bottom, he

10  wrote the first letter clearly on each signature as J; is

11  that correct?

12    A.    Correct.

13    Q.    And the initials that he put in there was J; is that

14  also correct?  And had to initial the side of the --

15    A.    Correct.

16    Q.    -- warranty form; is that correct?

17    A.    Correct.

18    Q.    Now, you said you didn't smell any smoke on him; is

19  that correct?

20    A.    Correct.

21    Q.    Do you smoke?

22    A.    No, ma'am.

23    Q.    Okay.  Would you recognize smoke -- the smell of

24  smoking or drinking if you smelled it?

25    A.    Yes, ma'am.

1    Q.    Let me ask you a question.  When you ran this --

2    this through the machine, did it come back stolen, the credit

3    card?

4    A.    No, ma'am.

5    Q.    Okay.  And you testified that -- that you asked for

6    I.D.; is that correct?

7    A.    That is correct.

8    Q.    Okay.  Because that's what you're supposed to do?

9    A.    It's not a policy.

10   Q.    Okay.

11   A.    It is now, though.

12   Q.    All right.  But you -- and you said that you asked

13   for additional I.D.?

14   A.    Yes, ma'am.

15   Q.    So if one of the boys testified that he didn't ever

16   show any I.D., then they would be lying?

17            MS. MILLER:  Objection, Your Honor.

18            THE COURT:  Sustained, comparative testimony.

19   The Rule has been invoked.

20   Q.    (By Ms. Balido)  So it's your testimony that the

21   defendant showed another -- another credit card as a form of

22   I.D.?

23   A.    Yes, ma'am.

24   Q.    You never asked for any sort of picture I.D.?

25   A.    No, ma'am.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Did he ever have to go out to the car to go search

2  to try to find some additional I.D.?

3    A.   Yes, he did.

4    Q.   Okay.  And is that when he came back with this

5  additional credit card?

6    A.   Yes, ma'am.

7    Q.   Now, you also said that the defendant and the boys

8  did not test out the Go-Peds outside the Richardson Motor

9  Sports; is that correct?

10   A.   That's correct.

11   Q.   Because that's against your policy not to have that

12  done?

13   A.   That is correct.

14   Q.   Did you call the Garland Police Department, or did

15  the Garland Police Department call you?

16   A.   They called me.

17   Q.   Okay.  And they came out and they -- and you filled

18  out a statement for them?

19   A.   They called me at home.

20   Q.   Okay.  And did they come to your home or did --

21   A.   No, they called me at 2:00 in the morning.  I had to

22  go down to the police office at 2:00 in the morning.

23   Q.   Okay.  And so that's when you filled everything out;

24  is that correct?

25   A.   Yes, ma'am.

1    Q.   Did you ever tell anyone from the Garland Police

2  Department that you heard the defendant speaking on the

3  telephone while in the shop?

4    A.   Not the defendant, ma'am.

5    Q.   Okay.  Who did you hear speak on the telephone?

6    A.   The little blond-headed boy.

7    Q.   What did you hear the little blond-headed boy say?

8    A.   He was calling home to talk to his mother.

9    Q.   All right.  And so you never heard the defendant

10  talk to anyone on the telephone about knowing where -- where

11  a certain place was or something to that effect?

12    A.   No, ma'am.

13    Q.   Was the transaction that commenced that evening, was

14  that kind of a rushed transaction since you were already

15  closed for the night?

16    A.   No, ma'am.

17    Q.   Not anymore rushed than your testimony here today?

18    A.   No, ma'am.

19            MS. BALIDO:  Pass the witness.

20            THE COURT:  Ms. Miller.

21                  Redirect Examination

22  By Ms. Miller:

23    Q.   Mr. Harp, just a couple other questions, and I don't

24  mean to get too personal but you said that you don't drink.

25  How was it that you're familiar with the signs of

1  intoxication?

2       A.    My father was an alcoholic.

3       Q.    So you're very familiar with --

4       A.    Yes, ma'am.

5       Q.    -- the smell of alcohol and the effects it has on

6  people?

7       A.    Yes, ma'am.

8              MS. MILLER:  Nothing further.  Thank you, Mr.

9  Harp.

10             THE COURT:  Ms. Balido.

11             MS. BALIDO:  I don't have anything further of

12  Mr. Harp.

13             THE COURT:  May this witness be excused,

14  subject to recall?

15             MS. BALIDO:  No objection from the defense.

16             THE COURT:  Thank you, Mr. Harp.  You are

17  excused, subject to recall.

18             MS. MILLER:  Call Debra Murphy.

19             (Witness brought forward.)

20             MS. MILLER:  She was sworn, Judge.

21             THE COURT:  Swear her again in front of the

22  jury.

23             (Witness sworn.)

24             THE COURT:  Thank you.  Invite your having a

25  seat to my left, please, ma'am.

Page 144

1                          DEBRA MURPHY

2    was called as a witness by the State and, after having been

3    first duly sworn, testified as follows:

4                        Direct Examination

5    By Ms. Miller:

6        Q.   Could you please introduce yourself to the jury?

7        A.   My name is Debra Murphy.

8        Q.   Debra, how are you employed?

9        A.   I'm a manager at a Racetrac convenience store.

10       Q.   And is that Racetrac located at 9620 Harry Hines

11   Boulevard in Dallas, Texas?

12       A.   Yes, ma'am.

13                 MS. MILLER:  May I approach, Your Honor.

14                 THE COURT:  You may.

15       Q.   (By Ms. Miller)  Debra.  I'm going to show you

16   what's been marked as State's Exhibit Number 15, and ask if

17   you can identify that?

18       A.   It's located right over here on the left.

19       Q.   Okay.  So State's 15 is a map including the area

20   where your race -- the Racetrac where you're a manager is

21   located?

22       A.   Yes, ma'am.

23       Q.   Can you mark on State's Exhibit Number 15, kind of

24   put a little bit -- a little X and write "Racetrac" roughly

25   where it would be located?

1      A.    (Witness so indicates.)

2      Q.    And is that near the Webbs Chapel Extension and

3  Harry Hines?

4      A.    Yes, ma'am.

5             MS. MILLER:  Your Honor, at this time we'd

6  offer State's 15, tender to opposing counsel.

7             (State's Exhibit No. 15 offered)

8             MR. BYCK:  No objection to State's 15.

9             THE COURT:  Admitted.

10            (State's Exhibit No. 15 admitted)

11            MS. MILLER:  May I publish, Your Honor.

12            THE COURT:  You may.

13     Q.    (By Ms. Miller)  Is that a fairly new Racetrac?  How

14  long has it been there?

15     A.    Probably four, five years.

16     Q.    Now, back on October 4th of 2000, were you employed

17  by Racetrac?

18     A.    Yes, ma'am, but not at that store.

19     Q.    But not at that particular store?

20     A.    Right.

21     Q.    Who was the manager there at the time?

22     A.    Somebody by the name of Mark Landrum.

23     Q.    You have been the manager at that particular store

24  since January of this year?

25     A.    Yes, ma'am.

1    Q.    Okay.  I want to show you State's Exhibit Number 16.

2    A.    Okay.

3    Q.    Do you recognize that?

4    A.    Our ATM machine.

5    Q.    And is that a picture of the Racetrac and the ATM

6    where you are currently manager?

7    A.    Yes, ma'am.

8    Q.    At 9620 Harry Hines Boulevard?

9    A.    Yes, ma'am.

10              MS. MILLER:  Your Honor, at this time we'd

11   offer State's 16, tender opposing counsel.

12              (State's Exhibit No. 16 offered)

13              MR. BYCK:  No objection.

14              THE COURT:  Admitted.

15              (State's Exhibit No. 16 admitted)

16   Q.    (By Ms. Miller)  Now, you said the ATM is on there.

17   Can you point to where the ATM is?

18   A.    Yes, ma'am.

19   Q.    So where my finger is?

20   A.    Yes, ma'am.

21   Q.    Okay.  And about how far is the ATM from the store?

22   A.    Maybe 50 yards.

23   Q.    And is it one that you can just drive up to and

24   use --

25   A.    Yes, ma'am.

1      Q.    -- while you're in your car?

2      A.    Yes, ma'am.

3      Q.    Okay.  Now, are there any video cameras or any other

4    type of surveillance out there by that ATM that you are aware

5    of?

6      A.    Not to my knowledge.

7      Q.    Thank you, Ms. Murphy.

8            MS. MILLER:  I'll pass the witness.

9            MR. BYCK:  We have no questions of this

10   witness.

11           THE COURT:  May she be excused, subject to

12   recall?

13           MR. BYCK:  No objection.

14           MS. MILLER:  No objection.

15           THE COURT:  Thank you.  You are excused,

16   subject to recall.

17           MR. DAVIS:  Your Honor, the State will call

18   Cesar De La Torre.

19           (Witness brought forward and sworn.)

20           THE COURT:  Thank you.  Have a seat to my

21   left, if you please, sir.

22         The State may continue.

23           MR. DAVIS:  Thank you.

24                   CESAR DE LA TORRE

25   was called as a witness by the State and, after having been

1    first duly sworn, testified as follows:

2                    Direct Examination

3    By Mr. Davis:

4        Q.    Sir, would you please tell us your full name?

5        A.    Cesar Gustave De La Torre.

6        Q.    All right.  Mr. De La Torre, how are you employed?

7        A.    I am a -- excuse me, I'm the photo operations

8    manager for The Associates.

9        Q.    What are your duties and responsibilities?

10       A.    Have several responsibilities, but one of the

11   responsibilities is pertaining to monitoring, identifying

12   fraud accounts on behalf of the bank.

13       Q.    Now, does The Associates through a bank actually

14   issue credit cards?

15       A.    Yes, our bank issues credit cards out of Delaware.

16       Q.    Okay.  And would they be MasterCards?

17       A.    They would be MasterCards and Visas.

18       Q.    Now, back on -- back on October the 11th of the year

19   2000, were you contacted by members of the Garland Police

20   Department and asked to do some research concerning a credit

21   card that had been issued to a Bertie Cunningham?

22       A.    Yes, sir.  Our bank was contacted.  Initially one of

23   our representatives was contacted on the evening of the

24   disappearance to monitor credit card activity.  I was

25   contacted the following day in regards to that activity to

1    follow up.

2        Q.    Specifically, were you asked to research some

3    transactions on a MasterCard that had been issued to Ms.

4    Cunningham?

5        A.    Yes, I was.

6        Q.    And do you have any records or anything with you

7    that indicates what the number on that credit card was?

8        A.    Yes, I do.

9        Q.    Okay.  If you would, if you wouldn't mind, just

10   refer to your records if that would help refresh your

11   memory.

12       A.    Certainly.  I'm ready.

13       Q.    Okay.  What number credit card were you looking for?

14       A.    It was a MasterCard issued on Washington Mutual,

15   MasterCard Account Number 5544 2600 1025 5141.

16       Q.    Okay.

17               MR. DAVIS:  May I approach, Your Honor.

18               THE COURT:  You may.

19       Q.    (By Mr. Davis)  Mr. De La Torre, let me ask you to

20   look at State's Exhibit Number 6.  Is that a Washington

21   Mutual credit card issued to Ms. Bertie Cunningham with the

22   number that you've just given to the members of the jury?

23       A.    Yes, it is.

24       Q.    So that is in fact the credit card that you were

25   asked to do some research on?

1    A.    Yes, it is.

2    Q.    And did you try to determine whether that credit

3 card had been used on either October the 4th or October the

4 5th of 2000?

5    A.    I tried to -- we tried to determine the activity for

6 both days actually.

7    Q.    Okay.  And, sir, did you actually determine that the

8 card had been used on October the 4th?

9    A.    Yes, we were able to determine that the credit did

10 card was used on October the 4th.

11    Q.    And did you have any indications that the credit

12 card first of all had been used at a Washington Mutual

13 location at 1225 East Belt Line Road in Richardson, Texas?

14    A.    Yes.

15    Q.    What was the results of your research?

16    A.    Our research indicated that the credit card was

17 attempted to be used for an ATM cash advance.  The individual

18 that attempted to use the credit card was unsuccessful

19 because they did not know the PIN number.

20    Q.    Do you have -- your records indicate how many

21 attempts were made at that ATM to obtain cash?

22    A.    There were two attempts made at that ATM.  One of

23 them at 1600, 16 hours, 4:16 in the afternoon, and then

24 another attempt at 1617 hours which would be 4:17 in the

25 afternoon.

1     Q.   So there were actually two attempts made to obtain

2  cash, both unsuccessful; is that right?

3     A.   That is correct.

4     Q.   And again, that was the credit card that had been

5  issued to Ms. Cunningham that was attempted to be used; is

6  that right?

7     A.   That is correct.

8     Q.   Did your research indicate any further activity on

9  that card for October the 4th?

10     A.   There was one other transaction attempted on October

11  the 4th.

12     Q.   And where did that take place?

13     A.   That transaction took place at a Bank One ATM at

14  9620 Harry Hines Boulevard in Dallas.

15     Q.   What was the time that the card was attempted to be

16  used at location?

17     A.   2330 hours, 11:30 p.m.

18     Q.   Let's jump forward one day now to October the 5th.

19  Did your records indicate that the cards had been used or

20  attempted to be used on October the 5th?

21     A.   Yes.

22     Q.   Where is the first transaction where the card was

23  used?

24     A.   The first transaction was again the card was trying

25  to be utilized at Bank One at 9620 Harry Hines Boulevard in

1    Dallas, and that was at 0434, 4 o'clock -- I mean, excuse me,

2    4:34 in the morning.

3        Q.   And so we had two attempts at the same location on

4    Harry Hines, the first being 11:30 -- 11:31 on October 4th,

5    and the next at 4:34 a.m. on October 5th; is that right?

6        A.   That is correct.

7        Q.   Was the card used again on October the 5th?

8        A.   Yes, the card was utilized again on October the 5th.

9        Q.   And where did that take place?

10       A.   Transactions occurred at a merchant by the name of

11   Chacho's in Terrell, Texas.

12       Q.   Uh-huh.  And what is the time that the card was

13   used?

14       A.   The card was used twice at that location.  The first

15   time the card was utilized was at 1835 hours, 6:35 p.m., and

16   the card again was used 1843 which is 6:43 p.m.

17       Q.   All right.  Do you -- do you show for the 6:35 p.m.,

18   the amount of that transaction?

19       A.   Yes.  $33.64.

20       Q.   Now, did your -- are your records able to determine

21   what was purchased at that time, or do they simply show an

22   amount?

23       A.   They just tell us that an authorization was granted

24   on the credit line for that account.

25       Q.   How about the 6:43 transaction, how much was

1    actually spent at that time?

2         A.    $70.44.

3         Q.    So the first one is a little over $33, and the next

4    one is a little over $70; is that correct?

5         A.    That is correct.

6         Q.    Was there any other activity on that card for

7    October the 5th?

8         A.    No, there was no further activity.

9         Q.    Any activity on October the 6th?

10        A.    No activity at that point.

11              MR. DAVIS:  May I approach, Your Honor.

12              THE COURT:  You may.

13        Q.    (By Mr. Davis)  Sir, if you would, taking a look at

14   State's Exhibit Number 17, do you recognize this to be a

15   report that's generated by your company?

16        A.    Yes, it is.

17        Q.    And would this be fair to say that these are records

18   that were generated with regard to the activity on this

19   MasterCard with regards to October the 4th and October the

20   5th?

21        A.    Yes, it is.

22        Q.    And the report is going to I guess document what

23   you've just told the members of the jury concerning the use

24   at the ATM in Richardson, as well as the ATM at Harry Hines,

25   and the two purchases at Chacho's in Terrell; is that right?

1      A.    Yes, sir.

2                  MR. DAVIS:  Your Honor, at this time we'll

3    offer State's Exhibit Number 17.

4                       (State's Exhibit No. 17 offered)

5                  MR. BYCK:  No objection to State's 17.

6                  THE COURT:  Admitted.

7                       (State's Exhibit No. 17 admitted)

8                  MR. DAVIS:  I'll pass the witness, Your Honor.

9                  MR. BYCK:  Your Honor, we have no questions of

10   this witness at this time, but we respectfully reserve the

11   right to cross-examine.

12                 THE COURT:  Sir, you are excused, subject to

13   recall.

14                 THE WITNESS:  Thank you.

15                 THE COURT:  You're welcome.

16                 MR. DAVIS:  Your Honor, the State will call

17   Richard Shollenberger.

18                 THE COURT:  Good afternoon, sir.  Ask you to

19   raise your right hand, please.

20                      (Witness sworn.)

21                 THE COURT:  Thank you, sir.

22         The State may continue.

23

24                  RICHARD SHOLLENBERGER

25   was called as a witness by the State and, after having been

1   first duly sworn, testified as follows:

2                     Direct Examination

3   By Mr. Davis:

4        Q.   Would you please tell us your full name?

5        A.   Richard Shollenberger.

6        Q.   Please spell your last name for the court reporter.

7        A.   S-h-o-l-l-e-n-b-e-r-g-e-r.

8        Q.   Okay.  Thank you.

9             Mr. Shollenberger, how are you employed?

10       A.   I work for Discover Financial Services.

11       Q.   What is your -- what's your position with that

12   company?

13       A.   I'm a regional field investigator.

14       Q.   What are your duties and responsibilities?

15       A.   I investigate fraud cases, I work with law

16   enforcement, custodian of records, testify in any court

17   proceedings that the company needs me to.

18       Q.   Discover actually issues credit cards, don't they?

19       A.   That's correct.

20       Q.   Would it be fair to say that a lot of your work then

21   would involve fraud on credit card transactions?

22       A.   That is correct.

23       Q.   I want to direct your attention back to October of

24   the year 2000.  At some point did the Garland Police

25   Department contact you with regards to Discover cards that

DARLINE W. LABAR, OFFICIAL REPORTER

1    had been issued to a Frances Conner and a Bertie Cunningham?

2        A.   Yes, they did.

3        Q.   Did they ask you to research transactions on those

4    two cards for October the 4th and 5th?

5        A.   That's correct.

6        Q.   Did you in fact do research to determine whether

7    those cards had been used on those dates?

8        A.   Yes, I did.

9        Q.   As a -- as a result of that investigation, were

10   certain reports generated that would -- that would actually

11   document the transactions on those cards?

12       A.   Yes, I did.

13               MR. DAVIS:  May I approach, Your Honor.

14               THE COURT:  You may.

15       Q.   (By Mr. Davis)  Mr. Shollenberger, I'm now showing

16   you State's Exhibits 18A and 18B.  18A going to a credit card

17   issued to Bertie Cunningham.  18B going to a credit card

18   issued to Frances Louise Connor.

19               Do these two documents actually contain the

20   transactions for these cards on October the 5th and the 4th,

21   as well as earlier into the month of September?

22       A.   That is correct.

23               MR. DAVIS:  Your Honor, at this time we will

24   offer State's Exhibits 18A and 18B.

25               (State's Exhibit No. 18A and 18B offered)

1          MR. BYCK:  No objection to 18A and B.

2          THE COURT:   18A and B are admitted.

3          (State's Exhibit No. 18A and 18B admitted)

4     Q.   (By Mr. Davis)  First of all, Mr. Shollenberger,

5  State's Exhibit 18A, the report that deals with the Discover

6  Card issued to Bertie Cunningham, is that in fact a report of

7  the activity on State's Exhibit Number 5, which is a Discover

8  Card issued to Bertie Cunningham?

9     A.   Yes, it is.

10    Q.   State's Exhibit 18B, does that report relate to

11 State's Exhibit Number 4, the Discover Card issued to Frances

12 Louise Connor?

13    A.   Yes, it does.

14    Q.   Now, let's talk about the card that had been issued

15 to Bertie Cunningham first, State's Exhibit Number 18A.  Was

16 that card in fact used on October the 4th of 2000?

17    A.   Yes, it was.

18    Q.   Where was it used?

19    A.   At Richardson Motor Sport.

20    Q.   And does your report indicate what time that card

21 was used?

22    A.   Yes, it does.

23    Q.   What time?

24    A.   19:45.  That's Eastern Standard Time.

25    Q.   And so that would have been 7:45 Eastern Standard

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1    Time which would be 6:45 our time, right?

 2         A.   I believe so.

 3         Q.   And does it give the amount of that transaction?

 4         A.   Yes, it's -- it's whole dollar amount is $1,728.

 5         Q.   So 6:45 p.m., October 4th, $1728 at Richardson Motor

 6    Sports, correct?

 7         A.   Correct.

 8         Q.   Any other activity on October the 4th?

 9         A.   No, there was not.

10         Q.   Any activity on October the 5th?

11         A.   Yes.

12         Q.   Where was the card first used on October the 5th?

13         A.   Cole Mountain in Terrell, Texas.

14         Q.   What's the time of that transaction as shown on the

15    report?

16         A.   It shows 20:09.

17         Q.   Which would be 8:09 Eastern time; is that correct?

18         A.   I believe so.

19         Q.   And again, that would be a little after 7:00 p.m.

20    Central time.

21              What was the amount of that transaction, sir?

22         A.   $25.  And again, it's rounded.  It doesn't show the

23    cents of each transaction.

24         Q.   Was the card used again on October the 5th?

25         A.   Yes, it was.
```

1    Q.    Where was it used this time?

2    A.    Phillips 66 station.

3    Q.    What's the time of the purchase?

4    A.    20:24.

5    Q.    Again, that's going to roughly be then 7:24 our

6  time.

7          What is the amount of that transaction?

8    A.    $22.

9    Q.    Was the card used again after that?

10   A.    No, it was not.

11   Q.    Let's turn to the report, State's Exhibit 18B, and

12 this is going to go to Ms. Connor's Discover Card.  Did your

13 records reflect that her card had been used on October the

14 4th?

15   A.    Yes, it does.

16   Q.    Where was it used?

17   A.    The first transaction on the 4th was at Dillard's.

18   Q.    What was the time of that purchase?

19   A.    The time shows 12:55.

20   Q.    Which will be 11:55 our time.  And what's the amount

21 of the purchase?

22   A.    $46.

23   Q.    So 11:55 a.m. at Dillard's.  And again, how much was

24 the purchase?

25   A.    $46.

1     Q.    Was it used again on October the 4th?

2     A.    Yes, it was.

3     Q.    Where was it used next?

4     A.    JC Penney's.

5     Q.    What time?

6     A.    15:58.

7     Q.    Which will now be 2:58 p.m. our time, I believe.

8  What's the amount of the purchase?

9     A.    $32.

10     Q.    Do your records indicate that the card was used

11  again on October the 4th?

12     A.    No, it does not.

13     Q.    Do your records reflect that the card was used on

14  October the 5th?

15     A.    Yes, it does.

16     Q.    Where was it used?

17     A.    It was used at a ATM machine.

18     Q.    Does it give the address or the location for the ATM

19  machine?

20     A.    No, it does not.

21     Q.    And what's the time of the use?

22     A.    On the 5th, the time is 5:33.

23     Q.    Again, going back, that will be 4:33 our time.   Does

24  it give an amount on that?

25     A.    Yes, it does.

1      Q.    What is the amount?

2      A.    $201.

3      Q.    Now, if -- Mr. Shollenberger -- well, first of all,

4  was the card used again after that transaction, or was that

5  the last transaction using Ms. Connor's card?

6      A.    That was the last transaction.

7      Q.    Let me ask you if someone were to take Ms. Connor's

8  Discover Card, go to an ATM machine, is it your understanding

9  in order to obtain money, that they have to have a personal

10 identification number?

11     A.    That's right.

12     Q.    Would your records indicate whether the individual

13 actually obtained the $201 at 4:33 a.m. or not?

14     A.    Yes, it would.

15     Q.    And what do your records indicate?

16     A.    That the transaction was declined.

17     Q.    Again, if the card had been used without a proper

18 PIN, then the transaction would have been denied; is that

19 correct?

20     A.    That's correct.

21     Q.    You've now told the jury about all the -- all the

22 transactions using those two cards for both October 4th and

23 5th, correct?

24     A.    That is correct.

25     Q.    Thank you, Mr. Shollenberger.

1          MR. DAVIS:  I pass the witness, Your Honor.

2                    Cross-Examination

3    By Ms. Balido:

4          Q.   Mr. Shollenberger, just so I can be clear, and

5    there's a reason I went to law school so I don't have to look

6    at these numbers -- these types of numbers.

7                What's the difference between an authorized only

8    entry on your records and a straight entry without the words

9    "authorized only"?

10         A.   I'm not sure I know what you're looking at.

11                   MS. BALIDO:  Okay.  May I approach the

12   witness.

13                   THE COURT:  Sure.

14         Q.   (By Ms. Balido)  Like here on State's Exhibit Number

15   18, it says "10/05 20:24," which is whatever time.  It says

16   Phillips 66 authorized only.  Do you know what that stands

17   for?

18         A.   It's -- that will show up any time you use it at a

19   Phillips 66.  It's just as -- just what the code is or the

20   name they have that will show up.  And what it is, is it will

21   show up that it's authorizing -- you swipe the card and this

22   is showing that you're authorizing it, like it will show the

23   corporate headquarters as opposed to the exact city.

24         Q.   Okay.  So it's not -- so it just shows that the

25   corporate headquarters in Kansas has authorized the charge,

1    not necessarily that they're using the card in Kansas?

2        A.    Right.

3        Q.    Okay.  And -- and is that the same situation on Ms.

4    Connor's card where it says "Dillard's authorized only"?

5        A.    Correct.

6        Q.    Okay.  And you said that the Dillard's charge

7    occurred at 12:55 Eastern time but 11:55 Central?

8        A.    Yeah, it's 12 -- yeah, 12:55 is what shows up on our

9    printout.

10       Q.    On -- on the 4th of October?

11       A.    Correct.

12       Q.    Okay.  And the next charge wasn't until 15:58 of the

13   4th?

14       A.    Correct.

15              THE COURT:  Anything further, Ms. Balido?

16              MS. BALIDO:  Judge, just one more question.

17       Q.    (By Ms. Balido)  And this -- and this -- these

18   records just show that this card was used, but does not show

19   who actually used those cards?

20       A.    Correct.

21       Q.    Okay.

22              MS. BALIDO:  That's all I have, Judge.

23              MR. DAVIS:  No further questions, Judge.

24              THE COURT:  May he be excused, subject to

25   recall?

DARLINE W. LABAR, OFFICIAL REPORTER

1    MR. DAVIS:  No objections.

2    MS. BALIDO:  No objections.

3    THE COURT:  Thank you, Mr. Shollenberger, you

4 are excused, subject to recall.

5    MR. DAVIS:  The State will call Ora Mae

6 Milton.

7    (Witness brought forward.)

8    THE COURT:  Good afternoon.  May I ask you to

9 raise your right hand, please, and be sworn in.

10    (Witness sworn.)

11    THE COURT:  Thank you.  Ms. Milton, I invite

12 your having a seat to my left, please.

13   You may proceed, counsel.

14    MR. DAVIS:  Thank you, Judge.

15    ORA MAE MILTON

16 was called as a witness by the State and, after having been

17 first duly sworn, testified as follows:

18    Direct Examination

19 By Mr. Davis:

20  Q. Ma'am, would you please tell us your full name?

21  A. Ora Mae Milton.

22  Q. All right.  Ms. Milton, where do you live?

23  A. Edgewood, Texas.

24  Q. How long have you lived in Edgewood?

25  A. All my life.

1    Q.   What is your actual address there in Edgewood?

2    A.   Post Office Box 396.

3    Q.   All right.  The physical house that you live in,

4    would that be at 509 Lamar?

5    A.   Yes, sir.

6    Q.   And just describe your home.  Is it a single family

7    residence?

8    A.   No, my grandkids stay with me.

9    Q.   All right.  How many grandkids do you have living

10   with you?

11   A.   Right now just two.

12   Q.   All right.  And what are their names and ages?

13   A.   Shod Tarrant and Jatora Yarber (phonetic).

14   Q.   Now, Shod Tarrant, that's a young man, correct?

15   A.   Right.

16   Q.   And then your -- you have a granddaughter, right?

17   A.   Right.

18   Q.   How old is Shod?

19   A.   About -- he's 26 or 27.  He's had a birthday.  I'm

20   not sure I remember, but he's 20 something.

21   Q.   Ms. Milton, do you still work?

22   A.   I work three days a week.

23   Q.   What kind of work do you?

24   A.   Housemaiding I guess you'd call it.

25   Q.   Did Shod go to -- go to school there in Edgewood?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    Yes, sir.

2      Q.    So he actually attended junior high and high school

3  in Edgewood; is that right?  Shod?

4      A.    Sorry, I didn't understand what you said.

5      Q.    Did Shod go to junior and senior high school down

6  there in Edgewood?

7      A.    Yes, sir, he graduated from down there.

8      Q.    Did you know a lot of the kids that Shod used to

9  hang around with when he was in school?  Did you meet some of

10 them?

11     A.    Yes, sir.

12     Q.    Do you know a person by the name of Jedidiah or Jim

13 Murphy?

14     A.    Yes, sir.

15     Q.    Was that someone that your grandson used to hang out

16 with and run around with?

17     A.    They played ball together and stuff like that.

18     Q.    Do you see him in the courtroom this afternoon?

19     A.    Yes, sir.

20     Q.    Could you just for the record tell me what's he

21 wearing today?

22     A.    My eyesight is kind of bad.  Can I turn?

23     Q.    Yes, ma'am.

24     A.    It looks like he's wearing a dark suit and light

25 shirt and eyeglasses.

```
1              MR. DAVIS:  May the record please reflect this
2   witness is identifying the defendant in open court.
3        Q.   (By Mr. Davis)  Ms. Milton, what did you used to
4   call Mr. Murphy, was it Jim, Jedidiah?  What did you refer to
5   him as?
6        A.   Jim.
7        Q.   Do you remember what he used to refer to -- refer to
8   you as?
9        A.   Granny.
10       Q.   Granny.  Okay.
11       A.   All the kids call me Granny.
12       Q.   I guess over the years you've seen the defendant
13   many, many times, haven't you?
14       A.   Yes, sir.  After he got grown, you know, and left
15   from around Edgewood, he always come to see me once every
16   year.
17       Q.   Ms. Milton, I want to direct your attention back to
18   October the 5th of last year, and ask you sometime that
19   afternoon did the defendant come to your house?
20       A.   Yes, sir, he came to my house.
21       Q.   Was he by himself or did he --
22       A.   Yes, sir.
23       Q.   -- come up there with someone else?
24       A.   No, sir, he was by himself.
25       Q.   Did he drive to your house?
```

```
1        A.    Yes, sir, he was in a car.

2        Q.    Do you remember what kind of car that he showed up

3   in that day?

4        A.    No, sir, I -- I didn't know the make of the car or

5   anything.

6        Q.    Did the --

7        A.    I just knew he was in a car.

8        Q.    Did the police later take that car away from your

9   house?

10       A.    Yes, sir.  Over in night or before day you could

11  say.  It was about day by the time they picked it up.

12       Q.    When the defendant showed up, did you have a chance

13  to talk with him?

14       A.    Yes, he came in and spoke to me, you know, hi,

15  Granny, and I come to see you, Granny.  And about that time,

16  you know, every year, like I say, he usually come see me

17  about once a year and we sit there and talked awhile.  And

18  then Shod came in and he said, well, said I'm going to take

19  you out to eat, you know like that, so they went out to eat

20  and he brought me a plate.

21       Q.    Did there appear to be anything wrong with the

22  defendant?  Did he seem to be upset or unhappy or nervous or

23  anything like that when you talked with him?

24       A.    No, sir.

25       Q.    Did he seem to be like his regular old self, just
```

1   kind of happy and --

2       A.   To me he did.  He seemed like he was just Jim.

3       Q.   Did it look like he had been crying?

4       A.   Not to me.

5       Q.   So he came in, y'all talked, he just said he was

6   there to visit with you; is that right?

7       A.   Yes, sir.

8       Q.   He mention anything about that he was on his way

9   down to see his daughter or his ex-wife or anything like

10  that?

11      A.   No, sir.

12      Q.   Did he tell you that he was heading down to Key West

13  with a girlfriend?

14      A.   No, sir.

15      Q.   Did he tell you that he was going down to Miami to

16  paint a club?

17      A.   No, sir.

18      Q.   And did he appear to have been drinking?  Could you

19  tell if Jim had been drinking or not?

20      A.   He didn't appear to be drinking, you know, or

21  nothing -- to me.  You know, he said those few words to me

22  and then he and my grandson sit there in the yard and was

23  talking.

24      Q.   All right.  And did I understand you to say that the

25  defendant left with your grandson to go out to eat; is that

1   right?

2       A.   He came to the door and told me, said, "Granny, we

3   going out to eat."  Said "we be back in a few minutes."

4       Q.   Did your grandson leave with him then?

5       A.   Yes, sir.

6       Q.   Did they drive off in the car that the defendant had

7   droven -- driven to your house in or some other car?

8       A.   No, it was the one he was in.

9       Q.   Do you know about how long that your grandson and

10  the defendant were gone before they came back?

11      A.   I can't just pinpoint it, but it wasn't too long.  I

12  would say maybe between 9:30 or 10:00, like that.

13      Q.   Okay.  So they came home later that evening, right?

14      A.   Yeah, they came in after they got through eating I

15  guess because they brought me a plate.

16      Q.   Did I understand that they actually brought food

17  back there for you?

18      A.   They just brought me -- it was a barbecue plate is

19  what it was, some barbecue ribs, beans, and potato salad.

20      Q.   When they came back, did you have a chance to talk

21  to the defendant again?

22      A.   He just said that he just had to come see Granny and

23  then we sit there and we talked about old times, you know

24  like, when they were growing up playing ball like that, and

25  then he said, "Well, Granny, can I spend the night?"  And I

1    just said, yes, you know, because usually he spend the night

2    when he come by to see me.

3        Q.   Uh-huh.  Did you tell him that it was okay for him

4    to spend the night?

5        A.   Yes, sir.

6        Q.   Did you tell him anything about he would have to

7    leave a little early the next morning or anything like that?

8        A.   Yes, sir, I told him because I have a granddaughter,

9    you know, there at the house.  And I would be gone after

10   work, and I didn't like for boys to be, you know, around the

11   house when I was gone.

12       Q.   Did the defendant say that he would go ahead and

13   leave early the next morning?

14       A.   Yes, sir, he said he was going to leave early the

15   next morning.

16       Q.   Where was the defendant going to sleep?

17       A.   In the boys' room.  I have bunk beds stacked.

18       Q.   Okay.  Was anybody --

19       A.   Because I had more than one -- more than the one

20   grandson and granddaughter sleeps in the same bedroom.  My

21   house is two bedroom.

22       Q.   So back on October 4th, was your granddaughter

23   living there at that time?

24       A.   Yes, sir.

25       Q.   And then Shod was living there, right?

1   A.   Right.

2   Q.   Was there a another grandchild living with you then?

3   A.   He live with -- he was in college.  He had gone to

4   college, Jonathan.

5   Q.   Was anybody else going to sleep in the same room as

6   the defendant?

7   A.   Nobody but he and Shod was in the boys' room.

8   Q.   Do you know about what time the defendant actually

9   went to bed that night?  Were you still up when he went to

10  bed?

11  A.   Yes.  I was listening at the 10 o'clock news.  It

12  was somewhere around 10:00.  I just can't remember and

13  pinpoint the time, but I always stay up until after 10

14  o'clock to the news.  And I'm sure it was somewhere, you

15  know, probably after 10:00.

16  Q.   Then you went on to bed, right?

17  A.   Yes, sir.  They went to bed, and I went to bed.

18  Q.   Did something wake you up early the next morning,

19  Ms. Milton?

20  A.   Gary Rose knocked at the door.

21  Q.   Who is Gary Rose?

22  A.   He's a police from Canton, Van Zandt County.

23  Q.   He's actually a Sheriff's Deputy with Van Zandt

24  County?

25  A.   Yes.

1     Q.    He's at the front door; is that right?

2     A.    Yeah, he knocked on the door.

3     Q.    Did he ask you about the defendant, about Jedidiah

4 Murphy?

5     A.    Yes, sir.  He asked me was he there.

6     Q.    Uh-huh.  And when you told him yes, did he actually

7 come into the house?

8     A.    He asked me could he come in and talk to him, and I

9 said "sure."

10     Q.    Uh-huh.  Sometime after Gary Rose got there, did

11 other police officers start arriving at your house, Ms.

12 Milton?

13     A.    Well, when he came in, I had -- I didn't see the

14 others.  When he came in, then all of them come in behind

15 him.  And I asked them what was going on.  And they said they

16 couldn't tell me then.

17     Q.    So a number of police officers came in, they started

18 talking with the defendant.  I guess to kind of fast forward

19 a little bit, did they eventually arrest the defendant and

20 take him away from your house?

21     A.    Yes, sir.

22     Q.    Did you ever see the defendant again after that?

23     A.    No, sir.

24     Q.    And I think you told me that the car that the

25 defendant had driven down to your place, the police

1    eventually, they towed that away also, didn't they?

2        A.    Yes, sir.

3        Q.    When -- when the defendant came back from eating

4    dinner, did he bring any kind of alcohol into your house?

5        A.    No, sir.

6        Q.    Do you let --

7        A.    Because he know that I don't approve of that.

8        Q.    Okay.  So he didn't bring any beer or whiskey or

9    anything like that into your house, right?

10       A.    No, sir.

11       Q.    And I think that you told us, didn't you, that when

12   he came back, y'all just sat around and had a good talk about

13   basically old times; is that right?

14       A.    Yeah, you know, reminiscing back over when they was

15   growing up, you know, little things like that.

16       Q.    He seemed -- did he seem to have any problem

17   remembering those sorts of things?

18       A.    No, sir, he was just Jim.

19       Q.    No indication he was having any problems at all?

20       A.    No, sir.

21       Q.    Okay.  Ms. Milton, thank you.

22             MR. DAVIS:  I'll pass the witness with one

23   exception, Your Honor, if I can approach.

24             THE COURT:  You may.

25       Q.    (By Mr. Davis)  Ms. Milton, let me show you State's

1    Exhibit Number 20.   Is that a photograph of your house there

2    at Edgewood?

3        A.   I guess it looks like my house.   I didn't know they

4    had that.

5        Q.   Actually I took that photograph.

6        A.   That's the tree, yeah.   It looks like my old car

7    sitting out there.

8        Q.   Do you remember the day that Investigator Richardson

9    and I came out and talked to you?

10       A.   Yeah.

11       Q.   Actually I took the photograph then.

12       A.   Yeah, you sneaked that one by me.

13            MR. DAVIS:  We'd offer State's Exhibit Number

14   20, Your Honor.

15            (State's Exhibit No. 20 offered)

16            MR. BYCK:  With that predicate, no objection.

17            THE COURT:  Admitted.

18            (State's Exhibit No. 20 admitted)

19            MR. DAVIS:  I'll pass the witness now, Your

20   Honor.

21            MS. BALIDO:  Judge, if I can have just a short

22   second.

23            THE COURT:  Mr. Davis, did this witness

24   generate a report, a written report?

25            MR. DAVIS:  No, sir.

1        <u>Cross-Examination</u>

2   By Ms. Balido:

3        Q.   Ms. Milton, my name is Jennifer Balido, and I

4   represent Jim Murphy in this case.  Okay?  And I'm going to

5   ask you some questions.  And if you don't understand what I'm

6   saying, just let me know and I'll try to rephrase it.  Okay?

7        A.   Yes, ma'am.

8        Q.   You lived in Edgewood all your life; is that

9   correct?

10        A.   Right.

11        Q.   Okay.  So you know a lot of the kids that grew up in

12   Edgewood; is that correct?

13        A.   Right.

14        Q.   And that -- and Shod and your other grandson Arthur;

15   is that right?

16        A.   Right.

17        Q.   They grew up with Jim there in Edgewood; is that

18   correct?

19        A.   Yeah, kind of -- you know, I don't know whether Jim

20   was the oldest or they were the oldest, but they were all,

21   you know, in school and they were all close together and

22   played ball together and like that.

23        Q.   And --

24        A.   But now I don't know which -- which one the oldest

25   whether my grandchildrens are older than Jim or Jim was the

1   oldest.  I don't know that.

2       Q.    Okay.  And also Jason Bonham who works for the

3   Edgewood Police Department, he also grew up with all them; is

4   that right?

5       A.    Well, for a while he was around in school with them,

6   and then he disappeared as far as I know.  I didn't see him

7   no more until he was grown, Jason Bonham.

8       Q.    Okay.  I want to talk to you a little bit about when

9   Jim came over to your house that day in October.  Okay.  Now,

10  how long do you work till during the day?

11      A.    Well, in the morning I go to work, get there about

12  8:00, and it varies from time to time because most of the

13  time where I work out in the country, it usually be always

14  from 2:30 to maybe 3:00 before I get in, or 4:00 maybe.  It

15  just varies sometimes.  Because sometimes she has a lot to

16  do.

17      Q.    Okay.  So when -- on the day that Jim came out to

18  the house, did you just see him that one time before he and

19  Shod went to go eat dinner or did you see him earlier that

20  afternoon?

21      A.    No, ma'am, I just saw him the one time when he came

22  to my house.

23      Q.    Okay.  So -- and that was at about what time do you

24  think?

25      A.    Well, I -- it had to be somewhere about 5:00 or

```
 1    around maybe after, somewhere along in there --

 2        Q.   Okay.

 3        A.   -- when he come to my house.

 4        Q.   Okay.

 5        A.   But like I say, you know, I'm there in the house

 6    puddling around, and I didn't look at no time or anything.

 7        Q.   Right.

 8        A.   And I can't verify just exactly what time he came

 9    there, but I do know it was late in the afternoon.

10        Q.   Okay.  And -- and when he came there, you didn't see

11    that he was carrying any alcohol or had any alcohol in the

12    car or anything like that, did you?

13        A.   No, ma'am, I didn't go out around the car.

14        Q.   Okay.

15        A.   He came in the house.  And, you know, I talked to

16    him there in the house.

17        Q.   Okay.

18        A.   I didn't go out around the car at all.

19        Q.   And you sat and talked with him for a while; is that

20    correct?

21        A.   Yes, ma'am.

22        Q.   And the first time that y'all sat and talked, kind

23    of that late afternoon, did he seem upset to you for any

24    reason?

25        A.   No, ma'am.  Like I say, he just seemed like Jim to
```

1   me.

2       Q.   And was it at that time that y'all started taking --

3   talking about old times and -- or was that later on in the

4   evening after they got back from eating dinner?

5       A.   No, when he first came there, he said, "Granny,"

6   said, "I had to come see you."  And I knew, you know, about

7   this -- that time of year he always come see me.

8       Q.   Right.

9       A.   And so we was talking like that, you know, and he

10  was talking to me about his little girl, you know, and all

11  like that.  And then he said "Granny," said, "I'm going to

12  take Shod out to eat."  And I said, "well, you boys be

13  careful, behave yourself."

14      Q.   Okay.

15      A.   Just like that.

16      Q.   Okay.  So he talked a little bit about his little

17  girl?

18      A.   Yeah, the first time.

19      Q.   Alyssa, is that her name?

20      A.   Yes, I think that's her name.

21      Q.   Did he talk about wanting to go see her or go talk

22  to her or anything like that?

23      A.   No, he was telling me how pretty she was and how she

24  had grown up, you know, and everything, because I hadn't seen

25  her.

```
 1        Q.    Okay.

 2        A.    And he was telling me how she looked, you know,

 3   things like that.

 4        Q.    Now, when he -- when you first saw him that

 5   afternoon, was Shod there at the house or was Shod gone from

 6   the house or where was he?

 7        A.    Shod came in just as -- Shod had been to report and

 8   he came in just as Jim -- I'll say about 15 -- 10 or 15

 9   minutes after Jim got there.

10        Q.    Okay.  And you said Shod came in from -- he had to

11   go report.  Was that to his probation officer?

12        A.    Yes, ma'am.

13        Q.    All right.  And did Shod seem surprised that he was

14   there?  Or did he seem like he knew that he was probably

15   going to be there?

16        A.    No, he was surprised to see him, you know, because

17   we hadn't seen him in a long time.

18        Q.    Okay.  And so you said that you pretty much stayed

19   inside the house and didn't ever go out and look at the car

20   that Jim was driving; is that correct?

21        A.    Yes, that's right.

22        Q.    All right.  Now, they went on to go eat dinner and

23   they brought you back a plate of food; is that right?

24        A.    They brought me back -- it wasn't no big old plate,

25   but an order of ribs and baked beans and potato salad and a
```

1   roll.

2   Q.   Okay.  Was that surprise -- did that surprise you,

3   or did you know that they were going to do that?

4   A.   No, I didn't know he was going to do it.  Yeah, it

5   was a surprise because I didn't know he was going to bring me

6   a plate back.

7   Q.   Okay.  And then you sat down with Jim and you talked

8   for a while.

9   A.   Yeah, he -- he went and put my food on the table and

10   then he came back in there and sat down and we talked.  And

11   that's when we were reminiscing back when they was growing

12   up.

13   Q.   Okay.  And where was Shod at this time?  Did he

14   leave?

15   A.   He was in there with us.

16   Q.   Okay.  Did he ever --

17   A.   We was all sitting in the living room.

18   Q.   All right.  So after he came back -- they came back

19   from eating dinner, did Shod ever leave with some other

20   people to go do anything?

21   A.   Not that I know of.

22   Q.   Okay.  So you're saying that Shod was with y'all the

23   whole time?

24   A.   Yes, ma'am.  We all was there in the living room.

25   Q.   So he didn't leave with a guy and another girl in

1    Mr. Murphy's car?

2        A.   No.

3        Q.   Or the car that Jim was driving?

4        A.   No.

5        Q.   Okay.  Did he ever leave at any time during that

6    day?  I'm talking about he -- let me make myself more clear.

7    Did Shod ever leave driving the car that Jim was driving that

8    day?

9        A.   Not that I know of.

10       Q.   And certainly not when y'all -- when they came back

11   from dinner because y'all sat around reminiscing?

12       A.   Right.

13       Q.   And did the boys ever go outside for any reason

14   after y'all had been talking for a while, like when you were

15   eating or anything like that?

16       A.   No, at first when he first came in, like I said,

17   before, they sit out in the yard awhile and I was inside the

18   house.

19       Q.   And that was in the early evening?

20       A.   Yes, ma'am.

21       Q.   Okay.  Did you know if they were drinking beer or

22   doing anything out there at that time?

23       A.   No, because I was back in the house doing what I had

24   to do there in the house.

25       Q.   Okay.  Now, tell me a little bit about -- about the

DARLINE W. LABAR, OFFICIAL REPORTER

1   way that your -- the boys' room is set up at your house.   You

2   said that there's bunk beds in there?

3        A.   Yes, ma'am.

4        Q.   And are those the only beds that are inside the

5   house?

6        A.   No, ma'am.  I have a bedroom.

7        Q.   I'm sorry.  Are those the only beds that are inside

8   the boys' rooms, just the bunk beds?

9        A.   Yes, ma'am.

10       Q.   Okay.

11       A.   It's --

12       Q.   And is that where Jim and --

13       A.   Shod were.

14       Q.   Shod went?

15       A.   Yes, ma'am.

16       Q.   Okay.  And where was Jim sleeping if you know?

17       A.   He was sleeping in one of the beds.

18       Q.   Do you know if he was on the top or the bottom?

19       A.   Well, they single.  They single out.

20       Q.   Okay.  So -- so they are bunk beds, but they are

21   flat on the ground?

22       A.   Yes, ma'am.

23       Q.   And so you were still awake or at least you told Mr.

24   Davis that you were awake when -- when Jim went to bed?

25       A.   Yes, ma'am.

1    Q.    Okay.  And was Shod in the house at that time?

2    A.    Yes, ma'am.

3    Q.    Okay.  Had he left the house in Jim's car for any

4  reason?

5    A.    Not that I know anything.  I know of him leaving the

6  house in the car at no time.

7    Q.    Okay.  And that was sometime after the 10 o'clock

8  news?

9    A.    Yes, ma'am.

10    Q.    How long do you think that you had been knowing Jim?

11    A.    It was after he was adopted to the Murphy family,

12  and Mr. Murphy and Tim Erwin coached my kids one year and so

13  I knew him that way.

14    Q.    Okay.  And so Jim --

15    A.    How old he was, I don't know.

16    Q.    And so Jim was adopted by the Murphys and then --

17  and then --

18    A.    That's when I get to know him.

19    Q.    Okay.  Because Mr. Murphy and Tim Erwin taught or

20  coached --

21    A.    They was my boys' coach, and he was on the team.

22    Q.    Okay.  And then Edgewood is small enough to have one

23  high school so they all went to high school together?

24    A.    Yes, ma'am.

25    Q.    And did you used to work with the Murphys as well,

1    work for them?

2        A.    I work for them one time, uh-huh.

3        Q.    Okay.  And when you say at one time, did you work

4    for them for a period of time or did you just go over there

5    one time --

6        A.    No, ma'am, I worked just a few days once for them.

7        Q.    Okay.

8                  MS. BALIDO:  Judge, can we approach the

9    bench?

10                 THE COURT:  Need a reporter?

11                 MS. BALIDO:  No, not at this point.

12                 (Side bar discussion off the record.)

13                 THE COURT:  Sheriff, let's take a short break.

14   Want counsel to stay in here to discuss the matters about

15   which -- at least one counsel for each side to stay in about

16   matters that were discussed here.

17                 THE BAILIFF:  All rise.

18                 (Jury recessed from courtroom.)

19                 THE COURT:  Let the record reflect the jury is

20   being excused from the courtroom at this time.

21            Respective attorneys examining this witness remain

22   in the courtroom.  The others may be excused during the

23   recess if they wish.

24            Mr. Murphy, counsel, you may be --

25                 MS. LITTLE:  Mr. Murphy would like to --

```
 1              THE COURT:  Quickly.

 2          Visitors in the gallery may be seated.

 3              (Brief Recess.)

 4              THE COURT:  Let the record reflect this

 5  hearing is being conducted outside the presence and hearing

 6  of the impaneled jury.  Mr. Murphy has returned to the

 7  courtroom.  Counsel for the State and the defense are both

 8  present.

 9          Defense may proceed with the proffer.

10      Q.  (By Ms. Balido)  Ms. Milton, I'm going to ask you

11  some questions about when Detective Rose or Deputy Rose came

12  into your house.  Okay?

13      A.  Uh-huh.

14      Q.  Now, you know that Deputy Rose is a member of the

15  Van Zandt County Sheriff's Department; is that correct?

16      A.  That's right.

17      Q.  Okay.  And were you actually present when he came

18  into the front part of the house?

19      A.  Yes, ma'am.  I'm the one woke up and heard him

20  knocking.

21      Q.  And you let him in the front door?

22      A.  Ma'am?

23      Q.  And you let him in the front door?

24      A.  Yes, ma'am.

25      Q.  Okay.  And then did -- Mr. Rose told you why he was
```

```
 1    there, that he was looking for Jim Murphy; is that correct?

 2         A.   No, he asked me was Jim there.

 3         Q.   Okay.

 4         A.   And I told him, yes.  And he said, "can I come in

 5    and talk to him."  And I said, yes.

 6         Q.   Okay.  And so did you have to show him what room he

 7    was sleeping in?

 8         A.   Yeah, I was directing him, because you have to go

 9    down the hall when you come out of the living room.

10         Q.   And were you standing near the doorway or near the

11    room when Mr. Rose or Deputy Rose actually walked into the

12    bedroom were Shod and Jim were sleeping?

13         A.   I stepped back from the living room door and then

14    Gary came in and the others was right behind him.  And I

15    don't know whether it was Gary or who, but they told me to

16    get back from the door there at the living room.  And I asked

17    what was going on.

18         Q.   And that's when they told you that they couldn't

19    tell you right then?

20         A.   Yeah, that's right.

21         Q.   Okay.  Did you hear any -- well, what did you hear

22    any of the officers say when they walked into the bedroom

23    where Shod and Jim were sleeping?

24         A.   They sent Shod out, and I didn't hear what they said

25    to Jim.
```

1    Q.  Okay.  So you --

2    A.  I didn't hear anything they said to him.  They sent

3  Shod out in the living room.

4    Q.  Okay.  So you didn't hear the officers say any words

5  at all to Jim?

6    A.  No, ma'am.  I didn't hear them say anything to him.

7    Q.  Okay.

8           MS. BALIDO:  Judge, that's all.

9           THE COURT:  Is that it?

10          MS. BALIDO:  For this witness, yes.

11          MR. DAVIS:  Just a couple of matters while

12  we're outside the presence of the jury.

13          THE COURT:  All right.

14          MR. DAVIS:  The next witness is going to be

15  Treshod Tarrant.  I'm going to tender right now, pursuant to

16  the Court's order, Mr. Tarrant's NCIC, TCIC records.  Let the

17  record also reflect that earlier today, I believe after we

18  came in from lunch, that I tendered to defense counsel the

19  grand jury testimony of the witnesses who testified

20  originally and on the reindictment in this case.  Also, I'm

21  going to tender to counsel right now the enhanced audio and

22  video slow down of the tape from Chacho's.  I thought if

23  we're in a break right now, because that witness will

24  becoming in right after Treshod Tarrant.  So if the Court

25  would wish, we could take a short break and they can look at

1    that.

2                    THE COURT:  Will you need Ms. Milton anymore

3    when the jury comes back?

4                    MS. BALIDO:  Yes, Judge.

5                    THE COURT:  Ms. Milton, you may step down,

6    take a short break.  If you'd please be back in the courtroom

7    in 15 minutes.

8                    (Recess of proceedings.)

9                    THE BAILIFF:  All rise.

10                    THE COURT:  Let the record reflect the jury is

11    returning at this time.

12            Jury may be seated.

13            Mr. Murphy, counsel, visitors in the gallery, you

14    may be seated.

15            And the media may be seated.

16            Defense may continue.

17    Q.    (By Ms. Balido)  Ms. Milton, for the -- for the

18    trial record, you're the same Ora Mae Milton that testified

19    before we took a break; is that correct?

20    A.    Yes, ma'am.

21    Q.    Okay.  Ms. Milton, now you said that you watched the

22    10 o'clock news that night; is that correct?

23    A.    Yes, ma'am.  I watch generally the 10 o'clock news

24    at night every night.

25    Q.    And which channel do you watch?  Do you remember?

1    A.   I switch, sometime -- most of the time I watch 4,

2    but I switches from time to time.

3    Q.   Okay.  Do you watch the 9 o'clock news on 4 and the

4    10 o'clock news or just the 10 o'clock news on 4?

5    A.   Just 10:00.  I'm usually still working at 9:00.

6    Q.   And that's the Fox 4 news channel; is that correct?

7    A.   That's correct.

8    Q.   Did they have anything on the TV that night about --

9    about Ms. Cunningham's disappearance?

10   A.   Not that I recall.  I had heard it the evening

11   before, about her being disappeared.

12   Q.   Okay.  And did they show Jim's picture on the TV on

13   that night as being the suspect?

14   A.   The night that I heard that she had disappeared?

15   Q.   No, the night that Jim actually spent the night in

16   the house?

17   A.   I don't recall seeing her picture or neither his.

18   It was -- it was morning when they left my house.  It was not

19   in the night.  It was morning by the time they left my house.

20   Q.   Okay.  But the night before when you were watching

21   the news, you never saw anything on there --

22   A.   No, ma'am.

23   Q.   -- about --

24   A.   No, ma'am, not anything about Jim being in it.  I

25   didn't see anything about Jim.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Okay.  Or anything about the lady on that night?

2    A.   All I -- all I seen in the news was that the lady

3  was missing, and that's all I had heard.

4    Q.   And about what time was it that you heard the

5  knocking on the front door of your house?

6    A.   It was going on morning by the time -- if I recall

7  right.  Like I say, I can't be perfect on the time, but it --

8  I'm sure it was going on morning when Gary knocked on my

9  door.

10    Q.   Okay.  So when you're saying going on morning, you

11  mean after midnight?

12    A.   That's what I -- I believe it was after midnight.

13    Q.   Okay.  And had you actually seen Shod and Jim go

14  into the bedroom to go to sleep the night before?

15    A.   The same time that they picked Jim up, I was sitting

16  when they -- in the living room when they went back to the

17  bedroom to go to bed.

18    Q.   And what happened once the detectives started

19  knocking on your door?

20    A.   Well, he knocked on the door, and I woke up.  And I

21  can remember seeing some lights flashing on the outside

22  because my living room window is double.  And I saw lights

23  flashing, and so I said I know I heard a knocking.  About

24  that time he knocked again, and I say who's there.  And he

25  said Gary.  And so I got up went to the front door and

1  cracked the door.  I didn't open it wide because I don't

2  trust many people.  I can't help if you are a police and my

3  screens is always locked.  So I cracked the door, and he told

4  me who he was.

5      Q.  Okay.

6      A.  He say I'm Gary.

7      Q.  Okay.  When he said that he was Gary, you knew who

8  Gary Rose was?

9      A.  Oh, yeah.  I've been knowing him every since he was

10  growing up.

11      Q.  Okay.  He had been out to the house before; is that

12  correct?

13      A.  Yes, ma'am, he been at my house before.

14      Q.  Okay.  Not just to visit but on business; is that

15  true?

16      A.  I think he had been there once on business at my

17  house, uh-huh.

18      Q.  Okay.  And he told you that he -- that he needed to

19  come in the house?

20      A.  After he knocked on the door -- as I said before, he

21  knocked on the door, told me who he was and he asked me was

22  Jim there.  And I said, yes.  And so he said, "Can I come in

23  and talk to him?"  I said, "sure."

24      Q.  Okay.

25      A.  And so I stepped back from the door, and he was

1  standing at the door.  He came in first.  And then when I

2  knew anything, I hadn't seen all the others out there.  Then

3  here come all the others in.

4      Q.   Okay.  About --

5      A.   That's when I asked -- I was standing back from the

6  door, I say "what's going on?"  And I don't know whether it

7  was Gary or who it was, they said we can't tell you now.

8      Q.   Okay.  And about how many officers do you think came

9  through your front door?

10     A.   Well, it was Gary, and it was Heath, a boy named

11 Heath, and Jennifer brother -- Bonham, and that's all the

12 ones that I knew.  I didn't know the rest of them.

13     Q.   So there was Heath, Jason Bonham?

14     A.   Uh-huh.

15     Q.   Gary Rose and then just a number of other ones?

16     A.   Yeah, I knew after I was talking to Heath and he

17 told me who he was, because he came along with the group,

18 too.  And he told me he was Heath Burden, and then I knew who

19 he -- him, but other than that, I didn't know the rest of

20 them.

21     Q.   Okay.  And what did Gary Rose do when he first came

22 into the house?

23     A.   He came in, and I pointed down the hall.  It's a

24 small hall that goes from the living room and turn to the

25 right to go into the bedroom.  And I pointed where that Jim

1    and Shod was in there asleep.  And he went on down that way,

2    and these others followed.

3        Q.    Okay.  And is that bedroom that they were in, the

4    boys' room, is that the front room --

5        A.    Yes, ma'am.

6        Q.    -- or the back room?

7        A.    That's the front bedroom.  I gave them the front

8    bedroom.

9        Q.    And if you know, which bed or who was closest to the

10   door?  Whose bed as closest to the door, Shod's or Jim's?

11       A.    I think Shod bed -- I know his bed is the one that's

12   closer to the door, and I'm sure he was in that one.  And Jim

13   was in the other boy's bed.

14       Q.    And what did they do with Shod once Gary Rose walked

15   into the bedroom?

16       A.    They just had him to come in there and sit in the

17   living room while they were back there with Jim.  And when

18   they got through with Jim, they carried Shod out and talked

19   to him.  They told him they wanted to talk to him.  And what

20   they said now I don't know because they carried him on the

21   outside.

22       Q.    Do you know who was in the bedroom with Jim?

23       A.    Shod.

24       Q.    Okay.

25       A.    Shod and Jim was in the same bedroom.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.    Okay.  After they brought Shod out, do you know

2    which officers were in there with Jim?

3    A.    I'm not sure, but I know Gary Rose probably was

4    still in there.

5    Q.    And did you hear Gary Rose say anything to Jim?

6    A.    No, ma'am.  Because it's a wall and a heating system

7    between the bedroom and the living room.  We was in the

8    living room.

9    Q.    Okay.  So you didn't hear anything about their

10   conversation at all?

11   A.    No, ma'am.

12   Q.    Okay.  Was there a point that Gary Rose came out and

13   Jason went in, or do you remember?

14   A.    I don't know about that.

15   Q.    Okay.

16   A.    All I know is when they was through I guess talking

17   with Jim and they had got him up and had him at the front

18   door, then Gary came -- I had went to the kitchen.  I asked

19   them could I go make me some coffee.  And they said, yes.  So

20   I was in there making some coffee.  I had sat down at the

21   dining table and my living room and kitchen is open there,

22   and so Gary came in the kitchen where I was sitting in the

23   chair and put his arm up on the back of the chair and then he

24   told me what had happened.  And that's when I knew what had

25   happened.  And he the only one that said anything to me about

1    it.

2        Q.   Okay.  Did he say anything about Shod being

3    involved?

4        A.   No, ma'am.

5        Q.   Who were the officers that took Shod outside of the

6    house?

7        A.   I don't know.

8        Q.   Was -- so they arrested Jim and took Jim out of the

9    house; is that correct?

10       A.   Yes, ma'am.

11       Q.   He was handcuffed and his hands were actually behind

12    his back.  Did you actually see that?

13       A.   Yeah, I saw that.

14       Q.   And did they take Shod out of the house as well?

15       A.   No, they just said they wanted to talk to him, ask

16    him some questions like, you know, something or other.  And I

17    don't know how far out in the yard they went.  They stepped

18    outside the living room, and how far they went out there in

19    the yard and talked to him, I don't know.

20       Q.   Do you remember talking to anybody -- talking to

21    anybody that night and having anybody write down -- any of

22    these officers write down what you told them?

23       A.   Not that I know of.

24       Q.   Okay.  Do you remember talking to an Officer

25    Mendoza, or do you just not remember?

1    A.    That same night that they arrested him?

2    Q.    Yes.

3    A.    Is that what you're talking about?  No, ma'am, I

4    don't remember talking to none of them and them writing down

5    anything.

6    Q.    Okay.  Did you talk to anybody at any time that they

7    wrote down what you told them, any one of these officers?

8    A.    I think when Mr. William and -- I don't know whether

9    he's the same one or not, but Mr. William and some white men

10   came to my house.

11   Q.    Okay.  And is that Mr. Richardson sitting right here

12   on the front row?

13   A.    Yeah, that one.  And a white man came to my house,

14   and I think they written down a few things.

15   Q.    But you never sat down and wrote out your side of

16   the story --

17   A.    No.

18   Q.    -- or anything that happened?

19   A.    No.  No, ma'am.

20        THE COURT:  Anything further?

21        MS. BALIDO:  Nothing further, Judge, at this

22   time.

23        MR. DAVIS:  Nothing further.

24        THE COURT:  Thank you.  You may step down.

25        The State may call its next witness.

DARLINE W. LABAR, OFFICIAL REPORTER

1              MR. DAVIS:  The State would call Shod Tarrant.

2         May Ms. Milton be excused?

3              THE COURT:  Subject to recall she may.

4              (Witness brought forward.)

5              THE COURT:  Come forward, please, sir.

6         Raise your right hand, please, sir.

7              (Witness sworn.)

8              THE COURT:  Have a seat to my left, if you

9    please, sir.

10         The State may continue.

11              MR. DAVIS:  Thank you.

12                   TRESHOD TARRANT

13   was called as a witness by the State and, after having been

14   first duly sworn, testified as follows:

15                   Direct Examination

16   By Mr. Davis:

17     Q.   Sir, would you please tell us your full name?

18     A.   Treshod Montrell Tarrant.

19     Q.   All right.  Mr. Tarrant, if you would, if you could

20   lean forward into that microphone and keep your voice up so

21   the last juror down here can hear you.

22          Where do you live right now?

23     A.   Edgewood, Texas.

24     Q.   Do you live with your grandmother Ora Mae Milton?

25     A.   Yes, sir.

1    Q.   Are you employed at this time?

2    A.   Yes, sir.

3    Q.   Where do you work?

4    A.   At Maid X in Terrell, Texas.

5    Q.   What kind of work do you do?

6    A.   Shrink wrap, operate a shrink wrap machine.

7    Q.   Back on October the 5th of the year 2000, were you

8    living with your -- with your grandmother there in Edgewood?

9    A.   Yes, sir.

10   Q.   Do you know a person by the name of Jedidiah or Jim

11   Murphy?

12   A.   Yes, sir.

13   Q.   Do you see him here in the courtroom this afternoon?

14   A.   Yes, sir.

15   Q.   Where is he sitting, and what's he wearing?

16   A.   He's sitting between two ladies, red tie, black

17   jacket.

18             MR. DAVIS:  Your Honor, may the record please

19   reflect this witness is identifying the defendant in open

20   court.

21   Q.   (By Mr. Davis)  Mr. Tarrant, how long have you known

22   Mr. Murphy?

23   A.   Pretty much all our -- from about 7th, 8th grade,

24   junior high up to now.

25   Q.   Okay.  So y'all went to junior and senior high

1    school together; is that right?

2         A.   Yes, sir.

3         Q.   And even after high school, y'all stayed in touch

4    with each other?

5         A.   Yes, sir.

6         Q.   Mr. Tarrant, I want to talk for a moment and ask you

7    whether or not you have been in trouble with the law before?

8         A.   Yes, sir, I've been trouble with the law.

9         Q.   Have you actually been convicted of the offense of

10   burglary?

11        A.   Yes, sir.

12        Q.   And have you been convicted of the offense of theft?

13        A.   Arson.

14        Q.   Of arson?

15        A.   Yes, sir.

16        Q.   Okay.  Were those both down in Van Zandt County?

17        A.   Yes, sir, they were.

18        Q.   Were you actually sentenced to the penitentiary?

19        A.   I was sentenced to probation, but after not

20   complying with my probation, I ended up going to the pen.

21        Q.   Okay.  Have you been arrested for any other criminal

22   offenses?

23        A.   No, sir.  Well, yes, sir, and the charge has been

24   dismissed.

25        Q.   So in Van Zandt County you were convicted of

DARLINE W. LABAR, OFFICIAL REPORTER

1    burglary, theft -- I mean, burglary and arson, placed on

2    probation, your probation was revoked, and then you actually

3    were sent to the penitentiary, correct?

4        A.   Yes.  Yes, sir.

5        Q.   Mr. Tarrant, let me ask you to direct your attention

6    again back to October the 5th of the year 2000.  That day

7    were you scheduled to go down and talk with your parole

8    officer?

9        A.   Yes, sir, I believe it was on a Thursday actually,

10   and that's the day that I go in and report.

11       Q.   All right.  Even though you got out of the

12   penitentiary, you're still on parole on, what, a monthly

13   basis --

14       A.   Yes, sir.

15       Q.   -- you've got to go and report to your officer?

16       A.   Yes, sir.

17       Q.   And that happened to be the day that you were

18   scheduled to do that; is that right?

19       A.   Yes, sir.

20       Q.   That afternoon did the defendant come to your

21   grandmother's house?

22       A.   Yes, sir, he did.

23       Q.   Had you already been down to report to your parole

24   officer or not?

25       A.   No, sir, he showed up.  We talked.  I was headed to

1    report.  I told him that I had to leave to go, you know, make

2    my appointment.  And we was to meet back at my granny's.

3         Q.   Did you see when the defendant actually came up to

4    your grandmother's house, did he drive up in a car?

5         A.   Yes, sir.

6         Q.   Was he by himself?

7         A.   Yes, sir.

8         Q.   You remember what kind of car that he came up in

9    that day?

10        A.   Like a grey Honda Accord or Civic.

11        Q.   Four door?

12        A.   Four door.

13        Q.   So y'all had this discussion.  How long a discussion

14   did you have before you actually left to go down to the

15   parole office?

16        A.   Probably 15, 20 minutes, maybe a little longer.

17        Q.   How was the defendant acting when he got to your

18   house and started talking to you?  Did you notice anything

19   unusual about him?

20        A.   No, sir.  I hadn't seen him in a while.  He told me,

21   you know, he had been -- had a new job and a new girlfriend

22   and he was down to see me.  I hadn't seen him in a while.

23        Q.   So he said he had a new girlfriend?

24        A.   Uh-huh.

25        Q.   Is that a yes?

1     A.   Yes, sir.

2     Q.   Okay.  Did he tell you where he had gotten the car

3 from?

4     A.   He told me it was his.

5     Q.   Did you get a chance to look at the car?

6     A.   Yes, sir, from when I came back and got ready to

7 leave with him.

8     Q.   Uh-huh.  So this -- let's stay with the first

9 conversation then.  Have you seen the defendant when he's

10 been drinking?

11     A.   Yes, sir.

12     Q.   Did it appear to you like he had been drinking when

13 he got to your house the first time?

14     A.   I kind of smelt it on his breath.

15     Q.   He seemed like he was really intoxicated or just

16 like he had been drinking some?

17     A.   He had been drinking.  I knew he had been drinking.

18 His eyes -- and then when I got in the car, I seen the empty

19 18 -- well, not empty, but partially empty 18-pack of Bud

20 Light.

21     Q.   That's actually after you came back from the parole

22 office, right?

23     A.   Yes, sir.

24     Q.   All right.  You went down -- where did you have to

25 report?  What city did you have to go to?

1     A.    Canton, Texas.

2     Q.    How long were you down there at the parole office?

3     A.    Roughly 45 minutes or so.

4     Q.    Did you come straight back to your grandmother's

5  house?

6     A.    Yes, sir, because I was supposed to meet Jim.  I was

7  looking forward to meeting --

8     Q.    Was the defendant still there at your grandmother's

9  when you first got there?

10    A.    No, sir, he pulled up.  I -- actually I seen him,

11 you know, en route back to my grandmother's house and he

12 followed me back to the house.

13    Q.    Where did you see him in Edgewood when you saw him

14 headed toward your grandmother's?

15    A.    Kind of over behind the Dairy Queen.

16    Q.    Is that down there on Highway 80?

17    A.    Yes, sir.

18    Q.    So y'all met back up there at your grandmother's

19 this time, right?

20    A.    Yes, sir.

21    Q.    Did y'all do some more talking before you went to

22 wherever y'all were going to go?

23    A.    Yes, sir, we sit and chitchatted and told me about

24 his girlfriend, Bertie or -- I was like, sounds like an old

25 woman's name.  He said that's her name.  And showed me credit

DARLINE W. LABAR, OFFICIAL REPORTER

1    cards.  And we was fixing to go out -- he was taking me out

2    to eat and was going to have some drinks.  And that's when we

3    then ventured to Terrell.

4        Q.   So he mentioned a girlfriend and he said her name

5    was Bertie; is that right?

6        A.   Uh-huh.

7        Q.   Then showed you a credit card; is that right?

8        A.   Uh-huh.

9             MR. DAVIS:  May I approach, Your Honor.

10            THE COURT:  You may.

11       Q.   (By Mr. Davis)  That credit card, Mr. Tarrant, that

12   he showed you, did it have the name Bertie on it?

13       A.   It said Bertie Cunningham.

14       Q.   Uh-huh.  Let me show you State's Exhibit 5 which is

15   a Discover Card with the name of Bertie Cunningham and

16   State's Exhibit Number 6 which is a MasterCard with the name

17   Bertie Cunningham.  Do you remember which of these two cards

18   that he actually showed you that day?

19       A.   Both of them.

20       Q.   Both of them?  So he showed you both the Discover

21   Card and the MasterCard?

22       A.   Yes, sir.

23       Q.   Before y'all headed out, did you have a chance to

24   look at the car?  Did you notice anything unusual about that

25   car?

1       A.   Well, I noticed some blood on the bumper, on the

2   back bumper of the car.

3       Q.   What did you do when you saw it?

4       A.   I asked him about it.

5       Q.   What did he say?

6       A.   He told me he had hit a back road.  He seen a deer,

7   he had his pistol, and he shot a deer, a deer ran across, he

8   happened to have his gun on him and he got it, put the deer

9   in the trunk and that's why the blood was on the back bumper.

10      Q.   Was he crying when he was telling you that?

11      A.   No, sir.

12      Q.   Did you think he was telling you the truth?

13      A.   Yes, sir.  Because I mean he's been deer hunting.  I

14  mean, he used to deer hunt when we were in school.

15      Q.   So you -- I guess you just accepted what he said to

16  you being the truth?

17      A.   Yes, sir.

18      Q.   Did y'all then leave to go someplace?

19      A.   Yes, sir.

20      Q.   Now, when he mentioned that he had emptied the gun

21  into it, did he show you a gun or did he say he still had a

22  gun on him or anything like that?

23      A.   No, sir.  He just told me that he shot the deer with

24  the gun and put it in the trunk, but he never did mention or

25  show me a pistol.

1    Q.   Did you ever open the trunk, or did he ever open it

2  for you?

3    A.   No, sir.

4    Q.   Where did y'all head out that evening?

5    A.   When we left my house, we headed to Terrell, Texas.

6    Q.   Now, let's just kind of back up for a little bit.

7  Edgewood, that's on Highway 80, isn't it?

8    A.   Yes, sir.

9    Q.   So if you headed out of Dallas going east, you'd

10  come to Terrell first, wouldn't you, before you get to your

11  town?

12    A.   Yes, sir.

13    Q.   And if you kept going east, where would you head

14  next, Wills Point?

15    A.   Wills Point and then Edgewood.

16    Q.   About -- about how far from Dallas is Edgewood, just

17  time wise?  How long does it take you to drive from Edgewood

18  to Dallas?

19    A.   50 minutes.

20    Q.   So y'all actually were going to head back west on

21  Highway 80, right?

22    A.   Yes, sir.

23    Q.   Where were you going to go to?

24    A.   To the beer store.

25    Q.   Were y'all talking on the way?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    Yes, sir.

2    Q.    You remember what y'all were talking about?

3    A.    About his job and him leaving to go to Florida and

4    just reminiscing, I ain't seen you in a while, the deal with

5    him and Chelsea.

6    Q.    That's his ex-wife, right?

7    A.    Yeah.  And the baby and just talking about

8    everything, you know, as friends would do, and getting to the

9    beer store.

10   Q.    Did he tell you why he was going down to Florida?

11   A.    He never told me.  He just told me he was going

12   there.

13   Q.    Ever tell you that the mob was after him?

14   A.    No, sir.

15   Q.    Did he ever --

16   A.    That I recall.

17   Q.    When he was telling you about going down to Florida,

18   was he crying about it?

19   A.    No, sir, but he had a look that -- that he didn't

20   want to go, but he was going.  But -- I didn't know none of

21   this stuff had happened, so I couldn't -- at the time I

22   couldn't --

23   Q.    So I guess y'all eventually got to the beer store,

24   right?

25   A.    Yes, sir.

1     Q.   What store did y'all go to?

2     A.   We stopped at some store on the interstate first and

3 got ready to get beer and some lady said something to him and

4 we left because -- I don't know.  She came out.  It was like

5 a drive through beer place.

6     Q.   Uh-huh.

7     A.   And we left and went to another beer store.

8     Q.   And that second store, was that in Terrell, still?

9     A.   Yes, sir.

10    Q.   Do you remember the name of that store?

11    A.   Chacho's.

12    Q.   Had you been to Chacho's before?

13    A.   Yes, sir.

14    Q.   Now Chacho's, is that kind of divided into two

15 halves down there?

16    A.   Yes, sir, liquor on one side and beer on the other

17 side.

18    Q.   So as you're looking at the store, I guess, what is

19 it, right half got beer and kind of a convenience store?

20    A.   Uh-huh.

21    Q.   A deli and then the left half's got the liquor store

22 part?

23    A.   Yes, sir.

24    Q.   When you got down there, did both of you go inside

25 or just one of you go inside to buy beer?

1     A.   He went inside and then I exited the car and yelled

2  at the owner's wife to, you know, tell him to get some orange

3  juice and then got back in the car.

4     Q.   Now, did you know the owner's wife?  Had you seen

5  her there before?

6     A.   Oh, yes, sir.

7     Q.   And so the defendant actually was the one that went

8  inside to make the purchase, right?

9     A.   Yes, sir.

10     Q.   Do you know how he was going to purchase --

11     A.   Credit card.

12     Q.   The same credit card he had shown you?

13     A.   Yes, sir.

14     Q.   What exactly was he going in there to get?

15     A.   Beer, 18-pack of Bud Light.  I wanted a bottle of

16  Hennessy, so he went to the liquor side, got me a bottle of

17  Hennessy, and then came out -- some orange juice.

18     Q.   So he bought an 18-pack of Bud Light, and then he

19  also while y'all were there at the store bought you some

20  Hennessy; is that right?

21     A.   Yes, sir.

22     Q.   And some more orange juice.  Did he get the orange

23  juice for you, too?

24     A.   Yes, sir.

25     Q.   Anything else that you remember him buying at that

1    time?

2         A.    No, sir.

3         Q.    About how long were y'all at the store while he's

4    inside actually making these purchases?

5         A.    Wasn't over ten minutes.

6         Q.    He came back out with everything, right?

7         A.    Yes, sir.

8         Q.    Did y'all stay there at Chacho's, or did y'all go

9    someplace else?

10        A.    No, we went out to eat after that, went to eat, he

11   had an upset stomach, and we was going to do a little

12   drinking after we got something to eat.

13        Q.    Where did y'all go to eat?

14        A.    To the restaurant on 80, Cole Mountain, pretty nice

15   restaurant.  We ate.

16        Q.    What kind of food do they serve over at Cole

17   Mountain?

18        A.    Oh, everything from prime rib, steak, pretty good

19   food.

20        Q.    Uh-huh.  Was the defendant doing the buying again

21   over there at Cole Mountain?

22        A.    Yes, sir.

23        Q.    How was he doing the buying over there?

24        A.    Credit card.

25        Q.    Same one?

1      A.    Yes, sir.

2      Q.    Do you remember what y'all ordered over there at

3   Cole Mountain?

4      A.    I ordered ribs, some -- I think it was ribs and

5   something.

6      Q.    How about --

7      A.    And a beer.

8      Q.    How about the defendant, did he order anything?

9      A.    Cheese sticks, ordered cheese sticks.  He ordered --

10  but then he didn't eat.  We packed it up and took it to

11  Granny.

12     Q.    When you finished eating, did y'all stop anywhere

13  else there?

14     A.    Yes, sir, we stopped at a gas station, got some more

15  gas.  He bought some Rolaids for his upset stomach, and

16  that's about it, some gum perhaps, maybe, but I don't

17  think -- I know some Rolaids -- Rolaids and gas.

18     Q.    Okay.  After you bought gas there at the service

19  station, did y'all head back over to your grandmother's house

20  or did y'all just drive around or what did you do?

21     A.    Oh, we headed back to Edgewood, went to Granny's.

22          MR. DAVIS:  May I approach, Your Honor.

23          THE COURT:  You may.

24     Q.    (By Mr. Davis)  Mr. Tarrant, let me show you State's

25  Exhibit Number 21.  Do you recognize that as a picture of

1    Chacho's there in Terrell?

2        A.   Yes, sir.

3        Q.   State's Exhibit Number 22, do you recognize that as

4    a Phillips 66 service station there?

5        A.   Yes, sir.

6        Q.   That y'all stopped at at Terrell?

7        A.   Yes, sir.

8        Q.   And finally State's Exhibit Number 23, is that a

9    photograph of Cole Mountain restaurant there in Terrell?

10       A.   Yes, sir.

11              MR. DAVIS:   Your Honor, at this time we'll

12   offer State's Exhibit 21, 22, and 23.

13              (State's Exhibit No. 21 through 23 offered)

14              MR. BYCK:   No objections to State's 21 through

15   23, inclusive.

16              THE COURT:   21, 22, and 23 are admitted.

17              (State's Exhibit No. 21 through 23 admitted)

18       Q.   (By Mr. Davis)  Now, these three places of business,

19   Chacho's, the service station, and Cole Mountain, they're

20   pretty close to each other, aren't they?

21       A.   Yes, sir.

22       Q.   What, about a half a mile, maybe a mile away from

23   each other?

24       A.   If that.

25       Q.   Chacho's, if you go down -- if you're going west on

1  80 going to Dallas, what do you do, just turn left on that

2  Highway 34?

3            THE COURT:   West or east?

4      Q.   (By Mr. Davis)   Going west.   If you're going west

5  from Edgewood?

6      A.   Make a left on Highway 34.

7      Q.   And then that service station is actually just there

8  at the intersection of 34 and 80, isn't it?

9      A.   Yes, sir.

10     Q.   And Cole Mountain is kind of across the street a

11 little bit from the Phillips 66?

12     A.   Yes, sir.

13     Q.   How long did it take y'all to get back to your

14 grandmother's house?

15     A.   30, 40 minutes.

16     Q.   Were y'all drinking on the way back?

17     A.   I was.

18     Q.   How about the defendant?

19     A.   He wasn't.   His stomach was kind of upset.

20     Q.   Did he -- did he drink anything at dinner that you

21 remember?

22     A.   I think we both ordered beers, but I don't know if

23 he finished it or -- we both ordered beers I think.

24     Q.   Do you actually remember seeing the defendant drink

25 anything once y'all got in the car, started heading toward

1  Terrell from your grandmother's house?

2      A.   I don't remember.

3      Q.   Was he complaining about his stomach at what point?

4  Was it at the restaurant he started complaining, or was it

5  earlier that he started complaining?

6      A.   Yeah, because I asked why come he wasn't eating.   He

7  said his stomach was upset and he wasn't eating.   Then we

8  went and bought the Rolaids after we ate and he had been

9  drinking for like two days previous to coming to see me.

10     Q.   Well --

11     A.   I mean, that's what he told me.

12     Q.   That's what he said to you, right?

13     A.   Yes, sir.

14     Q.   You hadn't been with him the last two days, had you?

15     A.   No, sir.

16     Q.   So when he told you he had been drinking for two

17  days, did you have any reason to disbelieve him at that time?

18     A.   No, sir.

19     Q.   On the way back to your grandmother's, he wasn't

20  drinking, right?

21     A.   Huh-uh.

22     Q.   Is that a no?

23     A.   Yes, sir.

24     Q.   When you got back to your grandmother's, did both of

25  you stay there or did one of you leave?   Just tell me what

1  happened when you got back there.

2      A.   When we got back to Granny's, we sitting around and

3  talked for a while and we ended up leaving and going up the

4  street and meeting some other people.

5      Q.   When you say we ended up leaving, both you and the

6  defendant?

7      A.   Yes, sir.  And we met a guy that I know that he

8  doesn't know, and we went up to our little park and hung out

9  and talked to some other friends and drank and just continued

10 talking to them.

11     Q.   Was the defendant with you?

12     A.   Yes, sir.

13     Q.   Is he drinking up there with you, or is he still not

14 drinking because of his stomach?

15     A.   Well, I think he had a beer or so.  I mean, he

16 wasn't drinking like he usually drink when he's with me, but

17 he was like sipping.  I think he had a beer or so, something

18 like that.

19     Q.   So y'all hung out up there.  Still talking, drinking

20 for a while?

21     A.   Hung out drinking.  Somehow P.A. ends up getting in

22 the car.  He got in the car with us.

23     Q.   Who is P.A.?

24     A.   The guy -- one of the guys that -- just from around

25 the neighborhood, white guy.

1    Q.    So he got in the car with you and the defendant?

2    A.    Yes, sir.

3    Q.    What did y'all do?

4    A.    Made a couple of loops through town, whatever, just

5    to see what was going on, see if anybody was going on.  Went

6    back to Granny's -- dropped him off, went back to granny's.

7    Q.    Hold on.  Dropped him off.  Who is him?

8    A.    P.A.

9    Q.    Dropped P.A. off once you got back, made the loop?

10   A.    Yes, sir.

11   Q.    What did you and Mr. Murphy do then?

12   A.    Went back to Granny's -- no, no, I'm skipping a

13   whole little section here.  After we got back, we ended up

14   going -- hanging out with some of my friends.  This was after

15   we dropped P.A. off and talked some more, we ended up going

16   back up to the apartment, hanging out with some of my friends

17   that lived at the apartment, drinking Hennessy.  And that's

18   when we started getting on the drinking.

19   Q.    Uh-huh.

20   A.    We fixed up some glasses of mixed drinks, sit there

21   for a while and started drinking Hennessy and talking and one

22   of the girls wanted to smoke some weed.  And we went back to

23   my Granny's and him and Ryan stayed at my Granny's sitting

24   out in the yard while me and the female went to Wills Point

25   Texas, got a joint in the car and came back to Edgewood.  He

DARLINE W. LABAR, OFFICIAL REPORTER

1    didn't want to go.

2        Q.   The defendant didn't want to go on that?

3        A.   Yes, sir.

4        Q.   So y'all got -- y'all came back there at a certain

5    point and then who was it, you and who went to Wills Point to

6    get some marijuana?

7        A.   Me, Christy Ball, and P.A.

8        Q.   And the defendant stayed at your grandmother's

9    during that time, right?

10       A.   Yes, sir.

11       Q.   When you were over there drinking Hennessy, what was

12   the defendant doing?  He drinking Hennessy, or is his stomach

13   still hurting?

14       A.   He's drinking with us.

15       Q.   Okay.  When you dropped him off, you went and got

16   some marijuana, you came back.  Was the defendant still at

17   your grandmother's house?

18       A.   Uh-huh.

19       Q.   You need to say yes or no.

20       A.   Yes, sir.

21       Q.   And, you know, Mr. Tarrant, just roughly what --

22   what time did you finally get home after you bought some

23   marijuana with these people -- what time did you get home to

24   your granny's at that time?

25       A.   We was in bed by 11:00, I mean, actually in the bed

1    by 11 o'clock, so couldn't have been no later than 10,

2    because when we came back from getting the marijuana, smoked

3    it, drank some more, and went to the house and laid down

4    basically.  Seeing as how we were in the bed by 11:00.

5         Q.   Now, the defendant over here, Mr. Murphy, he didn't

6    smoke any marijuana with you that night, did he?

7         A.   I don't remember.

8         Q.   You just remember him drinking some with you?

9         A.   Uh-huh.

10        Q.   And -- is that a yes?

11        A.   Yes, sir.

12        Q.   And he didn't go and buy the marijuana with you and

13   the girl and the other people, right?

14        A.   No, sir, he stayed at the house.

15        Q.   Did you talk with the defendant when you got back

16   for the last time to your grandmother's house?

17        A.   We talked about going out the next day.  He was

18   going to take me shopping.

19        Q.   He was going to take you shopping?

20        A.   Yes, sir.

21        Q.   He able to carry on a conversation with you before

22   you went to bed?

23        A.   Yes, sir.

24        Q.   You having any trouble talking with him?

25        A.   No, sir.

1    Q.   Did he seem to understand what you were saying to

2    him?

3    A.   Yes, sir.

4    Q.   Was he able to respond when you'd ask him a question

5    or say something?

6    A.   Yeah, he responded.

7    Q.   Whose idea was it to go out shopping the next day?

8    Did you say, hey, can you take me out shopping, or how did

9    that come up?

10   A.   No, sir, he just told my grandmother, you know, he

11   seen my shoes were looking kind of bad and I needed some new

12   shoes so he was going to take me out and buy me some clothes

13   the next day because I was doing bad or I was looking bad.

14   Q.   He mention anything about going someplace else the

15   next day besides Florida?

16   A.   No, sir.

17   Q.   Did he ever mention that he was on his way down to

18   take some personal items to his daughter, his ex-wife,

19   anything like that?

20   A.   Not to me.  I know about that, though.

21   Q.   But he didn't tell you that --

22   A.   No, sir.

23   Q.   -- that day, did he?

24   A.   No, sir.

25   Q.   His plans were to take you shopping and then I guess

1   eventually go to Florida, right?

2       A.   Yes, sir.

3       Q.   Did you and the defendant sleep in the same bedroom

4   or separate bedrooms?

5       A.   Same bedroom.

6       Q.   Somebody wake you up early that morning?

7       A.   Yes, sir.  A bunch of police.  Flashlights.  Telling

8   me I hadn't done anything wrong, but put the hands where you

9   can see them.  I'm like none of you been to my house and I

10  ain't done nothing wrong.  It's always been something.  So I

11  put my hands up, you know, laying under the cover and they go

12  over to the bed and start talking to Jim and getting him, you

13  know, into custody --

14      Q.   Uh-huh.  Did they let you stay in the room while

15  they were doing that?

16      A.   No, sir, they took me out of the room during the

17  process of apprehending him.

18      Q.   He's still in bed when they first -- first came in

19  contact with him, right?

20      A.   Yes, sir.

21      Q.   They had their guns drawn?

22      A.   Flashlights -- I'm assuming guns.  I mean, all I

23  woke up, looked like laser tag in the room, just flashlights

24  and loud voices.

25      Q.   You recognize any of the officers that came in?

1     A.   Yes, sir, quite a few of them.

2     Q.   Gary Rose, Deputy Gary Rose, was he one of them?

3     A.   Yes, sir.

4     Q.   Do you know a Jason Bonham?

5     A.   Yes, sir.

6     Q.   Had you and the defendant gone to school with Jason?

7     A.   Yes, sir.

8     Q.   So at least there's those two that you did recognize

9 on sight, correct?

10    A.   Yes, sir.

11    Q.   Did the police ever take you to the police station

12 before a Judge, anything like that?

13    A.   No, sir.

14    Q.   Did they talk with you that morning?

15    A.   Yes, sir.  They questioned me thoroughly and over

16 and over and over again.  I told them, you know, what

17 happened from the time he showed up to the time they showed

18 up.

19    Q.   And so I take it after they talked to you, they let

20 you stay there at your grandmother's, right?

21    A.   Yes, sir.

22    Q.   They never took you into custody?

23    A.   No, sir.

24    Q.   At some point did the police actually take the

25 defendant away from your grandmother's house?

1       A.    Yes, sir.

2       Q.    Did they ever bring him back to the house?

3       A.    No, sir.

4       Q.    You ever see him again that day?

5       A.    No, sir.

6       Q.    Have you ever talked with any of the attorneys

7    representing the defendant or any investigators who are

8    representing him?

9       A.    Yes, sir.

10      Q.    Who have you talked to?

11      A.    I've spoken with the lady on the end.

12      Q.    Okay.  Ms. Little?

13      A.    Yes, ma'am -- yes, sir.  And I spoken with the older

14   guy that I don't see him.

15      Q.    Perhaps an investigator?

16      A.    Perhaps.

17      Q.    Was he wearing glasses?

18      A.    Yes, sir.

19      Q.    When did you talk with them?

20      A.    It was sometime after it happened.  They came to the

21   house.

22      Q.    Did you tell them everything that you knew about

23   this?

24      A.    Yes, sir.

25      Q.    Did you tell them the same thing you've told this

1    jury over here?

2        A.   Yes, sir.  And I told them some more stuff, just us

3    growing up and in depth stuff.

4        Q.   Yeah.  Okay.  Just more about your personal history

5    maybe?

6        A.   Yes, sir.

7        Q.   All right.  And that conversation took place a long

8    time ago, right?

9        A.   Yes, sir.

10       Q.   Thank you, Mr. Tarrant.

11                MR. DAVIS:  I'll pass the witness.

12                MR. BYCK:  Your Honor, we'll respectfully

13   request to reserve cross-examination for a later time.

14                THE COURT:  Mr. Tarrant, you may step down,

15   sir.

16                MS. BALIDO:  Judge, if we can ask him to just

17   stick around for a little bit this afternoon.  There may be a

18   matter that we need to take up with him specifically.

19                THE COURT:  Mr. Tarrant, if you'd return to

20   the hall.  Don't leave the courthouse without permission.

21                MR. DAVIS:  The State calls Akran Aridi.

22                THE COURT:  Good afternoon.  May I ask you to

23   raise your right hand, please.

24                (Witness sworn.)

25                THE WITNESS:  Yes, I do.

```
 1              THE COURT:  Thank you.  Have a seat to my

 2  left, please.

 3          The State may continue.

 4              MR. DAVIS:  Thank you

 5                  AKRAN ARIDI

 6  was called as a witness by the State and, after having been

 7  first duly sworn, testified as follows:

 8                  Direct Examination

 9  By Mr. Davis:

10      Q.  Sir, would you please tell us your full name?

11      A.  Akran Aridi.

12      Q.  Can you please spell your first and your last name

13  for the court reporter?

14      A.  A-k-r-a-n.  A-r-i-d-i is the last name.

15      Q.  Sir, where do you live?

16      A.  Terrell.

17      Q.  Terrell, Texas?

18      A.  Uh-huh.

19      Q.  And how are you presently employed?

20      A.  I have a convenience store.

21      Q.  And where is that convenience store located?

22      A.  In Terrell.

23      Q.  What's the name of your store?

24      A.  Chacho's Grocery.

25      Q.  Mr. Aridi, are you married?
```

```
 1        A.    Yes.

 2        Q.    Have any children?

 3        A.    Yes.

 4        Q.    How many children do you have?

 5        A.    One.

 6        Q.    One.  Boy or girl?

 7        A.    A girl.

 8        Q.    What's her age?

 9        A.    Five years.

10        Q.    What's your wife's name?

11        A.    D-o-h-a.

12        Q.    Doha?

13        A.    Yes.

14        Q.    Does your wife work with you at Chacho's from time

15   to time?

16        A.    Yes, sir.

17        Q.    Does she also have another job or go to school or --

18        A.    She is a student, yes.

19        Q.    Where is she a student at?

20        A.    At El Centro College in the nursing.

21              THE REPORTER:  I'm sorry.  At Center?

22        A.    El Centro Nursing.

23        Q.    (By Mr. Davis)  El Centro Nursing?

24        A.    Yes.

25        Q.    Mr. Aridi, I want to go back to October the 5th of
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    the year 2000.  Were you and your wife working at your store

2    that day?

3        A.   Yes, sir.

4        Q.   What are the hours for Chacho's to be open there in

5    Terrell?

6        A.   From 9:00 in the morning till midnight.

7        Q.   Was anybody working with the two of you that day?

8        A.   There was one other help, yes.  There was one other

9    employee with us.

10       Q.   At 6:30 that day, were you and your wife still

11   working?

12       A.   Yes.

13       Q.   Was that other employee still with the two of you?

14       A.   Yes.  No, that employee is a friend.  I'm not sure

15   if she was working that time or she was just visiting, but

16   she was present.

17       Q.   Did someone come in to your store at about 6:30

18   p.m., that day to make some purchases and attempted to use a

19   Discover Card to make that purchase?

20       A.   That's correct.

21       Q.   If you would, please look around the courtroom and

22   tell me if you see the person present today that came in that

23   evening and tried to use the Discover Card to buy some stuff

24   from your store?

25       A.   I believe that's him.

1    Q.   And who are you pointing to?

2    A.   This gentleman with sunglasses -- I mean, glasses.

3    Q.   All right.  Is he -- what's he wearing?

4    A.   Red tie and a black suit.

5         MR. DAVIS:  May the record please reflect this

6    witness has identified the defendant in open court.

7    Q.   (By Mr. Davis)  Looking at the defendant today, has

8    his appearance changed from when he came in your store?

9    A.   I believe it did.

10   Q.   Uh-huh.

11   A.   A little bit.

12   Q.   A little bit.  When he came in that day, was he by

13   himself or was he with someone else?

14   A.   No, he came into the store by himself.

15   Q.   Do you remember what he came in there to buy that

16   day?

17   A.   I believe he came in to buy beer or something like

18   that first.

19   Q.   Now, does Chacho's have a lot of regular customers?

20   A.   Yes.

21   Q.   Do you know a lot of the people on sight when they

22   come in to purchase things from you?

23   A.   Definitely.

24   Q.   Had you ever seen the defendant before that day?

25   A.   No.

1    Q.    Do you remember who he actually talked with?  Did he

2    talk directly with you, or was he dealing with your wife?

3    A.    He was -- he was dealing with my wife.

4    Q.    Did you have an opportunity to look at him though

5    and listen to him a little bit --

6    A.    Yeah.

7    Q.    -- when he came in?

8    A.    I believe I did wait on him the second -- the second

9    time because I think he bought something the first time and

10   then he decided to buy something else, so I waited on him the

11   second time.

12   Q.    Uh-huh.  While he was in the store, was he -- was he

13   talking, saying things?

14   A.    I believe he was talking, yes.

15   Q.    Do you remember any of the things that he might have

16   said -- said when he came in the store that day?

17   A.    Well, I remember he was talking to just -- to

18   everybody.  I didn't personally have a conversation with him,

19   but he was talking and saying he had a party and stuff like

20   that, that they were going to a party.

21   Q.    That he was going to a party, right?  Did he talk to

22   you about any businesses in Terrell and credit cards that you

23   remember?

24   A.    Well, he seemed not to be very happy.  I guess he

25   tried to -- he stopped somewhere else to use the credit card

1    to purchase something using the credit card and some of the

2    businesses didn't accept credit card.  So he was complaining

3    about that.  I remember that.

4        Q.   Did you say he actually made a purchase?  Do you

5    remember any conversations about how he was going to make

6    that purchase?  Was he going to try to use a credit card at

7    your place of business, too?

8        A.   Yes.  He was trying to use a Discover first, and I

9    didn't take no Discover Card.  So he went back outside and

10   came back with a -- I believe either a Visa or a MasterCard.

11       Q.   And your store did take a Visa or MasterCard, right?

12       A.   Yes.

13       Q.   When he came back in with Visa or MasterCard, he

14   then completed that transaction; is that right?

15       A.   Uh-huh.

16       Q.   You say that you actually dealt with him the second

17   purchase.  Did he leave the store and then come back in or

18   tell me how that occurred.

19       A.   I believe he did walk out of the store and then came

20   back wanting liquor.

21       Q.   He wanted liquor this time?

22       A.   Right.  And I --

23       Q.   Okay.

24       A.   I have the liquor -- the liquor is next door.  It's

25   not in the same store.  I have two separate entry doors.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Do you remember what kind of liquor that he came in

2    there to purchase?

3    A.   Hennessy Cognac.

4    Q.   Hennessy Cognac.  That would have been kept in the

5    other half of the store, right?

6    A.   Yes.  Yes.

7    Q.   So how did you actually get the Hennessy Cognac for

8    him?

9    A.   Since he was using a credit card, my credit card

10   terminal is in the -- in this side of the store where I sell

11   beer and cigarettes and stuff like that, so we had to go to

12   the other store, get what he wanted, and then I charge him

13   for it on this side of the store where I can use -- run the

14   credit card on the terminal.

15   Q.   Who actually went into the liquor store to get the

16   Hennessy Cognac?

17   A.   I believe my wife did.

18   Q.   She brought it back.  Did he use the MasterCard or

19   the Visa again the second time?

20   A.   Yes, sir.

21   Q.   Any problem completing that transaction?

22   A.   No.

23   Q.   Did the defendant seem real upset, was he crying,

24   anything of that nature during the time he was inside your

25   store buying the beer or the Hennessy Cognac?

1    A.    No, there was nothing unusual that I noticed.

2    Q.    You say he was talking to other customers.    You

3    remember that?

4    A.    Uh-huh.

5    Q.    Seemed to be in a good mood at that point?

6    A.    Yeah, he was excited to be going to a party or

7    something seems like.

8    Q.    When the defendant left with the Hennessy Cognac,

9    did you ever see him again?

10    A.    No, sir.

11    Q.    Sometime later did the -- did the police come out

12    and obtain two receipts from your store?

13    A.    Yes.

14    Q.    Did they also ask you about security cameras that

15    might be in your store?

16    A.    Yes, sir.

17    Q.    Did your store actually have security cameras back

18    on October the 5th?

19    A.    Yes, sir.

20    Q.    Tell me a little bit about that.    How many cameras

21    did you have, and what did the cameras actually show?

22    A.    I had four cameras.    One of them covered the liquor

23    store, and the other three are in the convenience store.

24    Q.    And did you actually have a monitor there in your

25    store where you could see the four images, the one from the

DARLINE W. LABAR, OFFICIAL REPORTER

1   liquor store as well as the three cameras inside the other

2   half?

3       A.   Yes, sir.   Yes, sir.   I can see them standing by the

4   register.

5       Q.   And the purpose is what, security?

6       A.   That's right.

7       Q.   Did the police actually come out and get the

8   videotape that had been shot on October the 5th while the

9   defendant was inside the store?   Do you remember giving that

10  to the Garland Police Department?

11      A.   Yes, uh-huh.

12           MR. DAVIS:   May I approach, Your Honor.

13           THE COURT:   You may.

14      Q.   (By Mr. Davis)   Mr. Aridi, first of all, looking at

15  State's Exhibit Number 26, is this a true and correct copy of

16  the videotape that you gave to the Garland police showing the

17  defendant inside your store on October the 5th?

18      A.   That's right.

19      Q.   Have you had an opportunity to look at the

20  videotape?

21      A.   Uh-huh.

22      Q.   Is that a yes?

23      A.   Yes.

24      Q.   Now, State's Exhibit Number 26A, have you also had a

25  chance to look at it?

1      A.    Yes.

2      Q.    Now, just so we understand, the cameras that are

3  used there, do they show -- or when it's played back, do the

4  images come back quicker than real life?

5      A.    Yes.

6      Q.    Essentially they're speeded up, aren't they?

7      A.    Yes.

8      Q.    State's Exhibit Number 26, have we now slowed down

9  the images and sound to more of a real time, the way it

10 actually occurred there inside your store?

11     A.    Yes, I noticed that.

12     Q.    And State's Exhibit Number 26A still shows the same

13 images, the same sound, we've simply slowed that down; is

14 that right?

15     A.    Yes.

16           MR. DAVIS:  Your Honor, at this time the State

17 will offer State's Exhibits 26 and 26A, which have previously

18 been tendered to counsel.

19           (State's Exhibit No. 26 and 26A offered)

20           MS. BALIDO:  No objection.

21           THE COURT:  Admit them both.

22           (State's Exhibit No. 26 and 26A admitted)

23           MR. DAVIS:  Permission to publish.

24           THE COURT:  Granted.  For benefit of the jury,

25 are you going to show both?

DARLINE W. LABAR, OFFICIAL REPORTER

1        MR. DAVIS:  Yes, sir, I'll show both of them.

2        THE COURT:  Both of them?

3        MR. DAVIS:  Yes, sir.

4        MS. BALIDO:  Mr. Davis, what are the numbers

5   on that exhibit?  I'm sorry.

6        MR. DAVIS:  26 and 26A.

7        For the record, I'm going to be showing State's

8   Exhibit 26 first, Your Honor.

9   Q.    (By Mr. Davis)  Can you see the screen, Mr. Aridi?

10  A.    Yes.

11  Q.    The time stamp that's shown of 18:26:51, would that

12  essentially be 6:26 --

13  A.    Yes.

14  Q.    6:27 p.m.?  The female that's shown in the upper

15  left-hand corner, is that your wife?

16  A.    Yes, sir.

17  Q.    Do you see the individual at the counter now?

18  A.    Right.

19  Q.    Is that the defendant?

20  A.    Yes.

21  Q.    Is the defendant now back up at the counter with

22  your wife?

23  A.    Right.

24  Q.    Can you make out the two items that are there on the

25  counter?

1      A.    It's either 18-pack or a 24-pack, Budweiser -- I

2  mean, Bud Light or Natural Light Beer.

3      Q.    Essentially have we now seen the first transaction?

4      A.    Yes.

5      Q.    And so the jury understands, there's actually a

6  second transaction where the defendant came in to purchase

7  Hennessy Cognac; is that right?

8      A.    Yes.

9      Q.    While we're looking at the videotape, Mr. Aridi,

10  your store is located where in Terrell?

11      A.    500 South Virginia.

12      Q.    Is that Highway 34?

13      A.    Yes.

14      Q.    Would that be just a short distance south of Highway

15  80 there in Terrell?

16      A.    Yes, that's correct.

17      Q.    How long have you owned and operated this store?

18      A.    About three and a half years.

19      Q.    Do you know how the defendant got to your store that

20  day?

21      A.    (No response.)

22      Q.    Do you know whether he drove up?

23      A.    Yeah, he -- I believe he did.

24      Q.    Mr. Aridi, looking at the top left-hand corner

25  again, you see the individual in the white T-shirt there?

1       A.    Yes, sir.

2       Q.    We now see the defendant again; is that right?

3       A.    Right.

4       Q.    And you're actually dealing with him at this point,

5    right?

6       A.    Right.

7       Q.    Is this the transaction that you've told us about

8    involving the Hennessy Cognac?

9       A.    Yes.

10      Q.    During the time that you were dealing with the

11   defendant, he seem to have any difficulty understanding you?

12      A.    No.

13      Q.    Have any difficulty communicating with you?

14      A.    No.

15                  (Tape playing.)

16      Q.    (By Mr. Davis)  And as I understand, after that

17   purchase of the Hennessy, he never came back in your store

18   again, did he?

19      A.    No.

20                  MR. DAVIS:  For the record now, Your Honor,

21   I'm going to publish State's Exhibit Number 26A which is the

22   enhanced audio and slowed down video.

23                  THE COURT:  Mr. Davis, would you like the

24   Court to lower some of the lights?

25                  MR. DAVIS:  Yes, sir, if you don't mind.

1    Thank you.

2                 (Video played.)

3        Q.    (By Mr. Davis)   Mr. Aridi, having watched the

4    videotape, do you remember whether or not the defendant told

5    you or your wife that he was from Dallas?

6        A.    I don't remember if he said he was from Dallas.

7        Q.    Okay.  Do you remember whether or not he told your

8    wife or you that he actually worked for the Constable's

9    office there --

10       A.    I remember something like that, yes.

11       Q.    Okay.  Tell me what you remember about him making

12   that claim?

13       A.    I believe he mentioned that the party was going to

14   be for the Constable that he works for.  If I'm not mistaken

15   he said the Constable in Kaufman, though.

16       Q.    So were you under the impression that he worked for

17   the Constables Office in some capacity, either as a civilian

18   or actually a peace officer?

19       A.    Yes.

20                 MR. DAVIS:  I'll pass the witness, Your Honor.

21                      Cross-Examination

22   By Ms. Balido:

23       Q.    Mr. Aridi, is that pronounced correctly?

24       A.    Uh-huh.

25       Q.    My name is Jennifer Balido, and I'm going to ask you

1    some questions about your testimony.  Okay.  If you don't

2    understand anything I'm trying to ask you, just let me know.

3         A.   Okay.

4         Q.   All right?  The amount of alcohol that he was

5    buying, is that unusual those two, either 18-packs or

6    24-packs?

7         A.   Well, a lot of people come in and buy that much for

8    a party.

9         Q.   Okay.

10        A.   So it's not unusual.

11        Q.   All right.  So was it -- was it your suggestion to

12   him that he must be buying a lot of beer for a party buying

13   that amount of alcohol?  Do you think you mentioned that to

14   him first?

15        A.   No, I didn't mention anything to him like that.

16        Q.   So you're -- you said that it was his suggestion?

17        A.   Right.

18        Q.   And when the -- when the State's lawyer asked you,

19   you said that you remembered him saying something about

20   working for a Constables Office?

21        A.   Right.

22        Q.   Okay.  But he never showed you any type of badge or

23   any gun or anything like that?

24        A.   I didn't -- no.

25        Q.   Okay.  Let me ask you a question specifically about

DARLINE W. LABAR, OFFICIAL REPORTER

1  the videotape.  The first thing he does is he comes in and he

2  buys two 12-packs -- I mean, or 18-packs or 24-packs of beer,

3  correct?

4      A.   Correct.

5      Q.   And then he pays for it with a credit card.  He

6  leaves the shop, and then he comes back in?

7      A.   Right.

8      Q.   Okay.  And you're working at the counter then, and

9  then does he say -- okay.  And then you can see that your

10  wife leaves and goes around to the other side or goes

11  outside; is that correct?

12     A.   Right.

13     Q.   And that's the only way to get from the beer side to

14  the liquor side?

15     A.   That's correct.

16     Q.   Okay.  And do you know if it's at that time that --

17  do you know who Treshod Tarrant is?

18     A.   No, I didn't know then.

19     Q.   Okay.  So you don't remember seeing him out at that

20  time?

21     A.   No, I didn't see him at all.

22     Q.   Okay.  Do you know whether or not it was at that

23  time that Treshod Tarrant said he wanted some Hennessy?

24     A.   I don't know that.

25     Q.   Okay.

1       A.    I mean, I didn't know that then.

2       Q.    All right.  So -- so if you come back -- and then

3    she comes back in and she brings the bottle of Hennessy; is

4    that correct?

5       A.    Right.

6       Q.    And it's kind of unclear because you can't tell

7    that -- what exactly is being said from the video; is that

8    true?

9       A.    From what's being said?

10      Q.    Yeah, what's being said on the --

11      A.    Right, I couldn't understand the video.  No.

12      Q.    You're not the only one.

13               MR. DAVIS:  Object to the side bar.

14               THE COURT:  Sustained.

15      Q.    (By Ms. Balido)  So then the -- is it Mr. -- is it

16    Mr. Murphy, the person you've identified as Mr. Murphy, or is

17    it actually a large black man that walks out with the

18    Hennessy from the videotape?

19      A.    No, he did.

20      Q.    Okay.  So that's what you think the videotape shows?

21      A.    Right.

22      Q.    All right.

23               MS. BALIDO:  I'll pass the witness.

24               MR. DAVIS:  No further questions, Your Honor.

25               THE COURT:  May this witness be excused,

1    subject to recall as well?

2              MR. DAVIS:  No objection.

3              MR. BYCK:  No objection.

4              THE COURT:  Thank you.  You are excused,

5    subject to recall.

6              MR. DAVIS:  The State would call Deputy Gary

7    Rose.

8              (Witness brought into courtroom.)

9              THE COURT:  Good afternoon, Officer.  Ask you

10   to raise your right hand, please.

11             (Witness sworn.)

12             THE COURT:  Invite your taking a seat to my

13   left.

14        The State may continue.

15                    GARY ROSE

16   was called as a witness by the State and, after having been

17   first duly sworn, testified as follows:

18                  Direct Examination

19   By Mr. Davis:

20        Q.   Please tell us your full name.

21        A.   Gary Rose.

22        Q.   And how are you employed?

23        A.   By the Van Zandt County Sheriff's Department.

24        Q.   Are you a deputy with that department?

25        A.   Yes, sir.

1       Q.    How long have you been with the Van Zandt County

2   Sheriff's Department?

3       A.    Ten years.

4       Q.    And what's it -- what's your rank or your position

5   at this time?

6       A.    Deputy.

7       Q.    What are your duties and responsibilities?

8       A.    Patrol the county roads of Van Zandt County, take

9   reports.

10      Q.    Deputy Rose, I want to direct your attention to --

11  this will be actually October the 5th of the year 2000, and

12  ask about 10 o'clock that night were you at home when you

13  were contacted by the Van Zandt County Sheriff's Department?

14      A.    Yes, sir.

15      Q.    Were -- was some information given to you relating

16  to the defendant in this case, Jedidiah Isaac Murphy?

17      A.    Yes, sir.

18      Q.    Did you leave your home at that time, or did you

19  stay home for a while?

20      A.    I stayed home.

21      Q.    About 11:00 p.m. were you contacted again by the

22  dispatcher?

23      A.    Yes, sir.

24      Q.    And were you given more information concerning the

25  location of the defendant?

```
1        A.    Yes, sir.

2        Q.    Were you actually given an address to work with?

3        A.    Not at that time.

4        Q.    Directing your attention now forward to shortly

5    before 2:00 a.m. on October the 6th, did the dispatcher call

6    you again?

7        A.    Yes, sir.

8        Q.    And this time did she have or did he have an exact

9    location for the defendant in Edgewood?

10       A.    The sergeant on duty did.

11       Q.    What did you do in response to that call?

12       A.    I went to Edgewood.

13       Q.    Where is your home down there?

14       A.    I live approximately three miles north of Canton.

15       Q.    All right.  So you drove into Edgewood that morning?

16       A.    Yes, sir.

17       Q.    Who did you meet, if anyone, in Edgewood?

18       A.    I met with other deputies of the Sheriff's

19   Department.

20       Q.    Do you remember where y'all met that morning?

21       A.    At the Dairy Queen.

22       Q.    How many officers or how many other deputies were

23   there at that Dairy Queen?

24       A.    Approximately six to eight.

25       Q.    Any other departments represented at that time?
```

1      A.   Yes, sir.

2      Q.   Which other police departments were represented?

3      A.   The Wills Point Police Department and the Edgewood

4  Police Department.

5      Q.   Tell me what's the next thing that happened then.

6      A.   I had one of our sergeants, Sergeant Rick Goldey,

7  set up surveillance at the house.  He stayed on surveillance

8  of the house while we met at the Dairy Queen.

9      Q.   Which house are we talking about?

10     A.   It would be the house of Ora Mae Milton's.

11     Q.   All right.  So one individual then went up, set up

12  surveillance, and you stayed at the Dairy Queen; is that

13  right?

14     A.   Yes, sir.

15     Q.   What did you do at the Dairy Queen?

16     A.   There we -- I contacted the Garland Police

17  Department, told them that we had located the car belonging

18  to Bertie Cunningham and that the car was parked at the

19  residence and asked them if they wanted us to go ahead and

20  try to attempt an arrest.

21     Q.   Okay.  What was their response?

22     A.   They said that would be fine.

23     Q.   All right.  So what did you and the officers up

24  there at the Dairy Queen do?

25     A.   Okay.  We got organized.  We set up a perimeter team

1  and a team to go inside the house and make an arrest and then

2  we went to the residence.

3        Q.   So in all approximately how many officers or

4  deputies then went to that location where Ms. Milton lived?

5        A.   Approximately six to eight of us.

6        Q.   Okay.  I guess Garland or someone had informed you

7  what the charges were, hadn't they?

8        A.   Well, we knew at that time it was a stolen vehicle

9  and credit card abuse and possibly a murder charge.

10       Q.   When you got there to the residence, Deputy, did you

11  see any cars parked out front?

12       A.   Yes, sir.

13       Q.   What cars did you see out front?

14       A.   I seen the vehicle that was in the teletype as

15  being -- belonging to Bertie Cunningham's -- and I don't

16  remember the other vehicles.  I was concentrating on that

17  vehicle.

18       Q.   What sort of vehicle did Ms. Cunningham drive that

19  you were looking for?

20       A.   It was a -- I believe, a silver Honda.

21       Q.   You saw the vehicle there in front.  What did you do

22  next?

23       A.   I approached the door, along with several other

24  officers, and knocked on the door and spoke with Ms. Milton.

25       Q.   Had you been there to that house before?

1    A.   Yes, sir.

2    Q.   Did you know Ms. Milton?

3    A.   Yes, sir.

4    Q.   Did you know Shod Tarrant?

5    A.   Yes, sir.

6    Q.   So when Ms. Milton opened the door, I take it did

7 you recognize her?

8    A.   Yes, sir.

9    Q.   She appear to recognize you?

10    A.   Yes, sir.

11    Q.   What, if anything, did you say to Ms. Milton?

12    A.   I asked her if Jim Murphy was there.

13    Q.   What did she say?

14    A.   She said that he was.

15    Q.   What did you do next then?

16    A.   I asked her where he was at in the house, and she

17 told me.

18    Q.   Okay.  Where did she say that he was?

19    A.   In bed asleep.

20    Q.   When she told that you, what did y'all do?

21    A.   I told her I had a warrant for his arrest, a felony

22 warrant for his arrest, and we entered the house.

23    Q.   Did you go into the bedroom where he was?

24    A.   Yes, sir.

25    Q.   Was anybody else in the bedroom?

1   A.   Yes, sir.

2   Q.   Who else?

3   A.   Shod Tarrant.

4   Q.   Lights on?  Lights off?

5   A.   Lights off.

6   Q.   What did y'all do?

7   A.   We arrested Jedidiah Murphy.

8   Q.   All right.  Did y'all turn the lights on?  Did you

9   have your flashlights on?  Just tell me a little bit more

10  about how you actually arrested the defendant.

11  A.   We had a flashlight on, and we approached the bed

12  and woke him up.

13  Q.   All right.  Was Shod Tarrant also woke up?

14  A.   Once we woke Mr. Murphy up, he woke up.

15  Q.   So I take it the defendant in this case was actually

16  asleep in bed when you actually came up and made contact with

17  him; is that right?

18  A.   Yes, sir.

19  Q.   Now, the defendant in this case, do you recognize

20  him to be in the courtroom this afternoon?

21  A.   Yes, sir.

22  Q.   If you could, just please point out where he's

23  sitting and what he's wearing?

24  A.   Dark jacket with red tie.

25  Q.   All right.  Thank you.

```
 1              MR. DAVIS:  May the record please reflect this

 2    witness is identifying the defendant in open court.

 3       Q.   (By Mr. Davis)  Who was the first -- first peace

 4    officer that actually went up and made contact with the

 5    defendant?

 6       A.   I was.

 7       Q.   You were?

 8              MS. BALIDO:  Judge, at this time I believe we

 9    need to take up something outside the presence of the jury.

10              THE COURT:  Sheriff, retire the jury.

11              THE BAILIFF:  All rise.

12              (Jury recessed from courtroom.)

13              THE COURT:  Let the record reflect the jury is

14    being excused from the courtroom at this time.

15              (Jury recessed from courtroom.)

16              THE COURT:  Mr. Murphy, visitors in the

17    gallery, you may be seated.

18              Defense may proceed.

19                        Cross-Examination

20    By Ms. Balido:

21       Q.   Deputy Rose, my name is Jennifer Balido.  I'm going

22    to ask you some questions just about what happened after you

23    actually went into the room.   Okay?

24              You first -- so who was the first officer inside the

25    actual bedroom where Shod Tarrant and Jim Murphy were
```

1    sleeping?

2         A.   It was me.

3         Q.   Okay.  And was anybody else in the room at the time?

4    Besides those two people, any other law enforcement officers?

5         A.   Law enforcement officers, yes, ma'am.

6         Q.   And who were those people?

7         A.   Let me think.  I believe Sergeant Goldey was in

8    there with me.  Jason Bonham.  Seemed like there was a couple

9    more, but I can't remember which ones they were.

10        Q.   Okay.  And what was everybody's responsibility?  I

11   mean, there were obviously some people that were trying to

12   get Shod out of the room.  Do you know who they were?

13        A.   At the initial point of going in the room, we were

14   concentrating on effecting the arrest.  I seen Shod whenever

15   he was there, and I told them just to leave him alone at that

16   point because he was asleep.

17        Q.   And did he remain asleep until you arrested Jim

18   Murphy?

19        A.   He was asleep until we got him under control and in

20   custody.

21        Q.   Is the defendant asleep or Shod when you were --

22   okay.  I don't think I made myself clear.  Okay.  What is --

23   what did you do in regard to Jim Murphy?

24        A.   We immediately arrested him.

25        Q.   Okay.  And what did that entail exactly, when you

1   say you immediately arrested him?

2   　　　A.　　Restraining his arms and placing him in handcuffs.

3   　　　Q.　　Okay.　And where was Shod at this time?

4   　　　A.　　He was across the room in another bed asleep.

5   　　　Q.　　And he remained asleep until after Jim was arrested?

6   　　　A.　　He probably woke up during the arrest.

7   　　　Q.　　Okay.　What happened after you physically restrained

8   Mr. Murphy and placed him in handcuffs?

9   　　　A.　　I set him up in the bed.

10  　　　　　　　THE COURT:　Is this not all a matter that can

11  be heard by the jury?

12  　　　　　　　MS. BALIDO:　Well, Judge, I'm about to get

13  to --

14  　　　　　　　THE COURT:　Well, let's get right to it.

15  Let's move on.

16  　　　Q.　　(By Ms. Balido)　And what happened after you sat him

17  up in bed?

18  　　　A.　　I read him his Miranda rights.

19  　　　Q.　　Do you have any notes or anything that indicate that

20  you actually gave him any -- gave him his Miranda rights, any

21  signed waiver from the defendant?

22  　　　A.　　No, ma'am.

23  　　　Q.　　Any whip-out book or any notebook that you kept to

24  determine whether or not you gave him these Miranda warnings?

25  　　　A.　　No, ma'am.

 1        Q.    Okay.   Is there anything in writing that states that
 2   you gave him his Miranda warnings?

 3        A.    Just my supplement report.

 4        Q.    Yourself and your report?

 5        A.    My supplement report.

 6        Q.    Okay.   Your supplement report.   And who else was in
 7   the room at the time?

 8        A.    Okay.   I believe it was Sergeant Goldey, Jason
 9   Bonham, and a couple more deputies.   I don't remember which
10   ones it was.

11        Q.    And when you say you read his rights, what did you
12   say to him?

13        A.    I told him he had the right to remain silent and not
14   make any statement.   Any statement he made would be used
15   against him at his trial.   Any statement he made would be
16   used as evidence against him in court.   He had the right to
17   have a lawyer present to advise him prior to and during any
18   interview.   If he was unable to employ a lawyer, he had the
19   right to have a lawyer appointed to advise him prior to and
20   during any interview.   He had the right to terminate any
21   interview or questioning at any time.

22        Q.    And that was the -- that was the totality of the
23   rights that you read him?

24        A.    Yes, ma'am.

25        Q.    Did you -- and what was his reaction to you?

1    A.   He didn't indicate that he -- I normally ask them if

2    they understand.  I don't remember if I did or not.

3    Q.   So you don't remember asking him if he understood

4    his rights?

5    A.   Right.

6    Q.   Did he ever make any response to you that he did

7    understand his warnings?

8    A.   I can't remember.

9    Q.   What did he -- how did he react to you?  Did he act

10   like he understood what was going on or what was his reaction

11   to you being in the room?

12   A.   He appeared that he understood what was going on.

13             THE COURT:  Anything further outside the

14   jury's presence, Counsel?

15   Q.   (By Ms. Balido)  And what did you base your opinion

16   on that he understood what was going on?

17   A.   Because he was sitting up, he was looking at me.  He

18   didn't indicate any facial expressions like he didn't

19   understand.

20             MS. BALIDO:  That's fine, Judge.  That

21   concludes outside the presence.

22             THE COURT:  The State have anything outside

23   the jury's presence?

24             MR. DAVIS:  No, sir.

25             THE COURT:  Ms. Madore, may we have the jury,

1    please.

2                          (Brief recess.)

3                 THE COURT:  Let the record reflect this court

4    is convening this matter on its own motion, outside the

5    presence and hearing of the jury of 12 and one alternate.

6                 The Court and counsel will notice that the last

7    recess of the jury, one of the jurors, Ms. Lawley, was

8    assisted out of the courtroom by one of her fellow jurors.

9    At the conclusion of the proffer of the testimony, the Court

10   asked the bailiff, Ms. Madore, to return the juror to the

11   courtroom to continue the examination of Deputy Gary Rose of

12   the Van Zandt Sheriff's Department.  At that time, outside

13   the presence of the defendant and the attorneys, Ms. Madore

14   asked me if I would come to the hallway behind the court,

15   that there was a possible medical emergency.  I immediately

16   excused myself from the courtroom, was immediately confronted

17   by the bailiff, Ms. Grace Madore, and the juror, Ms. Joann

18   Lawley.  Ms. Lawley was on the phone standing upright, was

19   conversing with, according to Ms. Madore, her husband who is

20   a medical doctor here in the City of Dallas.  I asked if I

21   should be excused while she talked with her husband.  She

22   said no.  Obviously, I could not hear what her husband was

23   saying to her or a man that she represented to be her

24   husband.  No reason to doubt it.  She explained to her

25   husband that shortly before we took a recess, the courtroom

1    began spinning faster and faster and faster.  She never in

2    her opinion lost consciousness.  Her husband apparently told

3    her that before she endeavored to continue this afternoon or

4    come home, that her blood pressure be checked by competent

5    medical personnel here in the courthouse.

6         At that point I did excuse myself, return to the

7    courtroom.  Ms. Madore has now returned to the room.

8         Ms. Madore, could you further amplify from your

9    standpoint, i.e., a non-clinical medical standpoint, the

10    condition of Ms. Lawley as you understand it to be at the

11    present time, please?

12         THE BAILIFF:  Your Honor, I spoke with her

13    husband and he said because she had been sitting for quite

14    some time and sitting with her legs crossed, her blood

15    pressure most probably dropped and that's why she was feeling

16    dizzy.  And he suggested that she bounce on her toes for a

17    few minutes and she has been doing that back there in the

18    hallway and she feels fine now.

19         THE COURT:  Out of an abundance of caution,

20    I'm going to adjourn the proceedings until tomorrow morning

21    at 9 o'clock.  We will continue with the examination of

22    Deputy Gary Rose at that time.

23         Either side care to put anything additional on to

24    the trial record at this point?

25         MR. BYCK:  Nothing from the defense, Your

1    Honor.

2              MR. DAVIS:  No, Your Honor.

3              MS. LITTLE:  I think we need Shod to come back

4    tomorrow.

5              THE COURT:  All right.

6              MS. LITTLE:  Shod Tarrant.

7              THE COURT:  May we have him on standby?

8         Sheriff, we'll see you tomorrow morning.

9         Either side have any objection to Ms. Madore

10   excusing the jury?  Or do you want them to come into the

11   courtroom and I excuse them from --

12             MS. LITTLE:  No objection.

13             MR. BYCK:  No objection to Ms. Madore excusing

14   them.

15             MR. DAVIS:  No objection.

16             THE COURT:  Ms. Madore, if you would excuse

17   the jury.  9:00 a.m. tomorrow morning, please.

18             THE BAILIFF:  Yes, sir.

19             (Recess of proceedings.)

20

21

22

23

24

25

1                         Reporter's Certificate

2     STATE OF TEXAS:

3     COUNTY OF DALLAS:

4            I, Darline W. LaBar, Official Court Reporter of the

5     194th Judicial District Court, in and for Dallas County,

6     Texas do hereby certify that the foregoing volume constitutes

7     a true, complete and correct transcript of all portions of

8     evidence and other proceedings requested in writing by

9     counsel for the parties to be included in the statement of

10    facts, in the above styled and numbered cause, all of which

11    occurred in open court or in chambers and were reported by

12    me.

13           I further certify that this transcription of the

14    record of the proceedings truly and correctly reflects the

15    exhibits, if any, offered by the respective parties.

16           Witness my hand this the 14th day of October, A.D.,

17    2001.

18

19

20           DARLINE W. LABAR
             Official Court Reporter
21           194th Judicial District Court
             Dallas County, Texas
22           (214) 653-5803

23

24

25    Certification No. 1064 Expires December 31, 2002


                     DARLINE W. LABAR, OFFICIAL REPORTER