REPORTER'S RECORD

**74145**

VOLUME 48 of 65 VOLUMES

TRIAL COURT CAUSE NO. F00-02424-NM

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS BY

**FILED IN COURT OF CRIMINAL APPEALS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEC   5 2001

A P P E A R A N C E S :

Troy C. Bennett, Jr., Clerk

HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building
        Dallas, Dallas County, Texas   75207
        Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
            FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
        Phone:  214-653-9400
            FOR THE DEFENDANT.


            \*\*\*\*\*\*\*\*\*

        On the 5th day of June, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

        Proceedings reported by machine shorthand, computer

assisted transcription.

```
1                        INDEX VOLUME 48

2    June 5th, 2001                              PAGE     VOL.

3    Proceedings...................................... 2     48

4    Arguments on Voluntariness of Statement.......... 71    48

5    Reporter's Certificate........................... 267   48

6


7                   CHRONOLOGICAL WITNESS INDEX

8                      DIRECT        CROSS        VD      VOL.

9    GARY ROSE             14                             48

10   OZELLE WILCOXSON      21            35               48

11   JASON BONHAM          45                             48

12   JEDIDIAH ISAAC MURPHY 52, 70       57, 70            48

13   GARY ROSE             77, 121, 124  99, 123, 126     48

14   MATT MYERS            130, 254     204, 261   196    48

15


16                   ALPHABETICAL WITNESS INDEX

17                      DIRECT        CROSS        VD      VOL.

18   JASON BONHAM          45                             48

19   JEDIDIAH ISAAC MURPHY 52, 70       57, 70            48

20   MATT MYERS            130, 254     204, 261   196    48

21   GARY ROSE             14                             48

22   GARY ROSE             77, 121, 124  99, 123, 126     48

23   OZELLE WILCOXSON      21            35               48

24

25
```

DARLINE W. LABAR, OFFICIAL REPORTER

```
1                          EXHIBIT INDEX

2    STATE'S                    OFFERED        ADMITTED       VOL.

3       27    Map of Edgewood        122           122         48

4       28    Crime Scene Photo       88            88         48

5       29    Crime Scene Photo       88            88         48

6       30    Crime Scene Photo       88            88         48

7       35    Magistrate Warnings     26            27         48

8       36    Magistrate Warnings     26            27         48

9       38    Vacuum Hose            190           190         48

10      39    Heater Hose           190           190         48

11      40    Blue Towel            190           190         48

12      41    Miranda Warning Sheet 162           167         48

13      42    Photo of Defendant    196           198         48

14      43    Photo of Defendant    196           198         48

15      44    Photo of Defendant    196           198         48

16      45    Photo of Defendant    196           198         48

17      46    Photo of Defendant    196           198         48

18      47    Voluntary Statement   180           180         48

19      48    Miranda Warning Sheet 257           257         48

20      50    Miranda 10-11-00      259           260         48

21      51    Miranda 10-13-00      260           261         48

22      52    Receipt Cole Mountain 201           201         48

23      53    Receipt Cowboys       201           201         48

24

25
```

```
1              P R O C E E D I N G S

2              THE COURT:  Let the record -- let the record

3    reflect this hearing is being conducted in open court,

4    outside the presence and hearing of the impaneled jury.  The

5    defendant is present in court during the course of this

6    hearing.

7         Mr. Davis, I think you have a matter that you want

8    to put on the record.

9              MR. DAVIS:  Yes, sir, I did.

10             THE COURT:  Go ahead.

11             MR. DAVIS:  Yes, sir.  This is pursuant to the

12   Court's rulings yesterday.  When I came into the office this

13   morning, I found these xeroxed copies of reports.  Now, these

14   are reports from Van Zandt County Sheriff's Office.  I

15   believe all of these reports have previously been tendered to

16   defense counsel.  I don't see anything new, but out of an

17   abundance of caution, I'm going to at this time tender the

18   copies that were on my desk this morning to defense counsel.

19        In addition --

20             THE COURT:  Does defense acknowledge receipt

21   of the reports?

22             MS. BALIDO:  Yes, Your Honor.

23             MR. DAVIS:  In addition, I found some copies

24   of reports from the Dallas County Commercial Auto Theft Task

25   Force.  This would deal with an extraneous offense for which
```

1    the defendant is presently on probation here in Dallas

2    County.  And again, looking at the reports, I believe all of

3    these have previously been tendered to defense counsel, but

4    out of abundance of caution again, I'll tender those to

5    defense counsel at this time.

6              MR. BYCK:  We so acknowledge.

7              MR. DAVIS:  Thirdly, I've just been given what

8    appear to be notes from Judge Ozelle Wilcoxson who will

9    testify this morning with regards to the -- to the

10   arraignment of the defendant.  This would appear to be the

11   actual magistrate's warnings, as well as what appear to be

12   certain typed -- typed notes regarding her scheduling and the

13   times in which she did certain -- certain things in this

14   case.  I don't see anything exculpatory or mitigating in

15   them, but again, I've just received those this morning so

16   I'll tender those to defense counsel at this time.

17             MR. BYCK:  So acknowledged.

18             THE COURT:  Defense has a matter that they

19   wish to bring to the Court's attention in the State's

20   presence I understand?

21             MR. BYCK:  Yes, Your Honor.  We, having

22   received the information yesterday of a search and seizure of

23   the defendant's written notes, memoranda, and documents in

24   the Dallas County Jail approximately three weeks ago, we

25   would respectfully request a hearing before the Court in

1    which we would seek to determine either the legality of that

2    search and seizure and if it was an illegal search and

3    seizure, the amount of information that has been dispersed,

4    where it has been dispersed, who had the information, and if

5    that information led to other sources, facts, or information

6    being developed, all of which would be in violation of the

7    Defendant's Fourth Amendment rights and under the United

8    States Constitution and the applicable provision of the Texas

9    Constitution.  I think it's Article 1, Section 10.  And we

10   respectfully ask for a hearing.  We would submit to the Court

11   that the people involved in the hearing are essentially in

12   house.  They would be either district attorneys, sheriffs

13   officers, or sheriffs themselves, jail personnel.

14                THE COURT:  How quickly do you need this

15   hearing?  Here's my -- here's my thinking.  Friday is going

16   to be a down day.  We could either do it Friday or otherwise

17   we'd have to do it very early some morning or late some

18   afternoon.

19                MS. BALIDO:  Well, what the situation -- what

20   our concern is, Judge, is that there will be evidence placed

21   before the jury, but for the fact that the legal search and

22   seizure issue will, you know -- they would not have that

23   information.  And if that information's spread out or some

24   investigation was done based on the information gleaned from

25   the illegal search and seizure by the State, including notes

1    by the defendant to his lawyers, then the danger -- the peril

2    is that it spreads all through the case and the case in chief

3    by the State, so we'd like it as soon as possible.

4                    THE COURT:  May we begin it tomorrow morning

5    at 8:30 and not have the jury come in until 10:00?

6                    MR. DAVIS:  That's fine.  May I ask that the

7    letters be provided to the Court for in camera inspection

8    prior to the hearing so we can -- at least the Court at that

9    time will be advised as to whatever may have been seized by

10   the Dallas County Sheriff's Office.

11                   MR. BYCK:  Your Honor, we did receive -- we

12   did receive a sealed package from the Dallas County Sheriff's

13   Office.  We have not opened that package.

14                   THE COURT:  All right.

15                   MS. BALIDO:  I'm sending the intern up to go

16   get it, Judge.

17                   MR. BYCK:  And we would ask the District

18   Attorney if he has any other --

19                   MR. DAVIS:  So if I understand, this motion is

20   being made without the benefit of defense counsel actually

21   looking at the material to see if there's anything material

22   that may have been seized.

23                   MS. BALIDO:  Judge, this motion is being made

24   based on the statements made by the District Attorney

25   yesterday, that he saw those materials, that he did see that

1      those materials were letters that were written to --

2                      MR. DAVIS:  No, I'm sorry.  That is not my

3      statement.

4                      MS. LITTLE:  He said conceivably could have

5      been, but had not been --

6                      MR. DAVIS:  My understanding was -- let me

7      make this very clear, that that was not a letter that had

8      been written to defense counsel.

9                      MS. BALIDO:  That's --

10                     THE COURT:  The Court will accept the

11     invitation to see the documents in camera and make a

12     determination.

13                     MS. BALIDO:  That's all for you.

14                     MR. BYCK:  And we would inquire of the

15     District Attorney, Your Honor, whether there were any other

16     documents that he retained or whether he made -- whether he

17     has a file with a complete set of copies of the documents

18     that were subsequently re-returned to the Dallas County

19     Sheriff's Office.

20                     MR. DAVIS:  No.  Those were the only documents

21     that were viewed, so that -- and as I've stated, my

22     recollection was that two of those letters were from family

23     members to the defendant so there would be absolutely no

24     privilege at all there.  The other was not in the form of a

25     letter.  It was in the form of notes.  They were not

1   addressed to anyone.  So what --

2                   THE COURT:  In the interest of everybody's

3   time, if I may take a look in camera and determine the nature

4   of --

5                   MR. BYCK:  They're on their way down.  We

6   thank the Court.

7                   MS. BALIDO:  Judge, we additionally have three

8   other issues we'd like to take up.  First, this morning we

9   filed with the Court and served on the State's attorneys a

10  motion for mistrial pursuant to the decision of the United

11  States Supreme Court yesterday in what we'll call Penry II.

12  The United States Supreme Court reversed and remanded the

13  case of the State of Texas versus Johnny Paul Penry --

14                  THE COURT:  Have you -- have you read the

15  opinion and --

16                  MS. BALIDO:  I have, Your Honor.

17                  THE COURT:  The instructions that this jury

18  will be given are totally different from Penry II, so -- how

19  is this germane --

20                  MS. BALIDO:  Judge --

21                  THE COURT:  -- to the issue before this jury?

22                  MS. BALIDO:  Judge, we will submit that it is

23  germane because if you read the text, it is true that Penry's

24  instructions were different than the instructions that are

25  going to be given to this jury.  However --

1          THE COURT:  Totally different.

2          MS. BALIDO:  Totally different.  However, and

3    the Court does say that the Texas sentencing statute as it is

4    now that this jury will consider is more clear than the

5    instructions given under Penry II.  However, Judge, if you

6    read the text of the opinion, it says basically that -- in

7    explaining Penry I in relation to the consideration of

8    mitigating circumstances by capital sentencing juries, the

9    State clears up what Penry I said and did not say.  And what

10   Penry -- and this is the Supreme Court, Justice O'Connor

11   writing the opinion, that Penry I did not hold that the mere

12   mention of mitigating circumstances to a capital sentencing

13   jury satisfies the 8th Amendment.  Nor does it stand for the

14   proposition that it's constitutionally sufficient to inform

15   the jury that it may, quote, consider, that's a quote inside

16   the language, mitigating circumstances in deciding the

17   appropriate sentence.  Rather, the key under Penry I is that

18   the jury is able to consider and give mitigating effect to,

19   that's the emphasis added by the Supreme Court, a defendant's

20   mitigating evidence and imposing sentence.

21          What our contention is, is during jury selection in

22   this case, attempts were made by the defense to inquire as to

23   the potential jurors whether or not they could, quote, give

24   mitigating effect to certain evidence.  And those attempts to

25   bring forth that response from those potential jurors was

1    thwarted by an objection from the State and the sustaining of

2    that objection by the State by this Court.

3                    THE COURT:  I disagree with that.

4                    MS. BALIDO:  Well, Judge --

5                    THE COURT:  And the record will speak for

6    itself.

7                    MS. BALIDO:  The record will speak for itself.

8                    THE COURT:  I totally disagree.

9                    MS. BALIDO:  Judge, what the Court allowed us

10   to do is determine whether or not they would consider

11   mitigating evidence, but --

12                   THE COURT:  And I on my own, Ms. Balido, asked

13   each prospective juror, whether they were challenged for

14   cause or not, if they could give effect to mitigating

15   evidence, if presented, and address Special Issue Number 2

16   accordingly.

17                   MS. BALIDO:  Judge --

18                   THE COURT:  That's what I recall the record of

19   months of jury selection to reflect.

20                   MS. BALIDO:  Judge, the record will be clear

21   on what was said and what was not said.  If you remember that

22   there were times that we attempted to get into mitigating

23   evidence to determine whether or not they would give

24   mitigating effect to certain evidence.  And besides --

25   everyone said that they could consider it.  But when we

1     attempted to go further to see if they could actually give

2     mitigating effect to that, you denied us the ability to do

3     that.  And we attempted to go through there -- I cited two

4     cases, one was the Maldonado case, a 1999 case, and one was

5     another case that was a 1993 case that I believe that you

6     said was somebody that wasn't on the Court of Appeals -- on

7     the Court of Criminal Appeals anymore and that you weren't

8     going to rely upon that opinion.  And the defendant asserts

9     that we were denied the ability to go as far as Penry II

10    seems to say that we are able to in questioning these jurors

11    as to whether or not they can give mitigating effect to the

12    evidence presented in the sentencing phase if we get that

13    far.  And that's the basis of our motion for a mistrial at

14    this point.

15           THE COURT:  Defense request for a mistrial is

16    denied.

17           MS. BALIDO:  Secondly, Judge, it seems from

18    the way we kind of ended up yesterday in relationship to my

19    questions outside the presence of the jury to Deputy Rose of

20    the Van Zandt County Police Department, that I have not been

21    making myself clear as to what I'm trying to suppress in

22    regard to the oral confessions.  I'm basing my -- my Motion

23    to Suppress as to the oral statements on the case of Moon

24    versus State, 607, 569.  Basically I think it's kind of

25    the -- the thinking of everyone in the courtroom that

1    because Mr. Murphy made an oral statement that was

2    therefore -- that was later proved to be true by the finding

3    of Ms. Cunningham's body, under 38.22(C), that means that

4    oral statement comes in.  But what the Moon case says and

5    what I'm trying to develop through Deputy Rose's testimony

6    and the testimony of later on Jason Bonham of the Edgewood

7    Police Department is that Mr. Murphy was not Mirandized

8    properly and did not voluntarily waive his rights under

9    Miranda versus Arizona when he made these statements.  And I

10   think the record -- at least at this point the way that the

11   record has been developed is that he did not voluntarily

12   waive those rights.  There was no statement by the defendant

13   that he understood those rights and he read those.  And under

14   Moon versus State --

15              THE COURT:  And there was no statement that he

16   didn't understand them.

17              MS. BALIDO:  That's true and --

18              THE COURT:  He's not a rookie in the criminal

19   justice system.

20              MS. BALIDO:  Well, Judge, I understand that,

21   but what my concern is, is that these statements will get out

22   in front of the jury before there is a trial court finding

23   that those were either voluntarily waived or not.  And under

24   the Moon case it says that is an issue not for the jury as

25   under 38.22 when we're talking about written statements, but

1    is an issue for the trial court to determine as for two

2    things.  Number one, due process requirements of

3    voluntariness and the requirements, number two, of Miranda

4    are first met.  And that's what I'm trying to get to by

5    trying to get the jury out of the room, develop these

6    things --

7                   THE COURT:  Well, let's -- how much more

8    proffer do you want, Ms. Balido?  Do you want more proffer

9    this morning before the jury comes in?

10                  MS. BALIDO:  I'd like to ask a couple of

11   questions.

12                  THE COURT:  Let's get going.  And from now on,

13   tomorrow morning everybody be here at 8:30.  This is the type

14   of abuse that jurors must suffer throughout this country

15   about which they get so frustrated, so we're going to be in

16   here tomorrow morning 8:30, everybody in their chair whether

17   we do nothing or have a hearing.

18               Bring in the officer.

19                  MR. DAVIS:  He's getting him.

20                  MS. BALIDO:  Judge, I can just -- there's just

21   one -- one more thing that I'd like to put on the record and

22   just a clarification matter that we don't have to have a

23   hearing about or anything like that.  Under 24.03 of the Code

24   of Criminal Procedure, it states that both parties can rely

25   upon the subpoenas of the other party.  And I'm not concerned

1    about us relying upon the subpoenas of the other party or the

2    State relying upon our subpoenas.  What my concern is, is

3    that the District Attorneys Office has an agreement with

4    various police agencies that they do not have to subpoena

5    witnesses to come down here to testify, that they can just

6    call either a routing officer or whatever.  And we would like

7    to be rely on the fact that the people that they have not

8    subpoenaed, but have an agreement with the police agency that

9    if they call their officers, they'll be down here, that we

10   would like to be able to rely upon that agreement as well, or

11   if we need to go out and subpoena all these other witnesses

12   that the State is not going to call to testify.

13                  THE COURT:  Mr. Davis, care to respond?

14                  MR. DAVIS:  Well, you know, the agreements

15   that we have with various police agencies do not guarantee

16   that if I issue a routing slip this morning, that officer is

17   going to appear today.  I mean, some of these agencies

18   require certain time periods.  There are a lot of -- lot of

19   officers that may be on this witness list that I have no

20   intentions of routing, for instance.  I'll say right now I've

21   only routed two Garland police officers for instance.  We

22   don't have any arrangements with the Van Zandt County

23   Sheriff's Department or Wills Point PD or Terrell PD or

24   Edgewood PD.  We simply contact those departments, issue

25   subpoenas, if necessary, so --

```
 1              THE COURT:  Ms. Balido, what I'm hearing from

 2    Mr. Davis, if you want to guarantee their presence, I think

 3    it's incumbent upon the defense to issue a subpoena for those

 4    individuals that you reasonably anticipate will be needed.

 5              MR. BYCK:  May I tender this for the record,

 6    Your Honor?

 7          Your Honor, may the record reflect I'm tendering to

 8    the Court a sealed involve styled attempted suicide, and we

 9    would have it marked as defendant's -- whatever the court

10    reporter says.

11              THE COURT:  The Court acknowledges receipt,

12    and I will review it before the day is up.

13          Ms. Balido, you may continue with the proffer.

14                         GARY ROSE

15    was called as a witness by the Defendant and, after having

16    been first duly sworn, testified as follows:

17                      Direct Examination

18    By Ms. Balido:

19       Q.   And are you the same Gary Rose that testified

20    yesterday in the trial of this case?

21       A.   Yes, ma'am.

22       Q.   Detective Rose, I'm going to direct your attention

23    back to when you said that you had entered the bedroom of Ora

24    Mae Milton's house and took the defendant into custody.

25    Okay?
```

1    A.    Okay.

2    Q.    Now, you said that you took the defendant into

3 custody upon immediately walking into the room; is that

4 correct?

5    A.    Yes, ma'am.

6    Q.    Okay.  And he was therefore not free to leave?

7    A.    Correct.

8    Q.    Okay.  And you actually placed him under arrest; is

9 that correct?

10    A.    Yes, ma'am.

11    Q.    And then you recited the warnings that you gave him?

12    A.    Yes, ma'am.

13    Q.    Okay.  I want to -- and then you told us yesterday

14 that he did not have any reaction to the warnings that you

15 gave him?

16    A.    That's correct.

17    Q.    Okay.  Did he ever tell you that he understood the

18 warnings that you gave him?

19    A.    I don't remember.

20    Q.    Okay.  Are you saying it didn't happen, or you don't

21 remember?

22    A.    I don't remember.

23    Q.    Okay.  Did he ever ask you any questions regarding

24 those warnings?

25    A.    No, ma'am.

1    Q.   Did he ever say that he understood his warnings and

2  that he wanted to give up his rights and make a statement to

3  you?

4    A.   I don't recall him -- I don't remember him saying he

5  understood his warnings, and he never made the statement that

6  he wanted to give a statement to me, no.

7    Q.   Okay.  And then after you talked to him on this, did

8  you ask him questions regarding this offense?

9    A.   Yes, ma'am.

10    Q.   Okay.  Did he have any reaction at all to -- in

11  response to these warnings?

12    A.   No, ma'am.

13    Q.   Okay.  The things that he told you regarding the

14  offense, was that in response to questions that you asked

15  him?

16    A.   Yes, ma'am.

17    Q.   Okay.  And not just things that he blurted out once

18  he got arrested?

19    A.   Correct.

20    Q.   And what did you ask him about the offense?

21    A.   I asked him where Bertie Cunningham was.

22    Q.   And what was his response?

23    A.   His response was he said, "it was an accident, I

24  didn't mean to shoot her."  And then I asked him where -- I

25  asked him if she was dead.  And he said, yes.  And I asked

1    him where her body was.

2        Q.    And what did he say?

3        A.    He initially -- he told me that he didn't know where

4    the body was, that somebody had put it in the trunk of the

5    car and carried it off somewhere in the Dallas area.

6        Q.    That he put it in the trunk of the car and what --

7        A.    Someone else other than him had put it -- put the

8    body in the trunk of the car and dumped it in the Dallas area

9    somewhere.  He didn't know where it was.

10       Q.    Were there any other statements besides those

11   statements that he made to you in regard to this offense?

12       A.    No.

13       Q.    How long were you in there with Mr. -- with Mr.

14   Murphy?

15       A.    Approximately 5, 6 minutes.  It wasn't long.

16       Q.    And was -- did anybody else in your presence give

17   him any Miranda warnings?

18       A.    No, ma'am.

19       Q.    And you were the first person to see him that night?

20       A.    Yes, ma'am.

21       Q.    I guess the first person -- first law enforcement

22   officer to see him after he was awake; is that correct?

23       A.    After he was awake -- well, I was the first one in

24   the room.  And of course, I had other officers behind me, but

25   I was the first one in the room.  And then we were all there

1    together.

2        Q.    Okay.

3        A.    So --

4        Q.    And who was the other officers that were there?

5        A.    I believe it was Sergeant Rick Goldey, Corporal Joey

6    Branch.  I think Jason Bonham was in the room, of the

7    Edgewood Police Department.  And I can't remember who else

8    was in the room.

9        Q.    And -- and what was the last one?

10       A.    I believe it was -- I believe Jason Bonham of the

11   Edgewood Police Department was in the room.  I'm not for

12   certain.  And I don't know who else was in the room.

13       Q.    Do you carry a copy of either the Miranda warnings

14   or a 38.22 card with you?

15       A.    No, ma'am.

16       Q.    So this is just all done from your own memory?

17       A.    Yes, ma'am.

18       Q.    And at any time did Mr. Murphy waive his warnings

19   and say he did not want any of his -- he did not want a

20   lawyer or anything else and he just wanted to make a

21   statement?

22       A.    No, ma'am, he did not say that.

23       Q.    And he didn't say that he wanted his Miranda

24   warnings.  He just didn't say anything?

25       A.    He didn't say anything.

1    Q.   Do you know or not know if Officer Goldey or Branch

2  or Bonham heard you give those Miranda warnings?

3    A.   I don't -- I don't know if they heard because I was

4  looking at him.   They were behind me.   I don't know if they

5  were still in the room or if they heard it.

6           MS. BALIDO:   Pass the witness for the purpose

7  of this proffer, Judge.

8           MR. DAVIS:   No questions.

9           MS. BALIDO:   Judge, based on the -- we would

10  like to call Jason Bonham to the stand.

11           THE COURT:   You may step down, Officer.

12           MS. BALIDO:   Judge, Jason Bonham is not here.

13  It is my assumption that he was going to be here and was

14  going to be a witness for the State, and also Officer Goldey

15  is not here and --

16         Is Branch here or is Branch not here?

17           MR. DAVIS:   Let me just state for the record

18  that the only member of the Van Zandt County Sheriff's

19  Department who is here today is Gary Rose.   Right now I've

20  got no officers from Edgewood or Wills Point.   No one from

21  the defense has ever asked me to produce those people for

22  today's hearing or for any testimonies.   No, they're not

23  here.

24           MS. BALIDO:   Judge, at this time we would --

25  Jason Bonham is subpoenaed for the defense.   We would like an

1    opportunity to have him come down and testify for the Court.

2    I think that that can be done within the hour.  And based on

3    the conversation that we had this morning on reliance of the

4    State's subpoena or the State's witness list and the ruling

5    of the Court, we are not prepared and have not served Officer

6    Goldey or Joey Branch and would like an opportunity to do so.

7                    THE COURT:  Once again, classic example of the

8    frustration that jurors have with regard to courts.  And I am

9    prepared after this trial is over to explain to the jury just

10   exactly what's happened.  Will not do so during the trial for

11   obvious reasons, but I want both sides to understand my

12   impatience with the way that this jury is being treated, and

13   I think it is very, very unprofessional.  Counsel has known

14   for months and months and months what this was all about, and

15   now to have these good 13 citizens have their time wasted by

16   gamesmanship is I find unacceptable.

17          Call a recess and get them down here.

18                    MS. LITTLE:  Your Honor, can I use this phone

19   to call upstairs?

20                    THE COURT:  You may.

21                    (Recess taken.)

22                    THE BAILIFF:  All rise.

23                    (Jury returned to courtroom.)

24                    THE COURT:  Let the record reflect the jury is

25   returning to the courtroom at this time.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Jurors may be seated.

2      Mr. Murphy, counsel, visitors in the gallery, you

3  may be seated.

4      Good morning.

5          THE WITNESS:  How are you?

6          (Witness sworn.)

7          THE COURT:  Thank you.  Invite you to have a

8  seat, please.

9      Counsel may continue.

10              OZELLE WILCOXSON

11  was called as a witness by the State and, after having been

12  first duly sworn, testified as follows:

13              Direct Examination

14  By Ms. Miller:

15      Q.   Could you please introduce yourself to the jury and

16  then spell your last name for the court reporter?

17      A.   My name is Ozelle Wilcoxson, O-z-e-l-l-e and then

18  W-i-l-c-o-x-s-o-n.

19      Q.   Ms. Wilcoxson, how are you employed?

20      A.   I serve as a Justice of the Peace for Van Zandt

21  County.

22      Q.   Can you tell the jury what area Van Zandt County

23  encompasses?

24      A.   I serve Precinct 3 which is the Wills Point area and

25  the rural area of Edgewood to Highway 80 and then all the way

1    to Interstate 20 and then to Lake Tawakoni.

2         Q.    How long have you held that position?

3         A.    For 15 years plus a few months.

4         Q.    Were you originally appointed to that position and

5    then have been reelected?

6         A.     I was appointed for an unexpired time of an ill and

7    dying JP, and then I have been elected since, yes, ma'am.

8         Q.    Can you please tell this jury what some of your

9    duties and responsibilities as a JP out there are?

10        A.     Well, your Justice of the Peace Court is a people's

11   court, and we deal with Class C misdemeanors, mostly with the

12   trooper citations and your Van Zandt officers.  We do not

13   deal with any police officers within the cities.  We have

14   civil courts, and we also in our rural areas where there's no

15   medical examiner, we serve as the coroners of our county and

16   we also serve as magistrates.

17        Q.    Can you explain to the jury what a magistrate is?

18        A.     A magistrate is just simply a Justice of the Peace

19   or municipal court who will be called on to read the Miranda

20   rights to someone who is accused of a crime.

21        Q.    I want to direct your attention back to October 6th

22   of 2000, last year, and were you JP at that time, also?

23        A.    That's correct.

24        Q.    Did you receive a call at approximately 3:36 a.m.

25   from the Van Zandt County Sheriff's Department?

Page 23

```
1        A.    It was shortly before 4 o'clock a.m. that morning.

2        Q.    Okay.  And can you tell the jury the nature of that

3   dispatch or call?

4        A.    I was called to go on an inquest in the area of the

5   City of Edgewood.

6        Q.    And what again is an inquest for the jury?

7        A.    An inquest is where we go out to the scene where a

8   body has been found and we go out and a JP is not called

9   until there is an actual death.  And we are to --

10             MS. BALIDO:  Judge, I'm going to object to the

11   relevance of this testimony at this point based on the

12   proffer made by the State in regard to what she's going into

13   now.

14             THE COURT:  Sustained.

15             MS. BALIDO:  I'd ask that the jury be

16   instructed not to --

17             THE COURT:  The jury will disregard the last

18   portion of the witness's testimony and consider it for no

19   purpose.

20        Q.    (By Ms. Miller)  You were called out originally for

21   an inquest; is that correct?

22        A.    That's correct.

23        Q.    Did you meet a sheriff's deputy at the Dairy Queen

24   there in Edgewood?

25        A.    I did.
```

1    Q.   Okay.  When you got to Edgewood, did you -- to the

2  Dairy Queen in Edgewood, did the nature of your call or

3  dispatch change?

4    A.   I was then told that I would be arraigning a

5  suspect.

6    Q.   And when you found out that you were going to have

7  to arraign a suspect, did you have any actual warnings or the

8  magistrate paperwork with you at that point?

9    A.   No, I did not.

10    Q.   So what did you have to do?

11    A.   I went to Canton to the Van Zandt County Justice

12  Center where we have those type papers on file there and to

13  get an arraignment sheet.

14    Q.   Okay.  Now, at the point that you found out that you

15  were going to have to arraign someone, did you know that

16  person's name at that point?

17    A.   No, I did not.

18    Q.   Okay.  Did you know whether or not he was being

19  arrested on a -- outstanding Garland warrant?

20    A.   I don't believe that I did at that point.

21    Q.   Okay.  Now, when you went to Canton to get your --

22  the magistrate warnings, did you then go back to the Edgewood

23  Police Department in order to actually perform the

24  arraignment?

25    A.   Well, I actually had not gone to the police

1    department prior to that, but when I got the proper

2    paperwork, I was -- I was taken to the Edgewood Police

3    Department.

4         Q.   And when you got to the Edgewood Police Department,

5    did you come in contact with Detective Matt Myers from the

6    Garland Police Department and Deputy Gary Rose from the Van

7    Zandt Sheriff's Department, along with a person -- an

8    arrested person or suspect that you later came to know as

9    Jedidiah Isaac Murphy?

10        A.   I believe when I arrived, I was there with the --

11   the sheriff's deputy that brought me there and then they came

12   in shortly thereafter.

13        Q.   Okay.  When you say "they," was that Detective

14   Myers, Deputy Rose, and a person that was identified as

15   Jedidiah Isaac Murphy?

16        A.   That's correct.

17        Q.   Okay.  Now, when you arraign a defendant, can you

18   explain to the jury a little bit about what process that you

19   go through?

20        A.   Can I look at --

21        Q.   You bet.  You have some notes there with you?

22        A.   I do.  I have the arraignment sheets on two charges

23   that I arraigned a person identified as Jedidiah Isaac

24   Murphy.  When I -- when I arraign, I usually introduce

25   myself.  This is my policy.  I explain to them what I am

DARLINE W. LABAR, OFFICIAL REPORTER

1    about to do, and I fill out the paperwork.  And then I read

2    the magistrate warning.  And I read these and as I do, I

3    check them off and as a policy -- as a general rule, I will

4    ask them if they understand these things that I'm reading.

5              MS. MILLER:  May I approach, Your Honor?

6              THE COURT:  You may.

7         Q.   (By Ms. Miller)  Judge Wilcoxson, I'm going to show

8    you what's marked as State's Exhibits Number 35 and 36.  And

9    do you recognize these?

10        A.   Yes, I do.

11        Q.   Are they true and correct copies of the arraignment

12   sheets that you filled out on October 6th of 2000 when you

13   arraigned Jedidiah Isaac Murphy?

14        A.   They are.

15        Q.   Do you fill out everything on the sheet other than

16   have the person being arraigned signing it and then

17   initialing each of the warnings?

18        A.   That's correct.

19        Q.   Have there been any additions, deletions, or

20   alterations?   You have the originals; is that correct?

21        A.   Yes.  No, there is not.

22             MS. MILLER:  Your Honor, at this time we would

23   offer State's 35 and 36, tender to opposing counsel.

24             (State's Exhibit No. 35 and 36 offered)

25             MS. BALIDO:  Judge, I'd just ask to look at

1    also her notes that are the originals of such documents

2    before we --

3              THE COURT:   Request granted.

4              (Counsel inspects notes.)

5              MS. BALIDO:   Judge, no objection to State's 35

6    and 36.

7         Oh, I'm sorry.

8              THE COURT:   They are admitted.

9              (State's Exhibit No. 35 and 36 admitted)

10        Q.   (By Ms. Miller)  Judge Wilcoxson, according to your

11   notes or do you recall, did you arraign the defendant on a

12   credit card abuse first?

13        A.   Yes, ma'am, I did.

14        Q.   Okay.  And as far as State's Exhibit Number 35, it

15   sets out the different warnings.  Can you just read the

16   warnings that you read to Jedidiah Isaac Murphy?

17        A.   I read the offense.  "You are charged with the

18   offense of credit card abuse, Warrant Number RL30225, Garland

19   Police Department, Garland, Texas.  An affidavit charging you

20   with this offense has not been filed in this court.  You have

21   a right to have a lawyer and have your lawyer present prior

22   to and during any interview and questioning by peace officers

23   or attorneys representing the State.  If you are too poor to

24   afford a lawyer, you have the right to request the

25   appointment of a lawyer to be present prior to and during any

1   such interview and questioning.  You may have reasonable time

2   and opportunity to consult your lawyer if you desire.  You

3   have the right to remain silent.  You are not required to

4   make a statement, and any statement you make can and may be

5   used against you in court.  You have the right to stop any

6   interview or questioning at any time.  And with felonies you

7   have the right to have an examining trial."

8        Q.   Now, Judge Wilcoxson, I believe that you had stated

9   earlier that after each one of those warnings -- and they are

10  numbered; is that correct?

11       A.   That's correct.

12       Q.   After each warning, did you ask the defendant

13  whether he understood that particular warning?

14       A.   That is my policy, and I believe that I did.

15       Q.   Okay.  And, Judge Wilcoxson, do you see the person

16  that you came to know as Jedidiah Isaac Murphy here in the

17  courtroom?

18       A.   I feel that I do.

19       Q.   Can you point him out, describe what he's wearing

20  today?

21       A.   He's the young man over with the business suit and

22  tie on.

23       Q.   What color tie is he wearing?

24       A.   It's a dark tie.

25            MS. MILLER:   Okay.  Your Honor, we'd ask the

1   record reflect that the witness has identified the defendant

2   in open court.

3        Q.   (By Ms. Miller)  Now, did the defendant tell you

4   that he -- or acknowledge to you that he understood each and

5   every one of the warnings after you read them to him?

6        A.   He was very quiet, but, yes, he did, either with a

7   nod or a yes.

8        Q.   Okay.  And did you have the defendant initial each

9   and every one of the warnings, showing that he understood

10  them?

11       A.   Yes, I did.

12       Q.   Okay.  And did he sign his name down at the bottom

13  acknowledging that you read them, read him the warnings, and

14  that he understood them?

15       A.   He signed as the person warned.

16       Q.   Okay.  Now, on State's Exhibit Number 35 and 36,

17  there is a line or a signature "Gary Rose," under witnesses.

18  Is that Deputy Gary Rose of the Van Zandt County Sheriff's

19  Department?

20       A.   That's correct.

21       Q.   Also there is -- under "remarks" it says "known

22  address 1718 Barclay, Richardson, Texas."  And it says

23  09-01-75 WM.  Is that a date of birth 9-1 of 1975?

24       A.   That's correct.

25       Q.   And WM meaning white male?

1    A.    That's correct.

2    Q.    Drivers license unknown?

3    A.    Unknown by me at that time.

4    Q.    As far as the address goes, do you have the person

5  arraigned, in this particular case the defendant, Jedidiah

6  Isaac Murphy, acknowledge that that is in fact his address?

7    A.    That is my policy, and I have no reason to believe

8  that it was not done.

9    Q.    Now, do you recall whether or not he's the one that

10  actually gave you that address or whether you obtained it

11  from someone else?

12    A.    I do not recall.

13    Q.    Okay.  But as far as your policy is, you at least

14  get them to verify that that is the particular address?

15    A.    That's correct.

16    Q.    Okay.  Now, on State's Exhibit Number 36, that is a

17  magistrate warning for the offense of murder; is that

18  correct?

19    A.    Yes, ma'am.

20    Q.    Are the -- is State's Exhibit Number 36 almost

21  identical to State's Exhibit Number 35, other than what the

22  charge is and the bail amount?

23    A.    Except for the offense and the bail amount.

24    Q.    Okay.  And once again, is this arraignment done

25  separate and apart from the credit card abuse arraignment?

1      A.   It is.

2      Q.   So you read the warnings that you already read to

3  this jury two times to the defendant; is that correct?

4      A.   That's correct.

5      Q.   And did you also stop and ask the defendant after

6  each warning whether or not he understood them as you were

7  arraigning him the second time for the murder charge?

8      A.   That's my policy, and I have no reason to believe

9  that I did not.

10     Q.   And on State's Exhibit Number 36, does it also show

11  that he initialed each and every one of those warnings

12  showing that he understood those?

13     A.   Yes.

14     Q.   And did he also on State's Exhibit Number 36 sign as

15  the person that was in fact warned?

16     A.   He did.

17     Q.   Now, Judge Wilcoxson, you said that you have been

18  the Justice of the Peace for a little over 15 years.  In your

19  15 years as a JP and arraigning different people, have you

20  had the occasion to come in contact with intoxicated persons?

21     A.   I have.

22     Q.   And when you came in contact with the defendant, did

23  he appear to be intoxicated at the time that you were giving

24  him the warnings?

25     A.   I'm no expert, but I did not believe that he was

1    intoxicated.

2        Q.   Okay.  If someone is intoxicated when you go to

3    magistrate or arraign them, do you go ahead and proceed with

4    the arraignment or do you stop at that point and wait for

5    them to sober up?

6        A.   As a norm, as magistrates in Van Zandt County, we do

7    most of our magistrating at the Van Zandt County jail.  And

8    most of the time the defendants are not brought to us until

9    the next morning or afternoon.

10       Q.   If he had been intoxicated, would you have continued

11   the arraignment or would you have postponed it until you felt

12   that he was sober enough to proceed with the arraignment?

13       A.   I would not have arraigned this young man if he --

14   if I had felt he was intoxicated.

15       Q.   Okay.  Judge Wilcoxson, when you were magistrating

16   the defendant, you said that he appeared to understand each

17   and every one of his warnings and he either acknowledged it

18   by saying yes or by nodding; is that correct?

19       A.   That's correct.

20       Q.   And you said that he did not appear to be

21   intoxicated.  Did you smell any odor of an alcoholic beverage

22   on the defendant when you arraigned him?

23       A.   No, I did not.

24       Q.   Can you tell this jury how close in proximity the

25   defendant was to you during the arraignment?

1    A.    I was sitting at a desk in the outer room of this

2  small police department, and the defendant was standing

3  directly in front of the desk.

4    Q.    Okay.  And have you had the opportunity when you

5  have arraigned defendants in the past to smell the odor of an

6  alcoholic beverage on the defendant before?

7    A.    I have.  And sometimes there's a stale odor of

8  alcoholic beverages.

9    Q.    Now, when the defendant -- when you were arraigning

10  the defendant on the credit card abuse and on the murder

11  case, did he show any signs of remorse to you?

12    A.    No, he did not.

13    Q.    Was he crying when you told him that he was being

14  charged with murder or credit card abuse?

15    A.    No, he was not.

16    Q.    Okay.  Did he -- did he appear to be hallucinating

17  or hearing voices or not understanding what was going on

18  around him?

19    A.    No.

20    Q.    How -- what was the defendant's demeanor when you

21  were arraigning him, Judge?

22    A.    Just a kid, and he appeared sleepy.

23    Q.    Did he appear calm?

24    A.    Yes.

25    Q.    Judge Wilcoxson, when the defendant was brought

1    before you for the arraignments, you read him his Miranda

2    warnings.  Do you -- or did you know whether or not he had

3    been given any Miranda warnings prior to his arrival at the

4    Edgewood Police Department?

5              MS. BALIDO:  Judge, we'd object to that first

6    as hearsay, and, secondly, based on our objection that is, I

7    guess, pending before the Court at this time.

8              THE COURT:  Objection is overruled on both

9    counts at this point.

10    Q.   (By Ms. Miller)  Did you know whether he had been

11    given his Miranda warnings prior to arriving before you?

12    A.   I do not recall that being discussed in my presence.

13    Q.   Regardless of whether the defendant had been given

14    Miranda warnings prior to arriving before you at the Edgewood

15    Police Department, would you go ahead and give him the same

16    warnings that are shown in State's 35 and 36, regardless of

17    how many times he had been Mirandized prior to his appearance

18    before you?

19    A.   That's correct, I would.

20    Q.   Okay.  So if he had been given his Miranda warnings

21    ten times prior to coming before you, you would still give

22    him the same warnings that you gave him as evidenced in

23    State's 35 and 36?

24              MS. BALIDO:  Judge, that assumes facts not in

25    evidence at this time.

1          THE COURT:  Overruled.

2          You may answer, Judge.

3     A.    Yes, I would.

4     Q.    (By Ms. Miller)  Judge Wilcoxson, thank you very

5  much.

6          MS. MILLER:  And we'll pass the witness.  And,

7  Judge, as stated previously, her notes have already been

8  tendered to the defense.

9                    <u>Cross-Examination</u>

10  By Ms. Balido:

11     Q.    Judge Wilcoxson, my name is Jennifer Balido, and I

12  represent Jedidiah Murphy in this case.  And I'm going to ask

13  you some questions about the warnings that you gave him in

14  this case.

15     A.    Okay.

16     Q.    Let me ask you -- State's Exhibit Number 35 is

17  actually the credit card abuse warnings; is that correct?

18     A.    That's correct.

19     Q.    Okay.  And that actually has a credit card abuse

20  warrant number on it?

21     A.    That's correct.

22     Q.    Okay.  Now, State's Exhibit Number 36 is the

23  warnings that you gave for a murder case; is that correct?

24     A.    That's correct.

25     Q.    It just says murder, it doesn't say capital murder?

1    A.    That's correct.

2    Q.    Okay.  Are there any additional warnings that you

3    give a capital -- well, first, let me ask, have you ever

4    given any warnings to someone that was charged with capital

5    murder?

6    A.    Over the past 15 years probably one or two, and I

7    could not remember when.

8    Q.    Okay.  Is there anything special that you do when

9    you're arraigning somebody on capital murder charges in

10   relationship to the fact that the State can seek the death

11   penalty?

12   A.    No, I read these Miranda rights.

13   Q.    Okay.  Did you actually have the credit card abuse

14   warrant in your hand when you arraigned him on the credit

15   card case?

16   A.    I do not recall that, no.

17   Q.    And I assume that you did not have any sort of

18   warrant or affidavit for arrest warrant regarding the murder

19   case?

20   A.    Not at that time.

21   Q.    And actually he was being arraigned for murder, not

22   investigation of murder or not investigation of capital

23   murder?

24   A.    He was being arraigned for the charge, with the

25   offense of murder.

1    Q.   Now, you said that -- that you did not have any

2    arraignment papers with you at the time?

3    A.   No, I did not.

4    Q.   Okay.  Did you have a Penal Code with you at the

5    time?

6    A.   No, I did not.

7    Q.   Okay.  Did you -- is it commonly your practice or

8    not your practice to read out of or to refer to the Penal

9    Code when you're arraigning somebody on the charges that they

10   may be held on?

11   A.   There are occasions that I do.

12   Q.   Okay.  And on what occasions were those?

13   A.   Those would be when I would be in a setting where I

14   had the books available with me.

15   Q.   But they don't have -- you didn't -- they don't have

16   any books like that at the Edgewood Police Department?

17   A.   If they were, they were locked up.  I did not have

18   the availability of them, no.

19   Q.   Okay.  But if those books had been available, then

20   do you think it would have been your practice to go ahead and

21   read out what the actual charge, the Penal Code -- is it

22   19.01, capital murder or murder would be?

23   A.   That is not a norm that I would do because I don't

24   handle these kind of cases that much in Van Zandt County.

25   Q.   Okay.  In effect, this was kind of an out of the

1    ordinary experience?

2        A.    Well, to begin with, I was called out to do an

3    inquest.  And then I was asked to magistrate a defendant.

4        Q.    And you said that it's usually the practice of the

5    Van Zandt County Sheriff's Department to bring people down in

6    the morning so you usually don't see intoxicated people

7    because they've usually slept it off?

8        A.    Well, that's not always the case.  I've had

9    occasions when intoxicated people would come before me in the

10   morning and I would not arraign them because I felt like that

11   they were not able to understand all that I would be saying

12   to them at that time.

13       Q.    Okay.  So even after they've been sitting in the

14   jail for a little while, they still haven't slept it off

15   enough to fully understand their warnings?

16       A.    I'm not an expert, but there are occasions that I

17   feel uncomfortable with arraigning them and I do not do it.

18       Q.    Let me ask you a little bit about these warnings

19   that you read to Mr. Murphy.  It says basically in the first

20   warning that you're charged with the offense of -- in one of

21   them, credit card abuse, and the other one murder; is that

22   correct?

23       A.    That's correct.

24       Q.    But it does not set out what the punishment range is

25   for those offenses, either credit card abuse or murder?

1    A.   No, it does not.

2    Q.   Additionally, you put down that an affidavit

3    charging you with this offense has not been filed with the

4    court and that's in both cases?

5    A.   That's correct.

6    Q.   So you didn't know any -- you did not have an

7    affidavit in front of you stating the facts of this offense?

8    A.   No, I did not.

9    Q.   Okay.  Warning Number 2 is you have the right to

10   hire a lawyer and have your lawyer represent (sic) prior to

11   and during any interview and questioning by peace officers or

12   attorneys representing the State; is that correct?

13   A.   Have your lawyer present prior to and during any

14   interview.

15   Q.   Oh, I'm sorry.  It kind of sounded kind weird when I

16   said it.

17   A.   Okay.

18   Q.   I'm sorry.  If you are too poor to hire -- I'm

19   sorry.  If you are too poor to afford a lawyer, you have the

20   right to request the appointment of a lawyer to be present

21   prior to and during any such interview and questioning and

22   you may have reasonable time and opportunity to consult your

23   lawyer if you desire.

24        Is that basically what Number 2 says?

25   A.   That's correct.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.   Okay.  And you said at each point -- well, let me

2   ask you -- ask it this way.  Did you ever inquire as to Mr.

3   Murphy whether or not he was indigent?

4      A.   No, I did not.  I asked him if he understood these

5   rights.

6      Q.   Okay.  And so I'm assuming then that you also didn't

7   ever ask him if he wanted a lawyer?

8      A.   No, I did not.  I just asked him if he understood

9   these rights.

10     Q.   And is that done -- do you go through each one

11  individually and check it off and then have him -- have him

12  initial it, or is it one of those things that you read it

13  all, you check them all off, and then hand them to him?

14     A.   My policy is, and I have no reason to believe that I

15  did not do this, normally I will read the rights one at a

16  time and then I will say, do you understand these rights as

17  read.  And then when I get completely through, that's when

18  they initial that they've been read their rights and that

19  they -- and -- as read, and then they get a copy of this.

20     Q.   Okay.  I guess what I'm asking is, do you go through

21  and say Number 1, and read Number 1, and then say do you

22  understand that right as read?

23     A.   As a policy, I do.

24     Q.   Okay.

25     A.   And I have no reason to believe that I did not.

1    Q.    But the initials don't come to the very end when

2    he's signing it --

3    A.    That's correct.

4    Q.    -- and then also initial them?

5    A.    That's correct.

6    Q.    I want to talk to you a little bit about -- about

7    his demeanor that day.  You said when you were talking

8    about -- when he was responding to you in the -- when you

9    were explaining his warrants -- warnings to him, that he was

10   very quiet?

11   A.    He was quiet.

12   Q.    Okay.  So am I assuming that he wasn't laughing or

13   joyful in any way?

14   A.    He was just quiet.

15   Q.    Okay.  Do you remember him smiling or taking things

16   lightly?

17   A.    No, I do not.

18   Q.    You also described him as being sleepy.  What --

19   what indicated to you that you thought that he kind of looked

20   sleepy?

21   A.    I think I said he appeared sleepy.

22   Q.    Uh-huh.

23   A.    Just a kid, like he had just been woke up.

24   Q.    Okay.

25   A.    Perhaps.

1      Q.    Kind of still had -- kind of had that look about you

2   when you first wake up?

3      A.    Quiet.

4      Q.    Okay.  Were his eyes droopy or were they open?

5      A.    He was looking at me.

6      Q.    Okay.  But he was calm.  That was your testimony?

7      A.    He was quiet.

8      Q.    Okay.  Did -- now, the time on both of these sheets,

9   you said that you did these separately and apart from each

10  other; is that correct?

11     A.    I did, but they were together, and I used the same

12  time for the arraignment procedures.

13     Q.    Okay.  That's exactly what I'm asking.  So -- so

14  that's an approximate time although one may be at 5:02 and

15  one may be at 5:01?

16     A.    That's correct.

17     Q.    Okay.  Did Mr. Murphy ever make any sort of request

18  from you that he was hungry or he was tired or needed to go

19  to the bathroom or anything like that?

20     A.    No, he did not.

21     Q.    Let me also ask you a little bit -- now, you talked

22  to Ms. Miller about that you recognize the smell of alcohol,

23  but I don't ever think that she ever asked you the question:

24  Did he actually smell like alcohol?

25     A.    No, he did not.

1    Q.    Did he ever smell like marijuana?

2    A.    I'm not an expert, but I don't think so.  I have

3    smelled marijuana smell on people before, and I did not smell

4    that odor.

5    Q.    Okay.  Did you smell that, as you described it, the

6    stale smell sometimes that comes off of people from having

7    alcohol --

8    A.    No.

9    Q.    -- on or about their person?

10   A.    No, I did not.

11   Q.    Okay.  About how long total do you think that you

12   spent with Mr. Murphy?

13   A.    Just a brief period of time because as soon as we

14   got through with the magistrate procedures there at the

15   Edgewood Police Department, I was then taken on out to the

16   inquest site.

17   Q.    So do you have kind of a ball park?

18   A.    Probably no more than -- I don't know, maybe 10

19   minutes, 15 at the most.

20               MS. BALIDO:  Judge, I'll pass the witness.

21               MS. MILLER:  The State has no further

22   questions, Your Honor.

23               THE COURT:  May this witness be excused,

24   subject to recall, should such be necessary?

25               MS. BALIDO:  No objection.

1                    MS. MILLER:   No objection from the State, Your

2     Honor.

3                    THE COURT:   You are excused.

4                    (Witness excused from courtroom.)

5                    MR. DAVIS:   May we approach the bench for just

6     a moment?

7                    THE COURT:   You may.

8              Sheriff, if you'd retire the jury, please.

9              Ladies and gentlemen, there is a witness en route,

10    been en route for a while.   We thought he'd be here by now.

11    As soon as he gets here, we'll proceed.

12             Let the record reflect the jury is being excused

13    from the courtroom at this time.

14                    (Jury excused from courtroom.)

15                    THE COURT:   Mr. Murphy, you may be excused in

16    the company of the bailiff.

17             Ladies and gentlemen in the gallery, you may be

18    seated or excused.

19                    (Recess taken.)

20                    THE COURT:   Is Mr. Byck available?   Here he

21    is.

22             Let the record reflect this hearing is being

23    conducted in open court, outside the presence and hearing of

24    the impaneled jury.

25             Good morning.   Ask you to raise your right hand,

1   please.

2                   THE WITNESS:  Yes, sir.

3                   (Witness sworn.)

4                       JASON BONHAM

5   was called as a witness by the Defendant and, after having

6   been first duly sworn, testified as follows:

7                   <u>Direct Examination</u>

8   By Ms. Balido:

9       Q.    Could you please state your name for the record?

10      A.    Jason Bonham.

11      Q.    And, Jason, in October of 1990, you were a police

12  officer with the City of Edgewood; is that correct?

13      A.    Yes, ma'am.

14      Q.    Okay.

15                  THE DEFENDANT:  You said '90.

16                  MS. BALIDO:  I'm sorry.

17                  THE DEFENDANT:  2000.

18      Q.    (By Ms. Balido)  I'm sorry.   In the year of 2000.

19      A.    Yes, ma'am.

20      Q.    In October of 2000 you were a police officer?

21      A.    Yes, ma'am.

22      Q.    With the City of Edgewood?

23      A.    Yes, ma'am.

24      Q.    Okay.  And were you on duty the night of October the

25  5th --

1      A.    Yes.

2      Q.    -- 5th, the year 2000?

3      A.    If that's the night we're in question in here, no,

4   ma'am, I was not.

5      Q.    Okay.  So you were off duty, but you were still a

6   member of the police department?

7      A.    Yes, ma'am.

8      Q.    I don't want to get into basically what all came

9   about.  I just want to focus specifically at this point on

10  when you actually went into the house.

11     A.    Okay.

12     Q.    Okay.  Were you part of the --

13           THE COURT:  This is the house of Ora Mae

14  Milton?

15           THE WITNESS:  Yes, sir.

16           MS. BALIDO:  Thank you, Judge.

17     Q.    (By Ms. Balido)  And were you part of the arrest

18  team that initially or first walked into Ora Mae Milton's

19  house to arrest Jim Murphy?

20     A.    No, ma'am.

21     Q.    Okay.  You were part of the perimeter team or the

22  back door team sort of?

23     A.    Yes, ma'am.

24     Q.    Were you part of the group of officers that walked

25  into the bedroom where Jim Murphy was located, that first

1    group of officers?

2         A.   No, ma'am.

3         Q.   Okay.  Where were you when that occurred, if you

4    know?

5         A.   I was on the outside of the house.

6         Q.   Okay.  And when was it that you actually walked into

7    the house or into the bedroom?

8         A.   Me and some other officers were standing out

9    front -- out front of Ora Mae's house.  Chief Deputy at the

10   time Gary Rose came out and some other officers were with

11   him, said that he couldn't get a whole lot -- whole lot of

12   communication going on with Jim and asked me if I went to

13   school with him and I said, yes.  He asked me if I could go

14   talk to him.

15        Q.   And so you -- that was when you decided to go inside

16   the house?

17        A.   Yes, ma'am.

18        Q.   And you actually walked into the bedroom where Jim

19   was located?

20        A.   Yes, ma'am.

21        Q.   And were you the only person in the room with Jim at

22   the time, or were there other officers there?

23        A.   At the time when we actually got down to talking

24   about it?

25        Q.   Yes.

1       A.    There was another officer there -- at first I walked

2   in by myself and another officer came in a couple of minutes

3   later.

4       Q.    Did you ever Mirandize Jim Murphy that night?

5       A.    No, ma'am.

6       Q.    Okay.  Did you ever hear anybody read him his

7   rights?

8       A.    No, ma'am.

9       Q.    Okay.  So before you -- before you started asking

10  him questions and you went in there with the intent to ask

11  him questions about -- about the credit cards and also about

12  what other officers had told you in regard to the suspicion

13  of his -- his involvement in the disappearance of Ms.

14  Cunningham?

15      A.    The disappearance of Ms. Cunningham was my primary

16  reason for talking to him.

17      Q.    Okay.  And before you asked him questions, you did

18  not Mirandize him?

19      A.    I did not.

20      Q.    And you did not give him his 38.22 warnings?

21      A.    I did not give him any warnings.

22      Q.    Okay.  Did he ever tell you that he had been given

23  his warnings and he wished to waive those warnings or wished

24  to give up his rights under Miranda and talk to you about it?

25      A.    He did not.

Page 49

1     Q.    Okay.  So you just basically talked to him about

2  what had happened without any sort of talk about warnings at

3  all?

4     A.    Yes, ma'am.

5     Q.    Okay.

6              THE COURT:  Were you in uniform or plain

7  clothes at the time?

8              THE WITNESS:  I was in an off duty uniform,

9  generic.  I was working an off duty security job in Dallas.

10             THE COURT:  All right.

11    Q.    (By Ms. Balido)  But it wasn't your Edgewood

12  uniform?

13    A.    No, ma'am.

14    Q.    So were you sent in there by Gary Rose?

15    A.    I wasn't sent.

16    Q.    Okay.  But you volunteered to go in there --

17    A.    Yes.

18    Q.    -- and ask him questions?

19    A.    Yes.

20    Q.    Because you thought the defendant would talk to you

21  because y'all were friends?

22    A.    I felt comfortable.

23    Q.    Okay.

24             THE COURT:  What was the nature of your past

25  relationship with the defendant?  You said you went to school

```
 1   together?

 2                THE WITNESS:  Yes, sir, we were --

 3                THE COURT:  What grades?

 4                THE WITNESS:  Seven through high school.  7th

 5   grade through high school.

 6                THE COURT:  Middle school or junior high all

 7   the way through high school?

 8                THE WITNESS:  Yes, sir.

 9                THE COURT:  Graduated same class?

10                THE WITNESS:  No, sir, I didn't graduate.  I

11   dropped out in the 10th grade and he went on, I believe, to

12   graduate.

13                THE WITNESS:  All right.

14                MS. BALIDO:  Judge, we'll pass the witness.

15                MR. DAVIS:  I've got no questions for the

16   purpose of this hearing.

17                THE COURT:  Thank you.  You may step down,

18   sir.

19                THE WITNESS:  Yes, sir.

20                MR. DAVIS:  The State's ready to call Deputy

21   Gary Rose.

22                MS. BALIDO:  Judge, for the purposes of this

23   hearing, we would call for the limited purposes of this

24   hearing Jedidiah Murphy.

25                THE COURT:  Would you rise, please, raise your
```

1    right hand.

2                    (Defendant sworn.)

3                    MS. LITTLE:  Do you want him to sit here or

4    testify from here?

5                    THE COURT:  You can have him come up here.

6                    (Defendant takes the stand.)

7                    THE COURT:  As soon as we complete the

8    examination of this witness, I've been informed by the

9    bailiff that the catered lunch has arrived so we will break

10   for lunch after this.

11                   MR. DAVIS:  Until 1:30?

12                   THE COURT:  Pardon me?

13                   MR. DAVIS:  Until 1:30?

14                   THE COURT:  Until 1:30.

15        This witness is being called for the limited purpose

16   of the matter with regard to the Miranda warnings, the

17   morning in question.

18                   MS. BALIDO:  Yes, Judge, by the Miranda

19   warnings by Gary Rose in relationship to the oral --

20                   THE COURT:  The examination by both sides will

21   be limited to that issue.

22                   MR. DAVIS:  This is -- as I understand, this

23   hearing is for the purpose of exploring the voluntariness?

24                   THE COURT:  Correct.

25                   MR. DAVIS:  Okay.  Thank you.

JEDIDIAH ISAAC MURPHY

the defendant, was called as a witness in his own behalf and,

after having been first duly sworn, testified as follows:

<u>Direct Examination</u>

By Ms. Balido:

Q.   Can you please state your name for the record?

A.   Jedidiah Isaac Murphy.

Q.   And, Mr. Murphy, you are the man that stands accused

of capital murder in this case?

A.   Yes, ma'am.

Q.   I want to direct your attention to the early morning

hours of October the 5th, the year 2000.  You were -- you

were inside Ora Mae Milton's house at that time, the early

morning hours; is that correct?

A.   Yes, ma'am.

Q.   And can you tell us what's the -- well, before the

police came into the room, were you asleep or were you awake?

A.   Asleep.

Q.   Okay.  And when you say asleep, how long do you

think you had been asleep?

A.   A couple of hours.

Q.   Okay.  And was it a deep sleep, a light sleep, or

can you recall?

A.   It was a passed out sleep.

Q.   Okay.  You say it's a passed out sleep because what

1    had you been doing prior --

2        A.    We had been drinking all night.

3        Q.    Okay.

4        A.    Smoking marijuana.  We were both pretty hammered.

5        Q.    And when you say you were both pretty hammered, that

6    was referring to Treshod Tarrant?

7        A.    Yes, ma'am.

8        Q.    Okay.  And so I don't want to really focus on

9    Treshod.  I want to talk about you and your mental state at

10   the time.

11             You had been drinking all day; is that correct?

12       A.    Yes, ma'am.

13       Q.    Would you state that you were intoxicated at the

14   time that you went to sleep?

15       A.    Yes, ma'am.

16       Q.    Had you been ingesting marijuana prior to going to

17   sleep?

18       A.    Yes, ma'am.

19       Q.    What is the first thing you recall about the police

20   coming in that morning?

21       A.    Them flipping me over.  I was laying on my stomach,

22   and they flipped me -- no, I was laying on my back, and they

23   flipped me over on my stomach to put the handcuffs on me.

24       Q.    Okay.  Do you remember them saying that -- do you

25   remember anybody saying that you were under arrest?

1       A.   No, ma'am.

2       Q.   Do you remember anybody saying that you had any

3   rights under the law at all?

4       A.   No, ma'am.

5       Q.   You just remember people coming in, flipping over,

6   and then putting the handcuffs on you?

7       A.   Yes, ma'am.

8       Q.   What is the first thing you remember being said to

9   you?

10      A.   Well, they sit me up, and I was laying on my

11  stomach.  They sit me up on the edge of the bed.  Deputy Rose

12  asked me where she was.

13      Q.   Okay.  Where is she?

14      A.   Where is she?

15      Q.   Okay.  At any point did Deputy Rose read you any

16  Miranda warnings?

17      A.   Absolutely not.

18      Q.   That you recall?

19      A.   No, ma'am.

20      Q.   Okay.  Were you in such a -- well, did you ever tell

21  Deputy Rose that you understood any warnings?

22      A.   No, ma'am.

23      Q.   Or you understood what your rights were?

24      A.   No, ma'am.

25      Q.   Did you ever tell Deputy Rose that you wanted to

1    waive your rights and make statements regarding the location

2    of Ms. Cunningham or anything that had to do with Ms.

3    Cunningham?

4           A.    No, ma'am.

5                      (Defense counsel confer with one another.)

6           Q.    (By Ms. Balido)   At some point did Deputy Rose leave

7    the room?

8           A.    Yes, ma'am.

9           Q.    Okay.  And Jason Bonham came in; is that correct?

10          A.    Yes, ma'am.

11          Q.    Okay.  And did he ever read you any rights?

12          A.    No, ma'am.

13          Q.    Did you ever tell him that you wanted to waive your

14   rights under the law and -- and make a statement of any kind?

15          A.    No, ma'am.

16          Q.    Okay.  Did the other man that came in with Jason

17   read you any rights?

18          A.    No, ma'am.

19          Q.    Any -- anyone in the bedroom, any officer that may

20   have come into the bedroom, ever read you any rights

21   regarding you had the right to remain silent and your Miranda

22   warnings?

23          A.    No, ma'am.

24          Q.    And you never told any of those officers that you

25   wanted to give up those rights?

1      A.    No, ma'am.

2      Q.    Okay.  Do you remember anything about asking any

3  questions to the officers about requesting to get dressed or

4  go to the bathroom or anything like that?

5      A.    No, ma'am.

6      Q.    Okay.

7      A.    I was already dressed.

8      Q.    Okay.  How long was -- if you can estimate, do you

9  know how long Deputy Rose was in the room with you before

10  Jason came in?

11      A.    Not very long at all, 5 minutes, 3 minutes.  Just

12  long enough to ask me where she was and he went out and got

13  Jason and it kind of startled me because I ain't seen him in

14  a long time.

15      Q.    Seeing Jason startled you some?

16      A.    Yeah.

17      Q.    Can you tell me in your mind, Jim, when were you

18  first kind of aware of what was going on around you that

19  morning?  I mean, you know, you were flipped over and you --

20  and handcuffed and that kind of deal.  Did it take you awhile

21  to clear your head, or what was the situation?

22      A.    I couldn't -- I don't know -- I don't know really

23  what it was.  I didn't really come to until I started talking

24  to Jason.

25      Q.    Okay.

1    A.    I was sleepy and full of alcohol, so --

2    Q.    Okay.

3    A.    I wasn't very conscious.

4    Q.    Okay.  And so is it fair to say that you weren't

5    thinking very clearly at that point?

6    A.    Not at all.

7    Q.    Okay.  Were you thinking clearly enough at that

8    point to understand the ramifications of what you were doing?

9    A.    No, ma'am.

10   Q.    Okay.  But --

11   A.    I remember when Detective Rose came in there, but --

12   and I remember what he said, but as far as me comprehending

13   everything that was going on around me, I didn't do that.

14   Q.    Okay.

15         MS. BALIDO:  I'll pass the witness at this

16   time, Judge.

17                    Cross-Examination

18   By Mr. Davis:

19   Q.    You seemed to remember how long you had been asleep

20   that morning, correct?

21   A.    Roughly two hours, I believe.

22   Q.    So you remember that?

23   A.    Somewhat, yes, sir.

24   Q.    You remember the position that you were asleep when

25   the officers came into the room, right?

1      A.   Where -- as to where my head was?

2      Q.   No, sir, the fact that you were sleeping on your

3   back.  You remember that today, don't you?

4      A.   I remember because they flipped me over.

5      Q.   And you remember being flipped over on your stomach,

6   correct?

7      A.   Yes, sir.

8      Q.   You remember being handcuffed, right?

9      A.   Yes, sir.

10      Q.   You don't have any -- any problem remembering this

11   morning that they told you that you were under arrest.  You

12   remember that, don't you?

13      A.   Do what, now?

14      Q.   You remember one of those officers that morning

15   telling you that you were under arrest?

16      A.   Later on in the morning, yes, I did.  I took that as

17   a given when the handcuffs hit me.

18      Q.   So you understood the impact of having those

19   handcuffs put on your wrist, didn't you?

20      A.   Why sure.

21      Q.   Is that a yes?

22      A.   Why sure, yes, sir.

23      Q.   You seem to have a very clear memory that they did

24   not read you any Miranda warning.  You sure about that?

25      A.   I know exactly the first thing that came out of his

1     mouth.   I am sure of that.

2          Q.    So you were clear headed enough at that point to

3     know the very first thing that Deputy Rose said to you that

4     morning, correct?

5          A.    That is correct.

6          Q.    You remember the first thing he said was "where is

7     she."  You sure about that?

8          A.    Yes, I am.

9          Q.    No problem remembering it?

10         A.    No, sir.

11         Q.    What did you say in return?

12         A.    I don't remember.

13         Q.    You don't remember?

14         A.    Not exactly.

15         Q.    Well, give me your best shot.  What did you say?

16              MS. BALIDO:   Judge, asked and answered.  He

17    said he didn't remember.

18              THE COURT:   Overruled.

19         Q.    (By Mr. Davis)  Tell me what you remember.

20         A.    I remember him asking where she was, where she was,

21    and I remember saying something about the trunk of the car.

22         Q.    So as you sit here this morning, you now remember

23    that you said something about the trunk of the car?

24         A.    Well, that and listening to his testimony.  I put

25    two and two together.

1    Q.    So that jogged whatever memory that you had, right?

2    A.    A little bit, yes, it did.

3    Q.    What else do you remember Deputy Rose saying to you?

4    A.    I don't really remember him saying much else to me.

5    Q.    Did he say anything else to you?

6    A.    I can't answer that definitely, no.

7    Q.    Well, does that mean that you don't remember or that

8    it's possible he may have said or that he said -- wait until

9    I finish the question.  Or that he said something, but that

10   you just can't remember exactly what it was?

11   A.    There were quite a few people in the room, so I

12   couldn't tell exactly who was saying what at the time.

13   Q.    So as Deputy Rose is initially up there with you,

14   you remember that other people were in the room with him,

15   right?

16   A.    They were all over me.  I couldn't help but remember

17   that.

18   Q.    And you remember, don't you, that they were law

19   enforcement officers; is that correct?

20   A.    Well, yes, sir.

21   Q.    Were they also talking?

22   A.    I believe so.

23   Q.    You remember that?

24   A.    Well, yes, sir.

25   Q.    And all of this is happening before Jason Bonham

1    ever came in the room, right?

2        A.   I didn't realize he wasn't in the room.  I didn't

3    know that.

4        Q.   Well, this is all before Jason Bonham actually

5    started talking with you, right?

6        A.   It is, yes, sir.

7        Q.   So that as I recall when he asked you where is she,

8    you said something about the trunk.  You understood the

9    question that was being asked of you, didn't you?

10       A.   When he said where is Ms. Cunningham?

11       Q.   Yes, sir.

12       A.   Yeah, I knew what he was asking.

13       Q.   You didn't have any problems?  There was no

14   miscommunication.  You understood what he was asking of you,

15   correct?

16       A.   Well, I was a little in and out of it.  I was

17   intoxicated, so I really couldn't comprehend all that was

18   going on around me.

19       Q.   You responded --

20       A.   I did the best I could.

21       Q.   You responded to that question, didn't you?

22       A.   I did respond to that question.

23       Q.   And you gave them a location, didn't you?

24       A.   To the best of my ability, I believe I did.

25       Q.   How much marijuana did you smoke that day?

1    A.    Between -- I don't even know how many people there

2  were.   There were probably four or five of us.   We smoked

3  probably three or four joints.

4    Q.    Each person?

5    A.    No, no, they just passed them around.

6    Q.    Who were they?

7    A.    I don't know any one of Shod's friends.   I don't

8  know their names.   I didn't know them.   I knew Shod.   These

9  were Shod's friends.

10   Q.    Where did you smoke the pot?

11   A.    At the apartment.   One of them had an apartment.   We

12 were at his apartment.

13   Q.    Do you remember that?

14   A.    His girlfriend.

15   Q.    You remember that?

16   A.    When we were at his apartment?

17   Q.    Yes, sir.

18   A.    Yes, sir.

19   Q.    So you -- that actually had occurred before you were

20 ever awakened by Deputy Rose, didn't it?

21   A.    Yeah.

22   Q.    You have a memory of that today, don't you?

23   A.    Yeah, I was still drinking.

24   Q.    You remember the number of joints that y'all passed

25 around when you were smoking pot?

1   A.   Because Shod was rolling the marijuana right beside

2   me.

3   Q.   What time did that occur?

4   A.   Now, that's something I couldn't tell you.

5   Q.   Sometime in the evening?

6   A.   Late evening.

7   Q.   Is that after you ate in Terrell?

8   A.   I didn't eat anything.

9   Q.   Well, is that after the two of you went to the Cole

10   Mountain restaurant, let me rephrase it that way?

11   A.   Yes, it is.  Yes, it is.

12   Q.   Is that the only marijuana that you smoked that day?

13   A.   Yes, it is.

14   Q.   You said you were drinking all day.  What's the

15   first time that you had anything to drink on October the 5th?

16   A.   As far as -- well, I drank -- I started drinking --

17   you want to know what time I started drinking?

18   Q.   That's my question.

19   A.   October 5th was the day I was arrested, was it not?

20   Q.   No, sir, October 6th actually about 3:00 in the

21   morning.

22   A.   Well, October 4th and the 5th -- I started drinking

23   on the 4th at my sister Tonya's house, drank everything she

24   had in the bar and a bottle of champagne.

25   Q.   Let's just stop right there.  What all did she have

DARLINE W. LABAR, OFFICIAL REPORTER

1    in the bar that you drank then on the 4th?

2        A.    Tequila.

3        Q.    How much?

4        A.    There was about that much in the bottle, so I --

5        Q.    Holding up your fingers, what about an inch and a

6    half --

7        A.    About an inch and a half.

8        Q.    So you drank Tequila.  What else did you drink at

9    Tonya's house on the 4th?

10       A.    She had some Gilbey's gin.

11       Q.    How much of that did you drink?

12       A.    About the same amount.  About the same amount.

13       Q.    What else did you drink?

14       A.    Champagne.

15       Q.    How much?

16       A.    A whole bottle.

17       Q.    All right.  What time did that occur on October the

18   4th?

19       A.    Sir, I can't tell you an exact time.  I couldn't --

20       Q.    Morning, afternoon, or night?

21       A.    Just before noon.  Right at noon.

22       Q.    When is the next time that you had anything to

23   drink?

24       A.    When I went to Bleachers.

25       Q.    What did you have to drink?

1      A.    Two Jagermeisters.  I thought it was more, but he

2    said two.

3      Q.    You thought it was more.  How much did you think --

4      A.    I thought it was more than two shots.

5      Q.    How much did you think it was?

6      A.    More like four.

7      Q.    You now recall that it was two?

8      A.    Well, I'm going with what he said.

9      Q.    Two shots of Jagermeister at Bleachers.  What time

10   did that occur?

11     A.    I don't have that answer either.  I don't know.

12     Q.    Afternoon?

13     A.    Afternoon, I guess that would be about right.

14     Q.    What's the next time that you had anything to drink

15   on the 4th?

16     A.    When I went and bought some beer at the Racetrac or

17   past George Bush Highway.  I think it was a Racetrac.

18     Q.    When did that occur?

19     A.    I don't know the time.  It was after I had the car.

20     Q.    After you had Ms. Cunningham's car?

21     A.    Yes, sir.

22     Q.    Ryan Hammonds or Zach Mamot or Ashley Johnson with

23   you by that time, or had you not met them yet?

24     A.    I think they all three were with me.

25     Q.    What did you buy at the Racetrac?

1    A.    Some beer.

2    Q.    How much?

3    A.    I don't know if it was a 6 or 12-pack.  I can't

4    remember that either.

5    Q.    When did you consume it?

6    A.    Well, I was consuming it at the time.  I was just

7    drinking it as I was going.

8    Q.    How much of it did you drink?

9    A.    Every bit of it.

10    Q.    Sir?

11    A.    Every bit of it.

12    Q.    While these kids were with you?

13    A.    Not -- I didn't drink all of it while they were with

14    me, but I did consume it all.

15    Q.    How much did you drink while the kids were with you?

16    A.    Probably about five.

17    Q.    When did you finish it off then?

18    A.    Later that evening.

19    Q.    Like when?

20    A.    Just -- just continued to drink after I dropped them

21    all off.

22    Q.    Did you consume it before you got to Shawn Cruz's

23    house?

24    A.    Yes, I did.

25    Q.    Did you have anything -- well, did you purchase any

1    other alcoholic beverage before you got to Shawn Cruz's house

2    that night?

3        A.   I cannot remember.

4        Q.   Did you -- all right.  After you left Shawn Cruz's,

5    when is the next time you purchased any alcoholic beverages?

6        A.   I don't remember if it was that night or the next

7    day.

8        Q.   What did you purchase next?

9        A.   Oh, it would have been beer.

10       Q.   How are you sure of that?

11       A.   Because that's -- I got to where I quit drinking

12   liquor so much, but just every now and then because of my

13   stomach.  I got a bad problem with an ulcer.

14       Q.   Where do you remember buying beer next on the 5th

15   now?

16       A.   A.P.'s.  A.P.'s.

17       Q.   Where is that?

18       A.   Terrell, Texas.

19       Q.   Where is that located in Terrell?

20       A.   Off -- it's off 20.  I don't know.  It's one of the

21   exits off 20.  I can't remember what road it's on.

22       Q.   When did you buy that?

23       A.   I don't have -- I don't remember the time either.

24       Q.   Well, was that before you got down to Shod's house

25   to visit with him?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    Yes, sir, it was.

2    Q.    How much did you buy at A.P.'s?

3    A.    I believe it was an 18-pack.

4    Q.    How much of it did you consume before you got down

5    to Shod's house?

6    A.    Probably about 14.  I had a few of them left.

7    Q.    When you got to Shod's?

8    A.    Yes, sir.

9    Q.    Did you purchase any other alcoholic beverages

10   before you got to Shod's besides the 18-pack?

11   A.    I don't believe so.

12   Q.    Once you got to Shod's, how much more alcoholic

13   beverage did you -- did you purchase on the 5th?

14   A.    We went and got the two 18-packs and that bottle of

15   Cognac Hennessy.

16   Q.    And prior to the time that Deputy Rose came into

17   your room that morning, how much of the two 18-packs had you

18   consumed?

19   A.    Oh, I couldn't even imagine.  I have no idea.  No

20   idea.  Not even a clue.

21   Q.    So you got no clue as to how many of those?

22   A.    None at all.

23   Q.    The Hennessy, how much of that did you drink?

24   A.    We were just passing it around.  I don't know

25   exactly how much.  I could say it was mine, so I would say

1   shot wise probably 15 shots.

2        Q.   Now, that Hennessy, that's liquor that you tried to

3   stay away from --

4        A.   It is -- yes, it is.

5        Q.   Because of your stomach, right?

6        A.   Yes, it is.  Exactly.

7        Q.   Did you have anymore alcoholic beverage once you got

8   back to Shod's house before you went to bed?

9        A.   Back from smoking marijuana and drinking?

10       Q.   Right.  The last time that you actually got back to

11  Ms. Milton's house?

12       A.   I don't --

13       Q.   Did you have anything there -- she let -- she let

14  people drink in her house?

15       A.   No way.  Huh-uh.

16       Q.   Back on the 4th, did you smoke any pot that day?

17       A.   No, I did not.

18       Q.   Did you take any sort of illegal controlled

19  substance?  I'm talking cocaine, heroin, speed, anything?

20       A.   No, sir.

21       Q.   How about on the 5th?  Anything besides marijuana?

22       A.   No, sir.

23            MR. DAVIS:  I pass the witness, Your Honor.

24            MS. BALIDO:  Judge, I just have a couple of

25  more questions.

1                      Redirect Examination

2   By Ms. Balido:

3        Q.    Along with the alcohol that you drank at Tonya's

4   house, were there any kind of prescription medications that

5   you took over there as well?

6        A.    No, not that I remember.

7        Q.    Okay.  So you don't remember taking any?

8        A.    No, I don't believe I did.

9        Q.    Either that morning before you left to go to

10  Bleachers or the morning that you returned later on?

11       A.    I don't believe I did.

12       Q.    Okay.

13                 MS. BALIDO:  That's it, Judge.

14                     Recross-Examination

15  By Mr. Davis:

16       Q.    The Tequila, bottle of Tequila, did you finish that

17  off?

18       A.    The Tequila?

19       Q.    At Tonya's?

20       A.    I believe I did.

21       Q.    Did you leave the bottle there?

22       A.    Yes, I did.

23       Q.    How about the Gilbey's -- Gilbey's gin?  Did you

24  finish that bottle off?

25       A.    Yes.  I believe I left it there, also.

---

DARLINE W. LABAR, OFFICIAL REPORTER

1       Q.   And finally the champagne that you finished off, did

2  you leave the bottle there, too?

3       A.   Yes.

4              MR. DAVIS:  That's all I have, Judge.

5              THE COURT:  You may step down, sir.

6       Either side care to offer any further evidence on

7  the issue of the voluntariness of the alleged warnings?

8              MR. DAVIS:  No, Your Honor.

9              MS. BALIDO:  No, Your Honor.

10             THE COURT:  Argument.

11             MS. BALIDO:  Judge, I believe since it's our

12  initial burden of production that the warnings were not

13  given, it's up to the State to prove that they were given or

14  that they were voluntarily waived, so we would reserve the

15  right to close.

16             (Arguments on Voluntariness of Statement)

17             MR. DAVIS:  Well, I'll just point out to the

18  testimony of Deputy Gary Rose who has testified in open court

19  that he did in fact give those warnings, that at no time did

20  the defendant indicate he didn't understand the warnings or

21  that he did not want to talk with him.  There is no testimony

22  from Jason Bonham to that effect either that this man -- the

23  defendant has ever indicated that he didn't want to talk to

24  law enforcement.  In fact, the testimony will be before this

25  jury that he did in fact voluntarily tell Officer Bonham

1   where the body was without any coercion or threats or

2   promises.  Again, I would point out that the defendant's

3   testimony and contradictions there where he wants you to

4   believe he didn't come to and didn't understand anything that

5   was happening inside that room until Deputy Gary Rose got

6   there when in fact he's able to remember in great detail

7   where he was, what he was doing, positions that he was

8   sleeping, how long he had been sleeping.  And so I would

9   simply say that his testimony on that matter is simply not

10  credible.

11            THE COURT:  Defense may conclude.

12            MS. BALIDO:  Judge, we would agree with most

13  of what the State said as to what the testimony was, and

14  that's exactly the point.  The state of the testimony is that

15  Gary Rose said that he gave the warnings, however he never

16  said that there was any indication from the defendant that he

17  understood those warnings and that he wished to waive those

18  warnings.  There is just know indication at all.  There is

19  nothing in the record that said that he did understand the

20  warnings.  There's nothing in the record that he understood

21  the warnings and that he waived those warnings.  There's just

22  no indication at all in the record that the defendant did

23  understand his Miranda warnings and therefore waived those

24  Miranda warnings and decided to make oral statements to any

25  one of the police officers he made oral statements to.

1          We would state that under 38.22, subsection A, no

2   oral statement is admissible unless, number one, it was

3   recorded; or, number two, that the -- their rights were given

4   and waived; number three, that the recorder was capable of

5   making such a recording; and, number four, all voices were

6   I.D.ed.  There is no recording in this case, and so we would

7   say that it's on the burden of State to prove that the oral

8   statement should be admissible.  They can't do that through

9   Moon -- based on the holding of Moon versus State without

10  proving that the due process requirements of voluntariness

11  and the requirements of Miranda were first met.  And we would

12  say that on the facts of this case and the record as

13  developed through cross-examination of the defendant and the

14  testimony of the officers that they have not met their

15  burden.

16          So basically what we would say, Judge, is based on

17  38.22 and the protections that are set out in subsection A of

18  that section, that the statements be suppressed and that all

19  evidence taken from those statements or brought in by -- or

20  gained by the police, based on that statement, should be

21  suppressed.

22          Additionally, we would say that the State has not

23  shown that subsection C should apply in this case of 38.22,

24  and therefore there has been no proof to this Court that

25  those written statements should be brought in there, brought

1   into court as evidence.  And we would say that under Moon

2   versus State, under 38.22 of the Texas Code of Criminal

3   Procedure, over Article 1, Section 10, 13, and 19 of the

4   Texas Constitution and under the 5th, 6th, 8th, and 14th

5   Amendments to the United States Constitution and the United

6   States holding in -- in Miranda versus Arizona, in addition

7   to the holdings in Jackson v. Denno, 378 U.S. 670 -- 368 --

8   and most recently in Dickerson v. U.S. which is a U.S.

9   Supreme Court holding upholding Miranda on June 26th, the

10  year 2000, that court number -- the U.S. Court Number is

11  99-5525 -- that these oral statements were not made after

12  due process was served and after Miranda was given and

13  therefore should be suppressed and not entered into evidence

14  against the defendant for any purpose.

15          THE COURT:  The Court --

16          MS. BALIDO:  I'm sorry, Judge.  We would like

17  findings of facts and conclusions of law stated into the

18  record or in written form to be included in the record of

19  this case.

20          THE COURT:  Based upon the hearing conducted

21  in open court, outside the presence and hearing of the jury,

22  with regard to whether or not the Miranda warnings were given

23  by Deputy Gary Rose of the Van Zandt County Sheriff's

24  Department and the issue of whether or not the mental

25  condition of the accused, Jedidiah Isaac Murphy, was such if

1    given, he comprehended the import of the warnings, the Court

2    makes the following determinations:  Find as a matter of law

3    that the deputy did in fact upon entering the bedroom which

4    Mr. Chad Tarrant (sic) and the defendant, Jedidiah Isaac

5    Murphy, were sleeping, that Deputy Rose did in fact give the

6    defendant the Miranda warnings as is required by Miranda

7    versus Arizona, 86 Supreme Court, page 1602.  I further find

8    the testimony of the defendant as relates to his ingestion

9    prior to having received the warnings with regard to the

10   consumption of ethyl alcohol and cannabis was not such that

11   his mind was so altered that he did not and could not

12   understand the importance and significance of the warnings

13   being given to him by Deputy Rose.

14          I find therefore as a matter of law due process,

15   contrary to the contentions of the defense, have been

16   followed with regard to the matters and the evidence supplied

17   by Jedidiah Isaac Murphy subsequent to the warnings will be

18   admitted before the jury should the State's strategy so ask

19   those questions of the jury.

20          The record further reflect the defense has a

21   continuing objection to this and will not need to make

22   additional objections in front of the jury should this line

23   or testimony be offered once the jury has returned to the

24   court.

25          MS. BALIDO:  Judge, in that regard we would

```
 1    also like to request at this point that the -- that the Court

 2    include in its jury charge to the jury an instruction

 3    regarding this portion of the statements of the defendant.

 4                 THE COURT:  As is required by the Code of

 5    Criminal Procedure, that request will be granted.

 6                 MS. BALIDO:  Nothing further, Judge.

 7                 THE COURT:  Stand in recess for lunch.  The

 8    jury is eating.  I understand those of you that ordered

 9    lunch, it's here as well.  We will -- off the record for

10    scheduling purposes.

11                      (Recess of proceedings.)

12                 THE BAILIFF:  All rise.

13                 THE COURT:  Let the record reflect the jury is

14    returning to the courtroom at this time.

15                      (Jury returned to courtroom.)

16                 THE COURT:  Jurors may be seated.

17           Mr. Murphy, counsel, visitors in the gallery, you

18    may be seated.

19           Counsel may continue.

20                 MR. DAVIS:  Thank you.

21

22

23                      (No omissions.)

24

25
```

GARY ROSE

was called as a witness by the State and, after having been

first duly sworn, testified as follows:

Direct Examination

By Mr. Davis:

Q.   Just for the record, you're the same Deputy Gary

Rose who was testifying yesterday afternoon when we concluded

testimony; is that right?

A.   Yes, sir.

Q.   All right.  Deputy Rose, I believe that at the time

that we concluded yesterday you had told us that you had gone

inside the home of Ora Mae Milton and had actually gone into

a bedroom where Shod Tarrant and the defendant, Jedidiah

Murphy, were sleeping; is that right?

A.   Yes, sir.

Q.   And I believe the last question I asked you at the

time was:  Were you the first person who had any actual

contact with the defendant?

A.   Yes, sir.

Q.   And you were in fact the first person; is that

right?

A.   Yes, sir.

Q.   Now, can you tell the members of the jury what

happened when you went over to the bed where the defendant

was?  First of all, was he still sleeping?

1    A.   Yes, sir, he was asleep.

2    Q.   All right.  So what did you do at that point?

3    A.   At that point we woke him up and restrained him,

4  placed him in handcuffs, and set him up in the bed.

5    Q.   Now, Shod Tarrant, was he still in his own bed?

6    A.   Yes, sir.

7    Q.   And had you given any instructions to the officers

8  what they should do with Shod?

9    A.   No, sir, not at that point.

10    Q.   All right.  So you handcuffed the defendant, you sat

11  him up in bed, and then what is the next thing that you did?

12    A.   I read him his Miranda rights.

13    Q.   Now, when you say that you gave him his Miranda

14  warnings or his Miranda rights, are these warnings and rights

15  that you've given on several different occasions during your

16  career?

17    A.   Yes, sir.

18    Q.   When you give the rights, do you have a little three

19  by five card or a small business card that have those written

20  where you read the warnings to him, or do you give the

21  warnings by memory?

22    A.   If I was at the office, I would have the card, but I

23  didn't have a card with me, so I did it by memory.

24    Q.   All right.  Would you please now turn to the jury

25  and tell them the warnings that you gave to the defendant

1    that morning on October the 6th?

2        A.    You have the right to remain silent and not make any

3    statement.   Any statement you make can and will be used

4    against you at your trial.   Any statement you make can and

5    will be used as evidence against you in court.   You have the

6    right to have an attorney present to advise you prior to and

7    during any questioning.   If you are unable to employ a

8    lawyer, you have the right to have one appointed to advise

9    you prior to and during any questioning.   You have the right

10   to terminate any interview or questioning at any time.

11       Q.    All right.   Now, while you were giving these rights

12   or warnings to the defendant, was he looking at you?

13       A.    Yes, sir.

14       Q.    Did he appear to be listening to you?

15       A.    Yes, sir.

16     . Q.    All right.   When you concluded giving him his

17   warnings, did he tell you that he didn't understand the

18   warnings or that he wanted you to leave or that he wasn't

19   going to talk to you?

20       A.    No, sir.

21       Q.    Did he interrupt you while you were giving him his

22   warnings?

23       A.    No, sir.

24       Q.  . Was there anything that led you to believe that he

25   did not understand his warnings or that he wanted to somehow

1    invoke the rights to an attorney or to terminate the

2    interview?

3        A.   No, sir.

4        Q.   How close to the defendant were you at that time,

5    Deputy?

6        A.   I was probably within a foot, foot and a half in

7    front of him.

8        Q.   And I believe you told us he was looking -- his eyes

9    were open?

10       A.   Yes, sir.

11       Q.   Did he appear to be intoxicated during the time that

12   you were talking with him?

13       A.   No, sir.

14       Q.   Did he appear to be under the influence of any

15   drugs?

16       A.   Not that I could tell.

17       Q.   Did he evidence any sign whatsoever of any mental

18   illness or mental impairment during the time that you were

19   talking with him there in the bedroom?

20       A.   No, sir.

21       Q.   Did you believe at that time that he had understood

22   his Miranda rights?

23       A.   Yes, sir.

24       Q.   Now, without going into the contents of the

25   conversation, did you begin to have a conversation with the

1    defendant?

2        A.   Yes, sir.

3        Q.   And did you ask him a question or questions during

4    this conversation?

5        A.   Yes, sir.

6        Q.   Now, during this conversation, again did he appear

7    to understand what you were saying to him?

8        A.   Yes, sir.

9        Q.   At some points did he respond to you?

10       A.   Yes, sir.

11       Q.   Without making a judgment about whether his

12   responses were truthful or not truthful, did his responses

13   appear to be appropriate to what you had said to him?

14       A.   Yes, sir.

15       Q.   How long did you stay with the defendant in the

16   bedroom?

17       A.   I would say approximately 5 or 6 minutes.

18       Q.   Uh-huh.  During that time other -- other law

19   enforcement officers there with you?

20       A.   Yes, sir.

21       Q.   And to back it up, when you went into the bedroom,

22   you had your gun drawn, didn't you?

23       A.   Yes, sir.

24       Q.   Is that normal procedure if you're going in on this

25   type of an arrest?

1    A.   Yes, sir.

2    Q.   Is that done for -- for what purpose?  Your safety?

3    A.   Yes, sir.

4    Q.   So you stayed in there 4 or 5 minutes.  Did the

5  defendant leave the bedroom with you, or did he remain in

6  there?

7    A.   He remained in the bedroom.

8    Q.   And where, if anywhere, did you go at that point?

9    A.   At that point I went outside the front.

10    Q.   All right.  Where did you go to?

11    A.   To where the car was.

12    Q.   Would this be the silver Honda that you had seen out

13  front?

14    A.   Yes, sir.

15    Q.   And what did you do when you got to the Honda?

16    A.   I opened the trunk of the car.

17    Q.   Had you seen anything on the outside that led you to

18  open the trunk?

19    A.   Yes, sir.

20    Q.   What was that?

21    A.   Blood.

22    Q.   Blood?

23    A.   (Witness nods head.)

24    Q.   Where on the -- where on the car exactly did you see

25  this blood?

1    A.    On the rear bumper.

2    Q.    So you opened up the trunk; is that right?

3    A.    Yes, sir.

4    Q.    And tell the members of the jury what was the

5    appearance of the inside portion of the trunk when you popped

6    the latch?

7    A.    There was numerous items, looked like clothing

8    scattered throughout the back end.

9    Q.    All right.  And what about smell?  Anything unusual

10   there?

11   A.    Very pungent odor.

12   Q.    Have you had occasion in the past to smell items

13   that were bloody, perhaps had been left out in a heated

14   condition or perhaps out in the elements?

15   A.    Yes, sir.

16   Q.    Now, the smell that you had coming from that trunk,

17   was that consistent with that sort of smell that you had

18   experienced before?

19   A.    Yes, sir.

20   Q.    Did you find a body inside the trunk?

21   A.    No, sir.

22   Q.    Are you familiar with an Officer Jason Bonham?

23   A.    Yes, sir.

24   Q.    Who is that -- who is Jason Bonham?

25   A.    He was employed by the Edgewood Police Department at

1    that time.

2        Q.    Was Jason Bonham there at the location?

3        A.    Yes, sir.

4        Q.    And while you were outside with the Honda, was he

5    out there with you or was he somewhere else?

6        A.    He was somewhere else.

7        Q.    While you were outside, did you see Jason Bonham?

8        A.    At one point, yes, sir.

9        Q.    All right.  Tell me about that.  How did you come in

10   contact with Jason Bonham?

11       A.    After I had closed the trunk of the car, I was

12   walking back towards the house.  Jason met me outside --

13   outside the front of the house.

14       Q.    Did y'all have a conversation?

15       A.    Yes, sir.

16       Q.    What was the nature of that conversation?

17             MS. BALIDO:  Objection, hearsay.

18             THE COURT:  Overruled.

19       Q.    (By Mr. Davis)  You can go ahead and tell us.

20       A.    Jason had told me that --

21             MS. BALIDO:  Objection, hearsay.

22             THE COURT:  Overruled.

23       A.    Jason Bonham had told me that he had talked to

24   Murphy, and Murphy had told him where the body was.

25             MS. BALIDO:  Judge, we're going to object

DARLINE W. LABAR, OFFICIAL REPORTER

1    to -- first as hearsay.  Secondly, that we'd object that any

2    statement taken by any police officer at the scene was in

3    violation of Mr. Murphy's Miranda warnings against the United

4    States Constitution, the -- the 5th, 6th, 8th, and 14th

5    Amendments to the United States Constitutional, and Article

6    1, Section 9, 10, 13, and 19 of the Texas Constitution, and

7    Moon versus State.

8              THE COURT:  The Court recalls all those

9    objections having been made on repeated occasions this

10   morning outside the jury's presence.  I told the defense

11   they'd have a continuing objection in the presence of the

12   jury.  I'm telling the jury that the State -- that the

13   defense had a continuing objection.  The Court again

14   considers the defense objection.  They're again overruled.

15        Q.   (By Mr. Davis)  Sir, I'm sorry, I couldn't hear your

16   complete answer.  Will you tell me again what Jason Bonham

17   told you?

18        A.   Jason had told me he had spoken with Murphy, and

19   that Mr. Murphy had told him --

20             MS. BALIDO:  Judge, we're going to object to

21   this as double hearsay.

22             THE COURT:  Overruled.

23        Q.   (By Mr. Davis)  Now, would you please tell me

24   again?

25        A.   Jason had told me he had spoken with Mr. Murphy, and

1   he had told him where the body of Bertie Cunningham was.

2       Q.    When he told you that, what, if anything, did you

3   do?

4       A.    Myself, Jason Bonham, and Deputy Joey Branch got in

5   my car and drove to that location.

6       Q.    Where exactly did you -- did the three of you go to?

7       A.    To Livingston Road just north of Edgewood.

8       Q.    Now, the location there at 501 Lamar, would that be

9   fair to say that that house where Ora Mae Milton lives,

10  that's say on the north side of town, a little bit on the

11  west side?

12      A.    Yes, sir.

13      Q.    How far away from Ms. Milton's house did you and the

14  other two officers go then?

15      A.    I want to say approximately two to three miles.

16      Q.    Okay.  And again, what's the name of the creek that

17  y'all went to?

18      A.    It's known as Livingston is the way I've always

19  known it.

20      Q.    Just to kind of -- if you would describe that

21  location for the members of the jury.  If we were to drive

22  out there along with you, what would we see?  Is this an area

23  where there are a lot of houses, a lot of people living, a

24  developed area, or what sort of area was this?

25      A.    There's not a lot of people live out there.  It's

1    mostly farmland.  It's outside the city limits of Edgewood.

2         Q.    Is there a roadway that goes out there then?

3         A.    Yes, sir.

4         Q.    Is that a county road?

5         A.    Yes, sir.

6         Q.    Paved, unpaved, gravel?

7         A.    Partially paved, some spots is rock.

8         Q.    And as you went out there then, where exactly did

9    you stop?

10        A.    We stopped at the creek.

11        Q.    This a well-lighted area?

12        A.    No, sir.

13        Q.    And what did you -- what did you do when you stopped

14   there?

15        A.    We all three got out of the car with our

16   flashlights, walked up to the creek area, and shined our

17   lights down in the creek.

18               MR. DAVIS:  May I approach, Your Honor.

19               THE COURT:  You may.

20        Q.    (By Mr. Davis)  Deputy, if you would please look at

21   State's Exhibit 28, 29, and 30.  Do these three photographs

22   truly and accurately depict the area that you're just

23   testifying about there on that county road by Livingston

24   Creek?

25        A.    Yes, sir.

1      Q.   And do you think that they would assist the jury and

2   you in explaining just what this particular location looked

3   like?

4      A.   Yes, sir.

5              MR. DAVIS:   Your Honor, at this time we'll

6   offer State's Exhibits 28, 29, and 30.   These have previously

7   been tendered to counsel.

8              (State's Exhibit No. 28 through 30 offered)

9              MR. BYCK:   We have no objection to 28, 29, and

10  30.

11             THE COURT:   They are all admitted.

12             (State's Exhibit No. 28 through 30 admitted)

13             MR. BYCK:   Greg --

14             (Discussion off the record.)

15     Q.   (By Mr. Davis)   And, Deputy, just so we're clear

16  here, these are not photographs that were taken by you or any

17  other member of Van Zandt County Sheriff's Department,

18  correct?

19     A.   No, sir.

20     Q.   In fact, I'm not sure if you're aware, these are

21  photographs that I took.   Were you aware of that?

22     A.   I think you might have mentioned that.

23     Q.   Okay.

24             MR. DAVIS:   Can the witness please stand down

25  for just a moment?

```
1                    THE COURT:  You may.

2                    MR. DAVIS:  If you'll stand down here with

3    me --

4                    THE COURT:  Defense may posture themselves in

5    a manner that they may better observe the demonstration by

6    the witness and the prosecutor.

7         Q.   (By Mr. Davis)  Deputy, we're now looking at State's

8    Exhibit 28.  And as we look at this, can you just explain to

9    the members of the jury what they're now looking at?

10        A.   This is the road called Livingston Road.  It's a Van

11   Zandt County road.  It's north of Edgewood.

12        Q.   What direction are we looking there?

13        A.   North.

14        Q.   Is this the portion of the county road that is not

15   paved?

16        A.   Yes, sir.

17        Q.   Again, this location would be about how far out of

18   town from Edgewood?

19        A.   Approximately one mile.

20        Q.   And you're out there about what time --

21                  THE REPORTER:  I'm sorry.  I just heard

22   "approximately."  I didn't hear the end of the answer.

23                  THE WITNESS:  One. Approximately one mile.

24        Q.   (By Mr. Davis)  And approximately what time are you

25   and the other two officers out there?
```

1     A.   I want to say probably around 2:00 or 3:00ish in the

2  morning.

3     Q.   State's Exhibit Number 29.  Tell the members of the

4  jury what they'll be looking at here.

5     A.   This is the creek where the body of Ms. Cunningham

6  was found.

7     Q.   Be fair to say that this photograph was taken from

8  that county road looking down to the left portion of that

9  road?

10     A.   Yes, sir.

11               (Exhibit published to jury.)

12     Q.   (By Mr. Davis)  Finally, looking at State's Exhibit

13  Number 30, does that show another view of the creek taken

14  from an area now further down the creek, and we're looking

15  back at the county road in the distance; is that correct?

16     A.   Yes, sir.

17     Q.   This photograph here, State's Exhibit Number 30,

18  does this show certain boulders or rocks that line the creek?

19     A.   Yes, sir.

20     Q.   I take it that when you and the other two officers

21  went out there, y'all didn't take photographs at that time,

22  did you?

23     A.   No, sir.

24     Q.   Now, using State's Exhibit Number 30, Deputy, did

25  you see anything unusual in the creek when you looked down

1   there?

2       A.   The body was about down there.

3       Q.   And you've indicated a spot.  Have I now placed my

4   finger in that spot?

5       A.   Yes, sir.

6       Q.   Okay.  You say that you saw a body down in this

7   location?

8       A.   Yes, sir.

9       Q.   Describe what you saw at that point?

10      A.   The body was wrapped in what appeared to me to be

11  maybe a green duffle bag and maybe some towels or blankets

12  and then -- half of the body.

13      Q.   Go ahead and have your seat again.

14              (Witness retakes the stand.)

15      Q.   (By Mr. Davis)  And these photographs, we see that

16  there's some water in that creek.  When you looked in the

17  creek that night and saw the body, was there water in that

18  creek?

19      A.   Yes, sir.

20      Q.   Approximately how deep would you say the water was?

21      A.   I would say probably for the most part maybe one to

22  two foot deep.

23      Q.   Now, the body, did I understand you to say that it

24  appeared to be wrapped, at least partially?

25      A.   Yes, sir.

1      Q.    Could you tell whether this was a male or a female?

2      A.    At that point I couldn't tell.

3      Q.    Could you tell whether the individual was white or

4    black?

5      A.    No, sir.

6      Q.    You just saw that it was a body; is that right?

7      A.    Right.

8      Q.    When you saw that, what did you do next then?

9      A.    I contacted the Garland Police Department.

10     Q.    And how did you do that?

11     A.    By cell phone.

12     Q.    And did you in fact talk with some officers from the

13   Garland Police Department?

14     A.    Yes, sir.

15     Q.    And why did you call them at that point?

16     A.    To let them know that we have possibly another crime

17   scene.

18     Q.    And did you ask them anything at that point?

19     A.    I just asked them if they wanted me just to hold

20   both scenes.

21     Q.    And did they ask you then to preserve both scenes

22   until they got there?

23     A.    Yes, sir.

24     Q.    Now, did you stay out there at the creek or did you

25   go to another location then?

```
 1        A.    I went to another location.

 2        Q.    Where did you go to?

 3        A.    I went back to the Dairy Queen in Edgewood.

 4        Q.    Did the other two officers go with you, or did they

 5   remain there at the scene?

 6        A.    They remained at that scene.

 7        Q.    And what was the purpose of leaving them behind?

 8        A.    To make sure no one bothered the scene, it was

 9   preserved.

10        Q.    Now, at some point did Garland officers arrive there

11   at the Dairy Queen in Edgewood?

12        A.    Yes, sir.

13        Q.    Do you remember the names of any of the officers who

14   met with you that morning?

15        A.    I remember Matt Myer.

16        Q.    Detective Matt Myers?

17        A.    Yes, sir.

18        Q.    And did y'all have a short discussion there at the

19   Dairy Queen?

20        A.    Yes, sir.

21        Q.    And then did you go somewhere with Detective Myers?

22        A.    Yes, sir.

23        Q.    Tell the members of the jury where the two of y'all

24   went initially.

25        A.    We went back to the creek.
```

1    Q.   And did that give Detective Myers an opportunity to

2    view the crime scene and the body?

3    A.   Yes, sir.

4    Q.   How long do you think that you and Detective Myers

5    remained there at the scene?

6    A.   Maybe 5 or 10 minutes.

7    Q.   Where did the two of you go next?

8    A.   We went back to Ms. Milton's residence in Edgewood.

9    Q.   All right.  And once you got there, what did you do?

10   A.   I just basically turned everything over to him and

11   the Garland Police Department.

12   Q.   Okay.  So I guess at that time that -- it basically

13   become their case; is that right?

14   A.   Yes, sir.

15   Q.   Later did you actually release the crime scene there

16   at Livingston Creek to the Garland Police Department?

17   A.   Yes, sir.

18   Q.   Did you also release the scene at Ms. Milton's house

19   to the Garland Police Department?

20   A.   Yes, sir.

21   Q.   What was done with the silver Honda that you saw

22   outside?

23   A.   It was taken by the Garland Police Department.

24   Q.   After you got to Ms. Milton's house, was the

25   defendant still there?

1    A.    Yes, sir.

2    Q.    Did you have any further conversations with him?

3    A.    No, sir.

4    Q.    Were you present when any other police officers had

5    conversations with him?

6    A.    No, sir.

7    Q.    At some point was the defendant transported to the

8    Edgewood Police Department?

9    A.    Yes, sir.

10   Q.    Did you go to the Edgewood Police Department with

11   him?

12   A.    Yes, sir.

13   Q.    All right.  Were you actually the transporting

14   officer, or did you simply meet him over there at the police

15   department?

16   A.    I just met them over there.

17   Q.    What was the purpose of taking him to the police

18   department?

19   A.    To make sure they arrived at the police department.

20   Q.    And did Judge Ozelle Wilcoxson finally arrive there?

21   A.    Yes, sir.

22   Q.    Were you present when the arraignment was done?

23   A.    Yes, sir.

24   Q.    Have you witnessed arraignments in the past?

25   A.    Yes, sir.

1    Q.   Did you -- again, did you witness the arraignment

2  done by Judge Wilcoxson?

3    A.   Yes, sir.

4    Q.   Was there anything unusual about this arraignment in

5  comparison to the other arraignments --

6              MS. BALIDO:   Objection, bolstering.

7              THE COURT:   Overruled.

8    Q.   (By Mr. Davis)  -- in comparison to the other

9  arraignments that you had witnessed?

10    A.   No, sir.

11    Q.   How would you describe the defendant's behavior and

12  his demeanor during the time that the Judge was arraigning

13  him?

14    A.   The same, calm.  He stood there, didn't say

15  anything.  Didn't seem upset.

16    Q.   Did Judge Wilcoxson actually read his Miranda

17  rights?

18    A.   Yes, sir.

19    Q.   And were you asked to sign as a witness on the

20  magistrate's warning sheets?  Do you recall that?

21    A.   I think I was.  I can't really remember.

22    Q.   How long did that arraignment take as you recall?

23    A.   Probably -- maybe 15 minutes.

24    Q.   You said that the defendant was quiet.  Was he

25  crying?

```
 1        A.    I don't remember him crying.

 2        Q.    Was he saying anything that in your mind led you to

 3   believe that it might be inappropriate?

 4        A.    No, sir.

 5        Q.    Did he appear to understand the warnings that the

 6   Judge had given to him?

 7        A.    Yes, sir.

 8        Q.    Following the arraignment then, did you do anything

 9   more with the defendant?

10        A.    No, sir.

11        Q.    Who took actual custody of the defendant at that

12   time then?

13        A.    I don't remember which Garland officer did.

14        Q.    One of the Garland officers?

15        A.    Yes, sir.

16        Q.    And was it your understanding he was then

17   transported to the City of Garland?

18        A.    Yes, sir.

19        Q.    I want to go back for just a moment when you were at

20   that creek and you saw the body.  Did you see any -- any type

21   of wildlife in that creek?

22        A.    There was a turtle.

23        Q.    Describe to the members of the jury, what did that

24   turtle look like?

25        A.    It was a very large typical turtle that's found in
```

1    that area in the water.

2         Q.   Was it close to the body?

3         A.   Yes, sir.

4         Q.   How close to the body was this turtle?

5         A.   At one -- at one point it was very close, probably

6    just inches that I seen it.

7         Q.   Was anything done with the turtle at that time?

8         A.   Not that I -- not that I'm aware of.

9         Q.   Did you ever go back to the crime scene?

10        A.   Yes, sir.

11        Q.   When did you do that?

12        A.   Probably -- are you talking about the one at the

13   creek?

14        Q.   Yes, sir, at the creek?

15        A.   I returned there probably around 6 or 7 o'clock in

16   the morning.

17        Q.   Do you know whether or not Garland police officers

18   went to that creek, to that crime scene?

19        A.   Yes, sir.

20        Q.   Were you present when they were there?

21        A.   Yes, sir.

22        Q.   But again, when they -- when they got there, was it

23   your understanding that they were in charge of the crime

24   scene as far as evidence collection, documentation of

25   evidence, recovery of the body?  Was that your

1  responsibility, or was that their responsibility?

2      A.    That was Garland's responsibility.

3      Q.    Thank you, Deputy.

4            MR. DAVIS: I'll pass the witness.

5                     Cross-Examination

6  By Ms. Balido:

7      Q.    Deputy Rose, as you already know, my name is

8  Jennifer Balido.  And I'm going to ask you some questions

9  about your testimony in regard to this case and what you did

10  on this case.

11           You had a couple of calls that night before you

12  actually left your house and went down to the Dairy Queen; is

13  that correct?

14     A.    Yes, ma'am.

15     Q.    Okay.  And y'all didn't meet up at the Edgewood

16  Police Department and y'all didn't meet up at the Wills Point

17  Police Department and y'all didn't meet up at the Van Zandt

18  Sheriff's Department, y'all met down at the Dairy Queen; is

19  that correct?

20     A.    Yes, ma'am.

21     Q.    And who all met up down there at the Dairy Queen?

22     A.    I know there was Sergeant Goodson, Ronnie Goodson of

23  the Sheriff's Department; Corporal Joey Branch; James DeCoux;

24  Officer Kenney from the Wills Point Police Department; Jason

25  Bonham of the Edgewood Police Department.  There was Officer

DARLINE W. LABAR, OFFICIAL REPORTER

1    Harl Strange.  And that's all I can remember off the top of

2    my head that I met there.

3        Q.   Was there one of y'all's civilian jailors with

4    y'all, too, a guy by the name of Heath somebody?

5        A.   Yes, ma'am.

6        Q.   Okay.  And he's not really a police officer or

7    anything, he was just kind of along for the ride; is that

8    correct?

9        A.   He was riding with a deputy that night, yes, ma'am.

10       Q.   All right.  And basically the reason everybody was

11   meeting up over there at the Dairy Queen was because the car

12   had been spotted over at Ms. Milton's house; is that correct?

13       A.   Yes, ma'am.

14       Q.   Okay.  And so who was in charge of how things were

15   going to happen once y'all started to move on Ms. Milton's

16   house?

17       A.   I was.

18       Q.   Okay.  And is it true or is it not true that there

19   were -- there was a perimeter team that kind of was going

20   around the back of the house and then there was also the

21   arrest team?

22       A.   Yes, ma'am.

23       Q.   Okay.  And who was part of the arrest team?

24       A.   I was, Corporal Branch was, Sergeant Rick Goldey

25   was.  Those three I can remember off the top of my head.  I

1    can't remember who else was in the house with us.

2        Q.   Okay.  Do you not remember testifying previously

3    that also Jason Bonham was one of the first people inside the

4    house?

5        A.   I don't remember saying that he was one of the first

6    ones inside the house.

7        Q.   Okay.  So -- so if you said that previously, you

8    don't remember saying that?

9        A.   No, I didn't think that's what I said.

10       Q.   Okay.  So basically you walked up to Ms. Milton's

11   house; is that correct?

12       A.   Yes, ma'am.

13       Q.   And you knew it was Ms. Milton's house?

14       A.   Yes, ma'am.

15       Q.   Okay.  And you knew that -- that that's where Shod

16   or Treshod Tarrant lived; is that correct?

17       A.   Yes, ma'am.

18       Q.   You had been out there before?

19       A.   Yes, ma'am.

20       Q.   Had you been out there for business or pleasure?

21       A.   Business.

22       Q.   Okay.  And you recognized Ms. Milton, correct?

23       A.   Yes, ma'am.

24       Q.   And you told her pretty much it was Gary Rose of the

25   Van Zandt County Sheriff's Department; is that correct?

1    A.   Yes, ma'am.

2    Q.   And she knew who you were?

3    A.   Yes, ma'am.

4    Q.   Did you tell her that you had a warrant for Jim

5  Murphy's arrest?

6    A.   Yes, ma'am.

7    Q.   Okay.  Or did you -- and that's what your police

8  report says, or did you tell her that you couldn't tell her

9  what it was all about, but you just needed to speak to Jim?

10    A.   No, I told her I had a warrant for his arrest.

11    Q.   All right.  And when you entered the house, did

12  you -- were the lights on or off in the house?

13    A.   Best I remember they was all off.

14    Q.   Okay.

15    A.   It was dark, so --

16    Q.   And did you turn on any lights as you entered the

17  house?

18    A.   No, ma'am.

19    Q.   So how were you getting about?  Did y'all have

20  flashlights?

21    A.   Yes, ma'am.

22    Q.   Did you have a flashlight in one hand and your gun

23  in the other hand?

24    A.   Yes, ma'am.

25    Q.   All right.  Who was the first person in -- in the

1    door?

2        A.   I was.

3        Q.   And who were the second and third and fourth people

4    in the door?

5        A.   I couldn't tell you.

6        Q.   Okay.  And what happened once you got inside?

7        A.   Once I got inside the house --

8        Q.   Right.

9        A.   -- or the bedroom?

10       Q.   Right inside the house?

11       A.   Inside the house?

12       Q.   Uh-huh.

13       A.   I went straight towards -- I asked Ms. Milton where

14   he was in the house and she indicated back to the east of the

15   house and I started down the small hallway.

16       Q.   And you entered the bedroom where -- where you

17   believed Jim to be; is that correct?

18       A.   Yes, ma'am.

19       Q.   Okay.  And what was the first thing you did?

20       A.   I walked straight up to the bed.

21       Q.   All right.  Did you say you're under arrest?

22       A.   I think I called him by name.

23       Q.   Okay.

24       A.   Is the first thing I said.

25       Q.   Okay.  Did you call him Jediah Isaac Murphy or did

Page 104

1    you call him Jim Murphy?

2        A.    I probably called him Jim.   I don't remember which

3    one I used.

4        Q.    Okay.   Did you know him as Jim?

5        A.    I've heard him by both names.

6        Q.    Okay.   At that time you had?

7        A.    Yes.

8        Q.    And so you -- y'all went into the room, you grabbed

9    him, flipped him over, and handcuffed his hands behind his

10   back?

11       A.    Yes.

12       Q.    Okay.   And who helped you do that?

13       A.    I believe it was Joey Branch was in the room to help

14   me.   I believe Rick Goldey helped.   I mean, I'm looking

15   down.   I'm not looking to see whose hands are whose, so --

16       Q.    Okay.

17       A.    -- I'm just speculating here.

18       Q.    And who -- and so were you speculating when you

19   testified previously that also Officer Bonham was in the

20   room?

21       A.    Okay.   I don't think I testified that he was in the

22   room when we arrested him.   I think I testified he was in the

23   room when I read him his Miranda rights.

24       Q.    Okay.   So let's talk about that for a little bit.

25       A.    Okay.

1      Q.   You said that you told the D.A. that you were --

2   that you had actually read Mr. Murphy his Miranda rights?

3      A.   Yes, ma'am.

4      Q.   Okay.  And you looked at the jury and you said

5   exactly what those Miranda rights were; is that correct?

6      A.   Yes, ma'am.

7      Q.   Okay.  And -- and Mr. Davis asked you, were -- was

8   he looking at you, and you said yes.  And that's the truth;

9   is that correct?

10      A.   Yes, ma'am.

11      Q.   And that he asked you if he seemed to be listening,

12   and you said yes; is that correct?

13      A.   Yes, ma'am.

14      Q.   And then Mr. Davis asked you if he ever tried to

15   interrupt you, and you said no?

16      A.   That's correct.

17      Q.   Okay.  And then he asked you if there was anything

18   that led you to believe that he did not understand his

19   warnings, and you said no.

20      A.   Correct.

21      Q.   Is there anything that led you to believe that he

22   did understand his warnings?

23      A.   He didn't ask any questions about them, didn't make

24   any expressions like he didn't understand.

25      Q.   Did you say do you understand your warnings?

1     A.   I don't remember if I asked him or not.

2     Q.   Did you go through there and did you say you have a

3 right to remain silent, do you understand that?

4     A.   No.

5     Q.   Did you say, you have the right, you know, to have a

6 lawyer appointed for you and before you make any statement,

7 do you understand that?

8     A.   No, ma'am.

9     Q.   You say that if you can't afford a lawyer, one will

10 be appointed for you, do you understand that?

11     A.   No.

12     Q.   Did you say, you can terminate this interview at any

13 time, Jim, do you understand that?

14     A.   No, ma'am.

15     Q.   Did he ever say to you, I understand all that and I

16 want to make a statement?

17     A.   No.

18     Q.   Did he ever make any indication to you at all that

19 he did understand his warnings?

20     A.   He didn't verbally say he understood them, no.

21     Q.   And you never asked him?

22     A.   No, ma'am.  I cannot remember if I asked him or not.

23     Q.   And it's not in your police report?

24     A.   Correct.

25     Q.   Okay.  It says in your police report that you read

1   Jedidiah Murphy his Miranda rights, but you really didn't

2   read them, you just kind of recited them; is that correct?

3        A.    Correct.

4        Q.    But it doesn't say anything in your report about him

5   understanding and waiving his rights, does it?

6        A.    No, ma'am, it doesn't.

7        Q.    When you walked into the room, was Mr. Murphy asleep

8   on the bed?

9        A.    Yes, ma'am.

10       Q.    Okay.  Was it a situation that he looked up and

11  looked at you before you got to the bed?

12       A.    No, ma'am.

13       Q.    Okay.  So he was dead asleep on the bed before you

14  laid your hands on him?

15       A.    Yes, ma'am.

16       Q.    So is it safe to assume that you got him up from

17  sleep?

18       A.    Yes, ma'am.

19       Q.    Was there anything in the room that led you to

20  believe that he had been drinking?

21       A.    Not that I recall.

22       Q.    Okay.  There wasn't a smell of an alcoholic beverage

23  in there?

24       A.    I didn't smell anything.

25       Q.    Okay.  There wasn't a smell on or about his person

1    or his clothes that smelled like marijuana, was there?

2        A.   Not that I recall.

3        Q.   Okay.  Now, at this point is Treshod inside the room

4    or outside the room?

5        A.   He was inside the room.

6        Q.   Okay.  And did Treshod smell like he had been

7    drinking?

8        A.   I didn't get that close to him.

9        Q.   Okay.  When you walked in the room, were you -- did

10   you smell on anybody's clothes the smell of any marijuana?

11       A.   No, ma'am.

12       Q.   Did Mr. Murphy have his glasses on or his glasses

13   off?

14       A.   I believe they were off.

15       Q.   Because he was sleeping?

16       A.   Right.

17       Q.   Now, Mr. Davis asked you if you thought he was

18   intoxicated, and you said no; is that correct?

19       A.   That's correct.

20       Q.   And he asked if he was on drugs, and you said not

21   that you could tell; is that correct?

22       A.   That's correct.

23       Q.   I'm going to ask you some questions a little bit

24   about your training as a police officer.  There's a test that

25   is easily done called the horizontal gaze nystagmus test.

1  Are you trained in that test?

2       A.   No, ma'am.

3       Q.   Okay.  You've never -- you've never -- is it your

4  understanding that that's one of the indications -- that is

5  one of the tests that is an indicator of whether or not

6  there's alcohol in somebody's system?

7       A.   Yes, ma'am.

8       Q.   And you can also do something that's called the

9  hor -- I mean, the vertical gaze nystagmus test to determine

10 if there's any drugs in somebody's system; is that correct?

11      A.   That's correct.

12      Q.   Okay.  But you're not trained in that, are you?

13      A.   No, ma'am.

14      Q.   Okay.  And you didn't perform this -- this test on

15 him?

16      A.   No, ma'am.

17      Q.   Okay.  Did you do any sort of tests to determine

18 whether or not he was under the influence of any drugs or any

19 alcohol at the time that you busted into the bedroom?

20      A.   No, ma'am.

21      Q.   Did you ever ask anybody that might have been

22 trained in some of these intoxication tests to come forward?

23      A.   No, ma'am.

24      Q.   As soon as you got finished reading his rights to

25 him and after he had no response, you asked him some

1    questions?

2         A.   Yes, ma'am.

3         Q.   How long were you with the defendant?

4         A.   Maybe 5 or 6 minutes.

5         Q.   Okay.   And then you left and went outside the

6    bedroom; is that correct?

7         A.   Yes, ma'am.

8         Q.   And what did you do once you were outside the

9    bedroom?

10        A.   I went out to where the vehicle was, the Honda, and

11   opened the trunk.

12        Q.   And how did do you that?   How did you get the keys?

13        A.   The keys were in the living room.

14        Q.   So you grabbed the keys and went out there.   Wasn't

15   there some discussion or some kind of -- and when I say

16   discussion, some sort of discussion with some other officers

17   as to where the keys were?   Did you get the keys from

18   somebody else?

19        A.   No, ma'am.

20        Q.   Okay.   You didn't get the keys from Jason Bonham?

21        A.   No, ma'am.

22        Q.   Or any other member of the Van Zandt County

23   Sheriff's Department?

24        A.   No, ma'am.

25        Q.   Or the Edgewood Police Department?

1       A.    No, ma'am.

2       Q.    And there were some people from Terrell out there

3  eventually, weren't there?

4       A.    I never seen anybody from Terrell out there.

5       Q.    Okay.  So you got the keys and went out to the car?

6       A.    Yes, ma'am.

7       Q.    Let me ask you a question and go back a little bit

8  while you're sitting outside the Dairy Queen.  You're sitting

9  outside the Dairy Queen and at some point somebody makes the

10  decision that y'all are going to go to the house; is that

11  correct?

12      A.    Yes, ma'am.

13      Q.    And you call in to the Garland Police Department and

14  let them -- and let them know what's going on?

15      A.    Yes, ma'am.

16      Q.    Okay.  Who did you talk to?

17      A.    I believe it was Commander Lay.

18      Q.    Okay.  Commander Lay of the Garland Police

19  Department?

20      A.    Yes, ma'am.

21      Q.    Okay.  And isn't it true that Commander Lay told you

22  not to attempt to arrest Jedidiah Murphy until they got

23  there?

24      A.    No, ma'am.

25      Q.    So it's your testimony that he said go ahead and

1  arrest him?

2      A.   Yes, ma'am.

3      Q.   Go ahead and bust in there and recover the stolen

4  vehicle?

5      A.   Yes, ma'am.

6      Q.   And they were on their way?

7      A.   Yes, ma'am.

8      Q.   Was there anything that -- let me ask you it this

9  way.  After y'all got out there to the house, was there

10 anything besides your concern for the case and the type of

11 case you were dealing with, anything that happened out at the

12 house that caused you to kind of jump the gun and go in

13 sooner than expected?

14     A.   No, ma'am.

15     Q.   Okay.  The house was quiet?

16     A.   Yes, ma'am.

17              THE COURT:  Anything further?

18              MS. BALIDO:  No, Judge, I still have some more

19 questions.  I'm sorry.

20     Q.   (By Ms. Balido)  You opened up the trunk, so you

21 placed your hands on the -- on the keys to actually open up

22 the trunk; is that correct?

23     A.   Yes, ma'am.

24     Q.   And did you place your hands on the trunk as well?

25     A.   No, ma'am.

1    Q.    Just -- just on the keys and opened it up?

2    A.    Yes, ma'am.

3    Q.    Did you touch in -- anything inside the trunk?

4    A.    No, ma'am.

5    Q.    Did you ever tell Jason Bonham -- well, let me ask

6    you a question.  Jason Bonham of the Edgewood Police

7    Department was standing outside the house at that point, is

8    that correct, or was he inside the house?

9    A.    He was inside the house -- I -- now, let me rephrase

10   it.  I don't know -- I didn't know at that point where he

11   was.

12   Q.    Okay.  And it's not a big house out there, is it?

13   A.    No, ma'am.

14   Q.    Okay.  So let me just try to get this straight.  You

15   come out of the bedroom --

16   A.    Yes, ma'am.

17   Q.    -- at some point?  And where is Jason at that point?

18   A.    At that point I'm not sure where he is, because I'm

19   concentrating on going out and checking the car.

20   Q.    Did you say anything to Jason about going in and

21   talking to the defendant?

22   A.    No, ma'am.

23   Q.    You never said go in there and -- you never said

24   he's lying to me, go in there and see what you can do with

25   him?

1     A.   No, ma'am.

2     Q.   Or see if you can find out anything?

3     A.   No, ma'am.

4     Q.   So it's your testimony that the first time that you

5   talked to Jason was after he spoke with the defendant?

6     A.   Yes, ma'am.

7               MS. BALIDO:  May I approach the witness.

8               THE COURT:  You may.

9     Q.   (By Ms. Balido)  I'm directing your attention back

10   to State's Exhibits Number 28, 29, 30, and 31, and ask if

11   those are the pictures that you have talked about being in

12   the area of what's called Livingston or Livingston Hill; is

13   that correct?

14     A.   28, 29, 30 --

15     Q.   I'm sorry.

16     A.   I don't know about 31.

17     Q.   I'm sorry.  28, 29 and 30; is that correct?

18     A.   Yes, ma'am.

19     Q.   Okay.  And you said this was kind of a rural area?

20     A.   Yes, ma'am.

21     Q.   Are there farmhouses around here?

22     A.   There are houses, but they're scattered way far.

23     Q.   Okay.  And from where these pictures are taken,

24   isn't it true that at the point where these pictures are

25   taken that there is actually a farmhouse about 500 yards away

1   from where these were taken or is that not true?

2       A.   The closest house that I can recall is going to be

3   back south of this location.

4       Q.   Okay.  And about how close is it going to be?

5       A.   It's probably going to be at least -- I want to

6   guess about half a mile.

7       Q.   Okay.  So would that be about 500 yards?  I don't

8   know anything about math, so I don't know.

9       A.   I can't remember how long a mile is in yards.

10      Q.   Okay.  And there -- out there along the road there

11  is -- along that road next to Livingston Hill where you were

12  talking about, there's a telephone pole with some lines going

13  to and from the houses out there; is that correct?

14      A.   Yes, ma'am.

15      Q.   So after you get finished talking to -- well, after

16  you get finished talking to the defendant and after you get

17  finished going out and opening up the car and shutting it

18  back and telling everybody not to touch it, you went out to

19  Livingston Hill; is that correct?

20      A.   Yes, ma'am.

21      Q.   And at that time the Garland Police Department was

22  not at the house on Lamar?

23      A.   No, ma'am.

24      Q.   Then y'all went out to Livingston Hill and you came

25  back and still the Garland Police Department is not at Lamar?

1    A.    That's correct.

2    Q.    You're talking to them on the cell phone?

3    A.    Correct.

4    Q.    Okay.  So basically you're the person that's in

5    charge of the scene and what has gone on in the investigation

6    up to that point?

7    A.    Yes, ma'am.

8    Q.    Is this the first capital murder that you've ever

9    worked?

10    A.    Yes, ma'am.

11    Q.    And is -- is Mr. Murphy the first capital murder

12    defendant that you've ever read rights to?

13    A.    Yes, ma'am.

14    Q.    So you went back to the Dairy Queen at Edgewood and

15    that's where you met up with all the Garland police is at the

16    Dairy Queen?

17    A.    Yes, ma'am.

18    Q.    And you had no further conversations with Mr.

19    Murphy; is that correct?

20    A.    No, ma'am.

21    Q.    Okay.  You took Commander Lay -- according to your

22    report, you took Commander Lay and the other officers to

23    Lamar Street; is that right?

24    A.    We first went to Livingston Creek first.

25    Q.    Oh, that's right.  And then -- and then you took

1    them -- and then you took them back over to the house on

2    Lamar?

3         A.    Yes, ma'am.

4         Q.    And then you went to the Edgewood Police Department?

5         A.    Yes, ma'am.

6         Q.    And how did you go there?  In what vehicle?

7         A.    I went in my -- my vehicle.

8         Q.    Okay.  And then how was Mr. Murphy transported?

9         A.    By Garland.

10        Q.    Okay.  And who was in the car with Mr. Murphy at

11   that time?

12        A.    I believe -- if I remember correctly, Mr. Matt Myer

13   was, Detective Myer, and I don't know who the other officer

14   was.

15        Q.    Okay.  And did they both sit in the front seat or

16   did one of them sit in the back seat with Mr. Murphy?

17        A.    That I couldn't tell you.

18        Q.    Did you ride along behind them while you were

19   driving along or --

20        A.    No, I was in front.

21        Q.    In the front.  Leading them -- leading them to --

22        A.    Yes.

23        Q.    -- the police department?  Okay.

24              And then you testified that you were there when the

25   defendant was arraigned; is that correct?

1      A.    Yes, ma'am.

2      Q.    How would you describe him when he was arraigned?

3      A.    Very quiet, stood there.  As far as I can remember,

4   he didn't say anything.

5      Q.    Okay.  You don't remember him saying anything,

6   anything at all?

7      A.    Not that I can remember.

8      Q.    Okay.  So you don't remember him saying, yes, he

9   understood to each one of his rights as they were read to

10  him?

11     A.    Not that I remember.

12     Q.    Okay.

13           MS. BALIDO:  May I approach the witness.

14           THE COURT:  You may.

15     Q.    (By Ms. Balido)  Deputy Rose, I'm showing you what

16  has been introduced into evidence as State's Exhibit Number

17  36 and State's Exhibit Number 35, and I ask if you recognize

18  those documents?

19     A.    Yes, ma'am.

20     Q.    And those are the two arraignment sheets that were

21  used by the JP out there to read Mr. Murphy his rights; is

22  that correct?

23     A.    Yes, ma'am.

24     Q.    Okay.  And your name is listed as a witness; is that

25  correct?

1        A.    Yes, ma'am.

2        Q.    But you weren't the only witness, were you?

3        A.    No.

4        Q.    Okay.   Those two officers from Garland were also

5   there; is that correct?

6        A.    Yes, ma'am.

7        Q.    But you're the only one that actually signed as a

8   witness, is that also correct?

9        A.    Yes, ma'am.

10       Q.    And is that to say that you were there during the

11  entire time that Mr. Murphy was read his rights?

12       A.    Yes, ma'am.

13       Q.    Okay.   Would you describe him as sleepy at that

14  time?

15       A.    I really couldn't say whether he sleepy or not.

16       Q.    Okay.   Was he more or less sleepy than he was when

17  you woke him up in bed that morning?

18       A.    He just stood there.   As far as I remember, didn't

19  say anything.   That's about the best I can describe him.

20       Q.    Okay.   So would you say that he was pretty much the

21  same as he was when you first arrested him?

22       A.    Probably so.

23       Q.    You said he was calm, correct?

24       A.    Right.

25       Q.    Could you describe him as flat?

1      A.    What do you mean by flat?

2      Q.    Like no emotion?

3      A.    Yeah, I mean, he -- probably so because he wasn't

4  saying anything, no expressions that I could see on his face,

5  just there.

6      Q.    Okay.  He certainly wasn't happy?

7      A.    Probably not.

8      Q.    Okay.  He wasn't doing anything inappropriate to

9  make you think that he wasn't -- that he was making fun of

10  the situation or anything like that?

11     A.    No.

12     Q.    Up until the point, or I guess after the Garland

13  Police Department officers arrived, they were in charge of

14  the investigation; is that correct?

15     A.    After they arrived?

16     Q.    Yes.

17     A.    Yes, ma'am.

18     Q.    And up until that point you were the lead person on

19  this investigation; is that correct?

20     A.    Yes, ma'am.

21     Q.    And it was your responsibility to make sure that

22  everything was done by the book, so to speak; is that also

23  correct?

24     A.    Yes, ma'am.

25            MS. BALIDO:  I don't have any more questions.

```
 1                    MR. DAVIS:  Thank you.

 2                    Redirect Examination

 3   By Mr. Davis:

 4        Q.   Deputy Rose, let me just ask you:  When you got to

 5   the home of Ms. Milton, did you know the location of Ms.

 6   Cunningham's body?

 7        A.   No, sir.

 8        Q.   After you had talked with the defendant, did you

 9   know the location of the body?

10        A.   No, sir.

11        Q.   Did you know the location of Ms. Cunningham's body

12   before Jason Bonham --

13                    MS. BALIDO:  Objection, leading.

14        Q.   (By Mr. Davis)  -- told you what --

15                    THE COURT:  Overruled.

16        Q.   (By Mr. Davis)  -- the defendant had told -- told

17   him?

18        A.   I'm sorry.  Could you say it again?

19        Q.   Did you know the location of Ms. Cunningham's body

20   before Jason Bonham came up and told you what the defendant

21   had told him?

22        A.   No, sir.

23        Q.   As you're going out there to the creek, who was

24   actually given the directions about where y'all were going to

25   be going to?
```

1        A.    Jason Bonham.

2                    MR. DAVIS:  May I approach, Your Honor.

3                    THE COURT:  You may.

4        Q.    (By Mr. Davis)  Deputy Rose, if you will, look at

5   State's Exhibit Number 27.  Do you recognize that to be a map

6   of Edgewood, Texas, sir?

7        A.    Yes, sir.

8        Q.    Does it show the location of Ms. Milton's home, as

9   well as the location where you and the other officers found

10  the body of Ms. Cunningham?

11       A.    Yes, sir.

12                   MR. DAVIS:  At this time we'll offer State's

13  Exhibit Number 27.

14                   (State's Exhibit No. 27 offered)

15                   MR. BYCK:  No objection, 27.

16                   THE COURT:  Admitted.

17                   (State's Exhibit No. 27 admitted)

18       Q.    (By Mr. Davis)  Deputy, if you would, just place an

19  X for the location of Ms. Milton's house and then write

20  "Milton" by that if you don't mind.

21       A.    (Witness so indicates.)

22       Q.    Now, if you would, please put an X where you found

23  the body of Ms. Cunningham and then put "Cunningham" beside

24  that, please.

25       A.    (Witness so indicates.)

1              MR. DAVIS:  May I publish, Your Honor.

2              THE COURT:  You may.

3              (Exhibit published to jury.)

4              MR. DAVIS:  No further questions, Your Honor.

5              MS. BALIDO:  May I approach the witness.

6              THE COURT:  You may.

7                   Recross-Examination

8   By Ms. Balido:

9        Q.   State's Exhibit Number 27, the exhibit you just

10  spoke about with Mr. Davis, is the entirety of that location

11  in Van Zandt County, Texas?

12       A.   Yes, ma'am.

13       Q.   Is any of that in State's Exhibit Number 27 in

14  Dallas County, Texas?

15       A.   No, ma'am.

16       Q.   Now, Mr. Davis also asked you about a bunch of

17  questions about what you knew before you spoke to Jason

18  Bonham and what you knew after you spoke to Jason Bonham.

19  You remember that?

20       A.   Yes, ma'am.

21       Q.   Before you talked to Jason Bonham, did you tell any

22  member of the television press that it was an accident, that

23  Mrs. Cunningham was killed by accident?

24       A.   Before I spoke to Jason Bonham?

25       Q.   Yes.

1    A.    No, ma'am.

2    Q.    After you spoke to Jason Bonham, did you tell any

3  member of the television press that it was an accident, the

4  killing of Bertie Cunningham?

5    A.    No, I believe I might have said that he had stated

6  it was an accident.

7              MS. BALIDO:  Pass the witness.

8              Further Direct Examination

9  By Mr. Davis:

10   Q.    Okay.  Let's get into conversation that you had with

11 the defendant now.  And when you asked the defendant where

12 Ms. Cunningham's body was, did he give you a location?  Was

13 that his first response to you?

14   A.    He didn't give me --

15             MS. BALIDO:  Judge, I object to the content

16 of -- I asked my question very specifically about -- based

17 on just like the State did and I don't believe that we've

18 opened it up or waived the objection that we have to the --

19 any oral statements by the defendant.

20             THE COURT:  Defense objection is overruled.

21 The State may proceed.

22             MR. DAVIS:  Okay.

23   Q.    (By Mr. Davis)  First of all, what is the first --

24 what is the first thing that you said to the defendant after

25 you gave him his Miranda warnings?

1   A.   I asked him where Bertie Cunningham was.

2   Q.   And what response, if any, did the defendant give to

3   you, Deputy?

4   A.   He lowered his head, and he said it was an accident,

5   I didn't mean to shoot her.

6   Q.   All right.  And did you say anything next to the

7   defendant?

8   A.   Yes, sir.

9   Q.   What did you say to him?

10   A.   I asked him if she was dead.

11   Q.   What did he say to you?

12   A.   He said, yes.

13   Q.   Did you ask him anything else?

14   A.   Yes, sir.

15   Q.   What did you say to him?

16   A.   I asked him where her body was.

17   Q.   And did he respond to that?

18   A.   Yes, sir.

19   Q.   Tell the members of the jury what the defendant said

20   to you when you asked him the second time where her body was?

21   A.   He said he didn't know, that somebody else had put

22   her in the trunk of the car and carried her and dumped her up

23   in the Dallas area.

24   Q.   And is that the last bit of the conversation that

25   you had before you stopped talking with him and got the car

1    keys and went out there to the Honda?

2         A.   Yes, sir.

3              MR. DAVIS:  I'll pass the witness, Your Honor.

4                   Further Cross-Examination

5    By Ms. Balido:

6         Q.   Detective Rose, let me ask you a question:  The

7    first question you asked him was where is she; is that

8    correct?

9         A.   I asked him where Bertie Cunningham was.

10        Q.   Is it true or is it not true that that was the first

11   thing that you said to him, not that he was under arrest and

12   not that he -- and not his Miranda warnings?

13        A.   No, ma'am.

14        Q.   Okay.  You didn't just bust in there and ask where

15   is she, where is she?

16        A.   No, ma'am.

17        Q.   And your opinion at that point Treshod Tarrant was

18   still in the room?

19        A.   At that point I don't know if Shod was still in the

20   room or if they had already moved him to the living room.

21        Q.   Okay.  So he was in the room at some point, and then

22   he was out of the room; is that correct?

23        A.   Yes, ma'am.

24        Q.   And what was Mr. Murphy's physical response to your

25   question of where Ms. Cunningham was?

1     A.   His physical response?

2     Q.   Yes.

3     A.   He lowered his head.

4     Q.   Okay.  And that's when he stated that it was an

5 accident?

6     A.   Yes, ma'am.

7     Q.   And that the gun went off?

8     A.   Yes, ma'am.

9     Q.   And you asked him if he was -- if she was dead; is

10 that correct?

11    A.   Yes, ma'am.

12    Q.   And he said that she was?

13    A.   Yes, ma'am.

14    Q.   And then you asked him about the location of the

15 body, is that also correct?

16    A.   Yes, ma'am.

17    Q.   And what was his response to you?

18    A.   That someone else had put her in the trunk and had

19 dumped her body in the Dallas area, he didn't know where it

20 was.

21    Q.   Okay.  Did he mention who that someone else was?

22    A.   No, ma'am.

23    Q.   Did he ever say that he had help from somebody else

24 that was located inside the house?

25    A.   No, ma'am.

1      Q.   Did he ever indicate to you that it was Treshod

2  Tarrant that helped him move the body?

3      A.   No, ma'am.

4      Q.   He just said somebody else?

5      A.   Yes, ma'am.

6      Q.   Did you ask him for that somebody else's name?

7      A.   I don't remember if I did or if I didn't.

8      Q.   So that was the totality of what Mr. Murphy told you

9  before you went outside and looked in the car?

10     A.   Yes, ma'am.

11     Q.   Why did you go out and look in the car?

12     A.   Because other officers that came in and told me that

13 there was blood on the bumper and that it was a strong smell

14 coming out of the car.

15     Q.   Okay.  So -- so now these other officers are coming

16 into it, too?

17     A.   Right.

18     Q.   And you went out and you checked to see if she was

19 in the car and she wasn't in there?

20     A.   Correct.

21     Q.   So at least the part about her not being in the

22 trunk, being someplace else is the truth; is that correct?

23     A.   Yes, she was not in the trunk.

24     Q.   Okay.  Let me ask you.  Was Jason Bonham on duty at

25 the time?

1      A.   I believe he was off that night.

2      Q.   Okay.  But he had a uniform on.  Do you remember

3   that?

4      A.   I don't remember what he was wearing.

5      Q.   Okay.  Do you know that he has an off duty job as a

6   security person?

7      A.   No, I didn't know that.

8      Q.   Okay.  Did you send Jason Bonham in there to talk to

9   the defendant?

10      A.   No, ma'am.

11              MS. BALIDO:  Pass the witness.

12              MR. DAVIS:  No further questions.

13              THE COURT:  You may step down.

14              MS. BALIDO:  Judge, we'd ask that this witness

15   not be excused and stay in the courthouse.

16              THE COURT:  Sheriff, let's take a stretch

17   break for the jury and a rest break for the court reporter.

18   15 minutes.

19              THE BAILIFF:  All rise.

20              (Jury recessed from courtroom.)

21              THE COURT:  Record reflect this hearing is

22   being conducted in open court, outside the jury's presence.

23          At the request of the defense, I have gone over the

24   notes of Grand Prairie Police Department --

25              MS. BALIDO:  Garland.

1          THE COURT:  -- the Garland Police Department,

2    Officer Matt Myers, page by page.  A thick notebook was

3    tendered to me.  I have gone over every single page of that

4    notebook and wish to state on the record now, I am unaware of

5    anything of a Brady, Bagley, Kyles, Strickler nature to which

6    the defense is entitled.

7          Sheriff, may be have the jury, please.

8               THE BAILIFF:  Yes, sir.

9               THE COURT:  Let the record reflect the jury is

10   returning to the courtroom at this time.

11               (Jury returned to courtroom.)

12               THE COURT:  Members of the jury, you may be

13   seated.

14          Mr. Murphy, counsel, visitors in the gallery, you

15   may be seated.

16               MR. DAVIS:  Thank you.

17                    MATT MYERS

18   was called as a witness by the State and, after having been

19   first duly sworn, testified as follows:

20                 Direct Examination

21   By Mr. Davis:

22     Q.   Sir, would you please tell us your full name?

23     A.   My name is Matt Myers.

24     Q.   How are you employed?

25     A.   I'm a detective with the Garland Police Department.

1    Q.    How long have you been employed by the Garland

2    Police Department?

3    A.    I've just started my 24th year.

4    Q.    What is your present assignment?

5    A.    My present assignment is I'm a detective with the

6    Crimes Against Persons Unit.

7    Q.    How long have you been in that particular unit?

8    A.    I've been in the Crimes Against Persons Unit

9    since -- for about three years.  I've been a detective since

10   1998 -- I'm sorry, since 1988, excuse me.

11   Q.    As a member of the Crimes Against Persons Unit, can

12   you tell the members of the jury what type of cases that

13   you've worked on?

14   A.    Well, we investigate some different cases,

15   robberies.  We also investigate homicides and assaults.

16   Q.    Now, in reference to this case involving the death

17   of Bertie Cunningham, were you the lead detective?

18   A.    Yes, I was.

19   Q.    I want to direct your attention back, Detective, to

20   October the 5th of the year 2000, approximately right after

21   midnight, did you first become aware of this case?

22   A.    Yes, I did.

23   Q.    How did you become aware of the case?

24   A.    I was notified over the telephone by my supervisor.

25   Q.    And what was the nature of the case at that point

1    shortly after midnight?  Was this a homicide, or was this

2    working as another type of case?

3         A.   Yes, sir, we were initially advised of a missing

4    person, and that's how we started our investigation.

5         Q.   Were you at home when you got called?

6         A.   Yes, I was.

7         Q.   Did you go somewhere after you received that call?

8         A.   Yes, I did.

9         Q.   Where did you go to?

10        A.   I went directly to the Garland Police Department.

11        Q.   Did you meet with other investigators there?

12        A.   Yes, I did.

13        Q.   Did you stay there at the police department, or did

14   you go to other locations then?

15        A.   We were at the police department for a little while,

16   but we did go to some other locations that -- that early

17   morning.

18        Q.   Tell the members of the jury where you went.  Did

19   you go by yourself, first of all, or with other officers?

20        A.   No, I was with another -- another detective,

21   actually my supervisor.

22        Q.   And who would that be?

23        A.   That was Lieutenant Thompson.

24        Q.   Where did you and Lieutenant Thompson go to then?

25        A.   Well, the first thing that we did when we left the

1    police department was go to the area of Collin Creek Mall.

2         Q.   And Collin Creek Mall is located in Plano; is that

3    right?

4         A.   Yes, it is.

5         Q.   What would be the nearest intersections, just to

6    give the jury an idea if they're not aware of where Collin

7    Creek Mall is?

8         A.   Well, Collin Creek is located north of our city

9    limits.  It's basically off of Central Expressway or I-75.

10        Q.   Uh-huh.  You went there for the purpose of doing

11   what?

12        A.   Well, it was to make sure that a thorough search of

13   that grounds had been done.  We were -- had been advised that

14   that was the last place that Ms. Cunningham had been seen, so

15   it was a starting point to make sure that -- that a thorough

16   search had been done there.

17        Q.   Were you looking for her car?

18        A.   Yes.

19        Q.   Did you find Ms. Cunningham's car there?

20        A.   No, we did not.

21        Q.   Any evidence that Ms. Cunningham was there?

22        A.   No.

23        Q.   How long did you stay there?

24        A.   I would estimate that we were in the mall area for

25   about 20 or 30 minutes.

1     Q.   Where did you next go to?

2     A.   After we left the mall, we drove to a business

3 called Richardson Motor Sports.

4     Q.   And would that be -- would it be fair to say that's

5 south on North Central Expressway from Collin Creek Mall?

6     A.   Yes, it is.

7     Q.   Is that actually located in Richardson?

8     A.   Yes, it is.

9     Q.   Again, the purpose of you going to that location was

10 what?

11    A.   Well, we had received some information that a credit

12 card had been used there, so I just -- I wanted to get a feel

13 of where that location was.  I knew I would be returning

14 there, so I wanted to locate it so I would know exactly where

15 it was and know that I would be returning there the next day.

16    Q.   Okay.  So how long did you and Lieutenant Thompson

17 stay at that location?

18    A.   We probably were only there for about 5 or 10

19 minutes, not very long.  We checked the alley, did a search

20 of the immediate area around the -- around that business, but

21 we weren't there very long, maybe 10 minutes.

22    Q.   Did you talk with anyone at that location?

23    A.   Not at that time.

24    Q.   Where did you go next then?

25    A.   Our next -- the next thing we did was we started

1    checking some -- some of the main roads that would have been

2    between Ms. Cunningham's residence and the mall.

3        Q.    Did you check Plano Road?

4        A.    Yes, we did.

5        Q.    Did you check Jupiter Road?

6        A.    Yes, we did.

7        Q.    Do you recall any of the other major streets that

8    you checked that morning?

9        A.    Plano and Jupiter would have been the two -- two

10   main north-south arteries from her house.  I think we checked

11   a couple of east-west roads just to make sure the car wasn't

12   somewhere off of a direct route.

13       Q.    Were you able to find Ms. Cunningham's car on any of

14   those roads?

15       A.    No, we did not.

16       Q.    So what did y'all do next?

17       A.    We then -- we -- I believe we returned to the police

18   station, but I know that we ended up at Ms. Cunningham's

19   residence that early morning.

20       Q.    Would that be in the Oak Ridge neighborhood there in

21   North Garland?

22       A.    Yes.

23       Q.    Did you meet with anyone there?

24       A.    Yes, we met with Ms. Cunningham's sister.

25       Q.    Would that be Evelyn Shelton?

1    A.    Yes, it is.

2    Q.    And did you obtain some information from her?

3    A.    Yes, we did.

4    Q.    Was this -- what type of information in general did

5  you obtain from Ms. Shelton?

6    A.    Well, we -- we asked Ms. Shelton for a recent

7  photograph of Ms. Cunningham, a copy of her drivers license,

8  or we were looking for any bank records that she might have,

9  just anything that might help us identify Ms. Cunningham.  We

10  didn't know who she was or what she looked like at all, so we

11  needed photographs.

12    Q.    When you finished talking with Ms. Shelton, then

13  what did y'all do?

14    A.    We then returned to the police department I know for

15  sure after that.  It was -- we had been out most of the night

16  by then.  And we just returned to the police department to

17  kind of re-group and reorganize.

18    Q.    How long did you stay there?

19    A.    Well, we were probably there -- I know I left the

20  police department so that I could be at Richardson Motor

21  Sports when they opened at 8 o'clock.

22    Q.    Did Lieutenant Thompson go with you, or did you go

23  by yourself?

24    A.    Lieutenant Thompson did not go with me, but another

25  detective did.

1      Q.    Who was that?

2      A.    That would have been Detective Brown.

3      Q.    When you got there, was the Richardson Motor Sports

4  open?

5      A.    It was not open when we arrived, but that was -- we

6  got there about 7:30 or 7:40.  We knew that they were going

7  to open at 8 o'clock.

8      Q.    When they did open, did you have an opportunity to

9  talk to some of the employees inside?

10     A.    Yes, we did.

11     Q.    Did you collect any items at that point, any pieces

12 of paper or other physical items?

13     A.    Yes, we did.

14     Q.    Among other things, did you collect a receipt for a

15 purchase that had been made the night before?

16     A.    Yes, we did.

17     Q.    Did you also recover some warranty papers with

18 regards to that purchase?

19     A.    That's correct.  Yes, sir.

20     Q.    And on those warranty papers, sir, did you see a

21 name of a J. Isaac or a Jedidiah Murphy?

22     A.    I believe the papers were filled out J. Isaac

23 Murphy.

24     Q.    Okay.  When you obtained these papers with that name

25 on them, did you do something with that name?

1    A.    I returned that information back to the police
2  department and actually turned it over to Lieutenant
3  Thompson.
4    Q.    What were you hoping to gain by that?
5    A.    We were hoping to be able to come up with a
6  possible -- a possible suspect's name.
7    Q.    And did you come up with a possible suspect's name
8  or a possible location for that suspect?
9    A.    Yes, we did.
10   Q.    Were you still at the Richardson Motor Sports or
11 were you back at the police department or where were you when
12 you got that information?
13   A.    We were back at the police department.
14   Q.    And did you come up with a last known address for a
15 Jedidiah Murphy?
16   A.    Yes, we did.
17   Q.    And what was that address if you recall?
18   A.    Yes, I do recall.  It was, I believe, 1718 Barclay
19 Street in Richardson.
20   Q.    What did you do when you got that address?
21   A.    When we received that information, I immediately
22 left the police department to go and locate that address and
23 set up a surveillance.
24   Q.    Okay.  What was the purpose of setting up a
25 surveillance?  What were you hoping to see?

1      A.   Well, once again, we were looking for Ms.

2   Cunningham's car.  It hadn't been located yet.  So that's the

3   first thing that we were looking for is the car.

4      Q.   Anyone else out there with you during the

5   surveillance?

6      A.   No.  I left the police department by myself.

7   Lieutenant Thompson was aware that I -- that I was en route

8   over there, and he was in the process of locating another

9   detective or other detectives to come and assist me.

10      Q.   When you got over to Barclay, did you see Ms.

11   Cunningham's car there?

12      A.   No, I did not.

13      Q.   About this time -- about what time did you arrive

14   out there at Barclay that morning?

15      A.   I think it was shortly before -- shortly before the

16   lunch hour or shortly after the lunch hour.  I think I had

17   gone home and changed clothes and showered and get a bite to

18   eat, so I think when I returned to the police department, it

19   was shortly after the lunch hour.

20      Q.   So you get out there to Barclay, you don't see the

21   Honda.  Is that the type of car that you were looking for?

22      A.   Yes.

23      Q.   Did you -- did you maintain your surveillance for a

24   period of time?

25      A.   I was only -- I was only on Barclay Street for about

1    10 minutes, 10 or 15 minutes.

2        Q.   Uh-huh.  Did you leave then?

3        A.   Yes, I did.

4        Q.   Why did you leave?

5        A.   I was advised -- excuse me, I have a cold.  Excuse

6    me.

7        Q.   Would you like a glass of water?

8        A.   I'm okay.  Excuse me.

9            I was advised over the radio that there were persons

10   at Apollo Junior High School that had information about this

11   case, so I immediately went to the -- to the junior high

12   school.

13       Q.   Now, before you left Barclay, had you tried to make

14   contact with anybody inside the home?

15       A.   No, I did not.

16       Q.   So you then went to Apollo Junior High; is that

17   right?

18       A.   That's correct.

19       Q.   And who did you meet over at Apollo Junior High

20   School?

21       A.   I met the school resource officer, and I also met

22   two other individuals.

23       Q.   What were their names?

24       A.   Ms. Tonya Thorp and her daughter.

25       Q.   That would be Ashley Johnson.  Does that name sound

1  familiar?

2      A.    Yes, her name was Ashley Johnson.

3      Q.    Did you actually have some conversations with them?

4      A.    Yes, I did.

5      Q.    Without going into what was said at that point, did

6  you stay there at the junior high school or what did you do

7  as a result of talking to the two of them?

8      A.    Well, after I met with those two, I stayed at the

9  junior high school for, oh, probably only about 15 minutes or

10 so and asked Ms. Thorp if she would come to the police

11 department with her daughter where I could talk to them there

12 and she agreed to do that.

13     Q.    So Ms. Thorp and her daughter then went to the

14 Garland Police Department, met with you and talked with you,

15 correct?

16     A.    That's correct.

17     Q.    How long did y'all talk?

18     A.    I think we were probably a total of maybe an hour

19 and a half.  We were there for a little while.

20     Q.    Now, was it your understanding that Tonya Thorp was

21 the sister of Jedidiah Murphy?

22              MS. BALIDO:  I object to hearsay, based on

23 hearsay, Judge.

24              THE COURT:  Sustained.  Rephrase the

25 question.

1              MS. BALIDO:  Ask the jury to disregard.

2              THE COURT:  The Court denies -- in light of

3    the Court's previous instruction.

4         Q.   (By Mr. Davis)  Let me just ask you then.  How long

5    did you stay there at the Garland Police Department talking

6    with Tonya Thorp and Ashley Johnson?

7         A.   I think we were there for about an hour and a half,

8    maybe a couple of hours.

9         Q.   Again, without going into what was said, did you do

10   something after you talked with those two people?  What was

11   the next thing that you did after you finished talking with

12   them?

13        A.   Well, I asked both of them to provide a written

14   statement about -- about what we had talked about and they

15   both agreed to do that.

16        Q.   All right.  So you obtained a written statement from

17   them.  Then what did you do?

18        A.   (No response)

19        Q.   Did you stay at the police department, or did you go

20   to some other location?

21        A.   Well, I believe I would have met with my supervisor

22   then just to advise him.  There were some other detectives

23   out in the field doing some other work, so I think we were

24   waiting for them to return so that we could all once again

25   get together and talk.  They were doing some things I didn't

 1   know what they were doing.  I was doing some things that they

 2   didn't -- weren't aware of.

 3       Q.   Okay.  Did you in fact meet with them there at the

 4   police department later?

 5       A.   Yes.

 6       Q.   And when you finished meeting with them, what did

 7   you do at that point?

 8       A.   Well, we were getting into the early evening hours

 9   then, and I had been -- been awake and been at work -- been

10   working on the case for -- for about 18 hours I think, so

11   I -- actually I was sent home after I got done taking to Ms.

12   Thorp.

13       Q.   When is the next time that you did anything on this

14   case then, detective?

15       A.   Well, I had gone home.  I had been up all night and

16   all day so I went to bed.  And I got a call about 2 o'clock

17   in the morning.

18       Q.   This is going to be Friday, October 6th, correct?

19       A.   Yes.

20       Q.   2 o'clock in the morning you're at home?

21       A.   Yes.

22       Q.   Who called you?

23       A.   Once again, that would have been my supervisor,

24   Lieutenant Thompson.

25       Q.   Was it to discuss this particular case?

1      A.    Yes, it was.

2      Q.    Without going into what he said to you, what action

3   did you take after you talked with your commander?

4      A.    Well, he told me that some information --

5              MS. BALIDO:  Objection, hearsay.

6              THE COURT:  Sustained.

7      Q.    (By Mr. Davis)  Without going into what he said,

8   just tell the members of the jury what did you actually do

9   after you finished talking with him?

10      A.    I returned to the police department.

11      Q.    Did you stay there, or did you go someplace?

12      A.    We left the police department, went somewhere.

13      Q.    Where did you go to?

14      A.    We went to an address in Edgewood, Texas.

15      Q.    How many other -- how many other Garland police

16   officers went with you to Edgewood?

17      A.    I think there was a total of six of us.

18      Q.    And where in Edgewood did you go to?

19      A.    We went to a residence, to a home on Lamar Street.

20      Q.    Did you meet any -- any law enforcement officers

21   from Van Zandt County when you got to Edgewood?

22      A.    Yes, we did.

23      Q.    Where did you meet them?

24      A.    We met them at a Dairy Queen on Highway 80.

25      Q.    Do you remember whether or not Gary Rose who is a

1    Deputy Sheriff of Van Zandt County was one of those officers

2    or not?

3        A.   Yes, he was.

4        Q.   Did you meet with him before you went to the

5    residence there on Lamar?

6        A.   Yes, we did.

7        Q.   Okay.  Did Deputy Rose actually accompany you over

8    to the address on Lamar?

9        A.   Yes, he did.

10       Q.   When you got to Lamar, did you see anything that

11   caught your attention, first of all, as you drove up to that

12   residence?

13       A.   Yes.

14       Q.   What was that?

15       A.   I saw Ms. Cunningham's car parked in front of the

16   residence.

17       Q.   Would this be the silver Honda Accord?

18       A.   Thank you.

19              (Water handed to witness.)

20       A.   Yes.

21       Q.   (By Mr. Davis)  If you would then, tell the jury

22   what is the first thing then that happened once you and the

23   other peace officers got to that location?

24       A.   I was advised that Mr. Murphy was inside the

25   residence.

1        MS. BALIDO:  Objection based on hearsay.

2        THE COURT:  Overruled.

3    A.   And I then proceeded into the residence where I

4    personally observed Mr. Murphy.

5    Q.   (By Mr. Davis)  Where was Mr. Murphy when you first

6    saw him?

7    A.   He was in a bedroom at the rear of the residence.

8    Q.   Was he in there by himself, or were other law

9    enforcement officials there with him?

10   A.   There was at least one other law enforcement

11   official there with him.

12   Q.   Okay.  Do you know whether or not any other law

13   enforcement officers had spoken with Mr. Murphy prior to the

14   time that you met with him?

15   A.   Yes.

16   Q.   Did you have an opportunity to talk with Mr. Murphy,

17   also?

18   A.   Yes, I did.

19   Q.   Again, physically where in the bedroom was he?

20   A.   When I first walked into the room, he was seated --

21   seated on the bed.

22   Q.   Was -- was he clothed?

23   A.   I believe he had on a pair of shorts.

24   Q.   Was he handcuffed?

25   A.   Yes, he was.

1    Q.    Did you have your gun out or drawn when you first

2    went in there to talk with him?

3    A.    No, I did not.

4    Q.    Was Mr. Murphy awake?

5    A.    Yes, he was.

6    Q.    Did he appear to be alert?

7    A.    Yes, he did.

8    Q.    Did you actually go up to where he was then?

9    A.    I did.

10    Q.    How close to Mr. Murphy were you then?

11    A.    I was probably about a foot or maybe two feet away

12    from him.

13    Q.    Did you have an opportunity to observe his

14    appearance and his demeanor at that point?

15    A.    Yes, I did.

16    Q.    How would you describe his demeanor?

17    A.    He was just very quiet.

18    Q.    Did you observe whether or not he was intoxicated at

19    that point?

20    A.    I do not believe he was intoxicated at that time.

21    Q.    In your 20 plus years experience with the Garland

22    Police Department, have you had occasions to deal with

23    individuals who you knew were intoxicated?

24    A.    Yes, I have.

25    Q.    Few or many occasions?

1      A.    Many occasions.

2      Q.    Have you been -- have you received training to spot

3   signs of intoxication of suspects?

4      A.    Yes, I have.

5      Q.    First of all, what were some of the signs that you

6   were going to look for that morning?

7      A.    Well, I looked to make sure that his balance was

8   stable.  I would look in his eyes to see if his eyes were

9   bloodshot or watery.  I would also see if I could smell

10  alcohol on or about his person.

11     Q.    As you were there with him, did you observe any

12  indication that Mr. Murphy was intoxicated?

13     A.    No, I did not.

14     Q.    In your experience as a police officer, have you had

15  to deal with people who you knew were under the influence of

16  drugs?

17     A.    Yes.

18     Q.    Again, what would some of the common signs be if

19  somebody were under the influence of drugs?

20     A.    Well, some of those signs are similar to alcohol.

21  Their eyes may be bloodshot or watery.  Their balance may be

22  unstable or speech may be slurred.

23     Q.    Was Mr. Murphy exhibiting any signs of being under

24  the influence of drugs?

25     A.    No, he was not.

1     Q.   What's the first thing that you did when you came in

2   contact with Mr. Murphy then?

3     A.   I identified myself.  Lieutenant Thompson was with

4   me, and Commander Lay was also with me.  I identified them.

5     Q.   Now, were you in some police uniform or were you

6   wearing a suit similar to the one that you're wearing now?

7     A.   Well, I was not in a police uniform, but I was also

8   not wearing a neck tie.  I -- I was probably in just a pair

9   of slacks and a shirt.

10    Q.   So you identify yourself to Mr. Murphy; is that

11  correct?

12    A.   Yes.

13    Q.   Did he appear to understand what you were saying to

14  him?

15    A.   Yes, he did.

16    Q.   Did he acknowledge you in any fashion verbally at

17  that point?

18    A.   I don't recall that he did.

19    Q.   What's the next thing that you said or did?

20    A.   I would have advised him that he was under arrest

21  and offered Miranda warnings to him.

22    Q.   Now, the Miranda warnings that you gave to Mr.

23  Murphy, is it your practice to read those warnings off of a

24  card or do you give those warnings by memory to suspects?

25    A.   I give them by memory.

1    Q.   Did you do that that morning?

2    A.   Yes, I did.

3    Q.   Would you please tell the members of the jury the

4  warnings that you gave to Mr. Murphy there that morning.

5    A.   Yes, I would have told Mr. Murphy that you have the

6  right to remain silent, not make any statement to me.  That

7  if you do make any statement, that statement may and probably

8  will be used as evidence against you at your trial.  You have

9  the right to have an attorney present to counsel with you

10  prior to and during any questioning.  And if you cannot

11  afford an attorney, the State would appoint an attorney to

12  counsel with you.  You also have the right to terminate this

13  interview at any time.  I would then ask him if he understood

14  those rights.

15    Q.   Okay.  Are those the warnings that you gave to Mr.

16  Murphy that day?

17    A.   Yes.

18    Q.   Did you in fact ask Mr. Murphy if he understood

19  those rights?

20    A.   I did.

21    Q.   What response did he give to you?

22    A.   He verbally said "yes" and shook his head yes.

23    Q.   While you were reading the warnings or giving the

24  warnings to him, was he looking at you?

25    A.   He wasn't making direct eye contact with me, but he

1   was looking up.

2        Q.   All right.  Did he appear to be listening to you?

3        A.   Yes, he did.

4        Q.   After he told you that he understood his rights, at

5   any point did he tell you that he did not want to talk with

6   you?

7        A.   No, he did not.

8        Q.   At any point did he tell you that he wanted to

9   terminate the interview and have an attorney present?

10       A.   No, he did not.

11       Q.   What's the next thing that occurred then?

12       A.   I asked Mr. Murphy one question.  I asked him if he

13  knew where the credit cards were.

14       Q.   What credit cards were you referring to?

15       A.   I was referring to Ms. Cunningham's credit cards.

16       Q.   At the time that you asked that question of Mr.

17  Murphy, did you know where Ms. Cunningham's credit cards

18  were?

19       A.   No, I did not.

20       Q.   Did the defendant respond to you?

21       A.   Yes, he did.  He said that they were --

22            MS. BALIDO:  Judge, we're going to object to

23  anything that the defendant said based on our previous

24  objection.

25            THE COURT:  The Court recalls the objection.

1    It's again overruled.

2           You may answer.

3      A.   Yes, he did respond and told me that the credit

4    cards were outside in her car.

5      Q.   (By Mr. Davis)  Did someone subsequently look inside

6    the car to determine if her credit cards were in -- in Ms.

7    Cunningham's car?

8      A.   Yes.

9      Q.   Were the cards later found in her car?

10     A.   Yes, I believe they were.

11     Q.   Did you ask anything more of the defendant at that

12   time?

13     A.   No, I did not.

14     Q.   Did you continue talking with the defendant at that

15   point?

16     A.   No, I did not.

17     Q.   What did you do then?

18     A.   Mr. Murphy was then -- he was removed from the

19   residence.  He was in my custody at that time, and he was

20   transported to the Edgewood Police Department.

21     Q.   At some point did you go to a location at a creek

22   there in Edgewood?

23     A.   Yes, we did.

24     Q.   At what point did do you that?

25     A.   We did that after we left the Edgewood Police

1    Department.

2        Q.    So as I understand, you finished your interview with

3    the defendant, you then went to the Edgewood Police

4    Department.  Was the defendant transported over there, also?

5        A.    Yes.

6        Q.    Purpose being what?

7        A.    The purpose for that was so that he could meet with

8    the Magistrate and be arraigned.

9        Q.    Did the Magistrate appear there after a certain

10   period of time?

11       A.    Yes.

12       Q.    Where was Mr. Murphy while you were waiting for the

13   Magistrate to arrive there?

14       A.    He would have been seated in the back seat of one of

15   our police cars.

16       Q.    On the way over to the police department, did you

17   have any more conversations with Mr. Murphy?

18       A.    No, we did not.

19       Q.    Was he discussing anything or making any statements

20   to you on the way over?

21       A.    No, he did not.

22       Q.    When you got there and Mr. Murphy remained in the

23   car waiting for the Magistrate to get there, did a police

24   officer stay in the car with him or was he allowed to sit in

25   the car by himself?

1    A.   I think it was a little bit of both actually.   There

2  was a period of a few minutes that myself and my partner were

3  seated in the car.   I know I got out to talk with one of the

4  other police officers that was there.   I think my partner

5  stayed in the car the whole time.

6    Q.   Okay.   Did y'all make any attempt to question him

7  there at the police department before the Magistrate got

8  there?

9    A.   No, we did not.

10    Q.   After the Magistrate got there, did an arraignment

11  actually take place?

12    A.   Yes.

13    Q.   Did you witness that arraignment?

14    A.   Yes, I did.

15    Q.   Have you witnessed other arraignments in the past?

16    A.   Yes, I have.

17    Q.   Did you pretty much know what to expect at that

18  point?

19    A.   Yes, I did.

20    Q.   Do you know a Judge Ozelle Wilcoxson?

21    A.   Yes.

22    Q.   Did Judge Wilcoxson read the Miranda rights or

23  warnings to the defendant in this case?

24    A.   Yes, she did.

25    Q.   Now, I believe the evidence is that he was arraigned

1    on a charge of murder down there in Van Zandt County that

2    day.  Was that in reference to the death of Bertie

3    Cunningham?  Is that the murder that we're talking about?

4        A.   Yes, it is.

5        Q.   Was he also arraigned on a credit card abuse case

6    that you had a warrant for?

7        A.   Yes.

8        Q.   Were you able to observe the defendant during the

9    arraignment?

10       A.   Yes, I did.

11       Q.   Was there anything unusual about his actions while

12   the Judge was giving him his Miranda warnings?

13            MS. BALIDO:   Judge, I'm going to object to the

14   continual leading of this witness.

15            THE COURT:   Objection is overruled.

16       A.   No, I did not observe anything unusual.

17       Q.   (By Mr. Davis)  How would you describe his demeanor

18   then during the time he was being arraigned?

19       A.   He was still very quiet, very still and very quiet.

20       Q.   How long did the arraignment take?

21       A.   It probably took about 20 minutes once she got there

22   and we started.

23       Q.   And where did you go following the arraignment then?

24       A.   We left the police department and drove to the creek

25   area.

1    Q.    Who was with you?

2    A.    Mr. Murphy was in the car, and my partner, Detective

3    Tooke, was also in the car.

4    Q.    How long did it take you to get from the police

5    department over there to the creek location?

6    A.    Probably less than 10 minutes.

7    Q.    Did you or Detective Tooke make any effort to

8    question the defendant on the way over to the creek?

9    A.    No, we did not.

10    Q.    Did he make any statements to you on the way over

11    there?

12    A.    No, he did not.

13    Q.    What was his demeanor on the way to the creek then?

14    A.    He was still once again continuing to be -- he was

15    real still and very quiet.

16    Q.    When you finally got to the creek, tell the members

17    of the jury what occurred at that point.

18    A.    Well, the purpose for going to the creek was we

19    had -- I knew that there might possibly still be a murder

20    weapon somewhere.  I wanted --

21    Q.    What type -- I'm sorry -- what type of murder weapon

22    were you looking for?

23    A.    I was looking for a pistol, a handgun.

24    Q.    Any particular caliber?

25    A.    Yes, it was a .22 caliber.  And Mr. Murphy had -- I

1    had advised him the reason that we were returning to the

2    creek was to -- for him to point out an area where he may

3    have thrown the gun.  But when we got to the -- when we got

4    to the creek area and I asked Mr. Murphy to get out of the

5    car to show us where he had thrown the gun, he refused to get

6    out of the car, would not do that.

7        Q.   Was any effort made to try to find the pistol?

8        A.   Yes.

9        Q.   What did you do in that regard?

10       A.   Well, that night we hired a diver to go into the

11   creek to search for the gun that night.

12       Q.   Okay.  Did you yourself try to find the gun out

13   there by the creek with -- when the defendant was out there

14   with you?

15       A.   No, not that night.

16       Q.   How long did you, Detective Tooke, and the defendant

17   then stay at that location at the creek?

18       A.   We were probably only there for 5 or 10 minutes with

19   him.

20       Q.   Where did you go once you left the creek?

21       A.   We returned directly to the Garland Police

22   Department from there.

23       Q.   When you say "we," would that be you, Detective

24   Tooke, and the defendant; is that right?

25       A.   Yes.

1    Q.   Who is driving?

2    A.   Detective Tooke was driving.

3    Q.   Where are you sitting in the car?

4    A.   I was seated in the front seat.

5    Q.   And the defendant?

6    A.   He was seated right behind me in the rear passenger.

7    Q.   How long did it take for you to get from Edgewood to

8    the Garland Police Department?

9    A.   It's about a 45-minute drive, maybe -- maybe just a

10   little bit more than that.

11   Q.   Anything unusual occur on the way from Edgewood to

12   the Garland Police Department?

13   A.   No.

14   Q.   Did you or Detective Tooke make any effort to

15   question the defendant on the way to the police department?

16   A.   No, we did not.

17   Q.   Defendant's demeanor on the way back was what?

18   A.   Very still and very quiet the entire time.

19   Q.   When you arrived at the Garland Police Department,

20   what did you do with the defendant?

21   A.   We went to the jail area, to the book-in area to

22   process papers and book him into the jail.

23   Q.   Now, describe, if you will, the book-in process.  If

24   a suspect is brought into the Garland Police Department to be

25   booked in, what would be done with him?

1    A.    Well, they ascertain personal information, name and

2    address, phone numbers, next of kin information.  They remove

3    any jewelry from the -- from the person that's being booked

4    in.  They take clothing away from them and give them jail

5    clothes to wear.  They ascertain some medical history and

6    just some questions at the book-in -- at the book-in area

7    that they ask.

8    Q.    When the defendant went through the book-in process

9    and was asked for this information, was he able to provide

10   that information to the jail personnel?

11   A.    Yes, he did.

12   Q.    Was there anything unusual about his book-in process

13   then?

14   A.    No, there wasn't.

15   Q.    You've mentioned something about medical history.

16   If a prisoner is brought into the Garland jail and he

17   requires medical attention for whatever reason, what would be

18   the procedure at that point?  Would you go ahead and place

19   him into your jail, or would you do something else with him?

20   A.    No, actually if he would request -- any prisoner

21   that comes in and requests medical attention, we would

22   immediately take them to the emergency room at the local

23   hospital so that they could see a doctor.

24   Q.    Now, was Mr. Murphy taken to an emergency center

25   that morning or was he processed in?

1      A.   He was processed in.

2      Q.   Do you remember whether or not he asked for any sort

3 of medical attention at that point or gave a history of a

4 medical problem at that point?

5      A.   None that I'm aware of.

6      Q.   After the book-in procedure was finished -- and

7 approximately how long did that take?

8      A.   That usually takes about 20 minutes, maybe 30

9 minutes, depending on how busy they are.

10     Q.   Where was the defendant taken then?

11     A.   He was then taken to another area of the police

12 department.  It's an interview area.  It's located on the

13 second floor of the police department.

14     Q.   Approximately what time that morning then did the

15 defendant arrive in the interview room?

16     A.   He was in the -- around 8 o'clock.

17     Q.   The interview room, if you could, just describe it

18 for the members of the jury.

19     A.   It's a small room.  It's about 12 feet by 12 feet,

20 maybe just a little bit bigger or a little bit smaller.

21 There's no -- the walls are just painted plain white.

22 There's very little furniture in there.  There's a small

23 desk, a couple of chairs to be seated on.  No pictures on the

24 wall.  Just kind of a -- a very plain room really.

25     Q.   What did y'all do once he got up there?

Page 161

1     A.   Well, the very first thing we would do in the

2   interview room is once again give the person that we're

3   talking to their Miranda warning.

4     Q.   What's the purpose of doing that?

5     A.   Well, this time the Miranda warning was given not

6   verbally, but it was given in writing.

7     Q.   Did you use some sort of printed form, or how did

8   you do that?

9     A.   Yes, we have a printed standard form that we give to

10   all persons that we interview, the Miranda sheet.  It's the

11   same -- it's printed and --

12             MR. DAVIS:  May I approach, Your Honor.

13             THE COURT:  You may.

14     Q.   (By Mr. Davis)  Detective Myers, if you would please

15   look at State's Exhibit Number 41.  Do you recognize this

16   document, sir?

17     A.   Yes, I do.

18     Q.   Is this the printed Miranda warnings that you gave

19   to Jedidiah Murphy there on October 6th of the year 2000?

20     A.   Yes, it is.

21     Q.   Now, it has the Miranda warnings printed; is that

22   correct?

23     A.   Yes.

24     Q.   It also has the date and the time actually

25   handwritten in, correct?

1    A.    That's correct.

2    Q.    Does it contain your name of M.J. Myers as well as

3    that of the defendant, Jedidiah Murphy?

4    A.    Yes, it does.

5    Q.    Is there a place on that document for the signature

6    of the suspect in this case Jedidiah Murphy?

7    A.    Yes, there is.

8    Q.    Is his signature appearing on that document, sir?

9    A.    Yes, it does.

10              MR. DAVIS:  Your Honor, at this time for all

11   purposes the State will offer State's Exhibit Number 41.

12              (State's Exhibit No. 41 offered)

13              MR. BYCK:  Judge, we'd object and I'd like to

14   be heard outside the presence of the jury.

15              THE COURT:  Sheriff, if you'd retire the jury,

16   please.

17              THE BAILIFF:  Yes, sir.  All rise.

18              (Jury excused from courtroom.)

19              THE COURT:  The jury is being excused from the

20   courtroom at this time.

21         Detective, you may be seated.

22         Mr. Murphy, counsel, visitors in the gallery, you

23   may be seated.

24         Defense may proceed.

25              MS. BALIDO:  Judge, at this time, pursuant to

Page 163

1   pretrial motions filed and based on the testimony of the

2   hearing before the trial and the testimony up to this point,

3   we would ask for a ruling on our Jackson v. Denno hearing in

4   regard to the voluntariness of the confession and whether or

5   not it -- it submits to Miranda or comports to Miranda.   In

6   addition to what we've laid out in our -- in our motion, we

7   would also say that this -- anything that came out of or came

8   after the oral confessions that were admitted into evidence

9   over our objection was fruit to the poisonous tree and

10  therefore we would add that as one of our objections to any

11  written statements that may come into evidence.  But aside

12  from that, we would object on that -- on that basis at this

13  point and also there's no reason to believe that Mr. -- or

14  Detective Myers' testimony is going to be any different as to

15  the rest of it, so if you'd like me to, I can go ahead and

16  object to the actual statements.

17              THE COURT:  Go ahead.

18              MS. BALIDO:   Judge, we would -- we would

19  include our objection to all the written statements that were

20  made in this case based on Jackson v. Denno, based on

21  Miranda, based on 38.22, on Article 1, Section 9, 10, 13, and

22  19 of the -- I think just 10, 13, and 19 of the Texas

23  Constitution, Article -- excuse me, the 5th, 6th, 8th, and

24  14th Amendments to the United States Constitution, and

25  Article 38.22 of the Texas Code of Criminal Procedure.

1          THE COURT:  Based upon the status of the

2    record as it now exists, I know not what statements were

3    ultimately given.  May we have a short proffer as to after

4    the warnings what was subsequently done by defendant?

5          MR. DAVIS:  Yes, sir.  What was done -- I

6    believe the prior testimony is, Your Honor, that they -- the

7    detective and the defendant engaged in short conversation

8    about the possible abduction of Ms. Cunningham, that the

9    defendant agreed to go with Detective Myers --

10         THE COURT:  I recall that portion.  Was any

11   type of a statement produced in writing signed by the

12   defendant?

13         MR. DAVIS:  The detective and the defendant

14   rode around for about an hour and a half and then returned to

15   the interview room where the written statement itself which

16   is State's Exhibit Number 47 was actually written by the

17   defendant so --

18         THE COURT:  May we proceed with that portion

19   just before I dictate my decision into the record?

20         MR. DAVIS:  Your Honor, I believe that we

21   previously have gone into that matter.

22         THE COURT:  Where is -- where is the

23   document?

24         MR. DAVIS:  The document is down with the

25   court reporter, and I'm now handing that to the Court.

DARLINE W. LABAR, OFFICIAL REPORTER

1          MS. MILLER:  Judge, that was the hearing that

2     we had on Friday.

3          THE COURT:  I recall that.  Is this the

4     statement about which the defense makes objection?

5          MS. BALIDO:  Yes, Your Honor.

6          THE COURT:  State's Exhibit Number 47?

7          Anything further from either side before I dictate

8     my findings into the record?

9          MR. DAVIS:  Nothing from the State, Your

10     Honor.

11          MS. BALIDO:  Nothing from the defense, Your

12     Honor, at this point.

13          THE COURT:  The Court finds after a hearing

14     mandated by the United States Supreme Court in Jackson v.

15     Denno, found at 84 Supreme Court, page 1774, and following,

16     and also pursuant to the United States Supreme Court dictates

17     in Miranda versus Arizona, found at 86 Supreme Court 1602,

18     the Court finds beyond a reasonable doubt and without regard

19     to the truth or falsity of the statement identified as

20     State's Exhibit Number 47, that the defendant in this matter,

21     Jedidiah Isaac Murphy, was warned of his rights as is

22     required by Miranda versus Arizona on numerous occasions by

23     varying and differing peace officers involved with this

24     matter, that the defendant did knowingly waive his right to

25     an attorney and did freely and voluntarily without being

1    induced by compulsion, threats, promises, persuasions, make

2    and sign a statement in writing which is specifically

3    identified as State's Exhibit Number 47.

4         I further find that especially as relates to the

5    warnings given by Garland Detective Myers, that the

6    defendant's alleged mental condition by the ingestion of

7    alcohol or cannabis was not impaired in any significant

8    portion such that he did not sufficiently appreciate the

9    consequences of the warning.  I therefore find and rule as a

10   matter of law that the State's Exhibit Number 47, the

11   reported statement by the defendant, shall be presented or

12   admitted into evidence, should State's strategy so dictate.

13        MS. BALIDO:  Judge, just for housekeeping

14   purposes, we will make an additional objection if the later

15   statements are coming into evidence as well.

16        THE COURT:  All right.

17        MS. BALIDO:  But it will just be kind of short

18   like this so we won't have to take a break for the jury.

19        THE COURT:  Sheriff, may we have the jury back

20   in?

21        Let the record reflect the jury is returning to the

22   courtroom at this time.

23             (Jury returned to courtroom.)

24        THE COURT:  Jury may be seated.

25        Mr. Murphy, counsel, visitors in the gallery,

1    detective, you may be seated.

2            Consistent with the Court's ruling, you may

3    continue.

4            MR. DAVIS:  Thank you.

5    Q.   (By Mr. Davis)  Now, State's Exhibit Number 41, the

6    printed warnings form, what is the title of that document?

7    A.   It is titled "Warning to be Given Before Taking Any

8    Oral or Written confession."

9    Q.   Before you read any further --

10           MR. DAVIS:  Judge, formally has this document

11   been admitted?

12           THE COURT:  Admitted.

13           (State's Exhibit No. 41 admitted)

14           MR. DAVIS:  Thank you.

15   Q.   (By Mr. Davis)  I'm sorry.  Would you please give us

16   that title again?

17   A.   It's titled "Warning to be Given Before Taking Any

18   Written or Oral Confession."

19   Q.   Is this a printed form that's used by the Garland

20   Police Department?

21   A.   Yes, it is.

22   Q.   And underneath that, would you please read the first

23   portion underneath the title?  What does that contain?

24   A.   It contains the date and time and my name and the

25   defendant's name.

1      Q.    The date being what?

2      A.    It reads on October the 6th -- I'm sorry, on the 6th

3  day of October.

4      Q.    And what is the time that's on that document?

5      A.    8:52 a.m.

6      Q.    And that time would indicate what?

7      A.    That would be the time of day that Mr. Murphy signed

8  this document.

9      Q.    And again, your name and the defendant's name

10  appear.  Could you please read to the members of the jury the

11  Miranda warnings that are contained on State's Exhibit Number

12  41.

13      A.    Yes.  It says, number one, I have the right to have

14  a lawyer present to advise me either prior to or during any

15  questioning.

16            Number two, if I am unable to employ a lawyer, I

17  have the right to have a lawyer appointed to counsel with me

18  prior to or during any questioning.

19            And, number three, I have the right to remain silent

20  and not make any statement at all and that any statement that

21  I make may and probably will be used as evidence against me

22  at my trial.

23            Number four, I have the right to terminate the

24  interview at any time.

25      Q.    And what follows after those warnings?

1     A.    It says, "I understand all of the above explained

2  rights," and it is signed Jedidiah Murphy.

3     Q.    Okay.  Now, the Jedidiah Murphy that signed that

4  document, State's Exhibit Number 41, do you see him here in

5  the courtroom this afternoon?

6     A.    Yes, I do.

7     Q.    Please point him out and what he's wearing and where

8  he's sitting.

9     A.    He's in a dark colored suit with a dark colored

10  tie.  He's wearing glasses seated right here.

11          MR. DAVIS:  Your Honor, may the record please

12  reflect this witness has identified the defendant in open

13  court.

14     Q.    (By Mr. Davis)  How did you present that document to

15  Mr. Murphy?  Did you sit down and read out loud the

16  contents?  Did you give the document to him?  Just tell the

17  members of the jury how he actually learned the contents of

18  State's Exhibit Number 41.

19     A.    I would present this document to him, advise him

20  what the document was, that it was a Miranda warning sheet.

21  I would ask him then to read it, ask him to make sure that he

22  understood it.  Tell him that if there was something on the

23  sheet that he did not understand, to tell me what he didn't

24  understand and I would try to explain it to him.

25     Q.    Did it appear to you that Mr. Murphy did in fact

1    read State's Exhibit Number 41?

2         A.   Yes, he did.

3         Q.   What indications did you have that he was reading?

4         A.   Well, he held it in his hand.  I could see that his

5    eyes were moving across the paper.  He never indicated to me

6    that he didn't understand it.  And I believe that he read the

7    entire document.

8         Q.   Did he ever have any questions for you about any the

9    contents of State's Exhibit Number 41?

10        A.   No, he did not.

11        Q.   Did he ever indicate to you that he had a problem

12   with any of those warnings or rights?

13        A.   No, he did not.

14        Q.   Did he ever indicate to you that he wanted to

15   terminate the interview with you?

16        A.   No, he did not.

17        Q.   And he then signed State's Exhibit Number 41 in your

18   presence; is that right?

19        A.   That's correct.

20        Q.   After he signed the document, did y'all begin to

21   have a discussion?

22        A.   Yes, we did.

23        Q.   And in general what was the topic of your

24   discussion?

25        A.   Well, the first thing that I said to Mr. Murphy was

1   that we needed to try and ascertain the abduction location.

2   He said that he -- he didn't want to hide anything, that he

3   wanted to cooperate with us, and that he would answer any

4   questions that I had for him.

5       Q.   Now, did y'all have a short discussion about that

6   subject there at the police station?

7       A.   Yes, we did.

8       Q.   A few minutes later did you leave the police station

9   with Mr. Murphy?

10      A.   Yes, we did.

11      Q.   Did any other police officer go with you from the

12  station?

13      A.   Yes, Detective Tooke did.

14      Q.   Where did the three of you go?

15      A.   We drove back to the area of North Garland.  We --

16  the purpose for doing that was we were trying to locate an

17  area where -- that Mr. Murphy would recognize as being the

18  abduction location.

19      Q.   How did you know where to go to?

20      A.   Well, he had told us previously that he had been at

21  a bar, a sports bar located in North Garland.

22      Q.   Do you remember the name of that bar?

23      A.   Yes, I believe it was called Bleachers.

24      Q.   Now, you said that that bar is in the City of

25  Garland; is that correct?

1    A.   Yes, it is.

2    Q.   Is Bleachers in Dallas County, Texas?

3    A.   Yes, it is.

4    Q.   Did you go past that location?

5    A.   Yes, we did.

6    Q.   Did Mr. Murphy have any reaction when you went by

7  that location?

8    A.   Yes, he did.  Detective Tooke was driving the car.

9  And as we drove past the location, which I already knew where

10 it was, I just wanted to see if Mr. Murphy was going to

11 identify that site or not at that address, and he did.  He

12 said, "hey, you just drove past it."  So I knew he knew where

13 he was talking about, the location he was talking about.

14   Q.   Now, these other locations that you went to, were

15 they all in the City of Garland?

16   A.   Yes.

17   Q.   How many possible locations did you go with Mr.

18 Murphy to that morning?

19   A.   Well, we went to every major intersection -- every

20 intersection that would have been along these north-south

21 arteries of Jupiter Road.  And we also included Shiloh Road

22 and went over to Plano Road, any route that we thought that

23 Ms. Cunningham may have driven from the mall to her

24 residence.

25   Q.   Okay.  For those who aren't familiar with that area

1  now, you have Plano Road, and then to the east you have

2  Jupiter Road, correct?

3      A.   Yes.

4      Q.   And then to the east of Jupiter Road you have Shiloh

5  Road, all of them running north and south; is that correct?

6      A.   Those are all the main north-south arteries, yes.

7      Q.   So of the major east-west arteries that you went to

8  that day would have been what?

9      A.   They would have been Belt Line Road, Buckingham

10 Road.  We went as far south as Walnut Street, a big east-west

11 street in Garland.

12     Q.   Was Mr. Murphy able to give you a precise location

13 for the abduction after driving around with him that morning?

14     A.   No, he did not.

15     Q.   Did he give you any indication that some of them may

16 have been possible sites of the abduction?

17     A.   He pointed out a couple of areas as we were going by

18 or as we stopped that he recognized, but he never said that

19 this is -- this is the spot.

20     Q.   Uh-huh.  Now, all of the locations that you went to

21 that morning with Mr. Murphy, were all of those locations in

22 Dallas County, Texas?

23     A.   Yes, they were.

24     Q.   So I take it were you successful in finding a

25 specific location for the abduction or not that morning?

1    A.   We did not.

2    Q.   Okay.  Did you return Mr. Murphy to the police

3  station?

4    A.   Yes, we did.

5    Q.   About how long were you out with him that morning

6  before you got back to the station?

7    A.   I think we were out for about an hour and a half.

8  We could have been out maybe just a little bit more, a little

9  bit less, but roughly about an hour and a half.

10   Q.   Where did you take Mr. Murphy once you got back to

11  the police station?

12   A.   We returned to the interview room on the second

13  floor of the police department.

14   Q.   Same room?

15   A.   Yes, it's the same room we were in previously.

16   Q.   What did you do when you got back up there?

17   A.   I asked Mr. Murphy if he would be willing to sign a

18  statement, voluntary written statement.

19   Q.   And what did he say?

20   A.   He immediately said that he would.

21   Q.   Now, what procedure do you personally use to take a

22  voluntary written statement?  What's your practice?

23   A.   Well, it's a -- it's a printed -- part of it is a

24  printed form.  Present it to the person, tell them that this

25  is a statement in their own words, in their own handwriting,

DARLINE W. LABAR, OFFICIAL REPORTER

1    they can -- they can write whatever they want.  It's just --

2    it's just their account of what happened.

3       Q.   Do you allow suspects to hand write the statement

4    themselves, or do you normally write it out for them?

5       A.   I would always let the person write the statement if

6    they're able to.

7       Q.   And what would be a situation where you would feel

8    that you couldn't let a suspect write it out himself?

9       A.   I've had a situation a couple of times in my career

10    where a person would indicate to me that they're just not

11    able to write, they're not able to read or not able to

12    write.  And in those circumstances we make some other

13    arrangements to obtain a written statement.  Sometimes I

14    would write it.  Sometimes I would type it.

15       Q.   In this case did Mr. Murphy indicate that he wanted

16    to hand write his own statement?

17       A.   Yes, he did.

18       Q.   While a suspect is actually writing a statement, do

19    you stay with him?

20       A.   No, I would always leave the person alone while

21    they're writing.

22       Q.   What's the purpose of doing that?

23       A.   Well, there's a couple of different reasons.  It's

24    really to help them relax, and I don't want them to be able

25    to say that I in any way intimidated them to write their

1  statement.  So I always leave them alone when they're

2  writing.

3      Q.  In this case did you use the preprinted form used by

4  the Garland Police Department?

5      A.  Yes.

6      Q.  You let him hand write it himself; is that correct?

7      A.  That's correct.

8      Q.  Did you allow the defendant to hand write it alone

9  in the interview room?

10      A.  Yes.

11      Q.  What instructions did you give to him then before he

12  began writing the statement?

13      A.  Well, there's a -- there is another warning similar

14  to the Miranda warning on top of the printed form.  I wanted

15  to make sure that he understood that before we started

16  writing, so I went over that with him.

17      Q.  How did you go over that with him?

18      A.  I just once again handed that form to him, asking

19  him to read it, asking him if he had any questions about any

20  of that information, asking him if he understood that.

21      Q.  Did it appear to you that Mr. Murphy read that

22  portion of the preprinted form?

23      A.  Yes, it did.

24      Q.  Did he have any questions for you?

25      A.  No, he did not.

1    Q.   Did he make any comments that he didn't understand

2  that?

3    A.   No, he did not.

4    Q.   Did he give any indications that he didn't want to

5  give you a written statement?

6    A.   No, he did not.

7    Q.   So what did you do?

8    A.   I then left him alone with the forms, let him

9  write -- write his statement out.

10   Q.   How long did he -- did he take to write out a

11  statement?

12   A.   I think it was probably a total of probably 20

13  minutes, maybe 30.

14   Q.   Were there any times during that period where you

15  came into the room to check on his progress?

16   A.   I think I stuck my head in there one time.  I

17  cracked the door open.  It's what I would normally do with

18  anyone that was in there.  I don't know if they're finished

19  or not.  I'm not with them.  So I just cracked the door open,

20  ask them if they are finished.  If they say they are, I would

21  go in.  If they say they're not, then I would close the door

22  and leave them alone.

23   Q.   At a certain point did he indicate that he was

24  finished?

25   A.   Yes, he did.

1    Q.    What did you do at that point?

2    A.    I would then return into the room with him.  I took

3    the statement from him.  I read the statement.  I would ask

4    another person then to come into the room to witness the --

5    Mr. Murphy's signature onto the statement.

6    Q.    Now, is the suspect given an opportunity to make

7    changes or additions or deletions to his statement before he

8    has to sign it?

9    A.    Yes.

10   Q.    Was Mr. Murphy given that opportunity?

11   A.    Yes, he was.

12   Q.    Did he in fact sign the voluntary statement?

13   A.    Yes, he did.

14   Q.    Did you witness his signature?

15   A.    Yes, I did.

16   Q.    Who else witnessed his signature?

17   A.    Detective Tooke.

18         MR. DAVIS:  May I approach, Your Honor.

19         THE COURT:  You may.

20   Q.    (By Mr. Davis)  Detective Myers, looking at State's

21   Exhibit Number 47, if you will review that document and tell

22   me whether or not this is the voluntary written statement

23   that you took from the defendant, Jedidiah Isaac Murphy, on

24   October 6th, the year 2000?

25   A.    Yes, sir, it is.

1    Q.    How many pages?

2    A.    It consists of five pages.

3    Q.    Is the defendant's signature on each and every page?

4    A.    Yes, it is.

5    Q.    Would that be the same for your signature and that

6    of Detective Tooke?

7    A.    Yes.

8    Q.    Each page, does it have the same preprinted material

9    on it?

10   A.    Yes, it does.

11   Q.    Does each page contain the Miranda warnings that

12   you've just told this jury about?

13   A.    Yes, it does.

14   Q.    Now, prior to the time that Jedidiah Murphy signed

15   this document, sir, had you threatened him in any fashion in

16   order to have him produce this written statement for you?

17   A.    No, sir.

18   Q.    All right.  Had you compelled him in any way to sign

19   that statement?

20   A.    No, I did not.

21   Q.    Had you made any promises whatsoever to him before

22   he signed this statement?

23   A.    No, I did not.

24   Q.    Did Jedidiah Isaac Murphy freely and voluntarily

25   sign and execute State's Exhibit Number 47?

1          MS. BALIDO:  Judge, I'm going to object that

2    as being an ultimate fact question for the jury.

3          THE COURT:  Overruled.

4      A.   Yes, he did.

5          MR. DAVIS:  Your Honor, at this time we would

6    offer State's Exhibit Number 47 for all purposes.

7          (State's Exhibit No. 47 offered)

8          MS. BALIDO:  Judge, we'd object on the basis

9    of our previous objection.

10         THE COURT:  The Court recalls the previous

11   objections.  They are again overruled.  Admitted.

12         (State's Exhibit No. 47 admitted)

13     Q.   (By Mr. Davis)  At the top of that voluntary

14   statement form, again is there a place for the date?

15     A.   Yes.

16     Q.   And is that October 6th of 2000?

17     A.   Yes, it is.

18     Q.   Is there a place for the time?

19     A.   Yes, there is.

20     Q.   And what time is indicated on State's Exhibit Number

21   47?

22     A.   11:30 a.m.

23     Q.   Does that indicate the time that you began the

24   process with him, or is that the time that he actually signed

25   State's Exhibit Number 47?

1    A.    I think this is the time that he signed it.

2    Q.    There is a place -- would that be 217 North Fifth

3    Street which is the location for the police department?

4    A.    Yes.

5    Q.    Okay.  Place for his name, as well as his age, and

6    his home address; is that also right?

7    A.    That's correct.

8    Q.    And in this case what age was placed on that

9    document?

10    A.    It says 25 years old.

11    Q.    Home address is what?

12    A.    1718 Barclay, Richardson, Texas.

13    Q.    And I believe that you told me that following that

14    there are certain Miranda rights or warnings that are given;

15    is that right?

16    A.    Yes, there are.

17    Q.    If you would on that first page only, would you read

18    the Miranda rights and warnings that are contained on State's

19    Exhibit Number 47?

20    A.    It says:  I am giving this statement to M.J. Myers,

21    who has identified himself as a Police Officer of the City of

22    Garland, and he has duly warned me that I have the following

23    rights:  That I have the right to remain silent and not make

24    any statement at all; that any statement I make may be used

25    against me at my trial; that any statement I make may be used

1    as evidence against me in court; that I have the right to

2    have a lawyer present to advise me prior to and during any

3    questioning; that if I am unable to employ a lawyer, I have

4    the right to have a lawyer appointed to advise me prior to

5    and during any questioning and that I have the right to

6    terminate the interview at any time.  Prior to and during the

7    making of a statement, I have and do hereby knowingly,

8    intelligently, and voluntarily waive the above explained

9    rights and I do make the following voluntary statement to the

10   aforementioned person of my own free will and without any

11   promises or offers of leniency or favors, and through no

12   fear, coercion or threat of physical harm by any person or

13   persons whomsoever.

14        Q.   Now, following that printed form, is there space

15   then for the suspect, in this case Mr. Murphy, to hand write

16   whatever he wants to?

17        A.   Yes.

18        Q.   All right.  Sir, on State's Exhibit Number 47 then

19   will you please read what Mr. Murphy wrote with regards to

20   this statement?

21        A.   Yes.

22             "I was drinking heavily and decided I was going to

23   visit my daughter and end my life.  I packed my stuff and

24   left my sisters headed to Bleachers sports bar for something

25   to drink.  I drank more alcohol and started walking down the

1   road beside Bleachers on my way to 635 so I could hitch a

2   ride to Wills Point to see Alyssa where exactly I saw miss

3   Bertie but I told her I needed a ride to 635 and she agreed

4   to take me as long as she was safe.  I assured her I wasn't

5   out to hurt anyone and we drove off.  We drove (sic) off

6   toward 635 and about 30 minutes into heavy construction I

7   decided what I was doing was wrong so I told miss Bertie to

8   let me drive so I could take her and her car somewhere I

9   could leave them so I could hitch a ride to 635.  We pulled

10  into a parking lot and I told her I was going to put her in

11  the trunk and go to a payphone and call the police after I

12  got far enough away so they could get her out safely.  After

13  she got in the trunk I had the gun in my right hand and

14  before I shut the trunk I switched hands because I can't feel

15  my left hand and its habit for me to use my right hand to

16  open and close doors.  When I reached for the trunk lid I

17  still had the gun in my left hand and grabbed it too hard and

18  it shot her.  I freaked out and started to run, but turned

19  back to see what happened to her and I knew she was gone so I

20  drove around all night drinking as if I told myself this

21  didn't happen and decided I was going to wait until my sister

22  left for work and the whole time my mind was telling me it

23  didn't happen.  The next morning I went to my sisters, parked

24  the car in the garage and put a shop vac hose in the tailpipe

25  and into the back window.  I layed in the front seat and

1  crank the car and before I fell unconscious the thought of my

2  niece and sister seeing me dead and discovering what had

3  happened would destroy them both.  So I left the house and

4  decided to go see an old friend Shod and my daughter and kill

5  myself at the country somewhere.  I bought beer in Terrell

6  and continued to block what had happened while drinking.  I

7  went to Shods and then went for more beer and whiskey and

8  intended to leave that night to commit suicide.  I got tired

9  because I had been up for 2 days and hadn't stopped drinking

10 yet.  I put Miss Bertie at the bottom of Livingston hill

11 cause the end of all this had come, but was not going to kill

12 myself untill I saw Alyssa.  Shod offered me a place to sleep

13 and I decided to sleep till morning see Alyssa and finish my

14 life.  While sleeping the police came in and arrested me.  To

15 all the people destroyed by this was not intentional and I'm

16 sure you wish me dead and I would wish the same.  I'm

17 cooperating so you understand I'm not trying to hide what

18 happened and the fact is I'm not an evil person who hurts

19 people."

20     Q.   First of all, I want to talk about the locations

21 that Mr. Murphy mentions there in State's Exhibit Number 47.

22 When he talks about going to Bleachers, I guess -- I believe

23 you've already told us that Bleachers is located in Garland;

24 is that correct?

25     A.   Yes, it is.

1    Q.   When he stated that he started walking down the road

2    beside Bleachers on my way to 635, what is the road that

3    fronts Bleachers?

4    A.   That is, I believe, Arapaho.

5    Q.   Now, Arapaho at that point is what, an east-west or

6    a north-south road?

7    A.   It's actually east -- east and west right at

8    Bleachers.

9    Q.   If we were to continue walking down east on Arapaho,

10   would there come a point when it would become actually a

11   north-south road?

12   A.   Yes, it does -- it does curve around.

13   Q.   Does it become -- does it actually curve into

14   another road that continues further south?

15   A.   It would -- I think it curves around and changes

16   names into North Garland.

17   Q.   If we were to continue on North Garland south, would

18   North Garland Avenue actually intersect LBJ which is 635?

19   A.   Yes, it would.

20   Q.   Now, the southern boundary for the City of Garland

21   in that location would be what?

22   A.   It is 635.

23   Q.   So that I understand, the area from Bleachers south

24   to 635, Detective, is that entire area located within the

25   City of Garland?

1      A.    Yes, it is.

2      Q.    Is all of that area located within Dallas County,

3  Texas, sir?

4      A.    Yes, it is.

5      Q.    Now, as a general rule when a suspect gives you a

6  statement, is he free to write whatever he wants to?

7      A.    Yes, he is.

8      Q.    Was Mr. Murphy free to write whatever he wanted to?

9      A.    Yes, he was.

10     Q.    When you saw State's Exhibit Number 47 and had an

11 opportunity to read it, sir, were you in a position at that

12 point to verify all of the information that he had just given

13 to you?

14     A.    No.  At the time I was receiving this statement, I

15 was not.

16     Q.    I want to go specifically to portions of that

17 statement.  First statement when he says, "I was drinking

18 heavily and decided I was going to visit my daughter and end

19 my life."  When he made that statement that he had been

20 drinking heavily, had you had an opportunity at that point to

21 talk with Kenneth Clance who is the bartender at Bleachers?

22     A.    No.

23     Q.    Were you aware of his observations of the defendant

24 when he got to Bleachers and when he left Bleachers?

25     A.    No, I was not.

1     Q.    Did you know how many drinks the defendant actually

2  had at Bleachers?

3     A.    No, I did not.

4     Q.    Were you aware of Mr. Clance's opinion that the

5  defendant was not intoxicated when he left Bleachers?

6     A.    No, I was not.

7     Q.    Secondly, when the defendant says in his statement

8  that he drove around all night, at that point when he gave

9  that statement back to you, were you aware that Ms.

10  Cunningham's card had been used twice at a ATM machine in

11  Richardson shortly after 4:00 p.m. on October the 4th?

12     A.    No.  At the time of this statement I was not aware

13  of that.

14     Q.    Were you aware that Ms. Cunningham, as well as Ms.

15  Conner's credit cards had been used at 11:30 p.m. and later

16  at approximately 4:30 a.m. at an ATM machine on Harry Hines

17  in Dallas?

18     A.    No.  At the time of this statement, I was not aware

19  of that.

20     Q.    Were you aware that the defendant had shortly after

21  using the credit card at the ATM machine, that he had picked

22  up several young people in Richardson and started giving them

23  rides around town?

24     A.    I'm sorry.  You have to ask me that again.

25     Q.    Were you aware that the defendant around 5:00 p.m.

1    on October 4th had actually started giving young people rides

2    in Ms. Cunningham's car?

3        A.    Yes.

4        Q.    Were you aware that the defendant had been at the

5    Richardson Motor Sports with two of those juveniles at

6    approximately 6:20 p.m.?

7        A.    Yes.

8        Q.    The statement that he went to his sister's house,

9    there was some discussion in that statement about certain

10   items, hoses and the like.  At that point had any items been

11   recovered from that house similar to hoses or vacuum hoses or

12   anything of that sort?

13       A.    No, not at this time.

14       Q.    Now, later were certain items recovered?

15       A.    Yes, they were.

16       Q.    Did you recover them yourself?

17       A.    I did.

18       Q.    Tell the members of the jury where those items

19   were.

20       A.    They were located in the garage of the residence.

21       Q.    What was the condition?  Were they all lined up neat

22   and nice, or were they scattered about, or what was the

23   physical appearance of those items when you first saw them?

24       A.    They were just laying on the floor in the garage.  I

25   wouldn't say that -- they weren't -- they weren't stored on a

1    shelf.  They were just laying on the floor, scattered on the

2    floor.

3        Q.    You work suicides before?

4        A.    Yes, I have.

5        Q.    Have you worked suicides where carbon monoxide from

6    a car has been used as the suicide weapon?

7        A.    Yes, I have.

8        Q.    What was your impression having worked suicides and

9    having seen these items on the floor, what was your

10   impression at that time?

11              MR. BYCK:  Your Honor, this is complete

12   speculation.  This man is nowhere an expert in suicide or in

13   those manners of taking one's own life.  He has not been

14   qualified as an expert.  No predicate has been laid.  We

15   object.

16              THE COURT:  Objection is overruled.

17       Q.    (By Mr. Davis)  What was your impression?

18       A.    Well, as I recall, I'm not -- I'm not sure that I --

19   that it made an impression on me personally right then and

20   there when I collected it.  I -- he said that he had used

21   those items in an attempt to commit suicide.  I was there to

22   collect those items.  I found them, collected them, brought

23   them to the police department.

24              MR. DAVIS:  Okay.  May I approach, Your Honor.

25              THE COURT:  You may.

1    Q.   (By Mr. Davis)  Detective Myers, first of all,

2    looking at State's Exhibit 40, is this a blue towel that you

3    obtained from the garage there at 1718 Barclay?

4    A.   Yes, it is.

5    Q.   State's Exhibit Number 39, is this a hose that you

6    obtained from the garage there at Barclay?

7    A.   Yes.

8    Q.   State's Exhibit Number 38, is this another hose that

9    you obtained from the garage there on Barclay?

10    A.   Yes, it is.

11          MR. DAVIS:  Your Honor, at this time we'll

12    offer State's Exhibits 38, 39, and 40.

13          (State's Exhibit No. 38 through 40 offered)

14          MS. BALIDO:  Judge, if we can look at them

15    just for a second.  No objection.

16          MR. BYCK:   No objection to State's Exhibit

17    38, 39, and 40, inclusive.

18          THE COURT:  Admitted.

19          (State's Exhibit No. 38 through 40 admitted)

20    Q.   (By Mr. Davis)  Where exactly did you find these

21    three items?

22    A.   All three were on the floor in the garage.

23    Q.   Were the hoses hooked up together, or do you recall?

24    A.   I don't recall.  I don't think they were, but I'm

25    not sure.

1      Q.    Now, when he said that he had gone to his sister's

2   house, were you aware of whether or not members of the

3   Garland Police Department had been over there to process the

4   bathroom for signs of blood evidence?

5      A.    Yes, I was aware of that.

6      Q.    Are there different methods that the police agencies

7   use to detect really blood that's not visible to the naked

8   eye?

9      A.    Yes.

10      Q.    What sort of methods are used?

11      A.    One of the methods that we use is a process chemical

12   called luminal.

13      Q.    And what does luminal do?

14      A.    Luminal is a chemical that if you were to spray it

15   on any surface, it might indicate whether or not there's

16   blood on that surface.  Even though that blood is not visible

17   to the naked eye, the luminal will make -- make the blood

18   glow in the dark and it's just a -- it's an indication that

19   there is blood there.  Could have been there for a long time,

20   and the luminal will tell you that it's been there.

21      Q.    Now, at the time that he gave this statement, did

22   you know whether or not forensics people from the Garland

23   Police Department had processed a bathtub at 1718 Barclay for

24   possible blood evidence?

25      A.    I had been told that, yes.

1    Q.    It's your understanding they used luminal?

2    A.    Yes.

3    Q.    Were you aware of the results of the luminal?

4    A.    I was told they were getting some -- some hits on

5    the luminal in the bathtub and the shower area.

6    Q.    Which would be consistent with what?

7    A.    Finding blood.

8    Q.    When the defendant told you that this was an

9    accidental shooting, you didn't have the results of any

10   autopsy at that time, did you?

11   A.    Did not.

12   Q.    You hadn't had an opportunity to talk with the

13   medical examiner, had you?

14   A.    Had not at that time, no.

15   Q.    Were you aware of the location of the shot that was

16   inflicted on Ms. Cunningham?

17   A.    No, I was not.

18   Q.    Were you aware of the possible distance of the shot,

19   just how close the end of the barrel would have been at the

20   time that it fired into Ms. Cunningham?

21   A.    At that time I was not aware of that.

22   Q.    Were you aware of whether or not Ms. Cunningham had

23   bruising on her body, specifically to her chest, her arms,

24   and her shoulder area?

25   A.    No, I was not.

1    Q.   This -- this statement, did it contain any

2    explanation for what my have happened to Ms. Cunningham's

3    watch?

4    A.   No, it does not.

5    Q.   Does it contain any explanation as to what happened

6    to Ms. Cunningham's ring?

7              MS. BALIDO:   Judge, I'm going to object at

8    this point as argumentative.

9              THE COURT:   Sustained.

10             MS. BALIDO:   Exhibit speaks for itself.

11   Q.   (By Mr. Davis)   Sir, when he told you that he can't

12   feel his left hand, at that point had you talked with any

13   coworkers of Mr. Murphy from either Terrell or Wills Point?

14   A.   At that time I had not, no, sir.

15   Q.   Had you reviewed any medical records belonging to

16   Jedidiah Isaac Murphy?

17   A.   No, I had not.

18   Q.   Had you talked with any of the doctors who may have

19   treated him in the past?

20   A.   No, I did not.

21   Q.   So you simply, as I understand, allowed him to write

22   what he wanted to and he signed off on it, correct?

23   A.   That's correct.

24   Q.   Now, after you had concluded taking the statement

25   from Mr. Murphy, at some point did you become aware that

1    attorneys had arrived at the police station on his behalf?

2        A.   Yes, I did become aware of that.

3        Q.   And what did you do as a result of that?

4        A.   My super -- my supervisor advised me that there were

5    attorneys at the police department to see Mr. Murphy, and I

6    immediately returned him to the book-in or to the jail area.

7        Q.   Make any other attempt to interview him that day?

8        A.   None at all.

9        Q.   Did you ever see the attorneys who were there at the

10   police station?

11       A.   Yes, I did.

12       Q.   Are either of them or any of them here in the

13   courtroom this afternoon?

14       A.   Yes, they are.

15       Q.   Would you please point him out -- please point them

16   out?

17       A.   This gentleman seated right here with the white

18   shirt and blue tie and the lady dressed in yellow.

19       Q.   I believe that you're referring to Mr. Byck and Ms.

20   Little; is that correct?

21       A.   Yes, sir.

22       Q.   Did you have any conversations with them that day?

23       A.   No, I did not.

24       Q.   Now, did you have an opportunity to observe the

25   physical condition or appearance of the defendant when you

1    went back there to the police station?

2        A.    Yes.

3        Q.    Had his demeanor, his appearance changed in any way?

4        A.    His demeanor changed quite a bit when we got to the

5    police department actually.

6        Q.    How did it change?

7        A.    Well, he -- he almost immediately was no longer

8    quiet and silent.  He immediately opened up, said that he

9    wanted to cooperate, was very talkative and easy to talk to

10   from that point on really.

11       Q.    When you bring a suspect in in a case like this, are

12   you trained to observe for possible injuries that they may

13   have sustained?

14       A.    Yes.

15       Q.    Did you do that with Mr. Murphy?

16       A.    Yes.

17       Q.    Were photographs taken to document his physical

18   condition that day?

19       A.    He would have been photographed that day in the --

20   in the book-in proceeding.  He was photographed again I think

21   the next day.

22       Q.    And are you aware of how he appeared at that time?

23       A.    Yes.

24            MR. DAVIS:  Your Honor, may I please approach.

25            THE COURT:  You may.

1      Q.   (By Mr. Davis)  Detective Murphy, looking --

2  Detective Myers, I'm sorry, looking at State's Exhibits 42,

3  43, 44, 45, and 46, do you recognize these to be photographs

4  of the defendant taken while he was in custody at the Garland

5  police station?

6      A.   Yes, they are.

7             MR. DAVIS:  Your Honor, at this time we will

8  offer State's Exhibits 42 through 46.

9             (State's Exhibit No. 42 through 46 offered)

10             MS. BALIDO:  Judge, before I lodge my

11  objections, may I take this witness on voir dire?

12             THE COURT:  You may.

13                  Voir Dire Examination

14  By Ms. Balido:

15      Q.   Officer, you stated that -- that pictures were taken

16  at two separate times at the Garland jail; is that correct?

17      A.   Yes.

18      Q.   They were taken when he first booked in?

19      A.   Yes.

20      Q.   And they were also taken at a later time?

21      A.   Yes.

22      Q.   So that would be probably some were taken on the 6th

23  of October and some were taken on the 7th of October?

24      A.   Yes.

25      Q.   When were State's Exhibit Number 42, 43, 44, 45, and

1    46 taken?

2        A.   I was sure about all of them except for one.   If

3    you'd show them to me again, I can tell you.

4                 MS. BALIDO:   May I approach the witness,

5    Judge.

6                 THE COURT:   You may.

7        A.   These were all taken on the second day.

8        Q.   (By Ms. Balido)   Okay.   So these were not -- these

9    pictures were not taken as part of the book-in procedure for

10   the Garland county jail -- I mean the Garland City Jail?

11       A.   Yes, ma'am, that's correct.

12       Q.   Okay.   Did -- before you took these pictures, did

13   you read him -- specifically before you took these pictures,

14   did you read him any Miranda warnings?

15       A.   Yes.

16       Q.   Okay.   And that was done on the 7th; is that

17   correct?

18       A.   Yes, ma'am, that's correct.

19       Q.   Okay.   So these were taken after the Miranda

20   warnings were taken -- I mean, were told to him on that

21   second occasion?

22       A.   Yes, ma'am.

23       Q.   And did you tell him at the time that you were

24   taking these pictures that these pictures could be used

25   against him?

1          MR. DAVIS:  I'm sorry, Judge, I'm going to

2    object.  This is outside of any requirement.  Miranda warning

3    is not required to take a photograph.

4          THE COURT:  What's the defense objection?

5          MS. BALIDO:  Judge, our objection is that at

6    the time that these were taken they were not taken on any

7    kind of routine procedure, but taken for the fact to be used

8    against him in court.  For taking -- the state of the

9    evidence is right now that when they were taken, he was

10   assigned counsel and that the Miranda warnings were given and

11   therefore -- and later -- well, he was assigned counsel at

12   that time.  He was then re-approached by the detective, and

13   the detective initiated contact, the result of which is these

14   pictures.  And we would object on those -- on that basis at

15   this point.

16         THE COURT:  The Court rules as a matter of law

17   the photographs are non-testimonial.  The 5th Amendment is

18   not applicable.  The defense objection is overruled.  They

19   are admitted.

20         (State's Exhibit No. 42 through 46 admitted)

21   Q.   (By Mr. Davis)  Detective Myers, looking at the

22   defendant today, has his appearance changed from -- from

23   October the 6th of the year 2000?

24   A.   Yes, it has.

25   Q.   Looking first at State's Exhibit Number 42, is this

1    a photograph of his face and his head as it appeared on

2    October 7th of last year?

3        A.    Yes, it is.

4                    MR. DAVIS:  Permission to publish, Your Honor.

5                    THE COURT:  You may.

6                    (Exhibit published to jury.)

7        Q.    (By Mr. Davis)  As you looked at Mr. Murphy that

8    day, did you note some possible injuries?

9        A.    Yes.

10       Q.    First of all, State's Exhibit Number 43, is this a

11   photograph showing the palm area of Mr. Murphy?

12       A.    Yes.

13       Q.    And are there some areas there of red that you

14   indicated as possible injuries?

15       A.    Yes, sir, there is.

16                   (Exhibit published to jury.)

17       Q.    (By Mr. Davis)  State's Exhibit Number 44, would

18   this be the back portion of his hands?

19       A.    Yes, it is.

20       Q.    And again, did you feel that there may be some

21   possible scratches or injuries here?

22       A.    Possibly, yes.

23                   (Exhibit published to jury.)

24       Q.    (By Mr. Davis)  Detective, had you had an

25   opportunity to observe the area around that creek where Ms.

1    Cunningham's body was found?

2         A.    Yes, I did.

3         Q.    And what was the general nature of that area, smooth

4    banks, sandy?

5         A.    Well, it was -- it was -- part of it was covered by

6    some dirt banks.   Other parts was some pretty jagged concrete

7    that had been dumped there.

8         Q.    State's Exhibit Number 45, would that be the right

9    elbow area?

10        A.    Yes.

11             (Exhibit published to jury.)

12        Q.    (By Mr. Davis)   State's Exhibit Number 46, does this

13   show the back and the -- as well as the left shoulder area

14   for the defendant?

15        A.    Yes, it does.

16             MS. BALIDO:   Judge, at this point we'd object

17   before he shows it to the jury, publishing it to the jury.

18   We'd object the way that the picture is situated it -- the

19   probative value of the picture is substantially outweighed by

20   the prejudicial effect and we object for that reason.

21             THE COURT:   Rule 403, the objection is

22   overruled.   Admitted.

23             (Exhibit published to jury.)

24        Q.    (By Mr. Davis)   Detective Myers, at your direction

25   did -- did certain members of the Garland Police Department

1   retrieve some receipts from Terrell, Texas, in connection

2   with this case?

3       A.   Yes.

4       Q.   Specifically, did they retrieve receipts from Cole

5   Mountain Restaurant and Cowboys Quick Stop in Terrell?

6       A.   Yes, they did.

7       Q.   That was done at your direction as the lead

8   investigator; is that right?

9       A.   Myself and my supervisors, yes, sir.

10           MR. DAVIS:   May I approach, Your Honor.

11           THE COURT:   You may.

12      Q.   (By Mr. Davis)  State's Exhibits 52 and 53, do you

13  recognize those as being the receipts that were retrieved at

14  your direction from Cole Mountain and Cowboys Quick Stop in

15  Terrell?

16      A.   Yes.

17           MR. DAVIS:   At this time we would offer

18  State's Exhibits 52 and 53.

19           (State's Exhibit No. 52 and 53 offered)

20           MR. BYCK:   No objection 52 and 53.

21           THE COURT:   Both admitted.

22           (State's Exhibit No. 52 and 53 admitted)

23      Q.   (By Mr. Davis)  State's Exhibit Number 52, the

24  receipt from Cole Mountain, does that appear to be for a

25  total of 25.28 with a five-dollar tip?  Does that seem to be

1   the indication there, sir?

2       A.   Yes, sir.  $25.28 and a five-dollar tip.

3       Q.   The signature down there at the bottom, can you make

4   out what that purports to be?

5       A.   No, I can't.

6       Q.   First initial, can you make that one out?

7       A.   It's a J.

8       Q.   Does there appear to be a second initial of C at

9   some point?

10      A.   Well, the second name appears to be C-u-n, and then

11  it kind of scatters off after that.

12      Q.   State's Exhibit Number 53, the receipt from Cowboys

13  Quick, is that for a total of $22.29?

14      A.   Yes, sir.

15      Q.   And again, the signature, would it be similar to the

16  one that was on the previous document?

17      A.   Yes, first initial J and the last name C-u and then

18  it kind of scatters off after that.

19      Q.   The credit card number shown on State's Exhibit

20  Number 52 of 5429 being the -- that's the merchant number,

21  the Discover Card 6011, and with the numbers following, sir,

22  does that appear to be the number that matches State's

23  Exhibit Number 5 which is Discover Card issued to Bertie

24  Cunningham?

25      A.   Yes, it is.

1    Q.   The credit card number shown for the Cowboys Quick

2    Stop receipt again, would that be the credit card matching

3    the Discover Card belonging to Bertie Cunningham?

4    A.   Yes, it is.

5    Q.   When you spoke with the defendant again about the

6    location of the abduction, the locations that he provided to

7    you, sir, were they all within Dallas County, Texas?

8    A.   Yes.

9    Q.   Did he ever indicate otherwise that he either

10   abducted or shot Ms. Cunningham anywhere outside of Dallas

11   County?

12   A.   No, he did not.

13   Q.   Thank you, Detective.

14            MR. DAVIS:  I'll pass the witness.

15            THE COURT:  May I see the attorneys at the

16   bench for a scheduling matter?

17            (Side bar discussion off the record.)

18            THE COURT:  5-minute break.

19            (Recess.)

20            THE COURT:  Visitors in the gallery, you may

21   be seated.

22        Sheriff, bring in the jury.

23            THE BAILIFF:  Yes, sir.

24            THE COURT:  Let the record reflect the jury is

25   returning to the courtroom at this time.

```
 1                    (Jury returned to courtroom.)

 2               THE COURT:  Jury may be seated.

 3          Mr. Murphy, counsel, visitors in the gallery, you

 4     may be seated.

 5          Ladies and gentlemen, a couple of the jurors have

 6     some travel commitments, so does this witness and but for

 7     that fact we would be adjourning, but because of some travel

 8     commitments he has, we will continue this afternoon until his

 9     examination has been completed

10                         Cross-Examination

11     By Ms. Balido:

12        Q.   Detective Myers --

13               MS. BALIDO: I'm sorry.  May it please the

14     Court.

15               THE COURT:  It may.

16        Q.   (By Ms. Balido)  Detective Myers, as you know, my

17     name is Jennifer and I represent Mr. Murphy in this case.

18     Okay?  I'm going to ask you some questions about your

19     testimony.  If you don't understand anything I'm asking you

20     or you need me to repeat something, I will.  All right?

21        A.   Yes, ma'am.

22        Q.   You testified in an examining trial regarding this

23     offense; is that correct?

24        A.   Yes, ma'am.

25        Q.   And that examining trial commenced on October the
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    24th, the year 2000; is that right?

2        A.    That sounds right.

3        Q.    Okay.  And that was done in front of the Honorable

4    Vickers Cunningham, a Judge here in Dallas County; is that

5    correct?

6        A.    I'd have to take your word for that.

7        Q.    Okay.  It was not in this court in front of this

8    Judge?

9        A.    No, it was not.

10       Q.    All right.  And do you recall --

11             THE COURT:  Ladies and gentlemen, a district

12   court is by law prevented from handling an examining trial in

13   a capital murder case.

14             You may continue.

15       Q.    (By Ms. Balido)  And do you recall that during that

16   examining trial you discussed with the defense attorney and

17   the prosecutor that the defendant in this case had made a

18   voluntary statement; is that correct?

19       A.    I believe so.

20       Q.    And you didn't have it with you at that time?

21       A.    No, I don't think I did.

22       Q.    And the Judge ordered you to --

23             MR. DAVIS:  I'm going to object.  This is all

24   irrelevant, has nothing to do with his testimony.

25             THE COURT:  Overruled.

1          MR. DAVIS:  It's improper impeachment.  I

2   don't know the purpose of this.

3          THE COURT:  Overruled.

4   Q.   (By Ms. Balido)  And you were asked to turn over a

5   copy of that voluntary statement; is that correct?

6   A.   Yes.

7   Q.   Okay.  And did you in fact fax a copy of that

8   voluntary statement over to either the D.A.'s office or to

9   the defense attorneys as requested by that Judge?

10  A.   Yes.  The District Attorneys Office had that

11  statement in their possession, yes, ma'am.

12  Q.   On that day?

13  A.   I don't believe they had it on that day, but it was

14  made available to them.

15  Q.   Okay.  And at that time in addition to the voluntary

16  statements, you also had additional statements from the

17  defense; is that correct?  From the defendant?

18  A.   At that time?

19  Q.   Yes, on the 24th --

20  A.   Yes.

21  Q.   -- of October?

22  A.   Yes.

23  Q.   But you did not make the defense attorneys aware of

24  that at that time?

25  A.   No.

1      Q.   Okay.  In fact, you did not make those statements

2  aware to defense counsel until Thursday of last week; is that

3  correct?

4      A.   That's when that testimony come out, yes, ma'am.

5      Q.   Let me ask you a little bit about your training.

6  Now, you go through training to become a detective; is that

7  correct?

8      A.   Yes.

9      Q.   And in fact you go through training to become a

10 police officer; is that correct?

11     A.   Yes, ma'am.

12     Q.   And did you take like criminology in college or --

13 or anything like that?

14     A.   I did, yes.

15     Q.   Okay.  And where did you take that schooling?

16     A.   Some of my schooling was in a college in Ohio, some

17 was here in the Dallas area.

18     Q.   Okay.  And was any of that schooling done up at the

19 University of North Texas?

20     A.   No.

21     Q.   Okay.  Let me ask you about -- and part of that

22 training has to do with dealing with the use of handguns and

23 their proper use and their safe use in handling certain

24 situations; is that correct?

25     A.   That's correct.

1     Q.    Okay.  Have you heard of a phenomenon that's called

2     sympathetic firing?

3     A.    No, I have not.

4     Q.    Okay.  Maybe you don't know it by that name.  Have

5     you heard of the phenomenon that sometimes police officers --

6     well, let me ask you this.  Were you ever trained in your

7     police training that if you are -- are handling a gun in your

8     hand, that you are not to do anything else with your other

9     hand like search down or pat down a defendant for the fear

10    that this gun over here might go off?

11    A.    Well, if you're asking me if I'm aware -- aware that

12    there is a possibility of an accidental discharge --

13    Q.    That's basically what I'm getting to.

14    A.    Yes.

15    Q.    Okay.  And you're trained -- or you have been

16    trained through the police academy or whatever -- did you go

17    through the Garland Police Academy?

18    A.    Yes.

19    Q.    They have their own Garland Police Academy, don't

20    they?

21    A.    Yes, they do.

22    Q.    All right.  And were you trained that one of the

23    ways to keep from doing an -- having an accidental discharge

24    occur, that you are not to hold your gun with one hand and do

25    something else with the other hand?

1    A.   Well, actually we are trained not to -- not to do

2  that, period.

3    Q.   Okay.  In fact, you're trained to -- let's say

4  you're holding a gun on somebody, and then something else --

5  someone needs to pat -- you need to pat someone down or maybe

6  search an area or search a pocket, that you're supposed to

7  actually holster your weapon before you do that?

8    A.   Yes.

9    Q.   Okay.  And that's so this accidental discharge does

10  not happen?

11    A.   Yes, ma'am.

12    Q.   But sometimes unfortunately it does in certain

13  combat or certain situations where maybe somebody doesn't

14  follow that procedure?

15    A.   I've never personally been involved with an

16  accidental discharge --

17    Q.   Right.

18    A.   -- but I've heard of them.

19    Q.   Okay.  So it's not something that's outside the

20  realm of possibility?

21    A.   No, it's not.

22    Q.   Okay.  Have you ever read any articles about it and

23  how this sometimes happens in situations with police

24  officers?

25    A.   Yes.

1    Q.   Okay.  You said that your first place really that
2  you went to in regard to your investigation on this case was
3  Collin Creek Mall; is that correct?
4    A.   After leaving the police department, yes, ma'am.
5    Q.   Right, after leaving the Garland Police Department?
6    A.   Yes, ma'am.
7    Q.   You drove to Collin Creek Mall; is that correct?
8    A.   Yes.
9    Q.   And that location is in Collin County, Texas?
10   A.   Yes.
11   Q.   All right.  And you testified that -- and I'm kind
12 of jumping around a little bit, and I apologize for that.
13 You testified that when you talked to Mr. Murphy, once you
14 got to the Garland Police Department, that you read him his
15 rights, he signed the waiver, and then y'all went out driving
16 in the car with Detective Tooke; is that correct?
17   A.   Yes.
18   Q.   And you drove around in all sorts of locations in
19 Dallas County, Texas, hoping to jar the defendant's memory as
20 to where he first met up with Ms. Cunningham; is that
21 correct?
22   A.   That's correct.
23   Q.   And at that time you testified that you could not
24 pinpoint any location in Dallas County, Texas, where Ms.
25 Cunningham and -- and Mr. Murphy first met?

1      A.    We did not establish a specific location.

2      Q.    In Dallas County, Texas?

3      A.    That's correct.

4      Q.    And do you know where she was shot?

5      A.    No, I do not.

6      Q.    Okay.  So through your investigation, you have not

7   been able to pinpoint any location in Dallas County, Texas,

8   where she was shot?

9      A.    That's correct.

10     Q.    You also testified, and I wrote it down, that once

11  he got to the police station, that Mr. Cunningham was very

12  cooperative -- I'm sorry, that Mr. Murphy was very

13  cooperative and he kind of -- his mood seemed to change; is

14  that correct?

15     A.    Yes.

16     Q.    So when you were driving around in the car

17  throughout the morning of the 6th of October with Detective

18  Tooke and Mr. Murphy in the car, was he trying to be helpful

19  or was he being evasive or what was the situation at that

20  point?

21     A.    He said that he was trying to be helpful.  He was

22  looking -- he would look at an intersection or a building.

23  He would tell me whether he recognized it or didn't recognize

24  it.  So he wants me to -- he leads me to believe that he's

25  trying to cooperate at that time.

1    Q.    Okay.  Now, let me kind of back up a little bit and

2  ask you a few questions about your other testimony.  Let me

3  direct your attention back to where you first got this call

4  from Deputy Rose of the Garland -- I mean, of the Van Zandt

5  County Sheriff's Department.  Okay.  Did you get -- get the

6  call that said that they had located the vehicle, or was that

7  Commander Lay?

8    A.    I think that was Commander Lay.

9    Q.    Were you in Commander Lay's presence when that --

10  that call was gotten?

11    A.    No, I was not.

12    Q.    Did you ever tell Gary Rose of the Van Zandt County

13  Sheriff's Department not to act on anything or try to arrest

14  Jim Murphy before y'all got out there?

15    A.    I never -- I never saw Gary Rose before in my life

16  until the night when we got to the Dairy Queen, so I had not

17  talked to him on the phone or met him before we got there in

18  Edgewood that night.

19    Q.    Okay.  Did you and Commander Lay ever discuss

20  whether or not you wanted the Van Zandt County Sheriff's

21  Department to handle basically what was your investigation?

22    A.    No, I didn't.  I did not talk to Commander Lay about

23  that.

24    Q.    Okay.  So once you met up with Detective Rose down

25  at the Dairy Queen, did y'all first go to the scene or did

1  y'all go to the house on Lamar?

2      A.   As I recall, we went right straight to the house.

3      Q.   All right.  And the first thing that caught your

4  attention was Ms. Cunningham's car sitting outside the

5  residence?

6      A.   I saw it, yes, ma'am.

7      Q.   And then you went in there and you talked to Mr.

8  Murphy; is that correct?

9      A.   Yes.

10     Q.   Okay.  Would you agree with me that Mr. Murphy

11 looked like a man who had just been woken up?  If that's the

12 correct term of wake.  Did he look woken up?

13     A.   Well, he was awake.  I didn't think that he was

14 drifting in and out of sleep, so, I really don't -- don't

15 recall or if I was even looking to see if he had -- had just

16 been awakened or not.

17     Q.   Okay.  Any indication once you walked in the room

18 that anyone -- either in the house or -- well, first let me

19 start with the house.  When you drove up to the house, was

20 there any indication on the outside of the house that there

21 had been a large amount of beer consumed at that location?

22     A.   I didn't personally see any evidence of that.

23     Q.   Did you personally see any evidence of any marijuana

24 that had been smoked out around the cars or the house?

25     A.   No, I did not.

1     Q.   When you entered the bedroom where Treshod Tarrant

2   and Jim Murphy had been sleeping, did you smell any alcohol

3   in or about that room?

4     A.   No, I did not.

5     Q.   Did you smell any remnants of the smell of marijuana

6   in or about that room?

7     A.   No, I did not.

8     Q.   Okay.  And you know what marijuana smells like so if

9   you smelled it, you'd know it?

10    A.   Yes, ma'am.

11    Q.   Now, you said that Mr. Murphy when you walked in was

12   awake and alert; is that correct?

13    A.   Yes.

14    Q.   Okay.  And also in your training as a Garland police

15   officer and a Garland detective, you're taught how to spot

16   signs of intoxication; is that correct?

17    A.   Yes.

18    Q.   And is it true or not true that sometimes people

19   that are used to drinking a lot or used to taking drugs a

20   lot, have what is called masking where they can mask the

21   symptoms of alcohol better than let's say someone that's

22   never had a drink before?

23    A.   I think that's possible, yes.

24    Q.   Okay.  And that there are certain tests that can be

25   run on a defendant or a suspect to determine whether or not

1    that person has ingested alcohol or -- or taken illegal

2    drugs; is that true?

3        A.    Medical tests?

4        Q.    Well, there are medical tests, but then there are

5    also things called field sobriety tests that are taught to

6    different police officers; is that correct?

7        A.    Yes.

8        Q.    Okay.  And have you been trained in those -- I know

9    it's been a long time since you're a detective, but have you

10   been trained in --

11              MS. LITTLE:  Since you were in patrol.

12              MS. BALIDO:  Well, I mean, since now he's a

13   detective.

14       Q.    (By Ms. Balido)  But since you were patrol, were you

15   trained in how to spot these things?

16       A.    Well, I think the field sobriety tests that I

17   received training in would be considered pretty primitive by

18   today's standards.  I haven't received any training in what

19   is considered -- used today for field sobriety.

20       Q.    Okay.  The cutting edge technology of what -- of the

21   field sobriety tests, you don't have any idea about?

22       A.    I have received no training in that.

23       Q.    So you haven't ever been taught about the horizontal

24   gaze nystagmus test?

25       A.    I never have received training in that.

1    Q.   Okay.  Or the vertical gaze nystagmus test?

2    A.   No.

3    Q.   Do you know what they are?

4    A.   I -- I have an idea of what they are, but I've

5    received no training in them.

6    Q.   Okay.  Basically they're tests not to show how much

7    alcohol or drugs are in the system, but actually that there

8    are drugs or alcohol in the system.  Is that what your

9    knowledge is of them?

10   A.   Well, I don't know that they conclude that there is

11   drugs or alcohol.  It's just an indication that there might

12   be.

13   Q.   Okay.

14   A.   As a result of the tests that are given.

15   Q.   Would that be something that was important to know

16   before you questioned someone regarding a capital murder?

17   A.   Well, I would -- I would want to try and determine

18   whether I thought that person was under the influence of

19   alcohol or drugs before I questioned them, yes.

20   Q.   Okay.  And -- and basically from what you did, you

21   looked at him and you didn't think he was intoxicated and you

22   kind of talked to him and you didn't think he was intoxicated

23   and so that was good enough for you?

24   A.   Yes, ma'am, it was.

25   Q.   All right.

1          COURT REPORTER:   Judge, I need just one

2     minute.   Thank you.

3          THE COURT:   You may continue.

4     Q.   (By Ms. Balido)   Detective Myers, at certain points

5     during your testimony, and it may just be a testimonial

6     thing, I don't know, that's why I'm asking, there are points

7     that you said you would have done this and you would have

8     done that in regard to what you did in this case.   Are you

9     testifying that basically -- I guess what I'm asking, are you

10    testifying that you followed all these procedures in this

11    case because you actually followed all these procedures in

12    this case, or is it because you were trained to do it that

13    way and you follow your training and you would have done that

14    if you followed your training?   Do you have independent

15    recollection of doing everything that you've testified to, I

16    guess, is what I'm asking in this case?

17    A.   Yes.

18    Q.   Let me ask you about the way that you advised Mr.

19    Murphy of his rights.   Okay.   Did you go through -- and this

20    is orally, as he's still sitting there on the bed

21    handcuffed.   Okay.   Did you read through or not really read

22    through -- did you recite to him the warnings like you did to

23    the jury today, or did you go through each little part and

24    then ask him if he understood that?

25    A.   I recited the whole entire warning and asked him if

1    he understood it at the end of the warning.

2        Q.   Okay.  And you remember with clarity that he said,

3    yes, he understood it?

4        A.   Yes.

5        Q.   Did you ask him if he wanted to waive his rights and

6    make any statement before you asked him the question where

7    are the credit cards?

8        A.   I don't believe I did.

9        Q.   Okay.  But -- so you just asked him the question,

10   and he told you?

11       A.   I asked him if he understood his rights, and after

12   he acknowledged yes, then I asked the question.

13       Q.   Okay.  Did he acknowledge yes by -- by lowering his

14   head, by shaking his head, or saying yes?

15       A.   Both.

16       Q.   All right.  But you did not ask him if he waived his

17   rights before you asked him the question?

18       A.   No.

19       Q.   Okay.  And you just asked him the question and then

20   he answered it?

21       A.   Yes.

22       Q.   And you stated on -- in your direct examination that

23   he said, "they're outside in her car."  Is that the exact way

24   that he put it?

25       A.   I'd have to look at my note.  That's the -- that's

1   basically what he said.  I have a written note of exactly

2   what he said, but -- and I'd have to look at that.

3        Q.   Okay.  Do you have your notebook of your notes or --

4        A.   Yes.

5             MR. DAVIS:  Let the record reflect I'm handing

6   Detective Myers his notebook that the Court had previously

7   reviewed.

8        A.   I made a notation at that time, and I put in

9   quotation marks "in her car, comma, outside."

10       Q.   (By Ms. Balido)  Okay.  And did you also make an

11  indication on there in quotation marks that he said yes and

12  nodded his head?

13       A.   No, I didn't -- excuse me, let me look at that

14  again.  No, I did not make a notation of that.

15       Q.   But you made a notation of what she exactly said?

16       A.   Yes, of what he exactly said.

17       Q.   I'm sorry, what he exactly said.

18       A.   Yes.

19       Q.   And you asked no other questions of the defendant at

20  that time; is that correct?

21       A.   That's correct.

22       Q.   When you say that you made -- well, first let me ask

23  you.  When you read him his Miranda warnings, did you tell

24  him what he was charged with?

25       A.   Yes.

1    Q.    Okay.  What did you tell him?

2    A.    I told him he was being placed into custody for the

3    credit card abuse warrant that we had obtained and also that

4    he was -- would be charged with investigation of murder.

5    Q.    Okay.  Investigation of murder and not capital

6    murder?

7    A.    I don't really recall whether I used the word

8    "capital murder" or just murder, but I knew -- I know that I

9    advised him of one or the other.

10   Q.    But you'll agree with me that there's a vast

11   difference between -- under Texas law of murder and capital

12   murder?

13   A.    Yes, there is.

14   Q.    One you can get the death penalty for, and one you

15   can't?

16   A.    That's correct.

17   Q.    Did you discuss any of that with Mr. Murphy as you

18   were advising him of his rights and what he was charged

19   with?

20   A.    No, I did not.

21   Q.    Did you at any time discuss with him the difference

22   between murder and capital murder -- well, did you at any

23   time discuss with him the difference in murder and capital

24   murder?

25   A.    We did have a -- we did have a conversation about --

1   about the death penalty.

2       Q.   Okay.  And when did that occur?

3       A.   That occurred actually I think during the first

4   interview at the police department.

5       Q.   And how did it exactly come up?

6       A.   He's the one that brought it up actually.

7       Q.   Okay.

8       A.   He's the one that started the conversation about the

9   death penalty.

10      Q.   Okay.  And was it after this conversation that he

11  decided -- was it before or after his written statement?

12      A.   That would have been before his written statement.

13      Q.   Okay.  And was there any kind of discussion as to

14  whether or not the State would seek the death penalty if he

15  confessed or not?

16      A.   Well, as I recall that conversation, I -- he's the

17  one that brought it up.  I told him that that was something

18  that really was not for me to decide, that I would present

19  the case to the District Attorneys Office, I didn't know

20  whether the District Attorneys Office would seek the death

21  penalty.  And it was during that time that he said that he --

22  he thought he wanted the death penalty at that time.

23      Q.   Okay.  And why was that?

24      A.   I really have no idea why he would say that.

25      Q.   Did that have anything to do -- did you think that

1   kind of fit in with what you knew at the time about his

2   mental problems?

3       A.   Well, at that time I really wasn't even aware of any

4   mental history at all.

5       Q.   Did that fit into what you learned later about his

6   mental condition?

7       A.   No.   I got the impression at the time that he said

8   that, that -- I don't know whether he was being remorseful

9   for what he had done, feeling sorry for himself or whatever,

10  but I didn't think that those statements were a result of any

11  kind of a mental problem that he was having.

12      Q.   Okay.   Did you -- did you think that was strange?

13      A.   No, it really didn't strike me as strange at the

14  time.

15      Q.   Okay.   Was it unusual in your experience as a police

16  detective that someone would want the death penalty?

17      A.   Well, I don't think I've ever -- I've never been

18  involved in a -- in another case prior to this that a person

19  would even have been eligible for the death penalty.

20      Q.   So this is your first capital murder trial?

21      A.   Yes.

22      Q.   Now, when you testified that you made no -- you

23  asked him no other questions and then you get in the car and

24  you started driving -- well, after you -- after you asked him

25  where are the credit cards and you went out to the -- you

1   went out to the car, I assume, or did you go out to the car

2   at that time?

3       A.   No, I did not.   I went outside and looked in the

4   car, but evidence was retrieved from the car and the car was

5   searched after I left so I did not see that.

6       Q.   Okay.   So you immediately left; is that correct?

7       A.   I left very shortly after that.

8       Q.   Okay.   And it was your testimony that was -- there

9   was no more kind of interrogation or question and answer that

10   went on from that time until at least you got to the Edgewood

11   Police Department where he was arranged -- arraigned; is that

12   correct?

13       A.   Yes, that's correct.

14       Q.   And where was he located in the car when you

15   actually made the trip?

16       A.   He would have been in the back seat behind -- on the

17   passenger side.

18       Q.   Okay.   Any other officer back there guarding him?

19       A.   No, there was not.

20       Q.   You were in the front seat?

21       A.   Yes.

22       Q.   And so was Detective Tooke?

23       A.   Detective Tooke was the driver of the car.

24       Q.   How long did it take you to get from the house in

25   Edgewood to the Edgewood Police Department?

1    A.    It's a pretty short drive, probably 5 minutes or

2    less.

3    Q.    Is that a proper police procedure to place someone

4    that's under arrest for I guess -- not arrest for credit card

5    abuse, but -- and murder, just to place him back there by

6    himself?

7    A.    Yes.

8    Q.    All right.  When you -- when you brought him out of

9    the house and put him in the car, did he try to run away?

10   A.    No, he did not.

11   Q.    Did he try to fight you in any way?

12   A.    No, he did not.

13   Q.    So you were driving in the car and he was in the

14   back seat and you said that he was very quiet -- very still

15   and very quiet.  So I am assuming that he was very quiet,

16   that you mentioned it twice on that ride over there?

17   A.    He was very quiet, yes.

18   Q.    Okay.  Did you ever check back there and see if he

19   was asleep?

20   A.    No, I did not.

21   Q.    Okay.  And you got down to the -- to the Edgewood --

22   and that's when he was arraigned on murder and capital

23   murder?  I mean, I'm sorry on the murder charge and the

24   credit card charge?

25   A.    I believe he was actually arraigned on the -- on

1    credit card and capital murder.

2        Q.    Okay.  I'm not going to try to split hairs with you,

3    but if the arraignment sheet says murder, will you agree with

4    that?

5        A.    Yes.

6        Q.    Okay.  Who went along with you besides Tooke to the

7    Edgewood Police Department?

8        A.    We were escorted by -- they were in separate

9    vehicles, but it was some officers from either Edgewood P.D.

10   or the Van Zandt County Sheriff's Department.

11       Q.    Okay.  It was more than one person in a car?

12       A.    I'm really not sure.  I don't know how many officers

13   were in the other cars or even what agencies they were from.

14   I was just directed to follow them.  I didn't know where the

15   Edgewood Police Department was so I was following another car

16   to get there.

17       Q.    Okay.  And once you left the Edgewood police station

18   and you went back out to Livingston Hill, before you went out

19   there did you ask him any questions regarding the gun?

20       A.    Well, he -- I had some indication that -- I think

21   the other officers had said that he had made a statement that

22   he had shot Ms. Cunningham and so I did ask him at that time

23   that -- if he would take us and show us where the gun was.

24   That was the purpose for returning to the creek.

25       Q.    Okay.  So -- so it wasn't your purpose to return to

1   the creek -- was that your first time out to the creek?

2      A.   Yeah, I think it was.  I don't know if I went to the

3   creek earlier.  I don't think I did.  I think it was my first

4   time down there.

5      Q.   Okay.

6      A.   If I had been there previously, it would only have

7   been for a minute and two, and I would have turned right

8   around and left.  I had other business to attend to.  I think

9   it was my first trip down there.

10     Q.   And when you asked him about the -- about the

11  weapon, did -- did he tell you that's where it was?

12     A.   Yes, he did.

13     Q.   Okay.  And he did that kind of cooperatively?  I

14  mean, you didn't have to force it out of him or anything?

15     A.   No, he was cooperating.  Yes.

16     Q.   And then once -- how long did it take you to get

17  from the Edgewood Police Department to Livingston Hill?

18     A.   Once again, it's a pretty short drive, less than 5

19  minutes.

20     Q.   And again, he was still and quiet?

21     A.   Yes.

22     Q.   Was he asleep?

23     A.   I don't believe that he was.

24     Q.   Okay.  Did you ever look back there to check?

25     A.   No, I did not.

1    Q.   Okay.  And then he got out to the Livingston Hill,

2  and he said that he wouldn't get out of the car?

3    A.   No, he did not want to get out of the car.

4    Q.   Okay.  So he had been cooperative up to that point?

5    A.   Yes.

6    Q.   And that he wouldn't get out of the car?

7    A.   Did not want to, no.

8    Q.   Did you have to force him to get out of the car?

9    A.   No, we did not.

10    Q.   Did you say -- did you tell him that he had to get

11  out of the car?

12    A.   No, we did not.

13    Q.   Did you just ask him to get out of the car, and he

14  wouldn't get out?

15    A.   Yes.

16    Q.   And did he tell you anything out there about where

17  the gun might be?

18    A.   Yeah, he -- I made it clear to him why we were

19  there.  It was to try and locate the gun.  And so I asked him

20  where -- where was the gun located.  And he said, "it's in

21  the water near her body."  And he indicated that he had

22  tossed it in and he was indicating to me like this, that he

23  had tossed it under hand into the water.

24    Q.   Okay.  So now he was not handcuffed?

25    A.   Well, I -- it must have been my hand then that was

1    indicating that he tossed it into the water.

2        Q.    Okay.

3        A.    So he was handcuffed the entire time.

4        Q.    All right.  And then you went out -- back from that

5    location to the Garland Police Department?

6        A.    Yes.  When we left the creek, we returned and drove

7    directly to the Garland Police Department from there.

8        Q.    And how long did that take?

9        A.    That's about -- it was -- traffic was extremely

10   light.  It was very early in the morning.  I'm going to

11   estimate it to be around 45 minutes, give or take 10 or 15

12   minutes.

13       Q.    And do you -- would still describe him as still and

14   quiet in the back seat?

15       A.    That entire time, yes.

16       Q.    Okay.  Was he asleep at that time?

17       A.    I don't know if he was or not.

18       Q.    Did you ever look back to check?

19       A.    No, I did not.

20       Q.    Did you ever -- so if he was laying down flat in the

21   back seat, you might not have seen that?

22       A.    That's possible that he could have been -- could

23   have done that.

24       Q.    Okay.  And was that consistent or inconsistent with

25   what he talked about later about -- in his statement about

1   driving around and drinking heavily for this long period of

2   time?

3       A.   Was what consistent?

4       Q.   Was -- was him being quiet and still in the back of

5   the car or let me just ask you.  Would be -- falling asleep

6   in the back of a police car be consistent with someone that

7   hadn't had a lot of sleep in the past 48 hours?

8       A.   Yes, could be.

9       Q.   And consuming alcohol for the past 48 hours?

10      A.   Yes.

11      Q.   Okay.  Let me ask you a little bit about this

12  book-in process at the -- at the Garland City Jail.  I would

13  assume that there are people other than police detectives

14  that book in people that are going into the jail; is that

15  correct?

16      A.   Yes.

17      Q.   So there are actually book-in procedure -- well,

18  people that are employed to carry out book-in procedures; is

19  that correct?

20      A.   Yes.

21      Q.   Okay.  So it was not your primary responsibility to

22  do all the things to book him into jail?

23      A.   No, it was not.

24      Q.   Basically you lead him up at a counter and they do

25  all the rest?

1      A.    That's correct.

2      Q.    Okay.  And were you there during the entire book-in

3   procedure for Mr. Murphy?

4      A.    I believe that I was, yes.

5      Q.    Okay.  And you said at any time he did not ask to

6   see the nurse?

7      A.    No.

8      Q.    Okay.  And he did not ask to see any doctor that

9   might be on staff out there in Garland?

10     A.    No, he did not.

11     Q.    He did not ask to see any kind of psychiatrist at

12  that time; is that correct?

13     A.    That's correct.

14     Q.    Okay.  Is there a place on the book-in records from

15  Garland City Jail to indicate whether or not somebody has

16  been -- had any mental problems before?

17     A.    I don't know if it's there.  It's a form that I have

18  never filled out.  It's filled out by the people that do the

19  processing, so I don't think that that's a question, but I

20  don't know if it is or not.

21     Q.    Okay.  Would that be something that would be

22  important to know before you start questioning somebody

23  regarding their involvement in a capital murder?

24     A.    I think that might be important, yes.

25     Q.    All right.  So once he gets booked in to the Garland

1    City Jail -- and let me kind of back up for a second.  Before

2    he actually got booked in, there was a period that he sat out

3    in the car, correct?

4        A.    At -- at the Garland Police Department?

5        Q.    Yes.  Is that true or not true?

6        A.    No, I don't think that occurred.

7        Q.    Okay.

8        A.    I don't have any recollection of that at all.

9        Q.    I just must have gotten mistaken.  I'm sorry.  So

10   once he gets booked into the jail, he's taken to another area

11   of the police department?

12       A.    Yes.

13       Q.    And this is where the interrogation rooms are?

14       A.    Yes.

15       Q.    What are they called?

16       A.    They're called interview or interrogation rooms.

17       Q.    Okay.  And are they set up in such a way -- it's a

18   small room, correct?

19       A.    Yes.

20       Q.    What's the dimension of it?

21       A.    It's approximately 12 feet by 12 feet.

22       Q.    And what is the furniture that's in the

23   interrogation room?

24       A.    There's a small desk in there for the purposes of

25   writing.  It stores some documents.  A couple of chairs.  If

1    extra chairs are needed, sometimes there might be three or

2    four people in that room.  If extra chairs are needed, then

3    we'll just grab a chair from another area and bring it in.

4        Q.    And when the door to that room is shut, is there any

5    way for anyone to see inside that room?

6        A.    No, there's not.

7        Q.    So it's not basically like we see on the TV shows

8    like Law & Order or one of those places where there's a big

9    one-way mirror so people can look in and see what's going on

10   on the other side of the glass?

11       A.    No, that's not there.  It does not exist.

12       Q.    Okay.  And there's -- can you tell me whether or not

13   there's the policy of the Garland Police Department to record

14   interviews with suspects by any sort of audio recording

15   device?

16       A.    No.  We do not have a policy that says you will or

17   will not record statements from a prisoner.

18       Q.    Has it ever been the policy of the Garland Police

19   Department to record interviews or interrogations or the

20   taking of a voluntary statement, audio or video?

21       A.    We have in the past had the capabilities of making

22   audio recordings.

23       Q.    And you no longer have that capability?

24       A.    That equipment no longer is there, yes, ma'am,

25   that's correct.

1      Q.   But you are issued or you do have in your ability, I

2   guess, to check out from whatever supply shed there is at the

3   Garland City Jail or the police department one of those

4   little hand-held recorders or Dictaphones that could take

5   down everything that happens inside an interview room?

6      A.   I have access to one of those, yes, ma'am.

7      Q.   Okay.  But you did not use your access to that when

8   you questioned Mr. Murphy?

9      A.   No, I did not.

10      Q.   Is there also video or audio visual equipment that

11   can record both the picture and the sound of what is going on

12   in the interrogation room?  Do -- first, let me ask you, is

13   there anything in there right now set up to do that?

14      A.   No, there's not.

15      Q.   Has there ever been anything like that in the past

16   in the Garland jail?

17      A.   No, there has not been.

18      Q.   Do you have such equipment available for other

19   reasons?

20      A.   Yes.

21      Q.   Okay.  And that would be for physical evidence

22   gathering, that sort of thing?

23      A.   Yes, we have a camera that is assigned to the

24   Forensics Unit.  We use it to videotape crime scenes.

25      Q.   But that -- it wasn't used in the crime scene of

1    this case?

2        A.   I -- I would imagine that it was maybe some

3    different -- different parts of the investigation, but I

4    don't know -- it's something that I didn't do.  Forensic

5    investigator would have done that and so I don't know -- I

6    don't know for sure if a videotape was made or not.

7        Q.   But basic -- but basically this equipment is

8    available at the Garland City Jail or the Garland Police

9    Department, but you did not use it to record your interview

10   with Mr. Murphy?

11       A.   No, we did not.

12       Q.   Okay.  And as you stated, there is really no policy

13   to use it or not use it?

14       A.   That's correct.

15       Q.   Have you ever been party to any discussions with

16   your superiors or with members of the District Attorneys

17   Office about the pros and the cons of actually recording a

18   interrogation?

19       A.   Yes.

20       Q.   Okay.  And what were the pros and the cons of that

21   that were discussed?

22       A.   Well, I think whether or not you make a tape

23   recording, whether it's audio or video, it boils down to a

24   matter of personal preference.  First of all, whether or not

25   the investigator that's doing the interview is comfortable

1   with that equipment being in the room and whether or not the

2   investigator would think that the person that's being

3   interviewed is going to be comfortable with that equipment.

4   Some people would be inhibited or even intimidated by the

5   fact that a camera is right on them while they're trying to

6   do an interview, and I know I personally would be.

7       Q.   Okay.   So basically it's a personal preference of

8   the investigator?

9       A.   Yes.

10      Q.   Would you agree with me that if there was an audio

11  or visual recording of an interview, let's just say a

12  hypothetical interview, that that might be the best way for a

13  third party, say a jury, to fully understand what happened

14  inside the interview room?

15      A.   Well, I've seen -- I've seen audiotapes of

16  interviews that I think would be very beneficial to a jury,

17  but I've also seen them where they just -- they're not

18  beneficial at all.

19      Q.   Okay.   Because they just basically didn't do

20  anything?

21      A.   Well, once again, I go back to the person that's

22  conducting the interview or the person that's being

23  interviewed would be extremely inhibited or sometimes

24  intimidated by that equipment sitting there.

25      Q.   So --

1      A.    So it kind of slows the process down.

2      Q.    And it might -- it might hinder your ability to get

3  a statement from a suspect in that regard?

4      A.    It could at times, yes.

5      Q.    Okay.  So basically what we're left with is we're

6  left with whatever ends up on the -- on the defendant's

7  voluntary statement, and it doesn't say confession.  It says

8  voluntary statement; is that correct?  And your testimony of

9  what happened inside the video room?

10      A.    Yes.

11      Q.    Let me ask you a little bit about how Mr. Murphy's

12  demeanor changed once you got inside the video room?  Were

13  there times that he cried?

14      A.    Yes.

15      Q.    Was it on more than one occasion?

16      A.    Yes.

17      Q.    And was it crying just tears or were there actual

18  boo-hoos or how -- how can you actually describe that?

19      A.    Well, I don't know that I've ever described someone

20  crying before.  He -- he did cry for more than just a second

21  or two, and I guess to use -- use your words that he was

22  boo-hooing.

23      Q.    Okay.  Or -- or would sob be a better word?

24      A.    Possibly, yes.

25      Q.    Okay.  And at the examining trial you described that

1    as a sign of remorse.  Do you remember describing it that

2    way?

3        A.   I don't really recall using those words, but if

4    they're in the record, I must have.

5        Q.   Okay.  I think I figured out where I got mistaken.

6    When you were at Livingston Hill or Livingston Creek or

7    whatever that area is called, was there a time that both you

8    and Detective Tooke got out of the vehicle?

9        A.   I know that I did.

10       Q.   Okay.  And was there a time that -- that Mr. Murphy

11   was left in the car by himself that you know of or do you

12   know?

13       A.   Well, I don't -- I don't believe that Detective

14   Tooke ever got out of the car.  If he would have, he would

15   never have left the side of the car, but -- but I walked away

16   from the car.  I know what I did there.

17       Q.   Okay.  You walked away from the car, and Detective

18   Tooke left -- you don't know really?

19       A.   That's right.

20       Q.   Okay.  Is he here to testify?

21       A.   I have not seen Detective Tooke today.

22       Q.   Okay.  Or any time this week?

23       A.   No.

24       Q.   After you got inside the -- the interrogation room,

25   was there anybody else in there with you?

1      A.    Yes.

2      Q.    The entire time?

3      A.    Yes.

4      Q.    And who was that?

5      A.    Detective Tooke.

6      Q.    Okay.  And he is the one that actually signed the

7    place where there's a place for a witness signature?

8      A.    Yes.

9      Q.    Okay.  Are you aware that in some police departments

10   it is the policy to have a civilian witness, a non-police

11   witness, witness the signing of a statement or the taking of

12   a statement?

13     A.    Yes.

14     Q.    Okay.  And do you know why that that policy is in

15   place?

16     A.    Well, I would suspect that that is in place so that

17   later on at trial the person that signed that statement, that

18   witness could then say that he wasn't intimidated by the fact

19   that there was only two police officers there, that there was

20   also a civilian witness there.

21     Q.    Okay.  But it's the policy of the Garland Police

22   Department not to do that?

23     A.    We've done it both ways actually.

24     Q.    Okay.  In this case you did it the way -- with two

25   police officers?

1    A.    Yes, ma'am.

2    Q.    And no civilian in the room?

3    A.    That's correct.

4    Q.    Let me ask you a little bit about the time that

5  the -- well, the time that all these things took place.

6  About what time was Mr. Murphy booked into the Garland jail?

7    A.    When he signed his -- the first Miranda warning at

8  8:52 in the interrogation room, so we probably arrived at the

9  book-in area approximately 8:30.

10    Q.    Okay.  And so my --

11              MS. BALIDO:  May I approach, please.

12              THE COURT:  You may.

13    Q.    (By Ms. Balido)  So these warnings were signed that

14  are reflected on State's Exhibit Number 41 at approximately

15  8:52 a.m. the morning of October the 6th; is that correct?

16    A.    Yes.

17    Q.    And then you went into the interrogation room and

18  you began discussing aspects of the case?

19    A.    Yes, this would have been done in the interrogation

20  room.

21    Q.    And about how long did that take?

22    A.    How long did what take?

23    Q.    The initial conversation in the -- in the

24  interrogation room?

25    A.    After this was done?

1    Q.   Yes.

2    A.   We talked for about 10 or 15 minutes.

3    Q.   Okay.  And then you left to go out into Garland?

4    A.   Yes.

5    Q.   And did you drive around in some of the area that's

6    reflected in State's Exhibit Number 3?

7    A.   Yes.

8    Q.   Okay.  And State's Exhibit Number 3 is what?  What

9    does it depict?

10   A.   It's a map of the Jupiter and Arapaho area.  Plano

11   Road is included on this map.  I can see an indication of

12   Bleachers -- indicating the Bleachers Sports Bar.

13   Q.   Okay.  And where is the Garland City Jail located in

14   relation to those -- location in Garland?

15   A.   From this area it would be generally south and east.

16   Q.   Okay.  How far south and how far east from what is

17   depicted on State's Exhibit Number 3?

18   A.   To the police department?

19   Q.   Yes.

20   A.   I'm going to guess it to be about 4 or 5 miles.

21   Q.   Okay.  And on October the 6th, what type of day was

22   that?  What time -- I mean, what -- was it Monday, Tuesday,

23   Wednesday, Thursday, Friday, or do you recall?

24   A.   I think October the 6th was a Thursday.

25   Q.   Would it surprise you that it's Friday, the 6th?

1      A.    No.

2      Q.    Okay.

3      A.    I think October the 6th was the -- and -- because I

4   do recall the 7th being Saturday, because it was my day off.

5      Q.    Okay.

6      A.    It was the second day of the investigation, so

7   October the 6th was a Friday, yes.

8      Q.    And how long do you think that it would take you to

9   get from the Garland City Jail, 4 to 5 miles north and west,

10  to the locations that are indicated on State's Exhibit Number

11  3?

12     A.    Well, if you were to take a direct route there, you

13  could -- you could drive there in 5 to 10 minutes.

14     Q.    Okay.  5 miles in 5 minutes?

15     A.    Uh-huh.

16     Q.    Were you in a marked police -- marked police car

17  with the lights on or -- or is that just regular -- regular

18  speed?

19     A.    That's driving the speed limit.

20     Q.    Okay.  And about how long did you drive around

21  during -- you said that you went to every major intersection

22  in that area; is that correct?

23     A.    Yes.

24     Q.    Okay.  And every -- did you just drive past every

25  major intersection one time or did you try to come by it a

1    second time to see if maybe that might jog Mr. Murphy's

2    memory or how did that really occur?

3        A.   Well, we started off driving at Mr. Murphy's

4    direction.  Once we got to Bleachers, established that that's

5    where he said he was, then he was leading us where to drive

6    and we were going down some streets that he was pointing to.

7    And we did that for a little while.  And then once I felt

8    like he had exhausted all of the areas that he recognized, we

9    started driving to some areas at my direction then.  And we

10   did drive to sometimes the same intersection two or three

11   different times from different angles, from different

12   directions.

13       Q.   So at first Mr. Murphy was the one directing you

14   around to the area around Bleachers; is that correct?

15       A.   Yes.

16       Q.   So it didn't really sneak up on him like you

17   testified earlier?

18       A.   No.  He directed us to the general area, and I

19   don't -- I don't recall testifying that it snuck up on us.

20       Q.   Okay.  But you -- you testified that you didn't

21   really talk about it and just drove past it to see whether or

22   not it would jog his memory?

23       A.   That's right.  When we -- when we got in the car, he

24   was telling us to go to this Bleachers area, this Bleachers

25   Sports Bar.  I knew where it was.  I knew where the area was

1    that he was talking about. And I wanted Detective Tooke who

2    was driving to drive past it because I wanted to see if Mr.

3    Murphy was familiar with that area and if he could stop us

4    and point it out to us, and he did when we drove past the

5    Bleachers, he said, "hey, you just drove past the place." So

6    then I was satisfied at that point that he -- he was familiar

7    with at least that area and knew what he was talking about

8    there.

9        Q.    Did he later indicate to you that he was not

10   familiar with other areas that you were going to?

11       A.    Yes, he did.

12       Q.    Okay. And so you thought he was being helpful at

13   that point?

14       A.    Yes, I did.

15       Q.    And cooperative at that point?

16       A.    At that point I did, yes, ma'am.

17       Q.    And did you think at that point that he was telling

18   you the truth when he was telling you these things?

19       A.    Yes, I did.

20       Q.    And what time did you get back to -- so you left 10

21   or 15 minutes after he signed the waiver, the first waiver,

22   correct?

23       A.    Yes.

24       Q.    And then you drove around for about how long when

25   you went to all these intersections a number of times?

1      A.    I think we drove around for about an hour, hour and

2    a half.

3      Q.    Okay.  And it took about 5 minutes to get there from

4    the Garland jail, so I assume it took about -- I mean, yeah,

5    about 5 minutes to get back?

6      A.    5 or 10 minutes, yeah.  We started -- probably less

7    time to get back, but once we -- we started drifting back

8    towards the police department.

9      Q.    Okay.  And so about this time -- what time do you

10   think that you got back to the Garland Police Department?

11     A.    I think we probably got back about 10:30.

12     Q.    Okay.  And is that based on your own recollection or

13   is that based on what you are assuming looking at the

14   paperwork that's in front of you, the waiver, the statements,

15   and also the voluntary -- the voluntary statement?

16     A.    Well, I can't say that I looked at a clock and made

17   a notation of the exact time that we arrived back, you know.

18   I'm using the times on the -- on these forms to refresh my

19   memory and estimate a time that we got back.

20     Q.    And at that point in your investigation you were

21   satisfied that he was trying to cooperate with you?

22     A.    Well, I don't know that I would say that I was

23   satisfied that he was cooperating, but I felt that he was --

24   he was trying -- trying to cooperate with us.

25     Q.    Okay.  And at that point you hadn't determined that

1    the -- as Mr. Davis called it, abduction occurred in Dallas

2    County, Texas, correct?

3         A.    Well, we had not pinpointed a specific location, but

4    I personally was satisfied that the abduction had occurred

5    within the city limits of Garland.

6         Q.    Okay.  And -- but you did not pinpoint any location?

7         A.    No, we did not.

8         Q.    And that was the same with the actual death?

9         A.    That's correct.

10        Q.    And so then you went back to the police department

11   and you -- did you immediately go back into the room with Mr.

12   Murphy?

13        A.    Yes.

14        Q.    And did Detective Tooke go back in?

15        A.    Yes, he did.

16        Q.    And how did it come about that the voluntary

17   statement was being written?

18        A.    Well, just as soon as we returned to the

19   interrogation room, then I asked Mr. Murphy if he would be

20   willing to provide the statement, and he said that he would

21   be.

22        Q.    Okay.  And that was -- that was the entirety of your

23   conversation?

24        A.    Yes.

25        Q.    And so how did it come about that -- that the rest

1    of it took place?

2        A.    Well, when he agreed to give the statement, I

3    brought the forms to him, asked him to read the warnings on

4    the top, told him that it was his statement, that he could

5    write whatever he wanted to write on it.  I told him that he

6    would be left alone during the period that he was going to

7    write.  It was his story to tell.  He could write whatever he

8    wanted to.

9        Q.    Let me ask you just a little bit about the procedure

10   of going in and out of the jail when you've got somebody

11   charged with murder.  Do you have to talk to your supervisor

12   before you leave the building with somebody that's charged

13   with murder?

14       A.    No.

15       Q.    Do you have to check in -- check out with anybody?

16       A.    No.

17       Q.    Does he have to book out of the -- of the Garland

18   City Jail?

19       A.    No.

20       Q.    So there's no records of when you went in -- left

21   the Garland jail and no records as to when you came back?

22       A.    Well, there are -- there are log-in sheets in and

23   out of the jail, but I'm not sure that they were even there

24   that day or that we used them.  They might be.

25       Q.    Okay.  But you don't know?

1      A.    I don't know.

2      Q.    And you don't have them in that big notebook of

3  yours?

4      A.    No, I don't have that with me.  No.

5      Q.    Okay.  And when you got back to the jail after

6  driving Mr. Murphy around, did anybody tell you that Mr.

7  Murphy had been assigned counsel out of this court?

8      A.    When we returned?

9      Q.    Yes.

10     A.    No.

11     Q.    Did anyone tell you that assigned counsel was on

12  their way to Garland?

13     A.    No.

14     Q.    And when did you first learn that Mr. Murphy had

15  counsel?

16     A.    We had completed the statement.  We had -- we were

17  continuing our conversations and either Commander Lay or

18  Lieutenant Thompson, I'm not sure which, I think it was

19  actually Lieutenant Thompson knocked on the door and

20  interrupted me, interrupted the interview, asked me to step

21  outside and I did.  And he informed me that there were

22  lawyers there in the building.

23     Q.    And did Detective Tooke stay in there with Mr.

24  Murphy?

25     A.    Yes.

1    Q.    And actually see you leave the room?

2    A.    Yes.

3    Q.    Okay.   And did Commander Lay know where you were at

4    all times that morning -- well, first was he in the building?

5    A.    Yes.

6    Q.    And did you tell him that you were going to go

7    interview Jedidiah Murphy at 8:53 that morning?

8    A.    Well, actually my first -- my chain of command

9    supervisor is Lieutenant Thompson, so I would have been

10   communicating with him.

11   Q.    Okay.   Did you tell him that you were going to take

12   Mr. Murphy into the -- into the interrogation room?

13   A.    I don't have -- I don't have recollection that I

14   did.

15   Q.    Okay.   Did you tell Lieutenant Thompson that you

16   were going to leave the building with him and go drive him

17   around and see if you could figure out where -- where any of

18   the events in this case took place?

19   A.    Well, I can't say right here today that I have

20   recollection that I did, but I'm sure I would have.   I

21   would -- every time I leave the building like that, I would

22   have notified my supervisor.

23   Q.    And did you notify your supervisor that you were

24   back in the building?

25   A.    When we came back to the building, I don't -- I

1   think the next time I saw Lieutenant Thompson was when he

2   knocked on the door.  So when we came back, we would have

3   gone not to his office, we would have gone to the

4   interrogation room.  So I don't really remember seeing him

5   again until he knocked on the door.

6       Q.   And how long was it from the time that you went back

7   into the interrogation room to the time that he knocked on

8   the door?

9       A.   Oh, Mr. Murphy had completed the statement.  We had

10  signed it.  We had just started talking some more about the

11  fact that he was having trouble finding that location when we

12  were out driving around, so it was very shortly after he

13  signed the statement.

14      Q.   And so that would be very shortly after what time?

15      A.   Very shortly after 11:30.

16      Q.   And at that time your supervisor, Lieutenant

17  Thompson, notified you that -- that his attorneys had been

18  there?

19      A.   Yes, that attorneys were there.

20      Q.   Okay.  Did Lieutenant Thompson tell you how long

21  they had been waiting there?

22      A.   No, he did not.

23      Q.   Did he tell you that they had been waiting there

24  over an hour?

25      A.   No, he did not.

1    Q.   Okay.  Did he tell you that his lawyers had

2    complained that they had not been granted access to Mr.

3    Murphy?

4    A.   No, he did not.

5    Q.   Did anyone ever tell you that?

6    A.   No.

7    Q.   Let me ask you about the location of this

8    interrogation room.  Is it on a floor other than the ground

9    floor of the Garland Police Department?

10   A.   Yes, it is.

11   Q.   Okay.  And to your knowledge did -- and tell me

12   where it's located inside the Garland -- I've been out there

13   to the Garland Police Department, but is it -- is it on the

14   second floor or the third floor --

15            THE COURT:  Counsel, excuse me, is this a

16   relevant matter germane to the assistance of the jury with

17   regard to contested fact issues?

18            MS. BALIDO:  Yes, it is, Judge.

19            THE COURT:  Okay.  Let's move on.  Wind it

20   up.

21   A.   Yes, ma'am, it's located on the second floor.

22   Q.   (By Ms. Balido)  And is it located next to the

23   detective -- the detective offices?

24   A.   Yes.

25   Q.   Okay.  Were you ever aware that detective -- you

Case 3:10-cv-00163-N Document 42-10 Filed 05/05/10 Page 254 of 515 PageID 6821

```
 1    know who Detective Delmar of the Garland Police Department

 2    is?

 3        A.    Yes, I do.

 4        Q.    And you are in -- and you know that -- that

 5    Detective Delmar's wife also works for Garland?

 6        A.    Yes.

 7        Q.    And she works at the front desk?

 8        A.    I believe so.

 9        Q.    To your knowledge, did she ever call upstairs and

10    try to get in touch with you at your desk to try to tell you

11    that Mr. Murphy's attorneys were there?

12        A.    No.

13        Q.    Okay.  After -- after you interviewed and got a

14    statement from Mr. Murphy on October the 6th, the year 2000,

15    and after you found out that he had counsel, did you approach

16    Mr. Murphy again about talking about the offense?

17        A.    Not on October the 6th.

18        Q.    How about on October the 7th?

19        A.    I did on October the 7th.

20        Q.    And did you -- and why -- what was the purpose of

21    questioning him on that day?

22        A.    The purpose for that was because we still did not

23    have the answer to a lot of questions.  We did not know the

24    abduction point.  We had not recovered the gun.  We did not

25    know where the shot had been fired.  And so there was a lot
```

1    of questions that were important to the investigation.

2         Q.   Do you know any of that information now?

3         A.   No, I do not.

4         Q.   After you spoke to Mr. Murphy on October the 7th,

5    the year 2000, did you talk to him again?

6         A.   Yes.

7         Q.   And was the purpose for talking to him again to

8    determine or to gain more information about the abduction

9    site, the site of the actual death, I guess is my question?

10        A.   Yes.

11        Q.   Did you have him sign Miranda warnings?

12        A.   Yes.

13        Q.   Okay.  Do you know that information after that

14   interview?

15        A.   You're going to have to ask me that again.

16        Q.   Did you find out any new information regarding the

17   location of the, quote, abduction site, or the location of

18   the death of Ms. Cunningham?

19        A.   No, we did not.

20        Q.   And when did that interview take place?

21        A.   We did an interview on October the 7th, the next

22   day.  We did another interview on October the 11th, and we

23   attempted to do a fourth interview on October the 13th.

24        Q.   And the fourth interview on October the 14th --

25        A.   13th --

1      Q.    -- did you --

2      A.    The 13th, yes, ma'am.

3      Q.    I'm sorry, the 13th.  Was that for the purpose of

4  determining the location of, quote, the abduction site and

5  the location of where she was killed?

6      A.    Yes.

7      Q.    Did you learn any new information about that at that

8  time?

9      A.    No, we did not.

10      Q.    And did you turn over any paperwork in regard to

11  those interviews or anything that Mr. Murphy might have

12  signed pursuant to the order of Judge Cunningham during the

13  examining trial?

14            MR. DAVIS:  I'm sorry, Judge Cunningham's

15  order was to turn over voluntary statements, State's Exhibit

16  Number 47, that was provided to counsel.

17            MS. BALIDO:  I'm just asking if he turned it

18  over, Judge.

19            THE COURT:  Is it turned over?

20            THE WITNESS:  Yes.  To my knowledge, it was

21  turned over.

22      Q.    (By Ms. Balido)  To the defense attorneys or the

23  District Attorneys Office?

24      A.    I turned it over to the District Attorneys Office.

25            MS. BALIDO:  Judge, I'll pass the witness.

1    <u>Redirect Examination</u>

2    By Mr. Davis:

3        Q.    Detective Myers, I just have a few questions very

4    briefly for you.

5            With regard to State's Exhibit Number 47, that was

6    the voluntary statement that you testified to concerning the

7    examining trial before Judge Cunningham, correct?

8        A.    Yes.

9        Q.    Now, Detective Myers, at any time did it appear to

10   you like the defendant had passed out during the time that

11   you were interviewing him in Edgewood or bringing him back to

12   the Garland police station prior to the time that you took

13   the voluntary statement from him?

14       A.    No, I didn't see any of that.

15       Q.    Is it unusual for suspects to cry after they've been

16   arrested?

17       A.    No, it's not.

18       Q.    Have you ever arrested anybody for capital murder

19   where the State could seek the death penalty?

20       A.    No, I have not.

21       Q.    When was the first time that the defendant cried in

22   your presence?

23       A.    I think he probably cried during the very first

24   interview.

25       Q.    Up there at the Garland Police Department?

1     A.    Yes.

2     Q.    By that time he was under arrest and had already

3    been arraigned in this case, correct?

4     A.    That's correct.

5     Q.    Ms. Balido asked you about your opinion concerning

6    the defendant's truthfulness while you were riding around

7    town with him on October the 6th.  Did your opinion

8    concerning his truthfulness change over time?

9     A.    Yes, it did.

10     Q.    And why did it change?

11     A.    I think he knows the answer to some questions that I

12    don't know the answers to.  There was quite a few questions

13    that he did not provide answers to us to.

14     Q.    Did you later determine that portions of his

15    statement turned out to be false, information that he gave

16    you?

17     A.    Yes.

18     Q.    Did you later try to determine whether he had been

19    drinking over at his sister's house prior to going to

20    Bleachers?

21     A.    Yes, I did try to determine that.

22     Q.    Were you able to determine that?

23     A.    I was able -- no, I was not.

24     Q.    Did any member of that household every bring over to

25    you a bottle of champagne, an empty bottle of champagne?

1    A.    No, they did not.

2    Q.    Anybody ever bring over to you an empty bottle of

3  Gilbey's gin?

4    A.    No.

5    Q.    How about an empty bottle of Tequila?  They ever

6  bring that over to the police station?

7    A.    No, they did not.

8    Q.    To your knowledge, was -- were any empty bottles of

9  liquor, such as gin or Tequila or champagne seized or found

10 inside the residence of 1718 Barclay?

11   A.    No, they were not.

12   Q.    The interview that occurred on October the 7th that

13 Ms. Balido has now referred to, you said that you had the

14 defendant sign Miranda warnings; is that correct?

15   A.    Yes.

16   Q.    Same type of printed form that you had used on

17 October 6th?

18   A.    Yes.

19   Q.    On October 7th, did the defendant indicate to you

20 that he did not want to talk with you because he had

21 attorneys appointed for him?

22   A.    No, he did not indicate that.

23        MR. DAVIS:  May I approach, Your Honor.

24        THE COURT:  You may.

25   Q.    (By Mr. Davis)  Detective Myers, looking at State's

1    Exhibit Number 48, is this the Miranda warnings that you gave

2    to the defendant on October 7, the year 2000?

3        A.   Yes, they are.

4                MR. DAVIS:   Your Honor, at this time for all

5    purposes now we'll offer State's Exhibit Number 48.

6                (State's Exhibit No. 48 offered)

7                MS. BALIDO:   Judge, just the -- Judge, is he

8    just -- just the Miranda warnings; is that correct?

9                THE COURT:   It's my understanding.   I've not

10   seen the document.

11               MR. DAVIS:   Yes, sir.   This is State's Exhibit

12   Number 48 that we've discussed previously, the Miranda

13   warnings, Your Honor.

14               THE COURT:   Defense have any objection?

15               MS. BALIDO:   No objection to the Miranda

16   warnings, Judge.

17               THE COURT:   Admitted.

18               (State's Exhibit No. 48 admitted)

19       Q.   (By Mr. Davis)   These Miranda warnings again

20   briefly, they contain the same Miranda warnings; is that

21   right?

22       A.   Yes.

23       Q.   Now, at the time that you talked with him on October

24   7, you had become aware of Ms. Little and Mr. Byck being at

25   the police department, correct?

1    A.    Yes.

2    Q.    As a result, did you take some further action with

3    regards to Miranda warnings on the 7th?

4    A.    Yes, I did.

5    Q.    What did you do?

6    A.    I included five additional questions on the Miranda

7    sheet.

8    Q.    Okay.  Reading those now, first of all, did you

9    write in your own handwriting:  Did you meet with a lawyer or

10   lawyers yesterday?  His response was yes; is that right?

11   A.    That's correct.

12   Q.    Second question that you asked of him was that, does

13   the lawyer represent you, and he answered yes; is that right?

14   A.    That's correct.

15   Q.    Thirdly, you asked, did the lawyers advise you not

16   to talk to police officers, and his response at that time was

17   no; is that right?

18   A.    That's correct.

19   Q.    The fourth question being, did the lawyers advise

20   you to cooperate with police officers, and his answer at that

21   time was yes; is that right?

22   A.    That's correct.

23   Q.    And fifthly, will you talk to police officers today,

24   and his response was yes; is that right?

25   A.    That's correct.

Case 3:10-cv-00163-N   Document 42-10   Filed 05/05/10   Page 262 of 515   PageID 6829

1     Q.   Had he indicated on that date that he did not want

2  to talk or that he had been advised not to speak with you,

3  what would you have done at that time, sir?

4     A.   Had he indicated that he did not want to talk to us,

5  we would have immediately returned him to the jail area.

6     Q.   Okay.  Now, on October the 11th, which has been

7  referred to by Ms. Balido, let me show you what has

8  previously been marked as Defendant's Exhibit Number 3.  I'll

9  now mark that as State's Exhibit Number 50.  Ask you to look

10  at that, sir.  Is that the Miranda warnings that you used

11  with the defendant again on October 11th?

12     A.   Yes, it is.

13     Q.   And they contain the same Miranda warnings again,

14  don't they?

15     A.   Yes, sir.

16     Q.   And at this time did the defendant agree to talk

17  with you, and did he in fact sign State's Exhibit Number 50?

18     A.   Yes, he did.

19          MR. DAVIS:  At this time, Your Honor, we will

20  offer State's Exhibit Number 50.

21          (State's Exhibit No. 50 offered)

22          MS. BALIDO:  I haven't seen it, Judge.  I

23  mean, I've seen it in the pretrial hearing, but I haven't

24  seen it recently.  Is it just the Miranda warnings?

25          MR. DAVIS:  Just the Miranda warnings.

1          MS. BALIDO:  Then we have no objection.

2          THE COURT:  Admitted.

3          (State's Exhibit No. 50 admitted)

4    Q.  (By Mr. Davis)  Finally, sir, looking at what has

5  previously been marked as Defendant Exhibit Number 4, now

6  marked as State's Exhibit Number 51, is this the Miranda

7  warning that you used on October 13, the year 2000?

8    A.  Yes, it is.

9    Q.  Now, is this the occasion where Mr. Murphy decided

10  or indicated to you that he didn't want to speak to you any

11  further?

12    A.  That's correct.

13    Q.  And this document is not signed by him; is that

14  right?

15    A.  No, it's not.

16    Q.  As a result did you try to continue any sort of

17  interrogation or discussion with the -- with the suspect?

18    A.  No, we did not.

19          MR. DAVIS:  Your Honor, at this time we'll

20  offer for all purposes State's Exhibit Number 51, the Miranda

21  warnings for October the 13th.

22          (State's Exhibit No. 51 offered)

23          THE COURT:  Defense have any objection?

24          MS. BALIDO:  No objection.

25          THE COURT:  Admitted.

1          (State's Exhibit No. 51 admitted)

2     Q.    (By Mr. Davis)  Finally, let me ask you about some

3  locations.  Richardson Motor Sports.  Are you familiar with

4  that location, sir?

5     A.    Yes.  Yes, sir, I am.

6     Q.    Is that a location in Dallas County, Texas?

7     A.    Yes, it is.

8     Q.    Are you familiar with the Washington Mutual branch

9  that's located at 1225 East Belt Line Road in Richardson,

10  Texas?

11     A.    Yes.

12     Q.    Is that a location in Dallas County, Texas?

13     A.    Yes, it is.

14     Q.    Finally, 1718 Barclay Drive in Richardson, Texas, is

15  that a location in Dallas County, Texas?

16     A.    Yes, it is.

17     Q.    Finally, 9620 Harry Hines Boulevard in Dallas,

18  Texas.  I believe a Racetrac convenience store is located

19  there.  Is that in Dallas County, Texas?

20     A.    Yes, it is.

21          MR. DAVIS:  Pass the witness, Your Honor.

22                   Recross-Examination

23  By Ms. Balido:

24     Q.    Detective Myers, let me ask you:  The last time that

25  you attempted to interview Mr. Murphy was on what day?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    October the 13th.

2    Q.    Okay.  And since October the 13th, do you have any

3    additional information that the abduction site is in Dallas

4    County, State of Texas?

5    A.    No.

6    Q.    Since October the 13th, do you have any additional

7    information that the site of Ms. Cunningham's death was in

8    Dallas County, State of Texas?

9    A.    No additional information.

10   Q.    Okay.  Or do you have any indication that the actual

11   shot that was fired that killed Ms. Cunningham was in Dallas

12   County, State of Texas?

13   A.    Only by Mr. Murphy's statements.

14   Q.    Okay.  Just -- but nothing new past the 13th of

15   October, the year 2000?

16   A.    No, ma'am.  That's correct.

17   Q.    And each one of those times that you went back to

18   talk with him, he was -- he was cooperative; is that correct?

19   A.    Yes.

20   Q.    And he did answer your questions; is that correct?

21   A.    Yes, he did.

22   Q.    In fact, on the face of State's Exhibit Number 48,

23   he said he had a lawyer, but he still wanted to talk to you;

24   is that correct?

25   A.    That's correct.

1      Q.   And did you initiate that conduct or -- that contact

2  with the defendant or did he write you a letter or indicate

3  to you that he wanted to talk to you on that date?

4      A.   I initiated that contact.

5      Q.   Okay.  Let me ask you a question.  Where did you

6  learn to write down on the bottom of a Miranda warning

7  these -- these additional warnings or questions?

8      A.   I can't say that I learned it anywhere specific.  It

9  was a matter of experience.

10      Q.   Okay.  Was it through the experience of other cases

11  that you worked through the Garland Police Department?

12      A.   I would just say it was my experience as a detective

13  that I knew that that might become an issue later, and I

14  wanted to address it on October the 7th.

15      Q.   Okay.  Did you know it was -- through your

16  experience do you know that it's an issue as to who initiates

17  the contact in that sort of situation?

18      A.   My experience with that would be that once he

19  indicates he no longer wants to talk to me, then I would

20  never try to initiate contact with him again from that point

21  on.  It would be his responsibility then.

22      Q.   And it is not true --

23      A.   To contact me.

24      Q.   I'm sorry, I didn't mean to interrupt you.

25           It is not your understanding that you making the

1    attempt to talk with him is a different situation than him

2    making the attempt to talk with you?

3        A.   You're going to have to ask that one again.

4        Q.   Okay.  In your experience as a Garland police

5    officer, you've stated that -- that you wrote down these

6    questions because you knew it could be significant, correct?

7        A.   I knew it could become an issue later, yes, ma'am.

8        Q.   Okay.  Could it also in your experience as a police

9    officer, do you know that it could also become an issue as to

10   whether or not you make the contact after counsel has been

11   appointed or that the defendant or the suspect makes the

12   contact that he wants to talk further?

13       A.   I believe that that could only become an issue once

14   he invokes his rights.

15       Q.   Okay.  But in your opinion he did not invoke his

16   rights based on the answers to these questions?

17       A.   That's correct.

18       Q.   Okay.  Does your experience with -- as being a

19   detective with the Garland Police Department that you based

20   your decision to write these questions down, does that

21   include talking with members of the District Attorneys

22   Office?

23       A.   No, I did not -- I did not talk to members of the

24   District Attorneys Office about -- about this Miranda sheet

25   on October the 7th.

1        MS. BALIDO:  Judge, I'll pass the witness.

2        MR. DAVIS:  No further questions.

3        THE COURT:  Thank you, Detective.  You may

4   step down.

5            Ladies and gentlemen of the jury, a matter came to

6   the Court's attention during one or more of the hearings

7   outside your presence this morning.  We were in here a

8   considerable amount of time.  A matter came to the Court's

9   contention -- attention about which will necessitate a

10  hearing so we're going to be here starting tomorrow morning

11  at 8:30.  You however need not be here until 10 o'clock

12  tomorrow morning.

13           Now, those of you on an individual basis as -- it's

14  your call, that can go to work, maybe return some phone

15  calls, handle some correspondence, do matters such as that,

16  you are allowed to do that.  You are not required to do it.

17  It's just let your conscience be your guide.  Whatever your

18  individual circumstances may be, it's up to you.  Please

19  though be back here at 10 o'clock.  We're going to be

20  resuming hearing matters that came to the Court's attention

21  which may or may not be brought to your attention, depending

22  upon evidence presented to me tomorrow morning and findings

23  of fact that I make in conclusions of law, may or may not be

24  brought to your attention.  At the conclusion of the trial, I

25  will explain to you what they are, regardless of what the

1   decision may be.

2            See y'all tomorrow morning 10:00 a.m.

3                 THE BAILIFF:  All rise.

4                 THE COURT:  Please again recall the

5   instructions with regard to the media.  Very professional

6   journalist is the young man in the front row to the far

7   right.  And I think Channel 11 is in the back row.  Give them

8   equal time, print and electronic media.

9                 (Recess of proceedings.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4            I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13           I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16           Witness my hand this the 28th day of October, A.D.,

17   2001.


18

19

20                      DARLINE W. LABAR
21                      Official Court Reporter
                        194th Judicial District Court
22                      Dallas County, Texas
                        (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002

1
REPORTER'S RECORD  **74145**

2
VOLUME 49 of 65 VOLUMES

3
TRIAL COURT CAUSE NO. F00-02424-NM

4
THE STATE OF TEXAS        :        IN THE DISTRICT COURT

5
VS.        :        DALLAS COUNTY, TEXAS

6
JEDIDIAH ISAAC MURPHY        :        194TH JUDICIAL DISTRICT

7
********************

8
TRIAL ON THE MERITS BY JURY

9
********************

**FILED IN**
**COURT OF CRIMINAL APPEALS**

DEC   5 2001

Troy C. Bennett, Jr., Clerk

10
A P P E A R A N C E S:

11
HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building

12
        Dallas, Dallas County, Texas   75207
        Phone:  214-653-3600

13
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200

14
        FOR THE STATE OF TEXAS;

15
MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500

16
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office

17
        Phone:  214-653-9400
        FOR THE DEFENDANT.

18

19
********

20
        On the 6th day of June, 2001, the following

21
proceedings came on to be heard in the above-entitled and

22
numbered cause before the Honorable F. Harold Entz, Jr.,

23
Judge presiding, held in Dallas, Dallas County, Texas:

24
        Proceedings reported by machine shorthand, computer

25
assisted transcription.

DARLINE W. LABAR,  OFFICIAL REPORTER        ORIGINAL

```
1                          INDEX VOLUME 49

2    June 6th, 2001                              PAGE      VOL.

3    Proceedings...................................... 2      49

4    State of Texas Rests........................... 240      49

5    Reporter's Certificate......................... 242      49

6

7                  CHRONOLOGICAL WITNESS INDEX

8                    DIRECT        CROSS        VD      VOL.

9    CHARLES MCKINNEY     11, 23        22                49

10   DR. JENNIE DUVAL     32            56                49

11   LANNIE EMANUEL       64, 70, 73    67, 71, 74        49

12   JAMES ROGERS         75, 148       129          84, 94

13                                      151          125     49

14   DAVID DAVENPORT      154           161                49

15   JOHN DONAHUE         162           173                49

16   SHIRLEY BARD         178                              49

17   HARLAN BAILEY        186           191                49

18   DR. WILLIAM VANDIVER 192                              49

19   KIRSTEN ADAMES       221                              49

20

21                  ALPHABETICAL WITNESS INDEX

22                    DIRECT        CROSS        VD      VOL.

23   KIRSTEN ADAMES       221                              49

24   HARLAN BAILEY        186           191                49

25   SHIRLEY BARD         178                              49
```

| | | | | |
|---|---|---|---|---|
| 1 | DAVID DAVENPORT | 154 | 161 | 49 |
| 2 | JOHN DONAHUE | 162 | 173 | 49 |
| 3 | DR. JENNIE DUVAL | 32 | 56 | 49 |
| 4 | LANNIE EMANUEL | 64, 70, 73 | 67, 71, 74 | 49 |
| 5 | CHARLES MCKINNEY | 11, 23 | 22 | 49 |
| 6 | JAMES ROGERS | 75, 148 | 129 | 84, 94 |
| 7 | | | 151 | 125 | 49 |
| 8 | DR. WILLIAM VANDIVER 192 | | | 49 |
| 9 | | | | |

EXHIBIT INDEX

| | STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|---|
| 11 | | | | | |
| 12 | 2 | Autopsy Photo | 55 | 55 | 49 |
| 13 | 31 | Crime Scene Photo | 84 | 85 | 49 |
| 14 | 32 | Crime Scene Photo | 84 | 85 | 49 |
| 15 | 33 | Crime Scene Photo | 84 | 85 | 49 |
| 16 | 34 | Crime Scene Photo | 84 | 85 | 49 |
| 17 | 54 | Autopsy Report | 36 | 36 | 49 |
| 18 | 55 | Autopsy Photo | 41 | 41 | 49 |
| 19 | 58 | Autopsy Photo | 41 | 41 | 49 |
| 20 | 59 | Autopsy Photo | 41 | 41 | 49 |
| 21 | 60 | Autopsy Photo | 41 | 41 | 49 |
| 22 | 61 | Autopsy Photo | 41 | 41 | 49 |
| 23 | 62 | Autopsy Photo | 41 | 41 | 49 |
| 24 | 63 | Autopsy Photo | 41 | 41 | 49 |
| 25 | 63A | Bullet | 53 | 54 | 49 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 65 | Addison Harrington | 205 | 205 | 49 |
| 2 | 66 | Bank Records | 239 | 239 | 49 |
| 3 | 69 | Vandiver Records | 194 | 194 | 49 |
| 4 | 70 | Kaufman Hosp. Records | 196 | 196 | 49 |
| 5 | 71 | Hospital Records | 210 | 210 | 49 |
| 6 | 72 | Dr. Dehaan Records | 210 | 210 | 49 |
| 7 | 73 | Wadley Hospital | 210 | 210 | 49 |
| 8 | 74 | St. Michaels Records | 210 | 210 | 49 |
| 9 | 75 | Photo of Bathtub | 210 | 210 | 49 |
| 10 | 77 | Photo of Honda | 88 | 88 | 49 |
| 11 | 78 | Photo of Honda | 88 | 88 | 49 |
| 12 | 79 | Photo of Honda | 88 | 88 | 49 |
| 13 | 80 | Photo of Honda | 88 | 88 | 49 |
| 14 | 81 | Photo of Honda | 88 | 88 | 49 |
| 15 | 82 | Photo of Honda | 88 | 88 | 49 |
| 16 | 83 | Photo of Honda | 88 | 88 | 49 |
| 17 | 83A | Tan Purse | 93 | 93 | 49 |
| 18 | 84 | Photo of Honda | 88 | 88 | 49 |
| 19 | 85 | Photo of Honda | 88 | 88 | 49 |
| 20 | 86 | Brown Leather Wallet | 93 | 94 | 49 |
| 21 | 88 | Insurance Card | 96 | 97 | 49 |
| 22 | 89 | Church Offering | 96 | 97 | 49 |
| 23 | 90 | JCPenney Receipt | 97 | 97 | 49 |
| 24 | 91 | JCPenney Bag | 100 | 100 | 49 |
| 25 | 91A | Blue Robe | 100 | 100 | 49 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 91B | JCPenney Bloody Bag | 101 | 101 | 49 |
| 2 | 91C | White t-shirt | 102 | 102 | 49 |
| 3 | 93 | Dillard's Plastic Bag | 99 | 100 | 49 |
| 4 | 94 | Dillard's Receipt | 97 | 97 | 49 |
| 5 | 97 | Duffle Bag | 150 | 150 | 49 |
| 6 | 98 | Suitcase w/clothing | 149 | 150 | 49 |
| 7 | 99 | Receipt | 105 | 105 | 49 |
| 8 | 101 | Checkbook Cover | 106 | 106 | 49 |
| 9 | 102 | Checkbook Register | 106 | 106 | 49 |
| 10 | 103 | Citizens Bank Receipt | 107 | 107 | 49 |
| 11 | 104 | Defendant's ID Card | 108 | 108 | 49 |
| 12 | 105 | Wizard's Card | 108 | 108 | 49 |
| 13 | 106 | Cowboy's Receipt | 112 | 112 | 49 |
| 14 | 107A | Check Receipt | 113 | 114 | 49 |
| 15 | 107B | Check Receipt | 113 | 114 | 49 |
| 16 | 107C | Check Receipt | 113 | 114 | 49 |
| 17 | 107D | Check Receipt | 113 | 114 | 49 |
| 18 | 107E | Check Receipt | 113 | 114 | 49 |
| 19 | 109 | Dr. Lee Paper | 110 | 110 | 49 |
| 20 | 110 | Featherston's Card | 109 | 109 | 49 |
| 21 | 111 | Lynk Systems Paper | 112 | 112 | 49 |
| 22 | 112 | Yellow Paper | 111 | 111 | 49 |
| 23 | 113 | Yellow Paper | 111 | 111 | 49 |
| 24 | 114A | Money Order Receipt | 111 | 112 | 49 |
| 25 | 114B | Money Order Receipt | 111 | 112 | 49 |

| 1  | 115 | Print (Hood)           | 118 | 118 | 49   |
|----|-----|------------------------|-----|-----|------|
| 2  | 116 | Print (Rear Window)    | 118 | 118 | 49   |
| 3  | 117 | Print (Rear Window)    | 118 | 118 | 49   |
| 4  | 118 | Print (Door Handle)    | 118 | 118 | 49   |
| 5  | 119 | Print (Cigarette Pkg)  | 118 | 118 | 49   |
| 6  | 120 | Prints from Jail       | 123 | 123 | 49   |
| 7  | 121 | Pkg. Cigarettes        | 105 | 105 | 49   |
| 8  | 122 | Pkg. Cigarettes        | 105 | 105 | 49   |
| 9  | 123 | Trash Bag of Clothes   | 150 | 150 | 49   |
| 10 | 124 | Duffle Bag w/clothes   | 151 | 151 | 49   |
| 11 | 125 | Claim's Interview      | 235 | 235 | 49   |

| 12 | DEFENDANT'S |              | OFFERED | ADMITTED | VOL. |
|----|-------------|--------------|---------|----------|------|
| 13 | 9           | Dr. Duval Letter | 62  | 62       | 49   |

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  This hearing will be conducted in

3    open court, outside the presence and hearing of the impaneled

4    jury and the alternate.

5          Let the record reflect the defense, during trial,

6    has presented the Court a Motion to Suppress items seized

7    from the defendant's cell at the Dallas County Jail.  The

8    Court has had tendered to it for in camera inspection a

9    packet of materials allegedly consisting of those materials

10   that were seized from the cell in which the defendant,

11   Jedidiah Isaac Murphy, was housed at the time of the seizure.

12   An in camera inspection of those items that have been

13   presented to the Court include and are limited to the

14   following:  A number of letters and cards that were sent to

15   Mr. Murphy while he was in the Dallas County Jail reportedly

16   from relatives or friends of Mr. Murphy.  There is also a

17   religious tract of approximately 50 or so pages that are

18   somewhat of a workbook with regard to one's individual study

19   of the Holy Bible.  Also contained within the packets of

20   materials are three handwritten pages, purportedly, though I

21   know not to be certain, in the hand of Jedidiah Isaac Murphy,

22   written to his attorneys.  That comprises the materials that

23   the Court has received.

24          Absent counsel for either side dictating the

25   contrary into the record, I assume and it is merely an

DARLINE W. LABAR, OFFICIAL REPORTER

1    assumption, that the seizure of the materials about which I

2    made reference was absent a search warrant; am I correct?

3                   MS. MILLER:  Yes, you are correct, Your Honor,

4    and I don't know if you would like this Dallas County

5    Sheriffs Department report by Detective Allwardt from the

6    Physical Evidence Section marked as an exhibit.  For record

7    purposes, the last line on the first page --

8                   THE COURT:  Have you shown it to the defense?

9                   MS. MILLER:  I gave them a copy.

10                  MS. BALIDO:  This morning, Judge.  This is the

11   first time we've seen it, and that's not her fault.

12                  MS. MILLER:  They had subpoenaed all the

13   defendant's records so there we had no reason to believe they

14   did not already have this.  I received this from Sergeant

15   Lachman when I interviewed him, I believe it was last week or

16   the week before.  The last sentence on that report shows who

17   collected it and why they collected it, Your Honor.  The

18   State had no knowledge of the collection until I received

19   this report from Sergeant Lachman.  And it was at that time,

20   because it was not in any of the reports that had already

21   been tendered to Mr. Davis from the Sheriff's Department,

22   when I obtained that.  That is when we found out that they

23   had in fact seized these papers.  And other than what is in

24   the report, we had no knowledge as to what these papers

25   were.  That is when we went down to find out since it said

1    they believed they were related to the suicide attempt.

2                    THE COURT:  With regard to those matters about

3    which the Court has dictated into the record, has the State

4    read every one of those documents about which the Court has

5    made reference?  Perhaps not the religious tract, but the

6    notes from purported family members or friends and the

7    handwriting document, three pages in length, purportedly

8    written by Mr. Murphy?

9                    MR. DAVIS:  The -- I can represent to the

10   Court that Ms. Miller and I went down.  We first looked

11   through the notes that appeared to be from family members.

12   Now, we did read those.  We did in fact ask the Sheriff's

13   Department to make copies of those letters for us.  They

14   indicated there was another packet.  I looked at that other

15   packet.  Ms. Miller did not.  I did -- I briefly scanned

16   through some of that tract material, religious lessons or

17   whatever they appear --

18                   THE COURT:  Journey into Discipleship?

19                   MR. DAVIS:  Yes, sir, just to make sure that

20   all of them were consistent and all of them did deal with the

21   same subject matter.

22                   THE COURT:  All right.

23                   MR. DAVIS:  And they did appear to be so.  Did

24   not ask the Sheriffs Department to make a copy of that for

25   me.  I did glance over the other three handwritten pages to

1   determine again if they were related to this suicide or not.

2   And I noted that the date on that -- I have not viewed that

3   since the date that we went down to the physical evidence

4   room, but my recollection was that there was a date on there

5   from some time ago, either October or November of last year.

6                THE COURT:  On page 3, for purposes of the

7   record, there is in handwriting made by I know not whom

8   10-21-00, which I take to be October 21st, the year 2000.

9                MR. DAVIS:  Yes, sir.

10               THE COURT:  That's the only date that I have

11  seen on --

12               MR. DAVIS:  Yes, sir.

13               THE COURT:  Basically the three pages

14  purportedly written by Mr. Murphy about which the Court at

15  this stage has the most concern.

16               MR. DAVIS:  Yes, sir.

17               THE COURT:  For a couple of reasons.  Number

18  one, search and seizure problems, if there be any.  And,

19  number two, attorney-client privilege.

20               MR. DAVIS:  I looked at that, and I did note

21  the same date -- the same that the Court had noted.  I did

22  not see -- now, the other matters had been addressed -- his

23  letters, there were envelopes accompanying those letters.

24  There were no envelopes accompanying those three pages as I

25  recall.

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1                THE COURT:  Correct.  Correct.

 2                MR. DAVIS:  I didn't see an address addressed

 3     as a letter or a kite or any jail communication, and I am

 4     familiar with that having represented clients in jail.  I

 5     could not determine from a first glance whether they were a

 6     letter, whether they were notes.  I did note, though, at some

 7     stage, and I can't recall at what point in that, that they

 8     did relate -- it appeared to me to the examining trial that

 9     had occurred sometime contemporaneous with those notes.  I

10     glanced at them.  I did not have the Sheriff's Department

11     make a copy of that because it didn't --

12                THE COURT:  The three pages?

13                MR. DAVIS:  Yes, sir.

14                THE COURT:  Of handwriting?

15                MR. DAVIS:  I did not have copies of that

16     document made.  I have never had copies made of those

17     documents.

18                THE COURT:  Have you, after glancing or

19     reading or perusing those three documents, Mr. Davis,

20     utilized any of the contents of that material in trial

21     preparation?

22                MR. DAVIS:  No, sir, because again, my

23     recollection of what I did see was that it was -- essentially

24     it was an allegation that Detective Myers had not been

25     truthful during the examining trial.  That was the gist of
```

```
 1    what I got from looking at that document, but I --

 2                THE COURT:  I have not seen the entire

 3    transcript of the examining trial, but there are references

 4    made about the conformity of the table and a microphone --

 5                MR. DAVIS:  Right.

 6                THE COURT:  -- and some allegations of that

 7    nature.

 8                MR. DAVIS:  Right.

 9                THE COURT:  I concur with the State.

10                MR. DAVIS:  No, sir.  I didn't -- I didn't see

11    anything to utilize.

12                THE COURT:  All right.

13                MR. DAVIS:  Didn't see a need to have a copy

14    made, and so at the time the only copies that were made were

15    of the relatives' notes back to the defendant.  And again, my

16    recollection there is that there was nothing in there other

17    than there was talk about a family history and some medical

18    problems that -- as I recall, I think that the individual

19    writing to his mother, some sort of suicide or some sort of

20    health problems that she was undergoing.

21                THE COURT:  Ms. Balido, do you recall when you

22    joined the defense team?  Then I'll tell you why I ask the

23    question.  The reason I -- why you're thinking --

24                MS. BALIDO:  Maybe late December, Judge.

25                THE COURT:  The reason I made reference to
```

1    that, the first page begins, "Michael and Jane, parenthesis,

2    sorry if I've offended you by using your first names," so I

3    would assume that the letter was -- or the documentation was

4    generated prior to your coming on board on behalf of the

5    defense.

6              MS. BALIDO:  Yes, that would be correct.

7              THE COURT:  Has the defense read or seen --

8              MS. BALIDO:  No, sir.  We haven't seen

9    anything.

10             MR. BYCK:  No, Your Honor.

11             THE COURT:  On the occasions that you have

12   been up to visit with Mr. Murphy, he's never shared the

13   contents of this document with you, either post-examining

14   trial, prior to trial, or at any time?

15             MR. BYCK:  Your Honor, to be perfectly candid

16   with the Court, we did not look at the material that was

17   given to us by the Sheriff yesterday and marked as

18   Defendant's Exhibit Number 6.  We did not open that envelope

19   because we did not want to be accused of adding something to

20   it or taking anything away from it.

21             THE COURT:  Before we begin the hearing, let

22   me invite the defense now to examine these materials which I

23   have -- those are the entirety of the materials that were

24   presented to me by Mr. LaPere in the defense presence.

25             MS. BALIDO:  Judge, also in regard to the

1   report tendered by counsel, we would object to the Court

2   considering the truth of the matter asserted in that report

3   for purposes of findings of facts and conclusions of law in

4   this hearing, and -- and we would like to be heard --

5                THE COURT:  Fine.  That's the purpose of this

6   hearing.  We're going to air it all out.

7                MS. BALIDO:  Okay.  And so we would -- since

8   we did not know this document existed, although we did issue

9   a subpoena from the Sheriff's Department to turn over any and

10  all reports regarding any incident in the jail regarding our

11  client, I would --

12               THE COURT:  Well, we may be making a mountain

13  out of a molehill.  I'm not suggesting we are.  Let me invite

14  the defense to examine those materials.

15               MR. BYCK:  Let me go xerox this.  It will make

16  it easier for us --

17               MS. BALIDO:  Judge, my only concern is that if

18  there's a search and seizure, the true -- the issue of

19  whether or not these things were seized related to a suicide

20  attempt and the policies of seizing these items in a suicide

21  attempt may become an issue in the trial.  And just like

22  leave of the Court, if I could try to go get in touch with

23  Deputy Branch or Deputy -- or Detective Allwardt.

24               THE COURT:  Fine.  You -- we are going to

25  begin -- continue the trial on the merits at 10 o'clock.  I

```
 1   have given you an hour and a half.  I would ask that you --
 2              MS. BALIDO:  Judge, I don't understand -- I
 3   don't understand what I can do other than call him the second
 4   I get this report.  And I got it this morning.  I've asked
 5   for it numerous occasions from the State.
 6              THE COURT:  There are three of you in the
 7   courtroom.  That's why I have three defense attorneys.
 8              MS. LITTLE:  We still just got it this
 9   morning, Judge.
10              THE COURT:  Fine.  One of you -- you have an
11   investigator, you have a staff on the Public Defenders
12   Office.  Numerous times there's only one of the public
13   defenders in court during the voir dire.
14              MS. LITTLE:  I beg your pardon?
15              THE COURT:  At numerous times during jury
16   selection there was only one public defender in the
17   courtroom.
18              MS. LITTLE:  Well, I don't know what the Court
19   is directing to.
20              THE COURT:  Well, what I'm suggesting is all
21   three of you have been in here during this hearing when one
22   of you or your investigators could have been contacting those
23   that you want.  Just inefficiency in time is what I'm
24   suggesting.
25              MS. LITTLE:  Well, we just got the report this
```

1      morning, Judge.

2                      THE COURT:  Are you ready?

3                      MS. BALIDO:  Ready, Judge.

4                      THE COURT:  Good morning, Sheriff.  May I ask

5      you to raise your right hand.

6                      (Witness sworn.)

7                      THE COURT:  Thank you, sir.

8            Let the record reflect this hearing continues to be

9      conducted in open court, outside the presence and hearing of

10     the impaneled jury and one alternate.  The defendant,

11     Jedidiah Isaac Murphy, is in court during this hearing.

12           Counsel may proceed.

13                       CHARLES MCKINNEY

14     was called as a witness by the Defendant and, after having

15     been first duly sworn, testified as follows:

16                     Direct Examination

17     By Ms. Balido:

18        Q.   Can you please state your name for the record?

19        A.   Charles McKinney.

20        Q.   And, sir, what do you do for a living?

21        A.   I'm employed by Jim Bowles, Sheriff of Dallas

22     County.

23        Q.   And how long have you been employed by the Sheriff's

24     Department?

25        A.   36 years.

1    Q.   And what is your present assignment for the

2    Sheriff's Department?

3    A.   I'm Assistant Chief Deputy in Charge of Detention

4    Inmate Housing.

5    Q.   And when you talk about detention inmate housing,

6    you're talking about when people are accused of crimes or

7    convicted of county crimes, they're actually housed in the

8    Dallas County Jail; is that correct?

9    A.   That's correct.

10   Q.   Okay.  And are you familiar with the policies and

11   procedures regarding the Dallas County Jail?

12   A.   Pretty much so, yes, ma'am.

13   Q.   And especially regarding the inmate -- the inmate

14   housing procedures or the policies regarding inmate housing

15   that are used in everyday procedures in the Dallas County

16   Jail?

17   A.   Yes, ma'am.

18   Q.   Okay.  Let me ask you a question in regard to inmate

19   property in the cells.  Okay?  I understand that you seize

20   property once somebody is booked into the Dallas County Jail;

21   is that correct?

22   A.   That's correct.

23   Q.   Okay.

24   A.   Certain property.

25   Q.   Certain property.  And that is -- what -- what

DARLINE W. LABAR, OFFICIAL REPORTER

1    happens to that property?

2        A.   It goes into the vault in the inmate's property

3    file.

4        Q.   Okay.  Now -- now -- now that we've established

5    that, I don't want to talk about that type of property.

6        A.   All right.

7        Q.   What I want to talk about is I want to talk about

8    property that is either sent into the jail by someone outside

9    the jail, and I'm talking about letters or papers or

10   newspaper articles and that sort of thing --

11       A.   Okay.

12       Q.   And also paperwork or letters that are made by the

13   inmate himself while he's inside the jail.  Okay?

14       A.   Okay.

15       Q.   Does the Dallas County Jail have a policy regarding

16   the seizure of those types of writings, things that are

17   either sent in by U.S. mail or by -- well, let's start out

18   just sent in by U.S. mail?

19       A.   Yes, it does have policy.

20       Q.   Can you tell me what that policy is?

21       A.   Any privileged mail will not be opened except in

22   front of the inmate himself.  And it will not be read, but

23   can be searched for contraband.

24       Q.   Okay.

25       A.   Privileged mail being mail from the courts,

1   attorneys, public officials such as senators, President of

2   the United States, and so forth.  Non-privileged mail,

3   letters from loved ones, friends, and so forth, can be opened

4   for contraband.

5        Q.   Okay.  So basically -- let me ask you about the

6   policy of the Dallas County Sheriffs Department in regard to

7   non-privileged mail first.

8        A.   Okay.

9        Q.   You said it's opened to determine whether or not

10  there's contraband?

11       A.   Correct.

12       Q.   Is it also opened for the purpose of reading the

13  content of the letters themselves?

14       A.   As a general rule, no.  But it can be, yes.

15       Q.   Okay.  So as a general rule those letters are not

16  read?

17       A.   Correct.

18       Q.   And when is there an exception to that rule?

19       A.   Usually under court order.

20       Q.   Okay.  A court order or if there's like a search

21  warrant that you feel like it's necessary?

22       A.   Correct.  Right.

23       Q.   All right.  In regard to privileged mail from

24  attorneys, I would suppose it would be from attorneys if it

25  was evident from the outside of the envelope that it was from

DARLINE W. LABAR, OFFICIAL REPORTER

1   an attorney; is that correct?

2       A.   Correct.

3       Q.   And the other people that you mentioned, can you

4   tell me about the policy of opening that for contraband?  Are

5   those regularly opened for contraband?

6       A.   It's opened in front of the inmate.

7       Q.   Okay.  And tell me the policy of the Dallas

8   Sheriff's Department in regard to reading that mail?

9       A.   It is not read.  Privileged mail is not read.

10  Searched -- the envelope or box, whatever it would be in

11  would be searched for contraband only.

12      Q.   Okay.  Are there any exceptions to that rule that

13  you know of?

14      A.   No, ma'am.

15      Q.   Have you ever been asked by a court -- that you know

16  of, you or anyone you know of been asked by a court or court

17  order to seize that mail and read that mail, the privileged

18  mail?

19      A.   Any mail that ever come in on any inmate?

20      Q.   Yes.

21      A.   Not to my knowledge.

22      Q.   Okay.  Let me ask you in regard to -- is there ever

23  an occasion that in the regular practice of the Dallas

24  Sheriff's Department that papers made by the inmate would be

25  seized by the Dallas Sheriff's Department?

1    A.    Are they any instances where it could be?

2    Q.    Yes.

3    A.    Yes, ma'am.

4    Q.    Okay.  Could you tell us what those instances are?

5    A.    I could think of possibly three.  One would be under

6    a court order issued by a Judge directing us to for some

7    reason.  Number two, and I'm talking about inmate housing

8    employees seizing it.  Possibly if the volume of paperwork

9    became so great in a particular cell that it should become

10   either a safety or health hazard, it could be removed and put

11   in the inmate's property in the vault.  It would be a very

12   rare occasion, but it could happen.  Thirdly, and it would

13   not be by employees of the detention housing bureau, but if

14   it should become -- the cell become a crime scene for some

15   reason, then the evidence could be confiscated either by our

16   Physical Evidence Section or Criminal Investigation Division

17   in regards to this crime scene.

18   Q.    Okay.  And when you talk about crime scene, would a

19   crime scene include an attempted suicide?

20   A.    Yes, it would.

21   Q.    Okay.  When I talked to you on the telephone

22   yesterday, I guess, I didn't make myself clear when I asked

23   if there was any kind of procedure as to whether or not

24   someone's property would be seized if he tried to commit

25   suicide.  Do you remember me asking you that?

1    A.    You didn't mention suicide whatsoever.

2    Q.    Okay.  Did you talk with the District Attorneys

3 Office after I talked with you yesterday?

4    A.    No, I have not.

5    Q.    Okay.  Let me ask you if you know what the procedure

6 is regarding seizure of writings that are made by the person

7 in jail, the inmate, but looks like it's addressed to a

8 lawyer or after reading the contents of the letter, you find

9 out that it's basically to the person's lawyer, do you have

10 any policy about reading that or seizing that or anything

11 like that?

12    A.    Detention housing bureau does not open any mail

13 that's addressed to an attorney.

14    Q.    Okay.  Now, you mentioned that the inmate housing

15 employees could seize different items at different times.

16    A.    Yes, ma'am, that's correct.

17    Q.    And can you tell us when that would occur?

18    A.    Well, I'll repeat the three things I just said if

19 you want me to.  One is if it's under a court order.

20              MS. MILLER:  Your Honor, we object.

21              THE COURT:  No, it's repetitious.

22    Q.    (By Ms. Balido)  So those are the only reasons that

23 the inmate housing would -- would seize these items?

24    A.    To my knowledge, that should be the only reasons,

25 yes, ma'am.

DARLINE W. LABAR, OFFICIAL REPORTER

```
1      Q.   Okay.  Let me ask you also --

2                THE COURT:  Could you get a little more

3    specific on the issue at hand, please?  This particular

4    document as opposed to the global policy of the Dallas

5    Sheriff's Department.

6                MS. BALIDO:  Judge, we're trying to establish

7    that he has a reasonable expectation to privacy, and that's

8    what this is going to.

9                THE COURT:  Have you read the cases involving

10   this, counsel?

11               MS. BALIDO:  I have, Your Honor.

12               THE COURT:  What have you read?

13               MS. BALIDO:  I have read that in situations

14   where inmate property is housed or seized at the time that

15   they actually go into the jail, that is not privileged, that

16   is not -- or that is not garnered --

17               THE COURT:  To the specific issue at hand.

18               MS. BALIDO:  The specific issue at hand,

19   Judge, about property inside a cell where there are cases

20   that say that a defendant does have a reasonable expectation

21   of privacy and there are some cases that say they don't have

22   a reasonable expectation of privacy.  I'm -- but it's up to

23   the subjective beliefs of the defendant.  I'm trying to

24   establish what the policies are and then establish what --

25               THE COURT:  Okay.  Let's move on.
```

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1       Q.   (By Ms. Balido)  Do you know --

 2              THE COURT:  I've got a United States Supreme

 3  Court case and a Ninth Circuit case that are pretty

 4  persuasive.

 5              MS. BALIDO:  Is that the same Ninth Circuit

 6  case, Judge, that I cited on our Batson motion?

 7              THE COURT:  United States versus Hitchcock,

 8  467 F.2d 1107, and Alonzo versus New York, 82 Supreme Court

 9  1218.

10              MS. BALIDO:  And, Judge, is that the same

11  Ninth Circuit that I cited on our Batson motion which you

12  said was the most overruled court by the Supreme Court?

13              THE COURT:  That's true.

14       Q.   (By Ms. Balido)  Do you know anything about the

15  seizure of property of Jedidiah Isaac Murphy by Dallas

16  sheriffs officers?

17       A.   No, ma'am, I do not.

18       Q.   Okay.  And under your understanding did any inmate

19  housing official seize this property or seize any property

20  from Jedidiah Isaac Murphy after he was booked into jail?

21       A.   You say did?

22       Q.   I'm asking if you have any knowledge of that?

23       A.   I just said, no, ma'am, I do not.

24       Q.   After there is material seized for either -- for any

25  one of the reasons that you talked about, what is the normal
```

1   practice of what to do with that property?

2       A.   If it's in their court order, we'd do whatever the

3   Judge directed, either put it in our property evidence or

4   turn it over to the courts or whoever the Judge directed it

5   to be turned over to, number one.  Secondly, as I said awhile

6   ago, if for some reason should become such a large volume of

7   paperwork, that became a safety hazard or health hazard, it

8   would be put in the inmate's property in our vault.  Thirdly,

9   if it become a crime scene, then the Physical Evidence

10  Section, the Criminal Investigation Section would confiscate

11  it and put it in the Dallas Sheriff's Office property room as

12  evidence of that crime scene.

13      Q.   And in that regard on the third thing that we talked

14  about with the crime scene, would that be held within the

15  Dallas Sheriff's Department or would it be immediately turned

16  over to the Dallas District Attorneys Office?  Or do you

17  know?

18      A.   It would be put in Dallas Sheriff's Office

19  initially.  Now, how long it stayed there, I would have no

20  knowledge.

21      Q.   Along those lines again, Chief McKinney, you

22  wouldn't ordinarily -- well, what would be the regular

23  practice, if you know, if it was seized by the crime scene

24  and investigators and put into the records, or what happens

25  to it after that?

1      A.   I wouldn't have any knowledge.

2      Q.   Okay.  Let me ask you one more thing.  Is it the

3   regular practice, or are you aware of any exception or -- let

4   me start totally over.

5           Are you aware of any time that a member or members

6   of the Dallas District Attorneys Office has attempted to

7   seize letters coming into the jail, and I'm talking about

8   non-privileged letters, for the purpose of use in that

9   person's trial?

10              MS. MILLER:  Your Honor, we're going to object

11   to relevance as far as this hearing goes.

12              THE COURT:  Overruled.  You may answer.

13              MS. MILLER:  Because it has nothing to do with

14   the way these were seized.

15              THE COURT:  You may answer, Sheriff.

16      A.   On any inmate at any time, since 1946, Dallas

17   Sheriff's Office, you're talking about?

18      Q.   (By Ms. Balido)  I'm asking if you know if sometimes

19   the D.A.'s call up the Sheriff's Department and ask to see --

20              THE COURT:  Let him answer -- let him answer,

21   Ms. Balido.

22      A.   I'm just trying to clarify you talking about going

23   back any time.

24      Q.   (By Ms. Balido)  Uh-huh.

25      A.   Okay.

1    Q.    Is that a yes?

2    A.    No, I haven't answered.  I'm trying to think if I

3    can recall any.  My personal knowledge, I don't recall, to my

4    knowledge.

5    Q.    Does the Dallas Sheriff's Office have any policy

6    regarding turning over inmate mail, not privileged inmate

7    mail, to the Dallas District Attorneys Office upon their

8    request?

9    A.    To my knowledge, it would be under subpoena or court

10   order.

11   Q.    And you'd be surprised if they got it any other way?

12   A.    I'd be surprised.

13             MS. BALIDO:  I'll pass the witness, Judge.

14                      Cross-Examination

15   By Ms. Miller:

16   Q.    Sergeant McKinney, I just have just a couple

17   questions for you.  Since you're the Assistant Chief Deputy;

18   is that right?

19   A.    Yes, ma'am.  That's right.

20   Q.    And how long have you had that position?

21   A.    About 10 or 11 years.

22   Q.    Okay.  And can you tell this Court whether having a

23   razor blade, an inmate having a razor blade in his cell is

24   against the rules and regulations?

25   A.    No, ma'am, it's not against rules and regulations.

```
 1        Q.    How about a razor blade not within a razor?

 2        A.    No, ma'am.

 3        Q.    Okay.

 4              MS. MILLER:  I don't have any other questions,

 5   Your Honor.

 6              THE COURT:  Ms. Balido.

 7              MS. BALIDO:  Judge, I have a couple more

 8   questions.

 9                      Redirect Examination

10   By Ms. Balido:

11        Q.    To your knowledge, Chief McKinney, on the control

12   center or in the control center on the third floor of the

13   Dallas Sheriff's Department, of the West Tower -- third

14   floor, West Tower Control Center, to your knowledge, is there

15   a sign that says "all incoming and outgoing mail from

16   Jedidiah Isaac Murphy, Book-in Number 00089253, is to be sent

17   to Chief McKinney's office"?

18        A.    I have no knowledge of it.  I can assure you no mail

19   has never been sent to me at any time.

20              MS. BALIDO:  I have no further questions,

21   Judge.

22              MS. MILLER:  The State has nothing further,

23   Your Honor.

24              THE COURT:  Thank you, Sheriff.

25              THE WITNESS:  Thank you, Judge.
```

1          MS. BALIDO:  Judge, if I could go check on my
2    messages and see --
3          THE COURT:  You may.
4          (Recess taken.)
5          MS. BALIDO:  Judge, I do have one thing I can
6    put on the record while we're waiting.
7          THE COURT:  All right.
8          MS. BALIDO:  Judge, comes now the defendant,
9    Jedidiah Isaac Murphy, at this time to make a motion for
10   mistrial based on the following reason:  Off the record the
11   Judge has said on numerous occasions that he's concerned
12   about the wasting of the jury's time.  The defense does
13   appreciate that.  However, on the record yesterday, the Court
14   made two comments that concerns the defense.  First, when the
15   defense objected to the oral statements in front of the
16   jury -- being brought in front of the jury, the Court made
17   the comment that such objection had been heard and considered
18   outside the record by the Court and had been overruled and
19   that you overruled it again.  We believe that that
20   constituted a comment on the weight of the jury --
21         THE COURT:  Weight of the jury?
22         MS. BALIDO:  Constituted a comment on the
23   weight of the evidence to such a degree that an instruction
24   either at this time either in the jury instructions not to
25   consider any comment from the Court as being a comment on the

DARLINE W. LABAR, OFFICIAL REPORTER

1    weight of the evidence, that that cannot be cured.

2            Additionally, during the cross-examination of

3    Detective Myers, the Court sua sponte asked if what I was

4    asking was relevant and I needed to hurry it along.   I

5    believe that that constituted a comment on the weight of the

6    evidence to which no instruction can cure.   And we would

7    respectfully ask for a mistrial at this time.

8            THE COURT:   The Court denies it.   And

9    specifically with regard to number one, I call counsel's

10   attention to the fact that outside the jury's presence I told

11   them that by virtue of that ruling there would be no need for

12   them to make a further objection once the jury had returned

13   to the courtroom.   Number two, with regard to the matter

14   about which counsel makes reference, I call counsel's

15   attention to Texas Rule Of evidence 611, paragraph A, I have

16   control of the court.   And when I feel that time is being

17   unnecessarily consumed which I on the record wish to state

18   outside the jury's presence that I think the defense was

19   doing yesterday, I am going to side on behalf of the jury and

20   move this trial along.   Cross-examination should not be

21   limited in the Court's opinion to a mere recitation or a

22   repeat of the questions that the prosecutors have asked the

23   witness.

24           MS. BALIDO:   Judge, in response to your

25   response to number one, I do believe that through the reading

1    of the cases that I have in preparation of this case and

2    other appeal -- and appeals that I have filed, that even

3    though the Court did grant a running -- a running objection,

4    that it was my duty to object in front of the jury.  And

5    since that is going to be a jury issue in this case as to the

6    admissibility of the confession, that I thought it was

7    necessary on the record to make my objection at the time.

8              THE COURT:  Counsel, you do what you feel is

9    necessary in the courtroom, and I'll do likewise.

10             Have a hearing on the photographs.  The State may

11   begin.

12             MR. DAVIS:  Yes, Judge.  Your Honor, the

13   proffer will be in front of the jury.  I do intend to offer

14   State's Exhibits, I believe -- defense counsel has them.  I

15   believe that they are 42 -- I'm sorry, they are going to be

16   State's Exhibit 55 through 63, Your Honor.  And the State's

17   position is that they are necessary, that they are probative

18   of several different issues.  First of all, the manner and

19   means of death.  They will be probative as to exposure, state

20   of decomposition.  Also going to go to really the nature of

21   this offense, the place in which the defendant left this

22   body, goes to his state of mind, disregard for the safety and

23   the well-being of this individual, allowing her to be exposed

24   to aquatic life, to other wildlife out there in that

25   location.  So we certainly believe that they are relevant,

1    that they are probative.  There is no duplication in these

2    photographs.  The photographs of the body as a whole I

3    believe the Court has reviewed that is fully clothed.  The

4    only bare skin showing then will be actually extremities and

5    the head and the face portion of the photographs.  For those

6    reasons, we do intend to offer State's Exhibit 55 through 63,

7    Your Honor.

8              THE COURT:  The defense wishes to be heard.

9              MR. BYCK:  Yes, Your Honor.  May it please the

10   Court.

11        Your Honor, we would have no objections to State's

12   Exhibit Number 58.  State's Number 58, as I'm showing to the

13   Court, shows a gunshot wound to the forehead.

14        We would have no objection to State's 59, likewise

15   showing a gunshot wound to the cranial area.

16        We would have no objection to State's 60, showing

17   three wounds on the top of the scalp.

18        We have no objection to State's 61 in that it shows

19   bruising on the upper arm.

20        We have no objection to State's 63, some abrasions.

21        And finally, we have no objection to State's 55,

22   Your Honor, as it does show the complete body.  And I don't

23   believe that there is an alternative photograph to that.

24        We would object to -- pardon me, Your Honor, and in

25   reference to the last number, what was that?

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1              THE COURT:  55.

 2              MR. BYCK:  In -- okay.  62.  Your Honor, we

 3    would strenuously object to State's Exhibit Number 56 and

 4    especially State's Exhibit Number 57.  Your Honor, careful

 5    examination of State's 57 shows no gunshot wound.  It does

 6    not show any track of a bullet.  It shows nothing except what

 7    happened to the victim well after the fatal shot wound was

 8    inflicted.  While it may be relevant to prove the nature of

 9    the offense, what it really shows, Your Honor, is that an

10    action done by an independent force, that is, aquatic life in

11    that stream.  That there are -- its probative value is far,

12    far outweighed by the obvious, obvious gruesome nature of the

13    photographs.  We submit, Your Honor, that they would only

14    be -- especially the full face photograph, I think that's

15    57, would only be offered to inflame the jury, to show the

16    terrible depredations that occurred.  While it could

17    theoretically be argued, Your Honor that, that there's some

18    element of foreseeability in here, we would strenuously argue

19    that there really is not, that -- that the actor, the

20    perpetrator of the murder, could in no way foresee the

21    depredations that occurred to that body afterwards, that --

22              THE COURT:  The State care to be further

23    heard?

24              MR. DAVIS:  Well, I just cite to the Court the

25    State did previously file a response to defendant's motion in
```

 1    limine.  And in those cases I believe the Court probably has

 2    reviewed that autopsy photographs are generally admissible

 3    unless they depict mutilation of the victim caused by the

 4    autopsy itself.  Obviously, these were not caused by the

 5    autopsy.  They're caused by the direct actions of this

 6    defendant in making a conscious decision to leave this woman

 7    exposed in a creek in which there is water.  And those

 8    injuries are a direct result of his actions in this case.

 9                    THE COURT:  Mr. Byck, you wish further to be

10    heard?

11                    MR. BYCK:  Yes, Your Honor.

12            Your Honor, we would submit that Luis versus

13    Texas -- we do not have a citation on that, would be more

14    than happy to provide the Court a copy from the Court of

15    Criminal Appeals, TC Number 00-41-003.  It's number 73,281 in

16    the Court of Criminal Appeals.  The Court of Criminal Appeals

17    decided almost this exact situation.  With these gruesome

18    photographs, the Court of Criminal Appeals ordered the trial

19    court that they should consider the number of photographs

20    that are available, the size of the photograph, and that size

21    by the way, Your Honor, is approximately 11 and a half inches

22    by 7 and three-quarter inches.  That's the unmounted size.

23    They are in color.  The detail shown is absolutely graphic.

24    The photograph is obviously gruesome.  And that body has been

25    altered since the crime in some way that might enhance the

1    gruesomeness of the photograph to the defendant's detriment.

2              Now, Your Honor, we would finally object to State's

3    Exhibit Number 62, stating that there would be alternative

4    methods of proving the wounds or actually the bruises, Your

5    Honor, in State's Exhibit Number 62 by two photographs that

6    we will have marked as Defendant's 7 and 8 that could be

7    proved by the information contained in Defendant's 7 and 8

8    provided for us by the District Attorneys Office.  Those are

9    other photographs that do not show the head portion, but show

10   the bruises on the shoulder.

11             THE COURT:  The State has the right to close

12   the argument before the Court makes its ruling.

13             MR. DAVIS:  Well, again --

14             THE COURT:  Anything further, Mr. Davis?

15             MR. DAVIS:  Just drawing your attention with

16   regard to his argument about the photograph being gruesome,

17   I'm sure the Court is aware of the May v. State, 2000

18   decision out of the Court of Appeals here in Dallas, in which

19   the Court stated that although photographs may be gruesome,

20   that fact alone does not render them more prejudicial than

21   probative.  In this particular case that is not even the

22   standard in an autopsy photograph.  Actually it's whether the

23   probative value is substantially outweighed by the danger of

24   unfair prejudice, and I would state that they are not in this

25   case.

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1                    THE COURT:   In anticipation that the State
 2      will offer State's Exhibit 58, 59, 60, 61, and 63, if
 3      offered, assuming the defense makes no objection, they have
 4      indicated that they do not anticipate, they will be admitted
 5      into evidence.  The Court will permit the introduction of
 6      State's Exhibit Number 62, but only if the top three inches
 7      of the picture is redacted.  And the defense objections at
 8      this point on 56 and 57 are granted.
 9                    MR. BYCK:  We thank the Court.
10                    THE COURT:   Sheriff, may we have the jury,
11      please.
12             The Court wishes the record to reflect that the
13      Court utilized, as is required by the Court of Criminal
14      Appeals, under the case Long v. State, 823 S.W.2d 259, Rule
15      403, balancing test with regard to evaluating counsels'
16      objections and the offer.
17                    THE BAILIFF:  All rise.
18                    THE COURT:  Let the record reflect the jury is
19      returning to the courtroom at this time.
20                    (Jury returned to courtroom.)
21                    THE COURT:  Jury may be seated.
22             Ladies and gentlemen in the gallery, you may be
23      seated.
24             The State may proceed.
25                    MR. DAVIS:  The State will call Dr. Jennie
```

```
 1    Duval, Your Honor.
 2                 THE COURT:  Good morning.  Ask you to raise
 3    your right hand, please.
 4                 (Witness sworn.)
 5                 THE COURT:  Thank you, Doctor.
 6                 MR. DAVIS:  Good morning.
 7                 THE COURT:  You may continue.
 8                      DR. JENNIE DUVAL
 9    was called as a witness by the State and, after having been
10    first duly sworn, testified as follows:
11                      Direct Examination
12    By Mr. Davis:
13        Q.   Would you please tell us your full name?
14        A.   Yes.  It's Dr. Jennie Duval.  J-e-n-n-i-e,
15    D-u-v-a-l.
16        Q.   Are you a medical doctor?
17        A.   I am.
18        Q.   Dr. Duval, can you tell the members of the jury how
19    you're presently employed?
20        A.   I'm a medical examiner in the Dallas County Medical
21    Examiners Office.  That's here in Dallas.
22        Q.   How long have you been with the Medical Examiners
23    Office here in Dallas?
24        A.   It will be two years in August.
25        Q.   What is your position presently?
```

1      A.    I'm an assistant medical examiner.

2      Q.    And as such what are your duties and

3  responsibilities?

4      A.    Mainly to perform autopsies.  We also do some

5  teaching, medical students that rotate through, residents,

6  our own fellows that are in training in our office, testify

7  in court, give lectures, that sort of thing.

8      Q.    If you don't mind, would you briefly tell us about

9  your educational and professional training?

10     A.    My college degree is from the University of New

11 Hampshire.  I then obtained my medical degree, my M.D. from

12 McGill University.  That's in Montreal, Quebec.  I then

13 completed a four-year pathology residency at the University

14 of Massachusetts Medical Center, followed by two years of

15 forensic pathology training at the Boston Medical Examiners

16 Office, followed by another year surgical pathology training

17 back at the University of Massachusetts Medical Center, which

18 I finished in June of '99.  Then I started here about a month

19 later.

20     Q.    Now, I believe that you told us that one of your

21 primary duties would be to perform autopsies.  Is there a

22 general procedure that's used when you do an autopsy?

23     A.    Yes, basically every autopsy is the same.  We may do

24 additional studies and tests, depending on the case.

25     Q.    Could you briefly discuss the procedure that you

1  would use on an autopsy?

2      A.   Yes, in a homicide or suicide type of autopsy, we

3  always photograph the body as it's received in the office.

4  Then we'll search for trace evidence on the clothing and the

5  hands, fingernails.  We may take x-rays, depending on the

6  case.  If there's a gunshot wound or a stab wound, we're

7  looking for retained bullets or metal objects.  We would then

8  strip the body, clean it off as best we could and again take

9  photographs and in particular photographs of any injuries or

10 evidence of disease that we might find.  Then we would draw

11 blood for toxicology, sometimes eye fluid, and all that is

12 done before we start the internal examination of the autopsy.

13      The internal examination involves making incisions

14 into the body so that we can look at the body organs for

15 evidence of disease or injury so we would look at the heart,

16 the lungs, the brain, so forth.  We may save pieces of tissue

17 to look at microscopically.  We may save other body fluids

18 such as bile and urine to look for toxicology, drugs of

19 abuse, prescription drugs that are in the system.  We may

20 take other specimens for microbiology studies if we suspect

21 an infectious disease.  Those are the sorts of tests that we

22 do routinely.

23      Q.   When a body comes into your office for an autopsy,

24 is a unique case number assigned to it?

25      A.   Yes, a case number.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Would that -- would that case number follow any

2    evidence perhaps that you had gathered during your autopsy,

3    would it maintain that same unique case number if it had been

4    analyzed by someone else out there at your office?

5    A.   The same case number -- as soon as the body is

6    received into the office, the body is tagged with that

7    number.  All the paperwork that's generated, the autopsy

8    report, any other reports from the toxicology lab or the

9    crime lab all have that same number on it.

10    Q.   Now, on or about October the 6th of 2000, did you

11    perform an autopsy on an individual that you later came to

12    know as Bertie Cunningham?

13    A.   Yes, I did.

14    Q.   And did you in fact perform the autopsy and then

15    prepare an autopsy report of your findings in that matter?

16    A.   Yes, I did.

17             MR. DAVIS:  May I approach, Your Honor.

18             THE COURT:  You may.

19    Q.   (By Mr. Davis)  Doctor, I'm showing you now State's

20    Exhibit Number 54.  If you would, review that document and

21    tell me if it's a copy of the autopsy report that you

22    prepared in this case.

23    A.   Yes, it is.

24             MR. DAVIS:  Your Honor, at this time we will

25    offer State's Exhibit Number 54, the autopsy report.

```
 1                    (State's Exhibit No. 54 offered)

 2                    MR. BYCK:  We have no objection at this time,

 3   Your Honor.

 4                    THE COURT:  Admitted.

 5                    (State's Exhibit No. 54 admitted)

 6         Q.   (By Mr. Davis)  Dr. Duval, in this case can you tell

 7   us the case number that was assigned to this autopsy?

 8         A.   Yes, the case number is -- it has the prefix

 9   JP3564-00.

10         Q.   Now, if we could in this -- in this particular case

11   did the body come accompanied by clothing?  It was clothed

12   when it came to your office, correct?

13         A.   The body was fully dressed and also accompanied by

14   other articles of clothing.

15         Q.   Yeah.  Did you examine the body for personal effects

16   such as jewelry?

17         A.   Yes.

18         Q.   Was any jewelry with the body when it came to your

19   office?

20         A.   No.

21         Q.   No rings?

22         A.   No rings.

23         Q.   No watches?

24         A.   No.

25         Q.   Had they accompanied the body, would you have noted
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    that in your report?

2        A.   We always note whatever the body comes in with, any

3    clothing, any personal effects, any jewelry is always

4    described in the report.

5        Q.   Did you see any indication during your examination

6    of the victim's fingers that she had at one time been wearing

7    a ring?

8        A.   Yes, on the left ring finger there's a -- the skin

9    was pale as if a ring had been worn there.

10       Q.   Can you tell me the overall condition of this body?

11   How would you describe that?

12       A.   The body was in early to moderate state of

13   decomposition so the body had been dead for some time.

14   Postmortem changes had already set in.  In particular because

15   the body was found in water, there was some postmortem

16   changes related to aquatic animals.  In this case probably

17   turtles, fish, crab, same sort of thing.  So these animals

18   will accelerate the decomposition process.  The body had some

19   skin slippage.  That's one of the early changes of

20   decomposition when the skin starts to slough off.  There was

21   also fixed liver mortis, which is the settling of blood in

22   the body after death.  And after a period of several hours,

23   it becomes fixed in position.  It was absent rigor mortis,

24   this is, when the body comes stiff after death.  That's a

25   transient thing.  After several hours, 8 to 12 hours, it

1    remains full -- full rigor mortis for about another 12 hours

2    or so, and then it starts to dissipate.  And there was no

3    rigor mortis, so these are all changes that occur after death

4    and indicate that she had been dead for some time.

5         Q.   Now, was it your understanding that the body had

6    been found in a creek?

7         A.   Yes.

8         Q.   Was the appearance of the body consistent with that

9    history?

10        A.   Yes.

11        Q.   Now, when you talk about decomposition, you said

12   that -- did I understand you to say that it was apparent that

13   the individual had been dead for some period of time?

14        A.   Yes.

15        Q.   Generally can you tell us when decomposition might

16   set in after death?

17        A.   Well, these postmortem changes all begin

18   immediately.  Blood begins to settle.  The rigor mortis

19   starts to develop.  But once you start reaching the skin

20   sloughing off, once you start having the extensive aquatic

21   animal activity that I saw, you're talking at least a day,

22   maybe three days, somewhere in that ball park.

23        Q.   And I believe your examination took place at 11:30

24   in the morning on October the 6th, correct?

25        A.   Correct.

1    Q.    So the condition would have been consistent with Ms.

2   Cunningham having been dead for between one and three days at

3   that point; is that right?

4    A.    That's my opinion, yes.

5    Q.    Now, first of all, as you examined the body, did you

6   look for external injuries?

7    A.    Yes.

8    Q.    And if you would, can you tell us and tell the

9   members of the jury the types of external injuries that you

10   noted?

11    A.    Yes, there were a number of injuries.  Some of them

12   appeared postmortem like this animal activity.  There was

13   also a gunshot wound to the head that was clearly obvious.

14   There were some bruises on the upper arms and the backs of

15   the upper arms.  There was a bruise on the right side of her

16   chest.  And there were some abrasions across her upper

17   abdomen and left side of her chest or abdomen.  Those two

18   abrasions or scrapes appeared to be postmortem also.  There

19   was also some lacerations of the scalp.  And I believe that's

20   all the injuries we identified.

21    Q.    When we talk about lacerations, are we talking about

22   cuts, some injury that would actually cut the skin in some

23   way?

24    A.    Well, I prefer to use the word "split."  The skin is

25   split.  It's not cut as if with a knife.  It's a rupture of

1    the skin from impact against a hard object, so it could be a

2    flat surface, could be a rock, any hard surface would cause a

3    laceration.  And these -- these were splits over the top of

4    the scalp.  They are called lacerations.  And these again

5    appeared to be postmortem.

6         Q.   Did you take photographs to document these injuries?

7         A.   Yes.

8              MR. DAVIS:  May I approach, Your Honor.

9              THE COURT:  You may.

10        Q.   (By Mr. Davis)  Doctor, looking at State's Exhibits

11   58, 59, 60, 61, 62, 63, and finally State's Exhibit Number

12   55, let me ask you, do these -- well, if I may --

13             MR. DAVIS:  May I approach the bench for just

14   a moment, Your Honor.

15             THE COURT:  You may.

16        Q.   (By Mr. Davis)  And finally State's Exhibit Number

17   55, do you recognize these to be photographs that were taken

18   during the autopsy of Ms. Cunningham?

19        A.   Yes.

20        Q.   Do you believe that they would aid you in your

21   testimony to this jury concerning the injuries that were

22   inflicted, as well as the cause and the manner and means of

23   death of Ms. Cunningham?

24        A.   Yes.

25             MR. DAVIS:  Your Honor, at this time we will

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1    offer State's Exhibit 55, 58, 59, 60, 61, 62 and 63.

 2             (State's Exhibit No. 55 and 58 thru 63 offered)

 3                  MR. BYCK:  We have no objections to the offer

 4    pursuant to the Court's previous rulings.

 5                  MR. DAVIS:  And if I could approach counsel

 6    for just a moment on one matter there.

 7                  MR. BYCK:  Very well.

 8                  MR. DAVIS:  Are they admitted?

 9                  THE COURT:  They are admitted.

10             (State's Exhibit No. 55 and 58 thru 63 admitted)

11                  MR. DAVIS:  Thank you.  May the witness please

12    step down.

13                  THE COURT:  She may.

14                  (Witness leaves the stand.)

15        Q.   (By Mr. Davis)  Dr. Duval, if we could, the first

16    photograph that we're going to see here was taken of Ms.

17    Cunningham again during her autopsy; is that correct?

18        A.    That's right.

19        Q.    Was -- in this photograph do we see her still

20    clothed as she was when she came in for examination by your

21    office?

22        A.    This is the as is photograph we take as the body is

23    received into the office.

24        Q.    Okay.

25                  (Exhibit published to jury.)
```

1    Q.   (By Mr. Davis)  And again, this photograph would

2  note several different injuries, wouldn't it?

3    A.   Yes.

4    Q.   Will it first of all note injuries to her face, as

5  well as to her left arm?

6    A.   Yes.

7    Q.   Those injuries again being of what nature?

8    A.   Those are consistent with postmortem aquatic animal

9  activity, turtle bites.

10    Q.   I believe that you noted in your testimony earlier

11  that you had seen a gunshot wound to Ms. Cunningham's head;

12  is that correct?

13    A.   That's correct.

14    Q.   State's Exhibit 58 that we're about to show to the

15  jury, will this show that gunshot wound?

16    A.   Yes, it does.

17    Q.   Again, the location of that wound was, what, right

18  the right portion of the forehead; is that right?

19    A.   Yes, it's actually just behind the hairline.  The

20  hair has been shaved above the wound in this picture.

21    Q.   State's Exhibit 59, would this be another photograph

22  from a different angle showing that same gunshot wound?

23    A.   Yes, this is a close-up view of that same gunshot

24  wound.

25    Q.   Now, before we show this to the jury, when you

Page 43

1    examine a gunshot wound, the entry wound, sometimes can you

2    make some sort of determination about how close the end of

3    the barrel of that gun was to the skin at the time that it

4    was fired?

5        A.   Yes, we can determine if a wound is contact, either

6    tight contact or loose contact meaning the muzzle of the

7    weapon is right up against the skin either tightly or

8    loosely.  We can say it's close range if we see soot

9    deposited around the wound.  In a handgun close range is

10   about 6 inches or less.  We can say if it's an intermediate

11   range, if we see gunpowder stippling.  This is a impact of

12   gunpowder against the skin surface around the wound.  That's

13   from unburned particles of powder coming out of the muzzle of

14   the weapon, usually about 1200, 1500 feet per second.

15             THE REPORTER:  I'm sorry, ma'am.  I can't hear

16   you.

17       A.   Gunpowder stippling is when unburned powder grains

18   come out of the muzzle of the weapon and they strike the skin

19   at a very high velocity and they cause little scrapes in the

20   skin and sometimes embedded in the skin.  This is

21   intermediate range, and that occurs somewhere between six

22   inches and two feet in most instances.  Beyond two feet we

23   don't see soot.  We don't see gunpowder stippling.  We just

24   see the hole, the entrance wound.  And those we call distant

25   wounds, distant meaning greater than two feet.

1    Q.    Now, the gunshot wound to Ms. Cunningham first shown

2  in State's Exhibit Number 58, were you able to make some

3  determination about the distance of that particular gunshot?

4    A.    Yes.

5    Q.    State's Exhibit Number 59, again, showing that

6  gunshot wound, how did you term this particular gunshot

7  wound, tight contact, loose contact, intermediate, or

8  distance?

9    A.    This would be a loose contact gunshot wound.

10    Q.    And if you would, is there something about this

11  photograph that would assist the jury in understanding how

12  you made that sort of determination?

13    A.    Yes.  In the photograph you see this round black --

14  it looks like a hole and actually the central part is the

15  hole and all around the edge is imbedded soot and imbedded

16  gunpowder, so -- and it makes a very nice distinct ring

17  around the wound.  It's very close.  It's not dissipated at

18  all.  And this occurs with a loose contact type of wound.

19    Q.    And loose contact again would that actually mean

20  that the barrel of the gun is actually against the skin, but

21  it's not being pressed down into the skin; would that be

22  fair?

23    A.    That's exactly what it means.

24    Q.    It's actually making contact with the point where we

25  now see this wound; is that right?

1    A.   Right.  If it's a tight contact wound, the soot

2    would be driven into the wound.  You wouldn't see any on the

3    skin surface around the hole.  It would all be inside the

4    wound, and there was nothing inside the wound.

5    Q.   State's Exhibit Number 61, I believe that you -- or

6    State's Exhibit Number 60, I'm sorry.  I believe you earlier

7    had said that you found some evidence of lacerations to the

8    top portion of Ms. Cunningham's skull; is that right?

9    A.   Yes.

10   Q.   The jury now looking at State's Exhibit Number 60.

11   Would these injuries, Doctor, be consistent with the head

12   coming in contact with some hard and sharp object?

13   A.   More hard than sharp.  It's not consistent with a

14   knife for example.  It could be any hard object.  These are

15   blunt force injuries.

16   Q.   Uh-huh.  How about a jagged rock for instance?

17   A.   That could do it.

18   Q.   Can we tell from State's Exhibit Number 60 whether

19   this is prior to the death of Ms. Cunningham or after death

20   has occurred?  Is there any way of telling?

21   A.   Yes, these -- these lacerations or splits in the

22   skin have a very sort of greyish yellow appearance.  You

23   don't see a rim of red scraping around the -- which would --

24   tells us there's a vital reaction, meaning the bleeding

25   around the -- there is no blood within them.  There's no

1    blood around them, so these are consistent with postmortem

2    lacerations.

3                THE COURT:  Ms. Little, did you want reference

4    to what that number was?

5                MS. LITTLE:  Yes.

6                THE COURT:  What number was that?

7                MR. DAVIS:  That was State's Exhibit Number

8    60.

9                MS. LITTLE:  Thank you.

10                THE COURT:  Did you hear that, Ms. Little?

11                MS. LITTLE:  Yes, sir.

12       Q.   (By Mr. Davis)  Looking now at State's Exhibit

13    Number 61, what portion of the body are we now looking at?

14       A.   This is her upper abdomen, just below the rib cage.

15       Q.   What sort of injuries -- how would you describe

16    these particular injuries on State's Exhibit 63?

17       A.   These are called abrasions or scrapes of the skin.

18    This is very superficial.  They have a yellowish orange kind

19    of color to them.  Again, indicating that they are

20    postmortem.  They are also patterned.  There's a pattern to

21    them, parallel vertical lines.  It's very consistent with the

22    waistband of her pants, so it looks like these are postmortem

23    abrasions from her pants.

24       Q.   Would these particular injuries be consistent with

25    Ms. Cunningham's body having been dragged across some

DARLINE W. LABAR, OFFICIAL REPORTER

1   surface?

2       A.   Or any manipulation of her clothing would give the

3   same appearance.

4       Q.   So if her body weren't moving, but somehow her

5   clothing is being moved over her body, that could cause these

6   scratches, also?

7       A.   Yes.

8       Q.   Again, that's postmortem, after death?

9       A.   Yes.

10      Q.   State's Exhibit Number 61, what is the jury looking

11  at now?  What types of injuries?  First, I guess this is to

12  the right chest; is that right?

13      A.   That's right.

14      Q.   Okay.

15      A.   This is the right side of her chest.  Her arm has

16  been raised above her head so you can see this bruise, down

17  here.  It's a contusion.  This one is reddish purple.  It's

18  fairly small.  It's in the same line as her bra, her bra

19  line.  And this is -- because it has color in its appearance,

20  it's more likely to be antemortem.  This is an injury that

21  occurred before death.

22      Q.   Would you describe this as a -- as some sort of

23  sharp force injury or blunt force injury?

24      A.   This is blunt.  There's no break in the skin.  This

25  is just impact, either something impacted her or she's

1  impacted some other blunt object.

2      Q.   Okay.  Would it be consistent with someone taking a

3  fist, for instance, and striking her with a closed or open

4  fist of some sort, or would it be consistent with her having

5  been pushed up against an object to cause a bruise, or what

6  sorts of actions would be consistent with having caused these

7  injuries?

8      A.   It's not patterned enough to say that this looks

9  like a fist or a slap.  It's more nonspecific.  It's more

10 banging up against something.  It's your typical bruise that

11 you might get just from bumping up against something.

12     Q.   Perhaps the side of a car?

13     A.   Could be.

14     Q.   A trunk lid, some sort of object of that nature?

15     A.   Yes.

16     Q.   Again, that's prior to death, correct?

17     A.   Yes.

18     Q.   State's Exhibit Number 62, if you would, take this

19 please, Doctor, and describe to the members of the jury the

20 type of injury.

21     A.   This is -- occurred left arm, closer to left

22 shoulder.  It has been pulled across the chest, and you're

23 looking at a bruise outside back of that left upper arm.  And

24 again, this is a bruise.  It's larger than the other one.

25 It's purplish, reddish purple, bluish.  It's all consistent

1    with being an antemortem or before death bruise.  Again, it's

2    blunt force injury, bumping up against something.

3        Q.    Now, when we look at State's Exhibit 61 and 62, you

4    told us that you believe that they occurred prior to death.

5    Would you have an opinion as to whether or not these are

6    recent bruises, or did they occur days before Ms.

7    Cunningham's death?

8        A.    No, these look like fresh -- fresh bruises.  Could

9    have been minutes before her death to not days -- days you

10   start to see changes in the bruise.

11       Q.    Does the appearance and coloring change over time --

12       A.    Yes, it does.

13       Q.    -- the bruises?  Would these bruises be consistent

14   with having been produced at or near the time of her death?

15       A.    They're consistent with that, yes.

16       Q.    Go ahead and have a seat.

17                  (Witness retakes the stand.)

18       Q.    (By Mr. Davis)  I want to talk to you a bit more

19   about the gunshot wound, Dr. Duval.  You've told us that you

20   believe it was loose contact.  Can you tell us the path that

21   the bullet took once it entered Ms. Cunningham?

22       A.    So it enters the scalp just behind the hairline, on

23   the right side.  It perforates the underlying skull bone,

24   frontal bone.  It perforates the brain -- the frontal lobe of

25   the brain, just deep to that.  It keeps traveling slightly

1    downwards, slightly backwards, perforating the left temporal

2    lobe of the brain so it crosses the midline and strikes the

3    left side of the brain as well.  Strikes a bone on the floor

4    of the skull, and then becomes imbedded in that same left

5    temporal lobe of the brain.  And that's where I recovered the

6    bullet from.  So the path of the bullet is right to left,

7    slightly downwards, and slightly front to back.

8        Q.   Do you have an opinion as to whether this particular

9    gunshot wound would have caused the death of Ms. Cunningham?

10       A.   Yes, it did cause the death of Ms. Cunningham.

11       Q.   Do you have an opinion about how quickly death would

12   have occurred in this case?  For instance, do you believe

13   that Ms. Cunningham in all likelihood died instantly, or is

14   it medically probable that she remained conscious and alert

15   for a period of time?

16       A.   It's been my experience and experience of others,

17   and in fact there are several case reports of individuals

18   sustaining these small caliber gunshot wounds to the head

19   that affect the front half of the brain, and they remain

20   conscious and able to shoot themselves again in a suicide

21   type attempt, or just recover.  Usually they're left with

22   severe neurological deficits, major problems, but they can

23   recover, they can remain breathing spontaneously for some

24   time.  Yes.

25       Q.   Okay.  During the time that Ms. Cunningham would

DARLINE W. LABAR, OFFICIAL REPORTER

1    have remained conscious, do you have an opinion as to whether

2    she still would have had the ability to feel physical pain?

3         A.   I believe she would.

4         Q.   Okay.  Do you have an opinion as to the nature and

5    to the degree of the pain that she would have been suffering

6    as a result of this gunshot wound?

7         A.   I don't think I can quantitate how much pain she was

8    feeling.  I believe she could have remained conscious for

9    several minutes.  And when you're conscious, you feel pain.

10   And so whatever other injuries she sustained at that time,

11   the pain from the scalp and the wound in the scalp, she would

12   feel.

13        Q.   And while conscious, would she be aware of her

14   surroundings for instance?

15        A.   Probably, yes.

16        Q.   Assuming that -- assuming that she had been shot in

17   the trunk of an automobile and that trunk was then closed on

18   her while she's conscious, for instance, would she have the

19   ability to appreciate that she was now locked inside of a

20   trunk?

21        A.   I believe she would.

22        Q.   You mentioned a moment ago the toxicology tests are

23   run routinely on bodies.  Were they run in this case?

24        A.   Yes, they were.

25        Q.   Can you tell us the types of tests that were run?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    We routinely test for alcohol, such as ethanol, the

2  alcohol we drink; cannabinoids which is marijuana; and

3  general drug screen, looking for different classes of drugs,

4  as well as an opiate screen looking for heroin and other

5  drugs in that family.  We look for cocaine.  We look

6  generally for drugs of abuse.  We also pick up a number of

7  different prescription and non-prescription medications.

8      Q.    In this case, the screen for marijuana or

9  cannabinoid, was it negative or was it positive?

10     A.    It was negative.

11     Q.    No signs of any drug use, was there?

12     A.    Correct.

13     Q.    As a matter of fact, you ran a complete drug screen

14 and that also came back negative, right?

15     A.    Correct.

16     Q.    Now, when you looked at alcohols and acetones, did

17 you find a small amount of ethanol alcohol?

18     A.    There was a very small amount of ethanol, 0.01

19 percent.  This is -- I believe it's attributed to

20 decomposition.  We see low levels of alcohol with

21 decomposition because of the bacterial action and they

22 produce alcohol.  It's equivalent -- if you're thinking about

23 drinks and blood level, it's equivalent to less than one

24 drink of alcohol, less than one beer, less than one shot of

25 liquor, less than one glass of wine.  It's a very small

1    amount, and I believe it's postmortem.

2        Q.   So in this case you believe that that resulted from

3    the decomposition, having been out in the conditions for some

4    time before the body was brought in to your lab; is that

5    right?

6        A.   That's right.

7        Q.   Now, during the autopsy itself, did you recover the

8    bullet that had caused that gunshot wound to Ms. Cunningham?

9        A.   Yes.

10            MR. DAVIS:  May I approach, Your Honor.

11            THE COURT:  You may.

12       Q.   (By Mr. Davis)  Doctor, let me show you now what is

13   marked as State's Exhibit 63A, and if you would take a look

14   at that object and tell me whether or not this is the bullet

15   that you recovered during the autopsy of Ms. Cunningham.

16       A.   It is.  As I described it, it's a small caliber

17   deformed lead bullet.  I inscribed the case number and my

18   initials on the base of the bullet, and I filled out this

19   envelope, placed it in the envelope, sealed it, and submitted

20   it to the crime lab myself.  This is the same bullet.

21       Q.   Okay.  Thank you.

22            MR. DAVIS:  Your Honor, at this time we will

23   offer State's Exhibit 63A.

24            (State's Exhibit No. 63A offered)

25            MR. BYCK:  No objection to 63A.

DARLINE W. LABAR, OFFICIAL REPORTER

1            THE COURT:  Admitted.

2            (State's Exhibit No. 63A admitted)

3            MR. DAVIS:  May I publish briefly?

4            THE COURT:  You may.

5       Q.   (By Mr. Davis)  Again, this is a .22 caliber bullet;

6   is that correct?  Is that your opinion, or do you have an

7   opinion as to the caliber?

8       A.   Small caliber.  It's consistent with a .22 caliber

9   bullet.

10      Q.   Doctor, based upon the findings of your autopsy, as

11  well as the history provided to you, again, did you come to a

12  conclusion as to the cause of death in this matter?

13      A.   Yes, I did.

14      Q.   And can you tell us what opinions did you form?

15      A.   I believe Bertie Cunningham died of a gunshot wound

16  to the head, and that it's a homicide.

17      Q.   And her death then would have been consistent with

18  having been shot with a firearm; is that correct?

19      A.   That's correct.

20      Q.   Did you feel since her body had been found in water,

21  that drowning caused any part of her death after review of

22  all the material?

23      A.   Well, like I said, people can survive for a period

24  of time, these small caliber gunshot wounds to the head if it

25  doesn't affect the vital structures in the brain.  So if you

1   have a gunshot to the front half -- frontal lobes of the

2   brain, you can survive for several minutes or longer.  So

3   that if she had been dumped in the water immediately and had

4   still been alive and conscious and breathing, then she

5   certainly could have drowned.  Drowning could have

6   contributed to her death.

7       Q.   So as I understand in this case you cannot

8   absolutely rule out that drowning in water may also have been

9   a contributory cause to her death; is that right?

10      A.   That's right.

11              MR. DAVIS:  Again, may I approach, Your Honor.

12              THE COURT:  You may.

13      Q.   (By Mr. Davis)  Finally, Dr. Duval, if you could,

14  please look at State's Exhibit Number 2.  Looking at the case

15  number, does this appear to be a photograph that was taken of

16  Bertie Cunningham at or near the time of her autopsy?

17      A.   Yes.  This is a black and white identification

18  photo.  We take these of every autopsy we do.

19              MR. DAVIS:  Again, just for record purposes,

20  we'll offer State's Exhibit 2.

21              (State's Exhibit No. 2 offered)

22              MR. BYCK:  No objection, record only.

23              THE COURT:  Admitted.

24              (State's Exhibit No. 2 admitted)

25              MR. DAVIS:  I'll pass the witness, Your Honor.

1          MR. BYCK:  May it please the Court.

2                    <u>Cross-Examination</u>

3    By Mr. Byck:

4          Q.    Dr. Duval, my name is Michael Byck, and I represent

5    Jim Murphy in this trial.  I have not been to medical

6    school.  I have absolutely no background in the hard

7    sciences, so if I ask you a naive question or an untutored

8    question, please tutor me, if you would be so kind.

9          A.    Okay.

10         Q.    Doctor, I want to prove that Bertie Cunningham died

11   of drowning.  What medical evidence is there to prove that?

12   First of all, let's start at the beginning.  What would you

13   expect to find in an individual who had died by drowning?

14   What physical evidence would you expect to find that you

15   could show in a picture or show to the jury or show to me?

16         A.    Well, as I'm sure you're aware, there are no good

17   pathologic findings of drowning.  When we determine the cause

18   of death to be drowning, a lot of it is based on

19   circumstance.  There are some changes that go along with

20   drowning, such as heavy wet lungs from inhaling water, such

21   as water in the stomach, such as water in the sinuses of the

22   brain, the air spaces in the brain being filled with water.

23   These things go along with drowning, but you can also see

24   them in people that have died and then been dumped in water.

25   Also, people can drown and have dry lungs, because the

1    larynx, the upper part of your airway can just reflexly

2    close.  It's a defense mechanism so you don't inhale water.

3    And then you essentially suffocate because you still can't

4    get air.  So there are no good hard and fast medical findings

5    in drowning.

6        Q.    Are there any good hard and fast medical findings in

7    the autopsy of Bertie Cunningham that would show drowning?

8        A.    That would show drowning?

9        Q.    Yes.

10       A.    No, her lungs were not particularly heavy.  They

11   were a little bit heavy, but that can also be from pulmonary

12   edema or fluid in the lungs from having the brain injury.

13   There was no water in the stomach.  In fact, the gastric

14   contents were pretty dry.  There was a dry food bullous.  The

15   sinuses in the brain and with the nose, they were filled with

16   blood from the gunshot wound, so I don't have good evidence

17   that she drowned, except that she was clearly in the water.

18   We have the postmortem animal activity that also shows that

19   she was face down in the water or at least the left side of

20   her face was in the water.  So I can't conclude that she

21   drowned.  I can only speculate that it may have contributed

22   to her death.

23       Q.    Okay.  And that by your word is speculation?

24       A.    Yes.

25       Q.    It has no medical foundation, no medical basis aside

1    from the body being found in the water, of course?

2        A.   That's true.

3        Q.   Okay.  Now, you said that it was a gunshot wound,

4    close contact wound to the head, and the bullet, if I

5    understood you correctly, did not hit any vital structures in

6    the brain?

7        A.   Well, your brain is vital, but there's some parts of

8    the brain that are more vital than others.  There's the brain

9    stem which controls your respiration or your breathing,

10   controls your heart rate, it controls everything.  If there's

11   a injury to the brain stem, you're going to die instantly.

12       Q.   Was there an injury to the brain stem?

13       A.   No.

14       Q.   And you said in small caliber gunshot wounds like

15   this, that it is possible for the individual to remain alive

16   for a matter of minutes?

17       A.   Or longer.

18       Q.   Or longer.

19       A.   In -- sometimes in a comatose state.

20       Q.   Would -- do you have any evidence to show that Ms.

21   Cunningham was alive for any amount of time after that bullet

22   penetrated her skull and wound up on the other side of it?

23   Is there any evidence at all?

24       A.   Well, she did develop some bruising on the base of

25   the brain, and that is a consequence of the brain swelling.

DARLINE W. LABAR, OFFICIAL REPORTER

1   And the brain is confined in the skull, so that when it

2   swells, it gets pushed against the hard surfaces of the base

3   of the skull.  So there had to be time for the brain to

4   swell, time for these bruises on the base of the brain to

5   develop, so I do believe she survived for a few minutes

6   anyway.

7        Q.   Were those bruises noted in your autopsy?

8        A.   Yes, they are.

9        Q.   And where are they noted?

10       A.   Page 3.

11       Q.   Uh-huh.

12       A.   "Associated injuries," the fourth paragraph down.

13  There I describe herniation contusions of the bilateral

14  parahippocampal gyri, and fracture contusions of the

15  bilateral inferior frontal lobes.

16       Q.   Now, is there any possible way you can tell this

17  jury how probable it was that she survived for a couple of

18  minutes or any amount of time, or would that be a relatively

19  rare thing with the profound injury that she had with that

20  bullet?

21       A.   Well, it's not rare.  I've had several cases of

22  individuals that have shot themselves more than once in the

23  head.  I've coauthored a paper on it.  And we then --

24  literature search and found other cases reported in the

25  literature.  So it's not -- I wouldn't call it rare.  It is

1    uncommon, but it's not rare.

2         Q.   So it's not common at all?

3         A.   Okay.  Not common.

4         Q.   And in all the literature that you researched very

5    carefully for your professional paper, you only found a

6    couple of other cases?

7         A.   No, we found several others.

8         Q.   Well, how many is several?

9         A.   Probably a dozen, maybe 15 to 20.  I'd have to pull

10   the paper.

11        Q.   Out of how many possible gunshot wound homicides?

12        A.   Well, people don't report ordinary gunshot wounds so

13   I can't give you the denominator.

14        Q.   Okay.  You do see the importance in what I'm asking,

15   don't you?

16        A.   Yeah, I mean, I -- there's just no way to know for

17   certain if she survived.  I'm saying it's possible, and I've

18   seen it personally.

19        Q.   Okay.

20        A.   And --

21        Q.   But it is again a mere possibility, and not a

22   probability, right?

23        A.   Okay.  I'll give you that.  It's a -- it's a good

24   possibility.  Is it the most likely possibility?  Maybe not.

25        Q.   Okay.  Doctor, finally -- well, perhaps not finally,

DARLINE W. LABAR, OFFICIAL REPORTER

1  but you listed the cause of death as a gunshot wound to the

2  head?

3      A.   Yes.

4      Q.   Right?  Not drowning in water?

5      A.   In my conclusion in my report I state that drowning

6  may have contributed to her death.

7      Q.   Okay.  And the conclusion in your report -- is the

8  possibility that you mentioned a very important possibility?

9      A.   Important in terms of?

10     Q.   Important to communicating to the District Attorney

11 the cause of death, important to communicating to the jury

12 exactly what killed Ms. Cunningham?  Was it important?

13     A.   It's important enough that I put it in my

14 conclusion.

15     Q.   Would it be important enough to put in your death

16 certificate that you sent to the Judge Ozelle Wilcoxson?

17     A.   It's not -- that's not a death certificate we send.

18 The death certificate in out of county cases is completed by

19 the justice of the peace.  We are just a consultant.  So I

20 am --

21     Q.   Just a second, Doctor.

22          MR. BYCK:  May I have this document marked?

23          (Defendant's Exhibit No. 9 marked)

24     Q.   (By Mr. Byck)  Please pardon me for interrupting

25 you, Doctor.  You were saying that it wasn't important enough

1   to tell Judge Wilcoxson about, right?

2      A.   I don't think I said anything close to that.

3      Q.   Well, what did you say?

4      A.   I said that I do not complete death certificate on

5   out-of-county cases.  I send a cause of death statement to

6   them, an opinion as to the cause of death.

7      Q.   Okay.  Let me show you Defendant's Exhibit Number 9.

8   That document look familiar to you?

9      A.   Yes.

10     Q.   What is that?

11     A.   This is the cause of death sheet that is completed

12  the day of the autopsy and sent to the police investigating

13  agency, as well as the justice of the peace who referred the

14  case.

15          MR. BYCK:  Offer Defendant's 9 provided by the

16  State.

17          (Defendant's Exhibit No. 9 offered)

18          MR. DAVIS:  No objection.

19          THE COURT:  Admitted.

20          (Defendant's Exhibit No. 9 admitted)

21     Q.   (By Mr. Byck)  So you don't ordinarily include

22  speculation in your cause of death certificates?

23     A.   No.

24     Q.   Okay.

25          MR. BYCK:  Permission to publish, Your Honor.

1          THE COURT:  Granted.

2          MR. BYCK:  Ladies and gentlemen of the jury,

3    this is Defense Exhibit Number 9.  It speaks for itself.

4      Q.   (By Mr. Byck)  So there was no brain stem injury; is

5    that correct?

6      A.   None that I could see grossly.

7      Q.   If you suspect a brain stem injury, is there

8    something more that you can do than gross examination?

9      A.   There's subtle things that can happen in the brain

10   with any kind of trauma that we can't see by looking at the

11   brain.  All I can say is that half of the bullet was not

12   close to the brain stem.

13         MR. BYCK:  I have no further questions of this

14   witness.

15         MR. DAVIS:  No further questions, Your Honor.

16         THE COURT:  Thank you, Doctor.  You may step

17   down.  You may be excused, subject to recall.

18         THE WITNESS:  Okay.

19         MR. DAVIS:  The State will call Lonnie --

20   Lannie Emanuel.

21         THE COURT:  Good morning.  Ask you to raise

22   your right hand.

23              (Witness sworn.)

24                  LANNIE EMANUEL

25   was called as a witness by the State and, after having been

1    first duly sworn, testified as follows:

2                          Direct Examination

3    By Mr. Davis:

4         Q.   Sir, would you please tell us your full name?

5         A.   Lannie G. Emanuel.

6         Q.   And how are you employed?

7         A.   I'm employed with the Southwestern Institute of

8    Forensic Sciences.  That's sometimes referred to as SWIFS or

9    the Dallas County Crime Laboratory.

10        Q.   What position do you hold out there?

11        A.   I'm a firearm and toolmark examiner.

12        Q.   Can you tell us just a little bit about what a

13   firearms and a toolmark examiner does?

14        A.   Some of my duties would include the examination of

15   firearms, examination of ammunition and ammunition

16   components, microscopic examination of questioned bullets,

17   cartridge cases, and tookmarks.  I'm also responsible for

18   serial number restorations, distance determinations, fraction

19   matches, and examination of security devices.

20        Q.   Can you briefly tell us your professional

21   educational background and training?

22        A.   My formal training in firearm and tookmark

23   identification came while I was on active duty with the U.S.

24   Army.  This was a two-year resident court of instruction that

25   began in 1979.  After successful completion of the course, I

                    DARLINE W. LABAR, OFFICIAL REPORTER

1    was assigned to several of the laboratories within the United

2    States Army crime laboratory system, the first being at Fort

3    Gordon, Georgia.   I was then transferred to Fort Gillam,

4    Georgia, which is just located outside of Atlanta.   I had a

5    tour of duty at the European laboratory located in Frankfort,

6    Germany.   After returning to Fort Gillam in 1990, I decided

7    to retire and come to work for Dallas County.   I have

8    attended training on almost a yearly basis related to the

9    field of firearm and toolmark identification.

10        Q.   Sir, specifically in this case was an autopsy bullet

11   submitted to you for examination?

12        A.   Yes, it was.

13        Q.   State's Exhibit Number 63A, a bullet, should be in

14   front of you.   Do you see it up there?

15        A.   Yes.

16        Q.   Is that the bullet that you were asked to examine in

17   this matter?

18        A.   Yes, it is.

19        Q.   First of all, Mr. Emanuel, were you able to

20   determine the caliber of that bullet?

21        A.   Yes, I was.

22        Q.   And what were your findings?

23        A.   My examination revealed that this is consistent with

24   a .22 caliber bullet.

25        Q.   What other findings did you make in this case with

1    regard to that particular bullet?

2         A.    Another examination that we would conduct is try to

3    determine the class characteristics of the bullet.  In other

4    words, this bullet has been fired through a weapon, and the

5    barrel will leave certain marks on the bullet and these

6    marks -- the combination of marks will allow us to determine

7    a variety of different guns -- of weapons that the bullet

8    possibly could have been fired through.  And I did that in

9    this case.

10        Q.    Now, if we had a weapon, if we had a .22 caliber

11   pistol in our possession, would you be able to make some

12   determination about whether that particular bullet was fired

13   from a particular .22 caliber pistol?

14        A.    Yes.

15        Q.    How would you do that?

16        A.    That would be based on the individual

17   characteristics that the barrel leaves on the bullet as it's

18   fired.  Though microscopic in nature, we use a comparison

19   microscope to take a known bullet fired through a suspect

20   weapon and compare it to the questioned bullet or the marks

21   on the questioned bullet.  Provided there are sufficient

22   marks left on the bullet itself, we can make a determination

23   as to whether or not it was fired in that particular gun.

24        Q.    Was a weapon ever submitted to you for comparison

25   purposes with State's Exhibit Number 63A?

```
 1        A.    No, no weapon was ever submitted.

 2        Q.    As a result, you can't tell what particular weapon

 3   fired that bullet, can you?

 4        A.    No, I have no individual weapon to compare it to.

 5        Q.    Now, a .22 caliber pistol, would that be a firearm?

 6        A.    Yes.

 7        Q.    And would a firearm be a deadly weapon?

 8        A.    Yes.

 9        Q.    Thank you, Mr. Emanuel.

10              MR. DAVIS:  I'll pass the witness, Your Honor.

11                        Cross-Examination

12   By Ms. Balido:

13        Q.    Mr. Emanuel, my name is Jennifer Balido, and I don't

14   know if we've ever talked before in a courtroom setting, but

15   I'm going to ask you some questions about your testimony.

16              First thing, did you make a report?

17        A.    Yes, I did.

18        Q.    Okay.  I may have just misplaced my copy.  Do you

19   have it with you?

20        A.    Yes, I have a copy if you'd like.

21              MS. BALIDO:  May I approach the witness.

22              THE COURT:  You may.

23              (Copy given to defense counsel.)

24              MS. BALIDO:  Judge, may I have one second.

25              THE COURT:  You may.
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.    (By Ms. Balido)  Let me ask you a question, Mr.

2    Emanuel, about -- about some of your training and kind of

3    what you do to keep up with the literature at SWIFS.   Are

4    there periodicals that you read and articles that you read

5    regarding handgun and handgun safety?

6    A.    On a daily basis I do an examination of weapons, and

7    that leads to questions sometimes that I go into reference

8    and what we would call research.  And in answer to your

9    question, yes, in that nature.

10    Q.    Okay.  In your research or in your reading that you

11    do for your profession, have you ever come across a term

12    called "sympathetic firing"?

13    A.    Sympathetic discharge?  Yes.

14    Q.    Sympathetic discharge.  Can you explain to the jury

15    what that is?

16    A.    Sympathetic discharge is a term that describes a

17    condition when a revolver would have a cylinder loaded with

18    ammunition.  I don't know if everyone is familiar with a

19    revolver, but it's a handgun that has a cylinder and there's

20    holes drilled in the cylinder and each hole has ammunition in

21    it.  For the weapon to fire, the ammunition has to be brought

22    in line with the barrel.  Behind that there's a hammer that

23    then strikes the cartridge causing it to fire, forcing the

24    bullet out of the barrel.  When you have a sympathetic

25    discharge, you have a fire and the recoil of the weapon will

1    actually cause the cylinder to be forced back against the

2    frame and sometimes, if all conditions are right, the weapon

3    can actually fire from another one of the holes in the

4    cylinder not aligned with the barrel.

5        Q.   Let me also ask you if you have come into contact

6    with the situation where sometimes someone could be

7    holding -- and maybe this may be just -- we're talking about

8    two different things.  Let me ask you this.  Have you ever in

9    your literature heard about the term "unintentional

10   discharge"?

11       A.   That is a term that I have used from time to time.

12       Q.   Okay.  And is it consistent with the way that you've

13   used it that in some situations and most of the research is

14   done on actual police officer shooting -- shooting another

15   individual, that it can be the situation that someone is

16   holding a gun with one hand and either grabbing for or doing

17   something with the other hand and there's an unintentional

18   discharge on the hand that's holding the gun?

19       A.   When you say unintentional discharge, the way I

20   would use that term is actually it's the shooter's intent and

21   that's normally something that a firearms examiner -- there's

22   no examination that I could do to determine the shooter's

23   intent.  The weapon discharged.  And if it's unintentional,

24   perhaps the shooter did not intend to fire the weapon, but

25   then it did.

```
 1      Q.   Okay.  And so like you said, that's something a
 2   firearms person would not be involved in, the actual intent
 3   of the shooter?
 4      A.   That's correct.
 5      Q.   Okay.
 6           MS. BALIDO:  I'll pass the witness.
 7           THE COURT:  Anything further from the State?
 8           MR. DAVIS:  Yes, sir.
 9                     Redirect Examination
10   By Mr. Davis:
11      Q.   As I understand the pistol, the trigger has to be
12   pulled before the gun discharges, correct?
13      A.   That is correct.
14      Q.   So an individual has to put a finger on that trigger
15   and actually has to pull the trigger back before it will
16   discharge and actually fire?
17      A.   That is correct.
18      Q.   Now, as I understood when Ms. Balido talked to you
19   about sympathetic discharge, did I understand you to say that
20   that would occur after the trigger had been pulled once?
21      A.   That sympathetic discharge, as I described earlier,
22   occurs at the exact moment of firing.  The cartridge case is
23   struck by the hammer, which ignites the powder inside the
24   cartridge case which causes a tremendous release of gases
25   which is actually what forces the bullet out the barrel.
```

1    There's a reaction to that bullet being forced out the barrel

2    in that the cylinder will be forced back or slapped back

3    against the frame of the revolver.  And so a lot of times

4    when the sympathetic discharge will occur, it will give the

5    appearance that it was at the same time, but you actually

6    have two cartridges fired, one bullet going down the barrel,

7    the other going out beside or actually striking the front

8    part of the frame or where the barrel is attached to the

9    frame.

10       Q.   All right.  So this second bullet in a chamber

11   that's not aligned, okay, that will not fire on its own

12   unless the individual holding that pistol actually pulls the

13   trigger to discharge the bullet that is aligned, correct?

14       A.   That is correct.

15       Q.   Thank you, sir.

16            MR. DAVIS:  That's all the questions.

17            THE COURT:  Ms. Balido.

18                    Recross-Examination

19   By Ms. Balido:

20       Q.   Again, Mr. Emanuel, it must be that I'm -- that

21   where my confusion is I may be saying wrong and I'm certainly

22   no firearms expert and I haven't read all the literature

23   about this.

24            We talked about sympathetic discharge, and then we

25   also talked about the unintentional firing.  Let me ask you

1    if you're aware of -- under the term of unintentional firing,

2    if you have read anything or are aware of anything about what

3    is called sympathetic contraction?  What I'm talking about,

4    when the muscles of one limb exert a maximum or near maximum

5    force, the same muscles in the opposite limb can be

6    involuntary activated as well.  Have you heard of that?

7        A.    I think I understand what you're talking about now.

8        Q.    Okay.

9        A.    Which is the sympathetic discharge was completely

10   off of what you were asking.

11       Q.    Okay.  And like I say, I'm not an expert so I don't

12   know.

13       A.    Yes, and I don't know the exact term for that.  I

14   have been to a class and had exposure to training.  And what

15   she's discussing is at one time police officers were not

16   trained to have their guns drawn with finger off trigger.

17   And there were unintentional shootings that had occurred

18   during scuffles where people were actually being placed under

19   apprehension or for whatever reason, and as they were

20   grabbing with one hand, they would also grab the other, which

21   would cause the weapon to fire.  And at this point, I know

22   that I believe Dallas Police Department trains finger off

23   trigger so when they draw the weapon, they don't place their

24   finger on the trigger until they intend to fire the weapon.

25   That prevents the sympathetic discharge like -- like you were

1    describing, I think.

2        Q.   Okay.  So -- so as far as you know in your

3    information, this was such a situation that police agencies

4    had to train their officers to do something different to keep

5    from this sympathetic discharge or this sympathetic

6    contraction of the muscles to cause an unintentional firing

7    of the weapon?

8        A.   That is correct.

9              MS. BALIDO:  Pass the witness.

10                 Further Redirect Examination

11   By Mr. Davis:

12       Q.   Sir, pistols have trigger guards, don't they --

13       A.   Yes, they do.

14       Q.   -- as a rule?   And what's the purpose of a trigger

15   guard?

16       A.   A trigger guard is just as it sounds.  It's to guard

17   the trigger, keep something from coming in contact with the

18   trigger and causing the weapon to fire when you don't want it

19   to.

20       Q.   Such as a situation perhaps as Ms. Balido has termed

21   "sympathetic contraction," correct?

22       A.   If -- if -- for the sympathetic contraction and

23   again I don't know if that's the exact terminology, but for

24   what we're discussing, for that to actually produce a weapon

25   to fire -- cause a weapon to fire, the trigger finger would

1    have to be in -- on the trigger, inside the trigger guard.

2        Q.    Uh-huh.   Because if it's outside, it can't make

3    contact with the trigger, can it?

4        A.    That's correct.   The finger would then squeeze

5    against the weapon trigger guard.

6        Q.    So even in that occurrence, for that gun to

7    discharge, that individual still has to have his finger on

8    that trigger in a position to pull it back, correct?

9        A.    That is correct.

10                MR. DAVIS:   No further questions, Your Honor.

11                MS. BALIDO:   Just a couple more questions,

12    Judge.

13                   Further Recross-Examination

14    By Ms. Balido:

15        Q.    In your report you mentioned that there was a number

16    of guns that this bullet could have been shot through.

17        A.    Yes.

18        Q.    Okay.   How many -- is there any way of telling how

19    many different kinds of guns?

20        A.    There were -- I believe I counted about 22 or 24

21    different manufacturers that came up out of the database.

22        Q.    Okay.

23        A.    There could be others.

24        Q.    Okay.   And since you don't have the gun itself,

25    there's no way of knowing the amount of pressure that would

1    have to be put on the trigger before it could fire, the exact

2    amount of pressure?

3        A.   I would have no idea until I would test an

4    individual gun.

5                    MS. BALIDO:  Pass the witness.

6                    MR. DAVIS:  Nothing further, Your Honor.

7                    THE COURT:  Thank you, sir.  You may step

8    down.  Excused, subject to recall.

9                    THE WITNESS:  Thank you, sir.

10                   MR. DAVIS:  We call Officer Rogers.

11                   (Witness brought forward.)

12                   THE COURT:  Good morning.  Raise your right

13   hand, please, sir.

14                   (Witness sworn.)

15                   THE COURT:  Thank you, Officer.  Have a seat

16   to my left, if you please.

17           The State may continue.

18                   MR. DAVIS:  Thank you.

19                       JAMES ROGERS

20   was called as a witness by the State and, after having been

21   first duly sworn, testified as follows:

22                   Direct Examination

23   By Mr. Davis:

24       Q.   Sir, would you please tell us your full name?

25       A.   James Stewart Rogers.

1      Q.    Mr. Rogers, how are you employed?

2      A.    Forensic investigator with the Garland Police

3   Department.

4      Q.    Fist of all, how long have you been with the Garland

5   Police Department?

6      A.    Approximately seven years.

7      Q.    I believe you are a forensic investigator; is that

8   correct?

9      A.    Correct.

10      Q.    How long have you been a forensic investigator?

11      A.    Well, that title came to our department about two

12   years ago.  Before that we were crime scene search

13   technicians.  I also did the same job for about three years

14   at Wichita Falls PD.

15      Q.    So as I understand you've been doing this type of

16   work for approximately five years?

17      A.    Ten years.

18      Q.    Ten years in all.  Good.

19            Tell us first of all what are your duties and

20   responsibilities -- what type, what type of actions do you

21   take out there for the police department?

22      A.    Well, I go to a crime scene.  I photograph.  I

23   document any evidence's location.  I collect any physical

24   evidence.  I process items and areas for fingerprints.

25   Basically any kind of physical evidence.

1    Q.    What type of training have you received through your

2    present position?

3    A.    I received training through the police station

4    itself, through the FBI, through Texas D.P.S., Secret

5    Service, several private training facilities.

6    Q.    As I understood part of your duties then would be to

7    go to a crime scene.  First of all, would you document the

8    crime scene as best you could?

9    A.    Yes, sir.

10   Q.    At times do you collect evidence if it's available

11   at the crime scene?

12   A.    Yes, sir, I do.

13   Q.    And then would you collect other items such as

14   fingerprints if you can find them?

15   A.    Yes.

16   Q.    Are there times when you might be asked to -- to run

17   tests to detect possible blood evidence?

18   A.    Yes, sir.

19   Q.    And then finally are there occasions when you might

20   go to a crime scene and actually collect blood samples in

21   some way?

22   A.    Yes, sir, there are.

23   Q.    Officer Rogers, I want to direct your attention

24   first back to Thursday, October the 5th of 2000, ask you

25   whether at approximately 4:00 p.m. if you went to 1718

1    Barclay in Richardson, Texas?

2        A.   Yes, sir, I did.

3        Q.   What was the purpose of your trip to that location?

4        A.   To collect any evidence that might be found.

5        Q.   As part of -- as part of that, did you have an

6    occasion to go into the bathroom area of that home?

7        A.   Yes, sir, I did.

8        Q.   And once inside the bathroom, did you do certain

9    tests on any items there in the bathroom?

10       A.   Yes, sir.  I was asked to first perform a visual

11   search on the bathtub area, shower area, see if I could

12   visually detect any blood.  And then after that point I was

13   requested to use the chemical for presumptive blood tests.

14       Q.   First of all, when you looked at this bathtub, could

15   you visibly see any blood?

16       A.   No, sir.

17       Q.   You then made a decision or you were requested to do

18   some testing to try to detect blood that wasn't visible; is

19   that right?

20       A.   Yes, sir.

21       Q.   What particular kind of tests did you do out there?

22       A.   I applied a chemical called luminal to the bathtub

23   and shower wall.

24       Q.   And when you -- when you apply luminal, if blood is

25   going to be present there that you can't actually see, will

1    luminal react with it in some way?

2        A.   Yes, sir, it causes the iron in the blood to

3    luminesce and it appears as a pale blue glow.

4        Q.   When you applied the luminal to the bathtub out

5    there at Barclay, did you get any kind of reaction?

6        A.   We got a very limited reaction on the outside edge

7    of the bathtub.

8        Q.   Which was consistent with what in your opinion and

9    your experience?

10       A.   Possible blood, or perhaps bleach.

11       Q.   Bleach.  There's several other elements that will

12   react with luminal; is that right?

13       A.   Yes, sir, luminal reacts with iron, so it's a fairly

14   common substance.

15       Q.   Okay.  But again, one of the substances that would

16   react to luminal would be blood; is that right?

17       A.   Yes, sir.

18           MR. DAVIS:  Your Honor, at this time may I

19   approach.

20           THE COURT:  You may.

21       Q.   (By Mr. Davis)  Officer Rogers, showing you State's

22   Exhibit Number 75, is this a photograph of the bathtub that

23   you took there on Barclay?

24       A.   Yes, sir, it is.

25           MR. DAVIS:  Your Honor, at this time we would

1    offer State's Exhibit Number 75.

2                    (State's Exhibit No. 75 offered)

3              MS. BALIDO:  No objection.

4              THE COURT:  Admitted.

5                    (State's Exhibit No. 75 admitted)

6         Q.   (By Mr. Davis)  Now, in the photograph, again,

7    there's no blood visible in State's Exhibit Number 75, is

8    there?

9         A.   No, sir.

10        Q.   This photograph was taken before you applied the

11   luminal; is that right?

12        A.   Yes, sir.

13        Q.   While you were there at Barclay on October the 5th,

14   did you collect any empty gin bottles?

15        A.   No, sir, I don't believe I did.

16        Q.   Did you collect any empty Tequila bottles?

17        A.   No, sir.

18        Q.   How about any empty champagne bottles?

19        A.   No, sir.

20        Q.   Was any member of the household there while you were

21   doing this collection and search?

22        A.   The woman who resided there was.

23        Q.   Do you remember her name?

24        A.   No, sir.  I believe she was a relative --

25        Q.   Okay.

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.     -- of the defendant.

2      Q.     All right.  At any time did that -- did that

3  individual give you any empty bottles of Tequila, gin, or

4  champagne?

5      A.     No, sir.

6      Q.     Did you observe any bottles of that nature while you

7  were in the residence?

8      A.     Not that I recall, no, sir.

9      Q.     About how long did you stay at Barclay?

10     A.     Oh, probably an hour, maybe an hour and a half.

11     Q.     Did you -- did you on that date also go to a

12  location at 2023 Portsmouth in Richardson, Texas?

13     A.     Yes, sir.

14     Q.     The purpose of your visit to that location was what?

15     A.     To collect a Go-Ped and clothes of the person that

16  lived there.

17     Q.     Did you find a Go-Ped at that location?

18     A.     Yes, sir.

19     Q.     Did you take it?

20     A.     Yes.

21     Q.     Did you also take some clothing?

22     A.     Yes, sir.

23     Q.     Did you make any inspection of the outside portion

24  of the house?

25     A.     No.

1    Q.    Not at that time?

2    A.    No, sir.

3    Q.    Okay.  Did you do anything else at that location?

4    A.    No, I photographed the Go-Ped and the clothes and

5    collected them.  That's all I did.

6    Q.    Directing your attention forward now to October the

7    6th.  This will be a Friday.  At some point did you have an

8    occasion to go to Edgewood, Texas?

9    A.    Yes.

10   Q.    Do you remember about what time that you went there?

11   A.    I believe I was called in about 3:45 in the morning.

12   Q.    Uh-huh.  And do you recall, did some member of the

13   Garland Police Department ask you to go to Edgewood?

14   A.    Yes, sir.

15   Q.    Do you remember whether or not it was Detective

16   Myers or someone else?

17   A.    It was my supervisor.  He called me at home, said

18   that I needed to accompany him to that location.

19   Q.    Do you remember the location in Edgewood that you

20   first went to?

21   A.    Not by address, no.  We had to be led there by a

22   deputy.

23   Q.    Did you actually go to a house first?

24   A.    Yes, sir.

25   Q.    All right.  Sometime later did you go to another

DARLINE W. LABAR, OFFICIAL REPORTER

1    location in Edgewood?

2         A.    Yeah, we went to a creek bed.

3         Q.    And were other police officers already there when

4    you got there?

5         A.    Yes, sir.

6         Q.    Now, what time of day or night was it when you got

7    out there to the creek, would you estimate?

8         A.    It was about 6 o'clock in the morning.

9         Q.    Still dark outside?

10        A.    Very much so.

11        Q.    Did you have an opportunity to examine the crime

12   scene and to inspect it?

13        A.    Yes.

14        Q.    At the time that you got there, did you see a body

15   lying in the creek?

16        A.    Yes, sir, I did.

17        Q.    So the body had not yet been removed; is that right?

18        A.    That is correct.

19        Q.    What's the first thing that you did then when you

20   got to the crime scene there at the creek?

21        A.    Well, the first thing I did, I talked to the

22   officers that were already there to see if they had seen

23   anything I did not see.  Then I basically searched the area

24   with flashlights because it was -- like I said, it was very

25   dark.

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1        Q.    And --

 2        A.    Go ahead.

 3        Q.    At a certain point did you take photographs to

 4    document the crime scene?

 5        A.    Yes, sir, I did.

 6              MR. DAVIS:  May I approach, Your Honor.

 7              THE COURT:  You may.

 8        Q.    (By Mr. Davis)  Officer Rogers, showing you now

 9    State's Exhibits 31, 32, 33, and 34.  Are these photographs

10    that you took out there in Edgewood on October the 6th of the

11    year 2000?

12        A.    Yes, sir, they are.

13        Q.    Do they truly and accurately depict the crime scene

14    as you found it?

15        A.    Yes, sir.

16              MR. DAVIS:  Your Honor at this time we will

17    offer State's Exhibit 31, 32, 33, and 34.

18              (State's Exhibit No. 31 through 34 offered)

19              MR. BYCK:  Your Honor, may I have permission

20    to take the witness on voir dire very briefly?

21              THE COURT:  You may.

22                    Voir Dire Examination

23    By Mr. Byck:

24        Q.    Sir, you took all these photographs?

25        A.    Yes.
```

1    Q.   Let me show you 33 and 34.  Has the body been moved

2    or changed in position in any way between 33 and 34?

3    A.   Not -- no, other than just the wind or the water

4    motion.

5    Q.   But it's in exactly the same position.  Nobody went

6    into the water, changed it, raised an arm, moved it around or

7    anything while you were there?  No?

8    A.   No.

9             MR. BYCK:  Okay.  No objection to State's 31

10   through 34, inclusive.

11            THE COURT:  They are all admitted.

12            (State's Exhibit No. 31 through 34 admitted)

13            MR. DAVIS:  Permission to publish, Your Honor.

14            THE COURT:  You may.

15   Q.   (By Mr. Davis)  State's Exhibit Number 31, first of

16   all, Officer Rogers, what area of that -- of that crime scene

17   are we looking at?

18   A.   That is directly above the culvert area, that large

19   drain pipe.

20   Q.   State's Exhibit Number 30 which has previously been

21   admitted, would this also show from basically across the

22   creek the same tree and the culvert area that we see in

23   State's Exhibit Number 31?

24   A.   Yes, sir.

25   Q.   To kind of orient the jury, again, State's Exhibit

1    31 is still taken while it was dark out there, right?

2        A.    (No response.)

3             (Exhibit published to jury.)

4        Q.    (By Mr. Davis)   State's Exhibit Number 32, does this

5    show in greater detail the boulder or the large rock that's

6    shown in State's Exhibit 31?

7        A.    Yes, sir.

8        Q.    First of all, as we start -- as we start looking at

9    this rock, is there any object on this rock that caught your

10   attention in particular?

11       A.    Yes, sir, there's a section of hair caught on the

12   rock here.

13       Q.    Basically in the middle portion of the rock there?

14   Did you actually collect that hair for further analysis later

15   on?

16       A.    Yes, sir.

17       Q.    Now, State's Exhibit Number 33, this photograph,

18   would it be fair to say is now taken from the other side of

19   the creek looking across the creek toward the culvert and the

20   rocks that we've just been looking at?

21       A.    Yes, sir.

22       Q.    The body that's depicted in State's Exhibit Number

23   33, would it be fair to say that this body is down low in the

24   same area as the culvert and the rock?

25       A.    Yes, sir, it's almost directly beneath.

DARLINE W. LABAR, OFFICIAL REPORTER

1           (Exhibit published to jury.)

2       Q.   (By Mr. Davis)   The body is still in the water then;

3   is that what we're seeing?

4       A.   Yes, sir.

5       Q.   Could you tell whether a portion of the face was

6   actually underwater when you first saw the body?

7       A.   Yes, sir, it was.

8       Q.   While you were out there, Officer Rogers, did you

9   see any signs of aquatic action, in particular any turtles or

10  any other --

11      A.   Yes, sir, there was a large snapping turtle at the

12  position of the body.

13      Q.   Finally, State's Exhibit Number 34, is this a closer

14  view of the body that shows that portion of the body that's

15  actually under the water?

16      A.   Yes, sir.

17      Q.   How close to the body was this snapping turtle?

18      A.   It was -- it appeared to me to be taking a bite out

19  of her arm when I saw it so --

20      Q.   How large a turtle are we talking about?

21      A.   Across the shell was probably at least a foot and a

22  half.

23      Q.   How long did you -- did you stay at that particular

24  location at the creek?

25      A.   Probably two, two and a half hours.

1    Q.   When you -- when you left that particular crime

2    scene, did you go back to the Garland Police Department?

3    A.   Yes, sir.

4    Q.   And at that point were you asked to process a

5    vehicle for possible physical evidence?

6    A.   Yes, sir.

7    Q.   And in the process of that examination, did you take

8    photographs of the automobile?

9    A.   Yes, sir, I did.

10        MR. DAVIS:   May I approach, Your Honor.

11        THE COURT:   You may.

12    Q.   (By Mr. Davis)   First, Officer Rogers, the

13    automobile that you were asked to process there on October

14    the 6th, is it shown in State's Exhibit Number 7, the

15    four-door silver Honda Accord?

16    A.   Yes, sir, it is.

17    Q.   Looking at photographs that are marked now State's

18    Exhibit 77, 78, 79, 80, 81, 82, 83, and 84, are these

19    photographs that you took of the Honda as you processed it on

20    October the 6th, the year 2000?

21    A.   Yes, sir.

22        MR. DAVIS:   Your Honor, at this time we will

23    offer State's Exhibits 77 through 84.

24        (State's Exhibit No. 77 through 84 offered)

25        MS. BALIDO:   No objection.

1              THE COURT:  Admitted.

2              (State's Exhibit No. 77 through 84 admitted)

3      Q.   (By Mr. Davis)  First of all, looking at State's

4   Exhibit Number 77, the first photographs that we'll look at,

5   would it be fair to say that they show the trunk area of that

6   automobile?

7      A.   Yes, sir.

8      Q.   And is there any particular items that are shown

9   there in State's Exhibit Number 77, any blood evidence, other

10  physical evidence that you later collected for analysis?

11     A.   Yes, sir, in between these two bolts what we

12  believed to be blood.

13     Q.   This is with the trunk lid up; is that right?

14     A.   Yes, sir.

15     Q.   The trunk itself, did it have several items inside

16  still?

17     A.   Yes, sir, it did.

18     Q.   State's Exhibit Number 78, would this further show

19  a -- a portion of the trunk seal or the rim area of that

20  trunk?

21     A.   Yes, sir.

22     Q.   And do we also see evidence of blood there?

23     A.   Yes.

24              (Exhibit published to jury.)

25     Q.   (By Mr. Davis)  And again, the blood that you

1    observed here on the trunk lid, did you collect that and

2    later submit that to the Texas Department of Public Safety

3    lab for analysis?

4        A.    Yes, sir.

5        Q.    State's Exhibit Number 79, does this show the trunk

6    as it was when you first opened the lid?

7        A.    Yes.

8        Q.    Some of the items that the jury can see here, what

9    would they be?  Is there any clothing in there, for instance?

10       A.    Yes, sir, there's several items of clothing, bags

11   from stores, considerable amount of blood.

12       Q.    And as I understand, State's Exhibit Number 79 was

13   taken before any of those items was moved; is that right?

14       A.    Yes, sir.

15       Q.    State's Exhibit Number 80 then, does this show the

16   condition of the trunk once you started to move some of those

17   items?

18       A.    Yes, sir.

19              (Exhibits published to jury.)

20       Q.    (By Mr. Davis)  Once you had moved some of the

21   items, did blood become apparent to you?

22       A.    Yes, sir.

23       Q.    I want to now show you some of the photographs of

24   the interior portion of that automobile.  First of all,

25   State's Exhibit Number 81, would this be the back floorboard

1   area?  Specifically, would this be the -- behind the driver's

2   side, the rear compartment?

3        A.   Yes, sir.

4        Q.   The item that I'm now pointing to, Officer Rogers,

5   what's shown in that photograph?

6        A.   It's a bottle of Hennessy whiskey.

7        Q.   Was there still whiskey or liquid in that bottle?

8        A.   Yes, sir.

9        Q.   Officer Rogers, do you recall whether there were any

10  other whiskey bottles or containers for alcoholic beverages

11  inside the vehicle?

12       A.   Yes, sir, I believe there were a few beer cans as

13  well.

14       Q.   State's Exhibit 82, does this show the front two

15  seats of the Honda?

16       A.   Yes, sir.

17       Q.   The item that's contained there on the console, what

18  are we looking at?

19       A.   It's a cigarette package.

20       Q.   State's Exhibit Number 83, does that show in greater

21  detail the cigarette pack that's in the console area?

22       A.   Yes, sir.

23       Q.   Did you collect that for later analysis?

24       A.   Yes, sir, I did.

25       Q.   Looking now at State's Exhibit Number 84, what

1    portion of the automobile does this photograph show?

2        A.   That's the car door area on the front driver's door.

3        Q.   All right.  So on the driver's side door was there a

4    cargo holder or some area where you could place items?

5        A.   Yes, sir.

6        Q.   The items that we're seeing here in general what

7    were those items that were contained in that particular

8    holder?

9        A.   It's a checkbook register.

10       Q.   Again, that's on the driver's side?

11       A.   Yes, sir.

12       Q.   Okay.  Officer Rogers, I want to now talk to you for

13   a while about some of the items that you recovered and

14   collected in the automobile from the trunk area if we could

15   begin there.  First of all, did you collect a tan-colored

16   purse from the trunk area?

17       A.   Yes, sir.

18       Q.   Sir, if you would, if you'd look at State's Exhibit

19   Number 83, does this appear to be the tan-colored purse that

20   you retrieved from the trunk of that automobile?

21       A.   Yes, sir.

22       Q.   Is that -- what's this purse made out of?  How --

23       A.   I'd say a woven nylon.

24       Q.   Were there still some items in this purse when you

25   recovered it?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    Yes.

2                  MR. DAVIS:  Your Honor, at this time we will

3      offer State's Exhibit Number 83 with the contents thereof.

4                  MS. MILLER:  83 is already a photo --

5                  MR. BYCK:  83 is a photograph.

6                  MR. DAVIS:  Okay.  This would be 83A.

7                  (State's Exhibit No. 83A offered)

8                  MS. BALIDO:  Judge, if I could see it just for

9      a moment.

10                 MR. BYCK:  We have no objection to 83A.

11                 MR. DAVIS:  Make it 83A.

12                 THE COURT:  Admitted.

13                 (State's Exhibit No. 83A admitted)

14                 MR. DAVIS:  May I approach, Your Honor.

15                 THE COURT:  You may.

16     Q.    (By Mr. Davis)  Let me show you now what's been

17     marked as State's Exhibit Number 86.  Do you recognize this

18     brown leather billfold?

19     A.    Yes, sir.

20     Q.    Was this actually contained in State's Exhibit

21     Number 83A at the time that you recovered it?

22     A.    Yes, sir.

23                 MR. DAVIS:  Your Honor, at this time we will

24     offer State's Exhibit Number 86.

25                 (State's Exhibit No. 86 offered)

```
1            MR. BYCK:  Briefly on voir dire, Your Honor.

2            THE COURT:  Granted.

3                   Voir Dire Examination

4   By Mr. Byck:

5       Q.   Sir, let me show you State's Exhibit 86, and I want

6   you to look at these items contained therein.  Were these

7   items in State's 86 when you recovered it from State's 83A?

8       A.   I believe so, sir.

9            MR. BYCK:  No further questions.  No objection

10  to 86.

11           THE COURT:  Admitted.

12           (State's Exhibit No. 86 admitted)

13      Q.   (By Mr. Davis)  Now, State's Exhibit Number 83A, the

14  purse, first of all, I believe you testified that there were

15  several -- several items inside that purse at the time it was

16  recovered, correct?

17      A.   Yes, sir.

18      Q.   Sir, do we see several different cards, one being a

19  Foley's credit card, for instance, in the name of Bertie L.

20  Cunningham inside of that purse?

21      A.   Yes, sir.

22      Q.   Do we see a health insurance card with the name of

23  Bertie L. Cunningham?

24      A.   Yes, sir.

25      Q.   Okay.  Is there a another card, appears to be an ATM
```

1    card for Washington Mutual under the name of Bertie L.

2    Cunningham, correct?

3         A.   Yes, sir.

4         Q.   Be fair to say that there are several other personal

5    items, including glasses, pieces of paper, and other cosmetic

6    items inside the purse?

7         A.   Yes, sir.

8         Q.   State's Exhibit Number 86, the leather billfold,

9    again, does it contain a card, handwritten card inside with

10   the name of Bertie Cunningham, 2749 Laurel Oaks, Garland,

11   Texas, with the zip, with the phone number, with the notation

12   Mary Shelton -- I'm sorry, Mary E. Shelton with the address

13   of 3119 Big Oaks in Garland?

14        A.   Yes, sir.

15        Q.   Now, at the present time the billfold does not

16   contain any money, does it?

17        A.   No, sir.

18        Q.   It does contain several photographs as well as cards

19   again bearing the name of, in one instance, Orville

20   Cunningham, and B.L. Cunningham, correct?

21        A.   Yes.

22        Q.   Did you remove any money from the billfold at the

23   time that you seized it?

24        A.   I don't believe so, no, sir.

25        Q.   So that I'm clear, did this billfold contain any

```
1    money at the time that it was collected from that Honda
2    Accord automobile on October the 6th?
3        A.   No, sir.
4        Q.   Did you find any loose money inside State's Exhibit
5    Number 83A, the tan-colored purse?
6        A.   No.
7             MR. DAVIS:  If I can just have a continued
8    ability to approach, Your Honor.
9             THE COURT:  You may.
10            MR. DAVIS:  Thank you.
11       Q.   (By Mr. Davis)  State's Exhibit 88 which appears to
12   be a Texas liability insurance card, was that seized from the
13   trunk, also?
14       A.   Yes.
15       Q.   As well as State's Exhibit Number 89 which appears
16   to be an envelope bearing the name of Arapaho Baptist Church
17   from the trunk also?
18       A.   Yes.
19       Q.   You need to answer out yes or no.
20       A.   Oh, yes, sir.
21            MR. DAVIS:  We'll offer State's Exhibits 88
22   and 89 at this time.
23            (State's Exhibit No. 88 and 89 offered)
24            MR. BYCK:  No objection, 88 and 89.
25            THE COURT:  Admitted.
```

DARLINE W. LABAR, OFFICIAL REPORTER

1              (State's Exhibit No. 88 and 89 admitted)

2      Q.    (By Mr. Davis)  And, again, Officer Rogers, as we

3    look at these two exhibits, both of them bear the name of

4    Bertie Cunningham; is that right?

5      A.    Yes, sir.

6      Q.    Is there still -- does there appear to be something

7    contained in State's Exhibit Number 89?

8      A.    Yes, sir, it appears that there was money.  It's a

9    church donation so I didn't take it out of there.

10     Q.    Does it bear the notation of budget fund, $110;

11   United We Build, $40, for a total amount enclosed $150?

12     A.    Yes, sir.

13     Q.    Sir, let me show you two receipts.  First receipt

14   marked State's Exhibit 90.  The second receipt marked as

15   State's Exhibit 94.  Were these two items also recovered --

16   recovered from the trunk of the automobile?

17     A.    Yes, sir.

18            MR. DAVIS:  Your Honor, at this time we will

19   offer State's Exhibit Number 90, which is a JC Penney's

20   receipt, and State's Exhibit 94, which is a Dillard's

21   receipt.

22            (State's Exhibit No. 90 and 94 offered)

23            MR. BYCK:  No objection to 90, 94.

24            THE COURT:  Both admitted.

25            (State's Exhibit No. 90 and 94 admitted)

1    Q.   (By Mr. Davis)  First of all, let's look at the

2  Dillard's receipt.  Does that show a date, Officer Rogers?

3  It's faint, but does it show a date of 10-4-2000, with the

4  time of 11:55 on it?

5    A.   Yes, sir.

6    Q.   Total purchase amount there is what, $46 and --

7    A.   55 cents.

8    Q.   -- and 55 cents.

9         Secondly, the JC Penney's receipt, which is State's

10 Exhibit Number 90, sir, is that -- does that show a time of

11 2:55 p.m.?  Is that correct?

12   A.   Yes, sir, it is.

13   Q.   Okay.  Does it show that the date again is

14 10-4-2000?

15   A.   Yes, sir.

16   Q.   Does it show an amount of $32.73?

17   A.   Yes, sir, it does.

18   Q.   And the item, quantity one, does it show to be a

19 short robe?

20   A.   Yes, sir.

21   Q.   Does it indicate that the purchase was made with a

22 Discover Card?

23   A.   Yes, sir.

24   Q.   And some of the numbers are blanked out on that,

25 correct --

1       A.    Yes.

2       Q.    -- with X's?

3             Officer Rogers, if we look at the numbers that still

4    appear on this receipt, State's Exhibit Number 90, do the

5    numbers 7884 follow a long series of X's?

6       A.    Yes, sir.

7       Q.    Looking at State's Exhibit Number 4, which is a

8    Discover Card issued to Frances Louise Connor, can you please

9    read for the members of the jury the last four numbers that

10   appear on that card?

11      A.    7884.

12      Q.    So that the last four numbers of that credit card

13   match the numbers showing on the JC Penney receipt; is that

14   right?

15      A.    Yes, sir.

16            THE COURT:  You may continue, Counsel.

17            MR. DAVIS:  Thank you.

18      Q.    (By Mr. Davis)  Officer Rogers, State's Exhibit

19   Number 93 which appears to be a Dillard's bag, was that

20   retrieved from the trunk of the automobile also?

21      A.    Yes, sir.

22            MR. DAVIS:  We'll offer State's Exhibit Number

23   93 at this time.

24            (State's Exhibit No. 93 offered)

25            MR. BYCK:  No objection, 93.

1          THE COURT:  Admitted.

2              (State's Exhibit No. 93 admitted)

3      Q.   (By Mr. Davis)  State's Exhibit 90, which appears to

4  be a JC Penney's bag, was that recovered from the trunk

5  also?

6      A.   Yes.

7      Q.   Inside --

8              MS. MILLER:  Greg, you also have a 90.  It

9  needs to be 91.

10             MR. DAVIS:  Okay.  That will be Exhibit 91.

11  Okay.

12     Q.   (By Mr. Davis)  I understood you to say State's

13  Exhibit 91 was recovered from the trunk; is that correct?

14     A.   Yes, sir.

15     Q.   State's Exhibit 91A, which appears to be a blue

16  robe, was that also retrieved from the trunk?

17     A.   Yes.

18             MR. DAVIS:  Your Honor, at this time we will

19  offer State's Exhibit 91 and 91A.

20             (State's Exhibit No. 91 and 91A offered)

21             MR. BYCK:  No objection to 91 and 91A.

22             THE COURT:  Both admitted.

23             (State's Exhibit No. 91 and 91A admitted)

24     Q.   (By Mr. Davis)  Let me now show you what has been

25  marked as Exhibit 91B, Officer Rogers.  Does that appear to

1   be also a JC Penney's bag?

2       A.   Yes, sir.

3       Q.   What's -- what's the condition of this bag?

4       A.   The bag is covered with dried blood, and it's ripped

5   and torn.

6               MR. DAVIS:  Your Honor, at this time we will

7   offer State's Exhibit 91B.

8               (State's Exhibit No. 91B offered)

9               MR. BYCK:  No objection.

10              THE COURT:  Admitted.

11              (State's Exhibit No. 91B admitted)

12      Q.   (By Mr. Davis)  As I understand it, whenever you

13  retrieved State's Exhibit 91B, was it soaked in blood?

14      A.   Yes, sir.

15      Q.   Officer Rogers, I want to show you a white T-shirt.

16  It's been marked as State's Exhibit 91C.  Do you recognize

17  that as a white T-shirt that you recovered from the trunk of

18  that automobile, also?

19      A.   Yes, sir.

20      Q.   Now, there's a lot of writing with blue pen on the

21  T-shirt at this time.  Was that writing -- was that present

22  on the T-shirt at the time that you collected it, or has that

23  been placed on the T-shirt later?

24      A.   That was placed on it later.

25      Q.   Specifically, did you submit this T-shirt to the

```
 1   Texas Department of Public Safety lab for further analysis

 2   for blood and/or DNA work?

 3       A.   Yes.

 4       Q.   Do you assume that that's writing that the lab

 5   personnel actually placed on the T-shirt?

 6       A.   I believe that.

 7               MR. DAVIS:  Your Honor, at this time we will

 8   offer State's Exhibit 91C.

 9               (State's Exhibit No. 91C offered)

10               MR. BYCK: No objection to 91C.

11               THE COURT:  Admitted.

12               (State's Exhibit No. 91C admitted)

13       Q.   (By Mr. Davis)  The T-shirt itself appears to be

14   what, a Fruit of the Loom -- what's the size of that T-shirt?

15       A.   A large, 46-48.

16       Q.   Certain areas of that T-shirt have also been cut

17   out.  Do you assume that was done by the lab as they

18   collected possible blood samples?

19       A.   Yes, sir.

20       Q.   Okay.  Now, I want to turn your attention to the

21   items that you recovered from inside the vehicle.

22       A.   Okay.

23       Q.   First of all, as I understood, you actually

24   collected the cigarette packs that were inside the vehicle,

25   didn't you?
```

Page 103

```
 1        A.    Yes, sir.

 2              THE COURT:  Before we continue, may I see the

 3   attorneys at the side of the bench, scheduling matter.

 4        Ladies and gentlemen, we will continue with the

 5   presentation of the testimony of this witness later.  We'll

 6   take our lunch break, hour for your lunch.

 7              THE COURT:  All rise.

 8        Counsel, let's return 1:15.

 9        (Recess taken.)

10              THE COURT:  Before we -- on the record,

11   Darline.

12        Before we continue the hearing with regard to the

13   search of the jail cell, let me invite both sides to avail

14   themselves of the benefits of United States Supreme Court

15   case Hudson v. Palmer, found at 468 U.S. 517, also found at

16   104 Supreme Court 3194, 82 Lawyers Edition 2d 393.

17              MS. LITTLE:  What was the page number, Judge,

18   on that --

19              MS. BALIDO:  I've got it.

20              MS. LITTLE:  -- court cite?

21              MS. BALIDO:  I've got it.

22              THE COURT:  468 U.S. 517.  Case basically

23   holds a prisoner has no reasonable expectation of privacy in

24   a jail cell.  Therefore, no Fourth Amendment protection.

25   Opinion by then Chief Justice Warren Berger.
```

1          Sheriff, may we have the jury, please.

2                    THE BAILIFF:  Yes, sir.  All rise.

3                    THE COURT:  Let the record reflect the jury is

4     returning to the courtroom at this time.

5                    (Jury returned to courtroom.)

6                    THE COURT:  Jurors may be seated.

7          Mr. Murphy, you may be seated.

8          The witness may be seated.

9          Ms. King, may I ask for the benefit of counsel and

10    the jurors and the witness, the last question to be read

11    back.

12                    (Discussion off the record.)

13    Q.   (By Mr. Davis)  Officer Rogers, I had just asked you

14    about the pack of cigarettes that you found in the Honda.

15                    MR. DAVIS:  May I approach, Your Honor.

16                    THE COURT:  You may.

17    Q.   (By Mr. Davis)  State's Exhibits 121 and 122, are

18    these packages of cigarettes, Basic cigarettes that you

19    recovered from inside the Honda?

20    A.   Yes.

21    Q.   In addition to the two packs of cigarettes, did you

22    also recover a receipt from that area?

23    A.   Yes, sir.

24    Q.   State's Exhibit Number 99, do you recognize that to

25    be the receipt that you recovered from inside the console?

```
 1        A.   Yes, sir, I did.

 2                MR. DAVIS:  Your Honor, at this time we will

 3   offer State's Exhibits 99, 121, and 122.

 4            (State's Exhibit No. 99, 121 and 122 offered)

 5                MR. BYCK:  No objection to 99, 121, and 122.

 6                THE COURT:  All admitted.

 7            (State's Exhibit No. 99, 121, and 122 admitted)

 8        Q.   (By Mr. Davis)  Now, the receipt, State's Exhibit

 9   99, is there an address, first of all, of 9620 Harry Hines,

10   Dallas, Texas?

11        A.   Yes, sir.

12        Q.   Is there also a date of 10-4 2000, a time of 11:31

13   p.m.; is that correct?

14        A.   That is correct, yes, sir.

15        Q.   Underneath the date and the time, are there a number

16   of X's followed by four numbers 7147?

17        A.   Yes, sir.

18        Q.   Looking at State's Exhibit Number 5 which is a

19   Discover Card issued to Bertie Cunningham, the last four

20   numbers, do they match 7147?

21        A.   Yes, sir.

22        Q.   Is there a notation there that the transaction

23   selected cannot be processed?

24        A.   Yes, sir.

25        Q.   Now, I want to refer you to the checkbook that you
```

1    found in the cargo holder on the driver's side.  Do you

2    recall that?

3       A.   Yes, sir.

4       Q.   State's Exhibits 101 and 102, do you recognize 101

5    to be the checkbook cover that you recovered from that

6    location and State's Exhibit 102 to be a check registry that

7    you recovered?

8       A.   Yes, sir.

9            MR. DAVIS:  At this time we will offer State's

10   Exhibits 101 and 102.

11           (State's Exhibit No. 101 and 102 offered)

12           MR. BYCK:  No objection to 101, 102.

13           THE COURT:  Both admitted.

14           (State's Exhibit No. 101 and 102 admitted)

15       Q.   (By Mr. Davis)  In State's Exhibit 102, are there

16   several entries?

17       A.   Yes, sir.

18       Q.   And also I notice that there's a certain pinkish or

19   purplish color to certain documents such as State's Exhibit

20   99, and the registry, State's Exibit 102.  Can you tell the

21   members of the jury how that particular color has been

22   produced on these documents?

23       A.   Yes, sir, that coloration is from a chemical

24   compound called anhydron.  It reacts with amino acids and

25   sweat and that's how we develop latent fingerprints on

1    papers.

2        Q.   So when you recovered the documents, they didn't

3    have that color, but after you processed them for

4    fingerprints, that's how they got this color, right?

5        A.   Yes, sir.

6        Q.   State's Exhibit 103, do you recognize this to be

7    some sort of receipt from the Citizens National Bank of Wills

8    Point, Texas, and Grand Saline, Texas?

9        A.   Yes, sir.

10       Q.   Was that inside State's Exhibit 101 when you

11   recovered it?

12       A.   Yes, sir.

13               MR. DAVIS:  At this time we will offer State's

14   Exhibit 103.

15               (State's Exhibit No. 103 offered)

16               MR. BYCK:  No objection to 103.

17               THE COURT:  Admitted.

18               (State's Exhibit No. 103 admitted)

19       Q.   (By Mr. Davis)  Now, on the face of State's Exhibit

20   103 do we have some sort of receipt that indicates that a

21   deposit in the amount of $153.88 has been made?

22       A.   Yes, sir.

23       Q.   On the back is there some handwriting with the name

24   of Kirsten Adames, A-d-a-m-e-s, as well as a telephone number

25   of 800-777-2249, extension 8577?

```
 1        A.   Yes, sir.

 2        Q.   Looking now at State's Exhibit 104, is that a

 3   drivers license that you recovered from the checkbook cover

 4   101?

 5        A.   Yes, sir.

 6             MR. DAVIS:  We'll offer State's Exhibit 104,

 7   the defendant's -- it's in the name of Jedidiah Isaac Murphy.

 8             (State's Exhibit No. 104 offered)

 9             MR. BYCK:  Is that an I.D. card or a Texas

10   drivers license?

11             MR. DAVIS:  It's an identification card.

12             MR. BYCK:  No objection, 104.

13             THE COURT:  Admitted.

14             (State's Exhibit No. 104 admitted)

15        Q.   (By Mr. Davis)  State's Exhibit 105, which appears

16   to be a card from the Wizards Sports Cafe in Richardson,

17   Texas, did you also recover that from the Honda automobile?

18        A.   Yes, sir.

19             MR. DAVIS:  We'll offer State's Exhibit 105.

20             (State's Exhibit No. 105 offered)

21             MR. BYCK:  No objection to 105.

22             THE COURT:  Admitted.

23             (State's Exhibit No. 105 admitted)

24        Q.   (By Mr. Davis)  State's Exhibit 110, which is a

25   business card purporting to be that of Shelley D. Featherston
```

1    who is a Constable in Kaufman County, did you also recover

2    State's Exhibit 110 from the Honda automobile?

3        A.    Yes.

4              MR. DAVIS:  We will offer State's Exhibit 110

5    at this time.

6              (State's Exhibit No. 110 offered)

7              MR. BYCK:  No objection to 110.

8              THE COURT:  Admitted.

9              (State's Exhibit No. 110 admitted)

10       Q.    (By Mr. Davis)  Now, first of all, on the card,

11   State's Exhibit 105, which is the Wizards Sports Cafe at 747

12   South Central Expressway in Richardson, Texas, is there a

13   signature there for the member?

14       A.    Yes, sir.

15       Q.    Can you make out that signature?

16       A.    Jedidiah Murphy.

17       Q.    And does it also have date stamp?  Looks like

18   September --

19       A.    September 2001.

20       Q.    Again, the color on this card would have been due to

21   the processing that you did for fingerprints; is that right?

22       A.    Yes, sir.

23       Q.    The driver's -- or the identification card bearing

24   the name of Jedidiah Isaac Murphy, again, was that -- was

25   that included in the papers inside State's Exhibit 101?

1    A.   Yes, sir.

2    Q.   And does that relate date of birth 9-1-75, that it

3 expires on 9-1-06?

4    A.   Yes, sir.

5           (Exhibit published to jury.)

6    Q.  (By Mr. Davis)  Additionally, did you recover

7 several pieces of paper that you later processed for

8 fingerprints?

9    A.   Yes, sir.

10    Q.   Starting with State's Exhibit 109, is that a square

11 piece of paper that has the name Dr. Lee and what appears to

12 be a telephone number of 551-6957 on it?

13    A.   Yes.

14    Q.   Again, that was in the checkbook; is that correct?

15    A.   Yes.

16           MR. DAVIS:  We'll offer State's Exhibit 109 at

17 this time.

18           (State's Exhibit No. 109 offered)

19           MR. BYCK:  No objection to 109.

20           THE COURT:  Admitted.

21           (State's Exhibit No. 109 admitted)

22    Q.  (By Mr. Davis)  State's Exhibit 112, which appears

23 to be a rectangular yellow piece of paper, was that recovered

24 inside the Honda also?

25    A.   Yes.

1          MR. DAVIS:  We'll offer State's Exhibit 112 at

2    this time.

3               (State's Exhibit No. 112 offered)

4          MR. BYCK:  No objection to 112.

5          THE COURT:  Admitted.

6               (State's Exhibit No. 112 admitted)

7     Q.   (By Mr. Davis)  State's Exhibit 113, which appears

8    to be another rectangular shaped piece of yellow paper, was

9    that recovered from the Honda?

10    A.   Yes.

11          MR. DAVIS:  We'll offer State's Exhibit 113.

12               (State's Exhibit No. 113 offered)

13          MR. BYCK:  No objection.  113.

14          THE COURT:  Admitted.

15               (State's Exhibit No. 113 admitted)

16    Q.   (By Mr. Davis)  State's Exhibits 114A and 114B,

17    which would appear to be some sort of purchase or receipt for

18    a money order on both of these, again, both these were

19    recovered from the Honda; is that correct?

20    A.   Yes, sir.

21          MR. DAVIS:  We'll offer State's Exhibits 114A

22    and 114B.

23               (State's Exhibit No. 114A and 114B offered)

24          MR. BYCK:  No objection, 114A or B.

25          THE COURT:  Both admitted.

```
 1                    (State's Exhibit No. 114A and 114B admitted)

 2        Q.    (By Mr. Davis)  State's Exhibit 111, which appears

 3    to be a yellow piece of paper with the words Lynk Systems,

 4    Inc., of Atlanta, Georgia, did you recover that document from

 5    inside the Honda?

 6        A.    Yes, sir.

 7                    MR. DAVIS:  We'll offer State's Exhibit 111 at

 8    this time.

 9                    (State's Exhibit No. 111 offered)

10                    MR. BYCK:  No objection, 111.

11                    THE COURT:  Admitted.

12                    (State's Exhibit No. 111 admitted)

13        Q.    (By Mr. Davis)  State's Exhibit 106, which is a

14    yellow piece of paper which appears to be a receipt from

15    Cowboys Quick in Terrell, Texas, did you recover that

16    document from inside the Honda?

17        A.    Yes, sir.

18                    MR. DAVIS:  We'll offer State's Exhibit 106.

19                    (State's Exhibit No. 106 offered)

20                    MR. BYCK:  No objection, 106.

21                    THE COURT:  Admitted.

22                    (State's Exhibit No. 106 admitted)

23        Q.    (By Mr. Davis) On State's Exhibit 106, Officer

24    Rogers, does that appear 10-5-2000?

25        A.    Yes, sir.
```

1    Q.    Does there -- a time appear of 6:18 p.m.?

2    A.    Yes, sir.

3    Q.    Is it in the amount of $22.29?

4    A.    Yes, it is.

5    Q.    And does a signature appear there, sir?

6    A.    Yes, sir.

7    Q.    Officer Rogers, if you would, looking now at State's

8    Exhibit 53, which is a white copy of a receipt from Cowboys

9    Quick, which has previously been admitted into evidence, does

10   it appear that the contents of those two documents are

11   identical?

12   A.    Yes, sir.

13   Q.    So that it would appear that State's Exhibit 106 is

14   simply a carbon copy of the exhibit -- State's Exhibit 53; is

15   that correct?

16   A.    Yes, sir, that's correct.

17   Q.    Finally, a series of documents here that have been

18   marked State's Exhibits 107A, through 107E, do you recognize

19   these five documents as having been recovered from inside the

20   Honda, also?

21   A.    Yes, sir.

22              MR. DAVIS:  We'll offer State's Exhibits 107A

23   through 107E at this time.

24              (State's Exhibit No. 107A through 107E offered)

25              MS. BALIDO:  If we can just see them, Judge.

1          MR. DAVIS:  These are the workers compensation

2     receipts.

3          MR. BYCK:  No objection, 107A through E,

4     inclusive.

5          THE COURT:  Admitted.

6          (State's Exhibit No. 107A through 107E admitted)

7     Q.   (By Mr. Davis)  Looking at State's Exhibit 107A,

8     does this state that this is a workers compensation indemnity

9     partial payment?

10    A.   Yes, sir.

11    Q.   Does it state a loss date of June 22nd of the year

12    2000?

13    A.   Yes, sir.

14    Q.   Does it bear the name of Jedidiah Isaac Murphy?

15    A.   It does.

16    Q.   Does it bear the address of 727 East Northeast

17    Commerce Street, Number 4, Wills Point, Texas?

18    A.   727 East North Commerce Street, yes, sir.

19    Q.   And does it have an adjuster's number of 9W2?

20    A.   Yes, it does.

21    Q.   Does it have besides -- beside "Notes," the notation

22    7-2 through 7-8-2000?

23    A.   Yes, sir.

24    Q.   State's Exhibit 107B, is that the same contents

25    except with the note that it's 7-23 through 7-29-2000?

1      A.    Yes, sir.

2      Q.    107C, again, is that similar, except for the

3   notation 9-5 through 9-11-2000?

4      A.    It is.

5      Q.    107D.  Well, let me take you first of all to 107E,

6   that notation being 9-12 through 9-18 of 2000; is that right?

7      A.    Correct.

8      Q.    And finally, looking at 107D, the notation 9-26

9   through 2 -- through 10-2-2000, correct?

10      A.    Correct.

11      Q.    All right.  First of all, now, as I understand any

12   sort of blood evidence that may have been developed was sent

13   to the Texas Department of Public Safety lab for later

14   testing; is that correct?

15      A.    Yes, sir.

16      Q.    Now, did you process these items that we've just

17   talked about for possible fingerprint evidence?

18      A.    They were processed in our lab, yes, sir.

19      Q.    Was the automobile itself processed for

20   fingerprints?

21      A.    Yes, sir, it was.

22      Q.    Did you use the same method of the anhydron

23   solution, or did you use another method to actually

24   fingerprint the automobile?

25      A.    The automobile exterior was processed with black

1    magnetic powders.

2        Q.   How does that process work?  If you were to find --

3    first of all, let's go back.  Were you looking for latent

4    fingerprints?

5        A.   Yes, sir.

6        Q.   And when we use that term, what does that term mean

7    to you?

8        A.   Latent simply means it's not visible to the eye or

9    it's hidden.

10       Q.   How are latent fingerprints actually created?

11       A.   When your hand touches the surface, the oil or

12   residue that you get from your skin or your hair, whenever

13   you touch it, transfers from your finger to whatever surface

14   you are touching.

15       Q.   Are latent fingerprints always created when an

16   individual's finger touches another surface?

17       A.   There is always something left behind.  It might not

18   be a readable print, but there's something left behind, yes,

19   sir.

20       Q.   What is a readable print or a comparable print?

21       A.   A comparable print is a fingerprint that -- if you

22   look at the bottoms of your fingers, you see lines on there.

23   Where those lines start and stop or split are called

24   identification points, and that's what you make a comparison

25   of.  So if you have a given number of those, then it's a

1    comparable print.

2       Q.   Now, when you processed the Honda itself, were you

3    able to develop any comparable latent fingerprints?

4       A.   Yes, sir.

5       Q.   From different -- different locations of the

6    automobile?

7       A.   Yes, sir.

8       Q.   And when you found one of those fingerprints, then

9    how actually would you preserve the fingerprint?

10      A.   Okay.  Once the powder is applied and you identify a

11   fingerprint on the surface, then you apply a clear tape to it

12   and peel it off and apply the tape to a white card.

13               MR. DAVIS:  May I approach, Your Honor.

14               THE COURT:  You may.

15      Q.   (By Mr. Davis)  Officer Rogers, I'm now showing you

16   Exhibits 115, 116, 117, and 118.  Do you recognize these four

17   documents?

18      A.   Yes, sir, I do.

19      Q.   What are they?

20      A.   They're the white cards that I lifted fingerprints

21   with tape and placed the tape on the cards.

22      Q.   These are fingerprints that you actually lifted from

23   the Honda Accord; is that right?

24      A.   Yes, sir.

25               MR. DAVIS:  Your Honor, at this time we will

                DARLINE W. LABAR, OFFICIAL REPORTER

1    offer State's Exhibits 115, 116, 117, and 118, and I'm now

2    tendering them to counsel for their inspection.

3              (State's Exhibit No. 115 through 118 offered)

4              MR. BYCK:  No objection, 115 through 118.

5              THE COURT:  Admit them.

6              (State's Exhibit No. 115 through 118 admitted)

7       Q.   (By Mr. Davis)  In addition, did you lift any

8    fingerprints from either of the two packs of cigarettes that

9    are there before you?

10      A.   Yes, sir.

11      Q.   State's Exhibit 119, Officer Rogers, do you

12   recognize that, sir?

13      A.   Yes, sir, that is a fingerprint that was lifted from

14   the -- I believe it's 122, the unopened package.

15             MR. DAVIS:  Your Honor, at this time we will

16   offer State's Exhibit 119, and I'm again tendering that to

17   counsel for their inspection.

18             (State's Exhibit No. 119 offered)

19             MR. BYCK:  No objection to 119.

20             THE COURT:  Admitted.

21             (State's Exhibit No. 119 admitted)

22      Q.   (By Mr. Davis)  If we could, Officer Rogers, go

23   through these four cards from the Honda briefly.  State's

24   Exhibit Number 115, where was this particular fingerprint

25   lifted from?

1      A.    That was lifted from the driver's side of the front

2    hood.

3      Q.    Driver's side, front hood?

4      A.    Yes, sir.

5      Q.    Okay.  State's Exhibit 116, where was this

6    fingerprint lifted from?

7      A.    This was lifted from the interior upper edge of the

8    rear passenger door window.

9      Q.    So that actually is inside the vehicle itself?

10     A.    Yes, sir.

11     Q.    State's Exhibit 117, can you tell the members of the

12   jury where that fingerprint was lifted from?

13     A.    This came from the exterior driver's door frame.

14     Q.    Finally, State's Exhibit 118, where was this

15   fingerprint lifted from?

16     A.    This was lifted from the interior door handle of the

17   front driver's door.

18     Q.    And again, State's Exhibit 119 would have been

19   lifted from State's Exhibit 122 which is the unopened pack of

20   Basic cigarettes; is that right?

21     A.    That's correct.

22     Q.    In addition to those particular fingerprints, which

23   I take it were they lifted with black powder?

24     A.    Yes, sir.

25     Q.    When you analyzed the other items with a different

1   method, were you able to develop any comparable latent

2   fingerprints there?

3       A.   Yes, sir.

4       Q.   First of all, I want to direct your attention to the

5   piece of paper that bears the name Dr. Lee, and that's going

6   to be State's Exhibit 109.

7       A.   Yes, sir.

8       Q.   Okay.  Were you able to lift any comparable latent

9   fingerprints from that item?

10      A.   We enhanced them on the item.  They were not lifted,

11  though.

12      Q.   You were able to develop them, then?

13      A.   Yes, sir.

14      Q.   Were they comparable?

15      A.   Yes, sir.

16      Q.   I want to direct your attention to the yellow piece

17  of paper bearing the name Lynk Systems paper, and that's

18  going to be State's Exhibit 111.  Were you able to develop

19  latent comparable fingerprints there?

20      A.   Yes, sir.

21      Q.   On the item that's going to be State's Exhibit 112,

22  which is one of the rectangular pieces of yellow paper --

23      A.   Yes, sir.

24      Q.   -- actually both of them, State's Exhibit 112 and

25  113, were you able to develop comparable latent fingerprints?

1     A.   Yes, sir.

2     Q.   From the workers compensation receipts or check

3  stubs there, before -- were you able to lift or develop

4  comparable fingerprints, and this will be the 107 series

5  there in front of you?

6     A.   Yes, sir.

7     Q.   The sports card or the card -- membership card,

8  State's Exhibit 105 from Wizards Sports Cafe, bearing the

9  name of Jedidiah Murphy, were you able to develop

10  fingerprints there?

11     A.   Yes, sir.

12     Q.   From the business card belonging to Constable

13  Shelley D. Featherston, that's going to be State's Exhibit

14  110, were you able to develop comparable latent fingerprints

15  there?

16     A.   Yes, sir.

17     Q.   Finally, on State's Exhibit Number 99, which will be

18  the receipt from 9620 Harry Hines in Dallas --

19     A.   Yes, sir.

20     Q.   -- were you able to develop fingerprints there?

21     A.   Yes, I did.

22     Q.   In addition to that, were you able to develop

23  fingerprints on certain warranty documents?

24     A.   Yes, sir.

25          MR. DAVIS:  If I can approach.

1               THE COURT:  You may.

2        Q.    (By Mr. Davis)  Let me show you what's previously

3   been admitted into evidence as State's Exhibits 114A, 114B,

4   and 114C.  Are these the warranty documents that you were

5   referring to earlier that you lifted comparable or you

6   developed comparable fingerprints from?

7        A.    Yes, sir.

8        Q.    And these are what appear to be Go-Ped warranty

9   papers; is that correct?

10       A.    Yes, sir.

11       Q.    If we could go over the results of your work here.

12   Once you developed those particular fingerprints, did you

13   then begin the process of comparing them against a known set

14   of fingerprints?

15       A.    Yes, sir, they were compared against a card from our

16   jail.

17       Q.    State's Exhibit 120, Officer Rogers, do you

18   recognize that?

19       A.    Yes, sir, I do.

20       Q.    What is State's Exhibit 120?

21       A.    That is the book-in fingerprints from the arrest at

22   10-06-2000 of a Jedidiah Isaac Murphy.

23       Q.    Okay.  Is that the same individual seated at the

24   counsel table there with the kind of brownish or greenish

25   color shirt and dark tie?

1     A.    Yes, sir.

2     Q.    All right.

3            MR. DAVIS:  At this time we will offer State's

4     Exhibit 120.

5            (State's Exhibit No. 120 offered)

6            MR. BYCK:  No objection to 120.

7            THE COURT:  Admitted.

8            (State's Exhibit No. 120 admitted)

9     Q.    (By Mr. Davis)  When you compare fingerprints --

10    latent fingerprints against known fingerprints, how do you

11    actually do that comparison?

12    A.    You take the latent that's in question, lay it

13    beside the inked known fingerprint, and then you simply look

14    under magnifying glasses and look for those points that I

15    described earlier.

16    Q.    All right.  Let's go through the results of your

17    comparisons there.  The four fingerprints that you found

18    inside and outside the Honda automobile --

19            MS. BALIDO:  Judge, we're going to object at

20    this time.  I don't believe the proper foundation has been

21    laid for him to state any expert opinion as to the

22    comparability of these prints.

23            THE COURT:  Sustained.

24    Q.    (By Mr. Davis)  Officer Rogers, have you undergone

25    training in the comparison of fingerprints, sir?

1      A.    Yes, sir.

2      Q.    Can you tell us briefly the type of training that

3  you have received?

4      A.    I received basic and advanced latent fingerprint

5  training from the FBI.

6      Q.    Okay.  And what does that entail?

7      A.    That entails a week to two-week course going over

8  the components of fingerprints, the comparison of them, and

9  the actual matching of fingerprints.

10     Q.    Do you have any experience in the comparison of

11 fingerprints, sir?

12     A.    Yes, sir, I do.

13     Q.    Can you tell us briefly the experience that you have

14 in that area?

15     A.    Approximately nine years of comparison.

16     Q.    And while you've been doing that for nine years,

17 have you received additional training or supervision while

18 you've been employed by the Wichita Falls Police Department,

19 as well as the Garland Police Department?

20     A.    Yes, sir.  I've also received AFIS training through

21 the Texas Department of Public Safety.  AFIS is the

22 fingerprint computer.

23     Q.    Is there some sort of certification that you could

24 acquire for fingerprint comparison?

25     A.    Yes, sir, there is.  There's several.

1    Q.   Do you hold those?

2    A.   No, I do not at this time.  No.

3    Q.   Okay.  Do you have any -- any idea of the number of

4    fingerprints that you've compared during your career?

5    A.   Thousands.

6    Q.   Let me now go back to ask you whether or not you

7    compared the latent fingerprints to the known set of

8    fingerprints.

9              MS. BALIDO:  Judge, at this time before he

10   renders any verdict, I'd like to take this -- renders any

11   opinion, I'd like to take this witness on voir dire.

12             THE COURT:  You may.

13                  Voir Dire Examination

14   By Ms. Balido.

15   Q.   Officer Rogers, let me ask you a little bit about

16   this certification process that goes on.  What are the

17   different certifications that you could hold?

18   A.   There are different organizations.  The primary one

19   that most people have is through the IAI, which is the

20   International Association for Identification.  It's a tested

21   certification on latent fingerprint examination.

22   Q.   Okay.  Where you actually take a test and then

23   somebody comes back and checks your work and makes sure that

24   what you say is right; is that correct?

25   A.   Correct.

1    Q.   Okay.  And have you ever attempted to get this

2  certification?

3    A.   No, unfortunately departments that I work for will

4  not pay for them, and I've not had the money to pay for it

5  myself.

6    Q.   What are some additional certifications that you

7  could hold?

8    A.   For fingerprint examination?

9    Q.   Yes.

10    A.   The primary certification will be latent print

11  examination.

12    Q.   Okay.  And you said there were some other

13  certifications that you didn't have.  Do you know those names

14  or those associations?

15    A.   No.  The primary one is the IAI.

16    Q.   Okay.  And you've never taken that test?

17    A.   No, I have never been able to afford it.

18    Q.   Okay.  Have you ever gone through any sort of

19  testing procedure in such a way that an independent person

20  was -- would test you on whatever -- if your results are

21  correct?

22    A.   Yes.

23    Q.   Okay.  And is that done through the training that

24  you've had in the past?

25    A.   Yes, it is.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.    Okay.  But there's no certification that you got --

2   is there -- do you get certified out of that program?

3      A.    Yes.

4      Q.    Okay.  And is it a situation where you can either

5   pass or fail?

6      A.    Yes, it is.

7      Q.    Okay.

8            MS. BALIDO:  Judge, no further questions.

9   And, Judge, we'd assert that he's not qualified since he

10  doesn't hold this certification.

11           THE COURT:  Objection is overruled.

12     Q.    (By Mr. Davis)  In this particular case, Officer

13  Rogers, was your work checked by another member of the

14  Garland Police Department?

15     A.    Yes, every time a fingerprint comparison is done, it

16  is double checked by another person.

17     Q.    Now, I want to go back to the four fingerprints that

18  were lifted from the Honda automobile, sir.  Did you compare

19  those fingerprints against the known fingerprints of

20  Jedidiah -- Jedidiah Isaac Murphy?

21     A.    Yes, sir.

22     Q.    And what was the result of your comparison?

23     A.    That they all had been left by Jedidiah Isaac

24  Murphy.

25     Q.    The fingerprint that you developed from State's

DARLINE W. LABAR, OFFICIAL REPORTER

1    Exhibit 122, the unopened back of cigarettes there, did you

2    compare that against the defendant?

3        A.    Yes, sir.

4        Q.    What was the result of your comparison?

5        A.    That the fingerprint belonged to Jedidiah Isaac

6    Murphy.

7        Q.    The fingerprints that you found on State's Exhibit

8    109, the piece of paper bearing the name of Dr. Lee, what was

9    the result of your comparison, sir?

10       A.    That the fingerprint belonged to Jedidiah Isaac

11   Murphy.

12       Q.    The piece of paper, State's Exhibit 111, that bears

13   the name Lynk Systems paper, as well as the other two pieces

14   of yellow paper, State's Exhibit 112 and 113, what was the

15   result of your comparison?

16       A.    That they also belonged to Jedidiah Isaac Murphy.

17       Q.    The 114 -- the Exhibits 114A through E, what was the

18   result of the fingerprints that you developed from those

19   documents, sir?

20       A.    The ones that were matched belonged to Jedidiah

21   Isaac Murphy.

22       Q.    The fingerprint that you lifted from State's Exhibit

23   105, the Wizards Sports Cafe card, what was the result of

24   your comparison?

25       A.    They were matched to Jedidiah Isaac Murphy.

1    Q.   The fingerprint off the card bearing the name of

2  Shelley D. Featherston, Constable, I believe that's State's

3  Exhibit 110, what was the result of your comparison?

4    A.   They belong to Jedidiah Isaac Murphy.

5    Q.   State's Exhibit 99, the receipt from 9620 Harry

6  Hines, that's the one that bears the date of 10-4-2000 and

7  the time of 11:31 p.m., what was the result of your

8  comparison?

9    A.   That fingerprint belonged to Jedidiah Isaac Murphy.

10   Q.   Finally, the fingerprints that you developed off the

11 warranty papers there in front of you, the Go-Ped warranty

12 papers, I believe those are State's Exhibits 14A, B, and C,

13 what were the results of your comparison, sir?

14   A.   The fingerprint belonged to Jedidiah Isaac Murphy.

15            MR. DAVIS:  I'll pass the witness, Your Honor.

16                  <u>Cross-Examination</u>

17 By Ms. Balido:

18   Q.   Is it Officer Rogers, or --

19   A.   Investigator Rogers.

20   Q.   Investigator Rogers.  So are you actually a licensed

21 peace officer?

22   A.   No.

23   Q.   Okay.  What -- what exactly is your -- if you're not

24 a licensed police officer and you work for Garland police,

25 what exactly are you?

1    A.    I'm a forensic investigator.

2    Q.    Okay.  So you're a civilian?

3    A.    Yes.

4    Q.    All right.  Mr. Rogers, let me ask you a little bit

5   about the investigation that went on let's just say at the

6   time you got out to the house on Lamar Street where the car

7   was found.  Do you make the determination of what pictures

8   you take and what things you need to pull prints off of or

9   how is that done?

10   A.    Yes, I make a determination.  Plus, if my superiors

11  say take these photographs as well, I'll take those as well.

12   Q.    Okay.

13   A.    But I do make my own determination, yes.

14   Q.    Okay.  And who makes the determination of what items

15  are actually going to be fingerprinted?

16   A.    That will be my primary duty.

17   Q.    Okay.

18             MS. BALIDO:  May I approach the witness, Your

19  Honor.

20             THE COURT:  You may.

21   Q.    (By Ms. Balido)  Now, Investigator Rogers, I'm

22  showing you pictures of State's Exhibit Number 81, State's

23  Exhibit Number 79, State's Exhibit Number 80, State's Exhibit

24  Number 78, and State's Exhibit Number 77, and those are the

25  pictures that you took or some of the pictures that you took

1    regarding the car; is that correct?

2        A.   Yes.

3        Q.   Okay.  On State's Exhibit Number 77, it shows a spot

4    of blood on the trunk seal; is that correct?

5        A.   Yes, it is.

6        Q.   Okay.  Did you try to lift fingerprints off of any

7    area around the trunk?

8        A.   Yes.

9        Q.   Okay.  And what was the result of that?

10       A.   None made.

11       Q.   And that's your opinion, is that correct, that were

12   none there?

13       A.   Yes.

14       Q.   And what area of the trunk did you try to test?

15       A.   Test for fingerprints?

16       Q.   Yes.

17       A.   The exterior area, the smooth surfaces.

18       Q.   Okay.  Because the bumps areas or some of the

19   plastic areas don't usually hold fingerprints?

20       A.   It breaks up the fingerprint pattern.

21       Q.   All right.  And did you do that around the entire

22   area of the trunk?

23       A.   Yes.

24       Q.   Okay.  So if someone was leaning on the trunk like

25   this --

1     A.    Uh-huh.

2     Q.    -- you'd try to get either a palm print or a

3  fingerprint off; is that correct?

4     A.    Yes.

5     Q.    Did you get any partials?

6     A.    Yes.

7     Q.    Okay.  And did you try to compare any of the

8  partials to any known fingerprints?

9     A.    Yes, all the fingerprints that were lifted were

10  compared.

11     Q.    Okay.  To Jedidiah Isaac Murphy?

12     A.    To every suspect they have.

13     Q.    And who are all the suspects?

14     A.    The primary one is Jedidiah Isaac Murphy.

15     Q.    Okay.  Did you compare it to any other suspects?

16     A.    I did not.

17     Q.    Okay.  Did you ever compare any sort of fingerprints

18  or any partial fingerprints that you lifted from a man by the

19  name of Treshod Tarrant?

20     A.    I did not, no.

21     Q.    Okay.  And do you make that primary decision as to

22  who you should test and you should not test, or compare --

23  I'm sorry, not test?

24     A.    No, the detectives of the case submit a request for

25  fingerprint comparisons.

1    Q.    Okay.  And that would be Detective Myers?

2    A.    Yes.  In that particular case.

3    Q.    Let me ask you also specifically in regard to

4  State's Exhibit Number 81, do you see what's located inside

5  the car?

6    A.    Yes.

7    Q.    And what is located in -- what's primarily -- what's

8  primarily depicted in the photo?

9    A.    The Hennessy whiskey bottle.

10   Q.    And there's also a Diet Coke can?

11   A.    Yes.

12   Q.    Did you attempt to test that or -- excuse me, did

13  you attempt to compare or first lift latent fingerprints from

14  that?

15   A.    Yes.

16   Q.    And were you able to?

17   A.    I don't believe so.

18   Q.    Okay.  Did you get any partials on that?

19   A.    Yes.

20   Q.    Okay.  Did you try to compare the partials to any

21  known fingerprints?

22   A.    The partial prints that I got?  Yes.

23   Q.    Okay.  And was the only person that you compared

24  partial prints to in that situation Jedidiah Isaac Murphy?

25   A.    That I compared, yes.

1    Q.   Okay.  Do you know of anybody else comparing any

2   other prints that you know of?

3    A.   There was three other investigators that did

4   comparisons as well.

5    Q.   Okay.  But just what you did, you said that you

6   didn't compare them to anybody else?

7    A.   Correct.

8    Q.   Do you know of anyone that compared Treshod

9   Tarrant's fingerprints to any of the prints that you either

10   lifted or developed through the anhydron that day?

11    A.   Not that I know of, no.

12    Q.   On State's 80, I want to show you that for -- see if

13   we can do it this way.  There were a number of items in the

14   back of the trunk; is that correct?

15    A.   Yes.

16    Q.   And a number of items that are covered in blood; is

17   that also correct?

18    A.   Yes.

19    Q.   And is there also -- what is this right here, this

20   big square item?

21    A.   It's a suitcase.

22    Q.   Okay.  And did you pull that suitcase out as well?

23    A.   Yes, everything in the trunk is pulled out.

24    Q.   All right.  And did you determine who owned that

25   suitcase?

DARLINE W. LABAR, OFFICIAL REPORTER

Page 135

```
 1        A.    I did not at that time, no.

 2        Q.    Okay.  Did you find out later whose suitcase it was?

 3        A.    No.

 4        Q.    Okay.  Did it have any tags on it or anything that

 5   you made any records of whose it might be?

 6        A.    I don't believe so, no.

 7        Q.    And you're looking at your report when you're

 8   testifying; is that correct?

 9        A.    This is all it is.

10        Q.    And you testified with the prosecutor -- or the

11   prosecutor asked you about some luminal that was used on a

12   bathtub; is that correct?

13        A.    Yes, ma'am.

14        Q.    And what was the location of that bathtub?

15        A.    It was in a bathroom on Barclay.

16        Q.    Okay.  On Barclay?  All right.  And you said that --

17   that sometimes the luminal comes back showing up bleach as

18   well?

19        A.    Yes, it's primary reaction is iron.

20        Q.    Okay.

21        A.    So anything with iron it will react to it.

22        Q.    And did you try to scrape any of those or get a

23   sample from any of those places where it showed up iron?

24        A.    No.

25        Q.    Okay.  You just showed up luminal and -- but you
```

DARLINE W. LABAR, OFFICIAL REPORTER

1   didn't pry to preserve anything for testing for blood to see

2   if it was actually blood or if it could be bleach?

3       A.   My -- it was in my opinion and the others there

4   that --

5               MS. BALIDO:   Judge, I'm going to object to

6   hearsay based on the opinion of other people.

7               THE COURT:   Sustained.

8       Q.   (By Ms. Balido)  Just what was your opinion?

9       A.   It was my opinion it was an insufficient amount

10  there.

11      Q.   Okay.  So while you were actually in the house on

12  Barclay did you -- was it you that was making the decisions

13  on what to seize and what not to seize or was it kind of a

14  group effort or was it primarily Detective Myers?

15      A.   It was primarily Detective Myers.

16      Q.   Okay.  So did you actually have a conversation with

17  the person who owned the house there?

18      A.   No, I don't believe I did.

19      Q.   Okay.  And did you basically take from the residence

20  what Detective Myers gave you to take from the residence?

21      A.   He pointed it out, and I collected it.

22      Q.   Let me ask you a little bit about when you first

23  went out to the scene where Ms. Cunningham's body was found.

24  Where did you park your vehicle?

25      A.   Where did I park my vehicle?  On the road.

1      Q.   On the road?

2      A.   Yes.

3      Q.   Did you ever attempt to find any tire tracks or

4   anything like that that might have been left by any

5   vehicle -- any vehicle or vehicles that might have been out

6   at the Livingston Hill location?

7      A.   No.

8      Q.   And it was dark when you got there; is that correct?

9      A.   Yes.

10      Q.   And when you got there, there were people from the

11   Edgewood Police Department and the Van Zandt County Sheriff's

12   Department; is that correct?

13      A.   Yes.

14      Q.   And were people walking around the location?

15      A.   On the road, yes.

16      Q.   And were they actually walking down towards the

17   location in the creek where the body was actually found?

18      A.   No, the -- it was extremely steep.  Nobody wanted to

19   walk down there.

20      Q.   Okay.  So would it be safe to say that it would be

21   hard to walk down there at all?

22      A.   From the angle where we were parked, yes.

23      Q.   Okay.  And that was on which side -- I mean, the

24   roadside?

25      A.   The roadside, yes.

1    Q.    Okay.  When you got out there, who was out there?

2    A.    The people you mentioned, Commander and Lieutenant

3    from my department.

4    Q.    Commander Lay?

5    A.    Yes.

6    Q.    And Lieutenant Thompson?

7    A.    Uh-huh.

8    Q.    You need to say yes or no for the record.

9    A.    Yes.

10   Q.    And was Detective Myers out there at that point?

11   A.    I don't remember.

12   Q.    Okay.  Was Detective Tooke out there at that point?

13   A.    Also, I don't remember that.

14   Q.    And were the vehicles that carried everybody out

15   there to Livingston Hill, were they also on the road?

16   A.    Yes, they were.

17   Q.    Okay.  And is it safe to say that people were

18   walking back and forth and walking from the vehicles to the

19   edge of -- I guess we'll call that an eddy or whatever that

20   is down there, to the edge of where the creek starts, back

21   and forth to their vehicles, getting things or getting

22   flashlights and that sort of thing?

23   A.    Yes.

24   Q.    Okay.  Did anyone ever try to secure that area to

25   determine if there was any other evidence that could be found

DARLINE W. LABAR, OFFICIAL REPORTER

1    in the road area?

2        A.    Not to my knowledge.

3        Q.    Okay.  And would that be your primary responsibility

4    to cordon off whatever you thought was important --

5        A.    Had I been there before the numerous other people,

6    yes, I would have.

7        Q.    Okay.  And does the same thing go for out at the --

8    out at the scene -- excuse me, at the scene of where Ms.

9    Cunningham's car was found?  When you got there, there were a

10   number of officers there; is that correct?

11       A.    Correct.

12       Q.    And were there a number of civilians there, also?

13       A.    There was three -- two other civilians there.

14       Q.    Okay.  And there was also a couple of people that --

15   or you may or may not know this that worked for the Edgewood

16   Police Department, but are not peace officers?

17       A.    I'm not sure about that.

18       Q.    Okay.  About how many people do you think were out

19   there?

20       A.    That I saw?  Probably four to five.

21       Q.    Okay.  Was the -- was -- when you got there, was the

22   trunk open or shut?

23       A.    It was shut.

24       Q.    All right.  And how did you go about opening the

25   trunk?

```
1       A.   We towed the car back to Garland, and it was opened

2    in the maintenance bay.

3       Q.   Okay.  So the pictures that are taken are actually

4    in the maintenance bay.  They weren't taken at the scene?

5       A.   No, the -- they were both actually.  One was taken

6    in front of the house.

7       Q.   Okay.

8       A.   Then the others were taken at the maintenance place

9    where we opened it up.

10      Q.   Okay.  So the pictures with the trunk open, is that

11   at the scene or is that in the maintenance bay?

12      A.   That's at the maintenance bay.

13      Q.   Okay.  Were you aware that Deputy Rose of the Van

14   Zandt County Sheriff's Department had already opened the

15   trunk before you got there?

16      A.   No.

17      Q.   Okay.  And who did you get the keys from the

18   trunk -- for the trunk from?

19      A.   One of the officers there.

20      Q.   Okay.  You don't remember who it was?

21      A.   No, ma'am.

22      Q.   When you got there, was there -- was there any sort

23   of police tape around the vehicle or anything like that

24   blocking people off from access to the car?

25      A.   Yes.
```

1    Q.    And do you know who put that up there?

2    A.    It was there when I arrived.

3    Q.    Did you test on the -- on the trunk of the vehicle

4    to see whether or not there were palmprints or handprints or

5    fingerprints on the actual trunk of the vehicle?

6    A.    Yes.

7    Q.    And did you find any?

8    A.    I believe we found some partials, yes.

9    Q.    Okay.  Did you find -- compare those to Jedidiah

10   Isaac Murphy?

11   A.    I'm not sure if those were comparable prints or not.

12   Q.    Okay.  Did you ever compare those to Treshod

13   Tarrant?  You personally?

14   A.    I did not personally, no.

15   Q.    Okay.  Can you remember or do any of your reports

16   reflect that -- which hand was being used or which hand, if

17   you could tell, there was a palmprint or a partial palmprint?

18   A.    No.

19   Q.    Okay.  So you wouldn't know on a palmprint whether

20   or not it was the right hand or the left hand?

21   A.    On -- it would depend on how much of the palmprint

22   was there.

23   Q.    Okay.

24   A.    If it's just a smudge, perhaps not.  If it's a real

25   good, palmprint, yes.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Okay.  But there's nothing that you know of in your

2   reports that would indicate whether or not you found a right

3   -- a partial of a right palmprint or a partial of a left

4   palmprint?

5    A.   I don't believe so.

6    Q.   Mr. Rogers, let me ask you some questions about --

7   about handling blood evidence.

8    A.   Okay.

9    Q.   Okay?  Have you been trained on how to handle blood

10  evidence?

11   A.   Yes.

12   Q.   And how has that come about?  Because it didn't

13  happen -- did you go to the police academy?

14   A.   No.

15   Q.   Okay.  And Garland's got their own police academy

16  that you could have gone to, but you didn't, right?

17   A.   The police academy is for police officers.

18   Q.   Okay.  And that's not what you are?

19   A.   No.

20   Q.   Okay.  And -- but you have gone through classes in

21  regard to the handling of blood evidence?

22   A.   Yes.

23   Q.   Okay.  And does that include the way that things

24  should be stored for blood analysis at a later time?

25   A.   Yes.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.   And it's important to keep things separate; is that

2   correct?

3      A.   Yes.

4      Q.   And it's important to let things dry properly before

5   they're actually stored; is that also correct?

6      A.   Yes, it is.

7      Q.   Because if there's wet blood and things get folded

8   on top of each other, then what the evidence could show

9   doesn't necessarily show what the true thing -- what really

10  happened.  Does that make any sense?

11     A.   (Nods head.)

12     Q.   Okay.  Let me start back over.  It's very important

13  to follow all these procedures because if you fold wet blood

14  on top of wet blood or wet blood on top of something that

15  does not have blood on it, the wet blood could drip on it and

16  indicate something to you that's not necessarily true?

17     A.   Yes.

18     Q.   Okay.  And did you follow -- and where did you learn

19  these practice procedures?

20     A.   Crime scene reconstruction schools, blood splatter

21  analysis schools.

22     Q.   Okay.  And where did these take place?

23     A.   D.P.S. in Austin and also the Mansfield PD.

24     Q.   The Mansfield Police Department?

25     A.   Yes.

1    Q.    Okay.  And when was the last time you attended one

2    of these classes?

3    A.    Approximately six months ago.

4    Q.    Okay.  But that six months ago would be after this

5    case happened?

6    A.    Yes.

7    Q.    Okay.

8    A.    And before.  It's a -- I've been to three or four

9    crime scene schools, and each of them go over blood handling.

10   Q.    Okay.

11   A.    It's pretty common to every school.

12   Q.    Okay.  How many beer cans do you think you found in

13   the car?

14   A.    A couple.  I couldn't say for sure.

15   Q.    Okay.  So it's not listed in your inventory report?

16   A.    No.

17   Q.    And isn't it important to include in your inventory

18   report everything that you found at the scene?

19   A.    If you believe it's vital to the case, yes.

20   Q.    And would beer cans -- were they empty beer cans or

21   full beer cans?

22   A.    I believe they were full.

23   Q.    They were full?

24   A.    Uh-huh.

25   Q.    Did you find any empty beer cans?

1    A.    Not that I recall.

2    Q.    Was the Coke that you found in the back -- that's

3  pictured in the back seat of the car, was that empty?

4    A.    Yes.

5    Q.    Okay.  Did you test that for fingerprints?

6    A.    Yes.

7    Q.    Okay.  Did you find anything -- I'm sorry, I keep on

8  saying testing for fingerprints.  Did you compare those

9  fingerprints to any other fingerprints in this case?

10   A.    I don't believe there were any comparable prints off

11 that.

12   Q.    Okay.  Did you try to compare any of the partials

13 that you might have?

14   A.    If they were comparable prints.

15   Q.    Okay.  Did you compare any of those personally to

16 Treshod Tarrant?

17   A.    No, I did not.

18   Q.    Who else tested or who else compared fingerprints in

19 this case?

20   A.    Virginia Long, Holly Tharp, Bill Rice, and Vicki

21 Stanley.

22   Q.    Okay.  Anybody else -- were you the only person in

23 charge of collecting the evidence at the scene?  Were you the

24 only, I guess, forensic tech?

25   A.    At which scene?

1    Q.    At the -- well, let's start with seizing the items

2    from the car?

3    A.    Yes.

4    Q.    Were you the only person in charge of lifting latent

5    fingerprints from the vehicle?

6    A.    Yes.

7    Q.    Were you the only person that was in charge of

8    deciding which items in the car to put into your evidence log

9    and which items not to put into your evidence log?

10   A.    Yes.

11   Q.    What was done with the rest of the stuff that wasn't

12   logged in as evidence?

13   A.    It was placed in the property room.

14   Q.    Okay.  So you don't log it in as evidence, but you

15   still place it in the property room?

16   A.    Right.

17   Q.    So how do you know what's in there and not in there

18   if you just place it in the property room?

19   A.    Because the items the property room takes, they

20   inventory.

21   Q.    Oh.

22        MS. BALIDO:  Judge, just let me review the

23   reports and see if there's anything there.

24        THE COURT:  Yes, ma'am.

25   Q.    (By Ms. Balido)  Let me ask you a question about

DARLINE W. LABAR, OFFICIAL REPORTER

1    this AFIS computer.  AFIS stands for what?

2         A.    Automated fingerprint identification system.

3         Q.    Okay.  Is that one of those computers that like you

4    can see on TV where you can plug in some fingerprints and it

5    pops up who -- some comparable matches?

6         A.    In a roundabout way, yes.

7              THE COURT:  If there's a comparable in the

8    inventory of AFIS.

9              MS. BALIDO:  Yes.

10        Q.    (By Ms. Balido)  And who is included in the AFIS

11   computer that you know of?  What is the database composed of?

12        A.    The database is composed of every fingerprint card

13   from arrests in the State of Texas.

14        Q.    And does it also include like judges or prosecutors

15   or people like that as well?

16        A.    It's anybody with a state license is also included.

17        Q.    So y'all probably have mine, since I'm licensed by

18   the State of Texas.

19        A.    I would say.

20        Q.    Any of the comparable prints that you had in this

21   case, did you put it through the computer?

22        A.    I did not, no.

23             THE COURT:  Does Garland have an AFIS?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  For the benefit of taxpaying

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1    jurors, how much does the AFIS cost, if you know?

 2              THE WITNESS:  Approximately $100,000.  That's

 3    just the equipment, not the maintenance.

 4              MS. BALIDO:  Judge, I don't believe I have any

 5    further questions at this time.

 6              THE COURT:  Sheriff, let's take a break at

 7    this time for the benefit of the jurors.

 8              THE BAILIFF:  All rise.

 9              (Jury recessed from courtroom.)

10              THE BAILIFF:  All rise.

11              (Jury returned to courtroom.)

12              THE COURT:  Let the record reflect the jury is

13    returning to the courtroom at this time.

14         Jury may be seated.

15         Mr. Murphy, counsel, visitors in the gallery, you

16    may be seated.

17         Ms. Balido, the defense may continue, ma'am.

18              MS. BALIDO:  I believe I passed the witness

19    back to the State, Judge.

20              THE COURT:  All right.  Anything, Mr. Davis?

21              MR. DAVIS:  Yes, sir.

22                      Redirect Examination

23    By Mr. Davis:

24         Q.   Investigator Rogers, a couple of questions.  First

25    of all, did you examine the interior passenger compartment of
```

1    that car for possible blood evidence?

2         A.    Yes.

3         Q.    Did you find any evidence of blood inside the car?

4         A.    No, sir.

5         Q.    Now, with reference to what you found in the trunk,

6    would it be fair to say that you found men's clothing inside

7    the trunk and inside the car?

8         A.    Yes, sir.

9         Q.    Ms. Balido referred to a suitcase.

10              MR. DAVIS:  If I could approach, Your Honor.

11              THE COURT:  You may.

12        Q.    (By Mr. Davis)  State's Exhibit Number 98, does this

13   appear to be the suitcase that you recovered from that

14   vehicle?

15        A.    Yes.

16        Q.    Did it contain men's clothing?

17        A.    I believe it did, yes.

18        Q.    Okay.  Have you had an opportunity to look inside?

19        A.    Not since that time, no, sir.  It appears to be

20   T-shirt, jeans, men's clothing.

21              MR. DAVIS:  Your Honor, at this time we will

22   offer State's Exhibit 98 for demonstrative purposes only.

23              (State's Exhibit No. 98 offered)

24              MR. BYCK:  No objection to 98 for

25   demonstrative purposes only, Your Honor.

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1              THE COURT:  Admitted.

 2              (State's Exhibit No. 98 admitted)

 3         Q.   (By Mr. Davis)  State's Exhibit Number 97, which is

 4    a -- a green duffle bag with some additional clothing inside,

 5    again, was this recovered from the Honda automobile, sir?

 6         A.   Yes, sir.

 7              MR. DAVIS:  Again, for demonstrative purposes

 8    only, we will offer State's Exhibit 97.

 9              (State's Exhibit No. 97 offered)

10              MR. BYCK:  No objection for stated purpose.

11              THE COURT:  Admitted for stated purpose.

12              (State's Exhibit No. 97 admitted)

13         Q.   (By Mr. Davis)  State's Exhibit 123, which is a

14    black garbage bag, does this appear to contain a large amount

15    again of men's clothing, blue jeans, T-shirts, and assorted

16    other items?

17         A.   Yes.

18              MR. DAVIS:  Again, for demonstrative purposes

19    only, we'll offer State's Exhibit 123.

20              (State's Exhibit No. 123 offered)

21              MR. BYCK:  No objection to 123 for stated

22    purposes only.

23              THE COURT:  Admitted.

24              (State's Exhibit No. 123 admitted)

25         Q.   (By Mr. Davis)  Finally, a garbage bag with
```

1    contents, State's Exhibit 124, Investigator, does that

2    contain, again, a green camo-colored duffle bag again with

3    assorted men's clothing?

4       A.   Yes, sir.

5       Q.   Dirty?

6       A.   Yes, sir.

7       Q.   Okay.

8            MR. DAVIS:  Having closed it now, I'm going to

9    offer this for demonstrative purposes only, State's Exhibit

10   Number 124, Your Honor.

11           (State's Exhibit No. 124 offered)

12           MS. BALIDO:  Judge, if I could just inspect it

13   just for a second.

14           THE COURT:  You may.

15           MR. BYCK:  Good, no objection, Your Honor.

16           THE COURT:  Admitted.

17           (State's Exhibit No. 124 admitted)

18           MR. DAVIS:  No further questions, Your Honor.

19           THE COURT:  Ms. Balido.

20                     Recross-Examination

21   By Ms. Balido:

22       Q.   The duffle bag that's in --

23           MS. BALIDO:  What's that.

24           MR. BYCK:  124.

25       Q.   (By Ms. Balido)  -- 124, is that the duffle bag that

1  came from where?

2       A.   The trunk.

3       Q.   The trunk.  Did you -- were there two duffle bags in

4  the trunk?

5       A.   There was a duffle bag and a camo bag.

6       Q.   Okay.  And the camo bag is the one that's in State's

7  124, the stuff that smells?

8       A.   Yes, ma'am.

9       Q.   Or is musty or whatever?

10      A.   Yes.

11      Q.   And where did that come from?

12      A.   The trunk as well.

13      Q.   That didn't come from the creek?

14      A.   All the items I collected from the trunk were in the

15  trunk, yeah.

16      Q.   Okay.

17           MS. BALIDO:  Pass the witness, Judge.

18           MR. DAVIS:  No further questions.

19           THE COURT:  Either side have any objection to

20  the witness being excused, subject to recall given his --

21           MR. DAVIS:  No objection.

22           MR. BYCK:  No objection.

23           THE COURT:  -- location and proximity to the

24  courthouse?  Thank you.  You are excused, subject to recall.

25  You may step down.  Free to leave the courthouse.

DARLINE W. LABAR, OFFICIAL REPORTER

1           MR. DAVIS:  The State will call David

2    Davenport.

3           MS. BALIDO:  Judge, may I approach the

4    exhibits for a moment.

5           THE COURT:  You may.

6       Mr. Davis, for the benefit of the next witness, do

7    you want the exhibits to remain or --

8           MR. DAVIS:  I don't believe it will be

9    necessary for this witness, Your Honor.

10          THE COURT:  The court reporter has a great

11   responsibility in taking care of the evidence.

12          MR. DAVIS:  Yes, sir.

13          THE COURT:  I know she is very mindful of

14   monitoring each and every one of them.

15       Ms. King, if you need a moment to assemble those

16   items for safekeeping, you may do so.

17       Ms. King, for your purpose, is that adequate for

18   right now?

19          Would you raise you right hand, please.

20              (Witness sworn.)

21

22

23

24

25

DAVID DAVENPORT

1

2  was called as a witness by the State and, after having been

3  first duly sworn, testified as follows:

4                        Direct Examination

5  By Mr. Davis:

6       Q.   Sir, would you please tell us your full name?

7       A.   David Michael Davenport.

8       Q.   Sir, how are you employed?

9       A.   I'm employed with the Department of Public Safety

10  Crime Lab in Garland, Texas.

11       Q.   What's your title with the Texas Department of

12  Public Safety?

13       A.   I'm a criminalist.

14       Q.   And what exactly is a criminalist with the D.P.S.?

15       A.   A criminalist -- my job duties include receiving

16  evidence, analyzing evidence, maintain the disposition of the

17  evidence, analyzing, as well as reporting findings after

18  analyzing the evidence, and testifying in court when

19  necessary.

20       Q.   Could you tell the members of the jury a little bit

21  about your experience and training for your present

22  position?

23       A.   I have a Bachelor of science degree in forensic

24  science from Eastern Kentucky University.  After I completed

25  my degree, I had in-house training with the Department of

DARLINE W. LABAR, OFFICIAL REPORTER

1    Public Safety.  This included completing a series of

2    proficiency tests, hands-on mock cases, written tests,

3    supervised casework.

4        Q.    How long have you been with D.P.S.?

5        A.    Since January of 2000.

6        Q.    Where is your lab located at?

7        A.    It's in Garland, Texas, off of I-30.

8        Q.    Mr. Davenport, I want to direct your attention back

9    to November of last year.  And at that time, sir, did you

10   receive several items from the Dallas County Medical

11   Examiners office?

12       A.    Yes, sir.

13       Q.    Among them let me ask you, did you receive a blood

14   sample that purported to be that of a Bertie Cunningham?

15       A.    Yes, we did.

16       Q.    Did you also receive a known head hair sample

17   belonging to Bertie Cunningham?

18       A.    Yes, sir.

19       Q.    Did you also receive certain hairs that had been

20   recovered from Ms. Cunningham's sweat pants?

21       A.    Yes, sir.

22       Q.    And finally, did you receive a sexual assault kit?

23       A.    Yes, sir.

24       Q.    Just so the jury can understand, when we talk about

25   a sexual assault kit, is that a set of items that's collected

1    during the autopsy generally?

2         A.    That's correct.

3         Q.    Now, let me talk in a little bit greater detail

4    about that.  When you had the sexual assault kit, what were

5    you looking for as possible evidence of a sexual assault?

6         A.    Generally in the sexual assault kits we're looking

7    for semen, semen specific components.

8         Q.    In this particular case did you see any evidence

9    whatsoever of a sexual assault having occurred to Ms.

10   Cunningham?

11        A.    No, sir.

12        Q.    So as I understand, there's no semen or sperm

13   present at that time, correct?

14        A.    That's correct.

15        Q.    Now, in addition to those items, did you receive

16   some items from the Garland Police Department first?

17        A.    Yes, sir.

18        Q.    Did you receive a bloody JC Penney bag?

19        A.    Yes, sir.

20        Q.    Did you also receive a white T-shirt with possible

21   blood evidence on it?

22        A.    Yes, sir.

23        Q.    In addition to that, did you receive various hairs

24   that according to the report had been recovered close to

25   where the body was in a creek in Edgewood, Texas?

1          A.    Yes, sir.

2          Q.    Your job when you receive that -- that possible

3     blood evidence was to do what?

4          A.    My job is to look for blood evidence.  And if I find

5     any, to confirm that it's of a human origin.

6          Q.    Do you have some sort of presumptive test that you

7     do if you see possible blood evidence?

8          A.    Yes, sir.  What's involved in that is merely taking

9     a cotton swab and wetting the cotton swab and rubbing the

10    cotton swab against the stain so you transfer some of the

11    stain on the swab.  And if the chemicals on the cotton

12    swab -- and if the swab changes color, then that's positive

13    for possibly human blood.

14         Q.    Okay.  So at least that tells you that you have

15    blood, and then you do a later test to determine if it's

16    human blood; is that right?

17         A.    That's correct.

18         Q.    With regards to the JC Penney bag, did you detect

19    possible blood?

20         A.    Yes, sir.

21         Q.    And did you go one step further and determine that

22    it was human blood?

23         A.    Yes, sir.

24         Q.    The white T-shirt --

25                   MR. DAVIS:  If I could approach, Your Honor.

 1             THE COURT:  You may.

 2        Q.    (By Mr. Davis)  Mr. Davenport, do you recognize

 3   State's Exhibit 91C as being the white T-shirt that was

 4   submitted to you by the Garland Police Department?

 5        A.    Yes, sir.

 6        Q.    Tell the members of the jury what you did with

 7   State's Exhibit -- if you want me to, I can hold that up

 8   there for you.  With State's Exhibit 91C, exactly what did

 9   you do when you received this particular item?

10        A.    The blue writing you see here was not present on the

11   shirt when it was submitted.  I put this blue writing here.

12   I did a visual examination looking for anything that looks

13   like blood.  It's that simple.  And then after I see stains

14   that I think might possibly be blood, I test them with the

15   cotton swab test I spoke of earlier.

16        Q.    Did you actually cut out certain portions to do the

17   testing?

18        A.    Yes, sir.

19        Q.    Did you detect possible blood?

20        A.    Yes, sir.

21        Q.    Did you later determine that to be human blood?

22        A.    Yes, sir.

23        Q.    Let me talk to you about the hairs that were

24   submitted to you.  Well, let me go back one step further.

25             Did you also receive certain possible blood samples

Page 159.

```
 1    that had been obtained from the trunk of a Honda automobile?

 2        A.    Yes, sir.

 3        Q.    And again, did you do the testing with those

 4    samples?

 5        A.    Yes, sir.

 6        Q.    And did you finally determine that there was human

 7    blood present there also?

 8        A.    Yes, sir.

 9        Q.    Now, let me go forward to the hairs that were

10    submitted to you for some sort of analysis.  In this

11    particular case what sort of analysis did you do with the

12    hair that had purportedly come from a rock near the body of

13    Ms. Cunningham?  What did you do with that?

14        A.    The hair submitted from the rock were visually

15    examined.  That's just looking at hairs with the naked eye.

16    I looked at the hairs that were submitted from the victim,

17    the known head hairs from the victim, and just visually

18    compared them with the rock -- the hairs from the rock above

19    the culvert.

20        Q.    How about the hair?  Was there hair also on the

21    complainant or Ms. Cunningham's sweat pants?

22        A.    Yes, there was.

23        Q.    Did you do the same kind of microscopic comparison

24    there, too?

25        A.    It's not a microscopic.  It's simply visual exam
```

1    with the naked eye.

2         Q.   Finally, was there a hair that had been recovered

3    from a JC Penney bag also?

4         A.   Yes, sir.

5         Q.   Did you do the same kind of comparison with it?

6         A.   Yes, sir.

7         Q.   What were the results of your visual comparison with

8    the hair from the rock, the JC Penney bag, and the sweat

9    pants?

10        A.   All of these hairs submitted were visually

11   consistent with the victim's known head hair.

12        Q.   Now, do you yourself do any DNA analysis?

13        A.   No, sir, I do not.

14        Q.   All right.  In this particular case once you

15   determine that human blood was present, did you then preserve

16   those items so that someone else out there at the lab, mainly

17   John Donahue, could do DNA testing on them?

18        A.   Yes, sir.

19        Q.   With regards to the hairs that you did the visual

20   comparison on, is there certain types of DNA tests that can

21   also be run on hair?

22        A.   Yes, sir.

23        Q.   Does your lab perform those types of test?

24        A.   Yes.

25        Q.   Did you then send those hairs on to Mr. Donahue

1    again for DNA testing?

2        A.    Yes, sir.

3              MR. DAVIS:   Thank you, sir.   I'll pass the

4    witness.

5                          Cross-Examination

6    By Ms. Balido:

7        Q.    Mr. Davenport, did you make any reports regarding

8    your findings?

9        A.    I have the report here.

10       Q.    Okay.   Is there just one report -- I'm just --

11             MS. BALIDO:   May I approach the witness.

12             THE COURT:   Sure, certainly.

13       Q.    (By Ms. Balido)   I was tendered a report from the

14   State.   I just want to make sure it's the same one.

15       A.    Okay.

16       Q.    Okay.

17             MS. BALIDO:   Judge, I just need to put my

18   hands on one other exhibit.

19          Judge, I don't have any questions of this witness.

20             MR. DAVIS:   Nothing further.

21             THE COURT:   Thank you.   You may step down.

22   Excused, subject to recall.

23             MR. DAVIS:   The State will call John Donahue.

24             (Witness brought forward and sworn.)

25             THE COURT:   Mr. Davis.

1          MR. DAVIS:  Thank you.

2                    JOHN DONAHUE

3   was called as a witness by the State and, after having been

4   first duly sworn, testified as follows:

5                   Direct Examination

6   By Mr. Davis:

7       Q.   Sir, first of all, would you please tell us your

8   full name?

9       A.   John Donahue.

10      Q.   Mr. Donahue, how are you employed?

11      A.   I'm employed by the Texas Department of Public

12  Safety's Crime Laboratory in Garland, Texas.

13      Q.   What is your present position?

14      A.   I'm a serology DNA analyst for the department.

15      Q.   Can you please tell us, first of all, a little bit

16  about your educational and professional training for your

17  present position?

18      A.   I have a Bachelors degree from the University of

19  Tennessee with a major in zoology.  I have three years of

20  graduate work in microbiology at Indiana University where I

21  will be completing my thesis later this month.  I've been

22  trained by the Texas Department of Public Safety in both

23  basic forensic serology, as well as forensic DNA analysis.

24  I've also received various other trainings in forensic

25  analysis and investigation, along with forensic DNA analysis

1    from other organizations.

2        Q.    First of all, you told us that you did some serology

3    work.  What is serology?

4        A.    The analysis of body fluids, basically.

5        Q.    Would that include blood?

6        A.    Yes.

7        Q.    You also told us that you were a DNA analyst.  Can

8    you tell us what your duties and responsibilities are there?

9        A.    Basically I examine items of evidence for any --

10   items for any type of evidence that might contain DNA, such

11   as body fluids, blood, semen, saliva, also for hairs and

12   other things that might contain DNA.  I then perform DNA

13   analyses on these questioned items or these items of

14   evidence, compare them to known reference samples to

15   determine match or an exclusion.  I also report my findings

16   as part of my duties, and I testify in court as to those

17   findings.

18       Q.    In this particular case did you receive several

19   items for analysis from David Davenport who also works with

20   you?

21       A.    Yes.

22       Q.    I want to ask you, first of all, if you could -- if

23   you could briefly give us an overview of what is DNA, first

24   of all?

25       A.    Sure.  Basically DNA is a molecule -- if you want to

1    visualize it, it looks like a twisted ladder that acts as the

2    genetic material for you.  It's present in the nuclei or in

3    the nucleus of every cell in your body except red blood

4    cells.  They don't have a nucleus, so basically you can find

5    DNA in skin cells, white blood cells, sperm cells, egg cells,

6    any types of cells like that will have DNA present in them.

7    DNA, as I said, is the genetic materials that encodes all the

8    information for your body, so basically it's individualized

9    to you and no one else, except in the case of identical

10   twins.  Because DNA is unique and individualized, we can

11   analyze DNA and compare it to known samples for comparison

12   purposes.

13       Q.    Are there different types of DNA tests?

14       A.    Yes, there are.

15       Q.    Can you tell us the type of DNA testing that your

16   particular crime lab does?

17       A.    We do what is called PCR testing, which is short for

18   polymerase chain reaction.  What that basically entails is

19   that we will extract DNA from samples, whether they're

20   evidence or reference samples, and then we'll use

21   biochemical, a biochemical reaction called PCR to amplify

22   that amount of DNA to a quantity that we can analyze and

23   determine results from.

24       Q.    So if you had -- if you had a blood sample from me,

25   for instance, could you obtain my DNA profile?

1    A.    Yes.

2    Q.    And if you had then an unknown or you had a blood

3    source, blood -- blood source over here, you didn't know who

4    it came from, could you extract DNA from that blood and then

5    compare it against my DNA profile to determine if I could be

6    the source for that blood over here?

7    A.    Sure.   There are always certain parameters that you

8    have to worry about such as degradation of the questioned

9    sample and other types of things that would render a DNA test

10   basically inconclusive because you didn't recover anything,

11   but assuming that the stain was not treated in any, I guess,

12   degradory (sic) ways, then, yeah, I could recover it.

13   Degradation could occur from, you know, any number of

14   manners, but, yeah, basically.

15   Q.    So, for instance, assuming that the blood hadn't

16   been out in the elements too long or chemicals hadn't been

17   applied to it maybe, as long as those problems aren't

18   present, then you can extract DNA material, correct?

19   A.    Right.

20   Q.    In this particular case from David Davenport, did

21   you receive a blood sample that was belonging to a person by

22   the name of Bertie Cunningham?

23   A.    Yes.   It was dried on a -- I believe it was cotton

24   gauze.

25   Q.    Were you able to get a DNA profile for Bertie

 1    Cunningham then?

 2       A.    Yes.

 3       Q.    Any problems there?

 4       A.    No.

 5       Q.    Did you receive from David Davenport a blood sample

 6    that had come from a Honda trunk seal?

 7       A.    Yes, I did.

 8       Q.    Were you able to obtain a DNA profile from that

 9    blood sample?

10       A.    Yes.

11       Q.    Did you receive a blood sample that had come from a

12    JC Penney bag?

13       A.    Yes.

14       Q.    Again, were you able to obtain a DNA profile?

15       A.    I was.

16       Q.    Did you receive blood samples that had come from a

17    white T-shirt?

18       A.    Yes, I did.

19       Q.    Were you able to obtain DNA profile for that blood

20    sample also?

21       A.    Not a full profile, but I did receive -- or did

22    obtain usable DNA profiles from them.

23       Q.    Okay.  Now, let's start with the blood sample that

24    came from the Honda trunk seal.  Did you compare the DNA

25    profile from that sample to the DNA profile of Ms.

1   Cunningham?

2        A.    I did.

3        Q.    And what was the result of that comparison?

4        A.    I recovered -- the DNA profile that I recovered from

5   the trunk seal was consistent with the DNA profile from

6   Bertie Cunningham at eight of the nine genetic markers that

7   were examined.

8        Q.    How about the ninth genetic marker?

9        A.    I didn't get any reaction from that.

10       Q.    So would it be fair to say at the ninth marker --

11  actually these markers are things that are individual to each

12  individual, correct?

13       A.    Right.

14       Q.    Poor way of phrasing it, but you're matching up

15  those points along a line with a known sample, aren't you?

16       A.    Right.  What we're doing with this type of testing,

17  the amplification kit that we use amplifies nine different

18  genetic markers in a person's DNA, so we're looking at a

19  result at each marker.  And if you have a result that does

20  not match at one marker or more, then it's an exclusion.  So

21  we're confined to basically making a match at every marker

22  that gives a result.

23       Q.    Okay.  So on these particular nine markers then,

24  eight of them matched precisely, correct?

25       A.    That's correct.

 1      Q.    You did not get enough of a reaction to make a

 2  comparison on the ninth point; is that right?

 3      A.    I didn't get any result at all.

 4      Q.    So with the eight that matched then, you were not

 5  able to exclude Ms. Cunningham as a possible source; is that

 6  correct?

 7      A.    That's correct.

 8      Q.    How often in the random population would you expect

 9  to find Ms. Cunningham's DNA profile?

10      A.    At these eight markers, what we do -- well, in

11  short, we calculate a random match probability.  And what

12  that means basically is it's the idea that you could go out

13  into the population at random, pick out anybody, doesn't

14  matter who, and what would be the probability that that

15  person would also have these same DNA markers, that -- what

16  would be the probability that this person could not also be

17  excluded as a source and the random match probabilities for

18  this stain were approximately 1 in 821 million for the

19  Caucasian population, 1 in 2.9 billion for the black

20  population, and 1 in about 1 billion for the Hispanic

21  population.

22      Q.    My understanding is there's roughly, what, 260 to

23  270 million people who live in the United States?

24      A.    Right.

25      Q.    So we're talking about a result then that would mean

1    that if we took the population in the United States three

2    times over, then that's the frequency that you'd expect -- I

3    mean, one out of that particular sum of people where you

4    expect this particular DNA profile in the white population,

5    correct?

6         A.   Yes.

7         Q.   Let's talk about the bloodstain sample from the JC

8    Penney bag.  Were you able to match that up to the DNA

9    profile of Ms. Cunningham?

10        A.   I did.

11        Q.   And what were the results there?

12        A.   I got a match, or it was consistent with Bertie

13   Cunningham at all nine of the markers tested.

14        Q.   Now, you told us about what the frequency would be

15   on eight markers there.  How about -- how often would you

16   expect to find that DNA profile on all nine genetic markers

17   in the general population?

18        A.   About 1 in 212 billion for the Caucasian

19   population.  About 1 in 1.275 trillion for the black

20   population.  And about 1 in 129.5 billion for the Hispanic

21   population.

22        Q.   So if we just stay within the white population, it's

23   212 billion?

24        A.   That's correct.

25        Q.   And there are approximately 6 billion people in the

1   world?

2       A.   Yes.

3       Q.   The stain on the white T-shirt, were you able to

4   match the genetic marks there between that and that of Ms.

5   Cunningham?

6       A.   I examined two different stains on the white

7   T-shirt, and both of them, two differing degrees, were

8   consistent with Bertie Cunningham.

9       Q.   Anything to exclude Ms. Cunningham from those

10  stains?

11      A.   No.

12      Q.   What -- again, how many genetic markers did you --

13  were you able to match up on those two stains?

14      A.   The first stain that I examined which would have

15  been the stain that David Davenport listed as Stain 1, I

16  matched at eight markers, and it was the same -- the profile

17  that I recovered from that was the same as the profile I

18  recovered from the trunk seal.

19      Q.   So that -- again, that would be expected in the

20  white population -- that's 1 in, what, over 800 million; is

21  that right?

22      A.   For the Caucasian population, right.

23      Q.   How about the second stain from the white T-shirt?

24      A.   I amplified that with two -- we have two different

25  kits that we use, because the first kit that is normally --

1    the one that gives the most -- not most inclusive, but the

2    higher, I guess, statistical probabilities, that kit didn't

3    quite work as well in this stain as the other ones did, so I

4    used a second kit which I normally only use when we're

5    analyzing stains for entry into the crime sample database.

6    But I went ahead and utilized that kit on this stain as well,

7    and recovered a match with Bertie Cunningham at 9 -- 9 of 14

8    genetic markers.

9         Q.   Again, frequency in the general population for that

10   match?

11        A.   For this stain profile, the random match probability

12   for that is approximately 1 in 19.39 billion for the

13   Caucasian population.  One in about 4 billion for the black

14   population.  And 1 in about 10.6 billion for the Hispanic

15   population.

16        Q.   Did you also receive a sample from David Davenport

17   that purported to be from the bloodstain at 2025 Portsmouth?

18        A.   I did.

19        Q.   Did you compare that blood sample against that

20   profile of Ms. Cunningham?

21        A.   I did.

22        Q.   What were the results?

23        A.   It was consistent.

24        Q.   On how many genetic markers?

25        A.   All nine of the first nine tested.  It was the same

1    as the JC Penney bag from the trunk.

2        Q.    Finally, I want to talk to you about the hair that

3    was recovered from the rock here.  Can you do DNA testing on

4    hair?

5        A.    Yes.  You basically -- when you're analyzing DNA

6    from hairs, you're recovering it from the root.  The cells in

7    the root are the cells that are going to contain the type of

8    DNA that we use in this test.  And so that's what we looked

9    at.

10        Q.    Now, if you're doing hair, there's what's called

11    mitochondria of DNA analysis, isn't it?

12        A.    Yes.

13        Q.    That's actually -- if we're looking at the actual

14    shaft of the hair, there's actually DNA material that --

15    actually it's from the mother's side, isn't it?

16        A.    That's right.

17        Q.    Did you do that kind of DNA testing in this case or

18    did you do just what I'm going to call nuclear DNA?

19        A.    We don't perform mitochondrial DNA testing in our

20    laboratory.

21        Q.    If you have a hair that's been removed, at the very

22    bottom would there be a root to that hair?

23        A.    If it's been removed forcibly, yes.  If it falls out

24    naturally, there's usually not enough cellular material to

25    utilize.

1      Q.   In this case the hair that you analyzed, did it have

2   root material?

3      A.   Yes.

4      Q.   Then were you able to do the same type of PCR DNA

5   analysis as you had on the blood samples?

6      A.   I was.

7      Q.   What were the results of the DNA comparison between

8   the DNA in the hair that was submitted to you and the DNA

9   profile of Ms. Cunningham?

10     A.   The DNA from the hair -- from the hair root was

11   consistent with the DNA profile from Bertie Cunningham.

12     Q.   On how many genetic markers?

13     A.   Nine of the nine tested.  It was the same as the

14   stain from 2025 Portsmouth and the stain from the JC Penney

15   bag in the trunk.

16     Q.   And in the white population, what's the frequency of

17   seeing that in that profile?

18     A.   About 1 in 212 billion.

19     Q.   Thank you, sir.

20          MR. DAVIS:  I'll pass the witness.

21                    Cross-Examination

22   By Ms. Balido:

23     Q.   Mr. Donahue, I have one report of yours dated

24   February 27th, the year 2001, and I don't think I have

25   your -- that's your supplement report; is that correct?

1        A.    That's the only report that I wrote in this case,

2   because it was a follow-up, a DNA report.   It's going to be

3   listed as a supplemental report to the first one which was

4   written by David.

5        Q.    Okay.  In addition to the items that Mr. Davis

6   talked about, you also tested some blue denim shorts and blue

7   green plaid boxers; is that correct?

8        A.    Yes.

9        Q.    And those were delivered to you by who?

10        A.    James Rogers.

11        Q.    Of the Garland Police Department?  Or can you tell?

12        A.    Yes, Garland Police Department.

13        Q.    And those items were listed from coming from a

14   laundry room at 1718 Barclay; is that correct?

15        A.    Right.

16        Q.    And did you do analysis on those items as well?

17        A.    I did.  Initially I analyzed them to determine if

18   there was any blood on these items.  I detected human blood

19   on stains on the denim shorts, and I didn't detect any stains

20   with the visual characteristics of blood on the boxer shorts.

21        Q.    And what did the profile reveal to you once you did

22   the test?

23        A.    When I did the DNA analysis on the stains on these

24   shorts, I recovered from one stain from the shorts a profile

25   that was male in origin, so obviously it couldn't match

```
 1    Bertie Cunningham.  The other stain I recovered a profile

 2    that indicates a mixture at one genetic marker but again,

 3    it's a male -- the majority of this DNA profile is from a

 4    male and even at that one marker where there's a mixture,

 5    Bertie Cunningham was excluded.

 6        Q.   Okay.  Do DNA labs have to go through any sort of

 7    certification?

 8        A.   They don't have to, no, but ours is.

 9        Q.   Okay.  And are there others in the area that are not

10    certified that you know of?

11        A.   The other DNA labs in the area that I can think of

12    offhand are Gene Screen, and I believe they are accredited.

13    Obviously SWIFS in Dallas, Fort Worth, Tarrant County Medical

14    Examiner.  I think there might be one other, I believe

15    they're all accredited.

16        Q.   Okay.

17        A.   But not only the accreditation, but there are also

18    standards that have to be followed by federal law to receive

19    funding for this type of analysis.

20        Q.   Okay.  And the Texas Department of Public Safety has

21    all that in order?

22        A.   Yes.

23        Q.   Okay.  And you don't do mitochondrial DNA there?

24        A.   Right.

25        Q.   Why is that?
```

1          A.    It's fairly new.  It's extremely expensive to

2    perform, and we really at our laboratory don't get a lot of

3    call to perform that type of analysis.

4                     MS. BALIDO:  Judge, I don't have anything

5    further.

6                     MR. DAVIS:  Nothing further, Your Honor.

7                     THE COURT:  May he be excused, subject to

8    recall?

9                     MS. BALIDO:  No objection.

10                    MR. DAVIS:  No objection.

11                    THE COURT:  Thank you.  You are excused,

12   subject to recall, sir.

13                    THE COURT:  The State may continue.

14                    MS. MILLER:  Call Shirley Bard to the stand.

15                    MS. BALIDO:  Judge, there's a matter that we

16   need to take up outside the presence of the jury.

17                    MS. MILLER:  Judge, I don't think there is --

18                    THE COURT:  Sheriff, if you'd retire the jury.

19                    THE BAILIFF:  All rise.

20                    (Jury excused from courtroom.)

21                    THE COURT:  The jury is being excused from the

22   courtroom.

23             Mr. Murphy, counsel, visitors in the gallery, you

24   may be seated.

25             Will you raise your right hand, please, ma'am.

```
 1                      (Witness sworn.)
 2                 THE COURT:  Thank you.  Have a seat to my
 3     left.
 4                 MS. BALIDO:  Judge, really, when the jury was
 5     going out, I was talking to Ms. Miller, and it's in regard to
 6     the -- this witness may testify at a later time about an
 7     extraneous offense.  And I just want to make sure on the
 8     record that everybody knows that that's not going to be gone
 9     into unless we have a hearing outside the presence of the
10     jury.
11                 MS. MILLER:  Judge, she is also a punishment
12     witness.  Notice was given regarding terroristic threats made
13     by the defendant, but we have no intention in going into
14     those during our case in chief.  And I told Ms. Bard prior to
15     coming into the courtroom for her to make sure that she did
16     not go into any of those statements or actually threats that
17     were made by the defendant to her.
18                 THE COURT:  Is that understood, ma'am?
19                 THE WITNESS:  Yes, sir.
20                 THE COURT:  All right.  With that
21     understanding, may we forgo the hearing and bring the jury
22     back?
23                 MS. BALIDO:  That's fine, Judge.
24                 THE COURT:  Sheriff, may we have the jury,
25     please.
```

1    THE BAILIFF:  Yes, sir.

2    THE COURT:  Jury is returning to the courtroom

3  at this time.

4        (Jury returned to courtroom.)

5    THE COURT:  Jurors may be seated.

6    Mr. Murphy, counsel, visitors in the gallery, you

7  may be seated.

8    Ladies and gentlemen of the jury, this witness has

9  been sworn in.  She is under oath.

10                 SHIRLEY BARD

11 was called as a witness by the State and, after having been

12 first duly sworn, testified as follows:

13              Direct Examination

14 By Ms. Miller:

15    Q.   I'm going to ask you to pull the microphone a little

16 bit closer to you or lean a little but closer.  And can you

17 introduce yourself to the jury and spell your last name for

18 the court reporter?

19    A.   Yes.  I'm Shirley Ann Bard.  Last name is B-a-r-d.

20    Q.   Okay.  Ms. Bard, I want to direct your attention

21 back to last year, year 2000, can you tell this jury where

22 you were employed at the time?

23    A.   R&R Designs, 1112 Virginia Street in Terrell, Texas.

24    Q.   Can you explain to the jury what R&R Designs is,

25 what type of business?

1        A.    Well, they make all sorts of things for boats,

2    doors, just a little bit of everything.

3        Q.    How long were you employed by R&R Designs?

4        A.    Eight years.

5        Q.    When did you quit R&R Designs?

6        A.    January the 10th of this year.

7        Q.    Of this year, 2000?

8        A.    Uh-huh.   Uh-huh.

9        Q.    When you were employed at R&R Designs, tell the jury

10   what type of work you did.

11       A.    I was a welder.  I was TIG and MIG.

12              THE REPORTER:  I'm sorry?

13              THE WITNESS:  A welder, TIG and MIG.

14       Q.    (By Ms. Miller)  TIG meaning -- the initials T-I-G

15   and MIG, M-I-G; is that correct?

16       A.    That's correct.

17       Q.    And approximately how many other welders were

18   employed out there?

19       A.    Oh, we had anywhere from 3 to 8, 10.  It's just

20   according to what they needed at the time.

21       Q.    Were you familiar, or are you familiar with a person

22   you later came to know as Jedidiah Isaac Murphy?

23       A.    I didn't know him as that.

24       Q.    Okay.  Did you later come to find out the person

25   that you knew, his name was actually Jedidiah Isaac Murphy?

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1     A.    Yes.

 2     Q.    Can you tell the jury what name you knew him as?

 3     A.    Jim Hines.

 4     Q.    Now, do you see that person in the courtroom today?

 5     A.    Yes, I do.

 6     Q.    Could you point him out and describe what he's

 7  wearing?

 8     A.    He's wearing a suit and black tie and a black

 9  jacket.

10          MS. MILLER:   Your Honor, ask the record to

11  reflect the witness has identified the defendant in open

12  court.

13     Q.    (By Ms. Miller)  Ms. Bard, did the defendant, who

14  you identified and you said that you knew as Jim Hines, did

15  he work with you out at R&R Designs in early 2000?

16     A.    Yes.

17     Q.    Was -- what was his job?

18     A.    He was a MIG welder actually when they hired him on,

19  and I taught him how to TIG.

20     Q.    Okay.  Now, I'm sure that a lot of the jurors don't

21  necessarily know what MIG welding and TIG welding is.  Let's

22  talk about MIG welding, M-I-G welding first.  Can you explain

23  what MIG welding is to the jury?

24     A.    You have a wire gun or a roll of wire at the back of

25  you that comes through a line and you use a trigger so that
```

1    your temperature of the MIG, whatever you want, the wire

2    comes out and puts the pieces of metal together.

3        Q.   Now, what is the difference between MIG welding and

4    TIG welding?

5        A.   Well, TIG welding, there's two kinds of TIG.  You do

6    it with a pedal and you do it with a button on a line that

7    comes up and you got a little handle on it and you have to

8    push a button and put your filler rod into it as you get it

9    hot.

10       Q.   Now, I notice when you are making that explanation

11   to the jury, you're using --

12       A.   I'm using both hands.

13       Q.   Both hands?

14       A.   Yes, you use both hands except when you're fusing.

15   When you're fusing, you can use one hand, but you always have

16   that rod ready.

17       Q.   Now, Ms. Bard, you said when the defendant was

18   originally hired at R&R Designs, he was a MIG welder.  How

19   many hands do you have to use to do MIG welding?

20       A.   One.

21       Q.   Okay.  And do you recall whether the defendant was

22   right or left-handed?

23       A.   No, I don't.

24       Q.   Okay.  But regardless of whether the person is right

25   or left-handed, in order to do TIG welding the person is

1    required to use both hands?

2         A.    Both hands.

3         Q.    Now, did you have occasion to train the defendant in

4    TIG welding?

5         A.    Yes, I did.

6         Q.    The two-handed welding?

7         A.    Yes, I did.

8         Q.    And when you trained the defendant in this TIG

9    welding, tell the jury approximately how long it took you to

10   train him, over how long a period of time, about how many

11   hours a day?  Just rough estimate?

12        A.    There's so many of them that I have trained.  It's

13   hard to place just one.  Most of them welded, including Jim,

14   welded junk stuff for at last a half a day, just pieces of

15   metal that we brought in from outside that was junk that they

16   welded together for at least a half day.  I only had one

17   other welder that started within two hours after I started

18   training her.

19        Q.    And approximately how long did the defendant work at

20   R&R Designs while you were there?

21        A.    (No response.)

22        Q.    A few months?

23        A.    Probably.  I don't know -- so many people came and

24   went so often.

25        Q.    Were you the person who -- well, who was the foreman

1    of the shop?

2        A.   Jerry Thornton.

3        Q.   Okay.  Even though Jerry Thornton was the foreman of

4    the shop in name, who actually pretty much ran the shop,

5    supervised what the other welders were doing?

6        A.  Well, he come in and tell me what he wanted done and

7    I pretty much did it.  I didn't have a title.

8        Q.   Right.  You didn't have a title, but were you the

9    one who basically had to tell the other welders what needed

10   to be done, the priorities, that type of thing?

11       A.   The ones that would listen, and the others I told

12   Jerry he'd have to go tell them.

13       Q.   Okay.  And, Ms. Bard, so were -- was the defendant

14   one of the people who you would supervise, even though you

15   didn't necessarily have the title of supervisor?

16       A.   Uh-huh.  Yes.

17       Q.   Okay.  Did the time -- during the time that you

18   worked with the defendant, supervised him, helped train him

19   as the TIG welder, the two-handed welder, did you notice

20   whether or not the defendant had any problems using his left

21   hand?

22       A.   I didn't notice any problem with any hand.

23       Q.   Okay.  Did he complain to you at any time that he

24   could not do the two-handed welding because of any injury to

25   his left hand?

1      A.    Not to my knowledge.

2      Q.    Did the defendant, at any time he worked with you,

3  tell you about having injured his left hand?

4      A.    Not to my knowledge.

5      Q.    Did the defendant, while he worked with you, ever

6  black out?

7      A.    No.

8      Q.    Did the defendant, while he worked with you, ever

9  tell you that he had hallucinations?

10      A.    No.

11      Q.    Did the defendant, while he worked with you, ever

12  suffer a seizure that you knew of?

13      A.    No.

14      Q.    While the defendant worked for you, did the

15  defendant -- or worked with you, did he ever claim that he

16  had an alter ego or split personality?

17      A.    No.

18      Q.    While the defendant worked with you during the

19  earlier part of 2000, did he ever tell you that he was

20  suicidal?

21      A.    No.

22      Q.    As far as any complaints about the defendant's left

23  hand, did he make any complaints other than just being sore

24  from learning how to do the TIG welding?

25      A.    Well, we all got sore learning how to TIG weld.

1    Everybody I had come in there cried with their hands.

2       Q.   So during the months that you worked with the

3    defendant and helped train him in the TIG welding, you never

4    saw or heard of a problem where he could not use his left

5    hand or have any feeling in his left hand?

6       A.   No more than all the other welders that learn --

7    come in and didn't know how to weld that learned how to

8    weld.  They all cried with their hands.  They just had to

9    keep on going until they got strong enough to do it.

10      Q.   And when you're doing the two-handed welding, you

11   said that you have to have the rod ready?

12      A.   You have to have the rod and you fill it by using

13   this hand and you run the filler rod through your fingers to

14   go and you're pushing a button with this hand so you've got

15   two things going and this is hard to hold.  And you have to

16   go in several different directions.

17      Q.   Okay.

18           MS. MILLER:  Thank you, Ms. Bard.  I'll pass

19   the witness at this time.

20           MR. BYCK:  Your Honor, we will respectfully

21   reserve the right to cross-examine this witness at a later

22   time.

23           THE COURT:  Thank you, Ms. Bard.  You may step

24   down.

25           MR. DAVIS:  Your Honor, at this time the State

```
 1   will call Harlan Bailey.
 2                   (Witness brought forward.)
 3                   THE COURT:  Good afternoon, sir.  Will you
 4   raise your right hand.
 5                   (Witness sworn.)
 6                   THE COURT:  Thank you, sir.  Mr. Bailey, may I
 7   invite you to have a seat over here to my left, please.
 8            The State may continue.
 9                   MR. DAVIS:  Thank you.
10                        HARLAN BAILEY
11   was called as a witness by the State and, after having been
12   first duly sworn, testified as follows:
13                      Direct Examination
14   By Mr. Davis:
15       Q.   Would you please tell us your full name?
16       A.   Harlan Wade Bailey.
17       Q.   Mr. Bailey, where do you live right now?
18       A.   Grand Saline, Texas.
19       Q.   How are you employed?
20       A.   Griffin Products, welder.
21       Q.   And where is Griffin Products located?
22       A.   Wills Point.
23       Q.   And I think you told us that you're employed there
24   as a welder; is that right?
25       A.   Yes, sir.
```

1      Q.    How long have you been employed by Griffin Products?

2      A.    Right at four years.

3      Q.    As a welder out there, what kind of -- what kind of

4   duties do you have?  What kind of products do y'all make at

5   Griffin Products?

6      A.    We build restaurant equipment, sinks, tables.

7      Q.    I want to direct your attention back to June of last

8   year.  This will be June 2000.  Were you employed at Griffin

9   Products at that time?

10     A.    Yes.

11     Q.    Did an individual that you later came to know as

12  Jedidiah Murphy start working out there with you?

13     A.    Yes.

14     Q.    Do you see him in the courtroom this afternoon?

15     A.    Yes, sir.

16     Q.    If you would, just please point him out and tell us

17  what he's wearing.

18     A.    The suit, the glasses.

19           MR. DAVIS:  Your Honor, may the record please

20  reflect this witness is identifying the defendant in open

21  court.

22     Q.    (By Mr. Davis)  Was this the first time that you had

23  ever met Mr. Murphy?

24     A.    Yes, sir.

25     Q.    When he got hired out there at Griffin Products,

DARLINE W. LABAR, OFFICIAL REPORTER

1    what type of work did he start doing?

2         A.   He was a welder.

3         Q.   What kind of welding was Mr. Murphy doing for

4    Griffin Products?

5         A.   He was welding on stainless steal.

6         Q.   Is that the same kind of welding that you do?

7         A.   Yes, sir.

8         Q.   In that kind of a job, would the defendant be

9    required to use his left hand as part of his employment out

10   there?

11        A.   Yes.

12        Q.   What would be required -- if you're doing welding

13   like y'all were, what kind of use of your left hand would you

14   have to have?

15        A.   You would have to have real good use of it.  You'd

16   have to do lots of hammering and control of a switch and hold

17   the metal while you are welding it and tacking it and such as

18   that.

19        Q.   So you're going to have to have pretty good use of

20   your hands?

21        A.   Yes.

22        Q.   While he was out there, did y'all start talking a

23   little bit about family matters, personal matters, that sort

24   of thing?

25        A.   Yes.

1    Q.   And at some point did you have a conversation with

2   the defendant about an injury that he had to his left hand?

3    A.   I couldn't remember.

4    Q.   All right.  Did he ever mention to you that he was

5   having problems with his left hand while he was out there

6   working with you?

7    A.   No.

8    Q.   At some point did you have a discussion with him

9   about how much money he was making out there at Griffin

10  Products?

11   A.   I don't remember.

12   Q.   At some point shortly after he worked -- I believe

13  about three weeks after he started working at Griffin

14  Products, did the defendant have some sort of injury out

15  there?

16   A.   I don't remember it three weeks --

17   Q.   Okay.  Sometime though while he was out there?

18   A.   Yes.

19   Q.   Did anybody actually witness the injury?

20   A.   No.

21   Q.   Did the defendant at least complain that he had hurt

22  his theft thumb in the injury?

23   A.   Yes.

24   Q.   As a result of that, did he leave Griffin Products?

25   A.   Yes.

1   Q.   Is it your understanding that he went to -- under a

2   doctor's care at that point?

3   A.   Yes.

4   Q.   Did you ever see the defendant back up there at

5   Griffin Products after he injured his left thumb?

6   A.   One time.

7   Q.   Do you recall when that was?

8   A.   Sometime after he had the surgery.

9   Q.   So it was your understanding he actually had surgery

10  on his left thumb, right?

11  A.   Yes.

12  Q.   Did you have a conversation with the defendant when

13  he came back up there?

14  A.   A short one.

15  Q.   What was the nature of the conversation?

16  A.   I just asked him how it was going and how did

17  everything work, you know, on the surgery.  And he took his

18  thumb and hit it on a table and said he had no feeling in it.

19  Q.   In the left thumb?

20  A.   Yeah.

21  Q.   Make any other complaints about his left hand?

22  A.   No, that was about it.

23  Q.   Was that the last time that you saw him?

24  A.   That's the last time I've seen him.

25  Q.   Thank you, Mr. Bailey.

1        MR. DAVIS:  I pass the witness, Your Honor.

2                    Cross-Examination

3   By Mr. Byck:

4        Q.    Mr. Bailey, my name is Mike Byck.  I represent Jim.

5              Sometime after June the 22nd, which was when Mr.

6   Murphy was injured --

7        A.    Yes.

8        Q.    -- you saw him back up at the -- at your plant; is

9   that right?

10       A.    Yes.

11       Q.    And what did he do again with his thumb?

12       A.    Took his thumb and hit it on the edge of a work

13  table, said he had no feelings in it.

14       Q.    Did he have a splint or a cast on the thumb?

15       A.    No.

16       Q.    Just his regular thumb.

17       A.    Yeah.

18       Q.    And he banged it on the edge of a table?

19       A.    Uh-huh.

20       Q.    Hard?

21       A.    Not -- about like you did there.

22       Q.    About like I did?

23       A.    Yeah.

24       Q.    And said he had no feeling in it?

25       A.    Uh-huh.

1    MR. BYCK:  Thank you, sir.  Pass the witness.

2    MR. DAVIS:  No further questions.

3    THE COURT:  May this witness be excused?

4    MS. BALIDO:  No objection.

5    MR. DAVIS:  No objection.

6    THE COURT:  Thank you, sir.  You are excused.

7    MR. DAVIS:  Call Dr. William Vandiver.

8    (Witness brought forward.)

9    THE COURT:  Good afternoon.  May I ask that

10   you raise your right hand, please.

11   (Witness sworn.)

12   THE COURT:  Thank you.  Have a seat to my

13   left, please.

14                   DR. WILLIAM VANDIVER

15   was called as a witness by the State and, after having been

16   first duly sworn, testified as follows:

17                   Direct Examination

18   By Mr. Davis:

19   Q.   Sir, would you please tell us your full name?

20   A.   William Richard Vandiver.

21   Q.   Are you a medical doctor?

22   A.   Yes, sir.

23   Q.   Dr. Vandiver, do you have a specialty?

24   A.   Orthopaedic surgery.

25   Q.   Where is your practice located?

```
 1        A.    It's located in Kaufman, Texas.

 2        Q.    Can you tell us a bit about your educational and

 3   your professional training that you've received?

 4        A.    Yes, sir.  I went to Baylor University for an

 5   undergrad degree, bachelor of arts.  I then went to Michigan

 6   State University for medical school for four years.  I then

 7   went to -- I did a one-year internship in Flint, Michigan.  I

 8   then went to New York City, the Bronx, and did a four-year

 9   orthopaedic residency.  And then I did a further year of

10   orthopaedic sports medicine in Detroit, Michigan.

11        Q.    Are you board certified?

12        A.    I am not fully board certified in orthopaedics yet,

13   because you have to be in practice for 22 months, but I have

14   passed the written part, the first part of the boards.

15        Q.    Doctor, I want to direct your attention back to June

16   29th of 2000, and ask you whether an individual that you

17   later came to know as Jedidiah Murphy came to you as a

18   patient out there in Kaufman?

19        A.    Yes, sir, he did.

20        Q.    And do you recall what his complaint was or the

21   reason why he was coming to visit with you?

22        A.    He came in under workman's comp claim.  He stated

23   that he had an accident at work involving his left thumb.  He

24   believed he might have dislocated it.

25        Q.    Now, as a result of your treating him, did your
```

1    clinic start compiling certain records concerning his

2    treatment and care out there?

3         A.   Yes, sir.

4                   MR. DAVIS:  If I may approach, Your Honor.

5                   THE COURT:  You may.

6         Q.   (By Mr. Davis)  State's Exhibit 69, do you recognize

7    this to be a true and correct copy of the records at your

8    office previously provided to me, along with this affidavit?

9         A.   Yes, it is.

10                  MR. DAVIS:  At this time we'll offer State's

11   Exhibit 69 which has been on file more than 14 days prior to

12   trial, Your Honor.

13                  (State's Exhibit No. 69 offered)

14                  MR. BYCK:  No objection to State's 69.

15                  THE COURT:  Admitted.

16                  (State's Exhibit No. 69 admitted)

17        Q.   (By Mr. Davis)  Doctor, if you need to refer to your

18   records, please do so.

19             So his chief complaint was an injury to his left

20   thumb; is that correct?

21        A.   Yes, sir.

22        Q.   Your initial impression was that it might have been

23   dislocated?

24        A.   According to his history, it seemed that there

25   was -- that was a possibility, although it was not

                 DARLINE W. LABAR, OFFICIAL REPORTER

1    dislocated at the time I examined him.

2        Q.    Okay.   What was the condition of the thumb when you

3    did examine it?

4        A.    His left thumb was quite swollen, tender around this

5    area, the lower part of the thumb as it enters the palm.

6    There was some redness around it.   There was very little

7    motion that he could do actively or that I could do to try to

8    examine it because of the pain.

9        Q.    Did you make your diagnosis at that time?

10       A.    Yes, sir, I did.

11       Q.    What was your diagnosis?

12       A.    My diagnosis was that he had ruptured the ulnar

13   collateral ligament.   It's commonly called the skier's

14   thumb.   It's on this side of the thumb.   And often when the

15   thumb gets pulled forcefully back this way, it can rupture

16   with or without a dislocation.

17       Q.    Did you determine that surgery would be required?

18       A.    Yes, sir, at the time I felt that because of the

19   level of his symptoms and also the type of work that he did

20   which was very hand or manual intensive, that he would

21   benefit from such an operation.

22       Q.    Okay.   Did you actually perform surgery on the

23   defendant at a later date?

24       A.    Yes, sir.

25       Q.    And was that surgery performed at Presbyterian in

1   Kaufman?

2       A.   Yes, sir, it was.

3              MR. DAVIS:  Your Honor, at this time we'll

4   offer State's Exhibit Number 70, which is certified -- which

5   is an original copy of records from Presbyterian Hospital in

6   Kaufman.  Again, it's accompanied with an affidavit and has

7   been on file more than 14 days prior to trial.

8              (State's Exhibit No. 70 offered)

9              MR. BYCK:  No objection, State's 70.

10             THE COURT:  Admitted.

11             (State's Exhibit No. 70 admitted)

12      Q.   (By Mr. Davis)  Can you describe the surgery that

13  you performed on the defendant?

14      A.   Yes, sir, I made a -- kind of an incision over on

15  this side of the thumb, where I was describing, to expose the

16  area where that ligament was located.  Once I exposed it, I

17  recognized it as being torn and I did a repair -- end to end

18  repair.  After that was done, I tested to make sure it was

19  stable, including the joints.  Since he was under anesthesia,

20  I could now examine him more fully.  I then closed the skin,

21  placed him into a splint which included the thumb, and he

22  went home that same day.

23      Q.   Did you feel that you had repaired all the damage to

24  his thumb?

25      A.   Yes, sir.

1        Q.    Were there any complications that you could

2    determine at that time?

3        A.    No, there were not.

4        Q.    Did you feel like the surgery had been successful?

5        A.    Yes, sir, I did.

6        Q.    Was there any sign of nerve damage to the thumb that

7    you observed during that surgery?

8        A.    No, I did not.

9        Q.    And as I understand, he was discharged that same

10   day; is that right?

11       A.    Yes, it was day surgery.

12       Q.    Now, going forward to July the 20th of that same

13   year, did the defendant return for a post-operative visit

14   with you?

15       A.    Yes, he did.

16       Q.    And did he have any complaints at that time?

17       A.    He was a little sore, and he also stated that he had

18   no sensation on this side of his thumb, approximately this

19   area if I remember correctly.

20       Q.    Uh-huh.  Did that surprise you?

21       A.    It didn't really surprise me.  At the time I felt

22   that because the surgery was in somewhat close proximity to

23   that area, that post-operative swelling could have caused the

24   nerve to go out temporarily.

25       Q.    Did you suggest any treatment for the -- the

1   complained of numbness at that time?

2      A.   No, at that time I recommended to Mr. Murphy that we

3   observe it.  I felt very strongly that it was probably just

4   swelling since I had not visualized a nerve during the case,

5   and he agreed to that.

6      Q.   Uh-huh.  Did he return to your office again on

7   August the 17th?

8      A.   Yes, he did.

9      Q.   The purpose of that visit was what?

10      A.   It was a follow-up visit to check on his wound and

11   also to check that complained of numbness.

12      Q.   Was he still complaining of numbness?

13      A.   Yes, he was.

14      Q.   Do you remember specifically what his complaint was?

15      A.   He was concerned because he said that he had no

16   sensation whatsoever in that area, that he could literally

17   stick a pin -- he didn't say he had actually done that, but

18   he felt like he could do that and would have no -- no

19   feeling.  He was concerned about it because of his occupation

20   as a welder.

21      Q.   Did he feel that that would interfere with his

22   ability to perform as a welder?

23      A.   Yes, he did feel that way.

24      Q.   Were you surprised by the complaint coming now in

25   August of 2000?

1     A.   No, not particularly.

2     Q.   Did you decide to do something for Mr. Murphy at

3 that time?

4     A.   Yes, I did.  Since it had been, I believe, six weeks

5 since the surgery, I suggested that he go get EMG and nerve

6 conduction studies to see if there was evidence on their

7 part -- on the test part of any nerve damage.

8     Q.   All right.  If you would, nerve conduction test on a

9 thumb, exactly what are we talking about there?

10     A.   What they do is -- this test is performed by either

11 a neurologist or a rehab doctor.  And what they do, they

12 commonly use it for detecting carpal tunnel.  They put some

13 small rings on the fingers, and they have some electrodes

14 that stimulate the nerves at certain levels and they can

15 literally read the conduction speed or how fast the impulse

16 goes from where they stimulate the nerve to the -- to the

17 ring electrode around the finger.

18     Q.   So this test, as I understand, is designed to detect

19 any sort of damage to a nerve in this particular part of the

20 hand; is that right --

21     A.   Correct.

22     Q.   -- the thumb?  Who did you refer the defendant to

23 for that particular test?

24     A.   Dr. James Garrison.

25     Q.   And what type of doctor is Dr. Garrison?

1    A.   He's a physical medicine rehabilitation specialist.

2    Q.   Did you get word on September the 7th that Dr.

3    Garrison had in fact conducted those nerve conduction tests

4    on the defendant?

5    A.   Yes, I did.

6    Q.   Did he actually send a copy of his report to you?

7    A.   Yes, he did.

8    Q.   And what were the findings for Dr. Garrison after he

9    had conducted these nerve conduction tests on the defendant?

10   A.   His findings were that the -- first of all, all the

11   motor nerves, the nerves that generate the motion were

12   intact.  He stated that the median nerve, which is a nerve

13   that gives sensation to this entire pulp space of the thumb,

14   which is the nerve involved in carpal tunnel.  He also stated

15   that when he stimulated the radial nerve at the wrist, which

16   is well below where the surgery was done, that he didn't get

17   a clear impulse back to the thumb.  But at the time he

18   believed it might have been an impulse that was delivered by

19   the median nerve since it occupies a greater space in the

20   thumb.

21   Q.   So as I understand, we have two nerves in the

22   thumb.  We have a median nerve, correct?

23   A.   Correct.

24   Q.   What portion of the thumb would the median nerve be?

25   A.   The median nerve provides innervation to nearly all

1  of the pad, as well as all of the front of the thumb,

2  including this part of the hand.

3     Q.   Okay.  Was there any indication of any injury to the

4  median nerve in the left thumb?

5     A.   No, there was not.

6     Q.   What area again would the radial nerve control in

7  that thumb?

8     A.   The radial nerve would control the back of the

9  thumb.

10    Q.   Okay.  Now, was it the back of the thumb that the

11 defendant was complaining of numbness, or was it the area

12 controlled by the median nerve that he was complaining of

13 numbness?

14    A.   He was complaining of numbness in an area that was

15 closer to where the median nerve innervation is more so than

16 the radial nerve.

17    Q.   Again, as I understand, the test did not reveal any

18 damage to the median nerve, right?

19    A.   No, it did not.

20    Q.   And the way that you looked at the test, did you

21 interpret it that it was showing damage to the radial nerve

22 or not?

23    A.   It did not seem conclusively to show damage to the

24 radial nerve.

25    Q.   As I understand, the radial nerve would innervate

1    the back portion of the nerve anyway -- of the thumb?

2         A.    Correct.

3         Q.    Correct?

4         A.    Correct.

5         Q.    That was not the area that the defendant was

6    complaining of, was it?

7         A.    No, he was complaining more of the side and kind of

8    the -- what we call the ulnar pulp space which would be about

9    roughly around this area right here.

10        Q.    Directing your attention to October the 3rd of 2000,

11   was the defendant scheduled to come into your office for a

12   scheduled office visit?

13        A.    Yes, he was.

14        Q.    Did the defendant show up in your office on that

15   date for his scheduled visit?

16        A.    No, he did not.

17        Q.    When did you last actually see the defendant,

18   Jedidiah Isaac Murphy?

19        A.    I last saw him on October -- I'm sorry, August 17th,

20   the day I referred him for the -- for the test.

21        Q.    Do your records reflect any phone calls from the

22   defendant to your office after August 17th, the year 2000?

23        A.    Yes, there was a phone call that I took.  Mr. Murphy

24   was concerned that his employer had gotten a copy of the EMG

25   report.  The employer had stated that he needed to go back to

1    work at this point.  He was -- he was quite upset about

2    that.  I told him that I would look into it and see what

3    further options he might have.  I'd have to discuss it with

4    my office personnel that are specialists in comp issues.

5         Q.   Uh-huh.  When did he make that phone call?

6         A.   I don't recall the exact day, but I believe it was

7    probably within a week, to my best recollection of the -- the

8    day that Dr. Garrison sent out his results.

9         Q.   So that's going to be sometime perhaps

10   mid-September?

11        A.   Could be, around that area.

12        Q.   Certainly it was before October the 3rd, wasn't it?

13        A.   Yes, it was.

14        Q.   Now, when a -- when a patient comes in, a new

15   patient, do you take a history from that patient?

16        A.   Yes.  Yes, I do.

17        Q.   What's the purpose of that?

18        A.   Well, you take a general history to detect any

19   health problems, allergies, things like that, prior

20   surgeries.  Also, in the case of injuries like that, you

21   always ask the patient if they've had a prior injury or prior

22   problem in that area that might affect the current complaint.

23        Q.   Okay.  In this particular case, sir, did you ask the

24   defendant whether or not he had suffered a prior injury to

25   his left thumb?

1    A.   I did.   He did not -- to the best of my

2  recollection, he did not suffer a prior injury to his thumb.

3    Q.   Okay.   At least that's the history that he gave to

4  you; is that right?

5    A.   Correct.

6    Q.   And when a patient gives you a history, do you

7  assume since he's there for medical care, that he's going to

8  tell you the truth?

9    A.   Yes, sir.

10    Q.   At that time did you have any -- any reason to

11  believe that the defendant had in fact suffered or claimed an

12  on-the-job injury to his left thumb back in 1997?

13    A.   No, he did not give me that history.

14    Q.   When you talked about a past medical history, did

15  you ask for possible medications that he might be taking at

16  the time that he came in to see you?

17    A.   Yes, I -- the patients fill out a form where they

18  are instructed to write any current medications.   And then I

19  do ask while I'm speaking to them.

20    Q.   Okay.   In this case did the defendant indicate that

21  he was taking any medications at that time?

22    A.   He did not -- he did not list any medications on the

23  form.   I do not know.   I don't recall if I asked him if he

24  was taking any pain medication -- if he was taking any pain

25  medication.   I don't recall any other medications.

1     Q.   When you had -- when you were taking this medical

2  history from the defendant, did you have any of the records

3  at your disposal to determine whether or not he was telling

4  you the truth?

5     A.   No, I did not.

6              MR. DAVIS:  May I approach, Your Honor.

7              THE COURT:  You may.

8              MR. DAVIS:  Your Honor, at this time we'll

9  offer State's Exhibit 65, which will be the business records

10  of Addison Harrington, Incorporated.  Again, these have been

11  on file more than 14 days prior to trial.

12            (State's Exhibit No. 65 offered)

13            MS. BALIDO:  65?

14            MR. BYCK:  No objections, State's 65.

15            THE COURT:  Admitted.

16            (State's Exhibit No. 65 admitted)

17     Q.   (By Mr. Davis)  When he told you no prior injuries

18  to the left thumb, again, taking from your testimony, you did

19  not have access to the records of Addison Harrington,

20  Incorporated at that time, did you?

21     A.   No, I did not.

22     Q.   Referring now to those records, State's Exhibit

23  Number 65, sir, do you see a page that I'm looking at that's

24  entitled Addison-Harrington, Incorporated Accident

25  Investigation Form?

1   A.   Yes, I did.

2   Q.   Do you see the name of the injured employee to be

3   Jedidiah Isaac Murphy?

4   A.   Yes.

5   Q.   Do you see the date for that accident as 3-14-97 at

6   11 o'clock?

7   A.   Yes, I do.

8   Q.   Do you see a notation or a line that says "Apparent

9   Nature of Injuries"?

10   A.   Yes.

11   Q.   And in handwriting does it say out beside that

12   "broke left thumb at knuckle"?

13   A.   Yes, I do.

14   Q.   And is there an explanation for how the injury

15   occurred with writing following:  "Pulling string line tight

16   and nail holding string line came out of form hitting his

17   left thumb"?

18   A.   Yes.

19   Q.   Again, there's a date on the bottom of that of 3-17

20   of '97; is that right?

21   A.   Yes, it is.

22   Q.   Did the defendant ever mention that injury claim to

23   you, Dr. Vandiver?

24   A.   No, sir.

25   Q.   Would that have been important to know?

1      A.    Yes, it would have been.

2      Q.    Why would it have been important for you to know

3  that?

4      A.    It would have been important to determine if he had

5  any prior injuries to see if that had any affect on his

6  current injury.

7      Q.    Uh-huh.  Do you have any knowledge whether that

8  might affect the validity of his workers compensation claim?

9      A.    I can't say that for sure, but it's a possibility.

10     Q.    Did you ask the defendant whether or not he was

11 suffering from any seizures or any other illnesses?

12     A.    I remember he mentioned -- he mentioned depression,

13 and he mentioned seizures.

14     Q.    Okay.  The history that he gave you, did it show a

15 surgery to his left hand occurring in 1996?

16     A.    Yes.

17     Q.    Do you remember asking the defendant to give you

18 some more details about that surgery?

19     A.    Yes.

20     Q.    And do you remember what Mr. Murphy told you there

21 about the surgery to his left hand?

22     A.    Yes, I do.

23     Q.    Would you please tell the members of the jury what

24 the defendant told you in your office?

25     A.    He told me that he had suffered a gunshot wound to

1    his left hand, the palm area.  He said that he had several

2    surgeries to that area, reconstructive type surgeries,

3    especially involving the nerves.  He said that a doctor -- he

4    did not give me the name of the doctor at the time, stated

5    that doctor tried several times to reconstruct the nerves or

6    repair the nerves, but that it never resulted in returning

7    sensation.

8        Q.   Uh-huh.  What was your impression when he gave you

9    that type of history?  Did you think it would have some

10   impact on his ability to recover from the injury to his left

11   thumb?

12       A.   At the time I didn't think it would have an affect

13   on his left thumb.  In isolation it didn't seem to affect the

14   thumb at all at the time.

15       Q.   And in fact if you look at Dr. Garrison's records,

16   did in fact the defendant give the same type of history to

17   Dr. Garrison?

18       A.   Yes, he did.

19       Q.   When he gave you that history out there again, did

20   you have to assume that he was telling you the truth?

21       A.   Yes, I did.

22       Q.   Did you have any reason to disbelieve his account of

23   how his injury occurred or the severity of his injury?

24       A.   No, I did not.

25       Q.   Doctor, did the -- did you have access to any

1   medical records at that time concerning the injury to the

2   defendant's left hand?

3        A.   No, I did not.

4        Q.   Had you -- more specifically had you viewed the

5   records from a Jeffrey T. DeHaan, M.D. who is a physician in

6   Texarkana, Texas?

7        A.   No, I did not.

8        Q.   Had you reviewed any records from St. Michael's

9   Hospital in Texarkana, Texas, regarding the defendant?

10       A.   No, I did not.

11       Q.   Had you reviewed any records from Doctors Hospital

12  in New Boston, Texas, regarding the defendant and the injury

13  to his left hand?

14       A.   No, I did not.

15       Q.   Had you reviewed any records from Wadley Regional

16  Medical Center in Texarkana regarding this injury, sir?

17       A.   No, sir.

18            MR. DAVIS:   Your Honor, at this time the State

19  will offer State's Exhibit 71 which are copies of records

20  from Doctors Hospital in New Boston.  These records, again,

21  have been tendered to counsel and they've been on file more

22  than 14 days prior to trial.  State's Exhibit 72, copies of

23  records from Jeffrey T. DeHaan.  Again, they've been on file

24  more than 14 days prior to trial.  Records from Wadley

25  Regional Medical Center in Texarkana.  These records have

DARLINE W. LABAR, OFFICIAL REPORTER

1    been on file more than 14 days prior to trial.  Finally,

2    State's Exhibit 74, records from St. Michael's Hospital,

3    which again have been on file with the Court more than 14

4    days prior to trial.

5                (State's Exhibit No. 71 through 74 offered)

6                MR. BYCK:  No objection to 71 through 74.

7                THE COURT:  All admitted.

8                (State's Exhibit No. 71 through 74 admitted)

9        Q.   (By Mr. Davis)  Doctor, have you -- have you ever

10   had the opportunity to review the records that I've just had

11   admitted into evidence?

12       A.   Yes, I have.

13               MR. DAVIS:  May I approach, Your Honor.

14               THE COURT:  You may.

15       Q.   (By Mr. Davis)  Doctor, if we could -- starting off

16   with State's Exhibit 71, these will be the records from --

17   from Doctors Hospital in New Boston, Texas.  The first page,

18   do you recognize what type of document that is, sir?

19       A.   Yes.

20       Q.   What are we looking at, an emergency room record?

21       A.   Yes, it is.

22       Q.   The name of the patient up there, does that show to

23   be a Matthew Murphy?

24       A.   Yes, it does.

25       Q.   With date of birth of 9-18-75?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Yes.

2    Q.   Does it show a street address of 501B West Walters,

3  New Boston, Texas?

4    A.   Yes, it does.

5    Q.   And does it show basically a history of the

6  complaint that that patient is making at the time?

7    A.   Yes, it does, briefly.

8    Q.   What is the date for that record for the emergency

9  room?

10   A.   9-13-96.

11   Q.   9-13-96?

12   A.   Correct.

13   Q.   All right.  What complaint did the patient who

14 referred to himself as Matthew Murphy make when he came into

15 the hospital?

16   A.   It says that he complained of a puncture wound to

17 the palm of the left hand, secondary to being shot in the

18 hand.

19              THE REPORTER:  I'm sorry.  If you can slow

20 down for me.

21   A.   I'm sorry.  Complaint of a puncture wound to palm of

22 left hand, secondary to being shot in hand with pellet gun

23 while handling it at around 1:15 in the morning, or 12:15 in

24 the morning.

25   Q.   Uh-huh.  As far as the treatment, was he released

1    with instructions to come back later?

2        A.    Yes, he was.

3        Q.    What sort of treatment, if any, was actually given

4    to him before he left that hospital?

5        A.    He was given pain medication.  He was also given

6    some antibiotics.

7        Q.    If you'd look at State's Exhibit Number 73, which

8    will be records from Wadley Regional Medical Center.  Have

9    you had an opportunity to look through these records?

10       A.    Yes, I have.

11       Q.    Do these records show that the individual, again

12   identified as Matthew Murphy, appeared at Wadley Regional

13   Medical Center for treatment of his left hand?

14       A.    Yes, it did.

15       Q.    And if we look at that again, refer to whatever

16   portion of those records that you need to, but do those

17   records relate that he was admitted for treatment for his

18   left hand?

19       A.    Yes, he was.

20       Q.    The attending physician was who?

21       A.    Dr. DeHaan.

22       Q.    All right.  Are you familiar with Dr. DeHaan?

23       A.    I hadn't heard of him, but I understand he's a hand

24   specialist.

25       Q.    And again, was there a history that was provided

DARLINE W. LABAR, OFFICIAL REPORTER

1    concerning that injury?

2        A.   By Mr. Murphy, yes, as I stated previously.

3        Q.   Same type of history provided?

4        A.   Yes, sir.

5        Q.   And at some point was a decision made by Dr. DeHaan

6    to actually remove the pellet from his left hand?

7        A.   Yes, that was correct.

8        Q.   All right.  In the hospital records whenever surgery

9    is performed does the hospital keep an operative report or an

10   operative note?

11       A.   Yes, it does with the patient's chart.

12       Q.   Who actually prepares that operative note?  Would it

13   be the attending physician or surgeon?

14       A.   Yes, sir.

15       Q.   In those records has Dr. DeHaan actually prepared an

16   operative note to detail what occurred during the surgery on

17   Mr. Murphy's left hand?

18       A.   Yes, he provided the details of the surgery.

19       Q.   If you don't mind, would you please read that

20   operative note for the members of the jury?

21       A.   Okay.  It states date of operation is 9-13-96.

22   Attending surgeon is Dr. DeHaan.  His pre-operative diagnosis

23   was a gunshot wound to the left hand with swelling and

24   paresthesias of the hand.

25       Q.   What does paresthesias mean?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    Paresthesias means the patient is complaining of

2    decreased or altered sensation anywhere in the body.  In this

3    case in the fingers.

4    Q.    If there's swelling in a hand -- in the left hand,

5    for instance, would you expect perhaps there to be some

6    pressure on the nerves controlling that hand?

7    A.    Yes, that's possible.

8    Q.    And would -- could that account for numbness in the

9    hand?

10   A.    Yes, it could.

11   Q.    Would you continue, please?

12   A.    Sure.  He states that his procedure was incision and

13   drainage with fasciotomy.  Fasciotomy is a release of some of

14   the tough tissue underneath the skin which in the case of

15   swelling, there's no room for the swelling to go anywhere so

16   it can damage the structures within the facie, so he split

17   that open.  And then he turned the hand over because the

18   pellet was near the skin in the back.  He made a small

19   incision in the back and removed the pellet and closed both

20   wounds.

21   Q.    In the operative note does he make any mention about

22   possible nerve damage that he observed?

23   A.    He states the nerves were inspected and there was no

24   nerve laceration.

25   Q.    If you would, as a doctor, what does that mean to

1   you?  What did he see?

2       A.    That means that he visualized the nerves and did not

3   see any damage to them that could be detected by the human

4   eye.

5       Q.    Okay.  There appear to be any complications at all

6   with that surgery?

7       A.    Not in this operative note, no.

8       Q.    Would you consider that to be very complicated

9   surgery?

10      A.    Not particularly, no.

11      Q.    Just -- would it be fair to say that he went in

12  there and he removed the pellet and he closed it up?

13      A.    Correct.

14      Q.    Do you know how long that surgery took?

15      A.    I do not know exactly, but I -- I would imagine

16  something like that would not take more than an hour, but

17  that's only a guess.

18      Q.    Is there any note that any reconstructive surgery

19  was necessary on that left hand?

20      A.    No, there was not.

21      Q.    Now, that operative note there, does that square

22  with the history that Mr. Murphy gave to you when he came up

23  to your office in Kaufman?

24      A.    Only to the extent that there was a gunshot wound to

25  his hand.

Page 216

1      Q.   How does it differ from the history that he gave

2   you?

3      A.   His history was that he suffered the gunshot wound

4   to his hand, suffered nerve injury at that time, and that

5   further surgeries were an attempt to repair or reconstruct

6   the nerves, which was ultimately unsuccessful.

7      Q.   So that there's no evidence of any nerve damage,

8   correct?

9      A.   Not according to these documents, no.

10     Q.   Have you reviewed Dr. DeHaan's records, too?

11     A.   Yes, I have.

12     Q.   Any indication in his -- in his office records of

13  any nerve damage to Mr. Murphy's left hand?

14     A.   No, sir.

15     Q.   No reconstructive surgery?

16     A.   No, sir.

17     Q.   And looking at the records from St. Michael's

18  Hospital in Texarkana, does it appear that Mr. Murphy came in

19  sometime after the surgery because one of the sutures had

20  come loose or there was something he needed attention to?

21     A.   Yes, he -- I believe he called Dr. DeHaan stating

22  that his palm wound, I believe, had popped open.  Dr.

23  DeHaan's instructions were to go to the emergency room, have

24  the emergency room doctor see what was going on, and possibly

25  contact him if it seemed like it was something that needed

DARLINE W. LABAR, OFFICIAL REPORTER

 1    immediate attention.

 2        Q.   In the records from St. Michael's is there an

 3    indication that the defendant is making some complaint about

 4    numbness to -- to his fingers in the left hand?

 5        A.   Not at the time that he returned with the split

 6    open.  I remember seeing a small part of the note said

 7    sensory was okay based on the ER doctor's examination.

 8                    MR. DAVIS:  If I can approach, Your Honor.

 9                    THE COURT:  You may.

10        Q.   (By Mr. Davis)  Doctor, I'm now looking at the

11    records from St. Michael's, State's Exhibit 74, is there a

12    nursing assessment there with some notes about what the

13    patient was stating at that time?

14        A.   Yes, there is.

15        Q.   Okay.  And is he complaining about numbness in any

16    of his fingers in his left hand at that time?

17        A.   It states that he complained of numbness of the

18    fourth and fifth fingers.

19        Q.   Fourth and fifth fingers?

20        A.   Yes, sir.

21        Q.   No other fingers?

22        A.   No, sir.

23        Q.   All right.  My left hand -- what would you regard to

24    be my fourth and fifth finger?

25        A.   That would be the fourth and the fifth.

1    Q.    These two fingers only, correct?

2    A.    Yes, sir.

3    Q.    No complaint to these three fingers here or to the

4    thumb at that point, correct?

5    A.    No, sir.

6    Q.    And that's a history -- would you assume that's a

7    history that comes straight from the patient himself?

8    A.    Yes, as told to the nurse.

9    Q.    Now, at that time, again, the patient was referring

10   to himself by what name?

11   A.    Matthew Murphy.

12   Q.    Is he still giving the same home address there in

13   New Boston, Texas?

14   A.    Yes.

15   Q.    Doctor, as a rule when patients come to see you, do

16   they use their true name?

17   A.    Yes, I assume so.

18   Q.    Have you ever had an occasion where somebody came to

19   you for medical care and used an alias?

20   A.    Not to my knowledge.

21   Q.    Adopted a false name, perhaps the name of a brother

22   to seek medical care from you?

23   A.    Not to my knowledge.

24   Q.    While the defendant was under your care, Doctor, did

25   he ever complain of hearing voices?

```
 1      A.   No, he did not.

 2      Q.   Did he ever complain of an alter ego?

 3      A.   No, he did not.

 4      Q.   Ever complain of hallucinations to you?

 5      A.   No, sir.

 6      Q.   Ever claim to be suicidal?

 7      A.   No, sir.

 8      Q.   Certainly I guess as a physician, you're trained to

 9   make those sorts of assessments of risks for your patients,

10   aren't you?

11      A.   Yes, sir.  In general observation, yes.

12      Q.   In your general observations of Mr. Murphy, did you

13   ever feel him to be suicidal?

14      A.   No, sir.

15      Q.   Had you thought that he was in that state, would you

16   have recommended or sought additional care for him?

17      A.   If I felt that he was upset to the point where that

18   would be a possibility, I certainly would have tried to say

19   something to him myself.  If he communicated back any threats

20   to do harm to himself, I certainly would have tried to obtain

21   help, yes.

22      Q.   Was there ever a time where he was unresponsive or

23   incoherent with you?

24      A.   No, sir.

25      Q.   Was he always able to provide information to you?
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Yes, he was.

2    Q.   Again, the information that he provided to you, you

3 assumed was the truth, right?

4    A.   Yes, I did.

5         MR. DAVIS:  Thank you, Doctor.  I'll pass the

6 witness.

7         MR. BYCK:  Your Honor, we will respectfully

8 request to cross-examine this doctor at a later date.

9         THE COURT:  Given what I understand and note

10 to be the schedules of professionals in the medical field,

11 putting the defense on alert, give this individual adequate

12 time to make arrangements with regard to other professional

13 responsibilities that may come to his attention.

14        MR. BYCK:  We certainly will.

15        Doctor, how much advance notice could we give you?

16 Would half a day do it, or would you need an entire full

17 day?

18        THE WITNESS:  I'd prefer a day.

19        MR. BYCK:  A full day?

20        THE WITNESS:  Yes.

21        MR. BYCK:  Yes.

22        THE COURT:  With that understanding, Doctor,

23 you are excused.

24        THE WITNESS:  Thank you.

25        MR. DAVIS:  Your Honor, at this time the State

DARLINE W. LABAR, OFFICIAL REPORTER

1  will call Kirsten Adames.

2              (Witness brought forward.)

3              THE COURT:  Good afternoon.  May I ask that

4  you raise your right hand, please.

5              (Witness sworn.)

6              THE COURT:  Have a seat to my left, if you

7  please.

8          The State may continue.

9              MR. DAVIS:  Thank you.

10                 KIRSTEN ADAMES

11  was called as a witness by the State and, after having been

12  first duly sworn, testified as follows:

13              Direct Examination

14  By Mr. Davis:

15      Q.   Would you please tell us your full name?

16      A.   Kirsten Eileen Adames.

17      Q.   And, Ms. Adames, how are you employed?

18      A.   I'm a workers comp adjuster for Trinity Insurance.

19      Q.   Is that company located here in Dallas?

20      A.   Yes, sir.

21      Q.   How long have you been working for that insurance

22  company?

23      A.   About two and a half years.

24      Q.   How long have you been in the insurance business?

25      A.   21.

1   Q.   What are your duties and responsibilities as a

2   workers compensation claims adjuster?

3   A.   Handle claims.  I administer benefits as they are

4   due, medical and lost time benefits.

5   Q.   Now, workers compensation, would it be fair to say

6   that if you receive an on-the-job injury, then you may be

7   entitled to be paid workers compensation benefits?

8   A.   Yes, sir.

9   Q.   Does the system work so that if an employee sustains

10  an injury, the employer is actually required to send in

11  notice of that injury, isn't he?

12  A.   Yes, they are.

13  Q.   And is the employee then due medical care for his

14  injuries?

15  A.   Yes.  If the claim is found compensable, yes.

16  Q.   And if it's found to be compensable, is he also

17  entitled to certain monetary benefits to be paid on a regular

18  basis, too?

19  A.   Yes.

20  Q.   When it's determined that that person is no longer

21  medically disabled and he's able to go back to work, do his

22  payments -- his weekly benefits continue or are they

23  discontinued?

24  A.   They are discontinued.

25  Q.   Directing your attention now back to June of the

DARLINE W. LABAR, OFFICIAL REPORTER

1    year 2000, were you still employed with Unitrin at that time?

2        A.    Yes, I was.

3        Q.    Were you also still in the workers compensation unit

4    there?

5        A.    Yes, I was.

6        Q.    Did a file come to you regarding an employee by the

7    name of Jedidiah Isaac Murphy?

8        A.    Yes.

9        Q.    Were you the adjuster assigned to that file?

10       A.    Yes.

11       Q.    If you will, when a file -- when a file such as that

12   comes in, what do you do actually?  If you got notice that

13   this person is -- is claiming an on-the-job injury, what do

14   you do first?

15       A.  Well, you know as an adjuster we make a three-point

16   contact.  We contact the -- you know, try to get in touch

17   with the claimant, verify the injury with the employer, and

18   contact the treating doctor.

19       Q.    In this case did you talk with Dr. William Vandiver?

20       A.    I did not talk to him personally.

21       Q.    Did someone else at your direction do that?

22       A.    Well, I did talk to Dr. Vandiver after the claim was

23   already in progress.  I didn't talk to him at the very

24   beginning.

25       Q.    And was it -- was it determined at some point that

1      benefits would be paid to Mr. Murphy?

2          A.   Yes.

3          Q.   Do you remember how much he was receiving and on

4      what -- was it on a weekly basis that he receives his

5      payments?

6          A.   Yes, it was a weekly basis, and I do not remember

7      the weekly amount.

8          Q.   Was it your understanding that the defendant

9      continued to see Dr. Vandiver for a period of time?

10         A.   Yes.

11         Q.   Was it your understanding that he actually had some

12     surgery performed on his left thumb?

13         A.   Yes.

14         Q.   At a certain point, and as I understand, did your

15     insurance company pay for all the medical expenses?

16         A.   We pay for the reasonable and necessary medical

17     expenses.

18         Q.   All right.  At some point were you talking with the

19     defendant about the status of his thumb, about whether he's

20     well enough to go back to work, whether he needs more care,

21     were you having discussions with him?

22         A.   Yes.

23         Q.   And in general what was the nature of those

24     discussions?

25         A.   The fact that he was alleging that he had no feeling

DARLINE W. LABAR, OFFICIAL REPORTER

1   work there at Griffin Products?

2       A.   No, sir.

3       Q.   Now, when you get a -- when you get a claim such as

4   this, would it be important to know whether or not that

5   person, the claimant has suffered an injury to the same part

6   of his body or not?

7       A.   Yeah, that's usually one of the things we try to

8   find out.  And if we find that out after the fact, there's

9   some recourses that we take.

10      Q.   Why would that be important to know up front? If I

11  came in and I complained, for instance, that I've injured my

12  left thumb and I can't work as a result of that left thumb

13  being hurt, why would it be important for you as an adjuster

14  to know if I've hurt that thumb before or made a claim

15  before?

16      A.   Because if you've had prior injury to that same part

17  of the body, possibly the injury that you allege may not have

18  happened on the job.  It could have been a preexisting

19  condition.

20      Q.   All right.  Did -- in your -- in your discussions

21  with the defendant, did he ever mention that he had a prior

22  injury to his left thumb?

23      A.   No.

24      Q.   Did you know that he had made a claim back in 1997

25  to his left thumb, on-the-job injury?

1    A.    No, sir.  We do index checks.  It did not show up.

2    Q.    Did you know that -- at some point did you become

3    aware that he had had an injury to his left hand back in

4    1996?

5    A.    Yes, I was aware of it.

6    Q.    How did you become aware of that?

7    A.    I was informed by the employer that he had

8    suffered -- he had told them he had suffered a prior gunshot

9    wound to the hand.  The lady that actually took the report

10   had a statement for me and had also shared with me some

11   information about that.  But he told me something different.

12   Q.    Okay.  So is it my understanding that you had

13   another adjuster at your direction have a conversation with

14   the defendant about the injury to his left hand?

15   A.    Yes.

16   Q.    What had the defendant told you about that when you

17   asked him?

18   A.    He told me that he was getting a gun out of the

19   closet and that it snagged on something in the closet and

20   discharged into his hand.

21   Q.    Again, how far into this claims process did you

22   learn that?

23   A.    I knew after -- you know, probably after a month

24   that he had suffered a prior injury to his hand, not

25   necessarily the thumb, but it was to his hand.  And so that's

1    when I started trying to search out maybe where that prior

2    injury had further medical records.

3        Q.   Again, would that be important to know as a claims

4    adjuster if he's had a prior injury to the left hand?

5        A.   Yes, sir.

6        Q.   And do I understand you to say that you didn't learn

7    about the injury from him first, but from his employer,

8    right?

9        A.   That is correct.

10       Q.   And you then began searching for medical records

11   concerning that injury?

12       A.   Yes, I did.

13       Q.   Did ask you the defendant to help you try to find

14   those medical records?

15       A.   Yes, we did.

16       Q.   And do you remember having a discussion with him

17   about that?

18       A.   At one point -- it was when he was -- when I was

19   discussing with him about his hand.

20       Q.   Uh-huh.  Did he -- did he indicate that he had

21   records that he would provide to you?

22       A.   He said he didn't have them, but they were at

23   someone else's house.

24       Q.   Did he indicate that he would get those records to

25   you?

1    A.    I don't recall.

2    Q.    All right.  Did the defendant provide any medical

3  records to you concerning the injury to his left hand?

4    A.    Not at all.

5    Q.    Now, when you do a search for medical records, his

6  name is Jedidiah Isaac Murphy.  What name would you use?

7  Would you use Jedidiah Isaac Murphy, or would you look under

8  Matthew Murphy?

9    A.    I would have looked under Jedidiah Isaac Murphy.

10   Q.    Did he ever tell that you the records would be found

11  under another name of Matthew Murphy?

12   A.    No, sir.

13   Q.    So given that, were you ever able to search and find

14  the records from that particular injury?

15   A.    Yeah, we finally did get one piece of medical

16  information.

17   Q.    What was that?

18   A.    It was from a hospital, and it was under the name of

19  Matthew Murphy.  And it was a pellet wound to two fingers.

20   Q.    When did you get that?

21   A.    I can't remember the exact date, but I want to think

22  it was maybe in October.

23   Q.    Of last year?

24   A.    Yes, sir.

25   Q.    At a certain time then did you believe that the

DARLINE W. LABAR, OFFICIAL REPORTER

1    defendant was able to return to work?

2        A.   Yes.

3        Q.   And as a result, what decisions did you make about

4    the payment of his benefits?

5        A.   I explained to him on the phone that his -- when he

6    called me that his -- you know, I discussed with him the bona

7    fide offer of light duty employment, what that meant to him,

8    and he just asked does this mean I have to go back to work.

9    And I said, yes, it is, because if you do not return to work,

10   your benefits will cease.

11       Q.   Do you remember the day that the payments stopped to

12   Mr. Murphy?

13       A.   His check was due -- I believe his checks went out

14   on Thursday, and I found out -- the Thursday or the day that

15   he was to return to work, I called and that's when I found

16   out.

17              MR. DAVIS:  May I approach, Your Honor.

18              THE COURT:  You may.

19       Q.   (By Mr. Davis)  Showing you now State's Exhibit

20   107D.  Do you recognize this document?

21       A.   Yes, I do.

22       Q.   Okay.  What type of document is this?

23       A.   It's the bottom half of the check explaining what

24   the check is for.

25       Q.   Okay.  Is this something that would be sent to Mr.

1    Murphy as a part of his workers compensation claim?

2         A.   Yes, it comes attached to the check.

3         Q.   All right.  It has name Jedidiah Isaac Murphy,

4    Griffin Products.  Is this actually one of the -- a part of

5    the check, the bottom half of the check that was sent to Mr.

6    Murphy in connection with his claim?

7         A.   Yes, it is.

8         Q.   Adjuster 9W2?

9         A.   That's me.

10        Q.   Okay.  All right.  Okay.  The loss date of

11   6-22-2000, that's the date of Mr. Murphy's injury; is that

12   right?

13        A.   Yes, sir.

14        Q.   The notes down there, 9-26 to 10-2 --

15        A.   That was --

16        Q.   -- 2000?

17        A.   That would be for one week of benefits.

18        Q.   So these benefits here that he received were for the

19   weekend ending October 2nd of 2000; is that right?

20        A.   That is correct.

21        Q.   If the murder of Ms. Cunningham occurred on October

22   the 4th of 2000, would it be your understanding that that

23   would have been the last check that Mr. Murphy received with

24   regards to his claim?

25        A.   I'm sorry.  Can you repeat that question?

1      Q.    Was that the last check that Mr. Murphy received on

2    his workers compensation claim?

3      A.    Yes.

4      Q.    Do you know whether Mr. Murphy had any other source

5    of income other than his worker compensation claim?

6      A.    No.

7      Q.    Now, this -- you were saying that a statement was

8    taken from Mr. Murphy; is that right?

9      A.    Yes, it was.

10      Q.    And who did you have talk with Mr. Murphy about his

11    injury?

12      A.    Joanna Gilmore with Employers Claims Adjustment

13    Service.

14      Q.    Why did you have somebody outside of Unitrin contact

15    the defendant?  Why didn't yourself talk with him or have

16    another adjuster inside Unitrin?

17      A.    Oftentimes when we get overloaded and we're unable

18    to, you know, personally do the statement taking ourselves,

19    oftentimes we have to hire someone to do it for us because

20    we're loaded down.

21      Q.    Okay.  So that was done at your direction; is that

22    correct?

23      A.    Yes, it was.

24      Q.    Was that made a part of your workers compensation

25    claim file?

1    A.   Yes, it is.

2    Q.   Did you have -- did Ms. Gilmore actually send a copy

3    of that interview for your review?

4    A.   Oh, yes.

5    Q.   And again, that typed transcript of that statement

6    became a part of your business records with Unitrin; is that

7    what I understand?

8    A.   Yes, it did.

9    Q.   Now, Unitrin does maintain business records on a

10   regular basis, don't they?

11   A.   Oh, yes.

12   Q.   Entries made out there would be by someone who has

13   personal knowledge of the events; is that right?

14   A.   Yes, uh-huh.

15   Q.   They are made on a regular basis, day-to-day,

16   week-to-week?

17   A.   Any time we have a phone call or a piece of mail.

18   Q.   As I understand then, these would have been part of

19   your business records, correct?

20   A.   Yes, sir.

21   Q.   The records, I take it, too, are generated at or

22   near the time of the occurrence; is that right?

23   A.   Yes, sir.

24        MR. DAVIS:  If I can approach, Your Honor.

25        THE COURT:  You may.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.   (By Mr. Davis)  I hand you now several pieces of

2    paper.  Actually this will be 18 pages of documents.  Do you

3    recognize what I've had marked as State's Exhibit 125?

4      A.   Yes.

5      Q.   Is that the statement of Jedidiah Isaac Murphy that

6    was given to Joanna Gilmore at your direction on September

7    13, 2000?

8      A.   Yes, it is.

9      Q.   Again, when you received this, you made this a part

10   of your actual file in this case; is that right?

11     A.   Yes, sir.

12          MR. DAVIS:  At this time we will offer State's

13   Exhibit Number 125.

14          (State's Exhibit No. 125 offered)

15          MS. BALIDO:  Judge we'd like an opportunity to

16   see that exhibit.  We haven't seen it yet.

17          MR. BYCK:  Your Honor, may I approach the

18   witness to get an exhibit?

19          THE COURT:  You may.

20          MR. BYCK:  I thank the Court.

21          (Counsel examines document.)

22          MR. BYCK:  No objection, State's 125.

23          THE COURT:  Admitted.

24          (State's Exhibit No. 125 admitted)

25          MR. DAVIS:  May I publish, Your Honor, just

1    very briefly?

2              THE COURT:   You may.

3              MR. DAVIS:   Just portions of it.

4         Ladies and gentlemen, I'm now going to read to you

5    portions of the document, State's Exhibit 125, certain

6    questions and answers here directed to Mr. Murphy.   On page

7    10:  What happened to you -- "what happened after you had the

8    surgery done?

9              "Uh, well, there was a lot of, I had a cast put on

10   my hand and I had a, just partial of my thumb was exposed,

11   just like the tip of it and the next morning, I went home

12   basically that day and just, you know, went to sleep, just

13   slept all day, I guess, like the effects of anesthesia or

14   whatever.

15             "Uh-huh.

16             "When I woke up the next day I couldn't feel the

17   end of my thumb so I called the doctor immediately 'cause I

18   didn't know what was up and I asked him, you know, if maybe

19   that was something, maybe the anesthesia still or uh some of

20   the, you know, medicine or what have you.   I explained to him

21   the day I went in to his office the very first time I had

22   previous injury and I had four dead fingers and the only

23   finger I could feel was my thumb and I, you know, I told him

24   that it was real crucial that whatever he did to me, he

25   explained to me before that when this tendon -- when this

1    usually snaps."

2         He's asked: "And that's because of your other four

3    fingers?"

4         And his response is:  "Yes, ma'am, they're dead from

5    a gunshot wound.  I told the guy that hired me, Mr. Steve, he

6    knew about it.  I told him.  I usually tell everybody that I

7    work for.  But it's never really ever slowed me down or, you

8    know, after I was shot it slowed me down for awhile to get

9    used to it but once I'd gotten used to it it's never hindered

10   me really in any way.  As long as I could feel one finger I

11   knew when I had something, whether or not it was hot or, you

12   know, it kind of just kept me just normal.  But I knew

13   something was wrong the day after surgery and I couldn't feel

14   my finger.  I called Dr. Vandiver immediately and then I

15   called him, I don't know, I guess about every other day for a

16   week, two weeks."

17        On page 13 the adjuster is now asking him about the

18   prior injury to the left hand.

19        "Can you give me the particulars of that?

20        "I had a gunshot wound right through the center of

21   it and it severed the media nerve in my left hand.  Just

22   basically blew it in half.  I had a hole completely through

23   my hand."

24        Again, later referring to the same injury:  "Did you

25   receive an impairment rating from the previous gunshot

1  wound?

2          Um more or less, no.  I didn't stick around long

3  enough to, more or less, it's more or less the same kind of

4  situation that this.  They wanted me to stay off work and I

5  probably could've but it was an accidental gunshot wound, you

6  know.  I grabbed the gun and was going to move it from one

7  end of the closet to the other end of the closet and it went

8  off so I just figured that was my fault so I didn't, you

9  know, I didn't know anything about an impairment rating or

10 anything like that, I just went, with feeling in one hand I

11 didn't, it slowed me down, sure, but as long as I could use

12 my thumb and (inaudible) when I grab something as long as I

13 knew how much pressure I had on it 'cause of the pressure to

14 my thumb so I like adopted kind of."

15         Again, questions about the surgery.  "How many

16 surgeries did you have on the left hand?

17         "My, I had one for the gunshot wound and one for

18 the thumb.  But the one for my hand was like a couple of

19 different stages of surgery.  One guy opened it and the other

20 guy sewed it up kind of deal.  It was pretty lengthy

21 surgery."

22         I believe my last question to you, Ms. Adames, was

23 you didn't know whether the defendant had any other source of

24 income; is that correct?

25         A.   That is correct.

1    Q.    When you terminated his claim?

2    A.    Correct, because if he had had other source of

3    income, he would not be entitled to the full benefit wages.

4              MR. DAVIS:  Your Honor, at this time we'll

5    offer State's Exhibit Number 66.  These are the records from

6    Citizens National Bank.  Again, these have been on file with

7    the Court more than 14 days prior to trial.

8                    (State's Exhibit No. 66 offered)

9              MR. BYCK:  No objections to State's 66.

10              THE COURT:  Admitted.

11                    (State's Exhibit No. 66 admitted)

12              MR. DAVIS:  Permission to publish.

13              THE COURT:  Granted.

14              MR. DAVIS:  Ladies and gentlemen, State's

15    Exhibit 66 are records provided by the Citizens National Bank

16    of Wills Point, Texas.  They refer to the defendant, Jedidiah

17    Isaac Murphy, and to the account that he had with that bank.

18    Refer to specifically a statement summary for the time period

19    between September 17th, 2000, and October 15, 2000.  Shows

20    that the balance forward from those dates was $17.35.  Total

21    debits during that time period were $88.  Total credits were

22    zero.  Closing balance as to 10-15-2000 was negative $70.65.

23    On October 4th of 2000, a 20-dollar charge was made against

24    that account for non-sufficient funds.  On October 6th, 2000,

25    a 10-dollar charge for overdraft fee.  Again, on October 11,

1   a 20-dollar charge for non-sufficient fund fee.  And finally

2   on October 13, $8 maintenance fee.

3               Your Honor, I'll pass the witness.

4               MR. BYCK:  May we approach, Your Honor.

5               THE COURT:  You may.

6           Sheriff, five minute recess.

7               THE BAILIFF:  All rise.

8               (Jury excused from courtroom.)

9               THE BAILIFF:  All rise.

10              (Jury returned.)

11              THE COURT:  Jurors may be seated.

12          Mr. Murphy, counsel, visitors in the gallery and the

13  witness, you may be seated.

14              MR. BYCK:  Your Honor, we have no questions of

15  this witness.

16              THE COURT:  Thank you.  You may step down,

17  ma'am.

18              THE WITNESS:  Thank you.

19              THE COURT:  The State may continue.

20              MR. DAVIS:  Yes, Your Honor.  May it please

21  the Court, members of the jury, at this time the State of

22  Texas rests its case in chief.

23              (State of Texas Rests)

24              THE COURT:  State's rests at 4:53 p.m. on the

25  6th of June.

1          Ladies and gentlemen of the jury, we will stand in

2     recess for your purposes until tomorrow morning at 9:30 a.m.

3     We have some unattended business that we will begin

4     addressing about an hour or so before you get here.  Have a

5     good evening.  Recall the instructions I have heretofore

6     given to you.  Obviously, they remain in force and effect.

7     Have a good evening.  We'll see you tomorrow morning, 9:30

8     a.m.

9                    THE BAILIFF:  All rise.

10                   (Jury retired from the courtroom.)

11                   THE COURT:  Do the witnesses that counsel

12    cares to be heard tomorrow morning before the jury returns,

13    have they been notified?  Do they know to be here at 8:30

14    a.m.?  Is there any problems that the Court can assist

15    counsel with regard to securing their presence?

16                   MR. BYCK:  My doctor said he would be here at

17    1 o'clock.

18                   MS. BALIDO:  I --

19                   MR. DAVIS:  Your Honor, may I be excused, with

20    Ms. Miller remaining, with the Court's permission?  She is

21    fully capable.

22                   THE COURT:  Depending upon Ms. Miller's

23    acquiescence.

24                   (Recess of proceedings.)

25

Page 242

Reporter's Certificate

1

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4         I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13        I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16        Witness my hand this the 28th day of October, A.D.,

17   2001.

18

19

20

     DARLINE W. LABAR
21   Official Court Reporter
     194th Judicial District Court
22   Dallas County, Texas
     (214) 653-5803

23

24

25   Certification No. 1064 Expires December 31, 2002

DARLINE W. LABAR, OFFICIAL REPORTER