REPORTER'S RECORD

**74145**

VOLUME 50 OF 65 VOLUMES

TRIAL COURT CAUSE NO. F00-02424-NM

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

*********************

TRIAL ON THE MERITS BY JURY

*********************

**FILED IN**
**COURT OF CRIMINAL APPEALS**

DEC  5 2001

Troy C. Bennett, Jr., Clerk

A P P E A R A N C E S:

HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building
        Dallas, Dallas County, Texas  75207
        Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
            FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defenders Office
Dallas, Texas  75207
        Phone:  214-653-9400
            FOR THE DEFENDANT.

*********

On the ^ day of ^, 2001, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable F. Harold Entz, Jr., Judge presiding, held in Dallas, Dallas County, Texas:

Proceedings reported by machine shorthand, computer assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

```
 1                     INDEX VOLUME 50

 2   June 7th, 2001                          PAGE    VOL.

 3   Proceedings....................................  2      50

 4   Reporter's Certificate......................... 148     50

 5

 6              CHRONOLOGICAL WITNESS INDEX

 7                    DIRECT        CROSS        VD      VOL.

 8   MARY ERIN MILLER        2                            50

 9   GREG DAVIS              8                            50

10   TRESHOD TARRANT       25, 59       57               50

11   JASON BONHAM           62          79               50

12   EDWARD HUESKE          87                           50

13   EDWARD HUESKE          90          95               50

14   DR. NIZAM PEERWANI    100                           50

15   DR. NIZAM PEERWANI    104         113               50

16   DR. WILLIAM VANDIVER 122         128                50

17

18              ALPHABETICAL WITNESS INDEX

19                    DIRECT        CROSS        VD      VOL.

20   JASON BONHAM           62          79               50

21   GREG DAVIS              8                            50

22   EDWARD HUESKE          87                           50

23   EDWARD HUESKE          90          95               50

24   MARY ERIN MILLER        2                            50

25   DR. NIZAM PEERWANI    100                           50
```

```
 1  DR. NIZAM PEERWANI    104          113              50

 2  TRESHOD TARRANT         25, 59     57               50

 3  DR. WILLIAM VANDIVER 122           128              50

 4

 5                    EXHIBIT INDEX

 6  STATE'S                 OFFERED     ADMITTED      VOL.

 7    126   Autopsy Photo      117         117         50

 8  DEFENDANT'S              OFFERED     ADMITTED      VOL.

 9    6A   Handwritten Note    10          10          50

10    6B   Handwritten Note    10          10          50

11    6C   Handwritten Note    10          10          50

12    10   Dr. Krusz Records   25          25          50

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE COURT:  Ms. Balido, are you proceed to
 3    proceed with the hearing that commenced yesterday, ma'am?
 4              MS. BALIDO:  Yes, Judge, but my first witness
 5    just went outside, Ms. Miller.
 6              THE COURT:  All right.  Let the record reflect
 7    this hearing is conducted in open court, outside the presence
 8    and hearing of the impaneled jury and the alternate.
 9         The accused, Jedidiah Isaac Murphy, will be in court
10    at all times during the hearing unless I dictate the contrary
11    into the record.
12         Ms. Miller, you have been called as a witness in
13    this hearing.  If you'd have a seat.
14         Ms. Miller is an Assistant District Attorney in
15    Dallas County, Chief Prosecutor, 194th District Court.  As an
16    officer of the court, the Court will not impose the
17    obligation of an oath.
18         Ms. Balido.
19                    MARY ERIN MILLER
20    was called as a witness by the Defendant and, after having
21    the oath waived by the Court, testified as follows:
22                    Direct Examination
23    By Ms. Balido:
24         Q.   Can you please state your name for the record?
25         A.   Mary Erin Miller.
```

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.   Ms. Miller, you're currently employed as a Dallas

2  County Assistant District Attorney; is that correct?

3     A.   Yes.

4     Q.   And you are the Chief Prosecutor in the 194th

5  Judicial District Court?

6     A.   Yes.

7     Q.   And you are currently in trial in the case of the

8  State of Texas versus Jedidiah Isaac Murphy?

9     A.   Yes.

10     Q.   In regard to your trial preparation, when did you

11  become aware that there was a police report or actually a

12  crime scene search report regarding the attempted suicide of

13  Jedidiah Isaac Murphy?

14     A.   I believe it was either last week or the end of the

15  week before.

16     Q.   And is it your understanding at this point that

17  Jedidiah Isaac Murphy is not charged with the Texas Penal

18  Code offense of attempted suicide?

19     A.   Not to my knowledge.

20     Q.   It's not filed in this court?

21     A.   No.

22     Q.   When did you become aware that there were items

23  seized in relation to Mr. Murphy's attempted suicide?

24     A.   The day I spoke with Sergeant Lockman and Deputy

25  Rainy, and I forget the other deputy's name.

1    Q.    And it was your understanding at that time that they

2    had seized property from his cell in regard to the attempted

3    suicide; is that correct?

4    A.    Property in the form of papers and the razor blade

5    that was used.

6    Q.    Okay.  Did you then seek a search warrant for that

7    property?

8    A.    No.

9    Q.    At any time has a search warrant been issued for

10   that property, as far as you know?

11   A.    Not to my knowledge.

12   Q.    And what did you do after you found out that they

13   had seized property in regard to this attempted suicide?

14   A.    I notified Mr. Davis since he's lead counsel, asked

15   him if he wanted to go over them or if he wanted me to go

16   over them, and then contacted first someone in the Capers

17   Division of the Sheriff's Office to find out where they were,

18   and then talked with Ray LePere who is the deputy in charge

19   of the Sheriff's property room.

20   Q.    Okay.  And when you say Capers, just so the record

21   will be clear, that's the Crimes Against Persons Unit of the

22   sheriff's investigative office?

23   A.    Yes.

24   Q.    And then after talking with Mr. LePere, did he bring

25   you a packet which we have entered into the record as --

1          MS. BALIDO:  I'm not sure what the number is,

2     Judge.

3          THE REPORTER:  Defendant's 6.

4     Q.   (By Ms. Balido)  Defendant's Exhibit Number 6?

5     A.   No, he did not.

6     Q.   Okay.  When did you receive that?

7     A.   Mr. Davis and I went down to the Sheriff's property

8     room and the packet never left the property room or Mr.

9     LaPere's control.  We sat at a table within the Sheriff's

10    property room, and there was another female Sheriff's deputy

11    who also works down there, but I do not know her name.  And

12    Mr. LePere -- and the room is not even -- not even half the

13    size of the front half of this courtroom.  And all four

14    people were present at all times, and Mr. LePere sat at the

15    table with us as we looked at the paperwork in there.  And

16    then if one of the papers needed to be copied, he gave it to

17    the female Sheriff's deputy and she copied it.  And then they

18    gave us the copy.

19    Q.   Did you ever see any sort of release executed by

20    Jedidiah Isaac Murphy releasing his property to be viewed by

21    any person?

22    A.   No.

23    Q.   That wasn't part of any kind of paperwork that you

24    saw?

25    A.   No.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.    Can you tell me if it is -- to your knowledge, is

2   the Sheriff's office property room accessible to the public?

3      A.    No.

4      Q.    You have to go through a certain -- where is that

5   located?  Actually in the jail, or is it down on the first

6   floor of this building?

7      A.    It's down actually in the parking -- the private

8   Judges' parking garage of this building.  And Mr. LePere met

9   us out by the back elevator and let us in to that secured

10  area.  There -- to my understanding, there are at least two

11  different secured doors that you have to have a key to get

12  into.

13     Q.    And you don't have that key, and no one as part of

14  the District Attorneys Office has that key, but it's -- well,

15  first; is that correct?  As far as you know?

16     A.    As far as I know, no one with the D.A.'s office has

17  a key to that.

18     Q.    And you could only access that area with LePere's

19  ability to have the key or whoever was from the Sheriff's

20  Department to escort you around?

21     A.    Well, no.  The Sheriff's -- my understanding is the

22  District Clerk and the County Clerk also have evidence

23  lockers down there in the larger secured area.  So I guess

24  some of the District Clerks or County Clerk evidence

25  personnel have keys to get into the large area.  And then I

1    guess those individual agencies would have the separate keys

2    to get into their own property rooms within the larger

3    secured area.

4        Q.   You said that you viewed everything that was in the

5    packet; is that correct or not correct?

6        A.   No, I did not view everything that was in the

7    packet.  Between Mr. Davis and I, everything in the packet

8    was viewed.  I only viewed some of the defendant's

9    discipleship papers, to make sure there was nothing else in

10   that and I looked at a couple of the private letters.  I did

11   not look at or read any of the -- I believe it was three-page

12   handwritten notes by the defendant.

13       Q.   Okay.  That were addressed to my lawyers or to Jane

14   and Mike, you didn't look at any of that?

15       A.   I did not.

16       Q.   Okay.  Ms. Miller, you've been an Assistant District

17   Attorney in Dallas County for how long?

18       A.   13 and a half years.

19       Q.   And is it the regular practice of the Sheriff's

20   Department to -- the Dallas Sheriff's Department to turn over

21   papers that are seized in an attempted suicide attempt to the

22   District Attorneys Office, as far as you know?

23       A.   I have never in my 13 and a half years dealt with an

24   attempted suicide so I have no knowledge.  This is the first

25   time I have ever dealt with one.

1      Q.    Okay.

2                 MS. BALIDO:  I'll pass the witness, Judge.

3                 MR. DAVIS:  No questions.

4                 THE COURT:  Ms. Balido, you may continue.

5                 MS. BALIDO:  We call Mr. Davis to the stand.

6                 THE COURT:  Again, Mr. Davis is a Senior

7   Prosecutor with the Dallas District Attorneys Office, lead

8   prosecutor for the State in this matter, officer of the

9   court, will not impose the obligation of the oath.

10        Ms. Balido, you may proceed.

11                     GREG DAVIS

12   was called as a witness by the Defendant and, after having

13   the oath waived by the Court, testified as follows:

14                 Direct Examination

15   By Ms. Balido:

16      Q.    Can you please state your name for the record?

17      A.    My name is Greg Davis.

18      Q.    And, Mr. Davis, I know you have served as an

19   Assistant District Attorney, went out into private practice,

20   and come back.  What is your total service with the District

21   Attorney's Office?

22      A.    Let's see, I was in the District Attorneys from 1977

23   to 1982, and I've been back in the office since October of

24   1992.

25      Q.    And you are lead counsel on the case of the State of

DARLINE W. LABAR, OFFICIAL REPORTER

1   Texas versus Jedidiah Isaac Murphy?

2       A.   Yes.

3       Q.   When was it that you were first aware that there

4   were some items seized in Mr. Murphy's attempted suicide?

5       A.   When Ms. Miller told me.

6       Q.   And what did you decide to do once you learned that

7   information?

8       A.   Go down and look at them.

9       Q.   And in those items -- well, which items did you look

10  at?

11      A.   I looked at all the items in the packet.

12      Q.   And were some of those items three handwritten pages

13  that on the first page started out to Jane and Mike?

14      A.   They were three handwritten pages.  I don't know if

15  the first page was addressed to Jane and Mike.  I don't

16  remember the orders that those three papers were in in the

17  packet.

18              MS. BALIDO:  Judge, may I retrieve those

19  papers, please.

20              THE COURT:  You may.

21          (Defendant's Exhibit No. 6A, 6B, and 6C marked)

22      Q.   (By Ms. Balido)  Mr. Davis, I'm showing you what's

23  been marked for identification as Defendant's Exhibits 6A,

24  6B, 6C, and I ask if you recognize these papers.

25      A.   I think these are the three handwritten notes that I

DARLINE W. LABAR, OFFICIAL REPORTER

1    reviewed with Ms. Miller.

2        Q.    And you just saw me take them out of Defendant's

3    Exhibit Number 6; is that correct?

4        A.    Yes, I did.

5                MS. BALIDO:    Judge, for the purposes of this

6    hearing, we'd offer 6A, B, and C into the record.

7                (Defendant's Exhibit No. 6A, 6B, and 6C offered)

8                THE COURT:    Admitted.

9                (Defendant's Exhibit No. 6A, 6B, and 6C admitted)

10       Q.    (By Ms. Balido)   Ms. Davis, can you explain to the

11   Court what you did in regard to reviewing each sheet?

12       A.    You're talking about the three that you have in your

13   hand?

14       Q.    Yes.

15       A.    I looked over them.

16       Q.    And did you read them?

17       A.    I read portions of them, yes.

18       Q.    And did you make copies of them?

19       A.    No.

20       Q.    And Defendant's Exhibit Number 6A, that is -- at the

21   top it says "Michael and Jane," and then, "sorry if I've

22   offended you by using your first name"; is that correct?

23       A.    Yes.

24       Q.    And you knew at that time that the lawyers in this

25   case were named Michael Byck and Jane Roden, is that -- I'm

1  sorry, Jane Little; is that correct?

2       A.   Yes.

3       Q.   And did this look like to you that it -- and then on

4  the back of 6A it's signed, "Sincerely, Jim Ed"; is that

5  correct?

6       A.   Yes.

7       Q.   And through your investigation of this case is Jim

8  Ed one of the names of -- or one of the names that the

9  defendant, Jedidiah Isaac Murphy, has used in his life?

10      A.   Yes.

11      Q.   Did you know it to be -- did you think at that point

12 that it looked like a letter from Jedidiah Isaac Murphy?

13      A.   I wasn't sure what it was because on one of the

14 other attached pages I believe there's a date that refers

15 back to October of 2000.  There was no envelope accompanying

16 those three pages, either, so I didn't know what to make of

17 it at that time.

18      Q.   Okay.  So -- so are you saying that when you

19 originally looked at this that State's -- I mean, excuse me,

20 Defendant's Exhibit Number 6A, 6B, and 6C were attached?

21      A.   No, they weren't.

22      Q.   Okay.  So they were separate sheets; is that

23 correct?

24      A.   Yes.

25      Q.   Okay.  And so looking at Defendant's Exhibit 6A, you

DARLINE W. LABAR, OFFICIAL REPORTER

1   did not think that that was a letter to his attorneys?

2        A.   I didn't form any conclusion at that time.

3        Q.   And Defendant's Exhibit 6B, the first line of that

4   is "questions for my lawyers"; is that correct?

5        A.   Yes.

6        Q.   And there are a certain number of paragraphs that

7   are numbered one through six; is that correct?

8        A.   Yes.

9        Q.   And that's also signed Jim Ed; is that correct?

10        A.   Yes.

11        Q.   And additionally Defendant's Exhibit C, that is the

12   paper that you were talking about that had a date of

13   10-21-2000?

14        A.   That's right.

15        Q.   Okay.  And on the back of Defendant's Exhibit 6C,

16   does it have a notation?

17        A.   Yes.

18        Q.   And what is that notation?

19        A.   "To my lawyers, please help me with the problems I'm

20   having with the staff, sees me only as a monster."

21        Q.   Yesterday, Mr. Davis, you cross-examined a number

22   of -- well, you examined a number of the State's witnesses in

23   regard to hallucinations; is that correct?

24        A.   Yes.

25        Q.   Can you point out -- outside these letters that you

1    said that you reviewed, can you point out to any place in

2    your investigation that made mention of hallucinations?

3         A.   I can point to several instances.

4         Q.   Will you do so?

5         A.   First of all, the defendant's jail records.  His

6    medical records, I've reviewed those.  When he was first

7    booked into the Dallas County Jail, he made numerous

8    complaints of hallucinations.  I've also reviewed numerous

9    medical records from the defendant's past, various

10   institutions, including Glen Oaks Hospital in Greenville,

11   Texas; the Andrews Center in Tyler, Texas; Timberlawn

12   Psychiatric Hospital in Dallas, Texas.  And my recollection

13   is in all of those documents he's made complaints of

14   hallucinations.

15        Q.   And, Mr. Davis, yesterday you also talked to or

16   examined a number of witnesses regarding their knowledge or

17   hearing of any alter ego or split personality from the

18   defendant; is that correct?

19        A.   Yes.

20        Q.   And can you tell what source, absent these letters

21   that you reviewed, that you came across that information?

22        A.   Glen Oaks Hospital records.

23        Q.   And you know that specifically?

24        A.   Yes.

25        Q.   Can you state on the record for us, sir, if you used

1    any information gained on -- from those letters in your

2    preparation for trial at all?

3        A.    No, I haven't.

4        Q.    Did you use any information found in those -- that

5    you found in those letters in your trial strategy?

6        A.    No.

7        Q.    Did you use that information found in those letters

8    in any way at all?

9        A.    No.

10       Q.    Is it your testimony that looking at those letters

11   you did not know them to be letters to his lawyers?

12       A.    My answer again is that I didn't form any

13   conclusion.  My suspicions were that they were notes he had

14   written for himself.  Having represented defendants in the

15   past, I think it's a common practice for inmates to write

16   notes to themselves.  Based on the date on that letter or

17   that three-set handwritten notes, I didn't make any

18   conclusion whatsoever.

19       Q.    There are also some entries in those letters, aren't

20   there, Mr. Davis, regarding the problems that the defendant

21   saw with the investigative -- the head investigator Myers'

22   testimony at the examining trial?

23       A.    I believe there are.

24       Q.    Did you form any trial strategy regarding those

25   issues of fact that the defendant wrote down?

1     A.   No.

2     Q.   Did you talk with Detective Myers about any

3   information that that might -- that -- or talk about

4   preparing for those sorts of things on cross-examination?

5     A.   No.

6     Q.   At any time did you attempt to contact Mr. Byck or

7   Mr. Little (sic) and explain that you had viewed materials

8   that you thought might be notes for -- for them from their

9   client?

10     A.   No.

11     Q.   So it's your testimony you made no use at all of

12   this information at any part in your prosecution of Jedidiah

13   Isaac Murphy?

14     A.   Yes.

15          MS. BALIDO:  Pass the witness.

16          MS. MILLER:  No questions.

17          THE COURT:  Anything further you wish to put

18   on the record in your own behalf?

19          MR. DAVIS:  No, Your Honor.

20          MS. BALIDO:  Judge, I need to check and see if

21   my other witnesses are here.

22          (Brief recess.)

23          MS. BALIDO:  Judge --

24          THE COURT:  I'm inclined when they get here to

25   swear them in and make them post a bond until they testify.

DARLINE W. LABAR, OFFICIAL REPORTER

1    I am sick and tired of the Dallas County Sheriff's

2    Department's lack of cooperation with the court in this

3    particular matter, and I personally am going to take it up

4    with Jim Bowles and tell him just exactly what I think about

5    some of his senior officials and their lack of cooperation.

6    This is extremely unprofessional.

7            Go ahead.

8            MS. BALIDO:   Judge, the general rule set down

9    by the U.S. Supreme Court which the Court has cited to us in

10   court is Hudson versus Palmer where the Supreme Court said

11   that prisoners do not have an expectation of privacy with

12   respect to searches motivated by institutional security

13   concerns and performed by prison officials.   However, Judge,

14   the Federal Court of the Southern District of New York in

15   1999, citing U.S. versus Cohen, 796 Federal 2d 20 -- page 20

16   and pages 22 to 23, which is a Second District case in 1986,

17   said that when a search -- and here we're not saying it's the

18   search itself but actually the seizure, and we argue the

19   subsequent search by the Dallas County District Attorney's

20   Office, a separate police agency.   Okay.   The seizure by the

21   Dallas County District Attorney's Office and its use at trial

22   other than the institutional security concerns of the Dallas

23   Sheriff's Department, okay -- their seizure for that purpose,

24   is performed or initiated by law enforcement officials other

25   than those in charge of prison or jail and is unrelated to

1    institutional security concerns, the Court said a prisoner

2    has a reasonable expectations of privacy with respect to that

3    search.   Okay.   That's what those cases said.   And even in

4    the -- and the New York case is Rollack -- US versus Rollack,

5    R-o-l-l-a-c-k, 90 Federal Supplement 2d 263.

6          Now, when the Supreme Court took up the Rollack

7    case -- the U.S. Supreme Court took that case up, it did not

8    address the search of the jail cell issue per se, because

9    they -- because the federal court suppressed the jail search

10   in regard to papers found inside the cell, but granted the

11   search in regard to mail, saying that those were two

12   different things.   And also the Rollack case had the added

13   protection of actually having a warrant, a Judge signed a

14   warrant to go in there and seize those items which is clear

15   from the record did not happen here.

16         Basically what the case -- the Rollack case and

17   again citing U.S. versus Cohen, the Second Circuit case, that

18   government contended security concerns -- because, you know,

19   jails have an interest in preventing inmates from engaging in

20   criminal activity, here a suicide, and also they are

21   liability situation as well, to interpret it or extrapolate

22   it and to extend security to encompass everything that could

23   be deemed a criminal investigation would -- would render that

24   term meaningless because basically any criminal investigation

25   can be characterized in such a manner.

```
 1              Thirdly, Judge, what Cohen says, U.S. versus Cohen,

 2    that if it's not security and if it's -- if it's not for

 3    security purposes and if it's not the jail or prison

 4    officials doing it in pursuant to those, then therefore it's

 5    not immune from Fourth Amendment consideration.  That's what

 6    the Cohen case says.  And this case turning the information

 7    over to the District Attorney was not related to the

 8    prosecution of any matter, was not related to turning it over

 9    for liability purposes to the Civil Section of the District

10    Attorneys Office, but rather turning it over to the District

11    Attorneys Office for use in the capital murder trial of

12    Jedidiah Isaac Murphy, and that's why we think that that

13    seizure of the property is illegal.

14              THE COURT:  How can you show harm?

15              MS. BALIDO:  The harm basically, Judge, is

16    that the use of -- of this man's property -- and -- and we

17    would say that also --

18              THE COURT:  Can you show they used it

19    independent of outside sources?

20              MS. BALIDO:  Judge, we would say that the

21    attorney-client privilege is sacrosanct and -- and I

22    understand what he testified to and I also understand -- but

23    I understand that those issues were also brought up and --

24    and in cross-examination, and I would say that the harm is

25    basically that his expectation of privacy, that these things
```

1   were -- were taken from his cell, and if the Sheriff's

2   Department gets here, I believe that the policy will be that

3   he would be able to release it back to himself if he had sent

4   a kite in, that without the permission of Mr. Murphy to give

5   the State that, that they didn't have any -- they didn't have

6   any recognizable State action.  And -- and the harm is

7   actually the invasion of his privacy in itself.  And --

8           THE COURT:  Did they have -- did they not have

9   a legitimate right to examine the papers in light of the

10  conduct of Mr. Murphy which occasioned his being taken to

11  Parkland as a potential suicide?

12          MS. BALIDO:  Judge, they might have.  They

13  might have.  And if they thought that they had a legitimate

14  right to it, they could have gone to a Judge and asked for a

15  warrant.  What my problem is, is this unchecked ability of

16  the District Attorneys Office to go to the Sheriff's

17  Department which is -- and be granted access to property that

18  I would have to use a subpoena for, that they didn't -- they

19  did not use a subpoena for, they did not -- they did not have

20  a warrant for.  That -- that is the problem right there.

21  They may have had a right to it.  We're just saying they

22  shouldn't have gotten it without a warrant.  And the

23  warrantless search has no -- you know, they don't have any --

24  they don't qualify with any exception.  There wasn't

25  indigency -- exigency certainly.  And so there's no exception

1    to the warrantless search requirement that would allow them

2    access to those materials.

3           And finally, Judge, we'd make this -- we're basing

4    this -- our theory on the seizure actually of the D.A.'s is

5    the problem based on United States versus Brett, which is 412

6    Federal 2d 401, a Fifth Circuit case in 1969, where the

7    situation was that when a prisoner was booked into jail and

8    his things were seized at that time, the Court said that was

9    okay.  I think that's what the cases say, that everything is

10   okay.  But three days later went back and took a second look

11   at the property and it was that second seizure or second look

12   or search of the property which was the -- which is when they

13   found the heroin.  And the Fifth Circuit in Brett said that

14   the second search was more extensive than the first one

15   performed at the arrest and the inventory which is what we

16   would say -- is the State's looking at it for different

17   purposes than just the attempted suicide would be a more

18   extensive search.  Also, that the plain view -- that it was

19   in plain view of the property room was not -- was not a good

20   argument.  And third, that no exigent circumstances warranted

21   the disposal of the warrant requirement.  And that's what

22   we're saying, that they should have had a warrant.

23          Judge, we bring this motion based on the United

24   States Federal Constitution, the 4th and 14th Amendments to

25   the United States Constitution, Article 1, Section 9, 10, 13,

1   and 19 of the Texas Constitution, which includes the due

2   course of law provisions in the Texas Constitution, and an

3   argument that the Fourth Amendment rights that are mirrored

4   in Article 1, Section 9, of the Texas Constitution are more

5   expansive than those granted by the Fourth Amendment.  And we

6   would ask you to look at that based on Heightman versus

7   State.

8           To be honest with the Court, there is a similar but

9   not fact -- I mean, not the same facts case which is Oles,

10  O-l-e-s, versus the State of Texas, which is at 993 Southwest

11  2d 103, Texas Court of Criminal Appeals 1999, which they

12  allowed a search and found that Brett was not persuasive, but

13  we think that the facts in this case are more persuasive

14  based on what you know up to this point and what you'll

15  hopefully know later about the policies of the Texas -- I

16  mean, of the Dallas County Sheriff's Department.

17          THE COURT:  Having heard argument of the

18  defense in regard to this issue, the Court finds itself

19  obligated by the Constitutional mandate, United States

20  Supreme Court Hudson v. Palmer 104 Supreme Court 3194,

21  notwithstanding the fact that the Court even if the facts and

22  circumstances of this incident are in distinction or can be

23  altered on a fact situation from Hudson v. Palmer case, I

24  find that there was beyond a reasonable doubt no harm done by

25  the perusal by the State of the pages allegedly written by

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1    Jedidiah Isaac Murphy.  In no way do I wish to violate and
 2    necessarily condone the actions of the State in reading this
 3    particular material, however I find under the circumstances
 4    the reading of the material has occasioned no harm beyond any
 5    doubt to the defense to this point.
 6                   MS. BALIDO:  Judge, implicit in your finding,
 7    can I have a finding of fact as to whether or not you believe
 8    Defendant's Exhibit Number 6A, B, and C, are privileged under
 9    the attorney-client privilege?
10                   THE COURT:  The Court will hold its decision
11    until later to determine whether or not I believe that to be
12    the case.
13                   MS. BALIDO:  One other matter to put on the
14    record before the jury comes in, Judge.
15                   THE COURT:  Yes, sir (sic).
16                   MS. BALIDO:  At this time Jedidiah Isaac
17    Murphy in Cause Number F00-02424-M, moves this Court to
18    direct a verdict of not guilty for the following grounds:
19    First, there is no evidence upon which reasonable minds could
20    differ that this offense, being the murder or capital
21    murder -- or actually that the murder of Bertie Lee
22    Cunningham occurred in Dallas County, Texas.
23                   Additionally, I would believe that there was no
24    evidence to show that the abduction or the robbery which are
25    the underlying aggravating circumstances of this capital
```

1    murder, there is no evidence to believe that those events

2    happened in Dallas County, Texas.  The State must do

3    something other than say, well, there's no evidence to show

4    that it didn't happen in Dallas County, Texas.  And we would

5    say that -- that they have not sustained even a prima facie

6    case on that basis.

7            In addition to that, Judge, they have not showed or

8    made a prima facie case that -- that venue is proper in the

9    194th Judicial -- Judicial District Court of Dallas County,

10   Texas, based on the reasons they haven't shown that the

11   complainant was shot in Dallas County, Texas, or that she

12   died in Dallas County, Texas.  And for those reasons we would

13   show -- that's our first ground -- that the verdict should be

14   directed for the defense of not guilty.

15           Our second ground is that the State has failed to

16   prove beyond a reasonable doubt that the death was not an

17   accident and that reasonable minds could not differ at that

18   time -- and we -- and we believe they have not shown that the

19   death cannot be an accident.  That's our second ground.

20           The third ground is they have not proved beyond --

21   or made a prima facie case that Mr. Murphy, if he did cause

22   the death of Bertie Lee Cunningham, did so with the specific

23   intent to kill her.  And along also that grounds that he

24   intentionally caused the death of Bertie Lee Cunningham.

25           And, Judge, we would stand on our motion as read

```
 1    into the record.
 2                    THE COURT:  The Motion for Instructed Verdict
 3    is denied with particularity as relates to Issue Number 1.  I
 4    call defense counsel's attention to Articles 13.17 and 13.19
 5    of the Texas Code of Criminal Procedure.
 6          Sheriff, would you bring in the jury, please.
 7          Defense anticipate making an opening statement or
 8    not?
 9                    MR. BYCK:  No, Your Honor.
10                    MS. BALIDO:  I'll get my first witness.
11                    MS. MILLER:  Judge, 13.08 also we believe
12    applies.
13                    THE COURT:  13.08 as it relates to that.  I
14    concur.
15                    THE BAILIFF:  All rise.
16                    (Jury returned to courtroom.)
17                    THE COURT:  Let the record reflect the jury is
18    returning to the courtroom at this time.
19          Jurors may be seated.
20          Mr. Murphy, counsel, visitors in the gallery, you
21    may be seated.
22          State having rested, the defense may proceed.
23                    MR. BYCK:  Your Honor, we would offer as
24    Defendant's Exhibit -- to be named later by the court
25    reporter --
```

1          THE REPORTER:   10.

2          MR. BYCK:   -- Defendant's Exhibit 10, a

3   initial neurological investigation and various original notes

4   of the -- of the treatment -- it really wasn't treatment, the

5   examination conducted by Dr. John Claude Krusz, K-r-u-s-z.

6   And we offer these into evidence for all purposes.

7          (Defendant's Exhibit No. 10 offered)

8          MR. DAVIS:   No objection.

9          THE COURT:   They're admitted.

10          (Defendant's Exhibit No. 10 admitted)

11          MR. BYCK:   And we would ask permission to

12   publish this at a later time.

13          MS. BALIDO:   Your Honor, at this time we now

14   call Treshod Tarrant to the stand.

15          (Witness brought forward.)

16          THE COURT:   Mr. Tarrant, I ask that you retake

17   the stand to my left, sir.

18       You may proceed.

19          MS. BALIDO:   Thank you, Judge.

20          TRESHOD TARRANT

21   was called as a witness by the Defendant and, after having

22   been first duly sworn, testified as follows:

23          Direct Examination

24   By Ms. Balido:

25       Q.   Could you please state your name for the record?

```
 1        A.    Treshod Montrell Tarrant.

 2        Q.    And you're the same Treshod Montrell Tarrant that

 3   testified earlier in this case; is that correct?

 4        A.    Yes, ma'am.

 5        Q.    Okay.  Mr. Tarrant, you and I have never spoken

 6   before, have we?

 7        A.    Out in the hall.

 8        Q.    Okay.  When I said come on in?

 9        A.    Yes, ma'am.

10        Q.    Okay.  I want to ask you a couple of questions

11   about -- about what -- well, about the first time that you

12   saw Mr. Murphy out there at your grandmother's house.  Okay?

13        A.    Okay.

14        Q.    And that was before your parole meeting?

15        A.    Yes, ma'am.

16        Q.    Okay.  Can you tell us what he looked like when he

17   first showed up there?

18        A.    Well, when he first showed up, he was -- appeared to

19   be somewhat normal, you know, Jim just saying hi.  He hadn't

20   seen me in a long time.  As we talked and as the day

21   progressed after I got back from reporting, I noticed he was

22   kind of -- I don't know, starry-eyed like.

23        Q.    Kind of glassy-eyed?

24        A.    Glassy-eyed.  And I asked him what was -- you know,

25   what was wrong with him.  And he told me, you know, he had
```

1    been drinking a couple of days and just seemed starry-eyed

2    kind of.

3         Q.   Okay.  Did you -- did you find any or see any

4    evidence that he might have been drinking?  I'm talking about

5    beer cans and that kind of stuff?

6         A.   Yes, ma'am.  When I got in the car with him, it was

7    18-pack of Bud Light in the car and he probably had about

8    five beers left in it.

9         Q.   Okay.  So that would mean that 13 of them were

10   missing?

11        A.   Yes, ma'am.  And I drank the majority of them.

12        Q.   Okay.  Well, wait, hold on a second.  This is when

13   I'm talking about the first -- the first time that you saw

14   him, did you see anything in the car -- oh, I'm sorry, are

15   you talking about that you drank the majority of the five

16   afterwards?

17        A.   Afterwards, yes, ma'am.

18        Q.   Okay.  Did he seem upset?

19        A.   No.  He seemed kind of just sad like.  He wasn't

20   upset as in aggravated and, you know, mad, but he seemed just

21   like, I don't know, just like he wasn't into what we was

22   doing, but yet he was trying to be.

23        Q.   Okay.  Kind of preoccupied?

24        A.   Uh-huh.

25        Q.   Okay.  And sad?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    A little bit.

2    Q.    But he never got so sad that he cried?

3    A.    No, ma'am.

4    Q.    So then you went off and reported and you came back

5    to your house and he was still there; is that right?

6    A.    No, I seen him up town, we met, and then he followed

7    me back to the house.

8    Q.    Okay.  And what did y'all do once y'all got right

9    back to the house?

10   A.    Talked a little bit more, told my granny we was

11   fixing to leave, and shortly we left.

12   Q.    Okay.

13   A.    Headed to Terrell.

14   Q.    Okay.  Did -- tell me a little bit about your

15   granny.  She obviously doesn't like alcohol in the house.

16   A.    No, ma'am.

17   Q.    Okay.  And she doesn't -- she obviously -- certainly

18   doesn't like drugs in the house.

19   A.    No, ma'am.

20   Q.    Okay.  So do you usually, if you're drinking beer

21   around the house or whatever, do you go to a different

22   location or down to the park or --

23   A.    Outside, you know, beside the house, you know, kind

24   of over to the side under like a little tree.

25   Q.    Okay.  So she can't see you?

1    A.   Yeah.  No, ma'am.  But she knows.  I mean, I don't

2    hide it.  She knows I'm drinking, but I just kind of do it

3    where she can't directly see it.

4    Q.   Okay.  You went -- after you got back from your

5    parole officer meeting, is that when you drank the majority

6    of the five beers left?

7    A.   Yes, ma'am.

8    Q.   Okay.  And then what did y'all do after that?

9    A.   We went to Terrell, got more alcohol, went out to

10   eat.

11   Q.   Okay.  That's when you went to Chacho's; is that

12   right?

13   A.   Yes, ma'am.

14   Q.   Okay.  When was it that he showed you the credit

15   cards?

16   A.   In my front yard.  Before we left, I seen them.

17   Q.   And you said something interesting that you could --

18   when you read that it was Bertie?

19   A.   Uh-huh.

20   Q.   You thought that was an old lady's name, didn't you?

21   A.   Uh-huh.

22   Q.   Did you ever call him on it?

23   A.   No, ma'am.

24   Q.   Okay.  You thought it was weird, but -- but it

25   didn't matter?

1     A.    Yeah, it didn't matter.  It was Jim, you know.

2     Q.    Okay.

3     A.    I've been knowing him forever.  I had no reason to

4  disbelieve him.

5     Q.    Okay.  And he was going to buy you some alcohol; is

6  that right?

7     A.    Yes, ma'am.

8     Q.    Okay.  With those credit cards?

9     A.    With those credit cards.

10    Q.    And y'all went over to Chacho's; is that right?

11    A.    Yes, ma'am.

12    Q.    Let me ask you about what happened at Chacho's.

13  Now, Jim went in; is that right?

14    A.    Yes, ma'am.

15    Q.    And then at one point didn't the owner's wife,

16  Mrs. -- is it Aridi?

17    A.    Something like that.

18    Q.    Okay.  She came out and you shouted to her; isn't

19  that right?

20    A.    Yes, ma'am.

21    Q.    And what did you tell her to get?

22    A.    Told her to tell Jim to get some orange juice.

23    Q.    Did he already know that you wanted the Hennessy?

24    A.    Yes, ma'am.

25    Q.    Okay.  But he came out without it the first time?

1          A.    I don't remember exactly how it happened.   I think

2     he was in the store and she may have ran over to the liquor

3     side, I think, and got the Hennessy and was walking back and

4     he was still in the store when she stuck her head in, yelled

5     or told her husband to get the orange juice.   I don't know,

6     he came out with orange juice.

7          Q.    And did you actually go in and take the bag of --

8     that had the Hennessy in it?

9          A.    I don't know if she handed it to me or -- I stepped

10    out of the car.   She may have handed it to me, but I don't

11    think I ever went in the store.

12         Q.    Okay.   So -- so if on the videotape of the store

13    they show you taking the bag out, then you don't remember

14    that?

15         A.    If they -- I don't think I went into the store.   I

16    could have got it from her, because the -- I don't know,

17    liquor is not supposed to be on the beer side, but I don't

18    think I'd be on tape, period.

19         Q.    Okay.   And then -- when y'all left your house that

20    day, you said on your direct examination that y'all were

21    going out to eat and to do a little drinking?

22         A.    Yes, ma'am.

23         Q.    Okay.   And y'all went to Cole Mountain to eat?

24         A.    Yes, ma'am.

25         Q.    And y'all both ordered up a big order?

1    A.    Yes, ma'am.

2    Q.    And Jim didn't eat his, did he?

3    A.    No, he didn't.

4    Q.    Okay.

5    A.    He didn't eat, just kind of picked at it.

6    Q.    Did he eat any of those -- those cheese sticks that

7    you said that y'all ordered, or do you remember?

8    A.    Yeah, I think he did eat some of my cheese sticks

9    while we were waiting on it.

10   Q.    Okay.  But he didn't finish his meal?

11   A.    No, he didn't.

12   Q.    And that's what y'all boxed up to take to your

13   granny?

14   A.    Yes, ma'am.

15   Q.    Okay.  That was a little different for Jim, didn't

16   you think?

17   A.    What's that?

18   Q.    That he didn't eat his food?

19   A.    It kind of -- I just wondered why he didn't eat, you

20   know.  He spent that much money, and he didn't eat.

21   Q.    Okay.  Was he still drinking at this time?

22   A.    I think we both ordered a beer, but he wasn't

23   drinking like he normally would be drinking.

24   Q.    Okay.

25   A.    If we was out, you know, kicking it, he would be --

1          (Makes noise.)

2     Q.   (By Ms. Balido)  Okay.

3     A.   He was kind of laid back.

4     Q.   All right.  Had he had any more -- any more of those

5  beers that you originally saw in his car?

6     A.   No, ma'am, he never did drink no more of them.  I

7  drank all the rest of the 18-pack.

8     Q.   What about the two 18-packs y'all got at Chacho's,

9  did y'all open up a couple of those and kick those back

10  before you ate at Cole Mountain?

11     A.   I did.  I don't know if he -- if he drank any out of

12  them two 18-packs, it probably wasn't no more than three or

13  four beers out of the two 18-packs that we purchased.

14     Q.   Okay.  Ever hit on that bottle of Hennessy?

15     A.   I think he did when we was up -- because we went to

16  some friends' apartments, you know.  There was a whole bunch

17  going on.  We were drinking.  I poured up the glasses for

18  everybody.  And a couple of guys, they were just sitting

19  there drinking them straight.  He was sitting on the couch to

20  my right, just sitting there, kind of just peeping out

21  everything that was going on.  We was drinking and I don't --

22  if he did, he drank out of my glass, but I don't think he

23  actually had --

24     Q.   Okay.

25     A.   -- a glass.

1     Q.    But do you think he had any of that before y'all

2   went to Cole Mountain?

3     A.    What?  Any liquor?

4     Q.    Any Hennessy?

5     A.    Huh-uh.

6     Q.    Okay.  That just happened all at the apartment?

7     A.    Yes, ma'am.  The bottle wasn't even opened until we

8   made it back to Edgewood.

9     Q.    Okay.  And were there times when he was at Cole

10  Mountain that he just kind of sat there and was being quiet

11  and kind of just stared at his food or kinda didn't talk

12  much?

13    A.    He seemed like he was a little preoccupied at times,

14  but --

15    Q.    Still a little starry-eyed?

16    A.    I don't know.  It was like he wasn't in it, you

17  know.  He was just going through the motions.

18    Q.    Okay.  And after y'all got finished at Cole

19  Mountain, y'all stopped at a gas station again?

20    A.    Yes, ma'am.

21    Q.    And that was to buy him some Rolaids; is that right?

22    A.    Rolaids, gas.

23    Q.    Because his stomach was kind of bothering him?

24    A.    Yes, ma'am.

25    Q.    Did y'all buy any more beer there?

1    A.    No, ma'am.

2    Q.    Y'all didn't buy any more Hennessy there?

3    A.    No, ma'am.

4    Q.    Okay.  When was it that you went over to this

5    apartment?

6    A.    As soon as we rolled back into Edgewood, we was

7    headed back to Granny's and we seen a few of the people that

8    lived in the apartments out on the sidewalk.  We were driving

9    by.  We seen two girls.  We stopped.  Like, hey, what are

10   y'all doing.  They were like nothing.  We were talking to

11   Ryan and Carmela, "We going to do something tonight?"  And I

12   was like "Y'all want to drink some?"  And I pulled out the

13   bottle of Hennessy and they didn't really say they wanted to

14   drink.  They was like that's a lot of alcohol,

15   blah-blah-blah.  And that's when we said we'd be back.  We

16   went to Granny's for a minute I think and came back up to the

17   apartment and that's when we sat and drank.

18   Q.    Whose apartment is that?

19   A.    Ryan and Carmela's.

20   Q.    Okay.  And was that when -- was Christy Baugh and

21   Paul Privet there?  Is Paul who you call PA?

22   A.    Yes, ma'am.

23   Q.    So it was Kristi and PA, were they also there?

24   A.    Yes, ma'am.

25   Q.    Okay.  And was anybody smoking dope at the

1   apartment?

2      A.   Yes, ma'am.

3      Q.   And were you smoking dope?

4      A.   Yes, ma'am.

5      Q.   And was the defendant smoking dope, Jim?

6      A.   I don't -- I don't remember him hitting it, but --

7      Q.   But you don't know if he did or not?

8      A.   Why don't you ask him?

9      Q.   Okay.  A lot of -- a lot of pot, a little bit of

10  pot, how many joints do you think y'all had?

11     A.   One fat one.

12     Q.   Okay.  When was it that -- that somebody decided to

13  go buy some more pot; is that right?

14     A.   No, ma'am.

15     Q.   Y'all never went to a different place?

16     A.   No, ma'am.  We had -- we got it and then came

17  there.  We already had it, you know.  He stayed at my

18  grandma's --

19           THE COURT:  Excuse me.

20     Sheriff, would you retire the jury for a moment?

21     This will be a very, very short recess.

22        (Jury excused from courtroom.)

23          THE COURT:  Jury has been excused from the

24  courtroom on the Court's own motion at this time.

25     Mr. Murphy, counsel, visitors in the gallery, you

1    may be seated.

2              Mr. Tarrant, are you presently on parole still?

3                   THE WITNESS:  Yes, sir.

4                   THE COURT:  Questions have been posed to you

5    with regard to conduct which arguably could be considered

6    criminal.

7                   THE WITNESS:  Yes, sir.

8                   THE COURT:  That could result in your parole

9    being revoked and your being returned to the penitentiary.

10   The Court at this time, unless you instruct me not to, I'm

11   inclined to appoint you an attorney to represent you with

12   regard to your testimony.  This will be at no cost to you.

13                  THE WITNESS:  Yes, sir.

14                  THE COURT:  Because matters dealing with the

15   smoking of marijuana, and is it not also my understanding

16   that a condition of parole you are not supposed to drink

17   alcoholic beverages?

18                  THE WITNESS:  Yes.  I don't have a stipulation

19   in my parole about alcohol, because I don't have a drug

20   related case or anything.  But I'm not supposed to smoke

21   marijuana, but I'm just trying to be truthful.

22                  THE COURT:  I understand -- you're being

23   truthful.  And I commend you for your candor and honesty.

24   However sometimes one's candor and honesty may be such that

25   it results in a criminal case being filed against them.

```
 1                    THE WITNESS:  Yes, sir.  But I mean if I
 2   was -- I wouldn't test positive for marijuana because I don't
 3   use it everyday.  It was just the time and the --
 4                    THE COURT:  Counsel for both sides going to
 5   further explore the marijuana ingestion by this witness?
 6             Ms. Balido, are you further going to --
 7                    MS. BALIDO:  Well, first, Judge, he testified
 8   about going and buying some weed yesterday in his testimony.
 9                    THE COURT:  Well, I understand that.  And I --
10                    THE WITNESS:  That's the same -- that's the
11   same marijuana that we -- I didn't actually purchase it.
12   Christy purchased it.  I just took her to where it would be
13   made available for her.
14                    THE COURT:  No, no, don't talk.
15                    THE WITNESS:  Yes, sir.
16                    THE COURT:  Don't talk about it.
17                    THE WITNESS:  Yes, sir.  I understand.
18                    MS. BALIDO:  Judge, it's our contention that
19   he doesn't have anything to worry about on parole, based on
20   his testimony down here in this case.  And we've asked for
21   any kind of agreements to that, and if that's what the
22   situation is with the State, we'd like to know it.
23                    MR. DAVIS:  Well, the State has no agreements
24   whatsoever with Mr. Tarrant.  So that's the state of affairs
25   right now.  I have not spoken with his parole officer, don't
```

1    intend to speak with his parole officer, make no bargains or

2    deals with him for his testimony.

3                    THE COURT:  Sheriff, would you see if either

4    April Smith or Adam Seidel, both of whom have been here --

5                    THE BAILIFF:  Yes, sir.

6                    THE COURT:  -- this morning are available?

7                    (Brief pause.)

8                    THE COURT:  Let the record reflect the

9    Honorable Hugh Lucas has been commandeered by a Bailiff

10   assigned to the 194th District Court.

11           Mr. Lucas, the gentleman on the witness stand,

12   Treshod Tarrant, he is originally a witness for the State in

13   this, a capital murder case.  He has presented testimony to

14   the impaneled jury and one alternate about certain activities

15   that were conducted by him and the defendant, Mr. Jedidiah

16   Isaac Murphy, shortly before Mr. Murphy was arrested,

17   subsequently indicted, charged with capital murder.

18           Mr. Tarrant, I'm going to invite you at no cost to

19   you to speak with this gentleman with regard to your

20   testimony.

21           Mr. Lucas, let me explain to you that he is on

22   parole.  He has testified about certain matters dealing with

23   smoking of marijuana which arguably could be a reason to

24   revoke his parole.  Before we further explore that, I would

25   like for him to have the benefit of counsel with regard to

1    his 5th Amendment rights.

2            Do you have any -- I may invite you off the record

3    to confer with the attorneys on both sides.

4            MS. MILLER:  I was just going to tell him,

5    Judge, that Mr. Tarrant had already testified yesterday to

6    the use.

7            THE COURT:  All right.

8            MS. LITTLE:  From the State.

9            MS. MILLER:  And has testified again already,

10   so it is on the record at least twice already.

11           THE COURT:  And I should have, but I was not

12   anticipating -- it came up just like that before I could --

13           Mr. Tarrant, let me ask that you step down and

14   confer with this attorney in private.

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Mr. Lucas, if you and Mr. Tarrant

17   want to go back and use my office.

18           (Recess of proceedings.)

19           THE COURT:  Let the record reflect the Court

20   on its own motion has occasioned a recess in the trial.

21   During the recess the Court takes note that the Honorable

22   Hugh Lucas has had an occasion to counsel with the witness,

23   Treshod Tarrant.

24           Mr. Tarrant, do you acknowledge that you've had an

25   opportunity to confer with your attorney, Mr. Lucas?

```
 1                THE WITNESS:  Yes, sir.

 2                THE COURT:  Mr. Lucas, do you feel you've had

 3    an adequate opportunity to familiarize yourself with the

 4    circumstances from a legal nature confronting Mr. Tarrant as

 5    it relates to his testimony in this trial?

 6                MR. LUCAS:  Yes, Your Honor.

 7                THE COURT:  Are you available to remain in

 8    Court with him while he continues his testimony before the

 9    jury?

10                MR. LUCAS:  Yes, Your Honor.  I'm ready to put

11    some things in the record when the Court's ready.

12                THE COURT:  You may.

13                MR. LUCAS:  Your Honor, I was appointed to

14    represent this individual as a witness.  And I've advised Mr.

15    Tarrant of my appointment.  It's my understanding that he's

16    already testified earlier during this court proceeding that

17    he did in fact use marijuana in Van Zandt County I think

18    within the last six months or within the last year.  There

19    has been no case filed in Van Zandt County.  I've talked to

20    the Assistant District Attorney Mr. Davis, who advised me

21    that the State of Texas and Dallas County does not intend to

22    prosecute him and if, in fact, any cases arise in or any

23    investigation arises regarding the filing of charges, the

24    District Attorneys Office of Dallas County will recommend the

25    are charges not be filed.  If, in fact, the parole
```

1   authorities attempt to revoke Mr. Tarrant, Dallas County

2   District Attorney's Office advised me that they will -- they

3   will inform the parole authorities that witness was a

4   material witness in a capital murder and will urge the State

5   not to seek revocation.

6           I've also told the witness, Mr. Tarrant, that while

7   in the District Attorney office I handled parole matters for

8   a number of years and it's my opinion that the parole

9   authorities will not seek to revoke this witness as he is a

10  material witness in a capital murder.  And there is no case

11  filed at this time.  I've advised the defendant that anything

12  is possible, that he can be hit by an automobile on his way

13  home, that the State could seek to revoke his parole, but in

14  my opinion that will not happen.  And I told him that if

15  there is any type of parole hearing, I will without fee,

16  without charge represent him.  So after all of these

17  warnings, Your Honor, Mr. Tarrant has advised me that he's

18  told the truth throughout this proceeding and he wants to go

19  ahead and testify knowing the possible dangers involved.  He

20  wants to go ahead and testify truthfully before the jury as

21  he has throughout the trial.

22          Mr. Tarrant, is everything I've said to the Judge

23  true and correct?

24                  THE WITNESS:  True and correct.

25                  THE COURT:  Mr. Lucas, may I ask that you

DARLINE W. LABAR, OFFICIAL REPORTER

1    remain available in the courtroom while he testifies?  Does

2    your schedule --

3                 THE WITNESS:  Fine, Judge.

4                 THE COURT:  -- professional and personal such

5    that you can avail yourself?

6                 THE WITNESS:  Available, Your Honor.

7                 THE COURT:  Thank you.

8          Sheriff, may I ask that you bring in the jury.

9                 THE BAILIFF:  Yes, sir.

10                THE COURT:  Mr. Tarrant, at any time during

11   your examination by attorneys for either side you wish to

12   stop the proceedings and confer with your attorney, Mr.

13   Lucas, if you'd please let me know, and I will be more than

14   happy to make time available for you to confer with your

15   attorney?

16                THE WITNESS:  Yes, sir.

17                THE COURT:  Do you understand that?

18                THE WITNESS:  Yes, sir.

19                THE BAILIFF:  All rise.

20                THE COURT:  Let the record reflect the jury is

21   returning to the courtroom at this time.

22                (Jury returned to courtroom.)

23                THE COURT:  Jurors may be seated.

24         Mr. Murphy, counsel, Mr. Tarrant, visitors in the

25   gallery, you may be seated.

1        Ladies and gentlemen of the jury, in your absence

2    the Court in light of testimony presented by this witness,

3    felt compelled to appoint counsel to represent Mr. Tarrant.

4    I have done so in the person of the Honorable Hugh Lucas, the

5    gentleman whom you see seated in the front row who has just

6    risen.  Mr. Lucas is now an attorney in private practice.  He

7    was for many, many years a Assistant District Attorney.

8    Though he has far more hair than I, he and I were both law

9    school classmates.

10        He has agreed to the appointment that I have

11   assigned him to represent Mr. Tarrant.  Mr. Tarrant, Mr.

12   Lucas have had an opportunity during their recess to confer

13   with one another.  Mr. Lucas will be present in court at all

14   times during Mr. Tarrant's continued testimony.  I apprised

15   Mr. Tarrant that if at any time an attorney for either the

16   State or the defense asks a question about which he has a

17   question as to his legal rights as it relates to his parole

18   status or otherwise, be giving him an opportunity to confer

19   with Mr. Lucas.

20        With that understanding --

21        Is that your understanding as well, Mr. Tarrant?

22             THE WITNESS:  Yes, sir, it is.

23             THE COURT:  Ms. Balido, you may proceed.

24        And, ladies and gentlemen of the jury, I apologize

25   for the delay.

DARLINE W. LABAR, OFFICIAL REPORTER

1              MS. BALIDO:  Thank you, Judge.

2         Q.   (By Ms. Balido)  Now, Mr. Tarrant, what we were

3    talking about is when y'all drove out to go buy some

4    marijuana; is that correct?

5         A.   Yes, ma'am.

6         Q.   Okay.  And when did that occur?

7         A.   That occurred after we returned from, you know,

8    going out and eating and buying the beer, we sit around, and

9    was talking and the girls wanted some marijuana.  We was

10   already back into Edgewood.

11        Q.   Okay.  So --

12        A.   After the evening was over, our little dinner and

13   the beer buying.

14        Q.   Okay.  Let me ask you specifically where you were.

15   Y'all had already eaten dinner and gone and bought Rolaids

16   after dinner; is that correct?

17        A.   After we got back to Edgewood, we met the girls.  We

18   talked to the girls.  She wanted to go get some weed.  I

19   left.  Jim stayed at -- in Edgewood.  Me and her and PA left,

20   went to Wills Point, called a guy up to the car, and her and

21   him talked.  She gave him the money, got the marijuana.  Came

22   back to Edgewood.

23        Q.   Okay.  And so where in Edgewood was Jim at that

24   time?

25        A.   At my granny's house.

1    Q.   Okay.  And was your granny there?

2    A.   Yes, ma'am.

3    Q.   All right.  And which car did you drive to go buy

4  this marijuana, your car?

5    A.   Ms. Cunningham's car.

6    Q.   Okay.  And that's the Honda that we've been talking

7  about?

8    A.   Yes, ma'am.

9    Q.   So far you've eaten dinner off of Ms. Cunningham's

10  cards, credit cards?

11   A.   Yes, ma'am.

12   Q.   You've bought some alcohol with Ms. Cunningham's

13  credit cards?

14   A.   Yes, ma'am.

15   Q.   And now you're driving Ms. Cunningham's car to go

16  buy some weed in Wills Point?

17   A.   Yes, ma'am.  But I thought it was Mr. Murphy's car.

18   Q.   Okay.  But it's still a car that you've never seen

19  him in before?

20   A.   Yes, ma'am.

21   Q.   And let me ask you a little bit about this car.  You

22  said that he said that he shot a deer.  You need to say yes

23  or no.

24   A.   Yes, ma'am.

25   Q.   Did you ever ask to see that deer?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   No, ma'am, I didn't.

2    Q.   Did you ever open up the back of the trunk to see if

3 it actually was a deer?

4    A.   No, ma'am.  I didn't think the deer was in the car.

5 I thought maybe the blood that was left in the car was --

6 that's what I saw on the bumper.

7    Q.   Okay.

8    A.   From him killing the deer.

9    Q.   Okay.  So you -- you didn't think the deer was in

10 the car?

11    A.   No, ma'am.

12    Q.   Okay.

13    A.   That's why I didn't ask to see it.  I wasn't going

14 to be riding around with a deer in a trunk.

15    Q.   Okay.  Did you ever open the trunk?

16    A.   No, ma'am.

17    Q.   So you didn't think it was odd that he shows up in a

18 car that you've never seen before with blood on it, with

19 credit cards with an old lady's name on it, buying you

20 stuff -- did he usually buy you stuff?

21    A.   Yes, ma'am, we treat each other --

22    Q.   All the times?

23    A.   -- on the town before, yes, ma'am.

24    Q.   Okay.  So you didn't think it was weird when all

25 these things happened?

```
 1        A.    No, ma'am.

 2        Q.    And in fact you were talking about having a buying

 3   spree the next day; is that correct?

 4        A.    Yes, ma'am.

 5        Q.    Okay.  So after you went out in Ms. Cunningham's car

 6   and went to Wills Point and bought the marijuana, about how

 7   much did you buy?

 8        A.    I don't know.  She bought it.  She --

 9        Q.    You didn't see the bag?

10        A.    No, they went -- he went around the side of the

11   car.  Her and him conversed.  And she gave him the money.

12   They -- and we left, took off.

13        Q.    Okay.  So you never saw the bag of marijuana ever?

14        A.    I know it was a sack of marijuana and she rolled up

15   a joint and I was drinking and I took a few puffs off of it

16   sitting up at the apartment with Ryan and Carmela.  And that

17   was it.

18        Q.    How many --

19        A.    And several other people, you know, were passing it

20   around.

21        Q.    Okay.  About how many joints did y'all roll up and

22   pass around?

23        A.    I think one or two.  I think she rolled another one

24   after the first one, but I know it wasn't more than two.

25        Q.    Okay.  So after y'all went and bought the marijuana,
```

1    did you go back to your granny's house?

2        A.    Yes, ma'am.

3        Q.    And go pick up Jim?

4        A.    No, Jim was with me while we were sitting up at the

5    apartment.  After we got back from buying marijuana, we went

6    to Granny's, got Jim, and then we returned back up to the

7    apartment and that's when we were sitting around drinking,

8    talking, smoking.  And me and Jim went back to Granny's after

9    we finished.

10        Q.    Okay.  About how long do you think that you drank

11   and smoked -- smoked that night?

12        A.    An hour and a half, maybe, hour.

13        Q.    Okay.

14        A.    It wasn't that long because we were in bed by 11

15   o'clock.

16        Q.    Okay.  Did you feel like you were intoxicated that

17   night?

18        A.    Oh, yeah.

19        Q.    Oh, yeah?

20        A.    Yes, ma'am.

21        Q.    Okay.  Did the effect -- were you intoxicated both

22   on alcohol and marijuana?

23        A.    I was sleepy.  I think the marijuana made me

24   sleepy.  That's why we ended up going to bed, you know, at 11

25   o'clock because I'm sleepy.

1      Q.    Okay.

2      A.    That's something I don't usually do.  So therefore

3  it made me all tired and -- well, I went to bed.

4      Q.    Okay.  And you went to bed at about 11 o'clock, and

5  what time were you pulled out of bed by the police?

6      A.    Around 3:00, 3:30 that morning.

7      Q.    How did you feel when they pulled you out of bed?

8      A.    I was wondering what was going on.  I was like,

9  police come in the house.  I hadn't done nothing, and I'm

10  sitting there, just what is going on, what is going on.  They

11  are "put your hands up where we can see them."  I put my

12  hands up where they can see them.  I was like I hadn't done

13  nothing.  I hadn't done nothing.  They were like "we ain't

14  here for you.

15      Q.    Okay".  That's when you said you saw this laser tag

16  kind of flashlights going on?

17      A.    Yes, ma'am.  I was waking up.  And then when I woke

18  up, the laser tag was going on and I realized, hey, there's

19  police in the house.

20      Q.    Okay.  When the police came into your house, were

21  you still feeling the effects of the alcohol?

22      A.    Not really.

23      Q.    Okay.  You usually sleep that off pretty good?

24      A.    Yes, ma'am.

25      Q.    What about the marijuana?

1      A.    Huh-uh.

2      Q.    Were you groggy from being asleep?

3      A.    No, ma'am, not after they came in.  I was wide

4   awake, wondering what was going on.

5      Q.    Okay.  Tell me where exactly you got taken.  Or did

6   you stay in the room for a little while?

7      A.    I was laying in the bed for a minute.  They got Jim

8   into custody.  Then they told me, you know, come on, let's

9   get up.  And I had my boxers and they kind of let me pull

10  them up.  They took me into the living room and -- where I

11  was sitting on the couch.  Granny was in the kitchen.  And

12  they were back there dealing with Jim.

13     Q.    Okay.  Let me ask you a little bit about what you

14  saw when they put him into custody.  What did you actually

15  see them do, Treshod?

16     A.    What did I see them do?

17     Q.    What did you see the police do to Jim to -- you say

18  they put him in custody?

19     A.    They grabbed his ankles, pulled his ankles up toward

20  his butt and grabbed his arms, pulled his butt back, you

21  know, his arms towards his -- you know, like they was going

22  to hog tie him.

23     Q.    Okay.

24     A.    And --

25     Q.    Did they say you're under arrest?

1      A.    No, ma'am.

2      Q.    Okay.  Did you hear them ever give him his

3  warnings?  You know what Miranda warnings are, don't you?

4      A.    Yes, ma'am.

5      Q.    Did you ever hear them ever do that?

6      A.    No, ma'am.  I was in the living room by that time.

7      Q.    Okay.  But when they were -- did you actually see

8  them -- see the police put him up and sit him down on the

9  bed?

10     A.    No, ma'am.

11     Q.    Okay.  Now, who was -- who were the guys that

12 questioned you?

13     A.    The Garland police, Officer Mendoza, and

14 Detective -- Lieutenant somebody, his Lieutenant, Mendoza's

15 Lieutenant.

16     Q.    Okay.  And that's with the Garland Police

17 Department?

18     A.    Yes, ma'am.

19     Q.    Were you ever questioned by -- I think you said

20 yesterday that Gary Rose and Jason Bonham took you to the

21 police station?

22     A.    No, ma'am.

23     Q.    Did you say that yesterday?

24     A.    No, ma'am.  I never did go into the police station.

25     Q.    Okay.

1    A.   I was just questioned thoroughly over and over and

2  over and over again to make sure that what I was saying was

3  true.  And after they -- I told them over and over again,

4  they believed me, because I didn't have nothing to hide and

5  just left it at that.

6    Q.   Okay.  So when you told them something over and over

7  again, they believed you, right?

8    A.   Yes, ma'am.

9    Q.   Okay.

10    A.   I mean, they couldn't -- I'm sure they looked for

11  holes in my story, but I mean they couldn't find it because

12  it was the truth.

13    Q.   But your story was pretty consistent so they

14  believed you, as far as you know?

15    A.   As far as I know.

16    Q.   And who did all this questioning over and over and

17  over again?  Was that Gary Rose?

18    A.   Mendoza, his Lieutenant.

19    Q.   Was that Lieutenant Thompson?  Does that sound

20  familiar?

21    A.   I'm not for sure.

22    Q.   But he was a lieutenant?

23    A.   Yes, ma'am.

24    Q.   But they never took you to the police station?

25    A.   No, ma'am.

1    Q.   Did you help Jim put Ms. Cunningham in the creek?

2    A.   No, ma'am, I didn't.

3    Q.   Did you ever tell any of the officers that you did

4    not put her in the creek?

5    A.   Yes, sir (sic).  One of the officers tried to say

6    that -- well, how did his little hundred and something pounds

7    self do this by himself and I told them the same way that he

8    killed her is the same way that he did whatever with her.

9    Q.   So you knew at that point that he had killed her?

10   A.   No, I knew at the point that he had killed her after

11   they drug him out of the room and they come out and left and

12   came back.  And I asked my granny what was going on.  And she

13   said can I tell him.

14   Q.   You were -- you were pretty quick with that

15   knowledge, weren't you, that the same way that he killed

16   her.  You didn't know about that beforehand?

17   A.   No.  When the police asked me, did I help him take

18   the body out of the trunk and throw her into the creek, I

19   said no, the same way, you know, he had the strength to kill

20   the lady is the same way I guess he threw her in the creek.

21   Q.   Okay.  And that's one of the things that you said

22   over and over?

23   A.   No.  What I told them over and over was about the

24   night, the beginning from 4 o'clock that evening to the time

25   that they came.

---

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Okay.  And you told them about -- about buying

2  marijuana; is that correct?

3    A.   Yeah, I told them.  I ain't got nothing to hide.

4    Q.   And you told them about using marijuana; is that

5  correct?

6    A.   Yes, ma'am.

7    Q.   And you're on parole, aren't you?

8    A.   Yes, ma'am.

9    Q.   And part of your parole is --

10    A.   Do not use drugs.

11    Q.   Okay.  And do you have a -- what they call a blue

12  warrant, a warrant out for your arrest because you violated

13  your parole?

14    A.   No, ma'am.

15    Q.   Do you have any violations pending at this point?

16    A.   No, ma'am.

17    Q.   When you met up with your parole officer that day,

18  did you tell her you were going to go out and buy marijuana

19  that night?

20    A.   No, I didn't know that I was going to buy -- I

21  didn't buy marijuana.  Christy bought marijuana.

22    Q.   Did you help facilitate somebody buy marijuana that

23  night?

24    A.   Yes, ma'am.

25    Q.   Did you tell your parole officer when you made that

1  appointment that day that you were going to go out and do

2  that that night?

3      A.   No, ma'am.  This was after I had made my appointment

4  with my parole officer.

5      Q.   Okay.  Now, you understand that the District

6  Attorneys Office has said that if anything that you testify

7  to in this court, a case in Van Zandt County arises from what

8  you've testified to, that they'll recommend that a case not

9  be filed on you?

10          MR. DAVIS:  I'm sorry.  That's a

11  misrepresentation of what the Court has previously been told,

12  and I would object to that.  The Court is well aware that all

13  that I have said is that right now I have no plea bargains

14  with this individual, that if his parole officer calls me,

15  that I will advise them that he has been a material witness

16  in this case and that I would recommend that his parole not

17  be revoked as a result of his testimony.  And the Court is

18  well aware that that is the only agreement that has been

19  stated to this Court, and there is nothing said about what

20  may or may not occur in Van Zandt County, Texas.  And I

21  object to that --

22          MS. BALIDO:  Judge --

23          MR. DAVIS:  -- as being a misrepresentation.

24          MS. BALIDO:  Judge, I'm just going with what

25  Mr. Lucas proffered to the Court before the jury was brought

1    back in.

2                    THE COURT:  Let's move on.

3        Q.   (By Ms. Balido)  You're not too worried about your

4    parole, are you?

5        A.   No, because I don't do it.  It was just like a

6    special occasion.  I did it that one night.  And if he asks

7    me, I'll tell him, yes, sir, that I did use.  But if, you

8    know, he give me a UA, I'm going to be clean.  So I have

9    nothing really to worry about.

10       Q.   And your UA's going to be clean because you know

11   that if you use marijuana after a certain time, it's going to

12   come back -- if you use marijuana and you don't get tested

13   until a couple of weeks afterwards, you know it's not going

14   to show up on the test?  You know that, don't you?

15       A.   Whatever.

16       Q.   Okay.

17                    MS. BALIDO:  I don't have any further

18   questions.

19                    Cross-Examination

20   By Mr. Davis:

21       Q.   Mr. Tarrant let me -- let me talk to you a little

22   bit about kicking it with the defendant.  I mean, you've been

23   out with him before, haven't you?

24       A.   Yes, sir.

25       Q.   Y'all have been out drinking before, I imagine?

```
 1      A.    Yes, sir.

 2      Q.    I mean, he likes to drink, doesn't he?

 3      A.    Yes, sir.

 4      Q.    He likes to drink a lot as a matter of fact, doesn't

 5   he?

 6      A.    Yes, sir.

 7      Q.    Would you say that he's got a pretty good tolerance

 8   for alcohol?  In other words, does it take him a lot before

 9   he gets a buzz on?

10      A.    Yeah, he could drink probably as much as me and

11   still be functionable.

12      Q.    That evening who was doing the driving while you

13   were with him?

14      A.    He was.

15      Q.    Did he have any trouble driving to Terrell?

16      A.    No, sir.

17      Q.    After y'all had dinner there at Cole Mountain, did

18   he have any trouble getting y'all back to Edgewood?

19      A.    No, sir.

20      Q.    Now, Ms. Balido asked you about him not eating.  Did

21   you know that he had an upset stomach that night?

22      A.    Yes, sir, he told me, because I asked him why didn't

23   he eat.  He said his stomach was kind of upset.  I'm like

24   okay.  It's probably because he's been drinking two days.

25      Q.    Do you know whether or not he's got an ulcer?
```

1  A. I think he does. I think he does.

2  Q. Now, did he ever tell you before the police came

3 there that he had actually shot this woman?

4  A. No, sir.

5  Q. Didn't share that with you?

6  A. No, sir. The only thing he told me was he's going

7 to Florida after we, you know -- he departed from me, he was

8 headed to Florida.

9  Q. When he got there to Chacho's that night to buy the

10 beer and the Hennessy, how was he acting then?

11  A. Normal.

12  Q. Have you had a chance to look at how he was acting

13 inside that Chacho's in Terrell?

14  A. No, sir.

15   MR. DAVIS: That's all. I pass the witness,

16 Your Honor.

17      <u>Redirect Examination</u>

18 By Ms. Balido:

19  Q. Let me ask you a question, Mr. Tarrant, about the

20 car, a couple more questions about the car. You said that

21 you saw blood on it?

22  A. Uh-huh.

23  Q. You need to say yes or no.

24  A. Yes, I saw blood.

25  Q. And you saw -- and you asked -- you asked Mr. Murphy

1    about it, and he said that he had shot a deer; is that

2    correct?

3        A.    Yes, ma'am.

4        Q.    And when you drove that car to go buy some

5    marijuana, did it smell?

6        A.    Yes, ma'am.  It smelled like a bunch of dried up

7    blood or something.  It had a stench to it.

8        Q.    Okay.  And you never -- that didn't seem odd to you?

9        A.    Yeah, it seemed odd.  I asked him about that when I

10   first entered the car.  That's when he told me, you know, he

11   shot the deer.  He couldn't get the blood out of the back,

12   cracked the window.  Once we get going, you won't be able to

13   smell it.

14       Q.    Okay.  And so you never ventured any -- any further?

15       A.    Huh-uh.  No, ma'am.

16       Q.    And it didn't seem -- it didn't seem odd to you?

17       A.    No, ma'am, because he had been deer hunting before.

18   I mean, the first gun I seen was one of his.  It was a 30-30

19   on the top and a 12 gauge on the bottom, an over and under.

20       Q.    Okay.  But what my question is, is he shows up with

21   this car with blood on it, correct?

22       A.    Uh-huh.

23       Q.    Yes or no.

24       A.    Yes.

25       Q.    He -- it smells like blood?

1      A.    Yes, ma'am.

2      Q.    He's got credit cards?

3      A.    Yes, ma'am.

4      Q.    With what you term an old lady's name on it; is that

5 correct?

6      A.    Yes, ma'am.

7      Q.    And none of that seemed to ring any bells to you?

8      A.    No, because it's Jim.  I mean, I've known Jim

9 forever.  Nothing striked (sic) odd until the police came

10 into the house that night.

11     Q.    Okay.  But it didn't keep you from -- it wasn't odd

12 enough to keep you from benefitting from all the purchases?

13     A.    Benefitting --

14          MS. BALIDO:  Pass the witness because I don't

15 have any further questions, Judge.

16          MR. DAVIS:  No further questions, Judge.

17          THE COURT:  You may step down, sir.  Return to

18 the waiting room.

19          Defense may continue.

20          Mr. Lucas, you may be excused as well.

21          (Witness brought forward.)

22          MS. BALIDO:  The defense calls Jason Bonham.

23          Judge, I believe this witness has been previously

24 sworn but not sworn in front of the jury.

25          (Witness sworn.)

1              THE COURT:  Thank you, Ms. Balido.

2                      JASON BONHAM

3    was called as a witness by the Defendant and, after having

4    been first duly sworn, testified as follows:

5                   Direct Examination

6    By Ms. Balido:

7         Q.   Can you please state your name?

8         A.   Jason Bonham.

9         Q.   And what do you do for a living, Jason?

10        A.   Run my own lawn care service, and I'm a police

11   officer.

12        Q.   Okay.  Are you a reserve police officer?

13        A.   Yes, ma'am.

14        Q.   Okay.  Back in October of the year 2000, were you a

15   full-time police officer?

16        A.   Yes, ma'am.

17        Q.   And for which agency?

18        A.   The Wills Point Police Department.

19        Q.   Now, you know the person sitting to my left,

20   Jedidiah Isaac Murphy; is that correct?

21        A.   Yes, ma'am.

22        Q.   And you know him as Jim Murphy?

23        A.   Yes, ma'am.

24        Q.   And how do you know him?

25        A.   We were classmates.

1    Q.    Okay.  Back in October, I guess the late night hours

2    of October the 5th and early morning hours of October 6th,

3    were you driving back in to Edgewood -- well, number one,

4    were you on duty that night?

5    A.    No, ma'am.

6    Q.    What were you doing that night?

7    A.    I was working an off-duty security job.

8    Q.    Okay.  And after you got finished working that

9    off-duty security job, did you drive in to Edgewood?

10   A.    Yes, ma'am.

11   Q.    Okay.  And did you notice as you drove in a bunch of

12   police cars at the Dairy Queen?

13   A.    Yes, ma'am.

14   Q.    Okay.  And what did you do when you saw that?

15   A.    I recognized the officers in the cars, and I stopped

16   in to say hello.  They were friends.  See what was going on.

17   Q.    And did you find out what was going on?

18   A.    Yes, ma'am.

19   Q.    And what was going on?

20   A.    Basically they told me that they were there -- they

21   had a bolo, ways of -- means of communication between

22   departments on a car that had been stolen, reported stolen,

23   and the possible occupant of the car and where they were at,

24   and asked me if I knew anything about either of the

25   occupants.

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.   Okay.  And the occupant that they were asking you

2  about was Jedidiah Isaac Murphy?

3     A.   Yes, ma'am.

4     Q.   And initially what did you think about that?  Did

5  you know that person?

6     A.   Yes, ma'am.

7     Q.   Okay.  And so did you find out where they were --

8  where Mr. Murphy supposedly was?

9     A.   Yes, ma'am.

10     Q.   And where was he?

11     A.   At Treshod Tarrant's house.

12     Q.   Okay.  Did you know Treshod Tarrant?

13     A.   Yes, ma'am.

14     Q.   How did you know Treshod?

15     A.   I also went to school with him.

16     Q.   Okay.  And did you know where Treshod and Ora Mae

17  Milton lived?

18     A.   Yes, ma'am.

19     Q.   And that's not far from either your house or your

20  grandmother's house; is that right?

21     A.   I grew up two blocks from there.

22     Q.   Okay.  Did you become, I guess, part of the arrest

23  team that went out to Ms. Milton's house?

24     A.   I was present when they went -- when everybody went

25  to Ms. Milton's house.  I wouldn't say I was part of the

1    arrest team.  I didn't go -- I wasn't part of the entry team

2    or anything like that.

3        Q.   Okay.  But -- but you knew the house; is that

4    correct?

5        A.   Yes, ma'am.

6        Q.   And so you drew them a map?

7        A.   Yes, ma'am.

8        Q.   And who was in charge of -- I guess we'll call the

9    entry team?

10       A.   Chief Deputy Gary Rose.

11       Q.   Okay.  And what did you do as part of -- to help

12   effect this arrest beside making the map?

13       A.   Since I grew up in the area, they asked me if I was

14   familiar with the terrain outside the house.  I was.  And he

15   asked -- Gary Rose asked me if I would take a couple of

16   officers around the back so -- in a way that they wouldn't be

17   detected so they could watch the outer perimeter.

18       Q.   Was there any kind of discussion ever that they were

19   supposed to wait until Garland actually got there, or were

20   they just supposed to move in, or do you know?

21       A.   I don't recall any discussion like that.

22       Q.   Were you -- well, let's see.  So you were on the

23   outside of the house and -- towards the back of the house

24   when the entry team actually went in?

25       A.   Yes, ma'am.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.    And how long was the entry team in there?

2    A.    Roughly 30, 45 minutes.

3    Q.    Were they in there 30 or 45 minutes before you went

4  in?

5    A.    From the time that we got to the -- to the back of

6  the house and one of the other officers that had a radio,

7  radioed to everybody else and told them that we were in

8  position, they came in.  I don't know who it was, somebody

9  knocked on the door.  I could hear the knock.  Ms. Milton let

10  them in.  They talked for however long, 30, 45 minutes, and

11  then that's when they started coming out.

12    Q.    Okay.  So were you outside the house and was Gary

13  Rose inside the house?

14    A.    Yes, ma'am.

15    Q.    Okay.  And were you ever present when Gary Rose

16  read, or did you ever hear Gary Rose read Mr. Murphy his

17  rights?

18    A.    No, ma'am.

19    Q.    Could you hear anything that was going on inside the

20  bedroom from where you were standing?

21    A.    No, ma'am.

22    Q.    And when was the next time you saw Gary Rose?

23    A.    When he came out of the house.

24    Q.    Came all the way out of the house?

25    A.    Yes, ma'am.

1    Q.   And what did he do when he came all the way out of

2    the house?

3    A.   He came out the front door.  We were all standing in

4    the front.  He spoke with one of the other deputies that were

5    there.  I don't remember who.  He spoke with them briefly.

6    And they pointed out some -- something that -- that he would

7    probably want to look at that was on the trunk of the car

8    that was parked in front of the house.

9    Q.   Okay.  That looked like blood?

10   A.   Yes, ma'am.

11   Q.   And then did detective -- I'm sorry, Deputy Rose

12   ever approach you, or did you ever approach him?

13   A.   Well, we were -- we was both standing side by side.

14   It's a rather small little area there in the front yard.  We

15   were both standing pretty close to each other.

16   Q.   And what did Deputy Rose say to you about what had

17   happened inside?

18   A.   He couldn't -- he couldn't get anything that he

19   really thought was relevant out of Jim.

20   Q.   Did he ever say that Jim had told him that the --

21   that Ms. Cunningham was dead?

22   A.   No, ma'am.

23   Q.   Or that somebody had dumped his -- dumped Ms.

24   Cunningham's body somewhere in Dallas?  Did Rose ever tell

25   you that?

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1        A.    Not that I recall.

 2        Q.    Okay.  And then did you go in there to the house?

 3        A.    Yes, ma'am.

 4        Q.    And why did you go in there?

 5        A.    To speak with Jim.

 6        Q.    Did you go in there kind of as a police officer or

 7   as a friend or a little bit of both trying to just find out

 8   what happened?

 9        A.    More or less a little bit of both.

10        Q.    Okay.  And before you went in there, did you inquire

11   of Deputy Rose as whether or not he was Mirandized?

12        A.    Yes, ma'am.

13        Q.    Okay.  And did Deputy Rose say he had read him his

14   rights?

15        A.    Yes, ma'am.

16        Q.    Did Deputy Rose ever tell you that Mr. Murphy had

17   said, yes, that he understood his rights and had waived his

18   rights?

19        A.    I don't recall that.

20        Q.    Okay.  When you walked into the room, what did you

21   see -- into the bedroom I'm talking about?

22        A.    We walked into the bedroom.  There's two beds -- two

23   twin size beds in the bedroom.  Jim was sitting on the one

24   farthest from the door.

25        Q.    Okay.  What was his demeanor?
```

1    A.    He had his head down.

2    Q.    Okay.  Did he look up and greet you when you walked

3    in?

4    A.    No, ma'am.

5    Q.    Before -- well, did that surprise you that he didn't

6    look up and greet you when -- when you came in?

7    A.    I don't know if surprise was the word.  I don't know

8    that he knew it was me that walked in the door.

9    Q.    When you walked in, did you go in and sit down with

10   him?

11   A.    Yes, ma'am.

12   Q.    Okay.  When he saw it was you, did he greet you

13   then?

14   A.    Yes, ma'am.

15   Q.    And did you ask him about this offense?  Or let me

16   just ask you, you know, what did you ask him?  What did you

17   say when you sat down with him?

18   A.    Just asked him how he was and what was going on,

19   what happened.

20   Q.    And what was his response to that?

21   A.    He would turn away.  He wouldn't look -- he was --

22   he would in no way look me in the face, look in my direction,

23   he would always look to the side and give a little moan or a

24   gesture, you know, man, type of thing.

25   Q.    Okay.  And did you ask him again what --

DARLINE W. LABAR, OFFICIAL REPORTER

Page 70

```
 1        A.    Yes, ma'am.

 2        Q.    And how did you do that?  I guess just explain to

 3   the jury what you said next.

 4        A.    When I spoke with him and he was kind of brushing me

 5   off nonchalant, just looking away and everything, I still

 6   wasn't sure what all had actually happened, so I just kind of

 7   put it to him in a way that he could -- I felt he could

 8   relate to.  A couple of years earlier we had lost a

 9   classmate, and I was one of the officers that was a part in

10   finding that classmate.

11        Q.    That was a classmate that had committed suicide?

12        A.    Yes, ma'am.

13        Q.    Out in the country?

14        A.    Yes, ma'am.

15        Q.    And so how did you put it to him in those sorts of

16   terms?

17        A.    That if there really was -- I don't know what all

18   happened, and as his friend I really didn't want to know what

19   all happened, I just wasn't -- if it was my mother or if it

20   was his mother, I don't think anybody would want to find her

21   in a position or the way that I found my friend.

22        Q.    Okay.  And how was that position?

23        A.    The animals had pretty much had their -- had their

24   way with him.

25        Q.    Okay.  And so you recalled that to him?
```

1    A.   Yes, ma'am.

2    Q.   And what did -- and what did he say then?

3    A.   Nothing that I recall immediately.  His eyes bald up

4  and real watery -- got watery-eyed, and then he told me that

5  she was here.

6    Q.   Okay.  And did you inquire further as to what here

7  meant?

8    A.   Yes, ma'am.

9    Q.   And what did he tell you?

10    A.   He kept saying she's just -- she's here, you know,

11  that type of thing.

12    Q.   Okay.  Did he ever give you a precise location as to

13  where she was?

14    A.   Yes, ma'am.

15    Q.   And where was that?

16    A.   Eventually told me that she was at Livingston Hill.

17    Q.   Okay.  Was that a place you were familiar with?

18    A.   Yes, ma'am.

19    Q.   Okay.

20         MS. BALIDO:  May I approach the witness.

21         THE COURT:  Pardon me?

22         MS. BALIDO:  May I approach the witness.

23         THE COURT:  You may.

24    Q.   (By Ms. Balido)  I'm showing you what has been

25  marked and entered into evidence as State's Exhibit Number

1    28, Number 29, and then 30 right here.  And is that what

2    you -- can you tell me if you recognize these locations?

3        A.    Yes, ma'am.

4        Q.    You need to speak up for the court reporter.

5        A.    Yes, ma'am.   Yes, ma'am.

6        Q.    And is that the area outside of Edgewood that you

7    called Livingston Hill, or is that near the area?

8        A.    Yes, ma'am.

9        Q.    Okay.  Can you tell me a little bit about -- about

10   basically the creek that's depicted in one of those

11   pictures?  Are the sides sloped, or are they kind of

12   straight -- more straight up and down?

13       A.    In the pictures they're more of a straight up and

14   down, steep drop off.

15       Q.    Okay.  And from the road to down to the creek is

16   that kind of a steep area?

17       A.    Yes, ma'am.

18       Q.    Okay.  Rocky?

19       A.    Yes, ma'am.

20       Q.    A lot of brush?

21       A.    Yes, ma'am.

22       Q.    Okay.  Broken concrete and bricks and mortar?

23       A.    To name a few.

24       Q.    Okay.  And just basically some trash and broken

25   limbs, that sort of thing?

1    A.    Yes, ma'am.

2    Q.    Okay.  And about how -- how tall or how -- from

3    the -- from the water all the way up to the road, about how

4    much distance is that?

5    A.    Six feet.

6    Q.    Okay.

7    A.    Somewhere around six feet.

8    Q.    And from the road to -- well, kind of describe as to

9    the side of the road what sort of area -- does it drop off

10   steeply, is it just kind of jagged, that sort of thing?

11   A.    On which side of the road?

12   Q.    On the side of the road that goes to the creek, I'm

13   sorry?

14   A.    The creek goes directly under the road.

15   Q.    Okay.

16   A.    On either side -- on the right side there's a really

17   large concrete or steel pipe to let the water run through.

18   It's fairly steep on either side of the road, jagged and

19   steep with rocks.

20   Q.    Okay.  And where the ground drops off, we've got the

21   level area --

22   A.    Uh-huh.

23   Q.    -- where the road is, and where the ground drops off

24   to where the water starts, it's not -- it's not exactly

25   straight up and down?

1      A.    Not exactly.

2      Q.    Okay.  Can you tell me what kind of distance

3  horizontally it would be from the edge where it starts going

4  down to where the water actually is?   How much distance --

5      A.    Wide?

6      Q.    -- wide would you have to cover?

7      A.    Directly over the steel pipe, you know, you can

8  step -- just step straight off maybe a few inches.

9      Q.    Okay.

10     A.    Other parts you can walk to the creek, walk beside

11 the creek and still be on the road and it be as much as two

12 feet.

13     Q.    Okay.  Back to when you were talking with Jim, did

14 he tell you how -- how the gunshot happened?

15     A.    No, ma'am.

16     Q.    Okay.  Did he tell you if it was an accident or not?

17     A.    He did state that it was an accident.

18     Q.    Okay.  Did he give you any more details than that of

19 it being an accident?

20     A.    The only thing that I recall him saying was it just

21 went off, it was an accident.

22     Q.    And he was talking about the gun?

23     A.    That's what I --

24     Q.    You assumed?

25     A.    What I assume, yes, ma'am.

1     Q.    Now, after you talked with him, did you go back

2  outside?

3     A.    Yes, ma'am.

4     Q.    Okay.  And you told the other officers what Mr.

5  Murphy had said?

6     A.    I pulled Gary Rose to the side and told him.

7     Q.    Okay.  And then what happened?

8     A.    Gary asked me where the creek was and asked me if I

9  knew how to get there because he wasn't familiar with the

10  area.

11     Q.    Okay.  And is that creek in Van Zandt County?

12     A.    Yes, ma'am.

13     Q.    And he's a sheriff of Van Zandt County; is that

14  right?

15     A.    Yes, ma'am.

16     Q.    Okay.

17     A.    Deputy.

18     Q.    What?

19     A.    A deputy.

20     Q.    A Deputy sheriff.

21     A.    Yes, ma'am.

22     Q.    So did you take him out to that location?

23     A.    I rode with him.

24     Q.    Okay.  And you directed him where to go?

25     A.    Yes, ma'am.

1    Q.   Was anybody else with you?

2    A.   Joey Branch.

3    Q.   And once you got out there, what did you see?

4    A.   Jim had given specific directions on where we would

5 find the deceased.  And when we got out of the car, Gary

6 stopped right in the middle of the creek pretty much.  I was

7 in the passenger side, and I walked around to the front.  He

8 got out of the driver's side and kind of walked back to start

9 at the edge of the creek and just -- I kind of assume walk it

10 and look in the ditch from one side to the other.  By the

11 time I got to the front of the car and he got right at the

12 middle, we both kind of met -- our lights met on the same --

13 at the same time.

14    Q.   Okay.  And from the road where you were standing --

15 were you standing on the road at this point?

16    A.   The edge of the road.

17    Q.   The edge of the road.  From the road how far exactly

18 were you from where Ms. Cunningham was found?  Or where her

19 body was?

20    A.   Roughly six feet.  She was right on the very edge of

21 the creek.

22    Q.   Okay.  And was -- that time was the current in the

23 water, was it running fast or slow, or do you remember?

24    A.   I believe it was slow.

25    Q.   Okay.  Let me ask you since you've been out there,

1   in your opinion could you drop -- could somebody drop a body

2   from the road or the edge of the road down into the creek

3   without going down the bank?

4                    MR. DAVIS:  I'm going to object to that.  It

5   calls for speculation on the part of this witness.

6                    THE COURT:  Can you answer that without

7   speculating?

8                    THE WITNESS:  Yes, sir, I believe I can.

9                    THE COURT:  Objection is overruled.  You may

10  answer the question.

11      A.   I believe it would be very possible.

12      Q.   (By Ms. Balido)  Okay.  Let me ask you this, when --

13  when Jim told you that Ms. Cunningham was at Livingston

14  Hill -- and he gave you very specific instructions; is that

15  correct?

16      A.   Yes, ma'am.

17      Q.   He was helpful and cooperative with you to kind of

18  tell you where to go?

19      A.   Yes, ma'am.  Yes, ma'am.

20      Q.   Did you have a question in your mind about -- well,

21  did you know about what size of a woman Ms. Cunningham was at

22  that point?

23      A.   I believe Deputy Branch, he was one of the officers

24  at the Dairy Queen, and I believe he had told me she was

25  roughly a 150 pounds.

1        Q.    And you know what size the defendant is?

2        A.    Yes, ma'am.

3        Q.    Okay.  And what did you think about -- when he told

4    you that she was at Livingston Hill in the creek --

5        A.    Uh-huh.

6        Q.    -- did you have any concerns in regard to how she

7    ended up there?

8        A.    Yes, ma'am.

9        Q.    Okay.  And what was your concern about that?

10        A.    That's a lot of weight for one man to have to pick

11    up.

12        Q.    Did you talk about this with the defendant?

13        A.    Yes, ma'am.

14        Q.    And what did you ask him?

15        A.    If anybody had helped him.

16        Q.    And what was his response to that?

17        A.    He had no response.  The first time I asked him he

18    just kind of looked away as he did in the beginning.  I asked

19    him again and he said that he had help, but he wasn't saying

20    anything.

21        Q.    Okay.  Did you ask him specifically if Treshod

22    Tarrant had helped him?

23        A.    I don't recall if I specifically asked of any names.

24        Q.    Okay.  But this was still -- he was sitting in

25    Treshod's house?

1    A.    Yes, ma'am.

2    Q.    Did he ever tell you the name of the person that

3 helped him?

4    A.    No.

5         MS. BALIDO:   Pass the witness.

6              <u>Cross-Examination</u>

7 By Mr. Davis:

8    Q.    Jason, you and I have met before, haven't we?

9    A.    Yes, sir.

10   Q.    Do you remember when I came down to Edgewood and met

11 with you and you actually took me out to the creek where the

12 body was found?

13   A.    Yes, sir.

14   Q.    This has been a really difficult situation for you

15 personally, hasn't it?

16   A.    Yes, sir.

17   Q.    Jason, besides being classmates with the defendant,

18 you actually were friends with him at one point, weren't you?

19   A.    Yes, sir.

20   Q.    Y'all would socialize after school?

21   A.    Yes, sir.

22   Q.    Correct?

23   A.    Yes, sir.

24   Q.    You knew his family, the Murphys down there?

25   A.    Yes, sir.

1     Q.   In Edgewood, I suppose?  Did the -- did the

2  defendant have a brother while he was living with the Murphys

3  by the name of Matt Murphy?

4     A.   Yes, sir.

5     Q.   Jason, as I understand your testimony, when Deputy

6  Rose came out of the house and spoke with you, he told you

7  right then and there that he had given the defendant his

8  Miranda warnings, didn't he?

9     A.   Yes, sir.

10     Q.   And you remember that Deputy Rose told you that in

11  his opinion that the defendant had been lying to him?

12     A.   Yes, sir.

13     Q.   And that Deputy Rose actually asked you to go in and

14  speak with the defendant to try to get a possible location

15  for Ms. Cunningham's body, didn't he?

16     A.   Exactly.

17     Q.   And you agreed to do so partly because of your

18  status as a police officer, partly because you knew the

19  defendant?

20     A.   Yes, sir.

21     Q.   Now, when you went in there and started speaking

22  with the defendant, he appeared to understand everything that

23  you told him, didn't he?

24     A.   Yes, sir.

25     Q.   He didn't have any problems at all communicating

1    with you, did he?

2        A.    No, sir.

3        Q.    At any time did you feel like he was impaired to the

4    degree that he couldn't understand or take part in the

5    conversation with you?

6        A.    No, sir.

7        Q.    When he did start answering you, without going into

8    whether you believed him or not, at least his responses were

9    appropriate for what you were asking him, weren't they?

10       A.    I believe so.

11       Q.    Now, when you first started talking with him, you

12   eventually got around to discussing, I guess, what had

13   happened to your -- to your friend.  Now, did the defendant

14   know about those circumstances?

15       A.    Yes, sir.

16       Q.    So when you talked about your friend being left out

17   for the animals to feed off of, I mean that was a

18   circumstance that Jedidiah Murphy was already aware of,

19   wasn't he?

20       A.    Yes, sir.

21       Q.    About how your friend -- your mutual friend had

22   actually been exposed to animals?

23       A.    Yes, sir.

24       Q.    Then he began to give you the location, didn't he?

25       A.    Yes, sir.

1      Q.   And in fact he gave you great detail about this

2  location, isn't that right?

3      A.   Yes, sir.

4      Q.   Not only did he tell you that it was at Livingston

5  Hill, but then you remember asking him is she on the road or

6  not?

7      A.   Yes, sir.

8      Q.   And he told you, didn't he, that, no, she's not on

9  the road, correct?

10      A.   Correct.

11      Q.   Did he then tell you that she was in the creek?

12      A.   Yes, sir.

13      Q.   You remember asking him whether or not that would be

14  on the right-hand side or the left-hand side of the road?

15      A.   Yes, sir.

16      Q.   And do you remember the defendant was able at that

17  time to tell you that she would be found on the left side of

18  the road?

19      A.   Yes, sir.

20      Q.   So when you went out there, I suppose you had a very

21  good idea where you would eventually find Ms. Cunningham's

22  body, didn't you?

23      A.   Yes, sir.

24      Q.   Now, you were familiar with Livingston Hill, weren't

25  you?

1    A.   Yes, sir.

2    Q.   The defendant was also, wasn't he?

3    A.   Yes, sir.

4    Q.   As a matter of the fact, that was one of the places

5    when y'all were in high school where the kids would go out

6    and drink from time to time, wasn't it?

7    A.   Yes, sir.

8    Q.   So in his experience, Jedidiah Murphy had been out

9    there, he had been drinking and socializing with friends at

10   the very spot where Ms. Cunningham's body was found; isn't

11   that right?

12   A.   Yes, sir.

13   Q.   How would you -- how would you describe Livingston

14   creek there at that point?  Is that a place -- for instance,

15   is that a place where people will dump trash?

16   A.   Yes, sir.

17   Q.   As a matter of fact, isn't there a no dumping sign

18   near the point where Ms. Cunningham's body is found out

19   there?

20   A.   Yes, sir.

21   Q.   Jason, while you were -- while you were out there --

22   while you were out there, you saw the body in the water,

23   didn't you?

24   A.   Yes, sir.

25   Q.   Did you also see a turtle?

Page 84

1     A.   Yes, sir.

2     Q.   If you would, please tell the members of the jury

3  what you observed with regards to Ms. Cunningham's body and

4  the turtle while you were out there at the scene?

5     A.   There was a large turtle eating Ms. Cunningham's

6  flesh on her face and on her left hand.

7     Q.   Okay.  Did -- when you saw that happening, did you

8  have any thoughts about what to do about that at that point?

9     A.   I contemplated anything I could do, but I didn't

10  really know what to do.

11     Q.   Were you -- were you concerned that if you tried to

12  destroy the turtle, for instance, that it might interfere

13  with the crime scene?

14     A.   Yes, sir.

15     Q.   Later did you determine just how big that turtle

16  was?

17     A.   I had later knew that the turtle had came from an

18  area lake.  Another friend had caught it and told me that he

19  had dumped it out there about three days earlier.

20     Q.   How much did that turtle weigh?

21     A.   Roughly 80 pounds.

22     Q.   80 pounds?

23     A.   Yes, sir.

24     Q.   With how that body got in the creek, have you ever

25  seen a man tried to dispose of a body after he committed a

1  capital murder?

2      A.   No, sir, I haven't.

3      Q.   When you went in there to talk with the defendant,

4  had you ever interviewed somebody who was being charged with

5  capital murder and a possible death penalty?

6      A.   No, sir.

7      Q.   With regards to the defendant's use of alcohol,

8  you've seen him use alcohol on several occasions, haven't

9  you?

10     A.   Yes, sir.

11     Q.   Defendant started using as a teenager, didn't he?

12     A.   Yes, sir.

13     Q.   Would you say he's got a fairly high tolerance for

14 alcohol?

15     A.   In school when I was with him and I would see him

16 drink, I would say it would be about average.  I don't know

17 about high.

18     Q.   Once you left now, you actually left the high school

19 in the 10th grade; is that right?

20     A.   Yes, sir.

21     Q.   The defendant remained in the high school, correct?

22     A.   Yes, sir.

23     Q.   Had y'all -- had y'all stayed in contact really

24 after he left high school or had y'all kind of separated

25 there for a period of time?

1      A.   Football games, we'd still see each other at

2   football games, get-togethers down at Livingston Hill after

3   football games and things like that, we would see each other

4   there.

5      Q.   Jason, when I talked with you down there in

6   Edgewood, did you tell me that you prefer not to testify in

7   this case unless you absolutely had to?

8      A.   Yes, sir.

9            MR. DAVIS:   Thank you.   I'll pass the witness,

10   Your Honor.

11            MS. BALIDO:   I don't have anything further,

12   Judge.

13            THE COURT:   Thank you.   You may step down,

14   sir.

15        Sheriff, let's take a short break.

16            THE BAILIFF:   All rise.

17            (Jury placed on recess.)

18            THE BAILIFF:   All rise.

19            (Jury returned to courtroom.)

20            MR. DAVIS:   Your Honor, I'm sorry, can we

21   approach the bench, please, in anticipation of this

22   testimony.

23            (Side bar discussion off the record.)

24            THE COURT:   Sheriff, will you retire the jury.

25        Ask counsel in the future when they anticipate a

1    discussion at the bench, that they would apprise opposing

2    counsel so the jury will not be further inconvenienced.

3                    (Jury excused from courtroom.)

4                    THE COURT:  Visitors may be seated.

5            Witness come forward, please.

6                    MS. BALIDO:  For purposes of this hearing, the

7    defense would call Edward Hueske.

8                    THE COURT:  Raise your right hand.

9                    (Witness sworn.)

10                   THE COURT:  Putting counsel on notice for both

11   sides that should this matter happen again, the Court will be

12   inclined to disallow the testimony of the witness.

13                   MR. DAVIS:  May I proceed --

14                   THE COURT:  The jury has been inconvenienced

15   beyond belief, and I am very, very upset of their treatment.

16           You may proceed, counsel.

17                   MR. DAVIS:  Thank you.

18                   EDWARD HUESKE

19   was called as a witness by the State and, after having been

20   first duly sworn, testified as follows:

21                   <u>Direct Examination</u>

22   By Mr. Davis:

23       Q.   Sir, would you please tell me your name?

24       A.   Edward Hueske.

25       Q.   And, Mr. Hueske, as I understand, you've been hired

1    by the defense to render certain expert opinions in this

2    matter; is that correct?

3         A.   That's correct.

4         Q.   Sir, will you tell me what opinions you intend to

5    talk about in the presence of this jury during this case?

6         A.   The reasons for unintentional discharge of firearms.

7         Q.   If you would, just tell me what testimony you intend

8    to offer in that regard in front of this jury.

9         A.   That it is in fact possible for a firearm to be

10   unintentionally discharged as a result of a number of

11   factors.

12        Q.   Are you going to give those factors to the jury?

13        A.   Yes, sir.

14        Q.   Please give them to me, then.

15        A.   One would be the result of person holding a firearm

16   and in the process losing their balance.  As a result of

17   losing their balance, pressure can be implied to the trigger

18   by the trigger finger.  Another reason would be a person

19   holding a firearm pointing it at someone and is startled.

20   The result of that circumstance can also result in an

21   unintentional discharge.  And finally the third factor that

22   comes into play in unintentional discharge of weapons is

23   so-called sympathetic reaction which is the result of having

24   a firearm in one hand and carrying out some manipulation with

25   the opposite hand.  And there is a sympathetic muscle

1   response to the hand holding the firearm that can result in

2   unintentional discharge.

3       Q.   Okay.  Besides the general nature of your testimony

4   concerning these three possible reasons for an unintentional

5   discharge of a weapon, do you anticipate that you'll be asked

6   any questions concerning your opinions of what occurred in

7   this case?

8       A.   No, sir.

9       Q.   So as I understand, the only opinions that you will

10  then render in front of this jury will be that there are --

11  first, there are several possible reasons for an

12  unintentional discharge of a firearm, correct?

13      A.   That's correct.

14      Q.   And that you will then list essentially these three

15  reasons and perhaps give additional detail about them; is

16  that correct?

17      A.   That's correct.

18              MR. DAVIS:  With that understanding, that's

19  all I have, Your Honor.

20              THE COURT:  Do you have anything further?

21              MS. BALIDO:  No, Judge.

22              THE COURT:  Sheriff, may we have the jury.

23              THE BAILIFF:  All rise.

24              (Jury returned to courtroom.)

25              THE COURT:  Let the record reflect the jury is

1   returning to the courtroom at this time.

2           Members of the jury, you may be seated.

3           Mr. Murphy, counsel, visitors, you may be seated.

4           Raise your right hand, please.  Sworn in before the

5   jury.

6                   (Witness sworn.)

7                   THE WITNESS:  It will.

8                   THE COURT:  Thank you.

9                       EDWARD HUESKE

10   was called as a witness by the Defendant and, after having

11   been first duly sworn, testified as follows:

12                   Direct Examination

13   By Ms. Balido:

14       Q.   Can you please state your name for the ladies and

15   gentlemen of the jury?

16       A.   My name is Edward Hueske.

17       Q.   And, Mr. Hueske, how are you employed, sir?

18       A.    I'm self-employed as a consulting forensic

19   scientist.  I'm also on the faculty of the University of

20   North Texas in Denton in the Department of Criminal Justice.

21   And I'm also a training coordinator for the University of

22   North Texas Police Academy in Denton, which is a regional

23   police training facility providing training for police

24   recruits and also in-service training for experienced police

25   officers.  I also conduct training seminars for police

1    agencies, both in this country and abroad.

2        Q.   And how long have you been doing independent or

3    private forensic consulting?

4        A.   Approximately five years.

5        Q.   And what is your educational background?

6        A.    I hold a Bachelor of Science degree in chemistry

7    from Sam Houston State University, also have a Masters degree

8    in chemistry from Sam Houston State University.   And I've

9    done post-graduate work at the University of Texas at Austin,

10   Texas Christian University, and Sam Houston State University.

11       Q.    And what do you do to prepare to teach in the

12   Criminal Justice Department of the University of North Texas

13   and also at the police academy?

14       A.    Well, my preparation is my nearly 28 years

15   experience as a forensic scientist with law enforcement

16   agencies comprising 23 years of that experience.   I've taken

17   numerous training seminars over my 28 years from agencies

18   such as the Federal Bureau of Investigation, the Bureau of

19   Alcohol, Tobacco, and Firearms, the International Association

20   for Identification, the American Academy of Forensic

21   Sciences, Association of Firearm and Toolmark Examiners, and

22   other similar professional forensic organizations.

23       Q.    And in your experience, Mr. Hueske, have you had the

24   opportunity to train police recruits, I guess I'll call them,

25   on the proper way to handle their firearms?

1    A.   Yes, I have.

2    Q.   Let me ask you just specifically about something

3  that is a concern, or can I ask you is there a concern in

4  training of police recruits about what is called

5  unintentional discharge?

6    A.   Yes.

7    Q.   And can you tell me what the term "unintentional

8  discharge" of a weapon means to you in a forensic setting,

9  forensic criminalist setting?

10   A.   Well, I think the term is pretty well self

11 explanatory.  It simply means discharging a weapon without

12 intending to.

13   Q.   And is that a concern with police recruits so that

14 they're trained certain ways to kind of keep from that

15 happening?

16   A.   Yes.

17   Q.   First let's kind of go over what -- what -- well, I

18 mean, basically guns just don't go off; is that correct?

19   A.   That's correct.

20   Q.   Okay.  Can you explain how there could be an

21 unintentional discharge of a weapon?

22   A.   Well, if we eliminate things like dropping a weapon

23 or a weapon being struck by something and we limit the

24 discussion strictly to a weapon in someone's hand with their

25 finger on the trigger and talk about that, there are several

1  ways that a weapon could be unintentionally discharged in

2  that scenario.  If someone is holding a weapon and again,

3  their finger has to be on the trigger obviously, and is

4  holding the weapon and is startled, it's possible and

5  documented that the reaction to being startled can cause them

6  to unintentionally pull the trigger, fire the weapon.  If

7  someone --

8      Q.   Let me stop you right there just for a second.  So

9  you're saying if someone is startled, that the act of being

10  startled itself can cause the person to discharge the weapon

11  unintentionally?

12      A.   It can, yes.

13      Q.   Actually pull on the trigger?

14      A.   Yes.

15      Q.   Say like a police officer walking into a house and

16  is startled by someone in there?

17      A.   That's correct.

18      Q.   Okay.  And what is the second way that this

19  unintentional discharge can be -- can happen?

20      A.   Well, the second way is something that happens

21  fairly frequently in hunting accidents in particular.  And

22  that is when someone is holding a weapon -- again, understand

23  that you would have to have your finger on the trigger, and

24  they lose their balance.  And as they loose their balance and

25  try to catch themselves, they can unintentionally squeeze the

1    trigger, fire the weapon that way.

2        Q.   And what's the third way also that this

3    unintentional discharge can happen?

4        A.   The third way is what's known as sympathetic

5    firing.  This results when a person is holding a weapon with

6    one hand and then carries out some manipulation with the

7    other hand and basically the brain sends signals to both

8    hands and they intend to grab or squeeze, shove or push with

9    one hand, and it's the opposite hand that also gets part of

10   the brain signal.  And this is what's known as sympathetic

11   firing.  And the trigger can be squeezed unintentionally that

12   way.

13       Q.   And this last one I want to talk about just for a

14   second is -- are there certain ways that you train police

15   officers to keep them from being in the situation where this

16   sympathetic constriction of muscles won't occur and they

17   won't accidently or unintentionally discharged their police

18   weapon?

19       A.   Yes.

20       Q.   Okay.  And what usually is the training that is

21   involved with that?

22       A.   Well, there are a couple of things.  First of all,

23   officers are taught not to carry out manipulations where

24   they're holding their weapon on someone and then grab them.

25   But another situation would be or another part of the

1    training would be it's absolutely essential to keep the

2    finger off of the trigger.  Just that simple, because of the

3    possibility.

4        Q.    Okay.  And then also they're also taught just to --

5    if there's some manipulation that they have to do, then

6    they'll just holster the weapon before they do that?

7        A.    That's correct.

8        Q.    And is that because of the danger of this

9    sympathetic muscle movement is that great that we don't want

10   that sort of thing to happen?

11       A.    That's correct.

12                MS. BALIDO:  I pass the witness.

13                        Cross-Examination

14   By Mr. Davis:

15       Q.    Mr. Hueske, I guess the first time that you and I

16   had a chance to meet was last Friday, wasn't it?

17       A.    Yes, sir.

18       Q.    Do you remember I guess that you were on your way up

19   to my office at that time, correct?

20       A.    Yes.

21       Q.    And on Friday were you given an opportunity to view

22   all of the photographs concerning this case which were in my

23   possession?

24       A.    Yes, sir, I was.

25       Q.    Specifically you had a chance to look at all the

1   autopsy photographs, I take it?

2       A.   Yes, sir.

3       Q.   Crime scene photographs?

4       A.   Yes, sir.

5       Q.   Did you also have a chance to review the photographs

6   that had been taken of a Honda Accord?

7       A.   Yes, I did.

8       Q.   Were you also given access to the physical evidence

9   that was in our possession?

10      A.   Yes, sir, I was.

11      Q.   And did you have a chance to review that and to look

12  through and examine that?

13      A.   I was given that opportunity, yes.

14      Q.   Mr. Hueske, I take it from what you've told Ms.

15  Balido you've testified several times in matters such as this

16  one, haven't you?

17      A.   I have.

18      Q.   As a forensic expert; is that correct?

19      A.   That's correct.

20      Q.   Do you also do crime scene reconstruction work?

21      A.   Yes, I do.

22      Q.   As I understood your testimony, Mr. Hueske, in all

23  three of the possibilities for an unintentional discharge of

24  a firearm, the individual's finger would actually have to be

25  on the trigger of the firearm at some point; is that correct?

1       A.   In order for it to fire, that's correct.

2       Q.   Normally on a pistol or other firearm, is there

3  what's called a trigger guard?

4       A.   Yes, there is.

5       Q.   And could you just briefly describe for the members

6  of the jury what a trigger guard is and how it functions on a

7  firearm?

8       A.   It's a piece of metal that encircles the trigger.

9  It's there to prevent accidental firing from dropping or

10 something striking the hammer so that in order to fire, one

11 has to place their finger inside the trigger guard and

12 against the trigger.

13      Q.   And that would have to take place in all three of

14 these scenarios that we've just talked about before the

15 firearm will actually discharge, correct?

16      A.   That's correct.

17      Q.   I want to ask you now with regard to the autopsy

18 photographs, did you also have access to the autopsy itself

19 in this case?  Have you had a chance to review that?

20      A.   The autopsy itself, I was not present for.

21      Q.   The autopsy report in this case?

22      A.   Oh, I'm sorry.  I have not reviewed that.

23      Q.   Okay.  When you looked at the autopsy photographs in

24 this particular case, did you come to a conclusion that the

25 gunshot wound suffered by Ms. Cunningham was in fact a loose

1   contact shot?

2      A.   The photograph that I viewed was consistent with

3   that, yes.

4      Q.   Based upon what -- what did you observe in that

5   photograph that led you to that conclusion?

6      A.   There was a lack of what's known as powder stippling

7   around the margins of the wound, which is a consequence of

8   the muzzle being very close to the skin surface, so that the

9   gunpowder particles would go into the wound track as opposed

10  to striking the skin around the wound if the barrel were

11  further back.

12     Q.   So in this particular case, is it your opinion that

13  the firearm that produced that gunshot wound was in fact up

14  really in proximity to Ms. Cunningham's forehead at the time

15  that it was discharged and fired into her?

16     A.   That's the way it appears to me.

17     Q.   Thank you, sir.

18              MR. DAVIS:  I'll pass the witness.

19              THE COURT:  Ms. Balido.

20              MS. BALIDO:  Nothing further, Judge.

21              THE COURT:  May this witness be excused,

22  subject to recall?

23              MS. BALIDO:  No objection.

24              THE COURT:  Either side any objection?

25              MR. DAVIS:  No objection, Your Honor.

1    THE COURT:  Thank you, Mr. Hueske.  You are

2  excused, sir.

3        Defense may continue.

4    MS. BALIDO:  Judge, I believe that we will

5  proceed after lunch.

6    THE COURT:  Lunch break.

7        Ladies and gentlemen, there is a witness that I have

8  previously been notified will not be available until 1:30 --

9  1:00, 1:30.

10    MR. BYCK:  Probably 1:30.

11    MS. LITTLE:  It is definitely 1:30.

12    THE COURT:  See you at 1:30.

13        (Recess of proceedings.)

14    THE COURT:  Let the record reflect this

15  hearing is being conducted in open court, outside the

16  presence and hearing of the impaneled jury, the one

17  alternate.  Let the record further reflect the defendant,

18  Jedidiah Isaac Murphy, is in court and will be at all times

19  during this hearing, absent my dictating the contrary into

20  the record.

21        Ask that you raise your right hand, Doctor.

22        (Witness sworn.)

23    THE COURT:  Thank you.  You may lower your

24  hand.

25    THE WITNESS:  Thank you, sir.

1        THE COURT:   705 hearing at the request of the

2   State.

3            Mr. Davis, you may proceed.

4            MR. DAVIS:   Thank you.

5                    NIZAM PEERWANI

6   was called as a witness by the State and, after having been

7   first duly sworn, testified as follows:

8                    Direct Examination

9   By Mr. Davis:

10      Q.   Sir, would you please tell us your full name?

11      A.   My name is Nizam Peerwani, P-e-e-r-w-a-n-i,

12   N-i-z-a-m.

13      Q.   Dr. Peerwani, I understand that you're the Chief

14   Medical Examiner of Tarrant County, correct?

15      A.   Yes, sir.

16      Q.   I don't believe that we've ever met, have we?

17      A.   I don't think, sir.

18      Q.   My name is Greg Davis.  I'm representing the State

19   of Texas in this matter.

20           Dr. Peerwani, I understand you'll be called this

21   afternoon to render certain opinions in this case; is that

22   correct?

23      A.   Yes, sir.

24      Q.   If you would, let's go through the opinions that you

25   intend to express to this jury.  Can you tell me what you

1  intend to testify to this afternoon?

2      A.   Well, one thing that I've discussed with the defense

3  counsel is the issue of drowning, whether the decedent, Betty

4  (sic) Cunningham drown or didn't drown.  So that's one area

5  that I intend to address.

6      Q.   Okay.  What -- what opinion do you intend to express

7  on that matter?

8      A.   I intend to say that in fact that there is no way

9  scientifically you can say she drowned.  To say that she

10  possibly drowned is mere speculation.

11      Q.   So I understand what you'll say, there's no

12  scientific way to say that she's drowned in this particular

13  case; is that right?

14      A.   Yes, sir.

15      Q.   Okay.  Can you tell me what the next opinion will be

16  that you're going to render to this jury?

17      A.   I think that the issue that we are going to talk

18  about is specifically that and talk about the autopsy itself

19  as well as what is the purpose of autopsy in general.

20      Q.   Okay.  So -- so you intend to talk about the general

21  procedures used for autopsies, the purpose of an autopsy,

22  correct?

23      A.   Yes, sir.

24      Q.   With regards to the autopsy report that was prepared

25  in this case, do you intend to express any opinions about the

1    autopsy that was conducted in this particular case?

2        A.   No, sir.  I would not venture an opinion as to

3    whether or not this is adequate or inadequate, just basically

4    an autopsy report that I have reviewed.

5        Q.   Any other opinions that you -- that you intend to

6    express this afternoon?

7        A.   Well, anything that the defense counsel raises at

8    this point.  These are the only areas I'm aware of.

9        Q.   Okay.  Do you anticipate that you'll be expressing

10   some opinion about the time of death in this case?

11       A.   Yes.  If I'm asked about the mechanisms of death

12   after gunshot injury and how rapidly an individual dies, I

13   would render an opinion on that matter.

14       Q.   What would that opinion be?

15       A.   That opinion basically would be that with a small

16   caliber gunshot wound, one can't precisely say how long after

17   the gunshot a person could stay alive and there is no

18   scientific way to be certain as to exactly when death occurs.

19       Q.   Do you expect to render some sort of opinion about

20   the possible range of time that an individual could live as a

21   result of this type of gunshot wound?

22       A.   I would give a general parameters, but nothing very

23   specific.

24       Q.   What general parameters would you give?

25       A.   I would say that with a small caliber gunshot wound,

DARLINE W. LABAR, OFFICIAL REPORTER

1    a person would stay alive in the manner in which she was

2    inflicted injury, a few hours but not days.

3        Q.    In order to -- first of all, any other opinions that

4    you're aware of at this time, Doctor?

5        A.    No, sir.

6        Q.    In reaching those opinions, can you tell me what

7    material have you used in order to form your opinions?

8        A.    Well, it's based on experience, training, education,

9    as well as certification in forensics.

10       Q.    In this particular case, have you reviewed -- have

11   you reviewed any photographs provided to you by the defense?

12       A.    Yes, sir.

13       Q.    Do those photographs show Ms. Cunningham in water?

14   Do you recall those?

15       A.    Yes, sir, I saw two photographs with Ms. Cunningham

16   in water.

17       Q.    Have you reviewed any other photographs?  For

18   instance, have you reviewed the autopsy photographs in this

19   case?

20       A.    Yes, sir.

21       Q.    Have you reviewed any other materials provided to

22   you by the defense in this matter?

23       A.    I have reviewed the autopsy report that was provided

24   to me.

25            MR. DAVIS:  I believe that's it, Judge.

DARLINE W. LABAR, OFFICIAL REPORTER

1          THE COURT:  Defense have anything?

2          MR. BYCK:  I have no questions.

3          THE COURT:  Sheriff, may we have the jury.

4          THE BAILIFF:  All rise.

5          THE COURT:  Let the record reflect the jury is

6    returning to the courtroom at this time.

7          (Jury returned to courtroom.)

8          THE COURT:  Ladies and gentlemen of the jury,

9    you may be seated.

10         Mr. Murphy, counsel, visitors in the gallery, you

11   may be seated.

12         Ladies and gentlemen, this witness has previously

13   been sworn in, hearing conducted immediately prior to your

14   returning to the courtroom.  I assure you he is under oath.

15                    DR. NIZAM PEERWANI

16   was called as a witness by the Defendant and, after having

17   been first duly sworn, testified as follows:

18                    Direct Examination

19   By Mr. Byck:

20   Q.   Sir, would you state your name for the Court?

21   A.   My name is Nizam Peerwani.

22   Q.   And you are a medical doctor?

23   A.   Yes, sir.

24   Q.   Dr. Peerwani, how are you employed?

25   A.   I'm employed as a medical examiner for the counties

1    of Tarrant, Parker, and Denton in the State of Texas.

2         Q.   And are you the Chief Medical Examiner of Tarrant

3    County?

4         A.   Yes, sir.

5         Q.   Sir, what education and experience, training, and

6    qualifications do you have to hold that post?

7         A.   I did my undergraduate schooling for the American

8    University, graduating with a B.S. in biology and chemistry

9    in '72, and an M.D. in '76.  I then did four years of

10   post-graduate training in pathology at Baylor Hospital here

11   in Dallas.  I'm a board certified pathologist with

12   certification in anatomic, clinical, and forensic pathology.

13   And I've been practicing forensic pathology for the past 22

14   years.

15        Q.   Doctor, in those past 22 years, do you have any idea

16   how many autopsies you've performed?

17        A.   Probably over seven to eight thousand.

18        Q.   Seven to eight thousand?

19        A.   Yes, sir.

20        Q.   All right, sir.  Doctor, you have been previously

21   provided an autopsy that has been introduced into evidence on

22   a Bertie Cunningham; is that correct?

23        A.   Yes, sir.

24        Q.   And you have had occasion to read that autopsy

25   report as well as review the photographs which likewise have

1    been introduced into evidence --

2        A.    Yes, sir.

3        Q.    -- in this case?

4        A.    Yes, sir.

5        Q.    Doctor, I'd like to ask you what is the purpose of

6    an autopsy?

7        A.    What an autopsy is is a postmortem exam, and the

8    purpose of autopsies are to adjudicate on the cause of death

9    and reach conclusion on the manner of death.

10       Q.    And your job as a medical examiner, aside from

11   performing autopsies, would be?

12       A.    To decide as to what the person died of and to make

13   a ruling whether this is a natural or an unnatural death.

14       Q.    Is it further part of your job to regularly appear

15   in courts of law and testify?

16       A.    Yes, sir.

17       Q.    Now, Doctor, in this -- in this procedure where you

18   conduct an autopsy and you return a report and you testify,

19   are you a law enforcement agent or a member of the District

20   Attorneys Office or member of any law enforcement agency at

21   all?

22       A.    Well, in Texas a medical examiner is independent of

23   the District Attorneys Office or the law enforcement.  And

24   the medical examiner is -- is appointed under the statutory

25   definition of Article 49.25, and he's an independent examiner

1    into the cause of death.

2        Q.    And likewise, if you are independent of the District

3    Attorneys Office or any police or law enforcement

4    organization, are you also independent of any defense

5    organization, or anything of that nature?

6        A.    Yes, sir.

7        Q.    In other words, Doctor, it's your job to testify as

8    a neutral observer; is that correct?

9        A.    Yes, sir.

10       Q.    You're not to be partisan.  You're not to take

11   sides; is that correct?

12       A.    That's the general intention, yes, sir.

13       Q.    All right, sir.  In the autopsy report and the

14   photographs concerning the death of Ms. Bertie Cunningham,

15   contained therein is a -- at the very last page is a

16   statement by the examiners that based upon the investigation

17   report and autopsy findings, it is my opinion that Bertie

18   Cunningham, an 80-year-old white female, died of a gunshot

19   wound to the head, period.  It then goes on to say it is

20   possible that she may have survived the gunshot wound to the

21   head for period of time and consequently drowning may have

22   contributed to her death.

23            Now, Doctor, you have seen the photographs, I

24   believe they're State's Exhibits 34 and 35, where the body of

25   Mrs. Cunningham was found in water?

1      A.    Yes, sir.

2      Q.    As an autopsy surgeon, would you put that drowning

3  was a possibility every time a body was found in water?

4      A.    No, sir.

5      Q.    In order to establish death by drowning, what

6  evidence would you look for in the human body in your

7  autopsy?

8      A.    Well, there are certain positive findings that one

9  is to look for and establish and of course one is to make

10  sure there are no other intervening causes in a body or human

11  remains found in a body of water.  Obviously, the positive

12  things that we do see in death by drowning is findings of

13  respiratory death.  These findings include a severe

14  congestion of the lung, swelling or edema of the lung,

15  presence of large amounts of frothy food in the trachea or

16  the windpipe and the bronchioles, these are positive

17  findings.  Then of course the presence of such fluid and

18  froth indicates that the person was still respiring.  When

19  you say a person is still alive and then drowns, obviously he

20  or she is breathing and the air mixed with water will produce

21  all that.  So these are positive findings.

22          Sometime one has to adopt other methods of trying to

23  decide if in fact this person drown in the water.  One has to

24  do special studies and look for bone marrow findings of

25  drowning.  And these are tedious methods and long and drawn

1   out and most medical examiners don't really do that.  So we

2   basically look for positive findings.

3           The other thing of course is very important is to

4   see if there is any other intervening cause of death and if

5   that cause is present, could it have killed the person or

6   not.  So in general we do that exercise every time we find a

7   body floating in water or drown in a lake or river.

8       Q.  I see.  Now, Doctor, in regards to Mrs. Bertie

9   Cunningham, you've read the autopsy report, taken a look at

10  the photographs, is there any evidence that suggests to you

11  that Mrs. Cunningham died by drowning in water?

12      A.  No, sir.  Obviously, the body was found submerged

13  and there is some wrinkling of the palms and soles which

14  implies the body was immersed in water, but the lung findings

15  really do not support that finding.  So there are no positive

16  findings supporting that diagnosis.

17      Q.  All right, sir.  Now, further, you have read the

18  autopsy report regarding the loose contact wound to the head,

19  the path and track of the bullet, the -- the certain areas of

20  the brain that it went through.  I believe it went through

21  the frontal area and some other areas before it came to rest

22  in another area; is that correct?

23      A.  Yes, sir.

24      Q.  And this was a small caliber .22 wound; is that

25  correct?

1    A.   Yes, sir.

2    Q.   Now, in terms of -- of trying to decide, if you can,

3    if there are any basis that you can decide whether that wound

4    was either immediately fatal or immediately rendered the

5    individual unconscious and then was fatal, or that the wound

6    did not immediately render the individual unconscious and the

7    individual was conscious and aware for any particular amount

8    of time, are there any standards or are there any procedures

9    or are there any techniques that you can use to determine the

10   answer to any one of those three questions?   Whether the

11   death was immediate; unconsciousness was immediate, but the

12   death came later; or that conscious -- unconsciousness and

13   death were sometime after the infliction of the wound?   Are

14   there any techniques that you can use to decide those

15   questions?

16   A.   Well, I guess the most important thing to do is to

17   study the trajectory of the bullet and see through what parts

18   of the brain the bullet passed through.   There are obviously

19   some parts of the brain that are vital for sustaining life.

20   And if these are severed or injured, then death can be very

21   rapid.   On the other end, there are areas in the brain where

22   a person might not die instantaneously and maybe survive for

23   a while or days or months or years, depending upon the

24   injuries, so, yes, certainly one can examine the brain,

25   dissect the brain, and establish the track and then give a

1   predictive value based on past experiences and other learning

2   methods.

3       Q.   Doctor, according to the track as described in the

4   autopsy report, assuming that those observations were

5   correct, what conclusions did you reach about the immediacy

6   of death or the immediacy of the individual being rendered

7   unconscious and then dying?

8       A.   Well, I read a couple of things, counselor.  The

9   first thing I did in fact carefully read about the track.

10  And the track does pass through the right side of the brain

11  into the left side and goes to the midline structures.  I'm

12  not quite sure what the examiner meant by midline

13  structures.  I suppose she probably meant that it was about

14  the middle of the brain.  If in fact the midline structure

15  was the brain stem, then the death would have been very

16  rapid, because the brain stem is the main connecting pathway

17  of the brain to the spinal cord and when you sever that, the

18  person dies very rapidly.  But on the other hand, as the

19  examiner, she reported that she found what is called

20  contusions of hippocampus gyrus.  That implies that in fact

21  she survived a little bit.  How long, I can't be sure.

22      Q.   Doctor, let me stop you right there.  It's your

23  conclusion then that it's possible that it was not an

24  immediate fatality, but it would be impossible for you to say

25  whether the individual survived 30 seconds, 2 minutes, 5

DARLINE W. LABAR, OFFICIAL REPORTER

1    minutes, 10 minutes, 20 minutes, an hour, 4 hours, 12 hours?

2    Is that what you're saying?

3        A.    Basically what I'm saying is that I -- I think from

4    the description that she has provided, I don't think that she

5    died instantaneously.  Also based on the pictures that I saw,

6    I saw some contusion, ecchymosis of the right orbit or coon

7    eyes as we say, and this implies there was some functioning

8    of the heart, the heart was beating and the blood was seeping

9    blood into the tissues, so basically I agree with the

10   examiner, that it was not an instantaneous death, but I don't

11   believe she survived very long because the path of the bullet

12   is certain to an area of the brain called the ventricular

13   cavity and there an expanding hemorrhage would result in

14   death very soon within a few hours.  I would predict not more

15   than six hours or so.

16       Q.    Is there any way you could predict the consciousness

17   or the unconsciousness of the individual?

18       A.    There are anecdotal stories of people sustaining

19   gunshot wounds and staying conscious, but in vast majority of

20   the cases that I've done and examined they lose consciousness

21   very rapidly, so based on that alone, I predict this person

22   lost consciousness very rapidly after sustaining the gunshot

23   wound.

24       Q.    All right.  Would you feel or would you not feel

25   that any prediction to any amount of time that individual who

1   suffered those profound wounds as expressed in that autopsy

2   report would be speculation?

3       A.   I think that there is no scientific way to know in a

4   body that is partially decomposing and found in a creek to

5   give predictive time values in a precise fashion.

6       Q.   All right.  Is that a nice way of saying that

7   that -- that it would be speculation?

8       A.   I would -- yes, sir, I would say it's speculation.

9       Q.   All right.  Doctor, my final question to you is, why

10  don't you include speculation in autopsy reports?  I take it

11  from the tone and tenor of your comments that you don't

12  especially approve of speculation, where there is no physical

13  evidence or grounds for that speculation.  Why don't you

14  include it?

15      A.   I think it's all right for a medical examiner to

16  speculate when they are strategizing with the law enforcement

17  police agency, but I think that once you put it on a report,

18  it should be backed by scientific evidence.

19              MR. BYCK:  Thank you, Doctor.  Pass the

20  witness.

21                    Cross-Examination

22  By Mr. Davis:

23      Q.   Dr. Peerwani, we met for the first time this

24  afternoon; is that right?

25      A.   That's right.

Page 114

1     Q.   Dr. Peerwani, in this case, as I take it, you had an

2     opportunity to view two crime scene photographs, correct?

3     A.   Yes, sir.

4     Q.   You've also reviewed the autopsy photographs?

5     A.   Yes, sir.

6     Q.   And you were also provided with a copy of the

7     autopsy report itself; is that right?

8     A.   Yes, sir.

9     Q.   Were -- were you given the testimony of Dr. Jennie

10    Duval that she provided to this jury yesterday?

11    A.   No, sir.

12    Q.   So you don't know what Dr. Duval has previously told

13    this jury about the nature and extent of the injuries or her

14    particular findings; is that right?

15    A.   No, sir.

16    Q.   You stated that all medical examiners in the State

17    of Texas are independent of law enforcement, correct?

18    A.   Absolutely, sir.

19    Q.   And that is absolutely the case with the Dallas

20    County Medical Examiners Office as well?

21    A.   Absolutely right, sir.

22    Q.   Have you ever met with Dr. Duval who is employed

23    with the Medical Examiners Office here in Dallas?

24    A.   I may have met her.  I go to a lot of meetings, and

25    I know of her, yes, certainly.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Have you ever spoken with her in particular about

2    this particular case?

3    A.   No, sir.

4    Q.   So as I understand then with regards to what her

5    findings may or may not indicate, there has never been an

6    occasion where you've called her and said would you please

7    explain what you meant by this term or that term?

8    A.   No, sir.

9    Q.   Are you aware that Dr. Duval, for instance, when we

10   talk about the midline of the brain, are you aware that Dr.

11   Duval has previously told this jury that there was no injury

12   noted to the brain stem?

13   A.   I wouldn't be surprised, and the reason is because

14   she described the hippocampus contusion so I would not

15   disagree with her.

16   Q.   Would you agree with the statement that you would

17   expect Ms. Cunningham again not to die instantaneously, but

18   to survive for some period of time following this gunshot

19   wound?

20   A.   I would have no quarrels with that at all, based on

21   the autopsy findings.

22   Q.   And I believe that you previously told me that that

23   time period could range as high as a few hours, but certainly

24   not a few days; is that correct, also?

25   A.   Yes, sir.

1     Q.    The statement contained in the autopsy report on the

2     final page, on the conclusion:  It is my opinion that Bertie

3     Cunningham, an 80-year-old white female, died of a gunshot

4     wound to the head.

5           Do you agree with that conclusion as to the cause of

6     death?

7     A.    Absolutely.  Yes.

8     Q.    You -- you were telling us about some -- some

9     photograph or some evidence that you were able to look at

10    that led you to believe that Ms. Cunningham did not die

11    instantaneously.  And I'm not sure that I quite understood.

12    Did it have something to do with one of her eyes?

13    A.    Yes, sir.  The orbits, which are the eye sockets

14    show a -- what we call contusions or hemorrhaging.  These are

15    produced not because she was impacted there, but because of

16    the fracture of the roofs of the orbit.  And the reason she

17    does have periorbital ecchymosis or periorbital contusions is

18    because she was alive for a short while or a longer while.  I

19    can't be absolutely certain, so that is indicative that she

20    didn't die instantaneously.

21    Q.    Dr. Peerwani, I want to now show you what I've

22    marked as State's Exhibit 126, ask you whether or not you

23    recognize that to be one of the autopsy photographs in this

24    case that you reviewed?

25    A.    Yes, sir.

1    Q.   In particular does that show the type of bruising to

2    the orbital area that you've just described for the members

3    of the jury?

4    A.   Yes, sir.

5             MR. DAVIS:  Your Honor, at this time we will

6    offer State's Exhibit 126.

7             (State's Exhibit No. 126 offered)

8             MR. BYCK:  No objection to 126.

9             THE COURT:  Admitted.

10            (State's Exhibit No. 126 admitted)

11            MR. DAVIS:  May the witness step down.

12            THE COURT:  You may.

13            THE WITNESS:  Thank you, sir.

14   Q.   (By Mr. Davis)  Dr. Peerwani, if you don't mind,

15   would you please show this to -- this photograph 126 to the

16   jury and explain what you mean by the contusions and the

17   other injuries that you've just indicated?

18   A.   What I was telling the counselor here was the area

19   of bluish discoloration of the eyelid, which is the left

20   upper eyelid and --

21            THE REPORTER:  I'm sorry, Doctor, I cannot

22   hear you.

23   A.   All right.  I'll start over again.

24            THE REPORTER:  The bluish discoloration of the

25   eyelid, you can continue there.

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    Yes.  The bluish discoloration of the eyelid and

2    around the eye socket, and I'm pointing out on this State's

3    Exhibit 126 with my finger here.

4      Q.    (By Mr. Davis)  And again, that is some indication

5    to you that her heart remained beating for some period of

6    time to produce that type of bruising, correct?

7      A.    Yes, sir.

8      Q.    Doctor, I believe you had noted in your testimony

9    also that there were also some -- that you noticed some other

10   contusions to other extremities.  Did you note that during

11   your review of the autopsy photographs?

12     A.    Yes, sir.

13     Q.    Showing you now State's Exhibit 62.  Would it be

14   fair to say that State's Exhibit 62 shows the upper portion

15   of Ms. Cunningham's left arm?

16     A.    That's right, sir.

17     Q.    Okay.  Would you dis -- would you agree or disagree

18   with the statement that these marks and the bruising were

19   produced prior to Ms. Cunningham's death?

20     A.    Yes, they are consistent with what we call

21   antemortem injury.

22     Q.    Which would mean they were produced at or near the

23   time of her death; is that correct?

24     A.    Yes, sir.

25     Q.    As opposed to being produced at a later time after

DARLINE W. LABAR, OFFICIAL REPORTER

1    her death?

2        A.   Yes, sir.

3        Q.   State's Exhibit Number 61, I believe this will show

4    the upper chest area, as well as a portion of her right arm;

5    is that right?

6        A.   Yes, sir.

7        Q.   What would be your opinion about the timing of the

8    bruises here shown to the right portion of Ms. Cunningham's

9    body?  Were they produced before her death or after her

10   death?

11       A.   This is a little more difficult picture mainly

12   because of the fact that there is area of lividity which is

13   postmortem lividity.  And in fact if she had sustained that

14   postmortem, the blood would seep and collect out and look

15   like an antemortem, so that's a hard one.  I would probably

16   examine this more microscopically and confirm if this is an

17   antemortem or a postmortem.

18       Q.   So could be either on this.  You need to have -- you

19   personally, if you were doing the autopsy, would need a

20   little more information to work with?

21       A.   Yes, sir.

22       Q.   Finally, with regards to the gunshot wound itself, I

23   believe -- was it your testimony that you also agree this was

24   a loose contact gunshot wound?

25       A.   That's right.  I have no problem with that

---

DARLINE W. LABAR, OFFICIAL REPORTER

1   definition or that description.

2       Q.   Okay.  And what is it about that photograph or the

3   findings in the autopsy report that lead you to believe that

4   it was in fact a loose contact gunshot wound?

5       A.   What I'm basically seeing is a dense scorching and

6   soot or blackening around the defect, along the margins.  I

7   don't see a muzzle imprint which implies that it is high

8   contact gunshot wound.  I don't see tattooing which means

9   that it was held further away from the surface of the body.

10  And the description of loose contact is just good

11  description.

12      Q.   And again, is it your testimony that you would agree

13  that the cause of death in this case is consistent with Ms.

14  Cunningham having been shot with a firearm?

15      A.   That's right.

16      Q.   And a firearm is a deadly weapon, is it not?

17      A.   Yes, sir.

18      Q.   With regards to the drowning, did I understand you

19  to say that there are some cases in which individuals die

20  from drowning where you do have positive findings that will

21  indicate that drowning was the primary cause of death?

22      A.   Yes, sir.

23      Q.   Are there some cases where an individual dies as a

24  result of drowning where there aren't any positive findings?

25      A.   In the literature there is -- there is a type of

1  drowning described as dry drowning where the -- where the

2  mechanism of death is speculated as being laryngeal spasm or

3  spasm of the larynx and therefore the air does not enter the

4  lungs and as such the person does not have any frothy fluid

5  in the lungs.  This has been in the literature for a long

6  time.  I have yet to see a dry drowning during the past 22

7  years, so I don't believe in dry drowning at all personally,

8  but it's certainly mentioned.  And I hope I answered your

9  question.

10      Q.   Yes, sir, you did.  Thank you, Doctor.

11              MR. DAVIS:  I'll pass the witness.

12              MR. BYCK:  I have no further questions, Your

13  Honor.  May this doctor be excused to go back to Fort Worth?

14              MR. DAVIS:  No objection.

15              THE COURT:  Thank you.  You are excused to go

16  back to Tarrant County.

17              THE WITNESS:  Thank you, Your Honor.

18              THE COURT:  You're welcome.

19              (Witness excused from courtroom.)

20              THE COURT:  Sheriff, will you retire the jury,

21  please.

22        Ladies and gentlemen, I understand the next witness,

23  by cell phone, has indicated he's on his way.

24              (Jury retired from courtroom.)

25              THE COURT:  Jury has been excused from the

1   courtroom.

2              THE BAILIFF:  All rise.

3              (Jury returned to courtroom.)

4              THE COURT:  Let the record reflect the jury is

5   returning to the courtroom at this time.

6        Members of the jury, you may be seated.

7        Mr. Murphy, counsel, visitors in the gallery, and

8   Doctor.

9              MR. BYCK:  Thank you, Your Honor.

10       Your Honor, may the record reflect this witness has

11  been previously sworn.

12             THE COURT:  The record so reflect.

13             DR. WILLIAM VANDIVER

14  was called as a witness by the Defendant and, after having

15  been first duly sworn, testified as follows:

16                 Direct Examination

17  By Mr. Byck:

18       Q.   Dr. Vandiver, my name is Michael Byck, and I

19  represent Mr. Murphy.  You already have a copy of Defendant's

20  Exhibit Number 10.  That's a initial neurological --

21  neurologic evaluation by Dr. John Claude Krusz, K-r-u-s-z; is

22  that correct?

23       A.   Yes, sir.

24       Q.   And also, sir, for your own reference, let me give

25  you State's Exhibit Number 69, that part being the record of

1    Dr. James Garrison, to you.

2         A.    Yes, sir.

3         Q.    Now, both these reports have to do with Jedidiah

4    Isaac Murphy; is that correct?

5         A.    Yes, they do.

6         Q.    And Dr. Garrison's report is dated September 7th of

7    the year 2000, to you?

8         A.    Yes, sir.

9         Q.    Correct.  And Dr. Krusz' report is dated -- I don't

10   even know if there is a date on there.

11        A.    There is --

12        Q.    Yes, 6-1 of the year 2001, June the 1st, the year

13   2001.  You've had an opportunity to examine Defendant's

14   Exhibit Number 10?

15        A.    Yes, I have.

16        Q.    Is that right?

17        A.    Yes, sir.

18        Q.    Needless to say, Doctor, as the jury already knows

19   and as you will soon find out, I have absolutely no medical

20   experience at all.

21              What does Dr. Krusz' report tell you that is any

22   different from Dr. Garrison's report?

23        A.    Dr. Garrison's report did not note any -- any damage

24   based on his examination and testing to the median or ulnar

25   nerves.

1      Q.    All right.  And would you please explain to the jury

2    what Dr. Krusz reports in his report?

3      A.    Well, to get down to the conclusion, he suggests

4    some kind of -- he calls it axonal neuropathy which is kind

5    of -- to put it in more simple terms is some kind of damage

6    to the median nerve.  Axons are nerve cells.  And a

7    neuropathy is some kind of disorder.  And he also stated that

8    he felt that the ulnar nerve sensory conduction or the nerve

9    that supplies this part of the hand, mainly the small finger

10   and half of the ring finger, he stated the amplitude was

11   low.  And when I say amplitude, they have an machine, almost

12   like an oscilloscope that an electrician uses that makes

13   little waves.  And that reflects nerve activity.  And so the

14   nerve -- certain nerves will have certain amplitude meaning

15   how big the spike is on the screen.  And so if he's stating

16   that it was low, it means it's slightly lower than the

17   average height of the spike on the screen or on the sheet

18   that he reads which may be -- may have implication as to how

19   the nerve is functioning.

20      Q.    Doctor, further on the first page of Defendant's 10

21   at the very bottom of that page, he states in his neurologic

22   examination, sensory:  "There is a loss of sensation to

23   pinprick, light touch and temperature on the ventral side of

24   all four digits, the left side and on the side of the thumb

25   opposing the second digit."

1          What does that mean?

2      A.    That would be -- the ventral side is the palm side

3  of the fingers, so he's talking about the four fingers and

4  he's talking about that area we were discussing yesterday on

5  this side of the thumb opposing the index finger.  The dorsal

6  part of the hand would be the back.

7      Q.    If you were to -- if you were treating Mr. Murphy

8  and if you were to receive this report from Dr. Krusz, what

9  would be -- Dr. Krusz just did an evaluation.  There is

10  nothing in here about treatment.  What kind of treatment

11  would you give Mr. Murphy?

12      A.    Well, I'm not real clear on what kind of treatment I

13  could give Mr. Murphy.  Basically the report states that

14  there are -- he feels there are some disorders, some slowing

15  of the velocity in the ulnar sensory pattern and in the

16  median sensory pattern.  I felt when I read his raw data or

17  his numbers that he obtained, these numbers here which are

18  kind of -- what I was talking about before, with the spikes

19  and then the speed, the speed to which an impulse on a nerve

20  will travel through the hand, there was some abnormality, but

21  the numbers show it as not to be particularly severe.  And

22  also -- and it might be just a limitation of how he was

23  supposed to carry this out.  It doesn't really say at what

24  level necessarily the disorder is located.

25      Q.    What do you mean level the disorder is located?

1    A.   Well, for instance, if you're testing somebody for

2    carpal which is a peripheral nerve disorder, sort of what

3    we're talking about, they'll test at several levels.  They'll

4    go from the arm to the forearm, to the wrist, to the hand.

5    And usually you'll see a slowing or some kind of effect at

6    the carpal tunnel and sort of proves that that's where the

7    nerve problem is.

8         On his testing it shows some abnormalities in the

9    hand, but it didn't really suggest where exactly the -- and

10   this isn't an exact science, but it didn't -- didn't really

11   give a good idea of where that problem was, so to speak.

12   Q.   Is there any other conclusions you've come to after

13   reading this report?

14   A.   Well, based on my interpretation of this report,

15   it's kind of confusing in the sense that the numbers don't

16   seem to show a real severe change in sensation, or as

17   evidenced by these numbers which are an objective finding, it

18   doesn't show something like complete numbness.  It doesn't

19   show that there's no nerve impulses going through.  They're

20   going through.  There are slight changes which you can say

21   are abnormal.  However, they do not show that there's a

22   complete block of the nerve.  And it's not clear why this has

23   occurred to the nerve.

24   Q.   When you compare Dr. Krusz' report to Dr. Garrison's

25   report, as an orthopaedic specialist, do you see an

1  improvement, a degeneration?  What does a comparison between

2  the two reports tell you?

3      A.  Well, there's obviously a difference between them.

4  I cannot say why there's a difference.  I cannot say for sure

5  there was a degeneration or a change based on something

6  physiological.  All I can say is there's a difference between

7  the two reports.

8      Q.  Where is that difference, sir?

9      A.  The difference is in the ulnar nerve and median

10  nerve.  Dr. Garrison felt these nerves, the sensory and the

11  motor on those nerves was normal.  Dr. Krusz believes there

12  are some abnormalities, as I stated before.

13      Q.  Were there any other differences between the two

14  reports that you can see?

15      A.  Well, the two -- the two studies were done in

16  slightly different manners, so it's difficult to really

17  compare them on the details, but on the overall impression at

18  the end, Dr. Garrison, as I said, did not feel there was any

19  objective abnormalities in the median and ulnar nerves where

20  Dr. Krusz did find some abnormalities.

21      Q.  All right.  Was there any differences in the

22  conclusions between Dr. Garrison and Krusz regarding the

23  medial nerve?

24      A.  The median nerve?

25      Q.  The median nerve?

1      A.    Yes, there was.

2      Q.    What were those, sir?

3      A.    Okay.  Dr. Garrison, based on his motor or the

4  nerve's ability to move muscles in the sensory which is what

5  makes you feel, he felt they were normal.  Dr. Krusz felt

6  that there was some abnormality in the median nerve, both in

7  the motor side and in the sensory side, and also some

8  abnormality in the ulnar sensory, which it states in its

9  conclusion the ulnar sensory was slightly -- or the median

10  sensory velocity, sorry, was slightly slowed.  So like I

11  said, he is stating there are abnormalities.  However, they

12  are, according to his numbers, very slight abnormalities.

13      Q.    Do you see any other differences between the two

14  reports of a substantive medical nature?

15      A.    No, I do not.

16      Q.    Finally, one more question.  What about the

17  differences in the radial nerve?

18      A.    Dr. Krusz did not test the radial nerve, as far as I

19  can see on this report.

20            MR. BYCK:  Thank you, sir.  Pass the witness.

21                   Cross-Examination

22  By Mr. Davis:

23      Q.    Dr. Vandiver, you first had an opportunity to look

24  at Dr. Krusz' report this morning; is that correct?

25      A.    Yes, sir.

1      Q.    At the time that it was provided to the State; is

2   that right?

3      A.    Yes, sir.

4      Q.    First, I want to talk to you about the timing of

5   these two tests.  The test performed by Dr. Garrison was done

6   on September the 7th of 2000; is that correct?

7      A.    Yes, sir.

8      Q.    So that's going to be shortly -- that's going to be

9   less than one month before the murder of Bertie Cunningham on

10  October the 4th, 2000, right?

11     A.    Yes, sir.

12     Q.    The test done by Dr. Krusz is actually this year,

13  June the 1st, 2001, right?

14     A.    Yes, sir.

15     Q.    Obviously at the time that the examination was

16  performed by Dr. Krusz, this defendant was under indictment

17  and stood charged with the offense of capital murder,

18  correct?

19     A.    Yes, sir.

20     Q.    Mr. Byck asked you to talk about the neurologic

21  examination, and he specifically asked you about the sensory

22  portion where it says there is loss of sensation to pinprick,

23  light touch, and temperature on the ventral side of all four

24  digits, left side and on the side of the thumb opposing the

25  second digit.

1              First of all, let's talk about what sort of

2    examination that is, the sensory examination.  Is that

3    something that's based upon some objective scientific test

4    being performed on Mr. Murphy, or is that in response to what

5    he's telling Dr. Krusz out there in his office?

6         A.    Yes.  The examination -- first of all, the pinprick,

7    light touch, and temperature just what they mean.  They'll

8    take something cold, maybe something warm, touch it on the

9    skin and see if the patient knows that it's warm or cold.

10   The pinprick is just what it sounds like, kind of lightly

11   poking your skin to see if you respond, if you can feel it.

12   And then light touch is just what I'm doing here.  So, yes,

13   that -- the outcome of that testing is based on what the

14   patient tells the examiner.

15        Q.    Okay.  So if I go in -- if I go in to a doctor such

16   as Dr. Krusz and he performs the pinprick and he sticks -- he

17   places a pin -- when the doctors do the pinprick, are they

18   actually breaking the skin?

19        A.    No, they're not.

20        Q.    So if he takes a pin and he touches me on the

21   fingers here and I say I can't feel that, Dr. Krusz, what is

22   the sensory examination going to state in my report?

23        A.    Well, it will state just like he said, the patient

24   did not -- did not voice a response to that stimulus.

25        Q.    And if he does the light touch as you've

1  demonstrated and I say I don't feel anything, I can't feel

2  that, Dr. Krusz, is he going to say there's a loss of

3  sensation to light touch, also?

4      A.   Yes, sir.

5      Q.   And if he put something hot on my fingers or

6  something cold, and I say I don't know what you put on my

7  fingers, I can't feel the difference at all, is he going to

8  say there's a loss of sensation to temperature?

9      A.   Yes, sir, he is.

10     Q.   So that is -- that is going totally going to be

11 dependent on the truth and veracity, I suppose, of the

12 subject or the patient; is that right?

13     A.   Yes, sir.

14     Q.   I guess as a doctor when you perform an examination

15 again, you depend upon the patient to tell you the truth to

16 some extent, don't you?

17     A.   Yes, sir.

18     Q.   Now, did you get a chance to look at the history

19 that Jedidiah Isaac Murphy, the defendant in this case, gave

20 to Dr. Krusz about the 1996 injury to his left hand?

21     A.   Yes, sir, I did.

22     Q.   And I'm referring now to the statement in this

23 report that says he sustained a gunshot wound to his left

24 palm in 1996, when a .22 caliber handgun discharged and the

25 bullet fragments were removed from the dorsum of the hand?

1     A.    Correct.

2     Q.    Is that an accurate history that was provided to Dr.

3  Krusz, or was that inaccurate?

4     A.    There are differences between the history that was

5  provided to Dr. Krusz and Dr. DeHaan's assessment based on

6  his operative report and his physical examination at the time

7  of the injury.

8     Q.    In fact, it wasn't a .22 caliber handgun, was it?

9     A.    The history on the medical record that I looked at

10  from the time of the injury stated that it was a pellet.

11     Q.    Uh-huh.

12     A.    That was the word used.

13     Q.    When Mr. Murphy stated that bullet fragments were

14  removed from the dorsum of the hand, there weren't any bullet

15  fragments, were there?

16     A.    There was one single fragment, according to Dr.

17  DeHaan's operative report.

18     Q.    So this history that was given to Dr. Krusz by the

19  defendant, Jedidiah Isaac Murphy, was not correct, was it?

20     A.    It's not consistent with Dr. DeHaan's assessment,

21  no.

22     Q.    It's not consistent with any of the prior medical

23  records of Jedidiah Isaac Murphy that we've looked at, is it?

24     A.    No, it is not.

25     Q.    So when Dr. Krusz took that history, I suppose again

1   it would be fair to say that a doctor in his position, when

2   he's given that history, I guess he has to assume again that

3   the patient is being truthful with him, doesn't he?

4       A.   Yes, he does.

5       Q.   Also, is there a notation on this report concerning

6   past medical history?

7       A.   Yes, there is.

8       Q.   Now again, I want you to assume for me that Dr.

9   Krusz is getting that information from the defendant, from

10  Jedidiah Isaac Murphy.  What's the notation on Dr. Krusz'

11  report concerning past medical history?

12      A.   States unremarkable.

13      Q.   Unremarkable?

14      A.   Yes.

15      Q.   Is there also a notation for headache history?

16      A.   Yes, there is.

17      Q.   Would you assume again that this history is being

18  obtained from the defendant?

19      A.   Correct.

20      Q.   What's the notation of what Mr. Murphy told Dr.

21  Krusz?

22      A.   States there is none, no headache history.

23      Q.   Is there also a notation for pain history?

24      A.   Yes.

25      Q.   What's the notation there?

1    A.    States none.

2    Q.    Medications.  What response is on that report?

3    A.    Once again, none.

4    Q.    None?

5    A.    Yes, sir.

6    Q.    I want to go back for just a moment on this sensory

7    examination.  When we talk about a loss of sensation to the

8    ventral side of all four digits, what side of the fingers are

9    we talking about, Dr. Vandiver?

10   A.    Talking about the palm side.

11   Q.    All right.  And we're also talking about the side of

12   the thumb opposing the second digit again, would that be the

13   palm side of the thumb?

14   A.    That could be some of the palm side and some of

15   this, what you would call the side of the thumb, correct.

16   Q.    Now, the median nerve, does it -- does it innervate

17   the ventral side of any of -- any of the four fingers here?

18   A.    Yes, it innervates this -- the index finger, the

19   middle finger, half of the ring -- this half of the ring

20   finger, and the rest is a different nerve.

21   Q.    Okay.  And the rest -- the second half of the fourth

22   finger and the fifth finger are in the control of what nerve?

23   A.    The ulnar nerve.

24   Q.    So we're talking about the median nerve having the

25   first -- what I'm going to refer to as the second, the third,

1    and then a portion of the fourth; is that right?

2         A.   Correct.

3         Q.   On the ventral side?

4         A.   Yes, sir.

5         Q.   Does it also innervate the back side of any of these

6    fingers?

7         A.   Yes, sir, it innervates to about the knuckle here.

8    It innervates the back of the index, middle, and half of the

9    ring finger.

10        Q.   Doctor, did you see anything in this report that

11   indicated any loss of sensation to the back portion of these

12   fingers that the median nerve controls?

13        A.   No, that was not noted on the examination.

14        Q.   Do you find that unusual?

15        A.   Well, if you're testing a nerve damage and you want

16   to try to isolate where the nerve damage might be, it would

17   probably be prudent to test all of the entire distribution of

18   the nerves, especially a sensory nerve.

19        Q.   Okay.  Why is what?

20        A.   Because that could give you an idea of where the --

21   the pathology is located, where the nerve might be damaged,

22   if there is going to be a treatment for it.

23        Q.   Uh-huh.  And as I understand, again, the history

24   that -- or the responses given by Mr. Murphy to Dr. Krusz

25   makes absolutely no mention, does it, of having a loss of

1    sensation to the back side of the fingers that are controlled

2    by the median nerve, does it?

3        A.   No, it does not.

4        Q.   You -- you indicated that again the findings with

5    regard to the median nerve in Dr. Krusz' report, the left

6    median motor amplitude was low suggesting axonal neuropathy

7    in this trunk.  Again, could you just explain what is Dr.

8    Krusz saying there first?

9        A.   Let me just review that.

10            He's suggesting that the spike for what I was

11   talking about before, about amplitude, the height of the

12   spike was low indicating that there was evidence of some kind

13   of disorder within the nerve, based on his -- on his testing.

14       Q.   Tell us, if you will, again, just the basic

15   distinction between median motor and median sensory.

16       A.   The nerve has two functions, so to speak.  There's

17   some muscles in the hand.  Basically the hands -- the muscles

18   that oppose the thumb are controlled by the median nerve.

19   The median nerve also has a sensory function which is what we

20   discussed.  And right as the median nerve comes through the

21   carpal tunnel, right as it comes out of the carpal tunnel, it

22   splits into several branches, some of which are sensory, some

23   of which are motor.

24       Q.   Doctor, when we talk about the test results for the

25   median motor across the wrist here, okay, looking at the

1   numbers generated by Dr. Krusz, what sort of conclusions did

2   you reach concerning the median motor function?

3       A.   Except for the amplitude which is slightly

4   decreased, the other numbers, including conduction velocity,

5   which is how fast the impulses travel from one end of the

6   nerve to the other, and one can safely assume that if there

7   is significant damage to the nerve, that the conduction

8   velocity, such as in a carpal tunnel test, will be slowed

9   down to some extent.  That is not the case on the conduction

10  velocity of the median motor across the wrist which is going

11  in the hand.  And also the distal latency which is the speed

12  of which the nerve then affects the muscle or makes it do its

13  action is also not slowed down.

14      Q.   Is there anything in this test to suggest that Mr.

15  Murphy would have any difficulty actually making a fist or

16  actually being able to grab an object, such as the handle of

17  a gun and control it with the motors -- with the motor skills

18  or the muscles in his left arm or his left hand?  Anything to

19  suggest that he would have any problem doing that?

20      A.   No, not based on my interpretation of this report.

21      Q.   Now, the median sensory is the other function for

22  the nerve, correct?

23      A.   Yes, sir.

24      Q.   And looking again at the tests that were run by Dr.

25  Krusz, the median sensory, the forearm, the left side, under

1    the category of amplitude, is that WV or UV?

2        A.   Yes, it's -- I think it's -- I'm not sure what those

3    letters stand for.  It has to do with the -- with how the

4    wave looks.

5        Q.   Okay.  And Dr. Krusz' notation for that category,

6    median sensory amplitude, what did he say on his report?

7        A.   He said it was normal.

8        Q.   Normal?

9        A.   Yes, sir.

10       Q.   Which would indicate to you what?

11       A.   Which would indicate that the median sensory going

12   into the forearm and then coming up to the wrist was normal.

13       Q.   Uh-huh.

14       A.   There was no abnormality at that point.

15       Q.   Okay.  The next category being conduction velocity

16   meters per second.  Now, his finding -- as I understand, he

17   came up with a number of 49.4, correct?

18       A.   Yes.

19       Q.   What would be expected to be the normal value for

20   that particular category?

21       A.   Greater than 51 meters per second.

22       Q.   Greater than 51?

23       A.   Based on Ms. -- based on Dr. Krusz' form which shows

24   his normal values to the right, greater than 51 meters per

25   second would be the correct conduction velocity.

1    Q.   So we're talking about a shortfall of what, 1.6

2 meters per second?

3    A.   Correct.

4    Q.   From the expected normal value, correct?

5    A.   Correct.

6    Q.   Does that figure out to roughly a 3 percent

7 deviation from the expected value?

8    A.   Yes, it is.

9    Q.   And finally, the category median sensory, the distal

10 latency.  Tell us what that particular category is looking

11 at.

12    A.   It's looking at where the nerve reacts or there's

13 reaction in the nerve at the end wherever -- distal latency

14 means the end.  It could be in the wrist, but if you're

15 stimulating it up here, the distal latency would mean at the

16 end of where you're testing it, so it doesn't have to be the

17 tips of the fingers.  That means where you get a response

18 to -- you get a response to the electrode or whatever you are

19 using to see if that nerve has been stimulated.  And as soon

20 as that response occurs, then the time between the time you

21 stimulate it and the time you feel that response is where you

22 get the conduction velocity from.

23    Q.   Dr. Krusz came up with a value of 2.7 in that

24 category, right?

25    A.   Correct.

1      Q.    What would the expected normal value be for that?

2      A.    Less than 3.8.

3      Q.    Well, certainly 2.7 then would fall well within the

4   expected values there, wouldn't it?

5      A.    Yes, sir, it would.

6      Q.    So for median sensory the test results showed for

7   amplitude normal -- or distal latency, it was normal and when

8   it came down to conduction velocity, we're talking about a

9   deviation of approximately 3 percent from expected normal

10  values, correct?

11     A.    Correct.

12     Q.    When we go down there to the ulnar motor findings,

13  amplitude, Dr. Krusz found that to be normal, didn't he?

14     A.    Yes, he did.

15     Q.    Came down to conduction velocity, he found that to

16  be normal, didn't he?

17     A.    Correct.

18     Q.    And the final category of distal latency, that was

19  also normal, wasn't it?

20     A.    Yes, it was.

21     Q.    So when it came down to ulnar motor function, there

22  was nothing abnormal at all, was there?

23     A.    No, not according to this report.

24     Q.    And the only abnormality that he noted with the

25  ulnar was to the sensory where he's put down amplitude being

1    low?

2        A.    Correct.

3        Q.    Can you -- does that say anything to you

4    particularly?  Would you expect -- how do you -- how do you

5    interpret that when someone just says low?

6        A.    Well, it means they -- they don't see it the way it

7    should appear on that screen or on that readout, but one

8    thing that can happen with that is that you can have

9    inadvertent stimulus of another nerve that's close by whose

10   amplitude would be low if it was, you know, sort of labeled

11   as ulnar, but would be normal if it was labeled, say,

12   median.  So there is -- there is a possibility that either

13   that is an abnormal finding or it's based on stimulation of

14   a -- of an adjacent nerve.

15       Q.    Uh-huh.  The conduction velocity, the values

16   there -- the normal would have been expected to be at greater

17   than 52 and he found 41.2?

18       A.    Yes, he did.

19       Q.    And then distal latency, that was normal also,

20   wasn't it?

21       A.    Yes, it was.

22       Q.    So you're assuming these numbers are correct then.

23   What is your conclusion that you draw from the numbers when

24   we're talking about the ulnar sensory that -- what -- it

25   would again control the second half of the fourth and the

1    fifth finger, correct?

2        A.    Yes.   Based on his assessment, if we're assuming it

3    is the ulnar nerve indeed that was stimulated, then there is

4    a slowing of the conduction indicating some kind of

5    abnormality in the ulnar nerve.

6        Q.    When we talk about these averages or expected

7    numbers, you know, when we talk about, for instance, on the

8    ulnar sensory, the conduction velocity being -- the normal

9    being greater than 52, does every human being, including

10   every one in this courtroom, if we tested, are we all going

11   to be 52 if we're normal?

12       A.    Not necessarily.   These are numbers based on

13   averages.   There's a possibility that somebody could fall

14   below what's, quote, called normal and yet not have any

15   symptoms.

16       Q.    Okay.   So just because -- let's say if someone came

17   in there and tested out at a 47 or a, does that necessarily

18   mean that they're going to have some sort of problem with

19   their ulnar nerve sensation?

20       A.    No.   I couldn't say that for sure, no.

21       Q.    In order to make that kind of determination, let's

22   say -- and we're dealing with a supposed problem in the left

23   extremity here, what would you as a physician expect from

24   someone who is conducting these sorts of studies to do in

25   that regard?   Knowing that the average may not be the average

1    for every single individual, what would you prefer to see

2    done instead of just testing the left extremity?

3        A.   I would to -- if you have any doubt as to the

4    numbers, then the best thing to do would be to test the

5    contra lateral side, assuming it is not -- there are no

6    symptoms, there are no other damage that's known.  If you --

7    if you test the contra lateral side, then you would have a

8    better idea of what's, quote, normal for that individual.

9        Q.   In this particular case would you have preferred for

10   Dr. Krusz to have tested the right side, the right extremity,

11   the right arm of the defendant?

12       A.   In order to remove any doubt as to the veracity of

13   the numbers, that, in my opinion, would have been a good

14   idea.

15       Q.   Do you think that would have been helpful to

16   determine whether or not, for instance, when we're talking

17   about median sensory, to determine whether or not 49.4

18   instead of 51 is actually the average that you would expect

19   to see in Jedidiah Isaac Murphy?

20       A.   Correct.

21       Q.   Same be true I suppose when we're talking about the

22   ulnar sensory readings.  Would it have been helpful and

23   useful for you as a doctor to have the numbers run on the

24   right arm with regards to the ulnar nerve to see if that's

25   abnormal for him or whether it falls within the normal

1  category for Jedidiah Isaac Murphy?

2      A.   Yes, that would have been helpful.

3      Q.   That was not done, was it?

4      A.   No, sir, it was not.

5      Q.   Finally, Doctor, I want to -- I want to go down to

6  the final portion of this report, central responses.  What

7  does central responses mean to you as a doctor?

8      A.   Central responses have more to do with the -- the

9  overall function of the nerve, such as where it comes out of

10  the -- out of the cervical spine, comes down around the front

11  of the shoulder, and goes all the way down, all the way to

12  the end where it's function is.  So it has more to do with

13  the overall functioning of the nerve, not necessarily where

14  the nerve might be malfunctioning at one certain point.

15      Q.   Uh-huh.  If it is malfunctioning?

16      A.   Correct.

17      Q.   I want to read this statement to you, and I want you

18  to tell me whether you agree or disagree with this based upon

19  the numbers provided to us by Dr. Krusz.  Says:  "Left median

20  H reflex and F wave is markedly prolonged; this is also true

21  for the ulnar nerve.  This suggests profound neuropathy in

22  both nerve trunks."

23      A.   Correct.

24      Q.   Do you agree with that statement?

25      A.   Well, his numbers, according to how he tested,

1   obviously he found that they were prolonged.  However, when

2   he uses the word "trunks," I'm not sure if he's referring --

3   if you see a picture of the nerve, something called the

4   brachial plexus which is where the nerves all come out of the

5   side of your neck and they all kind of crisscross around and

6   they -- when they come out of your neck, they're not called

7   ulnar and regular nerves.  The nerve roots, they have numbers

8   just like your vertebrae have numbers.  And they kind of

9   crisscross, and then they come out at the end as the three

10  main nerves and also a couple of additional nerves that you

11  have in your upper arm.  So it's hard to tell whether he's

12  talking about the motor distribution or the sensory

13  distribution, what that means.

14          Now, I can tell you that on his form here, when he's

15  talking central responses, he's testing a muscle.  So it

16  could be that the abnormal response may have to do with --

17  with the muscle and not with the -- or the motor part of it

18  and not with the sensory part of it.

19          Another possibility is that when he uses the word

20  "trunk," there is a certain portion of that nerve plexus

21  where the nerves are called trunks.  And also you can say the

22  main nerve coming down the arm is a trunk because it's a main

23  like a cable.  So it's not clear if he's talking about an

24  abnormality showing up here or an abnormality anywhere along

25  the nerve itself before it branches out.

1    Q.   Do you agree with the characterization of neuropathy

2    being profound based on the numbers that you have before you?

3    A.   No, I do not.

4    Q.   So that I'm -- so that I'm clear here, did I

5    understand you to testify earlier that the numbers do not

6    show a complete numbness in the fingers of Jedidiah Murphy?

7    A.   No, based on this report there is a -- there is a

8    response in the fingers that would indicate that there are

9    impulses getting through.  I do not believe that one could

10   determine that there is complete loss of sensation based on

11   this test.

12   Q.   Thank you, Dr. Vandiver.

13           MR. BYCK:  Nothing further.

14           THE COURT:  Thank you, Doctor.  You again may

15   be excused.

16        Consistent with prior representation by counsel --

17           MR. BYCK:  Yes, Your Honor.

18           THE COURT:  Mr. Byck.

19           MR. BYCK:  Yes, Your Honor.

20           THE COURT:  Ladies and gentlemen, we'll stand

21   in recess until tomorrow morning.  You -- we're going to be

22   here before you are, but you need not be here until 9:15

23   tomorrow morning.  Let me give you a bit of an indication of

24   where we are just for your own life away from the Crowley

25   Courts Building.

1          We anticipate finishing all of the testimony

2     tomorrow before noon.  I have put both sides on alert that if

3     there is anticipated rebuttal evidence, to have those

4     witnesses available awaiting their opportunity to come right

5     into the courtroom so there will not be hopefully any delays.

6     Hope to conclude all of the testimony in the trial by noon.

7     Therefore you will be free to go about your own personal or

8     business life from noon onward until Monday morning.  We are

9     going to stay tomorrow afternoon and work on the Court's

10    charge, the instructions that I by law am required to give to

11    you before the attorneys make their summations or final

12    arguments, if you will, and before you begin your

13    deliberations.  So you'll have the entire weekend without

14    having to worry anymore about this than you normally would.

15         When you return Monday morning, it is anticipated

16    that charge will be prepared, ready for you to come out into

17    the courtroom.  I will read it to you.  The attorneys will

18    make their summations.  You will then be given an opportunity

19    to deliberate.  So hopefully that gives you a bit of an idea

20    of what you can anticipate tomorrow and the first part of

21    next week.

22         Have a good evening.  See you tomorrow morning, 9:15

23    a.m.

24              THE BAILIFF:  All rise.

25              (Jury excused from courtroom.)

DARLINE W. LABAR, OFFICIAL REPORTER

1                    Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4            I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13           I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16           Witness my hand this the 28th day of October, A.D.,

17   2001.

18

19

20                    DARLINE W. LABAR
21                    Official Court Reporter
                      194th Judicial District Court
22                    Dallas County, Texas
                      (214) 653-5803

23

24

25   Certification No. 1064 Expires December 31, 2002

REPORTER'S RECORD     **74145**

VOLUME 51 of 65 VOLUMES

TRIAL COURT CAUSE NO. F00-02424-NM

THE STATE OF TEXAS          :          IN THE DISTRICT COURT

VS.                         :          DALLAS COUNTY, TEXAS

JEDIDIAH ISAAC MURPHY       :          194TH JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS BY JURY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

FILED IN
COURT OF CRIMINAL APPEALS

DEC 5 2001

Troy C. Bennett, Jr., Clerk

A P P E A R A N C E S:

HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building
        Dallas, Dallas County, Texas  75207
        Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
            FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
        Phone:  214-653-9400
            FOR THE DEFENDANT.

\*\*\*\*\*\*\*\*

On the 8th day of June, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

        Proceedings reported by machine shorthand, computer

assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER     ORIGINAL

1                          INDEX VOLUME 51

2     June 8th, 2001                              PAGE      VOL.

3     Proceedings.....................................  2       51

4     Defense Rests.................................. 38       51

5     Both Sides Close.............................. 38       51

6     Reporter's Certificate........................ 51       51

7

8                     CHRONOLOGICAL WITNESS INDEX

9                     DIRECT          CROSS        VD       VOL.

10    DR. JOHN KRUSZ          2                             51

11    DR. JOHN KRUSZ          7, 37           24            51

12    JEDIDIAH ISAAC MURPHY 39                              51

13    RAY LaPERE             41, 45          44            51

14

15                    ALPHABETICAL WITNESS INDEX

16                    DIRECT          CROSS        VD       VOL.

17    DR. JOHN KRUSZ          2                             51

18    DR. JOHN KRUSZ          7, 37           24            51

19    RAY LaPERE             41, 45          44            51

20    JEDIDIAH ISAAC MURPHY 39                              51

21

22              *No Exhibits Adimitted This Volume*

23

24

25

PROCEEDINGS

1

2      THE COURT:  Let the record reflect this

3   hearing is being conducted in open court, outside the

4   presence and hearing of the impaneled juror and the one

5   alternate.  The accused, Jedidiah Isaac Murphy, will be

6   present in court at all times during this hearing.  The

7   hearing is occasioned by Texas Rules of Evidence Rule 705.

8          Is the State prepared to proceed with the 705

9   hearing with Dr. Krusz?

10      MR. DAVIS:  The State's ready, Your Honor.

11      THE COURT:  Is the defense prepared to

12   proceed?

13      MR. BYCK:  Yes, Your Honor.

14      THE COURT:  Good morning, Doctor.  May I ask

15   you to raise your right hand.

16          (Witness sworn.)

17      THE COURT:  Thank you very much.  You may

18   lower your hand, sir.

19      Counsel may proceed.

20      MR. DAVIS:  Thank you, sir.

21          DR. JOHN KRUSZ

22   was called as a witness by the State and, after having been

23   first duly sworn, testified as follows:

24              Direct Examination

25   By Mr. Davis:

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.   Would you please state your full name for the

2   record?

3     A.   John Claude Krusz.

4     Q.   You're a medical doctor; is that correct?

5     A.   Yes, sir.

6     Q.   Dr. Krusz, the purpose of this hearing is simply to

7   have you elicit for me what opinions that you intend to

8   express to this jury.  Would you please tell me what expert

9   opinions you do intend to talk to this jury about?

10     A.   To address findings relating to nerve conduction

11   velocity studies and a neurologic exam I performed on Mr.

12   Murphy.

13     Q.   So as I understand then, your opinion will be

14   limited to whatever opinions generally are found in your

15   report that's entitled "Initial Neurologic Evaluation"; is

16   that correct?

17     A.   Yes, and the implications thereof.

18     Q.   Okay.  And can you tell me what implications thereof

19   that you intend to express, because I've had the opportunity

20   to read your report.  What -- what conclusions will you be

21   expressing as a result of your evaluation?

22     A.   I don't have my report in front of me, so if I could

23   possibly see that.

24           THE COURT:  Absolutely.

25           (Exhibit handed to doctor.)

1       A.    My impression obviously is limited to the sense --

2   motor and sensory findings as above relating back to the

3   neurologic examination.  And then of course there's separate

4   data relative to testing individual nerve trunks so that

5   would be primarily the data that I would speak to.

6       Q.    (By Mr. Davis)  Okay.  So as I understand, you're

7   basically going to explain the data that you obtained during

8   the test --

9       A.    Yes, sir.

10      Q.    -- is the correct?  You'll explain what that means.

11      A.    Yes, sir.

12      Q.    And then I take it that you will be talking in some

13  greater detail about whatever conclusions that you drew from

14  the data?

15      A.    Yes.

16      Q.    All right.  Your report states that you -- that you

17  found profound neuropathy in both nerve trunks; is that

18  correct?  They're the findings --

19      A.    One portion of it does say that, yes.

20      Q.    All right.  Specifically what -- what opinions do

21  you intend to offer concerning Mr. Murphy's loss of sensation

22  in his four fingers?  What -- just in general can you tell me

23  what your testimony will be in that regard?

24      A.    Well, in general my testimony will relate to his

25  lack of ability to feel certain kinds of sensations in his

1   left land but not his right, various aspects of various

2   digits.  And I believe you asked me specifically about

3   sensation?

4       Q.   Yes, sir.  How about the motor function of his left

5   hand?

6       A.   Testimony will speak to various diminished capacity

7   to have motor strength, again, in various digits of his left

8   hand.

9       Q.   Okay.  In reaching those opinions, can you tell me

10  what documents, if any, that you relied upon?  Were you

11  provided with any documents in this case?

12      A.   No, I was not.

13      Q.   Specifically have you been provided with any of the

14  medical records of Mr. Murphy?

15      A.   I have not.

16      Q.   Were you provided with any sort of police reports to

17  review?

18      A.   No, I have not.

19      Q.   Were you provided with any photographs in this case

20  to review?

21      A.   No, I have not.

22               MR. DAVIS:  That's all I have, Judge.

23               THE COURT:  Mr. Byck.

24               MR. BYCK:  One thing, Your Honor.  Dr. Krusz

25  has a curriculum vita that evidently is somewhere in his

1    computer.  We would offer that CV for record purposes only,

2    and we would ask the indulgence of the Court and the District

3    Attorneys Office.  If Dr. Krusz could download it, either

4    into a computer, at some time other than this.  Is there

5    any --

6              MR. DAVIS:  I don't have any objection to

7    that.

8              THE COURT:  Defense request is granted by the

9    Court.

10             MR. BYCK:  Thank you.  We're ready for the

11   jury.

12         And, Your Honor, Dr. Krusz is on call at

13   Presbyterian Hospital.  If he is paged, we're just going to

14   have to terminate our interview at that time.

15             THE BAILIFF:  All rise.

16             THE COURT:  Let the record reflect the jury is

17   returning to the courtroom at this time.

18             (Jury returned to courtroom.)

19             THE COURT:  Ladies and gentlemen, you may be

20   seated.

21         Mr. Murphy, counsel, visitors in the gallery, you

22   may be seated.

23         Ladies and gentlemen, there was a hearing outside of

24   your presence before coming into the courtroom.  This witness

25   has been sworn in.  He is under oath.

1             Defense may proceed.

2                  MR. BYCK:  Thank you, Your Honor.  May it

3    please the Court.

4                      DR. JOHN KRUSZ

5    was called as a witness by the Defendant and, after having

6    been first duly sworn, testified as follows:

7                      Direct Examination

8    By Mr. Byck:

9       Q.   Sir, would you give your name and spell your last

10   name for the court reporter?

11      A.   John Claude Krusz, K-r-u-s-z.

12      Q.   And you are a medical doctor?

13      A.   Yes, sir.

14      Q.   Dr. Krusz, could you give us a brief description of

15   your educational background, employment, and experiences that

16   qualify you to hold both your -- you're a psychiatrist as

17   well as a medical doctor; is that correct?

18      A.   No, I'm trained as a neurologist, trained as a

19   physician with specialty training in neurology.  I have

20   boards in neurology and psychiatry.

21      Q.   You are board certified in psychiatry.

22      A.   In neurology and psychiatry.

23      Q.   In neurology and psychiatry.

24      A.   Yes.

25      Q.   Separate boards?

1    A.    No, it's a common board.

2    Q.    It's a common board.

3    A.    Yes.

4    Q.    And where did you go to school, sir?  What is your

5    educational background?

6    A.    I have an undergraduate degree in pharmacy and a

7    graduate degree in neuropharmacology.

8    Q.    From where?

9    A.    Down State Medical Center in New York.  I have a

10   medical degree from university -- State University of New

11   York in Buffalo, and then residency training at Baylor and

12   back in Down State Medical Center in neurology.

13   Q.    How long have you been practicing medicine?

14   A.    In Dallas, since 1987.

15   Q.    And before that?

16   A.    Well, I was doing my residency training.

17   Q.    I see.  And, Dr. Krusz, how are you currently

18   employed?

19   A.    I'm in private practice.

20   Q.    And are you the consulting neurologist for

21   Presbyterian Hospital?

22   A.    I'm just one of the attending doctors there.

23   Q.    But you are on call this particular month, aren't

24   you?

25   A.    Yes.

1      Q.    Okay.  Doctor, on June the 1st of this year, did you

2   have an occasion to conduct a neurologic evaluation of Mr.

3   Jim Murphy?

4      A.    Yes, I did.

5      Q.    And essentially what did that examination consist

6   of?

7      A.    Well, the exam was essentially limited to his left

8   upper extremity in terms of obtaining some history of various

9   traumas that he had sustained to -- to that hand.  We didn't

10  focus on general physical or neurological examination.  My

11  understanding was the purpose was to specifically address

12  problems that he was experiencing with his left arm, left

13  hand.

14     Q.    Now, concerning Mr. Murphy's medical history, did

15  you take a brief medical history from him?

16     A.    Only that -- yes, I mean, in one sentence that he

17  had been in good health prior to -- other than sustaining the

18  traumas to his left hand.

19     Q.    And what traumas did he tell you that he sustained?

20     A.    Three.  He had sustained a gunshot wound to his --

21  to the palm of his left hand, requiring surgical extraction

22  of bullet fragments through the -- to other side of his hand,

23  surgically.  That was in 1996.  He had also sustained a

24  second injury to his left thumb in June of 2000, such that he

25  had snapped his thumb backwards, was accident at work, and

1    that in turn required more surgical repair of the base of his

2    thumb joint.  And he had sustained a third self-inflicted

3    wound to his -- well, to an area above his wrist about a

4    month ago.

5        Q.  And, Doctor, if that -- if the gunshot wound was not

6    truly a gunshot wound but a pellet gun wound, would that make

7    any difference in the test and evaluation that you ran?

8        A.  It could.  Pellets typically will scatter, and since

9    the location of a pellet gun wound would -- you're in an area

10   where you have sort of a break up of two major nerve trunks

11   that supply your digits or fingers.  Theoretically, scatter

12   from a pellet gun wound could affect more than one nerve

13   trunk per se.

14       Q.  Did you see any independent physical corroboration

15   of Mr. Murphy's claims of prior injury?  Scars?  Surgical

16   incisions?  Wounds?  Anything like that?

17       A.  Well, as I commented, he does have several

18   well-healed scars, partially healed scars in one case.  But

19   as far as well-healed scars, he has a long -- we call it a

20   transverse scar across his mid palm, and he has a second scar

21   that's also well healed on what we call the dorsum of the

22   hand, the other side of the palm.  Those are two well-healed

23   scars which are easily to be found.

24       Q.  Now, you conducted a neurologic examination --

25       A.  Yes.

1    Q.   -- of his hand, and you did a sensory examination;

2    is that right?

3    A.   That's correct.

4    Q.   And what does that sensory examination consist?

5    A.   Well, a sensory exam basically regardless of what

6    body part you're testing sensation, you can really only test

7    three or four major sensations, light touch, temperature,

8    sharp sensations, pin prick.  In some cases one can test

9    whether a person can perceive the distance between two pin

10   pricks.  In some cases one could test what we call

11   graphesthesia which is the drawing of a symbol or number or a

12   letter of the alphabet on the skin.  Those are probably

13   really all the sensations you can really test on a person

14   regardless of what body part you test it on.

15   Q.   All right.  And you conducted these sensory tests on

16   Mr. Murphy's left hand; is that correct?

17   A.   I did.

18   Q.   And, Doctor, I -- I would imagine that you use a

19   needle to test the pressure or a hot -- something hot and

20   cold?  You describe to me how you would test this.

21   A.   Well, we can use hot and cold objects, and we often

22   use really a tuning fork that is aluminum so at room

23   temperature it stays cold.  And for -- detecting changes in

24   how one perceives cold, it's usually quite sufficient, so we

25   did use that.  Didn't use any hot -- any particular hot

1    object at all to test heat sensation.  For pin prick, we

2    usually have a -- what we call a Wartenberg wheel.  It's just

3    a rolling wheel with pins.  It's sort of like a wheel with

4    many spokes and that can test sharp sensation.

5        Q.   Now, if an individual wanted to fool you, Doctor,

6    for whatever reason, wanted you to think that there was a lot

7    less sensation or a lot less -- let's talk about sensation.

8    A lot less ability to perceive sensation in their hand, when

9    you conduct these tests, would an individual be able to fool

10   you?

11       A.   Well, in some ways the sensory part of the exam is

12   sort of a -- one of the weaker links in the sense that you

13   are dependent on the feedback from the person that you're

14   testing.  But in some ways we try to build in some fail-safes

15   in the sense that you could do some of the testing at a time

16   when you -- we sort of time portions of our testing to when a

17   person's got his eyes closed or blinking.  And if you don't

18   get a reaction that you would except -- for instance, if

19   somebody is being tested with a sharp object, they'll

20   typically withdraw a little bit.  And if they don't withdraw

21   from a non-body part, you get a sense that they didn't really

22   appreciate the sharp sensation as much.

23       Q.   Doctor, how many of these neurologic examinations

24   have you conducted on let's say, hands?

25       A.   I guess thousands is probably just a rough number.

1    Q.    And have you had occasion where individuals tried to

2    fool you, tried to make you think something?

3    A.    Yes.

4    Q.    Were you able to discover that?

5    A.    At times, yes.

6    Q.    All right.  But you're not perfect.  At other times

7    it's possible you could have been fooled?

8    A.    Yes.

9    Q.    All right.  What were the results of the sensory

10   examination that you conducted on Mr. Murphy?

11   A.    Well, the major findings were that below the scar

12   line, and really speaking from the base of the last -- the

13   four digits, not counting the thumb, there was a sharp drop

14   off in the ability to perceive light touch, temperature, pin

15   prick in all four digits primarily on this side of the hand,

16   less so on this side, again, compared to the right hand.

17   Q.    All right.  And for better or for worse we have all

18   become somewhat schooled in ventral and dorsal.

19   A.    Right.

20   Q.    Which side --

21   A.    This is ventral.  This is dorsal.

22   Q.    All right.  Did you detect through your experience

23   and through your observation any faking, any lack of

24   reporting, any lack of cooperation with Mr. Murphy as he gave

25   you his responses to your tests?

1      A.    I did not.

2      Q.    All right.  You went further and conducted motor

3  tests; is that true?

4      A.    Yes.

5      Q.    And of what do they consist?

6      A.    Well, a motor exam is testing the ability of muscles

7  to contract or the power that a muscle group can generate

8  based on voluntary effort.  And so we primarily tested

9  various muscle groups in the left upper -- well, actually the

10  left and upper extremity.  For one thing -- I'm sorry, I

11  don't know if I'm answering your question actually.

12      Q.    That I would imagine would be the ability to grasp

13  an object?

14      A.    To a certain extent.

15      Q.    What other abilities?

16      A.    Well, what we do is we try to look at individual

17  groups of muscles from the standpoint of -- of the use of a

18  limb let's say.  It actually -- one begins a motor exam by

19  simple observation.  So when he was brought to the office,

20  the first second I laid eyes on Mr. Murphy, you know, you

21  observe how he walks, how he holds his shoulders, how he uses

22  his arms.  Obviously, he was handcuffed.  Those had to be

23  removed for the exam.  And so how he used his upper

24  extremities is the first part of a motor exam.  During the

25  course of history gathering and so on, just the observation

1    of how somebody sits or holds their body in space is part of

2    a motor exam, even though it's by observation, not by

3    voluntary testing.  And when we go on to do a more detailed

4    exam, as we did more in the lower regions, if you will, of

5    the outer areas of the hand, then we focus in on specific

6    muscle groups.

7        Q.   What exactly did you do to test his -- would it be

8    motor strength --

9        A.   Yes.

10       Q.   -- is that what we're talking about --

11       A.   Yes, we're talking --

12       Q.   -- in his four digits and his thumb?

13       A.   Yes.

14       Q.   What did you have him do?

15       A.   Well, we started actually more at the elbow, and his

16   strength as far as flexion and extension was normal, at least

17   equal right versus left, let's put it that way.  And I would

18   call it normal.  His strength at the wrist per se in terms of

19   again flexion and extension, this being flexion, this being

20   extension, this being flexion, was equal, so that there

21   wasn't any great disparity between the right hand and the

22   left hand.  And then we started testing individual muscle

23   groups in different kinds of movements below the wrist

24   essentially.  And so we tested his ability to grip with his

25   fingers which would be called flexion, his sort of proximal

1  flexion, distal flexion, very distal flexion.  There's

2  extension of course.  There are certain muscle groups that

3  are -- lie between the fingers that allow us to do this and

4  maintain it with force.  And then there's a whole separate

5  set of muscle groups that allow our thumb to do various

6  functions, meaning abduction, adduction, apposition, and so

7  on.  There's just a whole range of motor functions.  And so

8  we tried to test as many aspects of those as we could do.

9      Q.   All right.  And, Doctor, again let me ask you if an

10 individual wanted to fake it, wanted to give you the

11 impression that he had less strength or less ability to flex,

12 less ability to -- whichever -- whichever way, would he be

13 able to do that?  Would an individual be able to fool you

14 that way?

15     A.   It's theoretically possible that somebody can give

16 you give you what we call giveaway weakness.  In other words,

17 they can voluntarily give you less effort in an affected body

18 part in an attempt to make it look like there's less motor

19 strength.  Sure, that certainly can occur.

20     Q.   Did you observe anything like that?

21     A.   No.  From my exam, I'm reasonably certain that I

22 didn't detect any giveaway weakness per se, at all.

23     Q.   All right.  And then you conducted the nerve

24 conduction velocity test, right?

25     A.   Yes.

1      Q.    Now, that can't be faked, can it?

2      A.    No, it's just a -- it's an independent measurement

3  of how nerve trunks send their signals.

4      Q.    And that has nothing to do with report -- with the

5  individual's reporting; is that right?

6      A.    That's right.

7      Q.    And please explain to us the nerve conduction

8  velocity study that you did on Mr. Murphy.

9      A.    Nerve conduction velocity studies have -- well,

10  there are sort of two major kinds.  One you can test the

11  motor component of a nerve trunk, keeping in mind that a

12  nerve trunk is not one thing.  It's a collection of different

13  size nerves, some of which are going from the spinal cord out

14  to muscles to make them work and some of which are bringing

15  information back.  Those are called sensory nerves of which

16  there are eight or nine varieties.  So a nerve trunk is a

17  mixed item, and so you can test the motor component, the

18  component that has to do with voluntary use of muscles, and

19  then you can test the sensory component of the nerve trunk.

20  So there are two separate -- and I think that's broken out in

21  my -- sort of work sheet, but those are the fundamental basic

22  things we test.  The other things we at look are what segment

23  of the nerve trunk are you testing.  So in this case -- for

24  one -- one -- let me back up.

25           There are two major nerve trunks we typically test

1  in the upper extremity.  One is called a median nerve, which

2  typically runs down the center of the hand and goes through a

3  little tunnel.  Most people know about carpal tunnels and

4  things like that.  Well, that's the median nerve that runs

5  through a little bony tunnel.  And typically has more to do

6  with the first three fingers for motor and sensation.  And

7  then there is the ulnar nerve.  When you bang your elbow on a

8  table, it's sort of a funny bone -- it's not a funny bone.

9  It's you're banging on the ulnar nerve trunk and sending off

10  sensations into the last two nerves -- the last two fingers.

11  And so that's kind of how the hand functions are split up.

12  Primarily there's a minor component from the radial nerve,

13  but we don't typically test that.  So two nerve trunks,

14  median and ulnar, and then the question becomes what segment

15  of those nerve trunks can you reasonably test.

16           Well, the only reasonable test you can do for the

17  median nerve trunk is below the wrist crease and above the

18  wrist crease, and you can test higher, too, but for the

19  purposes of this exam it doesn't matter.  So above and below

20  the wrist crease to the median nerve trunk and for the

21  purposes of the ulnar nerve trunk really just from the

22  segment from the wrist up to the elbow, and those were the

23  segments that we tested for those two nerve trunks, both

24  motor and sensory.

25           Q.    Now, in testing those you -- you got a bunch of

1   numbers; is that right?

2       A.   That's correct.

3       Q.   And first of all, where do the normal values come

4   from?

5       A.   Well, the norms have been developed over -- probably

6   since the late 30's or early 40's when nerve conduction

7   studies were initially founded, so to speak, or discovered.

8   And technology has been developing.  But fundamentally most

9   of the data on normal is men, women, different age groups,

10  have been around since the mid 70's.

11      Q.   And differences between normal -- the normal numbers

12  and the numbers that you got on Mr. Murphy don't appear to be

13  very large.  There doesn't appear to be, you know, twenties

14  or thirties.  It's sometimes just -- for example, on your

15  median motor nerve, your amplitude, normal is 17.5, looks

16  like less than 17.5?

17      A.   A value greater than 17.5.

18      Q.   Greater than 17.5.  You know why I went to law

19  school.

20           The value that you got from Mr. Murphy is 14.6.

21  There's not a lot of difference between that, but are those

22  small differences significant?

23      A.   Well, they can be.  I mean, you have to plug

24  everything back into the entire equation.  So looking at a --

25  one number doesn't tell you anything.  It's like saying the

1    barometric pressure is 30.06, what does that mean relative to

2    what?  That is maybe a bad example.  But 14.6, you call

3    that -- it's sort of a mild axonal neuropathy.  Axonal is

4    just one kind of neuropathy.  These numbers give you a hint

5    of what kind of nerve trunk damage you're -- you may be

6    looking at.  And so an amplitude means the size of a

7    response.  So when you look at the size of the wave that you

8    generate and you measure it which is what we do -- and in

9    this particular case, you're talking about the forearm

10   meaning above -- above the wrist for the median nerve.  The

11   amplitude is down some.  It's 14.6 whereas you want it

12   greater than 17.5.  So you call that a -- if you had to

13   categorize it, I guess you'd say it's a mild motor

14   neuropathy.

15        Q.   But it's the compilation of all the numbers, and

16   it's not a additive function I take it.  It's a calculus.

17        A.   Well, you're looking -- yeah, it's -- you're sort of

18   looking at everything.  I mean, conduction velocity counts.

19   The distal latencies, how long it takes a signal to traverse

20   from the stimulation point to the recording point.  That

21   counts as well.  And that's the purpose of the nerve

22   conduction study is to give us sort of objective data about

23   how a signal travels down a nerve trunk, or in the sensory

24   case up a nerve trunk.

25        Q.   Doctor, would it be important in establishing -- I

1    don't know, in establishing what to measure the nerve

2    conduction of the other hand, of the right hand?

3         A.   In the absence of any clinical symptoms relating to

4    that extremity, it's -- I suppose you could make a case for

5    doing it, but the expectations would be that the values would

6    be in the normal range.

7         Q.   All right.  Doctor, as a result of your examination

8    of Mr. Murphy, you said that the -- there is some profound

9    neuropathy in both nerve trunks.  Now, what nerve trunks are

10   you talking about, in terms of that neuropathy?

11        A.   Well, that relates -- that sentence relates to the

12   central responses part of the test.  That's a little

13   different from the nerve conduction study.  Central responses

14   are another way of getting information about sort of the

15   global way a nerve trunk carries a signal.  Basically the

16   central response is a measure of the conduction time from the

17   stimulation point up to the cervical spinal cord and back

18   again to a recording point down here.  So you're looking at

19   the transient time, if you will, for a signal.  And that

20   gives you a sense globally of how intact, how intactly

21   functioning is a nerve trunk.  So it gives you a hint of

22   whether there's neuropathy or not.

23        Q.   You got through your examinations more than a hint

24   of neuropathy, didn't you?

25        A.   Well, there was -- there were -- there certainly is

1    neuropathy.  I mean, it's greater below the wrist of the

2    median motor nerve.  It's -- the amplitude is really down, so

3    it's really a severe neuropathy blow the wrist, but again not

4    a great surprise in view of the history.

5        The ulnar sensory showed some low amplitude.  Again,

6    not a surprise, given the thumb injury.  So there's no

7    surprises here based on the history.  The central responses,

8    again, were quite prolonged.  The values that we generated in

9    both median and ulnar nerve do suggest there are really

10   marked degrees of neuropathy in both trunks.

11       Q.   And would you describe for the jury in laymen's

12   terms the practical effect of that neuropathy on the

13   operation of Mr. Murphy's left hand?   Does he have less

14   sensation or less gripping ability, or you tell us?

15       A.   Well, we didn't discuss the motor findings, but

16   again, the ability to use thumb properly certainly was born

17   out on the motor exam.  The ability to maintain finger

18   strength was weaker in the left hand.  The ability to flex

19   distally in the left hand was weaker compared to the right.

20   So I mean on exam there's that kind of data.  That -- that

21   there's -- neuropathy type data on the motor conduction

22   study, at central response, fits the clinical exam.  I mean,

23   you can look at it one of two ways.  You can do -- do a

24   clinical exam first, which is what I did, and then

25   corroborate your clinical findings by looking at sort of

1    objective data.  Or you can generate objective data first not

2    knowing anything about the person and then go and do an exam

3    and see whether the exam bears out motor and sensory findings

4    in both nerve trunks.  So we don't have the luxury of having

5    done it the second way.  We did the exam first and generated

6    the data second.  But in point of fact, the data fits the

7    clinical exam.

8         Q.    And is it your conclusion then that Mr. Murphy does

9    have neuropathy to the extent that he would lose some

10   sensation or have some numbness in his fingers and his thumb

11   of his left hand?

12        A.    Yes.  As clinically born out, I think he does have

13   loss sensation below the scar on the ventral side.  And he's

14   got loss of sensation on one half of the thumb from the thumb

15   injury.  And that forces him because of lack of knowing where

16   his -- all of that translates into other potential

17   consequences in the sense that in effect with eyes closed,

18   his brain doesn't know where the tips of his fingers are or

19   where the side of his thumb is because the brain is very

20   dependent on what we call proprioceptive type information.

21   And proprioception is just a fancy word for feedback about

22   the position of extremity part in space.  So even with eyes

23   open, there can be difficulty when you have numbness in -- in

24   manipulating fine objects, in picking up a staple or

25   something small, things of that nature.

1          MR. BYCK:   Thank you, Doctor.   Pass the

2     witness.

3                    Cross-Examination

4     By Mr. Davis:

5          Q.   Doctor, would you consider a .22 caliber pistol to

6     be a fine object?

7          A.   A --

8          Q.   Fine object?

9          A.   No, I would not.

10          Q.   Dr. Krusz, you and I met for the first time this

11     morning; is that correct?

12          A.   Yes, sir.

13          Q.   You were asked to see this individual.   Had you

14     ever -- had you ever evaluated an individual who was accused

15     of capital murder before?

16          A.   Yes.

17          Q.   Okay.   Would you agree with me that when the

18     defendant came in to give you certain information, that he

19     had a clear motive not to tell you the truth in this matter?

20          A.   I suspect that could be true.

21          Q.   Did you understand what his claims would be in this

22     particular case?

23          A.   I asked no questions about anything to do with this

24     case, of this gentleman.

25          Q.   Okay.   So I understand that no police reports were

1    provided to you?

2        A.   That's correct.

3        Q.   Okay.  No summaries of testimony?

4        A.   None.

5        Q.   So that when -- when you came in and you took the

6    history from this individual -- and first of all, that's a

7    normal part of every examination, isn't it, to take a history

8    from a patient?

9        A.   Yes.

10        Q.   What's the purpose of taking a history?

11        A.   Well, it's to get a sense of what the problem that

12    they're seeing you for, how it started, when it started,

13    circumstances of how it's progressed, historical features of

14    it.

15        Q.   Uh-huh.  Okay.  I mean, that's a very helpful part

16    of an examination for you as a physician, correct?

17        A.   Well, it can be, yes.

18        Q.   And when a patient gives you a history, I take it

19    you expect the individual to tell you the truth about his

20    history, don't you?

21        A.   I do.

22        Q.   All right.  And when the defendant gave you a

23    history in this matter that in 1996, that a .22 caliber

24    handgun had discharged and that bullet fragments had lodged

25    in his hand, I take it you took him at his word, didn't you?

Page 26

1    A.   I did.

2    Q.   I mean, you've -- have you had people who would lie

3    about their history before?

4    A.   Yes.

5    Q.   You can detect that sometimes, can't you?

6    A.   Sometimes.

7    Q.   Sometimes you can't?

8    A.   That's correct.

9    Q.   In this particular instance, sir, did you know that

10   the defendant had lied to you about the history he gave you

11   of that injury?

12   A.   No.

13   Q.   Okay.  Were you ever provided with any of the

14   medical records concerning prior medical care that Mr. Murphy

15   may have received to his left hand?

16   A.   No.

17   Q.   Specifically, have you ever had the opportunity to

18   review the records from Doctors Hospital in New Boston,

19   Texas; the records from Wadley Regional Medical Center in

20   Texarkana; the records from St. Michael's Hospital in

21   Texarkana; the records of Dr. Jeffrey DeHaan in Texarkana;

22   the records of Dr. William Vandiver from Kaufman, Texas; or

23   the records from Dr. James Garrison in Dallas and Kaufman?

24   A.   I have not.

25   Q.   So you have no idea whether this individual has

1   given different accounts of his history to other doctors,

2   have you?

3        A.   I do not.

4        Q.   You're not aware then, Doctor, that when this

5   defendant came in to the Doctors Hospital in New Boston in

6   1996 for treatment of his hand, that x-rays were taken of his

7   left hand?  You don't know that?

8        A.   No.

9        Q.   Have you had an -- well, since you don't know that,

10  I take it, that you don't know that x-rays indicated that a

11  pellet was lodged in his left hand rather than a .22 caliber

12  bullet.  You're not aware of that, are you?

13       A.   No.

14       Q.   You're not aware that there were no bullet

15  fragments, that simply there was a single pellet lodged in

16  his hand.  You're not aware of that, either, are you?

17       A.   No.

18       Q.   The defendant gave you a history that he had

19  suffered numbness in his second, third, fourth, and fifth

20  fingers since the date of that injury.  Were you aware that

21  when he came into the hospital prior to surgery, that he

22  complained only of loss of sensation to the third, fourth,

23  and fifth fingers?

24       A.   I'm not aware of that.

25       Q.   Are you aware that surgery was performed on the left

1    hand?  I take it that you assumed that from the scars that

2    you saw?

3       A.   And from his history, yes, sir.

4       Q.   All right.  Were you aware that Dr. DeHaan, the

5    orthopaede who performed the surgery, specifically noted that

6    there was no lacerations to the median nerve of his left

7    hand?  Are you aware of that?

8       A.   Not aware of that, no.

9       Q.   Are you aware that two weeks after the surgery that

10    Mr. Murphy came back to St. Michael's Hospital in Texarkana

11    and at this time his only complaint was numbness to the

12    fourth and fifth fingers of his left hand?  Are you aware of

13    that?

14       A.   No.

15       Q.   Were you even aware that Mr. Murphy had already

16    undergone another nerve conduction velocity study by another

17    physician back in 2000?

18       A.   No.

19       Q.   Do you know a Dr. James Garrison?

20       A.   Yes.

21       Q.   What do you know of Dr. Garrison?

22       A.   He's an excellent physiatrist.

23       Q.   Basically he practices physical medicine, right?

24       A.   Correct.

25       Q.   And in that field he would sometimes perform the

1  same type of neurologic exams or tests that you might

2  perform, correct?

3      A.    Correct.

4      Q.    So as I understand, you were not aware that on

5  September the 7th of the year 2000, that he in fact performed

6  nerve conduction studies to the left thumb of Jedidiah

7  Murphy?

8      A.    No.

9      Q.    You've never been provided with a copy of his

10 report?

11     A.    No.

12     Q.    So you don't know what the results of those tests

13 may have been prior to the time that you actually saw him and

14 conducted your own nerve conduction studies?

15     A.    No, sir, I do not.

16     Q.    Again, the sensory portion of this test, that's

17 subjective, isn't it?

18     A.    Yes.

19     Q.    I believe your testimony was that you're dependent

20 on the information given to you by the patient?

21     A.    Yes.  I called it sort of a weak link in the

22 neurologic exam.

23     Q.    Again, sometimes people come in and they try to fool

24 you, sometimes they don't, correct?

25     A.    Correct.

1    Q.   So the vast majority of people don't try to fool

2  you, do they?

3    A.   That's correct.

4    Q.   Sometimes you're able to catch them.  Sometimes you

5  can't catch them.

6    A.   True.

7    Q.   And as I understood you to say that you knew that

8  the defendant had suffered an injury back in 1996 that

9  required surgery to his left hand.  You were also aware of a

10  thumb injury in the year 2000.  And then you were made aware

11  of an injury to the defendant's left wrist that occurred

12  sometime in May of the year 2001, correct?

13    A.   Yes.

14    Q.   Were you given any medical records from the injury

15  that occurred in May 2001?

16    A.   I was not.

17    Q.   Now, an injury to the wrist certainly could have an

18  affect upon the motor and the sensory functions of nerves in

19  the hand blow the wrist, couldn't it?

20    A.   It could, but -- except that that particular

21  location would be sort of unlikely to do that.

22    Q.   Still it's possible, isn't it?

23    A.   Only if you were miswired, I guess.

24    Q.   Uh-huh.  I want to talk to you about the findings of

25  your nerve conduction studies.  First of all, going back

1   again to the motor function for the median nerve, can you

2   tell the members of the jury precisely what muscles and what

3   fingers would that particular motor function control in the

4   left hand?

5       A.   Well, the median nerve has a lot of functions that

6   relate to thumb functioning so the ability to pick up your

7   thumb to hitchhike would be a classic example of almost pure

8   median nerve directed motor function.  Then various ways of

9   moving your thumb in space, including the ability to do this,

10  make an okay sign and hold it tightly would also be in part

11  median nerve directed, but certainly the median nerves also

12  supplies the first three fingers really -- first two and a

13  half fingers, so motor functions relating to flexion would be

14  more median nerve directed.  And of course there are -- there

15  are also -- I think you asked me specifically about motor

16  function?

17      Q.   Yes, sir, about motor.

18      A.   Yeah.

19      Q.   Right.  So it's basically the flexion.  It's the

20  ability to, what, oppose the thumb to the second finger --

21      A.   Yes.

22      Q.   -- would be another function, and also the ability

23  to flex the thumb?

24      A.   Portions of flexion, extension, apposition,

25  abduction, adduction.

1        Q.   But basically as you're relating then, the ability

2   to grip an object, for instance, would be controlled by the

3   median motor?

4        A.   No, because that becomes a mixed nerve function.

5   The ability to grip an object at that point requires

6   coordination of median and ulnar nerves as well.   In general,

7   though we start talking about flexion in the last two digits

8   or last two and a half digits, you start bringing in ulnar

9   nerve functioning more and more, so the median and the ulnar

10   nerve trunks ultimately have to cooperate, so to speak.

11        Q.   Basically the motor -- the median motor then would

12   control the ability of the thumb, the second and the third

13   finger to grip.   The ulnar motor is now controlling primarily

14   the fourth and the fifth fingers' ability to contribute to

15   that grip; would that be fair?

16        A.   Except for a muscle here, the ulnar nerve curiously

17   enough does control the muscle that you can feel if you sort

18   of smash your thumb against your second -- your forefinger.

19   That muscle is called the first dorsal interossei, and that's

20   specifically innervated by the ulnar nerve.

21        Q.   The median motor here, the forearm, the function

22   from, what, the -- the elbow to the wrist, correct?

23        A.   Yes.

24        Q.   All right.   The values there, as far as the

25   conduction velocity study, that was well within normal,

DARLINE W. LABAR, OFFICIAL REPORTER

1    wasn't it?

2        A.    Yes.

3        Q.    Which would indicate what?

4        A.    Just that the -- well, when you do the calculation,

5    you take the distance from one stimulation point to another,

6    and then the amount of time it took.  You divide the distance

7    by the time.  The rate, the speed with which the signal was

8    conducted down the motor trunk was within normal limits.

9        Q.    Okay.

10       A.    That's all that data gives you.

11       Q.    Okay.  So this is -- this is within normal limits.

12   Now, looking across the wrist, the only abnormal number that

13   you got of the three studies was the amplitude, correct?

14       A.    Yes.

15       Q.    The conduction velocity, as a matter of fact, was

16   well within normal, wasn't it?

17       A.    Yes.

18       Q.    I mean, to be normal it had to be greater than 50.

19   You found this individual down here to have a reading of 57,

20   didn't you?

21       A.    Yes.

22       Q.    The distal latency was well within normal, correct?

23       A.    Yes.

24       Q.    And the only abnormality was a slight decrease in

25   the amplitude, correct?

1    A.   In the forearm and greater, so below the wrist.

2    Q.   Okay.  Now, you know, when you talk about this

3 individual's ability to use his left hand motor wise, you

4 didn't have the benefit of any of his work records, did you?

5    A.   No.

6    Q.   Did you know how he had been employed in the past?

7    A.   Very partially.  Just in describing the 2000 injury

8 to the thumb, he described that in a setting of a work

9 injury --

10    Q.   Okay.  Did you know that he did work that required

11 the use of his left hand to grip and to flex?  Did you know

12 that?

13    A.   Well, that was my impression that the work -- the

14 thumb injury was in -- he was using his hands at work at the

15 time of the thumb injury.

16    Q.   Did you know that in 2000 that this individual

17 worked as a welder?

18    A.   I believe he mentioned that.

19    Q.   Yeah.  And I take it since you didn't have the work

20 records, you didn't have an opportunity to speak with any of

21 his coworkers, did you?

22    A.   Did not.

23    Q.   To see how his hand had functioned in a workplace

24 setting prior to his thumb injury.  You didn't have that

25 benefit, did you?

1      A.    No.

2      Q.    Didn't have a chance to talk with Harlan Bailey of

3    Griffin Products?

4      A.    No, sir.

5      Q.    Didn't have an ability to talk with Shirley Bard of

6    R & R Designs either, did you?

7      A.    No, sir.

8      Q.    And when Mr. Byck asked you about the usefulness of

9    testing the right side against the left side, I believe your

10   testimony was that your expectations would be that the

11   results would be in the normal range, correct?

12     A.    Yes.

13     Q.    The normals simply are averages, aren't they?

14     A.    Yes, they're normed on things like ages.  And in

15   some cases the central responses, they're also normed on

16   height because it's the distance of the nerve trunk involved.

17     Q.    Yeah.  I mean, let's assume that I don't have any

18   injuries, any nerve injuries to my left hand.  If you tested

19   the conduction velocity rate for my median sensory function,

20   I believe the normal is greater than 51, correct?

21     A.    Yes, sir.

22     Q.    Is my rate going to be 51?

23     A.    It should be 51 or better.

24     Q.    Should be.  Is it possible it could be a little bit

25   lower and still be normal?  Since 51 is an average, I assume

1   there are some who are a little bit below that, there are

2   some who are a little bit above that to get an average.

3       A.   Well, these norms are taken from some reference

4   textbooks on nerve conduction velocity studies.  A colleague

5   of mine was involved in generating them, and I think most

6   people who do nerve conductions would accept these numbers --

7       Q.   Uh-huh.

8       A.   -- as valid, so, no, I think if you generate a 49,

9   it's slightly slowed.  If you generate a 53, it's normal, or

10  a 52, it's normal.  If you're right at 51, then you're at

11  the -- you know, you're right on the -- you're well -- you're

12  in the normal range.

13      Q.   So when the defendant generated a 49.4, that was

14  just slightly lower, that's all?

15      A.   Correct.

16      Q.   It wasn't profound, was it?

17      A.   No.

18      Q.   As a matter of fact, the amplitude for his median

19  sensory was normal, correct?

20      A.   Correct.

21      Q.   And the distal latency was well within normal,

22  also?

23      A.   Yes.

24      Q.   So the only deviation on his median sensory function

25  was approximately a 3 percent deviation from the normal

1    expected value on the normal conduction velocity meter per

2    se?

3        A.    Right.

4              MR. DAVIS:  No further questions, Your Honor.

5                    Redirect Examination

6    By Mr. Byck:

7        Q.    Dr. Krusz, very briefly, if the subject you examined

8    on June the 1st, Mr. Murphy, came in unconscious, unable to

9    give you any medical history, would that change your

10   conclusion -- the conclusions that you've expressed here in

11   court today?

12       A.    The only things I couldn't speak to would be the

13   motor and sensory exam.

14       Q.    Right.  He wouldn't be able to relate to that.  As

15   far as prior medical records are concerned, the examination

16   that you did showed his status on June the 1st; is that

17   correct?

18       A.    Yes.

19       Q.    Would -- would all the medical records that the man

20   had ever accumulated helped you in any way in reaching your

21   conclusions?

22       A.    Not as far as what I generated on June the 1st.

23              MR. BYCK:  Thank you, Doctor.  Pass the

24   witness.

25              MR. DAVIS:  No further questions.

1          MR. BYCK:  No further questions.  May this

2     witness be excused?

3          THE COURT:  He may.

4          (Defense Rests)

5          MR. BYCK:  Ladies and gentlemen of the jury,

6     the defense rests.

7          MR. DAVIS:  The State closes, Your Honor.

8          MR. BYCK:  And close.

9          (Both Sides Close)

10          THE COURT:  Close the testimony, Ms. King.

11          Ladies and gentlemen of the jury, as I indicated to

12     you before we adjourned yesterday, we will stand in recess

13     until Monday morning.  We're going to stay and work on the

14     Court's charge.  You however may go.  Each of you have a

15     pleasant weekend.  See you Monday morning, jury room, 9:00

16     a.m.

17          THE BAILIFF:  All rise.

18          (Jury recessed from courtroom.)

19          THE COURT:  Visitors of the gallery, you may

20     be seated or excused as you wish.

21          MS. BALIDO:  Judge, first on the record we had

22     some motions that you were taking under advisement that I had

23     discussed with you this morning that we could go ahead and

24     close in front of the jury and still be able to take up as we

25     work along today.

1              THE COURT:  I acknowledge.

2              MS. BALIDO:  Okay.  That included the Motion

3     to Suppress on -- I guess we need a final ruling on the

4     Motion to Suppress of the statements, the Motion to Suppress

5     on the jail seizure of property, where we may have one more

6     witness on that.  And then I think that's it at this point.

7     And so we can take those up as time permits today.

8              But for the purposes of this hearing, I'd like to

9     call my client, Jedidiah Isaac Murphy.  Can he just do it

10    from the table?

11             THE COURT:  He may.

12             Raise your right hand, please.

13             (Defendant sworn.)

14             THE DEFENDANT:  Yes, sir.

15                  JEDIDIAH ISAAC MURPHY

16    the defendant, was called as a witness in his own behalf and,

17    after having been first duly sworn, testified as follows:

18                  Direct Examination

19    By Ms. Balido:

20        Q.   Can you please state your name for the record?

21        A.   Jedidiah Isaac Murphy.

22        Q.   And, Mr. Murphy, before testimony began this

23    morning, you and I had a conversation as to your right either

24    to testify in this matter or not to testify in this matter;

25    is that true?

```
 1        A.    Yes, ma'am.

 2        Q.    And I explained to you that that is your decision

 3   and your decision alone?

 4        A.    Yes, ma'am.

 5        Q.    And we discussed all the pros and cons of you

 6   testifying and not testifying, and we came to the decision

 7   and specifically you came to the decision not to testify at

 8   this portion of the trial?

 9        A.    Yes, ma'am.

10        Q.    You need to say yes?

11        A.    Yes, ma'am.

12        Q.    Okay.  And that's your decision and your decision

13   alone?

14        A.    Yes, ma'am.

15              MS. BALIDO:  No further questions, Judge.

16              THE COURT:  Mr. Murphy, do you have any

17   questions for me with regard to your right either to testify

18   or not to testify?

19              THE DEFENDANT:  No, sir.

20              MS. BALIDO:  Nothing further, Judge.

21              THE COURT:  For Darline's sake, let's take

22   about a 10-minute break and then we'll resume.

23                   (Recess.)

24              THE COURT:  This is continuation of the

25   hearing with regard to the seizure of certain items from a
```

DARLINE W. LABAR, OFFICIAL REPORTER

 1    Dallas County Jail cell.  This hearing is continuing outside

 2    the presence and hearing of the 12 jurors and the alternate.

 3    Mr. Murphy is present in court and will be while -- at all

 4    times while this hearing continues.

 5            Ms. Balido, do you wish to call Mr. LePere?

 6                    MS. BALIDO:  Yes, please.

 7                    THE COURT:  Ray, if you please.

 8                    (Witness brought forward.)

 9                    THE COURT:  May I ask that you raise your

10    right hand, sir.

11                    (Witness sworn.)

12                    THE WITNESS:  I do.

13                    THE COURT:  Thank you, sir.

14                            RAY LaPERE

15    was called as a witness by the Defendant and, after having

16    been first duly sworn, testified as follows:

17                      Direct Examination

18    By Ms. Balido:

19        Q.    Can you please state your name for the record?

20        A.    Yes, ma'am.  Ray, R-a-y, LePere, L-e, capital

21    P-e-r-e.

22        Q.    And how are you employed, sir?

23        A.    I'm a Deputy Sheriff in Dallas County.

24        Q.    And what is your assignment within the Sheriff's

25    Department?

1   A.   I'm property and evidence officer.

2   Q.   Okay.  I've asked you to be here in regard to some

3   property that was seized from a Jedidiah Isaac Murphy.  Do

4   you understand that?

5   A.   Yes, ma'am.

6   Q.   Okay.  And there was an occasion that the District

7   Attorneys Office, or specifically Ms. Miller and Mr. Davis

8   came down and looked at some property that was seized from

9   Mr. Murphy's cell; is that correct?

10   A.   That's correct.

11   Q.   Okay.  How did that go about happening?

12   A.   I received a call from them on May 22nd of this

13   year, and they asked if they could see the evidence.  I met

14   them downstairs in the property room.  I opened the envelope,

15   and I pulled the pieces of paper out one by one so they could

16   look at them.

17   Q.   Okay.  And made copies for them if they --

18   A.   Yes.

19   Q.   -- wanted them?

20   A.   Uh-huh, yes.

21   Q.   And then returned those papers back into the packet?

22   A.   Yes, ma'am, every one of them.

23   Q.   Did they show you a subpoena for those papers?

24   A.   No, ma'am, they did not.

25   Q.   And did they -- or did they show you a warrant for

1  those papers?

2      A.  No, they did not.

3      Q.  Okay.  Let me ask you, was there any sort of sign-in

4  or sign-out procedure for them to go down there with you?

5      A.  I signed them in, and I signed them out.

6      Q.  Okay.  Let me ask you if me or Ms. Little or Mr.

7  Byck as one of the defense lawyers had wanted to see that

8  information, could we have done the same thing?

9      A.  I'm sure that you could.

10     Q.  Okay.  Would we have had to have had a subpoena to

11 look at those records?

12     A.  Or an order from the Judge.

13     Q.  Okay.  So for us to look at them, we would

14 probably -- or would we need a subpoena or an order from the

15 Judge to see those records?

16     A.  In past cases I've had Judges call me and tell me to

17 bring evidence so that the defense lawyers could look at

18 them.

19     Q.  Okay.  But absent an intervening act by the Judge,

20 could we just call you up and say we wanted to see the stuff

21 that you seized?

22     A.  I haven't had that happen to me yet.

23     Q.  Okay.  Just the regular practice up until this point

24 is that usually for defense lawyers to see, it's usually with

25 the act of either a Judge calling or --

1   A.   Or a subpoena or a warrant, sure.

2   Q.   Okay.

3        MS. BALIDO:  Nothing further, Judge.

4                    Cross-Examination

5   By Mr. Davis:

6   Q.   Mr. LePere, when Ms. Miller and I came down, my

7   understanding is from your testimony that when we finished

8   reviewing the documents, you retained custody of those

9   documents, correct?

10   A.   I did.

11   Q.   And neither Ms. Miller nor myself were permitted to

12   take any of those documents from the Sheriff's property room,

13   were we?

14   A.   None.

15   Q.   And in this case, to your knowledge, did the defense

16   attorneys representing Jedidiah Murphy make any effort to

17   view those objects in your possession?

18   A.   No, sir.

19   Q.   Did you ever receive a call from Judge Entz or any

20   other Judge requesting that you make the documents available

21   to them?

22   A.   No, sir.

23   Q.   To your knowledge, did any of the three attorneys

24   representing Mr. Murphy come to the Sheriff's property room

25   or call you requesting the ability to see those documents?

1      A.   No, sir.

2           MR. DAVIS:   That's all I have, Judge.

3           THE COURT:   Ms. Balido.

4                    Redirect Examination

5  By Ms. Balido:

6      Q.   Mr. LePere, although they did not physically take

7  the documents from your possession, did -- from what you saw,

8  did they look at all the documents within the packet that was

9  seized?

10     A.   I opened the package, and I would give them document

11  by document.  Some of them they would look at.  Some of them

12  they would hand back to me, and I kept in a pile.  They were

13  under my control, care, and custody at all times.

14     Q.   Okay.  But the Sheriff's Office did make copies for

15  whatever they wanted to see out of that packet?

16     A.   Yes.

17     Q.   Was -- earlier this week, I believe it was Monday,

18  did you come up to court and bring that packet to court?

19     A.   Yes, ma'am.

20     Q.   Okay.  And that's the first time -- and you turned

21  it over to the defense attorneys --

22     A.   Yes, ma'am, at 9:30 a.m. on 6-4-01.

23     Q.   Okay.  And it was signed off by Michael Byck, one of

24  the attorneys?

25     A.   Yes, ma'am.

1   Q.   Let me ask you, if Mr. Murphy had wanted to get back

2   that property, would there be a way for him to request --

3   because I believe that some of it was pictures and stuff like

4   that; is that correct?  Or do you recall?

5   A.   Ma'am, I don't recall.

6   Q.   Okay.

7   A.   Basically it's assorted written material.

8   Q.   Okay.  If he had wanted to get back some of that

9   assorted written material, what would he have had to do to

10  get that back?

11  A.   He would have had to have the detective handling the

12  case to order me to give it back to him.

13  Q.   Okay.  So probably he would have had to send a kite

14  to the detective handling the case saying he wanted some

15  stuff back?

16  A.   Yes.

17  Q.   But you didn't require anything from the District

18  Attorneys Office in writing to show them that material?

19  A.   No.

20                  MS. BALIDO:  Pass the witness.

21                  MR. DAVIS:  No further questions.

22                  MS. BALIDO:  No further questions, Judge.

23                  THE COURT:  May he be excused?

24                  MS. BALIDO:  He may be excused.

25                  MR. DAVIS:  No objection.

1              THE COURT:  Again, we apologize for delaying

2    you, sir.

3              THE WITNESS:  No problem, Judge.

4              THE COURT:  Any other -- off the record,

5    Darline.

6              (Discussion off the record.)

7              MS. BALIDO:  Judge, we made the bulk of our

8    argument yesterday based on our Motion to Suppress, the

9    materials that were seized by the Sheriff's Department and in

10   our argument subsequently seized by the District Attorneys

11   Office.  Based on the testimony of Deputy LePere, we would

12   show that again they were not seized with a search warrant or

13   a subpoena.  And based on it being a subsequent search or a

14   subsequent seizure after the initial seizure by the Sheriff's

15   Department for proper institutional purposes, we would say

16   that that part of the seizure by the District Attorneys

17   Office constituted an illegal search under the Fourth

18   Amendment and also under Article 1, Section 9, of the Texas

19   Constitution and the due course of law provision.

20             Additionally, when we go even farther into the

21   attorney-client privilege, we would like to make an

22   additional argument on the record that -- first, that the

23   harm is per se based on the attorney-client privilege being

24   sacrosanct under law.  And that secondly, that we can show

25   harm that although the District Attorney could show that he

1  did not use it to look for any additional information, we

2  would show that the harm could be implied by the fact that he

3  knew which direction the defense was going and the problems

4  that we thought he had with the State's case and therefore

5  would know that he wouldn't have to go any further and so

6  that would be an implied harm.  And I believe that based on

7  those additions, we would stand on our Motion to Suppress and

8  ask that you suppress the evidence.

9             THE COURT:  The Court, after further

10  consideration of the testimony of Mr. LePere and argument of

11  counsel, find again that there is no Fourth Amendment

12  constitutional right, especially under the circumstances as

13  were presented by the seizure of the materials from the cell

14  of Jedidiah Isaac Murphy.  I furthermore find that if though

15  error was committed, it was harmless beyond a reasonable

16  doubt under this circumstance.

17             MS. BALIDO:  And, Judge, again, we'd ask you

18  make a ruling or finding of fact and conclusion of law based

19  on -- well, make the finding of fact and conclusion of law

20  that the materials in Defendant's Exhibit 6A, B, and C were

21  subject to the attorney-client privilege.

22             THE COURT:  I find that a portion of the

23  materials were attorney-client privilege, arguably those in

24  the handwriting of Jedidiah Isaac Murphy.  However, I find

25  those other matters were not communications either from Mr.

1   Murphy to counsel or from counsel to Mr. Murphy, but were of

2   a personal nature from either family members and/or friends

3   and were not subject to attorney-client privileges.

4              MS. BALIDO:  So specifically, Judge, the

5   papers, the three written pages that constitute Defendant's

6   6A, 6B, and 6C?

7              THE COURT:  Those are the handwritten?

8              MS. BALIDO:  Yes.

9              THE COURT:  Yes.

10              MS. BALIDO:  That they are --

11              THE COURT:  That those arguably could be

12   construed as attorney-client privilege perhaps, but in light

13   of where they were, I don't know if it was in a secure and

14   confidential place.

15              MS. BALIDO:  Okay, Judge.  Thank you.

16              THE COURT:  Was it not opened for other

17   inmates in the cell to see?  Was it not available to guards

18   and other people?

19              MS. BALIDO:  Judge, I believe if you'll take a

20   look at Defendant's 6A, B, and C, you will see that the way

21   that they were when I pulled them out of the envelope, which

22   I don't know if they're still the way that they are now --

23              THE COURT:  They were folded.

24              MS. BALIDO:  They were all folded up with the

25   outside saying to my attorneys.  That's part of -- of

1    Defendant's Exhibit 6C.

2                    THE COURT:  The question remains had -- had

3    there been hypothetically a search of all the cells for

4    contraband, was the papers about which the defense makes

5    reference in such a way that they would not have been subject

6    to examination to determine whether or not contraband may

7    have been contained therein?

8                    MS. BALIDO:  Well, Judge, I think that Chief

9    McKinney basically talked about the way that they search

10   attorney-client privileges -- privileged information and

11   materials for contraband.  And I would assume that if the

12   Sheriff's Department had that legitimate institutional

13   security interest, that they would use the same or similar --

14                    THE COURT:  Means.

15                    MS. BALIDO:  -- means and protections to

16   protect the people that are sitting in the Dallas County Jail

17   because if they didn't, then basically the people that are

18   sitting there waiting for trial could have no attorney-client

19   privilege to anything that they wrote and pursuant -- in

20   pursuance of trial and that would implicate equal protection

21   arguments based on indigent and non-indigent defendants.

22                    THE COURT:  I understand.  Furthermore, the

23   Court sayeth not.

24                    MS. BALIDO:  Furthermore, the lawyer sayeth

25   not.

1                    Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4            I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13           I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16           Witness my hand this the 28th day of October, A.D.,

17   2001.

18

19

20           DARLINE W. LABAR
21           Official Court Reporter
             194th Judicial District Court
22           Dallas County, Texas
             (214) 653-5803

23

24

25   Certification No. 1064 Expires December 31, 2002

1    REPORTER'S RECORD

2    VOLUME 52 OF 65 VOLUMES        **74145**

3    TRIAL COURT CAUSE NO. F00-02424-NM

4    THE STATE OF TEXAS          :        IN THE DISTRICT COURT

5    VS.                          :        DALLAS COUNTY, TEXAS

6    JEDIDIAH ISAAC MURPHY        :        194TH JUDICIAL DISTRICT

7                    *********************

8                  TRIAL ON THE MERITS BY JURY

9                    *********************        FILED IN
                                         COURT OF CRIMINAL APPEALS

10   A P P E A R A N C E S:
                                               DEC  5 2001
11   HONORABLE BILL HILL, Criminal District Attorney
            Crowley Criminal Courts Building   Troy C. Bennett, Jr., Clerk
12          Dallas, Dallas County, Texas   75207
            Phone:  214-653-3600
13   BY:    MR. GREG DAVIS, A.D.A., SBOT # 05493550
            MS. MARY MILLER, A.D.A., SBOT # 21453200
14               FOR THE STATE OF TEXAS;

15   MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
     MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16   MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
     Dallas County Public Defenders Office
17   Dallas, Texas   75207
            Phone:  214-653-9400
18               FOR THE DEFENDANT.

19                    *********

20        On the 11th day of June, 2001, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable F. Harold Entz, Jr.,

23   Judge presiding, held in Dallas, Dallas County, Texas:

24        Proceedings reported by machine shorthand, computer

25   assisted transcription.

ORIGINAL

INDEX VOLUME 52

June 11th, 2001                                    PAGE      VOL.

Proceedings...................................... 2        52

Objections to Court's Charge..................... 2        52

Charge of the Court Read........................ 11        52

Argument By Ms. Miller.......................... 11        52

Argument By Mr. Byck............................ 21        52

Argument By Ms. Balido.......................... 24        52

Argument By Mr. Davis........................... 37        52

Verdict of the Jury on Guilt/Innocence.......... 50        52

Reporter's Certificate.......................... 62        52

```
 1                    P R O C E E D I N G S
 2              THE COURT:  The attorneys have had a bit of
 3    time to evaluate the contents of the charge as it now
 4    exists.  Does the State have any objection?
 5                   (Objections to Court's Charge)
 6              MR. DAVIS:  The State has no objection.
 7              THE COURT:  Ms. Balido, you may proceed on
 8    behalf of the defense.
 9              MS. BALIDO:  Thank you, Judge.
10          Comes now defendant, Jedidiah Isaac Murphy, and
11    objects to the Court's charge as prepared on the following
12    reasons or on the following grounds:  First, we would object
13    to the venue instruction included in the charge basically
14    because it is our contention that venue in this case should
15    attach to the murder itself and not the aggravating
16    circumstances surrounding the murder.
17          Additionally, we would object to the use of 13.17 of
18    the Code of Criminal Procedure using that instruction to give
19    definitions of venue to the jury, based on that it
20    unconstitutionally lessens the burden of proof as to a
21    material fact in this case with these facts.  And we would
22    make that objection based on the 5th, 6th, 8th, and 14th
23    Amendment of the United States Constitution, Article 1,
24    sections 10, 13, 19, and the due course of law provisions of
25    the Texas Constitution and 2.01 of the Penal Code which talks
```

1    about reasonable doubt.

2         We would additionally object -- so basically we're

3    objecting to all of the venue statute.  An alternative, we

4    would object that only the venue statute that is involved

5    with murder, which is 13.17, be allowed to go to the jury.

6    An alternative to that, if the Court is relying upon -- and

7    the Court is relying upon in this case Article 13.19 and

8    13.07 of the Code of Criminal Procedure, we would object to

9    that as -- that the State needed to plead that with

10   specificity at the beginning of this trial.  Information as

11   to whether or not an issue -- whether or not this was going

12   to be an issue was in the hands of the State, and so the

13   defendant would not have any knowledge whether or not it

14   should be subject to a motion to quash the indictment.

15        And we would rely on Fairfield versus State, which

16   is 610 Southwest 2d 771 and 779, Texas Court of Appeals case,

17   1981, where the Court said it's unnecessary for the defendant

18   to put -- to put venue at issue by a special plea or negation

19   of the allegation venue must be proved how alleged.  And we

20   would say that the State has not alleged venue in the way

21   that the jury charge now seeks the jury to have a finding and

22   therefore they should have pled this with specificity at the

23   beginning of this trial.

24        Additionally, we would now ask the Court to force

25   the State to elect which theory of the case that the State of

DARLINE W. LABAR, OFFICIAL REPORTER

1    Texas seeks to go upon in front of this jury, based on what

2    the jury charge says in this case.  It includes both

3    reference to the venue statute regarding theft, which is

4    incorporated into robbery, and also the kidnapping statute

5    regarding venue.  And we'd like to make a formal request now

6    to force the State to elect.

7              THE COURT:  The State choose to elect or the

8    State choose not to elect?

9              MR. DAVIS:  The State does not choose to elect

10   regarding the aggravating circumstance of robbery or

11   kidnapping.  The State does intend to elect as to the manner

12   and means of death, and we at this time do elect to go

13   forward with the theory of shooting with a firearm as opposed

14   to drowning in water.

15             MS. BALIDO:  Judge, based on -- Judge, we'd

16   ask you now since the State has now elected which -- how

17   they're going to proceed in this case, we'd ask you to make a

18   formal ruling to force them to elect in this case, based on

19   kidnapping or robbery.

20             THE COURT:  The Court declines to do so.

21             MS. BALIDO:  Based on your ruling then, Judge,

22   we would argue that the venue statute or the venue

23   instruction as placed in the jury charge is multifarious and

24   against the double jeopardy clause of the -- of the United

25   States Constitution, as well as the other parts of the United

1    States Constitution and the Texas Constitution that we've

2    cited above basically because under the kidnapping -- well,

3    under the venue instruction as written, it is conceivable

4    that the jury could come back and find venue on at least four

5    and maybe as much as five different basises (sic), and the

6    danger is that it has four or five different bases of -- to

7    find venue.  And if you don't find venue under those bases,

8    then it's a not guilty.  So we have a situation that some

9    jurors could find venue under the kidnapping statute and then

10   find him guilty of capital murder under the robbery statute.

11          Additionally, there could be some jurors who could

12   find -- find venue under the kidnapping statute, but then

13   find him guilty of capital murder under the robbery statute.

14   And we'd say that is the danger of not forcing the State to

15   elect, and we would object on those grounds.

16          THE COURT:  The Court finds that the Court of

17   Criminal Appeals in the Folsome case specifically addressed

18   that issue contrary to the objections raised by the defense.

19   The defense request is denied.

20          MS. BALIDO:  Judge, additionally we would

21   argue that it could be proper to have the venue statute

22   attaching to kidnapping and also the statute attaching to

23   robbery if there were lesser included offenses included in

24   this case of robbery and kidnapping, but that's not done.

25   There's simply the murder -- every lesser included offense

1    that is included in this case is -- has to do with a

2    homicide, and therefore again we return to our original

3    argument that venue attaches to the murder itself.

4            We'd also object to the intoxication instruction

5    because we believe that intoxication is not a defense to this

6    charge, based on the fact that it does damage to the jury's

7    ability to include his physical state in considering the

8    degree of mental state to find someone guilty either of

9    manslaughter, murder, or capital murder, and we'd object to

10    that instruction being included.

11            Can I have a ruling?

12            THE COURT:  Objection is denied.  Also, the

13    venue objection is denied as well.

14            MS. BALIDO:  Judge, we'd also request a jury

15    charge based on the Texas Penal Code 6.01, which is the

16    requirement of voluntary act or omission before someone can

17    be found guilty of or find -- well, found guilty in this

18    case.  Basically we would like the -- the jury to be

19    instructed as under Alfred versus State and be instructed

20    that the term "voluntary" means an absence of an accidental

21    act, omission, or possession.  Voluntariness refers only to a

22    body's -- a physical body's movements.  And we would argue

23    that we need this additional Alfred instruction because we

24    are no longer afforded the instruction or the defense of

25    accident after Adernandus versus State, which is a Texas

```
 1    Court of Appeals case, 1993.

 2            We would additionally assert that Brown versus

 3    State, 955 Southwest 2d 276, a Texas Court of Criminal

 4    Appeals case in 1997 says, if the admitted evidence raises

 5    the issue of conduct of the actor not being voluntary, the

 6    jury shall be charged, when requested, on the issue of

 7    voluntariness.  And we would say that -- that in this case we

 8    are entitled to that instruction and that the case that the

 9    Court is relying upon, which is the George case, was decided

10    before Adernandus and also before -- therefore before we lost

11    the accident instruction.

12            We'd also -- can I have a ruling on that, Judge?

13            THE COURT:  The Court specifically in light of

14    the contents of the statement given by Mr. Murphy to

15    Detective Myers denies the defense request with regard to the

16    issue of voluntariness of the act.

17            MS. BALIDO:  We would like our -- the

18    objection also to be considered under the testimony of Ed

19    Hueske as well, Judge.

20            THE COURT:  Request is denied.

21            MS. BALIDO:  We would also request an

22    additional instruction regarding Texas Penal Code 6.02(a),

23    that a person does not commit an offense unless he

24    intentionally, knowingly, or recklessly engages in the same

25    conduct as the definition of the offense requires.  And we
```

1    would just say if you're going to give us 6.01, we would like

2    6.02 as well, Judge.

3                    THE COURT:  Request is denied.

4              MS. BALIDO:  And finally, Judge, and I bet

5    you're glad to hear me say finally.  Finally, Judge, we would

6    argue that the law which the State seeks to apply in this

7    case and the Court has put forth in the charge, is different

8    from the law under which this jury was qualified.  We asked

9    numerous questions regarding this case that the record will

10   be clear on specifically about proving Dallas County beyond a

11   reasonable doubt.  And those questions to which the --

12   basically what happened is the State -- the defense brought

13   it up in their -- in their voir dire and then the State

14   accepted it and started using it on their own voir dire to

15   steal our thunder and we would argue that them taking on that

16   questioning in their own State's voir dire hereby estops them

17   from requesting a lesser burden of proof on venue at this

18   point.  And we make that specifically under the 5th, 6th, and

19   14th Amendments to the United States Constitution, Article 1,

20   Sections 10, 13, and 19, and the due course of law provisions

21   under the Texas Constitution.

22                    THE COURT:  Request denied.

23              MS. BALIDO:  Finally, Judge, and this is --

24              THE COURT:  I thought we were finally the last

25   --

1           MS. BALIDO:  It is.  That's the finally on the

2      jury charge.

3           Judge, having closed our hearing on the material

4      seized by the Dallas Sheriff's Department and subsequently

5      seized by the Dallas District Attorneys Office, you've made a

6      finding as to whether or not those materials were

7      attorney-client privilege, and we'd request that you make a

8      finding on the record as to whether or not those constituted

9      work product between the defendant and his attorneys.

10          THE COURT:  The Court so finds.

11          The trouble that the Court has continually had with

12     itself as relates to the three-page document allegedly in the

13     handwriting of the accused, Jedidiah Isaac Murphy, is that

14     although it would appear to be comments or content intended

15     for the attorney, the manner and means by which it was kept

16     in the cell of Jedidiah Isaac Murphy somewhat lessens the

17     privilege nature of the communication, in the Court's

18     opinion.

19          Plus, I also reiterate if error, it was the contents

20     and lack of utilization by the State made the constitutional

21     impropriety harmless beyond a reasonable doubt.

22          MS. BALIDO:  And we would object to that

23     finding, Judge.

24          MR. DAVIS:  Can we have a moment?

25          THE COURT:  Sir?

1           MR. DAVIS:  Can we have a moment with the

2     Court?

3           THE COURT:  You may.

4           (Discussion off the record.)

5           THE COURT:  May I ask the bailiffs to cause

6     the side door to be locked --

7           THE BAILIFF:  Yes, sir, it is.

8           THE COURT:  -- please.  Not trying to chill

9     anybody's constitutional right to come in, but it is a bit

10    disconcerting to the attorneys and the jurors for that door

11    to be opened.

12          Sheriff, may we have the jury, please.

13          THE BAILIFF:  Yes, sir.

14          (Jury returned to courtroom.)

15          THE BAILIFF:  All rise.

16          THE COURT:  Let the record reflect the jurors

17    are returning to the courtroom.

18          Jurors may be seated.

19          Mr. Murphy, counsel, visitors in the gallery, you

20    may be seated.

21          Ladies and gentlemen, before I begin reading the

22    Court's charge, I take note that you have been delayed this

23    morning as a result of me.  I want to assure you that we

24    worked hard Friday.  Fatigue set in very frankly, very

25    candidly, the attorneys and the Court.  We did not finish the

```
 1    task that we intended on Friday because of fatigue.  We saw

 2    ourselves going in circular motions and getting nothing done

 3    so we all agreed to get some rest over the weekend and we've

 4    been here since early this morning.  At last we have a

 5    completed charge I will read to you and then you'll begin

 6    hearing from the attorneys.  Again, I apologize.

 7            Cause Number F00-02424-M, styled the State of Texas

 8    versus Jedidiah Isaac Murphy, the charge of the Court as

 9    follows --

10                   (Charge of the Court Read)

11            THE COURT:  Ladies and gentlemen, on the last

12    page of the charge, which happens to be page 21, you will

13    find a verdict form, whatever the unanimous decision of the

14    jury after deliberations may be.

15            We next proceed with summation by counsel.  The

16    State having the burden of proof has the right both to open

17    and close.  The State will open in the person of the

18    Honorable Mary Miller.

19                   (Argument By Ms. Miller)

20            MS. MILLER:  May it please the Court.

21            Jedidiah Isaac Murphy, Jim Murphy, Jim Ed Murphy,

22    whatever you want to call him, is a cold-blooded killer.  On

23    October 4th of 2000, he preyed upon Bertie Cunningham.  He

24    had the specific intent to take her life, the specific intent

25    to cause her death.  And how did he do that?  By shooting her
```

1    in the head with a firearm, a deadly weapon, and he did that

2    during the course of a robbery or a kidnapping.  That's

3    capital murder, ladies and gentlemen, and nothing less.

4           The State told you on voir dire that that is what we

5    intended to prove beyond a reasonable doubt, and I would

6    submit to you that we have proven it beyond all possible

7    doubt.

8           Now, I know voir dire happened over three months ago

9    for some of you and just a few weeks ago for some of you, and

10   so I want to go over some of the things that we talked about

11   on voir dire.  One of the important things that wasn't really

12   talked about a whole lot was venue.  And when the Judge just

13   read it to you in the jury charge, you may have been

14   thinking, hey, that's something I didn't really hear about a

15   whole lot.  That is Dallas County.  That's what venue is.

16   During voir dire we talked to some of you about, well, if the

17   State doesn't prove Dallas County beyond a reasonable doubt,

18   could you follow the law and find the defendant not guilty.

19   But, ladies and gentlemen, that is not the law.  And I want

20   to bring your attention to that because on page 11 of the

21   charge, and it continues on through, venue, Dallas County, is

22   not an element of the offense.  And it must only be proven by

23   a preponderance of the evidence.  And that's something that

24   we talked about on voir dire.  The greater weight of the

25   credible evidence, more likely than not.  It does not have to

1    be proven beyond a reasonable doubt, because it is not a

2    criminative element of the offense.

3         Now, where is venue proper?  As the charge says,

4    venue is the county where the prosecution is -- of the

5    criminal offense is begun and tried.  Well, that's Dallas

6    County, and that's why you as citizens of Dallas County are

7    sitting here on this particular case.  There are several

8    different ways venue can be proper in Dallas County.  First,

9    it's where the offense occurred, and I would submit to you

10   it's a reasonable deduction from the evidence that the

11   offense of capital murder occurred here in Dallas County.

12   When you look at the defendant's own statement, State's

13   Exhibit Number 7, he said that he came in contact with Bertie

14   Cunningham as he was walking along the road beside

15   Bleachers.  He had not yet gotten to 635.  You heard

16   Detective Myers tell you that that portion of Garland is

17   Dallas County, Texas.  So I would submit to you that the

18   evidence shows that the offense occurred in Dallas County,

19   Texas, part of it.

20        He also said that they had not yet gotten to 635

21   when he made her quit driving and decided to put her in the

22   trunk of the car.  Therefore, that also shows the offense

23   occurred in Dallas County.

24        Secondly, you can look at where the property is

25   stolen, in one county, and removed by the offender to another

1    county, in the county where the defendant took the property,

2    or in any other county through or into which he may have

3    removed the same.  Why is that important in this particular

4    capital murder?  Because we have alleged that it occurred

5    during the course of a robbery.

6         Theft.  Robbery is theft, taking property from

7    another person without their effective consent.  There was

8    obviously no effective consent by Ms. Bertie Cunningham when

9    she had a gun pointed at her head when he decides to take the

10   credit cards and her car.  So what do you look at?  The

11   county through which the property was carried.  Well, you

12   know that the car and the credit cards traveled through

13   Dallas County because 2023 Portsmouth, Zach Mamot's house,

14   that is where the defendant picked up Zach Mamot and took him

15   back to.  Well, you know the car went through Dallas County

16   in order to get there.  Also, you have 9620 Harry Hines

17   Boulevard where the defendant attempted to use one of the

18   credit cards at the ATM machine, the Racetrac machine.  That

19   is Dallas County, also.  Also, you have 408 South Central

20   Expressway in Richardson, Texas, Dallas County.  That is

21   Richardson Motor Sports.  You know the defendant used the

22   stolen property there, the credit card, in order to buy two

23   Go-Peds -- three Go-Peds, two Sports and a Liquidmatic.

24        You also know that during all of those he was

25   driving Ms. Cunningham's car, another piece of the stolen

1    property from Ms. Cunningham.  So as part of the robbery you

2    know when you look at all of the evidence that Dallas County

3    is also proper because of the places where the defendant used

4    these stolen merchandise, stolen credit cards.

5            Also, venue is proper if -- proper if person

6    receives an injury in one county and dies in another by

7    reason of such injury in the county where the injury was

8    received or where the death occurred or in the county where

9    the dead body is found.  Well, we know Van Zandt County is

10   where it was found, but why is it also proper in Dallas

11   County?  Well, because you also know from his statement that

12   it was Dallas County.  Reasonable deduction from the evidence

13   that it was Dallas County where the injury occurred.  But you

14   also know that her body was taken through at least Dallas

15   County because what did John Donahue tell you?  He was the

16   DNA expert from the Department of Public Safety.  Miss

17   Cunningham's blood was found at 23 -- 2023 Portsmouth, Zach

18   Mamot's house.  So you know that she had to be in the trunk

19   at that time and her body -- the blood somehow leaked out at

20   2023 Portsmouth which is also Dallas County.

21           Fourth, you have to look at the county in which the

22   kidnapping offense was committed or in any county through,

23   into, or out of which the person kidnapped may have been

24   taken.  Once again, you know because Zach Mamot's house is

25   2023 Portsmouth, Dallas County, you know she was obviously

1   taken through Dallas County because you know that her body

2   was not dumped until she was in Van Zandt County.   So you

3   know the reasonable deduction from the evidence is her body

4   was in the trunk of that car when they went to the Washington

5   Mutual at 1225 East Belt Line Road in Richardson to use the

6   ATM there, 408 South Central Expressway in Richardson at

7   Richardson Motor Sports, 9620 Harry Hines Boulevard at the

8   Racetrac, the 2023 Portsmouth, and also you have the

9   defendant's own address where he was living in Richardson

10  with his sister Tonya Thorp.

11              So, ladies and gentlemen, venue is proper in Dallas

12  County several different ways, so I don't want you to get

13  hung up on that, but I wanted to clarify it because there was

14  a little bit of misinformation given to you on voir dire.   It

15  must only be proven by a preponderance of the evidence.   More

16  likely than not.

17              Now, what must be proven beyond a reasonable doubt,

18  the elements of the offense.   What are the elements of the

19  offense?   That's what the indictment sets out.   In order for

20  it to be capital murder, we must show that the defendant had

21  the specific intent to kill.   We must show that he intended

22  to take Ms. Cunningham's life, that he intentionally caused

23  her death by shooting her with a firearm, a deadly weapon,

24  that it was on October 4th, and it was during the commission

25  of a robbery or a kidnapping.

DARLINE W. LABAR, OFFICIAL REPORTER

1              Well, you have the definitions of robbery and

2      kidnapping, ladies and gentlemen, in the Court's charge.

3              Robbery.  It's during the commission of a theft,

4      with the intent to maintain -- obtain and maintain control of

5      property of another you either threaten or cause bodily

6      injury.

7              Kidnapping is when you abduct a person and you

8      secret them and move them from one place to another.  I would

9      submit to you there's no question when you shove someone in

10     the trunk of a car and drive them around, you are obviously

11     kidnapping them.  I would also submit when you take a

12     person's car, against their will, you use their credit cards

13     without their consent, and you do that by pointing a gun at

14     them, there is obviously a robbery.  Specific intent to kill

15     is what we must show during the course of a robbery or a

16     kidnapping.

17             Now, when you're looking at the Court's charge,

18     ladies and gentlemen, there is something that's called the

19     application paragraphs.  And they start on page 13, and it

20     starts with capital murder.  That is the first offense you

21     are to consider.  Only if you do not believe the State has

22     proven it beyond a reasonable doubt do you go to one of the

23     lesser included offenses.  The two lesser included offenses

24     that are contained in this Court's charge are murder and

25     manslaughter.

1          Now, even though the State does not believe that it

2     is murder or manslaughter, we believe we have proven the case

3     to you beyond a reasonable doubt, that the defendant did

4     intentionally take Miss Cunningham's life during the

5     commission of a robbery or kidnapping.

6          I want to talk about the lesser includeds for a

7     minute.  For murder, it is the second application paragraph,

8     and it's at the bottom of page 13.  It's now if you find and

9     believe from the evidence beyond a reasonable doubt that the

10    defendant, Jedidiah Isaac Murphy, on or about the -- on or

11    about October 4th, 2000, intentionally or knowingly caused

12    the death of Bertie Cunningham, an individual, by shooting

13    the said deceased with a firearm, a deadly weapon, you find

14    the defendant guilty of murder as included in the indictment,

15    or if you find and believe from the evidence beyond a

16    reasonable doubt that the defendant, Jedidiah Isaac Murphy,

17    on or about the 4th -- October 4th, 2000, committed or

18    attempted to commit a felony robbery and/or kidnapping and in

19    the course of and in furtherance of the commission or

20    attempted to commit robbery or kidnapping to Bertie

21    Cunningham, Jedidiah Isaac Murphy committed an act clearly

22    dangerous to human life by shooting the said Bertie

23    Cunningham in the head with a firearm, a deadly weapon, and

24    thereby caused the death of Bertie Cunningham, an individual,

25    you will find the defendant guilty of murder.

1              Why is it not murder?  Well, capital murder is

2     murder plus.  But when you're looking at this felony murder,

3     you're saying that he intended to cause the kidnapping or the

4     robbery, and he committed an act clearly dangerous to human

5     life by shooting her in the head.

6              Well, ladies and gentlemen, I would submit to you

7     that's not just an act clearly dangerous to human life.  You

8     don't put the gun up against someone's head and pull the

9     trigger unless you intend to take their life.  Also, it says

10    manslaughter, if you find --

11              THE COURT:  Per your request, counsel, 12

12    minutes.

13              MS. MILLER:  -- and believe from the evidence

14    beyond a reasonable doubt that Jedidiah Isaac Murphy on or

15    about 4th day of October 2000 recklessly caused the death of

16    Bertie Cunningham by shooting her in the head with a firearm,

17    a deadly weapon, you'll find the defendant guilty of

18    manslaughter.

19              Ladies and gentlemen, there is nothing reckless

20    again about putting a gun to an 80-year-old woman's head as

21    she is laying in the trunk of her car, pulling the trigger.

22    There is nothing reckless about that.  The definition of

23    reckless is contained within the Court's charge on page 5.

24    When he is aware of but consciously disregards a substantial

25    and unjustifiable risk that the circumstances exist or the

1    result will occur.  Well, ladies and gentlemen, you cannot

2    say that it is reckless when you place the gun against her

3    head.

4         Ladies and gentlemen, beyond a reasonable doubt,

5    even though we said on voir dire it's the highest burden of

6    proof, it is not an insurmountable one.  And I would submit

7    to you that we have proven our case beyond a reasonable

8    doubt.  We did in fact prove that it was Jedidiah Isaac

9    Murphy, that it was on October 4th of 2000, that it was

10   Bertie Cunningham that he put the cold, hard steel end of

11   that gun to her forehead as he forced her into the trunk of

12   that car, that he pulled the trigger, that it was a firearm,

13   it was a deadly weapon, and it was during the commission of a

14   robbery and a kidnapping.  That is exactly what the evidence

15   shows.  There was absolutely no mistake about it.

16        And the physical evidence, ladies and gentlemen,

17   shows it.  You heard from the medical examiner.  Loose

18   contact wound.  There is nothing accidental about it.  There

19   is nothing reckless about it.  This man set out to take her

20   life, and that is exactly what he did.  His greed is what

21   caused this.  His greed is what took her from her family.

22        Ladies and gentlemen, the State has proven this to

23   you not beyond a reasonable doubt, but beyond all possible

24   doubt.  When you sign that first verdict form, we, the jury,

25   find the defendant guilty of capital murder, you're not

DARLINE W. LABAR, OFFICIAL REPORTER

1    telling the defendant anything that he doesn't already know,

2    and you will be following your oath to a true verdict render

3    according to the law and the evidence.

4                    THE COURT:  Mr. Byck.

5                    (Argument By Mr. Byck)

6                    MR. BYCK:  Thank you, Your Honor.  May it

7    please the Court.

8               Mr. Davis, Ms. Miller.

9               Ms. Little, Ms. Balido.

10              Ladies and gentlemen of the jury, this is some tough

11   duty, folks.  This hasn't been easy.  It hasn't been easy for

12   us, and I know it hasn't been easy for you.  I'm going to

13   talk to you for a couple of minutes, just probably because it

14   would make me feel a little bit better about the whole

15   thing.

16              Bertie Cunningham is dead.  There is nothing we can

17   do about that.  You have a job though.  You have a job to

18   make some very, very, very critical decisions.  And it has

19   not been made easy on you.  It has not been made easy at all.

20              Did Jim Murphy shoot Ms. Cunningham?  Of course, he

21   did.  There is no doubt about that.  And if it was that

22   simple, you'd be gone and we'd be out of here.  But it's not

23   that simple.  Did the act happen?  Yes.  Well, ladies and

24   gentlemen, you've got to determine what was in a young man's

25   mind.  What was in his mind back on October the 4th when this

1  happened?  What was in his mind when he had been drinking.

2  Falling down sloshing stupid drunk?  No.  He had been

3  drinking.  What was in his heart when he transferred the gun

4  from one hand to the other?  Is the hand paralyzed?  Is the

5  hand crippled?  Is the hand useless?  No.  But it is

6  impaired.  There's no doubt about that.  That's why Dr.

7  Vandiver operated on it is because it was impaired.  That's

8  why he was offered light duty because it was impaired.  Those

9  are hard questions.  Those are questions that we're going to

10  ask you to look at these witnesses because you're the judges

11  of the credibility.  You're the judges of the believability.

12  You have to do that, and it's going to be hard.

13          A lot of the witnesses came down here, and they were

14  just as cash register honest with you as they could be.  But

15  don't think that your emotions aren't at stake here, ladies

16  and gentlemen, and don't think there wasn't a vampire out

17  there that wanted to prey on you, because there was.  And

18  this is what really, really bothers me.  It's hard enough for

19  Ms. Cunningham's family to go through this horror, to see

20  these pictures, to not have their sister or their mother or

21  their friend.  That's hard enough.  But it is absolutely, I

22  submit to you, shameful and detestable for a scientist, a

23  doctor to come down here and add gunpowder to a funeral pyre

24  and say to you, well, it's possible, it's possible that she

25  survived, that she was conscious, that she lived and

1  understood what was going on in the back of that trunk.

2  That's detestable, Dr. Duval, and you should be ashamed of

3  yourself.  There was no scientific basis to say that.  Dr.

4  Duval said it's possible she could have very well drowned in

5  water.

6          Well, Mr. Davis, the Chief Prosecutor in this case,

7  is not a vampire.  Mr. Davis withdrew that.  It is not in

8  your charge.  It is in the indictment because Dr. Duval wrote

9  that report.  But it's not in your charge because it is

10  unsupportable.  But Dr. Duval wasn't content with that.

11              THE COURT:  Five minutes, Counsel.

12              MR. BYCK:  Thank you, Your Honor.

13          She wanted to go one step further.  She wanted to

14  inflict on you this delusional horror of hers, that Ms.

15  Cunningham survived and that she was conscious.  And I want

16  to say to the family of Ms. Cunningham, I'm so sorry for what

17  happened to her.  I am so sorry that that beautiful woman is

18  not with us, but I am even sorrier that you had that burden

19  put on you by that horrible woman who to inflame the minds of

20  these people left you with that cruelest, cruelest of

21  speculations.  I'm sorry.

22          Ms. Balido will finish up.  I have nothing further

23  to say to you.

24              (Mr. Byck Leaves Courtroom)

25              THE COURT:  Defense may continue.

Page  24

1              (Argument By Ms. Balido)

2              MS. BALIDO:  May it please the Court.

3         Ladies and gentlemen of the jury, an old trial

4    lawyer once told me if you resort to arguing the charge,

5    you're kind of out of luck, but in this case it's an 18-page

6    document that you're going to have to sort through.  It's

7    important enough that the State spent most of its time on the

8    opening argument directing you to certain portions.  I'm

9    going to do that a little bit, too.

10         Let's talk about the jury charge and the type of

11   case this is.  This case is not one of those cases that

12   you're going to go back into the deliberation room and sit

13   down and say, well, did he do it.  It's not one of those

14   cases.  Because as Mr. Byck told you, if that was one of

15   those cases, then we wouldn't be here.  The question that you

16   need to go back there and the harder question to ask is what

17   has the State proven to you in this case.  What has the State

18   brought to you, because it's the State's burden of proof in

19   this case to show you, to prove to you beyond a reasonable

20   doubt that he's guilty of capital murder and no other crime.

21   That's their burden, and their burden alone.  Okay.  And

22   they've got to prove to you that they're -- that he's guilty

23   of capital murder by beyond a reasonable doubt.  That's the

24   burden of proof that they must show to you.  And you've --

25   you can see my jury instructions.  And I want to read to you

1   what reasonable doubt is.  What the Judge has instructed you

2   what reasonable doubt is.

3          Reasonable doubt is a doubt based on reason and

4   common sense, after a careful and impartial consideration of

5   all the evidence in the case.  It's the kind of doubt that

6   would make reasonable -- a reasonable person hesitate to act

7   in the most important of their own affairs.  Hesitate to act.

8   Proof beyond a reasonable doubt therefore must be proof of

9   such a convincing character that you would be willing to rely

10  upon it without hesitation in the most important of your own

11  affairs.  In the event that you have a reasonable doubt as to

12  the defendant's guilt after considering all the evidence

13  before you and these instructions, you will acquit him and

14  say by your verdict not guilty.  That's the final instruction

15  that you have.

16         But how it works is this.  You've got to go back

17  there and look at the jury charge.  And I submit to you that

18  it's going to take a long time to do this.  You look at

19  capital murder.  Okay.  You look at everything that applies

20  to capital murder.  Specific intent to kill being number one.

21  Then you set out murder and you set out -- you set out

22  manslaughter in the same way, because the parts -- they're

23  all -- all the instructions are all jumbled up in there.  You

24  need to see which instructions apply to which part of the

25  jury charge.  And you look and you see whether or not the

1    State has proven beyond a reasonable doubt that Jedidiah

2    Isaac Murphy had the specific intent to kill at the time of

3    Ms. Cunningham's death.  Did they prove that beyond a

4    reasonable doubt?  If they don't, we get to murder and those

5    instructions.  If they don't prove that, you get the

6    manslaughter.  And see if they -- and see if they prove that.

7             Now, the burden never shifts to the defendant.  It

8    never does.  It's the State's burden and the State's burden

9    alone.  The first thing they've got to prove to you is that

10   it happened in Dallas County, Texas.  I'm going to get to

11   that in a moment.  And as Ms. Miller instructed you, and

12   although we talked about if they don't prove Dallas County,

13   Texas, can you let him walk out of the courtroom, you know,

14   at that time.  That's what we talked about each of you --

15   with each of you on voir dire.  It's a preponderance of the

16   evidence.  They must prove venue by a preponderance of the

17   evidence.  But they've got to prove beyond a reasonable

18   doubt -- well, let me get back to venue just one second.

19            What the situation is not is proving that it could

20   be -- you know, it's not anyplace else so it is Dallas

21   County.  You see how that's kind of the backwards getting in

22   there?  They've got to prove that to you by a preponderance

23   of the evidence.  It's not up to the defense to prove that it

24   was not Dallas County, Texas.  Okay.  Because we don't have a

25   burden in this case.

DARLINE W. LABAR, OFFICIAL REPORTER

1      They must also prove to you beyond a reasonable

2   doubt that a voluntary either oral confession or written

3   confession was made in this case.  It's not up to us as the

4   defense to prove to you that it was involuntary.  They've got

5   to prove to you though their witnesses, through people like

6   Gary Rose and M.J. Myers, that these confessions were

7   voluntary.  The State must eliminate every reasonable doubt

8   from your mind by the proof and by the evidence that the

9   statements were voluntary in this case.

10      And finally, they must prove beyond a reasonable

11   doubt that Mr. Murphy intentionally caused the death of Ms.

12   Cunningham, that she (sic) had the specific intent to kill.

13   And it's not our burden as the State (sic) to prove that it

14   was anything but the specific intent to kill.  Okay.  It's

15   not the defendant's burden.  They must prove that to you

16   beyond a reasonable doubt.  They must eliminate every doubt

17   from your mind as to what Mr. Murphy's intent was at the time

18   of the death of Ms. Cunningham.

19      And as the jury charge tells you, if you have a

20   reasonable doubt whether or not it's capital murder, murder,

21   or manslaughter, you have to resolve that in the favor of the

22   defendant because you have a reasonable doubt.  Okay.

23      Let's look a little bit about this venue situation.

24   For it not to be very important, the State certainly did

25   spend a lot of time talking about it.  Okay.  First thing is

1    I want to refer you to State's Exhibit Number 3.  Okay.

2    There's a lot of things on State's Exhibit Number 3 that a

3    lot of witnesses put on there.  I tell you one thing that's

4    not on there is the Dallas County-Collin County line.  Okay.

5    There's a lot of things of all these different activities

6    that happened, but what's not on here is where she was killed

7    or the shots were fired or where she was abducted.  Okay.

8    And they can lie behind the law and ask you to find venue

9    because he resides in this county and that's fine.  They can

10   do that if they want to.  Okay.  Because they know that they

11   need to in this case basically.

12          And when that becomes important is Detective Myers'

13   testimony.  Okay.  He first talked to -- he first talked to

14   Jim about what happened out there.  Jim told him so they

15   got -- got in the car.  And they drove up all over the place,

16   northeast Dallas County, Texas, driving through Richardson,

17   driving through Garland.  And remember what they said, that

18   they even -- they even drove past Bleachers, kind of coming

19   up the back side to see whether or not Jim would notice or

20   not they passed Bleachers and did he.  Okay.  You heard how

21   they -- how he testified they started up north and came down.

22   Okay.  Don't you think they might have figured out something

23   if they had started south and gone north and kept on going

24   until they found something?  Don't you know if they went

25   outside of Dallas County, Texas, and drove on the major

 1    intersections outside Dallas County, Texas, that maybe there

 2    would have been a spark?  Okay.  That's something they have

 3    to prove.  They have to prove venue in this case.

 4          It's such an important situation that Detective

 5    Myers got his statement, trying to narrow him down from the

 6    defendant.  Did this happened in Dallas County, State of

 7    Texas?  After he made a statement.  He went back a second

 8    time.  Detective Myers, why did you go back a second time to

 9    go talk to him about this case?  Well, I went back to go

10    figure out if this happened in Dallas County, Texas.  Was he

11    cooperative?  Yes.  Did he tell you?  Yes.  Did he tell you

12    as much as he knew?  Yes.  Detective Myers went back a third

13    time.  Detective Myers, why did you go back a third time?

14    Well, I needed to figure out where this occurred.  I didn't

15    know where it occurred.  I didn't know if it happened in

16    Dallas County, Texas.  It's big enough concern for him that

17    he went back even a fourth time.  Detective Myers, after you

18    went back a fourth time, is there any additional information

19    that you can share with us as to where this murder took

20    place, where the death of Ms. Cunningham took place, where

21    the shots were fired, where she was taken, anything about

22    that?  No, there's no additional information.  That's how you

23    know how important it is.  Like I say, if they want to rely

24    on those general portions of the law, that's fine.  Then you

25    can find him guilty and find venue because of that.  But I'm

1    telling you, it's just not there.

2            There seems to be a theme with the State's case.

3    Basically, well, if there's no indication that it's not

4    Dallas County, then it must be.  Same goes along with the

5    confession and the written -- the oral statements and the

6    warnings that Gary Rose supposedly gave Mr. Cunningham

7    (sic).  Well, you know, Deputy Rose, after you came down from

8    the Dairy Queen and, you know, everybody all rounded up over

9    there and y'all got in there, did you read him his rights?

10   Well, yeah, I did.  Did he ever indicate to you that he was

11   waiving those rights?  No.  Did he ever -- but he didn't give

12   me any indication that he wasn't waiving those rights.  Okay.

13   Is that proof beyond a reasonable doubt?  I don't think so.

14   They've got to prove beyond a reasonable doubt that he waived

15   those rights.

16           So let's look at and make the State prove to you

17   beyond a reasonable doubt were the warnings given, number

18   one, and did he voluntarily assent and give up those rights,

19   even though there was no indication to Gary Rose that he

20   didn't.  Okay.  And things you can consider are what?  I hate

21   to vouch for what Shod was saying because I guess y'all could

22   tell that I didn't like Shod very much, didn't believe him,

23   but the kind of drinking and the drug taking that was going

24   on.  Well, let's say for a moment that you believe that he

25   understood his rights, that those rights were given, and that

DARLINE W. LABAR, OFFICIAL REPORTER

1   he took away those rights, that he -- that he -- that he

2   waived those rights and decided to make a statement?  He

3   makes a statement to Jason Bonham, and basically the

4   statement to Jason Bonham -- and let's go forward a little

5   bit -- a little bit farther also and talk about the written

6   statement that he gave to Detective Myers, if you find that

7   he waived those rights as well.

8            Those things -- those statements are consistent.

9   Okay.  The State wants you to believe only the part of the

10  statement of the defendant, what fits into their case.  They

11  only want you to look at what part of the statement deals

12  with Dallas County, Texas.  That helps them kind of get

13  through their venue problem.  They only want you to believe

14  the part of the statement where it says that he actually

15  killed Bertie Cunningham because that proves cause of death.

16  Okay?  But what they don't want you to believe and what they

17  spent a whole day doing is trying to prove that Jedidiah

18  Isaac Murphy is a liar when he made his statement.  Okay?

19  Basically his statement from the beginning, from the middle,

20  and from the end is that it was an accident.  Okay.  It

21  wasn't his intent to shoot her.  You need to look at his

22  statement in the case and read through it and see what is

23  proved and what is not proved.

24            I told her I needed a ride to 635 and she agreed to

25  take me as long as she was safe and I assured her that I

1   wasn't out to hurt anyone and we drove off.   Okay.   That

2   shows proof that -- that he's telling the truth, that it was

3   an accident.   It goes along with the theory of accident.

4   It's an involuntary thing that happened.   I told her that I

5   was going to put her in the trunk and go to the pay phone and

6   call the police, and after I got far enough away, they

7   could -- they could get her out safely after.   Okay.

8          Now, the act of actually putting somebody in a trunk

9   is bad in and of itself.   Okay.   And it's something that is

10  outside the norm of what law-abiding people do.   I don't --

11  I'm not trying -- I'm not trying to say that.   What I'm

12  saying is that in and of itself does not mean that he

13  intended to cause the death of Ms. Cunningham.   Okay.   He

14  explains what happened.   I switched hands because I can't

15  feel my left hand.   It's a habit for me to use my right hand

16  to open and close doors.   When I reached for the trunk and I

17  still had the gun with my left hand and I grabbed it too hard

18  and it shot.   Okay.   Now, you come to the -- you come to this

19  part of the statement and you read it and you go, well, guns

20  don't just go off.   Okay.   That's -- you know, but listen to

21  what he's saying.   Okay.   And listen to what the evidence

22  is.   He has been drinking.   Is he fully intoxicated?   No.   He

23  has this injury to his hand.   Okay.   Does it make it totally,

24  you know, debilitating that he can't use his hand?   No.

25  Could it lead to an accidental shooting?   I'd submit to you

1    that it could.

2              And then he talks about exactly what happened and

3    opening the trunk and he pulled it too hard and then we get

4    to the testimony of Mr. Hueske that was simply called in here

5    to explain, yes, guns sometimes go off and here's why.  Okay.

6    Because that's the biggest problem in the confession is how

7    could this gun go off.  And you heard about this sympathetic

8    muscle movement, that if you're moving with one hand,

9    sometimes the other hand pulls as well, and sometimes it can

10   be enough trouble to someone that the gun actually goes off.

11   Such a sympathetic movement.  This one is moving at a hundred

12   percent and there's a sympathetic movement and some

13   percentage on -- on the left hand and the gun goes off.

14   Okay.  It's such a problem that police officers are trained

15   not to go walking around with your finger on the trigger

16   going into somebody's house because a gun might go off.

17   Police officers are trained in their training exercises that

18   they've got to take their finger off the trigger, put the gun

19   in there before they start trying to maneuver anything with

20   your other hand because there's such a danger that this sort

21   of thing can happen.  And what that is, is it's not the

22   specific intent to kill.  Okay.  That's what it is not.

23             Now, Mr. Davis and the State is going to, I'm sure,

24   go talk about going over the sister's and how this

25   self-serving testimony about wanting to kill himself and

1  everything, over in the -- in the garage of his sister and

2  how that's probably not true and it's just self-serving.  I

3  want you to look at State's Exhibit Number 38 and look at

4  this hose and see if you can find a hole where it is burned

5  out perhaps by something hot it's not used to, but was used

6  in a way that is different than it was made to be used.

7  Again, things that are consistent, things that are proven by

8  the evidence that the State has shown you to show that the

9  defendant is trying to tell the truth as best he knows it in

10 his statement.

11        And finally, the last statement to all the people

12 destroyed by this, it was not intentional and I'm sure that

13 you wish me dead and I would wish the same.  I'm cooperating

14 so you understand that I'm not trying to hide what happened,

15 and the fact that I am not an evil person who hurts people.

16 Not intentional, not trying to hide from what he did, just

17 trying to explain how this horrible, horrible tragedy

18 happened.  That's what his confession says.

19        Again, what the State has to prove to you to get to

20 capital murder is the specific intent to kill.  Okay.  And

21 the State must prove to you that he intentionally caused the

22 death of Miss Bertie Cunningham, that it was his conscious

23 objective and desire to first engage in the conduct and then

24 cause the result.  That's the type of proof that they must

25 prove to you beyond a reasonable doubt before you can find

1    him guilty of capital murder.

2          And what the defense does not have to prove to you,

3    that it was an accident.   They have to prove that it wasn't

4    an accident, that it was intentional, that he had the

5    specific --

6                THE COURT:   Five minutes remain.

7                MS. BALIDO:   -- intent to kill.

8          Thank you, Judge.

9          The defense does not have to prove to you that it

10   was not an involuntary act.   They must prove to you -- the

11   State must prove to you beyond a reasonable doubt that it was

12   intentional.   The State must eliminate all reasonable doubt

13   from your mind before you can find him guilty of capital

14   murder.   And I'm not going to tell you which one, either

15   murder or manslaughter, I think it is.   That's up for you to

16   decide.   But what they want you to do is they want you to

17   look at all the evidence in this case separately.   Well, he

18   wasn't intoxicated so he must have intended to kill Ms.

19   Cunningham, specifically intended.   Well, you know, that hand

20   thing, you know, he's trying to make it bigger than it is, so

21   he -- so he had to have intended and had the specific intent

22   to kill Ms. Cunningham.   And this unintentional discharge

23   situation, just kind of throw that out the window.   And I'm

24   saying look at it all as a whole.   Look at all the facts in

25   the case and see whether or not they've proven their case

1   beyond a reasonable doubt.

2          And ask yourself, does a close contact wound

3   necessarily disprove accident in this case.  Considering, you

4   know, what the evidence is in this case and how the shots

5   occurred, does close contact necessarily disprove accident?

6   Does his actions after the fact necessarily disprove that

7   this was not an accident, that he had the specific intent to

8   kill?  Or can you see that it is a person that is -- that has

9   performed a tragic accident, committed a tragic accident, the

10  death that results in the death of a human person, of a human

11  being, and then is just basically and truthfully freaked out

12  about it and is going around and leap taking and trying to

13  get all his -- say good-bye to all his friends and his family

14  before he ends his life like he says in this confession.

15         In conclusion, ladies and gentlemen, if it -- if his

16  intent was reckless, then it's manslaughter.  If it's

17  knowing, that he knowingly committed this murder, it's

18  murder.  Only until the State proves to you that he had the

19  specific intent to kill Ms. Cunningham does it get to capital

20  murder.  And again, any doubt that you have goes to benefit

21  the defendant.  Read all the parts of the charge.

22         If you throw out the confessions, look at the

23  evidence what's left and see what it tells you.  If you keep

24  the confession in, look at all the evidence and see how it

25  proves up the defendant's statements and what happened.

1            And finally venue, did they prove Dallas County

2    Texas?  Because that's the one you're going to have to let

3    him go on, and that would be the hardest question and the

4    hardest thing that you'd ever have to do if that's the

5    decision you come to in this case.  Because if you're -- if

6    you come back with manslaughter, if you come back with

7    murder, if you come back with capital murder, you're not

8    alleving Jedidiah Isaac Murphy of any responsibility for what

9    he did.  You are making him responsible for what he did.

10   You're making him accountable on all three of those things.

11   You are just applying the law to the facts.  Okay.  But if

12   you look at venue and you believe that they haven't proved

13   venue to you, then you've got to let him go.  If they haven't

14   proved it by a preponderance of the evidence.  And you think

15   it's not important and you think it's not -- not critical in

16   this case, I want you to look at two things that the State

17   put into evidence before you.  The first the map, Defense

18   Exhibit Number 2 -- I mean -- excuse me, State's Exhibit

19   Number 3, and the pictures.  And notice the size of them.

20   The map is small.  The pictures are big.  What do you think

21   the State wants you to key in on?

22                    THE COURT:  Mr. Davis, the State may conclude.

23                    MR. DAVIS:  May it please the Court.

24                    THE COURT:  15 minutes.

25                    (Argument By Mr. Davis)

1          MR. DAVIS:  Thank you, Judge.

2          Ladies and gentlemen, first of all, on behalf of the

3    State of Texas, I want to thank you in this case, not for

4    coming down here, not for being a part of this jury because

5    we all know that really that -- you didn't have a choice

6    about that.  What I do want to thank you for though is the

7    very close consideration that you've given to the facts in

8    this case because it's upon those facts that you'll be basing

9    your verdict in this particular case.  That's what we

10   explained to you on voir dire, that your duty would be to

11   render a true verdict according to the law given to you by

12   the Judge and the evidence presented in this case.  So those

13   facts are very, very important because those are the facts

14   that show very clearly that this individual right down here,

15   Jedidiah Isaac Murphy, on October the 4th of the year 2000,

16   intentionally murdered Ms. Bertie Cunningham during the

17   commission of both a robbery and a kidnapping.  That's what

18   we're talking about in this case.

19          Now, let me just take a couple of moments if I could

20   and talk to you briefly about what Mr. Byck said to you

21   before he left.  He made a statement, and inasmuch as I

22   respect him, I have to disagree with him very, very much with

23   this particular statement.  Because he said as we sit here

24   right now, there is nothing that we can do about the death of

25   Bertie Cunningham.  And I've got to disagree very vigorously

1    on that point.  Because you have a choice right now as you

2    sit in this jury box.  Your choice is this:  You can turn a

3    blind eye to all the facts and the evidence that you've heard

4    in this case and take all responsibility away from this

5    cold-blooded killer.  Or you can follow the law and the

6    evidence and do justice.  That's all that we can do for

7    Bertie Cunningham.  But it's your job in this particular case

8    to do justice.  That's the job of this jury.

9            He also said to you, and frankly I didn't understand

10   this.  Perhaps you did.  About the vilification of Dr.

11   Duval.  That, to me, I didn't quite understand.  Perhaps you

12   did.  About her being some sort of detestable vampire, that

13   somehow we're supposed to heap all this anger and hatred

14   toward her because she came down here and as a medical doctor

15   told you because of the location of the body, circumstances

16   of where Ms. Cunningham was found, that she can't entirely

17   rule out drowning.  I suppose that if she's a detestable

18   vampire, then the defense's own expert, Dr. Peerwani, has to

19   be one, too.  Because you recall as he testified during the

20   defense's case, he said that there were no objective positive

21   findings for drowning, but there are cases in which there

22   aren't any positive findings.  And with regard to Ms.

23   Cunningham surviving for a period of time, you'll recall his

24   testimony being that exactly of Dr. Duval in that case, that

25   in these types of cases where the brain stem has not been

 1    affected, where those functions of the brain that directly

 2    affect the life functions have not been damaged, it is indeed

 3    very possible.   There are documented cases of individuals,

 4    such as Ms. Cunningham, surviving for a period of time.   And

 5    as Dr. Peerwani himself said, that could range up to a few

 6    hours in a case such as this.   So let's forget all that,

 7    let's forget the diversions.   Let's get down to what really

 8    matters in this case.

 9            Has the State of Texas proven its case beyond a

10    reasonable doubt as to the elements, and first, have we

11    proved venue beyond a preponderance of the evidence?   Have we

12    reached that 51 percent mark on venue?   Because as you recall

13    on voir dire, this is the lowest standard allowable in the

14    criminal justice system, preponderance of the evidence.   That

15    we tip those scales ever so slightly one way or another, 51

16    to 49.   Very clearly, we have.   Very clearly, we've gone

17    beyond that in this particular case.

18            I've never considered proving an indictment to a

19    jury --

20                  MS. BALIDO:   Judge, I'm going to object to the

21    personal statements of the --

22                  THE COURT:   Sustained.

23                  MS. BALIDO:   -- prosecutor.   Ask the jury

24    disregard.

25                  THE COURT:   The jury will disregard the last

1    comment of the prosecutor and consider it for no purpose.

2                MR. DAVIS:  Ladies and gentlemen, proving an

3    indictment to the jury, I would submit to you, is not hiding

4    behind the law.  That's what the State of Texas has done in

5    this case.  We've proven venue.  And as Ms. Miller has gone

6    over in great detail, and I'm not going to spend a lot of

7    time here, we've done that in multiple fashion here.  We've

8    done it because by the evidence presented by the statement of

9    the defendant himself, through the testimony of Detective

10   Myers, a reasonable deduction in this case.  This abduction

11   and murder occurred in the City of Garland somewhere south of

12   Bleachers, but before you get to LBJ Freeway.  And, ladies

13   and gentlemen, that entire area is in Dallas County, Texas.

14   The use of the property is very clearly been shown to have

15   been in Dallas County, Texas, at multiple locations.  The

16   injuries being received in Dallas County, Texas.  Again, you

17   look to the evidence, the blood evidence there on Portsmouth

18   where Zach and his mother lived, Dallas County, Texas.  I

19   mean very, very clearly venue has been shown.  So let's go

20   now to the next step.

21               Let's look at what's really in dispute in this case

22   and what's not in dispute.  Perhaps you sat there in the jury

23   box and kept waiting for one of these attorneys to address

24   the issues of robbery and kidnapping.  Complete silence on

25   those points.  Because why?  Because they're really can be no

1  dispute, can there?  That this defendant robbed Ms.

2  Cunningham and kidnapped Ms. Cunningham.  There's no real

3  question, there's no real dispute about that.  That's been

4  proven in this case.  The only real dispute for you to

5  consider at this time is this:  Did Jedidiah Isaac Murphy

6  intentionally shoot and kill Ms. Cunningham, or as the

7  defense claims did he accidentally cause the death somehow of

8  Ms. Cunningham?  And what I want to do for you the next few

9  minutes is this:  Let's go through all the evidence.  We're

10 not going to look at it in isolation.  That's not the way you

11 do things down here.  You look at things in its entirety.  I

12 want to go through a few things with you, both before the

13 shooting, during the shooting, and then finally after the

14 shooting.  Then you determine are these facts that are

15 indicative of an accident or do they show an intentional

16 pattern of behavior on the part of Jedidiah Isaac Murphy?

17       Let's look first of all, what evidence do we have

18 that this is an accident?  Really you just have the words of

19 this person down here, when he says to Detective Myers, the

20 gun just discharged and it was an accident and I didn't mean

21 to kill that woman.  That's really the only evidence that you

22 have here is his word for it.  That he just didn't mean to do

23 it.  And curious, isn't it, that the very first time that he

24 mentions anything about an accident is after he's already

25 been placed under arrest, he knows he's going to be charged

 1    with capital murder, and he's possibly facing the death

 2    penalty.  Because there is absolutely no evidence before you

 3    that this person went to any other individual before he got

 4    caught down there in his hiding place and said, hey, Shod, I

 5    need to tell you something.  Man, there's been a terrible

 6    accident here.  Or, hey, sister, you know, I just didn't mean

 7    to do it.  It's just a horrible misunderstanding here.  There

 8    is none of that, is there?  First time we hear that

 9    self-serving statement out of this man's mouth is when he

10    knows what he's facing, that some day he's going to have to

11    face a jury like you individuals right over here and the

12    State of Texas may seek his life in a death penalty case.

13    That's the evidence.

14          So what else do we look at?  Well, let's look at all

15    the intentional actions that this person had to take to get

16    him to that point.  He had to intentionally decide at his

17    Mother -- at his sister's house that day that he was going to

18    take possession of a .22 caliber pistol and leave her home

19    with it.  That gun didn't jump into his hand or his pocket,

20    did it?  That's a conscious decision that Jedidiah Murphy

21    made on the morning of October the 4th.  And he decided again

22    intentionally that he would take that gun from that

23    residence, wherever he went that day.  The next intentional

24    decision was to abduct Ms. Cunningham.  That did not happen

25    by accident.  He simply didn't jump into her car as she drove

1    home from Collin Creek Mall, did he?  He had to do

2    something.  We'll never know what, but he had to do something

3    to actually lure her into a position where he could take

4    control of her and commandeer her vehicle.  And that's

5    exactly what he made a decision to do that day.

6            How did she get in the trunk?  Did she jump in there

7    on her own?  Absolutely not.  The next intentional decision

8    is this:  To force that 80-year-old woman out of her car,

9    into her trunk, and then to intentionally decide to place

10   that gun into his hand, to hold that gun on this 80-year-old

11   woman as she is laying in that trunk, to intentionally decide

12   to take your finger and place it inside that trigger guard,

13   to intentionally place it on the trigger itself.  All of

14   those are intentional acts.  For what purpose?  To take the

15   life of Ms. Cunningham so there will be absolutely no witness

16   who can testify that he had abducted and robbed her that day.

17   And make no mistake about it, that was his motive because we

18   all know he had not even enough money at Bleachers bar to pay

19   for that second drink.  From his bank statements you know his

20   worker's comp checks had cut off two days earlier.  He's got

21   absolutely no money in the bank whatsoever.  And the motive

22   is very clear when he left that morning.  He's going to get

23   some money wherever he has to find it, from whomever he has

24   to take it from.  That's his motive that day.  And when he

25   shot that woman in the head and when he shot her at point

1   blank range, I will submit to you that that is a very clear

2   indication of what his intent was at that time.

3            Now, we don't have to stop right there, though,

4   because we have the benefit -- we have the benefit of seeing

5   what he does afterwards.  And again, as we go through there,

6   you ask yourself this:  Is this the actions of an innocent

7   man who has now accidentally taken the life of an 80-year-old

8   woman or not?  What's the very first thing that we know this

9   man does following the murder of Ms. Bertie Cunningham?  Does

10  he call 911 to say, I've got a shooting victim here, send

11  someone, send an ambulance, send someone to help save her

12  life?  Does he flag down a motorist?  Does he leave her at

13  some spot so she can get the necessary medical care for this

14  supposed accidental shooting?  No.  See, his mind works

15  differently.  His motives are not ours.  His motive was to

16  get money, so the very first thing -- imagine this, imagine

17  this, that her body in the trunk, perhaps still living, he

18  goes over to the Richardson ATM at Washington Mutual, takes

19  that credit card and plugs it in the machine trying to steal

20  her money.  Is that the act of an innocent man?

21           What's the next thing that we know?  He's out there

22  now showing this car off to these kids, bragging, hey, look

23  what my girlfriend got me, look at the cards, hey, let's go

24  out and have a good time, let's do some shopping, man, I'm

25  ready to do some shopping.  Is that what an innocent man

1    does?  There a woman lies dying or dead in the trunk.

2          The next step, Harry Hines, same old routine.  ATM

3    machine, 11:30 at night, 4:30 in the morning.  The acts of an

4    innocent person?

5          Next place he shows up is in Edgewood, Texas, over

6    there -- his old buddy Shod's house.  This is after the kids

7    have already told you when this guy is with them, it's just

8    the same old Jim like he doesn't have a care in the world.

9    Not one thought being given to Ms. Bertie Cunningham by this

10   individual right over here.  That's exactly what Shod tells

11   you, too.  Hey, it's the same old Jim, come down to visit,

12   let's have some good times and it's the same old spending

13   spree again.  If you had any doubt whatsoever about this

14   man's mind-set, I would invite you in that jury room to ask

15   for a VCR and watch that tape in Chacho's liquor store

16   because if you ever want some real insight into a

17   cold-blooded killer's mind and what really makes him tick and

18   how much disregard he has for human life, you take a look at

19   him as he jokes and kids around in Chacho's, the exaggerated

20   gestures and the fun he seems to be having taking the credit

21   card of Bertie Cunningham and giving it to the clerk there

22   for use in that liquor store.  That really tells you all you

23   need to know.

24               THE COURT:  Two minutes remain.

25               MR. DAVIS:  To add insult to injury, what does

1    he do with the body, this person who's supposedly

2    accidentally murdered Ms. Cunningham?  Well, he very

3    unceremoniously takes it down to the place where he knew so

4    well in high school, you know, his old party down there on

5    Livingston Hill, the place where they routinely dump trash.

6    Took the body, wrapped it up, and then dumped it in the creek

7    just like another piece of garbage.  That's the regard he has

8    for the human life of Bertie Cunningham.  And when you look

9    at the totality of all the actions again, I ask you this, are

10   these the acts of an innocent person who's accidentally taken

11   a life?  Clearly they are not.  They're the actions of this

12   person right here, because you see, he's not an innocent man,

13   is he?  He's a cold-blooded killer, who made a conscious,

14   intentional decision that day to take Ms. Bertie Cunningham

15   into his control, to stuff her into a trunk, to kill her, and

16   then to try to reap the benefits of his horrible actions.

17   You know, the truth sometimes is not pretty, and I really

18   regret that you had to look at a lot of this evidence.  This

19   is not pleasant to look at, but in order to understand

20   exactly what happened in this case, to more fully understand

21   the individual that we're dealing with, it was necessary that

22   you look at this.

23              And I'm going to ask you now to think back to when

24   we were on jury selection.  Each and every one of you made a

25   commitment to us.  And that commitment was to render a true

1    verdict according to the law and the evidence.  And I asked

2    each and every one of you, if the State of Texas proves its

3    case beyond a reasonable doubt as required by law, not only

4    could you, but would you find the defendant guilty.  At this

5    time, ladies and gentlemen, the State of Texas has met its

6    commitment.  We have shown this man's guilt beyond any

7    reasonable doubt.  I'm going to ask you to find him guilty of

8    capital murder at this time, not because I say that he's

9    guilty, but because again the facts and the evidence

10   presented in this case show beyond any doubt whatsoever that

11   Jedidiah Isaac Murphy on October the 4th of the year 2000,

12   intentionally killed Bertie Cunningham while he was robbing

13   and kidnapping her.  Thank you.

14            THE COURT:  Ladies and gentlemen, you will

15   retire, I believe lunch is --

16            THE BAILIFF:  Should be here soon.

17            THE COURT:  -- should be here by now.  The

18   alternate is invited to stay with the rest of the jurors

19   through lunch.  After -- before they begin their

20   deliberations, you will be excused.

21         Sheriff, if you'd retire the jury.

22            THE BAILIFF:  All rise.

23            (Jury excused from courtroom.)

24            THE COURT:  Sheriff, may we have the jury,

25   please.

---

DARLINE W. LABAR, OFFICIAL REPORTER

1      Before the jury returns, if there's anybody who

2  feels that they cannot restrain their emotions in an

3  appropriate fashion, I understand.  If you feel that way, I

4  would invite your considering excusing yourself from the

5  courtroom.  In no way do I wish my comments to be interpreted

6  as my attempt to, quote, unquote, chill anybody's

7  constitutional right to be in the courtroom when the verdict

8  is read.

9      The Court on its own motion, after I have read the

10  verdict, will be polling the jury individually on its own

11  motion.

12           THE BAILIFF:  All rise.

13           (Jury returned to courtroom.)

14           THE COURT:  Ladies and gentlemen of the jury,

15  you may be seated.

16      Mr. Murphy, counsel, visitors in the gallery, you

17  may be seated as well.

18      Ladies and gentlemen of the jury, the procedure that

19  will be followed next is I will read the verdict form.  After

20  I have done so, I will be calling you individually, polling

21  the jury.  It's called individually.  As I call your name,

22  may I ask that you individually rise upon your name being

23  called.  I will then ask you what your individual verdict

24  is.  After you have responded to that question, you may be

25  seated.  I will go to the next juror until all 12 have been

1    polled.

2                    (Verdict of the Jury on Guilt/Innocence)

3             THE COURT:  Cause Number F00-02424-M, styled

4    the State of Texas versus Jedidiah Isaac Murphy, verdict

5    reads as follows:  We, the jury, find the defendant, Jedidiah

6    Isaac Murphy, guilty of capital murder as charged in the

7    indictment, presiding juror Nichole Marie Briscoe.

8             I will now call the jurors in the manner in which

9    they were interviewed during voir dire, beginning with Juror

10   Number 1, Emilia Nisbet.

11            Ms. Nisbet, what is your individual verdict?

12                 JUROR:  Guilty of capital murder.

13            THE COURT:  Thank you.  You may be seated.

14        Juror Number 2, Dorothy Jennings, would you please

15   rise?  Ms. Jennings, your individual verdict?

16                 JUROR:  Guilty of capital murder.

17            THE COURT:  You may be seated.

18        Juror Number 3, Kathy S. Hunter.  Ms. Hunter, your

19   individual verdict?

20                 JUROR:  Guilty of capital murder.

21            THE COURT:  You may be seated.

22        Juror Number 4, the Presiding Juror, Nichole Marie

23   Briscoe.

24                 JUROR:  Guilty of capital murder.

25            THE COURT:  You may be seated.

1          Juror Number 5, Richard Anthony Bachmeyer.   Mr.

2    Bachmeyer, your verdict, sir?

3               JUROR:   Guilty of capital murder.

4               THE COURT:   You may be seated, sir.

5          Juror Number 6, Robert L. Mendro.   Mr. Mendro, sir,

6    your individual verdict?

7               JUROR:   Guilty of capital murder.

8               THE COURT:   You may be seated, sir.

9          Juror Number 7, Joann Ruby Lawley.   Ms. Lawley, your

10   individual verdict?

11              JUROR:   Guilty of capital murder.

12              THE COURT:   You may be seated.

13         Juror Number 8, Andre Garza.   Mr. Garza, your

14   verdict, sir?

15              JUROR:   Guilty of capital murder.

16              THE COURT:   You may be seated, sir.

17         Juror Number 9, Marcus Stanley Rasco.   Mr. Rasco,

18   your verdict, sir?

19              JUROR:   Guilty of capital murder.

20              THE COURT:   You may be seated.

21         Juror Number 10, Mark Milford Jones.   Mr. Jones,

22   your verdict, sir?

23              JUROR:   Guilty capital murder.

24              THE COURT:   You may be seated, sir.

25         Juror Number 11, Henry Lee Turner.   Mr. Turner, sir,

1    your individual verdict?

2              JUROR:  Guilty of capital murder.

3              THE COURT:  Mr. Turner, you may be seated.

4         Juror Number 12, Shannon Warner Hinckley.  Ms.

5    Hinckley, your verdict, ma'am?

6              JUROR:  Guilty of capital murder.

7              THE COURT:  You may be seated.

8         The Court accepts the verdict.  Ladies and gentlemen

9    of the jury, I'm going to ask that in the company of the

10   bailiff you return to the jury room.  We have some scheduling

11   matters that the attorneys have asked that I discuss with

12   you.  Going to have the court reporter come in with me.  I

13   don't want her presence in any way, shape, or form to be

14   construed by any of you as intimidating, but merely just to

15   memorialize everything that I am saying outside the presence

16   of Mr. Murphy and the attorneys.  Going to make some comments

17   to you.  I will then be excusing myself so you can discuss

18   with your fellow members some of the alternatives that I'm

19   going to present for your consideration after which if you

20   would again activate the jury call button, I'll come back in

21   if there's further discussion that you need.

22            One of the things we need to be cautious about when

23   I come in and talk with you, the court reporter is but one

24   person and can only take one person talking at a time, so if

25   we could have some sort of order to our discussion for the

1    benefit of the court reporter, please.

2         Sheriff, may I ask that you retire the jury.

3              THE BAILIFF:  All rise.

4              (Jury excused to jury room.)

5              THE COURT:  Visitors in the gallery, you may

6    be seated.

7         Before I go in and discuss with the jury some

8    scheduling options, one of the things in anticipation that

9    they will be asking me, which obviously would not have been

10   proper for me even to inquire until we reached this stage of

11   the trial, without telling me necessarily the nature of the

12   testimony, how long does the State think that their evidence

13   will take to present in the penalty phase of the trial in

14   light of the verdict?

15             MR. DAVIS:  Judge, I anticipate that the State

16   can complete its testimony in one day in this matter.

17             THE COURT:  One day?

18             MR. DAVIS:  Yes, sir.

19             THE COURT:  Ms. Little, lead counsel for the

20   defense, how much time do you anticipate?

21             MS. LITTLE:  I would say three days.  And

22   given argument about admissibility and things, it could be

23   four.

24             THE COURT:  Thank you very much.  I will

25   excuse myself a moment and bring this to the attention of the

1    jury.

2                     (Recess of proceedings.)

3                     THE COURT:  This hearing is being conducted in

4    the jury room.  Court reporter, court, a bailiff, Ms. Grace

5    Madore, present with the 12 jurors.

6                     Before we came in here, I asked the attorneys how

7    long they reasonably anticipated that their evidence from

8    each side would last in the penalty phase of the trial.  I

9    did not ask them until there was a verdict in this stage of

10   the trial because, depending upon your verdict of course,

11   their entire strategy with regard to punishment, had it been

12   other than capital murder, would have been vastly changed.

13   Obviously, both sides had prepared for a penalty on a capital

14   murder guilty verdict, but until if, as, and when that

15   occurred, of course, everything was kind of in flux.  Now

16   those matters will be set hard and fast.

17                    The State says, and I think very frankly they are

18   being unfailingly optimistic with themselves and with me,

19   that they will take but one day with regard to their

20   punishment evidence.  We have had a number of pretrial

21   hearings dealing with their presentation of anticipated

22   evidence if we should get to this stage of the trial.  Having

23   been at this many, many years, I see no way that given what

24   they are going to be presenting to you on the matter of

25   punishment, they can do it in one day.  That's my judicial

1   observation.  I'm not the lawyer.

2          The defense, very frankly much of their case has

3   been geared in anticipation of a penalty stage of the trial.

4   That I know because I have signed the orders granting them

5   the opportunity to hire some expert witnesses and I see what

6   their bills have been and they say and I think they're being

7   very realistic, they say, Judge, we're looking from a defense

8   standpoint three days.  Okay.

9          Now, our good scouter here, I say that not

10  pejoratively.  I'm an Eagle Scout as well, have been to

11  Philmont, and I know just with which you're going there.

12          Mr. Jones, you'll be back the 26th late?

13               MR. JONES:  Yes, sir, late sometime that day.

14               THE COURT:  Whatever we do is going to

15  inconvenience most of us.  That's a given.  I understand

16  that.  I am going to propose, and I want you to discuss this

17  with your fellow jurors after I leave.

18               MS. BRISCOE:  Okay.

19               THE COURT:  And let me tell you I am more

20  concerned about the 12 of you here than I am the lawyers.

21  You're my constituents, not they.  So it will largely be your

22  call.  I'll fade the heat with them.  Don't worry about

23  that.  I would propose a couple of alternatives for your

24  discussion and consideration.  Got a calendar up there.

25          I would propose one of the things we consider is

1    adjourning and resume the penalty phase of this proceeding

2    Wednesday, the 27th of June, and work that Wednesday,

3    Thursday, and Friday.  Following week is the 1st of July.  Of

4    course, the 4th is a holiday.  I would anticipate if were we

5    to do that, we could arguably be completed even if you decide

6    to work on that Saturday -- if you want to work on Saturday,

7    I will, but only if you want to.

8              MR. RASCO:  Saturday, the 7th?

9              THE COURT:  No, Saturday the 30th.  Now, the

10   4th is a holiday.  Either that or we could, if you wanted to,

11   not start until like the 2nd of July, let the State put on

12   their evidence on punishment, and as soon as they finish, we

13   not resume until after the 4th.  But I'm open for

14   alternatives as well.

15             MR. MENDRO:  Judge, I have a problem, because

16   in my original form we have a July vacation scheduled that we

17   set up a year ago.

18             THE COURT:  When?

19             MR. MENDRO:  It starts -- I could delay the

20   2nd or the 3rd, but I've got to be gone by the 4th.

21             THE COURT:  Okay.  That's the kind of output I

22   needed.

23             MR. TURNER:  I have a vacation scheduled for

24   the week of the 9th, also.

25             THE COURT:  What I'm hearing, and I'm going to

1    get out of here because I want you to discuss it without my

2    black robed intimidating presence and I hope it's not that.

3    But if you want to resume on the 27th, or arguably I could

4    force the State into presenting theirs tomorrow, seeing if

5    they could.

6         Mr. Jones, you have to be gone beginning -- you

7    leave, what, 5 o'clock?  I mean --

8              MR. JONES:  Bus leaves at 5:30 on Wednesday,

9    sir.

10             THE COURT:  We could have some State's

11   evidence before -- before Wednesday if you want that.  But if

12   you just want to have all of the penalty -- because the type

13   of evidence that will be -- will be presented will be totally

14   unlike the evidence that you heard in the guilt/innocence

15   phase of the trial.  It's just like the other side of the

16   coin, so it will be a bunch of different types of stuff that

17   you will hear.

18             MR. RASCO:  Are we allowed notes during that?

19             THE COURT:  Oh, sure.  Oh, yeah.

20        So anymore questions for me?  Then I'm going to get

21   out of here.  Discuss it with yourselves.  I apologize.  Any

22   type of situation like this is bad at best, but I want to

23   tell you, I saw this train wreck coming, and I told them --

24   the attorneys before the start of trial, and Ms. Madore will

25   tell you, and it's on the record.  I said, Mr. Jones has got

1    this scouting deal.  We've got an alternate.  I am willing to

2    take a chance and go with these 12 and allow Mr. Jones to be

3    excused, and both sides absolutely went in orbit.  They want

4    you 12.  Very frankly, I mean they were adamant about it.

5    They said, no, we don't want -- no, these are our 12.  And

6    they worked very, very hard, and they want this 12.  And they

7    knew the problems, and they knew what I was going to have to

8    come in and talk to you about.  They said, no, we don't want

9    any one of the 12, including Mr. Jones, to be excused.  So

10   you are the 12 chosen.

11              MS. BRISCOE:  Do you think it's realistic then

12   for maybe five days of testimony?

13              THE COURT:  Yeah.

14              MS. BRISCOE:  Total?

15              THE COURT:  But I would -- the State, if the

16   State says -- when Greg Davis puts on a penalty stage, does

17   it very, very quickly, very quickly.  This is the third or

18   fourth one of these he's tried before me and probably the

19   third or fourth one that Mr. Byck has.

20              MR. JONES:  So the State should be done in how

21   long, do you think, if they're saying one day?

22              THE COURT:  I give them a day and a half at

23   the most.

24              MS. BRISCOE:  So Tuesday and Wednesday we

25   could be --

DARLINE W. LABAR, OFFICIAL REPORTER

1          MR. GARZA:  We would be through by Wednesday?

2          MR. JONES:  And then we come --

3          THE COURT:  Yes.

4          MR. GARZA:  Sunday would not be a possibility,

5     just Saturday through Monday?

6          MS. BRISCOE:  Two questions.  One, if we split

7     it tomorrow and next day and come back the 27th, that's not

8     going to cause any problems in the overall procedure or

9     anything?

10          THE COURT:  Not legally, huh-uh.

11          MR. MENDRO:  Now, another question, are we

12     going to end up being sequestered during any part of the

13     penalty phase?

14          THE COURT:  Not that I anticipate, no.  That

15     option is always out there.  There will, I anticipate, be a

16     story in tomorrow morning's paper.  There has not been.  It's

17     been a concerted effort by the Dallas Morning News -- Tim,

18     the reporter that covers this beat and the editor, out of

19     respect for you, have decided that they are not going to run

20     the story on a day-by-day basis.  The first day they had it,

21     I've got that for you, won't give it until the trial is all

22     over.  There was that first day, but not an article since.

23     Not an article since.

24          But I'm going to get out of here.  If you'd activate

25     the jury call button.  You're the boss.

1          MR. JONES:  Thank you.

2          MS. BRISCOE:  Thank you.

3          (Recess.)

4          THE COURT:  Madame Presiding Juror, have you

5     had an opportunity to confer with your fellow jurors?

6          MS. BRISCOE:  Yes.

7          THE COURT:  What is your pleasure?

8          MS. BRISCOE:  We would like to begin tomorrow

9     and go until 3 o'clock on Wednesday, resume on the 27th, and

10    we are willing to work on that Saturday, the 30th, if need

11    be.

12          THE COURT:  Request granted.  See you tomorrow

13    morning 9 o'clock.

14          MS. BRISCOE:  Yes, sir.

15          (Return to open court)

16          THE COURT:  Let the record reflect I explained

17    to the jurors the alternatives that were possible options

18    with regard to the penalty phase of the trial.  They have

19    selected the following option, and I am notifying counsel

20    that this will be the procedure that we will follow the

21    penalty phase of this trial.

22          We will begin tomorrow morning at 9:00 a.m., with

23    the presentation of the evidence on behalf of the State.  We

24    will proceed until the State has rested in the penalty phase

25    of the trial, but not later than 3:00 p.m. on Wednesday.

1          I do not want, Mr. Davis, you or Ms. Miller to

2    interpret the jury's decision as to saying you have only

3    until 3 o'clock.

4               MR. DAVIS:   Yes, sir.

5               THE COURT:   Mr. Jones and his contingent will

6    be leaving -- the bus will be leaving at 5:30 on Wednesday

7    night.   Two and a half hours will give him sufficient time,

8    he says, to go home, take a quick shower, change clothes, get

9    to the bus.

10          We will then resume the trial wherever we are,

11   whether the State has rested or not rested, 9:00 a.m. on the

12   27th of June.   And it is the unanimous decision and desire of

13   the jurors to work 27th, 28th, 29th, and 30th, that Saturday.

14   So I am alerting counsel for both sides to be anticipating a

15   possible Saturday work day.

16          Stand in recess, resume tomorrow morning 9:00 a.m.

17               (Recess of proceedings.)

18

19

20

21

22

23

24

25

1                        Reporter's Certificate

2  STATE OF TEXAS:

3  COUNTY OF DALLAS:

4       I, Darline W. LaBar, Official Court Reporter of the

5  194th Judicial District Court, in and for Dallas County,

6  Texas do hereby certify that the foregoing volume constitutes

7  a true, complete and correct transcript of all portions of

8  evidence and other proceedings requested in writing by

9  counsel for the parties to be included in the statement of

10 facts, in the above styled and numbered cause, all of which

11 occurred in open court or in chambers and were reported by

12 me.

13      I further certify that this transcription of the

14 record of the proceedings truly and correctly reflects the

15 exhibits, if any, offered by the respective parties.

16      Witness my hand this the 29th day of October, A.D.,

17 2001.

18

19

20 _____
   DARLINE W. LABAR
21 Official Court Reporter
   194th Judicial District Court
22 Dallas County, Texas
   (214) 653-5803

23

24

25 Certification No. 1064 Expires December 31, 2002

                 DARLINE W. LABAR, OFFICIAL REPORTER