REPORTER'S RECORD

VOLUME 55 OF 65 VOLUMES

**74145**

TRIAL COURT CAUSE NO. F00-02424-M

THE STATE OF TEXAS          :          IN THE DISTRICT COURT

VS.                        :          DALLAS COUNTY, TEXAS

JEDIDIAH ISAAC MURPHY       :          194TH JUDICIAL DISTRICT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

PUNISHMENT PHASE BY THE JURY

FILED IN
COURT OF CRIMINAL APPEALS

DEC   5 2001

Troy C. Bennett, Jr., Clerk

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

A P P E A R A N C E S:

HONORABLE BILL HILL, Criminal District Attorney
          Crowley Criminal Courts Building
          Dallas, Dallas County, Texas   75207
          Phone:  214-653-3600
BY:   MR. GREG DAVIS, A.D.A., SBOT # 05493550
      MS. MARY MILLER, A.D.A., SBOT # 21453200
          FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defenders Office
Dallas, Texas   75207
          Phone:  214-653-9400
          FOR THE DEFENDANT.

\* \* \* \* \* \* \* \*

     On the 14th day of June, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

     Proceedings reported by machine shorthand, computer

assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

INDEX VOLUME 55

| June 14th, 2001 | | | PAGE | VOL. |
|---|---|---|---|---|
| Proceedings...................................... | | | 2 | 55 |
| Reporter's Certificate........................... | | | 25 | 55 |

CHRONOLOGICAL WITNESS INDEX

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| GILDA KESSNER | 2 | 23 | | 55 |

ALPHABETICAL WITNESS INDEX

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| GILDA KESSNER | 2 | 23 | | 55 |

EXHIBIT INDEX

| DEFENDANT'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 39  Gilda Kessner Vita | | 24 | | 55 |

```
1                    P R O C E E D I N G S
2              THE COURT:  Continuation of F00-02424-NM, the
3     State of Texas versus Jedidiah Isaac Murphy.  The State
4     continues to be represented by the Honorable Greg Davis, the
5     Honorable Mary Miller, both of whom are present in court at
6     this time.
7              The Honorable Jane Little, the Honorable Jennifer
8     Balido, the Honorable Mike Byck, present in court on behalf
9     of Mr. Murphy, who is also in court.
10             May I ask you to raise your right hand.
11                 (Witness sworn.)
12             MR. DAVIS:  Judge, my understanding this
13    hearing is for the purpose of 705 and 702.
14             THE COURT:  My understanding.
15             MR. DAVIS:  Thank you.
16                    GILDA KESSNER
17    was called as a witness by the State and, after having been
18    first duly sworn, testified as follows:
19                   Direct Examination
20    By Mr. Davis:
21        Q.    Please state your full name.
22        A.    Gilda Kessner.
23        Q.    Dr. Kessner, my name is Greg Davis.  I don't think
24    we've met before, have we?
25        A.    No, we haven't.
```

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.    Okay.   Dr. Kessner, you also understand the purpose

2  of this hearing this morning?

3      A.    Yes.

4      Q.    Dr. Kessner, first of all, did you bring to the

5  court your entire file on this matter?

6      A.    Yes.  I have it with me, and I have records that

7  I've reviewed.

8      Q.    Dr. Kessner, my understanding is that you will be

9  asked to express certain expert opinions to this jury; is

10  that also your understanding?

11      A.    Yes, sir.

12      Q.    Will you be expressing opinions on Special Issue

13  Number 1?

14      A.    Yes.

15      Q.    Will you be expressing opinions in Special Issue

16  Number 2?

17      A.    Referring to mitigation?

18      Q.    Yes.

19      A.    No.

20      Q.    With regards to the opinions that you expect to

21  render on Special Issue Number 1, what documents, if any,

22  have you reviewed?

23      A.    I have a list here of documents that I have

24  reviewed.  I can read them out.

25      Q.    I tell you what, what I'll be asking you at the end

1   of the hearing is just to get a copy of your file --

2       A.   Okay.

3       Q.   -- so as long as that -- that does contain all the

4   documents.

5               MS. LITTLE:   Judge, excuse me just a moment.

6   So much of what she has is what Greg has provided to me, so

7   it would save a lot of time if you go by the list and then

8   see what's missing.

9               MR. DAVIS:   Could I approach?

10              THE COURT:   Sure.

11      Q.   (By Mr. Davis)   Dr. Kessner, if I can just look

12  through that then, I may have some questions, I may not.

13              (Document handed to counsel.)

14              MR. DAVIS:   Thank you.

15      Q.   (By Mr. Davis)   Doctor, I recognize most of the

16  items on your list except for one, Dr. Richard Roscoe's --

17      A.   There's a letter contained in the information, I

18  believe just a brief summary.  He had been a treating

19  physician at one of the facilities, so he was acknowledging

20  that he had been involved with Mr. Murphy.

21      Q.   Okay.  Doctor, who have you interviewed in

22  connection with the opinions that you expect to render?

23      A.   Jedidiah Murphy.

24      Q.   On what dates have you interviewed him?

25      A.   May 28th at the Dallas County Jail.

```
 1      Q.    Have you interviewed him on any other dates?

 2      A.    No, sir.

 3      Q.    How long did you interview him on May 28th?

 4      A.    Approximately four hours.

 5      Q.    Did you administer any tests to him?

 6      A.    No, I did not.

 7      Q.    And did you gather some information that you would

 8   expect to form a basis of some of your opinions?

 9      A.    I gained some information on his adjustment to the

10   jail.  It's -- past psychiatric history, arrest history, just

11   background information.

12      Q.    Okay.

13      A.    To have a more personalized, particularized opinion.

14      Q.    What information did you get from him regarding his

15   adjustment to the jail?

16      A.    He did indicate to me that he had some problems with

17   adjusting to the -- the concept of being incarcerated, that

18   he had attempted to hurt himself with a razor and needed some

19   medical care for that.  He was taking psychiatric

20   medications.  Having problems at one point with depression

21   and then feeling better about how he was going to be able to

22   handle things, so his mood was fluctuating.  That he had some

23   problems with urination, controlling that, and that that had

24   been a problem since he had been in the jail.  He had

25   suffered from that since his first -- first foster home
```

1    placement, first adoption.

2         Q.   So he'd had problems with urination since his first

3    foster home?

4         A.   He said that it began, I believe, when he was living

5    with the Tolars, that he started having some problems with

6    that, urinating in front of others.

7         Q.   Any other problems specifically relating to his

8    incarceration that you can recall?  And you're referring to

9    some notes.  Would your notes more fully detail whatever

10   problems that he gave to you?

11        A.   Yes, whatever information he had given me, plus I

12   also reviewed incident reports from the jail.

13        Q.   Okay.

14        A.   Which would have detailed any significant incidents.

15        Q.   Okay.  I believe you told us he also gave you a

16   psychiatric history, treatment of any sort of psychiatric

17   problems he had experienced; is that right?

18        A.   We talked about his admissions and types of symptoms

19   that he had.

20        Q.   What did he say to you?  What did he tell you?

21        A.   He attributed a lot to it substance abuse, early

22   upbringing.  We talked about some of the diagnoses that he

23   had been given in the past.  And as I said, some of the

24   symptoms and what he felt those meant.

25        Q.   Okay.  He relates some of this to his substance

DARLINE W. LABAR, OFFICIAL REPORTER

1    abuse.  What history of substance abuse did he give to you?

2         A.   He indicated that he mostly had abused alcohol, that

3    he had taken some sleeping pills once on an overdose attempt.

4    I'd have to look at my notes specifically to see if he

5    admitted to -- I think probably a sampling of marijuana, but

6    alcohol was his drug of choice.

7         Q.   So he admitted using alcohol.  Did he give you a

8    starting date for the use of alcohol?

9         A.   I think it began excessive at age 14, probably some

10   introduction earlier than that I believe, but that's my

11   memory.  I'd have to look in my notes specifically.

12        Q.   What about the details of his use of marijuana?

13        A.   I'd have to find that.

14             Okay.  Other drugs.  He had tried marijuana in high

15   school on weekends.  Amphetamines when he was about 20 or 21

16   years old.  Didn't really like the amphetamines.  LSD when he

17   was around 21 or 22, maybe a total of five different times.

18   Cocaine when he was 19 or 20 after he moved to Dallas.

19        Q.   So as I understand, his use of cocaine, according to

20   his history, was limited to the ages of 19 and 20 when he was

21   in Dallas?

22        A.   That's what he was indicating.

23        Q.   So he's admitted to use of marijuana, amphetamines,

24   LSD, cocaine.  Any other controlled substances?

25        A.   No, he's not indicating that.  As I said, he's

1    indicating consistent chronic alcohol use, and then these

2    others are later and more experimental.

3         Q.   You also indicated that he expressed some problems

4    in his upbringing; is that right?

5         A.   Yes, living in two foster adoptive homes.

6         Q.   Okay.  More specifically, what problems did he --

7    did he detail for you, just besides the fact that he was in

8    foster homes?

9         A.   He talked about that he was split up from siblings,

10   that there was physical abuse, that there was domestic

11   violence, that he felt demeaned, he felt that there was a lot

12   of -- you know, putting down of his biological parents.  He

13   felt hopeless, ran away.  His brother took up for him, was

14   like a father to him.  His sister also ran away from the home

15   that she was placed in, so that there was enough of a

16   disruption -- that the adoption was disrupted and they were

17   sent back and then later on through meeting a teacher he was

18   adopted again into the Murphy's household.

19        Q.   So I understand that the problems that he told you

20   about occurred in the Tolar home as opposed to the Murphy

21   home?

22        A.   Those specific problems, yes, and then there was

23   sort of a different type of issue in the Murphy home.

24        Q.   Did he -- did he tell you why he was separated from

25   his siblings, his biological siblings, how he came to be in

1   the Tolar home?

2       A.   Well, he and his brother were in the Tolar home

3   together.  And his sister -- let me see, I'm not sure, I

4   can't remember her name --

5       Q.   You're talking about Donnie now, his brother?

6       A.   Yes, they were in the Tolar home together.  His

7   sister was placed in a different home.  And he had half

8   siblings that went with his mother at the time that she left

9   his father.

10      Q.   First of all, did he express any sort of problems

11  prior to being placed into the Tolar home, any physical

12  abuse, domestic violence, anything of that sort with his

13  biologic family prior to being placed into the Tolar home?

14      A.   Yes, he indicated his biological father was quite

15  violent in the home against his mother, against the children,

16  and also had alcohol abuse problems.

17      Q.   So the biological father was violent toward the

18  mother and the children and had problems with chronic

19  alcoholism?

20      A.   Yes.

21      Q.   What sort of -- what sort of physical violence did

22  the biological father use against Jedidiah Murphy, according

23  to Mr. Murphy?

24      A.   He just referred -- he just used the word that he

25  beat me and my brother and sister, drank all the time.

1    Q.    I'm sorry, beat -- beat Jedidiah Murphy, beat his

2    sister, also?

3    A.    And his brother.

4    Q.    Your understanding, again, he's referring to Donnie?

5    A.    Yes.

6    Q.    Do you have the name of the sister that he was

7    supposedly referring to?

8    A.    Holly Jo.

9    Q.    Holly Jo.

10          Did he give you any ages that this violence

11   occurred?  His age now, for instance, did that happen while

12   he was ages 2 to 4, 5 to 6?

13   A.    He indicated that the alcohol issues was essentially

14   continuous in his memory.

15   Q.    How about the violence?

16   A.    The same.  In other words, that the domestic

17   violence in the household was a pattern.

18   Q.    Did he express any -- any history of abuse or

19   violence regarding his grandparents?

20   A.    No, I don't believe he did.

21   Q.    Okay.  Now, I want to -- I want to go back to the

22   Tolar home for a moment.  You said that he -- he complained

23   of physical abuse occurring in the Tolar home, right?

24   A.    Yes.

25   Q.    Can you give me more details of what he told you

DARLINE W. LABAR, OFFICIAL REPORTER

1  there?  Who directed the abuse toward him?  What form did it

2  take?  Over what period of time?

3      A.    He indicated that it was -- that they were

4  physically abused by the -- there were sons in the home and

5  they were allowed to hit them, kick them, but that also the

6  parents would kick them, hit us, sometimes not feed us.  I

7  asked him about sexual abuse.  He said, "I don't want to talk

8  about it.  They were crazy sick people.  I really don't know

9  anymore."

10      Q.    That was his quote to you?

11      A.    Uh-huh.  Here he indicates that Donnie was 8 years

12  old at the time.  I think that was when they moved into the

13  home.  But that he was built -- Donnie was bigger -- big for

14  his age.

15      Q.    Was it -- was it your understanding when he talked

16  about being kicked and hit and not fed, that both the

17  parents, both Mr. and Mrs. Tolar were participating in that?

18      A.    He just used the word "parents," so he didn't

19  differentiate.  Locked in the bathroom.

20      Q.    He was locked in the bathroom?

21      A.    That's one of the things he indicated, yes.

22      Q.    Anything else regarding abuse?  Was he -- I know

23  that he's detailed the physical abuse.  He refused to talk to

24  you about the sexual abuse.  Any other for of abuse that he

25  alleged occurred?

1    A.    Well, the emotional abuse of taunts about the

2    biological parents.

3    Q.    Who was -- who was taunting him?

4    A.    He indicated that it was the parents -- I mean, the

5    entire family, I suppose, but he didn't distinguish that,

6    just that -- talked about my father, my mother, not feeding

7    us, just started thinking that we were worth nothing.

8    Q.    Did he make any specific reference to what

9    statements the parents would make to him about his parents,

10   about his biological parents?

11   A.    No, I don't think so.

12   Q.    And that -- during the course of the taunts then,

13   that would lead to not being fed; is that right?

14   A.    Well, I think that was part of it.  And then

15   possibly at the time they were also being beaten,

16   intermittently.

17   Q.    Where did the beatings take place, inside the home,

18   was that your understanding?

19   A.    He indicated that, yes.

20   Q.    You had also listed domestic violence earlier, just

21   in kind of the first list that you gave to me.  Was that in

22   reference to what occurred in his biological home, or did

23   that also occur in the Tolar home?

24   A.    I believe he's referring to the biological home.

25   I'd have to look a little further.  In other words, he

1   indicated there was not domestic violence between the

2   partners in the Tolar home.

3       Q.   You told us also that he gave you a history of

4   having run away from the Tolar home?

5       A.   Yes.

6       Q.   What were the circumstances for that?

7       A.   Basically that he and his brother would break out a

8   window and run away, get caught, and eventually we kept

9   running away, the police were called, we presented such a

10  problem that they took us to an orphanage and dropped us off.

11      Q.   So both he and his brother would run away.  Did that

12  occur on more than one occasion, according to --

13      A.   He's indicating that, yes.

14      Q.   Did he give you an approximate number, but --

15      A.   No.

16      Q.   More than one time?

17      A.   Uh-huh.

18      Q.   The police would bring him back; is that right?

19      A.   Or the police would be called, yes, but eventually

20  they just decided to end the adoption process.

21      Q.   Okay.  So that I understand that the decision to end

22  the adoption process was made by the parents; is that

23  correct?  Is that the history the defendant is giving to you?

24  Or was there some sort of governmental intervention to

25  actually take the children out of the Tolar home?

1   A. I believe that they were -- the records also

2 indicate that they were -- the Tolar family said that this

3 isn't working, we don't want to continue with this.

4   Q. So the history that the defendant gave you was that

5 he would repeatedly try to run away with his brother, the

6 parents, the Tolar's, finally tired of that, and decided to

7 end the adoption process and placed him in some sort of

8 shelter or orphanage?

9   A. Yes. I really don't know why they adopted us. They

10 were church going -- if you looked at them, you'd never

11 know. My brother is still not the same. He'll never be

12 right. So indicating that -- just the general chaos going on

13 with the family at the time led to this disruption.

14   Q. Did he tell you how long he stayed in the shelter

15 once he left the Tolar home?

16   A. No, but he did indicate that I think he was close to

17 high school age when he met the Murphys, and that's when he

18 was placed in their home. So he was with the Tolars about

19 five years, I think.

20   Q. Was there -- is there something in your notes that

21 indicates the approximate age he was when he first went with

22 the Murphys?

23   A. He indicates he was around 12, age 12.

24   Q. When he went into the Murphy home?

25   A. Uh-huh.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Did he express any -- any problems that he

2  experienced in the children's shelter after he left the Tolar

3  home?  Any forms of abuse, violence?

4    A.   No, he didn't discuss that.  He couldn't even

5  remember the name of it, just that it was in Fruitvale.

6    Q.   Okay.  You also indicated that he told you about

7  some problems that occurred in the Murphy home, too.

8    A.   Uh-huh.

9    Q.   Okay.  If you would just -- if you could just tell

10  me what the problems that the defendant told you about there.

11    A.   He indicated that he was in the same grade as their

12  son Matt.  They made me dress like him.  He got to pick out

13  my school clothes.  I was like a pet, but they were nice

14  people, clothes, cars, they had money.  I don't know where

15  they got it from.  I went from poverty to the other side

16  quick.  I was in hog heaven really if money made you happy.

17  But by the time I got there, I had already seen too much.  It

18  was hard to call them mom and dad.  I gave an effort.  He

19  refers to Mrs. Murphy as vindictive and Bob Murphy is cool

20  until I started getting in trouble in high school and he

21  dropped me like a rock.  I left at age 18, moved to Dallas.

22  Let's see, they talk -- she talked about -- I think he's

23  referring to Mrs. Murphy here, talked about my dad as a

24  drunk.  If it wasn't for her, I should be thankful.  I was

25  not a happy person during that period.  I was only happy

1    around my brother.

2        Q.   When he's referring to his brother there, is he

3    talking about --

4        A.   Donnie.

5        Q.   -- Matt --

6        A.   Donnie.

7        Q.   -- Donnie?   Did he give you any details of boot

8    camp?

9        A.   He talked about he was there about three months.

10   They picked cotton, busted rocks, did drill, and ceremony.

11   You learn how to make your bed marine style.   You get

12   promoted through Alpha, Bravo, Charlie, and Delta.   He says

13   got to work in the kitchen, had no problems, no write-ups,

14   graduated with honors.   He said he loved the experience.

15       Q.   Where was that boot camp?

16       A.   I'd have to look at the record and see -- he

17   didn't -- just know it was a TDCJ --

18       Q.   Do you recall it being --

19       A.   -- alternative --

20       Q.   -- Wichita Falls?

21       A.   Yes, I believe it was in Wichita Falls, in that

22   general area.   I'd have to look at the record though to be

23   sure.

24       Q.   Okay.   Did you take a general medical history from

25   the defendant when you talked with him?

1        A.    You mean in addition to psychiatric medications and

2   things like that?

3        Q.    Yes, ma'am.  More specifically, let me just direct

4   your attention -- did the defendant ever give you a history,

5   for instance, of having suffered from attention deficit

6   disorder?

7        A.    No, he didn't include that.

8        Q.    He didn't?

9        A.    I don't believe he did, but I would consider that

10  psychiatric history.

11       Q.    Okay.  And you did take a psychiatric history from

12  him?

13       A.    Talked about his treatment history, family history,

14  suicide attempt, depression.

15       Q.    Right.  So no -- no attention deficit disorder?  Did

16  he give you a history of having used Ritalin or Prozac as a

17  child or a teenager?

18       A.    I don't believe so.  I'd have to look further to

19  make sure though.

20       Q.    Did he give you a history of having suffered serious

21  head injuries as a child or as a teenager?

22       A.    He talked about being shot in the hand.

23       Q.    While we're there, what history did you get -- did

24  he give you with regards to being shot in the hand?

25       A.    Reconstructive and neurosurgery on his left hand in

1    Texarkana, can't feel all his fingers anymore, shattered the

2    median nerve, shot himself in the hand in '96 or '97, said it

3    was before his daughter was born.  He was mad at himself,

4    tired of being a drunk.  He and Chelsie had an argument.

5        Q.  Did you understand that to be that that was a

6    self-inflicted gunshot wound?

7        A.  Yes.

8        Q.  That it was an intentional act on his part?

9        A.  Yes.

10       Q.  It was not an accident?

11       A.  That's what he indicated.

12       Q.  Did he tell you what sort of weapon that he had

13   used, Dr. Kessner, by any chance?

14       A.  In the offense --

15       Q.  The '96 when he shot himself in the hand?

16       A.  I don't think he named the weapon.  Or if he did, I

17   didn't write it down.

18       Q.  Okay.  I guess we left off with the serious head

19   injuries.

20       A.  I asked him about the notes in the records on

21   extreme sports and he indicated he didn't know why -- where

22   that came from, where that information came from, but he did

23   refer to getting drunk and riding a bucking barrel, I guess,

24   falling off, hitting his head.  He was employed in a bar on

25   Garland Road, and it was him, another employee, and three

DARLINE W. LABAR, OFFICIAL REPORTER

1    patrons who defended against a brawl that broke out.  And

2    there was -- he was hit over the head with a bar stool.  And

3    then he mentioned blackouts when he was drinking.

4         Q.   How about comas?  He ever list any comas?

5         A.   Well, he indicated that he went unconscious when

6    he -- he became unconscious when he was hit with the bar

7    stool, but he regained consciousness.  He didn't need to go

8    to the hospital.

9         Q.   How about learning disabilities?

10        A.   I don't believe I saw anything about that in the

11   Edgefield -- Edgewood ISD records, and I believe he indicated

12   that.  I have to look and see here.  And also on the medical

13   issue, it mentioned the bladder retention urinary problems.

14        Q.   Doctor, how many times have you testified as an

15   expert in a capital murder case?

16        A.   I believe ten times.

17        Q.   Were those for the defense or for the State?

18        A.   For the defense.

19        Q.   Do you have a list of the cases that you testified

20   in?

21        A.   Yes.

22        Q.   Doctor, have you reviewed any specific pieces of

23   literature in connection with your opinions?

24        A.   Yes, I reviewed risk assessment literature, as well

25   as some literature referring to mental illness and the prison

1   system.

2       Q.   Would your file contain the titles of the literature

3   that you reviewed?

4       A.   I have a binder that has some of the information in

5   the back, but I don't have it all with me.  And some of -- a

6   couple of articles I have in here.

7       Q.   Is your binder here in court?

8       A.   Yes.

9       Q.   So that I suppose at the end of the -- what other

10  information is contained in your binder?

11      A.   Just articles.

12      Q.   I know that you've interviewed the defendant.  Have

13  you interviewed anyone else?

14      A.   No, sir.

15      Q.   What -- what opinions -- I know that you read

16  material about mental illness in -- what, in a prison

17  setting?

18      A.   In prison -- in State prisons systems, federal

19  prison systems.

20      Q.   Okay.  What opinions do you anticipate expressing

21  about that subject?

22      A.   Stedman-Wright's, based on neurostatistics,

23  approximately 8 percent of inmates have severe mental

24  illness, another 16 percent undergo some form of psychiatric

25  treatment at some time during their prison stay or have spent

1   the night in a psychiatric hospital, so it's around 24

2   percent could be categorized as having severe mental

3   illness -- either acute or chronic.

4       Q.   Okay.  How do you intend to relate that to Special

5   Issue Number 1?

6       A.   Basically that the prison system is prepared to

7   accommodate for offenders with mental illness.

8       Q.   Do you expect to express an opinion about whether

9   the defendant would pose a future danger in a prison setting?

10      A.   A statistical probability, and that's based on

11  research and some specific research that's been done in

12  Texas.

13      Q.   Do you intend to express an opinion about whether

14  the defendant would pose a future danger outside of the

15  prison?  In the community, if you will?

16      A.   Essentially I think the jury has decided his offense

17  signifies that he has been a danger in the community so we're

18  looking at a long-term prison term.

19      Q.   Do you --

20      A.   I'm not going to question their decision.

21      Q.   You have no reason to disagree with it?

22      A.   No, I'm going to accept the details of the offense

23  as factual.

24      Q.   Do you believe that this defendant does pose a

25  danger in the community?

1    A.   I think that he's demonstrated that he's a risk in

2    the community with non-offending individuals.

3    Q.   So when you talk about the prison setting, again

4    you're going to be referring to literature, the studies, the

5    base line studies and the like to give a statistical analysis

6    there; is that correct?

7    A.   A statistical analysis, and also -- as I said, also

8    to discuss the prison system's capacity to deal with mentally

9    ill offenders.

10    Q.   Doctor, do you anticipate doing any further work in

11    this case prior to testifying on -- on or about June 27th?

12    A.   I'll probably be spending a little more time looking

13    at the records.  And I have been -- I have made an attempt to

14    contact Dr. Ross Taylor, a psychiatrist at TDCJ, to get some

15    specific information on numbers, percentages in the system

16    who treat for mental illness.

17    Q.   And the records that you anticipate looking at, do

18    you have an idea of what particular records you'll be looking

19    at between now and the 27th?

20    A.   I'll probably look at the jail offense, incident

21    reports, that sort of thing again just to refresh my memory,

22    maybe some psychiatric records.  I understand it's going to

23    be a couple of weeks though.

24    Q.   Right.

25              MR. DAVIS:   Judge, I believe that's all I have

1    this morning.

2                        Cross-Examination

3    By Ms. Little:

4        Q.    I have just one question --

5                    MR. DAVIS:  If we can have an understanding

6    that before the doctor leaves, that I can be provide with a

7    copy of her file, as well as a copy of the material in her

8    binder.

9                    THE COURT:  Request granted.

10       Q.    (By Ms. Little)   Would it be possible that Jim

11   Murphy was in Childress at boot camp instead of than Wichita

12   Falls?

13       A.    That's possible.  I couldn't remember what it said

14   on there.

15                   MS. LITTLE:  Okay.  Thank you.  That's all I

16   have for now.

17                   MR. DAVIS:  Nothing further.

18                   THE COURT:  Thank you, Doctor.  You may step

19   down.

20                   THE COURT:  Jane, may I ask you to coordinate

21   with your witness the documents that the State is entitled

22   to?

23                   MS. MILLER:  Do you want Scott to Xerox?

24                   THE COURT:  Yes, if Scott is available.

25              Anything further this morning, counsel?

```
 1                    MS. LITTLE:  I'll offer Defense Exhibit Number

 2    39 for record purposes.

 3                    (Defendant's Exhibit No. 39 offered)

 4                    THE COURT:  The C V.?

 5                    MS. LITTLE:  Yes, sir.

 6                    THE COURT:  Anything further, counsel?

 7                    MS. LITTLE:  No, sir.

 8                    THE COURT:  The State have anything this

 9    morning?

10                    MR. DAVIS:  Nothing further, Your Honor.

11                    THE COURT:  Tomorrow morning, 9 o'clock.

12                    MS. LITTLE:  Yes, sir.

13                    (Recess of Proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4            I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13           I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16           Witness my hand this the 26th day of June, A.D.,

17   2001.

18

19

20                    DARLINE W. LABAR
21                    Official Court Reporter
                      194th Judicial District Court
22                    Dallas County, Texas
                      (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002

Page 1

1                    REPORTER'S RECORD

2              VOLUME 56 OF 65 VOLUMES **74145**

3          TRIAL COURT CAUSE NO. F00-02424-M

4    THE STATE OF TEXAS          :        IN THE DISTRICT COURT

5    VS.                         :        DALLAS COUNTY, TEXAS

6    JEDIDIAH ISAAC MURPHY       :        194TH JUDICIAL DISTRICT

7              ********************

8              PUNISHMENT PHASE BY JURY

9              ********************

**FILED IN
COURT OF CRIMINAL APPEALS**

DEC  5 2001

Troy C. Bennett, Jr., Clerk

10   A P P E A R A N C E S:

11   HONORABLE BILL HILL, Criminal District Attorney
            Crowley Criminal Courts Building
12          Dallas, Dallas County, Texas  75207
            Phone:  214-653-3600
13   BY:    MS. MARY MILLER, A.D.A., SBOT # 21453200
                FOR THE STATE OF TEXAS;

14

15   MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
     MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16   MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
     Dallas County Public Defenders Office
17   Frank Crowley Courts Building
     Dallas, Texas  75207
18          Phone:  214-653-9400
                FOR THE DEFENDANT.

19              *********

20        On the 15th day of June, 2001, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable F. Harold Entz, Jr.,

23   Judge presiding, held in Dallas, Dallas County, Texas:

24        Proceedings reported by machine shorthand, computer

25   assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER

1                           INDEX VOLUME 56

2    June 15th, 2001                                    PAGE      VOL.

3    Proceedings....................................... 2        56

4    Reporter's Certificate............................ 58       56

5

6                      CHRONOLOGICAL WITNESS INDEX

7                         DIRECT        CROSS        VD      VOL.

8    J. DOUGLAS CROWDER        3                                56

9    MARY CONNELL              25                               56

10

11                     ALPHABETICAL WITNESS INDEX

12                         DIRECT        CROSS        VD      VOL.

13   MARY CONNELL              25                               56

14   J. DOUGLAS CROWDER        3                                56

15

16                           EXHIBIT INDEX

17   STATE'S                OFFERED       ADMITTED        VOL.

18     144    Copied Photographs    54          54         56

19   DEFENDANT'S            OFFERED       ADMITTED        VOL.

20     40     Crowder Vita       20          20         56

21     41     Connell Vita       24          24         56

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:   Continuation of F00-02424-MM, case

3    styled the State of Texas versus Jedidiah Isaac Murphy.

4            The record reflect lead counsel for the State, the

5    Honorable Greg Davis, is present in court with co-counsel,

6    Chief Prosecutor, 194th District Court, the Honorable Mary

7    Miller.

8            Lead counsel for the accused, the Honorable Jane

9    Little, is present in court with her co-counsel, the

10   Honorable Michael Byck, the Honorable Jennifer Balido.

11           Let the record further reflect the defendant,

12   Jedidiah Isaac Murphy, will be in court at all times during

13   this hearing absent my dictating the contrary into the

14   record.

15           Dr. Crowder, may I ask that you raise your right

16   hand, please.

17                    (Witness sworn.)

18           THE COURT:   Let the record further reflect

19   this hearing is being conducted in open court, outside the

20   presence and hearing of the impaneled jury.

21           Mr. Davis, you may begin the interrogation of Dr.

22   Crowder.

23           MR. DAVIS:   Thank you.

24

25

1        JAYE DOUGLAS CROWDER

2  was called as a witness by the State and, after having been

3  first duly sworn, testified as follows:

4                    Direct Examination

5  By Mr. Davis:

6      Q.    Would you please tell us your full name for the

7  record?

8      A.    Yes.  Jaye Douglas Crowder.

9      Q.    Dr. Crowder, how are you doing today?

10     A.    Fine.

11     Q.    Dr. Crowder, I believe you understand the purpose of

12  this hearing?

13     A.    I think my findings; is that correct?

14     Q.    Yes, sir, under Rule 705.

15     A.    Uh-huh.

16     Q.    So I'll be asking you for your opinions and the

17  basis of your opinions.  Very briefly let me ask you, do you

18  anticipate expressing any opinions to the jury concerning

19  Special Issue Number 1?

20     A.    Which special issue --

21                THE COURT:    Future dangerousness.

22     Q.    (By Mr. Davis)  Future dangerousness?

23     A.    Yes.

24     Q.    Okay.  Do you anticipate expressing opinions about

25  Special Issue Number 2, mitigation?

1    A.    Yes.

2    Q.    If we could, starting with Special Issue Number 1,

3    what opinions do you anticipate rendering on that issue?

4    A.    There will be some literature discussing the

5    frequency of violence or aggression by murder defendants, and

6    there will be basically conclusion that the odds are against

7    serious violence in the future on the part of Mr. Murphy.

8    Q.    Okay.  So that again I understand, you're talking

9    general about some studies or literature that have been done

10   and then you'll apply that to Mr. Murphy's case and your

11   conclusion will be that he will not pose a future threat; is

12   that the gist of your testimony?

13   A.    I can't say that he will not pose a future threat.

14   What I can say is the odds are against it.  You can't predict

15   necessarily for one individual, what that one person will do.

16   Q.    Is that -- is that in reference to his behavior in

17   prison or outside of prison?

18   A.    Both.

19   Q.    Both?

20   A.    I'm sorry, the opinion about the danger, that has to

21   do with prison.  It refers to his behavior or it's based on

22   his behavior in both places.  I may have not made that clear.

23   Q.    So that you'll express an opinion that the odds are

24   against him actually posing a future -- future threat or

25   danger inside a prison?

1     A.    Correct.

2     Q.    Will you express any opinion about whether he will

3   pose a threat or a risk outside of a prison in the future?

4     A.    I don't anticipate being asked that on direct.   You

5   know, of course you can cross-examine me about that.

6     Q.    Have you formed an opinion on that subject?

7     A.    Yes.

8     Q.    What is your opinion?

9     A.    Well, on the outside, I would be concerned about

10  him.

11    Q.    If we could,, turning to Special Issue Number 2,

12  what opinions do you anticipate rendering?

13    A.    Mr. Murphy did have a difficult upbringing in which

14  his mother basically abandoned him and some of his siblings

15  in favor of other siblings.  He grew up in three different --

16  well, actually four different households at various times.

17  He witnessed some violence between his father who is an

18  alcoholic and his mother.  So those things would kind of

19  play.

20          Further, he has some genetic predispositions to

21  alcoholism and to -- probably to impulsiveness as a

22  personality disorder.

23    Q.    Okay.  So the upbringing, the four homes, the

24  domestic violence in his biological parents' home, correct?

25    A.    Yes.

1    Q.    A genetic predisposition towards alcoholism?

2    A.    Right.

3    Q.    And impulse control difficulties?

4    A.    Yes.

5    Q.    And did I understand you to say also to antisocial

6    personality disorder?

7    A.    I didn't say antisocial.  I said personality

8    disorder.

9    Q.    I'm sorry?

10    A.    To personality disorder, but not antisocial

11    personality disorder.

12    Q.    If you could, just explain in just a little bit more

13    detail what you mean by the term "personality disorder."

14    A.    That's a category of diagnoses in DSM IV which

15    refers to chronic maladaptive patterns of living which either

16    cause the person discomfort or difficulties functioning in

17    occupation, social, or other important roles.

18    Q.    Do you anticipate any other history being related to

19    the jury with regards to perhaps sexual or physical or

20    emotional abuse suffered by Mr. Murphy?

21    A.    There was some claim of that, which is difficult to

22    confirm.  He did claim that.  I would anticipate sharing what

23    that would do to a person, but I couldn't confirm one way or

24    another whether it occurred.

25    Q.    Do you anticipate any testimony with regards to

1    mental history or any sort of mental disorders he may have

2    suffered in the past?

3        A.   Yes.

4        Q.   Can you tell me a little bit about that, please?

5        A.   Yes.  He suffers from depression with strong anxiety

6    features.  He suffers from alcohol dependence.  As far as

7    personality disorder is concerned, I would diagnosis him with

8    narcissistic and borderline personality disorders.

9        Q.   How about besides alcohol, any other opinions

10   concerning substance abuse?

11       A.   He has had substance abuse in the past which doesn't

12   seem as extensive as the alcohol, so there is other substance

13   abuse also.

14       Q.   Who have you interviewed in connection with your

15   testimony?

16       A.   Interviewed his sister Tonya.  I interviewed his

17   mother Hope Abbott.  I interviewed his sister and his

18   brother-in-law which would be the Erwins.  I think you're

19   aware of them.  I interviewed Katherine Bunts who was a

20   teacher of his.  I interviewed a couple who are both teachers

21   named Shelnut who taught him also in school.

22       Q.   Uh-huh.

23       A.   I believe that's -- no, I'm sorry.  I interviewed

24   Randy Crow who is his AA sponsor as well.

25       Q.   Did you test -- did you interview the defendant

1    himself?

2         A.    Oh, yes, I interviewed him.

3         Q.    How many times have you interviewed the defendant?

4         A.    Three times.

5         Q.    Just so we can kind of shortcut this a little bit,

6    does your -- will your file reflect the dates that you

7    interviewed the defendant?

8         A.    Yes, it does reflect the dates.

9         Q.    Will it also reflect the dates and the contents of

10   any interviews you had with these other individuals?

11        A.    Yes, it does.

12        Q.    Have any -- any tests been run on the defendant at

13   your direction?

14        A.    Yes, they have.

15        Q.    What tests have been run?

16        A.    I asked for psychological testing,

17   neuropsychological testing and MRI and an EEG.

18        Q.    Who performed the psychological testing?

19        A.    Robert Lovitt, L-o-v-i-t-t.

20        Q.    Will your file contain a copy of his report?

21        A.    I received a verbal report from him, and I don't

22   believe there is a written report.

23        Q.    When was that test performed?  Recently?

24        A.    No.  It was probably a month or two ago.

25        Q.    And in general then can you tell me what the results

1    of his tests were?

2        A.    The results were consistent with my diagnosis of

3    personality disorder basically.   There were narcissistic --

4    strong narcissistic features, borderline features.   There

5    were some antisocial features.   There were -- there were

6    indications of his acute discomfort at this time as well.

7        Q.    Who performed the neuropsychological test?

8        A.    That would be Monroe Kullen.

9        Q.    And were they -- when were those tests performed?

10       A.    Again, it would be the same time frame as the

11   psychological testing.   There is a report on that testing.

12   It's in the -- it's in the files that you can look at.

13       Q.    In particular, going back one step, exactly what

14   psychological tests were performed by Dr. Lovitt?

15       A.    He did an MMPI 2 and a Rorschach.   I'm not sure if

16   he did a Millon, also, but at least those two tests.

17       Q.    All right.   And what neuropsychological tests were

18   done by Dr. Kullen?

19       A.    It would have been a Halstead-Reitan, and I think he

20   probably incorporated some other subtests that aren't

21   technically a part of that protocol, so it was more or less

22   at his discretion, be a whole list of procedures.

23       Q.    And in general, what were the results of the

24   neuropsychological testing done by Dr. Kullen?

25       A.    There was not any evidence of central nervous system

DARLINE W. LABAR, OFFICIAL REPORTER

1   damage.

2       Q.   Did I understand you to say that an EEG was also

3   performed?

4       A.   Yes.

5       Q.   When was that performed?

6       A.   Again, similar time frame.  I don't recall the exact

7   date.

8       Q.   But you recall who performed that test?

9       A.   That would have been done at Parkland, as well as

10  the MRI.  They were both done there in about the same time

11  frame.

12      Q.   Can you tell me in general what were the results of

13  the EEG?

14      A.   Yes.  That was considered within normal limits.

15      Q.   How about the MRI?  What were the results there?

16      A.   There was no central nervous system pathology.

17  There was some sinus findings and perhaps a cyst in the

18  sinuses, but nothing in the central nervous system.

19      Q.   Okay.  Besides the psychological, the

20  neuropsychological, the EEG, and MRI, were any other tests

21  done, to your knowledge?

22      A.   No.

23      Q.   Did you yourself administer any tests to the

24  defendant?

25      A.   No.

1      Q.    To your knowledge, has Dr. Mary Connell performed

2   any tests on the defendant?

3      A.    I think perhaps actually she did the MMPI 2 and

4   perhaps supplied her results to Dr. Lovitt to interpret.

5      Q.    Have you -- have you had discussions with Dr. Gilda

6   Kessner about this case?

7      A.    Yes.

8      Q.    Can you tell me the gist of your conversations with

9   her?

10     A.    Well, we discussed -- we've discussed these issues

11  that I've just enumerated.  We discussed the childhood

12  issues.  We discussed the dangerousness issue that you're

13  talking about.  We discussed diagnosis.

14     Q.    Have you had discussions with Dr. Connell as well?

15     A.    Yes.

16     Q.    Okay.  And what issues have you discussed with her?

17     A.    Of course she is mostly focused on the childhood

18  issues and a little bit of the psychology of events.

19     Q.    Has she made you aware of the opinions that she

20  anticipates rendering?

21     A.    Actually I don't think she has made me very aware.

22  I think we're in basic agreement that this was a difficult

23  childhood and it would predispose a person to maladjustment

24  in adult life.  And beyond that, I don't know any great

25  detail.

1    Q.   So that I understand, you did have a chance to

2    review findings from these tests, correct?

3    A.   I got a verbal report about the findings.  I didn't

4    look at the tests myself personally.

5    Q.   And what other documents have you reviewed, and I'm

6    not talking about the literature or studies necessarily, but

7    any other documents related to this case?

8    A.   I don't know if I can list them all.  It's a

9    great -- it's a great many.  The jail records, the incident

10   reports, the police reports and investigative notes, the

11   affidavits submitted by various witnesses, the medical

12   records from the Andrews Center, Green Oaks Hospital, Terrell

13   State Hospital, Timberlawn Hospital.  Nothing else comes to

14   mind right now, but a great many records.

15   Q.   In your --

16   A.   Probation records, I'm sorry I didn't --

17   Q.   Would that be from Van Zandt County, as well as

18   Dallas County?

19   A.   Yes.

20   Q.   Again, your notes in your file, will they contain

21   the contents of your interviews with the defendant?

22   A.   Yes, they do.

23   Q.   All the interviews, did they take place here in the

24   Dallas County Jail?

25   A.   Yes, they did.

 1     Q.   Do you remember in general what the dates were for

 2   those interviews?  Were they done recently, within the last

 3   couple of months?

 4     A.   They were done no later -- I mean, no earlier than

 5   late March.

 6     Q.   Doctor, do you anticipate doing any further work on

 7   this case prior to your testimony later this month?

 8     A.   Yes.

 9     Q.   What do you anticipate doing?

10     A.   I want to interview him one more time.  There are a

11   couple of other people I want to talk to.  In addition to

12   that, I will probably look for some other literature

13   references.

14     Q.   What is going to be the purpose of the fourth

15   interview with the defendant?

16     A.   I wanted to ask him some questions about extraneous

17   offenses that you were intending to introduce.

18     Q.   Okay.  You haven't -- you haven't talked with him

19   about that at this time?

20     A.   I've talked to him about some of them, but there was

21   one in particular.

22     Q.   Which one in particular?

23     A.   I understand that a woman has testified that he held

24   a gun to her head when they were out drinking one night.

25     Q.   When you've talked with the defendant in the past,

1    have you asked him to tell you about any other offenses that

2    he may have committed?

3        A.    Some of them, yes.

4        Q.    Okay.  Has he -- has he talked to you about an

5    incident that occurred in Wichita Falls?

6        A.    I don't believe so.

7        Q.    Has he talked with you about an event that occurred

8    to a nurse over in Arlington?

9        A.    You'd have to be more specific.

10        Q.    Woman's name is Cheryl Wilhelm who was abducted

11    around noon from a parking lot.

12        A.    Yes, we did discuss that.

13        Q.    Okay.  What's he told about that?

14        A.    He said that he did not commit that crime.

15        Q.    Did he talk to you about holding a knife on his

16    common law wife Chelsie Willis?

17        A.    Yes.

18        Q.    What's he told you about that?

19        A.    I think that he picked up a knife once.  That was

20    about it.

21        Q.    Has he told you -- well, I take it up to this point

22    he hasn't mentioned Mandy Kirl, has he, the girl who had the

23    gun held up to her head?

24        A.    We have not discussed that incident, that's right.

25        Q.    Has he discussed his prior burglary convictions down

1    in Van Zandt County with you?

2        A.    Yes.

3        Q.    His theft conviction up here in Dallas County?

4        A.    Yes.

5        Q.    Has he mentioned his suicide attempt up here in the

6    Dallas County Jail?

7        A.    Yes.

8        Q.    What's he related to you on that subject?

9        A.    Said he was very discouraged and he wanted to die.

10        Q.    Did he tell you how long he had been discouraged,

11    the precise reason for his discouragement?

12        A.    I think it was everything.  It was the concern about

13    his past actions, the mistakes he's made in his life, and

14    undoubtedly the pressure of the trial and the possible death

15    sentence are weighing on him, so all those things came into

16    it.

17        Q.    Okay.  Has he talked with you about the incident

18    that occurred over in the government center jail on the 7th

19    floor when he got into a fight with the guards?

20        A.    I wouldn't necessarily characterize it as a fight.

21    He did discuss that incident, the one I think you're

22    referring to.

23        Q.    What did he tell you about that?

24        A.    That he was going to be taken back to the holdover,

25    he didn't feel he could urinate in front of other people.  He

1   had not urinated that morning.  Didn't have his medication.

2   He was unwilling to go back, so he sort of passively resisted

3   them taking him.

4        Q.   What was he over there for?

5                  MS. LITTLE:  I'll object to this as beyond the

6   scope of this hearing.

7                  THE COURT:  Sustained.

8        Q.   (By Mr. Davis)  Are you using that incident to form

9   any conclusions in this case concerning his behavior in a

10  confined setting, such as prison?

11       A.   Sure, I took it into account.

12       Q.   If you would then, I want to talk about that

13  incident.  First of all, why was he in the government center

14  that day?

15                 MS. LITTLE:  I'll object to this, Your Honor.

16                 THE COURT:  Objection is overruled in light of

17  the response of the witness.

18       A.   He was talking -- I'm sorry.

19                 THE COURT:  Go ahead.

20       A.   He was there to talk to an investigator from the

21  defense team.

22       Q.   (By Mr. Davis)  Was he there to take a polygraph

23  examination?

24                 MS. LITTLE:  I'll object to that as going

25  beyond the scope of this hearing --

DARLINE W. LABAR, OFFICIAL REPORTER

 1                    THE COURT:  Sustained.

 2                    MS. LITTLE:  -- inadmissible.

 3         Q.   (By Mr. Davis)  Who was the investigator?

 4         A.   Mr. Parker.

 5         Q.   Bill Parker?

 6         A.   Yes.

 7         Q.   You're familiar with him, aren't you?

 8         A.   I've spoken to him.  I know him.

 9         Q.   Have you interviewed Bill Parker?

10         A.   I have not interviewed Bill Parker.

11         Q.   You mentioned that you want to interview two

12    additional individuals.  Who are they?

13         A.   One would be Matt Murphy.

14         Q.   Matt Murphy.

15         A.   And I'm still waiting for Mr. Murphy -- Bob Murphy.

16         Q.   So you're going to talk to Matt and Bob Murphy?

17         A.   Yes.

18         Q.   Do you anticipate any additional tests being done

19    prior to --

20         A.   No further -- no further testing.

21         Q.   And then you're going to do some additional study on

22    literature.  Is that going to deal basically with Special

23    Issue Number 1 or Number 2?

24         A.   That could deal with either.  I especially am

25    interested in some things with Special Issue Number 2 in that

1    regard.

2        Q.    Can you just tell me in general what types of things

3    do you intend to research further?

4        A.    Yes.   I'm particularly looking into the alcohol

5    issue.

6        Q.    In what respect?

7        A.    Predisposition to aggression, loss of impulse

8    control, poor judgment, perhaps the genetics of alcoholism.

9        Q.    Doctor, where is your file?  Do you have it?

10       A.    It's here.

11       Q.    Okay.   And again, as I understand, instead of taking

12   up time right now, as far as details of interviews,

13   conversations, dates, that sort of thing, your file should

14   contain that information, shouldn't it?

15       A.    Yes, it does contain it.

16       Q.    How -- how would I go about getting copies of the

17   medical tests that were run on Mr. Murphy?

18       A.    The EEG report, I believe, is here.   The MRI report,

19   I believe, actually Ms. Little has it or has a copy of it.

20   I'm not sure it's right here.   Take my word for it, it's

21   normal, but --

22       Q.    How about --

23       A.    -- I will get that to you.

24       Q.    Do you have a copy of the test done by Dr. Kullen?

25       A.    Yes.

1     Q.    Is that in your file?

2     A.    The testing -- the testing report, not the raw data

3  or anything.

4     Q.    Then your file, would that contain some sort of

5  notes about what you were told verbally about the MMPI 2, as

6  well as any other neurological tests that were done?

7     A.    I didn't get any verbal reports about the medical

8  testing, the EEG or the MRI.   That's all here.

9     Q.    No, I'm -- I'm talking --

10    A.    The psychological testing, there's not a report.   I

11 don't have any notes.

12    Q.    Where would I go about getting the results of those

13 tests?

14    A.    I suppose you'd need to talk to Dr. Lovitt about

15 that.

16         MR. DAVIS:   Judge, I believe that's all the

17 questions I have.

18         And I would ask that the Court adopt leave that we

19 be given an opportunity to make a copy of his file and then,

20 if we could have some understanding with counsel about being

21 provided with the other tests that Dr. Lovitt may have done

22 or Dr. Connell or the medical tests that may be in possession

23 of --

24         THE COURT:   I think Dr. Connell is scheduled

25 this afternoon.   We could make that inquiry.

1          MS. LITTLE:  1 o'clock.

2          THE COURT:  Ms. Little, can you --

3          MS. LITTLE:  Your Honor, regarding the MRI

4   results, I did receive from Dr. Crowder's secretary a fax

5   stating that would be the results, but it was not.  So I do

6   not have that.  But I'm sure we can easily obtain it.

7          Regarding the things in the file, certainly they're

8   here today.  I don't have anything from Dr. Lovitt either.

9   We can request that he do a written -- I don't have anything

10  of Dr. Lovitt's.

11         THE COURT:  All right.

12         MS. LITTLE:  I do know that he relied on some

13  test that Mary Connell did, but we can provide all of that.

14         THE COURT:  Okay.  Do you have any

15  questions --

16         MS. LITTLE:  Is there anything I left out?

17         THE COURT:  Do you have any questions for Dr.

18  Crowder of this hearing?

19         MS. LITTLE:  No, sir, I'd just offer Defense

20  Exhibit Number 40 for record purposes, which is his vita.

21         (Defendant's Exhibit No. 40 offered)

22         THE COURT:  CV?  Admitted.

23         (Defendant's Exhibit No. 40 admitted)

24         THE COURT:  Anything further?

25         MS. LITTLE:  Anything else?

1    Q.   (By Mr. Davis)   Let me just ask you, just because I

2  did have a Motion in Limine, also?  Do you intend -- do you

3  anticipate -- well, first, do you anticipate providing the

4  jury with any photographs, anything of that nature during

5  your testimony?

6    A.   No photographs, no.

7    Q.   Now, this history, I take it that it's part of your

8  testimony, you will be giving them an overall psychological

9  history of the defendant?

10   A.   Right.

11   Q.   Now -- and the basis of that is going to be what

12  you've been told by the defendant, as well as what you've

13  been told by family members, correct?  And --

14   A.   And the records.

15   Q.   -- and the records.  Okay.

16            MR. DAVIS:  That's all I have, Judge.

17            MS. LITTLE:  Let me just make one other

18  addition to the record, Judge.

19            THE COURT:  Yes, ma'am.

20            MS. LITTLE:  The vast majority of what Dr.

21  Crowder has is material that the State has provided to me

22  over the course of this trial and previous to the beginning

23  of jury selection which are all these records that we all

24  know about, jail, medical, jail behavior, all these

25  psychiatric places, all these police reports.  All these

1    things were provided by the State, and Dr. Crowder has all of

2    those things.

3                    THE COURT:  All right.  Anything further at

4    this hearing?

5                    MS. BALIDO:  Yes, Judge.  We -- also, we have

6    inquired previously as to the State -- specifically with Mr.

7    Davis, as to whether or not they plan on sending a expert

8    over to interview the defendant.  At this point they have

9    not -- they have not told us that they're going to.  And

10   since you're going to be out of town next week --

11                   THE COURT:  Pursuant to the United States

12   Supreme Court case Buchannan versus Kentucky, does the State

13   in light of Dr. Crowder's having personally examined the

14   defendant choose to call upon a forensic psychiatrist to

15   examine him as well?

16                   MR. DAVIS:  No, sir.

17                   MS. LITTLE:  We would just want it to be known

18   that if indeed that should change, that we would like an

19   opportunity that's adequate to talk to our client.

20                   MR. DAVIS:  I would -- I would reserve, you

21   know, my right to say otherwise after I've had a chance to

22   look at his records or the tests done by the doctor and

23   consult with someone.  If they determine it's necessary, I

24   will certainly come back to counsel and indicate that to

25   them.

1          THE COURT:  The State is so instructed and

2   ordered to apprise the defense of their -- if they have a

3   change of heart with regard to trial strategy.

4          MS. BALIDO:  What -- I'm sorry, Judge, what

5   our concern is that we have instructed our client not to talk

6   to anyone that we haven't told him to talk to.  And we don't

7   want it to be a situation that whatever expert they send over

8   there, 15 minutes after they tell us or whatever.  We just

9   want an opportunity --

10          MS. LITTLE:  Because we're not doing that.

11          MS. BALIDO:  We just need to be aware so we

12   can counsel our client as to what's going on.

13          THE COURT:  I would ask that the State make a

14   timely strategic decision whether or not to engage the

15   services of a forensic psychiatrist.

16          MR. DAVIS:  Yes, sir.

17          THE COURT:  Anything further?

18          MS. LITTLE:  We would also request if they've

19   already talked to someone about future danger, who views

20   things contrary to their position, we'd like to know under

21   Brady and due process who that person might be.

22          MR. DAVIS:  I have no Brady material to

23   disclose at this time.

24          THE COURT:  Anything further?  Hearing is

25   concluded.

DARLINE W. LABAR, OFFICIAL REPORTER

1          Thank you Dr. Crowder.

2                (Recess of proceedings.)

3                THE COURT:   Continuation of the hearings in

4    Cause F00-02424-NM, styled the State of Texas versus Jedidiah

5    Isaac Murphy.

6          The State continues to be represented by the

7    Honorable Greg Davis, the Honorable Mary Miller.

8          Lead counsel for the defense, the Honorable Jane

9    Little, and co-counsel, the Honorable Jennifer Balido, are

10   present in court during this hearing with the accused,

11   Jedidiah Isaac Murphy.

12         The State prepared to continue?

13               MR. DAVIS:   The State's ready, Your Honor.

14               THE COURT:   Is the defense prepared to

15   continue?

16               MS. LITTLE:   Yes, sir.

17               THE COURT:   Doctor, if you please.

18               MS. LITTLE:   Your Honor, we offer Defense

19   Exhibit Number 41, which I put for Darline up there, the vita

20   of Dr. Mary Connell.   The State has a copy as well.

21               (Defendant's Exhibit No. 41 offered)

22               THE COURT:   Any objection from the State?

23               MR. DAVIS:   No objection.

24               THE COURT:   Admitted.

25               (Defendant's Exhibit No. 41 admitted)

1        THE COURT:  Let the record reflect this

2  hearing is being conducted in open court, outside the

3  presence and hearing of the impaneled jury.

4        Mr. Davis, you may proceed.

5        MR. DAVIS:  Thank you.

6                    MARY CONNELL

7  was called as a witness by the State and, after having been

8  first duly sworn, testified as follows:

9                  <u>Direct Examination</u>

10  By Mr. Davis:

11     Q.    Would you please state your full name for the

12  record?

13     A.    Yes.  Mary Adene (phonetic) Connell.

14     Q.    Dr. Connell, you and I have met previously, I think,

15  haven't we?

16     A.    Yes, we have.

17     Q.    Dr. Connell, you understand the purpose of this

18  hearing is to have you elicit whatever opinions that you

19  expect to render in this case, as well as the basis for your

20  opinions?

21     A.    Yes, sir, I do.

22     Q.    Dr. Connell, first of all, do you expect to render

23  any opinions concerning Special Issue Number 1, the future

24  dangerousness issue?

25     A.    No, I do not.

1      Q.    Can you tell me what opinions that you anticipate

2   rendering on Special Issue Number 2 then?

3      A.    Yes, sir.  My opinion will have to do with the kinds

4   of mitigating factors that might have impacted on Jedidiah

5   Murphy's life to bring him to the point that he was at when

6   this crime occurred.  And that will include a number of

7   things.  I guess I could divide them by placement and

8   chronologically.  His first years, I guess, through about the

9   age of 5 with his biological parents were marked by family

10  violence, alcoholism on the part of his father, observing --

11  apparently observing his father knock his mother's teeth down

12  her throat, police being called, mother being taken to the

13  hospital and so forth.  They lived in a small home with at

14  times the paternal grandparents.  And there were, I think,

15  six children, three from one marriage and three from another

16  marriage in that household in addition to Jedidiah's mother

17  and father.  From about age 5 --

18     Q.    If we can just stop there with from birth to age 5.

19     A.    Yes.

20     Q.    Can you tell me the source or sources for the

21  information that you've just given to me?

22     A.    Yes, sir.  Hope Abbott, Jim Murphy's mother, and Mr.

23  Murphy himself.  Also, I would want to cite some information

24  that was provided to me by Ms. Tolar, the first adoptive

25  parent, who told me what Donnie and Jim Murphy told her --

1    then Kines rather than Murphy -- told her and her husband

2    about their early years.  She recalled that they regularly

3    made comments about things that had happened to them in their

4    home.

5         Q.   Okay.  So it would be Hope Abbott and Celeste Tolar?

6         A.   That's correct.

7         Q.   Any --

8         A.   And Mr. Murphy.

9         Q.   Right.  Any -- well, okay, Mr. Murphy, is that the

10   defendant?

11        A.   Yes.

12        Q.   That your referring to?

13        A.   Yes.

14        Q.   Okay.  Did you review any -- any documents with

15   regards to ages 0 to 5?

16        A.   No, I didn't.

17        Q.   Okay.  I believe you were about to begin with age 5

18   and onward?

19        A.   Yes.  It's not absolutely clear what chronological

20   age he was or what the dates were, but apparently along about

21   there Mr. Murphy was placed, along with his five half and

22   full siblings at Buckner's Baptist Children's Home by his

23   mother.  And then shortly thereafter, as I understand it, his

24   mother came and got the eldest three children, the children

25   from the previous marriage and took them with her.  And as I

1  understand it from her, left the area with another man.

2  After that, as I understand it, the grandparents, paternal

3  grandparents at some point came and got the children out of

4  Buckner, had attempted to take care of them themselves, but

5  they were both ailing and Mr. Murphy, Sr., or Mr. Kines, Sr.,

6  Roy Don Kines, was ill and also his health was seriously

7  compromised.  He could not take care of the children.  As I

8  understand it, a family member, a cousin arranged the

9  placement at the Tolars and -- that resulted in adoption.

10          And as I understand it, at Buckner, while the

11  children were there, Jim Murphy has very little memory of

12  those years at Buckner.  Donnie was a source of information

13  for me, and he told me a little bit about their placement at

14  Buckner, as much as he could remember, which was also --

15      Q.   I'm sorry.  Was there anything about their placement

16  or their stay at Buckner's that you think relates to Special

17  Issue Number 2?

18      A.   The very fact of their being there of course.  And

19  as I understand it, they probably held the opinion then that

20  they were there because their mother didn't want them.  That

21  I understand principally from Donnie and from Ms. Tolar --

22  Ms. Tolar.  We have not been able to identify any records or

23  obtain any records from that Buckner placement, but there

24  surely should have been some psychological testing during

25  those years.  I don't have that.

1      Q.    So the information concerning Buckner's comes

2   primarily again in some limited extent from the defendant,

3   Celeste Tolar, and Donnie Tolar?

4      A.    That's correct.  Donnie, I'm not sure what his last

5   name is now.

6      Q.    What would be the next chronological period that you

7   focused on?

8      A.    There was a brief hiatus during which Mr. Murphy was

9   in another placement in Fruitvale, and I don't know anything

10  about that so I won't be talking about it.  Then after that

11  he was in placement with the Murphys as I -- I'm sorry, with

12  the Tolars.

13     Q.    What is your understanding as far as the length of

14  stay at Buckner's home?

15     A.    Let me correct myself.  The Fruitvale placement

16  would have been after the Tolars.  I haven't been able to

17  establish that, but it seems to me that he must have been at

18  Buckner less than a year.  I just don't know.

19     Q.    Okay.  All right.  And then going forward to the

20  time that he spent in the Tolar home.

21     A.    And again, it's impossible to establish dates, or I

22  haven't been able to establish dates.  But I'm gathering that

23  he was at the Tolar's for about five years, roughly from the

24  age of 7 to 12.  And my understanding of the placement there

25  is based on what he told me about it, what Donnie told me

1   about it, what Celeste Tolar told me about it, photographs

2   that Celeste Tolar provided to me, and peripherally what Hope

3   Abbott said that she understood regarding that placement, but

4   I think she understood it through those same sources.

5       Q.   Uh-huh.  And again, specifically what occurred in

6   the Tolar home that you think would be relevant to Special

7   Issue Number 2?

8       A.   One thing that I think was particularly cogent was

9   that throughout that placement apparently both Donnie and Jim

10  maintained that they were not with their mother because their

11  mother didn't love them and didn't want to take care of them.

12  That's remarkable, of course, because for a child that age to

13  have to try to incorporate that fact in his sense of self,

14  would have special ramifications and impact on his sense of

15  his own lovability and worth.

16          And it's somewhat unusual, by the way, in my

17  experience with children, and I used to work at Buckner

18  children who are placed there who have a parent living,

19  generally do make lots of excuses for their parent and

20  believe the parent will come and get them at some point.  So

21  these children seemed remarkable in their acceptance of this

22  fact that their mother didn't care enough about them to take

23  care of them.

24          While at the Tolars, three deaths occurred in Mr.

25  Murphy's family.  His biological father died and both of his

1    grandparents died within apparently a very short period of

2    time.  While there, as I understand it from Donnie, the

3    children, the five boys, Donnie, Jim, and the three Tolar

4    children, would engage in considerable misbehavior antics

5    while Mr. Tolar was away at work.  He was a fireman and was

6    working 24 on, I think was away from home a lot.  Reportedly

7    when he would come home, Mrs. Tolar would tell him what the

8    children had done and then he would discipline the children.

9    She herself told me that she disciplined as long as her

10   strength held out, but that her husband took over when he got

11   home.

12            As I understand from Donnie, a great deal of

13   discipline was meted out on Jim for some reason.  And Donnie

14   felt the need to protect him and to stand up for him and

15   frequently intervened on his behalf.  The discipline that I

16   was told about principally by Donnie had to do with whippings

17   with bed slats, being locked in a room, being locked out of

18   the house, being not fed.  Mrs. Tolar herself told me that

19   principally with Donnie they would use isolation or locking

20   him in the room.  She didn't specifically say that they did

21   that with Jim, but nor did she deny it and I didn't ask her.

22   I felt that my ability to get information with her and

23   information that I needed was principally the pictures and

24   her account of their time there would have been compromised

25   by my being highly confrontive, so I didn't ask her.

1      Q.   So you didn't ask her whether her husband had used

2  improper discipline on the defendant?

3      A.   No, I certainly wouldn't have used the word

4  "improper" if I had asked such question.

5      Q.   Did you discuss the types of discipline that her

6  used on the defendant?

7      A.   No, I didn't discuss the specific types of

8  discipline with her.  Other than those that she told me

9  voluntarily.

10     Q.   That primarily concerned the discipline of Donnie?

11     A.   Yes.

12     Q.   By putting him basically in a time out or an

13  isolation setting?

14     A.   That's right.  In addition -- go on.

15     Q.   No, go ahead.  I'm sorry.

16     A.   In addition to that information, I have information

17  from Jim Murphy himself about that placement and about his

18  recollections there, that more or less corroborate, although

19  considerably understate, what his brother told me.  He also

20  said that Donnie would take up for him, that things would

21  snowball and get out of hand because of that.

22          I tried to establish whether Child Protective

23  Services was ever called or was ever involved and couldn't

24  gather that they ever were.  As I understand it, the

25  placement broke.  Mrs. Tolar told me because they just got to

DARLINE W. LABAR, OFFICIAL REPORTER

1   the point that they couldn't -- I don't remember her exact

2   words, put the children up any longer, and so they gave them

3   to the State to raise.  And that, I believe, is when the

4   brief placement at Fruitvale took place, and I think it was

5   while Jim was at that placement that he was at school in

6   Fruitvale and Mrs. Murphy saw him and felt that he would be a

7   good companion to her son.

8       Q.   So with regards to the history on the Tolar home,

9   the information would have come from the defendant, from

10   Donnie, from Celeste Tolar, and to some extent Hope Abbott;

11   is that correct?

12       A.   That's correct.

13       Q.   And as well as photographs that you obtained from

14   Celeste Tolar?

15       A.   That's correct.

16       Q.   Did you obtain any sort of records or documents from

17   Celeste Tolar?

18       A.   No, I didn't.

19       Q.   Did you review any sort of records regarding the

20   defendant's stay at Tolar, medical records?  I believe you

21   just said there were no CPS records generated, correct?

22       A.   I don't know.  I haven't obtained any.  I haven't

23   reviewed any documents for that period.

24       Q.   And then the next -- next stage would be his

25   placement at the -- I belief it was the Van Zandt County

1    Children's Shelter in Fruitvale.   Was there anything about

2    his stay there that would be relevant on Special Issue Number

3    2?

4        A.    I don't have any information about that placement.

5    Of course, the very fact of there being numerous placements

6    bears on Special Issue Number 2.

7        Q.    Have you reviewed any records concerning the

8    placement in Fruitvale?

9        A.    No.

10       Q.    Have you specifically spoken with anyone about that

11   placement?

12       A.    No, I haven't.

13       Q.    Was the defendant able to give you any information

14   about that placement or stay at Fruitvale?

15       A.    No, he gave me know information other than it

16   occurred.

17       Q.    And I take it that -- was Donnie able to provide you

18   any information?

19       A.    No, he wasn't.

20       Q.    Hope Abbott?

21       A.    No.

22       Q.    Or Celeste Tolar, besides what she's already told us

23   about actually some breakdown where they thought it was

24   necessary to take the children over there?

25       A.    Correct.   She gave me no information about the

1    Fruitvale placement beyond that.

2        Q.    What would be the next chronological period of time

3    that you focused on?

4        A.    I think essentially from about 12 -- age 12 to about

5    age 16.

6        Q.    Would that be the time spent at the Murphy home?

7        A.    Yes, sir.

8        Q.    What information do you think would be relevant on

9    Special Issue Number 2?

10       A.    I think that kind of skipping into the placement

11   some distance when the Murphys began to have marital problems

12   and decided to separate, Mr. Murphy felt that it was his

13   fault that the marriage was breaking down or had broken down

14   because Mr. Murphy had been spending more time with him than

15   with his own son, Matthew I believe is his name, and there

16   was apparently more camaraderie between Mr. Murphy and Jim

17   rather than Mr. Murphy and Matthews so in fact when they did

18   separate, Matthew went with his mother and Mr. Murphy went

19   with his father, his adoptive father.

20           And he said from that point on, that Mrs. Murphy

21   hated his guts and would have nothing to do with him.   In

22   fact, he indicated that he sent a picture of Alyssa his

23   daughter to her and she sent it back.   He reported then that

24   a series of events started occurring, and I guess backing up

25   a bit, started by way of his beginning to drink and

1    experiment with drugs at the age of 14.  And to be well

2    underway with serious drinking by the age of 15.  He

3    indicated that he shamed, embarrassed, and disappointed Mr.

4    Murphy by his behavior.  Mr. Murphy apparently bailed him out

5    a few times, smoothed things over for him a few times when he

6    got in trouble with the law, but ultimately decided not to

7    continue doing that and left him in jail on one arrest, the

8    one that resulted in his going to the boot camp in Childress

9    I think it was.  And he indicated that since that time his

10   relationship with Mr. Murphy has been very strained.  In

11   fact, he described it as his own being angry with Mr. Murphy

12   for leaving him in jail and not bailing him out.

13         So I think at that time it seems to me that his

14   character was congealing by way of the forces that have

15   impacted him up to that time, that he's being to identify

16   himself as an alcoholic, as he put it, as the spitting image

17   of his father, a person who wasn't a good person or didn't

18   support himself well.  He began to act out considerably and

19   without regard for the effect it was having on other people.

20   I think that probably rounds out that period.

21       Q.   Okay.  Did you -- did you speak with either Bob or

22   Samantha Murphy regarding that time period?

23       A.   No, I have not yet.  That's --

24       Q.   Who would have been the sources for your information

25   about what occurred in the Murphy home?

DARLINE W. LABAR, OFFICIAL REPORTER

1          A.    Mr. Murphy, Jim Murphy.

2          Q.    Okay.

3          A.    And my review of records, the records around the

4     arrest that led to the boot camp, for example, and his

5     reports and later social histories regarding events that

6     occurred around that time.

7          Q.    Did they -- would those be the social histories

8     included in medical records?

9          A.    Yes, sir, they would.

10         Q.    What would be the next chronological time period?

11         A.    As he got out of the boot camp and had formed, I

12    guess, or then formed his relationship with Chelsie Willis

13    and leading up until just before the crime occurred, that

14    period seems to be one characterized by intermittent periods

15    of sobriety and employment, but predominately drinking to the

16    point of severe impairment and reportedly some hallucinating

17    at times, some blackouts, some withdrawal efforts that

18    resulted in DT's.  He referred to himself as a wet head,

19    being in and out of treatment, in and out of difficulties

20    with the law, suffering numerous physical injuries at work,

21    which I assume was probably at least in part caused by his

22    difficulty focusing and thinking clearly owing to his

23    alcoholism and his general kind of self-destructive bent

24    apparently.

25                There was also some evidence of some excessive risk

1    taking, kind of throwing himself against things, almost

2    defy -- as if trying to hurt himself or see how far he could

3    push the -- push it.

4         I think there were some periods of intermittent good

5    functioning, according to Chelsie Willis, and periods when he

6    was right there for her, very involved with his new born

7    daughter, and then a later child that she had, quite

8    functional, doing things that were perhaps even beyond the

9    kin of -- or beyond the limits that Chelsie -- beyond

10   Chelsie's expectations for males in the household, caring

11   for, attending to the baby, nursing, feeding, bathing, taking

12   care of the house.  I think she suffered some illness, the

13   baby, the later -- the second baby had some illnesses and so

14   she said that when he was sober and straight, he was

15   extraordinary in his help and his comportment in the house.

16        He indicated that he was quite accomplished as a

17   welder.  When he worked, he did a good job and could work,

18   could get a job pretty easily, but the record indicates that

19   his employment was probably pretty spotty, lots of job

20   changes, lots of interruptions in his work by

21   hospitalizations and so forth.

22        I think there were one and probably two fairly

23   significant suicide attempts.

24   Q.    What were those?

25   A.    There was one in which he -- I think late '98 when

1    he took 40 -- took 40 tablets, ended up hospitalized for

2    about nine or ten days.  I don't have my notes open to that

3    time.  I can look for it.

4        Q.   I've got page 5 of your report that states that he

5    reported trying to kill himself in '97 or '98, taking 60

6    sleeping pills.  Is that what you're referring to?

7        A.   Yes, but the record indicates it might have been

8    reported as 40 at the time that it happened.

9        Q.   So the number 60 would have come from the defendant?

10       A.   Yes, and from records.  It's 11 -- apparently the

11   incident occurred on 11-18-98, and he was at Oak Haven on

12   11-19-98 for ten days for overdosing on 40 sleeping pills.

13   He was diagnosed alcohol dependent and discharged after, I

14   think, ten days with a GAF of 50 to 55 global assessment

15   functioning.  It's very low.

16            The other suicide attempt --

17       Q.   I'm sorry, what does that GAF indicate to you as a

18   psychologist?

19       A.   Well, it is indicates to me that he was having

20   tremendous difficulty functioning in the world.  There was

21   severe impairment in his ability to work, his ability to have

22   relationships, that he was so dysfunctional that he likely

23   could not have managed himself independently.

24       Q.   Okay.

25       A.   The other suicide attempt of which I'm aware was one

1   that he described that was apparently witnessed by Mr. Crow.

2   I haven't spoken with Mr. Crow yet, but the report that Mr.

3   Murphy gave me was that he was intent upon killing himself

4   and that he met with Mr. Crow at some establishment in the

5   parking lot and he had a loaded gun and was planning on

6   killing himself.  And Mr. Crow intervened -- I gathered from

7   the way Mr. Murphy told me about it, that he was asking for

8   Mr. Crow to intervene and he did so.

9        Q.   Where did that -- do you remember where that took

10  place?

11       A.   I don't remember.  I can look.  He said at a church

12  parking lot near his home.  I don't know whether it refers to

13  Mr. Crow's home or Mr. Murphy's home at the time.  He said

14  Mr. Crow brought his wife Lori along, that he had a 12 gauge

15  shotgun and it had ammunition in it and he racked it and got

16  a bullet in it, but it didn't go off.  He said that Mr.

17  Crow -- I think Mr. Crow followed him home.  They dropped

18  off his gun.  Mr. Crow called the police, and they took him

19  to jail in Kaufman.  And when he got out the next day, he

20  went Mr. Crow's home to pick up his truck which Mr. Crow had

21  driven home for him.  So those are the two suicide attempts

22  of which I'm aware.

23       Q.   Have you interviewed Chelsie Willis?

24       A.   Yes, I did, by telephone.

25       Q.   How many times have you interviewed the defendant?

1    A.    Three times.

2    Q.    Where did those interviews take place, in jail?

3    A.    Yes, they did.  The third time was practically not

4    an interview.  I saw him for some testing, and we talked

5    briefly.  The circumstances were that we were in this room

6    just off of this room, and there was another inmate there

7    being interviewed by her attorney.  And it was not a private

8    situation and somewhat noisy, so we didn't actually talk for

9    any length of time.

10   Q.    Have you administered any tests yourself to the

11   defendant?

12   A.    Yes, sir, I have.

13   Q.    What tests have you administered?

14   A.    The Shipley Institute of Living Scale which is a

15   brief measure of intellectual function, the Minnesota

16   Multiphasic Personality Inventory 2, the Millon Clinical

17   Multiaxial Inventory III and the TOMM.

18   Q.    And what again was the purpose of the Shipley

19   Institute of Living Scale?

20   A.    I wanted to get a general sense of his intellectual

21   capacity and whether he had over or underachieved in terms of

22   the application of intellect in his life.

23   Q.    What was your findings?

24   A.    I think he was of average.  That's toward high

25   average -- let me see, average intellectual ability so that

1   it appeared that he had achieved about the level one would

2   expect in terms of the career as a welder, in terms of high

3   school grades that were reported, and so forth.

4       Q.   All right.  What was the purpose of the MMPI 2?

5       A.   I wanted to get a sense of his current functioning,

6   his -- his mental state, his symptomatology, what level of

7   symptoms he was reporting at the time I was seeing him.

8       Q.   Okay.  What were your findings?

9       A.   He was extremely symptomatic.  He was subscribing to

10  a broad range of symptoms, suggesting that he was in extreme

11  emotional distress, anxious, depressed, confused, physically

12  symptomatic to some extent.

13      Q.   In what way?

14      A.   Oh, I don't know the specific items without

15  looking.  As I recall, he was having a number of symptoms

16  related to his -- attempting to get his medication adjusted

17  and was having difficulty sleeping.  I think he was having

18  some discomfort in his extremities.  Let's see, he was having

19  upset stomach, every few days having some pains over his

20  heart or in his chest.  His extremities were burning or

21  tingling or feeling like they were going to sleep.  A lot of

22  stomach trouble, headaches, blank spells.  Those may have

23  been historic rather than at the time.  Numbness.  He had an

24  injury to his thumb on his left hand, I think, that he

25  reported when asked that he did experience some numbness.  I

1   think that's about -- about all of the physical symptoms.

2       Q.   Do you recall when you administered the MMPI 2?

3       A.   I don't recall, but I can look.  2-28-01.

4       Q.   How about the Shipley Institute of Living Scales,

5   when was that administered?

6       A.   2-13-01.

7       Q.   The next test that you mentioned, was that MCMI --

8       A.   3.

9       Q.   -- 3?  What was the purpose of that test?

10      A.   Also an effort to gain a clearer understanding of

11  how Mr. Murphy was describing himself on -- along dimensions

12  of psychological symptomatology.  The MCMI 3 focuses

13  particularly on character pathology.  And I was interested in

14  seeing what picture would emerge from his MCMI 3 profile.

15      Q.   When was that administered?

16      A.   On 3-1-01.

17      Q.   What were your findings there?

18      A.   Again, he was extremely forthcoming, extraordinarily

19  symptomatic, made no effort to present himself in a desirable

20  way or to gloss over or minimize symptoms, as was the case

21  with the MMPI.  He answered questions suggesting that he's an

22  extremely depressed person, that by personality style, he's

23  somewhat dependent -- more than somewhat, very dependent,

24  that he has antisocial characteristics, that he suffers from

25  rather extreme anxiety, extreme alcohol dependence.  He had

1    symptoms that are similar to those people who are diagnosed

2    with posttraumatic stress disorder.  As I say, it was just

3    broadly extremely symptomatic.  There were no indications of

4    compulsive behavior, of paranoid thinking.  As I said, no

5    indications that he was trying to present in a positive light

6    or to gloss over his own shortcomings.

7         Q.   What was the final test, the TOMM?

8         A.   Yes, sir.

9         Q.   What is that test?

10        A.   It's the test of memory and malingering.  And I gave

11   it on the last date that I saw him, which was 3-1-01.

12        Q.   Okay.  What's the purpose of that test?

13        A.   The test is designed to provide an opportunity to

14   measure malingering, patients attempting to look worse than

15   they are, specifically in cognitive capacity.

16        Q.   How would a patient go about doing that?

17        A.   Typically the -- the test has two trials and then a

18   retention period of testing, so that you present the stimulus

19   for each of the items in Trial 1.  And then test the person

20   on their memory of them.  And then in Trial 2.  And finally

21   in the retention period, the person who's attempting to

22   malinger will generally assume that it would be a good idea

23   to have retained less information, to remember less.  And in

24   fact, even people with neurological impairment can do

25   extremely well on the instrument and not show a loss of

1   memory over this.  It's a 30-minute break between the last

2   item on the second trial and the retention period.  So people

3   who are attempting to look bad will generally miss a great

4   many items, even though the test is extremely simple and

5   straightforward, and will particularly miss items in their

6   retention period.

7       Q.   What does this statement mean?  The MCMI 3 results

8   were suggestive of the possibility of some symptom over

9   reporting with self-debasement predominating?

10      A.   Yes, sir, and that's why I administered the TOMM.

11  Both on the MMPI and the MPMI, Mr. Murphy was so symptomatic

12  that the software programs we use for scoring on the computer

13  suggested the need to rule out malingering, that is, he

14  seemed to be subscribing to such a broad range of symptoms

15  that it looked as though as he was more emotionally

16  distressed than one generally sees even in a clinical

17  population.

18      Q.   How many times have you administered the Shipley

19  Institute of Living Scale to individuals facing trial for the

20  death penalty?

21      A.   I would routinely administer it -- and I guess then

22  that that would mean somewhere in the neighborhood of ten

23  times.

24      Q.   How about -- again, defendants facing death penalty

25  trials, how many times have you administered MMPI 2?

1       A.    I think possibly about the same number.  Perhaps

2   fewer because it requires a certain reading level, so I'm not

3   sure that I've administered it to every single person I've

4   tested.   I think I've administered it orally at least once.

5       Q.    The same question for the MCMI 3?

6       A.    Relatively rarely, probably two or three times.

7       Q.    And again, what was the reason that you decided to

8   administer that test in this case?

9       A.    The MCMI 3?  I was interested in seeing how Mr.

10  Murphy would represent himself, whether he was fully

11  appreciative of the character pathology that was evident from

12  his history.  He was quite forthcoming with me on interview

13  and seemed to be willing to own up to his shortcomings and

14  his interpersonal difficulties.   And I -- I guess I wanted to

15  see that in a measured quantitative format and so I

16  administered it and he did in fact do just that.

17      Q.    How is that test administered?

18      A.    The MCMI 3?

19      Q.    Yes.

20      A.    It's 175-item instrument that is in true-false

21  format and the person reads the item and then says that's

22  true about me or that's false about me by coloring in the

23  bubble.

24      Q.    Finally, the TOMM test, how many times have you

25  administered that test to people facing the death penalty

1    trial?

2        A.   I don't think I ever have before Mr. Murphy.

3        Q.   You also -- I guess you had some time just to simply

4    interview him, correct?

5        A.   Yes.  Yes, sir, I did.

6        Q.   Just to gain some sort of information from a

7    clinical evaluation?

8        A.   Not for a clinical evaluation, but for an

9    evaluation, yes.

10       Q.   Did you believe him to be forthcoming?

11       A.   Generally, yes, I think he -- he certainly didn't

12   tell me everything there was to tell me about his history.

13   I'm not sure whether he picked and chose what he told me.

14   Seemed to go right to the heart of most of the things that

15   I've discovered would be considered the worst things about

16   him.  I limited the time to some extent.  I think I spent

17   three or so hours with him, so -- and there were numerous

18   interruptions, so I think there may have been times when he

19   didn't give me the whole history because of those

20   interruptions.  I don't know that I provided him ample

21   opportunity when we would then meet again to go back and mop

22   up if there was anything he left out.

23       Q.   Did he tell you that he held a gun up to the head of

24   Mandy Kirl in 1993?

25       A.   No, sir, he didn't.

1      Q.    Did he tell you that he kidnapped Cheryl Wilhelm in

2   Arlington, Texas, on August 26th, 1997?

3      A.    No, he didn't.

4      Q.    Did he tell you that he struck his common law wife,

5   girlfriend, or whatever she is, Chelsie Willis, back in

6   August of 1997?

7      A.    I don't know whether he gave me that specific date,

8   but he certainly told me that he struck her.

9      Q.    How did he strike her?

10     A.    He told me that they -- I'll have to find it in my

11  notes.

12              (Witness researches notes.)

13     A.    Okay.  I'm ready.

14     Q.    (By Mr. Davis)  Yes, ma'am.

15     A.    He said that he had struck his wife physically five

16  times.  He said he hit her in the face with an open hand one

17  time.  And I asked him to tell me about that, and he said

18  that she had thrown a tea glass at him and busted him on the

19  head -- the glass busted him on the head.  I asked and he

20  said it broke.  It was full of tea.  And he added I asked for

21  it.  He said she is not timid and she is not a martyr and

22  that she would admit her part in every one of the fights they

23  had.  He said that he went to anger management classes and

24  that he was charged once with family violence because of it,

25  but that the police were called out two or three times,

1    sometimes for verbal exchanges and hollering.

2        Q.    Did he make any mention where he got the knife that

3    he was holding on her when the police officer got there?

4        A.    No, he didn't.  I saw that in the record, and I

5    didn't -- I didn't interview him in great detail about

6    those.  In fact, as you can see, I didn't follow up on the

7    other four times.  He told me about one, and we went on from

8    there to talk further about the anger management and so

9    forth.  So I didn't go back and ask him about the other four

10   times he hit her.  I asked her.

11       Q.    I take it when you mentioned Chelsie busting a tea

12   glass on his head, that he didn't volunteer any information

13   about the knife?

14       A.    No, he didn't.

15       Q.    Doctor, can you just tell me, do you have a list

16   before you or some means of telling me what documents that

17   you've actually reviewed in this case?

18       A.    I think in the beginning of my report I listed --

19   no, I didn't list them in detail, did I?  Medical records,

20   some school records, police records regarding the offense, so

21   I don't -- I don't have them already listed, but I have them

22   tabbed and can run through them if you would like.  Shall I

23   do that?

24       Q.    Yes, if you don't mind.

25       A.    Okay.  Let's start with the infirmary records from

1   this current incarceration; Parkland -- Parkland's records;

2   and the Dallas County inmate mental health records.  Let's

3   see, the probation records, the Oak Haven records, Glen Oaks

4   records, Medical Center Arlington, Sabine Valley Center

5   Records.

6        Q.   Is that the Andrews Center?

7        A.   I think so.  Yes.  And Van Zandt County community --

8   oh, that's his probation.  The Garland police affidavits, and

9   the letter from Cindy Hale to Mr. Murphy and his written in

10  responses.  I think that's everything.

11       Q.   Doctor, do you anticipate doing any further work

12  prior to testifying in this matter?

13       A.   Yes, sir, I do.

14       Q.   What work do you anticipate doing?

15       A.   I intend to review some letters that were given to

16  me today that were reportedly written by Mr. Murphy to his

17  mother and his sister Tonya.

18            And by the way, when I was listing documents, I

19  didn't detail photographs.  The defense attorney gave me two

20  photographs of Mr. Murphy that I haven't otherwise

21  addressed.  You have copies of them in the materials that I

22  provided.

23            I intend to talk with Mr. Crow, with Mr. and Mrs.

24  Murphy if I can get their consent to do so, with his sister

25  Tonya, with Matthew Murphy -- excuse me.  And there is a

1   person Delosier -- Delosier, I'm not sure exactly who that

2   is.  Ms. Little told me that she wanted me to speak with

3   him.  I think it's a him.  I haven't got that information.

4   There was also an uncle she mentioned that she might like for

5   me to talk with who was aware of some of Mr. Murphy's

6   father's drinking history.  So those collateral contacts

7   incorporating the information that they provided in the draft

8   report that I've provided to you would be the additional

9   information that I intend to try to gather.

10      Q.   I know that you testified in the matter of Robert

11   Wayne Harris.  How many other capital murder trials have you

12   testified in?

13      A.   I think that's the only other one I've testified in.

14      Q.   How many other cases have you been a consultant in?

15      A.   Let's see, I think two others come to mind -- no,

16   wait, I'm sorry.  Perhaps three others.  I'm not sure --

17   sentencing, but I'm trying to remember whether the death

18   penalty was an issue.  I remember now.  It wasn't.  It would

19   be today, but at that time it was not a death penalty case.

20      Q.   All right.  Now, Doctor, included in your records

21   I've got what appears to be a printout of a power point

22   presentation; is that correct?

23      A.   That's correct.

24      Q.   Is that the presentation that you anticipate giving

25   to this jury?

1     A.    Not in its entirety.  That's the entire presentation

2     as it is today.  I intend to add to it.  I understand that

3     Tonya has some additional pictures and documents that I may

4     be able to obtain to include.

5     Q.    All right.  Do you have -- do you have photographs

6     with you right now that -- that you anticipate you'll be

7     showing to this jury?

8     A.    Yes, sir, I do.

9     Q.    Do you have them separated out so that I can see

10    what photographs you actually intend to use, because I know

11    you've been provided with a lot of photographs, haven't you?

12    A.    Yes, I have been.  I do have the ones from Ms. Tolar

13    that I intend to use separated out.  And I think I can pick

14    out the ones that I took myself -- out of the group of ones I

15    took myself, I think I can pick out the ones that I intend to

16    use.  And Ms. Little has one that I intend to use in that

17    envelope that I gave back to you.  One of those two is in my

18    power point presentation.  Okay.

19    Q.    Could I see that additional photograph Ms. Little

20    has in her possession?  You've separated these photographs in

21    front of you into two piles.  The one that's on your left,

22    would that be the pile that you anticipate using?

23    A.    No, sir, this is the one that Ms. -- these pictures

24    are from among the ones that Ms. Tolar gave me.  And these

25    pictures are from the ones that I took myself.

1      Q.    Okay.  So both piles --

2      A.    Are already in the power point presentation.

3            MS. LITTLE:  And here are the other two I

4      have.

5      A.    And only one of those two -- the one with his

6      daughter in it, this one.

7      Q.    (By Mr. Davis)  Okay.  And you've just now handed me

8      an additional photograph?

9      A.    Yes, sir.

10     Q.    Appears to be the defendant with his daughter and

11     with Chelsie Willis's youngest child?

12     A.    That's correct.

13     Q.    Okay.  First -- I don't know how the Court would

14     like to do this.  If we could have a -- because I will be

15     referring to these -- if I could --

16           MR. DAVIS:  What's my next number?

17           THE REPORTER:  143 would be the next number.

18     Q.    (By Mr. Davis)  Okay.  I'm going to -- as a group,

19     if we could, I'd like to have the three photographs that

20     you've just -- looks to be a picture of an old house, front

21     door of, what, Buckner's home, as well as a grave site for

22     Roy Donald Kines; is that correct?

23     A.    That's correct.

24           MR. DAVIS:  If we could have these

25     collectively, for the purpose of this hearing, identified as

1   State's Exhibit 143.

2              THE COURT:  Granted.

3      Q.   (By Mr. Davis)  And the remaining photographs which

4   appear to be the photographs in general of the defendant as a

5   child; is that right?

6      A.   That's correct.  Before you enter those as an

7   exhibit, I promised Ms. Tolar that I would do my very best to

8   get those back to her.  And I made copies so that -- I hoped

9   it would be possible to give those back to her in their

10  entirety.

11             MR. DAVIS:  I believe we can make arrangements

12  have these copied.

13             MS. LITTLE:  I think you already did copies of

14  all but the two I just gave you in the packet.

15             THE WITNESS:  I made the copies.  They're in

16  black and white.

17             MR. DAVIS:  Again, for purposes of this

18  hearing, the remaining photographs I'll introduce as State's

19  Exhibit 144.

20             (State's Exhibit No. 144 offered)

21             THE COURT:  Any objections, Ms. Little?

22             MS. LITTLE:  No, sir.

23             THE COURT:  Admitted, 144.

24             (State's Exhibit No. 144 admitted)

25      Q.   (By Mr. Davis)  Do you anticipate reviewing any

1   additional records?

2       A.   Yes.   If the records from Buckner can be found, I

3   certainly intend to review those.   I'd still like to review

4   school records.   Ms. Tolar admitted that she should have

5   some, but when I arrived to pick up the records, she didn't

6   have those included and I didn't realize until later that I

7   didn't get them from her, so I don't know whether I'll get

8   some from her.

9           I haven't spoken with the Murphys about what records

10  they might have, but anything that they would have that would

11  be relevant, I would be interested in reviewing.

12      Q.   (By Mr. Davis)   Do you have any plans to do any

13  further research?

14      A.   Not that I'm aware of, no.

15      Q.   Any plans to do any additional testing?

16      A.   No, sir.

17              MR. DAVIS:   Judge, I'll pass the witness for

18  the purpose of the 705 hearing.

19              THE COURT:   Ms. Little.

20              MS. LITTLE:   I don't have anything either,

21  Your Honor.

22              THE COURT:   Hearing concluded.

23              MR. DAVIS:   Judge, if again -- this goes to

24  the Motion in Limine that we previously filed.   And I don't

25  have that motion in front of me, but in general I believe the

DARLINE W. LABAR, OFFICIAL REPORTER

1   Court will recall that this motion goes to the probative

2   prejudicial value of mitigation evidence that I anticipated

3   would be offered.  And, in fact, that evidence has been

4   provided to me.  Essentially we have a number of photographs

5   of the defendant as a child, in State's Exhibit 144, and

6   again, pursuant to prior rulings, I would again urge my

7   objection to these photographs.  These photographs are not

8   relevant.  They're not probative of any issue.  I believe the

9   courts in the prior -- prior decisions have decided that

10  photographs such as this simply are vehicles to evoke

11  sympathy or emotional responses from a jury, and the cases

12  are very clear precisely on the issue of childhood

13  photographs not being relevant in mitigation.  So --

14              THE COURT:  May I see the photographs?

15              MR. DAVIS:  Yes, sir.  State's Exhibit 144,

16  again, contains the childhood photographs of the defendant.

17  And State's Exhibits 143, I don't have a problem with the

18  older home or the front door of Buckner's, but I do have a

19  problem with the third photograph in State's Exhibit 143

20  which would be a photograph of the grave site of Roy Donald

21  Kines which, again, I would suggest has absolutely no

22  probative value whatsoever, other than to evoke some sort of

23  sympathy for the defendant by showing his father's grave

24  site.  So would I object to that third photograph in State's

25  Exhibit 143, Your Honor.

1                   THE COURT:  Ms. Little, do you care to be

2      heard on this issue?

3                   MS. LITTLE:  I understand what the Rhodes case

4      says, Your Honor, but we have Penry II now, and this case is

5      about mitigation, as well as future danger, and I would

6      submit that all of those things, that there's not any unfair

7      balance for the jury to see any of these photographs.  They

8      can separate the wheat from the chaff.  There's going to be

9      victim impact testimony as well, I'm sure.  And I don't see

10     that there's going to be harm to the State.

11                  THE COURT:  The Court will review the

12     pertinent controlling issues, and I'll make my decision on

13     them before we resume on the 27th.  On the record.

14                  MR. DAVIS:  Okay.

15                  MS. LITTLE:  Is that it?

16                  THE COURT:  Hearing is concluded.

17                  (Recess of proceedings.)

18

19

20

21

22

23

24

25

Reporter's Certificate

STATE OF TEXAS:

COUNTY OF DALLAS:

    I, Darline W. LaBar, Official Court Reporter of the 194th Judicial District Court, in and for Dallas County, Texas do hereby certify that the foregoing volume constitutes a true, complete and correct transcript of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in the statement of facts, in the above styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

    I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

    Witness my hand this the 26th day of June, A.D., 2001.

_____
DARLINE W. LABAR
Official Court Reporter
194th Judicial District Court
Dallas County, Texas
(214) 653-5803

Certification No. 1064 Expires December 31, 2002

DARLINE W. LABAR, OFFICIAL REPORTER

1    REPORTER'S RECORD

2    VOLUME 57 of 65 VOLUMES    **74145**

3    TRIAL COURT CAUSE NO. F00-02424-NM

4    THE STATE OF TEXAS            :        IN THE DISTRICT COURT

5    VS.                          :        DALLAS COUNTY, TEXAS

6    JEDIDIAH ISAAC MURPHY        :        194TH JUDICIAL DISTRICT

7            *******************

8    PUNISHMENT PHASE BY JURY    **FILED IN COURT OF CRIMINAL APPEALS**

9            *******************    DEC  5 2001

10   A P P E A R A N C E S:        Troy C. Bennett, Jr., Clerk

11   HONORABLE BILL HILL, Criminal District Attorney
             Crowley Criminal Courts Building
12           Dallas, Dallas County, Texas  75207
             Phone:  214-653-3600
13   BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
             MS. MARY MILLER, A.D.A., SBOT # 21453200
14               FOR THE STATE OF TEXAS;

15   MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
     MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16   MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
     Dallas County Public Defender's Office
17           Phone:  214-653-9400
                 FOR THE DEFENDANT.

18

19               *********

20       On the 27th day of June, 2001, the following

21   proceedings came on to be heard in the above-entitled and

22   numbered cause before the Honorable F. Harold Entz, Jr.,

23   Judge presiding, held in Dallas, Dallas County, Texas:

24       Proceedings reported by machine shorthand, computer

25   assisted transcription.

```
 1                    INDEX VOLUME 57

 2  June 27th, 2001                        PAGE    VOL.

 3  Proceedings...................................... 2     57

 4  Reporter's Certificate........................... 267   57

 5

 6              CHRONOLOGICAL WITNESS INDEX

 7                  DIRECT        CROSS        VD     VOL.

 8  ROY MATHEW          4            8                  57

 9  LARRY REED         10           12                  57

10  KEVIN FOLMAR       13, 18       15                  57

11  KYLE COOK          21, 29, 34   26, 32             57

12  ROY DONALD TOLAR   36, 70, 82   49, 78, 84         57

13  MATT MURPHY        88           102                57

14  CHELSEA WILLIS     110, 158, 164 139, 161, 164     57

15  PAM SHERMAN        165          177                57

16  RANDY CROW         180, 193, 194 190, 193          57

17  JERRY WOOD         197          200                57

18  GARY KINES         202                             57

19  TONYA THORP        206, 222, 225 220, 224          57

20  HOPE ABBOTT        226          239                57

21  MARY A. CONNELL    256                             57

22

23              ALPHABETICAL WITNESS INDEX

24                  DIRECT        CROSS        VD     VOL.

25  HOPE ABBOTT        226          239                57
```

| 1  | MARY A. CONNELL | 256 | | 57 |
| 2  | KYLE COOK | 21, 29, 34 | 26, 32 | 57 |
| 3  | RANDY CROW | 180, 193, 194 | 190, 193 | 57 |
| 4  | KEVIN FOLMAR | 13, 18 | 15 | 57 |
| 5  | GARY KINES | 202 | | 57 |
| 6  | ROY MATHEW | 4 | 8 | 57 |
| 7  | MATT MURPHY | 88 | 102 | 57 |
| 8  | LARRY REED | 10 | 12 | 57 |
| 9  | PAM SHERMAN | 165 | 177 | 57 |
| 10 | TONYA THORP | 206, 222, 225 | 220, 224 | 57 |
| 11 | ROY DONALD TOLAR | 36, 70, 82 | 49, 78, 84 | 57 |
| 12 | CHELSEA WILLIS | 110, 158, 164 | 139, 161, 164 | 57 |
| 13 | JERRY WOOD | 197 | 200 | 57 |

14

15                          EXHIBIT INDEX

| 16 | STATE'S | | OFFERED | ADMITTED | VOL. |
|----|---------|--|---------|----------|------|
| 17 | 145 | Glen Oaks Records | 67 | 67 | 57 |
| 18 | 146 | Timberlawn Records | 80 | 80 | 57 |
| 19 | 147 | Oak Haven Records | 85 | 85 | 57 |
| 20 | 148 | Dr. Ingram Records | 246 | 246 | 57 |
| 21 | 149 | Chelsea's Diary | 141 | 142 | 57 |
| 22 | DEFENDANT'S | | OFFERED | ADMITTED | VOL. |
| 23 | 42 | Wall Chart | 19, 32 | 19, 32 | 57 |
| 24 | 43 | Polaroid | 26 | 26 | 57 |
| 25 | 44 | Polaroid | 26 | 26 | 57 |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 45 | Stipulation | 35 | 35 | 57 |
| 2 | 46 | Digital Jail Photo | 5 | 5 | 57 |
| 3 | 47 | Digital Jail Photo | 5 | 5 | 57 |
| 4 | 48 | Digital Jail Photo | 5 | 5 | 57 |
| 5 | 49 | Digital Jail Photo | 5 | 5 | 57 |
| 6 | 50 | Digital Jail Photo | 5 | 5 | 57 |
| 7 | 51 | Digital Jail Photo | 5 | 5 | 57 |
| 8 | 52 | Digital Jail Photo | 5 | 5 | 57 |
| 9 | 53 | Digital Jail Photo | 5 | 5 | 57 |
| 10 | 54 | Digital Jail Photo | 5 | 5 | 57 |
| 11 | 55 | Digital Jail Photo | 5 | 5 | 57 |
| 12 | 56 | Digital Jail Photo | 5 | 5 | 57 |
| 13 | 57 | Digital Jail Photo | 5 | 5 | 57 |
| 14 | 58 | Digital Jail Photo | 5 | 5 | 57 |
| 15 | 59 | Diary Sheet | 130 | 131 | 57 |
| 16 | 60 | Diary Sheet | 130 | 131 | 57 |
| 17 | 61 | Diary Sheet | 130 | 131 | 57 |
| 18 | 62 | Small Photo | 135 | 135 | 57 |
| 19 | | | | | |
| 20 | | | | | |
| 21 | | | | | |
| 22 | | | | | |
| 23 | | | | | |
| 24 | | | | | |
| 25 | | | | | |

PROCEEDINGS

1

2          THE COURT:  Both sides ready for the jury?

3          MS. BALIDO:  Judge, we have one thing to take

4   up, or actually two things to take up.  The first thing is

5   we'd like to make an oral Motion in Limine at this time that

6   the District Attorney -- that this Court order the District

7   Attorney, any of his witnesses to not mention whether or not

8   there was a polygraph taken over at the jail until such time

9   that this Court can make a ruling as to whether or not that

10  is relevant.

11         THE COURT:  Any objection, Mr. Davis?

12         MR. DAVIS:  No, sir, not to the Motion in

13  Limine.  No, sir.

14         THE COURT:  Request granted.

15         MS. BALIDO:  Additionally, Judge, yesterday we

16  filed a motion for mistrial based upon an unconstitutional

17  application of prosecutorial discretion in death penalty

18  cases in Dallas County.  We filed that with this court, and

19  we'd additionally -- we'd stand on our motion and

20  additionally cite the Court of Criminal Appeals concerns in

21  Payne, Mosley, and Goff -- well, actually the U.S. Supreme

22  Court's in Payne that in death penalty cases the value of the

23  victim in society being weighed in those cases by the jury

24  and in this case we feel by the State as being

25  unconstitutional.

1          THE COURT:  Motion for mistrial is denied.

2      Sheriff, may we have the jury, please.

3          MS. BALIDO:  Judge, also, we -- in our motion

4  for mistrial, we also specifically asked for a hearing with

5  the State of Texas to prove that it is constitutionally

6  applying the death -- the death penalty statute in Texas.

7          THE COURT:  Request denied.

8          (Jury returned to courtroom.)

9          THE BAILIFF:  All rise.

10          THE COURT:  Let the record reflect the jury is

11  returning to the courtroom at this time.

12      Jury may be seated.

13      Mr. Murphy, counsel, visitors in the gallery, you

14  may be seated.

15      Ladies and gentlemen, welcome back.

16      Defense may continue.  Call your next witness.

17          MS. BALIDO:  The defense calls Dallas Sheriff

18  Officer Roy Mathew to the stand.

19          (Witness sworn.)

20          THE COURT:  You do.  Thank you.  Have a seat

21  to my left, please.

22      You may continue.

23

24                      ROY MATHEW

25  was called as a witness by the Defendant and, after having

1   been first duly sworn, testified as follows:

2                    Direct Examination

3   By Ms. Balido:

4        Q.    Please state your name spell your last name for the

5   record?

6        A.    My name is Roy Mathew, M-a-t-h-e-w.

7        Q.    And you're employed with the Dallas Sheriff's

8   Department; is that correct?

9        A.    Right.

10       Q.    And what do you do for the Dallas Sheriff's

11  Department?

12       A.    D.S.O.

13       Q.    Yes.  Were you called to the jail to take digital

14  photographs on May the 6th, the year 2001?

15                  MS. BALIDO:  Approach the witness?

16                  THE COURT:  You may.

17       Q.    (By Ms. Balido)  I'm showing you what has been

18  marked for identification as Defendant's 46, 47, 48, 49, 50,

19  51, 52, 53, 54, 55, 56, and 57, 58.

20              Are these the photographs that you took of Jedidiah

21  Isaac Murphy in his cell on that night?

22       A.    Yeah, it is.

23       Q.    And do these pictures fairly and accurately depict

24  what you saw in that cell and how you saw Mr. Murphy on that

25  night?

1      A.   Right.

2                 MS. BALIDO:   Judge, at this time we've

3      tendered these to opposing counsel previously and we'd --

4                 MR. DAVIS:   No objection.

5                 MS. BALIDO:   -- we'd over them into evidence.

6            (Defendant's Exhibit No. 46 through 58 offered)

7                 THE COURT:   Admit them all.

8            (Defendant's Exhibit No. 46 through 58 admitted)

9                 MS. BALIDO:   Can I ask the witness to step

10     down?

11                THE COURT:   You may.

12     Q.   (By Ms. Balido)  Now, Mr. Mathew, besides taking

13     these pictures, did you do any investigation at all in this

14     case?

15     A.   Nothing.  Nothing.

16     Q.   Okay.  Mr. Mathew, Defendant's Exhibit 46, is that

17     an area in the jail depicted next to the --

18     A.   Commode.

19     Q.   -- the commode?

20     A.   Right.

21     Q.   And 47, are these Mr. Murphy's legs?

22     A.   Right.

23     Q.   Okay.  And that was as he was laying on his

24     mattress?

25     A.   He was on the floor, and they took him off.

 1      Q.   Okay.   On the floor.

 2                   (Photograph published to jury.)

 3      Q.   (By Ms. Balido)   After they took out the mattress?

 4      A.   Right.

 5      Q.   And this is the top half of Mr. Murphy's body in

 6  Defendant's Exhibit Number 48; is that correct?

 7      A.   Yes.

 8                   (Photograph published to jury.)

 9      Q.   (By Ms. Balido)   And Defendant's Exhibit 49, is this

10  Mr. Murphy with some sort of mask on his -- on his face?

11      A.   Right.

12      Q.   Defendant's 50, this is Mr. Murphy's body with

13  somebody actually putting pressure on the sides of his neck;

14  is that correct?

15      A.   Right.

16      Q.   And Defendant's Exhibit 51, this is a picture of the

17  top half of his legs and the lower part of his torso; is that

18  correct?

19      A.   Yeah.

20      Q.   And Defendant's 52, this is a full length shot that

21  looks like a jail nurse and then also a Sheriff's officer?

22      A.   That's right.

23      Q.   And 53 is a picture of Mr. Murphy with some sort of

24  device going up to his mouth; is that correct?

25      A.   Right.

1      Q.    Defendant's Exhibit Number 4 (sic), that is the area

2    around the commode again; is that correct?

3      A.    Right.

4      Q.    And what's the substance on the floor?

5      A.    It's boxers.

6      Q.    Okay.  And the red substance?

7      A.    Just --

8      Q.    Blood?

9      A.    Looks like tissue paper that --

10     Q.    That's what the thick portion is on the floor?

11     A.    Right.

12     Q.    55 and 56 are different views of the boxers and the

13   blood on the -- around the commode area; is that correct?

14     A.    Right.

15                 (Photographs published to jury.)

16     Q.    (By Ms. Balido)  And the last two pictures are

17   pictures of that as well; is that right?

18     A.    Right.

19     Q.    With boxers and the area around the commode?

20     A.    Right.

21     Q.    Did you take all these pictures?

22     A.    Yes.

23     Q.    With a digital camera?

24     A.    Right.

25                 MS. BALIDO:  You can have a seat.

1          (Witness retakes the stand.)

2          MS. BALIDO:  I'll pass the witness.

3                    Cross-Examination

4     By Mr. Davis:

5          Q.   Officer Mathew, my name is Greg Davis.  You and I

6     have never met before, have we?

7          A.   We never.

8          Q.   Officer Mathew, it would appear, wouldn't it, from

9     those photographs that that blood has been smeared on the

10    floor, hasn't it?

11         A.   Right.

12         Q.   Did you hear the defendant make any statements up

13    there when you came to make those photographs?

14         A.   No.

15         Q.   So you don't know whether he may have said I guess

16    this will delay jury selection?  You don't know whether he

17    said that or not, do you?

18         A.   No, huh-uh.

19         Q.   Did you see the defendant earlier that day in the

20    jail?

21         A.   No, I don't.

22         Q.   So I take it you don't know what he was doing

23    earlier in the day, do you?

24         A.   No.

25         Q.   You don't know whether he may have been watching an

1   NBA play-off game that day?

2       A.   No.

3       Q.   You don't know whether he talking with other inmates

4   that day, do you?

5       A.   No.

6       Q.   You don't know how he had been acting prior to this

7   incident, do you?

8       A.   No.

9       Q.   You don't know whether he may have been laughing

10  earlier in the day?

11      A.   No.

12      Q.   Did you interview any other inmates, or did you just

13  simply take the photographs?

14      A.   I just took the photographs.

15      Q.   Officer Mathew, had you ever seen the defendant

16  before that day?

17      A.   No.

18      Q.   Were you -- were you called to investigate an

19  incident that occurred on the 7th floor of the George Allen

20  Jail on April 6th of the year 2001?

21      A.   No.

22      Q.   Were you asked to take any photographs over there at

23  that location?

24      A.   No.

25      Q.   So you're not aware of what may have occurred on

1       April 6th the year 2001 at the George Allen Jail?

2            A.    No.

3                      MR. DAVIS:  Thank you, Officer Mathew.

4                 I'll pass the witness, Your Honor.

5                      THE COURT:  Ms. Balido.

6                      MS. BALIDO:  No questions, Judge.

7                      THE COURT:  Thank you, Sheriff.  You are

8       excused.

9                 Defense may call its next witness.

10                      MS. LITTLE:  We call Larry Reed.

11                      (Witness brought forward and sworn.)

12                      THE COURT:  Thank you, Mr. Reed.  Have a seat

13      to my left, please.

14                               LARRY REED

15      was called as a witness by the Defendant and, after having

16      been first duly sworn, testified as follows:

17                          Direct Examination

18      By Ms. Little:

19           Q.    State your name, sir.

20           A.    Larry Reed.

21           Q.    How are you employed?

22           A.    I'm criminal investigator for the Public Defenders

23      Office.

24           Q.    Are you the head investigator for the P.D.'s office?

25           A.    Chief Investigator.

1     Q.    How long have you done that?

2     A.    18 years.

3     Q.    And were you a Dallas Police officer previous to

4 that?

5     A.    Yes, I was.

6     Q.    How long were you a Dallas Police officer?

7     A.    Thirteen years.

8     Q.    Let me ask you if you went to Arlington, Texas, to

9 work on this case that the State is alleging Jim Murphy

10 committed in regard to the hospital in Arlington and the

11 route of that car that was taken in that kidnapping?

12     A.    Yes, I did.

13     Q.    When did you go there, Mr. Reed?

14     A.    That was March the 16th.

15     Q.    And did you -- did you go to Arlington Memorial

16 Hospital?

17     A.    Yes, I did.

18     Q.    Were you able to find the parking lot that it's

19 alleged this kidnapping occurred?

20     A.    Yes, I did.

21     Q.    What did you do then?

22     A.    I photographed the parking lot, and then I drove the

23 route that was indicated in the report that was taken.

24     Q.    And what route was that?

25     A.    That was after leaving the park lot, I went west on

1    Randol Mill Road and ended up at the intersection of Randol

2    Mill and Green Oaks.

3         Q.   And how far is it from the hospital to Randol Mill

4    and Green Oaks?

5         A.   That's four miles.

6         Q.   How long did it take you to drive that distance?

7         A.   10 minutes.

8         Q.   How fast were you going?

9         A.   I was doing the speed limit which was 50 miles an

10   hour.

11                       MS. LITTLE:   That's all I have.

12                       Cross-Examination

13   By Mr. Davis:

14        Q.   Mr. Reed, so it took you 10 minutes to go from the

15   parking lot to the intersection of Green Oaks and Randol

16   Mill; is that right?

17        A.   Yes, sir.

18        Q.   Okay.   How long did you spend on the parking lot

19   before you started driving in that direction?

20        A.   10 or 15 minutes.

21        Q.   Okay.   So in total then the 10 minutes that you

22   drove plus 10 to 15 minutes that you were on the parking lot,

23   correct?

24        A.   Correct.

25        Q.   Did you ever talk with Sherryl Wilhelm?

1      A.   No, I did not.

2      Q.   Interview anybody with the Arlington Police

3   Department about this incident?

4      A.   No, sir, I did not.

5           MR. DAVIS:  Thank you, sir.

6        That's all the questions I have, Your Honor.

7           MS. LITTLE:  Nothing further.

8           THE COURT:  Thank you, Mr. Reed.  You may step

9   down.  Excused if you wish.

10        Defense may continue.

11          MS. LITTLE:  Call Officer Folmar.

12          THE COURT:  Good morning, sir.  Ask that you

13  raise your right hand, please.

14              (Witness sworn.)

15          THE COURT:  Have a seat to my left, please.

16              KEVIN FOLMAR

17  was called as a witness by the Defendant and, after having

18  been first duly sworn, testified as follows:

19              Direct Examination

20  By Ms. Little:

21     Q.   State your name, please, sir?

22     A.   Kevin Folmar.

23     Q.   And how are you employed?

24     A.   I'm a police officer in the City of Wichita Falls.

25     Q.   How long have you been a police officer?

1    A.    Almost five years.

2    Q.    Do you recall sometime back in August of 1997, the

3    26th of August?

4    A.    Yes, ma'am.

5    Q.    And you recall that because you've been sought after

6    by both sides about an episode that happened that day in your

7    city; is that correct?

8    A.    Yes, ma'am.

9    Q.    Did you -- were you working patrol then?

10   A.    Yes, ma'am, I was.

11   Q.    And what did you do involving this case that we're

12   here about?

13   A.    I was dispatched to the Braum's located at 20 -- I

14   think it's 24 -- 2304 Kemp in reference to a robbery of an

15   individual.

16   Q.    And did you go to the Braum's Ice Cream?

17   A.    Yes, ma'am, I did.

18   Q.    What did you find when you got there?

19   A.    There was an elderly woman who stated to me that she

20   had been robbed by a light-skinned Hispanic or a white male.

21   Q.    And you took a report from her, such as you were

22   able to get; is that right?

23   A.    Yes, ma'am.

24   Q.    What else did you do at that scene?

25   A.    I spoke with her, and there was also a witness there

1   by the name of Felix Ozuna who observed a subject running

2   with her purse and he did give chase, but did not catch him

3   at that time.

4       Q.   Okay.  Did you ever have any other involvement in

5   this case?

6       A.   Not after taking that initial report, no, ma'am.

7       Q.   Who was the case assigned to?

8       A.   I believe it was Kyle Cook.

9            MS. LITTLE:  That's all I have.

10                      Cross-Examination

11  By Mr. Davis:

12      Q.   Officer Folmar, you said this was an elderly woman

13  that was robbed in Wichita Falls?

14      A.   Yes, sir, I believe she was around 69 or 70 at the

15  time.

16      Q.   And this occurred on August 26th of 1997, correct?

17      A.   Yes, sir.

18      Q.   What was the time that the robbery occurred?

19      A.   I believe it was 8:24 in the evening.

20      Q.   And what was the victim's name, if you recall?  Was

21  this a Margie Ellis?

22      A.   Yes, sir, I believe that's correct.

23      Q.   And isn't it true that Ms. Ellis told you that this

24  suspect walked by her vehicle or that she noticed him as she

25  was approaching her vehicle, correct?

1      A.   Yes, sir.

2      Q.   And that he continued to approach her as she

3   continued on to her vehicle; is that right?

4      A.   Yes, sir.

5      Q.   And then the suspect took her purse?

6      A.   She related to me that she put the strap around her

7   shoulder, she grabbed her purse with both hands, and then

8   that's when they got into the tussle and he -- the suspect

9   jerked it and she fell to the ground at that time.

10     Q.   So there was actually a physical struggle between

11  the suspect and this elderly woman, correct?

12     A.   Yes, sir.

13     Q.   And Ms. Ellis then as a result fell to the ground?

14     A.   Yes, sir.

15     Q.   Then the suspect did leave the scene, right?

16     A.   Yes, sir.

17     Q.   Ms. Ellis didn't see where he went to?

18     A.   No.  She didn't relate to me that information.

19     Q.   Okay.  Didn't tell you whether or not she saw him go

20  to a particular vehicle or not?

21     A.   Correct.  As a matter of fact, she didn't really --

22  couldn't give me that good of a description of him because

23  she said that she suffered from bad eyesight.

24     Q.   She was able to give you a partial description

25  though, wasn't she?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    Yes, sir.

2      Q.    I want to talk to you about that.  She was able to

3 tell you, wasn't she, that this individual appeared to be

4 about five feet ten in height?

5      A.    I don't believe that -- I believe that description

6 came from Mr. Ozuna.

7      Q.    Okay.

8      A.    I don't think that she could really give me any

9 specifics.  She was kind of upset at the time and excited.

10     Q.    Did she tell you that -- whether or not she thought

11 he had dark hair or not?

12     A.    I don't remember.  I think -- like I said, I believe

13 the description came from Mr. Ozuna.

14     Q.    Okay.  So she's robbed, she's knocked to the ground,

15 and then this suspect leaves, correct?

16     A.    Yes, sir.

17     Q.    She doesn't know whether he may have gone to a white

18 Grand Am?

19     A.    She didn't relay that information to me.

20     Q.    Okay.  Now, you are aware that Ms. Ellis's personal

21 property was found in a white Grand Am later?

22     A.    I didn't realize that until I was contacted about

23 this case.  I had -- didn't know anything else about it until

24 I was contacted by Dallas.

25     Q.    Okay.  Well, you are aware now, aren't you?

1      A.   Oh, yes, sir.

2      Q.   And you're aware that that vehicle belonged to a

3  Sherryl Wilhelm?

4      A.   I wasn't aware of that, sir.

5      Q.   Did anyone else interview Ms. Ellis about a possible

6  description?

7      A.   Like I said, after I took the initial report, I

8  filed it with our detectives, and then what they do is -- is

9  not anything that I have any knowledge of.

10      Q.   Okay.  Are the detectives here today?

11      A.   I believe Kyle -- Kyle Cook is here today, yes, sir.

12      Q.   Okay.  Is it possible that he may have spoken with

13  Ms. Ellis later?

14      A.   I believe he did.  I'm not for certain.

15      Q.   Okay.

16            MR. DAVIS:  That's all I have, Your Honor.

17            MS. LITTLE:  May I approach the witness.

18            THE COURT:  You may.

19                    Redirect Examination

20  By Ms. Little:

21      Q.   Officer Folmar, I'm showing you what's been marked

22  for identification purposes as Defendant's Exhibit Number 42.

23  Would you look at this for me?  We looked at this this

24  morning, did we not?

25      A.   Yes, we did.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.   And can you recognize that this is a portion of

2   Wichita Falls, Texas?

3      A.   Yes, ma'am.

4      Q.   Does it fairly and accurately depict this area where

5   the Braum's is and it's probably going to show that the car

6   was subsequently found?

7      A.   Yes, ma'am.

8      Q.   Do you think it would aid the jury in understanding

9   your testimony in this case?

10     A.   Probably so.

11              MS. LITTLE:  Did you see this?

12              (Defendant's Exhibit No. 42 offered)

13              MR. DAVIS:  No objection.

14              THE COURT:  Admitted.

15              (Defendant's Exhibit No. 42 admitted)

16              THE REPORTER:  Which exhibit number is it?

17              MS. LITTLE:  It is Exhibit Number 42.

18     Q.   (By Ms. Little)  I don't know if this will be easy

19   for you, Officer Folmar, but I'll try it.  Try not to write

20   on myself while I'm at it.  Can you see the map all right by

21   yourself?

22     A.   Yes, ma'am.

23     Q.   This 277, is that the Seymour Highway?

24     A.   Yes, ma'am, it is.

25     Q.   And that's a fairly major portion of your city; is

Page 20

1    that correct?

2         A.    Yes.

3         Q.    Now, you testified that the Braum's Ice Cream was at

4    2304 Kemp Boulevard.

5         A.    Yes, ma'am.

6         Q.    Can you point -- here's Kemp Boulevard, I see -- can

7    you point to where that -- approximately the Braum's is and

8    make a circle the best you can there?

9         A.    It's going to be in this area.

10        Q.    Okay.  And it faces on to Kemp Boulevard, does it

11   not?

12        A.    Yes, ma'am.

13        Q.    And it's on the corner?

14        A.    Right.

15        Q.    Okay.  Now, you did interview a Mr. Ozuna; is that

16   correct?

17        A.    Yes, ma'am.

18        Q.    And did you learn that he chased this person with

19   the purse?

20        A.    That's what he related to me.

21        Q.    From the paperwork, what route did he go?

22        A.    He said that he chased him up -- I think it was

23   either the 2000 or the 2200 block of Cannon and he lost him

24   in an alleyway on Tildon Street, so just a --

25        Q.    Okay.  Can you make a little -- a small mark at

DARLINE W. LABAR, OFFICIAL REPORTER

1    Tildon, if you can, so that will be obvious.

2         And are you personally aware of where the purse was

3    found later?

4         A.   No, I'm not.

5         Q.   Does this map reflect where on the Seymour Highway

6    the car was later found?

7         A.   I'm not sure of the exact address.  I'm not sure

8    what this block number is.  I'm not sure where the car was

9    located.

10        Q.   Okay.  Okay.

11             MS. LITTLE:  Thank you.  That's all I have.

12             THE COURT:  Mr. Davis.

13             MR. DAVIS:  No further questions.

14             THE COURT:  Thank you, Officer.  You may step

15   down, sir.

16        Good morning, sir.  May I ask that you raise your

17   right hand, please.

18             (Witness sworn.)

19             THE COURT:  Thank you, sir.  Invite you to

20   have a seat to my left, please.

21                     KYLE COOK

22   was called as a witness by the Defendant and, after having

23   been first duly sworn, testified as follows:

24   By Ms. Little:

25        Q.   State your name, please, sir?

```
 1        A.    Kyle Cook.

 2        Q.    Are you a Wichita Falls police detective?

 3        A.    Yes, ma'am.

 4        Q.    Is that the same job you held back in August of

 5   1997?

 6        A.    Yes, ma'am, it is.

 7        Q.    Were you assigned to work a robbery that happened at

 8   Braum's Ice Cream on that date?

 9        A.    On what --

10        Q.    On August 26th of 1997?

11        A.    Yes, ma'am.

12        Q.    What was your first involvement, Officer Cook?

13        A.    Receiving the original report written by a patrol

14   officer the morning of the 27th.

15        Q.    Okay.  And did you review the report?

16        A.    Yes, ma'am, I did.

17        Q.    Did you learn that Margie Ellis was the victim in

18   that robbery?

19        A.    Yes, ma'am.

20        Q.    And what description were you able to get from her

21   or was obtained from her?

22        A.    Description as to what?

23        Q.    The suspect.

24        A.    It was very vague.  Tall slender male with

25   olive-colored skin, possibly Hispanic or white male.
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Okay.  Did you talk to Mr. Ozuna who was the person

2    who gave chase?

3    A.   No, ma'am, I did not.

4    Q.   Are you aware from the paperwork the description

5    that he gave?

6    A.   At the time I was.  I'm not right at this moment.

7              MS. LITTLE:  May I approach the witness, Your

8    Honor.

9              THE COURT:  You may.

10             MR. DAVIS:  I'm going to object to this as

11   being hearsay, with regard to any description given by Mr.

12   Ozuna.

13             THE COURT:  Objection is overruled.

14   Q.   (By Ms. Little)  Would you look through this and see

15   if you can put your finger on where -- this is your paperwork

16   you're looking at; is that correct?

17   A.   This is actually Officer Folmar's, the original

18   report taken.

19             MR. DAVIS:  I reurge my objection at this

20   time.

21             THE COURT:  Objection sustained at this point.

22   Q.   (By Ms. Little)  At the time you knew this

23   information; is that correct?

24   A.   Yes, ma'am.

25   Q.   Have you refreshed your memory from this paperwork?

Page 24

1    A.    Yes, ma'am.

2    Q.    What clothing description did you --

3              MR. DAVIS:   Again, I'm going to object.

4              THE COURT:   Sustained.

5              MR. DAVIS:   This was not given to this

6    Officer.

7    Q.    (By Ms. Little)   What else did you do in the case,

8    Officer Cook?

9    A.    The morning of the 27th, around 10 o'clock in the

10   morning, I was notified that a vehicle had been found and it

11   was used or it was taken in a carjacking out of Arlington and

12   that some of my victim's property was found by that vehicle.

13   Q.    Okay.  Did you later learn there was property found

14   in the vehicle?

15   A.    I'm sorry, I didn't hear you.

16   Q.    Did you later learn there was property of Margie

17   Ellis in the vehicle?

18   A.    Yes, ma'am, later.

19   Q.    Was that car processed?

20   A.    Yes, ma'am, it was.

21   Q.    Were any prints that were usable lifted?

22   A.    I believe that they had taken a comparable, a

23   partial comparable print, palm print, but there was nothing

24   of AFIS quality.

25   Q.    Okay.  Did you talk to Margie Ellis yourself in the

Page 25

1    investigation?

2         A.   Yes, ma'am.

3         Q.   And did you get any further description from her?

4         A.   No, ma'am.

5         Q.   Did you later come on to a suspect, a potential

6    suspect in this case named John Elbert Warren?

7         A.   Yes, ma'am, I was introduced to him.

8         Q.   Tell the jury how his name came across your desk.

9         A.   The evening of the 27th, patrol officers were sent

10   to an address on Carla Street in reference to a suspicious

11   person.  As they entered the area, they observed a subject

12   matching the description and when he observed the police car,

13   he took off running.  After a short chase, they caught up

14   with the subject and through conversations he had made the

15   comment that he had recently moved back from Arlington -- I

16   mean, excuse me, I'm sorry, Irving, Texas.  The officer

17   hearing that he had just come back from Irving and them being

18   familiar with the information that I had broadcast to the

19   officers in reference to the carjacking out of Arlington,

20   they felt that he was also involved in that so they then

21   brought him to the police station.

22        Q.   And did you talk to him when he came to the police

23   station?

24        A.   I did.

25                  MS. LITTLE:  May I approach the witness.

1          THE COURT:   You may.

2      Q.   (By Ms. Little)   Let me show you what's been marked

3  for identification purposes as Defendant's 43 and 44.   Are

4  these photographs you took of John Elbert Warren?

5      A.   Yes, ma'am.

6              MS. LITTLE:   We'll offer these.

7              (Defendant's Exhibit No. 43 and 44 offered)

8              MR. DAVIS:   No objection.

9              THE COURT:   Admitted.

10             (Defendant's Exhibit No. 43 and 44 admitted)

11             MS. LITTLE:   May I have a moment.

12             THE COURT:   You may.

13             (Photographs published to jury.)

14     Q.   (By Ms. Little)   Now, basically, Detective Cook, the

15  fact that this person ran was sort of how he came across your

16  purview in regard to this case; is that right?

17     A.   Yes, ma'am.

18     Q.   And you cleared him later; is that correct?

19     A.   Yes, ma'am.

20     Q.   But he's a tall man with a thin face?

21     A.   Yes, ma'am.

22             MS. LITTLE:   That's all I have.

23                    Cross-Examination

24  By Mr. Davis:

25     Q.   Detective Cook, as I understand, you learned through

1    your investigation that the vehicle that was found later

2    containing Ms. Ellis's property, that vehicle belonged to a

3    Sherryl Wilhelm of Arlington, Texas, correct?

4        A.   Yes, sir.

5        Q.   That it had been taken in a carjacking that same day

6    earlier in Arlington, Texas, correct?

7        A.   It was taken on the 26th.

8        Q.   Uh-huh.  Okay.  You talked with Detective John

9    Stanton of the Arlington Police Department, didn't you?

10       A.   Yes, sir.

11       Q.   Did you get from him a description of the individual

12   who had kidnapped Sherryl Wilhelm in Arlington?

13       A.   Yes, sir, a generic description.

14       Q.   Uh-huh.  Okay.  And on August the 28th of 1997, you

15   went back and talked with Margie Ellis again, didn't you?

16       A.   Yes, sir.

17       Q.   On that date you had a -- you had already received a

18   description from Detective John Stanton, right?

19       A.   Yes, sir.

20       Q.   And as a matter of fact, when you went back and

21   talked with Ms. Ellis, she gave you a description that

22   matched that of the description given by Detective Stanton of

23   Arlington, didn't she?

24       A.   Yes, sir.

25       Q.   So Ms. Ellis's description on August the 28th

1    matched the description given to you by Detective John

2    Stanton in your conversations, right?

3         A.    Yes, sir.

4         Q.    Now, this Mr. Warren, did you ever charge him with

5    this offense?

6         A.    No, sir.

7         Q.    Ever arrest him for this offense?

8         A.    No, sir.

9         Q.    You matched his palmprints against the partial

10   palmprint recovered from the vehicle, didn't you?

11        A.    Compared, yes, sir.

12        Q.    Didn't match, did it?

13        A.    No, sir.

14        Q.    Did you later determine that Mr. Warren was not in

15   fact a suspect in this offense?

16        A.    Yes, sir.

17        Q.    Okay.  And what led you to that conclusion, sir?

18        A.    The descriptions of the suspect given, along with

19   his interview that was -- that I had done, his cooperation

20   towards the police officers, and then the prints themselves.

21        Q.    So Mr. Warren was never charged, correct?

22        A.    Correct.

23        Q.    In fact, no one was ever charged with this offense,

24   were they?

25        A.    The robbery?

1       Q.   Yes, sir.

2       A.   No, sir.

3       Q.   Of course, at the time that you were investigating,

4   you didn't know the name Jedidiah Isaac Murphy, did you?

5       A.   No, sir.

6            MR. DAVIS:   Thank you, sir.   I'll pass the

7   witness.

8            MS. LITTLE:   May I approach the witness.

9            THE COURT:   You may.

10                     Redirect Examination

11   By Ms. Little:

12      Q.   Officer Cook, please look at Defense Exhibit Number

13   42.   We looked at this this morning, did we not?

14      A.   Yes, ma'am.

15      Q.   You see where it's been marked the route of the

16   chase by Mr. Ozuna from the Braum's Ice Cream on there?

17      A.   (Nods head.)

18      Q.   And here's the Seymour Highway.   Are you oriented

19   there?

20      A.   Yes, ma'am.

21      Q.   Where was the vehicle found?   It may not be on this

22   map, but would you indicate to the jury --

23      A.   It would be on down here --

24      Q.   Okay.

25      A.   -- and towards out of town.

1    Q.   Further down the Seymour Highway, Route Number 277?

2    A.   Yes, ma'am.

3    Q.   Going out of town?  Where is Dallas in relation to

4 this map?

5    A.   Dallas would be back this way.

6    Q.   You're indicating off to the left of this map where

7 it says Hamilton Park in the corner; is that right?

8    A.   Yes, ma'am.

9    Q.   Where does the Seymour Highway go?

10   A.   To Holiday, Seymour, Texas.

11   Q.   Okay.  And did the car appear to be broken down to

12 you?

13   A.   Yes, ma'am.

14   Q.   What made you think that?

15   A.   The large amounts of oil found leading up to the

16 vehicle and then around the vehicle.

17   Q.   Okay.  Now, you testified awhile ago in response to

18 Greg Davis's question that the descriptions were the same.

19 The description you had from Margie Ellis was a light-skinned

20 Hispanic or a white male; is that right?

21   A.   Right.

22   Q.   Is that all the description that you had from Margie

23 Ellis?

24   A.   Yes, ma'am, stated it was generic.

25   Q.   And you're aware there was a different

```
 1   description --
 2                MR. DAVIS:  I'm going to object to that again
 3   as being hearsay.
 4                THE COURT:  Objection is overruled.  The
 5   matter's been opened sufficiently for the question to be
 6   asked.
 7                MR. DAVIS:  I haven't asked any questions
 8   about any other descriptions, Your Honor.
 9                THE COURT:  There has been some questions
10   about the identity of the perpetrator that's been developed.
11   You may ask the question.
12   Q.   (By Ms. Little)  There's another description from
13   the person who chased the man with the purse of Ms. Ellis; is
14   that correct?
15   A.   I'm sorry?
16   Q.   There is another description from Mr. Ozuna; isn't
17   that correct?
18   A.   Yes, ma'am.
19   Q.   And that description is a Hispanic male, 170 pounds;
20   is that right?
21   A.   Yes, ma'am.
22   Q.   Basically, Detective Cook, I think you explained to
23   me that you considered this case a recovery for Arlington?
24   A.   Yes, ma'am, as far as our department was concerned,
25   with the lack of evidence -- I mean it was pretty much a --
```

1    just a recovery mission for Arlington in reference to the

2    vehicle.

3        Q.    Okay.  And once that car was processed, did you then

4    get the car back to Arlington at some point?

5        A.    Yes, ma'am.

6        Q.    Do you know how long that took?

7        A.    Not right offhand, I don't.

8        Q.    Now, this -- this robbery of Ms. Ellis in Wichita

9    Falls was about 8:30 at night on the 26th of August, 1997; is

10   that right?

11       A.    Yes, ma'am.

12       Q.    And it was the next morning that the car was

13   recovered broken down on the Seymour Highway?

14       A.    Yes, ma'am.

15              MS. LITTLE:  That's all I have.  Thank you.

16                    Recross-Examination

17   By Mr. Davis:

18       Q.    Detective --

19              MS. LITTLE:  Oh, I will offer this for all

20   purposes.

21              (Defendant's Exhibit No. 42 offered)

22              MR. DAVIS:   No objection.

23              THE COURT:  Admitted.

24              (Defendant's Exhibit No. 42 admitted)

25       Q.    (By Mr. Davis)  Detective Cook, do you know how long

 1    that car had been there on the Seymour Highway?

 2        A.   No, sir, I do not.

 3        Q.   As I understand it, the car was broken down.  It was

 4    not capable of being driven back to Dallas, if it had come

 5    from Dallas; is that correct?

 6        A.   Yes, sir.

 7        Q.   Where is Childress in relationship to Wichita Falls?

 8        A.   West.

 9        Q.   About how far west of Wichita Falls would it be?

10        A.   I would say an hour.

11        Q.   I guess if you're coming from Dallas to get to

12    Childress, you can go right through Wichita Falls, can't

13    you?

14        A.   Yes, sir, around the back side.

15        Q.   Uh-huh.  Do you know whether or not there's a boot

16    camp in Childress?

17        A.   No, sir, I do not.

18        Q.   Possible there may be one in Childress, but you're

19    just not aware of it?

20        A.   Yes, sir.

21        Q.   Do you know whether or not the defendant had ever

22    spent any time at that boot camp in Childress, Texas.

23        A.   I do not know, sir.

24            MS. LITTLE:  Hearsay.

25            MR. DAVIS:  That's all I have.

<u>Further Redirect Examination</u>

By Ms. Little:

Q.   Just one other thing, Officer Cook.

You know the purse was found of Ms. Ellis on Minnetaska Avenue; is that right?

A.   Yes, ma'am.

Q.   Would you show the jury where that is?

A.   (Witness complies.)

Q.   So if I make a mark right here, that's where the purse was found; is that about right?  On Minnetaska?

So there's several locations here in this area of Seymour Highway and where the Braum's Ice Cream is, where the chase happened, and you know the chase went up Buchannan to Tildon and the purse was found back over here; is that right?

A.   Right.

Q.   Okay.

MS. LITTLE:  That's all I have.  Thank you.

MR. DAVIS:  No further questions.

THE COURT:  Thank you, Detective.  You may step down.

May he be excused?

MR. DAVIS:  No objection.

MS. LITTLE:  No objection.

THE COURT:  You are excused, sir.

THE WITNESS:  Thank you.

1          THE COURT:  Defense may continue.

2          MS. LITTLE:  We'll call Donnie Kines.

3      While Jennifer gets that next witness, Your Honor,

4  I'd offer Defense Exhibit Number 45 which is a stipulation

5  signed by both sides and by Jim Murphy.

6          (Defendant's Exhibit No. 45 offered)

7          MR. DAVIS:  No objection.

8          MS. LITTLE:  May I publish.

9          THE COURT:  Stipulation is admitted.  You

10  may.

11          (Defendant's Exhibit No. 45 admitted)

12          MS. LITTLE:  Comes now the defense --

13  defendant's attorney and the District Attorneys and agrees to

14  the following stipulation:  On August 26th of 1997, in the

15  afternoon, Margie Ellis, a 65-year-old woman, was at a

16  Braum's Ice Cream store in Wichita Falls.  A man ran up to

17  her, pushed her down, and grabbed her purse.  She did not get

18  a good look at the person who took her purse, partly because

19  her vision is not very good.  End of stipulation.

20          THE COURT:  Call your next witness.

21      Raise you right hand, please, sir.

22          (Witness sworn.)

23          THE COURT:  Thank you.  Have a seat, please.

24          MS. LITTLE:  Your Honor, can all Wichita Falls

25  people be released?

```
 1              MR. DAVIS:  No objection.

 2              THE COURT:  They may.

 3                    ROY DONALD TOLAR

 4    was called as a witness by the Defendant and, after having

 5    been first duly sworn, testified as follows:

 6                    Direct Examination

 7    By Ms. Little:

 8         Q.   State your name, please, sir.

 9         A.   My name is Roy Donald Tolar.

10         Q.   Okay.

11              THE COURT:  Last name again, please?

12              THE WITNESS:  Tolar.

13         Q.   (By Ms. Little)  How do you spell Tolar?

14         A.   T-o-l-a-r.

15         Q.   Okay.  You go by Donnie, don't you?

16         A.   Yes, ma'am.

17         Q.   How old are you, Donnie?

18         A.   I'm 27 years old.

19         Q.   Where do you live?

20         A.   I live in Sulphur Springs, Texas.

21         Q.   And how long have you lived there?

22         A.   About 15 years.

23         Q.   Who do you live with?

24         A.   I live with my foster father.

25         Q.   What is his name?
```

1    A.    Garth Looney.

2    Q.    Is he a rancher, Donnie?

3    A.    Yes, ma'am, he's a retired dairy farmer.

4    Q.    And do you work?

5    A.    Yes, ma'am.

6    Q.    Where do you work?

7    A.    I work A.K. Gillis & Sons.

8    Q.    What kind --

9          THE REPORTER:  I'm sorry?

10         THE WITNESS:  For A.K. Gillis & Sons.

11   Q.    (By Ms. Little)  I'm sorry.  I didn't hear what you

12   said.

13   A.    I work for A.K. Gillis & Sons.  They're an

14   incorporated contractor, do heavy dirt work and construction.

15   Q.    Okay.  Specifically, what do you do in your job?

16   A.    I drive a truck.

17   Q.    And that's fairly heavy labor for you, right?

18   A.    Yes, ma'am.

19   Q.    You work hard?

20   A.    Yes, ma'am.

21   Q.    How long have you worked for those people?

22   A.    I've been there three years this time.

23   Q.    Okay.  Had you worked for them previously?

24   A.    Yes, ma'am.

25   Q.    How long had you worked for them before?

1       A.   Probably a couple of years.

2       Q.   Okay.  Do you know Jedidiah Isaac Murphy who we call

3  Jim Murphy?

4       A.   Yes, ma'am, he's my brother.

5       Q.   Okay.  You're older than Jim; is that right?

6       A.   Yes, ma'am.

7       Q.   Do you remember how old you were when y'all left

8  your parents' home?

9       A.   Yes, ma'am.  I was about 7 years old.

10      Q.   Okay.  And who were your parents, Donnie?

11      A.   Roy Donald Kines and Hope Abbott.

12      Q.   Okay.  How many kids were in the family at that

13 time?

14      A.   There are six of us altogether.  There was three

15 boys and three girls.

16      Q.   Okay.  Would you name the boys?

17      A.   It was me, Jim Ed, and Bob.

18      Q.   Okay.  Were the boys?

19      A.   Yes, ma'am.

20      Q.   And were all of these children Hope's and Donnie

21 Kines', your dad's children?

22      A.   Yes, ma'am.

23      Q.   Who were the girls?

24      A.   Tonya, Tammy, and Holly.

25      Q.   Okay.  Who was the oldest of the girls?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    Tonya.

2    Q.    And how old was she at that time?

3    A.    She was probably 14 or 15.

4    Q.    You're not sure exactly?

5    A.    No, ma'am.

6    Q.    Did there come a time when you left the home of your

7 parents, Hope Abbott and Donnie Kines?

8    A.    Yes, ma'am.

9    Q.    Do you have much memory of living with your parents

10 before you left?

11    A.    Yes, ma'am.

12    Q.    What kinds of things do you remember as your

13 experiences?

14    A.    Just a regular home, you know, until everything

15 broke down and we all left.

16    Q.    Okay.  What caused the breakdown, do you know?

17    A.    Just divorce and, you know, family trouble.

18    Q.    Okay.  Was there drinking in the home, or do you

19 know at that time?

20    A.    Yes, ma'am, my daddy drank.

21    Q.    Okay.  When you left the home, did all six of you

22 leave?

23    A.    Yes, ma'am.

24    Q.    And where did you go, Donnie?

25    A.    Me and Jim Ed and my little sister went to live with

1    my dad's mother and daddy which was my grandparents and they

2    raised us until they got deathly ill.

3         Q.    Okay.  What are their names, Donnie?

4         A.    Margaret Kines and Ed Kines.

5         Q.    Okay.  And were they your dad's parents?

6         A.    Yes, ma'am.

7         Q.    Do you know about how long you lived with them?

8         A.    Off and on about probably 10 years.

9         Q.    Okay.

10        A.    To about '86.

11        Q.    Okay.  Did you ever go to Buckner's Orphanage?

12        A.    Yes, ma'am.

13        Q.    Do you know how old you were when that happened?

14        A.    I was probably -- probably 6 years old.

15        Q.    How old was Jim then?

16        A.    Jim was probably -- I might have been 7 or 8.  Jim

17   was probably 5 or 6 because there's a couple of years

18   difference in our age.

19        Q.    Okay.  Did you stay at Buckner's very long?

20        A.    I don't remember.  Seemed like forever, but it might

21   not have been but maybe six, eight weeks, maybe.

22        Q.    Okay.  And then where did you go?

23        A.    I think we went back to my grandparents', and then

24   we later on got adopted by the Tolars.

25        Q.    Okay.  Now, your grandparents were elderly; is that

Page 41

```
 1   right?

 2        A.   Yes, ma'am.

 3        Q.   How many of you did they try to take care of?

 4        A.   Well, they had all six of us from time to time, but

 5   later on they just had me and my little brother and my little

 6   sister.

 7        Q.   Okay.  Which little sister?

 8        A.   Holly Jo.

 9        Q.   All right.  Do you know when you were adopted by the

10   Tolars?

11        A.   I believe it was sometime back in '83, I think.

12        Q.   And do you know how old you and Jim were then?

13        A.   I was 9 or 10 years old, and Jim Ed was 7 or 8.

14        Q.   Okay.

15        A.   Something like that.

16        Q.   Did you have any particular problems when you were a

17   little kid, Donnie?

18        A.   Not anymore than just any other human being, you

19   know, hyperactive and just -- you know, just kid stuff.

20        Q.   Uh-huh.  Now, when you went to live with the Tolars,

21   did you have problems in that household?

22        A.   We had a few problems there.

23        Q.   Okay.  What kind of problems did you have?

24        A.   One, they was mean to my little brother all the

25   time.  And, you know, we wasn't their biological kids, and,
```

1    you know, probably know how all that goes.  You know, we got

2    in a little bit more trouble than the rest of the boys did.

3    We had to go to bed earlier than they did, a bunch of things

4    different.

5         Q.   Okay.  Did it seem like to you the treatment wasn't

6    even between you and Jim and the children of the Tolars?

7         A.   It never was.  That's why we're not there anymore.

8         Q.   Do you know how long you were at the Tolar's?

9         A.   Four years, probably.

10        Q.   Okay.  Do you remember that Ms. Tolar, Celeste

11   Tolar, took you for counseling?

12        A.   Yes, ma'am.

13        Q.   Do you -- what do you remember, if anything, about

14   that?

15        A.   I don't remember a whole lot about it.  I was a kid,

16   but a lot of it -- 90 percent was taking up for my little

17   brother all the time.

18        Q.   Okay.  Was Jim a timid kid then?

19        A.   Yes, ma'am.

20        Q.   When you were with the Tolars, did you ever do

21   anything to their house?

22             THE COURT:  Can you be more specific?

23        Q.   (By Ms. Little)  That was destructive?

24        A.   Yes, ma'am, I did, when I --

25        Q.   What did you do?

1    A.   They locked me in a room a couple of times.  I

2    believe I tore the door down getting out of there.

3    Q.   And do you know why they locked you in a room?

4    A.   Not really.  I wouldn't lock nobody in a room for

5    nothing.

6    Q.   But you did have some hyperactivity, didn't you?

7    A.   Yes, ma'am.

8    Q.   And what did you do to their house as a result of

9    some of the treatment that you received?

10   A.   Well, I got out of that room.  That's all I

11   remember.  That's basically all I remember what happened.

12   They locked me in a room and I come out of there.  I don't

13   remember if I went through the window, the door, or the wall,

14   but I come out.

15   Q.   Okay.  Do you remember which room you were locked

16   in?

17   A.   Yes, ma'am.

18   Q.   Which room was it?

19   A.   It was the first bedroom on the left going down the

20   hallway.

21   Q.   Okay.  Did the Tolars ultimately give you up and not

22   keep you at their home?

23   A.   Yes, ma'am.

24   Q.   Do you know whether or not Jim had a choice to stay

25   with the Tolars or not?

1        A.    I believe they both wanted us to leave.

2        Q.    Did you break out the windows in their house,

3   Donnie?

4        A.    The night we left, I did because they wouldn't let

5   me in the house.  They was whooping up on little brother, a

6   bunch of stuff went bad, and I came back in the house.  I

7   think I -- I believe I busted out a sliding glass window, I

8   think.

9        Q.    Okay.

10        A.    Come back in because they were beat -- they had two

11   or three of them on my little brother.  I don't remember all

12   the circumstance.  But they were whooping up on him.

13        Q.    Now, when you say two or three of them, who would

14   that be?

15        A.    I believe it was their other three sons, their

16   biological sons.

17        Q.    Okay.

18        A.    They was whooping up on my little brother Jim and I

19   came in there and got them off of him.

20        Q.    Okay.  Where did you go -- did you go to the Van

21   Zandt County Children's Shelter when you left the Tolars?

22        A.    Yes, ma'am, Fruitvale, Texas.

23        Q.    And do you know how long you were there?

24        A.    Probably a couple of months.

25        Q.    Did Jim get placed from there?

1    A.    Jim didn't stay there.  I think he didn't stay there

2    very long at all.  I think he later got adopted pretty quick

3    afterwards.

4    Q.    Okay.  Do you know anything about that person?   His

5    next adoption?

6    A.    It was Bob and Samantha Murphy out of Edgewood,

7    Texas.

8    Q.    Okay.  And how long did you stay at Van Zandt

9    Children's Shelter?

10    A.    Like I said, a couple of months, six or eight

11    months.

12    Q.    Where did you go then?

13    A.    The State picked up custody of me then, and I went

14    to live with a foster family in Sulphur Springs.  And one I'm

15    still acquainted with now.

16    Q.    Okay.  And so have you been with Garth Looney a long

17    time?

18    A.    Yes, ma'am, since about '86.

19    Q.    Okay.  The problems that you had with your

20    hyperactivity and stuff, did you ever take medication for

21    that?

22    A.    They tried to give me nearly everything in the world

23    for it, but I didn't take a whole lot of it.  Some of it made

24    me more hyperactive.  Some of it just -- boy, I couldn't

25    even -- some of it I couldn't even -- you know, just felt

1    like I was drunk or something, so I quit taking a lot of it.

2         Q.    Okay.  Do you know if you ever took Ritalin or

3    anything --

4         A.    I took Ritalin, Sidelar (phonetic), Ativan.  I took

5    Thorazine, Lithium.  I took everything you can imagine.  But

6    I didn't take it very long, because a lot of it, like I said,

7    made me where I couldn't even hardly function.

8         Q.    Okay.  Now, how long was it from the time you left

9    your mother Hope until you saw her again?

10        A.    Well, there was a time in there probably I didn't --

11   from about '83 to about '90 probably 2, I never seen my mom

12   very much.  Jim Ed never seen her till -- just about '83

13   until about -- Jim, he was about 17, 18 years old.

14        Q.    Okay.

15        A.    When I re -- reunited him, told him where everybody

16   lived.  I found them.  I've done -- did a lot of little, you

17   know, research and asked a bunch of questions, got a bunch of

18   numbers, and I got ahold of them.  I believe I give Jim the

19   number and everything after he graduated high school.

20        Q.    After that, y'all were back in touch with your

21   mother; is that right?

22        A.    Yes ma'am.

23        Q.    But through those years you had not been?

24        A.    No, ma'am.

25        Q.    In fact, was there a reunion of the family because

1    your sister Tonya married?

2         A.   Yes, ma'am.

3         Q.   Do you remember Jim being trouble to anybody when he

4    was a little kid?

5         A.   Yes, ma'am, I do.

6         Q.   What kind of trouble would he get into?

7         A.   Just like most of us, hyperactivity, and Jim was,

8    you know, he -- just kid stuff mainly, wasn't nothing real

9    serious.

10        Q.   Uh-huh.  Do you know how many Christmases you spent

11   with the Tolars?

12        A.   Probably three.

13        Q.   Do you have any memory of how long your therapy was

14   when you went with Celeste to the Canton MHMR?

15        A.   Off and on for I imagine a few months, I guess --

16   however -- it wasn't very long.

17        Q.   And then was it pretty soon after that that they

18   took y'all to the children's shelter?

19        A.   Not when we went to the children's shelter.  I

20   believe they called the law and the law come picked us up and

21   took us out there.

22        Q.   Okay.  Had you hidden under a house?

23        A.   I was hiding everywhere.  I was scared at the time.

24        Q.   Do you consider Jim to be the person you're closest

25   to in your family?

1    A.    Yes, ma'am.

2    Q.    Do you believe he considers you the same?

3    A.    Yes, ma'am.

4    Q.    Do you know how many times your dad had been married

5 before he married your mother?

6    A.    I don't believe anybody -- he may have been once,

7 but I don't think so.

8    Q.    Okay.  And did y'all -- did you and Jim have any

9 good times when you were little?

10   A.    Yes, ma'am.

11   Q.    What kinds of things did you do?

12   A.    We rode bikes, went camping, fishing, hunting.

13   Q.    Okay.  After y'all went to the children's shelter

14 and you were separated, how long was it before you were ever

15 together again?

16   A.    It was a good while because the people that adopted

17 my little brother, they didn't want me to see my little

18 brother.  They didn't want me to be around him.  I kind of

19 went behind their back, kind of had -- I might have even

20 caused Jim some trouble, you know, getting back in touch with

21 him.  They didn't want me -- they didn't want me to have

22 nothing to do with him.  You know, when somebody adopts

23 somebody, they generally want you to kind of forget about the

24 past and start over today and go on from there.

25   Q.    Okay.

1     A.   But I got ahold of him, and they eventually let me

2  visit with him and come around time from time.  They didn't

3  care for it a whole lot, but it's my little brother and I

4  enjoyed seeing him.

5     Q.   Do you know anything about the Murphys that adopted

6  Jim after y'all left the Tolars?

7     A.   Not a whole lot personally.  I know what -- I know

8  just coming over to their house and visiting my brother.

9     Q.   Okay.

10    A.   I didn't see a whole lot of them.

11              MS. LITTLE:  That's all I have.

12                    Cross-Examination

13  By Mr. Davis:

14    Q.   Mr. Tolar, my name is Greg Davis.  You and I have

15  never met, have we?

16    A.   No, sir.

17    Q.   As far as I remember we've never talked either, have

18  we?

19    A.   No, sir.

20    Q.   Mr. Tolar, I want to talk to you about your

21  grandparents a little bit.  Your grandparents were very good

22  to you, weren't they?

23    A.   Yes, sir, they was.

24    Q.   They were very good to the defendant, also?

25    A.   Yes, sir.

1    Q.   Is that fair to say both of them loved the defendant

2  very much?

3    A.   They loved all of us.

4    Q.   Treated -- treated the defendant well?

5    A.   Yes, sir.

6    Q.   Tried to -- tried to teach him what he needed to

7  know as a child?

8    A.   Yes, sir.

9    Q.   They were good people, weren't they?

10   A.   Yes, sir.

11   Q.   And while the defendant was in your grandparents

12  home, he had no problems at all, did he?

13   A.   Just hyperactivity.  Jim was always real hyper, you

14  know, he -- you know, I was, too, but I don't know too many

15  kids that ain't really.

16   Q.   Uh-huh.  But as far as when you're a kid, I mean

17  they tried to teach y'all right from wrong, didn't they?

18   A.   Yes, sir.

19   Q.   Discipline when you needed discipline, correct?

20            THE COURT:  You have to answer yes or no,

21  sir.

22   A.   Yes, sir.

23   Q.   (By Mr. Davis)  Gave you love when you needed love?

24   A.   Yes, sir.

25   Q.   I mean, certainly the defendant and you both felt

1   like you were very much wanted in your grandparents' home,

2   right?

3      A.   Yes, sir.

4      Q.   And again, while you and the defendant were in your

5   grandparents' home, the defendant was not mistreated in any

6   way, was he?

7      A.   My dad was an alcoholic.  He got a little rough from

8   time to time, but not as far as just -- nothing -- you know

9   abuse.  My dad scared me quite a bit.

10      Q.   Yeah.  No abuse by your grandparents?

11      A.   No, sir.

12      Q.   No physical or sexual abuse by your father?

13      A.   No, sir.

14      Q.   Would the same be true from your mother, no

15   physical, sexual abuse from her, either?

16      A.   No, sir.

17      Q.   As I understand, you and the defendant were only at

18   Buckner's for about six to eight weeks before the defendant

19   was -- and both of you were adopted by the Tolars in Grand

20   Saline, right?

21      A.   Yes, sir.

22      Q.   Now, when you were with the Tolars, I mean, you were

23   diagnosed as having attention deficit disorder yourself,

24   weren't you?

25      A.   Yes, sir.  I still got it, I imagine.

1    Q.   That's the reason why the Tolars took y'all -- took

2    you for counseling, wasn't it?

3    A.   Yes, sir.

4    Q.   That's the reason why they tried certain medications

5    with you to try to control that hyperactivity, right?

6    A.   Yes, sir.

7    Q.   Now, when y'all were with the Tolars -- now, isn't

8    it a fact that the Tolars tried as best they could to make

9    you and the defendant fit into that family along with their

10   other three sons?

11   A.   No, sir, they didn't.

12   Q.   As a matter of fact, I mean, they voluntarily took

13   the two of you in even though they already had three sons to

14   take care of, didn't they?

15   A.   Yes, sir.

16   Q.   Do you remember that the Tolars took y'all to Sunday

17   school along with the other three boys, didn't they?

18   A.   They did, but like I said them people wasn't -- they

19   wasn't as good as you might think they was.

20   Q.   My question to you, sir, was:  Did the Tolars take

21   you and the defendant, along with their other three sons, to

22   Sunday school?

23   A.   Yes, sir.

24   Q.   And y'all attended church regularly with the Tolars,

25   didn't you?

1      A.   Yes, sir.

2      Q.   Because the Tolars attended church on a very regular

3 basis, didn't they?

4      A.   Yes, sir.

5      Q.   The Tolars had no alcohol in their home, did they?

6      A.   I never seen none.  I never looked for none, no,

7 sir.

8      Q.   Okay.  You never did see Terry or Celeste Tolar

9 drinking in that house, did you?

10      A.   No, sir.

11      Q.   Do you know whether or not the defendant was talked

12 to by Terry Tolar about the use of alcohol while y'all were

13 living in that home?

14      A.   I don't remember none of that.

15      Q.   Do you know whether he -- whether he counseled him

16 or cautioned him about the use of alcohol while he was living

17 in that home?

18      A.   I imagine he counseled us about everything.

19      Q.   Okay.

20      A.   Yes, sir.

21      Q.   What sort of things would Terry Tolar counsel y'all

22 about?

23      A.   Just stuff that was maybe not going right.

24      Q.   So he would sit down and talk with you, wouldn't he?

25      A.   Yes, sir.  He wasn't there all the time.  He stayed

1     gone two or three days at a time.  He would come in for a day

2     or two or something.  I don't remember how all that worked,

3     but --

4          Q.   I mean, Terry Tolar was a firearm, wasn't he?

5          A.   I believe he was, yes, sir.

6          Q.   He would be on for 24 hours and be off for a certain

7     period of time and then he'd go -- have to go back on duty,

8     wouldn't he?

9          A.   Yes, sir.

10         Q.   During the time Celeste Tolar was there at the home,

11    wasn't she?

12         A.   Yes, sir.

13         Q.   You and the defendant could talk to her about what

14    was happening, too, couldn't you?

15         A.   Yes, sir.

16         Q.   Okay.  So if something was happening, I mean Celeste

17    Tolar would let you talk with her, wouldn't she?

18         A.   She let you talk to her, but she didn't listen, but,

19    yes, sir.

20         Q.   Okay.  So you talked with her, she tried to help

21    you, too, didn't she?

22         A.   She never tried to help me none.

23         Q.   Well, wasn't she the one that took you for

24    counseling?

25         A.   She took me for counseling, but I don't know what

1    reason for that was, anyway.

2        Q.   You didn't consider that to be any help by Celeste

3    Tolar?

4        A.   I didn't think I had that kind of problem, you know,

5    at the time to need counseling, but you're right, we did go

6    to counseling.

7        Q.   As a matter of fact, when the defendant was ready to

8    go to school, Terry Tolar actually enrolled the defendant in

9    school, didn't he?

10       A.   I don't know -- I don't know.

11       Q.   You don't remember that?

12       A.   Huh-uh.

13       Q.   Took an active interest in how he did in school,

14   didn't he?

15       A.   Yes, sir.

16       Q.   Same with you, I guess, didn't he?  He took an

17   interest in how you were doing, how your grades were?

18       A.   We had to go to school.  We got up, caught the bus

19   and rode bikes to school everyday.  You know, we couldn't

20   just skip out on not going to school.

21       Q.   Okay.  He -- as a matter of fact, he did more than

22   that.  Didn't he also enroll the defendant in T-ball, in

23   other activities outside the school?

24       A.   I don't remember none of that.

25       Q.   You don't remember that?

1    A.    No, sir.

2    Q.    You don't remember the defendant actually playing

3    T-ball while he was there at the Tolar home?

4    A.    I remember us playing baseball or T-ball, but I

5    don't remember how it all got placed.

6    Q.    Okay.  So you're going to church regularly while

7    you're with the Tolars, right?

8    A.    Yes, sir.

9    Q.    You're enrolled in school, correct?

10   A.    Yes, sir.

11   Q.    You're at other activities such as baseball while

12   you're living with the Tolars, right?

13   A.    Yes, sir.

14   Q.    There's no violence between Terry Tolar and Celeste

15   Tolar going on when you're with them, is there?

16   A.    Not with them, him and her.

17   Q.    So there's no domestic violence, correct?

18   A.    There was with me.

19   Q.    Well, I'm talking about between Mrs. Tolar and Mr.

20   Tolar.

21   A.    Not --

22   Q.    You didn't ever see them fight or have any sort of

23   violence, did you?

24   A.    No, not that I -- no, sir.

25   Q.    They're not drinking in that home, are they?

1      A.    No, sir.

2      Q.    They're not doing drugs in that home, are they?

3      A.    No, sir.

4      Q.    But wouldn't it be fair to say that while you're

5   there, I mean, you're having some behavioral problems, aren't

6   you?

7      A.    Not -- not that -- none that I remember really.

8      Q.    Well, when you tore down the door there at the

9   Tolar's home, I mean that took quite a bit of force to tear

10   that door down, didn't it?

11      A.    Yes, sir, it did.  But when you get hit and beat on

12   like I was and get locked in a room, you want to come out

13   there.  Them people -- them people weren't good to me and I'm

14   not --

15      Q.    I'm sorry.  Your response is --

16              THE COURT:  Volunteer an answer only to the

17   question asked, please.

18      Q.    (By Mr. Davis)  Your response then is, yes, it did

19   take a lot of force to knock that door down?  Is that your

20   response?

21      A.    Yes, sir.

22      Q.    And as a matter of fact, isn't it true that the

23   Tolars reluctantly put you and the defendant over there at

24   that children's shelter because they certainly -- they simply

25   could not control your behavior and it was having a negative

1    impact on the family; isn't that true?

2                    MS. LITTLE:  I object to that unless he knows

3    the answer.

4                    THE COURT:  Can you answer that of your own

5    personal knowledge, sir, or not?

6                    THE WITNESS:  No, sir.

7                    THE COURT:  Objection sustained.

8        Q.   (By Mr. Davis)  Your behavior was negatively

9    impacting that family, wasn't it?

10       A.   Not that I remember.

11       Q.   You don't think that any of your behavior had any

12   negative impact on either the parents or the other three

13   children?  You don't remember that?

14       A.   I remember.

15       Q.   Well, the government didn't take you out of that

16   house because of any abuse going on, did they?

17       A.   No.  They probably would have if I'd got ahold of

18   them.

19       Q.   When you went over there to the children's shelter,

20   Mr. Tolar, you talked with doctors, you talked with

21   counselors, didn't you?

22       A.   Yes, sir.

23       Q.   You didn't mention a single word about any abuse

24   going on in that house, did you?

25       A.   I told them what all went on while we left.

1        Q.    And were you around when the defendant talked with

2    the counselors, doctors, and other workers over there at the

3    children's shelter?

4        A.    No, sir.

5        Q.    So you don't know what he may have said?

6        A.    No, sir.

7        Q.    Did you talk with him about telling, hey, you got to

8    tell these people, you know, man, you've been whooped up bad,

9    you've been abused, treated real poorly over there at the

10   Tolars, you've got to tell these people what went on?  You

11   told him that, didn't you?

12       A.    I told them what they did to me.

13       Q.    But you don't know what the defendant said, do you?

14       A.    I wasn't there, I don't guess.

15       Q.    Have you ever seen the records from that children's

16   shelter?  Have you ever seen -- have you ever seen the

17   defendant's records?  Have you been shown those records?

18       A.    No, sir.  I don't think he stayed there very long to

19   have any records.

20       Q.    Do you know whether or not Dr. Richard Ingrim

21   examined him when he got over there to that children's

22   shelter?

23       A.    He may have, but he wasn't there but maybe a

24   short -- very short time.

25       Q.    Dr. Ingrim was your family doctor, wasn't he?

1    A.    I believe his name was Mr. Ingrim.

2    Q.    Yeah.  Ingrim -- did Dr. Ingrim come over and see

3  you?

4    A.    I seen somebody.

5    Q.    So you don't know what the defendant may have told

6  Dr. Ingrim, do you?

7    A.    I have no clue.

8    Q.    Because you haven't been shown those records, have

9  you?

10    A.    No, sir.  But whatever it was, I imagine it was

11  true.

12    Q.    So you got to assume whatever is in those records is

13  true, right?

14    A.    Yes, sir.  Terry Tolar was one mean rough man

15  whether you know it or not.  And he was rough with me and my

16  little brother.

17    Q.    Mr. Tolar, will you do me -- do me a favor and just

18  wait for the next question?  Would you do me that favor?

19    A.    Yes, sir.

20    Q.    Thank you.  When the defendant got over to the

21  Murphy's home, do you know how the defendant was acting over

22  there?

23    A.    No, sir.

24    Q.    Do you know when he started stealing at the Murphy's

25  home?

1      A.    No, sir.

2                  MS. LITTLE:   I'll object to that as assuming

3    facts not in evidence at this time.

4                  THE COURT:   Sustained.

5      Q.    (By Mr. Davis)   Do you know that he's been convicted

6    of burglary and theft?   Do you know that?

7      A.    No, sir.

8      Q.    You didn't keep up with his behavior and his

9    activities over at the Murphy home?

10     A.    They wouldn't let me see him for two or three

11   years.   I had to go behind their back to visit him.

12     Q.    When you visited with the defendant, did he ever

13   tell you, hey, I'm out here drinking all the day and smoking

14   pot everyday while I'm going to high school?   He tell you

15   that?

16     A.    No, sir, he didn't.

17     Q.    Well, do you think he was shooting straight with you

18   about what was going on in his life?

19     A.    That's my little brother.   He ain't never lied to me

20   before.

21     Q.    But he didn't tell you he was drinking all the time,

22   did he?

23     A.    No, sir.   I don't think nobody just talks about that

24   anyway.   Nobody tells about their drinking problem or drug

25   problem.

1    Q.    Didn't tell you that he was starting to do drugs

2  over there at the Murphy's?

3    A.    No, sir.

4    Q.    Did he tell you that -- that he went out and he got

5  convicted?

6    A.    No, sir.

7    Q.    Didn't share that information with you either?

8    A.    No, sir.

9    Q.    Did he tell you he went to boot camp?

10    A.    I believe I knew he went to boot camp, yes, sir.

11    Q.    How did you find that out?

12    A.    I got a letter from him.

13    Q.    As far as how the Murphys treated him, Mr. Murphy

14  treated him just like his son, didn't he?

15    A.    Well, he wouldn't let him visit me so -- that ain't

16  too human like, I don't think.

17    Q.    As a matter of fact, isn't it true that when he was

18  over there at the Murphys, that Mr. Murphy paid more

19  attention to the defendant than he did his own biological son

20  Matt?

21    A.    I have no clue.

22    Q.    Because you don't -- you don't know what happened in

23  that home, do you?

24    A.    Because they wouldn't -- they wouldn't let me visit.

25    Q.    Do you know what happened in that home between Mr.

1  Murphy and the defendant?

2       A.   No, sir, I don't.  I didn't live there.

3       Q.   Now, would you please wait for my next question.

4  Can you do that for me?

5       A.   Yes, sir.

6       Q.   Thank you.  And as I understand when the defendant

7  was 17 or 18 years of age, he was reunited with his mother,

8  Hope Abbott, wasn't he?

9       A.   Yes, sir.

10      Q.   Reunited with the whole family, Tonya, other

11 siblings?

12      A.   Yes, sir.

13      Q.   Correct?

14      A.   Yes, sir.

15      Q.   So from the age 17 to 18, he's had full contact with

16 his family, hasn't he?

17      A.   Yes, sir.

18      Q.   When is the last time that you talked with the

19 defendant?

20      A.   Whenever all that -- about seven or eight months

21 ago.

22      Q.   Haven't talked with him since?

23      A.   I've -- letters, not verbally, you know, face to

24 face.

25      Q.   Let's see, he's been sending you letters from the

1  jail?

2      A.   I would write him occasionally, and he writes me.

3      Q.   When did he admit that he shot Ms. Cunningham?

4      A.   He's never told me nothing about it.

5      Q.   He's never discussed that with you?

6      A.   He's never admitted nothing.  I don't know what all

7  happened.

8      Q.   So this person who's closer to you than anybody else

9  in the world has never admitted anything to you, right?

10     A.   He's never discussed none of that with me.

11     Q.   Did he ever discuss Mandy Kirl with you?

12     A.   I don't even know who Mandy Kirl is, no, sir.

13     Q.   Did he ever mention Sherryl Wilhelm to you?

14     A.   No, sir.

15     Q.   Did he ever mention the numerous fights that he had

16  with Chelsea Willis?

17     A.   I knew about a few of them.

18     Q.   He got violent with Chelsea Willis on more than one

19  occasion, didn't he?

20     A.   I have no clue how many times that took place.  I

21  just know that I've know that it has took place.

22     Q.   Do you know whether or not he broke Chelsea Willis's

23  nose once?

24     A.   I have no idea.

25     Q.   Did you ever ask the defendant, hey, tell me what

1    happened?  Did you really kill that woman or not?  Did you

2    ever ask him that question?

3        A.    No, sir, I haven't.

4        Q.    Never even asked him whether he guilty of this

5    offense or not?

6        A.    No, sir.

7        Q.    It didn't really matter to you, did it?

8        A.    Yes, it mattered to me.

9        Q.    But you never asked him?

10       A.    I haven't asked him.  I live a hundred miles from

11   here.

12       Q.    Never in a single letter that you wrote to him did

13   you say, hey, by the way, brother, will you tell me, did you

14   actually shoot that woman in the head like they said?  You

15   never asked him that question?

16       A.    No, sir.

17       Q.    Sir, would it be fair to say that there's a lot of

18   things about the defendant's life that you really have no

19   personal knowledge about?

20       A.    I know everything about him.  I know he's tried to

21   get help a number of times the last many, many years.

22   Terrell State wouldn't have him, wouldn't help him.  He's

23   been to Glen Oaks.  He's been to two or three places.  None

24   of them really have never succeeded on giving him any kind of

25   help.

1    Q.    Have you -- you looked through all those records?

2    A.    No, sir, but I know he has, because he was not in

3    jail at the time.

4    Q.    So you've never reviewed really what happened at

5    Glen Oaks or Timberlawn or Andrew Center?  You really don't

6    know what really happened at those institutions, do you?

7    A.    He was trying to seek some help.

8    Q.    Is that from what he's told you?

9    A.    That's what I know.

10   Q.    Oh, so you don't know that when he went to Glen Oaks

11   and Oak Haven and all these other places, he routinely

12   discharged himself early from those institutions --

13              MS. LITTLE:  I object to that as assuming

14   facts not in evidence.

15              THE COURT:  Objection is overruled in light of

16   the testimony the witness has previously given.

17   Q.    (By Mr. Davis)  And you say that you know

18   everything.  Do you know that?

19   A.    No, sir, I don't.  When you go to a doctor, you just

20   don't generally leave until they've helped you out.

21   Q.    Do you know whether or not he was using drugs when

22   he went to Glen Oaks?

23   A.    I have no clue.

24   Q.    You got no clue about that?

25   A.    No, sir.

1    Q.    You don't know whether he may have been using

2    amphetamines when he went over to Glen Oaks the first time?

3    A.    I have no clue.

4    Q.    You don't know whether he may have been using

5    cocaine and marijuana when he went over to Glen Oaks again?

6    A.    I have no clue.  If I knew that, I'd try to help

7    him.

8              (State's Exhibit No. 145 marked)

9              MR. DAVIS:  Your Honor, at this time we would

10   offer State's Exhibit 145.  These are the business records of

11   Glen Oaks Hospital.  They've been on file with the Court more

12   than 14 days prior to trial.

13             (State's Exhibit No. 145 offered)

14             MS. LITTLE:  No objection.

15             THE COURT:  Admitted.

16             (State's Exhibit No. 145 admitted)

17             MR. DAVIS:  May I approach the witness,

18   please.

19             THE COURT:  You may.

20   Q.    (By Mr. Davis)  Mr. Tolar, let me show you the

21   records from Glen Oaks Hospital.  You've never seen these

22   records, have you?

23   A.    If I knew he had that trouble, I would have helped

24   him myself.  He wouldn't have to have been going --

25   Q.    Well, sir --

1    A.    -- to Glen Oaks.

2    Q.    -- my question was:  Have you ever seen these

3    records?

4    A.    No, sir.

5    Q.    No one from the defense team has ever showed you

6    these records?

7    A.    No, sir.

8    Q.    Okay.  So when we look through these records, sir,

9    you don't know -- I take it that when he was admitted to Glen

10   Oaks the first time, that he denied any drug use.  You don't

11   know that, do you?

12   A.    I don't know none of that.

13   Q.    Okay.  You don't know that he had been taking

14   amphetamines prior to going into Glen Oaks?  You don't know

15   that, do you?

16   A.    No, I don't see where it says it on here, though.

17   Q.    Yes, sir, right here.  And taking his mother's

18   prescription pills?

19   A.    Where does it say anything about amphetamines at on

20   here?

21   Q.    I'll be happy to show you, sir.  Right where he's

22   screened for amphetamines.  Do you see that?  Do you see

23   amphetamines there?

24   A.    I see the word amphetamines.  I don't see where he's

25   been tested positive for them.

1      Q.    Went over his positive drug screen for

2   amphetamines.   Do you see it now?

3      A.    I see it now.

4      Q.    Prior to looking at the records, you didn't know

5   that your brother had tested positive for amphetamines when

6   he went in there, did you?

7      A.    No, sir.   If I did, I would have helped him myself.

8      Q.    As a matter of fact -- I mean, the truth of the

9   matter is that if your brother had come to you and said, hey,

10  I need some help, you would have done everything you could

11  possibly do to help him, right?

12     A.    If I knew it, I would have helped him.

13     Q.    All he had to do was tell you the truth, hey, I'm

14  having a drug problem, I'm having a drinking problem, I'm

15  having a problem with my anger.   And the truth of the matter

16  is you would have bent over backwards to do anything you

17  could possibly do to help him, wouldn't you?

18     A.    Yes, sir.

19     Q.    And again, you don't know because you haven't seen

20  these records?   You don't know whether or not he's tested

21  positive for cocaine and marijuana when he went back over

22  there, do you?

23     A.    I have no clue.   I didn't know none of that.

24     Q.    And again, if you had known that back in 1999 when

25  your brother went to Glen Oaks, you would have taken him for

1    help, you would have sat down and counseled him yourself, you

2    would have done anything you could possibly do to say you

3    need to get your life back on the right course, wouldn't you?

4         A.    I'd help him, yes, sir.

5         Q.    That's really been true throughout your life.   I

6    mean, has there ever been a time where you said to your

7    brother I'm not going to help you, I don't love you, I don't

8    care about you?

9         A.    No, sir.   I've never said that.

10        Q.    Is that true back in October of the year 2000, you

11   were ready and able to help your brother at that time,

12   weren't you, if he needed any help?

13        A.    Yes, sir.

14              MR. DAVIS:   No further questions.

15                     Redirect Examination

16   By Ms. Little:

17        Q.    Donnie, you do know that he did go into a number of

18   different places seeking help, don't you?

19        A.    Yes, ma'am.

20        Q.    And when you say you know everything about him, is

21   what you really mean that you think you know his heart

22   because y'all came up together?

23        A.    Yes, ma'am.

24        Q.    And you understand he does have problems?

25        A.    Yes, ma'am.   I've got problems.   Everybody has

1    problems.

2        Q.    Basically y'all moved through your early childhood

3    together in different locations; is that right?

4        A.    Yes, ma'am.

5        Q.    You went to Buckner's Orphanage; is that right?

6        A.    Yes, ma'am.

7        Q.    Do you remember what you thought about your mom back

8    then, as to whether she would come back and get you or not?

9        A.    I never knew.  I never thought I would ever see my

10   mom again.

11       Q.    Okay.  Did you think that if they just let you

12   leave, you could -- that you could go be with your mamma, or

13   did you think she wasn't coming back and that you were

14   abandoned by her at that time?

15       A.    I -- at one time I didn't figure I would ever see

16   her again.  She wasn't ever coming back.

17       Q.    Okay.  Was the Tolar household a fairly strict and

18   religious one?

19       A.    To the public, yes; behind close doors, no.

20       Q.    Well, when you were there at home with Celeste and

21   Terry was working, was there discipline done then?

22       A.    Very little.  She would wait until he got home a

23   couple of days later.

24       Q.    And then he was the primary disciplinarian?

25       A.    Yes, ma'am.

1     Q.    Was he also the stronger more run-the-house

2  personality in that family?

3     A.    Yes, ma'am.

4     Q.    And when you left and went to the Van Zandt County

5  Children's Shelter, did you feel that you were put out again?

6     A.    Yes, ma'am.

7     Q.    And then you were able to find a place where you

8  stayed and found some stability; is that right?

9     A.    Yes, ma'am.

10     Q.    Were you aware whether or not Jim went to another

11  place for a couple of weeks before he went to the Murphy's?

12     A.    I really didn't know where Jim went at the time.

13     Q.    And when you were living with your mother, Hope, and

14  your father, Donnie -- now, Donnie is dead, isn't he?

15     A.    Yes, ma'am.

16     Q.    Do you know how old you were when Donnie died?

17  Donnie, Sr.?

18     A.    He died in '84.  I was -- that was about 16 years

19  ago, so I was probably 8 or 9 years old.

20     Q.    That was for alcohol related, was it not?

21     A.    Yes, ma'am.

22     Q.    Do you recall any fights between your mother and

23  your father in the home when you were small?

24     A.    Yes, ma'am, I do.

25     Q.    What kinds of fights?

1    A.    Violence.  All I remember is just -- just bad stuff.

2    Q.    Was there hitting?

3    A.    Yes, ma'am, there was.

4    Q.    Did you witness any of that?

5    A.    I seen it.

6    Q.    Okay.  Do you recall whether your father had a game

7    he played with you where y'all pulled his boots off?

8    A.    Yes, ma'am.

9    Q.    Do you recall that?

10   A.    Yes, ma'am, I remember all that.

11   Q.    What do you remember about that, Donnie?

12   A.    He come in from work, and we'd play with him a

13   little it.

14   Q.    And did he have you pull the boots off?

15   A.    Yes, he would have us pull his boots off.

16   Q.    And then what would he do if you couldn't get them

17   off or if you were tugging on them?

18   A.    He would help us, I think, or get mad one.  I don't

19   really remember.

20   Q.    Was most of the violence that you observed between

21   your mother and you father in the home?

22   A.    Most of it was.  My dad used to get real mad at me

23   when I wouldn't get in the truck with him.  You know, when I

24   was that young of an age, you know, you weren't supposed to

25   be -- you know, mature enough mentally to think that, hey,

1    you don't need to be riding with this fellow, he's drunk, but

2    that's about the only time daddy would get real mad at me

3    when I didn't want to go with him a whole lot.

4         Q.    Okay.  So you left that home because your parents

5    gave y'all up?

6         A.    Yes, ma'am.

7         Q.    Then you went to the orphanage?

8         A.    Yes, ma'am.

9         Q.    Then you went to the Tolars, and that didn't work

10   out?

11        A.    No, ma'am.

12        Q.    And when you were at the Tolars, was the discipline

13   for their children the same as what it was for you and Jim?

14        A.    No, ma'am.  That was the main problem why we left.

15        Q.    And what was the difference, Donnie?

16        A.    We had to go bed different.  We couldn't do that

17   different.  We couldn't ride our bikes as far --

18        Q.    Wait, hold on.  What was different about the way you

19   went to bed?

20        A.    We would have to go to bed earlier, you know, a lot

21   earlier than the rest of their kids, even though me and Jim

22   Ed was older than a couple of their kids.  That -- you know,

23   I didn't understand none of that.

24        Q.    Okay.

25        A.    We got a little bit different kind of whoopings than

1    they did, because I don't never really recall them getting a

2    whole lot as far as physical, you know, discipline, like me

3    and my little brother did.

4        Q.   Okay.  So you felt that that was different, for the

5    Tolar birth children and you and Jim?

6        A.   Yes, ma'am.

7        Q.   What kind of whippings would you get?  Was it with

8    hands, belts, what?

9        A.   Terry was real rough on me, but I -- he -- he was

10   rough.  You know, for a Christian man, I don't see how you

11   can try to whoop somebody with a pecan limb and slam things

12   down and kick things over and sling things across the yard

13   and, you know, scream and holler at a fellow if you're that

14   kind of Christian, you know.  I wouldn't do it.

15       Q.   Okay.

16       A.   He was just real mean and he hollered and screamed

17   and he'd grab you and throw you around.  He was real rough on

18   me.  Whether I deserved it or not, I don't think I really

19   did, because I was a little kid.  You know, I wasn't a grown

20   man.

21       Q.   And that's different than the way you observed the

22   punishments for their own children?

23       A.   Yes, ma'am.  I -- I don't think they never done

24   nothing wrong in their eyes, to tell you the truth.

25       Q.   Okay.  What church did your -- did the Tolars

1    attend?

2         A.   I believe it was First Baptist with Grand Saline.

3         Q.   And was it in Grand Saline where you lived with

4    them?

5         A.   Yes, ma'am.

6         Q.   Were there any other differences that you can recall

7    between the treatment that you and Jim received and the

8    treatment that the Tolar children received?

9         A.   The bedtime and places we would go and like as far

10   as spending the night with friends and stuff, me and Jim

11   didn't get to do a whole lot of that, versus when their kids

12   did.  You know, just stuff like that, that really, if you

13   think about it now, it wasn't a whole lot, but when you're a

14   kid, that meant a lot -- or it did to me.  I never did

15   understand a lot of it.  They used to leave me at the house.

16   They would go on vacation.  They wouldn't even look for me.

17   They'd just take off and be gone.

18        Q.   Like where, for instance?  Can you recall?

19        A.   I think they went down to Houston a couple of times,

20   or Galveston once, and just left me at the house.

21        Q.   How old were you then?

22        A.   About 9 or 10 years old.

23        Q.   And how did you fend for yourself?

24        A.   I stayed up the road at a friend of mine's house.

25        Q.   Okay.  Did they know you were staying with another

1    friend?

2         A.    Not really.   I don't think they cared where I was

3    at.

4         Q.    Was Jim with you, or did he go with them?

5         A.    I believe he went a couple of times with them.   I

6    don't remember a whole lot about that family.   All I remember

7    is I'm glad I left.   Because he was mean and real -- Terry

8    was very, very violent.   He would catch nobody not being

9    around, he would jerk you and slam you around and he'd tell

10   you something real quick.   And he was real mean.   Like I

11   said, he was Christian, you know -- he was two-faced.

12        Q.    Uh-huh.

13        A.    Somebody is around, he's a little bit different, but

14   he didn't catch nobody not around, he was -- that's a pretty

15   rough man.

16        Q.    Okay.

17        A.    He'd get your attention some how.   If he had to pick

18   you up over his head or shake you or do whatever he wanted

19   to, he would try to get your attention.

20        Q.    Okay.   Was his treatment of you and Jim the same or

21   was one of you treated worse than the other?

22        A.    I don't know.   I never -- he -- I think me and Jim

23   was about basically the same, but -- to when it was their

24   kids, we were treated a lot different than their kids because

25   we was adopted.   And people don't understand that.   I do.

1    I've seen it in various cases in my lifetime since then that

2    we was not -- we was not their biological kids and we was

3    treated differently.

4        Q.   Okay.

5             MS. LITTLE:   That's all I have.   Thank you.

6                    <u>Recross-Examination</u>

7    By Mr. Davis:

8        Q.   Mr. Tolar, truth of the matter is, the defendant has

9    a history, he has a habit of lying and exaggerating his

10   problems, doesn't he?

11       A.   Not that I know of.

12       Q.   Not that you know of?   What has he told you about

13   the gunshot wound that he suffered to his left hand?

14       A.   I believe the only thing that's been discussed about

15   his hand was he had to have something trimmed off of his

16   thumb or tendon or something is the only thing I believe he's

17   ever spoke to me about.

18       Q.   He's never told about the pellet wound that he had

19   in the middle of his hand back in 1996?

20       A.   I don't remember nothing about a pellet.   I

21   remembered he injured his hand is all I remember him telling.

22       Q.   So as far as you know, he's never really sat down

23   and talked with you about the time that he was moving a gun

24   in the closet and it accidentally discharged and a pellet got

25   lodged in his palm.   You don't know that, do you?

1       A.    No, sir.

2       Q.    Have you talked with Dr. Krusz about what the

3  defendant may have told him about that incident?

4       A.    No, sir, I haven't.

5       Q.    Do you know whether or not he's told other doctors

6  that it was actually a .22 caliber pistol that fired into his

7  hand?

8       A.    I have no idea.  But, sir, I laid in the hospital

9  about four days over a .22 and I know, I've been around a .22

10 a time or two, and I don't believe I shot myself when it went

11 off.  And I'm living proof that they will go off.  And I'll

12 show you my foot if you'd like to see it.

13      Q.    Don't know whether he's told doctors that he

14 required reconstructive surgery to his hands?

15      A.    All I said, he's told me he's had to have something

16 worked on his thumb, you know, he didn't go in no details

17 about it.

18      Q.    Don't know whether he's told doctors that that

19 pellet or .22 caliber bullet shattered his median nerve?  You

20 don't know that either, do you?

21      A.    No, I don't know none of that.

22      Q.    Do you know whether he's told other doctors

23 different versions about what happened back there in 1996?

24      A.    I have no clue, no, sir.

25      Q.    Mr. Tolar, have you ever -- have you ever been shown

1   the records from Timberlawn Psychiatric Hospital in Dallas?

2       A.   No, sir, I never had no reason to be shown them.

3               MR. DAVIS:  Your Honor, at this time we'll

4   offer State's Exhibit 146.  Again, these are the business

5   records of Timberlawn Psychiatric Hospital.  They've been on

6   file for more than 14 days prior to trial, also.

7               (State's Exhibit No. 146 offered)

8               MS. LITTLE:  No objection.

9               THE COURT:  Admitted.

10              (State's Exhibit No. 146 admitted)

11              MR. DAVIS:  May I approach.

12              THE COURT:  You may.

13      Q.   (By Mr. Davis)  Mr. Tolar, I'm going to show you the

14   records for Timberlawn Psychiatric Hospital where your

15   brother was a patient back in October of 1999.  Do you know

16   whether or not he ever went to Timberlawn?

17      A.   I know he was trying to seek some help.

18      Q.   Do you know how long he stayed at Timberlawn?

19      A.   I have no clue.

20      Q.   Do you know that actually he was admitted on October

21   the 9th and that he discharged himself only three days

22   later?  You don't know that?

23      A.   I didn't know none of that.

24      Q.   Let me show you a history taken from your brother

25   concerning a gunshot wound to his hand.  You see this

1    notation right here under additional notes?

2        A.    I really can't read it very good.

3        Q.    Okay.

4        A.    It says gunshot wound to his hand.

5        Q.    Yeah.  Let me just, if I can help you then.  It says

6    a gunshot wound to the lung and hand from attempted robbery

7    where the patient was victim.  Do you see that?

8        A.    Somebody was trying to rob him.

9        Q.    That's what he's telling the doctors anyway, right?

10       A.    I guess that's what happened.  I don't know.  I

11   wasn't there.

12       Q.    You assume your brother was telling the truth?

13       A.    I don't know why he wouldn't.

14       Q.    Do you know at the time that he was at Timberlawn

15   again that he was still on three felony probations?  Do you

16   know that?

17       A.    I knew he had -- I knew he was on probation.  I

18   don't know what for.

19       Q.    And you don't know whether he's told different

20   versions to different people about what happened to his hand?

21       A.    No, sir.

22       Q.    Your brother ever been an IV drug user?

23       A.    Not that I know of.

24       Q.    Has he ever told you that he was an IV drug user?

25       A.    No, sir.

1    Q.    Personally do you know why your brother told the

2    doctors at Timberlawn that he had a history of IV drug use

3    back in 1994?

4    A.    I do not.

5    Q.    You didn't know that either, did you?

6    A.    No, sir.

7         MR. DAVIS:  No further questions.

8              Further Redirect Examination

9    By Ms. Little:

10   Q.    Donnie, you know he's sought treatment several

11   places; is that right?

12   A.    Yes, ma'am, I know he's tried to get help

13   everywhere.

14   Q.    And you knew that he had problems which is why he

15   was doing that?

16   A.    Yes, ma'am.

17   Q.    How old were you when y'all were separated?

18   A.    Probably 10, you know, when we got -- when he got

19   adopted by the Murphys and -- you know, the State had custody

20   of me and I went to live with a foster family and they've

21   been good to me.

22   Q.    Okay.

23   A.    I've lived there ever since.

24   Q.    So you didn't get to see Jim very much when he was

25   with the Murphys; is that right?

1    A.   Not at first.  Like I say, they kind of -- you know,

2    they didn't want me to see him or, you know, I think they

3    wanted -- I don't know really what they wanted, but I don't

4    think they really wanted me to be around for some reason.

5    Q.   So you didn't get to see much of him as y'all went

6    through your teenage years?

7    A.   No, ma'am.

8    Q.   And how much have you actually gotten to see him

9    through your adulthood?

10   A.   Quite a bit.  Me and Jim -- you know, good times and

11   bad times, we got together and discussed things and been

12   fishing, you know, just cooked out on the grill in the yard.

13   Q.   At holidays do you see each other?

14   A.   Not every holiday, but I try to see him at least

15   Thanksgiving or Christmas when he --

16   Q.   Okay.  And you've been living where all this time?

17   A.   I lived right at Sulphur Springs since about '80 --

18   about '87, I believe.

19   Q.   How often do you see him, once a month, once every

20   three weeks, once every three months?  Can you estimate?

21   A.   Probably once every three weeks.

22   Q.   And you know Chelsea Willis, don't you?

23   A.   Yes, ma'am.

24   Q.   And you've been together with them?

25   A.   I've been around both of them.

1      Q.    And essentially though y'all have gone from home to

2    home through your growing up?

3      A.    Yes, ma'am, lived everywhere.

4      Q.    And that's caused some problems, hasn't it?

5      A.    Yes, ma'am.

6               MS. LITTLE:   Thank you.   That's all I have.

7                     <u>Recross-Examination</u>

8    By Mr. Davis:

9      Q.    You say your brother sought help in a lot of

10   different places.   As a matter of fact, you know that your

11   brother has been unwilling to undergo treatment for his

12   problems?

13              MS. LITTLE:   I'll object to that as

14   characterizing something that's not before the Court and --

15              THE COURT:   Can you answer that question?

16              THE WITNESS:   No, sir, I didn't know that.

17     Q.    (By Mr. Davis)  Do you know that your brother was

18   ordered to go to anger management classes down there at Wills

19   Point?

20     A.    I didn't -- no, sir, I didn't know that.

21     Q.    Do you know whether or not he kept his appointments

22   down there?

23     A.    I don't know.

24     Q.    Do you know whether or not he was denied admission

25   to a medical facility back in 1998 because he refused to

 1    undergo drug treatment?

 2        A.   I didn't -- I didn't know that, no, sir.

 3                 MR. DAVIS:  Your Honor, at this time we'll

 4    offer State's Exhibit 147.  These are the business records of

 5    Oak Haven Recovery Center.  They've been on file with the

 6    Court more than 14 days.

 7                 (State's Exhibit No. 147 offered)

 8                 MS. LITTLE:  No objection.

 9                 THE COURT:  Admitted.

10                 (State's Exhibit No. 147 admitted)

11        Q.   (By Mr. Davis)  Mr. Tolar, let me show you the

12    records from Oak Haven Recovery Center.  Do you know whether

13    or not your brother ever went down to Oak Haven?

14        A.   I knew he was trying to get some help somewhere.  I

15    believe it was Oak -- Glen Oaks or Oak Haven, something like

16    that.

17        Q.   Right.  Do you see here this is a denial of

18    admission from those records?  Do you see a notation in here

19    that he is a severe polysubstance dependent person?  Do you

20    see that notation?

21        A.   Yes, sir.  I don't know what polysubstance is

22    though.

23        Q.   Many substances.  Do you know what that means?

24        A.   (No response.)

25        Q.   Okay.

1    A.   My whole family is, really.  I think it runs in the

2    blood.

3    Q.   You see where it says he's been to Andrew Center for

4    months and months and insists that all their efforts with

5    support of psychotherapy and medications are -- these are in

6    quotes, are useless?  Do you see that notation?

7    A.   Yes, sir.

8    Q.   See the next notation where it says, patient insists

9    that he has, quote, no drug dependency problem, but for some

10   reason whenever I drink, I go to jail.  You see that?

11   A.   Yes, sir.

12   Q.   Next statement is the patient indicates he's never

13   completely stopped drinking alcohol, insists he can control

14   his intake himself which is contradicted by his record as

15   well as from what his mother stated.  Do you see that?

16   A.   Yes, sir.

17   Q.   Let me direct your attention here to this

18   statement.  It says:  The patient in short has never gone to

19   a drug treatment center because he does not regard his

20   drinking of alcohol to be a significant problem.  Do you see

21   that?

22   A.   Uh-huh.  Yes, sir.

23   Q.   You see this statement, second paragraph, where it

24   says his admission is denied because the patient has been

25   unwilling to obtain treatment at a drug treatment center.

1    Until he does so, there is no possibility of dealing with the

2    underlying problems which the mother and finally the patient

3    reluctantly concurred.  Do you see that?

4        A.    Yes, sir.

5        Q.    I believe the next notation he's referred back to

6    the Andrews Center.

7             Did you know any of the details of that before I

8    showed you those records?

9        A.    No, I just know he was trying to get some help,

10   because he's had a severe drinking problem all his life.  My

11   daddy did, too.

12                   MR. DAVIS:  That's all I have, Your Honor.

13                   MS. LITTLE:  Nothing further.

14                   THE COURT:  You may step down, sir.

15           Sheriff, let's take a 15-minute recess for the

16   benefit of the jury and the reporter.

17                   THE BAILIFF:  All rise.

18                   (Jury excused from courtroom.)

19                   THE COURT:  Counsel, resume at 11 -- or at

20   10:50.

21                   MR. DAVIS:  Yes, sir.

22                   (Recess taken.)

23                   THE BAILIFF:  All rise.

24                   (Jury returned to courtroom.)

25                   THE COURT:  Let the record reflect the jury is

1       returning to the courtroom.

2               Ladies and gentlemen of the jury, you may be

3       seated.

4               Mr. Murphy, counsel, visitors in the gallery, you

5       may be seated.

6               The defense may call their next witness.

7               MS. LITTLE:  We call Matt Murphy.

8               (Witness sworn.)

9               THE COURT:  Have a seat to my left, please.

10              Counsel may continue.

11              MS. LITTLE:  Thank you.

12                           MATT MURPHY

13      was called as a witness by the Defendant and, after having

14      been first duly sworn, testified as follows:

15      By Ms. Little:

16          Q.   State your name, please.

17          A.   Matthew Murphy.

18          Q.   Matt, do you know Jim Murphy?

19          A.   Yes, he's my brother.

20          Q.   Okay.  How long has he been your brother?

21          A.   He's been my brother since I was in 5th grade.

22          Q.   Okay.  Is that when he came to live with your

23      family?

24          A.   Right.  Right.

25          Q.   Do you know how he came to live with your family?

1      A.    We adopted him.

2      Q.    Do you know where he first came to your mother's

3   attention?

4      A.    Through our school -- or actually not my school,

5   where she went to school.  She was -- saw him on the play

6   ground and he looked a lot like me so she thought it was me

7   and she wondered what I was doing at her school, and so she

8   went up to him and talked to him, found out it wasn't me and

9   from what I understand it was like, would you like to come to

10  our house, you know, and visit my son.  And after that, it

11  was pretty known that we were probably going to adopt Jim.

12     Q.    Okay.  Was your dad glad to do that at first, or did

13  it take him a little while?

14     A.    I think it was all of us.  We were just talking

15  about it.  I can remember the first day mom came home and

16  said anything, and we just talked about it.  Of course, I was

17  like, yeah, I want a brother, you know, especially somebody I

18  can play with that's my age.

19     Q.    Okay.  How many people are in your family, Matt?

20     A.    Altogether it's not a close related family.  There

21  was just my dad, my mother, and I.  My sister is a little bit

22  older than us.

23     Q.    And how many sisters do you have?

24     A.    I have two sisters.  One on my dad's side, and one

25  on my mother's side.

1    Q.   Okay.  Who are they, Matt?  What are their names?

2    A.   Lisa and Tracy.

3    Q.   Okay.

4    A.   Tracy is the closest to me.

5    Q.   Okay.  And where did you grow up?

6    A.   Edgewood, Texas.

7    Q.   Did your mother meet Jim in Fruitvale?

8    A.   Right.  Yes, that's correct.

9    Q.   And are y'all the same age?

10   A.   Yes, we are.  Well, 17 days.

11   Q.   Okay.  17 days difference?

12   A.   Uh-huh.

13   Q.   Now, you've lived in East Texas all of your life; is

14   that right?

15   A.   Except for just the couple of years when I was in

16   the military.

17   Q.   Okay.  And you're married now; is that correct?

18   A.   Not married.  But future -- future holds very

19   promising.

20   Q.   Okay.  And you like to golf, don't you?

21   A.   I do it for a living.

22   Q.   Okay.  You're also working though in another kind of

23   job, aren't you?

24   A.   I teach golf for a living, so --

25   Q.   Okay.

1     A.   It's all still under the same similarities.

2     Q.   Okay.  Now, when Jim came to live with y'all, would

3  you say he was a quiet, shy kid at first, or was he a real

4  vocal kid?  Or how would you describe him?

5     A.   Well, I don't think I would describe him as anything

6  extravagant.  I think he was a kid, just like anything.  I

7  don't think he was quiet or shy or extremely vocal or

8  anything like that.  I think he was just like me.  We hit it

9  off real well since the first day.

10     Q.   Okay.  And in fact, did your mother dress y'all

11  alike or have y'all dress alike?

12     A.   Everybody thought we were twins.  It's a crazy

13  thing.  We were 17 days difference and -- so of course, ages

14  were nearly perfect.  It was so funny, my mom would get us

15  confused sometimes, and so I can remember several times she

16  just said Matt Jim because she didn't know which one we were

17  and so she would just -- she knew if she said both of our

18  names that we'd -- one of us would answer, so --

19     Q.   Uh-huh.  So y'all adopted Jim and he became your

20  brother?

21     A.   Right.

22     Q.   In the 5th grade?

23     A.   Uh-huh.

24     Q.   What was -- what were things like when you were in

25  school?

1    A.    As in just --

2    Q.    Well, activities you were involved in and that sort

3    of thing?

4    A.    Well, we were both involved with several activities,

5    golf, we played basketball together when we were in junior

6    high and football together until Jim got hurt.  He had a

7    shoulder injury.  He didn't do that anymore.  We were both in

8    the historical society, did a lot of stuff with that.  And

9    then once high school came around, I got more political to

10   Jim and started doing more like student councils and he went

11   more to the agriculture culture side so he started hanging

12   out with the agriculture, doing the ag shops and stuff like

13   that.

14   Q.    Okay.  During that time, what kind of discipline was

15   in your home?

16   A.    Well, it was always a very strict, you know -- obey

17   the rules, you know, and you're punished if you don't obey

18   the rules.

19   Q.    Okay.  And through high school did things appear to

20   go fairly smoothly as far as you know?

21   A.    I -- I know that -- all I know is it's always been

22   real smooth.  And like I said, if a rule was broken, of

23   course we were punished, either we -- in the younger stages,

24   you know, we were spanked, but in the older stages we were

25   grounded, couldn't drive -- couldn't drive the car or

1    something like that.

2         Q.   Uh-huh.  Okay.  And did you do well in school?

3         A.   I did okay.  I -- was in the top 20 when I

4    graduated.

5         Q.   And how did Jim do?

6         A.   He wasn't too far -- too far behind me.  I don't

7    know exactly.  Unfortunately, I didn't keep up.  I guess I

8    should have.

9         Q.   Okay.  And during that time, your mom and dad were

10   getting along?

11        A.   Oh, yeah, up until, I guess, my junior year.

12        Q.   Okay.

13        A.   And that's when --

14        Q.   Had they divorced previously?

15        A.   They had divorced when I was very young, 1, 2 years

16   old.  And -- that was -- so that was a -- you know, it was

17   kind of -- they got back together and then divorced again,

18   so --

19        Q.   And during that time that you were from the 5th

20   grade through high school or towards the end of high school,

21   there was continuity in your family?

22        A.   Oh, absolutely.

23        Q.   And --

24        A.   Well, we were the poster -- poster family.  I mean,

25   it's so funny.  I was telling somebody the other day.  It was

DARLINE W. LABAR, OFFICIAL REPORTER

1   like, you know, everybody knew us just as the Murphys.  And

2   the two kids played baseball and dad couched, ran for City

3   Council, you know.  It was a big thing, and we were happy,

4   definitely.

5        Q.   Okay.  Were you aware of Jim drinking at some point?

6        A.   I think we both did.  I don't think there was ever a

7   separation of us drinking when we were in the high school.

8   Everybody does it in a small town.  There's nothing else to

9   do pretty much.

10       Q.   Okay.  Were you ever aware that it became a problem

11  for him where it didn't for you?

12       A.   I don't -- if it became a problem, I didn't see it.

13  It wasn't when I knew him.

14       Q.   Okay.  Did y'all continue to run around in those

15  same groups in school, or did Jim veer off to a different

16  sort of group?

17       A.   Groups were very small, if they were groups at all,

18  so -- I mean, we're talking there was 69 people who graduated

19  from my class.  There's not -- if there was anybody that hung

20  out from each other, we all hung out together.  And there

21  might be a couple of friends that were not the same, but most

22  of us all did the same things.

23       Q.   Okay.

24       A.   After football games, we all went to the same

25  pasture.

```
 1        Q.    Okay.  Same pasture, huh?

 2        A.    Yeah.

 3        Q.    Do you know Shod Tarrant?

 4        A.    Yes, I do.

 5        Q.    Was he part of your group?

 6        A.    No.  Well, he was when I was earlier, but not -- not

 7   after I got in high school.

 8        Q.    Okay.  Do you know whether Jim continued to be

 9   friends with him?

10        A.    Yeah, he became friends, or he was always friends

11   with him for as long as I'd known, but I never hung out with

12   him.

13        Q.    Okay.  When your parents -- your parents did split

14   up again and get divorced; is that correct?

15        A.    That's correct.

16        Q.    But just prior to that time, do you recall that

17   there was a neighbor lady who was elderly that y'all used to

18   go see?

19        A.    Absolutely.  Right down the corner from us.

20        Q.    Tell the jury about her.

21        A.    Well, we used to actually play baseball together and

22   everything else and my dad was the coach and never really

23   needed money, but he wanted us to show us the value of money

24   and so we decided to start mowing this -- mowing lawns for a

25   living.  Of course, our next-door neighbor and another
```

1    neighbor who was just right down the road -- well, actually

2    catty-cornered.  You can see her house from our house.  We

3    offered to start mowing her lawn, and it was a -- I mean, it

4    was definitely a learning experience, and we established

5    great relations with her, because it was an older lady.  She

6    had retired.  She was a -- I think she was an organist in the

7    church at one time so she had an organ.  She used to play for

8    us and everything else and cooked us little Chex mix.  That

9    was our favorite.  That was definitely our favorite when

10   she'd cook us Chex mix.  And we'd mow her lawn and

11   actually -- Jim and I both took really, really big concerns

12   on her lot.  It was like we wanted that to be the yard of the

13   month.  We took care of it.  We liked her.  We wanted

14   everything to be perfect in her lawn.  And dad was definitely

15   there to help us out with that too.

16        Q.   So you and Jim both cared very much about this lady

17   and did what you could to help her?

18        A.   Absolutely.

19        Q.   Even though you were pretty young kids really to

20   take care of an older person?

21        A.   Uh-huh.  And when she passed away, I mean, it really

22   hit us both.

23        Q.   Okay.  Did you ever become aware that Jim had a

24   drinking problem, Matt?

25        A.   Only through hearsay.  I never saw it personally.

1  So if it was something -- it was definitely something that

2  I've heard --

3       Q.    Okay.

4       A.    -- never witnessed it personally.

5       Q.    When were your parents divorced the last time?

6       A.    Well, they separated when we were 17, and then it

7  took probably a couple of years.  I want to say '95 was --

8  '95 or '96 was when they finally had the full divorce.

9       Q.    Okay.  And what kind of problems were they having?

10       A.    Well, money problems is always the thing that comes

11  up.  The other thing was just when I was playing golf and Jim

12  and I were playing golf at the country club, the main reason

13  that mom let go of the membership in the first place was

14  because my dad would get in trouble by staying out there too

15  late and going to the 19th hole.  And so when she got the

16  country club membership, she knew that was going to be the

17  end of the relationship, but she also knew that without that

18  membership, that I could never do anything, Jim could never

19  do anything, and we could -- and it was a safe haven for us

20  to be.  I mean, we weren't out, you know, partying with a

21  bunch of friends, we were playing golf.  And, you know, you

22  can't get in too much playing golf unless you kind of hit a

23  few too many trees or something like that.  But -- so it --

24  as soon as that happened, she knew that -- that was going to

25  be the end.  And, of course, she predicted it two years

1   later.  He stayed out too long, he came home, he was upset,

2   he got drunk, he yelled at us for just stupid things.  I

3   remember specifically one night where he yelled at me for

4   spinning out in the drive -- the driveway.  It was kind of

5   easy to do when you have slick tires and it's wet, you know.

6   And, of course, that started a big battle, and that was the

7   beginning of the end.

8       Q.   Okay.  When they did divorce, who was still at

9   home?  Were you still at home?

10      A.   We were -- Jim and I and my mother were still at

11  home.  And as a matter of fact, he left us with pretty much

12  nothing.  And I went to Europe on a school vacation.  And Jim

13  and my mom came to pick me up.  When we came back, the motor

14  home was gone and all the bank accounts were completely --

15  nothing was there.

16      Q.   Okay.  So at first Jim stayed with your mother and

17  her name is Samantha Murphy --

18      A.   Yes.

19      Q.   Is that correct?

20      A.   Absolutely.

21      Q.   And did you stay with your mother?

22      A.   Yes, I did.

23      Q.   Were there any hard feelings about the children

24  going to see their dad?

25      A.   We didn't -- she didn't want us to have anything to

1   do with him.  I mean, and really I didn't either.  I think we

2   all had a pretty bad attitude towards my dad, just because he

3   left us with nothing.  And when, you know -- some people take

4   it differently, you know.  Might take them years to finally

5   forgive.  Some people take three or four days.  So my mom is

6   still to this day, you know, doesn't want me to have anything

7   to do with him.

8        Q.   Or any of the other kids either; is that right?

9        A.   Right.

10       Q.   Now, did Jim stay with her very long after the

11  divorce?

12       A.   Actually it was nearly -- he left in early June of

13  '93, and then after that we -- like I said, we had nothing.

14  We had no money at all.  And so Jim and I kind of stood up

15  and we started taking -- taking care of business.  We both

16  got jobs as life guards, started teaching swimming lessons,

17  doing just about anything that you could bring a paycheck

18  home to.  And that was all the way up until I guess about

19  halfway of our fall semester of our senior year.

20       Q.   Okay.  And so you did what you could to help your

21  mother?

22       A.   Absolutely.

23       Q.   You and Jim both?

24       A.   Yes.

25       Q.   And what -- did there come a point in time that Jim

1    moved to your dad's?

2        A.    Yes, when -- like I said, it was about the middle of

3    our senior semester, our fall semester, so I'm thinking

4    October, September.   I can't remember exactly, but it was

5    right there at the beginning middle of the semester.

6        Q.    Okay.   And how did your mother take that?

7        A.    Well, of course she didn't want Jim to go and live

8    with the dad because he -- my dad was somebody that she

9    didn't like anymore.   And for Jim to go over there, well,

10   that's kind of like in her eyes crossing enemy lines.

11       Q.    Do you know if she's ever spoken to Jim since then?

12       A.    I know that there has been some type of connection

13   of trying to get Jim -- or Jim's trying to get them to talk

14   to mom.   She honestly just doesn't want to talk anymore or

15   have anything to do with him.

16       Q.    Okay.   So basically she disappeared from Jim's life

17   when he went to your dad's?

18       A.    Yes.

19       Q.    And that's true of all the children as far as you

20   don't tell her if you're going to see your dad or any of that

21   stuff?

22       A.    Right.   If I ever go see my dad, it's definitely --

23       Q.    On the QT?

24       A.    Yeah, I definitely don't tell mom that I'm going to

25   go see him.

1    Q.    Did you -- did you grow to love Jim as your brother,

2  Matt?

3    A.    I grew to love Jim as my own.  He was a part of me.

4  We were -- he was my right hand.  He was my left hand.  He

5  was whatever.  We were definitely everything that brothers

6  could be, except blood.

7    Q.    And was a lot of that because he was just a good

8  kid?

9    A.    Yes.  Well, that's one thing and then -- I mean, I

10  can -- I can't even count to you on how many -- on both hands

11  how many times he stood up for me or how many times I was

12  down and he built me up or took the rap for me because I did

13  something stupid, you know.

14    Q.    And so you're here today because you want the jury

15  to know that there's more to him than this case?

16    A.    Oh, absolutely.  There's definitely more to Jim than

17  just this case.  We're talking another 24 years of a life

18  that was great.  And, you know, one incident is something

19  that's going to -- it's probably going to affect his life

20  forever, but it's definitely something that's not his whole

21  life.

22    Q.    What other kinds of things did he do for you?

23    A.    Oh, goodness, just everything.  I can remember

24  several times where he just helped -- helped me with -- I

25  don't care what it was.  If it was getting out and hanging

1   out and stuff like that and I was always busy or something, I

2   remember Jim used to always get me out and go hang out with

3   friends.  Like I say, he was never a secluded or reclusive

4   person.  He was always friendly and we always had a lot of

5   friends and we always got out and did stuff.  Is there any

6   one occasion where I can remember he helped me?  Not at this

7   desk, but I could probably write a book about it.

8       Q.   And as long as your parents were together and things

9   were going smoothly, things went pretty well for Jim?

10      A.   Things were great.  I mean, if anything, I think we

11  were able to do what we wanted to do and provide Jim with a

12  family.

13      Q.   Okay.

14              MS. LITTLE:   Thank you.   That's all I have.

15                      Cross-Examination

16  By Mr. Davis:

17      Q.   Matt, while the defendant was over there in your

18  home, he had a great life, didn't he?

19      A.   Yes, sir.

20      Q.   Never abused in any way, was he?

21      A.   I don't think so, no.

22      Q.   I mean, would it be fair to say that he had the same

23  rights and privileges as you did as Bob and Samantha Murphy's

24  biological son?

25      A.   Absolutely.  As a matter of fact, that was one thing

1    we talked about, that my rights were actually going to be

2    kind of cut in half when he got there, because everything was

3    going to go that way.

4        Q.   He got to participate in golf, basketball, and

5    football with you?

6        A.   Uh-huh.

7        Q.   Your father also coached him in baseball, didn't he?

8        A.   Yes.

9        Q.   Your father also -- you remember your father working

10   to restore a pickup truck with the defendant?

11       A.   Yes, absolutely.

12       Q.   Okay.  And when that was restored, as a matter of

13   fact, your father gave that pickup truck to the defendant,

14   didn't he?

15       A.   That's correct.

16       Q.   He never wanted for money?

17       A.   No, sir.

18       Q.   I believe that you said as a matter of fact he had

19   access to a membership at the country club down there, didn't

20   he?

21       A.   That's correct.

22       Q.   As far as his abilities in school, he is a smart

23   individual, isn't he?

24       A.   Absolutely.

25       Q.   I believe your testimony was he didn't finish that

1    far behind you in school rankings?

2        A.   Like I said, he might have finished before me.  I

3    have no idea.  I just didn't keep up that much.

4        Q.   And as far as his drinking, you don't really know to

5    what extent he was drinking during high school, do you?

6        A.   In high school, it was very social.  We all -- like

7    I said, there was nothing else to do, so we all drank.

8        Q.   Did you ever know him to drink on a daily basis?

9        A.   I never knew him to drink on a daily basis, no.

10       Q.   Did you ever know him to use marijuana on a daily

11   basis?

12       A.   I never knew him at all.

13       Q.   As far as the use of alcohol and drugs in your home

14   when your parents were together, did they allow the two of

15   y'all to drink in their home?

16       A.   There was nothing in our home, so, no, of course,

17   not.

18       Q.   So there was no alcohol and certainly no drugs ever

19   present in your home?

20       A.   Never.

21       Q.   Did y'all -- did you consider that you received a

22   good moral training?

23       A.   I think so.  Absolutely.

24       Q.   Did y'all attend church?

25       A.   We attended church only when there was festive

Page 105

```
 1    things.  We went to camps -- we went to church camps, and we
 2    did stuff like that, but my relationship with church came
 3    after I got out of the family.
 4         Q.  As far as learning right from wrong, though, I mean,
 5    certainly that's something that was provided to you and to
 6    the defendant in the Murphy home?
 7         A.  Yes.
 8         Q.  As I understand, as you got older, the two of y'all
 9    kind of sought out different groups to hang out with, right?
10         A.  I think that was really just -- we got older, I
11    started playing more golf, and so I started hanging out with
12    all my golf buddies.  But those same people were -- were our
13    his friends, too.  Like I said, it wasn't the immediate
14    thing.  I mean, you can't -- you can't really separate
15    yourself in a town of only a thousand so --
16         Q.  Right.  But as far as Shod Tarrant goes, you did
17    separate yourself from Shod Tarrant, didn't you?
18         A.  I knew him, but after he graduated, I didn't have
19    anything to do with him.
20         Q.  Were you still in contact with the defendant when he
21    was convicted of burglary in Van Zandt County?
22         A.  Actually we lost relations -- our close relations
23    after Jim started living with dad.  And I do remember finding
24    out about it, and my mom telling me about what happened.  And
25    then I got a couple of letters from him when he was in jail.
```

1    But I -- like I said, we didn't hang out on a daily basis or

2    anything like that.  Plus, my life had changed a lot, too, by

3    then, and I was more involved in church and stuff like that.

4        Q.   When the -- when the Defendant got back from boot

5    camp, do you remember him being in boot camp in Childress,

6    Texas?  Does that sound familiar?

7        A.   I remember he was in a boot camp.  I don't -- I

8    don't know where it was or what it involved, but --

9        Q.   Do you remember when he came back from boot camp

10   that your father allowed him to come back and live with him

11   for a period of time?

12       A.   I didn't know that.

13       Q.   You didn't know that?

14       A.   I had no idea.

15       Q.   Do you know why your father finally asked the

16   defendant not to live with him anymore?

17       A.   No.  As a matter of fact, I kind of questioned my

18   dad and, you know, nothing really came out of it.  It was

19   just he didn't live here anymore.

20       Q.   Did your father actually purchase or help purchase a

21   new or a newer pickup truck for the defendant?

22       A.   I think there was a -- I mean, I know there was a

23   used pickup that was bought.  I don't know if my dad help buy

24   it.  See all that stuff is hearsay.  When I hear that about

25   what happens, you know, well, dad bought -- well, dad bought

1   Jim a new truck, well, that's comes from my mom who was on

2   the other enemy line so I had no idea.  But, yeah, there was

3   a new truck or newer truck that Jim was driving.  Uh-huh.

4       Q.   How much contact have you had with the defendant

5   since he came back from boot camp, Matt?

6       A.   I think I've seen him twice.  He's come by to see me

7   a couple of times, and he's always been very respectable to

8   my mom.  He let's me know that he's coming and then I kind of

9   look out for him until he comes up and drives around.

10      Q.   As far as what he's really been doing with his life

11  since he came back from boot camp, would it be fair to say

12  that really you don't have that much information about what

13  he's really been doing for the last few years?

14      A.   Actually I keep up with him a little bit more than

15  he thinks I do, or I did for awhile, especially when I was in

16  Terrell, I was a youth minister there for a while and had

17  good connections in the police department that they do a

18  little bit more skip tracing than me.  And I found out for a

19  while he was doing pretty well.  He had a child.  He had a

20  wife.  And then after that I lost relations.

21      Q.   Did you -- did you know that he was placed on a

22  probation up here in Dallas County for a felony, also?

23      A.   No, I didn't know anything about -- the only thing I

24  knew about was the probation for the charges that he was sent

25  to boot camp for.

1      Q.    Did you know anything about the violence that may

2    have occurred between him and a woman by the name of Chelsea

3    Willis?

4      A.    No, I don't.  I don't know anything about it.

5      Q.    Do you know anything -- do you know Mandy Kirl?

6      A.    I don't.

7      Q.    Have you ever discussed an incident over in

8    Arlington with the defendant concerning a Sherryl Wilhelm?

9      A.    No, I haven't.  I don't know anything about it.

10     Q.    Have you ever discussed an incident that occurred

11   the same day up in Wichita Falls involving a 65-year-old

12   woman?

13     A.    No.

14     Q.    Matt, you've never been in trouble with the law,

15   have you?

16     A.    No, I have not.

17     Q.    And where do you teach golf now?

18     A.    At Hank Haney, just right off of Park Lane.

19     Q.    As a -- as a child, Matt, did you -- did you take

20   Ritalin?

21     A.    Yes, I did.

22     Q.    Okay.  And as I understand, to your knowledge, the

23   defendant was not taking drugs while he was in your home, was

24   he?

25     A.    Right.

Page 199

1      Q.    Okay.  He was never in special education classes,

2   was he, to your knowledge?

3      A.    No.

4      Q.    Was he ever given a golf scholarship to Navarro

5   College.

6      A.    Not that I know of.  I didn't hear anything about

7   that.

8      Q.    Did you -- did you have a golf scholarship

9   yourself?

10     A.    I had one for Centenary College.

11     Q.    As far as you're concerned, I mean, he's still your

12  brother, isn't he?

13     A.    Absolutely.

14     Q.    And as long as you and he lived in that home, he was

15  treated just like a member of the family, wasn't he?

16     A.    That's correct.

17     Q.    I appreciate it.  Thanks.

18              MR. DAVIS:  I'll pass the witness.

19              MS. LITTLE:  I have nothing further.

20              THE COURT:  Thank you very much.  You may step

21  down, sir.

22              MS. LITTLE:  May this witness be excused?

23              MR. DAVIS:  No objection.

24              THE COURT:  You are excused.

25              THE WITNESS:  Thank you.

```
1              THE COURT:  Defense may continue.

2              MS. LITTLE:  Call Chelsea Willis.

3              THE COURT:  Name again, please.

4              MS. LITTLE:  Chelsea Willis.

5              THE COURT:  Raise your right hand, please.

6              (Witness sworn.)

7              THE COURT:  Thank you.  Have a seat to my left

8    if you please, ma'am.

9              THE COURT:  Ms. Little.

10                  CHELSEA WILLIS

11   was called as a witness by the Defendant and, after having

12   been first duly sworn, testified as follows:

13                  Direct Examination

14   By Ms. Little:

15        Q.   State your name.

16        A.   Chelsea Willis.

17        Q.   Chelsea, C-h-e-l-s-e-a?  Do you need a Kleenex or

18   anything?  Could we have a Kleenex?  Do you need a minute?

19        A.   (Nods head.)

20        Q.   Chelsea, how old are you?

21        A.   24.

22        Q.   And where did you grow up?

23        A.   Wills Point.

24        Q.   Did you live there all of your life?

25        A.   Yes, ma'am.
```

```
 1      Q.   Who raised you?

 2      A.   My grandfather.

 3      Q.   And is his name Logan Craft?

 4      A.   Yes, ma'am.

 5      Q.   When you -- when did you meet Jim Murphy?

 6      A.   Probably about '94.

 7      Q.   How old were you then, Chelsea?

 8      A.   I don't remember.  I think 15.

 9      Q.   Were you still in school then?

10      A.   No, I had quit.

11      Q.   Did you ever finish?

12      A.   No.

13      Q.   And where was it that you first met Jim?

14      A.   Edgewood.

15      Q.   Was it at school or hanging out?

16      A.   It was at a friend's house.

17      Q.   Do you remember who that friend was?

18      A.   Jeanne Evans.

19      Q.   Jeanne Evans.

20      A.   Uh-huh.

21      Q.   Was it a party of some sort, or was it --

22      A.   No, we just lived there and they came over.

23      Q.   Who was they, Chelsea?

24      A.   I imagine it was him and Shod Tarrant.

25      Q.   Shod Tarrant?
```

1    A.    (Nods head.)

2    Q.    And who introduced y'all?

3    A.    I guess -- I can't remember.  We just met.

4    Q.    And did you start to date right away?

5    A.    No.

6    Q.    Had you known him before at all?

7    A.    No.

8    Q.    Did you become friends?

9    A.    Yes.

10   Q.    Did you know that he was madly in love with you from

11   the second he saw you?

12   A.    No.

13   Q.    Did you ever learn that?

14   A.    Did I learn that?

15   Q.    Uh-huh.

16   A.    (Nods head.)

17   Q.    Okay.  And as friends, did you hang out together, or

18   how did the relationship develop?

19   A.    Friends, we just hung out.

20   Q.    And what kinds of things would you do, Chelsea?

21   A.    We mainly just stayed around the house, just regular

22   stuff.

23   Q.    Okay.

24   A.    Didn't go too many places.

25   Q.    Were you working then?

1    A.   No.  My friend worked, and I kept her kid while she

2  worked.

3    Q.   And that's how you supported yourself?

4    A.   Well --

5    Q.   And that was your friend Jennie?

6    A.   Yeah.

7    Q.   How long did you know Jim before your relationship

8  became a romantic one?

9    A.   It was the beginning of '96, so two years.

10    Q.   You knew him awhile before it became a romance?

11    A.   Uh-huh.

12    Q.   And did you ultimately move in together?

13    A.   Yes.

14    Q.   Do you know how old you were then?

15    A.   19, I think.

16    Q.   Okay.  And have you lived together on and off ever

17  since then?

18    A.   Yes.

19    Q.   And you're how old now did you say?

20    A.   24.

21    Q.   During the time that you were living together, what

22  kind of person was Jim to live with?

23    A.   As far as his kids, he was wonderful.  He was

24  wonderful to me when he wasn't drunk.  He had a bad alcohol

25  problem.

1       Q.   Did he have that from the time you knew him, or did

2   you know whether he had it --

3       A.   I didn't know it at first because I drank, too,

4   which just normal to me.

5       Q.   Okay.  And at some point you became aware that he

6   didn't have good control of his drinking?

7       A.   (Nods head.)

8            THE COURT:  You have to answer yes or no.

9       A.   Yes.

10      Q.   (By Ms. Little)  Do you know about when that would

11  have been, if you can approximate it?

12      A.   Two or three months after we started living

13  together.

14      Q.   Okay.  And were there arguments about that?

15      A.   Yes.

16      Q.   Did he stay with you a pretty long time when you

17  first moved in together?

18      A.   Yes.  We lived at his mom's house in Kaufman.

19      Q.   Okay.  And was that Hope Abbott?

20      A.   Uh-huh.

21      Q.   And was he working?

22      A.   No, ma'am.  I don't --

23      Q.   Did he work during the time that y'all were

24  together?

25      A.   Yes.

1        Q.    What kind of work did he do?

2        A.    At first I think it was a restaurant where I worked.

3        Q.    Uh-huh.

4        A.    And then it was mostly welding or -- mostly welding.

5        Q.    Mostly welding.  Were there times when y'all split

6    up over the years and didn't live together?

7        A.    Yes.

8        Q.    And did you have other people that you saw during

9    those times?

10       A.    Not until the very last time we split up.

11       Q.    Okay.  Do you have a little girl that is Jim's

12   child?

13       A.    Yes.

14       Q.    What is her name?

15       A.    Alyssa.

16       Q.    And when was Alyssa born?

17       A.    August 31st, 1977.

18       Q.    August 31st or July 31st?

19       A.    July 31st.

20       Q.    So Alyssa was born July 31st of 1997; is that right?

21       A.    Yes, ma'am.

22       Q.    And she's how old now?

23       A.    She will be 4 in July.

24       Q.    Did your grandmother Ruby Delossier come and stay

25   with you --

```
 1      A.   Yes.

 2      Q.   -- during that time?

 3      A.   Yes, ma'am.

 4      Q.   And was Jim there?

 5      A.   Yes, ma'am.

 6      Q.   Did you have a fairly easy delivery?

 7      A.   Yes, ma'am.

 8      Q.   And so you brought the baby home.  Was Jim there

 9  with your grandmother?

10      A.   Yes.

11      Q.   How -- was Jim helpful to you?

12      A.   Very.

13      Q.   Tell the jury how Jim was helpful to you.

14      A.   He just -- he was -- he done everything for my

15  child, just like he was a mother.  It was no different.

16      Q.   He changed diapers and all that that some men won't

17  do; is that right?

18      A.   Yeah.

19      Q.   And took care of the feeding and the tending and all

20  that?

21              THE COURT:  You have to answer yes or no.

22      A.   Yes.

23      Q.   (By Ms. Little)  And he helped you every way?

24              THE COURT:  You have to answer.

25      A.   Yes.
```

1    Q.    (By Ms. Little)   But did y'all have a fight a couple

2    of weeks after --

3    A.    Yes.

4    Q.    -- Alyssa was born?  And what was that fight over,

5    Chelsea?

6    A.    He had came home late from work that morning and he

7    had been stuck on the side of the road and he couldn't get

8    ahold of me and I guess he got ahold of his brother Bob and

9    brought him home and I didn't know if that was true or not,

10   so I made an argument out of it and it just went on all day

11   and he left.

12   Q.    Okay.  And was some of that to do with whether he

13   had been drinking or not?

14   A.    Yes, ma'am.

15   Q.    Did you believe he had been?

16   A.    That was my thought.

17   Q.    Okay.  And there were arguments about the drinking

18   on a fairly regular basis; is that right?

19   A.    Yes, ma'am.

20   Q.    Were the police called?

21   A.    Later that day because he left and when I -- I left

22   and I came home and he was passed out on the bed.  And I woke

23   him up, and that started a fight.

24   Q.    So an argument began when you woke him up?

25   A.    Uh-huh.

1     Q.   And the police were ultimately called?

2     A.   Yeah.

3     Q.   When y'all would have these arguments, Chelsea, did

4 you get hit by Jim occasionally?

5     A.   Yes, ma'am.

6     Q.   And did you hit Jim occasionally?

7     A.   There have been times, yes, ma'am.

8     Q.   Okay.  Did he wind up getting arrested over this

9 episode?

10    A.   Yes, ma'am.

11    Q.   And did you do anything about any hospitalization as

12 a result of that?

13    A.   No.

14    Q.   And was that on August the 17th of 1997?

15    A.   Yes, ma'am.

16    Q.   At that time was Jim working at Aavid?

17    A.   Yes, ma'am.

18    Q.   And what shift did he work?

19    A.   The nightshift.

20    Q.   Do you know what those hours were?

21    A.   I think 11:00 to 7:00 or 10:00 to 6:00.  I don't

22 remember.

23    Q.   But it was at the nighttime?

24       And so he was home during the day; is that right?

25    A.   Uh-huh.

1    Q.    And did he -- were you working then, or were you at

2    home then?

3    A.    At the end of August I started working and he -- I

4    worked nights for a little while and he -- I mean, like 2:00

5    to 10:00 or 2:00 to 9:00, and he watched Alyssa.

6    Q.    Okay.  And -- so he worked at night, you worked some

7    during the day after the end of August of '97, and he took

8    care of Alyssa when you were gone to work in the afternoon

9    and the evening?

10   A.    Uh-huh.

11   Q.    Is that right?

12   A.    Yes, ma'am.

13   Q.    Was your grandmother up there some of that time as

14   well?

15   A.    Yes, ma'am.

16   Q.    And as far as you know now, was he going to work

17   every night and coming home the next morning?

18   A.    Yes, ma'am.

19   Q.    And taking care of Alyssa?

20   A.    Yes, ma'am.

21   Q.    Did you later have another child, Chelsea?

22   A.    Yes, ma'am.

23   Q.    And was that because you and Jim had broken up?

24   A.    We had been split up for a long time.

25   Q.    And was this because of the drinking?

1     A.   He had tried to get help somewhere, and when he came

2   back from there, he didn't come home for a long time.

3     Q.   Okay.  Do you know where it was he went that time?

4     A.   I think Marshall.

5     Q.   Marshall, Texas?

6     A.   Uh-huh.

7     Q.   Were there other times during your time together

8   with him that he tried to get help for his problems?

9     A.   Yes, ma'am.

10    Q.   Do you recall taking him to Terrell at one point?

11    A.   Yes, ma'am.

12    Q.   Do you know about when that would have been?

13    A.   Right after the incident where the police were

14  called.

15    Q.   On August 17th of 1997?  And did you go to the

16  Terrell State Hospital?

17    A.   Yes, ma'am.

18    Q.   Were you able to get Jim in there, or was he able to

19  get admitted there?

20    A.   No, ma'am.

21    Q.   Do you know who you talked to by description or

22  name?

23    A.   It was an Iranian woman.  I'm not sure of her name.

24    Q.   And were you successful in getting Jim in there?

25    A.   Talking to her, she evaluated him and said that he

 1   didn't need help.

 2        Q.   Okay.  So he was turned away from the Terrell State

 3   Hospital?

 4        A.   (Nods head.)

 5             THE COURT:  Answer, please.

 6        A.   Yes.

 7        Q.   (By Ms. Little)  What other times did you take him

 8   places or you were aware of him going to places to get help?

 9        A.   He went to a place in Canton called -- I don't know

10   what it's called.  I can't remember.

11        Q.   But he went there.  Do you know about when that

12   would have been?

13        A.   Before he went to Marshall.

14        Q.   Okay.  And anything subsequent to that that you know

15   about?

16        A.   Not that I can remember, no.

17        Q.   Do you -- did you have another baby later on?

18        A.   Yes, ma'am.

19        Q.   Who was that?

20        A.   Brittany.

21        Q.   And Brittany is how old now?

22        A.   A year and two months.

23        Q.   A year and two months old?

24        A.   Yes, ma'am.

25        Q.   And who is the father of Brittany?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.   Arthur Tarrant.

2      Q.   Arthur Tarrant?

3      A.   Uh-huh.

4      Q.   Is he related to Shod Tarrant?

5      A.   Yes, ma'am.

6      Q.   They're brothers; is that right?

7      A.   Yes, ma'am.

8      Q.   Now, you were not with Jim at this time; is that

9  correct?

10      A.   No, ma'am.

11      Q.   Did you get back with Jim later on?

12      A.   Yes, ma'am.

13      Q.   And what was his response to Brittany?

14      A.   He just treated her like she was his.

15      Q.   So -- and in fact is her name Brittany Murphy?

16      A.   Yes, ma'am.

17      Q.   During the course of your number of years with Jim,

18  Chelsea, did you have to have some surgeries?

19      A.   Yes, ma'am.

20      Q.   What kind of surgeries did you have to have?

21      A.   I had a back surgery and kidney surgery.

22      Q.   What years do you think you had those surgeries?

23      A.   Back surgery was probably '96, and kidney surgery

24  was last year.

25      Q.   And at that time was Jim with you?

1       A.    Yes, ma'am.

2       Q.    Did he -- what did he do, if anything, to help you

3    when you were having these surgery problems?

4       A.    When I had my back surgery, he stayed with me.   When

5    I had kidney surgery, he kept both kids at home.

6       Q.    Okay.   And did he stay at your house and take care

7    of them?

8       A.    Yes.

9       Q.    And how long were you under the weather from the

10   kidney surgery?

11      A.    Months.

12      Q.    So he was there taking care of your children?

13      A.    (Nods head.)

14      Q.    And his children?

15      A.    (Nods head.)

16      Q.    Having known him and lived with him all this time,

17   Chelsea, what kind of person is he?

18      A.    He's sweet.   He just has a bad alcohol problem.   I

19   guess was incurable.   I don't know.

20      Q.    And when you say he's sweet, you mean when he's

21   not -- he hasn't had too much to drink?

22      A.    Yes, ma'am.

23      Q.    Now, y'all been together a long time, haven't you,

24   and you started real young?

25      A.    (Nods head.)

1    Q.   And you're still young?

2    A.   (Nods head.)

3    Q.   At least from where I'm sitting you're very young?

4    A.   Yes, ma'am.

5    Q.   Except for the drinking and the arguments that arose

6    out of that, did you always feel like you and Jim were kind

7    of meant for each other?

8    A.   Yes, ma'am.

9    Q.   But you've had an up and down road, haven't you?

10   A.   (Nods head.)

11              THE COURT:  Answer, please?

12   A.   Yes.

13   Q.   (By Ms. Little)  Do you know about any other

14   hospitalizations he's had?

15   A.   Yes, ma'am.

16   Q.   And what would they have been?

17   A.   There was one in Greenville, and I don't know --

18   Q.   You don't know the name of it?

19   A.   Glen Oaks.  There was one in Dallas, which I don't

20   have a clue what it was because we weren't even talking.  And

21   he went to Glen Oaks twice, I think.

22   Q.   And what problems does he have that you know about?

23   A.   When he was in Glen Oaks, I didn't know much because

24   I wasn't with him.  And I know that he had several problems,

25   but -- as far as seeing things or hearing things.  And

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1    drinking, I don't know all of them, because I wasn't --

 2         Q.   Did he have DT type problems sometimes?

 3         A.   Yes, ma'am.

 4         Q.   Do you know a man named Randy Crow?

 5         A.   Yes, ma'am.

 6         Q.   Who is Randy Crow, Chelsea?

 7         A.   Was his AA sponsor.

 8         Q.   Do you know when Randy Crow became part of Jim's

 9    life?

10         A.   When he got back from Marshall, Texas.

11         Q.   So he had been to some sort of treatment center and

12    then he went -- started going to AA meetings; is that right?

13         A.   Yes, ma'am.

14         Q.   And do you know Randy personally?

15         A.   Yes, ma'am.

16         Q.   Did you feel like he was helping Jim for a while?

17         A.   Yes, ma'am.

18         Q.   In fact, did y'all go to his house?

19         A.   Yes.

20         Q.   And take the baby and play games and things like

21    that?

22         A.   (Nods head.)

23         Q.   So there was a period of time that Jim was able to

24    work on the AA steps; is that right?

25         A.   (Nods head.)
```

1    Q.    Do you know if he ultimately lost contact with Randy

2    Crow?

3    A.    (Nods head.)

4    Q.    Do you know that?

5    A.    No.   Sorry.

6    Q.    You need to speak.   Okay?

7          During the time that you were with Jim, did you keep

8    a diary?

9    A.    Yes, ma'am.

10   Q.    And in that diary -- was it kind of like a day

11   finder where there was a little square you could write -- it

12   wasn't a long page or anything, was it?

13   A.    No, ma'am.

14   Q.    Have you always kept that?

15   A.    Yeah.

16   Q.    And did you write down stuff?

17   A.    Yes, ma'am.

18   Q.    Did you make entries everyday or just some days?

19   A.    Everyday.

20   Q.    And did you make entries when you and Jim argued?

21   A.    Yes, ma'am.

22   Q.    And did you make entries when things were good?

23   A.    Yes, ma'am.

24   Q.    Did you bring that book with you today?

25   A.    Yes, ma'am.

1          MR. DAVIS:  I'm going to object to it as being

2     hearsay.  And secondly, I have not been provided with any of

3     those copies prior to this time.  First of all, I'll be

4     objecting to it as being hearsay.  Anything that she's

5     written down previous to coming to court.

6          THE COURT:  Nothing upon which to rule on,

7     Counsel, you may continue.

8          Q.   (By Ms. Little)  You did bring that book today and

9     that would be available at the lunch hour; is that right?

10         A.   Yes, ma'am.

11         Q.   Were you pretty angry with Jim about all of this?

12         A.   Yes, ma'am.

13         Q.   And that's caused more problems, too, hasn't it?

14    It's caused -- you're hurt by it, and it's been horrible,

15    hasn't it?

16         A.   Yes, ma'am.

17         Q.   Do you feel from your knowledge of Jim Murphy,

18    Jedidiah Isaac Murphy, that he is a person who has a

19    conscience or has no conscience?

20         A.   He does.

21         Q.   And how do you know that, Chelsea?

22         A.   Because our arguments he would always feel bad the

23    next day for -- or even when it was over.

24         Q.   Even when it was over?

25         A.   (Nods head.)

1    Q.   And how would that manifest itself?  How would he --

2  how would he show that he felt badly about things?

3    A.   He would always apologize and things would be fine

4  for a while after that.

5    Q.   Did you see him feel remorse for things that

6  happened?

7    A.   Yes, ma'am.

8    Q.   Did he ever cry about it?

9    A.   Yes, ma'am.

10   Q.   Did he make himself vulnerable to you with his

11  problems?

12   A.   Yes, ma'am.

13   Q.   And has that been true of him for as long as you've

14  known him?

15   A.   Yes, ma'am.

16   Q.   To the best of your recollection today, was Jim at

17  home with you through the month of August of 1997?

18   A.   Yes, ma'am.

19   Q.   Working at Aavid at night and being with you and the

20  new baby during the day?

21   A.   Yes, ma'am.

22   Q.   After you went to Terrell that month of August of

23  1997, was he then back at home with you?

24   A.   When?

25   Q.   In August of '97?

1      A.   Yes, ma'am.

2      Q.   Would you ever believe in a million years he would

3 have done what he's been found guilty of?

4      A.   No, ma'am.

5           MS. LITTLE:   Your Honor, could we approach the

6 bench for just a moment.

7           THE COURT:   You may.

8           MS. LITTLE:   Okay.   May I proceed, Your Honor.

9           THE COURT:   You may.

10     Q.   (By Ms. Little)   Do you have the diary with you,

11 Chelsea, right now?

12     A.   It's outside.

13     Q.   Where is it?

14     A.   In my purse.   It's in that little room.

15           MS. BALIDO:   May I approach.

16           (Counsel brings book forward)

17           THE COURT:   You may.

18     Q.   (By Ms. Little)   Chelsea, would you get out the

19 diary?   It looks like it's been with you awhile.   And you

20 brought this today at my request; is that correct?

21     A.   Yes, ma'am.

22     Q.   And we Xeroxed some pages from it that have been

23 marked as Defendant's Exhibits 59, 60, and 61.   Would you

24 look at those dates and be sure that they're what you brought

25 to us that reflect that period of time?

1     A.    Yes, ma'am.

2     Q.    They are the same?  And these diary entries were

3  made by you at the time the events that you recorded them

4  occurred; is that correct?

5     A.    Yes, ma'am.

6     Q.    And they are all in your handwriting?

7     A.    Yes, ma'am.

8              MS. LITTLE:  We'll offer Defense Exhibits 59,

9  60, and 61.

10             (Defendant's Exhibit No. 59 through 61 offered)

11             MR. DAVIS:  I'll object at this time to those

12  being hearsay, Your Honor.  And also, would point out that in

13  my motion filed December the 19th of 2000, which the Court

14  has ruled upon, that I asked for any writings that the

15  defense intended to offer during the course of this trial.  I

16  have never been provided with this particular writing.

17             THE COURT:  Defense have any response to

18  that?

19             MS. LITTLE:  I've never seen this before

20  today, Your Honor.

21             THE COURT:  Well, is this not a form of Kyles

22  v. Whitley in reverse?

23             MS. LITTLE:  Well, I've offered to start --

24  have the lunch be early so they can look at this.  I've just

25  received it.  They declined to do that.

DARLINE W. LABAR, OFFICIAL REPORTER

1          THE COURT:  Are there any other documents

2    about which the defense anticipates offering consistent with

3    request made by the State?

4          MS. LITTLE:  No, sir.

5          THE COURT:  The Court finds under Rule 801(e)

6    the statements are not hearsay.  We will take a recess

7    however, and they will be admitted.  I will give the State

8    not only the lunch recess but if additional time to examine

9    the contents.  So we will take a lunch recess at this time.

10         Sheriff, if you would retire the jury.

11         The document is admitted.

12         (Defendant's Exhibit No. 59 through 61 admitted)

13         THE COURT:  Ms. Willis, you are excused for

14   lunch, too.  See you back at 1 o'clock, assuming the jury has

15   finished their lunch at that time.

16         Mr. Murphy, I remand you to the custody of the

17   Sheriff.

18         Visitors, including the media, you may be seated or

19   excused if you wish.

20         (Jury excused from courtroom)

21         MR. DAVIS:  Judge, just for record if I may

22   indicate that Ms. Willis at my request has now given me what

23   purports to be her day planner that Defendant's Exhibits 59,

24   60, and 61 have come from, so I will take that over the lunch

25   break.

1        (Lunch Recess Taken)

2              THE COURT:  Both sides ready for the jury to

3   return?

4              MR. DAVIS:  The State's ready, Your Honor.

5              THE BAILIFF:  All rise.

6        (Jury returned to courtroom)

7              THE COURT:  Let the record reflect the jury is

8   returning to the courtroom at this time.

9        Jurors may be seated.

10       Mr. Murphy, counsel, visitors in the gallery, you

11  may be seated.

12       Counsel may proceed.

13   Q.   (By Ms. Little)  Chelsea, you're the same person who

14  was sworn in earlier and that was testifying before lunch; is

15  that correct?

16   A.   Yes, ma'am.

17             MS. LITTLE:  May I approach the witness, Your

18  Honor.

19             THE COURT:  You may.

20   Q.   (By Ms. Little)  Chelsea, let me get you to look at

21  Defendant's Exhibits 59, 60, and 61.  Are these pages from a

22  diary that you were keeping?

23   A.   Yes.

24   Q.   In 1997?

25   A.   Yes, ma'am.

1      Q.    And I think that the jury has probably seen this.

2   Mr. Davis has your original right now.   You understand you'll

3   get that back?

4      A.    Yes, ma'am.

5      Q.    Is this a little entry that you made like on a day

6   finder or something each day?

7      A.    Yes, ma'am.

8      Q.    And you wrote everyday, did you not?

9      A.    Yes, ma'am.

10      Q.    Had you kept a diary previous to this year of 1997?

11      A.    Yes, ma'am.

12      Q.    And did you keep a diary subsequent to this year?

13      A.    Uh-huh.

14      Q.    Did you -- are you keeping one now, or have you quit

15   doing it?

16      A.    I quit.

17      Q.    If you'll look at Defense Exhibit Number 60 which is

18   the month of August 1997, did you make an entry for each day

19   of that month?

20      A.    Yes, ma'am.

21      Q.    Let me refer you specifically to the 22nd of

22   August.   What did you do that day?

23      A.    Washed clothes and ate at my dad's and watched kids.

24      Q.    And who would be included in that?

25      A.    Me, Jim, my daughter, and Jessica.

```
 1        Q.    And your dad?

 2        A.    And my dad.

 3        Q.    And did you go to his house to do all this?

 4        A.    Yes, ma'am.

 5        Q.    And y'all cooked and cleaned up; is that correct?

 6        A.    Yes, ma'am.

 7        Q.    On the 17th you've marked that out.  Is that the day

 8   that you had the big fight and the police came?

 9        A.    Yes, ma'am.

10        Q.    But you had written there; is that right?

11        A.    Yes, ma'am.

12        Q.    You also show on this page and on many other pages

13   that you -- if nothing happens that day, you write "stayed at

14   home."  Sometimes you add "that's all really"; is that

15   correct?

16        A.    Yes, ma'am.

17        Q.    And you wrote that on the 7th, 8th, and 9th of

18   August; is that correct?

19        A.    Yes, ma'am.

20        Q.    Now, this is just a week after your baby is born,

21   Alyssa; is that right?

22        A.    Yes, ma'am.

23        Q.    And on the 25th, 6th and 7th you also wrote "stayed

24   home"?

25        A.    Yes, ma'am.
```

1    Q.    Now, at that time was Jim working at night at Aavid?

2    A.    Yes, ma'am.

3    Q.    And you were at home?

4    A.    Yes, ma'am.

5    Q.    The night that you went to --

6              MS. LITTLE:  May I approach again, Your Honor.

7              THE COURT:  You may.

8    Q.    (By Ms. Little)  The night that you went to your

9    dad's, did y'all take a picture?

10   A.    Yes, ma'am.

11   Q.    On August 22nd of 1997?

12   A.    Yes, ma'am.

13   Q.    Let me show you Defense Exhibit Number 62 and ask

14   you if that is a photograph that was taken that night?

15   A.    Yes, ma'am.

16   Q.    August 22nd?

17             MS. LITTLE:  We'll offer Defendant's Exhibit

18   Number 62.

19             (Defendant's Exhibit No. 62 offered)

20             MR. DAVIS:  No objections.

21             THE COURT:  Admitted.

22             (Defendant's Exhibit No. 62 admitted)

23             MS. LITTLE:  May I publish, Your Honor.

24             THE COURT:  You may.

25   Q.    (By Ms. Little)  Chelsea, is this a photograph that

1    was taken of you and Jim in the kitchen of your father's

2    home?

3        A.   Yes, ma'am.

4        Q.   And that's you with a different color hair; is that

5    right?

6        A.   Yes, ma'am.

7        Q.   Okay.  At that time Jim was working at night; is

8    that right?  And he was home in the daytime?

9        A.   Yes.

10       Q.   Now, you also made entries throughout this diary

11   when y'all had fights and all kinds of things like that,

12   didn't you?

13       A.   Yes, ma'am.

14       Q.   And those are reflected during that month.  In that

15   week there were no fights; is that correct?

16       A.   Right.

17       Q.   The week of the 17 -- from the 17th on through the

18   end of the month?

19       A.   From the 18th on?

20       Q.   Yes.

21       A.   Yes, ma'am.

22       Q.   Did Jim go to get some kind of help or try to get

23   some kind of help after that arrest on the 17th?

24       A.   Yes, ma'am.

25       Q.   Where did he go then?

 1      A.   Terrell State.

 2      Q.   And you've already testified about that episode.

 3  Have there been times or has there ever been a time in your

 4  life while Jim was in your life that Jim made any kind of

 5  suicide attempt, Chelsea?

 6      A.   Yes, ma'am.

 7      Q.   About when would that have been?

 8      A.   I'm not sure of the exact date or --

 9      Q.   Do you know the year even?

10      A.   (No response.)

11      Q.   Let me ask you this --

12      A.   '99, maybe.

13      Q.   Maybe '99?

14      A.   '98 or '99.

15      Q.   And when that happened, did he go to the hospital

16  after that?

17      A.   Yes, ma'am.

18      Q.   Did his mother Hope take him?

19      A.   Yes, ma'am.

20      Q.   How did he try to kill himself at that time?

21      A.   Sleeping pills.

22      Q.   Okay.

23      A.   Over the counter.

24      Q.   Did he take Unisom, a lot of Unisoms?

25      A.   Yes.

1    Q.   So would it be fair to say, Chelsea, that Jim has

2    always been a very troubled person?

3    A.   Yes, ma'am.

4    Q.   And you're not in any way trying to excuse him for

5    anything, are you?

6    A.   No, ma'am.

7    Q.   Were there any other times that you know of that he

8    made any attempts on his own life?

9    A.   There was one where he had said he was going to kill

10   his self with a gun in Kaufman, but I don't know how that

11   whole story went.

12   Q.   Okay.  So essentially this diary which goes on

13   all -- forever doesn't indicate any fights on the 26th or

14   27th of August; is that right?

15   A.   Yes, ma'am.

16   Q.   And these are entries that you made at the time of

17   that date?

18   A.   Yes, ma'am.

19   Q.   Were you able to remember if you were working at all

20   in the evenings then or in the daytime?

21   A.   Well, I know I started four weeks after my daughter

22   was born, I believe, and from my calendar it says the end of

23   August, the 28th.

24   Q.   So during the month of August of '97 you were at

25   home?

1    A.   Uh-huh.

2    Q.   Did you have a car or a truck?

3    A.   A car.

4    Q.   And did Jim drive that car?

5    A.   Yes, ma'am.

6    Q.   Where did he drive it?

7    A.   To work and home.

8    Q.   And that was at night, right?

9    A.   Yes, ma'am.

10    Q.   But it was your vehicle, and there would be a fight

11 if he took it or went off with your car, wouldn't it?

12    A.   If it wouldn't have come home the next morning, yes,

13 ma'am.

14    Q.   Yes.

15          MS. LITTLE:  That's all I have, Chelsea.

16 Thank you.

17               Cross-Examination

18 By Mr. Davis:

19    Q.   Ms. Willis, we've met once before, haven't we?

20    A.   Yes, ma'am -- yes, sir.

21    Q.   Do you remember when I came out to your workplace in

22 Terrell?

23    A.   Yes, sir.

24    Q.   And I talked to you about possibly testifying in

25 this case?

1    A.   Yes, sir.

2    Q.   You remember at the time you told me that you did

3    not want to testify, correct?

4    A.   Yes, sir.

5    Q.   Chelsea, let me just -- let me talk to you about

6    what you were just talking with -- with the attorney with

7    about the suicide attempts.  The truth of the matter is that

8    this man, Jedidiah Murphy, to your knowledge, has never made

9    a serious attempt at suicide, has he?

10   A.   Well, yes, sir, he did.

11   Q.   Oh, he did?

12   A.   Uh-huh.  If he would not have called me when he took

13   those pills, he would have been dead.

14   Q.   Do you remember talking with a Dr. Mary Connell --

15   A.   Yes.

16   Q.   -- a defense expert on April the 3rd?

17   A.   Uh-huh.  I don't remember the exact date, but I

18   remember talking to her.

19   Q.   Have you had an opportunity to review what you told

20   Dr. Connell?

21   A.   No, ma'am -- no, sir.

22   Q.   So you don't recall telling Dr. Connell back on

23   April 3rd of this year that sometimes he would tell -- tell

24   them good-bye, you and other people, apparently planning to

25   kill himself, but he never made a serious attempt.  You

1    remember telling Dr. Connell that back on April 3rd?

2         A.   No, sir.

3         Q.   When you talked about your fights with the

4    defendant, do you know how many times that the two of y'all

5    fought?

6         A.   No, sir.

7         Q.   You made notations in your diary about that, didn't

8    you?

9         A.   Yes, sir.

10                  MR. DAVIS:  May I approach, Your Honor.

11                  THE COURT:  You may.

12        Q.   (By Mr. Davis)  Ms. Willis, I'm going to hand you

13   back your -- your diary.  Show you now State's Exhibit 149,

14   and ask you to look through that and tell me whether or not

15   that appears to be a true and correct copy of your entire

16   diary.

17        A.   Can I look through it?

18        Q.   If you don't mind, just to make sure none of the

19   months are missing.

20                  (Witness examines diary.)

21        Q.   (By Mr. Davis)  Does that appear to be complete?

22        A.   Yes, sir.

23                  MR. DAVIS:  Your Honor, at this time the State

24   will offer State's Exhibit 149.

25                  (State's Exhibit No. 149 offered)

1           MS. LITTLE:  No objection.

2           THE COURT:  Admitted.

3           (State's Exhibit No. 149 admitted)

4      Q.   (By Mr. Davis)  Leaving you with your original now.

5           Do you know how many notations that you made in your

6      diary concerning fights?

7      A.   No, sir.

8      Q.   Would it surprise you to find that you have notation

9      for April 2nd of 1996 about a fight?

10     A.   No, it wouldn't surprise me.  It doesn't mean that

11     they were physical fights.

12     Q.   Okay.  April 8th of '96?

13     A.   No, sir.

14     Q.   Would it surprise you to find out that you made 21

15     separate notations of fights with this man down here?

16     A.   Through two years, no, sir.

17     Q.   And you told Ms. Little just a moment ago that --

18     that you had hit the defendant in the past during some of

19     these fights.  Do you remember telling Ms. Little that?

20     A.   Yes.

21     Q.   Telling this jury that?

22     A.   Yes, sir.

23     Q.   Again, I'm going to direct you back to a

24     conversation that you had with Dr. Mary Connell, an expert

25     hired by the defense in this case, and you remember Dr.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Connell asking you about that very same subject, about the

2      fights that you had with the defendant?

3          A.   Yes, sir.

4          Q.   Do you remember Dr. Connell asking you whether you

5      had ever hit the defendant?

6          A.   Yes, sir.

7          Q.   Do you remember telling Dr. Connell back on April

8      the 3rd that you never hit him?

9          A.   I believe so.  I've pushed him.  I've never

10     physically hit him with my fist, so that is the reason why I

11     said that.

12         Q.   So the truth of the matter is that you have never

13     hit this man with your fist, have you?

14         A.   With my fist, no.

15         Q.   So when you told Dr. Connell that you never hit him,

16     that was the truth, wasn't it?

17         A.   Meant by hitting him with my fist, yes.

18         Q.   This -- this fight that you had on August the 16th

19     or the 17th, I'm sorry, that Sunday, when did the defendant

20     pull out the knife and hold that on you?

21         A.   He didn't hold a knife on me.

22         Q.   He didn't?

23         A.   No, sir.

24         Q.   He was holding a knife when the police officer

25     arrived, wasn't he?

1    A.    Yes, sir, he wasn't directing the knife towards me

2  nor the police officers.

3    Q.    Where did he get that knife from?

4    A.    Off the counter in the kitchen.

5    Q.    You and the defendant were the only people in that

6  apartment, weren't you?

7    A.    Yes, sir.  The reason for picking the knife up, I

8  don't have a clue.

9    Q.    You don't know why he picked it up, do you?

10   A.    No.

11   Q.    You don't know what he was going to do with it,

12  either, do you?

13   A.    He didn't seem to be going to do anything with the

14  knife.

15   Q.    He's a pretty unpredictable individual, isn't he?

16   A.    When he's drunk.

17   Q.    He was drunk then, wasn't he?

18   A.    Yes, sir.

19   Q.    You feel like you provoked him into hitting you that

20  day?

21   A.    I woke him up and was griping at him, yes, sir.

22   Q.    How did Jeanne Evans provoke him into having him hit

23  her left eye?

24   A.    She just stepped in between me and him.

25   Q.    She was actually coming to your rescue, wasn't she?

1    A.    She was taking up for me, yes.

2    Q.    That's when Jedidiah Murphy down here struck her in

3    the left eye?

4    A.    Yes, but I don't believe it was intentional.

5    Q.    Was that an accident?

6    A.    I'm not sure.  I believe so.

7    Q.    Was that when he broke your nose?

8    A.    Yes, sir.

9    Q.    Now, as a result of that, he was arrested by Wills

10   Point, wasn't he?

11   A.    Yes, sir.

12   Q.    And then a few days later you went down to the

13   police station or to the D.A.'s office and you asked them to

14   drop the charges, right?

15   A.    Yes.  I never filed any.  They said the State would

16   pick them up, and they did.

17   Q.    And then you went down and requested that nothing be

18   done to him, that he be released, and he was, wasn't he?

19   A.    We posted bond, yes, sir.

20   Q.    He was never charged with the offense then, was he?

21   A.    I don't remember.  We went to court, and as far as I

22   can remember, he was supposed to take a family violence

23   course in Edgewood.

24   Q.    He never did that, did he?

25   A.    Yes, he did go a few times.  I cannot remember how

1   many.

2        Q.   Where was that exactly?

3        A.   Edgewood, Texas.

4        Q.   What was the name of the facility that he was

5   supposed to go to?

6        A.   I don't have a clue.

7        Q.   Did you go with him?

8        A.   Yes.

9        Q.   Was that to the Van Zandt County Community

10  Counseling?  Does that sound familiar to you?

11       A.   If that's in Edgewood, yes.

12       Q.   How many times did the two of y'all go together?

13       A.   I don't recall.  It was not very many.

14       Q.   As a matter of fact, have you looked at the records

15  from Van Zandt County Community Counseling lately?

16       A.   No.

17       Q.   Do you know how many appointments that this man

18  failed to keep down there at that facility?

19       A.   I do not remember how many he failed to keep.  I

20  know that we did not go very many times, or that he did not

21  go very many times.

22       Q.   As a matter of fact he just simply decided to stop

23  going there, didn't he?

24       A.   No, sir, it wasn't exactly like that.  He had to

25  work.  I had to work.

1      Q.    He just couldn't work it into his busy schedule to

2    go down there for the anger management classes?

3      A.    I don't believe that, sir.

4      Q.    That's why he went down there, to try to get ahold

5    of his anger problem, wasn't it?

6      A.    Our family problem, yes, sir.

7      Q.    And he didn't keep the appointment for whatever

8    reason even though they were there to help him with that

9    particular problem, right?

10     A.    Yes, sir.

11     Q.    Since you've known this man, he's had an alcohol

12   problem, hasn't he?

13     A.    Yes, sir.

14     Q.    He's had a drug problem, too, hasn't he?

15     A.    He was doing a lot of drugs before I met him.  When

16   we got together, the only thing I really know of him doing

17   was smoking weed.  And there was times when he was taking

18   pills towards the end of this, that he did not do before.

19     Q.    When did he go into Glen Oaks?  You were with him

20   then, weren't you?

21     A.    No, sir.

22     Q.    You weren't with him?  When did you meet him,

23   in '90 --

24     A.    We didn't live together when he went to Glen Oaks.

25     Q.    So he may have been doing dope during that period of

1    time and you simply don't know it, right?

2        A.   Yes, sir.

3        Q.   He could have been doing things, for instance, like

4    amphetamines and you wouldn't know it?

5        A.   Yes, sir.

6        Q.   Marijuana?

7        A.   Yes, sir.

8        Q.   Cocaine?

9        A.   I don't -- I don't know what he did.

10        Q.   Back in 1996 the two of y'all moved to New Boston,

11    didn't you?

12        A.   Yes, sir.

13        Q.   Do you remember when his left hand got shot?

14        A.   Yes, sir.

15        Q.   How did that happen?

16        A.   He was going to see if the bullet would roll back

17    down instead of going through his hand.  I don't know the

18    whole ordeal.  It was a Benjamin and a pellet coming out of

19    there is not going to roll back down like a BB gun, so I

20    don't know.

21        Q.   Okay.  It wasn't a .22 caliber pistol, was it?

22        A.   A Benjamin Franklin -- I don't know what they're

23    called.  They're some kind of guns, pellet guns.

24        Q.   As a matter of fact, in your diary -- I mean, you

25    have a notation for the day that happened, September the 12th

1    of 1996.  Do you remember that?

2         A.   I don't remember what I said, no.

3         Q.   As I'm reading, went to Texarkana, came home, Jim

4    shot his hand, sorry babe, I love you?

5         A.   Uh-huh.

6         Q.   Was there a robbery attempt on your husband on that

7    day?

8         A.   No, sir, not that I'm aware of.

9         Q.   So if he told someone else that he got shot in the

10   hand as a result of being robbed and he was a victim of a

11   robbery, that's simply not the case, is it?

12        A.   No, sir.

13        Q.   Do you know whether your husband has ever said that

14   to anybody?

15        A.   No, sir.

16        Q.   It sure wouldn't be the truth, would it?

17        A.   No, sir.

18        Q.   Randy Crow, his AA sponsor -- Randy Crow was a very

19   good friend to him, wasn't he?

20        A.   Yes, sir.

21        Q.   Randy Crow was there for him when he needed him --

22        A.   Yes, sir.

23        Q.   -- correct?

24             Randy Crow tried to help him in every way possible,

25   didn't he?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    Yes, sir.

2      Q.    Tried to help him get a handle on his drinking

3  problems and other personal problems?

4      A.    Yes.

5      Q.    And y'all went over there and visited at Randy

6  Crow's home, didn't you?

7      A.    Yes, sir.

8      Q.    And during the time that you've known the

9  defendant -- I mean, there have been times, I guess, when

10  you've met his mother?

11      A.    Yes.

12      Q.    His brother Donnie?

13      A.    Yes.

14      Q.    To your knowledge those people have been available

15  for him, haven't they?

16      A.    In the past years, yes -- few years.

17      Q.    What has the defendant told you about shooting

18  Bertie Cunningham?

19      A.    Nothing.

20      Q.    Nothing?

21      A.    I have not spoke to Jim.

22      Q.    You haven't spoken to him since he got in jail?

23      A.    He called my house one night collect, and that's the

24  only time I've ever talked to him.

25      Q.    Y'all never even mentioned why he was in jail or the

DARLINE W. LABAR, OFFICIAL REPORTER

1    circumstances of whether he guilty of this crime?

2         A.    Talking to Jim, personally, no.  I have not spoke to

3    Jim.

4         Q.    Did you talk to him when he called you collect?

5         A.    For about a minute.

6         Q.    What, did you hang up on him or what?

7         A.    Yes.

8         Q.    So this sweet person down here -- I mean, you

9    don't -- you don't know whether he's admitted guilt in

10   killing Bertie Cunningham or not, do you?

11        A.    At the time, yes, I knew it because his sister had

12   told me.

13        Q.    But he's never come to you, the mother of his child,

14   and said, listen, you know, I need to tell you the truth, I

15   killed that woman out in Garland.  He's never said that to

16   you, has he?

17        A.    No, sir.

18        Q.    Ever written to you?

19        A.    He's written plenty of letters.  They're mostly for

20   his daughter.

21        Q.    And in those letters he's never discussed what he

22   did with Bertie Cunningham?

23        A.    He's said he's sorry for what he has done to our

24   family and her family, but that's --

25        Q.    Never -- never taken responsibility for killing an

1    80-year-old woman?

2        A.   Well, yes, he took responsibility for it or he

3    wouldn't have apologized in the letter.

4        Q.   This sweet person, has he ever mentioned Mandy Kirl

5    to you, what he did to Mandy Kirl?

6        A.   No.

7        Q.   Would you consider him to be a sweet person if you

8    learned that he took a handgun out, placed it to Mandy Kirl's

9    head and said are you afraid of dying?

10       A.   I wouldn't believe it.

11       Q.   You wouldn't?

12       A.   No.

13       Q.   How about if you learned that he went over to

14   Arlington, Texas, kidnapped a woman in broad daylight,

15   started driving her off from her workplace, still a sweet

16   person?

17       A.   I do not believe that.

18       Q.   If he went up to Wichita Falls and robbed

19   a 65-year-old woman that same day, sweet person or not?

20       A.   I don't believe that he'd do that, or that he did

21   that.

22       Q.   You still love him, don't you?

23       A.   Yes, sir.

24       Q.   You don't want him to get the death penalty, do you?

25       A.   No, for my daughter's sake.

1      Q.   This diary that you kept up, when did you quit

2   keeping a diary?

3      A.   Probably a year and a half, two years.

4      Q.   So actually there are diaries that post-date what

5   you've given us?

6      A.   I imagine so, sir.

7      Q.   You just didn't bring those to court with you?

8      A.   No.  I have some before that, too.

9      Q.   Did you bring those to court?

10      A.   No, sir.

11      Q.   Who asked you to bring this particular diary to

12   court?

13      A.   Ms. Little.

14      Q.   She told you about the allegations over in Arlington

15   in August of 1997, didn't she?

16      A.   I knew about them, yes.

17      Q.   When did you learn about those?

18      A.   When it all came up before court ever started, I

19   believe, or when it started.

20      Q.   This year?

21      A.   Yes.

22      Q.   Within the last couple of months?

23      A.   Yes.

24      Q.   You know looking through this -- this diary, you can

25   certainly look at yours if you care to, you know, you've

1    blacked out -- you've blacked out August the 17th of 1997

2    where he broke your nose, didn't you?

3        A.   Yes, sir, I done that in '97.

4        Q.   You didn't do that later on?

5        A.   No.

6        Q.   You know, as we look through this document -- again,

7    you can go through it if you want to, but that is the only

8    day that's blacked out in this entire diary, isn't it?

9        A.   There's stuff marked all over, just this one page

10   down here had to have said something that I marked out.

11   There's stuff all over this diary.

12       Q.   But you know when you look at the days, the

13   individual days and what happened on those days, Ms. Willis,

14   take your time if you want to, no other day has been blacked

15   out so that we can't read it now.

16       A.   It has nothing to do with you reading it, sir.

17   There's stuff all over here that's blacked out.  I've got

18   stuff here scribbled out all different months.  It was

19   something that I didn't want there, and that's when I erased

20   it is when he got out, because he looked at it, too, and I

21   didn't want him reading what I said.

22       Q.   What did you say?

23       A.   Well, I don't remember what I said.

24       Q.   You don't remember what your notation was?

25       A.   No.  I'm sure it had something to do with fighting,

 1   though.

 2        Q.   But right now we can't read that diary and tell what

 3   you wrote on that day, can we?

 4        A.   You have a police report.  You already know what

 5   happened that day.

 6        Q.   No, I'm referring to what you wrote in your personal

 7   diary that has now been put into evidence by the defense.  We

 8   cannot read your entry that day, can we?

 9        A.   No, sir.

10        Q.   Are you telling this jury that you have an

11   independent recollection of Jedidiah Murphy staying at home

12   with you on August the 26th, 1997?

13        A.   He went to work August the 26th that night.  He

14   would have had to come home the next morning because he was

15   in my car.  I went to work on the 28th.  He was keeping my

16   kid -- our kid.

17        Q.   When he came home from work on August the 26th, what

18   time did he get home?

19        A.   He always -- I don't remember what time he got off.

20   I don't remember his hours.  He always came home in the

21   mornings.

22        Q.   What did y'all talk about that day?

23        A.   Sir, I don't know.  The only reason I know this is

24   because I have it wrote down.

25        Q.   Yeah.   This notation makes absolutely no mention of

Page 156

1    Jim or Jedidiah Murphy, does it?

2        A.    If you read the whole calendar, it doesn't mention

3    him.  It says if we fought or it says we stayed home or --

4        Q.    Yeah --

5        A.    -- stayed here.

6        Q.    That's right.  There are several notations -- if

7    you'll read this entire -- there's a lot of notations about

8    Jim and I stayed home, Jim and I went to Wal-Mart, Jim and I

9    went to Texarkana.  There's plenty of notations when you do

10   something together with Jim Murphy, isn't there?

11       A.    Yes, but when we stayed home it just says stayed

12   home or stayed home and that's all really.

13       Q.    He had another house back during this period of

14   time, didn't he?

15       A.    His mother did and Ms. Gray.

16       Q.    I mean, there's a lot of notations -- for instance,

17   I notice in May and June of '97 where you said went over to

18   Jim's house, stayed at Jim's house, isn't there?

19       A.    Of '97?  Yes, because he was living with his mother

20   at that time because we have not moved into the trailer.  Or

21   it says on May 13th that we worked on house.  That means we

22   worked on where I'm living now.

23       Q.    Uh-huh.  Back on August 26th, what time did he go to

24   bed when he got in from work?

25       A.    Sir, I don't recall.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.    What time did he get up?

2      A.    I don't recall.

3      Q.    What did y'all have to eat?

4      A.    I don't recall.

5      Q.    I mean, you have no independent recollection really

6  of what happened on that day, do you?

7      A.    If I would have wrote it down, I would remember.

8      Q.    And the only thing again that you wrote down on that

9  day is "stayed home"?

10     A.    Home.

11     Q.    Two words, right?  Two words?

12     A.    Yes, sir.

13     Q.    Since you were at home, no one else was using your

14  automobile that day, were they?

15     A.    No.

16     Q.    So if the defendant had wanted to use your

17  automobile to drive maybe to Arlington, I mean, that vehicle

18  would have been available to him, wouldn't it?

19     A.    To go to Arlington, no.

20     Q.    Since you were not using it that day, were you?

21     A.    No, it would not have been available.

22     Q.    Well, if he told you that he was going to Arlington?

23     A.    No.

24     Q.    You were just going to make him stay home?

25     A.    More or less.

1    Q.   How many jobs has the defendant held since you've

2    known him?

3    A.   I don't recall.

4    Q.   10, 15, 20?  He doesn't work at any one place for

5    very long, does he?

6    A.   There's been a couple, but not very many, no.

7    Q.   His regular habit is to work a very short period of

8    time.  Then he leaves a job for whatever reason, doesn't he?

9    A.   I don't believe it's planned that way.

10   Q.   It just happens that way though, doesn't it?

11   A.   Yes, sir.

12   Q.   He'll leave, he'll stay off for a while, and then

13   get another job at another place, won't he?

14   A.   When he finds one, yes, sir.

15   Q.   Then the pattern just seems to repeat for whatever

16   reason, doesn't it?

17   A.   Yes, sir.

18            MR. DAVIS:  That's all I have, Your Honor.

19            MS. LITTLE:  May I approach the witness, Your

20   Honor.

21            THE COURT:  You may.

22                    Redirect Examination

23   By Ms. Little:

24   Q.   Chelsea, where's the actual diary?  Some of this is

25   in purple ink.  Some of it's in gold ink; is that right?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    Right.

2      Q.    And these are entries you made each day because you

3  kept a little log of yourself.  And lots of days not anything

4  happens, but you always put something; is that right?

5      A.    Yes, ma'am.

6      Q.    And there's no way you have any independent memory

7  now of what someone ate or what time they went to bed or

8  anything like that; is that correct?

9      A.    Yes, ma'am.

10     Q.    In fact, it would probably be pretty suspect if you

11 knew that, wouldn't it?

12           How do you know Mandy Kirl?

13     A.    Back in '94 when I met Jim, Jim, Shod, and Mandy

14 hung around each other.

15     Q.    Jim, Shod, and Mandy hung around together?

16     A.    Uh-huh.

17     Q.    What color was her hair then?

18     A.    Black, if I can remember correctly.

19     Q.    Okay.  At that time were you living with Jennie?

20     A.    Yes, ma'am.

21     Q.    And y'all had an apartment together.  I think you

22 testified you took care of her child and she went to work; is

23 that right?

24     A.    Yes, ma'am.

25     Q.    Were Jim and Shod at your place a lot of the time?

1    A.    Yes, ma'am.

2    Q.    In fact, they cooked over there, they slept over

3    there.  They were there a lot, weren't they?

4    A.    Yes, ma'am.

5    Q.    And did Mandy Kirl come with them to your apartment

6    some of the time?

7    A.    Yes, ma'am.

8    Q.    And the drinking and the weed smoking and stuff,

9    that went on then, didn't it?

10   A.    Yes, ma'am.

11   Q.    She was a party to that?

12   A.    Uh-huh.

13   Q.    Can you remember any specific time that she would

14   have been there or not?  It's been a long time ago.

15   A.    I can't remember.  It was when Jim was -- around his

16   graduation.  They came before and after.  I don't remember

17   dates, times.

18   Q.    Okay.  Did you ever see that there was any trouble

19   between any of the three of those people?

20   A.    No.

21   Q.    And they would be there and eat and, you know, drink

22   and smoke weed and stuff like that?

23   A.    Just normal, yes, ma'am.

24   Q.    Did you ever see any signs that Mandy Kirl was

25   afraid of Jim?

DARLINE W. LABAR, OFFICIAL REPORTER

1       A.    No, ma'am.

2       Q.    Or Shod or anybody else for that matter?

3       A.    No, ma'am.

4       Q.    Do you recall Jim going to a graduation party?

5       A.    I remember him going to a graduation, coming to our

6  house and getting dressed.

7       Q.    Before he went to the party?

8       A.    Yes.

9       Q.    And do you know anything about what happened then?

10      A.    No.

11      Q.    If anything?

12      A.    No, ma'am.

13      Q.    But you've seen Mandy Kirl at your apartment since

14  then with Shod and Jim?

15      A.    Yes.

16            MS. LITTLE:  That's all I have.  Thank you.

17                    Recross-Examination

18  By Mr. Davis:

19      Q.    Ms. Willis, I want you to look please at August the

20  25th of 1997 in your diary.  What notation did you make on

21  that day?

22      A.    August 25th?

23      Q.    Yes.

24      A.    Stayed home.

25      Q.    Same notation that you made for August 26th?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    Yes, sir.

2    Q.    Where was the defendant that day?

3    A.    We would have been at home.

4    Q.    You sure?

5    A.    As far as I can remember and what my calendar says,

6    yes, sir.

7    Q.    You wouldn't have let him take the car that day

8    either, would you?

9    A.    If Jim was not going to work or to the grocery store

10   or to my dad's house, no.

11   Q.    Do you know how he got to Canton that day to report

12   to his probation officer?

13   A.    Well, excuse me, probation.  No, I don't know.

14   Unless I took him or he took the car.

15   Q.    Well, you stayed home that day, didn't you?

16   A.    Well, going to Canton is not --

17   Q.    I mean, there are other occasions when you say Jim

18   went to court, right?

19   A.    Court and going to see the probation officers is

20   totally different.

21   Q.    Your notation on August 25th is stayed home, the

22   same one you made for August 26th, the day following --

23   A.    I made it on --

24   Q.    Is your testimony -- is your testimony now that you

25   went to Canton that day or did you stay home like you --

1      A.   Sir, I don't know.  All I have is what I wrote down.

2      Q.   And your initial response to me was that the

3   defendant stayed home that day with you, right?

4      A.   We didn't do nothing out of the ordinary.  It says

5   the same thing on the 7th, 8th, and 9th, too.

6      Q.   Do you know whether or not the defendant was having

7   money problems back on August the 25th of 1997?

8      A.   No.

9      Q.   Do you know whether or not he was behind in his

10  probation fees and restitution down in Canton?

11     A.   He's always been behind on those.

12     Q.   Do you know whether or not he was threatened with

13  jail if he didn't come up with at least $700 to pay to the

14  Probation Department?

15     A.   No.

16     Q.   Do you know whether or not he got that threat on

17  August the 25th of 1997, from the probation officers in

18  Canton, Texas?

19     A.   Kenneth Pruitt always threatened him with paying his

20  fees.  I do not know what day.

21     Q.   Have you had a chance to look at the records from

22  the Van Zandt County Probation Department?

23     A.   No, sir.

24     Q.   You don't know whether there may be an entry for

25  August 25th, 1997 or not, do you?

1  A. No.

2     MR. DAVIS: That's all I have, Your Honor.

3     Further Redirect Examination

4 By Ms. Little:

5  Q. It would be unusual to report on a Saturday and a

6 Monday though, wouldn't it, in the same month?

7  A. Twice a month, yeah, unless he was going to

8 community service.

9  Q. Okay. And would it be fair to say that staying at

10 home means that substantially you were at home. It doesn't

11 mean somebody went to go buy bread or something for the baby

12 or going to probation?

13  A. Yes, ma'am.

14  Q. Is that right?

15  A. Yes.

16  Q. But nobody was gone all day, that kind of thing?

17  A. Yes, ma'am.

18     MS. LITTLE: That's all I have. Thank you.

19     Further Recross-Examination

20 By Mr. Davis:

21  Q. As a matter of fact, do you know whether or not Ken

22 Pruitt had already filed a violation report with the District

23 Attorneys Office down there in Canton when your husband came

24 down there on August 25th or not?

25  A. No, sir.

1                    MR. DAVIS:  That's all I have, Your Honor.

2                    MS. LITTLE:  Nothing further.

3                    THE COURT:  You may step down, ma'am.

4          Defense may continue.

5                    MS. LITTLE:  We'll call Pam Sherman.

6                    THE COURT:  Ask you to raise your right hand,

7    please.

8                    (Witness sworn.)

9                    THE COURT:  Thank you.  Have a seat to my left

10   if you please, ma'am.

11                       PAM SHERMAN

12   was called as a witness by the Defendant and, after having

13   been first duly sworn, testified as follows:

14                    Direct Examination

15   By Ms. Little:

16       Q.   Would you state your name, please, ma'am?

17       A.   Pamela Sherman.

18       Q.   Ms. Sherman, where do you live?

19       A.   In Terrell, Texas.

20       Q.   Have you lived in East Texas most of your life or

21   all of it?

22       A.   For -- yes, for 20 or 30 years.

23       Q.   Okay.  Do you know Jim Murphy?

24       A.   I do.

25       Q.   How do you know him, Pam?

1   A.   He's my second cousin.

2   Q.   Are you related to his father?

3   A.   His father would be my first cousin.

4   Q.   And is that Donnie Kines?

5   A.   That's Donnie Kines.

6   Q.   Okay.  Where did you grow up, Pam?

7   A.   In Terrell and Kaufman, Texas, most of the time with

8   my Aunt Margaret.

9   Q.   And your Aunt Margaret, is she living now?

10   A.   No, she's not.  That was Donnie's mother.  She died

11   in '84, I believe.

12   Q.   Okay.  Did you grow up with Donnie Kines, the

13   senior, Jim's daddy?

14   A.   Yes, ma'am.

15   Q.   What can you tell the jury about your life at that

16   time and what the family life was like?  What kind of person

17   was Donnie Kines?

18   A.   He was mean.  He was a mean little boy.  He was five

19   years older than I was.   And he tormented myself and my

20   sister.  He was -- would always get into trouble, like Aunt

21   Maggie and Uncle Ed would always have to get him things.   He

22   chased us, tried to burn us with hot cigarettes.  One time he

23   killed my kitty cat with a fork, tried to drown me in a tank

24   out behind the house.  Did things like my cousins and I would

25   go swimming in the tank and he would -- we would go in our

DARLINE W. LABAR, OFFICIAL REPORTER

1    underwear when we were little girls and he would hide our

2    clothes, take our clothes to the barn, throw them out in the

3    woods.  He cussed, just -- it was terrible.

4         Q.    A pretty horrible existence for a child?

5         A.    Yes.

6         Q.    Did you stay in touch with him through the time that

7    y'all grew up?

8         A.    In touch.  We lived in Terrell.  I worked in

9    Terrell, and part of that time I lived in Grand Saline which

10   is further east than Terrell, but Aunt Maggie was like my

11   mother.  She was like my second mother.  And so even though I

12   didn't live with them when I was older, I would go and see

13   about Aunt Maggie.  She wasn't in good health and so I went

14   over there frequently, several times a week.

15        Q.    And in the -- after you had gotten -- how much older

16   than Jim are you?  About how many years older?

17        A.    I'm old enough to be Jim Ed's mother -- I mean, he's

18   probably 25.  I'm 52.

19        Q.    Okay.  Did you know Donnie when he was married to

20   Hope?

21        A.    Oh, yes.

22        Q.    How many times was Donnie married?

23        A.    I'm not going to say I know exactly.  I lost track

24   about five.  I think it was more than five.

25        Q.    And whereabouts, if you know, did Hope fall on that

1  scale?  Was she the last wife?

2      A.   She was the last wife, that I know of.

3      Q.   Okay.  When they married, did they both have

4  children from previous relationships?

5      A.   Donnie had a little boy that I know of from maybe

6  his first or second wife that I never knew after it was about

7  a year old.  I don't know of any children that Donnie had

8  other than that one.

9           Now, Hope had children when she came into the

10 marriage.

11     Q.   Okay.

12     A.   She had three, and I believe she was pregnant when

13 she married Donnie.

14     Q.   Do you know who those children were that she already

15 had?

16     A.   I know their names.  Tonya, and Tamera, and Bob.

17     Q.   Okay.  And then when she married senior Donnie

18 Kines --

19     A.   Right, and they named him Donnie when he was born.

20     Q.   And that's Donnie Tolar.  Do you know his last name

21 now?

22     A.   Right.

23     Q.   Do you know how long they stayed together?

24     A.   I could figure it out.  I mean, some of the kids

25 came to live with me in '83 and --

```
 1        Q.    Who would -- which of the ones would have come to be
 2   with you?
 3        A.    Tamera and Hope -- I mean, Tamera and Holly came to
 4   live with me for a while in '83.  And that's about the same
 5   time that Donnie and Jim Ed went to the Tolars in Grand
 6   Saline where I lived.
 7        Q.    Okay.  And that's Jim's brother Donnie?
 8        A.    Right.
 9        Q.    That's the younger -- Donnie Jr.?
10        A.    Right.
11        Q.    What, if anything, did you observe in the
12   relationship between Hope and Donnie Kines when they were
13   married to each other?
14        A.    They fought constantly, fought and drank and
15   sometimes weren't home for days.  Aunt Maggie would have the
16   kids by herself.  And Tonya, the oldest child, basically
17   acted as a mother to all the kids.
18        Q.    And how old was she at that time when the boys were
19   little?
20        A.    Well, she's 10 years older than Holly.  Holly was 4
21   when she came to my house.  Tonya would have been 14, so 9,
22   10, 11, 12, all those years, that's preteen, she did
23   everything for the kids.  She fed them.  She changed
24   diapers.  She took care of them like she was their mother.
25        Q.    Did you ever see any physical damage to anybody,
```

1    either Hope or Donnie?

2        A.   Oh, Hope's -- I would see Hope when her whole face

3    would be bruised and black and blue and swollen and stuff.   I

4    had seen Donnie hit her before.   Donnie spanked the kids,

5    whipped the kids with a belt, not like a daddy taking a child

6    to the bathroom to give them a spanking for discipline, but

7    just -- he would just rip his belt off for the least

8    provocation and just -- just beat them.

9        Q.   And do you know which children were beaten by

10   Donnie?

11       A.   It was usually the younger ones.   I don't

12   remember -- I've seen him slap and push the girls, Tonya and

13   Tamera, and Bob some, but it was usually the -- Jim Ed and

14   Donnie were the two that got it.   Jim Ed and Donnie seemed to

15   be the two that always got it.

16       Q.   And that's Jedidiah Isaac Murphy who is here today?

17       A.   Right.

18       Q.   Do you know anything about a little game that he

19   played with the kids about taking his boots off?

20       A.   Yeah.   On several occasions I witnessed him telling

21   them to take his -- help him take his boots off.   He was --

22       Q.   How old would they have been then?

23       A.   7, 8 -- 6, maybe.   He wore cowboy boots and anybody

24   that's ever worn cowboy boots, they're kind of hard to get

25   off.   And he would ask them to help him pull his boots off,

DARLINE W. LABAR, OFFICIAL REPORTER

1    and they would come over and grab the toe and the heel of the

2    boot and he would sit on the couch and they would try to pull

3    them off, but of course they couldn't, they were little.  And

4    we take his other foot and just put it into their chest and

5    just shove it so that the boot would come flying off and the

6    kid, the boot, and everything would hit the floor, hit the

7    wall, hit whatever.  And if they cried, they got a whipping.

8         Q.   Do you know if there was ever any attempt at any

9    kind of sexual contact on Donnie's part with any of these

10   children?

11        A.   I know that their -- I know what Tonya told me, and

12   I know that -- that Donnie had sexually molested her.  I

13   don't know to what extent that meant, but I do know that it

14   was most likely true and I believed her because I grew up in

15   that house.  And when I was 11 and Donnie was 16, he was

16   always trying to do things like that to me.  And there was no

17   one there that could protect you.  Nobody would believe a

18   kid.  So when she told me that, I believed her.

19        Q.   And whose house was that, Pam?

20        A.   At Aunt Maggie and Uncle Ed.

21        Q.   Now, Aunt Maggie and Uncle Ed did the best they

22   could to help everybody, didn't they?

23        A.   Yes, ma'am.

24        Q.   They were getting old though as time marched on.

25        A.   They were.

1    Q.   Did you -- did you ever involve yourself in trying

2  to place Jim and Donnie anywhere?

3    A.   I did.   Uncle Ed, I believe, had died in late '83 at

4  the time, and Aunt Maggie had heart problems and some lung

5  problems and she was a diabetic and she had all these little

6  kids to take care of.   And that's when Hope -- I don't know

7  where Hope was.   I think at that time Hope had left Aunt

8  Maggie's house and maybe gone to Dallas.   She took the three

9  bigger kids with her later, but the three little ones,

10  Donnie -- Little Donnie, Jim Ed, and Holly needed a place to

11  go and Aunt Maggie just couldn't take care of them anymore.

12  And I told her that I would help her, and I was a member of a

13  church in Grand Saline and I knew of a couple families that

14  were interested in adopting these -- the kids.

15    Q.   Uh-huh.

16    A.   And I talked to them and the Tolars were wanting to

17  take the boys and the Veeches were able -- wanting to take

18  Holly.   They didn't have any girls, and they wanted a little

19  girl.   And she was about 4 at the time.   I think the boys

20  were maybe 8 and 9.   And so I worked with them and the pastor

21  at the church and Aunt Maggie to try to find a home for them

22  that would be safe and good and --

23    Q.   You did the best you could.

24    A.   Yes, ma'am.

25    Q.   Was there a time though that Hope left the children

DARLINE W. LABAR, OFFICIAL REPORTER

1  at Buckner's Orphanage?

2      A.   She took the three bigger ones with her and left the

3  three little ones at Buckner's.  I can't remember if it was

4  for a few days or a few weeks.  I just don't remember.  I

5  know it was for more than a day or two.  And she said she was

6  going to take her kids and go to Dallas and leave Donnie's

7  kids at Buckner's because she couldn't take care of them

8  anymore.  And my Aunt Maggie couldn't stand it, and she went

9  and got them.  And I brought Holly home with me.  And later

10 on then that's when the boys went to the Tolar's, and then we

11 found a place for Holly and she went to the Veeches'.  And it

12 was -- we all lived in Grand Saline then.

13     Q.   Hope divorced Donnie, didn't she?

14     A.   That's what I heard.  I mean, that's what they told

15 me.

16     Q.   Was that -- Donnie is not living any longer, is he?

17     A.   No, Donnie died in late '83 or early '84.

18     Q.   Was that due to alcoholism?

19     A.   Yes, ma'am, he died from -- he had a bad pancreas

20 and he had been in the hospital several times with acute

21 pancreatitis and he died at home.

22     Q.   And how old was he then?

23     A.   40.

24     Q.   But he and Hope were no longer together at that

25 time?

1      A.   No, they were not.

2      Q.   Now, do you recall if the police were ever called

3  when he beat up Hope, or was this before --

4      A.   I know that the police were out there a number of

5  times for him beating up on Hope or for pushing Aunt Maggie

6  and stuff, but Kaufman County and all the police in Kaufman

7  know them and I'm sure -- I remember them coming.  I was

8  there several times when they came, but I don't remember if

9  there were any like particular reports filed or anything like

10  that.

11      Q.   This would be before there had become such an

12  emphasis on family violence like --

13      A.   Right.

14      Q.   -- we have today?

15      A.   Right.  They would just tell Donnie to calm down.  I

16  never remember them taking him to jail.  They would just tell

17  him to calm down, go to bed, you know.  And we knew them, the

18  police -- when they showed up, we knew all of them by name,

19  and they knew all of us, the Kineses.

20      Q.   Did you ever see any other damage to Hope besides

21  the bruising?  Did you ever see her teeth knocked out?

22      A.   Yes, I saw at one point.  I know she had to have

23  some extensive dental work done because of some teeth knocked

24  out.

25      Q.   Do you remember how Jim reacted when he had to leave

```
 1   Aunt Maggie?  Or were you aware of that?
 2        A.   Aunt Maggie's house was probably the only safe place
 3   that he ever knew when it was just Aunt Maggie and the kids
 4   by their self.  I mean, she was a good person, very loving
 5   and -- I'm sure she did the best she could.  And so without
 6   his mom and without his dad, to have to leave Aunt Maggie's
 7   house was terrible for him.  And he told me he -- that he
 8   just felt like he was being thrown away, that nobody wanted
 9   him.
10        Q.   Did he actually run after the car or anything?  Do
11   you know about that?
12        A.   (Nods head.)  He did.
13        Q.   And you placed him with the Tolars?
14        A.   Yeah, I helped that happen.
15        Q.   Did you keep up with him after that?
16        A.   I did for months -- for months I did, until Terry
17   and Celeste asked me not to, to try to separate myself
18   because they were trying to make a family with Jim Ed and
19   Little Donnie and their boys.  They had three boys of their
20   own.  And they felt like my involvement in Jim Ed and
21   Donnie's life was keeping them attached to the past and that
22   they couldn't get over it, they couldn't get past it.  And
23   against my better judgment, I thought I should do what they
24   asked.  That was their parents and -- and so I did.
25        Q.   And at the time that Jim and Donnie went to stay
```

1    with the Tolars, was there anything about them you noticed

2    that seemed out of whack?

3        A.    Not at all.  I mean, they were very -- they were

4    very strict people and -- but their three boys were fine and

5    they were well mannered and Terry and Celeste were both

6    involved in the church and seemed like good honest Christian

7    people.

8        Q.    Have you seen them from that day to this?

9        A.    I saw him a few times in Grand Saline, and I live in

10   Terrell now.  And I saw him in the Terrell -- in the Terrell

11   Wal-Mart when he was about 18 or 19.

12       Q.    Did you recognize him?

13       A.    Oh, yeah.

14       Q.    Did he speak to you?

15       A.    He said, oh, Aunt Pam, I haven't seen you in a long

16   time and he gave me a hug and he told me he was fine.

17       Q.    Okay.  I know this has been hard on you.  Thank you,

18   ma'am.

19                    MS. LITTLE:  I pass the witness.

20                    THE COURT:  Do you need a break before we --

21                    THE WITNESS:  No, I'm fine, I'm sorry, I --

22                    THE COURT:  If you should -- if you should

23   want to take a break, your request will be granted.

24                    THE WITNESS:  Thank you.

25                    THE COURT:  Do you want to continue?

```
 1              THE WITNESS:  Yes, I'm fine.  Thank you.

 2                    Cross-Examination

 3   By Mr. Davis:

 4       Q.   Ms. Sherman, if you need to take a break at any

 5   time, you just let me know.  Okay?

 6            Ms. Sherman, when you approached the Tolars about

 7   taking the defendant into their home, at first they were a

 8   little bit reluctant, weren't they?

 9       A.   Well, I think they told me that they were going to

10   think about it, talk about it.  They weren't rich people,

11   there was going to be, you know, money involved because of

12   just filing and lawyers and that sort of thing.

13       Q.   I mean, they already had three children in their

14   home --

15       A.   Right.

16       Q.   -- didn't they?

17       A.   Right.

18       Q.   This was not a situation where they were out

19   actively pursuing the adoption of two more boys, were they?

20       A.   No.

21       Q.   I mean, they thought about it at your request,

22   didn't they?

23       A.   Yes.

24       Q.   And you were relieved when they decided to take both

25   Donnie and Jim into their home, weren't you?
```

```
 1        A.    Yes.

 2        Q.    And as I understand your testimony, they were

 3   expressing a desire to try to make these two boys become a

 4   full part of their family, weren't they?

 5        A.    That's right.

 6        Q.    How many times did you see the defendant while he

 7   was living with the Tolars?

 8        A.    I'm going to say -- I mean, I -- maybe less than 10.

 9        Q.    And when you next saw him when he was 18 or 19 years

10   old in Terrell, he said he was fine, didn't he?

11        A.    That's what he said.

12        Q.    I mean, at what time did he tell you that these two

13   people were abusing him and his brother?

14        A.    He never told me that.

15        Q.    Never did tell you that these people had mistreated

16   him, right?

17        A.    No.

18        Q.    And from your observations in talking with him, I

19   mean, he was very active in a lot of activities while he

20   lived with the Tolars, wasn't he?

21        A.    I'm honestly not sure what he was doing when he was

22   living with the Tolars.  I tried to keep my distance.

23        Q.    Okay.  Was he attending church?

24        A.    Yes.

25        Q.    Because you were attending the same church with the
```

1    Tolars at that time, weren't you?

2         A.    I did for a short time, but my husband was a pastor

3    and we -- I went to the church where he pastored.

4         Q.    As far as any other outside activities, such as

5    baseball or things outside the school, that's really not

6    something that you would be familiar with --

7         A.    No.

8         Q.    -- correct?  You didn't -- you didn't talk with him

9    when he went over there to Fruitvale Children's Shelter, did

10   you?

11        A.    No.

12        Q.    So it was a number of years before you saw him

13   again, right?

14        A.    That's right.

15             MR. DAVIS:  That's all I have, Your Honor.

16             MS. LITTLE:  I don't have anything further.

17             THE COURT:  Thank you very much.  You may step

18   down, ma'am.

19             MS. LITTLE:  May this witness be excused?

20             MR. DAVIS:  No objection.

21             THE COURT:  You may be excused or you may

22   remain in the courtroom if you wish.

23             MS. LITTLE:  Randy Crow.

24             THE COURT:  Good afternoon.  May I ask you to

25   raise your right hand, please.

```
 1                    (Witness sworn.)

 2                    THE COURT:  Have a seat to my left, please.

 3                         RANDY CROW

 4    was called as a witness by the Defendant and, after having

 5    been first duly sworn, testified as follows:

 6                       Direct Examination

 7    By Ms. Little:

 8         Q.   Would you state your name, please, sir?

 9         A.   Randy Crow.

10         Q.   Mr. Crow, where do you live?

11         A.   Kaufman, Texas.

12         Q.   Have you lived in that area all your life?

13         A.   Yes, ma'am.

14         Q.   In fact, how long has your family been in Kaufman?

15         A.   I'm 41.

16         Q.   So at least that long that you know of?

17         A.   Uh-huh.

18         Q.   Do you know Jim Ed?

19         A.   Uh-huh.

20         Q.   Or Jedidiah Isaac Murphy?

21         A.   Yes, ma'am.

22         Q.   How long have you known him?

23         A.   Three to four years.

24         Q.   And how was it that you met him?

25         A.   Through a rehab recovery program.
```

1      Q.   Which one was that?

2      A.   AA.

3      Q.   And that was about three or four years ago?

4      A.   Yes, ma'am.

5      Q.   Tell the jury how you came to meet him or how y'all

6   came to come into contact together at that meeting?

7      A.   AA is a program of recovery.  Tell your story and

8   you get -- you got 12 steps to work.  And then Jim was

9   attracted to me.  He wanted what I had.  And that's the way I

10  live is I got to keep it away -- I've got to give it away to

11  keep it.

12     Q.   Now, you say that Jim was attracted to what you had.

13     A.   Uh-huh.

14     Q.   How long have you been going to AA meetings?

15     A.   I have 7 years, 11 months, and 3 days today.

16     Q.   And you've been married most of your life, haven't

17  you?

18     A.   24.  Last week was 23 years.

19     Q.   Okay.  And your wife is Rhonda?

20     A.   Lori.

21     Q.   Did she come with you today?

22     A.   Yes, ma'am.

23     Q.   Before you quit drinking, was your life pretty

24  rocky?

25     A.   Oh, yes, ma'am.

1    Q.   In fact, you told me that you and Rhonda had been up

2  and down and in and out for a long time before you quit

3  drinking?

4    A.   Yes, ma'am.

5    Q.   And did you meet somebody who had something you

6  wanted?

7    A.   Yes, ma'am, there's a -- there was a guy at the

8  meeting.  I had my sister take me to the meeting, help me --

9  I could walk probably here to there and I'd fall from crying

10  and I had no idea why.  My wife and I were separated and I

11  just knew I needed help.  I went to the head shrinks and the

12  doctors and stuff to get help and they -- she thought that I

13  might be an alcoholic and I agreed with her and my journey

14  began there.

15    Q.   And what was it about this person that you saw there

16  that attracted you?

17    A.   Big, tall, bald-headed, and he was smiling and

18  laughing and there was nothing funny in my whole life that

19  was going on through my head at the time and I wanted what he

20  had.  So he began -- he became my sponsor.

21    Q.   Okay.  And you were able to quit drinking?

22    A.   Yes.

23    Q.   Now, you lived all of your life with your own

24  parents, didn't you?

25    A.   Yes, ma'am.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   And, in fact, y'all go back so far -- do you know

2    the Kines family by reputation or the fact that they --

3    A.   I just knew the Kineses from my dad and them as

4    kids, trading their gardening corn, peas, whatever, for farm

5    equipment, horse-buggy wagon deal, way back.

6    Q.   But you didn't know them personally.

7    A.   No, ma'am.

8    Q.   Just knew of them?

9    A.   Just knew of them.

10   Q.   Small community?

11   A.   Yes, ma'am.

12   Q.   And you didn't know Jim was from that family?

13   A.   No, ma'am.

14   Q.   Did he approach you at the AA meeting?

15   A.   Yeah.  Yes, ma'am.

16   Q.   And how did it -- how did the relationship develop

17   from there?

18   A.   Just start talking, and if he wanted what I had, I

19   put him through a process of open the book to the prefix,

20   read the first 164 pages and then we'll talk about what you

21   read.

22   Q.   Okay.  What are the first 164 pages?

23   A.   This's just how -- how the program works.  This is

24   how it works, and he's got to do this to get this.

25   Q.   Okay.

1      A.   It took me 33 years to get there, so there's a lot I
2  got to unlearn, my character defects.  If I stop -- if my
3  truck would stop going from work here in Dallas going home,
4  if I stop exiting off on Carroll Avenue at the liquor store,
5  then I might not get to buy no beer.  That's a hard habit to
6  break.  I used to stop there two or three months.  What am I
7  doing?  I don't this no more.
8      Q.   Is there bad alcoholism in your family?
9      A.   Well, there is, but I'm the only one that I know
10  that's doing the program.
11      Q.   Okay.  And do you think you helped Jim?
12      A.   Oh, sure.  Sure.
13      Q.   Did he get involved in the program and --
14      A.   Yes, ma'am.
15      Q.   -- and make you his sponsor?
16      A.   Yeah.  I saw Jim get a six months of sobriety that
17  was real good and he was on fire.  I've been blessed not to
18  have a slip, and Jim had a slip.  And a slip is what it is.
19      Q.   Tell the jury what a slip is, please.
20      A.   You go back to drinking.
21      Q.   That's pretty common with drugs and alcohol, isn't
22  it?  I think we all know that from this courtroom -- working
23  here for years.
24      A.   Yes, it's just another experience.
25      Q.   How far did he get in the program?

1          A.    Me and Jim were working on probably his 4th step.

2    And you do a 5th step after you write down your 4th step on

3    paper.   You're looking at yourself on a piece of paper.   And

4    then he comes and discusses that with me.   When he starts

5    slowing down, then I tell him some of my story, and he picks

6    it back up -- you never ever complete it.   It's always an

7    ongoing deal.

8          Q.    Always ongoing.  And basically since you quit

9    drinking, you spend a good portion of your time trying to

10   help Jim or other people that have drinking problems?

11         A.    Yes, ma'am.

12         Q.    Did you get to know any of Jim's family in the

13   course of time that you worked with him?

14         A.    Yes, ma'am.

15         Q.    In fact, there's somebody at your house right now?

16         A.    Yes, ma'am.

17         Q.    Did you get to know any of Jim's family in the

18   course of the time that you worked with him?

19         A.    Jim's mother and Chelsea and the little baby.

20         Q.    And did y'all socialize?

21         A.    Oh, yeah, sure.  Socializing was at my house, just

22   showing that we can have fun without the drinking or the

23   drugs.  Playing games, I'm -- I'm 41 now.  Probably at the

24   time I was probably 39, playing jacks in my kitchen floor

25   with me with a bunch of grown-ups in the floor.  They're

1  coming over to see me in the floor playing jacks.  Just good

2  clean fun, eating and -- card games at the table and marble

3  games in the living room, that type.

4       Q.   So you knew Chelsea, and you know Jim together in a

5  relationship?

6       A.   Yes, ma'am.

7       Q.   Did it remind you at all of your relationship with

8  your wife?

9       A.   Oh, yes, ma'am.

10       Q.   How so?

11       A.   I met my wife when she was 12 and I was 14.  We're

12  still together.  We raised three children, the clubs, the

13  drinking, the not coming home at night.  Most of the time I

14  worked out of town and wasn't home, period.  Come home on the

15  weekends enough time to get her pregnant to have another

16  baby, just -- we grew up together learning how to live.

17       Q.   And did you have a lot of trouble in those early

18  years when you were drinking?

19       A.   Oh, gosh, yes, ma'am.

20       Q.   And did you see a lot of that in the relationship

21  between Jim and Chelsea?

22       A.   Yes, ma'am, Jim and Chelsea, I told them -- they

23  were talking about some of their problems, me in the back

24  seat, and I said y'all remind me so much of my wife and

25  myself, it's unreal, but they got a chance because they're

1    asking for help.  So --

2        Q.   And do you know how long ago it was that Jim made

3    the six months of sobriety and then fell off?

4        A.   To put an exact date on it, I'm going to say it was

5    two years, close to.

6        Q.   Did you continue to be his sponsor after that?

7        A.   I continued to be Jim's sponsor up until -- it's

8    called tough love.  And that's where -- me and Jim got too

9    close to each other as a -- I was more like a father figure

10   to him in trying to -- I had to tell him I wasn't going to be

11   his sponsor no more so it would give him a chance to grow, to

12   move on, and maybe to get him moving in the steps.  He got

13   kind of -- his complacency -- you get to feeling real good,

14   and you want to stay there.  You can't stay there, because

15   you'll get complacent and your old ways will come back and

16   get you.

17       Q.   Okay.

18       A.   Then you're subject to have another slip or drink

19   again or whatever.

20       Q.   So did you have a talk with him about the fact that

21   he was seeing you too much as a father?

22       A.   Yes, ma'am.  And I suggested my sponsor who's has 24

23   or 25 years now.  I told Jim Ed, to talk to Les and see if

24   Les will sponsor you to -- to get him moving more.

25       Q.   How did Jim react to your telling him he would have

1    to go away?

2       A.   It devastated Jim at the time.  If I knew it was

3    going to have that kind of effect on him, I wouldn't have

4    done it, but you never know who you're dealing with.  If

5    you're dealing with an alcoholic, you've got -- he could be a

6    thief, he could be a this, he could be that, he could be lots

7    of other things that go along with it.

8       Q.   You did the best you could, though, didn't you?

9       A.   Yes, ma'am.

10      Q.   You do believe in responsibility?

11      A.   Yes, ma'am.

12      Q.   But you also know that there are -- alcoholism is --

13   can be genetic and there are just problems there?

14      A.   Yes, ma'am.  I didn't ask to be an alcoholic.  I was

15   born an alcoholic.

16      Q.   And are you aware of the different -- at least the

17   fact that Jim has had some different homes over his life?

18      A.   Yes, ma'am.

19      Q.   And not a lot of stability that stayed constant?

20      A.   Right.

21      Q.   Are you aware of Jim ever trying to commit suicide?

22      A.   Yes, ma'am.

23      Q.   What can you tell the jury about that?

24      A.   Jim was -- he probably lived three miles from where

25   my house is, the park, which at the beginning we didn't know

1     we were that close together.  But his mother called me, that

2     Jim was in bad shape and he's got a gun in his truck, and

3     could I come down and help.  And I went down to the end of

4     the street and he was just drunk, and he did have the gun in

5     the truck and I tried to talk to him.  It wasn't going to

6     work, so the best thing I knew to do was leave.  Get me out

7     of the situation.  My wife was with me, and it was just a bad

8     situation.

9         Q.   He was not -- he didn't kill himself obviously.  Did

10    he try to?

11        A.   Why the gun misfired, I do not know, but it did.

12    It's the deal with Jim and Chelsea and him trying to see his

13    little girl, and she's living with another guy, that kind of

14    thing, and it was bouncing around, just kids growing up.

15    That's all it is.

16        Q.   And you were aware that Chelsea had a child that was

17    someone else's?

18        A.   Yes, ma'am.

19        Q.   That's not Jim's?

20        A.   She struck us as the child could be this or that,

21    and it was with a black man.  And she told Jim, Jim told me

22    and then -- and we go to the hospital, the day she has the

23    baby, and she had the baby and Jim Ed and me both supported

24    her as the best we could, accepting the fact, and it did

25    happen.  It was true.

1    Q.   And Jim has taken care of that baby?

2    A.   Yes, ma'am.

3         Chelsea over here, she's got kidney problems, back

4    problems, feet problems.  Jim Ed had hurt his hand, and was

5    not working and he would baby-sit while she worked and go on

6    and -- there was no doubt in my mind he loved Chelsea.

7    Q.   And took care of the kids?

8    A.   And he really loved the kids.

9    Q.   And played with those kids?

10   A.   That little baby, yes, ma'am.

11   Q.   About how long ago was it that you told Jim he'd

12   have to go get another sponsor?

13   A.   Probably year and a half.  It's been a year and a

14   half.

15   Q.   From right now?

16   A.   (Nods head.)

17         MS. LITTLE:  That's all I have.  Pass the

18   witness.

19                    Cross-Examination

20   By Mr. Davis:

21   Q.   Mr. Crow, my name is Greg Davis.  We've never met,

22   have we?

23   A.   No, sir.

24   Q.   Mr. Crow, for the last -- I think you said you had

25   met the defendant about three or four years ago?

1    A.   Yes, sir.

2    Q.   And during the time that you and he were together, I

3  mean, you made every effort that you could possibly make to

4  help this man, didn't you?

5    A.   Yes, sir.

6    Q.   I mean, you were there for encouragement when he

7  needed it?

8    A.   Yes, sir.

9    Q.   You were there to try to instruct him with regards

10  to the 12-step program, right?

11    A.   Yes, sir.

12    Q.   Really made every effort that you could to see that

13  he would successfully complete that 12-step program just like

14  you had?

15    A.   You don't ever successfully complete it.  I've got

16  to live it everyday to have it.

17    Q.   In order to do that, in order to stay away from

18  alcohol and to stay on that program, you had to make a

19  conscious decision that that's what you wanted in your life,

20  didn't you?

21    A.   Yes, sir.

22    Q.   But you've been able to do it now for how long?

23    A.   Seven years, eleven months, and three days.

24    Q.   You said just a moment ago that when you deal with

25  an alcoholic, you don't know whether you're dealing with

1    something else, he may be a thief or something else really

2    unknown to you, right?

3        A.   Right.

4        Q.   When you were trying to deal with the -- with the

5    defendant, did you know that he was in fact a thief?

6        A.   I didn't -- I did not know he was a thief, no, sir.

7        Q.   Did you know what other things he may have done to

8    other individuals?

9        A.   The only thing I knew about as far as -- as him

10   being a thief was a little piece of paper that y'all have

11   that counts up to this point.  I did see that piece of paper.

12       Q.   When is the last time that you talked with the

13   defendant?

14       A.   To Jim?

15       Q.   Yes, sir.

16       A.   Yesterday.

17       Q.   Yesterday.  And y'all have remained pretty close,

18   haven't you?

19       A.   Yes, sir.  It's a privilege for Jim to want to spend

20   time with me or even talk to me.

21       Q.   Y'all discuss this offense?

22       A.   To the -- I've asked Jim over and over and over if

23   what he can tell me any different than he already remembers

24   and it's just the same thing.

25       Q.   He hasn't told you anything more about that?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.   No, sir.

2      Q.   And you've made several attempts to ask him?

3      A.   I ask him every time I talk to him.  Is there

4  something different that he may remember about what

5  happened.  And we wouldn't all be sitting here -- if he

6  hadn't told what he told, we wouldn't be here now.

7             MR. DAVIS:  That's all I have, Your Honor.

8                   Redirect Examination

9  By Ms. Little:

10     Q.   And he told you that he didn't mean to kill Ms.

11  Cunningham, didn't he?

12     A.   No, ma'am, he did not.

13     Q.   You're saying he didn't mean to kill her?

14     A.   He did not mean to kill her.

15     Q.   But he did kill her?

16     A.   But he did.

17                  Recross-Examination

18  By Mr. Davis:

19     Q.   And you believe him, don't you?

20     A.   Yes, sir, with all my heart.

21     Q.   Did you ever discuss the kidnapping that occurred

22  over in Arlington in August of 1997?

23     A.   Jim and I looking at that piece of paper was -- that

24  was the only one that we did not -- we couldn't put -- Jim

25  could not put a fact that he did or he didn't or who the

1    woman was or whatever, and so --

2        Q.   He couldn't remember whether he did it or not?

3        A.   Right.

4        Q.   Thank you, sir.

5        A.   All right.

6               THE COURT:  Ms. Little.

7                 Further Redirect Examination

8    By Ms. Little:

9        Q.   Randy, did you -- did you observe any positive

10   qualities in Jim during your relationship with him?

11       A.   Yes, ma'am.

12       Q.   What kinds of things could you tell the jury about?

13       A.   I took Jim -- there's a process you have to go

14   through to get somebody to help for like a rehabilitation

15   center and -- he had to go to the emergency room, and he

16   wound up in Greenville, Texas.  It's call Glen Oaks.

17       Q.   It's called what?

18       A.   Glen Oaks.

19       Q.   Okay.

20       A.   And you go there and you can walk up in the door and

21   say I'm an alcoholic and I need help and you're in.  And Jim

22   went there and you go to group meetings all during the day,

23   three or four meetings during the day, and then I was taking

24   Jim cigarettes every other day or going to visit with him

25   when I could and talk with him.  And some of the people that

1    were in there said they didn't -- as we were talking in a

2    little room and I'm talking with Jim and there's other people

3    in there, and -- they said we don't know why Jim Ed, he has

4    all the answers to the questions, because he's already had

5    the experience of working with the steps.

6        Q.    Uh-huh.

7        A.    He knew what to do, but the consistency part with --

8        Q.    He knew what to say, but he didn't know how to live

9    it; would that fair be to say?

10       A.    Yeah, right.

11       Q.    Did you find him to be a loyal friend to you?

12       A.    Oh, yes, ma'am.

13       Q.    In fact, you loved him and he loved you; is that

14   right?

15       A.    Yes, ma'am.

16       Q.    Was he helpful to you as a friend?

17       A.    Oh, yes, ma'am.

18       Q.    Did you --

19       A.    The way Jim, the way -- the way for me to keep sober

20   is when Jim comes to me for the help is I'm looking right at

21   myself when I'm looking at Jim.  I'm looking right at me.

22   This is the way I used to be too.  For every one of Jim's,

23   there's 72 more of him.  For every one of me there's 74 -- 72

24   more out there that need help that's not getting help at

25   all.  The effort was there.

```
 1      Q.   He just couldn't overcome all his problems?

 2      A.   That's right.  It's a time process.  It takes time.

 3                MS. LITTLE:  Thank you.

 4                MR. DAVIS:  Nothing further.

 5                THE COURT:  Thank you, sir.  You may step

 6   down.

 7                THE COURT:  Sheriff, let's take a 15-minute

 8   break.

 9                THE BAILIFF:  All rise.

10                (Jury removed from courtroom.)

11                THE COURT:  Counsel, we'll resume at 2:45.

12                (Recess taken.)

13                THE COURT:  If we can have the jury, please.

14                THE BAILIFF:  All rise.

15                (Jury returned to courtroom.)

16                THE COURT:  Let the record reflect the jury is

17   returning to the courtroom at this time.

18           Jury may be seated.

19           Mr. Murphy, counsel, visitors in the gallery, you

20   may be seated.

21           Raise your right hand.

22                (Witness sworn.)

23                THE COURT:  Have a seat to my left, if you

24   please, sir.

25           Defense may continue.
```

JERRY WOOD

was called as a witness by the Defendant and, after having

been first duly sworn, testified as follows:

<u>Direct Examination</u>

By Ms. Little:

    Q.   State your name, please, sir.

    A.   Jerry Wood.

    Q.   Where are you employed?

    A.   Kaufman County Sheriff's Department.

    Q.   Did you have occasion to arrest Jim Murphy some

while back in Kaufman County?

    A.   Yes, ma'am, I did.

    Q.   What was that date?

    A.   May 13th, 1999.

    Q.   What kind of call did you receive?  Is it deputy, or

what do I call you?

    A.   I'm a sergeant now.  I was a deputy at the time.  As

a deputy, I received a call with reference to a possible

attempted suicide.

    Q.   And where was that call?

    A.   Faith Baptist Church.

    Q.   Is that in town there in Kaufman, or is it --

    A.   No, ma'am, it's in -- it's out in the country.

    Q.   Okay.  And did you respond to that call?

    A.   Yes, ma'am, I did.

1    Q.   What did you find when you got there?

2    A.   We set up -- dispatch advised that the vehicle that

3    the suicidal subject was driving was at that scene.   Me and

4    my deputy set up on it at a gas station where we observed the

5    vehicle.

6    Q.   And so you got a vehicle description?

7    A.   Yes, ma'am.

8    Q.   You knew what you were looking for?

9    A.   A maroon Chevorlet pickup.

10             THE REPORTER:   A maroon?

11             THE WITNESS:   Yes, ma'am.

12   Q.   (By Ms. Little)   And did you -- did the car cross

13   your path?

14   A.   Yes, ma'am, he did.

15   Q.   And what did y'all do?

16   A.   I attempted to stop the vehicle, activated my

17   emergency lights and sirens.   The vehicle continued driving

18   approximately 45 miles an hour for about two or three miles

19   until it stopped.

20   Q.   Okay.  So it didn't stop right away?

21   A.   No, ma'am.

22   Q.   But he didn't speed off?

23   A.   No, ma'am.

24   Q.   And race away or anything?

25   A.   No, ma'am.

1    Q.    Did you approach the driver of that car?

2    A.    We did a felony traffic stop, which means we

3    instructed the driver to exit the vehicle, from our units.

4    Q.    And did the driver do that?

5    A.    Yes, ma'am, he did.

6    Q.    Do you see him in court today?

7    A.    Yes, ma'am, I do.

8    Q.    Which person is he?

9    A.    Jedidiah Murphy.

10   Q.    Okay.  When he got out of the car, what did you do

11   next, Sergeant?

12   A.    Placed him in custody and put him in the squad car.

13   Q.    Did you determine whether or not he had a drivers

14   license?

15   A.    Subsequent computer search found that he had a

16   drivers license, but it was suspended.

17   Q.    Okay.  Did you file two charges on him?

18   A.    Yes, ma'am, I did.

19   Q.    What was those?

20   A.    Evading arrest with a motor vehicle and driving

21   while license suspended.

22   Q.    Okay.  Did you talk to him about a suicide attempt

23   at all, or did he talk to you about that?

24   A.    We gave him his Miranda warning at which time he

25   advised us he wanted to kill himself and that when he got out

1    of jail, he would try to kill his self.

2         Q.   In Kaufman do you have any kind of facilities or

3    places that you take people for observation at all, or do you

4    just have to put them in jail there?

5         A.   Put them in jail and put them on suicide watch at

6    first.  And if it continues, we have a place over in Terrell

7    where we take them to for evaluations.

8         Q.   Who called you to tell you about this?

9         A.   I'm not really sure.  I think the call came in

10   through dispatch from his mother.

11        Q.   Hope Abbott?

12        A.   Yes, ma'am.

13             MS. LITTLE:  That's all I have.  Thank you.

14                        Cross-Examination

15   By Mr. Davis:

16        Q.   Sergeant Wood, while the defendant was in your

17   presence, he make any attempt to harm himself?

18        A.   No, sir.

19        Q.   Did he have any weapons on him?

20        A.   No, sir.

21        Q.   Have any weapons in the vehicle?

22        A.   No, sir.

23        Q.   You say that you would initially take them to the

24   jail, then if you felt there was a further need for

25   observation, there's a place in Terrell that you can take

1    them to?

2       A.   Yes, sir, if they -- if they attempted it in the

3    jail, there's a place in Terrell that we take them for

4    evaluation.

5       Q.   Did you ever take him to Terrell for --

6       A.   No, sir.

7       Q.   -- observation?

8       A.   No, sir, I did not.

9       Q.   So I take it then he made no efforts to take his

10   life while he was --

11      A.   No, sir.

12      Q.   -- in the jail with you, right?

13      A.   No, sir.

14      Q.   Do you know how many other times this man has

15   attempted or threatened suicide?

16      A.   No, sir, I don't.

17              MR. DAVIS:  Thank you, sir.

18          That's all I have, Your Honor.

19              MS. LITTLE:  Nothing further.

20              THE COURT:  May this witness be excused,

21   subject to recall?

22              MS. LITTLE:  Yes.

23              MR. DAVIS:  No objections.

24              THE COURT:  Defense have any objection?

25              MS. BALIDO:  No objection, Judge.

1          THE COURT:  Thank you.  You are excused.

2     Defense may continue.

3          MS. LITTLE:  Call Gary Wayne Kines.

4          THE COURT:  Ladies and gentlemen, this witness

5  has been sworn in.  He's under oath.

6          Have a seat to my left, please.

7                    GARY KINES

8  was called as a witness by the Defendant and, after having

9  been first duly sworn, testified as follows:

10                Direct Examination

11  By Ms. Little:

12     Q.   Would you state your name, please, sir?

13     A.   Gary Kines.

14     Q.   Mr. Kines, you're here today because we requested

15  that you come down; is that right?

16     A.   Yes.

17     Q.   And you're here because you're related to Jim

18  Murphy; is that correct?

19     A.   Yes, it is.

20     Q.   When you came down here originally, did you know

21  that you were going to be related to Jim Murphy?

22     A.   No.

23     Q.   What were the circumstances that you came down here?

24     A.   I came down here to be a potential juror.

25     Q.   On this case?

1      A.   Yes.

2      Q.   And in the course of your being talked to by the

3  lawyers, did you discover that you were related to Jim

4  Murphy?

5      A.   Yes, ma'am.

6      Q.   And were you afforded an opportunity to talk to him?

7      A.   Yes.

8      Q.   Did you have an emotional reaction to that?

9      A.   Yeah, it was a shock.

10     Q.   Did you know when he was living, Donnie Kines, Jim's

11  daddy?

12     A.   No.

13     Q.   Did you know that he -- did you not have any

14  relationship with him about drinking?

15     A.   Oh, you talking about Donnie?

16     Q.   Yeah, Donnie.

17     A.   Yes, yes.

18     Q.   Okay.  Let's be clear who Donnie is.

19     A.   He's my cousin.

20     Q.   Okay.  And he's Jim daddy's?

21     A.   Correct.

22     Q.   You've learned that since then, right?

23     A.   Yes.

24     Q.   Do you know anything about his drinking habits?

25     A.   Donnie's?

1    Q.   Yes.

2    A.   Yes, I picked him up on two occasions from the Palms

3  Bar down off Military Parkway in Dallas and took him home.

4    Q.   Were you living in Dallas at that time?

5    A.   Yes, ma'am.

6    Q.   And why was it necessary for to you take him home?

7    A.   He was unable to get home.

8    Q.   Drunk as a skunk?

9    A.   Yes.

10    Q.   Were you also aware of him getting in fights when he

11  was drinking?

12    A.   Yes.  On one occasion he -- he was pretty well beat

13  up.

14    Q.   Okay.  Where did that happen, if you recall?

15    A.   At the Palms.

16    Q.   Is the Palm one of those places they call a pressure

17  cooker?

18    A.   Yes, it can be.

19    Q.   Okay.  What is that?  What is a pressure cooker?

20    A.   Its just a bar where a lot of things -- very

21  volatile type situations.

22    Q.   Is that a place that's called --

23    A.   Loud, rowdy.

24    Q.   Huh?

25    A.   Loud and rowdy.

```
 1        Q.    Loud and rowdy?

 2        A.    Uh-huh.

 3        Q.    Are they called pressure cookers because supposedly

 4   wives go there during the day and cook dinner at the last

 5   minute at night in a pressure cooker; is that where that

 6   comes from?

 7        A.    Yes.

 8        Q.    That place isn't open anymore, is it?

 9        A.    No.

10        Q.    And you wound up not on this jury?

11        A.    Right.

12              MS. LITTLE:  That's all I have.  Thank you.

13              MR. DAVIS:  Nothing further.

14              THE COURT:  Thank you, sir.  You may step

15   down.  You may remain in the courtroom or be excused if you

16   wish.

17              MS. LITTLE:  Call Tonya Thorp.

18              THE COURT:  Raise your right hand, please,

19   ma'am.

20              (Witness sworn.)

21              THE COURT:  Have a seat to my left, please.

22              MS. LITTLE:  May I proceed?

23              THE COURT:  You may.

24                     TONYA THORP

25   was called as a witness by the Defendant and, after having
```

1    been first duly sworn, testified as follows:

2                       Direct Examination

3    By Ms. Little:

4         Q.   State your name.

5         A.   Tonya Thorp.

6         Q.   Tonya, are you Jim Murphy's sister?

7         A.   Yes, I am.

8         Q.   The jury has already heard a good about deal your

9    family background.  I'd like to ask you what you remember

10   about your early childhood.

11        A.   It wasn't very good.

12        Q.   Are you one of the oldest kids?

13        A.   I was the oldest.

14        Q.   Okay.  And your mother is who?

15        A.   Hope Abbott.

16        Q.   And your dad is?

17        A.   My real dad I've never met.  The only dad that I

18   remember was Donnie.

19        Q.   And do you have other siblings that were also not

20   Donnie's that were older that predated your mother's

21   relationship with Donnie?

22        A.   Yes.

23        Q.   And who are they?

24        A.   Tamera and Bob.

25        Q.   Where are they now?

1    A.   Tamera lives in Houston, and Bob is in Kaufman.

2    Q.   Are they doing okay?

3    A.   Yes.

4    Q.   Do you have any connection to them?

5    A.   Yes, I do.

6    Q.   Holidays and things like that?

7    A.   Uh-huh.

8    Q.   Once your mother your -- married Donnie, how old

9  were you at that time?

10   A.   Five.

11   Q.   And how long did you live with your mother and

12  Donnie?

13   A.   Until about 13, I guess, 7th grade.

14   Q.   Were other children born?

15   A.   Yes.

16   Q.   And who was born after you -- or your mother married

17  Donnie?

18   A.   Donnie and then --

19   Q.   Donnie Jr. and Jim who is here in court?

20   A.   Yes, and Holly.

21   Q.   And Holly.  Where is Holly now?

22   A.   Holly is in Lancaster, I believe.

23   Q.   Do you have any connection to her?

24   A.   No, not really.

25   Q.   Do you know how things have turned out for her?

1    A.   Not so good.

2    Q.   When you were a little girl, Tonya, what kind of

3  relationship did you have with Donnie Sr.?

4    A.   Not much of one.  I didn't care for him.

5    Q.   Was that largely due with the way he treated your

6  mother?

7    A.   Yes.

8    Q.   And was this both before and after Donnie and Jim

9  were born?

10    A.   Yes.

11    Q.   Do you have any memories of specific things that

12  Donnie did to your mother?

13    A.   Yes, I do.

14    Q.   Would you tell the jury about some of those?

15    A.   He beat her.  He beat her very bad.

16    Q.   Were you a witness to that?

17    A.   Yes.

18    Q.   Was there a time when you observed him smash her

19  head against the wall?

20    A.   Yes, there was.

21    Q.   Do you know about when that was?

22    A.   I was in the 6th grade.  I remember the house.

23    Q.   And where were you living at that time?

24    A.   In Kemp.

25    Q.   Kemp, Texas?

```
 1        A.    Yes.

 2        Q.    Do you know what caused that to happen?

 3        A.    Alcohol.

 4        Q.    So Donnie Sr. was a serious alcoholic?

 5        A.    Very much so.

 6        Q.    Do you remember any specifics about that argument

 7   that caused him to smash your mother's head against the wall?

 8        A.    No, no specifics on the argument.  I -- it really

 9   didn't take much of anything for him to go off.

10        Q.    And what was the result of that injury to your

11   mother?  Did she have to be hospitalized?

12        A.    No, she didn't, but I had to pull splinters out of

13   her head.

14        Q.    Where did the splinters come from?

15        A.    The wall, the paneled wall.

16        Q.    Were Donnie and Jim around then, little Donnie?

17        A.    Yes.

18        Q.    Did they witness any of this, or do you recall?

19        A.    I don't -- I don't know.  I'm sure they did.  I

20   just -- I know I was there.

21        Q.    Okay.  Was there another occasion where your

22   mother's teeth were knocked out?

23        A.    She has had teeth knocked out.

24        Q.    And who did that?

25        A.    Donnie.
```

1    Q.   Did you witness that?

2    A.   I don't -- I don't remember it -- I just -- I don't

3    know that I was right there then.

4    Q.   Do you remember how Donnie Sr. treated little Donnie

5    and Jim?

6    A.   It was very strict, very -- I mean very -- the

7    slightest thing would just set him off.

8    Q.   At some point did your mother decide she couldn't

9    stay with him anymore?

10   A.   Yes.

11   Q.   And how many kids were there in the family at that

12   time?

13   A.   Six.

14   Q.   You three from her previous life, and Donnie and Jim

15   and Holly?

16   A.   Yes.

17   Q.   Did she leave him or did he go or how did that

18   happen?

19   A.   She -- I believe she left.  And then we were all

20   with her for a little while.

21   Q.   And then where did you go?

22   A.   To my grandparents.  Donnie's parents.

23   Q.   Maggie and Ed?

24   A.   Yes.

25   Q.   Did they live close by?

1     A.    Yes.

2     Q.    And did they try to take care of y'all?

3     A.    Yes.

4     Q.    They were getting old and not well though; is that

5  right?

6     A.    Correct.

7     Q.    Did you all wind up at Buckner's Orphanage?

8     A.    Yes.  I refused and agreed to a weekend and said if

9  I didn't like it, I wouldn't stay.

10    Q.    And so where did you go because of that?

11    A.    With my Aunt Pam.

12    Q.    Pam Sherman?

13    A.    Uh-huh.

14    Q.    How long did you stay with her, Tonya?

15    A.    Several months.  It wasn't a full year.

16    Q.    And then did your mom come get you again?

17    A.    Yes.

18    Q.    And did she get anybody besides you?

19    A.    She also got Tamera and Bob.

20    Q.    And Bob?

21    A.    And Bob.

22    Q.    Okay.  What about Donnie and Jim and Holly?

23    A.    She did not get them.  I don't know at that time if

24  it was because they were already adopted by the Tolars and

25  the Veeches or if they were still in Buckner.  I don't

1   remember.

2        Q.   Okay.   Did you loose contact with the younger

3   siblings after that?

4        A.   Yes.   Yes.

5        Q.   Had you done a lot of the care taking for those

6   kids?

7        A.   Yes, I did.

8        Q.   When you were with your mother and Donnie Sr.?

9        A.   Yes.

10       Q.   Do you remember when Donnie Sr. died?

11       A.   Vaguely.

12       Q.   Was your mother already gone from that relationship?

13       A.   Yes.

14       Q.   And when is the next time that you ever saw Jim

15   Murphy who was your brother Jim Ed Kines?

16       A.   At my wedding.

17       Q.   How many times have you been married, Tonya?

18       A.   Twice.

19       Q.   And who were you marrying at your wedding where you

20   saw Jim again?

21       A.   Randy Thorp.

22       Q.   How long ago was that?

23       A.   Almost 11 years.

24       Q.   And how did it come about that y'all all were able

25   to get together again?

1    A.    We all just somehow got -- they got in contact with

2    mom, and we just all got back together.  And it just so

3    happened that my wedding was coming up, and I invited all of

4    them.

5    Q.    And which of your siblings came to the wedding and

6    Jim's siblings?

7    A.    All of them.

8    Q.    Where did you marry?

9    A.    In Caddo Mills.

10   Q.    Here's a Kleenex right here if you need one.

11   A.    Thank you.  I got married at Caddo Mills, Texas, in

12   the church there.  Had the reception out at my husband's or

13   ex-husband's aunt and uncle's.

14   Q.    So that was sort of a reunion for y'all and a

15   relationship began again?

16   A.    Yes.

17   Q.    After all those years?

18   A.    Yes.

19   Q.    At that time you didn't know anything about what had

20   happened to Donnie and Jim, did you?

21   A.    No.

22   Q.    And Holly, I guess, for that matter?

23   A.    No.

24   Q.    Did you then develop a relationship with Jim and

25   Donnie?

1    A.    Yes.

2    Q.    And how did you manage that?

3    A.    We just all came back together and were very happy

4    about it and stayed in contact.

5    Q.    Did you have holidays together and that sort of

6    thing?

7    A.    Yes, ma'am.

8    Q.    And do you know Jim's girlfriend, Chelsea?

9    A.    Yes, ma'am.

10   Q.    Who would you see more often, Donnie or Jim?

11   A.    Jim.

12   Q.    In fact, did Jim stay with you on occasion?

13   A.    Yes, he did.

14   Q.    About how many different times did he do that?

15   A.    I believe three.

16   Q.    Do you know some approximate times when that might

17   have been?

18   A.    No, ma'am.

19   Q.    How about the most recent one?  Was that in the fall

20   of last year?

21   A.    Yes.

22   Q.    Did he come and stay with you for a month or so

23   before the beginning of October of last year 2000?

24   A.    Yes.

25   Q.    At that time were you in the process of getting a

```
 1    divorce from Randy Thorp?
 2        A.   Yes, I was.
 3        Q.   Where were you living?
 4        A.   In Richardson.
 5        Q.   Was that a house that you had with Randy and your
 6    children?
 7        A.   Yes.
 8        Q.   What children do you have, Tonya?
 9        A.   I have Ashley and Miranda.
10        Q.   And how old are they?
11        A.   Ashley will be 14 next month, and Miranda will be 7
12    in September.
13        Q.   When Jim came to stay with you, he was not working
14    at that time; is that correct?
15        A.   He was not.
16        Q.   And why did he come and stay with you?
17        A.   Him and Chelsea were having some problems.
18        Q.   He and Chelsea were having problems?
19        A.   Yes.
20        Q.   And they have been living where, do you know?
21        A.   Wills Point.
22        Q.   Wills Point?
23        A.   Yes.
24        Q.   Okay.  While he stayed with you, did he participate
25    and contribute to your family life in any way?
```

1    A.    Yes, he did.

2    Q.    What did he do?

3    A.    At that time I was working a lot of hours and worked

4    late and I could call him up and say, hey, I'm going to work

5    late, can you watch the kids and feed them, and he did.  He

6    would have dinner cooked and the house picked up when I got

7    home.

8    Q.    So he helped you throughout that month and a half or

9    so prior to this case that we're here about today?

10   A.    Very much.

11   Q.    Were you aware of any problems that he was having at

12   that time?

13   A.    No, ma'am.

14   Q.    Had you known -- been confided in about any of those

15   problems before the visit that was right before this case?

16   A.    I knew very little of it.  And just didn't talk

17   about it very much, chose not to.

18   Q.    Had you talked with him over the years about his

19   various placements after he left y'all?

20   A.    I knew where he was placed.

21   Q.    Okay.  So basically you had sort of someone to take

22   care of your kids for you while you were working when you

23   were trying to get a divorce and there was a lot of upheaval

24   in your life?

25   A.    Yes.

1     Q.   And in fact you talked to the police early on when

2  this case happened, didn't you?

3     A.   Yes, ma'am.

4     Q.   And so did your mother?

5     A.   Yes.

6     Q.   Were you aware that Jim had a drinking problem?

7     A.   Yes.

8     Q.   How long had you known about that?

9     A.   You know, I don't know.  I knew that he had been in

10  AA and with Randy Crow's help tried to overcome it.

11     Q.   Did you ever see him intoxicated that you know of?

12     A.   One time, one time.

13     Q.   So for the most part when he was around you and

14  close family members, other than Chelsea, he -- he didn't

15  appear to drink to you?

16     A.   No, never in my house.

17     Q.   Okay.  Did you see him after he was arrested?

18     A.   Yes.

19     Q.   How did he appear to you?

20     A.   Very upset.  He wouldn't look at me.  Just kept his

21  head down.  Just cried.  He was very upset.

22     Q.   And you've talked to the police on a number of

23  occasions?

24     A.   Yes, I did.

25     Q.   And gave them any information that you had?

```
 1        A.    Yes.

 2        Q.    As far as you know, Jim gave whatever information he

 3   had?

 4        A.    Yes.

 5        Q.    And you're here to support him today?

 6        A.    Yes, I am.

 7        Q.    You know this case is a very bad case?

 8        A.    Yes.

 9        Q.    Is there anything you can tell this jury that would

10   see -- so they can see Jim as being more than the sum of this

11   case?

12        A.    He is so much more than this.  I don't know what

13   happened.  This is not my brother.  This was not the sweet

14   brother that I love.  I don't know what happened.

15        Q.    In the time that you've been back in a relationship

16   with him since your wedding, have you had an opportunity to

17   discover if he gets his feelings hurt, if he feels bad about

18   things when he does the wrong thing?  Do you know anything

19   about that?

20        A.    No.  He pretty much keeps everything to himself.

21        Q.    But he's helpful to you and your kids?

22        A.    Very much, and my children love him.

23        Q.    And he has a relationship with his mother again?

24        A.    Yes.

25        Q.    Were you aware that he had been in these various
```

1  hospitals?

2      A.   Somewhat.  I recall -- Glen Oaks or Glen something

3  maybe in Greenville.  But I couldn't tell you for how long.

4  And I know that he had sought help awhile back from Terrell

5  State Hospital and was turned away.

6      Q.   Okay.  So somewhere along there you became aware

7  that he was a miserable person --

8      A.   Yes, ma'am.

9      Q.   -- not coping with whatever was going on with him?

10     A.   Yes.

11     Q.   Were you aware of any suicide attempts?

12     A.   Yes, I was.

13     Q.   What do you know about that, Tonya?

14     A.   I knew that he took some -- some pills and ended up

15  in the hospital.  As soon as I found out, I drove to Kaufman

16  to the hospital and pretty much --

17     Q.   Do you know Chelsea?

18     A.   Yes.

19     Q.   And have you -- have y'all socialized, you and

20  Chelsea and Jim?

21     A.   Yes.

22     Q.   And you know her children?

23     A.   Yes.

24     Q.   What have you observed about Jim's relationship with

25  that family unit and with those kids?

1    A.   He's a good daddy.  And Jim and Chelsea have always

2    gotten along in front of me.

3    Q.   In front of you they have?

4    A.   Yes, ma'am.

5    Q.   And he adores those girls, doesn't he?

6    A.   Very much so.

7    Q.   Did your father ever make any kind of pass at you,

8    Tonya?

9    A.   Yes, he did.

10   Q.   It didn't actually amount to anything full scale,

11   did it?

12   A.   No.

13            MS. LITTLE:   I'll pass this witness.

14                     Cross-Examination

15   By Mr. Davis:

16   Q.   Ms. Thorp, you just let me know if you need to take

17   a break.  Okay?

18   A.   Okay.

19   Q.   Concerning what happened with -- with your father

20   and the defendant, your father never did abuse your brother

21   Jim, did he?

22   A.   They got their butts spanked.  I wouldn't say

23   abused.  I don't know everything that went on.

24   Q.   So as far as you know, he was never physically or

25   sexually abused by your father, was he?

1    A.    No, not that I'm aware.

2    Q.    When you came back in contact with him, that was 11

3    years ago; is that right?

4    A.    Uh-huh.

5    Q.    So your brother would have been, what, about 14

6    years old, 15 years old, something like that?

7    A.    Something like that, yeah.

8    Q.    And since that time, since he's been 14 or 15 then,

9    you and other members of the family have had a relationship

10   with him, haven't you?

11   A.    Yes.

12   Q.    Would it be fair to say that you and other members

13   of the family have tried to be there for him, tried to help

14   him?

15   A.    Yes.

16   Q.    If your brother at any time had come to you and

17   said, you know, Tonya, I need some help, would you help me

18   with drugs, alcohol, my anger, what's happening with Chelsea,

19   would you have turned your back on your brother?

20   A.    No.

21   Q.    With regards to when he took the pills and

22   eventually went into Oak Haven, you know, don't you, that he

23   told the people down there that he did that just to get

24   attention?  Do you know that?

25   A.    No, I didn't.

1      Q.   And as far as you know, your brother never did drink

2   while he was there at your house, did he?

3      A.   No, not that I was aware.

4           MR. DAVIS:  That's all I have.  Thank you.

5                    Redirect Examination

6   By Ms. Little:

7      Q.   Tonya, once all of this trouble began in October,

8   did you go home after you thought something -- that Jim might

9   be involved in this some way?

10      A.   Yes, I did.

11      Q.   What did you find when you got there?

12      A.   I found a suicide letter on the table.

13      Q.   Do you know what's ever happened to that suicide

14   note?

15      A.   I gave it to Matt Myers at the Garland police.

16      Q.   So the Garland police have that note?

17      A.   Yes.

18      Q.   Do you recall what it said?

19      A.   I can't remember everything.  Just said that he was

20   upset and distraught and not happy and wanted to see his kids

21   and he was going to kill himself.

22      Q.   Did you find any evidence in your house -- was

23   anything unusual in the garage when you went in there?

24      A.   Yes, there was.

25      Q.   What was in there?  What did it look like out there?

1      A.    I found some hoses, like my vacuum cleaner

2  attachment hoses and my dry vac from the garage.  And I don't

3  know -- like a -- a hose from a car or something that were

4  out there attached together.

5      Q.    Do you know if pictures were taken of those before

6  they were removed from your garage?

7      A.    I don't remember if they took pictures or not

8  before.

9      Q.    Did you ever become aware that -- did you keep

10 liquor in your house, Tonya?

11     A.    Yes, I did.

12     Q.    Are you much of a drinker?

13     A.    No.  Socially.

14     Q.    Okay.  So about how often would somebody go in and

15 have a drink at your house?

16     A.    Not very often.

17     Q.    Did you have some bottles of liquor in your house?

18     A.    I did.

19     Q.    At some point did you go check them to see what

20 was -- if you had liquor or not?

21     A.    Actually I was cleaning my bar.  There was glass and

22 it was getting dusty.  I was just taking the bottles and the

23 glasses off and washing them.  And when I went to get the

24 bottles, they were -- they were empty.

25     Q.    Do you know how long that was after this October

1    4th?

2        A.   I would say a few weeks.

3        Q.   A few weeks?

4        A.   Yeah, two or three weeks, something like that.

5             MS. LITTLE:   I'll pass the witness.

6                    Recross-Examination

7    By Mr. Davis:

8        Q.   Tonya, do you remember the Garland Police Department

9    specifically asking you whether any liquor was missing from

10   your house?

11       A.   No, I do not.

12       Q.   And do you remember actually telling the Garland

13   Police Department shortly after this happened that you

14   couldn't tell whether anything was missing from your house?

15       A.   No, I don't remember that.

16       Q.   Do you remember being asked specifically by the

17   Garland Police Department to look for a missing or an empty

18   champagne bottle?

19       A.   Maybe some champagne.  I don't -- I don't remember.

20   I know I didn't look up at the liquor on the bar.  It never

21   crossed my mind.  I mean, it was up there for -- for so long.

22       Q.   And so when the Garland police asked to you do that

23   for them, you came back and told them that you couldn't tell

24   whether anything was missing from your house liquor wise,

25   didn't you?

DARLINE W. LABAR, OFFICIAL REPORTER

Page 225

1        A.    I don't recall what I said to them.

2        Q.    As far as what you found in your garage, you don't

3   know whether your brother really used those in any way or

4   not, do you?

5        A.    I don't know if he used them or not, no, but I know

6   they were put together.

7        Q.    Has he told you what he did to Ms. Cunningham?

8        A.    No, I don't -- I mean, I know that he said it was an

9   accident.

10       Q.    Did he tell you why he took her ATM card?

11       A.    No.

12       Q.    Less than hour after he abducted her and tried to

13   use it to obtain money?

14       A.    No.

15       Q.    Did he tell you why he tried to use the same card

16   down on Harry Hines later that day?

17       A.    No.

18              MR. DAVIS:   Thank you.   That's all I have.

19                     Further Redirect Examination

20   By Ms. Little:

21       Q.    And he didn't tell you, I guess, why he put his own

22   name on every one of those signed cards?

23       A.    He did not.

24              MS. LITTLE:   That's all I have.   Thank you.

25              MR. DAVIS:   Nothing further.

1          THE COURT:  You may step down, ma'am.

2      Defense may continue.

3          MS. LITTLE:  May she be excused?

4          MR. DAVIS:  No objection.

5          THE COURT:  You may be excused.  Remain in the

6  courtroom or be excused as you wish, ma'am.

7          THE WITNESS:  Thank you.

8          MS. LITTLE:  Hope Abbott.

9          THE COURT:  Ask you to raise your right hand,

10  please, ma'am.

11              (Witness sworn.)

12          THE COURT:  Have a seat to my left, please,

13  ma'am.

14                  HOPE ABBOTT

15  was called as a witness by the Defendant and, after having

16  been first duly sworn, testified as follows:

17                Direct Examination

18  By Ms. Little:

19      Q.   Would you state your name, please, ma'am?

20      A.   My name is Hope Abbott.

21      Q.   Ms. Abbott, are you Jim Murphy's mother?

22      A.   Yes, I am.

23      Q.   And you're Tonya's mother as well; is that correct?

24      A.   I'm sorry?

25      Q.   You're Tonya's mother as well?

```
 1        A.   I am.

 2        Q.   How many children do you have altogether?

 3        A.   I have six children.

 4        Q.   Were you married to Donnie -- Donnie Kines?

 5        A.   Yes, ma'am.

 6        Q.   How long were you married to him?

 7        A.   Donnie and I were married up until the day he died.

 8   We never were divorced.

 9        Q.   Did you stay with him, though?

10        A.   No, ma'am, I did not.

11        Q.   How long were you together before you left him?

12        A.   Approximately eight years.

13        Q.   And how long after -- after that was it that he

14   died?

15        A.   (No response.)

16        Q.   If you know?

17        A.   About three years later.  Two to three years later I

18   would say, as best I can recall, I'm sorry.

19        Q.   Okay.  Did you -- were you in a position where you

20   weren't able to keep all of your children?

21        A.   Yes, ma'am.

22        Q.   Did you have some help from Donnie Sr.'s parents for

23   a while?

24        A.   Off and on as much as they possibly could.  They

25   were -- I had no family.  I was adopted, an only child.  My
```

1  parents had passed away many years before.   There was no

2  family.   In all reality they helped as much as they possibly

3  could.   They were not wealthy.   Pam Sherman stepped in and

4  helped trying to get the children placed due to the fact that

5  I had had a stroke and was not able to care for everyone.

6  And Donnie signed the papers as well.

7       Q.   Okay.

8       A.   For the adoption to take place.

9       Q.   Were you able to keep up with your kids as they grew

10 up?

11      A.   In the beginning we were told that we would be able

12 to have regular visitation, that they would be able to see

13 us, they would have contact with their siblings.   And after

14 the papers were signed, this never took place.   It never

15 happened.   In fact, I was told that if I made contact with

16 them at all, that Mr. and Mrs. Kines would not be able to see

17 the children at all.

18      Q.   Okay.

19      A.   So, no, we were not.   When Jim Ed went to the

20 Murphys and Donnie ended up going to Mr. Looney, later on,

21 after they left their first adoptive home, then I got to

22 speak with Jim Ed.   And of course Garth made sure that Donnie

23 and we got to keep in contact with him at that time.

24      Q.   Okay.   During your marriage to Donnie Kines, Sr.,

25 was that a fairly rocky relationship?

DARLINE W. LABAR, OFFICIAL REPORTER

1        A.    Very brutal.

2        Q.    And you were not a drinker; is that correct?

3        A.    Oh, no, ma'am, not at all.

4        Q.    But he was?

5        A.    Yes, ma'am.

6        Q.    And his father, who's called Uncle Ed, drank a lot,

7    also, did he not?

8        A.    Yes, ma'am.

9        Q.    But he was a functional alcoholic; would that be

10   fair to say?

11       A.    As far as I know, he never missed a days work.  And

12   Donnie was a running alcoholic.  There might be a morning

13   that he would get up, appear to be fine, be cheerful, say

14   I'll see you this afternoon, and he'd be gone for two to

15   three weeks.  We'd never know where he was.

16       Q.    Were you working at that time?

17       A.    No, ma'am.

18       Q.    What decade was this in?

19       A.    The 70's.

20       Q.    The 70's, and early '80's or 70's?

21       A.    70's, yes, ma'am.

22       Q.    Was he physically abusive to you?

23       A.    Yes, ma'am.

24       Q.    What kind --

25       A.    If you'll notice, I have no teeth.

1     Q.   Do you know about when that happened?

2     A.   It started almost immediately after we married.  As

3  I say, I was an only child, an adopted child.  And my mother

4  and daddy always told me that I was the best thing since

5  sliced bread and I had very long hair.  I had my teeth

6  cosmetically done and he went after everything he could take

7  from me.

8     Q.   What kind of things would stir him up?

9     A.   It really -- a variety.  It didn't really make any

10  difference.  I would get told if we looked at pictures that I

11  lived in the past.  If I got a whatnot down that belonged to

12  my mother or things like this, it would become a

13  confrontational situation because he always thought that I

14  wanted to be better and -- which I never understood, but

15  that's what he felt, or I thought at that time he felt.

16     Q.   Did he hit on you on a regular basis?

17     A.   Yes, ma'am.

18     Q.   And was that from the time that you married him just

19  about?

20     A.   Yes, ma'am.

21     Q.   Did that continue after Donnie and Jim and Holly

22  were born?

23     A.   Oh, yes, ma'am.  It got worse because then if he

24  couldn't get me to fight, he would go after them.

25     Q.   Were you working originally when you were married to

Page 231

1    Donnie Sr.?

2        A.    Yeah, I have worked.  And that was something that he

3    did not approve of.  I was not allowed to.  There were a lot

4    of things that Donnie had strange ideas about.  One was a

5    woman working.  He felt that it was a man's place.  He

6    wouldn't let me take birth control pills.  He felt that any

7    woman who did that was morally going out to get away with

8    what she could get away with.

9        Q.    A cheap floozie sort of woman?

10       A.    Exactly.

11       Q.    Okay.

12       A.    And yet I never went to the clubs with him.  I never

13   went to the bars with him.  He always went on his own and --

14       Q.    You were in the nursing field however though; is

15   that correct?

16       A.    Yes, correct.

17       Q.    What kind of work did he do?

18       A.    He was construction, heavy equipment operator.

19       Q.    And what kinds of things would he do to the

20   children?

21       A.    He hollered, screamed, threatened, could be verbally

22   abusive.  He never got a chance to be really physical because

23   like I said, normally if that started, I would throw myself

24   right in between him and the babies and we'd go at it.

25       Q.    What made you finally decide to go?

DARLINE W. LABAR, OFFICIAL REPORTER

1   A.   Well, when I got beat down into the floor, I have --

2   I had a depression in the back of my skull.  You get your

3   teeth all knocked out.  You end up having to have surgery on

4   your mouth to remove the majority of bone.  I have

5   one-quarter inch left for which now I'll have to have

6   implants done.  I can no longer wear a plate.

7   Q.   Did he do that with his hands, or how did he hit

8   you?

9   A.   Fist.

10   Q.   And he threw you into the wall one time, too; is

11   that correct?

12   A.   Yes, he did and then beat me into the floor.

13   Q.   Is that when Tonya had to pull the splinters out of

14   your head?

15   A.   Yes, ma'am.  That is the crowning blow is when you

16   catch your little 8-year-old on his back screaming, get your

17   hands off my mother or I'll kill.  You know, you become, in

18   my opinion, as dysfunctional as the person that you live with

19   without really realizing it until something like that occurs

20   and then you see the damage that it does to everyone.

21   Q.   So you got out of the situation, but your kids had

22   to go elsewhere, most of them did?

23   A.   I hung on for a long time.  We moved to Terrell, and

24   I went to work for the State.  And I was working two jobs.

25   And I went to work at 6:30 in the morning, got off at 2:30 in

1    the afternoon, reported for duty at the State hospital at a

2    quarter of 3:00 and worked until 11:15, and I ended up with a

3    stroke.

4        Q.    So then things had to change after that?

5        A.    Yes, I was in the hospital for three weeks.

6        Q.    During the time that you were married to Donnie,

7    this is before we had all these family violence laws and

8    everything; is that right?

9        A.    Oh, yes.

10       Q.    Were the police called to your house?

11       A.    Many times.

12       Q.    Did Donnie ever get arrested?

13       A.    No, ma'am.  It was considered civil disturbance.

14   Basically what I got told was that I was married to him, it

15   was a civil disturbance, so what they were actually telling

16   me is if he decided to let me have it, there wasn't anything

17   they could do about it, unless they saw it or unless he hurt

18   me really bad.

19       Q.    Well, what about the time you got splinters in your

20   head and knocked your teeth out?  Did the police come out

21   those times?

22       A.    Yes, ma'am.

23       Q.    And nothing was done?

24       A.    No, ma'am.  The only person I can honestly say that

25   finally stepped up to the plate, we had a Sheriff in Kaufman,

1    and of course it was just something that was said.  I don't

2    know if it was ever documented.  And after he had gotten me

3    really good with the belt and with his first, Roy Brockaway,

4    who was the Sheriff, told him that, you know, that if he did

5    it again, that if I shot him, he was going to help me -- he

6    would help me.

7                    THE REPORTER:  Could you say his last name

8    again, please?

9                    THE WITNESS:  Brockaway, B-r-o-c-k-a-w-a-y.

10       A.    Because it was terrible.  I mean, it was just an

11   awful thing.  And the kids would be screaming, and it was

12   awful.

13       Q.    (By Ms. Little)  Now, Donnie's parents did help with

14   the kids for a little while, didn't they?

15       A.    Yes, they loved them very much and -- yeah, they

16   tried.  But as the old saying goes, blood is thicker than

17   water.  So when it came to me being there or him being there,

18   naturally, you know, they're not going to throw their son

19   out.

20       Q.    Uh-huh.

21       A.    But I really don't think that they would have ever

22   allowed him to truly abuse them if his daddy were aware what

23   was going on.

24       Q.    Okay.

25       A.    Now, if Margaret was there, I didn't worry about it

1    too much because she was not a drinker.  Ed, on the other

2    hand, was and when he was with us and not completely

3    oblivious, he wouldn't let him, you know, do anything to the

4    kids either.

5        Q.    Okay.  Now, did you lose touch altogether with

6    Donnie and Jim and Holly for a period of time?

7        A.    Yes, I did.

8        Q.    Do you recall how long a period of time that might

9    have been?

10       A.    Probably -- I'm going to say Holly about 8 years.

11   Jim probably about the same.  And then we -- we found out

12   that he had been adopted by the Murphys, and I remember

13   calling him on one of his birthdays.  I think it was his 13th

14   birthday.  And they did allow us to speak to him, for which I

15   was very grateful.  We did not get back in to full contact --

16   I came into contact with Donnie first.  And then Ruth and her

17   husband were having a lot of trouble with Holly, and she

18   called.

19       Q.    This is the Veeches?

20       A.    Yes, ma'am.  And she called me and told me that they

21   just didn't feel they could any longer keep her and do what

22   needed to be done and did I want to take her back and of

23   course I said yes.

24       Q.    Uh-huh.

25       A.    And then when Tonya got married -- well, Jim Ed had

```
 1    come with Donnie to the house one time.  I think that's when

 2    he had his foot hurt.  And that was the first time I had seen

 3    him in a long time.  And we spoke, but didn't push anything.

 4    And then at Tonya's wedding, we just all got together and

 5    were having a good time.  And it was like we were never

 6    apart.  And after that, he got into some trouble, and I

 7    helped him as much as I could, stood by him.  And when he got

 8    out, well, he came to live with me.

 9        Q.    And since that time, you've developed your

10    relationship again?

11        A.    Like -- it was just like we shut one door and opened

12    another.  It was wonderful.

13        Q.    And how old was he by the time that actually

14    happened, Hope?

15        A.    Okay.  He was 18.  He came to live with me probably

16    at 19.

17        Q.    And over the course of this, are you aware that he's

18    been a troubled person with problems he couldn't seem to get

19    a handle on?

20        A.    We didn't realize that it was as deep seeded as

21    perhaps it was.  I know that he had told me after he had

22    gotten into some trouble and tried to commit suicide, that he

23    had sought help several times at Terrell and was turned away.

24    So when he was released from Kaufman Hospital, the Sheriff's

25    Department went with me to Terrell in transport to take him.
```

1   And I was there when they did turn him away, even though we

2   had an order for admission.  They felt it was an alcohol and

3   drug problem, not a psychological or psychiatric.  So we went

4   back home that night.  And the next day we went to Canton,

5   and they helped us at -- I can't even think of the name of

6   the place.  I'm so sorry.

7       Q.   It was a place in Canton, though?

8       A.   Yes, ma'am, outreach clinic type thing, and they

9   helped us find a drug and alcohol program that we could get

10  him into.

11      Q.   And do you know about when that was?

12      A.   I believe, if I'm not mistaken, that was in

13  October -- September, October.

14      Q.   Of what year?

15      A.   '98.

16      Q.   Okay.  Then in '99 did you -- did he get arrested --

17      A.   Yes, ma'am.

18      Q.   -- on a suicide call in Kaufman?

19      A.   Yes, ma'am.

20      Q.   Did you try to get him into some kind of treatment

21  for that?

22      A.   We -- he ended up going -- they took him to jail,

23  and I went ahead and bonded him out the next day.  And then

24  he -- I can't remember if it was that time or the next.  I've

25  got all the dates written down.  It just all runs together.

1   I'm so sorry.  He went to Greenville, and they treated him in

2   Greenville.  And then from Greenville, he went to Timberlawn.

3       Q.   Okay.

4       A.   And he did fairly well.  The medication, of course,

5   was very strong.  And I think it scared him a little bit that

6   it had the control that it had.  But he seemed to have done

7   well.

8       Q.   Okay.

9       A.   And then he went back home to Chelsea after a time,

10  and everything seemed to be going pretty good.  And then of

11  course, you know, typical young folks, they --

12      Q.   Fussed --

13      A.   Fussed, yeah -- you know, you can't blame one or the

14  other on any of that.  It was just something that happened.

15  And he ended up coming to his sister's.

16      Q.   And did he help her around the house?

17      A.   Absolutely.  He was wonderful.  His nieces love him

18  very much.  The kids that were friends of Ashley's who is 13

19  years old would come by and see him all the time.  He was

20  absolutely great with them.  He's a sweet, kind, lovable

21  person.

22      Q.   That's the Jim you know?

23      A.   Yes, ma'am, it certainly is, always has been.

24      Q.   Now, you have some health problems right now

25  yourself; is that correct?

1    A.   Yes, ma'am.

2    Q.   What is that?

3    A.   I've got atherosclerosis.  I have got hypertrophy of

4 the left ventricle, congestive heart failure, GERD.

5    Q.   And so we weren't actually sure whether you'd be

6 able to come today, but you have been able to come; is that

7 right?

8    A.   Uh-huh, you bet.

9         MS. LITTLE:  Thank you.  That's all I have.

10 I'll pass the witness.

11                   Cross-Examination

12 By Mr. Davis:

13   Q.   Ms. Abbott, my name is Greg Davis.  I just have a

14 few questions for you this afternoon.  If you need to take a

15 break at any time, just let me know.

16   A.   Thank you, Mr. Davis.

17   Q.   Going back to when your son was living with you and

18 his father, your husband never did beat any of the children

19 in that home, did he?

20   A.   Oh, he whacked them a couple of times, but that's

21 when we would go at it, Mr. Davis, I'm not going to lie.

22 Yeah, he did.

23   Q.   He did beat them?

24   A.   He tried.

25   Q.   Okay.  Well, I need to know specifically with

Page 240

1  regards to the defendant, to your son, are you saying that

2  your husband beat him or not?

3      A.   Yes, I am saying that he -- now, when you're using

4  the term "beat," I mean -- I never allowed him, you know,

5  very much, because we would jump in there.  But, yeah, he hit

6  him, you bet he did, just like he did the rest of them.

7      Q.   Ms. Abbott, do you remember talking with Dr. Mary

8  Connell about this case?

9      A.   Yes, I do.

10     Q.   Do you remember Dr. Connell asking you about that

11 very same subject, about whether your husband ever beat the

12 children in the home?

13     A.   Right.

14     Q.   And do you remember telling Dr. Connell during a

15 telephone interview that when the children were young and

16 still at home with them, with you and your husband, they were

17 never beaten?

18     A.   When I'm using the term "beaten," I want to make it

19 perfectly clear, Mr. Davis, without ad-libbing or taking away

20 from, I need to know your definition of beat, number one.

21 Number two, he hit the tar out of them.  And that's when we

22 would get into the fight.  This is what happens.  But, no --

23 I mean, as far as being able to let him lay into them and

24 continue it, absolutely not.

25     Q.   Ms. Abbott, you yourself were adopted as a child,

1   weren't you?

2       A.   I certainly was.

3       Q.   If you don't mind my asking, how old were you when

4   you were adopted?

5       A.   I was two weeks old when my mother and dad got me,

6   six weeks old when I was adopted.

7       Q.   With regards to what may have happened in the Tolar

8   home, is it my understanding that you really had no contact

9   with -- with your sons Donnie or Jim during the time that

10  they were living with the Tolars?

11      A.   We went over there a couple of times.  After that,

12  it was very strained.  We were asked not to.

13      Q.   Okay.  So as far as what -- what really happened in

14  that home between the Tolars and your two sons, you really

15  don't have that much personal knowledge, do you?

16      A.   Only what I have been told.  And I don't know why

17  any little boys would want to tell you that.

18      Q.   Who -- who told you about what happened at the Tolar

19  home?

20      A.   Donnie and Jim.

21      Q.   And when did they tell you?

22      A.   Oh, it's been -- it's been awhile back.  They were

23  telling me about that after they left.  I didn't know about

24  what I would consider some of the sexual abuse until much

25  later on, but I did understand that they were supposed to

1  have been physically abused, psychologically abused,

2  deprived, and was very angry.

3      Q.  All right.  How long after they left the Tolar home

4  did they first tell you that they had been physically or

5  psychologically abused by the Tolars?

6      A.  I heard it first from Donnie when Donnie was at the

7  boys' home.

8      Q.  So that's --

9      A.  Pardon me?

10     Q.  That's while they're at the Fruitvale Children's

11  Center, right?

12     A.  Yes.

13     Q.  When did Jim Ed first tell you he had been

14  physically abused by the Tolars?

15     A.  After -- after he came to live with me, we talked

16  about that.

17     Q.  So it wasn't until age 19?

18     A.  Right.

19     Q.  And by the time he told you, Ms. Abbott, he was

20  already on two felony probations out of Van Zandt County,

21  wasn't he?

22     A.  Yes, sir.  But never used it for an excuse, Mr.

23  Davis.

24     Q.  And the allegation of sexual abuse that the Tolars,

25  who told you about that?

DARLINE W. LABAR, OFFICIAL REPORTER

1     A.   I'm not comfortable discussing that.

2     Q.   Was that sometime recently?

3     A.   Yes.

4     Q.   Within the last -- last few months?

5     A.   Yes.

6     Q.   Has it been since your son has been charged with

7  this offense, Ms. Abbott?

8     A.   Yes.

9     Q.   As I understand then since your son has been

10  somewhere in the neighborhood of 13 or 14 then, you've had an

11  ongoing relationship with him, haven't you?

12     A.   Not with Jim.  With Donnie, yes.  As I say, Garth

13  allowed us to talk to him.  I spoke with Jim on the phone.

14  We did not see him when he was with the Murphys.

15     Q.   And he is -- he is how old now?

16     A.   Who, Jim?

17     Q.   Yes.

18     A.   He was born in '75, so he's 25 years old -- will be

19  26.

20     Q.   So since he came to live with you, certainly that's

21  been around six years ago, as I understand, you've had an

22  ongoing relationship with him?

23     A.   Most assuredly.

24     Q.   And, Ms. Abbott, would it be fair to say that --

25  that you and as far as you know, every other member of your

1    family has done everything they could possibly do for your

2    son?

3         A.   In what capacity?

4         Q.   Well, in trying to help him with whatever kind of

5    problems he's had?

6         A.   Of course.  I mean, we're a close-knit family.

7    We'll do whatever we can do to help each other, most

8    assuredly, as he would help us.

9         Q.   As far as -- as far as how your son interacted with

10   the Murphys, your understanding was that things were pretty

11   good for your son at the Murphy home, weren't they?

12        A.   Yes, sir.

13        Q.   Then he had the problems down in Van Zandt County,

14   right?

15        A.   Yes, sir.

16        Q.   Had to go to boot camp, I think?

17        A.   Yes, sir.

18        Q.   And then as I understood your testimony, then when

19   he came back from boot camp, after he was already placed on

20   probation is when he started living with you, right?

21        A.   Yes, sir.

22        Q.   And you stood with him -- stood by him even after he

23   had legal problems?

24        A.   Oh, yes, sir.

25        Q.   Thank you, ma'am.

```
 1                    THE COURT:  Ms. Little, anything further?

 2                    MS. LITTLE:  No, sir.

 3                    THE COURT:  You may step down, ma'am.

 4                    MR. DAVIS:  I'm sorry, I had one additional

 5       question.

 6            Q.   (By Mr. Davis)  Ma'am, your son has -- your son has

 7       written to you from jail, hasn't he?

 8            A.   Yes, sir.

 9            Q.   On few or many occasions?

10            A.   Many.

11            Q.   Do you recall a letter in which your son used code

12       to communicate with you?

13            A.   Yes, I do.

14            Q.   And --

15            A.   It's not code.  It was numbers.  It was my

16       understanding that his mail had been held, and he felt that

17       in order -- it was just a silly prank.  And he wrote down a

18       series of numbers which, good Lord have mercy, I would have

19       no way of decoding to start with.  And I did not answer it

20       back that way.  We never -- if you'll notice, I mean there

21       was no response from me.

22            Q.   So --

23            A.   It was just a silly kid thing.

24            Q.   So in order to -- to avoid anyone in the Sheriff's

25       Department or anyone else from reading his mail then, he used
```

1    a series of numbers to --

2         A.    No.

3         Q.    -- in a letter to --

4         A.    No, he just did it one time as a stunt.  It was --

5    it was not to -- to impress anyone or to try to put anything

6    over on anyone.  It had absolutely no meaning whatsoever,

7    other than a bunch of numbers written down on a piece of

8    paper.

9              MR. DAVIS:  Your Honor, I have no further

10   questions, but at this time I'm going to offer State's

11   Exhibit Number 148 which are business records of Dr. Richard

12   Ingrim.

13             (State's Exhibit No. 148 offered)

14             MS. LITTLE:  No objection.

15             THE COURT:  Admitted.

16             (State's Exhibit No. 148 admitted)

17             MR. DAVIS:  May I please publish to the jury.

18             THE COURT:  You may.

19             MR. DAVIS:  Ladies and gentlemen, State's

20   Exhibit 148 will be the official business records of Dr.

21   Richard Ingrim.  These records indicate that Dr. Ingrim saw

22   the defendant, Jedidiah Murphy, on May the 16th of 1985,

23   which would have been during the time he was living with the

24   Tolars.  His name listed on the records will be Jim Tolar,

25   that on May the 16th of 1995, that the defendant was seen by

1    Dr. Ingrim because he had an insect sting on his left calf at

2    the time, possible bite -- spider bite, that he was treated

3    and released that same day.

4           The next entry on the records will indicate that on

5    July the 14th of 1986, the defendant was seen by Dr. Ingrim.

6    The notation at that point:  Patient is here for physical

7    exam for scout camp.  He is in excellent health.  However,

8    he's complaining in his left foot.  Eyes, ears, nose, and

9    throat is clear.  Chest is clear.  Heart has regular rhythm

10   without murmur.  Abdomen is soft with normal bowel sounds.

11   Left foot is tender in the mid instep.  Impression, flat

12   feet.  Otherwise, healthy child exam.  Plan:  High insteps in

13   his shoes.  No other restrictions --

14          The final entry by Dr. Ingrim will be January the

15   5th, 1987, which will be after the defendant left the Tolar

16   home he was placed at the Fruitvale Children's Shelter.

17   Again, stated 1-5 of '87:  This child -- the child has just

18   been placed in a children's shelter.  No evidence of

19   psychological or physical abuse is noted.  Physical exam is

20   excellent today.  Eyes, ears, nose, and throat unremarkable.

21   Chest is clear.  Heart has regular rhythm without murmur.

22   Abdomen soft with normal bowel sounds and normal gait.

23   Impression:  Well child exam.  Plan:  No treatment at this

24   time.  And again, that's from Dr. Richard Ingrim on January

25   the 5th of 1987.

1          Thank you, Your Honor.

2                    THE COURT:  Pass the witness.

3                    MS. LITTLE:  Nothing further.

4                    THE COURT:  Mr. Davis, you pass the witness?

5                    MR. DAVIS:  Yes, I have, Your Honor.

6                    MS. LITTLE:  Nothing further.

7                    THE COURT:  Thank you, Ms. Abbott.  You may

8    step down.

9                    MS. LITTLE:  May we approach the bench?

10                   THE COURT:  You may.

11                   (Counsel approaches the bench.)

12                   THE COURT:  Ms. King, let the record reflect a

13   scheduling hearing occurred at the side of the bench, outside

14   the presence and hearing of the reporter, the defendant, and

15   the jury.

16          Ladies and gentlemen, it's my understanding that the

17   defense anticipates their next witness to make a visual

18   presentation to you which will take a bit of time to set up

19   so we will stand in recess until tomorrow morning 9:15.

20   We'll resume the testimony at that time.

21          Please recall the instructions that I have

22   previously given you.

23                   THE BAILIFF:  All rise.

24                   THE COURT:  Have a good evening, 9:15.

25                   (Recess of proceedings.)

1          THE COURT:  Jury has been excused from the

2     courtroom at this time.

3          Visitors in the gallery, you may be seated or

4     excused.

5          MR. DAVIS:  Yes, sir, with regards to the

6     presentation by Dr. -- by Dr. Connell, I believe that I had

7     objected to the use of the childhood photographs at the last

8     hearing prior to our recess.  Again, I believe the case law

9     is very clear on this matter, that these types of photographs

10    are not relevant and probative to any issue in this case.

11    They are simply there to evoke some sort of sympathetic

12    response to the defendant.  And again, for that reason I

13    would reurge my objections to Dr. Connell being allowed to

14    publish the photographs that she has tendered to us

15    previously.

16         THE COURT:  Defense care to further -- you may

17    proceed.

18         MS. BALIDO:  Judge, we would argue that the

19    Rhodes case upon which the State relies is a -- first, we'd

20    argue it's a plurality opinion and that the holding in Rhodes

21    is that childhood photos are not automatically relevant to

22    the mitigation issue.  But looking at the Jackson case, which

23    is a Texas Court of Criminal Appeals opinion in 1999, found

24    at 992 Southwest 2d --

25         THE COURT:  Just a moment, just a moment.

1    Again, please.

2                MS. BALIDO:  The Jackson case, 992 Southwest

3    2d 469, where they're interpreting both the Rhodes case and

4    the later Cantu case which also brought up issues about

5    photographs, the court said we reject the notion that every

6    single piece of information about a defendant is relevant

7    without regard to whether that information would tend to show

8    that a life sentence rather than a death penalty is

9    warranted.  And that the appellant -- that the appellant was

10   once a child, even a happy one, does not in and of itself to

11   have a tendency to show whether or not he has a life sentence

12   rather than a death sentence.  That's page 480.

13          But in this specific case, the pictures -- well,

14   first, we'd argue that the pictures -- the State has opened

15   the door to pictures and pictures depicting his background

16   and character based on the picture that the State offered in

17   regard to the Murphy's house.  Looking at that picture, it's

18   a very happy home, it's got Christmas decorations and such

19   outside.  And the State is going to argue that the fact that

20   he was brought up in a happy home is aggravating and not

21   mitigating.  And I think that through the cross-examination

22   that Mr. Davis has done with the witnesses, I think that's

23   apparent that's what they're going to argue.

24          The pictures that we are trying to go into in regard

25   to the earlier times and the testimony we expect Ms. -- Dr.

1    Connell to give about how Ms. Tolar told her that the

2    pictures that they have of Jim and Donnie, the pictures

3    are -- although she hasn't given her any pictures, there are

4    no smiles on the children's faces, would go to show how in

5    this case Mr. Murphy has had very highs in his life and very

6    lows in his life and therefore would be relevant on the

7    mitigation question to talk about his character and his

8    background.

9          Rhodes did not say that relevant childhood pictures

10   cannot be admitted.  We're saying that they are relevant

11   based on this case and the status of this defendant and his

12   background and relevant in regard to the evidence that we

13   have put forth in this case so far and relevant to rebut what

14   the defense is saying -- I mean, what the State is saying.

15   And we would say that also under Penry II and the question

16   that has just been handed down by the Court of -- U.S.

17   Supreme Court, that mitigation evidence should be given high

18   priority and placed in front of the jury and that those

19   considerations must be taken into consideration by the jury.

20   Then we would argue in this case with this evidence that they

21   would be relevant.

22          I would also ask the Judge to look at Sandra Day

23   O'Connor's opinion in Franklin versus Lynaugh where evidence

24   about the defendant's background and character is relevant

25   because of the belief long-held in society that the defendant

1    who commits criminal acts that are attributable to a

2    disadvantaged background or to emotional or mental problems

3    may be less culpable than defendants who have no such

4    excuse.  And she is the one that wrote Penry II.  Those are

5    her concerns and obviously the concerns of the majority --

6                THE COURT:  Are those not cases -- aren't

7    those two opinions not case specific, period?

8                MS. BALIDO:  They are case specific, period.

9                THE COURT:  I mean, unlike a number of United

10   States Supreme Court cases over the past 25 years that have

11   broad constitutional implications for the entire body of

12   criminal law, do we not see, and specifically these two cases

13   are classic examples where the United States Supreme Court is

14   not drawing broad bright lines for all of us with regard to

15   many cases, but -- cherry picking cases and just case

16   specific for those facts of that case only.

17               MS. BALIDO:  Judge, I think if you're -- if

18   I'm trying to -- I'm trying to go where you're going.  If

19   you're talking about Penry II, is that what you're talking

20   about?

21               THE COURT:  Absolutely.  Penry II is a classic

22   example of cherry -- the United States Supreme Court

23   cherry-picking a case.

24               MS. BALIDO:  Exactly, Judge.  And I think if

25   you look at the language that is used in Sandra Day

---

                    DARLINE W. LABAR, OFFICIAL REPORTER

1   O'Connor's opinion, you'll see that their concerns are

2   broader than that, that they are cherry picking certain

3   cases.

4            THE COURT:  Oh, I mean.

5            MS. BALIDO:  Judge, and we would further argue

6   that these issues that we're dealing in this case, I would

7   say that this is one of the first trials that has gone into

8   that unexplored area of what Texas law calls mitigation.  And

9   therefore --

10           THE COURT:  Well, Penry II didn't even have

11  the instructions that we now have.

12           MS. BALIDO:  That's exactly, right, Judge.

13  I'm just -- I'm just --

14           THE COURT:  So I don't know how -- it looks

15  like we're comparing apples and oranges.

16           MS. BALIDO:  Judge, I think if you just look

17  at -- what I'm arguing is the language and the concerns that

18  they had in Penry II, although they cite, not necessarily

19  with approval the Texas --

20           THE COURT:  Five persons of the current United

21  States Supreme Court I think with regard to Penry are going

22  to do whatever they can to keep that man alive, period.  And

23  I think they have come to a conclusion, regardless how bad

24  they even take Penry III, goes up, they'll find some other

25  reason, based upon the language in Penry I and II.

1        MS. BALIDO:  Well, maybe they're telling us

2   something, Judge.

3        THE COURT:  Well, they better get a little bit

4   broader.

5        MS. BALIDO:  So that's where we stand on

6   our --

7        THE COURT:  The Court will hold its decision

8   until I reread the cases cited by counsel.  I am however,

9   with regard to another unfinished matter -- with regard to

10  the questionnaire that was given --

11       MR. DAVIS:  Well --

12       THE COURT:  -- to --

13       MR. DAVIS:  -- I can just tell you right now,

14  I'm going to withdraw my objections, so -- for record

15  purposes, I can do that right now.

16       THE COURT:  For purpose of the record, the

17  Court was going to grant the defense right to go into that

18  particular matter.

19       MR. DAVIS:  One --

20       THE COURT:  -- for purposes of the trial

21  record.

22       MR. DAVIS:  One other thing --

23       THE COURT:  Having read Wigmore, I'm convinced

24  that his treatise is very controlling in this issue.

25       MR. DAVIS:  When we had the original 705

DARLINE W. LABAR, OFFICIAL REPORTER

 1    hearings, the doctors indicated they would be doing some

 2    additional work, some additional research, going to

 3    additional sources for information.  And so if they have done

 4    that, and certainly I would like the opportunity to again go

 5    into a 705 hearing to determine what new information they may

 6    be basing their information and their opinions on, I know Dr.

 7    Connell is here this afternoon.  For instance, if she has

 8    talked with additional people, if she's done additional

 9    research, then I'd like to have the opportunity to --

10              THE COURT:  May we in the interest of the jury

11    time go into that --

12              MS. LITTLE:  Since we're not starting until

13    9:15 and she has to be here to set up, she could just be

14    here --

15              THE COURT:  Can we not have -- I mean, she can

16    at least give the additional 705 matter, unless she's going

17    to be doing extensive research tonight.

18              MS. LITTLE:  Okay.  What about the impact

19    witnesses?

20              MR. DAVIS:  I don't intend to call any

21    individuals for that purpose.

22              MS. LITTLE:  How about any other purposes?

23              MR. DAVIS:  I don't intend to put on any

24    victim impact testimony.

25              THE COURT:  May we have the doctor?

1        This hearing is being conducted in open court,

2   outside the presence and hearing of the jury panel.

3        Doctor, I anticipate this will be a short hearing.

4   We will see you back tomorrow morning.  But in interest of

5   the jury's time, we're going to take up a matter that may or

6   may not have some import.

7               THE WITNESS:  Okay.

8               THE COURT:  Let the record reflect this

9   hearing is being conducted in open court, outside the

10  presence and hearing of the impaneled jury.  The accused, the

11  defendant, Jedidiah Isaac Murphy, will be in court at all

12  times during this hearing.

13              MR. DAVIS:  Thank you.

14                    MARY A. CONNELL

15  was called as a witness by the State and, after having been

16  first duly sworn, testified as follows:

17                  Direct Examination

18  By Mr. Davis:

19       Q.    Again, your name is Dr. Mary Connell, correct?

20       A.    That's right.

21       Q.    Dr. Connell, the purpose of this hearing this

22  afternoon is to determine if you've done any additional work

23  on this case since our last 705 hearing.  So if I may, let me

24  ask you, first of all, have you talked with any additional

25  individuals --

1    A.   Yes.

2    Q.   -- about this matter?

3    A.   Sorry, yes, I have.

4    Q.   And who have you talked with since our last hearing?

5    A.   Matthew Murphy.  Let's see, Tonya Thorp.  Those are

6 the only two family members or collateral contacts that I've

7 talked with where there was any content other than just

8 logistics of trying to get in touch with each other.

9    Q.   Did you reduce your interviews with them to writing?

10    A.   Not the one with Matthew which occurred just now in

11 the waiting room.  And the one with Tonya Thorp, I do have

12 about one page of handwritten notes.

13    Q.   Let me ask you, do you intend to make a written note

14 of your interview with Matt Murphy?

15    A.   Yes, I do.

16    Q.   Do you think that will be ready by the time you

17 testify tomorrow morning?

18    A.   I think it will be, yes.

19    Q.   When did you speak with Tonya Thorp?

20    A.   On 6-17-01.

21    Q.   Have you reviewed any additional documents or

22 records?

23    A.   Yes, I have.

24    Q.   Okay.  What additional records have you reviewed?

25    A.   The letters from Jim Murphy that I mentioned having

1  just been handed the last time I was here.  Principally

2  letters to his mother and to Tonya, or to his mother and

3  Tonya together.  The Van Zandt County Children's Shelter

4  records, the Fruitvale school records, and the Edgewood

5  school records, and photographs provided by Tonya Thorp and

6  by Tracy Erwin.

7       Q.   The photographs provided by Tonya Thorp and Tracy

8  Erwin, do you have those with you or have copies of those

9  with you?

10               MS. LITTLE:  They're right here.

11      A.   The ones from Tracy Erwin are there, correct?

12               MS. LITTLE:  Let the record reflect that I'm

13  tendering those.

14      Q.   (By Mr. Davis)  Do you recall when you provided

15  those to Ms. Little?

16      A.   Today.

17               MS. LITTLE:  Those photographs were brought

18  this morning.

19      A.   Right.  Ms. Erwin told me outside that they were in

20  here, and I asked Ms. Little for them and I think they were

21  on the counsel table and she brought them out to me and so I

22  had a chance to look at them.

23      Q.   (By Mr. Davis)  Just looking at the photographs

24  briefly, they appear to be more childhood photographs

25  involving the defendant, do they not?

1    A.    Yes, essentially I think there are somewhere, it's

2    not clear exactly how old he is, but he's probably between 17

3    and 19.  So I had specifically asked for or sought out some

4    pictures of him from -- beyond the ones I had so from the age

5    of 13, forward, and those were some of the pictures that I

6    think were produced as a result of my request.  And then Ms.

7    Thorp also tried to generate some pictures for me, which she

8    sent me by e-mail.

9    Q.    Do you intend to use any of these new photographs in

10   your presentation?

11   A.    Yes, I would like to.

12   Q.    Okay.  Have you already included them in your

13   presentation?

14   A.    The ones that you're looking at, I have not yet had

15   an opportunity to scan and upload into my presentation.  The

16   ones that were e-mailed to me I have.  I think you have a

17   copy of the -- or I assume you do have a copy of the power

18   point slide presentation.  That includes those pictures, the

19   ones from Ms. Thorp.

20   Q.    The only -- the only copy of your power point

21   presentation I have is the one that you had with you at the

22   last hearing.

23   A.    Okay.

24   Q.    You have -- you now have an updated power point

25   presentation?

---

DARLINE W. LABAR, OFFICIAL REPORTER

1     A.   Yes, sir, I do.

2     Q.   As I understand, that again would be updated

3   tomorrow morning, right?

4     A.   I would hope to, yes.

5     Q.   So besides the defendant's letters, the Van Zandt

6   County Children's Shelter records, Fruitvale ISD, and

7   Edgewood ISD, as well as the photographs, any other documents

8   that you reviewed?

9     A.   No, sir.

10    Q.   Have you done any further research?

11    A.   No, sir.

12    Q.   Have you -- have you prepared any additional

13  reports?

14    A.   Only the expansion of the report that I suppose then

15  you have a copy of, and that expansion included Tonya Thorp's

16  interview notes.  So it was an additional two or three

17  paragraphs.

18    Q.   When you talk -- when we talk about the report, are

19  we talking -- the original report that I was given was a

20  17-page document?

21    A.   Yes.

22    Q.   Is that your report?

23    A.   That's the report I'm referring to.  And I said I

24  included my interview notes with Tonya Thorp.  I also

25  extracted some material from the additional documents and

1    included that as well, so that my current report is 19 pages

2    in length.

3         Q.    Have any of your opinions changed?

4         A.    No, sir.

5         Q.    Did you draw any particular opinions or conclusions

6    from your review of the additional documents?

7         A.    I gathered information that I guess underscored for

8    me a picture of -- of physical abuse in the biological home

9    and physical and psychological abuse in the Tolar home that

10   was somewhat clearer than I had before.

11        Q.    And you got that from the -- from the documents?

12        A.    From my interviews with Matthew Murphy and with

13   Tonya Thorp.  And from the review of -- of the children's --

14   the Van Zandt County records wherein interviews with Donnie

15   were recorded, and that commentary often included references

16   to Jim, to his and Jim's time at the Murphy's.

17        Q.    Okay.

18        A.    So pulling that together.

19        Q.    Do you have those records with you --

20        A.    Yes, I do.

21        Q.    From the children's shelter?

22        A.    Yes, I do.

23        Q.    And if you could, if you could just direct me to

24   that portion of the records that you believe indicate that

25   some sort of abuse occurred in the Tolar home?

DARLINE W. LABAR, OFFICIAL REPORTER

1     A.    Okay.  As I looked through the things that I have

2   marked, I see that some of the material that I got here added

3   descriptors to the alleged abuse in the biological home, so

4   it's partly that that I drew into my report.

5          I marked a paragraph on the intake study, page 4, in

6   which it mentions that Donnie described -- that Donnie's

7   behavior was described as defiant and uncontrollable while he

8   was at the Tolar's, and it gradually mellowed during his

9   placement at the children's shelter afterwards.  There were a

10  number of those mentioned in this report, which certainly

11  suggested to me that there was at least a misfit or a

12  mismatch of personalities, that perhaps the Tolars were

13  having some trouble setting up some sort of effective

14  behavior management regimen in their home.  And while that

15  doesn't necessarily suggest that they become abusive, put

16  together with what Ms. Tolar herself told me, it sort of

17  added dimensions of understanding.  And as I say,

18  contemporaneous reports of the difficulties that the kids

19  subsequently made much more clearly.

20    Q.    The -- you made some mention about abuse in the

21  biological home?

22    A.    Yes, sir.

23    Q.    Okay.  Directed toward the defendant?

24    A.    No, sir.

25    Q.    Who would that -- who would abuse have been directed

1  to?

2      A.   Well, of course, the physical fighting between the

3  parents, and then with Donnie's suffering a number of

4  injuries that in today's vernacular would be considered the

5  result at least of neglect if not some kind of inappropriate

6  parenting.  His reports that are included in here had to do

7  with I think his father trying to teach him to drive when he

8  was 5, him breaking his thumb, and some injuries like that

9  that would suggest that the household was not child safe,

10  let's say.  There was some other reports I think more

11  explicit.  The father dumping Jim and Donnie out of a dump

12  truck, resulting in Donnie breaking his arm.  I understand

13  that was not done in malice, but it was play kind of

14  recreational type activity that resulted in a broken arm.

15  And, of course, the theme of abandonment that I mentioned

16  when I testified on the 17th or whatever day it was.

17      Q.   Would that have been when they were taken to

18  Buckner's or to their grandparents' to live?

19      A.   Oh, yes, sir, but even before that, when the

20  biological mother left the children with, I guess, ailing and

21  elderly grandparents and an alcoholic father to seek her own

22  future.

23          There were again some contemporaneous reflections of

24  the children reporting that they were in placement because

25  their mother hated them, the psychological evaluation of

```
 1    Donnie that was accomplished on 4-14-74.

 2              Do you want me to continue?  I have three or four

 3    more places marked.

 4         Q.   If you don't mind.

 5         A.   There was an indication in a plan of service,

 6    children's plan of service dated 4-13-87 that Jim perceived

 7    that his brother was bribed to accept placement at the Van

 8    Zandt Children's Shelter rather than to be placed with Jim,

 9    and was bribed by the promise that he would receive his own

10    allowance.  Jim perceived Donnie and he to have been sort of

11    ripped apart with the placement.  I think what I understood

12    to be a psychologically very painful loss.  And that Jim --

13    that Donnie was domineering and threatening in his

14    interactions with Jim.

15              I think that's everything that I gleaned from that

16    record that I felt was significant enough to include in my

17    report.

18         Q.   Okay.  Do you intend to do any other work prior to

19    your testimony then besides what you told me -- I take it you

20    intend to update your power point presentation?

21         A.   That's correct, to --

22         Q.   Will you -- will you amend your report again to

23    include the information from Matt Murphy?

24         A.   Yes, and I also have calls out to several people

25    who -- with whom I've been exchanging telephone calls,
```

1    continue to try to get in touch with each other.  These were

2    people I named with you the other day, I believe.  I believe

3    all of them were named.  Ruby Delossier has returned my call,

4    but I've missed contact with her.  Matthew was on my list, if

5    I recall, that I gave you.  And I don't recall whether Bob

6    Murphy was on the list that I gave you, but I would still

7    very much like to reach him.  And Jim Murphy's sponsor whose

8    name escapes me at the moment.

9        Q.    Randy Crow?

10       A.    Yes, sir.  I met him today, and again, we've

11   exchanged I don't know how many phone calls trying to catch

12   each other, but would still like to have a chance to talk

13   with him and haven't had a chance yet.

14              MR. DAVIS:  Judge, I believe that's all the

15   questions I have this afternoon.  Obviously, I'd like to have

16   whatever updated report she has today and then whenever

17   another report is completed tomorrow, I'd like to have that,

18   and then I'd also like to have any written notes that she's

19   produced since the last date.  And then finally, before the

20   presentation tomorrow, obviously I'd like to look at the

21   amended power point presentation, see what additional

22   photographs have been included because I anticipate that I

23   would have the same objections to these new photographs since

24   they do appear to me to be again the same nature photographs,

25   childhood photographs of the defendant.  So I would

1    anticipate having the same objection to those photographs

2    tomorrow.

3                    THE COURT:  Ms. Connell, can you have your

4    presentation, your power point presentation here tomorrow

5    morning here at 9:00?

6                    THE WITNESS:  Yes, sir.

7                    THE COURT:  May we resume tomorrow morning 9

8    o'clock then?  In the meantime, I will reread the cases

9    counsel has cited and have a ruling with regard to the

10   photographs in question.   9 o'clock tomorrow morning.

11                   THE WITNESS:  Am I providing these copies to

12   you now?

13                   (Recess of proceedings.)

14

15

16

17

18

19

20

21

22

23

24

25

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1                    Reporter's Certificate

 2   STATE OF TEXAS:

 3   COUNTY OF DALLAS:

 4          I, Darline W. LaBar, Official Court Reporter of the

 5   194th Judicial District Court, in and for Dallas County,

 6   Texas do hereby certify that the foregoing volume constitutes

 7   a true, complete and correct transcript of all portions of

 8   evidence and other proceedings requested in writing by

 9   counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13          I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16          Witness my hand this the 12th day of November, A.D.,

17   2001.


18

19

20
                         DARLINE W. LABAR
21                       Official Court Reporter
                         194th Judicial District Court
22                       Dallas County, Texas
                         (214) 653-5803
23

24

25   Certification No. 1064 Expires December 31, 2002
```

REPORTER'S RECORD

VOLUME 58 of 65 VOLUMES  74145

TRIAL COURT CAUSE NO. F00-02424-NM

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

* * * * * * * * * * * * * * * * * * * *

PUNISHMENT PHASE BY JURY

* * * * * * * * * * * * * * * * * * * *

FILED IN
COURT OF CRIMINAL APPEALS

DEC 5 2001

A P P E A R A N C E S:

HONORABLE BILL HILL, Criminal District Attorney
          Crowley Criminal Courts Building
          Dallas, Dallas County, Texas  75207
          Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
             FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
          Phone:  214-653-9400
             FOR THE DEFENDANT.

Troy C. Bennett, Jr., Clerk

* * * * * * * *

On the 28th day of June, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

          Proceedings reported by machine shorthand, computer

assisted transcription.

DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

INDEX VOLUME 58

| | PAGE | VOL. |
|---|---|---|
| June 28th, 2001 | | |
| Proceedings...................................... 2 | | 58 |
| Reporter's Certificate......................... 208 | | 58 |

CHRONOLOGICAL WITNESS INDEX

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| MARY A. CONNELL | 10 | 70 | | 58 |
| DR. JAYE CROWDER | 132, 193, | 176, 198, 202 | | 58 |
| | 201, 204 | | | 58 |

ALPHABETICAL WITNESS INDEX

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| MARY A. CONNELL | 10 | 70 | | 58 |
| DR. JAYE CROWDER | 132, 193, | 176, 198, 202 | | 58 |
| | 201, 204 | | | 58 |

EXHIBIT INDEX

| STATE'S | | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 150 | Butcher Report | 108 | 108 | 58 |
| 151 | Millon Report | 111 | 111 | 58 |
| DEFENDANT'S | | OFFERED | ADMITTED | VOL. |
| 40 | Dr. Crowder Vita | 135 | 135 | 58 |
| 41 | Dr. Connell Vita | 70 | 70 | 58 |
| 63 | Dr. Connell Report | 131 | 131 | 58 |

P R O C E E D I N G S

1

2          THE COURT:  The State ready?

3          MR. DAVIS:  The State's ready.

4          THE COURT:  May I see the photographs that the

5   defense --

6          MR. DAVIS:  The --

7          MS. LITTLE:  There's been two added.

8          MR. DAVIS:  The Doctor has indicated that

9   she's going to add these two photographs to the presentation,

10  Your Honor.

11         THE COURT:  Are there any -- the State have

12  any objection to these two?

13         MR. DAVIS:  Well, I would have the same

14  objection.  I don't think they're relevant.  I don't believe

15  they have any probative value with regards to mitigation.

16  They simply show the defendant at apparently age 17.  I don't

17  know what relevance they would have to -- to any mitigation.

18         THE COURT:  Do you object on the relevance

19  grounds, Counsel?

20         MR. DAVIS:  Yes, sir.

21         THE COURT:  Are there any other pictures that

22  the State objects to?

23         MR. DAVIS:  Well, I'm objecting to all the

24  childhood photographs as well --

25         THE COURT:  May I see the rest of them?  I've

```
 1   not seen them.

 2                  MR. DAVIS:  Well, those -- those will be the

 3   photographs that were previously tendered to you --

 4                  THE COURT:  Oh, okay.

 5                  MR. DAVIS:  -- during the first one, and I'm

 6   objecting to the picture of the headstone of Roy Donald

 7   Kines.

 8                  THE COURT:  All right.

 9                  MR. DAVIS:  I fail to see any relevance there.

10                  THE COURT:  What's the defense position with

11   regard to the childhood photos?  I assume it deals with

12   Special Issue Number 2.

13                  MS. LITTLE:  Yes, sir.

14                  THE COURT:  I'm unable to glean any assistance

15   it might give to the jury on Special Issue Number 1 so I

16   assume it's for mitigation purposes and how is it relevant?

17                  MS. LITTLE:  It's relevant, Your Honor,

18   because everything about the background of the person accused

19   of this crime is relevant for Penry and other cases.  We -- I

20   mean, I -- you know, Jennifer has presented what we have to

21   present to the Court on that.  It's I think distinguishable

22   from a lot of other things in that it's something -- these

23   cases go on and on about mitigation and aggravation and

24   aggravation and mitigation.  It's actually a piece of

25   evidence that is going to be mitigating without something
```

1    being aggravating attached to it.

2          We would urge the Court to allow these pictures and

3    if not all of them, at least some of them.

4          THE COURT:  The Court during the

5    guilt/innocence stage of the trial ruled that there were

6    several offered graphic photos that the Court determined that

7    the prejudicial effect outweighed any probative value.  Last

8    night after we adjourned the proceedings in the courtroom, I

9    took upon myself to evaluate the cases about which counsel

10   made reference.  And I find particularly Court of Criminal

11   Appeal opinion Jackson v. State, found 992 Southwest 2d 469

12   at page 480, headnotes 14 and 15, to be illustrative and of

13   some benefit to the Court.  Without reading the entire

14   headnote, I will quote what is the pertinent portion from the

15   Court of Criminal Appeals.  Quoting:  We reject the notion

16   that every single piece of information about a defendant is

17   relevant without regard to whether that information would

18   tend to show that a life sentence, comma, rather than a death

19   penalty, comma, is warranted, period.  That appellant was

20   once a child, comma, even a happy one, comma, does not,

21   comma, in itself, comma, have any tendency to show that he

22   should receive a life sentence rather than a death penalty,

23   period, close quote.

24         For that reason the Court sustains the State's

25   objections with regard to the childhood photos, save and

1    except if there are any particular childhood photos that are

2    of a significant mitigating nature such as -- and I know not

3    this to be the case, I don't recall -- vestments of the

4    defendant was a child, an alter boy or had a time when he

5    received some type of special recognition for some type of

6    athletic achievement or a Boy Scout award, not necessarily,

7    but, of course, including Eagle Scout, but if there is some

8    particularly germane photo of a mitigating nature as opposed

9    to just a generic childhood photo, the Court will allow that

10   to be offered to the jury, but generic childhood photos,

11   based upon the authority of the Court of Criminal Appeals,

12   I've decided the State's objection is sustained.

13              MS. LITTLE:  Can I add one thing for the

14   record, Your Honor?

15              THE COURT:  Absolutely.

16              MS. LITTLE:  One of the big issues here is the

17   treatment of Jim Murphy, whether it to be considered

18   aggravating or mitigating, in the Tolar household.  There are

19   a number of photographs from that household which are

20   indicative, if the jury sees fit to take them that way, of an

21   unhappy child in an unhappy setting because there's numerous

22   photographs at holiday times with no smiling child.  We think

23   that is germane because that is something for the jury to

24   consider in determining how much aggravation or mitigation

25   there would be --

```
 1                    THE COURT:  I will permit those limited
 2   photographs, limited to the Tolar holiday occasions about
 3   which Ms. Little made reference.
 4              Anything further of the hearings?
 5                    MR. DAVIS:  No, Your Honor.
 6                    THE COURT:  May we have the jury, please.
 7                    MS. BALIDO:  Judge, I've got a couple of
 8   tables that might facilitate this a little bit better.
 9                    THE COURT:  All right.  Quickly, then.  We've
10   only had since yesterday at 4:30.
11              Limit it to the holiday occasions if you would,
12   Doctor.
13                    MS. BALIDO:  Judge, was that on the record?
14                    THE COURT:  You may.
15                    MS. BALIDO:  Judge, let the record reflect
16   that during an off-the-record discussion, Dr. Connell was
17   explaining that she is rearranging her presentation and
18   expressed that she thought that the pictures that she had
19   were germane, pursuant to the Court's ruling.  At that time
20   Mr. Davis expressed that the first picture shown was simply
21   entitled -- what, Mr. Davis?
22                    MR. DAVIS:  Well, it's not just the first
23   picture.  First picture I do object to because it's entitled
24   Donnie and Jim are placed with the Tolars.  He's standing
25   with his brother by an automobile or pickup truck.
```

1    The second photograph I'm going to object to, too,

2 because it says the Tolar boys.  And he's pictured with the

3 three natural children of the Tolars.  And again, that

4 doesn't appear to be a holiday photograph.

5    The next one I would object to is with the Tolars

6 from 1983 until 1988, and he's standing with -- well, that

7 apparently is mistitled because then the text is Jim Murphy

8 is front and center with Mr. Murphy, the three Murphy boys,

9 and Donnie.

10    Now, the next one, I don't -- you know, pursuant to

11 the Court's ruling, I wouldn't object to because it appears

12 to be Jim's 8th birthday which would be a holiday.

13    The next one is Christmas 1983, which I would think

14 would be admissible.

15    The next one is Christmas and birthday pictures

16 which, again, I would think to be admissible.

17    The next one is paternal grandparents with the

18 children.  Doesn't appear to be a holiday setting.  They

19 simply appear to be standing on some sort of porch together.

20    The next one I would think would not be admissible.

21 That's biological father died when Jim was 9.  That's a

22 photograph of the grave of Roy Donald Kines.

23    The next two are birthday and Christmas, so I would

24 have no objection to that.

25    The next one is Christmas 1987.  Wouldn't have any

DARLINE W. LABAR, OFFICIAL REPORTER

1   objections to that one.

2           The next one is picture of Edgewood High School.

3   I'm not going to object to that one.

4           THE WITNESS:  There should be a picture of Jim

5   and Matt at age 17 just before their high school.

6           MR. DAVIS:  Okay.  Then I would object to that

7   one.  That's not a holiday.

8           Jim Murphy and daughter Alyssa which I would object

9   to.  It doesn't pertain to any special awards, holidays,

10  etcetera.

11          THE COURT:  The Court will overrule the

12  State's objection.  I'll permit that one to be shown.

13          MR. DAVIS:  Okay.  The photograph Jim and

14  Matthew at age 17, I would object to.  It's just he and Matt

15  standing together.

16          Jim Murphy at home at about age 17.  He's simply

17  sitting in an easy chair with a cowboy hat on.  It doesn't

18  appear to be a holiday so I'm going to object to that one.

19          There are certain of them that I don't think would

20  fall within the Court's ruling.

21          THE COURT:  As I reiterated, limit it to

22  holiday scenes for the mitigating issue of unhappiness at

23  holidays, but just general generic photos, the Court,

24  pursuant to the Jackson v. State case is sustained, the

25  State's objection on the grounds of relevance.

1          MS. LITTLE:  You are allowing the picture with

2    the child, though, aren't you?

3          THE COURT:  Yes, I am.

4          THE WITNESS:  Shall I tell you which ones I've

5    X'd out then?

6          MR. DAVIS:  If you don't mind.

7          THE WITNESS:  Okay.  I'm sorry, Your Honor,

8    the headstone?

9          THE COURT:  Out.  Can we save this for

10   purposes of the trial record, Doctor, so --

11         THE WITNESS:  Yes, sir.

12         THE COURT:  -- the appellate court may see

13   differently than I.

14         THE WITNESS:  Okay.  I've removed slides --

15   Slides Number 11 and 12.  That's Donnie and Jim at the outset

16   of the Tolar placement and with the Tolar boys in a studio

17   type picture.  Number 13, which is Jim and Donnie and the

18   Tolar boys with Mr. Tolar.  I left in Number 14, 15, and 16.

19   Those are the holiday photos.  I took out Number 17, which

20   was the Tolar boys -- I'm sorry, Jim and Donnie and I think

21   there may be some other Kines children with the

22   grandparents.  I took out Number 19, the headstone.  I left

23   in Number 20, which was Christmas 1985.  It's just Jim.  I

24   left in Number 21 which is 11th birthday.  I took out Number

25   22 which although it was a holiday picture, it does not go to

1    the issue of unhappiness at the holidays.  I took out Number

2    31 which was Jim and Matthew at a sporting event in a high

3    school gym, I believe, but there was no indication that they

4    were being awarded something.  I left in his graduation.  I

5    took out the picture of Jim sitting in the recliner holding

6    the puppy.  And I left in Alyssa.

7                    THE COURT:  Thank you, Doctor.

8              Sheriff, may we have the jury, please.

9                    THE BAILIFF:  All rise.

10                   THE COURT:  Let the record reflect the jury is

11   returning to the courtroom at this time.

12                   (Jury returned to courtroom.)

13                   THE COURT:  Jurors may be seated.

14             Mr. Murphy, counsel, visitors in the gallery, you

15   may be seated.

16             Ladies and gentlemen, this witness has previously

17   been sworn in.  She is under oath.

18                   MS. LITTLE:  May I?

19                        MARY A. CONNELL

20   was called as a witness by the Defendant and, after having

21   been first duly sworn, testified as follows:

22                     Direct Examination

23   By Ms. Little:

24        Q.   State your name, please, ma'am.

25        A.   I'm Mary Connell.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   And you are a doctor of psychology; is that correct?

2    A.   Correct.

3    Q.   Dr. Connell, do you live here in Texas?

4    A.   I do.

5    Q.   And where do you live?

6    A.   In Fort Worth, Texas.

7    Q.   Do you -- did you begin a psychologist, or how did

8    your work career begin?

9    A.   Actually while I was working on my doctorate I

10   worked as a Child Protective Services caseworker for three

11   years in Tarrant County.  And when I got my doctorate, I went

12   to work then as a psychological intern or trainee at the

13   county mental health center on a Child Protective Services

14   contract.  After my first year when I was fully licensed, I

15   became the managing director of that contract and continued

16   for another two years at MHMR working on the Child Protective

17   Services contract and with Child and Family Services at

18   MHMR.  I then went into private practice and worked under

19   contract with Child Protective Services for the following 15

20   years doing evaluations of children and placement and of

21   parents who were allegedly abusive or neglectful.  At the

22   same time I was doing that, I was developing my own private

23   practice as a psychotherapist and eventually as a -- an

24   evaluator of families in distress.  I do a great many

25   court-ordered child custody evaluations of families,

1  particularly where sexual abuse has been alleged as part of

2  the divorce and custody battle.

3      Q.   What -- what kind of work were you doing for CPS

4  when you worked for them?

5      A.   I was a caseworker doing investigations of abuse and

6  neglect referrals for the first two and a half years, and for

7  the last six months I was a supervisor training field

8  placements, social work students.

9      Q.   And what education did you have at the time you were

10  holding that job?

11      A.   A Master's degree in counseling.

12      Q.   And where did you receive that degree?

13      A.   East Texas State -- I'm sorry Southeast Missouri

14  State, then college, now a university.

15      Q.   And where is your Bachelor's degree from?

16      A.   The same institution.

17      Q.   Okay.  And where did you get your Ph.D.?

18      A.   East Texas State University, now Texas A&M, and it's

19  an EDD, a doctor of education.

20      Q.   All right.  And when did you complete that degree,

21  the last one?

22      A.   1978.

23      Q.   How long have you been in this business, Dr.

24  Connell?  Since what year?

25      A.   Well, I got my Master's in 1969 and began working

DARLINE W. LABAR, OFFICIAL REPORTER

 1    actually at Buckner Baptist Children's Home.  That was my

 2    first semi-professional job.  I worked there for two years as

 3    a psychological associate, so I think it would be correct to

 4    say 1969 or '70 is when I began my career as a psychologist.

 5        Q.    And you are here today to talk to this jury about

 6    Jim Murphy; is that correct?

 7        A.    That's correct.

 8        Q.    What is your role in this case?

 9        A.    I've been asked to do an evaluation of Mr. Murphy to

10    look at one of the special issues that the jury can consider

11    in sentencing, Special Issue Number 2.

12        Q.    And that is which issue?

13        A.    Whether taking into consideration all of the

14    evidence, including the circumstances of the offense, the

15    defendant's character and background, and the personal moral

16    culpability of the defendant, there is sufficient mitigating

17    circumstance or circumstances to warrant that a sentence of

18    life imprisonment rather than a death sentence be imposed.

19        Q.    And in order to prepare information for this jury,

20    what did you do, Dr. Connell?

21        A.    I did a number of things.  First, I reviewed volumes

22    of records regarding the crime, Mr. Murphy's background, his

23    medical records and school records, and so forth.  And then I

24    met with him on three occasions, both interviewing and

25    testing him each time I met with him.  The last time was

1    almost exclusively testing, but in the first two interviews

2    with him, I gathered a history from him regarding his growing

3    up years and how he came to this point in his life and I

4    asked him questions about the crime.

5         In addition to the interviews, I did a number of

6    tests.  One is the Shipley Institute of Living Scale, which

7    is a brief measure of intellectual functioning.  And I

8    administered it just to get a general sense of whether he had

9    achieved at the expected level or whether he was an

10   underachiever or an overachiever academically and in terms of

11   his career.

12   Q.    What were the results of that test?

13   A.    He tested within the average range which is about in

14   keeping with his work as a welder, with the fact that he has

15   a high school education, so it seemed that he was functioning

16   at about the level one would expect intellectually.  I did

17   not do the further testing to look at the learning disorder

18   that would be expected, based on some early diagnoses of

19   attention deficit hyperactive disorder but just wanted to get

20   a very global sense of his present intellectual functioning.

21   Q.    All right.

22   A.    Then I did two tests that are designed to sample

23   personality attributes.  These are tests that involve Mr.

24   Murphy describing himself and by responding to some

25   true-false questions.  One is the MMPI II, and that stands

```
 1    for Minnesota Multiphasic Personality Inventory, II.  That

 2    test is a 567-item test, and it's kind of the standard or the

 3    flagship in personality assessment.  It's been in use for

 4    about 50 years, and we have thousands and thousands of

 5    studies on how different people in different populations test

 6    on this instrument.  I gave this test to Mr. Murphy and

 7    scored the results with a computer system looking at the kind

 8    of clinical interpretation, how did he look compared to other

 9    people in a clinical setting.

10              Do you want me to talk about the results?

11         Q.   Tell the jury what a clinical setting is.

12         A.   Well, as opposed to testing normals or people in a

13    job application setting.  For example, we use this test to

14    screen police officers or security guards.  There we expect

15    they're a reasonably normal outcome and we compare the person

16    that we're testing to other people who are reasonably normal.

17    I scored Mr. Murphy's test with norms for a clinical

18    population which would be a population of people who have

19    problems, who are coming in for treatment, or who are in a

20    mental hospital, people who are mentally disturbed, or who

21    have emotional distress rather than people that are trying to

22    seem normal.

23              And the results of that suggested that he was

24    extremely, extremely symptomatic.

25         Q.   What does that mean?
```

A.   He subscribed to a broad range of symptoms, symptoms of depression, anxiety, physical ailments, aches and pains, physical distress, such as stomachache, headaches, back, neck.  He subscribed to paranoid thoughts, feeling that people were out to get him or plotting to do harm to him, that he was suspicious and guarded, couldn't trust other people easily.  He subscribed to such a broad range of symptoms that the first interpretation is that this person may be exaggerating.

However, when I looked at the specific items that he subscribed to and considered those in light of my interview observations, I found that it didn't seem to me that he was exaggerating.  It seemed to me that he was being fairly faithful in describing himself and his functioning, acknowledging all of his shortcomings in terms of his alcohol dependence, his family relationships being disturbed.  All of those things go into the formula to elevate the scales.  So as I went through, I couldn't find any places where it seemed to me that he was exaggerating.

I also administered the Millon Clinical Multiaxial Inventory 3.  The -- we call it the MCMI 3.  And this test is somewhat shorter, 185 items, I believe, or 175 -- 175.  And it is aimed at looking at character problems.  This test samples problems in the development of character.  Again, trust issues, interpersonal issues, whether the person

```
 1    exploits other people or treats other people with integrity,

 2    whether the person has pride and controls his behavior or

 3    whether he acts out.  So it looks at those kind of things,

 4    character pathology.  And again, Mr. Murphy subscribed to a

 5    broad range of symptoms.  He described himself in fairly

 6    harsh terms, made no effort to try to look good on either of

 7    these instruments.  There's a measure that we call the lie

 8    scale or on the MCMI, the desire -- social desirability scale

 9    where a person who is trying to impress you distorts the

10    truth a little and tries to look better than the average

11    person.  In no way did Mr. Murphy attempt to look positive.

12    He was his own harshest critic, I think you can say.

13           And so in both of these tests the results were

14    suggestive of very, very disturbed functioning, extreme

15    emotional distress, and a great many symptoms.  In both cases

16    these results would be results that would cause you to make a

17    referral for psychiatric consultation and would probably

18    result in a person being medicated.

19       Q.   All right.  Because he was so symptomatic, did you

20    do any further testing to see if there was any malingering or

21    anything like that?

22       A.   Yes, I did.  And would do so routinely.  I think in

23    a forensic setting, that is we always consider when we're

24    seeing somebody who didn't come in to get help, somebody

25    who's being sent to us by someone else, to try to learn
```

1  something about that person.  We always consider that that

2  person is trying to control the outcome, that they're trying

3  to control how we see them, they're trying to spin things for

4  their own advantage.  So there are a number of scales built

5  into these tests to look at that tendency, and then there are

6  specific tests developed for that purpose.

7       I've referred to some of the tests that -- the

8  scales are built in, such as the lie scale or the social

9  desirability scale.  Faking bad is another tendency that we'd

10 consider.  And in fact that was elevated on the MMPI-2, that

11 it look as through Mr. Murphy might be trying to look sick.

12 Q.    Okay.

13 A.    So I gave the TOMM, which is the test of memory and

14 malingering, and that is a test that's specifically designed

15 to try to catch a person at malingering, to see if --

16 malingering means trying to look sick.  Like if somebody

17 comes in, they're trying to get some medication because they

18 like to use it for recreational purposes, they might

19 malinger.  Or if a person is trying to get out of the

20 military, they might malinger trying to look sick.  So that's

21 what the TOMM is designed to measure.

22 Q.    And you did give him that test?

23 A.    Yes, I did.

24 Q.    And what were the results of that test?

25 A.    The results were that he was at the far extreme in

```
 1      not trying to malinger.  He answered all of the questions
 2      right, and only missed one and then corrected himself so that
 3      he actually had a perfect score.  Where a malingerer will get
 4      them all right or many of them right the first time, but then
 5      on the memory part, when they're asked 30 minutes later to go
 6      through it again, they will show -- they'll try to show that
 7      they're cognitively slipping, that they're addled and they'll
 8      miss some on purpose.  It's an easy test that anybody should
 9      be able to get seven-eighths of the items right.  Somewhat
10      unusual for somebody to make a perfect score.
11           Q.   All right.
12           A.   Mr. Murphy showed no evidence of trying to malinger.
13           Q.   And where was this testing done?
14           A.   In each case in the Lew Sterrett jail.  The last
15      test was administered in the holding room right off of this
16      room.
17           Q.   And how long altogether did you talk to Jim Murphy?
18           A.   I think my -- my interviews that included testing
19      ran around seven hours.  Now, some of that time I was just
20      sitting and making notes while he completed test
21      questionnaires.
22           Q.   All right.  Now, did you also make an attempt to
23      find out something about his background?
24           A.   Yes, I did.
25           Q.   What did you do to get that information, Dr.
```

1   Connell?

2       A.   In addition to reviewing records, I talked to a

3   great many family members or associates who had known him

4   when he was growing up.  We refer to these as collateral

5   contacts.  And the purpose of them is again, when someone is

6   coming because someone else us wants us to assess them, we

7   assume that they are trying to control the outcome.  We do a

8   lot of checking and double-checking to see if what they tell

9   us turns out to be correct.  So I think I had about 8

10  collateral contacts, 8 or 10, people that I interviewed by --

11  generally by telephone.

12      Q.   All right.  And I don't know -- I'm not sure which

13  is the best way to break this up.  What did you learn from

14  his early years?

15      A.   The picture I gathered from the first five years of

16  his life was that he lived with full siblings and half

17  siblings in a household where he was the fifth of six

18  children born to his mother.  His father, as I understand it,

19  was married about five times.  He and -- I believe he and

20  Donnie, his next older brother, and maybe Holly, his younger

21  sister, were biological children of his parents.  And then --

22      Q.   Hope Abbott and Donnie Murphy?

23      A.   Correct.  And then Hope Abbott had three children

24  from previous marriages who also lived in the house.  They

25  lived in Kaufman, Texas, in a fairly rural area, sometimes in

1   the home of the paternal grandparents, Donnie Kines, Sr.'s

2   parents, and sometimes down the street -- down the road a

3   ways in a house of their own.  It's not altogether clear to

4   me exactly what point Hope Abbott left, but sometime during

5   the first five years and possibly fairly early during that

6   time she left for a considerable period and the children were

7   left with their father and grandparents.  I think then she

8   returned.   As I understand it, Donnie Kines was an alcoholic

9   and was a very, very abusive man.  The children witnessed a

10  great deal of fighting between their parents.  According to

11  Ms. Abbott, she tried generally to get between him and the

12  kids if it seemed that his anger was going to be directed at

13  one of the kids.  And Jim himself said he had no recollection

14  of ever having been abused at his father's hand.  Although he

15  understood from later years that his father may have been

16  abusive to some of the kids at some of the time.  He didn't

17  remember that.

18       He did remember seeing his father, as he put it,

19  knock his mother's teeth down her throat.  Remembered his

20  father being taken off to jail and/or a hospital.  So as I

21  understand it, the home was a very volatile one, and there

22  was a good deal of psychological strain and possibly

23  emotional abuse.

24       I think I have maybe a picture of the household.

25  This -- I don't know if you can see this.  Is that in a place

```
 1   where any of you can see it?

 2               MS. LITTLE:  I think we'll have to move it up

 3   and down so they can't see it.

 4               JUROR:  Yeah, that's better.

 5               THE WITNESS:  Okay.

 6        A.   This is the house of the grandparents.  This is the

 7   front porch.  And it's a very -- very small house.  I assume

 8   it was quite crowded when there were six children and four

 9   adults living there.

10        Q.   (By Ms. Little)  Now, we tried, Dr. Connell, to use

11   this big TV, didn't we?

12        A.   Yes, we did.  And there was a clicker and we weren't

13   able to do that.  And I apologize.  That was prepared with

14   the assumption you'd be able to see it from there.

15             This is Roy Don Kines, Mr. Murphy's father.

16        Q.   If we could slide this up and down, that may be the

17   best.  Let's just start up there.

18             How about -- how heavy is this?  These wheels are

19   kind of doing like the grocery carts do.

20        A.   Oh, you mean up and down this way?

21        Q.   Uh-huh.

22        A.   And that's the grandparents -- Kines grandparents.

23        Q.   Okay.

24        A.   Where are we now?  Okay.

25        Q.   And how long did those six children stay with Donnie
```

1    Kines Sr. and Hope?

2        A.   All six together intermittently during those five

3    years, the first five years of Jim's life.  As I say, I think

4    Hope took the three older ones off at some point or perhaps

5    left without them altogether and then came back.  And when

6    Jim was 5, I think she took all six children and placed them

7    at Buckner Children's Home.  And that's Buckner on the screen

8    there.

9        Q.   I can't see it.

10       (Laptop screen being rolled on a cart in front of jury.)

11       Q.   (By Ms. Little)  Now, did you become aware that --

12                MS. LITTLE:  Thank you.

13       Q.   (By Ms. Little)  Did you become aware that Tonya

14   would not stay at Buckner?  She was the oldest child; is that

15   right?

16       A.   Correct.

17       Q.   But the others were stuck there until somebody came

18   or --

19       A.   Exactly.  There is again a little confusion about

20   how long they were there, and we've been unable to obtain the

21   records from Buckner for some reason.  There surely should be

22   a fairly full set of records, but it's been impossible to get

23   ahold of those.

24               In the neighborhood of a year, apparently, Jim,

25   Donnie, and Holly remained at Buckner, but sometime during

1   that time Tonya went to live with an aunt, refusing to stay
2   at Buckner.  Then I believe her mother came back and gathered
3   up her and the two older children and left, leaving Donnie,
4   Jim, and Holly at Buckner.  Subsequent to that I think that
5   the paternal grandparents took the kids home and tried to
6   keep them, but were both ailing, and Mr. Kines, the father,
7   was severely alcoholic and sick, at that point terminally
8   ill.  And it was determined that they just couldn't take care
9   of the children.

10        Q.  All right.  And what affect did this have on Jim
11   Murphy?

12        A.  I think as I understand it, his recollection of that
13   period is that his mother just couldn't or wouldn't take care
14   of him and that his grandparents couldn't either.  He's, I
15   think, unable to articulate what that must have felt like,
16   but I understand from some later iterations how he perceived
17   it.  That would be moving forward a bit.

18        Q.  Okay.  And Donnie also was involved in this, and
19   they were both basically dropped off at the orphanage for
20   that period of time?

21        A.  That's right.

22        Q.  Am I moving too far ahead for you to discuss the
23   boys' reaction to this, that you may have thought was unlike
24   many children when they are left at an orphanage?

25        A.  Right.  That would be when they were at the Tolar

1    home and what the Tolars told me.

2        Q.    Okay.  And you said that Jim was there for about a

3    year?

4        A.    As I understand it.

5        Q.    We don't know exactly.

6        A.    Right.  I gather certainly well over six months, and

7    it may have been a year and a half.  I'm just not able to tie

8    that down.

9        Q.    Now, he did get adopted by the Tolar family; is that

10   correct?

11       A.    Correct.  After the grandparents got the children

12   out and tried to continue raising the three youngest kids, I

13   think it was perceived they couldn't do that and a family --

14   extended family member, an aunt, arranged the placement with

15   the Tolars for Jim and Donnie.  The Tolars were apparently an

16   acquaintance through church, and so it was arranged that

17   Donnie and Jim would go and live with the Tolars.

18       Q.    About what time was that?  Do you know?

19       A.    As nearly as I've been able to pin down -- I'm

20   sorry, I think it was before Jim's 8th birthday, because

21   certainly he spent his 8th birthday at the Tolar's and he was

22   there for five years ending at the age of 12, so he must have

23   been 7.

24       Q.    All right.  Have you talked to Terry Tolar, Mr.

25   Tolar?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   No, I haven't.  I met him, but I didn't interview

2  him.  I talked with Celeste.

3    Q.   Celeste, Mrs. Tolar?

4    A.   Yes.

5    Q.   Now, Donnie and Jim both went to live with the

6  Tolars who already had three sons; is that correct?

7    A.   That's correct.

8    Q.   Do you know what kind of work Mr. Tolar was doing?

9    A.   Yes, he was a fire fighter.

10    Q.   And what kind of a routine did they have in that

11  household, as best as you could understand?

12    A.   As I understood it, he worked long shifts, 48 hours,

13  then he would be off for 24 hours.  Which would leave her at

14  home with five boys while he was at work for 48 hours.

15    Q.   Now, was Jim having any problems at that time that

16  you've been able to find out?

17    A.   What I understood from virtually all sources was

18  that Jim was an extremely cooperative child who was doing his

19  best to make a good -- a good adaptation to the Tolar home,

20  was a reasonably well-behaved child, was, according to Ms.

21  Tolar, happy or good-spirited, well-behaved child.

22    Q.   How about Donnie?

23    A.   Donnie was apparently having tremendous difficulty

24  behaviorally, and his behavior problems escalated the whole

25  time he was at the Tolar's.  Apparently there were numerous

1    problems.  Ms. Tolar told me that she and Donnie were in

2    counseling at one point out at the Canton MHMR.  She said

3    that Jim might have gone with them a couple of times, but the

4    thrust of that counseling was aimed at trying to help her

5    gain control of Donnie's behavior.

6         Q.   And did you talk to Donnie about their lives at the

7    Tolar's?

8         A.   Yes, I did.

9         Q.   What did you learn from him about that?

10        A.   Well, he said that there would be three or four or

11   five boys in the house with Ms. Tolar.  And he said that

12   regarding Mr. Tolar, he said "that dude was mean.  He'd come

13   home and she'd tell him everything we did.  He'd try to talk

14   to us and he'd scream and start going crazy and he would hit

15   you with anything he could get."  Donnie went on to say, he

16   was rough, that dude.  He'd grab you.  He was really rough on

17   my brother.  He, my brother, was quiet, kind of stayed off to

18   himself, bashful, I guess, always off with one person or

19   alone, not with a group of kids.  He said that Mrs. Tolar

20   provoked most of the troubles telling Mr. Tolar things they

21   had done.

22        Q.   This is Donnie, correct?

23        A.   Uh-huh.  And he said I guess it made that guy

24   crazy.  I asked if Mr. Tolar was a drinker, and Donnie said

25   that he wasn't but that he was, quote, real weirded out on

1  religion.

2      Q.   What else did Donnie say about religion and that

3  connection?

4      A.   He said, don't get me wrong, I believe in Jesus

5  Christ, heaven, and hell, but they were too much.  He said

6  the Tolars wouldn't let them have friends who weren't just

7  like them.

8          I asked if Child Protective Services was ever

9  involved because of this alleged abuse, and Donnie said -- he

10  said that guy got to acting crazy picking on me, on my

11  brother two or three days before.  He said if they had not

12  come, I probably would have killed somebody.  My dad --

13      Q.   This is Donnie?

14      A.   Yeah.  He said, my dad being dead, he told me to

15  look after my little brother.  And that guy yelling and

16  screaming at him all the time, making him go to bed before

17  everybody else, mental disease, I don't know.

18          He went on to say that Jim was kind of an isolate

19  and that he tried to protect Jim, that Mr. Tolar's focus on

20  Jim enraged him.

21      Q.   Enraged Donnie?

22      A.   Yes.

23      Q.   Mentally where would you say the boys were with

24  their feeling of acceptance in the world when they came to

25  the Tolars?

1    A.   Ms. Tolar told me that they said from the beginning

2    that they were there because their mamma didn't love them,

3    didn't want them.

4    Q.   Did you find that an unusual expression of feeling

5    on children that age?

6    A.   I did.

7    Q.   How so?

8    A.   Well, in my own work at Buckner, for the -- I think

9    year and a half or two years that I was there, in testing the

10   children who were placed there, I was always struck by how

11   these kids, most of whom had biological parents in the world,

12   it's called an orphanage, but -- or it used to be called an

13   orphanage, but there were very few full orphans there.  And

14   most of the kids would talk about their biological parents in

15   idealized terms, and they would say that their parent or

16   parents were going to come get them at Easter or at Christmas

17   or at their birthday their parents would come and get them.

18   And they held out those hopes even in the face of evidence to

19   the contrary.  And so it just struck me as highly unusual for

20   a child of that age to have integrated the harsh reality that

21   a parent just didn't love them enough to take care of them.

22   Q.   And what else did you learn about the years at the

23   Tolar's?

24   A.   Well, I inquired of Ms. Tolar what life was like and

25   she talked about -- as I said, she talked about the therapy.

1    She said that Jim was a fairly good student in regular

2    classroom, that he made several A's, that he was never

3    diagnosed with difficulties, while Donnie was on Ritalin

4    briefly.  She said that Donnie was loud and rebellious and

5    destructive, and they would put him in a room for time-out,

6    and he would break a window or knock a hole in the wall.  And

7    she said the other boys could hear all of this conflict.  She

8    said Jim wasn't hard to manage until the last few months, and

9    then the boys would team up some.  Otherwise, she said Jim

10   was lighthearted, entertaining, convivial, full of life, and

11   they felt he had a bright future.

12            I asked her about discipline.  She said they called

13   for the police for help with Donnie on one occasion.  I asked

14   her if it was her husband who carried out most of the

15   discipline as Donnie had told me, and she said she herself

16   disciplined, quote, to the best of my strength, but that

17   Terry, when he got home, would discipline the children, too.

18            I asked her if Child Protective Services was ever

19   involved with the family and she said, no, the kids acted

20   better at school than they did at home.

21   Q.    What significance, if any, do you find in that?

22   A.    Well, that in addition to the observation from the

23   children's shelter records after they were removed and

24   Donnie's behavior steadily improving and then Mr. Murphy's

25   report to me that Jim was doing very poorly in school by the

1   end of the Tolar placement and immediately began to do better

2   when he was in the Murphy home, all suggest to me that these

3   kids were in fact having quite a hard time at the Murphy

4   home.

5       Q.   At the Murphy or the Tolar?

6       A.   I'm sorry, at the Tolar home, that there was

7   something very wrong in that household and that the kids were

8   functioning better anywhere else than there.  Would suggest

9   to me that the problem might have not just been the kids, but

10  there might have been some problems in parenting.

11      Q.   Okay.  Go ahead.

12      A.   Well, ultimately that placement then broke down --

13      Q.   Let's go back just one second here.  You did get --

14  did you go see Celeste Tolar and talk to her?

15      A.   Yes, I did.

16      Q.   What were the conditions under which you were able

17  to do that?

18      A.   I called her and talked with her on the telephone

19  and got this information from her on the telephone -- over

20  the telephone.  And I wanted to try and get some pictures and

21  report cards and records from that period of time.  And I

22  asked her, and she said in fact that she had those and that

23  she had some years earlier divided out into five boxes, the

24  pictures for each of the five boys.  And that I could have

25  the pictures.  In fact, while we talked on the telephone, she

1   went and found the box and said, yes, here it is.  And she

2   started going through Jim's box and telling me what was

3   there.  And so I asked if I could come out and pick them up.

4   We talked about various ways of my arranging to get them.

5   And understood that she was going to be going to Lake Whitney

6   the next morning.  It was about 4:00 in the afternoon when I

7   was talking to her, and she was going to be leaving the next

8   morning.  We talked about meeting in Forney, but ultimately I

9   decided to go right then and get the pictures.

10       Q.   Did you go to Grand Saline, or where did you go?

11       A.   Yes, I did, I went to Grand Saline.

12       Q.   Did you talk to her further while you were there and

13   get the pictures?

14       A.   I did talk with her briefly as she gave me the

15   pictures and told me what they were, showed me who was who.

16   Mr. Tolar was in and out preparing, I think, an RV for the --

17   they had a family reunion at the -- Lake Whitney the next day

18   and so I could see that they were in the middle of

19   preparation so I didn't protract that discussion with her at

20   all, just got the pictures and left.

21       Q.   Okay.  And in looking at those pictures, did you

22   look at a number of them that had Jim and/or Donnie in them?

23       A.   Yes, I haven't counted, but there was somewhere

24   between 20 and 30 pictures that she gave me.

25       Q.   Was there anything significant about those pictures

1    that you noticed in just looking at them?

2         A.    Yes.   I felt it was very significant that most of

3    the pictures had been taken around holiday or special events,

4    birthdays, Christmas, and almost to a number Jim was not

5    smiling.   He was very somber in almost all the pictures.

6    There were a few posed pictures that were the exception, when

7    all the kids were lined up for a photo.   But generally

8    speaking, even if he was opening his own present at his own

9    birthday party, he would not be smiling.   When the

10   grandparents apparently came to visit for Christmas, the

11   paternal grandparents, there was a picture of the children

12   all surrounding the grandparents and all the kids were

13   looking at the camera and the were looking at the camera, but

14   Jim was standing right next to his grandfather and he was

15   looking at his grandfather, so it seemed to me that -- that

16   he was a fairly unhappy or somber child.

17        Q.    Do we have some of those holiday pictures here?

18        A.    I think so, yes.   Let's see, this is Buckner as we

19   said, and this is his 8th birthday.   And there was a glow of

20   light on the part of his face, which you may be able to see.

21             Okay.   If you can see this.   This is him and I think

22   this is Donnie and this is Jim's first Christmas, also age 8.

23             This is a picture I just described at Christmas

24   where all the children -- and this -- this may be Donnie

25   here.   There's Jim.   There's his grandfather.   This is Jim

1  looking at his grandfather.  I'm sorry, that's small and hard

2  to see.

3          Right there and there's his grandfather looking

4  down.  This is his third Christmas at the Tolar's.  And his

5  11th birthday.  Okay.  I think that's it.

6          (Photographs shown to jury.)

7      Q.   (By Ms. Little)  Okay.  You said that the kids

8  seemed to do better at school and at the shelter they later

9  went to and that Jim and -- Jim and Donnie began to sort of

10  gang up together towards the end which was a problem for the

11  Tolars; is that right?

12      A.   That's correct.  Ms. Tolar said, and I quote, when

13  we couldn't hold them any longer, we turned them over to the

14  Van Zandt County Children's Shelter.

15      Q.   And then they -- when did they go to that shelter,

16  Dr. Connell?

17      A.   I think it was on New Year's Day, following that

18  last Christmas that I just showed you pictures.  So again,

19  I've had some difficulty getting dates, but I believe it was

20  as Jim was 12 years of age and he went to the Fruitvale

21  school while he was at the shelter.

22      Q.   What did you find out about both boys while they

23  were at the Van Zandt County Children's Shelter?

24      A.   As I said, Donnie almost immediately began to be

25  more compliant, seemed to be, according to the records, eager

1   to establish relationships with adults, including the staff

2   there, and then subsequently to Jim's next adoptive parents,

3   the Murphys, Donnie -- Donnie's records are much more replete

4   than Jim's are from the children's shelter.  Probably -- I

5   would assume that he was having more studies done of him

6   because of his reported bad behavior.  His grades improved.

7       Q.   Donnie's or Jim's?

8       A.   Donnie's.  He had no problems at school.  He gave

9   the history to the caseworkers who did the intake study and

10  talked about their childhood, talked about why they were in

11  placement, that they were there because their grandparents

12  became ill and died.  In fact, both grandparents and the

13  father died during the Tolar placement.  So by the time the

14  kids left the Tolars, they had not seen their mother in a

15  good long while and they basically had no -- no family at all

16  in their -- in the way that they looked at the world I think,

17  except each other.

18          Intake studies indicate that Donnie had come to

19  understand from Mrs. Tolar that the kids were a package deal,

20  and that was very important to him, that they stay together.

21  So when -- when Jim was being adopted by the Murphys without

22  Donnie, that was a source of great consternation to Donnie.

23  He really had a hard time with that apparently.

24      Q.   Go ahead.

25      A.   Let's see.

1    Q.   Donnie actually was in placement there longer than

2  Jim; is that right?

3    A.   Correct.  Jim went into the Murphy placement.  He

4  was attending the Fruitvale school where Mrs. Murphy taught

5  and she saw him on the playground and mistook him for her son

6  Matthew because of his stature, size, the way he looked.  And

7  she sought information about him.  And in fact asked Ms.

8  Tolar if she could adopt him or if she could take him in, saw

9  that he might be a good companion for her son Matthew.

10    Q.   Did Donnie ultimately get placed?

11    A.   Yes, Donnie ultimately got placed with a man named

12  Garth Looney who I understand had adopted two or three other

13  children and who was able to provide Donnie with a wonderful

14  and stable home environment.  In fact, Donnie I believe still

15  lives with Mr. Looney.

16    Q.   All right.  Do you know about when Jim -- how old

17  Jim was when he went to the Murphy's?

18    A.   I believe he was 12 when he went to the Murphy's.

19    Q.   And what can you tell the jury about that, from your

20  investigations?

21    A.   Well, Jim's own perception was that it was the

22  American dream, that it was a wonderful home, that they were

23  able to provide him with everything that he could need or

24  want, that he was very, very close to Mr. Murphy

25  particularly.  As time went on, he described his own

1   behavior.  He said he began to drink and use drugs when he

2   was 14 and that he embarrassed Mr. Murphy and disappointed

3   him.  He said that Mr. Murphy was a councilman or a city

4   manager or somehow involved in the City of Edgewood and a

5   public figure and that some of his own antics were kind of

6   brushed under the rug because of Mr. Murphy's pull.  But that

7   in time his behavior was -- brought great shame to Mr.

8   Murphy.  He said --

9        Q.   Mr. Tolar was also involved in politics and -- in

10  Grand Saline, wasn't he?  Wasn't he the mayor at one time?

11       A.   I believe so, yes.

12       Q.   Go ahead.

13       A.   Jim said that -- that he became closer and closer to

14  Mr. Murphy, and that that became a source of problems in the

15  household because he was more like Mr. Murphy and enjoyed

16  hunting and fishing and working on cars and that kind of

17  thing while Matthew didn't enjoy those things so that in time

18  it seemed as though his relationship with Mr. Murphy was

19  stronger than Matthew's relationship with his own father.

20  And ultimately the Murphys divorced, and Jim said that he

21  blamed himself for that.  He said it was his own fault.  He

22  said when they divorced, he chose to go with Mr. Murphy, and

23  from that time on, that Ms. Murphy hated his guts and wanted

24  nothing to do with him, that he sent her a picture of his

25  daughter when she was born and Ms. Murphy sent it back.

1        Mr. Murphy told me in my conversation with him this

2  morning, and I haven't been able to provide written notes

3  because it was as I was leaving the house this morning that I

4  was able to finally get in touch with him.  He told me that

5  Jim was -- was wrong, that while his behavior was

6  disappointing and he told Jim that, that he never gave up

7  hope for Jim.  That Jim came there a quiet and withdrawn

8  child, and that it was wonderful to watch him blossom in that

9  home.  He told me that he and Jim and Matthew did a lot of

10  hunting and fishing together.  He said that when Jim began to

11  act out, that he would have talks with him and would tell him

12  that he was disappointed in him.  And Jim would say why don't

13  you just spank me, that would be easier to take than a

14  talking to.  So it sounded like the relationship between them

15  was in fact a very close and special one.

16     Q.   And yet though Jim felt that any problems that came

17  up were his fault?

18     A.   Right.

19     Q.   The divorce was his fault, problems were his fault?

20     A.   Correct.  And I asked Mr. Murphy if there was -- at

21  all Jim's doing that the marriage broke up, and he said

22  absolutely not.  And in fact, that they had been divorced

23  earlier for about five years and had been back together for

24  four or five years before Jim and -- before Jim came into

25  their home, but that the problems they had didn't have

1    anything to do with Jim.  He said it was not altogether

2    correct, that Jim's behavior had anything to do with the

3    divorce, so --

4        Q.    Okay.  So from a child's point of view, would it be

5    fair to say that as a little boy Jim felt abandoned by his

6    own mother and family?

7        A.    Yes.

8        Q.    Then he went to the Tolar's.  And whatever the

9    problems may have been or whoever's fault they may have been,

10   that's another situation where he's been dropped off at the

11   orphanage basically?

12       A.    Correct.

13       Q.    And then the Murphy marriage failed, and Samantha

14   Murphy was the woman who adopted him; is that right?

15       A.    That's right.

16       Q.    Did you ever talk to her?

17       A.    No, I didn't.

18       Q.    Did you try to?

19       A.    No.  I was given to understand that she was not

20   going to be willing to talk to -- to people who might be

21   associated with his defense, and so I didn't try.  I talked

22   with her daughter who kind of gave me some information about

23   and corroborated Jim's version that Ms. Murphy won't have

24   anything to do with Jim, that the fact that Jim chose to live

25   with Mr. Murphy was the essence of that, that she never

1  forgave him for that.

2      Q.   This is a very acrimonious divorce, was it not?

3      A.   Yes, according to everyone that I talked with, yes.

4      Q.   While Jim was living there and blossoming, as Mr.

5  Murphy told you, what was going on in the house at that time?

6      A.   As I understand it from -- from Matthew and from his

7  older sister, Tracy Erwin, there was a great deal of fighting

8  between Samantha and Bob Murphy.  Jim did not tell me that,

9  but Matthew himself told me that his parents fought all the

10  time and that the police were called.  I asked Mr. Murphy

11  about that this morning, and he said regarding Jim, and I

12  said or at all, and he said Jim didn't bring about those

13  kinds of problems.  So I didn't get clear in my mind whether

14  the police did or didn't come out.  According to Tracy, they

15  did.  Matthew told me that he finally actually hit his father

16  in the face with his fist.

17      Q.   Matthew did?

18      A.   Yes, because of his father's assaults on his mother

19  and that Jim saw that, that it knocked Mr. Murphy over.  So I

20  think there surely may have been more disharmony for a longer

21  period than Jim Murphy gave me to understand.  He didn't

22  spend any time flushing that out, he just -- just focused on

23  his own destructive contribution to the household.

24      Q.   And what else did Matt tell you about what he knew

25  about Jim?  Did he talk about anything Jim may have ever said

1    about his life at the Tolar's?

2        A.   Well, yes, I asked him if Jim ever reported anything

3    from the Tolars and he -- he gave me a great many anecdotes

4    or incidents that Jim had told me.  Told me about one

5    incident that Jim told him about where the boys were -- Jim

6    and Donnie were tied to a chair so the Tolar boys could hit

7    them.  He told me of them being locked out of the house and

8    without food, of them being given different food from the

9    food the Tolar kids could get, that they didn't get some of

10   the treats and snacks that the Tolar kids got, that they were

11   sometimes sent to bed without food for punishment.  These

12   were the things that he heard from Jim over the years that

13   Jim was in their household.

14       Q.   From the time Jim came at 12 and as the time marched

15   on?

16       A.   Yes.

17       Q.   Did you learn anything about whether or not Donnie

18   was ever left behind at all?

19       A.   Donnie told me that he was.  He told me that he was

20   at a neighbor's when the Tolars were leaving to go somewhere

21   and they locked up the house, leaving him locked out.  He

22   told me, as I said earlier, of being locked in the room and

23   he said he tore the room up when he got locked in.  In fact,

24   Ms. Tolar affirmed that.  She said he knocked holes in the

25   wall.  So they both seemed to be talking about some of the

1    same incidents.

2          I gathered that the Tolars thought of this as

3    time-out, locking the kids in the room for punishment.

4    Q.   Okay.  Did -- how did Matt feel about Jim when they

5    were living together as brothers?

6    A.   I understand from Matt that they were -- that they

7    were pretty close, that they were of the same age and that

8    they got along well.  I gathered that there were some

9    differences and particularly when Jim began to do some acting

10   out that they kind of went their separate ways.  But he spoke

11   generally very fondly of Jim.

12   Q.   Did you find out whether or not the boys were

13   dressed alike when Jim first came to live with the Murphys?

14   A.   One of the pictures that Tracy Erwin provided me,

15   and she provided me with a number of pictures, shows them

16   dressed identically in suits and I understood that was at

17   Easter and Jim looks younger than 12, so this must have been

18   very early in the placement.  And so -- and I do think there

19   were times when they were -- Mr. Murphy specifically

20   mentioned that this morning when I was asking him about Jim's

21   recollection that he and Jim had more in common than he and

22   Matthew did, and he mentioned specifically that Jim liked to

23   wear jeans while Matthew likes to where Dockers and that

24   there were those kinds of differences.

25   Q.   Uh-huh.  Okay.  What were you able to learn, if

DARLINE W. LABAR, OFFICIAL REPORTER

1    anything, about drinking habits and how they began while Jim

2    was at the Murphy family?

3        A.   Well, that's -- that's exactly when I understand

4    that his drinking did begin, although I was given to

5    understand that the children may have been given alcohol by

6    Donnie Kines when they were young.  In fact, Hope Abbott told

7    me that when Donnie was 3, he was taken to the hospital -- to

8    the emergency room.  His dad had given him alcohol and had

9    let him fall out of the back of a truck.  So I understand

10   that he may have had alcohol when he was very, very young,

11   but there was surely a long period when he didn't.  During

12   the Tolar placement when he was 14, as I understand, he began

13   to drink.  And then he used some drugs during high school.  I

14   think he said he smoked marijuana all the way through high

15   school.

16       Q.   Okay.  That reminds me of something.  Did you learn

17   in your investigation about the earlier life of these boys

18   that Donnie Sr., while drunk one time, tried to teach Donnie,

19   a 5-year-old boy, to drive a car?

20       A.   Yes, I understood that he did, tried to teach him to

21   drive at age 5 and as a result Donnie Jr. broke his thumb or

22   hurt his thumb badly on the steering wheel, caught it on the

23   steering wheel.

24       Q.   Okay.  Regarding the drinking, were you able to find

25   any frame of reference for his drinking from any of the other

1    people that you talked to at that time?

2         A.   It was really understated and general.  I think that

3    even when -- much later when Jim was living with his sister

4    Tonya, she was not aware that he was drinking when he was.

5    So it's my understanding that he may have kept it fairly

6    hidden.  And that when he got in trouble, it came to the

7    forefront, but he may have been drinking without people

8    knowing it for a long time.  He certainly identifies himself

9    as an alcoholic from that early age.  I understood that he

10   attempted to tell Ms. Murphy that he had a drinking problem

11   when he was 15.

12        Q.   And what was the result of that?

13        A.   Apparently nothing.

14        Q.   Did he talk to Bob Murphy about it?

15        A.   I don't know.

16        Q.   You don't know?

17        A.   No.

18        Q.   During that time, though, where he had a brother

19   that he got along with and a father and a mother and a nice

20   home where there were creature comforts provided, he was

21   making good grades, was he not?

22        A.   Yes.

23        Q.   So to a large extent, except the alcohol problem, he

24   was thriving early in that time, in that placement with the

25   Murphys?

1    A.    Yes, it would certainly appear on the surface that

2  he was.

3    Q.    What did Jim tell you about his relationships that

4  would be -- other love relationships?

5    A.    He said he had a girlfriend through two years during

6  his high school years before he met Chelsea Willis, one

7  special girlfriend.

8    Q.    And that relationship has continued up until this --

9  October of this past year; is that right?

10   A.    With --

11   Q.    Chelsea?

12   A.    Oh, with Chelsea?  Yes, certainly.  Once he became

13  involved with her, then that became his only love

14  relationship from then on, as I understand it.  They had a

15  child together and for all practical purposes thought of

16  themselves as married.

17        I talked with Chelsea Willis and with Mr. Murphy

18  about that relationship.

19   Q.    And what did you learn from them?

20   A.    Well, from Mr. Murphy I learned that it was a

21  volatile relationship and that Chelsea was a strong-willed

22  and -- and perhaps stubborn person who -- who made her own

23  contribution to some of their fights and he said she would

24  readily admit that.  He reported that there were certain

25  things she wouldn't allow him to do.  She wouldn't allow him

1  to come home drunk and that there were good times, there were

2  special times, but that there was a lot of fighting.  He told

3  me that he hit her on five occasions.  When I asked him about

4  that, he said, "I'm just an alcoholic, it just got real bad,

5  it eat me up, tore up everything I had."  He said he went to

6  Alcoholics Anonymous in Kaufman.

7       Let's see, he said he and Chelsea got together in

8  1995, about 7 to 10 months after he was released from the

9  Childress boot camp where he had gone as a result of an

10  incident that occurred in his late high school years, age 17,

11  and he has been with Chelsea more or less since that time.

12  He said that she works at a lumberyard in Terrell, that she's

13  always been a wonderful mother, a good person, and a very

14  capable person.  He said he never caused her to be

15  hospitalized, but they had fought to the extent that the

16  police were called out numerous times and that Chelsea had

17  left him on several occasions.

18       Q.  So he was candid with you about his part in those

19  problems?

20       A.  Yes, he was.  He said that when he and Chelsea were

21  separated, he really began to drink heavily.  They broke up

22  and they didn't get along anymore and he didn't want Alyssa,

23  his daughter, to see the ongoing fighting.

24       And Chelsea herself told me a good deal about their

25  relationship.  She said she was never afraid of Jim, that she

DARLINE W. LABAR, OFFICIAL REPORTER

1   couldn't imagine him doing anything severely violent.  She

2   said that she never hit him, but she would not back down when

3   she felt she needed to say something.  She would say whatever

4   she needed to say.  She -- let's see --

5        Q.   Did she ever tell you that she threw a glass of tea

6   at him?

7        A.   Yes.  I'm trying to remember who told me that.  She

8   did, or he did.  I think he may have told me that she threw a

9   glass of tea at him and it was full and that it hit him in

10  the head.  Donnie also told me that story, and I don't know

11  whether he heard it from her, and he is friends with her, or

12  whether he heard it from Jim.

13       She told me of a number of suicide attempts and

14  about calling the ambulance when he would threaten suicide or

15  attempt suicide, threaten, when he would say good-bye to them

16  because he was planning on killing himself.  And I'm sorry,

17  she said that he never made a serious attempt.  She said that

18  she would call the ambulance when he would make the threats.

19  She said that many times he tried seriously to sober up, that

20  he would attend AA, but there was just too much on his mind.

21       She talked about the good times.  She said that when

22  Jim was sober and taking care -- that he was taking care of

23  the children, both their child together and a child she had

24  later, and that she'd had numerous kidney surgeries and that

25  he took care of Alyssa and Brittany and did everything he

1    needed to do when she was incapacitated.  She said she knew

2    it was hard for a man to do such things, but he did

3    everything, he washed clothes, cleaned the tub, and did,

4    quote, everything in the world right, end quote, during those

5    periods.

6            She said that Alyssa misses her daddy and thinks he

7    works for Jesus.  She said she didn't know how Alyssa got

8    that idea, but she wasn't going to correct her.  And she said

9    she hoped Alyssa would be able to make up her own mind about

10   him when she's 13 or 14 and old enough to know him.

11       Q.   Did you learn anything about any psychiatric

12   treatment that Jim had?

13       A.   Yes, I did.

14       Q.   What would that be?

15       A.   He had a number of placements for psychiatric

16   treatment and -- let's see, generally, I think, starting

17   sometime after the age of 19.  There was one time after the

18   suicide attempt during which time he took somewhere between

19   40 and 60 pills in an effort to commit suicide.

20           And then let's see, he was in Glen Oaks in

21   Greenville twice he said because he couldn't control his

22   mind.  He was in the Andrews Center in Canton, Texas.  He

23   said he went there on his own because he knew something was

24   wrong.  He was having blackouts and he said his train of

25   thought was messed up.  He said he wasn't drinking at the

1    time, but he gets, quote, depressed like you wouldn't

2    believe, end quote, and that he thought constantly of ways

3    that he could kill himself.

4          He told about another suicide effort where he tried

5    to shoot himself with a 12 gauge shotgun that had ammunition

6    in it, that he racked it, got the bullet in it, but it didn't

7    go off when he tried to shoot himself.

8        Q.   Were you able to corroborate that with anyone?

9        A.   I was never able to make contact with Randy Crow.

10       Q.   With Randy Crow?

11       A.   I tried to try as late last night, and have never

12   been able to talk with him, but I understood that he was

13   present when that happened.

14       Q.   Okay.

15       A.   He said he had been to Timberlawn twice, that he's

16   been medicated with Effexor, Ativan, Sinequan, Tegretol,

17   Seroquel, Haldol, Thorazine.

18       Q.   What are those drugs for?  Do you know?

19       A.   Generally depression and -- and psychosis.

20       Q.   And anxiety as well?

21       A.   Yes.  Yeah.

22       Q.   And were you able to find out if he had taken some

23   or other of those drugs through various times that he went to

24   Glen Oaks and Oak Haven and Andrews Center and Timberlawn?

25       A.   Yes.  I think he's been on and off a number of

 1    different drugs.  He was on Tegretol after the Andrews -- or

 2    while at Andrews.  And according to records, yeah, Librium,

 3    he's been on a number of medications.  He apparently had

 4    hallucinations, and it wasn't clear to me whether those were

 5    always associated with delirium tremens, with withdrawal, or

 6    whether they were visiting upon him of their own accord, but

 7    there were times when he would get on a table with snakes

 8    lashing at his boots.  He said he could hear them, feel

 9    them.  He was sure they were there, called the police.

10         Q.   That could be DT's, couldn't it?

11         A.   Could be, yes.

12         Q.   And was there drug use as you were able to discover?

13         A.   Yes, I think there was, according to his own

14    acknowledgment, in high school, but I think alcohol was

15    certainly his drug of choice.  And he described himself as

16    being in kind of last stages of alcoholism.  He said that the

17    treatment staff had referred to him as a wet head at various

18    times, so I think alcohol was certainly his drug of choice.

19         Q.   Now -- so you've looked at all these medical

20    records, you looked at a statement that he made to the

21    police -- more than one in fact, did you not?

22         A.   Yes.

23         Q.   You looked at the adoption records for he and

24    Donnie?

25         A.   Yes.

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1      Q.    And the police report?

 2      A.    Yes, ma'am.

 3      Q.    You've talked to these numerous family members?

 4      A.    Yes.

 5      Q.    What else can you tell the jury that might aid them

 6   in knowing what would be an appropriate thing to do in this

 7   case regarding all of these family issues?

 8      A.    Well, essentially I think a picture emerges for me

 9   of a person who had some intermittent violence associated

10   with drinking, but who is generally described by people as a

11   warm, outgoing, loving kind of person, who from a very early

12   age began to perceive himself as unlovable, unworthy of other

13   people's love.  Just time after time after time he lost the

14   people that he was close to, in some cases by clear

15   abandonment, such as Hope Abbott or the Tolars.  In other

16   cases by what for a child may seem like abandonment, the

17   death of his grandparents, the drinking and then death of his

18   father, being separated from Donnie.  Those were all losses

19   that a child of his age would have had a hard time trying to

20   process.  And inevitably he turned -- turned it in on himself

21   that there was something essentially unlovable about him.

22   And I think from the time that he was old enough to take

23   action, he began to try to do himself in, in one way or

24   another, and the drinking seemed to be a very

25   self-destructive vent, acting out in the placement with the
```

1     Murphys was quite self-destructive.

2          Q.   With the Tolars or the --

3          A.   The Murphys, when he began to act out.

4          Q.   Oh, when he got in trouble?

5          A.   Yes.

6          Q.   What did you find out about that?

7          A.   Well, I think just that, that he -- that he was

8     probably going through the kind of adolescent rebellion that

9     many kids go through, but that it had a lot more drive or ump

10    to it, fueled by the alcoholism and his self-loathing.

11         Q.   And then the breakup of that marriage?

12         A.   Yes, ultimately.  When Mr. Murphy spoke of the

13    crime, he talked about Ms. Bertie Cunningham in almost a

14    reverent or awed way.  He reiterated again and again and

15    again his self-loathing, his feeling that he's just the

16    spitting image of his father, the drunk, that he doesn't --

17    he doesn't imagine how anybody would be able to forgive him.

18    Generally he was extremely self-effacing, made no effort to

19    redeem himself.  He told me that there would be people who

20    would tell me that they cared deeply about him and that Randy

21    Crow, for example, loved him like a father would love his

22    son.  But notably absent is his capacity to accept himself,

23    and I think that was absent before this happened and was one

24    of the contributing factors that he was just on a

25    self-destructive vent.  He told me he was on his way to kill

DARLINE W. LABAR, OFFICIAL REPORTER

 1   himself.  He was going to say good-bye to his daughter the

 2   next morning, and go out and shoot himself at the lake.

 3       Q.   Now, he did -- you read the statements that he made

 4   to the police, did you not?

 5       A.   Yes, I did.

 6       Q.   And he said it was an accident, didn't he?

 7       A.   Yes, he did.

 8       Q.   Could that be considered as self-effacing at all?

 9   Or a denial of responsibility?  Or I suppose it could be

10   true, but the jury has convicted him of capital murder, so

11   what can you add to that, if anything?

12       A.   I really don't know.  In the way that he construes

13   it, I guess you can say that he -- it's a way that -- that he

14   can manage.  He cannot conceive himself doing something like

15   that to a sweet old woman.  And I think he construes it in a

16   way that makes it comprehensible to him, that this happened

17   at his hand.  But in the same breath, he says again and again

18   that he's not to be excused.  So I didn't -- I didn't take it

19   that he was trying to convince me of anything or sell me a

20   bill of goods about it.  I think he was telling me how he

21   honestly sees it and -- and recalls it.

22       Q.   Do you know anything about that period of time when

23   this crime occurred as far as his life circumstances?

24       A.   .I understand that he perceived his relationship with

25   Chelsea to be beyond repair, and he was living with his

1    sister Tonya and her children in Dallas and working.  And he

2    believed that nobody in that household or in his life then

3    knew of him being an alcoholic.  And he was the mentor, he

4    felt, for some of his daughter -- his sister's children's

5    friends who came to him for guidance and so forth.  And he

6    felt close to those kids and attached to those kids, but I

7    think he perceived himself to be directionless and aimless

8    and not worth living and made another of his many efforts to

9    plan to kill himself.

10        Q.   Are you aware of any attempts he made to kill

11   himself after Ms. Cunningham was killed?  Did you talk to

12   Tonya Thorp about Jim, his sister Tonya?

13        A.   I did talk with her briefly, and I understand he

14   left a note for her.  I -- I mean, he told me that what he

15   intended to do then was to go out to Wills Point, say

16   good-bye to Alyssa, his daughter, and then go out to the lake

17   to kill himself.  He told me that he knew he couldn't go to

18   Alyssa drunk, and he went to a friend's to sleep off the

19   drinking that he had been doing.  And it was while he was at

20   that friend's that he was arrested.  He told me that he had

21   made no effort to cover his tracks in any way in terms of

22   signing his own name when he used Ms. Cunningham's credit

23   cards to buy the kids gifts.  The police asked him why he

24   didn't, and he said I didn't intend to get away with

25   anything, I -- I wasn't planning on living.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   What have you learned about his relationship with

2  his daughter Alyssa?

3    A.   Well, according to him, he -- he couldn't tolerate

4  her coming and visiting him through the glass, as he put it,

5  in his cell and that he had his last telephone contact with

6  her in September.  And I think that Chelsea corroborated

7  that.  I understand that he had a close and loving

8  relationship with her before, according to both himself and

9  Chelsea.

10   Q.   Do we have a picture of him with Alyssa over here?

11   A.   Let's see, this is him.

12   Q.   Now, that's a photograph that has Jim and Alyssa and

13 Chelsea's other daughter Brittany?

14   A.   Brittany, right.

15   Q.   I think I've overlooked a couple of things that you

16 said about some of the testing, Dr. Connell.  When you were

17 doing examination of elevations in that testing --

18   A.   Yes.

19   Q.   -- I believe you stated in your report, which I'll

20 get a copy for us to give the jury, suggested that his

21 responses were not careless or random.  This is on page 10 of

22 your report.

23   A.   Right.

24   Q.   What -- what could you add to that to explain his

25 mental state and what was going on with him?

1      A.    Well, what I was looking at there was F and F back.

2   This is the fake bad scale on the MMPI-2, the scale that

3   shows elevations if the person is just subscribing to every

4   symptom that comes down the pike, adolescents often do that,

5   that kind of sense that everything is awful, my life is

6   awful, nobody understands me, life is not worth living.

7   Looking at the front half of the test and the back half of

8   the test, he subscribed to more and more negative symptoms as

9   the test went on and we -- we look at that to kind of get a

10  sense of how the person is conducting himself through the

11  process of taking the test.   Sometimes when a person gets

12  fatigued, they -- their defenses relax and they start

13  admitting to problems that they were before trying to gloss

14  over or deny.   And so -- and then sometimes they just are

15  responding carelessly as they get tired.   And so I was

16  looking to see if one of those things was going on, if he was

17  just getting careless and just saying true to everything.

18  And what I found when I looked at the symptoms that actually

19  were subscribed to in the back half of the test, it seemed to

20  me that these were exactly the symptoms he had been telling

21  me about on interview.   He -- for example, one of them was I

22  tried to commit suicide in the past.   And he said true.

23  Another one, I've had history of some seizures.   And he said,

24  true.   And he had told me during detox he sometimes had

25  seizures.   I suffer from mental confusion.   And he said,

1   true.  And in fact he had told me on interview of his
2   difficulty keeping his mind straight and feeling like his
3   thoughts were derailing at times.  Hearing voices without
4   knowing their source.  Can't keep his mind on anything.
5   Often feels as if things are not real.  Has had some strange
6   and peculiar thoughts, strange and peculiar experiences.  He
7   feels that there's something wrong with his mind.  These were
8   all consistent with what he had told me on interview and what
9   the mental health records showed he was reporting when he was
10  going to the mental hospitals over the years.  Feeling that
11  strangers are looking at him critically.  Sure he's being
12  talked about.  Feels he has enemies who really wish to harm
13  him.  Acknowledging that he has at times been seen as
14  hot-headed, at times feels like smashing things.  His future
15  feels hopeless to him.  He feels he's not as good as other
16  people.  He feels he's made serious mistakes in his life.
17  Life is a strain for him much of the time.  He feels useless,
18  feels like giving up hope.  He thinks he's no good at all.
19  He readily acknowledged his alcohol abuse and having been in
20  trouble with the law.  So all of these things are things that
21  the history bore out.  It certainly did not seem to me like a
22  person who had lived a perfectly normal life was coming in
23  and sitting down at this test and trying to look crazy.
24  Everything that he reported to me on the test were things
25  that were corroborated at other places in the history, and

1  that's an important distinction when you think about either

2  in defense of a crime, a person claiming insanity or in a

3  sentencing phase a person claiming, you know, an abuse

4  history or mental health history to try to get the law to go

5  easy on him.  These things said to me that Mr. Murphy was

6  being honest with me, that everything he was reporting to me

7  was corroborated by the history I gathered.

8      Q.   And what did you learn about his view of himself in

9  relation to other people?  How does he -- is he trusting of

10  other people or not?

11     A.   Not at all, and doesn't feel that he's as good as

12  other people or what other people are worth.

13     Q.   His attachments, are they -- are they strong or weak

14  or superficial or --

15     A.   I think he has some fairly strong attachments.  His

16  attachment to Chelsea seems to me like it's been a strong

17  one.  You can also look at it from another angle and say he

18  let her down.  The same would be the case with Mr. Murphy.

19  He yearns for a reconciliation of that relationship.  He --

20  the fact that Mr. Murphy in his eyes finally did give up on

21  him is a source of great pain for him.  So I think there are

22  attachments.  He can't bear the thought of visits with some

23  of his family members because of the pain.

24     Q.   Because of the strong attachment he feels?

25     A.   The attachment he feels and the shame and the

1    disgrace that he feels he has brought by his behavior and the

2    disgrace of being in the situation that he's in.  He said

3    that it was -- it was very difficult for him to visit with

4    his sisters and his mother because of those things.

5        Q.   And from your MCMI-III test results, did you find

6    that he was undergoing acute major depression?

7        A.   That was the suggestion from the test results,

8    right, characterized by some agitation and some erratic

9    thinking, not just deeply depressed, but deeply depressed

10   with an agitated edge, shifting between self-deprecation and

11   despair, thoughts of suicide and hopelessness, futility, to

12   occasional outbursts of bitter discontent or irrational

13   demands.  I think from looking at the jail records there were

14   some times when he had outbursts at staff.  He told me that

15   he was having difficulty of getting his medication with any

16   kind of regularity once the jury selection procedure started

17   because the med cart comes around at 9:00 in the morning and

18   he was being brought over here around 6:00 or 6:30 so he

19   wasn't getting his medication in the usual way.

20            His mother called me at one point and said that he

21   wasn't being given it at all for a few days and that he was

22   really getting increasingly agitated.  I could see that as

23   well on the occasions that I saw him.  It was as though he

24   was much more fragile and in a state of ill health, mentally,

25   compared to how he was the first two times I saw him when he

1   was being medicated regularly.

2       Q.   You also said I believe that the MCMI-III suggested

3   his bouts of alcoholism could be partly due to his

4   frustration and disappointment in his own life; is that

5   right?

6       A.   Certainly, I think that's -- that's precisely what

7   was going on.  I think he probably had a genetic

8   predisposition or vulnerability to addiction, but that what

9   fueled it, what drove him was his identification with his

10  father as seeing himself as sort of nothing but a drunk, not

11  worth anything, and trying to find some place where he felt

12  better and he got that temporarily from drinking, apparently.

13      Q.   What patterns have you noticed from this testing

14  about his behavior?

15      A.   Well, I think he's unpredictable, he's moody, he's

16  impulsive.  All those behaviors are intensified when he's

17  drinking.  Brooding resentment that may break out of control

18  from time to time.  It sounds like he could maintain an even

19  keel for a period of a month or two or sometimes three

20  months, working, staying sober, going to AA, maybe being in

21  outpatient treatment, but then something would set him off

22  and he would go on another binge, get aggressive, angry,

23  loud, belligerent, and things would spiral downward and out

24  of control.

25      Q.   Did you find anything from your testing or anything

1    else about any kind of emotional trauma that he had early?

2        A.   Well, yeah, I mean, I think the history very clearly

3    tells us that, that the resent -- the resentment and the

4    anger that were driving his behavior had to do with these

5    early loses and disappointments.  They echo through his whole

6    life from the observation of his father's abuse of his

7    mother, his sense that his mother abandoned him, that she

8    chose to retrieve some of his siblings but further abandoning

9    by leaving him in the institution, the reported abuse that

10   was perpetrated on him by his first adoptive father and --

11   which you'll remember he didn't tell me about, but his

12   brother Donnie did.  The eventual disruption of his second

13   adopted family, the marriage breaking down, and him feeling

14   responsible for it, feeling like just being there caused

15   things to fall apart, so that he seemed very early in his

16   life to develop the theory that he was unloved and

17   unlovable.  That his father's alcoholic and abusive patterns

18   were indelibly engraved in his own life script.  That he was

19   going to be reliving his father's life, that whoever he

20   touched or loved, he lost.  And I imagine that he drank to

21   drown out those feelings.

22       Q.   So some of that could be self-medication, as well as

23   a genetic propensity?

24       A.   Yes.

25       Q.   Were you ever able to find anything about any ADD

1   that he might have had early on?

2       A.   He said he was diagnosed with a ADHD.  In his school

3   records I did not see that -- I didn't find that.  I saw sort

4   of average performance to sometimes low average performance

5   which, you know, I think at the -- at the end of the Tolar

6   placement, for example, but then increased or improved

7   performance.  And according to Mr. Murphy, his grades stayed

8   pretty high until his senior year.  I think there were

9   indications of some hyperactive behavior.  Donnie said that

10  Jim would rock himself to sleep at night, and he said they

11  slept in bunk beds and he would get mad because of his

12  rocking behavior and he only realized later that Jim probably

13  couldn't help it.  Ms. Tolar mentioned that as well, his

14  rocking behavior.

15      Q.   What do you mean by that?  What's the rocking

16  behavior?

17      A.   I would think of it as having energy and no place to

18  put it or trying to self-suit, just laying in bed and kind of

19  rocking.  Mr. Murphy said that even at the age of 12 when

20  they got him, that he would roll his head to go to sleep.  He

21  couldn't just lie still.  He would always every night would

22  be rolling his head until he felt asleep.  So it sounds to me

23  like there was a kind of driven quality about some of his

24  behavior.  If you see somebody constantly needing to fidget

25  or to be moving all the time, one of the things that you

1    start to think about is the possibility of kind of a

2    hyperactive element.  But generally speaking, I don't think

3    there were strong indications of ADHD and the history that I

4    read.  People described him as a mellower, quieter child, not

5    as a rambunctious child, the way an ADHD kid would often be

6    described.

7        Q.   And the way that Donnie apparently was?

8        A.   That's correct.

9        Q.   Were you aware from Chelsea that Jim still was

10   rocking himself to sleep, even at the time that he was living

11   with her?

12       A.   I don't remember becoming aware of that from her.

13       Q.   Did you come up with a prognosis of your own about

14   Jim?

15       A.   Well, I wasn't asked specifically to do a risk

16   assessment or assessment of future dangerousness, but I

17   clearly was interested in trying to understand how -- how

18   this violent act occurred in a life that was otherwise

19   without indication of that level of violence.

20            MR. DAVIS:  I'm going to object.  At this time

21   if we're going to go into an issue that I've been told we're

22   not going to go into --

23            THE COURT:  Sustained.

24       Q.   (By Ms. Little)  You did -- you did want to

25   understand though as much as you could; is that right --

DARLINE W. LABAR, OFFICIAL REPORTER

1     A.    That's right.

2     Q.    -- Dr. Connell?

3     Did you also in trying to prepare your -- this

4 presentation for the jury talk to Hope Abbott?

5     A.    Yes, I did.

6     Q.    How long did you talk to Hope?

7     A.    I talked to her on three occasions by telephone and

8 on one occasion in person and probably altogether somewhere

9 in the neighborhood of an hour.

10     Q.    What conclusions did you draw about Ms. Abbott when

11 you talked to her?

12     A.    Well, I mean, I wasn't doing an assessment of her.

13     Q.    I understand.

14     A.    But was certainly trying to understand her

15 contributions and communications with Jim and how those had

16 affected his life.  I understood from her that she thought

17 placing the children in adoption would be giving them

18 opportunities.  She herself was adopted, and apparently by a

19 very loving family.  And she anticipated that she was going

20 to be providing her children with things that she couldn't

21 provide them by placing them for adoption.  And I understand

22 that she was up against tremendous difficulties in those

23 years when she placed the children at Buckner, suffering

24 regular severe abuse and unable to protect the children and

25 felt that she was doing the right thing.  And I understand

1    then that she didn't have any contact with Jim again until

2    her daughter's wedding.  And once she did have contact with

3    him, she remained in contact with him as best she could.  She

4    said that she had not gone to visit him because she had some

5    health difficulties that made it difficult for her to do that

6    kind of thing.  And that she had provided monies for him for

7    commissary when she could.  She said that it seemed

8    incredibly expensive, and she verified that things did in

9    fact cost as much as Jim said they did and that she tried to

10   send around 75 to a hundred dollars a month for commissary

11   while he was here.

12       Q.   Okay.  Did you talk to her about any suicide

13   attempts or commitments or psychiatric treatments?

14       A.   Yes, she talked about the suicide attempt that

15   resulted in her trying to get him placed.  And she talked

16   about a psychiatrist -- she called him by the name of, I

17   think she said Bob Gold -- refusing to hospitalize Jim on one

18   occasion.  And in her training as a nurse, I think she

19   understood some of what he needed and tried to get -- get him

20   plugged into treatment, but was frustrated in her efforts.

21   By the same token, she was kind of trying to oversee his

22   medication issues while he was here and was also experiencing

23   some frustration with that.  She said the 1997 suicide

24   attempt when he overdosed on Benadryl, that he was

25   hospitalized in Kaufman, and she said that he would work

1   and -- I'm sorry, that was his father, I think.  The next

2   part.

3        Q.   Did she talk to you about what Jim was like as a

4   little boy when he was still with her?

5        A.   Yes, she did.

6        Q.   What did she relate to you about that?  I think it's

7   on page 16.

8        A.   She said when the children were young, let's see --

9   I'm sorry, my pages are not numbered the way yours are.  Mine

10  are kind of all over the place.  Okay.  She said that he was

11  a very precocious, funny child who always smiled.  She said

12  if she lowered her voice and got gruff with him, it broke his

13  heart.  She said the other two boys would put him up to

14  things, such as throwing rocks or using a slingshot and that

15  if she got on to him, he would cry.

16       Q.   And did she express to you that she was aware of

17  what the boys perceived as abuse on the part of the Tolars?

18       A.   She did.  She said that she didn't know anything of

19  any sexual abuse.  And I asked her if there was ever any

20  sexual abuse.  She said, no.  If she had known for one second

21  that such a thing would have happened, she said you'd be

22  taking notes on me.  She talked about the Tolar family,

23  whipping the children with bed slats, locking them in the

24  house, leaving them without food at times, about Donnie

25  tearing up the room on one occasion.  She cried as she talked

DARLINE W. LABAR, OFFICIAL REPORTER

1      about that and said if she had known what they were going to

2      suffer in adoption, she never would have left them there.

3      And how bad she felt about in her part in putting them

4      through that.

5           Q.   Now, Ms. Tolar also related to you, didn't she, that

6      Jim and Donnie knew that the parents didn't want them?

7           A.   She said that's how they represented why they were

8      in adoption regularly, that they always said their mom didn't

9      love them, didn't want them.

10          Q.   How many different placements as an estimate could

11     you come up with that Jim went through himself from the time

12     he was -- with his real parents and then he moved a number of

13     times?

14          A.   Well, if you count the times that he was with his

15     grandparents, with at least his mother out of the home and

16     his father for all practical purposes out of the home, there

17     would be the two placements with his biological family and

18     then three formal placements.  There was the foster home in

19     Fruitvale, what he refers to as a foster home.  I couldn't

20     find much information about that.  I'm not sure whether he's

21     confusing the shelter placement with the foster placement or

22     in fact whether there was --

23          Q.   If it was a placement?

24          A.   Yeah, I don't know that.  And the Tolars and the

25     Murphys, so five that I know of, possibly six.

1    Q.    Okay.  And when you talked to Tonya about Jim, when

2  was it that you talked to her?

3    A.    Yesterday.

4    Q.    Just yesterday?

5    A.    I talked with her briefly before by telephone, but

6  principally about some logistics issues regarding her

7  father's death.

8    Q.    And did she tell you that Donnie Sr. was verbally

9  abusive of the children?

10    A.    She did, yes.  Oh, in fact, I'm sorry, I have a

11  conversation with her about --  in last week, I think it was,

12  and she gave me that information.  She said that he would

13  call them -- my pages are not numbered and I'm sorry I'm not

14  looking.  Since I'm going to be quoting, I want to be exactly

15  correct.  I may have another copy of it.

16        Ms. Little, I'm sorry --

17            MS. LITTLE:  May I approach the witness, Your

18  Honor.

19            THE COURT:  You may.

20    Q.    (By Ms. Little)  Let me ask you to look at this

21  which is a part of the report you provided to me; is that

22  right?

23    A.    Right.

24    Q.    I'm on this page here, if you'll just glance at

25  that.

1    A.   Okay.

2    Q.   Okay.  When you talked to Tonya, how did -- what

3    kind of discipline did she indicate, besides what we already

4    know about, beating up of Hope and those things, what was the

5    verbal abuse that she related to you?

6    A.   She said that in addition to belt whippings, her

7    father would say "you little shit," or "goddamn it, you

8    little bastard," to the children, that there was definitely

9    verbal abuse all through their childhood.

10   Q.   And did she compare Donnie and Jim to you?

11   A.   She did.  She said that Donnie was the rambunctious

12   one, the rascal, and that Jim was well-behaved and that if

13   anybody would have expected anything bad like this to have

14   happened, it would have seemed more likely that Donnie would

15   have gone in that direction than Jim.

16              THE COURT:  Anything further?

17              MS. LITTLE:  I believe not.  Thank you, Dr.

18   Connell.

19              THE COURT:  Take a short recess.

20              THE BAILIFF:  All rise.

21              (Jury excused from courtroom.)

22              THE COURT:  Counsel, we'll take a break until

23   11:30 and then --

24          Sam, what time is lunch?

25              THE BAILIFF:  It's supposed to be 12:00.

1    THE COURT:  Then we'll break for lunch.

2         (Recess taken.)

3    THE BAILIFF:  All rise.

4         (Jury returned to the courtroom.)

5    THE COURT:  Jury is returning to the courtroom

6  at this time.

7         Jurors may be seated.

8         Mr. Murphy, counsel, visitors in the gallery, you

9  may be seated.

10         MS. LITTLE:  Your Honor, before I pass Dr.

11  Connell for cross, I'd like to offer Defendant's Exhibit

12  Number 41 for all purposes, the Curriculum Vitae for all

13  purposes.

14         (Defendant's Exhibit No. 41 offered)

15    MR. DAVIS:  No objections.

16    THE COURT:  Admitted.

17         (Defendant's Exhibit No. 41 admitted)

18    THE COURT:  You may proceed.

19    MR. DAVIS:  Thank you.

20                    Cross-Examination

21  By Mr. Davis:

22    Q.   Dr. Connell, we've met before this morning, right?

23    A.   Yes, sir, we have.

24    Q.   As a matter of fact, I guess the first time that we

25  met is when you came over to testify on behalf of Robert

1    Wayne Harris here in Dallas County, wasn't it?

2        A.   I think that's right.

3        Q.   Robert Wayne Harris, you testified on the same issue

4    of mitigation as you testified on behalf of Jedidiah Murphy,

5    correct?

6        A.   That's correct, yes.

7        Q.   As you recall, Robert Wayne Harris is the person

8    that killed five coworkers at the Mighty Fine Car Wash in

9    Irving --

10            MR. BYCK:   To which we'll object, Your Honor.

11   This is totally irrelevant.

12            THE COURT:   Objection is overruled.

13       Q.   (By Mr. Davis)   Robert Wayne Harris is the

14   individual, is he not, who killed five coworkers -- shot and

15   killed them last year?

16       A.   That's correct.

17       Q.   And the testimony showed in that case in addition to

18   that that some months earlier he had taken a young woman,

19   kidnapped her and shot her, and then dumped her in a field in

20   Grand Prairie or Irving, hadn't he?

21       A.   Yes, sir.

22       Q.   Now, as I understand in this matter, Dr. Connell,

23   you were asked to look at and examine possible mitigating

24   circumstances, right?

25       A.   Yes, sir.

1    Q.   And I guess with that regards, it's important to try

2  to gain information from as many sources as you possibly can

3  that might aid you, correct?

4    A.   Yes, that's right.

5    Q.   And you did review some records and you have talked

6  with some individuals, but let me just ask you, have you ever

7  looked at any records from the Van Zandt County Community

8  Counseling Center?

9    A.   I have looked at records from the Van Zandt

10 Community something center.  Let me just get over there and

11 see.  No, I haven't.  These are from the Van Zandt County

12 Children's Shelter Board, so, no, I haven't.

13   Q.   Have you ever looked at any records from Doctor's

14 Hospital in New Boston?

15   A.   No, I don't think so.

16   Q.   Or the Wadley Regional Hospital in Texarkana?

17   A.   No, sir.

18   Q.   Have you ever looked at any records from a Dr.

19 DeHaan in Texarkana?

20   A.   No, sir.

21   Q.   St. Michael's Hospital in Texarkana?

22   A.   No.

23   Q.   Dr. Vandiver in Kaufman?

24   A.   No, I don't think so.

25   Q.   Now, the people that -- and again, you've talked

1     about the circumstances of this offense to this jury, but

2     have you made any efforts to talk with any member of the

3     Garland Police Department?

4          A.   No, sir, I have not.

5          Q.   Have you made any effort to talk with any member of

6     the Van Zandt County Sheriff's Department?

7          A.   No.

8          Q.   Wills Point Police Department?

9          A.   No, sir.

10         Q.   Terrell Police Department?

11         A.   No, sir.

12         Q.   You've talked extensively about the defendant's

13    medical history, but have you made any effort to talk with

14    any treating physician that this person has seen in the past?

15         A.   No, I didn't.

16         Q.   Have you talked with any of the doctors or

17    counselors that talked with him in any of these facilities

18    that he's been in over the years?

19         A.   No, I haven't.

20         Q.   You talked a little bit about his activities in the

21    jail.  Have you made any efforts to interview any Sheriff's

22    deputies or detention service officers?

23         A.   No, I haven't.

24         Q.   Have you talked with any other inmates?

25         A.   No.

1    Q.   Have you talked with any jail nurses about him?

2    A.   No, I have not.

3    Q.   Have you talked with an individual by the name of

4    Bill Parker?

5    A.   No, I have not.

6    Q.   Did you make any effort to talk with a Sherryl

7    Wilhelm?

8    A.   No, I didn't.

9    Q.   Margie Ellis of Wichita Falls?

10   A.   No, sir.

11   Q.   Did you ever attempt to talk with a Mandy Kirl?

12   A.   No, I didn't.

13   Q.   Or Jeanne Evans?

14   A.   No.

15   Q.   As I understand with regards to Samantha Murphy, you

16   were just told she wouldn't talk with you.  You didn't make

17   any effort to talk with her?

18   A.   That's correct.

19   Q.   You've talked extensively about the alleged abuse

20   that happened in the -- in the Tolar home.  Your primary

21   reason for contacting Celeste Tolar was to get some

22   photographs from her, wasn't it?

23   A.   Yes.  I also wanted to interview her, but I -- but I

24   wanted photographs as well.

25   Q.   All right.  And so you made no efforts whatsoever,

1    did you, to talk with Celeste Tolar about any alleged abuse

2    that happened in her home with regards to either Donnie or

3    Jim Murphy?

4        A.   I didn't ask her any questions that included the

5    word "abuse."  I asked her about discipline.

6        Q.   You met Terry Tolar, didn't you?

7        A.   Yes, I did.

8        Q.   At the time that you met Terry Tolar, Dr. Connell,

9    you knew that allegations were being made that he abused,

10   either physically, psychologically, or sexually abused the

11   defendant in this case, didn't you?

12       A.   Yes.

13       Q.   And yet you made no effort at all to talk with him

14   about that issue, did you?

15       A.   Correct.

16       Q.   You knew this man was being alleged to be an abuser,

17   those charges were being made against him, and yet you didn't

18   give that man a single opportunity, did you, to answer that

19   charge and address that charge with you, did you?

20       A.   No, I didn't.

21       Q.   So instead you decided to take as your own only

22   sources for that alleged abuse the word of this defendant

23   down here charged with capital murder and his brother Donnie

24   Tolar, correct?

25       A.   Yes, in terms of eyewitnesses to it, that's correct.

1    Q.   So neither Ms. Tolar or Mr. Tolar were given the

2    opportunity to answer those charges to you, were they?

3    A.   Well, when I asked Ms. Tolar about discipline, I

4    felt that she did touch on the kinds of discipline that were

5    being described that you characterize as abuse.

6    Q.   Well, she certainly didn't mention any sort of abuse

7    in that home, did she?

8    A.   Again, I guess it depends on how you look at the

9    things that she -- that she mentioned.  Some people would

10   consider it abusive to discipline until your strength gives

11   out.

12   Q.   Discipline until your strength goes out?

13   A.   Gives out.  I think those were the words she used.

14   Q.   I know they're words, but you take to that mean that

15   she's implying that she used abusive behavior towards these

16   boys?

17   A.   Well, as I said, I think there are some people who

18   would consider discipline to be abuse if it -- if it saps an

19   adult's physical strength.  If we're talking about whipping

20   until you don't have the strength to whip anymore, for

21   example, I think there are people who would call that abuse.

22   Q.   Ms. Tolar never did say that she whipped these boys

23   until her strength went out, did she?

24   A.   She said she disciplined until her strength gave

25   out.

1    Q.   Did she ever say that she put a hand on these boys,

2    such as whipping them or beating them until her strength went

3    out, Doctor?

4    A.   She didn't say she put a hand on them, and she

5    didn't say she whipped.  She said she disciplined until her

6    strength gave out.

7    Q.   What she said is she had five boys there to try to

8    discipline and at times she got too tired to handle the

9    situation herself so she waited for her husband to come home;

10   isn't that true?

11   A.   I suppose you could look at what she said that way.

12   I didn't -- I didn't hear it that way, but I suppose you

13   could.

14   Q.   The people that you've talked with, the family

15   members certainly are sympathetic toward the defendant,

16   aren't they?

17   A.   Not wholly.  Donnie, for example, when I talked with

18   him, shared some real, I guess, mixed feelings about -- about

19   whether Jim should have any sympathy at all for what he did.

20   Q.   Well, Donnie doesn't want him to die, does he?

21   A.   In the end I think he -- he iterated to me that he

22   didn't.  I didn't hear it stated terribly clearly.

23   Q.   Well, certainly his mother doesn't want to see him

24   die?

25   A.   Correct.

1    Q.   Neither does Tonya Thorp.

2    A.   I think that's right.

3    Q.   Matt Murphy who you talked with, what, yesterday?

4    A.   Yes.

5    Q.   He doesn't want to see him die, does he?

6    A.   No, I believe not.

7    Q.   And these were the primary sources for family

8 histories, abusive histories, trying to get these collateral

9 sources to try to corroborate this defendant's history to

10 you, right?

11    A.   They were some of the sources, yes.

12    Q.   Let's -- let's talk a little bit about the abuse,

13 first of all, that allegedly happened in the Tolar home.

14 Again, the only eyewitness accounts that you have because you

15 chose not to talk with the Tolars is Donnie and Jim, correct?

16    A.   That's correct.

17    Q.   Do you think it happened?  Do you think that they

18 were abused in that home?

19    A.   I don't know that I have enough information to know,

20 and I -- I don't think that Jim, for example, characterized

21 it to me as abusive.  It does sound to me as though there was

22 fairly severe discipline.  I would doubt that the kids ever

23 had marks on them, and some people consider that kind of the

24 threshold for physical abuse.  I -- I certainly gather that

25 there was a sense of a difference in how the two boys were

1    treated compared to the Tolar boys.  And I think that in

2    child welfare standards that's generally considered to be

3    emotional abuse, so it certainly does sound as though that

4    may have happened.  I don't have a real clear sense other

5    than that the boys themselves felt in the end unloved and Ms.

6    Tolar essentially affirmed that their patience just simply

7    wore out with these kids.

8         Q.   Do you consider Donnie Tolar to be a credible source

9    for information about what happened in that Tolar home?

10        A.   Not altogether.  I don't know that any child is an

11   utterly reliable source for periods of childhood and

12   particularly when they are emotionally charged.

13        Q.   Well, you know, for instance, you talked to Garth

14   Looney about Donnie, didn't you?

15        A.   Yes, sir.

16        Q.   This source -- one of the two sources -- eyewitness

17   sources.  And as a matter of fact, isn't it true that Garth

18   Looney who Donnie has lived with for several years stated to

19   you that Donnie has severe anger problems and is actually

20   abusive toward him?

21        A.   Yes, sir.

22        Q.   Which would be consistent with a history that Donnie

23   was abusive towards the Tolars and that they were unable to

24   control him in their home?

25        A.   It might be consistent with that.  It might also be

1  consistent that the way Donnie had learned to interact with

2  other people was through violence, learned it from his own

3  father, possibly learned some of that from the Tolars.  I

4  don't know that I could necessarily conclude exclusively that

5  it would mean that he was abusive to the Tolars.  It could

6  mean just the opposite.

7       Q.   And as a matter of fact, Garth Looney told you when

8  you interviewed him that he needs to get rid of Donnie, but

9  he doesn't know where to send him.  He's trying to get him

10 out of his home, isn't he?

11      A.   That's what he said, yes, sir.

12      Q.   And as I understood your testimony, correct me if

13 I'm wrong, but you said that one indication to you was the

14 fact that these boys very quickly after they got back to the

15 shelter started behaving better, starting mellowing out in

16 their behavior, correct?

17      A.   Yes, sir, and their grades improved.

18      Q.   You stand by that testimony, Doctor?

19      A.   Yes, sir.

20      Q.   I know that you've looked at the records from the

21 Children's Shelter Board in Van Zandt County, haven't you?

22      A.   Yes, I have.

23      Q.   For both Jim and Donnie Tolar, right?

24      A.   Yes, sir.

25      Q.   Doctor, isn't it true that both of these boys on

1    January the 17th were ordered out of the shelter --

2              THE COURT:   What year, please?

3              MR. DAVIS:   Of 1987.

4        Q.   (By Mr. Davis)   January 17th of 1987, some 16 days

5    after they were brought into the shelter by the Tolars, they

6    were ordered out of the shelter because the shelter personnel

7    could not control them, I believe, and Donnie's records, the

8    notation is that both of them were disrupting the shelter to

9    the extent that the shelter personnel asked the Tolars to

10   take them back into the home, didn't they?

11       A.   I know that they went back to the Tolar home and --

12   briefly for about two weeks, and I'm not finding the records

13   that your referring to.

14       Q.   Well, if you will, on Jim -- Jim Ed Tolar's records,

15   page 2, date of release 1-17-87, "return to parents, so out

16   of control that we could not continue to keep him."  Do you

17   see that notation, Dr. Connell?

18       A.   My page 2 is foster care intake studies.

19       Q.   This is the statistical sheet --

20             MR. DAVIS:   Could I approach the witness?

21             THE COURT:   You may.

22       Q.   (By Mr. Davis)   I'm not sure what number, but let me

23   direct your attention, Doctor, to entitled "Statistical

24   Sheet."  Do you see down here date of release discharge

25   information 1-17-87, "returned to parents.  So out of control

1    that we could not continue to keep him."  And discharged to

2    parents, to the Tolars?  You see that entry?

3        A.   Yes, I do.  I don't know whether I have that here in

4    my records, so I may not have seen it before.

5        Q.   Well, obviously these children did not mellow out

6    and did not improve immediately after they came to that

7    shelter from the Tolar home, did they?

8        A.   The records that I have, and I can quote from them,

9    indicate quite the opposite.

10       Q.   Who provided those records to you?

11       A.   Ms. Little.

12       Q.   Do you have a -- this is again with Jim Ed Tolar --

13   a discipline record for him that has at the top his name and

14   his date of birth?

15            MS. LITTLE:  Judge, before we go forward with

16   that, can she answer the question that he just asked her?

17   She's looking for her record that shows the opposite.

18       A.   I found my record that shows the opposite, and I do

19   not find the discipline record.  My record that shows the

20   opposite, if I can read to you, this is dated 1-20-87.  This

21   child and the brother were adopted three and one half years

22   ago.  This placement proved more than adoptive parents could

23   adjust to with two of their own children.  And I'm skipping

24   down.  Seems content and glad to be in this shelter.  Oh,

25   this is about Donnie.  And during Donnie's stay at the

1   shelter he has gradually developed a better rapport, respect,

2   and confidence and King's -- he is described by Mrs. King as

3   becoming better at controlling his bad behaviors, he's

4   courteous, often expresses his love and concern for the

5   Kings.  Mrs. King feels he is an easy to like child.

6        Q.   Doctor, in talking about Donnie now, do you see --

7   do you see a discipline record on Donnie Tolar?

8        A.   No, I apparently don't have discipline records; or

9   if I do, I cannot find them.

10                  MR. DAVIS:  If I could approach the witness,

11   Your Honor.

12                  THE COURT:  You may.

13        Q.   (By Mr. Davis)  Doctor, let mow show you a record

14   that apparently was not provided to you.  This is -- this

15   again refers to Donnie Tolar.

16        A.   Okay.

17        Q.   Donnie Tolar, date of birth 4-14-74.  Discipline

18   record, does it relate that physical punishment or

19   restrictions described as below, removed radio from room,

20   refused to turn it down -- refused to turn it down,

21   restricted from playing pool, gets in arguments or fights

22   every time he plays.  Other methods of discipline, asked

23   several times to keep it down, told if he can play without

24   arguing or fighting, he can play, but always ends up arguing.

25        A.   Uh-huh.

1    Q.   Okay.  That -- that page apparently was not provided

2   to you?

3    A.   Correct, it's not.

4         MS. LITTLE:  For clarification, is that in the

5   Donnie records?

6         THE WITNESS:  Yes.

7    Q.   (By Mr. Davis)  Now, also do you have the discipline

8   record for Jim Ed Tolar?

9    A.   No, I don't.

10        MR. DAVIS:  May I approach again, Your Honor.

11        THE COURT:  You may.

12   Q.   (By Mr. Davis)  And this discipline record is

13   dated -- dated 1-14-87.  Does it state:  Removed radio from

14   room, spanked Jim with five licks with open hand for profane

15   name calling, spitting, and kicking Mr. King who was his

16   house parent?

17   A.   Apparently, yes.

18   Q.   The record indicates that he is physically violent

19   toward the house parent who's trying to care for him,

20   correct? By kicking him?

21   A.   Right.

22   Q.   Attempt to explain child's confusion, getting mad at

23   house parents because of treatment from peers, and then on

24   help needed from caseworker in dealing with child's behavior,

25   states:  Child becomes out of control at the least

DARLINE W. LABAR, OFFICIAL REPORTER

1  provocation, remarks, or action of peers.  Does that appear

2  to be the entry there?

3      A.   Of others.

4      Q.   Of others.  Okay.

5      A.   Uh-huh.

6      Q.   So those entries, plus the fact that both boys were

7  removed back to the Tolar home, certainly are not consistent

8  with a history of these two boys adjusting very quickly to

9  their new surroundings at the Children's Shelter, do they?

10     A.   I'm not sure about the dates because -- was that

11 1-14-87?

12     Q.   1-14, with removal being 1-17.

13     A.   Their removal from the Children's Shelter?

14     Q.   Yes, back to the Tolar's home?

15     A.   And yet on 1-20-87 -- let's see, it indicates that

16 Donnie was placed there on 3-12-87, and that he is still at

17 the shelter on 1-20-87, and the date of this entry that I

18 read to you where he was adjusting well was, I believe, right

19 around the same time.  1-20-87, that it says seems content

20 and glad to be in shelter.  So I guess I don't know what to

21 make of these records.

22     Q.   Do you have a statistical sheet on Donnie Tolar?

23         MR. DAVIS:  If I could just approach.

24         THE COURT:  Okay.

25     Q.   (By Mr. Davis)  It may be easier to do it this way.

1      Let me show you a page from Donnie's records,

2  Doctor.  This is dated 1-17 of '87, date of release, 1-17-87,

3  circumstance:  Removed because he was completely out of

4  control.  Discharged to parents, which, again, would indicate

5  that he left that shelter on 1-17-87, correct?

6      A.   Yes.  Earlier it says:  Parents brought children

7  here stating they wanted to relinquish their parental rights,

8  that the children did not want to live with them any longer.

9      Q.   Right.

10      A.   And then discharge to the parents.

11      Q.   So the first comment would appear to be a comment

12  made at the time that the Tolars brought the children on

13  1-1-87.

14      A.   The children were told that the parents would not

15  take them back into their home.

16      Q.   You're referring to a document dated 1-1-87,

17  correct?

18      A.   Right.

19      Q.   So this would refer to the original placement by the

20  Tolars?

21      A.   At the shelter.

22      Q.   Shelter, right.

23      A.   The child's needs to be loved and encouraged that

24  he's going through a very trying time.

25      Q.   This, again, would be 1-1-87, right?

DARLINE W. LABAR, OFFICIAL REPORTER

1     A.   Right.  Donnie was returned to his parents because

2   of his inability to cope with his circumstances.

3     Q.   Again, that would have been shared with the child

4   on --

5     A.   On 1-1-87.  It's very difficult to follow the

6   chronology.  I don't have these records.  Donnie was removed

7   to a foster home.

8     Q.   You're talking about 7-17-87 at this time.  Well,

9   I'm sorry, 3-12-87, he's now -- actually, the DHS now takes

10   actual --

11     A.   Conservatorship.

12     Q.   -- conservatorship of him even though he may still

13   be at the shelter, right?

14     A.   Right.  He remained there apparently until 7-17-87,

15   by which time I think Jim had been at the Murphys for

16   sometime and Donnie had tried to get himself placed there,

17   too, unsuccessfully.  This is the --

18     Q.   This is the entry for 1-20-87.

19     A.   So it looks like I had a partial set of these

20   records, but in any case it doesn't seem to me like it's

21   possible to derive from looking at these records exactly what

22   the children's adjustment at the shelter was.  There are

23   entries that suggest it was good, and there are entries that

24   suggest it was problematic.  It's understood generally in

25   child residential placement that there will be a honeymoon

1    period when the child behaves well and that there will be an

2    acting out period after the honeymoon period of where the

3    child kind of tests the limits to see what -- to test whether

4    the people really like them and want them there and so

5    forth.  So without plotting all of this on a calendar, I have

6    trouble of making sense out of exactly what was going on.

7             Grade reports may be more telling as sort of a

8    consistent measure of the child's performance over time.

9        Q.   Were you -- the records of Donnie Tolar, did they

10   include an examination by Dr. Richard Ingrim?

11       A.   No.  Oh, of Donnie?  I'm sorry.

12       Q.   Of Donnie, yes.

13       A.   That's possible.  I have an evaluation of him, and I

14   don't recall who it was by.

15       Q.   And I'm not talking -- I'm not talking about the

16   psychological evaluations and testing, simply a physical

17   examination by Dr. Richard Ingrim.  Do your records reflect

18   that?

19       A.   No, I don't think so.

20       Q.   Let me ask you before I approach then, do the

21   records that were given to you of Jim Ed Tolar, do they

22   contain a record of a physical examination done by Dr.

23   Richard Ingrim on January 5th of 1987, shortly after the boys

24   got to the shelter?

25       A.    No, I see dental records from the next month, and

1   immunization records.  Oh, yes, I see a visit to Dr. Ingrim

2   on 1-2-87 and on 6-16-87 for -- it doesn't say which child.

3       Q.   I believe that would have been Donnie, but I'm not

4   sure.  I'm referring specifically to a record dated 1-5-87

5   signed by Dr. Richard Ingrim.

6       A.   I have a physical exam and -- yes, that must be the

7   document you're talking about.  I can read the date, but I

8   can't read the signature because of the nature -- the quality

9   of the copy.  It's about a four-page report; is that correct?

10      Q.   Let me --

11              MR. DAVIS:  If I may approach.

12      Q.   (By Mr. Davis)  Let me show you the document that

13  I'm referring to and perhaps that can speed things up a

14  little bit.

15      A.   Okay.

16      Q.   Looking -- well, let me show you.

17      A.   In my stack it's towards the bottom of this group.

18      Q.   Okay.  I'm showing you a page.  It's a one-page

19  document.  Actually it refers to -- it's page 4?

20      A.   Right.

21      Q.   Okay.  And your records do include that, do they

22  not?

23      A.   Yes, they do.

24      Q.   And page 4, actually there was several specific

25  questions that were answered by Dr. Ingrim, right?

1     A.   Right.

2     Q.   Does this patient show evidence of child abuse,

3  physical, sexual, psychological?  If yes, specify.  What was

4  Dr. Ingrim's response, Dr. Connell?

5     A.   No.

6     Q.   Are there any apparent problems in the area of

7  developmental level, speech behavior, or emotional

8  difficulties?  If yes, specify.  What is Dr. Ingrim's

9  response on January 5th of '87.

10     A.   No, that Donnie has no behavior problems or

11  emotional difficulties.

12     Q.   Is there anything of medical significance for this

13  patient not included in this form, and his answer again is

14  no, correct?

15     A.   Correct.

16     Q.   And the same document -- same type of document was

17  generated with regards to this defendant, Jedidiah Isaac

18  Murphy, was it not?

19     A.   If it was, I don't know that.  I don't have it.

20     Q.   Okay.  So for some reason you were provided with

21  that form for Donnie Tolar, but as I understand it, you

22  weren't provided with that similar form for this defendant

23  who you're testifying for?

24     A.   Correct.

25     Q.   Let me show you, Doctor --

1        A.    Oh, wait a minute.  I find one page, Jim Murphy,

2    physical exam, dated 11-3-88.  That looks like one of the

3    pages of Donnie's, but it only refers to his -- his need for

4    his vision exam.

5        Q.    Actually if we look at the documents here, actually

6    there was a similar four-page report generated by Dr. Ingrim,

7    medical history and physical examination.

8        A.    Okay.  I don't --

9        Q.    Do you have that?

10       A.    No, sir, I don't.

11       Q.    And again, looking at the fourth page with regards

12   to this defendant --

13       A.    Okay.

14       Q.    Okay.

15       A.    Is this it?

16       Q.    No, ma'am.  That's -- this again, is 1-5-87.

17       A.    Yep.  And this was in my school records so that

18   makes me wonder.  Nope, I'm sorry, I don't have that.  Okay.

19       Q.    Does the patient show evidence of child abuse,

20   physical, sexual, psychological?  And Dr. Ingrim's response

21   on January the 5th was no, correct?

22       A.    Correct.

23       Q.    Have you seen the medical records from Dr. Ingrim's

24   office?

25       A.    No, I haven't.  And by the same token in the

1    interest of completeness it said there that Jim had no

2    behavioral or emotional problems.

3        Q.    Right.

4              You were not provided with the office records from

5    Dr. Ingrim?

6        A.    No, sir, not other than those of Donnie that I just

7    read to you -- went over with you.

8        Q.    So you wouldn't be aware that he saw Dr. Ingrim at

9    least twice before he entered the shelter?

10       A.    No.

11       Q.    You don't know that?

12       A.    No, I don't know that.

13       Q.    All right.  You don't know that the office entry

14   says again there was no evidence of any psychological or

15   physical abuse.  You don't know that because you haven't seen

16   the records, weren't provided to you; is that correct?

17       A.    That's correct, uh-huh.

18       Q.    And these two children who were leaving a very

19   abusive environment, isn't it true that their reaction to

20   leaving that home and to entering the shelter which

21   supposedly would be a very much safer environment, Jim's

22   reaction was that he was confused, refused to listen to our

23   explanation of the shelter, screaming, kicking, and out of

24   control, right?

25       A.    Apparently.

1   Q.   Do you have the child care record intake -- child

2   card record intake dated 1-1-87?

3   A.   I have not read those words that you just -- that

4   you just read, I don't believe.

5                MR. DAVIS:  May I approach, Your Honor.

6                THE COURT:  You may.

7   A.   I have Donnie, but not on Jim.  Okay.  So let me

8   just read it.

9   Q.   (By Mr. Davis)  Okay.  So as I understand, the

10  record I'm showing you with regard to Jim, you were given

11  that record for Donnie but not for the defendant?

12  A.   Right.  I read the words that you just read, yes.

13  Q.   And Donnie's reaction was very similar, wasn't it?

14  He was very upset with being placed at that shelter?

15  A.   The records I have, as I said, indicate that he was

16  happy to be there.

17  Q.   When he was first -- first placed there in the

18  shelter, again the child card record intake for 1-1-87, the

19  day that he and his brother got there to the shelter from

20  this supposedly abusive home, his reaction, wasn't it crying,

21  hiding behind curtains, and very upset?

22  A.   Was that dated 1-12, did you say?

23  Q.   1-1-87, the day that he arrived at the shelter?

24  A.   And again, I did not have that.  So if you say

25  that's what it says, then I assume that's what it says.

1          THE COURT:  Mr. Davis, would this be an

2     appropriate place to --

3          MR. DAVIS:  It would, Your Honor.

4          THE COURT:  The bailiff has indicated that

5     jurors' lunch is here.  We will stand in recess.

6          THE BAILIFF:  All rise.

7          MR. BYCK:  How long?

8          THE COURT:  1:10.

9          (Recess taken.)

10         THE BAILIFF:  All rise.

11         (Jury returned to courtroom.)

12         THE COURT:  Jurors may be seated.  Mr. Murphy,

13    counsel, visitors in the gallery, you may be seated.

14         Mr. Davis, would you like the last question read

15    back to you?

16         MR. DAVIS:  I don't think I need that, Judge.

17    Thank you, though.

18    Q.   (By Mr. Davis)  Dr. Connell, I noticed that over the

19    break that you were on the witness stand and Ms. Little was

20    up there talking with you.  Were y'all discussing your

21    testimony?

22    A.   Yes, we were looking through my records and trying

23    to coordinate them with hers.

24    Q.   When you talked with the defendant in this case, was

25    it your belief that he was very forthcoming with you and

DARLINE W. LABAR, OFFICIAL REPORTER

1    being truthful with you?

2        A.    Yes, I thought he was truthful and forthcoming

3    inasmuch as I allowed him time to be, yes.

4        Q.    Now, when you came up there to see him, he knew who

5    you were, correct?

6        A.    Yes.

7        Q.    He knew that you had been sent up there by his

8    attorneys?

9        A.    Yes.

10        Q.    He knew that you would be acting as an expert

11    witness on his behalf?

12        A.    Yes.

13        Q.    He was charged with capital murder?

14        A.    Yes.

15        Q.    Facing the possible death penalty?

16        A.    Yes.

17        Q.    This man down here had every incentive in the world

18    to lie to you, didn't he?

19        A.    Yes.

20        Q.    And when he gave you a medical history, he told you

21    that he had been treated for ADHD, correct?

22        A.    Yes.  I think he told me he had been diagnosed

23    ADHD.  He was not medicated.

24        Q.    In all of the records that you've seen, there is not

25    one mention of a diagnosis of ADHD, is there?

1      A.    I didn't find one.

2      Q.    When he told you about the injury to his thumb,

3  matter of fact, his description to you was that his thumb was

4  ripped off or nearly ripped off, wasn't it?

5      A.    That may be.  I heard variously shot off, shot off

6  with a staple gun.

7      Q.    Of course, you didn't have the benefit of any of his

8  medical records from Dr. Vandiver, did you?

9      A.    I think I had a record that -- a medical record that

10  mentioned his thumb injury, but it may have been on the basis

11  of his report at the facility.  I don't think I had the

12  record where he was actually treated for his thumb injury.

13      Q.    When you talked with him about his account of the

14  crime, do you think he was being forthcoming with you at that

15  time?

16      A.    Yes, again, inasmuch as I allowed him time.  I

17  understand that I didn't hear everything that he has also

18  told other people.  Everything I did hear seemed consistent

19  with other reports that he had given, but I'm not sure I gave

20  him enough time to tell me everything that he had told other

21  people.

22      Q.    Okay.  Well, he certainly had enough time to tell

23  you that after he left Bleachers bar, that his next

24  recollection was waking up in the car driving with Ms.

25  Cunningham sitting beside him.  Do you remember him saying

1    that to you?

2         A.   Yes, I do.

3         Q.   And he had enough time to tell you that he found the

4    gun in the console of the car and that that scared him?

5         A.   Yes.

6         Q.   In fact, he had enough time to tell you he claimed

7    that Ms. Cunningham, the victim, the deceased in this case,

8    is actually the one that told him where the gun was?

9         A.   Yes.

10        Q.   That's what he claimed to you, didn't he?

11        A.   Yes, he did.

12        Q.   And when he talked about this being an accident and

13   the injury to his left hand, as a matter of fact, he said to

14   you that it was a through and through gunshot in his left

15   hand.  That's the account he gave to you?

16        A.   That's right.

17        Q.   And I guess you assumed that was correct, too?

18        A.   That's right, at the time I did.

19        Q.   Have you changed your opinion now?

20        A.   Yes.  As I said, I read in one of the medical

21   reports that it was described as a shot, the result of a

22   staple gun.  And I think that was a report that he gave about

23   it.  I don't have a way of knowing which of those two reports

24   was correct.

25        Q.   Well, as a matter of fact, the medical records from

1    Dr. Vandiver that are on file here show that he -- I'm sorry,

2    from Dr. DeHaan and from the hospitals in Texarkana show that

3    that was actually a pellet that lodged in his hand.   There

4    was no through and through injury.   Did you know that?

5        A.   No, I didn't.

6        Q.   Do you know how many different accounts he's given

7    to different people about that shooting back in 1996?

8        A.   No, sir, I don't.

9        Q.   You don't know that he's told some physicians that

10   he was a robbery victim, he got shot in the lung and the hand

11   during a robbery attempt?

12       A.   I didn't know that.

13       Q.   You don't know that he told some people it was a .22

14   caliber pistol?

15       A.   No, I didn't know that.

16       Q.   You didn't know that he's told some people that the

17   bullet shattered in his hand?

18       A.   No.

19       Q.   That the median nerve was shattered?

20       A.   I didn't know that.

21       Q.   During the discussion that you had with him about

22   this incident here, why did he go to the ATM machine at

23   Washington Mutual in Richardson, Texas, immediately following

24   the death of Bertie Cunningham?

25       A.   I don't think he mentioned that to me.   I'll go to

1   my notes and see.  I know that he did tell me that he bought

2   some beer.  I don't know whether he went there to get money

3   for that or for another reason.  Talked about using her

4   credit cards, but I don't -- I don't see a mention of the ATM

5   machine in my notes from my interviews with him.

6       Q.   You had the police records in your possession,

7   didn't you?

8       A.   Yes, I did.

9       Q.   You knew that he had used that credit card up there

10  at approximately 4:00 p.m. shortly after the death of Bertie

11  Cunningham, right?

12      A.   I ultimately knew that.  I eventually knew it.  I'm

13  not sure I knew it the day I was walking to him the first

14  time.

15      Q.   Well, you've talked to him how many times?

16      A.   I've talked to him three times.  As I said, the

17  third time was almost exclusively doing some testing and

18  talking about his medication issues.

19      Q.   You've never asked this man why he took that credit

20  card immediately following the death of Ms. Cunningham and

21  tried to obtain money out of her bank account?

22      A.   No, I haven't asked him that specifically.  As I

23  said, he told me about using her credit card to buy the kids

24  a Go-Peds or something.  So I think I may have sort of run

25  those together in my mind, but I didn't break that out.

1    Q.    Did you ever ask him why he tried to use the ATM

2  down on Harry lines later that night?

3    A.    No.

4    Q.    This man when you interviewed him told you that he

5  never hurt anyone in his life, didn't he?

6    A.    He said that at one time.  He also told of times

7  that he had hurt people, so --

8    Q.    Well, that statement when he told you he'd never

9  hurt anyone in his life, that certainly was a lie, wasn't it?

10    A.    Yes, you could describe it as a lie, as a

11  misstatement.  As I say, he told me otherwise at other times

12  so I don't think he was actually trying to sell me that.  I

13  think he was -- he was reflecting how he felt about himself,

14  that he didn't feel that he was a violent person.  But as I

15  said, he did tell me of violent acts that he had committed.

16    Q.    When did he mention Mandy Kirl to you, about putting

17  a gun up to her head?

18    A.    I don't think he did tell me about that.

19    Q.    When did he mention the kidnapping of Sherryl

20  Wilhelm over in Arlington?

21    A.    He did not.

22    Q.    Did he ever mention the robbery of Margie Ellis up

23  in Wichita Falls?

24    A.    No, he did not.  He told me he was arrested once

25  before, and I didn't ask him the details about the previous

DARLINE W. LABAR, OFFICIAL REPORTER

1   arrest.

2      Q.   Doctor, I want to talk just a minute about the test

3   that you administered to him, first of all, the Shipley

4   test.  His score was 105, wasn't it?

5      A.   That's correct.

6      Q.   100 would be the average score?

7      A.   That's right.

8      Q.   So he actually was a little bit above average on

9   intelligence, correct?

10     A.   Correct.  Still within the range of average, but

11  yes.

12     Q.   I think that you and your report or in your previous

13  testimony to me, you said he was average to high average on

14  that test, correct?

15     A.   Right.  He tested out average.  I think I may have

16  been referring to -- there are two portions of the test, one

17  is straight vocabulary, the other is verbal reasoning ability

18  and -- let's see, his verbal reasoning ability was within the

19  high average range.  His verbal ability was average, and the

20  overall intellectual estimate was average.  But the raw

21  intelligence as reflected on verbal reasoning ability was

22  better than actual vocabulary, suggesting more intelligent

23  than his education would allow.

24     Q.   That reasoning ability, would that also include

25  problem solving?

1    A.   Yes, sir.

2    Q.   So he is -- appeared to be high average when it

3 comes to solving problems?

4    A.   Yes, I think that's correct.

5    Q.   There was absolutely no evidence on that test of any

6 mental retardation, was there?

7    A.   No, there wasn't.

8    Q.   On the MMPI 2, I believe your testimony originally

9 was that you didn't think the defendant exaggerated on that

10 test; is that right?  Do you recall saying that?

11    A.   I recall saying that I didn't think he -- well, I'm

12 not sure exactly what I -- what I said or how I characterized

13 it.  I do think that he was extremely forthcoming in

14 describing his symptoms.  I felt like he was consistent in

15 describing his symptoms, consistent with the record that I

16 was able to uncover or read about him and with everything he

17 told me on interview.  So I didn't think he was purposely

18 exaggerating on any of the items in order to -- to make

19 himself look bad.  He does see himself as extremely

20 symptomatic in a way that may be exaggerated beyond how he

21 actually is, if that all makes sense.

22    Q.   It does.

23    A.   Okay.

24    Q.   I mean, it's not unusual for individuals in a county

25 jail setting to be depressed, is it?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.    No.

2    Q.    It's not unusual for them to be feeling anxiety, is

3  it?

4    A.    No.

5    Q.    Not unusual for them to have certain physical

6  symptoms, such as an upset stomach or headaches, correct?

7    A.    Correct.

8    Q.    It certainly wouldn't be unusual for a person facing

9  a death penalty trial to have those symptoms either, would

10  it?

11    A.    That's correct.

12    Q.    Now, the MMPI-2 is administered -- he actually goes

13  true and false on a lot of different questions, doesn't he?

14    A.    Yes.

15    Q.    Have you reviewed the answers that he gave to you on

16  that MMPI-2?

17    A.    Not on all 567 items, but on a number of -- what are

18  called critical items that my computer interpretative program

19  spits out to do some follow-up inquiry if you don't know what

20  the person was referring to.

21    Q.    Okay.  I'm looking at Question 37 on the test, and

22  this is reported as the question being:  At times I feel like

23  smashing things.  And the defendant's response to that was

24  true.

25    A.    Right.

1     Q.   Question 389:  I am often said to be a hot head.

2 And again, he's answered true to that, too; is that correct?

3     A.   That's correct.

4     Q.   Question 227.  Question was:  I don't blame people

5 for trying to grab everything they can in this world.  And

6 his response was what?

7     A.   True.

8     Q.   Doctor, who is James N. Butcher?

9     A.   Butcher is probably the leading expert in the

10 country on the interpretation of the MMPI.

11     Q.   In fact, Dr. Butcher, interpreted the MMPI-2 that

12 was administered to Jedidiah Murphy, didn't he?

13     A.   Yes.

14     Q.   As a matter of fact, you provided me with a copy of

15 his report sometime ago?

16     A.   Yes, I did.

17     Q.   Do you have a copy of that report there with you?

18     A.   Yes, I do.

19     Q.   Okay.  You see there on "Profile Validity" that Dr.

20 Butcher says, "This client's responses to the items that

21 appear near the end of the MMPI-2 were exaggerated in

22 comparison to his responses to items that appear in the

23 beginning of the test."

24     Do you see that?

25     A.   Yes.

1     Q.   "There is a" -- "there is a possibility that he

2  responded to the last section of items either carelessly,

3  randomly, or deceitfully, thereby invalidating that portion

4  of the test."

5     A.   That's right, I mentioned --

6     Q.   That was his -- that was his conclusion, wasn't it?

7     A.   Exactly, yes.  Well, it wasn't a conclusion.  It was

8  his hypothesis.

9     Q.   Well, that's his statement in this report?

10     A.   But if you notice on the beginning of the report, it

11  says that the interpretation that is offered is not meant to

12  be a final interpretation, that, interview, observation, and

13  history should be taken into account and so forth.  So he

14  offers these as hypotheses.  He gives those as some possible

15  reasons why F back as elevated.  And as I told you earlier, I

16  read through the items to try to understand which of those it

17  might be.

18     Q.   Under "Symptomatic Patterns" did Dr. Butcher state

19  that "he," the defendant, "appears to be immature,

20  aggressive, moody, and rebellious, and he has serious

21  problems controlling his impulses and temper.  He may be

22  assaultive, and his acting-out behavior has probably caused

23  him serious interpersonal problems.  He may attempt to deny

24  problems and blame others.  He has a low tolerance for

25  frustration, and he loses control easily."

1        Those were the statements of Dr. Butcher, weren't

2  they?

3        A.   They were, yes.

4        Q.   Under "Interpersonal Relations," this is on page 4,

5  isn't it true that Dr. Butcher states, "Although his

6  relationships tend to be quite superficial, he appears to

7  make acquaintances easily.  He lacks genuine interpersonal

8  warmth and manipulates people for his own gains, possibly

9  through intimidation."

10        Isn't what that Dr. Butcher said?

11        A.   Yes, that based upon his answers and his description

12  of himself, that would be a hypothesis about his personality.

13        Q.   Under "Diagnostic Considerations," did Dr. Butcher

14  make the statement in second paragraph, He appears to have a

15  number of personality characteristics that have been

16  associated with substance abuse or substance abuse --

17  substance use problems?

18        A.   Yes.

19        Q.   In the fourth paragraph did Dr. Butcher state This

20  client's profile matches that of the -- you'll have to help

21  me with the pronunciation of that next word if you don't

22  mind.

23        A.   The Megargee Type H offender.

24        Q.   One of the most seriously disturbed inmate types,

25  correct?

1    A.    Yes.

2    Q.    Did he go on?

3    A.    Excuse me, and that I need to mention to you that

4    seeing that language in here reminds me I did not score this

5    on straight clinical.  I scored it on the norms for inmate

6    populations.  That's why that wording would even be

7    included.  You also left out, when you were reading in

8    paragraph 2, number of personality characteristics associated

9    with substance abuse or substance use problems, that the next

10   sentence says, His scores on the addiction proneness

11   indicators suggest that there is a possibility of his

12   developing an addictive disorder.  Further evaluation for the

13   likelihood of a substance use or abuse disorder is

14   indicated.  In his responses to the MMPI-2, he has

15   acknowledged some problems with excessive use or abuse of

16   addictive substances.

17          That's where that language comes from, his own

18   description of his drinking history and drug abuse history.

19               MR. DAVIS:  May I approach, Your Honor.

20               THE COURT:  You may.

21   Q.    (By Mr. Davis)  Just so we have the complete file

22   with all of Dr. Butcher's comments, State's Exhibit Number

23   150, do you recognize that as the report of Dr. James Butcher

24   that you provided to me?

25   A.    Yes.

1     Q.    Okay.

2              MR. DAVIS:  Your Honor, at this time we'll

3  offer State's Exhibit 150 with the understanding that a clean

4  copy will be provided to the jury.

5              (State's Exhibit No. 150 offered)

6              MS. LITTLE:  No objection.

7              THE COURT:  Admitted.

8              (State's Exhibit No. 150 admitted)

9     Q.   (By Mr. Davis)  Doctor, in the fourth paragraph,

10  again, continuing, did Dr. Butcher make this statement:

11  "Adjustment to prison appears to be difficult for them,"

12  people with the Type H offender profile?

13     A.    Yes.

14     Q.    These individuals tend to have more disturbed

15  interpersonal relationships than other inmates.  They tend to

16  be quite aggressive and may be viewed by other inmates as

17  crazy.  Now, those are statements made by Dr. Butcher, aren't

18  they?

19     A.    Yes.

20     Q.    And under "Treatment "Considerations" on page 5 --

21     A.    But it goes on to say, "They show more anxiety,

22  unusual thinking, and irritability than other inmates.  Many

23  of these individuals were hard drug users prior to

24  incarceration."

25     Q.    And there's no doubt this defendant was a hard drug

1   user before his incarceration, wasn't he?

2       A.   When they say hard drug users, they're referring

3   generally there to heroin, at least to cocaine.  I don't know

4   that about him.  I know that he was an alcohol abuser.

5       Q.   Have you reviewed the records of Glen Oaks Hospital

6   and Timberlawn?

7       A.   Yes, I have.

8       Q.   And in those documents, isn't it true that this man

9   admits to the use of heroin and cocaine in his past, doesn't

10  he?

11      A.   Yes, he did admit to using, but I don't know that

12  that would characterize him as a hard drug user in the way

13  that it's intended here.  In other words, I'm not sure he was

14  strung out on those drugs over a period of time.

15      Q.   Under "Treatment Considerations," the first sentence

16  that Dr. Butcher has in State's Exhibit 150:  "Although

17  psychological problems are evident, inmates with this MMPI-2

18  clinical profile are poor candidates for psychotherapy"?

19      A.   Yes, it does.

20      Q.   "They are not very introspective and do not seek

21  psychological treatment on their own.  When they are forced

22  into treatment, they may be marginally cooperative but their

23  problems are ingrained and persistent.  They tend to use

24  denial a great deal and have little psychological insight.

25  They are quite self-serving, selfish, and immature; they

1    usually do not see a need for psychological therapy.

2    Individuals with this profile pattern are not very amenable

3    to changing their behavior.  They have anger-control problems

4    that are likely to interfere with treatment.   Early

5    termination of therapy is likely, possibly in anger.  The

6    manipulative behavior that patients with this profile exhibit

7    is likely to interfere with the development of trust in

8    relationships, making the treatment relationship stormy.

9    Individuals with this profile may develop substance-abuse

10   problems if treated with medication."

11           Those are the comments that Dr. Butcher made under

12   "Treatment Considerations," right?

13       A.   Yes.  And of course, we know that one is wrong, that

14   is, that Mr. Murphy did in fact present himself for treatment

15   on his own on at least one occasion.  And then the very next

16   line where you left off is:  "This MMPI-2 interpretation can

17   serve as a useful source of hypotheses about clients."  The

18   hypotheses that are generated here are generated on the basis

19   of Mr. Murphy's own admission of the problems and

20   characteristics that you just summarized.

21       Q.   Well, I mean, Dr. Butcher is looking at the MMPI

22   that was produced by you, correct?

23       A.   No, it was produced by Mr. Murphy.

24       Q.   Okay.  Yeah, right.  And you told us just a minute

25   ago that you thought Mr. Murphy was very forthcoming and his

DARLINE W. LABAR, OFFICIAL REPORTER

Page 111

1    answers were truthful on the MMPI, didn't you?

2        A.   Yes, in general, I think he was describing himself

3    very accurately.  He was being an honest informant about his

4    own worst characteristics.

5        Q.   Who is Dr. Theodore Millon?

6        A.   Millon.  He's the author or the developer of the

7    Millon Clinical Multiaxial Inventory, the MCMI-III.

8        Q.   I mean, he's actually the man that actually created

9    the MCMI-III, right?

10       A.   That's right.

11       Q.   You consider him to be authoritative?

12       A.   Yes, I do.

13              MR. DAVIS:  May I approach, Your Honor.

14              THE COURT:  You may.

15       Q.   (By Mr. Davis)  Doctor, let me hand you State's

16   Exhibit Number 151, ask you whether or not that is the report

17   produced by Dr. Millon in this case?

18       A.   Yes, it is.

19              MR. DAVIS:  At this time we'll offer State's

20   Exhibit 151, again with the understanding that a clean copy

21   will be provided to the jury.

22              (State's Exhibit No. 151 offered)

23              MS. LITTLE:  No objection.

24              THE COURT:  Admitted.

25              (State's Exhibit No. 151 admitted)

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.    (By Mr. Davis)   Again, my understanding was that you

2  thought the defendant was being truthful during the MCMI-III,

3  also, correct?

4    A.    Forthcoming I think is the term I used.   I -- I did

5  indicate that I felt that he had described himself in a

6  harshly -- harshly negative way.

7    Q.    And I believe your overall impression was that he

8  was acutely deeply depressed?

9    A.    Yes, that was certainly the reflection of his

10  responses on the MCMI-III.   In the interest of completeness,

11  the first paragraph of the capsuled summary is a very

12  important paragraph.

13    Q.    In that first -- when we talk about the "Capsule

14  Summary" in Dr. Millon's report, doesn't it state:   MCMI-III

15  reports are normal -- are normed on patients who were in the

16  early phases of assessment for psychotherapy for emotional

17  discomfort or social difficulties?

18    A.    That's correct.   Somebody who comes to a therapist

19  on his own because he's hurting and describes himself

20  sometime in an exaggerated way, sometimes in an honest way in

21  an effort to communicate to the therapist what all is wrong

22  so as to get some help or some attention or some sympathy.

23    Q.    I mean, they're under a clinical setting.   They're

24  not charged with capital murder, for instance, generally, are

25  they?

1          A.    That's correct.

2          Q.    They don't have an incentive to come into a

3     therapist or a counselor or psychologist and lie to them, do

4     they?

5          A.    Generally not.  I mean, it's also administered in

6     situations where that is the case, but, yes, that's right.

7          Q.    And so the next sentence in this report says:

8     "Respondents who do not fit this normative population or who

9     have inappropriately taken the MCMI-III for nonclinical

10    clinical purpose may have distorted reports"?

11         A.    Correct.

12         Q.    And certainly this defendant would fit within that

13    category, wouldn't he?

14         A.    It's conceivable.  I don't know that these results

15    should be considered definitive for diagnosis, for example.

16    I find them useful in elucidating or illuminating some of his

17    personality characteristics as he perceives them essentially.

18         Q.    As a matter of fact, under "Interpretative

19    Considerations," Dr. Millon said, "The clinician should be

20    aware that the inmate" -- in other words, the defendant --

21    "may have reported more psychological symptoms than

22    objectively exist.  Adjustments correcting for this tendency

23    were probably successful in retaining the instrument's

24    validity."

25              But there is always the possibility in this kind of

1   situation that an inmate, such as the defendant, may over

2   report his problems to you, isn't there?

3       A.   Certainly.

4       Q.   And with regards to the "Response Tendencies" of the

5   defendant on page 4, isn't it true that Dr. Millon says:

6   "This inmate's response style suggests a moderate tendency

7   toward self-deprecation and a consequent exaggeration of

8   current emotional problems."

9            Is that what it says?

10      A.   That's what it says, yes.

11      Q.   And when he talks about the Axis II Personality

12  Patterns on page 5, his first statement there, isn't it true,

13  is:  "This man appears to see himself as having had few of

14  the opportunities that he perceives that others have had.

15  This awareness may intrude on his thoughts and interfere with

16  his behavior, creating anger and resentment and ultimately

17  upsetting his capacity to cope in a satisfactory way with

18  many of his life tasks."

19      A.   You're skipping the first four paragraphs and going

20  to the last paragraph.

21      Q.   Yes, I'm asking you about the first paragraph on

22  page 5.

23      A.   Right.  That is what it says, yes.

24      Q.   And in fact, I mean you're aware that this person,

25  while he was in the Tolar home and in the Murphy home, had

1    many, many opportunities, didn't he?

2        A.    Yes, he did.

3        Q.    In fact, he had many opportunities that most of us

4    don't ever have in our lifetime?

5        A.    He had many opportunities that many people don't

6    have in their lifetime.

7        Q.    Country club privileges and membership being one of

8    them?

9        A.    Yes, sir.

10       Q.    Having fathers that will coach them in baseball, for

11   instance?

12       A.    Yes.

13       Q.    Scout camps provided by parents?

14       A.    Yes.

15       Q.    Looking on page 6, this would be under the category

16   of "Axis I: Clinical Syndromes," the second paragraph, does

17   that paragraph state:  "For some time, this man has probably

18   been engaged in abusing drugs, legal or street substances, or

19   both.  Irritable, negative, and hostile, he may employ drugs

20   not only to help him unwind his tensions and undo his

21   conflicts but also to serve as a statement of resentful

22   independence from the constraints of social convention and

23   expectation.  In addition to freeing him from feelings of

24   ambivalence toward himself and others, drugs liberate him

25   from whatever remnants of guilt he may experience over

1    discharging his less charitable impulses and fantasies.  Such

2    defiant and hostile are undergirded in part by

3    self-destructive elements.  For example, these are evident in

4    the careless disregard he may express about the consequences

5    that drugs can create."

6           That's the entirety of that paragraph, isn't it?

7       A.   Yes, it is.

8       Q.   And again, have you had an opportunity to look at

9    the individual responses that the defendant gave on the

10   MCMI-III?

11      A.   Again, not all 175 of them, but instead the critical

12   items that emerge as it's computer scored.

13      Q.   For instance, Question 51 to begin with, that

14   question asks:  When things get boring, I like to stir up

15   some excitement.  His response was true to that, wasn't it?

16      A.   Right.

17      Q.   You see Question 53?

18      A.   Yes.

19      Q.   Punishment never stopped me from doing what I

20   wanted?

21      A.   He answered true.

22      Q.   True to the statement "punishment never stopped me

23   from doing what I wanted."

24           Now, when he took this test on Question 76, he was

25   asked:  I keep having strange thoughts that I wish I could

1    get rid of.  And his response was false, wasn't it?

2        A.    Yes, it was.

3        Q.    When did you -- when was this test administered?

4        A.    On March the 1st, 2001.

5        Q.    Now, with regard to drug use, he was asked:  There

6    have been times when I couldn't get through the day without

7    some street drugs.  And his response was false to that,

8    wasn't it?

9        A.    What number is it?

10       Q.    That's number 118.

11       A.    Yes.

12       Q.    Which would indicate that he doesn't have a

13   compelling need for drugs.  That's more of a conscious kind

14   of recreational use of drugs?

15       A.    It would indicate that if that was true, yes.

16       Q.    Now, you -- you mentioned briefly that -- isn't it

17   true that the MCMI-III also indicated he had certain

18   antisocial characteristics?

19       A.    Yes, along with symptoms of PTSD, posttraumatic

20   stress disorder, and symptoms of alcohol dependence.

21       Q.    So --

22       A.    Yes.

23       Q.    If I may then, the answer is yes to the question,

24   did he have certain antisocial characteristics.  Was your

25   answer yes?

1     A.    Yes.

2     Q.    What is antisocial personality disorder, Doctor?

3     A.    It refers to a compilation of symptoms that include

4  being exploitive of others, having superficial and shallow

5  attachments to others, being manipulative, being insensitive

6  to the needs of others, or not caring about the consequences

7  of one's behavior, being impulsive, being immature, acting

8  out against societal norms, acting in violation of the rules

9  or the law.  I think that's the essence of it.

10    Q.    Individuals with that kind of personality disorder

11 are sometimes called either sociopaths or psychopaths, aren't

12 they?

13    A.    Actually the terminology that has advanced in the

14 past 5 to 10 years has differentiated psychopaths from

15 antisocial personality.  All psychopaths are antisocial

16 personalities, but by no means are all antisocial

17 personalities considered psychopaths.  Psychopath is the

18 extreme form of antisocial personality and represents -- I

19 think generally it's thought that something like 5 to 10

20 percent of antisocial personalities.

21    Q.    Is there a checklist for possible psychopathy?

22    A.    There is.

23    Q.    What's it called?

24    A.    The Psychopathy Checklist Revised.

25    Q.    Do you know how many elements are on that checklist?

1    A.   Yes, sir.

2    Q.   How many?

3    A.   20.

4    Q.   Would criminal versatility be one of them?

5    A.   Yes.

6    Q.   Criminal versatility would mean what to you?

7    A.   I don't have the manual in front of me.  I -- Hare's

8    very specific about the definitions of each of these terms

9    and I'm not -- I'm not sure exactly how it's defined.  I

10   think either three or five different kinds of criminal acts

11   in adulthood and there has to actually I think -- I don't

12   recall whether there has to actually be a record of them or

13   whether the person's admission of them is sufficient.  Hare

14   varies on some of the items in that sense, so I really can't

15   tell you the exact definition of versatility.

16   Q.   Well, let's see, the defendant has been convicted of

17   burglary of a motor vehicle.

18   A.   Yes, sir.

19   Q.   Convicted of burglary of a habitation, correct?

20   A.   Yes.

21   Q.   Convicted of theft?

22              MS. LITTLE:  Judge, I'm going to object to him

23   asking her what the psychopathy checklist things can be,

24   unless he qualifies her to administer it or evaluate.

25              THE COURT:  Objection is overruled.

DARLINE W. LABAR, OFFICIAL REPORTER

1  Q. (By Mr. Davis)  Certainly capital murder, another

2 type of offense?

3  A. Yes.

4  Q. Would you consider kidnapping to be a different kind

5 of offense, too?

6  A. Yes.

7  Q. Would you consider robbery to be a different type of

8 offense?

9  A. Than burglary?

10  Q. Than burglary, yes, ma'am.

11  A. Well, yes, but I'm not sure Hare does.  I don't

12 know.

13  Q. How about aggravated assault?

14  A. Yes.

15  Q. Certainly another one on the checklist would be

16 impulsivity, wouldn't it?

17  A. Yes.

18  Q. Certainly this defendant exhibits signs of

19 impulsivity, doesn't he?

20  A. Yes.

21  Q. Early behavior problems, would that also be on the

22 checklist?

23  A. It is on the -- on the checklist.

24  Q. Certainly this defendant would exhibit signs for

25 that, too, wouldn't he?

1       A.   Not according to the records, and I think that's

2   what Hare relies on there.  As you read, the Doctor indicated

3   there were no behavioral problems, Dr. Ingrim.   The school

4   records do not list behavior problems.   They list attention

5   problems, difficulty concentrating, difficulty getting his

6   work done, but I saw no reflection in his school records of

7   behavior problems.  And I don't think he was handled by

8   juvenile authorities up until adolescence, and I don't --

9   have not seen records to suggest that he was handled with any

10  degree of frequency during adolescence, although he himself

11  admitted to me that he had a couple of run-ins with the law.

12        Again, I would have to look.  Hare is very specific,

13  and you really cannot just eyeball these questions and give

14  answers and come up with any kind of reliable score, because

15  the scoring is so important.  It's extremely important to

16  apply the definitions correctly that it gives in the manual.

17      Q.   Well, one of the -- one of the matters on the

18  checklist would be a need for stimulation, proneness to

19  boredom, wouldn't it?

20      A.   Yes.

21      Q.   Conning and manipulative would also be one of the

22  checklist items, wouldn't it?

23      A.   Yes.

24      Q.   Lack of remorse or guilt, would that be on the

25  checklist?

1       A.    Yes.

2       Q.    Shallow effect?

3       A.    Shallow affect.   These five or six that you're

4  naming, I don't recall whether all of these are subsumed

5  under one item or whether you're -- whether you're listing

6  separate items.   If you have a copy of the checklist, I would

7  be glad to --

8       Q.    Well, yes, ma'am, I do.   I have a -- I have a copy

9  that has 20 items on it.

10       A.    Okay.

11       Q.    Lack of realistic long-term plans?

12       A.    Yes.

13       Q.    Irresponsibility?

14       A.    Yes.   And that's defined generally by way of whether

15  the person has been independently employed, gainfully, with

16  any degree of regularity or instead has exploited the good

17  will of others to get by.

18       Q.    Failure to accept responsibility for your own

19  actions?

20       A.    Right.   That is one.

21       Q.    Grandiose sense of self worth?

22       A.    Yes.

23       Q.    Superficial charm?

24       A.    Yes.

25       Q.    Pathological lying?

1    A.   Yes.

2    Q.   When you talked about him giving you a history of

3  being denied medications up in the jail, do you recall

4  testifying to that?

5    A.   I think what he indicated to me was that he was

6  getting it at different times or irregularly.  His mother is

7  who told me that he had been -- actually not gotten his

8  medication for two or three days.

9    Q.   And you made mention of an incident that occurred up

10  in the jail?

11    A.   Yes.  I was made aware of one.

12    Q.   And an incident involving a Sheriff's deputy or

13  jailors, correct?

14    A.   Yes, as I understood it.

15    Q.   Where they had to use physical force to restrain

16  him?

17    A.   Yes.

18    Q.   And that occurred on the 7th floor of the George

19  Allen Building, an area of the jail up there, didn't it?

20    A.   I can't tell you that.  I don't know.

21    Q.   Were you not given any records from the jail

22  concerning that incident?

23    A.   Yes, I was given records from the jail, and I

24  haven't reviewed them in the last 24 hours, so I can't tell

25  you whether that incident is detailed.  Several incident

1    reports were a part of those records, and several inmate

2    request forms with his requesting nursing assistance because

3    of hallucinations and other symptoms.   There was a suicide

4    effort that was one of the write-ups.   The records I got may

5    have been provided to me before the incident that you're

6    referring to, though.   I'm not sure I have a record of that

7    incident.

8        Q.   Okay.   But you've been made aware of that incident,

9    haven't you?

10       A.   I was told about it, yes.

11       Q.   Do you know who Bill Parker is?

12       A.   No, sir, I don't.

13       Q.   Have you ever met Bill Parker?

14       A.   No.

15       Q.   Do you know that he's an investigator?

16              MS. BALIDO:   Judge, may we approach the bench.

17              THE COURT:   Counsel will recall the Motion in

18   Limine and the Court's ruling.

19       Q.   (By Mr. Davis)   Do you know whether or not he acts

20   as a private investigator for defense counsel?

21       A.   I don't know.

22       Q.   Do you know whether or not the defendant was

23   scheduled to talk with Bill Parker that day?

24       A.   I don't know that.

25       Q.   Do you know the subject matter of that conversation,

DARLINE W. LABAR, OFFICIAL REPORTER

1    what it was planned to be?

2       A.   No.

3       Q.   Do you know whether or not the defendant feigned an

4    illness to avoid talking with Mr. Parker?

5       A.   I don't know that.

6       Q.   Do you know whether or not the defendant feigned a

7    seizure in order to avoid talking with Mr. Parker?

8       A.   No, I know nothing about the details.

9       Q.   Doctor, would it be fair to say that this man,

10   Jedidiah Murphy, looks at the world differently than most of

11   us look at it?

12      A.   Yes.

13              MR. DAVIS:   Thank you, Doctor.   I'll pass the

14   witness.

15              MS. LITTLE:   Your Honor --

16              THE COURT:   You may continue.

17              MS. LITTLE:   Your Honor, at this time I'd like

18   to ask the Court to take judicial notice of a subpoena that

19   was issued out of this court at my request for the custodian

20   of records at the Van Zandt County Children's Center.

21              THE COURT:   The Court takes judicial notice as

22   presented.

23              MS. LITTLE:   At this time I would offer the

24   business records of that center, numbering 10 pages, signed

25   by the custodian and offered and put into evidence, put in

1    the Court's file for offering prior to this trial.  10 pages.

2              MR. DAVIS:  I have no objection.

3              THE COURT:  Admitted.

4              (Records contained in Court's Jacket)

5        Q.   (By Ms. Little)  Dr. Connell, we did look at these

6    while ago, did we not?

7        A.   Correct.

8        Q.   And you have not -- you didn't find those in your

9    paperwork?

10       A.   That's correct.

11       Q.   But you do have Donnie's records; is that correct?

12       A.   That's correct.

13       Q.   Now, the answers, the information that's just been

14   testified to about the experts in these -- according to these

15   tests that you gave, are in part of your report; is that

16   correct?

17       A.   Yes, that information is in my report.

18       Q.   Those things were considered?

19       A.   Yes.

20       Q.   And it's your opinion that what Jim Murphy told you

21   was accurate, as far as you could determine, based on the

22   collateral contacts you made and a number of other things

23   that you did to try to corroborate what he was telling you;

24   is that correct?

25       A.   That's correct.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Now, if he had more than one hand injury over a

2    period of years, you don't know anything about that, do you?

3    A.   No.

4    Q.   Or do you?

5    A.   No, I think I was aware of -- of two hand injuries,

6    one that involved the staple gun nail -- nail gun going

7    through his thumb and another that was on-the-job welding.   I

8    read some medical reports from his treatment for several job

9    related injuries, and I think one of them involved his hand,

10   one involved his back and/or hip, but I don't recall

11   specifically.   I can look those up if you'd like.

12   Q.   No, that's all right.

13        Regarding -- there were several things that were

14   read out of this report that the D.A. has offered into

15   evidence.   One that I recall is that you said there were four

16   paragraphs left out shortly before page 6.   Do you recall

17   that?

18   A.   Yes.

19   Q.   Can you locate that information?

20   A.   Yes.   Okay.

21   Q.   For the sake of completeness, what else would help

22   the jury in understanding this testing?

23   A.   Well, "That this man experiences repeated episodes

24   of alcohol abuse may be reliably assumed.   These bouts may be

25   prompted in part by the frustration and disappointment in his

1    life.  He is characteristically unpredictable, moody, and

2    impulsive, and these behaviors may be intensified when he's

3    drinking heavily.  At these time, his brooding resentment

4    breaks out of control, often resulting in stormy and

5    destructive consequences.  He may subsequently express

6    genuine feelings of guilt and contrition, but the destructive

7    and injurious effects of is behavior are likely to persist.

8    Deep resentment that is restrained in his sober state may be

9    unleashed in full force when he's drinking and manifests

10   itself in irrational accusations and physical intimidation,

11   if not brutality, toward family members.  He may evince a

12   self-destructive facet to his extropunitive hostility, and

13   this serves to undermine both himself and others."

14        Q.   All right.

15        A.   I think that's essentially how I described him

16   earlier.  Also, in paragraph 2, seeing if there is -- if I

17   can just kind of cut to the chase.  "Shifts are probably

18   evident between expressions of self-deprecation and despair

19   that are mixed with thoughts of suicide and the expression of

20   hopelessness and futility that may be accompanied by

21   outbursts of bitter discontent and irrational demands.

22   Circumstances may have imposed constraints beyond his

23   manipulative abilities.  He may also feel trapped and

24   powerless to avoid raging inner tensions.  Period of loathing

25   for self-perceived deficits and weaknesses may be

 1    interspersed with momentary acts of defiance, if not

 2    brutality.  Fearful that he may jeopardize his problematic

 3    situation further, he may act contrite and self-accusatory

 4    following explosive acts.  Nevertheless, his periodic

 5    grumbling and periodic provocations provide a vehicle for

 6    discharging tension, for reasserting self-confidence --

 7    albeit briefly -- and for relieving the buildup of resentment

 8    and anger."

 9         Q.   And regarding any substance abuse that was discussed

10    in relation to these tests --

11         A.   Uh-huh.

12         Q.   -- to the best of your understanding from all the

13    people that you've talked to, Jim Murphy's big problem is

14    with alcohol; is that correct?

15         A.   That's what I understand, yes.

16         Q.   And there's no denying he's had experimentation and

17    use of other drugs through the years?

18         A.   That's correct.

19         Q.   But these are not things he continues to do as far

20    as anybody knows, as far as you know?

21         A.   As far as I know, that's correct.

22         Q.   And the purposes of these tests again, Dr. Connell,

23    are what?

24         A.   Well, I administered them in order to help myself

25    gain an understanding of his view of his own functioning and

1    an understanding of how he compares to other people in

2    similar situations.  I didn't administer them for the

3    diagnosis or treatment of a disorder, but just to give myself

4    a sort of objective and normative feel for who it was that I

5    was attempting to understand.

6        Q.   Okay.  And has your opinion changed any on what

7    you've testified to about him and what he's told you?  He's

8    told you the truth essentially?

9        A.   Yes, I think my opinion is still the same, that he

10   was essentially truthful with me, quite self-deprecating, not

11   attempting to blame anybody else for his own behavior.  He

12   generally was not the one who provided me with information

13   regarding any kind of abuse history or suffering.  He tended

14   to represent the people in his past and in an essentially

15   positive light with perhaps the exception of the Tolars.

16   That he was taking full responsibility for what had

17   happened.  If anything, he was blaming alcohol for what

18   happened.  And I'm not sure I would express that exactly as

19   blaming it as much as attempting to understand himself and

20   allow himself to live with what he had done, and not very

21   successfully at that.  He was still suffering enormously over

22   the guilt for what he had done and the shame for what he had

23   done.

24       Q.   And the report that you had provided to both me and

25   the State, we've talked about that and you've testified from

1  it and I've questioned you from it; is that correct?

2      A.    That's correct.

3                  MS. LITTLE:  May I approach the witness.

4                  THE COURT:  You may.

5                  MS. LITTLE:  At this time, Your Honor, subject

6  to taking care of my own marks and everything, I'd offer

7  Defense Exhibit Number 63, Dr. Connell's report.

8                  (Defendant's Exhibit No. 63 offered)

9                  MR. DAVIS:  No objection.

10                 THE COURT:  Admitted.

11                 (Defendant's Exhibit No. 63 admitted)

12                 MS. LITTLE:  Pass the witness.

13                 MR. DAVIS:  No further questions.

14                 THE COURT:  Thank you.  You may step down,

15 Doctor.

16          Ladies and gentlemen, the next witness I anticipate

17 calling has been notified, will be an forensic psychiatrist.

18 Been informed it's going to take a little bit of time to set

19 up a display for your consideration.

20          Sheriff, if you'd excuse the jury.

21                 THE BAILIFF:  All rise.

22                 THE COURT:  Let the record reflect the jury is

23 being excused from the courtroom.

24                 (Jury excused from the courtroom.)

25                 THE COURT:  Mr. Murphy, counsel, visitors in

1    the gallery, may be seated or excused as you wish.

2              MS. LITTLE:  Judge, also, and still on the

3    record, I want to make two copies of this, one with the

4    pictures that were admitted and ones that were not.  The not

5    admitted ones to be for record purposes.

6              THE COURT:  Granted.

7              (Break taken.)

8              THE BAILIFF:  All rise.

9              (Jury returned to courtroom.)

10             THE COURT:  Let the record reflect the jury is

11   returning to the courtroom at this time.

12        Jury may be seated.

13        Mr. Murphy, counsel, visitors in the gallery, you

14   may be seated.

15        Ladies and gentlemen of the jury, this witness has

16   previously been sworn in.  He's under oath.

17             JAYE DOUGLAS CROWDER

18   was called as a witness by the Defendant and, after having

19   been first duly sworn, testified as follows:

20             Direct Examination

21   By Ms. Little:

22        Q.   Would you state your name, please, sir?

23        A.   Jaye Douglas Crowder.

24        Q.   And how do you make your living?

25        A.   I am a psychiatrist.

DARLINE W. LABAR, OFFICIAL REPORTER

1     Q.    Here in Dallas?

2     A.    Yes, I am.

3     Q.    Where did you grow up, Dr. Crowder?

4     A.    I grew up in Fort Worth and in Abilene.

5     Q.    Where did you get your Bachelor's degree?

6     A.    That was at Abilene Christian University.

7     Q.    Did you go immediately from there to further

8  schooling, or did you work?

9     A.    No, I went on to medical school from there and did a

10 residency after medical school at UT Southwestern Medical

11 School here in Dallas.

12    Q.    Then you decided to specialize in psychiatry?

13    A.    Yes.

14    Q.    And when did you complete that program?

15    A.    The adult psychiatry residency was completed in

16 1984, and then I did a fellowship in forensic psychiatry at

17 the University of Virginia, completed in 1985.

18    Q.    And you've been practicing psychiatry ever since

19 that time?

20    A.    Yes.

21    Q.    Do you have a private practice, Dr. Crowder?

22    A.    I see individual patients.  I'm on the faculty of

23 Southwestern Medical School and so I don't take the money

24 directly.  I don't have another outside office, but I do see

25 individual patients in treatment.

1    Q.    And how long have you been doing that?

2    A.    That has been, of course, since 1985, since I joined

3    the staff there.

4    Q.    Do you hold positions in any professional

5    organizations?

6    A.    Yes, I'm vice chair of the Forensic Psychiatry

7    Committee of the Texas Society of Psychiatric Physicians.

8    I'm also a member of the American Academy of Psychiatry and

9    the Law, American Psychiatric Association, and the American

10   Medical Association.

11   Q.    Do you have publications?

12   A.    Yes.

13   Q.    And are you licensed here in Texas?

14   A.    Yes, I am.

15   Q.    Did you evaluate Jim Murphy for us in regard to this

16   capital murder case he's been tried for?

17   A.    Yes, I did.

18   Q.    Will you tell the jury, Dr. Crowder, what you did in

19   order to be able to present any information to the jury?

20   A.    Yes.  I did examinations of Mr. Murphy on the

21   following dates:  The 8th of March, the 17th of April, the

22   17th of May, and the 21st of this month, totaling about four

23   and a half hours.  I then reviewed a large number of records,

24   investigative records, medical records from Glen Oaks

25   Hospital, Timberlawn Hospital, Terrell State Hospital, the

DARLINE W. LABAR, OFFICIAL REPORTER

1   Andrews Center, Terrell Medical Center, the Columbia Medical

2   Center at Kaufman, the jail medical and psychiatric records

3   from the Lew Sterrett Justice Center where he's been

4   confined.  I looked at the records from the Van Zandt County

5   Probation Department, from the Dallas -- I'm sorry, from the

6   Van Zandt County Children's Board regarding himself and his

7   brother.  And I did a number of collateral interviews, as

8   well as looking at letters that he had written, and I can

9   enumerate the people that I interviewed by telephone, if you

10  like.

11      Q.   No, let's go work through that.

12      A.   Okay.

13           MS. LITTLE:  Your Honor, at this time we'd

14  offer Defense Exhibit Number 40, which is the vita of Dr.

15  Crowder.

16           (Defendant's Exhibit No. 40 offered)

17           MR. DAVIS:  No objection.

18           THE COURT:  Admitted.

19           (Defendant's Exhibit No. 40 admitted)

20      Q.   (By Ms. Little)  With all of the things that you've

21  looked at, Dr. Crowder, and all the collateral conversations,

22  and as well as your conversations with Jim Murphy, what

23  determination did you make regarding his problems?

24      A.   I would diagnose him as suffering from what we call

25  major depression and dysthymic disorder.  That's simply a

1    complicated way of saying this is a person who's had

2    depression for some period of time and it's a chronic

3    depression that tends not to go away for very long at a

4    time.   In addition, he suffered from alcohol dependence.

5    He's abused a number of substances in the past, though not so

6    recently.   I would also say that he suffers from a

7    narcissistic and borderline personality disorder with some

8    antisocial features.

9       Q.   All right.   Regarding -- did you mention the alcohol

10   dependence?

11      A.   Yes.

12      Q.   Regarding the depression, what have you learned

13   about him that leads you to form that conclusion?

14      A.   Well, a number of different centers, such as

15   Timberlawn Hospital, Glen Oaks Hospital, and Terrell State

16   Hospital talked about these various kinds of depression.   And

17   in addition to that, of course, he meets the criteria that we

18   set up with a diagnosis of this condition which are sad mood,

19   appetite changes, sleep changes, feelings of fatigue,

20   worthlessness, and suicidal thinking, which qualify him for

21   that diagnosis.

22          I want to clarify something about depression.

23   Depression is not being merely unhappy with one's

24   circumstances, but the chemistry in the central nervous

25   system so that sleep, appetite, and other functions,

DARLINE W. LABAR, OFFICIAL REPORTER

1    concentration are interfered with.

2        Q.    All right.  And what about, did you -- did you

3    discover if there was any attention deficit disorder?

4        A.    That's mentioned in the records, and he complained

5    of some features of that.  As people get older, they

6    sometimes tend to grow out of that.  It was frankly difficult

7    for me to tell whether he met criteria for that, but there

8    were diagnoses of attention deficit disorder in the Terrell

9    State Hospital records, for instance.

10       Q.    What do you attribute his depression to?

11       A.    Well, there are a number of factors.  There's a lot

12   of mental illness and alcohol abuse in his family.  In fact,

13   it's kind of right in the family.  So some of it is probably

14   inherited because there's a genetic predisposition to

15   suffering from depression.  In addition to that, of course,

16   early childhood experiences and losses of parenting figures

17   contribute to a person developing depression later.  So the

18   abandonments by his mother, his father's death, moving from

19   one residence to another on multiple occasions through

20   childhood, all of that serve to give him a less than secure

21   sense of himself and a secure -- less than secure sense of

22   where his needs would be met and how he would meet his needs

23   in life.

24       Q.    And where did you get the information about those

25   factors you just testified to?

1      A.    Well, it was from a number of sources.   I counted 13

2   collateral interviews that I did, so these are other people

3   that gave me information about his childhood.   I also have

4   the records from these various hospitalizations and from the

5   Van Zandt County Children's Shelter which gave me

6   information, as well as the reports that he gave me himself

7   in my interviews.

8      Q.    All right.  Did you read any literature in order to

9   help you with these diagnoses?

10      A.    Yes.

11      Q.    What literature did you review?

12      A.    Well, I looked at a number of textbooks, and I also

13   looked at the DSM IV which is our standard diagnostic

14   system.   It's lays out the criteria for diagnosis of various

15   disorders.

16      Q.    And did you bring transparencies for those here

17   today?

18      A.    Yes.

19      Q.    Would you like to do that now?

20      A.    Sure.  Simply start with an excerpt from this book,

21   which is about criminal behavior and what's known as

22   psychopathy, which I don't believe that Mr. Murphy really

23   suffers from.

24      Q.    Just a second.  Be sure everybody can hear.   You

25   said -- you're talking about psychopathy and you don't --

1  excuse me, believe that Mr. Murphy suffers from that; is that

2  correct?

3      A.    Correct.

4      Q.    Go ahead.

5      A.    Nevertheless, of course he's had some criminal

6  behavior.  And we need to look at what might account for some

7  of that.  It looks like this is way too big.

8      Q.    Not quite far enough to the right.  Okay.

9      A.    Technology is not pretty.

10     Q.    It's prettier than what we tried to do this morning

11  with the power point.

12     A.    I suppose.  That's why I try to get low tech.

13          All right.  What we have here is the risk of crime

14  for children who are reared without fathers, which we know

15  applies to Mr. Murphy.  There's a higher risk of crime in

16  those situations.  I would direct your attention to this

17  study.  Youngsters grades 6 to 8, living in one parent

18  families, twice as likely as those from two parent families

19  to use illegal drugs, to be sexually active, to engage in

20  vandalism, to skip school frequently, and to steal things

21  from stores.  Single parent children were also twice as

22  likely to have used a weapon at least twice to get something

23  from another person, to have been in trouble with the police,

24  to have been physically or sexually abused by an adult, and

25  to plan on quitting school before graduation.

1          Then I would direct your attention down here, just a

2     little bit lower on the page.  In 1986, of the juveniles

3     incarcerated in the United States for serious crimes, about

4     70 percent had been reared without fathers.  This 70 percent

5     figure seems to be a magic number because there are multiple

6     studies that say of teenagers that ran away from home, 72

7     percent came from single parent homes and that's usually

8     without fathers.  All the way down to -- here's a study of

9     135 children referred for crimes ranging from arson,

10    vandalism, and theft, to assault and burglary and criminal

11    sexual conduct.  This is youngsters 9 or younger.  70 percent

12    of these children were living in a single parent home.

13         What's the significance of this?  The significance

14    is people that do not grow up with a father figure a lot of

15    time do not internalize as much of a moral sense as many

16    other people do.  That's part of it.  The other part of it is

17    there's a lot of insecurity because you don't necessarily

18    feel loved or cared for and you don't know who's going to

19    take care of you.

20         Mr. Murphy went through about five, six homes, I

21    think, different homes and couldn't stay for a variety of

22    reasons.  Generally not his fault that he couldn't stay in

23    those homes, but someone would abandon him or it was

24    difficult to deal with his brother, but he was moved from

25    place to place.  In fact, he grew up with three different

1    last names.  His first last name was Kines.  Then he was

2    adopted to the Tolars and he took that name.  Then he had a

3    third name Murphy that he grew up with.

4            Part of the borderline personality disorder

5    diagnosis is a sense of poorly formed identity or not knowing

6    who you are.  It's difficult to know who you are when you

7    have all these different names, all these different homes,

8    and you're not sure that you're loved.  That's unfortunately

9    what we have in Mr. Murphy's case is someone who never really

10   felt love because his mother abandoned him.  I think you know

11   most of the story.  His parents -- grandparents then took

12   over.  They died, so they abandoned him in another sense.  He

13   then goes to Buckner Children's Home.  He then goes to

14   another home for a brief period of time where another child

15   could not adjust to him.  And then he goes to the Tolar's.

16   Then he goes to the Murphy home.  This is a lot of

17   instability for a youngster, and people like this tend to

18   grow up somewhat angry because they don't feel they can trust

19   life.  They don't feel that they can trust authority figures

20   to take care of them.

21       Q.   Okay.

22       A.   Skip over that.  Just to give you a point of

23   reference, this is from a particular textbook of psychiatry

24   by Tasman and Kay.  It's Volume 2, just to give you an idea

25   where it's from.

1          And here we have something about the biology of

2    aggression.  You can read this if you want to.  I don't know

3    that I'm going to bore you with it, but I'll tell you what

4    this says.  What it talks about is that people with

5    aggression both to themselves and others, and this is

6    impulsive aggression as opposed to predatory aggression,

7    people with that kind of aggression tend to have lower levels

8    of a particular neurotransmitter -- that's a brain chemical

9    that tells parts of the brain to turn on or turn off.  They

10   have lower levels of this particular neurotransmitter called

11   serotonin in their central nervous system.  That's what we

12   have here is an impulsive person that hurts himself and other

13   people.  Both suicide victims and people who commit impulsive

14   aggression have lower levels of this hormone.

15          So now we've got two factors.  What we're going to

16   see here is the coming together of multiple factors which

17   resulted in a lot of tragic circumstances.  It's not one of

18   them by themselves.  It's all of them together.  Have

19   insecurity, have a lot of anger about the lack of a stable

20   upbringing, you have lower levels of serotonin in the central

21   nervous system, and you don't have a father figure to

22   identify with so far.

23          Here is another factor in impulsive aggression that

24   we see.  What this talks about is brain imaging studies.

25   These studies look at the utilization of glucose which is the

DARLINE W. LABAR, OFFICIAL REPORTER

1    basic food -- food for thought, if you will, that feeds your

2    brain and helps it to operate.

3           Now, what you see here is brain imaging studies with

4    positron emission tomography -- don't even try to remember

5    that -- have found selective reductions in glucose,

6    metabolism, and the pre-frontal and frontal cortex of

7    patients with impulsive aggression.  In other words, the

8    frontal lobes of the person that commits impulsive aggression

9    tend not to use glucose appropriately.  They tend to be

10   turned off to a degree so that they don't feel things or see

11   things quite as the rest of us do.  And that contributes,

12   it's believed, to the impulsive aggression.

13          Now, what about alcohol?  Start to add alcohol to

14   this mix, and you have a problem.  When people are

15   chronically miserable because they're depressed, they tend to

16   want to in an impulsive fashion assuage that depression and

17   overcome the misery and the anxiety that they feel on a daily

18   basis with substance abuse.  Mr. Murphy's choice of substance

19   was alcohol.  That's how he got over the problems that he had

20   temporarily, but of course it caused longer term problems in

21   the outcome in the end.

22          Mr. Murphy seems to fall into what's known as a Type

23   2 alcoholic.  They have trouble stopping drinking because

24   they have an absence in the guilt -- of guilt and anxiety

25   about it, even though they might have a lot of remorse about

1    the results of it.  They have trouble.  They have a very

2    early onset.  Indeed he starts drinking at age 13 to 14 years

3    of age, and they have a tendency -- you see down here --

4    inability to abstain from alcohol, frequent fighting, and

5    arrests when drinking and the absence of guilt and anxiety

6    concerning drinking.  Kloninger postulated the transmission

7    of alcoholism in Type 2 alcoholic people was from fathers to

8    sons.  Hence, the term male limited alcoholism.  That's what

9    we see here, because Mr. Murphy's father was a highly abusive

10   man who committed criminal acts while he was drinking and

11   indeed other members of the family, including his own father,

12   were also alcoholics.  So what you have here is a -- really

13   an expression of what Kloninger talks about as male limited

14   alcoholism, which has early onset, they have trouble

15   stopping, and they tend to get more aggressive when they're

16   drinking.  The corollary to this is you take the alcohol

17   away, then they tend not to be as aggressive and indeed the

18   collateral interviews that I did with other people, such as

19   his common law wife, Chelsea Willis, reveal that he was much

20   less aggressive when he was not drinking.

21        Here we have just another section that talks about

22   alcohol and drug abuse.  Alcohol is well known for its

23   association with violence through its ability to lessen

24   inhibition against antisocial and violent behavior and to

25   decrease perceptual and cognitive alertness with resulting

1    impairment of judgment.  A number of epidemiological studies
2    have found a strong link between alcohol use and certain
3    types of homicide involving disputes.  It goes on to talk
4    about other drugs.
5          But the important thing to remember is there is a
6    link between alcohol and aggression because it disinhibits
7    people.  It makes them more likely to do what their impulses
8    command them to do, so people that are drinking can be very
9    different than people who are not drinking.  So here we have
10   all these factors coming together.  You have a nasty
11   childhood.  You have a loss of father figure.  You have
12   impulsive aggression and self-destructiveness, including
13   suicide attempts.  And he also would cut on himself and burn
14   himself.  This is documented in records before he was ever
15   arrested for capital murder.  He would actually burn himself
16   or cut on himself to relieve pain or anxiety or internal
17   distress.  You have somebody who is a miserable human being
18   basically, whose brain isn't quite right because it doesn't
19   have enough serotonin and the frontal lobes don't work
20   appropriately, and then he tries to fix that with alcohol
21   which causes a further problem and that's disinhibition or
22   loss of inhibition aggressive impulses.  So you have a recipe
23   for disaster here unfortunately and that's I think a lot of
24   what happened.  We know he was at least drinking some on the
25   day that this tragedy occurred.

1          Here's another factor in what we're looking at.
2    This is related to what happens in one's environment.  I
3    think I'll go up here.  I think anyone would agree that this
4    child, Mr. Murphy, was exposed to a lot of abuse and neglect
5    as a child.  This is the result, profound changes in affect
6    regulation.  That means the regulation of mood and
7    self-identity have long been noted in the clinical and
8    research literature on childhood victims of interpersonal
9    trauma.  Most noteworthy is the consistent finding that
10   childhood victims of neglect, physical abuse, and sexual
11   abuse, or a combination, are at much greater risks for
12   extended periods of anger unmodulated aggression,
13   apprehension, guilt, and fear, alterations in their personal
14   relationships to caregivers, and difficulty with intimacy.
15   Virtually all of the nine criteria for borderline personality
16   disorder are noted in childhood victims of abuse, and I won't
17   go through it, but basically it talks again about affective
18   disregulation or the fact that the emotions don't respond
19   normally.  And there's a lot of anger when people have been
20   abused as children.
21          Fortunately, there's some hope here.  This is the
22   course and prognosis of borderline personality disorder.  It
23   varies considerably, but most chronically there is -- most
24   commonly there is chronic instability in early adulthood with
25   episodes of serious affective -- that's emotional -- and

1   impulsive discontrol and extensive use of health and mental

2   health resources.   Impairment from the disorder and the risk

3   of suicide are greatest in the young adult years and

4   gradually wane with advancing age.   During theirs 30's and

5   40's most individuals with this disorder gain stability in

6   their relationships and vocational functioning.   Thus

7   borderline personality disorder tends to somewhat slowly

8   remit over time.   It does help to contain them in a

9   controlled environment to prevent further acting out.

10          I think that's what I have with literature.   I have

11  some other materials from the medical records and stuff.

12      Q.   Okay.   Well, let's talk about the medical records.

13  Are you referring to the psychiatric attempts that he's made

14  to get help for himself?

15      A.   Yes.

16      Q.   And you've named -- you've numbered many papers that

17  reflected treatment that he had attempted to do.   Overall was

18  he successful at all in those attempts to get treatment?

19      A.   Not very successful.   He frankly says that his

20  motivation was at times lacking.   It would come.   It would

21  go.   He actually joined Alcoholics Anonymous and was able to

22  maintain sobriety for a period of months, I think it was at

23  one point, but the temptation to go back and drink was too

24  strong, and he went back and did it despite knowing that it

25  was destructive to his family, his common law wife, and his

1    daughter to do that.  So he had some success with that, but

2    at the same time he frankly admits, like many alcoholics,

3    that he had trouble being motivated to stop drinking at times

4    as well.

5        Q.   Now, in these treatment centers where he went --

6    let's sit down for a minute, shall we?

7        A.   Sure.

8        Q.   In these treatment centers where he went, he would

9    tell himself; is that correct -- I mean, he would tell the

10   people where he was what his problems were?

11       A.   Absolutely.

12       Q.   And what was the first time period that he went to a

13   place that you know of?

14       A.   I think that was 1997, if I'm not mistaken.

15       Q.   And what precipitated his going to that place?

16       A.   He was admitted to Glen Oaks Hospital because he was

17   seeing hallucinations of snakes.  It looks like on that

18   occasion he was probably using amphetamines that caused him

19   to have hallucinations.

20       Q.   And -- but it did send him for treatment?

21       A.   Yes.

22       Q.   And what happened while he was there?

23       A.   He had something of a difficult time with it.  They

24   put him in groups in which people talked about sexual abuse.

25   And he had complained about sexual abuse being perpetrated by

1    Terry Tolar, one of his stepfathers that he had been adopted

2    to.  I don't know that we'll ever know whether that happened

3    or not, but I do know that he was very distressed in the

4    groups when that subject would come up and that would lead

5    him to be aggressive at times or angry at times and he

6    actually had a scuffle with one of the staff members at the

7    hospital.

8        Q.   That was in '96; is that correct?

9        A.   You know, forgive me, the dates are alluding me a

10   little bit.  I think this is '97 or '98.  It might have

11   been '99 even because there are several hospitalizations that

12   cluster together.

13       Q.   But this is previous to the case we're here about

14   today?

15       A.   Oh, absolutely.

16       Q.   During his time there, do you recall about how long

17   he stayed at the first treatment?

18       A.   It was only a few days, as I recall.  He left and

19   then he came back because he was seeing snakes again.

20       Q.   And he saw at that time and all of his future trips

21   to the mental hospitals various psychiatrists, did he not?

22       A.   Yes, he did.

23       Q.   And in the course of those, not only the first one,

24   but the one subsequent to, were the diagnoses similar from

25   those doctors at those hospitals?

1    A.   There were a number of diagnoses that were given,

2    depression, dysthymia, which would be consistent with my

3    diagnoses and he was given a diagnosis of what used to be

4    called multiple personality disorder.  I disagree with this

5    diagnosis, but he was given this at one point.  Most people

6    said there was depression and most everybody noticed the

7    substance abuse.

8         Terrell State Hospital mentioned the possibility of

9    borderline personality disorder.

10   Q.   Okay.  And what -- why do you think that the multi

11   personality disorder is not a correct diagnosis?

12   A.   That was based largely on Mr. Murphy's report that

13   he could not remember periods of time.  The problem with that

14   kind of thinking is that he's an alcoholic and alcoholics are

15   prone to blackouts.  It's very well known when they drink

16   heavily, they don't remember what goes on.  And it seems to

17   me there was no effort to distinguish this uncommon

18   phenomenon of multiple personality disorder from the very

19   common phenomenon of alcoholic forgetting and blackouts.

20   Q.   Okay.  Did he have this sort of problems when he was

21   there in that first treatment that you recall?

22   A.   Well, he did, he was -- he was irritable at times.

23   And I'm not remembering whether it was the first or the

24   second hospitalization at Glen Oaks, but he got somewhat

25   aggressive with one of the staff members who held on to him.

1   He had been very upset about what had gone on in one of the

2   groups about sexual abuse.

3       Q.   Okay.  He was never put out of any of these places

4   though as far as being discharged as a danger to anybody, was

5   he?

6       A.   No, that's the interesting thing.  I know of

7   psychiatric hospitals doing that sometimes, discharging

8   people that they feel are dangerous or for whom they have a

9   fear for the other patients or staff members, but in this

10  case they chose not to do that.

11      Q.   To your knowledge, did any of these places diagnose

12  narcissism?

13      A.   No.

14      Q.   Did any of them diagnose borderline personality

15  disorder?

16      A.   Yes, they did.  As again, I said Terrell State

17  Hospital said rule out borderline personality disorder which

18  means we think it might be there, but we're not absolutely

19  sure so we're not going to commit to the diagnosis.

20      Q.   Did anybody ever say that he had antisocial

21  personality disorder?

22      A.   No.

23      Q.   Would it be fair to say that because he continued to

24  put himself into these places that were supposed to help him

25  mentally, whether he stayed or not, whether he could follow

1   through or not, he is a most miserable person who is trying

2   to do something?

3        A.   Right.   I think it's clear he lead a really

4   horrendous life.   He felt good and he felt taken care of when

5   he had a relationship with somebody like Chelsea Willis, but

6   he had -- I'm sure there was a certain amount of jealousy and

7   a need to control and a need to make sure she was going to be

8   there.   That always relates to problems.   And then of course

9   he would drink and he would become aggressive with her.

10  There's no question he would fight with her.   She told me

11  about it.   He broke her nose on one occasion.   However, he

12  was most aggressive when he was drinking, and it was seldom

13  when he was not drinking in that relationship.

14       Q.   Okay.   What slides did you bring regarding the

15  mental health care?

16       A.   I actually had some others about the stay at the

17  children's shelter you may want to look at some point.   Do

18  you want to do that, or do you want to do the medical?

19       Q.   Let's do the medical records first, and then we'll

20  go backwards.

21       A.   I can tell you about some of these records -- see if

22  we can't make this work.   Perhaps you want to work with it.

23  You look far more adept than I am.

24       Q.   And do word processing, too.

25       A.   As a psychiatrist, I don't get a lot of offers to be

1  a mechanic in the garage, my abilities to work with

2  machinery.

3          Well, I'll just go through some of these.

4      Q.   Okay.

5      A.   This particular record from -- comes from Glen Oaks

6  Hospital, is in 1999.  It simply talks about the depression.

7  It says that he cries when he talks about his social history,

8  his history of his wife and his child.  It says his mood and

9  affect is very depressed and he has a restricted affect.

10 That is his facial expression seems kind of shut down by what

11 he's experiencing.

12         What else you see in this record is -- I might as

13 well sit down, I suppose.

14     Q.   Okay.

15     A.   You see checkmarks on impaired coping skills which

16 means he doesn't have much resilience when it comes to

17 stressors or problems.  People with depression just don't

18 like difficulty.  Some of them get so bad they don't like to

19 hear the phone ring or the door bell ring because they'll

20 have to go answer it.  That's an obligation, and they just

21 get so energy less, they don't want to deal with it.  So he

22 has impaired coping skills.  He has stress intolerance.

23 According to the Glen Oaks staff.  And he has impaired social

24 or interpersonal skills.  What this means is he doesn't know

25 how to get his needs met in relationships and therefore he

1    tends to drink or be manipulative and that's what he learned

2    in childhood to get by is being manipulative or dishonest.

3           Here's another notation on the 28th of August 1999.

4    Staff found him in the bathroom on the floor in a fetal

5    position, very frightened.  He was seeing snakes at the time.

6           On the 30th of August he talked about a sense of

7    shame and embarrassment about his past abuse.  He said he was

8    struggling with anger and rage surfacing which reminds him of

9    his dad who he doesn't want to be.  So even then he was quite

10   aware of how abusive and aggressive his father was and he

11   didn't want to be like him.

12          Also, on the 30th, you have patient attempted to

13   process his anger from yesterday.  They're trying to get him

14   to work through the anger and to deal with it, but tended to

15   deny the emotion, began to be anxious, and then left the

16   group due to hallucinations in response to a female

17   describing abuse or being abused.  Again, I can't tell you

18   that he was or wasn't abused.  What I can say is when abuse

19   came up in these groups that he would attend, it was very

20   disturbing to him which suggests at least he believed he had

21   been abused by people in the past.

22          He stated he couldn't tolerate discussions of child

23   abuse.  I get too angry and ran from the group.  He was

24   isolated and tearful after that.

25          Here's another notation, also from the 30th, same

1    group.  Tends to get angry and obsess or discuss -- sorry, in
2    the discussion of sexual abuse with the group.
3              Also, on the 31st of August of 1999:  If this is how
4    I'm going to have to live, I don't want to live.  If this is
5    how I'm going to live, I don't want to live.  That's when he
6    made some suicide attempts because he's miserable.
7              And here's a time he's trying to control his anger
8    on the 2nd of September.  He said he left the group because
9    he didn't want to hit anyone.  He was afraid he would because
10   he was so upset about what they were discussing.  He said,
11   I'm afraid somebody will get hurt.  And the next -- the next
12   notation within two or three hours is he's kicking a trash
13   can, the staff member asks him to stop, he charges the staff
14   member, he takes a swing at the staff member, and the staff
15   member holds on to him.  Later on, he seems to calm down and
16   he's okay.  The pattern tends to be that he apologizes later
17   for the -- for the aggression that he committed, but at the
18   time, you know, he gets very enraged, he's kind of out of
19   control.  There doesn't seem to be a sustained effort to
20   really hurt this person.  He takes a swing, and then it's
21   over.
22             On the 6th of September of 1999, he was found under
23   the sink talking about snakes, apparently hallucinating
24   again.  And he was verbally aggressive with the staff because
25   he's very -- he's unstable again because of the

1    hallucinations.  Then he's physically aggressive to the staff

2    again when they had to forcibly remove him from a closet

3    where he was hiding.  And yet no one appears to have been

4    hurt on that occasion.  Gave him medication.  He apologized

5    later for the aggression.

6        Q.   An he was not put out of that place at all, was he?

7        A.   He was not put out, no.

8             The Andrews Center, which was an alcohol treatment

9    center, notes that he cuts or he burns himself when he's

10   upset.  This again, is one of the criteria of borderline

11   personality disorder.  This again, pre -- pre-dates his

12   arrest for capital murder.

13            Here's a notation from the Andrews Center about two

14   years ago.  Walked into the facility in crisis.  He tried to

15   overdose the night before after his wife left him.  And

16   that's a lot of what we deal with.  When there's an

17   abandonment, again, he's going to be very sensitive to that.

18            I want to mention one other item, and that is a risk

19   assessment form done by the Probation Department.  And what

20   it says is that there is a probable relationship between

21   alcohol use and criminal activity.  So even the Probation

22   Department could recognize that there was -- there was a

23   relationship between his alcohol use and the criminal

24   behavior that he committed from time to time.

25        Q.   Okay.  Is that all you have on the medical records

 1   that you wanted to bring up?

 2       A.   Yes.

 3       Q.   Now, you've testified that a lot of the problems

 4   came from the dysfunctional homes he was in and how many

 5   homes he was in.  And you know that he had a brother Donnie

 6   who went with him up to the point that they lived at the

 7   Tolar's and then went to the Van Zandt County Children's

 8   Shelter; is that correct?

 9       A.   That is correct.

10       Q.   Did you look at in your attempt to figure out what's

11   happened to Jim Murphy's life, Donnie's records from the Van

12   Zandt County Children's Center?

13       A.   Yes.  Contains a lot of information about Donnie --

14   I mean about Jim and the family of origin.

15       Q.   And what can you tell the jury about that that might

16   aid them in understanding what's happened here?

17               THE WITNESS:  We have an actual overhead

18   projector again?

19               MS. BALIDO:  We do.

20               MS. LITTLE:  It works now?

21               MS. BALIDO:  This one does.

22               MS. LITTLE:  Good girl.

23               JUROR:  Do the mirror.

24               (Counsel setting up projector)

25               MS. BALIDO:  Y'all are so good.  That is why I

1    went to law school.

2              THE WITNESS:  I've got to say I'm through.

3         A.   Okay.  Okay.  Here we have some of the records from

4    the Van Zandt County Children's Shelter where Mr. Murphy and

5    his brother Donnie were placed after the Tolars felt they

6    couldn't handle mainly Donnie.  He was punching holes in

7    their wall and breaking windows and that sort of thing.

8              I think this shows you some of the mentality of a

9    child who feels rather abandoned.  Donnie states he never

10   wants to be adopted again and wants to stay with the Kings

11   until he's 18 years old.  He said Mrs. King told him he could

12   do this.  Despite my explanation, Donnie still wants this

13   placement to last until he's 18.  He doesn't want anymore

14   instability.  It's difficult for him.  So he wants to stay

15   with the foster family, the Kings.  Donnie is particularly

16   angry because he was promised by the Tolars that he and his

17   brother Jim Tolar were a package deal and they would not ever

18   be separated.  However, Jim is now living with a teacher from

19   his school, the Murphys in Edgewood, Texas.  Donnie feels his

20   brother's affections were bought off because the Murphys have

21   provided very well for Jim so far.  All right.

22             He doesn't want anymore instability.  He feels lied

23   to by people.  That's somewhat subjective probably.  I'm not

24   sure it's all necessarily true, but when you get angry when

25   you're a child and you don't understand why you don't have a

1   stable home, you start to blame people and think they must be

2   doing something behind the scenes to manipulate you.

3            Here's one other thing.  This is about the home

4   environment that Mr. Murphy grew up in.  His father also gave

5   him some whiskey -- this is talking about Donnie, not Jim,

6   but you can see what kind of father we might be dealing with

7   here when he gave his son whiskey and indeed this was

8   confirmed by Pam Sherman in my conversation with her.

9            This particular sheet talks about the environment

10  that both of these boys had felt with -- or had dealt with

11  growing up.  For having experienced so many losses,

12  disappointments, and rejections in his lifetime already,

13  Donnie exhibits a great strength, positive attitude,

14  etcetera, so he's easy to get to know and like.  And he's got

15  some strengths, yet at the same time during the three years

16  that Donnie lived with the Tolars, he was described as being

17  defiant and having an uncontrollable temper and failed a year

18  in school.  Since being at the Van Zandt Shelter with the

19  Kings, Donnie's behavior has greatly mellowed.  His grades

20  have improved, and he has not been in any serious trouble at

21  the Fruitvale schools.  That's interesting because it tends

22  to verify that maybe the Tolar's environment was not great

23  because Donnie calms down a great deal after he comes to the

24  Kings for the foster parenting.

25            Here you have Donnie being upset that the Kings

1    might leave.  And he told Mrs. King how much he loved her.

2    This is Donnie.  And seemed to be asking her to reassure him

3    that that was important to her.  This is -- this is a child

4    who has been sent from many -- from one location to another,

5    from one home to another, do you really love me.  He

6    compensates with anger.  He compensates with aggression.  He

7    acts out because he's unsure that anybody loves him.  You see

8    the underlying dynamic here which is the same as with Mr.

9    Murphy, lots of anger on the surface, underneath the kind of

10   pathetic wish that someone would care about him, because he's

11   not sure anyone ever did.

12        This particular piece of an evaluation, also with

13   the Van Zandt County Children's Shelter, tells you about the

14   environment that both of these boys came from.  Again,

15   talking about Donnie, but it's the same environment that he

16   and Jim grew up in.  Donnie's emotional development was

17   structured by a lifetime of disappointment and abandonment.

18   His natural mother left him when he was a baby.  His father

19   abandoned him in everything else by drinking himself to

20   death.  His grandparents became ill and died.  And the Tolar

21   offered him and his brother a home, but he could never attach

22   himself to him.  Now his brother is gone, as they say here.

23        You look down a little bit.  This is exactly the

24   same pattern you see with Mr. Murphy.  It seems that Donnie

25   was defiant and balked at the authority of the Tolars.  The

1    Kings observed that Donnie does not like to abide by the

2    rules and keep angry -- gets angry and goes into his room,

3    shuts the door, and turns the radio up full blast, but he

4    will eventually calm down, do as expected, apologize, and say

5    he loves them, the Kings, and it will be over with.  It seems

6    Donnie is coming to appreciate restrictions and respect

7    authority now more that he's with the Kings.  In other words,

8    again, it looks like it's a better environment than the

9    Tolars where they had been before.  Exactly the same pattern

10   as with Jim.  You get angry because you don't feel loved and

11   later you apologize and want to be taken back.  That's not

12   very good.  Basically what it says is the father was known to

13   be a chronic alcoholic to these evaluators.

14        This is something else that both of these boys

15   seemed to do.  This patient evidences a rather long-standing

16   depression which appears to arise from frustrated attempts to

17   get his emotional needs met.  The recent series of rejections

18   and losses he has experienced seems to have punctuated his

19   inner distress causing a sense of internal agitation and

20   disequilibrating emotion.  Disequilibrating means you feel

21   off balance.  You don't know what's going to come next

22   because people reject you willy-nilly.  Because he does not

23   have the cognitive skills needed to think through problems,

24   he will act out unmanageable distress impulsively and

25   aggressively.  You get distressed because you don't feel good

1    on the inside and they act aggressively.  Less agitating

2    emotional pain be covered and denied as when he struggles to

3    maintain a cover facade of inadequacy.  In this context he

4    will insist that no one can hurt me as he did during the

5    clinical interview.  Boasting, bragging, or overcompensating

6    for feelings of inadequacy may emerge as well.  This is where

7    the narcissistic personality disorder I was talking about

8    comes in.  People with narcissistic personality disorder,

9    unfortunately many doctors and many lawyers are like this,

10   have a sense of inadequacy underneath and they try to cover

11   it up by looking powerful, together, strong, nothing can hurt

12   me.  And underneath they feel somewhat vulnerable here, and

13   that's what you have here, somebody who wants to look

14   powerful.  Unfortunately, their own needs are so great, they

15   tend to neglect the needs of others and it hurts their

16   empathy for other people at times.  Nevertheless, they

17   maintain some ability to have empathy and care about other

18   people, especially other victims because they identify with

19   them.

20        I won't show you this one.  Basically Donnie was

21   saying that he bought some shoes with his own money that

22   other people bought for him.  It's an example of this

23   narcissistic bragging to feel good about yourself when really

24   you don't underneath.

25        Okay.  This is important here.  What's happened here

1    is that Jim has been placed in a home and Donnie is left in

2    the shelter and he's upset about this.  It says here that

3    this evaluator believes this an advantage for Mr. Murphy,

4    Jim, because Donnie tends to be domineering and threatening

5    to him.  So here's another form of abuse to some extent that

6    Mr. Murphy had to endure growing up.  And unfortunately, he

7    was almost the only person he could attach to because his

8    brother was a consistent presence in his life.

9            I'm not turning it off this time.

10   Q.    (By Ms. Little)  Okay.  Let's sit down, though.  Did

11   you talk to the Tolars, either one of them, Dr. Crowder?

12   A.    I did.

13   Q.    And what did you discover in your conversation?

14   A.    What I discovered was that they perceived Donnie was

15   the main problem.  He had been very difficult to control.

16   What Mr. Tolar said was had it not been for Donnie's acting

17   out, but they would have kept Jim, but that they gave Jim a

18   choice to stay with his brother or to stay with the Tolars

19   and he chose to stay with his brother instead.

20   Q.    Even though his brother picked on him and stuff, he

21   clung to that brother?

22   A.    Only constant presence in his life.  He's the only

23   one that had been there all this time.

24   Q.    Did you talk to Hope Abbott?

25   A.    Yes, I did.

1      Q.    Well, let me go back to the Tolars.  Did you talk to

2  Terry Tolar or Celeste Tolar?

3      A.    I talked to Terry.

4      Q.    Was there anything else in that household that you

5  could confirm or refute any of the allegations that you

6  discovered from talking to the Tolars, or anyone else for

7  that matter?

8      A.    I really couldn't.  Again, there's some suggestion

9  that even the foster parents, the Kings, were better parents

10 because Donnie's behavior settled down.  Other than that, I

11 can't confirm.  Mr. Tolar said he knew, and I didn't ask him

12 this, but he said he knew there had been allegations he had

13 sexually abused Jim, and he said -- he just spontaneously

14 told me that that wasn't true, they had a good environment,

15 that they cared a lot about him, and Jim had not been much

16 trouble to them.

17     Q.    And did Jim get in trouble outside of that home?

18 Did he show any signs that he was going to turn out to be a

19 big whopping antisocial personality disorder later?

20     A.    I would not use those terms, but, no, he didn't show

21 any signs of that really.  He was, I think, a little

22 difficult to handle when he was transferred to the Van Zandt

23 County shelter, but he didn't really show a great deal of

24 behavioral problems when he was growing up.  He did start

25 drinking at an early age, but I couldn't really find anyone

1    that said he had a lot of problems.  He did tell some lies at

2    times, some of which were designed to make him appear more

3    important, like he would say my dad owns this piece of land

4    or that sort of thing.  It seemed to be to make him look more

5    important.  Some of the other lies he would tell at times

6    were to avoid responsibility for problems, so he did have

7    that.  Those are about the only behavioral problems I could

8    detect until he was about 17 or 18 years old.

9        Q.   All right.  Did you talk to anyone in the schools

10   where he attended?

11       A.   Yes, I did.

12       Q.   Who did you talk to?

13       A.   I talked to a Mr. and Mrs. Shellnut and to a

14   Catherine Bunts (phonetic).  Mr. Shellnut had been -- I think

15   he's a superintendent now, but he had been a principal, and

16   his wife, Nita Shellnut, had been one of Mr. Murphy's

17   teachers and Catherine Bunts had been one of his teachers,

18   too.

19       Q.   What did you find from them?

20       A.   What I found was that he didn't give them a lot of

21   trouble and he seemed to be something of an unhappy child, or

22   a child that exhibited a certain amount of inner tension.

23   Teachers come to recognize this sort of thing, and they

24   recognized him as being an at risk child in that sense.

25       Q.   Did they know him when he was a child with the

1    Tolars or an older child with the Murphys?

2        A.   That would have been just when he had moved to the

3    Murphy's from the Tolar's.

4        Q.   Or from the shelter?

5        A.   From the shelter, true.

6        Q.   And they -- but they did say that he puffed and

7    bragged and tried to build himself up?

8        A.   Yes.  Mr. Shellnut recalled an incident where that

9    happened.

10       Q.   Did he recall anything about how Jim responded if he

11   got in trouble about lying or anything?

12       A.   He would sometimes be dishonest about that and try

13   to avoid responsibility.  He also said however he was never

14   an aggressive child.  He was in fact -- mousy was the word

15   Mr. Shellnut used to describe him.  And he never expected

16   this kind of outcome in Jim Murphy's life.

17       Q.   What about Ms. Bunts?

18       A.   It was a similar sort of thing, didn't give me a lot

19   of trouble.  I wouldn't have thought this would have

20   happened.  We were shocked that it did.

21       Q.   So all the information from these school personnel

22   indicates that Jim was not having overt problems that became

23   problems for others outside his life when he was a child?

24       A.   That's right.  He was -- he was being dishonest

25   about some things to make himself look big or to avoid

1    responsibility at times, but the only thing -- plus the

2    drinking, which people were not aware of.  But those are the

3    only things that I know, misbehavior in adolescence.

4        Q.   Who else did you talk to from his long ago past?

5        A.   I talked to Pam Sherman.  I talked to -- I don't

6    know what you mean by long ago.  Certainly I talked to Tonya

7    Thorp who was his sister, and she had seen some of the abuse

8    directly that his father had dealt out.

9        Q.   Uh-huh.  Okay.  So you've talked to a number of

10   people that know about his life when he was with his mother

11   originally?

12       A.   Yes.

13       Q.   And how he reacted when he and Donnie were put in

14   the Buckner's Orphanage home?

15       A.   Yes.

16       Q.   And actually have you talked to people that have

17   indicated to you he complained about the Tolars from a fairly

18   early age, even right after he left the Tolar's?

19       A.   Yes, some of the records indicate he didn't want to

20   live with the Tolars anymore immediately after leaving it,

21   and then Tracy Erwin and Tim Erwin who Tracy was Tracy

22   Murphy, formally was the stepsister, if you will, the

23   adoptive sister.  She talked about the complaints he had made

24   about his treatment at the Tolars and also Tim, her husband,

25   Tim Erwin also talked about the complaints he made about the

1    treatment there, so that comes from an early age.

2        Q.    All right.  Did you learn anything about his

3    treatment by the Murphys?

4        A.    Yes.

5        Q.    How did that home work?  It looked like a good thing

6    at first, did it not?

7        A.    Correct.

8        Q.    Jim was thrilled to death to get there?

9        A.    Right.

10       Q.    Did it turn out not to be quite as good as what he

11   had anticipated?

12       A.    Well, it really wasn't.  The Murphys ultimately

13   separated and divorced.  In fact, they had divorced once

14   already and remarried before he came, as I understand it.

15   Then they divorced again toward the end of his high school

16   years and that made him quite uncomfortable.  He did not feel

17   that Samantha Murphy treated him well, called him stupid,

18   slapped him on occasion, that sort of thing.  And then she

19   disowned him essentially when he chose to live with Bob

20   Murphy instead of with her at the end of that.  And some of

21   that may have been because he felt he could -- he could have

22   more freedom with Mr. Murphy, but she really would not talk

23   to him afterwards and that was confirmed by others that she

24   disowned him more or less after he chose the father over her.

25       Q.    Did -- and his choosing the father at the age of 17

1   or so years old would be fairly difficult for anyone.  Would

2   that not be so, if the father is working and they're kind of

3   on their own, foot loose, fancy free, have transportation?

4        A.   Well, it wouldn't be surprising, especially if the

5   relationship with the mother was not good before that.

6        Q.   Did you talk to Matt Murphy?

7        A.   Yes.

8        Q.   And who is he?

9        A.   That again, is an adoptive brother.  Son of Samantha

10  and Bob Murphy.

11       Q.   Did you ever learn that Jim felt that he was kind of

12  like a pet or a toy when he first went to the Murphy house?

13       A.   That's how he felt.  Whether that was true or not,

14  it's harder to tell.

15       Q.   Do you know what that was based on?

16       A.   I believe he felt that Samantha had adopted him to

17  have a playmate for her son Matt.  They dressed -- they were

18  asked to dress similarly while they were growing up.

19       Q.   And when that divorce occurred, did Jim feel any

20  responsibility for that?

21       A.   That I couldn't tell you.

22       Q.   You don't?

23       A.   I don't recall.

24       Q.   Do you think Jim Murphy is a person who feels

25  remorse and guilt for things that he does?

1    A.   Yes.

2    Q.   And what do you base that on?

3    A.   I base that on the fact that not one of the 13

4  people I talked to believed that he didn't have a capacity

5  for remorse.  Many of them reported affirmatively he does

6  have a capacity, I know he does, he apologized, that sort of

7  thing.  There were a couple who in light of later events

8  began to question that, but there was nobody that didn't feel

9  he had a capacity for remorse and most of them would very

10  affirmatively say, oh, yes, I know he has a capacity for

11  remorse.

12    Q.   In fact, from -- did you read the police reports and

13  the things that were connected to this case?

14    A.   Yes.

15    Q.   Did you form an opinion about whether in fact his

16  own guilt was used against him?

17    A.   Yes.

18    Q.   And what was that?

19    A.   Well -- and there are a great many indicators of

20  this, but a letter was written to him, signed by Cindy Hale,

21  saying would you please tell us what happened to our sister?

22  We want to put a memorial where she was killed.  Did she

23  suffer?  That sort of thing.  And he seemed to respond to

24  that by expressing sorrow and remorse for what he had done.

25  So that's here.  I have some overheads on that if you want to

1   see it, but they absolutely did play on -- play on his

2   sympathy and his capacity for remorse to get him to confess

3   and talk about what had happened in that circumstance.

4       Q.   And in fact he talked to them several times even

5   after he had a lawyer?

6       A.   Yes.

7       Q.   Is that your understanding?

8       A.   Yes.

9       Q.   And he told them where Ms. Cunningham was because

10  his friend Jason Bonham said, remember our friend that died

11  and the animals came?

12      A.   Yes.

13      Q.   And all of these things would be an attempt --

14  certainly what that -- their job is, is to find out what had

15  happened in this case, but Jim responded every time, didn't

16  he?  As far --

17      A.   As far as I can tell, he did respond to that, yes.

18      Q.   You had mentioned the DSM IV, I think.  Would you

19  tell the jury what Axis II means?

20      A.   We classify people according to clinical diagnosis,

21  like depression, schizophrenic, anxiety disorder.  Axis I is

22  just a place to put a name for what's going on with

23  somebody.  Axis II is the personality structure or

24  personality disorder.  And there are some other Axis, too,

25  but Axis II has to do with personality structure and

1    personality disorder.

2        Q.   Okay.  And from that is where you made your

3    determination of the narcissism?

4        A.   Yes.

5        Q.   And the borderline personality disorder?

6        A.   Yes.

7        Q.   And the antisocial traits?

8        A.   Yes.

9        Q.   He also has polysubstance abuse, and is there a

10   crossover between the substance abuse and the antisocial --

11   antisocial qualities?

12       A.   Yes, many people with substance abuse will engage in

13   antisocial behavior.

14       Q.   That's actually almost common sense, isn't it?

15       A.   Absolutely.  It's extremely, extremely common.

16       Q.   What -- you did say there were antisocial traits on

17   the part of Jim Murphy.  Which of those have you observed,

18   and how did you come to that information?

19       A.   There were times he was irresponsible.  He was

20   working, according to probation, 40 to 60 percent of the

21   time.  Some of the time he wasn't.  He seemed to want to be

22   taken care of on -- on worker compensation so that -- having

23   a parasitic kind of life-style, that may be a little

24   aggressive, but perhaps taking advantage of the system, if

25   you will, there may have been some of that there.  And there

1   were some at times criminal acts which he engaged in like

2   burglary of a vehicle and a habitation, I believe that he had

3   been convicted for before and was on probation for that.  He

4   was also irresponsible at times with showing up for probation

5   appointments.  At other times he would show up and pay

6   restitution.

7        Q.   Can you think of any others?

8        A.   There may be some.  I don't think of any others

9   right now.

10       Q.   What about -- did you feel that he had any

11  characteristics of posttraumatic stress disorder?

12       A.   He did complain of some symptoms of posttraumatic

13  stress disorder.  That overlaps so much with depression, it

14  was hard for me to tell whether that was present or not, and

15  you have to presume that the particular stressor of sexual

16  abuse in this case occurred and I wasn't sure whether that

17  happened.  It's possible he suffers from it, but it's hard

18  for me to tell.

19       Q.   And I think perhaps the diagnosis in one of his

20  hospital stays was dissociative disorder; is that right?

21       A.   Right.

22       Q.   What -- what is that?

23       A.   Well, that's the multiple personality that I was

24  talking about.

25       Q.   And you don't think that has any application to him?

1      A.   I really don't.

2      Q.   Now, he's made several attempts, whether strong ones

3  or light ones I would say, to kill himself --

4      A.   Yes.

5      Q.   Are you aware of those episodes in his life?

6      A.   Yes.

7      Q.   I think we have a trying to shoot himself once in

8  the face, pills, cutting himself in the jail.  Do you know

9  about those things?

10      A.   Yes.

11      Q.   Do you have an opinion about those in terms of

12  whether or not he is attention seeking, he's guilty, he's

13  trying to avoid consequences, he's manipulating?  What would

14  you say about those, and they may be different in each

15  instance, I don't know.

16      A.   It could be hard to tell.  I expect there's a

17  mixture of guilt, remorse, concern about himself, and a

18  desire to make -- make the environment be different.  That's

19  how borderlines react.  I'm so anxious, I want the

20  environment to be different and I'll doing something dramatic

21  to make the environment be different.  I feel terrible.  I'm

22  going to have to change something.  There's a mixture of all

23  these motives going on.  Like I said, there are many letters

24  that he wrote, too, that reflect remorse.  I think that's

25  part of it, but I can't say that there's not a manipulative

1    angle, too, because borderlines make manipulative suicide

2    attempts, so it's hard to distinguish out exactly what

3    mixture of what is involved in these attempts.

4        Q.   And you're aware that he did try to cut -- did cut

5    his throat and his wrist when he was in the jail?

6        A.   Yes.

7        Q.   Do you consider that a manipulation?

8        A.   It's very self-destructive.  There may have been

9    manipulative elements, but at the same time, it's very

10   difficult to cut your own throat.  And I don't -- I

11   personally do not believe it's all manipulation, no remorse,

12   no guilt about what's happened because he expresses it too

13   consistently.

14              MS. LITTLE:  I'll pass the witness.

15              THE COURT:  Let's take a 10-minute break,

16   Sheriff, for the benefit of the reporter.

17              THE BAILIFF:  All rise.

18              THE COURT:  Jury excused from the courtroom at

19   this time.

20              (Jury excused from courtroom.)

21              THE BAILIFF:  All rise.

22              (Jury returned to courtroom.)

23              THE COURT:  Let the record reflect the jury is

24   returning to the courtroom at this time.

25              Jurors may be seated.

1          Mr. Murphy, counsel, Dr. Crowder, you may be

2    seated.

3          Defense may proceed.

4          The State may proceed.

5               MR. DAVIS:  Yes, sir.

6                    Cross-Examination

7    By Mr. Davis:

8      Q.   Dr. Crowder, we've met prior to today, haven't we?

9      A.   Yes.

10     Q.   Dr. Crowder, would you tell us how many death

11   penalty cases in Texas have you testified?

12     A.   I couldn't tell you the number, maybe -- I'm just

13   estimating, maybe 15 or so.

14     Q.   Okay.  Who have you testified for, the State or the

15   defense, in those cases?

16     A.   The defense.

17     Q.   You've testified several times in Dallas County on

18   death penalty cases, haven't you?

19     A.   Yes, sir, I have.

20     Q.   And again, that's always been for the defense,

21   correct?

22     A.   Correct.

23     Q.   Okay.  At times you have expressed opinions about

24   future dangerousness, correct?

25     A.   Yes.

1    Q.   Kenneth Wayne Thomas, you testified on his behalf,

2    didn't you?

3    A.   Yes.

4    Q.   Kenneth Wayne Thomas was convicted of actually

5    breaking into the home of --

6              MR. BYCK:  Your Honor, we're going to object

7    to going into the facts behind any of the offenses that the

8    doctor is talking about.

9              THE COURT:  Objection is overruled.

10   Q.   (By Mr. Davis)  Isn't it true that Kenneth Wayne

11   Thomas broke into the home of Mr. and Mrs. Fred Finch?

12   A.   Yes.

13   Q.   That he stabbed and killed both of them?

14   A.   Yes.

15   Q.   Can you tell the members of the jury what, if

16   anything, did Kenneth Wayne Thomas do to Mr. Fred Finch after

17   he killed him?

18   A.   I believe he was sodomized, if I'm not mistaken.

19   This was the mid 80's, I think.

20   Q.   Penetrated him anally, didn't he?

21   A.   Yes.

22   Q.   In that case, you said that Kenneth Wayne Thomas was

23   not a future danger, correct?

24   A.   I said with treatment he would be a declining danger

25   is what I said.

1    Q.   You testified on behalf of Mario Reed King, didn't

2    you?

3    A.   I remember I evaluated him, and I can't recall

4    testifying for him, though.

5    Q.   Okay.  Do you remember what Mario King was convicted

6    of?  Let me ask you, do you remember that he stabbed and

7    killed both his parents?

8    A.   I believe that's true.

9    Q.   Do you remember that after he killed his mother, he

10   cut her finger off to get a ring?

11   A.   I believe that's true, also.

12   Q.   You also testified on behalf of Robert Atworth,

13   didn't you?

14   A.   Yes.

15   Q.   And Robert Atworth actually robbed and shot an

16   individual here in Dallas County, didn't he?

17   A.   Correct.

18   Q.   Slashed his torso?

19   A.   Yes.

20   Q.   And then do you remember that he cut off the

21   victim's finger and put it in his refrigerator?

22   A.   Yes.

23   Q.   And you said that Robert Atworth was not a future

24   danger, either, correct?

25   A.   Unlikely, yes.

DARLINE W. LABAR, OFFICIAL REPORTER

Page 179

1    Q.    Do you remember testifying on behalf of a woman by

2    the name of Kimberly McCarthy?

3    A.    Yes.

4    Q.    I believe that's the first time that you and I met

5    on a case such as this one, correct?

6    A.    That may be.  I don't remember the first time.

7    Q.    Do you remember that Kimberly McCarthy one morning

8    walked across the alley to the home of her 70-year-old

9    neighbor, a Dorothy Booth?  Do you remember that?

10   A.    Yes.

11   Q.    That she forced her way into Ms. -- or Dr. Booth's

12   home and stabbed her repeatedly?

13   A.    I do.

14   Q.    And do you also remember that while Dr. Booth was

15   still alive, that she cut off her finger to get a ring?

16   A.    Yes.

17   Q.    Do you remember also that Kimberly McCarthy some ten

18   years before had actually stabbed and killed two elderly

19   women in South Dallas who were both friends of hers?

20   A.    True.

21   Q.    And you testified in that case that Kimberly

22   McCarthy was not a future danger, didn't you?

23   A.    Right.

24   Q.    And you also testified on behalf of Robert Wayne

25   Harris.  Do you remember that?

1      A.    Yes.

2      Q.    And again, Robert Wayne Harris shot and killed five

3   coworkers at a car wash in Irving; is that right?

4      A.    Yes.

5      Q.    He also killed a young woman some months earlier and

6   left her in a field, correct?

7      A.    True.

8      Q.    You told the jury in Dallas County that you didn't

9   consider Robert Wayne Harris to be a future danger either,

10  right?

11     A.    No, I didn't say that.  I didn't testify about

12  future dangerousness.

13     Q.    You testified on mitigation.

14     A.    Mitigation, not future dangerousness.

15     Q.    Right.  And you said there were mitigating

16  circumstances in that case on behalf of Robert Wayne Harris,

17  right?

18     A.    Absolutely.

19     Q.    Robert Wayne Harris is on death row now, right?

20     A.    Yes.

21     Q.    Kimberly McCarthy is on death row right now?

22     A.    All of those people are.

23     Q.    Doctor, would it be fair to say that you have

24  problems with the way Texas applies its death penalty

25  statute?

1        A.    In some cases.

2        Q.    Well, as a matter of fact, your feelings are such

3   that you've already testified previously, haven't you, that

4   you -- in your opinion, you believe it would be illegal to

5   assess a death penalty against any of the women on death row?

6        A.    I think you may have misinterpreted that a little

7   bit.  What I showed in Kimberly McCarthy's trial is that not

8   one woman who had ever been confined on death row had

9   committed a disciplinary offense for being dangerous.  She

10  hadn't -- no woman on death row in Texas had ever hurt

11  anybody at that time.  I don't know what's happened since.

12  And I also told you that -- Karla Fay Tucker was executed

13  after 14 years on death row without committing an offense of

14  violence.  What troubled me was that the Texas death penalty

15  statute says someone has to be a future danger to be put to

16  death and that people that were not a future danger were

17  being executed in those cases.  That's what -- that's what

18  troubled me about women being executed, and you were aware of

19  this.

20       Q.    Well, let me just refresh your memory.  Do you

21  remember me asking you in the case of Kimberly McCarthy:  Let

22  me understand.  See if I can understand this.  You don't

23  think that any of these women pose such a future danger that

24  they should be assessed the death penalty, do you?

25            Do you remember your answer in that case?

1      A.   I expect I said no, because they had no

2   disciplinaries.

3      Q.   No, sir.  Your answer was:  No, that would be

4   illegal in my opinion.

5           Do you remember that being your answer?

6      A.   Well, that could well be.

7      Q.   Are you charging for the work that you've done in

8   this case, Doctor?

9      A.   Yes.

10      Q.   What are you charging?

11      A.   $175 an hour, $200 an hour for testimony.

12      Q.   Do you know to date how many hours that you've

13   worked in this matter?

14      A.   It's probably around 30 or so hours.

15      Q.   In the 13 collateral interviews that you've done,

16   Doctor, did you interview any members of the Garland Police

17   Department?

18      A.   No, looked at some records.

19      Q.   Van Zandt County Sheriff's Office, did you interview

20   any people from that department?

21      A.   Just records.

22      Q.   How about any member of the Dallas County Sheriff's

23   Office?

24      A.   No.

25      Q.   Jail nurses?

1    A.   No.

2    Q.   I know that you've reviewed records, but did you

3   make any attempt to talk with any of the physicians that

4   treated Jedidiah Murphy?

5    A.   No, I didn't talk with them.  I reviewed their

6   records.

7    Q.   Doctor, would any of your opinions change if you

8   learned that the defendant put a gun to the head of a young

9   woman and asked her, are you afraid to die?

10    A.   Well, my opinions of -- I'm sorry.

11              MS. LITTLE:  I was just going to object to

12   whether we're going to the background and the diagnosis of

13   Jim Murphy, as opposed to some future danger.  I'd object to

14   the question.

15              THE COURT:  Objection is overruled.

16    A.   My diagnosis doesn't change.  You take alcohol away,

17   and there's much less danger here.  That's what a lot of the

18   problem is.  There are many other problems, too.  But when

19   you don't have alcohol and you don't have the other

20   incentives and you don't have a woman and you don't have

21   somebody that's rejected him, you have many fewer incidents

22   of aggression on his part.

23    Q.   (By Mr. Davis)  So your opinion -- diagnosis

24   wouldn't change?

25    A.   No.

1    Q.   If you learned that the defendant kidnapped a nurse

2  in broad daylight in Arlington and refused the offer of money

3  and started to drive off with her, would that change any of

4  your opinions or diagnosis?

5    A.   No, it wouldn't.   I'm aware of these allegations,

6  and it wouldn't change any diagnosis or opinions.

7    Q.   And if you learned that the defendant robbed a

8  65-year-old woman in Wichita Falls, same question, would that

9  change any of your opinions or diagnosis?

10   A.   No.

11   Q.   Doctor, I know that you were asked to review some

12 records from the children shelter in Van Zandt County.   Did

13 Ms. Little provide those records to you?

14   A.   Yes.

15   Q.   Do you know whether or not you got a complete set of

16 the records or not?

17   A.   I believe there was an affidavit on them, but the

18 papers have now been separated.   I'm not sure.

19   Q.   Well, if it turned out there were additional records

20 that were not provided to you from that center, do you think

21 that some of those additional records might change your

22 opinions or diagnoses in this case?

23   A.   It's always possible, depending on what they say.

24   Q.   Did I understand you to say, Doctor, that you

25 thought the boys adjusted well once they got to the center?

---

1    A.   They calmed down according to the record I

2  reviewed.  They calmed down -- well, this is Donnie, of

3  course.  He didn't have as many problems in the Fruitvale

4  schools after a time.

5    Q.   Well, do you know, Doctor, that these two boys were

6  returned to the Tolar home some 17 days after they arrived at

7  the center?

8    A.   I believe I did read something along those lines.

9    Q.   And do you also see that they were returned to the

10  Tolars because in Donnie's case he was completely out of

11  control?  That's the reason why they had to send him back to

12  the Tolar home for a period of time?

13    A.   That would be when he left the Kings, I believe.  I

14  think that's true.

15    Q.   Right.  And do you recall that with regards to this

16  defendant, that again he was returned to the Tolars, too,

17  because he was out of control?

18    A.   They sometimes refer to them together.  All I recall

19  is the Tolars saying he wasn't much of a problem, it was

20  Donnie.

21    Q.   Well, have you seen a record with the date of

22  1-17-87 that says return to parents, so out of control that

23  we could not continue to keep him?  Have you been shown that

24  record from the children's shelter?

25    A.   I believe I did see it.  May I see it now?

1    Q.   Yes, sir, be happy to.

2         Do you know when you were shown that record?

3    A.   Yeah, I had it in the records.  Which one of these?

4    Q.   I believe the second page.  I believe --

5    A.   This one right here?

6    Q.   This one right here.

7    A.   Sorry.  Okay.  They want to relinquish their

8    parental rights.  The children don't want to live with them

9    anymore.  Return to parents, so out of control that we

10   can't -- cannot continue to keep him.

11   Q.   Yeah.  The reference to the parents relinquishing

12   that's with regards when they brought them on 1-1-87.

13   A.   Right.

14   Q.   They're returning to the Tolar home because he's out

15   of control is 1-17-87.  Did you have that record?

16   A.   Yes, I did have this record.  Absolutely.

17   Q.   That certainly would indicate these two boys -- at

18   least this defendant didn't adjust very well when he got over

19   there to that home, did he?

20   A.   He adjusted very poorly when he would leave one

21   circumstance for another.  He had already been placed in four

22   or five different homes by that time and it was very

23   disruptive to him.  To have a change of circumstances was

24   hard for him to handle.

25   Q.   Well, you know, too, he was physically attacking his

1    house parent when he got over there?

2         A.    Screaming and kicking, yes.

3         Q.    Showed that to be good adjustment?

4         A.    Well, depends on how long it lasts.  One episode of

5    screaming and kicking, I wouldn't say is enough to say it's a

6    poor adjustment.

7         Q.    These two boys that had allegedly been abused in the

8    Tolar home, there's no record that they refused to go back to

9    that home, is there?

10        A.    Says they didn't want to go back to the home.  You

11   just read it.

12        Q.    No, sir.  On the record from Jim Murphy dated

13   1-1-87:  Parents brought children here, stating they wanted

14   to relinquish their parental rights.  The children did not

15   want to live with them anymore.

16             That's not the reference to 1-17 when they were

17   taken back to the Tolar's.  Have you seen any reference of

18   either of these two boys said, hey, we don't want to go back

19   there to that awful home where we got abused.  We're not

20   going back to the Tolar's.

21             Have you seen any reference at all in this

22   children's shelter of these two boys refusing to go back to

23   that home?

24        A.    It said they didn't want to.  I'm not sure what you

25   mean by refusing.  They didn't have the power to refuse.

1        MR. DAVIS:  Could I?

2        THE COURT:  You may.

3    Q.   (By Mr. Davis)  Doctor, again, that statement about

4  these boys not wanting to go back, sir, that was made on

5  1-1-87, wasn't it?

6    A.   Sure.

7    Q.   Okay.  What I'm asking you is, is there any written

8  record that either of these two boys voiced any refusal to go

9  back on 1-17-87?

10   A.   You mean 16 days later did they change their mind

11  and want to go back?  I don't know of any change of mind in

12  that period of time.

13   Q.   And to your knowledge both of them then went back to

14  the Tolar home for a period of time?

15   A.   For a period of time.

16   Q.   Doctor, in your testimony I didn't hear you mention

17  any of the tests that were conducted on the defendant.  There

18  were several tests that you ordered to be administered on

19  this defendant, correct?

20   A.   I did order several tests.

21   Q.   First of all, you asked Dr. Monroe Cullum to perform

22  certain neuropsychological tests, didn't you?

23   A.   Yes.

24   Q.   And Dr. Monroe Cullum is with the Department of

25  Neurology at Southwestern; is that right?

1      A.    No, he's a neuropsychologist.

2      Q.    That's someone that you have a lot of confidence in?

3      A.    Oh, sure.

4      Q.    And what was the purpose of that testing?

5      A.    It was to rule out any central nervous system

6  damage.

7      Q.    And how would that be relevant in a case such as

8  this one?

9      A.    Demonstrable central nervous system damage would

10  make me worry that that was the basis of some kind of violent

11  behavior.

12     Q.    And as a matter of fact, the neuropsychological

13  tests done by the doctor showed no evidence of central

14  nervous system damage, right?

15     A.    That's correct.

16     Q.    And also revealed that this individual has above

17  average reasoning and problem solving skills?

18     A.    That's probably true.  He seems bright.

19     Q.    Did you also order that an EEG be performed on this

20  defendant?

21     A.    Yes.

22     Q.    What is -- what kind of test is that, Doctor?

23     A.    That measures the electrical brain activity.

24  Essentially wires are attached to the head, and there's a

25  monitoring of the electrical potentials in the central

1   nervous system.

2       Q.   Why would you want that kind of test done in this

3   particular case?  What were you looking for?

4       A.   What I was looking for, again, is any central

5   nervous system damage or abnormality on the EEG.

6       Q.   Would that also help you to confirm a history of

7   seizures, for instance?

8       A.   Yes, absolutely.

9       Q.   And in this case what was the result of that EEG?

10      A.   That was within normal limits.

11      Q.   Normal limits?

12      A.   Yes.

13      Q.   No abnormalities noted on that test?

14      A.   Correct.

15      Q.   Finally, did you ask that an MRI be done on the

16  defendant?

17      A.   Yes, sir, I did.

18      Q.   And again, if you could just briefly tell us what an

19  MRI is?

20      A.   Kind of complicated.  It has to do with making

21  certain molecules or atoms vibrate in a magnetic field.  And

22  that is the vibrations are then picked up to look at

23  structures in the brain, so it's a structural test to look at

24  whether there's a lesion, whether there are stroke sites,

25  which I didn't expect in this case, but a tumor or that sort

1   of thing might show up on this kind of a test.

2       Q.   Okay.  So in this case you were looking at possible

3   brain damage probably as -- possibly as an explanation for

4   this man's behavior and attitudes?

5       A.   Yes.

6       Q.   And in fact this MRI showed no brain damage, did it?

7       A.   That's correct.

8       Q.   So as I understand, the neuropsychological test, no

9   evidence of central nervous system damage, right?

10      A.   Correct.

11      Q.   The EEG was normal?

12      A.   Correct.

13      Q.   The MRI showed no brain -- not brain damage either,

14  did it?

15      A.   That's true.

16      Q.   Doctor, when you talked with Terry Tolar, as I

17  understood your testimony, he denied any abuse having

18  occurred in that home with regards to this defendant, right?

19      A.   That's true.

20      Q.   You mention a letter that was written or used by the

21  Garland Police Department at some point after the defendant's

22  arrest.  Since you didn't talk with any members of the

23  Garland Police Department, you haven't talked with Matt

24  Myers, the lead detective in this case, have you?

25      A.   No, I have not.

1      Q.    You don't know what his feelings are about the

2   genuineness of the defendant's responses, do you?  About what

3   Detective Myers' feelings are, whether this defendant was

4   being genuine and honest at the time he made those responses?

5      A.    I'm looking for who it was that talked about him

6   lowering his head when he talked about this event and seeing

7   if that's Myers, and I think it may be Gary Rose so it's not

8   Mr. Myers.  I don't know what his feeling was.

9      Q.    Well, you know Detective Myers has been here all

10  day, don't you?

11     A.    No.

12     Q.    Been asked by the defense to be present yesterday

13  and today?

14     A.    Nope.

15     Q.    So whether Detective Myers believes the defendant

16  was being genuine and honest, you simply don't know?

17     A.    Nope, don't know what he believes.

18     Q.    Doctor, I want to ask you with regard to Bertie

19  Cunningham, what emotions would you expect -- expect her to

20  experience just prior to her death in this particular case?

21     A.    If she was aware of what was happening, it was not

22  sudden, then I would expect her to experience a lot of fear,

23  a lot of anxiety, and there's usually thoughts of loved ones

24  in that kind of a situation.

25     Q.    Okay.  So you'd expect her to feel a great deal of

1  fear?

2     A.   Yes, I would.

3     Q.   Would you expect her to have a sensation of being

4  out of control?

5     A.   I would.

6     Q.   Panic?

7     A.   Could well be.

8     Q.   And would you expect Ms. Cunningham just prior to

9  her death to go through a situation where she thinks back

10  over her life to what she's done in her lifetime?

11     A.   Some people report that, yes.

12     Q.   Thank you, Doctor.

13               MR. DAVIS:  That's all I have, Your Honor.

14               MS. LITTLE:  Can we have just a moment, Your

15  Honor.

16               THE COURT:  You may.

17                    Redirect Examination

18  By Ms. Little:

19     Q.   Dr. Crowder, there was some discussion earlier about

20  a Hare test, are you familiar with that?

21     A.   Yes.

22     Q.   Is it also known as a psychopathy checklist?

23     A.   Yes, it is.

24     Q.   How many questions --

25               THE COURT:  Just a moment.  Ms. King, for

1    purpose of the record, Hare is H-a-r-e.

2        Q.   (By Ms. Little)   How many questions or how many

3    numbers of statements are there on that checklist?

4        A.   There are 40 criteria.

5        Q.   What is the validity of that test?

6        A.   This is a kind of a long question.   It's good for

7    predicting dangerousness outside prison settings.   Some

8    people feel it's good inside.   Other people feel it's

9    relatively poor or inadequate in present prison settings

10   because there's so much containment of the person.   There

11   a meda-analysis done recently in which the authors questioned

12   the value of the Hare to predict that a person would be

13   dangerous inside an institution.

14       Q.   All right.   And in fact was there a case of a Robert

15   Edwards?

16       A.   I think you mean Robert Atworth?

17       Q.   Yes, Atworth.

18       A.   Yes.

19       Q.   What happened in that case?

20       A.   That was a case that Mr. Davis just referred to.

21   There was evidence given about the Hare psychopathy checklist

22   and its elevation predicting the person would be a future

23   danger.   Now, Mr. Atworth was executed after two years.   I

24   saw him to determine his competence to be executed, and I

25   felt he was competent.   And he in fact gave up all of his

1   appeals.  There was a prediction by the prosecution expert

2   that the person would be a future danger, and yet later

3   investigation by a defense investigator in another case

4   revealed in fact he had not been a future danger.

5       Q.   In the penitentiary?

6       A.   In the penitentiary.  This is what gives me -- I

7   just want to say this is what gives me some misgivings about

8   things, that the prediction of dangerousness is not a very

9   exact science as applied and that there are a number of what

10  we call false positives in these cases and that's what --

11  that's what bothers me a great deal.

12      Q.   And how does a false positive occur?

13      A.   Think of a medical test.  The medical test is for

14  say high blood pressure.  This happens sometimes with what we

15  call white coat hypertension.  You come into the doctor's

16  office.  You're afraid he's going to diagnosis you with

17  something.  He had Italian food for lunch and his garlic

18  breath is bothering you.  You're blood pressure will go up.

19  He may diagnose you as having high blood pressure because

20  your blood pressure was momentarily elevated.  It's a false

21  positive because if you're not having to experience the

22  garlic breath and the fear of being diagnosed and not liking

23  the needles in the doctor's office, your blood pressure is

24  not high.  That's a false positive.

25          In this context what we talk about is the false

1   positives of killing people who are not a future danger.  And

2   the statistics are relatively poor for indicating that people

3   should be executed in many cases.  Now, there are some people

4   that cannot be kept safe in prison, but when you're doing 40

5   years without the possibility of parole, a lot of people are

6   not a future danger and that's what troubled me in some of

7   these cases.  So with false positives, you're killing people

8   that don't need to die.

9        In 1972 the U.S. Supreme Court acquitted or commuted

10  sentences to life of 588 people who had been sentenced to

11  death in the United States.  Some of these people were

12  released.  Others remained in prison.  How many murders were

13  committed by these 588 people who had gotten the death

14  penalty?  Six.  You had to kill 582 people who would not

15  commit a further murder to kill six who would commit a

16  further murder.  That's the problem with false positives.

17       And Mr. Atworth was indeed a false positive that

18  came out of this prosecutor's office.  That's what troubles

19  me about the death penalty.

20       The other thing is when no one woman on death row

21  ever committed a violent offense in confinement and when

22  someone like Karla Fay Tucker can be executed after 14 years

23  with one of the jurors and one of the prosecutors saying we

24  do not believe that this person should be executed anymore,

25  you have another problem with false positives.  She wasn't a

1    future danger as the jury had said she would be.  That's

2    troubling to me.  That's why I think it's illegal to kill

3    people that aren't a future danger.  That's what the Texas

4    law says.

5        Q.   And you've been sought out by defense lawyers to

6    testify or to help work on cases times when you were not able

7    to do anything that would be of any benefit, where you were

8    not ultimately called to testify or used in the case; is that

9    correct?

10       A.   Yes, I've seen over 40 capital murder defendants.

11   That's why I've only testified in 15 or 20.  Don't hold me to

12   that number, but it's not nearly all of them because I didn't

13   feel I had anything that was going to help them in their

14   defense in those cases.

15       Q.   And all of the future danger talk that's been

16   discussed about your previous testimonies, this was future

17   danger in the penitentiary?

18       A.   Yes.

19       Q.   These were people that were either going to be

20   executed or they were going to spend whatever number of years

21   the law required in prison?

22       A.   Yes, absolutely.

23       Q.   And back to these records of the Van Zandt

24   Children's Center.  These boys were children still at that

25   time; is that right?

1    A.    Yes.

2    Q.    And so if they acted out, it's not the same as going

3 and robbing a bank or something?  This is a child acting out?

4    A.    Right.  Out of the insecurity, I think, and the

5 instability of the environment.

6              MS. LITTLE:  That's all I have.  Thank you.

7                    Recross-Examination

8 By Mr. Davis:

9    Q.    Doctor, in fact you were hired and you actually

10 anticipated rendering opinions concerning future

11 dangerousness in this case, didn't you?

12    A.    Yes.

13    Q.    And yet on direct examination, as I recall, you

14 weren't asked a single question about future dangerousness

15 with regards to Jedidiah murder, were you?

16    A.    That's accurate.

17    Q.    When you look at Special Issue Number 1 and you see

18 the word "society," as I take it, you really only view that

19 as being prison, don't you?

20    A.    That's where the person is going to be.

21    Q.    Uh-huh.  So if you're looking at it, you're going to

22 limit it to prison.  You're not going to consider the free

23 world to be part of society with regards to Special Issue

24 Number 1?

25    A.    Not if these people are going to be confined.  It's

                DARLINE W. LABAR, OFFICIAL REPORTER

1    irrelevant to them.

2        Q.   Do you remember when I first questioned you about

3    what your opinions would be in this case?  Do you remember I

4    asked you in Mr. Murphy's case, would your conclusion be that

5    he will not pose a future threat?  Do you remember me asking

6    you that question at the 705 hearing?

7        A.   Yes, I do.

8        Q.   Do you remember your answer at that time to be:

9    With regards to Mr. Murphy, I can't say that he will not pose

10   a future threat.  What I can say is that the odds are against

11   it.  You can't predict necessarily for one individual what

12   that one person will do.

13            Do you remember that being your answer?

14       A.   And that's absolutely true for all of us here.  We

15   can't absolutely predict with regard to one individual.

16       Q.   Uh-huh.  So as far as you're concerned, when it

17   comes to Mr. Murphy, we just cannot predict what he's going

18   to do in the future?

19       A.   We can look at the odds though, and the odds are

20   against his future dangerousness in prison.

21       Q.   Based on all the studies that you've researched?

22       A.   Yes.

23       Q.   Have you conducted any of those studies yourself?

24       A.   Nope.

25       Q.   So you're just simply relying on research that other

DARLINE W. LABAR, OFFICIAL REPORTER

1    people have done in this area?

2        A.   That's the method of our profession, is to rely on

3    research from journals.

4        Q.   And many of these people that conduct this research

5    have a real problem with the Texas death penalty, don't they?

6        A.   Oh, I suppose -- I suppose some of them do.

7        Q.   Uh-huh.  James Markworth does, doesn't he?

8        A.   Yes, I think coming out of his analysis of the

9    statistics.

10       Q.   John Sorenson has a problem with it, doesn't he?

11       A.   I don't know if he individually and personally does

12   or not.

13       Q.   Do you remember me asking you whether you -- whether

14   you would express any opinion about whether this man will

15   pose a threat or a risk outside of a prison in the future?

16   Do you remember me asking you that question?

17       A.   I don't recall that specifically.  I know we dealt

18   with that issue.

19       Q.   Okay.

20              MR. DAVIS:  May I approach, Your Honor.

21              THE COURT:  Is this the June 14th hearing

22   outside the jury's presence?

23              MR. DAVIS:  It is, Your Honor.

24       Q.   (By Mr. Davis)  Dr. Crowder, let me show you a

25   transcript of that hearing, 705 hearing that we had in this

1    court.   Referring to page 5, question there:   Will you

2    express any opinion about whether he will pose a threat or

3    risk outside of a prison in the future?

4             Is that the question that I asked you?

5        A.   Yes.

6        Q.   And your answer was, what?

7        A.   I don't anticipate being asked that on direct.

8        Q.   You didn't anticipate Ms. Little asking you that

9    question, whether this man is going to pose a threat outside

10   the prison, right?

11       A.   Surely.

12       Q.   Then I asked you:   Have you formed an opinion on

13   that subject.

14            And you said that you had, right?

15       A.   Yes.

16       Q.   And I asked you:   What is your opinion?

17            And, sir, would you tell the members of the jury

18   what your answer was to that question?

19       A.   I said:   On the outside I would be concerned about

20   him.

21       Q.   Thank you, Doctor.

22       A.   Sure.

23            MR. DAVIS:   No further questions.

24            Further Redirect Examination

25   By Mr. Little:

1    Q.   And at the very least, Dr. Crowder, on the outside

2    is nonexistent for at least 40 years?

3    A.   Well, that's absolutely true.  We've got a 40-year

4    minimum before eligibility for parole so he would be eligible

5    for Social Security about the same time he's eligible for

6    parole.

7                    MS. LITTLE:   Thank you.

8                    Recross-Examination

9    By Mr. Davis:

10   Q.   Dr. Crowder, have you ever heard of the Texas 7?

11   A.   Yes, I have.

12   Q.   Do you know how many of those men were serving life

13   sentences before they escaped from the Connelly Unit and came

14   up here --

15                  MS. BALIDO:   Judge, I'm going to object to

16   relevance.

17                  THE COURT:   Overruled.   It's been opened up.

18   Q.   (By Mr. Davis)   Do you know how many of those men

19   were serving life sentences before they escaped and came up

20   here and shot and killed Officer Aubrey Hawkins of the Irving

21   Police Department?

22   A.   At least two.

23   Q.   Well, the man who is purported to be the ring

24   leader, George Rivas, do you know how many life sentences

25   that man was serving when he led that escape?

1      A.    18.

2      Q.    18 life sentences before he escaped.  Do you know

3   what sort of sentence that Michael Rodriquez was serving?

4      A.    He was on a life sentence for murder, I believe.

5      Q.    Michael Rodriquez actually was serving life for

6   capital murder, which would mean he would have a flat 40

7   years to do before under your assumption he would pose any

8   threat on the outside world, right?

9      A.    I agree with you.  There are 150,000 people in TDC.

10   Seven of them escaped.  There's about a 1 in 21,000 or so

11   chance that Mr. Murphy would escape.  That's true.

12      Q.    Donald Newberry, do you know he was serving a

13   99-year sentence for aggravated robbery when he escaped?  Do

14   you know that?

15      A.    I don't know the other specifics sentences.

16      Q.    Joseph Harper who escaped, do you know he was doing

17   50 years for murder when he left that institution?

18      A.    I can believe you.

19      Q.    Larry Harper was doing 50 years for aggravated

20   robbery, for aggravated rape when he escaped.  Patrick Murphy

21   was doing 50 years for aggravated rape.  And Randy Halprin

22   was serving 30 years for injury to a child before he escaped.

23   Correct?

24      A.    That's true.

25      Q.    And I assume that if I had asked you your opinions

1   about these individuals, that you would have said that these

2   men don't pose any threat in the free world until they're

3   eligible for parole and released into the free world,

4   wouldn't you?

5       A.   I would have said the odds were against it, and I

6   would have been right about 21,000 times to your one time

7   being right saying that they were.

8       Q.   You would have been wrong on all seven counts of the

9   Texas 7, wouldn't you?

10      A.   Seven out of 150,000 predictions I would have been

11  wrong.

12      Q.   You would have been wrong on every one of the men

13  who escaped out of the unit that day.

14      A.   7 out of 150,000 times, yes.

15              MR. DAVIS:  No further questions.

16              Further Redirect Examination

17  By Ms. Little:

18      Q.   Dr. Crowder, has there been anything that you've

19  seen through the records you've looked at, the interviews,

20  the knowledge of the people that you've talked to, that would

21  indicate to you that -- in fact, you had Jim sent over to

22  have an MRI done at a different facility, didn't you?

23      A.   Yes.

24      Q.   And he had other tests done outside of this

25  building, outside of the jail?

1      A.   He did.

2      Q.   And you went to see him and saw him.  He didn't

3  storm past you or anything, did he?

4      A.   No.

5      Q.   Have you seen any signs from anything you know about

6  him that he would be a great risk for escape?

7      A.   Not particularly.  Again, very few people escape.

8  Are there a few?  Yes, they are.

9           There's another important thing to point out here.

10  He was caught with razors on two occasions.  On one occasion

11  he chose to hurt himself.  On neither occasion did he choose

12  to hurt anyone else.  He had every opportunity to do so.  I

13  think you have to consider real carefully.  We've done the

14  experiment with him for a number of months now, and there's

15  really not any serious assaultiveness.  There was one

16  occasion on which he stiffened his arms and was unhappy

17  because they didn't take him to use the rest room by

18  himself.  They wrestled him to the ground.  No one was hurt.

19  I don't think you can say based on his record in jail, where

20  he had access to weapons, that he is much of a danger.  It

21  just doesn't seem plausible to me.

22                 MS. LITTLE:   Thank you.

23                 Further Recross-Examination

24  By Mr. Davis:

25      Q.   Do you know why he stiffened his arms and required

1   physical restraint over there in the George Allen Building?

2     A.   Yes.

3     Q.   Why was that?

4     A.   Well, as I said, he didn't want to use the rest room

5   in front of other people.  He has an inhibition about that.

6   He hadn't used the rest room for a long time, and he

7   wanted -- wanted to use the rest room alone.  That's as he

8   told me.

9     Q.   That's as he told you?

10     A.   Yes.

11     Q.   He didn't tell you it was because he refused to talk

12   with a Bill Parker who had been hired by the defense to

13   interview him over on the 7th floor?

14     A.   I'm not aware that he refused to talk to Mr. Parker.

15     Q.   You know that he feigned a seizure that day, too,

16   don't you?

17     A.   I would have to see the record because I know of one

18   instance in which he had what appears to be a panic attack.

19     Q.   Well, you didn't talk with any of the jail personnel

20   about that incident, did you?

21     A.   No, I read the record.

22          MR. DAVIS:  That's all, Judge.

23          THE COURT:  Thank you, Dr. Crowder.  You are

24   excused.

25          Ladies and gentlemen, we'll stand in recess,

```
 1    tomorrow morning 9:00 a.m.

 2                    THE BAILIFF:  All rise.

 3                    (Jury excused from courtroom.)

 4                    THE COURT:  Counsel, do we need any more 705

 5    before the next witness?

 6                    MR. DAVIS:  Yes, sir, I believe we do.

 7                    THE COURT:  8:45 for us, then.

 8                    THE COURT:  Jury has been excused.

 9              Visitors of the gallery, you may be seated or

10    excused.

11                    (Recess of proceedings.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Reporter's Certificate

STATE OF TEXAS:

COUNTY OF DALLAS:

I, Darline W. LaBar, Official Court Reporter of the 194th Judicial District Court, in and for Dallas County, Texas do hereby certify that the foregoing volume constitutes a true, complete and correct transcript of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in the statement of facts, in the above styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

Witness my hand this the 13th day of November, A.D., 2001.

DARLINE W. LABAR
Official Court Reporter
194th Judicial District Court
Dallas County, Texas
(214) 653-5803

Certification No. 1064 Expires December 31, 2002

DARLINE W. LABAR, OFFICIAL REPORTER