REPORTER'S RECORD

VOLUME 59 OF 65 VOLUMES

**74145**

TRIAL COURT CAUSE NO. F00-02424-NM

| | | |
|---|---|---|
| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PUNISHMENT PHASE BY THE JURY

**FILED IN
COURT OF CRIMINAL APPEALS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEC 5 2001

A P P E A R A N C E S:

Troy C. Bennett, Jr., Clerk

HONORABLE BILL HILL, Criminal District Attorney
          Crowley Criminal Courts Building
          Dallas, Dallas County, Texas   75207
          Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
            FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defenders Office
Dallas, Texas   75207
          Phone:  214-653-9400
            FOR THE DEFENDANT.

\*\*\*\*\*\*\*\*\*

         On the 29th day of June, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

         Proceedings reported by machine shorthand, computer

assisted transcription.

ORIGINAL

INDEX VOLUME 59

June 29th, 2001                                    PAGE      VOL.

Proceedings.......................................... 2        59

Defense Rests in Punishment...................... 146        59

State Rests in Rebuttal.......................... 212        59

Defense Rests in Rebuttal........................ 218        59

Both Sides Close in Punishment................... 218        59

Close of Testimony............................... 218        59

Reporter's Certificate........................... 221        59

CHRONOLOGICAL WITNESS INDEX

| | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| GILDA KESSNER | 2 | | | 59 |
| GILDA KESSNER | 4, 93 | 58 | | 59 |
| MATT MYERS | 103, 123, 132 | 123, 131 | | 59 |
| TRACY ERWIN | 133 | 138 | | 59 |
| TIM ERWIN | 139, 145 | 143 | | 59 |
| TERRY TOLAR | 146 | 162 | | 59 |
| NANCY SANDERS | 170 | 186 | | 59 |
| SHIRLEY BARD | 189, 211 | 205 | | 59 |
| JEDIDIAH MURPHY | 214 | | | 59 |
| GILDA KESSNER | 216 | | | 59 |

ALPHABETICAL WITNESS INDEX

|  | DIRECT | CROSS | VD | VOL. |
|---|---|---|---|---|
| SHIRLEY BARD | 189, 211 | 205 |  | 59 |
| TIM ERWIN | 139, 145 | 143 |  | 59 |
| TRACY ERWIN | 133 | 138 |  | 59 |
| GILDA KESSNER | 2 |  |  | 59 |
| GILDA KESSNER | 4, 93 | 58 |  | 59 |
| GILDA KESSNER | 216 |  |  | 59 |
| JEDIDIAH MURPHY | 214 |  |  | 59 |
| MATT MYERS | 103, 123, 132 | 123, 131 |  | 59 |
| NANCY SANDERS | 170 | 186 |  | 59 |
| TERRY TOLAR | 146 | 162 |  | 59 |

EXHIBIT INDEX

| DEFENDANT'S |  | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 2 | Questionnaire | 106 | 106 | 59 |
| 39 | Gilda Kessner Vita | 94 | 94 | 59 |
| 64 | Gilda Kessner Report | 94 | 94 | 59 |
| 65 | Behavior Sheet | 95 | 95 | 59 |
| 66 | Behavior Sheet | 95 | 95 | 59 |
| 67 | Behavior Sheet | 95 | 95 | 59 |
| 68 | Business Records | 101 | 102 | 59 |
| 70 | Connell Presentation | 212 | 212 | 59 |
| 70A | Above/Photos Removed | 212 | 213 | 59 |

```
 1                    P R O C E E D I N G S

 2              THE COURT:  This hearing is being conducted in

 3    open court, outside the presence and hearing of the impaneled

 4    jury.  Continuation of a Rule of Evidence 705 hearing.

 5          Mr. Davis, you may continue.

 6                      GILDA KESSNER

 7    was called as a witness by the State and, after having been

 8    first duly sworn, testified as follows:

 9                   Direct Examination

10    By Mr. Davis:

11       Q.   Dr. Kessner, at the first 705 hearing, you told me

12    what opinions that you intended to express to the jury.  Do

13    you anticipate expressing any additional opinions?

14       A.   Any change?  No.

15       Q.   Okay.  You told me who you had interviewed.  Have

16    you interviewed anyone since the last 705 hearing?

17       A.   No.

18       Q.   Have you reviewed any additional literature?

19       A.   I've re-reviewed the literature I had.  I've gotten

20    some information on mental health issues in the TDCJ system.

21    I also reviewed a report from Terrell State Hospital when he

22    was denied admission.

23       Q.   What was the date of that?

24       A.   That was June 16, 1998.

25       Q.   Have you re-interviewed the defendant?
```

Page 5

```
 1        A.   No, I have not.

 2        Q.   So you've done no more interviews.  You've told me

 3   about the literature that you reviewed.  You conducted --

 4   besides looking at the records from TDCJ, have you reviewed

 5   any additional records, done any further research?

 6        A.   No.  I mean, there's new literature that comes out

 7   all the time.  There was an article the other day, but I just

 8   skimmed it.  I didn't bring it with me.

 9        Q.   Okay.  Are you going to be relying on it?

10        A.   Not for my conclusions.

11                  MR. DAVIS:  I'm ready.

12                  THE COURT:  Defense ready for the jury to

13   return?

14                  MS. LITTLE:  Is our machine working?

15                  THE WITNESS:  No.  It's upside down and

16   backwards.

17                  THE COURT:  How long will it take the

18   technician to get here?

19                  MS. LITTLE:  He is at Irving Boulevard and

20   Wycliff from here, so it's a straight shoot around the corner

21   so he should be here any minute.

22                  (Recess taken.)

23                  THE BAILIFF:  All rise.

24                  THE COURT:  Let the record reflect the jury is

25   returning to the courtroom at this time.
```

```
 1                    (Jury returned to the courtroom.)

 2              THE COURT:  Jurors may be seated.

 3         Counsel, Mr. Murphy, visitors in the gallery, you

 4  may be seated.

 5         Ladies and gentlemen, this witness has been sworn

 6  in.  She is under oath.

 7              MS. LITTLE:  May I proceed, Your Honor.

 8              THE COURT:  You may.

 9                    GILDA KESSNER

10  was called as a witness by the Defendant and, after having

11  been first duly sworn, testified as follows:

12                  Direct Examination

13  By Ms. Little:

14     Q.  Would you state your name for the record, please,

15  ma'am?

16     A.  Gilda Kessner.

17     Q.  Dr. Kessner, what kind of work do you do?

18     A.  I'm a clinical and forensic psychologist with a

19  private practice in Dallas County.

20     Q.  What is your educational background?

21     A.  I have a Bachelor's degree in social work from

22  Abilene Christian University, a Master's degree in human

23  relations in business from Amber University in Dallas, and

24  doctor degree of clinical psychology from Baylor University

25  in Waco.
```

1    Q.   Have you had training, aside from your degrees, that

2  you've worked at to fulfill your career?  What kind of work

3  have you been doing?

4    A.   Well, part of my internship involved working at the

5  state hospital in Arkansas which included a forensic

6  inpatient psychiatric unit where they did evaluations for

7  court for competency to stand trial and mental state at the

8  time of the offense.  I also did three practicums while at

9  Baylor, one at the University counseling center with college

10  age students, one at Hardin, Texas, MHMR which involved

11  chronically and acutely psychiatrically ill patients from the

12  community, and one at the Waco VA Medical Center which was --

13  included an Acute Psychiatric Unit, and all -- or dementia

14  type of unit and posttraumatic stress disorder.  In addition

15  to that, I attend conferences as required for continuing

16  education.  I've also worked at the Texas Youth Commission at

17  two of their prisons and Dallas County Juvenile Probation.

18    Q.   And are you licensed here in Texas?

19    A.   Yes, I'm a licensed psychologist.

20    Q.   Let me ask you, Dr. Kessner, if you're here because

21  of the special issues that are in the death penalty statute

22  here in Texas?

23    A.   Yes, that's why you contacted me.

24    Q.   And specifically Special Issue Number 1, are you

25  familiar with that?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Yes.

2    Q.   And what does that issue relate to?

3    A.   That probability that someone will commit acts of

4  violence in the future that would constitute a threat to

5  society.

6    Q.   In regard to this, you realize that Jim Murphy or

7  Jedidiah Isaac Murphy is our client, who the State is seeking

8  the death penalty on?

9    A.   That's correct.

10   Q.   What did you do -- did you get some records that you

11  looked at to help you see what the overview was in this case?

12   A.   Yes, I reviewed numerous records from him.  I can

13  list them if you want.

14   Q.   Yes.

15   A.   Dallas County Jail incident reports; medical and

16  psychiatric records; Criminal Court Number 8 examining trial

17  transcript; Van Zandt County Children's Shelter Board;

18  Timberlawn Mental Health System; Dr. Richard Rasco, M.D.,

19  psychiatrist; Glen Oaks Hospital; Sabine Valley Center;

20  Substance Abuse Services Center; Oak Haven, Dallas Morning

21  News articles from October of 2000; Van Zandt -- Kaufman

22  County Sheriff's Department records; Van Zandt County

23  Department of Community Supervision and Corrections; Van

24  Zandt County Sheriff's Department; Van Zandt Community

25  Counseling Center; Van Zandt County Adult Probation; Garland,

1    Texas Police Department records; Wills Point, Texas Police

2    Department records; Bowie County Department of Community

3    Supervision and Corrections; Dallas County Department of

4    Community Supervision and Corrections; Dallas Police

5    Department; Terrell Police Department; Arlington Police

6    Department; Wichita Falls, Texas Police Department; Edgewood,

7    Texas Police Department; Texas Department of Public Safety

8    Computerized Criminal History Summary; TDCJ case summary;

9    Edgewood ISD, and Terrell State Hospital records.

10        Q.    Okay.   Now, since we're concentrating on Special

11   Issue Number 1, what did you do to prepare for your testimony

12   today?

13        A.    Well, I also interviewed the defendant, Mr. Murphy,

14   on May 28th for approximately four hours at the Dallas County

15   Jail.   I reviewed the records and I reviewed the literature

16   relating to this issue -- professional literature.   And in

17   addition I also reviewed some Texas Department of Criminal

18   Justice public information.

19        Q.    So essentially you're here to talk about risk

20   assessment; is that correct?

21        A.    That's correct.

22        Q.    Tell the jury a little bit about that, please.

23        A.    Well, it involves, as I said reviewing the

24   literature and the records and ideally interviewing the

25   defendant so that you can get an opportunity to have a

1  firsthand look at how they're adjusting to their

2  circumstances and their jail incarceration.

3      Q.   And how is that done?  Who does the research?

4      A.   The research is done generally by university

5  associated individuals, psychologists, sociologists,

6  criminologists, individuals -- individuals who are interested

7  in human behavior, public policy, social issues.

8      Q.   And are these studies done that apply to things

9  other than what you're here about today, which is risk

10  assessment?  Risk assessment like actuary tables and things

11  of that nature?

12      A.   Right.  Well, they do the research and publish in

13  professional journals on a broad spectrum of issues related

14  to risk assessment.  Everything from mental health to

15  correctional offenders and issues related between opportunity

16  for correctional officials and others to be able to identify

17  risk, so the literature covers broad spectrum.  I'm trying to

18  identify which factors are most predictive risk and in what

19  type of context.

20      Q.   And is -- and is actuarial table work essentially

21  the same thing as risk assessment in this forum?

22      A.   It is the fundamental method -- it's a very

23  important method in using -- that you should use in

24  predicting long-term risks over a long-term period of time.

25  If you're going to evaluate someone for suicidality, you use

1    a different method because you're looking at short-term

2    risks, but if you're looking at future danger, you're going

3    to look over essentially a lifetime or -- extended over

4    decades of time if you're looking at the prison system.  And

5    so the actuarial is a foundational method.

6         Q.   And you've brought some -- I would have to call them

7    slides, but you brought some information with you today?

8         A.   Yes.

9         Q.   To help you explain to the jury what we're talking

10   about; is that correct?

11        A.   Yes.

12        Q.   And do you have your copy there, and are you ready

13   to see if that machine works?  Is it working?  Got one up

14   there?

15        A.   Just a second.  The first one is up there.

16        Q.   Okay.  And that I think -- I hope says the question

17   of future dangerousness to society in capital cases; is that

18   correct?

19        A.   That's correct.

20        Q.   Would you explain what's on that sheet?

21        A.   This is just basically what we've been talking

22   about, the issues that are relevant when you're looking at an

23   individual to try to determine or make some reasonable

24   informed conclusion about their future risk, and so you're

25   going to look at individuals who have been in a similar

1   situation in prison.  Of course, the death penalty statute is

2   important to know about, the nature of science, how you

3   gather information rather than just making a guess, the

4   lit -- professional literature has published articles of

5   individuals who have been on death row and have had their

6   sentences commuted and placed in the general population.  And

7   then you would want to look also at general information on

8   inmate populations across the country.  And then there is the

9   application of the violence risk assessment methods that we

10   were discussing, and one reason why -- there has been --

11   recently there's been a flood of publications and it's

12   because of the expansiveness of the death penalty and

13   allegations of future dangerousness, even in federal cases.

14        Q.   So the application of violence risk assessment is

15   the particular method that you used.  That would be the next

16   to the last one; is that correct?

17        A.   Right.

18        Q.   And the historical information is all this

19   literature?

20        A.   Yes.

21        Q.   How far back does this literature go, Dr. Kessner?

22        A.   Well, there's some information on certain aspects of

23   it back into the 1800's.  It started being published in

24   professional journals in this country that I'm aware of in

25   the early 1900's and continues up to today.

1    Q.   Are we ready to go to the next one?  That appears to
2    say "risk components."  How do you assess risks, Dr. Kessner?
3        A.   Well, you have to understand what you're talking
4    about rather than just looking -- You have to define what
5    you're talking about.  That's one thing that we also see in
6    the literature was that it becomes -- as it becomes more
7    current, the definitions, the specifics become more
8    comparatively defined rather than simply just descriptive,
9    but what you're looking at is what's the probability of
10   violence, so we're going to have to frame it.  What's the
11   probability?  What type of violence are we talking about?
12   What time period are we referring to?  As I mentioned
13   earlier, we're talking about somebody being suicidal today
14   and tomorrow we're talking about a lifetime of risk or
15   violence.  And in what context are we talking about?  What
16   environment?
17       Q.   And what did you assess in terms of Jedidiah Murphy?
18       A.   Well, what I'm looking at here is the -- since he's
19   been convicted of a capital crime where he has a capital life
20   term of 40 years minimum in prison, and I did develop through
21   the literature -- the most recent literature a probability
22   which is 23.8.  It's a range, 23.8 to 29.1 percent
23   probability of risk of serious violence over the course of a
24   capital life term.  And then we can show how I came to that.
25       Q.   Okay.  Next.  Now, this is talking about risk

1   components and areas other than what we're about here today,

2   right?

3       A.   Right.   This is just like a reference point to show

4   that this is something -- it's not just used by psychologists

5   in capital murder trials.   It's also used in other arenas.

6   It's a scientific method that's used for other types of risk,

7   and it's what the insurance companies use when they assess

8   your premiums.

9       Q.   Okay.

10      A.   They don't know you.   They put you in category.   And

11  then once they have -- they are more familiar with your

12  personal history, then they can revise your category and your

13  premiums.   So basically it's essentially the same thing as

14  when they -- your 16-year-old son or daughter starts to drive

15  and they're going to determine what their risk is.   They look

16  at the same factors.

17      Q.   Okay.   Next picture.   What are the risk assessment

18  techniques?

19      A.   This is what we were referring to before.   There's

20  different methods that you can apply, and they range from

21  more scientific to less or least scientific.   Actuarial is

22  one that we've just been looking at.   It's the most

23  scientific method when we're talking about long range

24  predictions.

25           Then there is the pattern or anamnestic method which

DARLINE W. LABAR, OFFICIAL REPORTER

1    the phrase that people often hear, that past behavior is the

2    best predictor of future behavior.  But when we're looking at

3    this, we also want to take into account the context because

4    that saying is not necessarily true unless we look at the

5    context.  And then there's intensive clinical evaluation

6    which is what mental health professionals often use when they

7    are assessing someone for risk to themselves, someone who

8    might be suicidal, severely depressed, or psychotic.  They're

9    going to use different -- they're going to use a short-term

10   model, the personality, the support system, that type of

11   information to make a decision.  And then the least

12   scientific is just taking a hypothetical and making an

13   assumption at the end.

14        Q.   Okay.  That's normally done how?

15        A.   A hypothetical?  Well, you can give someone some

16   information and then ask them to make a conclusion based on

17   whatever -- if they're a professional or if they're not a

18   professional, but based on their own life experience.

19        Q.   Okay.  Next.

20        A.   I was just going to say the risk to that is

21   something that's called the illusory corollary which things

22   that we think are important in making a decision may not be

23   scientifically valid and may not actually be what is driving

24   the outcome.  And so that's the risk there.

25        Q.   That's why that's the least scientific?

DARLINE W. LABAR, OFFICIAL REPORTER

Page 14

1     A.    That's one factor why it's very unscientific, yes.

2     Q.    Anything else?

3     A.    (Nods head.)

4     Q.    Next.

5     A.    I'm sorry, this one is kind of small.

6     Q.    Okay.  This is models of violence risk assessment.

7     A.    These -- this is just how this information has been

8  written about in the literature, and this is back into the

9  1980's.  But it is referenced even earlier than that.  And

10  these are just four different sets of authors who are

11  referring to using the actuarial method in making long range

12  predictions about behavior, in particular in violence risk.

13  And they're using actuarial -- or if you can see, there's a

14  term in red for each one of these.  And like this is

15  referring to the base rate, which is important in looking at

16  actuarial prediction.  They're all referring to actuarial or

17  base rate as important in long range violence predictions

18  which they say right here.  Best estimated by the base rate

19  of violence in the group to which the individual belongs.

20     Q.    Okay.  So these are just people who have done

21  research in this area?

22     A.    Written about the statistical methods in using and

23  making predictions.

24     Q.    Okay.  Name some of those if you would, so it's not

25  easy to see.

        A.    Monahan has written extensively.  He's done a lot of

writing also about mental health risk.  Morris & Miller,

Hall, and Serin & Amos.

        Q.    And what is a base rate?

        A.    The base rate is considered to be the most

fundamental piece of information that you need in order to

make a prediction.  The base rate is considered to be the

most fundamental piece of information that you need in order

to make a prediction.  Otherwise, it's like being out at sea

in a fog with no compass.  You're just making a guess.  The

base rate is how often something happens.  It's a

prevalence.  For instance, the prevalence of depression in

the population in general versus the prevalence of depression

in a hospitalized sample.  So you're going to have less

prevalence in the population, more in the hospital sample,

and very often in psychiatric and medical, prevalence is

yearly or a lifetime risk such as breast cancer being every

woman -- every female born today has, for instance, about an

11 percent or 12 percent risk -- I think it's the latest I've

heard, and that means over the course of a lifetime which is

80 years and that's the probability that any person would get

that.  So that's the base rate.  And then -- but we're

looking in this particular type of case for Mr. Murphy, the

risk of violence.  What is the base rate and eventually

we'll -- that number that I gave earlier will show how I

1   reached that number.

2       Q.    Okay.  And what about the fundamental group

3   statistic?

4       A.    That is the base rate.

5       Q.    Okay.

6       A.    That is your foundation.

7       Q.    Okay.

8       A.    In other words, you have a group and you take an

9   individual and you measure the individual by the group.

10      Q.    Okay.  Next.  And what actuarial steps do you take

11  to glean this information?

12      A.    This is just sort of general outline.  You want to

13  identify the characteristics.  Basically you want to define

14  what you're doing.  You review the experience by looking at

15  that individual, looking at the historical record, establish

16  a base rate in the group -- in the larger group.  Then you

17  want to look at the context, so if we're looking at violence

18  among the general population or we're looking at violence

19  among criminal defendants or offenders or inmates, then we

20  want to make sure we're looking at the right context.  We

21  adjust the base rate for individual differences, just as they

22  would do for someone who is applying for car insurance.

23      Q.    Uh-huh.

24      A.    You get premiums for certain types of behavior and

25  training and, you know, if you don't have certain types of

```
 1    restraints in your car, then it's different.  And that's
 2    where we get the preventive measures.  We're going to adjust
 3    in a capital case based on the context and preventive
 4    measures that are applied for a capital defendant in prison
 5    and then compare other base rates.
 6        Q.   Okay.  What would be an example of some preventive
 7    measures out in the world?
 8        A.   Well, in the world we have -- for instance, if
 9    you're driving, you have police officers who drive in the
10    community, people always slow down.  We have traffic lights,
11    people are using seat belts, air bags.  There's talk now
12    about not using cell phones.  Those are the types of
13    preventative measures.  We're talking about psychiatric
14    patients.  We're talking about support groups.  We're talking
15    about case managers who monitor them on a frequent basis, if
16    they're chronically or acutely mentally ill, not eligible for
17    inpatient treatment for either lack of benefits or managed
18    care procedures.  And if we're looking at an offender on
19    probation or on parole, then those organizations have their
20    methods also for preventive supervision.
21        Q.   Okay.  And those measures would be such as?
22        A.   Similar to case management.  Frequent contact with
23    the individual, making sure that they are participating
24    whatever classes they need to go to.  If the person is --
25    needs to be in a halfway house, whether they're mentally
```

1    disordered defendant or offender or mental health patient.

2    Those are the types of things that would be considered.

3        Q.    Okay.  Next, please.  Base rates relevant to

4    likelihood of violence in prison.  Is that readable to

5    everybody?

6        A.    I think so.  The idea here is like we said, we want

7    to look at the context and so we're -- we're not going to

8    compare him to school boys who are fighting on the school

9    yard.  We're going to look at a relevant group.  We're going

10   to look at that fundamental group statistic and compare him

11   to that.  And so also we're going to look at the base rates

12   as the statistics for that group as well as in general

13   assaults by inmates in Texas and other prison systems,

14   federal prison systems, homicide of inmates or staff in State

15   and federal prison.  Disciplinary infractions.  And here --

16   this is part of the context, whether it's short or long-term

17   imprisonment.  That's important to the context.  And

18   underneath that the research has established that age is one

19   of the most important factors.  Fighting and assaults among

20   long-term inmates.  The length of the sentence -- age of the

21   inmate and the length of the sentence are just very important

22   factors in determining this information.

23            And then base rates on aging effects of criminality

24   and violence in general.  So those are important pieces of

25   information to someone that has a long-term sentence.

1    Q.   Would you go ahead briefly now and talk about the

2  difference between short-term and long-term inmates from the

3  research?

4    A.   The difference between long-term and short-term

5  inmates, as demonstrated in the research, indicates that when

6  someone receives a sentence, they begin the psychological

7  process of adapting to that sentence, whatever it's going to

8  be.  And in -- there's research that's done by an individual

9  named Flanagan who compared greater than 5 years, less than 5

10  years, and the level of rule infraction, based on age at the

11  time of admission, and got some remarkable results with that.

12    Q.   All right.  Now, I know I skipped, so can we go to

13  why this base rate applies to the Texas statute?

14    A.   Okay.  In particular to Mr. Murphy and capital

15  defendants in Texas, the research -- the literature has

16  information on defendants who -- across the country who were

17  determined -- their offense was determined to be particularly

18  violent so that they were given the death sentence and -- by

19  the jury.  And so we have information on the outcome -- their

20  outcome in prison.  From state to state inmate distribution

21  is similar.  There are -- violent inmates make up about

22  almost half of the prison population across the country.  And

23  that also prison facilities and procedures are consistent

24  across the country.

25    Q.   Uh-huh.

1      A.    They have the same kinds of standards and -- and

2  they have research and they have methods that they apply and

3  they're not reinventing the wheel from state to state as far

4  as official policies and procedures.

5      Q.    Uh-huh.

6      A.    And then we also have the fact that the findings in

7  the research are consistent from state to state across -- in

8  other words, we have different geographic regions.  We have

9  different time periods.  I mentioned earlier some information

10  from the 1800's.  Diverse prison settings, we're talking

11  about Texas and other states in federal systems.  Diverse

12  capital statutes.  The wording is different in the different

13  states.  And this might be different.  And then diverse

14  capital offense characteristics, whether there is a one

15  victim, multiple victim, young, old victim, what type of

16  weapon is used.  In other words, that the outcome for these

17  offenders in research is consistent across all of these

18  different factors.

19      Q.    Okay.  Next.  Tell the jury what Furman is, Dr.

20  Kessner.

21      A.    Furman is -- was a case in the early 70's, and it's

22  referenced in the literature quite extensively where the

23  Supreme Court at that time declared that the death penalty as

24  it was utilized was unconstitutional.  So there were people

25  across the country who were on death row who were then --

1    they had their sentences commuted and remained in prison for

2    the most part and were put into the general population.  So

3    there were some individuals -- Marquart is from -- Marquart

4    and Sorensen, I believe, were from Sam Houston State at the

5    time.

6         Q.   These are the men that did this study?

7         A.   That did this study and reviewed records and have

8    reported in professional literature on the findings.  So they

9    looked at violence among these offenders after they were

10   admitted to the general population because the prediction was

11   they would wreak havoc, they would be predatory against

12   inmates and guards as a group, entirely as a group.

13        Q.   So you have here 533 former death inmates across the

14   nation?

15        A.   They had -- remember, I said earlier about -- they

16   had to define things?  What they did is they took those who

17   were already on death row, not in jail waiting to go --

18        Q.   Uh-huh.

19        A.   -- but they -- they -- there's different lists of

20   offenders that were available, and they refined based on

21   those who were on death row at the time.

22        Q.   All right.  And then looked at the behavior over a

23   15-year period after their removal from death row?

24        A.   Right.

25        Q.   What were the results of that study?

1        A.    Well, the majority had no serious violations.  They

2    looked at assaults against guards, weapons with assaults

3    against inmates.  Now, there's a small group, about 7

4    percent, who had the majority of the violations.  It says at

5    least three or more.  And even among that group there's a

6    small minority who had excessive and the most violations,

7    whereas you might have one individual in there who had three

8    or four, you might have one individual who had 12 or 13

9    violations.  That's one of the things that we know in

10   behavior is that any type of behavior, violence, other types

11   of behavior, there's a small group out of the total that is

12   at the extreme ends of the behavior.  We know that about

13   intelligence -- we're not all intelligent.  We're not all the

14   smartest, and we're not all the least intelligent, but most

15   of the time huddle in the middle.  And what we have here is

16   the majority of the people did not break the rules.  We had a

17   small group that had one violation and a small group that had

18   the majority of the violations.

19       Q.    Okay.  And even within that small group, a smaller

20   group was repetitively bad?

21       A.    Right.

22       Q.    And that wasn't even all of that 7.4 percent of

23   chronic rule violators?

24       A.    Right.  It would be like 10 violations or more among

25   that group.

1    Q.    When you say 69.5 percent had no serious violations,

2  what do you mean by that?

3    A.    Talking about serious -- serious rule violations,

4  violence, or forming a riot or something along those lines.

5    Q.    Okay.  Next.  Okay.  This was a comparison, was it

6  not?

7    A.    This is a population that's extracted out of the

8  bigger population.  This is Texas, and that's not unusual.

9  You have a large population.  Then you want to see if a

10  smaller population has the same kind of result or if there

11  might be a difference, say, in Texas versus nationwide.

12    Q.    Uh-huh.

13    A.    And so they had individuals who had received a

14  sentence of death and were commuted and those are the

15  Furman.  And then they had individuals who were capital

16  offenders but had received a life sentence, and they used

17  them as a control group, as a comparison group.

18    Q.    So you had 47 death row commutees, right?

19    A.    Right.

20    Q.    And 156 life sentence inmates?

21    A.    Yes.

22    Q.    Which included very, very serious crimes?

23    A.    Yes.  Essentially I think both groups also included

24  murder, rape, and burglary or robbery.

25    Q.    Okay.  And then their ages are approximately the

1    same?

2        A.    Yes.

3        Q.    32 to 30, the other group.  And they were followed

4    for a number -- 11 years.  10 years in one, and 11 in the

5    other; is that correct?

6        A.    Right.

7        Q.    And what were the results of that?

8        A.    Well, among -- among this group at the time of the

9    study there were no prison homicides.  I believe -- right.

10   That's correct.  There were no prison homicides.  And among

11   each group there were -- among those who had serious rule

12   violations, that's the gray part, each group had among the

13   gray part had 14.3 serious rule violations.  So essentially

14   what this is showing is that there's no difference between

15   these two groups of people as far as their level of violence.

16       Q.    In prison?

17       A.    In prison.  70 percent of the life sentence inmates

18   did not have serious rule violations.  75 percent of the

19   Furman commuted inmates did not have serious rule violations.

20       Q.    Okay.  And what about aggravated assault and

21   fighting with a weapon?

22       A.    Again, we have no difference between the groups, 90

23   percent of the life sentence and 92 percent of the death

24   sentence commuted, inmates did not have those offenses in

25   prison.  So that's actually -- separate and apart from the

1     fact that there is a small group --

2        Q.   Uh-huh.

3        A.   -- that does have this extreme behavior, the second

4     most important thing about this slide is that among this

5     group there are -- there are no differences.

6        Q.   Okay.

7        A.   One was -- one group was given a death sentence, the

8     other was given life.

9        Q.   And this was a replication -- again, that came out

10    of the University of Texas?

11       A.   Yes.

12       Q.   Next.

13       A.   This is a more recently published study referring to

14    Indiana commuted capital offenders since 1972.  They went in

15    and looked -- this is by Cunningham and Reidy, I believe, and

16    they went in and looked at the records in that system and

17    they had 39 inmates.  They were in the general population.

18    And as you can see, 74 percent had no homicide, no assault,

19    or fight.  62 percent were never put in administrative

20    segregation in the prison system.

21       Q.   Okay.  And that doesn't actually reflect -- that

22    reflects serious -- from medium to serious.

23       A.   In other words, when you're admitted to

24    administrative segregation, it's for either your protection

25    or somebody else's protection, some kind of problem that you

1   need to be segregated.

2        Q.   What is administrative segregation, Dr. Kessner?

3        A.   It's essentially a tighter security within the

4   prison itself.

5        Q.   Okay.  Next.  This is another Marquart study; is

6   that correct?

7        A.   Marquart, Ekland-Olson, and Sorensen study, yes,

8   1989.

9        Q.   And that article is called what?

10        A.   "Gazing into the crystal ball:  Can jurors

11   accurately predict dangerousness in capital cases?"  Law &

12   Society Review is where it was published.

13        Q.   Okay.  Tell us about this chart.

14        A.   Well, this is in Texas, and I believe they looked

15   at -- this is 1986, was the year of reference, yes.  They

16   had -- and this is Texas.

17        Q.   Uh-huh.

18        A.   They had 90 inmates who had been on death row and

19   were commuted, and this is not Furman inmates.  These are, I

20   believe, other inmates.

21        Q.   Okay.

22        A.   Okay.  And then they also had capital offenders who

23   were sentenced to life.  Those are the two -- the red and the

24   green --

25        Q.   Okay.

1      A.    -- on the chart.

2      Q.    Okay.

3      A.    And then they had the Texas system itself, system

4  wide.  And at that time, 1986, 1985, they had under 40,000

5  offenders in the Texas Department of Corrections.  And then

6  they made -- so these are all comparison groups.  Well,

7  actually the death -- released or commuted death row inmates

8  are the group of interest, and then the rest are all

9  comparison groups.

10     Q.    Okay.

11     A.    And so then they also had a high security facility

12  called the Darrington Unit that they also used as a

13  comparison group.  And what they did was they look at the

14  records for reported serious rule violations among these

15  groups to see who had the most essentially.  And what they

16  found was that the life -- the capital life sentence

17  offenders and the commuted death row offenders had the lowest

18  rate of infraction.

19     Q.    How do you in explain that?  Can you explain that?

20     A.    Well, as I said, very often given long-term

21  sentences, and so they -- they adjust, they settle in knowing

22  that this is going to be their existence.  And as they age in

23  prison, that's a factor.

24     Q.    Okay.

25     A.    Aging has a major factor on behavior.

1    Q.   And what constitutes a person getting into the high

2  security?  Would that be gang activity?

3    A.   That could be gang or other types of violence, not

4  gang related, but other types of violence in the prison

5  system.

6    Q.   Next.  I jumped the gun, didn't I?  You titled this

7  "A Few Bad Apples."  Tell the jury about this sheet.

8    A.   That basically is the gang.  In other words, out of

9  the commuted death sentence and the life sentence inmates,

10  there were some bad apples in both groups.  They identified

11  them and they put them in administrative segregation to keep

12  them from being able to hurt anybody.  So there were -- in

13  both groups they found some people that might constitute a

14  threat, and they secured them.

15    Q.   And that was 8 out of 90 or 6 out of 107 --

16    A.   Yes.

17    Q.   -- versus two-thirds of both groups.  What was

18  there?

19    A.   Two-thirds of both of those groups had never been in

20  solitary confinement or an administrative segregation type of

21  setup.

22    Q.   And 90 percent of both the former death row inmates

23  and the life sentence inmates had trustee status; is that

24  correct?

25    A.   According to their records, which would indicate

1    good behavior to allow them to have some responsibility in

2    some area of the prison.

3         Q.   Okay.  Next.  Now, this is a disciplinary review

4    record from 1977 to '92; is that correct?

5         A.   Right, this is Missouri.

6         Q.   Okay.

7         A.   Interesting thing about Missouri is they house their

8    death row inmates in the general population.  At least at the

9    time of this publication in '96 they didn't have a separate

10   death row.

11        Q.   We do have, though?

12        A.   We do have.  But in Missouri they do not.  They were

13   able to compare three different groups all in the same

14   setting.  And -- in other words, these individuals were still

15   under sentence of death at the time.  They had not been

16   commuted.  So they had 93 death row inmates, 323 life without

17   parole inmates, 232 life with parole inmates.  And what they

18   found, interesting -- interestingly in the first three years

19   the death row inmates had the best behavior.  After three

20   years, there was no difference in groups.  All of the life

21   with parole inmates had one infraction.  And 78 percent of

22   both groups had no assaults whatsoever.

23        Q.   Okay.

24        A.   So again, they looked at all the three years, but

25   then they found essentially no differences so they pooled the

DARLINE W. LABAR, OFFICIAL REPORTER

1    results.

2        Q.   And that was regarding -- in all three groups there

3    were no differences regarding assaultive behavior?

4        A.   Right.

5        Q.   Okay.  Next.  Now, this is a New Jersey study; is

6    that right?

7        A.   This is a -- from New Jersey in the earlier --

8    earlier part of the 1900's.  As I said, we have changes --

9    the research becomes more refined, but basically what he did

10   was he looked at records of New Jersey capital offenders.

11   There were 34 who had received a commutation, and 21 had a

12   retrial and then placed back in the general population.  So a

13   total of 55 were released from death row between 1907 and

14   1960.  And when he was reviewing these records, there were no

15   allegations of any unmanageable behavior, anything that would

16   have constituted an unmanageable threat, a serious threat.

17       Q.   None at all?

18       A.   Right.  Of course, as I said earlier, that -- the

19   definition there is different from what the later studies

20   used.

21       Q.   And what was -- do you know the definition then?

22       A.   No, what I'm saying is that his -- in other words,

23   they -- they were not as refined, but still there was no

24   information about unmanageable behavior.

25       Q.   Okay.  I see.  Okay.  Next.  This is Texas

1    capital -- capital offenders; is that right?

2        A.    Correct.

3        Q.    And it's regarding the prison behavior of those

4    people.  Actually this is a pre-Furman, before the death

5    penalty statute went out and got changed later; is that

6    right?

7        A.    1924, I believe, Texas imposed -- had the imposition

8    of the death penalty.  And so what they did in -- between

9    1924 and 1972 pre-Furman, there were a hundred people

10   commuted from death row.  And they looked at the records that

11   were available from the Texas Department of Corrections to

12   see what they had here and they were -- it's a nice round

13   number, a hundred, 80 percent had no violent infractions.

14       Q.    Okay.  So far, the numbers are staying the same from

15   number to number; is that correct?

16       A.    Essentially we're looking at 80, 78, 80, sometimes

17   up to 90 percent, you know, depending on the definition, who

18   are not having a problem.  And that's the interesting thing

19   about -- from early 1900's to late 1900's we're seeing the

20   phenomenon, the same type of behavior in a group of people

21   who are violent, very violent in the community, and they're

22   under restriction in the prison system.  And we see that

23   as -- from study to study, with different authors in some

24   cases, or authors added, we're seeing that the results are

25   replicated.

1          Q.    Okay.  Now, let's go to the next one.

2          A.    Okay.  Also, it's noted here that there was no

3     inmate on officer violence among those who were violent.

4          Q.    Okay.  No inmate on officer violence?

5          A.    Yes, in this group.

6          Q.    Okay.  This is a federal prison confinement study?

7          A.    This is a small study that was done.  What they

8     wanted to do was find out about how well professionals in the

9     system could predict violent behavior.  And they had

10    psychologists and they had correctional officers.  And they

11    used a system of reviewing information that would ordinarily

12    be available in the prison when they get a new inmate.  They

13    didn't actually interview these people, but they looked at

14    the records and they gave information about offense history

15    and escape history and juvenile history, that sort of thing.

16    And then they asked them to rate these individuals, give a

17    probability that they might be a danger, and also to rate

18    their own confidence level.  And then they wanted to see what

19    actually -- what these individuals actually did, so how close

20    these people were.  Okay.

21         Q.    Okay.

22         A.    And what they found was that neither group was all

23    that good in predicting.

24         Q.    And the two groups were what again?

25         A.    Psychologists and correctional officers.

1      Q.   Okay.

2      A.   And one of the reasons why they weren't so good is

3   it says in the article they didn't have the base rate.   They

4   didn't understand the base rate.   They were just using

5   offense characteristics and other types of information to

6   make their decision, but what they found as far as what --

7   what they're looking at here -- what they found was they

8   wanted to predict who's going to be violent within the first

9   six months which is an adjustment period.

10      Q.   Okay.

11      A.   And what they found was that the younger the inmate,

12   and if they had not resided in a major city, if they were

13   from more a rural environment, and those who had more prior

14   arrests and convictions were more likely to have some problem

15   with adjustment.   I believe the study also indicated that the

16   base rate for that group, with that time frame, was 10

17   percent.   10 percent was going to have a problem.   And they

18   made their -- the individuals that were in the study, the

19   psychologists and correctional officers looked at the offense

20   history, the characteristics of the offense, that sort of

21   thing to make their -- their prediction.   And they were wrong

22   in their predictions, generally.

23      Q.   Okay.   This is your average number before the jury

24   now of the prison rule violations per inmate per year by

25   offense in 1986; is that correct?

1    A.    This is just some more information to show in

2   general statistics about prison.   What this is showing --

3   just prison rule violations per year, and they have a break

4   down of -- general break down of the type of offense.   And we

5   see highlighted total, violent offenses, property offenses,

6   drug offenses, and public order.   And the property offenders

7   had the highest rate of prison rule violations.   This is from

8   1986.   We're not talking about 2000, but we've already looked

9   at the early 19 -- we're looking at all across the century.

10          The homicide offenders, when they divided them out,

11  they had .9.   The manslaughter offenders had .8.   Violent

12  offenders, when you include assault, robbery, and rape, as a

13  total group had 1.4 --

14    Q.    Okay.

15    A.    -- rule violations.   And this is a nationwide

16  sample.

17    Q.    And these are people that are in prison for these

18  specific offenses that are enumerated here?

19    A.    Right.

20    Q.    So the lowest people are the homicide, manslaughter,

21  and drug offenders?

22    A.    Yes.

23    Q.    Okay.   Will you tell the jury about this -- I keep

24  wanting to call it a slide.   What do you call that?

25    A.    A slide.

1     Q.   Okay.  Good.  Thank you.

2     A.   This is -- this is just a little summary of what we

3 looked at so far, some of the research we've looked at.  Is

4 past violence in the community does not strongly or

5 consistently predict violence in prison.  Because we've been

6 looking for the most part, except for this last part,

7 everybody had been violent in the community.  Okay.

8     Q.   Okay.

9     A.   And that the current offense, according to this

10 federal -- this small federal study we looked at, the current

11 offense, escape history, prior convictions are weakly

12 associated with prison misconduct.  And they did use -- one

13 cues they gave the psychologists and correctional officers

14 was escape history.  And it was not statistically

15 significant.  And then also severe -- excuse me.

16     Q.   Do you have enough water?

17     A.   Probably use a little more.

18          (Water given to witness.)

19     Q.   (By Ms. Little)  Are you okay?

20     A.   I think so.

21          In general we've seen the severity of the offense is

22 not a good predictor.

23     Q.   Okay.

24     A.   Because essentially if you would say, yes, a hundred

25 percent of the time, you would be wrong between 80 and 90

DARLINE W. LABAR, OFFICIAL REPORTER

1   percent of the time probably.

2       Q.   There is very little association of prison

3   misconduct with the current offense or even priors?

4       A.   Correct.  I'm sorry.

5       Q.   Are you okay?

6       A.   (Nods head.)

7       Q.   Okay.  The next sheet.  I think I don't have all of

8   that.  This is the rates of assaults in TDCJ in 1998.  I

9   certainly can't see that far, so will you --

10      A.   Okay.  The first is -- this is per hundred inmates,

11  and this is for 1998.  First of all, 98 percent of the

12  inmates did not commit an assault, were not assaultive.

13  Actually we're looking at events in this -- there's -- TDCJ

14  puts out emergency action statistics which are events.  So

15  this number, 98, could actually be a little larger because

16  this is recording the events of assault that occurred.  But

17  the first column, which is very small, is inmate on inmate

18  which is 1.05 per 100 inmate annually for that year.

19      Q.   Uh-huh.

20      A.   The second one is inmate on staff which is 1.16 per

21  100 inmates.

22      Q.   Let's take a minute here.  Okay.  Next one.  Okay.

23  The base rate of inmate and staff homicide.  Is that in the

24  general population?

25      A.   This is from the Sourcebook of Criminal Justice.

DARLINE W. LABAR, OFFICIAL REPORTER

1    They put this out about every five years, and they do

2    statistics on all state prisons, parole, probation, juvenile,

3    just in general, and the federal system.  And for 1995 it

4    shows inmate on inmate homicide in these various systems.   7

5    per 100,000 in the federal.  Nationwide in the state prison

6    is 5.6 per 100,000.  In the Texas system, 3.9 per 100,000.

7         Q.   And this is homicides?

8         A.   Uh-huh.

9         Q.   Okay.  What about inmate on staff?

10        A.   In the federal system 1 per 100,000 inmates.  In

11   state systems nationwide 1.1 million.  In Texas for 1995

12   there were none.  In the last 18 years there have been two,

13   one in 1982, one in 1999, inmates killing correctional

14   officers.

15        Q.   Okay.  Okay.

16        A.   And then down at the bottom is a comparison of the

17   general population of violence in -- murder in the

18   community.  Murder and non-negligent homicide.  In the United

19   States there were 8 per 100,000; in Texas 9 per 100,000;

20   Houston, 18.2 per 100,000.  Then at the bottom for age 65 and

21   over 1.1 per 100,000.  So there you see evidence of the aging

22   affect on violence.

23        Q.   There's a significant drop as people age?

24        A.   Right.  It's not that it doesn't happen, but it

25   drops off significantly almost to baseline.

1    Q.   Almost to baseline?

2    A.   Uh-huh.

3    Q.   Next page.  Now, this is a showing distribution of

4  short and long-term broken down by offense types; is that

5  right.

6    A.   This is the Flanagan information I mentioned

7  earlier.  This is from 1979.  Essentially homicide offenders

8  make up a large proportion of the long-term inmates.  Robbery

9  offenders, while some of them are short-term, still there's a

10  large percentage that make up long-term, so violent offenders

11  are more often going to be long-term inmates.

12    Q.   Okay.

13    A.   This is from a dissertation.

14    Q.   Okay.  And the next one is Disciplinary Infraction

15  Rates?

16    A.   This is the age at admission affect.  Again, we're

17  looking at Flanagan's information.  He's looking at long and

18  short-term inmates.  And as you can see, these are the

19  short-term inmates.  These are the long-term inmates.  So

20  even --

21    Q.   The purple line is the short -- is the long-term?

22    A.   The purple and the pink -- pink is the long-term.

23    Q.   Okay.

24    A.   Even at the younger ages where there's a higher risk

25  for aggressiveness and violence, there's a big difference,

1    3.5 infraction versus 1.5, if you're coming in as a long-term

2    inmate.  And then in the early 20's after around age 21 or.

3    so, 22 -- excuse me, 22, it's going to start dropping.  As we

4    can see here, it drops -- it starts to drop from both groups

5    and around 40 it's less than -- starting to be less than 1, 1

6    or less, and by age -- over 40, we're dropping down to .5

7    infractions for -- for both groups --

8        Q.    Okay.

9        A.    -- at time of admission.  These are ages at

10    admission.

11        Q.    And these ages at admission and length of time

12    incarcerated, that has a bearing on risk, even in the

13    community, does it not?

14        A.    Well, yes it would.  Yes, it would.  The reason is

15    if you're young when you're admitted and you're in there for

16    a long time, you're old when you come out.

17        Q.    I don't have anymore of these.  Do you have some

18    more?

19        A.    You should have some more, yes.

20        Q.    Okay.  Just go ahead to the next one.  Okay.

21    Disciplinary Infraction Rates.  Is that where we are now?

22    No.

23        A.    Yeah, that's where we were.

24        Q.    These are the ones you added.  Are these the ones

25    you added?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   No.  Do you want this stack?

2    Q.   No, go ahead.  I can't see it, so go ahead and tell

3    the jury about it, if you will.  I've got -- I pick up later

4    on, on Cunningham's study.  Go ahead.

5    A.   This is a graph.  This is just to show the age

6    principle.  And these are incidents of prison infractions.

7    This is New York in 1975 by age.  And as you can see, the

8    peak is over age 20, and then it drops.  Here we are a little

9    bit -- like around age 32.  We're dropping again, and here we

10   are around age 60.  A little bit of a pickup after that,

11   could be related to some type of health reasons or

12   something -- someone might be a little more aggressive, but

13   the idea here is that we see where the peak is.  It's been

14   documented in the other literature since 1975.

15   Q.   Since 1975?

16   A.   This was 1975 in New York.

17   Q.   Okay.  Does that say Average Number of Prison Rule

18   Violations?

19   A.   Yes.

20   Q.   Go ahead.

21   A.   Here again, it's the same principle as in 1989,

22   Bureau of Justice Statistics.  They're talking about prison

23   rule violations.  The peak is over ages 18 to 24, right up

24   here.  And it drops again.  Here's around age 30, between 25

25   and 34.  It drops again, age 35 to 44.  There's age 45 plus.

1    So we see the same effect.  This is 1989.  Year after year

2    we're seeing the same effect.

3        Q.   It peaks and as they age it drops?

4        A.   Yes, this is in prison.

5        Q.   This is yearly violations?

6        A.   Per year, per inmate by age.

7        Q.   Okay.  Next.

8        A.   This is very faint, hard to see.  But this top --

9    basically it's showing the same shape of the graph.  In the

10   top graph is Wales in the 1800's.  The peak is basically over

11   the same age bracket.  This small little faint line down here

12   is women.  So we see the peak.  It's the same place, it's

13   just a very -- it's a much flatter graph.  Up here we have

14   males.  This is in the United States in 1970's.  Again, the

15   peak is the same.  This is -- I'd have to get it, I can't

16   even read it myself.  I think it's violence in the community,

17   but essentially it's demonstrating the same principle that as

18   individuals age, they're less likely to be rule violators,

19   less likely to be violent, less likely to engage in criminal

20   behavior.

21       Q.   Okay.  Now we're to Arrests for Violent Offense and

22   Murder by Age Group?

23       A.   Again, it's a little bit of a blip on the graph, but

24   we have the same concept back in the 20's, early 20's.  We

25   have the highest rate, and it's going to drop off

DARLINE W. LABAR, OFFICIAL REPORTER

1   significantly into the 40's and then it levels out.  Here we

2   have 65 plus year.  The blue or the darker line is murder and

3   non-negligent homicide or non-negligent murder --

4   manslaughter, excuse me.  And the pink is any violent

5   offense.  So that could be assault.  So basically we're

6   looking at the same shape of the line, and this is published

7   in 1977, Sourcebook of Criminal Justice Statistics.

8       Q.    Okay.  Characteristics of State Prison Inmates.  I

9   can read that.

10      A.    Right.  Remember, we talked on this first graph

11  about looking at characteristics of inmates in general as a

12  comparison group.  So we see across the country that almost

13  half across are convicted of some kind of a violent offense.

14  About 12 percent -- this is 1991 -- have been or were in

15  prison for conviction on homicide, and 28 percent of those

16  had been under the influence of drugs.  About 10 percent of

17  the prison population was sentenced to life.  74 percent in

18  maximum security had a current or prior sentence for a

19  violent offense.  And here we -- we just see more information

20  about the prison population in general, that they've been

21  incarcerated in the past or had been on probation.  Some had

22  convictions as juveniles.  70 percent had a prior conviction

23  as an adult, so they're just sort of showing the general

24  qualities of the prison population.

25      Q.    Which is not a good place, period?

1    A.    No, these are the base rates for who's in prison.

2    Q.    Okay.  What about this -- let's see, is there a

3    second page to that?

4    A.    That's it.

5    Q.    That even includes people who used a gun while

6    committing the offense there in prison?

7    A.    16 percent had or used or had a gun while committing

8    their current offense.

9    Q.    Okay.  How is the water holding out?

10   A.    I could use a little more.  Thank you.

11   Q.    Okay.  Go ahead and go to the next one.

12   A.    So this is basically a summary, a narrative summary

13   of what we've been looking at again.  Commuted capital

14   offenders had a very low rate of serious violent

15   infractions.  The seriousness of the offense does not predict

16   prison violence.  Texas prisoners have a low rate of serious

17   violence towards inmates and staff.  Rates of inmate and

18   staff homicide in prison are lower than the general

19   population in the community.  Violent offenders represent

20   almost half of the State prison population.  Murders

21   represent over 11 percent of the State prison population.  In

22   that last slide for 1991 they had 12 percent.  Almost half of

23   long-term inmates are murderers.  Disciplinary infraction

24   rates are lower for long-term inmates than short-term inmates

25   within each age-at-admission category.  Infraction rates are

DARLINE W. LABAR, OFFICIAL REPORTER

1   progressively lower as an inmate ages.  This is consistent

2   with multiple studies which demonstrate a marked decreasing

3   rate of criminality and violence with aging.

4       Q.   So a person who is in the penitentiary is in the 20

5   percentile range generally from all that you've said with the

6   consistent numbers -- not to be a future danger if they're

7   locked up in the penitentiary?

8       A.   I didn't understand the question.  Could you repeat

9   it?

10       Q.   Well, the numbers we've talked about are 80/20,

11   80/20, and the decline in the age is a decline in violence

12   and trouble in the penitentiary.  So the vast majority of

13   people, even though they're all criminals and many of them

14   are murderers, are not a future danger in the penitentiary?

15       A.   They don't -- they do not act out in the

16   penitentiary, that's correct.

17       Q.   Okay.  Next slide.

18       A.   There's a more recent study.  This is another

19   summary, and it utilizes information of a more recent study

20   which I'm going to show some more information on that in a

21   minute.  But basically this is a similar summary, but we've

22   got some anchoring base rates to show, so we're looking at

23   assault.  You're seeing 20 to 30 percent are going to be

24   involved in some kind of assault.  Repetitive assault is

25   about 10 percent.  Aggravated assault on staff is going to be

1    around 1 percent.  Homicide of an inmate by an inmate in

2    Texas is .2 per one thousand.  And the State -- in the United

3    States State prison systems homicide of staff is 1 per 1

4    million annually.

5        Q.   Are we to the next one yet?  All right.  Tell us

6    about the factors predictive of increased risk.

7        A.   Sorensen and Pilgrim have published an article.

8    It's actually published now.  I have it here with me.  And

9    they took a Texas prison population, all convicted of murder,

10   because they wanted to refine this information that we've

11   been looking at a little more clearly.  In other words,

12   they're working on refining the definition even further.  And

13   so they looked -- they had a population of around 10,000

14   originally, but for the purposes of this study, it bore down

15   to about 6,390 murderers convicted between 1989 and 1999.

16   None of these were under the age of 17 because in Texas

17   you're not eligible for the death penalty if you're under

18   17.  They wanted to get a group that was as similar to

19   capital offenders as possible.  So some of these are life

20   sentence capital offenders or murderers who received life

21   sentences.  And then they got their information and applied

22   their statistical procedures to get the results.  And the

23   rates of serious violence are extrapolated for a life

24   sentence, so over a course of 40 years, capital life

25   sentence.

1       Q.    A 40-year capital life sentence?

2       A.    Right.  Because they didn't follow these people for

3    40 years, but they -- they did a statistical process which

4    allowed them to extrapolate the information.

5       Q.    Okay.

6       A.    They looked at homicide, attempted homicide, assault

7    with a weapon, fight with a weapon, sexual assault, robbery

8    on an inmate.  These are -- and they also looked at

9    aggravated assaults on a correctional officer.  And they put

10   in information about the offender, everything from age,

11   education, socioeconomic status, mental health,

12   intelligence.  They looked at their work history, all of

13   those kind of data, military history.  They looked at offense

14   characteristics, so whether there was a weapon used, how many

15   victims.  They looked at prior record, arrest record.  They

16   looked at every bit of information about these individuals.

17   And then they also looked at prison records, rule

18   infractions, that sort of thing.  And to see what was

19   going -- because what they were looking for was what was

20   going to predict who was going to be violent.  So this is

21   what the -- after they did their studies, these are the

22   results of the study.

23            They found that the base rate of serious violence in

24   Texas prisons were people who had committed murder is 16.4

25   percent over the course of a capital life term.  And so

1    that's similar to the woman -- the female born today who has

2    the risk of breast cancer over life of an 80-year life span.

3        Q.    80-year life span?

4        A.    Right.  So we're looking at 16.4 probability.  And

5    they found in their study these factors, that if it was

6    committed in the course of a robbery or burglary, you would

7    add 7.4 percent.  If there were multiple victims, you would

8    add 5.6 percent.  If there was a contemporaneous murder or

9    assault, basically separate or an assault that was included

10   of another victim in this offense, if the individual was a

11   member of an identified gang, if there was a prior prison

12   term, and the gangs -- you can see the gang involvement adds

13   10.4 percent.  Prior prison term, you add 5.3.  And

14   consistent with the graphs that we've been showing about the

15   age factor, if you're under age 21, they're going to add 5.5.

16   So this is your number going in.  Just like when you're a

17   woman and you're born, that's your lifetime prevalence rate.

18   So they start out with this number, and these are things that

19   are an increased risk.

20       Q.    Okay.

21       A.    And if -- once you get this, this number doesn't

22   change for you as you age.  You continue to carry this risk

23   rate with you, whether it comes to fruition or not, that's --

24   that's just --

25       Q.    That's your number?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.   It's stamped on your head when you go in,

2  essentially, figuratively.  Now, the factors that they found

3  that were predictive of a reduced risk for violence in

4  prison -- again, we're looking -- we're starting out --

5  everybody going in we get the base rate of 16.4.  If you were

6  26 through 30 -- so between the ages of 21 or 25 or -- there

7  is no change.  That's the index group, because you don't --

8  at that age you don't have an increased risk, you don't have

9  a decreased risk.  So what they found here is that if you're

10 age 26 through 30 -- you remember how those graphs, they fell

11 off incrementally on the ages, you subtract 7.2.  Ages 31

12 through 35, you subtract 12.3.  And if you're over age 35

13 going in for a murder committed in the community, you

14 subtract 14.4 for your risk in prison to be violent in

15 prison.  So that the possible range is 2 percent lifetime

16 probability to 54.6 lifetime probability.  If you're under 21

17 and you have all of the aggravating factors, then you're

18 going to have a 54.6 percent risk.

19      Q.   Which is certainly a probability?

20      A.   Right.

21      Q.   It's a preponderance of the evidence?

22      A.   In other words, the gang membership and being under

23 21 is going to add significantly.

24      Q.   And we don't have that in this case?

25      A.   Not in this case.

1     Q.   Okay.

2     A.   So then we looked at Mr. Murphy.  Want to apply this

3 to him individually.  We look at the base rate, and then

4 there was a robbery that was involved in the commission of

5 the capital offense.  He has a prior prison term, but I put

6 it in brackets.  It was a TDCJ boot camp.  There was a

7 probation violation.  His probation was rescinded, and he was

8 sent in.  There's no indication that there were any

9 disciplinary problems while he was there, so when he

10 acknowledged that he had prior prison term, and you can add

11 or subtract.  I mean, you're not going to subtract it, but

12 you can -- you acknowledge it, and you can add it.  So that

13 gives his range from 23.8 to 29.1 overall risk rate for the

14 lifetime of a capital life term.  And this is a probability

15 which is a relative possibility.

16     Q.   So that's Jim's grade basically?

17     A.   Basically that's his grade, his statistical grade.

18 And he would carry this -- in other words, this is still his

19 rate at age 65.  It's not like we're -- driving your rate is

20 going to change.  Here, this over your lifetime.

21     Q.   Okay.  So tell us about the likelihood of Jim or

22 Jedidiah Murphy being violent in prison.

23     A.   Again, this is a narrative kind of reflection of

24 what we've been talking about, what we've looked at the

25 information here.  His increased risk have these two factors,

1    and then -- but this is the plus or minus over here.  On the

2    decreased risk side, we see that he did have the correctional

3    behavior.  He had no disciplinary write-ups that -- I mean

4    there was basically a base sheet indicating that there was no

5    problems.  And he's not had any write-ups for predatory

6    assault while in jail.  His hospital behavior which is an

7    institutional environment, not exactly the same, but we can

8    look at that.  He had no predatory assault against patients

9    or staff because as a mental -- as a mental health patient or

10   as a mentally ill offender, he could potentially go to one of

11   the three hospitals that TDCJ has if he has an acute episode

12   or some kind of chronic psychiatric illness.  That would be a

13   possibility.  And so looking at his hospital behavior in that

14   context is relevant.  He was -- he was not discharged from

15   the private hospitals for any kind of threatening or

16   unmanageable behavior.  And he is willing to seek mental

17   health treatment.  That's evident in his records.  He has

18   family contact, and they are supportive of him.  He has at

19   least average intelligence, which means he can be involved in

20   prison programs which would be -- have a positive affect on

21   him and his behavior.

22        Q.   Okay.  And let's -- let me emphasize this is -- the

23   prison is not the same environment as going to Timberlawn

24   Psychiatric Hospital, is it?

25        A.   No.  No.  I've been to the Montford Unit in

1   Lubbock.  I've see it.  It is a hospital, but it's within a

2   prison setting.  It has the same kind of security,

3   protection.

4        Q.   The attitude towards the person though is different.

5   What is the attitude towards someone in a psychiatric

6   hospital?

7        A.   I've worked at the psychiatric hospital.  The idea

8   is that when you're exhibiting symptoms, you have a

9   counselor, someone will come and talk to you, your

10  psychiatrist will come and talk to you, group members are

11  going to sit and talk to you.  They have training and

12  measures for dealing with -- if there's an aggressive act, if

13  someone is refusing to go to their room, they have approved

14  holds that they can put on someone.  And sometimes they put

15  soft restraints on them.  Maybe they might be restrained to

16  their wheelchair.  They might be restrained to their bed, but

17  they're still allowed to go to activities in some cases.

18  I've seen that.

19       Q.   Okay.

20       A.   So essentially if you're having a problem, you have

21  a lot of people to talk to.

22       Q.   And you're looked on as a patient --

23       A.   You're a patient.  You're not an offender; you're a

24  patient.

25       Q.   And in prison you're looked on quite differently --

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Right.  They have treatment for mental illness, but

2    the primary focus is on -- the first order is protection and

3    control.  And so they want to treat the mentally ill offender

4    to improve their behavior and their condition and improve

5    safety, that sort of thing, for those around them.  But

6    control is the major factor, and so where you might have some

7    of these other perks in a mental hospital -- in prison

8    hospital, if you continue to act out, you're more likely to

9    be isolated.

10    Q.   So essentially we have here in Jedidiah Murphy the

11    fact that there was a robbery in this murder increases his

12    risk?

13    A.   Yes.

14    Q.   And the fact that he went to boot camp for a few

15    months and got out is considered prison time or Texas

16    Department of Criminal Justice time?

17    A.   Yes.

18    Q.   But his risk is decreased by all of these things

19    you've gone over?

20    A.   Potentially those things are factors that will

21    decrease his risk for any kind of problem in prison, major

22    problems in prison.

23    Q.   Okay.  Let's go to the next one.  Okay.  What are

24    the custody options here?

25    A.   Well, capital offenders, if they're given a life

1  sentence, go into general population maximum security -- what

2  they call close custody.  If there are some problems or if

3  they need protective custody, then they can go into

4  administrative segregation.  I didn't show it on here, but

5  you can also include custody option at one of the three

6  hospitals that they have available.  And then for individuals

7  who are in the system who are considered to be violent or

8  predatory against inmates or correctional officers or anybody

9  else who might be there, then they have what they call super

10 max TCJC.  They have one at the Michael Unit.  I believe that

11 may be the first one they built.  I believe they may have

12 some others.  And it's a single cell, 23-hour a day lockdown,

13 with tight security and restrictive movement.  And so they

14 could be virtually isolated for -- could be years.  They

15 have -- they have levels within that system for people who

16 have not been a problem in the system and are transferred

17 there as a precautionary measure, they may go into the best

18 level.  But if you are having problems, you'll go into the

19 level where you have the least opportunity for any kind of

20 pleasantries in your cell.  You have minimum necessities in

21 your cell.

22       Q.   Okay.  Now, when a person goes to prison, Dr.

23 Kessner, where do they go first?

24       A.   There's a Diagnostic Unit, and they all go there and

25 they're evaluated for health, mental health classification.

1       Q.    And there are a lot of different classifications,

2   aren't there?

3       A.    Yes.

4       Q.    And they're all over the State.   There are different

5   place that do different things.   You've done some work in

6   regard to the way the penitentiary works, have you not?

7       A.    Yes.

8       Q.    Tell the jury a little bit about what kinds of

9   options are there --

10      A.    Well --

11      Q.    -- in prison.

12      A.    -- they have -- they have minimum and medium and

13  maximum, but for this type of offender you're always going to

14  be assigned to a maximum facility.   Now, based on their

15  behavior, they can be classed -- I believe someone convicted

16  of murder can only be classed -- what they call an S-3.   They

17  can't go any higher than that.   So they're in their -- they

18  could be in a minimum -- a maximum facility and be considered

19  what's called minimum in.   In other words, they have to stay

20  within the perimeters of the fence and razor wire under

21  observation, but they are able to work within that

22  environment.   And then -- as I said, there's the option of

23  the super max where they are not allowed to go anywhere.

24  They eat all their meals alone.   And they even exercise alone

25  in a very small cell under guard or under -- you know,

1    there's a guard that can see them and monitor them while

2    they're in there.  And so -- but that's the range for someone

3    who has committed a murder.

4         Q.    Okay.  Let's go to the next sheet.  Custody

5    Interventions Relevant to Risk Assessment.

6         A.    This is just a narrative description of some of the

7    things we've been talking about.  Deterrence is the fence,

8    the wire, the guards, the policies and procedures.  If

9    they're -- if they're managed properly, if they're adhered to

10   by the staff.  Classification procedures.  When they go in,

11   they get a packet.  They look at the information.  And they

12   assign inmates.  And they have a review, I believe -- I

13   believe within six months.  If there are no incidents,

14   they're going to have a review.  And then after that they

15   have scheduled reviews.  Medication consultation for health

16   and mental health issues that might relate to behavioral

17   problems, because there are physical health issues that can

18   relate to behavioral problems, someone with diabetes, there's

19   epilepsy, other types of problems that people have.

20   Counseling, there are group counseling opportunities.

21   Prevention and rehabilitation classes like substance abuse

22   groups, that sort of thing.  Mentoring programs, religious

23   programs, educational programs.  There's an opportunity to

24   get your GED, get a high school education, train for some

25   type of a trade.  Work programs in the system.  And inmate

1    organizations which would be support organizations.  All of

2    these are designed to improve the behavior because the first

3    priority is safety and control.

4        Q.    And it's a pretty grim scenario, isn't it?

5        A.    I've been in several prisons in Texas, and it is not

6    someplace you would want to spend your time.

7        Q.    Is there a next one?

8        A.    Nope.

9        Q.    You have looked at all these records for Jedidiah

10   Murphy, and you've testified about these things that would

11   make him a person who has a base rate that you have testified

12   to.  Does it make any difference in your opinion that

13   although Jim went to mental health places, he didn't stay or

14   complete?  Does that change your feeling that because he has

15   tried to get help, that would decrease his risk in prison?

16       A.    Are you asking if it would increase his risk that he

17   didn't stay?

18       Q.    Well, actually -- no.

19       A.    Ask the question again.

20       Q.    You said that the fact he sought help before it was

21   a decreasing factor for him.

22       A.    It's an indication that he's willing to seek out

23   help when he's having a problem.

24       Q.    Okay.  And even though he didn't successfully

25   complete those programs, does that change the fact that --

1   your risk factor?

2      A.   No.  No, it doesn't.

3      Q.   Now, you're aware of his suicide attempt in the

4   jail, are you not?

5      A.   Yes.

6      Q.   So tell the jury, if you will, from looking at

7   everything that you've looked at, whether in fact you think

8   Jim Murphy would be a predator or more preyed upon in the

9   penitentiary?

10      A.   Individuals with mental illness do have behavior

11   problems in a system like that, and that can be related to a

12   lot of factors.  They might have a higher incidence of

13   breaking the rules, but they're also considered to be more

14   vulnerable to more predatory inmates.  For instance, somebody

15   who had evidence of cutting on their arm could be considered

16   more vulnerable and so inmates that are inclined that way

17   might target them for either harassment, taking their

18   commissary, other things like that, so it's -- very often

19   this type of inmate is considered to be in need of protective

20   custody rather than being predatory.

21      Q.   And that's Jim Murphy?

22      A.   Yes.

23      Q.   And he's been in jail for a few months now, and he's

24   been in jail in the past.  Have you seen anything in those

25   records, although those are not prison sentences, they're

1    county jail scenarios except for the boot camp, that would

2    make you think that he would be a future danger or threat in

3    the penitentiary?

4        A.   As I said, his probability would be considered low.

5    And I think that it's -- based on his mental illness history,

6    he's made considerable number of assaults on himself and

7    statistically the more attempts the makes, the more likely he

8    will succeed.

9        Q.   Sooner or later?

10       A.   Yes.

11               MS. LITTLE:  Pass the witness.

12               THE COURT:  Take a break.

13               THE BAILIFF:  All rise.

14               THE COURT:  Counsel, let's stand in recess

15   until 11:00 a.m.

16                   (Jury excused from courtroom.)

17               THE BAILIFF:  All rise.

18               THE COURT:  Jury has returned to the

19   courtroom.

20           Mr. Murphy, counsel, visitors, you may be seated.

21           The State may proceed.

22                       Cross-Examination

23   By Mr. Davis:

24       Q.   Dr. Kessner, first of all, if you need to take a

25   break during this testimony, you just let me know.  Okay?

1           Dr. Kessner, as I understand, you were hired to look

2      at the future dangerousness issue in this case, correct?

3           A.   That's correct.

4           Q.   Are you donating your time in this case?

5           A.   No, I'm not.  I'm being paid.

6           Q.   How much -- how much are you charging for your time?

7           A.   $150 an hour.

8           Q.   And how many hours have you put into this case

9      already?

10          A.   I'm not certain.  I submitted one invoice for $4,300

11     at the end of the last -- before the break, the two-week

12     break.

13          Q.   Okay.  And you've done additional work since that

14     time?

15          A.   Yes, but I haven't calculated it yet.

16          Q.   This is not the first time that you've testified in

17     a capital murder trial, is it?

18          A.   No, it's not.

19          Q.   How many other times have you testified in a capital

20     murder trial?

21          A.   Approximately 9 or 10.  10 on mitigation and/or risk

22     assessment.

23          Q.   You've testified in several counties in Texas,

24     correct?

25          A.   That's correct.

1    Q.   And you've previously testified in death penalty

2  cases here in Dallas County, haven't you?

3    A.   Yes, I have.

4    Q.   You also testified in Karnes County, I believe, on a

5  death penalty case?

6    A.   That's correct.

7    Q.   And Karnes County, does that contain the Connally

8  Unit?

9    A.   Yes, it does.

10    Q.   The --

11    A.   It's near Bonham.  I'm not sure if it's in the same

12  county, but it's nearby.

13    Q.   The case that you testified for -- well, first of

14  all, in the 9 or 10 cases that you've testified for, have

15  they been for the State or the defense?

16    A.   For the defense.

17    Q.   The individual that you testified for in Karnes

18  County was a Kenneth Vochosky, correct?

19    A.   That's correct.

20    Q.   Now, he received the death penalty, did he not?

21    A.   Yes, he did.

22    Q.   And in that case do you recall that Kenneth Vochosky

23  assisted a man -- bailed a man out of --

24          MR. BYCK:  Your Honor, we will object to going

25  into the facts of these other cases as being irrelevant.

1     THE COURT: Overruled.

2   Q. (By Mr. Davis) In that case, isn't it true that

3 Kenneth Vochosky bailed a man out of jail who had been

4 arrested for a family or domestic violence case?

5   A. The man that you're referring to, I believe, was

6 a -- even a childhood friend and, yes, I think he had -- I'm

7 not sure he bailed him out, but they were together around the

8 time that the man left jail.

9   Q. Okay. As a matter of fact, in that case the man who

10 was in jail had threatened retaliation against the police

11 officers who put him in jail, correct?

12   A. He had long-term -- he had long-standing animosity

13 towards law enforcement, the man that was bailed out of jail,

14 yes.

15   Q. Kenneth Vochosky took that man to a gun shop and

16 bought 200 rounds of ammunition for him, didn't he?

17   A. I believe that was included as the facts of the

18 case. They had also had a history of hunting and target

19 shooting together.

20   Q. As a matter of fact, the man that had been

21 previously arrested for domestic violence then called the

22 police out to his residence and then proceeded to ambush and

23 kill three peace officers, didn't he?

24   A. Yes. He made a 911 call.

25   Q. Now, in Dallas County did you testify for a Leon

1  Dorsey?

2      A.   I testified in that case, yes.

3      Q.   Leon Dorsey, did he receive the death penalty, also?

4      A.   Yes, he received the death penalty.  He was

5  currently serving time, 60-year-sentence, I believe, on

6  another case and he received the death penalty in this case.

7      Q.   And in that case the facts were that he went into a

8  Blockbuster video store here in Dallas and forced the two

9  young employees to the back room, didn't he?

10      A.   I'm trying to remember if he -- if the facts were

11  that he put them in the back room, but I know there were two

12  employees.

13      Q.   Proceeded then to shoot and kill them both, didn't

14  he?

15      A.   They were both shot, yes.

16      Q.   After he committed that offense, isn't it true that

17  he went to Ennis, south of Dallas, and he proceeded to shoot

18  and kill a 50-year-old female store clerk in Ennis, Texas?

19      A.   That's the one I believe that he was currently in

20  prison for.  I'm not sure how close in time that event took

21  place.  I'm not sure.  It wasn't the same day.  It was much

22  later, I believe.

23      Q.   And he received a 60-year sentence there?

24      A.   Yes.

25      Q.   Before authorities discovered that he had committed

1   the Blockbuster case?

2       A.   I believe he was -- he was looked at initially in

3   the Blockbuster case and then on a cold case review they went

4   back and talked to him after he was already in TDCJ.

5       Q.   As I recall in that case didn't you testify about

6   both mitigation and future dangerousness?

7       A.   Yes, I did.

8       Q.   And again, the jury saw fit to assess a death

9   penalty against Leon Dorsey?

10      A.   Yes.

11      Q.   You remember testifying for a William Rayford here

12  in Dallas County?

13      A.   Yes.

14      Q.   Do you recall in that case that William Rayford went

15  over to an apartment, that he strangled, beat, and stabbed a

16  44-year-old woman to death?

17      A.   I believe it was actually a house and it was one

18  they had shared together for a time, but it was a house

19  rather than an apartment.

20      Q.   Did he -- did he strangle and beat and stab a

21  44-year-old woman to death?

22      A.   Yes.

23      Q.   And in fact he did that in front of the woman's

24  11-year-old son, didn't he?

25      A.   The son was present, yes.

1      Q.   And before he left that residence, isn't it true

2    that he took a knife and slit the boy's throat?

3      A.   I believe the boy was wounded.  I believe the woman

4    was actually chased out of the house and was beaten in a

5    nearby lot.

6      Q.   William Rayford had already committed a previous

7    murder, hadn't he?

8      A.   Yes, in the community.  He had killed his wife.

9      Q.   Back in 1986 he had killed his wife and had been in

10   the penitentiary system, then paroled out, right?

11     A.   He received, I think, a 23-year history -- sentence,

12   served about 8 years, and had a good adjustment in prison.

13     Q.   In that case you testified on the issue of future

14   dangerousness; is that correct?

15     A.   And mitigation.

16     Q.   And mitigation.  Did the jury agree with your

17   assessment, or did they assess the death penalty against

18   Rayford?

19     A.   They gave the death penalty.

20     Q.   Now, as far as expert testimony, I believe you've

21   already told us that in this case you're testifying about

22   future dangerousness, but you've also come into Dallas courts

23   and other courts in this State as an expert in mitigation?

24     A.   Yes.

25     Q.   Now, you've also come into Dallas County and you've

1   represented yourself to juries as an expert on eyewitness

2   identification, haven't you?

3       A.   I've testified in one case on that issue.

4       Q.   Have you ever done any study, any independent

5   studies into the issue of eyewitness identification?

6       A.   I've reviewed the literature, studied the

7   literature, talked to people who had done original research.

8       Q.   So I take it that your answer is, no, you yourself

9   have not done any study --

10      A.   You said study.  I've not done any research.

11      Q.   Doctor, you oppose the death penalty in Texas, don't

12  you?

13      A.   I would say that as I've worked on these cases, my

14  opinion has evolved.

15      Q.   And your opinion is what?

16      A.   Originally I was not necessarily opposed to it, but

17  I don't necessarily think that it is the remedy that the

18  public believes that it is.

19      Q.   And many of the authors and researchers that you

20  rely upon share your opinions, don't they, about the death

21  penalty?

22      A.   Some may.

23      Q.   James Marquart does, doesn't he?

24      A.   I have not read his opinion.

25      Q.   Doctor, would you agree with me that in reaching any

1    conclusion in a matter as serious as this one, that it's

2    important to get as much information as possible?

3         A.   I think information is vital, yes.

4         Q.   I mean, even insurance underwriters do that when

5    they're deciding to issue a policy, don't they?

6         A.   Correct.

7         Q.   And when you talked about the insurance industry,

8    have you ever worked for an insurance company?

9         A.   No, I haven't.

10        Q.   Never been an underwriter, have you?

11        A.   No, I haven't.

12        Q.   You would agree with me that insurance companies may

13   set an initial premium on an individual, but they use that

14   individual's personal history in adjusting the premiums up

15   and down, don't they?

16        A.   Relevant personal history, yes.

17        Q.   Right.  I mean, if somebody goes out with car

18   insurance, they get into a lot of accidents, that premium is

19   going up, isn't it?

20        A.   It would, yes, or they would be canceled.

21        Q.   Now in this particular case how many people did you

22   interview?

23        A.   I interviewed the defendant and reviewed the records

24   that are in this suitcase over here.

25        Q.   So the only person that you interviewed is Jedidiah

1    Murphy, right?

2        A.   Yes.

3        Q.   You never talked with any member of any law

4    enforcement department, did you?

5        A.   No, I read law enforcement records.

6        Q.   Never talked with the people down from Van Zandt

7    County Probation Department?

8        A.   No, I took the conviction facts of the case as

9    accurate so I wasn't going to dispute that information.

10       Q.   Well, with regards to all the medical treatment and

11   his willingness to undergo treatment, you never went back to

12   any of the treating physicians or counselors that he had seen

13   previously, did you?

14       A.   I read their reports.

15       Q.   Did you ever pick up a telephone and say, hey,

16   doctor, I'd like to talk to you about Jedidiah Murphy?

17       A.   No.

18       Q.   Did you ever talk about any of his other victims?

19       A.   To Mr. Murphy?

20       Q.   No.  For instance, did you ever talk with Elisabeth

21   Erwin?

22       A.   No, I didn't.

23       Q.   Debbie Armstrong?

24       A.   The only person I talked to was Mr. Murphy.

25       Q.   Would you agree with me, Doctor, that your opinions

1  are only as good as the information that you receive?

2      A.   That's the foundation for my opinions, yes.

3      Q.   When you talked with the defendant, did you consider

4  him to be a credible source of information?

5      A.   He was reasonably credible.  He did not deny his

6  record, his history of contact with law enforcement, that

7  sort of thing.  He was pretty clear about that.

8      Q.   During your interviews with him, did he lie to you?

9      A.   I don't believe that anything he said was

10  inconsistent with what was in the records.

11      Q.   You discussed the 1996 gunshot wound to his left

12  hand, didn't you?

13      A.   That was self-inflicted.

14      Q.   That's what he told you, that it was self-inflicted?

15      A.   In front of his girlfriend.  That was also indicated

16  in different records, based on his self report to those

17  individuals.

18      Q.   To what individuals?

19      A.   When he would be in a mental hospital and he would

20  tell them he had a gunshot wound to the hand, that sort of

21  thing.

22      Q.   Yeah, I know he mentioned a gunshot wound, but do

23  you know the reasons that he gave various doctors about how

24  that gunshot wound occurred?

25      A.   Being angry, upset, fighting with his girlfriend.

1    There's a lot of different reasons why individuals with that

2    type of mental illness history give for inflicting self

3    harm.  It's not unusual.

4        Q.   Well, I mean have you ever looked at the records

5    from the hospitals in Texarkana or the physician that treated

6    him in Texarkana?

7        A.   I didn't see those records.

8        Q.   So you don't know that he gave entirely different

9    versions to the doctors that treated him on the spot, right?

10        A.   No, I didn't see the Texarkana records.

11        Q.   And in fact, in the records at Timberlawn he tried

12    to claim to the doctors over there that it was -- that

13    gunshot wound was a result of a robbery attempt where he was

14    a victim --

15        A.   Yes, I saw that.

16        Q.   You remember that, don't you?  That was totally

17    inconsistent with what the man tried to tell you, isn't it?

18        A.   Yes.  But for the most part in the records it was --

19    I believe indicated that it was self-inflicted.

20        Q.   I've looked at those records, and I don't see

21    anything about self-inflicted.

22             MS. LITTLE:  I'll object to that as

23    testifying --

24             THE COURT:  Sustained.

25        Q.   (By Mr. Davis)  This man tried to claim to you,

DARLINE W. LABAR, OFFICIAL REPORTER

1    didn't he, that he shattered his median nerve in that gunshot

2    wound?  That's what he told you, isn't it?

3        A.   I think he indicated that was the result, that there

4    was a numbness or some kind of loss sensation in his fingers,

5    paresthesia.

6        Q.   Have you reviewed your notes of your interview with

7    the defendant?

8                    (Witness retrieves notes.)

9        Q.   (By Mr. Davis)  Your records indicate, don't they,

10   that this man told you that he was treated in Texarkana,

11   shattered median nerve, can't feel fingers anymore?

12       A.   Yeah, I think he said that.

13       Q.   That's not true, is it?

14       A.   Well, as I said, I haven't seen the reports from

15   Texarkana.  I know that's what he claimed.  There were

16   several instances where he claimed things somewhere in a

17   record and when I questioned him about it, he would say

18   things like he didn't know why they had that in there, he

19   didn't know why it said that, but generally it had to do with

20   things about his own person.

21       Q.   So you haven't seen the operative report of Dr.

22   DeHaan in Texarkana that states there was not even a

23   laceration to the median nerve?

24       A.   No, I haven't seen that.

25       Q.   When he talked about the incident over at the

1   government center jail, do you remember talking with him

2   about that, don't you, where he stiffened up?

3       A.   Yes, it was related to his claim of having urinary

4   retention.

5       Q.   And he claimed to you that he stiffened up because

6   he had to go to the bathroom, right?

7       A.   He indicated that he'd had that problem since he was

8   a child, I believe, living with the Tolars.

9       Q.   Again, my question to you is this:  Did he tell you

10  that at the government center jail that he stiffened up

11  because he had to go to the bathroom?

12      A.   He'd had the problem for some time.  He had to go to

13  the bathroom and he couldn't go around other people is what

14  he told me.

15      Q.   You've seen the incident report, haven't you?

16      A.   I saw the offense report, uh-huh.

17      Q.   Have you seen the nurses notes?

18      A.   I did see them.  I don't recall what they said at

19  this time.

20      Q.   Do you recall that the nurses notes indicate that

21  once he -- well, first of all, he told you he was there to

22  talk to some investigator guy.  I think that's the expression

23  he used, wasn't it?

24      A.   What page of my notes are you looking at?

25      Q.   Let's see, I don't know how they're numbered, but

1     they're --

2          A.    The front -- the front pages are numbered.

3          Q.    Okay.  15, I'm sorry.  Toward the bottom, do you see

4     stiffened up because he had to go to --

5          A.    Yes, uh-huh.

6          Q.    Okay.

7          A.    Asked nurse to let him go to the bathroom.

8          Q.    Right.  At the government center, talked to an

9     investigator guy.  You understood that that was the reason he

10    was at the government center that day, right?

11         A.    Yes.

12         Q.    And as a matter of fact, the nurses notes indicate

13    that once that investigator left, this man never made another

14    request to go see or go to the bathroom or seek medical care

15    for any supposed urinary problems, did he?

16         A.    As I say, I'd have to look at that again to refresh

17    my memory.

18         Q.    Let me just -- let's go to the studies if we could

19    for a moment.  Again, have you ever done any independent

20    research of your own as to these base rate figures that

21    you've talked to the jury about?

22         A.    No, I haven't.

23         Q.    So you're relying again on studies done by other

24    people and their research?

25         A.    The studies are done by other individuals and then

1    some of the information is also Department of Justice

2    statistics.

3        Q.   And I saw a slide on the Furman study, that's

4    something that you are relying upon, isn't it?

5        A.   Well, that is a historical base rate to make as a

6    comparison.

7        Q.   Now, the Furman decision came down in 1972, didn't

8    it?

9        A.   Yes, that's correct.

10       Q.   And would you agree with me, Doctor, that the

11   individuals that were studied in Furman -- I mean, some of

12   those individuals committed offenses that aren't even

13   considered to be capital murder in the United States

14   anymore?

15       A.   Some of them committed rape, and some of them

16   committed robbery.

17       Q.   Right.  So you've got non-capital offenders by

18   today's definition being studied in Furman, don't you?

19       A.   Some of them, but the majority of them were murders.

20       Q.   Well, even with regards to the murders, they don't

21   necessarily fit within the category of capital murder today,

22   do they?

23       A.   Some may, some may not.

24       Q.   So you've got a segment there that's being studied,

25   robbery, rape, and what I'm going to, for lack of a better

DARLINE W. LABAR, OFFICIAL REPORTER

1    term, call simple murder, not capital murder, right?

2        A.    Well, I believe it was found that they were being

3    over inclusive in -- in decisions and that's why the Supreme

4    Court wanted them to narrow the definition.

5        Q.    Yeah, and they're looking at inmates from states

6    whose capital murder scheme is very different than that of

7    the State of Texas, right?

8        A.    As I said, the studies are consistent across this

9    diversity.

10       Q.    Again, my question, please, is this:  Are they

11   looking at states with capital murder defendants where the

12   State's capital murder scheme is different than that of the

13   State of Texas?

14       A.    Diverse capital statutes.

15       Q.    And even if we're looking at Texas, forgetting the

16   other states used in that study, would you agree with me that

17   the capital murder sentencing scheme in Texas has changed

18   dramatically since Furman was decided?

19       A.    There have been additions to this -- to the nature

20   of the offense over the time.

21       Q.    Well, there has been -- as a matter of fact, when

22   Furman was decided, we had no Special Issue Number 2

23   concerning mitigation in the State of Texas even, did we?

24       A.    I believe that's right.

25       Q.    Yeah.  And even the issues concerning future

1    dangerousness, deliberateness, etcetera, they've changed

2    since Furman, too, haven't they?

3        A.   Correct.

4        Q.   When you talked about the Texas Department of

5    Criminal Justice, have you ever worked for the Department

6    of -- the Texas Department of Criminal Justice?

7        A.   I have not been an employee, no.

8        Q.   You talked about behavior inside the penitentiary

9    system here in Texas.  Talking about the general population

10   first, certainly criminal acts of violence occur in the

11   general population, don't they?

12       A.   Sure, they do.

13       Q.   And rules infractions occur in the general

14   population, don't they?

15       A.   Yes, they do.

16       Q.   Not all assaultive behavior, not all criminal acts

17   of violence are reported in the general population, are they?

18       A.   I would say those that lead to injury or consequence

19   probably are reported.  The ones that are more significant --

20   a fight may not be, but anything that results in injury or

21   requirement for medical attention would be listed.

22       Q.   So assaults -- some assaultive behavior wouldn't

23   even be reported to the staff to be included in these

24   studies, would they?

25       A.   Well, having a fist fight wouldn't be that unusual

1  and that may or may not be observed by a guard.  So it might

2  not get reported.

3      Q.   So the numbers that you've -- that you've relayed to

4  this jury may not include all of the true violence that

5  occurs in the penitentiary general population, correct?

6      A.   Well, that may -- correct, but it would be a

7  consistent effect across the population and different

8  populations.

9      Q.   How much of the assaultive behavior is -- goes

10 unreported in the Texas Department of Criminal Justice

11 system?

12     A.   Well, if it's unreported, then no one would know,

13 right?

14     Q.   As a matter of fact, if we just look at death row

15 inmates -- I mean, criminal acts of violence occur even in

16 death row in the State of Texas, don't they?

17     A.   They have occurred in that population.

18     Q.   Death row would have to be considered an extremely

19 secure area within the overall prison population, wouldn't

20 it?

21     A.   I believe it's more secure now, but there was a time

22 when they were allowed to work in the prison system and so

23 there was more movement and opportunity for interaction at

24 that time.  It was before 1998.

25     Q.   I mean, cells used in the death row system, each

1    inmate's housed separately there, aren't they?

2        A.   Now they are.  They're housed separately, but as I

3    said, I think before 1998 they were allowed to move around

4    and they went to work.

5        Q.   Well, were they housed separately on death row,

6    prior to the new Terrell Unit?

7        A.   I think at that time they had cells, in some

8    circumstances.

9        Q.   I mean, some of those cells even had wire mesh so

10   that the inmates couldn't assault the staff members and other

11   inmates, didn't they?

12       A.   That was I think in the early days.

13       Q.   And yet despite those precautions and single cell of

14   the inmates, I mean assaults have occurred on death row,

15   haven't they?

16       A.   Prior to single celling or subsequent to single

17   celling?

18       Q.   Well, I'm just asking --

19       A.   There have been assaults on death row, yes.

20       Q.   Kidnappings have occurred on death row, haven't

21   they?

22       A.   I'm not familiar with any kidnappings on -- well,

23   let's see.  I'm not familiar with any kidnappings on death

24   row.

25       Q.   Murders?

1        A.    Yes.

2        Q.    I mean, even murders have occurred while people are

3    housed on death row, right?

4        A.    It's my understanding that there was one in 1979,

5    and -- of a death row inmate killing another death row

6    inmate, was a self-defense plea and he got three years.

7        Q.    You're saying that's the only homicide that's

8    occurred on death row?

9        A.    Well, I think there may have been one other.  The

10    victim was not a death row inmate.  I believe that's the

11    information I have.

12        Q.    People have escaped from death row, haven't they?

13        A.    1998 Thanksgiving, there was one escape.

14        Q.    You talked about all of the programs that are

15    available for inmates down there at the TDCJ.  You talk about

16    rehabilitation classes for instance.  Do you remember that?

17        A.    Yes, for substance abuse and emotional issues and --

18        Q.    The truth is when Jedidiah Murphy goes down to the

19    prison system, no one can force him to attend those types of

20    programs, can they?

21        A.    To my understanding, that's correct.

22        Q.    Inmate organizations.  Again, no one can force

23    Jedidiah Murphy to join those organizations and take part in

24    them, can they?

25        A.    I think the purpose would be absent if somebody

1    forced somebody to participate.

2         Q.   So the answer would be no, correct?

3         A.   Right.   Some inmates prefer to be isolated and spend

4    their time alone.

5         Q.   Uh-huh.   As far as educational or religious programs

6    or mentoring programs, again, when Mr. Murphy gets to the

7    penitentiary system, no one can force him to take advantage

8    of any of those programs either, can they?

9         A.   That's correct.

10        Q.   And with regards to psychological services, such as

11   counseling or therapy, if this man says I'm not taking part

12   in that kind of program, that's it, isn't it?

13        A.   Well, they're not going to force someone, but there

14   are instances where someone is participating in a program and

15   they decide they don't want to participate for a while and

16   they return to the group, I've seen that in different records

17   that I've reviewed.   So it may fluctuate over time.

18        Q.   So if Mr. Murphy says I'm not going to go through

19   any counseling or therapy, I don't take -- I'm not going to

20   take part in that, I'm not going to take advantage of it, the

21   truth of the matter is, no one can force him to go through

22   that?

23        A.   That would be his choice.

24        Q.   And in the past he's shown a propensity not to take

25   advantage of help offered to him, hasn't he?

1        A.    Well, he's been presented for mental health

2   treatment, and he has not always -- there are indications in

3   the record that he's asked to be discharged.  That's not

4   inconsistent with his diagnosis.

5        Q.    Well, I mean Timberlawn, for instance, he went over

6   there and discharged after three days, didn't he?

7        A.    I think that was a stabilization.  Some -- some

8   admissions are more for stabilizations.  I know he presented

9   to Terrell, and they did not admit him.

10       Q.    Well, they said they had an alcohol and drug program

11  and referred him on to another program, didn't they?

12       A.    Right.  At one time they did have a well-known

13  recognized drug and alcohol program.  It's been discontinued.

14       Q.    Right.  And down there at Glen Oaks, I mean he

15  wasn't always cooperative down there, was he?

16       A.    The records indicate that there was some behavior

17  problem, but that's not unusual.  Sometimes the treatment

18  itself leads to what's called iatrogenic effects.  That is,

19  that the treatment elicits the illness.

20       Q.    Well, for instance.  He refused to take part in

21  group counseling, didn't he, while at Glen Oaks?

22       A.    He would leave group counseling when the subject of

23  sexual abuse came up, saying it was too troubling to him to

24  sit there and listen to it.

25       Q.    And the behavioral problems with the staff members

1    down there -- now, the truth is Glen Oaks could have said

2    you're out of here based on assaultive behavior towards a

3    staff member, couldn't they?

4         A.   Well, as I said, if they had assessed him as being

5    at that level of risk, they would have discharged him and

6    didn't discharge him.

7         Q.   So they gave him the benefit of allowing him to stay

8    there and continued to try to help him even though he'd

9    exhibited that kind of behavior; is that right?

10        A.   I think there was like one or two incidents of that

11   type of behavior which is not unusual considering his

12   diagnosis.  And it's not unusual for a psychiatric facility.

13   I worked in several.

14        Q.   So, again, the question is, Glen Oaks allowed him to

15   stay in their facility and continued to offer him counseling

16   even after he exhibited that type of behavior; is that -- is

17   that true or not true?

18        A.   They did not discharge him.

19        Q.   Your studies and your base rates, as I understand,

20   Doctor, we all start out with a 16.4, right?

21        A.   Anyone entering the Texas Department of Criminal

22   Justice on a capital murder charge for a life sentence would

23   start out with a base rate of 16.4, based on their study.

24        Q.   And based again upon the studies, did I understand

25   you to say that the highest possible base rate that a person

DARLINE W. LABAR, OFFICIAL REPORTER

1  could accumulate on that type of offense would be 54.6?

2     A.   Probability of acts of severe violence.

3     Q.   So in the worst of the worst cases, assuming that

4  you had there before you the very worst offender with the

5  highest possible base rate, you're going to come into a court

6  and turn to a jury and say that the man is -- if we assume

7  that 50.1 is a probability, that the man is only 3.5 percent

8  over probability, right?

9     A.   I'm not sure I understand your question.   In other

10  words, that's his lifetime probability.   That's his risk

11  level.

12     Q.   And you're going to say to a jury in the very worst

13  of cases, that individual's risk assessment is 3.5 percent

14  over the threshold for a probability.   You're not going to

15  say anything higher than 54.6 based on these studies, are

16  you?

17     A.   Based on this research -- well, you're never going

18  to give a hundred percent probability to anybody.   That would

19  be totally scientifically inaccurate.   Based on this study,

20  they refined the information and this is the probability that

21  they developed, based on the factors that predict an increase

22  in risk.

23     Q.   My question again is this:   In the very worst case

24  imaginable, Doctor, you're never going to come in and

25  according to your study say that person is higher than a 54.6

1  percent risk factor?

2     A.   According to the research that's available now, that

3  is -- that is the level of risk that someone could achieve.

4     Q.   And that's -- that is the research that you consider

5  to be credible that you're basing your opinions upon, right?

6     A.   Yes.

7     Q.   Did I understand you to say, Doctor, that basically

8  extraneous offenses, what a person has done in the past,

9  really plays no part in this risk assessment?

10    A.   It's not that it plays no part.  It's just the

11 research has demonstrated that it does not predict violence

12 in prison.  It may predict violence in the community, under

13 certain circumstances, but you have to take the context into

14 consideration when you're going to make your prediction.

15    Q.   Your context is prison, right?

16    A.   Yes.

17    Q.   So in a prison context, extraneous offenses really

18 play no part in building up this risk factor assessment, does

19 it?

20    A.   That -- Sorensen and Pilgrim took all factors,

21 offender, victim, offense characteristics into consideration

22 in their statistical analysis and it didn't prove to be

23 predictive, other than referring to contemporaneous assaults.

24    Q.   So again --

25    A.   -- and gang membership.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.    -- based on the studies that you're relying upon,

2    past behavior is not a predictive factor, is it?

3    A.    In a very limited sense --

4    Q.    In a prison setting?

5    A.    Gang membership would increase someone's risk, and

6    for instance, in an identified street gang that might be

7    recruitment -- easily recruited from by the prison gang

8    population and assault contemporaneous with the capital

9    offense.

10    Q.    Well, if a man had previously committed two

11    burglaries, for instance, prior to commission of a capital

12    murder offense, that's no predictive factor?

13    A.    It's not going to predict violence in prison over

14    the course of a capital life term.

15    Q.    If a man kidnapped a woman in broad daylight, again,

16    same opinion, that's not a predictive factor for you, is it?

17    A.    When you look -- if you --

18    Q.    Is it a predictive factor?

19    A.    No, it's not predictive of violence in prison.

20    Q.    Thank you.  Aggravated assault against an

21    individual, holding a gun to her head, is that a predictive

22    factor for violence in the prison system?

23    A.    Looking at the context, if that occurs in the

24    community, it is not predictive of violence in the prison

25    system.

1  Q.   Robbery in the community prior to the commission of

2  capital murder, is it a predictive factor for violence in a

3  prison system?

4  A.   All of these offenders had those types of histories

5  so we're looking at things that will distinguish someone as

6  more violent or more likely to be violent in prison and so

7  statistically it's not going to predict more violence in

8  prison.

9  Q.   As a matter of fact, don't the studies indicate that

10 murderers serving long sentences pose a lower risk in prison

11 than other types of inmates?

12 A.   They have a lower infraction rate.  As I said,

13 there's a small group among that group that are going have a

14 high rate of infraction and that will be violent.

15 Q.   Again, if you look at the studies, if you base their

16 risk factors upon the studies that you're basing them on, I

17 mean those people would score very low on a risk assessment

18 scale, wouldn't they?

19 A.   Some would, but you also take prior prison behavior

20 and so if you have that information, you would also apply it

21 and that's how you would likely modify your risk level.  For

22 instance, if you had somebody that had been in prison before

23 and they were violent, then that 54.6, you would say it's a

24 low estimate.

25 Q.   You know who the Texas 7 are, don't you?

1      A.    Yes, I do.

2      Q.    You know who George Rivas is, don't you?

3      A.    Yes, I do.

4      Q.    You know that prior to the escape, he had no major

5   violations in the prison system, did he?

6      A.    I don't believe any of the offenders had any major

7   violations in the prison system.

8      Q.    He was serving 18 life sentences.  Based upon that

9   again, the predictive -- the prediction would have been for

10   no violence in prison by George Rivas, wouldn't it?

11      A.    No predatory violence in prison.

12      Q.    And yet during that escape in fact he did use

13   predatory violence to effect his escape, didn't he?

14      A.    Yes.

15      Q.    And the same would be true of the others, Michael

16   Rodriguez who was serving a capital life sentence, and others

17   who were very serving very long aggravated sentences, I mean

18   the prediction would have been that they pose a very low risk

19   for predatory violence in a prison?

20      A.    As I said, in any group there's going to be a small

21   minority that is going to be a high risk and going to break

22   the rules at a higher rate.

23      Q.    The studies would not have predicted the violence

24   that was inflicted by the Texas 7 in prison, would it?

25      A.    Based on their community behavior, no, not

1  necessarily.  I haven't evaluated them, looked at their

2  records to determine if they had a prior prison sentence and

3  what that was indicated, their ages at the time they went

4  into prison.

5      Q.  Again, the studies, as I understood your slides and

6  the literature, the level of the violence of the capital

7  murder itself does not predict future violence in prison,

8  right?

9      A.  Well, because all of the individuals have been

10  judged to have a high level of violence in the community by

11  virtue of their offense, so it does not distinguish them as

12  more violent in prison.

13      Q.  So if this defendant down here had killed another

14  80-year-old woman sometime before he killed Bertie

15  Cunningham, that wouldn't change your risk assessment for him

16  either, would it?

17      A.  No, that's not going to increase his level.  They

18  didn't find that that was predictive in this study.  They

19  would have added that in as a variable that was not

20  predictive.

21      Q.  Was your answer, yes, it would not change my opinion

22  about him?

23      A.  It would not have altered the conclusion.

24      Q.  If he had gone out that day on October the 4th and

25  killed 10 Bertie Cunninghams or 20 Bertie Cunninghams or 30

1    Bertie Cunninghams, that wouldn't alter your opinion of his

2    risk assessment in prison, would it?

3         A.   On the same day that Ms. Cunningham was killed?

4         Q.   Yes.

5         A.   In a spree, yes, it would have.  Multiple victims or

6    assault in commission -- contemporaneously with that offense,

7    yes, it would have inflated his risk factor.  That was found

8    to be predictive in the study.

9         Q.   Well, let's say during one criminal -- one criminal

10   event he killed 20 or 30 individuals, would that have changed

11   your assessment on him?

12        A.   You just add the percentage of risk level that that

13   counts for.  I think it was 7.4 -- 5.6 for multiple victims;

14   robbery, 7.4; attempted murder or assault contemporaneously

15   at the similar time of this offense, you add 4 percent.

16        Q.   You remember when you were asked about multiple

17   victims in Leon Dorsey?

18        A.   No, I don't remember.  This research wasn't

19   available at that time.

20        Q.   You remember the prosecutor asking you that day

21   whether your opinion would change if Leon Dorsey killed 20

22   people, 30 people, 40 people, whether your opinions would

23   change and your answer at that time was, no, it wouldn't

24   change your risk assessment for Leon Dorsey.

25        A.   Leon Dorsey had had a relatively good adjustment in

DARLINE W. LABAR, OFFICIAL REPORTER

1  prison.   I think he had 4 years in prison to evaluate so

2  that's the second -- on the slide where it said actuarial and

3  then pattern, so we had a pattern to look at with him for his

4  adjustment in prison.

5      Q.   But when the prosecutor asked you in Leon Dorsey

6  about two years ago whether you would add additional risks

7  factors if Leon Dorsey was found to have killed 20, 30, or 40

8  people, you said at that time, no, that you're not going to

9  add risk factors?

10     A.   Correct.   As I said, this research was not available

11  at that time.   So it hadn't been refined to that level.   So I

12  would have added -- I forgot it again, 7 -- 5.6 percent for

13  multiple victims.

14     Q.   So it turned out that the research that you were

15  basing your opinion on in the Leon Dorsey case, that was

16  wrong, wasn't it?

17     A.   No, it wasn't wrong.

18     Q.   They amended their findings, didn't they?

19     A.   No, this isn't -- that's the nature of research.   It

20  develops as new information becomes available and they put in

21  this -- that's what they were trying to do with this research

22  was to be able to add some factors so you could distinguish a

23  higher risk level.

24     Q.   So if we had looked -- if we had based your risk

25  assessment in this case on research available to you two or

1    three years ago, you would have come up with a different

2    conclusion, correct?

3        A.    In any event -- not necessarily.  In any event

4    someone is going to fall somewhere -- if you are going to be

5    violent, it's going to fall somewhere between 10, 20 to 30

6    percent risk.  As we saw in the slide, that was the level of

7    individuals that had serious rule violations or violent

8    offenses in prison.  Consistently 70 to 90 percent did not

9    have that.  So that was what I was basing that on.  That

10   would still be true.

11       Q.    Research may change next year?

12       A.    It's pretty consistent research over a whole

13   century.

14       Q.    Assaultive behavior in the community is not a

15   predictive for violence in prison, right?  I think you've

16   just told us that.  Kidnaps, robberies, those sorts of

17   things, they don't count for anything in the risk assessment?

18       A.    Because the majority -- if it's not in the --

19       Q.    I'm sorry, do they count or not?

20       A.    Unless it was at the time of the capital offense, it

21   does not predict a greater risk in prison.

22       Q.    Severity of the offense doesn't -- doesn't count

23   either?  It doesn't increase the risk assessment, does it?

24       A.    That particular slide was related to that federal

25   system, and within the first six months did it predict

1  behavior problems within the first six months, so this one

2  indicates that there's some factors about the offense that

3  could predict long-term risk for violence.

4      Q.  What sort of things would that be?

5      A.  Again, robbery or burglary in the commission of a

6  capital offense, multiple victims, gang membership, age under

7  21.  Those are factors that they found in the analysis were

8  predictive of a higher level of risk, higher probability.

9      Q.  What would it -- what would it take for you to say

10  that somebody is going to be a future danger in prison?

11      A.  There -- there was one case that I worked on out of

12  State, and I recommended that if he received life sentence,

13  that he should be kept in the maximum level security that

14  they have because he was definitely a risk for predatory

15  violence in prison.

16      Q.  Based upon what?

17      A.  Based on the fact that he had been in prison before

18  and been violent in prison.

19      Q.  So absent -- absent somebody already going to prison

20  and demonstrating prison violence, they're not going to meet

21  that threshold of 50.1 percent, are they?

22      A.  Some will, based on the factors that are listed.

23  Some are going to go over that level.

24      Q.  Doctor, I noticed, and correct me if I'm wrong, but

25  you were not asked any opinions about whether you thought

1    this man would be a future danger outside of prison.  Were

2    you asked any questions of that nature?

3        A.   I wasn't asked to answer that question.

4        Q.   Because the whole context that you were testifying

5    for this morning is the context that the setting is prison,

6    right?

7        A.   That's the setting for at least a minimum of 40

8    years.

9        Q.   So when you look at the word "society" on Special

10   Issue Number 1, that means prison to you for at least 40

11   years, doesn't it?

12       A.   A minimum of 40 years, yes.

13       Q.   You don't consider society to be a part -- I mean

14   for the free world where you and I live to be a part of

15   society in Question Number 1 for at least 40 years, do you?

16       A.   He would be in prison for at least 40 years, yes.

17       Q.   So if you're looking at Special Issue Number 1 as a

18   juror, you're not going to consider the free world part of

19   society for the next 40 years, are you?

20       A.   Not for the next 40 years.  Now, beyond that there's

21   potential for parole.

22       Q.   Or escape?

23       A.   Well, that -- a lot depends on policies and

24   procedures being followed by the staff.

25       Q.   Let me ask you, considering the community at large

1    here, do you have an opinion whether this man would pose a

2    future danger in the community at large, outside of prison?

3        A.   I think at this time where he stands right now, he

4    has demonstrated he's violent in the community.

5        Q.   Is your answer yes?

6        A.   Yes.

7        Q.   Thank you, Doctor.

8        A.   Thank you.

9             THE COURT:  Ms. Little.

10                    Redirect Examination

11   By Ms. Little:

12       Q.   Dr. Kessner, Jedidiah Murphy has been convicted of

13   capital murder; is that correct?

14       A.   Yes, he has.

15       Q.   And so there are two options here, a death sentence

16   whenever that would occur --

17       A.   Yes.

18       Q.   -- where he would remain in prison until the time

19   that sentence was carried out?

20       A.   Yes.

21       Q.   Or life in the penitentiary which at the present

22   time means 40 years?

23       A.   Yes, ma'am.

24       Q.   So he's going to be in prison, one way or the other?

25       A.   He'll be incapacitated, yes.

Page 94

1      Q.   Now, are you aware that in the general population

2    inmates can and are forced to work?

3      A.   Yes.   They do assessments though and they -- there

4    may be for mental health considerations -- if -- they may

5    assign certain types of work based on physical and mental

6    health issues.

7      Q.   If you are mentally and physically able to work, you

8    are required to?

9      A.   Yes.

10               MS. LITTLE:  May I approach the witness, Your

11   Honor.

12               THE COURT:  You may.

13               MS. LITTLE:  At this time, Your Honor, I would

14   offer Defense Exhibit 39 which is Gilda Kessner's vita.

15               (Defendant's Exhibit No. 39 offered)

16               MR. DAVIS:  No objection.

17               THE COURT:  Admitted.

18               (Defendant's Exhibit No. 39 admitted)

19               MS. LITTLE:  And a copy, a soft copy of the

20   slides that were presented to this jury.

21               (Defendant's Exhibit No. 64 offered)

22               MR. DAVIS:  No objection.

23               THE COURT:  Admitted.

24               (Defendant's Exhibit No. 64 admitted)

25      Q.   (By Ms. Little)  Dr. Kessner, let me ask you to look

1    at Defendant's Exhibits 65, 66, and 67, and see if these are

2    other slides or copies of slides that you brought me today?

3        A.   Yes, these are three.

4        Q.   Okay.  And we didn't go over those before, and I'm

5    not going to ask that we set that paraphernalia up again.  So

6    I'm going to ask you to talk about these, but I'm going to

7    show them to the D.A. first.

8                 MS. LITTLE:  We'll offer these.

9            (Defendant's Exhibit No. 65 through 67 offered)

10                MR. DAVIS:  If I can have a moment.  I haven't

11   seen these previously, Your Honor.

12               Judge, I have no objections to Defendant's Exhibits

13   65, 66, or 67.

14                THE COURT:  Admitted.

15           (Defendant's Exhibit No. 65 through 67 admitted)

16       Q.   (By Ms. Little)  Now, Dr. Kessner, there's been --

17   you know what the diagnosis is essentially here by the

18   psychiatrist that examined Jedidiah Murphy, don't you?

19       A.   Yes.  There are different diagnosis, but they are

20   consistent.

21       Q.   Okay.  There are, from what you know and looking at

22   the records, etcetera, some antisocial qualities in Jedidiah

23   Murphy?

24       A.   Yes, he has some antisocial traits.

25       Q.   Okay.  So did I ask to you bring some information

DARLINE W. LABAR, OFFICIAL REPORTER

1    about that, regarding persons who are in prison who have

2    antisocial personality disorder who are diagnosed as

3    antisocial personality disorder?

4         A.   Yes.

5         Q.   Let me ask you to step down because we're not going

6    to go through all that again.

7              Let's go to the middle.

8                   THE COURT:   Okay.

9                   (Witness leaves the stand.)

10        Q.   (By Ms. Little)   This is Defendant's Exhibit Number

11   65, "Antisocial Personality Disorder Prevalence Among Prison

12   Inmates."   Will you discuss that with this jury?

13        A.    Essentially antisocial personality disorder does not

14   mean the same thing as criminality, but we find that in

15   prison that -- these are different research studies dating

16   back to 1969 actually -- that are referring to antisocial

17   personality disorder and they find that between 49 and 80

18   percent of inmates would qualify for that diagnosis.   So then

19   we'll see that that is something that is commonly found in

20   prison.   So again, it doesn't help us to distinguish among

21   inmates who's going to be more of a problem.   If everybody

22   has the same trait, almost everybody has the same trait, it's

23   not going to tell us much.   And it's a trait that's also

24   found in the community among people who do not violate the

25   law.

1           And in addition we have the DSM, the diagnostic and

2     statistical manual that we use that evolved over time.   And

3     so there are a lot of questions about the disorder itself and

4     what actually we are defining.

5           Q.   Okay.   And Defendant's Exhibit Number 66.

6           A.   This just shows that in NIMH Epidemiologic Catchment

7     Area Study, that's where they look in a geographic area and

8     they want to see what the numbers are in that area.   In 1991

9     53 percent of community residents diagnosed with antisocial

10    personality disorder had no significant -- actually arrest

11    record itself is not necessarily indicative of antisocial

12    personality disorder.   A couple of different studies in one

13    large community in the Northwest, 35 percent of males age 18

14    already had some contact with the police.   And in another

15    location 25 percent males by the time of age 18 had already

16    some non-traffic related contact with the police department.

17    So just being arrested is not an indication of antisocial

18    personality disorder.

19          Q.   Okay.   And Defendant's Exhibit Number 67.

20          A.   This talks about the changes in the DSM.   The

21    criteria has shifted over time.   With DSM-III-R there was

22    three and a half million opportunities for -- because there

23    was subcategories and so you may have the diagnosis -- the

24    person sitting next to you may have the diagnosis and there

25    are no similarities between you and the behavior, so right

 1    there we're looking at something -- what are we defining.  So

 2    then that was way too broad.  So they changed it for DSM-IV

 3    which is what we use now and we still have 400,000.  So --

 4    and they are not weighted.  The symptoms are not weighted.

 5    For instance, financial irresponsibility can be considered

 6    one, and there are certain things in our culture of financial

 7    irresponsibility that people might feel uncomfortable, such

 8    as failure to pay child support.  And that could have been

 9    included by a clinician to add that criteria to this

10    individual, so that shows you how broad it could be, as well

11    as assaulting somebody.  Okay.  And we're looking at a group

12    of factors, so not any one thing can provide the diagnosis.

13            Temporal instability, we talked about the aging

14    factor.  As people age, their propensity for breaking the

15    law, for being violent is going to be reduced over time.  A

16    lot of the personality disorder problems, which are basically

17    relationships problems that wreak havoc in their

18    relationships and their ability to get along at work, at

19    home, and at school that sort of ages out in the 40's for a

20    lot of this.  Not necessarily -- there are some that may have

21    a lot more disturbance of thinking more related to

22    schizophrenia that would continue to have a problem, but a

23    lot of the relationship issues may have leveled out some.

24    Q.    Okay.

25    A.    Let's see here.  And the overlap of substance abuse

1    disorders.  A lot of the symptom criteria also can be found

2    in a similar vein under substance abuse disorder.  So what

3    you have to do is you see is this a person that has a

4    substance problem and substance abuse is driving this other

5    behavior, or do we have someone who is very antisocial who

6    happens to use substances.  In fact, the idea is that if it

7    is the substance and then you diagnosis the substance

8    dependence and you do not diagnose -- you can diagnose

9    antisocial traits, you can put that on there as an indicator

10   that they're having -- that the substance abuse is leading

11   them to have involvement with the criminal justice system.

12   Whether it's domestic violence or assaulting in the

13   community, driving vehicles under the influence, whatever

14   they're doing, but if the primary diagnosis is substance

15   that's driving the antisocial behavior, then you have an

16   substance abuse disorder diagnosis.

17        Q.    Thank you.

18              Now, Dr. Kessner, all of these studies that you've

19   talked about have been done over a period of years and the

20   numbers are consistent.  Is that what you testified to?

21        A.    Yes, the findings are consistent over time.

22        Q.    And this is because comparisons are made, is it not?

23        A.    Yes, I mean there are comparings with the general

24   populations.  They're comparing the groups that, you know, in

25   the previous studies and we see that the numbers are the

DARLINE W. LABAR, OFFICIAL REPORTER

1    same.

2        Q.    Okay.  So if somebody comes in and says, well, they

3    were five knife assaults in the prison, with nothing to look

4    at overall -- am I making myself clear where I'm trying to go

5    with this?

6        A.    Yes.

7        Q.    What would that tell this jury, if anything at all?

8        A.    It wouldn't tell them anything because you don't

9    know how many people are in prison.  If there's 200,000

10   people in prison, that gives you some information as to what

11   the prevalence is.  If you have five people in prison, then

12   you know you have a hundred percent problem.

13       Q.    Okay.

14       A.    So I mean, you have to know the context.  You have

15   to know the information.  Just the numbers by themselves are

16   not necessarily informative.

17       Q.    Okay.

18                MS. LITTLE:  That's all I have at this time.

19   Thank you.

20                MR. DAVIS:  No further questions.

21                THE COURT:  Take a lunch break.  We will stand

22   in recess until 1 o'clock.

23                (Recess of proceedings.)

24                THE BAILIFF:  All rise.

25                (Jury recessed from courtroom.)

1            THE COURT:  Counsel, this next witness has

2   some kind of mechanical presentation.  I would invite them to

3   start about in one minute getting it ready.

4            MS. BALIDO:  I don't think that will be a

5   problem.

6            THE COURT:  I'm not going to have any more

7   delays.

8                 (Recess of proceedings.)

9            THE BAILIFF:  All rise.

10            THE COURT:  Record reflect the jury is

11   returning to the courtroom at this time.

12                 (Jury returned to courtroom.)

13            THE COURT:  Jury may be seated.

14       Mr. Murphy, counsel, visitors in the gallery, you

15   may be seated.

16       Defense may continue.

17            MS. LITTLE:  Your Honor, at this time we would

18   offer Defense Exhibit Number 68, which is actually a

19   duplication of some records that have already been put into

20   evidence by Mr. Davis, specifically Aavid Thermal Tech

21   employment records for August of 1997.  These are simply

22   better copies of the time cards.

23                 (Defendant's Exhibit No. 68 offered)

24            MR. DAVIS:  No objection.

25            THE COURT:  Admitted.

1          (Defendant's Exhibit No. 68 admitted)

2          MS. LITTLE:  May I, Your Honor.

3          THE COURT:  You may.

4          MS. LITTLE:  Ladies and gentlemen, what we

5    have here are the time cards for Jim Murphy's employment at a

6    place called Aavid in August of 1997 on through September.

7    There are a number of these records, but specifically right

8    here, where I opened it up, this is the 24th, 25th, 26th,

9    27th, 28th, 29th, and 30th of August of 1997.  And as you can

10   see here, the punch cards reflect going to work at 2035, late

11   at night on the 25th, getting off work at 7:00 a.m.; Tuesday

12   the 26th, getting to work at 2314, getting off at 8:02; the

13   27th, going to work at 2354, getting off work at 7 -- that

14   looks like 65, you can sort that out; 28th, he goes to work

15   at 2330 and gets out of work at 7:54; the 29th, it goes on

16   essentially the same; 23/8, 23/7, for that important week of

17   August 27th -- 26th of 1997.

18          Jennifer.

19          MS. BALIDO:  Judge, the defense calls

20   Detective Myers of the Garland Police Department.

21          THE COURT:  You may continue.

22

23

24          MATT MYERS

25   was called as a witness by the Defendant and, after having

1   been first duly sworn, testified as follows:

2                    Direct Examination

3   By Ms. Balido:

4        Q.   Can you please state your name for the record?

5        A.   My name is Matt Myers.

6        Q.   And you're the same Matt Myers that has testified

7   previously in this case; is that correct?

8        A.   Yes, ma'am.

9        Q.   I'm going to direct your attention specifically back

10  to when you were interviewing Mr. Murphy at the Garland

11  Police Department the very first time.  Okay?

12       A.   Yes, ma'am.

13       Q.   When you sat down with Mr. Murphy in that first

14  initial interview, was he emotional at that time?

15       A.   Part of the time he was, yes, ma'am.

16       Q.   Okay.  And it wasn't just one, but a couple of

17  different times he did get rather emotional; is that correct?

18       A.   Well, actually it was one time on a couple of

19  different days.

20       Q.   Okay.  He got emotional one time on a couple of

21  different days?

22       A.   Uh-huh.

23       Q.   Okay.  And how did he -- how did he, I guess,

24  manifest or how physically did he show his emotion?  Was he

25  violent?  Did he cry?  Did he just tear up?  What was the

1   situation?

2       A.    I would describe it -- he wasn't violent.  He cried

3   very briefly.  I'd say maybe 30 seconds, maybe a minute.

4       Q.    Okay.  But that -- this happened on more than one

5   occasion?

6       A.    It happened on two separate occasions.

7       Q.    Uh-huh.  And when you were asking him questions,

8   isn't true that when he was answering you, he was forthright

9   and direct?

10      A.    I thought he was some of the times.

11      Q.    Okay.  And that again, he was also remorseful at

12  times?

13      A.    Well, he was emotional and he did -- you know, he

14  did cry.

15      Q.    But he was remorseful, you thought?

16      A.    Yes.

17      Q.    Okay.  And is it true that the first thing that he

18  told you was that he was the person that was responsible for

19  Ms. Cunningham's disappearance and death?

20      A.    He did admit to that pretty quickly, yes.

21      Q.    Okay.  And also in your interview with Mr. Murphy,

22  did he also let you know that he had some sort of mental

23  background or you became aware that there was some sort of

24  mental background?

25      A.    Yes.

1      Q.   Let me ask you about not the first time you
2  interviewed him and not the second time that you went back
3  and interviewed him, but the third time that you went back
4  and interviewed him.   Okay?
5      A.   Yes.
6      Q.   Can you tell me and the ladies and gentlemen of the
7  jury who is Cindy Hale?
8      A.   Cindy Hale is actually an employee of the police
9  department.
10      Q.   Okay.   And --
11           MS. BALIDO:   May I approach the witness.
12           THE COURT:   You may.
13      Q.   (By Ms. Balido)   I'm showing you what has been
14  marked as an exhibit -- as Defendant's Exhibit Number 2, and
15  I ask if you recognize this document.
16      A.   I do.
17      Q.   And what is this document?
18      A.   This is a two-page -- a two-page document that was
19  presented to Mr. Murphy on October the 11th.
20      Q.   Okay.   Has it been changed or altered in any way
21  since the last time you saw it?
22      A.   I don't believe so, no.
23      Q.   Okay.   In fact you pulled it out of your notebook
24  and gave it to me so I could make it an exhibit, is that
25  correct, at a prior hearing?

1        A.    That's correct.

2                    MS. BALIDO:   Judge, at this time we'd offer it

3    as Defense Exhibit Number 2 for all purposes.

4                    (Defendant's Exhibit No. 2 offered)

5                    MR. DAVIS:   No objection.

6                    THE COURT:   Admitted.

7                    (Defendant's Exhibit No. 2 admitted)

8        Q.    (By Ms. Balido)   Now, Detective Myers, this is a

9    questionnaire that who prepared?

10       A.    The questionnaire was actually prepared by my

11   supervisor.

12       Q.    Okay.   Who is that?

13       A.    His name is Lieutenant Thompson.

14       Q.    And so Lieutenant Thompson actually prepared this

15   document; is that correct?

16       A.    That's correct.

17       Q.    And what was the purpose of preparing this document?

18       A.    Well, the purpose is to hopefully gather more

19   information or gather more evidence.

20       Q.    And it's set out in sort of a letter like form; is

21   that correct?   It's addressed to Mr. Jim Murphy?

22       A.    Yes.

23       Q.    And then on the end it's signed by a Cindy Hale; is

24   that correct?

25       A.    That's correct.

1    Q.    And Mr. Thompson or Lieutenant Thompson or whoever

2    he is over at Garland, he didn't actually sign this.  You got

3    Cindy Hale to sign this; is that correct?

4    A.    That's correct.

5    Q.    Is she related to Ms. Cunningham in any way?

6    A.    No, she is not.

7    Q.    Not a member of the family or anything like that?

8    A.    No, she is not.

9    Q.    And she is certainly not the sister of the deceased

10   as well?

11   A.    That's correct, she is not.

12   Q.    I wonder if you will read along with me as I read

13   this document just to make sure I don't do anything or say

14   anything that's not in this document.  Okay?

15         October the 10th, the year 2000.  Now, that is after

16   Mr. Murphy has been arrested; is that correct?

17   A.    Yes, it is.

18   Q.    And it's before he was transferred to the Lew

19   Sterrett Jail; is that correct?

20   A.    That's correct.

21   Q.    And it was before he was appointed counsel that you

22   know of, is that correct, or did you know?

23   A.    To my knowledge, yes.

24   Q.    Okay.  And he's already spoken to you once and given

25   you a written statement?

1    A.    That's correct.

2    Q.    And then you went back a second time and asked him

3 some additional questions and he gave you some additional

4 information?

5    A.    That's correct.

6    Q.    And this is the third time that you went to go talk

7 with him?

8    A.    Yes, it is.

9    Q.    Okay:   It reads:   "Mr. Jim Murphy, I am writing this

10 letter to you in hopes that you can shed some light on the

11 death of my sister.   Detective Matt Myers told me that you

12 have been cooperating with him and have given him information

13 about the death of Bertie.   Mr. Myers told me that you have

14 expressed sorrow for what you have done, and I appreciate

15 that.   I, along with the rest of Bertie's family have

16 questions that Mr. Myers cannot answer, even though he has

17 told us all he knows.   I am writing this letter in hopes that

18 you will answer my questions, which will give the family

19 peace of mind and closure in this matter.   We loved Bertie

20 very much and we are hurting and grieving at this time.

21 Please help us heal by answering my questions.   I am going to

22 list the questions below and give you a space to respond.

23 Mr. Myers will then deliver the letter to me after you have

24 responded.   Thank you in advance for your help."

25        And so that's the first paragraph; is that correct?

Page 109

1     A.    Yes.

2     Q.    Okay.  So basically everything in that paragraph is

3  not true, based that it's written supposedly by the hand of

4  Cindy Hale; is that correct?

5     A.    Well, it was not written by the hand of Cindy Hale,

6  no, ma'am.

7     Q.    And she's not Ms. Cunningham's sister?

8     A.    No, she's not.

9     Q.    Did you discuss with the family before you did this?

10    A.    No, we did not.

11    Q.    The first question under the questionnaire is: Was

12 Bertie scared or mistreated when you made her give you a

13 ride?

14          And what did Mr. -- well, first, let me ask you

15 this:  How did this go about?  Was this kind of the same

16 situation that you had when you -- when you described the

17 first interview with Mr. Murphy, where you gave him the sheet

18 of paper and then walked out of the room, or did you stay in

19 there at this time?

20    A.    No, I left him alone during this entire time.

21    Q.    Okay.  And again, you described that room as not --

22 you weren't able to see inside or anything like that; is that

23 correct?

24    A.    That's correct.  Same room.

25    Q.    And so you weren't able to look in a peephole or any

1    sort of double-sided glass or mirror or anything like that?

2        A.   No, I was not.

3        Q.   Okay.  So you left Mr. Cunningham (sic) in this

4    room.  What instructions did you give to him?

5        A.   Just explained the questionnaire to him, told him it

6    was a questionnaire from the family, that the family had some

7    questions, and would he be willing to look at it and respond

8    to the questions.  He said that he would.

9        Q.   Okay.

10       A.   And he was then presented with the documents.

11       Q.   Okay.  And actually you did give him his Miranda

12   warnings before you had him sign this or look at this?

13       A.   That's correct.

14       Q.   Okay.  Is it the regular practice of the Garland

15   Police Department to do this sort of thing?

16       A.   Well --

17       Q.   Or is this kind of new for y'all?

18       A.   It's hard to say whether it's a regular practice.  I

19   mean, we would use whatever tools we felt were necessary.

20   Cases are different.  Different cases call for different

21   procedures.  So it's the first time I've ever done that or

22   been involved in that.

23       Q.   Okay.  And so in this situation, what do you think

24   made this situation different, that this might be a tool that

25   might be to your advantage to use?

1      A.   Well, I think that this was different in respect

2   that we still had a lot of questions that we didn't know the

3   answers to.  So this was just -- this was just a tool that we

4   would use to try to obtain the answers to those questions.

5      Q.   And is it also a tool that you could use to play on

6   somebody's sympathy maybe, or maybe somebody's emotions to

7   get the answers that you wanted?

8      A.   Oh, I would say that's possible, yes.

9      Q.   The first question in this questionnaire from the

10   family, "was Bertie scared or mistreated when you made her

11   give you a ride," and what was his answer?

12      A.   It says, "Not at all."

13      Q.   "Did Bertie talk to you and treat you well as we

14   think she would have done?"  And what is his answer?

15      A.   "Yes, she did."

16      Q.   "When Bertie was killed, did she suffer?"  Was there

17   any sort of answer to that?

18      A.   There was no response to that question.

19      Q.   "Can we get the rings back that Bertie was wearing?

20   The family is prepared to pay for the rings if you can tell

21   us who got them, the rings have sentimental value as well --

22   for me as well as the family."  Is there any response to

23   that?

24      A.   No response.

25      Q.   "Bertie was a very religious person and I think that

1    she would pray for you.  Did she pray while she was with

2    you?"  What was his response to that?

3        A.    "She had no reason to pray nothing was going to

4    happen."

5        Q.    The next question is:  "The family would like to put

6    up a cross or memorial stone either at the place you picked

7    Bertie up or the place that she died.  We need your help to

8    get this done.  Please tell me where you picked her up or

9    where she died.  This would be a marker that we could put up

10   to show our love for Bertie, and that we still think about

11   her."  And what was his response to that?

12       A.    It says:  "Sir or ma'am I'm very sorry for what has

13   happened to your family.  I've destroyed many many lives from

14   this.  I will continue to work with Mr. Myers so I can at

15   least give you peace, but as of right now I can't remember."

16       Q.    Now, the next question is:  "I know that Bertie

17   helped others who were in need.  Did you tell Bertie that you

18   were in need of assistance, and is that why she tried to help

19   you?"  And what was his response to that?

20       A.    "I had all my luggage w/me so she knew I needed help

21   & once again I'm very very sorry for your loss maam.  If I

22   could bring her back I would do it for you.  This was a

23   horrible horrible accident & I'm sorry for causing you pain."

24       Q.    And then this is a -- well, it's kind of -- it ends

25   with a question, but this is kind of the next little

1  paragraph before the signature:  Mr. Myers told me that he

2  can not make you answer questions because of legal matters.

3  I fully understand that, but I am elderly like my sister,

4  Bertie, and this would help with me and my family deal with

5  our unanswered questions.  Mr. Myers told me that he would

6  help me by presenting you with my questions.  Mr. Myers told

7  me that he would let you sit in a room to respond and would

8  not interfere with your responses.  I would also like to know

9  if you would respond to any other questions that I might have

10  at a later time?

11          Is that what that -- how that reads?

12     A.    Yes.

13     Q.    And it's signed Cindy Hale; is that correct?

14     A.    Yes.

15     Q.    And then at the very end, after the signature, Mr.

16  Murphy wrote some additional words; is that correct?

17     A.    He did.

18     Q.    And would you read those for us, please?

19     A.    It says:  I was told if I'm honest and ask for

20  forgiveness God will forgive me for what has happened and one

21  day I'll have more peace in my life as well.  I will answer

22  any question I can to help you.  Another bad thing.

23     Q.    Okay.  Now, there's another bad thing doesn't seem

24  to have a period at the end; is that correct?

25     A.    There is not.

1       Q.   Okay.  And did you tell him to quit writing at that

2   time, or how did that occur?

3       A.   No, he was never instructed to stop writing.  I just

4   asked if he was finish or not.

5       Q.   Okay.  And you're saying that he said he was

6   finished then?

7       A.   Yes.

8       Q.   Okay.  Did you talk to anybody at the Dallas

9   District Attorneys Office and ask them their advice as to

10  whether or not you should give him this supposed family

11  questionnaire before you gave it to him?

12      A.   No, we did not.

13      Q.   And this material was not part of the material that

14  was -- or the statement that was sent to the District

15  Attorneys Office to be included in any statements by the

16  defendant like Judge Cunningham ordered you to do in the

17  examining trial; is that correct?

18      A.   No, I believe that document was included in the

19  packet when we filed the case.

20      Q.   Okay.

21      A.   Should have been.

22      Q.   So it may have been sent to the District Attorneys

23  Office, but it -- that's as far as you know?

24      A.   Yes.

25      Q.   And -- was it apparent to you at the pretrial

DARLINE W. LABAR, OFFICIAL REPORTER

1    hearing that we had before the trial began -- that occurred

2    on the Thursday before this trial began, that that was the

3    first time I had ever seen that document?  Did that become

4    apparent to you?

5         A.   You're going to have to ask me that again.  I'm

6    sorry.

7         Q.   Okay.  When we had the hearing regarding any

8    statements made by the defendant.  Okay?

9         A.   Uh-huh.

10        Q.   Did it become apparent to you at that time that the

11   first time that I or any member of the defense team knew

12   there was an additional questionnaire like this, that that

13   happened at that hearing?  Or was that not apparent to you?

14        A.   I'm really not sure when you were first aware of

15   that document.  I don't know that.

16        Q.   Was Mr. Murphy remorseful at that time, or did he

17   seem upset when he was filling out that questionnaire?

18        A.   No, he was not.

19        Q.   Okay.  But you weren't with him the whole time?

20        A.   That's correct.

21        Q.   When you were investigating this case, there was --

22   I guess after the Richardson situation where Ms. Cunningham's

23   credit cards had been used by Mr. Murphy, but before Mr.

24   Murphy was actually taken into custody, there was a time that

25   there were a lot of calls coming in from different people in

1   the community as to who might have done this; is that

2   correct?  Or is that not correct?

3        A.   No, I don't think that -- no, I don't think we got a

4   lot of calls on the case.

5        Q.   But were there -- there were calls that happened

6   during that period that came from Tonya Thorp; is that true?

7        A.   There was a call, yes, from Ms. Thorp.

8        Q.   Okay.  And -- and some other members of the -- of

9   Mr. Murphy's family, like the Erwins and some other people;

10  is that true?

11       A.   I don't think Mr. Erwin called, but I talked to Ms.

12  Thorp myself.  I think Mr. Erwin's communication with the

13  Garland Police Department was through the -- through the

14  Terrell Police Department.

15       Q.   Okay.  You as the investigating officer, do you

16  remember ever getting a call from Chuck Shollenmer from out

17  in East Texas someplace, either Canton or any of those

18  places?

19       A.   No, I did not.

20       Q.   Okay.  So you didn't -- so he or one of your other

21  investigating officers never told you that he had spoken to

22  Mr. Murphy the morning of the disappearance of Ms. Cunningham

23  and that he was very depressed that day?

24       A.   I'd have to go back and look at my notes.  The name

25  right now is not familiar to me, but there was a lot of names

DARLINE W. LABAR, OFFICIAL REPORTER

1    during the course of that investigation -- his name may --

2    excuse me, may very well be in the notes.  I'm just not --

3    I'm not familiar with it right now.

4        Q.   Okay.  So does the text of that conversation sound

5    very familiar to you?

6        A.   Well, yeah, it does -- I think it probably -- there

7    is something in my notes about that, but it does ring a bell

8    to me.

9        Q.   Now, you talked personally with Ms. Thorp during the

10   course of your investigation; is that correct?

11       A.   That's correct.

12       Q.   And you were also out at her house when the search

13   of her house was done; is that true or not true?

14       A.   No, that's not true.  I was not present at that

15   time.

16       Q.   Okay.  And so did you have more than one

17   conversation with her during the course of your

18   investigation?

19       A.   Yeah, I think I had a couple that were personal face

20   to face and a couple, maybe one or two more on the telephone.

21       Q.   Okay.  And were you part of a search team that went

22   back additionally and picked up those brown hoses?

23       A.   Yes.

24       Q.   Okay.  And where were those located?

25       A.   They were in the garage.

1  Q.  Okay.  And why did you go back over there to go look

2  for those hoses in the garage?

3  A.  Well, because Mr. Murphy had told us that -- of a

4  suicide attempt there, and we went there to gather evidence.

5  Q.  Okay.  And did you gather evidence?

6  A.  Yes, we did, those hoses.

7  Q.  Okay.  Were they attached or not attached when you

8  got there?

9  A.  Well, I'm not -- I'm not completely sure.  I think

10  they might have been -- I think they were not attached, but

11  I'm not -- I'm not really sure about that.

12  Q.  Okay.  Were they in the boxes like they look like

13  they should have been, or were they just kind of out in the

14  garage, or can you recall?

15  A.  I know that they were on the floor in the garage as

16  I recall.

17  Q.  Okay.  And did you see any damage to the -- that

18  looked like it could have been caused by heat or anything

19  like that that would lead to you believing that that part of

20  his story was consistent?

21  A.  I don't recall that at all.

22  Q.  Okay.  Did you look for it?

23  A.  I don't even recall looking for it actually.

24  Q.  And all the times that you talked to Tonya Thorp,

25  and I believe that there were some members of the Garland

1    Police Department that were also talking to his mother at

2    some point; is that correct?  Or do you know?

3         A.   No, not to my knowledge.

4         Q.   Okay.  Well, let's just kind of focus on Tonya at

5    some point.  In your first interview he mentioned something

6    of some sort of mental background or that he had been

7    hospitalized or something like that; is that correct?

8         A.   I think it was actually during the second.

9         Q.   Did you ever ask Tonya Thorp about that?

10        A.   Actually when Mr. Murphy advised me of that, that's

11   one of the telephone conversations that I had with Tonya.  I

12   did call her that evening to tell her that Mr. Murphy had

13   said that he wanted to see a doctor, a psychologist, and I

14   just was to call her to inform her of that.

15        Q.   Did you ask her about any of his history then?

16        A.   No, I did not.

17        Q.   Okay.  Ever ask anybody in his family about any

18   history like that?

19        A.   No, I did not.

20        Q.   You also noticed during his -- in your interview

21   with him that he actually had some damage to his hand; is

22   that correct?  You actually saw it?

23        A.   Yes.

24        Q.   Okay.  And one of the times that you went back to

25   see Tonya or over to Tonya's house, you actually also seized

1   a suicide note; is that correct?  Was that when you also got

2   the hoses?

3       A.   No, I think that was collected during the first

4   visit by the other officers.

5       Q.   Okay.  But there actually was a suicide note that

6   was -- that was tied into the hoses as well?

7       A.   Yes, there was a note.

8       Q.   And did you think it was his plan to kill himself

9   that day which was after the disappearance of Ms. Cunningham?

10      A.   That's what he said.

11      Q.   And did you feel like his writing a note and also

12  finding the hose in the garage, did you feel like that that

13  was an indication of perhaps his intention to -- for him to

14  commit suicide?

15      A.   Can you ask me that again, please?

16      Q.   Okay.  Was finding the hose in the garage and having

17  seized the suicide note an illustration of -- to you as an

18  intention to commit suicide on the part of Mr. Murphy?

19      A.   Well, possibly.  I've worked a lot of suicides.

20  I've been to a lot of suicide calls.  My general experience

21  with that is people that don't -- don't follow through with

22  it rarely do.  If they threaten to commit suicide and don't

23  follow through with the act, then generally they don't do it.

24      Q.   Do you remember in the examining trial answering

25  that question differently?

DARLINE W. LABAR, OFFICIAL REPORTER

Page 121

 1      A.   No, I don't.

 2      Q.   Okay.

 3                MS. BALIDO:   May I approach the witness.

 4                THE COURT:   You may.

 5      Q.   (By Ms. Balido)   I'm going to start here on page 32,

 6   and I'm going to start reading and just tell me if I'm not

 7   reading it correctly.   The answer was --

 8                MR. DAVIS:   I'm sorry, could we have a

 9   question that was asked as part of this possible impeachment

10   here.   I think that's the proper method.

11                THE COURT:   Sustained.

12      Q.   (By Ms. Balido)   Okay.   Is the question:   Was that

13   an illustration of perhaps an intention to commit suicide?

14   And what was your answer?

15      A.   It says:   It was to me, yes.

16      Q.   Now, let me ask you basically -- when you first got

17   to the -- well, to Treshod's house out in Edgewood and talked

18   to the defendant, you basically placed him under arrest at

19   that time; is that correct?

20      A.   Yes.

21      Q.   And he had already told his friend Jason Bonham

22   where Ms. Cunningham's body was found?

23      A.   That was my understanding, yes.

24      Q.   And then you took him down to the police station and

25   you read him his rights, correct?

1          THE COURT:  Avoid repetition.  We've gone over

2    this.

3          MR. DAVIS:  I'm sorry --

4      Q.   (By Ms. Balido)  Basically every time you talked to

5    him, he gave you answers to your questions; is that correct?

6      A.   To some of the questions, yes.

7      Q.   Yes.  And that was until the last time, and that was

8    after he talked to his lawyers; is that correct?

9      A.   Well, we talked to him right up until the point

10   where he -- where he exercised his rights to not talk to us.

11     Q.   Okay.

12     A.   Which would have been on -- I forgot the date, of

13   the 13th or 14th.

14     Q.   That was October 13th; is that correct?

15     A.   13th.

16     Q.   So the first statement he made, he did not have a

17   lawyer at that time, he waived his rights and talked to you?

18     A.   That's correct.

19     Q.   The second time that you went to go talk to him, he

20   did have a lawyer at that time, but he waived his rights and

21   talked to you?

22     A.   That's correct.

23     Q.   And then you went back a third time and gave this

24   supposed family questionnaire; is that correct?

25     A.   That's correct.

1    Q.   And then the fourth time he told you that he didn't

2    want to talk to you again unless his lawyer was there?

3    A.   That's correct.

4              MS. BALIDO:  I'll pass the witness.

5                      Cross-Examination

6    By Mr. Davis:

7    Q.   Detective, let me just ask you with regards to Tonya

8    Thorp, did you have a conversation with Tonya Thorp about

9    alcohol or liquor being missing or taken from her home by the

10   defendant?

11   A.   Yes, I did.

12   Q.   What did you ask Tonya Thorp to do?

13   A.   I asked her to check her residence to see if in fact

14   there was a bottle of alcohol missing from the residence.

15   Q.   Okay.  Did she come back later and tell you what she

16   had found?

17   A.   Yes, she did.

18   Q.   What did Tonya Thorp tell you just shortly after the

19   investigation began?

20   A.   In regards to the missing alcohol?

21   Q.   Yes, sir.

22   A.   She said that -- that she was not able to really

23   locate any missing bottles.

24   Q.   Now this -- this supposed suicide over at Tonya

25   Thorp's home, you don't know whether he made a serious effort

1    that day or not to commit suicide, do you?

2        A.   No, I don't.

3        Q.   But again, it's been your experience as a police

4    officer and dealing with suicide cases, that people who

5    threaten it but don't carry through generally don't follow

6    through with their threats, right?

7        A.   Many times.

8        Q.   Do you know how many times in this man's life that

9    he's threatened to commit suicide and then didn't follow

10   through?

11       A.   No, I don't.

12       Q.   You said with regards to the emotion that he showed,

13   is it unusual for individuals who come into the police

14   station who have been charged and confined on aggravated

15   offenses, such as capital murder or aggravated robbery or

16   something of that sort, is it unusual for them to show

17   emotion?

18       A.   No, that's not unusual at all.

19       Q.   Now, this -- this letter that you used as an

20   investigative tool with the defendant, let me ask you, as I

21   understood your testimony, he refused or failed to give a

22   response when he was asked whether this woman, Ms.

23   Cunningham, suffered; is that correct?

24       A.   I'm sorry, you'll have to ask me that again.

25       Q.   As I understood your testimony, the defendant did

DARLINE W. LABAR, OFFICIAL REPORTER

1    not respond on that letter when he was asked whether Ms.

2    Cunningham suffered or not; is that right?

3        A.   That's correct.

4        Q.   And he also refused to respond when you asked for

5    the -- what had happened to her rings and jewelry, too,

6    didn't he?

7        A.   No, he did not respond to that.

8        Q.   Did he ever tell you what he had done with Ms.

9    Cunningham's jewelry?

10       A.   No, he did not.

11       Q.   Did he ever tell you why he went up there to

12   Washington Mutual ATM machine to use her credit cards?

13       A.   No, not specifically.

14       Q.   And when he told you that he could not give you an

15   abduction location for Ms. Cunningham, as you sit here today

16   do you think he was being honest and genuine when he said he

17   didn't remember?

18       A.   No, I think he knows where the abduction site is.

19       Q.   And when he said that -- when he met Ms. Cunningham,

20   he had all of his luggage with him, certainly that does not

21   comport with the account given by Kenneth Clance, the

22   bartender up there at Bleachers, who said he came in there

23   without anything that day, does it?

24       A.   Well, I did not personally talk to Mr. Clance, so --

25       Q.   And finally when he told you there at the bottom of

1    the form that he would answer any more questions that you

2    had, that wasn't true either, was it?

3        A.   No, he didn't follow through with that.  No, sir.

4        Q.   In fact, the next time you tried to talk to him, he

5    did invoke his 5th Amendment privilege at that time, didn't

6    he?

7        A.   Yes, he did.

8        Q.   Now, sir, you knew by the time you approached him

9    with this letter, you already knew that he had lawyers,

10   correct?

11       A.   That's correct.

12       Q.   Did you know whether or not he'd had a chance to

13   talk with them there at the Garland City Jail?

14       A.   Well, I knew he had met with them at least one time.

15       Q.   So before he made those particular responses, you

16   know he had already talked with his lawyers at least one

17   time?

18       A.   Yes, I know that.  Yes.

19       Q.   You don't know what advice he was given because all

20   those communications are confidential, aren't they?

21       A.   That's correct.

22            MR. DAVIS:  Thank you, sir.  I'll pass the

23   witness.

24                    Redirect Examination

25   By Ms. Balido:

Page 127

1    Q.   In regard to what you talked about to Ms. Thorp

2    about the missing alcohol, did you ask her about any

3    alcoholic beverages or just a bottle of champagne?

4    A.   Well, actually as I recall we did ask her about a

5    bottle of champagne and I think two bottles of beer --

6    Q.   Okay.

7    A.   -- as I recall.  I think she did come back and say

8    there was either one or two bottles of beer missing from the

9    house, but she -- she could not either -- she could not

10   confirm if any champagne was missing.

11   Q.   Okay.  And did you talk to -- about when did that

12   conversation take place?

13   A.   When?

14   Q.   Yes.

15   A.   A date?

16   Q.   Well, around the same week that you're having all

17   these conversations or two weeks later or a month later?

18   A.   Oh, it was -- it was -- I think it was the same day

19   that we went and collected the hoses.  I think that was the

20   only time I was at her house.  I might have been there -- but

21   it would have been during that week.  I may have been there

22   twice, but I think I was there only once.

23   Q.   And in regard to where you found the hoses and that

24   sort of thing, there aren't any pictures of how the hoses

25   were laying or whether or not they were connected or anything

1  like that; is that correct?

2      A.   That's correct.

3      Q.   Okay.  And is it usual when you're out collecting

4  evidence to first take a picture of it before you touch it or

5  move it so you can see how the actual location was?

6      A.   Well, we would sometimes photograph evidence, but we

7  don't always do it.

8      Q.   Okay.  But sometimes that becomes important to the

9  jury as to where it's located and how it is found; is that

10  correct, Detective Myers?

11      A.   It can be, yes.

12      Q.   Okay.

13              MS. BALIDO:  May I approach the witness,

14  Judge.

15              THE COURT:  You may.

16      Q.   (By Ms. Balido)  Detective Myers, I'm -- well, hold

17  on a second.

18              (Defendant's Exhibit 69 marked)

19      Q.   (By Ms. Balido)  Detective Myers, I'm showing you

20  what has been marked previously as State's Exhibit 48 and

21  State's Exhibit 49, but that now been marked for

22  identification as Defendant's Exhibit 69, and I ask if you

23  recognize it?

24      A.   Yes, I do.

25      Q.   And what is it?

1    A.   It is a -- the first page is a copy of the Miranda

2    warnings, and the second page is a hand drawn map.

3    Q.   Okay.  And my copy right here has a -- has the fifth

4    line of the first page taken off, but I believe that's in

5    evidence already.  But is this the Miranda warning that you

6    gave and the second interview that you had with Mr. Murphy?

7    A.   Yes.

8    Q.   Okay.  And the second page of this document is a

9    handwritten map; is that correct?

10   A.   Yes, it is.

11   Q.   Is that in your hand or in someone else's hand?

12   A.   It has -- this is my writing here, but everything

13   else is in Mr. Murphy's writing.

14   Q.   Okay.  Did he draw this in response from a -- from a

15   request from you?

16   A.   Yes.

17   Q.   Okay.  And what did you ask him to do?

18   A.   I asked -- we were still trying to establish the

19   abduction location, so I asked him to draw a map as best he

20   could remember what the parking lot or what the area was.

21   Q.   Okay.  So now at this time you have taken him out in

22   northeast Dallas County and driven him around all sorts of

23   different locations; is that correct?

24   A.   Previously.

25   Q.   Previous to this?

1     A.    Yes.

2     Q.    And then you got a written statement from him in

3  regard to the location of this offense; is that correct?

4     A.    Yes.

5     Q.    And then you went back and asked him to draw you a

6  map; is that correct?

7     A.    Yes.

8     Q.    To the best of his ability; is that correct?

9     A.    Yes.

10     Q.    And he did that, didn't he?

11     A.    Yes.

12     Q.    Okay.  Is there anything that you think he was

13  trying to be untruthful or was he trying to leave stuff out

14  to confuse you or do you think he was trying to actually

15  write down for you what he thought the location was?

16     A.    I have no idea really if he was being truthful about

17  it or not.

18     Q.    Okay.  But there are actually cars and parking lots

19  and buildings and streets and townhouses and -- and where a

20  bus might be located on this map; is that correct?

21     A.    Yes.

22     Q.    Okay.  After he got finished with this, did you tell

23  him to add anything else if you thought -- if he thought it

24  was important or try to spur his memory or jar his memory to

25  see if there was anything else he could add to help you?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    I don't recall asking him that.

2      Q.    Okay.  And after this, that's when you went back and

3   gave him that questionnaire; is that correct?

4      A.    This was -- this was during the second interview and

5   the questionnaire was during the third interview.

6      Q.    And it's still your opinion that he was being -- he

7   was not being forthright and truthful?

8      A.    I think he knows a lot of things he hasn't told us.

9            MS. BALIDO:   I don't have anything further.

10                    Recross-Examination

11  By Mr. Davis:

12     Q.    Detective Myers, you never could find a location

13  that exactly matched the map the defendant drew for you, did

14  you?

15     A.    No, we did not.

16     Q.    But isn't it true there were -- there was at least

17  one location that you had very strong suspicion about based

18  on that map and what you knew about the case, wasn't there?

19     A.    Yes, there was.

20     Q.    Was that the Walgreen's Drug Store at the

21  intersection of Campbell Road and Plano Road?

22     A.    Yes.

23     Q.    Okay.  That certainly is in Dallas County, isn't it?

24     A.    Yes, it is.

25     Q.    That's a location that the defendant had been to

1    prior -- prior to that date, isn't it?

2        A.   He told me that he had.

3        Q.   So the defendant was familiar with that location,

4    wasn't he?

5        A.   He's very familiar with that.

6        Q.   And certainly that would have been a location that

7    would have been on the way home for Ms. Cunningham driving

8    from Plano -- I mean, from Collin Creek Mall in Plano taking

9    Plano Road back down to her home in North Garland, too,

10   right?

11       A.   Yes, she would have driven past there had she taken

12   the Plano Road route.

13       Q.   And you know that Ms. Cunningham had stopped at that

14   same Walgreen's on other occasions, hadn't she?

15       A.   Yes, the family told me she frequented that drug

16   store.

17              MR. DAVIS:  Thank you, sir.  That's all I

18   have.

19              Further Redirect Examination

20   By Ms. Balido:

21       Q.   So he admitted to you that he had been at that

22   location?

23       A.   Yes.

24       Q.   Okay.  And that was a response to a question that

25   you asked?

1       A.    Yes.

2       Q.    Trying to find out where this -- where this

3    occurred?

4       A.    Yes.

5             MS. BALIDO:  I don't have any more questions,

6    Judge.

7             MR. DAVIS:  No further questions, sir.

8             THE COURT:  You may step down, sir.

9        You may call your next witness.

10            MS. LITTLE:  Call Tracy Erwin.

11            MR. DAVIS:  May this witness be excused?

12            MS. BALIDO:  No objection, Judge.

13            THE COURT:  You may be excused.  You may

14   remain in the courtroom or be excused.

15            THE WITNESS:  Thank you, Your Honor.

16            THE COURT:  Raise your right hand, please.

17            (Witness sworn.)

18                    TRACY ERWIN

19   was called as a witness by the Defendant and, after having

20   been first duly sworn, testified as follows:

21                  Direct Examination

22   By Ms. Little:

23      Q.    State your name, please, ma'am.

24      A.    Tracy Erwin.

25      Q.    Tracy, where do you live?

```
 1       A.    Edgewood, Texas.

 2       Q.    And how long have you lived there?

 3       A.    All my life just about.

 4       Q.    Are you married, and do you have a family?

 5       A.    Yes.

 6       Q.    About how long have you been married?

 7       A.    For almost 20 years.

 8       Q.    And your husband is in the hall as well; is that

 9   right?

10       A.    Yes, ma'am.

11       Q.    And what is his name?

12       A.    Tim.

13       Q.    And how many kids have you got, Tracy?

14       A.    We have four children.

15       Q.    And how old are they?

16       A.    18, 16, 14, and 23 months.

17       Q.    And one about to go to A&M; is that right?

18       A.    Correct.

19       Q.    Do you know Jim Murphy?

20       A.    Yes, I do.

21       Q.    His actual legal name is Jedidiah Isaac Murphy; is

22   that correct?

23       A.    Correct.

24       Q.    Where did that name come from, Tracy?

25       A.    They chose that name when my mom and stepfather
```

1    adopted him.

2        Q.    Okay.  Was that a name in your stepfather's family?

3        A.    Yes, ma'am.

4        Q.    And so you've known Jim since he was how old?

5        A.    Approximately 12 years old.

6        Q.    Were you living in the home at that time?

7        A.    No, I was not.

8        Q.    But you had grown up in the home?

9        A.    Yes, I had.

10       Q.    And Bob Murphy was your stepfather?

11       A.    Yes.

12       Q.    Will you tell the jury a little bit about your life

13   in the home when you were still living with your mother and

14   your stepfather?

15       A.    Well, it was kind of a up and down home.  We had

16   happy times, but we also had hard times.  He was very strict,

17   not with me, but with the boys and with my mother.  And he

18   was abusive to my mother at times.

19       Q.    Did he -- did your brother Matt -- was he close to

20   Jim?

21       A.    Yes.

22       Q.    In fact, did they -- did they have a lot of other

23   friends, or did they just cling together?

24       A.    They had friends, but they didn't do a whole lot

25   with friends.  They didn't go with friends, and friends

1    didn't come over to the house that often.

2         Q.   Why was that?

3         A.   It seemed that there was always things that they had

4    to do or pretty much that, they just -- I don't know why I

5    questioned it at times, but I never really knew exactly why,

6    but they had each other.  I knew they had each other, and so

7    I felt like at least they had each other.

8         Q.   Uh-huh.  Now, you said that your stepfather was a

9    very strict man.  How was he strict with the children?

10        A.   He just run -- he ran a tight -- he held a tight

11   rope.  He had a short temper, and I was -- I feared him, and

12   I felt like they feared him.

13        Q.   Was there any drinking problem in that household?

14        A.   He didn't have a drinking problem, but he did drink

15   at times because he played golf and he was around it some.

16   And if he did drink, his temper was worse.

17        Q.   Okay.  What sort of corporal punishment was meted

18   out, if any, in the home?

19        A.   Mainly they -- they would be grounded if he -- I've

20   seen him at times throw items or push or point in the chest

21   real hard.  That's all I can remember, but -- he was hard on

22   them.

23        Q.   Okay.  Now, when -- when your mother and he divorced

24   that last time, Jim ultimately went with him; is that right?

25        A.   That's correct.

1    Q.   Did -- whether there was going to be child support

2    paid have anything to do with that?

3    A.   I felt like it did.

4    Q.   Tell the jury what you mean.

5    A.   I felt like Jim was a pawn used between them for the

6    divorce.

7    Q.   And that's because Matt went with your mother?

8    A.   Matt went with mother.  There was no doubt that he

9    was going to go with my mother.  And if Jim went with Bob,

10   then there wouldn't be child support paid.

11   Q.   And then once Jim went with Bob, do you know if

12   there was any real supervision of any kind?

13   A.   I do not feel like there was.  I know he was left

14   alone quite a bit.

15   Q.   With Shod Tarrant?

16   A.   I know he was with Shod at times.  I'm not real sure

17   how often.

18   Q.   Did you know anything about Jim having a drinking

19   problem?

20   A.   He did not have a drinking problem before he went

21   with Bob.  I know he started -- I know he told either my

22   mother or Matt that -- that he did after that, but I don't

23   know when and I don't know exactly what he said.

24   Q.   Are you aware that he complained of the treatment at

25   the Tolar's from the time he got to your parents' home?

```
 1        A.   Yes, I am.
 2                  MS. LITTLE:  That's all I have.  Thank you.
 3                        Cross-Examination
 4   By Mr. Davis:
 5        Q.   Ms. Erwin, you love the defendant very much, don't
 6   you?
 7        A.   Who?  Pardon?
 8        Q.   The defendant?  You love him very much, don't you?
 9        A.   Yes, I do.
10        Q.   You don't want him to receive the death penalty in
11   this case, do you?
12        A.   No, I do not.
13                  MR. DAVIS:  That's all I have, Judge.
14                  MS. LITTLE:  Thank you.
15                  THE COURT:  You may step down.
16                  MS. BALIDO:  May she be excused?
17                  MR. DAVIS:  No objection.
18                  THE COURT:  You may be excused, if you wish.
19                  MS. LITTLE:  Tim Erwin.
20                  THE COURT:  Raise your right hand, please,
21   sir.
22                  (Witness sworn.)
23                        TIM ERWIN
24   was called as a witness by the Defendant and, after having
25   been first duly sworn, testified as follows:
```

DARLINE W. LABAR, OFFICIAL REPORTER

                         Direct Examination

1

2    By Ms. Little:

3         Q.   State your name, please, sir.

4         A.   Bear with me.  I'm going to try to do my best.  Tim

5    Erwin.

6         Q.   Tim, you live in East Texas, too.  I can tell by

7    your accent.

8         A.   Yes, ma'am, I do.

9         Q.   Okay.  Have you always?

10        A.   Yes, ma'am.

11        Q.   And you're married to Tracy who was just in here?

12        A.   Yes, ma'am.

13        Q.   Did you have some experiences with Jim Murphy?

14        A.   Yes, ma'am, I did.

15        Q.   When he was a fairly young guy?

16        A.   Yes, ma'am.

17        Q.   What was your experience with him?

18        A.   For the most part, it was all good experiences.  I

19   never had any trouble with him.  I coached him in Little

20   League, camped out together, fished.  I have a lawn care

21   service, also.  He's probably one of the best workers I ever

22   had help me, real hard worker.

23        Q.   And you've known him since he was how old?

24        A.   I believe he was like 11 or 12 years old.  And --

25        Q.   Did you have him come to your house when he first

```
 1   got there to the Murphy's?

 2        A.   Yes.  He came over to the house several times.

 3        Q.   And did he seem to enjoy that?

 4        A.   Yes.  You know, the first experience -- you know, he

 5   came over and I put him on a horse, bareback, told him it

 6   wouldn't buck, and of course it bucked him all over the

 7   pasture and got a good laugh out of it.  But, you know, I'm

 8   kind of a little practical joker, like to cut up and stuff,

 9   and we kind of had a little bond there after that, you know.

10   I know some of y'all might not understand it, but, you know,

11   when you do stuff like that together, two guys get out and do

12   stuff like that.

13        Q.   Okay.  And you coached him through Little League?

14        A.   Yes, ma'am.

15        Q.   And did you see any signs of problems for him at

16   that time?

17        A.   Not anything different than anybody else.  I mean,

18   when they get to be teenagers, I've got three of them at the

19   house now that drive you crazy, but he wasn't anything really

20   any different than anybody else.

21        Q.   You know Shod Tarrant as well, do you not?

22        A.   Yes, ma'am.

23        Q.   Could you say the same for him?

24        A.   No, ma'am.  I don't want to talk bad about nobody,

25   but I guess I don't really have anything good to say about
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    him.

2        Q.    Did you have an opportunity to observe any of the

3    discipline that went on in the Murphy household regarding Jim

4    and/or Matt?

5        A.    Well, you know, it was -- I guess a lot of hearsay.

6    I didn't actually see a whole lot going on, but you could

7    hear, you know, his -- it was pretty strict over there at the

8    house, you know.   Sometimes I thought they could have had a

9    little bit more leniency that they didn't get, that they

10   should have got, but that's not my deal, you know.   It's not

11   my avenue.   But I know every time him and Matt both came over

12   to the house, you know, I kind of like to laugh and cut up

13   and have a good time because you never know which is your

14   last day and I like to live everyday like it's your last.

15       Q.    You're a fireman, are you not?

16       A.    Yes, ma'am, I've been on for 18.

17       Q.    Were you aware of a time when Matt actually struck

18   his father in the face?

19       A.    Yes, ma'am, I believe it was real late in the night

20   one night, he called over at the house.

21       Q.    Do you know what precipitated that?

22       A.    I might have before I walked up here on this stand.

23   I don't really know.   I sure don't.   I just know there was a

24   confrontation.

25              MR. DAVIS:   I'm sorry --

1          THE COURT:  Sustained.

2      Q.   (By Ms. Little)  Without talking about anything more

3   to do with it, did you go over to Ms. Cunningham's church?

4      A.   When it all happened, and I'm not trying to just sit

5   up here and babble, but I'd like to kind of say my piece up

6   here.  When it first happened, I was shocked.  I couldn't

7   believe it.  I was at the fire station out on a fire when I

8   saw it on the news.  And I was deeply saddened.  I cried this

9   morning coming in to work about the Cunningham family, and

10  you just don't know how hard it bothered me.  And me and my

11  daughter and my son carried two sprays of flowers over to the

12  church to let them know we're sorry for what happened.  You

13  know, we're not all a crazy family and this was just a side

14  of Jim that happened I never seen.  I didn't know about it.

15  And I wanted them to know that.  The Sunday school class

16  welcomed me in and talked to me.  And then I went and saw Jim

17  and I didn't say anything he done was right.  It was a

18  horrible thing to do.  And I said the only thing I can tell

19  you to do is get yourself right with the Lord because, you

20  know, you're going to have to take what's coming, but -- and

21  I hope he's got everything right now.

22      Q.   But the Jim that you knew would not -- was not the

23  Jim that would do something like this?

24      A.   No, ma'am, it caught me off guard.

25      Q.   Okay.

1              MS. LITTLE:   Thank you.   That's all I have.

2                        <u>Cross-Examination</u>

3    By Mr. Davis:

4        Q.    Mr. Erwin, how old are your kids now?

5        A.    I got a daughter fixing to go to A&M.   She's just

6    graduated, 18.   Here I am going to get in trouble again.

7        Q.    You just take your time.   Okay?

8        A.    16.   One has already had a wreck, just got her

9    license.   And a 14-year-old son.   And then I have a

10   2-year-old surprise.   Vasectomies don't work.

11       Q.    Mr. Erwin, do you think that any of your kids have

12   probably complained about you being too strict?   You know how

13   teenagers are?

14       A.    Oh, they say I babble a lot and I know y'all

15   probably saying that yourself while I'm sitting up here, but,

16   you know, I like to look at two sides of the spectrum, kind

17   of get their input.   I know people are kids, too.   A long

18   time ago I thought you can't wait to get to be an adult

19   because you're smart.   And I figured out there's some people

20   that don't ever get smart, little kids are just as smart as

21   they are so --

22       Q.    Sometimes --

23       A.    -- sometimes.

24       Q.    Sometimes kids think they know better than their

25   parents, don't they?

1        A.    A lot of times.

2        Q.    Shod Tarrant, to your knowledge, he's never

3   kidnapped anybody, has he?

4        A.    Not to my knowledge.

5        Q.    He's never put a gun up to somebody's head just for

6   fun and asked them if they're afraid to die, has he?

7        A.    Not to my knowledge.  I -- I didn't hang around him.

8        Q.    I mean, to your knowledge, he's never -- never

9   killed an 80-year-old woman, has he?

10       A.    No, sir, not that I know of.

11       Q.    As far as you know, he didn't force the defendant to

12  hang around him back when they were growing up either, did

13  he?

14       A.    No.  I've answered your questions.  I know what --

15       Q.    Now, you love the defendant very much.  That's

16  obvious.  Correct?

17       A.    Yes, sir, it's hard to -- when you get shell-shocked

18  or something like this, you can't just turn your back.

19       Q.    And I mean that's been true since you've -- since

20  you've known him, isn't it?

21       A.    Yes, sir.

22       Q.    Has there ever been a time that you haven't been

23  available for this man if he needed help?

24       A.    No, sir, I've tried to be there.  He come by

25  periodically, checked by.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.   So if he'd come to you and said, Tim, you know, I've

2  got a problem and would you please help me with it, you

3  certainly wouldn't have turned your back on him, would you?

4      A.   No, sir.

5           MR. DAVIS:   Thank you, sir.   Pass the witness.

6                    Redirect Examination

7  By Ms. Little:

8      Q.   Did you ever know Tim that he had any kind of

9  drinking problem?

10     A.   He came by the house a couple of times, and he

11 showed me his wife, his baby, said he had a good job, showed

12 me his car.  He was tickled to death, and all he wanted was a

13 pat on the back, tell him what a good job he was doing and I

14 tried to do that.  Then it wasn't too long after that he came

15 by and he was pretty well soused and I told him he needed to

16 get off the liquor.  He said it was kind of like when he

17 drinks, everything is okay, kind of it gives him a security

18 blanket.  And I told him that that security blanket isn't

19 going to last long, he needs to get off of it.   I'm sorry.

20           MS. LITTLE:   That's all.

21           MR. DAVIS:   No further questions.

22           THE COURT:   You may step down, sir.

23       Defense may continue.

24           MS. BALIDO:   Can we have just one second,

25 Judge?  I'm sorry.  Judge, if I can have two seconds.

DARLINE W. LABAR, OFFICIAL REPORTER

1          MS. LITTLE:  Judge, subject to offering the

2    remainder of photographs that were admitted before the jury,

3    we will be resting.

4               (Defense Rests in Punishment)

5          MR. DAVIS:  The State's ready, Your Honor.

6    The State will call Terry Tolar.

7          THE COURT:  Mr. Tolar, ask you to raise your

8    right hand, please, sir.

9               (Witness sworn.)

10          THE COURT:  Have a seat to my left, please.

11                    TERRY TOLAR

12   was called as a witness by the State and, after having been

13   first duly sworn, testified as follows:

14               <u>Direct Examination</u>

15   By Mr. Davis:

16      Q.   Sir, first of all, would you please state your name?

17      A.   My name is Terry Tolar.

18      Q.   Mr. Tolar, where do you -- where do you live at this

19   time?

20      A.   I live at 1219 Van Zandt County Road 1803 in Grand

21   Saline.

22      Q.   How are you employed?

23      A.   I'm employed with the Tyler Fire Department.

24      Q.   How long have you been with the Tyler Fire

25   Department?

1    A.    A little over 18 and a half years now.

2    Q.    Are you married?

3    A.    Yes, I am.

4    Q.    And your wife's name is what?

5    A.    Celeste.

6    Q.    How long have you been married to Celeste?

7    A.    31 years.

8    Q.    Do you have children?

9    A.    Yes, we have three sons.

10   Q.    Okay.  And if you would, would you please give us

11   their names and ages?

12   A.    Oldest son is Terry Jr., he's 29; Jeremy is 27; Eric

13   is 24.

14   Q.    Do they still live in the Van Zandt County area?

15   A.    No, they don't.  Eric does, but Terry Jr. and Jeremy

16   live in the Metroplex area.

17   Q.    Okay.  They employed?

18   A.    Yes, they are.

19   Q.    Your children married?

20   A.    One is married, my oldest one, yes.

21   Q.    Sir, how long have you personally lived in Van Zandt

22   County?

23   A.    Since 1966.

24   Q.    And where did you move from?

25   A.    I moved from Pasadena, Texas, area.

Page 148

1    Q.    Did your family move from that area while you were a

2    child?

3    A.    Yes, sir.

4    Q.    Do your parents still live in Van Zandt County?

5    A.    Yes, they do.

6    Q.    You know the defendant in this case, Jedidiah Isaac

7    Murphy, don't you?

8    A.    Yes, sir, I do.

9    Q.    I guess you came to know him when his name was Jim

10   Ed Kines; is that right?

11   A.    That's correct.

12   Q.    Directing your attention back to 1983, do you

13   remember how the adoption of the defendant came about?

14   A.    Jim's relative -- I don't remember if -- exactly

15   if -- I think she was a cousin to his mother.  I'm not --

16   I'm not exactly sure.  The lady's name was Pam Sherman.  She

17   was a good friend of ours.  She came to us telling us about

18   Jim and his brother Donnie.

19   Q.    Okay.  Now, when Pam Sherman came to you and your

20   wife, were y'all actively seeking more children?

21   A.    No, we were not.

22   Q.    I mean, you already had your three sons, didn't you?

23   A.    Yes, sir, we did.

24   Q.    And did she ask you to consider taking in Jim and

25   his brother Donnie?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   At first it was just Donnie.  She initially talked

2    to us about taking him in.

3    Q.   And did she later ask you to consider taking in Jim,

4    too?

5    A.   Yes, sir, she did.

6    Q.   When she -- when she came to you with those

7    requests, did you decide that you needed to do something

8    before you made that decision whether to take these two boys

9    in or not?

10   A.   Yes, sir, we did.

11   Q.   Could you tell the jury what did you and your wife

12   do before you made that decision?

13   A.   My wife and I really sat down and did a lot of

14   praying and discussing with our pastor about what we should

15   do.  And the requirements the boys would need and the things

16   we would need to do to take care of them, and that's what we

17   did.

18   Q.   And did you finally come to a decision that you

19   would take both of these boys in?

20   A.   Yes, sir, we did.

21   Q.   Had you come from a large family yourself?

22   A.   Yes, sir, I did.

23   Q.   How many brothers and sisters did you grow up with?

24   A.   I grew up with eight brothers and three sisters.

25   Q.   So I guess five children actually be less than you

DARLINE W. LABAR, OFFICIAL REPORTER

```
 1    grew up with, right?

 2         A.    That's correct.

 3         Q.    And was there a time then when actually both the

 4    boys then moved into your home?

 5         A.    Yes, sir, they did.

 6         Q.    In Grand Saline?

 7         A.    Yes, sir.

 8         Q.    How did -- how did the defendant seem to react to

 9    moving into your home?

10         A.    He seemed to take the move quite well.

11         Q.    What kind of indications did you have that the move

12    was good for him and he enjoyed it?

13         A.    He just seemed to blend in real well with my sons.

14    We just -- we tried to treat them exactly the same as we did

15    our own children.

16         Q.    As a matter of fact, you changed his name from Kines

17    to Tolar, didn't you?

18         A.    Yes, I did.

19         Q.    Y'all went through a formal adoption process, didn't

20    you?

21         A.    Yes, sir.

22         Q.    Did you -- after these two boys had been adopted and

23    they were living in your home, did you make an effort to

24    include them and to treat them like you had your other three

25    sons?
```

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Yes, sir, we did.

2    Q.   Okay.  Can you tell the members of the jury why that

3    was important to you to have these two boys feel like they

4    were really a part of your family?

5    A.   We felt like if we were going to take the boys in,

6    that they needed to be part of the family.  That's the main

7    reason we took them in, so they would have a complete family

8    unit.

9    Q.   If the family was going to do something, were they

10   left behind or were they made a part of the activities?

11   A.   No, sir, everyone was always included.

12   Q.   I take it that when you took these two boys in, you

13   and your wife and your boys were already attending church and

14   Sunday School, weren't you?

15   A.   Yes, sir, we were.

16   Q.   Where did you attend at that time, Mr. Tolar?

17   A.   We attended Main Street Baptist Church.

18   Q.   When Jim and Donnie became a member of the family,

19   did you see to it that they also attended church with you as

20   a family?

21   A.   Yes, sir.

22   Q.   Did they attend Sunday School with the three boys?

23   A.   Yes, sir, they did.

24   Q.   Did you -- in addition to the training that they

25   received in the church, did you make it a point to try to

1 teach them the difference between right and wrong?

2  A. Yes, sir, we did.

3  Q. Were there other occasions where there was

4 activities outside the school that you made sure they were a

5 part of?

6  A. Yes, sir.

7  Q. Can you tell the members of the jury what other

8 kinds of activities that you made sure the defendant and

9 Donnie were included in?

10  A. They participated in the summer baseball league.

11 Jim was also in a children's choir at the Methodist church

12 that they had.  It was a very good program.  He really seemed

13 to enjoy it, also.

14  Q. The medical records from Dr. Ingrim indicate that

15 he -- that the defendant went to him one time for a physical

16 to attend a Scout camp.  Were there that type -- were there

17 those type activities, too, that the defendant was allowed --

18  A. Yes, sir.

19  Q. -- to participate in?

20  A. Yes, sir.

21  Q. Did you have discussions with the defendant about

22 drinking alcohol?

23  A. Yes, sir, I did.

24  Q. When -- when the defendant came to your home, you

25 were made aware that his father was an alcoholic; is that

1   right?

2      A.   Yes, sir.

3      Q.   And can you tell the members of the jury what kinds

4   of conversations that you had with the defendant about the

5   subject of alcohol use and drinking?

6      A.   We just made it known that we really didn't find

7   that to be a conduct that was good, not because of his father

8   or anything, but because I have a brother and a

9   brother-in-law that are alcoholics.  And I used those as a

10   point to not pattern your life after that.

11      Q.   So you had experienced the same issues in your own

12   home, hadn't you?

13      A.   Yes, sir, we had.

14      Q.   Do you remember what reaction the defendant had when

15   you said that you didn't allow the use of alcohol in your

16   home?

17      A.   Not really.  I don't think there was any reaction,

18   positive or negative.

19      Q.   Was the defendant enrolled in school there?

20      A.   Yes, sir, he was.

21      Q.   He would have been about how old when he came into

22   your home, sir?

23      A.   I think he was getting close to about 9 years old.

24   I believe that's --

25      Q.   In all how long did he stay in your home?

1    A.   A little less than three years.

2    Q.   How did he seem to do in school?

3    A.   Just basically kind of an average student.

4    Q.   Uh-huh.  Did you keep up with his school work?

5    A.   Yes, sir, we always watched the boys' work, helped

6  them keep up.

7    Q.   So if he had homework or tests or something like

8  that, would you and your wife be available to try to help him

9  or to work with problems with him?

10    A.   Yes, sir.

11    Q.   And did both of you do that with him?

12    A.   Yes, sir, we did.

13    Q.   Now, Donnie, when he came into your home, did it

14  become apparent that he had certain behavioral problems?

15    A.   Yes, sir.

16    Q.   What sort of behavioral problems did Donnie have?

17    A.   Donnie was finally diagnosed with you hyperactive

18  attention deficit disorder.

19    Q.   Did you try to seek out some treatment for Donnie?

20    A.   Yes, sir.  Donnie was -- saw a medical physician

21  that put him on Ritalin, and we also had counseling for

22  Donnie almost throughout the entire time we had the boys.

23    Q.   Was there any time when the defendant required

24  medical treatment for any behavioral problems?

25    A.   No, sir.

1      Q.    Did he ever require any counseling for behavioral or

2    emotional problems?

3      A.    The only counseling that he got would be just when

4    the family as a whole went for counseling in connection with

5    Donnie.

6      Q.    When you say the whole family, certainly would that

7    include you and your wife?

8      A.    Myself, my wife, and my three sons, also.

9      Q.    So your other three sons would go and attend these

10   sessions, too?

11     A.    When the counselor requested them, yes, sir.

12     Q.    Can you give us some examples of problems that you

13   had with Donnie's behavior while he was in the home?

14     A.    Donnie would want something and would just throw a

15   temper tantrum, the most basic of terms, to get it.  We tried

16   everything we could to try to get him to stop that behavior,

17   but we never found anything that would affect it.

18     Q.    What forms of discipline did you use or try to use

19   with Donnie?

20     A.    We did use spanking.  We used putting him in a

21   corner, time-outs, putting him -- making him go to a room by

22   himself.  It just -- anything the counselors could think of

23   to suggest to us we would use.

24     Q.    Now, did you discipline your other three children,

25   your other -- our natural children?

1    A.   Yes, sir.

2    Q.   What forms of discipline would you use with your own

3  children?

4    A.   Normally we used spanking, but sometimes we would

5  send them to a room.

6    Q.   What forms of discipline would you use with the

7  defendant while he was in your home?

8    A.   A spanking or sometimes sent to his room.

9    Q.   Same type of discipline that you used on your own

10 three natural children?

11   A.   Yes, sir.

12   Q.   Moving back to Donnie, was there ever -- was there

13 ever a time when he became violent when you tried to use one

14 of these forms of discipline with him?

15   A.   Yes, sir, he became violent.  He tore a door off the

16 bathroom.

17   Q.   Can you tell the members of the jury a little more

18 about how that came about?

19   A.   The counselor had said that we needed to prepare a

20 room in the house to put Donnie in, to isolate him for 30

21 minutes at a time when it required it, for him to calm down.

22 And this particular occasion he refused to go into the

23 bathroom.  I had to physically pick him up, hold his arms and

24 legs together enough to get him inside the bathroom.  I shut

25 the door.  And he just threw himself against the door to the

1    point that he tore the door into about three pieces and came

2    out of the room.  He actually did that.

3        Q.   Going forward, 1986, which would be approximately

4    three years after the boys came into your home, had Donnie's

5    problems, behavioral problems subsided or were they

6    continuing?

7        A.   They were continuing.  If anything, they were

8    progressively worse.

9        Q.   Did you see whether his behavioral problems were

10   having a negative impact on the rest of the family?

11       A.   Yes, sir.

12       Q.   What were your conclusions?

13       A.   After more interaction with counselors, our

14   counselor finally -- we had at the time finally told us we

15   could make a choice.  We could keep Donnie, or we could loose

16   our whole family.  It was the counselor's conclusion that if

17   we kept Donnie in the family, that we -- our whole family

18   would disintegrate.

19       Q.   After the counselor told you that, did you have a

20   discussion with Jim and Donnie about -- about how to resolve

21   this situation?

22       A.   Yes, sir, we did.

23       Q.   And can you tell the jury what you discussed with

24   them?

25       A.   We told the boys that we were going to have to put

1    them in the Van Zandt County Children's Shelter, that we had

2    tried everything we knew to get the family unit to stay

3    together, to, you know, create a family atmosphere for them

4    that they could live with.  And that Donnie couldn't live

5    with it.  He would do -- he would act out, flare up, then he

6    would say he was sorry, and within two minutes be doing the

7    same thing again.

8        Q.   Had you seen any changes in the defendant's behavior

9    from 1983 to 1986?  Had it stayed the same, gotten better, or

10   had it deteriorated, also?

11       A.   Jim's behavior stayed fairly constant.

12       Q.   All right.  So you told the boys that Donnie had to

13   leave, right?

14       A.   Yes, sir.

15       Q.   Was there any decision on forcing the defendant to

16   leave your home?

17       A.   No, sir.

18       Q.   Was he still welcome in your home?

19       A.   Yes, sir.

20       Q.   Was he told that?

21       A.   Yes, sir.

22       Q.   Was he given the choice to stay in your home or to

23   go with Donnie to the children's shelter?

24       A.   He basically made that decision on his own.  He told

25   us he would not stay.  He was staying with his brother.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   How did that make you feel, Mr. Tolar?

2    A.   It hurt quite a bit.

3    Q.   How so?

4    A.   We really felt that Donnie had severe problems that

5    we weren't going to be able to address, but we thought that

6    Jim could really make something of himself and could really

7    be a member of the family and had tried to be a member of the

8    family.

9    Q.   Were you happy with Donnie having to leave your

10   home?

11   A.   No, sir, we were not.

12   Q.   And finally, around New Year's of 1987, did you and

13   your wife finally take both Jim and Donnie to the Van Zandt

14   County Children's Center there in Fruitvale?

15   A.   Yes, sir, we did.

16   Q.   Do you know whether or not your wife went up to the

17   shelter later to see the boys and visit with them?

18   A.   Yes, sir.

19   Q.   Did she?

20   A.   Yes, sir, she did.

21   Q.   Do you know how many time she tried to see the

22   boys?

23   A.   They were numerous times.

24   Q.   While the -- while the defendant was with you, was

25   his family doctor Dr. Richard Ingram?

1      A.   Yes, sir, we visited Dr. Ingrim and probably also

2   visited Dr. Sherbert.

3      Q.   While he was in your home, did the defendant suffer

4   any major health problems?

5      A.   No, sir, he did not.

6      Q.   Did he -- did he suffer from attention deficit

7   disorder while he was in your home?

8      A.   To the best of my knowledge, he did not.

9      Q.   Was he dyslexic when he was in your home?

10      A.   No, sir, I don't believe he was.

11      Q.   Did you keep up with his medical history after he

12   left your home?

13      A.   No, sir, we didn't.

14      Q.   Did you become aware later that he had moved into

15   the Murphy home in Edgewood?

16      A.   Yes, sir.

17      Q.   Did you know Bob Murphy and his wife?

18      A.   We only met through the adoption process.

19      Q.   Sir, let me ask you, did you in any way ever abuse

20   Donnie Tolar while he was in your home?  Either physically,

21   psychologically, or sexually abuse Donnie Tolar?

22      A.   There was never any psychological and definitely no

23   sexual abuse of Donnie.  In retrospect, I believe that there

24   may have been one or two occasions when Donnie was

25   disciplined physically more than he should have been.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   And in what way?

2    A.   In that in -- this is -- it wasn't uncommon for

3 Donnie to have to be disciplined 10 or 12 times a day.  And I

4 think that there were maybe two times that it just -- I got

5 to the end of my rope with him and I lost more control than I

6 should have.

7    Q.   What did you do to him when you finally lost

8 control?

9    A.   There would be maybe more spanking than there should

10 have been, but nothing more than that.

11    Q.   Let me ask you, with regards to the defendant in

12 this case, did you ever physically, psychologically, or

13 sexually abuse him?

14    A.   Never.

15    Q.   Was there ever a time -- looking back now in

16 retrospect, was there ever a time that you used excessive

17 discipline or force with Jedidiah Murphy?

18    A.   No, sir, never.

19    Q.   Was there ever a time, for instance, when you -- you

20 and your wife refused to feed him?

21    A.   No, sir.

22    Q.   Was there ever a time when you and your wife refused

23 to let him back in the house and forced him to stay outside,

24 for instance?

25    A.   No, sir.

1    Q.   Did you ever -- did you ever use bed slats to spank

2   him with?

3    A.   No, sir.

4    Q.   Did you ever kick him?

5    A.   No, sir.

6    Q.   Mr. Tolar, is it easy for you to come down here

7   today and testify in this matter?

8    A.   No, it's extremely difficult.

9    Q.   You still have some feelings for the defendant,

10   don't you.

11    A.   I still have extreme affection for Jim.

12         MR. DAVIS:  Thank you, sir.  I'll pass the

13   witness.

14                    Cross-Examination

15   By Ms. Little:

16    Q.   Mr. Tolar, we met just a little while ago here in

17   the courtroom, did we not?  I'm Jane Little.  I just have a

18   couple of questions for you, really.

19         You had your three sons.  Are you still close to

20   those boys?

21    A.   Yes, ma'am, we are.

22    Q.   They come for holidays and everything?

23    A.   Yes.

24    Q.   All of them?

25    A.   Just normally, on -- as a rule, yes, all three would

1   be around for holidays.

2       Q.   Was there ever a time when you left the house and

3   Donnie was not home?

4       A.   I can't think of a time specifically right now, no,

5   ma'am.

6       Q.   What I'm looking to here, Mr. Tolar, is, you know,

7   the perception of a child who has already been abandoned

8   once, so you see where I'm coming from?

9       A.   Yes, ma'am.

10      Q.   You took them in, and you don't ever recall a time

11  when Donnie wasn't there, so you left?

12      A.   I really can't say that.

13      Q.   Now, you said time-out.  What would that mean in

14  your home?

15      A.   That would mean either going over into an area of

16  the room by yourself, away from the television or the radio,

17  anything like that, or going to your room.

18      Q.   And when they went to their rooms, were they locked

19  in there?

20      A.   Donnie was, under the guidance of the counselors.

21      Q.   Did you ever sit on them?

22      A.   We might have been playing and rolling around and

23  something like that, but as far as sit on them to punish

24  them, no, ma'am.

25      Q.   It sounds to me like Donnie was more than a handful

```
 1   so I'm just trying to understand what went on.  Did you --
 2   did you ever do punishments where maybe some kids got Cokes
 3   and others only got water as a way of, you know, showing
 4   disapproval of behavior?
 5       A.   No, ma'am.
 6       Q.   Or were there differences in the hours they went to
 7   bed, your children and the adopted two?
 8       A.   The only differences in hours they went to bed would
 9   be according to age.
10       Q.   Now, Donnie was, I think, maybe -- Donnie might be
11   28 now.  You said your oldest son was 29?
12       A.   That's correct.
13       Q.   And then Jim was born September 1st of 1975, so
14   he'll be 26 in September.  And your other boys -- let's see
15   what did you tell me?  Jeremy is 27 now?
16       A.   I believe that's correct.
17       Q.   And Eric is 24; is that right?
18       A.   I think that's correct.
19       Q.   So how would -- who went to bed first and who
20   didn't?
21       A.   The older ones would stay up a little later.
22       Q.   And would that -- so that would be Terry?
23       A.   Yes.
24       Q.   And I guess Donnie?  Would that be right?
25       A.   That would be correct.
```

1    Q.    What time would the older boys go to bed?

2    A.    There was like 30 minutes difference between the bed

3  times.

4    Q.    Now, you -- you've been a fireman all these years.

5  What kind of -- I guess the shifts there are just like they

6  are here and everywhere else where you work so many days and

7  then you're off?

8    A.    That's correct.   24 hours on duty, 48 hours off.

9    Q.    And the times when you were not there, your wife was

10  a housewife who took care of your children, right?

11    A.    That's correct.

12    Q.    She did not work outside the home?

13    A.    At that time, no, ma'am.

14    Q.    Did you ever feel that it was necessary to do any

15  disciplining because your wife was just unable to continue?

16    A.    I did -- I tried to do all of the disciplining when

17  I was at home, because there were times that I would not be

18  there she would have to do the disciplining.

19    Q.    And you said 10 or 12 times a day for Donnie?

20    A.    It was not unusual.

21    Q.    How long was he on Ritalin, Mr. Tolar?

22    A.    I know at least two years.

23    Q.    Okay.   Did it help him at all?   Or did it make him

24  worse?

25    A.    I couldn't see any change, positive or negative.

1    Q.   Actually, Mr. Tolar, we've tried to find the records

2  for the counseling that y'all went to.  It was in Canton,

3  wasn't it?

4    A.   Yes, ma'am.

5    Q.   They're telling us there are no such records.  Where

6  exactly is that place?

7    A.   It was on -- I believe it's Highway 198.  That's

8  where the building was at that time, but I know it's not --

9  they are no longer in that building, but it was Texas MHMR.

10    Q.   Do you recall who the counselor was?

11    A.   No, ma'am.  There were at least three counselors.

12    Q.   And can you think of any reason why they wouldn't

13  still have those records?

14    A.   No, ma'am, I cannot.

15    Q.   Now, this would have been in the 19 -- early 1980's;

16  is that right?

17    A.   Yes, ma'am, that would be about '85 or '86.

18    Q.   How sophisticated do you think the -- these agencies

19  were at that time in your town?

20              MR. DAVIS:  I'm going to object to that.

21              THE COURT:  Can you answer that of your own

22  personal knowledge, or would it just be a --

23              THE WITNESS:  It would just be just a guess.

24              THE COURT:  Objection sustained.

25    Q.   (By Ms. Little)  The children's shelter records are

1       in evidence, at least what I was able to get, and some of

2       what Mr. Davis got.  When the children were brought back, did

3       Donnie break out all the windows in your house?

4            A.    No, ma'am.

5            Q.    Did he break out any windows in your house?

6            A.    I think he broke out one or two.  One -- but now one

7       of those I think was an accident.  One was in anger.

8            Q.    Okay.  And then did they run a couple of houses down

9       and hide under the house and the police had to come get them?

10           A.    I don't have any recollection of that.

11           Q.    What is the actual pivotal event that caused you to

12      take the children back, if you can remember?

13           A.    Donnie threatened to assault me with a handsaw.

14           Q.    Okay.  I didn't see that anywhere in those records.

15      Have you had an opportunity to look at those records to help

16      you remember what went on at that time?

17           A.    No, ma'am, I have not looked at those records.

18           Q.    There was a preacher named Pesnell I believe?

19           A.    That's correct.

20           Q.    He was involved in this; is that true?

21           A.    Yes, ma'am.

22           Q.    And nobody -- nobody at that time complained that

23      y'all had abused those kids?

24           A.    No, ma'am.

25           Q.    Or that -- except for Donnie, that the kids were a

1    problem?

2        A.    That's correct.

3        Q.    And there was never any kind of -- that you know of,

4    I guess, follow-up with any kind of Child Protective Services

5    or anybody that would be looking further for the interest of

6    the children after you took them back?

7        A.    Not that I know of.

8        Q.    In fact, the Van Zandt County Children's Center is

9    just someone's former home, isn't it?  And it's a place where

10   they -- a temporary placement for children.  They may stay

11   awhile, but it's not a foster home and it's not a -- an

12   orphanage like a huge Buckner's orphanage type place --

13       A.    That's correct.

14       Q.    Would that be fair to say?

15       A.    Yes, ma'am.

16       Q.    So as far as you know, nothing was done -- like what

17   we have now with all this involvement where lawyers get

18   appointed to represent children and all these kinds of

19   things, there was none of that, was there?

20       A.    Not to my knowledge, no, ma'am.

21                  MS. LITTLE:  That's all I have.  Thank you.

22                  MR. DAVIS:  Nothing further.

23                  THE COURT:  Thank you, Mr. Tolar.  May he be

24   excused?

25                  MR. DAVIS:  No objection.

1            MS. LITTLE:   No objection.

2            THE COURT:   You may be excused to stay in the

3    courtroom or be excused as you wish.

4            20-minute break.

5            THE BAILIFF:   All rise.

6            (Jury excused from courtroom.)

7            THE COURT:   The jury is leaving the courtroom

8    at this time.

9        May I see one of the attorneys for either side for

10   scheduling purposes.

11       Visitors may be seated or excused as you wish.

12            (Recess of proceedings.)

13            THE BAILIFF:   All rise.

14            THE COURT:   Let the record reflect the jury is

15   returning to the courtroom at this time.

16            (Jury returned to courtroom.)

17            THE COURT:   The jury may be seated.

18       Mr. Murphy, counsel, visitors, you may be seated.

19        The State may continue.

20            MR. DAVIS:   The State will call Nancy Sanders,

21   and she has not been sworn at this time.

22            (Witness brought forward.)

23            THE COURT:   Thank you, Ms. Sanders.   You may

24   be seated if you please.

25

NANCY SANDERS

1

2    was called as a witness by the State and, after having been

3    first duly sworn, testified as follows:

4                        Direct Examination

5    By Mr. Davis:

6        Q.    Will you please tell us your full name?

7        A.    Nancy Phelps Sanders.

8        Q.    Ms. Sanders, how are you employed?

9        A.    I'm a nurse for Dallas County in the Dallas County

10   Jail.

11       Q.    Okay.  How long have you been a nurse for Dallas

12   County?

13       A.    22 years.

14       Q.    And there are several jails here in Dallas County.

15   Which jail are you assigned to?

16       A.    The George Allen facility.

17       Q.    And is that located over at 600 Commerce?

18       A.    Yes.

19       Q.    That actually be the white courthouse where these

20   courts used to be located at one time, right?

21       A.    Yes, sir.

22       Q.    What are your duties and responsibilities at this

23   time?

24       A.    I'm the nursing supervisor for that facility.  I

25   oversee all of the day-to-day running of the jail.  I see

DARLINE W. LABAR, OFFICIAL REPORTER

1   inmates.  I take care of staffing problems, and I also deal

2   with the Sheriff's Department as needed.

3       Q.   Just briefly, would you tell us a little bit about

4   your training and experience?

5       A.   I graduated from nursing school in 1971.  I am

6   licensed to practice vocational nursing in the State of

7   Texas.  I went to work for Dallas County in June of 1979.

8       Q.   Ms. Sanders, I want to direct your attention back to

9   April the 6th of the year 2001.  At that time were you also

10  working at the George Allen jail?

11      A.   Yes, sir.

12      Q.   In that jail would it be fair to say that inmates

13  are housed on floors 8 through 12 over at the white

14  courthouse?

15      A.   Yes, sir.

16      Q.   And do you have an infirmary over there?

17      A.   We have a female infirmary, and we have an area that

18  they call the infirmary that is where we see male inmates

19  that are ill.  It's where our nurses station is located.

20      Q.   And where is the male infirmary located over there?

21      A.   It's on the 8th floor.

22      Q.   Now, sometime the morning of April the 6th, 2001,

23  did you see the defendant, Jedidiah Isaac Murphy, over there

24  at the infirmary on the 8th floor?

25      A.   Saw him at the nurses station, yes, sir.

1    Q.   Now, had he been transferred over from the Lew

2    Sterrett jail sometime that morning?

3    A.   Yes.

4    Q.   Okay.  He was not regularly housed over there at

5    George Allen, was he?

6    A.   No, sir.

7    Q.   At about 9:00 a.m. that morning, did you receive a

8    call that an inmate was complaining about his health on the

9    7th floor over at George Allen?

10    A.   Yes.

11    Q.   Now, the 7th floor over there, that's also part of

12    the jail, isn't it?

13    A.   Yes, sir.

14    Q.   Does it still contain intake over there?  I know at

15    one time it used to.

16    A.   No, sir, it houses holdover facilities for people

17    that are being transferred from our jail to Sterrett for

18    court.  It also houses inmates that are coming to George

19    Allen for court.  It also houses inmates who are in holding

20    for parole hearings and that type of thing.  Also holds --

21    houses the jail administration offices for that facility.

22    Q.   Now, on the 7th floor you just told us there were

23    holdover cells, correct, for the inmates?

24    A.   Yes.

25    Q.   Are there also rooms for parole hearings?

DARLINE W. LABAR, OFFICIAL REPORTER

1    A.   Yes.

2    Q.   Are there also rooms provided over there for defense

3 investigators to talk with inmates?

4    A.   Yes.

5    Q.   Did you in fact go down there to the 7th floor?

6    A.   I did at one point in time, yes.

7    Q.   Okay.  When you were told that an inmate was having

8 problems, were you directed to the holdover cells down there?

9    A.   The -- at the early morning call that I got, no,

10 sir, I talked to the officers and asked them to bring the

11 inmate to the 8th floor.

12    Q.   Okay.

13    A.   And then later I went down.

14    Q.   Okay.  Was that inmate brought up there to you?

15    A.   Yes, sir.

16    Q.   And was that the defendant in this case, Jedidiah

17 Isaac Murphy?

18    A.   Yes, sir.

19    Q.   And at that time was Mr. Murphy making some

20 complaints to you?

21    A.   Yes.

22    Q.   What complaints was he making at that time?

23    A.   At that time he stated that he had not urinated in

24 several days, three or four days, that he had been to

25 Parkland previously and he needed to be -- to go back.

1     Q.    So he was asking to be taken out to Parkland

2  Hospital for treatment?

3     A.    Yes.

4     Q.    What did you do in response to his complaints?  Did

5  you talk with somebody?

6     A.    I talked to the nurses at Lew Sterrett.

7     Q.    Who would be familiar with his medical care?

8     A.    Yes, and they had his medical records.

9     Q.    Uh-huh.  And did you learn whether or not he had

10 tried to go out there or made an attempt to try to get out to

11 Parkland in the past?

12    A.    Yes, I was told that he had not been to Parkland as

13 he was telling me and that he had tried that in the past and

14 that there was nothing wrong with him.

15    Q.    Okay.  So did you notify the defendant of what you

16 had been told?

17    A.    Yes, I did.  I told him that when he finished his

18 business at the George Allen Building, that I would notify or

19 talk to the nurses.  I would talk to them again, and I would

20 make a notation on his down and out that he was to be taken

21 directly to the nurse at Lew Sterrett when he returned.

22    Q.    Did he ever tell you at that time that he needed to

23 go to the bathroom, that he didn't want to go in front of

24 other inmates in his --

25    A.    No.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   -- holdover cell?

2    A.   No.

3    Q.   Was he in fact then transferred back to floor seven

4    to one of the holdover cells?

5    A.   Yes.

6    Q.   Now, at approximately 1 o'clock that afternoon, did

7    you receive another call concerning an inmate having health

8    problems on the 7th floor in a holdover cell?

9    A.   Yes, sir.

10    Q.   And what was the nature of that call at 1 o'clock?

11    A.   I was told that an inmate was saying that he was ill

12    and had requested an ambulance be called and that he be taken

13    to Parkland.

14    Q.   Did you go down to the 7th floor that time?

15    A.   Yes, sir, I went down at that time.

16    Q.   Did you go to the holdover cell?

17    A.   Yes, sir.

18    Q.   When you looked in the holdover cell, approximately

19    how many inmates were in there?

20    A.   Oh, there were probably 10 -- 5 to 10, if not more.

21    And they were stating that the man was on the floor and he

22    was unconscious.

23    Q.   This man who was on the floor, did you recognize

24    him?

25    A.   Yes, sir.

1    Q.   And who was he?

2    A.   It was Mr. Murphy.

3    Q.   Was he in fact laying on the floor?

4    A.   Yes, he was on the floor.

5    Q.   What did you decide to do when you saw him on the

6    floor?

7    A.   Well, for security reasons I can't go into the

8    holdover area without an officer, so I asked that they bring

9    an officer so that I could get in -- have access to him.  At

10   that time I noticed that he would lift his head up and look

11   around and then put his head back down.

12   Q.   So -- so I take it then you continued to observe him

13   while --

14   A.   Yes, while --

15   Q.   -- he was on the floor?

16   A.   Yes, while they went and got the officers.

17   Q.   And did I understand you to say that as you watched

18   him, that the defendant down here actually raised his head

19   and started looking around; is that right?

20   A.   Yes, sir.  Yes.

21   Q.   Do you remember how many times he did that while you

22   were watching him?

23   A.   Oh, probably at least two, maybe three.

24   Q.   Well, did that -- as a result of seeing that, did

25   you form some opinion about whether this man was actually

1    unconscious or not?

2        A.   Yes, I determined that he was not.

3        Q.   Did you finally get access to the holdover cell?

4        A.   Yes.

5        Q.   And when you came inside, did you say something to

6    the defendant?

7        A.   I didn't go into the holdover.  I went to the door

8    and told him he needed to get up off the floor and come out

9    so he could be -- so I could examine him or evaluate him.

10       Q.   And can you tell the member of the jury, what was

11   his response when you told him to get up off the floor?

12       A.   First he started cursing, and then he got up.

13       Q.   Do you remember what he said?

14       A.   Something like, oh, shit, or something to that

15   effect.  Anyway he got up, and he walked out.

16       Q.   So he didn't have any difficult getting up when you

17   asked him or told him he needed to get up?

18       A.   No, sir.

19       Q.   Did he seem to be upset?

20       A.   Yes, he was very upset and angry.

21       Q.   When he came out, did you still take his vital signs

22   to check his health condition?

23       A.   I took his vital signs, and I talked to him and

24   explained to him that I couldn't -- there was nothing that I

25   could do at that time except let him finish his business that

1   he had there and send him back to Lew Sterrett where they

2   could access his medical records and he could see the doctor

3   or whoever was there.

4        Q.   Did he appear to understand what you were saying to

5   him?

6        A.   Yes, sir.

7        Q.   How were his vital signs?

8        A.   They were within normal limits if I remember

9   correctly.

10       Q.   Was there a time when he was actually taken into a

11  room to talk with an investigator by the name of Bill Parker?

12       A.   Yes, sir.

13       Q.   And did he actually go in that room?

14       A.   Yes, he did.

15       Q.   Do you remember how long he stayed in that room?

16       A.   It wasn't very long.  I was talking to the

17  Lieutenant, and he was there only probably a couple of

18  minutes.

19       Q.   Did he come out then?

20       A.   Yes, he did.

21       Q.   What was his mood or his condition when he came out?

22       A.   He told us that he wanted to be taken to Parkland,

23  and he was told that he was not going to Parkland at that

24  time and that he was going to be placed in a holdover and

25  taken probably back to Lew Sterrett.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   How did the defendant react when he was told that he

2    was going to have to go back to a holdover and that he

3    wouldn't get his wish to go to Parkland Hospital?

4    A.   He became very combative and started to fight the

5    officers.

6    Q.   Do you remember what, if anything, he did to the

7    Lieutenant who was present?

8    A.   He kicked the Lieutenant.

9    Q.   And when you say that he began fighting, were there

10   other deputies there?

11   A.   There were two other deputies, and then also the

12   investigator that he was there to talk with.

13   Q.   If you could, as best you can, just describe what

14   happened after the defendant kicked the Lieutenant, what --

15   what sort of confrontation came about?

16   A.   The deputies and the investigator and the Lieutenant

17   wrestled with him, got him to the floor, got him handcuffed.

18   Then they got him up and put him in the holdover area.

19   Q.   So they had to actually use physical force to

20   restrain him?

21   A.   Yes.

22   Q.   And as I understand it, it was the -- it was the

23   Lieutenant, the deputies, and actually the investigator

24   himself, Bill Parker, helped subdue the defendant, right?

25   A.   Yes.

1    Q.    He was then taken back to the holdover?

2    A.    Yes.

3    Q.    At some point did Bill Parker leave?

4    A.    Yes.   While I was on the 7th floor right after they

5    had put the inmate back in the holdover, the investigator

6    left.

7    Q.    Now, was the defendant in a position there in the

8    holdover cell to actually see Mr. Parker leave?

9    A.    Yes, sir.   They had put him in what they call the

10   electric holdover which -- the way that it's set up, most of

11   the men are on one side of the control center and the females

12   are on other side but they have a small isolated holdover.

13   And he was placed in that holdover and you can see from that

14   holdover the control center and the elevator area that

15   goes -- leaves out of the building.

16   Q.    Did the defendant's attitude change after Mr. Parker

17   left?

18   A.    Yes, sir.   I was told that he was then asking --

19        MS. LITTLE:   I object to what she was told.

20        THE COURT:   Sustained.

21   Q.    (By Mr. Davis)   When did you next have contact with

22   the defendant?

23   A.    He had been transferred to our facility after the

24   incident and they had placed him in a single cell on the 8th

25   floor and the officers came and reported to me --

DARLINE W. LABAR, OFFICIAL REPORTER

1          MS. LITTLE:  I'll object to what the officers

2     told her.

3          THE COURT:  Sustained.

4     Q.   (By Mr. Davis)  Well, were you directed to the

5     holdover cell where Jedidiah Murphy was?

6     A.   Yes.

7     Q.   Was it your understanding that he was having some

8     sort of health problem there?

9     A.   Yes.

10    Q.   Okay.  And when you got there, just tell the members

11    of the jury what you observed the defendant doing there on

12    the 8th floor.

13    A.   He was sitting in the floor of his cell organizing

14    his commissary and his property.  And he -- I asked him if he

15    was having any problems, and he told me no, that at that time

16    he was fine.  I asked him if he had made any comments about

17    harming himself or anything of that nature.  And he told me

18    that he might have, but that he was concerned that he wasn't

19    going to get his property.  But that since he had all of his

20    property, he would be fine.

21    Q.   Well, this is after Bill Parker has left, right?

22    A.   Yes.

23    Q.   He says he's not having any problems, right?

24    A.   That's correct.

25    Q.   Did he specifically -- did he ever talk about

1    problems urinating then?

2        A.    No.

3        Q.    Was he asking to go to Parkland Hospital?

4        A.    No.

5        Q.    How long did you stay with the defendant at that

6    time?

7        A.    I was probably there 3 to 5 minutes.

8        Q.    Did you have to give him any medical treatment or

9    care at that time?

10       A.    No, we just talked.

11       Q.    Now, later did you again have contact with the

12   defendant while he was in a holdover cell or a single cell on

13   the 8th floor that day?

14       A.    Yes, sir.  Later that night I went back and saw him

15   again.

16       Q.    Okay.  And just -- if you could, just describe the

17   cell that he was being held in at that time.

18       A.    It's a single cell.  It holds one person.  It has a

19   bunk.  It has a table area.  It has a shower.  It's

20   directly -- I mean, there's a line of approximately six

21   cells in that area.  They're all single cells.  They are

22   adjacent to what we call a medical tank which in this

23   particular case houses geriatric inmates or people that are

24   over 60 years old.

25       Q.    So he was in an area for medical treatment, medical

DARLINE W. LABAR, OFFICIAL REPORTER

1    tank; is that right?

2        A.   Yes.

3        Q.   Now, Lew Sterrett has medical tanks, too, don't

4    they?

5        A.   Yes.

6        Q.   Are they different than the medical tanks over there

7    at George Allen?  For instance, do they have more creature

8    comforts available to them over there at the medical tanks in

9    Lew Sterrett?

10       A.   The single cells do because over there they're

11   actually multiple men tanks that are racked off -- what they

12   call racked off.  So that only one person comes out at a

13   time.  They can see the television, and they have more

14   contact with other inmates.  They can talk to each other.

15   They have windows.  It's a little bit brighter.  They can see

16   the hallway because it's a glass enclose, where at George

17   Allen it's on older jail.  There's more steel and concrete.

18       Q.   Do they have windows over there at George Allen?

19       A.   No.

20       Q.   They do at Lew Sterrett, though, right?

21       A.   Right.

22       Q.   At Lew Sterrett are the inmates allowed out of their

23   cell during the day?

24       A.   One hour a day.

25       Q.   And do they have access to a day room?

1      A.   Yes.

2      Q.   How about at George Allen?

3      A.   No, they stay in their cell 24 hours a day.

4      Q.   How about access to a television?  Do inmates over

5  at Lew Sterrett have that?

6      A.   In the central day room they do.

7      Q.   How about at George Allen?

8      A.   No.  There is no television for single cell area.

9      Q.   If you could, could you describe the defendant's

10  condition when you later saw him then that night?

11      A.   He was agitated.  He appeared angry.  He stated that

12  he was going to harm himself, that he needed to be moved back

13  to Lew Sterrett, that he would go on suicide precautions, and

14  that he would prefer to be on suicide precautions than stay

15  at George Allen any longer.  And he continued to tell me that

16  I had to have him moved.  I needed to call the doctor and get

17  him transferred, that he was paranoid and delusional and

18  could not stay in that facility.

19      Q.   So he wanted to go back to Lew Sterrett, right?

20      A.   Yes.

21      Q.   He said he would go on suicide watch if that was

22  necessary, just to get back over to Lew Sterrett?

23      A.   Yes.

24      Q.   Now, when he told you that he was paranoid and

25  delusional, I mean in your 22 years up there in the Dallas

1    County Jail, have you had occasion to deal with people who

2    are actually paranoid and delusional?

3         A.   Yes, sir.

4         Q.   Were his actions and statements consistent with a

5    person who was actually paranoid or delusional?

6         A.   No.

7         Q.   Why not?

8         A.   Number one, he wasn't saying that anyone was trying

9    to hurt him, no one was trying to harm him.  He was alert,

10   oriented.  He knew what was going on.  Most people that are

11   delusional are not in touch with reality.  They seem to think

12   that things are going on or they have more power than they do

13   or people that are paranoid think someone is going to hurt

14   them, whether it be an officer, whether it be other inmates.

15   They show some signs of fear.  His was just agitation and

16   said he didn't like it there and he wanted to be transferred.

17        Q.   By the way, when you talked with him later that

18   night, was he making any complaints about problems urinating?

19        A.   No.

20        Q.   Did he demand to go to Parkland Hospital?

21        A.   No.

22        Q.   His only demand was to go back to Lew Sterrett?

23        A.   Yes.

24        Q.   Did he eventually get his wish to go back to Lew

25   Sterrett?

1     A.   Yes.

2          MR. DAVIS:   Thank you, Ms. Sanders.

3     I pass the witness.

4                    <u>Cross-Examination</u>

5  By Ms. Little:

6     Q.   Is it Ms. Sanders?

7     A.   Yes.

8     Q.   Ms. Sanders, you've worked over there a long time so

9  you've seen just about everything, haven't you?

10    A.   Yes, ma'am.

11    Q.   Now, a single cell is not the same thing as the

12 suicide tank, is it?

13    A.   It's almost -- it's -- they're both considered

14 single cell.  The thing with the suicide tank, it's an 8-man

15 tank with 8 individual cells.  And those people are racked

16 off at all times.  They cannot come in, and they are by

17 themselves.

18    Q.   Okay.  And when people have health problems or

19 something they need, they send y'all what's called a kite,

20 don't they?

21    A.   Yes.

22    Q.   Tell the jury what that is.

23    A.   The kite is simply a form that they send out and

24 they make a notation of whether they need to see the doctor,

25 the dentist, the nurse, and what their basic complaint is or

1    what they're trying to get, whether it be medication,

2    somebody to talk to.  Basically it just tells us what they

3    want.

4       Q.   Okay.  And you get a lot of people that want things

5    that are just -- you get sort of case hardened because people

6    in jail complain a lot, don't they?  And it's not always

7    legitimate?

8       A.   That's true.

9       Q.   Now, when he was complaining about the urinary

10   problems, he was in a cell with you say 5 to 10, possibly

11   more people, right?

12      A.   The first time I saw him, no, he was in a room with

13   just me and the officer.

14      Q.   He was complaining then about urinary problems?

15      A.   He said that he had not urinated in about 3 or 4

16   days.

17      Q.   Then he was placed -- because you went down to see

18   him and when you went back.  He was in a cell with a number

19   of other people?

20      A.   Uh-huh.

21      Q.   What is BAC?

22      A.   Behavioral Activity Control.

23      Q.   What is it that y'all used to call that?  Bare ass

24   on concrete, wasn't it?

25      A.   Yes.

DARLINE W. LABAR, OFFICIAL REPORTER

1    Q.   Bare ass on concrete?

2    A.   That's one of the slang terms, yes.

3    Q.   What does that mean?

4    A.   It means that they have absolutely no possessions.

5    Q.   And no clothes?

6    A.   That's what I mean.

7    Q.   And they're in a single cell?

8    A.   Yes.

9    Q.   And that's where you go when you're on suicide

10   watch?

11   A.   Not at all times.  They don't use behavioral

12   activity control now except in extreme situations.  They have

13   to give them a paper drape at least, and in most cases they

14   are allowed to keep their mattress and their underwear.

15   Q.   That's not always true, is it?

16   A.   It depends upon how they're saying they're going to

17   harm themselves.

18   Q.   It's not always true though, is it?

19   A.   No.

20   Q.   Have you ever heard of a somatoform disorder?

21   A.   No.

22   Q.   Do you know what that is?

23   A.   No.

24   Q.   And when you went down there and saw that he was

25   moving his head around and told him to get up and come out,

DARLINE W. LABAR, OFFICIAL REPORTER

Page 189

1   he did what you told him, didn't he?

2       A.   Yes.

3       Q.   Now, when he is in Crowley, are you aware that he's

4   in the psych ward there?

5       A.   Yes.

6       Q.   And that he takes medication everyday?

7       A.   Yes.

8       Q.   Numerous medications?

9       A.   I don't know exactly what he takes, but I do know

10   that he was on medication.

11              MS. LITTLE:  Thank you.  That's all I have.

12              MR. DAVIS:  No further questions.

13              THE COURT:  Thank you.  You may step down.

14   You are excused.

15          The State may continue.

16              MS. MILLER:  Call Shirley Bard to the stand.

17              THE COURT:  This witness has been previously

18   sworn in, is under oath.

19              MS. MILLER:  May I proceed?

20              THE COURT:  You may.

21                      SHIRLEY BARD

22   was called as a witness by the State and, after having been

23   first duly sworn, testified as follows:

24                  Direct Examination

25   By Ms. Miller:

1    Q.   Would you please state your name and reintroduce

2  yourself to the jury?

3    A.   I'm Shirley Bard from Wills Point.

4    Q.   Ms. Bard, you are the same Shirley Bard who

5  testified during the guilt/innocence phase of this trial; is

6  that correct?

7    A.   That's correct.

8    Q.   Okay.  Just to remind the jury, you know the

9  defendant, Jedidiah Isaac Murphy, but you knew him under a

10  different name?

11    A.   Jim Kines.

12    Q.   And you knew him because you worked with him

13  welding; is that correct?

14    A.   That's correct.

15    Q.   Now, Ms. Bard, you said, I believe, during

16  guilt/innocence that you had helped basically train the

17  defendant on TIG welding?

18    A.   Yes.

19    Q.   Okay.  Now, during the course of working with the

20  defendant -- so this was back in the early part of 2000; is

21  that correct?

22    A.   I'm not sure.

23    Q.   Okay.

24    A.   No -- yeah, it was, because I went to work for

25  someplace else January the 10th of 2001.

DARLINE W. LABAR, OFFICIAL REPORTER

1      Q.    Okay.  Now --

2      A.    Excuse me.

3      Q.    Did you, while you were working with the defendant,

4   have some problems with him?

5      A.    Yes, I did.

6      Q.    Okay.  Can you explain to the jury when you're doing

7   the TIG welding and what use you have for pallets?

8      A.    Pallets is wood structure that we stack our

9   merchandise on after we get through welding it so it can be

10  transferred to another part of the building.

11     Q.    Okay.  And on a particular day -- well, do you-all

12  have to go get your own pallets?

13     A.    Yes, we have to go outside and they are quite heavy

14  in carrying them in.

15     Q.    And on this particular day did you go out and get a

16  pallet?

17     A.    Yes, I did.

18     Q.    And after you had gotten a pallet and -- and put it

19  in your work station, did someone come take it?

20     A.    Yes, while I had my back turned working with some

21  stuff behind me.

22     Q.    Who took it?

23     A.    Jim.

24     Q.    The defendant?

25     A.    Yes.

1    Q.   Did you talk to the defendant about him taking your

2  pallet?

3    A.   Well, the pallet had blood on it from -- I guess

4  where they were making it and I went over and looked around,

5  because everyone's pretty bad about doing something like

6  this, especially to me, because I was a woman working there.

7  And I went over and saw the pallet.  Jim had his stuff on

8  it.  And I said, Jim, did you get my pallet.  He said, yeah,

9  there's plenty Fing pallets out there.  I said, you go get --

10   Q.   Now, Shirley, I'm going to stop you there, and I

11  know you don't like using the words, but it's important for

12  the jury to understand what -- use the exact words that the

13  defendant used.

14   A.   He said, "yeah, there's plenty of fucking pallets

15  out there.  Go get your own."

16        I said, "that is mine.  You got it out of my

17  station."

18   Q.   How did the defendant react to that?

19   A.   He reacted for me to go screw myself.

20   Q.   So what, if anything --

21   A.   I went and got another pallet.

22   Q.   Okay.  And was that the -- did you think that was

23  the end of the situation?

24   A.   Yes, I did.

25   Q.   Was it the end of the situation, Shirley?

DARLINE W. LABAR, OFFICIAL REPORTER

1      A.    No, it wasn't.

2      Q.    Tell the jury what happened then.

3      A.    The next morning he caught me real early -- well, it

4    actually started when I went to leave that evening.

5      Q.    Okay.

6      A.    And he was at least two car lengths back.  I was

7    parked at the very front, and I pulled out in front of him,

8    but he was two car lengths back.  I had plenty of time,

9    plenty of room.

10     Q.    So what did the defendant do at that point?

11     A.    He didn't do anything at that point.

12     Q.    Okay.

13     A.    It was the next morning.

14     Q.    So when you got to work the next morning, was the

15    defendant already there?

16     A.    No.

17     Q.    Okay.  Did he come up after you had already gotten

18    to work?

19     A.    Yes.

20     Q.    And tell the jury what happened then, Shirley.

21     A.    He come over into my station and he told me he was

22    going to knock my fucking head off if I ever cut him off

23    again.

24           And I said, "Jim, I didn't cut you off."

25           And he said, "you mouth back to me and I'll knock

```
 1    your fucking head off."  And I had to call the foreman from

 2    the back to get him out of my station.

 3        Q.   Now, was he drunk at that time, Shirley?

 4        A.   Not to my knowledge.

 5        Q.   Did he appear to be high or on any type of drugs at

 6    that point?

 7        A.   Not to my knowledge.

 8        Q.   As a matter of fact --

 9        A.   But a lot of people did do drugs there at work, but

10    I don't think he hung out with them.

11        Q.   Well, as a matter of fact, didn't the defendant take

12    a lot of pride and brag about not using alcohol or drugs?

13        A.   Yes, he did.

14        Q.   And so when he made these comments to you, Shirley,

15    tell -- tell the jury what the defendant's demeanor was, how

16    he was acting when he told you that he was going to knock

17    your fucking head off?

18        A.   He acted like he was going to knock my fucking head

19    off.

20        Q.   Okay.  Was he -- was his voice raised or was he --

21        A.   Yes, he was loud.  He was mad.

22        Q.   Okay.  You said that you had to go get --

23        A.   No, I called Jerry.  He was standing at the back,

24    and I called him to get up there and get him out of my

25    station, because I couldn't get to my hammer.  And that was
```

DARLINE W. LABAR, OFFICIAL REPORTER

1   the only protection I would have had.

2       Q.   So did the foreman come and get the defendant out of

3   your station?

4       A.   Yes, the foreman came up and told him, said, "shoo,

5   Jim, go on back over to your station."

6       Q.   And how --

7       A.   And that's because the foreman was half afraid of

8   him.

9       Q.   How did the defendant react?

10      A.   He just turned and walked off.

11      Q.   Okay.  Now, was that the end of the situation,

12  Shirley?

13      A.   No, I took it to the owner of the company.

14      Q.   Okay.

15      A.   And I told him what happened, and he said, well --

16              MS. LITTLE:   I object to what the owner of the

17  company said.

18              THE COURT:   Sustained unless it's in the

19  presence of the defendant.

20      Q.   (By Ms. Miller)  Without going into what the owner

21  said, did -- did you have another confrontation with the

22  defendant?

23      A.   Yes, I did.

24      Q.   Okay.  And was that the same day or the next day?

25  Or a couple of days later?

1    A.    It was probably a day or two later.  It might have

2  been the same day.  I don't know.  I've slept since then and

3  I have another job and I don't remember this part.

4    Q.    Okay, Shirley.  Tell -- well, tell the jury about

5  the confrontation again -- the next confrontation?

6    A.    Well, Jim said if I started any more problems for

7  him, he was going to kill me.

8    Q.    Did you believe him?

9    A.    Not at the time.  I just thought he was just

10  mouthing off, and he --

11    Q.    Did --

12    A.    Well, he talked about guns all the time and what

13  access he had to them and all the things that he did and

14  everything and --

15    Q.    Okay.  Let me stop you right there, Shirley.  You

16  said that he talked about guns and the access he had to them

17  and what he did.  Tell the jury what the defendant told you

18  about the access he had to guns and what type of guns.

19    A.    All kinds of guns.  He told me he had an AK.  I

20  don't know.  I didn't see it, but that's just what he said.

21  But it was enough to put the fire -- fear in me.

22    Q.    Did he tell you that he basically had access to

23  anything he wanted?

24    A.    Yes.

25    Q.    Did he -- you said that he also talked about other

DARLINE W. LABAR, OFFICIAL REPORTER

1  things that he had done.  What types of things did the

2  defendant brag to you about, Shirley?

3      A.   With a certain guy they would go out and shoot

4  things and at people and whatever.

5      Q.   So the defendant -- this certain guy, was that

6  Chelsea Willis, his girlfriend or wife's grandfather that he

7  was saying?

8      A.   Yes.

9      Q.   And so he told you that they -- that he and

10  Chelsea's grandfather -- was that Logan?

11      A.   Yes.

12      Q.   Okay.  Talked about shooting at people?

13      A.   That's what Jim told.

14      Q.   Did you believe him?

15      A.   I didn't have any reason not to.  I didn't have any

16  reason to.  I was -- it was just let him go past me and

17  forget it.

18      Q.   But he did brag to you about doing this with his

19  wife's grandfather?

20      A.   Yes.  He told all kinds of tales.

21      Q.   Okay.  Do you remember some of the other tales he

22  told you, Shirley?

23      A.   Yeah, some Mexicans was camping on Logan's place and

24  they went down and took potshots at them and all kinds of

25  stuff like that.

```
 1        Q.    Okay.  Now, Shirley, did -- did the defendant make
 2   some more threats to you after he told you not to cut him
 3   off?
 4        A.    Yeah.
 5        Q.    Okay.  Tell the jury about it.
 6        A.    He threatened to shoot me.
 7        Q.    Okay.
 8        A.    And he said --
 9        Q.    What --
10        A.    When he got fired, his last threat for me, of
11   shooting me.
12        Q.    Okay.  Let's back up, Shirley.  Okay.  The morning
13   after he -- you pulled in front of him, you said there were
14   at least two car lengths between you?
15        A.    Uh-huh.  Uh-huh.
16        Q.    He comes in and says that you better not cut him
17   off?
18        A.    Yeah, that's when he was going to knock my head off.
19        Q.    Okay.  Now, when was the next time that he
20   threatened you after that?
21        A.    Two or three days later when there was some more
22   problems that we had there.
23        Q.    Tell -- Shirley, tell the jury what problems you
24   had.
25        A.    Well, we just had problems working together.  I
```

DARLINE W. LABAR, OFFICIAL REPORTER

1   was -- I didn't have the title of lead, but I was teaching

2   people and the foreman would tell me what needed to be done

3   and everything.  And Jim was getting all the guys over there

4   in the corner and talking to them.  He has that charisma with

5   the guys, you know.  They all talk guy stuff.  I stayed over

6   at my station away from all of them.  And then at noon I

7   would -- I was working two jobs and at noon I'd lay down to

8   take a nap.  I only had 30 minutes.  During that 30 minutes,

9   Jim would bang on metal.  He would drop things on the floor.

10  He would pick up pallets and slam them on the floor.  And I

11  just laid there.  I was resting.  I couldn't sleep, so that

12  was fine, also.

13       Q.   Did you tell me it was just out of pure meanness

14  that you felt he was doing this?

15       A.   That's what I felt, yes, and then I got to where I

16  went somewhere place else and laid down after about two or

17  three days of it.

18       Q.   Did you tell me that you finally got yourself some

19  earplugs, too?

20       A.   Yeah.

21       Q.   So then what happened, Shirley?

22       A.   Then -- like I say, we were still having quite a bit

23  of problems and he was still wising off and smarting off and

24  he came over to the microwave one morning.  I was, you

25  know -- he didn't come over.  I didn't notice him standing

1    there, and I went to the microwave.  And I went to put my

2    stuff in the microwave.  There were two of them there.  And

3    he said, "I guess I owe you an apology."

4            I said, "I think you certainly do."

5    Q.  So how did he respond when you told him you he owed

6    you an apology?

7    A.  He didn't like it very much.  I walked off and went

8    to my station.  Then he come to my station.

9    Q.  And what did he say, Shirley?

10   A.  He told me that he had access to anything he wanted

11   and I should know it by now and he would blow me away.

12   Q.  Now, is that what he said, Shirley?

13   A.  He said he could kill me and I wouldn't know it was

14   coming.

15   Q.  Did you believe him at that point?

16   A.  I got scared, yes.

17   Q.  So what did you do?

18   A.  I went to the boss.

19   Q.  And --

20   A.  I went to the foreman, and I told him I quit.

21   Q.  So because of this defendant, you quit your job

22   because of the threats he was making?

23   A.  I went to quit my job.  I went -- I got part of my

24   stuff, I went to my truck, I went to the foreman, I told him,

25   I went to my truck, and the foreman caught me at my truck.

1      Q.   Okay.  And were you told to calm down and come back

2   in a little bit?

3      A.   I was told by one of the owners because the foreman

4   caught the owner as he was pulling up and called him over

5   there and I told him what happened.  And they told me to go

6   have lunch.  It was on them.  And come back in 30, 35

7   minutes.

8      Q.   Did you, Shirley?

9      A.   Yeah, I came back in about 35 minutes.

10      Q.   And did you come in contact with the defendant after

11   you came back?

12      A.   Yes.  He was getting in his car when I pulled up and

13   parked.

14      Q.   Did he stop and have words with you?

15      A.   Yes, he did.

16      Q.   And tell the jury what he said, Shirley.

17      A.   He told me that I was nothing, I was a piece of

18   shit, and that I would never see it coming, I could be at

19   work, I could be at home, I could be driving down the road,

20   and he would blow me away.

21      Q.   And was there something about the defendant's

22   demeanor that particularly frightened you, Shirley?

23      A.   I felt like he meant it.  I asked my son about him,

24   and my son said if he killed you, mom, he better --

25               MR. BYCK:   I object --

```
1              THE COURT:  Sustained.

2              MR. BYCK:  -- to what her son said.

3      Q.   (By Ms. Miller)  Without going in to what your son

4  said.  So the defendant told you he was basically going to

5  kill you and you wouldn't know when it was coming?

6      A.   Uh-huh.

7      Q.   You have to answer yes or no.

8      A.   Yes.

9      Q.   Now, Shirley, how was the defendant acting when he

10  told you that he was going to kill you this time?

11     A.   He was calm, cool, and collected.

12     Q.   Did he appear to be under the influence of anything

13  at this time?

14     A.   He didn't seem to be angry at all.  He just meant

15  what he said.

16     Q.   And so a couple of the other times he was angry and

17  ranting, but this time he was just cool, calm, and collected

18  when he told you that you wouldn't know when it was coming?

19     A.   Uh-huh.  Yes.

20     Q.   Shirley, you said that you -- that that scared you,

21  and that you thought that he could and would follow through

22  with that.  So what did you do at that point?

23     A.   Well, I looked over my shoulder all the time.  And I

24  was very careful where I went and what I did.  And I also

25  asked a few people if he was capable of doing it.  Some said
```

1    yes --

2                    MR. BYCK:   Objection as to what other people

3    said.

4                    THE COURT:   Sustained.

5                    MR. BYCK:   Ask the jury to disregard.

6                    THE COURT:   The jury will disregard the last

7    response of the witness.

8        Q.   (By Ms. Miller)   Shirley, you can't go into what

9    other people told you.

10       A.   I'm sorry.

11       Q.   But as a result of the threats the defendant made

12   against you, were you scared enough that you called --

13       A.   Van Zandt County.

14       Q.   Van Zandt County --

15       A.   Sheriff's Department?  Yes, I did.

16       Q.   Now, you didn't know the defendant's name to be

17   Jedidiah Isaac Murphy, did you?

18       A.   No, I did not.

19       Q.   So when you called the police department, were you

20   checking up on the defendant under the name you knew him as?

21       A.   Jim Hines (sic), yes.

22       Q.   Okay.  And so you weren't able to find anything out

23   about him under that name?

24       A.   They said they didn't have anything on a Jim Hines.

25       Q.   Okay.  So you were so scared that you actually

1    called the Sheriff's Department to check up on him?

2         A.    That's correct.

3         Q.    Did you have -- Shirley, did you have any more

4    contact with the defendant after he made the final threat?

5         A.    No.

6         Q.    Now, you said, Shirley, that you had been working

7    two jobs.  Did the defendant know where your other job was?

8         A.    Oh, yeah, him and his wife came in there all the

9    time.

10        Q.    Where was that?

11        A.    It was in Wills Point at a little bait shop.

12        Q.    And as a matter of fact, did the defendant make

13   specific comments about your other job when he made the

14   threats?

15        A.    Yes, he did.

16        Q.    So when he was threatening you, he even made

17   reference to where your other job was?

18        A.    Sure.  He said he knew where I lived, he knew where

19   I worked, and he wouldn't have any problem.

20        Q.    And how did that make you feel, Shirley?

21        A.    Scared.

22        Q.    Okay.  Thank you, Shirley.

23              MS. MILLER:  I'll pass the witness, Your

24   Honor.

25

1                          <u>Cross-Examination</u>

2     By Ms. Little:

3          Q.    Ms. Bard, I'm Jane Little.  I've got just a few

4     questions for you.

5          A.    Okay.

6          Q.    How long had you worked at R & R Designs?

7          A.    7, 8 years.

8          Q.    And you've told us this at the first part of the

9     trial, but would you tell me again what your job was?

10         A.    Well, I was a TIG welder.

11         Q.    Was that the same job you had all the time you were

12    there?

13         A.    Yes.

14         Q.    Now, you said that you weren't officially a

15    supervisor and you apparently were the only or one of very

16    few women; is that correct?

17         A.    That's correct.

18         Q.    But you didn't have the title of supervisor?

19         A.    That's correct.

20         Q.    So what -- what supervisory job did you have there?

21         A.    Well --

22         Q.    What did you supervise?

23         A.    I just taught people how to weld.  And the foreman

24    would come and tell me what needed to go that day and how

25    soon it needed to go.  If we had something hot, it had to go

1   right then, put my quickest people on it and get it done.

2       Q.   Okay.   Now, you said that -- obviously you felt a

3   little on the outside of the men that worked there; is that

4   right?

5       A.   Oh, sure.

6       Q.   And you said that not everybody accepted your

7   position of sort of an unofficial authority figure; is that

8   right?

9       A.   There was one or two that didn't.   The rest of them

10  pretty much did.

11      Q.   How about Rufus and Anthony?

12      A.   Rufus?

13      Q.   Uh-huh.

14      A.   Rufus was a MIG welder.   I didn't teach him

15  anything.

16      Q.   You didn't get in the middle of a confrontation he

17  had with an Anthony in there?

18      A.   Yeah, I did.   That was when Rufus was going to cut

19  Anthony, and I went and told the owner.

20      Q.   Okay.   In fact that's a place where everybody works

21  hard.   It's hard manual labor, isn't it?

22      A.   That's correct.

23      Q.   And there's a lot of cussing and carrying on and

24  locker room kind of talk, isn't there?

25      A.   Except for me.   I didn't do it, and I asked them to

1   stay out of my station.

2       Q.   But that's what went on.  That's the nature of that

3   kind of a business?

4       A.   That's correct.

5       Q.   And you said that you and Jim didn't get along

6   essentially?

7       A.   We did to start with.  I befriended him, and I

8   helped him do anything I could, sold him a little frog that

9   was made that I had had for years for him to give to his wife

10  because she liked frogs.

11      Q.   Uh-huh.

12      A.   I mean, you know, I just -- I befriended him and he

13  turned on me.  I didn't understand why.

14      Q.   Well, let me ask you this, do you know who Logan

15  Craft is?

16      A.   All I know is what he told me.

17      Q.   Did you know Logan Craft is a person who's of some

18  substance in his -- in that town?

19      A.   Supposed to be a retired Marine.

20      Q.   Okay.  Did he ever hold any office there that you

21  know of?

22      A.   I don't have any idea.  I didn't even -- never heard

23  of the man until Jim spoke of him.

24      Q.   And you don't know how old he is or anything like

25  that?

1    A.   I have no earthly, never seen the man, never met
2    him.
3    Q.   But you assume that some former Marine that was an
4    elderly man that was a grandfather would be out shooting at
5    people with Jim Murphy?
6    A.   I've known men to do it before.
7    Q.   You have?
8    A.   Yes, I have.
9    Q.   Did they work at R & R Designs?
10   A.   No.
11   Q.   Now, whatever caused the problem, you know, however
12   it got cross-ways with y'all, you testified that you did get
13   cross-ways?
14   A.   Yes, we did.
15   Q.   And that time that he came to apologize to you and
16   you said, yes, you owe me an apology and walked off, that was
17   over what specifically?
18   A.   That was over him telling me he was going to knock
19   my Fing head off.
20   Q.   Okay.  So I take it that you didn't accept that
21   apology?
22   A.   Yes, I accepted it, but I did not want to have any
23   more confrontation out of him.
24   Q.   So you just walked off when he said that?
25   A.   That's right.

1      Q.    How many sons have you got, Ms. Bard?

2      A.    I have three boys.

3      Q.    How old are they?

4      A.    37, 39, and 41.

5      Q.    Did you ever tell Jim that you were going to have

6   your sons chop him up and spit him in the river?

7      A.    No, I did not.

8      Q.    Did you ever have a situation where he was in the

9   parking lot and you ran out in front of him in your car?

10     A.    No.  I didn't cut him off if that's what you're

11  thinking.

12     Q.    Yeah, I guess that's the right word.

13     A.    Yeah.

14     Q.    Now, you were in a position where you were training

15  people, but not being called a supervisor, which we see that

16  down here.

17     A.    Uh-huh.

18     Q.    And that's not any fun, is it?

19     A.    Well, no, it isn't.

20     Q.    Because you have all the responsibility and none of

21  the real authority and certainly not the money?

22     A.    No, the responsibility went on Jerry Thornton, not

23  me.  I just had to answer to him.

24     Q.    Did you -- if Bojack (phonetic) were here, do you

25  think he would say the same thing that you said about these

1    threats in the parking lot?

2        A.   Bojack?  Yeah, because I asked Bojack.

3        Q.   When would that have been?

4        A.   At the store where I worked.  I asked him if he was

5    capable.

6        Q.   If he was what?

7        A.   If he was capable of doing that to me.

8        Q.   No, I'm talking about being a witness to it.  To

9    whether this ever actually happened or not, the threats in

10   the parking lot?

11       A.   I don't think Bojack ever heard it unless he was

12   standing there and I didn't see him.

13       Q.   Ms. Bard, when you began working at R & R Designs,

14   what was your hourly wage?

15       A.   $5 an hour.

16       Q.   And you were there how many years did you tell me?

17       A.   Eight years.

18       Q.   And what was your wage when you left?

19       A.   $10 an hour.

20       Q.   And how long had Jim worked there?

21       A.   About three months or less.

22       Q.   And he made 9.50 an hour, didn't he?

23       A.   No.  He told me he made 8.75.  I don't know.

24       Q.   If the records reflected that he made 9.50 from

25   Stephanie that would be correct, wouldn't it?

DARLINE W. LABAR, OFFICIAL REPORTER

1        A.    Yes, it would.

2              MS. LITTLE:   That's all I have.   Thank you.

3                     Redirect Examination

4    By Ms. Miller:

5        Q.    Ms. Bard, I have just a couple other questions.

6    Now, Bojack is somebody that the defendant got hired there at

7    R and R?

8        A.    That's correct.

9        Q.    Is that correct?

10       A.    Uh-huh.

11       Q.    And did the defendant ever talk to you about his

12   prior arrests, about having --

13       A.    Jim's prior arrests?

14       Q.    Yeah, did the defendant --

15       A.    Oh, yeah.

16       Q.    -- tell you about being arrested before?

17       A.    Yeah, he was arrested while -- while he worked

18   there.

19       Q.    And did he seem ashamed of it?

20       A.    No.

21       Q.    Tell the jury how -- when he was talking about his

22   prior arrests, how he seemed to view them.

23       A.    He bragged about it.   I mean, it was something that

24   was always someone else's fault.   It wasn't his fault.   He

25   didn't do what they said he did, and he didn't realize it was

```
 1    a police officer standing there when he hit him.

 2                    MS. MILLER:  Thank you, Ms. Bard.

 3          I'll pass the witness.

 4                    MS. LITTLE:  Nothing further.

 5                    THE COURT:  Thank you.  You may step down,

 6    ma'am.

 7                    THE WITNESS:  May I go home?

 8          MR. DAVIS:  May this witness be excused?

 9          MS. LITTLE:  No objection.

10          THE COURT:  She may be excused.

11          MR. DAVIS:  Your Honor, ladies and gentlemen

12    of the jury, at this time the State rests in rebuttal.

13                    (State Rests in Rebuttal)

14          MS. LITTLE:  Your Honor, we need to -- at this

15    time we'll offer the slides that Ms. -- Dr. Connell had that

16    went with that presentation that's already in evidence, as

17    Defense Exhibit Number 70 for all purposes.

18                    (Defendant's Exhibit No. 70 offered)

19          MR. DAVIS:  No objection.

20          THE COURT:  Admitted.

21                    (Defendant's Exhibit No. 70 admitted)

22          MS. LITTLE:  And Defendant's Exhibit Number

23    70A for record purposes only.

24                    (Defendant's Exhibit No. 70A offered)

25          THE COURT:  Those are the matters about which
```

```
 1   the objection was sustained?

 2               MS. LITTLE:  I'm sorry --

 3               THE COURT:  For record purposes?

 4               MS. LITTLE:  Yes.

 5               THE COURT:  Admitted for trial record purposes

 6   only.

 7               (Defendant's Exhibit No. 70A admitted)

 8               MS. LITTLE:  We may need to take up a matter

 9   outside the jury's presence, please.

10               THE COURT:  Sheriff, if you'd retire the jury.

11               THE BAILIFF:  All rise.

12               (Jury excused from courtroom.)

13               THE COURT:  The jury has been excused from the

14   courtroom at this time.

15          Mr. Murphy, counsel, visitors in the gallery, you

16   may be excused.

17               MS. BALIDO:  May we have five minutes in the

18   holdover, Judge.

19               (Recess taken.)

20               THE COURT:  Let the record reflect this

21   hearing is being conducted in open court, outside the

22   presence and hearing of the impaneled jury.

23          The defense may proceed.

24               MS. BALIDO:  We call the defendant, Jedidiah

25   Isaac Murphy.
```

1          THE COURT:   You may.

2          MS. BALIDO:   He's been previously sworn.

3          THE COURT:   He may testify where he finds

4    himself seated.

5          MS. BALIDO:   Okay.

6               JEDIDIAH ISAAC MURPHY

7    the defendant, was called as a witness in his own behalf and,

8    after having been first duly sworn, testified as follows:

9                    Direct Examination

10   By Ms. Balido:

11        Q.   Mr. Murphy, I have explained to you on a number of

12   occasions now that you have a right to testify on your own

13   behalf in the punishment hearing of this case; is that

14   correct?

15        A.   Yes, ma'am.

16        Q.   And I've explained and we have discussed on numerous

17   occasions the pros and cons of either testifying or not

18   testifying in this case; is that true?

19        A.   Yes, ma'am.

20        Q.   Both on guilt/innocence and also punishment; is that

21   true?

22        A.   Yes, ma'am.

23        Q.   And you have decided not to testify in this case?

24        A.   Yes, ma'am.

25        Q.   And that is your decision and your decision alone;

```
 1    is that correct?

 2         A.    Yes, ma'am.

 3                    MS. BALIDO:  Okay.  Nothing further, Judge.

 4                    THE COURT:  Mr. Murphy, by your responses, may

 5    I assume that nobody has forced or threatened or coerced you

 6    from testifying?

 7                    THE DEFENDANT:  Yes, sir.  No one did that.

 8                    THE COURT:  Do you have any questions for me

 9    in that regard?

10                    THE DEFENDANT:  No, sir.

11                    THE COURT:  None whatsoever?

12                    THE DEFENDANT:  Not a one.

13                    THE COURT:  Both sides ready for the jury to

14    return?

15                    MR. DAVIS:  We're ready.

16                    MS. LITTLE:  Gilda is here.  Shall she take

17    the stand?

18                    THE COURT:  We need the jury, first.

19         Sheriff.

20                    THE BAILIFF:  All rise.

21                    (Jury returned to courtroom.)

22                    THE COURT:  Let the record reflect the jury

23    has returned to the courtroom at this time.

24         Jury may be seated.

25         Mr. Murphy, counsel, visitors in the gallery, you
```

1    may be seated, please.

2            Defense may continue.

3                MS. LITTLE:  At this point we'll recall Dr.

4    Kessner.

5                THE COURT:  Doctor, if you please.

6                    GILDA KESSNER

7    was called as a witness by the Defendant and, after having

8    been first duly sworn, testified as follows:

9                    Direct Examination

10   By Ms. Little:

11       Q.   State your name, please, ma'am.

12       A.   Gilda Kessner.

13       Q.   You are the same Dr. Gilda Kessner that testified

14   earlier today; is that correct?

15       A.   Yes, ma'am.

16       Q.   Dr. Kessner, did I ask you this morning early to

17   review the Van Zandt jail records --

18       A.   Which I did.

19       Q.   -- that you testified about in this case?

20       A.   Yes.

21       Q.   And did do you that?

22       A.   Yes, I did.

23       Q.   Did you look at a form --

24                MS. LITTLE:  May I approach the witness, Your

25   Honor.

```
 1              THE COURT:  You may.
 2       Q.   (By Ms. Little)  Did you look at a form at my
 3   request this morning that's from the Van Zandt County Jail
 4   medical and/or and dental --
 5       A.   Yes, I did.
 6       Q.   -- portion?  What's the date of that?
 7       A.   10-26-95.
 8       Q.   And is there an indication there of some sort of
 9   urination problem?
10       A.   Urinary tract infection, needs assistance
11   immediately, and then problem -- complaint of -- I can't make
12   out this word, on urination.
13       Q.   And that was when he was in jail in October of 1995?
14       A.   Yes.
15       Q.   Tell the jury what somatoform means, Dr. Kessner?
16       A.    It's a category of disorders where an individual
17   will express emotional disturbance or psychological problems
18   with physical symptoms.  Very often medical doctors will do a
19   workup and not be able to find anything that can be
20   discovered through traditional medical tests.  There may be
21   in some cases an actual illness, however very often there are
22   complaints of pain, neurological symptoms, sexual
23   dysfunction, and other types of symptoms in that regard.  And
24   urinary retention is one of the symptoms that can be found.
25   It's actually a category of disorders.  So there's the
```

1   somatoform pain disorder, somatization disorder.  And it's

2   basically the way some individuals will express their

3   psychological distress.

4                    MS. LITTLE:  Thank you.  That's all I have.

5                    MR. DAVIS:  No questions.

6                    THE COURT:  Thank you.  You may again step

7   down.

8          Defense may continue.

9                    MS. LITTLE:  At this time, Your Honor, ladies

10  and gentlemen, the defense will rest.

11                   (Defense Rests in Rebuttal.)

12                   MR. DAVIS:  The State closes, Your Honor.

13                   MS. LITTLE:  Close.

14                   (Both Sides Close in Punishment.)

15                   THE COURT:  Ms. King, close the testimony,

16  please.

17                   (Close of testimony.)

18                   THE COURT:  Ms. Briscoe, ladies and gentlemen,

19  we'll stand in recess until tomorrow morning at 9:30.  A copy

20  of the first draft of the charge has been prepared, submitted

21  to the attorneys.  There necessarily will be some changes

22  which we'll make this afternoon.  We're going to be

23  assembling tomorrow morning before you.

24          It's my understanding that the bailiffs have

25  suggested an appropriate place for all of you to park

1  tomorrow morning; am I correct?  Anybody have a question

2  about that?

3          Ladies and gentlemen, I'm not, and I have absolutely

4  no way of knowing, nor do you, nor any of us, how long the

5  deliberations will last.  However, out of an abundance of

6  caution for your benefit, I'm going to ask that you pack some

7  additional items for bed wear and matters such as that.  We

8  have already -- not anticipating, predicting, because we do

9  not know, but obviously you don't know as well, but we've

10  already made reservations if deliberations should go into

11  Sunday.  So you may want to warn your family and friends and

12  those of you that have to take care of plants and pets or

13  whatnot make additional arrangements in the possibility.  Not

14  predicting it, none of us can, but it would be of great

15  benefit to you to make plans before you come down here,

16  rather than have the Sheriff go out and try to scramble up

17  some stuff and escort you to your house or apartment or

18  townhouse as the case may be.  Done that in the past.  It's a

19  hassle, especially to you good folks.  We want to avoid that

20  for your benefit.  Again, I'm not predicting it will happen.

21  We don't know.  But out of an abundance of caution and based

22  on past experience, you know, better to be safe than sorry.

23  So we'll see you-all tomorrow morning, jury room, 9:30 a.m.

24  Have a good evening.

25          THE BAILIFF:  All rise.

```
 1                    (Jury excused from courtroom.)

 2                    THE COURT:  Visitors in the gallery, you may

 3   be excused or seated as you wish.

 4                    (Recess of proceedings.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    Reporter's Certificate

2    STATE OF TEXAS:

3    COUNTY OF DALLAS:

4         I, Darline W. LaBar, Official Court Reporter of the

5    194th Judicial District Court, in and for Dallas County,

6    Texas do hereby certify that the foregoing volume constitutes

7    a true, complete and correct transcript of all portions of

8    evidence and other proceedings requested in writing by

9    counsel for the parties to be included in the statement of

10   facts, in the above styled and numbered cause, all of which

11   occurred in open court or in chambers and were reported by

12   me.

13        I further certify that this transcription of the

14   record of the proceedings truly and correctly reflects the

15   exhibits, if any, offered by the respective parties.

16        Witness my hand this the 13th day on November, A.D.,

17   2001.

18

19

20                    DARLINE W. LABAR

21                    Official Court Reporter

22                    194th Judicial District Court
                      Dallas County, Texas
                      (214) 653-5803

23

24

25   Certification No. 1064 Expires December 31, 2002

REPORTER'S RECORD

VOLUME 60 of 65 VOLUMES 74145

TRIAL COURT CAUSE NO. F00-02424-NM

| THE STATE OF TEXAS | : | IN THE DISTRICT COURT |
| VS. | : | DALLAS COUNTY, TEXAS |
| JEDIDIAH ISAAC MURPHY | : | 194TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PUNISHMENT PHASE BY THE JURY

FILED IN
COURT OF CRIMINAL APPEALS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEC 5 2001

A P P E A R A N C E S:

Troy C. Bennett, Jr., Clerk

HONORABLE BILL HILL, Criminal District Attorney
        Crowley Criminal Courts Building
        Dallas, Dallas County, Texas   75207
        Phone:  214-653-3600
BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
        MS. MARY MILLER, A.D.A., SBOT # 21453200
            FOR THE STATE OF TEXAS;

MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
Dallas County Public Defender's Office
        Phone:  214-653-9400
            FOR THE DEFENDANT.


            \*\*\*\*\*\*\*\*\*

        On the 30th day of June, 2001, the following

proceedings came on to be heard in the above-entitled and

numbered cause before the Honorable F. Harold Entz, Jr.,

Judge presiding, held in Dallas, Dallas County, Texas:

        Proceedings reported by machine shorthand, computer

assisted transcription.


DARLINE W. LABAR, OFFICIAL REPORTER

ORIGINAL

1                          INDEX VOLUME 60

2     June 30th, 2001                        PAGE     VOL.

3     Proceedings.......................................  2      60

4     Objections to Court's Charge......................  2      60

5     Charge of the Court Read..........................  4      60

6     PUNISHMENT ARGUMENTS:

7     Argument By Ms. Miller............................  4      60

8     Argument By Ms. Balido............................ 17      60

9     Argument By Ms. Little............................ 33      60

10    Argument By Mr. Davis............................. 44      60

11    Jury Verdict in Punishment....................... 61      60

12    Jury Polled Individually......................... 62      60

13    Defendant Sentenced.............................. 70      60

14    Reporter's Certificate........................... 72      60

15

16

17

18

19

20

21

22

23

24

25

<div align="center">P R O C E E D I N G S</div>

THE COURT:  The State have any objection to the charge?

MR. DAVIS:  No, Your Honor.

THE COURT:  Ms. Balido, you may dictate your objections into the record.

<div align="center">(Objections to Court's Charge)</div>

MS. BALIDO:  You're assuming I have objections, Judge.  And I do have a couple of objections, Judge.

First, we would object to the paragraph -- the second full paragraph on page 4 where the jury is instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling in answering special issues.  We feel it comments on the weight of the evidence on the mitigation question, Special Issue Number 2.  That's our first objection.

THE COURT:  Objection is overruled.  I cite for authority the United States Supreme Court case of Ramos, R-a-m-o-s, versus California.

MS. BALIDO:  And additionally, Judge, prior to the beginning of the punishment phase of the trial, we filed a motion for jury instructions regarding evidence introduced at punishment for consideration of the special issues.  In that motion under the Roman Numeral III we asked for a

1    instruction or an instruction saying the State has introduced

2    evidence that the defendant has committed unadjudicated

3    criminal offenses and/or bad acts.  You shall only consider

4    such evidence in answering special issue -- the first special

5    issue that deals with the issue of a continuing threat to

6    society if it helps you answer that issue.  You denied our

7    request to instruct the jury, so before the -- before the

8    beginning of the hearing and we'd ask you to instruct it in

9    the jury charge of the case.

10                    THE COURT:  Request denied.

11                    MS. BALIDO:  And we were making both of these

12   requests under the 5th, 6th, 8th, and 14th Amendments of the

13   United States Constitution, Article 1, Section 10, 13, 19 of

14   the Texas Constitution, the due course of law provision of

15   the Texas Constitution, the due process clause in the Equal

16   Protection Clause of the United States Constitution, and

17   Article 37.07(1) of the Texas Code of Criminal Procedure.

18                    THE COURT:  Anything further?

19                    MS. BALIDO:  Nothing further, Judge.

20                    THE COURT:  Sheriff, may we have Mr. Murphy,

21   please.

22              May we have the jury, please.

23                    THE BAILIFF:  All rise.

24              (Jury returned to the courtroom.)

25                    THE COURT:  Let the record reflect the jury is

1    returning to the courtroom, 9:29 a.m.

2            Ms. Briscoe, members of the jury, you may be seated.

3            Mr. Murphy, counsel, visitors in the gallery, you

4    may be seated.

5            Cause F00-02424-M, styled the State of Texas versus

6    Jedidiah Isaac Murphy, charge of the Court in the penalty

7    phase of the trial reads as follows:

8                    (Charge of the Court Read)

9            THE COURT:  Ms. Briscoe, members of the jury,

10   beginning on page 8 and following through page 10 are

11   possible special issue verdict forms, whatever the decision

12   of the jury may be.  I would like to also call your

13   attention, Mrs. Briscoe, to the last line on page 10, verdict

14   of the jury, so after you've answered the special issues,

15   however you and the jurors do, then there is another

16   appropriate line at the bottom signifying that it is your

17   verdict.

18           Proceed with counsel.  The State has the right by

19   law both to open and close.  The State has informed opposing

20   counsel and the Court that they will begin in the person of

21   the Honorable Mary Miller.

22           Ms. Miller.

23                   (Argument By Ms. Miller)

24           MS. MILLER:  May it please the Court, counsel.

25   Ladies and gentlemen of the jury, I just want to

DARLINE W. LABAR, OFFICIAL REPORTER

1   thank you to begin with for the attention that you have paid.

2   It seems like it's been ages since we started this trial, and

3   I know you're probably ready for this to be over, but this is

4   probably the most important part of the trial.

5        You have two special issues that you must answer,

6   and depending upon how you answer those special issues, the

7   Judge will then be required by law, if you answer them yes

8   and no, to sentence this defendant, Jedidiah Isaac Murphy, to

9   death.

10        On voir dire we talked to each and every one of you

11   about those special issues and some of the terms that were in

12   those special issues and how they would not be defined, but

13   that you would basically have to use your common sense and

14   the common everyday definition of what they were.  The first

15   special issue is Special Issue Number 1, and to remind you

16   and as the jury charge tells you, the State has the burden of

17   proof in order to prove beyond a reasonable doubt that

18   Special Issue Number 1 should in fact be answered yes, a

19   burden that we gladly accept, one that we believe that we

20   have met.

21        The special issue is as follows:  Do you believe or

22   do you find beyond a reasonable doubt that the defendant,

23   Jedidiah Isaac Murphy, Jim Murphy, Jim Ed Hines, Jim Kines,

24   Jim Tolar, whatever you want to call him, do you find beyond

25   a reasonable doubt that there is a probability that the

1    defendant will commit criminal acts of violence that will

2    constitute a continuing threat to society.

3            Now, it's real interesting because we talked to each

4    and every one of you on voir dire about what you believed

5    society meant.  And every single one of you said that society

6    was not limited to the prison.  Yet what was the evidence

7    that the defense brought to you to try and say that the

8    defendant was not going to be a future danger?  They brought

9    you two doctors to say, well, in prison the defendant

10   probably would not be a continuing threat to society.  In

11   prison this man probably would not commit criminal acts of

12   violence that would constitute a continuing threat to

13   society.  But the interesting thing, ladies and gentlemen, is

14   neither one of those, Dr. Crowder nor Mary Connell, would

15   even be qualified to sit as a juror on a death penalty case

16   because they limited the criminal acts of violence to

17   murder.  That's what Dr. Crowder said.  In order for a person

18   to be a continuing threat, in order for this person to be a

19   continuing threat, you have to limit it to prison and it

20   would have to be murder that he commits.  Well, as each and

21   every one of you know through voir dire, someone who limits

22   it that way, wouldn't even be qualified to sit where you're

23   sitting.  They want you to narrow the focus and narrow the

24   scope.  But that's not what the law says, ladies and

25   gentlemen.  Would this man -- in all probability --

1          MS. BALIDO:  I object to the prosecutor's

2     argument.  That's not what the law is.  She's trying to tell

3     the jury what society means.

4          THE COURT:  The charge contains the law

5     applicable.  The Court declines to make any further comment

6     in this regard.

7          MS. MILLER:  And the law says you cannot limit

8     criminal acts of violence --

9          MS. BALIDO:  Judge --

10          MS. MILLER:  -- merely to murder.

11          MS. BALIDO:  -- the jury can decide what

12     society means.

13          MS. MILLER:  You cannot limit it to murder.

14     The law says that.

15          MS. BALIDO:  Judge, may I have a ruling?

16          THE COURT:  Objection is overruled.

17          MS. MILLER:  And that's exactly what Dr.

18     Crowder wants you to do in order to believe that this

19     defendant would not be a future danger.  Probability, more

20     likely than not, 50.1 percent, tip the scales.  That's what

21     you have to look at.

22          Now, every one of you also said that one of the best

23     predictors of the past -- of the future is the past.  Look at

24     someone's behavior to look and see what they're going to do.

25     Gilda Kessner, Dr. Kessner said, oh, you don't look at

1    somebody's past in order to look at future dangerousness,

2    don't look at whether or not they raped, don't look at

3    whether or not they robbed, don't look at whether or not they

4    kidnapped, don't look at whether or not they committed

5    criminal acts of violence prior to this capital murder.  All

6    we really want you to look at is this particular little

7    capital murder.  Don't look at anything else that this man

8    has done in the past.  And then we're going to come up with

9    some number that says 26.3 percent up to 29.1 percent.  And

10   yet isn't it very interesting that they don't want to look at

11   anything else in the defendant's past to say whether he's

12   going to be a future danger in prison, limiting it once again

13   to in prison.  Yet every one of their experts said, yeah, if

14   you include society as the free world, every one of them

15   would be afraid and said that he would be a continuing threat

16   to society in the free world.

17            Well, ladies and gentlemen, you all know, we talked

18   about the Texas 7.  They were doing life sentences.  They

19   would not have even been considered a future danger according

20   to the statistics that their experts want you to look at.

21   But let's look at what the defendant has done in the past,

22   ladies and gentlemen, because the best predictor, I would

23   submit to you, of the future is the past.

24            What is this defendant's resume?  Well, you know

25   that in 1993 or in 1994, he took Mandy Kirl, a girl that he

1   had just met, for a ride in a pickup truck.  And what does he

2   do?  He parks and they're just sitting there and he reaches

3   under the front seat and pulls out a gun.  And he looks at it

4   and she said she thinks he's looking to see if it's loaded.

5   And then what does he do, he holds it to her left temple,

6   pressing against her head.  Are you afraid to die?  And you

7   heard what Ms. Kirl said.  She was terrified.  She didn't

8   know whether she was going to live or die then.  And how did

9   the defendant act as he was doing that?  Cool, calm, and

10  collected as he is holding the cold metal of that gun to her

11  head.  Kind of interesting that that's the very same way that

12  Ms. Cunningham died, isn't it?

13              MS. BALIDO:  Judge, I object.  That's -- she's

14  trying to prove up an extraneous offense by the -- by the

15  conviction of the capital murder.

16              THE COURT:  Objection is overruled.

17              MS. MILLER:  Then, you know that the defendant

18  had an aggravated assault in 1993 against Chelsea Willis.

19  Pulls a knife out, breaks her nose.  Yet, oh, you know,

20  forgive him, he was drinking, he didn't really mean it,

21  because as he's told people, I've never intentionally hurt

22  anyone.

23              You also have a burglary of a habitation.  You have

24  burglary of a vehicle on June 2nd of 1994.  And what does the

25  defendant get?  He's placed on probation and sent to boot

```
 1   camp.  We as a society tried to rehabilitate this man.  We
 2   gave him the opportunity to conform his actions to the norms
 3   of society.  We sent him to boot camp to get some discipline.
 4   And when you look at what he told some of the doctors, it was
 5   a very good experience for me.  I really learned a lot.  Did
 6   it stop him from his criminal behavior?  No, it sure didn't
 7   because what does he do?  He comes up to Dallas and commits a
 8   theft when he's in a stolen vehicle and that was August 18th
 9   of 1995.  Once again society says, well, okay, we're going to
10   give you another chance, Mr. Murphy, another chance to try
11   and conform, another chance to get some help.  And what does
12   the defendant do?  Thumbs his nose at it once again,
13   manipulates the system once again.  Then what does he do?
14   I'm sorry, he's got the possession of marijuana, March 14th
15   of 1996.  And then there's the aggravated assault, I'm sorry,
16   on August 17th of 1997, of Chelsea Willis.  He's called
17   out -- the police are called out because what does Chelsea
18   do?  Well, I was tired of his drinking.  I woke him up when
19   he was passed out so it's really my fault because I shouldn't
20   have woke him up.  Well, this man has manipulated everyone
21   around him to make them think that they're the ones at fault,
22   that they're the ones that are responsible for his actions.
23        So what does he do?  He starts a physical fight with
24   the mother of his child.  And then one of the friends tries
25   to step in and break it up to prevent this man from beating
```

1    on Chelsea Willis.  And what happens to Jeanne?  He slugs her

2    in the face, punches her in the eye, and then he breaks

3    Chelsea's nose and then he holds a knife on her.

4            August 26th of 1997, you have the kidnapping,

5    Sherryl Wilhelm in Arlington.  Look at Defendant's Exhibit

6    Number 62 and State's Exhibit Number 141.  Remember, Sherryl

7    Wilhelm gave a composite right after it happened.  And

8    Defendant's Exhibit Number 62 is what Chelsea said, look,

9    this picture was taken at my dad's in August of 1997.  Look

10   at the uncanny resemblance, ladies and gentlemen, between the

11   picture of the defendant in August of 1997 and the composite

12   that Sherryl Wilhelm did.  Who committed that kidnapping?

13   Who committed that aggravated robbery, that car jacking in

14   1997?  The defendant.  Proved it beyond a reasonable doubt?

15   You bet.  And what do you know about it?  I submit it's a

16   reasonable deduction from the evidence, ladies and gentlemen,

17   from all of the evidence that's been presented that had Ms.

18   Wilhelm not jumped out of that car, we probably would have

19   had another dead body.  She told you, I knew that if I didn't

20   get out of that car, then I probably would never get out

21   alive.

22           And so what did she do?  She risked life and limb,

23   suffered at the hands of this man in order to get away from

24   him.  This is the defendant's handiwork, ladies and

25   gentlemen.  This is his resume.  This shows what type of

1  future danger he is to society.  And not just society in

2  prison, but all of us, society in general.

3          May 14th of 1999, the defendant gets a driving while

4  license suspended.  Then in January, February of 2000, you

5  have Shirley Bard who was working with the defendant, who was

6  training the defendant, trying to help him better himself,

7  look, Jim, I'll teach you, I'll help you, I'll do what I can

8  to help you learn a trade.  And what does he do?  I'm going

9  to knock your fucking head off.  I am going to blow your

10  fucking head off.  You're not going to know when it's

11  coming.  You're not going to know how or where.  It might be

12  at your house because I know where you live.  It might be at

13  your other job because I know where you work.  You never know

14  when it's going to come.  And they want to blame the

15  defendant's actions on alcohol and drugs.  But you heard

16  Shirley Bard.  He was not intoxicated.  He wasn't even

17  drinking.  He was not under the influence of anything when he

18  makes these threats on three or four separate occasions

19  against a woman who had tried to help him.  He shows how he

20  repays people's kindness.  I'm going to blow your fucking

21  head off.  That's what kind of respect the defendant has for

22  society and for women.  Because if you look at it, most of

23  the people he preys on are people he thinks are going to be

24  weaker than him, the fairer sex, people that he thinks he can

25  control and intimidate and manipulate.

1          What else do you know?  He bragged about his prior

2     arrests.  He wasn't ashamed of the fact that he had been

3     arrested before.  It was like a badge of honor to him.

4               THE COURT:  Per your request, 15 minutes.

5               MS. MILLER:  And what else did he do?  He

6     bragged about the types of weapons that he could get his

7     hands on, AK 47.  I've got an AK 47.  I can get anything I

8     want.  Shirley Bard was scared to death, so scared she even

9     called the police department, but she didn't know the

10    defendant's true name.

11         Future danger, ladies and gentlemen?  Not beyond a

12    reasonable doubt, but all doubt.  Not just a probability.

13    Ladies and gentlemen, when you look at this defendant's

14    resume, I would submit to you that it is a certainty that

15    this man is a future danger to our community, to society,

16    regardless of where he is confined.

17         The answer to Special Issue Number 1 should be

18    answered yes.

19         Let's talk about Special Issue Number 2.

20    Mitigation.  Should you change a death sentence to one of

21    life?  Special Issue Number 2 reads as follows:  Do you find

22    from the evidence, taking into consideration all of the

23    evidence, including the circumstances of the offense.  Now,

24    it's been awhile since we talked about the circumstances of

25    the offense, but that's very important when you're looking at

1    Special Issue Number 2.  What you've heard recently is mostly

2    about the defendant or really kind of makes you wonder who's

3    on trial.  Heard a whole lot more about the defendant's

4    brother really than the defendant, as far as mitigation

5    goes.  The defendant's character and background and the

6    personal moral culpability of the defendant, that there is

7    sufficient mitigating circumstance or circumstances to

8    warrant that a death sentence -- I'm sorry, that a sentence

9    of life imprisonment rather than a death sentence be imposed.

10         When you look at that, is there sufficient

11   mitigating circumstances?  Well, ladies and gentlemen, I

12   would submit to you that there's not a single solitary

13   mitigating circumstance in here, let alone sufficient

14   mitigating circumstances to change a death sentence to one of

15   life.

16         The facts of the offense.  What do you know about

17   the facts of the offense?  Bertie Cunningham, an 80-year-old

18   woman, minding her own business, somehow came into contact

19   with this defendant.  And we know what the results of that

20   contact were.  She's dead.  She's dead because this defendant

21   put a bullet in her brain.

22         Circumstances of the offense?  Look at his own

23   confession.  Look at the versions of the events that the

24   defendant gave to their experts.  Mary Connell has in here --

25   says he had the gun in his right hand waving it in broad

DARLINE W. LABAR, OFFICIAL REPORTER

1  daylight and he transferred the gun from his right hand on

2  top of the trunk to his left hand and it went off.  There is

3  no way when you transfer the gun on the top of the trunk that

4  you can have a contact wound to an 80-year-old woman's head.

5  He has lied consistently to the police, to the experts, to

6  his family, and to his friends because the physical evidence

7  shows you that this was a cold-blooded execution of an

8  80-year-old woman.  And you know from their own experts, Dr.

9  Peerwani, and our expert Dr. Duval, that in all likelihood

10  she didn't die immediately.  She rode around in the trunk of

11  that car while that defendant is living it up, buying

12  scooters, trying to get her money out of the ATM's.

13          The defendant's background and character.  Well,

14  you've got it all right there, ladies and gentlemen.  If

15  Donnie Kines can rise above it, if Donnie Tolar can rise

16  above the background, then why can't this man who had many

17  more opportunities than Donnie did?

18          Personal moral culpability of the defendant.

19  Personal moral culpability of the defendant.  This is what he

20  chose to do, ladies and gentlemen.  There was no accident

21  about it.  And their own experts brought in the

22  interpretations of the MMPI, and the MCMI-III.  Read those,

23  ladies and gentlemen.  This -- it is chilling what it says

24  about the defendant.  This client's profile matches that of

25  the Megargee Type H offender, one of the most seriously

1   disturbed inmate types.  Adjustment to prison appears to be

2   difficult for them.  The relative frequency of this

3   defendant's profile is only 2.3 percent.  His feeling that

4   punishment should not have the affect of preventing him from

5   acting as he wishes results in a seesaw attention with

6   others.  You know he doesn't think punishment should stop him

7   because we've tried.  We've tried rehabilitation.  We've

8   tried punishment.  And what has he done?  He has escalated.

9   And we're now here because of a capital murder.

10          Ladies and gentlemen, the last thing that Bertie

11  Cunningham gazed upon on October 4th of 2000, was the face of

12  evil.  The last face that she saw as she was taking her dying

13  breaths as a result of the hands and actions of this man was

14  the face of evil.  And over the last three weeks of testimony

15  you have gazed upon the face of evil, ladies and gentlemen.

16  And it is embodied in that man right there.  I would submit

17  to you that all of the evidence in this case shows that

18  Special Issue Number 1 should be answered yes and Special

19  Issue Number 2 should be answered no.  This man cannot --

20  cannot be allowed to be a continuing threat to anyone,

21  because we know exactly what he will do if he is allowed to

22  live.

23                  THE COURT:  Defense may proceed.

24                  MS. BALIDO:  May it please the Court.

25                  THE COURT:  Ms. Balido.

1            (Argument By Ms. Balido)

2            MS. BALIDO:  Ladies and gentlemen, let's get

3   something out in the open right now.  There is no one in this

4   courtroom that is responsible for the death of Ms.

5   Cunningham, except for this man Jim Murphy.  There is no one.

6   There is no one that should be held accountable for the death

7   of Ms. Cunningham than that man sitting right there, Mr.

8   Murphy.  He did it by his own hand.  He said it in the words

9   of his confession in his voluntary statement.  And you said

10  so by your verdict.  You have held him accountable.  You have

11  held him responsible for the death of Ms. Cunningham.  And

12  now what your decision is, is what is the appropriate

13  punishment.  And what you have to do is you have to go back

14  to the charge and look at the charge and answer those

15  questions.  Okay.  You can't just sit here as you're sitting

16  here right now and say that guy deserves the death penalty.

17  How do I answer to get there.  You've got to look at Special

18  Issue Number 1 and see if the State, who has the burden of

19  proof -- the burden of proving that issue, should be answered

20  yes beyond a reasonable doubt.  Have they done it?  If they

21  have, answer the question yes and go to Special Issue Number

22  2.  If they have not, answer that question no, and he will

23  spend the rest of his life, as a reasonable deduction from

24  the evidence, the rest of his life in the penitentiary, 40

25  calendar years, day-for-day, week-for-week, month-for-month,

1    year-for-year in the penitentiary system.  If you answer

2    Special Issue Number 1 yes and you get to Special Issue

3    Number 2 and you find that there's no mitigating

4    circumstances, then you sentence -- or the Judge will

5    sentence the defendant to death.

6          In that charge however you will not find an

7    instruction that in any type of case the death penalty is

8    mandatory or that because of a certain type of crime, you

9    automatically have to answer those questions in such a way --

10   in such a way that the death penalty is mandatory or

11   automatic.  That's not in that charge.  You've got to look at

12   Special Issue Number 1 first, answer it, and if you answer it

13   yes, look at Special Issue Number 2.  That's just so

14   important.

15         I'm going to talk to you just a little bit about the

16   death penalty generally, and we talked about it on voir dire.

17   You do not have to kill this man to do justice in this case.

18   You do not have to kill him to do justice in this case.  No

19   matter what your verdict is, no matter how you answer those

20   questions, it's a reasonable deduction from the evidence

21   you've heard that he's 25, 24, 25 years old, he will spend

22   the next 40 years of his life in the penitentiary, and it's a

23   reasonable deduction from the evidence that he won't ever see

24   the light of day outside the penitentiary setting.  So what

25   that means is that with the death penalty, the time of his

1    death will either come at the hands of the State on a date

2    certain or it will be left to the hand of God.  It will

3    either happen in two years or three years when all the

4    appeals are done, or it will be left to the time that God

5    decides it's time for him to die and to come face him on his

6    judgment day.  That's what it looks like.  That's what it is.

7            Now, on voir dire a lot of you mentioned, when we're

8    talking about punishment, and we're talking about the death

9    penalty and murder cases, that you believe an eye for an eye.

10   But when you look at it that way, that he'll spend the rest

11   of his life in the penitentiary, and its just a matter of

12   when he's going to die and at whose hand he's going to die

13   from, what the death penalty turns into is an act of revenge,

14   an act of retribution, an eye for an eye, Old Testament eye

15   for an eye mentality.  And I just want to throw something out

16   to you to think about.  Ghandi said in the face of

17   persecution of his people, persecution in the killing of his

18   people when they were trying to assert civil disobedience and

19   their civil rights, Ghandi said, okay, they're killing us.

20   They're ending the lives of our people.  If we act or try to

21   assert an eye for an eye, we make the whole world blind.  And

22   I'd just ask you to think about that for a moment.

23           Let's look at Special Issue Number 1, and let's talk

24   a little bit about the burden of proof because it's so, so

25   important in this case.  They must prove to you beyond a

1   reasonable doubt that Special Issue Number 1 should be

2   answered yes.  And it's so important because you are the only

3   people that will make that decision.  There won't be a

4   decision in two years or somebody else to evaluate him in 2

5   years or 5 years or 10 years or 40 years to say he is no

6   longer a continuing threat to society.  Only you are the

7   people that are charged with making that decision so it's so

8   important that you hold the State to its burden of proof and

9   proving that Special Issue Number 1 should be answered yes.

10  Make them prove that to you.

11          And remember what we talked about on voir dire that

12  there's no automatic answer.  Just because you found him

13  guilty of capital murder, it should not be automatically

14  answered yes, that he's going to be a continuing threat to

15  society.  So let's look at the evidence and see what the

16  situation is.  If you believe that he will spend the next 40

17  calendar years in the penitentiary, his society that he is

18  going to be around is going to be a penitentiary setting.

19  Okay.  And you heard the State talk about society as a

20  whole.  Basically that's up to you to decide how you're going

21  to evaluate that word "society."  The Judge isn't going to do

22  it.  The lawyers can't do it.  The courts can't do it.  It's

23  only what you decide society is.

24          And let's go ahead and talk about the Texas 7 for a

25  moment.  I guess the D.A.'s want to go ahead and say there's

1    no way that the Texas Department of Criminal Justice

2    Institutional Division can do their job.  That there is no

3    way that they can do their job.  I guarantee you that's not

4    what TDCJ says to the legislature when they ask for millions

5    of dollars to build super max prisons and everything else.

6    So I guess they -- that the D.A.'s have decided because of

7    the Texas 7, that future dangerousness should always be

8    answered yes.  Because there is no way they can house people

9    that commit murders.  But that's just not so.  If you

10   remember what Dr. Kessner said, and she said it in response

11   to one of Mr. Davis's questions about the Texas 7.  Are you

12   saying that these -- you know, that these people -- I don't

13   really remember the question, but her answer was important.

14   Her answer was if the policies and regulations of the Texas

15   Department of Criminal Justice were followed and obeyed by

16   the staff, there would not be a danger.  But the D.A.'s want

17   you to look at the Texas 7 and put fear in your mind that the

18   TDCJ cannot do their job.  But, ladies and gentlemen, they're

19   in the business of housing people, and they're in the

20   business of housing people that have antisocial disorders.

21   You've seen it.  You've seen the population graphs about how

22   many people -- that's what they are set up to do.  They're

23   set up to house and keep from the free society in custody

24   people like Jedidiah Isaac Murphy who have been committed --

25   I mean, convicted of capital murder.  That's what their job

1  is.  And if they do their job right and follow the policies

2  and the regulations, there is not a danger to free society.

3          So what do we do?  We look at the society inside the

4  prison.  And I agree with Ms. Miller on this point.  I'm sure

5  y'all will be surprised.  But let's look at his actions in

6  jail, in an institutional setting, and see what those actions

7  are and see whether or not past behavior can prove future

8  dangerousness.  Let's look at that.

9          For the last nine months this man has been in the

10  custody of the Dallas County Jail.  He can't get toilet paper

11  without talking to somebody.  He can't eat without talking to

12  somebody.  He can't get his mail without talking to

13  somebody.  He can't come to court without talking to

14  somebody, all employed by the Dallas Sheriff's Department.

15  He can't go take a test over at Parkland without leaving this

16  building and going to Parkland and coming back.  He can't go

17  to all these different tests that's being taken.  He can't

18  have access to any experts, any lawyers, any visitors,

19  anything without being talked to or touched by somebody that

20  works for the Dallas County Sheriff's office.  I'd say he's

21  come into contact with hundreds if not thousands of people

22  over at the Lew Sterrett Justice Center.

23          And who does the State come to prove to you beyond a

24  reasonable doubt that he's going to be a future danger in the

25  penitentiary, but two incidents, one which is a suicide

1    attempt which they don't even think was even a reg -- I mean,

2    a serious suicide attempt.  That sometimes as the testimony

3    showed -- sometimes that's a ruse.  Sometimes people try it

4    to escape.  Sometime people are trying to hurt correctional

5    officers.  But everyone said, no, that wasn't this

6    situation.  Maybe he was just trying to get attention.  And

7    one scuffle in jail that was testified to yesterday by the

8    jail nurse, a scuffle that was so unimportant that no -- no

9    additional charges were filed in the jail and the person that

10   supposedly got kicked in the chest didn't even think it was

11   important to come down here and testify about it.  Those are

12   the two incidents that they show that he's going to be a

13   future dangerousness in the jail.

14            They want you to look at his other crimes.  Okay.

15   Well, let's look at them.  Possession of marijuana, driving

16   while license suspended, unauthorized use of a motor vehicle,

17   or I guess that was the theft case, burglary of a motor

18   vehicle and burglary of a friend's house, and the assault on

19   Chelsea.  Well, let's look.  He was already on probation for

20   burglary of a habitation and picked up a Dallas County

21   unauthorized use of a motor vehicle.  And the prosecutor

22   keeps on talking about what society did to him then.  Well,

23   you can check the records and you can see that society in

24   that situation was this court.  And this court decided that

25   he was such a danger to society, that they put him back out

1   on probation.  Okay.  That's what society, meaning this

2   court, did to him after they knew all these other things had

3   happened.

4          Additionally, the records also show that there was

5   not a motion to revoke his probation until this case came up

6   and he was such a bad probationer.  He was such a danger to

7   society, he was such -- you know, everything else that -- you

8   know, he's such a danger of society, but they didn't file a

9   motion until this case came up, regardless of what happened

10  after that.

11         What you don't see in those records is any kind of

12  problems in the Van Zandt County jail when he got arrested,

13  the Terrell jail, the Wills Point jail, or wherever he was,

14  or even the Dallas County Jail on those occasions to show

15  that he would be a future danger if he was inside an

16  institutional setting.

17         You additionally have the boot camp records where he

18  was actually a part of TDCJ, the boot camp, and there were no

19  disciplinary infractions.  I submit to you that shows that he

20  does well in an institutional setting, when he's away from

21  the alcohol, when he's in a very structured environment that

22  are set up to deal with the types of antisocial traits that

23  he has.

24         And then we get to the extraneous offenses.  And you

25  need to read the charge when it talks about extraneous

 1   offenses, because they must prove each one of these

 2   extraneous offenses to you beyond a reasonable doubt.  And

 3   you cannot take into consideration that he's been convicted

 4   of capital murder to make you think that's more true, that

 5   one of these -- or that you think that one of these

 6   extraneous offenses proves that he did all of these

 7   extraneous offenses.  They must prove each and every one of

 8   them to you beyond a reasonable doubt.

 9          Now, the first one is Mandy Kirl.  Now, there is no

10   police report because she never filed a police report because

11   it wasn't important enough to her to call the police, even

12   though supposedly he held a gun to her head.  He (sic) knew

13   where he lived.  He (sic) knew who he was, but she didn't

14   think it was important enough to call the police.  She's a

15   friend of Shod's and they went to go get firewood in the

16   middle of the night during a party alone.  And you know from

17   Chelsea Willis that they still saw each other after this

18   party.  And from the -- that witness's own words she said

19   that she wasn't too afraid of him to go out and talk to him

20   at the street by herself after it happened, to tell him off.

21          Secondly, Shirley Bard.  Again, no police report

22   filed although she said that she didn't know who he was, but

23   he did brag about his criminal record and I didn't quite

24   really understand that.  But I think you can tell that

25   Shirley Bard pretty much can take -- can give out as much as

1    she can take.  And maybe they get did get in a verbal

2    altercation and maybe there were some words that were flying,

3    but have they proved that to you beyond a reasonable doubt.

4              And then we get to this kidnapping in Arlington.

5    And there is absolutely positively not one doubt in my

6    mind --

7              MR. DAVIS:  I would object to the personal --

8              THE COURT:  Sustained.  Confine your argument

9    to other -- matters other than personal opinion.

10             MS. BALIDO:  Ms. Wilhelm believes to the

11   bottom of her soul that Jedidiah Isaac Murphy did that.  You

12   saw it -- I mean, you saw what she says.  But does that make

13   her eyewitness identification, and that's all they have in

14   this case is this eyewitness identification, any less

15   questionable?  Now, you have a chance -- if you have a

16   dispute about what her testimony was, to ask for certain

17   parts of her testimony with specificity.  And how she

18   identified him went like this.  It happened to her, she

19   talked to the police.  They did this composite photograph.

20   She gave a description to the police about a young man, a

21   certain weight, a certain height with olive skin.  The

22   composite was done, and then it was dropped for a certain

23   amount of time or they couldn't find him.  Then, a few years

24   later, and she told you that every time she hears something

25   about a kidnapping in a car, her radar goes up.  She hears

1   this for a second and kind of brings up the emotions again.

2   She looks up, she sees his face.  She looks on the Internet a

3   little bit, confirming to herself that this is the same man.

4   It looks like the man that did this to her.  Talks to her

5   mother.  You know, that picture, yeah, that does look like

6   the man that did it to you, confirming it again.  So she

7   calls the police officer and says the man that kidnapped the

8   lady in Garland is the man who kidnapped me.  So lo and

9   behold, here comes the Arlington Police Department with a

10  picture of the man who kidnapped Bertie Cunningham and puts

11  it in a lineup and of course the lineup is -- and she picks

12  out Jim Murphy.  And then she comes to court, and I think

13  that the record will show you that her testimony in the

14  courtroom when she testified was that she came down on a

15  pretrial hearing and she came in and Mr. Davis asked her do

16  you see the person that kidnapped you in the courtroom today

17  and she said no.  Later on, he said do you see the person in

18  the courtroom that you picked out of the lineup.  And she

19  looked again and said yes.

20          Now, do you see the person that kidnapped you that

21  day?  And she said yes, and then she came into court and

22  identified him.  Again, it's ever going, ever confirming this

23  information.  This is very, very tough because this is one of

24  those eyewitness cases that has no physical evidence, no

25  fingerprints, no DNA that's going to come back in 15 years

1    and say he's not the man.  Your decision is the final

2    decision on this.  No other person or no other jury has heard

3    these extraneous offenses before.  There are no judgments,

4    there are no sentences.  That's for you and you alone to

5    decide.

6              And to believe that he committed that offense in

7    Arlington, you have to believe that he worked a full shift --

8              THE COURT:  Counsel, per your request, 20

9    minutes.

10             MS. BALIDO:  Thank you, Judge.

11             He worked a full shift at his job.  He left at his

12   regular time.  He either hitchhiked or took Chelsea's car

13   over to Arlington by 11:45, kidnapped Ms. Wilhelm, dumped her

14   out of the car, and somehow got to Wichita Falls where there

15   was another person that was kidnapped and the man who -- I

16   mean, another person that was mugged and the man who mugged

17   that person was chased by this Felix Ozuna guy and he

18   described him to the police --

19             MR. DAVIS:  I'm going to object to that.  That

20   was excluded as hearsay, as I recall, Your Honor.

21             THE COURT:  Sustained.

22             MS. BALIDO:  And all the property was left,

23   including Ms. Wilhelm's car was left in Wichita Falls and

24   found the next morning, but Jedidiah Murphy is at work just

25   like any regular day that night and worked another full

1  shift.  And we've got Chelsea who came in with her calendar

2  that said it was just like any other day.  And don't you know

3  that if he took her car for any amount of time, she would

4  have thought he was drinking and she would have said big

5  fight with Jim on her calendar, just like she did every time.

6           It's problematic because it's hard to prove how it

7  was just another day, but there are work records and there's

8  Chelsea's calendar.

9           The State must prove to you beyond a reasonable

10 doubt that he committed those extraneous offenses and that

11 the person that did that -- and that is in the composite is

12 Jim Murphy, not Matt Murphy who looks the same, not Warren

13 who looks like the suspect they thought in Wichita Falls and

14 not half the D.A. interns that have been sitting in here all

15 afternoon, young, 25, dark hair, short on the sides.

16          I'm just going to talk just real briefly for the

17 next couple of minutes about Special Issue Number 2, but what

18 you have to know is that Special Issue 1 must be proved

19 beyond a reasonable doubt.  And just because you find him, if

20 you do, to be a continuing threat to society, whatever you

21 find that to be, doesn't mean that he should get the death

22 penalty.  Because you have to look at and must consider all

23 the evidence in regard to mitigation in this case.  Because

24 this case is more than the events of October 2000.  You know,

25 you read in the paper of stories of children that have --

1    that witness their father beat their mother, knock the teeth

2    out of their mother.  You see stories in the paper about

3    children who observe harsh discipline, whippings and beatings

4    of other siblings, locking in rooms, and you think to

5    yourself those kids will never be the same.  They don't have

6    a chance.  And that's what mitigation is.  That's what

7    mitigation is.  Because he's one of those kids.  And this is

8    more than free will and choice and stepping away from that

9    sort of situation as the State would have you believe,

10   because it wasn't Jim's choice to be born of a son-of-a-bitch

11   father and a mother who left him at Buckner, not once but

12   twice and had him run down the street after her and after the

13   car.  It's not his choice to go to the Tolars, and whatever

14   you believe about the Tolars, the fact of the matter is that

15   he didn't have a choice to go there and he didn't have a

16   choice as a child to leave, regardless of what informal

17   choice they gave him.  The choice between the brother that's

18   the only stability he's ever had and staying with a family.

19   It wasn't his choice to go to the Murphy's where he got to

20   have a glimpse of what a real life might really be about only

21   to have that snatched away when his adoptive mother would not

22   talk to him at all or acknowledge his existence after he

23   chose to go with the parent he was closer to.  Those were not

24   choices that he made.  Those are institutional failures.

25   Those are family failures.  Those are society failures to

1    protect the child that he was and to try to help the adult

2    that he is.

3              Now, we're being accused of trying to excuse his

4    behavior through mitigation.  And I'm not saying that because

5    of that he's not responsible for Ms. Cunningham's death.  He

6    should be held accountable for Ms. Cunningham's death.  I'm

7    not excusing his behavior one bit.  But you cannot tell me

8    that there has not been irreparable harm to that family when

9    you look at the kind of person that Donnie is.  You look at

10   the kind of person that Jim is and you look at the kind of

11   person that Tonya Thorp is trying to be but struggles with

12   everyday. All the children in that family have problems.

13   It's not just Jim.  Jim has the additional problem of he's

14   addicted to alcohol.  And what it shows -- it's not an excuse

15   what it shows, but it shows how he's different from what we

16   normal law-abiding people are.  It shows how he can come to a

17   place in his life that he can hold a gun to the head of an

18   80-year-old woman and that's not outside the realm.  I

19   mean -- and it's troubling and we talked about it on voir

20   dire how it's troubling because that sort of thing is -- is

21   mitigating because he's had all these problems, but it's also

22   aggravating and shows that he's dangerous.  And that's what

23   the problem is, and those are the sorts of things you have to

24   sort out.

25              But it also explains the things he did afterwards

1   that he went around, he went to Tonya's house, he went by

2   Cruz's house and dumped off some stuff for his family.   He

3   was buying presents for people because he was leaving one way

4   or another.   He may have been going to Florida.   He may have

5   been going to kill himself.

6              THE COURT:   25 minutes, Counsel.

7              MS. BALIDO:   Thank you, Judge.

8         What he's trying to do is he's trying to -- I don't

9   know what he's trying to do, but what he is doing is he's --

10  he's signing these receipts and he's leaving bread crumbs to

11  get caught.   Okay.   It was open and notorious what he was

12  doing.   People were looking for him.   There were receipts all

13  over town.   And he was looking to get caught, and the police

14  finally caught him.   And what's the first thing that he does

15  to Matt Murphy (sic) when he's caught, he accepted

16  responsibility that he's the person that killed her and told

17  them where the body was.

18        Now, you've heard of some bad cases in this

19  courtroom, and they were brought up by the State.   You've

20  heard of people sodomizing their victims after their death.

21  You've heard people slitting the throats of children to not

22  leave witnesses.   You've heard of people beating some people

23  to death.   You've heard of people -- you've heard of the

24  Texas 7 and how they killed a police officer on Christmas

25  Eve, you know, while they were trying to rob somebody after

1   they had broken out of the prison setting.  Those are the

2   kind of cases that you've heard about that -- that have

3   received the death penalty and the State is going for the

4   death penalty on.

5            But those are not the facts of this case, and I say

6   that with all respect, with not trying to diminish the way

7   that Ms. Cunningham died.  But those types of cases are not

8   Jim.  And there is something to be said for that.  Jim is

9   going to prison for the rest of his life.  And they say that

10  in prison you're born again every morning and you die again

11  at night and you wake up another day and you're born again

12  that morning.  He's going to live the rest of his life cold

13  and afraid and alone, and that's exactly what he deserves,

14  because that's what happened to Ms. Cunningham.  And when he

15  dies in prison, he's going to die cold and afraid and alone,

16  and that's what he deserves.  But the question is, is that

17  going to be done by the hand of the State or by the hand of

18  God.  And as the Judge told you, the mitigation question is

19  the mercy question.  And I ask each one of you to show mercy

20  for Jim Cun -- Jim Murphy.  Not because he deserves it, and

21  not because he showed one ounce of mercy to Ms. Cunningham in

22  this case.  But only because mercy was given to you, and it's

23  yours to give.

24            THE COURT:  Ms. Little.

25            (Argument By Ms. Little)

1          MS. LITTLE:  Thank you.

2          Your Honor, ladies and gentlemen.

3          It's horrible, isn't it?  Everything about this is

4     horrible.  What I would like to say to you first is that we,

5     Jennifer and Mike and I, are also members of this community.

6     We share your values, your concerns about crime, and what

7     happens in our community.  I need to reiterate to you though

8     that this is a case where you're going to be punishing --

9     you're going to be punishing.  Either way it's a punishment.

10    There -- it's been said before.  It's going to be said

11    again.  There are no excuses for this.  No excuses.  No

12    excuses.  But I hope when you're doing your deliberating,

13    that you'll realize that in a sense you've become inductees

14    into the Army being selected as jurors in this case.

15    Because, you know, it's not easy to kill a person, even if

16    you think they deserve it.  So it's kind of necessary to

17    train you to get you ready so you can easily do it.  And

18    that's done the same way in trials all over the country, as

19    it's done in the Army when there's a war.  And that way is to

20    dehumanize the person who has been accused of the crime.

21          Now, Jim Murphy has done quite a bit of that himself

22    by his actions, but the best way to dehumanize is to make

23    everything black and white, everything simple, black and

24    white, no grays, no differences, no -- no consideration for

25    complexity in people, no consideration for that.  So although

1   you can consider mitigating evidence, the State I'm sure, and

2   you know, we don't get to talk after they do, they're going

3   to suggest to you that there's not anything mitigating, that

4   everything is aggravating, and that is a decision that you

5   will have to make once you go back there to deliberate.  But

6   I hope you will keep in mind that everything isn't simple.  I

7   know -- I know that you will.

8        Mitigating things in the case of Jim Murphy can be

9   the background with his original family, the Kines, where his

10  father tried to drown children when he was a teenager, killed

11  a kitten with a fork, tried to sexually molest his cousin who

12  was 11, marries half a dozen women, winds up with Hope

13  Abbott, has more kids and more kids, and drinks and drinks

14  and drinks.  Hope Abbott becomes ill.  She, certainly in the

15  eyes of Jim, abandoned those boys.

16        Mary Connell told you that unlike most small

17  children who are in denial, these children early thought that

18  they had been thrown away.  Thrown away.

19        They wind up being adopted by the Tolars, and I'm

20  not even going to try to figure out what happened at the

21  Tolar's, but Dr. Connell and Dr. Crowder both told you that

22  because of the behavior after, that there were some problems

23  in that home, some kind of problems in that home.  Mr. Tolar

24  himself told you that it was unmanageable for them.  They,

25  I'm sure, were trying to do something good.  They wind up

1   with five boys and one of them is Donnie who is

2   uncontrollable, but he admitted that they did time-out by

3   locking Donnie up.  How do you control a kid like Donnie that

4   doesn't bleed over into the other children?  Whether it was

5   intentional or not, there were problems in that home with

6   abuse and discipline.  I would submit to you that that's a

7   fair deduction from what you've heard.

8           Then the kids go to the Van Zandt County Children's

9   Shelter and we're back in the early 80's, so that means that

10   the preacher takes them there.  There is no kind of court

11   proceeding to determine if there's been anything done

12   improperly.  There's no lawyer appointed to represent the

13   children in the Van Zandt County Children's Shelter.  So

14   there was never any kind of investigation done to determine

15   anything about these kids or their placement or what was

16   going on in that household, so we'll never know that.

17           Now, of course, we have all of these things.  We

18   didn't have them then.  We didn't have those things then.  So

19   Jim winds up with another lucky break and he goes to the

20   Murphy's and it looks like the American dream to him.  And at

21   first it is.  But then you find out that there's abuse in

22   that family.  There's a lot of drinking in that family, that

23   Matt Murphy himself slugged his father for abuse.  And it

24   just keeps on keeping on, keeping on.

25           I would submit to you that by this time it's too

1    late for Jim anyway.  The abandonment initially did it to him

2    probably and then whether the Tolars had any problems with it

3    or not, a little kid is being taken places and dumped and

4    taken places and dumped and taken places and dumped is not

5    going to probably have a very positive reception of the

6    motives of people that take them in, even if they're well

7    meaning, and especially with the circumstances and the

8    discipline in that home.

9            So Jim did have some things when he went to the

10    Murphy's.  And then he started drinking.  Because Jim is a

11    chronic alcoholic.  Tracy told you there were problems in

12    that home.  Lots of problems in that home.  So we've got Jim

13    abandoned by his mother.  Jim abandoned by the Tolars.  Jim

14    abandoned by the Murphys -- Mrs. Murphy, and ultimately Mr.

15    Murphy.  And that's his history.  I'm not going to stand here

16    and tell you that Jim doesn't lie.  He sure does.  He lies

17    and he manipulates.  That's right.  He does that because

18    that's how he learned to survive as a child.  Donnie

19    externalized it.  Jim internalized it.  Donnie didn't drink.

20            Now, these cases that are from the past seemly would

21    not be very significant I don't think as an individual one,

22    except perhaps for the burglaries, but those cases were never

23    revoked either.  And the burglary of the vehicle that he had

24    was three months after he got a 10-year probation for it.  He

25    stayed on those probations all these years, so you know he

1   had been doing something he was supposed to do, if not all.

2   And you know he's got a checkered past with it.  He's works

3   awhile, does well for a while, falls off.  You also know,

4   which I would consider to be a mitigating factor and I hope

5   that you will, is that he loves other people and he's loved

6   by them.  He's not an antisocial personality disorder.  He's

7   ashamed of what he did.  He's ashamed for his family.  He's

8   ashamed for the Cunninghams.  He was a child who did not have

9   problems with the law when he was a young person.  He started

10  running around with Shod Tarrant, and I would submit to you

11  that you know he has living relationships from what you've

12  heard.  There are people who care about him.  But you know

13  you have to know inside that's true, you have to know.  You

14  know he has a narcissistic personality disorder which makes

15  him brag and be haughty and show off and run his mouth

16  because of his insecurity.  You know that he has borderline

17  personality disorder, which also causes a lot of these

18  problems.  And you know that he's an alcoholic.  You also

19  know that he's tried to get help over and over and over

20  again.

21          Now, the State is going to say, so what, he never

22  followed through.  I don't think you can ever get quite that

23  far with it.  I don't think he could.  But the fact that he

24  kept trying has to show you that he was trying to feel

25  better.  He was trying to fix himself.  He was trying and

1   trying.  And then he'd fall off.  He goes to AA.  He goes to

2   all these mental institutions.  These are attempts to avoid

3   misery.  These are attempts to avoid pain.  Unfortunately, he

4   does the drinking to avoid the pain usually.

5          The State is going to tell that you there's not a

6   remorseful thing about him.  I submit to you that's wrong.

7   Everything has to be black and white to kill the enemy.

8   Everything has to be black and white to kill the enemy.  We

9   do have in our law, the law of the land, certain instances

10  where specific intent to kill is okay.  In this particular

11  state the only deadly weapon that can be used is a jury.

12         Remorse, I would submit to you, is very much

13  apparent in the life of Jim.  He confesses to this crime.  We

14  go down there to see him on the 7th of October, and I hope

15  you don't think I am so stupid that I would run around that

16  jail for three hours waiting to see him only to say, now you

17  be sure and keep on talking to the police.  He gives them a

18  confession.  He says it's an accident.  In his mind I think

19  that's the way he can accept it, because he feels guilty

20  about it.  They only want you to believe what suits their

21  case.  Everything else is a lie.  Jim lies about these

22  things, but not what fits the theory of the State's case.

23             THE COURT:  Five minutes remain.

24             MS. LITTLE:  So he gives how many statements?

25  The first one, the one we had to drag out of him where it

1  shows some remorse.  Barely we know about that.  Finally that

2  gets to you, but that's not remorse, according to Matt

3  Myers.  The crying, the tears are not remorse, because you

4  see everything has to be black and white.  I submit to you

5  that you can do something this horrible and still feel bad

6  about it and still feel remorse.

7          Matt Myers told you that Jim admitted that he had

8  been to that Walgreen's where they think that he got her.

9  Why would he do that?  He continued to try to help them in

10  spite of all the legal advice he got.  They played on his

11  guilt throughout this because he has it.  Jason Bonham got

12  the information about where Ms. Cunningham was because he

13  reminded him of their friend in high school that killed

14  himself and the animals got him.  And if you remember what

15  Jason Bonham said, Jim said, "oh, man."

16          Now, the State's going to make a big issue, I feel

17  sure, too, about him going and drinking after this murder and

18  that that shows no remorse.  He didn't turn himself in.

19  That's no remorse.  People respond differently to things even

20  when they're at fault.  His response was to do what he always

21  does which is to go start drinking.  He never, as Jennifer

22  mentioned to you, made any effort to hide from the police.

23  He put his own name and address on the credit cards. He knew

24  it was just a matter of time.  He starts drinking to dull

25  what he's done and everything else about his miserable life.

1   And when they catch him, he helps them.

2         Now, Dr. Kessner talked to you about future danger,

3   and I -- I don't have time to go back over this, but you know

4   you have all these things to take in there with you.   Future

5   danger is something that's been -- there have been a lot of

6   studies done and over the past hundred years you know that

7   there's a very small percentage of people who are a danger in

8   the prison population, even murderers of which they're 11

9   percent of the population.  You know that Jim's base rate for

10  serious violence is 16.4, that he gets a plus 7.4 for the

11  robbery and in brackets 5.3 because of his prior prison term,

12  which is not even like a normal prison term.  It's like going

13  to the military boot camp, and then they get out in a few

14  months.  You know he conformed there.  You don't have one

15  single piece of evidence -- one single piece of evidence to

16  make you think that Jim is going to be a future danger in the

17  penitentiary.  His percentage for overall risk rate is 23.8

18  percent up to 29.1 percent.  Now, Mr. Davis wasn't very happy

19  with the cap of 54 percent because probability is probably

20  50, 51.

21         I know that y'all have listened so carefully.   I

22  want to thank you for it.  I want you to please consider

23  everything you've heard.  I'm not asking you to excuse one

24  thing he's done.  But the evidence that you've got before

25  you, from the scientific studies, is that he is not likely to

1    be a future risk in the penitentiary.  If you want to worry

2    that there might be another jail break later and kill him

3    because of that, then, you know, that's just not what's

4    supposed to be going on here.  You promised us during jury

5    selection that because we have a victim here that is the most

6    unbelievably awful victim that you could ever hope to come up

7    with, that you would not automatically answer that first

8    issue yes.  That was the oath you took when you became

9    jurors.  Jim Murphy tried to kill himself in prison, in the

10   jail there.  His other attempts were probably more attention

11   getting than anything else, but he cut his own throat and he

12   cut his own wrist down.  Maybe he wants you to give him the

13   death penalty.  I don't know.  But I'd ask you to do this in

14   a civilized way, which I know you will, because if you do

15   just answer the future issue -- future danger issue based on

16   the capital crime, then we're not far enough away from just

17   going out to a tree somewhere.  That's why we have this law.

18   That's why we need people like you that will follow it.  You

19   can punish him.  He'll be punished.  He's not going to live

20   40 years I would submit to you.  Dr. Kessner told you he's

21   more likely to be a preyed upon person than a predator.  He's

22   going to be somebody's housewife.  The principal said he was

23   a mousy little guy, talking big and bragging and acting like

24   he's a bigger shot than he is, and lying about where his hand

25   was shot or what caused that to happen.  That's all just

1    bragging.  You know, we don't give the death penalty for

2    lying and bragging.  We don't do that in this State.

3         Please consider very carefully.  You can take all

4    that evidence back.  I put all those composites in evidence

5    to show that they're so generic, that they're very limited in

6    their ability to help find a person.  The photo lineup is

7    horrible on the Sherryl Wilhelm case.  They'd have you think

8    he went off to Wichita Falls and then got back.  Now,

9    physically I guess he could do that, but I believe the way it

10   went in testimony is that the objection was sustained but the

11   door was opened.  And it was testified that Ozuna chased a

12   170-pound Hispanic male three blocks down an alley.  You've

13   got a purse found over here on Minnetaska.  You've got a

14   broken car on the way to somewhere, away from Dallas over

15   here.  You've got nothing to connect Jim with Arlington,

16   Texas, or Wichita Falls.  And even if you think he might have

17   done that, Chelsea's diary shows you he was there.  He's got

18   these ears.  How could she not notice that.  He didn't do

19   that.

20        And you remember on very voir dire we talked to you

21   about that van that was found close to a scene in a green

22   parka, a black male.  A woman was raped in a college.  She

23   accused him.  He was convicted.  He was sentenced.  He went

24   to the penitentiary.  And it turned out not to be him.

25   Please don't let that case tilt you into a death penalty for

1    Jim.  Please don't.  They have not proven it.  And there's no

2    correction if you make a mistake.

3          I want to thank you very much.  I know you're all

4    tired.  We're all tired.  I think this might be the most

5    important thing you ever do, and I know you'll give just

6    consideration to it.  Thank you.

7                THE COURT:  Mr. Davis, the State may

8    continue.

9                (Argument By Mr. Davis)

10                MR. DAVIS:  May it please the Court.

11          Ladies and gentlemen, I'm just going to have a

12    little over 20 minutes to speak with you this morning.  I

13    think we can all agree that this has been a very long and

14    horrible journey we've had to go through together.  I would

15    assume that when we had you down here on jury selection, that

16    none of you in your wildest nightmares could ever have

17    imagined the kind of brutality in these types of crimes,

18    these types of actions that you've had to listen to these

19    past three weeks.  And it's taken a lot of courage for you

20    people to hang in there, to be attentive, to really brace

21    what's really happening in this case.  And for that I do

22    sincerely appreciate your courage and your attentiveness

23    throughout this case.

24                Now, at the outset let me just say that -- I want to

25    acknowledge that those were two very eloquent arguments given

1    to you by the defense.  You know, it's only natural in a case

2    like this to show some emotion, to focus on the defendant.

3    That's only natural in a case like this for that to be done.

4    You know, it's a little much perhaps to accuse you of being a

5    lynch mob or to being Army soldiers that are going to go out

6    there and kill someone in some cold-hearted fashion, to

7    equate you in a sense with being the same type of

8    cold-blooded murderer that Jedidiah Isaac Murphy is, because

9    you're not.  Let's make one thing very clear this morning.

10   We're not at this point because of something that we've done.

11   We're not at a point where we have to make a decision like

12   this because of something that you've done.  We're here

13   because of Jedidiah Murphy, the way he's lived his life, and

14   the outright evil choices that this man has made throughout

15   his life.  Make no mistake about it.  That's why we're here

16   this morning.  So none of you should feel any sort of guilt

17   at this point about what we're going to do in this particular

18   case and the decisions that you have to make at this stage.

19   Don't feel any guilt.  It's not your responsibility that

20   you're here for that reason.

21            You know, the old adage goes that actions speak

22   louder than words.  And no matter how hard you try to

23   humanize Jedidiah Isaac Murphy, his actions say all that you

24   need to know about what he's about now and what he's going to

25   be in the future.  And let's look at some of those actions

1    for the next few minutes.  You know, you have to start, I

2    would submit, with the murder of Bertie Cunningham.  If you

3    look at how that came about.  I mean, here's a man who made a

4    conscious decision again to bring a gun out of that home of

5    Tonya Thorp.  I mean, there was a fair amount of planning to

6    this thing because you see, he made a conscious decision,

7    didn't he, that he would pick out one of the most vulnerable

8    and helpless victims imaginable, an 80-year-old woman whose

9    defenses are totally down.  She's in her neighborhood at 3:00

10   p.m., and yet this man right here chose to pick out Bertie

11   Cunningham to violate and to kill that day.  I mean, those

12   are the facts that you're dealing with in this type of crime.

13   You know, that crime was violent beyond belief.  A gun put up

14   to that poor woman's head and at a contact range a bullet put

15   into her brain.

16       And what did he show us about how much dignity he

17   felt about Ms. Cunningham then before he had 12 jurors

18   impaneled to decide his fate?  You know, close the trunk on

19   her like she's a sack of cement or garbage and toted her

20   around town.

21       Now, Ms. Little says he reacted the way he always

22   does, that he went out there and started drinking.  You know

23   from the evidence in this case that's not how he reacted to

24   the death of Bertie Cunningham.  The Garland police have

25   never received an explanation.  These doctors up here have

1  never received an explanation about why his very first action

2  while that poor woman lie dying in that trunk was to go up to

3  an ATM machine and start trying to rifle through her checking

4  account to get her money.  Or why he went down to Harry Hines

5  and did the very same thing.  You know, if you want again a

6  reminder of what his mind-set is before you 12 people are

7  impaneled, before he's captured and he's told about a

8  possible death penalty, all you have to do is look at that

9  tape from Chacho's in Terrell because again, his actions

10  speak louder than any words that could be spoken in this

11  court.  They really do truly tell you all you need to know.

12       And as far as this man being cooperative and helpful

13  with the Garland Police Department, you know, again, never an

14  explanation for what he was really doing.  This statement

15  that he never was afraid to just, you know, let it open, use

16  his name.  That's not true either.  If you look at some of

17  those other credit card receipts, you'll see that once he

18  buys those Go-Peds, he goes into the mode and very often he's

19  signing Cunningham to the receipts.  You know, why is he so

20  careless?  You know, that's up to you to decide.  But you

21  have to know this, that in this man's mind, you know, when he

22  signs that statement and he says this was an accident, why

23  should you have any regard for what you've done earlier

24  because you see, if he can get one jury in Dallas County to

25  buy that excuse, he walks smooth out of this courthouse,

1  smooth out, not guilty, accident, forget it, and he's free

2  again, isn't he?  You know, they say today, no excuses.

3  That's quite a change, isn't it, from a couple of weeks ago?

4  It's kind of like getting to the middle of that stream and

5  that horse that you're riding just ain't going to make it

6  across that creek, is it?  And so you've got to jump on

7  another one.  And now you say there are no excuses what he

8  did to Ms. Cunningham.  Yet, when he was first there in the

9  Garland Police Department and he had an opportunity to tell

10  his side of the story, what does he do?  He gives a legal

11  excuse that would walk him out of this courthouse.  That's

12  his true mind-set.  It really is.  And, you know, if you look

13  at his cold remorseless way of doing things, I think we can

14  agree, can't we, that this guy's got one of the most

15  inconvenient or most convenient lapses of memory that you'll

16  ever see, doesn't he?  To the point where he's trying to sell

17  the story to his doctors that, by golly, you know, he doesn't

18  remember anything from Bleachers until he just happened to

19  wake up in that car and poor Ms. Cunningham is sitting next

20  to him.  And, you know, matter of fact, Doctor, my victim,

21  the one that I killed, I mean, she's the one that pointed the

22  gun out to me and said, hey, look over here, Jimbo, it's in

23  the console.  Now, again, you're free to believe that if you

24  want to, but it makes absolutely no sense.  And I would

25  submit to you that his memory lapses are very convenient and

1   they're very deliberate.  Just like Matt Myers told you

2   yesterday, there's things this man knows, he ain't telling.

3   And that's by his choice.

4          Now, you know, I guess having lived in this county

5   all my life, I guess you just have to say it's a sad

6   commentary to where we've gotten to, isn't it?  It really

7   is.  I guess there are places that common sense would tell

8   you may not be safe to you, places and times where maybe

9   you're not free to do what you want to do, but, by golly,

10  have we gotten to the point in this county where an

11  80-year-old woman isn't free to go run an errand for a sister

12  who can't and to get back to her home safely, without a

13  predatory individual like Jedidiah Murphy capturing her and

14  murdering in broad daylight?  Have we really gotten that far?

15  I guess we have.  And that indeed is very, very sad.  It's a

16  very sad commentary about this county.  But it's sad and it's

17  a result of individuals just like this man right down here.

18  Nothing that we've done.  Everything that he's done.

19         You know, when we look at his resume, as Ms. Miller

20  said, I think what this tells you is several things, but

21  primarily what it says is this, that this man has lived his

22  life in such a way that he's put you on notice.  He's put you

23  on notice that he will not abide by the same rules that you

24  and I abide by.  No matter whether they're relatively minor

25  or major, he has no respect for human life, for the rights of

1    others.   That's the kind of individual that we're talking

2    about right here.   We're talking about the kind of man who

3    with Ms. Cunningham will act as a Judge, jury, and

4    executioner of a totally innocent individual and then come in

5    here through his attorneys and ask for mercy.   That's the

6    kind of person that we're talking about, aren't we, in

7    Jedidiah Isaac Murphy here?

8            You know, I've got to stand here on behalf of the

9    State of Texas, and I've got to tell you that we've made

10   mistakes in our dealings with Jedidiah Isaac Murphy, haven't

11   we?   You see, when he came into the courts of Van Zandt

12   County, we made a very serious mistake.   He told us, the

13   State of Texas, what he was willing to take, and we gave it

14   to him.   We underestimated him as an individual.   We

15   underestimated his threat to the community.   We took him at

16   his word, and we said we'll give you the minimum here.   We'll

17   put you on probation.   As a matter of fact, we'll put you on

18   two probations and we'll leave you free to basically do as

19   you please.   And I'm very sad to tell you up here in Dallas

20   County, in this very same court, we made another horrible

21   mistake because we looked Jedidiah Isaac Murphy right in the

22   eyes and we said to him, tell us what you want.   He gave us

23   his order, and then you know what, we filled his order and we

24   gave him what he wanted and we underestimated him again.

25   That's our mistake, and I'm sad to say we've got to take some

DARLINE W. LABAR, OFFICIAL REPORTER

1    responsibility for it.

2            You know, and as we dealt with him on other charges

3    of marijuana and DWLS and other things, again, we gave him

4    what he wanted to get out of this system.  Those were

5    mistakes that we made unfortunately.  They turned out to be

6    very deadly mistakes and Bertie Cunningham paid with her

7    life, I'll submit, partly because of the mistakes the State

8    of Texas did.  And our mistake was in believing in him,

9    trying to help him, and taking him at his word that he would

10   not be a future threat to society.  And we were mistaken

11   about that.  And now today, again through Ms. Little and Ms.

12   Balido, this man sits here and he -- basically he has put his

13   order in to you, and you've got a choice right now.  There is

14   a true fork in the road that you've got to look at.  You are

15   either going to give this man again what he wants, which is

16   the minimum of a life sentence, or you're going to do what's

17   right.  That's your decision.  Do we repeat the mistakes of

18   the past?  Do we underestimate his future threats to society

19   again?  Are we at this time, this date, finally said no

20   more?  This is the end of the road.  We're not going to

21   jeopardize society anymore because of what you've done.

22           You know, Special Issue Number 1, is he a future

23   threat to society.  I'll submit to you the answer without

24   question is yes.  The defense wants you to limit that word

25   "society" to prison only.  Why?  Because it's really the

1    only hope they have of having you good 12 people answer no to

2    Special Issue Number 1.  But if you look at his behavior in

3    the Dallas County Jail even, you've really got to question

4    that, don't you?  I mean, you've really got to question what

5    he's all about.

6              Here's a man who on two different occasions through

7    his own actions tries to get out to Parkland Hospital, a much

8    less secure facility than the Dallas County Jail.

9              MR. BYCK:  Objection, Your Honor.  Been no

10   evidence, arguing outside the record, speculation.

11             THE COURT:  Sustained.

12             MR. BYCK:  Ask the jury be instructed to

13   disregard.

14             THE COURT:  Jury will disregard the last

15   comment by the prosecutor.

16             MR. BYCK:  Respectfully move for a mistrial.

17             THE COURT:  Denied.

18             MR. DAVIS:  Tried to leave a highly secure

19   area of the Dallas County Jail to get to a hospital here in

20   this community.

21             How does he do it?  Well, this suicide attempt --

22   again, you're free to draw whatever conclusions you want to.

23   It's curious though, isn't it?  Here's a man who knows full

24   well how to kill.  He's got no trouble with Bertie

25   Cunningham.  But time and time again, even up there in the

DARLINE W. LABAR, OFFICIAL REPORTER

1    Dallas County Jail, he just can't quite succeed at taking his

2    own life.  And I'll submit to you that that attempt up there

3    in the Dallas County Jail was a ruse.  It was a ruse again to

4    try to invoke sympathy on your part and to get out of the

5    highly secure area of the Dallas County Jail.  It's the very

6    same effort he made with nurse Sanders, you know, where he

7    claimed to be unconscious and she came down there.  She

8    observed him raising his head, looking about, again trying to

9    manipulate the environment for his own advantage, for his own

10   sympathetic purposes.  And thank God she kept looking at him

11   and she found him out and he assaulted the personnel up

12   there.  And those complaints that were so serious before that

13   he needed to leave that secure environment for, poof, they

14   disappear when Bill Parker leaves the building.  And they're

15   never heard of again.  I mean, you've really go to question.

16   This guy is smart.  We know that.  He's a problem solver if

17   ever there was one, according to his records.  He figures the

18   system out.

19          You know, all you have to do if you really have a

20   question about what this guy's going to do in prison, if you

21   look at the defense's own expert -- now, these are not people

22   that the State of Texas hired on his behalf, but you look at

23   Dr. James Butcher who the defense hired and this report was

24   brought out on cross-examination.  And you remember what Dr.

25   Butcher said?  You know, he's the doctor, I suppose, who's

1   not opposed to the death penalty.  Here is what he says about

2   the defendant.  He says this man right here is a poor

3   candidate for psychotherapy.  Individuals with his profile

4   are not very amenable to changing their behavior.  You have a

5   litany illustrating his behavior.  He goes on to say this,

6   they tend to be quite aggressive.  And finally, if you have

7   any question about what this man is all about in a confined

8   setting, adjustment to prison appears to be difficult for

9   them.  Those aren't my words, ladies and gentlemen.  That's

10  not some expert that we hired.  That's Dr. James Butcher

11  hired by the defense to look at the tests administered to

12  this man over here.  So even if I look at that set alone,

13  which each and every one of you told us you weren't going to

14  do, but even if you do that, I mean, their own expert says,

15  that ain't going to fly in this case.  This man is going to

16  be a danger wherever he's going to be.  And if you look at

17  the community as a whole and each and every one of you

18  pledged to us that you would in this case.  Even Dr. Kessner

19  and Dr. Crowder who came in here, had to tell you that they

20  are not happy with the death penalty in the State of Texas

21  and have serious problems with it.  When I asked each and

22  every one of them, I said, Dr. Crowder, Dr. Kessner, do you

23  have an opinion about whether this man is going to be a

24  threat in this community.

25          Yes, I do.

DARLINE W. LABAR, OFFICIAL REPORTER

1          What is that opinion?

2          Yes, he will be a future threat and danger in the

3     community as a whole.  Again, those are not people that I

4     hired.  Those are people that came right from this table over

5     here and at least they were honest enough to come in here and

6     tell you, future danger in the community, no question about

7     it.  That's their opinion.

8          When you look now at Question Number 2 briefly,

9     mitigation -- mitigating circumstance.  I'll submit to you

10    this.  While things are not always black and white, I think

11    we have a pretty clear picture, don't we, about what's

12    happening here?  What we have really here, we've got a

13    lifetime of excuses, a lifetime of blaming, a lifetime of

14    trying to shift the responsibility to other people.

15         Now, I'm not saying that he grew up to age 5 in a

16    wonderful home.  I mean, there's no question, that was a bad

17    home to have to grow up in.  No question about it.

18         Now, many of his father's actions that you heard

19    about, occurred before this man is even born.  But he had to

20    see some things that none of us would want to have to see.

21    But the evidence, I submit to you, from age 5 on, for the

22    last 20 years this man hadn't even witnessed abuse of any

23    form.  He's never ever been the victim of abuse the evidence

24    shows, never.  Even in his father's home there's no evidence

25    that this man ever was the victim of abuse at his father's

1    hands.  He may have seen it --

2              MS. LITTLE:  I'll object to that as a

3    misstatement of the evidence.

4              THE COURT:  Province of the jury to recall the

5    testimony as they heard it.

6              MR. DAVIS:  You know, and Ms. Little, you

7    know, wrote this down.  She talked about trying to dehumanize

8    individuals.  You know, some plot on our part to dehumanize

9    the defendant.  I'll tell you what's dehumanizing.  That's

10   what you had to hear about poor Terry Tolar.  You talk about

11   a vicious slanderous smear campaign launched against a good,

12   honest hard-working man.  This Terry Tolar, he wasn't going

13   out looking for kids.  He and his wife had to pray about

14   that.  Even though they had three more in the home, they

15   decided to take this boy and his brother, even with his

16   problems, and tried to help them.  No abuse ever was meted

17   out against this person at the hands of either Terry or

18   Celeste Tolar.  You know, and if you've got any doubt about

19   that, again, I suggest that you look at the records.  Those

20   records that were generated on January the 5th of 1987, by

21   Dr. Richard Ingrim.  And he very clearly says with regard to

22   this person down here, no evidence of psychological or

23   physical or sexual abuse.  None whatsoever.  Because it just

24   didn't happen.  Those are the facts and the reality here.

25             What other possible mitigating circumstances?

1   Well, we know he's not retarded.  We know by all the tests

2   done this is an above average, smart guy, good problem

3   solver.  He's got absolutely no damage to his brain or

4   central nervous system.  This isn't somebody who's been the

5   victim of nature here.  None whatsoever, the doctors say,

6   after testing.  We know, you know, again smart.  He's

7   capable, but a man who's made terrible decisions.  The

8   decision to pick up that bottle, to pick up the needles, to

9   pick up the pills, again, are all decisions made by this

10   individual right over here with very serious consequences.

11   Again, voluntary decisions, every single one of them.  And

12   I'd submit to you that this person has been blessed in his

13   life with people who have hung with him and stuck with him

14   through thick and thin.  I mean, family members, regardless

15   of his behavior, have always been available for him, haven't

16   they?  His family out here, Randy Crow, all of these people,

17   you know, that regardless of what he did to them or to

18   others, came in here and told you there was never a time that

19   I didn't love this man.  There was never a time that I turned

20   my back on this man.  There was never a time if he said, hey,

21   I've got a problem, I need your help, that I wouldn't have

22   done everything necessary to help you.  I mean, that's the

23   reality here.  We've got a person unfortunately who has made

24   countless evil choices in his life.  And no matter how good a

25   boy he may have been early on, the sad fact is people

1    sometimes change.   Sometimes they change for the better, and

2    sometimes they don't.   And we've got one here today who's

3    made some decisions that have taken him down a very horrible

4    dark road.

5                    THE COURT:   Two minutes remain, Counsel.

6                    MR. DAVIS:   Let me talk to you briefly about

7    Sherryl Wilhelm and the kidnapping that occurred.   You know,

8    you don't just have to take the eyewitness account of Ms.

9    Wilhelm where she's with this man for several minutes.

10   You've got Randy Crow, don't you?   Now, this is one of the

11   defendant's closest confidants, friends, and supporters that

12   he's ever had in his life.   You remember when I asked Randy

13   Crow, did you discuss that kidnapping case over in

14   Arlington?   He said, yes, I did.   We looked at some

15   paperwork.   I said, what exactly did the defendant tell you?

16   You remember what Randy Crow said because it's very, very

17   important here.   He said to all of us, he said, this man down

18   here, he didn't deny it.   What he said was, you know, Randy,

19   I just don't remember if I kidnapped that woman or not.

20   That's exactly what Randy Crow came in here to this

21   courthouse and told you and that is the truth.   That's

22   exactly what this man said.

23                   You know, again it's only natural to focus on him.

24   But, you know, Bertie Cunningham over here, this good and

25   saintly woman over here, you know, there was a time not so

1    long ago when she was still ours, wasn't she?  She was ours.

2    She was our neighbor, our helper.  She was our sister.  She

3    was our grandmother.  She was our mother.  Even more than

4    that, she was an example to all of us, I submit to you, on

5    how you live your life with dignity and grace.  She is no

6    longer with us because an individual back on October the 4th

7    of the year 2000, made a conscious decision to take her from

8    us and he had absolutely no right to do that at all for his

9    own greedy purposes, but he did it, didn't he?

10            We're coming to the end here.  You know, it started

11   a long time ago.  It's kind of like a marathon race in a way.

12   Van Zandt County Sheriff's Department, members of the Garland

13   Police Department, they picked up that torch of truth a long

14   time ago, and they ran with it as long as they were allowed,

15   and then they handed that torch to Ms. Miller and myself.

16   And I can honestly tell you we've done everything we can do

17   to try to illuminate the truth for you.  We can't cross the

18   line.  I mean, at this point I've got to hand that torch over

19   to you.  You 12 people are the only ones who are allowed to

20   cross the line and to find the true verdict in this case.  So

21   now on behalf of Ms. Cunningham's family and their lives that

22   have been shattered forever and on behalf of this voice who

23   has been silenced forever, I'm going to use my voice and I'm

24   going to ask you to keep the commitment that you made to Ms.

25   Miller and myself, to render a true verdict in this case, to

1    do true justice, to follow the law and the evidence.   True

2    verdict in this case is this, Special Issue Number 1 yes.

3    Answer to Special Issue Number 2 no.   And each and every one

4    of you made the solemn commitment to us, regardless of the

5    consequences, if the evidence told you those were the

6    answers, that you could and you would return those answers,

7    and I'm going to ask you to keep your commitments to us at

8    this time, to render that true verdict in this case.

9            I want to thank you for your service here, and God

10   be with all of you.

11           THE COURT:   Sheriff, if you'd retire the jury.

12           Ladies and gentlemen, you begin your deliberations

13   and when lunch has arrived, we'll take a lunch break.

14               (Jury excused from courtroom.)

15           THE COURT:   Visitors may be excused or seated

16   as you wish.

17               (Recess for deliberations at 11:19 a.m.)

18           THE COURT:   If there's anybody in the

19   courtroom who feels regardless of the jury's answers, they

20   cannot control their emotions, and I realize that may be the

21   case, I would invite you to consider excusing yourself from

22   the courtroom at this time.   I do not wish my comment in any

23   way, shape, or form to be interpreted by any of you as my

24   desire that any of you excuse yourself from the courtroom,

25   but this is, I understand and appreciate, has been an

1    emotional experience for all of us.  And I can understand if

2    anybody wishes to excuse themselves, they are invited to do

3    so.

4         It's my understanding the defense wishes the jury to

5    be polled individually; am I correct?

6              MS. LITTLE:  That's right.

7              THE COURT:  Sheriff, may we have the jury,

8    please.

9              THE BAILIFF:  All rise.

10             (Jury returned to the courtroom.)

11             THE COURT:  Ms. Briscoe, members of the jury,

12   you may be seated.

13        Mr. Murphy, counsel, visitors in the gallery, you

14   may be seated as well.

15             (Jury Verdict in Punishment)

16             THE COURT:  Cause Number F00-02424-M, styled

17   the State of Texas versus Jedidiah Isaac Murphy, verdict

18   reads as follows:

19        Answer to Special Issue Number 1:  We, the jury,

20   unanimously find and determine beyond a reasonable doubt that

21   the answer to this special issue is yes.  Signed Nichole

22   Marie Briscoe, presiding juror.

23        Answer to Special Issue Number 2:  We, the jury,

24   unanimously find that the answer to this special issue is

25   no.  Signed Nichole Marie Briscoe, presiding juror.

1      Verdict of the jury reads as follows:  We, the jury,

2  having answered the foregoing issues, return the same unto

3  the Court as our verdict.  Again, signed Nichole Marie

4  Briscoe, presiding juror.

5      Ms. Briscoe, ladies and gentlemen of the jury, a

6  request has been made of the Court to poll you individually.

7  I will call you individually.  I will ask the special issue

8  verbatim to you.  Afterwards you will respond either yes or

9  no, according to your conscience.

10      (Jury Polled Individually)

11      THE COURT:  Juror Number 1, Emilia Nisbet.

12  Ms. Nisbet, do you find from the evidence beyond a reasonable

13  doubt that there is a probability that the defendant would

14  commit criminal acts of violence that would constitute a

15  continuing threat to society?

16      JUROR:  Yes, sir.

17      THE COURT:  Ms. Nisbet, Special Issue Number

18  2:  Do you find from the evidence, taking into consideration

19  all of the evidence, including the circumstances of the

20  offense, the defendant's character and background, and the

21  personal moral culpability of the defendant, that there is a

22  sufficient mitigating circumstance or circumstances to

23  warrant that a sentence of life imprisonment rather than

24  death be imposed?

25      Your answer?

1          JUROR:  No, sir.

2          THE COURT:  You may be seated.

3      Juror Number 2, Dorothy Jennings.  Ms. Jennings,

4  Special Issue Number 1:  Do you find from the evidence beyond

5  a reasonable doubt that there is a probability that the

6  defendant would commit criminal acts of violence that would

7  constitute a continuing threat to society?

8          JUROR:  Yes.

9          THE COURT:  Special Issue Number 2:  Do you

10  find from the evidence, taking into consideration all of the

11  evidence, including the circumstances of the offense, the

12  defendant's character and background, and the personal moral

13  culpability of the defendant, that there is a sufficient

14  mitigating circumstance or circumstances to warrant that a

15  sentence of life imprisonment rather than a death sentence be

16  imposed?

17          JUROR:  No.

18          THE COURT:  You may be seated.

19      Juror Number 3, Kathy S. Hunter.  Ms. Hunter,

20  Special Issue Number 1:  Do you find from the evidence beyond

21  a reasonable doubt that there is a probability that the

22  defendant would commit criminal acts of violence that would

23  constitute a continuing threat to society?

24          JUROR:  Yes.

25          THE COURT:  Special Issue Number 2:  Do you

1  find from the evidence, taking into consideration all of the

2  evidence, including the circumstances of the offense, the

3  defendant's character and background, and the personal moral

4  culpability of the defendant, that there is a sufficient

5  mitigating circumstance or circumstances to warrant that a

6  sentence of life imprisonment rather than a death sentence be

7  imposed?

8          JUROR:  No.

9          THE COURT:  You may be seated.

10         Presiding juror, Nichole Briscoe.  Ms. Briscoe,

11  Special Issue Number 1:  Do you find from the evidence beyond

12  a reasonable doubt that there is a probability that the

13  defendant would commit criminal acts of violence that would

14  constitute a continuing threat to society?

15         JUROR:  Yes.

16         THE COURT:  Special Issue Number 2:  Do you

17  find from the evidence, taking into consideration all of the

18  evidence, including the circumstances of the offense, the

19  defendant's character and background, and the personal moral

20  culpability of the defendant, that there is a sufficient

21  mitigating circumstance or circumstances to warrant that a

22  sentence of life imprisonment rather than a death sentence be

23  imposed?

24         JUROR:  No, sir.

25         THE COURT:  Be seated.

1            Richard A. Bachmeyer.  Mr. Bachmeyer, Special Issue

2   Number 1:  Do you find from the evidence beyond a reasonable

3   doubt that there is a probability that the defendant would

4   commit criminal acts of violence that would constitute a

5   continuing threat to society?

6            JUROR:  Yes.

7            THE COURT:  Special Issue Number 2:  Do you

8   find from the evidence, taking into consideration all of the

9   evidence, including the circumstances of the offense, the

10  defendant's character and background, and the personal moral

11  culpability of the defendant that there is a sufficient

12  mitigating circumstance or circumstances to warrant that a

13  sentence of life imprisonment rather than a death sentence be

14  imposed?

15           JUROR:  No.

16           THE COURT:  You may be seated.

17           Robert L. Mendro.  Mr. Mendro, Special Issue Number

18  1:  Do you find from the evidence beyond a reasonable doubt

19  that there is a probability that the defendant would commit

20  criminal acts of violence that would constitute a continuing

21  threat to society?

22           JUROR:  Yes.

23           THE COURT:  Special Issue Number 2:  Do you

24  find from the evidence, taking into consideration all of the

25  evidence, including the circumstances of the offense, the

1    defendant's character and background, and the personal moral

2    culpability of the defendant, that there is a sufficient

3    mitigating circumstance or circumstances to warrant that a

4    sentence of life imprisonment rather than a death sentence be

5    imposed?

6                    JUROR:  No.

7                    THE COURT:  You may be seated.

8           Jo Ann Lawley.  Ms. Lawley, Special Issue Number 1:

9    Do you find from the evidence beyond a reasonable doubt that

10   there is a probability that the defendant would commit

11   criminal acts of violence that would constitute a continuing

12   threat to society?

13                   JUROR:  Yes.

14                   THE COURT:  Special Issue Number 2:  Do you

15   find from the evidence, taking into consideration all of the

16   evidence, including the circumstances of the offense, the

17   defendant's character and background, and the personal moral

18   culpability of the defendant, that there is a sufficient

19   mitigating circumstance or circumstances to warrant that a

20   sentence of life imprisonment rather than a death sentence be

21   imposed?

22                   JUROR:  No.

23                   THE COURT:  You may be seated.

24          Andre Garza.  Mr. Garza, Special Issue Number 1:

25   Do you find from the evidence beyond a reasonable doubt that

1    there is a probability that the defendant would commit

2    criminal acts of violence that would constitute a continuing

3    threat to society?

4            JUROR:  Yes.

5            THE COURT:  Special Issue Number 2:  Do you

6    find from the evidence, taking into consideration all of the

7    evidence, including the circumstances of the offense, the

8    defendant's character and background, and the personal moral

9    culpability of the defendant, that there is a sufficient

10   mitigating circumstance or circumstances to warrant that a

11   sentence of life imprisonment rather than a death sentence be

12   imposed?

13           JUROR:  No.

14           THE COURT:  You may be seated.

15       Marcus S. Rasco.  Mr. Rasco, Special Issue Number

16   1:  Do you find from the evidence beyond a reasonable doubt

17   that there is a probability that the defendant would commit

18   criminal acts of violence that would constitute a continuing

19   threat to society?

20           JUROR:  Yes, sir.

21           THE COURT:  Special Issue Number 2:  Do you

22   find from the evidence, taking into consideration all of the

23   evidence, including the circumstances of the offense, the

24   defendant's character and background, and the personal moral

25   culpability of the defendant, that there is a sufficient

1  mitigating circumstance or circumstances to warrant that a

2  sentence of life imprisonment rather than a death sentence be

3  imposed?

4                    JUROR:  No, sir.

5                    THE COURT:  Be seated.

6          Mark T. Jones.  Mr. Jones, Special Issue Number 1:

7  Do you find from the evidence beyond a reasonable doubt that

8  there is a probability that the defendant would commit

9  criminal acts of violence that would constitute a continuing

10 threat to society?

11                   JUROR:  Yes, sir.

12                   THE COURT:  Special Issue Number 2:  Do you

13 find from the evidence, taking into consideration all of the

14 evidence, including the circumstances of the offense, the

15 defendant's character and background, the personal moral

16 culpability of the defendant, that there is a sufficient

17 mitigating circumstance or circumstances to warrant that a

18 sentence of life imprisonment rather than a death sentence be

19 imposed?

20                   JUROR:  No, sir.

21                   THE COURT:  You may be seated.

22         Mr. Henry Lee Turner.  Mr. Turner, sir, Special

23 Issue Number 1:  Do you find from the evidence beyond a

24 reasonable doubt that there is a probability that the

25 defendant would commit criminal acts of violence that would

1  constitute a continuing threat to society?

2           JUROR:  Yes.

3           THE COURT:  Special Issue Number 2:  Do you

4  find from the evidence, taking into consideration all of the

5  evidence, including the circumstances of the offense, the

6  defendant's character and background, and the personal moral

7  culpability of the defendant, that there is a sufficient

8  mitigating circumstance or circumstances to warrant that a

9  sentence of life imprisonment rather than a death sentence be

10  imposed?

11          JUROR:  No.

12          THE COURT:  You may be seated.

13      Ms. Shannon Hinckley.  Ms. Hinckley, Special Issue

14  Number 1:  Do you find from the evidence beyond a reasonable

15  doubt that there is a probability that the defendant would

16  commit criminal acts of violence that would constitute a

17  continuing threat to society?

18          JUROR:  Yes.

19          THE COURT:  Special issue Number 2:  Do you

20  find from the evidence, taking into consideration all of the

21  evidence, including the circumstances of the offense, the

22  defendant's character and background, and the personal moral

23  culpability of the defendant, that there is a sufficient

24  mitigating circumstance or circumstances to warrant that a

25  sentence of life imprisonment rather than a death sentence be

1    imposed?

2                    JUROR:  No.

3                    THE COURT:  You may be seated.

4                    (Defendant Sentenced)

5                    THE COURT:  Jedidiah Isaac Murphy, may I ask

6    that you please rise.

7              Cause Number F00-02424-M, styled the State of Texas

8    versus Jedidiah Isaac Murphy, pursuant to the answers to the

9    special issues by this jury, Order, Judgment, and Decree of

10   the Court that you be taken by the Sheriff of Dallas County,

11   by him safely held until transferred to an authorized

12   receiving agent of the Institutional Division of the Texas

13   Department of Criminal Justice, Huntsville, Texas, death row,

14   where you shall await the outcome of the appeals.  In the

15   meantime, you are imposed to a sentence of death.  Remand you

16   to the bailiffs.

17             Ms. Briscoe, ladies and gentlemen, it's been a very

18   physically -- it's okay to cry.  Draining time for all of

19   us.  If any of you find it necessary after going through this

20   experience that you need some professional help, if you would

21   please feel free to contact me privately, I will see to it

22   that help is given to you, to cope with any emotional

23   problems that you may have at no cost to you.  You may retire

24   back into the jury room.

25             If any of you desire to be escorted by the bailiffs,

1  that will be made available to you.  The attorneys may want

2  to visit with you.  You are allowed to, but you are not

3  required to.  Likewise, representatives of the media are

4  here.  You are free to talk with them if you wish, but you

5  are not required to.  It's up to you.  Thank you very much.

6  You-all are excused.

7              (Jury excused from courtroom.)

<div align="center">Reporter's Certificate</div>

STATE OF TEXAS:

COUNTY OF DALLAS:

   I, Darline W. LaBar, Official Court Reporter of the 194th Judicial District Court, in and for Dallas County, Texas do hereby certify that the foregoing volume constitutes a true, complete and correct transcript of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in the statement of facts, in the above styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

   I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

   Witness my hand this the 13th day of November, A.D., 2001.

DARLINE W. LABAR
Official Court Reporter
194th Judicial District Court
Dallas County, Texas
(214) 653-5803

Certification No. 1064 Expires December 31, 2002

1               REPORTER'S RECORD

2           VOLUME 61 OF 65 VOLUMES          **74145**

3       TRIAL COURT CAUSE NO. F00-02424-NM

4   THE STATE OF TEXAS          :      IN THE DISTRICT COURT

5   VS.                         :      DALLAS COUNTY, TEXAS

6   JEDIDIAH ISAAC MURPHY       :      194TH JUDICIAL DISTRICT

7               ********************        **FILED IN**

8               EXHIBIT VOLUME         **COURT OF CRIMINAL APPEALS**

9               ********************        DEC 5 2001

10  A P P E A R A N C E S:            **Troy C. Bennett, Jr., Clerk**

11  HONORABLE BILL HILL, Criminal District Attorney
            Crowley Criminal Courts Building
12          Dallas, Dallas County, Texas  75207
            Phone:  214-653-3600
13  BY:     MR. GREG DAVIS, A.D.A., SBOT # 05493550
            MS. MARY MILLER, A.D.A., SBOT # 21453200
14              FOR THE STATE OF TEXAS;

15  MS. JANE LITTLE, Attorney at Law, SBOT # 12424210
    MR. MICHAEL BYCK, Attorney at Law, SBOT # 03549500
16  MS. JENNIFER BALIDO, Attorney at Law, SBOT # 10474880
    Dallas County Public Defender's Office
17          Phone:  214-653-9400
                FOR THE DEFENDANT.

18

19              *********

20      On the 26th day of February, through the 30th day of

21  June, 2001, the following proceedings came on to be heard in

22  the above-entitled and numbered cause before the Honorable F.

23  Harold Entz, Jr., Judge presiding, held in Dallas, Dallas

24  County, Texas:  Proceedings reported by machine shorthand,

25  computer assisted transcription.

                DARLINE W. LABAR, OFFICIAL REPORTER

1

2

3

4

5

6

7

8

9

10              State's Exhibit Number PT1

11              Juror History - Cannon

12               (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                    JUROR HISTORY SYSTEM
                    LINE SELECT SCREEN
    LAST                FIRST          MI        CASE NUMBER(S)
   ---------------    ---------------  -        ----------- ---------
    CANNON             MARVIN          M  F98  68837
    CANNON             MAXINE          L  F81  04489T
    CANNON             MICHAEL         P  F97  52855
    CANNON             MICHELE         C  F92  67353I
    CANNON             NANCY           K  F99  929012
    CANNON             OLGA PENA       R  M97  23888
    CANNON             PATRICIA           F72  75595J
    CANNON             PEGGY           J  186  35249L
    CANNON             PEGGY JANE      P  M99  40043
    CANNON             RAYMOND         W  178  02385H
    CANNON             RICHARD            181  24272
    CANNON             RITA            A  M97  21604J
    CANNON             ROBERT          L  F79  050780
    CANNON             ROBIN              F91  60036
    CANNON             SANDRA          M  F93  42361R
    PF3=EXIT   PF8=PAGE FORWARD   PF7=PAGE BACKWARD
    POSITION CURSOR ON LINE TO VIEW AND PRESS ENTER
```

STATE'S
EXHIBIT

Pretrial

PENGAD-Bayonne,N.J.



1

2

3

4

5

6

7

8

9

10                State's Exhibit Number PT2

11              Juror History - Biggerstaff

12                  (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
2
Pretrial
PENGAD-Bayonne, N.J.

JUROR HISTORY SYSTEM
INQUIRY SCREEN

JUROR INFORMATION                    DEFENDANT INFORMATION
DL #    00000000   DOB                LAST   AUDBREY
LAST    BIGGERSTAFF                   FIRST OVERTURF              MI A
FIRST   ANDREA          MI  L         DATE  04 25 84    CASE #  83 76117
STREET  00744KINGSWOOD               CHARGE  ASSAULT
CITY RICHARDSON          ZIP 75080 0000 PLEA (G-N-O) N
JUROR (G-F-B)  F                      ELIGIBLE FOR PROBATION (Y OR N)
COMMENTS CONVERSION REC FROM OLD JURY HISTORY SYSTEM
          AUDBREY OVERTURF
          R=J+J
                        TRIAL INFORMATION
  VERDICT (G-N-H)  G      PRIOR CONVICTION SHOWN (Y OR N)  Y
PUNISHED BY (JG OR JU) JG PUNISHMENT  30DAYS
PROSECUTORS  LEAD LAST  SHIPMAN              FIRST
          PICK LAST  KUCERA                FIRST

CASE (G-B-F)  F
          ENTER A NEW KEY, LAST NAME, OR PERFORM A TASK
          PF3=EXIT  PF4=UPDT  PF5=ADD  ETC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

State's Exhibit Number PT3

Juror History - Mendro

(Copy attached)

NAM/MENDRO,ROBERT,SEX/M,RAC/W,DOB/19450907.
PUR/C
REQ/INV WIMER,OPR/WIMER

JUROR HISTORY SYSTEM
INQUIRY SCREEN

JUROR INFORMATION                    DEFENDANT INFORMATION
DL # 00000000  DOB:                  LAST ROBERT
LAST MENDRO                          FIRST FRANTZ          MI D
FIRST ROBERT          MI L          DATE 04 26 83  CASE # 182 68693J
STREET 0820 MEADOW  #2033           CHARGE RESISTING ARREST
CITY COPPEL          ZIP 75019 0000  PLEA (G-N-O) N
JUROR (G-F-B) B                      ELIGIBLE FOR PROBATION (Y OR N) Y
COMMENTS CONVERSION REC FROM OLD JURY HISTORY SYSTEM
ROBERT FRANTZ
R=J+J

                    TRIAL INFORMATION
VERDICT (G-N-H) N          PRIOR CONVICTION SHOWN (Y OR N) N
PUNISHED BY (JG OR JU)     PUNISHMENT
PROSECUTORS LEAD LAST  FULLER          FIRST
            PICK LAST  MARSHALL        FIRST
CASE (G-B-F) B
            ENTER A NEW KEY, LAST NAME, OR PERFORM A TASK
PF3=EXIT  PF4=UPDT  PF5=ADD  PF8=NEXT  PF7=PREV
dXJI55

NAME MENDRO MARILYN
NAME TYPE DF
RACE  -
SEX  -
DOB  -
NUMBER TYPE ___
COURT ___
PENDING  -

FIELD          DESCRIPTION

STATE'S EXHIBIT 3 Pretrial
PENGAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10          State's Exhibit Number PT4

11          Juror History - Brooks

12             (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
            BROOKSHIRE         FRANCES
      BROOKSHIRE         EDYE              S F93 587 L
      BROOKSHIRE         GAIL              S M92 21618
      BROOKSHIRE         GRACE               F85 99740J
```

INVALID CURSOR POSITION. PLEASE RE-SELECT
POSITION CURSOR ON LINE TO VIEW AND PRESS ENTER
JUROR HISTORY SYSTEM
INQUIRY SCREEN

STATE'S
EXHIBIT
4
Pretrial

JUROR INFORMATION                    DEFENDANT INFORMATION
DL #    00949443   DOB   03 21 1952     LAST  RICHTER
LAST    BROOKS                          FIRST DAVID           MI C
FIRST   THOMAS          MI              DATE  10 25 94   CASE # M94 47087
STREET  4102 EDGEWOOD                   CHARGE  DWI
CITY  GARLAND              ZIP 75042    PLEA (G-N-O) N
JUROR (G-F-B)  F                        ELIGIBLE FOR PROBATION (Y OR N)  Y
COMMENTS


                     TRIAL INFORMATION
   VERDICT (G-N-H)  N    PRIOR CONVICTION SHOWN (Y OR N)  N
   PUNISHED BY (JG OR JU)  JU PUNISHMENT  NONE
   PROSECUTORS  LEAD LAST  WILLIAMS          FIRST  CHRISTIE
                PICK LAST  WIRSKYE           FIRST  BILL
   CASE (G-B-F)  B
            ENTER A NEW KEY, LAST NAME, OR PERFORM A TASK
            PF3=EXIT  PF4=UPDT  PF5=ADD  PF8=NEXT  PF7=PREV
¢XJI56  NAME ENTERED BROOKS LINDA J

| N | NAME | ARC | RS | DOB | CASE/BOND | NAME TYPE DF CT | CHARGE | DISP |
|---|------|-----|----|----|-----------|-----------------|--------|------|
| 1 | BROOKS LINDA J | A | U | 000000 | MC8321644 | MM | SPD | QUAS |
| 2 | BROOKS LINDA J | A | UU | 000000 | MC91B4916 | MD | ILLEG LN CHG | DISM |
| 3 | BROOKS LINDA J | A | NF | 122049 | MC86C1965 | MM | ART 6701H 1B | NFOG |
| 4 | BROOKS LINDA JEAN | A | WF | 061751 | MA8347917 | MA | DWI | DISM |
| 5 | BROOKS LINDA JEAN | A | WF | 061751 | MA8357070 | MA | PROST | NFOG |


   * * * E N D   O F   R E C O R D S   R E T R I E V E D * * *






INE NO 01
 ¢XJI55




         NAME SANDERS LINDA
         NAME TYPE DF
         RACE _
         SEX _
         DOB 04 19 1940
         NUMBER TYPE __
         COURT ___
         PENDING _


         FIELD        DESCRIPTION
         NAME         LAST FIRST MIDDLE--USE NO PUNCTUATION

1

2

3

4

5

6

7

8

9

10          State's Exhibit Number PT5

11            Juror History - Rasco

12              (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S EXHIBIT 5
Pretrial

BIRTH
FORMER COUNTY  000    FORMER PRCT      JURY
TRANS CODE  W    TRANS DATE 12 08 97   CANCEL REASON      DFID
TRANS-1 CODE  R  TRANS-1 DATE 08 29 96   TRANS-2 CODE  X  TRANS-2

DIST DATA   CITY COUNCIL IR  PLACE 00  SCH DIST IR  PLACE 00  COLLEGE 05
              WATER NAME 00  WATER NO      FLOOD DIST 00
              CONGRESS  30  SENATE  08  LEGIS  114  ST SCH DIST 12  JST/PEACE 2
                                             FRAME NUMBERS

              V O T E R    H I S T O R Y   B Y   E L E C T I O N

    CERT NO 01669463    NAME RASCO MARCUS STANLEY    CURRENT PRCT 4016

EL POL ELEC     ELECTION NAME  VOTED   EL POL ELEC     ELECTION NAME   VOTE
ID PTY DATE                      PRCT   ID PTY DATE                      PRC
A0  X 11-07 00 2000 GENERAL / PRE4016P  64    11-08 94 GOVERNOR         4416
A6  R 03-14 00 2000 PRIMARY REP/D4016P  57  R 04-12 94 PRIMARY RUN OFF  4416
A2  X 11-02 99 CONSTITUTIONAL AME4016P  55  R 03-08 94 PRIMARY         4416
38  X 02-06 99 CITY IRVING - BON04016P  52    11-02 93 DST; CHISD; REP-104416
B4    11-03 98 GOVERNOR/CITY COF 4816P  45    06-05 93 RO2 = US SENATE 4416
A4  R 03-10 98 PRIMARY         4016P  42    05-01 93 JNT=2,3,4,C,F,J,K 4416
97  X 11-04 97 CONST AMND;DISD-4 4467E  38    11-03 92 PRESIDENTIAL     4416
96    10-04 97 IRVING ISD - BOND 4467E  29  R 03-10 92 PRIMARY         4416
95    05-09 97 CNST AMND;N; COOPLAA67P  26    11-05 91 CONST/JNT=C,D    4416
93  X 05-17 97 CITY OF IRVING   4467P  25    08-10 91 AMEND/ALL SCHOOL 4416
92    05-03 97 JOINT 28 ENTRIES  4467P  18    11-06 90 GOVERNOR         4416
89    11-05 96 PRESIDENTIAL     4467P  14  R 03-13 90 PRIMARY         4416
85    08-10 96 JNT A,N,Y&CITY-IR 4467P  05    11-08 88 PRESIDENTIAL     4416
80    05-04 96 JOINT 27 ENT.    4467P  01  R 03-08 88 PRIMARY         4416
78  R 03-12 96 PRIMARY         4467P
72  X 11-07 95 CONST AMENDMENTS  4467P
69  X 05-06 95 JNT - F,T,S      4467P

                    JUROR HISTORY SYSTEM
                     INQUIRY SCREEN
         JUROR INFORMATION            DEFENDANT INFORMATION
DL #    03054671   DOB   05 29 1951    LAST  DOMINGUEZ
LAST    RASCO                          FIRST  JOSE          MI
FIRST   MARCUS STANLEY   MI            DATE  09 22 99   CASE # F99 48164
STREET  POST OFFICE BOX 153720         CHARGE  AGG KIDNAPPING
CITY IRVING          ZIP 75015         PLEA (G-N-O) N
JUROR (G-F-B)  G                       ELIGIBLE FOR PROBATION (Y OR N)  Y
COMMENTS GOOD

                    TRIAL INFORMATION
   VERDICT (G-N-H)  G     PRIOR CONVICTION SHOWN (Y OR N)  N
   PUNISHED BY (JG OR JU) JU PUNISHMENT  18YRS 1S, 1S, TDC
   PROSECUTORS  LEAD LAST  VELASCO           FIRST  K
              PICK LAST  BAILEY            FIRST  J
   CASE (G-B-F)  G
         ENTER A NEW KEY, LAST NAME, OR PERFORM A TASK
    PF3=EXIT  PF4=UPDT  PF5=ADD  PF6=NEXT  PF7=PREV
RETURN  05/08/01  07.08.35
CCH#2L015TL TDAX,
QH-T,TX0570158A
NAM/RASCO,MARCUS,SEX/M,RAC/W,DOB/19510829,
PUB/C
REG/INV WIMER,DPR/WIMER
**TEXAS ID SUMMARY**

1
2
3
4
5
6
7
8
9
10              State's Exhibit Number PT6
11              Juror History - Smits
12                (Copy attached)
13
14
15
16
17
18
19
20
21
22
23
24
25

NAME    SMITS           GLORIA              VIRGINIA        WASSON
RESIDENCE ADDR   00739 ORIOLE
RESID CITY    CO        RESID ZIP 019
MAIL ADDR 1   739 ORIOLE
MAIL ADDR 2
MAIL CITY     COPPELL               MAIL ST TX         MAIL ZIP   75019
BIRTH PLACE CITY              COUNTY            STATE/COUNTRY
FORMER COUNTY   000    FORMER PRCT       JURY
TRANS CODE  W   TRANS DATE 12 08 97   CANCEL REASON      OPID
TRANS-1 CODE   W  TRANS-1 DATE 12 19 95   TRANS-2 CODE   W  TRANS-2 DATE 11 20 9

DIST DATA    CITY COUNCIL CO  PLACE 00  SCH DIST CO  PLACE 00  COLLEGE 02
             WATER NAME 00  WATER NO     FLOOD DIST 00
             CONGRESS  26  SENATE  09  LEGIS  099  ST SCH DIST 12  JST/PEACE 2
                                            FRAME NUMBERS    ,

            V O T E R   H I S T O R Y   B Y   E L E C T I O N

    CERT NO 01328313    NAME SMITS GLORIA VIRGINI     CURRENT PRCT 1306

EL  POL  ELEC      ELECTION NAME  VOTED   EL POL  ELEC        ELECTION NAME   VOTE
ID  PTY  DATE                     PRCT    ID PTY  DATE                        PRC
A0   X  11-07 00 2000 GENERAL / PRE1306P
94      06-07 97 COPPELL, CK HILL  1370P
89      11-05 96 PRESIDENTIAL      1370P
38      11-03 92 PRESIDENTIAL      1235P
26      11-05 91 CONST/JNT=C,D     1235P
18      11-06 90 GOVERNOR          1235P
14   D  03-13 90 PRIMARY           1235P
05      11-08 88 PRESIDENTIAL      1235P

                    JUROR HISTORY SYSTEM
                    INQUIRY SCREEN
        JUROR INFORMATION                 DEFENDANT INFORMATION
DL #    08906168   DOB   10 01 1942    LAST  SKIPWORTH
LAST    SMITS                          FIRST FRED            MI R
FIRST   GLORIA         MI  V           DATE  08 25 97   CASE # M96 45054E
STREET  739 ORIOLE                     CHARGE  DWI 2ND
CITY COPPELL           ZIP 75019        PLEA (G-N-O) N
JUROR (G-F-B)  G                       ELIGIBLE FOR PROBATION (Y OR N)   Y
COMMENTS GOOD

                    TRIAL INFORMATION
  VERDICT (G-N-H)  G      PRIOR CONVICTION SHOWN (Y OR N)   Y
  PUNISHED BY (JG OR JU) JG PUNISHMENT  1YR/2YR PROB $750
  PROSECUTORS  LEAD LAST  MONTALVO        FIRST  DAN
               PICK LAST  HYDE            FIRST  HEATH
  CASE (G-B-F)  F
         ENTER A NEW KEY, LAST NAME, OR PERFORM A TASK
         PF3=EXIT  PF4=UPDT  PF5=ADD  PF8=NEXT  PF7=PREV
¢XJI55

STATE'S EXHIBIT 6 Pretrial

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

State's Exhibit Number PT7

Juror History - Wilson

(Copy attached)

STATE'S
EXHIBIT
7
Pretrial

JUROR HISTORY SYSTEM
INQUIRY SCREEN

JUROR INFORMATION                    DEFENDANT INFORMATION
D. #   00000000  DOB                 LAST  MARSHALL
LAST   WILSON                        FIRST L                MI W
FIRST  JOHN          MI  K           DATE  07 30 82   CASE # F82 86583
STREET 02763BEECHMONT                CHARGE  THEFT 200-1000
CITY COPPEL          ZIP 75019 0000  PLEA (G-N-O) N
JUROR (G-F-B)  F                     ELIGIBLE FOR PROBATION (Y OR N)  N
COMMENTS CONVERSION REC FROM OLD JURY HISTORY SYSTEM
         MARSHALL L WHEELER
         R=J+J

                    TRIAL INFORMATION
 VERDICT (G-N-H)  G      PRIOR CONVICTION SHOWN (Y OR N)  Y
PUNISHED BY (JG OR JU) JG PUNISHMENT  ESCAPED PRIOR SENTENCE
PROSECUTORS  LEAD LAST  EGGLESTON        FIRST
             PICK LAST  D                FIRST
 CASE (G-B-F)  F
          ENTER A NEW KEY, LAST NAME, OR PERFORM A TASK
      PF3=EXIT  PF4=UPDT  PF5=ADD  PF8=NEXT  PF7=PREV
                 JUROR HISTORY SYSTEM
                    INQUIRY SCREEN

      JUROR INFORMATION                  DEFENDANT INFORMATION
DL #   08670461  DOB  02 02 1960    LAST  KITCHEN
LAST   WILSON                       FIRST JERRY            MI
FIRST  JOHN          MI  K          DATE  01 12 98   CASE # F97 29194
STREET  9408 MILL HOLLOW            CHARGE  DEADLY CON HAB
CITY DALLAS          ZIP 75243      PLEA (G-N-O) N
J OR (G-F-B)  G                     ELIGIBLE FOR PROBATION (Y OR N)  Y
COMMENTS GOOD


                    TRIAL INFORMATION
 VERDICT (G-N-H)  G      PRIOR CONVICTION SHOWN (Y OR N)  N
PUNISHED BY (JG OR JU) JU PUNISHMENT  8TDC,PROB 4 5YRS $7500 FINE
PROSECUTORS  LEAD LAST  MADDLE         FIRST  L
             PICK LAST  MADDLE         FIRST  L
 CASE (G-B-F)  F
          ENTER A NEW KEY, LAST NAME, OR PERFORM A TASK
      PF3=EXIT  PF4=UPDT  PF5=ADD  PF8=NEXT  PF7=PREV
                 JUROR HISTORY SYSTEM
                  LINE SELECT SCREEN

| LAST | FIRST | MI | CASE NUMBER(S) | |
|------|-------|----|----------------|---|
| WILSON | JOHN | K | F82 86583 | |
| WILSON | JOHN | K | F97 29194 | |
| WILSON | JOHN | M | 177 02464E | |
| WILSON | JOHN | P | F91 59563 | |
| WILSON | JOHN | P | M95 43589 | |
| WILSON | JOHN | R | M98 39605 | |
| WILSON | JOHN | T | F79 09406N | |
| WILSON | JOHN | T | F79 09263Q | F82 90571 |

1

2

3

4

5

6

7

8

9

10          State's Exhibit Number PT8

11          Juror History - Joyce

12          (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
8
Pretrial

JUROR HISTORY SYSTEM
INQUIRY SCREEN

JUROR INFORMATION                          DEFENDANT INFORMATION
DL #   00000000   DOB                      LAST  KENNETH
LAST   WICKS
FIRST  JOYCE              MI               FIRST R                    MI R
STREET 00725SE         2ND                 DATE  08 16 84   CASE # F84 73378I
CITY GRANDPRAIRIE          ZIP 75050 0000  CHARGE  MURDER/2D
JUROR (G-F-B)  G                           PLEA (G-N-O) N
COMMENTS CONVERSION REC FROM OLD JURY HISTORY SYSTEM   ELIGIBLE FOR PROBATION (Y OR N)  N
         KENNETH R RHODES
         R=J+J

                        TRIAL INFORMATION
   VERDICT (G-N-H)  G          PRIOR CONVICTION SHOWN (Y OR N)  Y
   PUNISHED BY (J8 OR JU) JR PUNISHMENT  LIFE
   PROSECUTORS  LEAD LAST  MITCHELL          FIRST
                PICK LAST  PHILLIPS          FIRST
   CASE (G-B-F)  F

           ENTER A NEW KEY, LAST NAME, OR PERFORM A TASK
        PF3=EXIT  PF4=UPDT  PF5=ADD  PF8=NEXT  PF7=PREV
                    JUROR HISTORY SYSTEM
                    LINE SELECT SCREEN
        LAST              FIRST         MI       CASE NUMBER(S)
        ----------------  --------------- -       ----------- ---------
        WICKS             JOYCE            F84 73378I
        WICKS             JOYCE         E  F90 50023P
        WICKS             KENNETH       R  174 04618E
        WICKS             KIRBY         A  F94 03744V     F95 76315
        WICKS             RANDY         W  F00 46623
        WICKS             WILLIAM       W  F86 91912J
        WICKWARE          DANIEL        N  F76 03327J     F76 04109J
        WICKWIRE          DOUGLAS       E  82 80066
        WIDDERS           WALLACE          F78 06205Q
        WIDDOES           HAZEL         L  F92 73668U
        WIDENER           BETTY         L  F87 83061V
        WIDENER           JAMES         F  F86 81472V     F87 76516V
        WIDKER            RONALD        W  81 05770M
        WIDLER            MICHAEL       H  F78 02969H
        WIDLUS            HANNAH        B  79 17039H
           PF3=EXIT  PF8=PAGE FORWARD  PF7=PAGE BACKWARD
           POSITION CURSOR ON LINE TO VIEW AND PRESS ENTER
RETURN  05/17/01  07.33.15
DCH#2LO1DTL TDAX.
NO RECORD TCIC
DH-T.TX057015A
NAM/WICKS,JOYCE.SEX/F.RAC/W.DOB/19380129.
PUR/C
REQ/INV WIMER.OPR/WIMER


RETURN  05/17/01  07.33.24
DC  2LO1DTL TDAX.
DH-T.TX057015A
NAM/JOHNSON,JOYCE.SEX/F.RAC/W.DOB/19380129.
PUR/C
REQ/INV WIMER.OPR/WIMER
**TEXAS ID SUMMARY**
TEXAS DEPARTMENT OF PUBLIC SAFETY COMPUTERIZED CRIMINAL HISTORY SUMMARY

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 1

11                 Photograph of Complainant

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 2

11                       Autopsy Photo

12                     (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25





STATE'S
EXHIBIT

2

1

2

3

4

5

6

7

8

9

10             State's Exhibit Number 3

11                 Map of Garland

12                (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



PENGAD-Bayonne, N.J.

**STATE'S EXHIBIT**

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

State's Exhibit Number 4

Frances Conner Discover Card

(Copy attached)





1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 6

11              Bertie Cunningham Master Card

12                     (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25





1

2

3

4

5

6

7

8

9

10                  State's Exhibit Number 7

11                  Photograph of Honda

12                  (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25





1

2

3

4

5

6

7

8

9

10                     State's Exhibit Number 5

11              Bertie Cunningham Discover Card

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
7

GAD-Bayonne N.J.



1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 8

11                   Videotape at JCPenney

12   (Not attached - retained by Physical evidence clerk)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

State's Exhibit Number 10

Photograph

(Copy attached)



STATE'S
EXHIBIT
_10_

1

2

3

4

5

6

7

8

9

10             State's Exhibit Number 11

11         Photograph of Washington Mutual

12              (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
11

1

2

3

4

5

6

7

8

9

10            State's Exhibit Number 12

11      Photograph of Richardson Motor Sports

12              (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

State's Exhibit Number 13

Receipt

(Copy attached)



STATE'S
EXHIBIT
13



451571404970

RICHARDSON MOTOR S....
493 S CENTRAL EXPWY
RICHARDSON, TX 75080

TIME 5:49 PM          DATE 10/04/...
6811008050627147

SALE
TERMINAL # 436835
TRAN TYPE  SALE

$1728.75

JEANNIE CUNNINGHAM
I AGREE TO PAY ABOVE TOTAL AMOUNT
ACCORDING TO CARD ISSUER AGREEMENT

THANK YOU
PLEASE COME AGAIN

1

2

3

4

5

6

7

8

9

10                          State's Exhibit Number 14A

11                             Go-Ped Warranty

12                             (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

INOVATION
NOT
UPLICATION

CALIFORNIA

# GO PED ®

## FUN ON A STICK™

WE MAKE
TRANSPORTATION
FUN! ™

Model Description **LIQUIMATIC**  Serial No. **HB-25701**

**ATMONT MOTOR WERKS WARRANTY REGISTRATION:** THIS WARRANTY REGISTRATION MUST BE COMPLETED BY THE SELLING
EALER AND SUBMITTED TO PATMONT MOTOR WERKS WITHIN 10 DAYS FROM DATE OF SALE FOR WARRANTY ENTITLEMENT. YOUR COPY OF
HIS REGISTRATION IS YOUR PROOF OF WARRANTY ENTITLEMENT.

| Dealer Number | Date Of Sales | Purchasers Name | | Purchasers Phone |
|---|---|---|---|---|
| 177 | 10 4 00 | BISMARI MURAAEY | | 972 250 LK 18 |
| Address | | City | State / province | Zip or postal code |
| 146 W EAST IRWAY TERRACH | | | TX | 18013 |

**WARNING:** Read and understand warnings and owners manual before operation. Serious injury or death can result from ignoring
Warnings or improper use.

## WHAT WE GUARANTEE AND WHAT YOU PROMISE US

Altered, defaced, or removed serial numbers or safety warning labels void this warranty.

tmont Motor Werks, a Corporation (hereinafter referred to as P.M.W.) expressly warrants that each of its products is free from defects in material and
rkmanship under normal operating conditions and according to proper use for a period of 90 days from the date of original purchase.

rmal operating conditions require adequate fuel / oil ratio and / or routine care and maintenance by the purchaser of the product. Proper use means that the
M.W. transportation product is to be used only in the manner intended for personal transportation of a single rider with proper safety equipment described on the
ED SAFETY WARNING LABEL affixed to the product. P.M.W. Transportation Products are intended for use only with the proper safety equipment on
oothly paved, safe, dry, non-oily surfaces in accordance with local regulations during daylight hours.

express consideration for purchasers execution of the limited warranty and liability agreement, P.M.W. will repair or replace any part or component, other than
es, of the P.M.W. transportation product free of charge to the original purchaser who registers his/her product under the warranty program. Warranty service can
obtained by calling your local dealer or the Tech. Line at (510) 373-7827 and following the instructions given by the service representative. Shipping costs will
at the purchasers' expense.

is warranty does not apply to tire wear, operation under abnormal conditions or damage to the vehicle brought on by improper use. Racing, competitive or
mmercial use, or modification of the product shall void this express limited warranty.

rchaser herewith acknowledges: (a) P.M.W. assumes no liability for any mis-use of any of its transportation products. (b) Under this limited warranty and
bility agreement P.M.W. shall have no obligation and the purchaser or user shall have no remedy against P.M.W., its officers, agents or assigns for any
mages, including without limitation, incidental, consequential, special, punitive damages arising from direct or indirect injury to person or property, or any
her loss, whether or not occasioned by negligence, or otherwise, on the part of P.M.W. (c) Purchaser acknowledges that there is an inherent risk in the operation
motorcycles, bicycles, mopeds, and all P.M.W. transportation products, and herewith assumes the risk of any injury arising from operation of any P.M.W.
nsportation product.

iginal owner will indemnify and hold P.M.W. harmless and will take full responsibility for conveying all safety warnings, instructions, and limited warranty if
it is sold, lent, or otherwise transferred to other persons and will indemnify P.M.W. from any claims against it for arising of original owners' failure to do so.

IE EXPRESS LIMITED WARRANTY DESCRIBED ABOVE SHALL BE EXCLUSIVE AND THERE IS NO OTHER WARRANTY OR LIABILITY,
PRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE AND WHETHER OR NOT OCCASIONED BY SELLER'S NEGLIGENCE. THERE IS
) IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO WARRANTIES WHICH
TEND BEYOND THOSE EXPRESSLY STATED HEREIN.

OTICE: Some states do not allow the exclusion or limitation of incidental or consequential damages and some states do not allow limitation on how long an
plied warranty lasts, therefore, some of the above limitations may not apply to you.

### PLEASE ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND EACH WARNING BY PLACING YOUR INITIALS IN EACH BOX.

___ This device does not conform to federal motor vehicle safety standards and is not intended for operation on public streets, roads or highways.

___ Safety helmet, goggles, gloves, elbow and knee pads, appropriate shoes, and bright clothing must be worn while operating this device to reduce potential of injury.

___ Do not operate this device in traffic, wet, frozen, oily or unpaved surfaces. Avoid uneven surfaces, chuckholes, surface cracks, obstacles and night in conditions of darkness.

___ Operator only, never carry passengers under any circumstances; doing so reduces stability and control, operator needs full use of entire riding surface.

___ Pregnant persons should not use this product.

___ Never use alcohol or drugs before or while operating this device. They slow reaction time and impair judgement.

___ This product should not be used by minors without adult supervision.

___ High speeds, jumps and trick maneuvers are dangerous and could result in loss of control and other accidents.

___ When accelerating or climbing hills, you will need to lean forward, under breaking conditions you will need to lean back, to keep wheels in contact with the ground.

___ Never permit a guest to use this device unless the guest has read the owners manual and all labels.

___ Engine shut off switch is available for rear wheel breaking or use in the event of throttle failure or other emergency when engine shut off is desired.

___ This product should not be used by persons unwilling or unable to take responsibility for there own actions.

___ Read all additional warnings and instructions in owers' manual before operating this P.M.W. product.

___ Modifications or alterations to manufacturers original product voids all warranties.

### WE SETTLE ARGUMENTS BY ARBITRATION

ANY DISPUTES HEREUNDER WILL BE RESOLVED THROUGH BINDING ARBITRATION IN THE COUNTY OF ALAMEDA, STATE OF CALIFORNIA,
ACCORDING TO CALIFORNIA CODE OF CIVIL PROCEDURE §1280 ET SEQUITUR. PURCHASER, BY SIGNING AGREES TO ARBITRATE ALL DISPUTES.

_____ (Purchasers Initials required)

OTICE: BY SIGNING BELOW YOU ARE AGREEING TO HAVE ANY DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DIS-
TES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW, AND THAT YOU ARE GIVING UP ANY RIGHTS YOU MIGHT
SSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY SIGNING BELOW YOU GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY
ND APPEAL UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO
BITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF
VIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

You should feel free to consult an attorney before signing this limited warranty and liability agreement.

have read understood and agreed to be bound by the limited warranty and liability agreement above and agree to submit disputes arising out of
atters included in the arbitration of disputes to neutral arbitration.

ignature (required) _____  Date **10-4-00**

ignature of parent or guardian if user is under the age of majority

## Patmont Products Require Personal Responsibility

**IF IT DOESN'T SAY
GO-PED
IT'S NOT A GO-PED®**

## www.goped.com

1997 Patmont Motor Werks All Rights Reserved

MAIL TO:
PMW
P.O. BOX 97
PLEASANTON, CA 94588

Go-Ped is a registered

STATE'S
EXHIBIT
14A

1

2

3

4

5

6

7

8

9

10                   State's Exhibit Number 14B

11                      Go-Ped Warranty

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

**INNOVATION NOT DUPLICATION**

**CALIFORNIA**

# GO-PED®

## FUN ON A STICK™

**WE MAKE TRANSPORT FUN!** ™

| Model Description | Sport | Serial No. | T - 39669 |
|---|---|---|---|

**PATMONT MOTOR WERKS WARRANTY REGISTRATION:** THIS WARRANTY REGISTRATION MUST BE COMPLETED BY THE SELLING DEALER AND SUBMITTED TO PATMONT MOTOR WERKS WITHIN 10 DAYS FROM DATE OF SALE FOR WARRANTY ENTITLEMENT. YOUR COPY OF THIS REGISTRATION IS YOUR PROOF OF WARRANTY ENTITLEMENT.

| Dealer Number | Date Of Sale | Purchasers' Name | Purchasers' Phone |
|---|---|---|---|
| | 10-5-00 | ISAAC MURPHEY | 972-1/8 7 05 |
| Address | 22-7 W EAST COAST | City TERREL | State or province TX | Zip or postal code 75143 |

WARNING: Read and understand warnings and owners manual before operation. Serious injury or death can result form ignoring Warnings or improper use.

### WHAT WE GUARANTEE AND WHAT WE PROMISE US
Altered, defaced, or removed serial numbers or safety warning labels void this warranty.

Patmont Motor Werks, a Corporation (hereinafter referred to as P.M.W.) expressly warrants that each of its products is free from defects in material and workmanship under normal operating conditions and according to proper use for a period of 90 days from the date of original purchase.

Normal operating conditions require adequate fuel / oil ratio and / or routine care and maintenance by the purchaser of the product. Proper use means that the P.M.W. transportation product is to be used only in the manner intended for personal transportation of a single rider with proper safety equipment described on the RED SAFETY WARNING LABEL affixed to the product. P.M.W. Transportation Products are intended for use only with the proper safety equipment on smoothly paved, safe, dry, non-oily surfaces in accordance with local regulations during daylight hours.

In express consideration for purchasers execution of the limited warranty and liability agreement, P.M.W. will repair or replace any part or component, other than tires, of the P.M.W. transportation product free of charge to the original purchaser who registers his/her product under the warranty program. Warranty service can be obtained by calling your local dealer or the Tech. Line at (510) 373-7821 and following the instructions given by the service representative. Shipping costs will be at the purchasers' expense.

This warranty does not apply to tire wear, operation under abnormal conditions or damage to the vehicle brought on by improper use. Racing, competitive or commercial use, or modification of the product shall void this express limited warranty.

Purchaser herewith acknowledges: (a) P.M.W. assumes no liability for any mis-use of any of its transportation products. (b) Under this limited warranty and liability agreement P.M.W. shall have no obligation and the purchaser or user shall have no remedy against P.M.W., its officers, agents or assigns for any damages, including without limitation, incidental, consequential, special, punitive damages arising from direct or indirect injury to person or property, or any other loss, whether or not occasioned by negligence, or otherwise, on the part of P.M.W. (c) Purchaser acknowledges that there is an inherent risk in the operation of motorcycles, bicycles, mopeds, and all P.M.W. transportation products, and herewith assumes the risk of any injury arising from operation of any P.M.W. transportation product.

Original owner will indemnify and hold P.M.W. harmless and will take full responsibility for conveying all safety warnings, instructions, and limited warranty if unit is sold, lent, or otherwise transferred to other persons and will indemnify P.M.W. from any claims against it for original owners' failure to do so.

THE EXPRESS LIMITED WARRANTY DESCRIBED ABOVE SHALL BE EXCLUSIVE AND THERE IS NO OTHER WARRANTY OR LIABILITY, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE AND WHETHER OR NOT OCCASIONED BY SELLER'S NEGLIGENCE. THERE IS NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THOSE EXPRESSLY STATED HEREIN.

NOTICE: Some states do not allow the exclusion or limitation of incidental or consequential damages and some states do not allow limitation on how long an implied warranty lasts, therefore, some of the above limitations may not apply to you.

### PLEASE ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND EACH WARNING BY PLACING YOUR INITIALS IN EACH BOX.

- This device does not conform to federal motor vehicle safety standards and is not intended for operation on public streets, roads or highways.
- Safety helmet, goggles, gloves, elbow and knee pads, appropriate shoes, and bright clothing must be worn while operating this device to reduce potential of injury.
- Do not operate this device in traffic, wet, frozen, oily or unpaved surfaces. Avoid uneven surfaces, chuckholes, surface cracks, obstacles and night in conditions of darkness.
- Operator only, never carry passengers under any circumstances; doing so reduces stability and control, operator needs full use of entire riding surface.
- Pregnant persons should not use this product.
- Never use alcohol or drugs before or while operating this device. They slow reaction time and impair judgement.
- This product should not be used by minors without adult supervision.
- High speeds, jumps and trick maneuvers are dangerous and could result in loss of control and other accidents.
- When accelerating or climbing hills, you will need to lean forward, under breaking conditions you will need to lean back, to keep wheels in contact with the ground.
- Never permit a guest to use this device unless the guest has read the owners manual and all labels.
- Engine shut off switch is available for rear wheel breaking or use in the event of throttle failure or other emergency when engine shut off is desired.
- This product should not be used by persons unwilling or unable to take responsibility for there own actions.
- Read all additional warnings and instructions in owners' manual before operating this P.M.W. product.
- Modifications or alterations to manufactures original product voids all warranties.

### WE SETTLE ARGUMENTS BY ARBITRATION
ANY DISPUTES HEREUNDER WILL BE RESOLVED THROUGH BINDING ARBITRATION IN THE COUNTY OF ALAMEDA, STATE OF CALIFORNIA, ACCORDING TO CALIFORNIA CODE OF CIVIL PROCEDURE, §1280 ET SEQUITUR. PURCHASER, BY SIGNING AGREES TO ARBITRATE ALL DISPUTES.

**(Purchasers initials required)**

NOTICE: BY SIGNING BELOW YOU ARE AGREEING TO HAVE ANY DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW, AND THAT YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY SIGNING BELOW YOU GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

You should feel free to consult an attorney before signing this limited warranty and liability agreement.

I have read understood and agreed to be bound by the limited warranty and liability agreement above and agree to submit disputes arising out of matters included in the arbitration of disputes provision to neutral arbitration.

Signature (required) _____  Date 10-5-00

Signature of parent or guardian if user is under the age of majority

## Patmont Products Require Personal Responsibility

**IF IT DOESN'T SAY GO-PED® IT'S NOT A GO-PED®**

STATE'S EXHIBIT 14B

# www.goped.com

© 1997 Patmont Motor Werks All Rights Reserved

Go-Ped® is a registered trade mark of P.M.W.

MANUFACTURER'S COPY

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 14C

11                       Go-Ped Warranty

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

**INNOVATION NOT DUPLICATION**

CALIFORNIA

**GO-PED®**

**FUN ON A STICK™**

**WE MAKE FUN!**

| Model Description | SPORT | Serial No. | F40965 |
|---|---|---|---|

**PATMONT MOTOR WERKS WARRANTY REGISTRATION:** THIS WARRANTY REGISTRATION MUST BE COMPLETED BY THE SELLING DEALER AND SUBMITTED TO PATMONT MOTOR WERKS WITHIN 10 DAYS FROM DATE OF SALE FOR WARRANTY ENTITLEMENT. YOUR COPY OF THIS REGISTRATION IS YOUR PROOF OF WARRANTY ENTITLEMENT.

| Dealer Number | Date Of Sales | Purchasers Name | Purchasers Phone |
|---|---|---|---|
| AZ 717 | 1014 02 5T5/AAC | MURDHEY | B12-K (187) |
| Address 717 N EAST | | City TEMPLE | State or province AZ | Zip or postal code 73714 |

**WARNING:** Read and understand warnings and owners manual before purchase. Serious injury or death can result from ignoring Warnings or improper use.

## WHAT WE GUARANTEE AND WHAT YOU PROMISE US
Altered, defaced, or removed serial numbers or safety warning labels void this warranty.

Patmont Motor Werks, a Corporation (hereinafter referred to as P.M.W.) expressly warrants that each of its products is free from defects in material and workmanship under normal operating conditions and according to proper use for a period of 90 days from the date of original purchase.

Normal operating conditions require adequate fuel / oil ratio and / or routine care and maintenance by the purchaser of the product. Proper use means that the P.M.W. transportation product is to be used only in the manner intended for personal transportation of a single rider with proper safety equipment described on the RED SAFETY WARNING LABEL affixed to the product. P.M.W. Transportation Products are intended for use only with the proper safety equipment on smoothly paved, safe, dry, non-oily surfaces in accordance with local regulations during daylight hours.

In express consideration for purchasers execution of the limited warranty and liability agreement, P.M.W. will repair or replace any part or component, other than tires, of the P.M.W. transportation product free of charge to the original purchaser who registers his/her product under the warranty program. Warranty service can be obtained by calling your local dealer or the Tech. Line at (510) 373-7827 and following the instructions given by the service representative. Shipping costs will be at the purchasers' expense.

This warranty does not apply to tire wear, operation under abnormal conditions or damage to the vehicle brought on by improper use. Racing, competitive or commercial use, or modification of the product shall void this express limited warranty.

Purchaser herewith acknowledges: (a) P.M.W. assumes no liability for any mis-use of any of its transportation products. (b) Under this limited warranty and liability agreement P.M.W. shall have no obligation and the purchaser or user shall have no remedy against P.M.W., its officers, agents or assigns for any damages, including without limitation, incidental, consequential, special, punitive damages arising from direct or indirect injury to person or property, or any injury, whether or not occasioned by negligence, or otherwise, on the part of P.M.W. (c) Purchaser acknowledges that there is an inherent risk in the operation of motorcycles, bicycles, mopeds, and all P.M.W. transportation products, and herewith assumes the risk of any injury arising from operation of any P.M.W. transportation product.

Original owner will indemnify and hold P.M.W. harmless and will take full responsibility for conveying all safety warnings, instructions, and limited warranty if unit is sold, lent, or otherwise transferred to other persons and will indemnify P.M.W. from any claims against it for original owners' failure to do so.

THE EXPRESS LIMITED WARRANTY DESCRIBED ABOVE SHALL BE EXCLUSIVE AND THERE IS NO OTHER WARRANTY OR LIABILITY, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE AND WHETHER OR NOT OCCASIONED BY SELLER'S NEGLIGENCE. THERE IS NO IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THOSE EXPRESSLY STATED HEREIN.

NOTICE: Some states do not allow the exclusion or limitation of incidental or consequential damages and some states do not allow limitation on how long an implied warranty lasts, therefore, some of the above limitations may not apply to you.

### PLEASE ACKNOWLEDGE THAT YOU HAVE READ AND UNDERSTAND EACH WARNING BY PLACING YOUR INITIALS IN EACH BOX.

_____ This device does not conform to federal motor vehicle safety standards and is not intended for operation on public streets, roads or highways.

_____ Safety helmet, goggles, gloves, elbow and knee pads, appropriate shoes, and bright clothing must be worn while operating this device to reduce potential of injury.

_____ Do not operate this device in traffic, wet, frozen, oily or unpaved surfaces. Avoid uneven surfaces, chuckholes, surface cracks, obstacles and night in conditions of darkness.

_____ Operator only, never carry passengers under any circumstances; doing so reduces stability and control, operator needs full use of entire riding surface.

_____ Pregnant persons should not use this product.

_____ Never use alcohol or drugs before or while operating this device. They slow reaction time and impair judgement.

_____ This product should not be used by minors without adult supervision.

_____ High speeds, jumps and trick maneuvers are dangerous and could result in loss of control and other accidents.

_____ When accelerating or climbing hills, you will need to lean forward, under breaking conditions you will need to lean back, to keep wheels in contact with the ground.

_____ Never permit a guest to use this device unless the guest has read the owners manual and all labels.

_____ Engine shut off switch is available for rear wheel breaking or use in the event of throttle failure or other emergency when engine shut off is desired.

_____ This product should not be used by persons unwilling or unable to take responsibility for there own actions.

_____ Read all additional warnings and instructions in owners' manual before operating this P.M.W. product.

_____ Modifications or alterations to manufacturers original product voids all warranties.

### WE SETTLE ARGUMENTS BY ARBITRATION
ANY DISPUTES HEREUNDER WILL BE RESOLVED THROUGH BINDING ARBITRATION IN THE COUNTY OF ALAMEDA, STATE OF CALIFORNIA, ACCORDING TO CALIFORNIA CODE OF CIVIL PROCEDURE, §1280 ET SEQUITUR. PURCHASER, BY SIGNING AGREES TO ARBITRATE ALL DISPUTES.

_____ (Purchasers Initials required)

NOTICE: BY SIGNING BELOW YOU ARE AGREEING TO HAVE ANY DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DIS-PUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY SIGNING BELOW YOU GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

You should feel free to consult an attorney before signing this limited warranty and liability agreement.

I have read understood and agreed to be bound by the limited warranty and liability agreement above and agree to submit disputes arising out of matters included in the arbitration of disputes provision to neutral arbitration.

Signature (required) _____ Date 10-4-00

Signature of parent or guardian if user is under the age of majority

## Patmont Products Require Personal Responsibility

**IF IT DOESN'T SAY GO-PED IT'S NOT A GO-PED®**

**www.goped.com**

© 1997 Patmont Motor Werks All Rights Reserved

MAIL TO:
PMW
P.O. BOX 97
PLEASANTON, CA 94588

Go-Ped® is a registe

STATE'S EXHIBIT 14r

1

2

3

4

5

6

7

8

9

10          State's Exhibit Number 15

11              Map of Dallas

12            (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
15

PENGAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 16

11                      Photo of RaceTrac

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
_16_

1

2

3

4

5

6

7

8

9

10                     State's Exhibit Number 17

11             Transaction Report Master Card

12                       (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
5542600102551141  430183  WASHINGTON  6011  000  000  00  999   0  V   1 1  200.00           9  160341  PIN # INVALID       6050          FDR  901 30  05   1757500000000031  001020500000006
N                 0403   1     000  000  00       0          9999999999999    0.30               CD  2E                        0  0 0 270861603613  00                 1757500000000031  001020500000006
                                                                                                  10/04                                                                1757500000000031  001020500000006
5542600102551141  430183  WASHINGTON  6011  000  000  00  999   0  V   1 1  200.00           9  160404  PIN # INVALID       6050          FDR  901 30  05   1757500000000031  001020500000006
N                 0403   1     000  000  00       0          9999999999999    0.00               CD  2E                        0  0 0 270806160405781  00                1757500000000031  001020500000006
                                                                                                  10/04                                                                1757500000000031  001020500000006
5542600102551141  430183  WASHINGTON  6011  000  000  00  999   0  V   1 1   40.00   BASA     9  161651  PIN # INVALID       6050          FDR  901 30  05   1757500000000031  001020500000006
N                 0403   1     000  000  00       0          9999999999999                        CD  2E                        0  0 0 270806161673667  00                1757500000000031  001020500000006
                                                                                                  10/04                                                                1757500000000031  001020500000006
5542600102551141  430183  WASHINGTON  6011  000  000  00  999   0  V   1 1   40.00   BASI     9  161712  PIN # INVALID       6050          FDR  901 30  05   1757500000000031  001020500000006
N                 0403   1     000  000  00       0          9999999999999                        CD  2E                        0  0 0 270806161777356  00                1757500000000031  001020500000007
                                                                                                  10/04                                                                1757500000000031  001020500000007
1225 E. BELT LINE        RICHARDSON               999       0  V   1 1  201.50   BASF         9  233040  PIN # INVALID                     FDR  05          1757500000000031  001020500000007
                                                             9999999999999                        CD  2E                        0  0 0 270806233020011  00                1757500000000031  001099600000006
5542600102551141  430183  BANC ONE   6011  000  000  00  999      0  V   1 1   40.00   BASA   9  161651  PIN # INVALID       6050          FDR  901 30  05   1757500000000031  001099600000006
N                 0403   1     000  000  00       0          9999999999999                        CD  2E                        0  0 0 270806161673667  00                1757500000000031  001099600000006
1225 E. BELT LINE        RICHARDSON               999       0  V   1 1  101.50   BASF         9  043403  AUTH GRANTED       04            FDR  901 30  05   1757500000000031  001099600000006
                                                             9999999999999    0.00               CD       000                   0  0 0 279060643438331  00                1757500000000031  001099600000007
900 HARRY HINES          DALLAS                   999  DE   0  V   1 1  9999999999999                                               101       1757500000000031  001099600000007
                                                             9999999999999                                                                                               1757500000000031  001099600000007
900 HARRY HINES          DALLAS                   999  DE   0  V   1 1  9999999999999                                               101       1757500000000031  001099600000007
                                                             9999999999999                                                                                               1757500000000031  001099600000008
5542600102551141  430183  BANC ONE   6011  000  000  00  999  DE  0  Y   1 1   33.64   IZ01   9  183504  AUTH GRANTED          480          FDR  901 30  05   1757500000000031  001099600000008
N                 0403   1     720  764  48  025             9999999999999    10/05  00       MA  10/05  00  1     3013  76 1  29 88  Y  2791018431825    00   1757500000000031  001049000000007
7239   542929007062235   3491  Y   1 1   33.64   IZ01       MCS9YCS90      184356  10/05     417             0  0  0  2791018431825    00                  1757500000000031  001049000000007
CHACHO'S                 TERRELL    TX            00                          00                                                       101       1757500000000031  001049000000007
N N               0                                                                                                                                                       1757500000000031  001049000000008
                                                                                                                                                          101                             001049000000008
```

STATE'S EXHIBIT 17

1

2

3

4

5

6

7

8

9

10          State's Exhibit Number 18A

11      Transaction Report Discover Card

12          (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
  6011 0080 5062 7147   *        DISCOVER CARD      *  DSC052    @1FA 10/06/00
                        *     FEDNET DETAIL REVIEW  *             —
CUNNINGHAM,BERTIE        *      NO AUTH BUYERS       *                14:26:44
                        *    FOR THIS ACCOUNT  *
GARLAND                TX                           CM EXP DATE: 08/03

10/05 20:24 MA     $22     PHLLPS 66 AUTH ONLY      OLATHE       KS
10/05 20:09 MA     $25     COLE MOUNTAIN            TERRELL      TX
10/04 19:45 MA  $1,728  HQ RICHARDSON MOTOR SPORT   RICHARDSON   TX
10/03 13:35 MA      $8     HOME DEPOT 556           GARLAND      TX
10/03       PY    $314-       PAYMENT - THANK YOU
10/02 17:51 MA     $17     MFS 81                   GARLAND      TX
09/28 15:08 MA     $10     SNS 225                  RICHARDSON   TX
09/25 17:03 MA      $8     ALBERTSONS 4260          RICHARDSON   TX
09/25 10:29 MA     $16     MFS 81                   GARLAND      TX
09/22 10:47 MA     $15     SNS 207                  GARLAND      TX
09/19 12:41 MA     $15     CLARK RETAIL ENTERPRISES GLEN ELLYN   IL
09/18 15:05 MA      $8     IHOP 1413                PLANO        TX
09/15 10:37 MA     $13     KROGER DALLAS # 557      GARLAND      TX
09/14 12:10 MA     $12     ALBERTSONS 4260          RICHARDSON   TX
09/14 11:08 MA     $21     SEARS 1207               RICHARDSON   TX

F3=SFR  F6=MEMOS  F7=UP  F8=DOWN  F9=SFI  F11=EXPAND  F18=ADD MEMOS
```

STATE'S
EXHIBIT
18A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

State's Exhibit Number 18B

Transaction Report Discover Card

(Copy attached)

```
  6011 0085 3069 7884   *       DISCOVER CARD        *  DSC052   @518 10/05/00
                         *   FEDNET DETAIL REVIEW    *
CONNER, FRANCES LOUISE           *  NO AUTH BUYERS   *                  09:06:40
                                 * FOR THIS ACCOUNT  *
                                                          CM EXP DATE: 03/05
DALLAS                   TX

10/05 05:33 CD    $201    MAC/PHILDELPHIA NAT'L       NEW ALBANY     OH
10/04 15:58 MA     $32    JC PENNEY AUTH RETAIL       DALLAS         TX
10/04 12:55 MA     $46    DILLARDS,AUTH ONLY          LITTLE ROCK    AR
10/03 13:59 MA     $14    ECKERD 0943                 RICHARDSON     TX
10/03 13:42 MA     $20    ALBERTSONS 4260             RICHARDSON     TX
10/02 17:02 MA      $9    DRUG EMPORIUM 14            RICHARDSON     TX
09/29 16:44 MA     $44    ALBERTSONS 4260             RICHARDSON     TX
09/26 16:05 MA     $12    MERVYN'S AUTH ONLY          PHOENIX        AZ
09/25 17:08 MA     $52    ALBERTSONS 4260             RICHARDSON     TX
09/22 15:30 MA     $13    WALMART*SAMS CLUB AUTH      BENTONVILLE    AR
09/13 16:30 MA     $12 HQ WALGREEN ELECTRONIC         DANVILLE       IL
09/13 14:33 MA     $98 HQ V TERRY MILLER, DDS         DALLAS         TX
09/11 10:18 NM            TAAP ACCOUNT                  JALICEA
09/04       PY    $213-   PAYMENT - THANK YOU
09/01 04:26 NM            PRELIMINARY REISSUE

F3=SFR   F6=MEMOS   F7=UP   F8=DOWN   F9=SFI   F11=EXPAND   F18=ADD MEMOS
```

PENGAD-Bayonne,N.J.

STATE'S
EXHIBIT

18B

1

2

3

4

5

6

7

8

9

10                  State's Exhibit Number 20

11                Photograph of 509 Lamar

12                     (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
20

1

2

3

4

5

6

7

8

9

10          State's Exhibit Number 21

11          Photograph of Chacho's

12              (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



PENGAD-Bayonne, N.J.

STATE'S
EXHIBIT
21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

State's Exhibit Number 22

Photograph of Cowboys

(Copy attached)



**STATE'S EXHIBIT**

22

PENGAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 23

11                 Photograph of Cole Mountain

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
73

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 26

11                      Videotape (Fast Speed)

12      (Not attached - retained by Physical evidence clerk)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10                     State's Exhibit Number 26A

11                     Videotape (Slower Speed)

12     (Not attached - retained by Physical evidence clerk)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 27

11                       Map of Edgewood

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
27

PENGAD-Bayonne,N.J.

1
2
3
4
5
6
7
8
9
10              State's Exhibit Number 28
11              Crime Scene Photograph
12                 (Copy attached)
13
14
15
16
17
18
19
20
21
22
23
24
25



STATE'S
EXHIBIT
28

PENGAD-Bayonne, N.J.

1

2

3

4

5

6

7

8

9

10          State's Exhibit Number 29

11          Crime Scene Photograph

12             (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
29

PENGAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 30

11                   Crime Scene Photograph

12                     (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
30

PENGAD-Bayonne, N.J.

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 31

11                     Crime Scene Photograph

12                       (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
3/



1
2
3
4
5
6
7
8
9
10              State's Exhibit Number 32
11             Crime Scene Photograph
12               (Copy attached)
13
14
15
16
17
18
19
20
21
22
23
24
25

STATE'S
EXHIBIT
32

ENGAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10                  State's Exhibit Number 33

11                  Crime Scene Photograph

12                     (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
32

PENGAD-Bayonne, N.J.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

State's Exhibit Number 34

Crime Scene Photograph

(Copy attached)



STATE'S EXHIBIT
34

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 35

11                      Magistrate Warning

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

B31278

# State of Texas
# County of Van Zandt

Before me, the undersigned magistrate of the State of Texas on this day personally appeared

_Jedidiah Isaac Murphy_

in the custody of _Chief Gary Rose, Van Zandt County Sheriff's Department_, A peace

officer and said person was given the following warning by me:

☑ (1) You are charged with the offense(s) of _Credit Card Abuse Warrant # R03022J_

_Garland Police Department, Garland, Tx_

An affidavit charging you with this offense(s) *(has) (has not) been filed in this Court.

☑ (2) You have a right to hire a lawyer and have your lawyer present prior to and during any interview and question-
ing by peace officers or attorneys representing the State. If you are too poor to afford a lawyer, you have the right to
request the appointment of a lawyer to be present prior to and during any such interview and questioning. You may have
reasonable time and opportunity to consult your lawyer if you desire.

☑ (3) You have the right to remain silent.

☑ (4) You are not required to make a statement, and any statement you make can and may be used against you in Court.

☑ (5) You have the right to stop any interview or questioning at any time.

☑ (6) You have the right to have an examining trial.

*Your bail is set at $ _50,000.00_        *Bail not determined        *Bail is denied

☑ Check while reading

Place of Warning _Van Zandt_                    _Jedidiah Isaac Murphy_
_Edgewood Police Department_            Person Warned _Ozella Williamson_
_Edgewood, Tx 75117_                        Magistrate
TIME: _5:00_ _October_ A.M.            Title _Justice of the Peace, Precinct 3_
DATE: _5:00 October_ 19 _2000_

REMARKS:                                        WITNESSES:
_Known Address_                              _Gary Rose_
_1718 Barclay_                                Name
_Richardson, Tx_                            Address
                                                    City
_090175 WM_                                Name
_DL - Unknown_                            Address
Delete what is not applicable.              City

White Magistrate _____          Pink: District Attorney
Yellow: Agency _____            Gold: Defendant

STATE'S EXHIBIT 35

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 36

11                      Magistrate Warning

12                       (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

B31269

# State of Texas
# County of Van Zandt

Before me, the undersigned magistrate of the State of Texas on this day personally appeared

*Jedidiah Isaac Murphy*

in the custody of *Chief Deputy Gary Rose, Van Zandt County*, A peace

officer and said person was given the following warning by me: *Sheriff's Department*

☑ (1) You are charged with the offense(s) of _____

*Murder*

_____

_____

An affidavit charging you with this offense(s) *(has) *(has not) been filed in this Court.

☑ (2) You have a right to hire a lawyer and have your lawyer present prior to and during any interview and question-
ing by peace officers or attorneys representing the State. If you are too poor to afford a lawyer, you have the right to
request the appointment of a lawyer to be present prior to and during any such interview and questioning. You may have
reasonable time and opportunity to consult your lawyer if you desire.

☑ (3) You have the right to remain silent.

☑ (4) You are not required to make a statement, and any statement you make can and may be used against you in Court.

☑ (5) You have the right to stop any interview or questioning at any time.

☑ (6) You have the right to have an examining trial.

*Your bail is set at $ *1,000,000.00*    *Bail not determined    *Bail is denied

☑ Check while reading

Place of Warning *Van Zandt*                    *Jedidiah Isaac Murphy*
                                                            Person Warned
*Edgewood Police Department*                    *Steve Wilborn*
                                                            Magistrate
*Edgewood, Tx  75117*    *Justice of the Peace, Precinct 3*
                                                            Title

TIME: *5:00*    *A* M.

DATE: *October 6*  19 *2000*

REMARKS:                                       WITNESSES:

*Known Address*                                *Gary Rose*
                                               Name
*1718 Barclay*
                                               Address
*Richardson, Tx*
                                               City

*090175  WM*                                   Name
*DL Unknown*
                                               Address

Delete what is not applicable.                 City

.White Magistrate _____               Pink: District Attorney

Yellow: Agency _____                  Gold: Defendant

STATE'S EXHIBIT 36

1

2

3

4

5

6

7

8

9

10                          State's Exhibit Number 38

11                               Vacuum Hose

12        (Not attached - retained by Physical evidence clerk)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10             State's Exhibit Number 39

11                    Heater Hose

12    (Not attached - retained by Physical evidence clerk)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10                   State's Exhibit Number 40

11                        Blue Towel

12     (Not attached - retained by Physical evidence clerk)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10                   State's Exhibit Number 41

11           Miranda Warning Sheet 10-6-2000

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

WARNING TO BE GIVEN BEFORE TAKING

ANY ORAL OR WRITTEN CONFESSION

ON THE  6  DAY OF  October  , 2000 AT 8:52  O'CLOCK  A M,

M. J. Myers  ADVISED ME,  Jedidiah Isaac Murphy THAT

1.    I HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE ME EITHER PRIOR
      TO OR DURING ANY QUESTIONING.

2.    IF I AM UNABLE TO EMPLOY A LAWYER I HAVE THE RIGHT TO HAVE A LAWYER
      APPOINTED TO COUNSEL WITH ME PRIOR TO OR DURING ANY QUESTIONING, AND

3.    I HAVE THE RIGHT TO REMAIN SILENT AND NOT MAKE ANY STATEMENT AT ALL
      AND THAT ANY STATEMENT THAT I MAKE MAY AND PROBABLY WILL BE USED IN
      EVIDENCE AGAINST ME AT MY TRIAL.

4.    I HAVE THE RIGHT TO TERMINATE THE INTERVIEW AT ANY TIME.

I UNDERSTAND ALL OF THE ABOVE EXPLAINED RIGHTS.

SIGNED  _____

WITNESS  _____

STATE'S
EXHIBIT
41

PENGAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10        State's Exhibit Number 42

11        Photograph of Defendant

12          (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
42

PENGAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10                     State's Exhibit Number 43

11                   Photograph of Defendant

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
43

PENGAD-Bayonne,N.J.



1

2

3

4

5

6

7

8

9

10           State's Exhibit Number 44

11           Photograph of Defendant

12             (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
44

PENGAD-Bayonne,N.J.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

State's Exhibit Number 45

Photograph of Defendant

(Copy attached)



STATE'S
EXHIBIT
45

PENGAD-Bayonne, N.J.

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 46

11                    Photograph of Defendant

12                        (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
46

PENGAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 47

11                    Voluntary Statement

12                     (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUNTARY STATEMENT

DATE Oct 6 , 20 00 . TIME 11:30 A.M. PLACE 217 N. Fifth St. Garland Tx

I, Jedidiah Isaac Murphy , am 25 years old and I live at 1718 Barclay Richardson Tx

I am giving this statement to M. J. Myers , who has identified himself as a Police Officer of the City of Garland, and he has duly warned me that I have the following rights: that I have the right to remain silent and not make any statement at all; that any statement I make may be used against me at my trial; that any statement I make may be used as evidence against me in court; that I have the right to have a lawyer present to advise me prior to and during any questioning; that if I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and that I have the right to terminate the interview at any time.

Prior to and during the making of the statement, I have and do hereby knowingly, intelligently, and voluntarily waive the above explained rights and I do make the following voluntary statement to the aforementioned person of my own free will and without any promises or offers of leniency or favors, and through no fear, coercion or threat of physical harm by any person or persons whomsoever:

I was drinking heavily and decided I was going to visit my daughter and end my life. I packed my stuff and left my sisters headed for Bleachers sports bar for something to drink. I drank more alcohol and started walking down the road beside Bleachers on my way to 635 so I could hitch a ride to Wells Point to see Alyssa where exactly I saw miss Bertie but I told her I needed a ride to 635 and she agreed to take me as long as she was safe I assured her I wasn't out to hurt anyone and we drove off. We rode off toward 635 and about 30 minutes into heavy Construction I decided what

I have read this statement consisting of 5 page(s), each page of which bears my signature, and I do affirm that all facts and statements contained herein are true and correct.

_Jedidiah Isaac Murphy_
Signature of person making voluntary statement

The above warnings were given by and this voluntary statement was taken by:

_M J Myers_
(This must be one and the same officer as named above)

Witness _J V Cook #215_

STATE'S EXHIBIT
47

# VOLUNTARY STATEMENT

DATE Oct 6 , 20 00 TIME 11:30 A.M. PLACE 217 N. Fifth St Garland Tx

I, Jedidiah Isaac Murphy , am 25 years old and I live at 1218 Barclay Richardson Tx .

I am giving this statement to M. J. Myers , who has identified himself as a Police Officer of the City of Garland, and he has duly warned me that I have the following rights: that I have the right to remain silent and not make any statement at all; that any statement I make may be used against me at my trial; that any statement I make may be used as evidence against me in court; that I have the right to a lawyer present to advise me prior to and during any questioning; that if I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and that I have the right to terminate the interview at any time.

Prior to and during the making of the statement, I have and do hereby knowingly, intelligently, and voluntarily waive the above explained rights and I do make the following voluntary statement to the aforementioned person of my own free will and without any promises or offers of leniency or favors, and through no fear, coercion or threat of physical harm by any person or persons whomsoever:

I was doing was wrong so I told miss Berte to let me drive so I could take her and her car somewhere I could leave them so I could hitch a ride to 635. We pulled into a parking lot and I told her I was going to put her in the trunk and go to a payphone and call the police after I got far enough away so they could get her out safely after she got in the trunk I had the gun in my right hand and before I shut the trunk I switched hands because I cant feel my left hand and its habbit for me to use my right hand to open and

I have read this statement consisting of 5 page(s), each page of which bears my signature, and I do affirm that all facts and statements contained herein are true and correct.

_Jedidiah Isaac Murphy_
Signature of person making voluntary statement

The above warnings were given by and this voluntary statement was taken by:

_M J Myers_
(This must be one and the same officer as named above)

Witness _D r Tole #215_

VOLUNTARY STATEMENT

TE __Oct 6__, 20 __00__. TIME __11:30__ A.M. PLACE __217 N. Fifth Garland Tx 75040__

I, __Jedidiah Isaac Murphy__, am __25__ years old and I live at
__1718 Barclay Richardson Tx__.

I am giving this statement to __M. J. Myers__, who has identified himself
as a Police Officer of the City of Garland, and he has duly warned me that I have the following rights: that I have
the right to remain silent and not make any statement at all; that any statement I make may be used against me at my
trial; that any statement I make may be used as evidence against me in court; that I have the right to have a lawyer
present to advise me prior to and during any questioning; that if I am unable to employ a lawyer, I have the right to
have a lawyer appointed to advise me prior to and during any questioning and that I have the right to terminate the
interview at any time.

Prior to and during the making of the statement, I have and do hereby knowingly, intelligently, and voluntarily waive
the above explained rights and I do make the following voluntary statement to the aforementioned person of my own
free will and without any promises or offers of leniency or favors, and through no fear, coercion or threat of physical
harm by any person or persons whomsoever:

Close doors. When I reached for the trunk
lid I still had the gun in my left
hand and grabbed it too hard and it shot
her I freaked out and started to run but
raced back to see what happened to her and
I knew she was gone so I drove all night
drinking at if I told myself this didn't happen
and decided I was going to wait until my
sister left for work and the whole time my
mind was telling me it didn't happen. The
next morning I went to my sisters, parked
the car in the garage and put a shop vac
hose in the tailpipe and into the back window.

I have read this statement consisting of __5__ page(s), each page of which bears my signature, and I do affirm that
all facts and statements contained herein are true and correct.

_Jedidiah Isaac Murphy_
Signature of person making voluntary statement

The above warnings were given by and this voluntary statement
was taken by:

_M J Myers_
(This must be one and the same officer as named above)

Witness __J V Locke #215__

## VOLUNTARY STATEMENT

DATE Oct 6 , 20 09 . TIME 11:30 A. M. PLACE 217 N. Fifth St Garland Tx

I, Jedidiah Isaac Murphy , am 25 years old and I live at 1218 Barclay Richardson Tx .

I am giving this statement to M. J. Myers , who has identified himself as a Police Officer of the City of Garland, and he has duly warned me that I have the following rights: that I have the right to remain silent and not make any statement at all; that any statement I make may be used against me at my trial; that any statement I make may be used as evidence against me in court; that I have the right to have a lawyer present to advise me prior to and during any questioning; that if I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and that I have the right to terminate the interview at any time.

Prior to and during the making of the statement, I have and do hereby knowingly, intelligently, and voluntarily waive the above explained rights and I do make the following voluntary statement to the aforementioned person of my own free will and without any promises or offers of leniency or favors, and through no fear, coercion or threat of physical harm by any person or persons whomsoever:

I layed in the front seat and cranke the car and before I fell unconcous the thought of my neice and sister seeing me dead and discovering what had happened would destroy them both. So I left the house and decided to go see and old friend Shod and my daughter and kill myself at the country somewhere I bought beer in tinsil and contined to block what had happened while drinking I went to Shods and then went for moe beer and wisky and intended to leave that night to commit suicide. I got tired because I had been up for 2 days and hadnt stopped drinking yet.

I have read this statement consisting of 5 page(s), each page of which bears my signature, and I do affirm that all facts and statements contained herein are true and correct.

_Jedidiah Isaac Murphy_
Signature of person making voluntary statement

The above warnings were given by and this voluntary statement was taken by:

_M J Myers_
(This must be one and the same officer as named above)

Witness _____

**VOLUNTARY STATEMENT**

DATE __Oct 6__, __2000__. TIME __11:30__ A_.M. PLACE __217 N. Fifth St Garland Tx__

I, __Jedidiah Isaac Murphy__, am __25__ years old and I live at __1718 Barclay Richardson Tx__

I am giving this statement to __M. J. Myers__, who has identified himself as a Police Officer of the City of Garland, and he has duly warned me that I have the following rights: that I have the right to remain silent and not make any statement at all; that any statement I make may be used against me at my trial; that any statement I make may be used as evidence against me in court; that I have the right to have a lawyer present to advise me prior to and during any questioning; that if I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning and that I have the right to terminate the interview at any time.

Prior to and during the making of the statement, I have and do hereby knowingly, intelligently, and voluntarily waive the above explained rights and I do make the following voluntary statement to the aforementioned person of my own free will and without any promises or offers of leniency or favors, and through no fear, coercion or threat of physical harm by any person or persons whomsoever:

I put miss Berta at the bottom of Livingston hill cause the end of all this had come but was not going to kill myself untill I saw alysa Stood offered me a place to sleep and I decided to sleep till morning see Alysia and finish my life. While sleeping the police came in and arrested me. To all the people destroyed by this was not intentional and I'm sure you wish me dead and I would wish the same. I'm cooperating so you understand I'm not trying to hide what happened and the fact is I'm now an evil person who hurts people

I have read this statement consisting of __5__ page(s), each page of which bears my signature, and I do affirm that all facts and statements contained herein are true and correct.

__Jedidiah Isaac Murphy__
Signature of person making voluntary statement

The above warnings were given by and this voluntary statement was taken by:

__M J Myers__
(This must be one and the same officer as named above)

Witness __V Poole #215__

1

2

3

4

5

6

7

8

9

10                     State's Exhibit Number 48

11             Miranda Warning Sheet 10-7-200

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

2 ½ oz Coffee
1 cigarette

STATE'S
EXHIBIT
48

DEFENDANT'S
EXHIBIT
69

Mbl
Returned to
Cell @ 12:05 Pm

## WARNING TO BE GIVEN BEFORE TAKING

## ANY ORAL OR WRITTEN CONFESSION

ON THE __7__ DAY OF __OcTobER__, 2̶0̶ __2000__, AT __11:30__ O'CLOCK __A__ M,

__M. J. MYERS__ ADVISED ME, __JEDIDAH Isaac Murphy__ THAT

1.  I HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE ME EITHER PRIOR
    TO OR DURING ANY QUESTIONING.

2.  IF I AM UNABLE TO EMPLOY A LAWYER I HAVE THE RIGHT TO HAVE A LAWYER
    APPOINTED TO COUNSEL WITH ME PRIOR TO OR DURING ANY QUESTIONING, AND

3.  I HAVE THE RIGHT TO REMAIN SILENT AND NOT MAKE ANY STATEMENT AT ALL
    AND THAT ANY STATEMENT THAT I MAKE MAY AND PROBABLY WILL BE USED IN
    EVIDENCE AGAINST ME AT MY TRIAL.

4.  I HAVE THE RIGHT TO TERMINATE THE INTERVIEW AT ANY TIME.

I UNDERSTAND ALL OF THE ABOVE EXPLAINED RIGHTS.

SIGNED __Jedidiah Isaac Murphy__

WITNESS __MJ Myers__

ᴶᴹ YES 1. DID YOU MEET WITH A LAWYER(s) YESTERDAY?

ᴶᴹ YES 2. DOES THE LAWYER(s) REPRESENT YOU?

ᴶᴹ NO 3. DID THE LAWYER(s) ADVISE YOU NOT TO TALK
       TO POLICE OFFICERS?

ᴶᴹ YES 4. DID THE LAWYER(s) ADVISE YOU TO COOPERATE
       WITH POLICE OFFICERS.

STATE'S
EXHIBIT
49



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

State's Exhibit Number 50

Miranda Warning Sheet 10-11-2000

(Copy attached)

STATE'S
EXHIBIT
50

DEFENDANT'S
EXHIBIT
3

WARNING TO BE GIVEN BEFORE TAKING

ANY ORAL OR WRITTEN CONFESSION

ON THE 11 DAY OF October , 2000 , AT 9:02 O'CLOCK A M,

M. J. MYERS ADVISED ME, Jedidiah Isaac Murphy THAT

1.  I HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE ME EITHER PRIOR
    TO OR DURING ANY QUESTIONING.

2.  IF I AM UNABLE TO EMPLOY A LAWYER I HAVE THE RIGHT TO HAVE A LAWYER
    APPOINTED TO COUNSEL WITH ME PRIOR TO OR DURING ANY QUESTIONING, AND

3.  I HAVE THE RIGHT TO REMAIN SILENT AND NOT MAKE ANY STATEMENT AT ALL
    AND THAT ANY STATEMENT THAT I MAKE MAY AND PROBABLY WILL BE USED IN
    EVIDENCE AGAINST ME AT MY TRIAL.

4.  I HAVE THE RIGHT TO TERMINATE THE INTERVIEW AT ANY TIME.

I UNDERSTAND ALL OF THE ABOVE EXPLAINED RIGHTS.

SIGNED Jedidiah I. Murphy

WITNESS MJ Myers

2 coffee
2 cigarettes

1

2

3

4

5

6

7

8

9

10                      State's Exhibit Number 51

11            Miranda Warning Sheet 10-13-2000

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
51



DEFENDANT'S
EXHIBIT

WARNING TO BE GIVEN BEFORE TAKING

ANY ORAL OR WRITTEN CONFESSION

ON THE ___13___ DAY OF ___October___, 19 2000, AT _____ O'CLOCK ___ M,

___M. J. Myers___ ADVISED ME, ___Jedidiah Isaac Murphy___ THAT

1.  I HAVE THE RIGHT TO HAVE A LAWYER PRESENT TO ADVISE ME EITHER PRIOR
    TO OR DURING ANY QUESTIONING.

2.  IF I AM UNABLE TO EMPLOY A LAWYER I HAVE THE RIGHT TO HAVE A LAWYER
    APPOINTED TO COUNSEL WITH ME PRIOR TO OR DURING ANY QUESTIONING, AND

3.  I HAVE THE RIGHT TO REMAIN SILENT AND NOT MAKE ANY STATEMENT AT ALL
    AND THAT ANY STATEMENT THAT I MAKE MAY AND PROBABLY WILL BE USED IN
    EVIDENCE AGAINST ME AT MY TRIAL.

4.  I HAVE THE RIGHT TO TERMINATE THE INTERVIEW AT ANY TIME.

    I UNDERSTAND ALL OF THE ABOVE EXPLAINED RIGHTS.

SIGNED _____

WITNESS _____

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 52

11                    Receipt Cole Mountain

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



COLE MOUNTAIN
419 E. MOORE
TERRELL, TX 75160

TERMINAL I.D.: LL160778

MERCHANT #: 5422209371590288

DISCOVER SVA: 13
XXXXXXXXXXXX2147
SALE EXP: 09/03
BATCH: 2294 INVOICE: 227128
DATE: OCT 05, 00 TIME: 19:05
AUTH NO: 005454

BASE $25.23
TIP

TOTAL

GERTIE GUNNINGHAM

X

I AGREE TO PAY ABOVE TOTAL AMOUNT
ACCORDING TO CARD ISSUER AGREEMENT
(MERCHANT AGREEMENT IF CREDIT VOUCHER)

STATE'S
EXHIBIT
52

PENGAD-Bayonne, N.J.

COLE MOUNTAIN
419 E. MOORE
TERRELL, TX 75160

TERMINAL I.D.:                    LK140778

MERCHANT #:              542929007150386

DISCOVER                         SRV: 13
6011006050627147
SALE                          EXP.: 08/03
BATCH: 000064              INVOICE: 27128
DATE: OCT 05, 00              TIME: 19:05
                          AUTH NO: 005464

BASE                             $25.28
TIP

TOTAL

BERTIE CUNNINGHAM

X _____
I AGREE TO PAY ABOVE TOTAL AMOUNT
ACCORDING TO CARD ISSUER AGREEMENT
(MERCHANT AGREEMENT IF CREDIT VOUCHER)

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 53

11                    Cowboys Quick Receipt

12                     (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

COWBOYS QUICK
228 E MOORE
TERRELL TX 75160

0911646028
*** CHARGE ***

10/05/09 05:18 PM

15.393 V UNL @ 1.449 $ 22.29
---------
TOTAL $ 22.29

CUSTOMER AGREES TO PAY THE ABOVE TOTAL AMOUNT ACCORDING TO THE CARD ISSUER AGREEMENT. PHILLIPS 66 CO.
DS 6011008050627147 08/03
005037 INVOICE# 3982
CUNNINGHAM/BERTIE

CARDHOLDER'S SIGNATURE

STATE'S EXHIBIT 53
PENGAD-Bayonne, N.J.

```
            COWBOYS QUICK
             220 E MOORE
            TERRELL TX 75160

             0911040020
           *** CHARGE ***
10/05/00                        06:18 PM

   15.383 V   UNL @$ 1.449  $   22.29
                             ---------
              TOTAL          $   22.29

CUSTOMER AGREES TO PAY THE ABOVE TOTAL
AMOUNT ACCORDING TO THE CARD ISSUER
AGREEMENT.   PHILLIPS 66 CO.
DS  6011000050627147       00/03
005037  INVOICE#    3982
CUNNINGHAM/BERTIE
```

CARDHOLDER'S SIGNATURE

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 54

11                      Autopsy Report

12                     (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHWESTERN
INSTITUTE OF FORENSIC SCIENCES
5230 Medical Center Drive
Dallas, Texas   75235

COPY

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

**Case No.** JP3564-00-2564JD

**Name:** Cunningham, Bertie

**Age:** 80          **Race:** White          **Sex:** Female

**Date of Death:** 06 OCT 2000 (Found)   **Date of Examination:** 06 OCT 2000
**Time of Death:** Found 5:17 am          **Time of Examination:** 11:30 am

**Pronounced at:** Livingston Creek, 1 mi. S. of Edgewood
                   Rural, Van Zandt County, Texas

### AUTOPSY REPORT:

**ORGAN WEIGHTS:**

| Brain | 1180 g | R. Lung | 520 g | R. Kidney | 110 g |
|-------|--------|---------|-------|-----------|-------|
| Heart | 420 g  | L. Lung | 480 g | L. Kidney | 110 g |
| Liver | 1110 g | Spleen  | 90 g  |           |       |

This autopsy is performed at the request of W. Ozelle Wilcoxson, Justice of the Peace, Precinct 3, Place 1, Van Zandt County, Texas.

**EXTERNAL EXAMINATION:**

The body is photographed, fingerprinted, palm printed, x-rayed, and tagged. Radiographs of the head reveal multiple tiny fragments and one larger fragment of radiodense material consistent with the recovered projectile.

The body is received in a green crash bag and dressed in a short-sleeved floral-print blouse, a beige bra with a left prosthesis, white panties, pink pants, and two white sandals. Also received with the body is a blue plastic bag, a green duffel bag, a brown towel, a green sweat shirt, and gray sweat pants. All clothing is soaking wet and heavy. The blouse is bloodstained. No jewelry or personal effects are present. The hands are not enclosed in paper bags. Several black hairs are recovered from the clothing and submitted in an appropriately labeled envelope to the Criminal Investigation Laboratory.

The body is that of a normally developed, elderly, adult, white female of average frame who appears the recorded age of 80 years. The body is mildly overweight, measuring 64 inches (162.6 cm) and weighing 142 pounds (64.4 kg). The preservation is that of very early to early decomposition with absence of rigor mortis, fixed red-purple lividity over the posterior aspect of the body, skin slippage over the posterior aspect of the body, and extensive aquatic animal activity involving the left earlobe, the left side of the face, including

STATE'S
EXHIBIT
54

PENGAD-Bayonne,N.J.



Case No:   JP3564-00-2564JD

Name:   Cunningham, Bertie

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

the left eye, the left side of the nose, the left cheek, and the left jaw. Aquatic animal activity is also noted about the left posterior forearm. The body is not embalmed. The body is cold to touch after refrigeration.

The hairline is normal. The head hair is thin, gray/black, short and loosely curled, measuring up to 3 inches in length. The body hair pattern is that of a normal average adult female. The scalp is unremarkable except as noted subsequently. The ears are unremarkable. The earlobes are not pierced. The right eye is closed. The left eye is open as a result of aquatic animal activity. The corneae are slightly cloudy to cloudy, the irides brown, and the conjunctivae remarkable for a right lateral scleral hemorrhage. The nose and mouth are unremarkable. The teeth are natural and in good repair. The face, neck, chest, right breast, abdomen, extremities, genitalia, and back are all normally developed. The genitalia are those of a normal adult female. The fingernails are extremely short, covered with rose nail polish, and atraumatic.

IDENTIFYING MARKS AND SCARS:

There is a mastectomy scar extending from the midline of the chest across the left side of the chest to the axilla. A 3 inch, puckered, oblique, linear scar is noted over the right lower quadrant of the abdomen. A 4 inch, linear, vertical, well-healed scar is noted in the lower abdomen extending from the umbilicus to the symphysis pubis. A 1/2 inch, horizontal, well-healed scar is noted over the right knee.

EVIDENCE OF TREATMENT:

None.

EVIDENCE OF INJURY:

Evidence of injury consists of contusions and abrasions of the upper arms and trunk, and a single penetrating gunshot wound to the head.

PENETRATING GUNSHOT WOUND TO THE HEAD:

Entrance: Located over the right side of the forehead/frontal scalp, just behind the hairline, centered 1-1/2 inches below the top of the head and 2-1/4 inches to the right of midline and 3 inches above and 3/4 of an inch in front of the superior attachment of the right ear, is a gunshot entrance wound. The wound is round, measuring 1/8 inch in diameter and is surrounded by a thick (1/8 inch) rim of soot and visible gunpowder. No stippling is present.

Injuries: After perforating the scalp, the bullet entered the right frontal bone, creating a round, 3/8 inch diameter skull defect with distinct beveling inward. No soot is identified on the frontal bone or underlying dura. The bullet next perforated the right superiolateral frontal lobe and traveled downwards and posteriorly through the midline brain structures, emerging from the inferomedial aspect of the left temporal lobe. The bullet next struck the medial end of the left petrous ridge.



Case No:  JP3564-00-2564JD

Name:  Cunningham, Bertie

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

**Recovery:**  Recovered from the left temporal lobe is a deformed, small-caliber, lead bullet. The base is inscribed with the numbers "JP3564-00" over the letters "JD," and submitted in an appropriately labeled envelope to the Criminal Investigation Laboratory. Also recovered are several minute lead fragments surrounding the entrance wound in the subscalpular tissues. These fragments are submitted in the same envelope.

**Path:**  Right to left, downwards, and front to back.

**Range of fire:**  Loose contact (soot and gunpowder deposited on abrasion ring).

**Associated injuries:**  Associated with the bullet trajectory is a right periorbital contusion and right lateral scleral hemorrhage, subscalpular hemorrhage surrounding the gunshot entrance wound, fractures of the anterior cranial fossae, subarachnoid hemorrhage about the right frontal lobe, pulpefaction and hemorrhage along the wound path, and herniation contusions (bilateral parahippocampal gyri) and fracture contusions (bilateral inferior frontal lobes). Also present is a small amount of fluid and clotted blood in the sphenoid sinus.

OTHER INJURIES:

A 2 x 2 inch purple, irregular skin contusion is noted over the posterolateral aspect of the left upper arm. On the posteromedial aspect of the right upper arm, is a 1 inch, oval-shaped, blue-purple skin contusion and a 1/2 inch round, blue-purple skin contusion. On the right side of the chest, underlying the bra line, is a 1/2 inch oval-shaped, dark purple skin contusion. A horizontal, yellow-brown, patterned skin imprint/abrasion, measuring 6 x 1 inch is noted over the epigastrium. On the left side of the abdomen is a 5 x 1/8 inch linear, yellow-brown, patterned skin imprint/abrasion.

An ill-defined red-purple discoloration of the vaginal orifice at 3 and 9 o'clock is identified and sectioned for histology.

These injury having been described will not be repeated.

EVIDENCE COLLECTED:

- Pulled head hair standard
- Hairs recovered from clothing
- Blood standard
- Clothing
- Sexual assault kit
- Recovered projectile
- Handwashings.

INTERNAL EXAMINATION:

BODY CAVITIES:  The body wall fat measures up to 1-1/2 inches in maximal thickness. All body viscera are in their normal anatomic relationship and position. There is approximately 20 cc of decomposition fluid in the right chest

COPY

Case No:  JP3564-00-2564JD                                        Page        4

Name:     Cunningham, Bertie


DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

cavity, 40 cc in the left  chest cavity  and  2 cc in  the pericardial sac.  The peritoneal cavity is dry.  There  are dense fibrous adhesions between the  right lung and the right chest wall.

BODY FLUIDS: The  stomach contains 25 cc of dry, partially digested, soft,  dark unrecognizable food fragments. The mucosal surface is autolyzed. The  bladder is empty. The gallbladder contains 2 cc of light brown bile.

HEAD: See previous description.

NECK:  The  cutaneous  and  subcutaneous  surfaces  of  the  anterior  neck  are unremarkable. There is no strap muscle or carotid sheath hemorrhage. The thyroid cartilage  and hyoid bone are intact.  The lumen of  the larynx and trachea  is patent. The mucosal surfaces are unremarkable.

CARDIOVASCULAR SYSTEM: The aorta is of normal course  and caliber with scattered intimal fatty streaks. The  pericardium is unremarkable. The heart  is enlarged. The epicardial surface  is  unremarkable. The  coronary arterial system is right dominant.  Multiple  sections  reveal partial calcification of the  proximal left anterior descending and  right  coronary  arteries. There  is no atherosclerotic narrowing.  Sections through  the myocardium  reveal uniform,  tan-brown  muscle tissue. All four chambers appear to be somewhat dilated. There is no evidence of old  or recent infarct. The endocardial surface is smooth  and tan-brown.  There are no septal defects.  All  cardiac valve leaflets are  relatively thin and translucent.

RESPIRATORY SYSTEM: The pleural surfaces of the lungs  are plum-colored,  smooth and crepitant. The pulmonary arteries are free of thromboemboli and the  bronchi are free of  fluid or obstruction.  The sectioned surfaces  reveal a  speckled pattern of  anthracosis  and  mild  congestion.  There  is  no  evidence  of consolidation or tumor.

GENITOURINARY SYSTEM: The renal capsules strip with ease, revealing pale, finely granular  subcapsular surfaces. The sectioned  surfaces  reveal  a  normal renal architecture. The  calyces, pelves and ureters are unremarkable. The bladder  is empty.  The bladder  wall  and  bladder mucosa  are unremarkable.  The  uterus, fallopian tubes,  and  ovaries are not found. The vaginal cuff  is  unremarkable except as noted above.

ENDOCRINE SYSTEM:  The adrenal glands are  unremarkable. The  thyroid  gland  is remarkable for a 1 cm nodule of the left lobe with a dark  red, meaty  sectioned surface. The remainder of the thyroid gland is notably pale.

Except  as noted above and for an absent appendix,  the remaining  organ systems comprising the GASTROINTESTINAL, LYMPHORETICULAR, and MUSCULOSKELETAL  systems are unremarkable for the recorded age, sex, and state of preservation.

MICROSCOPIC EXAMINATION:

Vaginal orifice:  Vascular congestion; no hemorrhage identified.

Case No: JP3564-00-2564JD

Name: Cunningham, Bertie



DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

FINDINGS:

1. Penetrating gunshot wound to the head:

   a. Entrance:  right frontal scalp.
   b. Injuries:  severe craniocerebral trauma.
   c. Recovery:  small-caliber, deformed lead bullet from brain.
   d. Path:  right to left, downwards and front to back.
   e. Range of fire:  loose contact.

2. Blunt force injuries  consisting of contusions  of the upper arms and  right side of the chest.

3. Early decomposition with extensive postmortem aquatic animal activity.

4. Status post appendectomy,  total abdominal hysterectomy  and  bilateral salpingo-oophorectomy.

5. History of being abducted from a  mall, shot with  a  22-caliber weapon, and dumped in a river. The body was recovered two days later.

(Continued on next page)

Case No: JP3564-00-2564JD

me: Cunningham, Bertie



Page 6

DALLAS COUNTY
INSTITUTE OF FORENSIC SCIENCES

**CONCLUSION:**

Based upon the investigation report and autopsy findings, it is my opinion that Bertie Cunningham, an 80-year-old white female, died of a gunshot wound to the head. It is possible that she may have survived the gunshot wound to the head for a period of time and, consequently, drowning may have contributed to her death.

**MANNER OF DEATH:** Homicide.

Jennie V. Duval, M.D.
Medical Examiner

Jill B. Urban, M.D.
Medical Examiner

Lynn A. Salzberger, M.D.
Medical Examiner

J. K. Townsend-Parchman, M.D.
Medical Examiner

Joni L. McClain, M.D.
Medical Examiner

Sheila Spotswood, M.D.
Medical Examiner

**TOXICOLOGY:**

Blood:  Alcohols and Acetone - 0.01% ethanol.
        Cannabinoid Screen - negative.
        Drug Screen - negative.

Vitreous:  Alcohols and Acetone - negative.

J. M. Guileyardo, M.D.
Deputy Chief Medical Examiner

Jeffrey J. Barnard, M.D.
Chief Medical Examiner

Protocol typed by Maybelle Doughty

Case 3:10-cv-00160-N Document 118-18 Filed 05/08/13 Page 428 of 546 PageID 8340

Name ___Cunningham, Bertie___   Case No. __JP3564-00__

Age __80__   Sex __F__   Date __10/6/00__



GSW (entrance)

For report only:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

State's Exhibit Number 55

Autopsy Photograph

(Copy attached)



00-3564

STATE'S
EXHIBIT
55

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 58

11                     Autopsy Photograph

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
58

PENGAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 59

11                      Autopsy Photograph

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE'S
EXHIBIT
59

1

2

3

4

5

6

7

8

9

10                       State's Exhibit Number 60

11                        Autopsy Photograph

12                        (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

356410

1

2

3

4

5

6

7

8

9

10          State's Exhibit Number 61

11           Autopsy Photograph

12            (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

3564.00

STATE'S
EXHIBIT
61

ENJAD-Bayonne,N.J.

1

2

3

4

5

6

7

8

9

10              State's Exhibit Number 62

11                 Autopsy Photograph

12                  (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
62

1

2

3

4

5

6

7

8

9

10              State's Exhibit Number 63

11                 Autopsy Photograph

12                 (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT
63

PENGAD-Bayonne,N.J.

1
2
3
4
5
6
7
8
9
10                  State's Exhibit Number 63A
11                        Autopsy Slug
12                      (Copy attached)
13
14
15
16
17
18
19
20
21
22
23
24
25



1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 65

11                  Addison Harrington Records

12                       (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF _DALLAS_ | § |

BEFORE ME, the undersigned authority, on this day personally appeared _Peter Harrington_, who being by me duly sworn, deposed as follows:

"My name is _Peter Harrington_, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of Addison Harrington, Inc. Attached hereto are _16_ pages of records from Addison Harrington, Inc. These said _16_ pages of records are kept by Addison Harrington, Inc. in the regular course of business, and it was the regular course of business of Addison Harrington, Inc. for an employee or representative of Addison Harrington, Inc. with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original."

**BUSINESS RECORDS AFFIDAVIT - Page 1**

STATE'S
EXHIBIT
_65_

_(signature)_

Affiant

SUBSCRIBED AND SWORN TO BEFORE ME this 29th day of ___JANUARY___, 200_,

to certify which witness my hand and seal of office.

T. L. PRAZUCK
MY COMMISSION EXPIRES
April 12, 2003

_(signature)_
Notary Public in and for

___DALLAS___ County, ___TEXAS___

My Commission Expires:
___4-12-03___

**BUSINESS RECORDS AFFIDAVIT - Page 2**

Case 3:10-cv-00163-N   Document 42-13   Filed 05/05/10   Page 448 of 546   PageID 8360

# FAX COVERSHEET

 **ADDISON HARRINGTON, INC.**

13370 BRANCH VIEW * SUITE 130 * DALLAS, TEXAS 75234 * PH(972)488-1751 * FX(972)488-1782

Date: _11·15·00_

Number of pages
including cover sheet: _2_

**TO:**
_Invest. Willy Richardson_

Phone:
Fax: _214 653 ~~3024~~ 3924_
CC:

**FROM:**
_LISA SERVANTES_

**REMARKS:**   ☐ URGENT   ☑ FOR YOUR REVIEW   ☐ REPLY ASAP   ☐ PLEASE COMMENT

_Called wanting information on employee_
_for ~~~~ Car_





ADDISON-HARRINGTON, INC.

ACCIDENT INVESTIGATION FORM

Name of Injured Employee _Jediah Issiac Murphy_ Accident Date: _3-14-97_ Time: _11:00_

Place of Accident: _St Monica_ Supervisor: _Chals_

Apparent Nature of Injuries: _bRoke LeFt Thumb at Knuckle_

Describe **fully** how accident/injuries occurred:
(What was the employee doing when injured? Regular job? What went wrong? Proper equipment furnished? Used? Proper training given? Personal protective equipment needed? Being used? Environmental factors? Other appropriate information?)

_Pulling String Line Tight + Nail Holding String Line came out of Foem hitting his Left Thumb._

Name & Address of Witnesses:

_Peimo Jimmenez_

What can be done to prevent a recurrence of this type of accident? _Have SaFty meeting_

Has this been done? _Yes_ If no, when will it be done? _____

How will it be done & by whom? _____

Other Comments? _____

Name of Investigator? _Chals Flows_ Title: _Foeeman_

Date _3-17-97_

*J. Murphy —*
*Physicians*
*Work Release*

**◆ COLUMBIA**
**Medical Center at Terrell**

1551 Hwy. 34 S. - Terrell, Texas 75160 (214)-563-7611

Name J. MURPHY                Date 3/11/97

Address _____ , Texas

℞

MR. MURPHY MAY RETURN

TO WORK TODAY.

REFILL _____
NON-REP

TROY L. MILLER, MD
DEA - BM1397505
DPS - 30081928  TX LIC - J2888

_____ M.D.
Product Selection
Permitted              Dispense As Written _____ M.D.

Reg. No. _____

Case 3:10-cv-00163-N   Document 42-13   Filed 05/03/20   Page 451 of 546   PageID 8363

**RMH ENTERPRISES, INC.**
13370 BRANCH VIEW, SUITE 130C
DALLAS, TEXAS 75234
(972) 488-1751

43-1465

## APPLICATION FOR EMPLOYMENT

DATE: 12-28-96

NAME: MURPHY    JEDIDIAH    ISAAC        1 09-01-75
(Last name first)                            DATE OF BIRTH:

ADDRESS: 6305 FM 429    (City, State, Zip Code)

PHONE NUMBER: (903) 873-2215    SOCIAL SECURITY NUMBER: 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

1246 8174        97
DRIVERS LICENSE OR I.D. NUMBER, STATE ISSUED, EXPIRATION DATE

### WORK EXPERIENCE

| Company Name & Phone No. | Duties | Supervisor |
|---|---|---|
| H & K | FORKLIFT | DON MYERS |
| FRASIER INDUSTRIES | FORKLIFT | RODNEY BROWN |
| SMITH BLAIR | CRAINE | MIKE PHILLIPS |

REFERENCES: BILLY COURTNEY  (903) 896-1220  CON. WORKER
Name                    Phone No.            Occupation

LOGAN CRAFT    903-873-2215    FORMAN TCI
Name                Phone No.        Occupation

**IN CASE OF EMERGENCY NOTIFY: HOPE ABBOTT    214-962-7445
Name and phone number

=======================================================

RMH ENTERPRISES, INC. HIRING PRIORITY IS AS FOLLOWS:

Applicant was hired because:

A. Current employees of the company_____
B. Past employees with proven safety, attendance, and work attendance._____
C. Applicants recommended by current supervisors._____
D. Applicants recommended by current employees._____
E. Unknown applicants._____

JOB CLASSIFICATION: _____    RATE OF PAY $ 7.00 JW 8

Immigration and Naturalization Service

OMB No. 1115-0135

Employment Eligibility Verification

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE.** It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

## Section 1. Employee Information and Verification. To be completed and signed by employee at the time employment begins

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| MURPHY | JEDIDIAH | ISAAC | |

| Address (Street Name and Number) | Apt. # | Date of Birth (month/day/year) |
|---|---|---|
| 900 EAST SOUTH COMMERCE | | 09-01-75 |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| WILLS POINT | TX | 75169 | 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 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
☑ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien # A
☐ An alien authorized to work until ___/___/___
(Alien # or Admission #

Employee's Signature    *Jedidiah Murphy*

Date (month/day/year)   1-29-97

### Preparer and/or Translator Certification. (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| | |

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|
| | |

## Section 2. Employer Review and Verification. To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: _____ | | Tx Drivers License | | Social Security Card |
| Issuing authority: _____ | | Tx Dept of Public Safety | | US Dept of Health |
| Document #: _____ | | 12468174 | | 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 |
| Expiration Date (if any): __/__/__ | | __/__/__ | | __/__/__ |
| Document #: _____ | | | | |
| Expiration Date (if any): __/__/__ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| *Ray Moore* | RAY MOORE | FOREMAN |

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|
| RMH ENTERPRISES, INC. 13370 BRANCH VIEW, SUITE 130C, DALLAS, TEXAS 75234 | | 1/29/97 |

## Section 3. Updating and Reverification. To be completed and signed by employer

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|
| | |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____   Document #: _____   Expiration Date (if any): __/__/__

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|
| | |

Form I-9 (Rev. 11-21-91) N

Case 3:10-cv-00163-N   Document 42-13   Filed 05/05/10   Page 453 of 546   PageID 8365

# Form W-4 (1997)

**Want More Money in Your Paycheck?**
If you expect to be able to take the earned income credit for 1997 and a child lives with you, you may be able to have part of the credit added to your take-home pay. For details, get Form W-5 from your employer.

**Purpose.** Complete Form W-4 so that your employer can withhold the correct amount of Federal income tax from your pay. Form W-4 may be completed electronically, if your employer has an electronic system. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption From Withholding.** Read line 7 of the certificate below to see if you can claim exempt status. *If exempt, only complete lines 1, 2, 3, 4, 7, and sign the form to validate it.* No Federal income tax will be withheld from your pay. Your exemption expires February 17, 1998.

**Note:** You cannot claim exemption from withholding if (1) your income exceeds $650 and includes unearned income (e.g., interest and dividends) and (2) another person can claim you as a dependent on their tax return.

**Basic Instructions.** If you are not exempt, complete the Personal Allowances Worksheet. Additional worksheets on page 2 so you can adjust your withholding allowances based on itemized deductions, adjustments to income, or two-earner/two-job situations. Complete all worksheets that apply to your situation. The worksheets will help you figure the number of withholding allowances you are entitled to claim. However, you may claim fewer allowances than this.

**Head of Household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals.

**Nonwage Income.** If you have a large amount of nonwage income, such as interest or dividends, you should consider making

estimated tax payments using Form 1040-ES. Otherwise, you may find that you owe additional tax at the end of the year.

**Two Earners/Two Jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one W-4. This total should be divided among all jobs. Your withholding will usually be most accurate when all allowances are claimed on the W-4 filed for the highest paying job and zero allowances are claimed for the others.

**Check Your Withholding.** After your W-4 takes effect, use Pub. 919, Is My Withholding Correct for 1997?, to see how the dollar amount you are having withheld compares to your estimated total annual tax. Get Pub. 919 especially if you used the Two-Earner/Two-Job Worksheet and your earnings exceed $150,000 (Single) or $200,000 (Married). To order Pub. 919, call 1-800-829-3676. Check your telephone directory for the IRS assistance number for further help.

**Sign This Form.** Form W-4 is not considered valid unless you sign it.

---

## Personal Allowances Worksheet

| | | | |
|---|---|---|---|
| **A** | Enter "1" for **yourself** if no one else can claim you as a dependent | . . . . | **A** 1 |
| **B** | Enter "1" if: { • You are single and have only one job; or • You are married, have only one job, and your spouse does not work; or • Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less. } | | **B** 1 |
| **C** | Enter "1" for your **spouse.** But, you may choose to enter -0- if you are married and have either a working spouse or more than one job (this may help you avoid having too little tax withheld) . . . . . . | | **C** |
| **D** | Enter number of **dependents** (other than your spouse or yourself) you will claim on your tax return . . . | | **D** |
| **E** | Enter "1" if you will file as **head of household** on your tax return (see conditions under Head of Household above) | | **E** |
| **F** | Enter "1" if you have at least $1,500 of **child or dependent care expenses** for which you plan to claim a credit | ▶ | **F** |
| **G** | Add lines A through F and enter total here. **Note:** This amount may be different from the number of exemptions you claim on your return ▶ | | **G** |

For accuracy, complete all worksheets that apply.
- If you plan to **itemize or claim adjustments to income** and want to reduce your withholding, see the Deductions and Adjustments Worksheet on page 2.
- If you are **single** and have more than one job and your combined earnings from all jobs exceed $32,000 OR if you are **married** and have a working spouse or more than one job, and the combined earnings from all jobs exceed $55,000, see the Two-Earner/Two-Job Worksheet on page 2 if you want to avoid having too little tax withheld.
- If **neither** of the above situations applies, stop here and enter the number from line G on line 5 of Form W-4 below.

---

-------------- Cut here and give the certificate to your employer. Keep the top portion for your records. --------------

| Form **W-4** | **Employee's Withholding Allowance Certificate** | | OMB No. 1545-0010 |
|---|---|---|---|
| Department of the Treasury Internal Revenue Service | ▶ For Privacy Act and Paperwork Reduction Act Notice, see reverse. | | **1997** |

| 1 Type or print your first name and middle initial | Last name | 2 Your social security number |
|---|---|---|
| JEDIDIAH I | MURPHY | 456 71 2610 |

| Home address (number and street or rural route) | 3 ☐ Single ☒ Married ☐ Married, but withhold at higher Single rate. |
|---|---|
| 900 EAST SOUTH COMMERCE | Note: If married, but legally separated, or spouse is a nonresident alien, check the Single box. |

| City or town, state, and ZIP code | 4 If your last name differs from that on your social security card, check here and call 1-800-772-1213 for a new card. . . . ▶ ☐ |
|---|---|
| WILLS POINT TX 75169 | |

| | | 5 | |
|---|---|---|---|
| 5 | Total number of allowances you are claiming (from line G above or from the worksheets on page 2 if they apply) . | **5** | 3 |
| 6 | Additional amount, if any, you want withheld from each paycheck . . . . . . . . . | **6** $ | |
| 7 | I claim exemption from withholding for 1997, and I certify that I meet **BOTH** of the following conditions for exemption: • Last year I had a right to a refund of **ALL** Federal income tax withheld because I had **NO** tax liability; **AND** • This year I expect a refund of **ALL** Federal income tax withheld because I expect to have **NO** tax liability. If you meet both conditions, enter "EXEMPT" here . . . . . . . ▶ | **7** | |

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate or entitled to claim exempt status.

Employee's signature ▶ *Jedidiah Murphy*      Date ▶ 1-29 , 19 97

| 8 Employer's name and address (Employer: Complete 8 and 10 only if sending to the IRS) | 9 Office code (optional) | 10 Employer identification number |
|---|---|---|
| | | |

Cat. No. 10220Q

# Form W-4 (1996)

## Want More Money In Your Paycheck?

If you expect to be able to take the earned income credit for 1996 and a child lives with you, you may be able to have part of the credit added to your take-home pay. For details, get Form W-5 from your employer.

**Purpose.** Complete Form W-4 so that your employer can withhold the correct amount of Federal income tax from your pay. Because your tax situation may change, you may want to refigure your withholding each year.

**Exemption From Withholding.** Read line 7 of the certificate below to see if you can claim exempt status. *If exempt, only complete lines 1, 2, 3, 4, 7, and sign the form to validate it.* No Federal income tax will be withheld from your pay. Your exemption expires February 18, 1997.

**Note:** *You cannot claim exemption from withholding if (1) your income exceeds $650*

and includes unearned income (e.g., interest and dividends) and (2) another person can claim you as a dependent on their tax return.

**Basic Instructions.** If you are not exempt, complete the Personal Allowances Worksheet. Additional worksheets on page 2 so you can adjust your withholding allowances based on itemized deductions, adjustments to income, or two-earner/two-job situations. Complete all worksheets that apply to your situation. The worksheets will help you figure the number of withholding allowances you are entitled to claim. However, you may claim fewer allowances than this.

**Head of Household.** Generally, you may claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals.

**Nonwage Income.** If you have a large amount of nonwage income, such as interest or dividends, you should consider making estimated tax payments using Form 1040-ES.

Otherwise, you may find that you owe additional tax at the end of the year.

**Two Earners/Two Jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one W-4. This total should be divided among all jobs. Your withholding will usually be most accurate when all allowances are claimed on the W-4 filed for the highest paying job and zero allowances are claimed for the others.

**Check Your Withholding.** After your W-4 takes effect, use Pub. 919, Is My Withholding Correct for 1996?, to see how the dollar amount you are having withheld compares to your estimated total annual tax. Get Pub. 919 especially if you used the Two Earner/Two Job Worksheet and your earnings exceed $150,000 (Single) or $200,000 (Married). To order Pub. 919, call 1-800-829-3676. Check your telephone directory for the IRS assistance number for further help.

**Sign This Form.** Form W-4 is not considered valid unless you sign it.

---

### Personal Allowances Worksheet

| | | | |
|---|---|---|---|
| A | Enter "1" for yourself if no one else can claim you as a dependent | A | 1 |
| B | Enter "1" if: { • You are single and have only one job; or <br> • You are married, have only one job, and your spouse does not work; or <br> • Your wages from a second job or your spouse's wages (or the total of both) are $1,000 or less. } | B | |
| C | Enter "1" for your spouse. But, you may choose to enter -0- if you are married and have either a working spouse or more than one job (this may help you avoid having too little tax withheld) | C | |
| D | Enter number of dependents (other than your spouse or yourself) you will claim on your tax return | D | 2 |
| E | Enter "1" if you will file as head of household on your tax return (see conditions under Head of Household above) | E | |
| F | Enter "1" if you have at least $1,500 of child or dependent care expenses for which you plan to claim a credit | F | |
| G | Add lines A through F and enter total here. **Note:** This amount may be different from the number of exemptions you claim on your return ▶ | G | 3 |

For accuracy, do all worksheets that apply.
- If you plan to itemize or claim adjustments to income and want to reduce your withholding, see the Deductions and Adjustments Worksheet on page 2.
- If you are **single** and have more than one job and your combined earnings from all jobs exceed $30,000 OR if you are married and have a **working spouse** or **more than one job**, and the combined earnings from all jobs exceed $50,000, see the Two-Earner/Two-Job Worksheet on page 2 if you want to avoid having too little tax withheld.
- If **neither** of the above situations applies, stop here and enter the number from line G on line 5 of Form W-4 below.

- - - - - - - - - - - **Cut here and give the certificate to your employer. Keep the top portion for your records.** - - - - - - - - - - -

---

| Form **W-4** | **Employee's Withholding Allowance Certificate** | OMB No. 1545-0010 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | ▶ For Privacy Act and Paperwork Reduction Act Notice, see reverse. | **1996** |

| 1  Type or print your first name and middle initial    Last name | 2  Your social security number |
|---|---|
| JEDIDIAH      MURPHY   I | 456 71 2610 |

| Home address (number and street or rural route) | 3  ☐ Single  ☐ Married  ☑ Married, but withhold at higher Single rate. |
|---|---|
| 6305 FM 429 | **Note:** *If married, but legally separated, or spouse is a nonresident alien, check the Single box.* |
| City or town, state, and ZIP code | 4  If your last name differs from that on your social security card, check |
| KAUFMAN  TX  75142 | here and call 1-800-772-1213 for a new card ▶ ☐ |

| 5 | Total number of allowances you are claiming (from line G above or from the worksheets on page 2 if they apply) | 5 | 3 |
|---|---|---|---|
| 6 | Additional amount, if any, you want withheld from each paycheck | 6 | $ |
| 7 | I claim exemption from withholding for 1996 and I certify that I meet BOTH of the following conditions for exemption: <br> • Last year I had a right to a refund of ALL Federal income tax withheld because I had NO tax liability; AND <br> • This year I expect a refund of ALL Federal income tax withheld because I expect to have NO tax liability. <br> If you meet both conditions, enter "EXEMPT" here ▶ | 7 | |

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed on this certificate or entitled to claim exempt status.

| Employee's signature ▶ *Jedidiah Murphy* | Date ▶ 12-28-   1996 |
|---|---|

| 8  Employer's name and address (Employer: Complete 8 and 10 only if sending to the IRS) | 9  Office code (optional) | 10  Employer identification number |
|---|---|---|

Cat. No. 10220Q

Case 3:09-cv-00298-N Document 42-13    Filed 05/05/10    Page 455 of 546    PageID 8367

**U.S. Department of Justice**
Immigration and Naturalization Service

**Employment Eligibility Verificat**

Please read instructions carefully before completing this form. The instructions must be available during completion this form. **ANTI-DISCRIMINATION NOTICE.** It is illegal to discriminate against work eligible individuals. Employe CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| MURPHY | JEDIDIAH | I | |

| Address (Street Name and Number) | | Apt. # | Date of Birth (month/day/year) |
|---|---|---|---|
| 6308 FM 429 | | | 08-01-75 |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| KAUFMAN | TX | 75142 | 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 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
- [x] A citizen or national of the United States
- [ ] A Lawful Permanent Resident (Alien # A
- [ ] An alien authorized to work until ___/___/___
      (Alien # or Admission #

| Employee's Signature | Date (month/day/year) |
|---|---|
| Jedidiah M | 12-28-96 |

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| | |

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|
| | |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: | | Driver License | | Social Security Card |
| Issuing authority: | | Tex Dep. P.S | | US Dep Health |
| Document #: | | 12468174 | | 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 |
| Expiration Date (if any): ___/___/___ | | 9/1/97 | | ___/___/___ |
| Document #: | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

**CERTIFICATION - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).**

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| Charles Flowers | Charles Flowers | Foreman |

| Business or Organization Name    Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|
| RMH ENTERPRISES, INC.    13370 BRANCH VIEW, SUITE 130C, DALLAS, TEXAS 75234 | 12/28/96 |

**Section 3. Updating and Reverification.** To be completed and signed by employer

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|
| | |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibity.

Document Title: _____    Document #: _____    Expiration Date (if any): ___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employe presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|
| | |

Form I-9 (Rev 11-21-91) N

# RMH ENTERPRISES, INC.

### SAFETY PROGRAM & DRUG TESTING

I, _JEDIDIAH MURPHY_ , have read and understood that RMH ENTERPRISES, INC. dru
**EMPLOYEE NAME**

program and agree to observe all rules and regulations set forth in this program.  I understand that complia
with the above stated policy is a condition of my employment at RMH ENTERPRISES, INC.  I also underst
the disciplinary action that will be taken if I have been found to be in violation of this policy or refuse to com
with any of its requirements.

I, _JEDIDIAH MURPHY_ , understand that RMH ENTERPRISES, INC. may require
**EMPLOYEE NAME**

applicant's take a pre-hire drug test, employment dependant upon test results.  It is also my understanding t
RMH ENTERPRISES, INC. may require random drug testing, employment dependant upon test results.


_____
Signature

_12 - 28 - 96_
Date


_____
Witness

_12 - 28 96_
Date

**RMH ENTERPRISES, INC.**
**13370 BRANCH VIEW LANE, SUITE 130C**
**DALLAS, TEXAS 75234**
**(972) 488-1751**

### NOTIFICATION OF WORKERS' COMPENSATION NONSUBSCRIBER

I, _Jedidiah M_____ , understand that RMH Enterprises, Inc. is a nonsubscriber to the

workers' compensation program.  However, I do understand that RMH Enterprises, Inc. has a group health

program to cover on the job injuries and that said company's insurance company will be notified of my

employment so that coverage will begin at once.  I also understand that should an injury occur, I am to notify

RMH Enterprises, Inc. at once so that they may direct me to their medical provider.  I understand that should I

follow all guidelines set forth, I may be eligible for weekly income benefits until I am able to return to work.


_Jedidiah_____        _12-29-96_
**EMPLOYEE SIGNATURE**                **DATE**


_Charles Thauer_____        _12-28-96_
**WITNESS**                          **DATE**

1

2

3

4

5

6

7

8

9

10                    State's Exhibit Number 66

11              Citizen's National Bank Records

12                      (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

F00-02424-M

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## AFFIDAVIT

| STATE OF TEXAS | § |
| | § |
| COUNTY OF *Van Zandt* | § |

BEFORE ME, the undersigned authority, on this day personally appeared *Darlene Monson*, who being by me duly sworn, deposed as follows:

"My name is *Darlene Monson*. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of Citizen's National Bank. Attached hereto are ___4___ pages of records from Citizen's National Bank. These said ___4___ pages of records are kept by Citizen's National Bank in the regular course of business, and it was the regular course of business of Citizen's National Bank for an employee or representative of Citizen's National Bank with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original."

BUSINESS RECORDS AFFIDAVIT - Page 1

STATE'S
EXHIBIT
66

PENGAD-Bayonne, N.J.

_Darlene Morrison_
Affiant

SUBSCRIBED AND SWORN TO BEFORE ME this __8__ day of __Jan__ _____, 2000,

to certify which witness my hand and seal of office.

> WILLIE L. RICHARDSON
> COMMISSION EXPIRES
> JULY 31, 2003

_Willie L Richardson_
Notary Public in and for

_____ County, _____

My Commission Expires:
_7- 31 2003_

**BUSINESS RECORDS AFFIDAVIT - Page 2**

```
ACCT #   2092115                CHECKING                          EMC•0605
DATE OPENED 03-24-00
TODAYS DATE 12-05-00
OWNER 22078-1  IND        BRANCH CLASS CYCLE STATUS SVC CHG
  JEDIDIAH I MURPHY         100   058   010    CL    ST    OD        10-00
    IND 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 EX      BASIC 2 CHECKING                  NSF WV PA OWV CHV RE
                                                               7  N  N   N   N  N

      MEMO BAL      LEDGER BAL       COLLECT BAL      AVAILBL BAL      LAST DEP/PMNT
        0.00          0.00             0.00             0.00        09-05    40.00
-----------------------------------------------------------------------------------
MONTH  AVERAGE LEDGER  AVERAGE COLLECT   MONTH  AVERAGE LEDGER  AVERAGE COLLECT

00-10      -62.10          -62.10        00-04      194.62         182.07
00-09       18.76           18.76        00-03      228.75         153.75
00-08       86.19           70.24        00-02        0.00           0.00
QTR-1       15.07            9.64        QTR-3      201.81         176.10

00-07       68.42           68.42        00-01        0.00           0.00
00-06       24.14           24.14        99-12        0.00           0.00
00-05       63.85           57.31        99-11        0.00           0.00
QTR-2       52.44           50.24        QTR-4        0.00           0.00
•6-MO•      33.86           30.05        •YEAR•      62.74          55.16

P
```

```
(BCF021)                    Customer Information File                    EMC*0605
  CIF #       22078                                                      12-05-00
     Name                        SSN/TIN No   Home Phone   Work Phone
  I JEDIDIAH I MURPHY            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  903-873-6959


     Street Address          Address Line 2      City              ST Zip
  I HOLD MAIL AT BANK                         WILLS POINT        TX 75169


  Inq Level  Security Code  Key Cust   Emp/Rel  Other Svcs       Profit
     40                        N          N                         Y

  Appl     Acct #       Rel/Stt      Memo Bal  Note/Title    Cyc C N1 /N2 /Add
  DDA-058 2092115       OW/CL          0.00                  010 I   I       I
```

CITIZENS NATIONAL BANK
500 N 4TH STREET
WILLS POINT TX  75169
(903) 873-4157

JEDIDIAH I MURPHY
HOLD MAIL AT BANK
WILLS POINT TX  75169

| | | PRIMARY ACCT DDA-2092115 | ENCLOSURES 0 |
|---|---|---|---|
| | ON LINE REQUEST CUSTOMER NUMBER | 22078 | PAGE NO 1 |

| | | LAST DATE 09-17-00 | STATEMENT DATE 10-15-00 |
|---|---|---|---|

| ACCOUNT TYPE AND NUMBER CHECKING 2092115 | BALANCE FORWARD 17.35 | TOTAL DEBITS 88.00 | TOTAL CREDITS 0.00 | CLOSING BALANCE 70.65- |
|---|---|---|---|---|

BASIC 2 CHECKING
CHECKING 2092115

| DATE..... | | .....AMOUNT.....WITHDRAWALS AND OTHER DEBITS |
|---|---|---|
| 09-22 | 20.00 | NONSUFFICIENT FUND FEE |
| 09-29 | 10.00 | OVERDRAFT FEE |
| 10-04 | 20.00 | NONSUFFICIENT FUND FEE |
| 10-06 | 10.00 | OVERDRAFT FEE |
| 10-11 | 20.00 | NONSUFFICIENT FUND FEE |
| 10-13 | 8.00 | MAINTENANCE FEE    SVC CH* |

AVERAGE BALANCE $21.58-
AVERAGE COLLECTED BALANCE $21.58-
MINIMUM BALANCE OF $62.65- OCCURED ON 10-11-00

```
CITIZENS NATIONAL BANK                                    PRIMARY ACCT          ENCLOSURES
500 N 4TH STREET                                          DDA-2092115           0
WILLS POINT TX  75169
(903) 873-4157                          ON LINE REQUEST CUSTOMER NUMBER  PAGE NO

JEDIDIAH I MURPHY                                         22078                 1
HOLD MAIL AT BANK                                         LAST        STATEMENT
WILLS POINT TX 75169                                      DATE        DATE

                                                          10-15-00    11-15-00
```

```
ACCOUNT              BALANCE      TOTAL          TOTAL       CLOSING
TYPE AND NUMBER      FORWARD      DEBITS         CREDITS     BALANCE
CHECKING 2092115     70.65-       20.00          90.65       0.00
```

```
BASIC 2 CHECKING
CHECKING 2092115

DATE...........AMOUNT...DEPOSITS AND OTHER CREDITS
10-30            90.65    SERVICE CHG REVERSAL

DATE...........AMOUNT...WITHDRAWALS AND OTHER DEBITS
10-19            20.00    NONSUFFICIENT FUND FEE

AVERAGE BALANCE $39.00-
AVERAGE COLLECTED BALANCE $39.00-
MINIMUM BALANCE OF $90.65- OCCURRED ON 10-19-00
```

1

2

3

4

5

6

7

8

9

10                          State's Exhibit Number 69

11                         Dr. Vandiver's Records

12                            (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Sherry Maness, who being by me duly sworn, deposed as follows:

"My name is Sherry Maness, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of Texas Orthopaedic Associates, L.L.P. Attached hereto are _25_ pages of records from Texas Orthopaedic Associates, L.L.P. These said _25_ pages of records are kept by Texas Orthopaedic Associates, L.L.P. in the regular course of business, and it was the regular course of business of Texas Orthopaedic Associates, L.L.P. for an employee or representative of Texas Orthopaedic Associates, L.L.P. with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original."

STATE'S
EXHIBIT
69

_____
Affiant

SUBSCRIBED AND SWORN TO BEFORE ME this 17 day of NOV _____, 2000, to

certify which witness my hand and seal of office.

WILLIE L. RICHARDSON
COMMISSION EXPIRES
JULY 31, 2003

_____
Notary Public in and for
_____ County, _____

My Commission Expires:
7-31-2003

## Texas Orthopaedic Associates

Office Use Only: RRS JAR MJC TGS RHB (WRV)

Patient Legal Name: MURPHY ~ JEDIDIAH ISAAC
Last          First          Middle          Preferred Name

Address: 727 E NORTH COMMERCE # C/   Home #: (903) 878-6959
Street                    Apartment #

WILLS POINT   TX   75169          Date of Birth: 9-1-75  Age: 24
City          State          Zip Code

Social Security #: 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  Drivers Lic. #: 12468174   Marital Status: (S) M D W   Sex: F / (M)
State

Employer: GRIFFIN PRODUCTS          Work #: (903) 873-6388
Company Name

Address: 303 BLUEBIRD PRKWY WILLSPOINT TX 75169
Street      Suite #          City          State     Zip Code

## Guarantor (if patient is a minor) or Spouse Information or Emergency Contact

Name: _____   Relationship: _____
Last          First          Middle

DOB: _____ SSN: _____ Home #: ( )          Marital Status: S M D W

Address: _____
Street          Apartment #          City          State     Zip Code

Employer: _____ Work #: ( )

Address: _____
Street          Suite #          City          State     Zip Code

Other Parent Information:
Name: _____ Relationship: _____ DOB: _____
Last          First          Middle

Address: _____
Street          Apartment #          City          State     Zip Code

Social Security #: _____ Home #: ( )          Work #: ( )

Family Doctor/PCP: _____ Phone #: ( )          Referred By: _____

Insurance  Primary: UNITRIN  W/C          Phone #: (800) 926-1887
Insurance Name

_____ ID#: _____ Group #: _____          HMO

Policy Holder's Name
Secondary: _____ Phone #: ( )          PPO
Insurance Name

_____ ID#: _____ Group #: _____          IN

Policy Holder's Name

## Information Regarding Medical Problem          Date of Injury / Onset: _____

Result of Accident? ☐ Y ☐ N     Injured on the Job? ☐ Y * ☐ N     In Automobile Accident ? ☐ Y ☐ N

**If YES, Tell Receptionist**

Please Circle: Right / Left     Finger (Hand) Wrist Arm Shoulder Elbow Back/Neck Hip Leg Knee Foot Ankle Toe

How did injury occur? Include location where it happened. TRYING TO CATCH TOOL FALL
ID STRUCK MY LEFT THUMB ON THE TABLE,

### RELEASE OF INFORMATION AND ASSIGNMENT OF BENEFITS
I authorize Texas Orthopaedic Associates L.L.P. to release to my insurance company any information acquired in the course of my care and permit payment directly t
Texas Orthopaedic Associates L.L.P. any benefits due for services rendered.  I recognize and accept complete financial responsibility for any balance remaining after
the payment of correct benefits.

X Jedidiah I. Murphy          6-29-00
Patient / Guardian Signature          Date

# TEXAS ORTHOPAEDIC ASSOCIATES, L.L.P.
## Injury and Illness Information

**Patient Name:** _Jedidiah S Murphy_     **Date of Birth:** _9-1-75_

**Is this claim the result of illness?**     Yes _____     No _✓_

**Is this claim the result of an injury?**     Yes _✓_     No _____

**Please describe the nature of the illness or injury (what hurts):** _DISLOCATED_

_LFT THUMB_

**Was this illness or injury sustained in connection with any employment?**     Yes _✓_     No _____

**Was this illness or injury the result of an automobile accident?**     Yes _____     No _✓_

**If due to injury or accident, please describe in detail how the injury or accident occurred:**

Date of injury, accident or onset of illness:     _6-22-00_

Where the injury of accident occurred:     _GRIFFIN PRODUCTS_

How the injury or accident occurred:     _TRYING TO CATCH_

_TOOL OUT OF THE AIR AND STRUCK_

_MY ~~XXX~~ THUMB ON THE EDGE OF TABLE_

**If due to injury or accident, is a third party responsible?**     Yes _____     No _✓_

**If yes, Name of Responsible Party:** _____

Telephone Number: _____

Address: _____

_____

I certify the above statements and details are accurate and true to the best of my knowledge.

_Jedidiah S Murphy_                                    _6-29-00_
**Patient/Parent/Guardian's Signature**                    **Date**

Case 3:10-cv-00163-N  Document 43-10  Filed 05/05/10  Page 470 of 546   PageID 8382

## W/C INSURANCE VERIFICATION FORM

Patient Name: _Jedidiah Murphy_

Patient referred by: _____  Acct #: _____

Pt. Phone #: _903-873-6959_  DOB: _9-01-75_  SS #: _____

Employed by: _Griffen Products_

Employer's Address: _303 Blue Bird Parkway  P.O. Box 90_
_Wills Point, TX  75169_

Pt's Occupation: _____  Dept: _____

☐ Requested copy of employer's initial report.                    _Stansel Kenneth_

♦♦♦♦ DATE OF INJURY: _6-22-00_  Employer Phone #: _903 893-6388_

Pt's Detail of Injury: _- Lt Thumb & tendons_

_____

_____

_____

♦♦♦♦ CLAIM #: _1116 0160_

W/C Carrier: _Unitren Prop & Casualty_

W/C Address: _P.O. Box  655028_
_Dallas Tx  75265_  _#3_

♦♦♦♦ ADJUSTER: _Chuck Dorley_  PHONE #: _1800 936-1887 X8452_

Specific Care Approved: ☐ Orthopaedic Consult / Office Visit _____ _Bus._

☐ X-rays _____

☐ Fx Care _____

☐ Follow-up Care _____

☐ Other _____

_____

Special Notes / Information: _____

_____

_____

Verified by employee: _Sylvia_  Dated: _6-23-00_



**TEXAS ORTHOPAEDIC ASSOCIATES**
**MEDICAL HISTORY**

Name _JEDIDIAH I. MURPHY_ Age _24_ Height _5'10"_ Weight _140_

Family Physician_____   Today's Date _6-29-00_

**Past Medical History**
Have you ever had any of the following?

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| Diabetes | ☐ | ☐ | Seizures | ☐ | ☐ |
| Gout | ☐ | ☐ | Free Bleeding | ☐ | ☐ |
| High Blood Pressure | ☐ | ☐ | Heart Disease | ☐ | ☐ |
| Cancer | ☐ | ☑ | Lung Disease | ☐ | ☐ |
| Ulcers | ☑ | ☐ | Blood Transfusions | ☐ | ☐ |
| Asthma/Hayfever | ☐ | ☐ | Infectious Diseases | ☐ | ☐ |
| Other _____ | | | _____ | | |

**Past Surgical History**
List any surgery that you have had and approximately what year it was performed.
Operation _LFT HAND_ Year _96_   Operation _____ Year _____
_APENDIX_ _93_
_RT LUNG_ _95_

**Medications/Allergies**
What medicine do you currently take, how often do you take it, and what is the dosage(if you know)?

_____   _____   _____

Are you allergic to any medicine? ☑Yes ☐No   Which ones? _IODINE_

**Family History**
Is your:   Mother alive? ☑Yes ☐No Age ____ Illnesses/ Cause of death _____
Father alive? ☐Yes ☑No Age _39_ Illnesses/ Cause of death _PSOROSIS_
How many: Sisters do you have? _3_ Any illnesses? _NO_
Brothers do you have? _2_ Any illnesses? _NO_
Which (if any) of the illnesses listed under Past Medical History (above) run in your family?
_ALCAOLISIM_

**Social History**
Are you currently:   ☑Single?   ☐Married?   ☐Divorced? ☐Widowed?
☑Employed? ☐Unemployed?   ☐Retired?   Occupation _WELDER_

Do you:

| | Yes | No | |
|---|---|---|---|
| Smoke cigarrettes? | ☑ | ☐ | How many packs per day? _1_ |
| Smoke cigars? | ☐ | ☐ | |
| Chew tobacco? | ☐ | ☐ | |
| Do you drink alcohol? | ☐ | ☑ | How many drinks per day? _____ |

**Review of Systems**
Have you had:

| | Yes | No | |
|---|---|---|---|
| Any recent change in bowel habits? | ☐ | ☑ | |
| Any major changes in your weight? | ☐ | ☑ | |
| (Females only) Are you: | | | |
| Pregnant? | ☐ | ☐ | Date of last menstrual period?_____ |
| Having any menstrual irregularities? | ☐ | ☐ | |

June 30, 2000



xas Orthopaedic
Associates, L.L.P.

John A. Racanelli, M.D.

Robert R. Scheinberg, M.D.

Michael J. Champine, M.D.

Timothy G. Schacherer, M.D.

    d H. Blum, M.D.

William R. Vandiver, M.D.

Ruby D. Mize, M.D., Ret.

    Walnut Hill Lane
Suite 130, LB 11
Dallas, Texas 75231
214-750-1207
Fax 214-750-8504

6200 West Parker Road
Suite 516
Plano, Texas 75093
972-578-1138
Fax 972-578-1132

    West Highway 243
Suite B
    man, Texas 75112
    972-2122
Fax 972-962-2130

To whom It May Concern -

    Jedidiah Murphy suffered a left thumb meta-carpo-phalangeal dislocation while on the job on June 22, 2000. At that time, the joint spontaneously reduced but he ruptured his ulnar collateral ligament which is a very important stabilizer of this joint. Also known as "skiers thumb" or "gamekeeper's thumb", it will not heel without surgery because the ligament edges are not opposed. He needs an open repair. After that he will be in a thumb splint for about 3 weeks - then gentle motion. Unrestricted use of the thumb in about 8-10 weeks.

        Thank you,

        William R. Vandiver MD

Texas Orthopaedic Associates, L.L.P.

July 20, 2000

RE: MURPHY, Jedidiahi

Jedidiahi comes in for follow-up of open and end repair of his left thumb metacarpal phalangeal joint ulnar collateral ligament. He says he is not having much pain, however, he does have numbness on the ulnar portion of his thumb distal to the incision. His wound is healing well. His stitches were removed and he remains stable to mild stress.

At this point we can only wait for the nerve to recover. It might be shocked by the surgery, however, there is a good chance that it will come back.

In the meantime, Jedidiahi will not be able to do his regular welding work as it takes a lot of fine detail. He will follow-up in the office in one month, but he may be released back to work prior to that if his nerve recovers.

William R. Vandiver, M.D.   MO
WRV/laf

August 17, 2000

RE: MURPHY, Jedidiah

Jedidiah is now about six weeks status post left thumb ulnar collateral ligament repair. His main concern and complaint is continued numbness over the ulnar aspect of the thumb. He is concerned about this because of his job and ability to do welding work.

On physical examination, his wound is well healed. He has very good range of motion, however, he does have very slight or no sensation over the medial part of his thumb and some of the palmar pad.

I will now refer Jedidiah to Dr. Garrison for some EMG studies of the left thumb to see if we can determine the level and/or the severity of the nerve damage. We will see him back as soon as this consult is completed.

William R. Vandiver, M.D.
WRV/laf

October 3, 2000

RE: MURPHY, Jedidiahi

Jedidiahi was scheduled to come in today at 3:30. he did not show up. We will try to contact him for rescheduling.

William R. Vandiver, M.D.   MO
WRV/laf



**Texas Orthopaedic
Associates, L.L.P.**

John A. Racanelli, M.D.

Robert R. Scheinberg, M.D.

Michael J. Champine, M.D.

Timothy G. Schacherer, M.D.

Todd H. Blum, M.D.

William R. Vandiver, M.D.

Bobs D. Mize, M.D., Ret.

Walnut Hill Lane
Suite 130, LB 14
Dallas, Texas 75231
214-750-1207
Fax 214-750-8501

6200 West Parker Road
Suite 546
Plano, Texas 75093
972-378-1138
Fax 972-378-1132

709 West Highway 243
Suite B
Kaufman, Texas 75142
972-962-2122
Fax 972-962-2130

June 29, 2000

RE: MURPHY, Jedidiah

Mr. Murphy is a 24-year-old, white male employed by Griffin Products who on the 21st of June of this year was working and trying to catch a falling tool. He struck his left thumb on the table apparently dislocating it at the metacarpal phalangeal joint. He immediately sought assistance and in the process of trying to brace his hand he apparently spontaneously reduced the thumb. However, shortly after this he experienced quite a bit of swelling about the joint. He was subsequently in the Emergency Room in Terrell where x-rays revealed no fracture, no dislocation at the time. He was placed into a splint and told to follow-up here.

Today he still has quite a bit of discomfort in the thumb. There is still swelling present.

On physical examination with the splint removed, there is quite a bit of swelling about his left thumb metacarpal phalangeal joint. Other than the swelling, there does not appear to be any gross deformity or evidence of recurrent dislocation or subluxation. The area is extremely tender to the touch. However, even with very careful and mild testing of the ligaments he does have an obvious deficiency in his ulnar collateral ligament. Also, there is quite a bit of ecchymosis in this area indicating such an injury. He is not able to actively flex his IP joint. However, this is probably due to pain. However, he is neurovascularly intact in his left thumb distal to the injury.

IMPRESSION:     STATUS POST LEFT THUMB METACARPAL PHALANGEAL DISLOCATION WITH SPONTANEOUS REDUCTION WHILE ON THE JOB WITH A CLINICALLY OBVIOUS RUPTURE OF THE ULNAR COLLATERAL LIGAMENT.

PLAN:     The natural history of this condition was explained at length to Mr. Murphy. In all likelihood he has a stener lesion where the ruptured ulnar collateral ligament has popped out in front of the adductor aponeurosis, therefore, impeding any possibility of healing. Since he is a manual laborer, I recommended that he get this ligament surgically repaired, as he will have quite a bit of symptomatic instability in the future if he does not. He has agreed with this plan, therefore, we will obtain certification from his comp carrier and schedule him as soon as possible.

William R. Vandiver, M.D.     /t0
WRV/laf

## TEXAS ORTHOPAEDIC ASSOCIATES
### PHONE LOG

Patient Name: _Jedidiah Murphy_     D.O.B.: _9-1-75_

Please date and initial each entry.

_Emg c̄ Dr Garrison  Left Thumb  9/7/00 3:00._
_101 N. Houston  800 949-8888_

_10/5/00 Discharge pt - due to arrest. ⊕ Do Not_
_see pt_

ROBERT R. SCHÖ NBERG, M.D.
MICHAEL J. CHAMPINE, M.D.
TIMOTHY G. SCHACHERER, M.D.
RONALD H. BLUM, M.D.
WILLIAM R. VANDIVER, M.D.

TEXAS ORTHOPAEDIC ASSOCIATES, L.L.P.
ORTHOPAEDIC SURGE

☐ 8210 Walnut Hill Ln.   ☐ 6200 W. Parker Rd.   ☐ 709 W. Hwy. 243
Suite 130                 Suite 516                Suite B
Dallas, TX 75231          Plano, Texas 75093       Kaufman, TX 75142
214-750-1207              972-378-1438             972-932-2122

Name _Murphy, Jedidiah_____   Date _6/29/00___

Address _____   City _____

Reg. No. _____

Darvocet N-100
Sis i T – ii PO q4-6h prn pain

Disp, 40 (forty)

Refill x one (1)

DISP  | 0 | 4 | 0 |

_____ M.D.          _____ M.D.

Product selection permitted          Dispense as written
REPT. UT. DICT. 1 2 3 4 Times   P.R.N. ☐  Non-Rep. ☐   No Call ☐

## Texas Orthopaedic Associates, L.L.P.

☐ 8210 Walnut Hill Lane, Ste. 130     ☐ 6200 W. Parker Rd., Ste. 516     ☒ 709 W. Hwy. 243, Suite B
   Dallas, Texas 75231                    Plano, Texas 75093                 Kaufman, Texas 75142
   214-750-1207                           972-378-1438                       972-932-2122

Date _____6/29/00_____

To Whom It May Concern:

_____Jedidiah Murphy_____

is under my care for the treatment of _s/p Left thumb_

_retacarpophalangeal joint dislocation and_

_ulnar collateral ligament rupture_

Patient _will require surgical repair of_

_the above ligament_

_____

_____

_____

If you have any questions concerning this patient, please do
not hesitate to contact me.

_____
Physician's Signature

☐ John A. Racanelli, M.D.
☐ Robert R. Scheinberg, M.D.
☐ Michael J. Champine, M.D.
☐ Timothy G. Schacherer, M.D.
☐ Ronald H. Blum, M.D.
☒ William R. Vandiver, M.D.

FORM 104 REV 11/99

## Texas Orthopaedic Associates, L.L.P.

❏ 8210 Walnut Hill Lane, Ste. 130
Dallas, Texas 75231
214-750-1207

❏ 6200 W. Parker Rd., Ste. 516
Plano, Texas 75093
972-378-1438

❏ 709 W. Hwy. 243, Suite B
Kaufman, Texas 75142
972-932-2122

Date _8 - 17 - 00_

To Whom It May Concern:

_Jedediah Murphy_

is under my care for the treatment of _Collateral ligament left Thumb_

Patient _Patient is to remain off work. Recommend EMG._

If you have any questions concerning this patient, please do not hesitate to contact me.

_____ Physician's Signature

❏ John A. Racanelli, M.D.
❏ Robert R. Scheinberg, M.D.
❏ Michael J. Champine, M.D.
❏ Timothy G. Schacherer, M.D.
❏ Ronald H. Blum, M.D.
❏ William R. Vandiver, M.D.

FORM 104 REV 11/99

Faxed 888-557-8599

## Texas Orthopaedic Associates, L.L.P.

☐ 8210 Walnut Hill Lane, Ste. 130          ☐ 6200 W. Parker Rd., Ste. 516          ☐ 709 W. Hwy. 243, Suite B
     Dallas, Texas 75231                              Plano, Texas 75093                          Kaufman, Texas 75142
     214-750-1207                                      972-378-1438                                972-932-2122

Date  9-14-00

To Whom It May Concern:

_Jedidiah Murphy_

is under my care for the treatment of _left ulnar_

_collateral ligament_

Patient _may return to work 9-18-00._
_Patient is not to lift greater_
_than 20 lbs._

If you have any questions concerning this patient, please do
not hesitate to contact me.

_[signature]_

Physician's Signature

☐ John A. Racanelli, M.D.
☐ Robert R. Scheinberg, M.D.
☐ Michael J. Champine, M.D.
☐ Timothy G. Schacherer, M.D.
☐ Ronald H. Blum, M.D.
☑ William R. Vandiver, M.D.

FORM 104 REV 11/99

_Attn: Kirsten Adames_

Operation

Case 3:10-cv-00163-N   Document 42-33   Filed 03/05/10   Page 482 of 546   PageID 8394

## OPERATIVE REPORT

PATIENT NAME:        MURPHY, JEDIDIAH
MR#:                 402372
PHYSICIAN:           William R. Vandiver, M.D./ID: 93902
ADMISSION DATE:      7-7-00
OPERATION DATE:      7-7-00

ATTENDING ORTHOPEDIC SURGEON:  WILLIAM RICHARD VANDIVER, M.D.

PREOPERATIVE DIAGNOSES:  Rupture of the ulnar collateral ligament of the left thumb, metacarpal phalangeal joint.

POSTOPERATIVE DIAGNOSES:  Same.

NAME OF OPERATION:  Open end-to-end repair of the above ligament.

SURGEON:  William R. Vandiver, M.D./ID: 93902

ANESTHESIA:  LMA administers by Robert V. Johnston, M.D.
CC:  ANESTHESIA SERVICE/ID: 93114

PROCEDURE NOTE:  The patient was brought into the Operating Room and placed in a comfortable supine position on the operating table. Once LMA anesthesia had been successfully induced, a tourniquet was placed high in the patient's left arm and the patient's left upper extremity from the bottom end of the tourniquet out to the fingertips was prepped and draped in a routine sterile fashion. The extremity was exsanguinated using a 4 inch Esmarch bandage and the tourniquet was inflated to 220 mm/Hg. A bayonet type incision was made on the dorsal ulnar aspect of the base of the thumb centered over the metacarpal phalangeal joint. Dissection was carefully carried through the subcutaneous fat until the abductor aponeurosis could be seen. The piece of ligament could be seen at the superior end of the piece of aponeurosis. The aponeurosis was split with a pair of scissors. The tendon ends were fairly well approximated once the aponeurosis was split. The repair was carried out using #2-0 Vicryl until a solid repair was achieved. The aponeurosis was repaired back over the ulnar collateral ligament using #4-0 Vicryl and the subcutaneous was also approximated using #4-0 Vicryl. The skin was closed using #4-0 nylon vertical mattress sutures.

A sterile dressing consisting of bacitracin ointment, Adaptic, 4 x 4s and Webril was placed. The tourniquet was taken down. Tourniquet time was 33 minutes. After this, a short arm thumb spica cast was applied using 2 inch fiberglass rolls.

PATIENT NAME:        MURPHY, JEDIDIAH
MR#:                 402372
PHYSICIAN:           William R. Vandiver, M.D./ID: 93902


ESTIMATED BLOOD LOSS:  Minimal.

There were no specimens and no complications.

Before placing the cast, the  patient's joint was stressed and it
was seen to be stable now as it was, as the right side was during
the preoperative examination.

The patient was  taken to the Post Anesthesia Care Unit in stable
condition.

_____
William R. Vandiver, M.D./ID: 93902

TM
DD:  07-07-00
DT:  07-07-00
                        (END OF REPORT)

PRESBYTERIAN HOSPITAL
Of Kaufman

**INSTRUCTIONS:**
PHYSICIAN — (1) USE BALL POINT PEN
(2) PRESS FIRMLY

NURSE — (1) USE BALL POINT PEN
(2) PRESS FIRMLY

(3) DETACH LAST ... IES IMMEDIATELY AFTER CHARTING IS
COMPLETED BY NURSES AND FORWARD TO PHARMACY.

| DATE | TIME | DESCRIPTION | |
|------|------|-------------|---|
| 7-7-00 | 7:30 | Allergies: Iodine | CHECK HERE IF APPROVED GENERIC EQUIVALENT IS NOT ACCEPTABLE |
| | | 1. Admit Day Surgery Dr Van Inwer | |
| | | 2. Diet: NPO p Midnight 7-6-00 | |
| | | 3. Labs: CBC | |
| | | 4. pt to sign permit | |
| | | 5. Dx: Ulna Collateral ligament | |

DOCTOR'S SIGNATURE

Murphy, Jerhold

# Presbyterian
## Hospital of Kaufman
A Member of Presbyterian Healthcare System

DATE 6/30/00                    TIME

CHIEF COMPLAINT _Left Thumb Pain_

PRESENT ILLNESS _24 y.o. w/m injured left MCP on 6-22-00. Ruptured ulnar collateral ligament._

PAST HISTORY    ALLERGIES [ ] NKA _Codeine_

REVIEW OF SYSTEMS _see above_

MEDICATIONS

SURGICAL _Lt hand 96, appendix 93, lung 95_

MEDICAL

FAMILY / SOCIAL

| | SMOKES | DRUGS | ALCOHOL |
|---|---|---|---|
| | / | Ø | Ø |

| ASSESSMENT | B/P | T | P | R | WT |
|---|---|---|---|---|---|
| HEENT | | | | | |
| BREASTS | _Deferred_ | | | | |
| CARDIOVASCULAR | _RRR_ | | | | |
| CHEST | _CTA_ | | | | |
| ABDOMEN | _Soft, NT, ⊕BS_ | | | | |
| GENITOURINARY | _Deferred._ | | | | |
| MUSCULOSKELETAL | _Pain left thumb_ | | | | |
| NEUROLOGICAL | _Intact UE_ | | | | |
| IMPRESSION | _Ulnar collateral ligament tear_ | | | | |

THE RISKS, BENEFITS AND ALTERNATIVES OF THE OPERATION OR PROCEDURE HAVE BEEN EXPLAINED AND PATIENT / FAMILY UNDERSTAND(S) AND AGREE(S) TO THE OPERATION OR PROCEDURE. [✓] YES  [ ] NO

PLAN _Open repair ulnar collateral ligament_

PROGRESS/OPERATION/DISCHARGE NOTE [ ] SEE DICTATION

PRINCIPAL Dx

CONDITION

INSTRUCTIONS                    [ ] INSTRUCTION SHEET COMPLETED

MEDICATIONS

FOLLOW-UP

ACTIVITY                    DIET

_[signature]_                    7/5/00
Physician Signature                    Date

**SHORT STAY RECORD**

446350 (3/98)

**Presbyterian
Hospital of Kaufman**
A Member of Presbyterian Healthcare System

*Murphy*

### DISCLOSURE AND CONSENT
### MEDICAL AND SURGICAL PROCEDURES

*TO THE PATIENT: You have the right, as a patient, to be informed about your condition and the recommended surgical, medical, or diagnostic procedure to be used so that you may make the decision whether or not to undergo the procedure after knowing the risks and hazards involved. This disclosure is not meant to scare or alarm you; it is simply an effort to make you better informed so you may give or withhold your consent to the procedure.*

I (we) voluntarily request Dr. _William R Vandiver md_
as my physician, and such associates, technical assistants and other health care providers as they may deem necessary, to treat my condition which has been explained to me by my physician as: _Ruptured ulnar_
_Collateral Ligament Left thumb/hand_
I (we) understand that the following surgical, medical, and/or diagnostic procedures are planned for me and I (we) voluntarily consent and authorize these procedures:

_____

_____

I (we) understand that my physician may discover other or different conditions which require additional or different procedures than those planned. I (we) authorize my physician, and such associates, technical assistants and other health care providers to perform such other procedures which are advisable in their professional judgment.

I (we) (do) (do not) consent to the use of blood and blood products as deemed necessary. I (we) also realize that the following risks and hazards may occur in connection with this particular procedure: **fever, transfusion reactions which may include kidney failure or anemia, heart failure, hepatitis, AIDS (Acquired immune deficiency syndrome) and other infections.**

I (we) understand that no warranty or guarantee has been made to me as to result or cure.

Just as there may be risks and hazards in continuing my present condition without treatment, there are also risks and hazards related to the performance of the surgical, medical, and/or diagnostic procedures planned for me. I (we) realize that common to surgical, medical, and/or diagnostic procedures is the potential for infection, blood clots in veins and lungs, hemorrhage, allergic reactions, and even death. I (we) also realize that the following risks and hazards may occur in connection with this particular procedure:

_Infection, possible need for further surgery._

I (we) understand that anesthesia involves additional risks and hazards but I (we) request the use of anesthetics for the relief and protection from pain during the planned and additional procedures. I (we) realize the anesthesia may have to be changed possibly without explanation to me (us).

I (we) understand that certain complications may result from the use of any anesthetic including respiratory problems, drug reaction, paralysis, brain damage or even death. Other risks and hazards which may result from the use of general anesthetics range from minor discomfort to injury to vocal cords, teeth or eyes. I (we) understand that other risks and hazards resulting from spinal or epidural anesthetics include headache and chronic pain.

I (we) have been given an opportunity to ask questions about my condition, alternative forms of anesthesia and treatment, risks of nontreatment, the procedures to be used, and the risks and hazards involved, and I (we) believe that I (we) certify this form has been fully explained to me, that I (we) have read it or have had it read to me, that the blank spaces have been filled in, and that I (we) understand its contents.

| | am | | | am |
|---|---|---|---|---|
| DATE:_____ TIME:_____ pm | | DATE:_____ TIME:_____ pm | | |

I (We) have sufficient information to give this informed consent.          I (We) have sufficient information to give this informed consent.

_____          _____
PATIENT/Other legally responsible person sign          PATIENT/Other legally responsible person sign

I have explained the risk, benefits, and alternatives and the          I have explained the risk, benefits, and alternatives and the
patient/family understands and agrees to the procedure.          patient/family understands and agrees to the anesthesia.

_____ 7/5/00          _____
Surgeon Sign          Date   Time          Anesthesiologist / CRNA Sign          Date   Time

WITNESS:          WITNESS:

Name:_____          Name:_____

Address: _____          Address: _____

City, State, Zip: _____          City, State, Zip: _____

Item 4339

**SOUTHWEST MEDICAL EXAMINERS, INC.**
7502 Greenville Avenue
Suite 600
Dallas, Texas 75231

(214) 368-4963
(888) 336-8759
Fax (214) 750-5775
Fax (877) 768-5439

June 30, 2000

Trinity Universal Insurance
Chuck Donley
P.O. Box 655028
Dallas, Texas 75265-5028

DR. William R. Dandiver
709 West Highway 243, Suite B
Kaufman, Texas 75142

Presbyterian Hospital of Kaufman
843 West Highway 243
Kaufman, Texas 75142

Jedidiah Murphy
727 East North Commerce, # 4
Wills Point, Texas 75169

| | |
|---|---|
| **Employee:** | Jedidiah Murphy |
| **Date of Loss:** | 06/22/00 |
| **SSN:** | 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 |
| **Claim Number:** | 11160160 |

This is to confirm that on 06/30/00 we approved preauthorization of the following health care treatment(s) and/or service(s) as required under Title 28, Part II, Chapter 134.600, Subchapter G of the Texas Administrative Code:

**Outpatient surgery to be performed 07/07/00:**
**Repair Ulnar Collateral Ligament Tear Left Thumb**

The assigned preauthorization number is **TU0050A**. Please use this number on all correspondence and billing forms regarding this injured employee.

This certification does not guarantee payment. Compensability can be determined only by your adjuster and the determination of actual benefits can only be made upon receipt of the completed claim. Payment for the services received is subject to statutory limitations, eligibility, compensability, as well as, medical necessity.

Any questions or changes should be directed to the preauthorization department of Southwest Medical Examiners at 888-336-8759.

URA NUMBER:  05091

Sincerely,

*Kim Risk, R.N.*

Kim Risk, R.N.

Name: MURPHY, JEDIDIAH                   Pt. Type: X
Location: DSUR    Room: DSUR-            Med Rec #:(00002)0000-40-23-72
     or:  VANDIVER, WILLIAM R            Acct #:      120-0157667
   #: 0093902

_____ HEMATOLOGY _____
_____

                                          06JUL00
                                    _____

PROCEDURE                          UNITS      _____
_____ Complete Blood Count
WBC .    x10^3/uL      3.6 - 11.1            6.3
RBC      x10^6/uL      4.27 - 5.61           5.06
HGB      g/dL          12.9 - 17.3           15.5
HCT      %             37.6 - 50.5           45.9
MCV      fl            79.3 - 97.3           90.7
MCH      pg            26.8 - 33.4           30.5
MCHC     g/dL          32.9 - 35.5           33.7
RDW      %             11.5 - 15.0           12.3
PLT      x10^3/uL      130 - 400             256
MP       fl            7.5 - 10.7            8.3
NL .     %             43.2 - 71.5           46.4
LYMPH    %             16.8 - 43.4           38.8
MONO     %             0.0 - 12.4            9.9
EOS      %             0.0 - 7.8             4.2
NE#      x10^3/uL      1.9 - 7.2             3.0
LYMPH#   x10^3/uL      1.1 - 2.7             2.4
MONO#    x10^3/uL      0.0 - 0.8             0.6
F   }    x10^3/uL      0.0 - 0.5             .0.3
    )#   x10^3/uL      0.0 - 0.1             0.0

_____

MURPHY, JEDIDIAH                   End of Report                   Page:   1

## REHABILITATION MEDICAL SPECIALISTS OF DALLAS, P.A.



JAMES S. GARRISON, M.D.                    DONALD M. McPHAUL, M.D.

# FAX

| TO FAX: *972-962-2112* | DATE: *9/12/00* |
|---|---|
| ATTENTION: *Sylvia / Dr Vandiver* | |

FROM:  Ann ☐                Mary Gayle ☒  @ Fax 214-987-0739

If there are any difficulties with this transmission, please call 214-987-1460 (Dallas) or
1-800-949-888 (Kaufman and surrounding area).

RE:  *Jedidiah's EMG Report —*
*if any questions, Dr G will*
*be in office all afternoon —*
*then OOT thru Sunday*

NUMBER OF PAGES INCLUDING THIS COVER SHEET: *5*

8210 Walnut Hill Lane, Suite 614, L/B 54, Dallas, TX 75231-4405 / Tel. (214) 987-1460 / Fax. (214) 987-0739
Kaufman Clinic, 101 N. Houston, Kaufman, TX 75142 / Tel. (800) 949-8888 / Fax. (214) 987-0739



09/12/2000 TUE 11:55  FAX 214 987 0739 GARRISON & MCPHAUL                    002/005

# REHABILITATION MEDICAL SPECIALISTS OF DALLAS, P.A.



JAMES S. GARRISON, M.D.                                        DONALD M. McPHAUL, M.D.

September 7, 2000

William Vandiver, M.D.
709 W. Hwy 243, Suite B
Kaufman, TX 75142

Re:  Jedidiah Murphy
     Date of Injury:       6/22/00
     Claim No:             11160160

Dear Dr. Vandiver:

This letter is to give you a report on your patient Jim Murphy, whom I saw in consultation September 7, 2000 for electrodiagnostic studies of the left thumb. This is a 25-year-old man with the chief complaint of pain, stiffness and numbness in the left thumb. He explained that he was injured at work June 22, 2000 when he struck the left thumb against a table leg while trying to catch some falling equipment. He went to surgery for repair of an avulsed ulnar collateral ligament of the thumb. Afterward, he noticed numbness over part of the thumb. The numbness persists. He has had no previous injury to the left thumb. He does have a past history of gunshot wound to the left hand, with nerve injury resulting in a loss of sensation over the whole hand except the thumb. He reports that he still has impaired sensation in the second, third, fourth and fifth fingers. He had several surgical procedures for repair and reconstruction of the left hand at that time.

On examination, a healed surgical incision was noted over the ulnar aspect of the left thumb MP joint. There was a Tinel sign to percussion over the cutaneous sensory nerve on the ulnar aspect of the thumb proximal to the healed incision scar. There was some pain and restriction of motion of the left thumb. Motor function of hand intrinsic muscles appeared to be intact.

Electromyography was done to the left abductor pollicis brevis, first dorsal interosseous and extensor indices proprius muscles. The muscles examined had normal insertional activity, no abnormal spontaneous electrical activity and normal motor unit action potentials with respect to amplitude, configuration and recruitment.

8210 Walnut Hill Lane, Suite 614, L/B 54, Dallas, TX 75231-4405 / Tel. (214) 987-1460 / Fax. (214) 987-0739
Kaufman Clinic, 101 N. Houston, Kaufman, TX 75142 / Tel. (800) 949-8888 / Fax. (214) 987-0739

Jedidiah Murphy
September 7, 2000
Dr. Vandiver
Page 2

Nerve conduction studies were limited to sensory conduction studies of the left thumb, as authorized. The left median nerve orthodromic sensory latency from the thumb to the wrist was 2.7 milliseconds, with a sensory nerve action potential amplitude of 32.1 microvolts. The left median nerve antidromic sensory latency from wrist to thumb was 2.7 milliseconds, with a sensory nerve action potential amplitude of 20.5 microvolts. The radial nerve sensory action potential was unobtainable in the thumb when ring-recording electrodes were placed on the thumb and the radial nerve was stimulated at the wrist. In response to electrical stimulation via ring electrodes around the thumb, a nerve action potential was obtained over the radial nerve at the wrist, but the potential was low in amplitude with the same latency and configuration as the median sensory nerve action potential. Therefore, this response may have been due to volume conduction of the nerve action potential from the median nerve in the wrist rather than a radial nerve action potential.

IMPRESSION:

1. Normal EMG findings in the muscles tested. No evidence of nerve injury was seen in the EMG examination.

2. Normal nerve conduction studies of the left median nerve sensory branch to the thumb.

3. The radial nerve sensory action potential was unobtainable in the thumb when ring-recording electodes were placed on the thumb and the radial nerve was stimulated at the wrist. These findings are consistent with conduction block of the radial cutaneous sensory nerve to the thumb.

Thank you for asking me to see Jedidiah Murphy. If I can assist you further in his care, please call.

Sincerely,


James S. Garrison, M.D.
JSG/bf

**Rehabilitation Medical Specialists**
**of Dallas, P.A.**
8210 Walnut Hill Lane, Suite 614
Dallas, Texas 75231

Patient:      Murphy, Jedidiah            Test Date:    00/09/07
Ref. M.D.:   Dr. Vandiver

## Sensory Nerve Study

**Left Med/Uln/Rad Nerve**

| Rec Site: Wrist | Lat (ms) | Pk Lat (ms) | Amp (uV) | Dist (mm) |
|---|---|---|---|---|
| STIM SITE | | | | |
| R Thumb | 2.2 | 2.7 | 3.4 | 100 |
| M Thumb | 2.2 | 2.7 | 32.1 | 100 |

NOTES:Stim site: ring electrodes on thumb. Radial response may be volume conduction from median nerve

**Left Med/Uln/Rad Nerve**

| Stim Site: Wrist | Lat (ms) | Pk Lat (ms) | Amp (uV) | Dist (mm) |
|---|---|---|---|---|
| REC SITE | | | | 100 |
| R Thumb | NR | | | 100 |
| M Thumb | 2.2 | 2.7 | 20.5 | 100 |

NOTES:antidromic stimulation at wrist, recording ring electrodes on thumb

## EMG Study

| Name | | Ins Act | Fibs | PSW | Fascics | Polyph | MU Amp | MU Dur | Config | Pattern | Int Pat | Recruit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| L. Abd.Pol.Br. | Normal | | | | | | | | | | | |
| L. Dors.Int.1 | Normal | | | | | | | | | | | |
| L. Ext.Ind.Pro. | Normal | | | | | | | | | | | |

## Impression

1. Normal EMG fnindings in the muscles tested.  No evidence of nerve injury affecting the last motor branch of the left median, radial, or ulnar nerves was seen in the EMG examination
2. Normal nerve conduction studies of the left median nerve sensory branch to the thumb.
3. The radial nerve sensory action potential was unobtainable in the thumb when ring recording electrodes were placed on the thumb and the radial nerve was stimulated at the wrist.
4. In response to electrical stimulation via ring electrodes around the thumb, a nerve action potential was obtained over the radial nerve at the wrist, but the potential was low in amplitude, with the same latency and configuration as the median sensory nerve action potential. This response may have been due to volume conduction of the nerve action potential from the nearby median nerve in the wrist.

page 2

Patient:    Murphy, Jedidiah                    00/09/07

L. Med/Uln/Rad SNC

**Medical Center at Terrell**

NAME: MURPHY,JEDIDIAH ISAAC
ATTENDING DR: Farnes,Stephen MD
DOB: 09/01/1975    AGE: 24    SEX: M
ACCT: TL0021110687 LOC: TL.ER
EXAM DATE: 06/22/2000 STATUS: DEP ER
RADIOLOGY NO:
UNIT NO: TL00051795

EXAMS:                          REASON FOR EXAM:
000076390 HAND PA/AP, LAT & OBLIQUE   R/O FRACTURE

CLINICAL HISTORY:  HYPEREXTENDED HIS LEFT THUMB WITH PAIN.

Three views of the left hand dated 6/22/00, reviewed without a prior
study for comparison, show soft tissue swelling involving the MC-P
articulation of the thumb.  Encircling metal rings involve the fourth
digit.  A metallic wrist band involves the wrist.

IMPRESSION: SOFT TISSUE SWELLING WITHOUT ACUTE FRACTURES NOTED.

JOB#: 3767


*Electronically Signed by STEVEN L. ALTSHULER M.D. on 06/22/2000 at 1350*
            REPORTED AND SIGNED BY: STEVEN L. ALTSHULER, M.D.


CC: RADIOLOGY CONSULTING ASSO

DICTATED DATE/TIME: 06/22/2000 (1227)
TECHNOLOGIST: HETTY SMITH MRT (TDH)
TRANSCRIBED DATE/TIME: 06/22/2000 (1253)
TRANSCRIPTIONIST: TL.MR.DW
ELECTRONIC SIGNATURE DATE/TIME: 06/22/2000 (1350)
PRINTED DATE/TIME: 06/29/2000 (0856)   BATCH NO: 735

PAGE 1                    RADIOLOGY

1
2
3
4
5
6
7
8
9
10                    State's Exhibit Number 70
11        Kaufman Presbyterian Hosptial Records
12                    (Copy attached)
13
14
15
16
17
18
19
20
21
22
23
24
25

CAUSE NO.
*F 00-02424*

| | | |
|---|---|---|
| STATE OF TEXAS | § | *194 TH JUDICIAL* |
| | § | *DISTRICT COURT* |
| V. | § | |
| | § | |
| *JEDIDIAH ISAAC MURPHY* | § | DALLAS COUNTY, TEXAS |

**FILED**
MAY 15 2001
JIM HAMLIN
DIST. CLERK, DALLAS CO., TEXAS
DEPUTY

## BUSINESS RECORD AFFIDAVIT

Before me, the undersigned authority appeared *Barbara Ray*, who, being by me duly sworn, deposed as follows:

My name is *Barbara Ray*, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

I am the custodian of the records of *PRESBYTERIAN HOSPITAL*. Attached hereto are *28* pages of records from *PRESBYTERIAN HOSPITAL*. These said *28* pages of records are kept by *PRESBYTERIAN HOSPITAL* in the regular course of business, and it was the regular course of business of for an employee or representative of *PRESBYTERIAN HOSPITAL*, with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the exact duplicates of the original.

**AFFIANT**

SWORN TO AND SUBSCRIBED before me on the *15th* day of *May*, 2001.

Notary Public,

*Larry P. Reid* State of Texas

*Larry P. Reid* Notary's printed name:

My Commission expires: _____

LARRY P. REID
COMMISSION EXPIRES
JUNE 26, 2004

STATE'S
EXHIBIT
70

Affidavit - Solo Page

07/06/00

K0

PRESBYTERIAN HOSPITAL OF KAUFMAN

1200157667   OT   402372
MURPHY ,JEDIDIAH
24 / M   DSUR       ORT

93902  VANDIVER  WILLIAM

Att. Physician:_____ Admit Date:_____ Discharge Date:_____

Anesthesiologist(s):_____ Consultant(s):_____

PRINCIPAL DIAGNOSIS:    (reason for admission after study)

_____

SECONDARY DIAGNOSIS/CO-MORBID CONDITIONS/COMPLICATIONS:

_____

_____

_____

_____

Adverse Drug Reaction? Yes__ No__ Drug:_____

PRINCIPAL PROCEDURE:  (Surgery/Procedure for the principal diagnosis)

_____

SECONDARY PROCEDURES: (Other surgery/procedures performed)

_____

_____

_____

DISCHARGE DESCRIPTION:

AHR - ROUTINE DISCHARGE
AMA - LEFT AGAINST MEDICAL ADVICE
ATW - HOME CARE/HOSPICE RELATED TO ADM
ARS - HOME CARE/HOSPICE NOT RELATED
      TO ADMISSION
ARU - HOME CARE START 3 DAYS AFTER
      DISCHARGE DATE
ATA - TRANS/DISCH TO ANOTHER FACILITY,
      EXCLUDING ACUTE CARE
ATD - TRANSFER TO HOSP OWNED SNU

ATE - TRANSFER TO OTHER SNU
ATH - TRANS TO ACUTE CARE GEN'L HOSP
ATI - TRANSFER TO NURSING HOME
ATV - TRANSF TO HOSP OWNED PSYCH
ATP - TRANSFER TO OTHER PSYCH UNIT
ATU - TRANS TO HOSP OWNED REHAB CNTR
ATR - TRANSFER TO OTHER REHAB CENTER
ATT- TRANS TO INPATIENT HOSPICE
DBA - EXPIRED - AUTOPSY
DBN - EXPIRED - NO AUTOPSY

PHYSICIAN:_____      DATE:_____

PATIENT SUMMARY

10:18 07/06/00 FROM N00K,PMSADMF1
P1567207

PRESBYTERIAN HOSPITAL OF KAUFMAN
--------------------------------------------------------------------------------
```
PATIENT NAME:  MURPHY ,JEDIDIAH                  PATIENT NUMBER :  1200157667
PATIENT TYPE:  X                                 MED REC NUMBER :  402372
SERVICE/CLINIC CODE:   ORT / DSUR                ROOM/BED NUMBER:
DIAGNOSIS:  RUPT ULNER COLLATERAL LIGAMENT       EXPECTED ARRIVAL DATE: 07/07/00
        - .. LT THUMB                            EXPECTED ARRIVAL TIME: _  10:18
   ** PATIENT INFORMATION **
   STREET:     727 E N COMMERCE #4
   CITY:       WILLS POINT                       STATE:  TX
   ZIP CODE:   75169                             PHONE NO: 903-873-6959
   MARITAL STS:  S    SEX:  M                    BIRTHDATE: 09/01/1975  AGE :  24
   SSN:          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                     RELIGION: DNV
                                                 CONGREGATION:

   ** PATIENT EMPLOYER INFORMATION **
   EMP NAME:   GRIFFIN PRODUCTS
   EMP ADDR:                                     CITY:
   STATE:                                        ZIP CODE:
   OCCUPATION:                                   PHONE NO.:  903-873-6388

   ** REGISTRATION INFORMATION **
   REGISTRATION DATE: 07/07/00  ADMIT DR VANDIVER   WILLIAM R   93902
   REGISTRATION TIME: 10:18     ATTND DR VANDIVER   WILLIAM R   93902
   REGISTRATION SOURCE:  RP     REFER DR VANDIVER ZANE A      T40693
   PREVIOUS ADMIT DATE:  08/23/99   ADMITTED BY:  RGKSKH    REF SRC: PHYS
   ACCIDENT INDICATOR:  J   ACCIDENT DATE: 06/22/00   ONSET DATE:  06/22/00

   ** EMERGENCY CONTACT INFORMATION **
   NAME:    CRAFT ,LOGAN             RELATION TO PATIENT: OTHER
   STREET:                           CITY:
   STATE:     ZIP CODE:              PHONE NO: 903-873-2215
   ** GUARANTOR INFORMATION **
   NAME:   MURPHY ,JEDIDIAH          RELATION TO PATIENT: SELF
   STREET: 727 E N COMMERCE #4       CITY:
   STATE : TX  ZIP CODE: 75169       PHONE NO: 903-873-6959

   ** INSURANCE INFORMATION **                   FINANCIAL CLASS:  K
   1SUBSCRIBER: MURPHY ,JEDIDIAH       POLICY NO.: 456712610        COB: 1
   GROUP NAME:  GRIFFIN PRODUCTS       GROUP NO:              INS PLAN CODE: V01
   MAIL TO: UNITRIN                    DOB: 09/01/1975
            P O BOX 655028                                       BC PLAN:
            DALLAS        TX   75265  TREATMENT AUTHORIZE ID: TU0050A
        BEFN PH#: 800-926-1887 PRECERT PH#: 888-336-8759  BEHV PH#:
   2SUBSCRIBER:                        POLICY NO.:                  COB:
   GROUP NAME:                         GROUP NO:             INS PLAN CODE:
   MAIL TO:                            DOB:
                                                                BC PLAN:
                                   TREATMENT AUTHORIZE ID:
          BENF PH#:          PRECERT PH#:          BEHV PH#:
   3SUBSCRIBER:                        POLICY NO.:                  COB:
   GROUP NAME:                         GROUP NO:             INS PLAN CODE:
   MAIL TO:                            DOB:
                                                                BC PLAN:
                                   TREATMENT AUTHORIZE ID:
          BENF PH#:          PRECERT PH#:          BEHV PH#:
   4SUBSCRIBER:                        POLICY NO.:                  COB:
   GROUP NAME:                         GROUP NO:             INS PLAN CODE:
   MAIL TO:                            DOB:
                                                                BC PLAN:
                                   TREATMENT AUTHORIZE ID:
          BENF PH#:          PRECERT PH#:          BEHV PH#:
```
--------------------------------------------------------------------------------
                                                              RGKTLW

Case Presbyterian Document 42-13 Filed 05/05/10 Page 500 of 546 PageID 8412

**Presbyterian**
**Hospital of Kaufman**
A Member of Presbyterian Healthcare System

DATE 6/30/00   TIME

**CHIEF COMPLAINT** Left thumb Pain

**PRESENT ILLNESS** 24 y.o. w/m injured left MCP on 6-22-00. Ruptured ulnar collateral ligament.

**PAST HISTORY  ALLERGIES [ ] NKA** Codeine

**REVIEW OF SYSTEMS** see above

**MEDICATIONS**

**SURGICAL** Lt hand 96, appendix 93, lung 95

| | SMOKES | DRUGS | ALCOHOL |
|---|---|---|---|
| | ✓ | Ø | Ø |

**MEDICAL**

**FAMILY / SOCIAL**

| ASSESSMENT | B/P | T | P | R | WT |
|---|---|---|---|---|---|
| HEENT | | | | | |
| BREASTS | Deferred | | | | |
| CARDIOVASCULAR | RRR | | | | |
| CHEST | CTA | | | | |
| ABDOMEN | Soft, NT, ⊕BS | | | | |
| GENITOURINARY | Deferred | | | | |
| MUSCULOSKELETAL | Pain left thumb | | | | |
| NEUROLOGICAL | Intact UE | | | | |
| IMPRESSION | Ulnar collateral ligament tear | | | | |

THE RISKS, BENEFITS AND ALTERNATIVES OF THE OPERATION OR PROCEDURE HAVE BEEN EXPLAINED AND PATIENT / FAMILY UNDERSTAND(S) AND AGREE(S) TO THE OPERATION OR PROCEDURE. [✓] YES [ ] NO

**PLAN** Open repair ulnar collateral ligament

**PROGRESS/OPERATION/DISCHARGE NOTE [ ] SEE DICTATION**

**PRINCIPAL Dx**

**CONDITION**

**INSTRUCTIONS**   [ ] INSTRUCTION SHEET COMPLETED

**MEDICATIONS**

**FOLLOW-UP**

**ACTIVITY**   DIET

Physician Signature   7/5/00   Date

**SHORT STAY RECORD**

446350 (3/98)

## UNIVERSAL CONSENT FOR TREATMENT

I understand that my health condition requires inpatient or outpatient admission. I consent to and authorize testing, treatment and/or hospital care as ordered by my doctor and his/her consultants, associates and assistants. I authorize Hospital nurses, employees and others as necessary to carry out the instructions of my doctor(s) with respect to the procedures and treatment they have ordered. I understand that it may be necessary for representatives of outside health care companies to assist in my care. I also understand student nurses and others in professional training programs may be among the individuals who provide care to me. If I am to receive obstetrical care, this consent is given for any child(ren) born to me during this hospitalization. I understand that in connection with my treatment, photos or videos may be taken. Any tissue or body parts removed from my body may be retained or disposed of by the Hospital at its sole discretion.

I also understand and acknowledge that Texas law provides if any health care worker is exposed to my blood or other bodily fluid, the Hospital may perform tests, with or without my consent, on my blood or other bodily fluid to determine the presence of any communicable disease, including but not limited to, Hepatitis, HIV/AIDS and Syphilis. I understand that such testing is necessary to protect those who will be caring for me while I am a patient of the Hospital. I understand that the results of tests taken under these circumstances are confidential and do not become a part of my medical record.

**I acknowledge and agree that the doctors participating in my care in the Hospital do not work for the Hospital. They are not employees, servants or agents of the Hospital. They are either engaged in the private practice of medicine or are licensed practitioners participating in the care of patients as part of a post-graduate medical education program. In addition to my attending doctor, other doctors who may participate in my care may include radiologists, pathologists, anesthesiologists, neonatologists, cardiologists, emergency physicians and other specialists. I acknowledge and agree that the Hospital is not responsible for the judgment or conduct of any doctor who treats or provides a professional service to me, but rather is an independent contractor who is engaged in private practice and is not an agent, servant or employee of the Hospital.**

**NO GUARANTEE: I acknowledge that no guarantees or warranties have been made to me with respect to treatment to be provided at this Hospital. I understand that all supplies, medical devices and other goods sold or furnished to me by the Hospital are sold or furnished on an "AS IS" basis, and Texas Health Resources disclaims any expressed or implied warranties with respect to them.**

If the person signing this form is not the patient, please give full name, phone number and address:

_____

_____

I HAVE READ AND UNDERSTAND THIS INFORMATION.

| | | |
|---|---|---|
| _Signature_ (handwritten) | _Relationship_ (handwritten) | |
| Signature of Patient or Legally Authorized Representative | Relationship to Patient | Reason Patient Unable to Sign |
| _Signature_ (handwritten) | _Admit Rep_ (handwritten) | 7-6-0 |
| Witness | Title | Date of Signature |

**HOSPITAL BOX MUST BE CHECKED**

## Texas Health Resources

**UNIVERSAL CONSENT FOR TREATMENT**
FORM NO. HM-998541055 (8/99)

☐ AMH  ☐ HMHEB  ☐ MRMC  ☐ PHW
☐ HCCH  ☐ HMNW  ☐ PHD  ☐ SPMC
☐ HMEC  ☐ HMSPG  ☐ PHK  ☐ WRH
☐ HMFW  ☐ HMSW  ☐ PHP  ☐ Other_____


9080
THR 60 (Rev. 8/99)

PATIENT IDENTIFICATION
MURPHY, JEDIDIAH
09/01/1975    24 / M    OT
07/07/00    DSUR    DRT
83902    VANDIVER  WILLIAM

# AUTHORIZATION TO RELEASE VERBAL HEALTH CARE INFORMATION DURING THIS ADMISSION

*With exceptions the law has created, you have the right to decide what verbal information the hospital can release during your admission. Please take a moment to read this form carefully to properly choose the option which best suits your needs.*

I understand there are times when the law allows the hospital to release information regardless of whether or not I give my consent. For example, the hospital may release information to doctors, nurses and others who provide me with health care or are prospective health care providers; to government agencies as authorized by law; to insurance companies or others who are responsible for paying my medical bills; or to a court of law that issues a subpoena or court order. I understand this information may be released either orally or in document form.

I understand that "Directory Information", such as my presence in the hospital, my room number, room telephone number, age, sex, race and one word statement relating to my condition may be released to all who ask unless I specifically request to be a "No Information" patient as stated below.

☐ **STANDARD DISCLOSURE** - I authorize this hospital and medical staff members to discuss my medical history, diagnosis, treatment and prognosis with those listed below. I understand this may include information regarding testing, examination and treatment for HIV, AIDS related illness, mental health and drug, alcohol or chemical abuse.

☐ spouse _____

☐ children _____     _____

_____     _____

_____     _____

☐ parent _____     _____

☐ other _____     _____

☐ **NO INFORMATION** - I do not authorize release of any information regarding my admission or treatment. I choose to be a "No Information" patient and I realize that mail, flowers, telephone calls and visitors will be refused on my behalf. (The hospital staff will not be able to acknowledge nor deny my absence or presence.)

This authorization will expire at the end of my hospitalization or clinic service, unless I revoke the consent prior to that time.

_____     _____     _____
Signature of Patient or *Legally Authorized Representative     Relationship     Date

_____     _____     7-6-00
Witness     Date

*For Purposes of this form, "Legally Authorized Representatives" include: 1) legal guardian, 2) agents authorized in a Medical Power of Attorney, 3) Attorney or guardian ad litem appointed by the court, 4) attorney retained by the patient or patient's legally authorized representative, 5) parent or legal guardian of a minor, 6) a personal representative or statutory beneficiary if the patient is deceased, that is a spouse, adult children and parents of the deceased patient.

PATIENT IDENTIFICATION

## Texas Health Resources
Authorization for Verbal Release of Health Care
Information During Admission for Services
Form HM-998540228 (Rev. 8/99)

☐ AMH   ☐ HMHEB   ☐ MRMC   ☐ PHW
☐ HCCH   ☐ HMNW   ☐ PHD   ☐ SPMC
☐ HMEC   ☐ HMSPG   ☐ PHK   ☐ WRH
☐ HMFW   ☐ HMSW   ☐ PHP   ☐ Other _____

9100

THR 63 (Rev. 8/99)

# ADMISSION ACKNOWLEDGMENTS

**RELEASE OF INFORMATION:** I consent and authorize the Hospital to release all information contained in my financial and medical records, including diagnoses and test results, to (a) any of my treating practitioners, (b) my insurance company or health plan, (c) any other person or entity that is responsible for paying or processing for payment of any portion of my Hospital bill, (d) governmental or accrediting agencies, (e) any other health care provider to which I am transferred for care, (f) to entities utilizing this information for quality management, peer review and/or outcome analysis such as tumor registry follow-up, or (g) any other person or entity as required or allowed by state and federal law. This consent applies to all records created in the course of and relating to this hospitalization, including those related to alcohol and/or substance abuse diagnosis or treatment, mental health treatment, and/or any communicable disease, including HIV/AIDS. To provide the practitioners who will treat me during this hospitalization with access to my prior medical history, I also consent and authorize any health care provider to release to any of the practitioners who treat me during this hospitalization all information contained in my medical records from prior treatment that is relevant to my current care and treatment. If I am the patient or the patient's legal guardian, I also consent to release of billing and medical records to my primary care physician and his/her medical group. I authorize the Hospital to release my home address, telephone number and social security number to the manufacturers of the medical devices I receive, in accordance with the medical device tracking provisions of the federal Safe Medical Devices Act.

This release shall remain valid until I notify the Hospital, in writing, of my desire to revoke it. I understand there are times when the law allows the Hospital to release information regardless of whether or not I give my consent. For example, the Hospital may release information to doctors, nurses and others who provide me with health care or are prospective health care providers; to government agencies as authorized by law; to insurance companies or others who are responsible for paying my medical bills; or to a court of law that issues a subpoena or court order. I understand this information may be released either orally or in document form whether or not I withdraw my consent.

**ADVANCE DIRECTIVES:**
**a.** To be completed for Hospital outpatients and emergency room patients only:
Are you (the patient) presenting an Out-of-Hospital         ☐ Yes   ☑ No        Copy provided?        ☐ Yes    ☐ No
DNR order or bracelet?

**b.** To be completed for Hospital inpatients and outpatients undergoing invasive procedures only:
1. Who is answering the following questions?        Patient? ☑ Yes    ☐ No        Person with Patient?   ☑ Yes    ☐ No
2. Was printed information about Advance Directives                                   Information received?  ☐ Yes    ☐ No
   offered to you?                                 ☑ Yes    ☐ No
3. Do you (the patient) have a Directive to Physicians (Living Will)?  ☐ Yes    ☐ No   Copy provided?        ☐ Yes    ☐ No
4. Do you (the patient) have a Medical Power of Attorney?   ☐ Yes    ☐ No   Copy provided?        ☐ Yes    ☐ No
5. Do you (the patient) have a Mental Health Directive?     ☐ Yes    ☐ No   Copy provided?        ☐ Yes    ☐ No
6. Are you (the patient) presenting an Out-of-Hospital      ☐ Yes    ☑ No   Copy provided?        ☐ Yes    ☐ No
   DNR order or bracelet?
7. Would you like to discuss Advance Directives with       ☐ Yes    ☐ No   Referral to:_____
   a Hospital staff member?

**I understand it is my responsibility to provide a copy of my Advance Directives to the Hospital.**
**(*Hospital Staff Note: Shaded area indicates that Advance Directive follow-up documentation is required.)**

**PATIENT RIGHTS AND RESPONSIBILITIES:** I have received written information regarding my rights and responsibilities as a patient. This information tells me how to register a complaint I might have.

**MY VALUABLES:** I understand that the Hospital does not assume responsibility for personal property I may keep with me during my treatment/hospitalization. I understand that unnecessary items should be sent home, and that a safe is available for my valuables.

**FINANCIAL AGREEMENT/ASSIGNMENT OF BENEFITS:** I hereby assign to the Hospital, and any practitioner providing care and treatment to me, any and all benefits and all interest and rights (including causes of action and the right to enforce payment) for services rendered under any insurance policies or any reimbursement or prepaid health care plan. If my treatment was caused by events which result in legal action, I assign to the Hospital an interest in any claims I may have. I hereby promise to pay for all services rendered to me to the extent I am legally responsible for such payment; I understand I am responsible for all health insurance copayments and deductibles. Charity care may be available if Hospital eligibility criteria are met.

If I am a MEDICAID PATIENT, I understand that the services or items that I request to be provided to me may not be covered under the Texas Medical Assistance Program as being reasonable and medically necessary for my care. I understand that the Texas Department of Human Services or its health insuring agent determines the medical necessity of the services or items that I request and receive. I also understand that I am responsible for payment of the services or items I request and receive if these services or items are determined not to be reasonable and medically necessary for my care. If I am a Medicaid Star patient, these provisions may not apply.

**FOR MEDICARE/TRICARE PATIENTS ONLY:** I acknowledge receipt of the written material entitled, "Important Message from Medicare/Tricare."

If the person signing this form is not the patient, please give full name, phone number and address:

**I HAVE READ AND UNDERSTAND THE INFORMATION ABOVE AND ON THE BACK OF THIS FORM.**

| | | |
|---|---|---|
| _(signature)_ | _(signature)_ | _7-6-00_ |
| Signature of Patient or Legally Authorized Representative | Relationship to Patient | Reason Patient Unable to Sign |
| _(signature)_ | _(signature)_ | |
| Witness | Title | Date of Signature |

---

**HOSPITAL BOX MUST BE CHECKED**



## Texas Health Resources
### ADMISSION ACKNOWLEDGEMENTS
FORM NO. HM-998540682 (Rev. 8/99) PAGE 1 OF 2

9051

THR 61 (Rev. 8/99)

☐ AMH   ☐ HMHEB   ☐ MRMC   ☐ PHW
☐ HCCH  ☐ HMNW    ☐ PHD    ☐ SPMC
☐ HMEC  ☐ HMSPG   ☐ PHK    ☐ WRH
☐ HMFW  ☐ HMSW    ☐ PHP    ☐ Other_____

PATIENT IDENTIFICATION
MURPHY ,JEDIDIAH
03/01/1975    24 / M    01
                OSUR      03
07/07/00
93902   VANDIVER WILLIAM

| SIGNATURES | INT* | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

1200157567    402272
MURPHY , JEDIDIAH
09/01/1975        24 / M
07/07/00          D UP
S3902  LYNCH  WM  JULIAN

Teaching method code *  A = audiovisual      D = demonstration
                        B = role play        H = handout
                        C = explanation      G = group class

Barriers to Learning
Identified on
Admission Data Form

| DATE | TIME | INTERVENTION — Include content taught and identity of learner if other than the patient. | TIME SPENT | TEACHING METHOD | EVALUATION | | | | REVISION | | | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | STATES/VERBALIZES KNOWLEDGE CONTENT | CAN RETURN DEMONSTRATE | ROUTINELY PERFORMS | NO EVIDENCE OF LEARNING | RE-TEACH | NEEDS PRACTICE | ONGOING REINFORCEMENT | |
| 7/6/00 | | PRE-ADMISSION : | | C/H | | | | | | | | |
| | | Instructed Patient | | | | | | | | | | |
| | | & Significant Other | | | | | | | | | | |
| | | Importance of NPO, | | | | | | | ? | | | |
| | | Enemas, Showers,Pre- | | | | | | | | | | |
| | | Operative Medications | | | | | | | | | | |
| | | Blood draws,EKG,Chest | | | | | | | | | | |
| | | Xray, Time to arrive | | | ✓ | | | | | | | |
| | | Orientation to Room | | | ✓ | | | | | | ✓Danforth RN | |
| 7-7-00 | | POST-OPERATIVE : | 5 | C/H | | | | | | | | |
| | | Instructed Patient | | | | | | | | ✓ | | |
| | | & Significant Other | | | | | | | | | | |
| | | Medication Actions | | | ·. | | | | | | | |
| | | and Side Effects, | | | | | | | | | | |
| | | Wound and Dressing | | | | | | | | | | |
| | | Care, Icepacks,Diet, | | | | | | | | | | |
| | | Activity. | | | ✓ | | | | | | | |
| | | | | | | | | | | | | |
| | | Discharge  Instruction | | H | ✓ | | | | | | | |
| | | Sheet and Prescriptions | | | | | | | | | | |
| | | Provided | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Form # 17568  New 11/94                TEACHING · LEARNING RECORD

INSTRUCTIONS:
PHYSICIAN — (1) USE BALL POINT PEN    (1) USE BALL POINT PEN    (1) DETACH LAST    INSTRUCTIONS: WHEN LAST IS
(2) PRESS FIRMLY    (2) PRESS FIRMLY    COMPLETED B...    ...ASES AND FORWARD TO PHARMACY.

| DATE | TIME | DESCRIPTION |
|------|------|-------------|
| 7-7-00 | 7:30 | Allergies: Iodine |
| | | 1. Admit Day Surgery Dr Van Sinex |
| | | 2. Diet: NPO p Midnight 7-6-00 |
| | | 3. Labs: CBC      done |
| | | 4. pt to sign permit |
| | | 5. Dx: Ulnar Collateral ligament |

CHECK HERE IF APPROVED GENERIC EQUIVALENT IS NOT ACCEPTABLE

7/6/00

DOCTOR'S SIGNATURE

1

| DATE | TIME | DESCRIPTION |
|------|------|-------------|
| 7/7/00 | 0900 | 1. Discharge pt home today |
| | | 2. Morphine 4 mg IV q2h prn severe pain |
| | | 3. Toradol 30 mg IV Now      — done PAUL. |
| | | 4. Vicodin ii PO q4h prn mild - moderate pain |
| | | 5. Act Regular |

CHECK HERE IF APPROVED GENERIC EQUIVALENT IS NOT ACCEPTABLE

2

DOCTOR'S SIGNATURE

CHECK HERE IF APPROVED GENERIC EQUIVALENT IS NOT ACCEPTABLE

3

DOCTOR'S SIGNATURE

X64166

445800 4406

**Presbyterian**
**Hospital of Kaufman**
A Member of Presbyterian Healthcare System

### DISCLOSURE AND CONSENT
### MEDICAL AND SURGICAL PROCEDURES

*TO THE PATIENT: You have the right, as a patient, to be informed about your condition and the recommended surgical, medical, or diagnostic procedure to be used so that you may make the decision whether or not to undergo the procedure after knowing the risks and hazards involved. This disclosure is not meant to scare or alarm you; it is simply an effort to make you better informed so you may give or withhold your consent to the procedure.*

I (we) voluntarily request Dr. _William R. Vandiver M.D._ as my physician, and such associates, technical assistants and other health care providers as they may deem necessary, to treat my condition which has been explained to me by my physician as: _Ruptured ulnar Collateral Ligament Left Thumb/hand_

I (we) understand that the following surgical, medical, and/or diagnostic procedures are planned for me and I (we) voluntarily consent and authorize these procedures: _Ulnar Collateral Ligament Repair Left Thumb/hand_

I (we) understand that my physician may discover other or different conditions which require additional or different procedures than those planned. I (we) authorize my physician, and such associates, technical assistants and other health care providers to perform such other procedures which are advisable in their professional judgment.

I (we) **(do)** (do not) consent to the use of blood and blood products as deemed necessary. I (we) also realize that the following risks and hazards may occur in connection with this particular procedure: **fever, transfusion reactions which may include kidney failure or anemia, heart failure, hepatitis, AIDS (Acquired immune deficiency syndrome) and other infections.**

I (we) understand that no warranty or guarantee has been made to me as to result or cure.

Just as there may be risks and hazards in continuing my present condition without treatment, there are also risks and hazards related to the performance of the surgical, medical, and/or diagnostic procedures planned for me. I (we) realize that common to surgical, medical, and/or diagnostic procedures is the potential for infection, blood clots in veins and lungs, hemorrhage, allergic reactions, and even death. I (we) also realize that the following risks and hazards may occur in connection with this particular procedure: _Infection, possible need for further Surgery._

I (we) understand that anesthesia involves additional risks and hazards but I (we) request the use of anesthetics for the relief and protection from pain during the planned and additional procedures. I (we) realize the anesthesia may have to be changed possibly without explanation to me (us).

I (we) understand that certain complications may result from the use of any anesthetic including respiratory problems, drug reaction, paralysis, brain damage or even death. Other risks and hazards which may result from the use of general anesthetics range from minor discomfort to injury to vocal cords, teeth or eyes. I (we) understand that other risks and hazards resulting from spinal or epidural anesthetics include headache and chronic pain.

I (we) have been given an opportunity to ask questions about my condition, alternative forms of anesthesia and treatment, risks of nontreatment, the procedures to be used, and the risks and hazards involved, and I (we) believe that I (we) certify this form has been fully explained to me, that I (we) have read it or have had it read to me, that the blank spaces have been filled in, and that I (we) understand its contents.

DATE: _7-6-00_  TIME: _1050_ (am)/pm
I (We) have sufficient information to give this informed consent.
_____
PATIENT/Other legally responsible person sign

DATE: _7-7-00_ TIME: _730_ (am)/pm
I (We) have sufficient information to give this informed consent.
_____
PATIENT/Other legally responsible person sign

I have explained the risk, benefits, and alternatives and the patient/family understands and agrees to the procedure.
_____
Surgeon Sign    Date _7/5/00_   Time

I have explained the risk, benefits, and alternatives and the patient/family understands and agrees to the anesthesia.
_____
Anesthesiologist / CRNA Sign   Date _7/7/00_  Time _72 A_

WITNESS:

Name: _____

Address: _____

City, State, Zip: _____

WITNESS:

Name: _____

Address: _____

City, State, Zip: _____

Item 4339

# PRESBYTERIAN HOSPITAL OF KAUFMAN

## ANESTHESIA RECORD

Procedure: Ligament Repair (R) hand
Procedure

| | | |
|---|---|---|
| Anesthesia | START | STOP |
| Procedure | 815 | 835 |

DATE: 7/6/80   OR No.   Page   of   Surgeon(s)

### PRE PROCEDURE
- ☑ Identified  ☐ ID Band  ☐ Questioning
- ☐ Chart Reviewed  ☑ Permit Signed
- ☐ NPO Since _____
- **Pre-anesthetic State:**  ☐ Calm
- ☑ Awake  ☐ Asleep
- ☐ Apprehensive  ☐ Confused
- ☐ Uncooperative  ☐ Unresponsive

### PATIENT SAFETY
- ☑ Anes. Machine #221 493 ☑ Checked
- ☑ Safety Belt On  ☐ Axillary Roll
- ☑ Armboard Restraints  ☐ Arms Tucked
- ☑ Pressure points checked and padded
- ☑ Eye Care:  ☐ Ointment  ☐ Saline
- ☑ Taped  ☐ Pads  ☑ Goggles

### MONITORS AND EQUIPMENT
- ☐ Steth:  Precord ☐ Esoph ☐ Other
- ☑ Non-Invasive BP ☐ Left ☐ Right
- ☑ Continuous EKG  ☐ V Lead EKG
- ☑ Pulse Oximeter  ☐ Oxygen Sensor
- ☑ End Tidal CO₂  ☐ Gas Analyzer
- ☑ Temp. Skin  ☐ Nerve Stimulator
- ☑ Warming Blanket  ☐ EEG ☐ Doppler

- ☐ Airway Humidifier ☐ Fluid Warmer
- ☐ NG / OG Tube  ☐ Foley Catheter
- ☐ Art Line
- ☐ CVP
- ☐ PA Line
- ☑ IV(s) _____

### ANESTHETIC TECHNIQUE
- **General:** ☑ Pre-Oxygenation ☐ L.T.A.
- ☑ Rapid Sequence ☐ Cricord Pressure
- ☑ Intravenous  ☐ Inhalation
- ☐ Intramuscular  ☐ Rectal
- **Regional:** ☐ Spinal  ☐ Epidural
- ☐ Axillary ☐ Bier Block ☐ Ankle Block
- ☐ _____  ☐ Position _____
- ☐ Prep _____  ☐ Local _____
- ☐ Needle _____
- ☐ Drug(s) _____
- ☐ Dose _____ ☐ Attempts x _____
- ☐ Site _____ ☐ Level _____
- ☐ Catheter _____  ☐ See Remarks
- ☐ Other: ☐ M.A.C. ☐ _____

### AIRWAY MANAGEMENT
- **Intubation:** ☐ Oral  ☑ Tube Size _____
- ☐ Stylet used  ☐ Nasal  ☑ Regular
- ☐ Magil's  ☐ Direct  ☐ RAE
- ☐ Fiber Optic  ☐ Blind  ☑ Armored
- ☐ Blade MAC 3  ☐ Laser
- ☐ Secured at _____ cm ☐ Endobronch
- ☑ Attempts x _____ ☑ET CO₂ present
- ☐ Breath sounds _____
- ☐ Uncuffed leaks at _____ cm H₂O
- ☐ Cuffed  ☐ Min. occ. press. ☐ Air ☐ NS
- **Airway:** ☐ Oral  ☐ Nasal  ☐ Difficult
- **Circuit:** ☐ Circle  ☐ NRB  see Remarks
- ☐ Mask Case  ☐ Nasal Cannula
- ☐ Via Tracheostomy ☐ Simple O₂ mask

### RECOVERY
| Location | PACU | Time | 840 |
|---|---|---|---|
| B/P | 118/89 | O₂Sat | 97% |
| T | R | | T 96.0 |

- ☐ Awake  ☐ Stable  ☐ Nasal Oxygen
- ☐ Drowsy  ☐ Unstable ☐ Mask Oxygen
- ☐ Somnolent  ☐ Intubated ☐ Tpiece Oxygen
- ☐ Unarousable ☐ Ventilator ☐ Oral/Nasal airway

**Recovery Notes**

### FLUID TOTALS
| Crystalloid _____ | EBL _____ |
|---|---|
| Blood _____ | Urine _____ |

---

**TIME:** 815  850

| | | | | | |
|---|---|---|---|---|---|
| Oxygen (L/min) | 15 | | | | |
| N₂O Air (L/min) | | | | | |
| SEVO (%) | 5.3 | | | | |

**TOTALS**

### REMARKS

To room
monitor

IV induction
→ #4 LHA

↑↑ Denaity
9804
↓ 837

Ancef
one gram
@ 805
837

### FLUIDS / AGENTS
| Propofol | 200 | | |
|---|---|---|---|
| LR | | 3100 | |
| Urine (ml) | | | |
| EBL (ml) | | 200 | |

### MONITORS
| EKG | | | | | |
|---|---|---|---|---|---|
| % O₂ Inspired | 94 | 94 | 55 | 18 | |
| O₂ Saturation | 99 | 98 | 98 | 98 | |
| End Tidal CO₂ | | 34 | 40 | 48 | |
| Temp: °C  °F | | 36 | | | |
| P/S | 24 | 40 | 76 | | |

### VITAL SIGNS

| | 200 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Preinduction Assessment | 180 | | | | | | | |
| | 160 | ✓ | | | | | | |
| | 140 | | | | ✓ | | | |
| | 120 | ✓ | | | | | | |
| B/P | 100 | ✓ ✓ ✓ ✓ ✓ ✓ | | | | | | |
| | 80 | • • • • • • | | | | | | |
| P | 60 | | | | | | | |
| | 40 | ∧ ∧ ∧ ∧ ∧ ∧ | | | | | | |
| R | 20 | ○ ⊗ ○ ○ ○ ○ | | | | | | |

### VENT
| Tidal Volume | | |
|---|---|---|
| Resp. Rate | | |
| Peak Pressure | | |
| PEEP | | |
| Symbols for Remarks | | |
| Position | 0 | |

### SYMBOLS
- ✕ ANESTHESIA
- ⊙ OPERATION
- ⋀ B/P CUFF PRESSURE
- ⊥ ARTERIAL LINE PRESSURE
- ▲ MEAN ARTERIAL PRESSURE
- • PULSE
- ○ SPONT RESP
- ⊗ ASSISTED RESP
- ⊠ CONTROLLED RESP
- T TOURNIQUET

PATIENT IDENTIFICATION

Anesthesia Provider

Controlled Drugs:
| Drug | Issued | Used | Destroyed | Returned | Provider |
|---|---|---|---|---|---|

Witness

KO
402372
MURPHY JOSIDIAH
05/21/1973  94 / M   OT
07/07/09   DSUR   ORT
S3902  VANDIVER WILLIAM
444840

43

# PREANESTHESIA EVALUATION

| Age | Sex: M F | Height 5'10" | Weight 142 |
|---|---|---|---|

**Proposed Procedure** (?) Chord Reconstruction

**Pre-Procedure Vital Signs**
B/P     P     R     T

**Previous Anesthesia / Operations** ☐ None
- lung. chest tube NCB
- appendix (ex lap)  GA } No anesthesia
- head GSW block ≥ GA } problem
- (?) knee

**Current Medications** ☐ None
Ø

**Family History of Anesthesia Complications** ☐ None

**Allergies** ☐ NKDA
Iodine Flexeril

**History From:**
☐ Patient     ☐ Significant Other
☐ Parent / Guardian     ☐ Chart
☐ Communication / Language Problems
☐ Poor Historian

## AIRWAY / TEETH / HEAD & NECK
ok.

| SYSTEM | WNI | COMMENTS | DIAGNOSTIC STUDIES |
|---|---|---|---|

**RESPIRATORY** ☐
Asthma — Productive Cough
Bronchitis — Recent URI
COPD — SOB
Dyspnea — Tuberculosis
Orthopnea
Pneumonia

Comment: hx of (?) chest trauma.

**EKG**

**Chest X-ray**

**CARDIOVASCULAR** ☐
Abnormal EKG — Hypertension
Angina — MI
ASHD — Murmur
CHF — Pacemaker
Dysrhythmia — Rheumatic Fever
Exercise Tolerance — Valvular Disease

**Pulmonary Studies**

**HEPATO / GASTROINTESTINAL** ☐
Ethanol Use: ☐ Yes ☐ No     Frequency ___
"Street Drug" Use: ☐ Yes ☐ No     Frequency ___

Bowel Obstruction
Cirrhosis
Hepatitis / Jaundice
Hiatal Hernia / Reflux
Nausea & Vomiting
Ulcers

**Other**

**NEURO / MUSCULOSKELETAL** ☐
... / Problems — Muscle Weakness
... Muscle Weakness — Neuromuscular Dis.
CVA / Stroke / TIAs — Paralysis
DJD — Paresthesis
Headaches / ↑ICP — Syncope
Loss of Consciousness — Seizures

Comment: Confined to (?) hand.

**LABORATORY STUDIES**
Hgb / Hct / CBC
15.5 / 45.9
256,000

**RENAL / ENDOCRINE** ☐
Diabetes
Renal Failure / Dialysis
Thyroid Disease
Urinary Retention
Urinary Tract Infection
Weight Loss / Gain

**Electrolytes**

**Urinalysis**

**OTHER**
Anemia — Immunosuppressed
Bleeding tendencies — Pregnancy
Cancer — Sickle Cell Dis. / Trait
Chemotherapy — Recent Steroids
Dehydration — Transfusion History
Hemophelia

**Blood Usage**
☐ Discussed - Risks, Benefits, Alternatives
☐ Planned
☐ Blood Available ___ Units
☐ Not Planned

**Problem List / Diagnoses** H/chest trauma / smoker

**Planned Anesthesia / Special Monitors** (General) Regional MAC TIVA
**Risks / Benefits / Alternatives Discussed**

**PHYSICAL STATUS** 1 2 3 4 5 E

## POSTANESTHESIA NOTE
Uneventful anesthesia...
...

Signed _____ Date 7/21/00 Time ___

**Pre-Anesthesia Medications Ordered**

**PATIENT IDENTIFICATION**

**Post-op Recovery Plan:** PACU I     PACU II     SCU     MED/Surg.

**Evaluator Signature** [signature]     Date 7/7/00     Time 7A

KO 402372
MURPHY, JEDIDIAH
08/01/1975   24 / M   OT
07/07/00   BSUR   ORT
93902   VANCIVER WILLIAM

**Presbyterian Hospital of Kaufman**
A Member of Presbyterian Healthcare System

# OPERATING ROOM RECORD

DATE: 7-7-00

```
1000157567   432333
MURPHY JEDICIAH
09/01/1975   24 / M
07/07/00     OSUR
93902 VANDIVER WILLI
```
**PATIENT IDENTIFICATION**

WOUND CLASSIFICATION: (I) II III IV

ANESTHETIST:
ORT
ANESTHESIOLOGIST:
B. Johnston

**TIMES:**
ANES. START TIME: 0745 am/pm
PT. IN O.R.: 0745 am/pm
SURGERY START: 0805 am/pm
SURGERY END: 0835 am/pm
PT. OUT 0845 am/pm

TYPE OF ANESTHESIA: ☒GENERAL ☐SPINAL ☐EPIDURAL ☐IV SED ☐LOCAL ☐LOCAL WITH M.A.C. ☐TIVA
☐BLOCK: _____ ☐OTHER: _____
O.R. # II

TYPE OF PROCEDURE: ☒SCHEDULED ☐UNSCHEDULED ☐EMERGENCY
PT IDENTIFICATION: ☒VERBAL ☒CHART ☒ARM BAND ☐STAMP PLATE
VERIFICATION OF PROCEDURE/LOCATION: ☒VERBAL ☒CONSENT FORM
PREVIOUS SURGERY: ☒NO ☐YES ☐IMPLANTS/PROSTHESIS OR METAL HARDWARE:
LIST: _____
SURGEON NOTIFIED PT TO OR: 0745
PERSONAL ITEMS: ☒NO ☐YES LIST: _____

SURGEON: W. Vandiver
SURGEON ASSISTANTS: _____
CIRCULATING NURSES: TReffeth RN/OR
CIRCULATOR RELIEF: _____ IN: _____ OUT: _____
SCRUB NURSES: Milliny ST
SCRUB NURSE RELIEF: _____ IN: _____ OUT: _____
PRE-OP DIAGNOSIS: Ruptured Ulnar Collateral Ligament Left Thumb
POST-OP DIAGNOSIS: Same

OPERATION: Repair Left thumb Collateral Ulnar Ligament

CONSENTS: ☒IN CHART  HX & PHYSICAL: ☒IN CHART
ALLERGIES: ☐NONE LIST: IODINE
NPO AFTER MN: ☒YES ☐NO SINCE: _____ am/pm
BLOOD ORDERED: ☐NO ☐YES ☐PERMIT
☐ID BAND #: _____
KNOWN INFECTIOUS DISEASE: ☒NONE LIST:

SPECIMENS TO PATHOLOGY: ☒NONE ☐YES

CULTURES TO LAB: ☒NONE ☐YES

X-RAYS/FLURO: ☒NONE ☐PORTABLE ☐C-ARM
OPERATOR: _____

DRESSINGS: ☐NONE ☐MASTISOL ☐BETADINE GAUZE
☒ADAPTIC ☐CAST/SPLINT ☐XEROFORM ☐TELFA
☐TAPE ☐STERISTRIP ☒4X4 ☒KLING ☐ABD ☐ACE
☐OTHER: _____
LOCATION: (L) thumb

DRAINS: ☒NONE ☐YES TYPE/LOCATION: _____

PACKS: ☒NONE ☐YES TYPE/LOCATION: _____

## PROSTHESIS/IMPLANTS: ☒NONE

| TYPE/LOCATION | MANUFACTURER | SIZE | MODEL # | LOT # |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## MEDICATIONS/IRRIGATION ☐NONE

| TYPE/STRENGTH | DOSAGE | ROUTE/SITE | BY |
|---|---|---|---|
| Ancef / NS Irrig | | | WV |
| | | | |
| | | | |

E. BLOOD GIVEN: ☒NO ☐YES (SEE ANESTHESIA RECORD)   ESTIMATED BLOOD LOSS: _____ URINE OUTPUT: _____
CONDITION ON DISCHARGE: ☒SATISFACTORY ☐OTHER: _____ DISCHARGE PER: ☒STRETCHER ☐BED ☐OTHER: _____
DISCHARGE TO: ☒PACU ☐FLOOR ☐ICU ☐OTHER: _____ RM #: _____

NURSES COMMENTS: To Holding. A 10 x 3 Permits & Allergies verified. To OR. Prep & position. Induction. Post op to PACu. Responding from GETA.

R.N. SIGNATURE X Tammy Reffeth RN/OR

**INSTRUCTIONS:** CHECK BOXES FOR ASSESSMENT/INTERVENTIONS WHEN IMPLEMENTED. ALL NURSING DIAGNOSES ARE LISTED BY LETTER; EACH APPLICABLE GOAL IS CROSS-REFERENCED TO THE DIAGNOSIS BY THE CORRESPONDING LETTER IN THE ROW BELOW.

| NURSING DIAGNOSIS | GOAL | GOAL ACHIEVED | |
|---|---|---|---|
| | | YES | NO |
| A. POTENTIAL FOR KNOWLEDGE DEFICIT/ANXIETY RELATED TO SURGICAL INTERVENTION. | A. DEMONSTRATES KNOWLEDGE/COPING STRATEGIES. | ✓ | |
| B. POTENTIAL FOR INFECTION. | B. NO KNOWN INFECTION RELATED TO INTRAOPERATIVE CARE. | ✓ | |
| C. POTENTIAL FOR UNANTICIPATED ALTERATION TO SKIN INTEGRITY. | C. SKIN INTEGRITY MAINTAINED. | ✓ | |
| D. POTENTIAL FOR INJURY RELATED TO INTRAOPERATIVE HAZARDS. | D. NO INTRAOPERATIVE INJURY OCCURS. | ✓ | |
| E. POTENTIAL FOR ALTERATION OF FLUID AND ELECTROLYTE BALANCE. | E. SURGEON NOTIFIED OF ALL FACTORS RELATING TO FLUID AND ELECTROLYTE BALANCE. | ✓ | |

**A. LEVEL OF RESPONSIVENESS: PRE-OP**
- ☒ ALERT
- ☐ AGITATED
- ☐ DISORIENTED
- ☐ SEDATED
- ☐ UNRESPONSIVE
- ☐ RESPONDS TO VERBAL/TACTILE STIMULATION

**A. EMOTIONAL STATUS:**
- ☒ CALM, RELAXED
- ☐ APPREHENSIVE, BUT PARTICIPATED IN CARE
- ☐ FRIGHTENED, UNABLE TO PARTICIPATE
- ☐ STATED FEARS

**A. SENSORY LIMITATIONS/COMMUNICATION:**
- ☒ NO SENSORY LIMITATIONS NOTED
- ☐ SIGHT  ☐ GLASSES/CONTACTS REMOVED
- ☐ HEARING  ☐ HEARING AIDS REMOVED
- ☐ SPEECH  ☐ LANGUAGE BARRIER
- ☐ OTHER: _____

**A. FAMILY:** ☐ NO ☒ YES  REPORT TO FAMILY
WHERE: OR Lobby _____
_____

**A. COMFORT MEASURES IMPLEMENTED:**
- ☒ WARM BLANKET  ☐ PILLOW
- ☐ OTHER: _____

**B. SKIN PREP:** ☒ N/A  ☐ SHAVE  ☐ CLIP
- ☐ PRE-OP  ☐ IN O.R.

**B. SKIN PREP SOLUTION:**
- ☐ BETADINE SCRUB
- ☐ BETADINE SOLUTION
- ☒ HIBICLENS  ☐ PREVAIL
- ☐ PHISOHEX
- ☐ OTHER: _____

**B. INTRAOPERATIVE CATHETER**
- ☐ FOLEY _____ fr. _____ cc
- ☐ STRAIGHT CATH _____ fr.
- ☒ N/A
- ☐ CLEAR  ☐ CLOUDY  ☐ BLOODY

**C/D. INTRAOPERATIVE POSITIONING:**
TRANSFER TO O.R. TABLE PRIOR TO SURGERY:
- ☒ SELF  ☐ ASSISTED  ☐ N/A
- ☐ ROLLER DEVICE

TRANSFER AFTER SURGERY PER:
- ☒ ROLLER DEVICE  ☐ ASSISTED  ☐ SELF

PT. POSITIONED ON:
- ☐ O.R. TABLE  ☐ FX. TABLE  ☐ STRETCHER
- ☐ OTHER: _____

**C/D. SURGICAL POSITIONS USED:**
- ☒ SUPINE  ☐ LITHOTOMY
- ☐ PRONE  ☐ FOWLERS/SEMI FOWLERS
- ☐ J. KNIFE  ☐ LATERAL ☐ RT. ☐ LT.

**C/D. SAFETY BELT/RESTRAINTS USED:**
- ☒ ACROSS THIGHS ☒ B/L ☐ RT. ☐ LT.
- ☐ ACROSS CALVES  ☐ ACROSS HIPS
- ☐ ACROSS FEET  ☐ ACROSS ABDOMEN
- ☐ B/L WRISTS  ☐ RT. ☐ LT.
- ☐ ARMS TUCKED  ☐ RT. ☐ LT.
- ☒ BELT DURING INDUCTION/EMERGENCE
- ☐ OTHER: _____

**C/D. PADDING/EQUIPMENT USED AND LOCATION:**
- ☐ N/A
- ☒ PILLOWS ✓ Knees ✓ Head
- ☐ ROLLS/SANDBAGS _____
- ☐ PADS _____
- ☒ EGGCRATE heels
- ☐ STIRRUPS _____
- ☐ LEG HOLDER _____
- ☐ KIDNEY REST _____
- ☐ ARM SLED _____
- ☐ TAPE _____
- ☐ OTHER: _____

**C/E. SKIN INTEGRITY: PRE-OP**
- ☒ SKIN INTACT, ADEQUATE HYDRATION
- ☐ TRAUMATIC WOUNDS
- ☐ SKIN LESIONS/ULCERS
- ☐ PRESENCE OF DRAINS:
  (CHECK TYPES) ☐ FOLEY ☐ NG
  ☐ WOUND ☐ OSTOMIES
  POST-OP: ☒ SAME ☐ OTHER: _____

**D. RANGE OF MOTION: PRE-OP**
- ☒ WITHIN NORMAL LIMITS
- ☐ CONTRACTURES
- ☐ FRACTURES ☐ CASTS ☐ TRACTION
- ☐ MISSING LIMBS
- ☐ PARALYSIS
- ☐ OTHER: _____
  POST-OP: ☒ SAME ☐ OTHER: _____

**D. RESPIRATIONS:**
- ☒ WITH EASE  ☐ LABORED
- ☐ VENTILATORY ASSISTANCE/PT. INTUBATED
- ☐ TRACHEOSTOMY  ☐ OXYGEN IN USE
  POST-OP: ☒ SAME ☐ OTHER: _____

**D. ELECTROCAUTERY:**
- ☐ MONOPOLAR: ☒ N/A
- UNIT: _____ PAD SITE: _____
- SETTING: CUT: _____
  COAG: _____
- APPLIED BY: _____
- SKIN AT REMOVAL: ☐ INTACT ☐ OTHER: _____
- ☐ BIPOLAR: ☐ N/A
- UNIT: _____ SETTING: _____

**D. THERMAL UNITS:**
- ☐ N/A
- TYPE: ☒ BLANKETROL II TEMP: _H_
- ☐ BAIR HUGGER: _____

**D. TOURNIQUET:**
- ☐ N/A
- UNIT: Zimmer ATS APPLIED BY: TR
- LOCATION: (L) L ARM

| TIME UP | TIME DOWN | PRESSURE SETTING | TOTAL TIME |
|---|---|---|---|
| 0804 | 0837 | 250 | 33 |

**D. COUNTS**

| | PRE-OP | #1 | #2 | #3 | CHANGE OF SHIFT CT. |
|---|---|---|---|---|---|
| SPONGE: CORRECT | | | | | |
| *INCORRECT | | | | | |
| NOT TAKEN | ✓ | | | | |
| SHARP: CORRECT | | | | | |
| *INCORRECT | | | | | |
| NOT TAKEN | ✓ | | | | |
| INSTRUMENT: CORRECT | | | | | |
| *INCORRECT | | | | ✓ | |
| NOT TAKEN | | | | | |

**COUNT BY:**

(1) _____ CIRCULATOR NURSE

(1) _____ SCRUB NURSE

(2) _____ CIRCULATOR NURSE

(2) _____ SCRUB NURSE

(3) _____ CIRCULATOR NURSE

(3) _____ SCRUB NURSE

* ACTION TAKEN: ☐ SURGEON NOTIFIED
  ☐ X-RAY TAKEN

**E. CELL SAVER:**
- ☒ N/A
- OPERATOR: _____
- TYPE OF USE: _____

# PRESBYTERIAN HOSPITAL OF KAUFMAN

```
1200 57667    402372
MURPHY JEDIDIAH
09/01/1975    24 / M    OT
07/07/00    DSUR    ORT
93902    VANDIVER WILLIAM
```

Teaching method code · A = audovisual     D = demonstration     Barriers to Learning
                        B = role play       H = handout           Identified on
                        C = explanation     G = group class       Admission Data Form

| DATE / TIME | INTERVENTION — Include content taught and identity of learner if other than the patient. | TIME SPENT | TEACHING METHOD | EVALUATION |  |  |  | REVISION |  | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | VERBALIZES UNDERSTANDING/STATES CONTENT | CAN RETURN DEMONSTRATE | ROUTINELY PERFORMS | NO EVIDENCE OF LEARNING | RE-TEACH | NEEDS PRACTICE ONGOING REINFORCEMENT |  |
| 7/7/00 0745 | PRE-OPERATIVE : Instructed Patient on Peri-Operative Process, Moniters, Positioning, Skin Prep, Electrocautery. |  | C |  |  |  |  |  |  |  |
| 7/7/00 0850 | PACU : Instructed Patient to Deep Breath and Cough, Orientation to place and situation, Incisional splinting, Pain control, Medication Action & Side Effects, Dressings, Drains, Limb elevation, and Effects of Anesthesia |  | C |  |  |  |  |  |  |  |

**Presbyterian Hospital of Kaufman**
A Member of the Presbyterian Healthcare System

DATE 1/4/00   ARRIVAL IN RR 0850   FROM II

OPERATION/PROCEDURE Repair O Thumbs ligament

SURGEON/OTHER Vandiver   ANES B Johnson 02/07/00

ANESTHESIA: ☐ GEN ☐ SPINAL ☐ LOCAL ☐ OTHER _____

1300157667   402372   KO
MURPHY ,JEDIDIAH
09/01/1975   24 / M   OT
02/07/00   DSUR   ORT
93902 VANDIVER WILLIAM

**AIRWAY ADJUNCT:**

| | ON ARRIVAL | TIME | IN | DC'd |
|---|---|---|---|---|
| NONE | ☒ | | | |
| ORAL | ☐ | | | |
| NASAL | ☐ | | | |
| ETT | ☐ | | | |
| CHIN/JAW SUPPORT | ☐ | | | |

EKG RHYTHM NSR

ALLERGIES Iodine

SPECIAL INFO _____

MEDICAL HISTORY _____

**O₂:**
VIA ____ ON ____ DC'd ____ TIME

TBAR ____ %
MASK 40 % air 0900
N.C. ____ L/min
ROOM AIR

| VENT. SETTINGS | | | |
|---|---|---|---|
| TIME | RATE | TV | FIO₂ |
| | | | |
| | | | |
| | | | |

**MEDICATION RECORD**

| TIME | MEDICATION ROUTE AND SITE | NURSE |
|---|---|---|
| 0850 | Demerol 25mg sluP | MC |
| 0855 | Toradol 30mg sluP | MC |
| 0900 | Demerol 25mg sluP | MC |

PREOP BP 137/108

**VITAL SIGN RECORD / FREQUENT OBSERVATIONS**

| TIME | NIBP | ART.BP | PULSE | RESP | TEMP | O₂SAT | REGIONAL | | | | LAB | XRAY | INITIALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0850 | 143/89 | — | 77 | 18 | 96° | 99 | | | | | | | MC |
| 0855 | 127/89 | — | 76 | 18 | — | 99 | | | | | | | |
| 0900 | 136/81 | — | 71 | 18 | — | 99 | | | | | | | |
| 0905 | 126/86 | — | 70 | 18 | — | 99 | | | | | | | |
| 0910 | 130/79 | — | 76 | 18 | — | 96 | | | | | | | |
| 0915 | 124/82 | — | 74 | 18 | — | 96 | | | | | | | |
| 0920 | 124/80 | — | 66 | 18 | 96° | 98 | | | | | | | |

**INTAKE**

| TIME | NO. | SOLUTION AND AMOUNT | AMT INFUSED | SITE | CONDITION ADM | DISCH |
|---|---|---|---|---|---|---|
| ON ARR | | LR 600 LTC | 200? | R Hand | WNL | WNL |
| | | | | | | |

**OUTPUT**

| TIME | VOID | CATH | NG | EMESIS | HEMOVAC | DAVOL | J.P. | OTHER |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| TOTAL | | | | | | | | |

**SIGNATURES** INITIALS
PRIMARY NURSE: M Crouch RN   MC

TOTAL ____ 200? ____ WNL OR SEE NN

DATE 7/7/00

| TIME | NURSES PROGRESS NOTES |
|------|----------------------|
| 0850 | From OR via stretcher c̄ rails ↑. Lungs clear to auscultation O₂ 40% FT. Pt awake & talking. Shaking. Applied bair hugger warmer. (L) hand cast on. Able to move digits on request. Brisk CRT. Pt c/o severe pain in (L) hand. Administered Demerol 25mg SIVP. |
| 0855 | Pt still has c/o pain. Administered Toradol 3mg SIVP. Elevated (L) arm ——— MMurphRN |
| 0900 | Pt states pain is a little better. Administered Demerol 25mg SIVP for c/o moderate pain of 6 on 1-10 scale ——— MMurphRN |
| 0905 | Pt resting c̄ eyes closed. Resp even & unlabored O₂ sats satisfactory on room air ——— MMurphRN |
| 0910 | Encouraged to deep breath & cough. Pt states pain is better but still hurts some — MMurphRN |
| 0920 | Meets discharge criteria for PMed. Called report to E. Daugherty RN ——— MMurphRN |

Stamp: 1200157667   402372 KG
MURPHY, JEDIDIAH
09/01/1975
07/07/00   24 / M   OT
93900   OSUB   ORT
VANDERBILT WILLIAM

| TIME | NURSES PROGRESS NOTES |
|------|----------------------|
|      |                      |

**DISCHARGE SUMMARY**

DISCHARGE TIME 0920   VIA ☐ BED ☒ STRETCHER
☐ OTHER

ACCOMPANIED BY _MMurphRN_

TRANSPORTED WITH ☐ O₂ ☐ EKG MONITOR ☐ AMBU

RESTRAINTS: ☐ VEST ☐ WRISTS ☐ ANKLES

TRANSPORTED TO _PMU_

REPORT TAKEN BY _E. Daugherty RN_ AT _09_

☐ SIDE RAILS UP   ☒ CALL BELL WITHIN REACH

FAMILY IN ROOM ☒ YES ☐ NO

| PAR SCORE/TIME | ARR | 15 | 30 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ACTIVITY | 2 | 2 | 2 | | | | | | |
| RESPIRATION | 2 | 2 | 2 | | | | | | |
| CIRCULATION | 2 | 2 | 2 | | | | | | |
| CONSCIOUSNESS | 2 | 2 | 2 | | | | | | |
| COLOR | 2 | 2 | 2 | | | | | | |
| TOTAL | 10 | 10 | 10 | | | | | | |

POST ANESTHESIA CARE UNIT RECORD

# Presbyterian Hospital of Kaufman

P.O. Box 310
Kaufman, Texas  75142
Phone  (972)-932-7200

```
1P00157667    4C3372
MURPHY ,JEDIDIAH
09/01/1975   24 / M
07/07/00
93902  VANCIVER  WILLIAM
```

| Reason for admission: | (L) thumb surgery since 6/22/00 |
|---|---|

| Language Spoken: | English | Height: | 5'10 | Weight: | 145 |
|---|---|---|---|---|---|
| Religion: | N/A | Highest Level Education: | grad H.S. | | |

Allergies (Medicine, Foods, Other):  (Iodine -topical  )

Latex Allergies:    Yes        No ✓

| | NO | YES | AMOUNT DAILY |
|---|---|---|---|
| Tobacco Use | | ✓ | 3/4 pack |
| Alcohol Use | ✓ | | |
| Recreational Drug Use | ✓ | | |

| Last Menstrual Period: | | N/A | | |
|---|---|---|---|---|
| Do you feel safe at home? | Yes: ✓ | No: | | |
| Have you ever been physically or sexually abused? | Yes: | No: ✓ | | |
| Do you have a living will / advance directive? | Yes: | No: ✓ | | |
| Would you like more information? | Yes: | No: ✓ | | |

| Do you have? (circle all that apply) | Dentures | Hearing Aid | (Glasses)/Contacts | Cane |
|---|---|---|---|---|
| | Walker | Braces | Wheelchair | Other: |

| Health Problems? (circle all that apply) | Asthma | Angina | Hiatal Hernia | Arthritis |
|---|---|---|---|---|
| | Bronchitis | CHF | Hepatitis | Back problems |
| | COPD | High Blood Pressur | Ulcers | Stroke |
| | Pneumonia | Heart Attack | Cancer | Fainting |
| | T.B. | Rheumatic Fever | | Seizures |
| | Diabetes | Anemia | | Paralysis |
| | Weight Gain/Loss | Bleeding Tendency | | Other: |

| PAIN: | | | | | |
|---|---|---|---|---|---|
| | None | Intermittent | (Continuous) | Date of onset: | 6/22/00 |

Does pain interfere with functional abilities?   If yes, describe:
Cant work — (Welder )

| PREVIOUS SURGERIES | DATE |
|---|---|
| (L) hand — neurosurgery. GSW | |
| (R) lung — MVA punctured | |
| nipple . | |
| | |
| | |

**Admission Data   ACU**

## CURRENT MEDICATIONS

| Presciption Drugs | Dose | Frequency | Last Dose |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| Over-the-Counter Drugs/Herbal | Dose | Frequency | Last Dose |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Do you use complimentary or alternative treatments?

## NUTRITIONAL SCREENING

Check below all that apply:

|  | |
|---|---|
|  | Obesity |
|  | Unintentional weight loss >10 lbs in past 6 months |
|  | Decreased appetite / food intake |
|  | GI Symptoms:  Nausea / Vomiting, Diarrhea > 2 days |
|  | Problems: Diabetes, Decubitus ulcer (stage III or IV), Cancer (not resconstructive) HIV/AIDS |
|  | NPO or CLQ for > 3 days |
|  | TPN / Tube feeding |
|  | Pregnant / Lactating women |
|  | Nutrition Assessment: If any box above is checked (pt at nutrition risk) place order in SMS |
| ✓ | None apply |

| Barriers to learning: (circle all that apply) | Sight Hearing Age | Mental Language | Emotional Other |
|---|---|---|---|

| Are you: | 1)  motivated to learn? | Yes: ✓ | No: |
|---|---|---|---|
|  | 2)  able to understand new information? | Yes: ✓ | No: |

| Best approach to learning: (check all that apply) | Visual Auditory | Reading Demonstration |
|---|---|---|

**Signature:**
**Date:**
**Nurse:**



**Presbyterian Hospital of Kaufman**
A Member of Presbyterian Healthcare System

```
                              XO
       1200157647    402372
  MURPHY ,JEDIDIAH
  09/01/1975    24 / M    OT
  07/07/00       PSUR     PAT
  53002  VANDIVER  WILLIAM
```

**SURGICAL PROCEDURE** (L) thumb

Date: 7-7-00   Time: 7⁰⁰        If Day Surgery - Designated Driver:

Allergies: Topical Iodine                        wife

IV Time: 7⁰⁰   IV fluid/amt RL   Site Rhand   Gauge 20   Rate 20

Vital Signs:   Temp 95.7   Pulse 72   Resp 20   B/P 133/68

### PRE - OP CHECKLIST

| | YES | NO | N/A | COMMENTS | RN Int. |
|---|---|---|---|---|---|
| CONSENT(S) SIGNED | ✓ | * | | * Required | |
| TRANSFUSION CONSENT NOTED | ✓ | * | | * Required | |
| HISTORY AND PHYSICAL ON CHART | ✓ | * | | * Required | |
| N.P.O. at   12⁰⁰ | ✓ | | | | |
| OPERATIVE SITE VERIFIED & LABELED | ✓ | | | | |
| ALLERGIES NOTED ON FRONT OF CHART | ✓ | | | | |
| ALLERGY BRACELET ON | ✓ | | | | |
| ID BRACELET ON | ✓ | | | | |
| BLOOD BRACELET ON | | | ✓ | | |
| JEWELRY REMOVED | ✓ | | | | |
| GLASSES / CONTACTS REMOVED. | ✓ | | | | |
| DENTURES REMOVED | | | ✓ | | |
| NAIL POLISH REMOVED | | | ✓ | | |
| MAKE UP REMOVED | | | ✓ | | |
| UNDERWEAR REMOVED | ✓ | | | | |
| DR NOTIFIED OF ANY ABNORMAL REPORTS | | | ✓ | | |
| BY: | | | | | |
| LAB REPORTS | ✓ | | | | |
| X-RAY REPORTS | | | ✓ | | |
| EKG REPORTS | | | ✓ | | |
| OLD CHART | | | ✓ | | |
| CONSULTATION | | | ✓ | | |
| VOIDED PRIOR TO LEAVING UNIT | ✓ | | | | |
| SIDE RAILS UP | ✓ | | | | |
| MAR on Chart | ✓ | | | | |

NURSES NOTES (PRE-OP) _____

_____

_____

_____

_____

_____

TIME TO O.R. _____   NURSE SIGNATURE: _____

**Surgical Pre-Op Checklist**                                    # 4375



1P00157667   492372
KO
MURPHY,JEDIDIAH
09/01/1975   24 / M   6"
07/07/00   0508
93902   VANDIVER  LILLIAM

**DATE OF SURGERY** 7-7-00    **TIME TO ARRIVE** 6'5AM

**LOCATION:**   2nd Floor - Day Surgery

**FAMILY M.D.** _____

### SPECIFIC INSTRUCTIONS / PREPS:

ENEMA _____

SHOWER _____

MEDS TO TAKE A.M. OF SURGERY _____

OTHER: _____    Pediatric Assessment (If applicable) _____

### PRE ADMISSION INSTRUCTIONS FOR PATIENT

1. **Nothing to eat or drink after midnight the night before surgery, no gum, no tobacco.**

2. **You must have someone drive you home.**

3. **Wear comfortable, loose fitting clothes.**

4. ~~Do not wear makeup (no mascara, no nail polish.)~~

5. ~~No contact lenses. You will be asked to remove dentures.~~

6. **You will be required to remove all your clothing and wear a hospital gown prior to your procedure.**

7. **There is a waiting room on ground floor where your visitors may wait while you are in surgery.**

8. **After surgery you will return to your room until you meet discharge criteria.**

9. **Bring all your medications with you.**

10. **Leave your valuables at home.**

WE LOOK FORWARD TO YOUR VISIT AND HOPE YOUR STAY WILL BE A PLEASANT ONE.

### I UNDERSTAND THE ABOVE INSTRUCTIONS

PATIENT'S SIGNATURE: _Jedidiah_ _____

ADMISSION NURSE: _____ (N)   DATE: 7/6/00

**Ambulatory Care Unit Pre-Admission Assessment**

White Copy - Patient          Yellow Copy - Medical Records

**AMBULATORY SURGERY**
**DISCHARGE INSTRUCTIONS**

1200157647    402372
MURPHY ,JEDIDIAH
09/01/1975    24 / M    CT
07/07/00    0708    5 5

*In order to continue your care at home, please follow the instructions checked below.*

1.  **GENERAL ANESTHESIA OR SEDATION**
    ✓ Do not drive or operate machinery for 24 hours.
    Do not consume alcohol, tranquilizers, sleeping medications, or any non-prescribed medication for 24 hours.
    Do not make important decisions or sign any important papers in the next 24 hours.
    You should have someone with you tonight at home.
    Children may appear flushed for several hours after surgery.

2.  **ACTIVITY**
    ✓ You are advised to go directly home from the hospital. Restrict your activities and rest for a day. Resume light to normal activity tomorrow.
    ___ You may resume normal activity today. Do not engage in strenuous activity that may place stress on your incision.
    ___ Specific activity instructions: _____

3.  **FLUIDS AND DIET**
    ✓ Begin with clear liquids, bouillon, dry toast, soda crackers.
    If not nauseated, you may go to a regular diet when you desire. Greasy and spicy foods are not advised.
    ___ Special diet instructions: _____

4.  **MEDICATIONS**
    ✓ Prescription sent with you. Use as directed. When taking pain medications, you may experience dizziness or drowsiness. Do not drink alcohol or drive when you are taking these medications.
    You may take a non-prescription "headache remedy" type medication that you normally use, if your surgeon permits, preferably one that does not contain aspirin.
    You may resume your daily prescription medication schedule.

5.  **OPERATIVE SITE**
    ✓ Keep dressing clean and dry.
    ___ Do not change dressing.
    ___ Change dressing when soiled or wet.
    ___ May remove dressing _____
    ___ May wash over incision in shower.
    ___ Special instructions: _____

6.  **EXTREMITIES: ARMS, HANDS, LEGS, FEET**
    ✓ Keep operative extremity elevated as much as possible to lessen swelling and discomfort.

7.  **GYNECOLOGICAL PROCEDURES**
    ___ No tampons, douching, or intercourse until _____
    ___ D&C and laparoscopic patients may have varying amounts of vaginal drainage for a few days.
    ___ Laparoscopic patients may develop shoulder pain in first 24 hours from residual gas.

8.  **EAR SURGERY**
    ___ No water or foreign objects in ears.

9.  **FOLLOW-UP CARE**
    ✓ Call my office to make an appointment for your post-op check up. I want to see you: *Call 972-932-2122*

10. **OTHER**

Call your surgeon if you have any problem that concerns you. After hours, you can reach your physician through his answering service. **IF YOU NEED IMMEDIATE ATTENTION, COME TO PHK EMERGENCY CENTER OR TO ANOTHER HOSPITAL NEAR YOUR HOME.**
     Emergency Center Phone Number is: 972-932-7245 _____

**SPECIFIC COMPLICATIONS TO WATCH FOR:**
-Fever over 101 F by mouth.                                        -Numb, tingling, or cold fingers or toes.
-Pain not relieved by medication ordered (severe).                -Blood-soaked dressing. *(Small amounts of oozing may be normal.)*
-Swelling around operative site.                                  -Increasing and progressive drainage from surgical area or exam site.
-Increased redness, warmth, hardness, around operative area.      -Inability to urinate.

A follow-up call will be attempted by a recovery room nurse in 24-28 hours to check on your progress. If you have any questions, call your doctor.

Physician signature _____   Date 7/7/00 _____

I have read and understand the above discharge instructions. I have no further questions regarding these instructions.

Patient signature _____   Date _____

BY: _____

Name:
Room:
Sex:
Diagnosis:
Physician:
Comments:

**PRN MEDS**

Allergies: 120015766 7 402372
MURPHY ,JEDIDIAH
08/01/1975   24 / M    5T
07/07/00      0508      TST
93902  VANTIVER ,WILLIAM

| Adminstration Period Medication | Start | Stop | Nights - 1 0001 thru 0700 | Days 0701 thru 1900 | Nights - 2 1901 thru 0000 |
|---|---|---|---|---|---|
| Vicodin Ṫ tabs 7p/1 po q4 p PRN | 7/1 | | | D/Sp | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| MEDS NOT GIVEN | | INJECTION SITES | | SIGNATURE /INT | SIGNATURE/INT | SIGNATURE/IN |
|---|---|---|---|---|---|---|
| A NPO Diag | E. Mod Dose | J. Right Upper Arm | O. Left Abdomen | / | / | |
| B. NPO Surg | F. Absent from Dept | K. Left Upper Arm | P. Right Thigh | / | / | |
| C. Pt Refused | G. Drug not Avail | L. Right Gluteus | Q. Left Thigh | / | / | |
| D. Nausea | H. See Nursing Notes | M. Left Gluteus | R. Right Ventrogluteal | / | / | |

CLINICAL LABORATORY

FINAL CHART  - DO NOT DISCARD

ESBYTERIAN HOSPITAL OF KAUFMAN
0 West Highway 243
Kaufman, TX 75142
(972)932-7287
CLIA NUMBER:45D0478494   JCAHO NUMBER: 9116

Patient:  MURPHY, JEDIDIAH
Hosp #: 120-0157667   Med Rec #: (00002)0000-40-23-72
Location:         Room: 0202-01
Physician:  VANDIVER, WILLIAM R

_____   HEMATOLOGY   _____

COLLECT DATE:   06JUL00
COLLECT TIME:   1046

| TEST | UNITS | | RANGE |
|------|-------|---|-------|
| | Complete Blood Count | | |
| WBC | x10^3/uL | 6.3 | 3.6 - 11.1 |
| RBC | x10^6/uL | 5.06 | 4.27 - 5.61 |
| HGB | g/dL | 15.5 | 12.9 - 17.3 |
| HCT | % | 45.9 | 37.6 - 50.5 |
| MCV | fl | 90.7 | 79.3 - 97.3 |
| MCH | pg | 30.5 | 26.8 - 33.4 |
| MCHC | g/dL | 33.7 | 32.9 - 35.5 |
| RDW | % | 12.3 | 11.5 - 15.0 |
| PLT | x10^3/uL | 256 | 130 - 400 |
| MPV | fl | 8.3 | 7.5 - 10.7 |
| NEUT | % | 46.4 | 43.2 - 71.5 |
| LYMPH | % | 38.8 | 16.8 - 43.4 |
| MONO | % | 9.9 | 0.0 - 12.4 |
| EOS | % | 4.2 | 0.0 - 7.8 |
| NE# | x10^3/uL | 3.0 | 1.9 - 7.2 |
| LYMPH# | x10^3/uL | 2.4 | 1.1 - 2.7 |
| MONO# | x10^3/uL | 0.6 | 0.0 - 0.8 |
| EOS# | x10^3/uL | 0.3 | 0.0 - 0.5 |
| BASO# | x10^3/uL | 0.0 | 0.0 - 0.1 |

END OF REPORT

```
*********** LAB EXPEDITE RESULT REPORT *****************
NAME:MURPHY, JEDIDIAH           ACCT #:120-0157667
ROOM: DSUR BED:                 MED #:(00002)0000-40-23-72
DOCTOR: VANDIVER, WILLIAM R       ACCESSION: 00-188-00697
```

_____  HEMATOLOGY  _____

```
         COLLECT DATE:  06JUL00
         COLLECT TIME:   1046
PROCEDURE      UNITS                  REFERENCE RANGE
   Complete Blood Count  _____
  WBC    x10^3/uL        6.3          3.6 - 11.1
  RBC    x10^6/uL        5.06         4.27 - 5.61
  HGB    g/dL            15.5         12.9 - 17.3
  HCT    %               45.9         37.6 - 50.5
  MCV    fl              90.7         79.3 - 97.3
  MCH    pg              30.5         26.8 - 33.4
  MCHC   g/dL            33.7         32.9 - 35.5
  RDW    %               12.3         11.5 - 15.0
  PLT    x10^3/uL        256          130 - 400
  MPV    fl              8.3          7.5 - 10.7
  NEUT   %               46.4         43.2 - 71.5
  LYMPH  %               38.8         16.8 - 43.4
  MONO   %               9.9          0.0 - 12.4
  EOS    %               4.2          0.0 - 7.8
  NE#    x10^3/uL        3.0          1.9 - 7.2
  LYMPH# x10^3/uL        2.4          1.1 - 2.7
  MONO#  x10^3/uL        0.6          0.0 - 0.8
  EOS#   x10^3/uL        0.3          0.0 - 0.5
  BASO#  x10^3/uL        0.0          0.0 - 0.1
```



WRV Presbyterian K 17001571 7

PRE-OP VERIFICATION FORM

09/01/1975
09/07/00

SURGERY DATE 7-7-00 MJC TGS JAR RRS VAND PHD PHR PRSC

PRE-OP DATE_____ PRE OP LOCATION: DALLAS PLANO WYLIE

PT NAME: Jedidiah Murphy _____ DOB:_____
INSURANCE CO: Unitrin _____ PPO HMO MC (WC) INDEMNITY
PRIMARY_____ SECONDARY_____ SUPPLEMENT_____

**VERIFY**

ADDRESS_____
CITY/STATE/ZIP:_____
INSURED:_____ DOB:_____
SS#: 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 ____ GROUP_____ PLAN_____
WORK COMP CLAIM #:_____ D.O.I_____
EMPLOYER Griffin Products W/C CARRIER Unitrin
ADJ Chuck Donly _____ PHONE NO._____
REVIEW CO SW Medical ____ PHONE NO. 214 888-336-8159

**PRECERT**

fx 800 877-768-5439
PHONE #: 214 368-4963 _____ SPOKE TO: Kim
CPT CODE_____ DIAGNOSIS CODE_____
DAY SURGERY ✓ DAY SURGERY 23 HR____ SAME DAY ADMIT____ IH____
AUTH# 7 U 00 50A* _____ # OF DAYS_____ GLOBAL____
VALID REFERRAL FROM PCP IN EFFECT YES NO_____
NUMBER OF VISITS LEFT_____ GOOD TILL_____ ASST SURGEON YES____ NO____
SECOND SURGICAL OPINION: NO YES DATE_____ /BY____

**BENEFITS**

PHONE #:_____ SPOKE TO:_____
COPAY:$_____ DEDUCTIBLE:$_____ MET:$_____ YEAR_____
EFFECTIVE DATE:_____ PAYS____% OF NEG FEE R/C TO OOP OF $_____
(DOES DOES NOT INCLUDE DEDUCTIBLE), THEN PAYS____%. OOP MET $_____
L.T. MAX $_____ BENEFITS AVAILABLE FOR ASST SURGEON YES NO
IN NET WORK____ OUT NETWORK____ PRE-EXISTING CONDITION YES____ NO____
COMMENTS_____
_____ DATE_____ BY_____

**SURGERY CHECK LIST**

1. Surgery Scheduled 7-7-00 _____
2. Insurance Verified: ✓

**DEPOSIT**

REFER TO LEDGER/ADD NOTE Yes No DISCUSSED WITH PATIENT:_____
_____ DATE:_____ /BY_____

See attached

**Presbyterian Hospital of Kaufman**

```
1P00157647    403872
MURPHY ,JEDIDIAH
09/01/1975    24 / M
07/07/00      0CUR    OUT
STESS  VANSICKLE  WILLIAM
```

TIME FROM PACU __0925__          O.R. _____          G.I LAB _____

| IV: YES ___ NO ___ | LOC | Dressing: Yes ✓ No ___ | NAUSEA: YES ___ NO ___ |
|---|---|---|---|

Fluids/Amount/Rate: __RL__
__KJU__

Site: __R hand__
Edema: Yes ___ No ✓
_____ R.N.
Next IV Time: __Ø__
Fluids/Amount/Rate: _____

D/C Time: __0940__
Amt. Inf.
_____ R.N.

LOC
Awake ___
Alert ✓
Oriented ✓
Other * _____
RESP: WNL ✓ Abnormal ___

SKIN:
Warm ✓ Cool ___
Other * _____
CIRCULATION STATUS:
Site __L hand__
Warm ✓ Cool ___
Prompt Cap. Refill __<3sec.__
N/A

Dressing: Yes ✓ No ___
Site: __Cast L hand__

Drainage: Yes ___ No ✓
Scant ___ Med ___ Large ___
Color: Serous _____
Sanguinous _____

Drains: Yes ___ No ✓
Type: _____
Amount _____
Foley: Yes ___ No ✓

Voided Time: __0955__
Amount: _____

NAUSEA: YES ___ NO ___
Pain: None ___ Mild ✓
Moderate ___ Severe ___

Siderails Up: Yes ___ No ✓

Call light within reach :
Yes ___ No ___

Family / S.O. Present:
Yes ✓ No ___

RX - Given ✓ received
prior to Hosp.

| TIME | B/P | PULSE | RESP. | TEMP. | TIME | B/P | PULSE | RESP. | TEMP. |
|---|---|---|---|---|---|---|---|---|---|
| 0930 | 117/65 | 88 | 18 | 96° | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

| Discharge Goals Met | Yes | No | Discharge Goals Met | Yes | No |
|---|---|---|---|---|---|
| VS WNL | ✓ | | Discharge Instruction Sheet Signed | ✓ | |
| Circ. Status WNL | ✓ | | Food Drug Guide Given | ✓ | |
| Neuro Status Unchanged | ✓ | | RX Given | prior to Hosp. | |
| Resp. Status WNL | ✓ | | Discharge Criteria Met | | |
| Pain Controlled with Oral Analgesic | ✓ | | Accompanied by Responsible Adult | | |
| Tolerating Diet | ✓ | | Phsyician Notified if disharge criteria no met * - yes [ ] | | |
| Voided Prior to Discharge | ✓ | | * Orders received | | |

NURSES NOTES  Arrived via stretcher from RR A+Ox3 IV WNL ©
arm c cast from elbow to knuckles fingers free thumb stabilize
cup refill brisk c/o mild pain. 0940 At pres'n Tol well IV site
Ld cath intact she WNL. Pt refused sandwich crackers & jello
Given C/o mod. pain Vicodin 1# tabs given po
0955 Pt anxious & ready for D/C ride has not arrived advised pt to
rest in room until ride arrived pt upset & left on elevator to
wait on ride downstairs against Medical advise At gait stead
© c/o dizziness or unsteadiness, instructed pt to keep arm ↑ §

Time Discharged __1000__          Discharge Destination: Home ✓ Observation Room ___ * Other _____

RN Signature: _____ RN

**Ambulatory Care Unit**
Post OP Nurses Notes/Discharge Summary

PRESBYTERIAN HOSPITAL OF KAUFMAN
P.O. BOX 310, HWY. 243
KAUFMAN, TX  75142

OPERATIVE REPORT

PATIENT NAME:        MURPHY, JEDIDIAH
MR#:                 402372
PHYSICIAN:           William R. Vandiver, M.D./ID: 93902
ADMISSION DATE:      7-7-00
OPERATION DATE:      7-7-00

ATTENDING ORTHOPEDIC SURGEON:  WILLIAM RICHARD VANDIVER, M.D.

PREOPERATIVE DIAGNOSES:  Rupture of the ulnar collateral ligament
of the left thumb, metacarpal phalangeal joint.

POSTOPERATIVE DIAGNOSES:  Same.

NAME OF OPERATION:  Open end-to-end repair of the above ligament.

SURGEON:  William R. Vandiver, M.D./ID: 93902

ANESTHESIA:  LMA administers by Robert V. Johnston, M.D.
CC:  ANESTHESIA SERVICE/ID: 93114

PROCEDURE NOTE:  The patient was brought into the Operating Room
and placed in a comfortable supine position on the operating table.
Once LMA anesthesia had been successfully induced, a tourniquet was
placed high in the patient's left arm and the patient's left upper
extremity from the bottom end of the tourniquet out to the
fingertips was prepped and draped in a routine sterile fashion.
The extremity was exsanguinated using a 4 inch Esmarch bandage and
the tourniquet was inflated to 220 mm/Hg.  A bayonet type incision
was made on the dorsal ulnar aspect of the base of the thumb
centered over the metacarpal phalangeal joint.   Dissection was
carefully carried through the subcutaneous fat until the abductor
aponeurosis could be seen.  The piece of ligament could be seen at
the superior end of the piece of aponeurosis.  The aponeurosis was
split with a pair of scissors.  The tendon ends were fairly well
approximated once the aponeurosis was split.   The repair was
carried out using #2-0 Vicryl until a solid repair was achieved.
The aponeurosis was repaired back over the ulnar collateral
ligament using #4-0 Vicryl and the subcutaneous was also
approximated using #4-0 Vicryl.  The skin was closed using #4-0
nylon vertical mattress sutures.

A sterile dressing consisting of bacitracin ointment, Adaptic, 4 x
4s and Webril was placed.   The tourniquet was taken down.
Tourniquet time was 33 minutes.   After this, a short arm thumb
spica cast was applied using 2 inch fiberglass rolls.

PATIENT NAME:            MURPHY, JEDIDIAH
MR#:                     402372
PHYSICIAN:               William R. Vandiver, M.D./ID: 93902

ESTIMATED BLOOD LOSS:  Minimal.

There were no specimens and no complications.

Before placing the cast, the patient's joint was stressed and it
was seen to be stable now as it was, as the right side was during
the preoperative examination.

The patient was taken to the Post Anesthesia Care Unit in stable
condition.

_____
William R. Vandiver, M.D./ID: 93902

TM
DD:   07-07-00
DT:   07-07-00

                    (END OF REPORT)

1
2
3
4
5
6
7
8
9
10          State's Exhibit Number 71
11          Doctors Hospital Records
12             (Copy attached)
13
14
15
16
17
18
19
20
21
22
23
24
25

F00-02424-M

| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## AFFIDAVIT

| STATE OF TEXAS | § |
| | § |
| COUNTY OF *Bowie* | § |

BEFORE ME, the undersigned authority, on this day personally appeared *Virginia White*, who being by me duly sworn, deposed as follows:

"My name is *Virginia White*, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of Doctors Hospital. Attached hereto are *5* pages of records from Doctors Hospital. These said *5* pages of records are kept by Doctors Hospital in the regular course of business, and it was the regular course of business of Doctors Hospital for an employee or representative of Doctors Hospital with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original."

**BUSINESS RECORDS AFFIDAVIT - Page 1**

STATE'S EXHIBIT 71
PENGAD-Bayonne, N.J.

*Virginia White*
Affiant

SUBSCRIBED AND SWORN TO BEFORE ME this *24th* day of *January*, 2000, to certify which witness my hand and seal of office.

*Gayla Hooper*
Notary Public in and for

*Bowie* County, *Texas*



GAYLA HOOPER
MY COMMISSION EXPIRES
July 19, 2003

My Commission Expires:
*July 19, 2003*

**BUSINESS RECORDS AFFIDAVIT - Page 2**

**DOCTORS HOSPITAL**

ALL BLANKS MUST BE FILLED IN. USE N/A IF NOT APPLICABLE. ALL ORIGINAL REPORTS MUST BE ATTACHED.

18195-
49902

EMERGENCY ROOM RECORD

☐ BLUE CROSS ☐ COMMERCIAL ☐ MEDICARE
☐ WKMN COMP ☐ MEDICAID ☑ SELF PAY    HOSP. NO.

| CHART NO. 25141 | ADM. DATE 9-13-96 | DRIVER'S LICENSE NO. | MEDICAL RECORD NO. 49166 | RACE Cauc | SOCIAL SECURITY NO. |

| LAST NAME Murphy | FIRST NAME Matthew | M.I. S | BIRTHDATE 9-18-75 | AGE 20 | SEX M | PATIENTS PHONE NO. |

ACCIDENT INFO:   FAMILY DOCTOR/DOCTOR ON CALL  Gurav

| TIME | GUARANTOR NAME Matthew Murphy | ADDRESS (BOX NO. & STREET NO.) 501B W. Walters | CITY New Boston | STATE TX | ZIP 75570 |

LOCATION   EMPLOYER  Snelling Temporary

EMPLOYER ADDRESS   PHONE - EMPLOYER

HOSPITALIZATION INSURANCE OR MEDICARE  Self   SUBSCRIBER'S NAME   CERT. OR POLICY NO.   GROUP NO.

2.

RELATIVE (Katherine Lu)  Ruby Pelozier   ADDRESS   PHONE

BROUGHT IN BY: ☐ SELF ☑ RELATIVE ☐ OTHER ☐ POLICE | CONDITION ON ARRIVAL: ☑ GOOD ☐ FAIR ☐ POOR ☐ CRITICAL ☐ SHOCK ☐ COMA ☐ HEMORRHAGE | ☐ FIRE

| TIME OF: | ARRIVAL 0030 | TIME NOTIFIED 0100 | TIME OF EXAM | DISCHARGE | PREVIOUS TREATMENT AT N.B.G.H. ☐ YES ☑ NO | DATE |
TETANUS IMM. ☐ BOOSTER   DATE
FIRE POLICE
LMP:

COMPLAINT & HISTORY  c/o puncture wound to palm of ℞ hand 2° to being shot in hand c̄ pellet gun while handling to a around 0013. tonight. CFT's < 3sec. + sensory perception 2nd, 3rd, 4th + 5th digits.

ACUITY LEVEL ① 2 3 4

| TIME | T. | P. | R. | B.P. |
|------|-----|-----|-----|-------|
| 0035 | 98⁶ | 78 | 20 | 134/10 |
| 0045 |     | 76 | 78 | 146/9  |

ROUTINE MEDS: None

DRUG/OTHER ALLERGIES: Iodine

PERTINENT PHYSICAL FINDINGS: DIAGNOSIS/IMPRESSIONS

REQUESTED ☐ LAB ☐ X-RAY ☐ E.K.G.

TESTS ORDERED: (LIST)

0100
TREATMENT  Released c̄ site cleansed, drsg applied, instructions to Patient, per T.O. Dr. Gurav.

| MEDICATIONS | SITE | TIME | BY WHOM |
|-------------|------|------|---------|
| Duricef | P.O. | 0120 | |
| Motrin 800 mg | P.O. | 0120 | |
| Talwin 30 mg IM (L) hip | 1135 | Mueller |
| ℞ - Tab. Cipro 500 q TMP | | | |
| ℞ - Tab. | | | |

INSTRUCTIONS ON:   TIME   PHYSICIAN   NOTIFIED: ☐ PATIENT ☐ RELATIVE   ☐ POLICE ☐ MED. EXAM.

CONDITION OF PT. AT DISCHARGE/TRANSFER: ☑ SAME ☐ IMPROVED ☐ DETERIORATED ☐ EXPIRED   ADMITTED ☐ YES ☑ NO   TIME   DOCTOR   ROOM NO.

NURSES NAME (TYPE OR PRINT)   Rick Jessie RN
SIGNATURE x

PHYSICIANS NAME (TYPE OR PRINT)   R. Reed
SIGNATURE x   9/13/96

CHART

Case 3:10-cv-00163-N    Document 42-13    Filed 05/05/10    Page 530 of 546    PageID 8442

DOCTORS HOSPITAL

ALL BLANKS MUST BE FILLED IN. USE N/A IF NOT APPLICABLE. ALL ORIGINAL REPORTS MUST BE ATTACHED.

| RGENCY / M RECORD | | ☐ BLUE CROSS | ☐ WKMN COMP | ☐ MEDICARE | ☐ MEDICAID | ☐ WORK. COMP. | ☐ SELF PAY | HOSP. NO. | |
|---|---|---|---|---|---|---|---|---|---|

| CHART NO. 25141 | ADM. DATE 9-13-96 | DRIVER'S LICENSE NO. | MEDICAL RECORD NO. | RACE | SOCIAL SECURITY NO. |
|---|---|---|---|---|---|

| N. Murphy | FIRST NAME Matthew | M.I. S | BIRTHDATE 9-13-75 | AGE 20 | SEX M | PATIENTS PHONE NO. |
|---|---|---|---|---|---|---|

## TREATMENT RECOMMENDED

| ☐ Sutured | ☐ X-Ray | ☐ Tetanus Booster | ☐ Medication |
|---|---|---|---|
| ☐ Lavaged | ☐ Lab Test | ☐ Hypertet & Booster | ☐ Other_____ |

NOTE: Treatment given in the Emergency Service is offered as emergency first care ONLY. Follow-up treatment by a physician may be important for your safety, and you are urged to follow carefully the instructions checked below:

☐ TETANUS - Within the next 24 hours, consult your physician as to whether or not you should receive injections to protect you against the disease of tetanus (lockjaw).

As a consequence of even small injuries this disease can be fatal, so the considered advice of your physician will be essential to your safety.

☐ HEAD INJURY - Contact your physician immediately if any of the following conditions occur:
- Persistent or increasingly severe headache
- Vomiting
- Unusual drowsiness
- Drainage of blood or fluid from ear or nose
- Convulsions
- Weakness of limbs or loss of coordination
- Blurred vision
- Stiffness of neck

☐ NECK AND BACK INJURIES
___ 1. Complete bed rest for 24 or 48 hours
___ 2. Sleep on a firm mattress or place boards under your mattress
___ 3. Apply wet heat (warm towel) to affected area
___ 4. See family doctor or return to Emergency Room if NO improvement in 48 hours.

Within the next _____ days, check with your physician for:

☐ Removal of sutures

☐ Examination of wound

☐ Further treatment of the condition which brought you here

☐ VOMITING
___ 1. No food or liquids for 4 hours
___ 2. Only clear liquids for first 24 hours
___ 3. If vomiting persists see family doctor or return to Emergency Room

☐ WOUND CARE
___ 1. Keep wound cleaned and dry.
___ 2. See family doctor or return to Emergency Room immediately if FEVER or other signs of infection occur: (1) Redness, (2) Swelling, (3) Discharge or (4) Red streaks on skin from wound.
___ 3. See family doctor or return to Emergency Room as indicated below:
   (1)_____ days following injury for wound examination
   (2)_____ days following treatment for removal of stitches

☐ SPRAINS AND BRUISES
___ 1. Elevate affected part.
___ 2. Apply ice packs to affected area for 10-20 minutes four times daily during first 24 to 48 hours following injury.
___ 3. No weight bearing on affected area for _____ days.

☐ CAST CARE
___ 1. Keep casted limb elevated
___ 2. Report any numbness or tingling to your doctor
___ 3. Keep your cast dry
___ 4. Report any signs of infection (1) Redness, (2) Swelling, (3) Discharge or foul odor.
___ 5. Do not insert sharp objects in your cast to relieve itching

☐ Other_____

PATIENT ACKNOWLEDGEMENT OF INSTRUCTIONS AND ADVICE

I have received and understand the instructions indicated above. I also understand that I had emergency examination and/or treatment only and that I will arrange for follow-up care as instructed above.

| Matthew Murphy | 9-13-96 | RM |
|---|---|---|
| PATIENT'S OR RESPONSIBLE PERSON'S SIGNATURE | DATE | PHYSICIAN SIGNATURE |

**EMERGENCY COPY**

# EMERGENCY ROOM CHARGES

## EMERGENCY ROOM FEES (DOES NOT INCLUDE DOCTOR CHG.)

- LIMITED
- INTERMEDIATE
- EXTENDED
- INTENSIVE

## CASH CART

- CARDIAC MONITER
- ATROPINE ER SYRINGE
- EPINEPHRINE INJ.
- E.T. AIRWAY
- HYPERTET 2500
- LASIX INJ.
- LASIX (LUROSEMIDE) INJ.
- LIDOCAINE INJ.
- LIDOCAINE 2gm. I.V.
- NARCAN (NALOXONE) INJ.
- SOLU-MEDROL INJ.
- SODIUM BICARB BRISTOJECT

## IV SUPPLIES

- D5W 250 ml BAG
- D5W 500 ml BAG
- D5W 1000 ml BAG
- D5W 250 ml BAG
- SET
- SCALP VEIN 21 GA
- SCALP VEIN 23 GA
- IPCAC
- IPECAC
- IV PEDATRIC
- SOLP VEIN 23 GA
- SCALP VEIN 23 GA
- INSULIN INJ A/S
- GARAMYCIN (OPHTH.) (ANY)
- HYDROGEN PEROXIDE (ANY)
- D5/.33 500 CHL 1000 m
- D5/.33 500 CHL 1000 m
- D5/.45 500 CHL 1000 m
- D5W 1000 cc
- D5W 100 ml BAG
- D5W 500 ml BAG
- D5W 1000 ml BAG
- D5/1000 ml BAG

## PHARMACY

- ACT AMONIPHEN RESUPP.
- ACTIFED SYRUP c CODEINE
- ADDRENALIN (EPINEPH.) 1 MG
- AMINOPHYLLIN INJ.
- AMOXICILLIN CAP

- AMPICILLIN CAP
- AMPICILLIN INJ
- ANTIVENT (MECLIZINE TAB)
- APRESOLINE 20 MG INJ
- ASPIRIN RS
- ASPIRIN TAB 325 MG
- AUGMENTIN TAB
- BACITRACIN ONT PKG
- BACITRIN/SEPTRA A/S
- BENADRYL (ANY ORAL)
- BENADRYL INJ
- BENTYL INJ
- BENTYL ORAL
- BETADINE OINT/SPRAY/SOL
- BICILLIN 900/300
- BRETHINE INJ.
- CECLOR ORAL DOSE 250 MG
- CECLOR SUSP. 75 ML
- CELESTONE SOLUSPAN 1 ML
- CIPRO TAB
- DARVOCET N-100
- DECADRON INJ 4 MG
- DEMEROL INJ. A/S
- DEPO MEDROL INJ.
- DEXTROSE 50% 50 ml
- DILANTIN 100mg CAP
- DILANTIN 100mg INJ.
- DRAMAMINE INJ.
- DURAGEF CAP
- ENTEX-LA TAB
- FLEXERIL TAB
- PROCARDIA
- PHENERGRAN LIQ (ANY)
- PHENERGRAN INJ
- PARAFON FORTE/CHLOROZOX
- NUBAIN INJ 10 mg
- NTG TAB S.L. .25 s
- NITROGLYCERIN OINT DOSE
- NEOSPORIN OINT.
- NALDECON SYRUP
- MOTRIN
- MORPHINE INJ.
- MICRO-K CAP.
- MARCAINE INJ
- MAALOX/MYLANTA (ANY)
- LOMOTIL (DIPHENOXYLATE)
- KANTREX INJ.
- PYTRIDIUM 100 mg TAB

## RESPIRATORY

- REGLAN INJ 10mg
- SILVADENE 50gm
- SILVADENE 400 gm
- STADOL A/S INJ
- TAGAMET TAB
- TALWIN INJ
- TALWIN NX TAB
- TALWIN INJ
- TETANUS/DIPH-TH TOXOID
- TETANUS TOXOID 0.5 ml
- THEODUR TAB A/S
- TIGAN INJ.
- TRANXENE CAP
- TUSSI-ORGANIDIN LIQ
- TYLENOL/COD TAB
- TYLENOL/COD TAB
- TYLENOL ELIX DOSE
- TYLENOL INFANT DROPS 15 ml
- TYLENOL SUP.
- TYLENOL TAB 5 gr.
- TYLENOL TAB A/S
- VALIUM INJ A/S
- VALIUM TAB A/S
- VISTARIL (HYDROXYZINE) INJ.
- WYCILLIN 600,000 IU INJ
- WYCILLIN 1,200,000 IU INJ
- XYLOCAINE VISCOUS DOSE
- XYLOCAINE INJ (ANY)
- ZANTAC 150 mg TAB
- XYLOCAINE INJ (ANY)
- O₂ CANNULA
- O₂ MASK
- UP-DRAFT NEBULIZER
- IPPB SET-UP
- SUCTION SET-UP
- O₂ SET-UP
- BRONKOSOL
- ALUPENT

Lubicleare

## ORTHOPEDIC

- LONG ARM CAST, ADULT
- SHORT ARM CAST, ADULT
- LONG ARM CAST, CHILD
- SHORT ARM CAST, CHILD
- LONG LEG CAST, ADULT
- SHORT LEG CAST, ADULT
- LONG LEG CAST, CHILD
- SHORT LEG CAST, CHILD
- PLASTER SPLINTS

## MISCELLANEOUS

- LADDER SPLINT
- RICHARDS ARM SPLINT
- SHOULDER IMMOBILIZER
- CERVICAL COLLAR
- KNEE IMMOBILIZER
- RIB BELT
- LACERATION TRAY/MINOR
- LACERATION TRAY/MAJOR
- PLASTIC SET
- STERILE 4x4 SINGLES
- STERILE 4x4 PKG.
- SUTURES
- SUTURES
- VAG EXAM TRAY
- EYE EXAM TRAY
- EYE DRESSING TRAY
- ADAPTIC/XEROFORM 3 x 8
- NASAL PACKING TRAY
- STERI STRIPS
- STERI STRIPS
- 3-WAY STOPCOCK
- STERILE BASIN
- STERILE GLOVES PAIR
- LUMBAR PUNCTURE KIT
- FOLEY CATHETER TRAY
- IN/OUT CATHETER TRAY
- TEXAS CATHETER
- CLEAN-CATCH URINE KIT
- KERLIX 4.5" ROLL
- CONFORM 2" ROLL
- CONFORM 3" ROLL
- CONFORM 4" ROLL
- CONFORM 6" ROLL
- ACE BANDAGE 2" ROLL
- ACE BANDAGE 3" ROLL
- ACE BANDAGE 4" ROLL
- ACE BANDAGE 5" ROLL
- ACE BANDAGE 6" ROLL
- ICE PACK
- NORMAL SALINE 1,000 cc. IRRIG
- STERILE WATER 1,000 cc. IRRIG

Case 3:10-cv-... Document... Filed... Page 531 of 546 PageID 8243



Lateral



(L)                                                    (R)



(L)                                                    (A)



1

2

3

4

5

6

7

8

9

10            State's Exhibit Number 72

11            Dr. Dehaan's Records

12              (Copy attached)

13

14

15

16

17

18

19

20

21

22

23

24

25

F00-02424-M

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH JUDICIAL |
| | § | |
| | § | |
| V. | § | DISTRICT COURT OF |
| | § | |
| | § | |
| JEDIDIAH ISAAC MURPHY | § | DALLAS COUNTY, TEXAS |

## <u>AFFIDAVIT</u>

STATE OF TEXAS                      §
                                            §
COUNTY OF *Bowie*                 §

     BEFORE ME, the undersigned authority, on this day personally appeared Jeffrey T. DeHaan, M.D., who being by me duly sworn, deposed as follows:

     "My name is Jeffrey T. DeHaan, M.D., I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

     I am the custodian of the records of Jeffrey T. DeHaan, M.D. Attached hereto are *9* pages of records from Jeffrey T. DeHaan, M.D. These said *9* pages of records are kept by Jeffrey T. DeHaan, M.D. in the regular course of business, and it was the regular course of business of Jeffrey T. DeHaan, M.D. for an employee or representative of Jeffrey T. DeHaan, M.D. with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original."

BUSINESS RECORDS AFFIDAVIT - Page 1

STATE'S
EXHIBIT
72

PENGAD-Bayonne,N.J.

_Paula Hancock_
Affiant

SUBSCRIBED AND SWORN TO BEFORE ME this 28th day of _NOVEMBER_, 2000, to

certify which witness my hand and seal of office.



_Nancy C. James_
Notary Public in and for
BOWIE            County, TEXAS

My Commission Expires:
10-17-02

PAGE 1            MATTHEW MURPHY            963505

9-17-96

Matthew is here F/U GSW to the hand, self-inflicted.  He was I & D'd emergently last week and is here for a check-up.

His wound looks good today and we'll redress it.  I'll see him back next week for stitch removal.  I encouraged him to start moving his fingers more in order to get the flexibility back to his fingers.

J.T. DEHAAN, M.D./ch

9-26-96

Mr. Murphy is F/U I & D of a hand bullet removal.  His incision looks good and we'll take the stitches out today.  We'll see him back here again on a prn basis.

J.T. DEHAAN, M.D./ch
9-26-96   X-ray, left hand/PG

**9-30-96   4:00p.m.   Pt. called & stated incision on hand had pulled apart & was draining & bothering him.  I told pt. to go to SMH ER and have ER physician check incision tonight./KM**

10-3-96

Matthew is here F/U wound dehiscence of his hand.  His hand is clean, there's no evidence of any infection, and at this time we'll go ahead and redress the wound.  He'll return here on a prn basis.  He can go ahead and start working next Monday.

J. T. DEHAAN, M.D./ch

10/16/96 - Ultram 50 mg ĩ q 6° PRN Pain - Super D 792-5391
#30                                                    (EM)

10/25/96 - Cataflam 50 mg ĩ bid #40 Called to Super D 794-3508

## PATIENT MEDICAL HISTORY

Name _Matthew Murphy_ Date _9-17-95_ Chart Number _____

List medication allergies _Iodine_

List medications you are currently taking ~~Ketones~~ _Vicodine & Anti_

Name of your regular doctor _____

List any operations you have had _Hand Surgery_

Work History

What type of work do you do? _Fork lift_

If retired, what year? _____

If disabled, what is your disability? _____

Medical History

Check if you have been, are being treated for, or have a problem with:

__seizures
__dizziness
__blackouts
__visual problems
__headaches
__hearing problems
__hoarseness
__cough up blood
__chest pain
__shortness of breath
__high blood pressure
__urinary retention
__glaucoma
__blood clots
__colitis
__change of bowel
  habits

__poor circulation
__heart disease
__irregular heart beat
__nausea, vomiting
__stomach pain
__indigestion
__vomit blood
__blood in stool
__anemia
__diabetes
__tumor or cancer
__gallstones
__thyroid disorder
__nervous disorder
__swelling of feet
__chronic cough
__leg pain

__liver disease
__female problems
__joint, bone pain
__skin problems
__blood in urine
__kidney stones
__kidney or bladder
  infections
__prostatitis
__leakage of urine
__asthma
__ulcer
__stroke
__bleeding disorder
__breast problems
__pregnancy
__nursing(currently)

Family History

__diabetes
__heart disease
__kidney disease
__cancer or tumors

Signed _Matthew Murphy_ 9-17-96

Updated _____
        _____
        _____

Wadley Regional Medical Center
OPERATING ROOM NURSING REPORT

Page: 1

PROCEDURE DATE: 09/13/96   ROOM: 03000

PATIENT NAME: MURPHY,MATTHEW                    ACCT#: W02423929        UNIT#: M0089550

--------------------------------------------------------------------------------

PREOPERATIVE ASSESSMENT:

Allergies: Iodine
Awareness Level: Alert
                 Oriented
Anxiety Level: Cooperative
               Nervous
Skin Integrity: Warm
                Dry
                Other
   If Skin Integrity is listed as OTHER, please see below for clarification.
   DEMA, TAUT SKIN LEFT HAND.  MOVEMENT INTACT.
Mobility: No Limitations
NPO Status: N
CBC: Y        CHEM: N        UA: N        Chest: Y        EKG: N        H&H: Y        PT/PTT: N
  Other: XRAY BONE
Appropriate Permits: Y                  Chart checked and verified by: Nicole Foster,RN
Armbands:   ID:Y        Allergy:Y        Blood:Y        BBK:Y
Operative procedure site confirmed: Y
   Comments: REPORTS WEARING CONTACT IN RIGHT EYE ONLY.  CONTACT REMOVED PER
             PT. AND IMMEDIATELY IMMERSED IN BSS IN LABELED CONTAINER.
Pre-op shave completed: Y        Pre-op Visit: Holding Room
Patient Oriented to OR: Y
Case Cancelled: N
--------------------------------------------------------------------------------
In OR: 1600      Anesth. Start: 1600      Surg Start: 1622      Surg End: 1645      Out OR: 1655
--------------------------------------------------------------------------------
Case Classification: Elective          Wound Classification: Contaminated
--------------------------------------------------------------------------------
Pre-Op Diagnosis: GSW LEFT HAND
Post-Op Diagnosis: SAME
Procedure:
Misc Procedure: FASCIOTOMY LEFT HAND
Additional Procedure:


Family Notified: 1625 /     /     /     /     /     /     /     /     /
--------------------------------------------------------------------------------
Attending Surgeon: DeHaan,Jeffrey T.
Scrub Nurse: Patricia Byram,LVN
Circulating Nurse: Nicole Foster,RN
Anesthesiologist/CRNA: David Lummus, CRNA
                       Dianna Robinson, M.D.
Anesthesia Type: General
--------------------------------------------------------------------------------
POTENTIAL FOR INJURY RELATED TO:
GOAL: Patient will remain injury free.

**Wadley Regional Medical Center**
OPERATING ROOM NURSING REPORT                                        Page: 2

*PROCEDURE DATE:* 09/13/96     ROOM: 03000

*PATIENT NAME: MURPHY,MATTHEW*                    *ACCT#: W02423929*     *UNIT#: M0089550*

-------------------------------------------------------------------------------

Method of Transfer: Assisted
Positioning: Supine, Legs Parallel, Arms on Armboards
Positioning Aids: Pillow Under Head
                  Right Ulnar Pad
Positioned by OR Staff: Nicole Foster,RN
Positioned by Anesthesiologist/CRNA: David Lummus, CRNA
Saftey Strap Applied: Y    Location: Upper Thighs

EQUIPMENT:
ESU: Y   ID#: D   Cut: 1   Coag: 40   Bipolar#:     Setting:
 Pad Location: Right Thigh
    Post-op skin condition: Clear
Tourniquet: Y  Location: L Upper Arm  Up: 1622  Down: 1643   Setting: 250 mmHg
    Post-op skin condition: Clear
-------------------------------------------------------------------------------

FIRST COUNT:
Circulator: NF   Scrub: PB   Sponge: C   Needles/Sharps: C   Instruments: C

CLOSING COUNT:
Circulator: NF   Scrub: PB   Sponge: C   Needles/Sharps: C   Instruments: C

FINAL COUNT:
Circulator: NF   Scrub: PB   Sponge: C   Needles/Sharps: C   Instruments: C

MD notified of count: Y
-------------------------------------------------------------------------------

POTENTIAL FOR ALTERED BODY TEMP/COMFORT:
Goal: Patient will maintain normal body temperature intra-operatively.

Temp Probe: None
Warm blanket applied: Y


IRRIGATION SOLUTIONS:
   Sterile H20: Y  #Used: 1
Normal Saline: Y  #Used: 1

MEDICATIONS:
   Bacitracin 50,000u



SPECIMENS: Y
Other: BULLET LEFT HAND TO SECURITY: WOOTEN
-------------------------------------------------------------------------------

Wadley Regional Medical Center
OPERATING ROOM NURSING REPORT                                    Page: 3

PROCEDURE DATE: 09/13/96    ROOM: 03000

PATIENT NAME: MURPHY,MATTHEW                    ACCT#: W02423929      UNIT#: M0089550

---------------------------------------------------------------------------------

POTENTIAL FOR INFECTION:
Goal: Avoidance of patient infection.

Surgical Skin Prep:
Number Location                    Solution
 #1    L Hand to Elbow             Hibiclens/Alcohol


Dressings/Packs:  Adaptic
                  4X4
                  Kerlix Rolls
                  ABD
                  Ace Bandage 4"
Tape: Silk
Catheter:
---------------------------------------------------------------------------------
POTENTIAL FOR INJURY DURING TRANSFER:
Goal: Patient will be transferred without injury.

Method: Lifter
        Roller
        Stretcher
Airway: Extubated
        Room Air
From OR: Awakening
Discharged to: PACU
Comments/Evaluation: LEFT HAND ELEVATED.  SANGUINOUS DC ON ACE: SURGEON INFORMED,
 ADDITIONAL DRESSING ORDERED.  ABD'S AND ADDITIONAL ACE APPLIED
 WITHOUT INCREASE IN DRAINAGE.
-----------------------------------------------------------------------------
Signed:


Signed:


Signed:



*END OF REPORT*

# WADLEY REGIONAL
## MEDICAL CENTER

HISTORY AND PHYSICAL EXAMINATION

PT. NAME:  MURPHY,MATTHEW                    ACCT. #:  M02423929

MR UNIT #:  M0089550
ADMISSION DATE:  09/13/96                    ROOM #:  495
DISCHARGE DATE:


ADMISSION DIAGNOSIS:
Gunshot wound left hand, volar entrance with paresthesias to the hand.

HPI:  This is a thin man who shot himself in left hand in the volar entrance
area. He presented to the Emergency Room in New Boston and was transferred here,
told to get a doctor who specializes in hand problems.  He presents to the
Emergency Room here with a swollen hand, tender, with paresthesias in the long,
ring, and 5th fingers.

PMH:  Negative.

PHYSICAL EXAMINATION:

GENERAL:  Healthy, skinny gentleman.

VITAL SIGNS:  Stable.

LUNGS:  Clear.

ABDOMEN:  Non-tender.

ORTHO:  He has a volar entrance wound pretty much smack in the middle of the
palm. You can palpate the pellet in the dorsal aspect of the hand.  He does have
decreased sensation to the 3rd, 4th, and 5th digits.  The index and thumb are
OK.  He has good flexor tendon flexion to all digits.  Good capillary refill of
the fingers.

PLAN:  At this time we will be admitted for incision and drainage of the palmar
area.  Also, want to remove the bullet as well as are going to be there.


                                    _____
                                    Jeffrey T. DeHaan



D:  DEHJT        T:  DA
DD:  09/13/96    DT:  09/13/96

# WADLEY REGIONAL
# MEDICAL CENTER

### OPERATIVE RECORD

PT. NAME:  MURPHY,MATTHEW                          ACCT. #:  W02423929

ROOM #:  49B                                      MR UNIT #:  M0089550
ADMISSION DATE:  09/13/96
DISCHARGE DATE:


DATE OF OPERATION:    09/13/96

PREOP. DIAG.:    Gunshot wound left hand with swelling of the left hand and
                 paresthesias of the hand.

POSTOP. DIAG.:   Same.

PROCEDURE:       Incision and drainage with fasciotomy of the left hand palmar
                    aspect.
                 Removal of foreign object dorsum of hand.

SURGEON:         DeHaan.

ANESTHESIA:      General.

POSITION:        Supine.

NARRATIVE:  The patient was brought to the Operating Room and put under general
anesthesia.  The left hand was prepped and draped in routine sterile fashion.
An incision was made in the distal palmar crease and advanced through subq
tissue.  There was a small hematoma present but not drastic. The entire fascia
was decompressed.  The nerves were inspected and there was no nerve laceration.
This area was irrigated copiously and then it was closed very loosely with three
3-0 Nylon sutures.  A longitudinal incision was made over the dorsum of the hand
and advanced down to the pellet which was removed without difficulty.  This
wound was also closed with 3-0 Nylon. A sterile bulky dressing was then applied
to the hand and he was taken to the Recovery Room in stable condition.


                                        _____
                                        Jeffrey T. DeHaan



D:  DEHJT       T:  DA
DD:  09/13/96   DT:  09/13/96

| PATIENT NUMBER | DATE | TIME IN | CHIEF COMPLAINT |
|---|---|---|---|
| W02423929 | 09/13/96 | 1341 | GSW LEFT HAND |

**PATIENT NAME:** MURPHY, MATTHEW

**PHYSICIAN:** ER DOCTOR

| AGE | DATE OF BIRTH | SEX | ORIGIN | MARITAL STATUS | ARRIVED |
|---|---|---|---|---|---|
| 20 | 09/18/75 | M | | | WALK IN |

| TRIAGE LEVEL | TRAUMA SCORE | ALLERGIES | | | |
|---|---|---|---|---|---|
| 3 | | IODINE | | | |

**TRIAGE NURSE:** NUP HIGSHE

**ER BED #** TS17

**LAST TETANUS:** 18 MO. AGO

| | DR. CALLED / TIME | REPLY | ARRIVED |
|---|---|---|---|
| | / : | : | : |
| | / : | : | : |

IMMUNIZATIONS CURRENT? ☐ YES ☐ NO ☐ UNKNOWN
IF NO OR UNKNOWN, DOCUMENT TREATMENT OR REFERRAL.

**ASSESSMENT/NOTES:**

A. PT ALERT. SKIN W/D. NO DISTRESS. RESP. REG. UNLA-
BORED. SEEN TODAY AT NEW BOSTON HOSPITAL.

(time) *[handwritten, partially illegible]* ... left hand ... New Boston ... unable to feel any sensation in 3rd & ... Pt Reglan 10mg IVP over 2min. Benadryl 30cc

**CURRENT MEDICATIONS:**

TALWIN

| LMP | GRAV | PARA | ABO | FHT | WT |
|---|---|---|---|---|---|
| BP | T | P | R | TIME | INITIA |
| 136/90 | 98.6 | 90 | 20 | 1341 | |

**REFER TO PHYSICIAN:** _____ DR. ____

| ✓ | PHYSICIAN'S ORDERS | ORDERED TIME/INITIALS | ✓ | PHYSICIAN'S ORDERS | ORDERED TIME/INITIALS |
|---|---|---|---|---|---|
| | AAS | | | GLUCOSE | |
| | ABG'S | | | LYTES | |
| | ACCUCHECK | | | MONITOR | |
| | BETA HCG | | | OLD CHARTS | |
| | CBC | | | O₂ | |
| | CPK | | | PT/PTT | |
| | CXR | | | PULSE OX | |
| | CARDIAC ENZYMES | | | SMA 6 | |
| | DINAMAP | | | SMA 20 | |
| | EKG | | | UA | |
| | ETOH | | | URINE: DRUG SCREEN | |

*[handwritten orders:]* Reglan 10mg IV / Benadryl 30cc PO / V.O. Dr. Robinson

**PHYSICIAN NOTES:  TIME SEEN:**

A.

B.

D. DoHann C5162.

**X-RAYS:**

**LAB:** H/H ___ WBC 7 ___ 20 ___ UA ___

**DIAGNOSIS:**

**DISPOSITION:** RELEASE TO: _____ ADMITTED TO: _____ ☐ SURGERY ☐ MORGUE ☐ FUNERAL HOME ☐ TRANSFERRED TO OTHER FACILITY

**DID DOCTOR SEE PATIENT?** ☑ YES ☐ NO   **CONDITION ON DISCHARGE:** ☐ IMPROVED ☑ UNCHANGED   **TIME OUT:** 1602

**INSTRUCTIONS TO PATIENT:**

**SIGNED BY NURSE:** _____ RN   **SIGNED BY PHYSICIAN:** _____

PHYSICIAN'S COPY

Case 3:10-cv-00168-N   Document 42-13   Filed 05/05/10   Page 545 of 546   PageID 4674

DOCTOR _Denaud_   NEW PATIENT INFORMATION   DATE _9-11-96_

| PATIENT NAME   Last   First   MI | Date Of Birth | Sex | Social Security |
|---|---|---|---|
| Murphy Matthew S | 9/18/75 | M | |

| Street Address | City | State | Zip Code | Phone |
|---|---|---|---|---|
| 501 B West Walters | New Boston | TX | 75570 | |

| Maiden Name | Marital Status | Employer Name | Type Of Work | Driver's License# | St. |
|---|---|---|---|---|---|
| | M S W D Sep | | | | |

| Employer Phone | Employer Address | City | State | Zip Code |
|---|---|---|---|---|

| Friend Or Relative | Relationship | Phone 903 | Address | City | State | Zip Code |
|---|---|---|---|---|---|---|
| Chelsea Willis | girlfriend | 628-4429 | same | | | |

Drug Allergies, If Any

| Responsible Party (R/P) Name   Last   First   MI | DOB | Sex | Social Security Number |
|---|---|---|---|
| myself | / / | | |

| R/P Address | City | State | Zip Code | Phone |
|---|---|---|---|---|

| Employer Name | Phone | Type Of Work |
|---|---|---|

| Insurance Co. Name   (Primary) | Policy No./Member I.D. | Ins. Co. Group No. | Coverage Date | Expiration Date |
|---|---|---|---|---|
| none | | | / / | / / |

| Insurance Co. Address | City | State | Zip Code |
|---|---|---|---|

| Insured Name (If Not R/P) | Patient Relation To Insured | Insurance Phone Number |
|---|---|---|
| | ☐ Self ☐ Child ☐ Spouse ☐ Other | |

| Insurance Co. Name   (Secondary) | Policy No./Member I.D. | Ins. Co. Group No. | Coverage Date | Expiration Date |
|---|---|---|---|---|
| | | | / / | / / |

| Insurance Co. Address | City | State | Zip Code |
|---|---|---|---|

| Insured Name (If Not R/P) | Patient Relation To Insured | Insurance Phone Number |
|---|---|---|
| | ☐ Self ☐ Child ☐ Spouse ☐ Other | |

| Were You Injured On The Job? | Date Of Injury | Describe Accident | Name Of Attorney |
|---|---|---|---|
| ☐ Yes ☒ No | / / | | |

| Was An Automobile Involved? | Date Of Injury | Were X-Rays Taken? | If Yes, Where Were X-rays Taken? | Date X-rays Taken |
|---|---|---|---|---|
| ☐ Yes ☐ No | / / | ☐ Yes ☐ No | | |

| Referred By | Reason For Seeing Doctor |
|---|---|
| | Checkup hand |

All Professional Services Rendered Are Charged To The Patient. Necessary Forms Will Be Completed To Help Expedite Insurance Carrier Payments. However, The Patient Is Responsible For All Fees, Regardless of Insurance Coverage. It Is, Also, Customary to Pay For Services When Rendered Unless Other Arrangements Have Been Made In Advance With Our Office.

## INSURANCE AUTHORIZATION AND ASSIGNMENTS

I request the payment of authorized Medicare/Other Insurance Company benefits be made either to or on my behalf to Orthopedic Specialists of Texarkana, P.A. for any services furnished me by that physician/supplier. I authorize any holder of medical information about me to release to the Health Care Financing Administration and its agents any information needed to determine these benefits payable to related services.

I understand my signature requests that payment be made and authorizes release of medical information necessary to pay the claim. If item 9 of the HCFA-1500 claim form is completed, my signature authorizes releasing of the information to the insurer or agency shown. In Medicare/Other Insurance Company assigned cases, the physician or supplier agrees to accept the charge determination of the Medicare/Other Insurance Company as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare/Other Insurance Company.

SIGNATURE _Matthew Murphy_   DATE _9-17-96_

1                    Reporter's Certificate

2   STATE OF TEXAS:

3   COUNTY OF DALLAS:

4          I, Darline W. LaBar, Official Court Reporter of the

5   194th Judicial District Court, in and for Dallas County,

6   Texas do hereby certify that the foregoing volume constitutes

7   a true, complete and correct transcript of all portions of

8   evidence and other proceedings requested in writing by

9   counsel for the parties to be included in the statement of

10  facts, in the above styled and numbered cause, all of which

11  occurred in open court or in chambers and were reported by

12  me.

13         I further certify that this transcription of the

14  record of the proceedings truly and correctly reflects the

15  exhibits, if any, offered by the respective parties.

16         Witness my hand this the 27th day of November, A.D.,

17  2001.

18

19

20  _____
                    DARLINE W. LABAR
21                  Official Court Reporter
                    194th Judicial District Court
22                  Dallas County, Texas
                    (214) 653-5803
23

24

25  Certification No. 1064 Expires December 31, 2002

DARLINE W. LABAR, OFFICIAL REPORTER